# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:14-cv-02887-JLK

ALEJANDRO MENOCAL
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

     Plaintiffs,

v.

THE GEO GROUP, INC.,

     Defendant.

---

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

---

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................... 2

II.  THE COURT SHOULD IGNORE GEO'S "CONTRACT" EXHIBIT AND TREAT
     DEFENDANT'S FILING AS A MOTION TO DISMISS. ................................................... 4

III. THE COURT SHOULD DENY GEO'S MOTION TO DISMISS PLAINTIFFS' CLAIMS
     ARISING UNDER THE COLORADO MINIMUM WAGE LAW. ....................................... 4

A.  Neither Federal Law Nor The Federal Contract Requires GEO to Violate
    Colorado's Minimum Wage Law. ......................................................................... 5
B.  Defendant Is An Employer Subject to the Wage Order. ........................................ 7
    i.   GEO Is a Health and Medical Industry Employer Covered by the Wage Order.
        ................................................................................................................... 9
    ii.  GEO Is a Retail and Service Industry Employer Covered by the Wage Order. 14
    iii. GEO Is a Food And Beverage Industry Employer Covered by the Wage Order..
        ................................................................................................................. 16
C.  Plaintiffs Are Employees Covered by the Wage Order....................................... 19
    i.   Advisory Bulletin 34(I) Does Not Apply to Plaintiffs. ................................... 20
    ii.  The Question of FLSA Coverage Is Not Before the Court.............................. 22

IV. BECAUSE PLAINTIFFS PLAUSIBLY ALLEGE VIOLATIONS OF THE FORCED LABOR
    STATUTE, DEFENDANT'S MOTION MUST BE DENIED................................................ 24
A.  The Forced Labor Statute Applies to GEO.......................................................... 25
B.  GEO's Outdated Involuntary Servitude Authorities Do Not Apply to Forced Labor
    Claims Against Private, For-Profit Prison Companies. ......................................... 29

V.   PLAINTIFFS HAVE PLAUSIBLY PLEADED UNJUST ENRICHMENT. ........................... 34

VI.  CONCLUSION......................................................................................................... 35

## I.  INTRODUCTION

The Geo Group, Inc. ("GEO" or "Defendant") is in the business of detaining

immigrants for profit. GEO conducts this business at its detention facility in Aurora,

Colorado and elsewhere. Plaintiffs and members of the class they seek to represent play

an integral role in GEO's business model. By paying Plaintiffs just $1 per day to perform

vital functions at the Aurora detention facility, GEO can increase its profits. And by

characterizing a sweeping array of janitorial and maintenance tasks as compulsory under

its housing sanitation policy and forcing all detainees to perform these functions under

the threat solitary confinement, GEO can obtain vital labor for free, increasing its profits

even further. With revenue streaming in on the backs of free or near-free labor from a captive workforce, it is safe to assume GEO would prefer to continue business as usual at the Aurora detention facility. But for the nettling state and federal laws giving rise to Plaintiffs' causes of action, it might.

Colorado's worker protections against sub-minimum wages and the U.S. Congress's protections against forced labor render GEO's manner of doing business at its Aurora detention facility unlawful, as the well pleaded allegations in Plaintiffs' complaint demonstrate. Because GEO provides medical services, detention services, and food and beverage services, the State of Colorado requires that it pay its workers at least the minimum wage. The federal statute and appropriations laws allowing payments of $1 per day to immigrant detainees set a floor -- not a ceiling -- on the amount ICE may reimburse contractors and the detainees for their voluntary services. The compulsory janitorial services GEO requires every detainee to perform under the threat of solitary confinement violate the federal forced labor statute. The federal government's standards circumscribe the personal housekeeping tasks immigrant detainees can be forced to perform. GEO's forced labor program far exceeds that circumscription.

In its motion to dismiss, GEO attempts to protect its profit model by seeking shelter in its role as a government contractor. For the reasons set forth herein, no such shelter exists for the corporation's unlawful detainee labor practices. The motion must consequently be denied.

## II.    THE COURT SHOULD IGNORE GEO'S "CONTRACT" EXHIBIT AND TREAT DEFENDANT'S FILING AS A MOTION TO DISMISS.

Defendant attaches excerpts of an unauthenticated and severely redacted document purported to be a contract between the U.S. Department of Homeland Security ("DHS") Immigration and Customs Enforcement ("ICE") and GEO to its Motion to Dismiss. Doc. 11-2.[1] Plaintiffs object to Defendant's use of redacted contractual excerpts that Defendant contends are the only parts relevant to this case. GEO rejected Plaintiffs' request to review an un-redacted version of the contract.

Pursuant to Rule 12(d), when faced with documents outside the pleadings attached to a motion to dismiss, the court must either: (1) convert the motion into one for summary judgment, or (2) ignore the documents and consider the filing as a motion to dismiss. The Court should ignore Defendant's redacted contract and partial ICE Handbook and decide the Motion under Rule 12(b)(6).[2]

## III.    THE COURT SHOULD DENY GEO'S MOTION TO DISMISS PLAINTIFFS' CLAIMS ARISING UNDER THE COLORADO MINIMUM WAGE LAW.

Plaintiffs' complaint presents sufficient factual allegations to demonstrate GEO's actions plausibly violated the plain text of the Colorado Minimum Wage Order ("Wage

---

[1] "Doc. 11-2" is an example of the convention Plaintiffs use to identify the docket number assigned to a specific paper by the Court's CM/ECF system. All citations to page numbers reference the page number assigned by CM/ECF, rather than any stray numbering appearing on the document submitted.

[2] Should the Court convert to a motion for summary judgment, Plaintiffs attach hereto a Fed. R. Civ. P. 56(d) affidavit seeking deferral of a ruling on the motion until Plaintiffs can acquire the un-redacted contract in discovery. Pl. Ex. 1. Plaintiffs request notice of any conversion. *Christensen v. Big Horn Cnty Bd. of Cnty Commissioners* 374 Fed. App'x. 821, 826 (10th Cir. 2010).

Order"). 7 CCR 1103-1. Contrary to GEO's claims, no reasonable interpretation of federal or state law counsels a different result.

### A. Neither Federal Law Nor The Federal Contract Requires GEO to Violate Colorado's Minimum Wage Law.

Defendant contends that no Colorado minimum wage claim can be stated against it because the federal government limited the compensation Defendant pays to Plaintiffs. Doc. 11 at 4-5. However, neither 8 U.S.C. §1555(d), nor P.L. No. 95-86, 91 Stat. 426 (1978), nor Defendant's contract with the Department of Homeland Security prohibits payment of more than $1/day to the Plaintiffs.

The federal statutes upon which Defendant relies allow for appropriations to the former I.N.S. related to civil immigration detainees' work for that agency. Nowhere do they forbid GEO – a private, for-profit contractor – from paying more than the $1/day appropriated. 8 U.S.C. § 1555(d) simply states:

> Appropriations now or hereafter provided for the Immigration and Naturalization Service shall be available for the payment of… (d) payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed.

8 USC 1555(d). In turn, P.L. No. 95-86, 91 Stat. 426 (1978) is an appropriations statute providing in pertinent part:

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the Departments of State, Justice and Commerce, the Judiciary, and related agencies for the fiscal year ending September 30, 1978, and for other purposes, namely:…

> payment of allowances (at a rate not in excess of $1 per day) to aliens,
> while held in custody under the immigration laws, for work performed[.]

