**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-CV-02887-JLK-CBS

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
on their own behalf and on behalf of all others similarly situated,

       Plaintiffs,

vs.

THE GEO GROUP, INC.,

       Defendant.

---

## REPLY IN SUPPORT OF MOTION TO DISMISS

---

       Defendant THE GEO GROUP, INC., by its attorneys, Vaughan & DeMuro, submits this reply in support of its motion to dismiss [Doc. 11] Plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.

## I.    <u>INTRODUCTION</u>

       Plaintiffs' response to the motion to dismiss [Doc. 15] begins with an introductory section that is completely unsupported in law or fact and is merely a recitation of a political philosophy regarding immigration reform.  Such statements are insufficient to defeat a motion to dismiss.

## II.   DISMISSAL UNDER FED.R.CIV.P. 12(b)(6)

Plaintiffs' claims are directly related to certain portions of the contract between Defendant and DHS/ICE pursuant to which the Aurora facility is operated.  Defendant attached the pertinent portions of that contract as Exhibit C to its Motion to Dismiss.[1]  Doc. 11-2, pp. 1-21.  Plaintiffs contend that pursuant to Fed.R.Civ.P. 12(d), because the contract is outside the pleadings, this Court must either ignore the contract or convert GEO's motion into one for summary judgment.  Doc. 15, p.4.  "[I]f a document is referenced in and central to a complaint, a court need not convert the motion but may consider that document on a motion to dismiss."  Martinez v. The City and County of Denver, Civil Action No. 08-cv-01503-PAB-MJW, 2010 WL 1380529, *1 (D.Colo. March 31, 2010), citing GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir.1997).  In the present case, Plaintiffs' Complaint refers to the "Detainee Voluntary Work Program" (Doc. 1 ¶¶ 25, 28, 42, 50, 89, 103); and the Housing Unit Sanitation policies (Doc. 1 ¶¶ 5, 54, 59, 71, 103).  Docs. 11-2. Neither of those documents would exist without the GEO-DHS/ICE contract mandates both programs and policies.  Doc. 11-2 pp. 12, 13, 16.  As such, the contract is "central to" Plaintiffs' complaint and Plaintiffs should not be able to avoid a motion to dismiss simply by not referring to the contract in their Complaint.  GFF Corp., 130 F.3d at 1385.

Furthermore, "facts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment."

---

[1]  Plaintiffs contend that the contract is "unauthenticated."  Doc. 15, p. 4.  Attached as Exhibit E is the declaration of Dawn Ceja to authenticate the contract.

Martinez, 2010 WL 1380529, *1, *quoting* Tal v. Hogan, 453 F.3d 1244, 1264 n. 24 (10th Cir.

2006).  The contract at issue in this case is subject to judicial notice.  Doc. 11 p. 4.

Additionally, as noted in the Motion, the Tenth Circuit and courts in this District have

previously recognized that Defendant is a private corporation that operates the Aurora

facility pursuant to its contract with DHS/ICE.[2]   This Court may take judicial notice of its

own files and records.  See Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1278

n. 1 (10th Cir.2004);  Van Woudenberg ex rel. Foor v. Gibson, 211 F.3d 560, 568 (10th Cir.

2000), *abrogated on other grounds by* McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir.

2001). Therefore, this Court may take judicial notice that Plaintiffs were in DHS/ICE

custody and housed at the Aurora facility and notice of the DHS/ICE contact that governs

their detention.  Plaintiffs ignore this point and these binding authorities.

### III.   ARGUMENT AND AUTHORITY

### A.   THE COLORADO WAGE ACT AND COLORADO MINIMUM WAGE ORDER DO NOT APPLY IN THIS CASE.

Plaintiffs' first claim asserts the failure to be paid the minimum wage under Colorado

law.  Plaintiffs, as DHS/ICE detainees, were paid one dollar ($1.00) per day for their

voluntary work pursuant to 8 U.S.C. § 1555(d), the Department of Justice Appropriation

Act, 1978, Pub.L. No. 95-86, 91 Stat. 426 (1978) ("payment . . . (at a rate not in excess of

$1 per day) to aliens while held in custody under the immigration laws, for work performed),

---

[2]  Cohen v. Zaki, 411 F. App'x 136, 137 (10th Cir. 2011), Cohen v. Zaki, GEO-ICE, et al, 09-cv-02966-LTB-CBS, *3 (D.Colo. May 28, 2010), Haithcox v. The GEO Group, Inc., Civil No. 07-cv-00160-REB-MEH, 2008 WL 2487913, *1 (D.Colo. June 16, 2008); Andrews v. The GEO Group, Inc., Civil Case No. 06-cv-00844-REB-BNB, 2007 WL 3054967 (D.Colo. Oct. 18, 2007); Valencia v. The GEO Group, Inc., Civil Action No. 05-cv-296-LTB-PAC, 2007 WL 628067 (D.Colo. Feb. 26, 2007).

and the contract for services between Defendant and DHS/ICE.  Doc. 11 pp. 4-5.  Plaintiffs respond that none of these "prohibits payment of more than $1/day to the Plaintiffs."  Doc. 15, p. 5-7.  Of course, none require such a payment either.

Plaintiffs assert that 8 U.S.C. § 1555(d) and Pub.L. No. 95-86 only apply to 1978 appropriations and only apply to what the government pays for detainee labor, not to what a government contractor such as Defendant must pay.  Doc. 15 p. 6.  First, Plaintiffs have provided nothing demonstrating that 8 U.S.C. § 1555(d) and Pub.L. No. 95-86 have been repealed, overturned, or superseded.  Second, the Department of Justice Appropriations Authorization Act, 1979, Pub. L. No. 96-132, § 2 (10), 93 Stat. 1040, 1042 (1979), gave the INS (now DHS/ICE) authority comparable to the authority in 8 U.S.C. 1555(d).  The 1979 Act appropriates money to the INS/DHS/ICE for "payment of allowances to aliens, while held in custody under the immigration laws, for work performed."  Id.  Unlike Section 1555(d), however, Section 2(10) does not require Congress to set the rate of compensation for each fiscal year.  93 Stat. at 1042.  Congress has renewed Section 2(10) in subsequent fiscal years.  See e.g. Pub.L.No. 98-166, 205(a), 97 Stat 1086 (1984); Pub.L.No. 102-140, 102(a), 105 Stat. at 791 (1992); Pub.L.No. 104-208, 102(a), 110 Stat. at 3009-17 (1997); Pub.L.No. 107-77, 102, 115 Stat. 764 (2002).  Thus, DHS/ICE retains authority to expend appropriated funds to pay aliens for labor performed while in custody and there is nothing in the law that says that DHS/ICE cannot pay those appropriated funds to aliens through a contractor such as Defendant.  Finally, Congress set the hourly rate "not to exceed $1.00 per day," and if it wanted to increase that hourly rate it could have, but it has not.  Plaintiffs'

remedy is to seek an increase in that rate with Congress or not participate in the **Voluntary**

