**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-CV-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
on their own behalf and on behalf of all others similarly situated,

      Plaintiffs,

vs.

THE GEO GROUP, INC.,

      Defendant.

---

**MOTION FOR RECONSIDERATION**
**OF ORDER DENYING GEO GROUP, INC.'S MOTION TO DISMISS**

---

Defendant THE GEO GROUP, INC. ("GEO"), by its attorneys, Vaughan & DeMuro and Norton Rose Fulbright US LLP, moves the Court for reconsideration of adverse rulings in the Court's July 6, 2015 Memorandum Opinion and Order (Doc. 23, "Order") denying GEO's Motion to Dismiss.

**Certification Pursuant to D.C.COLO.LCivR 7.1(a).** Defendant's counsel has conferred with the Plaintiffs' counsel regarding the requested relief and scheduling of the filing of this motion. Plaintiffs oppose this motion.

**INTRODUCTION**

The Court declined to dismiss the Plaintiffs' claim for relief under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1859, 1593, 1595; Doc. 23 at 8-9. Whether Congress authorized a cause of action for federal detainees to sue for compensation for forced labor under these provisions of the TVPA is an issue of first impression in the Tenth Circuit, and the United States generally. The Court has issued a ruling that no other federal court has yet made, and that is likely to have a significant precedential or persuasive power across the Nation. Caution is therefore appropriate. Respectfully, GEO believes the ruling was in clear error, will result in manifest injustice, and should be corrected before litigation in this case and other cases grows in scale.

As the text of the TVPA and its legislative history make clear, Congress directed the statute at activities connected to the international and domestic <u>trafficking of persons</u>, not at federal detainees who are lawfully kept in the custody of the United States government and perform housekeeping chores at their detention facility. GEO, which operates the Aurora detention facility under a contract with a federal agency, Immigration and Customs Enforcement ("ICE"), does not "traffic" anyone. And even if the "plain text" of the TVPA could be read to encompass the Plaintiffs' allegations that their housekeeping duties were forced, such an interpretation is contrary to Congressional intent, and should be rejected as "absurd," as that term is understood under well-established rules of statutory construction. Furthermore, GEO's interpretation of Section 1589 is supported by the fact that a judicially recognized "civic duty" exception to the federal prohibition against involuntary servitude existed long before Section 1589 was enacted, and was not abrogated by the passage of Section

1589. GEO respectfully requests that the Court reconsider and reverse its ruling, and dismiss Plaintiffs' TVPA claim.

The Court should also reconsider its ruling that the Plaintiffs may pursue an unjust enrichment claim to recover the "fair market value" of work they have performed through ICE's Voluntary Work Program ("VWP"). Doc. 23 at 10-11. The Court correctly dismissed Plaintiffs' claim that they are entitled to a minimum wage under the Colorado Minimum Wage Order ("CMWO"), recognizing that there is no employer/employee relationship between GEO and the Plaintiffs. Doc. 23 at 3-7. Similar reasoning requires dismissal of the unjust enrichment claim. Congress authorized payment to alien detainees who work in the VWP program. But in doing so, Congress did not convert detainees into employees who engage in bargained-for exchanges of services-for-compensation during their time in a federal detention facility. Plaintiffs have pled nothing that plausibly establishes that they had, or could have had, any reasonable expectation of obtaining "fair market value" for their VWP work at Aurora. Under these circumstances, the allegations that GEO retained benefits from the labor of Plaintiffs or others (thereby violating "principles of justice, equity, and good conscience") are conclusory. Put simply, there is not, and never was, any "market" for the Plaintiffs' work under the VWP, and the Court should not create such a fictional market.

Finally, the Court should reconsider its ruling that GEO is not entitled to the government contractor defense. To the extent the Court's ruling would allow detainees to state claims for the "fair market value" of VWP labor as "unjust enrichment," such claims would impermissibly interfere with, and conflict with, the federal government's

interest in contracting with GEO or other private entities to operate the federal detention system, including the VWP program.

## BACKGROUND

**TVPA allegations**. Congress enacted the Trafficking Victims Protection Act of 2000 with the express purpose "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." TVPA, § 102(a), 22 U.S.C. § 7101(a).

Plaintiffs allege that GEO committed violations of subsections 18 U.S.C. §§ 1589(a)(1), (2) and (4) of the TVPA. Section 1589(a) provides:

(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

18 U.S.C. § 1859(a); Compl. at ¶¶ 76-78. Subjection (d) provides for fines or criminal punishments. 18 U.S.C. § 1859(d).

Plaintiffs seek a remedy under 18 U.S.C. § 1595(a), which provides that an individual who is a victim of a violation of Section 1589 "may bring a civil action against

4

the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) . . . and may recover damages and reasonable attorneys fees." 18 U.S.C. § 1595(a); Compl. ¶¶ 83, 85. Plaintiffs also seek mandatory restitution authorized by 18 U.S.C. § 1593. Compl. ¶ 84.

The ICE Detainee Handbook informs detainees that "[t]he center will maintain the highest sanitation standards at all times in all locations without exception" and that "[t]here will be an organized, supervised and continuous program of daily cleaning by all detainees to maintain those standards." Doc. 11-1, Ex. B at 16. ICE's "Housing Unit Sanitation policy" states that "[e]ach and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit Officer will be responsible for assuring this general cleanup is done on a regular basis." Id. at 17. Detainees are required to participate in keeping "clean and sanitary all commonly accessible areas of the housing unit including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs." Id. Each detainee is also required to keep his/her personal living area clean and sanitary, including his/her bunk and the immediate floor area around the bunk. Id. at 16.

Plaintiffs allege that six detainees at Aurora are randomly selected each day and forced to clean housing pods at the facility for no pay and under threat of solitary confinement as punishment for any refusal to work. Compl. ¶¶ 5-6, 71-74. GEO allegedly "saved costs associated with paying for custodial work by using the

uncompensated and coerced labor of Plaintiffs and others to clean cells and living areas." Id. at ¶ 75.

As the Court noted, GEO argued in its motion to dismiss that "the TVPA is inapplicable because its purpose was to prevent human trafficking, and cases exclusively apply the TVPA to trafficking persons for labor and/or sex." Doc. 23 at 8 (citing Motion to Dismiss at 12-13). The Court denied the motion to dismiss the TVPA claim, but the Order did not explain why Congress would have intended a statute expressly designed to combat human trafficking to apply to detainees lawfully held in the custody of the federal government.

