## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 14-CV-02887-JLK

ALEJANDRO MENOCAL, *et al.*,

    Plaintiffs,

vs.

THE GEO GROUP, INC.,

    Defendant.

---

## MOTION FOR CLASS CERTIFICATION UNDER RULE 23(b)(3) AND APPOINTMENT OF CLASS COUNSEL UNDER RULE 23(g)

---

### Table of Contents

I.   Introduction ........................................................................................................... 3

II.  Statement of Facts ............................................................................................... 4

  A.  The Forced Labor Policy ................................................................................ 4

  B.  The VWP Policy .............................................................................................. 7

III.  Forced Labor .................................................................................................... 10

  A.  The Proposed Class ...................................................................................... 10

  B.  Plaintiffs Satisfy the Requirements of Rule 23(a) ................................... 10

    1.  Numerosity ............................................................................................... 10

    2.  Commonality ............................................................................................. 11

    3.  Typicality ................................................................................................... 12

    4.  Adequacy ................................................................................................... 13

C.   Common Questions of Law and Fact Predominate and a Class Action is the Superior Method of Resolving Plaintiffs' Forced Labor Claims ................................... 13

    1.   Predominance ................................................................................................ 14

    2.   Superiority ..................................................................................................... 19

IV.   The Voluntary Work Program ....................................................................................... 19

A.   The Proposed Class ............................................................................................. 19

B.   Plaintiffs Satisfy the Requirements of Rule 23(a) .................................................. 20

    1.   Numerosity ..................................................................................................... 20

    2.   Commonality ................................................................................................... 20

    3.   Typicality ....................................................................................................... 22

    4.   Adequacy ....................................................................................................... 22

C.   Common Questions of Law and Fact Predominate and a Class Action is the Superior Method of Resolving Plaintiffs' Forced Labor Claims ................................... 22

    1.   Predominance ................................................................................................ 23

    2.   Superiority ..................................................................................................... 24

V.   The Court Should Appoint Plaintiffs' Counsel as Class Counsel .............................. 24

## CERTIFICATE OF CONFERRAL PURSUANT TO D.C.COLO.LCIvR 7.1(A)

Defendant has indicated its opposition to this motion in conferrals throughout the class discovery process. A briefing schedule has been set, but Plaintiffs will work in good faith to resolve any issues, including extensions, that may arise. Prior to filing, Plaintiffs' counsel emailed Defendant's counsel regarding exhibits to this motion that were potentially mistakenly not marked as confidential by Defendant pursuant to the protective order. Out of an abundance of caution, Plaintiffs will file those exhibits as restricted and will work with Defendants to comply with D.C.COLO.LCIvR 7.2's restriction rules.

# I.    INTRODUCTION

Defendant Geo Group, Inc. (hereinafter "GEO") is a private, for-profit company that contracts with the federal government to provide detention and corrections services. This case is about GEO's operation of a private detention facility that houses civil immigration detainees in Aurora, Colorado pursuant to GEO's contract with U.S. Immigration and Customs Enforcement (hereinafter "ICE").[1] Plaintiffs allege that GEO maximizes its profits at that facility by exploiting conscripted, coerced, and underpaid detainee labor to clean, maintain, and operate the facility. By relying on these workers, GEO is able to maintain its *entire* facility—a facility that detains thousands of people every year—with only *one* non-detainee janitor on the payroll. The named Plaintiffs and the class they seek to represent were detained at the Aurora facility while awaiting immigration proceedings. They are GEO's captive workforce.

Plaintiffs' claims relate to two distinct work policies imposed on them by GEO. The first policy is the "Forced Labor Policy," whereby GEO requires Plaintiffs and members of the putative Forced Labor Class to perform uncompensated janitorial labor under threat of solitary confinement. Plaintiffs allege that this practice violates the federal

---

[1] This lawsuit pertains only to immigration detainees detained in GEO's Aurora Detention Facility. All references to "detainees" are limited to this relevant population. All discussion of uniform application of programs and policies is limited to immigration detainees at the Aurora facility.

forced labor statute. 18 U.S.C. § 1589.

The second policy is the Voluntary Work Program ("VWP") Policy. Pursuant to the VWP Policy, Plaintiffs and members of the putative VWP Class perform administrative and maintenance work at the Aurora facility for pay of $1.00 a day. GEO falsely represents to its detainees that it is prohibited from paying them more than $1.00 per day for their VWP work. Plaintiffs allege that GEO is unjustly enriched by the millions of dollars it would otherwise pay to outside contractors if it were not able to defraud and exploit its detainees for cheap labor under the VWP Policy.

