# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 14-CV-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
on their own behalf and on behalf of all others similarly situated,

      Plaintiffs,

vs.

THE GEO GROUP, INC.,

      Defendant.

## DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

I. GEO Lawfully Administers And Supervises Detainee Housekeeping And The Voluntary Work Program Pursuant To Its Contract With ICE ........................ 3

   A. The Requirement That Detainees Perform Housekeeping Chores Is Lawful ...................................................................................................... 3

   B. The $1.00 Per Day Allowance Under The Federally-Authorized VWP Is Lawful ............................................................................................. 7

   C. The Plaintiff Detainees' Claims ................................................................. 13

ARGUMENT ......................................................................................................... 14

I. Plaintiffs' Proposed Classes Do Not Satisfy Rule 23(a) ....................... 16

   A. Numerosity ....................................................................................... 17

   B. Commonality ..................................................................................... 19

     1. TVPA Class ................................................................................. 19

     2. Unjust Enrichment Class ............................................................. 23

   C. Typicality .......................................................................................... 27

II. Plaintiffs' Proposed Classes Do Not Satisfy Rule 23(b)(3) ................. 30

   A. Predominance .................................................................................... 32

     1. TVPA Class ................................................................................. 32

     2. Unjust Enrichment Class ............................................................. 40

   B. Superiority ......................................................................................... 45

CONCLUSION ...................................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alcohol Monitoring Sys. Inc. v. Actsoft, Inc.*,
    682 F. Supp. 2d 1237 (D. Colo. 2010) ........................................................ 18

*Alvarado Guevara v. INS*,
    902 F.2d 394 (5th Cir. 1990) ................................................... 11, 12, 25, 27

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................... 31

*Bayh v. Sonnenburg*,
    573 N.E.2d 398 (Ind. 1991) ...................................................................... 7

*Bijeol v. Nelson*,
    579 F.2d 423 (7th Cir. 1978) ................................................................ 6, 7

*Bock v. Am. Growth Fund Sponsors, Inc.*,
    904 P.2d 1381 (Colo. App. 1995) ............................................................ 25

*Britvar v. Schainuck*,
    791 P.2d 1183 (Colo. App. 1989) .............................................................. 2

*CGC Holdings Co., LLC v. Broad & Cassel*,
    773 F.3d 1076 (10th Cir. 2014) ......................................................*passim*

*Channer v. Hall*,
    112 F.3d 214 (5th Cir. 1997) ................................................................ 6, 7

*Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*,
    765 F.3d 1205 (10th Cir. 2014) ................................................... 17, 18, 28

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) .................................................... 15, 29, 31, 43, 44

*David v. Signal Int'l, LLC*,
    No. 08-cv-1220, 2012 WL 10759668 (E.D. La. Jan. 4, 2012) ........................ 33, 36, 37

*DCB Constr. Co., Inc. v. Cent. City Devel. Co.*,
    965 P.2d 115 (Colo. 1998) ................................................................. 23, 44

*Ellis v. Spectranetics Corp.*,
    No. 15-cv-01857, 2015 WL 9259928 (D. Colo. Dec. 18, 2015) .................................. 28

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ..................................................................................................... 32

*Esplin v. Hirschi*,
    402 F.2d 94 (10th Cir. 1968) ....................................................................................... 31

*Ford v. Nassau Cnty. Exec.*,
    41 F. Supp. 2d 392 (E.D.N.Y. 1999) ............................................................................. 7

*Friedman v. Dollar Thrifty Automotive Grp., Inc.*,
    304 F.R.D. 601 (D. Colo. 2015) .............................................................. 15, 31, 40, 42

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ..................................................................................................... 18

*Guevara v. INS*,
    No. 90-1476, 1992 WL 1029 (Fed. Cir. Jan. 6, 1992) ........................................... 11, 12

*Hannon Law Firm, LLC v. Melat, Pressman & Higbie, LLP*,
    293 P.3d 55 (Colo. App. 2011) ................................................................................... 41

*Hause v. Vaught*,
    993 F.2d 1079 (4th Cir. 1993) ................................................................................... 6, 7

*Headley v. Church of Scientology Int'l*,
    687 F.3d 1173 (9th Cir. 2012) ..................................................................................... 33

*Jackson v. Siringas*,
    No. 12-15474, 2013 WL 3810301 (E.D. Mich. July 23, 2013) .................................. 6, 7

*Jobson v. Henne*,
    355 F.2d 129 (2d Cir. 1966) .......................................................................................... 6

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ................................................................................... 38

*Lewis v. Lewis*,
    189 P.3d 1134 (Colo. 2008) ........................................................................... 23, 40, 44

*Loving v. Kelly*,
    No. 11-355, 2011 WL 4344109 (M.D. La. July 27, 2011) ............................................ 7

*Magoon v. Tex. Dep't of Criminal Justice*,
  Nos. 99-40897 & 99-41060, 2001 WL 43533 (5th Cir. Jan. 5, 2001) ........................... 7

*Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*,
  287 P.3d 842 (Colo. 2012) ....................................................................... 23, 40, 42, 44

*In re Mots. to Certify Classes Against Court Reporting Firms*,
  715 F. Supp. 2d 1265 (S.D. Fla. 2010) *aff'd* 439 F. App'x 849 (11th Cir.
  2011) ........................................................................................................................... 40

*Panwar v. Access Therapies, Inc.*,
  No. 1:12-cv-00619, 2015 WL 329013 (S.D. Ind. Jan. 22, 2015) ............................... 37

*Pliego v. Los Arcos Mexican Restaurants, Inc.*,
  313 F.R.D. 117 (D. Colo. 2016) ........................................................................... 28, 30

*Rex v. Owens ex rel. State of Okla.*,
  585 F.2d 432 (10th Cir. 1978) ................................................................................... 17

*Schwartz v. Celestial Seasonings, Inc.*,
  178 F.R.D. 545 (D. Colo. 1998) ................................................................................. 28

*Seabron v. Am. Family Mut. Ins. Co.*,
  No. 11-cv-01096, 2013 WL 3713652 (D. Colo. July 16, 2013) ................................. 44

*Shook v. El Paso Cnty.*,
  386 F.3d 963 (10th Cir. 2004) ................................................................................... 30

*Stanford v. Ronald H. Mayer Real Estate*,
  849 P.2d 921 (Colo. App. 1993) ................................................................................. 2

*Stender v. Archstone-Smith Operating Trust*,
  No. 07-cv-02503, 2015 WL 5675304 (D. Colo. Sept. 28, 2015) ................... 15, 43, 44

*Tabor v. Hilti, Inc.*,
  703 F.3d 1206 (10th Cir. 2013) ............................................................. 16, 17, 19, 22

*Tanedo v. E. Baton Rouge Parish Sch. Bd.*,
  No. 10-cv-01172, 2011 WL 7095434 (C.D. Cal. Dec. 12, 2011) ............................... 35

*Tourscher v. McCullough*,
  184 F.3d 236 (3d Cir. 1999) ...................................................................................... 27

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) ...................................................................................... 38

*United States v. Callahan,*
    801 F.3d 606 (6th Cir. 2015) .................................................................. 38

*United States v. Dann,*
    652 F.3d 1160 (9th Cir. 2011) ................................................................. 35

*United States v. Harrell,*
    642 F.3d 907 (10th Cir. 2011) ................................................................ 18

*United States v. Kaufman,*
    546 F.3d 1242 (10th Cir. 2008) .............................................................. 38

*United States v. Rivera,*
    799 F.3d 180 (2d Cir. 2015).................................................................... 37

*In re Urethane Antitrust Litig.,*
    768 F.3d 1245 (10th Cir. 2014) ........................................................ 20, 43

*Vallario v. Vandehey,*
    554 F.3d 1259 (10th Cir. 2009) .............................................................. 15

*Vega v. T-Mobile USA, Inc.,*
    564 F.3d 1256 (11th Cir. 2009) .................................................... 27, 28, 30

*Viernow v. Euripides Devel. Corp.,*
    157 F.3d 785 (10th Cir. 1998) ................................................................ 24

*Villarreal v. Woodham,*
    113 F.3d 202 (11th Cir. 1997) ................................................................ 27

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ....................................................................... *passim*

*Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.,*
    725 F.3d 1213 (10th Cir. 2013) ....................................................... *passim*

*Ward v. Dixie Nat'l Life Ins. Co.,*
    595 F.3d 164 (4th Cir. 2010) ................................................................. 39

*Whyte v. Suffolk County Sherriff's Dep't,*
    No. 15-00444-E (Sup. Ct. Mass. Jan. 8, 2016) ......................................... 12

## Rules and Statutes

8 U.S.C. § 1103 ................................................................................................ 3

8 U.S.C. § 1225 ................................................................................................ 3

8 U.S.C. § 1226 ................................................................................................ 3

8 U.S.C. § 1226a .............................................................................................. 3

8 U.S.C. § 1231 ................................................................................................ 3

8 U.S.C. § 1555(d) ..................................................................................... 10, 12

18 U.S.C. § 1589 ...................................................................................... *passim*

18 U.S.C. § 1593 .............................................................................................. 38

18 U.S.C. § 1595 .............................................................................................. 38

Act of July 28, 1950, 64 Stat. 380, ch. 503, § 6 ............................................. 10

Dep't of Justice Appropriation Act, 1978, Pub. L. No. 95-86, 91 Stat. 419
   (Aug. 2, 1977) .............................................................................................. 10

Dep't of Justice Appropriation Act, 1979, Pub. L. No. 95-431, 92 Stat.
   1021 (Oct. 18, 1978) .................................................................................... 10

Dep't of Justice Appropriations Authorization Act, 1979, Pub. L. No. 96-
   132, § 2(10), 93 Stat. 1040 (1979) .............................................................. 10

Federal Rule of Civil Procedure 23 ........................................................ *passim*

Pub. L. No. 98-166, § 205(a), 97 Stat. 1071 (1983) ...................................... 11

Pub. L. No. 102-140, § 102(a), 105 Stat. 782 (1991) .................................... 11

Pub. L. No. 104-208, § 102, 110 Stat. 3009 (1996) ...................................... 11

Pub. L. No. 107-77, § 102, 115 Stat. 750 (2001) .......................................... 11

## Other Authorities

1 William B. Rubenstein, et al., *Newberg on Class Actions* (5th ed. 2011) ..... 17

4 William B. Rubenstein, et al., *Newberg on Class Actions* (5th ed. 2014) ..... 43

*The Applicability of Employer Sanctions to Alien Detainees Performing Work in INS Detention Facilities*, General Counsel Op. No. 92-8, 1992 WL 1369347 (Feb. 26, 1992)................................................................................ 12, 13

*Your CO 243-C Memorandum of November 15, 1991: DOD Request for Alien Labor*, General Counsel Op. No. 92-63, 1992 WL 1369402 (Nov. 13, 1992) ......................................................................................................... 11, 13

## INTRODUCTION

Defendant The GEO Group, Inc. ("GEO") submits this brief in opposition to the Plaintiffs' Motion for Class Certification (Dkt. 49, the "Motion" or "Mot.").

