IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALEGRA,
on their own behalf and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

ORDER GRANTING MOTION FOR CLASS CERTIFICATION UNDER RULE 23(b)(3)
AND APPOINTMENT OF CLASS COUNSEL UNDER RULE 23(g) (ECF NO. 49)

---

Kane, J.

      Plaintiffs Alejandro Menocal, Marcos Brambila, Grisel Xahuentitla, Hugo Hernandez,

Lourdes Argueta, Jesus Gaytan, Olga Alexaklina, Dagoberto Vizguerra, and Demetrio Valerga

(Representatives) are current and former detainees of the Aurora Detention Facility (Facility), a

private immigration detention center in Aurora, Colorado, owned and operated by Defendant The

GEO Group, Inc. (GEO).  Representatives originally brought three claims against GEO for: (1)

noncompliance with the Colorado Minimum Wages of Workers Act, Colo. Rev. Stat. § 8-6-101,

*et seq*.; (2) violations of the forced labor provision of the Trafficking Victims Protection Act

(TVPA), 18 U.S.C. §§ 1589, 1595; and (3) unjust enrichment. Representatives brought the

claims on their own behalf and on behalf of proposed classes of similarly-situated current and former detainees of the Facility. GEO moved to dismiss the claims, and I granted its motion as to only the Colorado minimum wage claim. Representatives now seek certification of the proposed classes for their remaining TVPA and unjust enrichment claims.

Although Representatives and putative class members have diverse backgrounds, their circumstances are uniquely suited for a class action. All share the experience of having been detained in the Facility and subjected to uniform policies that purposefully eliminate nonconformity. The questions posed in this case are complex and novel, but the answers to those questions can be provided on a classwide basis. Appreciating that the class action is "a valuable tool to circumvent the barriers to the pursuit of justice," Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 25:24 (4th ed.), I GRANT the Motion for Class Certification Under Rule 23(b)(3) and Appointment of Class Counsel under Rule 23(g) (ECF No. 49).

## I. Background

Representatives take issue with two aspects of GEO's operation of the Aurora Detention Facility. First, they allege that, in carrying out its Housing Unit Sanitation Policy, GEO violated the Trafficking Victims Protection Act by requiring detainees to clean the private and common areas of the Facility without any compensation and under the threat of solitary confinement and other punishments. Second, they claim that GEO was unjustly enriched by paying detainees who participated in its Voluntary Work Program (VWP) only $1 per day.

GEO, a for-profit, multinational corporation, operates the Facility pursuant to a contract with U.S. Immigration and Customs Enforcement (ICE). ICE's Performance Based National Detention Standards mandate that all detainees perform personal housekeeping. Specifically,

> [d]etainees are required to maintain their immediate living areas in a neat and orderly manner by: 1. making their bunk beds daily; 2. stacking loose papers; 3.

> keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.

Def.'s Opp. Class Certification Ex. 2 at 15-16, ECF No. 51-2. GEO combined these responsibilities with portions of the American Correctional Association standards and its own corporate policy to develop the Facility's Housing Unit Sanitation Policy, which has been in effect since 1995. Mot. Class Certification Ex. 1 at 15:23-25, 27:9-14, 86:22-87:3, ECF No. 50-1. Representatives claim that the detainees' compulsory duties under the Sanitation Policy, such as sweeping and mopping floors and cleaning toilets and showers, fall outside the scope of ICE's personal housekeeping requirement. The GEO Detainee Handbook Local Supplement, with which all detainees at the Facility are provided, states that failure to perform one's duties under the Sanitation Policy is a "high-moderate" offense for which detainees can be punished by the initiation of criminal proceedings, termination from their jobs, and up to 72 hours in disciplinary segregation, among other sanctions. Mot. Class Certification Ex. 1 at 29:13-30:2, 79:13-25; Ex. 4 at 18, 26, ECF No. 50-3. Representatives and other detainees were aware of the Sanitation Policy during their detention and claim that they performed the required duties to avoid solitary confinement. *See* Mot. Class Certification Ex. 5 ¶ 3, ECF No. 49-2; Ex. 6 ¶ 3, ECF No. 49-3; Ex. 7 ¶ 3, ECF No. 49-4; Ex. 8 ¶ 3, ECF No. 49-5; Ex. 9 ¶ 3, ECF No. 49-6; Ex. 10 ¶ 3, ECF No. 49-7; Ex. 11 ¶ 3, ECF No. 49-8; Ex. 12 ¶ 3, ECF No. 49-9. Based on these allegations, Representatives assert that the labor performed by detainees at the Facility pursuant to the Sanitation Policy is forced labor in violation of the TVPA. They request that I certify a TVPA class of "[a]ll persons detained in Defendant's Aurora Detention Facility in the ten years prior to the filing of this action." Mot. Class Certification at 10, ECF No. 49.

