**WARNING: AT LEAST ONE DOCUMENT COULD NOT BE INCLUDED!**
**Please see below.**

| Document Number | Document Description | Pages | Document Error |
|---|---|---|---|
| Document 49 attachment 10 | Attachment | 23 | **DOCUMENT COULD NOT BE RETRIEVED! However, it may still be viewable individually.** |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-CV-02887-JLK

ALEJANDRO MENOCAL, *et al.*,

      Plaintiffs,

vs.

THE GEO GROUP, INC.,

      Defendant.

---

**MOTION FOR CLASS CERTIFICATION UNDER RULE 23(b)(3) AND
APPOINTMENT OF CLASS COUNSEL UNDER RULE 23(g)**

---

### Table of Contents

I.   Introduction ........................................................................................................... 3

II.  Statement of Facts ................................................................................................ 4

   A.  The Forced Labor Policy ................................................................................. 4

   B.  The VWP Policy .............................................................................................. 7

III. Forced Labor ...................................................................................................... 10

   A.  The Proposed Class ....................................................................................... 10

   B.  Plaintiffs Satisfy the Requirements of Rule 23(a) ....................................... 10

      1.  Numerosity ............................................................................................... 10

      2.  Commonality ............................................................................................ 11

      3.  Typicality ................................................................................................. 12

      4.  Adequacy .................................................................................................. 13

C.  Common Questions of Law and Fact Predominate and a Class Action is the
Superior Method of Resolving Plaintiffs' Forced Labor Claims ................................... 13

    1.  Predominance ........................................................................................................ 14

    2.  Superiority ............................................................................................................. 19

IV.  The Voluntary Work Program ........................................................................................ 19

A.  The Proposed Class ......................................................................................................... 19

B.  Plaintiffs Satisfy the Requirements of Rule 23(a) ..................................................... 20

    1.  Numerosity ............................................................................................................ 20

    2.  Commonality ......................................................................................................... 20

    3.  Typicality ............................................................................................................... 22

    4.  Adequacy ............................................................................................................... 22

C.  Common Questions of Law and Fact Predominate and a Class Action is the
Superior Method of Resolving Plaintiffs' Forced Labor Claims ................................... 22

    1.  Predominance ........................................................................................................ 23

    2.  Superiority ............................................................................................................. 24

V.  The Court Should Appoint Plaintiffs' Counsel as Class Counsel ............................. 24

## CERTIFICATE OF CONFERRAL PURSUANT TO D.C.COLO.LCIVR 7.1(A)

Defendant has indicated its opposition to this motion in conferrals throughout the

class discovery process. A briefing schedule has been set, but Plaintiffs will work in good

faith to resolve any issues, including extensions, that may arise. Prior to filing, Plaintiffs'

counsel emailed Defendant's counsel regarding exhibits to this motion that were

potentially mistakenly not marked as confidential by Defendant pursuant to the protective

order. Out of an abundance of caution, Plaintiffs will file those exhibits as restricted and

will work with Defendants to comply with D.C.COLO.LCivR 7.2's restriction rules.

## I.    INTRODUCTION

Defendant Geo Group, Inc. (hereinafter "GEO") is a private, for-profit company that contracts with the federal government to provide detention and corrections services. This case is about GEO's operation of a private detention facility that houses civil immigration detainees in Aurora, Colorado pursuant to GEO's contract with U.S. Immigration and Customs Enforcement (hereinafter "ICE").[1] Plaintiffs allege that GEO maximizes its profits at that facility by exploiting conscripted, coerced, and underpaid detainee labor to clean, maintain, and operate the facility. By relying on these workers, GEO is able to maintain its *entire* facility—a facility that detains thousands of people every year—with only *one* non-detainee janitor on the payroll. The named Plaintiffs and the class they seek to represent were detained at the Aurora facility while awaiting immigration proceedings. They are GEO's captive workforce.

Plaintiffs' claims relate to two distinct work policies imposed on them by GEO. The first policy is the "Forced Labor Policy," whereby GEO requires Plaintiffs and members of the putative Forced Labor Class to perform uncompensated janitorial labor under threat of solitary confinement. Plaintiffs allege that this practice violates the federal

---

[1] This lawsuit pertains only to immigration detainees detained in GEO's Aurora Detention Facility. All references to "detainees" are limited to this relevant population. All discussion of uniform application of programs and policies is limited to immigration detainees at the Aurora facility.

forced labor statute. 18 U.S.C. § 1589.

The second policy is the Voluntary Work Program ("VWP") Policy. Pursuant to the VWP Policy, Plaintiffs and members of the putative VWP Class perform administrative and maintenance work at the Aurora facility for pay of $1.00 a day. GEO falsely represents to its detainees that it is prohibited from paying them more than $1.00 per day for their VWP work. Plaintiffs allege that GEO is unjustly enriched by the millions of dollars it would otherwise pay to outside contractors if it were not able to defraud and exploit its detainees for cheap labor under the VWP Policy.

## II.    STATEMENT OF FACTS

### A.  The Forced Labor Policy

The Aurora facility contains approximately thirteen "units," each with a common space and approximately eighty beds. Pursuant to its Forced Labor Policy, GEO requires its detainees to perform comprehensive cleaning of this cell and common space. Pls.' Ex. 1, 30(b)(6) Deposition of The GEO Group, Inc. (Dawn Ceja) ("GEO Dep.") at 26:1-11, 29:13-16; 37:23-38:5. The vast majority of this uncompensated work, performed under threat of solitary confinement, falls outside of ICE's Performance Based National Detention Standards ("PBNDS"), which limits the scope of uncompensated detainee housekeeping. Pls.' Ex. 1, GEO Dep. at 90:10-20. The PBNDS provides that

> Work assignments are voluntary; however, all detainees are
> responsible for personal housekeeping.  Detainees are re-
> quired to maintain their immediate living areas in a neat and

4

> orderly manner by: 1. making their bunk beds daily; 2. stack-
> ing loose papers; 3. keeping the floor free of debris and divid-
> ers free of clutter; and 4. refraining from hanging/draping
> clothing, pictures, keepsakes, or other objects from beds,
> overhead lighting fixtures or other furniture.

Dkt. No. 11-1 at pp. 3-4. For example, detainees are required to sweep and mop floors,

clean windows and divider walls, clean and scrub sinks, toilets and showers, empty and

wash trash receptacles, wipe down equipment surfaces, wipe down mattresses and

pillows, and clean up dining areas and common rooms after meals. Pls.' Ex. 2, Policy &

Procedure Manual; Pls.' Ex. 1, GEO Dep. at 36:24-37:13; 43:9-45:25; 86:11-21. In short,

GEO has interpreted the PBNDS to give it carte blanche to assign detainees to perform

almost any janitorial work it requires in the detention pods. *See, e.g.*, Pls.' Ex. 1, GEO

Dep. at 134:2-140:25.

All of this work is unpaid, even though it stretches far beyond the mere "personal

housekeeping" that ICE requires detainees to perform. Pls.' Ex. 1, GEO Dep. at 84:19-22.

And, because of the Forced Labor Policy, GEO is able to avoid paying outside custodians

and janitors to clean housing units. For all of these thousand beds and their common

spaces, GEO employs *one* outside custodian, who must be paid the $12 per hour wage set

for that position by the Department of Labor. Pls.' Ex. 1, GEO Dep. at 103:1-21 (citing

Pls.' Ex. 3, DOL Wage Determination for the Aurora Detention Facility).

The Forced Labor Policy's cleaning requirements are set forth in GEO's Policy

and Procedure Manual and Housekeeping/Maintenance Plan, provided to all GEO staff,

who in turn implement these policies throughout the facility.  Pls.' Ex. 1, GEO Dep. at

41:5-43:16; Pls.' Ex. 2, Policy & Procedure Manual. Through the implementation of

staff, the Forced Labor Policy applies to all detainees, Pls.' Ex. 1, GEO Dep. at 29:13-16,

which means that approximately 50,000-60,000 detainees have been subject to this policy

during the past ten years. Pls.' Ex. 1, GEO Dep. at 49:8-50:6.[2]

The Forced Labor Policy and the severe consequences of defying it are also set out

clearly for detainees to read and understand. GEO authors and issues to all detainees a

Detainee Handbook Local Supplement that informs detainees that failure to perform

housing unit sanitation work is a 300-level "High Moderate" disciplinary offense, which

could subject detainees to up to 72 hours in disciplinary segregation (also known as

solitary confinement) or even to criminal prosecution. Pls.' Ex. 1, GEO Dep. at 51:21-

52:25; 79:8-80:25; 84:19-85:15; 88:7-90:3; Pls.' Ex. 4 at PL000054. Detainees charged

with 300-level offenses are placed in GEO's administrative segregation housing unit.

Pls.' Ex. 1, GEO Dep. at 57:15-58:5. Administrative segregation cells are adjacent to

disciplinary segregation cells. Detainees in administrative segregation are confined to

their locked, single-occupant cell for twenty hours per day. Pls.' Ex. 1, GEO Dep. at

77:21-80:25. After their charges are processed and solitary confinement imposed,

--------------------

[2] Plaintiffs seek to represent a class of "All detainees who were forced to perform uncompen-
sated work for GEO at the Aurora Detention Facility under GEO's Housing Unit Sanitation pol-
icy between October 22, 2004 and the present." Dkt. No. 1 at ¶55.

detainees are sent to disciplinary segregation where they are confined, alone, to their cells for 22 hours per day and are deprived of all social time. Pls.' Ex. 1, GEO Dep. at 54:13-55:6; 117:2-20.

Plaintiffs were uniformly aware of GEO's requirement that they perform uncompensated cleaning and maintenance work and that the consequence of a refusal to perform this labor was solitary confinement.  Pls.' Ex. 5, Decl. of Alejandro Menocal Lepe at ¶3; Pls.' Ex. 6, Decl. of Grisel Xahuentitla-Flores at ¶3; Pls.' Ex. 7, Decl. of Lourdes Argueta at ¶3; Pls.' Ex. 8, Decl. of Jesus Gaytan at ¶3; Pls.' Ex. 9, Decl. of Demitrio Valerga at ¶3. So too were absent members of the Forced Labor Class. Pls.' Ex. 10, Decl. of Carlos Eliezer Ortiz Muñoz at ¶3; Pls.' Ex. 11, Decl. of Alejandro Hernandez Torres at ¶3; Pls.' Ex. 12, Decl. Of Adriana Mendoza Castellanos at ¶3.

**B.  The VWP Policy**

The VWP Policy operates alongside the Forced Labor Policy to minimize GEO's costs. GEO utilized the labor of Plaintiffs and other VWP participants to clean, operate, and maintain the facility, compensating all participants at the rate of $1.00 per day.[3] VWP participants worked in food service, cleaning, maintenance, laundry, facility

_____

[3] Plaintiffs' unjust enrichment count pertains only to "civil immigration detainees who performed work for GEO the Aurora Detention Facility in the "Detainee Voluntary Work Program" between October 22, 2012 and the present."  Dkt. No. 1 at ¶87.  All references to program participants are limited to this relevant population.  All discussion of uniform application of programs and policies is limited to those program participants at the Aurora facility.

operations, the detainee law library, and the barber shop. Pls.' Ex. 13, Policy & Procedure Manual 8.1.8-AUR. GEO testified that at least several hundred people participated in its Aurora Detention Facility VWP within the past three years.  Pls.' Ex. 14, GEO Dep. (Furst) at 13:1-12. While as many as 80 jobs at a time were filled through the VWP, high turnover rates precluded GEO from testifying to cumulative numbers of individuals in the program. *Id.* Indeed, GEO's invoice records demonstrate that in November of 2012 alone 780 distinct individuals worked in the VWP program. Pls.' Ex. 15, Man-Days Billing Report: 11/1/2012-11/30/2012.

The practices and procedures associated with the VWP Policy were largely uniform across the class. All participants filled out common Detainee Work Detail Application forms. Pls.' Ex. 1, GEO Dep. 153:13-18; 184:1-184:12. All participants received uniform job descriptions, common to all participants in their job class. *Id.*  All VWP participants executed a standardized Detainee Voluntary Work Program Agreement. [4] *Id*; Pls.' Ex. 14, GEO Dep. (Furst) at 46:16-47:4. And all participants received uniform Work Detail Orientation forms listing work rules and compensation. *Id.*

Additionally, all detainees were uniformly subjected to the policies and practices that make GEOs' retention of the value of their work unjust. Detainees are locked in a

---

[4] GEO contends that it does not have an agreement or contract with VWP participants. Pls.' Ex. 1, GEO Dep. at 149:25-150:11.

secure facility at GEO's mercy. They are deprived of clothing and possessions, limited in their contact with family, and are subject to rules that punish offenses like "insolence toward a staff member," Pls.' Ex. 4 at PL000054, "using abusive language," Pls.' Ex. 4 at PL0000055, and "[c]onduct that disrupts or interferes with the security or orderly operation of the facility." *Id.* They cannot seek any paying jobs except for jobs available through the $1.00-a-day VWP Policy. And yet, GEO misled VWP participants regarding the possibility that they could negotiate for higher wages. It informed the detainees, that "[t]he pricing is approved by ICE. GEO does not set the pricing. ICE tells us what the daily pay is for [VWP participants]." Pls.' Ex. 1, GEO Dep. 39:7-40:10; Pls.' Ex. 16. These representations were false. In reality, the PBNDS ICE publishes sets a floor, rather than a ceiling, and requires only that "[t]he compensation is ***at least*** $1.00 (USD) per day." Dkt. No. 11-1 PBNDS 5.8 at 385 (emphasis added).[5]

Furthermore, GEO derives significant economic benefit from the labor it obtains from VWP participants. GEO employs just one non-detainee custodian to clean its 525 bed facility. Pls.' Ex. 1, GEO Dep. 38:14-19; 101:6-103:21. The rest of GEO's cleaning labor comes from the VWP at $1.00 per day. VWP participants also perform the same work as maintenance workers employed by GEO. Pls.' Ex. 1, GEO Dep. 46:14-47:3.

---

[5] GEO's contract with ICE similarly sets reimbursement to GEO at a minimum of $1.00 per day, but allows the Contract Officer to approve a higher rate. Dkt. No. 11-2 at 7.

GEO concedes that it would have to hire additional corrections officers—paid at the rate of $24.05 per hour—to perform the work of VWP participants if the VWP policy did not exist. Pls.' Ex. 1, GEO Dep. 170:20-171:25; Pls.' Ex. 14, GEO Dep. (Furst) at 49:9-49:23. At the very least, absent the VWP, GEO would have no choice but to hire new workers and to pay them consistent with the hourly wages corresponding to their jobs in the Department of Labor's wage determination for the facility. Pls.' Ex. 3, DOL Wage Determination. GEO has saved millions of dollars during the class period by relying on VWP labor. *See* Pls.' Ex. 13, Policy & Procedure Manual 8.1.8-AUR; Pls' Ex. 15, Man-Days Billing Report.

