# Exhibit C



# Performance-Based National Detention Standards 2011



U.S. Immigration and Customs Enforcement

# Preface

In keeping with our commitment to transform the immigration detention system, U.S. Immigration and Customs Enforcement (ICE) has revised its detention standards. These new standards, known as the Performance-Based National Detention Standards 2011 (PBNDS 2011), are an important step in detention reform.

ICE is charged with removing aliens who lack lawful status in the United States and focuses its resources on removing criminals, recent border entrants, immigration fugitives, and recidivists. Detention is an important and necessary part of immigration enforcement. Because ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care. ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law.

The PBNDS 2011 reflect ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose. The PBNDS 2011 are crafted to improve medical and mental health services, increase access to legal services and religious opportunities, improve communication with detainees with no or limited English proficiency, improve the process for reporting and responding to complaints, and increase recreation and visitation.

The PBNDS 2011 are also drafted to include a range of compliance, from minimal to optimal. As such, these standards can be implemented widely, while also forecasting our new direction and laying the groundwork for future changes.

In closing, I would like to thank the ICE employees and stakeholders who provided significant input and dedicated many hours to revising these standards. I appreciate the collaboration and support in this important mission - reforming the immigration detention system to ensure it comports with our national expectations. The PBNDS 2011 are an important step in a multiyear process and I look forward to continued collaboration within ICE, with state and local governments, nongovernmental organizations, Congress, and all of our stakeholders as we move forward in reforming our detention system.


John Morton
Director

# Table of Contents

1. SAFETY ................................................................. 1
    1.1 Emergency Plans............................................1
    1.2 Environmental Health and Safety .............................20
    1.3 Transportation (by Land) ...........................................38
2. SECURITY ........................................................51
    2.1 Admission and Release............................................51
    2.2 Custody Classification System...................................62
    2.3 Contraband................................................................80
    2.4 Facility Security and Control ....................................84
    2.5 Funds and Personal Property....................................94
    2.6 Hold Rooms in Detention Facilities ........................104
    2.7 Key and Lock Control .............................................109
    2.8 Population Counts ..................................................117
    2.9 Post Orders..............................................................121
    2.10 Searches of Detainees...........................................124
    2.11 Sexual Abuse and Assault Prevention and Intervention ..............................................................134
    2.12 Special Management Units ...................................181
    2.13 Staff-Detainee Communication.............................199
    2.14 Tool Control...........................................................203
    2.15 Use of Force and Restraints ..................................211
3. ORDER .............................................................226
    3.1 Disciplinary System..................................................226
4. CARE .................................................................241
    4.1 Food Service ............................................................241
    4.2 Hunger Strikes .........................................................268
    4.3 Medical Care............................................................272
    4.4 Medical Care (Women)...........................................322
    4.5 Personal Hygiene.....................................................327
    4.6 Significant Self-harm and Suicide Prevention and Intervention ..............................................................331
    4.7 Terminal Illness, Advance Directives and Death .....338
    4.8 Disability Identification, Assessment, and Accommodation ......................................................344
5. ACTIVITIES.......................................................358
    5.1 Correspondence and Other Mail.............................358
    5.2 Trips for Non-Medical Emergencies ........................365
    5.3 Marriage Requests ..................................................368
    5.4 Recreation ...............................................................371
    5.5 Religious Practices ...................................................376
    5.6 Telephone Access ....................................................386
    5.7 Visitation .................................................................393
    5.8 Voluntary Work Program.........................................407
6. JUSTICE ...........................................................412
    6.1 Detainee Handbook.................................................412
    6.2 Grievance System ....................................................416
    6.3 Law Libraries and Legal Materials...........................424
    6.4 Legal Rights Group Presentations ...........................438
7. ADMINISTRATION AND MANAGEMENT .........445
    7.1 Detention Files ........................................................445
    7.2 Interview and Tours ................................................449
    7.3 Staff Training ...........................................................457
    7.4 Detainee Transfers ..................................................461
    7.5 Definitions...............................................................468

