# Exhibit A



Naomi G. Beer
Tel 303.572.6549
Fax 303.572.6540
BeerN@gtlaw.com

March 4, 2019

VIA EMAIL
Juno Turner
Elizabeth Stork
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, New York 10017
jturner@outtengolden.com
estork@outtengolden.com

  Re: *Alejandro Menocal v. The GEO Group, Inc.* - Case No. 2014CV02887

Dear Juno and Elizabeth,

  I write on behalf of The Geo Group, Inc. ("GEO") to respond to your letter of February 15, 2019 and other recent correspondence.

## ICE Review

  Your February 15 letter first asks to "meet and confer" as to the legal basis for GEO's belief that it cannot produce certain documents without ICE's review and/or approval, and the specific identification of documents GEO has withheld as a result of the belief. Letter at p. 1. While you are correct that the Parties negotiated a Protective Order that has mitigated some of the need for ICE review prior to production, certain categories of documents – in particular, documents that may contain "Covered Information" – were carved out of the Protective Order with the agreement that such documents would be addressed on a case by case basis. *See* Joint Status Report and Motion for Entry of Proposed Amended Stipulated Protective Order ("Joint Status Report") at ¶ B(2). Further, prior to the filing of the Protective Order and accompanying Joint Status Report, there was extensive back and forth regarding this precise issue. Ultimately, the following language was included in the Joint Status Report:

> Additionally, the parties recognize that nothing in the Proposed Amended Protective Order prohibits the Government from reviewing documents prior to disclosure in discovery. Plaintiffs reserve the right to oppose any such review.

(*Id.*). While Plaintiffs have reserved the right to object to such review, GEO has made its position clear throughout these discussions that certain documents need ICE review and approval prior to production. By way of example, you point to VWP reimbursement records maintained by Keefe Commissary as documents that GEO should be able to produce without ICE review.

March 4, 2019
Page 2

The issue with those records, however, is that they contain detainees' names. While it is likely that ICE will approve their production quickly (as it did with respect to the class list, which also contains detainee names), GEO cannot produce those documents without prior ICE approval.

With respect to your request that GEO identify the "specific documents that [we] believe require ICE review" (Letter at p. 1), this is where the carve out from the Protective Order for "Covered Information" becomes significant. Notwithstanding Judge Kane's Order, some of the information that Plaintiffs seek through discovery in this litigation is still controlled by ICE and, accordingly, is subject to disclosure pursuant to the U.S. Department of Homeland Security's ("DHS") *Touhy* regulations, 6 C.F.R. §§ 5.41 *et seq.* The entire point of working with ICE and the U.S. Department of Justice ("DOJ") on the Protective Order was to try to facilitate a process whereby GEO could meet its discovery obligations with minimal disruption while *complying* with DHS's *Touhy* regulations.

Moreover, GEO's understanding of the categories of documents that may be subject to ICE review in this case is based on ICE's position in related litigation where ICE has also reviewed and provided input regarding the protective order in place.[1] Additionally, as you know, in this case, ICE and DOJ have communicated the Government's position that ICE needs to review and redact data that may contain information that is subject to certain statutory and regulatory disclosure restrictions ("Covered Information") prior to its production. The Government has based this position on its conclusion that the following federal statutes and regulations "prohibit disclosure of records that may be the subject of discovery" and contain Covered Information:

- 8 U.S.C. § 1367(a)(2), which prohibits disclosure of any information which relates to an alien who is the beneficiary of an application for relief, whether pending or approved, under the Violence Against Women Act;

- 8 U.S.C. § 1367(a)(2), which prohibits disclosure of any information which relates to an alien who is the beneficiary of an application for a T Visa, concerning trafficking victims;

- 8 U.S.C. § 1367(a)(2), which prohibits disclosure of any information which relates to an alien who is the beneficiary of an application for a U Visa, concerning victims of crimes;

- 8 U.S.C. § 1255a(c)(5), which prohibits disclosure of information relating to Legalization/Special Agricultural Worker claims; and

- 8 C.F.R. § 208.6, which prohibits disclosure of information contained in or pertaining to an asylum or refugee application, information pertaining to a credible fear determination pursuant to 8 C.F.R. § 208.30, and information pertaining to a reasonable fear determination pursuant to 8 C.F.R. § 208.31.

