# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02887 JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S AFFIRMATIVE DEFENSE

---

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................... 1

II.   STATEMENT OF UNDISPUTED FACTS ............................................... 2

    A.   GEO's Contract to Operate the Aurora Detention Facility............................ 2

    B.   The Performance-Based National Detention Standards Govern GEO's Contract Performance. ........................................................... 6

    C.   The PBNDS and Incorporated ACA Standards Contain Housekeeping and Voluntary Work Program Requirements........................... 8

    D.   GEO's Housekeeping Unit Sanitation Policy Is Not Required or Administered by ICE....................................................................... 10

    E.   GEO Tells Detainees That They Are Required to Clean Dorm Common Areas. ......................................................................... 13

    F.   Solitary Confinement at Aurora. ................................................... 15

    G.   The PBNDS Provide GEO A Wide Range of Options to Punish Offenses... 16

    H.   GEO Places Detainees in Solitary Confinement for Refusing to Clean the Facility. ....................................................................... 18

    I.   GEO Has Discretion to Set Wages For the Voluntary Work Program. ........ 19

III.   PROCEDURAL BACKGROUND ........................................................... 21

IV.   LEGAL STANDARD .......................................................................... 23

V.   ARGUMENT..................................................................................... 23

    A.   Derivative Sovereign Immunity Cannot Shield GEO Because GEO Developed the Policies Plaintiffs Challenge........................................ 24

        1.   The HUSP Violates GEO's Contract With ICE. ............................... 27

        2.   ICE Did Not Direct the HUSP. .................................................. 29

        3.   Mere Government Authorization Is Not Enough for Derivative Sovereign Immunity to Apply........................................... 31

        4.   ICE Did Not Direct the Dollar-A-Day Pay Rate Under the VWP...... 33

B.   The Government Contractor Defense Does Not Apply Because GEO Had Discretion to Develop the Relevant Terms of the VWP. ................................34

VI.  CONCLUSION ............................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                     **PAGE(S)**

*Adler v. Wal-Mart Stores, Inc.*,
   144 F.3d 664 (10th Cir. 1998)...................................................................... 23

*Bentley v. Cleveland Cty. Bd. of Cty. Comm'rs*,
   41 F.3d 600 (10th Cir. 1994)........................................................................ 23

*Boyle v. United Techs. Corp.*,
   487 U.S. 500 (1988).............................................................................. 34, 35

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
   797 F.3d 720 (9th Cir. 2015)............................................................. 27, 30, 33

*Campbell-Ewald Co. v. Gomez*,
   136 S. Ct. 663 (2016) ........................................................................ *passim*

*Corr. Servs. Corp. v. Malesko*,
   534 U.S. 61 (2001) .................................................................................... 24

*Cunningham v. General Dynamics Info. Techs., Inc.*,
   888 F.3d 640 (4th Cir. 2018)............................................................. 26, 27, 29

*Filarsky v. Delia*,
   566 U.S. 377 (2012) ................................................................................. 24

*Hudgens v. Bell Helicopters/Textron*,
   328 F.3d 1329 (11th Cir. 2003)................................................................... 35

*In re Joint E. & S. Dist. N.Y. Asbestos Litig.*,
   897 F.2d 626 (2d Cir. 1990)....................................................................... 35

*In re Katrina Canal Breaches Litig.*,
   620 F.3d 455 (5th Cir. 2010)...................................................................... 35

*In re KBR, Inc., Burn Pit Litig.*,
   744 F.3d 326 (4th Cir. 2014).......................................................... 24, 25, 30

*Menocal v. GEO Grp., Inc.*,
   113 F. Supp. 3d 1125 (D. Colo. 2015) ................................................... 33, 35

*Myers v. United States*,
   323 F.2d 580 (9th Cir. 1963) ........................................................................... 25

*Navajo Nation v. Dalley*,
   896 F.3d 1196 (10th Cir. 2018) ....................................................................... 29

*Nwauzor v. GEO Group, Inc.*,
   No. 17 Civ. 5769, 2020 WL 1689728 (W.D. Wash, April 7, 2020) ...................... 27, 34

*Salim v. Mitchell*,
   268 F. Supp. 3d 1132 (E.D. Wash. 2017) ..................................................... 30, 31, 33

*Trevino v. Gen. Dynamics Corp.*,
   865 F.2d 1474 (5th Cir. 1989) ......................................................................... 35

*In re World Trade Center Disaster Site Litig.*,
   456 F. Supp. 2d 520 (S.D.N.Y. 2006) ............................................................... 24

*U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.* .......................................... 23, 24, 29
   928 F.3d 42 (D.C. Cir. 2019)

*Yearsley v. W.A. Ross Const. Co.*,
   309 U.S. 18 (1940) .................................................................................. *passim*

## STATUTES

6 U.S.C. § 542 .................................................................................................... 2

8 U.S.C. § 1555(d) ............................................................................................. 20

8 U.S.C. §§ 1101 ............................................................................................... 2

18 U.S.C. §1589 ..................................................................................... 21, 27, 28

Pub. L. No. 95-431, 92 Stat. 1021 (1978) ........................................................ 20

## RULES

Fed. R. Civ. P. 56(a) .......................................................................................... 23

## REGULATIONS

48 C.F.R. § 52.222-3 ........................................................................................... 4

FAR 52.222-50(b) ........................................................................................ 5, 27

FAR 52.222-50(a) ............................................................................................ 28

Federal Acquisition Regulation 52.222-50 .......................................................... 5

## I.    INTRODUCTION

This lawsuit challenges two policies developed and implemented by the GEO Group ("GEO") at its ICE Contract Detention Facility in Aurora, Colorado ("Aurora Facility").  First, Plaintiffs allege that, pursuant to an internal policy called the Housekeeping Unit Sanitation Policy ("HUSP"), GEO compelled detainees at the Aurora Facility to perform necessary janitorial work without pay by threatening anyone who tried to refuse with solitary confinement.  And second, Plaintiffs allege that GEO unjustly enriched itself by paying detainees only a dollar a day to perform much of the other work necessary to run the Aurora Facility, including broader janitorial and maintenance tasks, food preparation, stripping and waxing floors, cutting hair, and doing laundry.  GEO has argued that these practices were required by its contract with Immigration and Customs Enforcement ("ICE"), and that it should therefore enjoy the protection of the government's sovereign immunity.

But the undisputed record shows that it was GEO that developed and implemented both the HUSP and the dollar-a-day reimbursement rate – and in fact, ICE itself has rejected GEO's attempt to blame its actions on the government, calling this litigation a "defense of [GEO's] contract performance," not a consequence of ICE policy.  Statement of Undisputed Facts ("SUF") ¶ 23.  GEO is a private, for-profit firm with discretion to decide how to perform its government contract on a day-to-day basis.  GEO made a business decision to coerce and underpay workers performing essential tasks at Aurora. That GEO sells detention services to the government does not shield it from liability for its own legal violations.

Because neither the HUSP nor the dollar-a-day payment were "directed by the Government," *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 (2016) (quoting *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940)), as required for a contractor to share in the government's immunity, Plaintiffs respectfully request that the Court grant partial summary judgment as to GEO's government contractor defense.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    <u>GEO's Contract to Operate the Aurora Detention Facility.</u>

1.    ICE is a federal agency tasked with enforcing U.S. immigration laws.  6 U.S.C. § 542

2.    ICE has the authority to detain foreign nationals suspected of entering the United States unlawfully.  Immigration and Nationality Act, codified at 8 U.S.C. §§ 1101 *et seq.*

3.    ICE contracts with GEO to house some of its detainees in detention facilities throughout the country.  *See* https://www.geogroup.com/Locations

4.    Among GEO's portfolio of ICE detention facilities is the Aurora Facility.  *Id.*

5.    GEO continuously operated the Aurora Facility, under contract with ICE, from October 22, 2004 to October 22, 2014.  Ex. A (A. Martin Dep. 58:1-6); Ex. K (Ely Decl. ¶ 7)[1]

---

[1]    All exhibits referenced herein are attached to the Declaration of Michael J. Scimone in Support of Plaintiffs' Motion for Partial Summary Judgment As To Defendant's Affirmative Defense.

