# Exhibit A

Amber Martin
October 09, 2019                                                    1

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                       DISTRICT OF COLORADO
 2
                      CASE NO. 1:14-cv-02887-JLK
 3

 4   ALEJANDRO MENOCAL, et al.,

 5                    Plaintiffs,

 6   -vs-

 7   THE GEO GROUP, INC.,

 8                    Defendant.
     _____/
 9

10

11

12

13              DEPOSITION OF AMBER MARTIN
                   Pages 1 Through 209
14

15

16

17              Wednesday, October 9, 2019
                 8:58 a.m. - 3:21 p.m.
18
                   951 Yamato Road
19                    Suite 285
                 Boca Raton, Florida 33431
20

21

22

23

24              Stenographically Reported By:
                 Nancy Cannizzaro, RMR
25              Registered Merit Reporter
```

Amber Martin
October 09, 2019                                        2

```
 1                    APPEARANCES

 2

 3   On Behalf of the Plaintiffs:
          OUTTEN & GOLDEN, LLP
 4        685 Third Avenue
          25th Floor
 5        New York, New York 10017
          212.245.1000
 6        mscimone@outtengolden.com
          BY:  MICHAEL J. SCIMONE, ESQUIRE
 7

 8   On Behalf of the Defendant:
          AKERMAN, LLP
 9        1900 Sixteenth Street
          Suite 1700
10        Denver, Colorado 80202
          303.260.7712
11        colin.barnacle@akerman.com
          BY:  COLIN L. BARNACLE, ESQUIRE
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Amber Martin
October 09, 2019                                          16

1          Q.    Okay.  So you said -- so your current --

2    well, I'm going to focus most of my questions today on

3    the period from 2004 to 2014.

4          A.    Okay.

5          Q.    And so just keep that in mind.  It's kind

6    of a framing point.  But please specify if it's unclear

7    or ask me to clarify if it's unclear what time period I'm

8    focusing on.  So I'm going to focus, I think, mostly on

9    the role in contract administration.

10              So can you -- you said that involves

11   responsibility for administration and negotiation of

12   contracts and modifications.  Did I get that right?

13         A.    Yes.

14         Q.    Okay.  And is that -- you have an executive

15   role at that --

16         A.    Yes.

17         Q.    -- in that area?

18              And so how many direct reports do you have?

19         A.    Seventeen.

20         Q.    I won't ask you to name them all, but can

21   you describe their roles or titles?

22         A.    I have two particular departments within

23   contract administration.  One is research and

24   development; so I have a senior director over that.  And

25   then the other is basically administering the

Amber Martin
October 09, 2019                                    17

```
 1    modifications and clarifying all the financial aspects;

 2    so I have a senior director over finance.  And there are

 3    people underneath both of them.

 4           Q.    Who is the senior for R&D?

 5           A.    His name is Dan O'Donnell.

 6           Q.    And the other person, is that a director of

 7    finance, did you say?

 8           A.    Yes.  Senior director of finance.

 9           Q.    Senior director.  Who is in that title?

10           A.    Andrew Grossman.

11           Q.    And when you say "administering contract

12    modifications," what does that entail?

13           A.    Once modifications have been finalized --

14    negotiated and finalized, they will come through.

15    They're tracked.  They make sure that everything is, you

16    know, complete and correct and accurate on the

17    modification.  If there is anything that's not accurate,

18    then they go back to the client and, you know, work those

19    things out.  Once that comes in, then we have a database.

20    They distribute things.  They make sure they're, you

21    know, up in the database with the contracts and

22    everything is correct.

23           Q.    And has that general sort of overview you

24    described been consistent in the period from 2004 to

25    2014?
```

Amber Martin
October 09, 2019                          18

```
 1            A.     It became more formal in 2011.

 2            Q.     Okay.  In what way?

 3            A.     That we introduced a contract database.  It

 4     came more to put the technology more up to date.

 5            Q.     So when you say that you review the

 6     modifications to make sure they're complete, correct, and

 7     accurate, what are you reviewing for accuracy?  Is that a

 8     preexisting contract you're looking at or something else?

 9            A.     When we're talking about modifications,

10     we're modifying the existing contracts and we're looking

11     for accuracy, as far as terminology, financial aspects,

12     dates, you know, and everything that we've agreed to is

13     in the modification.

14            Q.     Okay.  About how many people work in the

15     research and development department?

16            A.     Well, the research and development

17     department also has the satellite office, which is in

18     Boulder.

19            Q.     About how many people work there?

20            A.     There's four people that work there and

21     then there's four that work in the corporate office.  So

22     eight.

23            Q.     Okay.  And where is the finance department

24     located?

25            A.     In Boca, the corporate office.
```

Amber Martin
October 09, 2019                                    57

1     BY MR. SCIMONE:

2          Q.    37755.

3          A.    Okay.  I'm sorry.  I'm missing a 5.

4          Q.    Just above the Bates number in the last

5     line of the e mail, you see where it says "NLT"?

6          A.    No later than.

7          Q.    I'm sorry, what is that?

8          A.    No later than.

9          Q.    Oh, no later than.  Got it.  I was

10    wondering about that.

11               So once these PBNDS changes are

12    incorporated into facility-level policies, you said

13    they're communicated typically to ICE.  Who at ICE are

14    they communicated to?

15         A.    Their on-site auditor, their COTR.

16         Q.    That's the technical representative?

17         A.    Yes.

18         Q.    Okay.  And do you know what ICE -- ICE's

19    review process is from there?

20         A.    I don't know.

21         Q.    Okay.  You have no visibility into that

22    process at all?

23         A.    No.  I don't think they think I need to

24    know that.

