# Exhibit F

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2

3           CIVIL ACTION NO.: 1:14-cv-02887-JLK

4

    ALEJANDRO MENOCAL, et al.,
5

6            Plaintiffs,

7   -vs-

8

    THE GEO GROUP, INC.,
9

10           Defendant.
    _____/
11

12

                 DEPOSITION OF DANIEL RAGSDALE
13

14

                 Thursday, February 27, 2020
15                 9:20 a.m. - 3:14 p.m.

16

                 Shavitz Law Group, P.A.
17                 951 Yamato Road, #285
                 Boca Raton, Florida 33431
18

19

20           Stenographically Reported By:
             JOYCE L. BLUTEAU, RPR, FPR
21        Registered Professional Reporter
             Florida Professional Reporter
22

23

24

25

```
 1    APPEARANCES:

 2
      On behalf of the Plaintiffs:
 3

 4         TOWARDS JUSTICE
           1410 High Street
 5         Suite 300
           Denver, Colorado 80218
 6         720.441.2236
           juno@towardsjustice.org
 7         BY: JUNO TURNER, ESQUIRE

 8

 9         OUTTEN & GOLDEN, LLP
           685 Third Avenue
10         25th Floor
           New York, New York 10017
11         212.245.1000
           akoshkin@outtengolden.com
12         BY: ADAM L. KOSHKIN, ESQUIRE

13

14    On behalf of the Defendant:
           AKERMAN, LLP
15         1900 Sixteenth Street
           Suite 1700
16         Denver, Colorado 80202
           303.260.7712
17         colin.barnacle@akerman.com
           adrienne.scheffey@akerman.com
18         BY: COLIN L. BARNACLE, ESQUIRE and
               ADRIENNE SCHEFFEY, ESQUIRE
19

20
           THE GEO GROUP, INC.
21         4955 Technology Way
           Boca Raton, Florida 33431
22         561.443.1786
           cwilke@geogroup.com
23         BY:  CHERYL L. WILKE, ESQUIRE, VP CORPORATE COUNSEL

24
                              -   -   -
25
```

Daniel Ragsdale
February 27, 2020                                    14

```
 1   work?

 2        A.   For U.S. Immigration and Customs Enforcement.

 3        Q.   And what was the last role that you held with

 4   U.S. Immigration --

 5        A.   I was the deputy director.

 6        Q.   Let me finish my question.

 7        A.   Sorry.

 8        Q.   That's okay.

 9             The deputy director for anything in particular?

10        A.   For the agency.

11        Q.   For ICE?

12        A.   Correct.

13        Q.   And how long were you in that role?

14        A.   Five years.

15        Q.   So from approximately 2012 to 2017?

16        A.   It would have been, I believe, December of 2012

17   until May of '17.

18        Q.   And did you have a prior position with ICE?

19        A.   Yes.

20        Q.   And what was that?

21        A.   I was the executive associate director for

22   management and administration.

23        Q.   And how long were you in that role?

24        A.   From approximately October 2010 until

25   December 2012.
```

Daniel Ragsdale
February 27, 2020                        15

```
 1       Q.   How long were you employed with ICE all
 2  together?
 3       A.   Twenty-one years.
 4       Q.   And prior to working for ICE, where did you
 5  work?
 6       A.   The Department of Justice, the Immigration and
 7  Naturalization Service.
 8       Q.   Were you an attorney with them?
 9       A.   I was.
10       Q.   What's the highest level of education that
11  you've attained?
12       A.   I have a juris doctorate.
13       Q.   From where?
14       A.   Fordham University.
15       Q.   Me too.
16            What year did you graduate?
17       A.   I don't want to say.  1993.
18       Q.   Okay.  I was class of '06.
19            MR. BARNACLE:  That's why you don't want to
20       say.
21            THE WITNESS:  Exactly.
22            MS. TURNER:  I was still in high school.
23  BY MS. TURNER:
24       Q.   Okay.  Are you aware that there are some
25  housekeeping tasks that all detainees at GEO's Aurora
```

