# Exhibit L



# Performance-Based National Detention Standards 2011



U.S. Immigration
and Customs
Enforcement

GEO-MEN 00064018

# Preface

In keeping with our commitment to transform the immigration detention system, U.S. Immigration and Customs Enforcement (ICE) has revised its detention standards. These new standards, known as the Performance-Based National Detention Standards 2011 (PBNDS 2011), are an important step in detention reform.

ICE is charged with removing aliens who lack lawful status in the United States and focuses its resources on removing criminals, recent border entrants, immigration fugitives, and recidivists. Detention is an important and necessary part of immigration enforcement. Because ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care. ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law.

The PBNDS 2011 reflect ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose. The PBNDS 2011 are crafted to improve medical and mental health services, increase access to legal services and religious opportunities, improve communication with detainees with no or limited English proficiency, improve the process for reporting and responding to complaints, and increase recreation and visitation.

The PBNDS 2011 are also drafted to include a range of compliance, from minimal to optimal. As such, these standards can be implemented widely, while also forecasting our new direction and laying the groundwork for future changes.

In closing, I would like to thank the ICE employees and stakeholders who provided significant input and dedicated many hours to revising these standards. I appreciate the collaboration and support in this important mission - reforming the immigration detention system to ensure it comports with our national expectations. The PBNDS 2011 are an important step in a multiyear process and I look forward to continued collaboration within ICE, with state and local governments, nongovernmental organizations, Congress, and all of our stakeholders as we move forward in reforming our detention system.

John Morton
Director

GEO-MEN 00064019

# 1.2 Environmental Health and Safety

## I. Purpose and Scope

This detention standard protects detainees, staff, volunteers and contractors from injury and illness by maintaining high facility standards of cleanliness and sanitation, safe work practices and control of hazardous substances and equipment.

This detention standard applies to the following types of facilities housing ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Facility cleanliness and sanitation shall be maintained at the highest level.

2. Compliance with all applicable federal, state and local safety and sanitation laws shall be ensured by documented internal and external inspections, and by corrective action when indicated.

3. Compliance with all applicable fire safety codes and fire safety performance requirements for facility furnishings shall be ensured.

4. Flammable, poisonous, toxic and caustic materials shall be controlled and used in a safe manner.

5. Compliance with fire prevention regulations, inspection requirements and other practices, including periodic fire drills, shall ensure the safety of detainees, staff and visitors.

6. Staff shall be knowledgeable about procedures an.3

7. d responsibilities during emergency situations, including those that require evacuation, in accordance with a written plan and with training at least annually.

8. The facility shall have a written plan for immediate release of detainees from locked areas, and provisions for a back-up system.

9. A sufficient number of properly positioned emergency exits, clear from obstruction, shall be distinctly and permanently marked.

10. Preventive maintenance and regular inspections shall be performed to ensure timely emergency repairs or replacement and to prevent dangerous and life-threatening situations.

11. Potential disease transfer shall be minimized through proper sanitization of barbering equipment and supplies.

12. Pests and vermin shall be controlled and eliminated.

13. Safe, potable water shall be available throughout the facility.

14. Emergency lighting and life-sustaining

GEO-MEN 00064040

equipment shall be maintained and periodically tested.

15. Disposal of garbage and hazardous waste shall be in compliance with applicable government regulations.

16. The applicable content and procedures in this standard shall be communicated to the detainee in a language or manner the detainee can understand.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Environmental Health and Safety" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-1A-01, 1A-02, 1A-03, 1A-07, 1A-14, 1A-15, 1A-16, 1A-17, 1A-18, 1A-19, 1A-20,1C-01, 1C-02, 1C-03, 1C-04, 1C-05, IC-07, 1C-08, 1C-09, 1C-10, 1C-11, 1C-12, 1C-13, 1C-14, 1C-15, 4B-07, 4C-18.

Occupational Safety and Health Administration (OSHA) Regulations.

NFPA Standards.

U.S. Public Health Service Report on Carcinogens.

## V. Expected Practices

## A. Environmental Health and Safety

### 1. General Environmental Health

Environmental health conditions shall be maintained at a level that meets recognized standards of hygiene, including those from the:

a. American Correctional Association;

b. Occupational Safety and Health Administration;

c. Environmental Protection Agency;

d. Food and Drug Administration;

e. National Fire Protection Association's Life Safety Code; and

f. National Center for Disease Control and Prevention.

The health services department or equivalent shall assist in the identification and correction of conditions that could adversely impact the health of detainees, employees and visitors. The facility administrator designee for environmental health is responsible for developing and implementing policies, procedures and guidelines for the environmental health program that are intended to identify and eliminate or control as necessary, sources of injuries and modes of transmission of agents or vectors of communicable diseases.

The facility administrator designee shall:

a. conduct special safety investigations and comprehensive surveys of environmental health conditions; and

b. provide advisory, consultative, inspection and training services regarding environmental health conditions.

The health services administrator or equivalent is responsible for:

a. implementing a program that assists in maintaining a high level of environmental

GEO-MEN 00064041

sanitation; and

b. providing recommendations to the facility administrator concerning environmental health conditions, in consultation with the environmental health designee.

## 2. Staff and Detainee Safety

The facility administrator shall ensure that adequate provisions are made for staff and detainee safety, in accordance with these detention standards and applicable law. Standard "7.3 Staff Training" further addresses employee training-related issues. Standard "5.8 Voluntary Work Program" addresses detainee training issues for workers. Detainees shall receive safety instruction as necessary for living area-related assignments, such as working with cleaning products to clean general use areas.

Detainee living area safety shall be emphasized to staff and detainees to include providing, as noted in the standards, a housekeeping plan. For example, when there are safety concerns with a detainee sleeping in a top bunk that is not along a wall and that has no bed rail, accommodations shall be made to ensure safety. (Because of the potential safety risk they pose, bed rails are not common in detention settings except for medical housing units.) In locations where ladders are unavailable, alternate accommodations, such as the use of bottom bunks or the addition of a ladder or step, shall be made for detainees on a case-by-case basis. Detainees who have medical or physical problems that may be aggravated by sleeping on a top bunk shall be referred to the medical unit for consideration of a lower bunk permit.

## 3. General Housekeeping

The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness. When possible, the use of non-toxic cleaning supplies is recommended.

a. All horizontal surfaces shall be dampdusted daily with an approved germicidal solution used according to the manufacturer's directions.

b. Windows, window frames and windowsills shall be cleaned on a weekly schedule.

c. Furniture and fixtures shall be cleaned daily.

d. Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions.

e. A clean mop head shall be used each time the floors are mopped.

f. Waste containers shall weigh less than 50 lbs., be non-porous and lined with plastic bags; the liner shall be changed daily.

g. Waste containers shall be washed weekly at a minimum, or as needed when they become soiled.

h. Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

## 4. Pests and Vermin

The facility administrator shall contract with licensed pest-control professionals to perform monthly inspections to identify and eradicate rodents, insects and other vermin. The contract shall include a preventive spraying program for indigenous insects and a provision for callback services as necessary. Doors to the outside should be tight fitting and door sweeps should be installed to prevent the entry of vermin from outside.

## 5. Certification of Facility Water Supply

At least annually, a state laboratory shall test samples of drinking and wastewater to ensure compliance with applicable standards. A copy of the

GEO-MEN 00064042

testing and safety certification shall be maintained on site.

### 6. Emergency Electrical Power Generator

At least every two weeks, emergency power generators shall be tested for one hour, and the oil, water, hoses and belts of these generators shall be inspected for mechanical readiness to perform in an emergency situation.

Power generators are to be inspected weekly and load-tested quarterly at a minimum, or in accordance with manufacturer's recommendations and instruction manual. Technicians shall check starting battery voltage, generator voltage and amperage output at a minimum, and shall perform all other necessary checks as well.

Other emergency equipment and systems shall be tested quarterly, and all necessary follow-up repairs or replacement shall be performed as soon as feasible.

### 7. Garbage and Refuse

a. Garbage and refuse includes all trash, rubbish and other putrescible and non-putrescible solid waste, except the solid and liquid waste discharged into the sanitary sewer system of the facility.

b. Garbage and refuse shall be collected and removed from common areas at least daily to maintain sanitary conditions and to avoid creating health hazards.

c. Facilities shall comply with all federal, state and local environmental regulations and requirements governing methods for handling and disposing of refuse.

## B. Hazardous Materials

Every facility shall establish a system for storing, issuing, using and maintaining inventories of and accountability for hazardous materials. The facility

program shall be supervised by an individual trained in accordance with OSHA standards. The effectiveness of any such system depends not only on written policies, procedures and precautions, but also on adequate supervision and responsible behavior of staff and detainees, including following instructions precisely, taking prescribed precautions and using safety equipment properly.

A list of common flammable, toxic and caustic substances is included at the end of this detention standard as "Appendix 1.2.A: Common Flammable, Toxic and Caustic Substances."

### 1. Personal Responsibility

Every individual who uses a hazardous substance must:

a. be trained in accordance with OSHA standards;

b. be knowledgeable about and follow all prescribed precautions;

c. wear personal protective equipment when indicated; and

d. promptly report hazards or spills to the designated authority.

### 2. Protective Equipment

a. Protective eye, face, and other appropriate equipment (such as footwear, gloves, gowns, and/or aprons) is required where there is a reasonable probability of injury preventable by such equipment. Areas of the facility where such injuries can occur shall be conspicuously marked with eye-hazard warning signs.

b. Eyewash stations that meet OSHA standards shall be installed in designated areas throughout the facility, and all employees and detainees in those areas shall be instructed in their use.

### 3. Inventories

Every area shall maintain a current inventory of the

GEO-MEN 00064043

hazardous substances (e.g., flammable, toxic or caustic) used and stored there. Inventory records shall be maintained separately for each substance. Entries for each shall be logged on a separate card (or equivalent), and filed alphabetically by substance. The entries shall contain relevant data, including purchase dates and quantities, use dates and quantities and quantities on hand.

### 4. Material Safety Data Sheet Files

a. Every department or other area of the facility using hazardous substances shall maintain a file of Material Safety Data Sheets (MSDS) that includes a list of the locations where hazardous substances are stored, along with a diagram and legend of these locations. Designated staff from each department or area shall provide a copy of each file to the maintenance supervisor.

b. MSDS are produced by manufacturers and provide vital information on individual hazardous substances, including instructions on safe handling, storage and disposal; prohibited interactions; etc.

c. Staff and detainees shall have ready and continuous access to the MSDS for the substances with which they are working. Staff and detainees who do not read English shall not be authorized to work with these materials.

d. Because changes in MSDS occur often and without notice, staff must:

1) review the latest issuance from the manufacturers of the relevant substances;

2) update the MSDS files as necessary; and

3) forward any changes to the maintenance supervisor, so that the copy is kept current.

### 5. Master Index

The maintenance supervisor or facility administrator designee shall compile:

a. a master index of all hazardous substances in the facility and their locations;

b. a master file of MSDS; and

c. a comprehensive, up-to-date list of emergency phone numbers (e.g., fire department, poison control center, etc.).

The maintenance supervisor shall maintain this information in the safety office (or equivalent) and ensure that a copy is sent to the local fire department.

### 6. General Guidelines Regarding Hazardous Substances

a. Issuance
Flammable, caustic and toxic substances (hazardous substances) shall be issued (i.e., drawn from supply points to canisters or dispensed) only under the supervision of the designated officer.

b. Amounts
Hazardous substances shall be issued in single-day increments (the amount needed for one day's work.)

c. Supervision
Qualified staff shall closely monitor detainees working with hazardous substances.

d. Accountability
Inventory records for a hazardous substance must be kept current before, during and after each use.

### 7. Flammable and Combustible Liquids

a. As required by the Federal Hazardous Substances Labeling Act, any liquid or aerosol labeled "flammable" or "combustible" must be stored and used as prescribed on the label.

b. Lighting fixtures and electrical equipment installed in flammable liquid storage rooms must

GEO-MEN 00064044

meet National Electrical Code requirements in hazardous locations.

c. Every hazardous material storage room shall:

  1) be of fire-resistant construction and properly secured;

  2) have self-closing fire doors at each opening;

  3) be constructed with either a four-inch sill or a four-inch depressed floor; and

  4) have a ventilation system (mechanical or gravity flow), which provides at least six air changes per hour, within 12 inches of the floor.

d. Every storage cabinet shall:

  1) be constructed according to the applicable code and securely locked at all times;

  2) be clear of open passageways, stairways and other emergency exit areas;

  3) be conspicuously labeled: "Flammable— Keep Fire Away"; and

  4) contain not more than 60 gallons of Class I or Class II liquids, or more than 120 gallons of Class III liquids.

e. Storage rooms and cabinets may be entered only under secure conditions and under the supervision of authorized staff.

f. Any portable container that is not the original shipping container must be designated as an approved safety canister, and must be listed or labeled by a nationally recognized testing laboratory. Each container shall bear a legible label that identifies its contents.

g. Excess liquids shall remain in original containers, tightly closed, in the storage room or cabinet.

h. The MSDS shall govern use of particular

flammable or combustible liquids.

i. Only authorized staff may dispense flammable and combustible liquids, using acceptable methods for drawing from or transferring these liquids.

j. Drawing from or transferring any of these liquids into containers indoors is prohibited except:

  1) through a closed piping system;

  2) from a safety can;

  3) by a device drawing through the top; or

  4) by gravity, through an approved self-closing system.

  An approved grounding and bonding system must be used when liquids are dispensed from drums.

k. Without exception, cleaning liquids must have a flash point at or above 100º F (e.g., Stoddard solvents, kerosene). Cleaning operations must be in an approved parts-cleaner or dip tank, fitted with a fusible link lid with a 160 degree F melting-temperature link.

l. Staff shall follow MSDS directions:

  1) when disposing of excess flammable or combustible liquids; or

  2) after a chemical spill.

8. Toxic and Caustic Substances

a. All toxic and caustic materials must be stored in secure areas, in their original containers, with the manufacturer's label intact on each container.

b. Only authorized staff shall draw/dispense these substances, in accordance with the applicable MSDS.

c. Staff shall either return unused amounts to the original container(s) or, under certain circumstances, to another suitable, clearly

GEO-MEN 00064045

labeled container within the storage area.

d. MSDS directions shall determine the disposal and spill procedures for toxic and caustic materials used in the facility.

## 9. Poisonous Substances

Poisonous substances or chemicals (e.g., methyl alcohol, sulfuric acid, muriatic acid, caustic soda or tannic acid, etc.) pose a very high (Class I) caustic hazard due to their toxicity.

Methyl alcohol, variously referred to as wood alcohol and methanol, is commonly found in industrial applications (e.g., shellac thinner, paint solvent, duplicating fluid, solvents for leather cements and dyes, flushing fluid for hydraulic brake systems).

a. If ingested, methyl alcohol can cause permanent blindness or death.

b. Staff must directly supervise the use of any product containing methyl alcohol. Products that contain methyl alcohol in highly diluted amounts (e.g., shoe dye) may be issued to detainees, but only in the smallest workable quantities.

c. Immediate medical attention is vital any time methyl alcohol poisoning is suspected.

## 10. Other Toxic Substances

a. Permanent antifreeze containing ethylene glycol shall be stored in a locked area and dispensed only by authorized staff.

b. Typewriter cleaner containing carbon tetrachloride or trichlorochane shall be dispensed in small quantities and used under direct staff supervision.

c. Cleaning fluids containing carbon tetrachloride or tetrachloride or trichlorochane shall be strictly controlled.

d. Glues of every type may contain hazardous

chemicals. Toxic glues must be stored in a locked location, for use only by authorized staff. When use of a nontoxic product is not possible, staff must closely supervise all stages of handling.

e. The use of dyes and cements for leather requires close supervision. Nonflammable types shall be used whenever possible.

f. Ethyl alcohol, isopropyl alcohol and other antiseptic products shall be stored and used only in the medical department and only under close supervision. To the extent practical, such chemicals shall be diluted and issued in small quantities to prevent any injuries or lethal accumulation.

g. Pesticides not currently approved by the Environmental Protection Agency, such as DDT and 1080 (sodium fluoroacetate) are prohibited. The maintenance supervisor is responsible for purchasing, storing (in a locked area) and dispensing all pesticides used in the facility.

h. The maintenance supervisor or other staff members responsible for herbicides must hold a current state license as a certified private applicator. Persons applying herbicides must wear proper clothing and protective gear.

i. Lyes may be used only in dye solutions and only under the direct supervision of staff.

