# Exhibit M



# Operations Manual ICE Performance Based National Detention Standards (PBNDS)

## Table Of Contents

**PART 1   SAFETY**

1 **Emergency Plans** (DOC | 227 KB) (PDF | 303 KB)

2 **Environmental Health and Safety** (DOC | 187 KB) (PDF | 254 KB)

3 **Transportation (By Land)** (DOC | 128 KB) (PDF | 180 KB)

**PART 2   SECURITY**

4 **Admission and Release** (DOC | 98 KB) (PDF | 155 KB)

5 **Classification System** (DOC | 145 KB) (PDF | 220 KB)

6 **Contraband** (DOC | 68 KB) (PDF | 82 KB)

7 **Facility Security and Control** (DOC | 101 KB) (PDF | 129 KB)

8 **Funds and Personal Property** (DOC | 121 KB) (PDF | 151 KB)

9 **Hold Rooms in Detention Facilities** (DOC | 81 KB) (PDF | 101 KB)

10 **Key and Lock Control** (DOC | 102 KB) (PDF | 128 KB)

11 **Population Counts** (DOC | 51 KB) (PDF | 60 KB)

**12  Post Orders** (<u>DOC</u> | 61 KB) (<u>PDF</u> | 71 KB)

**13  Searches of Detainees** (<u>DOC</u> | 104 KB) (<u>PDF</u> | 141 KB)

**14  Sexual Abuse and Assault Prevention and Intervention** (<u>DOC</u> | 151 KB) (<u>PDF</u> | 220 KB)

**15  Special Management Units** (<u>DOC</u> | 130 KB) (<u>PDF</u> | 182 KB)

**16  Staff-Detainee Communication** (<u>DOC</u> | 78 KB) (<u>PDF</u> | 94 KB)

**17  Tool Control** (<u>DOC</u> | 111 KB) (<u>PDF</u> | 145 KB)

**18  Use of Force and Restraints** (<u>DOC</u> | 152 KB) (<u>PDF</u> | 197 KB)

## PART 3  ORDER

**19  Disciplinary System** (<u>DOC</u> | 137 KB) (<u>PDF</u> | 193 KB)

## PART 4  CARE

**20  Food Service** (<u>DOC</u> | 225 KB) (<u>PDF</u> | 341 KB)

**21  Hunger Strikes** (<u>DOC</u> | 64 KB) (<u>PDF</u> | 73 KB)

**22  Medical Care** (<u>DOC</u> | 247 KB) (<u>PDF</u> | 296 KB)

**23  Personal Hygiene** (<u>DOC</u> | 69 KB) (<u>PDF</u> | 78 KB)

**24  Suicide Prevention and Intervention** (<u>DOC</u> | 73 KB) (<u>PDF</u> | 73 KB)

**25  Terminal Illness, Advance Directives, and Death** (<u>DOC</u> | 114 KB) (<u>PDF</u> | 130 KB)
<u>See ICE Directive 7-9.0 01 Oct 09</u>

## PART 5  ACTIVITIES

**26  Correspondence and Other Mail** (<u>DOC</u> | 90 KB) (<u>PDF</u> | 107 KB)

**27  Escorted Trips for Non-Medical Emergencies** (<u>DOC</u> | 62 KB) (<u>PDF</u> | 72 KB)

**28  Marriage Requests** (<u>DOC</u> | 62 KB) (<u>PDF</u> | 69 KB)

**29  Recreation** (<u>DOC</u> | 90 KB) (<u>PDF</u> | 105 KB)

**30  Religious Practices** (<u>DOC</u> | 74 KB) (<u>PDF</u> | 86 KB)

GEO-MEN 00062906

**31  Telephone Access** (<u>DOC</u> | 97 KB) (<u>PDF</u> | 93 KB)

**32  Visitation** (<u>DOC</u> | 138 KB) (<u>PDF</u> | 183 KB)

**33  Voluntary Work Program** (<u>DOC</u> | 81 KB) (<u>PDF</u> | 35 KB)

## PART 6   JUSTICE

**34  Detainee Handbook** (<u>DOC</u> | 66 KB) (<u>PDF</u> | 71 KB)

**35  Grievance System** (<u>DOC</u> | 88 KB) (<u>PDF</u> | 113 KB)

**36  Law Libraries and Legal Material** (<u>DOC</u> | 133 KB) (<u>PDF</u> | 168 KB)

**37  Legal Rights Group Presentations** (<u>DOC</u> | 84 KB) (<u>PDF</u> | 101 KB)

## PART 7   ADMINISTRATION & MANAGEMENT

**38  Detention Files** (<u>DOC</u> | 77 KB) (<u>PDF</u> | 90 KB)

**39  News Media Interviews and Tours** (<u>DOC</u> | 60 KB) (<u>PDF</u> | 82 KB)

**40  Staff Training** (<u>DOC</u> | 94 KB) (<u>PDF</u> | 120 KB)

**41  Transfer of Detainees** (<u>DOC</u> | 135 KB) (<u>PDF</u> | 185 KB)

**42  Definitions** (<u>DOC</u> | 81 KB) (<u>PDF</u> | 142 KB)

GEO-MEN 00062907

## ICE/DRO DETENTION STANDARD

## ENVIRONMENTAL HEALTH AND SAFETY

**I. PURPOSE AND SCOPE. This Detention Standard protects detainees, staff, volunteers, and contractors from injury and illness by maintaining high facility standards of cleanliness and sanitation, safe work practices, and control of hazardous substances and equipment.**

It applies to the following types of facilities housing DRO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by DRO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

***Procedures in italics are specifically required for SPCs and CDFs***. IGSAs must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Some terms used in this document are defined in the separate **Definitions** Standard.

**II. EXPECTED OUTCOMES.** The expected outcomes of this Detention Standard are:

1. Facility cleanliness and sanitation will be maintained at the highest level.

2. Compliance with all applicable safety and sanitation laws will be ensured by documented internal and external inspections and corrective action when indicated.

3. Compliance with all applicable fire safety codes and fire safety performance requirements for the facility furnishings will be ensured.

4. Flammable, poisonous, toxic, and caustic materials will be controlled and used in a safe manner.

5. Compliance with fire prevention regulations, inspection requirements, and practices, including periodic fire drills, will ensure the safety of detainees, staff, and visitors.

6. Staff will be knowledgeable about procedures and responsibilities during emergency situations, including those that require evacuation, in accordance with a written plan and at least annual training.

7. The facility will have a plan for immediate release of detainees from locked areas and provisions for a back-up system

8. A sufficient number of properly positioned emergency exits that are clear from obstruction will be distinctly and permanently marked.

9. Preventive maintenance and regular inspections will be performed to ensure timely emergency repairs or replacement to prevent dangerous and life-threatening situations.

GEO-MEN 00062932

10. Potential disease transfer will be minimized by the proper sanitization of barbering equipment and supplies.

11. Pests and vermin will be controlled and eliminated.

12. Safe potable water will be available throughout the facility.

13. Emergency lighting and life-sustaining equipment will be maintained and periodically tested.

14. Disposal of garbage and hazardous waste will be in compliance with applicable government regulations.

15. The applicable content and information in this standard will be communicated in a language or manner which the detainee can understand.

**III. DIRECTIVES AFFECTED.**  This Detention Standard replaces **Environmental Health and Safety** dated 9/20/2000.

**IV. REFERENCES**

- American Correctional Association 4th Edition, Standards for Adult Detention Facilities: 4-ALDF-1A-01, 1A-02, 1A-03, 1A-07, 1A-14, 1A-15, 1A-16, 1A-17, 1A-18, 1A-19, 1A-20,1C-01, 1C-02, 1C-03, 1C-04, 1C-05, IC-07, 1C-08, 1C-09, 1C-10, 1C-11, 1C-12, 1C-13, 1C-14, 1C-15, 4B-07, 4C-18.

- Occupational Safety and Health Administration (OSHA) Regulations

- NFPA Standards

- US Public Health Service Report on Carcinogens

**V. EXPECTED PRACTICES – <u>GENERAL ENVIRONMENTAL HEALTH AND SAFETY</u>**

**A. General Environmental Health**

Environmental health conditions shall be maintained at a level that meets recognized standards of hygiene, including those from the:

- American Correctional Association,

- Occupational Safety and Health Administration,

- Environmental Protection Agency,

- Food and Drug Administration,

- National Fire Protection Association's Life Safety Code, and

- National Center for Disease Control and Prevention.

The Health Services Department or IGSA equivalent shall assist in the identification and correction of conditions that could adversely impact the health of detainees, employees, and visitors.  The sanitarian consultant is responsible for developing and implementing

GEO-MEN 00062933

policies, procedures, and guidelines for the environmental health program that are intended to evaluate and eliminate or control as necessary, sources of injuries and modes of transmission of agents or vectors of communicable diseases.

The consultant shall:

- Conduct special investigations and comprehensive surveys of environmental health conditions, and

- Provide advisory, consultative, inspection, and training services regarding environmental health conditions.

The medical facility's Health Services Administrator is responsible for:

- Implementing a program that assists in maintaining a high level of environmental sanitation, and

- Providing recommendations to the facility administrator concerning environmental health conditions, in consultation with the sanitarian consultant.

### B. Staff and Detainee Safety

The facility administrator shall ensure that adequate provisions are made for staff and detainee safety in accordance with these Detention Standards and applicable law. The Detention Standard on **Staff Training** further addresses employee training related issues. The Detention Standard on **Volunteer Work Program** addresses detainee training issues for workers. Detainees will receive safety instruction where necessary for living area-related assignments such as working with cleaning products to clean general use areas.


Detainee living area safety will be emphasized to staff and detainees to include providing, as noted in the standards, a housekeeping plan. Bed rails are not common in detention settings except for medical housing units because of the potential safety risk they pose. When there are safety concerns with a detainee sleeping in a top bunk that is not along a wall and has no bed rail, accommodations will be made to ensure safety. In locations where ladders are not available, accommodations for detainees, such as the use of bottom bunks or the addition of a ladder or step, will be made on a case by case basis. Detainees who have medical or physical problems that sleeping on a top bunk will aggravate will be referred to the medical unit for consideration of a lower bunk permit.

### C. General Housekeeping

The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness. When possible, the use of non-toxic cleaning supplies is recommended.

1. All horizontal surfaces shall be damp-dusted daily with an approved germicidal solution used according to the manufacturer's directions.

2. Windows, window frames, and windowsills shall be cleaned on a regular

---

GEO-MEN 00062934

schedule, but do not require daily cleaning.

3. Furniture and fixtures shall be cleaned daily.

4. Floors shall be mopped daily and when soiled using the double-bucket mopping technique, and with a hospital disinfectant-detergent solution mixed according to the manufacturers directions.

5. A clean mop head shall be used each time the floors are mopped.

6. Waste containers shall be non-porous and lined with plastic bags and the liner shall be changed daily.

7. The container itself shall be washed at least weekly, or as needed when it becomes soiled.

8. Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

### D. Pests and Vermin

The facility administrator shall contract with licensed pest-control professionals to perform monthly inspections to identify and eradicate rodents, insects, and vermin. The contract shall include a preventive spraying program for indigenous insects and a provision for callback services as necessary.

### E. Certification of Facility Water Supply

At least annually, a state laboratory shall test samples of drinking and wastewater to ensure compliance with applicable standards. A copy of the testing and safety certification shall be maintained on-site.

### F. Emergency Electrical Power Generator

At least every two weeks, emergency power generators shall be tested for one hour, and the oil, water, hoses and belts of these generators shall be inspected for mechanical readiness to perform in an emergency situation .

Power generators are inspected weekly and load tested quarterly at a minimum, or in accordance with manufacturer's recommendations and instruction manual. Among other things, the technicians shall check starting battery voltage, generator voltage and amperage output.

Other emergency equipment and systems shall be tested quarterly, and needed follow-up repairs or replacement shall be accomplished as soon as feasible.

### G. Garbage and Refuse

- Garbage and refuse includes all trash, rubbish, and other putrescible and non-putrescible solid waste, except the solid and liquid waste discharged into the sanitary sewer system of the facility.

- Garbage and refuse shall be collected and removed as often as necessary to maintain sanitary conditions and to avoid creating health hazards.

- Facilities shall comply with all federal, state and local environmental regulations

GEO-MEN 00062935

and requirements governing methods for handling and disposing of refuse.

## VI. – HAZARDOUS MATERIALS

Every facility shall establish a system for storing, issuing, using, and maintaining inventories of and accountability for hazardous materials.  The facility program will be supervised by a person who has been trained in accordance with OSHA standards.  The effectiveness of any such system depends not only on written policies, procedures, and precautions but also on adequate supervision and responsible behavior of staff and detainees, including following instructions precisely, taking prescribed precautions and using safety equipment properly.

A list of common flammable, toxic, and caustic substances is included at the end of this Detention Standard as Table A.

### A.  Personal Responsibility

Every individual who uses a hazardous substance must:

- be trained in accordance with OSHA standards;
- be knowledgeable about and follow all prescribed precautions;
- wear personal protective equipment when indicated; and
- promptly report hazards or spills to the designated authority.

### B.  Protective Equipment

- Protective eye and face equipment is required where there is a reasonable probability of injury that can be prevented by such equipment.  Areas of the facility where such injuries can occur shall be conspicuously marked with eye hazard warning signs.
- Eyewash stations that meet the standards of the OSHA shall be installed in designated areas throughout the facility, and all employees and detainees in those areas shall be instructed in their use.

### C.  Inventories

Every area shall maintain a current inventory of the hazardous substances (flammable, toxic, or caustic) used and stored there.  Inventory records shall be maintained separately for each substance.  Entries for each shall be logged on a separate card (or equivalent) filed alphabetically by substance.  The entries shall contain relevant data, including purchase dates and quantities, use dates and quantities, and quantities on hand.

### D.  Material Safety Data Sheets Files

Every department or other area of the facility using hazardous substances shall maintain a file of Material Safety Data Sheets (MSDSs) that includes a list of the locations where hazardous substances are stored, along with a diagram and legend of

---

GEO-MEN 00062936

these locations.  Designated staff from each department or area shall provide a copy of each file to the Maintenance Supervisor.

- MSDSs are produced by manufacturers and provide vital information on individual hazardous substances, including instructions on safe handling, storage, disposal, prohibited interactions, etc.

