# Exhibit N

## INS DETENTION STANDARD

### VOLUNTARY WORK PROGRAM

**I.      POLICY**

Every facility with a work program will provide detainees the opportunity to work and earn money.   While not legally required to do so, INS affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

**II.     APPLICABILITY**

The standards provided in this Detention Standard shall apply to the following facilities housing INS detainees:

1.   Service Processing Centers (SPCs);

2.   Contract Detention Facilities (CDFs); and

3.   State or local government facilities used by INS through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours; referred to as "IGSA facilities."

Within the document additional implementing procedures are identified for SPCs and CDFs. Those procedures appear in italics.   IGSA facilities may find such procedures useful as guidelines.  IGSAs may adopt, adapt or establish alternatives to, the procedures specified for SPCs/CDFs, provided they meet or exceed the objective represented by each standard.

See the separate "Definitions" Standard for the meaning of certain terms used in this document.

**III.    STANDARDS AND PROCEDURES**

**A.     Voluntary Work Program**

Detainees who are physically and mentally able to work will be provided the opportunity to participate in any voluntary work program.

The detainee's classification level will determine the type of work assignment for which he/she is eligible.

*General work assignments at SPCs/CDFs do not require specific skills.  A sample of work assignments and corresponding classification levels follows:*

GEO-MEN 00063671

| Work Assignment | Level |
|---|---|
| 1. Kitchen worker (either shift) | 1-2 (and 3, if screened for violence) |
| 2. Recreation/Library/Barber | 1-2 (and 3, if screened for violence) |
| 3. Living area clean-up/janitorial | 1-3 |
| 4. Area cleaning (inside facility) | 1-3 |
| 5. Area cleaning (outside facility) | 1 |
| 6. Evening workers (unit janitorial) | 1-2 |
| 7. Evening workers (building janitorial) | 1-2 |
| 8. Processing | 1-2 |
| 9. Bus detail | 1-3 |
| 10. Maintenance | 1-2 |
| 11. Lawn care | 1-3 |
| 12. Laundry | 1-2 |

**B.**   **Voluntary Work Program Objectives**

Through the voluntary work program:

1.   Physically and mentally able detainees are gainfully employed while contributing to the orderly operation of the facility;

2.   Essential operations and services improve through the productivity of detainees; and

3.   Inactivity-induced idleness and disciplinary-code violations will decline.

**C.**   **Required Work Assignments**

Work assignments are voluntary.   However, all detainees are responsible for personal housekeeping.

*In SPCs/CDFs, detainees are required to maintain their immediate living areas in a neat and orderly manner.  This involves making their bunk beds daily, stacking loose papers, keeping the floor free of debris and dividers free of clutter, and hanging/draping no articles of clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture.*

**D.**   **Voluntary Special Details**

Detainees may volunteer for the temporary work details that occasionally arise. The work, which generally last from several hours to several days, can involve digging trenches, removing topsoil, and other labor-intensive work.  Level-3 detainees will not, under any circumstances, work outside the secure outer perimeter.  With immediate supervision, lower categories of level-3 detainees may participate in special details.

GEO-MEN 00063672

**E.**     **Detainee Selection**

The OIC shall develop site-specific rules for selecting work detail volunteers.

*In SPCs/CDFs, these general procedures apply:*

a.     *Staff will present the detainee's name and A-number to the shift supervisor or the requesting department head.*

b.     *The shift supervisor/department head will review the detainee's detention file and/or A-file for classification purpose, scanning documents that might provide relevant information.*

c.     *Inquiries to staff members about the detainee's attitude and behavior may affect the supervisor's selection.*

d.     *Staff will explain the rules and regulations as well as privileges relating to the detainee worker's status.*

*The primary factors in hiring a detainee as a worker will be his/her classification level and the specific requirements of the job.*

**F.**     **Discrimination in Hiring Detainee Workers**

Volunteering detainees will not be denied work opportunities based on non-merit factors, such as social group, race, religion, sex, physical or mental handicaps, or national origin.

**G.**     **Physically and Mentally Challenged Detainees**

INS maintains custody of physically and mentally challenged detainees whose disabilities range from minor to debilitating.  While some of these individuals' medical restrictions will prevent them from working, those with less severe disabilities will have the opportunity to participate in the voluntary work program, in appropriate work projects.

The selecting official must consider the precise limitations of a disabled individual before rejecting certain work assignments. Expediency or convenience will not justify the rejection or pigeonholing of a detainee who, with reasonable accommodation, can perform the essential function of the work involved.  In disputed cases, the official will consult medical personnel to ascertain the detainee's assignability with regard to a given project.

**H.**     **Hours of Work**

Detainees participating in the volunteer work program are required to work according to a fixed schedule.

---

GEO-MEN 00063673

*In SPCs/CDFs, the normal scheduled workday for a detainee employed full-time is a maximum of 8 hours. Detainees who wish to participate in the work program will not be permitted to work in excess of 8 hours daily, 40 hours weekly.*

*Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program*

**I.** **Work Restrictions**

The OIC may restrict the number of work details permitted a detainee during one day.

*In SPCs/CDFs, a detainee may participate in only one work detail per day. Also, the detainee is required to sign a voluntary work program agreement before every new assignment. Completed agreements will be filed in the detainee's detention file. (Sample agreement attached).*

**J.** **Facilities That Detain Criminal Aliens**

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

**K.** **Compensation**

Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.

*In SPCs/CDFs, the stipend is $1.00 per day, to be paid daily.*

**L.** **Removal of Detainee from Work Detail**

A detainee may be removed from a work detail for cause. Upon removing a detainee from a work detail, the OIC shall place a written justification in the detainee's detention file.

A non-exhaustive list of reasons for removal follows:

1.    Unsatisfactory performance.

2.    Disruptive behavior, threats to security, etc.

3.    Infraction of a facility rule, regulation or policy, leading to removal from a work details as a sanction imposed by the Institutional Disciplinary Panel.

4.    Physical inability to perform all functions required by the job, whether because of a lack of strength or a medical condition. Such detainees may be removed from a work detail to prevent future injuries.

GEO-MEN 00063674

**M.**   **Detainee Responsibility**

The OIC will establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

*In SPCs/CDFs, the detainee is expected to be ready to report for work at the required time. The detainee may not leave an assignment without permission.*

The detainee will perform all assigned tasks diligently and conscientiously. Removal from the work detail and/or disciplinary action may result when a detainee evades attendance and performance standards in assigned activities, or encourages others to do so.

The detainee will exercise care in performing assigned work, using safety equipment and other precautions in accordance with the work supervisor's instructions. In the event of a work-related injury, the detainee shall notify the work supervisor, who will immediately implement injury-response procedures (see section III. O., below).

**N.**   **Detainee Training and Safety**

All detention facilities shall comply with all applicable health and safety regulations and standards.

The OIC shall ensure that all department heads develop and institutes, in conjunction with the facility's training officer, appropriate training for all detainee workers.

1.   *In all SPCs/CDFs the Voluntary Work Program shall operate in compliance with the following:*

   a.   *Occupational Safety and Health Administration (OSHA) regulations set forth in 29 CFR Parts 1910, 1926, and 1960 (current indexes attached);*
   b.   *National Fire Protection Association 101 Life Safety Code (current index attached);*
   c.   *American Correctional Association Standards for Adult Local Detention Facilities (see section IV., below);*
   d.   *INS Environmental Occupational Safety and Health Program Handbook.*

2.   Upon the detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials. The supervisor shall demonstrate safety features and practices. Workers will learn to recognize hazards in the workplace, to understand the protective devices and clothing provided, and to report deficiencies to their supervisors. INS will not tolerate "lack of knowledge or skill" as an accident's cause. Therefore, the detainee shall undertake no assignment before signing a voluntary work program agreement. Among other things, by signing the agreement the detainee confirms he/she has received and understood training about the assigned job from the supervisor. This agreement will be placed in the detainee's detention file.

GEO-MEN 00063675

3.  Medical staff, working with the Public Health Service, will ensure detainees are medically screened and certified before undertaking a food service assignment.

4.  The facility will provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5.  *Each Regional Safety and Health Officer (RSHO) shall be responsible for providing every SPC/CDF in his/her region with complete and current copies of the documents listed in III.N.1., above, including 29 CFR Parts 1910, 1926 and 1960. The OIC shall ensure that the facility operates in compliance with all currently applicable standards.*

## 0.  Detainee Injury and Reporting Procedures

The OIC shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of INS.

*In SPCs/CDFs, if a detainee is injured while performing his/her work assignment, the following procedures apply:*

1.  *The work supervisor will immediately notify the facility medical staff. In the event that the accident occurs in a facility that does not provide 24-hour medical coverage, the supervisor will contact the on-call medical officer for instructions.*

2.  *First aid will be administered when necessary.*

3.  *Medical staff will determine what treatment is necessary and where that treatment will take place.*

4.  *The work supervisor will complete a detainee accident report and submit it to the OIC for review and processing. A copy of this report will be placed in the detainee's A-file.*

GEO-MEN 00063676

**IV.**     <u>**AMERICAN CORRECTIONAL ASSOCIATION STANDARDS REFERENCED**</u>:

American Correctional Association 3rd Edition, Standards for Adult Detention Facilities: 3-ALDF-3E-04, 5A-01, 5A-03, 5A-04, 5A-05, 5A-06, 5A-08, 5A-13.

**Approval of Standard**

Michael D.  Cronin
**Acting Executive Associate Commissioner**
**Office of Programs**

SEP 2 0 2000
_____
**Date**

Michael A.  Pearson
**Executive Associate Commissioner**
**Office of Field Operations**

SEP 2 0 2000
_____
**Date**

GEO-MEN 00063677

## INS DETENTION STANDARD

### DISCIPLINARY POLICY

I. **POLICY**

To provide a safe and orderly living environment, facility authorities will impose disciplinary sanctions on any detainee whose behavior is not in compliance with facility rules and procedures.

II. **APPLICABILITY**

The standards provided in this Detention Standard shall apply to the following facilities housing INS detainees:

1. Service Processing Centers (SPCs);

2. Contract Detention Facilities (CDFs); and

3. State or local government facilities used by INS through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours; referred to as "IGSA facilities."

Within the document additional implementing procedures are identified for SPCs and CDFs. Those procedures appear in italics. IGSA facilities may find such procedures useful as guidelines. IGSAs may adopt, adapt or establish alternatives to, the procedures specified for SPCs/CDFs, provided they meet or exceed the objective represented by each standard.

See the separate "Definitions" Standard for the meaning of certain terms used in this document.

III. **STANDARDS AND PROCEDURES**

A. **Guidelines**

1. Each facility holding INS detainees in custody will have a detainee disciplinary system. This disciplinary system shall have progressive levels of reviews, appeals, procedures, and documentation procedures. The disciplinary policy and procedures shall clearly define detainee rights and responsibilities

2. Disciplinary action may not be capricious or retaliatory.

3. Staff may not impose or allow imposition of the following sanctions: corporal punishment; deviations from normal food services; deprivation of clothing, bedding, or items of personal hygiene; deprivation of correspondence privileges; or deprivation of physical exercise unless such activity creates an unsafe condition.

GEO-MEN 00063718

4.   The facility shall not hold a detainee accountable for his/her conduct if a medical authority finds him/her mentally incompetent.

A mentally incompetent individual unable to appreciate the difference between appropriate and inappropriate behavior– between "right" and "wrong"–is not capable of acting in accordance with those norms.  Therefore, he/she is not responsible for his/her "wrongful" actions.

Also, a person who lacks the ability to understand the nature of the disciplinary proceedings against him/her, or to assist in his/her own defense, is considered incompetent.   Disciplinary proceedings against such a detainee shall be postponed until such time as the detainee is able to understand the nature of the disciplinary proceedings and to assist in his/her own defense.  If the detainee's mental status does not improve within a reasonable amount of time, the Incident Report shall "find" the detainee incompetent to assist in his/her own defense.  Under that circumstance, disciplinary proceedings cannot move forward.

5.   The detainee handbook or equivalent, issued to each detainee upon admittance, shall provide notice of the facility's rules of conduct, and of the sanctions imposed for violations of the rules.  Among other things, the handbook shall advise detainees of the following:

a.   The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage, and harassment;

b.   The right of freedom from discrimination based on race, religion, national origin, sex, handicap, or political beliefs;

c.   The right to pursue a grievance in accordance with written procedures (provided in the handbook);

d.   The right to correspond with persons or organizations, consistent with safety, security, and the orderly operation of the facility; and

e.   The right to due process, including the prompt resolution of a disciplinary matter (in accordance with the rules, procedures, and sanctions provided. in the handbook).

*In SPCs/CDFs, copies of the rules of conduct and disciplinary sanctions will be posted in English, Spanish, and/or other languages spoken by significant numbers of detainees, as follows:*

a.   *Disciplinary Severity Scale*
b.   *Prohibited Acts*
c.   *Sanctions*

---

GEO-MEN 00063719

**B.**   **Incident Reports**

Officers who witness a prohibited act or have reason to suspect one has been committed shall prepare and submit an incident report. All incident reports must state the facts clearly, precisely, and concisely, omitting no details that could prove significant.  Reports also will identify the officer(s), the detainee(s), and all witness(es) to the incident.

INS approval is required for the incident-report forms used in CDFs and IGSA facilities.

*In SPCs/CDFs, minor transgressions will be settled informally, by mutual consent, whenever possible.  If, however, the officer involved thinks an informal resolution inappropriate or unachievable, he/she shall prepare an Incident Report and Notice of Charges, forwarding it to the appropriate supervisor before the end of the assigned shift.*

*The incident report shall cite the relevant rule or standard without quoting it in its entirety. For example, for destruction of government property, the report would cite, briefly, "Code 218–Destroying Government Property."*

*If the officer observes anything unusual in the detainee's behavior or demeanor, he/she shall so note in the report.  The reporting officer shall also list all staff, contract officers or detainee witnesses to the incident, and the disposition of any physical evidence (weapons, property, etc.) relating to the incident. The reporting officer will sign the report and include title, date and time the report was signed. The shift supervisor shall review all incident reports before going off duty.*

**C.**   **Investigations**

IGSAs shall have procedures in place to ensure that all incident reports are investigated within 24 hours of the incident.

The investigating officer shall have supervisory rank, or higher (unless prevented by personnel shortages) and shall have had no prior involvement in the incident, either as witness or officer at the scene. If an officer below supervisory rank conducts the investigation, the shift supervisor shall review his/her report(s) for accuracy and completeness, and sign them.

*In SPCs/CDFs, the officer designated to investigate the incident is responsible for completing the necessary interviews, collecting evidence, and submitting written reports.*

***The investigating officer shall:***

1.   *Commence the investigation within 24 hrs. of receipt of the incident report.*

2.   *Advise the detainee of the right to remain silent at every stage of the disciplinary process, and ensure he/she has a complete listing of detainee rights*

3.   *Advise the detainee that, although silence may not be used to support a finding of guilt, silence is rarely interpreted in the detainee's favor.*

GEO-MEN 00063720

4.      Provide the detainee(s) with a copy of the incident report/notice of charges at least 24 hours before the start of disciplinary proceedings.

5.      Advise the detainee of his/her right, if applicable, to an initial hearing before the Unit Disciplinary Committee (UDC) within 24 hours of his/her notification of charges.

6.      Terminate the investigation if the incident is under investigation elsewhere, e.g., on criminal grounds, unless and until the agency with primary jurisdiction concludes its investigation or indicates that it will not pursue the matter.

7.      Record personal observances and other potentially material information.

8.      Prepare a factual report of the investigation, including the location or disposition of any physical evidence.

9.      Forward to the UDC all reports relevant to the disciplinary hearing.  NOTE: policy expressly prohibits providing a copy of any such report(s) to the detainee at this stage of the disciplinary process.

## Unit Disciplinary Committee (UDC)

All facilities shall establish an intermediate level of investigation/adjudication is present to adjudicate low or moderate infractions.  They shall also ensure that the detainee is afforded all the rights listed under "Detainee Rights in UDC Proceedings," below.

*In SPCs/CDFs:*

The UDC administering unit discipline shall comprise from one to three members, at least one of whom is a supervisor.

The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident.   Only if virtually every available officer witnessed or was directly involved in the incident shall an exception to this rule occur

The UDC will conduct hearings and, to the extent possible, informally resolve cases involving "high moderate" or "low moderate" charges, in accordance with the list of charges and related sanctions (see III., I., below).  Unresolved cases and cases involving serious charges are forwarded  to the Institutional Disciplinary Panel.

**The UDC shall have authority to:**

1.      Conduct hearing and informally resolve incidents involving High Moderate or Low Moderate charges.

2.      Consider written reports, statements, and physical evidence.

GEO-MEN 00063721

3.    *Hear pleadings on the part of the detainee.*

4.    *Make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.*

5.    *Impose minor sanctions "E" through "M" in accordance with the table of prohibited acts and associated sanctions (see section III.I., below).*

**The detainee in UDC proceedings shall have the right to:**

1.    *Remain silent at any stage of the disciplinary process.*

2.    *Due process, including a UDC hearing within 24 hours of the end of the investigation, and:*

    a.    *To attend the entire hearing (excluding committee deliberations); or*

    b.    *To waive the right to appear.*

    *If security considerations prevent the detainee's attendance, the committee must document the security considerations.*

3.    *Present statements and evidence in his/her own behalf.*

4.    *Appeal the committee's determination through the detainee appeal process.*

**The UDC shall:**

1.    *Advise the detainee of above-listed rights before the hearing.*

2.    *Refer to the IDP any incident involving a serious violation, i.e., associated with an A-through-D-range sanction.  This includes code violations in the "Greatest" and "High" categories (100s and 200s).*

3.    *Serve the detainee with:*

    a.    *A copy of the UDC decision and sanctions imposed; or*

    b.    *Written notification of charges and hearing before the IDP.*

4.    *If the detainee's case is being referred to the IDP, advise the detainee, in writing, of*

    a.    *The right to call witnesses and present evidence before the IDP; and*

    b.    *The right to a staff representative before the IDP.*

---

GEO-MEN 00063722

E.     **Staff Representation**

*In SPCs/CDFs, the Officer in Charge (OIC) shall, upon the detainee's request, assign a staff representative to help prepare a defense. This help will be automatically provided for illiterate detainees, detainees with limited English-language skills; detainees without means of collecting and presenting essential evidence and detainees in administrative or disciplinary segregation.*

1.    *A staff representative must be a full-time employee.*

2.    *Because of the potential conflict of interest, the OIC, members of the IDP and of the UDC initially involved in the case, eyewitnesses, the reporting and investigating officers, and anyone else with a stake in the outcome shall not act as staff representative.*

3.    *The detainee may select his/her staff representative, barring anyone identified in #2, above.*

4.    *The IDP shall arrange for the presence of the staff representative selected by the detainee. If that staff member declines or is unavailable, the detainee has three choices. He/she may select a different representative; wait for the unavailable staff member to become available (within a reasonable period); or proceed without a staff representative.*

5.    *A staff member declining to serve as a detainee's representative must state the reason on the staff representative form.*

6.    *If several officers decline, the OIC shall assign a staff member to serve as that detainee's staff representative.*

7.    *The staff representative shall be free to speak to witnesses and to present evidence in the detainee's behalf, including any mitigating circumstances.*

8.    *The IDP shall allow the staff representative enough time to speak with the detainee and interview witnesses. The standard pre-hearing preparation time will suit most cases. However, the IDP may grant a delay if required for an adequate defense.*

9.    *The IDP shall establish the reliability of information provided by a confidential informant before considering it in the disciplinary proceedings.*

10.    *The IDP may withhold the confidential informant's identity from the staff representative. While the staff representative may challenge the substance of any confidential information the IDP discloses, he/she may not question its reliability (pre-established by the IDP).*

11.    *When the detainee cannot effectively present his/her own case, the OIC shall appoint a staff representative, even if not requested by the detainee.*

GEO-MEN 00063723

F.   **Institutional Disciplinary Panel**

All facilities that house INS detainees shall have a disciplinary panel to adjudicate detainee incident reports.  Only the disciplinary panel can place a detainee in disciplinary segregation.

