# Exhibit O

1                  IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF COLORADO

3    _____

4
          ALEJANDRO MENOCAL, et al.,                )
5                                                   )
                                                    )
6                     Plaintiffs,                   ) Case No.
                                                    )
7              vs.                                  ) 1:14-cv-
                                                    ) 02887-JLK
8         THE GEO GROUP, INC.,                      )
                                                    )
9                                                   )
                      Defendant.                    )
10                                                  )

11

12   _____

13

14                VIDEOTAPED DEPOSITION OF KEVIN MARTIN

15                        November 19, 2019

16                           9:31 a.m.

17                      205 North First Street

18                      La Conner, Washington

19

20

21

22

23   Reported by:
     Connie Recob, CCR, RMR, CRR
24   CCR No. 2631
     Job No. 854755 - NE 288153
25

Kevin Martin
November 19, 2019                                      2

1      APPEARANCES:

2

3      For the Plaintiffs:

4           ELIZABETH STORK
            MICHAEL J. SCIMONE
5           OUTTEN & GOLDEN LLP
            685 Third Avenue, 25th Floor
6           New York, New York 10017
            (212) 245-1000
7           estork@outtengolden.com
            mscimone@outtengolden.com

8

9      For the Defendant:

10          ALLISON ANGEL
            AKERMAN LLP
11          1900 Sixteenth Street, Suite 1700
            Denver, Colorado 80202
12          (303) 640-2511
            allison.angel@akerman.com

13

14     Also Present:

15              Danielle Greene - Videographer

16

17

18

19

20

21

22

23

24

25

Kevin Martin
November 19, 2019                    40

```
 1         A.  189, okay.

 2         Q.  And do you recognize this section of the

 3    PBNDS?

 4         A.  Yes.

 5         Q.  And how did this -- how is this section

 6    incorporated into the disciplinary system at GEO?

 7         A.  The disciplinary system at GEO is specific.

 8    The disciplinary system -- this is the disciplinary

 9    system.

10         Q.  So you mentioned before the Detainee

11    Handbook?

12         A.  Yes.

13         Q.  And does the Detainee Handbook lay out these

14    exact rules from the PBNDS for the detainees as far as

15    discipline goes?

16         A.  Yes.

17              MS. ANGEL:  Objection.  You can answer.

18              THE WITNESS:  Yes, it does.

19    BY MS. STORK:

20         Q.  Do you know if there's any deviation from --

21    between the DB -- excuse me, between the GEO Detainee

22    Handbook and the PBNDS as far as disciplinary

23    requirements?

24         A.  Not as far as disciplinary requirements, not

25    that I can recall.
```

Kevin Martin
November 19, 2019                                               41

1        Q.  You can flip through if you --

2        A.  Yeah.  I'm --

3        Q.  -- if it would help you recall.

4        A.  I'm trying to think, there were -- I mean,

5    there were -- there were other aspects of the handbook

6    or GEO documents that, if Immigration -- we would go

7    by whatever the most stringent was.  So if Immigration

8    said, A, but GEO said B, and it was more stringent

9    than A, then we would go with B.

10           And I'm trying to -- I'm sure there's a dozen

11   examples of when that occurred because that would come

12   up during audits.  Why are we doing this?  And we

13   would just have to show that Immigration requires this

14   as opposed to what GEO required, or ACA, American

15   Correctional Association.  So we would go by whatever

16   the most stringent was.

17       Q.  Do you recall any time when the ACA

18   requirements, like a specific example of what you were

19   just discussing where the ACA requirements would

20   require something less stringent, but ICE required

21   something more stringent as far as detainee

22   discipline?

23       A.  Not as far as detainee discipline, no.

24       Q.  Okay.  Anything else then?

25       A.  Tool control, specifically.  That was always

1    a -- a headache because our corporate office had what

2    was called class A tools, B tools, AA, BB, and

3    Immigration was very specific to just restricted and

4    nonrestricted, and the layout of the way they wanted

5    shadowed and colored black or red depending on those

6    tools.  And they were --

7           Again, that was one that we -- I have to back

8    up.  We did not go with the most stringent at that

9    time.  We did what Immigration required because they

10   were the client and that's specifically what they

11   wanted.  And that's also what -- well, the PBNDS

12   required, so we went with what Immigration preferred

13   on that.

14      Q.  So sometimes Immigration -- I'm going to

15   refer to Immigration and ICE interchangeably.

