# Exhibit P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02887-JLK

_____

RULE 30(b)(6) DEPOSITION OF:
DAWN CEJA - March 29, 2016
The GEO Group, Inc.

_____

ALEJANDRO MENOCAL, et al.,

Plaintiffs,

v.

THE GEO GROUP, INC.,

Defendant.

_____

        PURSUANT TO NOTICE, the Rule 30(b)(6)
deposition of DAWN CEJA, THE GEO GROUP, INC., was
taken on behalf of the Plaintiffs at 600 Grant Street,
Suite 450, Denver, Colorado 80203, on March 29, 2016,
at 9:34 a.m., before Darcy Curtis, Registered
Professional Reporter and Notary Public within
Colorado.

                          A P P E A R A N C E S

     For the Plaintiffs:

                    ANDREW FREE, ESQ.
                    Law Office of R. Andrew Free
                    1212 7th Avenue North
                    Nashville, Tennessee 37208

                    ALEXANDER HOOD, ESQ.
                    Towards Justice
                    1535 High Street
                    Suite 300
                    Denver, Colorado 80218

                    ANDREW H. TURNER, ESQ.
                    Buescher, Kelman, Perera & Turner, P.C.
                    600 Grant Street
                    Suite 450
                    Denver, Colorado 80203

                    BRANDT P. MILSTEIN, ESQ.
                    Milstein Law Office
                    595 Canyon Boulevard
                    Boulder, Colorado 80302


     For the Defendant:

                    SHELBY A. FELTON, ESQ.
                    Vaughan & DeMuro
                    720 South Colorado Boulevard
                    Penthouse, North Tower
                    Denver, Colorado 80246

```
 1            A.    For ICE housing units, I would say

 2   approximately 13 units.

 3            Q.    How many different beds are there within

 4   those 13 units?

 5            A.    It varies.  The large ones contain 80.

 6            Q.    Okay.  Do you sometimes call those units

 7   pods?

 8            A.    Sometimes, yes.

 9            Q.    What else do you use to refer to them?

10            A.    Housing unit.

11            Q.    What are they named in order to

12   differentiate them?  In other words, you don't call

13   each housing unit a housing unit.  You may use a

14   letter or a name system.  How does that work?

15            A.    They're each annotated with a letter and

16   a number.

17            Q.    What are the letters and numbers?

18            A.    One section are the A units, one section

19   are B units, another section is D, as in David,

20   another section is E, as in Edward, medical area.

21            Q.    Anything else?

22            A.    Not regarding immigration, no.

23            Q.    Okay.  So I think you told me a moment

24   ago that for immigration at the Aurora Detention

25   Facility, there are 13 units?
```

```
 1          A.    That includes medical and E unit, yes.

 2          Q.    Okay.  There's no C unit for immigrants?

 3          A.    Not for ICE, no.

 4          Q.    And no F or G unit?

 5          A.    No.

 6          Q.    When an ICE detainee is subject to this

 7    housing unit sanitation policy, can you explain to me,

 8    please, who is creating this policy.

 9          A.    So the policy is pieces of ACA

10    requirements, PBNDS, the ICE Performance-Based

11    National Detention Standards, and sometimes pieces of

12    corporate GEO policy.  So we take all of these

13    requirements and we put them into a site-specific

14    policy.

15          Q.    Who is "we"?

16          A.    The facility.

17          Q.    And in that case, this is the Aurora

18    facility?

19          A.    Yes.

20          Q.    And is that GEO?

21          A.    The Aurora facility.

22          Q.    When you're talking about we, you're

23    discussing The GEO Group?

24          A.    I am saying the Aurora staff.  Every GEO

25    facility is different, so I am only referring to
```

 1   Aurora.

 2          Q.   That's all I want you to discuss for the

 3   purposes of this question.

 4          A.   Okay.

 5          Q.   I'm asking:  Do you know the name of the

 6   person or the people, names of the people, who take

 7   these three sources of the policy and put them

 8   together?

