# Exhibit B

| AWARD/CONTRACT | | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | | RATING | PAGE OF PAGES 1 , 92 |
|---|---|---|---|---|---|

| 2. CONTRACT (Proc. Inst. Ident.) NO. HSCEDM-11-D-00003 | | 3. EFFECTIVE DATE See Block 20C | 4. REQUISITION/PURCHASE REQUEST/PROJECT NO. |
|---|---|---|---|

| 5 ISSUED BY | CODE | ICE/DM/DC-Laguna | 6. ADMINISTERED BY (if other than Item 5) | CODE | ICE/DM/DC-LAGUNA |
|---|---|---|---|---|---|
| ICE/Detent Mngt/Detent Contract-LAG Immigration and Customs Enforcement Office of Acquisition Management 24000 Avila Road, Room 3104 Laguna Niguel CA 92677 | | | ICE/Detent Mngt/Detent Contract-LAG Immigration and Customs Enforcement Office of Acquisition Management 24000 Avila Road, Room 3104 Attn: Al Kidd (949) 425-7025 Laguna Niguel CA 92677 | | |

7. NAME AND ADDRESS OF CONTRACTOR (No., Street, City, Country, State and ZIP Code)

GEO GROUP INC THE
621 NW 53RD ST STE 700
BOCA RATON FL 334878242

8. DELIVERY
[ ] FOB ORIGIN   [X] OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT
Net 30

CODE 6127064650000   FACILITY CODE

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN   ITEM

| 11. SHIP TO/MARK FOR | CODE | ICE/ERO/CENTENNIAL | 12. PAYMENT WILL BE MADE BY | CODE | ICE-ERO/FOD-FDN |
|---|---|---|---|---|---|
| ICE-ERO-FOD-FDN Immigration Customs Enforcement 12445 East Caley Avenue Centennial CO 80111 | | | DHS, ICE Burlington Finance Center P.O. Box 1620 Attn: ICE-ERO/FOD-FDN Williston VT 05495-1620 | | |

| 13 AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION: [ ] 10 U.S.C. 2304 (c) ( )  [ ] 41 U.S.C. 253 (c) ( ) | 14. ACCOUNTING AND APPROPRIATION DATA See Schedule |
|---|---|

| 15A. ITEM NO | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | Continued | | | | |
| | | | 15G. TOTAL AMOUNT OF CONTRACT | | $0.00 |

## 16. TABLE OF CONTENTS

| (X) | SEC | DESCRIPTION | PAGE(S) | (X) | SEC | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 78 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 12 | X | J | LIST OF ATTACHMENTS | 92 |
| X | D | PACKAGING AND MARKING | 35 | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 36 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 37 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 39 | | L | INSTRS., CCNDS., AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 42 | | M | EVALUATION FACTORS FOR AWARD | |

CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE

| 17. [ ] CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return ___ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents. (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.) | 18. [X] AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number HSCEDM-11-R-00002 including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents. (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary. |
|---|---|

| 19A. NAME AND TITLE OF SIGNER (Type or print) Ron Maddux, Executive Vice President | 20A. NAME OF CONTRACTING OFFICER Roberta J. Halls |
|---|---|
| 19B. NAME OF CONTRACTOR BY _(signature)_ (Signature of person authorized to sign) | 19C. DATE SIGNED 09/15/11 | 20B. UNITED STATES OF AMERICA BY _(signature)_ (Signature of the Contracting Officer) | 20C. DATE SIGNED 9-15-11 |

NSN 7540-01-152-8069
PREVIOUS EDITION IS UNUSABLE

STANDARD FORM 26 (Rev. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

CONFIDENTIAL

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>HSCEDM-11-D-00003 | | PAGE<br>2 | OF<br>92 |
|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | DUNS Number:  612706465<br>FINANCE POC: Amelia Sanchez,<br>amelia.sanchez@dhs.gov, 720-875-2040<br>PROGRAM POC: COTR John Jameson,<br>john.jameson@dhs.gov, 303-739-8725<br>.<br>IAW FAR 52.222-43, Fair Labor Standards Act and<br>Service Contract Act □ Price Adjustment (Multiple<br>Year and Option Contracts), this contract already<br>includes a price increase of 2% per year for<br>Collective Bargaining Agreement labor categories.<br> Therefore, the Government will allow adjustment<br>only over and above the 2% increase annually when<br>warranted.<br>.<br>The Offeror's proposal dated May 2, 2011 and as<br>negotiated through August 24, 2011 for technical,<br>medical, staffing and transportation submissions<br>constitutes their Performance Work Statement<br>(PWS).  All documents are hereby incorporated<br>into the contract in section J, Attachment 2.<br><br>Period of Performance is September 16, 2011<br>through September 15, 2021, if all options are<br>exercised.<br>.<br>Accounting Info:<br>To be provided on individual delivery order<br>FOB: Destination<br><br>BASE PERIOD: 09/16/2011 - 09/15/2013 | | | | |
| 0001 | Contractor Owned Contractor Operated Detention<br>Facility in accordance with the terms and<br>conditions of this contract. Offeror shall<br>provide fully burdened bed day rates only. Unit<br>of Issue DA is equivalent to bed-day.<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | | | | |
| 0001A | Bed Day Rate For Minimum Quantity - The<br>Governments minimum quantity to be ordered via<br>task order is 350 beds per day multiplied by 365<br>days multiplied by 2 years plus 1 day for leap<br>year in February 2012 for a total of 255,850.<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES<br><br>Accounting Info:<br>To be provided on individual delivery order<br>Continued ... | 255850 | DA | 135.50 | 34,667,675.00 |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

CONFIDENTIAL

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>HSCEDM-11-D-00003 | PAGE<br>3 | OF<br>92 |
|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | $0.00 (Subject to Availability of Funds) | | | | |
| 0001B | Bed Day Rate In Excess Of Minimum Quantity - The Government may order an additional quantity estimated to be 175 beds (351 to 525 beds) per day multiplied by 365 days multiplied by 2 years plus 1 day for leap year in 2012 for a total not to exceed 127,925.<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES<br><br>Accounting Info:<br>To be provided on individual delivery order<br> $0.00 (Subject to Availability of Funds) | 127925 | DA | 19.50 | 2,494,537.50 |
| 0002 | TRANSPORTATION SERVICES IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THIS CONTRACT.<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES<br><br>Accounting Info:<br>To be provided on individual delivery order<br> $0.00 (Subject to Availability of Funds) | | | | 0.00 |
| 0002A | TRANSPORTATION SERVICES - Monthly Flat Fixed Fee includes all staff, vehicles and vehicle maintenance.<br>.<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES<br><br>Accounting Info:<br>To be provided on individual delivery order<br> $0.00 (Subject to Availability of Funds) | 24 | MO | 155,512.73 | 3,732,305.52 |
| 0002B | Direct Fuel Pass-Thru. Vendor Bill exact cost paid at the pump on a monthly basis.  No fees or mark-ups are allowed.  Not to exceed $54,000.<br>.<br>Product/Service Code:  AD55<br><br>Accounting Info:<br>To be provided on individual delivery order<br> $0.00 (Subject to Availability of Funds) | | | | 54,000.00 |
| 0003 | Remote Custody<br>These estimated hours are for detainee medical trips/visits and associated waiting time for detention officers only, not to exceed 4,000 hours.<br>Continued ... | 4000 | HR | 49.00 | 196,000.00 |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

CONFIDENTIAL

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>HSCEDM-11-D-00003 | | | | PAGE<br>4 | OF<br>92 |

NAME OF OFFEROR OR CONTRACTOR

GEO GROUP INC THE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | Base Period<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES<br><br>Accounting Info:<br>To be provided on individual delivery order<br> $0.00 (Subject to Availability of Funds) | | | | |
| 0004 | Stipend for Detainee Work Program - Reimbursement for this line item will be at actual cost of $1.00 per day per detainee. The contractor shall not exceed the quantity shown without prior approval by the Contracting Officer.<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES<br><br>Accounting Info:<br>To be provided on individual delivery order<br> $0.00 (Subject to Availability of Funds) | 76650 | DA | 1.00 | 76,650.00 |
| 0005 | MEDICAL SERVICES-In accordance with the terms and conditions of this contract.  Monthly Flat Fixed Fee includes all medical staff and in-house supplies.<br>Product/Service Code:  Q201<br>Product/Service Description: GENERAL HEALTH CARE SERVICES<br><br>Accounting Info:<br>To be provided on individual delivery order<br> $0.00 (Subject to Availability of Funds)<br><br>OPTION PERIOD 1: 09/16/2013 - 09/15/2015 | 24 | MO | 212,925.83 | 5,110,219.92 |
| 1001 | Contractor Owned Contractor Operated Detention Facility in accordance with the terms and conditions of this contract. Offeror shall provide fully burdened bed day rates only. Unit of Issue DA is equivalent to bed-day.<br>(Option Line Item)<br>09/16/2013<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | | | | 0.00 |
| 1001A | Bed Day Rate For Minimum Quantity - The Governments minimum quantity to be ordered via task order is 350 beds per day multiplied by 365 days multiplied by 2 years for a total of 255,500.<br>Option Period 1<br>(Option Line Item)<br>Continued ... | 255500 | DA | 139.71 | 35,695,905.00 |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

CONFIDENTIAL

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED HSCEDM-11-D-00003 | | | PAGE 5 | OF 92 |
|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | 09/16/2013<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | | | | |
| 1001B | Bed Day Rate In Excess Of Minimum Quantity - The Government may order an additional quantity estimated to be 175 beds (351 to 525 beds) per day multiplied by 365 days multiplied by 2 years for a total not to exceed 127,750.<br>Option Period 1<br>(Option Line Item)<br>09/16/2013<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | 127750 | DA | 20.31 | 2,594,602.50 |
| 1002 | TRANSPORTATION SERVICES IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THIS CONTRACT.<br>(Option Line Item)<br>09/16/2013<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | | | | 0.00 |
| 1002A | TRANSPORTATION SERVICES - Monthly Flat Fixed Fee includes all staff, vehicles and vehicle maintenance.<br>(Option Line Item)<br>09/16/2013<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | 24 | MO | 158,622.99 | 3,806,951.76 |
| 1002B | Direct Fuel Pass-Thru. Vendor Bill exact cost paid at the pump on a monthly basis.  No fees or mark-ups are allowed.  Not to exceed $54,000.<br>(Option Line Item)<br>09/16/2013<br>Product/Service Code:  AD55 | | | | 54,000.00 |
| 1003 | Remote Custody<br>These estimated hours are for detainee medical trips/visits and associated waiting time for detention officers only, not to exceed 4,000 hours.<br>Option Period 1<br>(Option Line Item)<br>09/16/2013<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | 4000 | HR | 49.00 | 196,000.00 |
| 1004 | Stipend for Detainee Work Program - Reimbursement for this line item will be at actual cost of<br>Continued ... | 76650 | DA | 1.00 | 76,650.00 |

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

CONFIDENTIAL   GEO_MEN 00019617

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>HSCEDM-11-D-00003 | | | | PAGE<br>6 | OF<br>92 |
|---|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR

GEO GROUP INC THE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | $1.00 per day per detainee. The contractor shall not exceed the quantity shown without prior approval by the Contracting Officer.<br>Option Period 1<br>(Option Line Item)<br>09/16/2013<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | | | | |
| 1005 | MEDICAL SERVICES-In accordance with the terms and conditions of this contract.  Monthly Flat Fixed Fee includes all medical staff and in-house supplies.<br>Option Period 1<br>(Option Line Item)<br>09/16/2013<br>Product/Service Code:  Q201<br>Product/Service Description: GENERAL HEALTH CARE SERVICES<br><br>OPTION PERIOD 2: 09/16/2015 - 09/15/2017 | 24 | MO | 217,786.68 | 5,226,880.32 |
| 2001 | Contractor Owned Contractor Operated Detention Facility in accordance with the terms and conditions of this contract. Offeror shall provide fully burdened bed day rates only. Unit of Issue DA is equivalent to bed-day.<br>(Option Line Item)<br>09/16/2015<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | | | | 0.00 |
| 2001A | Bed Day Rate For Minimum Quantity - The Governments minimum quantity to be ordered via task order is 350 beds per day multiplied by 365 days multiplied by 2 years plus 1 day for leap in 2016 for a total of 255,850.<br>Option Period 2<br>(Option Line Item)<br>09/16/2015<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | 255850 | DA | 144.13 | 36,875,660.50 |
| 2001B | Bed Day Rate In Excess Of Minimum Quantity - The Government may order an additional quantity estimated to be 175 beds (350 to 525 beds) per day multiplied by 365 days multiplied by 2 years plus 1 day for a total not to exceed 127,925.<br>Option Period 2<br>(Option Line Item)<br>Continued ... | 127925 | DA | 21.16 | 2,706,893.00 |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

CONFIDENTIAL

GEO_MEN 00019618

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED HSCEDM-11-D-00003 | | | PAGE 7 | OF 92 |
|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR

GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | 09/16/2015 Product/Service Code:  S206 Product/Service Description: GUARD SERVICES | | | | |
| 2002 | TRANSPORTATION SERVICES IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THIS CONTRACT. (Option Line Item) 09/16/2015 Product/Service Code:  S206 Product/Service Description: GUARD SERVICES | | | | 0.00 |
| 2002A | TRANSPORTATION SERVICES - Monthly Flat Fixed Fee includes all staff, vehicles and vehicle maintenance. (Option Line Item) 09/16/2015 Product/Service Code:  S206 Product/Service Description: GUARD SERVICES | 24 | MO | 161,795.44 | 3,883,090.56 |
| 2002B | Direct Fuel Pass-Thru. Vendor Bill exact cost paid at the pump on a monthly basis.  No fees or mark-ups are allowed. Not to exceed $54,000. (Option Line Item) 09/16/2015 Product/Service Code:  S206 Product/Service Description: GUARD SERVICES | | | | 54,000.00 |
| 2003 | Remote Custody These estimated hours are for detainee medical trips/visits and associated waiting time for detention officers only, not to exceed 4,000 hours. Option Period 2 (Option Line Item) 09/16/2015 Product/Service Code:  S206 Product/Service Description: GUARD SERVICES | 4000 | HR | 49.00 | 196,000.00 |
| 2004 | Stipend for Detainee Work Program - Reimbursement for this line item will be at actual cost of $1.00 per day per detainee. The contractor shall not exceed the quantity shown without prior approval by the Contracting Officer. Option Period 2 (Option Line Item) 09/16/2015 Product/Service Code:  S206 Product/Service Description: GUARD SERVICES | 76650 | DA | 1.00 | 76,650.00 |
| 2005 | MEDICAL SERVICES-In accordance with the terms and Continued ... | 24 | MO | 222,943.47 | 5,350,643.28 |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86) Sponsored by GSA FAR (48 CFR) 53.110

CONFIDENTIAL

GEO_MEN 00019619

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>HSCEDM-11-D-00003 | PAGE<br>8 | OF<br>92 |
|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR

GEO GROUP INC THE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | conditions of this contract. Monthly Flat Fixed Fee includes all medical staff and in-house supplies.<br>Option Period 2<br>(Option Line Item)<br>09/16/2015<br>Product/Service Code:  Q201<br>Product/Service Description: GENERAL HEALTH CARE SERVICES<br><br>OPTION PERIOD 3: 09/16/2017 - 09/15/2019 | | | | |
| 3001 | Contractor Owned Contractor Operated Detention Facility in accordance with the terms and conditions of this contract. Offeror shall provide fully burdened bed day rates only. Unit of Issue DA is equivalent to bed-day.<br>(Option Line Item)<br>09/16/2017<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | | | | 0.00 |
| 3001A | Bed Day Rate For Minimum Quantity - The Governments minimum quantity to be ordered via task order is 300 beds per day multiplied by 365 days multiplied by 2 years for a total of 255,500.<br>Option Period 3<br>(Option Line Item)<br>09/16/2017<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | 255500 | DA | 148.80 | 38,018,400.00 |
| 3001B | Bed Day Rate In Excess Of Minimum Quantity - The Government may order an additional quantity estimated to be 175 beds (350 to 525 beds) per day multiplied by 365 days multiplied by 2 years for a total not to exceed 127,750.<br>Option Period 3<br>(Option Line Item)<br>09/16/2017<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | 127750 | DA | 22.05 | 2,816,887.50 |
| 3002 | TRANSPORTATION SERVICES IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THIS CONTRACT.<br>(Option Line Item)<br>09/16/2017<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES<br><br>Continued ... | | | | 0.00 |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

CONFIDENTIAL

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>HSCEDM-11-D-00003 | | PAGE<br>9 | OF<br>92 |
|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR

GEO GROUP INC THE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| 3002A | TRANSPORTATION SERVICES - Monthly Flat Fixed Fee includes all staff, vehicles and vehicle maintenance.<br>(Option Line Item)<br>09/16/2017<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | 24 | MO | 165,031.35 | 3,960,752.40 |
| 3002B | Direct Fuel Pass-Thru. Vendor Bill exact cost paid at the pump on a monthly basis.  No fees or mark-ups are allowed.  Not to exceed $54,000.<br>(Option Line Item)<br>09/16/2017<br>Product/Service Code:  AD55 | | | | 54,000.00 |
| 3003 | Remote Custody<br>These estimated hours are for detainee medical trips/visits and associated waiting time for detention officers only,  not to exceed 4,000 hours.<br>Option Period 3<br>(Option Line Item)<br>09/16/2017<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | 4000 | HR | 49.00 | 196,000.00 |
| 3004 | Stipend for Detainee Work Program - Reimbursement for this line item will be at actual cost of $1.00 per day per detainee. The contractor shall not exceed the quantity shown without prior approval by the Contracting Officer.<br>Option Period 3<br>(Option Line Item)<br>09/16/2017<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | 76650 | DA | 1.00 | 76,650.00 |
| 3005 | MEDICAL SERVICES-In accordance with the terms and conditions of this contract.  Monthly Flat Fixed Fee includes all medical staff and in-house supplies.<br>Option Period 3<br>(Option Line Item)<br>09/16/2017<br>Product/Service Code:  Q201<br>Product/Service Description: GENERAL HEALTH CARE SERVICES<br><br>OPTION PERIOD 4: 09/16/2019 - 09/15/2021<br><br>Continued ... | 24 | MO | 228,414.20 | 5,481,940.80 |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

CONFIDENTIAL

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED HSCEDM-11-D-00003 | PAGE 10 | OF 92 |
|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| 4001 | Contractor Owned Contractor Operated Detention Facility in accordance with the terms and conditions of this contract. Offeror shall provide fully burdened bed day rates only. Unit of Issue DA is equivalent to bed-day. (Option Line Item) 09/16/2019 Product/Service Code:  S206 Product/Service Description: GUARD SERVICES | | | | 0.00 |
| 4001A | Bed Day Rate For Minimum Quantity - The Governments minimum quantity to be ordered via task order is 350 beds per day multiplied by 365 days multiplied by 2 years plus 1 day for leap in 2020 for a total of 255,850. Option Period 4 (Option Line Item) 09/16/2019 Product/Service Code:  S206 Product/Service Description: GUARD SERVICES | 255850 | DA | 153.71 | 39,326,703.50 |
| 4001B | Bed Day Rate In Excess Of Minimum Quantity - The Government may order an additional quantity estimated to be 175 beds (350 to 525 beds) per day multiplied by 365 days multiplied by 2 years plus 1 day for a total not to exceed 127,925. Option Period 4 (Option Line Item) 09/16/2019 Product/Service Code:  S206 Product/Service Description: GUARD SERVICES | 127925 | DA | 22.99 | 2,940,995.75 |
| 4002 | TRANSPORTATION SERVICES IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THIS CONTRACT. (Option Line Item) 09/16/2019 Product/Service Code:  S206 Product/Service Description: GUARD SERVICES | | | | 0.00 |
| 4002A | TRANSPORTATION SERVICES - Monthly Flat Fixed Fee includes all staff, vehicles and vehicle maintenance. (Option Line Item) 09/16/2019 Product/Service Code:  S206 Product/Service Description: GUARD SERVICES | 24 | MO | 168,331.98 | 4,039,967.52 |
| 4002B | Direct Fuel Pass-Thru. Vendor Bill exact cost paid at the pump on a monthly basis.  No fees or mark-ups are allowed.  Not to exceed $54,000. Continued ... | | | | 54,000.00 |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

CONFIDENTIAL

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>HSCEDM-11-D-00003 | | | PAGE<br>11 | OF<br>92 |
|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | (Option Line Item)<br>09/16/2019<br>Product/Service Code:  AD55 | | | | |
| 4003 | Remote Custody<br>These estimated hours are for detainee medical<br>trips/visits and associated waiting time for<br>detention officers only, not to exceed 4,000<br>hours.<br>Option Period 4<br>(Option Line Item)<br>09/16/2019<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | 4000 | HR | 49.00 | 196,000.00 |
| 4004 | Stipend for Detainee Work Program - Reimbursement<br>for this line item will be at actual cost of<br>$1.00 per day per detainee. The contractor shall<br>not exceed the quantity shown without prior<br>approval by the Contracting Officer.<br>Option Period 4<br>(Option Line Item)<br>09/16/2019<br>Product/Service Code:  S206<br>Product/Service Description: GUARD SERVICES | 76650 | DA | 1.00 | 76,650.00 |
| 4005 | MEDICAL SERVICES-In accordance with the terms and<br>conditions of this contract.  Monthly Flat Fixed<br>Fee includes all medical staff and in-house<br>supplies.<br>Option Period 4<br>(Option Line Item)<br>09/16/2019<br>Product/Service Code:  Q201<br>Product/Service Description: GENERAL HEALTH CARE<br>SERVICES<br><br>The total amount of award: $245,985,498.17. The<br>obligation for this award is shown in box 15G. | 24 | MO | 234,218.16 | 5,621,235.84 |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

CONFIDENTIAL

# Table of Contents

**PART I - SECTION A**
Solicitation Standard Form 33 …….……..…………………………………………..   **Pg 1**

**PART I - SECTION B**
Supplies or Services ……………………………………………………………   **Pg 2**

**PART I - SECTION C**
Description/Specifications for Contractor-Owned, Contractor-Operated
   Detention Facility in the Denver Metropolitan Area ……………………………   **Pg 12**

**PART I - SECTION D**
Packaging and Marking ……………………………………………………………   **Pg 35**

**PART I - SECTION E**
Inspection and Acceptance ……………………………………………………………   **Pg 36**

**PART I - SECTION F**
Deliveries of Performance …….……………………………………………………   **Pg 37**

**PART I - SECTION G**
Contract Administration Data …………………………………………………………   **Pg 39**

**PART I - SECTION H**
Special Contract Requirements …………………………………………………………   **Pg 42**

**PART II - SECTION I**
Contract Clauses …………………………………………………………………   **Pg 78**

**PART III - SECTION J**
List of Documents, Exhibits and Other Attachments ………….…………………   **Pg 92**

CONFIDENTIAL

**SECTION C – DESCRIPTION/SPECIFICATIONS FOR CONTRACTOR-OWNED, CONTRACTOR-OPERATED DETENTION FACILITY IN THE DENVER METROPOLITAN AREA**

I.   **INTRODUCTION**

A.   **Background**

The United States Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE) is responsible for the detention, health, welfare, transportation, and removal of detainees, and those subject to final order of removal from the United States.  ICE houses detainees in Contract Detention Facilities (CDF) and other federal, state, local, and private facilities.

B.   **Mission**

The mission of the Enforcement and Removal Operations (ERO) Program is the planning, management, and direction of broad programs relating to the supervision, detention, and removal of detainees who are in the United States illegally.  These activities are chiefly concerned with the processing and enforcement of departure from the United States of detainees who have entered illegally or have become removable after admission.

In implementing its mission, ERO is responsible for carrying out all orders for the required departure of detainees handed down in removal proceedings, or prior thereto, and arranging for detention of detainees when such detention becomes necessary.

C.   **Statement of Objectives (SOO)**

The Statement of Objectives (SOO) (Attachment 2) is for performance-based services and applies to designated ICE solicitations and contracts for detention, transportation, food services and medical services at the Contractor-Owned and Contractor-Operated Facility. This SOO sets forth the contract objectives and other relevant information that applies to solicitations and contracts that incorporate this SOO.

D.   **Performance Work Statement (PWS)**

The GEO Group's proposal, Attachment 3 to the contract, constitutes the PWS.  All documents are hereby incorporated into the contract.

**Contract Objectives**

1.   A fully controlled, secured, safe, and supervised facility for DHS ICE detainees in accordance with information and guidelines contained in this contract.

2.   The staffing of fully trained, knowledgeable and responsive detention officers (armed and unarmed) and support personnel, including managers, who have proper security clearances and efficiently carry out the law enforcement and administrative duties required by the contract, laws and regulations.

3.   The timely acquiring and/or accomplishing of training, certifications, licenses, drug testing, uniforms, equipment, supplies and vehicles necessary to provide the full range of required detention and transportation services seven (7) days a week, twenty-four (24) hours per day throughout the contract period of performance.

12

GEO_MEN 00019625

**Specific Objectives**

**Emergency Plans**

1. The facility will have in place contingency plans to quickly and effectively respond to any emergency situations that arise and to minimize their severity.

2. Staff will be trained at least annually in emergency preparedness and implementation of the facility's emergency plans.

3. An evacuation plan will be in place in the event of a fire or other major emergency, and the plan will be locally approved in accordance with this Detention Standard and updated at least annually.

4. Events, staff responses, and command-related decisions during and immediately after emergency situations will be accurately recorded and documented.

5. Plans will include procedures for handling detainees with special needs during an emergency or evacuation.

6. The applicable content and procedures in this standard will be communicated in a language or other manner that the detainee can understand.

**Environmental Health and Safety**

1. Facility cleanliness and sanitation will be maintained at the highest level.

2. Compliance with all applicable safety and sanitation laws will be ensured by documented internal and external inspections and corrective action when indicated.

3. Compliance with all applicable fire safety codes and fire safety performance requirements for the facility furnishings will be ensured.

4. Flammable, poisonous, toxic, and caustic materials will be controlled and used in a safe manner.

5. Compliance with fire prevention regulations, inspection requirements, and practices, including periodic fire drills, will ensure the safety of detainees, staff, and visitors.

6. Staff will be trained and knowledgeable about procedures and responsibilities during emergency situations, including those that require evacuation, in accordance with a written plan and at least annual training.

7. The facility will have a plan for immediate release of detainees from locked areas and provisions for a back-up system.

8. A sufficient number of properly positioned emergency exits that are clear from obstruction will be distinctly and permanently marked.

9. Preventive maintenance and regular inspections will be performed to ensure timely emergency repairs or replacement to prevent dangerous and life-threatening situations.

10. Potential disease transfer will be minimized by the proper sanitization of barbering equipment and supplies.

11. Pests and vermin will be controlled and eliminated.

13

12. Safe potable water will be available throughout the facility.

13. Emergency lighting and life-sustaining equipment will be maintained and periodically tested.

14. Disposal of garbage and hazardous waste will be in compliance with applicable government regulations.

15. The applicable content and information in this standard will be communicated in a language or manner that the detainee can understand.

**Transportation (by Land)**

1. The general public, detainees, and staff will be protected from harm when detainees are transported.

2. Vehicles used for transporting detainees will be properly equipped, maintained, and operated.

3. Detainees will be transported in a safe and humane manner, under the supervision of trained and experienced staff.

4. To the extent practicable, reasonable accommodations (e.g. wheelchairs, canes) will be made for detainees with physical disabilities and impairments in accordance with security and safety needs.

**Admission and Release**

1. Upon admission, each detainee will be screened to ensure facility safety, security, and good order.  Strip searches will only be done when articulable facts supporting the conclusion that reasonable suspicion exists. All facts should be documented on form G1025 (Record of Search).

2. Upon admission, each detainee's personal property and valuables will be checked for contraband, inventoried, receipted, and stored.

3. Each detainee's identification documents will be secured in the detainee's detention file.

4. Upon admission, each detainee will be medically screened to protect the health of the detainee and others in the facility.

5. Upon admission, each detainee will be given an opportunity to shower and be issued clean clothing, bedding, towels, and personal hygiene items.

6. Upon admission, each detainee will undergo screening interviews and complete questionnaires and other forms.

7. Each newly admitted detainee will be kept separated from the general population until classified and then housed accordingly.

8. Each newly admitted detainee will be oriented to the facility through written material on facility policies, rules, prohibited acts, and procedures and, in some facilities, by viewing an orientation video, in a language or manner he or she can understand.

9. Detainees will be released, removed, or transferred from a facility only when ICE/ERO staff have followed specified procedures and completed required forms.

14

10. The facility will maintain accurate records and documentation on all detainees' admission, orientation, and release.

11. Detainees will be given an opportunity to make a three minute telephone call during admission process. All calls will be logged.

12. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Classification System**

1. The community, staff, contractors, volunteers, and detainees will be protected from harm through a formal classification process for managing and separating detainees by threat risk that is based on verifiable and documented data.

2. Each detainee will be expeditiously classified upon admission to the facility and before being admitted into general population housing.

3. Non-criminal detainees will be protected from harm by assigning detainees housing with persons of similar backgrounds and criminal history.

4. Each detainee's classification will be reviewed at regular intervals, when required by changes in the detainee's behaviour or circumstances, or upon discovery of additional, relevant information.

5. Detainees will be able to appeal their classification levels.

6. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Contraband**

1. Contraband will be identified, detected, controlled, and disposed of properly.

2. Detainee personal property that would be considered contraband within the facility will be mailed to a third party or stored until the detainee's release, unless that property is illegal or a threat to safety or security.

3. Contraband that may be evidence in connection with a violation of a criminal statute will be preserved, inventoried, controlled, and stored so as to maintain and document the chain of custody.

4. The applicable content and procedures in this standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Facility Security and Control**

1. Essential security posts and positions will be staffed with qualified personnel.

2. Facility security and safety will be monitored and coordinated by a secure, well equipped, and continuously staffed control center.

3. The facility's perimeter will ensure that detainees remain within and that public access is denied without proper authorization.

4. Information about routine procedures, emergency situations, and unusual incidents will be continually recorded in permanent post logs and shift reports.

15

CONFIDENTIAL

5. Facility safety, security and good order, including the safety, health and well-being of staff and detainees, will be enhanced through ongoing observation, supervision, and personal contact and interaction between staff and detainees.

6. Special security and control measures will consistently be applied to Special Management Unit entrances.

**Funds and Personal Property**

1. The security, safety and good order of each facility will be maintained through an immediate search of each newly admitted detainee's property.