Pl. Ex. 2 at 1, 8. The same paragraph of P.L. No. 95-86 that references immigration

detainee labor provides appropriations for all manner of purchases, going on to state, for

example: "…of the amount herein appropriated, not to exceed $50,000 may be used for

the emergency replacement of aircraft upon certificate of the Attorney General." Pl. Ex. 2

at 8. No one would suggest that P.L. No. 95-86 capped the permissible payment that can

lawfully be made for an emergency replacement aircraft at $50,000. It simply limits the

amount of the 1978 appropriation that can be so used. The same is true of the

appropriation made for detained alien labor. At most, 8 USC § 1555(d) and P.L. No. 95-

86 cap the price the government will pay for a particular service. Furthermore, the

appropriation applies by its terms only to Fiscal Year 1978 and does not appropriate the

funds currently paid to GEO. Thus, neither Section 1555(d) nor P.L. No. 95-86 controls

here.

Defendant's contract with ICE simply reiterates the daily unit price per head the

government will pay GEO for its operation of the detainee voluntary work program. Doc.

11-2 at 3, 7.[3] The contract does not prohibit Defendant from making a higher payment.

Rather, the contract expressly permits GEO to request that the Contracting Officer

authorize a higher rate of reimbursement. Doc. 11-2 at 7. Indeed, the contract expressly

---

[3] To offer as complete a response as possible to Defendant's Motion, Plaintiffs are compelled to
respond to and reference the document that Plaintiffs ask the Court to ignore in § I above.
Plaintiffs acknowledge the contradiction, and note that they are actively seeking the contract
GEO elected to withhold from Plaintiffs and the Court using proper channels. *See* 5 U.S.C. §
552.

contemplates the application and potential supremacy of state law. It identifies "[a]pplicable federal, state and local labor laws and codes" as among the regulatory "constraints" with which Defendant must comply. Doc. 11-2 at 16 ¶18.[4] The contract further identifies the ICE Performance Based National Detention Standards ("PBNDS") as among the regulatory "constraints" with which Defendant must comply. Doc. 11-2 at 16 ¶10.[5] The PBNDS contemplates payment of detainees in the voluntary work program, stating that "[t]he compensation is ***at least*** $1.00 (USD) per day." Doc. 11-1 at 5 (emphasis added). The contract therefore cannot be understood to prohibit the payment of *more* than $1/day.

In sum, neither federal law nor Defendant's contract with ICE prohibit paying the Plaintiffs more than $1/day.[6] At most, they set the price the government will pay to GEO. Nothing prohibits GEO from making lawful wage payments to the incremental detriment of its profit margin.

## B.  Defendant Is An Employer Subject to the Wage Order.

The Wage Order defines the term "Employer" as:

---

[4] Having accessed prior iterations of the contract at issue, Plaintiffs are aware, upon information and belief, that portions of the contract Defendant redacted or withheld incorporate by reference the requirements of state and local labor laws and codes. Doc. 11-2 at 18.

[5] Upon information and belief, portions of the contract Defendant redacted or withheld incorporate by reference these PBNDS Standards. Doc. 11-2 at 18.

[6] To the extent that work program forms or disclosures (or even GEO's contract) purport to cap the rate at less than the Colorado minimum wage, they constitute void "agreements to work for a lesser wage". C.R.S. § 8-6-118.

> [E]very person, firm, partnership, association, corporation… employing
> any person in Colorado, except that the provisions of this Wage Order
> shall not apply to state, federal and municipal governments or political
> sub-divisions thereof, including; cities, counties, municipal
> corporations, quasi-municipal corporations, school districts, and
> irrigation, reservoir, or drainage conservation companies or special
> districts organized and existing under the laws of Colorado.

7 CCR 1103-1(2). The breadth of intended coverage is emphasized by the definition's use

of the term "every". This definition provides an exhaustive list of those entities that are

categorically exempt. *Id*. Defendant, a private corporation employing people in Colorado,

doesn't claim to be any of the types of governmental entities listed as exempt. Rather,

Defendant asks the Court to graft an exemption for "government contractors" or

"correctional service providers" onto the Wage Order.[7] The Court should decline this

invitation.

Federal Courts apply Colorado rules of statutory construction when analyzing the

Wage Order. *Salazar v. Butterball, LLC*, 644 F.3d 1130, 143 (10the Cir. 2011). Colorado

courts apply the cannon *expressio unius est exclusio alterius* when reading lists of

statutory exceptions. *City of Arvada v. Colorado Intergovernmental Risk Sharing Agency*,

19 P.3d 10, 13 (Colo. 2001). "When the legislature speaks with exactitude, we must

construe the statute to mean that the inclusion or specification of a particular set of

conditions necessarily excludes others." *Lunsford v. W. States Life Ins.*, 908 P.2d 79, 84

---

[7] Extension of governmental exemptions from the CMWWA and its implementing Wage Order
to governmental contractors would have vast consequences. Given the frequency with which
governmental entities contract with "Food and Beverage" and "Health and Medical" businesses
to whom the Wage Order expressly applies, such an interpretation would diminish the
applicability of the minimum wage significantly.

(Colo. 1995). The Wage Order lists the entities it excludes from the definition of
"employer" without any indication that such list is non-exclusive. 7 CCR 1103-1(2).
Colorado law further cautions adherence to the plain text of the statute. *Smith v. Exec.
Custom Homes, Inc.,* 230 P.3d 1186, 1190 (Colo. 2010)("[W]e must refrain from going
beyond the plain meaning of the statute to 'accomplish something the plain language
does not suggest.'").

Rules of construction applicable to remedial statutes should also inform the
Court's analysis. "A remedial statute is to be liberally construed to accomplish its object.
. . . Furthermore, exceptions to a remedial statute are to be strictly construed." *In re R.C.*,
No. 11CA1940, 2013 COA 77, P8-P9 (Colo. Ct. App. 2013)(internal citations omitted).
In this case, the General Assembly enacted a specific directive to liberally construe the
Colorado Minimum Wages of Workers Act ("CMWWA"), pursuant to which the Wage
Order is promulgated. C.R.S. § 8-6-102. This liberal construction dictates that Defendant
is an "employer" subject to the Wage Order.

> i. GEO Is a Health and Medical Industry Employer Covered by the
> Wage Order.

The Wage Order applies to Health and Medical industry employers, defined as:

> **Health and Medical**: any business or enterprise engaged in providing
> medical, dental, surgical or other health services including but not limited
> to medical and dental offices, hospitals, home health care, hospice care,
> nursing homes, and mental health centers, and includes any employee who
> is engaged in the performance of work connected with or incidental to such
> business or enterprise, including office personnel.

7 CCR 1103-1(2)(D). The words and phrases continued in this and all other Wage Order
definitions must be assigned their ordinary and commonly accepted meaning:

We look first to the statutory language, giving words and phrases their commonly accepted and understood meaning. If the statutory language is unambiguous, we need not resort to interpretive statutory construction rules because we presume that the General Assembly meant what it clearly said. Where the statute's language is plain and clear, we must apply the statute as written.

*Students for Concealed Carry on Campus, LLC v. Regents of the Univ. of Colo.,* 280 P.3d 18, 22 (Colo. Ct. App. 2010) (internal citations omitted) *aff'd,* 271 P.3d 496 (Colo. 2012).