**Work Program**.

Plaintiffs next contend that the appropriations laws apply to DHS/ICE and what the

government will pay detainees, but do not apply to what Defendant, as a private company,

must pay detainees.  Doc. 15, p. 5.  Plaintiffs cite no law for this assertion.  None of the

cited laws require Defendant to pay more than $1.00 per day just because it is a

government contractor.   Plaintiffs state that "at most" the laws "cap the price the

government will pay for a particular service."  Doc. 15, p. 6.  However, Defendant has

stepped into the shoes of the government through its contractual obligations to perform a

unique government function – the detention of persons under U.S. immigration laws.  The

Aurora facility is even identified on the DHS/ICE website as an ICE detention facility and

the ICE Denver field office.   See  http://www.ice.gov/detention-facility/denver-contract

-detention-facility.  There is no mention of Defendant on that webpage.

As the Supreme Court described it in Correctional Services Corp. v. Malesko, 534

U.S. 61, 74, 122 S.Ct. 515 (2001), the government contractor defense applies "[w]here the

government has directed a contractor to do the very thing that is the subject of the claim."

Under this doctrine, where "a private party has contracted with the federal government to

carry out a project on behalf of the government, then that private party, like the federal

government, is shielded from liability under the doctrine of sovereign immunity."  Norwood

v. Esmor, Inc., 1997 WL 65913, at *4 (S.D.N.Y. Feb.13, 1997) (citing Yearsley v. W.A.

Ross Constr. Co., 309 U.S. 18, 19, 60 S.Ct. 413 (1940)).  In the present case, DHS/ICE

specifically directed Defendant to do the very thing that is the subject of the claim – house

detainees with immigration violations, establish a voluntary detainee work program, and pay the detainees who volunteer for that program $1.00 per day.  DHS/ICE made precise requirements of Defendant in the contract including with respect to the program payments. Therefore, as a government contractor carrying out this function, Defendant possesses sovereign immunity and cannot be held liable.

Plaintiffs assert that the contract between DHS/ICE and Defendant does not "prohibit Defendant from making a higher payment" to Plaintiffs.  Doc. 15, p. 6.  In support of this argument, Plaintiffs claim the contract "expressly permits GEO to request that the Contracting Officer authorize a higher rate of reimbursement."  Id.  To the contrary, the plain language of the contract states that Defendant "shall not exceed the **quantity** shown without prior approval by the Contracting Officer."  Doc. 11-2, pp. 3, 5-8.  The **quantity** is the total dollar amount allocated for that line item in the contract.  Id.  The contract makes no statement that Defendant may seek approval for a **rate** higher than $1.00 per day.  Id. To the contrary, the contract prohibits Defendant from making a higher payment providing that the government's appropriation or "reimbursement . . . will be at actual cost of $1.00 per day per detainee."  Id.

Plaintiffs state that the contract "contemplates the application and potential supremacy of state law,"[3] but they do not go so far as to claim the supremacy of state law.[4]

---

[3]  This is based merely on a general provision requiring defendant to comply with "applicable federal, state and local labor laws and codes."

[4] Plaintiffs also state that the pages of the contract redacted or withheld contain such a statement regarding the application of state law.  Doc. 15 pp. 6-7, n. 4.  Section H of the contract states that it is subject to applicable federal, state and local labor laws and codes (Doc. 11-2, p. 16)and Section I of the contract contains no statement regarding state

Doc. 15 pp. 6-7.   However, in this case, state law is not supreme.

This is a contract with the United States government that is subject to the McNamara-O'Hara Service Contract Act, 42 U.S.C. § 351, *et seq.* ("SCA").   Ex. E pp. 8-9. The SCA applies to contracts to provide services to the United States that exceed $2,500.00[5] and requires the payment of **minimum wage** and fringe benefits to employees and the wage determinations issued by the Department of Labor under that Act and the Fair Labor Standards Act.   <u>American Waste Removal Co. v. Donovan</u>, 748 F.2d 1406, 1407 (10th Cir. 1984).

In the present case, the minimum wages of the SCA preempt the minimum wages of Colorado Wage Order 30.[6]

> [S]tate law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a "scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)

<u>English v. Gen. Elec. Co.</u>, 496 U.S. 72, 79, 110 S. Ct. 2270, 2275 (1990).   As stated before, housing immigration detainees is a field to be occupied exclusively by the Federal

---

and local labor laws and codes (Exhibit E).

[5]   The contract price exceeds $2500.   Ex. E.

[6]   The DOL wage determination at issue is attached as Exhibit F.   The contract (Ex. E) and the wage determination (Ex. F) apply to all employees who work at the Aurora Facility.   There is no minimum wage listed for detainees as they are excluded from employment under the DHS/ICE contract because they are not U.S. citizens.   Ex. E.

Government.  Additionally, the SCA requires that federal contractors pay specific minimum wage rates for specific occupations.  Exs. E, F.  As such, the federal government completely occupies the regulatory fields at issue in this case.  Therefore, contrary to Plaintiffs' position, there is no room to apply Colorado's minimum wage law.  To hold otherwise would subject the federal government's contracting partners to state law requirements (such as paying a state minimum wage) that is not allocated in the price of the contract, and could even render contractors unable to perform their contracts with the federal government.

Finally, Plaintiff refers to the PBNDS statement that detainees must be paid "at least" $1.00 per day.  Doc. 15 p. 7.  However, the PBNDS does not require that Defendant or any other contractor pay detainees more than $1.00 per day or ignore the appropriation in the federal contract.[7]

For these reasons the Colorado minimum wage law does not apply in this case.