The Court noted that **the Plaintiffs** relied on the argument "that the plain text of the TVPA reaches any type of forced labor." Doc. 23 at 8 (citing Nunag-Tanedo v. E. Baton Rouge Sch. Bd., 790 F. Supp. 2d 1134 (C.D. Cal. 2011)) (emphasis added). However, the Court did not expressly endorse this textualist view, and the Order does not reveal the Court's substantive analysis of the "plain text" of Section 1589. Nor did the Court explain why, **even if** the interpretation of the TVPA turned on the "plain text" of Section 1589, that textual reading would control, despite the clear statutory statements of Congressional intent and legislative history undermining this expansive reading of Section 1589. As discussed below, GEO respectfully believes the Court has misapprehended the controlling law.

The Court stated that two prior cases, United States v. Kozminski, 487 U.S. 931 (1988), which narrowly construed the scope of 18 U.S.C. 1584's prohibition on involuntary servitude to overt physical acts of violence, and Channer v. Hall, 112 F.3d 214 (5th Cir. 1997), which recognized that a detainee's performance of housekeeping

duties is a "civic duty" that does not violate the prohibition against involuntary servitude, are inapplicable to this case because Section 1589, which was enacted after those cases, contains "language . . . broader than the language at issue in <u>Kozminski</u> and <u>Channer</u>, and intentionally so." Doc. 23 at 8-9. The Court concluded that GEO had failed to meet a burden to cite authority "for reading a civic duty exception into § 1589" for a private detention facility operator. Doc. 23 at 9-10.

For reasons discussed below, GEO believes the Court failed to adhere to fundamental principles of statutory construction, and inappropriately shifted the burden to GEO to prove that the civic duty exception applied, rather than requiring Plaintiffs to show it does not.

**Unjust enrichment allegations**. The Plaintiffs allege that they were entitled to the wage required by the CMWO for their VPW work – and the Court correctly dismissed that claim – but in the alternative Plaintiffs allege that by paying Plaintiffs $1 per day for a variety of work performed under the VPW, GEO was "unjustly enriched" under Colorado law. Compl. ¶¶ 1, 2, 9, 101-07.

The VPW provides "detainees opportunities to work and earn money while confined." INS, <u>2011 Operations Manual ICE Performance-Based National Detention Standards</u> at 382, available at http://www.ice.gov/detention-standards/2011; Doc. 11-1, Ex. A.[1] The program also serves other purposes, including that "[e]ssential operations and services shall be enhanced through detainee productivity;" "[t]he negative impact of

---

[1] Detainees can volunteer for work assignments, but cannot be required to work, except for "personal housekeeping," id. at 382, which includes tasks related to the upkeep of a detainees' immediate living areas, such as "making their bunk beds daily, stacking loose papers, keeping the floor free of debris and dividers free of clutter." <u>Id</u>. at 383-84.

confinement shall be reduced through decreased idleness, improved morale and fewer disciplinary incidents." Id. at 382. The program provides that "[d]etainee working conditions shall comply with all applicable federal, state and local work safety laws and regulations;" imposes limitations on hours worked per week; provides conditions for detainee selection and removal from job details; and creates a grievance procedure. Id. at 382-85; Doc. 11-1, Ex. B at 17.

The Complaint only seeks unjust enrichment with respect to work performed under the VWP (and not unpaid housekeeping duties). See Compl. ¶¶ 103-04. Plaintiffs claim that GEO's "retention of any benefit collected directly and indirectly from Plaintiffs and others' labor violated principles of justice, equity, and good conscience." Id. at ¶ 105. Plaintiffs claim that they are entitled to recover "all amounts wrongfully and improperly obtained" and should be entitled to "benefits [GEO] has unjustly obtained," as well as exemplary damages. Id. at ¶¶ 106-07.

The Court refused to dismiss the Plaintiffs' unjust enrichment claim. Doc. 23 at 10-11. The Order, however, does not identify the nature of the unjust enrichment claim that is permitted to go forward, although the Order appears to conclude that the claim for disgorgement and damages seeks the "fair market value" of the Plaintiffs' work at the Aurora facility.[2] Id. at 10. In GEO's view, the failure to dismiss the unjust enrichment claim is clear error and a manifest injustice. Plaintiffs have no claim for the "fair market value" of their services because there is no "market" for those services in the context of

---

[2] The Court held that an unjust enrichment claim alleging the fair market value of services that exceeds the minimum wage was not duplicative of the Plaintiffs wage claim under the Colorado Minimum Wage Order, but the Court did not identify the scope of the "fair market value" that the Plaintiffs are permitted to seek. Id.

a federal detention facility.  The Plaintiffs had no reasonable expectation that they would be paid more than $1 per day, and GEO therefore did not receive any unjust benefit at the expense of the Plaintiffs.

**Government Contractor Defense**.  The Court held that GEO was not entitled to the government  contractor defense because there is no "significant conflict" between a federal interest and state law.  Doc. 23 at 13.  Specifically, the Court concluded that the contract between GEO and ICE "only defines how [GEO] will be reimbursed for the Detainee Work Program and does not prohibit [GEO] from paying detainees in excess of $1/day in order to comply with Colorado labor laws."  Id.  In GEO's view, permitting Plaintiffs to recover "fair market value" for VWP work interferes with and conflicts with GEO and ICE's contractual relationship, and a federal interest in operating detention facilities.

## STANDARDS OF REVIEW

The Court is authorized to consider this motion for reconsideration under the Court's plenary power to revisit and amend interlocutory orders as justice requires. Paramount Pictures Corp. v. Thompson Theatres, Inc., 621 F.2d 1088, 1090 (10th Cir. 1980) (citing Fed. R. Civ. P. 54(b)); see Houston Fearless Corp. v. Teter, 313 F.2d 91, 92 (10th Cir. 1962).   The grounds for a motion to reconsider an interlocutory order are typically limited to: "(1) an intervening change in the controlling law; (2) new evidence previously unavailable; and (3) the need to correct clear error or prevent manifest injustice."  Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000) (citing Brumark Corp. v. Samson Res. Corp., 57 F.3d 941, 948 (10th Cir. 1995)).  A motion to reconsider is "appropriate where the Court has misapprehended the facts, a party's

position, or the controlling law."  Id. (citing Van Skiver v. United States, 952 F.2d 1241, 1243 (10th Cir. 1991)).