## II.    STATEMENT OF FACTS

### A. **The Forced Labor Policy**

The Aurora facility contains approximately thirteen "units," each with a common space and approximately eighty beds. Pursuant to its Forced Labor Policy, GEO requires its detainees to perform comprehensive cleaning of this cell and common space. Pls.' Ex. 1, 30(b)(6) Deposition of The GEO Group, Inc. (Dawn Ceja) ("GEO Dep.") at 26:1-11, 29:13-16; 37:23-38:5. The vast majority of this uncompensated work, performed under threat of solitary confinement, falls outside of ICE's Performance Based National Detention Standards ("PBNDS"), which limits the scope of uncompensated detainee housekeeping. Pls.' Ex. 1, GEO Dep. at 90:10-20. The PBNDS provides that

> Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.  Detainees are re-quired to maintain their immediate living areas in a neat and

> orderly manner by:  1. making their bunk beds daily; 2. stack-
> ing loose papers; 3. keeping the floor free of debris and divid-
> ers free of clutter; and 4. refraining from hanging/draping
> clothing, pictures, keepsakes, or other objects from beds,
> overhead lighting fixtures or other furniture.

Dkt. No. 11-1 at pp. 3-4. For example, detainees are required to sweep and mop floors,

clean windows and divider walls, clean and scrub sinks, toilets and showers, empty and

wash trash receptacles, wipe down equipment surfaces, wipe down mattresses and

pillows, and clean up dining areas and common rooms after meals.  Pls.' Ex. 2, Policy &

Procedure Manual; Pls.' Ex. 1, GEO Dep. at 36:24-37:13; 43:9-45:25; 86:11-21. In short,

GEO has interpreted the PBNDS to give it carte blanche to assign detainees to perform

almost any janitorial work it requires in the detention pods. *See, e.g.*, Pls.' Ex. 1, GEO

Dep. at 134:2-140:25.

All of this work is unpaid, even though it stretches far beyond the mere "personal

housekeeping" that ICE requires detainees to perform. Pls.' Ex. 1, GEO Dep. at 84:19-22.

And, because of the Forced Labor Policy, GEO is able to avoid paying outside custodians

and janitors to clean housing units. For all of these thousand beds and their common

spaces, GEO employs ***one*** outside custodian, who must be paid the $12 per hour wage set

for that position by the Department of Labor. Pls.' Ex. 1, GEO Dep. at 103:1-21 (citing

Pls.' Ex. 3, DOL Wage Determination for the Aurora Detention Facility).

The Forced Labor Policy's cleaning requirements are set forth in GEO's Policy

and Procedure Manual and Housekeeping/Maintenance Plan, provided to all GEO staff,

who in turn implement these policies throughout the facility.  Pls.' Ex. 1, GEO Dep. at

41:5-43:16; Pls.' Ex. 2, Policy & Procedure Manual. Through the implementation of

staff, the Forced Labor Policy applies to all detainees, Pls.' Ex. 1, GEO Dep. at 29:13-16,

which means that approximately 50,000-60,000 detainees have been subject to this policy

during the past ten years. Pls.' Ex. 1, GEO Dep. at 49:8-50:6.[2]

The Forced Labor Policy and the severe consequences of defying it are also set out

clearly for detainees to read and understand. GEO authors and issues to all detainees a

Detainee Handbook Local Supplement that informs detainees that failure to perform

housing unit sanitation work is a 300-level "High Moderate" disciplinary offense, which

could subject detainees to up to 72 hours in disciplinary segregation (also known as

solitary confinement) or even to criminal prosecution. Pls.' Ex. 1, GEO Dep. at 51:21-

52:25; 79:8-80:25; 84:19-85:15; 88:7-90:3; Pls.' Ex. 4 at PL000054. Detainees charged

with 300-level offenses are placed in GEO's administrative segregation housing unit.

Pls.' Ex. 1, GEO Dep. at 57:15-58:5. Administrative segregation cells are adjacent to

disciplinary segregation cells. Detainees in administrative segregation are confined to

their locked, single-occupant cell for twenty hours per day. Pls.' Ex. 1, GEO Dep. at

77:21-80:25. After their charges are processed and solitary confinement imposed,

_____

[2] Plaintiffs seek to represent a class of "All detainees who were forced to perform uncompen-
sated work for GEO at the Aurora Detention Facility under GEO's Housing Unit Sanitation pol-
icy between October 22, 2004 and the present." Dkt. No. 1 at ¶55.