Plaintiffs' hyperbolic rhetoric—inventing a so-called "Forced Labor Policy," gratuitously invoking images of the "master's whip," "slave-like conditions," and a "captive workforce" that is "exploit[ed] conscripted, coerced, and underpaid," Mot. at 3, 17, 21—is no substitute for their lack of a factual or legal basis for this case.   It is undisputed that Plaintiffs—and the putative class members—were (or are) lawfully detained at GEO's Aurora facility, pursuant to a contract between GEO and Immigration and Customs Enforcement ("ICE").   The requirement that detainees perform household chores, as well as the allowance of $1.00 per day for participating in a voluntary work program, are fully authorized by the federal government—and have been for decades.

Plaintiffs clearly dislike the ICE policies that authorize required housekeeping by detainees, and ICE's Voluntary Work Program ("VWP") that is administered and supervised by GEO.   Yet, rather than submit their grievances to Congress or raise a challenge to ICE, Plaintiffs ask this Court to certify a class of 50,000 to 60,000 detainees based on a claim that GEO subjects detainees to "forced labor" in violation of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589 *et seq.*, and to certify another class of detainees who are alleged to have "unjustly enriched" GEO through their own, voluntary choice to participate in a work program.   Plaintiffs have not identified a single case in which a court has certified a class in circumstances remotely comparable.

1

This Court should not be the first to do so.  Both proposed classes fall woefully short of meeting the strict requirements for class certification under Federal Rule of Civil Procedure 23, and certification must therefore be denied.

## BACKGROUND

GEO has already exposed in detail the legal deficiencies in both of Plaintiffs' remaining claims.  Their TVPA claim is at odds with multiple, basic principles of statutory construction, as well as with common sense.  *See* GEO Mot. for Reconsideration (Dkt. 29) at 10–23; GEO Mot. to Certify and Stay (Dkt. 38) at 7–10. Likewise, Plaintiffs' unjust enrichment claim fails because Plaintiffs—who are not employees in any sense—did not allege, and could never show, a "reasonable expectation" of being paid more than $1.00 per day for participating in the VWP.  *See*, *e.g.*, *Stanford v. Ronald H. Mayer Real Estate*, 849 P.2d 921, 923 (Colo. App. 1993); *Britvar v. Schainuck*, 791 P.2d 1183, 1184 (Colo. App. 1989) ("[A] plaintiff cannot recover for unjust enrichment . . . for services rendered absent proof of circumstances indicating that compensation is reasonably expected.").  *See also* GEO Mot. for Reconsideration, at 23–28; GEO Mot. to Certify and Stay, at 11–13.  GEO is not attempting to reargue the merits of the Plaintiffs' remaining claims at this juncture.  But to understand the class action issues, it is necessary to have some background on the work programs at the Aurora facility and the legal framework in which they are administered.

**I.     GEO Lawfully Administers And Supervises Detainee Housekeeping And The Voluntary Work Program Pursuant To Its Contract With ICE.**

The Immigration and Nationality Act ("INA") confers on ICE broad authority to detain aliens pending removal or a removal hearing, and mandates that ICE detain certain categories of aliens. *See* 8 U.S.C. §§ 1225, 1226, 1226a, 1231. ICE has responsibility to provide safe, secure, and humane confinement for aliens in the United States who may be subject to removal. *See id.* ICE also has authority to contract with private sector entities, such as GEO, to provide secure facilities. *Id.* § 1231(g). ICE may disburse funds at the discretion of the Secretary of the Department of Homeland Security. *Id.* §§ 1103(a), (c).

Detainees at the Aurora facility are required to perform certain housekeeping duties in their common living areas without pay, and detainees may also volunteer to participate in the federally-authorized VWP for $1.00 per day. Both the work requirement and payment for voluntary work are entirely lawful, and conform to ICE's standards as well as GEO's ICE-approved policies and contractual obligations.

**A.     The Requirement That Detainees Perform Housekeeping Chores Is Lawful.**

Proper sanitation at the Aurora facility is crucial. *See* Deposition of Dawn Ceja (Pl.'s Ex. 1), at 81:11-23 ("Ceja Dep."). Consequently, ICE requires that detention facilities "maintain the highest sanitation standards at all times in all locations without exception." *See* ICE Aurora Facility Detainee Handbook ("ICE Aurora Handbook") (GEO Ex. 1) at PL000046; Performance-Based Nat'l Detention Standards 2011 ("PBNDS") (GEO Ex. 2) § 1.2 (V.A.3); ICE Nat'l Detainee Handbook (GEO Ex. 3), at

PL000092.  This is done through "an organized, supervised and continuous program of daily cleaning by all detainees[.]"  ICE Aurora Handbook (GEO Ex. 1) at PL000046; Ceja Dep. (Pl.'s Ex. 1), at 36:8-36:23.  GEO administers and supervises an ICE-approved program for implementing these requirements.  *See*, *e.g*., Aurora Detention Center, Policy and Procedure Manual ("P&P") (Pl.'s Ex. 2) § 12.1.4 (GEO_MEN 00001510-13) (bearing ICE approval); Ceja Dep. (Pl.'s Ex. 1), at 39:17-40:25, 125:24-134:25 (testifying that ICE's detention standards authorize the housekeeping duties requirement at Aurora).

The program involves two overlapping types of duties: personal housekeeping and cleaning of common living areas.  *See* Ceja Dep. (Pl.'s Ex. 1), at 36:8–37:22, 39:17–40:25, 128:20–131:16, 133:15–134:25; PBNDS (GEO Ex. 2) §§ 1.2 (V.A.3), 5.8 (V.C).  First, all detainees are required to keep their "personal living area clean and sanitary," including the bunk and immediate floor area about and under the bunk, locker and any personal items.  ICE Aurora Handbook (GEO Ex. 1) at PL000046 (emphasis added); *see also* PBNDS (GEO Ex. 2) § 5.8 (V.C).  Second, ICE also requires that "[e]ach and every detainee … participate in the facility's sanitation program." ICE Aurora Handbook (GEO Ex. 1), at PL000047; PBNDS (GEO Ex. 2) § 1.2 (V.A.3) ("staff and detainees [must] maintain a high standard of facility sanitation and general cleanliness").  The "[h]ousing units and all common areas must be kept clean and should be ready for inspection at any time."  ICE Aurora Handbook (GEO Ex. 1) at PL000046.[1]  A list of detainees designated

---

[1]    Plaintiffs inaccurately argue that GEO has misinterpreted ICE standards to "give [GEO] carte blanche to assign detainees to perform almost any janitorial work it requires in the detention pods."  Mot. at 5.  This simply ignores that the ICE Aurora Handbook and the ICE-

to perform duties is developed each day by staff and is posted daily for viewing by detainees. *Id.* at PL000047.  Additionally, ICE specifies that the Housing Unit Officer is responsible for assuring that a general cleanup is done on a regular basis, and "all detainees" must participate during a general cleanup.  *Id.*; Ceja Dep. (Pl.'s Ex. 1), at 36:24-37:22; 40:7-25.[2]

Under ICE policy, "[r]efusal to clean [an] assigned living area" constitutes a 300-level "high moderate" offense, which could result in the typical sanctions of a warning or reprimand.  *See* PBNDS (GEO Ex. 2), App'x 3.1.A, § III; Ceja Dep. (Pl.'s Ex. 1), at 51:12-52:23; 79:19-25.  A permissible, but rare, step is to place a detainee in disciplinary segregation.  Ceja Dep. (Pl.'s Ex. 1), at 88:24-90:3.  If this rare step is taken, the detainee is initially placed in administrative segregation while awaiting a hearing.  *Id.* at 57:15-58:5.  In administrative segregation, detainees are still allowed to watch television, although their amount of social time is reduced to 2 hours.  *Id.* at 54:4-12, 55:15-19.  GEO's corporate representative, Ms. Dawn Ceja, could recall only one instance where a detainee "complained about being put into seg for a cleaning issue."  *Id.* at 69:5-22, 71:12-18.  In fact, those who are placed in administrative segregation (if found "guilty") are usually sentenced to "time-served" and never spend any time in disciplinary

---

approved policies and procedures for sanitation at Aurora require the cleaning of "common areas."  ICE Aurora Handbook (GEO Ex. 1) at PL000046; P&P (Pl.'s Ex. 2) § 12.1.4 (GEO_MEN 00001511).

[2]     Not all of the housekeeping in the common areas of the facilities is done by detainees. The Aurora facility's maintenance department performs upkeep and preventative maintenance on the facility's HVAC systems and rooftop units, changes filters and lightbulbs. Ceja Dep. (Pl.'s Ex. 1), at 19:21-20:13.   Aurora has one janitor, but her tasks are generally focused on administrative areas outside of the detainees' common living areas. *Id.* at 101:6-16.

segregation. *Id*. at 57:15-58:5.  This is perhaps why Plaintiffs have offered no evidence

of any detainee being placed in disciplinary segregation for refusing to perform the

required housecleaning responsibilities.[3]   None of the Plaintiffs or other detainees who

submitted declarations in support of the Motion state that they themselves have been

placed in segregation for refusing to clean.

Courts have repeatedly upheld requirements that federal detainees perform

housekeeping chores without pay (or for minimal pay).  *See, e.g.*, *Channer v. Hall*, 112

F.3d 214, 219 (5th Cir. 1997) (holding that "the federal government is entitled to require

a communal contribution by an INS detainee in the form of housekeeping tasks"); *Hause*

*v. Vaught*, 993 F.2d 1079, 1081, 1085 (4th Cir. 1993) (holding that pretrial detainees may

be required to "assist in cleaning the common areas of their cell-block"); *Bijeol v. Nelson*,

579 F.2d 423, 424–25 (7th Cir. 1978) (holding that a pretrial detainee "may

constitutionally be compelled to perform simple housekeeping tasks in his or her own cell

and community areas"); *Jobson v. Henne*, 355 F.2d 129, 131–32 (2d Cir. 1966)

(explaining that detained patients may be required to perform "chores of a normal

housekeeping type and kind"); *Jackson v. Siringas*, No. 12-15474, 2013 WL 3810301, at

*10 (E.D. Mich. July 23, 2013) ("[R]equiring a pretrial detainee to help clean his living

---

[3]      Some declarants state that they believe other detainees were put in segregation for refusing to clean, but this evidence is unreliable.   For example, Alejandro Hernandez Torres' declaration states that non-plaintiff detainees Ricardo Tinoco and Cesar Duran were placed in segregation for refusing to clean, but a review of their files reveals that they were not.  *See* Ceja Decl. ¶ 2 (GEO Ex. 4).

unit, including common areas, does not amount to involuntary servitude as prohibited by the Thirteenth Amendment.").