Separately, GEO offers a Voluntary Work Program that allows detainees to work in various positions around the Facility and earn $1 per day. As part of the program, detainees perform tasks such as maintaining the on-site medical facility, doing laundry, preparing meals, and cleaning the Facility. ICE's Performance Based National Detention Standards require that detainees be compensated "at least $1.00 (USD) per day" for work completed under the facility's VWP. Mot. Dismiss, Ex. 1 at 5, ECF No. 11-1. Representatives allege that GEO misled VWP participants to believe it could pay them no more than $1 per day under the ICE standards. Representatives also stress that GEO employs only a single outside custodian and that detainees are unable to seek other employment in a competitive market. Mot. Class Certification at 9. As a result, they claim that GEO derives significant economic benefit from its VWP and has been unjustly enriched because of it. Representatives propose certification of an unjust enrichment class comprised of "[a]ll people who performed work [at] Defendant's Aurora Detention Facility under Defendant's [Voluntary Work Program] Policy in the three years prior to the filing of this action."

## II. Legal Standard

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). The exception is appropriate when the party seeking certification can establish the four threshold requirements set forth in Federal Rule of Civil Procedure 23(a) and fulfillment of at least one of the provisions in Rule 23(b). "When addressing class certification, the district court must undertake a 'rigorous analysis' to satisfy itself that the prerequisites of Rule 23 . . . are met." *CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014). Under Rule 23(a), the party requesting

certification must first show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." If successful, the party must then demonstrate, pursuant to Rule 23(b), one of the following: (1) individual adjudication would create a risk of incompatible standards of conduct for the party opposing the class or would impair other members' ability to protect their interests; (2) injunctive or declaratory relief is appropriate for the class as a whole due to the action or inaction of the party opposing the class; or (3) common questions of law or fact predominate over any individual questions and a class action is the superior method for "fairly and efficiently adjudicating the controversy."

Here, Representatives rely on Rule 23(b)(3), which requires *predominance* of questions of law or fact common to the class and *superiority* of the class action method. The conditions of predominance and superiority were added "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23 advisory committee's note).  In determining if these requirements are met, I must consider, among other factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

III. Discussion

GEO challenges Representatives' satisfaction of almost all of the Rule 23 considerations.

Preliminarily, I find that Representatives have demonstrated that the proposed classes satisfy the

numerosity[1] and adequacy requirements. As to the remaining factors—commonality and

typicality under Rule 23(a) and predominance and superiority under Rule 23(b)(3), GEO's most

compelling, but ultimately unconvincing, argument is that elements of both claims necessitate

inquiries specific to each class member.

A. Trafficking Victims Protection Act Claim

The forced labor provision of the TVPA makes it unlawful for anyone to:

knowingly provide[] or obtain[] the labor or services of a person. . . (1) *by means of* force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) *by means of* serious harm or threats of serious harm to that person or another person; (3) *by means of* the abuse or threatened abuse of law or legal process; or (4) *by means of* any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589 (emphasis added). The element that the labor be obtained "by means of" the

defendant's improper coercion is central to the parties' dispute. GEO claims that evaluating

whether this element is fulfilled requires an individualized assessment of what caused each