## III.    FORCED LABOR

### A.  The Proposed Class

> ALL PERSONS DETAINED IN DEFENDANT'S AURORA DETENTION FACILITY IN THE TEN YEARS PRIOR TO THE FILING OF THIS ACTION

### B.   Plaintiffs Satisfy the Requirements of Rule 23(a)

#### 1.  Numerosity

The proposed class is so "numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Forced Labor Class contains approximately 50,000 to 60,000 members and therefore presumptively meets the numerosity requirement of Rule 23. Alba Conte, Herbert B. Newberg, & William B. Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. 2011) (suggesting that a class of 40 or more members should

presumptively satisfy numerosity).

### 2. **Commonality**

The proposed class also meets the commonality requirement of Rule 23(a)(3).

Federal law provides a private cause of action against anyone who "knowingly . . .

obtains the labor or services of a person"

> (1) by means of force, threats of force, physical restraint, or
> threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to
> that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal
> process; or
>
> (4) by means of any scheme, plan, or pattern intended to
> cause the person to believe that, if that person did not perform
> such labor or services, that person or another person would
> suffer serious harm or physical restraint

18 U.S.C. § 1589(a).

The resolution of Plaintiffs' claims alleging that GEO violated that provision will

turn on questions that are common to the putative class, including (1) whether GEO

obtains the labor of class members; (2) whether GEO threatens class members with

physical restraint, serious harm, or abuse of the legal process; and (3) whether GEO

"knowingly" obtains class members' labor "by . . . means of" these threats.

Evidence in the record establishes that these common questions have "common

answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564

U.S. 338, 350 (2011). This case is about a written Forced Labor Policy set out clearly for

the employees responsible for enforcing it and the detainees responsible for abiding by it.
That policy provides that class members must perform housing unit sanitation work or be
subject to an administrative legal process that could result in up to 72 hours in solitary
confinement. Plaintiffs allege that tens of thousands of class members provided labor to
GEO pursuant to that policy. At trial, the Forced Labor Class will ask the factfinder to
conclude that the uniformly applicable Forced Labor Policy violates the forced labor
statute. In other words, that policy is the common "glue" that allows the Forced Labor
Class's claims to be resolved "in one stroke." *In re Urethane Antitrust Litig.*, 768 F.3d
1245, 1253 (10th Cir. 2014) (internal quotation marks omitted).

   3. **Typicality**

      Plaintiffs' claims are also "typical of the claims . . . of the class."  Fed. R. Civ.
Proc. 23(a)(3). Plaintiffs all performed work for GEO pursuant to the Forced Labor
Policy. Pls.' Ex. 5, Decl. of Alejandro Menocal Lepe at ¶3; Pls.' Ex. 6, Decl. of Grisel
Xahuentitla-Flores at ¶3; Pls.' Ex. 7, Decl. of Lourdes Argueta at ¶3; Pls.' Ex. 8, Decl. of
Jesus Gaytan at ¶3; Pls.' Ex. 9, Decl. of Demitrio Valerga at ¶3. And the Forced Labor
Policy and the threat of solitary confinement form the basis of Plaintiffs' forced labor
claims, just as they form the basis for the putative class claims. *See Bass v. PJCOMN
Acquisition Corp.*, No. 09-CV-01614-REB-MEH, 2011 WL 2149602, at *3 (D. Colo.
June 1, 2011) ("A plaintiff's claim is typical of class claims if it challenges the same
conduct that would be challenged by the class.").

4. **Adequacy**

Plaintiffs and Plaintiffs' counsel can "fairly and adequately protect the interest of the class." Fed. R. Civ. Proc. 23(a)(4). There is no apparent conflict of interest between the potential class members and either the named Plaintiffs or named Plaintiffs' counsel. The named Plaintiffs can only recover if they succeed on legal theories that would also lead to recovery for the class. Moreover, the named Plaintiffs' attorneys' incentives are aligned with the class; their contingent fee agreement with the named Plaintiffs only allows the attorneys to be compensated if they successfully prosecute the suit. Pls.' Ex. 17; *see Rutter & Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180, 1187-1188 (10th Cir. 2002).

Furthermore, Plaintiffs' counsel are uniquely qualified to prosecute this action. *United Food & Commer. Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 654 (W.D. Okla. 2012) (internal citations omitted) (adequacy of class counsel "implicates "the experience and competence of the attorney[s] representing the class."). They have substantial experience litigating cases against private civil detention facilities, Pls.' Ex. 17, Free & Meyer Decls., and representing low-wage immigrant workers in class and collective actions, Pls.' Ex. 17. Additionally, counsel and their bilingual staff members can communicate with the Spanish-speaking members of the class. *Id.*

**C.** **Common Questions of Law and Fact Predominate and a Class Action is the Superior Method of Resolving Plaintiffs' Forced Labor Claims**

This class should be certified under Rule 23(b)(3) because "questions of law or

fact common to the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

1. **Predominance**

For common questions of law or fact to predominate under Rule 23(b)(3), "[i]t is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that answers to those common questions" be dispositive of the plaintiff's claims. *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). Rather, "the predominance prong asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (internal quotation marks omitted).

In addressing predominance, the Court should remain mindful of the continued role it can play, after certifying a class, in ensuring that Plaintiffs' claims are most efficiently prosecuted in a class action. *See, e.g.*, *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347 (6th Cir. 2011) (affirming decertification of class where discovery revealed that individual issues would predominate). For this reason, "the interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action." *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968).

With respect to Plaintiffs' forced labor claims, the common questions at issue

include, among others, (1) whether GEO obtain labor from class members; (2) whether GEO threatens class members with physical restraint, serious harm, or abuse of the legal process; and (3) whether GEO "knowingly" obtains that labor "by . . . means of" these threats. These questions easily predominate over any individual questions of law or fact.

Plaintiffs' forced labor claims turn on whether GEO "knowingly" obtained Plaintiffs' labor "by . . . means of" the threat of solitary confinement. For two reasons, however, that question does not call for a predominance-defeating, individualized inquiry into the minds of each class member. First, the language and structure of the forced labor statute in fact call for an objective inquiry that turns on whether a reasonable person would provide labor to the GEO if placed in the position of the person providing such labor. *See, e.g.*, *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, No. LA CV10-01172 JAK, 2011 WL 7095434, at *7 (C.D. Cal. Dec. 12, 2011) (concluding that forced labor statute calls for an objective inquiry and it is susceptible to class-wide adjudication). That purpose is evident in the fact that the statute focuses on the GEO's scienter, not the plaintiff's state of mind. Under Section 1589, "someone is guilty of forced labor if he intends to cause a person in his employ to believe that if she does not continue to work, she will suffer the type of serious harm . . . that would compel someone in her circumstances to continue working to avoid that harm." *United States v. Dann*, 652 F.3d

1160, 1169-70 (9th Cir. 2011).[6]

In other words, a person violates the forced labor statute if he obtains labor through threats that he intends or knows would cause a certain state of mind in a reasonable person in the position of the laborer. Applied to the facts of this case, that standard would require asking a factfinder whether GEO implemented the Forced Labor Policy to obtain labor from detainees, knowing or intending that a reasonable person in the detainees' position would feel compelled to provide that labor. That question would be answered based on a consideration of the uniformly applicable Forced Labor Policy and the factfinder's analysis of how a reasonable person would respond to that policy.

Second, even if the Court were to conclude that to establish liability, Plaintiffs must show that class members provided labor **because of** GEO's threats, the common questions and proof upon which Plaintiffs' forced labor claims will turn would overwhelm any individual issues. Even under a subjective standards, some forced labor cases are clearly susceptible to classwide adjudication: "[B]ased on the type of coercion

---

[6] Indeed, the definition of "serious harm" under the statute makes specific reference to a "reasonable person" standard.  Serious harm

> means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel *a reasonable person of the same background and in the same circumstances* to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c) (emphasis added).

used, there may be cases where consent becomes irrelevant. In other words, some 'choices' might be so illegitimate that any decision to work is 'involuntary.'" *David v. Signal Int'l*, LLC, No. CIV.A. 08-1220, 2012 WL 10759668 at \*21 (E.D. La. Jan. 4, 2012).

This case falls in that category. The facts here precisely illustrate the limits of consent-based defenses to forced labor claims. In the modern era, "the typical techniques . . . used to hold persons in slavelike conditions are not limited to physical or legal means." *United States v. Kozminski*, 487 U.S. 931, 956 (1988) (Brennan, J. concurring). Therefore, in many modern cases, factfinders must engage in a fact-based inquiry to examine the extent and nature of the GEO's coercive conduct. *Id.* However, the ***legal compulsion*** to work remains an obvious and clear-cut example of forced labor. As Justice Brennan observed, "the use of the master's whip and the power of the State to compel one human to labor for another were clearly core elements of slavery that the Thirteenth Amendment and its statutory progeny intended to eliminate." *Id.* at 954. Under these classic "slavelike conditions," "[c]onsent becomes irrelevant." *David*, 2012 WL 10759668, at \*21. Similarly, here, it makes little sense to require class members to make individual showings of coercion when GEO ***requires*** class members to provide it with free labor.

The Court need not, however, decide that subjective consent is irrelevant in order to determine that Plaintiffs have established predominance. It is enough to conclude, at

this stage, that the evidence supports an inference that class members did not voluntarily

consent to the Forced Labor Policy. *See CGC Holding*, 773 F.3d 1073 (10th Cir. 2014).

*Id.* at 1091. When the facts giving rise to that inference apply across an entire putative

class, class certification is proper. *Id.* at 1093; *see also In re U.S. Foodservice Inc.*

*Pricing Litig*., 729 F.3d 108, 120 (2d Cir. 2013) (affirming class certification of RICO

claims, holding that "payment may constitute circumstantial proof of reliance based on

the reasonable inference that customers who pay the amount specified in an inflated

invoice would not have done so absent reliance upon the invoice's implicit representation

that the invoiced amount was honestly owed"); *Klay v. Humana, Inc*., 382 F.3d 1241

(11th Cir. 2004) (civil RICO on behalf of a putative class of all doctors who submitted at

least one claim to any of the GEO HMOs during a twelve-year period).

   In this case, evidence that all class members were informed that they would be

subject to the possibility of solitary confinement if they declined to labor for GEO gives

rise, at the very least, to an inference that class members provided labor to GEO ***because***

***of*** the possibility of solitary confinement. The choice between solitary confinement and

work is no choice at all. Just as an individual plaintiff asserting a "forced labor" claim

could rely on this fact to demonstrate causation, "[f]or the purposes of class certification,

[there is] no reason why a putative class containing plaintiffs" who were all subject to the

same policy "should not be entitled to posit the same inference to a factfinder on a

classwide basis." *CGC Holding*, 773 F.3d at 1092.

2. **Superiority**

A class action is also the superior method of resolving this controversy. To the knowledge of Plaintiffs' counsel, no other potential class member has filed any claim in any court or administrative proceeding based on the Forced Labor Policy. Thus, no other potential class member has demonstrated an interest in controlling this litigation. *See* Fed. R. Civ. P. 23(b)(3)(A)-(B).

Furthermore, the class action vehicle is the superior method for adjudicating this controversy because it involves current and former immigrant detainees, most of whom lack English proficiency, and many of whom have limited financial resources. Many class members likely reside in different countries. It is extraordinarily unlikely that they would assert these claims individually. *Cook v. Rockwell International Corp.*, 181 F.R.D. 473, 482 (D. Colo. 1998).

Finally, the District of Colorado is ideal for the concentration of this litigation because it is home to GEO's Aurora facility.

## IV.    THE VOLUNTARY WORK PROGRAM

**A.  <u>The Proposed Class</u>**

> ALL PEOPLE WHO PERFORMED WORK DEFEND-
> ANT'S AURORA DETENTION FACILITY UNDER DE-
> FENDANT'S VWP POLICY IN THE THREE YEARS
> PRIOR TO THE FILING OF THIS ACTION

**B.  Plaintiffs Satisfy the Requirements of Rule 23(a)**

1. **Numerosity**

Several hundred people participated in the Voluntary Work Program over the past three years, and therefore the VWP Class presumptively meets the numerosity requirement of Rule 23. Alba Conte, Herbert B. Newberg, & William B. Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. 2011) (suggesting that a class of 40 or more members should presumptively satisfy numerosity).

2. **Commonality**

The proposed class also meets the commonality requirement of Rule 23(a)(3). Pursuant to Colorado law, a plaintiff may recover in equity based on the GEO's unjust enrichment if: "(1) at plaintiff's expense; (2) GEO received a benefit; (3) under circumstances that would make it unjust for GEO to retain the benefit without paying." *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 445 (Colo. 2000).

In this case, the VWP Class raises the common, classwide questions of (1) whether the class provided GEO with a benefit in the form of substantially discounted labor, and (2) whether, under the circumstances of this case, it would be unjust for GEO to retain that benefit.  Those common questions will be subject to common answers that, like Plaintiffs' forced labor claims, will be apt to drive the classwide resolution of the litigation. *Dukes*, 564 U.S. at 350.

As to the first question, there should be no dispute that the VWP Policy has itself

provided GEO with enormous amounts of cheap labor that has saved it millions of dollars over the past three years.

The second question is equally susceptible to classwide adjudication based on the facts of this case. "Whether injustice results often will turn on whether a party engaged in some type of wrongdoing" determined through "a highly fact-intensive inquiry." *Dudding*, 11 P.3d at 445. Colorado courts have explained that this prong of the unjust enrichment test often presents a "difficult question[] for trial courts." *Redd Iron, Inc. v. Int'l Sales & Servs. Corp.*, 200 P.3d 1133, 1136 (Colo. App. 2008). However, the fact-intensive nature of the analysis does not preclude the availability of common proof to establish unjust enrichment across an entire class.

In this case, Plaintiffs' unjust enrichment theory rests on two features of the VWP Policy that apply classwide: first, that GEO misrepresents to Plaintiffs—who are a captive workforce with limited freedom and without any other paying work opportunities—that ICE sets VWP payment at exactly $1 a day, and second, that GEO relies on this necessarily captive workforce for $1-a-day labor, when it would otherwise turn to an open market that would supply similar labor at substantially higher costs. *See, e.g.*, *DCB Constr. Co. v. Central City Dev. Co.*, 965 P.2d 115, 122 (Colo.1998) (providing examples of the types of malfeasance that support a finding of unjust enrichment). At this stage, the Court need not determine whether these facts support a finding of unjust enrichment. It is enough for now to conclude that many of the facts

supporting Plaintiffs' unjust enrichment claims apply across the entire VWP Class.

### 3. **Typicality**

Plaintiffs' claims are also "typical of the claims . . . of the class." Fed. R. Civ.

Proc. 23(a)(3). Plaintiffs all performed work for GEO under the VWP Policy. Pls.' Ex. 5,

Decl. of Alejandro Menocal Lepe at ¶3; Pls.' Ex. 6, Decl. of Grisel Xahuentitla-Flores at

¶3; Pls.' Ex. 7, Decl. of Lourdes Argueta at ¶3; Pls.' Ex. 8, Decl. of Jesus Gaytan at ¶3;

Pls.' Ex. 9, Decl. of Demitrio Valerga at ¶3. They claim here that GEO misled them

about whether they could ever be paid more than $1 a day. Additionally, they claim that

through the VWP Policy, GEO was able to save considerable amounts of money that it

would otherwise have to spend on labor through outside employees or contractors. Those

claims are typical of the class. *See Bass v. PJCOMN Acquisition Corp.*, No. 09-CV-

01614-REB-MEH, 2011 WL 2149602, at *3 (D. Colo. June 1, 2011) ("A plaintiff's claim

is typical of class claims if it challenges the same conduct that would be challenged by

the class.").