# Acronyms and Abbreviations

AFOD: Assistant Field Office Director

BIA: DOJ Board of Immigration Appeals

CBP: DHS Customs and Border Protection

CD: Clinical Director

CDC: Center for Disease Control, Department of Health and Human Services

CDF: Contract Detention Facility

CMA: Clinical Medical Authority

COR: Contracting Officer's Representative

CRCL: DHS Civil Rights and Civil Liberties

DHS: Department of Homeland Security

DOJ: Department of Justice

DRIL: ICE ERO Detention and Reporting Information Line

DSCU: ICE ERO Detention Standards Compliance Unit

EOIR: DOJ Executive Office for Immigration Review

ERO: ICE Enforcement and Removal Operations

FOD: Field Office Director

FSA: Food Service Administrator

GAB: Grievance Appeals Board

GO: Grievance Officer

HSA: Health Services Administrator

IAO: ICE Air Operations

IDP: Institution Disciplinary Panel

IGSA: Intergovernmental Service Agreement

IHSC: ICE Health Services Corps

JIC: DHS Joint Intake Center

LEP: Limited English Proficiency

LOP: Legal Orientation Program

LPR: Legal Permanent Resident

MDR: Multi-Drug Resistant

MOU: Memorandum of Understanding

MSDS: Material Safety Data Sheet

NCCHC: National Commission on Correctional Health Care

NCIC: National Crime Information Center, Federal Bureau of Investigation

NIC: DOJ National Institute of Corrections

OIC: Officer in Charge

OIG: DHS Office of the Inspector General

OPLA: ICE Office of the Principal Legal Advisor

OPR: ICE Office of Professional Responsibility

ORR: Office of Refugee Resettlement, Department of Health and Human Services

OSHA: Occupational Safety and Health Administration, Department of Labor

PBNDS: Performance-Based National Detention Standards

PII: Personally Identifiable Information

PREA: Prison Rape Elimination Act

SAFE: Sexual Assault Forensic Examiner

SANE: Sexual Assault Nurse Examiner

SART: Sexual Assault Response Team

SIR: Significant Incident Report

SMI: Serious Mental Illness

SMU: Special Management Unit

SPC: Service Processing Center

SRT: Situation Response Team

SRT: Special Response Team

# 1.1 Emergency Plans

## I. Purpose and Scope

This detention standard ensures a safe environment for detainees and employees by establishing contingency plans to quickly and effectively respond to emergency situations and to minimize their severity.

This detention standard applies to the following types of facilities housing ICE Enforcement and Removal Operations (ERO) detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs and CDFs.* IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Each facility shall have in place contingency plans to quickly and effectively respond to emergency situations and to minimize their severity.

2. Staff shall be trained annually, at a minimum, in emergency preparedness and implementation of the facility's emergency plans.

3. An evacuation plan, in the event of a fire or other major emergency, shall be in place, and the plan shall be approved locally in accordance with this standard and updated annually at a minimum.

4. Events, staff responses and command-related decisions during and immediately after emergency situations shall be accurately recorded and documented.

5. Plans shall include procedures for assisting detainees with special needs during an emergency or evacuation.

6. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Emergency Plans"

# 7.2 Interviews and Tours

## I. Purpose and Scope

This detention standard ensures that the public and the media are informed of events within the facility's areas of responsibility through interviews and tours.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. The public and the media shall be informed of operations and events within the facility's areas of responsibility.

2. The privacy of detainees and staff, including the right of a detainee to not be photographed or recorded, shall be protected.

## III. Standards Affected

This detention standard replaces provisions on media visits and tours that were removed from the detention standard on "Visitation" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ADLF-7D-21, 7F-01.

## V. Expected Practices

### A. News Media Interviews and Tours

#### 1. General

ICE/ERO supports the provision of public access to non-classified, non-sensitive and non-confidential information about its operations in the interest of transparency. Access will not be denied based on the political or editorial viewpoint of the requestor.

ICE/ERO also has a responsibility to protect the privacy and other rights of detainees, including the right of a detainee to not be photographed or recorded.

By regulating interviews in the detention setting, the facility administrator ensures the secure, orderly and safe operation of the facility. Interviews by reporters, other news media representatives, non-governmental organizations, academics and parties not included in other visitation categories in standard "5.7 Visitation" shall be permitted access to facilities only by special arrangement and with prior approval of the respective ICE/ERO Field Office Director. ICE may designate Public Affairs Officers (PAO) to serve in Field Offices as liaisons with media representatives for some or all requests and communications covered by this standard.