---

[1] It is GEO's hope that, here, because of ICE and DOJ's involvement in the Protective Order in this case, they might further relax their need to review certain categories of documents that might contain ICE information.

March 4, 2019
Page 3

The Government has also advised that the "consequences for unauthorized disclosure of these categories of records include criminal and civil penalties." For your convenience, we have attached the August 21, 2018 letter from the DOJ, which notably was issued *after* Judge Kane's decision regarding *Touhy*, and which makes clear the DOJ's position that *Touhy* still applies to GEO, notwithstanding Judge Kane's order.

Based upon the guidance previously provided by ICE and DOJ in a related case, GEO has identified the following categories of data that likely will require ICE review before they may be disclosed to Plaintiffs in this case:

- Documents marked "For Official Use Only," "FOUO," "Law Enforcement Use Only," or with similar text;

- ICE audits and inspections;

- Communications with ICE;

- Invoices submitted to ICE;

- Non-public ICE policies or procedures;

- Information related to applications submitted pursuant to the Violence Against Women Act;

- T Visa/U Visa information;

- Information related to Seasonal Agricultural Worker claims;

- Information related to asylum/refugee claims;

- Personally identifiable information of detainees (including names and A-numbers); and

- Personally identifiable information of ICE officials.

As to the pace of discovery, GEO has made two supplemental productions thus far (and a third if you count the class list), and anticipates producing an additional group of documents shortly. GEO also is preparing to produce the Keefe documents, discussed above, as soon as it gets approval from ICE to do so. The parties' recent meet and confer correspondence – including some of the clarification made in your February 15, 2019 letter – have further focused areas for supplemental production. We also had a call on February 7, 2019 regarding ESI and received a follow-up email from you on Friday, March 1, 2019. Moreover, as discussed during our January 15, 2019 meet and confer, and in our January 28, 2019 letter, part of GEO's supplementation is tied to finalizing a new set of search terms, which, as you know, is still a work in progress. In your March 1 email, you note that you are still reviewing the search terms we provided. GEO looks forward to discussing your feedback when your review is complete.

March 4, 2019
Page 4

## Plaintiffs' First and Second Set of Requests for Production of Documents

Request Nos. 1–3

As to the VWP reimbursement documents and the need for ICE approval prior to production, please see the discussion above.

As to your question about whether GEO tracks the hours worked by class members, as stated in GEO's Responses and Objections to Plaintiffs' Third Set of Interrogatories served on February 6, 2019, GEO does not track the actual hours worked by class members. *See* Resp. to Interrogatory No. 17.

Request Nos. 5–7 (and related Interrogatory Nos. 5 & 6)

With respect to your reference to emails that may have been sent to or from Dawn Ceja, the warden and/or the chief of security at the Aurora Facility on the topic of disciplinary charges, GEO expects that this would be covered through the new search terms discussed in the prior meet and confer correspondence. As to disciplinary records contained in the detainee files, as has been previously explained, there is a significant burden attendant to review and production of those files. That being said, GEO is willing to meet and confer on this issue as you propose in your letter.

Request No. 8

GEO has asked ICE to clarify the extent to which it has class list information for the 2004 to 2006 time period that would be the same as (or similar to) the class list information already produced. To date, GEO has not received a substantive response from ICE. However, GEO remains hopeful that ICE will be able to provide the requested information, which would resolve this issue. Alternatively, some class list information potentially could be extracted from detainee files, but this would be an extremely burdensome exercise, and would be unlikely to provide information that is anywhere near as robust as the information that was extracted electronically for the 2007 to 2014 time-period. Moreover, given that this request seeks information from 12 to 15 years ago, any contact information that could potentially be derived from such files is almost certainly stale. As to your threat to file a motion to compel on this issue, GEO cannot provide what it does not have, nor is it proportional to the needs of the case to insist on manually extracting what is almost certainly stale information from the detainee files.