6.     Operations for the Aurora Facility are governed by a contract between GEO and ICE.  Ex. B (GEO_MEN 00019613 (2011 Contract)); Ex. C (GEO-MEN 00059635 (2006 Contract)); Ex. D (GEO-MEN 00059744 (2003 Contract)), (collectively "the Contract"); Ex. K (Ely Decl. ¶ 7))

7.     The Contract has been renewed over time by mutual consent of GEO and ICE.  Ex. A (A. Martin Dep. 58:1-10); *see also* Ex. I (Hill Dep. 29:22-30:6)

8.     The Contract may be modified during its term by mutual consent of GEO and ICE.  Ex. A (A. Martin Dep. 17:13-17)

9.     The Contract is a "performance-based contract."  Ex. B (GEO_MEN 00019625 (2011 Contract)); Ex. C (GEO-MEN 00059642 (2006 Contract)); Ex D (GEO-MEN 00059755 (2003 Contract)); Ex. K (Ely Decl. ¶ 1)

10.     Performance-based contracting "is a results-oriented method of contracting focused on outputs, quality, and outcomes."  Ex. E (Declaration of Tae D. Johnson, *State of Washington v. GEO Group, Inc.*, Case No. 17-cv-05806 (W.D. Wash), ECF No. 91 at ¶ 8)

11.     "Performance-based contracts do not designate *how* a contractor is to perform the work, but rather establish[] the expected outcomes and results that the government expects.  It is then the responsibility of the contractor to meet the government's requirements at the price the vendor quoted."  *Id.*

12.     As a performance-based contract, the Contract requires GEO to develop "all plans, policies, and procedures" required by the Contract, and then submit them to ICE for "review and concurrence."  Ex. C (GEO-MEN 00059643 (2006

3

Contract); *see also* Ex. B (GEO_MEN 00019814 (2011 Contract) ("It is GEO's policy

that each of our facilities develops a manual of uniform policies and procedures" which

"appropriately reflect . . . contractual requirements.")); Ex. D (GEO-MEN 00059759

(2003 Contract) ("The Contractor shall prepare and submit all policies, plans, post orders

and procedures to INS for review and approval."))

13.     The Contract makes GEO "responsible for all costs associated with

and incurred as part of providing the services outlined in this contract." Ex. C (GEO-

MEN 00059642 (2006 Contract)); *see also* Ex. B (GEO_MEN 00019614, 19657 (2011

Contract) (noting that ICE "shall provide fully burdened bed day rates only" and that any

costs not covered by that rate are the contractor's to bear)); Ex. D (GEO-MEN 00059748

(2003 Contract) ("[T]he contractor shall provide a detention facility, and all labor,

materials and equipment necessary to operate and maintain temporary residential care,

and secure detention."))

14.     The Contract provides that detainee labor must be used "in

accordance with the detainee work plan developed by" GEO. Ex F ((Ragsdale 30(b)(6)

Dep. 25:1-18); Ex. C (GEO-MEN 00059662 (2006 Contract)); Ex. G (GEO_MEN

00038529 (2004 Detainee Work Plan)); Ex. H (GEO_MEN 00038563 (2014 Detainee

Work Plan))

15.     The Contract requires that the detainee work plan "must be

voluntary." Ex. C (GEO-MEN 00059662 (2006 Contract)); *see also* Ex. B (GEO_MEN

00019643 (2011 Contract) ("Detainees will be able to volunteer for work

assignments.")); Ex. D (GEO-MEN 00059796 (2003 Contract) (incorporating 48 C.F.R.

§ 52.222-3 into contract, which requires work by those in federal custody to be performed "on a voluntary basis."))

16. The Contract prohibits GEO from using forced labor in performance of the Contract by incorporating Federal Acquisition Regulation 52.222-50. Ex. B (GEO_MEN 00019697 (2011 Contract) (incorporating Federal Acquisition Regulation ("FAR") 52.222-50)); Ex. C (GEO-MEN 00059684 (2006 Contract) (same))[2]

17. FAR 52.222-50(b) expresses "a policy prohibiting trafficking in persons," including the "[u]se [of] forced labor in the performance of [a government] contract."

18. This regulation reflects the federal government's intent to "protect vulnerable individuals" and enforce its "zero-tolerance policy regarding Government employees and contractor personnel engaging in any form" of forced labor. *See* White House, Executive Order – Strengthening Protections Against Trafficking in Persons In Federal Contracts, No. 13627 (September 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/executive-order-strengthening-protections-against-trafficking-persons-fe

19. GEO is responsible for the day-to-day performance of the Contract. Ex. F (Ragsdale 30(b)(6) Dep. 52:21-22)

20. GEO receives a fixed dollar amount from ICE per detainee it houses, per day, under the Contract. Ex. B (GEO_MEN 00019614 (2011 Contract)); Ex. C

---

[2] FAR 52.222-50 (codified at 48 C.F.R. § 52.222-50) became effective on April 19, 2006 and was thus not incorporated into the 2003 Contract.

(GEO-MEN 00059636 (2006 Contract)); Ex. D (GEO-MEN 00059748 (2003 Contract));

Ex. F (Ragsdale 30(b)(6) Dep. 41:8-16 (defining "bed day rate" as "price per bed per day

at Aurora."))

      21.    The profit GEO receives from the Aurora Facility is the difference

between the amount it receives from ICE and the amount it spends, including on housing

detainees and running the facility.  Ex. I (Hill Dep. 59:18-24); Ex. J (Krumpelmann Dep.

23:23-24:4)

      22.    On April 18, 2018, GEO submitted to ICE a request for an

"equitable adjustment" of its compensation for the 2011 Contract on the basis that the

"contract requirements are incomplete because GEO reasonably believed it could perform

these specifications and contract requirements without incurring legal fees to defend such

specifications and contract requirements."  Ex. K (Ely Decl. ¶ 27)

      23.    On June 21, 2018, ICE declined GEO's request for adjustment,

stating that "GEO's defense of [this lawsuit] is a defense of its contract performance."

*Id*. ¶ 28

### B.    The Performance-Based National Detention Standards Govern GEO's Contract Performance.

      24.    The Performance Based National Detention Standards ("PBNDS")

are a series of minimum standards for detention facilities developed by ICE.  Ex. L

(GEO-MEN 00064019 (2011 PBNDS)); Ex. M (GEO-MEN 00062905 (2008 PBNDS));

Ex. N (GEO-MEN 00063383 (INS Detention Standards));[3] Ex. A (A. Martin Dep. 96:19-97:6; 99:5-101:9)

25.     The PBNDS are incorporated into the Contract.  Ex. A (A. Martin Dep. 94:21-95:5); Ex. B (GEO_MEN 00019655-56 (2011 Contract) (identifying the PBNDS as part of the "statutory, regulatory, policy, and operational considerations that will affect the Contractor.")); Ex. C (GEO-MEN 00059644 (2006 Contract) (same, referring to "ICE Detention Standards")); Ex. D (GEO-MEN 00059754 (2003 Contract) ("[T]he contractor is required to perform in continual compliance with the most current editions of the INS Detention Standards."))