25         Q.    Okay.  And -- withdrawn.

Amber Martin
October 09, 2019                              58

```
 1                    Okay.  Let me back up a little bit.  I'm
 2      going to take a step back.  So how long has GEO had a
 3      contract to operate the Aurora facility?
 4               A.    The Aurora facility was the first facility
 5      for GEO, so it's around the 1986, '87 era.
 6               Q.    First facility for ICE?
 7               A.    First facility ever.
 8               Q.    Oh, okay.  And that contract has been
 9      renewed over time, I take it?
10               A.    Yes.
11               Q.    How many times has it been renewed?
12               A.    I can't recollect.
13               Q.    Okay.  When was the current version signed,
14      the current contract?
15               A.    I think a couple of years ago.  I have to
16      look.
17               Q.    Do you know when the prior iteration of a
18      contract was signed before that one?
19               A.    No.  I'm assuming they're five-year
20      contracts.
21               Q.    Okay.
22               A.    Okay.
23               Q.    Okay.  Typically -- just about sort of the
24      process from one version of the contract to the next, is
25      it typical that there are modifications from one period
```

Amber Martin
October 09, 2019                                      59

1    of -- one term of a contract to the next one?

2           A.    Okay.  When you're saying from one contract

3    to the next or one term?

4           Q.    Yeah.  So you had said you assume they're

5    typically five-year contracts.  So when one contract

6    period is ending, there's a renewal of the contract?

7           A.    Well, it usually goes out for an RFP and

8    there's a competition.  So it's not necessarily a

9    renewal; it's a brand new contract.

10          Q.    Okay.  RFP is request for proposal?

11          A.    Yes.

12          Q.    Okay.  And can you just kind of walk me

13   through that overall process of the RFP.  How does that

14   work?

15          A.    Request for proposal goes out on a

16   government data line, which is called FedBizOpps.  So

17   it's open to whoever wants to bid on those contracts.  It

18   gives timelines as far as, you know, ability to ask

19   questions, to respond to the RFP.  And then there's a

20   review process, just like any other request for proposal

21   process.  It's pretty much standard throughout federal,

22   state governments, local governments.  And then they

23   grade the proposal and award the contract.

24          Q.    Okay.  I don't have a lot of familiarity

25   with the federal contracting process, so I'm going to ask

Amber Martin
October 09, 2019                                69

1          Q.    Okay.  And so for the sanitation aspect,

2    who -- I'll ask, from the 2004 to 2014 time frame, who or

3    what office was responsible for drafting those aspects of

4    the Technical Proposal?

5          A.    It could have been a combination.  I don't

6    know.

7          Q.    Okay.

8          A.    I don't know if it would have been our

9    operations folks.  I know that that would have all fallen

10   under the business development people to identify who

11   their subject-matter expert was.  So I couldn't answer

12   who they would have picked.

13         Q.    So not a particular department then?

14         A.    Not necessarily.

15         Q.    Okay.  In a case like that, would it be

16   typical to identify a subject-matter expert from the

17   facility level to be responsible for that?

18         A.    Sometimes they brought facility level in,

19   sometimes they brought regional level in.  Like I said,

20   it was their determination on who they wanted to bring in

21   to assist in responding to the proposal.

22         Q.    Okay.  Do you know who was responsible for

23   drafting the sanitation policies that are currently in

24   place at Aurora?

25         A.    It would have been the facility.

Amber Martin
October 09, 2019                                    70

```
 1            Q.    Okay.  And the sanitation policies that

 2     were in effect from 2004 to 2014, do you have any idea

 3     who was responsible for drafting those originally?

 4            A.    No.

 5            Q.    If I wanted to find out that information,

 6     is there a way to do that?  Is there someplace --

 7            A.    For the policies?

 8            Q.    Yeah.  Who was responsible for originally

 9     drafting those?

10            A.    Let me go back.  When a facility is

11     awarded -- when we're awarded a contract and it's a brand

12     new facility, there's regional oversight starting

13     policies and operations and all of that, because you

14     don't have all your facility administration there.

15            Q.    Right.

16            A.    So regional takes the lead on, you know,

17     developing policies when a facility first opens.

18                  Now, after that, you know, all of it goes

19     through the client to get approved before being

20     instituted on the facility.  After that, any updates and

21     changes and policies and procedures are handled by the

22     facility.  From a contract to a contract, it would most

23     likely have been the same policies and updated along the

24     timelines, you know, when they needed to be updated, when

25     they were reviewed annually, those type of things.
```

Amber Martin
October 09, 2019                                          71

 1              So when I say "the facility is responsible

 2     for," they're responsible for maintaining those

 3     operations on a day-to-day, but there's things that began

 4     when a new contract begins.

 5          Q.    Okay.  Thank you.  So the original policies

 6     from Aurora would have been created probably back in 1986

 7     at least?

 8          A.    And that would have probably been at the

 9     corporate level, because we were a smaller group then.

10          Q.    And that was the first facility that was

11     opened?

12          A.    Yes.

13          Q.    Okay.

14          A.    We've evolved.

15          Q.    I'm sure.  Can you speak to the process

16     again during a renewal for the RFP process.  When there's

17     a Technical Proposal on a particular aspect like this,

18     can you speak to the process of how that's developed

19     internally at GEO.  In other words, it's created -- you

20     mentioned the subject-matter expert.  Is there then a

21     further process of renewing that?

22          A.    Yes.  Like I said, business development has

23     a whole process on how they answer, review, et cetera.