Daniel Ragsdale
February 27, 2020                        16

```
 1    facility are required to perform?

 2         A.    Yes.

 3         Q.    And are those tasks generally referred to as

 4    the Housing Unit Sanitation Policy?

 5         A.    I've never heard it referred to.  I had to ask

 6    what the HUSP is, so I know there's lots of acronyms that

 7    float around.  I know there is a policy to clean the

 8    immediate living area in Aurora, yes.

 9         Q.    Okay.  And what is your understanding of what

10    that policy is?

11         A.    That folks will clean their immediate living

12    area, meaning making their bed, dealing with their own

13    personal property in their immediate living area.  And

14    they also share sort of a common obligation to clean, you

15    know, where the microwave is, where the, you know, game

16    boards are, video games, to keep things in place in a

17    reasonable cleanliness; the bathroom, you know, the

18    areas, the communal areas is the word I'm looking for.

19         Q.    And that would include the day room area?

20         A.    Correct.

21         Q.    And is it consistent with your understanding

22    that there's a rotation of folks who are assigned to do

23    that?

24         A.    I understand it does rotate.  The precise

25    nature of how they do those rotations, I don't know.
```

Daniel Ragsdale
February 27, 2020                    17

1      Q.    Okay.  For purposes of today's deposition, can

2  we agree that when we refer to the Housing Unit

3  Sanitation Policy or HUSP, we're referring to the

4  requirement for detainees to clean the common areas on a

5  rotating basis?

6      A.    Again, I don't know precisely how they rotate.

7  I know it's shared so --

8      Q.    Um-hmm.

9      A.    -- to the extent "rotation" is a term of art,

10  you know, yes, we can agree.  Again, I can't vouch for

11  the specifics at Aurora.

12      Q.    I understand that.

13            Okay.  And then are you aware of a policy at

14  the Aurora facility called the Voluntary Work Program?

15      A.    I am.

16      Q.    And what is your understanding of what that

17  entails?

18      A.    The Voluntary Work Program is an ICE detention

19  standard requirement, so there's a, what essentially is a

20  local policy implementing ICE's detention standard at

21  Aurora.

22      Q.    And what is the detention standard that is

23  being implemented?

24      A.    The Voluntary Work Program.

25      Q.    What does the Voluntary Work Program entail?

Daniel Ragsdale
February 27, 2020                                    22

1          Q.    I mean, I'll represent to you I reviewed this

2    and this is the only reference I see to detainee labor in

3    this contract.

4          A.    So I just flipped, again, because we were

5    sitting here, to GEO_MENOCAL 00059751 and I see this is

6    the same contract line item number of 004, adult detainee

7    volunteer wages estimated, 16,500 per six months, so I

8    see another reference to it.

9          Q.    And this in the option period section of the

10   contract; correct?

11         A.    Yes.

12         Q.    And so what does that -- what's your

13   understanding of what the option period is?

14         A.    So for contracts there's a base term of the

15   contract and then there are option periods.  So, again,

16   as I flip through there on pages ending in 749, it says

17   option period one, page 750, option period two, the page

18   I mentioned 751 is option period three, and so on.

19         Q.    And so these are -- the parties can agree to

20   extend under these terms?

21         A.    Correct.  And it appears that item number

22   exists in the option years too.

23         Q.    Do you understand that -- strike that.

24               Does The GEO Group contend that any portion of

25   that contract authorizes The GEO Group to send detainees

Daniel Ragsdale
February 27, 2020                              23

```
 1   for segregation for refusal to clean pursuant to the

 2   Housing Unit Sanitation Policy?

 3       A.   So the ICE disciplinary standard permits that

 4   as a sanction.  So to the extent the standard authorizes

 5   it, it is a possibility that GEO's subordinate

 6   disciplinary policy would mention or could have that same

 7   sanction.

 8       Q.   Okay.  But it's not specifically discussed in

 9   this contract.

10       A.   I don't believe so.

11       Q.   Tab 41.

12            Mark this as Exhibit 3.  Please.

13            (Exhibit 3, 9/29/06 Contract between ICE and

14   The GEO Group, was marked for identification.)

15   BY MS. TURNER:

16       Q.   So the court reporter has passed you a document

17   that's been marked as Exhibit 3.

18            Do you recognize this document?

19       A.   This also appears to be a contract between The

20   GEO Group and ICE.  I'm trying to look at the -- see the

21   location that it is talking about here.  So I'm looking

22   on -- oddly, I don't see the location where the

23   performance is happening.  I could be missing it.

24       Q.   If you take a look at page 59643, which is

25   page 8 of the document.
```