## 11. Labeling of Chemicals, Solvents and Other Hazardous Materials

The facility administrator shall individually assign the following responsibilities associated with the labeling procedure:

a. identifying the nature of potentially hazardous materials adopted for use;

b. overseeing use of properly labeled containers for hazardous materials, including any and all

GEO-MEN 00064046

miscellaneous containers into which employees might transfer materials;

c.  instructing staff in the meaning of the classification code and the MSDS, including the safe handling procedures for each material;

d.  working with staff ensure that containers are properly labeled; and

e.  correctly labeling all smaller containers to correspond to the manufacturer-affixed labels on larger shipping containers.

## 12. Controlled Hazardous Materials

Certain substances require special treatment and careful planning and precautions before use. These controlled materials are classified according to the type of hazard and the nature of the restrictions imposed for their safe use, as specified in OSHA regulations.

a.  Class I: Industrial Solvents
Industrial solvents and chemicals used as paint thinners, degreasers and cleaning agents may have toxic properties and low flash points, making them dangerous fire hazards.

b.  Class II: Restricted Materials
Beryllium and its alloys and compounds, and silver solder containing cadmium, pose a danger to workers, for whom special precautions must be taken.

c.  Class III: Recognized Carcinogens
OSHA-listed carcinogens are governed by the OSHA regulations provided in 29 CFR 1910.1000.

Although asbestos appears on the OSHA list, it is exempt from the regulation when:

1)  no asbestos fibers shall be released into the air during handling and use; and

2)  the asbestos consists of firmly bound fibers

contained in a product such as a transit pipe, wallboard, or tile (except when being sawed or otherwise handled in a way that releases fibers into the air).

d.  Class IV: Suspected Carcinogenic, Teratogenic and Mutagenic Materials
Chemical agents, substances, mixtures and exposures are listed in the biennial *Report on Carcinogens* issued by the U.S. Public Health Service, in accordance with the Public Health Service Act. The maintenance supervisor shall ensure that the facility has copies of the report and that there is compliance with the provisions of the latest edition.

## C. Fire Prevention and Control

### 1. Fire Safety Codes

Every facility shall comply with standards and regulations issued by:

a.  OSHA;

b.  the American Correctional Association "mandatory" Expected Practices [Mandatory ACA Expected Practice 4-ALDF-1C-07 requires that the facility conform to applicable federal, state and/or local fire safety codes, and that of the authority having jurisdiction document compliance. A fire alarm and automatic detection system are required (or else there must be a plan for addressing these or other deficiencies within a reasonable time period), as approved by the authority having jurisdiction. If the authority approves any variance, exceptions or equivalencies, they must not constitute a serious life-safety threat to the occupants of the facility.];

c.  local and national fire safety codes; and

d.  applicable standards of the American Society for Testing and Materials, American National

GEO-MEN 00064047

Standards Institute and Underwriters' Laboratories or Factory Mutual Engineering Corporation.

New construction, alterations and renovations, shall comply with:

a. the latest revision or update of the International Council Codes;

b. the Uniform Building Code; or

c. the Standard Building Code, in accordance with 40 U.S.C § 619 and local law.

If the local government does not mandate adherence to a particular code, construction must conform to the International Council Codes.

In addition, construction shall comply with the latest edition of the National Fire Protection Association (NFPA)'s 101, Life Safety Code and National Fire Codes (NFCs). If the fire protection and life safety requirements of a local building code differ from NFPA 101 or the NFCs, the requirements of NFPA 101 and the NFCs shall take precedence and be recognized as equivalent to those of the local building code.

2. Inspections

a. A qualified departmental staff member shall conduct weekly fire and safety inspections.

b. Facility maintenance (safety) staff shall conduct monthly inspections.

c. Written reports of the inspections shall be forwarded to the facility administrator for review and, if necessary, corrective action determinations. The maintenance supervisor shall maintain inspection reports and records of corrective action in the safety office. Fire safety deficiencies shall be promptly addressed.

3. Fire Prevention, Control and Evacuation Plan

Every facility shall develop a written fire

prevention, control and evacuation plan that includes the following:

a. control of ignition sources;

b. control of combustible and flammable fuel load sources;

c. provisions for occupant protection from fire and smoke;

d. inspection, testing and maintenance of fire protection equipment, in accordance with NFPA codes, etc.;

e. monthly fire inspections;

f. installation of fire protection equipment throughout the facility, in accordance with NFPA codes;

g. accessible, current floor plans (including all buildings and rooms); prominently posted evacuation maps/plans; and exit signs and directional arrows for traffic flow, with a copy of each revision filed with the local fire department; and

h. exit diagrams that shall be conspicuously posted throughout the facility.

4. Fire Drills

Fire drills shall be conducted and documented at least quarterly in all facility locations including administrative areas.

a. Fire drills in housing units, medical clinics and other areas occupied or staffed during non-working hours shall be timed so that employees on each shift participate in an annual drill.

b. Detainees shall be evacuated during fire drills, except:

1) in areas where security would be jeopardized;

2) in medical areas where patient health could be jeopardized; or

GEO-MEN 00064048

3) in individual cases when evacuation of patients or detainees is logistically not feasible.

Staff shall simulate drills in areas where detainees are not evacuated.

c. Emergency-key drills shall be included in each fire drill, and timed. Emergency keys shall be drawn and used by the appropriate staff to unlock one set of emergency exit doors not in daily use. NFPA recommends a limit of four and one-half minutes for drawing keys and unlocking emergency doors. However, when conducting fire drills, emphasis shall be placed on safe and orderly evacuation rather than speed.

### 5. Exit Diagram

In addition to a general area diagram, the following information must be provided on signs:

a. instructions in English, Spanish and the next most prevalent language at the facility;

b. "You are here" markers on exit maps; and

c. emergency equipment locations.

"Areas of Safe Refuge" shall be identified and explained on diagrams. Diagram posting shall be in accordance with applicable fire safety regulations of the jurisdiction.

### D. Medical Operation

### 1. Needles and Other Sharp Objects

A mandatory, uniform procedure shall be established for the safe handling and disposal of used needles and other potentially sharp objects (sharps) to prevent both mechanical injury and the percutaneous transmission of infectious disease organisms, such as the hepatitis B virus (HBV) and human immunodeficiency virus (HIV). Sharps are defined as all disposable or discarded items derived from detainee care that could potentially transmit disease via direct subdermal inoculation. Items included are: hypodermic needles and syringes, scalpel blades, glass vials or ampules containing materials deemed to be infectious, burrs, glass cartridges and lancets.

Accidental injuries from sharp objects are common in health care programs; most are from needle sticks caused by staff attempting to recap hypodermic needles. A uniform procedure for used needles and other disposable sharps is necessary to reduce the number of such injuries by preventing the secondary handling of needles and other dangerous sharp objects used in the delivery of medical care.

### 2. Standard Precautions (includes "Universal Precautions")

Staff shall frequently wash their hands and take additional routine precautions to prevent contact with blood or other body fluids.

a. Gloves shall be worn: prior to touching blood and body fluids, mucous membranes, or non intact skin of all patients; prior to handling items or surfaces soiled with blood or body fluids; and prior to performing venipuncture and other vascular access procedures.

b. Gloves shall be changed after contact with each detainee.

c. Masks and protective eyewear or face shields shall be worn during procedures that are likely to generate droplets of blood or other body fluids.

d. Gowns and/or aprons shall be worn during procedures that are likely to generate splashes of blood or other body fluids.

e. Hands and other skin surfaces shall be washed immediately and thoroughly if contaminated with blood or other body fluids. Hands shall be washed immediately after gloves are removed.

f. All health-care workers shall take precautions to

GEO-MEN 00064049

prevent injuries caused by needles, scalpels and other sharp instruments or devices during procedures, especially at the following times: when cleaning used instruments, during disposal of used needles and when handling sharp instruments after procedures. Instruments and drugs shall be maintained in a secure and sanitary condition.

g. To prevent needle-stick injuries, needles shall not be recapped, purposely bent or broken, removed from disposable syringes, or otherwise manipulated by hand. After use, disposable syringes and needles, scalpel blades and other sharp items shall be placed in puncture-resistant containers for disposal.

h. Large-bore reusable needles shall be placed in a puncture-resistant container for transport to the reprocessing area.

i. To minimize the need for emergency mouth-to-mouth resuscitation, mouthpieces, resuscitation bags or other ventilation devices shall be available for use in areas in which the need for resuscitation is foreseeable.

j. Health-care workers who have exudative lesions or weeping dermatitis shall refrain from all direct patient care and from handling patient care equipment until the condition resolves.

k. Pregnant health-care workers shall strictly adhere to precautions to minimize the risk to the fetus of perinatal transmission of HIV.

l. Isolation precautions shall be used as necessary if associated conditions, such as infectious diarrhea or tuberculosis, are diagnosed or suspected. Implementation of standard blood and body fluid precautions for all detainees eliminates the need for the use of isolation category of "blood and body fluid precautions" previously recommended by the Centers for

Disease Control for individuals known or suspected to be infected with blood-borne pathogens.

Staff shall encourage detainees to wash their hands frequently and to take additional routine precautions to prevent contact with blood or other body fluids.

### 3. Accidental Needle Sticks

Any employee or detainee who receives a needle stick or who is cut while handling potentially contaminated sharps shall be counseled regarding baseline testing for HBV and HIV, and referred to his/her usual source of health care. If the injury also involves a person who is a known source of possible infection, that person shall also be tested for HBV and HIV. The incident shall be reported as an occupational injury and documented in accordance with applicable regulations for commissioned officers and civil service employees, respectively.

The leading health service provider's exposure-control plan shall be followed in the event of a needle stick.

### 4. Inventory

Items that pose a security risk, such as sharp instruments, syringes, needles and scissors, shall be inventoried and checked weekly by an individual designated by the medical facility's Health Service Administrator (HSA) or equivalent.

### 5. Handling

Without removing the needles or replacing the needle covers, staff shall place used (disposable) syringes in a plastic disposal box or container.

a. Disposal Containers

1) Use only commercially available, biohazardous-waste sharps containers approved by the National Institute of Safety and Health (e.g., a "Winfield Sharps

GEO-MEN 00064050

Container").

2) Do not use milk cartons or plastic milk jugs or other plastic containers of similar thickness.

3) Use containers with a two-gallon capacity (approximate).

4) Under no circumstances shall an item be removed from the Winfield Sharps Container (Sharps Container).

b. Location

Sharps Containers shall be located on top of counters or, if on the wall, at least five feet above ground. Sharps Containers shall never sit on the floor.

c. Disposal

When the disposal box is one-half to two-thirds full, the lid shall be closed and locked, and tape shall be placed over the top of the lid to indicate that it is ready for disposal. The Sharps Container shall be labeled with the words "infectious waste" or with the universal biohazard symbol, and placed in the proper area for removal and disposal.

Sharps are considered infectious waste, and final disposal of the Sharps Container and contents shall be through a commercial contractor that handles disposal of infectious waste in accordance with all local and federal regulations.

The HSA shall make arrangements for disposal with an approved contractor and is responsible for validating that the contractor's disposal methods are in accordance with all infectious and hazardous waste disposal laws and regulations. Arrangements shall be made with local hospitals, when possible, for disposal with the hospitals' own infectious waste.

6. Environmental Health in Medical Operations

While many of the following considerations, precautions and specific procedures apply to

situations that typically arise in medical operations, in many cases they have general application to all facility operations.

a. General Housekeeping

Environmental cleanliness shall reduce, control and prevent nosocomial infections due to contaminated environmental surfaces. The HSA or designee is responsible for ensuring the cleanliness of the medical facility.

Using an acceptable health agency standard as a model, the HSA shall establish:

1) the cleaning equipment, cleansers, disinfectants and detergents to be used;

2) the methods of cleaning; and

3) the frequency of cleaning and inspections.

The HSA or designee shall make a daily visual inspection of the medical facility, noting the condition of floors, walls, windows, horizontal surfaces and equipment.

All surfaces touched by detainees or staff shall be cleaned using fresh solutions of appropriate disinfectant products, applied with clean cloths, mops or wipes. Cleaned surfaces need not be monitored microbiologically since the results of such tests have been shown not to correlate with infection risk. Floors, walls, beds, tables and other surfaces that usually come in contact with intact skin require low-level disinfection

Horizontal surfaces in detainee care areas are cleaned on a regular basis, when soiling or spills occur. Additionally, short-stay units are cleaned when a detainee is discharged. Cleaning of walls, blinds or curtains is required only when visibly soiled.

The Chief Nurse (or equivalent) is responsible for training all staff and detainees in using proper housekeeping procedures and proper handling of

GEO-MEN 00064051

hazardous materials and chemicals.

1) General Cleaning

  a) All horizontal surfaces shall be damp dusted daily with an approved germicidal solution.

  b) Windows, window frames and windowsills shall be cleaned on a regular schedule, but do not require daily cleaning.

  c) Furniture and fixtures shall be cleaned daily.

  d) Floors shall be mopped daily and when soiled using the double bucket mopping technique. The cleaning solution shall be a hospital disinfectant-detergent solution mixed according to the manufacturer's directions. A clean mop head shall be used each time the floors are mopped.

  e) Waste containers shall be lined with plastic bags and the liner shall be changed daily. The container itself shall be washed at least weekly, or as needed when it becomes soiled.

  f) Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

2) Isolation Cleaning

  a) An approved germicidal detergent solution shall be freshly prepared in accordance with the manufacturer's specifications for each cleaning.

  b) After cleaning the isolation room, mops and cleaning cloths shall be laundered before being reused.

  c) Dirty water and used disinfecting solutions shall be discarded and the buckets and basins disinfected before being refilled. Items used in cleaning a contaminated isolation room shall never be taken into another area.

  d) Linens shall be carefully removed from the bed and double-bagged for transport.

  e) All waste materials shall be double-bagged and disposed of as contaminated waste.

3) Terminal Cleaning

  a) Every item in the room must be cleaned with an approved hospital germicidal solution.

  b) When applicable, linen shall be stripped from the bed, with care taken not to shake the linen. Linen shall be folded away from the person and folded inward into a bundle, then removed with minimal agitation.

  c) When applicable, all reusable receptacles (e.g., drainage bottles, urinals, bedpans, water pitchers) shall be emptied and rinsed with germicidal solutions.

  d) All equipment that is not to be discarded (e.g., IV poles, respirators, suction machines) shall be washed with an approved germicidal solution following manufacturer's guidelines for cleaning the specific piece of equipment.

  e) When applicable, mattresses and pillows covered with durable plastic covers shall be washed thoroughly with the approved germicidal solution.

  f) When applicable, beds shall be washed thoroughly, using a small brush soaked in germicidal solution to gain access to small holes and crevices, to areas between the springs and to the casters.

  g) All furniture shall be washed with a

GEO-MEN 00064052

germicidal detergent solution. Use a small brush if necessary. Outside and underside as well as legs and casters must also be washed.

h) Wastebaskets shall be thoroughly washed with a germicidal solution after trash and liner have been removed.

i) Telephones shall be thoroughly cleaned with a clean cloth soaked in the germicidal solution. The earpiece and mouthpiece shall be unscrewed, scrubbed, dried and replaced.

j) Walls and ceilings need not be washed entirely, but areas that are soiled shall be washed with germicidal solution.

4) Choice of Disinfecting Materials
Hospital-grade disinfectant detergent formulations registered by the Environmental Protection Agency (EPA) may be used for environmental surface cleaning, but the physical removal of microorganisms by scrubbing is as imperative as any antimicrobial effect of the cleaning agent used.