- Staff and detainees shall have ready and continuous access to the MSDSs for the substances with which they are working. Staff and detainees that do not read English will not be authorized to work with these materials.

- Because changes in MSDSs occur often and without notice, staff must:

  o review the latest issuance from the manufacturers of the relevant substances;

  o update the MSDS files as necessary; and

  o forward any changes to the Maintenance Supervisor, so that the copy is kept current.

### E.  Master Index

The Maintenance Supervisor shall compile:

- a master index of all hazardous substances in the facility and their locations;

- a master file of MSDSs; and

- a comprehensive, up-to-date list of emergency phone numbers (fire department, poison control center, etc.).

The Maintenance Supervisor maintains this information in the safety office (or equivalent) and ensures a copy is sent to the local fire department.

### F.  General Guidelines Regarding Hazardous Substances

**Issuance.**  Flammable, caustic, and toxic substances (hazardous substances) shall be issued (that is, drawn from supply points to canisters or dispensed) only under the supervision of the designated officer.

**Amounts.**  Hazardous substances shall be issued in single-day increments (the amount needed for one day's work.)

**Supervision.**  Qualified staff shall closely monitor detainees working with hazardous substances.

**Accountability.**  Inventory records for a hazardous substance must be kept current before, during, and after each use.

### G.  Flammable and Combustible Liquids

1. Any liquid or aerosol labeled "Flammable" or "Combustible" must be stored and used as prescribed on the label required by the Federal Hazardous Substances Labeling Act.

GEO-MEN 00062937

2. Lighting fixtures and electrical equipment installed in flammable liquid storage rooms must meet National Electrical Code requirements in hazardous locations.

3. Every hazardous material storage room shall:

   - Be of fire-resistant construction and properly secured;

   - Have self-closing fire doors at each opening;

   - Be constructed with either a four-inch sill or a four-inch depressed floor; and

   - Have a ventilation system (mechanical or gravity flow) within 12 inches of the floor, which provides at least six air changes per hour.

4. Every storage cabinet shall:

   - Be constructed according to code and securely locked at all times;

   - Be clear of open passageways, stairways, and other emergency exit areas;

   - Be conspicuously labeled: "Flammable -- Keep Fire Away"; and

   - Contain not more than 60 gallons of Class I or Class II liquids, or more than 120 gallons of Class III liquids.

5. Storage rooms and cabinets may be entered only under secure conditions and under the supervision of authorized staff.

6. Any portable container that is not the original shipping container must be designated as an approved safety can, which is listed or labeled by a nationally recognized testing laboratory.  Each container shall bear a legible label that identifies its contents.

7. Excess liquids shall remain in original containers, tightly closed, in the storage room or cabinet.

8. The MSDS shall govern use of a particular flammable or combustible liquid.

9. Only authorized staff may dispense flammable and combustible liquids, using acceptable methods for drawing or transferring these liquids.

   Drawing from or transferring any of these liquids into containers indoors is prohibited except:

   - Through a closed piping system;

   - From a safety can;

   - By a device drawing through the top; or

   - By gravity, through an approved self-closing system.

   An approved grounding and bonding system must be used when liquids are dispensed from drums.

10. Without exception, cleaning liquids must have a flash point at or above 100° F (for example, Stoddard solvents, kerosene).  Cleaning operations must be in an approved parts-cleaner or dip tank fitted with a fusible link lid with a 160° F melting-temperature link.

GEO-MEN 00062938

11. Staff shall follow MSDS directions:

- When disposing of excess flammable or combustible liquids; or

- After a chemical spill.

### H. Toxic and Caustic Substances

- All toxic and caustic materials must be stored in secure areas, in their original containers, with the manufacturer's label intact on each container.

- Authorized staff only shall draw/dispense these substances, in accordance with the applicable Material Safety Data Sheet(s).

- Staff shall either return unused amounts to the original container(s) or, under certain circumstances, to another suitable, clearly labeled container n the storage area.

- MSDS directions shall determine the disposal and spill procedures for toxic and caustic materials used in the facility.

### I. Poisonous Substances

Poisonous substances or chemicals, such as methyl alcohol, sulfuric acid, muriatic acid, caustic soda or tannic acid, among others, pose a very high (Class I) caustic hazard due to their toxicity.

**Methyl alcohol**, variously referred to as wood alcohol and methanol, is commonly found in industrial applications (for example, shellac thinner, paint solvent, duplicating fluid, solvents for leather cements and dyes, flushing fluid for hydraulic brake systems):

- If ingested, methyl alcohol can cause permanent blindness or death.

- Staff must directly supervise the use of any product containing methyl alcohol. Products containing methyl alcohol in a very diluted state, such as shoe dye, may be issued to detainees, but only in the smallest workable quantities.

- Immediate medical attention is vital any time methyl alcohol poisoning is suspected.

### J. Other Toxic Substances

1. Permanent **antifreeze** containing ethylene glycol shall be stored in a locked area and dispensed only by authorized staff.

2. **Typewriter cleaner** containing carbon tetrachloride or tricholorochane shall be dispensed in small quantities and used under direct staff supervision.

3. **Cleaning fluids** containing carbon tetrachloride or tetrachloride or tricholoroethylene shall be strictly controlled.

4. **Glues** of every type may contain hazardous chemicals. When use of a nontoxic product is not possible, staff must closely supervise all stages of handling. The toxic glues must be stored in a locked location.

5. The use of **dyes and cements for leather** requires close supervision.

---

GEO-MEN 00062939

Nonflammable types shall be used whenever possible.

6. **Ethyl alcohol, isopropyl alcohol, and other antiseptic products** shall be stored and used only in the medical department and only under close supervision.  To the extent practical, such chemicals shall be diluted and issued in small quantities to prevent any injuries or lethal accumulation.

7. **Pesticides** not currently approved by the Environmental Protection Agency, such as DDT and 1080 (sodium fluoracetate), are prohibited.  The Maintenance Supervisor is responsible for purchasing, storing (in a locked area), and dispensing all pesticides used in the facility.

8. The Maintenance Supervisor or other staff members responsible for **herbicides** must hold a current state license as a Certified Private Applicator.  Persons applying herbicides must wear proper clothing and protective gear.

9. **Lyes** may be used only in dye solutions and only under the direct supervision of staff.

### K. Labeling of Chemicals, Solvents, and Other Hazardous Materials

The facility administrator shall individually assign the following responsibilities associated with the labeling procedure:

- Identifying the hazardous nature of materials adopted for use;

- Requiring use of properly labeled containers for hazardous materials, including any and all miscellaneous containers into which employees might transfer the material;

- Teaching staff the meaning of the classification code and the MSDS, including the safe handling procedures for each material, and impressing on staff the need to ensure containers are properly labeled; and

- Placing correct labels on all smaller containers when only the larger shipping container bears the manufacturer-affixed label.

### L. Controlled Hazardous Materials

Certain substances require special treatment and careful planning and precautions before use. These controlled materials are classified according to the type of hazard and the nature of the restrictions imposed for their safe use, as specified in OSHA regulations.

**Class I: Industrial Solvents.**  Industrial solvents and chemicals used as paint thinners, degreasers, and cleaning agents may have toxic properties and low flash points, making them dangerous fire hazards.

**Class II: Restricted Materials.**  Beryllium, its alloys and compounds, and silver solder containing cadmium pose a danger to workers, for whom special precautions must be taken.

**Class III: Recognized Carcinogens.**  OSHA-listed carcinogens are governed by the OSHA regulations provided in 29 CFR 1910.1000.

GEO-MEN 00062940

Although asbestos appears on the OSHA list, it is exempt from the regulation when:

- no asbestos fibers will be released into the air during handling and use; and

- the asbestos consists of firmly bound fibers contained in a product such as: a transit pipe, wallboard, or tile (except when being sawed or otherwise handled in a way that releases fibers into the air).

**Class IV: Suspected Carcinogenic, Teratogenic, and Mutagenic Materials.** Chemical agents, substances, mixtures, and exposures are listed in the biennial *Report on Carcinogens* issued by the U.S. Public Health Service, in accordance with the Public Health Service Act.  The Maintenance Supervisor shall ensure the facility has copies of the report and that there is compliance with the provisions of the latest edition.

## VII.   EXPECTED PRACTICES – <u>FIRE PREVENTION AND CONTROL</u>

### A. Fire Safety Codes

Every facility shall comply with standards and regulations issued by:

- OSHA;

- the American Correctional Association "mandatory" Expected Practices;

  (Mandatory ACA Expected Practice 4-ALDF-1C-07 requires that the facility conform to applicable federal, state, and/or local fire safety codes, and that the authority having jurisdiction document compliance.  A **fire alarm and automatic detection system are required** (or there is a plan for addressing these or other deficiencies within a reasonable time period), as approved by the authority having jurisdiction.  If the authority approves any variance, exceptions, or equivalencies, they must not constitute a serious life-safety threat to the occupants of the facility.)

- local and national fire safety codes, and

- applicable standards of the American Society for Testing and Materials, American National Standards Institute, and Underwriters' Laboratories or Factory Mutual Engineering Corporation.

New construction, alterations, and renovations, shall comply with:

- the latest revision or update of the International Council Codes.

- the Uniform Building Code; or

- the Standard Building Code, in accordance with 40 USC Title 619 and local law.

If the local government does not mandate adherence to a particular code, construction must conform to the International Council Codes.

In addition, the construction shall comply with the latest edition of the National Fire Protection Association's (NFPA) 101, Life Safety Code and National Fire Codes (NFCs). If the fire protection and life safety requirements of a local building code differ

---

GEO-MEN 00062941

from NFPA 101 or the NFCs, the requirements of NFPA 101 and the NFCs shall take precedence and be recognized as equivalent to the local building code.

## B. Inspections

A qualified departmental staff member shall conduct weekly fire and safety Inspections.

Facility maintenance (safety) staff shall conduct monthly inspections.

Written reports of the inspections shall be forwarded to the facility administrator for review and, if necessary, corrective action determinations.  The Maintenance Supervisor shall maintain inspection reports and records of corrective action in the safety office.  Fire safety deficiencies shall be promptly addressed.

## C. Fire Prevention, Control, and Evacuation Plan

Every facility shall develop a fire prevention, control, and evacuation plan that includes the following:

1. Control of ignition sources;

2. Control of combustible and flammable fuel load sources;

3. Provisions for occupant protection from fire and smoke;

4. Inspection, testing, and maintenance of fire protection equipment, in accordance with NFPA codes, etc.;

5. Monthly fire inspections;

6. Installation of fire protection equipment throughout the facility, in accordance with NFPA codes;

7. Accessible, current floor plans (buildings and rooms); prominently posted evacuation maps/plans; exit signs and directional arrows for traffic flow; with a copy of each revision filed with the local fire department; and

8. Exit diagrams that shall be conspicuously posted throughout the facility.

## D. Fire Drills

Fire drills shall be conducted and documented at least quarterly in all facility locations including administrative areas.

1. Fire drills in housing units, medical clinics, and other areas occupied or staffed during non-working hours shall be timed so that employees on each shift participate in an annual drill.

2. Detainees shall be evacuated during fire drills, except: in areas where security would be jeopardized; in medical areas where patient health could be jeopardized; or in individual cases when evacuation of patients is logistically not feasible.  Staff shall simulate drills in areas where detainees are not evacuated.

3. Emergency-key drills shall be included in each fire drill, and timed.  Emergency keys shall be drawn and used by the appropriate staff to unlock one set of emergency exit doors not in daily use.  NFPA recommends a limit of four and one-half minutes for drawing keys and unlocking emergency doors. However,

GEO-MEN 00062942

when conducting fire drills emphasis will be placed on safe and orderly evacuation rather than speed.

### E.  Exit Diagram

In addition to a general area diagram, the following information must be provided on signs:

- Instructions in English, Spanish and the next most prevalent language at the facility;

- "You Are Here" markers on exit maps; and

- Emergency equipment locations.

"Areas of Safe Refuge" shall be identified and explained on diagrams. Diagram posting will be in accordance with applicable fire safety regulations of the jurisdiction.

## VIII.   EXPECTED PRACTICES – <u>MEDICAL OPERATIONS</u>

### A.  Needles and Other Sharp Objects

An established uniform procedure shall be established for the safe handling and disposal of used needles and other potentially sharp objects (sharps) to prevent both mechanical injury and the percutaneous transmission of infectious disease organisms, such as hepatitis B virus (HBV) and human immunodeficiency virus (HIV).  Sharps are defined as all disposable or discarded items derived from detainee care that could potentially transmit disease via direct subdermal inoculation.  Items included are: hypodermic needles and syringes, scalpel blades, glass vials or ampules containing materials deemed to be infectious, burrs, glass cartridges, and lancets.


Accidental injuries from sharp objects are common in health care programs; most are from needle sticks caused by staff attempting to recap hypodermic needles.  A uniform procedure for used needles and other disposable sharps is necessary to reduce the number of such injuries by preventing the secondary handling of needles and other dangerous sharp objects used in the delivery of medical care.

### B.  Standard Precautions (includes "Universal Precautions")


Staff shall frequently wash their hands and routinely take precautions to prevent contact with blood or other body fluids.

a.  Gloves shall be worn: prior to touching blood and body fluids, mucous membranes, or non-intact skin of all patients; prior to handling items or surfaces soiled with blood or body fluids; and prior to performing venipuncture and other vascular access procedures.

Gloves shall be changed after contact with each detainee.

b.  Masks and protective eye wear or face shields shall be worn during procedures that are likely to generate droplets of blood or other body fluids,

GEO-MEN 00062943

c.  Gowns or aprons shall be worn during procedures that are likely to generate splashes of blood or other body fluids.

d.  Hands and other skin surfaces shall be washed immediately and thoroughly if contaminated with blood or other body fluids.  Hands shall be washed immediately after gloves are removed.

e.  All health-care workers shall take precautions to prevent injuries caused by needles, scalpels, and other sharp instruments or devices during procedures, when cleaning used instruments, during disposal of used needles, and when handling sharp instruments after procedures.  Instruments and drugs will be maintained in a secure and sanitary condition,

f.   To prevent needle stick injuries, needles shall not be recapped, purposely bent or broken by hand, removed from disposable syringes, or otherwise manipulated by hand.  After use, disposable syringes and needles, scalpel blades, and other sharp items shall be placed in puncture-resistant containers for disposal.

g.  Large-bore reusable needles shall be placed in a puncture resistant container for transport to the reprocessing area.

h.  To minimize the need for emergency mouth-to-mouth resuscitation, mouthpieces, resuscitation bags or other ventilation devices shall be available for use in areas in which the need for resuscitation is predictable.