*In SPCs and CDFs*

*1.      The IDP will consist of three members, including the chairperson.*

*2.      The OIC shall appoint the three members of the panel..*

*Members will be appointed by the OIC.   The panel shall not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident. Only if virtually every available officer witnessed or was directly involved in the incident shall an exception to this rule occur*

**The IDP shall have authority to:**

*1.      Conduct hearings on all charges and allegations referred by the UDC.*

*2.      Call witnesses to testify.*

*3.      Consider written reports, statements, physical evidence, and oral testimony.*

*4.      Hear pleadings by detainee and staff representative.*

*5.      Make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.*

*6.      Impose sanctions as listed and authorized in each category.*

**The IDP shall:**

*1.      Verify that the detainee has been advised of, and afforded, his/her rights, as provided above.*

*2.      Remind the detainee of his/her right to a staff representative, providing one if requested.*

*3.      Advise the detainee of his/her right to waive the hearing and admit having committed the offense.*

GEO-MEN 00063724

4.   *Conduct the hearing on the first business day after receiving the UDC's referral, unless the detainee waives the 24-hour notification provision, requesting an immediate hearing.  In cases where a hearing is delayed, the reason(s) must be documented (e.g., a continuing investigation of facts, their unavailability of one or more essential witnesses, etc.) and approved by the OIC.   If the detainee is being held in segregation, the delay shall not exceed 72 hours, barring an emergency.*

5.   *Prepare a written record of its proceedings.  This record must show that the detainee was advised of his/her rights.  It must also document the evidence considered by the Panel and subsequent findings; the decision and sanctions imposed, along with a brief explanation.*

6.   *Forward the entire record to the OIC, who may (a) concur; (b) terminate the proceedings; or (c) impose stiffer or lesser sanctions.*

7.   *Serve the detainee with written notification of the decision.*

## G.   **Postponement of Disciplinary Proceedings**

All facilities shall permit hearing postponements or continuances under certain circumstances.

*In SPCs/CDFs, circumstances justifying the postponement or continuance of a hearing might include: defense preparation, physical or mental illness, security, escape, disciplinary transfer, removal or pending criminal prosecution.*

*An uncooperative detainee may also cause a delay in the proceedings, either because of inappropriate behavior during the hearing process or a refusal to participate in a productive manner.*

## H.   **Duration of Punishment**

The duration of punishment shall be within established limits. Neither the panel recommending sanctions nor the OIC making the final decision shall impose sanctions arbitrarily, outside these limits.

1.   Punishments range from the withholding of privilege(s) to segregation.  Time in segregation after a hearing will generally not exceed 60 days.

2.   Time served in segregation pending the outcoming of the proceedings may be credited to the number of days to be spent in the segregation unit after the decision is announced.

3.   The disciplinary report and accompanying documents are not placed in the file of a detainee who is found not guilty.  However, the facility may retain the material in its own files for institutional uses (statistical, historical, etc.).

GEO-MEN 00063725

**I.**   **Disciplinary Severity Scale and Prohibited Acts**

All facilities shall have graduated scales of offenses and disciplinary consequences, as provided in this section.

*SPCs/CDFs shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section.*

*Prohibited acts are divided into four categories: "Greatest," "High," "Moderate," and "Low Moderate." The sanctions authorized for each category (see table of sanctions, below) will be imposed only if the detainee is found to have committed a prohibited act.*

   *a.*   ***"Greatest" offenses:*** *The IDP shall impose and execute at least one sanction in the A through E range. Additional sanctions (A through G) may be imposed and either executed or suspended, at the discretion of the panel. The IDP may impose and execute sanctions F and G only in conjunction with sanction A, B, C, D, and/or E.*

   *b.*   ***"High" offenses:*** *The IDP shall impose and execute at least one sanction in the A through M range. Additional sanctions (A through M) may be imposed, and, either executed or suspended, at the discretion of the panel.*

   *c.*   ***"High Moderate" offenses:*** *The IDP shall impose at least one sanction in the A through M range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.*

   *d.*   ***"Low Moderate" offenses:*** *The IDP shall impose at least one sanction in the E through M range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.*

**J.**   **Documents**

All documents relevant to the incident, subsequent investigation, hearing(s), etc., will be completed and distributed in accordance with facility procedures.

*In SPCs/CDFs, documents will be prepared and distributed as follows:*

***Incident Report/Notice of Charges***

*The officer shall prepare a report and submit it to the INS or CDF supervisor immediately after the incident takes place. If the incident is resolved informally, the officer will so note on the original report, which will then be forwarded to the Chief Detention Enforcement Officer or Chief of Security.*

GEO-MEN 00063726

*If the UDC is to be involved, the supervisor shall serve the detainee with a copy of the Notice of Charges upon completion of the investigation, no less than 24 hours before the UDC hearing.*

*The UDC receives the original copy.*

*If the UDC hears the matter, the ranking member of that committee shall serve the detainee with a copy of the Incident Report/Notice of Charges indicating their decision. The UDC, upon conclusion of its proceedings, will forward the entire record to either the Chief of Detention or the IDP, as appropriate.*

***Investigation Report***

*Original–submitted to the UDC.*
*Detainee does not receive a copy*

***UDC Report of Findings and Action***

*Original–served on the detainee after the committee issues its findings*
*Copy–to the detainee detention file (guilty finding only)*

***Notice of IDP Hearing***

*Original–served on detainee*
*Copy–detainee detention file*

***Detainee Rights at IDP Hearing***
*Original–served on detainee*
*Copy–facility detention file*

***IDP Report***

*Original–detainee detention file*
*Copy–detainee*

**K.**     **Confidential Information**

When a decision relies on information from a confidential informant, the UDC or IDP shall include in the hearing record the factual basis for finding the information reliable.

**L.**     **Notice to Detainees**

The detainee handbook, or equivalent, shall notify detainees of the following:

1.     The disciplinary process.
2.     The prohibited acts and disciplinary severity scale:
3.     The procedure for appealing disciplinary findings.

---

GEO-MEN 00063727

## IV. AMERICAN CORRECTIONAL ASSOCIATION STANDARDS REFERENCED

American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities: 3-ALDF-3C-01, 3C-02, 3C-03, 3C-04, 3C-05, 3C-06, 3C-07, 3C-08, 3C-09, 3C-10, 3C-11, 3C-12, 3C-13, 3C-14, 3C-15, 3C-16, 3C-17, 3C-18, 3C-19, 3C-20, 3C-21, 3C-22

**Approval of Standard**

Michael D. Cronin
Acting Executive Associate Commissioner
Office of Programs

SEP 2 0 2000
_____
Date

Michael A. Pearson
Executive Associate Commissioner
Office of Field Operations

SEP 2 0 2000
_____
Date

GEO-MEN 00063728

# "GREATEST" OFFENSE CATEGORY

| CODE | PROHIBITED ACTS | | SANCTIONS |
|---|---|---|---|
| 100 | Killing | A. | Initiate criminal proceedings |
| 101 | Assaulting any person (includes sexual assault) | B. | Disciplinary transfer (recommend) |
| 102 | Escape from escort; escape from a secure facility | C. | Disciplinary segregation (up to 60 days) |
| 103 | Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of greatest severity, e.g., a riot or an escape; otherwise the charge is classified as Code 218 or 321) | D. | Make monetary restitution, if funds are available. |
| 104 | Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, escape tool, device, or ammunition. | | |
| 105 | Rioting | | |
| 106 | Inciting others to riot | | |
| 107 | Hostage-taking | | |
| 108 | Assaulting a staff member or any law enforcement officer | | |
| 109 | Threatening a staff member or any law enforcement office with bodily harm. | | |
| *198 | Interfering with a staff member in the performance of duties (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable. | | |
| *199 | Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable. | | |

GEO-MEN 00063729

# "HIGH" OFFENSE CATEGORY

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 200 | Escape from unescorted activities, open or secure facility, without violence | A. | Initiate criminal proceedings |
| 201 | Fighting, boxing, wrestling, sparring, and any other form of physical encounter, including horseplay, that causes or could cause injury to another person; except when part of an approved recreational or athletic activity | B. | Disciplinary transfer (recommend) |
| | | C. | Disciplinary segregation (up to 60 days) |
| | | D. | Make monetary restitution, if funds are available |
| 202 | Possession or introduction of an unauthorized tool | E. | Loss of privileges: commissary, movies, recreation, etc. |
| 203 | Loss, misplacement, or damage of any restricted tool | F. | Change housing |
| 204 | Threatening another with bodily harm | G. | Remove from program and/ or group activity |
| 205 | Extortion, blackmail, protection: demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm, or avoiding a threat being informed against | H. | Loss of job |
| | | I. | Impound and store detainee's personal property |
| 206 | Engaging in sexual acts | J. | Confiscate contraband |
| 207 | Making sexual proposals or threats | K. | Restrict to housing unit |
| 208 | Wearing a disguise or mask | | |
| 209 | Tampering with or blocking any lock device | | |
| 210 | Adulteration of food or drink | | |

## "HIGH" OFFENSE CATEGORY, cont'd

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 211 | Possession, introduction, or use of narcotics, narcotic parapher-nalia, or drugs not prescribed for the individual by the medical staff | A. | Initiate criminal proceedings |
| | | B. | Disciplinary transfer (recommend) |
| 212 | Possessing an officer's or staff member's clothing | | |
| | | C. | Disciplinary segregation (up to 60 days) |
| 213 | Engaging in or inciting a group demonstration | | |
| | | D. | Make monetary restitution, if funds are available |
| 214 | Encouraging others to participate in a work stoppage or to refuse to work | E. | Loss of privileges: commissary, movies, recreation, etc. |
| 215 | Refusing to provide a urine sample or or otherwise cooperate in a drug test | | |
| 216 | Introducing alcohol into the facility | F. | Change housing |
| 217 | Giving or offering an official or staff member a bribe or anything of value | G. | Remove from program and/or group activity |
| | | H. | Loss of job |
| 218 | Giving money to, or receiving money from, any person for an illegal or prohibited purpose, such as introducing/conveying contraband | I. | Impound and store detainee's property |
| | | J. | Confiscate contraband |
| 219 | Destroying, altering, or damaging property (government or another person's) worth more than $100 | K. | Restrict to housing unit |
| 220 | Being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days | | |

## "HIGH" OFFENSE CATEGORY, cont'd

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 221 | Signing, preparing, circulating, or soliciting support for prohibited group petitions | A. | Initiate criminal proceedings |
| 222 | Possessing or introducing an incendiary device, e.g., matches, a lighter, etc. | B. | Disciplinary segregation (recommend) |
| 223 | Any act that could endanger person(s) and/or property | C. | Disciplinary segregation |
| *298 | Interfering with a staff member in the performance of duties (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | D. | Make monetary restitution, if funds are available |
| | | E. | Loss of privileges, e.g., commissary, movies, recreation, etc. |
| | | F. | Change housing |
| *299 | Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | G. | Remove from program and/or group activity |
| | | H. | Loss of job |
| | | I. | Impound and store detainee's personal property |
| | | J. | Confiscate contraband |
| | | K. | Restrict to housing unit |

*When the prohibited act is interfering with a staff member in the performance of duties (Code 198, 298, 398 or 498) or conduct that disrupts (Code 199, 299, 399 or 499), the Disciplinary Committee should specify in its findings the severity-level of the conduct, citing a comparable offense in that category. For example, "We find the act of to be of high severity, most comparable to Code 213, "engaging in a group demonstration."

GEO-MEN 00063732

# "HIGH MODERATE" OFFENSE CATEGORY

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 300 | Indecent exposure | A. | Initiate criminal proceedings |
| 301 | Stealing (theft) | B. | Disciplinary transfer (recommend) |
| 302 | Misuse of authorized medication | | |
| 303 | Loss, misplacement, or damage of a less restricted tool | C. | Disciplinary segregation (up to 72 hours) |
| 304 | Lending property or other item of value for profit/increased return | D. | Make monetary restitution |
| 305 | Possession of item(s) not authorized for receipt or retention; not issued through regular channels | E. | Loss of privileges, e.g., vending machines, recreation, etc. |
| | | F. | Change housing |
| 306 | Refusal to clean assigned living area | G. | Remove from program |
| 307 | Refusing to obey a staff member/ officer's order (may be categorized and charged as a greater or lesser offense, depending on the kind of disobedience: continuing to riot is Code 105--Rioting; continuing to fight, Code 201--Fighting; refusing to provide a urine sample, Code 215 | H. | Loss of job |
| | | I. | Impound and store detainee's personal property |
| | | J. | Confiscate contraband |
| | | K. | Restrict to housing unit |
| 308 | Insolence toward a staff member | L. | Reprimand |
| 309 | Lying or providing false statement to staff | M. | Warning |

GEO-MEN 00063733

## "HIGH MODERATE" OFFENSE CATEGORY,

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|------------------|---|-----------|
| 310 | Counterfeiting, forging, or other unauthorized reproduction of money or other official document or item, e.g. security document, identification card, etc. (may be categorized as greater or lesser offense, depending on the nature and purpose of the reproduction, e.g., counterfeiting release papers to effect escape--Code 102 or 200) | A. | Initiate criminal proceedings |
| | | B. | Disciplinary transfer (recommend) |
| | | C. | Disciplinary segregation (up to 72 hours) |
| 311 | Participating in an unauthorized meeting or gathering | D. | Make monetary restitution |
| 312 | Being in an unauthorized area | E. | Loss of privileges, e.g., vending machines, recreation, etc. |
| 313 | Failure to stand count | F. | Change housing |
| 314 | Interfering with count | G. | Remove from program and/or group activity |
| 315 | Making, possessing, or using intoxicant(s) | H. | Loss of job |
| 316 | Refusing a breathalyzer test or other test of alcohol consumption | I. | Impound and store detainee's personal property |
| 317 | Gambling | J. | Confiscate contraband |
| 318 | Preparing or conducting a gambling pool | K. | Restrict to housing unit |
| 319 | Possession of gambling paraphernalia | L. | Reprimand |
| 320 | Unauthorized contact with public. | M. | Warning |

# HIGH MODERATE" OFFENSE CATEGORY,

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 321 | Giving money or another item of value to, or accepting money or another item of value from anyone, including another detainee, without staff authorization | A. | Initiate criminal proceedings |
| | | B. | Disciplinary transfer (recommend) |
| 322 | Destroying, altering, or damaging property (government or another person's) person's) worth more than $100 | C. | Disciplinary (up to 72 hours) |
| | | D. | Make monetary restitution |
| *398 | Interfering with a staff member in the performance of duties (offense must be of high moderate severity).  This charge is to be used only when no other charge in this category is applicable. | E. | Loss of privileges; vending machines, recreation, etc. |
| | | F. | Change housing |
| *399 | Conduct that disrupts or interferes with the security or orderly   running (offense must be of high moderate severity). This charge is to be used only when no other charge in this category is applicable. | G. | Remove from program and/or group activity |
| | | H. | Loss of job |
| | | I. | Impound and store detainee's personal property |
| | | J. | Confiscate contraband |
| | | K. | Restrict to housing unit |
| | | L. | Reprimand |

NOTE:  Any combination of high moderate and low moderate offenses during a 90-day  period  shall  constitute  a  high offense.

GEO-MEN 00063735

# "LOW MODERATE" OFFENSE CATEGORY

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|------------------|---|-----------|
| 400 | Possession of property belonging to another person | D. | Make monetary restitution |
| 401 | Possessing unauthorized clothing | E. | Loss of privileges, e.g., commissary, vending machines, recreation |
| 402 | Malingering, feigning illness | | |
| 403 | Smoking where prohibited | F. | Change housing |
| 404 | Using abusive or obscene language | G. | Remove from program and/or group activity |
| 405 | Tattooing, body piercing, or self-mutilation | | |
| 406 | Unauthorized use of mail or telephone (with restriction or temporary suspension of the abused privileges often the appropriate sanction) | H. | Loss of job |
| | | I. | Impound, store detainee's personal property |
| 407 | Conduct with a visitor in violation of rules and regulations (with restriction or temporary suspension of visiting privileges often the appropriate sanction) | J. | Confiscate contraband |
| | | K. | Restrict to housing unit |
| | | L. | Reprimand |
| 408 | Conducting a business | M. | Warning |
| 409 | Possession of money or currency, unless specifically authorized | | |
| 410 | Failure to follow safety or sanitation regulations | | |
| 411 | Unauthorized use of equipment or machinery | | |
| 412 | Using equipment or machinery contrary to posted safety standards | | |

GEO-MEN 00063736

## "LOW MODERATE" OFFENSE CATEGORY, cont'd

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 413 | Being unsanitary or untidy, failing to keep self and living area in accordance with posted standards | D. | Make monetary restitution |
| 498 | Interfering with a staff member in the performance of duties (offense must be of low moderate severity). This charge is to be used only when no other charge in this category is applicable. | E. | Loss of privileges. e.g., commissary, vending machines, recreation |
| | | F. | Change housing |
| | | G. | Remove from program and/or group activity |
| | | H. | Loss of job |
| *499 | Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of low moderate severity). This charge is to be used only when no other charge in this category is applicable. | I. | Impound and store detainee's personal property |
| | | J. | Confiscate contraband |
| | | K. | Restrict to housing unit |
| | | L. | Reprimand |
| | | M. | Warning |

## INS DETENTION STANDARD

### ENVIRONMENTAL HEALTH AND SAFETY

**I.      POLICY**

Each facility will establish a hazardous materials program for the control, handling, storage, and use of flammable, toxic, and caustic materials.  This will protect detainees, staff, and visitors, preventing breaches in safety and security.  Among other things, the facility will include the identification and labeling of hazardous materials in accordance with applicable regulations, standards and codes (Occupational Safety and Health Administration (OSHA), National Fire Protection Association, etc.); will provide warnings of incompatible materials, etc.