16      A.  Yes.

17      Q.  Is that --

18      A.  Yes.  Understandable.

19      Q.  Does that make sense to you?

20      A.  Yes.

21      Q.  When you're referring to "Immigration,"

22   you're referring to ICE, correct?

23      A.  Yes.

24      Q.  So sometimes what ICE required was less

25   stringent and sometimes it was more stringent than the

Kevin Martin
November 19, 2019                                    50

```
 1            And again, the standards back then, when I
 2    first started, we did not have the extensive
 3    classification process that they have now.  It
 4    literally was some questions that we would ask the
 5    detainee.  We did not get what was called a 213 from
 6    Immigration, their -- their history, so we would
 7    classify them based off their answers to determine
 8    where they were going to be housed in the facility.
 9        Q.  And when was that that you're referring to
10    where you would classify them based on sort of a GEO
11    policy rather than the Immigration standards?
12            MS. ANGEL:  Objection.
13            THE WITNESS:  Well, it -- it wasn't -- it was
14    an Immigration, but it wasn't as extensive as their
15    standard is now because back then, they -- and I can't
16    even get into how Immigration worked.  But the
17    document that they had wasn't as detailed as what
18    Immigration does now as far as every detainee that
19    comes in now has an entire history that they provide:
20    Where they were contacted, if they had any criminal
21    charges, if -- you know, anything and everything that
22    they can provide us.
23            Back then, before -- ironically, but before a
24    lot of the computer processes, we would wait until we
25    would get their file transferred up from -- I believe
```

```
 1      it was Houston.  But we would classify the detainee,

 2      and I want to say that was probably 2000 -- 2000,

 3      maybe early 2001.

 4      BY MS. STORK:

 5           Q.  And after that, you were an administrative

 6      lieutenant?

 7           A.  Yes.

 8           Q.  And what were your duties in that role?

 9           A.  Duties in that role, one to two days a week,

10      I would be the shift supervisor, but the majority of

11      my time, I would be doing employee schedules.  I would

12      be working on ACA files.  Each department had a large

13      number of files, you know, files related to American

14      Correctional Association.  So I would have to go pull

15      documents, print, scan documents for files, whatever

16      other projects that either the warden or assistant

17      warden needed -- needed done.

18           Q.  Okay.  So it was a mix of being a shift

19      supervisor over other detention officers and

20      administrative, like, back-office work?

21           A.  Correct.

22           Q.  And then when you were compliance manager

23      after that for about nine years, what were your duties

24      in that role?

25           A.  I was in charge of writing all policies.  I
```

Kevin Martin
November 19, 2019                                          52

1    oversaw all the audits that we had.  Again, wrote

2    quite a few articles for newsletter.  It sounds pretty

3    boring, but I was extremely busy.  There was one year

4    we had seven different audits, so it was -- I mean, we

5    had a tremendous amount of oversight, so it was

6    preparing for those audits.  And then we also had

7    internal audits.

8            The Immigration standards have audit tools

9    attached to them and -- I haven't flipped through this

10   whole document to see if it has the audit tools, but

11   we would have internal audits that we would do just to

12   make sure that we were -- we were in compliance.

13      Q.  So you oversaw all audits, both internal GEO

14   audits, ICE audits, American Correctional Association

15   audits.

16           Were there other kinds of audits that you

17   were in charge of?

18           MS. ANGEL:  Objection.  Just audits at

19   Aurora?

20           MS. STORK:  Sorry?

21           MS. ANGEL:  I said objection.  Just audits at

22   Aurora?

23           MS. STORK:  At Aurora, excuse me, yes.

24           THE WITNESS:  We had the Immigration audits.

25   American Correctional Association was every three

Kevin Martin
November 19, 2019                                                63

1            A.   Yes.

2                 MS. STORK:  Do you have the date?

3                 MS. ANGEL:  Yes.  I was going to say again,

4      if you want it.  It's June 9th, 2014.

5                 THE WITNESS:  Okay.

6      BY MS. STORK:

7            Q.   Does that sound correct to you?

8            A.   Yes.  Yeah.

9                 MS. ANGEL:  If you want to take a couple

10     minutes to look at that, it would be a good time to

11     take a break.

12                MS. STORK:  It would be a good time for a

13     break.