 9          A.   It changes.  Currently we have our

10   accreditation manager that does our policy review.

11          Q.   Anybody else?

12          A.   Everybody will review a policy, and if

13   they have additions or things that need to be deleted,

14   that's what I refer to as a policy review.  It's a

15   group.  Then the final policy is reviewed by the

16   warden and signed off when it's done by the warden and

17   by immigration.

18          Q.   Who is "we" in the policy review group?

19          A.   Usually the department heads, so it could

20   be myself, the program manager, the accreditation

21   manager, the chief of security.  Usually people more

22   in the upper echelon.

23          Q.   How often does that happen?

24          A.   Annually.

25          Q.   Who at ICE signs off on the policy?

 1            A.    The COTAR, the contracting officer's

 2    technical representative.

 3            Q.    **Do you know which version of the**

 4    **Performance-Based National Detention Standards the**

 5    **policy is currently drawn from?**

 6            A.    Currently we are going off of the 2011,

 7    and then I think there's been some adjustments on

 8    there that are from 2013.

 9            Q.    **Do you happen to know which version of**

10    **the Performance-Based National Detention Standard**

11    **governs the current contract between ICE and GEO?**

12            A.    The same ones that I just said.

13            Q.    **Okay.  The housing unit sanitation policy**

14    **applies to all ICE detainees at the Aurora Detention**

15    **Facility, correct?**

16            A.    Yes.

17            Q.    **Are they provided a copy of this policy?**

18            A.    No.

19            Q.    **What are they provided in order to know**

20    **how they need to comply?**

21            A.    They, upon initial admission, review a

22    PowerPoint presentation as an orientation video.  They

23    receive a handbook, a local supplement handbook, and

24    they also receive an ICE handbook.  In each housing

25    unit are bulletin boards, and we post notices and

```
 1    things along such as that on those housing unit

 2    bulletin boards.

 3            Q.   Is it a separate PowerPoint and video?

 4            A.   Yes.

 5            Q.   Okay.  And that PowerPoint includes

 6    information about the housing unit sanitation policy,

 7    correct?

 8            A.   Yes.

 9            Q.   Have you seen the video?

10            A.   I initially put the original one

11    together, yes.

12            Q.   You were responsible for compiling it.

13    Do you know if that's the one that's used right now?

14            A.   There have been updates to it.

15            Q.   Okay.  Do you know what information it

16    provides detainees regarding the housing unit

17    sanitation policy?

18            A.   I would have to review it again to give

19    you accurate information.

20            Q.   Okay.  Can you remember anything about

21    what it says?

22            A.   No.

23            Q.   Do you know what languages it's brought

24    in?

25            A.   English and Spanish.
```

Menocal v. The Geo Group, Inc.                    DAWN CEJA                            3/29/2016

1   of anything else that the detainees are informed about

2   what they have to do to comply with the housing unit

3   sanitation policy?

4           A.    Not outside of the housing unit, no.

5           Q.    I would like you to take a look in Tab 7

6   of the binder in front of you.  And we're going to

7   turn -- we're going to make Tab 7 Exhibit 2 to this

8   deposition.

9                 (Deposition Exhibit 2 was marked.)

10          Q.    I'm going to represent to you that Tab 7

11  includes documents that The GEO Group has provided to

12  the plaintiffs' counsel that are marked GEO_MEN and

13  they begin with the No. 1 and they continue through

14  the No. 159.  That's at the end of Tab 7 right before

15  Tab 8.  We're going to call those Bates numbers.  So

16  if I use that, you know what that means.

17          A.    Yes.

18          Q.    If you would turn to what's marked as 55,

19  page 55 -- it's on the side, so you will have to turn

20  your binder 90 degrees -- do you recognize what's in

21  front of you?

22          A.    Yes.

23          Q.    What is that?

24          A.    A page of the detainee handbook.

25          Q.    You can turn to the previous page.  And

1    at the top left-hand corner, it says, "ICE Detainee

2    Handbook."

3         A.   Yes.  However, I'm not sure which year

4    this is.