2. Each detainee's funds, valuables, baggage, and personal property will be inventoried, receipted, stored and safeguarded for the duration of their detention.

3. Each detainee will be informed about what funds and property may be retained in his or her possession and about procedures to report missing or damaged property.

4. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Hold Rooms in Detention Facilities**

1. Safety, security, and comfort of detainees temporarily confined in Hold Rooms will be ensured.

2. No detainee will be confined in a Hold Room for more than twelve hours.

3. Males and females will be confined separately.

4. Minor (under 18 will be held apart from adults, except for related adults or legal guardians, provided there are no safety or security concerns with this arrangement. Please note this facility does not house minors.

5. Any detainee with disabilities, including temporary disabilities, will be housed in a manner that provides for his or her safety, comfort and security.

6. Detainees awaiting a medical visit will be seen as promptly as possible.

**Key and Lock Control**

1. All staff will be trained in the proper care and handling of keys and locks.

2. Keys will be controlled and accounted for.

3. Locks and locking devices will be continually inspected, maintained, and inventoried.

4. Employees will store their firearms in secure gun lockers before entering the facility.

**Population Counts**

1. Security, safety, and orderly facility operations will be maintained through an ongoing, effective system of population counts every shift and accountability for detainees.

16

**Post Orders**

1. Each detention officer will have current written Post Orders that specifically apply to the assigned post, with step-by-step procedures in sufficient detail to guide an officer assigned to that post for the first time.

2. Signed and dated records will be maintained to show that assigned officers acknowledged that they read and understood the Post Orders.

3. Post Orders will be formally reviewed annually and updated as needed.

**Searches of Detainees**

1. Detainees will live and work in a safe and orderly environment.

2. Contraband will be controlled.

3. Searches of detainees, housing, and work areas will be conducted without unnecessary force and in ways that preserve the dignity of detainees.

4. When body searches are conducted, the least intrusive practicable search method will be employed, as indicated by the type of contraband and the method of suspected introduction or concealment.

5. Pat searches of detainees and metal detector screening will be conducted routinely to control contraband.

6. A strip search will be conducted only when there is reasonable suspicion that contraband may be concealed on the person, or when there is a reasonable suspicion that a good opportunity for concealment has occurred, and when properly authorized by a supervisor.

7. A body cavity search will be conducted by designated health personnel only when authorized by the facility administrator on the basis of reasonable suspicion that contraband may be concealed in or on the detainee's person.

8. "Dry cells" will be used for contraband detection only when there is reasonable suspicion of concealment, with proper authorization, and in accordance with required procedures.

9. Contraband that may be evidence in connection with a violation of a criminal statute will be preserved, inventoried, controlled, and stored so as to maintain and document the chain of custody.

10. Canine units (in facilities that have them) may be used for contraband detection when detainees are not present, but canine use for force, intimidation, control, or searches of detainees is prohibited.

11. The applicable contents and procedures in the applicable ICE detention standard will be communicated to the detainee in a language or manner that the detainee can understand.

CONFIDENTIAL                                                          GEO_MEN 00019630

**Sexual Abuse and Assault Prevention and Intervention**

1. Sexual abuse and assault of detainees will be prevented.

2. Detainees will be informed about the facility's sexual abuse or assault prevention and intervention program.

3. Detainees will be screened to identify those likely to be sexual aggressors or sexual victims and will be housed to prevent sexual abuse or assault. Detainees who are considered likely to become victims will be placed in the least restrictive housing that is available and appropriate.

4. All allegations of sexual abuse or assault will be promptly and effectively reported and investigated. Detainees will not be punished for truthfully reporting abuse or signs of abuse observed.

5. If sexual abuse or assault of any detainee occurs, the medical, psychological, safety, and social needs of the victim will be promptly and effectively met.

6. Where possible and feasible, a victim of sexual assault will be referred under appropriate security provisions to a specialized community facility for treatment and gathering of evidence.

7. Assailants will be confined and disciplined and may be subject to criminal prosecution.

8. Sexual conduct between detainees, staff, volunteers, or contract personnel, regardless of consensual status, is prohibited and subject to administrative, disciplinary, and criminal sanctions.

9. All case records associated with claims of sexual abuse, including incident reports, investigative reports, offender information, case disposition, medical and counselling evaluation findings, and recommendations for post-release treatment and/or counselling will be retained in accordance with an established schedule.

10. For monitoring, evaluating, and assessing the effectiveness of the sexual abuse and assault prevention and intervention program, incidents of sexual abuse and assault will be specifically documented and tracked as specified in this Detention Standard (in addition to standard facility operational and disciplinary documentation of any assault).

11. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Special Management Units**

1. Each facility will have Special Management Units (SMU) with an Administrative Segregation section for detainees segregated from the general population for administrative reasons and a Disciplinary Segregation section for detainees segregated from the general population for disciplinary reasons.

2. Detainees housed in the general population, staff, contractors, volunteers, and the local community will be protected from harm by the segregation of certain detainees in SMUs.

18

3.  Any detainee who represents an immediate, significant threat to safety, security or good order will be immediately controlled by staff, for cause, and with supervisory approval, placed in Administrative Segregation.

4.  Health care personnel will be immediately informed when a detainee is admitted to an SMU to provide assessment and review as indicated by health care authority protocols.

5.  A detainee will be placed in "protective custody" status in Administrative Segregation only when there is documentation that it is warranted and that no reasonable alternatives are available.

6.  A detainee will be placed in Disciplinary Segregation only after a finding by a Disciplinary Hearing Panel that the detainee is guilty of a prohibited act or rule violation classified at a "Greatest", "High", or "High-Moderate" level, as defined in the Detention Standard on Disciplinary System.

7.  The status of detainees in Special Management Units will be reviewed in accordance with required time schedules by supervisory staff and the results of those reviews will be documented.

8.  A detainee will remain in Disciplinary Segregation for no more than 60 days for violations associated with a single incident, and his or her status will be reviewed after the first 30 days, and each 30 days thereafter by the facility administrator and the Field Office Director to determine if continued detention in Disciplinary Segregation is still warranted.

9.  Detainees in SMUs will be afforded basic living conditions that approximate those provided to the general population, consistent with the safety and security considerations that are inherent in more controlled housing, and in consideration of the purpose for which each detainee is segregated.

10. In general, when a detainee in an SMU is deprived of any usually authorized items or activity, a report of the action is forwarded to the facility administrator for notice and review.

11. Detainees in SMUs will have regular access to supervisory, management, program, and health care staff.

12.  Each detainee in an SMU will be offered a minimum of one hour of recreation per day, five days a week, unless documented security or safety considerations dictate otherwise.

13. Detainees in SMUs will be able to write and receive mail and correspondence as they would otherwise be able to do while detained within the general population.

14. Detainees in SMUs will be provided opportunities for general visitation, including legal visitation, unless there are substantial, documented reasons for withholding those privileges.

15. Detainees in SMUs will have access to personal legal materials, law library materials, and legal visits, in accordance with provisions in this Detention Standard.

19

16. Detainees in SMUs will have access to telephones, in accordance with provisions in this Detention Standard.

17. Detainees in SMUs will have access to programs and services such as commissary, library, religious guidance, and recreation, in accordance with provisions in this Detention Standard.

18. Detailed records will be maintained on the circumstances related to a detainee's confinement to the SMU, through required permanent SMU logs and individual detainee records.

19. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Staff Detainee Communication**

1. Detainees will have frequent opportunities for informal contact with facility managerial and supervisory staff and with ICE/ERO Field Office staff.

2. Facility managerial and supervisory staff and ICE/ERO Field Office staff will frequently and directly observe facility operations and conditions of confinement.

3. Detainees will be able to submit written questions, requests, and concerns to ICE/ERO staff and receive timely responses.

4. Detainees will be informed about how to directly contact the Department of Homeland Security Office of the Inspector General.

5. Detainee telephone serviceability will be monitored and documented by ICE staff and any problems immediately reported.

6. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Tool Control**

1. Tools, maintenance implements, culinary utensils, medical and dental instruments, equipment, and supplies (particularly syringes, needles, and other sharps) will be maintained on an inventory, continually controlled and accounted for to insure the safe and orderly operation of the facility.

**Use of Force and Restraints**

1. Physical force will be used only as a last resort and is restricted to instances of justifiable self-defence, protection of others, protection of property, and prevention of escapes.

2. Facilities will endorse the concept that confrontation avoidance is the recommended method for resolving situations and should always be attempted prior to any calculated use of force.

3. Physical force or restraint devices will not be used as punishment.

4. In circumstances when prior supervisory approval is required, restraints will not be applied without that approval.

20

5. Four/five-point restraints will be applied only in extreme circumstances and only where other types of restraints have proven ineffective. Advance approval is required, as is prompt notification of and examination by the medical staff. These restraints will be continued only in accordance with required procedures and documentation.

6. Intermediate force devices will be used only in circumstances prescribed herein, with required prior approvals.

7. All weapons and related equipment will be stored securely in designated areas to which only authorized persons have access.

8. Chemical agents and related security equipment will be inventoried at least monthly to determine their condition and expiration dates.

9. A written record of routine and emergency distribution of security equipment will be maintained.

10. An employee will submit a written report no later than the end of his or her shift when force was used on any detainee for any reason, or if any detainee remains in any type of restraints at the end of that shift. This includes discharge of a firearm and use of less lethal devices to control detainees.

11. Telephonic notification to the Field Office Director (FOD) shall occur as soon as practicable. The FOD will be notified of any use-of-force incident involving an ICE detainee within two business days via an incident report.

12. Canines will not be used for force, control or intimidation of detainees.

13. Facilities will adhere to DHS' Use of Deadly Force Policy.

14. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Disciplinary System**

1. Detainees will be informed of facility rules and regulations, prohibited acts, disciplinary sanctions that may be imposed, their rights in the disciplinary system and the procedure for appealing disciplinary findings.

2. The facility will have graduated severity scales of prohibited acts and disciplinary consequences.

3. Where permitted by facility policy, staff will informally settle minor transgressions by mutual consent, whenever possible.

4. Staff who witness a prohibited act that cannot or should not be resolved informally, or have reason to suspect that a detainee has engaged in a prohibited act, will prepare a clear, concise, and complete Incident Report.

5. Each Incident Report will be objectively and impartially investigated and reported, ordinarily by a person of supervisory rank.

6. When appropriate, a serious incident that may constitute a criminal act will be referred to the proper investigative agency, and the administrative investigation will be suspended, pending the outcome of that referral.

CONFIDENTIAL

GEO_MEN 00019634

7. When appropriate, a serious incident that may constitute a criminal act will be referred to the proper investigative agency, and the administrative investigation will be suspended, pending the outcome of that referral.

8. At each step of the disciplinary and appeal process, the detainee will be advised of his or her rights in a language he or she understands, and translation or interpretation services will be provided as needed.

9. A Unit Disciplinary Committee (UDC) will further investigate and adjudicate the incident and may impose minor sanctions or refer the matter to a higher level disciplinary panel.

10. An Institution Disciplinary Panel (IDP) will conduct formal hearings on Incident Reports referred from UDCs and may impose higher level sanctions for "Greatest" and "High" level prohibited acts.

11. Detainees before the IDP will be afforded a staff representative, upon request, or automatically if the detainee is illiterate, has limited English language skills or otherwise needs special assistance.

12. Actions of the IDP will be reviewed by the facility administrator, who may concur with the findings and sanctions or modify them.

13. At all steps in the disciplinary process, any sanctions imposed will be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

14. All steps of the disciplinary process will be done within the required time limits.

15. At all steps of the disciplinary process, accurate and complete records will be maintained. The detainee will receive copies of all reports, exhibits, and other documents considered or generated in the hearing process, except insofar as the disclosure of such documents may pose an imminent threat to the safety and security of the facility staff or other detainees, or if the document or other evidence is otherwise protected from disclosure.

16. If a detainee is found not guilty at any stage of the disciplinary process, the incident records will not be placed or retained in the detainee's file, even if they are retained elsewhere for statistical or historical purposes.

17. Detainees will be able to appeal disciplinary decisions through a formal grievance system. No detainee will be harassed, disciplined, punished or otherwise retaliated against for filing a complaint or grievance.

18. Detainees shall be afforded the following rights: the right to protection from abuse, the right to freedom from discrimination, the right to pursue a grievance, the right to correspond with persons or organizations and the right to due process.

19. The applicable content and procedures in this standard will be communicated to the detainee in a language or manner that the detainee can understand.

22

GEO_MEN 00019635

**Food Service**

1. All detainees will be provided nutritionally balanced diets that are reviewed at least quarterly by food service personnel and at least annually by a qualified nutritionist or dietician.

2. Detainees, staff and others will be protected from harm and facility order will be maintained by the application of sound security practices in all aspects of food service and dining room operations.

3. Detainees, staff, and others will be protected from injury and illness by adequate food service training and the application of sound safety and sanitation practices in all aspects of food service and dining room operations.

4. Dining room facilities and operating procedures will provide sufficient space and time for detainees to eat meals in a relatively relaxed, unregimented atmosphere.

5. Food service facilities and equipment will meet established governmental health and safety codes, as documented by an independent, outside source.

6. Detainees, staff, and others will be protected from health-related harm by advance medical screening and clearance before any detainee is assigned to work in food service operations.

7. Food service areas will be continuously inspected by food service staff and other assigned personnel on schedules determined by the food service administrator and by applicable policy requirements.

8. Stored food goods will be maintained in accordance with required conditions and temperatures.

9. Therapeutic medical diets and supplemental food will be provided as prescribed by appropriate clinicians.

10. Special diets and special ceremonial meals will be provided for detainees whose religious beliefs require the adherence to religious dietary laws.

11. Detainees will receive a religious or special diet free of any personal cost.

12. Food will never be used for reward or punishment.

**Hunger Strikes**

1. Any detainee who does not eat for 72 hours will be referred to the medical department for evaluation and possible treatment.

2. When medically advisable, a detainee on a hunger strike will be isolated for close supervision, observation, and monitoring.

3. The ICE/ERO Field Office Director (FOD) will be notified when a detainee is on a hunger strike.

4. The detainee's health will be carefully monitored and documented, as will the detainee's intake of foods and liquids.

5. A detainee on a hunger strike will be counselled and advised of the medical risks and will be encouraged to end the hunger strike or accept medical treatment.

23

6.  Involuntary medical treatment will be administered only with the medical, psychiatric, and legal safeguards specified herein.

7.  A record of interactions with the striking detainee, provision of food, attempted and successful medical treatment, and communications between the Clinical Medical Authority, Facility Administrator, and ICE/ERO will be established.

8.  The information in this detention standard will be communicated in a language or other manner that the detainee can understand.

**Medical Care**

1.  Detainees will have access to a continuum of health care services, including prevention, health education, diagnosis, and treatment.

2.  Health care needs will be met in a timely and efficient manner.

3.  Newly admitted detainees will be informed, orally and in writing, about how to access health services.

4.  Detainees will be able to initiate requests for health services on a daily basis.

5.  Detainees will receive timely follow-up to their health care requests.

6.  Detainees will have continuity of care from admission to transfer, discharge, or removal, including referral to community-based providers when indicated.

7.  A detainee who needs health care beyond facility resources will be transferred in a timely manner to an appropriate facility where care is available.  A written list of referral sources, including emergency and routine care, will be maintained as necessary and updated at minimum annually.