In this case, GEO contracts with the government to provide medical care and health services to detainees. Doc. 11-2 at 5, 20-21. Plaintiffs allege "GEO provides health services to the detainee population at the Aurora Detention Facility." Doc. 1 at ¶45. Defendant is a "business or enterprise engaged in providing… health services". 7 CCR 1103-1(2)(D). Plaintiffs allege that they "cleaned and maintained GEO's on-site medical facility, cleaned the medical facility's toilets, floors and windows, [and] did medical facility laundry". Doc. 1 at ¶1. Plaintiffs are "employee[s] engaged in the performance of work connected with or incidental to such business or enterprise, including office personnel."  7 CCR 1103-1(2)(D). Giving the terms of the Wage Order their commonly accepted and understood meaning, Defendant is a Health and Medical employer within the plain language of the Wage Order.

GEO says otherwise. Defendant urges the Court to construe the regulation's illustrative list of covered health and medical employers as limiting, or even exclusive. Doc. 11 at 7. This argument ignores the plain text preceding the list of examples, which states that the definition "includ[es] **but [is] not limited to**" the examples which follow. 7 CCR 1103-1(2)(D) (emphasis added). It is wrong for another reason. Colorado Division

10

of Labor Advisory Bulletins contemplate application of the Wage Order to businesses not

listed as examples in the regulatory text – for example, bakeries, non-profit organizations,

and religious and charitable organizations. Pl. Ex. 3, Colorado Division of Labor,

Advisory Bulletins & Resource Guide 30(I) (2012). Available at:

https://www.colorado.gov/pacific/cdle/search/site/Advisory%20Bulletins.[8] Because the

list of examples in 7 CCR 1103-1(D) should not be read as exclusive or narrowing,

C.R.S. § 8-6-102 (directing liberal construction), GEO's claim proposed interpretation is

incorrect.

Defendant also asks the Court to import into the text of Wage Order a requirement

that covered entities provide health services to the "consuming public". Doc. 11 at 7. No

such requirement is present in the Health and Medical definition. 7 CCR 1103-1(2)(D).

The drafters knew how to impose that requirement where they intended to. Indeed, they

placed a "consuming public" requirement in the Retail and Service industry definition

appearing in the same regulatory subsection. 7 CCR 1103-1(2)(A). Where drafters

demonstrate the capacity to limit legislation expressly, Colorado courts regard their

failure to do so as significant. *People v. Quinonez*, 735 P.2d 159, 164 (Colo. 1987)

("There is no doubt that the legislature knows how to require express factual findings

when it feels such are appropriate."); *Coats v. Dish Network, L.L.C.*, Nos. 12CA0595 &

---

[8] The Court may reference government publications available online without converting a motion
to dismiss to a motion for summary judgment. *Jones v. City of Cincinnati*, 521 F.3d 555, 562
(6th Cir.2008) (a court may consider public records without converting a Rule 12(b)(6) motion
into a Rule 56 motion); *Menominee Tribe of Wisconsin v. Thompson,* 161 F.3d 449, 456 (7th
Cir.1998) ("[j]udicial notice of historical documents, documents contained in the public record
and reports of administrative bodies is proper" and the court may consider such judicially noticed
documents without converting a motion to dismiss into a motion for summary judgment).

12CA1704, 2013 COA 62, P20 (Colo. Ct. App. 2013); *Students for Concealed Carry on Campus, LLC*, 280 P.3d at 23 ("Had the legislature intended to exempt universities, it knew how to do so."); *People v. Benavidez,* 222 P.3d 391, 394 (Colo. Ct. App. 2009).

The term "consuming public" does not appear in the definition of Health and Medical employer. 7 CCR 1103-1(2)(D).[9] Nor does the suggestion that health services must be sold to the recipient appear in the text of the Order. Rather, the Wage Order covers "any business or enterprise engaged in providing" health services. *Id.* Where the drafters intended to require that the covered business "offers for sale" the goods or services it purveys, they did so expressly. 7 CCR 1103-1(2)(C) ("Food and Beverage"). Defendant's proposed sale and public consumption requirements are foreign to the "Health and Medical" definition.[10]

Defendant's argument that GEO is not a "Health and Medical" employer because it performs and sells other incarceration services together with healthcare is unavailing.

---

[9] Even were the Court to limit "Health and Medical" to those businesses offering services to the "consuming public", GEO should be considered such a business. As set forth above, GEO sells services including healthcare to the public sector. Doc. 11-2 at 5, 20-21. It is difficult to imagine a consumer more public than the government, which contracts on behalf of the public and in the public trust.

[10] Defendant's suggestion that the "general public" must be able to access the health services of a covered provider similarly lacks textual foundation. There is no indication in 7 CCR 1103-1(2)(D) that coverage may be contingent on the identity of the healthcare recipient. To imply such a "general public" requirement would have the significant effect of excluding from coverage the employees of private hospitals and nursing homes which the "general public" cannot access. This is inconsistent with the Colorado Division of Labor's opinion that "In general, private for-profit hospitals are covered by Colorado wage law and Colorado Minimum Wage Order Number 28, whereas state and government-operated hospitals are not covered by Colorado wage law and the Wage Order." Pl. Ex. 3, Colorado Division of Labor, Advisory Bulletins And Resource Guide 24(I) (2012): https://www.colorado.gov/pacific/cdle/search/site/Advisory%20Bulletins.

12

Nothing in the text of the regulation indicates that a business must engage exclusively or even primarily in healthcare to qualify as a "Health and Medical" covered enterprise. 7 CCR 1103-1(2)(D). Indeed, several businesses offered as examples of covered enterprises perform many diverse services. Nursing homes typically provide lodging, nutritional and recreational services. But they are covered "Health and Medical" businesses all the same. *Id.* Country clubs provide sporting and recreational services. But they are covered "Food and Beverage" businesses all the same. 7 CCR 1103-1(2)(C). In many cases, the primary focus of a multifaceted, diversified business would be difficult to determine, and such an inquiry would cloud the rights of employees. The Wage Order neither requires nor authorizes the Court to undertake a primacy analysis. The test is simply whether a business engages in providing health services. 7 CCR 1103-1(2)(D). GEO does so, and is therefore a covered "Health and Medical" business.[11]

The *Butterball* and *Baldozier* cases upon which Defendant relies construed the Wage Order's definitions of "Food and Beverage" and "Retail and Service" respectively and did not reach the definition of "Health and Medical", which provides an independently sufficient basis for coverage in this case. *Butterball*, 644 F.3d 1130; *Baldozier v. Am. Family Mut. Ins. Co.*, 375 F.Supp.2d 1089, 1091 (D. Colo. 2005). GEO is a "business… engaged in providing… health services." All Plaintiffs were "engaged in

---

[11] If GEO's performance of incarceration as well as health services and culinary services excluded it from the Wage Order, not only would the Plaintiff detainees be deprived of Wage Order protection, so too would the registered nurses and cooks GEO employs at the Aurora facility. Addition of a "primary business" test to the definitions undermines the Wage Order at its core and is inconsistent with the mandate to construe the CMWWA liberally to effect its remedial purposes. C.R.S. § 8-6-102.

13

the performance of work connected with or incidental to" GEO. 7 CCR 1103-1(2)(D).

The Court need not consider the scope of "Food and Beverage" or "Retail and Service"

coverage to find that Plaintiffs and Defendant are covered by the Wage Order by virtue of

the Health and Medical provision. Even if such inquiry were necessary, however,

Defendants' arguments against coverage likewise fail.

      ii.  <u>GEO Is a Retail and Service Industry Employer Covered by the
Wage Order.</u>

The Wage Order also applies to Retail and Service industry employers, defined as:

> **Retail and Service:** any business or enterprise that sells or offers for sale,
> any service, commodity, article, good, real estate, wares, or merchandise to
> the consuming public, and that generates 50% or more of its annual dollar
> volume of business from such sales. The retail and service industry offers
> goods or services that will not be made available for resale. It also includes
> amusement and recreation, public accommodations, banks, credit unions,
> savings and loans, and includes any employee who is engaged in the
> performance of work connected with or incidental to such business or
> enterprise, including office personnel.