**B.      COLORADO LAW ALSO DOES NOT APPLY ACCORDING TO ITS EXPRESS TERMS**.

As discussed above, the Colorado Minimum Wage of Workers statute, C.R.S. § 8-6-101, *et seq.* and Colorado Minimum Wage Order 30, 7 CCR 1103-1*,* do not apply to Defendant because Defendant is covered by the minimum wage provisions of the SCA.  As such, Plaintiffs' claim pursuant to Colorado wage laws should be dismissed.  However, even if the SCA did not preempt Colorado minimum wage law, Defendant is not subject

---

[7] Plaintiffs state that the redacted portions of the contract refer to the PBNDS.  Doc. 15, p. 7, n. 5.  To the contrary, the portion of the contract referring to the PBNDS was not redacted.  See Doc. 11-2, p. 16.

to the state law by its terms.

### 1. Colorado Wage Law Does Not Apply Because Defendant is Not An Employer.

Plaintiffs assert Defendant is an "employer" as defined by the Colorado wage laws and, therefore, such laws should apply to Defendant.  Doc 15, pp 8-9.  Plaintiffs are attempting to stretch the definition of "employer" under the CMWO by liberally construing the statute through statutory construction rules.  A contractor performing the functions of the federal government does not become an "employer" under the statute through any liberal construction.  Having a few detainees volunteer to perform laundry and janitorial duties does not turn Defendant into their employer.

Plaintiffs conceded that the definition of "employer" under the CMWO which includes an exemption for governments, but argue that this Court should decline to apply this exemption to Defendant as a government contractor.  Doc. 15, p. 8.  Applying the CMWO's exemption to Defendant would be consistent with the well established body of law applying the government contractor defense to state law claims.  In acknowledging the defense in a state law products liability action, the Third Circuit in Carley v. Wheeled Coach, 991 F.2d 1117, 1123 (1993), applied the holdings in Yearsley v. W.A. Ross Construction Co., 309 U.S. 18, 60 S.Ct. 413 (1940) and Boyle v. United Technologies Corp., 487 U.S. 500, 507–08, 108 S.Ct. 2510, 2515-16 (1988) and two other circuits:

> Our holding is consistent with Burgess v. Colorado Serum Co., 772 F.2d 844, 846 (11th Cir.1985), and Boruski v. United States, 803 F.2d 1421, 1430 (7th Cir.1986). . . . After observing that the defense originated in cases immunizing private contractors from liability arising out of public work

> projects, 772 F.2d at 846 (citing <u>Yearsley</u>, 309 U.S. at 18, 60
> S.Ct. at 413; <u>Myers v. United States</u>, 323 F.2d 580 (9th
> Cir.1963)), the court concluded that the rationale of the
> defense is the extension of sovereign immunity, and that **in
> circumstances where the government would not be liable,
> private actors acting pursuant to government directives
> should not be liable either**. <u>Id</u>.

[Emphasis added.]  Because the CMWO would not be applied to DHS/ICE, Defendant,

acting pursuant to DHS/ICE directives, should not be liable either.

<u>See also</u> <u>Peoples v. CCA Det. Centers</u>, 422 F.3d 1090, 1104 (10th Cir. 2005),

*opinion vacated in part on reh'g en banc*, 449 F.3d 1097 (10th Cir. 2006) ("We recognize

that the Supreme Court, in dicta, suggested that the government contractor defense might

apply to a state-law tort claim against a privately-operated federal prison when 'the

government has directed the contractor to do the very thing that is the subject of the claim.'

<u>Malesko</u>, 534 U.S. at 74 n. 6, 122 S.Ct. 515."); <u>Andrew v. Unisys Corp.</u>, 936 F.Supp. 821,

830 (W.D.Okla.1996) (applying the defense to state claims for negligence and breach of

warranties in a product liability case); <u>Bowers v. J & M Discount Towing, LLC.</u>, 472

F.Supp.2d 1248, 1265 (D.N.M. 2006) (towing company with a contract with the Internal

Revenue Service had a colorable government contractor defense[8] to a state law claim for

conversion); <u>Guillory v. Ree's Contract Service, Inc.</u>, 872 F.Supp. 344 (S.D.Miss. 1994)

(colorable defense in action against private security company and security officer for

injuries sustained during assault in federal building).

Plaintiffs assert that applying an exemption to government contractors would "have

---

[8] The court did not determine the case based on the defense as it dismissed the case on other grounds.

vast consequences" and "diminish the applicability of the minimum wage significantly."

Doc. 15 p. 8, n. 7. There is no basis for such speculation.  Defendant operates the only

dedicated ICE facility in Colorado.  <u>See</u> http://www.ice.gov/detention-facility.  Nor would

minimum wages be diminished because government contractors such as Defendant are

governed by the minimum wage requirements of the SCA.  Furthermore, as a matter of

policy, it is appropriate to apply the government contractor defense because otherwise

companies will not conduct typically government functions.  The Third Circuit noted that

applying   the   defense   protects   "federal   interests,   such   as   preventing   judicial

second-guessing of the government's public policy decisions, and limiting the government's

financial burdens."  <u>Carley</u>, 991 F.2d at 1124. This assertion is entirely speculative.

        In addition to the inapplicability of the "employer" defendant, Defendant is not an

"employer" because it does not all with the limited industry definitions of the CMWO.

### 2.   Defendant is Not in the Retail and Service Industry.

        As asserted in its Motion, Defendant is not an employer under the CMWO because

the CMWO regulates wages only for employers in four industries including retail and

service industries.  Doc. 11, 5-6.  Retail and service industries are defined as businesses

offering services for sale "to the **consuming public**."  7 CCR 1103-1(1)(A) (emphasis

added).  None of these terms are defined by the CMWO.  Therefore, the Court may look

to other statutes to determine the meaning of those terms.  <u>See</u> <u>Pringle v. Valdez</u>, 171

P.3d 624, 626 (Colo. 2007) (the court of appeals looked to other statutes for definitions)<u>;</u>

<u>B.G.'s, Inc. v. Gross</u>, 23 P.3d 691, 694 (Colo.2001)(noting that other statutes dealing with

the same subject is an extrinsic aid to statutory interpretation); City of Colorado Springs v. Powell, 48 P.3d 561, 565 (Colo. 2002).  Courts may also "consult definitions contained in recognized dictionaries to determine the ordinary meaning of words."  Griego v. People, 19 P.3d 1, 9 (Colo. 2001), as modified on denial of reh'g (Mar. 12, 2001).