**ARGUMENT**

## I.  PLAINTIFFS DO NOT STATE A CLAIM UNDER THE TVPA.

The Court should reconsider and reverse its prior ruling because the TVPA does not apply to the conduct alleged by the Plaintiffs.   Even if the plain language of Section 1589 were fairly construed to encompass the Plaintiffs' allegations of "forced labor," applying the TVPA to the performance of household chores in a federal detention facility results in an interpretation that is contrary to Congress's intent.    Additionally, Congress's enactment of Section 1589 subsequent to the judicial pronouncement that detainees' performance of household duties is a "civic duty" that does not violate the prohibition against involuntary servitude, without eliminating such an exception, is further evidence that Congress intended detainee work to lie beyond Section 1589's purview.

### A.    Interpreting The TVPA To Apply To The Conduct Alleged In The Complaint Violates The "Absurdity" Doctrine.

"In the interpretation of statutes, the function of the courts is easily stated.  It is to construe the language so as to give effect to the intent of Congress." United States v. Am. Trucking Ass'ns, Inc., 310 U.S. 534, 542 (1940). "[W]here applying the plain language [of a statute] 'would produce an absurd and unjust result which Congress could not have intended,' [a court] need not apply the language in such a fashion." Robbins v. Chronister, 402 F.3d 1047, 1050 (10th Cir. 2005) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 574 (1982)).   "[T]his is because 'interpretations of a statute which would produce absurd results are to be avoided if alternative

interpretations consistent with the legislative purpose are available.'" <u>Id</u>. (quoting <u>Griffin</u>, 458 U.S. at 575); <u>Sunshine Haven Nursing Operations v. Dep't of HHS</u>, 742 F.3d 1239, 1250 (10th Cir. 2014). <u>See also Perry v. Commerce Loan Co</u>., 383 U.S. 392, 400 (1966) (noting that when the conventional interpretation of a statutory text produces "absurd or futile results," a court may look "beyond the words to the purpose of the act" (quoting <u>Am. Trucking Ass'ns</u>, 310 U.S. at 543).

The U.S. Supreme Court and the Tenth Circuit have concluded on many occasions that, even where the plain language of a statute may reach alleged conduct, the plain meaning should not be applied because it is contrary to legislative intent. In the Supreme Court's classic "absurdity" doctrine decision, <u>Rector, Etc. of Holy Trinity Church v. United States</u>, 143 U.S. 457 (1892),[3] the Alien Contract Labor Act prohibited businesses from bringing anyone into the country "to perform labor or service of any kind." <u>Id</u>. at 458. A religious corporation had contracted with an individual from England to immigrate to the United States to serve as a pastor in its church. <u>Id</u>. at 458. The federal government sued the corporation to recover a statutory penalty, basing its argument on the "plain meaning" of the act. <u>Id</u>. The Supreme Court found that "[i]t must be conceded that the act of the corporation is within the letter of this section." <u>Id</u>. at 458. However, the court rejected the government's argument that the statute covered pastoral services. <u>Id</u>. at 458-59. Stating that "[i]t is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit,

---

[3] The Tenth Circuit continues to apply the absurdity doctrine, as applied in the <u>Holy Trinity</u>. <u>See</u>, <u>e.g.</u>, <u>United States v. Black</u>, 773 F.3d 1113, 115-16 (10th Cir. 2014) (interpreting criminal statute to avoid "strange results" in the application of the statute); <u>In re Busetta-Silvia</u>, 314 B.R. 218, 223-224 n.25 (B.A.P. 10th Cir. 2004) (recognizing <u>Holy Trinity</u>'s doctrine).

nor within the intention of its makers," the Court found the government's interpretation to be absurd. Id. at 459. The Court looked to the act's legislative history, and found that it was relatively clear that Congress intended the word "labor" to mean a worker that performs "manual labor," and not that of "a professional man," or "any class whose toil is that of the brain," such as a pastors. Id. at 463. Congress's intent "was simply to stay the influx of [ ] cheap, unskilled labor." Id. at 465. The Supreme Court reversed the judgment, declaring that "[i]t is the duty of the courts, under those circumstances, to say that, however broad the language of the statute may be, the act, although within the letter, is not within the intention of the legislature, and therefore cannot be within the statute." Id. at 472.

Likewise, in Public Citizen v. United States Dep't of Justice, 491 U.S. 440 (1989), the Court relied on the absurdity doctrine to avoid the ordinary meaning of the Federal Advisory Committee Act ("FACA"), which imposed detailed registration and open-meeting requirements on federal "advisory committees." Id. at 446-47. "Advisory committee" was defined in the statute as any committee "utilized by one or more agencies in the interest of obtaining advice or recommendations." Id. at 451. At issue in the case was whether a subcommittee of the American Bar Association ("ABA") was an "advisory committee." Id. at 447. Under the ordinary meaning of the statute, the ABA subcommittee was an advisory committee because the President routinely sought its recommendations on judicial nominees. Id. at 470 (Kennedy, J., concurring). But the majority refused to adopt that interpretation. Id. at 454 (majority opinion) (citing Holy Trinity, 143 U.S. at 459). Reviewing the legislative history, the Supreme Court concluded that it was unlikely that Congress intended the statute to cover every formal

and informal meeting between the President and a group rendering advice. Id. at 467. While acknowledging that a "literalistic reading" of the FACA provision would apply to the ABA Committee, that reading "would catch far more groups and consulting arrangements than Congress could conceivably have intended." Id. at 463-64. Therefore, the court concluded that FACA did not apply.