6

detainees are sent to disciplinary segregation where they are confined, alone, to their cells for 22 hours per day and are deprived of all social time. Pls.' Ex. 1, GEO Dep. at 54:13-55:6; 117:2-20.

Plaintiffs were uniformly aware of GEO's requirement that they perform uncompensated cleaning and maintenance work and that the consequence of a refusal to perform this labor was solitary confinement.  Pls.' Ex. 5, Decl. of Alejandro Menocal Lepe at ¶3; Pls.' Ex. 6, Decl. of Grisel Xahuentitla-Flores at ¶3; Pls.' Ex. 7, Decl. of Lourdes Argueta at ¶3; Pls.' Ex. 8, Decl. of Jesus Gaytan at ¶3; Pls.' Ex. 9, Decl. of Demitrio Valerga at ¶3. So too were absent members of the Forced Labor Class. Pls.' Ex. 10, Decl. of Carlos Eliezer Ortiz Muñoz at ¶3; Pls.' Ex. 11, Decl. of Alejandro Hernandez Torres at ¶3; Pls.' Ex. 12, Decl. Of Adriana Mendoza Castellanos at ¶3.

**B.  The VWP Policy**

The VWP Policy operates alongside the Forced Labor Policy to minimize GEO's costs. GEO utilized the labor of Plaintiffs and other VWP participants to clean, operate, and maintain the facility, compensating all participants at the rate of $1.00 per day.[3] VWP participants worked in food service, cleaning, maintenance, laundry, facility

_____

[3] Plaintiffs' unjust enrichment count pertains only to "civil immigration detainees who performed work for GEO the Aurora Detention Facility in the "Detainee Voluntary Work Program" between October 22, 2012 and the present."  Dkt. No. 1 at ¶87.  All references to program participants are limited to this relevant population.  All discussion of uniform application of programs and policies is limited to those program participants at the Aurora facility.

operations, the detainee law library, and the barber shop. Pls.' Ex. 13, Policy & Procedure

Manual 8.1.8-AUR. GEO testified that at least several hundred people participated in its

Aurora Detention Facility VWP within the past three years.  Pls.' Ex. 14, GEO Dep.

(Furst) at 13:1-12. While as many as 80 jobs at a time were filled through the VWP, high

turnover rates precluded GEO from testifying to cumulative numbers of individuals in the

program. *Id.* Indeed, GEO's invoice records demonstrate that in November of 2012 alone

780 distinct individuals worked in the VWP program. Pls.' Ex. 15, Man-Days Billing

Report: 11/1/2012-11/30/2012.

 The practices and procedures associated with the VWP Policy were largely

uniform across the class. All participants filled out common Detainee Work Detail

Application forms. Pls.' Ex. 1, GEO Dep. 153:13-18; 184:1-184:12. All participants

received uniform job descriptions, common to all participants in their job class. *Id.*  All

VWP participants executed a standardized Detainee Voluntary Work Program

Agreement. [4] *Id*; Pls.' Ex. 14, GEO Dep. (Furst) at 46:16-47:4. And all participants

received uniform Work Detail Orientation forms listing work rules and compensation. *Id.*

 Additionally, all detainees were uniformly subjected to the policies and practices

that make GEOs' retention of the value of their work unjust. Detainees are locked in a

---

[4] GEO contends that it does not have an agreement or contract with VWP participants. Pls.' Ex.
1, GEO Dep. at 149:25-150:11.

secure facility at GEO's mercy. They are deprived of clothing and possessions, limited in their contact with family, and are subject to rules that punish offenses like "insolence toward a staff member," Pls.' Ex. 4 at PL000054, "using abusive language," Pls.' Ex. 4 at PL0000055, and "[c]onduct that disrupts or interferes with the security or orderly operation of the facility." *Id.* They cannot seek any paying jobs except for jobs available through the $1.00-a-day VWP Policy. And yet, GEO misled VWP participants regarding the possibility that they could negotiate for higher wages. It informed the detainees, that "[t]he pricing is approved by ICE. GEO does not set the pricing. ICE tells us what the daily pay is for [VWP participants]." Pls.' Ex. 1, GEO Dep. 39:7-40:10; Pls.' Ex. 16. These representations were false. In reality, the PBNDS ICE publishes sets a floor, rather than a ceiling, and requires only that "[t]he compensation is ***at least*** $1.00 (USD) per day." Dkt. No. 11-1 PBNDS 5.8 at 385 (emphasis added).[5]