In this case, the plaintiff and non-plaintiff declarants uniformly state that they were required to perform cleaning work in private and common living areas without pay. *See* Dkt. 49-2 ¶ 3 (Menocal Decl.); Dkt. 49-3 ¶ 3 (Xahuentitla-Flores Decl.); Dkt 49-4 ¶ 3 (Argueta Decl.); Dkt. 49-5 ¶ 3 (Gaytan Decl.); Dkt. 49-6 ¶ 3 (Valerga Decl.); Dkt. 49-7 ¶ 3 (Muñoz Decl.); Dkt. 49-8 ¶ 3 (Hernandez Torres Decl.); Dkt. 49-9 ¶ 3 (Mendoza Castellanos Decl.) (collectively "Pl. Decls."). These duties are easily within the scope of the personal housekeeping and common area cleaning duties that are lawfully required of a detainee.[4]

### B.   The $1.00 Per Day Allowance Under The Federally-Authorized VWP Is Lawful.

The Aurora facility, like other ICE detention facilities, "utilizes detainees to perform such functions as painting, food services, laundry services, barbershop and

---

[4]   General housekeeping duties have been deemed to include a wide range of activities, including fixing and distributing meals, scrubbing dishes, laundering the sheets and clothing of other inmates, cleaning communal bathrooms and shower stalls, removing trash from common areas, and sweeping, mopping, and vacuuming general-use hallways and rooms. *See Magoon v. Tex. Dep't of Criminal Justice*, Nos. 99-40897 & 99-41060, 2001 WL 43533, at *2 (5th Cir. Jan. 5, 2001) ("shower squad and laundry"); *Channer*, 112 F.3d at 219 (kitchen service); *Hause*, 993 F.2d at 1081, 1085 (cleaning common areas of a cell-block); *Bijeol*, 579 F.2d at 424–25 & n.1 (dusting, vacuuming, and emptying ashtrays in common areas); *Jackson*, 2013 WL 3810301, at *10 (cleaning communal toilets that had overflowed and "clean[ing] the housing unit area"); *Loving v. Kelly*, No. 11-355, 2011 WL 4344109, at *1-2 (M.D. La. July 27, 2011) (sweeping and mopping hallways and a patient day room, disinfecting a patient bathroom and shower stall, and removing trash from the ward); *Ford v. Nassau Cnty. Exec.*, 41 F. Supp. 2d 392, 394–95, 397 (E.D.N.Y. 1999) (pushing a food cart, distributing trays of food, mopping, and sweeping); *Bayh v. Sonnenburg*, 573 N.E.2d 398, 409–12 (Ind. 1991) (fixing meals, scrubbing dishes, cutting grass, washing sheets and clothing, and cleaning floors).

sanitation" through the ICE-authorized VWP.  ICE Aurora Handbook (GEO Ex. 1), at PL000036; ICE Nat'l Detainee Handbook (GEO Ex. 3), at PL000092; PBNDS (GEO Ex. 2) § 5.8.  GEO administers and supervises the VWP at Aurora pursuant to ICE standards, and under the terms of the ICE-approved Aurora policies and procedures.  *See* P&P (Pl.'s Ex. 13) § 8.1.8  (GEO_MEN 00001395) (bearing signature of approval from ICE officer).

The VWP has several objectives: (1) to allow physically and mentally able detainees to be gainfully employed while contributing to the orderly operation of the facility; (2) to improve essential operations and services through the productivity of detainees; and (3) to reduce inactivity-induced idleness and disciplinary-code violations. P&P (Pl.'s Ex. 13) § 8.1.8 (GEO_MEN 00001395); *see* PBNDS (GEO Ex. 2) § 5.8.

In contrast to the ICE-approved housekeeping chores, all work under the VWP is performed on a voluntary basis.  P&P (Pl.'s Ex. 13) § 8.1.8 (GEO_MEN 00001395) ("Work assignments are voluntary.").  The facility's Classification Officer selects and assigns eligible workers for job vacancies, based on numerous factors including classification level, criminal history, escape history and medical status.  ICE Aurora Handbook (GEO Ex. 1), at PL000036.  Up to 80 people per day work in the VWP at Aurora.  Deposition of Melody Furst (Pl.'s Ex. 14), at 12:5-8 ("Furst Dep.").   No detainee is allowed to work more than one shift (or eight hours per day), and no more than 40 hours per week. *Id*. at 42:7-9; P&P (Pl.'s Ex. 13) § 8.1.8 (GEO_MEN 00001396-97).  And detainees may be removed from the program for unexcused absences or

unsatisfactory performance or specified inappropriate behavior.   P&P (Pl.'s Ex. 13) § 8.1.8 (GEO_MEN 00001397).   All of the rules pertaining to the VWP are communicated to each participant in a language or manner the detainee can understand. *Id*. at 00001398.

Detainees receive training on job tasks and safety and medical treatment when needed.  *Id*. at GEO_MEN 00001398-99.  Detainees' performance is regularly evaluated and recorded, and detainees receive written recognition of competencies that they acquire.  *Id*. at GEO_MEN 00001397.  Indeed, it is common for GEO's detention officers to work along with detainees who are performing VWP jobs.  *See* Ceja Dep. (Pl.'s Ex. 1), at 168:7-170:3; *id.* at 169:22-170:3 ("Q. … They're actually cooking the meals, is that right, or are they standing guard while the detainees cook meals? A.  It's both. … They're assisting and supervising.").

ICE states that "[d]etainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.  The compensation is at least $1.00 (USD) per day."  PBNDS (GEO Ex. 2) § 5.8 (V.K).  Thus, a facility may lawfully provide an allowance of $1.00 per day under ICE policy.  GEO's standard policy for Aurora provides that detainees shall receive an allowance (or "stipend") of $1.00 per day, paid daily.  Furst Dep. (Pl.'s Ex. 14), at 44:2-5; P&P (Pl.'s Ex. 13) § 8.1.8 (GEO_MEN 00001397).  GEO pays the amount directly to detainees on a daily basis, and then GEO is reimbursed by ICE.  Furst Dep. (Pl.'s Ex. 14), at 34:24-35:8, 42:22-43:6.  The $1.00 per day allowance accords with the reimbursement rate for VWP work determined by the

contract between ICE and GEO.  Ceja Dep. (Pl.'s Ex. 1), at 185:14-19, 187:1-8; Furst

Dep. (Pl.'s Ex. 14), at 39:12-40:10, 46:5-12; Dkt. 11-2, Ex. C at 3 (providing for

reimbursement "at actual cost of $1.00 per day per detainee" and that GEO "shall not

exceed the quantity shown without prior approval by the Contracting Officer").

The $1.00 per day is Congressionally authorized.  From 1950 to 1979, Congress

authorized  "payment of allowances . . . to aliens, while held in custody under the

immigration laws, for work performed."  8 U.S.C. § 1555(d); Act of July 28, 1950, 64

Stat. 380, ch. 503, § 6.  But the amount to be paid was left to be "specified from time to

time in the appropriation Act involved" for each fiscal year.  8 U.S.C. § 1555(d).  The

appropriations bills for this time period authorized reimbursement for the VWP program

"at a rate not in excess of $1.00 per day."  *See, e.g.*, Dep't of Justice Appropriation Act,

1979, Pub. L. No. 95-431, 92 Stat. 1021, 1027 (Oct. 18, 1978); Dep't of Justice

Appropriation Act, 1978, Pub. L. No. 95-86, 91 Stat. 419, 426 (Aug. 2, 1977).

After the 1979 appropriation, Congress ceased specifically appropriating monies

for the VWP program, opting instead to provide more general appropriations

authorization.  *See* Dep't of Justice Appropriations Authorization Act, 1979, Pub. L. No.

96-132, § 2(10), 93 Stat. 1040, 1042 (1979) ("Section 2(10)") (appropriating funds to the

INS "for expenses necessary for the administration and enforcement of the laws relating

to immigration  . . ., including—(B) payment of allowances to aliens, while held in

custody under the immigration laws, for work performed…." )  Under this more general

authority, INS (and now ICE) retained authority to reimburse VWP detainees, but

without the requirement that "Congress [] set the rate of compensation for each fiscal year." *See* U.S. Dep't of Justice, Immigration and Naturalization Service, *Your CO 243-C Memorandum of November 15, 1991: DOD Request for Alien Labor*, General Counsel Op. No. 92-63, 1992 WL 1369402, at *1 (Nov. 13, 1992) (citing 93 Stat. at 1042).[5] Today, the rate for VWP reimbursement is typically dictated—as it is here—by the contract between ICE and each individual detention facility.   The $1.00 per day allowance, then, is "a matter of legislative [and agency] discretion." *See Guevara v. INS*, No. 90-1476, 1992 WL 1029, at *2 (Fed. Cir. Jan. 6, 1992) (unpublished).  Plaintiffs have identified no lawful basis on which detainees can assert a right to bargain with GEO for an allowance of more than $1.00 per day, as if they were in a labor market.

The $1.00 per day allowance has withstood legal challenges for decades.   In *Alvarado Guevara v. INS*, 902 F.2d 394 (5th Cir. 1990), current and former detainees brought an action against, *inter alia*, the INS and an INS processing center, challenging the $1.00 per day allowance as a violation of the minimum wage provisions of the Fair Labor Standards Act ("FLSA").   The Fifth Circuit held that "[d]espite this apparent exchange of money for labor," the plaintiffs were not covered by the FLSA, because the congressional motive for enacting the FLSA was to protect the "standard of living" and "general well-being" of the worker in American industry.  *Id*. at 396 (quotation marks

---

[5]     Congress has renewed Section 2(10) in subsequent fiscal years. *See, e.g.*, Pub. L. No. 98-166, § 205(a), 97 Stat. 1071, 1086 (1983); Pub. L. No. 102-140, § 102(a), 105 Stat. 782, 791 (1991); Pub. L. No. 104-208, § 102, 110 Stat. 3009, 3009-17 (1996); Pub. L. No. 107-77, § 102, 115 Stat. 750, 764 (2001) (providing that "Authorities contained in the Department of Justice Appropriation Authorization Act, Fiscal Year 1980 (Public Law 96-132; 93 Stat. 1040 (1979)), as amended, shall remain in effect until the effective date of a subsequent Department of Justice Appropriation Authorization Act").

omitted).  By contrast, alien detainees are "removed from American industry," they are

"not within the group that Congress sought to protect in enacting the FLSA." *Id.* at 396.