---

[1]Representatives have carried their burden by offering "'some evidence of established, ascertainable numbers constituting the class.'" *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1214-15 (10th Cir. 2014) (citing *Rex v. Owens ex rel. Okla.*, 585 F.2d 432, 436 (10th Cir. 1978)). With respect to the TVPA class, GEO's Assistant Warden of Operations estimated that, in the past ten years, 50,000 to 60,000 individuals have been detained at the Facility and subject to the Sanitation Policy. Mot. Class Certification Ex. 1 at 49:24-50:2. As for the unjust enrichment class, GEO's records show that 787 detainees participated in the Voluntary Work Program in November 2012 alone. Mot. Class Certification Ex. 15 at 7, ECF No. 50-6. Representatives approximate that there will be 2,000 total members of the class. GEO argues that Representatives cannot simply rely on the presumption that classes with greater than 40 putative members satisfy the numerosity requirement. Representatives do not just depend on that presumption, however; they have also shown that joinder would be impracticable due to the unique characteristics of the class members, namely that many are spread around the world and are not fluent in English or the U.S. legal system.

putative class member to perform labor under the Sanitation Policy. Consequently, GEO asserts that the commonality, typicality, predominance, and superiority requirements are not met for the TVPA class.

*Federal Rule of Civil Procedure 23(a): Commonality & Typicality*

To fulfill the commonality requirement, Representatives must demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(1). A qualifying question must be "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. The analysis must not focus on the mere existence of common questions but on "'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* at 350 (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Nevertheless, "[i]t is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that the answers to those common questions be dispositive." *CGC Holding Co., LLC*, 773 F.3d at 1087 (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013)).

Representatives submit that the common questions putative class members share are: "(1) whether GEO obtains the labor of class members; (2) whether GEO threatens class members with physical restraint, serious harm, or abuse of the legal process; and (3) whether GEO 'knowingly' obtains class members' labor 'by . . . means of' these threats." Mot. Class Certification at 11. GEO argues that these questions fail to demonstrate, as required by *Wal-Mart Stores, Inc. v. Dukes*, that an issue central to the validity of Representatives' claim is susceptible to classwide resolution.

7

In *Wal-Mart*, the Supreme Court found that a proposed class of female employees alleging discrimination under Title VII lacked even a single question common to the class and thus did not satisfy the commonality requirement. 564 U.S. at 342, 359. Relying on the fact that the defendant had no specific discriminatory employment policy or biased evaluation method, the Court found that the central question of why each class member was disfavored could not produce a common answer. *Id.* at 352-55, 59. The defendant's local supervisors were given discretion over employment decisions such that it was unlikely that each manager exercised their discretion in a common discriminatory manner. *Id.* at 355-56. The Court stated that "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it [would] be impossible to say that examination of all the class members' claims for relief [would] produce a common answer . . . ." *Id.* at 352.

Unlike in *Wal-Mart*, GEO has a specific, uniformly applicable Sanitation Policy that is the subject of Representatives' TVPA claim. This Policy is the glue that holds the allegations of the Representatives and putative class members together,[2] creating a number of crucial questions with common answers. For example: Does GEO employ a Sanitation Policy that constitutes improper means of coercion under the forced labor statute? Does GEO knowingly obtain detainees' labor using that Policy? Is there a civic duty exception to the forced labor statute that makes the Policy acceptable? Representatives have demonstrated the existence of common questions that can resolve issues "central to the validity" of its TVPA claim "in one stroke." *Wal-Mart Stores, Inc*, 564 U.S. at 350.

---

[2]GEO argues that each class member could have labored due to different parts of the Policy so the Policy as a whole cannot be the glue. The text of the statute contradicts that assertion. The statue provides that "a scheme, plan, or pattern" can constitute improper means without requiring determination of which specific part of the scheme, plan, or pattern motivated the laborer. 18 U.S.C. § 1589. Thus, a uniform policy can be the glue that holds the allegations of a class together.

"The commonality and typicality requirements of Rule 23(a) do not require that every member of the class share a fact situation *identical* to that of the named plaintiff." *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014) (citation omitted). Furthermore, "differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988).