### 4. **Adequacy**

For the same reasons that Plaintiffs and their counsel meet the adequacy

requirement for the Forced Labor Class, they meet that requirement for the VWP class.

### C. <u>Common Questions of Law and Fact Predominate and a Class Action is the Superior Method of Resolving Plaintiffs' Forced Labor Claims</u>

This class should be certified under Rule 23(b)(3) because "questions of law or

fact common to the class predominate over any questions affecting only individual

members, and . . . a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy."

1. **Predominance**

Because of the nature of the VWP Class's claims, common issues easily

predominate over any individual questions. As explained above, the question posed by

Plaintiffs' unjust enrichment claims is not whether any particular individual unjustly

enriched GEO because of the quality of his work or the nature of GEO's

misrepresentations to him. Rather, Plaintiffs unjust enrichment claims call for a classwide

adjudication of the "intentions, expectations, and behavior of the parties" related to the

entire VWP Policy. *Hannon Law Firm, LLC v. Melat, Pressman & Higbie, LLP*, 293

P.3d 55, 59 (Colo. App. 2011).

Plaintiffs' acknowledge that individual questions may arise with respect to

damages arising from GEO's unjust enrichment. After all, not all VWP participants

worked the same number of hours or performed the same work. The possibility of

individualized damages awards, however, does not defeat predominance, particularly

where liability can be determined on a classwide basis. *In re Urethane Antitrust Litig.*,

768 F.3d 1245, 1255 (10th Cir. 2014); *see also Roach v. T.L. Cannon Corp.,* 778 F.3d

401, 409 (2d Cir. 2015) ("[I]ndividualized damages determinations alone cannot preclude

certification under Rule 23(b)(3)").

In this case, the Court could later decide to bifurcate damages determinations for

the VWP Class. Plaintiffs' contend, however, that even this minimal level of individualization is unnecessary here. Through the use of a formula and statistical sampling that consider variables like the number of hours worked, the type of work performed, and the fair market value of such work, the factfinder could determine unjust enrichment damages without individualized hearings. This evidence would be available to an individual plaintiff alleging unjust enrichment damages and it "cannot be deemed improper merely because the claim is brought on behalf of a class." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016).

2. **Superiority**

For largely the same reasons that Plaintiffs meet the superiority requirement for the Forced Labor Class, they meet that requirement for the VWP class as well.

## V.    THE COURT SHOULD APPOINT PLAINTIFFS' COUNSEL AS CLASS COUNSEL

Should the Court grant Plaintiffs' motion, it must appoint class counsel. Fed. R. Civ. P. 23(g). Plaintiffs' counsel request appointment as class counsel.

Collectively they have invested significant time in identifying and investigating potential claims in this action. The team of attorneys representing Plaintiffs has significant class action experience and many have served as class counsel. Moreover, the varied litigation experience of the team will be beneficial to the classes' pursuit of the claims here. Further, a large portion of the persons composing the classes will be immigrant Spanish speakers. Plaintiffs' counsel are largely bilingual and have significant

experience with this client base. Finally, Plaintiffs' counsel are committed to advancing the costs of this litigation. *See* Pls.' Ex. 17.

WHEREFORE, the Plaintiffs request that:

1. The Court certify the classes;

2. The named Plaintiffs be named class representative of any classes certified by the Court; and

3. That Attorneys Brand Milstein, Andrew Turner, Andrew Free, Alexander Hood, David Seligman, Andrew Schmidt, and Hans Meyer be appointed class counsel.

Dated: 5/6/2016                              Respectfully Submitted,

*S/ Alexander Hood*
Alexander Hood
David Seligman
Andrew Schmidt
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
(720) 441-2236
alex@towardsjustice.org
david@towardsjustice.org
andy@towardsjustice.org

*S/ Brandt Milstein*
Milstein Law Office
595 Canyon Boulevard
Boulder, CO 80302
(303) 440-8780
brandt@milsteinlawoffice.com

*S/ Andrew Turner*
Beuscher, Kelman, Perera, & Turner, P.C.
600 Grant St., Suite 450
Denver, CO 80203
(303) 333-7751
aturner@laborlawdenver.com

*S/ R. Andrew Free*
1212 7th Avenue North
Nashville, Tennessee 37208
(844) 321-3221
(615) 829-8959
Andrew@ImmigrantCivilRights.com

*S/ Hans Meyer*
Meyer Law Office, P.C.
P.O. Box 40394
Denver, CO 80204
(303) 831-0817
hans@themeyerlawoffice.com

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that on 5/6/2016, the above was filed using this Court's CM/ECF system, which caused all counsel of record to be served electronically pursuant to FRCP 5.

s/ Alexander Hood
Alexander Hood
Attorney for the Plaintiffs

05-2081

Attachment 1 - HSCEDM-11-D-00003-P00010

WD 05-2081 (Rev.-14) was first posted on www.wdol.gov on 08/05/2014
*******************************************************************************

| REGISTER OF WAGE DETERMINATIONS UNDER | U.S. DEPARTMENT OF LABOR |
| THE SERVICE CONTRACT ACT | EMPLOYMENT STANDARDS ADMINISTRATION |
| By direction of the Secretary of Labor | WAGE AND HOUR DIVISION |
| | WASHINGTON D.C.  20210 |

| | Wage Determination No.: 2005-2081 |
| Diane C. Koplewski     Division of | Revision No.: 14 |
| Director       Wage Determinations | Date Of Revision: 07/25/2014 |

State: Colorado

Area: Colorado Counties of Adams, Arapahoe, Boulder, Broomfield, Clear Creek,
Denver, Douglas, Elbert, Gilpin, Grand, Jackson, Jefferson, Logan, Morgan,
Park, Phillips, Sedgwick, Summit, Washington, Weld, Yuma

**Fringe Benefits Required Follow the Occupational Listing**

| OCCUPATION CODE - TITLE | FOOTNOTE | RATE |
|---|---|---|
| 01000 - Administrative Support And Clerical Occupations | | |
| 01011 - Accounting Clerk I | | 14.16 |
| 01012 - Accounting Clerk II | | 16.44 |
| 01013 - Accounting Clerk III | | 18.38 |
| 01020 - Administrative Assistant | | 26.31 |
| 01040 - Court Reporter | | 19.59 |
| 01051 - Data Entry Operator I | | 14.06 |
| 01052 - Data Entry Operator II | | 15.35 |
| 01060 - Dispatcher, Motor Vehicle | | 19.37 |
| 01070 - Document Preparation Clerk | | 14.55 |
| 01090 - Duplicating Machine Operator | | 14.55 |
| 01111 - General Clerk I | | 13.39 |
| 01112 - General Clerk II | | 14.61 |
| 01113 - General Clerk III | | 16.40 |
| 01120 - Housing Referral Assistant | | 21.75 |
| 01141 - Messenger Courier | | 13.02 |
| 01191 - Order Clerk I | | 14.93 |
| 01192 - Order Clerk II | | 16.29 |
| 01261 - Personnel Assistant (Employment) I | | 16.67 |
| 01262 - Personnel Assistant (Employment) II | | 18.65 |
| 01263 - Personnel Assistant (Employment) III | | 20.79 |
| 01270 - Production Control Clerk | | 22.33 |
| 01280 - Receptionist | | 14.27 |
| 01290 - Rental Clerk | | 15.53 |
| 01300 - Scheduler, Maintenance | | 17.15 |
| 01311 - Secretary I | | 17.15 |
| 01312 - Secretary II | | 19.19 |
| 01313 - Secretary III | | 21.75 |
| 01320 - Service Order Dispatcher | | 14.37 |
| 01410 - Supply Technician | | 26.31 |
| 01420 - Survey Worker | | 17.77 |
| 01531 - Travel Clerk I | | 13.55 |
| 01532 - Travel Clerk II | | 14.20 |
| 01533 - Travel Clerk III | | 15.19 |
| 01611 - Word Processor I | | 14.15 |
| 01612 - Word Processor II | | 15.88 |
| 01613 - Word Processor III | | 17.77 |
| 05000 - Automotive Service Occupations | | |
| 05005 - Automobile Body Repairer, Fiberglass | | 26.19 |
| 05010 - Automotive  Electrician | | 20.43 |

Page 1

Pl. Ex. 3

Case No. 1:14-cv-02887-JLK-CYC   Document 67   Filed 06/16/15   USDC Colorado

                                   05-2081

```
  05040 - Automotive Glass Installer                           19.36
  05070 - Automotive Worker                                    19.36
  05110 - Mobile Equipment Servicer                            17.61
  05130 - Motor Equipment Metal Mechanic                       20.82
  05160 - Motor Equipment Metal Worker                         19.36
  05190 - Motor Vehicle Mechanic                               20.82
  05220 - Motor Vehicle Mechanic Helper                        16.41
  05250 - Motor Vehicle Upholstery Worker                      19.36
  05280 - Motor Vehicle Wrecker                                19.36
  05310 - Painter, Automotive                                  19.69
  05340 - Radiator Repair Specialist                           19.36
  05370 - Tire Repairer                                        14.98
  05400 - Transmission Repair Specialist                       20.82
07000 - Food Preparation And Service Occupations
  07010 - Baker                                                14.52
  07041 - Cook I                                               13.06
  07042 - Cook II                                              15.10
  07070 - Dishwasher                                            9.69
  07130 - Food Service Worker                                  10.90
  07210 - Meat Cutter                                          15.13
  07260 - Waiter/Waitress                                      10.65
09000 - Furniture Maintenance And Repair Occupations
  09010 - Electrostatic Spray Painter                          19.06
  09040 - Furniture Handler                                    15.90
  09080 - Furniture Refinisher                                 19.06
  09090 - Furniture Refinisher Helper                          15.90
  09110 - Furniture Repairer, Minor                            18.10
  09130 - Upholsterer                                          19.06
11000 - General Services And Support Occupations
  11030 - Cleaner, Vehicles                                    11.08
  11060 - Elevator Operator                                    11.08
  11090 - Gardener                                             18.19
  11122 - Housekeeping Aide                                    12.46
  11150 - Janitor                                              12.01
  11210 - Laborer, Grounds Maintenance                         14.67
  11240 - Maid or Houseman                                      9.16
  11260 - Pruner                                               13.16
  11270 - Tractor Operator                                     17.30
  11330 - Trail Maintenance Worker                             14.67
  11360 - Window Cleaner                                       13.37
12000 - Health Occupations
  12010 - Ambulance Driver                                     18.18
  12011 - Breath Alcohol Technician                            20.66
  12012 - Certified Occupational Therapist Assistant           19.48
  12015 - Certified Physical Therapist Assistant               18.75
  12020 - Dental Assistant                                     18.55
  12025 - Dental Hygienist                                     36.80
  12030 - EKG Technician                                       24.05
  12035 - Electroneurodiagnostic Technologist                  24.05
  12040 - Emergency Medical Technician                         18.18
  12071 - Licensed Practical Nurse I                           18.46
  12072 - Licensed Practical Nurse II                          20.66
  12073 - Licensed Practical Nurse III                         23.03
  12100 - Medical Assistant                                    15.94
  12130 - Medical Laboratory Technician                        17.47
  12160 - Medical Record Clerk                                 16.12
  12190 - Medical Record Technician                            18.04
  12195 - Medical Transcriptionist                             18.73
  12210 - Nuclear Medicine Technologist                        36.64
  12221 - Nursing Assistant I                                  11.78
  12222 - Nursing Assistant II                                 13.25
  12223 - Nursing Assistant III                                14.46
  12224 - Nursing Assistant IV                                 16.23
```

05-2081

| | |
|---|---|
| 12235 – Optical Dispenser | 20.66 |
| 12236 – Optical Technician | 18.46 |
| 12250 – Pharmacy Technician | 15.81 |
| 12280 – Phlebotomist | 16.23 |
| 12305 – Radiologic Technologist | 26.85 |
| 12311 – Registered Nurse I | 29.98 |
| 12312 – Registered Nurse II | 36.67 |
| 12313 – Registered Nurse II, Specialist | 36.67 |
| 12314 – Registered Nurse III | 43.96 |
| 12315 – Registered Nurse III, Anesthetist | 43.96 |
| 12316 – Registered Nurse IV | 53.17 |
| 12317 – Scheduler (Drug and Alcohol Testing) | 27.05 |
| 13000 – Information And Arts Occupations | |
| 13011 – Exhibits Specialist I | 18.46 |
| 13012 – Exhibits Specialist II | 22.87 |
| 13013 – Exhibits Specialist III | 27.97 |
| 13041 – Illustrator I | 20.05 |
| 13042 – Illustrator II | 23.10 |
| 13043 – Illustrator III | 28.26 |
| 13047 – Librarian | 28.29 |
| 13050 – Library Aide/Clerk | 15.88 |
| 13054 – Library Information Technology Systems Administrator | 25.55 |
| 13058 – Library Technician | 17.64 |
| 13061 – Media Specialist I | 18.43 |
| 13062 – Media Specialist II | 20.62 |
| 13063 – Media Specialist III | 22.99 |
| 13071 – Photographer I | 16.85 |
| 13072 – Photographer II | 18.85 |
| 13073 – Photographer III | 23.36 |
| 13074 – Photographer IV | 28.57 |
| 13075 – Photographer V | 34.56 |
| 13110 – Video Teleconference Technician | 18.26 |
| 14000 – Information Technology Occupations | |
| 14041 – Computer Operator I | 17.81 |
| 14042 – Computer Operator II | 19.93 |
| 14043 – Computer Operator III | 22.21 |
| 14044 – Computer Operator IV | 24.69 |
| 14045 – Computer Operator V | 28.56 |
| 14071 – Computer Programmer I | 24.31 |
| 14072 – Computer Programmer II (see 1) | |
| 14073 – Computer Programmer III (see 1) | |
| 14074 – Computer Programmer IV (see 1) | |
| 14101 – Computer Systems Analyst I (see 1) | |
| 14102 – Computer Systems Analyst II (see 1) | |
| 14103 – Computer Systems Analyst III (see 1) | |
| 14150 – Peripheral Equipment Operator | 17.81 |
| 14160 – Personal Computer Support Technician | 24.69 |
| 15000 – Instructional Occupations | |
| 15010 – Aircrew Training Devices Instructor (Non-Rated) | 35.58 |
| 15020 – Aircrew Training Devices Instructor (Rated) | 43.06 |
| 15030 – Air Crew Training Devices Instructor (Pilot) | 49.15 |
| 15050 – Computer Based Training Specialist / Instructor | 35.58 |
| 15060 – Educational Technologist | 31.17 |
| 15070 – Flight Instructor (Pilot) | 49.15 |
| 15080 – Graphic Artist | 21.93 |
| 15090 – Technical Instructor | 21.99 |
| 15095 – Technical Instructor/Course Developer | 26.89 |
| 15110 – Test Proctor | 17.74 |
| 15120 – Tutor | 17.74 |
| 16000 – Laundry, Dry-Cleaning, Pressing And Related Occupations | |
| 16010 – Assembler | 9.84 |
| 16030 – Counter Attendant | 9.84 |