#### 2. Media Representatives

The term "media representative" is intended to refer to persons whose principal employment is to gather, document or report news for any of the following entities:

a. a newspaper that circulates among the general

public and publishes news of a general interest (e.g., political, religious, commercial or social affairs);

b. a news magazine with a national circulation sold to the general public by newsstands and mail subscriptions;

c. a national or international news service;

d. a radio or television news program of a station licensed by the Federal Communications Commission (FCC); or

e. other representatives or entities that gather information in accordance with the definition of "representative of the news media" contained in the Freedom of Information Act (5 U.S.C. § 552(a)(4)(A)(ii)) as amended by section 3 of P.L.110-175.

In addition to those persons listed above, such representatives may include, but are not limited to, individuals reporting for certain electronic media outlets, online media publications and other media freelance journalists or bloggers.

### 3. Media Visits and Tours

Media representatives may request advance appointments to tour those facilities, according to the following stipulations.

a. To tour an SPC or CDF, visitors will contact the Field Office Director or the Assistant Field Office Director assigned to the facility. The Chief of Security shall be responsible for implementing the necessary security procedures.

b. To tour an IGSA facility, visitors will contact the Field Office Director responsible for that area of responsibility, who will in turn notify the facility. Local facilities' policies and procedures shall govern.

Visitors will abide by the policies and procedures of the facility being visited or toured. Visitors must obtain advance permission from the facility administrator and Field Office Director before taking photographs in or of any facility. Detainees have the right not to be photographed (still, movie or video), and not to have their voices recorded by the media. Thus, the facility administrator shall advise both visitors and detainees that use of any detainee's name, identifiable photo or recorded voice requires that individual's prior permission. Such permission will be recorded by the visitor's completion of a signed release from the detainee before photographing or recording the detainee's voice. The original form shall be filed in the detainee's A-file with a copy placed in the facility's detention file.

If the presence of video, film or audio equipment or related personnel poses a threat to the safety or security of the facility, its staff or its detainees, the Field Office Director may limit or prohibit such access. Prior to the tour, the Field Office Director shall explain the terms and guidelines of the tour to the visitors.

During and after an emergency, or when indications exist that extra security measures may be needed due to a possible disturbance in the facility, the Field Office Director may suspend visits for an appropriate period.

### 4. Personal Interviews

A media representative or member of the public, including non-governmental organizations and academics, planning to conduct a personal interview at a facility shall submit a written request to the responsible Field Office Director, preferably 48 hours prior to, and no less than 24 hours prior to, the time slot requested. The Field Office Director may waive the 24-hour rule if convinced of the need for urgency.

Through facility staff, the Field Office Director shall inform the detainee of the interview request. Before the Field Office Director considers the interview request, the detainee must then indicate his/her willingness to be interviewed by signing a consent form. The original written consent shall be filed in the detainee's A-file, and a copy shall be placed in the

facility's detention file.

"Appendix 7.2.A: Detainee Interview Release Form" provides a sample news interview authorization form that may be used. The original of the form shall be filed in the detainee's A-file with a copy in the facility's detention file. Detainees should not be pressured or coerced out of granting the interview request, nor should the facility in any way retaliate against a detainee for lawful communication with a member of the media or a member of the public.

ICE/ERO shall normally act in writing within 48 hours of the written request. Possible reasons for disapproval may include, but are not limited to, the following situations.

a. The news media representative or news organization he/she represents or the visitor does not agree to the conditions established by this policy or has previously failed to abide by them.

b. The Field Office Director finds it probable that the proposed interview may endanger the health or safety of the interviewer, cause serious unrest within the facility or disturb the orderly and secure operation of the facility.

c. The detainee is involved in a pending court action and the court with jurisdiction over the matter has issued a gag rule or the Field Office Director, after consultation with the respective ICE Office of Chief Counsel, thinks the proposed interview could affect the outcome of the court case.

If the requesting party believes the request was unfairly or erroneously denied, the requesting party may contact ICE/ERO headquarters.

Interviews shall take place during normal business hours in a location determined by the facility administrator. The facility administrator shall provide a location conducive to the interviewing activity, consistent with the safety, security and good order of the facility. The Field Office Director may limit the number of interviews with a particular detainee to a reasonable number per month. Further, if interviews are imposing a serious strain on staff or facility resources, the Field Office Director may restrict the time allotted for interviews.

For facility safety and security, ICE/ERO reserves the right to monitor, but not participate in, detainee interviews.

A media representative interested in touring the facility and photographing or recording any other detainees in conjunction with an individual interview must follow all applicable requirements and procedures, and shall indicate this interest at the time of his/her request for an interview.