Request No. 12

You have agreed to limit this Request to:

> [A]ll documents summarizing, constituting, or reflecting any contract and/or agreement you executed to purchase labor for services for which GEO either used or considered using detainee labor, including but not limited to cleaning,

March 4, 2019
Page 5

> housekeeping, laundry, landscaping, kitchen and snow removal services at the Aurora Facility between October 22, 2004 and the present.

Based on this clarification, we understand that you are now seeking only agreements between GEO and third-parties relating to the Aurora facility for services where GEO has actually used or considered using detainee labor for the same services. Given that the VWP class starts in 2012, not 2004, we think the request for all such contracts dating back to 2004 – including for things such as housekeeping, laundry, landscaping, kitchen and snow removal – is overly broad, not proportional and far afield of the scope of the certified claims. Similarly, the extension of the time- period to the present is also overly broad and not proportional, given that both classes end in 2014. That being said, GEO appreciates your effort to narrow this Request and will, subject to the Protective Order, produce copies of contracts for cleaning services, if any, for the time period from October 22, 2004 through October 22, 2014. Similarly, GEO will produce copies of contracts with housekeeping, laundry and kitchen services for the time period from October 22, 2012 through October 22, 2014.[2] Based on its reasonable investigation to date, GEO does not believe that it has used or considered using detainee labor for snow removal or landscaping services.

### Request Nos. 17–21

While you state your position that these Requests encompass video footage, we disagree that they could be fairly read to include such footage. Merely including a stock lengthy list in the definition of documents does not transform these Requests into ones for video footage. Indeed, Request Nos. 20 and 21 refer to "records of hours" and "hours spent by Plaintiffs performing such work," respectively. A reasonable reading of those Requests does not contemplate the production of video footage, which likely would not even capture all of the hours spent working by any individual detainee and thus cannot fairly be construed to be a "record of hours."

That being said, GEO can confirm that it does not have responsive video footage. GEO's CCTV system has a fixed amount of memory and once it reaches its capacity, it overwrites the oldest recorded footage. Generally, the capacity is such that it overwrites about every 30 days. Moreover, the preservation of such video is extremely burdensome and cannot be justified as proportional to the needs of the case, given the lack of relevance of the content to the claims and defenses at issue here.

### Request Nos. 32 & 33

You state that it is your position that disclosure of the wages required under the Service Contract Act constitutes an incomplete response to these Requests, but note that you are willing to meet and confer to narrow the scope of documents requested. GEO agrees it makes sense to meet and confer regarding your position on these Requests.

---

[2] GEO anticipates that these contracts would be between GEO and third parties, and would thus not constitute the type of "Official Information" that requires ICE review. However, GEO reserves all rights regarding its need to follow applicable regulations if they are implicated by these documents.

March 4, 2019
Page 6

## Plaintiffs' First and Second Sets of Interrogatories

<ins>Interrogatory Nos. 3 & 4</ins>

You asked for clarification that the employee roster produced at GEO_MEN_00020548: "(1) reflects everyone who supervised class members working in the VWP and pursuant to the Housing Unit Sanitation Policy throughout the class period, and (2) includes only employees who supervised class members working in the VWP and pursuant to the Housing Unit Sanitation Policy."

The referenced roster contains all of the GEO employees at the Aurora Detention Facility during the class periods. In addition, the roster contains each employee's date of hire and termination date. Further, it remains GEO's position that all detention officers are assigned to supervise VWP participants or detainees performing HUSP tasks because a detention officer on shift at a location that has VWP participants or detainees performing HUSP tasks is responsible for the safety and security of all the detainees at that location. Thus, all detention officers assigned to the Aurora Detention Facility during the class periods are responsive to these Interrogatories. Plaintiffs can extract the detention officers working at the Aurora Detention Facility during the class periods from this roster. GEO trusts that this clarification answers your questions and confirms that GEO has fully responded to these Interrogatories.

<ins>Interrogatory No. 8</ins>

You insist that GEO policies from other facilities related to disciplinary or corrective action under the HUSP are "relevant to whether GEO's conduct at the Aurora Facility was purportedly authorized or required by ICE, and to whether GEO's conduct at the Aurora facility was unjust" and ask GEO to amend its response to this Interrogatory. GEO does not see the connection between the policies at other facilities and what happened (or did not happen) at Aurora. It therefore remains GEO's position that policies from other facilities are not relevant to this case. Moreover, even if these policies were relevant (which they are not), GEO objects to this request for other facility information as not proportional to the needs of this case. Accordingly, GEO declines to amend its response to this Interrogatory.