26.     Pursuant to the Contract, GEO must abide by the PBNDS.  *Id.*; *see also* Ex. P (Ceja 30(b)(6) Dep. 90:17-20)

27.     A modification to the 2011 Contract incorporated the 2011 PBNDS into that contract.  Ex. B.1 (GEO_MEN 00020406); Ex. P (Ceja 30(b)(6) Dep. 125:10-23)

28.     The PBNDS supersede other sources of authority for operating the Aurora Facility under ICE contract.  Ex. P (Ceja 30(b)(6) Dep. 90:10-16)

29.     If there is a discrepancy between GEO's policy or practice and the PBNDS, the PBNDS control.  Ex. P (Ceja 30(b)(6) Dep. 90:10-16); Ex. F (Ragsdale 30(b)(6) Dep. 66:20-67:1)

---

[3]     The INS Detention Standard manual was the precursor to the PBNDS. https://www.ice.gov/factsheets/facilities-pbnds.  For ease of reference, "PBNDS" in this Motion is inclusive of the INS Detention Standards unless otherwise specified.

30.     The Contract between ICE and GEO provides that "[i]n cases where other standards conflict with DHS/ICE policy or standards, DHS/ICE policy and standards prevail."  Ex. B (GEO_MEN 00019657 (2011 Contract)); Ex. C (GEO-MEN 00059644 (2006 Contract)); Ex. D (GEO_MEN 00059759 (2003 Contract))

### C.     The PBNDS and Incorporated ACA Standards Contain Housekeeping and Voluntary Work Program Requirements.

31.     In the "Environmental Health and Safety" section, under the heading "General Housekeeping," the PBNDS state:

> The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness.  When possible, the use of non-toxic cleaning supplies is recommended.
>
> a.     All horizontal surfaces shall be dampdusted daily with an approved germicidal solution used according to the manufacturer's directions.
> b.     Windows, window frames, and windowsills shall be cleaned on a weekly schedule.
> c.     Furniture and fixtures shall be cleaned daily.
> d.     Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions.
> e.     A clean mop head shall be used each time the floors are mopped.
> f.     Waste containers shall weigh less than 50 lbs., be non-porous and lined with plastic bags; the liner shall be changed daily.
> g.     Waste containers shall be washed weekly at a minimum, or as needed when they become soiled.
> h.     Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

Ex. L (GEO-MEN 00064042 (2011 PBNDS)); *see also* Ex. M (GEO-MEN 00062934-35 (2008 PBNDS)); Ex. N (GEO-MEN 00063790 (INS Detention Standard))

32.     The Environmental Health and Safety section of the PBNDS references certain sections of the American Correctional Association ("ACA") Standards for Adult Local Detention Facilities. *See, e.g.*, Ex. L (GEO-MEN 00064041 (2011 PBNDS)); Ex. M (GEO-MEN 00062933 (2008 PBNDS)); Ex. N (GEO-MEN 00063797 (INS Detention Standard))

33.     ACA Standard 4-ALDF-1A-04 requires that: "The facility is clean and in good repair.  A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance."  Ex. Q (ALDF-1A-04); Ex. R (A. Martin 30(b)(6) Dep. 16:11-17:23)

34.     ACA Standard 4-ALDF-1A-01 requires regular sanitation inspections of detention facilities.  Ex. Q (ALDF-1A-01); Ex. R (A. Martin 30(b)(6) Dep. 18:8-19:4)

35.     The Voluntary Work Program ("VWP") section of the PBNDS provides that detainees "shall be provided the opportunity to participate in a voluntary work program."  Ex. L (GEO-MEN 00064345 (2011 PBNDS))

36.     The VWP section of the PBNDS states: "Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.  Detainees are required to maintain their immediate living areas in a neat and orderly manner by: 1. making their beds daily; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture."  Ex. L (GEO-MEN 00064345 (2011 PBNDS); Ex. R (A. Martin 30(b)(6) Dep. 25:25-26:24);

9

*see also* Ex. M (GEO-MEN 00063294-95 (2008 PBNDS); Ex. N (GEO-MEN 00063672 (INS Detention Standard))

37.     The Voluntary Work Program section of the 2011 PBNDS requires that detainees in that program be paid "at least $1.00 (USD) per day."  Ex. L (GEO-MEN 00064347 (2011 PBNDS))

38.     The Voluntary Work Program section of the PBNDS references certain sections of the ACA Standards.  Ex. L (GEO-MEN 00064345 (2011 PBNDS)); Ex. M (GEO-MEN 00063294 (2008 PBNDS)); Ex. N (GEO-MEN 00063677 (INS Detention Standard))

39.     ACA Standard 4-ALDF-5C-08 requires that: "Pretrial and unsentenced inmates are not required to work except to do personal housekeeping and to clean their housing area.  Inmates are allowed to volunteer for work assignments."  Ex. S (4-ALDF-5C-08)

   **D.    GEO's Housekeeping Unit Sanitation Policy Is Not Required or Administered by ICE.**

40.     GEO's Aurora Facility-level policies are developed by local GEO employees.  Ex. O (K. Martin Dep. 51:22-25)

41.     These policies are reviewed and amended by local GEO employees at Aurora on an annual basis.  Ex. O (K. Martin Dep. 64:17-23); Ex. P (Ceja 30(b)(6) Dep. 33:22-34:1)

42.     The annual policy review is conducted by the Aurora Facility's Policy Review Committee, which is made up of local Aurora GEO staff.  Ex. A (A. Martin Dep. 70:20-25); Ex. P (Ceja 30(b)(6) Dep. 34:2-7)

43.     Each policy is also reviewed and approved by an on-site ICE official called the Contracting Officer's Technical Representative ("COTR").  Ex. T (Nelson Dep. 150:22-151:2)

44.     GEO's Policy Number 12.1.4 – AUR, titled "Sanitation Procedures," is intended to "provide staff and detainees with a clean sanitary living environment consistent with all applicable codes, standards and sound detention practices."  Ex. U (GEO_MEN 00038687 (2004); GEO_MEN 00038653 (2004-05); GEO_MEN 00038676 (2005-06); GEO_MEN 00038628 (2006-07); GEO_MEN 00038665 (2007-08); GEO_MEN 00038632 (2008-09) GEO_MEN 00038613 (2009-10); GEO_MEN 00038625 (2010); GEO_MEN 00007203 (2010-11); GEO_MEN 00038649 (2011-12); GEO-MEN 00099980 (2012-13); GEO-MEN 00088208 (2013-14))

45.     GEO's Sanitation Procedures document requires that "[e]ach detainee will be responsible for the cleanliness of his or her cell or living area, including walls, floors, sink, toilet, windows, and other property within the cell, room, or living areas."  *Id*.

46.     GEO's Sanitation Procedures do not specify which aspects of cleaning are the responsibility of HUSP workers and which are the responsibility of VWP workers.  *See generally* Ex. U ((GEO_MEN 00038687-98 (2004); GEO_MEN 00038653-64 (2004-05); GEO_MEN 0003967676-86 (2005-06); GEO_MEN 00038628-

31 (2006-07); GEO_MEN 00038665-75 (2007-08); GEO_MEN 00038632-39 (2008-09)

GEO_MEN 00038613-15 (2009-10); GEO_MEN 00038625-27 (2010); GEO_MEN

00007203-06 (2010-11); GEO_MEN 00038649-52 (2011-12); GEO-MEN 00099980-83

(2012-13); GEO-MEN 00088208-11 (2013-14))

47.     In addition to the sanitation procedures described in Policy Number

12.1.4 – AUR, GEO requires detainees to perform a general cleanup after each meal.  Ex.