24     I'm not really involved in that.

25          Q.    Okay.

Amber Martin
October 09, 2019                                    93

1    titled "Statement of Objectives" at the top.  Under the

2    introduction, Section A, second sentence in -- well, the

3    first sentence -- I'm just picking up about halfway --

4    no, the second sentence: "ICE is reforming the

5    immigration detention system to move away from a penal

6    model of detention."  Do you see that?

7            A.    I'm sorry.  Oh, yes.

8            Q.    Okay.  What's your understanding of what

9    that means?

10           A.    I don't know.  I mean, I guess from the

11   prison-life atmosphere to a civil atmosphere.

12           Q.    Are you familiar with that policy?  Has

13   that been something that's part of your work?

14           A.    I'm sorry?

15           Q.    Well, are you familiar with that policy,

16   moving from a penal model to a more civil detention

17   model?

18           A.    I know that's where ICE has been -- is

19   heading, just like everyone else is.

20           Q.    And the next sentence begins:  "A key goal

21   of reform is to create a civil detention system that is

22   not penal in nature..."

23               What is that -- do you understand what the

24   reference to "reform" refers to?  Is there a particular

25   initiative or project that that's referring to?

Amber Martin
October 09, 2019                                        94

```
 1              A.    No.  Not that I know of.

 2              Q.    Do you know when that shift began?

 3              A.    No.  I guess during this time period.

 4              Q.    From your experience at The GEO Group

 5    during this time frame, do you have a general sort of

 6    sense of the time frame in which there was a shift from a

 7    penal model to a civil detention model?

 8              A.    Well, the shifts began with the new ICE.

 9    Obviously, with the 2008 PBNDS standards, reforms in the

10    2011 PBNDS standard, the optimal standards that came out

11    after that.  I mean, there's been reform, as you put it,

12    all along.

13              Q.    So is that -- those reforms reflect

14    principally to the changes in the PBNDS?  Is that --

15              A.    Yeah.  That's definitely a big influence.

16              Q.    If you'll turn to page 656.

17                    MR. BARNACLE:  I'm sorry, what did you just

18         say?

19                    MR. SCIMONE:  Page 656.

20    BY MR. SCIMONE:

21              Q.    This section actually begins on the prior

22    page titled "Constraints."  And it says:  "The following

23    constraints comprise the statutory, regulatory, policy

24    and operational considerations that will affect the

25    Contractor."  And to direct your attention down to
```

Amber Martin
October 09, 2019                                  95

 1   Item 10 on the following page, it lists the PBNDS there.

 2   I think you said this earlier, but does this mean that

 3   the PBNDS is effectively incorporated as part of this

 4   contract?

 5           A.    Yes, it is.

 6           Q.    All right.  And these other line items are

 7   also -- and compliance with these other items here is

 8   also part of the contract?

 9           A.    Yes.  They're all included in the contract.

10           Q.    Okay.  You can put that aside.

11           A.    Okay.

12           Q.    We're going to refer back to all these, I'm

13   sure.

14                 (Plaintiff Exhibit No. 10 was marked for

15           identification.)

16   BY MR. SCIMONE:

17           Q.    Exhibit 10 is Bates stamped GEO-MEN 10553

18   through 592.  Take a moment to review and let me know

19   when you're ready.

20           A.    Okay.

21           Q.    Do you recognize this document?

22           A.    I don't recognize this document, no.

23           Q.    It's titled "Summary of Major Changes

24   Between the 2008 and 2011 Performance-Based National

25   Detention Standards," just to give a sense of time frame.

Amber Martin
October 09, 2019                                    96

 1              From looking through, do you have any sense

 2     of how this document was used or it may have originated?

 3        A.    This appears to be during a time that the

 4     optimal non-mandatories and optimal mandatories came out,

 5     as I was referring to before.  But without specifically

 6     looking through and making sure of that, but this appears

 7     to be when those reviews came about.  So I'm guessing

 8     about 2013.

 9        Q.    Does this appear to you to be a document

10     that originated with ICE?

11        A.    I don't know.  It's not numbered or

12     anything, so I don't know where it would be originated

13     from.

14        Q.    Okay.  If you'll look near the bottom of

15     the first page, bottom third or so, there's a reference

16     here to optimal provisions.  I think you spoke earlier

17     about optimal aspects of the PBNDS.

18        A.    Uh-huh.

19        Q.    Can you explain your understanding of what

20     that means in practice.

21        A.    There's optimal provisions and there's

22     optimal non-mandatory provisions and optimal mandatory

23     provisions.  Some of these non-mandatory provisions, like

24     I said, came about to enhance some of these provisions

25     that possibly had issues with physical structure, some

1    things that a facility -- standalone facilities could not

2    comply with, but they were researched to see "How many of

3    these can you comply with?" "How many of these can you

4    comply with that's going to be a larger cost?" and that

5    was a process.  And that happened, like I said, back in

6    2013.

7            Q.    The second sentence here says:  "Optimal

8    provisions in the standards are not unilaterally

9    binding."

10           A.    Correct.

11           Q.    "However, implementation of these

12    provisions furthers effective operation of a facility at

13    the level intended by ICE under revised standards."

14           A.    Correct.

15           Q.    Does that comport with your understanding

16    that an optimal provision is not necessarily a binding

17    one?

18           A.    It's not unilaterally binding.  It can be

19    bilaterally binding.

20           Q.    What does that mean in practice?

21           A.    Well, unilateral is if there's -- the

22    change and scope of the contract doesn't affect anything

23    financial, physical structure or change of scope and

24    services so that ICE can unilaterally bind the contractor

25    to that change in the contract even though it's a change

Amber Martin
October 09, 2019                                    98

 1    of scope.

 2            Q.    Okay.

 3            A.    And bilaterally means that we both agree

 4    and there's a change -- there's a modified portion of

 5    that that may change the price of the contract or may

 6    change something else that, you know, changes the

 7    operation and gives -- you know, those type of things.