Daniel Ragsdale
February 27, 2020                              24

```
 1        A.    Um-hmm.

 2        Q.    So that makes reference to, at the top it says,

 3   the facility shall be located within the GEO political

 4   boundaries of Denver, Colorado.

 5        A.    Okay.

 6        Q.    Does The GEO Group operate any other facilities

 7   in the Denver area other than Aurora?

 8        A.    For ICE, not that I'm aware of.

 9        Q.    So is it fair to assume that this is for the

10   operation of Aurora facility?

11        A.    Yes.  As cryptically as possible, but yes.

12        Q.    And then if you just take a look at the first

13   page, the date that this is signed is September 29, 2006;

14   correct?

15        A.    Yes.

16        Q.    So if you take a look at page 59661, at the

17   very bottom, Section 10.6 says, "Manage a Detainee Work

18   Program."

19        A.    Yes, I see that.

20        Q.    And then it continues on the next page.

21              Does this portion of the contract relate to the

22   Voluntary Work Program?

23        A.    Yes, I believe it does.  It notes attachment

24   three, ICE Voluntary Work Program form.

25        Q.    And the first line of the top of this page
```

Daniel Ragsdale
February 27, 2020                          25

 1    says, "Detainee labor shall be used in accordance with

 2    the detainee work plan developed by the contractor."

 3              Do you see that?

 4       A.    Um-hmm.

 5       Q.    What is the detainee work plan?

 6       A.    As far as I know it would be the facility

 7    specific plan that implements the Voluntary Work Program.

 8    I don't have a specific knowledge of that document from

 9    2006.

10       Q.    And the detainee work plan is something that's

11    developed by The GEO Group?

12       A.    That is what this says.

13       Q.    It also says that the detainee work plan must

14    be voluntary.

15              Is that consistent with your understanding of

16    this program?

17       A.    It is, and it's also what the standard

18    requires.

19       Q.    That's the PBNDS standard?

20       A.    Correct.

21       Q.    And then in the next paragraph it states that,

22    "Detainees shall not be used to perform the

23    responsibilities or duties of an employee of the

24    contractor."

25              Is that consistent with your understanding?

Daniel Ragsdale
February 27, 2020                                26

```
 1        A.    Yes.

 2        Q.    Going back to the detainee work plan, what

 3   information does that document contain?

 4        A.    I've actually never seen a Detainee Work

 5   Program document.  It's, again, a facility-specific

 6   document, and also this was from 2006 which obviously is

 7   before my time with GEO.

 8        Q.    Again, GEO Group has designated you to testify

 9   about these topics, and so to the extent he's not able to

10   testify about them, we may need to speak with a different

11   witness.

12            MR. BARNACLE:  I will just simply state for the

13        record that I agree with that to the extent that it's

14        within the scope of the topic that you guys have

15        identified.

16   BY MS. TURNER:

17        Q.    And so GEO has the discretion to develop the

18   detainee work plan?

19        A.    So assuming this is -- again, as I understand

20   it, the common language here, each detainee, there's a

21   form that they fill out, again, that's referenced in the

22   same paragraph in attachment three that the detainee has

23   an understanding of what they'll be doing, and the

24   contractor has an understanding of what the detainee will

25   be doing when.
```

Daniel Ragsdale
February 27, 2020                              40

1      Q.   Okay.

2      A.   Also on page 31393 it says, "Section C,

3   Description:  Denver Metropolitan area."

4      Q.   Great.  Do you know whether -- is this the

5   contract that is currently in effect for the Aurora

6   facility?

7      A.   Again, that's not my particular area, so I'm

8   not -- I couldn't really tell you for sure.