Cost, safety and acceptance by staff shall be the criteria for selecting any such registered agent. The manufacturer's instructions for use shall be followed exactly.

b. Blood and Body Fluid Clean-up
Spills of blood and body fluids shall be cleaned up and the surface decontaminated in such a manner as to minimize the possibility of workers becoming exposed to infectious organisms, including HIV and HBV. A suitable cleanup kit shall be maintained for use in cases of spills of blood and body fluids. Cleanup kits may be obtained from commercial sources, or may be compiled by Health Services Department (HSD)

staff or the designated health care provider.

1) Compiling a Cleanup Kit

To prepare a cleanup kit for blood and body fluid spills, package the following materials in a 12" x 15" clear zip-lock bag:

a) gloves, rubber or vinyl, household-type (2 pair);

b) clean absorbent rags (4);

c) absorbent paper towels (15);

d) disposable bag marked "contaminated" size 23"x10"x39", minimum thickness 1.5 mils.;

e) Clear plastic bag 13"x10"x39", minimum thickness 1.5 mils.; and

f) Bottle of "hospital disinfectant" (containing quaternary ammonium chlorides in at least 0.8% dilution), or a bottle of household bleach such as "Clorox" or "Purex" (5.25% sodium hypochlorite).

2) Selection of Disinfectants
Dilute solutions of sodium hypochlorite are reported extremely effective against both HIV and the Hepatitis B virus and therefore have been recommended for use in environmental decontamination procedures. Quaternary ammonium compounds are less effective against Hepatitis B. Chlorine in solution inactivates viruses quickly and efficiently, but must reach the virus particles to do so.

Proteinaceous materials may interfere with the ability of the appropriate disinfectant solution to reach the virus particles. Since quaternary disinfecting compounds may act as a detergent as well as a disinfectant, these compounds may be used for cleaning and removal of proteinaceous materials from

GEO-MEN 00064053

surfaces. However, when using such a compound to clean a surface, it shall be necessary to follow with the use of chlorine solution for final disinfection.

Most blood or fluids shall be removed from the surface during routine medical cleaning procedures before application of the disinfectant; in such cases, use of sodium hypochlorite solution shall be sufficient.

3) Selection of Gloves
Household or industrial rubber gloves are recommended for use rather than surgical rubber gloves, as surgical gloves are somewhat porous and are less resistant to mechanical damage and punctures during clean-up procedures.

4) Assignment of Cleaning Duties to Detainees in Medical Facilities
Detainee workers may be assigned duties cleaning the medical facility. Detainees are permitted to clean floors and walls and to remove trash, but are not permitted to clean medical equipment.

5) Instructions for Use of Clean-Up Kit

a) Open the bag and remove the supplies.

b) Put on one pair of gloves.

c) Depending on the type of disinfectant in the kit, take out bottle of "hospital disinfectant," or prepare a dilute solution of sodium hypochlorite. To prepare a 1:10 dilution of 5.25% sodium hypochlorite, mix 1 part of 5.25% sodium hypochlorite (common household bleach) with 10 parts water.

d) Open the large clear plastic bag and the large bag marked "contaminated." Place them next to each other.

e) Use paper towels to absorb as much of the spilled fluid as possible; then place soiled paper towels in the large clear plastic bag.

f) Pour the solution carefully onto the spill area. Dispose of the empty bottle in the large, clear plastic bag. Leave disinfectant in place for 15 minutes.

g) Use the rags to clean the area, and place rags in the large clear plastic bag.

h) Tie off the clear plastic bag and place it inside the large plastic bag marked "Contaminated."

i) Remove gloves carefully and place them in the plastic bag marked "Contaminated."

j) Put on the second pair of gloves and tie the "Contaminated" trash bag closed.

k) Properly dispose of the "Contaminated" trash bag in a contaminated-waste receptacle.

l) Properly dispose of the second pair of gloves in the contaminated-waste receptacle.

m) Wash your hands.

n) Prepare a new clean-up kit.

NOTE: Do not place linen or non-disposable articles in the "Contaminated" trash bag.

c. Hazardous and Infectious Waste Disposal
Infectious and hazardous waste generated at a medical facility shall be stored and disposed of safely and in accordance with all applicable federal and state regulations.

For identified wastes that represent sufficient risk of causing infection or injury during handling and disposal, the following precautions shall be applied.

1) Definitions

GEO-MEN 00064054

Hazardous or infectious waste is defined as: microbiology laboratory waste; human blood and blood products; sharps (as defined in "Section VIII," "A" above); laboratory and other chemicals; or certain drugs such as antineoplastic.

Miscellaneous biomedical waste is defined as waste materials that are not specifically defined as infectious waste. Such waste includes bandages, dressings, casts, catheters and disposable pads.

Waste from detainees in isolation is not considered to be infectious waste unless it falls within the specific definition of infectious waste as stated above.

2) Collection and Storage
Infectious waste must be separated from the general waste stream and clearly labeled as infectious, adhering to the following practices:

a) Infectious waste shall be double-bagged and tied and labeled "Infectious Waste."

b) The bags used must be impermeable, commercially supplied red bags intended specifically for biohazardous waste storage.

c) Miscellaneous biomedical waste shall be double-bagged and tied but need not be labeled as infectious.

3) Treatment and Disposal
Blood products and designated body fluids shall be poured slowly and carefully down a toilet to prevent splash. Compacting of untreated infectious waste is prohibited. The waste disposal contractor must meet all state and local requirements for transportation and disposal.

## E. Barber Operations

Sanitation in barber operations is imperative because of the possible transfer of diseases through direct contact or by towels, combs and clippers. Towels shall not be reused by other detainees until sanitized. Instruments such as combs and clippers shall not be used successively on detainees without proper cleaning and disinfecting.

1. For sanitation reasons, barbering operations must be located in a room that is not used for any other purpose. The room must have sufficient light, and be supplied with hot and cold running water. The floors, walls and ceilings shall be smooth, nonabsorbent and easily cleaned.

2. Each barbershop shall have all equipment and facilities necessary for maintaining sanitary procedures for hair care, including covered metal containers for waste, disinfectants, dispensable headrest covers, laundered towels and haircloths.

3. After each detainee visit, all hair care tools that came in contact with the detainee shall be cleaned and effectively disinfected. Ultraviolet lights are not appropriate for sterilization but may be used for maintaining tools that have already been properly sterilized.

4. Detailed hair care sanitation regulations shall be conspicuously posted in each barbershop for the use of all hair care personnel and detainees. Cotton pads, absorbent cotton and other single or dispensable toilet articles may not be reused, and shall be placed in a proper waste receptacle immediately after use. The common use of brushes, neck dusters, shaving mugs and shaving brushes is prohibited.

5. Barbers or beauticians shall not provide service to any detainee when the skin of the detainee's face, neck or scalp is inflamed, or when there is scaling, pus or other skin eruptions, unless

GEO-MEN 00064055

service of such detainee is performed in accordance with the specific authorization of the chief medical officer. No person who is infested with head lice shall be served.

GEO-MEN 00064056

# Appendix 1.2.A: Common Flammable, Toxic and Caustic Substances

## Class I Liquids

Gasoline

Benzene (Petroleum ether)

Acetine

Hexane

Lacquer

Lacquer thinner

Denatured alcohol

Ethyl alcohol

Xylene (Xylol)

Contact cement (flammable)

Toudi (Toluene)

Methyl ethyl ether

Methyl ethyl ketone

Naphtha Y, M and P

## Class II Liquids

Diesel fuel

Motor fuel

Kerosene

Cleaning solvents

Mineral spirits

Agitene

## Class III Liquids

Paint (oil base)

Linseed oil

Mineral oil

Neat's-foot oil

Sunray conditioner

Guardian fluid

## Toxic Substances

Ammonia

Chlorine

Antifreeze

Duplicating fluid

Methyl alcohol

Defoliants

Herbicides

Pesticides

## Caustic Substances

Lye

Muriatic acid

Caustic soda

Sulfuric acid

Tannic acid

GEO-MEN 00064057

# 2.12 Special Management Units

## I. Purpose and Scope

This detention standard protects detainees, staff, contractors, volunteers and the community from harm by segregating certain detainees from the general population in Special Management Units with an Administrative Segregation section for detainees segregated for administrative reasons and a Disciplinary Segregation section for detainees segregated for disciplinary reasons.

This detention standard applies to the following types of facilities housing ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. The facility shall have a Special Management Unit (SMU) with provisions for separating the administrative segregation section, for detainees segregated from the general population for administrative reasons, from the disciplinary segregation section, for detainees segregated from the general population for disciplinary reasons.

2. Detainees housed in the general population, staff, contractors, volunteers and the local community shall be protected from harm by the segregation of certain detainees in an SMU.

3. Any detainee who represents an immediate, significant threat to safety, security or good order shall be immediately controlled by staff and, if cause exists and supervisory approval granted, placed in administrative segregation. ICE and the detainee shall be immediately provided a copy of the administrative segregation order describing the reasons for the detainee's placement in the SMU. The attorney of record shall be notified of the administrative segregation order within 24 hours.

4. Administrative segregation may also be available to detainees for the purpose of providing "protective custody." A detainee shall be placed in "protective custody" status in administrative segregation only when there is documentation and supervisory approval that it is necessary to protect a detainee from harm and that no reasonable alternatives are available.

5. A detainee shall be placed in disciplinary segregation only after a finding by a disciplinary hearing panel that the detainee is guilty of a prohibited act or rule violation classified at a "greatest," "high" or "high-moderate" level, as defined in "Appendix 3.1.A: Prohibited Acts and Sanctions," found in "3.1 Disciplinary System."

6. Health care personnel shall be immediately

GEO-MEN 00064169

informed when a detainee is admitted to an SMU and shall conduct an assessment and review of the detainees medical and mental health status and care needs. Health care personnel shall at a minimum conduct a daily assessment of detainees in an SMU. Where reason for concern exists, a qualified medical, or mental health professional shall conduct a complete evaluation.

7. Detainees with serious mental illness may not be automatically placed in an SMU on the basis of such mental illness. Every effort shall be made to place detainees with serious mental illness in a setting in or outside of the facility in which appropriate treatment can be provided, rather than an SMU, if separation from the general population is necessary

8. The status of detainees in SMUs shall be reviewed by supervisory staff in accordance with required time schedules, and the results of those reviews shall be documented.

9. A detainee shall remain in disciplinary segregation for no more than 30 days per violation, and his/her status shall be reviewed by the facility administrator and the Field Office Director after the first 30 days and each 30 days thereafter, to determine whether continued detention in disciplinary segregation is warranted.

10. Detainees in SMU shall be afforded basic living conditions that approximate those provided to the general population, consistent with the safety and security considerations that are inherent in more controlled housing, and in consideration of the purpose for which each detainee is segregated.

11. In general, when a detainee in an SMU is deprived of any usually authorized items or activity, a report of the action shall be forwarded to the facility administrator for notice and review.

12. Detainees in SMU shall have regular access to supervisory, management, program and health care staff.

13. Each detainee in an SMU shall be offered individual recreation or appropriate group recreation time, unless documented security, safety, or medical considerations dictate otherwise.

14. Detainees in SMU shall be able to write, send and receive mail and correspondence as they would otherwise be able to do while detained within the general population.

15. Detainees in SMU shall be provided opportunities for general visitation, including legal visitation, unless there are substantial, documented reasons for withholding those privileges.

16. Detainees in SMU shall have access to personal legal materials, law library materials and legal visits, in accordance with provisions in the PBNDS.

17. Detainees in SMU shall have access to telephones, in accordance with provisions in the PBNDS.

18. Detainees in SMU shall have access to programs and services such as commissary, library, religious guidance and recreation, in accordance with provisions in the PBNDS.

19. Detailed records shall be maintained on the circumstances related to a detainee's confinement to the SMU, through required permanent SMU logs and individual detainee records.

20. The applicable content and procedures in this standard shall be communicated to the detainee in a language or manner the detainee can understand.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Special Management Unit (Administrative Segregation)" and "Special Management Unit (Disciplinary Segregation)," both dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-44 through 2A-66.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.4 Facility Security and Control";
- "2.6 Hold Rooms in Detention Facilities";
- "2.10 Searches of Detainees";
- "2.13 Staff-Detainee Communication";
- "3.1 Disciplinary System";"
- "4.5 Personal Hygiene";
- "4.6 Significant Self-harm and Suicide Prevention and Intervention";
- "5.1 Correspondence and Other Mail";
- "5.4 Recreation";
- "5.6 Telephone Access";
- "5.7 Visitation"; and

- "6.3 Law Libraries and Legal Material."

## V. Expected Practices

### A. Placement in Administrative Segregation

Administrative Segregation status is a nonpunitive status in which restricted conditions of confinement are required only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility. For matters of safety and security, staff may have to take immediate action to control a detainee, including placement in administrative segregation.

Detainees in administrative segregation shall not be commingled with detainees in disciplinary segregation.

Each facility shall develop and follow written procedures, consistent with this standard, governing the management of its administrative segregation unit. These procedures must document detailed reasons for placement of an individual in administrative segregation. Detainees must be provided a copy of the administrative segregation order.

Prior to the detainee's placement in administrative segregation, the facility administrator or designee shall review the case to determine whether administrative segregation is in fact warranted. The facility administrator may delegate to a supervisor the authority to place a detainee in administrative segregation.

### 1. Reasons for Placement in Administrative Segregation

A detainee may be placed in administrative segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees; for the secure and orderly operation of the facility; for

GEO-MEN 00064171

medical reasons; or under other circumstances as set forth below. Some examples of incidents warranting a detainee's assignment to administrative segregation include, but are not limited to, the following.

a. A detainee is awaiting an investigation or a hearing for a violation of facility rules. Pre-disciplinary hearing detention shall be ordered only as necessary to prevent further violation of those rules or to protect the security and orderly operation of the facility.

   1) Pre-disciplinary hearing detention is not to be used as a punitive measure.

   2) Time served in pre-hearing detention may be deducted from any time ordered by the Institutional Disciplinary Panel (IDP).

b. A detainee is a threat to the security of the facility. The facility administrator may determine that a detainee's criminal record, past behavior at other institutions, behavior while in ICE/ERO detention, or other evidence is sufficient to warrant placement of the detainee in administrative segregation. Copies of records supporting this action shall be attached to the administrative segregation order.

c. A detainee requires protection. Protective custody may be initiated at the detainee's request or by staff as needed to protect the detainee from harm. Each facility shall develop procedures to consider continued placement in protective custody as well as provisions for release from protective custody when appropriate. Frequently, the types of detainees who require this type of treatment include, but are not limited to:

   1) victims of detainee assaults;

   2) detainee informants or witnesses (e.g., detainees who provide information to institutional staff or any law enforcement

agency concerning improper or criminal activities by others);

   3) sexual predators or other detainees charged with a heinous or notorious crime;

   4) detainees who have been pressured by other detainees to participate in sexual activity;

   5) detainees who refuse to enter the general population because of alleged intimidation from other detainees;

   6) detainees who refuse to return to the general population, but who do not provide the reason for refusal;

   7) detainees who appear to be in danger of bodily harm;

   8) detainees who seek protection, claiming to be former law enforcement officers or to have held sensitive law enforcement positions, whether or not there is official information to verify the claim; or

   9) detainees who request protective custody.

   Use of administrative segregation to protect vulnerable populations shall be restricted to those instances where reasonable efforts have been made to provide appropriate housing and shall be made for the least amount of time practicable, and when no other viable housing options exist, and as a last resort. Detainees who have been placed in administrative segregation for protective custody shall have access to programs, services, visitation, counsel and other services available to the general population to the maximum extent possible.

d. A detainee is scheduled for release, removal, or transfer within 24 hours. Such segregation may be ordered for security reasons or for the orderly operation of the facility.

GEO-MEN 00064172

e. The IDP may order a detainee into administrative segregation following disciplinary segregation if it determines that releasing the detainee into the general population would pose a threat to the detainee or security and orderly operation of the facility. A detainee transferred from disciplinary segregation to administrative segregation shall enjoy the same privileges as all other detainees in administrative segregation, provided receipt of such privileges poses no threat to the safety, security, or orderly operation of the facility.

f. A medical professional who ordered a detainee removed from the general population shall complete and sign an administrative segregation order (see below), unless the detainee is to stay in the medical department's isolation ward.