I.   Health-care workers who have exudative lesions or weeping dermatitis shall refrain from all direct patient care and from handling patient care equipment until the condition resolves.

j.   Pregnant health-care workers shall strictly adhere to precautions to minimize the risk to the infant of perinatal transmission of HIV.

k.   Implementation of standard blood and body fluid precautions for all detainees eliminates the need for the use of isolation category of "Blood and Body Fluid Precautions" previously recommended by the Centers for Disease Control for individuals known or suspected to be infected with blood-borne pathogens. Isolation precautions shall be used as necessary if associated conditions, such as infectious diarrhea or tuberculosis, are diagnosed or suspected.

Staff should encourage detainees to frequently wash their hands and routinely take precautions to prevent contact with blood or other body fluids.

### C.  Accidental Needle Sticks

Any employee or detainee who receives a needle stick or who is cut while handling potentially contaminated sharps shall be counseled regarding baseline testing for HBV and HIV and referred to their usual source of health care.  If the injury also involves a person who is a known source of possible infection, that person shall also be tested for HBV and HIV. The incident shall be reported as an occupational injury and documented in accordance with applicable regulations for commissioned officers and civil service employees, respectively.

The leading health service provider's exposure-control plan shall be followed in the event of a needle stick.

GEO-MEN 00062944

### D. Inventory

Items that pose a security risk, such as sharp instruments, syringes, needles, and scissors, shall be inventoried and checked weekly by an individual designated by the medical facility's Health Service Administrator (HSA) or equivalent.

### E. Handling

Without removing the needles or replacing the needle covers, staff shall place used (disposable) syringes in a plastic disposal box or container.

#### 1. Disposal Containers

Use only commercially available, biohazardous-waste sharps containers approved by the National Institute of Safety and Health (for example, a "Winfield Sharps Container.").

Do not use milk cartons or plastic milk jugs or other plastic containers of similar thickness.

Use containers with a two-gallon capacity (approximate)

Under no circumstances shall an item be removed from the sharps container.

#### 2. Location

Sharps Containers shall be located on top of counters or, if on the wall, at least five feet above ground. Containers shall never sit on the floor.

#### 3. Disposal

When the disposal box is one-half to two-thirds full, the lid shall be closed and locked, and tape shall be placed over the top of the lid to indicate that it is ready for disposal.  The container shall be labeled with the words "infectious waste" or with the universal biohazard symbol, and placed in the proper area for removal and disposal.

Sharps are considered infectious waste, and final disposal of the container and contents shall be through a commercial contractor that handles disposal of infectious waste in accordance with all local and federal regulations.

The HSA shall make arrangements for disposal with an approved contractor and is responsible for validating that the contractor's disposal methods are in accordance with all infectious and hazardous waste disposal laws and regulations. Arrangements shall be made with local hospitals, if possible, for disposal with the hospitals' own infectious waste.

### F. Environmental Health in Medical Operations

While many of the following considerations, precautions, and specific procedures apply to situations that typically arise in medical operations, in many cases they have general application to all facility operations.

#### 1. General Housekeeping

Environmental cleanliness will prevent, reduce and control nosocomial infections due to contaminated environmental surfaces. The HSA or designee is responsible

GEO-MEN 00062945

for ensuring the cleanliness of the medical facility.

Using an acceptable health agency standard as a model, the HSA shall establish:

- The cleaning equipment; cleansers; disinfectants and detergents to be used,
- The Methods of cleaning, and
- The frequency of cleaning and inspections.

The HSA or designee shall make a daily visual inspection of the medical facility noting the condition of floors, walls, windows, horizontal surfaces, and equipment.

All surfaces touched by detainees or staff shall be cleaned using fresh solutions of appropriate disinfectant products, applied with clean cloths, mops, or wipes. Cleaned surfaces need not be monitored microbiologically since the results of such tests have been shown not to correlate with infection risk.  Floors, walls, beds, tables, and other surfaces that usually come in contact with intact skin require low-level disinfection.

Horizontal surfaces in detainee care areas are cleaned on a regular basis, when soiling or spills occur.  Additionally, short-stay units are cleaned when a detainee is discharged.  Cleaning of walls, blinds, or curtains is required only when visibly soiled.

The Chief Nurse (or equivalent) is responsible for training all staff and detainees in using proper housekeeping procedures and proper handling of hazardous materials and chemicals.

### a.  General Cleaning

1. All horizontal surfaces shall be damp-dusted daily with an approved germicidal solution.

2. Windows, window frames, and windowsills shall be cleaned on a regular schedule, but do not require daily cleaning.

3. Furniture and fixtures shall be cleaned daily.

4. Floors shall be mopped daily and when soiled using the double-bucket mopping technique.  The cleaning solution shall be a hospital disinfectant-detergent solution mixed according to the manufacturer's directions.  A clean mop head shall be used each time the floors are mopped.

5. Waste containers shall be lined with plastic bags and the liner shall be changed daily.  The container itself shall be washed at least weekly, or as needed when it becomes soiled.

6. Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

### b.  Isolation Cleaning

1. An approved germicidal detergent solution shall be freshly prepared in accordance with the manufacturer's specifications for each cleaning.

---

GEO-MEN 00062946

2. After cleaning the isolation room, mops and cleaning cloths shall be laundered before being reused.

3. Dirty water and used disinfecting solutions shall be discarded and the buckets and basins disinfected before being refilled.  Items used in cleaning a contaminated isolation room shall never be taken into another area.

4. Linens shall be carefully removed from the bed and double bagged for transport.

5. All waste materials shall be double bagged and disposed of as contaminated waste.

**c. Terminal Cleaning**

1. Every item in the room must be cleaned with an approved hospital germicidal solution.

2. When applicable, linen shall be stripped from the bed, with care taken not to shake the linen.  Linen shall be folded away from the person and folded inward into a bundle, then removed with minimal agitation.

3. When applicable, all reusable receptacles such as drainage bottles, urinals, bedpans, water pitchers shall be emptied and rinsed with germicidal solutions.

4. All equipment that is not to be discarded, such as IV poles, respirators and suction machines, shall be washed with an approved germicidal solution following manufacturer's guidelines for cleaning the specific piece of equipment.

5. When applicable, mattresses and pillows covered with durable plastic covers shall be thoroughly washed with the approved germicidal solution.

6. When applicable, beds shall be washed thoroughly using a small brush soaked in the germicidal solution to gain access to small holes and crevices, to areas between the springs, and to the casters.

7. All furniture shall be washed with a germicidal detergent solution.  Use a small brush if necessary.  Outside and underside as well as legs and casters must also be washed.

8. Wastebaskets shall be thoroughly washed with a germicidal solution after trash has been removed.

9. Telephones shall be thoroughly cleaned with a clean cloth soaked in the germicidal solution.  The earpiece and mouthpiece shall be unscrewed, scrubbed, dried and replaced.

10. Walls and ceilings need not be washed entirely, but areas that are obviously soiled shall be washed with germicidal solution.

GEO-MEN 00062947

### d.  Choice of Disinfecting Materials

Hospital-grade disinfectant-detergent formulations registered by the Environmental Protection Agency may be used for environmental surface cleaning, but the physical removal of microorganisms by scrubbing is also as important as any antimicrobial effect of the cleaning agent used.

Cost, safety, and acceptance by staff should be the criteria for selecting any such registered agent.  The manufacturer's instructions for use shall be followed exactly.

## 2.  Blood and Body Fluid Clean-up

Spills of blood and body fluids shall be cleaned up and the surface decontaminated in such a manner as to minimize the possibility of workers becoming exposed to infectious organisms, including HIV and HBV.  A suitable cleanup kit shall be maintained for use in cases of spills of blood and body fluids.  Cleanup kits may be obtained from commercial sources, or kits may be put together by ICE/DRO HSD staff or the designated health care provider.

### a.  Making a Clean-up Kit

To prepare a clean-up kit for blood and body fluid spills, package the following materials in a 12" x 15" clear" Ziploc" bag:

Gloves, rubber or vinyl, household type, (2 pair)

Clean absorbent rags (4)

Absorbent paper towels (15)

Disposable bag marked "Contaminated" size 23"x10"x39", minimum thickness 1.5 mils.

Clear plastic bag 13"x10"x39", minimum thickness 1.5 mils.

Bottle of "hospital disinfectant" (containing quaternary ammonium chlorides in at least 0.8% dilution), or a bottle of household bleach such as "Clorox" or "Purex" (5.25 % sodium hypochlorite).

### b.  Selection of Disinfectants

Dilute solutions of sodium hypochlorite are reported extremely effective against both HIV and the Hepatitis B virus and therefore have been recommended for use in environmental decontamination procedures. Quaternary ammonium compounds are less effective against Hepatitis B.   Chlorine in solution inactivates virus quickly and efficiently but must reach the virus particles to do so.

Proteinaceous materials may interfere with the ability of the appropriate disinfectant solution to reach the virus particles.  Since quaternary disinfecting compounds may act as a detergent as well as a disinfectant, their use may help in the cleaning and removal of proteinaceous materials from surfaces.

---

GEO-MEN 00062948

A facility may use one of these compounds to help clean the surface, and then follow with the use of chlorine solution for final disinfection.  Using one disinfectant compound rather than two would keep the procedure as simple as possible.  By following routine medical cleaning procedures, most blood or fluids would be removed from the surface before application of the disinfectant, so the use of sodium hypochlorite solution shall be sufficient.

### c.  Selection of Gloves

Household or industrial rubber gloves have been recommended for use rather than surgical rubber gloves.  Surgical gloves are somewhat porous and are less resistant to mechanical damage and punctures during clean-up procedures.

### d.  Assignment of Cleaning Duties to Detainees in Medical Facilities

Detainee workers may be assigned duties cleaning the medical facility. Detainees are permitted to clean floors, walls, and to remove trash, but are not permitted to clean medical equipment.

### e.  Instructions for Use of Clean-Up Kit

1.  Open the bag and remove the supplies.

2.  Depending on the type of disinfectant in the kit, take out bottle of "hospital disinfectant", or prepare a dilute solution of sodium hypochlorite.  To prepare a 1:10 dilution of 5.25% sodium hypochlorite, mix 1 part of 5.25 % sodium hypochlorite (common household bleach) with 10 parts water.

3.  Open the large clear plastic bag and the large bag marked "Contaminated".  Place them next to each other.

4.  Put on one pair of gloves.

5.  Use paper towels to absorb as much of the fluid as possible; then place paper towels in the large clear plastic bag.

6.  Pour the solution carefully onto the spill area.  Dispose of the empty bottle in the large, clear plastic bag.  Leave disinfectant in place for 15 minutes.

7.  Use the rags to clean the area, and place rags in the large clear plastic bag.

8.  Tie off the clear plastic bag and place it inside the large plastic bag marked "Contaminated."

9.  Remove gloves carefully and place them in the plastic bag marked "Contaminated."

10. Put on the second pair of gloves and tie the "Contaminated" trash bag closed.

11. Dispose of the "Contaminated" trash bag properly in a contaminated-waste receptacle.

12. Dispose of the second pair of gloves in the contaminated-waste

GEO-MEN 00062949

receptacle.

13. Wash your hands.

14. Prepare a new clean-up kit.

NOTE:  Do not place linen or non-disposable articles in the "Contaminated" trash bag.

### 3.  Hazardous and Infectious Waste Disposal

Infectious and hazardous waste generated at a medical facility shall be stored and disposed of safely and in accordance with all applicable federal and state regulations.

For identified wastes that represent sufficient risk of causing infection or injury during handling and disposal, the following precautions shall be applied.

#### a.  Definitions

Hazardous or infectious waste is defined as: microbiology laboratory waste; human blood and blood products; sharps (as defined in Section VIII, A above); laboratory and other chemicals; or certain drugs such as antineoplastic.

Miscellaneous biomedical waste is defined as waste materials that are not specifically defined as infectious waste.  Such waste includes bandages, dressings, casts, catheters, and disposable pads.

Waste from detainees in isolation is not considered to be infectious waste unless it falls within the specific definition of infectious waste as stated above.

#### b.  Collection and Storage

Infectious waste must be separated from the general waste stream and clearly labeled as infectious:

- Infectious waste shall be double-bagged and tied and labeled "Infectious Waste."

- The bags used must be impermeable, commercially supplied red bags intended specifically for biohazardous waste storage.

- Miscellaneous biomedical waste shall be double-bagged and tied but need not be labeled as infectious.

#### c.  Treatment and Disposal

Blood products and designated body fluids shall be poured slowly and carefully down a toilet to prevent splash.  Compacting of untreated infectious waste is prohibited.  The waste disposal contractor must meet all state or and local requirements for transportation and disposal.

## IX. – BARBER OPERATIONS

Sanitation in barber operations is of the utmost concern because of the possible transfer of

---

*Environmental Health and Safety*       19       *December 2, 2008*

GEO-MEN 00062950

diseases through direct contact or by towels, combs and clippers.  Towels shall not be reused by other detainees until sanitized. Instruments such as combs and clippers shall not be used successively on detainees without proper cleaning and disinfecting.

1. For sanitation reasons, it is preferable that barbering operations be located in a room that is not used for any other purpose.  The floors, walls, and ceilings should be smooth, nonabsorbent and easily cleaned. There should be sufficient light, and the room shall be supplied with hot and cold running water.

2. Each barbershop should have all equipment and facilities necessary for maintaining sanitary procedures for hair care, including covered metal containers for waste, disinfectants, dispensable headrest covers, laundered towels, and haircloths.

3. After each detainee visit, all hair care tools that came in contact with the detainee shall be cleaned and effectively disinfected.  Ultraviolet lights are not appropriate for sterilization but may be used for maintaining tools that have already been properly sterilized.

4. Detailed hair care sanitation regulations shall be conspicuously posted in each barbershop for the use of all hair care personnel and detainees.  Cotton pads, absorbent cotton and other single or dispensable toilet articles may not be reused, and shall be placed in a proper waste receptacle immediately after use. The common use of brushes, neck duster, shaving mugs and shaving brushes is prohibited.