**II.     APPLICABILITY**

The standards provided in this Detention Standard will apply to the following facilities housing INS detainees:

1.   Service Processing Centers (SPCs);

2.   Contract Detention Facilities (CDFs); and

3.   State or local government facilities used by INS through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours; referred to as "IGSA facilities."

Within the document additional implementing procedures are identified for SPCs and CDFs. Those procedures appear in italics.  IGSA facilities may find such procedures useful as guidelines.  IGSAs may adopt, adapt or establish alternatives to, the procedures specified for SPCs/CDFs, provided they meet or exceed the objective represented by each standard.

See the separate "Definitions" Standard for the meaning of certain terms used in this document.

**III.    STANDARDS AND PROCEDURES**

Every facility will establish a system for storing, issuing, and maintaining inventories of and accountability for hazardous materials.  Adopting such a system may require changes in facility storage methods, inventory maintenance, and recordkeeping.   The system's effectiveness will depend on staff and detainees following instructions precisely and taking prescribed precautions, including using safety equipment.

**A.      Inventories**

Every area will maintain a running inventory of the hazardous (flammable, toxic, or caustic) substances used and stored in that area.  Inventory records will be maintained separately for

GEO-MEN 00063777

each substance, with entries for each logged on a separate card (or equivalent).  That is, the account keeping will not be chronological, but filed alphabetically, by substance (dates, quantities, etc.).

**B.**     **Material Safety Data Sheets (MSDSs); Files**

Every area using hazardous substances will maintain a self-contained file of the corresponding Material Safety Data Sheets (MSDSs).  The MSDSs provide vital information on individual hazardous substances, including instructions on safe handling, storage, and disposal, prohibited interactions, etc.  Staff and detainees will have ready and continuous access to the MSDSs for the substances with which they are working while in the work area.

Because changes in MSDSs occur often and without broad notice, staff must review the latest issuance from the manufacturers of the relevant substances, updating the MSDS files as necessary.

The MSDS file in each area should include a list of all areas where hazardous substances are stored, along with a plant diagram and legend.  Staff will provide a copy of this information and all MSDSs contained in the file, forwarding updates upon receipt, to the Maintenance Supervisor or designate.

**C.**     **Master Index**

The Maintenance Supervisor or designate will compile a master index of all hazardous substances in the facility, including locations, along with a master file of MSDSs. He/she will maintain this information in the safety office (or equivalent), with a copy to the local fire department. Documentation of the semi-annual reviews will be maintained in the MSDS master file.

The master index will also include a comprehensive, up-to-date list of emergency phone numbers (fire department, poison control center, etc.).

**D.**     **Personal Responsibility**

Every individual using a hazardous substance in the facility must be familiar with and follow all prescribed precautions, wear personal protective equipment when necessary, and report hazards or spills to the designated authority.

**E.**     **General Guidelines**

1.     Issuance:  Flammable, caustic, and toxic substances (hazardous substances) will be issued (i.e., drawn from supply points to canisters or dispensed) only under the supervision of the designated officer.

2.     Amounts:  A hazardous substances will be issued in single-day increments, i.e., the amount needed for one day's work.

---

GEO-MEN 00063778

3.   Supervision: Qualified staff will closely monitor detainees working with hazardous substances.

4.   Accountability:  Inventory records for a hazardous substance must be kept current before, during, and after each use.

F.   **Specific Guidelines for Storage, Use, and Disposal of Flammable and Combustible Liquids**

1.   Any liquid or aerosol labeled "Flammable" or "Combustible" must be stored and used as prescribed on the label, in accordance with the Federal Hazardous Substances Labeling Act, to protect both life and property.

2.   Lighting fixtures and electrical equipment installed in flammable-liquid storage rooms must meet National Electrical Code requirements for same in hazardous locations.

3.   Every hazardous-material storage room will:

   a.   Be of fire-resistant construction and properly secured;

   b.   Have self-closing fire doors at each opening;

   c.   Be constructed with either a four-inch sill or a four-inch depressed floor; and

   d.   Have a ventilation system (mechanical or gravity flow) within 12 inches of the floor, which provides at least six air changes per hour.

4.   Every storage cabinet will:

   a.   Be constructed according to code and securely locked at all times;

   b.   Stand clear of open passageways, stairways, and other emergency exit areas;

   c.   Be conspicuously labeled: "Flammable–Keep Fire Away"; and

   d.   Contain either 60 gallons, maximum, of Class I and/or Class II liquids or 120 gallons, maximum, of Class III liquids.

5.   Storage rooms and cabinets cannot be entered except under secure conditions, under the supervision of authorized staff.

6.   A portable container that is not the original shipping containers must be an approved safety can, listed or labeled by a nationally recognized testing laboratory.  Each will bear a legible label that identifies its contents.

7.   Excess liquids will remain in original containers, tightly closed, in the storage room or cabinet.

GEO-MEN 00063779

8.   The MSDS will govern use of a particular flammable or combustible liquid.

9.   Only authorized staff will dispense flammable and combustible liquids dispensed only by an authorized staff member, using acceptable methods for drawing from or transferring these liquids.

Drawing from or transferring any of these liquids into containers indoors is prohibited unless:

a.   Through a closed piping system;
b.   From a safety can;
c.   By a device drawing through the top; or
d.   By gravity, through an approved self-closing system.

An approved grounding and bonding system must be used when liquids are dispensed from drums.

10.  Without exception, cleaning liquids must have a flash point at or above 100° F (e.g., Stoddard solvents, kerosene). Cleaning operations must be in an approved parts-cleaner or dip tank fitted with a fusible link lid with a 160° F melting-temperature link.

11.  Staff will follow MSDS directions in disposing of excess flammable or combustible liquids.

12.  Likewise, staff will follow the method provided in the MSDS in case of a chemical spill.

**G.   Toxic and Caustic Substances**

1.   All toxic and caustic materials must be stored in secure areas, in their original containers, with the manufacturer's label intact on each container.

2.   Authorized staff only will draw/dispense these substances, in accordance with the applicable Material Safety Data Sheet(s).

3.   Staff will either return unused amounts to the original container(s) or, under certain circumstances, to another suitable, clearly labeled container n the storage area..

4.   MSDS directions will determine the disposal and spill procedures for toxic and caustic materials used in the facility.

**H.   Poisonous Substances**

1.   Poisonous substances or chemicals pose a very high (Class I) caustic hazard due to their toxicity, e.g., methyl alcohol, sulfuric acid, muriatic acid, caustic soda, tannic acid, etc.

GEO-MEN 00063780

2.  Methyl alcohol, variously referred to as wood alcohol and methanol, is commonly found in industrial applications (e.g., shellac thinner, paint solvent, duplicating fluid, solvents for leather cements and dyes, flushing fluid for hydraulic brake systems). If ingested, methyl alcohol can cause permanent blindness or death.

3.  Staff must directly supervise the use of any product containing methyl alcohol. Products containing methyl alcohol in a diluted state, such as shoe dye, may be issued to detainees, but only in the smallest workable quantities.

4.  Immediate medical attention is vital any time methyl alcohol poisoning is suspected.

I.  **Other Toxic Substances**

1.  Permanent antifreeze containing ethylene glycol will be stored in a locked area and dispensed only by authorized staff.

2.  Typewriter cleaner containing carbon tetrachloride or tricholorochane will be dispensed in small quantities and used under direct supervision by staff.

3.  Cleaning fluids containing carbon tetrachloride or tetrachloride or tricholoroethylene must be strictly controlled.

4.  Glues of every type may contain hazardous chemicals.  When use of a nontoxic product is not possible, staff must closely supervise all stages of handling. The toxic glues must be stored in a locked location.

5.  The use of dyes and cements for leather requires close supervision.  Nonflammable types will be used whenever possible.

6.  Ethyl alcohol, isopropyl alcohol, and other antiseptic products will be stored and used in the medical department only, under close supervision.  To the extent practicable, such chemicals will be diluted and issued only in small quantities so as to prevent any injuries or lethal accumulation.

7.  Pesticides not currently approved by the Environmental Protection Agency, such as DDT and 1080 (sodium fluoracetate), are prohibited.  The Maintenance Supervisor or designate is responsible for purchasing, storing (in a locked area), and dispensing all the pesticides used in the facility.

8.  The Maintenance Supervisor or designate or other staff member responsible for herbicides must hold a current state license as a Certified Private Applicator.  Persons applying herbicides must wear proper clothing and protective gear.

9.  Lyes may be used only in dye solutions and only under the direct supervision of staff.

GEO-MEN 00063781

**J.**     **Labeling of Chemicals, Solvents, and Other Hazardous Materials**

The OIC will individually assign the following responsibilities associated with the labeling procedure:

1.     Identifying the hazardous nature of materials adopted for use;

2.     Requiring use of properly labeled containers for hazardous materials, including any and all miscellaneous containers into which employees might transfer the material;

3.     Teaching staff the meaning of the classification code and the MSDS, including the safe handling procedures for each material,; and impressing on staff the need to ensure containers are properly labeled; and

4.     Placing correct labels on all smaller containers when only the larger shipping container bears the manufacturer-affixed label;

**K.**     **Controlled Hazardous Materials**

Certain substances require special treatment, including careful planning before use, which goes beyond attention to the warning label.   These controlled materials are classified according to the type of hazard and the nature of the restrictions imposed for their safe use, as specified in OSHA regulations.

**Class I: Industrial Solvents.** Includes industrial solvents and chemicals used as paint thinners, degreasers, and cleaning agents that may have toxic properties and low flash points, making them dangerous fire hazards.

**Class II: Restricted Materials.** Beryllium, its alloys and compounds, and silver solder containing cadmium pose a danger to workers, for whom special precautions must be taken.

**Class III: Recognized Carcinogens.**   OSHA-listed carcinogens are governed by the OSHA regulations provided in 29 CFR 1910.1000.   Although asbestos appears on the OSHA list, it is exempt from the regulation under the following circumstances:  (i) when no asbestos fibers will be released into the air during handling and use; and (ii) when the asbestos in question consists of firmly bound asbestos fibers contained in a product, e.g., a transit pipe, wallboard, or tile, except when being sawed or otherwise handled in a way that releases fibers into the air.

**Class IV: Suspected Carcinogenic, Teratogenic, and Mutagenic Materials**: Chemical agents, substances, mixtures, and exposures listed in the biennial *Report on Carcinogens* issued by the U.S. Public Health Service, in accordance with the Public Health Service Act; the Maintenance Supervisor or designate will ensure the facility has and complies with the provisions of the latest edition.

GEO-MEN 00063782

L.    **FIRE PREVENTION AND CONTROL**

1.    **Fire Safety Codes**

Every facility will comply with standards and regulations issued by the Environmental Protection Agency (EPA) and OSHA, the American Correctional Association's "mandatory" standards, local and national fire safety codes, and the applicable standards of the American Society for Testing and Materials, American National Standards Institute, and Underwriters' Laboratories or Factory Mutual Engineering Corporation.

New construction, alterations, and renovations, will comply with the latest revision or update of the BOCA National Building Code (issued by Building Officials and Code Administrators International); the Uniform Building Code, or the Standard Building Code, in accordance with 40 USC Title 619 and local law.  If the local government does not mandate adherence to a particular code, the construction must conform to the BOCA National Building Code.

In addition, the construction will comply with the latest edition of the National Fire Protection Association's *NFPA 101, Life Safety Code* and *National Fire Codes*.  If the fire protection and life safety requirements of a building code differ from the *NFPA 101* or the *National Fire Codes*, the requirements of NFPA 101 and the NFCs will take precedence, recognized as equivalent to the specifications of any local building code.

2.    **Inspections**

A qualified departmental staff member will conduct weekly fire and safety Inspections; the maintenance (safety) staff will conduct monthly inspections.  Written reports of the inspections will be forwarded to the OIC for review and, if necessary, corrective action determinations. The Maintenance Supervisor or designate will maintain inspection reports and records of corrective action in the safety office.

3.    **Fire Prevention, Control, and Evacuation Plan**

Every institution will develop a fire prevention, control, and evacuation plan to include, among other thing, the following:

a.    Control of ignition sources;

b.    Control of combustible and flammable fuel load sources;

c.    Provisions for occupant protection from fire and smoke;

d.    Inspection, testing, and maintenance of fire protection equipment, in accordance with NFPA codes, etc.;

GEO-MEN 00063783

e.     Monthly fire inspections;

f.     Installing fire protection equipment throughout the facility, in accordance with *NFPA 10, Standard for Portable Fire Extinguishers*;

g.     Accessible, current floor plans (buildings and rooms); prominently posted evacuation maps/plans; exit signs and directional arrows for traffic flow; with a copy of each revision filed with the local fire department;

h.     Conspicuously posted exit diagram conspicuously posted for and in each area.

**4.     <u>Fire Drills</u>**

Monthly fire drills will be conducted and documented separately in each department.

a.     Fire drills in housing units, medical clinics, and other areas occupied or staffed during non-working hours will be timed so that employees on each shift participate in an annual drill.

b.     Detainees will be evacuated during fire drills, except in areas where security would be jeopardized or in medical areas where patient health could be jeopardized or, in individual cases when evacuation of patients is logistically not feasible. Staff- simulated drills will take place instead in the areas where detainees are not evacuated.

c.     Emergency-key drills will be included in each fire drill, and timed. Emergency keys will be drawn and used by the appropriate staff to unlock one set of emergency exit doors not in daily use. NFPA recommends a limit of four and one-half minutes for drawing keys and unlocking emergency doors.

**5.     <u>Exit Diagram</u>**

In addition to a general area diagram, the following information must be provided on existing signs:

a.     English and Spanish instructions;

b.     "You Are Here" markers;

c.     Emergency equipment locations.

New signs and sign replacements will also identify and explain "Areas of Safe Refuge."

---

GEO-MEN 00063784

**M.**     **Pests and Vermin**

The OIC will contract with licensed pest-control professionals to perform monthly inspections.   During these routine inspections, they will identify and eradicate rodents, insects, and vermin.  The contract will include a preventative spraying program for indigenous insects.

**N.**     **Certification of Facility Water Supply**

A state laboratory will test samples of drinking and wastewater to ensure compliance with applicable standards.

**O.**     **Emergency Electrical Power Generator**

Power generators will be tested at least every two weeks.  Other emergency equipment and systems will undergo quarterly testing, with follow-up repairs or replacement as necessary.

The biweekly test of the emergency electrical generator will last one hour.  During that time, the oil, water, hoses and belts will be inspected for mechanical readiness to perform in an emergency situation.   The emergency generator will also receive quarterly testing and servicing from an external generator-service company.  Among other things, the technicians will check starting battery voltage, generator voltage and amperage output.

**P.**     **Guidelines for Specific Areas of the Facility; Barber Operations**

Sanitation of barber operations is of the utmost concern because of the possible transfer of diseases through direct contact or by towels, combs and clippers.  Towels must not be reused after use on one person.  Instruments such as combs and clippers will not be used successively on detainees without proper cleaning and disinfecting.   The following standards will be adhered to:

1.     The operation will be located in a separate room not used for any other purpose.  The floor will be smooth, nonabsorbent and easily cleaned.  Walls and ceiling will be in good repair and painted a light color.  Artificial lighting of at least 50-foot candles will be provided.  Mechanical ventilation of 5 air changes per hour will be provided if there are no operable windows to provide fresh air.  At least one lavatory will be provided.  Both hot and cold water will be available, and the hot water will be capable of maintaining a constant flow of water between 105 degrees and 120 degrees.

2.     Each barbershop will be provided with all equipment and facilities necessary for maintaining sanitary procedures of hair care.  Each shop will be provided with appropriate cabinets, covered metal containers for waste, disinfectants, dispensable headrest covers, laundered towels and haircloths.

GEO-MEN 00063785

3. Between detainees, all hair care tools coming in contact with the detainees will be cleaned and effectively disinfected. Hair care tools come into intimate contact with the detainees' scalp and skin, and when reused without disinfection, provide excellent means for transfer of ringworm or other skin and scalp diseases. Clippers may be treated for pathogenic organisms and fungi by an approved bactericidal and fungicidal process. Ultraviolet lights may only be used for maintaining tools after sterilization.

4. Each barbershop will have detailed hair care sanitation regulations posted in a conspicuous location for the use of all hair care personnel and detainees

   a. All scissors, combs or other tools (except clippers) will be thoroughly washed with soap and hot water to remove film and debris and effectively disinfected immediately after use on each detainee and before being used for the service of any other detainee.

   b. After cleaning, the clipper blades will be immersed in the disinfectant solution and agitated for a period of not less than 15 seconds before use on any other detainee. The solution will be replaced as often as necessary.

   c. No hair care specialist will use for the service of a detainee any headrest cover, neck strap, towel, or washcloth that has been used for any other detainee, unless the same will have been properly laundered since its last use.

   d. Clean hair cloths may be reused; however, when a hair cloth is used in servicing a detainee, a neck strip, a freshly laundered towel, or other suitable protection will be placed between the hair cloth and the neck of the detainee. Soiled or unclean hair clothes may not be used.

   e. Cotton pads, absorbent cotton and other single or dispensable toilette articles may not be reused, and will be placed in a proper waste receptacle immediately after use.

   f. The common use of brushes, neck duster, shaving mugs and shaving brushes will be prohibited.

   g. The making of shaving lather in a wash basin or lavatory for use in serving a detainee is prohibited.

   h. The use of powder puffs, sponges, lump alum, styptic pencils, and similar items is prohibited.

   I. The removal or treatment of blackheads, carbuncles, infected hairs, or any sores or lesions is prohibited.

---

GEO-MEN 00063786

j.   The pulling of hair from ears, nostrils, eyebrows, and moustaches is prohibited.

k.   No barber or beautician will serve any detainee when the skin of the detainee's face, neck, or scalp is inflamed, scaling, contains pus, or is erupted, unless service of such detainee is performed in accordance with the specific authorization of the Chief Medical Officer.

i.   No person will be served when infested with head lice.

**Q.   Guidelines for Specific Areas of the Facility, Medical Operations**

An established uniform procedure will be provided for the safe handling and disposal of used needles and other potentially sharp objects to prevent both mechanical injury and the percutaneous transmission of infectious disease organisms, especially the hepatitis B virus (HBV) and the human immunodeficiency virus (HIV).

A uniform procedure for used needles and other disposable sharps is necessary to reduce the number of such injuries by preventing the secondary handling of needles and other dangerous sharp objects used in the delivery of medical care. Accidental injuries from sharp objects (sharps) are common in health care programs, mostly from needle sticks caused by attempting to recap hypodermic needles.

Sharps will be defined as all disposable or discarded items derived from detainee care that could potentially transmit disease via direct subdermal inoculation. Items included under this policy are: hypodermic needles and syringes, scalpel blades, glass vials or ampules containing materials deemed to be infectious, burrs, glass cartridges, lancets. The following procedures will be observed when handling and disposing of needles and other hazardous sharp items.

1.   **Inventory**

An inventory will be kept of those items that pose a security risk, such as sharp instruments, syringes, needles, and scissors. This inventory will be checked weekly by an individual designated by the medical facility Health Service Administrator (HSA) or equivalent.