14                THE VIDEOGRAPHER:  The time is now 10:53 a.m.

15     And we're off the record.

16                    (Recess 10:53-11:00.)

17                THE VIDEOGRAPHER:  The time is now 11:00 a.m.

18     and we are back on the record.

19

20                    EXAMINATION (Continuing)

21     BY MS. STORK:

22           Q.   Okay.  Mr. Martin, before we took a break, we

23     were talking about your experience in your different

24     roles at GEO.

25                So just looking back to Exhibit 1, which is a

Kevin Martin
November 19, 2019                                    64

 1     version of your resume, in -- on the first page, which

 2     is Bates stamped GEO-MEN-0019835, it says that you

 3     "participated in development, review and revision of

 4     security sanitation policies and procedures."

 5             Do you see that?

 6         A.  Yes.

 7         Q.  So which policies regarding sanitation did

 8     you -- well, did you review or develop or revise

 9     sanitation policies?

10             Tell me about your role specific to

11     sanitation policies.

12             MS. ANGEL:  Objection.

13             THE WITNESS:  It would have been varied

14     depending on the positions that I held.  So if we go

15     back to when I was the fire safety manager, the fire

16     safety manager was responsible for the sanitation

17     policy.  Each department head -- policies were

18     reviewed on an annual basis, so each department head

19     was responsible for reviewing all policies, so every

20     month we would have approximately 12 policies that

21     were reviewed.

22             Department heads reviewed all the policies,

23     would make any recommended changes.  There were -- it

24     might be a typo or whatever it may be or just change

25     of internal processes.  More specific, if you were the

 1    department head that had responsibility over that

 2    policy, it was more than just a casual once-over.  You

 3    had to make sure that that was ultimately what -- what

 4    the facility was doing.

 5            Now, when I went to compliance, it was a

 6    little different because in compliance, ultimately, I

 7    would make the changes to the policies that were

 8    recommended once either the assistant warden or the

 9    warden signed off on them.  Now, some of them were

10    automatic, specifically like the 2011 standards.  If

11    there was changes in the standard, then I had to

12    change the policy.  So again, depending on which

13    position I was in, I had a little more responsibility

14    for the policy.

15            Now, as far as sanitation policy, I can tell

16    you clearly that that policy would have changed around

17    2011 or 2010.  We moved into the new facility in, I

18    believe it was 2010, or was it 2011 when we moved from

19    the old facility into the new facility.  I know it was

20    on my brother's birthday.  But basically, all the

21    policies were revised to a degree just because of the

22    physical layout of the building.

23    BY MS. STORK:

24        Q.  Got it.  And at that time, 2011, 2010, were

25    you the fire safety manager?

```
 1             MS. ANGEL:  Objection.

 2    BY MS. STORK:

 3        Q.   When you were on a UDC?

 4        A.   Right.  For a UDC, you would have a copy of

 5    the disciplinary packet that would include the

 6    officer's statement of what the detainee allegedly

 7    did; if there was any additional officer statements,

 8    detainee statements, if there were witnesses.  It

 9    would be the entire packet of what transpired.

10             You would then bring -- depending on what it

11    was, you would bring the detainee into the office, sit

12    down with the detainee, go over, get their side of the

13    story, and then based on the reports, based on the

14    detainee's statement, determine if there was an

15    infraction committed.  We may review video.  It just

16    kind of depended on what the infraction was.

17        Q.   And I'm sorry if you already explained this,

18    but how many members would there be on a UDC or

19    would --

20        A.   UDC was --

21        Q.   -- it just be one person?

22        A.   -- typically one person.

23        Q.   So you were essentially the judge deciding

24    whether the infraction had been committed?

25             MS. ANGEL:  Objection.
```

Kevin Martin
November 19, 2019                                           73

```
 1              THE WITNESS:  I don't know if you want to say

 2      judge.  I mean, you -- I don't know if that would be

 3      the correct word, but I'm -- ultimately you were

 4      determining, yeah, whether or not the -- the

 5      infraction, based on the -- the -- again, whether

 6      there was a video or the detainee's statement, officer

 7      statements, you would determine whether or not the --

 8      the infraction occurred.

 9      BY MS. STORK:

10         Q.  And would you also assess sanctions?

11         A.  Yes.

12         Q.  Okay.  And what was your guide for what

13      sanctions to assess?

14         A.  The PBNDS.

15         Q.  And I know we looked at the PBNDS earlier,

16      Exhibit 2, and pointed out that there are levels of

17      offenses, 100- through 400-level offenses, and then

18      each level has a series of sanctions that are

19      permitted; is that right?

20         A.  Yes.

21         Q.  So how did you choose between -- you know,

22      how did you choose which sanction would be

23      appropriate --

24              MS. ANGEL:  Objection.

25      ////
```