5         Q.   Okay.  Would it make a difference for the

6    answers?

7         A.   Not necessarily.  However, it is reviewed

8    annually.

9         Q.   Sure.  I'll tell you what.  If you see

10   this policy and something sticks out at you as not

11   being current or not accurately reflecting GEO's

12   policies about the housing unit sanitation, let me

13   know.

14        A.   Okay.

15        Q.   Is that fair?

16        A.   Yes.

17        Q.   We'll work off of this document.  If we

18   need to change it, just let us know.  Fair?

19        A.   Yes.

20        Q.   Great.  Who put this document together,

21   this ICE detainee handbook?

22        A.   It's a group of people.  So the handbook

23   has been in effect since I started back in 1995.  So

24   over the years as standards change, contracts change,

25   the policy review committee will review this on an

```
 1   annual basis and make changes as needed.

 2            Q.    And the policy review committee has

 3   always been GEO or its corporate predecessor; is that

 4   correct?

 5            A.    Local Aurora staff, yes.

 6            Q.    The local GEO folks in Aurora?

 7            A.    Yes.

 8            Q.    Again, I'm not asking about any GEO

 9   office anywhere else for the purpose of this next line

10   of questions.  Section V on page 55, do you see that

11   section?

12            A.    Yes.

13            Q.    And what does that say?  It says, "The

14   center will maintain the highest sanitation standards

15   at all times in all locations without exception.

16   There will be an organized, supervised and continuous

17   program of daily cleaning by all detainees to maintain

18   those standards."

19            A.    Yes.

20            Q.    Is this part of your housing unit

21   sanitation policy?

22            A.    To have high sanitation levels, yes.

23            Q.    And indeed, to have an organized,

24   supervised and continuous program of daily cleaning by

25   all detainees to maintain those standards?
```

Menocal v. The Geo Group, Inc.                DAWN CEJA                              3/29/2016

1          A.   Correct, the voluntary work program with

2     the detainees.

3          Q.   So when you read this second sentence,

4     you are understanding the organized, supervised

5     continuous program of daily cleaning by all detainees

6     to mean the voluntary work program; is that right?

7          A.   It's all encompassing.  So you have your

8     voluntary work program, which covers areas in laundry

9     or kitchen, and then you have your housing unit

10    sanitation, which we discussed earlier.

11         Q.   Okay.  What else does the voluntary work

12    program cover that is not covered by the housing unit

13    sanitation policy?

14         A.   I don't follow your question.

15         Q.   It's because I've been trying to sort of

16    separate these things out into topics, because I want

17    us to be in one lane, if we can, mentally.

18         A.   Okay.

19         Q.   Because we have a topic about the

20    voluntary work program; we have a topic about the

21    housing sanitation policy.  It seems to me that you've

22    described it as two programs, the voluntary work

23    program and then the obligations of the detainees.  Is

24    that a fair understanding?

25         A.   I see it as your housing unit where you

Menocal v. The Geo Group, Inc.                    DAWN CEJA                              3/29/2016

1   do your housing unit sanitation, and then there is as

2   well your voluntary work program where they put in an

3   application and are chosen to work in other areas of

4   the facility.

5          Q.   But sometimes the voluntary work program

6   detainees work in the housing unit; is that right?

7          A.   Yes.

8          Q.   If you'll turn the page to the next part

9   of the exhibit, it's page 56.  Do you see on the

10  left-hand column where it says, "Housing Unit

11  Sanitation"?

12         A.   Yes.

13         Q.   It says, "Each and every detainee must

14  participate in the facility's sanitation program.  A

15  list of detainees is developed each day by staff and

16  is posted daily for viewing.  During a general cleanup

17  all detainees must participate.  The assigned housing

18  unit officer will be responsible for assuring this

19  general cleanup is done on a regular basis."  Do you

20  see that?