8.  A transportation system will be available that ensures timely access to health care services that are only available outside the facility, including prioritization of medical need, urgency (such as the use of ambulance instead of standard transportation) and transfer of medical information.

9.  A detainee who requires close, chronic or convalescent medical supervision will be treated in accordance with a written plan approved by licensed physician, dentist, or mental health practitioner that includes directions to health care providers and other involved medical personnel.

10. Detainees will have access to specified 24-hour emergency medical, dental, and mental health services.

11. Minimum requirements for medical housing units will be met.

12. Female detainees will undergo pregnancy testing and pregnancy management services.

13. Screening, prevention and control measures will be utilized to assist in prevention and management of infectious and communicable diseases.

14. Bio-hazardous waste will be managed and medical and dental equipment decontaminated in accordance with standard medical practices and in compliance with applicable laws.

24

GEO_MEN 00019637

15. Detainees with chronic conditions will receive care and treatment for conditions where non-treatment would result in negative outcomes or permanent disability as determined by the clinical medical authority.

16. The facility administrator will develop a plan to ensure that ICE is notified in writing of any detainee whose special medical or mental health needs require special consideration in such matters as housing, transfer, or transportation.

17. Detainees will have access to emergency and specified routine dental care provided under direction and supervision of a licensed dentist.

18. Detainees will be provided health education and wellness information.

19. Each newly admitted detainee, including transfers, will receive a documented medical, dental, and mental health screening upon intake and, within 14 days of arrival, a comprehensive health appraisal by qualified personnel in a private setting as practicable to ensure safety.

20. Detainees with suspected or known mental health concerns will be referred as needed for evaluation, diagnosis, treatment, and stabilization

21. Mental health crisis intervention services will be identified and available for detainees who experience acute mental health episodes.

22. Restraints for medical or mental health purposes will be authorized only by the facility's clinical medical authority, in accordance with the requirements specified in this Detention Standard.

23. Prior to placement in a non-detention facility or special unit within the facility specifically designated for the care of the severely mentally ill or developmentally disabled, a detainee shall be afforded due process in compliance with applicable laws.

24. Medical and dental orthodontist or prostheses and other aids to impairment are supplied in a timely manner when the health of the detainee would otherwise be adversely affected, as determined by the responsible physician or dentist.

25. Detoxification from alcohol, opiates, hypnotics, other stimulants, and sedatives is done only under medical supervision in accordance with applicable laws.

26. Pharmaceuticals and non-prescription medicines will be secured, stored and inventoried.

27. Prescriptions and medications will be ordered, dispensed, and administered in a timely and sufficient manner as prescribed by a health care professional.

28. Health care services will be administered by the health administrative authority, and clinical decisions will be the sole province of the clinical medical authority.

29. Health care services will be provided by a sufficient number of appropriately trained and qualified personnel, whose duties are governed by thorough and detailed job descriptions and who are verifiable licensed, certified, credentialed, and/or registered in compliance with applicable state and federal requirements.

CONFIDENTIAL                                                                                           GEO_MEN 00019638

30. Detention and health care personnel will be trained, initially and annually, to respond to health-related emergency situations within four minutes and in the proper use of emergency medical equipment.

31. Information about each detainee's health status will be treated as confidential, and health records will be maintained in accordance with accepted standards separately from other detainee detention files and be accessible only in accordance with written procedures and applicable laws.  Health record files on each detainee will be well organized, available to all practitioners, and properly maintained and safeguarded.

32. Informed consent standards will be observed and adequately documented.  Staff will make reasonable efforts to ensure that detainees understand their medical condition and care.

33. Medical and mental health interviews, screenings, appraisals, examinations, and procedures will be conducted in settings that respect detainees' privacy in accordance with safe and orderly operations of the facility.

34. Detainees will be provided same sex chaperones as appropriate or as requested.

35. When a detainee is transferred to another facility, the transferring facility will send a completed medical transfer summary and other medical documentation as appropriate to the receiving facility.

36. Detainees in Special Management Units will have access to the same health care services as detainees in the general population.

37. Non-English speaking detainees and/or detainees who are deaf and/or hard at hearing will be provided interpretation/translation services or other assistance as needed for medical care activities.

38. Detainees with special needs, including physical or developmental disabilities will be evaluated and given the appropriate care and communication their situation requires.

**Personal Hygiene**

1. Each facility will maintain an inventory of clothing, bedding, linens, towels and personal hygiene items that is sufficient to meet the needs of detainees.

2. Each detainee will have suitable, clean bedding, linens, blankets, and towels.

3. Each detainee will have sufficient clean clothing that is properly fitted, climatically suitable, durable, and presentable.

4. Detainees will be held accountable for clothing, bedding, linens, and towels assigned to them.

5. Detainees, including those with disabilities, will be able to maintain acceptable personal hygiene practices.

**Suicide Prevention and Intervention**

1. All staff responsible for supervising detainees will be trained, initially during orientation and at least annually, on effective methods of suicide prevention and intervention with detainees.

26

2. Staff will act to prevent suicides with appropriate sensitivity, supervision, and medical referrals.

3. Any clinically suicidal detainee will receive preventive supervision, treatment, and therapeutic follow-up, in accordance with ICE policy.

4. The information in this standard will be communicated in a language or manner that the detainee can understand.

**Terminal Illness, Advance Directives, and Death**

1. The continuum of health care services provided detainees will address terminal illness, fatal injury, and advance directives.

2. Each detainee who has a terminal illness or potentially fatal injury will receive medical care consistent with standard medical practices.

3. In the event of a detainee's death, specified officials and the detainee's designated next of kin will be immediately notified.

4. In the event of a detainee's death, required notifications will be made to authorities outside of ICE/ERO (such as the local coroner or medical examiner), and required procedures will be followed regarding such matters as autopsies, death certificates, burials, and the disposition of decedent's property. Established guidelines and applicable laws will be observed in regard to notification of a detainee death while in custody.

5. The medical records of detainees addressed herein will be complete.

6. The information in this standard will be communicated in a language or manner that the detainee can understand.

**Correspondence and Other Mail**

1. Detainees will be able to correspond with their families, the community, legal representatives, government offices, and consular officials.

2. Detainees will be notified of the facility's rules on correspondence and other mail through the Detainee Handbook, or supplement, which is provided to each detainee upon admittance.

3. The amount and content of correspondence detainees send at their own expense will not be limited except to protect public safety or facility security and order.

4. Indigent detainees will receive a specified postage allowance to maintain community ties and necessary postage for privileged correspondence.

5. Detainees will have access to general interest publications.

6. Incoming and outgoing mail, with the exception of Special Correspondence and Legal Mail, will be opened to inspect for contraband and to intercept cash, checks, and money orders.

7. General correspondence will be read or rejected only to protect the safe, secure and orderly operation of the facility, and detainees will be notified in writing when correspondence is withheld in part or in full.

27

GEO_MEN 00019640

8. Detainees will be permitted to send Special Correspondence and Legal Mail to a specified class of persons and organizations, and incoming mail from these persons will opened only in the presence of the detainees (unless waived) to check for contraband (except when contamination is suspected).

9. Incoming and outgoing letters will be held for no more than 24 hours and packages no more than 48 hours before distribution, excluding weekends, holidays, or exceptional circumstances.

10. Detainees in SMUs will have the same correspondence privileges as detainees in the general population.

11. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Escorted Trips for Non-Medical Emergencies**

1. Within the constraints of safety and security, selected detainees will be able to visit critically ill members of the immediate family or to attend their funerals, while under constant staff supervision.

2. Safety and security will be primary considerations in planning, approving, and escorting a detainee out of a facility for a non-medical emergency.

**Marriage Requests**

1. Each marriage request from an ICE/ERO detainee will receive a case-by-case review.

2. Consistency in decisions to approve or deny a marriage request will be achieved by the application of guidelines.

3. Ordinarily, a detainee's request for permission to marry will be granted.

**Recreation**

1. Detainees will have daily opportunities to participate in leisure-time activities outside their respective cells or rooms.

2. Detainees will have access to exercise opportunities and equipment, including at least one hour daily of physical exercise outside the cell, and outdoors, when practicable.

3. Any detainee housed in a facility that cannot meet minimum standards for indoor and outdoor recreation will be considered for voluntary transfer to a facility that does.

4. Each detainee in an SMU will receive (or be offered) a minimum of one hour of exercise per day, five days a week, unless documented security or safety considerations dictate otherwise.

5. Each citizen volunteer who provides or participates in facility recreational programs will complete an appropriate, documented orientation program and sign an acknowledgement of his or her understanding of the applicable rules and procedures and agreement to comply with them.

**Religious Practices**

1. Detainees will have opportunities to participate in practices of their religious faith that are deemed essential by that faith, limited only by a documented showing of threat to

28

GEO_MEN 00019641

the safety of persons involved in such activity itself, or disruption of order in the facility.

2. All religions represented in a detainee population will have equal status without discrimination based on any detainee's race, ethnicity, religion, national origin, gender, sexual orientation, or disability.

3. Each facility's religious program will be planned, administered, and coordinated in an organized and orderly manner.

4. Adequate space, equipment and staff (including security and clerical) will be provided for conducting and administering religious programs.

5. Detainees of faiths not directly represented by chaplaincy staff will be assisted in contacting external clergy or religious service providers.

6. Each facility's religious program will be augmented and enhanced by community clergy, contractors, volunteers and groups that provide individual and group assembly religious services and counselling.

7. Detainees in Special Management Units and hospital units will have access to religious programs and services.

8. Special diets will be provided for detainees whose religious beliefs require the adherence to religious dietary laws.

9. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Telephone Access**

1. Detainees will have reasonable and equitable access to reasonably priced telephone services.

2. Detainees with hearing or speech disabilities will have reasonable accommodations to allow for appropriate telephone services.

3. Detainees in Special Management Units will have access to telephones, commensurate with facility security and good order.

4. Detainees will be able to make free calls to the ICE/ERO-provided list of free legal service providers for the purpose of obtaining initial legal representation, to consular officials and to the DHS Office of Inspector General.

5. Telephone access procedures will foster legal access.

6. Telephones will be maintained in proper working order.

7. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Visitation**

1. Detainees will be able to receive visits from their families, associates, legal representatives, consular officials, and others in the community.

CONFIDENTIAL                                                                GEO_MEN 00019642

2. Visits between legal representatives and assistants and an individual detainee are confidential and shall not be subject to auditory supervision.  Private consultation rooms shall be available for such meetings.

3. Detainees will be advised of their right to contact their consular representatives and receive visits from their consulate officers

4. Detainees will be advised of visiting privileges and procedures as part of the facility's admission and orientation program in a language they can understand.

5. Information about visiting policies and procedures will be readily available to the public.

6. The number of visitors a detainee may receive and the length of visits will be limited only by reasonable constraints of space, scheduling, staff availability, safety, security, and good order.  The minimum duration for a visit shall be 30 minutes.

7. Visitors will be required to adequately identify themselves and register to be admitted into a facility, and safety, security and good order will be maintained.

8. A background check will be conducted on all new volunteers prior to their being approved to provide services to detainees.

9. Each new volunteer will complete an appropriate, documented orientation program and sign an acknowledgement of his or her understanding of the applicable rules and procedures and agreement to comply with them.

10. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Voluntary Work Program**

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of safety, security, and good order.

2. Detainees will be able to volunteer for work assignments but otherwise not be required to work, except to do personal housekeeping.

3. Essential operations and services will be enhanced through productivity from detainees.

4. The negative impact of confinement will be reduced through less idleness, improved morale and fewer disciplinary incidents.

5. Detainee working conditions will comply with all applicable federal, state, and local work safety laws and regulations.

6. There will be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation, or disability.

7. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

30

GEO_MEN 00019643

**Detainee Handbook**

Upon admission a facility, each detainee will be provided the comprehensive written orientation materials in the form of a detainee handbook. The local facility shall provide a detainee handbook supplement, which describes such matters as:

–   Grievance Systems

–   Services and Programs

–   Medical Care

–   Law Libraries and Legal Materials

–   Correspondence and Other Materials

–   Staff–Detainee Communications

–   Classification Systems

–   Disciplinary Systems

1.  Each detainee will verify, by signature and date, receipt of those orientation materials, and that acknowledgement will be maintained in the detainee's detention file.

2.  The ICE National Detainee Handbook will be provided in English, Spanish, and other languages as determined necessary by the Field Office Director (FOD). Orientation materials will be read to detainees who cannot read, or they will be provided the material via audio or video recordings.

3.  Interpretative services will be provided to detainees who do not speak the languages in which the orientation materials are written.

4.  The information in this standard will be communicated in a language or manner that the detainee can understand.

**Grievance System**

1.  Detainees will be informed about the facility's informal and formal grievance system in a language or manner he or she understands.

2.  Staff and detainees will mutually resolve most complaints and grievances orally and informally in their daily interaction.

3.  Detainees will be able to file formal grievances, including medical grievances, and receive written responses, including the basis for the decision, in a timely manner.

4.  Detainees will be able to file emergency grievances that involve an immediate threat to their safety or welfare and receive written responses, including the basis for the decision, in a timely manner.

5.  Detainees will be able to appeal initial decisions on grievances to at least one higher level of review.

6.  Accurate records will be maintained on grievances filed and their resolution.

7.  No detainee will be harassed, disciplined, punished, or otherwise retaliated against for filing a complaint or grievance.

31

8. The applicable contents and procedures in this standard will be communicated in a language or manner that the detainee can understand.

**Law Libraries and Legal Material**

1. Detainees will have regular access (no less than five hours per week) to law libraries, legal materials and related materials.

2. Detainees will not be forced to forgo recreation time to use the law library and requests for additional time to use the law library shall be accommodated to the extent possible, including accommodations of work schedules when practicable, consistent with the orderly and secure operation of the facility.

3. Detainees will have access to courts and counsel.

4. Detainees will be able to have confidential contact with attorneys and their authorized representatives in person, on the telephone and through correspondence.

5. Detainees will have access to a properly equipped law library, legal materials and equipment to facilitate the preparation of documents as well as photocopying resources.

6. Detainees who are illiterate, non-English-speaking or indigent will receive appropriate special assistance.

7. Detainees in special management units will have access to legal materials on the same basis as the general population.

8. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Legal Rights Group Presentations**

1. Detainees will have access to available group presentations on United States immigration law and procedures.

2. Persons and organizations requesting to make such group presentations will be able to obtain clear information about how to request such visits and how to conduct them.

3. Facility security and good order will be maintained.

4. Detainees shall not be subject to reprisals, retaliation, or penalties for attending legal rights group presentations.

5. Detainees will be able to communicate and correspond with representatives from the legal groups who make presentations at the facilities.

6. Detainees will have access to information and materials provided by legal groups. Organizations will be permitted to distribute information in response to specific legal inquiries.

7. Foreign nationals will have access to the diplomatic representative of their country of origin.

**Detention Files**

1. A Detention File will be maintained on each detainee admitted to the detention facility for more than 24 hours.

CONFIDENTIAL                                                                    GEO_MEN 00019645

2. Each Detention File will include all documents, forms, and other information specified herein.

3. The security of each Detention File and its contents will be maintained.

4. Staff will have access to Detention Files, as needed, for official purposes.

5. Information from a Detention File will be released to an outside third party only with the detainee's signed consent.

6. Release of information on detainees will be in accordance with applicable federal and state regulations.

7. Electronic record-keeping systems and data will be protected from unauthorized access.

8. The facility will maintain files necessary to carry out their responsibilities and will maintain them for a minimum of 18 months for auditing purposes.