7 CCR 1103-1(2)(A). Plaintiffs allege GEO sells incarceration services to governmental

customers and generates more than 50% of its annual dollar volume of business from

such sales. Doc. 1 at ¶44. Defendant sells these incarceration services to the final,

governmental consumer. They cannot be made available for resale. 7 CCR 1103-1(2)(A).

GEO is therefore a Retail and Service business covered by the plain text of the Wage

Order.[12] *Students for Concealed Carry on Campus,* 280 P.3d at 22.

---

[12]  Plaintiffs argue that Defendant is covered by the Wage Order for three independently
sufficient reasons: Defendant is a (1) Health and Medical, (2) Retail and Service, and (3) Food
and Beverage employer. 7 CCR 1103-1(2). The Tenth Circuit has recognized such overlapping
coverage under the Wage Order. *Butterball*, 644 F.3d at 1145 ("There is no evidence to suggest

14

Defendant contends, without citation to authority, that sales to the public sector do not constitute sales to the "consuming public" for the purposes of the Wage Order. Doc. 11 at 5-6. Of course, the public contracts which GEO are made on behalf of the public and in the public trust. 48 C.F.R. § 2803.101-3; 5 C.F.R. § 2635.101. It is difficult to conceive of a more public consumer than a federal agency. While the services GEO provides are purchased by governments rather than individuals, this Court has held that the retail sales covered by the Wage Order include final sales to other businesses, and that Wage Order coverage is not limited to those businesses making sales to individual consumers. *Bowe v. SMC Elec. Prods.*, 935 F. Supp. 1126, 1133-34 (D. Colo. 1996) *reconsideration granted* 945 F. Supp. 1482, 1485 (D. Colo. 1996). Businesses selling services to governments are not properly excluded from the Wage Order. "The MWO itself does not support such a narrow interpretation but reflects an intention to provide broad protection." *Bowe*, 945 F. Supp. at 1485.

Defendant's argument that detention services are not services covered by the definition is similarly unavailing. Doc. 11 at 6. The Retail and Service industry definition specifically includes "***any*** business or enterprise that sells or offers for sale ***any service***". 7 CCR 1103-1(2)(A) (emphasis added). In Defendant's words, GEO "is a private provider of correctional, detention, and residential treatment *services* to federal, state and local governments around the world." Doc. 11 at 1 (emphasis added). *Baldozier* is distinct because Defendant there presented evidence that coverage of the insurance

that the Colorado Division of Labor intended each industry definition to be mutually exclusive.").

industry was considered and rejected by the Colorado Division of Labor, which had

further authored opinion letters and Advisory Bulletins confirming that the Wage Order

does not extend to the insurance industry. 375 F.Supp.2d at 1091-92. The Court in

*Baldozier* expressly rested its decision on this specific evidence of the drafters' intent. *Id.*

at 1092. GEO offers no such evidence here. Indeed, none exists.

Defendant's argument that the examples of covered businesses listed in 7 CCR

1103-1(2)(A) is exclusive or limiting is as unpersuasive here as it was in the Health and

Medical context. The regulation states that "Retail and Service" definition encompasses

businesses making final sales of services to the consuming public, and that "[i]t also

includes" the listed businesses. 7 CCR 1103-1(2)(A). As noted above, the Colorado

Division of Labor has applied the Wage Order to businesses not specifically listed among

covered examples. The definition of Retail and Service includes those business providing

detention services to the public sector.

        iii.   <u>GEO Is a Food And Beverage Industry Employer Covered by the
Wage Order.</u>

The Wage Order also applies to the Food and Beverage industry, defined as:

> **Food and Beverage:** any business or enterprise that prepares and offers for
> sale, food or beverages for consumption either on or off the premises. Such
> business or enterprise includes but is not limited to: restaurants, snack bars,
> drinking establishments, catering services, fast-food businesses, country
> clubs and any other business or establishment required to have a food or
> liquor license or permit, and includes any employee who is engaged in the
> performance of work connected with or incidental to such business or
> enterprise, including office personnel.

7 CCR 1103-1(2)(C). Plaintiffs allege that GEO prepares food for the detainees it houses

and offers it for sale. Doc. 1 at ¶46. Defendant sells food service to the government. Doc.

11-2 at 10. The food the government purchases is consumed on premises by detainees.
Doc. 11 at 7. The food is not offered for resale and is provided directly by GEO to its
final consumer. Doc. 11 at 7. Defendant also offers food and beverages for sale to
detainee consumers at its on-site commissary. Doc. 1 at ¶46; Doc. 11-1 at 12. These
foods and beverages must be consumed on premises and are not for re-sale. Finally,
Plaintiffs allege that "GEO produces food at the Aurora Detention Facility for
consumption by outside entities that conduct training exercises at the Aurora Detention
Facility." Doc. 1 at ¶46. Defendant thus prepares and offers food for sale within the
meaning of the Wage Order. 7 CCR 1103-1(2)(C).

Further, the Food and Beverage definition includes any "business or establishment
required to have a food or liquor license or permit." 7 CCR 1103-1(2)(C). Defendant's
contract identifies the ICE PBNDS as among the regulatory "Constraints" with which the
GEO must comply. Doc. 11-2 at 16. PBNDS 4.1 requires that "[a]n independent, external
inspector shall conduct annual inspections to ensure that the food service facilities and
equipment meet governmental health and safety codes." Pl. Ex. 4 at 27 §(J)(13).[13] GEO's
food service is contractually required to pass inspection assuring compliance with
governmental health and safety codes. Defendant is therefore contractually required to
have a food license or permit. Accordingly, GEO is a Food and Beverage industry
employer within the plain text of the Wage Order. 7 CCR 1103-1(2)(C).

Defendant's reliance on *Butterball* to urge a contrary result is misplaced. Doc. 11
at 6 (citing 644 F.3d 1130 (10th Cir. 2011)). The Tenth Circuit's decision turned on

---

[13] Available at http://www.ice.gov/detention-standards/2011/

Butterball's status as a wholesaler, selling food for resale rather than to the end consumer. 644 F.3d at 1144. GEO does not sell food at wholesale or for resale. GEO serves the food it sells directly to the end consumer.[14] Butterball is also distinct in that it was not required to maintain a food or beverage license or permit. 644 F.3d at 1144. GEO is, however, contractually required to pass inspection assuring compliance with governmental health and safety codes. Doc. 11-2 at 16; Pl. Ex. 4 at 27 (PBNDS at 4.1(J)(13)). Defendant's coverage as a Food and Beverage employer is therefore consistent with the *Butterball* decision.

GEO's argument that it is not a Food and Beverage employer because it sells detention services together with food services fails for the reasons discussed above in the context of "Health and Medical". The Wage Order does not require that the covered employer sells food primarily or exclusively. "Like the FLSA, the MWO is remedial in nature and its coverage should be liberally construed." *Bowe*, 945 F. Supp. at 1484.