A "consumer" is regularly defined in the Colorado statutes as a natural person other than an organization who purchases goods and services for personal, family, or household purposes, but not for business or research purposes.[9]  Retail is defined as the sale of goods in relatively small quantities for use or consumption rather than for resale from a place open to the general public .[10]  It is clear from these definitions that Defendant is not in the retail or service business as the Aurora facility is not open to the general public and does not provide goods or services for individuals to purchase for personal use.

Plaintiffs discuss statutory construction stating that Colorado applies the cannon that "the inclusion of one thing implies the exclusion of another" and that "inclusion ...  of a particular set of conditions necessarily excludes others."  Doc. 15 p. 8-9.[11]  Applying these principles also shows that Defendant is not a Retail or Service industry because the CMWO's specific inclusion of related industries such as amusement and recreation, public

---

[9]  Colo. Rev. Stat. Ann. §§ 4-1-201; 5-3.1-102; 5-1-301; 5-9.5-103; 10-4-1601; 12-14.3-102; 25-17-302; 25-38-103; 29-11-102.5; 35-21-101; 35-29-102; 42-10-101.

[10]  See http://www.merriam-webster.com/dictionary/retail; Colo. Rev. Stat. Ann. § 25-41-101; Liger v. New Orleans Hornets NBA Ltd. P'ship, 565 F. Supp. 2d 680, 687-88 (E.D. La. 2008), citing Shultz v. Adair's Cafeterias, Inc., 420 F.2d 390, 395 (10th Cir. 1969).

[11]  Plaintiffs relied on  City of Arvada v. Colorado Intergovernmental Risk Sharing Agency, 19 P.3d 10, 13, n. 6 (Colo. 2001) and Lunsford v. W. States Life Ins., 908 P.2d 79, 84 (Colo. 1995).

accommodations, banks, credit unions, and savings and loans as retail and service industries necessarily excludes unrelated industries such as the detention, correction, and residential treatment facilities operated by Defendant.

Plaintiffs rely on <u>Bowe v. SMC Elec. Products, Inc.</u>, 935 F.Supp. 1126 (D.Colo.) *opinion adhered to on reconsideration*, 945 F.Supp. 1482 (D.Colo. 1996), to assert that sales includes sales to other business, not just individuals. Doc. 15 p.15. However, <u>Bowe</u> addressed a different wage order using different language. <u>Bowe</u> addressed Wage Order 19 which defined the retail industry as "any industry, business, or establishment engaged in or concerned with the selling or offering for sale any commodity ... **to the consumer**." 935 F.Supp. at 1133 (emphasis added). In contrast, Wage Order 30, at issue in this case, requires that retail sales and service be to the "consuming **public**."

<u>Bowe</u> does not assist in the present case because the government is not the "consuming public," it is the government. As stated, Defendant only provides its services to one entity, the government. Members of the public, such as persons who shop at the mall or the grocery store, cannot purchase services from Defendant, or even enter most of the Aurora facility. Even if Plaintiffs were to assert they were the "consuming public" the assertion would fail because they are not members of the public, they are detained under the control of DHS/INS. Defendant does not provide services to the "consuming public," and, therefore, the CMWO does not apply.

### 3.    Defendant is Not in the Food and Beverage Industry.

As asserted in its Motion, Defendant is not an employer under the CMWO because

it is also not in the Food and Beverage industry as claimed by Plaintiffs.  Doc. 1 ¶ 46.  This

Court has addressed the examples of food and beverage industries listed in the CMWO,

and held that the examples should be interpreted "as narrowing the definition provided in

the Wage Order."  Salazar v. Butterball, LLC, No. 08-CV-02071-MSK-CBS, 2009 WL

6048979, at *16 (D.Colo. Dec. 3, 2009), *report and recommendation adopted*, 2010 WL

965353, at *11 (D.Colo. Mar. 15, 2010).  Upholding that decision, the Tenth Circuit held

that this portion of the CMWO applies to "employers . . . that sell food directly to the

**consuming public**."  Salazar v. Butterball, LLC, 644 F.3d 1130, 1144 (2011) (emphasis

added).

This issue here is whether Defendant sells food and does it sell food to the

consuming public.  The Court can look to the FLSA for guidance in interpreting the

provisions of the CMWO.  Salazar, 2009 WL 6048979, at *15.[12]  A "sale" in the retail and

service designations of the FLSA has been held to require "selling in small quantities to the

ultimate consumer" or "establishments comparable to the local corner grocery store."

Dunlop v. Oklahoma Bd. of Regents, No. 75-1188, 1975 WL 3575, at *3 (10th Cir. Dec. 15,

1975), *citing* Hodgson v. Duke University, 460 F. 2d 172, 176 (4th Cir. 1972).  Defendant

---

[12]  Salazar, 2009 WL 6048979, at *15 (meaning of donning, doffing, sanitizing, or
walking time); Flood v. Mercantile Adjustment Bureau, LLC, 176 P.3d 769, 773 (Colo.2008)
(look to federal case law for persuasive guidance bearing on the construction of Colorado
Fair Debt Collection Practices Act); Rutt v. Poudre Educ. Ass'n, 151 P.3d 585, 590
(Colo.App.2006) (when the pertinent portions of the Colorado and federal rules statutes
are essentially the same federal authority is persuasive in analysis of the Colorado statute);
Chase v. Farmers Ins. Exch., 129 P.3d 1011 (Colo.App.2004) (an exemption under the
FLSA to employer seeking to establish an exemption under Colorado law).

does not sell food at all, let alone in small quantities to DHS/INS or the detainees or anyone else.  The general consuming public, such as people working at other businesses close to the Aurora facility, cannot come to the facility and purchase lunch.  Defendant has a services contract with DHS/ICE and as part of that contract, Defendant must feed the detainees.

Plaintiffs state that Defendant's reliance on <u>Salazar</u> is misplaced because that decision related to food wholesalers.  Doc. 15, p. 17-18.  That distinction does not affect the validity of the Court's analysis of the statute.  Furthermore, Plaintiffs' interpretation of the industry definition would result in every business with an onsite cafeteria for their employees and every school, and day care center being deemed part of the food and beverage industry.[13]  This is an absurd result.

### 4.  Defendant is Not in the Health and Medical Industry.

Finally, Defendant is not an employer under the CMWO because it is not a Health and Medical business under the CMWO.  7 CCR 1103-1(1)(D).  Plaintiffs respond that words and phrases in a statute must be given their ordinary and common meaning and that because Defendant provides medical care to its detainees, it is a Health and Medical business.  Doc. 15 pp. 9-10.  However, in statutory construction, it is also true that the courts will not adopt a statutory interpretation that leads to an illogical or absurd result or is at odds with the legislative scheme.  <u>Fischbach v. Holzberlein</u>, 215 P.3d 407 (Colo.App.