Applying the TVPA to this case produces a result just as absurd and inconsistent with legislative intent as those rejected in Holy Trinity and Public Citizen. Section 102 of the TVPA provides, with great clarity, Congress's purpose in enacting that legislation and the substantial findings that support the law. As noted, Congress described its own purpose "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." TVPA, § 102(a), 22 U.S.C. § 7101(a). "The TVPA was enacted after Congress took a substantial amount of evidence on the traffic in the sexual services of women based on importing women from around the world by force or fraud." United States v. Todd, 627 F.3d 329, 333 (9th Cir. 2010). Congress made twenty-four (24) separate findings, noting, for example, that "the degrading institution of slavery continues throughout the world," as "[a]t least 700,000 persons annually, primarily women and children, are trafficked within or across international borders" and about "50,000 women and children are trafficked into the United States each year." TVPA at § 102(b), 22 U.S.C. § 7101(b)(1).[4] There are

---

[4] As noted by Congress, this "transnational crime" "includes forced labor and involves significant violations of labor, public health, and human rights standards worldwide." Id. at § 7101(b)(3). Traffickers, Congress found, "primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic

numerous other findings—**none of which** indicate, or even suggest, that Congress intended Section 1589 to apply to detainees who are lawfully held in the custody of the United States at a private detention facility, and who allege "forced labor" amounting to routine housekeeping responsibilities.

The legislative history also confirms that Section 1589 was enacted as a tool for combatting human trafficking. The Joint Explanatory Statement of the Committee of Conference described the TVPA generally as an "Act to combat trafficking of persons, especially into the sex trade, slavery, and slavery-like conditions, in the United States and countries around the world through prevention, through prosecution and enforcement against traffickers, and through protection and assistance to victims of trafficking." Victims of Trafficking and Violence Protection Act of 2000, H.R. Conf. Rep. 106–939 at 1 (Oct. 5, 2000) ("Conference Report"). The managers' discussion of Section 12 of the House Bill, which included Section 1589, was entitled "STRENGTHENING PROSECUTION AND PUNISHMENT OF TRAFFICKERS." Id. at 99 (capitalization in original). Section 12, the managers explained, "adds several new criminal violations **in the areas of trafficking in persons**." Id. (emphasis added). Section 1589 was one of these new criminal provisions, "creat[ing] a new crime of forced labor." Id.

Moreover, the managers made clear that Section 1589 was not to be a general law regulating labor. In compromising on the language of Section 1589, the managers

---

unemployment, discrimination, and the lack of economic opportunities in countries of origin." Id. at § 7101(b)(4). Traffickers also buy children from poor families, selling them "into prostitution or into various types of forced or bonded labor." Id. "Trafficking in persons is increasingly perpetrated by organized, sophisticated criminal enterprises." Id. at § 7101(b)(8).

expressly rejected language from the House Bill that "might have criminalized conduct that is currently regulated by labor law." Id. at 101.[5]    Instead, Section 1589 was "intended to address the increasingly subtle methods **of traffickers** who place their victims in modern-day slavery, such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." Id. (emphasis added). See also Alvarado v. Universidad Carlos Albizu, No. 10-22072-CIV, 2010 WL 3385345, at *4 (S.D. Fla. Aug. 25, 2010) ("Typical § 1589 cases involve use of force, threats of violence, fraud, and coercion that prevent the employee/traffickee from having viable exit options.").

In directing the statutory focus to "means other than overt violence," Section 1589 was intended to expand the category of unlawful conduct beyond that recognized in Kozminski, a case that had limited Section 1584's definition of "involuntary servitude" to "physical harm or threats of force against victims." Conference Report at 101. For example, the conference managers noted that Section 1589's broader reach applied to persons who have "been trafficked into domestic service" by "more subtle means designed to cause their victims to believe that serious harm will result to themselves or others if they leave, as when a nanny is led to believe that children in her care will be harmed if she leaves the home." Id.; see also United States v. Dann, 652 F.3d 1160, 1172 (9th Cir. 2011) (construing Congressional intent in enacting Section 1589) (citing Conference Report at 101). Or, it may cover "a scheme, plan, or pattern intended to cause a belief of serious harm may refer to intentionally causing the victim to believe

_____

[5] Rejected were provisions "addressing fraud or deception to obtain labor or services of minors, mentally incompetent persons, or persons otherwise particularly susceptible." Id. at 100.

that her family will face harms such as banishment, starvation, or bankruptcy in their home country." Conference Report at 101. And in certain instances, Section 1589 was intended to "permit prosecutions where children are brought to the United States and face extreme nonviolent and psychological coercion (e.g. isolation, denial of sleep, and other punishments)." Id. Thus, by the references and examples based on cross-border trafficking, it is clear that Congress intended that Section 1589 broaden the TVPA's application **with respect to trafficking activity**, not to broaden it beyond the trafficking context to wholly unrelated areas, such as federal detention facilities.

Plaintiffs' allegations are categorically different from the type of conduct Section 1589 was intended to proscribe. To "traffic" means "to trade or deal in." Black's Law Dictionary, 8th ed. at 1534. GEO did not, and does not, "trade or deal in" the Plaintiffs or anyone else at the Aurora facility, and the household duties expected of detainees do not involve GEO in "trafficking" persons for forced labor. Plaintiffs and other detainees are at the facility because they are in the lawful custody of ICE, which exercises exclusive authority to place them at Aurora, not because GEO trafficked them there.

Moreover, the fact that Section 1589 includes the expansive term "whoever" does not make Plaintiffs' interpretation any less absurd or any less contrary to legislative intent. For example, in Holy Trinity, the Court was asked to apply the plain meaning of the equally expansive phrase "labor . . . **of any kind**." 143 U.S. at 458-59 (emphasis added). By refusing to do so, the Supreme Court rejected the precise interpretive approach that Plaintiffs urge, and which the Court accepted in this case. Under this precedent, it was error to give dispositive weight to Section 1589's broadly written text in light of the overwhelming statutory evidence and legislative history indicating that

Congress meant Section 1589 to address an area of law entirely distinct from the facts of this case. See Am. Trucking Ass'ns, 310 U.S. at 543 (canon of absurdity applies "even when the plain meaning did not produce absurd results but merely an unreasonable one plainly at variance with the policy of the legislation as a whole") (footnote and internal citation omitted); Holy Trinity, 143 U.S. at 460 (stating that a statute "**must** be so construed to avoid . . . absurdity") (emphasis added).

**B.    Judicial Recognition Of The "Civic Duty" Exception Prior To The Enactment Of Section 1589 Is Further Evidence Of Congress's Intent To Exclude Housekeeping Duties.**

Congress's intent to exclude detainee housekeeping duties in federal detention facilities from the TVPA's purview is also evident from another canon of statutory construction.