Furthermore, GEO derives significant economic benefit from the labor it obtains from VWP participants. GEO employs just one non-detainee custodian to clean its 525 bed facility. Pls.' Ex. 1, GEO Dep. 38:14-19; 101:6-103:21. The rest of GEO's cleaning labor comes from the VWP at $1.00 per day. VWP participants also perform the same work as maintenance workers employed by GEO. Pls.' Ex. 1, GEO Dep. 46:14-47:3.

---

[5] GEO's contract with ICE similarly sets reimbursement to GEO at a minimum of $1.00 per day, but allows the Contract Officer to approve a higher rate. Dkt. No. 11-2 at 7.

GEO concedes that it would have to hire additional corrections officers—paid at the rate of $24.05 per hour—to perform the work of VWP participants if the VWP policy did not exist. Pls.' Ex. 1, GEO Dep. 170:20-171:25; Pls.' Ex. 14, GEO Dep. (Furst) at 49:9-49:23. At the very least, absent the VWP, GEO would have no choice but to hire new workers and to pay them consistent with the hourly wages corresponding to their jobs in the Department of Labor's wage determination for the facility. Pls.' Ex. 3, DOL Wage Determination. GEO has saved millions of dollars during the class period by relying on VWP labor. *See* Pls.' Ex. 13, Policy & Procedure Manual 8.1.8-AUR; Pls' Ex. 15, Man-Days Billing Report.

## III.    FORCED LABOR

### A.  **The Proposed Class**

> ALL PERSONS DETAINED IN DEFENDANT'S AURORA DETENTION FACILITY IN THE TEN YEARS PRIOR TO THE FILING OF THIS ACTION

### B.   **Plaintiffs Satisfy the Requirements of Rule 23(a)**

#### 1.  **Numerosity**

The proposed class is so "numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Forced Labor Class contains approximately 50,000 to 60,000 members and therefore presumptively meets the numerosity requirement of Rule 23. Alba Conte, Herbert B. Newberg, & William B. Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. 2011) (suggesting that a class of 40 or more members should

presumptively satisfy numerosity).

## 2. **Commonality**

The proposed class also meets the commonality requirement of Rule 23(a)(3).

Federal law provides a private cause of action against anyone who "knowingly . . .

obtains the labor or services of a person"

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint

18 U.S.C. § 1589(a).

The resolution of Plaintiffs' claims alleging that GEO violated that provision will

turn on questions that are common to the putative class, including (1) whether GEO

obtains the labor of class members; (2) whether GEO threatens class members with

physical restraint, serious harm, or abuse of the legal process; and (3) whether GEO

"knowingly" obtains class members' labor "by . . . means of" these threats.

Evidence in the record establishes that these common questions have "common

answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564

U.S. 338, 350 (2011). This case is about a written Forced Labor Policy set out clearly for

the employees responsible for enforcing it and the detainees responsible for abiding by it.

That policy provides that class members must perform housing unit sanitation work or be

subject to an administrative legal process that could result in up to 72 hours in solitary

confinement. Plaintiffs allege that tens of thousands of class members provided labor to

GEO pursuant to that policy. At trial, the Forced Labor Class will ask the factfinder to

conclude that the uniformly applicable Forced Labor Policy violates the forced labor

statute. In other words, that policy is the common "glue" that allows the Forced Labor

Class's claims to be resolved "in one stroke." *In re Urethane Antitrust Litig.*, 768 F.3d

1245, 1253 (10th Cir. 2014) (internal quotation marks omitted).

3. **Typicality**

Plaintiffs' claims are also "typical of the claims . . . of the class." Fed. R. Civ.

Proc. 23(a)(3). Plaintiffs all performed work for GEO pursuant to the Forced Labor

Policy. Pls.' Ex. 5, Decl. of Alejandro Menocal Lepe at ¶3; Pls.' Ex. 6, Decl. of Grisel

Xahuentitla-Flores at ¶3; Pls.' Ex. 7, Decl. of Lourdes Argueta at ¶3; Pls.' Ex. 8, Decl. of

Jesus Gaytan at ¶3; Pls.' Ex. 9, Decl. of Demitrio Valerga at ¶3. And the Forced Labor

Policy and the threat of solitary confinement form the basis of Plaintiffs' forced labor

claims, just as they form the basis for the putative class claims. *See Bass v. PJCOMN*

*Acquisition Corp.*, No. 09-CV-01614-REB-MEH, 2011 WL 2149602, at *3 (D. Colo.