Thus, the allowance is "a valid exercise of the congressional power to regulate the

conduct of aliens." *Id.* at 396–97.  *See also Guevara*, 1992 WL 1029, at *2 ("Congress

was not unaware of the situation in which these detainees might find themselves, or of the

practice of the INS in asking for volunteers to undertake work projects at the detention

centers.") (citing 8 U.S.C. § 1555(d)).  Recently, a Massachusetts court also rejected an

ICE detainees' claim for more than $1 per day.  *See Whyte v. Suffolk Cnty. Sherriff's*

*Dep't*, No. 15-00444-E (Sup. Ct. Mass. Jan. 8, 2016) (appeal filed, Feb. 4, 2016) (opinion

attached as GEO Ex. 5).[6]

The INS General Counsel has likewise concluded that "[a]lien detainees who

perform work for the INS . . . are not considered 'employees' for purposes of employer

sanctions."  INS General Counsel, *The Applicability of Employer Sanctions to Alien*

*Detainees Performing Work in INS Detention Facilities*, General Counsel Op. No. 92-8,

---

[6]    In *Whyte*, the ICE detainee, who was represented by at least one of the counsel for
Plaintiffs in this case, sued the Suffolk County Sheriff's Department for violations of state wage
laws, breach of contract and unjust enrichment based on a claim that the County deprived him of
the fair value of his services by only paying him $1.00 per day.  The trial court dismissed the
entire case for failure to state a claim, rejecting all of the minimum wage contentions, relying on
several of the same cases that GEO relies on here, such as *Guevara v. INS*, *supra*.  *See id.* at 4-5.
The court found "no persuasive argument as to why this court should deviate from the sound
reasoning and guidance of this jurisprudence."  *Id.* at 5.  The state wage laws "do not apply to
[plaintiff] as an ICE detainee in a Massachusetts correctional facility."  *Id.* at 6.  The court also
rejected the detainee's breach of contract and unjust enrichment claims.  *Id.*

1992 WL 1369347, at *1 (Feb. 26, 1992).  Rather, "[a] detainee performs work for institution maintenance, not compensation." *Id.*[7]

Accordingly, the $1.00 per day allowance to detainees for performance of  VWP jobs, paid by GEO and reimbursed by ICE, is entirely lawful and approved by the federal government.

### C.    The Plaintiff Detainees' Claims.

In light of this background, the Plaintiffs' claims and their proposed classes are simply unworkable.  Plaintiffs propose a class of "[a]ll persons detained in [GEO's] Aurora Detention Facility in the ten years prior to the filing of this action,"  Mot. at 10, premised on the claim that the housekeeping chores allegedly performed by the 50,000-60,000 detainees at the Aurora were all uniformly instances of "forced labor" performed under threats of disciplinary segregation that violate the TVPA.  The requirement that detainees perform the housekeeping chores was and remains categorically lawful and provides no basis for certifying a class (based on a strained interpretation of the TVPA) to permit the Plaintiffs to sue for damages or restitution for performing those chores.  Even if the TVPA somehow applied in this context (and it does not), the proposed class collapses under the impossible task of aggregating the tens of thousands of individualized

---

[7]     *See also id.* (concluding that "[w]ork performed by alien detainees is incident to their detention," and the allowance of $1.00 per day for detainee work under 8 U.S.C. § 1555(d) "does not constitute an appointment of the detainee to the position of a federal employee").  In fact, the INS General Counsel also opined that INS was authorized to use the labor of aliens at a federal detention facility to perform projects at a neighboring Air Force facility, where INS would "share in the benefit of the aliens' labor." *See* INS General Counsel, *supra,* 1992 WL 1369402, at *2.

determinations that would need to be made about why and how detainees performed their household chores.

Similarly, Plaintiffs propose a class of "[a]ll people who performed work [at] [GEO's] Aurora detention facility under [GEO's] VWP policy in the three years prior to the filing of this action," Mot. at 19, on the theory that GEO was unjustly enriched by the labor of all of the detainees who voluntarily worked in the VWP.   But GEO administered and supervised the VWP as directed by ICE and paid the only allowance ($1.00 per day) ever authorized by Congress.[8]  No detainee ever had a reasonable expectation that his or her VWP job would pay a negotiated wage.   Classes are rarely, if ever, certified based on unjust enrichment claims because, like this case, trying these claims would involve highly individualized inquiries into the expectations and intentions of each individual Plaintiff and proposed class member about whether and why work was performed, and whether the work provided an "unjust" benefit to GEO that would support an equitable remedy.

## ARGUMENT

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotation marks omitted).  To ensure that class actions remain the exception, and not the norm, "a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Comcast Corp. v. Behrend*,

---

[8]     Using Colorado unjust enrichment law to require GEO to pay more than the $1.00 per day it was permitted to pay under its contract impermissibly interferes with the federal government's contracting prerogatives.  Accordingly, GEO continues to assert the government contractor defense. *See* GEO Mot. for Reconsideration (Dkt. 29) at 29–30.

133 S. Ct. 1426, 1432 (2013) (quoting *Wal-Mart*, 564 U.S. at 350). The plaintiff bears

the burden of showing that the class complies with Rule 23, and district courts must

"conduct a 'rigorous analysis' before concluding that Rule 23's requirements have been

satisfied." *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d

1213, 1217 (10th Cir. 2013); *see also Friedman v. Dollar Thrifty Automotive Grp., Inc.*,

304 F.R.D. 601, 605 (D. Colo. 2015); *Stender v. Archstone-Smith Operating Trust*, No.

07-cv-02503, 2015 WL 5675304, at *4 (D. Colo. Sept. 28, 2015).

In conducting its rigorous analysis of class certification, the Court must address

Rule 23's "requirements 'through findings,' regardless of whether these findings

necessarily 'overlap with issues on the merits.'" *Friedman*, 304 F.R.D. at 606 (quoting

*Vallario v. Vandehey*, 554 F.3d 1259, 1267 (10th Cir. 2009)); *see also Wal-Mart*, 564

U.S. at 351 (noting that frequently the rigorous analysis under Rule 23 "will entail some

overlap with the merits of the plaintiff's underlying claim" which "cannot be helped" as

the class determination "generally involves considerations that are enmeshed in the

factual and legal issues comprising the plaintiff's cause of action") (quotation marks

omitted).

A district court errs by "'relaxing and shifting Rule 23(a)'s strict burden of proof'

to the party opposing certification, 'liberally construing' the class certification

requirements, or resolving doubts 'in favor of certification.'" *Friedman*, 304 F.R.D at

605 (alterations omitted) (quoting *XTO Energy*, 725 F.3d at 1218). Thus, "[a]ctual, not

presumed, conformance" with Rule 23 remains "indispensable." *CGC Holdings Co.,*

*LLC v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014) (alterations and quotation marks omitted).

Plaintiffs request that the Court certify two classes under Fed. R. Civ. P. 23(a) and (b)(3): (1) a class comprised of all detainees at GEO's Aurora detention facility over the past 10 years (the "TVPA class"); and (2) a class comprised of detainees who participated in the VWP (the "Unjust Enrichment class").  *See* Mot. at 10, 19.   As explained below, neither of Plaintiffs' proposed classes satisfy the threshold requirements of Rule 23(a), and the Court should therefore deny class certification on that basis alone.   Moreover, even if the Court were to conclude that either or both of Plaintiffs' proposed classes satisfy Rule 23(a), neither class comes remotely close to satisfying the stringent requirements of Rule 23(b)(3).   Consequently, the Court must deny Plaintiffs' request for certification in its entirety.

## I.     Plaintiffs' Proposed Classes Do Not Satisfy Rule 23(a).

Federal Rule of Civil Procedure 23(a) imposes threshold requirements for class certification.  A class may be certified "only if":

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).   In order for class certification to be appropriate, the "'party seeking class action certification must [first] demonstrate, under a strict burden of proof, that all of the requirements of [Rule] 23(a) are clearly met.'"   *Tabor v. Hilti, Inc.*, 703

F.3d 1206, 1228 (10th Cir. 2013) (quoting *Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 435 (10th Cir. 1978)). Thus, the party seeking class certification "must be prepared to ***prove*** that there are ***in fact*** sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 564 U.S. at 350 (emphasis added).

Plaintiffs do not satisfy Rule 23(a)'s threshold requirements of numerosity, commonality, or typicality as to either proposed class. The Court must therefore deny class certification.

### A.    Numerosity.

Rule 23(a) requires that "the class [be] so numerous that joinder of all members is impracticable." *See* Fed. R. Civ. P. 23(a)(1). The Tenth Circuit has held that this requirement is "not a question of numbers" only. *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) (quotation marks omitted). Rather, the numerosity inquiry requires consideration of various factors, including "[1] the nature of the action, [2] the size of the individual claims, and [3] the location of the members of the class or the property that is the subject matter of the dispute," *id*. at 1215 (quotation marks omitted), as the means of assessing whether "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

As to both their proposed classes, Plaintiffs' rely solely on an alleged "presumption" that classes with greater than 40 putative members satisfy the "numerosity" requirement. *See* Mot. at 10 (citing 1 William B. Rubenstein, et al., *Newberg on Class Actions*, § 3:12 (5th ed. 2011)); *id*. at 20 (same). This is insufficient.

Even if numerosity only depended on the number of putative class-members involved (which it does not), the Supreme Court has been crystal clear that "actual, ***not presumed***, conformance with Rule 23(a) remains . . . indispensable." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (emphasis added). The Court therefore cannot conclude that Plaintiffs have met their "strict burden of proof," *XTO Energy*, 725 F.3d at 1218, by reliance on this presumption.

Moreover, apart from each class' estimated number, Plaintiffs have not put forward any evidence regarding the ***other*** factors relevant to the numerosity inquiry. *See Colo. Cross*, 765 F.3d at 1215; *cf*. Mot. at 10, 20. Thus, having failed to prove that numerosity is "***in fact***" satisfied, *Wal-Mart*, 564 U.S. at 350 (emphasis added), Plaintiffs have not met their "strict burden of proof" under Rule 23. *XTO Energy*, 725 F.3d at 1218. The Court must deny certification for both classes on this basis alone. *See id.* ("[I]t is not the defendant who bears the burden of showing that the proposed class does not comply with Rule 23, but rather the plaintiff who bears the burden of showing that the class does comply with Rule 23.") (quotation marks and alterations omitted).[9]

---

[9]       Nor should the Court entertain any attempt by the Plaintiffs to offer new evidence for the first time in their reply brief. *United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) (arguments raised for the first time in a reply brief generally are deemed waived); *Alcohol Monitoring Sys. Inc. v. Actsoft, Inc*., 682 F. Supp. 2d 1237, 1242 (D. Colo. 2010) (noting that "[t]he rationale underpinning this rule is tied to the fact that a responding party to a motion ordinarily does not have an opportunity to respond to a reply").

## B.    Commonality.

Plaintiffs have not met their "strict burden [to] pro[ve]," *Tabor*, 703 F.3d at 1228, that their putative TVPA and Unjust Enrichment classes satisfy the commonality requirement of Rule 23(a)(2).

Fed. R. Civ. P. 23(a)(2) requires that there be "questions of law or fact common to the class."  The "commonality" requirement is not satisfied where the putative class members claim "that they have all suffered a violation of the same provision of law," or identify a factual commonality which "gives no cause to believe that their claims can productively be litigated at once."  *See Wal-Mart*, 564 U.S. at 350.  Rather, commonality "requires the plaintiff to demonstrate that the class members have suffered ***the same injury***." *Id.* (emphasis added) (quotation marks omitted); *see also Tabor*, 703 F.3d at 1228 (same).  In other words, "[t]heir claims must depend on a common contention" which "must be of such a nature ***that it is capable of classwide resolution***—which means that determination of its truth or falsity ***will resolve an issue that is central to the validity of each one of the claims in one stroke***."  *Wal-Mart*, 564 U.S. at 350 (emphasis added).