GEO contends that Representatives' experiences could not be typical, because perception of a threat is subjective and because none of Representatives were actually placed in segregation for refusing to clean. GEO also points out that Representatives detention at the Facility only spans back to May 2011, while the proposed class goes back ten years. The nature of detention is unique in that it allows the detainer to almost fully control the experience of the detainee. In this case, Representatives and the putative class members were all subject to and impacted by the Sanitation Policy, and the duties they performed under the Policy were at the direction of GEO's staff.[3] Mot. Class Certification Ex. 2 at 1-3, ECF No. 50-2. I find it irrelevant that no Representative was actually disciplined with segregation for violating the Policy, since the forced labor statute includes threats, schemes, plans, and patterns as improper means of coercion. As for the time period covered by the class, GEO's Assistant Warden of Operations testified that its Sanitation Policy had been in effect since 1995, when she began working for the company. Mot. Class Certification Ex. 1 12:23-13:1, 23:8-16, 86:22-87:3. Representatives and the proposed class of individuals detained during the ten years prior to the filing of the Complaint

---

[3]One way in which GEO implements the Policy is by posting a list of detainees who are required to perform additional cleanup of the common areas each day. Mot. Class Certification Ex. 4 at 19. GEO does not allege and there is nothing in the record to show that detainees who are not on the daily list still choose to perform the additional duties or that detainees work autonomously.

could, therefore, bring claims based on the same legal or remedial theory. Representatives have shown that the typicality requirement is met for their Proposed TVPA class.

*Federal Rule of Civil Procedure 23(b)(3): Predominance and Superiority*

While the class undoubtedly satisfies the Rule 23(a) factors, the Rule 23(b)(3) "predominance criterion is far more demanding." *Amchem Prods., Inc.*, 521 U.S. at 623–24. Its "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623.  In considering whether questions of law or fact common to class members predominate, I look to the specific elements of the underlying claim. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

GEO contends that, to satisfy the "by means of" element of the forced labor statute, each class member would need to show what specifically compelled him or her to perform the sanitation duties at the Facility. It suggests that some detainees labored just because they desired to stay occupied. And, with respect to those hypothetical detainees, GEO claims it could not have violated the TVPA because it did not obtain their labor "by means of" improper coercion. Representatives refute this argument, stating that, instead of individually inquiring as to why each detainee labored, a reasonable person standard should be used. According to Representatives, "the language and structure of the forced labor statute . . . call for an objective inquiry that turns on whether a reasonable person would provide labor to[] GEO if placed in the position of the person providing such labor." Mot. Class Certification at 15.

Representatives cite *Nuñag-Tanedo v. East Baton Rouge Parish School Board*, No. LA CV 10-01172 JAK (MLGx), 2011 WL 7095434 (C.D. Cal. Dec. 12, 2011), as support for their assertion that a reasonable person standard should be used. *Nuñag-Tanedo* involved a class of Filipino nationals who were recruited to work as teachers in Louisiana public schools and felt

compelled to teach in order to repay the exorbitant debts they incurred as part of the recruitment process. *Id.* at *1. Construing the forced labor statute, the court in *Nuñag-Tanedo* found that the putative class members shared the same background and circumstances such that a reasonable person standard could be used to determine whether it was the defendants' scheme that ultimately compelled the plaintiffs to work. *Id.* at *1.

In turn, GEO relies on *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619, 2015 WL 329013 (S.D. Ind. Jan. 22, 2015), and *David v. Signal International, LLC*, No. 08-1220, 2012 WL 10759668, at *15 (E.D. La. Jan. 4, 2012), to challenge the use of a reasonable person standard. The proposed classes in *Panwar* and *David*, as in *Nuñag-Tanedo*, were comprised of foreign citizens who were recruited to work in the United States and then were allegedly coerced by improper means to continue laboring. Unlike in *Nuñag-Tanedo*, however, the courts in both *Panwar* and *David* determined that the use of a classwide reasonable person standard was not appropriate. *Panwar*, 2015 WL 329013, at *1; *David*, 2012 WL 10759668, at *1-2.