Page 3

05-2081

```
16040 - Dry Cleaner                                              12.71
16070 - Finisher, Flatwork, Machine                               9.84
16090 - Presser, Hand                                             9.84
16110 - Presser, Machine, Drycleaning                             9.84
16130 - Presser, Machine, Shirts                                  9.84
16160 - Presser, Machine, Wearing Apparel, Laundry                9.84
16190 - Sewing Machine Operator                                  13.57
16220 - Tailor                                                   14.48
16250 - Washer, Machine                                          10.93
19000 - Machine Tool Operation And Repair Occupations
19010 - Machine-Tool Operator (Tool Room)                        18.32
19040 - Tool And Die Maker                                       21.57
21000 - Materials Handling And Packing Occupations
21020 - Forklift Operator                                        14.96
21030 - Material Coordinator                                     22.33
21040 - Material Expediter                                       22.33
21050 - Material Handling Laborer                                17.36
21071 - Order Filler                                             13.44
21080 - Production Line Worker (Food Processing)                 14.96
21110 - Shipping Packer                                          15.20
21130 - Shipping/Receiving Clerk                                 15.20
21140 - Store Worker I                                           11.90
21150 - Stock Clerk                                              15.99
21210 - Tools And Parts Attendant                                16.28
21410 - Warehouse Specialist                                     14.96
23000 - Mechanics And Maintenance And Repair Occupations
23010 - Aerospace Structural Welder                              27.73
23021 - Aircraft Mechanic I                                      27.10
23022 - Aircraft Mechanic II                                     28.53
23023 - Aircraft Mechanic III                                    29.70
23040 - Aircraft Mechanic Helper                                 19.22
23050 - Aircraft, Painter                                        25.80
23060 - Aircraft Servicer                                        22.49
23080 - Aircraft Worker                                          24.13
23110 - Appliance Mechanic                                       22.34
23120 - Bicycle Repairer                                         14.98
23125 - Cable Splicer                                            30.57
23130 - Carpenter, Maintenance                                   19.40
23140 - Carpet Layer                                             18.72
23160 - Electrician, Maintenance                                 24.90
23181 - Electronics Technician Maintenance I                     22.14
23182 - Electronics Technician Maintenance II                    23.65
23183 - Electronics Technician Maintenance III                   25.12
23260 - Fabric Worker                                            20.52
23290 - Fire Alarm System Mechanic                               21.09
23310 - Fire Extinguisher Repairer                               18.97
23311 - Fuel Distribution System Mechanic                        23.46
23312 - Fuel Distribution System Operator                        18.97
23370 - General Maintenance Worker                               19.16
23380 - Ground Support Equipment Mechanic                        27.10
23381 - Ground Support Equipment Servicer                        22.49
23382 - Ground Support Equipment Worker                          24.13
23391 - Gunsmith I                                               17.13
23392 - Gunsmith II                                              19.81
23393 - Gunsmith III                                             22.48
23410 - Heating, Ventilation And Air-Conditioning                22.73
Mechanic
23411 - Heating, Ventilation And Air Contditioning               23.92
Mechanic (Research Facility)
23430 - Heavy Equipment Mechanic                                 22.05
23440 - Heavy Equipment Operator                                 20.98
23460 - Instrument Mechanic                                      28.48
23465 - Laboratory/Shelter Mechanic                              21.17
```

05-2081

```
23470 - Laborer                                                  13.87
23510 - Locksmith                                                20.97
23530 - Machinery Maintenance Mechanic                           23.43
23550 - Machinist, Maintenance                                   19.33
23580 - Maintenance Trades Helper                                15.26
23591 - Metrology Technician I                                   28.48
23592 - Metrology Technician II                                  29.91
23593 - Metrology Technician III                                 31.16
23640 - Millwright                                               22.48
23710 - Office Appliance Repairer                                21.44
23760 - Painter, Maintenance                                     17.84
23790 - Pipefitter, Maintenance                                  24.59
23810 - Plumber, Maintenance                                     21.93
23820 - Pneudraulic Systems Mechanic                             22.48
23850 - Rigger                                                   22.48
23870 - Scale Mechanic                                           19.81
23890 - Sheet-Metal Worker, Maintenance                          19.85
23910 - Small Engine Mechanic                                    17.92
23931 - Telecommunications Mechanic I                            27.08
23932 - Telecommunications Mechanic II                           28.50
23950 - Telephone Lineman                                        23.34
23960 - Welder, Combination, Maintenance                         19.79
23965 - Well Driller                                             20.88
23970 - Woodcraft Worker                                         22.48
23980 - Woodworker                                               17.13
24000 - Personal Needs Occupations
  24570 - Child Care Attendant                                   10.69
  24580 - Child Care Center Clerk                                14.17
  24610 - Chore Aide                                             10.52
  24620 - Family Readiness And Support Services                  15.93
  Coordinator
  24630 - Homemaker                                              16.29
25000 - Plant And System Operations Occupations
  25010 - Boiler Tender                                          24.70
  25040 - Sewage Plant Operator                                  22.79
  25070 - Stationary Engineer                                    24.70
  25190 - Ventilation Equipment Tender                           17.33
  25210 - Water Treatment Plant Operator                         22.79
27000 - Protective Service Occupations
  27004 - Alarm Monitor                                          20.94
  27007 - Baggage Inspector                                      13.19
  27008 - Corrections Officer                                    23.36
  27010 - Court Security Officer                                 27.27
  27030 - Detection Dog Handler                                  21.32
  27040 - Detention Officer                                      24.05
  27070 - Firefighter                                            29.32
  27101 - Guard I                                                13.19
  27102 - Guard II                                               21.32
  27131 - Police Officer I                                       29.14
  27132 - Police Officer II                                      32.39
28000 - Recreation Occupations
  28041 - Carnival Equipment Operator                            13.08
  28042 - Carnival Equipment Repairer                            14.10
  28043 - Carnival Equpment Worker                               10.23
  28210 - Gate Attendant/Gate Tender                             15.14
  28310 - Lifeguard                                              11.73
  28350 - Park Attendant (Aide)                                  16.75
  28510 - Recreation Aide/Health Facility Attendant              12.36
  28515 - Recreation Specialist                                  16.28
  28630 - Sports Official                                        13.49
  28690 - Swimming Pool Operator                                 17.05
29000 - Stevedoring/Longshoremen Occupational Services
  29010 - Blocker And Bracer                                     23.50
```

Page 5

05-2081

```
29020 - Hatch Tender                                                 23.50
29030 - Line Handler                                                 23.50
29041 - Stevedore I                                                  21.91
29042 - Stevedore II                                                 25.48
30000 - Technical Occupations
30010 - Air Traffic Control Specialist, Center (HFO)     (see 2)     38.39
30011 - Air Traffic Control Specialist, Station (HFO)    (see 2)     26.47
30012 - Air Traffic Control Specialist, Terminal (HFO) (see 2)       29.16
30021 - Archeological Technician I                                   19.40
30022 - Archeological Technician II                                  21.70
30023 - Archeological Technician III                                 26.89
30030 - Cartographic Technician                                      26.41
30040 - Civil Engineering Technician                                 24.61
30061 - Drafter/CAD Operator I                                       18.45
30062 - Drafter/CAD Operator II                                      20.65
30063 - Drafter/CAD Operator III                                     23.84
30064 - Drafter/CAD Operator IV                                      31.50
30081 - Engineering Technician I                                     18.44
30082 - Engineering Technician II                                    20.69
30083 - Engineering Technician III                                   23.15
30084 - Engineering Technician IV                                    28.69
30085 - Engineering Technician V                                     35.09
30086 - Engineering Technician VI                                    42.45
30090 - Environmental Technician                                     24.08
30210 - Laboratory Technician                                        21.37
30240 - Mathematical Technician                                      26.62
30361 - Paralegal/Legal Assistant I                                  19.46
30362 - Paralegal/Legal Assistant II                                 24.11
30363 - Paralegal/Legal Assistant III                                29.49
30364 - Paralegal/Legal Assistant IV                                 35.68
30390 - Photo-Optics Technician                                      26.62
30461 - Technical Writer I                                           26.26
30462 - Technical Writer II                                          32.12
30463 - Technical Writer III                                         38.86
30491 - Unexploded Ordnance (UXO) Technician I                       24.40
30492 - Unexploded Ordnance (UXO) Technician II                      29.52
30493 - Unexploded Ordnance (UXO) Technician III                     35.38
30494 - Unexploded (UXO) Safety Escort                               24.40
30495 - Unexploded (UXO) Sweep Personnel                             24.40
30620 - Weather Observer, Combined Upper Air Or          (see 2)     23.84
Surface Programs
30621 - Weather Observer, Senior                         (see 2)     26.41
31000 - Transportation/Mobile Equipment Operation Occupations
31020 - Bus Aide                                                     11.89
31030 - Bus Driver                                                   15.89
31043 - Driver Courier                                               14.49
31260 - Parking and Lot Attendant                                     9.13
31290 - Shuttle Bus Driver                                           15.55
31310 - Taxi Driver                                                  12.89
31361 - Truckdriver, Light                                           15.55
31362 - Truckdriver, Medium                                          19.65
31363 - Truckdriver, Heavy                                           20.37
31364 - Truckdriver, Tractor-Trailer                                 20.37
99000 - Miscellaneous Occupations
99030 - Cashier                                                      10.78
99050 - Desk Clerk                                                   10.42
99095 - Embalmer                                                     23.94
99251 - Laboratory Animal Caretaker I                                10.92
99252 - Laboratory Animal Caretaker II                               11.74
99310 - Mortician                                                    24.19
99410 - Pest Controller                                              20.41
99510 - Photofinishing Worker                                        12.03
99710 - Recycling Laborer                                            18.59
```

Page 6

05-2081

| | |
|---|---|
| 99711 - Recycling Specialist | 22.42 |
| 99730 - Refuse Collector | 16.70 |
| 99810 - Sales Clerk | 12.60 |
| 99820 - School Crossing Guard | 12.64 |
| 99830 - Survey Party Chief | 22.70 |
| 99831 - Surveying Aide | 12.60 |
| 99832 - Surveying Technician | 20.64 |
| 99840 - Vending Machine Attendant | 14.38 |
| 99841 - Vending Machine Repairer | 17.05 |
| 99842 - Vending Machine Repairer Helper | 14.38 |

---

ALL OCCUPATIONS LISTED ABOVE RECEIVE THE FOLLOWING BENEFITS:

HEALTH & WELFARE: $4.02 per hour or $160.80 per week or $696.79 per month

VACATION: 2 weeks paid vacation after 1 year of service with a contractor or successor; 3 weeks after 5 years, and 4 weeks after 15 years. Length of service includes the whole span of continuous service with the present contractor or successor, wherever employed, and with the predecessor contractors in the performance of similar work at the same Federal facility. (Reg. 29 CFR 4.173)

HOLIDAYS: A minimum of ten paid holidays per year, New Year's Day, Martin Luther King Jr's Birthday, Washington's Birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, and Christmas Day. (A contractor may substitute for any of the named holidays another day off with pay in accordance with a plan communicated to the employees involved.) (See 29 CFR 4174)

THE OCCUPATIONS WHICH HAVE NUMBERED FOOTNOTES IN PARENTHESES RECEIVE THE FOLLOWING:

1) COMPUTER EMPLOYEES: Under the SCA at section 8(b), this wage determination does not apply to any employee who individually qualifies as a bona fide executive, administrative, or professional employee as defined in 29 C.F.R. Part 541. Because most Computer System Analysts and Computer Programmers who are compensated at a rate not less than $27.63 (or on a salary or fee basis at a rate not less than $455 per week) an hour would likely qualify as exempt computer professionals, (29 C.F.R. 541. 400) wage rates may not be listed on this wage determination for all occupations within those job families. In addition, because this wage determination may not list a wage rate for some or all occupations within those job families if the survey data indicates that the prevailing wage rate for the occupation equals or exceeds $27.63 per hour conformances may be necessary for certain nonexempt employees. For example, if an individual employee is nonexempt but nevertheless performs duties within the scope of one of the Computer Systems Analyst or Computer Programmer occupations for which this wage determination does not specify an SCA wage rate, then the wage rate for that employee must be conformed in accordance with the conformance procedures described in the conformance note included on this wage determination.

Additionally, because job titles vary widely and change quickly in the computer industry, job titles are not determinative of the application of the computer professional exemption. Therefore, the exemption applies only to computer employees who satisfy the compensation requirements and whose primary duty consists of:
    (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;
    (2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and

Page 7

05-2081
related to user or system design specifications;
    (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
    (4) A combination of the aforementioned duties, the performance of which requires the same level of skills. (29 C.F.R. 541.400).

2)  AIR TRAFFIC CONTROLLERS AND WEATHER OBSERVERS - NIGHT PAY & SUNDAY PAY:  If you work at night as part of a regular tour of duty, you will earn a night differential and receive an additional 10% of basic pay for any hours worked between 6pm and 6am. If you are a full-time employed (40 hours a week) and Sunday is part of your regularly scheduled workweek, you are paid at your rate of basic pay plus a Sunday premium of 25% of your basic rate for each hour of Sunday work which is not overtime (i.e. occasional work on Sunday outside the normal tour of duty is considered overtime work).

HAZARDOUS PAY DIFFERENTIAL: An 8 percent differential is applicable to employees employed in a position that represents a high degree of hazard when working with or in close proximity to ordinance, explosives, and incendiary materials.  This includes work such as screening, blending, dying, mixing, and pressing of sensitive ordance, explosives, and pyrotechnic compositions such as lead azide, black powder and photoflash powder.  All dry-house activities involving propellants or explosives.
    Demilitarization, modification, renovation, demolition, and maintenance operations on sensitive ordnance, explosives and incendiary materials.  All operations involving regrading and cleaning of artillery ranges.

A 4 percent differential is applicable to employees employed in a position that represents a low degree of hazard when working with, or in close proximity to ordance, (or employees possibly adjacent to) explosives and incendiary materials which involves potential injury such as laceration of hands, face, or arms of the employee engaged in the operation,  irritation of the skin, minor burns and the like; minimal damage to immediate or adjacent work area or equipment being used. All operations involving, unloading, storage, and hauling of ordance, explosive, and incendiary ordnance material other than small arms ammunition.  These differentials are only applicable to work that has been specifically designated by the agency for ordance, explosives, and incendiary material differential pay.

** UNIFORM ALLOWANCE **

If employees are required to wear uniforms in the performance of this contract (either by the terms of the Government contract, by the employer, by the state or local law, etc.), the cost of furnishing such uniforms and maintaining (by laundering or dry cleaning) such uniforms is an expense that may not be borne by an employee where such cost reduces the hourly rate below that required by the wage determination. The Department of Labor will accept payment in accordance with the following standards as compliance:

The contractor or subcontractor is required to furnish all employees with an adequate number of uniforms without cost or to reimburse employees for the actual cost of the uniforms.  In addition, where uniform cleaning and maintenance is made the responsibility of the employee, all contractors and subcontractors subject to this wage determination shall (in the absence of a bona fide collective bargaining agreement providing for a different amount, or the furnishing of contrary affirmative proof as to the actual cost), reimburse all employees for such cleaning and maintenance at a rate of $3.35 per week (or $.67 cents per day).  However, in those instances where the uniforms furnished are made of "wash and wear" materials, may be routinely washed and dried with other personal garments, and do not require any special treatment such as dry cleaning, daily washing, or commercial laundering in order to meet the cleanliness or appearance standards set by the terms of the Government contract, by the contractor, by law, or by the nature of the work, there is no requirement that employees be reimbursed for uniform maintenance costs.