### 5. Press Pools

A press pool may be established when the PAO, Field Office Director and facility administrator determine that the volume of interview requests warrants such action.

In such an event, the Field Office Director shall notify all media representatives with pending or requested interviews, tours or visits that, effective immediately and until further notice, all media representatives must comply with the press pool guidelines established by the Field Office Director.

All material generated from such a press pool must be made available to all news media, without right of first publication or broadcast.

The press pool shall comprise one member each from the following groups:

a. a television outlet (for video);

b. a radio network outlet;

c. a print outlet; and

d. a still photographer.

Each group shall choose its representative for the press pool. The Field Office Director shall, upon request, provide the media information about a detainee, provided such information is a matter of public record and not protected by privacy laws, Department of Homeland Security policy, or

ICE/ERO policy. Security and safety concerns for staff and detainees require that specific removal-related data remain confidential.

### 6. Special Conditions for Media Representatives

To be approved to interview or visit a detainee or tour an ICE facility, the media representative must certify that he/she is familiar with and accepts the rules and regulations governing media conduct. He/she must at all times comply with those rules and regulations.

Media representatives shall collect information only from a primary source(s), and shall neither solicit nor use personal information from one detainee about another who is unwilling to be interviewed.

A media request may not delay or otherwise interfere with the admission, in-processing, or departure of any detainee. Routine processing of ICE detainees shall take precedence over media interviews.

## B. Non-Governmental Organization (NGO) and Other Agency Stakeholder Facility Tours, Visitation, or Tours with Visitation

ICE detention facilities will maintain an open and transparent approach to immigration detention through managed access of stakeholders participating in approved tours, visits, or tours with visitation. All tours and visits requests shall be governed by this standard and other applicable ICE policies or procedures on NGO and/or stakeholder access to detention facilities.

All requests by NGOs and other stakeholders (which include, but are not limited to, community service organizations, intergovernmental entities, faith-based organizations, members of academia, and legal groups (e.g., pro bono legal service provider groups)) for tours, visits, or tours with visits must be submitted in writing to the local ICE/ERO Field Office supervising the facility or the ICE Office of State, Local and Tribal Coordination (OSLTC). Tour requests should not be directed to the facility.

All requests shall be forwarded to the Field Office for review. When deciding whether to approve or deny the request, the Field Office Director, or his or her designee, will take into consideration safety and security, and the availability of personnel to staff the tour, visitation, or tour with visitation. All tour or visit participants will be expected to submit personal information required by applicable ICE policies, so the Field Office can perform background checks as necessary.

When requesting visitation or a tour with visitation, stakeholders may pre-identify any detainee with whom they may wish to speak by providing ICE with a list of specific detainees in advance. Stakeholders are not required to pre-identify a detainee(s) with whom they may wish to meet during their tour and/or visit. In order to meet with detainees who have not been pre-identified, stakeholders shall provide to ICE a sign-up sheet.

All stakeholders shall provide ICE a completed tour/visitation notification flyer and a signed ICE Stakeholder Visitor Code of Conduct.

If the tour/visit is approved, the facility shall post both the ICE sign-up sheet and the ICE stakeholder tour/visit notification flyer at least 48 hours in advance of the tour or visitation in appropriate locations (e.g., message boards, housing areas). The facility staff may also make appropriate oral announcements to detainees about the upcoming tour/visit (e.g., announcement during meal times). The facility staff is not required to inform a detainee's attorney that a stakeholder will tour/visit the facility or for overseeing the content of the consent form or ensuring that the detainee and the stakeholder have completed it.

On the day of the visitation, the facility staff shall give the NGO or stakeholder access to pre-identified detainees and/or to detainees who have signed up in advance to speak with the stakeholder. The facility

staff shall arrange for the visitation to occur in a pre-determined common area or space.

The facility staff may maintain a physical presence in the meeting room to maintain safety and security.

To ensure security and avoid any disruptions in daily operations, all NGOs and other stakeholders touring and/or conducting visitation with detainees shall maintain proper and appropriate decorum, adhere to applicable ICE and facility standards, and may be asked to sign a code of conduct form.

This Standard does not apply to (1) Legal Orientation Program or Know Your Rights presentation providers; (2) law firms, organizations, or sole attorney practitioner providing or seeking to provide legal representation; and (3) health care practitioners with a request from a detainee's counsel to conduct an examination relevant to the detainee's case.