<ins>Interrogatory No. 16</ins>

You reiterated that it is Plaintiffs' position that calculating the fair-market value of Class Members' work requires consideration of the cost to GEO of employee leave, fringe benefits, and other costs attendant to recruiting, screening, hiring, and retention of workers. Like the response under RFP 32 and 33 above, GEO is willing to meet and confer to discuss why you believe the information provided thus far is not adequate.

## Other Matters

We also wanted to follow up regarding the questions you posed in your December 6, 2018 email regarding the produced class list data, which GEO obtained from ICE. Because GEO could not answer Plaintiffs' questions about the ICE information, we posed the questions directly

March 4, 2019
Page 7

to ICE. On Friday, March 1, we finally received a response from ICE to our inquiry. We have restated your questions and have included ICE'S responses below.

- Question (2): Please provide us with a key to the spreadsheet that explains the meaning of the column labels, as well as the values within those labels. For example, what is the meaning of "domicile," "home," "permanent residence," etc. in the "Address Type" column?

    Response: The labels in the Address Type column have no significant meaning. Rather, the case Officer at the time of case creation randomly picks a label that may correlate to where the subject is currently residing at the time of entry. The Officer may also just select the first drop down descriptor they see.

- Question (3): We understand that the class member contact information comes from ICE and reflects the address ICE obtained from the class member at each contact point. From our review, it appears that much or all of this data was exported from the ICE Ident-Enforce database. Can you confirm? If yes, our understanding is that that database records when particular information was added to the database, which would enable us to determine what information was provided most recently. Can you add that information to the spreadsheet?

    Response: ICE Ident is a fingerprint database. Enforce is no longer used and ICE has switched over to EAGLE for case or encounter creations which then reflects in EARM. STU can only provide what information is put in the database by the Officer. The entry date for addresses is not a mandatory field, STU can pull all addresses but not the actual date it was entered.

- Question (4): What information sources or databases did ICE search to obtain the information in the spreadsheet? Does the information come only from ICE-controlled sources, or was ICE able to access other government agencies' databases or source information? Please identify each source individually, and note any databases or sources of information that reside outside of ICE.

    Response: STU pulls the supporting data from the ICE Integrated Decision Support database (IIDS). Any case information created by an Officer will be stored and or reported to this database for extraction. The information came from an ICE database.

- Question (6): The spreadsheet contains columns for the name and contact information of the class members' immigration attorneys, but none of those cells contain any information. Please provide that information where available, as it may facilitate the notice process.

    Response: The information where available has been provided. This is not a mandatory field and is not always filled in or completed.

March 4, 2019
Page 8

      Thank you for your consideration.  We trust that this responds to the questions in your letter.  As always, GEO is available to discuss any questions or concerns you have about the contents of this letter.

                                                    Very truly yours,

NGB/ck
Enclosure
cc:     Scott Schipma (via email schipmas@gtlaw.com)
        David Palmer (via email palmerd@gtlaw.com)
        Dawn Ellison (via email ellisond@gtlaw.com)
        Dana Eismeier (via email deismeier@bfwlaw.com)
        Mickey Ley (via email mley@bfwlaw.com)
        Ossai Miazad (via email om@outtengolden.com)
        Rachel Dempsey (via email rdempsey@outtengolden.com)
        Adam Koshkin (via email akoshkin@outtengolden.com)
        David Lopez (via email pdl@outtengolden.com)
        Alexander Hood (via email alex@towardsjustice.org)
        David Seligman (via email david@towardsjustice.org)
        Andrew Schmidt (via email andy@towardsjustice.org)
        R. Andrew Free (via email Andrew@ImmigrantCivilRights.com)
        Brandt Milstein (via email brandt@milsteinlawoffice.com)
        Andrew Turner (via email aturner@laborlawdenver.com)
        Hans Meyer (via email hans@themeyerlawoffice.com)

*ACTIVE 41950012v1*