P (Ceja 30(b)(6) Dep. 37:5-9); Ex. O (K. Martin Dep. 142:24-143:1)

48.     During a general cleanup, GEO requires detainees "clean up the

tables, wipe down the tables, and sweep and mop the floors."  Ex. P (Ceja 30(b)(6) Dep.

36:24-37:9)

49.     GEO also tells detainees that they have a "common obligation to

clean . . . the communal areas," including the dayroom and bathrooms, on a rotating

basis.  Ex. F (Ragsdale 30(b)(6) Dep. 16:14-18)

50.     The general cleanup is not listed among the facility's sanitation

procedures.  *See generally* Ex. U ((GEO_MEN 00038687-98 (2004); GEO_MEN

00038653-64 (2004-05); GEO_MEN 0003967676-86 (2005-06); GEO_MEN 00038628-

31 (2006-07); GEO_MEN 00038665-75 (2007-08); GEO_MEN 00038632-39 (2008-09)

GEO_MEN 00038613-15 (2009-10); GEO_MEN 00038625-27 (2010); GEO_MEN

00007203-06 (2010-11); GEO_MEN 00038649-52 (2011-12); GEO-MEN 00099980-83

(2012-13); GEO-MEN 00088208-11 (2013-14))

51.     The post-meal cleanup of tables, floors, and other communal areas

that GEO requires is called the Housing Unit Sanitation Policy, or HUSP.  Ex. F

(Ragsdale 30(b)(6) Dep. 15:24-16:25); Ex. P (Ceja 30(b)(6) Dep. 84:3-14); Ex. R (A. Martin 30(b)(6) Dep. 11:4-19)

52.     GEO never verified with ICE whether communal areas are part of the "living area" described in the PBNDS.  Ex. A (A. Martin Dep. 196:23-198:6)

53.     Detainees do not receive payment for their work under the HUSP. Ex. P (Ceja 30(b)(6) Dep. 84:8-24)

54.     The HUSP is a "GEO policy, created by GEO."  Ex K (Ely Decl. ¶ 22); Ex. P (Ceja 30(b)(6) Dep. 27:6-28:1)

55.     The HUSP is not created by ICE.  Ex. K (Ely Decl. ¶ 22.)

56.     The HUSP is not required by the Contract.  *Id.*

57.     ICE did not draft or negotiate the HUSP.  *Id.*

**E.      GEO Tells Detainees That They Are Required to Clean Dorm Common Areas.**

58.     GEO's local detainee handbook for the Aurora facility sets out rules for detainees' conduct and privileges within the Aurora facility.  Ex. P (Ceja 30(b)(6) Dep. 29:19-24; 32:23-37:13); Ex. V (GEO_MEN 00040731-75 (Local Detainee Handbook (2002 version))); Ex. W (PL000029-55 (Local Detainee Handbook (2013 version)))

59.     The Aurora Detainee Handbook has been in effect since at least 1995.  Ex. P (Ceja 30(b)(6) Dep. 33:22-34:1)

60.     The Aurora Detainee Handbook is issued to all detainees entering Aurora.  Ex. P (Ceja 30(b)(6) Dep. 29:21-24)

61.     The Aurora Detainee Handbook communicates the rules and policies of the Aurora Facility to detainees.  Ex. P (Ceja 30(b)(6) Dep. 29:19-24)

62.     Like the PBNDS, GEO's Aurora Detainee Handbook states that detainees are "required to keep [their] personal living area clean and sanitary."  Ex. V (GEO_MEN 00040757 (Local Detainee Handbook (2002 version))); Ex. W (PL000046 (Local Detainee Handbook (2013 version)))

63.     The Aurora Detainee Handbook defines "personal living area" as 1. the detainee's "bunk and immediate floor area around and under [the] bunk," 2. the detainee's locker, and 3. the detainee's personal items.  *Id*.

64.     The HUSP in GEO's Aurora Detainee Handbook also provides: "Each and every detainee must participate in the facility's sanitation program.  A list of detainees is developed each day by staff and is posted [daily] for viewing.  During a general cleanup all detainees must participate.  The assigned Housing Unit [or Dorm] Officer will be responsible for assuring this general cleanup is done on a regular basis." Ex. V (GEO_MEN 00040758 (Local Detainee Handbook (2002 version) (under heading "Dormitory Sanitation"))); Ex. W (PL000047 (Local Detainee Handbook (2013 version) (under heading "Housing Unit Sanitation"))); *see also* Ex. X (GEO_MEN 00052387 (Detainee Orientation Video) at 2)

65.     The Aurora Detainee Handbook states "[a]ll detainees in a housing unit [or dorm] are required to keep clean and sanitary all commonly accessible areas of the housing unit [or dorm], including walls, floors, windows, windows ledges, showers, sinks, toilets, tables, and chairs."  Ex. V (GEO_MEN 00040759 (Local Detainee

Handbook (2002 version))); Ex. W (PL000047 (Local Detainee Handbook (2013 version)))

66.     That section also states that "Detainees will take turns cleaning the [day space]" and the "day room area will be kept clean at all times." *Id*.

### F.     Solitary Confinement at Aurora.

67.     GEO policy describes segregation as "[c]onfinement in a cell isolated from the general population."  Ex. Y (GEO-MEN 00037770 (Policy Number 10.2.11 – AUR))

68.     Disciplinary and administrative segregation are both forms of segregation used at the Aurora Facility.  *Id*.

69.     According to ICE standards, administrative segregation should be used only when "restricted conditions of confinement are required [] to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility."  Ex. L (GEO_MEN 00064171 (2011 PBNDS)); Ex. M (GEO-MEN 00063097 (2008 PBNDS); *see also* Ex. N (GEO-MEN 00063863-64 (INS Standards))

70.     Administrative segregation may be used to confine detainees prior to a hearing on whether disciplinary segregation will be imposed for a rule violation, but "only as necessary to prevent further violation of those rules or to protect the security and orderly operation of the facility."  Ex. L (GEO-MEN 00064172 (2011 PBNDS)); Ex. M (GEO-MEN 00063097 (2008 PBNDS)); *see also* Ex. N (GEO-MEN 00063864 (INS Standards))

71.     Administrative segregation "is not to be used as a punitive measure."

*Id*.

72.     Disciplinary segregation, which involves punitive segregation for disciplinary reasons, may only be administered after a detainee has received a disciplinary hearing and been found guilty of an offense authorizing such punishment. Ex. L (GEO-MEN 00064169 (2011 PBNDS)); Ex. M (GEO-MEN 00063090 (2008 PBNDS)); Ex. N (GEO-MEN 00063883 (INS Standards))

73.     Detainees in both administrative and disciplinary segregation are housed in a section of the detention facility called the Special Management Unit ("SMU").  Ex. L (GEO-MEN 00064169 (2011 PBNDS)); Ex. M (GEO-MEN 00063090 (2008 PBNDS)); Ex. N (GEO-MEN 00063863 (INS Standards))

74.     The SMU at Aurora consists entirely of single-occupancy cells.  Ex. P (Ceja 30(b)(6) Dep. 54:17-55:6)

### G.     The PBNDS Provide GEO A Wide Range of Options to Punish Offenses.

75.     The PBNDS state that "each facility [shall] have graduated severity scales of prohibited acts and disciplinary consequences."  Ex. L (GEO-MEN 00064209 (2011 PBNDS)); Ex. M (GEO-MEN 00063138 (2008 PBNDS)); *see also* Ex. N (GEO-MEN 00063726 (INS Standards))

76.     The PBNDS allow GEO discretion in determining the severity scales that it applies to different offenses.  Ex. A (A. Martin Dep. 146:16-147:3); Ex. O (K. Martin Dep. 73:12-80:8)