 8                  But there's two different kinds.

 9    Unilateral is, ICE says do it, you do it, and there's no

10    negotiation, et cetera.  Unless they say, "You do it,"

11    and we come back and say, "But there is a financial, you

12    know, stance to this that we need to make you aware of,

13    and there's a provision to raise that level up to."

14            Q.    So for those -- I think I understand the

15    two categories.  Is GEO always required to meet all of

16    the optimal standards or are some of them, I guess,

17    optional?

18            A.    No.  There's -- okay.  In this process, the

19    ones that were optional, as you say, or non-mandatory --

20            Q.    Right.

21            A.    -- we agreed to -- we mutually agreed to

22    which ones we could follow without having to change or

23    which ones we could follow that the government wanted to

24    pay for.  And so those are the standards we have to meet,

25    whatever we agree to bilaterally.

1      Q.    And that happened around 2013, I think you

2  said?

3      A.    Yeah.  I think it was.  It may have been a

4  little later, but I think it was 2013, 2014.

5      Q.    So the second paragraph under "Optimal

6  Provisions" says:  "The PBNDS 2011 thus allows for a

7  range of compliance, to facilitate the immediate

8  implementation of these standards..."

9            What does that mean?

10     A.    I have no idea.  I'm hoping there's not a

11 range of compliance as far as meeting standards.

12     Q.    Okay.  You understand that to mean that

13 there are some areas where a contractor might not

14 bilaterally agree with ICE to meet a certain standard and

15 ICE might then permit that even though it's not -- in

16 other words, it's not a mandatory sort of minimum

17 standard under the PBNDS; it's something that ICE would

18 like to see happen but doesn't necessarily require?

19     A.    That's your non-mandatories.

20     Q.    Okay.

21     A.    That's what your non-mandatories are.  It's

22 like ICE would like to see this happen, but it's not

23 required or we mutually agree that it's going to be

24 required.  Once it's embedded into the contract, it

25 doesn't matter.  If it's non-mandatory, mandatory,

Amber Martin
October 09, 2019                                    100

```
 1   whatever, it's part of the contract and it's required.

 2           Q.    Okay.  But there is a category of

 3   non-mandatory PBNDS standards that exist?

 4           A.    Well, they're called optimal non-mandatory.

 5   It's just an enhancement of what the standards are

 6   already: more square footage or -- I'm just trying to

 7   think off the top of my head.

 8           Q.    Yeah.  Just, I guess, for example --

 9           A.    There is one other issue.  There may be

10   where there's a mandatory standard that the facility

11   can't meet it because of restrictions, mainly usually

12   because of physical structure, and there's a process of

13   waivers that ICE can waive.

14           Q.    Okay.  Who deals with the waiver process at

15   ICE?

16           A.    I don't know.  I mean, it probably would go

17   through the contracting officer.

18           Q.    Okay.

19           A.    You know, but it's handled through

20   compliance.

21           Q.    Okay.

22           A.    It's public.  I mean, there's a -- it says

23   what -- it's not only GEO.  There's other people that

24   waive standards.  I don't know what committee that is.

25           Q.    Right.  Did you deal with that when you
```

Amber Martin
October 09, 2019                                    101

```
 1    were in -- when you dealt with contract compliance in

 2    2000 to 2011?

 3            A.    No.  I mean, the standards 2008, 2011

 4    were -- they're kind of probably fairly new in that

 5    frame, because I dealt with these in 2013, after I dealt

 6    with the contract administration.  But as far as

 7    compliance levels, we dealt with -- we didn't have any

 8    waivers or anything like that.  This was the first

 9    process of really changing things.

10            Q.    Okay.

11            A.    Or agreeing to new things.

12            Q.    Okay.  So maybe this is helpful to talk

13    about in the context of an example.  Let me see.  Bear

14    with me a minute.  Here we go.  If you look at 580, so

15    Section 5.4 is recreation.  And so there's -- this is

16    major changes in the PBNDS under recreation and detention

17    standard.  It says:  "Expanded Recreation for General

18    Populations."  And below that you'll see "Optimal

19    Recreation for General Populations."  And so the first

20    one is, you know:  "Detainees shall have at least four

21    hours a day access, seven days a week, to outdoor

22    recreation, weather and scheduling permitted.  Outdoor

23    recreation shall support leisure activities, outdoor

24    sports and exercise as referenced and defined by the

25    National Commission on Correctional Health Care
```

Amber Martin
October 09, 2019                                    102

1    Standards, provided outside the confines of the housing

2    structure and/or solid enclosures."

3                So I'm sort of -- I guess I'm trying to

4    understand how this sort of works with respect to the

5    contract.  Would GEO, I guess, be asked to provide this

6    level of recreation and then there would be a discussion

7    about whether or not it could in fact comply with that?

8           A.    Yes.

9           Q.    And then would that typically become a term

10   of the contract or would it simply be left as this is

11   something you can comply -- you can meet, but you don't

12   necessarily have to meet the standard?

13          A.    No.  They were modified, as you can see

14   with the earlier documentation you showed me.  The

15   contract was actually modified.

16          Q.    Okay.  And if you'll turn to page 105585 --

17   actually, 84.  So this deals with Section 5.8, Voluntary

18   Work Program.  Are you familiar with that program?

19          A.    Yes.

20          Q.    Okay.  Just in general terms, so that we

21   have a working understanding, what is the Voluntary Work

22   Program?

23          A.    It's a program that's offered to the

24   detainees if they want to voluntarily work in

25   subcategories, and they get paid a fee for their service.