9      Q.   It appears from my review of the contract that

10  there was the option to extend it past the initial period

11  right up until September of 2019, if you look on

12  page 31391.

13     A.   39391?

14     Q.   Sorry, 31391.

15     A.   Okay.  I see option period for 9/16/19.

16     Q.   Do you have any understanding as to whether or

17  not GEO and ICE exercised these options to keep the

18  contract in effect?

19     A.   So I know the facilities continue to operate,

20  and I know it must be done pursuant to an agreement.  I'm

21  not the best person to answer the specific question as to

22  which agreement is in effect.

23          Again, our executive vice president of contract

24  administration would know that answer.

25     Q.   Okay.  Let's assume for purposes of our

Daniel Ragsdale
February 27, 2020                              41

1    discussion that this agreement remained in effect at

2    least until September of 2014, which is when the class

3    period ended.  And I'll follow-up with counsel perhaps to

4    confirm that that's the case since he's been designated

5    for that topic.

6              So if you could take a look at page 31382.

7        A.   Yes.

8        Q.   So at the bottom there's an item that says,

9    "Bed day rate for a minimum quantity."  And then it says

10   a couple columns over, "Unit price, $135.50."

11             Do you have an understanding of what this

12   refers to?

13       A.   So, as I understand it, ICE will buy beds per

14   day from their contractors, and it's commonly known as

15   the bed day rate.  And I believe that is a reference to

16   the price per bed per day for Aurora under this contract.

17       Q.   Okay.  And it says, "Minimum quantity."

18             Do you have an understanding of what that

19   refers to?

20       A.   So there's a term that's called like a

21   guaranteed minimum, and this would be a minimum number of

22   beds that the government would buy regardless of whether

23   they use them or not.

24       Q.   Got it, okay.

25             And then if you look at the next page, at the

Daniel Ragsdale
February 27, 2020                          42

1    very top it says, "Bed day rate in excess of minimum

2    quantity," and then the unit price for that is $19.50.

3         A.   Yes.  So once they're above a certain number,

4    the price per bed goes down, and this appears to be if

5    they go above a certain number, the price is 19.50.

6         Q.   Okay.  So --

7              MR. BARNACLE:  I just want to let the record

8         reflect that questions regarding bed day rates and

9         costs of the contract, generally speaking, are not

10         topics for which Mr. Ragsdale has been designated.

11              MS. TURNER:  Okay.  I'm still entitled to ask

12         him questions as a fact witness, so to the extent he

13         understands those questions, he can answer them.

14              MR. BARNACLE:  Fair enough, but it's not

15         corporate designee testimony.

16    BY MS. TURNER:

17         Q.   Turning to the next page, 31384, Item No. 4

18    there makes reference to a stipend for the Detainee Work

19    Program?

20         A.   Yes.

21         Q.   And then it says, "Reimbursement for this line

22    item will be the actual cost of $1 per day per detainee."

23    And then it says, "Unit price, $1."

24              So what's your understanding of what this

25    refers to?

 1   facility; correct?

 2        A.   Yes.   They are required to run a proper

 3   facility, yes.

 4        Q.   Okay.   Just going back to Exhibit 5, the

 5   contract in the binder, if you can turn to the page Bates

 6   stamped 31417, and so Section E.

 7        A.   31417?

 8        Q.   Yes.

 9        A.   Okay.

10        Q.   Section E towards the bottom.

11        A.   Yes.

12        Q.   Okay.   That makes reference to the QASP, again;

13   correct?

14        A.   Yes.

15        Q.   And so is it correct that this and the

16   subsequent pages sort of describe one of the mechanisms

17   that the government will use to evaluate GEO's

18   performance under this contract?