## 2. Administrative Segregation Order

A written order shall be completed and approved by the facility administrator or designee before a detainee is placed in administrative segregation, except when exigent circumstances make such documentation impracticable. In such cases, an order shall be prepared as soon as possible.

a. Prior to a detainee's actual placement in administrative segregation, the facility administrator or designee shall complete the administrative segregation order (Form I-885 or equivalent), detailing the reasons for placing a detainee in administrative segregation.

b. In an emergency, the detainee's placement in administrative segregation may precede the paperwork, which the facility administrator or designee shall prepare as soon as possible after the detainee's placement.

c. All memoranda, medical reports and other relevant documents shall be attached to the administrative segregation order.

d. If the segregation is ordered for protective custody purposes, the order shall state whether the detainee requested the segregation, and whether the detainee requests a hearing concerning the segregation.

e. The administrative segregation order shall be immediately provided to the detainee in a language or manner the detainee can understand, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate

f. The order shall remain on file with the SMU until the detainee is returned to the general population.

g. When the detainee is released from the SMU, the releasing officer shall indicate the date and time of release on the administrative segregation order. The completed order shall then be forwarded to the Chief of Security for inclusion in the detainee's detention file.

## 3. Review of Detainee Status in Administrative Segregation

All facilities shall implement written procedures for the regular review of all detainees held in administrative segregation, consistent with the procedures specified below.

a. A supervisor shall conduct a review within 72 hours of the detainee's placement in administrative segregation to determine whether segregation is still warranted.

GEO-MEN 00064173

1) The review shall include an interview with the detainee.

2) A written record shall be made of the decision and the justification. The administrative segregation review (Form I-885) shall be used for the review.

3) If the detainee has been segregated for his/her own protection, but not at the detainee's request, the signature of the facility administrator or assistant facility administrator is required on the Form I-885 to authorize the alien's continued detention.

b. A supervisor shall conduct an identical review after the detainee has spent seven days in administrative segregation, and every week thereafter, for the first 30 days and every 10 days thereafter, at a minimum.

c. The review shall include an interview with the detainee, and a written record shall be made of the decision and its justification.

d. When the reviewing authority concludes that the detainee should be removed from administrative segregation, he/she shall submit that recommendation to the facility administrator (or designee) for approval.

e. A copy of the decision and justification for each review shall be given to the detainee unless, in exceptional circumstances, this provision would jeopardize the facility's safety, security, or orderly operations. The detainee shall also be given an opportunity to appeal a review decision to the facility administrator.

f. After seven consecutive days in administrative segregation, the detainee may exercise the right to appeal the conclusions and recommendations of any review conducted to the facility administrator. The detainee may use any standard form of written communication, for example, a detainee request, to file the appeal.

g. If a detainee has been in administrative segregation for more than 30 days and objects to that status, the facility administrator shall review the case to determine whether that status should continue. This review shall take into account the detainee's views and shall result in a written record of the decision and its justification. A similar review shall take place each 30 days thereafter.

h. When a detainee has been held in administrative segregation for more than 30 days, the facility administrator shall notify the Field Office Director, who shall notify the ICE/ERO Deputy Assistant Director, Detention Management Division in writing.

## B. Placement in Disciplinary Segregation

To provide detainees in the general population a safe and orderly living environment, facility authorities may discipline anyone whose behavior does not comply with facility rules and regulations. Such discipline may involve temporary confinement in the SMU, apart from the general population. A detainee may be placed in disciplinary segregation only by order of the IDP, or its equivalent, after a hearing in which the detainee has been found to have committed a prohibited act and only when alternative dispositions may inadequately regulate the detainee's behavior.

### 1. Duration

The maximum sanction is 30 days in disciplinary segregation per violation, except in extraordinary circumstances, such as violations of offense 101 through 109 listed in the "Greatest" offense category in Appendix 3.1.A. After the first 30 days, and each 30 days thereafter, the facility administrator shall send a written justification for the continued segregation to the Field Office

GEO-MEN 00064174

Director.

### 2. Disciplinary Segregation Order

A written order shall be completed and signed by the chair of the IDP (or disciplinary hearing officer) before a detainee is placed into disciplinary segregation.

a. Prior to a detainee's actual placement in disciplinary segregation, the IDP chairman shall complete the disciplinary segregation order (Form I-883 or equivalent), detailing the reasons for placing a detainee in disciplinary segregation. All relevant documentation must be attached to the order.

b. The completed disciplinary segregation order shall be immediately provided to the detainee in a language or manner the detainee can understand, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

The order shall remain on file with the SMU until the detainee is returned to the general population.

c. When the detainee is released from the SMU, the releasing officer shall indicate the date and time of release on the disciplinary segregation order. The completed order shall then be forwarded to the Chief of Security for inclusion in the detainee's detention file.

### 3. Review of Detainee Status in Disciplinary

### Segregation

All facilities shall implement written procedures for the regular review of all disciplinary segregation cases, consistent with the following procedures:

a. A security supervisor, or the equivalent, shall interview the detainee and review his/her status in disciplinary segregation every seven days to determine whether the detainee:

1) Abides by all rules and regulations; and,

2) Is provided showers, meals, recreation and other basic living standards, as required by this detention standard.

b. The supervisor shall document his/her findings after every review, by completing a disciplinary segregation review (Form I-887).

1) The supervisor may recommend the detainee's early release from the SMU upon finding that time in disciplinary segregation is no longer necessary to regulate the detainee's behavior.

2) An early-release recommendation must have the facility administrator's approval before the detainee may be returned to the general population. In conducting this review, the facility administrator will consider any request by the detainee to present written evidence or available witnesses. The review shall take into account the detainee's views.

3) The supervisor may shorten, but not extend, the original sanction.

4) All review documents shall be placed in the detainee's detention file.

5) After each formal review, the detainee shall be given a written copy of the reviewing officer's decision and the basis for his/her finding, unless such a copy may result in a compromise of institutional security. If a

GEO-MEN 00064175

written copy cannot be delivered, the detainee shall be advised of the decision orally, and the detention file shall so note, identifying the reasons why the notice was not provided in writing.

c. The facility administrator and the Field Office Director shall review the status of a detainee in disciplinary segregation after the first 30 days of segregation, and each 30 days thereafter, to determine whether continued detention in disciplinary segregation is warranted.

## C. Logs and Records

### 1. Permanent SMU Log

A permanent log shall be maintained in the SMU to record all activities concerning SMU detainees (e.g., meals served, recreational time, visitors, etc.).

The SMU log shall record the detainee's name, A-number, housing location, date admitted, reasons for admission, status review dates, tentative release date (for detainees in disciplinary segregation), the authorizing official, and date released. These logs shall also be used by supervisory staff and other officials to record their visits to the unit.

### 2. Visitors' Log

A separate log shall be maintained in the SMU of all persons visiting the unit. This separate record shall include notation of:

a. the time and date of the visit, and

b. any unusual activity or behavior of an individual detainee, with a follow-up memorandum sent through the facility administrator to the detainee's file.

### 3. Special Management Housing Unit Record

The Special Management Housing Unit Record or comparable form shall be prepared immediately upon the detainee's placement in the SMU.

a. The special housing unit officer shall immediately record:

1) whether the detainee ate, showered, recreated and took any medication; and

2) any additional information, such as whether the detainee has a medical condition, or has exhibited suicidal/assaultive behavior.

3) the officer that conducts the activity shall print his/her name and sign the record.

b. The facility medical officer shall sign each individual's record when he/she visits a detainee in the SMU. The housing officer shall initial the record after the medical visits are completed, but no later than the end of the shift.

c. A new form must be created for each week the detainee is in the SMU. The completed weekly forms shall be retained at the SMU until the detainee is released from the SMU.

d. Upon a detainee's release from the SMU, the releasing officer shall attach that detainee's entire housing unit record to either the administrative segregation order or disciplinary segregation order and forward it to the Chief of Security or equivalent for inclusion into the detainee's detention file.

## D. Basic Requirements for All Special Management Units

Conditions of confinement are based on the amount of supervision required to control a detainee and to safeguard the detainee, other detainees and facility staff.

***Detainees must be evaluated by a medical professional prior to placement in an SMU.*

In every instance, any exceptions to these requirements shall be:

1. made only for the purpose of ensuring detainee

GEO-MEN 00064176

and facility staff safety and security (i.e., not for purposes of punishment);

2. approved by a supervisor (or higher official);

3. on a temporary and situational basis, continued only for as long as it is justified by threat to the safety or security of the facility, its staff, or detainee population; and

4. documented in the Permanent SMU Unit log and, under circumstances specified later in this detention standard, documented in a memo which shall be placed in the individual detainee's detention file.

When a detainee in an SMU is deprived of any usual authorized items or activity, a report of the action shall be forwarded to the facility administrator for review. This report shall be made part of the detainee's detention file.

## E. Translation/Interpretation Services

Detainees shall be provided translation or interpretation services while in the SMU, to assist with their understanding of the reason and conditions of confinement as well as their rights and responsibilities while in confinement.

## F. Special Needs

Detainees in the SMU shall be provided appropriate accommodations and professional assistance for special conditions as needed (e.g., medical, therapeutic, or mental health treatment), on an equal basis as those in the general population.

## G. Control of Contraband and Tools

In accordance with procedures detailed in standard "2.4 Facility Security and Control," each facility administrator is required to establish written policy and procedures to control and secure SMU entrances, contraband, tools and food carts.

## H. Cell Occupancy

Ordinarily, the number of detainees confined to each cell or room may not exceed the capacity for which it was designed. Under exigent circumstances, before approving any additional cell occupancy on a temporary basis, the facility administrator shall consult with ICE/ERO Detention Management Division, who shall consult with DHS/ICE legal counsel. If a decision is made to approve such additional cell occupancy, a report of the action shall be filed with the facility and with the Field Office Director.

## I. Cell Condition

Cells and rooms used for purposes of segregation must be well ventilated, adequately lit, appropriately heated/cooled and maintained in a sanitary condition at all times in accordance with the standards for general population, consistent with safety and security.

1. All SMU cells must be equipped with beds that are securely fastened to the cell floor or wall. SMU cells must also be conducive to maintaining a safe and secure environment for all detainees, with particular emphasis on allowing for full visibility and appropriate observation by staff and wherever possible on eliminating potential safety hazards such as sharp edges and anchoring devices.

2. Conditions for close observation in a "dry cell" without water are detailed in standard "2.10 Searches of Detainees."

## J. Personal Property

Each facility shall issue guidelines in accordance with this standard concerning the property detainees may retain in each type of segregation. Generally, detainees in disciplinary segregation shall be subject to more stringent personal property restrictions and control than those in administrative segregation, given the non-punitive nature of administrative

GEO-MEN 00064177

segregation.

## K. Privileges

Each facility shall issue guidelines in accordance with this standard concerning the privileges detainees may have in each type of segregation.

### 1. Administrative Segregation

Generally, these detainees shall receive the same privileges available to detainees in the general population, consistent with any safety and security considerations for detainees, facility staff and security.

When space and resources are available, detainees in administrative segregation may be provided opportunities to spend time outside their cells (in addition to the required recreation periods), for such activities as socializing, watching TV and playing board games, and may be assigned to work details (e.g., as orderlies in the SMU).

### 2. Disciplinary Segregation

Generally, these detainees shall have fewer privileges than other detainees in either the general population or in administrative segregation. More specifically, they are subject to more stringent personal property control including, but not limited to, limitations on their reading material and television viewing (which may be completely terminated), and restricted commissary or vending machine purchases.

## L. Close Supervision

Detainees in SMU shall be personally observed and logged at least every 30 minutes on an irregular schedule. For cases that warrant increased observation, the SMU personnel shall personally observe detainees accordingly. (See also standard "4.6 Significant Self-harm and Suicide Prevention and Intervention" and the "Dry Cells" section in standard "2.10 Searches of Detainees.")

## M. Supervisory and Staff Visits

In addition to the direct supervision performed by unit staff:

1. The shift supervisor shall see each segregated detainee daily, including on weekends and holidays.

2. The facility administrator (or designee) shall visit each SMU daily.

3. Program staff may visit a detainee upon his/her request.

The facility administrator may require other staff to visit each detainee daily.

## N. Health Care

Health care personnel shall conduct face-to-face medical assessments at least once daily for detainees in an SMU. Where reason for concern exists, assessments shall be followed up with a complete evaluation by a qualified medical or mental health professional, and indicated treatment.

Detainees with serious mental illness may not be automatically placed in an SMU on the basis of such mental illness. Every effort shall be made to place detainees with serious mental illness in a setting in or outside of the facility in which appropriate treatment can be provided, rather than an SMU, if separation from the general population is necessary.

Medical visits shall be recorded on the SMU housing record or comparable form, and any action taken shall be documented in a separate logbook. A detainee's mental health status shall be reviewed and documented at least once every 30 days.

## O. Meals

Detainees in SMU shall be provided three nutritionally adequate meals per day, according to the general population meal schedule and ordinarily

GEO-MEN 00064178

from the same menu.  Deviation from meals served to the general population must be documented, including an explanation as to why SMU did not receive the same meal.

## P. Clothing and Personal Hygiene

In accordance with standard "4.5 Personal Hygiene," detainees in SMU may shave and shower at least three times weekly and receive other basic services such as laundry, hair care, barbering, clothing, bedding and linen equivalent to general population detainees and consistent with safety and security of the facility.

1. As needed, staff shall provide toilet tissue, a wash basin, tooth brush and shaving utensils, and may issue retrievable kits of toilet articles.

2. A detainee may be denied such items as clothing, mattress, bedding, linens, or pillow for medical or mental health reasons if his/her possession of such items raises concerns for detainee safety and/or facility security.

   a. All denials of such items shall be documented.

   b. If a detainee is so disturbed that he/ she is likely to destroy clothing or bedding, or create a disturbance by risking harm to self or others, the medical department shall be notified immediately and a regimen of treatment and control shall be instituted by the medical staff, as necessary.

   c. Extreme detainee behavior, such as destroying clothing or bedding or harmful behavior to self or others, must be documented, made part of the detainee's file with the facility, and reported to the Field Office Director to implement necessary efforts to protect and care for the detainee.

## Q. Correspondence

In accordance with standard "5.1 Correspondence and Other Mail," detainees in an SMU may write, send and receive letters and other correspondence, in a manner similar to those housed in the facility's general population.

## R. Visitation

In accordance with standard "5.7 Visitation," while in an SMU, a detainee ordinarily retains visiting privileges.

Segregated detainees may ordinarily use the visiting room during normal visiting hours. However, the facility may restrict or disallow visits for a detainee who violates visitation rules or whose behavior otherwise indicates the detainee would be a threat to the security or the good order of the visiting room.

1. Visitation may be restricted or disallowed when a detainee in administrative segregation is charged with, or has been found to have committed a prohibited act related to visiting privileges, or has otherwise acted in a way that would reasonably indicate that he/she would be a threat to the orderliness or security of the visiting room.

2. Under no circumstances may detainees participate in visitation while in restraints. If the detainee's behavior warrants restraints, the visit may not be granted under general population visiting conditions.

3. Where visits are restricted or disallowed, a report shall be filed with the facility administrator and ICE/ERO, and made part of the detainee's file.

4. Detainees in protective custody, and violent and disruptive detainees, shall not use the visitation room during normal visitation hours. In cases in which a visit would present an unreasonable security risk, visits may be disallowed for a particular detainee.

GEO-MEN 00064179

## S. Legal Visits

In accordance with standard "5.7 Visitation," detainees in SMU may not be denied legal visitation. However, the facility administrator or designee may implement whatever security precautions are necessary to protect the detainee and visitors and maintain good order. In such cases, staff shall advise legal service providers and assistants of any security concerns as soon as possible.

## T. Religious Guidance

In accordance with standard "5.5 Religious Practices," detainees in an SMU shall be permitted to participate in religious practices, consistent with the safety, security, and orderly operation of the facility.

Detainees in an SMU shall be allowed visits by members of the clergy or other religious service providers, upon request, unless the supervisor determines that such a visit presents a safety or security risk or would interfere with the orderly operation of the facility. Violent or uncooperative detainees may be temporarily denied access to religious guidance. Staff shall advise the religious service provider of the detainee's present state of behavior before he/she agrees to visit the detainee.