5. Barbers or beauticians shall not provide service to  any detainee when the skin of the detainee's face, neck, or scalp is inflamed, or when there is scaling, pus, or other skin eruptions, unless service of such detainee is performed in accordance with the specific authorization of the Chief Medical Officer.  No person who is infested with head lice shall be served.

**Standard Approved:**

**James T. Hayes, Jr. /s/**                    **12/5/2008**

_____        _____

**James T. Hayes, Jr.**                             **Date**
**Director**
**Office of Detention and Removal Operations**

GEO-MEN 00062951

## TABLE A

## Common Flammable, Toxic, and Caustic Substances

### Class I Liquids

Gasoline
Benzene (Petroleum ether)
Acetine
Hexane
Lacquer
Lacquer thinner
Denatured alcohol
Ethyl alcohol
Xylene (Xylol)
Contact cement (flammable)
Toudi (Toluene)
Methyl ethyl ether
Methyl ethyl ketone
Naphtha Y, M, and P

### Class II Liquids

Diesel fuel
Motor fuel
Kerosene
Cleaning solvents
Mineral spirits
Agitene

### Class III Liquids

Paint (oil base)
Linseed oil
Mineral oil
Neat's-foot oil
Sunray conditioner
Guardian fluid

### Toxic Substances

Ammonia
Chlorine
Antifreeze
Duplicating fluid
Methyl alcohol
Defoliants
Herbicides
Pesticides

### Caustic Substances

Lye
Muriatic acid
Caustic soda
Sulfuric acid
Tannic acid

---

*Environmental Health and Safety*                    21

GEO-MEN 00062952

## ICE/DRO DETENTION STANDARD

## SPECIAL MANAGEMENT UNITS

**I.  PURPOSE AND SCOPE.  This Detention Standard protects detainees, staff, contractors, volunteers, and the community from harm by segregating certain detainees from the general population in Special Management Units (SMUs) with an Administrative Segregation section for detainees segregated for administrative reasons and a Disciplinary Segregation section for detainees segregated for disciplinary reasons.**

It applies to the following types of facilities housing DRO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by DRO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

***Procedures in italics are specifically required for SPCs and CDFs***.  IGSAs must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Some terms used in this document may be defined in the separate **Definitions** Standard.

**II.  EXPECTED OUTCOMES.**  The expected outcomes of this Detention Standard are:

1.   Each facility will have Special Management Units with an Administrative Segregation section for detainees segregated from the general population for administrative reasons and a Disciplinary Segregation section for detainees segregated from the general population for disciplinary reasons.

2.   Detainees housed in the general population, staff, contractors, volunteers, and the local community will be protected from harm by the segregation of certain detainees in SMUs.

3.   Any detainee who represents an immediate, significant threat to safety, security or good order will be immediately controlled by staff and, for cause and with supervisory approval, placed in Administrative Segregation.

4.   Health care personnel will be immediately informed when a detainee is admitted to an SMU to provide assessment and review as indicated by health care authority protocols.

5.   A detainee will be placed in "protective custody" status in Administrative Segregation only when there is documentation that it is warranted and that no reasonable alternatives are available.

---

GEO-MEN 00063088

6.  A detainee will be placed in Disciplinary Segregation only after a finding by a Disciplinary Hearing Panel that the detainee is guilty of a prohibited act or rule violation classified at a "Greatest", "High", or "High-Moderate" level, as defined in the Detention Standard on Disciplinary System, Attachment A: Prohibited Acts and Sanctions.

7.  The status of detainees in Special Management Units will be reviewed in accordance with required time schedules by supervisory staff and the results of those reviews will be documented.

8.  A detainee will remain in Disciplinary Segregation for no more than 60 days for violations associated with a single incident, and his or her status will be reviewed after the first 30 days, and each 30 days thereafter by the facility administrator and the Field Office Director to determine if continued detention in Disciplinary Segregation is still warranted.

9.  Detainees in SMUs will be afforded basic living conditions that approximate those provided to the general population, consistent with the safety and security considerations that are inherent in more controlled housing, and in consideration of the purpose for which each detainee is segregated.

10. In general, when a detainee in an SMU is deprived of any usually authorized items or activity, a report of the action is forwarded to the facility administrator for notice and review.

11. Detainees in SMUs will have regular access to supervisory, management, program, and health care staff.

12. Each detainee in an SMU will be offered a minimum of one hour of recreation per day, five days a week, unless documented security or safety considerations dictate otherwise.

13. Detainees in SMUs will be able to write and receive mail and correspondence as they would otherwise be able to do while detained within the general population.

14. Detainees in SMUs will be provided opportunities for general visitation, including legal visitation, unless there are substantial, documented reasons for withholding those privileges.

15. Detainees in SMUs will have access to personal legal materials, law library materials, and legal visits, in accordance with provisions in this Detention Standard.

16. Detainees in SMUs will have access to telephones, in accordance with provisions in this Detention Standard.

17. Detainees in SMUs will have access to programs and services such as commissary, library, religious guidance, and recreation, in accordance with provisions in this Detention Standard.

18. Detailed records will be maintained on the circumstances related to a detainee's confinement to the SMU, through required permanent SMU logs and individual detainee records.

19. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

---

GEO-MEN 00063089

**III. DIRECTIVES AFFECTED.** This Detention Standard replaces **Special Management Unit (Administrative Segregation)** and **Special Management Unit (Disciplinary Segregation)**, both dated 9/20/2000.

**IV. REFERENCES**

American Correctional Association 4th Edition Standards for Adult Local Detention Facilities: 4-ALDF-2A-44 through 2A-66.

ICE/DRO Detention Standards on:

**Correspondence and Other Mail**
**Disciplinary System**
**Facility Security and Control**
**Law Libraries and Legal Material**
**Personal Hygiene**
**Recreation**
**Searches of Detainees, particularly the section on Close Observation in a "Dry Cell"**
**Staff-Detainee Communication**
**Telephone Access**
**Visitation**
**Hold Rooms in Detention Facilities**
**Suicide Prevention and Intervention**

**V. EXPECTED PRACTICES**

**A. Overview**

At times, a detainee must be isolated from the general population of ICE detainees for the protection of the detainee, other detainees, and facility staff. Such isolation is generically termed "segregation" and takes two different forms, depending on its intended purpose:

1. **Administrative Segregation** (also referred to as "Administrative Detention" by the Federal Bureau of Prisons), and

2. **Disciplinary Segregation** (also referred to as "Disciplinary Detention" by the ACA Standards).

DRO refers to each of these types of segregated housing as a "Special Management Unit," and in many detention facilities, there is one SMU that has two sections, one for each type of segregation. While many of the standards, requirements, and basic operational procedures are the same for both SMU types, some distinct differences remain and are detailed below under **Basic Requirements for All Special Management Units**.

A detainee may be placed in **Disciplinary Segregation** only after being found guilty, through a formal disciplinary process, of a facility rule violation. Therefore, detainees in **Disciplinary Segregation** generally have fewer privileges than those in non-punitive **Administrative Segregation**. In particular, they are subject to more stringent controls,

---

GEO-MEN 00063090

for example, in regard to personal property and reading material. Additional limitations may also be imposed upon their television viewing, commissary/vending machine privileges, etc. Detainees in Administrative Segregation generally will be housed separately from those in Disciplinary Segregation

Because of that basic difference, the procedures for placing a detainee in **Administrative Segregation** are different than those for **Disciplinary Segregation**, as are the requirements for periodic review of each detainee, as detailed below.

## B. Basic Requirements for All Special Management Units

Conditions of confinement are based on the amount of supervision required to control a detainee and safeguard the detainee, other detainees, and facility staff. Therefore, the standard SMU living conditions specified below may not be modified for either disciplinary or punitive purposes. Staff shall treat each detainee in an SMU in a decent and humane manner, regardless of the purpose for which the detainee is segregated.

In every instance, any exceptions to these requirements shall be:

- Made only for the purpose of ensuring detainee and facility staff safety and security (i.e., not for purposes of punishment);

- Approved by a security supervisor (or higher official);

- On a temporary and situational basis, continued only for as long as it is justified by threat to the safety or security of the facility, its staff, or detainee population; and

- Documented in the unit log and, under circumstances specified later in this Detention Standard, documented in a memo which shall be placed in the individual detainee's detention file.

When a detainee in an SMU is deprived of any usual authorized items or activity, a report of the action shall be forwarded to the facility administrator. This report shall be made part of the detainee's facility record or disciplinary file.

1. **Control of Contraband and Tools.** In accordance with procedures detailed in the Detention Standard on **Facility Security and Control**, each facility administrator is required to establish written policy and procedures to control and secure SMU entrances, contraband, tools, and food carts.

2. **Permanent Special Management Unit Logs**. The facility administrator shall ensure that permanent housing logs are maintained in SMUs to record specified data on detainees upon admission to and release from the unit. These logs shall also be used by supervisory staff and other officials to record their visits to the unit.

3. **Cell Occupancy.** Ordinarily, the number of detainees confined to each cell or room may not exceed the capacity for which it was designed. Under exigent circumstances, before approving any additional cell occupancy on a temporary basis, the facility administrator shall consult with HQ DRO's Detention Management Division, who shall consult with DHS/ICE legal counsel. If a decision is made to approve such additional cell occupancy, a report of the action should be filed with the facility and with the ICE Field Office Director.

GEO-MEN 00063091

4. **Cell Condition.** Cells and rooms used for purposes of segregation must be well ventilated, adequately lit, appropriately heated and maintained in a sanitary condition at all times.

   a.  All cells must be equipped with beds that are securely fastened to the cell floor or wall.

   b.  Conditions for close observation in a "dry cell" without water are detailed in the Detention Standard on **Searches of Detainees**.

5. **Personal Property.** Each facility shall issue guidelines in accordance with this Standard concerning the property detainees may retain in each type of segregation. Generally, detainees in **Disciplinary Segregation** shall be subject to more stringent personal property restrictions and control than those in **Administrative Segregation**, given the non-punitive nature of Administrative Segregation.

6. **Privileges.** Each facility shall issue guidelines in accordance with this Standard concerning the privileges detainees may have in each type of segregation.

   a.  **Administrative Segregation** -- Generally, these detainees shall receive the same privileges as are available to detainees in the general population, depending on any safety and security considerations for detainees, facility staff and security.  When space and resources are available, detainees in **Administrative Segregation** may be provided opportunities to spend time outside their cells (in addition to the required recreation periods), for such activities as socializing, watching TV, and playing board games and may be assigned to work details (for example, as orderlies in the SMU).

   b.  **Disciplinary Segregation** -- Generally, these detainees shall have fewer privileges than other detainees in either the general population or in Administrative Segregation.  More specifically, they are subject to more stringent personal property control including, but not limited to, limitations on their reading material and television viewing (which may be completely terminated), and restricted commissary or vending machine purchases.

7. **Close Supervision.** Detainees in SMUs shall be personally observed at least every 30 minutes on an irregular schedule.  For cases that warrant increased observation, the SMU personnel will personally observe them accordingly.     (See also **Suicide Prevention** and **Searches of Detainees**, section on dry cells.)

8. **Supervisory and Staff Visits.** In addition to the direct supervision performed by unit staff:

a.  The shift supervisor shall see each segregated detainee daily, including weekends and holidays.

b.  The facility administrator (or designee) shall visit each SMU daily.

c.  Program staff may visit a detainee upon his or her request.

d.  Field Office staff shall visit a detainee in accordance with the Detention Standard on **Staff-Detainee Communications**.

The facility administrator may require other staff to visit each detainee daily.

9. **Health Care.**  A health care provider shall visit every detainee in an SMU at least

GEO-MEN 00063092

once daily.  Detainees shall be provided medications as prescribed for them.  Detainees will have access to regularly scheduled sick call regardless of housing assignment.

Any action taken shall be documented in a separate logbook, and the medical visit shall be recorded on the SMU Housing Record (Form I-888) or equivalent form.  A detainee's mental health status shall be reviewed and documented at least once every 30 days.

**10. Meals.** Detainees in SMUs shall be provided three nutritionally adequate meals per day, according to the general population meal schedule and ordinarily from the same menu; however, for reasons of safety and security, detainees in SMUs shall eat with disposable utensils.

**11. Clothing and Personal Hygiene.** In accordance with the Detention Standard on **Personal Hygiene**, detainees in SMUs may shave and shower at least three times weekly and receive other basic services such as laundry, hair care, barbering, clothing, bedding, and linen equivalent to general population detainees and consistent with safety and security of the facility.

a.  As needed, staff shall provide toilet tissue, a wash basin, tooth brush, and shaving utensils, and may issue retrievable kits of toilet articles.

b.  A detainee may be denied such items as clothing, mattress, bedding, linens, or pillow for medical or mental health reasons if his or her possession of such items raises concerns for detainee safety and/or facility security.  All denials of such items shall be documented.  If a detainee is so disturbed that he or she is likely to destroy clothing or bedding or create a disturbance by risking harm to self or others, the medical department shall be notified immediately and a regimen of treatment and control shall be instituted by the medical staff, as necessary.  Extreme detainee behavior, such as destroying clothing or bedding or harmful behavior to self or others, must be documented, made part of the detainee's file with the facility and reported to the ICE Field Office Director to implement necessary efforts to protect and care for the detainee.

**12.  Correspondence.** In accordance with the Detention Standard on **Correspondence and Other Mail**, detainees in an SMU may write and receive letters and other correspondence like those housed in the facility's general population.

**13.  Visitation.** In accordance with the Detention Standard on **Visitation**, while in an SMU, a detainee ordinarily retains visiting privileges.

In a facility that allows contact visits, segregated detainees may ordinarily use the visiting room during normal visiting hours.  However, the facility may restrict or disallow general visits for a detainee who violates visitation rules or whose behavior otherwise indicates the detainee would be a threat to the security or the good order of the visiting room.

a. General visitation may be restricted or disallowed when a detainee in **Administrative Segregation** is charged with, or has been found to have committed, a prohibited act related to visiting privileges or has otherwise acted in a way that would reasonably indicate that he or she would be a threat to the orderliness or security of the visiting room.

b.  Under no circumstances may detainees participate in general visitation while in

GEO-MEN 00063093

restraints.  If the detainee's behavior warrants restraints, the visit may not be granted under general population visiting conditions.