2.   **Handling**

Without removing the needles or replacing the needle covers, staff will place used (disposable) syringes in a plastic disposal box or container.

a.   **Disposal Containers**

Use only commercially available, biohazardous-waste sharps containers approved by the National Institute of Safety and Health. An example of an approved brand is "Winfield Sharps Container." Do not use milk cartons or plastic milk jugs as they have been found to puncture easily.

GEO-MEN 00063787

Likewise do not use other plastic containers of similar thickness.

Containers will be of approximately two-gallon capacity in order to be of sufficient size to receive various types of sharps.  Under no circumstances will an item be removed from the container.

**b.**    **Location**

Containers will be located on top of counters or, if on the wall, at least five feet above ground.  Containers will not sit on the floor.

**c.**    **Disposal**

When the disposal box is ½ to 2/3 full, the lid will be closed and locked, tape will be placed over the top of the lid to indicate that it is ready for disposal. The container will be labeled with the words "infectious waste" or with the universal biohazard symbol, and placed in the proper area for removal and disposal.  Sharps will be considered as infectious waste and final disposal of the container and contents will be through a commercial contractor that handles disposal of infectious waste in accordance with all local and federal regulations.

The HSA will make arrangements for disposal with an approved contractor and is responsible for validating that the contractor's disposal methods are in accordance with all infectious and hazardous waste disposal laws and regulations.  Arrangements will be made with local hospitals, if possible, for disposal with the hospitals' own infectious waste.

**3.**    **Accidental Needle Sticks**

Should an individual receive a needle stick or be cut while handling potentially contaminated sharps, the individual will be counseled regarding baseline testing for HBV and HIV and referred to their usual source of health care.  If the injury also involves a person who is a known source of possible infection, that person will also be tested for HBV and HIV.  The incident will be reported as an occupational injury and documented in accordance with applicable regulations for commissioned officers and civil service employees, respectively.

The leading health service provider's exposure-control plan will be followed in the event of a needle stick.

GEO-MEN 00063788

**R.**   **General Environmental Health Guidelines**

1.   Environmental health conditions will be maintained at a level that meets recognized standards of hygiene. The standards include those from the American Correctional Association, the Occupational Safety and Health Administration, the Environmental Protection Agency, the Food and Drug Administration, the National Fire Protection Association's Life Safety Code, and the National Center for Disease Control and Prevention.

The INS HSD or IGSA equivalent activities are designed to assist in the identification and correction of conditions that could adversely impact the health of detainees, employees, and visitors.  The INS sanitarian consultant is responsible for developing and implementing policies, procedures, and guidelines pertaining to activities of the environmental health program.  These elements are intended to evaluate, and eliminate or control as necessary, both sources and modes of transmission of agents or vectors of communicable disease and of injuries.

The sanitation consultant will conduct special investigations and comprehensive surveys of environmental health conditions.  Advisory, consultative, inspection and training services regarding environmental health conditions will also be provided through the sanitarian consultant.

The medical facility HSA is responsible for implementing a program that will assist in maintaining a high level of environmental sanitation.  In consultation with the sanitarian consultant, they will provide recommendations to the INS OIC concerning environmental health conditions.

2.   **Housekeeping**

The key to the prevention and control of nosocomial infections due to contaminated environmental surfaces is environmental cleanliness.  Responsibility for ensuring the cleanliness of the medical facility lies with the HSA or with an individual designated by the HSA or other health care provider utilized.  The HSA or designee will make a daily visual inspection of the medical facility noting the condition of floors, walls, windows, horizontal surfaces, and equipment.

Methods of cleaning; cleaning equipment; cleansers; disinfectants and detergents to be used; plus, the frequency of cleaning and inspections will be established using an acceptable health agency standard as the model.

Proper housekeeping procedures include the cleaning of surfaces touched by detainees or staff with fresh solutions of appropriate disinfectant products, applied with clean cloths, mops, or wipes.  Cleaned surfaces need not be monitored microbiologically since the results of such tests have been shown not to correlate with infection risk.  Floors, walls, beds, tables, and other surfaces that usually come in contact with intact skin require low-level disinfection.

GEO-MEN 00063789

Since these surfaces are rarely associated with the transmission of infections to patients or personnel, extraordinary attempts to disinfect or sterilize these surfaces are not indicated.

Horizontal surfaces in detainee care areas are cleaned on a regular basis, when soiling or spills occur and in short-stay units when a detainee is discharged.  Cleaning of walls, blinds, or curtains is indicated only when visibly soiled. The Chief Nurse is responsible for training all staff and detainees in using proper housekeeping procedures and proper handling of hazardous materials and chemicals.

**a.**　　**General Cleaning Procedures**

　　1.　　All horizontal surfaces will be damp-dusted daily with an approved germicidal solution.

　　2.　　Windows, window frames, and windowsills will be cleaned on a regular schedule, but do not require daily cleaning.

　　3.　　Furniture and fixtures will be cleaned daily.

　　4.　　Floors will be mopped daily and when soiled using the double-bucket mopping technique, and with a hospital disinfectant-detergent solution mixed according to the manufacturers directions.  A clean mop head will be used each time the floors are mopped.

　　5.　　Waste containers will be lined with plastic bags and the liner will be changed daily.  The container itself will be washed at least weekly, or as needed when it becomes soiled.

　　6.　　Cubicle curtains will be laundered monthly or during terminal cleaning following treatment of an infectious patient.

**b.**　　**Procedures for Isolation Cleaning**

　　1.　　An approved germicidal detergent solution will be freshly prepared in accordance with the manufacturer's specifications for each cleaning.

　　2.　　After cleaning the isolation room, mops and cleaning cloths will be laundered before being reused.

　　3.　　Dirty water and used disinfecting solutions will be discarded and the buckets and basins disinfected before being refilled.  Items used in cleaning an isolation (contaminated) room will never be taken into another area.

---

GEO-MEN 00063790

4.  Linens will be carefully removed from the bed and double bagged for transport.

5.  All waste materials will be double bagged and disposed of as contaminated waste.

c.  **Procedures for Terminal Cleaning**

1.  Every item in the room must be cleaned with an approved hospital germicidal solution.

2.  When applicable, linen will be stripped from the bed, with care taken not to shake linen. Linen will be folded away from the person and folded inward into a bundle, then removed with minimal agitation.

3.  When applicable, all reusable receptacles such as drainage bottles, urinals, bedpans, water pitchers will be emptied and rinsed with germicidal solutions.

4.  All equipment that is not to be discarded, such as IV poles, respirators and suction machines, will be washed with an approved germicidal solution following manufacturer's guidelines for cleaning the specific piece of equipment.

5.  When applicable, mattresses and pillows covered with durable plastic covers will be thoroughly washed with the approved germicidal solution.

6.  When applicable, beds will be washed thoroughly using a small brush soaked in the germicidal solution to gain access to small holes and crevices, to areas between the springs, and the casters.

7.  All furniture will be washed with a germicidal detergent solution. Use a small brush if necessary. Outside and underside as well as legs and casters must also be washed.

8.  Wastebaskets will be thoroughly washed with a germicidal solution after trash has been removed.

9.  Telephones will be thoroughly cleaned with a clean cloth soaked in the germicidal solution. The earpiece and mouthpiece will be unscrewed, scrubbed, dried and replaced.

10. Walls and ceilings need not be washed entirely, but areas that are obviously soiled will be washed with germicidal solution.

GEO-MEN 00063791

d.    **Choice of Disinfecting Materials**

Hospital grade disinfectant-detergent formulations registered by the Environmental Protection Agency may be used for environmental surface cleaning, but the physical removal of microorganisms by scrubbing is probably as important as any antimicrobial effect of the cleaning agent used.

Therefore cost, safety, and acceptance by staff can be the criteria for selecting any such registered agent. *The manufacturer's instructions for use will be followed exactly.*

3.    **Blood and Body Fluid Clean-up**

Spills of blood and body fluids will be cleaned up and the surface decontaminated in such a manner as to minimize the possibility of workers becoming exposed to infectious organisms, including HIV and HBV.   A suitable cleanup kit will be maintained for use in cases of spills of blood and body fluids.   Cleanup kits may be obtained from commercial sources, or kits may be put together by INS HSD staff or leading health care provider.

a.    **Making a Clean-up Kit**

To prepare a cleanup kit for blood and body fluid spills, package the following materials in a 12" x 15" clear" Ziplock" bag.

Gloves, rubber or vinyl, household type, (2 pair)

Clean absorbent rags (4)

Absorbent paper towels (15)

Disposable bag marked "Contaminated" size 23"x10"x39", minimum thickness 1.5 mils.

Clear plastic bag 13"x10"x39", minimum thickness 1.5 mils.

Bottle of "hospital disinfectant"  (containing quaternary ammonium chlorides in at least 0.8% dilution), or a bottle of household bleach such as "Clorox" or "Purex" (5.25 % sodium hypochlorite).

b.    **Selection of Disinfectants**

Quaternary disinfectants are less effective against Hepatitis B, while dilute solutions of sodium hypochlorite are reported extremely effective against both HIV and the Hepatitis B virus, and therefore have been recommended for use in environmental decontamination procedures rather than quaternary

GEO-MEN 00063792

ammonium compounds.  Chlorine in solution inactivates virus quickly and efficiently, but must reach the virus particles to do so.  Proteinaceous materials may interfere with the ability of the appropriate disinfectant solution to reach the virus particles.  Since quaternary disinfecting compounds may act as a detergent as well as a disinfectant, their use may help in the cleaning and removal of proteinaceous materials from surfaces. A facility may wish to use one of these compounds to help clean the surface, then follow with the use of chlorine solution for final disinfection.  Using one disinfectant compound rather than two would keep the procedure as simple as possible.  By following the mechanical procedure listed in the article, most blood or fluids would be removed from the surface before application of the disinfectant, so the use of sodium hypochlorite solution will be sufficient.

**c.**    **Selection of Gloves**

Household or industrial rubber gloves have been recommended for use rather than surgical rubber gloves.  Surgical gloves are somewhat porous and are less resistant to mechanical damage and punctures during cleanup procedures.

**d.**    **Use of Detainees as Housekeeping Workers**

Detainee workers may be used to assist in cleaning the medical facility. Detainees will be allowed to clean floors, walls, and to remove trash, but will not be allowed to clean medical equipment.

**4.**    **Instructions for Use of Clean-Up Kit**

a.    Obtain a Cleanup Kit.
b.    Open the bag.
c.    Remove supplies.
d.    Depending on the type of disinfectant you have included in your kit, take out bottle of "hospital disinfectant", or prepare a dilute solution of sodium hypochlorite.  To prepare a 1:10 dilution of 5.25% sodium hypochlorite, mix 1 part of 5.25 % sodium hypochlorite (common household bleach) with 10 parts water.
e.    Open the large clear plastic bag and the large bag marked "Contaminated". Place them next to each other.
f.    Put on one pair of gloves.
g.    Use paper towels to absorb as much of the fluid as possible; then place paper towels in the large clear plastic bag.
h.    Pour solution carefully onto the spill area.  Dispose of the empty bottle in the large, clear plastic bag.  Leave disinfectant in place for 15 minutes.
I.    Use the rags to clean the area.  Place rags in the large clear plastic bag.
j.    Tie off the clear plastic bag and place inside the large plastic bag marked "Contaminated".
k.    Remove gloves carefully and place in the plastic bag marked "Contaminated".

GEO-MEN 00063793

l.   Put on the second pair of gloves and tie the "Contaminated" trash bag closed.
m.   Dispose of the "Contaminated" trash bag properly in a contaminated-waste receptacle.
n.   Dispose of the second pair of gloves in the contaminated-waste receptacle.
o.   Wash your hands.
p.   Prepare a new clean-up kit.

NOTE:  Do not place linen or non-disposable articles in the "Contaminated" trash bag.

**5.**   **Hazardous and Infectious Waste Disposal**

Infectious and hazardous waste generated at a medical facility will be stored and disposed of safely and in accordance with all applicable federal and state regulations.

For identified wastes that represent sufficient risk of causing infection or injury during handling and disposal some special precautions appear prudent.

**a.**   **Definitions**

Hazardous or infectious waste is defined as: microbiology laboratory waste; human blood and blood products; sharps (all discarded items derived from patient care in medical facilities which could potentially transmit disease via direct subdermal inoculation or present a risk of injury & skin penetration); laboratory and other chemicals; certain drugs such as neoplastic.

Miscellaneous biomedical waste is defined as waste materials that are not specifically defined as infectious waste.  Such waste includes bandages, dressings, casts, catheters, and disposable pads.

Waste from detainees in isolation is not considered to be infectious waste unless it falls within the specific definition of infectious waste as stated above.

**b.**   **Collection and Storage**

Infectious waste must be separated from the general waste stream and clearly labeled as infectious.  Infectious waste will be double-bagged and tied and marked with a label reading "Infectious Waste".   The bags must be impermeable, commercially supplied red bags, sold specifically for biohazardous waste storage. Miscellaneous biomedical waste will be double-bagged and tied, but need not be labeled as infectious.

GEO-MEN 00063794

c.      **Treatment and Disposal**

Blood products and designated body fluids will be poured slowly and carefully down the toilet to prevent splash. Compacting of untreated infectious waste is prohibited. The waste disposal contractor must meet all state or and local requirements for transportation and disposal.

S.    **Universal Precautions**

1.    Staff will routinely take precautions to prevent contact with blood or other body fluids, using these guidelines:

a.    Gloves will be worn for touching blood and body fluids, mucous membranes, or non-intact skin of all patients, for handling items or surfaces soiled with blood or body fluids, and for performing venipuncture and other vascular access procedures. Gloves will be changed after contact with each detainee.

b.    Masks and protective eye wear or face shields will be worn during procedures that are likely to generate droplets of blood or other body fluids, to prevent exposure of mucous membranes of the mouth nose or eyes.

c.    Gowns or aprons will be worn during procedures that are likely to generate splashes of blood or other body fluids.

d.    Hands and other skin surfaces will be washed immediately and thoroughly if contaminated with blood or other body fluids. Hands will be washed immediately after gloves are removed.

e.    All health-care workers will take precautions to prevent injuries caused by needles, scalpels, and other sharp instruments or devices during procedures; when cleaning used instruments; during disposal of used needles; and when handling sharp instruments after procedures.

f.    To prevent needle stick injuries, needles will not be recapped, purposely bent or broken by hand, removed from disposable syringes, or otherwise manipulated by hand. After use, disposable syringes and needles, scalpel blades, and other sharp items will be placed in puncture-resistant containers for disposal.

g.    Large-bore reusable needles will be placed in a puncture resistant container for transport to the reprocessing area.

h.    Although saliva has not been implicated in HIV transmission, to minimize the need for emergency mouth-to-mouth resuscitation, mouthpieces, resuscitation bags or other ventilation devices will be available for use in areas in which the need for resuscitation is predictable.

GEO-MEN 00063795

I.    Health-care workers who have exudative lesions or weeping dermatitis will refrain from all direct patient care and from handling patient-care equipment until the condition resolves.

j.    Pregnant health-care workers are not known to be at greater risk of contracting HIV infection than health-care workers who are not pregnant; however, if a health care worker develops HIV infection during pregnancy, the infant is at risk of infection from perinatal transmission.  Because of this risk, pregnant health care workers will be especially familiar with and strictly adhere to precautions to minimize the risk of HIV transmission.

k.    Implementation of universal blood and body fluid precautions for all detainees eliminates the need for the use of isolation category of "Blood and Body Fluid Precautions" previously recommended by the Centers for Disease Control for individuals known or suspected to be infected with blood-borne pathogens. Isolation precautions will be used as necessary if associated conditions, such as infectious diarrhea or tuberculosis, are diagnosed or suspected.

**T.**    <u>Protective Equipment</u>

1.    Protective eye and face equipment will be required where there is a reasonable probability of injury that can be prevented by such equipment.  These areas of the facility will be conspicuously marked with eye hazard warning signs.

2.    OSHA-approved eyewash stations will be installed in designated areas throughout the facility.  All employees and detainees in those areas will be instructed in their use.

**U.**    <u>Garbage and Refuse</u>

1.    Refuse includes all garbage, rubbish, and other putrescible and non-putrescible solid waste, except the solid and liquid waste discharged into the sanitary sewer system of the facility.

2.    Garbage and refuse will be collected and removed as often as necessary to maintain sanitary conditions and to avoid creating health hazards.

3.    Methods for handling and disposing of refuse affects the local environment, compliance with the requirements of local and federal agencies is essential.

GEO-MEN 00063796

IV.   **AMERICAN CORRECTIONAL ASSOCIATION STANDARDS REFERENCED**

American Correctional Association 3rd Edition, Standards for Adult Detention Facilities:
3-ALDF-3B-01, 3B-02, 3B-05, 3B-10, 3B-11, 3B-12.4D-01, 4D-03, 4D-13

**Approval of Standard**

Michael D. Cronin
Acting Executive Associate Commissioner
Office of Programs

SEP 2 0 2000
_____
Date

Michael A. Pearson
Executive Associate Commissioner
Office of Field Operations

SEP 2 0 2000
_____
Date

GEO-MEN 00063797

## INS DETENTION STANDARD

### SPECIAL MANAGEMENT UNIT
### (Administrative Segregation)

I.   **POLICY**

Each facility will establish a Special Management Unit that will isolate certain detainees from the general population. The Special Management Unit will have two sections, one for detainees in Administrative Segregation; the other for detainees being segregated for disciplinary reasons (see the "Special Management Unit [Disciplinary Segregation]" Standard).

II.  **APPLICABILITY**

The standards provided in this Detention Standard shall apply to the following facilities housing INS detainees:

1.  Service Processing Centers (SPCs);

2.  Contract Detention Facilities (CDFs); and

3.  State or local government facilities used by INS through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours; referred to as "IGSA facilities."

Within the document additional implementing procedures are identified for SPCs and CDFs. Those procedures appear in italics. IGSA facilities may find such procedures useful as guidelines. IGSAs may adopt, adapt or establish alternatives to, the procedures specified for SPCs/CDFs, provided they meet or exceed the objective represented by each standard

See the separate "Definitions" Standard for the meaning of certain terms used in this document

III. **STANDARDS AND PROCEDURES**

A.   **Placement in Administrative Segregation**

Administrative segregation is a non-punitive form of separation from the general population used when the continued presence of the detainee in the general population would pose a threat to self, staff, other detainees, property, or the security or orderly operation of the facility. Others in this housing status includes detainees who require protective custody, those who cannot be placed in the local population because they are en route to another facility (holdovers), those who are awaiting a hearing before a disciplinary panel, and those requiring separation for medical reasons.

---

GEO-MEN 00063863

Administrative segregation status is a non-punitive status in which restricted conditions of confinement are required only to ensure the safety of detainees or others, the protection of property, or the security or orderly running of the facility.

The facility shall develop and follow written procedures consistent with this standard.