 1    BY MS. STORK:

 2         Q.  -- for the offense?

 3              MS. ANGEL:  Objection.  Foundation.

 4    BY MS. STORK:

 5         Q.  As a UDC member or as a -- would you call it

 6    a -- I'm trying to get the terminology right, if it's

 7    a committee of one essentially, but it's --

 8         A.  Well, it was ironic that it's a committee,

 9    but you're the committee to one.

10         Q.  Right.

11         A.  In the -- and I'd have to go through the ICE

12    Center, but in this standard, it says if -- depending

13    on which level -- like here, let's see.  Perfect.  I

14    just found the page.

15              So like on Page 194, it breaks down the --

16    UDC's responsibility and it would say:  "Impose minor

17    sanctions E through M."  So if we look through --

18    let's see if I can even find it.  It's been a while.

19    Now it's confusing because it says E through M, but

20    I'm not seeing a...

21         Q.  E through M?

22         A.  -- breakdown of E through M.  It says:

23    "Impose sanctions E through M."

24         Q.  Yeah.

25         A.  But I'm -- I'm seeing the sanctions, but

Kevin Martin
November 19, 2019                                    75

```
 1    they're numbered.

 2         Q.  I'm seeing the same thing.

 3         A.  Because there was a -- like, obviously if it

 4    was -- well, I can't say obviously because you guys

 5    didn't work there.  But say somebody was tattooing,

 6    you're not going to initiate criminal proceedings.  So

 7    it was broken down depending on what the infraction

 8    was, you know, the 100 to 400.

 9              So you would look at it and determine whether

10    or not it was a warning or restricted to their

11    housing.  Again, it -- it just kind of -- it kind of

12    varied depending on the sanction.

13         Q.  So it looks like -- correct me if I'm wrong,

14    but it looks, from the Page 194 that you're referring

15    to in Exhibit 2, that the UDC has the authority to

16    impose minor sanctions E through M, and -- and that if

17    you look on the right-hand column:  "The UDC shall

18    refer to the IDP an incident involving a serious

19    violation associated with an A through D range

20    sanction."

21              Is that what you recall?

22         A.  Correct.  So if it was a 100 or a -- it was

23    kind of redundant.  If it was a 100- or 200-level

24    charge, they would still go to the UDC and the UDC

25    would just refer them to the IDP.  We may provide
```

Kevin Martin
November 19, 2019                                          76

1    additional information.  We may end up doing more

2    witnesses or whatever it may be.

3              If it was a 3- or 400 level, the majority of

4    the time, the UDC or that staff member would impose

5    sanctions.  If there was something that they weren't

6    comfortable with or there was something -- you still

7    could refer it to the IDP even if it was a 3- or 400-

8    level charge, but 100 and 200 always went to the IDP.

9         Q.  Got it.

10        A.  Or at least -- I can just say that all the

11   ones that I did ever went to the IDP, if they were a

12   3- -- or, excuse me, a 1- or a 200 level.

13        Q.  Let's look then down at the 300-level

14   offenses on page -- starting on Page 200 and then

15   going on to Page 201.

16              If you look at the list of sanctions for

17   300-level offenses, disciplinary segregation up to

18   72 hours is a sanction, a possible sanction, right?

19        A.  Correct.

20        Q.  And is that sanction something the UDC would

21   have the authority to authorize or is that a sanction

22   that the IDP would have to approve?