21         A.   Yes.

22         Q.   Is that the current policy of GEO?

23         A.   Yes.

24         Q.   What's a general cleanup?

25         A.   After meals they have a day room area,

1   which is a common area, where all of the TVs and

2   tables are located.  They all eat at these tables, so

3   after meal service, they will clean up the tables,

4   wipe down the tables, and sweep and mop the floors.

5            Q.   And that is -- according to this policy,

6   all detainees are required to participate?

7            A.   In that common area cleanup.

8            Q.   So that's every meal?

9            A.   Yes.

10           Q.   So when it says, "this general cleanup is

11   done on a regular basis," that's one of the examples.

12   A meal time is one of the examples; is that right?

13           A.   Yes.

14           Q.   Are there any other examples of when a

15   general cleanup happens?

16           A.   No.  The general cleanup that that is

17   discussing is after the meal service.

18           Q.   Okay.  So there's never another time when

19   there's a general cleanup?

20           A.   Not in the common area, no.

21           Q.   Okay.  What about anywhere else?

22           A.   No.

23           Q.   All right.  Every single detainee at the

24   Aurora Detention Facility who is detained under the

25   ICE contract is bound by this housing unit sanitation

```
 1    policy; is that right?

 2           A.   If they're housed in a housing unit.

 3           Q.   Where else could they be housed if

 4    they're an ICE detainee?

 5           A.   Medical.

 6           Q.   So if you're in medical, you're not

 7    subject to those cleanup requirements?

 8           A.   If there's a medical condition or some

 9    type of contagious disease that they may have, then,

10    no.

11           Q.   Okay.  How many people can be housed in

12    medical at a time?

13           A.   I believe there's 11 beds in there.

14           Q.   Okay.  What's the current bed count at

15    the facility for ICE detainees?

16           A.   Today?

17           Q.   Yes.  How many available beds do you

18    have?

19           A.   The contract is up to 525.

20           Q.   So the maximum number of beds that you

21    can supply to ICE under your contract?

22           A.   Yes.

23           Q.   If you could, I now would like you to

24    take a look at pages 46 and 51 -- excuse me -- 46

25    through 51.  So you're going to go backwards and
```

1        Q.   And explain to me what that is.  How do

2   you get there?  What's the purpose of it?

3             MS. FELTON:  Object to form.

4        Q.   (BY MR. FREE)  Compound.  Let's just

5   explain to me what the disciplinary segregation unit

6   is.

7        A.   So if a detainee is charged with an

8   offense, they will -- depending on the offense, they

9   could go to disciplinary segregation.  However, if

10  they haven't had their hearing, they will be on the

11  administrative segregation side, so they will still be

12  afforded all of the opportunities, such as TV and

13  recreation and everything else, until their hearing is

14  done.  Once the hearing is done, depending on which

15  level of offense, after their hearing if they are

16  found guilty and disciplinary segregation time is

17  warranted, they will be moved to the other side so

18  they can't see the television.

19       Q.   How does disciplinary segregation differ

20  from the living unit that the detainee is normally

21  detained within?

22       A.   There's not a lot of difference.  And let

23  me explain why.  Because in our segregation unit,

24  they're still afforded television and they are also

25  afforded social time.  They still get recreation.

**Menocal v. The Geo Group, Inc.**                    **DAWN CEJA**                         **3/29/2016**

Page 54

```
 1    They still get all of the regular amenities that

 2    general population gets.  It's just more of a

 3    restricted movement.

 4           Q.    How is movement restricted within

 5    disciplinary segregation?

 6           A.    So they don't get as much time out of

 7    their cell as you would in general population.  So

 8    social time for somebody that is in administrative

 9    segregation can be up to two hours a day where they

10    can come out of their cell and socialize with other

11    detainees that are in administrative segregation in

12    the segregation unit.

13           Q.    What about for disciplinary segregation?

14    How much social time is there there?

15           A.    No social time for disciplinary

16    segregation.

17           Q.    Unlike the situation you described

18    earlier in the general pop housing units, in both

19    administrative segregation and disciplinary

20    segregation, the doors are closed, right?

21                 MS. FELTON:  Object to form.

22           A.    Yes.

23           Q.    (BY MR. FREE)  Is there anybody else in

24    the detainee's cell with him or her when he or she is

25    in administrative segregation?
```

1          A.    They are all single cell units.

2          Q.    **What about in disciplinary segregation?**

3    **Is anybody else in the cell with a person who is**

4    **detained in disciplinary segregation?**

5          A.    No.  It's one unit.  So one side is

6    disciplinary, one is administrative.