9. Inactive, closed Detention Files will be properly archived.

**News Media Interviews and Tours**

1. The public and the media will be informed of operations and events within the facility's areas of responsibility.

2. The privacy of detainees and staff will be protected, including the right of a detainee to not be photographed or recorded.

**Staff Training**

1. Before assuming duties, each new employee, contractor, or volunteer will be provided an appropriate orientation to the facility and the ICE/ERO National Detention Standards.

2. All part-time staff and contract personnel shall receive formal orientation training appropriate to their assignments.  Any part-time, volunteer, or contract personnel working more than twenty hours per week shall receive training appropriate to their position and commensurate with their full-time colleagues.

3. Training for staff, contractors, and volunteers will be provided by instructors who are qualified to conduct such training.

4. Staff and contractors who have minimal detainee contact (such as clerical and other support staff) will receive initial and annual training commensurate with their responsibilities.

5. Professional, support, and health care staff and contractors who have regular or daily contact with detainees, or who have significant responsibility involving detainees, will receive initial and annual training commensurate with their position.

6. Security staff and contractors will receive initial and annual training commensurate with their position.

7. Facility management and supervisory staff and contractors will receive initial and annual training commensurate with their position.

CONFIDENTIAL                                                                                    GEO_MEN 00019646

8. Personnel and contractors assigned to any type of emergency response unit or team will receive initial and annual training commensurate with these responsibilities including annual refresher courses or emergency procedures and protocols.

9. Personnel and contractors authorized to use firearms will receive appropriate training before being assigned to a post involving their use and will demonstrate competency in firearms use at least annually.

10. Personnel and contractors authorized to use chemical agents will receive thorough training in their use and in the treatment of individuals exposed to a chemical agent.

11. Security staff and contractors will be trained in self-defense and use-of-force procedures to include confrontation avoidance and emergency protocols.

12. In addition to employment training requirements, employees and contractors will be encouraged to continue their education and professional development through such incentives as salary enhancement, reimbursement of costs, and administrative leave.

13. Initial orientation, initial training, and annual training programs will include information on drug-free workplace requirements and procedures.

14. Initial orientation, initial training, and annual training programs will include information on the facility's written code of ethics.

15. Initial orientation, initial training, and annual training programs will include updates on new issues and procedures and include reviews of the Detainee Handbook and detainee rights.

16. New staff, contractors, and volunteers will acknowledge in writing that they have reviewed facility work rules, ethics, regulations, conditions of employment, and related documents. A copy of the signed acknowledgement will be maintained in each person's personnel file.

17. Training shall be conducted on the requirements of special-needs detainees.

**Transfer of Detainees**

1. Decisions to transfer detainees will be made by authorized officials on the basis of complete and accurate case information.

2. The legal representative-of-record will be properly notified when a detainee is transferred, in accordance with sound security practices.

3. The detainee will be properly notified, orally and in writing when he or she is being transferred to another facility in accordance with sound security practices.

4. Transportation and receiving facility staff will have accurate and complete records on each transferred detainee.

5. Transfer of detainees will be accomplished safely and securely, particularly those with special health care concerns including appropriate medical information.

6. Transferred detainees funds, valuables and other personal property will be safeguarded.

7. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

34

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

### H-1 - CLAUSE AND PROVISION NUMBERING:

The clauses and provisions in this document are in numerical order but may not be numbered sequentially.

### H-2 - NO RIGHT OF REFUSAL

The contractor **DOES NOT** have the right of refusal and shall take all detainees in ICE facility who are sent to the facility.

### H-3 - PARTNERING PHILOSOPHY

A major intent of this acquisition is to create a "partnership" between ICE and the Contractor. ICE intends to structure the contract in a manner that ensures the Contractor's goals and objectives are in alignment with those of ICE. Superior performance on the Contractor's part will have both an indirect and direct effect on the accomplishment of ICE's mission. Within the context of the ICE/Contractor partnership, ICE does not use the terms "partner" and "partnership" as legal terms. The ICE/Contractor partnership will reflect the attributes of an open, collaborative, customer-oriented, and professional relationship. In addition to meeting the program objectives, the Contractor is encouraged to:

1. Consistently take steps to understand ICE's crucial national security mission, its business issues and opportunities, and its responsibilities under Section 287(g) of the Illegal Immigration Reform and Immigrant Responsibility Act;

2. Work collaboratively with other Federal, state and local law enforcement organizations, Contractors, Government agencies, and business partners to ensure success; and

3. Under a performance-based contract, performance measures and metrics will be used extensively to monitor Contractor performance. ICE and the Contractor shall monitor progress using agreed-upon performance metrics.

To establish and maintain a congenial line of communication with the Contractor, the Contractor's Facility Administrator and the COTR shall work together as a team to ensure that required work is accomplished in an efficient and proper manner.

### H-4 - PLACE OF PERFORMANCE

Aurora Detention Center, 3130 N. Oakland Street, Aurora, CO 80010.

### H-5 - CONSTRAINTS

The following constraints comprise the statutory, regulatory, policy and operational considerations that will affect the Contractor. The Contractor shall become familiar with all constraints affecting the work to be performed. These constraints may change over time; the Contractor shall be knowledgeable of any changes to the constraints and perform in accordance with the most current version of the constraints. Constraints include, but are not limited to:

1. Memoranda of Understanding between ICE and individual law enforcement jurisdictions that may apply (copies of applicable MOUs will be provided to the contractor);

2. DHS Management Directive (MD) 11042.1 - Safeguarding Sensitive but Unclassified (For Official Use Only) Information, (http://www.fas.org/sgp/othergov/dhs-sbu-rev.pdf );

42

3. DHS Directive Number 121-01 and Instruction Handbook Number 121-01-007, the Department of Homeland Security Personnel Suitability and Security Program, (http://dhsconnect.dhs.gov/policies/Instruction%20Supplements/Instruction%20121-01-007%20Personnel%20Suitability%20and%20Security%20Program%20(Revision%2000).pdf );

4. Other applicable Executive Orders and Management Directives;

5. Post Orders;

6. General Directives;

7. American Correctional Association (ACA) Standards for Adult Detention Facilities (most current edition) and the most recent copy of the supplement issued every two years. A copy is obtainable for purchase through the internet website http://www.aca.org/store/bookstore/;

8. National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails (most current edition). A copy is obtainable for purchase through the Internet website http://www.ncchc.org.

9. Officer's Handbook M-68, A Guide to Proper Conduct and Relationships with Aliens and the General Public - http://onlineplus.uscis.dhs.gov/lpbinplus/lpext.dll/Infobase/m68/m68-1?f=templates&fn=document-frame.htm&2.0;

10. The DHS/ICE PBNDS (Performance Based National Detention Standards) - A copy of the current version is obtainable on the Internet website: http://www.ice.gov/detention-standards/2008/

11. All rules and regulations governing usage of firearms, public buildings and grounds;

12. All regulations provided to the Contractor through the COTR;

13. Federal Information Security Management Act (FISMA) of 2002, (http://csrc.nist.gov/drivers/documents/FISMA-final.pdf );

14. The Patriot Act of 2001, revised 2010, (http://www.aclu.org/national-security/text-usa-patriot-act );

15. The Illegal Immigration Reform and Immigrant Responsibility Act (IIAIRA), P. L. 104-208, (http://immigration-usa.com/ina_96.html);

16. Federal Acquisition Regulation (FAR) (http://farsite.hill.af.mil/vffara.htm), and DHS Acquisition Regulation (HSAR), (http://farsite.hill.af.mil/vfhsara.htm);

17. Applicable federal, state facility codes, rules, regulations and policies;

18. Applicable federal, state and local labor laws and codes;

19. Applicable federal, state and local firearm laws, regulations and codes;

20. Alignment with external sources (e.g. state and local law enforcement organizations);

21. All applicable environmental requirements, including Executive Orders and Management Directives;

22. Existing lease agreements.

43

GEO_MEN 00019656

23. DHS Non-Disclosure Agreement Requirements; and

24. Organizational Conflict of Interest Provisions.

Accomplishments of some ACA and NCCHC standards are augmented by DHS/ICE policy and/or procedure.  In these instances, the contract provides direction for the enhanced requirements.  In cases where other standards conflict with DHS/ICE policy or standards, DHS/ICE policy and standards prevail.

**H-6 - EXPLANATION OF TERMS/ACRONYMS (See PBNDS 2008 for additional Definitions)**

1. ADMINISTRATIVE CONTRACTING OFFICER:  Government employee responsible for contract compliance, contract administration, cost control, property control, and reviewing Contracting Officer's Technical Representative (COTR) assessment of Contractor's performance.  Often the same person as the Contracting Officer.

2. ADULT:  Any detainee eighteen (18) years of age or older or anyone adjudicated in a criminal court to constitute an adult.

3. ALIEN:  Any person who is not a citizen or national of the United States.

4. AMERICAN CORRECTIONAL ASSOCIATION (ACA):  The American Correctional Association is the oldest and largest international correctional association in the world.  ACA serves all disciplines within the corrections profession and is dedicated to excellence in every aspect of the field.

5. ADULT RESIDENTIAL STANDARDS:  Focus on the results or outcomes the standards are expected to accomplish.  The expected outcomes for each detention standard is stated, rather than assumed, and the prescribed expected practices represent what is to be done to accomplish those expected outcomes.

6. BED-DAY:  The total billable cost to the Government to maintain and house one detainee for one day.  Bed-day means a detainee that occupies a bed in a housing unit or a detainee in custody for at least 4 hours in either a holding cell or staging area (not both.)  If the detainee is moved from the holding cell or staging area into a housing unit the same day, only one bed day charge is allowable.  Bed day means day in, not day out, and all days in between.  The Contractor may charge for day of arrival, but not day of departure.

7. BED-DAY RATE:  The rate charged for each individual detainee per day.  Bed-day rate is an all-inclusive burdened rate to include all costs inclusive of direct costs, indirect costs, overhead and profit necessary to provide the stated requirements.

8. BUREAU OF PRISONS (BOP):  The U.S. Federal Bureau of Prisons protects society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately secure, and that provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens.

9. CONTRABAND:  Items that pose a threat to the security of people or property.  A contraband item fits into either the category of hard or soft contraband as defined below:

   a. Hard Contraband:  Any item that is inherently dangerous as a weapon or tool of violence, e.g., a knife, explosives, a "zip gun," or brass knuckles.  Because hard

44

CONFIDENTIAL

GEO_MEN 00019657

contraband presents an immediate physical threat in or to the facility, a detainee found in possession of hard contraband could face disciplinary action or criminal prosecution.

b.  Soft Contraband: Any item that presents a nuisance which does not pose a direct and immediate threat to an individual's safety.  Soft contraband has the potential to create dangerous or unsanitary conditions in the facility, such as excess papers that create a fire hazard, food items that are spoiled or retained beyond the point of safe consumption, etc.

10.  CONTRACT DETENTION OFFICERS (CDO):  Contractor's uniformed staff members responsible for the security, care, transportation, and supervision of detainees during all phases of activity in a detention facility.  The officer is also responsible for the safety and security of the facility.

11.  CONTRACTING OFFICER (CO):  An employee of the Government responsible for the complete conduct and integrity of the contracting process, including administration after award.  The only individual authorized to issue changes to this contract.

12.  CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (COTR):  An employee of the Government designated and authorized by the Contracting Officer to monitor all technical aspects and assisting in administering the contract.

13.  CONTRACTOR:  The entity with whom the Government enters into a contract to provide the required services.

14.  CONTRACTOR EMPLOYEE:  An employee of a private Contractor hired to perform a variety of detailed services under this contract.

15.  CONTROL ROOM:  Integrates all internal and external security communications networks within a secure room.  Activities conducted within the control room have a critical impact on the institution's orderly and secure operation.

16.  DELIVERABLE:  A work product produced by the Contractor and delivered to the Government.

17.  DEPARTMENT OF HOMELAND SECURITY (DHS):  A department of the United States Government which includes U.S. Immigration and Customs Enforcement (ICE).

18.  DEPARTMENT OF JUSTICE (DOJ):  A department of the United States Government, which includes the Executive Office of Immigration Review (EOIR), the Federal Bureau of Investigation (FBI), the Federal Bureau of Prisons (BOP), and the U.S. Marshals Service (USMS).

19.  DETAINEE:  Any person confined under the auspices and the authority of any Federal agency.  Some of whom may have substantial and varied criminal histories.

20.  DETAINEE RECORDS:  Information concerning the individual's personal, criminal and medical history, behavior, and activities while in custody, including, but not limited to detainee personal property receipts, visitors list, photographs, fingerprints, disciplinary infractions, actions taken, grievance reports, medical records, work assignments, program participation, miscellaneous correspondence, etc.

45

21. <u>ENFORCEMENT AND REMOVAL OPERATIONS (ERO)</u>:  A division within ICE whose mission is the planning, management, and direction of broad programs relating to the supervision, detention, and deportation of detainees who are in the United States illegally.

22. <u>DIRECTIVE</u>:  A document issued by the U.S. Government and signed by the President, Departmental Secretary, or an Assistant Secretary that establishes policy, delegates authority, and assigns responsibilities.

23. <u>EMERGENCY</u>:  Any significant disruption of normal facility procedure, policy, or activity caused by riot, strike, escape, fire, medical exigency, natural disaster, or other serious incident.

24. <u>ENTRY ON DUTY (EOD)</u>:  The first day the employee begins performance at a designated duty station on this contract.

25. <u>EXECUTIVE OFFICE OF IMMIGRATION REVIEW (EOIR)</u>:  An Agency of the Department of Justice.

26. <u>FACILITY</u>:  The physical plant and grounds in which the Contractor's services are operated.

27. <u>FACILITY ADMINISTRATOR</u>:  The official, regardless of local title (e.g., jail administrator, Facility Director, warden, superintendent), who has the ultimate responsibility for managing and operating the contract detention facility.  The qualifications for the holder of this office shall be consistent with ACA and NCCHC standards.

28. <u>FLIGHT OPERATIONS UNIT (FOU)</u>:  The FOU, located in Kansas City, MO, is the principal mass air transportation and deportation coordinating entity within ERO.  It manages Government and contract flights to the southern tier of the United States, Caribbean, and northern South America and orchestrates DRO flight standardization and safety.

29. <u>GOVERNMENT</u>:  Refers to the United States Government

30. <u>GRIEVANCE</u>:  A written complaint filed by a detainee with the facility administrator concerning personal health/welfare or the operations and services of the facility.

31. <u>ICE HEALTH SERVICES CORPS (IHSC)</u>:  The primary entity for the planning, management, policy formation, program coordination, direction, and liaison for all health matters pertaining to undocumented migrants in the custody of the U.S. Immigration and Customs Enforcement, DHS.

32. <u>IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE)</u>:  A law enforcement agency within DHS.

33. <u>INCIDENT REPORT</u>:  A written document reporting an event, such as minor disturbances, officer misconduct, any detainee rule infraction, etc.

34. <u>LIFE SAFETY CODE</u>:  A manual published by The National Fire Protection Association specifying minimum standards for fire safety necessary in the public interest.

35. <u>MAN-HOUR</u>:  Man-hour means productive hours when the required services are performed.  Only productive hours can be billed and invoiced.

46

36. <u>MEDICAL RECORDS:</u>  Separate records of medical examinations and diagnosis maintained by the responsible physician or nurse.  The following information from these records shall be transferred to the detainee record: date and time of all medical examinations and copies of standing or direct medical orders from the physician to the facility staff.