---

[14] Defendant misreads *Butterball* to turn on a "consuming public" requirement that Defendants argue would exclude both governmental purchasers and detainee consumers. Doc. 11 at 6. This misunderstanding may arise from GEO's partial quotation of a sentence, omitting the final clause which contextualizes the Tenth Circuit's reference to "consuming public". *Compare,* Doc. 11 at 6 *with Butterball,* 644 F.3d 1130 at 1144 ("Reading the food and beverage industry definition as a whole, it is plain that food and beverage employers are those that sell food directly to the consuming public, *rather than for resale*.")(emphasis added). Provision of food directly to the end consumer is the touchstone of coverage according to *Butterball.* The Tenth Circuit simply used the phrase "consuming public" to differentiate wholesalers from retailers. Moreover, as discussed in the context of the "Retail and Service" definition, the governmental purchaser buying GEO's food service is within the "consuming public". So too are the detainees who buy food in Defendant's commissary and the law enforcement agencies who purchase catered lunches from GEO in conjunction with trainings held at or near the Aurora Detention Facility. Doc. 1 at ¶46.

Under this liberal construction, GEO is a Food and Beverage business covered by the

Wage Order.

### C. Plaintiffs Are Employees Covered by the Wage Order.

According to the Wage Order, an "Employee" is:

> [a]ny person performing labor or services for the benefit of an employer
> in which the employer may command when, where, and how much
> labor or services shall be performed. For the purpose of this Wage
> Order, an individual primarily free from control and direction in the
> performance of contracted labor or services, and who is customarily
> engaged in an independent trade, occupation, profession, or business
> related to the service performed is not an employee.

7 CCR 1103-1(2).  The breadth of this definition is evident in its use of the term "any

person." *Id*. Plaintiffs allege that they are people who performed labor or services for the

benefit of Defendant. Doc. 1 at ¶1. Defendant had physical custody of Plaintiffs, escorted

them to and from work and supervised their performance. Doc. 1 at ¶48. Plaintiffs are

therefore "employees" of Defendant, as that term is defined by the Wage Order.

The Wage Order lists the workers exempt from its protections. Defendants do not

and cannot contend that the detainee Plaintiffs performed their work free of control and

direction. 7 CCR 1103-1(2). Nor does GEO contend that Plaintiffs are included on the list

of exempt employees, listed at 7 CCR 1103-1(5).[15] Plaintiffs are thus not exempted from

the definition of "employee" in the Wage Order.

---

[15] Plaintiffs are not exempt as "bona fide volunteers".  7 CCR 1103-1(5).  While they are not
required to work in the "Detainee Voluntary Work Program", Plaintiffs "volunteer" only in the
same sense that every employee covered by the Wage Order volunteers – by applying for a job.

i.  Advisory Bulletin 34(I) Does Not Apply to Plaintiffs.

Defendant's reliance on Colorado Division of Labor Advisory Bulletin 34(I) is

misplaced. Doc. 11 at 10. This Advisory Bulletin provides as follows:

> Inmates and prisoners are exempt from all provisions of Colorado
> Minimum Wage Order Number 28.  Inmates confined to a city or county
> jail or any department of corrections facility as an inmate and who, as a part
> of such confinement, is working performing services, or participating in a
> training or work release program are not employees according to Colorado
> law.
>
> The employment status of parolees and probationers is determined on a
> case-by-case basis in accordance with all relevant facts and Colorado laws
> and regulations.

Doc. 11-2 at 24. Advisory Bulletin 34(I) is expressly limited to inmates and prisoners in

the criminal justice context and does not, by its terms, reach civil immigration detainees.

Doc. 11-2 at 24. The Bulletin uses the term "inmate" as modified by the phrase "confined

to a city or county jail or any department of corrections facility". *Id.* Plaintiffs are not

confined to a city or county jail or department of corrections facility. Nor are they

prisoners. The Colorado Code defines the term "prisoner" to "mean[] any person

convicted of an offense in Colorado or any other state or any person under arrest for

suspicion of the commission of a crime in Colorado or any other state."  C.R.S. § 16-3-

107.5(1)(b). Plaintiffs in this case are detained for civil immigration charges, not for

criminal offenses. "It is elementary that deportation or exclusion proceedings are not

punishment for crime." *Petition of Brooks*, 5 F.2d 238, 239 (D. Mass. 1925); *See also*,

*Fong Yue Ting v. United States*, 149 U.S. 698, 730 (U.S. 1893)("The order of deportation

is not a punishment for crime.").

Indeed, the statute the Colorado Division of Labor cites as underpinning Advisory Bulletin 34(I) applies exclusively to criminal detention. *See* C.R.S. § 8-40-301(3)(a) ("'employee' excludes any person who is confined to a city or county jail or any department of corrections facility as an inmate…"). The terms "inmate" and "prisoner" must be construed in light of the surrounding language in Advisory Bulletin 34(I). *Bedford v. Johnson*, 102 Colo. 203, 208 (Colo. 1938)(applying "the legal doctrine of *noscitur a sociis* to the effect that the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it."). Advisory Bulletin 34(I) speaks only to the criminal justice context.

The Division of Labor specifically addressed the context of incarcerated workers and did not exclude civil immigration detainees from protections of the Wage Order. Had the Colorado Division of Labor intended Advisory Bulletin 34(I) to exempt civil immigration detainees from the protections of Wage Order, it would have so stated. *Benavidez,* 222 P.3d at 394. This Court has recognized the Division's regular publication of clarifying Advisory Bulletins and has applied this rule of construction to them. *Salazar v. Butterball,* No. 08-cv-02071-MSK-CBS, 2009 U.S. Dist. Lexis 125989, at *52 (D. Colo. Dec. 3, 2009)("If Colorado's regulatory agencies intended that the Wage Order apply to a processor such as Butterball which supplies wholesale and retail customers with processed food, the Wage Order could have been clarified, just as it was clarified for the status of bakeries, yet it was not so clarified.") *recommendation adopted at* 2010 U.S. Dist. Lexis 24252 (D. Colo. Mar. 15, 2010) *aff'd* 644 F.3d 1130 (10th Cir. 2011).

The plain language of Advisory Bulletin 34(I) does not encompass the Plaintiffs. The categories of incarcerated persons listed therein should be deemed exhaustive. *Lunsford*, 908 P.2d at 84. This exception to the remedial Wage Order should be strictly construed and limited to its express terms. *In re R.C.*, 2013 COA 77 at P8-P9; C.R.S. § 8-6-102.

### ii.    The Question of FLSA Coverage Is Not Before the Court.

As Defendant notes, the Wage Order guarantees the Colorado Minimum Wage to employees covered by either the Colorado Minimum Wage Order or the Fair Labor Standards Act ("FLSA"). 7 CCR 1103-1 at pg. 1. Plaintiffs allege coverage only under the Wage Order. Doc. 1 at ¶¶ 42-48. They have not alleged that they are covered by the FLSA.

The FLSA cases Defendant submits are not probative of coverage under state law. Because the FLSA is a federal enactment under the Commerce Clause, it protects only those engaged in interstate commerce. 29 U.S.C. § 202(a); 29 U.S.C. § 206(a); 29 U.S.C. § 207(a). While Defendant's proffered authorities deem detained workers to be excluded from the interstate economy regulated by the FLSA, that is irrelevant to Colorado law, which lacks any comparable provision requiring engagement in commerce.[16] Regardless, the work Plaintiffs perform has an actual impact on wages in the external economy.