---

[13]  Colorado Revised Statute 25-4-1602(14) excludes private boarding houses, hospital and health facility patient feeding operations, and child care centers and facilities from the definition of "retail food establishment."

2009).  Following Plaintiffs' reasoning, any business that provided on-site medical care would qualify under the CMWO as a health or medical business.  This would include schools and any business with an in-house nurse.  This is an absurd interpretation of the CMWO.

The examples of a health/medical business identified in the CMWO include "medical and dental offices, hospitals, home health care, hospice care, nursing homes, and mental health centers."  7 CCR 1103-1(1)(D).  All of these examples are similar in that they are in the business of providing healthcare to the general public, which Defendant does not do. Plaintiffs respond that this list cannot be read as "limiting, or [ ] exclusive," because the regulation states that the list "includ[es] but [is] not limited to."  Doc. 15 p. 10.  However, as stated in the Motion, the court in Salazar, addressed the "including, but not limited to" language as it existed in the list of examples of food and beverage business in the CMWO.

In Salazar, this Court held that while the "list of examples is not exclusive nor exhaustive, the examples listed **share a characteristic** that provides insight into the intended scope of the definition – the examples describe only businesses that sell food or beverages to the ultimate consumer." Salazar, 2010 WL 965353 at *11 (emphasis added). This is precisely what Defendant stated in its Motion – the examples of health/medical businesses listed **share a characteristic** that provides insight into the intended scope of the definition – the examples describe only businesses that provide medical services to the consuming public.  Doc. 11 p. 7.

Plaintiffs also state that interpreting the medical business list in the CMWO to apply

only to businesses that provide medical care to the general public is incorrect because the Division of Labor Advisory Bulletins "contemplate application of the Wage Order to businesses not listed as examples in the regulatory text."  Doc. 15 p. 11, Ex. 3.  However, the "Forward" of the Bulletin specifically states it is provided for "general advisory, clarification, and explanatory purposes only.  The Bulletins and associated materials **are not intended to expand, narrow, or contradict current law**."  Ex. 3 (emphasis added). Current law states that the list of Medical and Health businesses should be interpreted based on its shared characteristics.

Plaintiffs then argue that if the legislature had intended the list of medical businesses covered to be those that provide care to the "consuming public," it would have included "consuming public" in the industry definition as the legislature did in the definition of the "Retail and Service" industry.  Doc. 15 p. 11.  This is a repeat of the same argument. The industry definition of "Food and Beverage" also does not contain the language "consuming public," and yet this Court and the Tenth Circuit interpreted the definition of that industry to require sales to the "consuming public."  See discussion of Salazar above. The interpretation of the Health and Medical industry should be consistent with the other industries.

Plaintiffs continue making the same argument over and over that the "Health and Medical" industry should not be interpreted as only those businesses offering care to the general or consuming public.  Plaintiffs state that there is no suggestion in the CMWO that the "services must be sold to the recipient" and "where the drafters intended to require"

such sales "they did so expressly."  Doc. 15 p. 12.  Again, interpreting the regulation to require that the health services be "sold" to the recipient is exactly what this Court did in Salazar in relation to the Food and Beverage industry.  There is no reason why such an interpretation should not also be applied to the Health and Medical Industry.

Plaintiffs claim that if such an interpretation were applied, Defendant would still be "considered such a business" because it sells health care services to the "public sector." Doc. 15 p. 12 n.9.  This is incorrect because members of the public, such as people working at other businesses close to the Aurora facility, cannot receive health care services at the Aurora facility, but they can at the other facilities listed in the industry definition.  The relatively small class of individuals incarcerated by the federal government for immigration violations is not the same as the "public sector."

Plaintiffs also assert that the interpretation used in Salazar would have the "effect of excluding from coverage the employees of private hospitals and nursing homes which the 'general public' cannot access."  Doc. 15 p. 12 n. 10.  Plaintiffs, however, do not explain why the general public cannot access private health facilities.  Any member of the general public can access any private facility pursuant to the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395.  Therefore, interpreting the Health and Medical industry to require that services be provided to the general consuming public does not have the affect of excluding private facilities from the industry.

Plaintiffs next state that the assertion that Defendant cannot be a Health and Medical employer because "it performs and sells other incarceration services together with

healthcare is unavailing." Doc. 15 p. 12-13.  Plaintiffs then launch into a discussion of a "primacy analysis," for determining an employer's industry.  However, Defendant never suggested that there is a "primacy" analysis or test to determine an industry under the CMWO.  Such an analysis is unnecessary under the law and irrelevant.

Therefore, because Defendant does not provide any health or medical services to the consuming public, it is not covered by the CMWO.

### 5.        Plaintiffs Are Not Employees

As stated above, this case is governed by the SCA.  The DHS/ICE contract with Defendant requires that anyone Defendant employs on the contract be a U.S. citizen.  Ex. E p. 3.  Because Plaintiffs are not U.S. citizens, it is DHS/ICE's determination that Defendant cannot employ them.

Additionally, Plaintiffs are not employees under the CMWO because they are not covered by either the FLSA or the CMWO.  7 CCR 1103-1.  Plaintiffs do not meet the definition of "employees" under the CMWO because they are excluded from the FLSA..  Plaintiffs respond that they are not seeking coverage under the FLSA.[14]  Doc. 15 p. 22.

---

[14]  Plaintiffs assert that <u>Franks v. Oklahoma State Industries</u>, 7 F.3d 971, 972 (10th Cir. 1993) turns on the economic realities test.  Doc. 15 pp. 22-23, n.16.  However, the court held exactly to the contrary, "the economic reality test was not intended to apply to work performed in the prison by a prison inmate."  <u>Id</u>. at 973.  Also contrary to Plaintiffs' assertion, <u>Franks</u> did not rely on the plaintiffs status as "convicted murderers, rapists, burglars, armed robbers, swindlers, thieves, and the like."  That language was used by the 9th Circuit in <u>Gilbreath v. Cutter Biological, Inc.</u>, 931 F.2d 1320 (9th Cir.1991).  <u>Franks</u> made no such statement.  Plaintiffs state that in contrast they are not in punitive detention, they are civil detainees with immigration violations.  Actually, some of the civil detainees in the Aurora facility come to the facility after they have completed criminal prison sentences at other facilities and prior to being deported.