The Supreme Court and the Tenth Circuit have directed courts to interpret statutes with the presumption that Congress is aware of federal court decisions pertinent to its law-making, and legislates against the backdrop of those decisions. Jurado-Gutierrez v. Greene, 190 F.3d 1135, 1146 (10th Cir. 1999), as amended on denial of reh'g (Nov. 29, 1999) ("In fact, we generally assume Congress knows the law and legislates in light of federal court precedent."); see also Bd. of Cnty. Comm'rs, Fremont Cnty., Colorado v. E.E.O.C., 405 F.3d 840, 845 (10th Cir. 2005); Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."). Thus, in Jurado-Gutierrez, the Tenth Circuit interpreted a provision of the Anti-Terrorism and Effective Death Penalty Act to permit habeas review under the pre-

existing habeas statute in light of intervening judicial opinions that distinguished between "review" and "appeals" within the immigration context.  Id. at 1146.

In Channer, a detainee claimed that he was subjected to involuntary servitude in violation of the Thirteenth Amendment when he was forced to work in the food service department of the facility.  112 F.3d at 217.  The court assumed arguendo that the Thirteenth Amendment claim against officials gave rise to a cause of action under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).  Channer, 112 F.3d at 217.  Furthermore, the court assumed, without deciding, that the plaintiff's allegations that he was threatened with segregated detention amounted to a form of legal punishment, and that there would be at least some evidence that his services were compelled by the use of legal coercion.  Id. at 218.

Notwithstanding **both** of these significant assumptions, however, the Fifth Circuit nonetheless held that the detainee had failed to state a claim of involuntary servitude, following other courts that had "held that compelling individuals who are involuntarily confined in mental institutions to perform housekeeping tasks does not violate the Thirteenth Amendment."  Id. at 218-19 (discussing Bayh v. Sonnenburg, 573 N.E.2d 398, 412 (Ind. 1991) and Jobson v. Henne, 355 F.2d 129, 131–32 (2d Cir. 1966)).[6] Recognizing this "civic duty" exception to the prohibition on involuntary servitude, the

---

[6] Like Plaintiffs, the confined persons had the status of detainees.  In Bayh, the plaintiffs were mental hospital patients who performed a variety of work activities while hospitalized, such as fixing meals, scrubbing dishes, doing the laundry, and cleaning the building. The Indiana Supreme Court held that such labor fit within the Thirteen Amendment's "civic duty" exception.  573 N.E.2d  at 410–11.  Jobson held that inmates in mental hospitals can be required to perform housekeeping chores.  355 F.2d at 131–32.

Fifth Circuit concluded that, even assuming that he was compelled to work through the threat of solitary confinement, the detainee's Thirteenth Amendment right was not violated.  Id. at 218.[7]

Channer post-dated Congress's 1948 enactment of 18 U.S.C. § 1584, which, like the Thirteenth Amendment, prohibits "involuntary servitude."  Importantly, however, Channer pre-dated Congress's 2000 enactment of a pertinent statute, Section 1589. Because Section 1589 was enacted after the TVPA's civic duty exception was judicially recognized, and both sections cover work allegedly coerced by force, Congress is presumed to have drafted Section 1589 with the expectation that the exception would apply to Section 1589, too.   As a consequence, a proper interpretation of Section 1589 must presume that Congress was aware that courts had applied a "civic duty" exception to claims alleging that general housekeeping duties were "involuntary servitude," and

_____

[7] Other courts have recognized a similar exception, even if not dubbing it a "civic duty" exception.  In Hause v. Vaught, 993 F.2d 1079, 1085 (4th Cir. 1993), the Fourth Circuit denied a pretrial detainee's Thirteenth Amendment claim after concluding that complaint alleged no more than "general housekeeping responsibilities," and that such responsibilities are not inherently punitive and are related to the legitimate, non-punitive governmental objective of prison cleanliness.  Courts have also held that pretrial detainees cannot sue for violation of the Thirteenth Amendment if they voluntarily choose to work while confined, even if the choice that they make as to whether or not to work is a "painful" one.  Brooks v. George County, Miss., 84 F.3d 157 (5th Cir. 1996); Watson v. Graves, 909 F.2d 1549 (5th Cir. 1990).  But see McGarry v. Pallito, 687 F.3d 505, 510-12 (2d Cir. 2012) (reversing dismissal of claim by pretrial detainee who brought claims against state prison officials alleging that his "work in the prison laundry was compelled and maintained by the use and threatened use of physical and legal coercion" in violation of the Thirteenth Amendment).  Notably, McGarry held that a pre-trial detainee stated a Thirteenth Amendment claim under Kozminski, thereby clearly indicating the Second Circuit did not understand that Supreme Court authority to be superceded.  Id. at 512-13 (citing Kozminski, 487 U.S. at 952).   However, McGarry did involve allegations under the TVPA, and the Second Circuit's opinion does not indicate that the appellee raised a "civic duty" exception.  The Second Circuit did not hold that such an exception was inapplicable to allegations of forced labor by detainees under the TVPA.

that Congress, in enacting the Section 1589's pertinent prohibition on forced labor without any exception to that rule, intended that the same "civic duty" exception would apply.  See Jurado-Gutierrez, 190 F.3d at 1146; Goodyear Atomic Corp., 486 U.S. at 184-85.

This Court declined to dismiss the TVPA claim on the ground that GEO "cited no authority for reading a civic duty exception into § 1589, or for applying such an exception to a private, for-profit corporation under contract with the government."  Doc. 23 at 10.  However, the civic duty exception is a judicially recognized exception (Channer) to the federal prohibition against involuntary servitude, including allegations of forced labor.  As the party asserting that the TVPA grants them a right to relief, **the Plaintiffs** had the burden to show that why this judicially recognized exception did not preclude relief.  See, e.g., Lochman v. County of Charlevoix, 94 F.3d 248, 251 (6th Cir. 1996) (in determining whether federal statute created an enforceable right under 42 U.S.C. § 1983, plaintiff bore burden to show that judicially-made exceptions did not apply).  The Court clearly erred in shifting this burden.

The Court also implicitly concluded that Channer did not control its interpretation of the TVPA because Section 1589's language is "broader than the language at issue in Kozminski and Channer, and intentionally so."  Doc. 23 at 9.  However, GEO does not dispute that Section 1589 punishes conduct not otherwise punishable as "involuntary servitude" under Section 1584 or the Thirteenth Amendment.  As noted, Section 1589 was passed in response to the Kozminski decision, which limited "involuntary servitude" under Section 1584 to cases "involving the compulsion of services by the use or

threatened use of physical or legal coercion," thereby excluding claims based on allegations of psychological coercion.  See 487 U.S. at 948.