June 1, 2011) ("A plaintiff's claim is typical of class claims if it challenges the same

conduct that would be challenged by the class.").

4. **Adequacy**

Plaintiffs and Plaintiffs' counsel can "fairly and adequately protect the interest of the class." Fed. R. Civ. Proc. 23(a)(4). There is no apparent conflict of interest between the potential class members and either the named Plaintiffs or named Plaintiffs' counsel. The named Plaintiffs can only recover if they succeed on legal theories that would also lead to recovery for the class. Moreover, the named Plaintiffs' attorneys' incentives are aligned with the class; their contingent fee agreement with the named Plaintiffs only allows the attorneys to be compensated if they successfully prosecute the suit. Pls.' Ex. 17; *see Rutter & Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180, 1187-1188 (10th Cir. 2002).

Furthermore, Plaintiffs' counsel are uniquely qualified to prosecute this action. *United Food & Commer. Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 654 (W.D. Okla. 2012) (internal citations omitted) (adequacy of class counsel "implicates "the experience and competence of the attorney[s] representing the class."). They have substantial experience litigating cases against private civil detention facilities, Pls.' Ex. 17, Free & Meyer Decls., and representing low-wage immigrant workers in class and collective actions, Pls.' Ex. 17. Additionally, counsel and their bilingual staff members can communicate with the Spanish-speaking members of the class. *Id.*

## C. Common Questions of Law and Fact Predominate and a Class Action is the Superior Method of Resolving Plaintiffs' Forced Labor Claims

This class should be certified under Rule 23(b)(3) because "questions of law or

fact common to the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### 1. **Predominance**

For common questions of law or fact to predominate under Rule 23(b)(3), "[i]t is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that answers to those common questions" be dispositive of the plaintiff's claims. *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). Rather, "the predominance prong asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (internal quotation marks omitted).

In addressing predominance, the Court should remain mindful of the continued role it can play, after certifying a class, in ensuring that Plaintiffs' claims are most efficiently prosecuted in a class action. *See, e.g.*, *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347 (6th Cir. 2011) (affirming decertification of class where discovery revealed that individual issues would predominate). For this reason, "the interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action." *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968).

With respect to Plaintiffs' forced labor claims, the common questions at issue

include, among others, (1) whether GEO obtain labor from class members; (2) whether GEO threatens class members with physical restraint, serious harm, or abuse of the legal process; and (3) whether GEO "knowingly" obtains that labor "by . . . means of" these threats. These questions easily predominate over any individual questions of law or fact.

Plaintiffs' forced labor claims turn on whether GEO "knowingly" obtained Plaintiffs' labor "by . . . means of" the threat of solitary confinement. For two reasons, however, that question does not call for a predominance-defeating, individualized inquiry into the minds of each class member. First, the language and structure of the forced labor statute in fact call for an objective inquiry that turns on whether a reasonable person would provide labor to the GEO if placed in the position of the person providing such labor. *See, e.g.*, *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, No. LA CV10-01172 JAK, 2011 WL 7095434, at *7 (C.D. Cal. Dec. 12, 2011) (concluding that forced labor statute calls for an objective inquiry and it is susceptible to class-wide adjudication). That purpose is evident in the fact that the statute focuses on the GEO's scienter, not the plaintiff's state of mind. Under Section 1589, "someone is guilty of forced labor if he intends to cause a person in his employ to believe that if she does not continue to work, she will suffer the type of serious harm . . . that would compel someone in her circumstances to continue working to avoid that harm." *United States v. Dann*, 652 F.3d

1160, 1169-70 (9th Cir. 2011).[6]

In other words, a person violates the forced labor statute if he obtains labor through threats that he intends or knows would cause a certain state of mind in a reasonable person in the position of the laborer. Applied to the facts of this case, that standard would require asking a factfinder whether GEO implemented the Forced Labor Policy to obtain labor from detainees, knowing or intending that a reasonable person in the detainees' position would feel compelled to provide that labor. That question would be answered based on a consideration of the uniformly applicable Forced Labor Policy and the factfinder's analysis of how a reasonable person would respond to that policy.