### 1.    TVPA Class.

Plaintiffs request that the Court certify the following class: "All persons detained in [GEO's] Aurora Detention Facility in the ten years prior to the filing of this action."  *See* Mot. at 10.  None of the "commonalities" that Plaintiffs advance satisfy Rule 23(a)(2).

19

Plaintiffs start by identifying three putative common questions: (1) whether GEO "obtains the labor of class members"; (2) whether GEO "threatens class members with physical restraint, serious harm or abuse of the legal process'; and (3) whether GEO "'knowingly' obtains class members' labor 'by . . . means of' these threats." Mot. at 11 (quoting 18 U.S.C. § 1589(a)(1)). These three "commonalities" are, however, simply elements of § 1589. *See* 18 U.S.C. § 1589(a). So Plaintiffs' argument on this point is, in reality, that Rule 23(a)(2) is satisfied because all putative class-members would be asserting that GEO violated the same provision of law.

The Supreme Court has, however, been crystal clear that merely alleging "that [class-members] have all suffered a violation of the same provision of law," is **insufficient** to satisfy the commonality requirement. *See Wal-Mart*, 564 U.S. at 350. Just as Title VII plaintiffs cannot satisfy the commonality requirement by alleging "that they have all suffered a Title VII injury, or even a disparate-impact Title VII injury," *id.*, neither can Plaintiffs here satisfy the commonality requirement by alleging that all class-members suffered a § 1589 injury.

Plaintiffs only other asserted basis for satisfying the commonality requirement is the existence of the so-called "Forced Labor Policy," which Plaintiffs argue "is the common 'glue' that allows the Forced Labor Class's claims to be resolved 'in one stroke.'" Mot. at 12 (quoting *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1253 (10th Cir. 2014)). This, too, is wrong.

Plaintiffs appear to argue that the so-called "Forced Labor Policy" itself constitutes a "threat" within the meaning of § 1589. But this question, however, is not susceptible to producing "common answers." *See Wal-Mart*, 564 U.S. at 350 (quotation marks omitted). Even assuming the TVPA would apply, to determine whether the Aurora facility's ICE-approved housekeeping requirements (and the attendant sanctions) constitute a "threat" under § 1589 would require an individualized assessment into what, if anything, each individual detainee perceived to be threatened in each instance that the detainee performed housekeeping chores. For instance, the ICE Aurora Handbook for detainees indicates that "[r]efusal to clean [an] assigned living area" is one of twenty-four different "level-300" offenses. *See* ICE Aurora Handbook (GEO Ex. 1) at PL000054. And this category of offenses is subject to thirteen different potential "sanctions," including a "[w]arning," a "[r]eprimand," "monetary restitution," "[r]emov[al] from [a] program and/or group activity," and "[l]oss of privileges." *Id.*

The Plaintiffs' theory depends on the factually unsupported and implausible assumption that each and every putative class detainee (assuming each detainee reviewed his or her ICE Aurora Handbook) reached the conclusion that "[r]efusal to clean [their] assigned living area," *id.*, will be penalized by "[d]isciplinary segregation" in an manner that violates § 1589. *Id.* The evidence indicates that that was not the routine experience; commonly, issues are resolved by detainees speaking with GEO officers who are making their rounds at the facility without any segregation or other measures involved. *See* Ceja Dep. (Pl.'s Ex. 1), at 70:19-71:11. The determination of what, if anything, compelled

housekeeping to be performed in each instance would require precisely the individualized inquiry that is not susceptible to "classwide resolution," *Wal-Mart*, 564 U.S. at 350. Evidence that one detainee perceived the ICE Aurora Handbook as a "threat" of disciplinary segregation would not "generat[e] [a] common answer[]" for all other detainees. *Id*. (quotation marks omitted).[10]

The existence of multiple possible sanctions, coupled with the need for individualized evidence of the purported injury that would violate § 1589, is fatal to Plaintiffs' ability to satisfy Rule 23(a)(2)'s commonality requirement. As noted, Plaintiffs must show, "under a strict burden of proof," *Tabor*, 703 F.3d at 1228, that "the class members have suffered ***the same injury***," *Wal-Mart*, 564 U.S. at 350 (emphasis added) (quotation marks omitted), and that the putative class "depend[s] upon a common contention" that "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. For these reasons, Plaintiffs have failed to show, "under a strict burden of proof," that the requirement of Rule 23(a)(2) is satisfied. *See Tabor*, 703 F.3d at 1228. The Court should therefore deny the motion to certify the TVPA class.

---

[10] The likelihood that the ICE Aurora Handbook was not perceived, on a class-wide basis, as a "threat" is evidenced by the fact that none of the declarants identified that handbook (or any other written source) as the basis for their understanding that refusal to participate in the required cleaning could result in disciplinary segregation; rather, the declarants indicate that they learned of this by allegedly seeing other people put in "isolation" or "solitary confinement." *See generally* Pl. Decls. ¶ 3, *supra* at 7.

### 2. Unjust Enrichment Class.

Plaintiffs request that the Court certify the following class: "All people who performed work [at] [GEO's] Aurora detention facility under defendant's VWP policy in the three years prior to the filing of this action." *See* Mot. at 19.

To make out an unjust enrichment claim, a plaintiff must prove: (1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation. *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008); *see also DCB Constr. Co., Inc. v. Cent. City Devel. Co.*, 965 P.2d 115, 120–21 (Colo. 1998) (same). The third element— *i.e.*, whether retention of the benefit under certain "circumstances" would be unjust—"is a fact-intensive inquiry in which courts look to, among other things, the intentions, expectations, and behavior of the parties." *Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 287 P.3d 842, 847 (Colo. 2012). Under Colorado law, courts must "make extensive factual findings" and give "careful consideration of particular circumstances" to determine "whether a party has been unjustly enriched." *Lewis*, 189 P.3d at 1140; *see also DCB Constr.*, 965 P.2d at 120 ("The notion of what is or is not 'unjust' is an inherently malleable and unpredictable standard.").

Plaintiffs assert that a first "common issue" is whether "GEO *misrepresents* to Plaintiffs . . . that ICE sets VWP payment at exactly $1 a day." *See* Mot. at 21 (emphasis

added).  This does not come remotely close to satisfying Rule 23(a)(2).[11]  Some individual detainees *who inquired as to additional pay* could have concluded that GEO, in response, stated that ICE sets pay at $1.00 per day.  *See* Furst Dep. (Pl.'s Ex. 14), at 39:2–40:10; *see also* Detainee Grievance Forms (Pl.'s Ex. 16).  But even assuming that this statement would somehow be a misrepresentation to the detainees who received such an answer (which GEO denies), there is no evidence as to how many participants in the VWP inquired about additional pay *or* how many of those who inquired were told that ICE dictates $1.00 per day pay.  Moreover, Handbooks given to the detainees upon admittance and VWP applications represent that pay will be $1.00 per day.  *See* ICE Nat'l Detainee Handbook (GEO Ex. 3), at PL000092 ("you will be paid $1.00 per day worked"); VWP Application (GEO Ex. 6), at PL000058 ("Work detail members will receive $1.00 per work day.  The maximum paid out will be $1.00 per day."). But neither of these statements of the daily $1.00 allowance constitutes evidence that GEO made a classwide representation that *ICE* dictates a $1.00 per day.

Thus, even indulging Plaintiffs' misrepresentation theory, proving that GEO unjustly derived a benefit in any particular circumstance based on an alleged "misrepresentation" that ICE dictates the $1.00 per day allowance would require

---

[11]   The Plaintiffs' "misrepresentation" theory should also be rejected because it was not pled.  *See* Compl. ¶¶ 86–107.  Nowhere in the Plaintiffs' complaint do they allege that unjust enrichment arises from a misrepresentation about what ICE tells GEO with respect to the permissible allowances under the VWP. Alternatively, Plaintiffs' assertion of this new theory should be considered a request to amend the complaint, *see Viernow v. Euripides Devel. Corp.*, 157 F.3d 785, 790 n.9 (10th Cir. 1998), which, if granted, should provide GEO a full opportunity to move to dismiss the amended complaint.

*individualized* proof about what a detainee read and heard in the circumstances.   For example, proving that one VWP detainee inquired into additional pay and was told that ICE dictates $1.00 per day pay would have no bearing on whether *other* participants in the VWP likewise inquired and received the same answer.   Nor have Plaintiffs' provided any basis for how to assess whether this purported misrepresentation led to an unjust benefit retained by GEO and any particular instance.   This is no issue that can be settled "in one stroke," *Wal-Mart*, 564 U.S. at 350, and there is no reason to believe putative class members' claims could "productively be litigated at once."   *Id.*

Plaintiffs' remaining alleged "common issue" appears to be that the $1.00 per day pay is "substantially discounted" from market rates.   *See* Mot. at 20; *id*. at 21 (stating that GEO would "otherwise turn to an open market that would supply similar labor at substantially higher costs").   But whether an amount paid is "substantially discounted" depends on what it is being compared to.   Plaintiffs argument presupposes that the VWP detainees are participants in the same market as other persons who could become employed by ICE to perform the same work.   *See Bock v. Am. Growth Fund Sponsors, Inc.*, 904 P.2d 1381, 1387 (Colo. App. 1995) (holding in unjust enrichment context that "the measure [of damages is] the difference between the consideration paid *and the fair market value of the employee's services*") (emphasis added).   This is a false comparison. As this Court recognized in dismissing Plaintiffs Colorado minimum wage claim, Plaintiffs are not "employees" covered by that law, *see* Dkt. 23 at 3, and neither are they covered by the FLSA.   *See Alvarado*, 902 F.2d at 396–97 (holding that detainee-

immigrants were not covered by the minimum wage provision of the Fair Labor Standards Act because the detainees—like the detainees here—are "removed from the American industry").

Thus, Plaintiffs allegation of "substantial" difference is premised on a comparison that is not legally relevant to an unjust enrichment claim under Colorado law.  Whether $1.00 per day in the VWP is "substantially" less than what an employee would get paid for such work outside of the VWP is therefore not an "issue central to" the unjust enrichment claim, and, moreover, resolving that question would not "generate . . . *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 564 U.S. at 350 (quotation marks omitted).  And Plaintiffs have utterly failed to put forward evidence—as is their burden—to support a claim that the $1.00 per day pay received by VPW participates is "substantially" less than others who are similarly situated.  *See XTO Energy*, 725 F.3d at 1218 ("[I]t is not the defendant who bears the burden of showing that the proposed class does not comply with Rule 23, but rather the plaintiff who bears the burden of showing that the class does comply with Rule 23.") (quotation marks and alterations omitted).