In *Panwar*, the court found that the backgrounds and circumstances of the plaintiffs and class members varied too greatly to apply a uniform reasonable person standard. 2015 WL 329013, at *6. The class members had different contracts, worked in different states, and faced different working conditions. *Id.* The court reasoned that it was likely that "a significant number" of putative class members did not labor due to improper coercion as they never sought to terminate their contracts, were not threatened by deportation, or would not be seriously harmed by having to pay damages for breach of their employment contracts. *Id.* The facts in this case are distinct from those in *Panwar* given that Representatives and the putative class members here were all subject to a universal policy under uniform conditions.

The second case GEO cites, *David v. Signal International, LLC*, goes beyond looking at the similarities and differences of class members' circumstances and meticulously analyzes the "by means of" element of the forced labor statute. The plaintiffs in *David* asserted, as Representatives do here, that the statute concerns only the defendant's conduct and whether a reasonable person in the plaintiffs' shoes would have been compelled to provide labor against his or her will. 2012 WL 10759668, at *17.  For guidance on the proper query under the statute, the court looked to *United States v. Kozminski*, 487 U.S. 931 (1988). *Id.* at *17-19. The Supreme Court held in *Kozminski* that, for the purposes of criminal prosecution, involuntary servitude under 18 U.S.C. § 1584 is limited to the "compulsion of services by the use or threatened use of physical or legal coercion." 487 U.S. at 952-53. The forced labor statute was enacted in response to that holding in order to combat the exploitation of workers via means other than physical or legal coercion, including through threats of and actual non-physical "serious harm." H.R. Conf. Rep. 106-939, 3-5. In *Kozminski*, the Supreme Court alluded to causation, stating: "[T]he vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve." 487 U.S. at 952. The court in *David* consequently determined that "the forced labor analysis cannot be confined solely to the defendant's conduct but necessarily must take into account the particular victim's vulnerabilities." *David*, 2012 WL 10759668, at *19. It additionally concluded that whether the defendants' coercive conduct caused the plaintiffs to labor could not "be answered via generalized class-wide proof but rather must be answered individually based upon individualized proof." *Id.* at *21.

I find the analysis in *David* to be persuasive in that the forced labor statute does contain both an objective and a subjective component. The subjective component is whether the victims

actually labored *because of* the perpetrator's conduct, while the objective component is whether

a reasonable person would respond in a similar way as the victims. *See id.* at *20.

Representatives' proposal that the subjective component be eliminated by using only a

reasonable person standard does not coincide with the statute.[4]

Nevertheless, the holding in *David* does not foreclose certification of the proposed class

in this case. Representatives argue, as an alternative to eliminating the subjective component of

the statue, that the "by means of" element can be satisfied by inferring from classwide proof that

the putative class members labored because of GEO's improper means of coercion.

Representatives are correct that there is nothing preventing such an inference. I have not found

and GEO has not provided any authority requiring that, for TVPA claims, causation must be

proven by direct and not circumstantial evidence. Were a jury deciding the individual merits of

Representatives claims, it surely would be permitted to make such an inference. Thus, it should

be allowed on a classwide basis as well. *See CGC Holding Co., LLC*, 773 F.3d at 1092.

Representatives and the putative class members in this case were directed by GEO's staff

when, where, and how to perform their sanitation duties. Given the climate in which they were

detained, it is possible that an inference of causation would be appropriate even despite some

class members' purported willingness to work for reasons other than GEO's improper means of

coercion. *See David*, 2012 WL 10759668, at *21 ("[B]ased on the type of coercion used, there

may be cases where consent becomes irrelevant."). For class certification purposes, though, I

---

[4]Representatives highlight that individuals can also be convicted of or held civilly liable for *attempting* to violate the forced labor statute under 18 U.S.C. § 1594. They claim that, even if some putative class members labored for reasons other than GEO's improper means of coercion, GEO still attempted to obtain their labor via those means. As a result, Representatives argue that such class members would be entitled to the same civil remedy, making an individual inquiry regarding causation unnecessary. Their Complaint, however, does not assert a claim for attempt under 18 U.S.C. § 1594.

need only conclude that the "by means of" element could be established by classwide

circumstantial evidence.