Page 8

05-2081
REQUEST FOR AUTHORIZATION OF ADDITIONAL CLASSIFICATION AND WAGE RATE {Standard Form 1444 (SF 1444)}

Conformance Process:

The contracting officer shall require that any class of service employee which is not listed herein and which is to be employed under the contract (i.e., the work to be performed is not performed by any classification listed in the wage determination), be classified by the contractor so as to provide a reasonable relationship (i.e., appropriate level of skill comparison) between such unlisted classifications and the classifications listed in the wage determination. Such conformed classes of employees shall be paid the monetary wages and furnished the fringe benefits as are determined. Such conforming process shall be initiated by the contractor prior to the performance of contract work by such unlisted class(es) of employees. The conformed classification, wage rate, and/or fringe benefits shall be retroactive to the commencement date of the contract. {See Section 4.6 (C)(vi)} When multiple wage determinations are included in a contract, a separate SF 1444 should be prepared for each wage determination to which a class(es) is to be conformed.

The process for preparing a conformance request is as follows:

1) When preparing the bid, the contractor identifies the need for a conformed occupation(s) and computes a proposed rate(s).

2) After contract award, the contractor prepares a written report listing in order proposed classification title(s), a Federal grade equivalency (FGE) for each proposed classification(s), job description(s), and rationale for proposed wage rate(s), including information regarding the agreement or disagreement of the authorized representative of the employees involved, or where there is no authorized representative, the employees themselves. This report should be submitted to the contracting officer no later than 30 days after such unlisted class(es) of employees performs any contract work.

3) The contracting officer reviews the proposed action and promptly submits a report of the action, together with the agency's recommendations and pertinent information including the position of the contractor and the employees, to the Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, for review. (See section 4.6(b)(2) of Regulations 29 CFR Part 4).

4) Within 30 days of receipt, the Wage and Hour Division approves, modifies, or disapproves the action via transmittal to the agency contracting officer, or notifies the contracting officer that additional time will be required to process the request.

5) The contracting officer transmits the Wage and Hour decision to the contractor.

6) The contractor informs the affected employees.

Information required by the Regulations must be submitted on SF 1444 or bond paper.

When preparing a conformance request, the "Service Contract Act Directory of Occupations" (the Directory) should be used to compare job definitions to insure that duties requested are not performed by a classification already listed in the wage determination. Remember, it is not the job title, but the required tasks that determine whether a class is included in an established wage determination. Conformances may not be used to artificially split, combine, or subdivide classifications listed in the wage determination.

The duties of employees under job titles listed are those described in the "Service Contract Act Directory of Occupations", Fifth Edition, April 2006, unless otherwise indicated. Copies of the Directory are available on the Internet. A links to the Directory may be found on the WHD home page at http://www.dol.
Page 9

05-2081

gov/esa/whd/ or through the Wage Determinations On-Line (WDOL) Web site at
http://wdol.gov/.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

        Plaintiffs,

v.

THE GEO GROUP, INC.,

        Defendant.

---

## DECLARATION OF ALEJANDRO MENOCAL LEPE

1.  My name is Alejandro Menocal Lepe. I am a named Plaintiff in this lawsuit. I am over eighteen years old. I have personal knowledge of the contents of this declaration.

2.  I was detained at the Aurora Detention Facility between approximately June 6, 2014 and September 11, 2014. That facility is operated by The GEO Group. During my time in the Aurora Detention Facility, I have worked for the Defendant.

3.  When I first arrived at the Aurora Detention Facility, I did not have a $1/day job, but I worked in the voluntary work program. I cleaned the rec yard for a few hours each day. Along with all of the other detainees, I also was required to clean my living area. I was not paid for the work I did cleaning my living area or cleaning the rec yard. I did the work because if you did not, the guards would send you to the "hole," which was isolation, or solitary confinement. I myself was not put into solitary confinement, but I did witness a group of six detainees refuse to clean the common living areas, and they were put into the "hole" for refusing to work.

Pl. Ex. 5

4. From approximately July 28, 2014 to September 1, 2014, I worked for GEO for $1/day. Because I had been volunteering, when another detainee was transferred out of the detention center, a GEO guard asked me if I would like the job. I worked as a food server for the other detainees, and then after the detainees ate, I would clear the dining area of the food and containers, and then clean up the dining area. I worked a few hours in the morning, a few hours in the afternoon for lunch, and a few hours in the evening for dinner, approximately six to eight hours a day. The pay of $1/day stayed the same, no matter if we worked two hours or six hours. The pay of $1/day also was the same regardless of what kind of work you were doing, in the kitchen, in the laundry, or landscaping.

5. I want to present this lawsuit on my own behalf and on behalf of all the other detainees who were forced to clean for no pay and/or who were paid $1/day for their work in the voluntary work program. I understand that, as a representative, I have the responsibility to participate actively in this case and to assure that the interests of the other workers are protected by my attorneys. I am ready and able to do this. Moreover, I am ready to reimburse my attorneys a proportionate share of the costs of sending a letter notifying the other workers of this lawsuit and of their right to participate.

6. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___28th___ th day of ___SEPTEMBER___2015.

Alejandro Menocal Lepe

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

     Plaintiffs,

v.

THE GEO GROUP, INC.,

     Defendant.

## DECLARATION OF GRISEL XAHUENTITLA-FLORES

1. My name is Grisel Xahuentitla-Flores. I am a named Plaintiff in this lawsuit. I am over eighteen years old. I have personal knowledge of the contents of this declaration.

2. I was detained at the Aurora Detention Facility between approximately May 15, 2014 through September 3, 2014. That facility is operated by The GEO Group. During my time in the Aurora Detention Facility, I have worked for the Defendant.

3. When I first arrived at the Aurora Detention Facility, I did not have a $1/day job in the voluntary work program. During that time, I had to work for no pay doing cleaning work in the common and private living areas. Every day, the guards would call on some of the detainees to clean. None of us got paid anything for the work we did on the cleaning crews. If we didn't do the cleaning, we would be sent to the hole -- or solitary confinement. One time, during my detention, I saw one of the GEO guards, I don't remember her name, though I believe she was a lieutenant, tell another detainee who was sick that she would be sent to the hole if she did not do the cleaning.

Pl. Ex. 6

4. From approximately May, 2014 through June, 2014. I worked for GEO in the voluntary work program as a "trustee" in my pod. They paid $1/day for that work. You apply for the jobs and GEO personnel interview, hire and supervise you. The GEO people determine when you work and for how long. The pay rate is the same for every detainee I know to have worked in that program, it didn't matter how many hours each detainee worked, they only paid them $1 per day. I have known of more than 50 people who have worked all kinds of jobs in the voluntary work program. I worked approximately six hours per day. The pay for that work was always $1/day.

5. I want to present this lawsuit on my own behalf and on behalf of all the other detainees who were forced to clean for no pay and/or who were paid $1/day for their work in the voluntary work program. I understand that, as a representative, I have the responsibility to participate actively in this case and to assure that the interests of the other workers are protected by my attorneys. I am ready and able to do this. Moreover, I am ready to reimburse my attorneys a proportionate share of the costs of sending a letter notifying the other workers of this lawsuit and of their right to participate.

6. I declare under penalty of perjury under the laws of the Unites States of America that the foregoing is true and correct.

Executed on this ___22nd th___ day of ___April___, 2016.

Grisel Xahuentitla-Flores

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:  1:14-cv-02887

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

     Plaintiffs,

v.

THE GEO GROUP, INC.,

     Defendant.

---

## DECLARATION OF LOURDES ARGUETA

1. My name is Lourdes Argueta.  I am a named Plaintiff in this lawsuit.  I am over eighteen years old.  I have personal knowledge of the contents of this declaration.

2. I have been detained at the Aurora Detention Facility since approximately May 8, 2014.  The facility where I am detained is operated by The GEO Group.  During my time in the Aurora Detention Facility, I have worked for the Defendant.

3. When I first arrived at the Aurora Detention Facility, I did not have a $1/day job in the voluntary work program.  During that time, I had to work for no pay doing cleaning work in the common and private living areas.  Every day, the guards would assign six of the detainees in my pod who didn't have a job in the voluntary work program to clean the pod. None of us got paid anything for the work we did cleaning the pod. We were threatened with being put in solitary confinement, or "segregation," if we refused to clean. I have spoken with GEO guards about this specifically and they tell me that detainees will be put in solitary if they refuse to clean.

Pl. Ex. 7

4.  Since approximately May 15, 2014, I have been working for GEO in the voluntary work program, cleaning the GEO medical unit. The other detainees who work for GEO and I clean toilets, sweep and mop floors, pull carpets and clean floors, clean windows, remove trash, clean offices and desks, clean patients' rooms (including cleaning up blood, feces and urine), and perform other cleaning tasks in GEO's medical unit. I have also worked for GEO in the booking area of the facility, creating new detainee files, and I have worked for GEO putting together new detainee clothing packages. The other detainees who I work with and I all get paid $1 per day for our work.

5.  I want to present this lawsuit on my own behalf and on behalf of all the other detainees who were forced to clean for no pay and/or who were paid $1/day for their work in the voluntary work program. I understand that, as a representative, I have the responsibility to participate actively in this case and to assure that the interests of the other workers are protected by my attorneys. I am ready and able to do this. Moreover, I am ready to reimburse my attorneys a proportionate share of the costs of sending a letter notifying the other workers of this lawsuit and of their right to participate.

6.  I declare under penalty of perjury under the laws of the Unites States of America that the foregoing is true and correct.


Executed on this 2nd day of December, 2014.



Lourdes Argueta

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

     Plaintiffs,

v.

THE GEO GROUP, INC.,

     Defendant.

---

## DECLARATION OF JESUS GAYTAN

1. My name is Jesus Gaytan. I am a named Plaintiff in this lawsuit. I am over eighteen years old. I have personal knowledge of the contents of this declaration.

2. I was detained at the Aurora Detention Facility between approximately May 2014 through October 23, 2014. That facility is operated by The GEO Group. During my time in the Aurora Detention Facility, I have worked for the Defendant.

3. When I first arrived at the Aurora Detention Facility, I did not have a $1/day job in the voluntary work program. During that time, I had to work for no pay doing cleaning work in the common and private living areas. Every day, the guards would call on six of the detainees who didn't have a job in the voluntary work program. Those six individuals had to clean. The people the guards chose would rotate so that everybody had to take a turn on the cleaning crew. None of us got paid anything for the work we did on the cleaning crews. I did the cleaning because I was told that I'd be sent to solitary confinement if I didn't do the cleaning.

Pl. Ex. 8

4. From approximately May, 2014 through October 2014, I worked for GEO in the voluntary work program. They paid $1/day for that work. You apply for the jobs and GEO personnel interview, hire and supervise you. The GEO people determine when you work and for how long. My job was to work in the laundry. I worked between 6 and 8 hours per day, 5 days per week.

5. I want to present this lawsuit on my own behalf and on behalf of all the other detainees who were forced to clean for no pay and/or who were paid $1/day for their work in the voluntary work program. I understand that, as a representative, I have the responsibility to participate actively in this case and to assure that the interests of the other workers are protected by my attorneys. I am ready and able to do this. Moreover, I am ready to reimburse my attorneys a proportionate share of the costs of sending a letter notifying the other workers of this lawsuit and of their right to participate.

6. I declare under penalty of perjury under the laws of the Unites States of America that the foregoing is true and correct.

Executed on this ___2___ th day of __November__, 2015.

Jesus Gaytan

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:  1:14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

　　　Plaintiffs,

v.

THE GEO GROUP, INC.,

　　　Defendant.

## DECLARATION OF DEMTRIO A. VALERGA

1. My name is Demetrio A. Valerga.  I am a named Plaintiff in this lawsuit.  I am over eighteen years old.  I have personal knowledge of the contents of this declaration.

2. I was detained at the Aurora Detention Facility between approximately 5/22/2011-6/8/2011 and 9/11/2013-7/11/2014. That facility is operated by The GEO Group.  During my time in the Aurora Detention Facility, I worked for the GEO Group.

3. From 5/22/2011through 6/8/2011 and from 9/11/2013 through 10/25/2013, I did not have a $1/day job in the voluntary work program.  During those times, I had to work for no pay doing cleaning work in the common and private living areas. Every day, the guards would call on six of the detainees who didn't have a job in the voluntary work program.  Those six individuals had to clean.  The people the guards chose would rotate so that everybody had to take a turn on the cleaning crew.  None of us got paid anything for the work we did on the cleaning crews.  I did the work anyway because it was well known that those who refused to do that work for free were put in "the hole" – or solitary confinement.  I know that guards

Pl. Ex. 9

threatened detainees with solitary confinement if they didn't clean because a guard threatened me with being put in the hole when I protested that I didn't want to do the cleaning work for free.

4. From approximately 10/25/2013-6/4/2014, with a two-week period without work in there somewhere, I worked for GEO in the voluntary work program. They paid me$1/day for that work. You apply for the jobs and GEO personnel interview, hire and supervise you. The GEO people determine when you work and for how long. The pay rate is the same for every detainee I know to have worked in that program. I have known more than 20 people who have worked all kinds of jobs in the voluntary work program. My job was to work in the kitchen and stripping and waxing floors. I worked from 4 a.m. until noon, five days per week in the kitchen. When I was waxing and stripping floors, I worked Sunday through Thursday nights starting at approximately 11 p.m. until approximately 6 a.m. The pay for that work was always $1/day.

5. I want to present this lawsuit on my own behalf and on behalf of all the other detainees who were forced to clean for no pay and/or who were paid $1/day for their work in the voluntary work program. I understand that, as a representative, I have the responsibility to participate actively in this case and to assure that the interests of the other workers are protected by my attorneys. I am ready and able to do this. Moreover, I am ready to reimburse my attorneys a proportionate share of the costs of sending a letter notifying the other workers of this lawsuit and of their right to participate.

6. I declare under penalty of perjury under the laws of the Unites States of America that the foregoing is true and correct.

Executed on this _27_ th day of _August_ , 2015.


Demetrio A. Valerga

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:  1:14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

     Plaintiffs,

v.

THE GEO GROUP, INC.,

     Defendant.

---

## DECLARATION OF CARLOS ELIEZER ORTIZ MUÑOZ

1. My name is Carlos Eliezer Ortiz Muñoz. I am over eighteen years old.  I have personal knowledge of the contents of this declaration.

2. I was detained at the Aurora Detention Facility in 2014 and 2015. That facility is operated by The GEO Group.  During my time in the Aurora Detention Facility, I worked for GEO.