77.     The PBNDS authorize up to 72 hours of disciplinary segregation as punishment for certain offenses in what is designated as the "high moderate" offense category.  Ex L (GEO-MEN 00064221 (2011 PBNDS)); Ex. M (GEO-MEN 00063153 (2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards))

78.     High moderate offenses are also referred to as "300-level" offenses because the code numbers for these offenses are in the 300s.  Ex. L (GEO-MEN 00064220-21 (2011 PBNDS)); Ex. M (GEO-MEN 00063152-53 (2008 PBNDS)); Ex. N (GEO-MEN 00063733-34 (INS Standards)); Ex. O. (K. Martin Dep. 75:3-76:15)

79.     "Refus[ing] to clean assigned living area" is among the 300-level offenses.  Ex. L (GEO-MEN 00064220 (2011 PBNDS)); Ex. M (GEO-MEN 00063152 (2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards))

80.     The PBNDS list 13 different sanctions that could be applied to a high moderate offense: (1) initiate criminal proceedings; (2) recommend disciplinary transfer; (3) disciplinary segregation up to 72 hours; (4) make monetary restitution; (5) loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.); (6) change housing; (7) remove from program and/or group activity; (8) loss of job; (9) impound and store detainee's personal property; (10) confiscate contraband; (11) restrict to housing unit; (12) reprimand; (13) warning.  Ex. L (GEO-MEN 00064221-22 (2011 PBNDS); Ex. M (GEO-MEN 00063153 (2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards))

81.     The PBNDS provide that incidents involving "high moderate" offenses (i.e., 300-level offenses) shall be sent to a Unit Disciplinary Committee

("UDC").  Ex. L ((GEO-MEN 00064213-14 (2011 PBNDS); Ex. M (GEO-MEN

00063143 (2008 PBNDS)); Ex. N (GEO-MEN 00063721 (INS Standards))

> **H.**   **GEO Places Detainees in Solitary Confinement for Refusing to Clean the Facility.**

82.   At orientation, detainees receive an overview of the Aurora

Facility's disciplinary process, including examples of various offenses that could lead to

discipline.  Ex. X (GEO_MEN 00052387 (Detainee Orientation Video) at 4-7); *see also*

Ex. O (K. Martin Dep. 214:10-215:20 (noting that detainees received the orientation

video reflecting the prevailing ICE standards throughout the class period))

83.   One of the specific examples detainees receive of an offense that can

lead to discipline is "failure to follow safety or sanitation rules."  Ex. X (GEO_MEN

00052387 (Detainee Orientation Video) at 7)

84.   According to the Aurora Detainee Handbook, if a dormitory officer

determines the day room area is not sufficiently clean, he or she can instruct the detainees

to clean it, and "[c]ontinued refusal to clean the area will result in further disciplinary

action."  Ex. V (GEO_MEN 00040759 (Local Detainee Handbook (2002 version))); Ex.

W (PL000047 (Local Detainee Handbook (2013 version)))

85.   The UDC has the discretion to choose whether to issue minor

sanctions or refer the case to the Institution Disciplinary Panel for more serious sanctions.

Ex. L (GEO-MEN 00064213-14 (2011 PBNDS); Ex. M (GEO-MEN 00063143 (2008

PBNDS)); Ex. N (GEO-MEN 00063721 (INS Standards)); Ex. O (K. Martin Dep. 73:12-

80:8)

86.     If the UDC chooses to issue sanctions, the UDC staff member has discretion to choose which sanction to issue for the offense based on his or her knowledge and experience.  Ex. O (K. Martin Dep. 77:8-80:8)

87.     The UDC has the authority to impose disciplinary segregation as punishment for a 300-level offense.  Ex. O (K. Martin Dep. 76:16-77:1)

88.     GEO placed detainees in segregation many times during the class period for refusing to clean.  Ex. Z (GEO_MEN 00057697, GEO_MEN 00047810, GEO_MEN 00047812-17, GEO-MEN 00065434, GEO-MEN 00065393, GEO-MEN 00065211, GEO-MEN 00065032-33 (disciplinary charges and reports))

**I.     GEO Has Discretion to Set Wages For the Voluntary Work Program.**

89.     GEO determines the types of jobs available in the VWP on a facility-by-facility basis, and the ICE COTR approves them at the facility level.  Ex. A (A. Martin Dep. 120:1-9)

90.     The Contract does not identify how many detainees will participate in the VWP.  Ex. R (A. Martin 30(b)(6) Dep. 72:13-72:25)

91.     GEO has the discretion to develop the VWP based on its needs and the availability of detainee labor.  *Id*.

92.     The 2011 Contract provides that ICE will reimburse GEO $1.00 per day for each detainee working in the VWP.  Ex. B (GEO_MEN 00019616 (2011 Contract))

93.     GEO pays detainees who work in the VWP at the Aurora Facility $1.00 per day.  Ex. A (A. Martin Dep. 104:23-25); Ex. AA (GEO_MEN 00057594 (Detainee Work Detail Application))

94.     ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP.  8 U.S.C. § 1555(d); Appropriations Act, Immigration and Naturalization Service Salaries and Expenses, Pub. L. No. 95-431, 92 Stat. 1021 (1978)

95.     ICE does not prohibit its contractors from *paying* more than $1.00 per day for work performed in the VWP.  Ex. A (A. Martin Dep. 106:11-19; 110:10-13); Ex. L (GEO-MEN 00064347 (2011 PBNDS) (compensation for VWP work is "at *least* $1.00 (USD) per day" (emphasis added)))

96.     GEO pays detainees more than $1.00 per day at other ICE facilities, including $1.00 to $3.00 per day at its South Texas Detention Facility, $1.00 to $2.50 per day at its Folkston ICE Processing Center, $1.00 to $3.00 per day at its Joe Corley Detention Facility, and $1.00 to $4.00 per day at its LaSalle Detention Facility.  Ex. A (A. Martin Dep. 109:15-110:13); Ex. BB (GEO-MEN 00170339 (VWP Pay Rates))

97.     GEO pays detainees more than $1.00 per day at other facilities to incentivize detainee participation in the VWP, such as when the VWP is "undersubscribed."  Ex. F (Ragsdale 30(b)(6) Dep. 155:5-17)

98.     In facilities where GEO pays detainees more than $1.00 per day for VWP work, it does so "on [its] own dime."  Ex. A (A. Martin Dep. 107:18-22)

### III.     PROCEDURAL BACKGROUND

Plaintiffs filed this class action on October 22, 2014, alleging that, *inter alia*, (1) the HUSP and related use of solitary confinement constituted forced labor in violation of the Trafficking Victims' Protection Act ("TVPA"), 18 U.S.C. § 1589, and (2) GEO was unjustly enriched by its policy and practice of paying detainee workers either $1 per day or nothing at all.[4]  ECF No. 1.  GEO moved to dismiss, arguing that it could not be held liable for these claims on the basis of the "government contractor defense."  ECF No. 18 at 5-8, 28.  In support of this argument, GEO cited to case law on derivative sovereign immunity, which is related to but distinct from the government contractor defense.  *Id.*

The Court permitted Plaintiffs' unjust enrichment and TVPA claims to move forward.  ECF No. 23.  The Court held that the government contractor defense was not grounds for dismissal, because the contract between ICE and GEO "does not *prohibit* Defendant from paying detainees in excess of $1/day in order to comply with Colorado labor laws."  *Id.* at 13.  In its subsequently-filed answer, GEO again raised the affirmative defense that Plaintiffs' claims are barred by the government contractor defense.  ECF No. 26 at 14.