Amber Martin
October 09, 2019                                                    103

 1   And it helps with their skills and that type of thing.

 2          Q.    If you look at the next page, 585, at the

 3   very top, it says: "Compensation: The required

 4   compensation for work was increased from $1.00 per day to

 5   'at least $1.00 per day.'"  Do you see that?

 6          A.    Yes.

 7          Q.    Before this change, it was just $1 per day?

 8          A.    Yes.

 9          Q.    And this increased it?

10          A.    Increased the ability to do more than $1 a

11   day.

12          Q.    So --

13          A.    From a contractor's perspective.

14          Q.    Okay.  In other words, paying more than $1

15   a day was optional?

16          A.    Yes.

17          Q.    So does that mean ICE left GEO discretion

18   as to how much it would pay in that program?

19          A.    No.

20          Q.    Okay.  Can you explain.

21          A.    The only -- this is a pass-through cost.

22   So the only amounts legislatively that they were allowing

23   was $1 a day.  So that's the only amount that was, you

24   know, like I said, passed through through the contract

25   and invoiced.

Amber Martin
October 09, 2019                                    104

1          Q.    You say the amounts they were legislatively

2    allowing.

3          A.    There was a conflict with this and what ICE

4    was paying for.

5          Q.    Can you explain the conflict?

6          A.    Well, this said that it was at least $1 a

7    day, but --

8          Q.    Right.

9          A.    -- but ICE could not pay for more than $1 a

10   day according to the statute.

11         Q.    Okay.  But notwithstanding the fact that

12   ICE couldn't reimburse more than $1 a day, it was

13   allowing GEO to pay more than $1 a day?

14         A.    Well, we had to get permission from ICE to

15   do that, so that also conflicted with this.

16         Q.    Did GEO ever seek permission to pay more

17   than $1 a day?

18         A.    I don't know.

19         Q.    This would have been around the 2011 time

20   frame?

21         A.    I don't believe that we, at Aurora, did

22   that, no.

23         Q.    Okay.  So Aurora didn't seek permission to

24   pay more than $1 a day?

25         A.    No.  Because we couldn't get paid more than

Amber Martin
October 09, 2019                                          105

```
 1   $1 a day or the detainee couldn't get paid more than $1 a
 2   day.
 3            Q.    Okay.  Let me see if I have it straight.
 4   So ICE changed the standards to permit GEO to pay more
 5   than $1 a day, but because GEO wasn't getting reimbursed
 6   more than $1 a day, it didn't seek to increase that
 7   amount?
 8            A.    And ICE couldn't pay more than $1 a day.
 9            Q.    But it didn't seek permission from ICE to
10   pay more than $1 a day?
11            A.    Right.  Because there wasn't the
12   possibility to pay more.
13            Q.    And GEO didn't want to pay it if it wasn't
14   getting reimbursed by ICE?
15            A.    Well, it's a contractural requirement as
16   far as we're concerned and we've already priced this.
17            Q.    Right.  But I guess I'm -- what I'm saying
18   is, the decision was based on the pricing, not whether --
19   not whether GEO was permitted to pay more than $1 a day.
20   In other words, GEO could have paid more than $1 a day
21   notwithstanding the fact it wasn't getting reimbursed?
22            A.    Well, again, we had to seek permission from
23   ICE to do that.
24            Q.    Sure.
25            A.    I think the person that put this together
```

1    was trying to open the door for future issues, so it was

2    more broad and they didn't have to, you know, change this

3    again.  ICE couldn't pay more than $1 a day; we couldn't

4    get reimbursed more than $1 a day.  So this was all

5    conflicted in this statement.

6          Q.    Well, I guess I'm trying to understand

7    "conflicted."  Because as I --

8          A.    If I wanted to go modify a contract and pay

9    $1.50 a day, ICE could not pay that.  So the contract

10   could never be modified.

11         Q.    Well, you could pay something without

12   getting reimbursed from ICE if ICE gave you permission to

13   do that, right?

14         A.    Yeah.  But they couldn't give permission to

15   do that because they couldn't pay more than $1 a day.

16         Q.    No.  I understand they couldn't pay more,

17   but they could give permission for GEO to pay more; it

18   would just be a cost borne by GEO, right?

19         A.    I guess.

20         Q.    Okay.  We saw earlier there was a term in

21   the 2006 contract that says that all costs are -- of

22   complying with the contract are to be borne by the

23   contractor?

24         A.    Right.

25         Q.    So that would then become a cost that GEO

Amber Martin
October 09, 2019                                    107

```
 1    would have to bear if it got permission from ICE to pay

 2    more than $1 a day but was still being reimbursed only at

 3    $1 a day?

 4         A.    Yes.  But it would be difficult to modify

 5    the contract to do that.

 6         Q.    More so than any other contract

 7    modification?

 8         A.    Again, because there's strict parameters

 9    of ICE can't pay more than $1 a day, we can't -- if we

10    can't be reimbursed more than $1 a day, in order to give

11    permission to do something that is outside the realm, it

12    would -- I don't know how that would be done in a

13    contract modification.

14         Q.    Well, there are contract modifications --

15         A.    I think this would be done outside that.  I

16    don't know.

17         Q.    Outside what?  I'm sorry?

18         A.    Like I said, I don't see ICE permitting

19    that as a contract modification since statutorily they

20    can't pay more than $1 a day and we can't get reimbursed

21    more than $1 a day.  It wasn't just asked along those

22    bases.  I guess we could do it on our own dime.

23         Q.    Right.

24         A.    But the contract was priced this way, et

25    cetera.
```

Amber Martin
October 09, 2019                                                    108

 1          Q.    Right.  I guess, procedurally, if GEO made

 2   that decision to do this, as you put it, on your own

 3   time -- on its own dime, the process for getting that

 4   permission from ICE would be -- would it be the same as

 5   any other contract modification?