19        A.   Yes.

20        Q.   And then if you turn to page 31712.

21        A.   Yes.

22        Q.   Actually, sorry, looks like at 31711.   So is

23   this correct -- am I correct that this a sort of detailed

24   recitation of the quality assurance surveillance plan

25   that the government expects GEO to implement pursuant to

Daniel Ragsdale
February 27, 2020                          52

```
 1    this contract?

 2              MR. BARNACLE:  Object to form.

 3              THE WITNESS:  It's my understanding that QASP

 4        belongs to the agency, right.  In other words --

 5    BY MS. TURNER:

 6        Q.    Meaning ICE?

 7        A.    Right.  This is ICE's -- the first line says

 8    ICE's Quality Assurance Surveillance Plan.  It's premised

 9    on that the contractor, not the government is responsible

10    for the day-to-day operation.  The QASP is ICE's plan,

11    but there's a derivative quality plan the contractor has

12    to develop to perform and then test its services.

13        Q.    Got it.

14              And going back to that language you cited, it

15    says, "The QASP is based on the premise that the

16    contractor, not the government, is responsible for the

17    day-to-day operation of the facility and all the

18    management and quality control actions required to meet

19    the terms of the agreement."

20              Is that correct in your understanding?

21        A.    Yes.  The contractor's responsible for the

22    contractor's performance day-to-day.

23        Q.    Okay.  And then just looking at the next page,

24    Item 4.

25        A.    712?
```

Daniel Ragsdale
February 27, 2020                    53

1        Q.    Yes.

2        A.    1712, sorry.

3        Q.    That, right under Item 4, it says, "The

4    contractor shall develop, implement, and maintain the

5    quality control plan that illustrates the methods it will

6    use to review its performance and ensure it conforms to

7    the performance requirements."

8              Is that consistent with your understanding of

9    how the quality control plan is developed?

10       A.    Yes.  We have -- GEO has its own quality

11   control plan, yes.

12       Q.    And GEO develops that quality control plan to

13   make sure that it's complying with the terms of the

14   contract?

15       A.    Yes.

16             MS. TURNER:  We've been going over an hour.

17       Let's take a quick break.

18             MR. BARNACLE:  Sure.

19             (A recess was taken from 10:30 a.m. to

20   10:38 a.m.)

21   BY MS. TURNER:

22       Q.    Back on record.  Let's mark this as 7.

23             (Exhibit 7, Answers to Interrogatories, was

24   marked for identification.)

25

Daniel Ragsdale
February 27, 2020                                    54

```
 1    BY MS. TURNER:
 2        Q.    The court reporter has handed you a document
 3    marked Exhibit 7.  You can review it and let me know when
 4    you're ready.
 5        A.    Okay.  I skimmed it.
 6        Q.    Do you recognize this document?
 7        A.    I recognize it as a pleading but, no, I'm not
 8    familiar with it.
 9        Q.    Okay.  You didn't review it as part of your
10    deposition preparation?
11        A.    No.
12        Q.    Okay.  So I'm going to direct your attention to
13    page 3 of Exhibit 7.  And so this interrogatory asks GEO
14    to -- Interrogatory No. 24 asks GEO to "Identify all
15    communications, acts or authorization of any kind from
16    ICE that form the basis of your affirmative defense that
17    plaintiffs' claims relating to GEO's Housing Unit
18    Sanitation Policy," quote, "are barred by the government
19    contractor defense," end quote.
20            And so then below that is the response that GEO
21    has provided to this interrogatory, so I have some
22    questions about that.
23        A.    Okay.
24        Q.    And so in the second paragraph of GEO's
25    response, it states that, "ICE has approved the following
```

Daniel Ragsdale
February 27, 2020                    65

1    detainees are required to do to maintain their immediate

2    living areas in a neat and orderly manner.

3         Do you agree?

4    A.   Yes.  I would say it is a nonexclusive list of

5    things that what are generally understood as to how to

6    keep an area tidy.

7    Q.   And this is the list of things that is included

8    in the policy that was approved by ICE; correct?

9    A.   As it relates to this specific policy, yes.  I

10   mean, on the top left page of this document ending in

11   548, there's a signature that says "ICE approval."

12   Q.   Okay.  Going back to the first page of

13   Exhibit 9, there's a list under A where it states, "A

14   sample of work assignments follow," and it lists eight

15   categories of potential work assignments.

16        Do you see that?

17   A.   I do.

18   Q.   If GEO wants to assign Voluntary Work Program

19   workers a different category of assignments, can it do

20   so?