Each facility shall develop procedures to allow detainees to retain religious items within their possession (e.g., religious wearing apparel, religious headwear, prayer rugs, beads, prayer rocks, medallions) consistent with good security practices. (See also standard "5.5 Religious Practices").

## U. Reading Materials (Non-Legal)

Detainees in SMU shall have access to reading materials, including religious materials. The Recreation Specialist shall offer each detainee soft-bound, reading materials of this type on a rotating

basis.

## V. Legal Materials

Detainees in SMU shall have access to legal materials in accordance with standard "6.3 Law Libraries and Legal Material."

Detainees may retain all personal legal material upon admittance to an SMU, provided such material does not create a safety, security, or sanitation hazard.

Detainees with a large amount of personal legal material may be required to place a portion with their stored personal property, with access permitted during scheduled hours. Requests for access to such legal material shall be accommodated as soon as possible, but in no case more than 24 hours after receipt of the initial detainee request to retrieve documents, except in the event of documented security reasons.

## W. Law Library and Legal Rights Group Presentations Access

In accordance with standard "6.3 Law Libraries and Legal Material," detainees housed in administrative segregation or disciplinary segregation units shall have the same law library access as the general population, unless compelling security concerns require limitations.

1. Facilities may supervise the library use of a detainee housed in an SMU as warranted by the individual's behavior.  Violent or uncooperative detainees may be temporarily denied access to the law library if necessary to maintain security, until such time as their behavior warrants resumed access. In some circumstances, legal material may be brought to individuals in disciplinary segregation.

2. Detainees segregated for protection must be provided access to legal materials. Such

GEO-MEN 00064180

detainees may be required to use the law library separately or, if that is not feasible, legal materials must be brought to them, upon request.

3. Denial of access to the law library must be:

   a. supported by compelling security concerns;

   b. for the shortest period required for security; and

   c. fully documented in the SMU housing logbook.

The facility administrator shall notify ICE/ERO every time access is denied, with documentation placed in the detention file.

In accordance with standard "6.4 Legal Rights Group Presentations," facility staff and/or ICE/ERO shall notify detainees in segregation in advance of legal rights group presentations and provide these detainees an opportunity to attend. Group legal rights presentations shall be open to all detainees, including detainees in SMUs, except when a particular detainee's attendance may pose a security risk. If a detainee in segregation cannot attend for this reason, designated facility staff shall make alternative arrangements to offer a separate presentation and individual consultation to the detainee, if the detainee or the presenter so requests.

## X. Recreation

Recreation for detainees housed in the SMU shall be separate from the general population. As necessary or advisable to prevent assaults and to reduce management problems, recreation for some individuals shall be solitary and shall occur separate from all other detainees. In accordance with standard "5.4 Recreation":

1. Detainees in the SMU for administrative reasons shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least seven days per week.

Detainees in the SMU for disciplinary reasons shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least five days per week.

*\*\*Detainees in the SMU for administrative reasons shall be offered at least two hours of exercise per day, seven days a week, unless documented security, safety or medical considerations dictate otherwise.*

*\*\*Detainees in the SMU for disciplinary reasons shall be offered at least one hour of exercise per day, seven days a week, unless documented security, safety or medical considerations dictate otherwise.*

2. Where cover is not provided to mitigate inclement weather, detainees shall be provided weather-appropriate equipment and attire

3. The recreation privilege shall be denied or suspended only if the detainee's recreational activity may unreasonably endanger safety or security:

   a. A detainee may be denied recreation privileges only with the facility administrator's written authorization, documenting why the detainee poses an unreasonable risk even when recreating alone. However, when necessary to control an *immediate* situation for reasons of safety and security, SMU staff may deny an instance of recreation, upon verbal approval from the shift supervisor, and shall document the reasons in the unit logbook(s). The supervisor may also require additional written documentation from the SMU staff for the facility administrator. When a detainee in an SMU is deprived of recreation (or any usual authorized items or activity), a written report of the action shall be forwarded to the facility administrator. Denial of recreation must be

GEO-MEN 00064181

evaluated daily by a shift supervisor.

b. A detainee in disciplinary segregation may temporarily lose recreation privileges upon a disciplinary panel's written determination that he/she poses an unreasonable risk to the facility, himself/herself, or others.

c. When recreation privileges are suspended, the disciplinary panel or facility administrator shall provide the detainee written notification, including the reason(s) for the suspension, any conditions that must be met before restoration of privileges, and the duration of the suspension provided the requisite conditions are met for its restoration.

d. The denial of recreation privileges shall be included as part of the regular reviews required for all detainees in SMU status.  In accordance with SMU procedures, and using the forms required by this standard, the reviewer(s) shall state, in writing, whether the detainee continues to pose a threat to self, others, or facility security and, if so, why.

e. Denial of recreation privileges for more than seven days requires the concurrence of the facility administrator and a health care professional. It is expected that such denials shall rarely occur, and only in extreme circumstances.

f. The facility shall notify the Field Office Director in writing when a detainee is denied recreation privileges in excess of seven days.

## Y. Telephone Access

As detailed in standard "5.6 Telephone Access," detainees in SMU shall have access to telephones in a manner that is consistent with the special safety and security requirements of such units. Detainees shall be permitted to place calls to attorneys, other legal representatives, courts, government offices (including the DHS Office of the Inspector General, DHS Office for Civil Rights and Civil Liberties, ICE/OPR Joint Intake Center, and embassies or consulates, according to the facility schedule. Any denial of telephone access shall be documented.

In general, any detainee in an SMU may be reasonably restricted from using or having access to a phone if that access is used for criminal purposes or would endanger any person, or if the detainee damages the equipment provided. In such instances, staff must clearly document why such restrictions are necessary to preserve the safety, security and good order of the facility. Detainees in disciplinary segregation may be restricted, as part of the disciplinary process, from using telephones to make general calls. However, even in disciplinary segregation, detainees shall have telephone access for special purposes.

GEO-MEN 00064182

# 3.1 Disciplinary System

## I. Purpose and Scope

This detention standard promotes a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system, requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions to those who do not comply.

This detention standard applies to the following types of facilities housing ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall be informed of facility rules and regulations, prohibited acts, disciplinary sanctions that may be imposed, their rights in the disciplinary system and the procedure for appealing disciplinary findings.

2. Each facility shall have graduated severity scales of prohibited acts and disciplinary consequences.

3. Where permitted by facility policy, staff shall informally settle minor transgressions through mutual consent, whenever possible.

4. Staff who have reason to suspect that a detainee has engaged in a prohibited act or who witness a prohibited act that cannot or should not be resolved informally, shall prepare a clear, concise and complete incident report.

5. Each Incident Report shall be objectively and impartially investigated and reported, ordinarily by a person of supervisory rank.

6. A serious incident that may constitute a criminal act shall be referred to the proper investigative agency as appropriate, and administrative investigations shall be suspended pending the outcome of that referral.

7. At each step of the disciplinary and appeal process, the detainee shall be advised in writing of his/her rights in a language he/she understands, and translation or interpretation services shall be provided as needed.

8. If any staff at any stage of the disciplinary process has reason to believe that the detainee is mentally ill or mentally incompetent, the facility shall provide for an assessment by qualified medical personnel.

9. A Unit Disciplinary Committee (UDC) shall further investigate and adjudicate the incident and may impose minor sanctions or refer the matter to a higher level disciplinary panel.

10. An Institution Disciplinary Panel (IDP) shall conduct formal hearings on Incident Reports referred from UDCs and may impose higher level sanctions for "greatest" and "high" level prohibited acts.

11. Detainees before the IDP shall be afforded a

GEO-MEN 00064209

staff representative, upon request, or automatically if the detainee is illiterate, has limited English language skills or otherwise needs special assistance.

12. Actions of the IDP shall be reviewed by the facility administrator, who may concur with the findings and sanctions or modify them.

13. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

14. All steps of the disciplinary process shall be performed within the required time limits.

15. At all steps of the disciplinary process, accurate and complete records shall be maintained. The detainee shall receive copies of all reports, exhibits and other documents considered or generated in the hearing process, except insofar as the disclosure of such documents may pose an imminent threat to the safety, security and orderly conduct of the facility staff or other detainees, or if the document or other evidence is otherwise protected from disclosure.

16. If a detainee is found not guilty at any stage of the disciplinary process, the incident records shall not be placed or retained in the detainee's file, even if these records are retained elsewhere for statistical or historical purposes.

17. Detainees shall be allowed to appeal disciplinary decisions through a formal grievance system. No staff member shall harass, discipline, punish or otherwise retaliate against any detainee for filing a complaint or grievance.

18. Detainees shall be afforded rights including, but not limited to, the following: the right to protection from abuse; the right to freedom from discrimination; the right to pursue a grievance;

the right to correspond with persons or organizations; and the right to due process.

19. The applicable content and procedures in this standard shall be communicated to the detainee in a language or manner the detainee can understand.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Disciplinary Policy" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-3A-01, 3A-02, 6B-05, 6C-01 through 6C-19.

## V. Expected Practices

### A. Guidelines

1. Detainees shall receive translation or interpretation services, including accommodation for the hearing impaired, throughout the investigative, disciplinary and appeal process.

2. Each facility holding ICE/ERO detainees in custody shall have a detainee disciplinary system with progressive levels of reviews, appeals, procedures and documentation procedures. Written disciplinary policy and procedures shall clearly define detainee rights and

GEO-MEN 00064210

responsibilities. The policy, procedures and rules shall be reviewed annually at a minimum.

3. Disciplinary action may not be capricious or retaliatory nor based on race, religion, national origin, gender, sexual orientation, disability or political beliefs.

4. Staff may not impose or allow imposition of the following sanctions: corporal punishment; deprivation of food services, to include use of Nutraloaf or "food loaf"; deprivation of clothing, bedding or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal access and legal materials; or deprivation of indoor or outdoor recreation, unless such activity would create a documented unsafe condition within the facility. Any sanction imposed shall be approved by the facility administrator and reviewed by the Field Office Director.

5. The facility shall not hold a detainee accountable for his/her conduct if a medical authority finds him/her mentally incompetent. For purposes of these standards, a mentally incompetent individual is defined as an individual who is unable to appreciate the difference between appropriate and inappropriate behavior, or between "right" and "wrong." Such an individual is not capable of acting in accordance with those norms and therefore, cannot be held responsible for his/her "wrongful" actions

6. A person who cannot assist in his/her own defense because he/she lacks the ability to understand the nature of the disciplinary proceedings, as determined by a medical authority, shall be considered incompetent. Disciplinary proceedings against such a detainee shall be postponed until such time as the detainee is able to understand the nature of the disciplinary proceedings and to assist in his/her own defense. If the detainee's mental status does not improve within a reasonable amount of time, the officer must find the detainee incompetent to assist in his/her own defense, and note such finding on the Incident Report.

## B. Notice to Detainees

The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of the facility's rules of conduct and prohibited acts, the sanctions imposed for violations of the rules, the disciplinary severity scale, the disciplinary process and the procedure for appealing disciplinary findings. Detainees shall have the following rights and shall receive notice of them in the handbook:

1. The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage and harassment;

2. The right of freedom from discrimination based on race, religion, national origin, gender, sexual orientation, physical or mental ability, or political beliefs;

3. The right to pursue a grievance in accordance with procedures provided in the detainee handbook, without fear of retaliation;

4. The right to pursue a grievance in accordance with standard "6.2 Grievance System" and procedures provided in the detainee handbook.

5. The right to correspond with persons or organizations, consistent with safety, security and the orderly operation of the facility; and

6. The right to due process, including the prompt resolution of a disciplinary matter.

Copies of the rules of conduct, rights and disciplinary sanctions shall be provided to all detainees and posted in English, Spanish, and other languages spoken by significant segments of the population with limited English proficiency. Copies

GEO-MEN 00064211

to be provided and posted are as follows:

1. Disciplinary Severity Scale;

2. Prohibited Acts; and

3. Sanctions.

## C. Disciplinary Severity Scale and Prohibited Acts

All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.

*Prohibited acts are divided into four categories: "greatest," "high," "moderate" and "low moderate." The sanctions authorized for each category shall be imposed only if the detainee is found to have committed a prohibited act (see "Appendix 3.1.A: Offense Categories").*

### 1. Greatest Offenses

*The IDP shall impose and execute at least one sanction in the A through E range. Additional sanctions (A through G) may be imposed and either executed or suspended, at the discretion of the panel. The IDP may impose and execute sanctions F and G only in conjunction with sanction A, B, C, D, and/or E.*

### 2. High Offenses

*The IDP shall impose and execute at least one sanction in the A through M range. Additional sanctions (A through M) may be imposed or may be suspended at the discretion of the panel.*

### 3. High Moderate Offenses

*The IDP shall impose at least one sanction in the A through M range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.*

### 4. Low Moderate Offenses

*The IDP shall impose at least one sanction in the E through M range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.*

## D. Incident Reports

Officers who witness a prohibited act, or have reason to suspect one has been committed, shall prepare and submit an Incident Report. All Incident Reports must state facts clearly, precisely and concisely, omitting no details that may prove significant. Reports also shall identify the officer(s), the detainee(s) and all witnesses to the incident.

Minor transgressions shall be settled informally and by mutual consent whenever possible. If however the officer involved thinks an informal resolution is inappropriate or unattainable, he or she shall prepare an Incident Report and submit it to the appropriate supervisor before the end of the assigned shift.

ICE/ERO pre-approval is required for use of ICE Incident Report forms in CDFs and IGSA facilities.

*The Incident Report shall cite the relevant rule or standard without quoting it in its entirety. (For example, in the event of destruction of government property, the report shall cite, briefly, "Code 218— Destroying Government Property," specify the exact manner in which the detainee is alleged to have violated the cited rule or standard, and include all relevant facts such as time, dates and places.)*

*If the officer observes anything unusual in the detainee's behavior or demeanor, he/she shall so note in the report. The reporting officer shall also list all staff, contract officers, and/or detainee witnesses to the incident and the disposition of any physical evidence (e.g., weapons, property, etc.) relating to the incident. The reporting officer shall*

GEO-MEN 00064212

*sign the report and include title, date and time the report was signed. The shift supervisor shall review all Incident Reports before going off duty.*

## E. Investigations

IGSAs shall have procedures in place to ensure that all Incident Reports are investigated within 24 hours of the incident.

The investigating officer must have supervisory rank or higher (unless prevented by personnel shortages) and shall have had no prior involvement in the incident, as either witness or officer at the scene. If an officer below supervisory rank conducts the investigation, the shift supervisor shall review his/her report(s) for accuracy and completeness and sign them.

The investigating officer shall:

1. Commence the investigation within 24 hours of receipt of the Incident Report.

2. Advise the detainee of his/her right to remain silent at every stage of the disciplinary process, and ensure that he/she has a complete listing of detainee rights.

3. Provide the detainee a copy of the Incident Report and notice of charges at least 24 hours before the start of any disciplinary proceedings.

4. Terminate the administrative investigation, if the incident is under investigation on different grounds (i.e., the prohibited act is under criminal investigation), unless and until the agency with primary jurisdiction concludes its investigation or indicates it shall not pursue the matter.

   Contraband that may be evidence in connection with a violation of a criminal statute shall be preserved, inventoried, controlled and stored so as to maintain and document the chain of custody. Contraband shall be reported to the appropriate law enforcement authority for action

and possible seizure and prosecution. See "Preservation of Evidence" in standard "2.10 Searches of Detainees"

5. Advise the detainee in writing of the detainee's right, if applicable, to an initial hearing before the Unit Disciplinary Committee (UDC) within 24 hours of his/her notification of charges.

6. Record personal observances and other potentially material information.

7. Prepare a factual report of the investigation, including the location or disposition of any physical evidence.

8. Forward to the UDC all reports relevant to the disciplinary hearing—but do not provide a copy to the detainee at this stage of the disciplinary process, except for a copy of the Incident Report as instructed in #4 above in this section of this standard.