*In SPCs and CDFs, detainees in protective custody and violent and disruptive detainees shall not use the visitation room during normal visitation hours.  Violent and disruptive detainees may be limited to non-contact visits.  In extreme cases, where a visit would present an unreasonable security risk, even non-contact general visits may be disallowed for a particular detainee.*

**14.  Legal Visits.** In accordance with the Detention Standard on **Visitation**, detainees in SMUs may not be denied legal visitation.  However, the facility administrator, or designee, may implement whatever security precautions are necessary to protect the detainee and visitors and maintain good order.  In such cases, staff shall advise legal service providers and assistants of any security concerns prior to their visits.

**15.  Religious Guidance.** Detainees in SMUs shall be allowed visits by members of the clergy, upon request, unless the supervisor determines such a visit presents a safety or security risk, or would interfere with the orderly operation of the facility.  Violent and uncooperative detainees may be temporarily denied access to religious guidance.  Staff shall advise the clergy member of the detainee's present state of behavior before he or she agrees to visit the detainee. Each facility will develop procedures to allow detainees to retain religious items within their possession consistent with good security practices (e.g., religious wearing apparel, religious headwear, prayer rugs, beads, prayer rocks, medallions).

**16.  Reading Materials (Non-Legal).** Detainees in SMUs shall have access to reading materials, including religious materials.  The Recreation Specialist shall offer each detainee soft-bound, reading materials of this type on a rotating basis

**17.  Legal Materials.** Detainees in SMUs shall have access to legal materials, in accordance with the Detention Standard on **Law Libraries and Legal Material**.

Detainees may retain a reasonable amount of personal legal material upon admittance to an SMU, provided such material does not create a safety, security or sanitation hazard.

Detainees with a large amount of legal material may be required to place a portion with their stored personal property, with access permitted during scheduled hours.  Requests for access to such legal material shall be accommodated as soon as possible, but in no case more than 24 hours after receipt of the initial detainee request to retrieve documents, except for documented security reasons.

**18.  Law Library Access.** In accordance with the Detention Standard on **Law Libraries and Legal Material**, detainees housed in **Administrative Segregation** or **Disciplinary Segregation** units shall have the same law library access as the general population, unless compelling security concerns require limitations.

a.  Facilities may supervise the library use by a detainee housed in an SMU as warranted by the individual's behavior.  Detainees segregated for protection must be provided access to legal materials.  Such detainees may be required to use the law library separately or, if that is not feasible, legal materials must be brought to them upon request

GEO-MEN 00063094

b.  Violent or uncooperative detainees may be temporarily denied access to the law library if necessary to maintain security, until such time as their behavior warrants resumed access.  In some circumstances, legal material may be brought to individuals in **Disciplinary Segregation**.

c.  Denial of access to the law library must be:

- Supported by compelling security concerns;

- For the shortest period required for security; and

- Fully documented in the SMU housing logbook.

d.  The facility administrator shall notify ICE/DRO every time access is denied, with documentation placed in the detention file.

**19.  Recreation.**  Recreation for detainees housed in the SMU shall be separate from the general population.  As necessary or advisable to prevent assaults and reduce management problems, recreation for some individuals will be alone and separate from all other detainees.

a.  The facility administrator shall develop and implement procedures to ensure that detainees who must be kept apart never participate in activities in the same location at the same time as detainees housed in the general population.  For example, recreation for detainees in protective custody shall be separate from other detainees.

Nevertheless, detainees in the SMU shall be offered at least one hour of recreation per day, scheduled at a reasonable time, at least five days per week.  Where cover is not provided to mitigate inclement weather, detainees shall be provided weather-appropriate equipment and attire.

b.  The recreation privilege shall be denied or suspended only if the detainee's recreational activity would unreasonably endanger detainee safety or security. The case of a detainee denied recreation privileges shall be reviewed at least once each week, as part of the reviews required for all detainees in SMU status.

- As part of this process, the reviewer shall document whether the detainee continues to pose a threat to self, others, or facility security and, if so, why.

- The facility shall notify ICE/DRO when a detainee's denied recreation privileges exceeds 7 days.

- Such a denial of recreation privileges (for more than 7 days) requires the concurrence of the facility administrator and a health care professional.  It is expected that such denials shall rarely occur, and only in extreme circumstances.

c.  Ordinarily, a detainee may be denied recreation privileges only with the facility administrator's written authorization, documenting why the detainee poses an unreasonable risk even when recreating alone.  When necessary to control an immediate situation for reasons of safety and security, SMU staff may deny an instance of recreation, upon verbal approval from the shift supervisor, and document the reasons for that denial in the unit logbook(s).  In such a case, the supervisor may also require additional written documentation from the SMU staff for the facility administrator.  When a detainee in an SMU is deprived of recreation (or any other usually authorized items or

GEO-MEN 00063095

activity), a report of the action shall be forwarded to the facility administrator.

Examples of such circumstances may include, but are not limited to:

1.  A detainee segregated for specific administrative purposes,

2.  A detainee in protective custody, or

3.  A detainee whose mental and/or physical condition requires special handling and treatment by staff (for example, detainees who are drug or alcohol addicts or abusers, emotionally disturbed, mentally retarded, mentally ill, suicidal, disabled, or infirm).

d.  A detainee in **Disciplinary Segregation** may temporarily lose recreation privileges upon a disciplinary panel's written determination that he or she poses an unreasonable risk to the facility, him/herself, or others.

When his or her recreation privileges are suspended, the disciplinary panel or facility administrator shall provide the detainee with written notification, the reason(s) for the suspension, the duration of the suspension, and any conditions that must be met before the restoration of his or her privileges provided the requisite conditions are met.

**20. Telephone Access.**  As detailed in the Detention Standard on **Telephone Access**, detainees in SMUs shall have access to telephones in a manner that is consistent with the special safety and security requirements of such units.  Telephone access for legal calls will be provided,  including calls to attorneys, other legal representatives, courts, government offices (including the Office of the Inspector General, Office for Civil rights, and Civil Liberties, DHS Joint Intake Center, and DHS Office of Internal Audit), and embassies or consulates, according to the facility schedule.  Any denial of telephone access will be documented.

In general, any detainee in an SMU may be reasonably restricted from using or having access to a phone if that access is used for criminal purposes or would endanger any person, or if the detainee damages the equipment provided.  In such instances, staff must clearly document why such restrictions are necessary to preserve the safety, security, and good order of the facility.

### a. Administrative Segregation

Ordinarily, staff shall permit detainees in Administrative Segregation to have telephone access similar to detainees in the general population, but in a manner consistent with the special security and safety requirements of detainees in these units.  This requirement applies to a detainee in Administrative Segregation pending a hearing because he or she has been charged with a rule violation, as well as a detainee in Administrative Segregation for other than disciplinary reasons (for example, protective custody, suicide risk, etc.).

### b. Disciplinary Segregation

Detainees in Disciplinary Segregation may be restricted from using telephones to make general calls as part of the disciplinary process; however, even in Disciplinary Segregation, detainees shall have some telephone access for special purposes.

---

GEO-MEN 00063096

Ordinarily, staff shall permit detainees in Disciplinary Segregation to make direct or free Consular and legal calls as described in the Detention Standard on **Telephone Access**, except for compelling and documented reasons of safety, security, and good order.

### 21. Translation/Interpretation Services

Detainees will be provided translation or interpretation services while in the Special Management Unit to assist with their understanding of conditions of confinement as well as their rights and responsibilities.

### 22. Special Needs

Detainees in the SMU will be provided appropriate accommodations and professional assistance such as medical, therapeutic, or mental health treatment for special needs, as necessary.

## C.  Placement in Administrative Segregation

Administrative Segregation status is a non-punitive status in which restricted conditions of confinement are required only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility.  For matters of safety and security, staff may have to take immediate action to control a detainee, including placement in Administrative Segregation.  Examples include detainees who require protective custody, who cannot be placed in the local population because they are en route to another facility ("holdovers"), who are awaiting a disciplinary hearing, or who require separation for medical reasons.

Each facility shall develop and follow written procedures governing the management of its Administrative Segregation unit that are consistent with this Detention Standard. These procedures must document detailed reasons for placement of an individual in Administrative Segregation.  Detainees must be provided with a copy of the Administrative Segregation Order.

Prior to the detainee's placement in Administrative Segregation, the facility administrator and security supervisor, or equivalent, shall review the case to determine whether Administrative Segregation is, in fact, warranted.  The facility administrator may delegate to the security supervisor the authority to place a detainee in Administrative Segregation.

**1. Reasons for Placement in Administrative Segregation.** A detainee may be placed in Administrative Segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees, for the secure and orderly operation of the facility, for medical reasons, or other circumstances as set forth below.  Some examples of incidents warranting a detainee's assignment to Administrative Segregation include, but are not limited to, the following:

(a) A detainee is awaiting an investigation or a hearing for a violation of facility rules. Pre-disciplinary hearing detention should be ordered only as necessary to prevent further violation of those rules or to protect the security and orderly operation of the facility.  It is not to be used as a punitive measure.

Time served in pre-hearing detention may be deducted from any time ordered by the

GEO-MEN 00063097

Institutional Disciplinary Panel (IDP).

(b) A detainee is a threat to the security of the facility.  The facility administrator may determine that a detainee's criminal record, past behavior at other institutions, behavior while in ICE/DRO detention, or other evidence is sufficient to warrant placement of the detainee in Administrative Segregation. Copies of records supporting this action shall be attached to the Administrative Segregation Order.

(c) A detainee requires protection.  Protective Custody may be initiated at the detainee's request or by whoever first ordered his or her segregation to protect the detainee from harm.   Each facility will develop procedures to consider continued placement in protective custody as well as provisions for release from protective custody when appropriate.  Frequently, the types of detainees who require this type of treatment include, but are not limited to:

▪   Victims of detainee assaults;

▪   Detainee informants or witnesses - detainees who provide information to institutional staff or any law enforcement agency concerning improper or criminal activities by others;

▪   Sexual predators;

▪   Detainees who have been pressured by other detainees to participate in sexual activity;

▪   Detainees who request Protective Custody;

▪   Detainees who refuse to enter the general population because of alleged intimidation from other detainees;

▪   Detainees who refuse to return to the general population, but who do not provide the reason for refusal;

▪   Detainees who appear to be in danger of bodily harm; or

▪   Detainees who seek protection, claiming to be former law enforcement officers or to have held sensitive law enforcement positions, whether or not there is official information to verify the claim.

(d) The IDP may order a detainee into Administrative Segregation following Disciplinary Segregation after determining that releasing the detainee into the general population would pose a threat to the security and orderly operation of the facility.  A detainee transferred from Disciplinary Segregation to Administrative Segregation shall enjoy the same privileges as all other detainees in Administrative Segregation.

(e) A medical professional who ordered a detainee removed from the general population shall complete and sign an Administrative Segregation Order (see below), unless the detainee is to stay in the medical department's isolation ward.

(f) A detainee is scheduled for release, removal, or transfer within 24 hours.  Such segregation may be ordered for security reasons or for the orderly operation of the facility.

**2.  Administrative Segregation Order.** A written order shall be completed and approved by a security supervisor before a detainee is placed in Administrative

GEO-MEN 00063098

Segregation, except when exigent circumstances make this impracticable.  In such cases, an order shall be prepared as soon as possible.  A copy of the order shall be given to the detainee within 24 hours, unless delivery would jeopardize the safety, security, or orderly operation of the facility.

a.   The facility administrator or designee shall complete the Administrative Segregation Order (Form I-885 or equivalent), detailing the reasons for placing a detainee in Administrative Segregation, before his or her actual placement.

b.   An Administrative Segregation Order is not required for a detainee awaiting removal, release, or transfer within 24 hours of its service.

c.   In an emergency, the detainee's placement in Administrative Segregation may precede the paperwork, which the facility administrator shall prepare as soon as possible after the detainee's placement.

d.   All memoranda, medical reports, and other relevant documents shall be attached to the Administrative Segregation Order.

e.   A copy of the completed Administrative Segregation Order shall be given to the detainee within 24 hours of placement in Administrative Segregation, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

f.   The order shall remain on file with the SMU until the detainee is returned to the general population.

g.   When the detainee is released from the SMU, the releasing officer shall indicate date and time of release on the Administrative Segregation Order.  The completed order is then forwarded to the chief of security for inclusion into the detainee's detention file.

h.   If the segregation is ordered for protective custody purposes, the order shall state whether the detainee requested the segregation, and whether the detainee requests a hearing concerning the segregation.

**3.  Review of Detainee Status in Administrative Segregation.** All facilities shall implement written procedures for the regular review of all detainees held in Administrative Segregation, consistent with the procedures specified below.

a.   A security supervisor shall conduct a review within 72 hours of the detainee's placement in Administrative Segregation to determine whether segregation is still warranted. The review shall include an interview with the detainee.  A written record shall be made of the decision and the justification. The **Administrative Segregation Review** (Form I-885) shall be used for the review. If the detainee has been segregated for his or her own protection, but **not** at the detainee's request, the signature of the facility administrator or assistant facility administrator is required on the Form I-885 to authorize the alien's continued detention.

b.   A security supervisor shall conduct the same type of review after the detainee has spent seven days in Administrative Segregation, and every week thereafter, for the first 60 days and (at least) every 30 days thereafter.

c.   The review shall include an interview with the detainee, and a written record shall be made of the decision and its justification.

d.   When the reviewing authority concludes that the detainee should be removed from

GEO-MEN 00063099

Administrative Segregation, they shall submit that recommendation to the facility administrator (or designee) for approval.

e.  A copy of the decision and justification for each review shall be given to the detainee, unless, in exceptional circumstances, this provision would jeopardize the facility's security.  The detainee shall also be given an opportunity to appeal a review decision to a higher authority within the facility.

f.   After seven consecutive days in Administrative Segregation, the detainee may exercise the right to appeal the conclusions and recommendations of any review conducted to the facility administrator.  The detainee may use any standard form of written communication, for example, detainee request, to file the appeal.

g.  If a detainee has been in Administrative Segregation for more than 30 days and objects to that status, the facility administrator shall review the case to determine whether that status should continue.  This review shall take into account the detainee's views and shall result in a written record of the decision and its justification.  A similar review shall take place every 30 days and each 30 days thereafter.

h.  When a detainee has been held in Administrative Segregation for **more than 30 days**, the facility administrator shall notify the Field Office Director (FOD), who shall notify the ICE/DRO Assistant Director, Detention Management Division in writing.

i.   When a detainee is held in Administrative Segregation for **more than 60 days**, the FOD shall notify in writing, the Deputy Assistant Director, Detention Management Division.  The Deputy Assistant Director shall then consider whether it would be appropriate to transfer the detainee to a facility where s/he may be placed in the general population.