*In SPCs/CDFs:*

1.  *Prior to the detainee's placement in administrative segregation, the Officer in Charge (OIC) and Supervisory Detention Enforcement Officers (SDEO) or CDF equivalent will review the case to determine whether administrative segregation is warranted.*

2.  *The OIC may delegate authority to place a detainee in administrative segregation to the SDEO.*

3.  *A detainee may be placed in administrative segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees; for the secure or orderly operation of the facility; for medical reasons, etc. Examples include, but are not limited to the following:*

    a.  *A detainee is awaiting an investigation or a hearing for a violation of facility rules. Pre-disciplinary hearing detention should be ordered only as necessary to prevent further rules violation(s) or to protect the security and orderly operation of the facility. It is not to be used as a punitive measure. Time served in pre-hearing detention may be deducted from any time ordered by the Institutional Disciplinary Panel (IDP).*

    b.  *A detainee is a threat to the security of the facility. The OIC may determine that a detainee's criminal record, past behavior at other institutions, behavior while in INS detention, or other evidence is sufficient to warrant placing the detainee in administrative segregation. Copies of records supporting this action will be attached to the Administrative Segregation Order.*

    c.  *A detainee requires protection. Protective custody (PC) may be initiated at the detainee's request or ordered to protect the detainee from harm. Examples include:*

        1.  *Victims of detainee assaults;*

        2.  *Detainee informants/witnesses - detainees who provide information to the institution staff or any law enforcement agency concerning improper activities by others;*

        3.  *Sexual predators;*

GEO-MEN 00063864

4.    *Detainees who have been pressured by other detainees to participate in sexual activity;*

5.    *Detainees who request PC;*

6.    *Detainees who refuse to enter the general population because of alleged intimidation from other detainees;*

7.    *Detainees who refuse to return to the general population, but who will not provide the reason for refusal;*

8.    *Detainees who appear to be in danger of bodily harm; or*

9.    *Detainees who seek protection, claiming to be former law enforcement officers or to have held a sensitive law enforcement position, whether or not there is official information to verify the claim.*

d.    *The IDP may order a detainee into administrative segregation following disciplinary segregation after determining that releasing the detainee into the general population would pose a threat to the security and orderly operation of the facility. A detainee transferred from disciplinary segregation to administrative segregation shall enjoy the same privileges as all others in administrative segregation.*

e.    *A medical professional ordering a detainee removed from the general population shall complete and sign the Administrative Segregation Order, unless the detainee will stay in the medical department's isolation/segregation ward.*

f.    *A detainee is scheduled for release, removal, or transfer within 24 hours. Such segregation may be ordered for security reasons or for the orderly operation of the facility.*

## B.    <u>Administrative Segregation Order</u>

A written order shall be completed and approved by a supervisory officer before a detainee is placed in administrative segregation, except when exigent circumstances make this impracticable. In such cases, an order shall be prepared as soon as possible. A copy of the order shall be given to the detainee within 24 hours, unless delivery would jeopardize the safety, security, or orderly operation of the facility.

GEO-MEN 00063865

*In SPCs/CDFs:*

1.  *The OIC shall complete the Administrative Segregation Order (I-885 attached), detailing the reasons for placing a detainee in administrative segregation, before actual placement.*

2.  *In an emergency, the detainee's placement in administrative segregation may precede the paperwork, which the OIC will prepare as soon as possible.*

3.  *All memoranda, medical reports, and other relevant documents shall be attached to the segregation order.*

4.  *A copy of the completed Administrative Segregation Order will be given to the detainee within 24 hours of placement in administrative segregation, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.*

5.  *The order will remain on file with the Special Management Unit (SMU) until the detainee is returned to the general population.*

6.  *When the detainee is released from the SMU, the releasing officer will indicate date and time of release on the Administrative Segregation Order, then forward the completed order to the Chief Detention Enforcement Officer for insertion into the detainee's detention file.*

7.  *If the segregation is ordered for PC purposes, the order shall state whether the detainee requested the segregation; also, whether the detainee requests a hearing concerning the segregation.*

8.  *No Administrative Segregation Order is required for a detainee awaiting removal, release, or transfer within 24 hours.*

**C.   Review of Detainee Status in Administrative Segregation**

All facilities shall implement written procedures for the regular review of all administrative-detention cases, consistent with the procedures specified below.

*In SPCs/CDFs, a supervisory officer shall conduct a review within 72 hours of the detainee's placement in administrative segregation to determine whether segregation is still warranted. The review shall include an interview with the detainee. A written record shall be made of the decision and the justification. The Administrative Segregation Review Form (I-885) will be used for the review. If the detainee has been segregated for the detainee's protection, but not at the detainee's request, the signature of the OIC or Assistant OIC is required on the I-885 to authorize continued detention.*

GEO-MEN 00063866

*A supervisory officer shall conduct the same type of review after the detainee has spent seven days in administrative segregation, and every week thereafter for the first month and at least every 30 days thereafter. The review shall include an interview with the detainee. A written record shall be made of the decision and the justification.*

*A copy of the decision and justification for each review shall be given to the detainee, unless, in exceptional circumstances, this provision would jeopardize security. The detainee shall be given an opportunity to appeal a review decision to a higher authority within the facility.*

*The Assistant District Director, Detention and Removal shall be notified when any INS detainee has been in administrative detention for more than 30 days. This notification shall be made through the on-site INS OIC, if one is posted at the facility. When a detainee is held in administrative segregation for more than 60 days, the Office of the Assistant Regional Director for Detention and Removal shall be notified by the Assistant District Director, Detention and Removal, in writing of the reasons. The Region shall then consider whether transfer of the detainee to a facility where he/she may be placed in the general population would be appropriate.*

*If an INS detainee has been in administrative segregation for more than 30 days and objects to this status, the OIC shall review the case to determine whether that status should continue. This review shall take into account the views of the detainee. A written record shall be made of the decision and the justification. A similar review shall take place every 30 days.*

*After seven consecutive days in administrative segregation, the detainee may exercise the right to appeal to the OIC the conclusions and recommendations of any review conducted. The detainee may use any standard form of written communication, e.g., detainee request, to file the appeal.*

**D.**      **Conditions of Administrative Segregation (Basic Living Standards)**

1.      Detainees in administrative segregation shall receive the same general privileges as detainees in the general population, consistent with available resources and security considerations.

2.      The quarters used for segregation shall be well ventilated, adequately lit, appropriately heated and maintained in a sanitary condition at all times. All cells must be equipped with beds. The beds shall be securely fastened to the cell floor or wall.

3.      The number of detainees confined to each cell or room in administrative segregation should not exceed the capacity for which it was designed. The OIC may approve excess occupancy, on a temporary basis, if the OIC finds that the other basic living standards can still be maintained.

GEO-MEN 00063867

The American Correctional Association Standards for Adult Local Detention Facilities, 3-ALDF-2C-01, 3rd Edition, requires 35 square feet of unencumbered space for a single cell occupant; if confinement exceeds 10 hours per day, the required space doubles to at least 70 square feet.

4.  Clothing and bedding shall be issued to detainees in administrative segregation in accordance with the "Issuance and Exchange of Clothing, Bedding, Linen and Towels" standard. Detainees in administrative segregation will be provided the same opportunity for the exchange of clothing, bedding, and linen, and for laundry as detainees in the general population.

    *In SPCs/CDFs, a detainee in administrative segregation may wear normal institutional clothing and shall be furnished a mattress and bedding. A detainee may not be segregated without clothing, mattress, blankets and pillow, except:*

    a.  *When prescribed by a medical professional for medical or psychiatric reasons. If a detainee is so seriously disturbed that he/she is likely to destroy clothing or bedding, or to create a disturbance putting self or others at risk, the medical department shall be consulted immediately to determine whether a regimen of treatment and control may be instituted.*

    b.  *When the shift supervisor determines the detainee poses a threat to self or property.*

    *Exceptions shall occur only when necessary for security purposes, as determined by the OIC. Any exception, and the reasons, shall be recorded in the housing unit log.*

5.  Detainees in administrative segregation shall receive three nutritionally adequate meals per day, from the menu served to the general population. For security purposes, detainees in the SMU shall use disposable utensils only. Under no circumstances shall food be used as punishment**.**

6.  Segregated detainees shall have the opportunity to maintain a normal level of personal hygiene. Staff shall provide toilet tissue, a wash basin, tooth brush, shaving utensils, etc., as needed, and may issue retrievable kits of toilet articles.

    Each segregated detainee shall have the opportunity to shower and shave at least three times a week, unless these procedures would present an undue security hazard. This security hazard will be documented and signed by the OIC, indicating his/her review and approval. Denial of showers will be temporary and situational, and will continue only as long as justified by the security threat.

GEO-MEN 00063868

7.  Detainees in administrative segregation will be provided, where practicable, barbering services.  Exceptions to this procedure may be permitted only when found necessary by the OIC.

8.  Recreation shall be provided to detainees in administrative segregation in accordance with the "Recreation" standard.

These provisions shall be carried out, absent compelling security or safety reasons documented by the OIC.  A detainee's recreation privileges may be withheld temporarily after a severely disruptive incident.  Staff shall document by memorandum and logbook(s) notation every instance when a detainee is denied recreation.  The memorandum shall be placed in the detainee's detention file.

When space and resources are available, detainees in administrative segregation will be able to participate in TV viewing, board games, socializing and work details (e.g., an orderly in the SMU); and provided opportunities to spend time outside their cells, over and above recreation periods.

9.  The OIC will issue guidelines concerning the property that detainees may retain in administrative segregation.

10. A reasonable amount of non-legal reading material will be available to detainees in administrative segregation.  The detainee will also be permitted religious material, unless the religious item would pose a threat to security

*In SPCs/CDFs, the Recreation Specialist (RS) shall provide a reasonable amount of softbound, non-legal reading material, not to exceed two books per detainee at any one time, on a circulating basis.*

11. Detainees in administrative segregation will be permitted to retain a reasonable amount of personal legal material, unless this would create a security threat.  If personal legal material is placed in storage, the detainee shall be able to access the material promptly, upon request.

*In SPCs/CDFs, detainees will be permitted to retain all personal legal material upon admittance to segregation, provided such material does not create a safety, security and/or sanitation hazard.  Detainees with a large amount of personal legal material may be required to place a portion of the material in their personal property, with access permitted during designated hours.  Requests to access such legal material should be met as soon as possible, but in no case longer than twenty-four (24) hours after receipt of the initial detainee request to retrieve documents, unless documented security concerns preclude action within this time-frame.*

GEO-MEN 00063869

12.    A medical professional shall visit every detainee in administrative segregation at least three times a week. In addition to the direct supervision afforded by the unit officer, the shift supervisor shall see each segregated detainee daily, including weekends and holidays.

*In SPCs/CDFs, the OIC may designate other staff officers to visit each detainee daily. A nurse, doctor or other appropriate health care professional shall visit every detainee placed in administrative segregation at least once every workday. The medical visit shall be notated on the SMU Housing Record (Form I-888). The medical professional will question each detainee to identify medical problems or requests. Any action taken will be documented in a separate logbook.*

13.    The facility shall follow the "Visitation" standard in setting visitation rules for detainees in administrative segregation. Ordinarily, a detainee retains visitation privileges while in administrative segregation.

14.    In facilities that permit contact visits, all efforts should be made to allow the detainee to utilize the visiting room during normal visiting hours. The determining factor is the reason the detainee is in segregation. Detainees in PC will not use the visitation room during normal visitation hours. In addition, violent and disruptive detainees may be limited to non-contact visitation. In extreme cases, even non-contact general visitation may be disallowed for a particular detainee where the visit would present an unreasonable security risk.

Under no circumstances are detainees to participate in general visitation while in restraints. If the detainee=s behavior warrants restraints, the visit will not be granted.

General visitation may be restricted or disallowed when a detainee, while in an administrative segregation status, is charged with, or has been found to have committed, a prohibited act having to do with visiting guidelines or has otherwise acted in a way that would reasonably indicate that he or she would be a threat to the orderliness or security of the visiting room.

Detainees in administrative segregation may not be denied legal visitation, but reasonable security precautions will be taken where necessary. Legal service providers and assistants will be notified of any security concerns prior to the meeting.

15.    Detainees in administrative segregation shall have the same correspondence privileges as detainees in the general population.

16.    The facility shall follow the "Telephone Access" standard that provides guidelines for detainees in administrative segregation. Detainees in administrative segregation will be permitted telephone access similar to that provided to detainees in the general population, but in a manner consistent with the special security and safety requirements of detainees in these units.

GEO-MEN 00063870

17.     Members of the clergy may visit detainees in administrative segregation, unless the shift supervisor determines the visit presents a security risk or will interfere with the orderly operating of the facility.

Violent and uncooperative detainees may be temporarily denied access to religious services until such time as their behavior and attitude warrants.

18.     Detainees housed in administrative segregation shall have the same law library access as the general population, consistent with security, although the facility may establish a policy of upon-request-only access. The level of supervision will depend on the individual's behavior and attitude.

19.     Detainees in the SMU for protective custody will be required to use the law library separately or will have requested legal material delivered to them.

20.     Detainees in administrative segregation shall have the same correspondence privileges as detainees in the general population (see the "Correspondence and Other Mail" standard).

## E.   **Forms and Reviews**

1.      A permanent log will be maintained in the SMU.  The log will record all activities concerning the SMU detainees, e.g., meals served, recreation, visitors, etc.

*In SPCs/CDFs, the SMU log will record the detainee's name, A-number, housing location, date admitted, reasons for admission, tentative release date (for detainees in disciplinary segregation), and the authorizing official.  All releases from the unit will be similarly recorded.  All persons visiting the unit will sign a separate log, giving time and date of visit.  Unusual activity or behavior of individual detainees will be recorded in the log, with a follow-up memorandum sent through the OIC to the detainee's file.*

2.      *The attached Special Management Housing Unit Record (Form I-888) shall be prepared immediately upon the detainee's placement in the SMU.  The form will be filled out at the end of each shift.  CDFs and IGSA facilities shall use the I-888 or a comparable form for the same purpose.*

*The special housing officer for each shift will record whether the detainee ate, showered, exercised and took any medication.  The record will also be used to notate additional information, e.g., if the detainee has a medical condition, has exhibited suicidal/assaultive behavior, etc.*

*The facility medical officer will be required to sign each individual record when he/she visits the detainee in administrative segregation. The housing officer will initial the record either after the medical visits are completed or at the end of the shift.*

GEO-MEN 00063871

A new record must be created for each week the detainee is in administrative segregation. The completed weekly Special Housing Unit Records will be retained at the SMU until the detainee is released from SMU.

Upon release from the SMU, the releasing officer will ensure that the entire housing unit record relating to the detainee is attached to the Administrative Segregation Order and forwarded to the CDEO for inclusion in the detainee's detention file.

3. The attached I-885 shall be used for formal status reviews (see section III.C., above).

GEO-MEN 00063872

IV.    **AMERICAN CORRECTIONAL ASSOCIATION STANDARDS REFERENCED**
American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities: 3-ALDF-3D-01, 3D-02, 3D-03, 3D-05, 3D-06, 3D-09, 3D-11, 3D-12, 3D-13, 3D-14, 3D-15, 3D-16, 3D-17, 3D-18, 3D-19, 3D-20, 3D-21, 3D-22, 3D-24.

**Approval of Standard**

Michael D. Cronin
**Acting Executive Associate Commissioner**
**Office of Programs**

SEP 2 0 300

**Date**

Michael A. Pearson
**Executive Associate Commissioner**
**Office of Field Operations**

SEP 2 0 300

**Date**

GEO-MEN 00063873

**U.S. Department of Justice**
Immigration and Naturalization Service

**Administrative Segregation Order**

To:_____

From:_____  Title:_____

Detainee:_____  A#:_____

**The Above Named Detainee Is to Be Admitted to Administrative Segregation For The Following Reason(s):**

_____  (A)  Is pending an investigation/hearing for the commission of a prohibited act or rule violation and requires pre-hearing detention.

_____  (B)  Is under medical observation (medical staff must comment and sign this Order).

_____  (C)  Is pending a transfer or release within 24 hours.

_____  (D)  Is terminating confinement in Disciplinary Segregation and has been ordered in Administrative Segregation by the Disciplinary Panel.

_____  (E)  Is a security risk to him/herself or the security of the facility.

_____  (F)  Detainee has requested admission for Protective Custody.

I hereby request placement in the Administrative Segregation unit for my own protection. **I do[   ]    do not [   ]**   request a hearing concerning my segregation.

Detainee:_____  A-number:_____  Date:_____

Record below, a brief outline of the circumstances and the names of any witnesses to events leading to placement in Administrative Segregation.

_____

_____

_____

_____

Medical Officer:_____

Admitted by:  _____  Title:  _____
Admitted:  (Date):_____  Time:  _____

Released by:  _____  Title:  _____
Released:  (Date)_____  Time:  _____

Form No.  I-886 (02/08/99)

GEO-MEN 00063874

**U.S. Department of Justice**
Immigration and Naturalization Service

# Administrative Segregation Review

On_____Supervisory Detention Enforcement Officer (SDEO) or contract equivalent_____
      Date                                                                                    (Officer)
conducted a formal review of the Special housing status of_____A#_____ who is presently in:
                                                                 (detainee)

     Protective Custody Status   [ ]      Other Administrative Segregation    [ ]      _____
     Medical Segregation           [ ]

Authorizing Supervisor:   _____

Authorizing USPHS Officer (if segregation is for medical reasons):   _____

Detainee has been in Administrative Segregation for_____days.

**The following factors were reviewed with the results as indicated:**

|  | YES | NO |
|---|:---:|:---:|
| 1.  Does the reason for initial placement remain valid? | [ ] | [ ] |
| 2.  Does the detainee pose a threat to himself? | [ ] | [ ] |
| 3.  Does the detainee pose a threat to others? | [ ] | [ ] |
| 4.  Does the detainee pose a threat to property? | [ ] | [ ] |
| 5.  Does the detainee pose a threat to security? | [ ] | [ ] |
| 6.  Is the detainee defiant towards authority? | [ ] | [ ] |
| 7.  Is the detainee unwilling or unable to live in the general population? | [ ] | [ ] |
| 8.  Is the detainee's habitual conduct, language, or behavior of a type which may provoke or instigate stressful/violent situations amongst the general population? | [ ] | [ ] |

If any of the above factors are marked "YES", the detainee must continue his/her existing status, unless the OIC determines otherwise.  If all factors are marked "NO," the detainee may be released.

## DOCUMENT REVIEW

| | | |
|---|:---:|:---:|
| 1.  Is the detainee being offered three showers/week and taken showers? | [ ] | [ ] |
| 2.  Is the detainee exercising at least one hour daily, 5 days a week? | [ ] | [ ] |
| 3.  Is the detainee being offered three meals daily and consuming at least one meal daily? | [ ] | [ ] |
| 4.  Is the detainee receiving daily visits from medical staff? | [ ] | [ ] |
| 5.  Are the special housing officers signing and properly filling out the special housing unit record? | [ ] | [ ] |

A "NO" answer to any of the above questions will require notification of the Detention Operations Supervisor or officer of equal or greater rank.