23              MS. ANGEL:  Objection.

24              THE WITNESS:  For a 300 level, the UDC could

25   impose disciplinary -- excuse me, disciplinary

Kevin Martin
November 19, 2019                                          77

```
 1    segregation.

 2    BY MS. STORK:

 3        Q.  So as a UDC, how would you know -- and if you

 4    look again, excuse me, at this list of sanctions, it's

 5    quite a range, right?  I mean, reprimand is a possible

 6    sanction and disciplinary segregation is another

 7    sanction.

 8            How would the UDC know which one to choose

 9    for a 300-level offense?

10            MS. ANGEL:  Objection.  Foundation.  And to

11    the extent that you're asking him how other people did

12    it, I don't think he can comment on how other people

13    did it, but if you want to ask him how he chose, I

14    think that's a fair question.

15    BY MS. STORK:

16        Q.  You can answer the question.

17        A.  Okay.  Yeah, again, how other people would

18    have done it, I -- I couldn't -- I couldn't say.  But

19    it would be based off of the severity -- and again, we

20    can go back to the layouts of the facility.

21            So when -- when we were in the old facility,

22    it was very difficult to take away a loss of

23    privileges like commissary because the system wasn't

24    set up to where you could not allow them to -- to

25    purchase commissary.  When we moved to the new
```

 1    facility and a new system, they could go in there.  If

 2    we -- if I did a disciplinary hearing and say, Okay,

 3    this guy can't order commissary, I could give it to

 4    the detainee account clerks, and it would be put into

 5    the computer and they couldn't get commissary.  And

 6    then also other detainees are buying commissary for

 7    them.  It was a waste of everybody's time for some of

 8    the -- for some of the sanctions.

 9            If you look at, like: "Restrict to housing

10    unit," well, most of the time, the detainees are in

11    the housing unit.  You're not taking away their access

12    to court.  You're not taking away their access to --

13    to law library or recreation, and we only took away

14    visitation privileges if an incident occurred while it

15    was in visitation.

16            So me, personally, there were certain

17    sanctions that were a waste, like "remove from

18    programs or group activity."  Well, if they weren't in

19    any kind of a program or in an activity, we didn't do

20    that.  They didn't have a job; they didn't lose a job.

21    So it kind of, you know -- so there were sometimes,

22    depending on what it was, you just automatically wiped

23    out half -- half of the possible sanctions.

24        Q.  So would it be fair to say that because some

25    of the listed sanctions here in the PBNDS weren't

 1    effective based on the layout of the facility or just

 2    the reality on the ground, you -- you would choose a

 3    different sanction from the list?

 4            MS. ANGEL:  Objection.

 5            THE WITNESS:  Correct, yes.

 6    BY MS. STORK:

 7       Q.  And as UDC, you had the authority to do that,

 8    to choose any sanction from the list, correct?

 9       A.  I want to say that -- and this seems odd when

10    I'm looking at it now, but I wanted to say that the

11    charges were broken down differently to where, if it

12    was a -- say a 323 charge, which I don't think -- I've

13    never even heard anybody getting that, but you could

14    only do, say, six through 12.

15            And that's what's confusing, where it almost

16    seems like there's something missing because on --

17    like we go back to Page 194, where it says, "Impose

18    minor sanctions E through M," I don't see E through M.

19    I'm seeing numbers.  And I remember -- like, if we had

20    a copy of the handbook where it would say E through M

21    or if I could -- I'd have to find it.

22            But they were -- depending on the charges,

23    you could only do certain sanctions.  And, again, even

24    though this is making it sound like if it's a 300, you

25    could do 1 through 12.  I don't know.  This document

 1    seems -- it seems different now for some reason.

 2        Q.  Okay.  So you recall maybe in the Detainee

 3    Handbook there was a further breakdown of what

 4    punishments corresponded or could correspond to what

 5    infractions within the 300 level?

 6        A.  But it would have been based off of -- it

 7    would have been based off of the -- the standards

 8    themselves.

 9        Q.  Based off of the PBNDS?

10        A.  Yes, because even when we look at Page 192

11    where it talks about the ID, the -- where it first

12    breaks it down, it says:  "Sanctions A through G," "F

13    and G only," "A, B, C, D and E," or "G through M," but

14    I'm not seeing anywhere where it gives letters for the

15    sanctions.  All I'm seeing is numbers, and I do recall

16    seeing a letter, so I'm not sure if...

17        Q.  Well, we can look into that and see if we

18    can --

19        A.  Okay.

20        Q.  -- find the letter categories that are

21    referenced here.