7          Q.    **What's the purpose of administrative**

8    **segregation?**

9          A.    That can vary also.  So there's

10   protective custody.  A detainee can request to be

11   placed on protective custody.  We could say, hey, you

12   need to be put on protective custody, based on threats

13   that are being made, for that person's safety.  ICE

14   can request somebody be placed in administrative seg

15   for protective custody purposes.  A lot of people just

16   like to go back there for the peace and quiet.  We

17   only average about four people back there, so it's

18   very quiet.  They get to watch TV.  Some people really

19   enjoy it back there.

20         Q.    **I don't understand.  You just told me**

21   **that a lot of people like to go to administrative**

22   **segregation for the peace and quiet.  And I think I**

23   **understood you to testify that there are only four**

24   **people back there during a given day?**

25         A.    On average.

1     Q.    You have 500 beds that at some point are

2   in some level of being filled; is that right?

3     A.    525.

4     Q.    So if it's so popular, why doesn't

5   everybody go back there during the day?

6     A.    Some of them do for short periods of

7   time.

8     Q.    Like how long?

9     A.    It depends.  Some go back there for a

10  week.  Some go back there for a few days.  Some just

11  say they can't handle general population living.

12    Q.    They go to administrative segregation,

13  not disciplinary segregation?

14    A.    Correct.  Only -- and I'm only discussing

15  administrative segregation.

16    Q.    Let's talk about disciplinary

17  segregation.  Same explanation that you gave for

18  administrative segregation as far as the purpose, or

19  does it have a different purpose?

20    A.    As I stated earlier, if you get charged

21  with a violation, depending on the level, usually 100

22  and 200 levels, you're automatically going to be taken

23  back there and be put on the administrative

24  segregation side pending your hearing.

25    Q.    I don't know that that answers my

Page 83

1                (At this time Mr. Turner entered the

2      room.)

3           Q.    Do you recognize this document?

4           A.    Yes.

5           Q.    Or these documents?

6           A.    Yes.

7           Q.    What are they?  Let's start with the

8      first page.

9           A.    They are all different versions of the

10     cleanup list over the years that has been used to

11     specify who is going to clean up after meal service.

12          Q.    Who created these documents?

13          A.    I do not know who created any of these

14     versions.

15          Q.    Okay.  How often are they distributed to

16     detainees?

17          A.    Usually --

18                MS. FELTON:  Object to form.

19          A.    They're not distributed to detainees, but

20     usually what happens is the assigned officer on the

21     graveyard shift will fill out the names and the person

22     who will be responsible for the following day's meals,

23     so when dayshift comes on, it will be ready to go.

24          Q.    (BY MR. FREE)  Okay.  And then where is

25     this posted, if it's posted?

Page 84

1        A.   Usually it's posted right by the detainee

2   mailboxes.  They fold it and hang it over the edge.

3        **Q.   As far as you know, is this the way that**

4   **the detainees find out that they're responsible for**

5   **cleaning up after meals pursuant to the housing unit**

6   **sanitation policy?**

7        A.   Yes.

8        **Q.   Okay.  This falls -- I just want to make**

9   **sure I understand.  This falls outside of the realm of**

10  **the voluntary work program; is that right?**

11       A.   This is for all of the common area, yes.

12       **Q.   This is within the housing unit**

13  **sanitation policy and not the voluntary work program?**

14       A.   It's part of the living area.

15       **Q.   How does that answer my question?**

16       A.   What I referred to before, when we had

17  the same discussion, that the common area is part of

18  the living area.  It's all connected.