37. <u>MEDICAL SCREENING:</u>  A system of structured observation and/or initial health assessment performed within the first 24 hours to identify newly arrived detainees who could pose a health or safety threat to themselves or others.

38. <u>MILEAGE RATE:</u>  A fully burdened rate inclusive of the mileage rate in accordance with the General Service Administration (GSA) Federal Travel Regulation, vehicle equipment, maintenance, and fuel costs.

39. <u>NATIONAL COMMISION ON CORRECTIONAL HEALTHCARE (NCCHC).</u>

40. <u>NOTICE TO PROCEED (NTP):</u>  Written notification from the Government to the Contractor stating the date that the Offeror may begin work, subject to the conditions of the contract.

41. <u>OFFICE OF PROFESSIONAL RESPONSIBILITY, PERSONNEL SECURITY UNIT (OPR-PSU):</u>  The ICE office, which implements a component-wide personnel security program.

42. <u>PERFORMANCE BASED NATIONAL DETENTION STANDARDS (PBNDS):</u>  Focus on the results or outcomes the standards are expected to accomplish.  The expected outcomes for each detention standard is stated, rather than assumed, and the prescribed expected practices represent what is to be done to accomplish those expected outcomes.

43. <u>PERFORMANCE REQUIREMENT SUMMARY (PRS):</u>  The PRS communicates what the Government intends to qualitatively inspect.  The PRS is based on the ACA Standards for Adult Local Detention Facilities (ALDF), NCCHC, and PBNDSO.

44. <u>PERFORMANCE WORK STATEMENT (PWS):</u>  Part of the solicitation which identifies the technical, functional and performance characteristics of the required services.  In response to the Government's solicitation, offerors shall propose a Performance Work Statement (PWS) that both complies with ICE operational and legal requirements and specifically correlates with the offeror's proposed solution.  Accordingly, the final PWS will become a part of the resultant contract.

45. <u>PERIMETER:</u>  The outer portions of a facility, which actually provide for secure confinement of detainees.

46. <u>POLICY:</u>  A definite written course or method of action, which guides and determines present and future decisions and actions.

47. <u>PROCEDURE:</u>  The detailed and sequential actions that must be executed to ensure that a policy is implemented. It is the method of performing an operation or a manner of proceeding on a course of action. It differs from a policy in that it directs action required to perform a specific task within the guidelines of that policy.

48. <u>QUALIFIED HEALTH PROFESSIONAL:</u>  Physicians, dentists, and other professional and technical workers who by state law engage in activities that support, complement or

47

GEO_MEN 00019660

supplement the functions of physicians and/or dentists who are licensed, registered, or certified, as appropriate to their qualifications, to practice.

49. <u>QUALITY ASSURANCE:</u>  Actions taken by the Government to ensure that the requirements of the contract are met by the Contractor.

50. <u>QUALITY ASSURANCE SURVEILLANCE PLAN (QASP):</u>  A Government-produced document that is based on the premise that the Contractor, and not the Government, is responsible for the day-to-day operation of the facility and all the management and quality control actions required to meet the terms of the contract.  The role of the Government in quality assurance is to ensure performance standards are achieved and maintained.  The QASP validates that the Contractor is complying with ERO-mandated quality standards in operating, maintaining, and repairing detention facilities.

51. <u>QUALITY CONTROL:</u>  The Contractor's inspection system, which covers all of the services to be performed under the contract.  The actions that a Contractor takes to control the production of services so that they meet the requirements stated in the contract.

52. <u>QUALITY CONTROL PLAN (QCP):</u>  A Contractor produced self-inspection plan that describes the internal staffing and procedures that the prospective Contractor will use to meet the quality, quantity, timeliness, responsiveness, customer satisfaction, and other performance standards specified in the contract.

53. <u>RESPONSIBLE PHYSICIAN:</u>  A person licensed to practice medicine with whom the facility enters into a contractual agreement to plan for and provide health care services to the detainee population of the facility.

54. <u>SENSITIVE INFORMATION:</u>  Any information which could affect the national interest, law enforcement activities, the conduct of federal programs, or the privacy to which individuals are entitled under Title 5, U.S. Code, Section 552a.  All detainee records are considered sensitive information.

55. <u>SICK CALL:</u>  A system through which a detainee reports and receives individualized and appropriate medical services for non-emergency illness or injury.

56. <u>STANDING MEDICAL ORDERS:</u>  Written orders, by a physician, to medical personnel for the definitive treatment of identified person, self-limiting conditions and for on-site treatment of emergency conditions.

57. <u>SUITABILITY:</u>  Security clearance process for Contractor and all Contractor Employees to determine suitability to work on a Government contract.

58. <u>SUPERVISORY CONTRACT DETENTION OFFICER</u> (SCDO). Supervising Detention Officer.

59. <u>TOUR OF DUTY:</u>  No more than 12 hours in any 24-hour period with a minimum of eight (8) hours off between shifts, except as directed by state or local law.

60. <u>TRAINING:</u>  An organized, planned, and evaluated activity designed to achieve specific learning objectives and enhance personnel performance.  Training may occur on site, at an academy or training center, at an institution of higher learning, professional meetings, or through contract service or closely supervised on-the-job training.  Training programs usually include requirements for completion, attendance records, and certification of

48

GEO_MEN 00019661

completion.  Meetings of professional associations may be considered training when there is clear evidence of the above elements.  All trainers must be certified and certification shall by approved by the COTR.  All training shall be conducted in accordance with the PBNDS on Staff Training and ACA and NCCHC Standards on Training and Staff Development.

61. <u>TRANSPORTATION COSTS:</u>  All inclusive or burdened rates for transportation of detainees.  Cost includes, but is not limited to, labor, overtime outside of standard working hours, equipment, material, supplies, and other related costs necessary to respond to requests by designated officials for movement of detainees from place to place necessary for processing, court hearings, interviews, doctor's appointments, airports, and transporting in-between detention facilities (counties, state and federal).

62. <u>TRAVEL COST:</u>  Cost inclusive of lodging and meals and incidental expenses (MI&E) for Contract Detention Officers exceeding the standard working hours. Cost is based on actual charges per occurrence, not to exceed the allowable GSA Federal Travel Regulation rates/costs in effect on the dates of travel.

63. <u>UNITED STATES MARSHALS SERVICE (USMS):</u>  A law enforcement agency within DOJ.

64. <u>UNITED STATES PUBLIC HEALTH SERVICES (USPHS):</u>  An agency of the U.S. Department of Health and Human Services working in conjunction with ICE to provide health services for detainees at some facilities through its ICE Health Services Corps (IHSC).

65. <u>WEAPONS:</u>  This includes but is not limited to firearms, ammunition, knives, slappers, billy clubs, electronic defense modules, chemical weapons (mace), and nightsticks.

## H-7 - BACKGROUND AND SECURITY CLEARANCE PROCEDURES

1. General

   The DHS has determined that performance of the tasks as described in this contract requires that the Contractor, subcontractor(s), vendor(s), etc. (herein known as Contractor) have access to sensitive DHS information, and that the Contractor shall adhere to the following.

2. Suitability Determination

   DHS will have and exercise full control over granting, denying, withholding or terminating unescorted Government facility and/or sensitive Government information access for Contractor employees, based upon the results of a background investigation. DHS may, as it deems appropriate, authorize and make a favorable entry on duty (EOD) decision based on preliminary security checks.  The favorable EOD decision would allow the employees to commence work temporarily prior to the completion of the full investigation.  The granting of a favorable EOD decision shall not be considered as assurance that a full employment suitability authorization will follow as a result thereof. The granting of a favorable EOD decision or a full employment suitability determination shall in no way prevent, preclude, or bar the withdrawal or termination of any such access by DHS, at any time during the term of the contract.  No employee of the Contractor shall be allowed to EOD and/or access sensitive information or systems without a favorable EOD decision or suitability determination by the Office of Professional Responsibility,

49

# SECTION I - CONTRACT CLAUSES

**52.252-2 Clauses Incorporated by Reference (FEB 1998)**

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es): http://farsite.hill.af.mil/vffara.htm .

**52.202-1   Definitions (JUL 2004)**

**52.203-3   Gratuities (APR 1984)**

**52.203-5   Covenant Against Contingent Fees (APR 1984)**

**52.203-6   Restrictions on Subcontractor Sales to the Government (SEP 2006)**

**52.203-7   Anti-Kickback Procedures (OCT 2010)**

**52.203-8   Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity (JAN 1997)**

**52.203-10   Price or Fee Adjustment for Illegal or Improper Activity (JAN 1997)**

**52.203-12   Limitation on Payments to Influence Certain Federal Transactions (OCT 2010)**

**52.203-13   Contractor Code of Business Ethics and Conduct (APR 2010)**

**52.203-14   Display of Hotline Poster(s) (DEC 2007)**

   (b) (3) DHS OIG Hotline Poster; http://www.dhs.gov/xoig/assets/DHS_OIG_Hotline.pdf

**52.204-4   Printed or Copied Double-Sided on Recycled Paper (AUG 2000)**

**52.204-7   Central Contractor Registration (APR 2008)**

**52.204-9   Personal Identity Verification of Contractor Personnel (JAN 2011)**

**52.204-10   Reporting Subcontract Awards (JUL 2010)**

**52.209-6   Protecting the Government's Interest When Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment (DEC 2010)**

**52.209-9   Updates of Publicly Available Information Regarding Responsibility Matters (JAN 2011)**

**52.215-2   Audit and Records - Negotiation (OCT 2010)**

**52.215-8   Order of Precedence - Uniform Contract Format (OCT 1997)**

**52.215-10   Price Reduction for Defective Cost or Pricing Data (AUG 2011)**

**52.215-11   Price Reduction for Defective Cost or Pricing Data - Modifications (AUG 2011)**

**52.215-12   Subcontractor Cost or Pricing Data (OCT 2010)**

**52.215-13   Subcontractor Cost or Pricing Data - Modifications (OCT 2010)**

**52.215-14   Integrity of Unit Prices (OCT 2010)**

**52.215-15   Pension Adjustments and Asset Reversions (OCT 2010)**

78

GEO_MEN 00019691

**52.215-18 Reversion or Adjustment of Plans for Postretirement Benefits (PRB) Other Than Pensions (JUL 2005)**

**52.215-19 Notification of Ownership Changes (OCT 1997)**

(a) The Contractor shall make the following notifications in writing:

(1) When the Contractor becomes aware that a change in its ownership has occurred, or is certain to occur, that could result in changes in the valuation of its capitalized assets in the accounting records, the Contractor shall notify the Administrative Contracting Officer (ACO) within 30 days.

(2) The Contractor shall also notify the ACO within 30 days whenever changes to asset valuations or any other cost changes have occurred or are certain to occur as a result of a change in ownership.

(b) The Contractor shall -

(1) Maintain current, accurate, and complete inventory records of assets and their costs;

(2) Provide the ACO or designated representative ready access to the records upon request;

(3) Ensure that all individual and grouped assets, their capitalized values, accumulated depreciation or amortization, and remaining useful lives are identified accurately before and after each of the Contractor's ownership changes; and

(4) Retain and continue to maintain depreciation and amortization schedules based on the asset records maintained before each Contractor ownership change.

(c) The Contractor shall include the substance of this clause in all subcontracts under this contract that meet the applicability requirement of FAR 15.408(k).

**52.215-21 Requirements for Cost or Pricing Data or Information Other Than Cost or Pricing Data - Modifications (OCT 2010)**

(a) *Exceptions from certified cost or pricing data.*

(1) In lieu of submitting certified cost or pricing data for modifications under this contract, for price adjustments expected to exceed the threshold set forth at FAR 15.403-4 on the date of the agreement on price or the date of the award, whichever is later, the Contractor may submit a written request for exception by submitting the information described in the following subparagraphs. The Contracting Officer may require additional supporting information, but only to the extent necessary to determine whether an exception should be granted, and whether the price is fair and reasonable -

(i) *Identification of the law or regulation establishing the price offered.* If the price is controlled under law by periodic rulings, reviews, or similar actions of a governmental body, attach a copy of the controlling document, unless it was previously submitted to the contracting office.

(ii) *Information on modifications of contracts or subcontracts for commercial items.*

(A) If --

79

GEO_MEN 00019692

(1) The original contract or subcontract was granted an exception from cost or pricing data requirements because the price agreed upon was based on adequate price competition or prices set by law or regulation, or was a contract or subcontract for the acquisition of a commercial item; and

(2) The modification (to the contract or subcontract) is not exempted based on one of these exceptions, then the Contractor may provide information to establish that the modification would not change the contract or subcontract from a contract or subcontract for the acquisition of a commercial item to a contract or subcontract for the acquisition of an item other than a commercial item.

(B) For a commercial item exception, the Contractor shall provide, at a minimum, information on prices at which the same item or similar items have previously been sold that is adequate for evaluating the reasonableness of the price of the modification. Such information may include --

(1) For catalog items, a copy of or identification of the catalog and its date, or the appropriate pages for the offered items, or a statement that the catalog is on file in the buying office to which the proposal is being submitted. Provide a copy or describe current discount policies and price lists (published or unpublished), e.g., wholesale, original equipment manufacturer, or reseller. Also explain the basis of each offered price and its relationship to the established catalog price, including how the proposed price relates to the price of recent sales in quantities similar to the proposed quantities.

(2) For market-priced items, the source and date or period of the market quotation or other basis for market price, the base amount, and applicable discounts. In addition, describe the nature of the market.

(3) For items included on an active Federal Supply Service Multiple Award Schedule contract, proof that an exception has been granted for the schedule item.

(2) The Contractor grants the Contracting Officer or an authorized representative the right to examine, at any time before award, books, records, documents, or other directly pertinent records to verify any request for an exception under this clause, and the reasonableness of price. For items priced using catalog or market prices, or law or regulation, access does not extend to cost or profit information or other data relevant solely to the Contractor's determination of the prices to be offered in the catalog or marketplace.

(b) *Requirements for certified cost or pricing data.* If the contractor is not granted an exception from the requirement to submit certified cost or pricing data, the following applies:

(1) The Contractor shall prepare and submit certified cost or pricing data, data other than certified cost or pricing data, and supporting attachments in accordance with the instructions contained in Table 15–2 of FAR 15.408, which is incorporated by reference with the same force and effect as though it were inserted here in full text. The instructions in Table 15–2 are incorporated as a mandatory format to be used in

80

CONFIDENTIAL

this contract, unless the Contracting Officer and the Contractor agree to a different format and change this clause to use Alternate I.

(2) As soon as practicable after agreement on price, but before award (except for unpriced actions), the Contractor shall submit a Certificate of Current Cost or Pricing Data, as prescribed by FAR 15.406-2.

**52.216-18  Ordering (OCT 1995)**

Contract Award; Last Day of Option Period, if exercised.

**52.216-19  Order Limitations (OCT 1995)**

(a) *Minimum order.*  When the Government requires supplies or services covered by this contract in an amount of less than 127,750 Bed-Days, the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.

(1) The minimum order applies to the number of Bed-Days ordered per individual Base Period or Option Period.

(2) The minimum order sated in this clause does not guarantee the Bed-Day rate at which those Bed-days are ordered.  The Bed-Day rate at which these quantities will be billed are in accordance with Section B of the contract.

3) There is no guaranteed minimum per day, per month, or per year.