---

[16] While rooted in the FLSA-specific question of the detainee's engagement in commerce, *Alvarado Guevara v. I.N.S.*, 902 F.2d 394 (5th Cir. 1990) is distinguishable for several additional reasons. *Alvarado* turns on the distinct characteristics of government employment, which status the detainees there sought. *Id.* at 396, n.2. Plaintiffs here allege employment not by the government but by a private corporation. Moreover, *Alvarado* relies upon FLSA definitions and congressional intent, both of which are immaterial to the instant case. *Id* at 396. The Tenth Circuit's decision in *Franks v. Oklahoma State Indus.*, 7 F.3d 971, 973 (10th Cir. Okla. 1993)

Plaintiffs performed necessary work for the benefit of GEO.[17]  Defendant would have had

to contract workers in the external labor market to perform these services had the Plaintiff

detainees not been employed to perform them for $1/day.[18] Doc. 1 at 1; *id.* at ¶75.[19]

---

similarly turns on the "economic realities" test specific to FLSA's definition of "employee". No
reported decision or Interpretive Bulletin applies that FLSA-specific test to the entirely distinct
definition of "employee" appearing in Colorado's Wage Order. *Franks* is also distinct because it
relied on the Plaintiffs' status as "convicted murderers, rapists, burglars, armed robbers,
swindlers, thieves, and the like…" *Id* at 972 (quoting *Gilbreath v. Cutter Bilolgical, Inc.*, 931
F.2d 1320 (9th Cir. 2001). As set forth above, Plaintiffs here are not in punitive detention and are
not awaiting trial on criminal charges. They are civil detainees charged with immigration
violations.

[17] "In the course of their employment by GEO, Plaintiffs and others scrubbed bathrooms,
showers, toilets, and windows throughout GEO's Aurora facility.  They cleaned and maintained
GEO's on-site medical facility, cleaned the medical facility's toilets, floors and windows,
cleaned patient rooms and medical staff offices, swept mopped, stripped, and waxed the floors of
the medical facility, did medical facility laundry, swept mopped stripped and waxed floors
throughout the facility, did detainee laundry, prepared and served detainee meals, assisted in
preparing catered meals for law enforcement events sponsored by GEO, performed clerical work
for GEO, prepared clothing for newly arriving detainees, provided barber services to detainees,
ran the facility's law library, cleaned the facility's intake area and solitary confinement unit, deep
cleaned and prepared vacant portions of the facility for newly arriving detainees, cleaned the
facility's warehouse, and maintained the exterior and landscaping of the GEO building, *inter
alia.*" Doc. 1 at ¶1.

[18] The Supreme Court discussed the obvious, deleterious impacts of detainee labor on the free
economy, and affirmed the interest of states in mitigating those impacts in *Whitfield v. Ohio*, 297
U.S. 431, 439-40   (1936)("All such legislation, state and federal, proceeds upon the view that
free labor, properly compensated, cannot compete successfully with the enforced and unpaid or
underpaid convict labor of the prison. A state basing its legislation upon that conception has the
right and power, so far as the federal Constitution is concerned, by non-discriminating
legislation, to preserve its policy from impairment or defeat, by any means appropriate to the end
and not inconsistent with that instrument.").

[19] C.R.S. § 8-6-104 is not the limiting declaration of legislative purpose Defendant supposes it to
be. Doc. 11 at 10. The "Legislative declaration" associated with the CMWWA is actually
codified at C.R.S. § 8-6-101, which declares that inadequate wages have a pernicious effect on the
health and morals of Colorado's workers and on the overall welfare of the State.  The
question of what conditions of labor are impermissibly detrimental is deferred to the Director of
the Division of Labor, which publishes the Wage Order after notice and comment.  C.R.S. § 8-6-
106.  It is the province of the Director, not of Defendant, to determine who is in need of a living
wage. Doc. 11 at 10.  As set forth above, the Wage Order indicates that Defendant has an

Even if Plaintiffs are not covered by the FLSA,[20] that doesn't preclude their coverage under Colorado's Wage Order. The Wage Order expressly contemplates that it will diverge from the FLSA, providing greater protection and setting higher standards in some instances. 7 CCR 1103-1(22); *Bowe*, 945 F. Supp. at 1485. The fact that the Wage Order applies its minimum wage protections to those employees covered by *either* the Wage Order *or* the FLSA demonstrates that the Wage Order was intended to include in its protection those omitted from the FLSA. 7 CCR 1103-1 at pg. 1. Plaintiffs are entitled to the protections of the Wage Order.

Plaintiffs' complaint presents sufficient allegations to demonstrate GEO's practice of paying detainees $1 per day to perform vital functions violates the Wage Order. GEO offers no persuasive reason for excluding itself and the Plaintiffs from the Order's protections. Accordingly, Defendant's Motion to Dismiss Plaintiffs' claims under the Wage Order must be denied.

## IV.  BECAUSE PLAINTIFFS PLAUSIBLY ALLEGE VIOLATIONS OF THE FORCED LABOR STATUTE, DEFENDANT'S MOTION MUST BE DENIED.

Plaintiffs' complaint presents sufficient factual allegations to demonstrate GEO's actions plausibly violated the plain text of the forced labor statute, 18 U.S.C. § 1589. Defendant presents two contentions to the contrary. First, GEO claims, in essence, that

---

impermissibly pernicious effect on the morals of workers and of the state of Colorado where it pays the Plaintiffs $1/day.

[20] While Plaintiffs do not depend upon, or even allege coverage under the FLSA, it should be noted that the Circuits are split regarding whether criminal detainees are categorically excluded from the coverage of that Act. *Compare, Hale v. State of Arizona*, 993 F.2d 1387, 1389 (9th Cir. 1993) *with Franks*, 7 F.3d at 973.

Congress did not intend for a private prison corporation holding civil immigration detainees for profit to be covered by the Trafficking Victims Protection Act ("TVPA"). Doc. 11 at 12-14. Second, GEO maintains that because it has not engaged in involuntary servitude, it cannot be held liable for engaging in forced labor. Doc. 11 at 13-14. Both contentions are without merit, and GEO's motion to dismiss Plaintiffs' forced labor claims should consequently be denied.

Plaintiffs allege GEO violated the forced labor statute by randomly selecting six detainees per pod per day and forcing them to clean the pods in its Aurora Facility. Doc. 1 at ¶5. Plaintiffs further allege GEO or its agents forced Plaintiffs and other class members to clean the entirety of the facility's pods – not just their own areas or places that would benefit them personally – for no pay, and under threat of solitary confinement for any refusal to work. *Id.* ¶6. Rather than cleaning their own cells and areas, Plaintiffs and the members of the class they seek to represent were required, under the threat of solitary confinement, to clean the cells of other detainees in the pods where they were detained. *Id.* ¶¶6, 59, 72, 83. This forced labor program included the requirement that Plaintiffs and the other members of the Class clean walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs for no pay. Doc. 11 at 13. These allegations, taken as true, given rise to a reasonable inference that Defendant could be held liable under 18 U.S.C. § 1589.

### A. The Forced Labor Statute Applies to GEO.

In construing the federal statute at issue, as in any case involving statutory interpretation, the appropriate starting point is the plain language of the law. *United*

*States v. Lamirand*, 669 F.3d 1091, 1094 (10th Cir. 2012)(quoting *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009)("statutory interpretation beings with the plain language of the statute"). "If the terms of the statute are clear and unambiguous, the inquiry ends[.]" *Lamirand*, 669 F.3d at 1094 (quoting *United States v. Sprenger*, 625 F.3d 1305, 1307 (10th Cir. 2010)).

In this case, the plain language of the forced labor statute is clear: "[w]hoever knowingly . . . obtains [ ] labor or services . . . by means of physical restraint . . . threats of serious harm . . . or threatened abuse of legal process . . . shall be punished." 18 U.S.C. § 1589(a).[21] No exceptions, exclusions, or exemptions exist in the text of the statute that would exclude GEO from liability for violating the terms of the law. The very first word of 18 U.S.C. §§ 1589(a), (b), and (d) is "whoever."