While Plaintiffs may not assert an FLSA claim, as stated above, it is appropriate to consider the FLSA case law on the same issue.  The court in <u>Alvarado Guevara v. I.N.S.</u>, 902 F.2d 394 (5th Cir. 1990), held that the FLSA excludes imprisoned individuals, including immigration detainees, from the statutory definition of employee because they are under the direct supervision and control of a governmental entity, whereas the intent of the FLSA was to "protect the standard of living and general well-being of the worker **in American industry**." <u>Id</u>. at 396.[15]  Similarly, because Plaintiffs are not "employees" under the FLSA, the CMWO does not apply to them.

For the very same reasons cited in FLSA law, Plaintiffs are not employees as that term is used in the CMWO itself.  Detainees are not whom the Colorado minimum wage laws were intended to protect.  Plaintiffs assert that the FLSA cases cited by Defendant (Doc. 11 p. 9) "are not probative of coverage under state law" because the FLSA protects only those engaged in interstate commerce" and Colorado wage law does not "requir[e] engagement in commerce."  Doc. 15 p. 22.  The distinction is not relevant here.  While it is correct that the FLSA applies to employers in interstate commerce, the FLSA cases

_____

[15]  Plaintiffs assert that <u>Alvarado</u> is rooted in the question of the detainee's engagement in interstate commerce. Doc. 15 p. 22, n.16.  While the FLSA does apply to employers in interstate commerce, there is no discussion in <u>Alvarado</u> regarding how a detainee fits into interstate commerce.  Plaintiffs also attempt to distinguish <u>Alvarado</u> by asserting that it "turns on the distinct characteristics of government employment." <u>Id</u>.  This is not correct.  The court mentions in a passing footnote that an additional reason the detainees could not be employees was because they were not appointed to a federal position. <u>Alvarado</u> "turns" on the reasoning that the detainees did not need their standard of living protected because their standard of living was provided for them. <u>Alvarado</u>, 902 F.2d at 396.

defining employees that Defendant cited did not determine that the FLSA did not apply to prisoners, inmates, and pretrial detainees because of how they fit within interstate commerce. It was based on the cost of living. Both the FLSA and the Colorado minimum wage law were enacted to ensure wages are adequate to "supply the necessary cost of living" of workers. Alvarado, 902 F.2d at 396; and C.R.S. § 8-6-104.

Another reason to look at the FLSA for assistance in interpreting the definition of employee, is that both the FLSA and the Colorado Department of Labor ("CDOL") exclude prisoners from the definition of employee. See Doc. 11, p. 10; Advisory Bulletin and Resource Guide 34(I), Doc. 11-2, p.24. The same reasoning of the federal courts that prisoners and detainees are not employees under the FLSA should be applied here to find that Plaintiffs are not employees under the CMWO – the purpose of the minimum wage is protect the standard of living and general well-being of the worker. Plaintiffs do not need that protection as their living is provided for by DHS/ICE.

Plaintiffs respond that they fall within the definition of "employee" in the CMWO (Doc. 15 p. 19) and that Advisory Bulletin 34(I) does not apply to them because they are not prisoners and are not confined in a city or county jail or a department of corrections facility (Doc. 15 p. 20). However, Plaintiffs are taking too narrow of an approach. The CMWO uses the term "prisoner" generically because it is obvious that minimum wage laws should not apply to any class of persons detained under government control. It even provides that inmates on a "work release program" are not subject to the law and suggests that parolees might not qualify for protection.

Plaintiffs also respond that the Wage Order will "diverge from the FLSA" to provide great protection."   Doc. 15 p. 24.   However, as stated, Plaintiffs do not require that protection because their standard of living is provided by DHS/ICE and they may opt not to participate in the voluntary work program.

### C.   THE TRAFFICKING VICTIMS PROTECTION ACT DOES NOT APPLY IN THIS CASE.

Plaintiffs' second claim asserts that Defendant has violated the Trafficking Victims Protection Act ("TVPA") ,18 U.S.C. § 1589, by requiring that detainees assist in cleaning the pod where they live.

Plaintiffs state that Defendant took the position that the TVPA "only protects victims of more commonly recognized forms of human trafficking," but that "actions have gone forward against those who procured labor or services using forced labor in the fields that would not normally be associated with trafficking."   Doc. 15 p. 27.   Plaintiffs do not cite where in the Motion Defendant took this position.   To the contrary, Defendant took the position that forced labor in the fields is one of the types of trafficking the TVPA was enacted to protect.   In support of that, Defendant cited the decision from this Court in Camayo v. John Peroulis & Sons Sheep, Inc., Civil Action Nos. 10-cv-00772-MSK-MJW, 11-cv-01132-MSK-MJW, 2012 WL 4359086 (D.Colo. Sept. 24, 2012), where the defendants operated two ranches and recruited the plaintiffs to come from Peru to work on the ranches.

Plaintiffs cite Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd., 790 F.Supp. 2d 1134 (C.D.Cal. 2011), which is very similar to Camayo and very different from Plaintiffs'

situation.  In Nunag-Tanedo, the defendants recruited the plaintiffs from the Philippines to teach school in the United States.  The plaintiffs incurred great personal financial expense to come to the United States including recruiting fees paid to the defendants.  The defendants confiscated the passports and visas of the plaintiffs and would not provide them until the plaintiffs paid the defendants more money.  Once in the United States, if the plaintiffs did not comply with the defendants' demands, the defendants threatened them with deportation, letting their visas lapse, termination, and civil lawsuits.

In contrast, Plaintiffs' TVPA claim is based on six detainees being randomly selected each day to clean the housing pods in which they live.  Doc. 1 ¶¶ 5, 59, 71, 72.  Unlike Camayo and Nunag-Tanedo, Defendant did not recruit Plaintiffs to the United States and into the Aurora facility with the purpose of putting them to work.  Plaintiffs are in the custody of DHS/ICE for immigration violations and are only in the facility pursuant to the authority of DHS/ICE and are only required to do the limited housekeeping mandated by DHS/ICE.  Therefore, Plaintiffs do not have a claim under the TVPA.