While Section 1589 proscribes new conduct, however, it also proscribes conduct that was previously punishable, i.e., forced labor by means of threats of physical coercion.  See Section 1589(a)(1).   Adding Section 1589 did not eradicate the law that applies to the overlapping areas between Sections 1584 and 1589, i.e., the prohibition on forced labor.  What makes Section 1589 broader – extending the "forced labor" to include forms of psychological coercion – does not extend Section 1589 beyond the context of "trafficking" and into the detention facility context.  The conduct alleged here is precisely the type of conduct at issue in Channer, which implicates the performance of the same "civic duty" recognized in Channer.  Thus, even though Section 1589 broadens the range of prohibited trafficking conduct to include forms of psychological coercion, it does not eliminate the judicially-recognized civic duty exception for Channer-type allegations.

The opposite conclusion produces anomalous results.  If the Court's categorical exclusion of a "civic duty" exception in Section 1589 is correct, the "civic duty" exception may apply to conduct under Section 1584 (prohibiting involuntary servitude) but not to the exact same conduct when charged under Section 1589.  Presumed to be aware of the civic duty exception, Congress surely did not intend such an arbitrary result.  To avoid such anomalous results, Section 1589 should be interpreted to incorporate the "civic duty" exception with respect to the forms of coercion alleged in this case.  So interpreted, Plaintiffs' TVPA claim should plainly be dismissed under Channer.

Finally, GEO underscores that neither the Plaintiffs nor the Court cite any case in which a U.S. court has recognized the TVPA to create a right of federal detainees to recover damages for forced labor against a private detention facility operator under the TVPA.[8]  Nor have Plaintiffs identified any other federal statute that entitles them to relief for "forced labor."  A federal detainee alleging constitutional violations may, in very limited circumstances, seek a remedy of money damages directly under the U.S. Constitution under <u>Bivens</u>.  However, Plaintiffs do not even attempt to allege a constitutional violation, and had they tried to do so, the Court would have had no grounds to imply such a constitutional remedy against a private detention facility operator, because Plaintiffs have not alleged that they lack any alternative remedies.

_____

[8] Plaintiffs cited a California district court case, <u>Nunag-Tanedo</u>, 790 F. Supp. 2d at 1143-46, arguing that the extension of the TVPA to a class of Filipino teachers recruited to the United States supported extending the statute to the Plaintiffs.   Doc. 15 at 27.  However, <u>Nunag-Tanedo</u> still involved trafficking activity.  <u>See id</u>. at 1137 ("This putative class action involves allegations of fraud, human trafficking, and racketeering").   The facts show the hallmarks of trafficking activity.   The defendants required a second payment from the plaintiffs before the defendants would return plaintiffs' visas and passports and before plaintiffs would be permitted to depart for the United States.   The defendants told Plaintiffs that if they did not pay the additional fees, Plaintiffs would forfeit fees already paid, would not be permitted to travel to the United States, and would not be given their visas. Plaintiffs felt that they had to comply with defendants' demands since they needed to work in the United States to repay their debts.  <u>Id</u>. at 1138-39.  Likewise, Plaintiffs cited case, <u>United States v. Kaufman</u>, 546 F.3d 1242, 1260 (10th Cir. 2008), involved forcing mentally handicapped residents of a ranch to perform sex acts.  Doc. 15 at 27.  Both cases involve allegations of trafficking, and thus were within the intended purpose of the TVPA.   The U.S. Department of Justice's decision to bring a TVPA claim against a sheriff that used inmates to perform services for a private business owned by his wife, <u>see</u> <u>United States v. Peterson</u>, 544 F. Supp. 2d 1363, 1375 (M.D. Ga. 2008); Doc. 15 at 28 n.22, is easily distinguishable, because GEO lawfully contracts with ICE to operate a facility housing federal detainees and housekeeping chores engaged in by Plaintiffs are done pursuant to their detention, not for a third party private business.   None of these cases involves extending the TVPA's right of action to federal detainees.

Corr. Servs. Corp. v. Malesko, 534 U.S. 61 (2001).[9]  Thus, the Court has fashioned –

without any indication that Congress so intended – a new statutory damages remedy for

federal detainees against private detention facility operators, where the law would

otherwise likely afford no such remedy under a federal statute or the U.S. Constitution.

## II.     THE COURT SHOULD DISMISS THE UNJUST ENRICHMENT CLAIM.

A "claim of unjust enrichment is a judicially-created remedy designed to undo the

benefit to one party that comes at the unfair detriment of another," and the claim of

"[u]njust enrichment is based on principles commonly associated with restitution."  Lewis

v. Lewis, 189 P.3d 1134, 1141 (Colo. 2008) (citation omitted).  A party claiming unjust

enrichment must prove that (1) the defendant received a benefit, (2) at the plaintiff's

expense, (3) under circumstances that would make it unjust for the defendant to retain

the benefit without commensurate compensation.  Id.

Importantly, a claim for unjust enrichment should be denied where a plaintiff "had

no sustainable expectation of compensation under the circumstances."  Stanford v.

Ronald H. Mayer Real Estate, 849 P.2d 921, 923 (Colo. App. 1993);  Britvar v.

Schainuck, 791 P.2d 1183, 1184 (Colo. App. 1989) (citing Schuck Corp. v. Sorkowitz,

_____

[9] In Malesko, the Supreme Court declined to imply a damages remedy against a private entity operating a halfway house under a contract with the Bureau of Prisons for an alleged violation of an inmate's constitutional rights.  Id. at 63. The Malesko court pointed out that in the thirty years after Bivens was decided, the Court had extended its application only twice, "to provide an otherwise non-existent cause of action against individual officers alleged to have acted unconstitutionally ... and to provide a cause of action for a plaintiff who lacked any alternative remedy for harms caused by an individual officer's unconstitutional conduct."  Id. at 70. See also Minneci v. Pollard, 132 S. Ct. 617, 622 (2012) (declining to extend Bivens remedy against individual employees of a private detention facility where plaintiffs fail to allege a lack of alternative state law remedies).  Here, Plaintiffs had available to them the remedy of an administrative grievance procedure.  See 2011 Operations Manual, supra at 6.2.