Second, even if the Court were to conclude that to establish liability, Plaintiffs must show that class members provided labor *because of* GEO's threats, the common questions and proof upon which Plaintiffs' forced labor claims will turn would overwhelm any individual issues. Even under a subjective standards, some forced labor cases are clearly susceptible to classwide adjudication: "[B]ased on the type of coercion

---

[6] Indeed, the definition of "serious harm" under the statute makes specific reference to a "reasonable person" standard.  Serious harm

> means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel *a reasonable person of the same background and in the same circumstances* to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c) (emphasis added).

used, there may be cases where consent becomes irrelevant. In other words, some 'choices' might be so illegitimate that any decision to work is 'involuntary.'" *David v. Signal Int'l*, LLC, No. CIV.A. 08-1220, 2012 WL 10759668 at *21 (E.D. La. Jan. 4, 2012).

This case falls in that category. The facts here precisely illustrate the limits of consent-based defenses to forced labor claims. In the modern era, "the typical techniques . . . used to hold persons in slavelike conditions are not limited to physical or legal means." *United States v. Kozminski*, 487 U.S. 931, 956 (1988) (Brennan, J. concurring). Therefore, in many modern cases, factfinders must engage in a fact-based inquiry to examine the extent and nature of the GEO's coercive conduct. *Id.* However, the ***legal compulsion*** to work remains an obvious and clear-cut example of forced labor. As Justice Brennan observed, "the use of the master's whip and the power of the State to compel one human to labor for another were clearly core elements of slavery that the Thirteenth Amendment and its statutory progeny intended to eliminate." *Id.* at 954. Under these classic "slavelike conditions," "[c]onsent becomes irrelevant." *David*, 2012 WL 10759668, at *21. Similarly, here, it makes little sense to require class members to make individual showings of coercion when GEO ***requires*** class members to provide it with free labor.

The Court need not, however, decide that subjective consent is irrelevant in order to determine that Plaintiffs have established predominance. It is enough to conclude, at

this stage, that the evidence supports an inference that class members did not voluntarily consent to the Forced Labor Policy. *See CGC Holding*, 773 F.3d 1073 (10th Cir. 2014). *Id.* at 1091. When the facts giving rise to that inference apply across an entire putative class, class certification is proper. *Id.* at 1093; *see also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (affirming class certification of RICO claims, holding that "payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed"); *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) (civil RICO on behalf of a putative class of all doctors who submitted at least one claim to any of the GEO HMOs during a twelve-year period).

In this case, evidence that all class members were informed that they would be subject to the possibility of solitary confinement if they declined to labor for GEO gives rise, at the very least, to an inference that class members provided labor to GEO ***because of*** the possibility of solitary confinement. The choice between solitary confinement and work is no choice at all. Just as an individual plaintiff asserting a "forced labor" claim could rely on this fact to demonstrate causation, "[f]or the purposes of class certification, [there is] no reason why a putative class containing plaintiffs" who were all subject to the same policy "should not be entitled to posit the same inference to a factfinder on a classwide basis." *CGC Holding*, 773 F.3d at 1092.

## 2. **Superiority**

A class action is also the superior method of resolving this controversy. To the knowledge of Plaintiffs' counsel, no other potential class member has filed any claim in any court or administrative proceeding based on the Forced Labor Policy. Thus, no other potential class member has demonstrated an interest in controlling this litigation. *See* Fed. R. Civ. P. 23(b)(3)(A)-(B).

Furthermore, the class action vehicle is the superior method for adjudicating this controversy because it involves current and former immigrant detainees, most of whom lack English proficiency, and many of whom have limited financial resources. Many class members likely reside in different countries. It is extraordinarily unlikely that they would assert these claims individually. *Cook v. Rockwell International Corp.*, 181 F.R.D. 473, 482 (D. Colo. 1998).

Finally, the District of Colorado is ideal for the concentration of this litigation because it is home to GEO's Aurora facility.

## IV.    THE VOLUNTARY WORK PROGRAM

### A.  <u>The Proposed Class</u>

> ALL PEOPLE WHO PERFORMED WORK DEFEND-
> ANT'S AURORA DETENTION FACILITY UNDER DE-
> FENDANT'S VWP POLICY IN THE THREE YEARS
> PRIOR TO THE FILING OF THIS ACTION

## B.  Plaintiffs Satisfy the Requirements of Rule 23(a)

### 1. Numerosity

Several hundred people participated in the Voluntary Work Program over the past three years, and therefore the VWP Class presumptively meets the numerosity requirement of Rule 23. Alba Conte, Herbert B. Newberg, & William B. Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. 2011) (suggesting that a class of 40 or more members should presumptively satisfy numerosity).