At bottom, Plaintiffs' unjust enrichment argument appears to be premised on the idea that "GEO relies on [a] necessarily captive workforce for $1-a-day labor, when it would otherwise turn to an open market that would supply similar labor at substantially higher costs."  Mot. at 21.  But this yields no common issue; only unanswered questions.  Plaintiffs provide no example of a successful claim for unjust enrichment based on such a

theory (much less, a class).  For example, Plaintiffs do not place in evidence any proof that GEO or any other federal detention facility operator has operated a facility based on labor from an "open market;" therefore any "benefit" GEO has received is pure speculation.  *See Tourscher v. McCullough*, 184 F.3d 236, 243–44 (3d Cir. 1999) (pretrial detainee not entitled to minimum wage because standard of living is guaranteed and work "bears no indicia of traditional free-market employment");  *Villarreal v. Woodham*, 113 F.3d 202, 206–07 (11th Cir. 1997) (same); *Alvarado*, 902 F.2d at 396 (immigrant detainees "not within the group" protected by labor laws).  For reasons already described, no detainee would have ever had a reasonable expectation that he or she would be paid more than $1.00 per day at the Aurora facility, and if some hypothetical detainee ever did, whether GEO "unjustly" derived any benefit from that detainee would necessarily be an individualized inquiry completely inappropriate for classwide resolution.

## C.    Typicality.

Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]"  *See* Fed. R. Civ. P. 23(a)(3).[12] Plaintiffs' proposed classes fail to satisfy this requirement.

"Typicality exists where the claims of the representative plaintiff 'arise out of the same course of conduct and are based on the same theories as those of the absent class

---

[12]     *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1275 (11th Cir. 2009) (noting that "[a]lthough typicality and commonality may be related," they are distinct because "traditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class.") (quotation marks and alterations omitted).

members . . . .'" *See Ellis v. Spectranetics Corp.*, No. 15-cv-01857, 2015 WL 9259928, at *2 (D. Colo. Dec. 18, 2015) (quoting *Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 552 (D. Colo. 1998)).   Thus, for a plaintiffs' claim to be typical, it must "challenge[] the same conduct that would be challenged by the class," *Pliego v. Los Arcos Mexican Restaurants, Inc.*, 313 F.R.D. 117, 126 (D. Colo. 2016) (quotation marks omitted), such that there is a "sufficient nexus [] between the claims of the named representatives and those of the class at large." *Vega*, 564 F.3d at 1275 (quotation marks omitted).[13]

There is no evidence that the Plaintiffs are "typical" of the class for purposes of the TVPA claim.   Although the Plaintiff and non-plaintiff declarants make similar statements that failure to perform housekeeping work would result in being put in "the hole" or "solitary confinement," and some state that they knew of other detainees being sent there for a refusal to work, ***none*** of the declarants were placed in segregation themselves for refusing to clean.   To the extent the Plaintiffs claim to have perceived a "threat" of being placed in segregation, this perception of a threat is subjective, and could turn on allegations of entirely different conduct.   Additionally, the proposed TVPA claim spans 10 years prior to the filing of the action, yet the declarants stay at Aurora only spans back to May 2011.   *See* Dkt. 49-6 (Valerga Decl).   Therefore there is no proof that the experience of any of the Plaintiffs would be typical of detainees at Aurora prior to May 2011.

---

[13]     This requires that "the claims of the class representative and class members are based on the same legal or remedial theory." *Colo. Cross*, 765 F.3d at 1216 (quotation marks omitted).

Plaintiffs have also failed to "affirmatively demonstrate" that their proposed Unjust Enrichment class satisfies the typicality requirement. *See Comcast Corp.*, 133 S. Ct. at 1432. Plaintiffs assert—in their arguments supporting "commonality" and "typicality"—that one of the two pillars of their unjust enrichment claim is "that GEO misrepresents to Plaintiffs . . . that ICE sets VWP payment at exactly $1 a day[.]" *See* Mot. at 21; *see id*. at 22 (asserting that Plaintiffs' unjust enrichment claims are typical because "[t]hey claim here that GEO misled them about whether they could ever be paid more than $1 a day"). As already explained, Plaintiffs' alleged "misrepresentation" does not qualify as a common question for Rule 23(a)(2) purposes because Plaintiffs have offered no evidence that GEO has made the alleged "misrepresentation" to detainees on a classwide basis; rather, the only evidence offered shows that such a representation has been made to ***individual*** VWP participants who specifically inquired. *See supra* at 23–24.

But even if every other member of the putative class had made such an inquiry, the Plaintiffs own evidence shows that ***they do not all share this feature***. Five of the nine named-Plaintiffs submitted declarations.[14] While these Plaintiffs' state that they were paid $1.00 per day, only one of those five, along with another Plaintiff who did not submit a declaration, has submitted any evidence that he inquired as to whether he could receive higher pay, or that any GEO party represented to them that ICE dictates $1.00 per

---

[14]     *See* Dkt. 49-2 (Menocal Decl.); Dkt. 49-3 (Xahuentitla-Flores Decl.); Dkt. 49-4 (Argueta Decl.); Dkt. 49-5 (Gaytan Decl.); Dkt. 49-6 (Valerga Decl.).

day.  *See* Pl. Decls. *supra* at n.14; Detainee Grievance Forms (Pl.'s Ex. 16).  Nor did Plaintiffs include such an allegation in the Complaint.  *See* Compl. ¶¶ 86–107 (unjust enrichment allegations).  By contrast, two of the putative class-members' declarations ***do*** state that they inquired into receiving higher pay, and were told that GEO could not pay more.  *See* Dkt. 49-9 (Castellanos Decl.) ¶ 4 ("I was told that GEO could only pay $1 per day."); Dkt. 49-8 (Torres Decl.) ¶ 4 ("One guard . . . told me that GEO could only pay one dollar per day, no more.").  But the third non-Plaintiff declarant does not allege that he inquired regarding the $1.00 per day pay.  *See* Dkt. 49-7 (Muñoz Decl.).  Thus, the evidence demonstrates that not all Plaintiffs share with the putative class-members one of the essential "features" on which the unjust enrichment claim "rests," *cf.* Mot. at 21, and not all putative class-members share that feature either.  Plaintiffs would not be "challenge[ing] the same conduct that would be challenged by the class," *Pliego*, 313 F.R.D. at 126, and therefore there is not a "sufficient nexus [] between the claims of the named representatives and those of the class at large." *Vega*, 564 F.3d at 1275.

## II.    Plaintiffs' Proposed Classes Do Not Satisfy Rule 23(b)(3).

If a court determines that Rule 23(a)'s "threshold requirements" are satisfied, "it must then examine whether the action falls within one of three categories of suits set forth in Rule 23(b)." *Shook v. El Paso Cnty.*, 386 F.3d 963, 971 (10th Cir. 2004)

(quotation marks omitted). Plaintiffs allege that its proposed classes may be certified under Rule 23(b)(3).[15] *See* Mot. at 13–19, 22–24.

Rule 23(b)(3) provides that a court may certify a class if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." As the Supreme Court has noted, Rule 23(b)(3) is "an 'adventuresome innovation,'" that is "designed for situations 'in which class-action treatment is not as clearly called for.'" *Comcast Corp.*, 133 S. Ct. at 1432 (quoting *Wal-Mart*, 564 U.S. at 362). As with Rule 23(a), Rule 23(b)(3) "demands a rigorous analysis" by the district court to ensure that its requirements are satisfied. *See XTO Energy*, 725 F.3d at 1219 (quotation marks omitted). In particular, both the Supreme Court and the Tenth Circuit have repeatedly recognized that "Rule 23(b)(3)'s predominance criterion is '***far more demanding***' than Rule 23(a)'s commonality requirement." *Id.* at 1220 (emphasis added) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)); *see also Friedman*, 304 F.R.D. at 615 (same).

Rule 23(b)(3)'s predominance inquiry "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *CGC Holding*, 773 F.3d at 1087 (quoting *Amchem Prods.*, 521 U.S. at 623). While "predominance" does not

---

[15] Plaintiffs argue that "'in a doubtful case, . . . any error . . . should be committed in favor of allowing the class action.'" *See* Mot. at 14 (quoting *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968)). This misstates current Tenth Circuit law. In *XTO Energy*, the Tenth Circuit reversed a district court's certification order that relied on precisely this principle, concluding that applying such an "err-on-the-side-of-certification" principle was an abuse of discretion. *See* 725 F.3d at 1217–18, 1221.

require absolute uniformity,  Rule 23(b)(3) does require that "common, aggregation-enabling, issues in the case ***are more prevalent or important*** than the non-common, aggregation-defeating, individual issues." *CGC Holding*, 773 F.3d at 1087 (emphasis added) (quotation marks omitted). "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

Neither of Plaintiffs proposed classes satisfy Rule 23(b)(3)'s requirements.  As such, this Court must deny certification.

## A.    Predominance.

### 1.  TVPA Class.

Plaintiffs' TVPA class falls woefully short of satisfying Rule 23(b)(3)'s "far more demanding" standard. *See XTO Energy*, 725 F.3d at 1220 (quotation marks omitted).

Section 1589's language, which centers around an individual "person" being forced to labor,[16] evinces that the "non-common, aggregation-defeating, individual

---

[16]    Section 1589(a) provides:

(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

    (1)   by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

    (2)   by means of serious harm or threats of serious harm to that person or another person;

    (3)   by means of the abuse or threatened abuse of law or legal process; or

    (4)    by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

issues" are "more prevalent [and] important" than common issues.  *See CGC Holding*, 773 F.3d at 1087. First, § 1589's text is clear that it only proscribes the listed conduct— *e.g.*, "threats of physical restraint" or "threats of serious harm"—when "the labor or services of a person" are obtained "*by means of*" that conduct.  *See* § 1589(a)(1)–(4) (emphasis added).  This language requires that the defendant's alleged conduct have *caused* the plaintiff to perform "labor or services."  *See* § 1589(a); *see, e.g., Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1179–80 (9th Cir. 2012).  And as courts have also recognized, proving that a defendant's alleged conduct caused a plaintiff to perform labor or services is a highly individualized inquiry, which requires individualized proof. *See David v. Signal Int'l, LLC*, No. 08-cv-1220, 2012 WL 10759668, at *16–22 (E.D. La. Jan. 4, 2012).