Representatives reference *CGC Holding Co., LLC v. Broad and Cassel* as an example of

when circumstantial evidence can be used to show causation on a classwide basis. In *CGC*

*Holding*, the Tenth Circuit held that certification of a class of real estate borrowers bringing

claims under the Racketeer Influenced and Corrupt Organizations (RICO) Act was appropriate

even though actual and proximate causation were elements of the claim. 773 F.3d at 1080-81.

The court found that, under certain circumstances, "it is beneficial to permit a commonsense

inference . . . applicable to the entire class to answer a predominating question as required by

Rule 23." *Id.* at 1089. The circumstances here—namely the class members' detainment, the

imposition of a uniform policy, and the numerous other questions common to the class—

certainly make it beneficial to permit such an inference.[5]

In a final effort to show that individual questions predominate as to the TVPA claim,

GEO asserts that any damages inquiry would have to be specific to each class member. But,

considering the numerous questions common to the class, I find that the possible need for

specific damages determinations does not predominate. *In re Urethane Antitrust Litig.*, 768 F.3d

1245, 1255 (10th Cir. 2014); *see also* Fed. R. Civ. P. 23 advisory committee's note ("[A] fraud

perpetrated on numerous persons by the use of similar misrepresentations may be an appealing

situation for a class action, and it may remain so despite the need, if liability is found, for

separate determination of the damages suffered by individuals within the class."). Since

causation under the forced labor statute "can be found through generalized, classwide proof,"

common questions predominate in this case and "class treatment is valuable in order to take

---

[5]GEO argues that the rationale applied in the RICO context in *CGC Holding* cannot be extended
to TVPA claims. I disagree. The analysis in *CGC Holding* may not dictate the outcome in this
matter, but it is instructive.

advantage of the efficiencies essential to class actions." *CGC Holding Co., LLC*, 773 F.3d at 1089 (citations omitted).

"[C]lass status is appropriate as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation." *Id.* at 1087. In including Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Amchem Prods., Inc.*, 521 U.S. at 617 (quoting Kaplan, A Prefatory Note, 10 B.C. Ind. & Com. L. Rev. 497, 497 (1969)). In this case, the putative class members reside in countries around the world, lack English proficiency, and have little knowledge of the legal system in the United States. It is unlikely that they would individually bring these innovative claims against GEO. Further, if they were to do so, each detainee would have to litigate the same exact issues regarding GEO's Sanitation Policy. The class action is the superior method for adjudicating the TVPA claim. Representatives have thus demonstrated that their proposed TVPA class fulfills the requirements of Rule 23(a) & (b)(3) such that certification is appropriate.

B. Unjust Enrichment Claim

Turning to Representatives unjust enrichment claim, GEO's arguments against certification similarly involve whether an element of the claim compels individualized inquiries. To succeed on a claim of unjust enrichment, a plaintiff must prove "(1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (citing *Salzman v. Bachrach*, 996 P.2d 1263, 1266-67 (Colo. 2000)). Determining whether retention of the benefit is unjust involves "careful consideration of

particular circumstances," *Lewis*, 189 P.3d at 1140 (citation omitted), and "a fact-intensive inquiry in which courts look to, among other things, the intentions, expectations, and behavior of the parties," *Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 287 P.3d 842, 847 (Colo. 2012) (citing *Lewis*, 189 P.3d at 1140, 1143). The analysis "often will turn on whether a party engaged in some type of wrongdoing." *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 445 (Colo. 2000).

GEO argues that the "unjust" element, dependent on the intentions, expectations, and behavior of the parties, requires an inquiry specific to each putative class member and cannot be demonstrated on a classwide basis. As with the TVPA claim, GEO contends that the necessity of an individualized inquiry for one of the elements of the claim prevents the commonality, typicality, predominance, and superiority requirements from being met.