3. When I first arrived at the Aurora Detention Facility, I did not have a $1/day job in the voluntary work program. During that time, I had to work for no pay doing cleaning work in the common and private living areas.  Every day, the guards would call on six of the detainees who didn't have a job in the voluntary work program. Those six individuals had to clean. The people the guards chose would rotate so that everybody had to take a turn on the cleaning crew.  None of us got paid anything for the work we did on the cleaning crews. People who refused to clean were put in solitary. I saw this happen to a detainee whose name I don't remember. Some of the guards would threaten us by saying: "¿Quieres ir al oyo?"- "You want to go to the hole?"

Pl. Ex. 10

4. For approximately three months I worked for GEO in the voluntary work program. They paid $1/day for that work. I worked in the kitchen. Everyone complained about the fact that they only paid us $1 per day. You apply for the jobs and GEO personnel interview, hire and supervise you. The GEO people determine when you work and for how long. The pay rate is the same for every detainee I know to have worked in that program. For example, I knew Christian Heredia and Omar Gonzalez, both of whom also worked in the program. They were only paid $1 per day as well.

5. I declare under penalty of perjury under the laws of the Unites States of America that the foregoing is true and correct.

Executed on this ___25___ th day of ___April___, 2016.


_Carlos Ortiz_
Carlos Eliezer Ortiz Muñoz

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

       Plaintiffs,

v.

THE GEO GROUP, INC.,

       Defendant.

---

## DECLARATION OF ALEJANDRO HERNANDEZ TORRES
---

1. My name is Alejandro Hernandez Torres. I am over eighteen years old. I have personal knowledge of the contents of this declaration.

2. I was detained at the Aurora Detention Facility between approximately 4/3/2012 and 8/3/2015. That facility is operated by The GEO Group. During my time in the Aurora Detention Facility, I worked for GEO.

3. When I first arrived at the Aurora Detention Facility, I did not have a $1/day job in the voluntary work program. During that time, I had to work for no pay doing cleaning work in the common and private living areas. Every day, the guards would call on six of the detainees who didn't have a job in the voluntary work program. Those six individuals had to clean. The people the guards chose would rotate so that everybody had to take a turn on the cleaning crew. None of us got paid anything for the work we did on the cleaning crews. If anyone refused to do this work, they would be put in segregation, or "the hole." I know this because the guards told us that if anyone didn't do the work, they'd be put in segregation and because during the time I was detained, I witnessed at least 10 people get put in segregation for refusing to do the pod cleaning work. I remember that Ricardo

Pl. Ex. 11

Tinoco, "Alex" (I don't remember his last name), and Cesar Duran, among others were taken to segregation for refusing to do the unpaid cleaning work.

4. From approximately from the end of 2012 to July, 2015, I worked for GEO in the voluntary work program. My job was to clean and wax the floors for GEO. They paid $1/day for that work. I asked various guards if GEO could pay more than $1 per day. One guard, last name "Barajona" I believe, told me that GEO could only pay one dollar per day, no more.

5. You apply for the jobs and GEO personnel interview, hire and supervise you. The GEO people determine when you work and for how long. The pay rate is the same for every detainee I know to have worked in that program. I have known many people who have worked all kinds of jobs in the voluntary work program. I normally worked five to seven hours per day. The pay for that work was always $1/day.

6. I declare under penalty of perjury under the laws of the Unites States of America that the foregoing is true and correct.


Executed on this  11 <sup>th</sup> day of  April, 2016.



     */s/ Alejandro Hernandez Torres*
     Alejandro Hernandez Torres

**Translator's Affidavit**

I certify that I am fluent in Spanish and English. I certify that I have reviewed the attached documents and that the English is a true and accurate translation of the Spanish.

Translator: Irene Vasquez

STATE OF COLORADO )
                   ) ss.
COUNTY OF DENVER   )

Subscribed and sworn to me this 6th day of May, 2016 by Irene Vasquez.