On February 27, 2017, the Court granted Plaintiffs' motion for class certification. ECF No. 57.  After GEO lost its interlocutory appeal of that decision before the Tenth Circuit, ECF No. 114, the parties began class discovery.  As part of that process, on October 24, 2019, Plaintiffs served an interrogatory on GEO requesting "all

---

[4]     The Court dismissed Plaintiffs' claim that paying detainees $1 per day for VWP work violated the Colorado Minimum Wage Order.  *See* ECF No. 23.

communications, acts, or authorization of any other kind from ICE" that formed the basis

for the government contractor defense as to Plaintiffs' TVPA claims.  GEO responded on

February 4, 2020 with several categories of documents and policies on which it purported

to rest its defense, which include:

- the local Aurora policies governing sanitation procedures and the detainee work program;

- the absence of any findings of noncompliance from various audits and oversight personnel;

- the PBNDS;

- ICE's National Detainee Handbook; and

- the ACA standards.

Ex. CC.  Plaintiffs also sent GEO a 30(b)(6) notice on November 1, 2019 that requested

testimony as to the following topics:

- Contracts with ICE regarding the use of detainee labor to clean the Aurora Detention Center, and any communications that GEO contends constitute ICE approval, endorsement, or instruction as to the use of detainee labor for these purposes, from October 22, 2004 to the present.

- Contracts with ICE regarding the use of administrative or disciplinary segregation, and any communications that GEO contends constitute ICE approval, endorsement, or instruction as to the use of administrative or disciplinary segregation in response to detainees' refusal to comply with the HUSP.

GEO produced Dan Ragsdale, Executive Vice President for Contract Compliance, to

testify as to these topics on February 27, 2020.

## IV.     LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A fact is material when "under the substantive law it is essential to

the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670

(10th Cir. 1998).  Courts applying the summary judgment standard "view the factual

record and draw all reasonable inferences therefrom most favorably to the nonmovant."

*Id.*

## V.     ARGUMENT

The government contractor defense, and the related (but distinct) concept of

derivative sovereign immunity,[5] are not free passes for government contractors to break

the law.  Rather, they are limited grants of immunity that apply where the government

directs a contractor to perform the specific acts that give rise to the claims.  *See, e.g.*,

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 (2016) (derivative sovereign

immunity is available to a federal contractor who "simply performed as the Government

---

[5]     GEO did not plead derivative sovereign immunity as a defense in its Answer.  *See*
ECF No. 26.  This Motion addresses it regardless, because GEO appears to have
conflated derivative sovereign immunity with the government contractor defense; its
Motion to Dismiss reply referred to the two doctrines interchangeably.  *See* ECF No. 18
at 5-6; *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.* ("*In re OPM*"), 928 F.3d
42, 71 (D.C. Cir. 2019) (the government contractor defense and sovereign immunity are
"apples and oranges").  By failing to plead derivative sovereign immunity, GEO
has waived it, which is an independent ground on which this Motion may be granted.  *See,
e.g.*, *Bentley v. Cleveland Cty. Bd. of Cty. Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994)
("Failure to plead an affirmative defense results in a waiver of that defense").

directed"); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001) (the government

contractor defense applies under the "special circumstances" where "the government has

directed a contractor to do the very thing that is the subject of the claim").

Here, the undisputed record shows that the policies Plaintiffs challenge were

GEO's own, and were not required – or, in the case of the HUSP, even *permitted* – by

GEO's contract with ICE.  Therefore, GEO cannot hide behind the government to protect

it from suit, and the Court should grant summary judgment on GEO's government

contractor defense.

### A.   Derivative Sovereign Immunity Cannot Shield GEO Because GEO Developed the Policies Plaintiffs Challenge.

Derivative sovereign immunity is a federal common-law principle that provides

limited protection to contractors who work under contract with the United States

government.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377, 384-89 (2012) (describing history

of derivative sovereign immunity).  Its "driving purpose . . . is to prevent the contractor

from being held liable when the government is actually at fault but is otherwise immune

from liability.'" *In re OPM*, 928 F.3d at 70 (quoting *In re World Trade Center Disaster

Site Litig.*, 456 F. Supp. 2d 520, 560 (S.D.N.Y. 2006)) (internal quotation marks omitted).

Unlike sovereign immunity, however, derivative sovereign immunity "is not

absolute." *Campbell-Ewald*, 136 S. Ct. at 671.  Although a contractor who "simply

performed as the Government directed" may share the government's immunity, *id.* at

673, derivative sovereign immunity does not protect a contractor that takes steps "over

and beyond acts required to be performed by it under the contract," *In re KBR, Inc., Burn*

*Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) (quoting *Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963)).  Here, both the HUSP and the dollar-a-day wage rate were policies developed by GEO; they were not required by its contract with ICE. Accordingly, derivative sovereign immunity cannot apply.

The modern formulation of derivative sovereign immunity began with *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), where the Supreme Court considered claims against a contractor who had been hired by the government to build dikes along the Missouri River.  *Id*. at 19.  This construction caused parts of the petitioners' land to wash away, leading them to sue the contractor for damages.  *Id*.  The *Yearsley* Court noted that the work that led to the washout "was all authorized and directed by the Government of the United States."  *Id*. at 20.  The Court then held that "if th[e] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."  *Id*. at 20-21.  This conclusion came with the proviso that an agent of the government could be liable if "he exceeded his authority or . . . it was not validly conferred."  *Id*. at 21 (citing cases).

In *Campbell-Ewald*, the Supreme Court clarified that derivative sovereign immunity does not apply to contractors who fail to follow the government's directives. 136 S. Ct. at 672.  Campbell-Ewald was an advertising and marketing firm that contracted with the Navy on a campaign to send text messages to young adults encouraging them to learn more about enlistment.  *Id*. at 667. In support of that campaign, Campbell-Ewald subcontracted with a firm that generated a list of cell phone

numbers to which the text messages would be sent. *Id*. Under the Telephone Consumer Protection Act ("TCPA"), any such text messages require prior express consent from the recipient. *Id*. at 666-67. But some of the recipients had not consented to be messaged, and one of them sued Campbell-Ewald on behalf of a putative class in federal court. *Id*. at 667.

The Supreme Court rejected Campbell-Ewald's argument that its status as a federal contractor provided it immunity from the plaintiff's suit, holding that on the record before it, there was "no basis for arguing that [the plaintiff's] right to remain message-free was in doubt or that Campbell[-Ewald] complied with the Navy's instructions." *Id*. at 674. Specifically, the Court focused on evidence that the Navy authorized Campbell-Ewald "to send text messages only to individuals who had 'opted in' to receive solicitations," and that the Navy "relied on Campbell[-Ewald]'s representation that the list was in compliance" with the TCPA. *Id*. at 673-74. Accordingly, the government contractor defense did not apply. *Id*. at 674.

Two years later, the Fourth Circuit applied that rule in *Cunningham v. General Dynamics Information Technology, Inc.*, 888 F.3d 640, 647-49 (4th Cir. 2018), holding that where the government *does* direct the specific violation at issue in a lawsuit against a government contractor, derivative sovereign immunity may attach. The courts in both *Cunningham* and *Campbell-Ewald* faced the same question: Was a contractor liable under the TCPA for making unauthorized communications in the performance of a government contract? But, whereas in *Campbell-Ewald*, a private subcontractor developed the list of phone numbers at issue, 136 S. Ct. at 673-74, in *Cunningham*, the

*government* provided the contractor with the restricted phone numbers, and the contract required the contractor to call them, 888 F.3d at 647.  This distinction drove the different outcomes, as derivative sovereign immunity is limited to circumstances where the contractor is following government directions.  *Id.* (calling *Cunningham* "vastly distinguishable" from *Campbell-Ewald* because the *Campbell-Ewald* contract placed the responsibility for developing a list of approved numbers onto the contractor, not the government); *see also Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015) ("We have held that derivative sovereign immunity, as discussed in *Yearsley*, is limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications.'"); *Nwauzor v. GEO Group, Inc.*, No. 17 Civ. 5769, 2020 WL 1689728, at *8-9 (W.D. Wash, April 7, 2020) (in a case alleging claims against GEO under Washington State minimum wage law, holding that there was no derivative sovereign immunity because GEO "has not shown that it was directed by the government to pay participants in the VWP only $1 per day").