 6          A.    Yes.

 7          Q.    So there's a process that's well

 8   established to do that, and we talked about it earlier

 9   today, right?

10          A.    Yes.

11               MR. SCIMONE:  Okay.  Off the record for a

12          minute.

13               (A discussion was held off the record.)

14               (Plaintiff Exhibit No. 11 was marked for

15          identification.)

16   BY MR. SCIMONE:

17          Q.    Okay.  Ms. Martin, the court reporter has

18   just handed you Exhibit 11.  This has a document

19   identification number at the bottom, a little different

20   than the others.  This is 2018-ICLI-0052 2141, running

21   through 2169.  I was just getting all that on the record.

22               Do you recognize this document?

23          A.    No.  I mean, it looks like a detention

24   handbook -- Detainee Handbook for LaSalle Processing

25   Center, but I haven't seen it specifically.

Amber Martin
October 09, 2019                                              109

```
 1              Q.    Okay.  LaSalle Processing Center is a

 2   facility operated by The GEO Group?

 3              A.    Yes, it is.

 4              Q.    Okay.  Is that an ICE detention facility?

 5              A.    Yes, it is.

 6              Q.    If you'll look at page 10, there's a

 7   section here titled "Voluntary Work Program" at the

 8   bottom of the page.

 9              A.    Okay.

10              Q.    First of all, before I ask about this, do

11   you have any responsibility for the contract at LaSalle?

12              A.    Yes.

13              Q.    Okay.

14              A.    I have responsibility over all contracts.

15              Q.    Okay.  So this Voluntary Work Program

16   section, if you look at the second sentence, says:  "Any

17   detainee assigned to work in the kitchen will be paid

18   $4.00 per day."  Do you see that?

19              A.    Uh-huh.

20              Q.    And laundry work details and barbershop

21   workers will be paid $3 per day?

22              A.    Uh-huh.

23              Q.    And then special detail workers are paid $2

24   a day?

25              A.    Yes.
```

Amber Martin
October 09, 2019                                                110

```
 1            Q.    And then all other job assignments are $1
 2    per day, correct?
 3            A.    Correct.
 4            Q.    The same PBNDS provision applies at LaSalle
 5    as applies at Aurora, correct?
 6            A.    Yes.
 7            Q.    Okay.  So the reimbursement for the LaSalle
 8    facility is also $1 per day for the VWP, right?
 9            A.    Correct.
10            Q.    So this is an example of a case where GEO
11    did in fact opt to pay more, at least in certain jobs,
12    than it was getting reimbursed by ICE, correct?
13            A.    Yes.
14            Q.    Did GEO get permission from ICE to do that?
15            A.    I'm assuming they did.
16            Q.    Were you involved in seeking that
17    permission?
18            A.    No.
19            Q.    Do you know when that happened?
20            A.    No.  Just an assumption on my part reading
21    this.
22            Q.    Okay.  Do you know why GEO pays more for
23    these jobs at LaSalle than it does at Aurora?
24            A.    No.
25            Q.    Do you know if that's still the case at
```

1    LaSalle?  This says, if you look at the first page,

2    revised June 2017.

3              A.    I don't know.

4              Q.    Okay.  And do you know what the -- what the

5    term of the contract at -- of the current contract at

6    LaSalle is?

7              A.    LaSalle is an IGSA, which is a different

8    type.  It's not a direct contract.  It's an

9    Intergovernmental Service Agreement.  The actual contract

10   is between the LaSalle Economic Development Division and

11   ICE, and LaSalle then contracts with us to operate the

12   facility.  So we don't have a direct contract.  This may

13   be why the differences.

14             Q.    Okay.  So the contract is between GEO and

15   LaSalle?

16             A.    Yes.

17             Q.    Is that a municipal division: LaSalle?

18             A.    Yes.  Well, it's a parish, but it's --

19   LaSalle Economic Development Division is who the contract

20   is with.

21             Q.    Do you know who pays the difference in the

22   cost of VWP program?  The difference meaning the amount

23   over $1 per day for these specific jobs.

24             A.    They would be -- LaSalle would be

25   responsible or GEO would be responsible.

Amber Martin
October 09, 2019                                          119

1          Q.     So are they approving a proposal that's

2   created in the first instance by GEO?

3          A.     I don't know if it has anything to do with

4   the proposal.  They have to approve the specific job

5   assignments for the detainees.

6          Q.     My question about who decides is about who

7   selects initially what those job assignments are going to

8   be.  Is it initiated by GEO or is it initiated by ICE?

9          A.     I think it's a combination.  They're pretty

10  much normal procedures for kitchen, laundry, janitorial,

11  that type of thing.  But the job assignments itself, I

12  mean, if we propose something, they would still have to

13  be approved by ICE.  I'm not really sure who instigates

14  that process.

15         Q.     Okay.  But it's based on a proposal that's

16  created by The GEO Group?