21   A.   I think it would require ICE approval.  In

22   other words, this is a list of eight items that ICE

23   approved as part of the work program.  If GEO wanted to

24   do something, what I would say is that does not fall in

25   these eight categories, I believe ICE should approve it.

Daniel Ragsdale
February 27, 2020                    66

1          Q.    Uh-huh.  And who would approve it for ICE?

2          A.    It would be somebody at the ICE field office

3     level, either the -- in this case it's probably the COTR,

4     the Contractor's Officer's Technical Representative that

5     may sign it, but the facility is led by either some --

6     the title I think is an officer in charge.  There's an

7     ICE supervisory detention and deportation officer that is

8     physically there that is responsible for the ICE work at

9     the facility.

10         Q.    Okay.  Is it fair to say that the use of the

11    term "sample" here suggests that GEO has some flexibility

12    in identifying potential other work assignments and

13    submitting them for approval?

14         A.    I agree that "sample" does mean a nonexhaustive

15    list; however, you know, a reasonable person would say,

16    you know, I don't think this means that someone can do

17    something that's particularly specialized, something

18    that's particularly dangerous, something that sort of

19    exceeds what essentially -- you know, I think it's

20    important to note the standard is what governs.  In other

21    words, this document is subordinate to ICE's

22    Performance-Based Detention Standards.  Those standards,

23    you know, lay out the broad themes in which things are

24    required to be done, and that is really the concrete that

25    these things must be done.  That is the constraining

Daniel Ragsdale
February 27, 2020                    67

```
 1   document.
 2        Q.   Got it.
 3        Okay.  So going back to the Housing Unit
 4   Sanitation Policy, I think your testimony was to the
 5   extent it's described in this document, it is under C
 6   where it says, "The detainees are not required to work
 7   except to do personal housekeeping and to clean their
 8   housing area," correct?
 9             MR. BARNACLE:  Object to the form.
10             THE WITNESS:  Yes.  And "housing area" is the
11        term that I think we had a discussion about the
12        elasticity of housing area, because it would
13        different in a cell environment kind of space versus
14        a dormitory, et cetera.
15   BY MS. TURNER:
16        Q.   Okay.  But we agreed that it was generally the
17   area around their bunk; correct?
18             MR. BARNACLE:  Object to the form.
19             THE WITNESS:  Well, again, I think it depends
20        on whether there's a common area.  In other words,
21        just so we understand the same architecture, if you
22        had a celled environment that the only common area
23        was a hallway and there were no facilities for the
24        detainees to share, let's just say, and, again, I'm
25        thinking of something very judicial looking, that
```

Daniel Ragsdale
February 27, 2020                          68

```
 1        there's nothing in the hallway except to just

 2        transverse the area, then I believe they would have

 3        no, you know, there would be no obligation outside

 4        their immediate living area which would be their

 5        cell.

 6             But where you have a dormitory area where

 7        you've got an immediate living area of the bed, but

 8        then you also have a microwave and where the tables

 9        are, you've got game tables and things of that nature

10        that are clearly shared, I understand this to be

11        there may be obligations to those shared -- I'm

12        trying to think of the word -- you know, items that

13        they would have a shared responsibility to clean.  In

14        other words, you could not take your personal soda,

15        dump it on a game table, and then expect not to have

16        to wipe it up.

17   BY MS. TURNER:

18        Q.   Right.  So clean up after yourself in the

19   common areas; correct?

20        A.   Correct, and to the extent common areas exist.

21        Q.   Right.  Okay.  You can't leave your personal

22   property strewn around the common areas; correct?

23        A.   Correct.

24        Q.   Mark this, please.  This is 10?

25             THE COURT REPORTER:  Ten.
```

1      Q.   That is, the appropriations bill involves what

2    the government can reimburse the contractor for; correct?

3      A.   Yes.

4      Q.   Okay.  So my question is a little bit different

5    which is why GEO paid the detainees a dollar a day.

6      A.   So, again, sort of my understanding, that when

7    ICE puts out, you know, a request for a proposal for a

8    contract, you know, there's a, you know, certain size of

9    the facility, there's standards, there's all these, you

10   know, sort of requirements.