## F. Unit Disciplinary Committee (UDC)

All facilities shall establish an intermediate level of investigation/adjudication process to adjudicate low or moderate infractions. They shall also ensure that the detainee is afforded all the UDC rights listed below.

The UDC administering unit discipline shall comprise up to three members, at least one of whom is a supervisor. The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident, except in the unlikely event that every available officer witnessed or was directly involved in the incident.

The UDC shall conduct hearings and, to the best extent possible, shall informally resolve cases involving high moderate or low moderate charges in accordance with the list of charges and related sanctions noted as "Appendix 3.1.A: Offense

GEO-MEN 00064213

Categories." Unresolved cases and cases involving serious charges are forwarded to the institution disciplinary panel.

The UDC shall have authority to:

1. conduct hearings and resolve incidents involving high moderate or low moderate charges;

2. consider written reports, statements and physical evidence;

3. hear pleadings on the part of the detainee;

4. make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence; and

5. impose minor sanctions "E" through "M" in accordance with the table of prohibited acts and associated sanctions later in this document.

The detainee in UDC proceedings shall have the right to:

1. remain silent at any stage of the disciplinary process;

2. due process, which includes:

   a. attending the entire hearing (excluding committee deliberations);

   b. waiving the right to appear; or

   c. having a UDC hearing within 24 hours after the conclusion of the investigation.

   If security considerations prevent detainee attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process via telephonic testimony, document submission, written statements or questions to be asked of witnesses;

3. Present statements and evidence, including witness testimony on his/her own behalf; and

4. Appeal the committee's determination through the detainee grievance process.

The UDC shall:

1. advise the detainee of his/her rights at the hearing;

2. refer to the IDP any incident involving a serious violation associated with an A-through-D-range sanction. This includes code violations in the "greatest" and "high" categories (100s and 200s);

3. serve the detainee with:

   a. a copy of the UDC decision which must contain the reason for the disposition and sanctions imposed; or

   b. written notification of charges and hearing before the IDP; and

4. if the detainee's case is being referred to the IDP, advise the detainee, in writing, of:

   a. The right to call witnesses and present evidence before the IDP, and

   b. The right to a staff representative before the IDP.

## G. Staff Representation for the IDP

The facility administrator shall upon the detainee's request, assign a staff representative to help prepare a defense prior to the commencement of the IDP. This help shall be automatically provided for detainees who are illiterate, have limited English-language skills, or who are without means of collecting and presenting essential evidence. Detainees shall also have the option of receiving assistance from another detainee of their selection rather than a staff representative, subject to approval from the facility administrator.

1. *A staff representative must be a full-time employee.*

GEO-MEN 00064214

2. *Because of the potential conflict of interest, the facility administrator, members of the IDP and of the UDC initially involved in the case, eyewitnesses, the reporting and investigating officers and anyone else with a stake in the outcome shall not act as staff representative.*

3. *The detainee may select his/her staff representative, barring those identified in paragraph 2 above.*

4. *The IDP shall arrange for the presence of the staff representative selected by the detainee. If that staff member declines or is unavailable, the detainee may:*

   a. *select a different representative;*

   b. *wait for the unavailable staff member to become available (within a reasonable period); or*

   c. *proceed without a staff representative.*

5. *A staff member who declines to serve must state the reason on the staff representative form.*

6. *If several staff decline, the facility administrator shall assign one.*

7. *The staff representative shall be free to speak to witnesses and to present evidence on the detainee's behalf, including evidence of any mitigating circumstances. The staff representative must act in good faith on behalf of the charged detainee, and interview witnesses and obtain documentary evidence as requested by the detainee or as otherwise reasonably seen as relevant to the defense of the charges or in mitigation of the charges.*

8. *The IDP shall allow the staff representative enough time to speak with the detainee and interview witnesses prior to commencement of the proceeding. The IDP may grant a request for extension of time if required for an adequate defense.*

9. *The IDP shall establish the reliability of information provided by a confidential source before considering it in the disciplinary proceedings.*

10. *The IDP may withhold the confidential source's identity from the staff representative. While the staff representative may challenge the substance of any confidential information the IDP discloses, he/she may not question its reliability (which is pre-established by the IDP).*

11. *In the event that a detainee cannot effectively present his/her own case, the facility administrator shall appoint a staff representative, even if not requested by the detainee.*

## H. Institution Disciplinary Panel

All facilities that house ICE/ERO detainees shall have a disciplinary panel to adjudicate detainee Incident Reports. Only the disciplinary panel may place a detainee in disciplinary segregation.

The term "Institution Disciplinary Panel" or "IDP" refers either to a three-person panel appointed by the facility administrator, or a one-person disciplinary hearing officer, depending on the practice at the facility.

The panel may not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident. Exceptions may occur only if the number of officers required for the panel cannot be filled due their direct involvement in the incident.

The IDP shall have authority to:

1. conduct hearings on all charges and allegations referred by the UDC;

2. call witnesses to testify;

GEO-MEN 00064215

3. consider written reports, statements, physical evidence and oral testimony;

4. hear pleadings by detainee and staff representative;

5. make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence; and

6. impose sanctions as listed and authorized in each category.

The detainee in IDP proceedings shall have the right to:

1. remain silent at any stage of the disciplinary process;

2. due process, which includes:

   a. attending the entire hearing (excluding committee deliberations);

   b. waiving the right to appear; or

   c. having an IDP hearing within 24 hours after the conclusion of the investigation.

      If security considerations prevent the detainee's attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process by telephonic testimony, the submission of documents, written statements or questions to be asked of witnesses;

3. present statements and evidence, including witness testimony, on his/her behalf; and

4. appeal the committee's determination through the detainee grievance process.

The IDP shall:

1. verify that the detainee has been advised of and afforded his/her rights, as provided above in this standard;

2. remind the detainee of his/her right to a staff representative, provide one if requested and verify that a staff representative has been assigned when a representative is requested;

3. advise the detainee of his/her right to waive the hearing and admit having committed the offense;

4. conduct the hearing on the first business day after receiving the UDC referral, unless the detainee waives the 24-hour notification provision and requests an immediate hearing. In cases where a hearing is delayed, the reason(s) must be documented (e.g., a continuing investigation of facts, unavailability of one or more essential witnesses, etc.) and approved by the facility administrator. If the detainee is being held in segregation, the delay shall not exceed 72 hours, barring an emergency;

5. prepare a written record of any hearing. This record must show that the detainee was advised of his/her rights. It must also document the evidence considered by the Panel and subsequent findings and the decision and sanctions imposed, along with a brief explanation;

6. forward the entire record to the facility administrator, who may (a) concur, (b) terminate the proceedings or (c) impose more severe or more lenient sanctions; and

7. serve the detainee with written notification of the decision, which must contain the reason for the decision.

## I. Confidential Information

When a decision relies on information from a confidential source, the UDC or IDP shall disclose as much confidential information as may be disclosed without jeopardizing the safety and security of facility staff and other persons, and shall

GEO-MEN 00064216

include in the hearing record the factual basis for finding the information reliable.

## J. Postponement of Disciplinary Proceedings

All facilities shall permit hearing postponements or continuances under certain circumstances.

Circumstances justifying the postponement or continuance of a hearing might include, but are not limited to: defense preparation, physical or mental illness, security, escape, disciplinary transfer or pending criminal prosecution.

An uncooperative detainee may also cause a delay in the proceedings, either because of inappropriate behavior during the hearing process or a refusal to participate in a productive manner.

## K. Duration of Sanctions

The duration of sanctions shall be within established limits. Neither the panel recommending sanctions nor the facility administrator making the final decision shall impose sanctions arbitrarily, beyond these limits.

1. Sanctions range from the withholding of privilege(s) to segregation. Time in segregation or the withholding of privileges after a hearing shall generally not exceed 30 days per violation, except in extraordinary circumstances, such as violations of offenses 101 through 109 listed in the "Greatest" offense category in Appendix 3.1.A.

2. Time served in segregation pending the outcome of the proceedings may be credited to the number of days to be spent in the segregation unit after an adverse decision is announced.

3. The disciplinary report and accompanying documents are not placed in the file of a detainee who is found not guilty. The facility, however, may retain the material in its own files for

Institution statistical or historical purposes.

4. A detainee shall be removed from segregation if a health care professional concludes that continued segregation is detrimental to the detainee's medical or mental health.

## L. Documents

All documents relevant to the incident, subsequent investigation and hearing(s) shall be completed and distributed in accordance with facility procedures.

### 1. Incident Report/Notice of Charges

The officer shall prepare an Incident Report and submit it to the supervisor immediately after the incident takes place. If the incident is resolved informally, the officer shall so note on the original report, which shall then be forwarded to the Chief of Security.

*If the UDC is to be involved, the supervisor shall serve the detainee with a copy of the Notice of Charges upon completion of the investigation, no less than 24 hours before the UDC hearing.*

*The UDC receives the original copy.*

*If the UDC hears the matter, the ranking member of that committee shall serve the detainee with a copy of the Incident Report/Notice of Charges indicating their decision. The UDC, upon conclusion of its proceedings, shall forward the entire record to either the Chief of Security or the IDP, as appropriate.*

### 2. Investigation Report

*The original shall be submitted to the UDC.*

*The detainee does not receive a copy.*

### 3. UDC Report of Findings and Action

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the detainee detention*

GEO-MEN 00064217

*file (guilty finding only).*

**4. Notice of IDP Hearing**

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the detainee detention file.*

**5. Detainee Rights at IDP Hearing**

*The original shall be served on the detainee after*

*the committee issues its findings.*

*A copy shall be included in the facility detention file.*

**6. IDP Report**

*The original shall be included in the detainee detention file.*

*A copy shall be provided to the detainee.*

GEO-MEN 00064218

# Appendix 3.1.A: Offense Categories

## I. "Greatest" Offense Category

### A. Prohibited Acts

100    Killing

101    Assaulting any person (includes sexual assault)

102    Escape from escort; escape from a secure facility

103    Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of greatest severity [e.g., a riot or an escape]; otherwise the charge is classified as Code 218 or 321)

104    Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, escape tool, device or ammunition

105    Rioting

106    Inciting others to riot

107    Hostage-taking

108    Assaulting a staff member or any law enforcement officer

109    Threatening a staff member or any law enforcement office with bodily harm

*198   Interfering with a staff member in the performance of duties (conduct must be of the greatest severity; this charge is to be used only if another charge of greatest severity is not applicable)

*199   Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the greatest severity; this charge is to be used only if another charge of greatest severity is not applicable)

### B. Sanctions

1.  Initiate criminal proceedings

2.  Disciplinary transfer (recommend)

3.  Disciplinary segregation (up to 60 days)

4.  Make monetary restitution, if funds are available

5.  Loss of privileges (e.g., commissary, vending machines, movies, recreation, etc.)

## II. "High" Offense Category

### A. Prohibited Acts

200    Escape from unescorted activities open or secure facility, proceeding without violence

201    Fighting, boxing, wrestling, sparring and any other form of physical encounter, including horseplay, that causes or could cause injury to another person, except when part of an approved recreational or athletic activity

202    Possession or introduction of an unauthorized tool

203    Loss, misplacement or damage of any restricted tool

204    Threatening another with bodily harm

205    Extortion, blackmail, protection and demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm or avoiding a threat of being informed against

206    Engaging in sexual acts

207    Making sexual proposals or threats

208    Wearing a disguise or mask

209    Tampering with or blocking any lock device

GEO-MEN 00064219

210    *Adulterating of food or drink*

211    *Possessing, introducing, or using narcotics, narcotic paraphernalia or drugs not prescribed for the individual by the medical staff*

212    *Possessing an officer's or staff member's clothing*

213    *Engaging in or inciting a group demonstration*

214    *Encouraging others to participate in a work stoppage or to refuse to work*

215    *Refusing to provide a urine sample or otherwise cooperate in a drug test*

216    *Introducing alcohol into the facility*

217    *Giving or offering an official or staff member a bribe or anything of value*

218    *Giving money to, or receiving money from, any person for an illegal or prohibited purpose (e.g., introducing/conveying contraband)*

219    *Destroying, altering, or damaging property (government or another person's) worth more than $100*

220    *Being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days*

222    *Possessing or introducing an incendiary device (e.g., matches, lighter, etc.)*

223    *Engaging in any act that could endanger person(s) and/or property*

*298    *Interfering with a staff member in the performance of duties (conduct must be of highest severity; this charge is to be used only when no other charge of highest severity is applicable)*

*299    *Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity; this charge is to be used only when no other charge of highest severity is applicable)*

**B. Sanctions**

1.  *Initiate criminal proceedings*

2.  *Disciplinary transfer (recommend)*

3.  *Disciplinary segregation (up to 30 days)*

4.  *Make monetary restitution, if funds are available*

5.  *Loss of privileges (e.g., commissary, vending machines, movies, recreation, etc.)*

6.  *Change housing*

7.  *Remove from program and/or group activity*

8.  *Loss of job*

9.  *Impound and store detainee's personal property*

10.   *Confiscate contraband*

11.   *Restrict to housing unit*

12.   *Warning*

## III. ""High Moderate" Offense Category

**A. Prohibited Acts**

300    *Indecent exposure*

301    *Stealing (theft)*

302    *Misusing authorized medication*

303    *Loss, misplacement or damage of a less restricted tool*

304    *Lending property or other item of value for profit/increased return*

305    *Possessing item(s) not authorized for receipt or retention and not issued through regular channels*

306    *Refusing to clean assigned living area*

GEO-MEN 00064220

307    Refusing to obey the order of a staff member or officer (may be categorized and charged as a greater or lesser offense, depending on the kind of disobedience: continuing to riot is Code 105—Rioting; continuing to fight Code 201—Fighting; refusing to provide a urine sample, Code 215—Refusing to provide a urine sample or otherwise cooperate in a drug test).

308    Insolence toward a staff member

309    Lying or providing false statement to staff

310    Counterfeiting, forging or other unauthorized reproduction of money proceedings or other official document or item (e.g., security document, identification card, etc.); may be categorized as greater or lesser offense, depending on the nature and purpose of the reproduction (e.g., counterfeiting release papers to effect escape—Code 102 or 200).

311    Participating in an unauthorized meeting or gathering

312    Being in an unauthorized area

313    Failing to stand count

314    Interfering with count

315    Making, possessing, or using intoxicant(s)

316    Refusing a breathalyzer test or other test of alcohol consumption

317    Gambling

318    Preparing or conducting a gambling pool

319    Possessing gambling paraphernalia

320    Unauthorized contact with the public

321    Giving money or another item of value to, or accepting money or another item of value from, anyone, including another detainee,
without staff authorization

322    Destroying, altering, or damaging property (government or another person's) worth more than $100

323    Signing, preparing, circulating, or soliciting support for prohibited group petitions

*398    Interfering with a staff member in the performance of duties (offense must be of high moderate severity; this charge to be used only when no other charge in this category is applicable)

*399    Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of high moderate severity; this charge is to be used only when no other charge in this category is applicable)

NOTE: Any combination of high moderate and low moderate offenses during a 90-day period shall constitute a high offense.

B. Sanctions

1. Initiate criminal proceedings

2. Disciplinary transfer (recommend)

3. Disciplinary segregation (up to 72 hours)

4. Make monetary restitution, if funds are available

5. Loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.)

6. Change housing

7. Remove from program and/or group activity

8. Loss of job

9. Impound and store detainee's personal property

10.    Confiscate contraband

11.    Restrict to housing unit

12.    Reprimand

GEO-MEN 00064221

13.   Warning

## IV. ""Low Moderate" Offense Category

### A. Prohibited Acts

400   Possessing property belonging to another person

401   Possessing unauthorized clothing

402   Malingering; feigning illness

403   Smoking where prohibited

404   Using abusive or obscene language

405   Tattooing, body piercing or self-mutilation

406   Unauthorized use of mail or telephone (with restriction or temporary suspension of the abused privileges often the appropriate sanction)

407   Conduct with a visitor in violation of rules and regulations (with restriction or temporary suspension of visiting privileges often the appropriate sanction)

408   Conducting a business

409   Possessing money or currency, unless specifically authorized

410   Failing to follow safety or sanitation regulations

411   Unauthorized use of equipment or machinery

412   Using equipment or machinery contrary to posted safety standards

413   Being unsanitary or untidy; failing to keep self and living area in accordance with posted standards

*498   Interfering with a staff member in the performance of duties (offense must be of low moderate severity; this charge is to be used only when no other charge in this category is applicable)

*499   Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of low moderate severity; this charge is to be used only when no other charge in this category is applicable)

### B. Sanctions

1.  Loss of privileges, commissary, vending machines, movies, recreation, etc

2.  Change housing

3.  Remove from program and/or group activity

4.  Loss of job

5.  Impound and store detainee's personal property

6.  Confiscate contraband

7.  Restrict to housing unit

8.  Reprimand

9.  Warning

GEO-MEN 00064222

# 5.8 Voluntary Work Program

## I. Purpose and Scope

This detention standard provides detainees opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

While not legally required to do so, ICE/ ERO affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

This detention standard applies to the following types of facilities housing ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

2. Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping.