### D.  Placement in Disciplinary Segregation.

To provide detainees in the general population a safe and orderly living environment, facility authorities shall discipline anyone whose behavior does not comply with facility rules and regulations.  Such discipline may involve temporary confinement in the SMU apart from the general population.  A detainee may be placed in Disciplinary Segregation only by order of the Institutional Disciplinary Panel (IDP), or its equivalent, after a hearing in which the detainee has been found to have committed a prohibited act.   Ultimately, the IDP may order the detainee's placement into Disciplinary Segregation, but only when alternative dispositions would inadequately regulate the detainee's behavior.

GEO-MEN 00063100

**1. Duration.** A maximum sanction of 60 days in Disciplinary Segregation shall apply to violations related to a single prohibited incident. After the first 30 days, and each 30 days thereafter, the facility administrator shall send a written justification to the FOD, who may decide to transfer the detainee to a facility where security is such that he or she could be placed in the general population.

**2. Disciplinary Segregation Order.** A written order shall be completed and signed by the chair of the IDP (or disciplinary hearing officer) before a detainee is placed into Disciplinary Segregation. A copy of the order shall be given to the detainee within 24 hours, unless delivery would jeopardize the safety, security, or the orderly operation of the facility or the safety of another detainee.

a. The IDP chairman shall prepare the **Disciplinary Segregation Order** (Form I-883 or equivalent), detailing the reasons for placing a detainee in Disciplinary Segregation, before his or her actual placement. All relevant documentation must be attached to the order.

b. A copy of the completed Disciplinary Segregation Order shall be given to the detainee within 24 hours of placement in Disciplinary Segregation, unless delivery would jeopardize the safe, secure, or orderly operation of the facility. The order shall be maintained on file in the SMU until the detainee is released from the SMU.

When the detainee is released from the SMU, the releasing officer shall indicate date and time of release on the Disciplinary Segregation Order, then forward the completed order to the chief of security for insertion into the detainee's detention file.

**3. Review of Detainee Status in Disciplinary Segregation.** All facilities shall implement written procedures for the regular review of all Disciplinary Segregation cases, consistent with the following procedures:

a. A security supervisor, or the equivalent, shall interview the detainee and review his or her status in Disciplinary Segregation every seven days to determine whether the detainee:

- Abides by all rules and regulations; and,

- Is provided showers, meals, recreation, and other basic living standards, as required by this Detention Standard.

b. The security supervisor shall document his or her findings after every review, by completing a **Disciplinary Segregation Review** (Form I-887).

- The security supervisor may recommend the detainee's early release from the SMU upon finding that time in Disciplinary Segregation is no longer necessary to regulate the detainee's behavior.

- An early-release recommendation must have the facility administrator's approval before the detainee may be returned to the general population.

- The security supervisor may shorten, but not extend, the original sanction.

- All review documents shall be placed in the detainee's detention file.

- At each formal review, the detainee shall be given a written copy of the reviewing officer's decision and the basis for his or her finding, unless it would result in a compromise of institutional security. If for some reason it can not be delivered, then the

GEO-MEN 00063101

detainee should be advised of the decision orally and the detention file should be so noted and the reasons identified in writing as to why the notice could not be provided in writing.

### E. Logs and Records

1. **Permanent SMU Log.**  A permanent log shall be maintained in the SMU to record all activities concerning the SMU detainees, such as the meals served, recreational time, and visitors.

*In SPCs and CDFs, the SMU log shall record the detainee's name, A-number, housing location, date admitted, reasons for admission, tentative release date (for detainees in Disciplinary Segregation), the authorizing official, and date released.*

**2. Visitor's Log.**  *In SPCs and CDFs, a separate log shall be maintained in the SMU of all persons visiting the unit.  This separate record shall include notation of:*

- *The time and date of the visit, and*

- *Any unusual activity or behavior of an individual detainee, with a follow-up memorandum sent through the facility administrator to the detainee's file.*

**3. Individual Special Management Housing Unit Record.**  *In SPCs, **Special Management Housing Unit Record**, (Form I-888) shall be prepared immediately upon a detainee's placement in the SMU.  CDFs and IGSA facilities shall use the Form I-888 or comparable form for this purpose as well.*

*a. The special housing unit officer shall immediately record:*

- *Whether the detainee ate, showered, recreated, and took any medication; and*

- *Any additional information, such as whether the detainee has a medical condition, or has exhibited suicidal/assaultive behavior.*

- *The officer that conducts the activity will print his/her name and  sign the record.*

*b. The facility medical officer shall sign each individual's record when he or she visits a detainee in the SMU.  The housing officer shall initial the record after the medical visits are completed, but no later than the end of the shift.*

*c. A new Form I-888 must be created for each week the detainee is in the SMU. The completed weekly forms shall be retained at the SMU until the detainee is released from the SMU.*

*d. Upon a detainee's release from the SMU, the releasing officer shall attach the entire housing unit record related to that detainee to either the Administrative Segregation Order or Disciplinary Segregation Order and forward it to the chief of security for inclusion into the detainee's detention file.*

**Standard Approved:**

**James T. Hayes, Jr. /s/**                    **12/5/2008**

_____          _____

*Special Management Units*                    15                    *December 2, 2008*

GEO-MEN 00063102

**James T. Hayes, Jr.**                                    **Date**
**Director**
**Office of Detention and Removal Operations**

---

GEO-MEN 00063103

## ICE/DRO DETENTION STANDARD

### DISCIPLINARY SYSTEM

**I.  PURPOSE AND SCOPE.  This Detention Standard promotes a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system, requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions to those who do not comply.**

It applies to the following types of facilities housing ICE/DRO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by DRO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

***Procedures in italics are specifically required for SPCs and CDFs***.  IGSAs must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Some terms used in this document may be defined in the separate **Definitions** Standard.

**II.  EXPECTED OUTCOMES.**  The expected outcomes of this Detention Standard are:

1. Detainees will be informed of facility rules and regulations, prohibited acts, disciplinary sanctions that may be imposed, their rights in the disciplinary system and the procedure for appealing disciplinary findings.

2. Each facility will have graduated severity scales of prohibited acts and disciplinary consequences.

3. Where permitted by facility policy, staff will informally settle minor transgressions by mutual consent, whenever possible.

4. Staff who witness a prohibited act that cannot or should not be resolved informally, or have reason to suspect that a detainee has engaged in a prohibited act, will prepare a clear, concise, and complete Incident Report.

5. Each Incident Report will be objectively and impartially investigated and reported, ordinarily by a person of supervisory rank.

6. When appropriate, a serious incident that may constitute a criminal act will be referred to the proper investigative agency, and the administrative investigation will be suspended, pending the outcome of that referral.

7. At each step of the disciplinary and appeal process, the detainee will be advised of his or her rights in a language he or she understands, and translation or interpretation services will be provided as needed.

8. A Unit Disciplinary Committee (UDC) will further investigate and adjudicate the incident and may impose minor sanctions or refer the matter to a higher level disciplinary panel.

---

GEO-MEN 00063138

9. An Institution Disciplinary Panel (IDP) will conduct formal hearings on Incident Reports referred from UDCs and may impose higher level sanctions for "Greatest" and "High" level prohibited acts.

10. Detainees before the IDP will be afforded a staff representative, upon request, or automatically if the detainee is illiterate, has limited English language skills or otherwise needs special assistance.

11. Actions of the IDP will be reviewed by the facility administrator, who may concur with the findings and sanctions or modify them.

12. At all steps in the disciplinary process, any sanctions imposed will be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

13. All steps of the disciplinary process will be done within the required time limits.

14. At all steps of the disciplinary process, accurate and complete records will be maintained.  The detainee will receive copies of all reports, exhibits, and other documents considered or generated in the hearing process, except insofar as the disclosure of such documents may pose an imminent threat to the safety and security of the facility staff or other detainees, or if the document or other evidence is otherwise protected from disclosure.

15. If a detainee is found not guilty at any stage of the disciplinary process, the incident records will not be placed or retained in the detainee's file, even if they are retained elsewhere for statistical or historical purposes.

16. Detainees will be able to appeal disciplinary decisions through a formal grievance system.  No detainee will be harassed, disciplined, punished or otherwise retaliated against for filing a complaint or grievance.

17. Detainees shall be afforded the following rights: the right to protection from abuse, the right to freedom from discrimination, the right to pursue a grievance, the right to correspond with persons or organizations and the right to due process.

18. The applicable content and procedures in this standard will be communicated to the detainee in a language or manner which the detainee can understand.

**III. DIRECTIVES AFFECTED.**  This Detention Standard replaces **Disciplinary Policy** dated 9/20/2000.

**IV. REFERENCES**

American Correctional Association 4th Edition Standards for Adult Local Detention Facilities: 4-ALDF-3A-01, 3A-02, 6B-05, 6C-01 through 6C-19.

**V. EXPECTED PRACTICES**

**A. Guidelines**

1. Detainees will receive translation or interpretation services throughout the investigative, disciplinary, and appeal process, including accommodation for the hearing impaired.

---

*Disciplinary System*                                    2                          *December 2, 2008*

GEO-MEN 00063139

2.    Each facility holding ICE/DRO detainees in custody shall have a detainee disciplinary system with progressive levels of reviews, appeals, procedures, and documentation procedures.  Written disciplinary policy and procedures shall clearly define detainee rights and responsibilities.  The policy, procedures and rules shall be reviewed at least annually.

3.  Disciplinary action may not be capricious or retaliatory nor based on race, religion, national origin, sex, sexual orientation, disability, or political beliefs.

4.  Staff may not impose or allow imposition of the following sanctions: corporal punishment; deprivation of food services to include use of Nutraloaf or "food loaf"; deprivation of clothing, bedding, or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal access and legal materials; or deprivation of physical exercise unless such activity creates a documented unsafe condition.

5.  The facility shall not hold a detainee accountable for his or her conduct if a medical authority finds him or her mentally incompetent.  For purposes of these standards, a mentally incompetent individual is defined as an individual who is unable to appreciate the difference between appropriate and inappropriate behavior, or between "right" and "wrong."  Such an individual is not capable of acting in accordance with those norms and therefore, cannot be held responsible for his or her "wrongful" actions.

Also, a person who cannot assist in his or her own defense because he or she lacks the ability to understand the nature of the disciplinary proceedings shall be considered incompetent.   Disciplinary proceedings against such a detainee shall be postponed until such time as the detainee is able to understand the nature of the disciplinary proceedings and to assist in his or her own defense.  If the detainee's mental status does not improve within a reasonable amount of time, the officer must find the detainee incompetent to assist in his or her own defense and note such finding on the Incident Report.

## B.  Notice to Detainees

The Detainee Handbook, or supplement, issued to each detainee upon admittance, shall provide notice of the facility's rules of conduct and prohibited acts, the sanctions imposed for violations of the rules, the disciplinary severity scale, the disciplinary process and the procedure for appealing disciplinary findings.  Detainees shall have the following rights and shall receive notice of them in the Handbook:

- The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage, and harassment;

- The right of freedom from discrimination based on race, religion, national origin, sex, sexual orientation, handicap, or political beliefs;

- The right to pursue a grievance in accordance with procedures provided in the Handbook without fear of retaliation;

- The right to pursue a grievance in accordance with the Grievance System Detention Standard and procedures provided in the handbook.

GEO-MEN 00063140

- The right to correspond with persons or organizations, consistent with safety, security, and the orderly operation of the facility; and

- The right to due process, including the prompt resolution of a disciplinary matter.

Copies of the rules of conduct, rights, and disciplinary sanctions shall be provided to all detainees and posted in English, Spanish, and/or other languages spoken by significant numbers of detainees, as follows:

1. Disciplinary Severity Scale

2. Prohibited Acts

3. Sanctions

## C. Disciplinary Severity Scale and Prohibited Acts

All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.

*SPCs and CDFs shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section.*

*Prohibited acts are divided into four categories:  Greatest, High, Moderate, and Low Moderate.  The sanctions authorized for each category shall be imposed only if the detainee is found to have committed a prohibited act.  (See Attachment A -- Prohibited Acts and Sanctions.)*

*Greatest offenses: The IDP shall impose and execute at least one sanction in the A through E range.  Additional sanctions (A through G) may be imposed and either executed or suspended, at the discretion of the panel.  The IDP may impose and execute sanctions F and G only in conjunction with sanction A, B, C, D, and/or E.*

*High offenses: The IDP shall impose and execute at least one sanction in the A through M range.  Additional sanctions (A through M) may be imposed or may be suspended at the discretion of the panel.*

*High Moderate offenses: The IDP shall impose at least one sanction in the A through M range, but may suspend any or all, once imposed.  Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.*

*Low Moderate offenses: The IDP shall impose at least one sanction in the E through M range, but may suspend any or all, once imposed.  Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.*

## D. Incident Reports

Officers who witness a prohibited act or have reason to suspect one has been committed shall prepare and submit an Incident Report. All Incident Reports must state the facts clearly, precisely, and concisely, omitting no details that could prove significant.  Reports also shall identify the officer(s), the detainee(s), and all witnesses to the incident.

GEO-MEN 00063141

ICE/DRO pre-approval is required for use of ICE Incident Report forms in CDFs and IGSA facilities.

*In SPCs and CDFs, minor transgressions shall be settled informally and by mutual consent whenever possible. If, however, the officer involved thinks an informal resolution is inappropriate or unattainable, he or she shall prepare an Incident Report and Notice of Charges and submit it to the appropriate supervisor before the end of the assigned shift.*

*The Incident Report shall cite the relevant rule or standard without quoting it in its entirety. (For example, for destruction of government property, the report would cite, briefly, "Code 218–Destroying Government Property and specify the exact manner in which the detainee is alleged to have violated the cited rule or standard including all relevant facts as to time, dates, and places.")*

*If the officer observes anything unusual in the detainee's behavior or demeanor, he or she shall so note in the report. The reporting officer shall also list all staff, contract officers or detainee witnesses to the incident, and the disposition of any physical evidence (weapons, property, etc.) relating to the incident. The reporting officer shall sign the report and include title, date and time the report was signed. The shift supervisor shall review all Incident Reports before going off duty.*

## E. Investigations

IGSAs shall have procedures in place to ensure that all Incident Reports are investigated within 24 hours of the incident.