I state that the initial reason for my placement in Protective Custody (PC) no longer remains valid.  I am requesting removal from PC status.  Translation into the Spanish or other language provided by_____.

Detainee Signature:_____Date/Time:_____

**For the reasons above,    I recommend [ ] do not recommend [ ]    removal from PC status.**

SDEO signature:_____Date/Time:_____

[ ]      Concur with Recommendation
[ ]      Release
[ ]      Continue Status

_____/_____
      Officer in Charge           Date

Form No I-885  (02/08/00)

GEO-MEN 00063875

**U.S. Department of Justice**
Immigration and Naturalization Service

## Special Management Unit Housing Record

Name of Detainee:_____ A#:_____ Room#:_____

Violation or Reason:_____ Received Date:_____ Time:_____

Admittance Authorized by:_____ Release Date:_____ Time:_____

Pertinent Information:_____

| Date | Shift | B | L | D | Sh | Rec | Medical * | Housing Officer | Comments |
|------|-------|---|---|---|----|-----|-----------|-----------------|----------|
|      | 1st   |   |   |   |    |     |           |                 |          |
|      | 2nd   |   |   |   |    |     |           |                 |          |
|      | 3rd   |   |   |   |    |     |           |                 |          |
|      | 1st   |   |   |   |    |     |           |                 |          |
|      | 2nd   |   |   |   |    |     |           |                 |          |
|      | 3rd   |   |   |   |    |     |           |                 |          |
|      | 1st   |   |   |   |    |     |           |                 |          |
|      | 2nd   |   |   |   |    |     |           |                 |          |
|      | 3rd   |   |   |   |    |     |           |                 |          |
|      | 1st   |   |   |   |    |     |           |                 |          |
|      | 2nd   |   |   |   |    |     |           |                 |          |
|      | 3rd   |   |   |   |    |     |           |                 |          |
|      | 1st   |   |   |   |    |     |           |                 |          |
|      | 2nd   |   |   |   |    |     |           |                 |          |
|      | 3rd   |   |   |   |    |     |           |                 |          |
|      | 1st   |   |   |   |    |     |           |                 |          |
|      | 2nd   |   |   |   |    |     |           |                 |          |
|      | 3rd   |   |   |   |    |     |           |                 |          |
|      | 1st   |   |   |   |    |     |           |                 |          |
|      | 2nd   |   |   |   |    |     |           |                 |          |
|      | 3rd   |   |   |   |    |     |           |                 |          |

**Pertinent Information** - Epileptic, Diabetic, Suicidal, Assaultive, etc.

**B** (Breakfast)      **L** (Lunch)      **(D)** Dinner      **(Sh)** Showers -- **Indicate Yes or No**
**Rec** (Recreation)  --  log in actual time, i.e., 0900/1000

*   Medical representative will initial in the medical block on the special housing unit record daily.

Form No.  I-888 (02/08/00)

GEO-MEN 00063876

# U.S. Immigration and Naturalization Service
## NATIONAL DETENTION STANDARDS
## MONITORING INSTRUMENT

**Policy:** The Special Management Unit required in every facility isolates certain detainees from the general population. The Special Management Unit will consist of two sections.  One, Administrative Segregation, houses detainees isolated for their own protection; the other for detainees being disciplined for wrongdoing (see the "Special Management Unit [Disciplinary Segregation]" standard).

| SPECIAL MANAGEMENT UNIT (SMU) Administrative Segregation | | | |
|---|---|---|---|
| Components | Yes | No | Remarks |
| 1. Does the Administrative Segregation unit provide non-punitive protection from the general population and individuals undergoing disciplinary segregation? <br> a. Is a detainee placed in the SMU (administrative) in accordance with written criteria? | | | |
| 2. Can staff place a detainee in the SMU (administrative) before a written order has been approved? <br> a. Is a copy of the order given to the detainee within 24 hours? <br> b. If not, why? | | | |
| 3. Does the OIC regularly review the status of detainees in administrative detention? <br> a. Does a supervisory officer conduct a review within 72 hours of the detainee's placement in the SMU (administrative)? | | | |
| 4. Does a supervisory officer conduct another review after the detainee has spent seven days in administrative segregation? <br> a. Every week thereafter for the first month? <br> b. Every 30 days after the first month? <br> c. Does each review include an interview with the detainee? <br> d. Is a written record made of the decision and the justification? | | | |

GEO-MEN 00063877

| SPECIAL MANAGEMENT UNIT (SMU) Administrative Segregation | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 5. Is the detainee given a copy of the decision and justification for each review?<br>a. If not, why not?<br>b. Is the detainee given an opportunity to appeal the reviewer's decision to someone else in the facility? | | | |
| 6. Does the OIC routinely notify the Assistant District Director, Detention and Removal (ADD/DRO), any time a detainee's stay in administrative detention exceeds 30 days?<br>a. Upon notification that the detainee's administrative segregation has exceeded 60 days, does the ADD/DRO forward written notice to the Assistant Regional Director?<br>b. How often does INS transfer detainees still in the SMU after 60 days to a facility they will not require administrative segregation? | | | |
| 7. Does the OIC review the case of every detainee who objects to administrative segregation after 30 days in the SMU?<br>a. Is a written record made of the decision and the justification?<br>b. Does the detainee receive a copy of this record? | | | |
| 8. Is the detainee given the right to appeal to the OIC the conclusions and recommendations of any review conducted after the detainee has remained in administrative segregation for seven consecutive days?<br>a. Does the detainee use any acceptable forms of written communication to file the appeal, e.g., detainee request? | | | |
| 9. Do administratively segregated detainees enjoy the same general privileges as detainees in the general population?<br>a. If not, explain. | | | |

| SPECIAL MANAGEMENT UNIT (SMU) Administrative Segregation | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 10.  Is the SMU well ventilated?<br>    a.  Adequately lighted?<br>    b.  Appropriately heated?<br>    c.  Maintained in a sanitary condition? | | | |
| 11. Are all cells equipped with beds?<br>    a.  If yes, is every bed securely fastened to the floor or wall? | | | |
| 12. Does the number of detainees in any cell exceed the occupancy limit?<br>    a.  Does the OIC approve excess occupancy on a case-by-case basis?<br>    b.  When occupancy exceeds recommended capacity, do basic living standards decline?<br>    c.  Do criteria for objectively assessing living standards exist?<br>    d.  If yes, are the criteria included in the written procedures? | | | |
| 13. Do the segregated detainees have fewer opportunities to exchange/launder clothing, bedding, and linen than detainees in the general population? | | | |
| 14. Do detainees receive three nutritious meals per day?<br>    a.  From the general population's menu of the day?<br>    b.  Do detainees eat only with disposable utensils?<br>    c.  Is food ever used as punishment? | | | |
| 15. Can each detainee maintain a normal level of personal hygiene in the SMU?<br>    a.  Do the detainee have the opportunity to shower and shave at least three times a week?<br>    b.  If not, explain. | | | |

| SPECIAL MANAGEMENT UNIT (SMU) Administrative Segregation | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 16. Are the detainees provided:<br>  a. Barbering services?<br>  b. Recreation privileges in accordance with the "Detainee Recreation" standard?<br>  c. Non-legal reading material?<br>  d. Religious material?<br>  e. The same correspondence privileges as detainees in the general population?<br>  f. Telephone access similar to that of the general population?<br>  g. Personal legal material? | | | |
| 17. Does a health care professional visit every detainee at least three times a week?<br>  a. Does the shift supervisor visit each detainee daily?<br>  b. Weekends and holidays? | | | |
| 18. Do procedures comply with the "Visitation" standard?<br>  a. Does the detainee retain visiting privileges?<br>  b. Is the visiting room available during normal visiting hours? | | | |
| 19. Are visits from clergy allowed? | | | |
| 20. Do the detainees have less law-library access than the general population?<br>  a. Are they required to use the law library separately, as a group?<br>  b. Are legal materials brought to them? | | | |
| 21. Does the SMU maintain a permanent log?<br>  a. If yes, does it register every detainee-related activity, e.g., meals served, recreation, visitors etc.? | | | |
| 22. Do SPC procedures include completing the SMU Housing Record (I-888) immediately upon a detainee's placement in the SMU?<br>  a. Does staff complete the form at the end of each shift?<br>  b. Do CDFs and IGSA facilities use Form I-888 (or local equivalent)? | | | |

GEO-MEN 00063880

| SPECIAL MANAGEMENT UNIT (SMU) Administrative Segregation | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 23. Does staff record whether the detainee ate, showered, exercised and took any medication during every shift?<br>a. Does the log record all pertinent information, e.g., a medical condition, suicidal/assaultive behavior, etc.?<br>b. Does the medical officer/health care professional sign each individual's record during each visit?<br>c. Does the housing officer initial the record when all detainee services are completed or at the end of the shift? | | | |
| 24. Is a new record created for each week the detainee is in Administrative Segregation?<br>a. Are these weekly records retained in the SMU until the detainee's return to the general population? | | | |

GEO-MEN 00063881

# U.S. Immigration and Naturalization Service
## NATIONAL DETENTION STANDARDS
## MONITORING INSTRUMENT

| SPECIAL MANAGEMENT UNIT (SMU) |
|:---:|
| **Administrative Segregation** |

**Verification Sources:**

**The following may serve as sources of information for auditors verifying the facility's compliance with this detention standard:**

| SOURCE | TIME | DATE | LOCATION |
|---|---|---|---|
| A.  SMU Observation | | | |
| B.  SMU logs | | | |
| C.  Review of the facility's Administrative Segregation policy and procedures | | | |
| D.   Detainee and staff interviews | | | |
| E.  *Other | | | |

Facilities must complete the attached Plan of Action for bringing operations into compliance.  For each element found out of compliance, the plan of action will specify remedial action and the estimated timetable for compliance.

**\*Remarks**: *(Record significant facts, observations, other sources used, etc.)*


_____
Auditor's Signature


_____
Date

GEO-MEN 00063882

## INS DETENTION STANDARDS

### SPECIAL MANAGEMENT UNIT
### (Disciplinary Segregation)

---

I. **POLICY**

Each facility will establish a Special Management Unit that will isolate certain detainees from the general population. The Special Management Unit will have two sections, one for detainees being segregated for disciplinary reasons; the other for detainees being segregated for administrative reasons (see "Special Management Unit [Administrative Segregation]" Standard).

II. **APPLICABILITY**

The standards provided in this Detention Standard shall apply to the following facilities housing INS detainees:

1. Service Processing Centers (SPCs);

2. Contract Detention Facilities (CDFs); and

3. State or local government facilities used by INS through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours; referred to as "IGSA facilities."

Within the document additional implementing procedures are identified for SPCs and CDFs. Those procedures appear in italics. IGSA facilities may find such procedures useful as guidelines. IGSAs may adopt, adapt or establish alternatives to, the procedures specified for SPCs/CDFs, provided they meet or exceed the objective represented by each standard

See the separate "Definitions" Standard for the meaning of certain terms used in this document.

III. **STANDARDS AND PROCEDURES**

A. **Placement in Disciplinary Segregation**

To provide detainees in the general population a safe and orderly living environment, facility authorities shall discipline anyone whose behavior does not comply with facility rules and regulations. This may involve temporary confinement apart from the general population, in the Special Management Unit (SMU). A detainee may be placed in disciplinary segregation only by order of the Institutional Disciplinary Committee, after a hearing in which the detainee has been found to have committed a prohibited act.

---

GEO-MEN 00063883

The disciplinary committee may order placement in disciplinary segregation only when alternative dispositions would inadequately regulate the detainee's behavior.

A maximum sanction of 60 days in disciplinary segregation shall apply to violations associated with a single incident.  After the first 30 days, the OIC shall send a written justification to the Assistant District Director for Detention and Removal (ADD/DRO).  Considering the grounds for the OIC's disciplinary action, the ADD/DRO may decide to transfer the detainee to a facility where security is such that he/she could be placed in the general population.

**B.**   **Disciplinary Segregation Order**

A written order shall be completed and signed by the chair of the Institutional Disciplinary Committee panel before a detainee is placed in disciplinary segregation.  A copy of the order shall be given to the detainee within 24 hours, unless delivery would jeopardize safety, security, or the orderly operation of the facility.

*In SPCs/CDFs:*

1.   *The Institutional Disciplinary Panel's chairman shall prepare the Disciplinary Segregation Order (I-883 attached), detailing the reasons for placing a detainee in disciplinary segregation, before actual placement.  All relevant documentation must be attached to the order.*

2.   *A copy of the completed Disciplinary Segregation Order will be given to the detainee within 24 hours of placement in disciplinary segregation, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.*

3.   *The order will be maintained on file with the Special Management Unit (SMU) until the detainee is released from the SMU.*

4.   *When the detainee is released from the SMU, the releasing officer will indicate date and time of release on the Disciplinary Segregation Order, then forward the completed order to the Chief Detention Enforcement Officer for insertion into the detainee's detention file.*

**C.**   **Review of Detainee Status in Disciplinary Segregation**

All facilities shall implement written procedures for the regular review of all disciplinary-segregation cases, consistent with the procedures specified below.

*In SPCs/CDFs:*

1.   *The Supervisory Detention Enforcement Officer (SDEO) shall review the status of a detainee in disciplinary segregation every seven days to determine whether the detainee:*

---

GEO-MEN 00063884

a. *abides by all rules and regulations; and,*

b. *is provided showers, meals, recreation, and other basic living standards, in accordance with section III.D., below.*

*The weekly review(s) will include an interview with the detainee. The SDEO shall document his/her findings after every review, by completing a Disciplinary Segregation Review Form (I-887).*

2. *The SDEO may recommend the detainee's early release from the SMU upon finding that time in disciplinary segregation is no longer necessary to regulate the detainee's behavior.*

3. *An early-release recommendation must have OIC approval before the detainee can be returned to the general population.*

4. *The SDEO may shorten, but not extend, the original sanction.*

5. *All review documents shall be placed in the detainee's detention file.*

6. *Provided institutional security is not compromised, the detainee shall receive at each formal review, a written copy of the reviewing officer's decision and the basis for this finding.*

**D.** <u>**Conditions of Segregation (Basic Living Standards)**</u>

1. The conditions of confinement will depend on the amount of supervision required to control the individual and safeguard other detainees and staff.

2. Detainees housed in disciplinary segregation generally have fewer privileges than those housed in administrative segregation. These detainees are subject to more stringent personal property control, restricted reading material, and limitations imposed on television viewing, commissary/vending machine privileges, etc.

3. Standard living conditions shall not be modified for detainees in the SMU for disciplinary purposes.

4. The OIC shall maintain the same living levels of decency and humane treatment for each detainee in disciplinary segregation, regardless of the purpose for which the detainee has been segregated. When different treatment is required for security concerns presented by an individual detainee, staff shall prepare written documentation justifying this action. This document will be signed by the OIC, indicating his/her approval.

GEO-MEN 00063885

5.  Dry cells may not be a part of the disciplinary segregation unit. Dry cells will be a part of the medical facility and under the supervision and control of the medical staff.

6.  The quarters used for segregation must be well ventilated, adequately lit, appropriately heated and maintained in a sanitary condition at all times. All cells must be equipped with beds. The beds shall be securely fastened to the cell floor or wall.

7.  The number of detainees confined to each cell or room in disciplinary segregation should not exceed the capacity for which it was designed. The OIC may approve excess occupancy, on a temporary basis, if the OIC finds that the other basic living standards can still be maintained.

    The American Correctional Association Standards for Adult Local Detention Facilities, 3-ALDF-2C-01, 3rd Edition, requires 35 square feet of unencumbered space for a single cell occupant; if confinement exceeds 10 hours per day, the required space doubles to at least 70 square feet.

8.  Clothing and bedding shall be issued to detainees in disciplinary segregation in accordance with the "Issuance and Exchange of Clothing, Bedding, Linen and Towels" standard. Detainees in disciplinary segregation will be provided the same opportunity for the exchange of clothing, bedding, and linen, and for laundry as detainees in the general population. If, for security purposes, the OIC authorizes an exception, the exception, and its justification, shall be documented in the SMU log.

9.  A detainee may be deprived of clothing, mattress, blanket, pillow, etc., for medical or psychiatric reasons only, as determined by the medical officer.

    If a detainee is so seriously disturbed that he/she is likely to destroy clothing or bedding or create a disturbance risking harm to self or others, the medical department shall be notified immediately and a regimen of treatment and control shall be instituted by the medical officer.

10. Detainees shall receive their meals according to the schedule used by the general population. Detainees in segregation will be provided nutritionally adequate meals, ordinarily from the menu served to the general population.

    Detainees in the SMU shall, for security reasons, eat with disposable utensils. Food shall not be used as punishment

11. Segregated detainees shall have the opportunity to maintain a normal level of personal hygiene. Staff shall provide toilet tissue, a wash basin, tooth brush, shaving utensils, etc., as needed, and may issue retrievable kits of toilet articles.

GEO-MEN 00063886

Each segregated detainee shall have the opportunity to shower and shave at least three times a week, unless these procedures would present an undue security hazard.

    a.    The security hazard will be documented and signed by the OIC, indicating his/her review and approval.

    b.    Denial of showers will be temporary and situational, and will continue only as long as justified by the security threat.

12.    Detainees in the SMU will be provided barbering services. Exceptions to this procedure may be permitted only when authorized by the OIC.

13.    Recreation shall be provided to detainees in disciplinary segregation in accordance with the "Recreation" standard. The standard provisions shall be carried out, absent compelling security or safety reasons documented by the OIC. A detainee's recreation privileges may be withheld temporarily after a severely disruptive incident.

Staff shall document by memorandum and logbook(s) notation every instance when a detainee is denied recreation. The memorandum shall be placed in the detainee's detention file.

14.    As a rule, detainees in disciplinary segregation will have significantly fewer items of personal property than other detainees. With the exception of items of personal hygiene, detainees in disciplinary segregation may lose the privilege of making commissary or vending machine purchases.

15.    Access to legal and non-legal reading material shall be as follows:

    a.    Detainees may retain personal legal material upon admittance to disciplinary segregation, provided such material does not create a safety, security and/or sanitation hazard.

    b.    Detainees with a large amount of legal material may be required to place a portion of the material in their personal property, with access permitted during scheduled hours.

    c.    Requests for access to legal material shall be accommodated as soon as possible, but in no case more than 24 hours after receipt of the initial detainee request to retrieve documents, except for documented security reasons.

    d.    The Recreation Specialist (RS) shall offer each detainee soft-bound, non-legal books on a rotating basis, provided no detainee has more than two books (excluding religious material) at any one time.

GEO-MEN 00063887

    e.    When developing the schedule for law library-access, the OIC will set aside blocks of time for the detainees in disciplinary segregation. These detainees will be afforded legal access comparable to, but not the same as, that of the general population.  Security constraints may impose limits on law-library access.

- The facility may choose to provide segregated detainees upon-request access only.

- Violent and/or uncooperative detainees may be temporarily denied access to the law library, until such time as their behavior and attitude warrants resumed access.