22            But putting that aside, based on your

23    recollection, you -- you said you did recall that the

24    UDC could impose segregation, disciplinary segregation

25    up to 72 hours, right; that would not have to go to

Kevin Martin
November 19, 2019                                    141

```
 1          Q.  And prior to 2010, what would the -- would
 2     there have been any differences in this schedule
 3     because you were in the old facility?  What would the
 4     differences -- what were the differences?
 5               MS. ANGEL:  Objection.
 6               THE WITNESS:  Well, just the layout of the
 7     building would have been differently.  So laundry
 8     exchange -- it was a smaller facility, so laundry
 9     exchange would have been a little different.  I'd have
10     to go through line by line, but let's see.
11               Like at 4 o'clock, that could have changed
12     because we didn't always have releases on Tuesday and
13     Friday so that could have changed.
14     BY MS. STORK:
15          Q.  Well, let me ask you about some specific
16     provisions, or specific items in the schedule.
17          A.  Okay.
18          Q.  Were the meal service times the same prior to
19     2010 and after 2010?
20               MS. ANGEL:  Objection.
21               THE WITNESS:  Mealtimes changed.  Meals used
22     to be served at approximately 7 o'clock in the morning
23     and then that switched to 5 a.m.  Like, that would
24     have been in the early 2000s.
25     BY MS. STORK:
```

Kevin Martin
November 19, 2019                                          142

1          Q.  So then in the early 2000s through 2014, meal

2     service was around 5 a.m., correct?

3          A.  Correct.

4          Q.  Okay.  And what about the meal service

5     cleanup time?  When meal service cleanup begins, I

6     think you can see it starts at 0600 for breakfast,

7     1100 for lunch and 1730 for dinner?

8          A.  Uh-huh.

9          Q.  Are those times, were those the same --

10    excuse me.

11          Did the meal service cleanup start at roughly

12    those times throughout the 2004 to 2014 time frame?

13          A.  Roughly.  Again, it depends -- meal service

14    would start at 5, but you might have some units that

15    wouldn't get fed until closer to 6.

16          Q.  Okay.

17          A.  So obviously as large as the facility is,

18    it -- you know, I can't say it's 6:12, 6:04, you know.

19    So basically, after they finished eating, they would

20    start cleaning up.  So if they got served first and

21    they got served at 5, they might be done at 5:15 or

22    5:30.  You know, it kind of depends how long it took

23    everybody to eat.

24          Q.  And as soon as everyone ate, meal service

25    cleanup with begin, correct?

          1          A.   Correct.

          2          Q.   Okay.  And how long -- excuse me.

          3               How long did meal service cleanup typically

          4     take?

          5          A.   Not even five minutes, less -- definitely

          6     less than 10 minutes.

          7          Q.   And that was in every housing unit?

          8          A.   Yes.

          9          Q.   And did you supervise meal service cleanup?

         10          A.   I didn't, no.

         11          Q.   Okay.  So how do you know how long it took?

         12          A.   Just -- just from seeing it take place.

         13     Well, I guess I can say I observed it, but I didn't

         14     observe it as a -- an officer or as part of my job

         15     responsibility.  We may have been, like, during audits

         16     standing there watching meal service take place and --

         17     and observe.  Because typically, all the detainees

         18     would participate, especially for breakfast.  After

         19     meal service was done, they'd clean up and they could

         20     start watching TV.  So it was just a matter of putting

         21     all their trays on the cart, sweeping, mopping if

         22     needed, throwing away trash and done.

         23          Q.   Okay.  So sweeping, mopping?

         24          A.   They would wipe off the tables.

         25          Q.   Cleaning trays?

 1          A.  So they -- basically, they would take their

 2     trays, put them back on a cart.  They would wipe off

 3     the tables, sweep the day area, mop and be done with

 4     it, and that would be -- that would be it.

 5          Q.  And do you recall whether all the detainees

 6     who were eating at the time would participate or

 7     whether it was a -- a group of detainees assigned?

 8          A.  There was a group that was assigned, but

 9     there were a lot of other detainees that just

10     volunteered to do it because, again, the quicker it

11     was done, the quicker they could start watching TV.

12          Q.  And how was the group who was -- who were

13     designated to clean assigned?

14          A.  A list was generated based off of the

15     detainees that were housed in that unit.  If they

16     were -- if they were trustees, they weren't placed on

17     the list because they were -- they might have been

18     already working somewhere else.  So it was, I want to

19     say a change from the old building to the new

20     building, the -- the number of detainees, because the

21     old building, we had smaller housing units.  So I want

22     to say there was three people assigned; in the new

23     building, there was five people assigned.

24               And they would post this list on the front of

25     the officer station, and the detainees all knew

Kevin Martin
November 19, 2019                                    214

 1          Q.  Just like common knowledge at the facility?

 2          A.  Correct.

 3                   (Exhibit No. 12 marked

 4                    for identification.)