19       **Q.   Let's try this a different way.  Do**

20  **people get paid for doing these jobs?**

21       A.   No.

22       **Q.   Are they required to do these jobs?**

23       A.   To keep the area clean, we assign them,

24  yes.

25       **Q.   The answer is, yes, they're required to**

1   do these jobs?

2          A.   Yes.

3          Q.   If they don't do these jobs, they can

4   potentially be charged with a disciplinary infraction,

5   a 300-level infraction?

6          A.   Possibly, yes.

7          Q.   And that could possibly lead to solitary

8   confinement?

9               MS. FELTON:  Object to form.

10         Q.   (BY MR. FREE)  Excuse me.  Administrative

11   segregation; is that right?

12         A.   Yes.

13         Q.   And this is something that is explained

14   to the detainees when they come in?

15         A.   It's in the handbook, yes.

16         Q.   And this is a uniform policy throughout

17   all of the tiers in which ICE detainees are kept?

18               MS. FELTON:  Object to form.

19         A.   I don't know.

20         Q.   (BY MR. FREE)  Let me clarify.  In each

21   place where an ICE detainee is housed, does GEO use a

22   cleanup list, like the ones we've just reviewed, to

23   notify the detainees of their responsibilities for

24   cleaning?

25         A.   I do not --

 1   you'll turn to PL 54, the 300-level offense that you

 2   were referring to earlier, would that have been 306,

 3   refusal to clean assigned living area?

 4        A.   Yes.

 5        Q.   Okay.  And that's in the high moderate

 6   offense category; is that right?

 7        A.   Yes.

 8        Q.   There are low moderate offense

 9   categories, but this is not in them; is that right?

10        A.   Yes.  If you're referring to the 400

11   level, yes.

12        Q.   That is right.  And in the list of

13   sanctions that apply to high moderate offenses,

14   detainees are informed through this document that GEO

15   could initiate criminal proceedings?

16             MS. FELTON:  Object to form.

17        Q.   (BY MR. FREE)  Is that right?

18        A.   That's what is listed, yes.

19        Q.   I'm going to ask whether these other

20   sanctions could follow from a 306 violation.  I think

21   the one we talked about earlier was a disciplinary

22   segregation, up to 72 hours, right?

23        A.   Yes.

24        Q.   They could lose a job; is that right?

25        A.   Yes.

```
 1              Q.   They could be given a disciplinary

 2    transfer; is that right?

 3              A.   That's what is listed.

 4              Q.   That is GEO's policy?

 5                   MS. FELTON:  Object to form.

 6              A.   This comes out of the PBNDS.

 7              Q.   (BY MR. FREE)  I'm sorry.  I thought you

 8    said it was in the ICE detainee handbook.

 9              A.   Yes, but it's based off of the PBNDS.

10              Q.   Is it your understanding that if there's

11    a discrepancy between GEO's policy or practice and the

12    PBNDS, the PBNDS controls; in other words, GEO must

13    follow the PBNDS?

14                   MS. FELTON:  Object to form.

15              A.   Yes.  It is part -- it's tied to the

16    contract.

17              Q.   (BY MR. FREE)  Okay.  Yes, exactly.  So

18    GEO, as part of the contract, has agreed to abide by

19    the PBNDS; is that right?

20              A.   Yes.

21              Q.   To the extent this ICE detainee handbook

22    that's given to the detainees contains things that

23    aren't explicitly mentioned in the PBNDS, it's GEO's

24    requirement that these things comply with the PBNDS,

25    right?
```

Page 91

1               MS. FELTON:  Object to form.

2          A.   I don't understand.

3          Q.   (BY MR. FREE)  Okay.  The PBNDS does not

4     contain all of these lists of codes, right?

5          A.   I'm pretty sure they do.

6          Q.   Okay.  We'll come back to that.

7          A.   I'm pretty sure.

8          Q.   This is taken directly from the PBNDS?

9          A.   I'm pretty sure.

10          Q.   And that's 2008, 2011?

11          A.   It's been in the last two versions, the

12     2008 and the 2011.