(b) *Maximum order.* The Contractor is not obligated to honor --

(1) Any order for a single item in excess of 255,500 Bed Days;

(2) Any order for a combination of items in excess of 100% of (b) (1) above; or

(3) A series of orders from the same ordering office within five days that together call for quantities exceeding the limitation in subparagraph (b)(1) or (2) of this section.

(c) If this is a requirements contract (*i.e.*, includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) of this section.

(d) Notwithstanding paragraphs (b) and (c) of this section, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within five days after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons. Upon receiving this notice, the Government may acquire the supplies or services from another source.

**52.216-22  Indefinite Quantity (OCT 1995)**

The final day of the option period, if exercised.

**52.217-8   Option to Extend Services (NOV 1999)**
30 days

81

GEO_MEN 00019694

**52.217-9    Option to Extend the Term of the Contract (MAR 2000)**

(a) The Government may extend the term of this contract by written notice to the Contractor within <u>30 days</u>; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least <u>60 days</u> before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed <u>10 years</u>.

**52.219-8    Utilization of Small Business Concerns (JAN 2011)**

**52.219-9    Small Business Subcontracting Plan (JAN 2011)**

**52.219-16    Liquidated Damages -- Subcontracting Plan (Jan 1999)**

    (a) "Failure to make a good faith effort to comply with the subcontracting plan", as used in this clause, means a willful or intentional failure to perform in accordance with the requirements of the subcontracting plan approved under the clause in this contract entitled "Small Business Subcontracting Plan," or willful or intentional action to frustrate the plan.

    (b) Performance shall be measured by applying the percentage goals to the total actual subcontracting dollars or, if a commercial plan is involved, to the pro rata share of actual subcontracting dollars attributable to Government contracts covered by the commercial plan. If, at contract completion, or in the case of a commercial plan, at the close of the fiscal year for which the plan is applicable, the Contractor has failed to meet its subcontracting goals and the Contracting Officer decides in accordance with paragraph (c) of this clause that the Contractor failed to make a good faith effort to comply with its subcontracting plan, established in accordance with the clause in this contract entitled "Small Business Subcontracting Plan," the Contractor shall pay the Government liquidated damages in an amount stated. The amount of probable damages attributable to the Contractor's failure to comply shall be an amount equal to the actual dollar amount by which the Contractor failed to achieve each subcontract goal.

    (c) Before the Contracting Officer makes a final decision that the Contractor has failed to make such good faith effort, the Contracting Officer shall give the Contractor written notice specifying the failure and permitting the Contractor to demonstrate what good faith efforts have been made and to discuss the matter. Failure to respond to the notice may be taken as an admission that no valid explanation exists. If, after consideration of all the pertinent data, the Contracting Officer finds that the Contractor failed to make a good faith effort to comply with the subcontracting plan, the Contracting Officer shall issue a final decision to that effect and require that the Contractor pay the Government liquidated damages as provided in paragraph (b) of this clause.

    (d) With respect to commercial plans; the Contracting Officer who approved the plan will perform the functions of the Contracting Officer under this clause on behalf of all

CONFIDENTIAL

GEO_MEN 00019695

agencies with contracts covered by that commercial plan.

(e) The Contractor shall have the right of appeal, under the clause in this contract entitled, Disputes, from any final decision of the Contracting Officer.

(f) Liquidated damages shall be in addition to any other remedies that the Government may have.

**52.219-28   Post-Award Small Business Program Representation (APR 2009)**

Is not a small business concern.

**52.222-1   Notice to the Government of Labor Disputes (FEB 1997)**

**52.222-3   Convict Labor (JUN 2003)**

**52.222-4   Contract Work Hours and Safety Standards Act - Overtime Compensation (JUL 2005)**

**52.222-21   Prohibition of Segregated Facilities (FEB 1999)**

**52.222-26   Equal Opportunity (MAR 2007)**

**52.222-35   Equal Opportunity for Veterans (SEP 2010)**

**52.222-36   Affirmative Action for Workers with Disabilities (OCT 2010)**

**52.222-37   Employment Reports on Veterans (SEP 2010)**

**52.222-40   Notification of Employee Rights Under the National Labor Relations Act (DEC 2010)**

**52.222-41   Service Contract Act of 1965, as Amended (NOV 2007)**

**52.222-42   Statement of Equivalent Rates for Federal Hires (MAY 1989)**

In compliance with the Service Contract Act of 1965, as amended, and the regulations of the Secretary of Labor (29 CFR Part 4), this clause identifies the classes of service employees expected to be employed under the contract and states the wages and fringe benefits payable to each if they were employed by the contracting agency subject to the provisions of 5 U.S.C. 5341 or 5332.

*This Statement is for Information Only:  It is not a Wage Determination*

| Employee Class | Monetary Wage | Fringe Benefits |
|---|---|---|
| Accounting Clerk II (GS-3) | $12.82 | $3.58 |
| General Clerk (GS-4) | $14.39 | $4.02 |
| Personnel Assistant II (GS-4) | $14.39 | $4.02 |
| Personnel Assistant III (GS-5) | $16.10 | $4.50 |
| Secretary II (GS-5) | $16.10 | $4.50 |
| Janitor (WG-2) | $12.01 | $3.36 |
| General Maintenance Wrkr (WG-8) | $20.70 | $5.80 |
| General Maintenance Wrkr Sup (WG-8/2) | $21.57 | $6.04 |

83

| | | |
|---|---|---|
| Court Security Officer (GS-6) | $17.95 | $5.02 |
| Detention Officer (GS-6) | $17.95 | $5.02 |
| Recreation Specialist (GS-7) | $19.95 | $5.58 |
| Recreation Specialist Supv (GS-9) | $24.40 | $6.83 |
| Licensed Practical Nurse II (GS-4) | $14.39 | $4.02 |
| Laborer, Ground Maintenance (WG-3) | $14.67 | $3.58 |
| Food Service Worker (WG-2) | $10.90 | $3.05 |
| Cook I (WG-6) | $12.57 | $3.52 |
| Cook II (WG-8) | $13.83 | $3.87 |
| Records Clerk (GS-4) | $14.39 | $4.02 |
| Stock Clerk (WG-4) | $15.69 | $4.02 |
| Warehouse Specialist (WG-5) | $14.96 | $4.19 |

**52.222-43  Fair Labor Standards Act and Service Contract Act - Price Adjustment (Multiple Year and Option Contracts) (SEP 2009)**

**52.222-46  Evaluation of Compensation for Professional Employees (Feb 1993)**

**52.222-50  Combating Trafficking in Persons (FEB 2009)**

**52.222-54  Employment Eligibility Verification (JAN 2009)**

**52.223-2  Affirmative Procurement of Bio-based Products under Service and Construction Contracts (DEC 2007)**

**52.223-6  Drug-Free Workplace (MAY 2001)**

**52.223-12  Refrigeration Equipment and Air Conditioners (MAY 1995)**

**52.223-15  Energy Efficiency in Energy-Consuming Products (DEC 2007)**

**52.223-17  Affirmative Procurement of EPA-Designated Items in Service and Construction Contracts (MAY 2008)**

**52.223-18  Contractor Policy to Ban Text Messaging While Driving (AUG 2011)**

**52.224-1  Privacy Act Notification (APR 1984)**

The Contractor will be required to design, develop, or operate a system of records on individuals, to accomplish an agency function subject to the Privacy Act of 1974, Public Law 93-579, December 31, 1974 (5 U.S.C.552a) and applicable agency regulations. Violation of the Act may involve the imposition of criminal penalties.

**52.224-2  Privacy Act (APR 1984)**

**52.225-1  Buy American Act - Supplies (FEB 2009)**

**52.225-13  Restrictions on Certain Foreign Purchases (JUN 2008)**

**52.226-6  Promoting Excess Food Donation to Nonprofit Organizations (MAR 2009)**

**52.227-1  Authorization and Consent (DEC 2007)**

84

**52.227-2   Notice and Assistance Regarding Patent and Copyright Infringement (DEC 2007)**

**52.227-14   Rights in Data--General (DEC 2007)**

**52.229-3   Federal, State, and Local Taxes (APR 2003)**

**52.232-1   Payments (APR 1984)**

**52.232-8   Discounts for Prompt Payment (FEB 2002)**

**52.232-9   Limitation on Withholding of Payments (APR 1984)**

**52.232-11   Extras (APR 1984)**

**52.232-17   Interest (OCT 2010)**

**52.232-18   Availability of Funds (APR 1984)**

**52.232-19   Availability of Funds for the Next Fiscal Year (APR 1984)**
Funds are not presently available for performance under this contract beyond **September 30, 2011**. The Government's obligation for performance of this contract beyond that date is contingent upon the availability of appropriated funds from which payment for contract purposes can be made. No legal liability on the part of the Government for any payment may arise for performance under this contract beyond **September 30, 2011**, until funds are made available to the Contracting Officer for performance and until the Contractor receives notice of availability, to be confirmed in writing by the Contracting Officer.

**52.232-23   Assignment of Claims (JAN 1986)**

**52.232-25   Prompt Payment (OCT 2008)**

**52.232-33   Payment by Electronic Funds Transfer - Central Contractor Registration (OCT 2003)**

**52.233-1   Disputes (JUL 2002)**

**52.233-3   Protest after Award (AUG 1996)**

**52.233-4   Applicable Law for Breach of Contract Claim (OCT 2004)**

**52.237-3   Continuity of Services (JAN 1991)**

**52.237-7   Indemnification and Medical Liability Insurance (JAN 1997**

(a) $2 million (per specialty per occurrence), Maximum aggregate amount of $6 million

**52.242-13   Bankruptcy (JUL 1995)**

**52.243-1   Changes - Fixed-Price (AUG 1987) - Alternate I (AUG 1987)**

**52.244-6   Subcontracts for Commercial Items (DEC 2010)**

**52.245-1   Government Property (AUG 2010)**

**52.245-9   Use and Charges (AUG 2010)**

**52.246-25   Limitation of Liability - Services (FEB 1997)**

**52.248-1   Value Engineering (OCT 2010)**

**52.249-2   Termination for Convenience of the Government (Fixed-Price) (MAY 2004)**

CONFIDENTIAL                                                                    GEO_MEN 00019698

**52.249-8    Default (Fixed-Price Supply and Service) (APR 1984)**

**52.251-1    Government Supply Sources (AUG 2010)**

**52.253-1    Computer Generated Forms (JAN 1991)**

**3052.204-70    Security Requirements for Unclassified Information Technology Resources (JUN 2006)**

(a) The Contractor shall be responsible for Information Technology (IT) security for all systems connected to a DHS network or operated by the Contractor for DHS, regardless of location. This clause applies to all or any part of the contract that includes information technology resources or services for which the Contractor must have physical or electronic access to sensitive information contained in DHS unclassified systems that directly support the agency's mission.

(b) The Contractor shall provide, implement, and maintain an IT Security Plan. This plan shall describe the processes and procedures that will be followed to ensure appropriate security of IT resources that are developed, processed, or used under this contract.

(1) Within 30 days after contract award, the contractor shall submit for approval its IT Security Plan, which shall be consistent with and further detail the approach contained in the Offeror's proposal. The plan, as approved by the Contracting Officer, shall be incorporated into the contract as a compliance document.

(2) The Contractor's IT Security Plan shall comply with Federal laws that include, but are not limited to, the Computer Security Act of 1987 (40 U.S.C. 1441 et seq.); the Government Information Security Reform Act of 2000; and the Federal Information Security Management Act of 2002; and with Federal policies and procedures that include, but are not limited to, OMB Circular A-130.

(3) The security plan shall specifically include instructions regarding handling and protecting sensitive information at the Contractor's site (including any information stored, processed, or transmitted using the Contractor's computer systems), and the secure management, operation, maintenance, programming, and system administration of computer systems, networks, and telecommunications systems.

(c) Examples of tasks that require security provisions include—

(1) Acquisition, transmission or analysis of data owned by DHS with significant replacement cost should the contractor's copy be corrupted; and

(2) Access to DHS networks or computers at a level beyond that granted the general public (e.g., such as bypassing a firewall).

(d) At the expiration of the contract, the contractor shall return all sensitive DHS information and IT resources provided to the contractor during the contract, and certify that all non-public DHS information has been purged from any contractor-owned system. Components shall conduct reviews to ensure that the security requirements in the contract are implemented and enforced.

(e) Within 6 months after contract award, the contractor shall submit written proof of IT Security accreditation to DHS for approval by the DHS Contracting Officer. Accreditation will proceed according to the criteria of the DHS Sensitive System Policy

86

Publication, 4300A (Version 2.1, July 26, 2004) or any replacement publication, which the Contracting Officer will provide upon request. This accreditation will include a final security plan, risk assessment, security test and evaluation, and disaster recovery plan/continuity of operations plan.  This accreditation, when accepted by the Contracting Officer, shall be incorporated into the contract as a compliance document.  The contractor shall comply with the approved accreditation documentation.

### 3052.204-71   Contractor Employee Access (JUN 2006)

(a) ``Sensitive Information,'' as used in this Chapter, means any information, the loss, misuse, disclosure, or unauthorized access to or modification of which could adversely affect the national or homeland security interest, or the conduct of Federal programs, or the privacy to which individuals are entitled under section 552a of title 5, United States Code (the Privacy Act), but which has not been specifically authorized under criteria established by an Executive Order or an Act of Congress to be kept secret in the interest of national defense, homeland security or foreign policy. This definition includes the following categories of information:

(1) Protected Critical Infrastructure Information (PCII) as set out in the Critical Infrastructure Information Act of 2002 (Title II, Subtitle B, of the Homeland Security Act, Pub. L. 107-296, 196 Stat. 2135), as amended, the implementing regulations thereto (Title 6, Code of Federal Regulations, part 29) as amended, the applicable PCII Procedures Manual, as amended, and any supplementary guidance officially communicated by an authorized official of the Department of Homeland Security (including the PCII Program Manager or his/her designee);

(2) Sensitive Security Information (SSI), as defined in Title 49, Code of Federal Regulations, part 1520, as amended, ``Policies and Procedures of Safeguarding and Control of SSI,'' as amended, and any supplementary guidance officially communicated by an authorized official of the Department of Homeland Security (including the Assistant Secretary for the Transportation Security Administration or his/her designee);

(3) Information designated as ``For Official Use Only,'' which is unclassified information of a sensitive nature and the unauthorized disclosure of which could adversely impact a person's privacy or welfare, the conduct of Federal programs, or other programs or operations essential to the national or homeland security interest; and

(4) Any information that is designated ``sensitive'' or subject to other controls, safeguards or protections in accordance with subsequently adopted homeland security information handling procedures.

(b) ``Information Technology Resources'' include, but are not limited to, computer equipment, networking equipment, telecommunications equipment, cabling, network drives, computer drives, network software, computer software, software programs, intranet sites, and internet sites.

(c) Contractor employees working on this contract must complete such forms as may be necessary for security or other reasons, including the conduct of background investigations to determine suitability. Completed forms shall be submitted as directed by the Contracting Officer. Upon the Contracting Officer's request, the Contractor's employees shall be fingerprinted, or subject to other investigations as required. All

87

GEO_MEN 00019700

contractor employees requiring recurring access to Government facilities or  access to sensitive information or IT resources are required to have a favorably adjudicated background investigation prior to commencing work on this contract unless this requirement is waived under Departmental procedures.