Similarly, 18 U.S.C. § 1595 affords individuals a civil remedy "against the perpetrator (or ***whoever*** knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has

---

[21] The forced labor statute provides:

   (a)  Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

     (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
     (2) by means of serious harm or threats of serious harm to that person or another person;
     (3) by means of the abuse or threatened abuse of law or legal process; or
     (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

   shall be punished as provided under subsection (d).

engaged in [a prohibited act]).” (emphasis added). Contrary to Defendant’s assertion that the forced labor statute only protects victims of more commonly recognized forms of human trafficking, civil suits and criminal actions have gone forward against those who procured labor or services using forced labor in fields that would not normally be associated with trafficking. *See, e.g.*, *Nunag-Tanedo v. East Baton Rouge Parish School Board*, 790 F. Supp. 2d 1134, 1143-46 (E.D. Cal. 2011) (denying motion to dismiss forced labor claim on behalf of a class of Filipino teachers recruited to the United States); s*ee also United States v. Kaufman*, 546 F.3d 1242, 1260 (10th Cir. 2008) (rejecting Defendants’ claim that forcing mentally handicapped residents of a ranch to perform sex acts was not what Congress intended to prohibit when it limited the forced labor statute to procuring “labor” and “services”).

In *Nunag-Tanedo*, the defendant recruiters and parish school board cited the same House of Representatives Conference Report as Defendant in this case to demonstrate the intent of the TVPA was to “combat trafficking in persons, especially in the sex trade, slavery, and slavery-like conditions.” 790 F. Supp. 2d at 1144. Like GEO, the defendants in *Nunag-Tanedo* used this legislative history to argue that “[t]eaching high school math and science hardly qualifies as the type of activity targeted by Congress.” *Id.* Rejecting this contention, the district court held, based on the language of the forced labor statute, that the “TVPA not only protects victims from the most heinous human trafficking crimes, but also various additional types of fraud and extortion leading to forced labor.”

*Id.* at 1145. As in *Nunag-Tanedo* nothing about GEO's role as a for-profit detention provider changes this straightforward statutory equation.[22]

Even if the plain text of the forced labor provision of the TVPA were somehow ambiguous, the specific history surrounding its enactment demonstrates that Congress intended this prohibition to be enforced expansively. Congress added the forced labor statute in order to abrogate the Supreme Court's decision in *United States v. Kozminski*, which construed 'involuntary servitude' narrowly to include only "compulsory labor akin to African slavery, which in practical operation would tend to produce like undesirable results." 487 U.S. 931, 942 (1988). In enacting Section 1589, Congress significantly broadened the scope of federal protections to cover "severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski*." *Kaufman*, 546 F.3d at 1261 (10th Cir. 2008) (quoting H.R. Conf. Rep. No. 106-939, at 101, *as reprinted in* 2000 U.S.C.C.A.N. 1380, 1393.).

This legal and historical context – which explains Congress's specific purpose enacting § 1589 – also explains why Congress's more general findings in enacting the TVPA as a whole offer no indication that Congress intended to exempt people in Plaintiffs' situation from the new protections against forced labor. *Cf.* Doc. 11 at 12-13. When it passed in 2000, the TVPA also included new government assistance for victims of trafficking, new crimes for trafficking and document servitude, and new, clearer

---

[22] The U.S. DOJ – one of the agencies responsible for enforcing the forced labor statute's criminal penalties – saw no impediment to charging the Sheriff of Clinch County, Georgia with violating the forced labor act when he coerced inmates in his custody to perform labor for a private business owned by his wife. *See United States v. Peterson*, 544 F.Supp.2d 1363, 1375 (M.D. Ga. 2008) (dismissing the indictment for lack of factual specificity).

definitions of sex trafficking and labor trafficking. *See generally* 22 U.S.C. §§ 7101,

7102. Nothing in those sweeping additions or the Congressional findings that prompted

them indicates a Congressional intent to limit the scope of the forced labor prohibition.

To the contrary, expansive coverage that includes "whoever" engages in forced labor is

more in keeping with the letter and spirit of the forced labor provision and the TVPA

within which Congress placed it.[23]

### B. GEO's Outdated Involuntary Servitude Authorities Do Not Apply to Forced Labor Claims Against Private, For-Profit Prison Companies.

Admitting that no authority exists exempting a private corporation in the business

of housing immigration detainees for profit from the forced labor statute, Doc. 11 at 13,

GEO offers inapposite and superseded cases to argue Plaintiffs have failed to state a

claim. Specifically, GEO claims the "most closely analogous" case to this one is *Channer*

*v. Hall*, 112 F.3d 214 (5th Cir. 1997). According to GEO, "the law and facts from

*Channer* are easily applied to Plaintiffs in this present case." Doc. 11 at 14. GEO is

incorrect.

In *Channer*, the Fifth Circuit rejected a Thirteenth Amendment involuntary

servitude claim by a *pro se* detainee of the INS – ICE's predecessor agency. 112 F.3d at

215. The plaintiff was housed by the U.S. Department of Justice in a Bureau of Prisons

facility in Oakdale, Louisiana while awaiting arrest on a detainer from the State of

---

[23] GEO's argument to the contrary harkens back to one rejected by the Supreme Court nearly one hundred years ago in *Caminetti v. United States*, 242 U.S. 470 (1917). *Caminetti* applied the plain meaning of the Mann Act, also known as the "White Slave Traffic Act," to reject a defendant's claim that transportation of women across state lines for "debauchery or other immoral purposes," did not violate the law because the legislative history demonstrated only that the primary purpose of the legislation was to prohibit the commercial "white slave trade."

Connecticut to serve 22 years in prison for an armed robbery he committed there. *Id.* As

GEO concedes, *Channer* is a case about involuntary servitude. *Id.* at 217; Doc. 11 at 13.

As GEO likewise concedes, the Fifth Circuit relied heavily on the Supreme Court's

decision in *Kozminski* to reject the Plaintiff's involuntary servitude claims. *Channer*, 112

F.3d at 217-18; Doc. at 13.

     *Channer* is inapposite to Plaintiffs' forced labor claims for at least three reasons.

First, GEO's reliance on *Channer* is misplaced because *Channer* and *Kozminski* both

predate Congress's enactment of the forced labor statute. The law upon which Plaintiffs

rely to bring their forced labor claim did not exist when the Fifth Circuit decided

*Channer*. Because Congress's purpose in creating the forced labor statute was to expand

the narrow construction in *Kozminski*, GEO's claim that "the law and facts from *Channer*

are easily applied to Plaintiffs in this present case" misses the mark. Doc. 11 at 14.

     The second reason *Channer* is distinct is that the standard for the permissible

scope of "housekeeping" duties an immigration detainee may be forced to perform in that

case is broader than the standards subsequently adopted by ICE that govern Plaintiffs and

class members. In *Channer*, the Fifth Circuit characterized "working in Oakdale's Food

Services Department" from 4:30 a.m. 12:30 p.m. each day as a "housekeeping chore."