Plaintiffs cite to U.S. v. Peterson, 544 F.Supp.2d 1363 (M.D.Ga. 2008), to suggest that a detention provider, such as Defendant, can be subjected to the TVPA.  Doc. 15 p. 28 n.22.  But, Peterson aptly explains why the TVPA does not apply to Defendant.  There a sheriff was charged with violations of the TVPA because he allegedly "obtained the labor of inmate Strickland 'by means of the abuse or threatened abuse of law or the legal process, to wit: the defendant did obtain the labor of inmate Strickland at a private business owned by the wife of Defendant Peterson.'" Id. at 1375.  The court dismissed the

indictment as factually insufficient because it did not specify what acts the sheriff committed that were a violation of the TVPA.  However, the court also stated, "merely putting an inmate to work is not in and of itself an abuse of legal process, and if that was the basis for the charge this Court would have to dismiss for failure to state a prosecutable offense." Id.

Defendant did not locate any cases applying the TVPA to anyone similarly situated to Plaintiffs or Defendant.  In response, Plaintiffs state that "no authority exists exempting a private corporation in the business of housing immigration detainees for profit from the forced labor statute."  Doc. 15 p. 29.  There are no such cases because the TVPA does not apply to persons in the custody of DHS/ICE for immigration violations and detained pursuant to a contract with Defendant.  Rather, application of the law has been limited to criminal and civil violations related to recruiting and bringing persons into the U.S. or another country for the purpose of engaging them in labor and/or sex.  See Panwar v. Access Therapies, Inc., 975 F.Supp.2d 948 (S.D.Ind. 2013); Antonatos v. Waraich, Civil Action No. 12-cv-01905-JMC, 2013 WL 4523792 (D.S.C. Aug. 27 2013) (unpublished) ; Vaughan v. Aegis Communications Group, LLC, Case No. 13-cv-05097-MDH , 2014 WL 4421600, slip op. (W.D.Mo. Sept. 9, 2014); Aguirre v. Best Care Agency, Inc., 961 F.Supp.2d 427 (E.D.N.Y. 2013); David v. Signal Int'l, LLC, No. CIV.A. 08-1220, 2014 WL 5489359, at *6 (E.D.La. Aug. 13, 2014).

Although the TVPA appears to have never been applied to DHS/ICE detainees, an analogous situation to Plaintiffs' allegations is presented by Channer v. Hall, 112 F.3d 214

(5th Cir. 1997), in which an INS detainee alleged that he was forced to work in violation of the prohibition against involuntary servitude.  Channer relied on U.S. v. Kozminski, 487 U.S. 931, 952, 108 S.Ct. 2751, 2765 (1988), which held that involuntary servitude in the context of 18 U.S.C. § 1584 means being "forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process."  Channer, 112 F.3d at 217.

Plaintiffs assert that Defendant cannot rely on Channer or Kozminski because both cases pre-date the TVPA and because the TVPA was created to address the shortcomings of the involuntary servitude laws found by the Court in Kozminski.  To the contrary, neither Kozminski nor Channer have been overturned or superseded and both are still good law.

Furthermore, the Code section at issue in Channer and Kozminski, is similar to the Code section at issue in this case.  Title 18 of the United States Code, Chapter 77 addresses crimes and criminal procedure in peonage, slavery and trafficking in person. Kozminski and Channer addressed Sec. 1584 of that chapter, involuntary servitude. Plaintiffs in the present case bring their claim under Sec. 1589 of that same chapter, forced labor.  These two sections are substantially similar because they are both meant to protect persons that are trafficked for the purpose of forcing them to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process.  David v. Signal Int'l, LLC, No. CIV.A. 08-1220, 2012 WL 10759668,*17-20, slip op. (E.D. La. Jan. 4, 2012) (lengthy discussion of the two sections,

Channer, and Kozminski).[16]   The difference is that psychological coercion is recognized

in Sec. 1589, but not in Sec. 1584.   David, 2012 WL 10759668, *18-19.[17]   Therefore,

because Defendant relied on Kozminski and Channer for the purpose of discussing

detainees who are forced to work without regard to the type of coercion alleged,

Defendant's reliance is appropriate.

Plaintiffs next assert that Channer is distinct from the present case because the

scope of permitted housekeeping duties in Channer are broader than the scope of the

duties now allowed under the PBNDS.  Doc. 15 p. 30-31.  However, there is no language

in Channer stating that the scope of the duties performed by the detainee had anything to

do with the court's decision.  Channer, 112 F.3d at 218-19.  The Channer decision was

simply that INS detainees could be required to participate in communal contribution in the

form of housekeeping tasks as an exception to involuntary servitude.   Id.   Therefore,

---

[16]   The Kozminski Court "consider[ed] the scope of conduct pertinent to the meaning of 'involuntary servitude' for purposes of a criminal prosecution under § 1584. . . . [T]he Court concluded that 'involuntary servitude' was limited to cases involving the compulsion of services by the use or threatened use of physical or legal coercion — psychological coercion would not suffice. Kozminski, 487 U.S. at 948." David, 2012 WL 10759668, *18.

[17]   "Congress enacted § 1589 in the wake of Kozminski to provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in Kozminski. H.R. Rep. 106–939. Section 1589 is intended to address the increasingly subtle methods of traffickers who often use means other than overt violence. Id. With § 1589, prosecutors would no longer be required to demonstrate physical harm or threats of force against victims because the 'serious harm' standard employed by the statute encompasses a broad array of harms, both physical and non-physical. Id." David, 2012 WL 10759668, *18.

Plaintiffs lengthy discussion of the scope of duties permitted by the PBNDS and the Housing Sanitation Policy is completely irrelevant to whether the TVPA applies to Plaintiffs' claims.[18]

Plaintiffs next assert that even if there is an exception to involuntary servitude, it applies to governments, not private contractors.  Doc. 15 p. 32.  There is no actual law which applies such a limitation.  Plaintiffs claim that <u>Bayh v. Sonnenburg</u>, 573 N.E.2d 398, 411 (Ind. 1991) "distinguished cases holding persons detained in custodial situations in private mental hospitals as having 'little persuasive value.'"  Doc. 15 p. 32.  To the contrary, <u>Bayh</u> mentioned one case, <u>Weidenfeller v. Kidulis</u>, 380 F.Supp. 445 (E.D.Wis. 1974), and stated, "[t]he defendants in <u>Weidenfeller</u> were private hospitals, and that court incorrectly relied on In <u>Jobson [v. Henne</u>, 355 F.2d 129 (2d Cir.1966)].  As a result, these cases have little persuasive value." <u>Bayh</u>, 573 N.E.2nd at 411.[19]  This is not a holding that government contractors are not entitled to the exception to involuntary servitude requiring that

---

[18]  Plaintiffs spend an entire page discussing the scope of duties in the PBNDS compared to the Housing Sanitation Policy.  Doc. 15 p. 30-31, including n. 24-26.  Defendant disagrees with Plaintiffs characterization of the documents, but addressing the scope of duties is unnecessary for determining the Motion to Dismiss.  However, even the <u>McGarry v. Pallito</u>, 687 F.3d 505 (2nd Cir. 2012), case relied on by Plaintiffs held, that correctional institutions may require inmates to clean "the areas in **or around** their cells." [Emphasis added.]