686 P.2d 1366 (Colo. App. 1984)) ("[a] plaintiff cannot recover for unjust enrichment on a quasi-contractual claim for services rendered absent proof of circumstances indicating that compensation is reasonably expected."); see 42 C.J.S. Implied Contracts § 28 (Supp. June 2015).

The Plaintiffs allege that by paying Plaintiffs $1 per day for their labor, GEO was "unjustly enriched" by the Plaintiffs and others, and that retention of the benefit of the "labor" violates principles of justice, equity, and good conscience" thereby entitling the Plaintiffs and others to disgorgement of "all amounts that Defendant has wrongfully and improperly obtained." Compl. ¶¶ 102-07. In denying GEO's motion to dismiss this claim, the Court's order does not clearly identify the nature of the unjust enrichment claim that Plaintiffs are permitted to bring, although the Order may conclude that the Plaintiffs can seek the "fair market value of their services" in some measure. Doc. 23 at 10.[10]

Allowing an unjust enrichment claim for the fair market value of the housekeeping duties performed by Plaintiffs or other federal detainees would be clear error that will work a manifest injustice. The ruling should therefore be reversed. The Order cites a Colorado case, Bock v. Am. Growth Fund Sponsors, Inc., 904 P.2d 1381, 1387 (Colo. App. 1995), for the proposition that "the proper measure of unjust enrichment is [the]

---

[10] The Court held that "[t]o the extent Plaintiffs allege that the fair market value of their services exceeds the minimum wage, the remedies sought by the CMWO claim and the unjust enrichment claim are different, and the unjust enrichment claim is not duplicative." Doc. 23 at 10. The Order does not unequivocally state that the Plaintiffs can seek fair market value of their VWP work. While GEO's view is that the unjust enrichment claim should be dismissed, the indefiniteness of the Order is another reason the Court should reconsider it.

difference between consideration paid and fair market value of employee's services." Doc. 23 at 10-11. By this citation, the Court appears to conclude or analogize the Plaintiffs' work to be a matter of an exchange of labor between the detainees, as employees of GEO, in which GEO unjustly deprived the Plaintiffs of what they were due.[11] This is error.

As this Court held with respect to Colorado wage law, detainees are not employees. Doc. 23 at 3. In performing work under the VWP, Plaintiffs could not have reasonably expected to obtain, and are not entitled to, fair market compensation for services provided to GEO. In Bayh, supra, patients of a mental hospital (who had the status of detainees) sued for back pay under a theory of unjust enrichment for work performed at the facility. The court reversed a judgment in favor of the plaintiffs, concluding that the plaintiffs did not present substantial evidence to show they expected to be paid, and that there was uncontroverted evidence showing hospital officials told many of the plaintiffs they would not be paid for their work. Because the patients labored without expecting payment, they could not recover in quasi-contract. 573 N.E.2d at 408-09.

Likewise here, even on the face of the pleadings, Plaintiffs have alleged no facts that establish that they had a reasonable basis to expect fair market value for their VWP work, or could have otherwise reasonably expected to be paid fair market value. In fact, the Complaint indicates just the opposite. See Compl. ¶ 28 ("All of Defendant's

---

[11] For example, in Bock, the court held that an employee could proceed against the defendant corporations on theory that corporations had been unjustly enriched by employee services, at reduced wages, as result of shareholder's fraudulent representation that employee would receive stock of corporations upon shareholder's death. 904 P.2d at 1385-87.

employees in the 'Detainee Voluntary Work Program were uniformly paid $1 per day of work . . ."). Therefore there is no basis for seeking unjust enrichment.

ICE's description of the VWP states that compensation is "at least" $1 per day, Doc. 11-1, Ex. A at 5, but that does not create a reasonable expectation of payment of fair market value for the work. Paid detainee labor has been authorized by Congress for more than six decades, since 1950. <u>See</u> 8 U.S.C. § 1555(d) (providing for "payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed"). Indicative of Congress's intent to limit such payments to aliens, and not create a labor market for their services, Congress has once appropriated "payment of allowances (at a rate not in excess of $1 per day) to aliens, while held in custody under immigration laws for work performed." <u>See</u> Department of Justice Appropriation Act, 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1027 (Oct. 18, 1978); Department of Justice Appropriation Act, 1978, Pub. L. No. 95-86, 91 Stat. 419, 426 (August 2, 1977). Congress has never raised that rate.

Congress's authorization of payment to detainees does not make them employees participating in an exchange of labor for compensation. In <u>Alvarado Guevara v. INS</u>, 902 F.2d 394, 397 (5th Cir. 1990), current and former alien detainees brought an action against ICE's predecessor, the Immigration and Naturalization Service ("INS"), an INS processing center, and government officials, challenging the $1 per day payment as a violation of the minimum wage provisions of the FLSA and as a

violation of the U.S. Constitution.[12]  The Fifth Circuit held that "[d]espite this apparent exchange of money for labor," the plaintiffs were not covered by the FLSA, because the congressional motive for enacting the FLSA was to protect the "standard of living" and "general well-being" of the worker in American industry.  Id. at 395. Because alien detainees are "**removed from American industry**," they are "not within the group that Congress sought to protect in enacting the FLSA."  Id. at 396 (emphasis added). Detainees, like prisoners, are removed from American industry because "they have been incarcerated and are under the direct supervision and control of a governmental entity."  Id.  The court further held that the Congressional authorization of the payment to detained aliens is "a valid exercise of the congressional power to regulate the conduct of aliens."  Id. at 396-97.