### 2. Commonality

The proposed class also meets the commonality requirement of Rule 23(a)(3). Pursuant to Colorado law, a plaintiff may recover in equity based on the GEO's unjust enrichment if: "(1) at plaintiff's expense; (2) GEO received a benefit; (3) under circumstances that would make it unjust for GEO to retain the benefit without paying." *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 445 (Colo. 2000).

In this case, the VWP Class raises the common, classwide questions of (1) whether the class provided GEO with a benefit in the form of substantially discounted labor, and (2) whether, under the circumstances of this case, it would be unjust for GEO to retain that benefit.  Those common questions will be subject to common answers that, like Plaintiffs' forced labor claims, will be apt to drive the classwide resolution of the litigation. *Dukes*, 564 U.S. at 350.

As to the first question, there should be no dispute that the VWP Policy has itself

provided GEO with enormous amounts of cheap labor that has saved it millions of dollars over the past three years.

The second question is equally susceptible to classwide adjudication based on the facts of this case. "Whether injustice results often will turn on whether a party engaged in some type of wrongdoing" determined through "a highly fact-intensive inquiry." *Dudding*, 11 P.3d at 445. Colorado courts have explained that this prong of the unjust enrichment test often presents a "difficult question[] for trial courts." *Redd Iron, Inc. v. Int'l Sales & Servs. Corp.*, 200 P.3d 1133, 1136 (Colo. App. 2008). However, the fact-intensive nature of the analysis does not preclude the availability of common proof to establish unjust enrichment across an entire class.

In this case, Plaintiffs' unjust enrichment theory rests on two features of the VWP Policy that apply classwide: first, that GEO misrepresents to Plaintiffs—who are a captive workforce with limited freedom and without any other paying work opportunities—that ICE sets VWP payment at exactly $1 a day, and second, that GEO relies on this necessarily captive workforce for $1-a-day labor, when it would otherwise turn to an open market that would supply similar labor at substantially higher costs. *See, e.g.*, *DCB Constr. Co. v. Central City Dev. Co.*, 965 P.2d 115, 122 (Colo.1998) (providing examples of the types of malfeasance that support a finding of unjust enrichment). At this stage, the Court need not determine whether these facts support a finding of unjust enrichment. It is enough for now to conclude that many of the facts

supporting Plaintiffs' unjust enrichment claims apply across the entire VWP Class.

3. **Typicality**

Plaintiffs' claims are also "typical of the claims . . . of the class." Fed. R. Civ.

Proc. 23(a)(3). Plaintiffs all performed work for GEO under the VWP Policy. Pls.' Ex. 5,

Decl. of Alejandro Menocal Lepe at ¶3; Pls.' Ex. 6, Decl. of Grisel Xahuentitla-Flores at

¶3; Pls.' Ex. 7, Decl. of Lourdes Argueta at ¶3; Pls.' Ex. 8, Decl. of Jesus Gaytan at ¶3;

Pls.' Ex. 9, Decl. of Demitrio Valerga at ¶3. They claim here that GEO misled them

about whether they could ever be paid more than $1 a day. Additionally, they claim that

through the VWP Policy, GEO was able to save considerable amounts of money that it

would otherwise have to spend on labor through outside employees or contractors. Those

claims are typical of the class. *See Bass v. PJCOMN Acquisition Corp.*, No. 09-CV-

01614-REB-MEH, 2011 WL 2149602, at *3 (D. Colo. June 1, 2011) ("A plaintiff's claim

is typical of class claims if it challenges the same conduct that would be challenged by

the class.").

4. **Adequacy**

For the same reasons that Plaintiffs and their counsel meet the adequacy

requirement for the Forced Labor Class, they meet that requirement for the VWP class.

**C. <u>Common Questions of Law and Fact Predominate and a Class Action is the
Superior Method of Resolving Plaintiffs' Forced Labor Claims</u>**

This class should be certified under Rule 23(b)(3) because "questions of law or

fact common to the class predominate over any questions affecting only individual

members, and . . . a class action is superior to other available methods for fairly and
efficiently adjudicating the controversy."