Proving the required causal connection in this case will require a highly-individualized inquiry into the reasons for why each of the putative class members performed the cleaning duties required of Aurora detainees.  Demonstrating that one detainee's labor was obtained "by means of" conduct proscribed in § 1589 does not resolve whether any other detainee's performance of labor or services—much less *all* 50,000 or 60,000 putative class-members—was likewise caused by such conduct.[17]  This necessity of individualized assessment is particularly acute with respect to whether

---

[17]     Even if 99 percent of the putative TVPA class-members did perform their mandatory cleaning duties because of the possible sanctions (and no evidence indicates that is true), the remaining one percent would still represent over *500* putative class members whose claims *could not* be adjudicated on a class-wide basis.

putative class members performed their requiring housekeeping duties ***without*** having experienced any of the available sanctions for not doing so.[18]  To prove that the "threat" of disciplinary segregation, or any of the other available sanctions[19] were the "means" by which a detainee's labor or service was obtained, would require some proof that the threatened, but not imposed, sanction was ***the*** reason he or she performed the labor in every instance.  Indeed, even under Plaintiffs' theory, there would be no reason to award damages or restitution to a detainee who performed chores because, for example, he or she wished to stay busy; but the reasons each detainee performed the chores cannot be ascertained without individual inquiry.

The individualized nature of § 1589's causal requirement precludes class-certification here.  Indeed, Plaintiffs themselves acknowledge that their TVPA claims "turn on" whether GEO "obtained Plaintiffs' labor 'by . . . means of' the threat of solitary confinement."  Mot. at 15.  Because this central issue necessitates individualized proof, the individualized issues in the case are "more prevalent [and] important" than any alleged common issues.  *See CGC Holding*, 773 F.3d at 1087.[20]

---

[18]    Plaintiffs' proposed class is not limited to detainees who were sanctioned for not performing their required housekeeping duties. *See* Mot. at 10 (defining class).  Quite the contrary, none of the Plaintiffs declare that they were cited for any offense for refusing to perform the chores.

[19]    This is assuming solely for the sake of argument that any sanction that could be imposed for a level-300 offense would fall within a category of conduct proscribed by § 1589.

[20]    Plaintiffs again assert that the elements of a § 1589 claim constitute common questions under Rule 23(a)(2).  As indicated above, this is incorrect.  *See supra* at 19–20.  Because those "questions" do not qualify as common questions of law or fact under Rule 23(a)(2), they cannot aid Plaintiffs in the context of Rule 23(b)(3)'s predominance requirement.

Plaintiffs argue, however, that § 1589's causal requirement is purely objective—"turn[ing] on whether a reasonable person would provide labor . . . if placed in the position of the person providing such labor," Mot. at 15—such that no individualized determination of causation would be needed. *See* Mot. at 15–17 (relying on *Tanedo v. E. Baton Rouge Parish Sch. Bd.*, No. 10-cv-01172, 2011 WL 7095434 (C.D. Cal. Dec. 12, 2011)).[21]   In particular, Plaintiffs argue that a purely objective focus is "evident in the fact that the statute focuses on the [defendant's] scienter, not the plaintiff's state of mind," and because § 1589's definition of "serious harm" refers to "reasonable person." *See* Mot. at 15–16.  Neither argument is correct.

First, Plaintiffs cite no authority for the strange proposition that the presence of a *mens rea* (addressing the defendant's state of mind) has any bearing on whether the defendant's ***actions*** produced a certain result.   And there is no reason why it would.[22]

---

[21]   *Id*. at 16 ("Applied to the facts of this case, that standard would require asking a factfinder whether GEO implemented the Forced Labor Policy to obtain labor from detainees, knowing or intending that a reasonably person in the detainees' position would feel compelled to provide that labor. That question would be answered based on a consideration of the uniformly applicable Forced Labor Policy and the factfinder's analysis of how a reasonable person would respond to that policy.").

[22]   Plaintiffs quote *United States v. Dann*, 652 F.3d 1160, 1169–70 (9th Cir. 2011) to support this argument.  *See* Mot. at 15–16.  This case does not, however, adopt an objective standard to causation. Rather, the passage quoted is interpreting the term "serious harm."  *See* 652 F.3d at 1169–70.  In its discussion, the Court notes that, in order for "harm" to be sufficiently "serious," it must be the type of harm that would cause a "reasonable person" to perform labor or services. *Id*. at 1170.  But that rule does not remove the ***separate*** requirement that the "serious harm" ***in fact*** cause the particular plaintiff person to perform the labor or service.  *See id*. at 1169–70. Indeed, if § 1589(c)(2)'s reference to a "reasonable person" were sufficient to create a purely objective standard for causation, it could do so only with respect to ***some*** of the subparts in § 1589(a), since only some subparts reference "serious harm."  *Cf*., § 1589(a)(1) (not referencing "serious harm).  This interpretation would create a convoluted statute with differing causation

Section 1589 requires that the "labor or services" at issue be obtained "by means of" the conduct specified.   § 1589(a)(1)–(4).   That inquiry necessarily turns on what, in fact, motivated the plaintiff to perform the labor or service, not on what the defendant knew.

Likewise, Plaintiffs' reliance on § 1589's definition of "serious harm" is also misplaced.   *See* Mot. at 16 & n.6.   Section 1589 provides that "serious harm" is determined by looking to whether a "reasonable person of the same background and in the same circumstances" would be "compel[led]" to perform the labor or services.   *See* § 1589(c)(2).   But as other courts have held, this reference to a "reasonable person" does not create a purely objective causation standard: "[T]he injection of the objective reasonable person standard into the forced labor equation does not serve to eliminate the subjective aspects of the crime"; rather, "the jury must still determine whether the victim was coerced subjectively to provide labor based on the defendant's threats." *David*, 2012 WL 10759668, at *20.   In other words, while "the victim's response to the defendant's actions must pass the reasonable person test," *id*. "[t]he plaintiff must prove . . . that compulsion at the hands of the defendant caused the plaintiff to render his services involuntarily," *id*., and "one cannot determine whether the defendant's actions [caused] the victim to provide labor ***without looking to the specific victim involved***." *Id*. at *19 (emphasis added).   In fact, the plaintiff's burden to show a subjective coercion is "the very essence of the crime of forced labor[.]"  *Id*. at *20; *see also United States v. Rivera*,

---

standards depending on which form of proscribed conduct was alleged, without any textual basis for doing so.

36

799 F.3d 180, 186–87 (2d Cir. 2015); *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619, 2015 WL 329013, at *6 (S.D. Ind. Jan. 22, 2015) (holding in the Rule 23(a)(3) context that "it would not be appropriate to apply a 'reasonable person' standard to determine whether the Defendants' varying actions constituted a threat of harm for each proposed class member").

Plaintiffs argue, alternatively, that even if a subjective standard of causation applies, "it makes little sense to require . . . individual showings of coercion when GEO ***requires***" detainees to perform cleaning duties. *See* Mot. at 17.  Their sole basis for this claim comes from dicta in *David, supra*, which speculated—after having determined not to certify the TVPA class at issue there—that "based on the type of coercion used, there may be cases where consent becomes irrelevant."  2012 WL 10759668, at *21.  This argument rests on the absurd insinuation that the sanctions available for not performing cleaning duties are remotely comparable to the horrific abuse slaves suffer by "use of the master's whip."  *See* Mot. at 17 (quotation marks omitted).  Plaintiffs—as well as every other putative class member—are (or were) lawfully detained under the authority of the United States government, and each of the sanctions for a 300-level offense (including disciplinary segregation) is expressly authorized by ICE.  *See* PBNDS (GEO Ex. 2), at App'x 3.1.A, § III (listing offenses and sanctions identical to those in ICE Aurora Handbook).[23]

---

[23]      In similar fashion, Plaintiffs argue that "[i]t is enough to conclude . . . that the evidence supports ***an inference*** that class members did not voluntarily consent" to performing their cleaning duties.  *See* Mot. at 17–18 (emphasis added).  But  Plaintiffs do not cite any authority

In the end, Plaintiffs' belief that it "makes no sense" to require each putative class-member prove causation is irrelevant since the text of § 1589 mandates that a plaintiff do so.  *See* § 1589(a) (prohibiting obtaining "the labor or services of ***a person***" by specified means) (emphasis added).  Indeed, plaintiffs in § 1589 cases that (unlike here) actually involved slave-like treatment still proved, on an individualized basis, that their labor was obtained "by means of" proscribed conduct.  *See, e.g.*, *United States v. Callahan*, 801 F.3d 606, 613, 615, 620–21 (6th Cir. 2015) (relying on individualized evidence of coercion to affirm § 1589 conviction where victims were forced to perform labor by, *inter alia*, "threaten[ing] or assault[ing]" her, "depriv[ing] [her] of food," "shoving [one victim's] face in dog excrement," "locking [a victim] in the basement," and "ordered [one victim] to beat [another victim]"); *accord United States v. Kaufman*, 546 F.3d 1242, 1246, 1263–64 (10th Cir. 2008) (considering sufficiency-of-evidence challenge to § 1584 conviction and crediting testimony by victim that he did not perform the work voluntarily).

Moreover, in addition to the individualized causation issue just discussed, Plaintiffs seek class-wide compensatory and punitive damages, as well as restitution for the alleged § 1589 violation.  *See* Compl. ¶¶ 83–84; §§ 1595(a), 1593.  Plaintiffs make no effort to contend that the TVPA damages they seek present a question that can be resolved on a class-wide basis, Mot. at 10–13; nor do they address damages in the context

---

that such an inference is permissible in the § 1589 context, but rather seek to import a rationale applied ***in the RICO context*** to § 1589 claims.  *See* Mot. at 18 (citing *CHC Holding*, 773 F.3d at 1073 (RICO case), *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (RICO case), and *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) (RICO case)).

38

of their Rule 23(b)(3) argument.  *See* Mot. at 14–18.  While individualized damages do not automatically preclude class certification, "predominance may be destroyed if individualized issues will overwhelm those questions common to the class[.]"  *XTO Energy*, 725 F.3d at 1220; *see also id.* ("'To be sure, individualized damage determinations cut against class certification under Rule 23(b)(3).'") (quoting *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010)).

Establishing damages for a § 1589 violation would necessarily be an intensely individualized determination, one dependent on which of the numerous possible proscribed "means" in § 1589(a) was implicated by the facts of each putative class-member's case.  Indeed, even if a jury were to conclude that the requirement that detainees perform housekeeping chores (and the attendant sanctions) constituted a "threat" proscribed by § 1589, any damages assessment would necessarily need to inquire into whether any of the ***other*** means of § 1589(a) were violated, *e.g.*, whether "force" was used, whether "physical restraint" was involved,  or whether "psychological, financial, or reputational harm" occurred.   *See* § 1589(a)(1), (2); § 1589(c)(2).[24] Calculating damages for any detainee who ***was*** subject to "force," "physical restraint," etc. would require proof of these occurrences, but none of these issues are susceptible to class-wide determination.  And further individualized assessment would be required for those putative class-members who attempt to prove their entitlement to punitive damages.  *See* Compl. ¶ 83.  Thus, many of the 50,000 to 60,000 putative class-members' damages

---

[24]      In their Complaint, Plaintiffs allege violations of, and seek damages for conduct proscribed in § 1589(a)(1), (2), and (4). *See* Compl. ¶¶ 76–78.

inquiries would devolve into mini-trials on what additional portions of § 1589 may have been violated vis-à-vis a particular detainee, and whether that detainee was entitled to punitive damages. Plaintiffs, however, have indicated no means by which these damages could be uniformly calculated—because none exists.