*Federal Rule of Civil Procedure 23(a): Commonality and Typicality*

Again, I start the certification analysis with the Rule 23(a) commonality requirement that there be at least one question common to the class that will resolve an issue central to the validity of the claim "in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350, 359. Representatives assert that the questions common to the proposed class are: "(1) whether the class provided GEO with a benefit in the form of substantially discounted labor, and (2) whether, under the circumstances of this case, it would be unjust for GEO to retain that benefit." Consistent with its overarching argument, GEO states that the second question regarding the "unjust" element is not a question common to the class as it requires an individualized inquiry.[6] I address this argument further

---

[6]GEO's other arguments purportedly addressing commonality for the unjust enrichment class relate more to the merits of the claim than the existence of common questions. Citing *Alvarado Guevara v. Immigration and Naturalization Service*, 902 F.2d 394, 396-96 (5th Cir. 1990), GEO asserts that detainees are not participants in the same market as other persons who could become employed by ICE since they are removed from the American industry. According to GEO, detainees could not reasonably expect that they would be paid more than $1.00 per day. It is

below in discussing the predominance factor. For the purposes of the commonality requirement, though, I find that Representatives have demonstrated the existence of at least a single common question—whether GEO received a benefit from VWP participants' labor—the determination of which will resolve an issue central to the validity of the unjust enrichment claim in one stroke.

GEO also claims that Representatives' experiences are not typical of the class because its representation that ICE dictates the $1.00 per day pay rate was only made to specific individuals and not on a classwide basis. According to GEO, Representatives and putative class members would not be challenging the same conduct under the same legal theories as required for typicality. Representatives respond by stating that their unjust enrichment claim does not turn on class members' individualized reliance on GEO's explanation of the pay rate, but instead, that the misrepresentation contributes to the context of GEO's enrichment. As noted throughout this order, detainment presents distinctive conditions. Representatives, like the putative class members, worked under the Voluntary Work Program in an environment GEO controlled. GEO dictated the jobs they performed, the rate they were paid, and the alleged savings it experienced. Representatives' unjust enrichment claim challenges the same conduct under the same legal theories as any unjust enrichment claim putative class members would bring. Thus, with respect to that claim, Representatives have demonstrated the proposed class fulfills the Rule 23(a) prerequisites.

*Federal Rule of Civil Procedure 23(b)(3): Predominance and Superiority*

The more stringent predominance factor demands that I look to the elements of the claim and fully consider GEO's argument regarding the necessity of individualized inquiries in determining whether its enrichment is unjust. The "unjust" element of the claim calls for an

---

unclear how this line of reasoning relates to the commonality analysis. If anything, the question of whether detainees should be paid in line with the market seems to support the existence of questions that can be answered on a classwide basis.

analysis of "the intentions, expectations, and behavior of the parties" to determine when retention of the benefit becomes unjust. *Melat, Pressman & Higbie*, 287 P.3d at 847 (citing *Lewis*, 189 P.3d at 1140, 1143). GEO insists that such expectations and intentions are highly individualized and could not be consistent classwide. I am not persuaded. It is not necessary to analyze the intentions, expectations, and behavior of each individual class member; it is enough to consider the overall context based on classwide proof. GEO "has failed to explain why it would be equitable for it to retain [the benefit conferred by] some of the putative class members, but inequitable to retain [the benefit] from others." *James D. Hinson Elec. Contr. Co. v. BellSouth Telecomms., Inc.*, 275 F.R.D. 638, 647 (M.D. Fla. 2011). GEO's treatment of participants in the VWP was based on uniform policies and, therefore, it is likely that, if its retention of a benefit was unjust with respect to one class member, it was unjust with respect to all class members.

GEO quotes *Friedman v. Dollar Thrifty Automotive Group, Inc.*, 304 F.R.D. 601 (D. Colo. 2015), twice to support the proposition that class certification is inappropriate for unjust enrichment claims, because "common questions will rarely, if ever, predominate." Def.'s Opp. Class Certification at 40, 42 (quoting *Friedman*, 304 F.R.D. at 611). In *Friedman*, however, the court determined that whether the defendant's enrichment from its sales were unjust turned on the circumstances of the sales, "implicat[ing] 2.58 million face-to-face individualized transactions in which customers with varying circumstances, preferences, and levels of knowledge . . . engaged with thousands of [the defendant's] agents . . . ." *Friedman*, 304 F.R.D. at 609, 611. Those interactions were unscripted and each could differ based on what was told to or understood by the consumer about purchasing the defendant's products. *Id.* at 609-10. Under those circumstances, it is logical that the answers to the common questions could not be

established by common evidence and would not predominate, but those are not the facts of this

case. Here, there is a consistent policy under which detained individuals worked and were paid

the same amount. Perhaps the extent to which GEO was unjustly enriched would require

individualized inquiries, but whether it was unjust at all could be determined on a classwide

basis.