Notary Public

Witness my hand and official seal

[SEAL]
```
ANTOINETTE VEGA
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20034021686
MY COMMISSION EXPIRES JULY 17, 2019
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:  1:14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

     Plaintiffs,

v.

THE GEO GROUP, INC.,

     Defendant.

---

## DECLARACIÓN DE ALEJANDRO HERNANDEZ TORRES

---

1. Mi nombre es Alejandro Hernandez Torres. Tengo más de dieciocho años de edad. Tengo conocimiento personal del contenido de esta declaración.

2. Fui detenido en el Centro de Detención de Aurora entre aproximadamente 4/3/2012 y 8/3/2015. Esa instalación está operada por el Grupo GEO. Durante mi tiempo en el sitio en el Centro de Detención de Aurora, trabajé para GEO.

3. Cuando llegué por primera vez en el Centro de Detención de Aurora, yo no tenía un trabajo de $1/día en el programa de trabajo voluntario. Durante ese tiempo, tuve que trabajar sin pago haciendo trabajos de limpieza en las zonas comunales y privadas. Todos los días, las guardias llamaban a seis de los detenidos. Esas seis personas tuvieron que limpiar. La gente que los guardias escojieron girarían para que todos tendrian una vuelta en el equipo de limpieza. No nos pagaron nada por el trabajo que hicimos en los equipos de limpieza. Si alguien se negó de hacer la limpieza, los mandaron al "hoyo" o segregación. Yo se que esto los guardias nos dijeron que si alguien se negó de hacer la limpieza, los

mandarían al hoyo, y porque durante el tiempo que fui detenido, yo vi por lo menos 10 personas que fueron mandados a segregación por no querer participar en la limpieza. Me acuerdo que Ricardo Tinoco, "Alex" (no me acuerdo de cómo se appellida), y Cesar Duran, entre otros, fueron mandados al hoyo por negarse de hacer la limpieza sin pago.

4.  Desde aproximadamente los fines del 2012 a julio del 2015, trabajé para GEO en el programa de trabajo voluntario. Mi trabajo era de limpiar y encerar los pisos. Pagaban $1 por día por ese trabajo. Les pregunte a varias personas de GEO si podían pagar mas que $1 por día, y todos me dijeron que no. Un guardia, que se apellidaba "Barajona" yo creo, me dijo que GEO solo podía pagar $1 al día, no mas.

5.  Solicita uno los puestos de trabajo y personal de GEO le entrevistan, le contraten y le supervisen. La gente GEO determinan cuando se trabaja y por cuánto tiempo. La tarifa de pago es lo mismo para todos los detenidos que he conocido que han trabajado en esta programa. He conocido muchas personas que han trabajado todo tipo de puestos de trabajo en el programa de trabajo voluntario. Normalmente, yo trabajaba dos de 5 a 7 horas por día. El pago por ese trabajo siempre era $1/día.

6.  Declaro bajo pena de perjurio bajo las leyes de los Estados Unidos de América, que lo anterior es verdadero y correcto.

Ejecutado en este ___11___ día de ___Abril___, 2016.


___Alejandro Hernandez___
Alejandro Hernandez Torres

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

     Plaintiffs,

v.

THE GEO GROUP, INC.,

     Defendant.

---

## DECLARATION OF ADRIANA MENDOZA CASTELLANOS

---

1. My name is Adriana Mendoza Castellanos. I am over eighteen years old. I have personal knowledge of the contents of this declaration.

2. I was detained at the Aurora Detention Facility between approximately 1/15/2014 and 10/23/2014. That facility is operated by The GEO Group. During my time in the Aurora Detention Facility, I worked for GEO.

3. When I first arrived at the Aurora Detention Facility, I did not have a $1/day job in the voluntary work program. During that time, I had to work for no pay doing cleaning work in the common and private living areas. Every day, the guards would call on six of the detainees. Those six individuals had to clean. The people the guards chose would rotate so that everybody had to take a turn on the cleaning crew. None of us got paid anything for the work we did on the cleaning crews. We had to do the cleaning, and if someone was sick, they had to find someone else to do the cleaning for them. There was no choice about it. The correctional officers told us, and told me directly, that they would send us to the "hole," or solitary confinement, if I/we didn't do the cleaning.

Pl. Ex. 12

4. From approximately 1/2014 through 10/22/2014, I worked for GEO in the voluntary work program. They paid $1/day for that work. I was told that GEO could only pay $1 per day, and couldn't pay any more than that. We asked various GEO employees why we weren't paid more, and they told us that GEO could not pay more. I remember that we asked a guard named "Vasquez," who was in charge of the work, if we could be paid more and she told us that GEO was not allowed to pay more. I remember that we were in my unit when we asked "Vasquez" this question.

5. You apply for the $1/day jobs and GEO personnel interview, hire and supervise you. The GEO people determine when you work and for how long. The pay rate is the same for every detainee I know to have worked in that program. I have known more than 20 people who have worked all kinds of jobs in the voluntary work program. Normally, I worked two to three hours per day. The pay for that work was always $1/day.

6. I declare under penalty of perjury under the laws of the Unites States of America that the foregoing is true and correct.

Executed on this  22  <sup>th</sup> day of  April , 2016.


_Adriana Mendoza_
Adriana Mendoza Castellanos

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALEGRA,
on their own behalf and on behalf of all others similarly situated,

        Plaintiffs,

v.

THE GEO GROUP, INC.,

        Defendant.

---

ORDER GRANTING MOTION FOR CLASS CERTIFICATION UNDER RULE 23(b)(3)
AND APPOINTMENT OF CLASS COUNSEL UNDER RULE 23(g) (ECF NO. 49)

---

Kane, J.

      Plaintiffs Alejandro Menocal, Marcos Brambila, Grisel Xahuentitla, Hugo Hernandez,

Lourdes Argueta, Jesus Gaytan, Olga Alexaklina, Dagoberto Vizguerra, and Demetrio Valerga

(Representatives) are current and former detainees of the Aurora Detention Facility (Facility), a

private immigration detention center in Aurora, Colorado, owned and operated by Defendant The

GEO Group, Inc. (GEO).  Representatives originally brought three claims against GEO for: (1)

noncompliance with the Colorado Minimum Wages of Workers Act, Colo. Rev. Stat. § 8-6-101,

*et seq.*; (2) violations of the forced labor provision of the Trafficking Victims Protection Act

(TVPA), 18 U.S.C. §§ 1589, 1595; and (3) unjust enrichment. Representatives brought the

1

claims on their own behalf and on behalf of proposed classes of similarly-situated current and former detainees of the Facility. GEO moved to dismiss the claims, and I granted its motion as to only the Colorado minimum wage claim. Representatives now seek certification of the proposed classes for their remaining TVPA and unjust enrichment claims.

Although Representatives and putative class members have diverse backgrounds, their circumstances are uniquely suited for a class action. All share the experience of having been detained in the Facility and subjected to uniform policies that purposefully eliminate nonconformity. The questions posed in this case are complex and novel, but the answers to those questions can be provided on a classwide basis. Appreciating that the class action is "a valuable tool to circumvent the barriers to the pursuit of justice," Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 25:24 (4th ed.), I GRANT the Motion for Class Certification Under Rule 23(b)(3) and Appointment of Class Counsel under Rule 23(g) (ECF No. 49).

## I. Background

Representatives take issue with two aspects of GEO's operation of the Aurora Detention Facility. First, they allege that, in carrying out its Housing Unit Sanitation Policy, GEO violated the Trafficking Victims Protection Act by requiring detainees to clean the private and common areas of the Facility without any compensation and under the threat of solitary confinement and other punishments. Second, they claim that GEO was unjustly enriched by paying detainees who participated in its Voluntary Work Program (VWP) only $1 per day.

GEO, a for-profit, multinational corporation, operates the Facility pursuant to a contract with U.S. Immigration and Customs Enforcement (ICE). ICE's Performance Based National Detention Standards mandate that all detainees perform personal housekeeping. Specifically,

> [d]etainees are required to maintain their immediate living areas in a neat and orderly manner by: 1. making their bunk beds daily; 2. stacking loose papers; 3.

2

> keeping the floor free of debris and dividers free of clutter; and 4. refraining from
> hanging/draping clothing, pictures, keepsakes, or other objects from beds,
> overhead lighting fixtures or other furniture.

Def.'s Opp. Class Certification Ex. 2 at 15-16, ECF No. 51-2. GEO combined these

responsibilities with portions of the American Correctional Association standards and its own

corporate policy to develop the Facility's Housing Unit Sanitation Policy, which has been in

effect since 1995. Mot. Class Certification Ex. 1 at 15:23-25, 27:9-14, 86:22-87:3, ECF No. 50-

1. Representatives claim that the detainees' compulsory duties under the Sanitation Policy, such

as sweeping and mopping floors and cleaning toilets and showers, fall outside the scope of ICE's

personal housekeeping requirement. The GEO Detainee Handbook Local Supplement, with

which all detainees at the Facility are provided, states that failure to perform one's duties under

the Sanitation Policy is a "high-moderate" offense for which detainees can be punished by the

initiation of criminal proceedings, termination from their jobs, and up to 72 hours in disciplinary

segregation, among other sanctions. Mot. Class Certification Ex. 1 at 29:13-30:2, 79:13-25; Ex. 4

at 18, 26, ECF No. 50-3. Representatives and other detainees were aware of the Sanitation Policy

during their detention and claim that they performed the required duties to avoid solitary

confinement. *See* Mot. Class Certification Ex. 5 ¶ 3, ECF No. 49-2; Ex. 6 ¶ 3, ECF No. 49-3; Ex.

7 ¶ 3, ECF No. 49-4; Ex. 8 ¶ 3, ECF No. 49-5; Ex. 9 ¶ 3, ECF No. 49-6; Ex. 10 ¶ 3, ECF No. 49-

7; Ex. 11 ¶ 3, ECF No. 49-8; Ex. 12 ¶ 3, ECF No. 49-9. Based on these allegations,

Representatives assert that the labor performed by detainees at the Facility pursuant to the

Sanitation Policy is forced labor in violation of the TVPA. They request that I certify a TVPA

class of "[a]ll persons detained in Defendant's Aurora Detention Facility in the ten years prior to

the filing of this action." Mot. Class Certification at 10, ECF No. 49.

Separately, GEO offers a Voluntary Work Program that allows detainees to work in various positions around the Facility and earn $1 per day. As part of the program, detainees perform tasks such as maintaining the on-site medical facility, doing laundry, preparing meals, and cleaning the Facility. ICE's Performance Based National Detention Standards require that detainees be compensated "at least $1.00 (USD) per day" for work completed under the facility's VWP. Mot. Dismiss, Ex. 1 at 5, ECF No. 11-1. Representatives allege that GEO misled VWP participants to believe it could pay them no more than $1 per day under the ICE standards. Representatives also stress that GEO employs only a single outside custodian and that detainees are unable to seek other employment in a competitive market. Mot. Class Certification at 9. As a result, they claim that GEO derives significant economic benefit from its VWP and has been unjustly enriched because of it. Representatives propose certification of an unjust enrichment class comprised of "[a]ll people who performed work [at] Defendant's Aurora Detention Facility under Defendant's [Voluntary Work Program] Policy in the three years prior to the filing of this action."

## II. Legal Standard

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). The exception is appropriate when the party seeking certification can establish the four threshold requirements set forth in Federal Rule of Civil Procedure 23(a) and fulfillment of at least one of the provisions in Rule 23(b). "When addressing class certification, the district court must undertake a 'rigorous analysis' to satisfy itself that the prerequisites of Rule 23 . . . are met." *CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014). Under Rule 23(a), the party requesting

certification must first show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." If successful, the party must then demonstrate, pursuant to Rule 23(b), one of the following: (1) individual adjudication would create a risk of incompatible standards of conduct for the party opposing the class or would impair other members' ability to protect their interests; (2) injunctive or declaratory relief is appropriate for the class as a whole due to the action or inaction of the party opposing the class; or (3) common questions of law or fact predominate over any individual questions and a class action is the superior method for "fairly and efficiently adjudicating the controversy."

Here, Representatives rely on Rule 23(b)(3), which requires *predominance* of questions of law or fact common to the class and *superiority* of the class action method. The conditions of predominance and superiority were added "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23 advisory committee's note). In determining if these requirements are met, I must consider, among other factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

### III. Discussion

GEO challenges Representatives' satisfaction of almost all of the Rule 23 considerations.

Preliminarily, I find that Representatives have demonstrated that the proposed classes satisfy the

numerosity[1] and adequacy requirements. As to the remaining factors—commonality and

typicality under Rule 23(a) and predominance and superiority under Rule 23(b)(3), GEO's most

compelling, but ultimately unconvincing, argument is that elements of both claims necessitate

inquiries specific to each class member.

A. Trafficking Victims Protection Act Claim

The forced labor provision of the TVPA makes it unlawful for anyone to:

knowingly provide[] or obtain[] the labor or services of a person. . . (1) *by means of* force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) *by means of* serious harm or threats of serious harm to that person or another person; (3) *by means of* the abuse or threatened abuse of law or legal process; or (4) *by means of* any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589 (emphasis added). The element that the labor be obtained "by means of" the

defendant's improper coercion is central to the parties' dispute. GEO claims that evaluating

whether this element is fulfilled requires an individualized assessment of what caused each

---

[1]Representatives have carried their burden by offering "'some evidence of established, ascertainable numbers constituting the class.'" *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1214-15 (10th Cir. 2014) (citing *Rex v. Owens ex rel. Okla.*, 585 F.2d 432, 436 (10th Cir. 1978)). With respect to the TVPA class, GEO's Assistant Warden of Operations estimated that, in the past ten years, 50,000 to 60,000 individuals have been detained at the Facility and subject to the Sanitation Policy. Mot. Class Certification Ex. 1 at 49:24-50:2. As for the unjust enrichment class, GEO's records show that 787 detainees participated in the Voluntary Work Program in November 2012 alone. Mot. Class Certification Ex. 15 at 7, ECF No. 50-6. Representatives approximate that there will be 2,000 total members of the class. GEO argues that Representatives cannot simply rely on the presumption that classes with greater than 40 putative members satisfy the numerosity requirement. Representatives do not just depend on that presumption, however; they have also shown that joinder would be impracticable due to the unique characteristics of the class members, namely that many are spread around the world and are not fluent in English or the U.S. legal system.

putative class member to perform labor under the Sanitation Policy. Consequently, GEO asserts

that the commonality, typicality, predominance, and superiority requirements are not met for the

TVPA class.

*Federal Rule of Civil Procedure 23(a): Commonality & Typicality*

To fulfill the commonality requirement, Representatives must demonstrate that "there are

questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(1). A qualifying question

must be "of such a nature that it is capable of classwide resolution—which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each one

of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. The analysis must not focus

on the mere existence of common questions but on "'the capacity of a classwide proceeding to

generate common *answers* apt to drive the resolution of the litigation.'" *Id.* at 350 (quoting

Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132

(2009)). Nevertheless, "[i]t is not necessary that all of the elements of the claim entail questions

of fact and law that are common to the class, nor that the answers to those common questions be

dispositive." *CGC Holding Co., LLC*, 773 F.3d at 1087 (citing *Amgen Inc. v. Conn. Ret. Plans &*

*Trust Funds*, 133 S. Ct. 1184, 1196 (2013)).

Representatives submit that the common questions putative class members share are: "(1)

whether GEO obtains the labor of class members; (2) whether GEO threatens class members

with physical restraint, serious harm, or abuse of the legal process; and (3) whether GEO

'knowingly' obtains class members' labor 'by . . . means of' these threats." Mot. Class

Certification at 11. GEO argues that these questions fail to demonstrate, as required by *Wal-Mart*

*Stores, Inc. v. Dukes*, that an issue central to the validity of Representatives' claim is susceptible

to classwide resolution.

7

In *Wal-Mart*, the Supreme Court found that a proposed class of female employees alleging discrimination under Title VII lacked even a single question common to the class and thus did not satisfy the commonality requirement. 564 U.S. at 342, 359. Relying on the fact that the defendant had no specific discriminatory employment policy or biased evaluation method, the Court found that the central question of why each class member was disfavored could not produce a common answer. *Id.* at 352-55, 59. The defendant's local supervisors were given discretion over employment decisions such that it was unlikely that each manager exercised their discretion in a common discriminatory manner. *Id.* at 355-56. The Court stated that "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it [would] be impossible to say that examination of all the class members' claims for relief [would] produce a common answer . . . ." *Id.* at 352.

Unlike in *Wal-Mart*, GEO has a specific, uniformly applicable Sanitation Policy that is the subject of Representatives' TVPA claim. This Policy is the glue that holds the allegations of the Representatives and putative class members together,[2] creating a number of crucial questions with common answers. For example: Does GEO employ a Sanitation Policy that constitutes improper means of coercion under the forced labor statute? Does GEO knowingly obtain detainees' labor using that Policy? Is there a civic duty exception to the forced labor statute that makes the Policy acceptable? Representatives have demonstrated the existence of common questions that can resolve issues "central to the validity" of its TVPA claim "in one stroke." *Wal-Mart Stores, Inc*, 564 U.S. at 350.

---

[2]GEO argues that each class member could have labored due to different parts of the Policy so the Policy as a whole cannot be the glue. The text of the statute contradicts that assertion. The statue provides that "a scheme, plan, or pattern" can constitute improper means without requiring determination of which specific part of the scheme, plan, or pattern motivated the laborer. 18 U.S.C. § 1589. Thus, a uniform policy can be the glue that holds the allegations of a class together.

"The commonality and typicality requirements of Rule 23(a) do not require that every member of the class share a fact situation *identical* to that of the named plaintiff." *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014) (citation omitted). Furthermore, "differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988).

GEO contends that Representatives' experiences could not be typical, because perception of a threat is subjective and because none of Representatives were actually placed in segregation for refusing to clean. GEO also points out that Representatives detention at the Facility only spans back to May 2011, while the proposed class goes back ten years. The nature of detention is unique in that it allows the detainer to almost fully control the experience of the detainee. In this case, Representatives and the putative class members were all subject to and impacted by the Sanitation Policy, and the duties they performed under the Policy were at the direction of GEO's staff.[3] Mot. Class Certification Ex. 2 at 1-3, ECF No. 50-2. I find it irrelevant that no Representative was actually disciplined with segregation for violating the Policy, since the forced labor statute includes threats, schemes, plans, and patterns as improper means of coercion. As for the time period covered by the class, GEO's Assistant Warden of Operations testified that its Sanitation Policy had been in effect since 1995, when she began working for the company. Mot. Class Certification Ex. 1 12:23-13:1, 23:8-16, 86:22-87:3. Representatives and the proposed class of individuals detained during the ten years prior to the filing of the Complaint

---

[3]One way in which GEO implements the Policy is by posting a list of detainees who are required to perform additional cleanup of the common areas each day. Mot. Class Certification Ex. 4 at 19. GEO does not allege and there is nothing in the record to show that detainees who are not on the daily list still choose to perform the additional duties or that detainees work autonomously.

could, therefore, bring claims based on the same legal or remedial theory. Representatives have shown that the typicality requirement is met for their Proposed TVPA class.

*Federal Rule of Civil Procedure 23(b)(3): Predominance and Superiority*

While the class undoubtedly satisfies the Rule 23(a) factors, the Rule 23(b)(3) "predominance criterion is far more demanding." *Amchem Prods., Inc.*, 521 U.S. at 623–24. Its "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623. In considering whether questions of law or fact common to class members predominate, I look to the specific elements of the underlying claim. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

GEO contends that, to satisfy the "by means of" element of the forced labor statute, each class member would need to show what specifically compelled him or her to perform the sanitation duties at the Facility. It suggests that some detainees labored just because they desired to stay occupied. And, with respect to those hypothetical detainees, GEO claims it could not have violated the TVPA because it did not obtain their labor "by means of" improper coercion. Representatives refute this argument, stating that, instead of individually inquiring as to why each detainee labored, a reasonable person standard should be used. According to Representatives, "the language and structure of the forced labor statute . . . call for an objective inquiry that turns on whether a reasonable person would provide labor to[] GEO if placed in the position of the person providing such labor." Mot. Class Certification at 15.

Representatives cite *Nuñag-Tanedo v. East Baton Rouge Parish School Board*, No. LA CV 10-01172 JAK (MLGx), 2011 WL 7095434 (C.D. Cal. Dec. 12, 2011), as support for their assertion that a reasonable person standard should be used. *Nuñag-Tanedo* involved a class of Filipino nationals who were recruited to work as teachers in Louisiana public schools and felt

compelled to teach in order to repay the exorbitant debts they incurred as part of the recruitment process. *Id.* at *1. Construing the forced labor statute, the court in *Nuñag-Tanedo* found that the putative class members shared the same background and circumstances such that a reasonable person standard could be used to determine whether it was the defendants' scheme that ultimately compelled the plaintiffs to work. *Id.* at *1.

In turn, GEO relies on *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619, 2015 WL 329013 (S.D. Ind. Jan. 22, 2015), and *David v. Signal International, LLC*, No. 08-1220, 2012 WL 10759668, at *15 (E.D. La. Jan. 4, 2012), to challenge the use of a reasonable person standard. The proposed classes in *Panwar* and *David*, as in *Nuñag-Tanedo*, were comprised of foreign citizens who were recruited to work in the United States and then were allegedly coerced by improper means to continue laboring. Unlike in *Nuñag-Tanedo*, however, the courts in both *Panwar* and *David* determined that the use of a classwide reasonable person standard was not appropriate. *Panwar*, 2015 WL 329013, at *1; *David*, 2012 WL 10759668, at *1-2.

In *Panwar*, the court found that the backgrounds and circumstances of the plaintiffs and class members varied too greatly to apply a uniform reasonable person standard. 2015 WL 329013, at *6. The class members had different contracts, worked in different states, and faced different working conditions. *Id.* The court reasoned that it was likely that "a significant number" of putative class members did not labor due to improper coercion as they never sought to terminate their contracts, were not threatened by deportation, or would not be seriously harmed by having to pay damages for breach of their employment contracts. *Id.* The facts in this case are distinct from those in *Panwar* given that Representatives and the putative class members here were all subject to a universal policy under uniform conditions.

The second case GEO cites, *David v. Signal International, LLC*, goes beyond looking at the similarities and differences of class members' circumstances and meticulously analyzes the "by means of" element of the forced labor statute. The plaintiffs in *David* asserted, as Representatives do here, that the statute concerns only the defendant's conduct and whether a reasonable person in the plaintiffs' shoes would have been compelled to provide labor against his or her will. 2012 WL 10759668, at *17.  For guidance on the proper query under the statute, the court looked to *United States v. Kozminski*, 487 U.S. 931 (1988). *Id.* at *17-19. The Supreme Court held in *Kozminski* that, for the purposes of criminal prosecution, involuntary servitude under 18 U.S.C. § 1584 is limited to the "compulsion of services by the use or threatened use of physical or legal coercion." 487 U.S. at 952-53. The forced labor statute was enacted in response to that holding in order to combat the exploitation of workers via means other than physical or legal coercion, including through threats of and actual non-physical "serious harm." H.R. Conf. Rep. 106-939, 3-5. In *Kozminski*, the Supreme Court alluded to causation, stating: "[T]he vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve." 487 U.S. at 952. The court in *David* consequently determined that "the forced labor analysis cannot be confined solely to the defendant's conduct but necessarily must take into account the particular victim's vulnerabilities." *David*, 2012 WL 10759668, at *19. It additionally concluded that whether the defendants' coercive conduct caused the plaintiffs to labor could not "be answered via generalized class-wide proof but rather must be answered individually based upon individualized proof." *Id.* at *21.

I find the analysis in *David* to be persuasive in that the forced labor statute does contain both an objective and a subjective component. The subjective component is whether the victims

actually labored *because of* the perpetrator's conduct, while the objective component is whether a reasonable person would respond in a similar way as the victims. *See id.* at *20. Representatives' proposal that the subjective component be eliminated by using only a reasonable person standard does not coincide with the statute.[4]

Nevertheless, the holding in *David* does not foreclose certification of the proposed class in this case. Representatives argue, as an alternative to eliminating the subjective component of the statue, that the "by means of" element can be satisfied by inferring from classwide proof that the putative class members labored because of GEO's improper means of coercion. Representatives are correct that there is nothing preventing such an inference. I have not found and GEO has not provided any authority requiring that, for TVPA claims, causation must be proven by direct and not circumstantial evidence. Were a jury deciding the individual merits of Representatives claims, it surely would be permitted to make such an inference. Thus, it should be allowed on a classwide basis as well. *See CGC Holding Co., LLC*, 773 F.3d at 1092.

Representatives and the putative class members in this case were directed by GEO's staff when, where, and how to perform their sanitation duties. Given the climate in which they were detained, it is possible that an inference of causation would be appropriate even despite some class members' purported willingness to work for reasons other than GEO's improper means of coercion. *See David*, 2012 WL 10759668, at *21 ("[B]ased on the type of coercion used, there may be cases where consent becomes irrelevant."). For class certification purposes, though, I

---

[4]Representatives highlight that individuals can also be convicted of or held civilly liable for *attempting* to violate the forced labor statute under 18 U.S.C. § 1594. They claim that, even if some putative class members labored for reasons other than GEO's improper means of coercion, GEO still attempted to obtain their labor via those means. As a result, Representatives argue that such class members would be entitled to the same civil remedy, making an individual inquiry regarding causation unnecessary. Their Complaint, however, does not assert a claim for attempt under 18 U.S.C. § 1594.

need only conclude that the "by means of" element could be established by classwide circumstantial evidence.

Representatives reference *CGC Holding Co., LLC v. Broad and Cassel* as an example of when circumstantial evidence can be used to show causation on a classwide basis. In *CGC Holding*, the Tenth Circuit held that certification of a class of real estate borrowers bringing claims under the Racketeer Influenced and Corrupt Organizations (RICO) Act was appropriate even though actual and proximate causation were elements of the claim. 773 F.3d at 1080-81. The court found that, under certain circumstances, "it is beneficial to permit a commonsense inference . . . applicable to the entire class to answer a predominating question as required by Rule 23." *Id.* at 1089. The circumstances here—namely the class members' detainment, the imposition of a uniform policy, and the numerous other questions common to the class— certainly make it beneficial to permit such an inference.[5]

In a final effort to show that individual questions predominate as to the TVPA claim, GEO asserts that any damages inquiry would have to be specific to each class member. But, considering the numerous questions common to the class, I find that the possible need for specific damages determinations does not predominate. *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014); *see also* Fed. R. Civ. P. 23 advisory committee's note ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class."). Since causation under the forced labor statute "can be found through generalized, classwide proof," common questions predominate in this case and "class treatment is valuable in order to take

---

[5]GEO argues that the rationale applied in the RICO context in *CGC Holding* cannot be extended to TVPA claims. I disagree. The analysis in *CGC Holding* may not dictate the outcome in this matter, but it is instructive.

advantage of the efficiencies essential to class actions." *CGC Holding Co., LLC*, 773 F.3d at 1089 (citations omitted).

"[C]lass status is appropriate as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation." *Id.* at 1087. In including Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Amchem Prods., Inc.*, 521 U.S. at 617 (quoting Kaplan, A Prefatory Note, 10 B.C. Ind. & Com. L. Rev. 497, 497 (1969)). In this case, the putative class members reside in countries around the world, lack English proficiency, and have little knowledge of the legal system in the United States. It is unlikely that they would individually bring these innovative claims against GEO. Further, if they were to do so, each detainee would have to litigate the same exact issues regarding GEO's Sanitation Policy. The class action is the superior method for adjudicating the TVPA claim. Representatives have thus demonstrated that their proposed TVPA class fulfills the requirements of Rule 23(a) & (b)(3) such that certification is appropriate.

B. Unjust Enrichment Claim

Turning to Representatives unjust enrichment claim, GEO's arguments against certification similarly involve whether an element of the claim compels individualized inquiries. To succeed on a claim of unjust enrichment, a plaintiff must prove "(1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (citing *Salzman v. Bachrach*, 996 P.2d 1263, 1266-67 (Colo. 2000)). Determining whether retention of the benefit is unjust involves "careful consideration of

particular circumstances," *Lewis*, 189 P.3d at 1140 (citation omitted), and "a fact-intensive

inquiry in which courts look to, among other things, the intentions, expectations, and behavior of

the parties," *Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 287 P.3d 842, 847

(Colo. 2012) (citing *Lewis*, 189 P.3d at 1140, 1143). The analysis "often will turn on whether a

party engaged in some type of wrongdoing." *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441,

445 (Colo. 2000).

GEO argues that the "unjust" element, dependent on the intentions, expectations, and

behavior of the parties, requires an inquiry specific to each putative class member and cannot be

demonstrated on a classwide basis. As with the TVPA claim, GEO contends that the necessity of

an individualized inquiry for one of the elements of the claim prevents the commonality,

typicality, predominance, and superiority requirements from being met.

*Federal Rule of Civil Procedure 23(a): Commonality and Typicality*

Again, I start the certification analysis with the Rule 23(a) commonality requirement that

there be at least one question common to the class that will resolve an issue central to the validity

of the claim "in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350, 359. Representatives assert

that the questions common to the proposed class are: "(1) whether the class provided GEO with a

benefit in the form of substantially discounted labor, and (2) whether, under the circumstances of

this case, it would be unjust for GEO to retain that benefit." Consistent with its overarching

argument, GEO states that the second question regarding the "unjust" element is not a question

common to the class as it requires an individualized inquiry.[6] I address this argument further

---

[6]GEO's other arguments purportedly addressing commonality for the unjust enrichment class
relate more to the merits of the claim than the existence of common questions. Citing *Alvarado
Guevara v. Immigration and Naturalization Service*, 902 F.2d 394, 396-96 (5th Cir. 1990), GEO
asserts that detainees are not participants in the same market as other persons who could become
employed by ICE since they are removed from the American industry. According to GEO,
detainees could not reasonably expect that they would be paid more than $1.00 per day. It is

below in discussing the predominance factor. For the purposes of the commonality requirement,

though, I find that Representatives have demonstrated the existence of at least a single common

question—whether GEO received a benefit from VWP participants' labor—the determination of

which will resolve an issue central to the validity of the unjust enrichment claim in one stroke.

GEO also claims that Representatives' experiences are not typical of the class because its

representation that ICE dictates the $1.00 per day pay rate was only made to specific individuals

and not on a classwide basis. According to GEO, Representatives and putative class members

would not be challenging the same conduct under the same legal theories as required for

typicality. Representatives respond by stating that their unjust enrichment claim does not turn on

class members' individualized reliance on GEO's explanation of the pay rate, but instead, that

the misrepresentation contributes to the context of GEO's enrichment. As noted throughout this

order, detainment presents distinctive conditions. Representatives, like the putative class

members, worked under the Voluntary Work Program in an environment GEO controlled. GEO

dictated the jobs they performed, the rate they were paid, and the alleged savings it experienced.

Representatives' unjust enrichment claim challenges the same conduct under the same legal

theories as any unjust enrichment claim putative class members would bring. Thus, with respect

to that claim, Representatives have demonstrated the proposed class fulfills the Rule 23(a)

prerequisites.

*Federal Rule of Civil Procedure 23(b)(3): Predominance and Superiority*

The more stringent predominance factor demands that I look to the elements of the claim

and fully consider GEO's argument regarding the necessity of individualized inquiries in

determining whether its enrichment is unjust. The "unjust" element of the claim calls for an

---

unclear how this line of reasoning relates to the commonality analysis. If anything, the question
of whether detainees should be paid in line with the market seems to support the existence of
questions that can be answered on a classwide basis.

analysis of "the intentions, expectations, and behavior of the parties" to determine when retention of the benefit becomes unjust. *Melat, Pressman & Higbie*, 287 P.3d at 847 (citing *Lewis*, 189 P.3d at 1140, 1143). GEO insists that such expectations and intentions are highly individualized and could not be consistent classwide. I am not persuaded. It is not necessary to analyze the intentions, expectations, and behavior of each individual class member; it is enough to consider the overall context based on classwide proof. GEO "has failed to explain why it would be equitable for it to retain [the benefit conferred by] some of the putative class members, but inequitable to retain [the benefit] from others." *James D. Hinson Elec. Contr. Co. v. BellSouth Telecomms., Inc.*, 275 F.R.D. 638, 647 (M.D. Fla. 2011). GEO's treatment of participants in the VWP was based on uniform policies and, therefore, it is likely that, if its retention of a benefit was unjust with respect to one class member, it was unjust with respect to all class members.

GEO quotes *Friedman v. Dollar Thrifty Automotive Group, Inc.*, 304 F.R.D. 601 (D. Colo. 2015), twice to support the proposition that class certification is inappropriate for unjust enrichment claims, because "common questions will rarely, if ever, predominate." Def.'s Opp. Class Certification at 40, 42 (quoting *Friedman*, 304 F.R.D. at 611). In *Friedman*, however, the court determined that whether the defendant's enrichment from its sales were unjust turned on the circumstances of the sales, "implicat[ing] 2.58 million face-to-face individualized transactions in which customers with varying circumstances, preferences, and levels of knowledge . . . engaged with thousands of [the defendant's] agents . . . ." *Friedman*, 304 F.R.D. at 609, 611. Those interactions were unscripted and each could differ based on what was told to or understood by the consumer about purchasing the defendant's products. *Id.* at 609-10. Under those circumstances, it is logical that the answers to the common questions could not be

18

established by common evidence and would not predominate, but those are not the facts of this case. Here, there is a consistent policy under which detained individuals worked and were paid the same amount. Perhaps the extent to which GEO was unjustly enriched would require individualized inquiries, but whether it was unjust at all could be determined on a classwide basis.

Observing that the extent inquiry would likely be particular to each class member, GEO argues that individualized damages questions predominate over any common questions. Since VWP participants worked varying hours and did not all perform the same type of work,[7] any award to them would need to account for those individual factors. Representatives assert that damages could be determined by a formula and statistical sampling taking into account the number of hours worked, type of work performed, and fair market value of such work. However, they have not provided a detailed model or expert opinion on calculating damages, which GEO claims is necessary for them to sufficiently carry their burden. I agree with Representatives that there is no requirement that they produce expert testimony at this stage on the precise formula to be used for the calculation of damages. *See* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 12:4 (5th ed.) (explaining that, in many class actions such as wage and hour cases, individual damages are easily calculable, while other more complex cases require the proponents of class certification to provide a classwide method for calculating individual damages). I find that Representatives have demonstrated that individual damages in this case should be easily calculable using a simple formula. If this proves untrue, decertification or amendment of the class for damages determinations may be appropriate at a later juncture.

---

[7]GEO also contends that, for the damages analysis, participants would need individualized proof of whether it made misrepresentations to them specifically. Def.'s Opp. Class Certification at 42-43. Any misrepresentations, however, should not be relevant in determining the extent to which a particular participant enriched GEO.

Additionally, the class action is the superior method for adjudicating Representatives'
unjust enrichment claim. I am not aware of any other suit asserting the claims brought in this
case and no other class member has demonstrated an interest in controlling the litigation. As
stated above, many of the putative class members are immigrant detainees who lack English
proficiency. They have limited financial resources and reside in countries around the world. It is
very likely that these claims would not be brought by individual detainees, especially considering
the case's innovative nature.

Representatives have demonstrated that the Rule 23(a) and (b)(3) requirements are
satisfied with respect to their TVPA and unjust enrichment claims despite GEO's arguments that
elements of each claim require individualized inquiries that preclude certification. In light of the
pervasive character of the common issues and the *de minimis* nature of any individualized issues,
I conclude that this case is an exception to the rule and class certification for both claims is
appropriate. *See In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006).

C. Appointment of Representatives' Counsel as Class Counsel

Upon certifying a class, class counsel must also be appointed. Fed. R. Civ. P. 23(g)(1). In
doing so, I "must consider: (i) the work counsel has done in identifying or investigating potential
claims in the action; (ii) counsel's experience in handing class actions, other complex litigation,
and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law;
and (iv) the resources that counsel will commit to representing the class . . . ." *Id.*
Representatives' counsel have invested significant time, energy, and resources into this case.
They have uniquely relevant experience with the client base and with bringing complex claims
against detention facilities. Many of the attorneys and their staff are also Spanish speakers,

making it easier for them to communicate with some members of the classes. I find that

Representatives' counsel are well-suited to represent the classes and appoint them to do so.

### IV. Conclusion

For the foregoing reasons, I GRANT the Motion for Class Certification Under Rule

23(b)(3) and Appointment of Class Counsel Under Rule 23(g) (ECF No. 49). The classes as

proposed in the Motion are certified for Representatives' TVPA and unjust enrichment claims.

Alejandro Menocal, Marcos Brambila, Grisel Xahuentitla, Hugo Hernandez, Lourdes Argueta,

Jesus Gaytan, Olga Alexaklina, Dagoberto Vizguerra, and Demetrio Valerga are named as

representatives of the classes. Attorneys Brandt Milstein, Andrew Turner, Andrew Free,

Alexander Hood, David Seligman, Andrew Schmidt, and Hans Meyer are appointed as counsel

for the classes. To proceed with this case, the parties shall file a revised Proposed Stipulated

Scheduling and Discovery Order by March 27, 2017.

DATED this 27th day of February, 2017.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE

FILED
United States Court of Appeals
Tenth Circuit

April 11, 2017

Elisabeth A. Shumaker
Clerk of Court

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

THE GEO GROUP, INC.,

     Petitioner,

v.

ALEJANDRO MENOCAL; MARCOS
BRAMBILA; GRISEL XAHUENTITLA;
HUGO HERNANDEZ; LOURDES
ARGUETA; JESUS GAYTAN; OLGA
ALEXAKLINA; DAGOBERTO
VIZGUERRA; DEMETRIO VALERGA,
on their own behalf and on behalf of all
others similarly situated,

     Respondents.

No. 17-701
(D.C. No. 1:14-CV-02887-JLK)
(D. Colo.)

_____

## ORDER
_____

Before **TYMKOVICH**, Chief Judge, **HARTZ** and **MATHESON**, Circuit Judges.
_____

     This matter is before the court on the GEO Group's *Petition for Permission to Appeal Class Certification*. *See* Fed. R. App. P. 5(a); Fed. R. Civ. P. 23(f). We also have a response from the plaintiffs/respondents. In addition, on March 30, 2017, the petitioner filed an unopposed motion for leave to file a reply in support of the petition. As a preliminary matter, we grant the motion to file the reply, and direct the clerk to file the reply attached to the motion.

Upon consideration of the Petition, the response, the reply, and the materials on file, we note both the complexity and difficulty of the issues presented, and we *grant* the Petition. Within 14 days of the date of this order, the petitioner shall pay the $505 filing and docketing fees to the Clerk of the District Court for the District of Colorado. *See* Fed. R. App. P. 5(d)(1)(A). The date of this order shall serve as the date of the notice of appeal in the new matter. *Id.* at 5(d)(2).

The clerk of this court is directed to open the new appeal once the clerk of the district court notifies this court that the filing fee has been paid. *Id.* at 5(d)(3).

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

2

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**April 11, 2017**

_____

**Elisabeth A. Shumaker**
**Clerk of Court**

THE GEO GROUP, INC.,

     Petitioner,

v.

ALEJANDRO MENOCAL; MARCOS
BRAMBILA; GRISEL XAHUENTITLA;
HUGO HERNANDEZ; LOURDES
ARGUETA; JESUS GAYTAN; OLGA
ALEXAKLINA; DAGOBERTO
VIZGUERRA; DEMETRIO VALERGA,
on their own behalf and on behalf of all
others similarly situated,

     Respondents.

No. 17-701
(D.C. No. 1:14-CV-02887-JLK)
(D. Colo.)

_____

## ORDER
_____

Before **TYMKOVICH**, Chief Judge, **HARTZ** and **MATHESON**, Circuit Judges.
_____

     This matter is before the court on the GEO Group's *Petition for Permission to
Appeal Class Certification*. *See* Fed. R. App. P. 5(a); Fed. R. Civ. P. 23(f). We also have
a response from the plaintiffs/respondents. In addition, on March 30, 2017, the petitioner
filed an unopposed motion for leave to file a reply in support of the petition. As a
preliminary matter, we grant the motion to file the reply, and direct the clerk to file the
reply attached to the motion.

Upon consideration of the Petition, the response, the reply, and the materials on file, we note both the complexity and difficulty of the issues presented, and we *grant* the Petition. Within 14 days of the date of this order, the petitioner shall pay the $505 filing and docketing fees to the Clerk of the District Court for the District of Colorado. *See* Fed. R. App. P. 5(d)(1)(A). The date of this order shall serve as the date of the notice of appeal in the new matter. *Id.* at 5(d)(2).

The clerk of this court is directed to open the new appeal once the clerk of the district court notifies this court that the filing fee has been paid. *Id.* at 5(d)(3).

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

```
Court Name: U.S. District Court, Colorad
o
Division: 1
Receipt Number: COX079387
Cashier ID: mv
Transaction Date: 04/14/2017
Payer Name: Mark T. Emery
----------------------------------------
NOTICE OF APPEAL/DOCKETING FEE
 For: Mark T. Emery
 Amount:      $505.00
----------------------------------------
CREDIT CARD
 Amt Tendered:  $505.00
----------------------------------------
Total Due:     $505.00
Total Tendered: $505.00
Change Amt:      $0.00

Notice of Appeal
14-cv-2887

A fee of $53.00 will be assessed on
any returned check.
```