### 1.    The HUSP Violates GEO's Contract With ICE.

GEO's HUSP is a paradigmatic example of the case contemplated in *Campbell-Ewald* where a contractor violates both federal law and the government's instructions. 136 S. Ct. at 672.  The HUSP claim arises under the TVPA, which prohibits labor procured by, *inter alia*, force, threats of force, serious harm, or threats of serious harm. 18 U.S.C. §1589(a).  GEO's contract specifically incorporates a nearly identical definition of forced labor in the form of Federal Acquisition Regulation ("FAR") 52.222-50(b), which expresses "a policy prohibiting trafficking in persons," including the "[u]se

[of] forced labor in the performance of [a government] contract."  SUF ¶ 17.[6]  This regulation states the federal government's intent to "protect vulnerable individuals" and enforce its "zero-tolerance policy regarding Government employees and contractor personnel engaging in any form" of forced labor.  SUF ¶ 18.

Like the contract in *Campbell-Ewald*, GEO's contract with ICE – far from directing GEO to violate the TVPA – specifically required GEO to observe the law's prohibitions.  *See* 136 S. Ct. at 673 (contract "noted the importance of ensuring that . . . all recipients had consented to receiving messages like the recruiting text.").  And both the government's interest in enforcing the TVPA and Plaintiffs' right to be free from forced labor are well-established.  *See* SUF ¶¶ 16-18.  Therefore, in the absence of any indication that Plaintiffs' rights under the TVPA are "in doubt or that [GEO] complied with [ICE's] instructions," *Campbell-Ewald*, 136 S. Ct. at 674, derivative sovereign immunity cannot attach.

---

[6]       *Compare* FAR 52.222-50(a) (defining forced labor as "knowingly providing or obtaining the labor or services of a person (1) By threats of serious harm to, or physical restraint against, that person or another person; (2) By means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or (3) By means of the abuse or threatened abuse of law or the legal process.) *with* 18 U.S.C. § 1589 (defining forced labor as that obtained: "(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.").

GEO's HUSP also violates specific prohibitions against unpaid labor that are incorporated into the Contract.  The HUSP, which requires that detainees perform unpaid work such as cleaning tables, sweeping and mopping floors, and cleaning the common areas of their dormitories after meals, SUF ¶¶ 47-49, conflicts on its face with the PBNDS, which require that "work assignments are voluntary," and list only four specific housekeeping chores that may be required: (1) making beds daily, (2) stacking loose papers, (3) keeping floors and dividers free of debris or clutter, and (4) not hanging anything from the beds, fixtures, or furniture,[7] SUF ¶ 36.

These violations are GEO's, not ICE's, and GEO cannot claim it was merely "executing [the government's] will," *Yearsley*, 309 U.S. at 20-21, or that ICE is "actually at fault" for the offending policies, *In re OPM*, 928 F.3d at 70.  Rather, GEO developed policies that "failed to adhere to the contract" between GEO and ICE.  *Cunningham*, 888 F.3d at 648.  The sovereign immunity of the United States does not protect GEO from liability flowing from such a failure.

### 2.      ICE Did Not Direct the HUSP.

Even if the Contract did not prohibit the HUSP, it is undisputed that the HUSP was "a GEO policy, created by GEO," and was not directed, drafted, or negotiated by

---

[7]      The fact that the PBNDS list these four specific, defined chores as the only form of "personal housekeeping" that detainees are required to perform implies that other, materially different forms of labor are not permitted.  *Cf. Navajo Nation v. Dalley*, 896 F.3d 1196, 1213 (10th Cir. 2018) (describing the *expressio unius est exclusio alterius* canon of interpretation, which provides that "the enumeration of certain things" suggests the absence of "intent of including things not listed or embraced") (internal quotation marks omitted).

ICE.  SUF ¶¶ 54-57.  As a performance-based contract, the focus of GEO's contract with

ICE is on the results rather than the methods of implementation, and the day-to-day

performance of the contract is delegated to GEO.  SUF ¶¶ 9-11, 19.  The contract, and the

incorporated PBNDS and ACA Standards, require GEO only to maintain certain levels of

sanitation and hygiene; they do not require it to use the threat of solitary confinement to

procure free labor in doing so.  SUF ¶¶ 16, 31-33, 36, 75-88.

     In other words, ICE "told [GEO] what goals to achieve but not how to achieve

them."  *In re KBR*, 744 F.3d at 339.  Therefore, GEO cannot claim that it actions were

merely "executing [ICE's] will," and derivative sovereign immunity does not apply.

*Yearsley*, 309 U.S. at 20-21; *see also In re KBR*, 744 F.3d at 346 (derivative sovereign

immunity would not apply if the contractor "enjoyed some discretion in how to perform

its contractually authorized responsibilities"); *Cabalce*, 797 F.3d at 732 (no derivative

sovereign immunity where the contractor "designed the [challenged] plan without

government control or supervision"); *Salim v. Mitchell*, 268 F. Supp. 3d 1132, 1149 (E.D.

Wash. 2017) (testimony from the defendant that he could choose which of several

government-approved interrogation techniques to apply supported conclusion that the

government contractor defense did not apply).

### 3.      Mere Government Authorization Is Not Enough for Derivative Sovereign Immunity to Apply.

GEO may argue that it is protected by derivative sovereign immunity because ICE

officials reviewed and approved the HUSP.[8]  But even close government supervision and

approval of a contractor's work does not confer immunity, as long as the contractor

exercised its own agency in carrying out the acts challenged by a plaintiff.  For example,

in *Salim v. Mitchell*, the court considered whether the psychologists who designed and

implemented the CIA's "enhanced interrogation" program could be held liable for

injuries and death that occurred as a result.  268 F. Supp. 3d at 1138-39.  It concluded that

the psychologists had not acted "merely and solely as directed by the Government,"

because they "had a role in the design of the Program, trained interrogators for the

Program, and exercised some discretion in the application of the Program."  *Id*. at 1150.

Even though the CIA had authorized the enhanced interrogation techniques, supervised

their implementation, and was fully aware that they were used, the contractors were able

to decide which techniques to use and when to use them.  *Id*. at 1150.  This holding

reflects the underlying principle that courts applying derivative sovereign immunity

require that the government *directed* the challenged decisions, not simply that a

government representative signed off on plans developed and implemented by a

contractor.  *See, e.g., Yearsley*, 309 U.S. at 20 (governmental immunity applies only

---

[8]      *See* Ex. CC (Defendant The GEO Group Inc's Second Supplemental Responses to Plaintiffs' Fifth Set of Interrogatories).

when a contractor's work is "authorized *and directed*" by the government (emphasis added)).

Here, not only is there no evidence that ICE directed the HUSP, there is little evidence that ICE was even *aware* of the details of that policy.  ICE places a Contracting Officer's Technical Representative on-site at Aurora to sign off on GEO's formal policies.  SUF ¶ 43.  But GEO's formal written policy documents do not distinguish between the work assigned to HUSP workers and the work assigned to VWP workers.  SUF ¶ 46.  This leaves it unclear on the face of the written policy what, if any, work was performed by unpaid detainees, and does not show that the government was aware that the labor was unpaid (as opposed to being performed by VWP workers or GEO employees).  Even in the Aurora Detainee Handbook, the policy is described in vague terms that do not make clear that detainees will be required to participate in a rotating clean-up after other detainees in common areas, and not merely "keep clean and sanitary all commonly accessible areas of the dorm."  SUF ¶ 65.  This vague statement is a far cry from evidence that ICE approved or even was aware of fact that the HUSP required extensive *unpaid* janitorial work cleaning up after others, such as wiping down tables, sweeping and mopping floors, and other cleaning tasks in the common area.  SUF ¶ 47-49.  And GEO never specifically sought to clarify with ICE whether the scope of the unpaid cleaning it required matched the limited chores permitted by the PBNDS.  SUF ¶ 52.

### 4.      ICE Did Not Direct the Dollar-A-Day Pay Rate Under the VWP.

In denying GEO's Motion to Dismiss at the beginning of this litigation, this Court

held that "the [ICE-GEO] contract only defines how Defendant will be reimbursed for the

Detainee Work Program and does not *prohibit* Defendant from paying detainees in excess

of $1/day."  *Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1135 (D. Colo. 2015).

Based on that determination, the Court denied GEO's motion to dismiss Plaintiffs' claims

under the government contractor defense.  *Id*.  Since that decision, more evidence has

emerged that GEO set the VWP rate at its own discretion.  GEO's contract with ICE

required it to have a VWP, but ICE delegated the authority to design that program at the

Aurora Facility to GEO.  SUF ¶¶ 89-92.  The PBNDS, which are incorporated into the

contract, require that detainees receive "*at least*" a dollar a day, SUF ¶ 37, but they leave

the decision of how much to pay above that amount to the discretion of individual

facilities.  SUF ¶ 96-97.  And, most significantly, many facilities run by GEO do, in fact,

pay detainees more than a dollar a day, with ICE's consent, even though any amount

above a dollar is not reimbursed by ICE.  SUF ¶ 96-98.

As discussed above, derivative sovereign immunity applies only to acts that were

directed by the government, not to acts the contractor undertook of its own discretion.

Therefore, just as with the HUSP claim, the Court should grant summary judgment to

Plaintiffs on GEO's derivative sovereign immunity defense to Plaintiffs' VWP claim.

*See, e.g.*, *Cabalce*, 797 F.3d at 732 (government contractor defense does not apply where

contractor had "discretion in the design process'"); *Salim*, 268 F. Supp. 3d at 1138-39

(defense did not apply where the contractor had discretion in how to implement the

challenged torture program); *Nwauzor*, 2020 WL 1689728, at *8-9 (denying GEO's

motion for summary judgment on derivative sovereign immunity because it had not

shown ICE directed it to pay VWP participants only $1 per day).

### B. The Government Contractor Defense Does Not Apply Because GEO Had Discretion to Develop the Relevant Terms of the VWP.

In contrast to derivative sovereign immunity, which concerns whether contractors

executing the will of the government may claim sovereign immunity, the government

contractor defense addresses whether the common-law immunity doctrine preempts

liability for violations of state law committed by government contractors. *See Boyle v.*

*United Techs. Corp.*, 487 U.S. 500, 505 n.1 (1988) (limiting case to preemption analysis

and distinguishing that analysis from a decision on the merits of immunity). Although

related to derivative sovereign immunity, the government contractor defense is more

limited, and does not apply to Plaintiffs' federal TVPA claims. *Id*. Even so, the guiding

principles behind derivative sovereign immunity and the government contractor defense

are similar, as both address when government contractors are subject to suit. Applying

those principles, GEO enjoys no protection from Plaintiffs' unjust enrichment claims

under the government contractor defense.

The government contractor defense was first articulated in *Boyle v. United*

*Technologies*, which addressed when, if ever, government contractors could be liable for

state law torts. The Supreme Court held that, in the products liability context, immunity

from such claims attaches to government contractors only if "(1) the United States

approved reasonably precise specifications; (2) the equipment conformed to those

specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. Subsequent decisions from lower courts have expanded the defense beyond products liability to other state law claims. *See, e.g.*, *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1334 (11th Cir. 2003) (holding that the government contractor defense can apply to service contracts).

The government contractor defense, like derivative sovereign immunity, hinges on to what extent the government directed the actions challenged by the lawsuit. *Boyle*, 487 U.S. at 509 (noting that if a contractor "could comply with both its contractual obligations and [the law it is accused of violating]," the government contractor defense does not apply); *see also Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir. 1989) (defense does not apply when the government "merely accepts, without any substantive review or evaluation, decisions made by a government contractor"). "[S]tripped to its essentials," the government contractor defense "is fundamentally a claim that '[t]he Government made me do it.'" *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 465 (5th Cir. 2010) (quoting *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990)) (internal quotation marks omitted).

Here, as discussed above in the context of derivative sovereign immunity, this Court has already rejected GEO's position that it was forced to reimburse VWP workers at the challenged dollar-a-day rate. *See Menocal*, 113 F. Supp. 3d at 1135 ("[T]here is no 'significant conflict' between a federal interest and state law as required for the assertion of the government contractor defense."). Therefore, for the same reasons that it enjoys

no protection from derivative sovereign immunity, the undisputed facts show that the government contractor defense does not protect GEO from Plaintiffs' VWP claims.

## VI.    CONCLUSION

This case concerns GEO's own performance as a private prison contractor – not a series of acts that were directed by the government.  In direct contravention of ICE's rules, GEO chose to extract forced labor by threatening Plaintiffs and the Class Members with solitary confinement.  And GEO chose to pay some detainees the bare minimum it could get away with – a dollar a day – to replace labor that it otherwise would have had to purchase by paying fair wages to employees.  GEO cannot blame these choices on the government; it must take responsibility for its own actions.  Plaintiffs' claims should proceed to trial, and summary judgment should be granted as to GEO's immunity defense.

Dated: New York, NY
         April 29, 2020

Respectfully submitted,

By: */s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
E-Mail: mscimone@outtengolden.com

Rachel Dempsey
Adam Koshkin
**OUTTEN & GOLDEN LLP**
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
E-Mail: rdempsey@outtengolden.com
E-Mail: akoshkin@outtengolden.com

David Lopez
**OUTTEN & GOLDEN LLP**
601 Massachusetts Avenue NW
Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
E-Mail: pdl@outtengolden.com

Alexander Hood
David Seligman
Andrew Schmidt
Juno Turner
**TOWARDS JUSTICE**
1410 High St., Suite 300
Denver, CO 80218
(720) 441-2236
alex@towardsjustice.org
david@towardsjustice.org
andy@towardsjustice.org
juno@towardsjustice.org

R. Andrew Free
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
T: (844) 321-3221
Andrew@ImmigrantCivilRights.com

Brandt Milstein
**MILSTEIN LAW OFFICE**
1123 Spruce Street
Boulder, CO 80302
(303) 440-8780
brandt@milsteinlawoffice.com

Andrew Turner
**THE KELMAN BUESCHER FIRM,
P.C.**
600 Grant St., Suite 825
Denver, CO 80203
(303) 333-7751
aturner@laborlawdenver.com

Hans Meyer
**MEYER LAW OFFICE, P.C.**
P.O. Box 40394
Denver, CO 80204
(303) 831-0817
hans@themeyerlawoffice.com

*Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2020, a copy of the foregoing document was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Michael J. Scimone
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
E-Mail: mscimone@outtengolden.com