17                MR. BARNACLE:  Object to the form.

18         A.     I don't know that.  I mean, like I said,

19  we're proposing -- there's a Technical Proposal that will

20  have detainee job assignments, voluntary job assignments,

21  but the actual job assignments have to be approved by

22  ICE.

23  BY MR. SCIMONE:

24         Q.     Okay.  And --

25         A.     This is just a general broad perspective.

Amber Martin
October 09, 2019                                          120

```
 1          Q.    Who would be involved in that process at
 2   The GEO Group?  Who would know, I guess, where that
 3   proposal initiated?  Would that be someone in the
 4   operations group?
 5          A.    No.  It would probably be done at the
 6   facility level.  Specific job assignments would be done
 7   at the facility level and approved by the ICE COTR at the
 8   facility level.  Job assignments may vary at different
 9   facilities.
10                (Plaintiff Exhibit No. 12 was marked for
11           identification.)
12   BY MR. SCIMONE:
13          Q.    You've just been handed a document Bates
14   stamped GEO_MEN 00073000.  Do you recognize this
15   document?
16          A.    I've -- well, it's from Dana Adams to
17   myself.
18          Q.    Do you recognize this to be an e-mail?
19          A.    Yes.
20          Q.    Who is Dana Adams?
21          A.    He was contracting officer for ICE.
22          Q.    And this is dated June 16, 2014, correct?
23          A.    Yes.
24          Q.    And he's writing to you at your GEO Group
25   e-mail address?
```

Amber Martin
October 09, 2019                                          121

```
 1              A.    Yes.

 2              Q.    Okay.  And what -- he's within the Office

 3    of Acquisition Management; is that correct?

 4              A.    Yes.

 5              Q.    So he's -- is he then superior to the

 6    contracting officer in terms of rank?

 7              A.    He is a contracting officer or was a

 8    contracting officer.  He no longer works for ICE.  At

 9    this time, back in '14, I'm not sure if he had a

10    supervisory role at the time or not.  He started as a CO

11    and he did have a supervisory role later.

12              Q.    And is this -- here he's the deputy

13    assistant director.  Was this one of the supervisory

14    roles?

15              A.    Yes.  I'm sorry.  I didn't see his title.

16              Q.    No problem.

17              So he writes here:  "Dear Amber, Another

18    question has come up."

19              And this is -- by the way, the subject line

20    here is "Volunteer Work Program."  Do you see that?

21              A.    Yes.

22              Q.    Okay.  So he writes:  "Detainees work in

23    some facilities for a dollar a day.  What might they be

24    doing in terms of the work they do?  I have always

25    thought menial tasks, maybe cleaning, moving things,
```

Amber Martin
October 09, 2019                                    145

```
 1              A.    Right.  Uh-huh.

 2              Q.    Okay.  Do you want to take a break?

 3              A.    If you don't mind.

 4              Q.    That's fine.

 5                    (Recess from 1:10 p.m. to 1:14 p.m.)

 6   BY MR. SCIMONE:

 7              Q.    Picking up where we just left off, you

 8   described prior to a couple of years ago there being an

 9   informal policy prohibiting the use of disciplinary

10   segregation for refusal to clean.  Was that informal

11   policy written or reflected anywhere?

12              A.    No.  Like I said, the "not cleaning your

13   room" would not rise to the level of putting somebody in

14   segregation.

15              Q.    And is there any sort of documents that

16   would reflect that?

17              A.    Currently there is, because I wanted to

18   make sure it was -- there was no doubt the language was

19   clarified, et cetera.  I believe there's an updated -- I

20   don't know if it's an updated directive or if it was

21   updated in the handbook.

22              Q.    Would that be subject to a contract

23   modification?

24              A.    No.

25              Q.    Okay.  Would it have been an update to
```

Amber Martin
October 09, 2019                                          146

```
 1   policies in the policy manual?

 2          A.    Like I said, I'm not sure if it was a

 3   directive, if it came through the detainee handbook, or

 4   if it was a policy at the facility level.  I'm not sure.

 5          Q.    Were you involved in memorializing that

 6   policy?

 7          A.    No.

 8          Q.    Who was responsible for that?

 9          A.    I think it was at the operation level.

10   Probably Dave Donohue overall responsible.

11          Q.    Did you have any communications with ICE

12   about that policy change?

13          A.    I didn't, no.

14          Q.    Do you know whether Dave Donohue did?

15          A.    I don't know.

16          Q.    That would have had to be approved by ICE,

17   correct?

18          A.    What?

19          Q.    That change to the policy.

20          A.    Not necessarily, because these are -- these

21   are layers of what we can -- what we can do, and we have

22   opted not to put anybody in segregation for not cleaning

23   their room.  As you will see in the PBNDS, they have a

24   lot of things that go under high to moderate level.  One

25   of the things is not cleaning your room.  Then they have
```

Amber Martin
October 09, 2019                                        147

 1    different sanctions.  So we just wouldn't associate a

 2    sanction of somebody not cleaning their room to putting

 3    them in segregation.

 4          Q.    But prior to a couple of years ago, that

 5    wasn't written down anywhere?

 6          A.    No.  It didn't really need to be, but it

 7    wasn't written down anywhere.

 8          Q.    What led to that becoming a formal policy?

 9          A.    I just think with the clarity of things

10    going on in the political environment, we just wanted to

11    make sure that things were put in writing and that the

12    language was clear.

13          Q.    And a couple of years ago would have been

14    2016?

15          A.    Yeah.  And don't get me holding as to how

16    many years back this has been.  It could have been 2017.

17          Q.    Okay.  But within the last two years or so?

18          A.    Yes.

19          Q.    Give or take?

20          A.    Uh-huh.

21          Q.    That was during the time that this lawsuit

22    was pending, correct?

23          A.    I think this lawsuit was pending -- yes, it

24    was.

25          Q.    This has been pending since 2014.

Amber Martin
October 09, 2019                                              148

```
 1          A.    Yes.
 2          Q.    All right.  And you're aware that there are
 3   other lawsuits pending currently against The GEO Group
 4   related to work done by detainees in ICE detention
 5   facilities?
 6          A.    Yes.
 7          Q.    And you're aware that one of the
 8   allegations in several of those cases has been that GEO
 9   requires detainees to do work and threatens them with
10   solitary confinement if they don't.  You understand that
11   that's one of the allegations, correct?
12          A.    Yes, I do.
13          Q.    Okay.  And you understand that's an
14   allegation in this lawsuit?
15          A.    Yes.
16          Q.    Was there any causal connection between
17   those lawsuits being filed and that policy being
18   memorialized and formalized?
19          A.    Again, with the political environment, yes,
20   it's probably -- lawsuits probably contributed to that.
21   Although this was not a practice that we've ever done, we
22   just wanted to make sure that it was clearly clarified
23   that it's not being done and it's not going to be done.
24          Q.    And if we wanted to look back and verify
25   that it wasn't being done prior to that policy being in
```

Amber Martin
October 09, 2019                                    196

```
 1          Q.    Meaning the common areas of the pod -- the

 2   housing pod?

 3          A.    Yes.

 4          Q.    That's included in what's described in the

 5   detainee handbook, according to your reading?

 6          A.    Yes.

 7          Q.    Okay.  And that's the understanding that

 8   GEO applies?  In other words, it's not just your personal

 9   reading, but that's what GEO's policy is based on.  Is

10   that your understanding?

11          A.    Yes.

12          Q.    Okay.  And then you mentioned also on

13   page 64220, that's the Bates number, it's describing the

14   offences --

15          A.    Yes.

16          Q.    -- and prohibited acts.  Number 306 says:

17   "Refusing to clean assigned living area."

18                Is it your testimony that that wording

19   suggests something more than just the cells?

20          A.    Yes.

21          Q.    What about those words tells you that it's

22   not just the cells?

23          A.    Because the assigned common area, the

24   living area, is where detainees eat, recreate, watch

25   television, have programs.  That's their area that they
```

Amber Martin
October 09, 2019                              197

 1   live in.  It's not just their cell.

 2          Q.    So isn't that a question of how ICE is

 3   defining living area in that document from ICE?

 4          A.    Yes.

 5          Q.    And that's -- so you're testifying about

 6   GEO's understanding of what assigned living area means?

 7          A.    Yes.

 8          Q.    Okay.  But there's no communication from

 9   ICE, is there, or is there, that defines assigned living

10   area to mean more than just the cell, is there?

11          A.    The policy.  I mean, the review of the

12   policy.  If there was any question about what a common

13   living area is, I mean, in this industry, their housing

14   area is their living area.

15          Q.    Okay.  So -- and you've never raised this

16   specifically with ICE because you don't see any conflict

17   between the way that this is phrased in the Housing Unit

18   Sanitation Policy and that language in Section 5.8 that

19   we looked at that says: "Detainee shall not be required

20   to work except to do personal housekeeping"?

21          A.    No.  I don't see any conflict.  I see this

22   as a part -- part of an entire book of standards that

23   incorporates that part and incorporates ACA and

24   incorporates the detention handbook, and I think they're

25   all-inclusive.

Amber Martin
October 09, 2019                                         198

1          Q.    And that's never a topic that you

2    specifically sought to clarify with ICE just to be clear?

3               MR. BARNACLE:  Object to the form.

4          A.    No.  I never specifically sought to clarify

5    it because I thought it was clear through the review of

6    the policy.

7    BY MR. SCIMONE:

8          Q.    That was done by the COTR?

9          A.    I think so, without knowing the signature.

10   It's definitely an ICE official.

11         Q.    Okay.  One more topic, I guess.  Bear with

12   me.

13               Okay.  If you can look at Exhibit I and

14   page 19652.

15               MR. BARNACLE:  Do you mean Exhibit 9?

16               MR. SCIMONE:  Yes.

17               MR. BARNACLE:  Sorry.  What's the number

18         again?

19               MR. SCIMONE:  19652.

20         A.    Okay.

21   BY MR. SCIMONE:

22         Q.    I would like to direct your attention to

23   the last full paragraph just above the two bullet points

24   on that page.  It says:  "The COTR is responsible for

25   monitoring the performance of work under this contract.

1    In no event, however, will any understanding, agreement,

2    modification, change order or other matter deviating from

3    the terms and conditions of this contract be effective or

4    binding upon the Government unless formalized by proper

5    contractual documents executed by the Contracting

6    Officer."  Do you see that?

7            A.    Yes.

8            Q.    Does that match your understanding of what

9    COTR is authorized to sign off on?

10           A.    Yes.

11           Q.    Have you ever encountered a situation where

12   a COTR had signed off on something that you understood to

13   be in conflict with the contract?

14           A.    I mean, I've encountered where the COTRs

15   directed the facility to do something and the facilities

16   question and ask, "Is this contractually" -- "Can we

17   contractually do this without contracting officer and

18   modification?"  In that instance, yes.

19           Q.    We had an example earlier today with the

20   firearms --

21           A.    Firearms, exactly.

22           Q.    -- certification.

23                 Okay.  So if a COTR -- okay.  So that's an

24   example.  Is there a situation where the COTR had

25   authorized something that then was put into effect before

CERTIFICATE OF REPORTER


THE STATE OF FLORIDA )

COUNTY OF PALM BEACH )


          I, Nancy Cannizzaro, Registered Merit
Reporter, certify that I was authorized to and did
stenographically report the foregoing deposition of AMBER
MARTIN, pages 1 through 207; that a review of the
transcript was requested; and that the transcript is
a true and complete record of my stenographic notes.

          I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties, nor
am I a relative or employee of any of the parties'
attorneys or counsel connected with the action, nor am I
financially interested in the action.


          DATED this 23rd day of October, 2019.




          _____
          Nancy Cannizzaro, RMR