11        The Voluntary Work Program is a requirement,

12   and the dollar a day is sort of the rate that is set.

13   For all, you know, again, the reasons we talked about,

14   even there's been ebb and flow even in the agency's

15   documents that sort of have that language, at least a

16   dollar a day, a dollar a day, you know, no more than a

17   dollar a day.  I mean, there's been a variety of things

18   around that.  So, I mean, that's -- the basic rule is a

19   dollar a day based on sort of that reimbursement rate

20   that ICE is authorized to pay.

21      Q.   So GEO pays the workers a dollar a day because

22   GEO gets reimbursed a dollar a day; correct?

23      A.   Yes.

24      Q.   Okay.  And -- but GEO does pay higher rates for

25   Voluntary Work Programs at some other facilities;

Daniel Ragsdale
February 27, 2020                                    155

 1   correct?

 2        A.    That is my understanding, yes.

 3        Q.    Okay.  And that was case during the time period

 4   covered by this lawsuit?

 5        A.    So I don't know the specifics about Aurora.  I

 6   do know that, you know, there's some sense that some -- I

 7   mean, there's some places where there are more requests

 8   than there are slots for people to volunteer.  And there

 9   are other places where, again, it could depend on length

10   of stay, it could depend on, obviously, peoples' personal

11   preferences, et cetera, that, you know, things can be

12   undersubscribed.

13             And then to incentivize it or for work that is

14   more complicated, requires more training, then GEO can

15   pay more than a dollar a day and has.  I don't know, you

16   know, the contours of the dollars at Aurora, you know,

17   personally over 14 years or 10 years.

18        Q.    Okay.  This actually only applies to three

19   years.  I don't know if that makes it easier, but the

20   Voluntary Work Program claim only involves approximately

21   2011 to 2014.

22        A.    Okay.

23        Q.    And it's my understanding that VWP workers were

24   paid a dollar a day for the duration of the class period.

25   Is that your understanding?

Daniel Ragsdale
February 27, 2020                              156

 1        A.    I have no reason to know the details of it.

 2   Again, I would say the general idea is it's a dollar a

 3   day.

 4        Q.    Okay.  So at those facilities where GEO pays

 5   more than a dollar a day, is it reimbursed by ICE for

 6   more than a dollar?

 7        A.    No.  I think ICE has a cap at a dollar a day.

 8        Q.    Okay.  What if anything does GEO communicate

 9   with ICE when it decides to pay more than a dollar a day

10   for Voluntary Work Programs at those facilities?

11        A.    So the mechanics of the communication, again, I

12   probably -- it probably varies by facility.  Again, you

13   know, it is for those, you know, reasons that GEO and ICE

14   are co-located at these facilities so that is what I

15   would expect, a communication that would happen with the

16   facility administrator and the officer in charge or the

17   assistant field office director.

18             I mean, I think that's germane information that

19   should be regularly shared, but I couldn't represent to

20   you whether it's done in a weekly meeting, whether it's

21   done in writing, so I think it would probably vary, you

22   know, by location.

23        Q.    And if GEO wishes to pay more than a dollar a

24   day but is not seeking reimbursement from ICE for more

25   than a dollar a day, does it need to seek ICE's

1                          CERTIFICATE OF REPORTER

2

     THE STATE OF FLORIDA,          )

3

     COUNTY OF PALM BEACH.          )

4

5

6            I, Joyce L. Bluteau, Registered Professional
     Reporter, Florida Professional Reporter, certify that I
     was authorized to and did stenographically report the
7    deposition of DANIEL RAGSDALE; pages 1 through 183; that
     a review of the transcript was requested; and that the
8    transcript is a true record of my stenographic notes.

9

10           I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties, nor
     am I a relative or employee of any of the parties'
11   attorneys or counsel connected with the action, nor am I
     financially interested in the action.

12

13           DATED this 3rd day of March, 2020.

14

15

16

17

18

19

20   _____

     Joyce L. Bluteau,
21   Registered Professional Reporter
     Florida Professional Reporter

22

23

24

25