3. Essential operations and services shall be enhanced through detainee productivity.

4. The negative impact of confinement shall be reduced through decreased idleness, improved morale and fewer disciplinary incidents.

5. Detainee working conditions shall comply with all applicable federal, state and local work safety laws and regulations.

6. There shall be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation or disability.

7. The applicable content and procedures in this standard shall be communicated to the detainee in a language or manner the detainee can understand.

   All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

   Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Voluntary Work Program" dated 12/2/2008.

This detention standard incorporates the requirements regarding detainees' assigned to work

GEO-MEN 00064344

outside of a facility's secure perimeter originally communicated via a memorandum to all Field Office Directors from the Acting Director of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) (11/2/2004).

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-5C-06, 5C-08, 5C-11(M), 6B-02.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "1.2 Environmental Health and Safety"; and
- "4.1 Food Service."

## V. Expected Practices

### A. Voluntary Work Program

Detainees who are physically and mentally able to work shall be provided the opportunity to participate in a voluntary work program. The detainee's classification level shall determine the type of work assignment for which he/she is eligible. Generally, high custody detainees shall not be given work opportunities outside their housing units/living areas. Non-dedicated IGSAs will have discretion on whether or not they will allow detainees to participate in the voluntary work program.

### B. Work Outside the Secure Perimeter

ICE detainees may not work outside the secure perimeter of non-dedicated IGSA facilities.

*In SPCs, CDFs, and dedicated IGSAs, low custody detainees may work outside the secure perimeter on facility grounds. They must be directly supervised at a ratio of no less than one staff member to four*

*detainees. The detainees shall be within sight and sound of that staff member at all times.*

### C. Personal Housekeeping Required

Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.

*Detainees are required to maintain their immediate living areas in a neat and orderly manner by:*

1. *making their bunk beds daily;*
2. *stacking loose papers;*
3. *keeping the floor free of debris and dividers free of clutter; and*
4. *refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.*

### D. Detainee Selection

The facility administrator shall develop site-specific rules for selecting work detail volunteers. These site-specific rules shall be recorded in a facility procedure that shall include a voluntary work program agreement. The voluntary work program agreement shall document the facility's program and shall be in compliance with this detention standard.

*The primary factors in hiring a detainee as a worker shall be his/her classification level and the specific requirements of the job.*

1. *Staff shall present the detainee's name to the shift supervisor or the requesting department head.*
2. *The shift supervisor or department head shall review the detainee's classification and other relevant documents in the detainee's detention file.*
3. *The shift supervisor or department head shall*

GEO-MEN 00064345

*assess the detainee's language skills because these skills affect the detainee's ability to perform the specific requirements of the job under supervision. To the extent possible, work opportunities shall be provided to detainees who are able to communicate with supervising staff effectively and in a manner that does not compromise safety and security.*

*4. Inquiries to staff about the detainee's attitude and behavior may be used as a factor in the supervisor's selection.*

*Staff shall explain the rules and regulations as well as privileges relating to the detainee worker's status. The detainee shall be required to sign a voluntary work program agreement before commencing each new assignment. Completed agreements shall be filed in the detainee's detention file.*

## E. Special Details

Detainees may volunteer for temporary work details that occasionally arise. The work, which generally lasts from several hours to several days, may involve labor-intensive work.

## F. Discrimination in Hiring Prohibited

Detainees shall not be denied voluntary work opportunities on the basis of such factors as a detainee's race, religion, national origin, gender, sexual orientation or disability.

## G. Physically and Mentally Challenged Detainees

While medical or mental health restrictions may prevent some physically or mentally challenged detainees from working, those with less severe disabilities shall have the opportunity to participate in the voluntary work program in appropriate work assignments.

1. The selecting official must consider the precise limitations of a disabled individual before rejecting that individual for selected work assignments.

2. Expediency or convenience is insufficient justification to reject or "pigeonhole" a detainee who, with reasonable accommodation, can perform essential functions of the work assignment.

3. In disputed cases, the selecting official shall consult medical personnel to ascertain the detainee's suitability for a given project.

## H. Hours of Work

Detainees who participate in the volunteer work program are required to work according to a schedule.

The normal scheduled workday for a detainee employed full time is a maximum of 8 hours. Detainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly.

Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program.

## I. Number of Details in One Day

The facility administrator may restrict the number of work details permitted a detainee during one day.

*In SPCs, CDFs, and dedicated IGSAs a detainee may participate in only one work detail per day.*

## J. Establishing Detainee Classification Level

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

## K. Compensation

Detainees shall receive monetary compensation for

GEO-MEN 00064346

work completed in accordance with the facility's standard policy.

The compensation is at least $1.00 (USD) per day. The facility shall have an established system that ensures detainees receive the pay owed them before being transferred or released.

## L. Removal of Detainee from Work Detail

A detainee may be removed from a work detail for such causes as:

1. unsatisfactory performance;

2. disruptive behavior, threats to security, etc.;

3. physical inability to perform the essential elements of the job due to a medical condition or lack of strength;

4. prevention of injuries to the detainee; and/or

5. a removal sanction imposed by the Institutional Disciplinary Panel for an infraction of a facility rule, regulation or policy.

When a detainee is removed from a work detail, the facility administrator shall place written documentation of the circumstances and reasons in the detainee detention file.

Detainees may file a grievance to the local Field Office Director or facility administrator if they believe they were unfairly removed from work, in accordance with standard "6.2 Grievance System."

## M. Detainee Responsibility

The facility administrator shall establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

The detainee is expected to be ready to report for work at the required time and may not leave an assignment without permission.

1. The detainee shall perform all assigned tasks diligently and conscientiously.

2. The detainee may not evade attendance and performance standards in assigned activities nor encourage others to do so.

3. The detainee shall exercise care in performing assigned work, using safety equipment and taking other precautions in accordance with the work supervisor's instructions.

4. In the event of a work-related injury, the detainee shall notify the work supervisor, who shall immediately implement injury-response procedures.

## N. Detainee Training and Safety

All detention facilities shall comply with all applicable health and safety regulations and standards.

The facility administrator shall ensure that all department heads, in collaboration with the facility's safety/training officer, develop and institute appropriate training for all detainee workers.

1. The voluntary work program shall operate in compliance with the following codes and regulations:

   a. Occupational Safety and Health Administration (OSHA) regulations;

   b. National Fire Protection Association 101 Life Safety Code; and

   c. International Council Codes (ICC).

   Each facility administrator's designee is responsible for providing access to complete and current versions of the documents listed above.

   The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

2. Upon a detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if

GEO-MEN 00064347

relevant, hazardous materials, including:

a. safety features and practices demonstrated by the supervisor; and

b. recognition of hazards in the workplace, including the purpose for protective devices and clothing provided, reporting deficiencies to their supervisors (staff and detainees who do not read nor understand English shall not be authorized to work with hazardous materials).

A detainee shall not undertake any assignment before signing a voluntary work program agreement that, among other things, confirms that the detainee has received and understood training from the supervisor about the work assignment.

The voluntary work program agreement, which each detainee is required to sign prior to commencing each new assignment, shall be placed in the detainee's detention file.

3. For a food service assignment, medical staff, in conjunction with the U.S. Public Health Service, shall ensure that detainees are medically screened and certified before undertaking the assignment.

4. The facility shall provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5. The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

## O. Detainee Injury and Reporting Procedures

The facility administrator shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/ERO.

If a detainee is injured while performing his/her work assignment:

1. The work supervisor shall immediately notify facility medical staff. In the event the accident occurs in a facility that does not provide 24-hour medical care, the supervisor shall contact the on-call medical officer for instructions.

2. First aid shall be administered as necessary.

3. Medical staff shall determine what treatment is necessary and where that treatment shall take place.

4. The work supervisor shall complete a detainee accident report and submit it to the facility administrator for review and processing and file it in the detainee's detention file and A-file.

GEO-MEN 00064348

# 7.5 Definitions

### A-File, Alien File

The legal file maintained by DHS for each detainee. Contents include but are not limited to the detainee's identification documents (passport, driver's license, other identification cards, etc.), photographs, immigration history, prior criminal record if any, and all documents and transactions relating to the detainee's immigration case.

### ACA

American Correctional Association.

### Administrative Health Authority

The administrative authority is responsible for all access to care, personnel, equipment and fiscal resources to support the delivery of health care services.

### Administrative Segregation

A non-punitive form of separation from the general population used for administrative reasons.  Administrative segregation is available only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility, as determined by a facility administrator or supervisor.  Administrative segregation may be available, among other reasons, for detainees awaiting investigations or hearings for violations of facility rules, detainees scheduled for release, removal, or transfer within 24 hours, and, under more limited circumstances, detainees who require protective custody or separation from the general population for medical reasons.

### Admission/Admissions Process

In-processing of newly arrived detainees, which includes an orientation to the policies, programs, rules and procedures of the facility. Classification, assignment of living quarters, various inspections, medical screening and safeguarding of funds, valuables and other personal property is completed during this process.

### Ambulatory Restraints

"Soft" or "hard" equipment used to restrict a detainee's movement but leaving him or her able to eat, drink or attend to basic bodily functions without staff intervention.

### Ammunition Control Officer (ACO)

An individual who has been designated in writing as the officer responsible for the physical and administrative control of ammunition in the authorizing official's area of accountability.

### Body-cavity Search

The visual inspection or physical probing of body openings (anus, vagina, ears, nose, mouth, etc) where weapons, drugs, or other contraband could be secreted. This is the most intrusive means of searching an individual, reserved for instances where other search techniques have been considered but rejected as ineffective under the particular circumstances of the case. Body-cavity search procedures govern physical probes, but not visual inspections.

For example, the procedures would not be appropriate for a visual inspection of the inside of the mouth, nose, or ears, unless contraband is found during the course of that inspection. Body-cavity procedures apply whenever contraband is found, because retrieving/seizing the item will involve physical entry into or probing within the cavity (in this example, the mouth, nose, or ear).

### Caustic

Capable of burning, corroding, eroding or destroying by chemical action.

### Census Check

See Informal Count.

GEO-MEN 00064404

## Chain of Command

Order of authority (rank); executive, senior management, senior staff, etc. The position titles may vary according to the type of facility (SPC, CDF, or IGSA) and local facility titles. The on-site order of authority at a detention facility descends from the facility administrator to assistant or associate facility administrators to department heads to shift supervisors and other supervisors. Similarly, the ICE/ERO chain-of-command at a detention facility descends from the officer–in-charge (OIC) to the associate OIC to the chief detention enforcement officer/Chief of Security, detention operations supervisor, etc.

## Chemical

A substance with a distinct molecular composition produced by or used in a chemical process.

## Chief of Security

A generic term for the department head in charge of a detention facility's security employees and operations. The position titles may vary according to the type of facility (SPC, CDF, or IGSA) and local facility titles. Ordinarily, a Chief of Security (chief detention enforcement agent, captain, etc.) is organizationally directly under an assistant or associate facility administrator.

## Chronic disease

An illness or condition that affects an individual's well being for an extended interval, usually at least six months, and generally is not curable but can be managed to provide optimum functioning within any limitations the condition imposes on the individual.

## Chronic disease program (care clinic)

Incorporates a treatment plan and regular clinic visits. The clinician monitors the patient's progress during clinic visits and, when necessary changes the treatment. The program also includes patient education for symptom management.

## Class R (Restricted) Tools

Devices to which detainees are forbidden access except in the presence and constant supervision of staff for reasons of safety or security. Class R includes devices that can be used to manufacture or serve as weapons capable of doing serious bodily harm or structural damage to the facility. All portable power tools and accessories are in this category. Class R also includes ladders and other such items that are not inherently dangerous but could prove useful in unauthorized activities, such as escape attempts.

## Classification

A process used to make housing and program assignments by assessing detainees on the basis of objective information about past behavior, criminal records, special needs, etc.

## Clinical Director (CD)

A designated individual licensed to practice medicine and provide health services with final responsibility for decisions related to medical judgments.  A CD and CMA are equivalent positions.

## Clinical Medical Authority (CMA)

The medical authority is responsible for the delivery of all health care services to the detainee population. These services include, but are not limited to, medical, nursing, dental, mental health and nutritional services. A CD and CMA are equivalent positions.

## Combustible Liquid

A substance with a flash point at or above 100° Fahrenheit.

## Commissary

GEO-MEN 00064405

An area or system where detainees may purchase approved items.

### Contact Visit

A meeting between detainee and another person authorized to take place in an area free of obstacles or barriers that prevent physical contact.

### Container

Any bag, barrel, bottle, box, can, cylinder, drum, reaction vessel, storage tank, or other vessel holding a hazardous chemical; does not include pipes or piping systems.

### Contraband

Any unauthorized item in the facility: illegal, prohibited by facility rules, or otherwise posing a threat to the security or orderly operation of the facility. This includes unauthorized funds.

### Contract Detention Facility (CDF)

A facility that provides detention services under a competitively bid contract awarded by the ICE.

### Control Office

An officer who directs security activities from the Control Center.

### Count Slip

Documentation of the number of detainees confirmed present during a population count in a specific area, signed by the officers involved in the count.

### Correspondence

Letters, postcards and other forms of written material not classified as packages or publications. Large envelopes containing papers qualify as correspondence, but boxes, sacks and other shipping cartons do not. Books, magazines, newspapers and other incoming printed matter are not "correspondence."

### Criminal Alien

A foreign national convicted of one or more crimes.

### Dedicated IGSA Facility (Dedicated IGSA)

An IGSA  facility that solely houses ICE detainees.  Also see "IGSA FACILITY" and "INTERGOVERNMENTAL SERVICE AGREEMENT."

### Detainee Handbook

The policies and procedures governing detainee life in the facility: daily operations, rules of conduct, sanctions for rule violations, recreation and other programs, services, etc.; defined in writing and provided to each detainee upon admission to the facility.

### Detention File

Contents include receipts for funds, valuables and other personal property; documentation of disciplinary action; reports on detainee behavior; detainee's written requests, complaints and other communications; official responses to detainee communications; records from Special Management Unit, etc.

### Dietician

A professional trained in foods and the management of diets (dietetics) who is credentialed by the Commission on Dietetic Registration of the American Dietetic Association, or who has the documented equivalent in education, training, or experience, with evidence of relevant continuing education.

### Disciplinary Hearing

Non-judicial administrative procedure to determine whether substantial evidence supports finding a detainee guilty of a rule violation.

### Disciplinary Committee

One or more impartial staff members who conduct

GEO-MEN 00064406

and/or oversee a disciplinary hearing. A lower-level committee (Unit Disciplinary Committee) investigates a formal Incident Report and may impose minor sanctions or refer the matter to a higher-level disciplinary committee. A higher-level committee (Institution Disciplinary Panel) conducts formal hearings on Incident Reports referred from the lower level committee and may impose higher level sanctions for higher level prohibited acts. Also see Institution Disciplinary Panel.

Disciplinary Segregation

A punitive form of separation from the general population used for disciplinary reasons.  Disciplinary segregation is available only after a finding by a disciplinary hearing panel that the detainee is guilty of a serious prohibited act or rule violation.

Dry Cell

A cell or room without running water where a detainee can be closely observed by staff until the detainee has voided or passed contraband or until sufficient time has elapsed to preclude the possibility that the detainee is concealing contraband. Dry cells may be used when there is reasonable suspicion that a detainee has ingested contraband or concealed contraband in a body cavity.

Emergency Changes

Measures immediately necessary to maintain security or to protect the health and safety of staff and detainees.

Exposure/Exposed

Subjected or potentially subjected to a hazardous substance by any means (inhalation, ingestion, skin contact, absorption, etc.)

Face-to-photo Count

A process that verifies identity of each detainee by comparing every person present with the photographic likeness on his/her housing card.

Facility Administrator

A generic term for the chief executive officer of a detention facility. The formal title may vary (warden, Officer In Charge, sheriff, jail administrator, etc.).

Field Office Directory (FOD)

Individual with chief responsibility for facilities in his assigned geographic area.

Firearms Control Officer (FCO)

Individual designated responsible for the physical and administrative control of all firearms under the jurisdiction of the authorizing official.

Flammability Hazard

Has a flash point below 200 degrees Fahrenheit, closed cup, or is subject to spontaneous heating.

Flammable Liquid

A substance with a flash point below 100 degrees Fahrenheit (37.8 Centigrade).

Flash Point

The minimum temperature at which the vapor of a combustible liquid can form an ignitable mixture with air.

Food Service Administrator (FSA)

The official responsible for planning, controlling, directing and evaluating Food Service Department operations.

Formal Count

When the detainee population is assembled at specific times for attendance check, conducted in accordance with written procedures.

Four/Five-point Restraint

A restraint system that confines an individual to a

GEO-MEN 00064407

bed or bunk in either a supine or prone position. Ordered by the facility administrator when a detainee's unacceptable behavior appears likely to continue risking injury to self or others.

Funds

Cash, checks, money orders and other negotiable instruments.

General Correspondence

All correspondence other than "special correspondence."

General Population

Detainees whose housing and activities are not specially restricted. The term is ordinarily used to differentiate detainees in the "general population" from those in Special Housing Units.

Grievance

A complaint based on a circumstance or incident perceived as unjust.

Hard Contraband

Any item that poses a serious threat to the life, safety or security of the facility detainees or staff.

Health Assessment

The process whereby an individual's health status is evaluated. This process will address the patient's physical, dental and mental health appropriate to the patient's condition and will include, as determined by the health care provider, questioning the patient about symptoms, a physical examination appropriate to the complaint and, as appropriate, review of screening information, collection of additional information relating to mental, dental and medical health issues, immunization histories, laboratory and diagnostic tests, other examinations, review of results, initiation of therapy and development of a treatment plan.

Health Authority

The health services administrator (HSA), clinical director (CD), or agency responsible for the provision of health care services at a facility or system of facilities. The responsible physician may be the health authority. Health authority may also be referred to as the medical department.

Health Care Practitioner

Defined as an individual who is licensed, certified, or credentialed by a state, territory or other appropriate body to provide health care services within the scope and skills of the respective health care profession.

Health Hazard

Includes carcinogens, toxic agents, reproductive toxins, irritants, corrosives, sanitizers, hepatotoxins, nephrotoxins, neurotoxins and other agents that act on the hemopoietic system or damage the lungs, skin, eyes, or mucous membranes.

Health Screening

A system for preliminary screening of the physical and mental condition of individual detainees upon arrival at the facility; conducted by health care personnel or by a specially health trained officer. The combination of structured inquiry and observation is designed to obtain immediate treatment for new arrivals who are in need of emergency health care, identify and meet ongoing current health needs, and isolate those with communicable diseases.

Hold Room

A secure area used for temporary confinement of detainees before in-processing, institutional appointments (court, medical), release, transfer to another facility, or deportation-related transportation.

Hunger Strike

A voluntary fast undertaken as a means of protest or

GEO-MEN 00064408

manipulation. Whether or not a detainee actually declares that he or she is on a hunger strike, staff are required to refer any detainee who is observed to not have eaten for 72 hours for medical evaluation and monitoring.

IGSA Facility (IGSA)

A state or local government facility used by ERO through an Intergovernmental Service Agreement.  Also see "INTERGOVERNMENTAL SERVICE AGREEMENT."

Illegal Contraband

Any item prohibited by law, the possession of which constitutes grounds for felony or misdemeanor charges.

Indigent

Without funds, or with only nominal funds. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account.

Informal grievance

An oral complaint or concern received from a detainee. Informal grievances may be handled at the lowest level in the organization possible to effectively resolve the complaint with no written response.

Informal Count

Population count conducted according to no fixed schedule, when detainees are working, engaged in other programs, or involved in recreational activities. Unless a detainee is missing, these counts are not reported; also called "census check" or "irregular count."

Informal Resolution

Brings closure to a complaint or issue of concern to a detainee, satisfactory to the detainee and staff member involved; does not require filing of a written grievance.

Informed Consent

An agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature, consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed action is not undertaken.

In-processing

Administrative processing of a detainee arriving at a detention facility (See "Admissions").

Institution Disciplinary Panel (IDP)

Review board responsible for conducting disciplinary hearings and imposing sanctions for cases of detainee misconduct referred for disposition following the hearing. The IDP usually comprises a hearing officer and representatives of different departments in the facility.

Intergovernmental Service Agreement

A cooperative agreement between ICE and any state, territory or political subdivision for the construction, renovation or acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services. ICE may enter into an IGSA with any such unit of government guaranteeing to provide bed space for ICE detainees, and to provide the clothing, medical care, food and drink, security and other services specified in the ICE/ERO detention standards; facilities providing such services are referred to as "IGSA facilities."

Investigating Officer

An individual of supervisory or higher rank who conducts an investigation of alleged misconduct and was not involved in the incident; usually a supervisory detention enforcement officer or shift supervisor.

Irregular Count

GEO-MEN 00064409

See Informal Count.

Least Intrusive

In the context of a search, terminology used to refer to alternative means of finding contraband, such as questions, metal detectors, pat down searches and boss chairs, prior to conducting a strip search.

Legal Assistant

An individual (other than an interpreter) who, working under the direction and supervision of an attorney or other legal representative, assists with group presentations and in representing individual detainees. Legal assistants may interview detainees, assist detainees in completing forms and deliver papers to detainees without the supervisory attorney being present.

Legal Correspondence

See "special correspondence."

Legal File

See A-File.

Legal Representative

An attorney or other person representing another in a matter of law, including law students, law graduates not yet admitted to the bar; "reputable individuals"; accredited representatives; accredited officials and attorneys outside the United States (see 8 CFR § 292.1, "Representation and Appearances").

Leisure-time Activities

Activities which are designed to provide detainees with recreational opportunities both inside and outside the living area, e.g., soccer, basketball, chess, checkers, television.

Life-sustaining Procedure (Life Support)

A medical intervention or procedure that uses artificial means to sustain a vital function.

Mail Inspection

Examination of incoming and outgoing letters, packages, etc., for contraband, including cash, checks and money orders.

Master Count

Total number of detainees housed at a facility.

Material Safety Data Sheet (MSDS)

Basic information about a hazardous chemical, prepared and issued by the manufacturer, in accordance with Occupational Safety and Health Administration regulations (see 29 CFR 1910.1200; see also OSHA Form 174); among other things, specifies precautions for normal use, handling, storage, disposal and spill cleanup.

Medical Classification System

A system by which a detainee's medical and mental health  conditions and needs are assessed to allow for appropriate placement in a facility with the resources necessary to provide appropriate level of care to meet those needs.

Medical Discharge Plan

The discharge plan includes: admission diagnosis; discharge diagnosis; brief medical history including the chief complaint and any essential physical findings discovered; all diagnostic test (e.g., x-rays, lab results, ECG's, etc) results; list of any medications prescribed; a brief summary of care provided, the detainee's response to treatment, medical complications encountered, any outside health care referrals that may have interrupted the infirmary period or that be pending; and continuity of care plan.

Medical Personnel

Includes all qualified health care professionals as well as administrative and support staff (e.g. health record administrators, laboratory technicians, nursing and medical assistants, clerical workers).

Mental Health Provider

GEO-MEN 00064410

Psychiatrist, clinical or counseling psychologist, physician, psychiatric nurse, clinical social worker or any other mental health professional who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients. .

Messenger

A person (neither a legal representative nor a legal assistant) whose purpose is to deliver or convey documents, forms, etc., to and from the detainee; not afforded the visitation privileges of legal representatives and legal assistants.

Minor

A juvenile; a person under the age of 18.

Mogul keys

Key and knob operated deadlocking latch/ deadbolt for use in detention institutions as well as commercial, government and industrial buildings for utmost physical security. The large-scale design accommodates an oversized latch and deadbolt plus mogul key cylinder. These institutional grade construction features and tamper resistant fittings afford exceptional structural strength to impede forced and surreptitious entry.

National Commission on Correctional Health Care (NCCHC)

Establishes the standards for health service in correctional facilities on which accreditation is based.

National Fire Protection Association

Principal source of fire protection standards and codes.

NCCHC

National Commission on Correctional Health care.

Non-Contact Visit

Visitation with a barrier preventing physical contact

between the detainee and his or her visitors.

Non-dedicated IGSA Facility (Non-dedicated IGSA)

An IGSA facility that houses ICE detainees as well as other inmate populations in a shared use facility.  Also see "IGSA FACILITY" and "INTERGOVERNMENTAL SERVICE AGREEMENT."

Non-Medical Emergency Escorted Trip

Authorized detainee visit to a critically ill member of his/her immediate family, or to attend the funeral of a member of his/her immediate family. "Immediate family" member refers to a parent (including stepparent and foster parent), child, spouse, sister, or brother of the detainee.

Non-merit Factor

Any characteristic or factor immaterial to a detainee's mental or physical ability to perform a given assignment.

Non-security Key

A key which if duplicated by unauthorized persons and/or lost, would not constitute an emergency requiring urgent action; not critical to facility safety and security.

Out Count

Detainees temporarily away from the facility, but accounted for by the facility and included in the master count.

Paracentric Keys

Keys designed to open a paracentric lock. It is distinguishable by the contorted shape of its blade, which protrudes past the centre vertical line of the key barrel. Instead of the wards on the outer face of the lock simply protruding into the shape of the key along the spine, the wards protrude into the shape of the key along the entire width of the key, including along the length of the teeth.

GEO-MEN 00064411

**Pat-down Search**

Relies on the sensitivity of the officer's hands as they tap or run over the detainee's clothed body; may require the detainee to reveal pocket contents. The least intrusive body search.

**Physical Examination**

A thorough evaluation of an individual's physical condition and medical history conducted by or under the supervision of a licensed medical professional acting within the scope of his or her practice.

**Plan of Action**

Describes steps the facility will take to convert a condition that has caused a determination of noncompliance with a standard.

**Post Orders**

Written orders that specify the duties of each position, hour-by-hour, and the procedures the post officer will follow in carrying out those duties.

**Progressive Restraints**

Control the detainee in the least restrictive manner required, until and unless the detainee's behavior warrants stronger and more secure means of inhibiting movement.

**Protective Custody (PC)**

Administrative segregation for the detainee's own safety.

**Qualified health care professionals**

Include physicians, physicians assistants, nurses, nurse practitioners, dentists, mental health professionals and others who by virtue of their education, credentials and experience are permitted by law and within their scope of practice to evaluate and care for patients.

**Reasonable Suspicion**

Not intuition, but specific, articulable facts that would cause a reasonable law enforcement officer to suspect that a particular person is concealing a weapon, contraband, or evidence of a crime.

**Religious Practices**

Worship, observances, services, meetings, ceremonies, etc., associated with a particular faith; access to religious publications, religious symbolic items, religious counseling and religious study classes; and adherence to dietary rules and restrictions.

**Sally Port**

An enclosure situated in the perimeter wall or fence surrounding the facility, containing double gates or doors, of which one cannot open until the other has closed, to prevent a breach in the perimeter security; handles pedestrian and/or vehicular traffic.

**Sanitation**

The creation and maintenance of hygienic conditions; in the context of food, involves handling, preparing, and storing items in a clean environment, eliminating sources of contamination.

**Satellite Feeding**

Food served and consumed in a location other than where prepared.

**Security Key**

A key which if duplicated by unauthorized persons and/or lost, would jeopardize life, safety, property or security, or would facilitate escape.

**Segregation**

Confinement in an individual cell isolated from the general population; for administrative, disciplinary, or protective reasons.

**Service Processing Center (SPC)**

A detention facility the primary operator and

GEO-MEN 00064412

controlling party of which is ICE.

## Shift Supervisor

A generic term for the detention security supervisor in charge of operations during a shift. The position titles may vary according to the type of facility (SPC, CDF, or IGSA) and local facility titles. Ordinarily, a shift supervisor (detention operations supervisor, lieutenant, etc.) is, organizationally, directly under the Chief of Security (chief detention enforcement agent, captain, etc.).

## Soft Contraband

Any unauthorized item that does not constitute hard contraband, i.e., does not pose a serious threat to human safety or facility security; includes that quantity of an item possessed in an amount exceeding the established limit.

## Special Correspondence or Legal Mail

Detainees' written communications to or from any of the following:

a. private attorneys and other legal representatives;

b. government attorneys;

c. judges and courts;

d. embassies and consulates;

e. the president and vice president of the United States;

f. members of Congress;

g. the Department of Justice (including the DOJ Office of the Inspector General);

h. the Department of Homeland Security (including U.S. Immigration and Customs Enforcement, ICE Health Services Corps, the Office of Enforcement and Removal Operations, the DHS Office for Civil Rights and Civil Liberties, and the DHS Office of the Inspector General);

i. outside health care professionals;

j. administrators of grievance systems; and

k. representatives of the news media.

## Special Management Unit (SMU)

A housing unit for detainees in administrative or disciplinary segregation.

## Special Needs Detainee

A detainee whose mental and/or physical condition requires different accommodations or arrangements than a general population detainee would receive. Special needs detainees include but are not limited to those who are emotionally disturbed, developmentally disabled, mentally ill, physically handicapped, chronically ill, disabled, or infirm and the drug or alcohol addicted.

## Strip Search

A visual inspection of all body surfaces and body cavities.

## Terminally Ill Detainee

A detainee whose physical condition has deteriorated to the point where the prognosis is less than a year to live.

## TJC

The Joint Commission [formerly the Joint Commission on Accreditation of Health care Organizations (JCAHO)]

An independent, not-for-profit organization that evaluates and accredits more than 15,000 health care organizations and programs in the United States. TJC is the Nation's predominant standards-setting and accrediting body in health care.

## Toxic

Poisonous; capable of causing injury or death.

## Trained Investigators

A person who has been trained in investigative techniques to include interview techniques for

GEO-MEN 00064413

victims and proper procedures for collecting and storing evidence.

### Training

An organized, planned and evaluated activity designed to achieve specific learning objectives and enhance personnel performance. Training may occur on site, at an academy or training center, an institution of higher learning, professional meetings, or through contract service or closely supervised on-the-job training. Training programs usually include requirements for completion, attendance records and certification of completion. Meetings of professional associations are considered training where there is clear evidence of the direct bearing on job performance. In all cases, the activity must be part of an overall training program.

### Training Coordinator

A person responsible for ensuring all training requirements are met and documented. This person will often develop and conduct training.

### Transgender

Transgender people are those whose gender identity or expression is different from their assigned sex at birth.

### Unencumbered Space

Open, usable space measuring at least seven feet in at least one dimension, free of plumbing fixtures, desk, locker, bed and other furniture and fixtures (measured in operational position).

### Unauthorized Funds

Negotiable instruments (checks, money orders, etc.) or cash in a detainee's possession exceeding the facility-established limit.

### Unauthorized Property

Not inherently illegal, but against the facility's written rules.

### Unit Disciplinary Committee

See Disciplinary Committee.

### Volunteer Group

Individuals who collectively donate time and effort to enhance the activities and programs offered to detainees; selected on basis of personal qualities and skills (recreation, counseling, education, religion, etc.).

### Work Assignment

Carpentry, plumbing, food service and other operational activities included in the facility's Voluntary Work Program, for which a detainee may volunteer.

GEO-MEN 00064414