The investigating officer shall have supervisory rank or higher (unless prevented by personnel shortages) and shall have had no prior involvement in the incident, either as witness or officer at the scene. If an officer below supervisory rank conducts the investigation, the shift supervisor shall review his or her report(s) for accuracy and completeness and sign them.

*In SPCs and CDFs, the officer designated to investigate the incident is responsible for completing the necessary interviews, collecting evidence, and submitting written reports.*

*The investigating officer shall:*

1. *Commence the investigation within 24 hours of receipt of the Incident Report.*

2. *Advise the detainee of the right to remain silent at every stage of the disciplinary process and ensure he or she has a complete listing of detainee rights.*

3. *Provide the detainee a copy of the Incident Report and notice of charges at least 24 hours before the start of any disciplinary proceedings.*

4. *Terminate the administrative investigation, if the incident is under investigation on different grounds (that is, the prohibited act is under criminal investigation), unless and until the agency with primary jurisdiction concludes its investigation or indicates it will not pursue the matter.*

   *Contraband that may be evidence in connection with a violation of a criminal statute shall be preserved, inventoried, controlled, and stored so as to*

---

GEO-MEN 00063142

*maintain and document the chain of custody. The documentation shall be reported to the appropriate law enforcement authority for action and possible seizure and prosecution. See **Preservation of Evidence** in the Detention Standard on **Searches of Detainees**.*

5. *Advise the detainee of his or her right, if applicable, to an initial hearing before the Unit Disciplinary Committee (UDC) within 24 hours of his or her notification of charges.*

6. *Record personal observances and other potentially material information.*

7. *Prepare a factual report of the investigation, including the location or disposition of any physical evidence.*

8. *Forward to the UDC all reports relevant to the disciplinary hearing – but do **not** provide a copy to the detainee at this stage of the disciplinary process, except for a copy of the Incident Report as instructed in #4 above.*

### F.  Unit Disciplinary Committee (UDC)

All facilities shall establish an intermediate level of investigation/adjudication process to adjudicate low or moderate infractions.  They shall also ensure that the detainee is afforded all the UDC rights listed below.

The UDC administering unit discipline shall be comprised of one to three members, at least one of whom is a supervisor.

The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident.  Only in the unlikely event that practically every available officer witnessed or was directly involved in the incident may an exception occur.

The UDC shall conduct hearings and, to the best extent possible, informally resolve cases involving High Moderate or Low Moderate charges in accordance with the list of charges and related sanctions noted as Attachment A of this Standard.  Unresolved cases and cases involving serious charges are forwarded to the Institution Disciplinary Panel.

**The UDC shall have authority to:**

1. Conduct hearings and resolve incidents involving High Moderate or Low Moderate charges.

2. Consider written reports, statements, and physical evidence.

3. Hear pleadings on the part of the detainee.

4. Make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.

5. Impose minor sanctions "E" through "M" in accordance with the table of prohibited acts and associated sanctions later in this document.

**The detainee in UDC proceedings shall have the right to:**

1. Remain silent at any stage of the disciplinary process.

2. Due process, which includes:

GEO-MEN 00063143

- Attending the entire hearing (excluding committee deliberations);

- Waiving the right to appear; or

- Having a UDC hearing within 24 hours after the conclusion of the investigation.

If security considerations prevent detainee attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process via telephonic testimony, the submission of documents, written statements, or questions to be asked of witnesses.

3. Present statements and evidence, including witness testimony on his or her own behalf.

4. Appeal the committee's determination through the detainee grievance process.

**The UDC shall:**

1. Advise the detainee of his or her rights at the hearing.

2. Refer to the IDP any incident involving a serious violation associated with an A-through-D-range sanction.  This includes code violations in the "Greatest" and "High" categories (100s and 200s).

3. Serve the detainee with:

- A copy of the UDC decision which must contain the reason for the disposition and sanctions imposed; or

- Written notification of charges and hearing before the IDP.

4. If the detainee's case is being referred to the IDP, advise the detainee, in writing, of

- The right to call witnesses and present evidence before the IDP; and

- The right to a staff representative before the IDP.

## G. Staff Representation

*In SPCs and CDFs, the facility administrator shall, upon the detainee's request, assign a staff representative to help prepare a defense.  This help shall be automatically provided for detainees who are illiterate, have limited English-language skills, are without means of collecting and presenting essential evidence, or are in administrative or disciplinary segregation.*

1. *A staff representative must be a full-time employee.*

2. *Because of the potential conflict of interest, the facility administrator, members of the IDP and of the UDC initially involved in the case, eyewitnesses, the reporting and investigating officers, and anyone else with a stake in the outcome shall not act as staff representative.*

3. *The detainee may select his or her staff representative, barring those identified in #2 above.*

4. *The IDP shall arrange for the presence of the staff representative selected by the*

GEO-MEN 00063144

*detainee. If that staff member declines or is unavailable, the detainee may:*

- *Select a different representative;*
- *Wait for the unavailable staff member to become available (within a reasonable period); or,*
- *Proceed without a staff representative.*

5. *A staff member who declines to serve must state the reason on the staff representative form.*

6. *If several staff decline, the facility administrator shall assign one.*

7. *The staff representative shall be free to speak to witnesses and to present evidence on the detainee's behalf, including any mitigating circumstances. The staff representative must act in good faith on behalf of the charged detainee, and interview witnesses and obtain documentary evidence as is requested by the detainee or is otherwise reasonably seen as relevant to the defense of the charges or in mitigation of the charges.*

8. *The IDP shall allow the staff representative enough time to speak with the detainee and interview witnesses prior to the commencement of the proceeding. The IDP may grant a request for extension of time if required for an adequate defense.*

9. *The IDP shall establish the reliability of information provided by a confidential source before considering it in the disciplinary proceedings.*

10. *The IDP may withhold the confidential source's identity from the staff representative. While the staff representative may challenge the substance of any confidential information the IDP discloses, he or she may not question its reliability (which is pre-established by the IDP).*

11. *When the detainee cannot effectively present his or her own case, the facility administrator shall appoint a staff representative, even if not requested by the detainee.*

## H. Institution Disciplinary Panel

All facilities that house ICE/DRO detainees shall have a disciplinary panel to adjudicate detainee Incident Reports. Only the disciplinary panel may place a detainee in disciplinary segregation.

The term "Institution Disciplinary Panel" or "IDP" refers either to a **three-person panel** appointed by the facility administrator, or a **one-person disciplinary hearing officer**, depending on the practice at the facility.

The panel may not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident. Exceptions may occur only if the number of officers required for the panel cannot be filled due their direct involvement in the incident. **The IDP shall have authority to:**

1. Conduct hearings on all charges and allegations referred by the UDC.

2. Call witnesses to testify.

GEO-MEN 00063145

3. Consider written reports, statements, physical evidence, and oral testimony.

4. Hear pleadings by detainee and staff representative.

5. Make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.

6. Impose sanctions as listed and authorized in each category.

**The detainee in IDP proceedings shall have the right to:**

1. Remain silent at any stage of the disciplinary process.

2. Due process, which includes:

   ▪ Attending the entire hearing (excluding committee deliberations);

   ▪ Waiving the right to appear; or

   ▪ Having an IDP hearing within 24 hours after the conclusion of the investigation.

If security considerations prevent the detainee's attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process by telephonic testimony, the submission of documents, written statements or questions to be asked of witnesses.

3. Present statements and evidence, including witness testimony, on his or her behalf.

4. Appeal the committee's determination through the detainee grievance process.

**The IDP shall:**

1. Verify that the detainee has been advised of and afforded his or her rights, as provided above.

2. Remind the detainee of his or her right to a staff representative, and provide one if requested.

3. Advise the detainee of his or her right to waive the hearing and admit having committed the offense.

4. Conduct the hearing on the first business day after receiving the UDC referral, unless the detainee waives the 24-hour notification provision and requests an immediate hearing.  In cases where a hearing is delayed, the reason(s) must be documented (for example, a continuing investigation of facts, unavailability of one or more essential witnesses, etc.) and approved by the facility administrator.  If the detainee is being held in segregation, the delay shall not exceed 72 hours, barring an emergency.

GEO-MEN 00063146

5. Prepare a written record of any hearing. This record must show that the detainee was advised of his or her rights.  It must also document the evidence considered by the Panel and subsequent findings and the decision and sanctions imposed, along with a brief explanation.

6. Forward the entire record to the facility administrator, who may (a) concur; (b) terminate the proceedings; or (c) impose more severe or more lenient sanctions.

7. Serve the detainee with written notification of the decision, which must contain the reason for the decision.

## I. Confidential Information

When a decision relies on information from a confidential source, the UDC or IDP shall disclose as much of the confidential information as may be disclosed without jeopardizing the safety and security of facility staff and other persons, and shall include in the hearing record the factual basis for finding the information reliable.

## J. Postponement of Disciplinary Proceedings

All facilities shall permit hearing postponements or continuances under certain circumstances.

*In SPCs and CDFs, circumstances justifying the postponement or continuance of a hearing might include: defense preparation, physical or mental illness, security, escape, disciplinary transfer, deportation, or pending criminal prosecution.*

*An uncooperative detainee may also cause a delay in the proceedings, either because of inappropriate behavior during the hearing process or a refusal to participate in a productive manner.*

## K. Duration of Sanctions

The duration of sanctions shall be within established limits. Neither the panel recommending sanctions nor the *facility administrator* making the final decision shall impose sanctions arbitrarily, beyond these limits.

1. Sanctions range from the withholding of privilege(s) to segregation.  Time in segregation or the withholding of privileges after a hearing shall generally not exceed 60 days per violation.

2. Time served in segregation pending the outcome of the proceedings may be credited to the number of days to be spent in the segregation unit after an adverse decision is announced.

3. The disciplinary report and accompanying documents are not placed in the file of a detainee who is found not guilty. The facility, however, may retain the material in its own files for Institution statistical or historical purposes.

4. A detainee may be removed from segregation if a health care professional concludes that continued segregation is detrimental to the detainee's medical or mental health.

GEO-MEN 00063147

### L.  Documents

All documents relevant to the incident, subsequent investigation and  hearing(s), shall be completed and distributed in accordance with facility procedures.

*In SPCs and CDFs, documents shall be prepared and distributed as follows:*

#### Incident Report/Notice of Charges

*The officer shall prepare an Incident Report and submit it to the ICE/DRO or CDF supervisor immediately after the incident takes place.  If the incident is resolved informally, the officer shall so note on the original report, which shall then be forwarded to the chief of security.*

*If the UDC is to be involved, the supervisor shall serve the detainee with a copy of the Notice of Charges upon completion of the investigation, no less than 24 hours before the UDC hearing.*

*The UDC receives the original copy.*

*If the UDC hears the matter, the ranking member of that committee shall serve the detainee with a copy of the Incident Report/Notice of Charges indicating their decision. The UDC, upon conclusion of its proceedings, shall forward the entire record to either the chief of security or the IDP, as appropriate.*

#### Investigation Report
*Original – submitted to the UDC.*
*Detainee does not receive a copy*

#### UDC Report of Findings and Action
*Original – served on the detainee after the committee issues its findings*
*Copy – to the detainee detention file (guilty finding only)*

#### Notice of IDP Hearing
*Original – served on detainee*
*Copy – detainee detention file*

#### Detainee Rights at IDP Hearing
*Original – served on detainee*
*Copy – facility detention file*

#### IDP Report
*Original – detainee detention file*
*Copy – detainee*

**Standard Approved:**

   James T. Hayes, Jr. /s/                                    12/5/2008

_____               _____

**James T. Hayes, Jr.**                                    **Date**
**Director**
**Office of Detention and Removal Operations**

_____

GEO-MEN 00063148

Attachment A
Prohibited Acts and Sanctions

# "GREATEST" OFFENSE CATEGORY

## PROHIBITED ACTS

100 Killing

101 Assaulting any person (includes sexual assault)

102 Escape from escort; escape from a secure facility

103 Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of greatest severity, e.g., a riot or an escape; otherwise the charge is classified as Code 218 or 321).

104 Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, escape tool, device, or ammunition

105 Rioting

106 Inciting others to riot

107 Hostage-taking

108 Assaulting a staff member or any law enforcement officer

109 Threatening a staff member or any law enforcement office with bodily harm

*198 Interfering with a staff member in the performance of duties (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable.

*199 Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable.

## "GREATEST" OFFENSE CATEGORY SANCTIONS

A. Initiate criminal proceedings

B. Disciplinary transfer (recommend)

C. Disciplinary Segregation (up to 60 days)

D. Make monetary restitution, if funds are available

E. Loss of privileges, e.g., commissary, vending machines, movies, recreation, etc

GEO-MEN 00063149

Attachment A
Prohibited Acts and Sanctions

# "HIGH" OFFENSE CATEGORY

## PROHIBITED ACTS

200 Escape from unescorted activities open or secure facility, proceedings without violence

201 Fighting, boxing, wrestling, sparring, and any other form of physical encounter, including horseplay, that causes or could cause injury to another person; except when part of an approved recreational or athletic activity

202 Possession or introduction of an unauthorized tool

203 Loss, misplacement, or damage of any restricted tool

204 Threatening another with bodily harm

205 Extortion, blackmail, protection, demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm, or avoiding a threat of being informed against

206 Engaging in sexual acts

207 Making sexual proposals or threats

208 Wearing a disguise or mask

209 Tampering with or blocking any lock device

210 Adulteration of food or drink

211 Possession, introduction, or use of narcotics, narcotic paraphernalia, or drugs not prescribed for the individual by the medical staff

212 Possessing an officer's or staff member's clothing

213 Engaging in or inciting a group demonstration

214 Encouraging others to participate in a work stoppage or to refuse to work

215 Refusing to provide a urine sample or otherwise cooperate in a drug test

216 Introducing alcohol into the facility

217 Giving or offering an official or staff member a bribe or anything of value

218 Giving money to, or receiving money from, any person for an illegal or prohibited purpose, such as introducing/conveying contraband

219 Destroying, altering, or damaging property (government or another person's) worth more than $100

220 Being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days

221 Signing, preparing, circulating, or soliciting support for prohibited group petitions

---

GEO-MEN 00063150

Attachment A
Prohibited Acts and Sanctions

222 Possessing or introducing an incendiary device, e.g., matches, a lighter, etc.

223 Any act that could endanger person(s) and/or property

*298 Interfering with a staff member in the performance of duties (conduct must be of highest severity).  This charge is to be used only when no other charge of highest severity is applicable.

*299 Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity).  This charge is to be used only when no other charge of highest severity is applicable.


*When the prohibited act is interfering with a staff member in the performance of duties (Code 198, 298, 398 or 498) or conduct that disrupts (Code 199, 299, 399 or 499), the Disciplinary Committee should specify in its findings the severity-level of the conduct, citing a comparable offense in that category. For example, "We find the act of to be of high severity, most comparable to Code 213, "engaging in a group demonstration."

## "HIGH" OFFENSE CATEGORY SANCTIONS

A. Initiate criminal proceedings

B. Disciplinary transfer (recommend)

C. Disciplinary Segregation (up to 30 days)

D. Make monetary restitution, if funds are available

E. Loss of privileges, e.g., commissary, vending machines, movies, recreation, etc

F. Change housing

G Remove from program and/or group activity

H. Loss of job

I. Impound and store detainee's personal property

J. Confiscate contraband

K. Restrict to housing unit

M. Warning

GEO-MEN 00063151

Attachment A
Prohibited Acts and Sanctions

# "HIGH MODERATE" OFFENSE CATEGORY

## PROHIBITED ACTS

300 Indecent exposure

301 Stealing (theft)

302 Misuse of authorized medication

303 Loss, misplacement, or damage of a less restricted tool.

304 Lending property or other item of value for profit/increased return

305 Possession of item(s) not authorized for receipt or retention; not issued through regular channels

306 Refusal to clean assigned living area

307 Refusing to obey the order of a staff member or officer's (may be categorized and charged as a greater or lesser offense, depending on the kind of disobedience: continuing to riot is Code 105--Rioting; continuing to fight Code 201--Fighting; refusing to provide a urine sample, Code 215.

308 Insolence toward a staff member

309 Lying or providing false statement to staff

310 Counterfeiting, forging, or other unauthorized reproduction of money proceedings or other official document or item, e.g. security document, identification card, etc. (may be categorized as greater or lesser offense, depending on the nature and purpose of the reproduction, e.g., counterfeiting release papers to effect escape--Code 102 or 200).

311 Participating in an unauthorized meeting or gathering

312 Being in an unauthorized area

313 Failure to stand count

314 Interfering with count

315 Making, possessing, or using intoxicant(s)

316 Refusing a breathalyzer test or other test of alcohol consumption

317 Gambling

318 Preparing or conducting a gambling pool

319 Possession of gambling paraphernalia

320 Unauthorized contact with public

321 Giving money or another item of value to, or accepting money or another item of value from anyone, including another detainee, without staff authorization

---

GEO-MEN 00063152

Attachment A
Prohibited Acts and Sanctions

322 Destroying, altering, or damaging property (government or another person's) person's) worth more than $100

*398 Interfering with a staff member in the performance of duties (offense must be of high moderate severity).  This charge to be used only when no other charge in this category is applicable.

*399 Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of high moderate severity).  This charge is to be used only when no other charge in this category is applicable.

NOTE: Any combination of high moderate and low moderate offenses during a 90-day period shall constitute a high offense.

## "HIGH MODERATE" OFFENSE CATEGORY SANCTIONS

A. Initiate criminal proceedings

B. Disciplinary transfer (recommend)

C. Disciplinary Segregation (up to 72 hours)

D. Make monetary restitution, if funds are available

E. Loss of privileges, e.g. commissary, vending machines, movies, recreation, etc

F. Change housing

G Remove from program and/or group activity

H. Loss of job

I. Impound and store detainee's personal property

J. Confiscate contraband

K. Restrict to housing unit

L. Reprimand

M. Warning

GEO-MEN 00063153

Attachment A
Prohibited Acts and Sanctions

# "LOW MODERATE" OFFENSE CATEGORY

## PROHIBITED ACTS

400 Possession of property belonging to another person

401 Possessing unauthorized clothing

402 Malingering, feigning illness

403 Smoking where prohibited

404 Using abusive or obscene language

405 Tattooing, body piercing, or self-mutilation

406 Unauthorized use of mail or telephone (with restriction or temporary suspension of the abused privileges often the appropriate sanction)

407 Conduct with a visitor in violation of rules and regulations (with restriction or temporary suspension of visiting privileges often the appropriate sanction)

408 Conducting a business

409 Possession of money or currency, unless specifically authorized

410 Failure to follow safety or sanitation regulations

411 Unauthorized use of equipment or machinery

412 Using equipment or machinery contrary to posted safety standards

413 Being unsanitary or untidy, failing to keep self and living area in accordance with posted standards

498 Interfering with a staff member in the performance of duties (offense must be of low moderate severity).  This charge is to be used only when no other charge in this category is applicable.

*499 Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of low moderate severity).  This charge is to be used only when no other charge in this category is applicable.

GEO-MEN 00063154

Attachment A
Prohibited Acts and Sanctions

## "LOW MODERATE" OFFENSE CATEGORY SANCTIONS

E. Loss of privileges, commissary, vending machines, movies, recreation, etc

F. Change housing

G Remove from program and/or group activity

H. Loss of job

I. Impound and store detainee's personal property

J. Confiscate contraband

K. Restrict to housing unit

L. Reprimand

M. Warning

GEO-MEN 00063155

## ICE/DRO DETENTION STANDARD

### VOLUNTARY WORK PROGRAM

**I. PURPOSE AND SCOPE.   This Detention Standard provides detainees opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of safety, security and good order.**

While not legally required to do so, ICE/DRO affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

This Detention Standard applies to the following types of facilities housing DRO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by DRO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

***Procedures in italics are specifically required for SPCs and CDFs***.  IGSAs must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Some terms used in this document may be defined in the separate **Definitions** Standard.

**II. EXPECTED OUTCOMES.**  The expected outcomes of this Detention Standard are:

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of safety, security, and good order.

2. Detainees will be able to volunteer for work assignments but otherwise not be required to work, except to do personal housekeeping.

3. Essential operations and services will be enhanced through productivity from detainees.

4. The negative impact of confinement will be reduced through less idleness, improved morale and fewer disciplinary incidents.

5. Detainee working conditions will comply with all applicable federal, state, and local work safety laws and regulations.

6. There will be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation, or disability.

7. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

GEO-MEN 00063293

**III. DIRECTIVES AFFECTED.** This Detention Standard replaces **Voluntary Work Program** dated 9/20/2000.

This Detention Standard incorporates the requirements regarding detainees' being assigned to work outside of a facility's secure perimeter originally communicated via a memorandum to all Field Office Directors from the Acting Director of U.S. Immigration and Customs Enforcement (2/2/2004).

## IV. REFERENCES

American Correctional Association 4th Edition, Standards for Adult Detention Facilities: 4-ALDF-5C-06, 5C-08, 5C-11(M), 6B-02.

Environmental Health and Safety National Detention Standard

Food Service National Detention Standard

## V. EXPECTED PRACTICES

### A. Voluntary Work Program

Detainees who are physically and mentally able to work shall be provided the opportunity to participate in any voluntary work program.

The detainee's classification level shall determine the type of work assignment for which he/she is eligible.

Level 3 detainees shall not be given work opportunities outside their housing units/living areas.

### B. Work Outside the Secure Perimeter

ICE detainees may not work outside the secure perimeter of local jails and facilities used under Intergovernmental Service Agreements.

*In SPCs and CDFs, only detainees classified as Level 1 (or the facility's equivalent "Low" custody designation) may work outside the secure perimeter on facility grounds. They must be directly supervised at a ratio of not less than one staff member to four detainees.  The detainees shall be within sight and sound of that staff member at all times.*

### C. Personal Housekeeping Required

Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.

*In SPCs and CDFs, detainees are required to maintain their immediate living areas in a neat and orderly manner by:*

- *Making their bunk beds daily,*
- *Stacking loose papers,*
- *Keeping the floor free of debris and dividers free of clutter, and*

---

GEO-MEN 00063294

- *Not hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture.*

### D. Detainee Selection

The facility administrator shall develop site-specific rules for selecting work detail volunteers. These site-specific rules will be recorded in a facility procedure that will include a voluntary work program agreement. The voluntary work program agreement will document the facility's program and will be in compliance with this Detention Standard.

*In SPCs and CDFs, the primary factors in hiring a detainee as a worker shall be his or her classification level and the specific requirements of the job:*

- *Staff shall present the detainee's name and A-number to the shift supervisor or the requesting department head.*

- *The shift supervisor or department head shall review the detainee's classification and other relevant documents in the detainee's detention file and/or A-file.*

- *The shift supervisor or department head shall assess the detainee's language skills as it affects the detainee's ability to perform the specific requirements of the job under supervision. To the extent possible, work opportunities should be provided to detainees who are able to communicate with supervising staff effectively and in a manner that does not compromise safety and security.*

- *Inquiries to staff about the detainee's attitude and behavior may be used as a factor in the supervisor's selection.*

*Staff shall explain the rules and regulations as well as privileges relating to the detainee worker's status. The detainee is required to sign a **voluntary work program agreement** before every new assignment. Completed agreements shall be filed in the detainee's detention file*

### E. Special Details

Detainees may volunteer for temporary work details that occasionally arise. The work, which generally lasts from several hours to several days, may involve such tasks as digging trenches, removing topsoil and other labor-intensive work.

### F. Discrimination in Hiring Prohibited

Detainees shall not be denied voluntary work opportunities on the basis of such factors as a detainee's race, religion, national origin, gender, sexual orientation or disability.

### G. Physically and Mentally Challenged Detainees

While medical or mental health restrictions may prevent some physically or mentally challenged detainees from working, those with less severe disabilities shall have the opportunity to participate in the voluntary work program in appropriate work assignments.

- The selecting official must consider the precise limitations of a disabled individual before rejecting that individual for selected work assignments.

GEO-MEN 00063295

- Expediency or convenience is insufficient justification to reject or "pigeonhole" a detainee who, with reasonable accommodation, can perform essential functions of the work assignment.

- In disputed cases, the selecting official shall consult medical personnel to ascertain the detainee's suitability for a given project.

### H.  Hours of Work

Detainees who participate in the volunteer work program are required to work according to a fixed schedule.

*In SPCs and CDFs, the normal scheduled workday for a detainee employed full time is a maximum of 8 hours.  Detainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly.*

*Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program.*

### I.   Number of Details in One Day

The facility administrator may restrict the number of work details permitted a detainee during one day.

*In SPCs and CDFs, a detainee may participate in only one work detail per day.*

### J.  Facilities That Detain Criminal Aliens

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

### K.  Compensation

Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.

*In SPCs and CDFs, the compensation is $1.00 per day.  Ordinarily, it is to be paid daily, unless the facility has a system in place that ensures detainees receive the pay owed them before being transferred or released.*

### L.  Removal of Detainee from Work Detail

A detainee may be removed from a work detail for such causes as:

- Unsatisfactory performance;

- Disruptive behavior, threats to security, etc.;

- Physical inability to perform all functions required by the job, whether because of a lack of strength or a medical condition;

- Prevention of injuries to the detainee;

- A removal sanction imposed by the Institutional Disciplinary Panel for an infraction of a facility rule, regulation, or policy.

---

GEO-MEN 00063296

When a detainee is removed from a work detail, the facility administrator shall place written documentation of the circumstances and reasons in the detainee detention file.

## M. Detainee Responsibility

The facility administrator shall establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

*In SPCs and CDFs, the detainee is expected to be ready to report for work at the required time and may not leave an assignment without permission.*

- The detainee shall perform all assigned tasks diligently and conscientiously.

- The detainee may not evade attendance and performance standards in assigned activities or encourage others to do so.

- The detainee shall exercise care in performing assigned work, using safety equipment and taking other precautions in accordance with the work supervisor's instructions.

- In the event of a work-related injury, the detainee shall notify the work supervisor who shall immediately implement injury response procedures.

## N. Detainee Training and Safety

All detention facilities shall comply with all applicable health and safety regulations and standards.

The facility administrator shall ensure that all department heads develop and institute, in collaboration with the facility's safety/training officer, appropriate training for all detainee workers.

1. *In SPCs and CDFs the voluntary work program shall operate in compliance with:*
   - *Occupational Safety and Health Administration (OSHA) regulations.*

   - *National Fire Protection Association 101 Life Safety Code*

   - *American Correctional Association Standards for Adult Local Detention Facilities, current edition*

   - *International Council Codes (ICC)*

   *Each facility administrator's designee is responsible for providing every SPC and CDF in his or her jurisdiction access to complete and current versions of the documents listed above.*

   *The facility administrator shall ensure that the facility operates in compliance with all applicable standards.*

2. Upon a detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials including:

   - Safety features and practices demonstrated by the supervisor
   - Recognition of hazards in the workplace, including the purpose for protective devices and clothing provided, reporting deficiencies to their supervisors. Staff and detainees that do not read English will not be authorized to work

GEO-MEN 00063297

with hazardous materials.

- A detainee shall not undertake any assignment before signing a voluntary work program agreement that, among other things, confirms that the detainee has received and understood training from the supervisor about the work assignment.

The voluntary work program agreement shall be placed in the detainee's detention file.

3. For a food service assignment, medical staff, in conjunction with the Public Health Service, shall ensure that detainees are medically screened and certified before undertaking the assignment.

4. The facility shall provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5. *The facility administrator shall ensure that the facility operates in compliance with all applicable standards.*

## O.  Detainee Injury and Reporting Procedures

The facility administrator shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/DRO.

*In SPCs and CDFs, if a detainee is injured while performing his or her work assignment:*

1. *The work supervisor shall immediately notify the facility medical staff.  In the event that the accident occurs in a facility that does not provide 24-hour medical care, the supervisor shall contact the on-call medical officer for instructions.*

2. *First aid shall be administered when necessary.*

3. *Medical staff shall determine what treatment is necessary and where that treatment shall take place.*

4. *The work supervisor shall complete a detainee accident report and submit it to the facility administrator for review and processing and file it in the detainee's detention file and A-file.*

**Standard Approved:**

**James T. Hayes, Jr. /s/**                              **12/5/2008**

_____          _____

**James T. Hayes, Jr.**                              **Date**
**Director**
**Office of Detention and Removal Operations**

GEO-MEN 00063298