- On a case-by-case basis, legal material may be brought to individuals in disciplinary segregation. Denial of access to the law library must be justified by compelling security concerns, be fully documented in the SMU logbook, and last no longer than necessary for security purposes.

16.    A medical professional shall visit every detainee in administrative segregation at least three times a week. In addition to the direct supervision afforded by the unit officer, the shift supervisor shall see each segregated detainee daily, including weekends and holidays.

*In SPCs/CDFs, the OIC may designate other staff officers to visit each detainee daily. nurse, doctor or other appropriate health care professional shall visit every detainee placed in disciplinary segregation at least once every workday. The medical visit shall be recorded on the SMU Housing Record (Form I-888). The medical professional will question each detainee to identify medical problems or requests. Any action taken will be documented in a separate logbook.*

17.    The facility shall follow the "Visitation" standard in setting visitation rules for detainees in disciplinary segregation.

As a rule, a detainee retains visiting privileges while in disciplinary segregation. The determining factor is the reason for which the detainee is being disciplined.

Detainees in disciplinary segregation may not be denied legal visitation.  However, the OIC will implement security precautions when necessary.  In such cases, legal service providers and assistants will be notified of any security concerns prior to visitation.

18.    Detainees in disciplinary segregation shall have the same correspondence privileges as detainees in the general population.

GEO-MEN 00063888

19.   In accordance with the "Telephone Access" standard, detainees in disciplinary segregation shall be restricted to telephone calls for the following purposes:

   a.   calls relating to the detainee's immigration case or other legal matters, including consultation calls;

   b.   calls to consular/embassy officials; and

   c.   family emergencies, as determined by the OIC.

20.   Segregated detainees shall be allowed visits by members of the clergy, upon request, unless the supervisor determines the visit presents a security risk or will interfere with the orderly operation of the facility.

   a.   The clergy member shall be told the detainees present state of behavior.

   b.   The clergy member must agree to meet the segregated detainee.

   c.   Violent and uncooperative detainees may be temporarily denied access to religious services until such time as their behavior and attitude warrants.

## E.   Forms and Reviews

1.   A permanent log will be maintained in the SMU.  The log will not all activities concerning the SMU detainees, e.g., meals served, recreation, visitors, etc.

   *In SPCs/CDFs, the SMU log will record the detainee's name, A-number, housing location, admitted, reasons for admission, tentative release date (for detainees in disciplinary segregation), and the authorizing official.  All releases from the unit will be similarly recorded.  All persons visiting the unit will sign a separate log, giving time and date of visit.  Unusual activity or behavior of individual detainees will be recorded in the log, with a follow-up memorandum sent through the OIC to the detainee's file.*

2.   *In SPCs the attached I-888 shall be prepared immediately upon the detainee's placement in the SMU.  The form will be filled out at the end of each shift.  CDFs and IGSA facilities shall use the I-888 or equivalent for the same purpose.*

   *The special housing officer for each shift will record whether the detainee ate, showered, exercised and took any medication.  The I-888 will also be used to record additional information, e.g., if the detainee has a medical condition, has exhibited suicidal/assaultive behavior, etc.*

GEO-MEN 00063889

*The facility medical officer will be required to sign each individual's record when he/she visits the detainee in disciplinary segregation. The housing officer will initial the record either after the medical visits are completed or at the end of the shift.*

*A new record must be created for each week the detainee is in disciplinary segregation.  The completed weekly Special Housing Unit Records will be retained at the SMU until the detainee is released from SMU.*

*The detainee's release from the SMU, the releasing officer will insure that the entire housing unit record relating to the detainee is attached to the Disciplinary Segregation Order and forwarded to the CDEO for inclusion in the detainee's detention file.*

3.      *The attached I-887 shall be used for formal status reviews (see section III.C., above).*

GEO-MEN 00063890

IV.     **AMERICAN CORRECTIONAL ASSOCIATION STANDARDS REFERENCED**
         American Correctional Association 3rd Edition Standards for Adult Local Detention
         Facilities: 3-ALDF-3D-01, 3D-04, 3D-07, 3D-09, 3D-11, 3D-12, 3D-13, 3D-14, 3D-15, 3D-
         16, 3D-17, 3D-18, 3D-19, 3D-20, 3D-21, 3D-23.

**Approval of Standard**

Michael D. Cronin
Acting Executive Associate Commissioner
Office of Programs

SEP 2 0 2000
**Date**

Michael A. Pearson
Executive Associate Commissioner
Office of Field Operations

SEP 2 0 2000
**Date**

GEO-MEN 00063891

**U.S. Department of Justice**
Immigration and Naturalization Service

**Disciplinary Segregation Order**

To:   **SPECIAL MANAGEMENT UNIT**                    Date/Time of

From: _____
         (Officer In Charge or designee)


Subject: Placement of _____ A-Number_____
                              (Detainee Name)

**An Institutional Disciplinary Panel Hearing Was Conducted on** _____. **The Above**
                                                                                                    **Date**
**Named Detainee Was Found to Have Committed the Specified Prohibited Act(s) listed below.**


PROHIBITED ACT(S)_____ CODE:_____
                         _____ CODE:_____
                         _____ CODE:_____
                         _____ CODE:_____
                         _____ CODE:_____

                                                    **DAYS IMPOSED:_____**


**BELOW IS A BRIEF OUTLINE OF SPECIAL INSTRUCTIONS AND/OR INFORMATION**:
_____
_____
_____
_____
_____
_____

Admitted:   Date:_____   Time:_____

Released:   Date:_____   Time:_____


Released by:_____
                      (Officer & Title)

Form I-883 (02/08/00)

GEO-MEN 00063892

**U.S. Department of Justice**
Immigration and Naturalization Service

# Disciplinary Segregation Review

On_____Supervisory Detention Enforcement Officer (SDEO) or contract equivalent_____,
(Officer)

conducted a formal review of the Disciplinary Segregation status of_____A#_____ .

Date Disciplinary Segregation began: _____

Date Disciplinary Segregation ends: _____

Detainee has been in Disciplinary Segregation for_____days.

**The following factors were reviewed with the results as indicated**:

|   | | YES | NO |
|---|---|---|---|
| 1. Does the reason for initial placement remain valid? | | [ ] | [ ] |
| 2. Does the detainee pose a threat to himself? | | [ ] | [ ] |
| 3. Does the detainee pose a threat to others? | | [ ] | [ ] |
| 4. Does the detainee pose a threat to property? | | [ ] | [ ] |
| 5. Does the detainee pose a threat to security? | | [ ] | [ ] |
| 6. Is the detainee defiant towards authority? | | [ ] | [ ] |
| 7. Is the detainee unwilling or unable to live in the general population? | | [ ] | [ ] |
| 8. Is the detainee's habitual conduct, language, or behavior of a type which may provoke or instigate stressful/violent situations amongst the general population? | | [ ] | [ ] |

If any of the above factors are marked "YES", the detainee must continue his/her existing status, unless the OIC determines otherwise.  If all factors are marked "NO", the detainee may be released.

**DOCUMENT REVIEW**

| | | | |
|---|---|---|---|
| 1. Is the detainee bathing at least twice weekly? | | [ ] | [ ] |
| 2. Is the detainee exercising at least one hour daily, 5 days a week? | | [ ] | [ ] |
| 3. Is the detainee consuming at least one meal daily? | | [ ] | [ ] |
| 4. Is the detainee receiving daily visits from medical staff? | | [ ] | [ ] |
| 5. Are the special housing officers signing and properly filling out the special housing unit record? | | [ ] | [ ] |

A "NO" answer to any of the above questions will require notification of the Detention Operations Supervisor or officer of equal or greater rank.

**For the reasons above,   I recommend [ ] do not recommend [ ]   removal from DS status.**

SDEO signature:_____Date/Time:_____

[ ]   Concur with Recommendation
[ ]   Release
[ ]   Continue Status

_____
Officer in Charge            Date

Form No I-887 (02/08/00)

GEO-MEN 00063893

**U.S. Department of Justice**
Immigration and Naturalization Service

## Special Management Unit Housing Record

Name of Detainee:_____  A#:_____  Room#:_____

Violation or Reason:_____  Received Date:_____  Time:_____

Admittance Authorized by:_____  Release Date:_____  Time:_____

Pertinent Information:_____

| Date | Shift | B | L | D | Sh | Rec | Medical * | Housing Officer | Comments |
|------|-------|---|---|---|----|----|-----------|----------------|----------|
|  | 1st |  |  |  |  |  |  |  |  |
|  | 2nd |  |  |  |  |  |  |  |  |
|  | 3rd |  |  |  |  |  |  |  |  |
|  | 1st |  |  |  |  |  |  |  |  |
|  | 2nd |  |  |  |  |  |  |  |  |
|  | 3rd |  |  |  |  |  |  |  |  |
|  | 1st |  |  |  |  |  |  |  |  |
|  | 2nd |  |  |  |  |  |  |  |  |
|  | 3rd |  |  |  |  |  |  |  |  |
|  | 1st |  |  |  |  |  |  |  |  |
|  | 2nd |  |  |  |  |  |  |  |  |
|  | 3rd |  |  |  |  |  |  |  |  |
|  | 1st |  |  |  |  |  |  |  |  |
|  | 2nd |  |  |  |  |  |  |  |  |
|  | 3rd |  |  |  |  |  |  |  |  |
|  | 1st |  |  |  |  |  |  |  |  |
|  | 2nd |  |  |  |  |  |  |  |  |
|  | 3rd |  |  |  |  |  |  |  |  |
|  | 1st |  |  |  |  |  |  |  |  |
|  | 2nd |  |  |  |  |  |  |  |  |
|  | 3rd |  |  |  |  |  |  |  |  |

**Pertinent Information** - Epileptic, Diabetic, Suicidal, Assaultive, etc.

**B** (Breakfast)        **L** (Lunch)        **(D)** Dinner        **(Sh)** Showers -- **Indicate Yes or No**
**Rec** (Recreation)  --  log in actual time, i.e., 0900/1000

\*   Medical representative will initial in the medical block on the special housing unit record daily.

Form No.  I-888 (02/08/00)

GEO-MEN 00063894

# U.S. Immigration and Naturalization Service
## NATIONAL DETENTION STANDARDS
## MONITORING INSTRUMENT

**Policy:** Each facility will establish a Special Management Unit in which to isolate certain detainees from the general population. The Special Management Unit will have two sections, one for detainees in Administrative Segregation; the other for detainees being segregated for disciplinary reasons.

| SPECIAL MANAGEMENT UNIT (Disciplinary Segregation) | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 1. Do officers placing detainees in disciplinary segregation follow written procedures?<br>a. By disciplinary panel? | | | |
| 2. Does the sanction for violations committed during one incident ever exceed 60 days?<br>a. After 30 days, is the ADD notified, in writing, of the reasons? | | | |
| 3. Does a completed Disciplinary Segregation Order accompany the detainee into the SMU?<br>a. Does the detainee receive a copy of the order within 24 hours of placement in disciplinary segregation? | | | |
| 3. Do standard procedures include reviewing the cases of individual detainees housed in disciplinary detention at set intervals?<br>a. Who conducts the review?<br>b. What is reviewed?<br>c. How is the review documented?<br>d. Does the reviewer interview the detainee?<br>e. Can the reviewing officer recommend an early release from the SMU?<br>f. If yes, under what circumstances?<br>g. After each formal review, does the detainee receive a written copy of the decision and reason(s) for it? | | | |
| 4. Are the conditions of confinement in the SMU proportional to the amount of control necessary to protect detainees and staff? | | | |

GEO-MEN 00063895

| SPECIAL MANAGEMENT UNIT<br>(Disciplinary Segregation) | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 5.  Do detainees in disciplinary segregation have fewer privileges than those housed in administrative segregation? | | | |
| 6.  Are living conditions in disciplinary SMUs modified to reinforce acceptable behavior?<br>   a.  If yes, does staff prepare written documentation for this action?<br>   b.  Does the OIC sign to indicate approval? | | | |
| 7.  Does every detainee in disciplinary segregation receive the same humane treatment, regardless of offense? | | | |
| 8.  Are the quarters used for segregation:<br>   a.  Well-ventilated?<br>   b.  Adequately lighted?<br>   c.  Appropriately heated?<br>   d.  Maintained in a sanitary condition? | | | |
| 9.  Are all cells equipped with beds?<br>   a.  If yes, are beds securely fastened to the floor or wall of the cell? | | | |
| 10. Does the number of detainees confined to each cell or room exceed the number for which the space was designate?<br>   a.  Does the OIC approve excess occupancy on a temporary basis? | | | |
| 11.  Is a dry cell part of the disciplinary SMU? | | | |
| 12.  Under what circumstances are detainees segregated without clothing, mattress, blanket, or pillow?<br>   a.  Do detainees in the SMU wear special clothing? | | | |
| 13. Do detainees in the SMU have the same opportunities to exchange clothing, bedding, etc., as other detainees? | | | |
| 14. Do detainees in the SMU receive three nutritious meals/days?<br>   a.  Selected from the Food Service's menu of the day?<br>   b.  Do detainees eat with disposable utensils only?<br>   c.  Is food used as punishment? | | | |

GEO-MEN 00063896

| SPECIAL MANAGEMENT UNIT (Disciplinary Segregation) | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 15. Are detainees allowed to maintain a normal level of personal hygiene, including the opportunity to shower and shave at least three times/week? | | | |
| 16. Do the detainees receive:<br>   a.  Barbering services?<br>   b.  Recreation privileges?<br>   c.  Other-than-legal reading material?<br>   d.  Religious material?<br>   e.  The same correspondence privileges as other detainees?<br>   f.  Personal legal material? | | | |
| 17. Is phone access limited by number or type of calls?  Do limits apply to the following:<br>   a.  Calls about the detainee's immigration case or other legal matters?<br>   b.  Calls to consular/embassy officials?<br>   c.  Calls during family emergencies (as determined by the OIC)? | | | |
| 18. Does a health care professional visit every detainee in disciplinary segregation every day, Monday through Friday?<br>   a.  Does the shift supervisor visit each segregated detainee daily?<br>   b.  Weekends and holidays? | | | |
| 19. Are SMU detainees allowed visitors, in accordance with the "Visitation" standard?<br>   a.  Are they allowed to use of the visiting room during normal visiting hours?<br>   b.  Do detainees participate in general visitation while in restraints? | | | |
| 20. Do SMU detainees receive legal visits, as provided in the "Visitation" standard?<br>   a.  In certain circumstances only?<br>   b.  Are legal service providers notified of security concerns arising before a visit? | | | |

GEO-MEN 00063897

| SPECIAL MANAGEMENT UNIT (Disciplinary Segregation) | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 21. Are visits from clergy allowed?<br>   a. If yes, does staff disclose the reason for the detainee's disciplinary segregation?<br>   b. Is the clergy member given the option of visiting/not visiting the segregated detainee?<br>   c. Are violent/uncooperative detainees denied access to religious services until their behavior improves? | | | |
| 22. Do SMU detainees have the same law library access as others?<br>   a. If yes, only upon request?<br>   b. Do violent/uncooperative detainees retain access to the law library?<br>   c. Is legal material brought to individuals in the SMU on a case-by-case basis?<br>   d. Does staff document every incident of denied access to the law library?<br>   e. Where? | | | |
| 23. Are all detainee-related occurrences documented, e.g., meals served, recreation activities, visitors, etc.? | | | |
| 24. Is the SPC's Special Management Housing Unit Record (I-888) prepared as soon as the detainee is placed in the SMU?<br>   a. Are all I-888s filled out by the end of each shift?<br>   b. Does the CDF/IGSA facility use the I-888 (or equivalent local form)? | | | |

GEO-MEN 00063898

| SPECIAL MANAGEMENT UNIT (Disciplinary Segregation) | | | |
|---|---|---|---|
| Components | Yes | No | Remarks |
| 25. Does SMU staff record whether the detainee ate, showered, exercised, took medication, etc.?<br>  a. Are details about the detainee logged, e.g., a medical condition, suicidal/violent behavior, etc.?<br>  b. Does the health care official sign individual records after each visit?<br>  c. Does the housing officer initial the record when all detainee services are completed or at the end of the shift?<br>  d. Is a new record created weekly for each detainee in the SMU?<br>  e. Does the SMU retain these records until the detainee leaves the SMU? | | | |

# U.S. Immigration and Naturalization Service
## NATIONAL DETENTION STANDARDS
## MONITORING INSTRUMENT

| SPECIAL MANAGEMENT UNIT (Disciplinary Segregation) |
| --- |

## Verification Sources:

**The following may serve as sources of information for auditors verifying the facility's compliance with this detention standard:**

| SOURCE | TIME | DATE | LOCATION |
| --- | --- | --- | --- |
| A.  Detainee Detention Files | | | |
| B.  SMU Logs | | | |
| C.  Facility Policy and Procedures | | | |
| D.  Detainee and staff interviews | | | |
| E.  Observations of SMU | | | |

Facilities must complete the attached Plan of Action for bringing operations into compliance.  For each element found out of compliance, the plan of action will specify remedial action and the estimated timetable for compliance.

**Remarks**: *(Record significant facts, observations, other sources used, etc.)*

_____

Auditor's Signature

_____

Date

GEO-MEN 00063900

# INS DETENTION STANDARD

## DEFINITIONS

*This document defines certain terms used in one or more INS detention standards.*

**A-FILE, ALIEN FILE**–The legal file maintained by INS for each detainee. Contents include, but are not limited to passport, driver's license, other identification cards, and photographs; immigration history (prior record); and all documents and transactions relating to the detainee's immigration case

**ACCREDITED REPRESENTATIVE**–A person representing an organization whom the Board of Immigration Appeals has found qualified to practice before INS and/or the Board, in accordance with the regulations (see 8 CFR §§ 292.1 and 292.2).

**ADMINISTRATIVE SEGREGATION**–A form of separation from the general population used when the continued presence of the detainee in the general population would pose a threat to life, property, self, other detainees, or staff or to the security or orderly running of the facility. This housing status also includes detainees who require protective custody, those who cannot be placed in the local population because they are en route to another facility (holdovers), those who are awaiting a hearing before a disciplinary panel, and those requiring separation for medical reasons.

**ADMISSION/ADMISSIONS PROCESS**–In-processing of newly arrived detainees, which includes an orientation to the policies, programs, rules, and procedures of the facility. Classification, assignment to living quarters, various inspections, medical screening, and safeguarding of funds, valuables and other personal property is completed during this process.

**AMBULATORY RESTRAINTS**–"Soft" or "hard" equipment used to restrict a detainee's movement but leaving him/her able to eat, drink, or attend to basic bodily functions without staff intervention.

**AMMUNITION CONTROL OFFICER (ACO)** – An individual who has been designated, in writing, responsibility for the physical and administrative control of ammunition in the authorizing official's area of accountability.

**ATTORNEY**–A member in good standing of the bar of the highest court of any State, possession, territory, Commonwealth, or the District of Columbia; who is not under an order of any court suspending, enjoining, restraining, disbarring, or otherwise restricting him/her in the practice of law (see 8 CFR § 1.1.(f)).

**BODY-CAVITY SEARCH**–The visual inspection or physical probing of body openings (anus, vagina, ears, nose, mouth, etc) where weapons, drugs, or other contraband could be secreted. This is the most intrusive means of searching an individual, reserved for instances where other search techniques have been considered but rejected as ineffective under the particular circumstances of the case. Body-cavity search procedures govern physical probes, but not look-only inspections.

GEO-MEN 00064008

For example, the procedures would not be appropriate for a *visual* inspection of the inside of the mouth, nose, or ears, unless contraband is found during the course of that inspection. Body-search procedures apply whenever contraband is found, because retrieving/seizing the item(s) will involve physical entry into or probing within the cavity (in this example, the mouth, nose, or ear).

**CAUSTIC**–Capable of burning, corroding, eroding, or destroying by chemical action.       .

**CENSUS CHECK**–See **INFORMAL COUNT.**

**CHAIN OF COMMAND**–Order of authority (rank): executive, senior management, senior staff, etc. The on-site order of authority at a detention facility descends from the Officer–In-Charge (OIC) to the Associate OIC to the Chief Detention Enforcement Officer/Chief of Security, Detention Operations Supervisor, etc.

**CHEMICAL**–A substance with a distinct molecular composition produced by or used in a chemical process.

**CLASS R (RESTRICTED) TOOLS**–Devices to which detainees are forbidden access except in the presence and constant supervision of staff for reasons of safety or security.  Class R includes devices that can be used to manufacture or serve as weapons capable of doing serious bodily harm or structural damage to the facility. All portable power tools and accessories are in this category. Class R also includes ladders and other such items that are not inherently dangerous but could prove useful in unauthorized activities, e.g., escape attempts.

**CLASSIFICATION**–A process for assessing detainees on the basis of objective information about past behavior, criminal records, special needs, etc.; used to make housing and program assignments.

**CLINICAL DIRECTOR (CD)** –Responsible for the delivery of health care services to INS detainees.

 **COMBUSTIBLE LIQUID**—A substance with a flash point at or above 100° Fahrenheit.

**COMMISSARY**—An area or system where detainees may purchase approved items.

**CONSULTATION VISITATION**–A discussion, either in person or by telephone, between a detainee subject to expedited removal and a person of the detainee's choosing.

**CONTACT VISIT**—A meeting between detainee and another person authorized to take place in an area free of obstacles or barriers that prevent physical contact.

**CONTAINER**—Any bag, barrel, bottle, box, can, cylinder, drum, reaction vessel, storage tank, or other vessel holding a hazardous chemical; does not include pipes or piping systems.

**CONTRABAND**—Any unauthorized item in the facility: illegal, prohibited by facility rules, or otherwise posing a threat to the security or orderly operation of the facility.  This includes unauthorized funds.

GEO-MEN 00064009

**CONTRACT DETENTION FACILITY (CDF)**–Provides detention services under a competitively bid contract awarded by the INS.

**CONTROL OFFICER**—Directs security activities from the Control Center.

**COUNT SLIP**–Documentation of the number of detainees confirmed present during a population count in a specific area, signed by the officers involved in the count**.**

**CORRESPONDENCE**—Letters, postcards and other forms of written material not classified as packages or publications. Large envelopes containing papers qualify as correspondence, but boxes, sacks, and other shipping cartons do not.  Books, magazines, newspapers and other incoming printed matter are not "correspondence."

**CRIMINAL ALIEN**—A foreign national convicted of one or more crimes.

**DETAINEE HANDBOOK**—The policies and procedures governing detainee life in the facility: daily operations, rules of conduct, sanctions for rule violations, recreation and other programs, services, etc.; defined in writing and provided to each detainee upon admission to the facility.

**DETENTION FILE** – Contents include receipts for funds, valuables, and other personal property; documentation of disciplinary action; reports on detainee behavior; detainee's written requests, complaints, and other communications; official responses to detainee communications; records from Special Management Unit, etc.

**DIETICIAN**–Individual registered or eligible for registration with the American Dietetic Association or who has the documented equivalent in education, training, or experience, with evidence of relevant continuing education.

**DISCIPLINARY HEARING**—Non-judicial administrative procedure to determine whether substantial evidence supports finding a detainee guilty of a rule violation.

**DISCIPLINARY COMMITTEE**–One or more impartial staff members who conduct and/or oversee a disciplinary hearing; see also "INSTITUTIONAL DISCIPLINARY PANEL."

**DISCIPLINARY SEGREGATION**—Confinement in a cell removed from the general population after a serious violation of facility rules (in accordance with written procedures).

**DIVISION OF IMMIGRATION HEALTH SERVICES (DIHS)**–The U.S. Public Health Service division charged with advancing global disease prevention through the delivery of primary health care to INS detainees. Through a memorandum of understanding with the INS, DIHS physicians, dentists, physician assistants, nurse practitioners, nurses, pharmacists, and health care administrators staff INS medical facilities.  The health-care services they provide include disease-screening and -prevention. In addition, DIHS is responsible for all aspects of planning, policy formulation, and program direction and management, including coordination and liaison activities, for all health matters concerning INS detainees.

GEO-MEN 00064010

**EMERGENCY CHANGES** - Measures immediately necessary to maintain security or to protect the health and safety of staff and detainees.

**EXPOSURE/EXPOSED—**Subjected or potentially subjected to a hazardous substance by any means (inhalation, ingestion, skin contact, absorption, etc.).

**FACE-TO-PHOTO COUNT—**Verifies identity of each detainee by comparing every person present with the photographic likeness on his/her housing card.

**FIREARMS CONTROL OFFICER (FCO)**–Individual designated responsible for the physical and administrative control of all firearms under the jurisdiction of the authorizing official.

**FLAMMABILITY HAZARD—**Has a flash point below 200° Fahrenheit, closed cup, or is subject to spontaneous heating.

**FLAMMABLE LIQUID—**A substance with a flash point below 100° Fahrenheit (37.8° Centigrade).

**FLASH POINT—**The minimum temperature at which the vapor of a combustible liquid can form an ignitable mixture with air.

**FOOD SERVICE ADMINISTRATOR (FSA)—**Responsible for planning, controlling, directing, and evaluating Food Service Department operations.

**FORMAL COUNT—**Detainee population assembled at specific times for attendance check, conducted in accordance with written procedures.

**FOUR-POINT RESTRAINT—**Confines the individual to a bed or bunk in either a supine or prone position.  Ordered by OIC when detainee's unacceptable behavior appears likely to continue, risking injury to self or others.

**FULL-TIME WORK ASSIGNMENT—**Employed from beginning to end of a shift.

**FUNDS—**Cash, checks, money orders, and other negotiable instruments.

**GENERAL CORRESPONDENCE—**All correspondence other than "special correspondence."

**GRIEVANCE—**A complaint based on a circumstance or incident perceived as unjust.

**GROUP PRESENTATION ON LEGAL RIGHTS—**Informational session held in a detention facility by an attorney or other legal representative to inform all interested detainees about U.S. immigration law and procedures; not a forum for providing confidential or case-specific legal advice.

**HARD CONTRABAND—**Poses a serious threat to the security of the facility.

GEO-MEN 00064011

**HEALTH HAZARD—**Includes carcinogens, toxic agents, reproductive toxins, irritants, corrosives, senitizers, hepatotoxins, nephrotoxins, neurotoxins, and other agents that act on the hemopoietic system or damage the lungs, skin, eyes, or mucous membranes.

**HEALTH SCREENING**–A system for preliminary assessment of the physical and mental condition of individual detainees upon arrival at the facility; conducted by health care personnel or by a health-trained detention officer. The combination of structured inquiry and observation is designed to prevent new arrivals who appear to  pose a health or safety threat to themselves or others from moving into the general population..

**HEALTH SERVICES ADMINISTRATOR (HSA)**–Executive responsible for the facility's health care program; may also serve as Clinical Director.

**HOLD ROOM**–A secure area used for temporary confinement of detainees before in-processing, institutional appointments (court, medical), release, transfer to another facility, or deportation- related transportation.

**HOLY DAY**–A day specified for religious observance.

**HUNGER STRIKE**–A voluntary fast undertaken as a means of protest; medical evaluation of a hunger-striking detainee is standard after 72 hours or earlier, at the discretion of medical staff.

**ILLEGAL CONTRABAND—**Any item prohibited by law, the possession of which constitutes grounds for felony or misdemeanor charges.

**INDIGENT**–Without funds, or with nominal funds.

**INDOOR RECREATION AREA**–A covered and enclosed exercise space 1,000 square feet or larger, encompassing 15 square feet per detainee for the planned capacity (number using the space at one time).

**INFORMAL COUNT**–Population count conducted according to no fixed schedule, when detainees are working, engaged in other programs, or involved in recreational activities.  Unless a detainee is missing, these counts are not reported; also called "census check" or "irregular count."

**INFORMAL RESOLUTION**– Brings closure to a complaint or issue of concern to a detainee, satisfactory to the detainee and staff member involved; does not require filing of  a written grievance.

**INSTITUTIONAL DISCIPLINARY PANEL (IDP)**–Review board responsible for conducting disciplinary hearings and imposing sanctions for cases of detainee misconduct referred for disposition following the hearing.  The IDP usually comprises a Hearing Officer and representatives of different departments in the facility

**INTERGOVERNMENTAL SERVICE AGREEMENT (IGSA)**–A cooperative agreement between INS and any State, territory or political subdivision, for the construction, renovation, or acquisition of equipment, supplies, or materials required to establish acceptable conditions of confinement and detention services.  INS may enter into an IGSA with any such unit of government

GEO-MEN 00064012

guaranteeing to provide bed space for INS detainees, and to provide the clothing, medical care, food and drink, security, and other necessities specified in the INS Detention Standards; facilities providing such services are referred to as "IGSA facilities."

**INVESTIGATING OFFICER**–The disinterested individual of supervisory or higher rank who conducts an investigation of alleged misconduct; usually a Supervisory Detention Enforcement Officer or shift supervisor.

**IRREGULAR COUNT**–See **INFORMAL COUNT.**

**LEGAL ASSISTANT**–An individual (other than an interpreter) who, working under the direction and supervision of an attorney or other legal representative, assists with group presentations and in representing individual detainees.  Legal assistants may interview detainees, assist detainees in completing forms, and deliver papers to detainees without the attorney being present.

**LEGAL FILE**–See **A-FILE.**

 **LEGAL REPRESENTATIVE** – An attorney or other person representing another in a matter of law, including law students, law graduates not yet admitted to the bar; "reputable individuals"; accredited representatives; accredited officials; and attorneys outside the United States (see 8 CFR § 292.1, "Representation and Appearances").

**LIFE-SUSTAINING PROCEDURE (LIFE SUPPORT)** – A medical intervention or procedure that uses artificial means to sustain a vital function.

**MAIL INSPECTION**–Examination of incoming and outgoing letters, packages, etc., for contraband, cash, checks and money orders.

**MASTER COUNT**–Total number of detainees housed at a facility.

**MATERIAL SAFETY DATA SHEET (MSDS)**–Basic information about a hazardous chemical, prepared and issued by the manufacturer, in accordance with Occupational Safety and Health Administration regulations (see 29 CFR 1910.1200; see also OSHA Form 174); among other things, specifies precautions for normal use, handling, storage, disposal, and spill cleanup.

**MESSENGER**–A person (neither a legal representative nor a legal assistant) whose purpose is to deliver or convey documents, forms, etc., to and from the detainee; not afforded the visitation privileges of legal representatives and legal assistants.

**MINOR**–A juvenile; a person under the age of 18.

**NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE**–Establishes the standards for health service in correctional facilities on which accreditation is based.

**NATIONAL FIRE PROTECTION ASSOCIATION**–Principal source of fire protection standards and codes.

GEO-MEN 00064013

**NON-CONTACT VISIT**–A barrier preventing physical contact between detainee and visitor(s).

**NON-MEDICAL EMERGENCY ESCORTED TRIP**–Authorized detainee visit to a critically ill member of his/her immediate family, or to attend the funeral of a member of his/her immediate family. "Immediate family" member refers to a parent (including stepparent and foster parent), child, spouse, sister, or brother of the detainee.

**NON-MERIT FACTOR**–Any characteristic or status immaterial to a detainee's mental or physical ability to perform a given assignment.

**NON-SECURITY KEY(S)**–If duplicated by unauthorized persons and/or lost, would not constitute an emergency, requiring urgent action;  not critical to facility  safety and security.

**OFFICER-IN-CHARGE (OIC)**–The highest-ranking official in the on-site chain of command at a facility; the facility director.  In contract and IGSA facilities, often referred to by another title, e.g., Administrator, Warden, etc.

**OUT COUNTS**–Detainees temporarily away from the facility, but included in the master count

**OUTDOOR RECREATION AREA**–Open-air space for exercise or other leisure activities, large enough to allow 15 square feet per detainee for the largest group expected to use the area at any one time; but not less than 1,500 square feet.

**PAT-DOWN SEARCH**–Relies on the sensitivity of the officer's hands as they tap or run over the detainee's clothed body; may require the detainee to reveal pocket contents.  The least intrusive body search.

**PHYSICAL EXAMINATION**—A thorough evaluation of an individual's physical condition and medical history conducted by or under the supervision of a licensed professional.

**PLAN OF ACTION**–Describes steps the facility will take to convert a condition that has caused a determination of noncompliance with a standard.

**POSSESSION**–Control over an item on one's person, or in one's assigned or personal space.

**POST ORDERS**—Written orders that specify the duties of each position, hour-by-hour, and the procedures the post officer will follow in carrying out those duties.

**PROGRESSIVE RESTRAINTS**–Control the detainee in the least restrictive manner required, until and unless the detainee's behavior warrants stronger and more secure means of inhibiting movement.

**PROTECTIVE CUSTODY (PC)**—Administrative segregation for the detainee's own safety.

**REASONABLE SUSPICION**—Not intuition, but articulable facts that lead the officer(s) to suspect a particular person is concealing a weapon, contraband, or evidence of a crime.

GEO-MEN 00064014

**RELIGIOUS PRACTICES**–Worship, observances, services, meetings, ceremonies, etc., associated with a particular faith; access to religious publications, religious symbolic items, religious counseling and religious study classes; and adherence to dietary rules and restrictions.

**REPRESENTATIVE OF THE NEWS MEDIA**–Person whose principal employment is gathering or reporting news for a:

- General circulation newspaper (covering politics, society, business, sports, arts, religion, etc.) which publishes legal notices for the local distribution area; A newsmagazine with a national circulation, sold at newsstands and by subscription;
- Newsmagazine with a national circulation, sold at newsstands and by subscription;
- National or international news service; or
- News program produced for a radio or television station licensed by the Federal Communications Commission (or foreign equivalent).

**SALLY PORT**–An enclosure situated in the perimeter wall or fence surrounding the facility, containing double gates or doors, of which one cannot open until the other has closed, to prevent a breach in the perimeter security; handles pedestrian and/or vehicular traffic.

**SANITATION**–The creation and maintenance of hygienic conditions; in the context of food, involves handling, preparing, and storing items in a clean environment, eliminating sources of contamination.

**SATELLITE FEEDING**–Food served and consumed in a location other than where prepared.

**SECURITY KEY(S)**— If duplicated by unauthorized persons and/or lost, would jeopardize life, safety, property, or security; or would facilitate escape.

**SEGREGATION**—Confinement in an individual cell isolated from the general population; for administrative, disciplinary, or protective reasons.

**SERVICE PROCESSING CENTER (SPC) -** A detention facility of which the primary operator and controlling party is the INS.

**SOFT CONTRABAND**–Any unauthorized item that does not constitute hard contraband, i.e., does not pose a threat to human safety or facility security; includes that quantity of an item possessed in an amount exceeding the established limit.

**SPECIAL CORRESPONDENCE/MAIL**–Detainee correspondence to or from private attorneys or other legal representatives, government attorneys, judges, courts, embassies and consulates, the U.S. President or Vice President, members of the U.S. Congress, the U.S. Department of Justice (including the INS and the Office of the Inspector General), the U.S. Public Health Service, administrators of grievance systems, and representatives of the news media. Correspondence will only be treated as special if the sender (for incoming correspondence) or recipient (for outgoing correspondence) and his/her title and office are adequately identified on the envelope to provide a clear indication that the correspondence belongs in this category.

GEO-MEN 00064015

**SPECIAL MANAGEMENT UNIT (SMU)**–A housing unit for detainees in administrative or disciplinary segregation.

**SPECIAL-NEED DETAINEE**–A detainee whose mental and/or physical condition requires special handling and treatment by staff.  Special needs detainees include, but are not limited to, those who are emotionally disturbed, mentally retarded or mentally ill, physically disabled, infirm, and drug or alcohol addicts/abusers.

**STRIP SEARCH**–The removal or rearrangement of some or all of an individual's clothing to enable officers to examine the clothing and surfaces of the detainee's body, including breasts, navel, exterior anal and genital areas, and the inside of the nose, ears, and mouth.  To the extent possible, the officers conduct the search visually, without touching the body parts.

**TERMINALLY ILL/INJURED**–In critical condition, beyond medical intervention, with death imminent or expected during the course of detention or hospitalization, according to the attending physician.

**TOXIC**–Poisonous**;** capable of causing injury or death.

**TRAINING**–An organized, planned, and evaluated activity designed to achieve specific learning objectives and enhance personnel performance.  Training may occur on site, at an academy or training center, an institution of higher learning, professional meetings, or through contract service or closely supervised on-the-job training. Training programs usually include requirements for completion, attendance records, and certification of completion. Meetings of professional associations are considered training where there is clear evidence of the direct bearing on job performance.  In all cases, the activity must be part of an overall training program.

**UNENCUMBERED SPACE**–Open, usable space measuring at least seven feet in at least one dimension, free of plumbing fixtures, desk, locker, bed, and other furniture and fixtures (measured in operational position).

**UNAUTHORIZED FUNDS**–Negotiable instruments (checks, money orders, etc.) or cash in a detainee's possession exceeding the facility-established limit.

**UNAUTHORIZED PROPERTY—**Not inherently illegal, but against the facility's written rules.

**UNIT DISCIPLINARY COMMITTEE**–See **DISCIPLINARY COMMITTEE**.

**VOLUNTEER GROUP**–Individuals who collectively donate time and effort to enhance the activities and programs offered to detainees; selected on basis of personal qualities and skills (recreation, counseling, education, religion, etc.).

**WORK ASSIGNMENT**–Carpentry, plumbing, food service, and other operational activities included in the facility's Voluntary Work Program, for which a detainee may volunteer.

GEO-MEN 00064016

**Approval of Standard**

Michael D. Cronin
**Acting Executive Associate Commissioner**
**Office of Programs**

SEP 20 2000
**Date**

Michael A. Pearson
**Executive Associate Commissioner**
**Office of Field Operations**

SEP 20 2000
**Date**

GEO-MEN 00064017