 5      BY MS. STORK:

 6          Q.  The court reporter just handed you

 7      Exhibit 12.  Do you recognize this document?

 8          A.  Detainee orientation video, yes.

 9          Q.  Yes.  So what is this?

10          A.  This was a video that was played in intake

11      and all the housing units that basically just gave an

12      overview of the facility to the detainees.

13          Q.  And you said a video.  This is a PowerPoint

14      presentation, right?

15          A.  It was on a loop, correct, so it came out as

16      a video.

17          Q.  Okay.

18          A.  Okay.

19          Q.  It's been referred to as -- alternatively as

20      like a presentation and a video, so I was confused?

21          A.  Okay.  It was a -- it was a PowerPoint

22      presentation that was just on a continuous loop.

23          Q.  Okay.

24          A.  So there was this video in English and

25      Spanish.  Then there was PREA videos and there were a

Kevin Martin
November 19, 2019                                    215

1     few other -- I can't remember everything that was

2     required, but everything that was required by ICE to

3     be shown.  Know your rights videos that would be shown

4     in intake.

5          Q.  Okay.

6          A.  And then when we were in the old facility, it

7     was also played on one of the channels continuously.

8          Q.  Okay.  So this was shown to every detainee

9     when they entered the facility, correct, from 2004 to

10    2014?

11             MS. ANGEL:  Objection.

12    BY MS. STORK:

13         Q.  It didn't change?

14         A.  It definitely would have changed, because I

15    can tell by the pictures and the people that are here

16    and the -- you know what?  I have to go back and look

17    at the standards at that time of what were required

18    versus, you know.  At the time that this was sent in

19    2014, this was updated with regards to the standards

20    at that time.

21         Q.  Got it.  Okay.  If you turn to --

22    unfortunately, there's no page numbers.  There's a

23    slide like halfway through that's titled:  "Safety and

24    Dorm Sanitation."

25             Just let me know when you get there.

Kevin Martin
November 19, 2019                                    216

```
 1        A.  Okay.

 2             MS. ANGEL:  Sorry.  Can you hang on one

 3    second.

 4             MS. STORK:  Sure.

 5             MS. ANGEL:  Safety and?

 6             MS. STORK:  "Safety and Dorm Sanitation" is

 7    the title.

 8             MS. ANGEL:  Sorry.  I'm just trying to...

 9             MS. STORK:  It's okay.  It's unfortunate

10    there are no page numbers.

11             MS. ANGEL:  Got it.  Okay.

12    BY MS. STORK:

13        Q.  Are you there, Mr. Martin?

14        A.  Yes.

15        Q.  Okay.  In the second bullet, it says:  "Each

16    and every detainee must participate in the sanitation

17    program.  A list of detainees is developed each day

18    and is posted for viewing."

19             Is that the list of the three- or the

20    five-person crew that you were referring to earlier?

21        A.  Yes.

22        Q.  "During a general cleanup, all detainees must

23    participate."

24             What is the general cleanup referring to?

25        A.  That's what that's referring to.  It's
```

Kevin Martin
November 19, 2019                                                        302

1                    REPORTER'S CERTIFICATE

2

3        I, CONNIE A. RECOB, the undersigned Certified

4   Court Reporter, pursuant to RCW 5.28.010 authorized to

5   administer oaths and affirmations in and for the State

6   of Washington, do hereby certify that the sworn

7   testimony and/or proceedings, a transcript of which is

8   attached, was given before me at the time and place

9   stated therein; that any and/or all witness(es) were

10  duly sworn to testify to the truth; that the sworn

11  testimony and/or proceedings were by me

12  stenographically recorded and transcribed under my

13  supervision, to the best of my ability; that the

14  foregoing transcript contains a full, true, and

15  accurate record of all the sworn testimony and/or

16  proceedings given and occurring at the time and place

17  stated in the transcript; that a review of which was

18  requested; that I am in no way related to any party to

19  the matter, nor to any counsel, nor do I have any

20  financial interest in the event of the cause.

21       WITNESS MY HAND and SIGNATURE this 3rd day of

22  December, 2019.

23  _____

24  CONNIE A. RECOB, RMR, CRR
    Washington Certified Court Reporter, CCR 2631
25  c.recob@gmail.com