13          Q.   Okay.

14          A.   That's where we get it from.

15          Q.   As part of your duties as assistant

16     warden of operations, have you ever seen a document

17     called a statement of work?

18          A.   That sounds like something that would be

19     in the contract.

20          Q.   Okay.  Do you have any understanding as

21     to what the purpose of that document is?

22               MS. FELTON:  Object to form.

23          Q.   (BY MR. FREE)  No?

24          A.   It's in the contract.

25          Q.   Okay.

1    say force to work.

2              Q.    (BY MR. FREE)  I'll rephrase.  Thank you

3    for clarifying that you didn't understand.  Is there

4    anything in the Performance-Based National Detention

5    Standards that expands the scope of work that

6    detainees may be required to do?

7              A.    Maybe not in the PBNDS, but I would also

8    want to check the contract to see if there's anything

9    specific.

10             Q.    That's a great idea.  Let's look at it.

11   If you turn to page 14 of the same tab, Tab 7, do you

12   see at the top it says, "Section H - Special Contract

13   Requirements"?

14             A.    Yes.

15             Q.    And I will proffer to you that if you go

16   backward, you're going to find that this is part of

17   the GEO contract that has been disclosed to the

18   plaintiffs in heavily redacted form at GEO Menocal

19   Bates 1 all of the way to this page, page 14.  This is

20   all part of their contract.

21             A.    Okay.

22             Q.    Okay.  Does that look right to you, that

23   that's all part of the contract?

24             A.    Yes.

25             Q.    So it says, "The following

1    constraints" -- this is at Section H-5.  The previous

2    several paragraphs are blocked out.  We can't see

3    them.  "The following constraints comprise the

4    statutory, regulatory, policy and operational

5    consideration that will affect the contractor."  It

6    says, "Constraints include, but are not limited to" --

7    if you turn the page and go to page 15, you look at

8    No. 10 --

9              A.   Yes.

10             Q.   -- it says the PBNDS.  In this one, it

11   says 2008, so I'm a little confused about the

12   testimony earlier that 2011 applies.  It's okay.  For

13   our purposes, we're just going to agree that '11 is

14   what applies, right?

15             A.   2011 does apply because there was a

16   contract modification that incorporates all of the

17   2011 standards into the current contract.

18             Q.   So we don't have that, but maybe we'll

19   get it.  Do you know if that contract modification

20   alters in any way the voluntary work program?

21             A.   From what I recall, is that it

22   incorporates the 2011 PBNDS, so everything that's in

23   the PBNDS applies.

24             Q.   Got it.  So if you look at the things

25   that the contractor must follow, the statutory,

 1    regulatory, policy and operational consideration,

 2    No. 10 says the PBNDS.  Does that make sense?

 3         A.    Yes.

 4         Q.    Okay.  So when you say you're going to

 5    have to look at the contract, the contract requires

 6    GEO to follow the PBNDS, right?

 7         A.    Yes.

 8         Q.    Okay.  Now, you seem like you want to say

 9    something else.

10         A.    I just want to make sure that we're on

11    the same page here.

12         Q.    Sure.

13         A.    Because I understand that this

14    incorporates the 2008.  However, there might be a

15    section in the contract that also refers to other

16    sections in the contract that would reflect back on

17    the PBNDS, if that makes sense.

18         Q.    As far as you know, the PBNDS that is in

19    front of you is the one that's in force and the one

20    that GEO follows?

21         A.    Yes.

22         Q.    And as far as you know, there's nothing

23    else in the PBNDS that would permit GEO to require

24    additional work by detainees?

25         A.    Correct.

### REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           ) ss.
CITY AND COUNTY OF DENVER  )

      I, Darcy Curtis, Registered Professional Reporter and Notary Public ID 20064016972, State of Colorado, do hereby certify that previous to the commencement of the examination, the said DAWN CEJA was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

      I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

      IN WITNESS WHEREOF, I have affixed my signature this 12th day of April, 2016.

      My commission expires May 2, 2018.

___X_ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.