(d)  The Contracting Officer may require the contractor to prohibit individuals from working on the contract if the government deems their initial or continued employment contrary to the public interest for any reason, including, but not limited to, carelessness, in subordination, incompetence, or security concerns.

(e)  Work under this contract may involve access to sensitive information.  Therefore, the Contractor shall not disclose, orally or in writing, any sensitive information to any person unless authorized in writing by the Contracting Officer.  For those contractor employees authorized access to sensitive information, the contractor shall ensure that these persons receive training concerning the protection and disclosure of sensitive information both during and after contract performance.

(f)  The Contractor shall include the substance of this clause in all subcontracts at any tier where the subcontractor may have access to Government facilities, sensitive information, or resources.

Contracting Officers shall include the following language as a special contract requirement when either clause 3052.204-70 and/or 3052.204.71 is used consistent with the provisions in HSAR 3004.470-3:

Contractors requiring recurring access to Government facilities or access to sensitive but unclassified information and/or logical access to Information Technology (IT) resources shall verify minimal fitness requirements for all persons/candidates designated for employment under any Department of Homeland Security (DHS) contract by pre-screening the person/candidate prior to submitting their name for consideration to work on the contract.  Pre-screening the candidate ensures that minimum fitness requirements are considered and mitigates the burden of DHS having to conduct background investigations on objectionable candidates.  The Contractor shall submit only those candidates that have not had a felony conviction within the past 36 months, illegal drug use within the past 12 months, or misconduct such as criminal activity on the job relating to fraud or theft within the past 12 months from the date of submission of their name as a candidate to perform work under this contract.  Pre-screening shall be conducted within 15 days after contract award.  The fitness determination does not impact the candidate's fitness for employment with your firm on other assignments unrelated to this contract. This requirement shall be placed in all subcontracts if the subcontractor requires routine physical access, access to sensitive but unclassified information, and/or logical access to IT resources.  Failure to comply with the pre-screening requirement will result in the Contracting Officer taking the appropriate remedy (i.e. recording non-compliance into the Past Performance Database, contract termination).

Definition(s):  Logical access means providing an authorized user the ability to access one or more computer system resources such as a workstation, network, application, or database through automated tools.  A logical access control system (LACS) requires validation of an individual's identify through some mechanism such as a personal identification number (PIN) care, username and password, biometric, or other token.  The

88

GEO_MEN 00019701

system has the capability to assign different access privileges to different persons depending on their roles and responsibilities in an organization.

### 3052.209-70   Prohibition on Contracts with Corporate Expatriates (JUN 2006)

(a) Prohibitions.  Section 835 of the Homeland Security Act, 6 U.S.C. 395, prohibits the Department of Homeland Security from entering into any contract with a foreign incorporated entity which is treated as an inverted domestic corporation as defined in this clause, or with any subsidiary of such an entity. The Secretary shall waive the prohibition with respect to any specific contract if the Secretary determines that the waiver is required in the interest of national security.

(b) Definitions. As used in this clause:

Expanded Affiliated Group means an affiliated group as defined in section 1504 (a) of the Internal Revenue Code of 1986 (without regard to section 1504 (b) of such Code), except that section 1504 of such Code shall be applied by substituting `more than 50 percent' for `at least 80 percent' each place it appears.

Foreign Incorporated Entity means any entity which is, or but for subsection (b) of section 835 of the Homeland Security Act, 6 U.S.C. 395, would be, treated as a foreign corporation for purposes of the Internal Revenue Code of 1986.

Inverted Domestic Corporation means a foreign incorporated entity shall be treated as an inverted domestic corporation if, pursuant to a plan (or a series of related transactions)

(1) The entity completes the direct or indirect acquisition of substantially all of the properties held directly or indirectly by a domestic corporation or substantially all of the properties constituting a trade or business of a domestic partnership;

(2) After the acquisition at least 80 percent of the stock (by vote or value) of the entity is held

  (i)  In the case of an acquisition with respect to a domestic corporation, by former shareholders of the domestic corporation by reason of holding stock in the domestic corporation; or

  (ii) In the case of an acquisition with respect to a domestic partnership, by former partners of the domestic partnership by reason of holding a capital or profits interest in the domestic partnership; and

(3) The expanded affiliated group which after the acquisition includes the entity does not have substantial business activities in the foreign country in which or under the law of which the entity is created or organized when compared to the total business activities of such expanded affiliated group.  Person, domestic, and foreign have the meanings given such terms by paragraphs (1), (4), and (5) of section 7701(a) of the Internal Revenue Code of 1986, respectively.

(c) Special rules. The following definitions and special rules shall apply when determining whether a foreign incorporated entity should be treated as an inverted domestic corporation.

89

(1) Certain Stock Disregarded. For the purpose of treating a foreign incorporated entity as an inverted domestic corporation these shall not be taken into account in determining ownership:

    (i) Stock held by members of the expanded affiliated group which includes the foreign incorporated entity; or

    (ii) stock of such entity which is sold in a public offering related to the acquisition described in subsection (b)(1) of Section 835 of the Homeland Security Act, 6 U.S.C. 395(b)(1).

(2) Plan Deemed In Certain Cases. If a foreign incorporated entity acquires directly or indirectly substantially all of the properties of a domestic corporation or partnership during the 4-year period beginning on the date which is 2 years before the ownership requirements of subsection (b)(2) are met, such actions shall be treated as pursuant to a plan.

(3) Certain Transfers Disregarded. The transfer of properties or liabilities (including by contribution or distribution) shall be disregarded if such transfers are part of a plan a principal purpose of which is to avoid the purposes of this section.

(d) Special Rule for Related Partnerships. For purposes of applying section 835(b) of the Homeland Security Act, 6 U.S.C. 395(b) to the acquisition of a domestic partnership, except as provided in regulations, all domestic partnerships which are under common control (within the meaning of section 482 of the Internal Revenue Code of 1986) shall be treated as a partnership.

(e) Treatment of Certain Rights.

(1) Certain rights shall be treated as stocks to the extent necessary to reflect the present value of all equitable interests incident to the transaction, as follows:

    (i) warrants

    (ii) options

    (iii) Contracts to acquire stock

    (iv) Convertible debt instruments; and

    (v) Other similar interests.

(2) Rights labeled as stocks shall not be treated as stocks whenever it is deemed appropriate to do so to reflect the present value of the transaction or to disregard transactions whose recognition would defeat the purpose of Section 835.

(f) Disclosure. The Offeror under this solicitation represents that (Check one):

__ it is not a foreign incorporated entity that should be treated as an inverted domestic corporation pursuant to the criteria of (HSAR) 48 CFR 3009.104-70 through 3009.104-73;

__ it is a foreign incorporated entity that should be treated as an inverted domestic corporation pursuant to the criteria of (HSAR) 48 CFR 3009.104-70 through 3009.104-73, but it has submitted a request for waiver pursuant to 3009.104-74, which has not been denied; or

90

GEO_MEN 00019703

__ it is a foreign incorporated entity that should be treated as an inverted domestic
corporation pursuant to the criteria of (HSAR) 48 CFR 3009.104-70 through 3009.104-
73, but it plans to submit a request for waiver pursuant to 3009.104-74.

(g) A copy of the approved waiver, if a waiver has already been granted, or the waiver
request, if a waiver has been applied for, shall be attached to the bid or proposal.

**3052.215-70   Key Personnel or Facilities (DEC 2003)**

The Key Personnel or Facilities under this Contract:

1) Warden / Facility Administrator

2) Assistant Warden /Assistant Facility Administrator

3) Chief of Security

4) Quality Assurance Manager

5) Environment, Health and Safety Officer

6) Corporate Security Officer

7) Health Service Administrator

8) Clinical Director

**3052.219-70   Small Business Subcontracting Plan Reporting (JUN 2006)**

**3052.222-70   Strikes or Picketing Affecting Timely Completion of the Contract Work
(DEC 2003)**

**3052.222-71   Strikes or Picketing Affecting Access to a DHS Facility (DEC 2003)**

**3052.242-71   Dissemination of Contract Information (DEC 2003)**

**3052.242-72   Contracting Officer's Technical Representative (DEC 2003)**

**3052.245-70   Government Property Reports (AUG 2008) (Deviation)**

91



# I.   Technical and Management Capability
## 1.1.   Quality Control and Assurance

The GEO Group, Inc. (GEO) recognizes the vital role of quality control in every aspect of its operations. The primary focus of the Aurora ICE Processing Center (the Center) is to provide safe, secure, and humane care and custody of detainees. As a means to maintain this goal, GEO will retain the comprehensive Quality Control Plan (QCP) currently in place at the center, which has been reviewed and approved by the Federal Government, and ensures operations that are in compliance with the Performance Based National Detention Standards, court orders, American Correctional Association (ACA) Standards, standards established by the National Commission of Correctional Health Care (NCCHC), and specific client policies.

**Policies & Procedures**

It is GEO's policy that each of our facilities develops a manual of uniform policies and procedures based on the Corporation's philosophy, goals, and operational procedures. These procedures provide effective guidelines for the standardization of GEO operations. In addition, pursuant to contract and/or accreditation requirements, each GEO facility develops supplemental procedures.  All policies and procedures appropriately reflect constitutional, legal, contractual and professional requirements. Policies and procedures are reviewed and revised at least annually and updated as needed.

**Inspections**

GEO will continually conduct monitoring utilizing a comprehensive self-monitoring plan approved by the Government for providing corporate, regional, and center level assurance of quality control. Procedures shall provide for corporate level monitoring to be accomplished through a series of announced and unannounced visits to the center by corporate and regional management, as well as by dedicated contract compliance staff. These visits will include a complete and thorough annual audit with follow-up audits as required. An audit function led by the Corporate Vice President, Contracts Administration, the Corporate Director of Compliance, and the Regional Director of Contract Compliance will conduct the regularly scheduled annual and ad hoc audits and follow-up visits. The Regional Director of Contract Compliance shall coordinate with the Corporate Vice President, Contacts Administration and the Corporate Director of Compliance for the review and approval of the performance of the self-audits and any resulting corrective actions. Center administrative staff will audit all functional areas of the center, as listed in the QCP Document Checklist. The Quality Assurance Manager staffed at the center will be responsible for the organization, planning, and implementation of internal audits and inspections. The Quality Assurance Manager will work with both Regional and Corporate contract staff to ensure the center's compliance with the Government's Quality Assurance Surveillance Plan (QASP).



The center staff, conducting self-audits, and GEO corporate and regional personnel, conducting annual compliance audits, will inspect the following areas on both a scheduled and unscheduled basis:

- Administration and management;
- Center security and control;
- Detainee activities;
- Safety standards;
- Detainee legal resources;
- Detainee care and healthcare; and
- Order.

The QCP shall include the provision for monthly self-audits that include a performance review of the center operations for compliance with the QCP and contract requirements.

GEO is familiar with, and understands, the Government's requirement to monitor the center on an annual basis. Acknowledging that this full-center review will include both announced and unannounced site visits, GEO will ensure the Government shall have unimpeded access to the center. All records, including financial, maintenance, employee, and detainee records will be available for review.

All written audits by the Contracting Officer's Technical Representative (COTR) will be received by the Warden/Facility Administrator and forwarded to GEO's contract compliance personnel at the regional and corporate offices. The center staff will work with corporate and regional staff to investigate any findings of non-compliance and respond with a written statement of corrective actions either taken or planned. For those items that require a corrective period of time to implement, a schedule of action with a timetable for completion will be included.

## Methodology

The over-riding purpose of the QCP is to perpetually self-assess the contract's performance in order to ensure it conforms to performance requirements, identify deficiencies in the quality of services throughout the entire scope of the contract, and implement corrective action before the level of performance becomes unsatisfactory. To accomplish this function, and create a synergy for the QCP, a system of audits has been implemented, specifically for this contract, to monitor all departmental outputs. The plan provides the statistical tracking needed to observe trends and to frequently revisit the contract requirements and client's expectations.

## Emphasis on Compliance

GEO understands its responsibility for compliance with the requirements and performance standards of this contract and the RFP. The Warden/Facility Administrator and staff are primarily responsible for maintaining compliance with all applicable standards. When continuing operations at the Aurora ICE Processing Center, GEO will continue its responsibility to confirm compliance, to recognize areas of non-compliance, to identify corrective action plans and to verify the implementation of improvements. The manner used to accomplish this is through the use of internal self-assessments, and scheduled and unscheduled external compliance reviews by specialized staff in particular areas of corrections with knowledge of the contract.

CONFIDENTIAL



As a standard for all GEO contracts, corporate and regional staff will be in daily, weekly, and monthly contact with the Warden/Facility Administrator to gather the information necessary to monitor performance. A variety of GEO corporate and regional personnel representing financial, health services, programs, food service, and general operations areas will take numerous trips to the center in an effort to maintain an efficient QCP. During these visits and throughout the duration of the contract, corporate and regional staff shall remain in constant communication regarding their impressions, findings, and evaluations of personnel, morale, and procedures at our facilities.

The onsite Quality Assurance Manager will be responsible for managing and overseeing the Center's internal self assessment process, the QCP. The Center's QCP requires monthly audits by center staff augmented by annual regional staff audits to review the performance of Center operations for compliance with the QCP and compliance with the contract requirements. The plan requires documentation of each audit including a plan for corrective action when appropriate. Concluding each audit a subsequent review is conducted to ensure corrective action was taken as prescribed.

**Supervisory Plan**

**Persons Conducting Inspections**:
Corporate Vice President, Contract Administration – Extent of Authority: Full authority for directing contract compliance audits including compliance with corrective action.

Corporate Director of Compliance – Extent of Authority: Full authority to convene and conduct all facets of audits to require corrective action and to work with client on pending issues regarding policies and procedures.

Corporate Manager of Compliance – Extent of Authority: Assists in convening and conducting all facets of audits and corrective action, works with the region and facilities on client and pending issues regarding policies and procedures.

Regional Director of Contract Compliance – Extent of Authority: Full authority to conduct all facets of audits to require corrective action and to work with client on pending issues regarding policies and procedures.

Regional Manager of Contract Compliance – Extent of Authority: Full authority for ensuring compliance with contract deliverables required prior to and after the Notice to Proceed is issued. Full authority to conduct audits and monitor compliance with corrective action plans, and will be charged with the responsibility of overseeing compliance with contractual requirements.

Warden/Facility Administrator – Extent of Authority: Full authority for day-to-day operations of the center. Responsible for ensuring quality control procedures are in place and functioning at the Center level.

Quality Assurance Manager – Responsible for managing and overseeing the QCP at the Center.

**Communications Plan**

GEO_MEN 00019816



While developing the QCP for this Center, GEO welcomes all communications from the Government, and agrees to work closely with the Contracting Officer (CO) or COTR to identify the strategic issues vital to both quality assurance and quality control. GEO will incorporate these requirements into the QCP in order to align the initiatives with those of the Government's QASP and ensure full compliance. Anyone at the GEO corporate office is available at all times for the CO or the COTR to call regarding this contract. For the purposes of consistency and reliability of communication, the following procedures are suggested:

The Warden/Facility Administrator and the Quality Assurance Manager will work with on-site monitoring staff to establish a reliable and confidential relationship wherein day-to-day communications take place at the Center level with compliance reviews, discussions regarding the reviews, and corrective actions.

The COTR and the CO (as well as other Government representatives) are invited to staff meetings regarding the management/operation of the Center. These meetings are critical for Center operations staff to maintain awareness and implement plans regarding improving areas, areas that need work, and areas that need direction.

GEO_MEN 00019817