112 F.3d at 215, 219. In reaching this conclusion, the court relied on the Indiana Supreme

Court's conclusion that the Thirteenth Amendment's "civic duty" exception allows

institutions to force persons confined to mental institutions to fix meals, scrub dishes, do laundry, and clean the building. *Id.* at 218-19.[24]

By contrast, ICE's PBNDS Standards set forth a substantially narrower standard for the housekeeping duties ICE detainees like Plaintiffs must perform.[25] According to these standards the scope of labor detainees may be required to perform as part of any personal, housekeeping obligation is limited to their immediate living area. On the other hand, labor and services such as "Living area clean-up/janitorial" and "area cleaning," are described as work assignments in the 2000 PBNDS Voluntary Work Program.[26]

GEO's Housing Sanitation Policy thus includes labor and services that fall well outside the personal housekeeping responsibilities imposed by ICE in its PBNDS. GEO requires, under threat of solitary confinement, that each detainee perform jobs such as cleaning walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs. Doc. 11 at 13. But these tasks all fall well within the scope of the duties assigned to participants in the Voluntary Work Program, which, their very terms, cannot be compulsory.[27] Because GEO's contracting partner – ICE – has adopted specific, narrower, and binding standards limiting the permissible scope of detainees'

---

[24] The *Channer* panel also relied on the Second Circuit's decision in *Jobson v. Henne*, 355 F.2d 129, 131-32 (1966), which has since been substantially clarified by *McGarry v. Pallito*, 687 F.3d 505, 513 (2d Cir. 2012)(emphasizing footnote 3 in *Jobson*, which cabins the housekeeping exception to chores which are "personally related.").

[25] See Pl. Ex. 4, 2011 Operations Manual ICE Performance-Based National Detention Standards (2011) available at http://www.ice.gov/detention-standards/2011 (emphasis added).

[26] PBNDS 2000, Section III.A "Voluntary Work Program" http://www.ice.gov/doclib/dro/detention-standards/pdf/work.pdf.

[27] *Id.*

31

housekeeping chores, GEO's reliance on the broader scope of activities set forth in *Channer* is inapposite and unpersuasive.

The third reason why *Channer* is distinct is that, even if that case's civic duty exception to the involuntary servitude prohibition applied here – which it does not – the exception is inapplicable to for-profit, private prison contractors like GEO. As the Supreme Court has repeatedly recognized, private prison corporations such as GEO are legally and factually dissimilar from the federal government, even when they perform tasks on its behalf. *See, e.g.*, *Minneci v. Pollard*, 132 S.Ct. 617, 620 (2012)(refusing to imply a *Bivens* remedy against employees of GEO); *Richardson v. McKnight*, 521 U.S. 399, 409 (1997)(denying qualified immunity to for-profit private prison guards).

Whereas the Oakdale Federal Detention Center in *Channer* and the Indiana state mental institutions in *Bayh*[28] were government-owned, publicly-operated facilities, the Aurora Detention Facility is not. The forced labor Plaintiffs allege in this case occurred not at the urging of the federal government, but rather, at the insistence of GEO—a "firm [that] is systematically organized to perform a major administrative task for profit." *Richardson*, 521 U.S. at 409.

This distinction makes a difference. *Channer* held that "*the federal government* is entitled to require communal contribution by an INS detainee in the form of housekeeping tasks." 112 F.3d at 119. *Bayh* likewise expressly distinguished cases holding persons detained in custodial situations within private mental hospitals as having "little persuasive value," 573 N.E.2d 398, 411, and it noted that the *Bayh* plaintiffs'

---

[28] 573 N.E.2d 398, 412 (Ind. 1991).

unjust enrichment argument might have succeeded if "the coercive defendant [were] a private actor[.]" *Id.* at 409.

In this case, Plaintiffs and the proposed Class have no 'civic duty' to enrich a private actor by performing work not contemplated under DHS's detention standards – the PBNDS. The federal government has specified only four categories of mandatory housekeeping duties that fall outside the scope of the Voluntary Work Program. *See* PBNDS 2000, 2008, 2011. GEO, the private, for-profit corporation that houses Plaintiffs purports to expand these four categories under threat of solitary confinement to include extensive labor not required by the PBNDS, and contemplated elsewhere as part of the Voluntary Work Program. Unlike the federal- and state-run facilities in *Channer* and *Bayh*, GEO has a profit motive that informs its staffing and management decisions. And unlike the detainees in *Channer* and *Bayh*, the performance of involuntary labor under the housekeeping exception profits a private corporation – not a government entity.

No court has ever held that a private prison contractor forcing detainees, under threat of solitary confinement, to perform tasks the federal government is paying the contractor to do itself would be immune from liability under the forced labor provision. GEO provides no persuasive authority suggesting this court should be the first to do so. Because Plaintiffs have plausibly alleged violations of forced labor statute, GEO's motion to dismiss this part of Plaintiffs' complaint must be denied.

## V.    PLAINTIFFS HAVE PLAUSIBLY PLEADED UNJUST ENRICHMENT.

GEO argues that Plaintiffs' unjust enrichment claim must be dismissed because
Plaintiffs have an adequate remedy at law. Doc. 11 at 15.[29] This argument rings hollow
because GEO also contends that Plaintiffs cannot state a claim for remedy at law.
Regardless, Defendant's argument fails because it assumes, without explanation or
citation to authority, that Plaintiffs' recovery in unjust enrichment would be identical to
their recovery under the minimum wage claim. On the contrary, Colorado courts have
determined that if liability for unjust enrichment is found, the measure of damages is
based on a theory of restitution, requiring the disgorgement of the benefit received from
defendants. *DCB Const. Co. v. Central City Dev. Co.*, 965 P. 2d 115, 118-19 (Colo.
1998) (citing Restatement of Restitution § 1 (1937)); *Earthinfo v. Hydrosphere Resource*,
900 P. 2d 113, 119 (Colo. 1995).

Restitution damages are measured by the difference between the amount paid to
the employee and the fair market value of the employee's services. *Bock v. Am. Growth
Fund Sponsors, Inc.,* 904 P.2d 1381, 1387 (Colo. App. 1995) ("the measure is … the
difference between the consideration paid and the fair market value of the employee's
services"); *see Earthinfo*, 900 P. 2d at 119 (listing various measures of restitution). In
contrast, the measure of damages for the Colorado minimum wage claim is unpaid

---

[29] Among the cases cited by Defendant, it erroneously cites *Harris Grp., Inc. v. Robinson*, 209
P.3d 1188, 1205 (Colo.App. 2009). That case treats the doctrine of duplicative damages, not the
bar on equitable remedies if a remedy at law exists. *Id.* The doctrine of duplicative damages is
only relevant when damages are being determined and is thus irrelevant here. *See US Industries,
Inc. v. Touche Ross & Co.*, 854 F. 2d 1223, 1258-1260 (10th Cir. 1988) (considering duplication
after a jury award).

minimum wage. *See* C.R.S. § 8-6-118. There is simply no basis for assuming the fair market value of Plaintiffs' labor equates to minimum wage.

## VI.    CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss should be DENIED.

Respectfully submitted,


*S/ Brandt Milstein*
MILSTEIN LAW OFFICE
595 Canyon Boulevard
Boulder, CO 80302
303.440.8780
brandt@milsteinlawoffice.com

*S/ Andrew Turner*
BUESCHER, KELMAN & PERERA, P.C.
600 Grant St., Suite 450
Denver, CO 80203
303.333.7751
aturner@laborlawdenver.com

*S/ Alexander Hood*
TOWARDS JUSTICE
601 16th St. Suite C #207
Golden, CO 80401
720.239.2606
alex@towardsjustice.org

*S/ Hans Meyer*
Meyer Law Office, P.C.
P.O. Box 40394
Denver, CO 80204
303.831.0817
hans@themeyerlawoffice.com

*S/ R. Andrew Free*
Bank of America Plaza
414 Union St., Suite 900
Nashville, TN 37219
615.244.2202
Andrew@ImmigrantCivilRights.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I filed this *Response* electronically through the CM/ECF system, which caused all parties entitled to service to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

*S/ Brandt Milstein*

36