[19]  <u>Weidenfeller</u> and was a case regarding mentally handicapped persons in a private mental institution who made FLSA claims, not involuntary servitude claims.  <u>Bayh</u> was a case regarding mental patients in state facilities making involuntary servitude claims.  <u>Jobson</u> was an inmate at a state mental institution also making an involuntary servitude claim.

detainees keep their living areas clean.

As discussed at length above, Defendant is entitled to the government contractor defense and as such, because DHS/ICE would not be found to have violated the TVPA, neither should Defendant.  Plaintiffs state that their labor "occurred not at the urging of the federal government, but rather, at the insistence of" Defendant.  Doc. 15 p. 32.  This is incorrect.  As stated, Plaintiffs are not in Defendant's custody.  They are in the custody of DHS/ICE and through the contract with Defendant, DHS/ICE tells Defendant what duties Plaintiffs shall perform.[20]

For these reasons, Plaintiffs' claim under the TVPA should be dismissed.

### D.    UNJUST ENRICHMENT

Plaintiffs' third claim asserts Defendant has been unjustly enriched by the Detainee Voluntary Work Program in violation of state common law.  Doc. 1 ¶¶ 89, 103, 104. Plaintiffs argue first that Defendant cannot argue for dismissal based on Plaintiffs having an adequate remedy at law because Defendant argues elsewhere that Plaintiffs' first claim under the Colorado minimum wage law does not state a claim.  Doc. 15, p. 34.  At most, that means that the third claim should be dismissed if the first claim survives this Motion.

More importantly, the third claim for unjust enrichment does not present a claim that is different from the minimum wage claim.  It is alleged in the third claim that Defendant employs Plaintiffs in its "Detainee Voluntary Work Program" for $1.00 per day to the

---

[20]   Defendant denies Plaintiffs' unsupported allegations that they are required to perform housekeeping duties that are outside the PBNDS.  Doc. 15, p. 33.

detriment of the Plaintiffs and resulting in unjust enrichment for Defendant which should disgorge to Plaintiffs the benefits that it unjustly obtained.  Doc. 1, pp. 17-18, ¶¶ 103-106. The third claim also incorporated earlier allegations of the Complaint that Defendant violated the Colorado Minimum Wage Order for which Plaintiffs seek actual damages. Doc. 1, p. 17, ¶ 101; p. 3, ¶¶ 3-4.

In other words, Plaintiffs are seeking to recover the difference between $1.00 per day and what they would have earned if they were paid the minimum wage for each hour they worked that day. This is the same theory and the same relief that Plaintiffs seek on the first claim.  As Defendant pointed out in its Motion, duplicate wage claims of this type should be dismissed.  Doc. 11, p. 15.

Plaintiffs dispute this, contending now that on the third claim they are seeking the difference between $1.00 a day and the value of their services.  Doc. 15, p. 34.  This is a surprise, as Plaintiffs incorporated the minimum wage allegations into the third claim, as noted above, and alleged nothing there about seeking the value of their services.   If Plaintiffs' theory is really to seek the value of their services, why are their Complaint (including the third claim) and response brief devoted to an argument for application of the minimum wage?  The "value of services" argument is simply put forth at this time to try to avoid dismissal of the third claim.

Plaintiffs also argue that the third claim seeks a different measure of damages - disgorgement of Defendant's alleged profit.  But, what would Defendant be disgorging if Plaintiffs prevail on the minimum wage theory incorporated into the third claim? The unjust

enrichment would seem to be what it saved by paying $1.00 per day rather than the minimum wage, which takes us back to the same measure.

On the other hand, if Plaintiffs are really now seeking to recover the value of their services on the third claim, that is not the same as the measure of damages that Defendant must disgorge its profit.  The alleged profit would be measured by what the Defendant would have paid in the market to obtain employees or a cleaning company to do this work, and the amount would have to be adjusted by increased or saved expenses (other than wages) to reach a net profit amount.  It is impossible to follow Plaintiffs' changing view anyway, because after stating that the measure of damages is disgorgement of profits (which they at least plead), they cite a case for the new theory of "value of services," which expressly rejected the use of a disgorgement of profits theory on the facts of that case. Doc. 15, p. 34, *citing* Bock v. American Growth Fund Sponsors, Inc., 904 P.2d 1381, 1387 (Colo. App. 1995).

In any event, this new theory was not plead in the third claim which incorporates allegations on the minimum wage theory. This claim, therefore, should also be dismissed under Twombly and Iqbal. Doc. 11, pp. 2-3.

For these reasons, Plaintiffs unjust enrichment claim should be dismissed.

## E.     THE STATE CLAIMS SHOULD BE DISMISSED

Finally, because the TVPA claim is the only federal claim pled in this case and should be dismissed, this Court should also exercise its discretion to dismiss the state law minimum wage claim and unjust enrichment claim.  See 28 U.S.C. § 1367(c)(3).

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' complaint should be dismissed for failure

to state a claim.

Submitted January 16, 2015.            VAUGHAN & DeMURO

*/s/ Shelby A. Felton*
David R. DeMuro
Shelby A. Felton
3900 E. Mexico Ave., Suite 620
Denver, Colorado 80210
(303) 837-9200
Email:sfelton@vaughandemuro.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2014, I electronically filed Defendant's **REPLY IN SUPPORT OF MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following

Brandt Milstein                              Andrew Turner
brandt@milsteinlawoffice.com                 aturner@laborlawdenver.com

Alexander Hood                               Hans Meyer
alex@towardsjustice.org                      hans@themeyerlawoffice.com

R. Andrew Free
Andrew@ImmigrantCivilRights.com

/s/Shelby A. Felton
Shelby A. Felton
3900 E. Mexico Ave., Suite 620
Denver, Colorado 80210
(303) 837-9200
(303) 837-9400 fax
Emails:sfelton@vaughandemuro.com