A subsequent legal opinion of the General Counsel of the INS reinforces that alien detainees do not participate in a labor market during their detention.  See INS Gen. Counsel, Applicability of Employer Sanctions to Alien Detainees Performing Work in INS Detention Facilities, Genco Op. No. 92-8, 1992 WL 1369347 (Feb. 26, 1992) (concluding that sanctions against employers for work by undocumented immigrants imposed by the Immigration and Nationality Act did not apply to alien detainees performing work in INS detention facilities).  The INS General Counsel concluded that "[a]lien detainees who perform work for the INS while in INS custody in a contract or Service detention facility are not considered 'employees' for purposes of employer

---

[12] Like the allegations in this case, it was "customary to announce to the detainees, over a public address system, that volunteer duties are available to those detainees who wish to participate," and pursuant to 8 U.S.C. § 1555(d), volunteers were compensated $1.00 per day for their participation.  902 F.2d at 395-96.

sanctions." Id. at 1. Detainees, like inmates, "may be required to participate in an institutional work program, and for that participation receive remuneration." Id. at 2. Although detainees perform duties under work programs, and receive a gratuity for doing so (e.g. $1 per day), no employer/employee relationship is ever formed. Id. "A detainee performs work for institution maintenance, not compensation." Id. The allowance of $1 per day for detainee work under 8 U.S.C. § 1555(d) "does not constitute an appointment of the detainee to the position of a federal employee." Id. (citation omitted).

This case does not involve the FLSA or the employer sanctions at issue in the INS legal opinion, but the reasoning of these authorities goes straight to the heart of the issue here. In participating in the VWP for a uniformly-paid $1 per day, Plaintiffs and other detainees were never employees selling their labor to GEO for fair market value, and could never have reasonably expected fair market value when providing their labor (and the Complaint makes no such allegation). Therefore GEO never unjustly received any benefit at the expense of the Plaintiffs or other detainees. See Bayh, 573 N.E.2d at 408-09; Britvar, 791 P.2d at 1184; Stanford, 849 P.2d at 923. Plaintiffs' conclusory allegations that GEO was unjustly enriched at the expense of the Plaintiffs are simply inadequate to plausibly state a claim for unjust enrichment. There was no market, period. It would be clear error and a manifest injustice to fictionalize such a labor market and require GEO to pay a "fair market value" for work that was never contemplated as such, and that was performed for $1 per day.

## III. THE GOVERNMENT CONTRACTOR DEFENSE APPLIES.

In light of the foregoing analysis of the unjust enrichment claim, the Court should also reconsider its ruling denying GEO's motion to dismiss on the basis of the government contract defense.

The Court concluded that there was no "significant conflict" between a federal interest and state law because the contract between ICE and GEO "only defines how [GEO] will be reimbursed for the Detainee Work Program and does not prohibit [GEO] from paying detainees in excess of $1/day in order to comply with Colorado labor laws." Doc. 23 at 13.  Cf. Boyle v. United Tech. Corp., 487 U.S. 500, 507-08 (1988). However, the Court correctly held that GEO is not required to comply with Colorado labor laws.

ICE's manual provides that compensation under the VWP is "at least $1.00 (USD) per day."  See Doc. 11-1, Ex. A at 5.  But there is no indication that Congress, or ICE, intends for pay to be determined on an ever-fluctuating market basis.  As noted, Congress has only once appropriated the funds authorized by 8 U.S.C. § 1555(d), and it appropriated $1 per day.  GEO's contract with ICE provides that the reimbursed rate shall not exceed $1 per day "without prior approval by the Contracting Officer," indicating a federal interest in limiting costs, and in retaining federal discretionary oversight of costs.  Doc. 11-2, Ex. C at 3.  The VWP requires that a "facility shall have an established system that ensures detainees receive the pay owed them before being transferred or released," indicating that the pay is a fixed and identifiable amount, not an amount open to a post-hoc "fair market value" determination, or identifiable only by abstract references to "retention of any benefit collected directly and indirectly from

Plaintiffs' and others' labor," or "benefits [GEO] has unjustly obtained."  Compl. ¶¶ 103, 105.

To the extent the Court's ruling allows Plaintiffs to seek the alleged "fair market value" of work performed under the VWP, the Court has created a significant conflict between the state law unjust enrichment claim and federal interest in limiting the amount of remuneration provided to detainees for work performed under the VWP.  The mutual obligations between GEO and ICE cannot be driven by the equitable remedies allegedly afforded under state law.  See United States v. City of Las Cruces, 289 F.3d 1170, 1186 (10th Cir. 2002) ("'The obligations to and rights of the United States under its contracts are governed exclusively by federal law.'") (quoting Boyle, 487 U.S. at 504).  Colorado unjust enrichment claims cannot vary the term of GEO's contract with ICE "without prior approval by the Contracting Officer." Doc. 11-2, Ex. C at 3.

Doing so would interpose terms in the Aurora facility contract between GEO and ICE (e.g., the per diem pay under the VWP), and could potentially have broader impacts on ICE's effort to operate detention facilities through private contractors.  See Boyle, 487 U.S. at 507 ("The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price.  Either way, the interests of the United States will be directly affected.").  The Court should reverse its ruling and hold that GEO is protected from liability by the government contractor defense.

**CONCLUSION**

For the foregoing reasons, the Court should reconsider the Order and grant GEO's Motion to Dismiss on all counts, and grant all other relief to which GEO is entitled.

Dated: August 4, 2015

Respectfully submitted,

/s/ Charles A. Deacon
Charles A. Deacon
Norton Rose Fulbright US LLP
300 Convent Street, Suite 2100
San Antonio, Texas 78205-3792
Tel +1 210 270 7133
Fax +1 210 270 7205
charlie.deacon@nortonrosefulbright.com

Mark Emery
Norton Rose Fulbright US LLP
799 9th Street, NW, Suite 1000
Washington, DC 20001-4501
Tel +1 202 662 0210
Fax +1 202 662 4643
mark.emery@nortonrosefulbright.com

/s/ Shelby A. Felton
Shelby A. Felton
David DeMuro
Vaughan & DeMuro
3900 E. Mexico Ave., Suite 620
Denver, CO  80210
Tel +1 (303) 837-9200
Fax +1 (303) 837-9400
sfelton@vaughandemuro.com

Counsel for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2015, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following attorneys for the Plaintiffs:

Brandt Milstein
brandt@milsteinlawoffice.com

Andrew Turner
aturner@laborlawdenver.com

Alexander Hood
alex@towardsjustice.org

Hans Meyer
hans@themeyerlawoffice.com

R. Andrew Free
Andrew@ImmigrantCivilRights.com

/s/ Charles A. Deacon
Charles A. Deacon
Norton Rose Fulbright US LLP
300 Convent Street, Suite 2100
San Antonio, Texas 78205-3792
Tel +1 210 270 7133
Fax +1 210 270 7205
charlie.deacon@nortonrosefulbright.com

Counsel for Defendant