1. **Predominance**

Because of the nature of the VWP Class's claims, common issues easily
predominate over any individual questions. As explained above, the question posed by
Plaintiffs' unjust enrichment claims is not whether any particular individual unjustly
enriched GEO because of the quality of his work or the nature of GEO's
misrepresentations to him. Rather, Plaintiffs unjust enrichment claims call for a classwide
adjudication of the "intentions, expectations, and behavior of the parties" related to the
entire VWP Policy. *Hannon Law Firm, LLC v. Melat, Pressman & Higbie, LLP*, 293
P.3d 55, 59 (Colo. App. 2011).

Plaintiffs' acknowledge that individual questions may arise with respect to
damages arising from GEO's unjust enrichment. After all, not all VWP participants
worked the same number of hours or performed the same work. The possibility of
individualized damages awards, however, does not defeat predominance, particularly
where liability can be determined on a classwide basis. *In re Urethane Antitrust Litig.*,
768 F.3d 1245, 1255 (10th Cir. 2014); *see also Roach v. T.L. Cannon Corp.,* 778 F.3d
401, 409 (2d Cir. 2015) ("[I]ndividualized damages determinations alone cannot preclude
certification under Rule 23(b)(3)").

In this case, the Court could later decide to bifurcate damages determinations for

the VWP Class. Plaintiffs' contend, however, that even this minimal level of individualization is unnecessary here. Through the use of a formula and statistical sampling that consider variables like the number of hours worked, the type of work performed, and the fair market value of such work, the factfinder could determine unjust enrichment damages without individualized hearings. This evidence would be available to an individual plaintiff alleging unjust enrichment damages and it "cannot be deemed improper merely because the claim is brought on behalf of a class." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016).

2. **Superiority**

For largely the same reasons that Plaintiffs meet the superiority requirement for the Forced Labor Class, they meet that requirement for the VWP class as well.

## V.    THE COURT SHOULD APPOINT PLAINTIFFS' COUNSEL AS CLASS COUNSEL

Should the Court grant Plaintiffs' motion, it must appoint class counsel. Fed. R. Civ. P. 23(g). Plaintiffs' counsel request appointment as class counsel.

Collectively they have invested significant time in identifying and investigating potential claims in this action. The team of attorneys representing Plaintiffs has significant class action experience and many have served as class counsel. Moreover, the varied litigation experience of the team will be beneficial to the classes' pursuit of the claims here. Further, a large portion of the persons composing the classes will be immigrant Spanish speakers. Plaintiffs' counsel are largely bilingual and have significant

experience with this client base. Finally, Plaintiffs' counsel are committed to advancing

the costs of this litigation. *See* Pls.' Ex. 17.

WHEREFORE, the Plaintiffs request that:

1. The Court certify the classes;

2. The named Plaintiffs be named class representative of any classes certified by

   the Court; and

3. That Attorneys Brand Milstein, Andrew Turner, Andrew Free, Alexander

   Hood, David Seligman, Andrew Schmidt, and Hans Meyer be appointed class

   counsel.

Dated: 5/6/2016                          Respectfully Submitted,

                                         *S/ Alexander Hood*
                                         Alexander Hood
                                         David Seligman
                                         Andrew Schmidt
                                         Towards Justice
                                         1535 High St., Suite 300
                                         Denver, CO 80218
                                         (720) 441-2236
                                         alex@towardsjustice.org
                                         david@towardsjustice.org
                                         andy@towardsjustice.org

                                         *S/ Brandt Milstein*
                                         Milstein Law Office
                                         595 Canyon Boulevard
                                         Boulder, CO 80302
                                         (303) 440-8780
                                         brandt@milsteinlawoffice.com

*S/ Andrew Turner*
Beuscher, Kelman, Perera, & Turner, P.C.
600 Grant St., Suite 450
Denver, CO 80203
(303) 333-7751
aturner@laborlawdenver.com

*S/ R. Andrew Free*
1212 7th Avenue North
Nashville, Tennessee 37208
(844) 321-3221
(615) 829-8959
Andrew@ImmigrantCivilRights.com

*S/ Hans Meyer*
Meyer Law Office, P.C.
P.O. Box 40394
Denver, CO 80204
(303) 831-0817
hans@themeyerlawoffice.com

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that on 5/6/2016, the above was filed using this Court's CM/ECF system, which caused all counsel of record to be served electronically pursuant to FRCP 5.


s/ Alexander Hood
Alexander Hood
Attorney for the Plaintiffs