In short, the highly-individualized questions inherent in § 1589's causal requirement, and in a damages assessment, "are more prevalent [and] important," *CGC Holding*, 773 F.3d at 1087, than any common issue that might exist. The Court should therefore deny certification of Plaintiffs' proposed TVPA class.

### 2. Unjust Enrichment Class.

To make out an unjust enrichment claim, a plaintiff must prove: (1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation. *Lewis*, 189 P.3d at 1141. Because of the "fact-intensive" nature of unjust enrichment claims, *Melat*, 287 P.3d at 847, "'courts generally find that unjust enrichment claims *are not appropriately certified for class treatment, as common questions will rarely, if ever, predominate*.'" *Friedman*, 304 F.R.D. at 611 (quoting *In re Mots. to Certify Classes Against Court Reporting Firms*, 715 F. Supp. 2d 1265, 1284 (S.D. Fla. 2010) *aff'd* 439 F. App'x 849 (11th Cir. 2011)).

Plaintiffs argue that Rule 23(b)(3)'s predominance requirement is "easily" satisfied here, but their argument for this conclusion is nonsensical. Plaintiffs argue that "the question posed by Plaintiffs' unjust enrichment claims is *not* whether any particular

individual unjustly enriched GEO . . . ."   Mot. at 23 (emphasis added).   But if no "particular individual unjustly enriched GEO" then no Plaintiff or putative class-member has a *claim* against GEO.   Thus, the "question posed" by Plaintiffs unjust enrichment claims is *precisely* whether GEO was unjustly enriched by individual Plaintiffs.

The individualized nature of an unjust enrichment claim cannot be salvaged by Plaintiffs' argument that the "unjust enrichment claims call for a classwide adjudication of the *"*intentions, expectations, and behavior of the parties related to the entire VWP Policy."   Mot. at 23 (quoting *Hannon Law Firm, LLC v. Melat, Pressman & Higbie, LLP*, 293 P.3d 55, 59 (Colo. App. 2011)).   Plaintiffs act like it is self-evident that the "intentions, expectations, and behavior of the parties*"* is a common question that can predominate over individualized issue.[25]   This is wrong.   As the Supreme Court held, a common question under Rule 23(a)(2) is one whose "determination . . . will resolve an issue that is  central to the validity of each one of the claims *in one stroke*."   *Wal-Mart*, 564 U.S. at 350 (emphasis added).   "Expectations" and "intentions" are, however, highly individualized, and determining the "expectations" or "intentions" of one VWP participant would provide no insights into the "expectations" or "intentions" of another VWP participant.

Thus, far from supporting Plaintiffs Rule 23(b)(3) predominance argument, the highly-individualized nature of discerning "expectations" and "intentions" demonstrates

---

[25]   Plaintiffs did not argue in their Rule 23(a)(2) section that the *"*intentions, expectations, and behavior of the parties related to the entire VWP Policy" was a "common question."   *See* Mot. at 20–21.

41

why, in this case, "non-common, aggregation defeating, individual issues," are "more prevalent [and] important" that common issues. *See CGC Holding*, 773 F.3d at 1087. Indeed, it is precisely because an assessment of parties' intentions and expectations is such a "fact-intensive" inquiry, *Melat*, 287 P.3d at 847, that "courts generally find that unjust enrichment claims are not appropriately certified for class treatment, ***as common questions will rarely, if ever, predominate***." *Friedman*, 304 F.R.D. at 611 (emphasis added) (quotation marks omitted).

The individualized nature of the damages sought further demonstrates that Rule 23(b)(3)'s predominance requirement is not satisfied. *Cf.* Mot. at 23–24. Plaintiffs acknowledge that "individual questions may arise with respect to damages," Mot. at 23, but argue that the possibility of individualized-damages awards does not automatically preclude certification. *Id.* (citing cases). As the Tenth Circuit has recognized, however, "individualized damage determinations cut against class certification under Rule 23(b)(3)," and "predominance may be destroyed if individualized issues will overwhelm those questions common to the class[.]" *XTO Energy*, 725 F.3d at 1220 (quotation marks omitted). Individualized issues predominate here.

Plaintiffs' themselves identify two issues that would require individualized assessment with respect to damages: (1) VWP participants worked a different number of hours; and (2) VWP participants did not all perform the same work. *See* Mot. at 23. Beyond these, other factors that could hypothetically be relevant to the damages inquiry would require individualized assessment. For example, as discussed above, Plaintiffs

argue that GEO made misrepresentations to detainees regarding the $1.00 per day pay. *See* Mot. at 21; *supra* at 23–24, 28–30.   But because Plaintiffs have not identified any general source of the alleged misrepresentation, individualized proof would be required to show to whom GEO made the allegedly false representation.  *See supra* at 23–24, 28–30.

In short, any class-wide damages assessment would necessarily involve highly-individualized assessments.   Combined with the individualized inquiries necessary to demonstrate the "expectations" and "intentions" of each putative class-member, these individualized issues overwhelmingly predominate any potential common issues.

Plaintiffs argue further that the Court could side-step these individualized concerns by "use of a formula and statistical sampling . . . [so] the factfinder could determine unjust enrichment damages without individualized hearings."  *See* Mot. at 24.[26]  But it is Plaintiffs burden to "***present[]*** 'a common formula to the class' that 'approximate[s] damages,' " if it wishes to avoid a case-by-case damages assessment.  *See Stender*, 2015 WL 5675304, at *11 (emphasis added) (quoting *Newberg*, § 12.5 and *Urethane Antitrust Litig.*, 768 F.3d at 1257.   Plaintiffs have plainly not met this burden as they have not presented ***any*** means or method of calculating damages that would not require "individualized hearings."   Mot. at 24.   Both this Court and the Supreme Court have

---

[26]    It is unclear whether Plaintiffs are here referring to "aggregate damages" (*i.e.*, class-wide damages) or a common method of calculating individualized damages.  *See* 4 William B. Rubenstein, et al., *Newberg on Class Actions*, § 12.1, at 91–92 (5th ed. 2014) (hereafter "*Newberg*") (differentiating between "aggregate damages" and a common-means for calculating "individualized" damages).

found insufficient asserted class-wide methods for calculating damages.  *See, e.g.*, *Comcast Corp.*, 133 S. Ct. at 1432–35; *Stender*, 2015 WL 5675304, at *11.  Plaintiffs opaque reference to "a formula and statistical sampling," Mot. at   24—without *identifying* any such formula or statistics—is *a fortiori* insufficient.  *See, e.g.*, *Seabron v. Am. Family Mut. Ins. Co.*, No. 11-cv-01096, 2013 WL 3713652, at *9 (D. Colo. July 16, 2013) ("Plaintiffs have failed to set forth any model for calculating damages on a class-wide basis.  Such failure is further reason for this Court to deny Plaintiffs' class certification motion.").

Lastly, Plaintiffs suggest that the Court could "bifurcate damages determinations for the [Unjust Enrichment] class."  *See* Mot. at 23–24.  This would not, however, cure the significant predominance issues vis-à-vis the non-damages elements of an unjust enrichment claim.  As courts have recognized, and as noted above, the necessity of inquiring into whether a benefit was "unjustly" retained is "inherently malleable and unpredictable," *DCB Constr.*, 965 P.2d at 120, and requires a "fact-intensive inquiry" into, *inter alia*, "the intentions, expectations, and behavior of the parties." *Melat*, 287 P.3d at 847; *see also Lewis*, 189 P.3d at 1140 (court must "make extensive factual findings" and give "careful consideration of particular circumstances" to determine "whether a party has been unjustly enriched").  This inquiry, separate from determining damages, could not be done without a detainee-by-detainee assessment. *See supra* at 40–41.

## B. Superiority.

Rule 23(b)(3) also requires that Plaintiffs prove that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This inquiry should take account of "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

Plaintiffs have also failed to satisfy their burden under this requirement as to either proposed class because Plaintiff has not presented evidence to support the points it alleges show that a class action is "superior" in this context. *See XTO Energy*, 725 F.3d at 1218 ("[I]t is not the defendant who bears the burden of showing that the proposed class does not comply with Rule 23, but rather the plaintiff who bears the burden of showing that the class does comply with Rule 23.") (quotation marks and alterations omitted).

As to the TVPA class, Plaintiffs opine on what is "likely" to be the case, but do not present evidence to support these claims. *See* Mot. at 19. And as to the Unjust Enrichment class, Plaintiffs only state that "largely the same reasons" support a finding of superiority. *See* Mot. at 24. In essence, Plaintiffs are asking the Court to presume that the statements it makes to support superiority are, in fact, true. But "[a]ctual, not

presumed, conformance with Rule 23 remains indispensable." *CGC Holding*, 773 F.3d at 1086 (quotation marks and alterations omitted).   Such generalized and unsupported statements fall woefully short of satisfying the Plaintiffs strict burden to "prove that . . . in fact" a class action "is superior to other available methods[.]"   *Wal-Mart*, 564 U.S. at 350; Fed. R. Civ. P. 23(b)(3).   Given the many individualized mini-trial type determinations that inhere in the Plaintiffs' remaining causes of action, it is clear that classwide resolution of neither question is superior.   The Court should therefore deny certification on this basis as well.

## CONCLUSION

For these reasons, GEO respectfully requests that the Court deny Plaintiffs' motion for class certification in its entirety.

Dated: June 1, 2016                    Respectfully submitted,

/s/ Mark Emery
Mark Emery
NORTON ROSE FULBRIGHT US LLP
799 9th Street, N.W., Suite 1000
Washington, D.C. 20001-4501
Tel +1 202 662-0210
Fax +1 202 662-4643
mark.emery@nortonrosefulbright.com

Charles A. Deacon
NORTON ROSE FULBRIGHT US LLP
300 Convent Street, Suite 2100
San Antonio, Texas 78205-3792
Tel +1 210 270 7133
Fax +1 210 270 7205
charlie.deacon@nortonrosefulbright.com

46

Shelby A. Felton
David DeMuro
VAUGHAN & DEMURO
720 S. Colorado Blvd.
North Tower Penthouse
Denver, CO  80246
Tel +1 (303) 837-9200
Fax +1 (303) 837-9400
sfelton@vaughandemuro.com

*Counsel for The GEO Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2016, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following attorneys for the Plaintiffs:

Brandt Milstein
brandt@milsteinlawoffice.com

Andrew Turner
aturner@laborlawdenver.com

Alexander Hood
alex@towardsjustice.org

Hans Meyer
hans@themeyerlawoffice.com

R. Andrew Free
Andrew@ImmigrantCivilRights.com

/s/ Mark Emery
Mark Emery
NORTON ROSE FULBRIGHT US LLP
799 9th Street, N.W., Suite 1000
Washington, D.C. 20001-4501
Tel +1 202 662-0210
Fax +1 202 662-4643
mark.emery@nortonrosefulbright.com

*Counsel for The GEO Group, Inc.*