Observing that the extent inquiry would likely be particular to each class member, GEO

argues that individualized damages questions predominate over any common questions. Since

VWP participants worked varying hours and did not all perform the same type of work,[7] any

award to them would need to account for those individual factors. Representatives assert that

damages could be determined by a formula and statistical sampling taking into account the

number of hours worked, type of work performed, and fair market value of such work. However,

they have not provided a detailed model or expert opinion on calculating damages, which GEO

claims is necessary for them to sufficiently carry their burden. I agree with Representatives that

there is no requirement that they produce expert testimony at this stage on the precise formula to

be used for the calculation of damages. *See* Alba Conte & Herbert Newberg, *Newberg on Class*

*Actions* § 12:4 (5th ed.) (explaining that, in many class actions such as wage and hour cases,

individual damages are easily calculable, while other more complex cases require the proponents

of class certification to provide a classwide method for calculating individual damages). I find

that Representatives have demonstrated that individual damages in this case should be easily

calculable using a simple formula. If this proves untrue, decertification or amendment of the

class for damages determinations may be appropriate at a later juncture.

_____

[7]GEO also contends that, for the damages analysis, participants would need individualized proof
of whether it made misrepresentations to them specifically. Def.'s Opp. Class Certification at 42-
43. Any misrepresentations, however, should not be relevant in determining the extent to which a
particular participant enriched GEO.

Additionally, the class action is the superior method for adjudicating Representatives' unjust enrichment claim. I am not aware of any other suit asserting the claims brought in this case and no other class member has demonstrated an interest in controlling the litigation. As stated above, many of the putative class members are immigrant detainees who lack English proficiency. They have limited financial resources and reside in countries around the world. It is very likely that these claims would not be brought by individual detainees, especially considering the case's innovative nature.

Representatives have demonstrated that the Rule 23(a) and (b)(3) requirements are satisfied with respect to their TVPA and unjust enrichment claims despite GEO's arguments that elements of each claim require individualized inquiries that preclude certification. In light of the pervasive character of the common issues and the *de minimis* nature of any individualized issues, I conclude that this case is an exception to the rule and class certification for both claims is appropriate. *See In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006).

C. Appointment of Representatives' Counsel as Class Counsel

Upon certifying a class, class counsel must also be appointed. Fed. R. Civ. P. 23(g)(1). In doing so, I "must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handing class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class . . . ." *Id.* Representatives' counsel have invested significant time, energy, and resources into this case. They have uniquely relevant experience with the client base and with bringing complex claims against detention facilities. Many of the attorneys and their staff are also Spanish speakers,

making it easier for them to communicate with some members of the classes. I find that Representatives' counsel are well-suited to represent the classes and appoint them to do so.

### IV. Conclusion

For the foregoing reasons, I GRANT the Motion for Class Certification Under Rule 23(b)(3) and Appointment of Class Counsel Under Rule 23(g) (ECF No. 49). The classes as proposed in the Motion are certified for Representatives' TVPA and unjust enrichment claims. Alejandro Menocal, Marcos Brambila, Grisel Xahuentitla, Hugo Hernandez, Lourdes Argueta, Jesus Gaytan, Olga Alexaklina, Dagoberto Vizguerra, and Demetrio Valerga are named as representatives of the classes. Attorneys Brandt Milstein, Andrew Turner, Andrew Free, Alexander Hood, David Seligman, Andrew Schmidt, and Hans Meyer are appointed as counsel for the classes. To proceed with this case, the parties shall file a revised Proposed Stipulated Scheduling and Discovery Order by March 27, 2017.

DATED this 27th day of February, 2017.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE