**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated*,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

**DEFENDANT THE GEO GROUP, INC.'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S
AFFIRMATIVE DEFENSE**

---

Defendant The GEO Group, Inc. ("Defendant" or "GEO"), by and through its undersigned

counsel, hereby submits its response in opposition to Plaintiffs' Motion for Summary Judgment

on Defendant's Affirmative Defense (ECF No. 260) ("Motion") and respectfully requests that this

Court deny Plaintiffs Motion and enter judgment in favor of GEO.

## I.    INTRODUCTION

The length of Plaintiffs' Motion obscures a simple fact: the U.S. Immigration and Customs

Enforcement ("ICE") *mandatory* performance standards provide for punishment up to and

53343955;4

including 72 hours of disciplinary segregation for a detainee's "[r]efusal to clean assigned living area." ICE also *requires* its contractors, including GEO, to notify detainees in writing of prohibited acts and the corresponding potential discipline. GEO's compliance with those *legal requirements* is what Plaintiffs allege amounts to a violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1589 *et seq.* ("TVPA"). Likewise, Plaintiffs' Motion ignores the fact that ICE's performance standards *required* a payment of exactly $1.00 per day for Voluntary Work Program ("VWP") participants for approximately half of the applicable three-year class period (October 22, 2011 through June 22, 2013). Immunity clearly applies during that time. For the VWP class period thereafter (June 23, 2013 through October 22, 2014), GEO continued to follow the explicit direction of ICE, that $1.00 per day was a permissible minimum payment for VWP participants. Accordingly, the doctrine of derivative sovereign immunity and the government contractor defense preclude Plaintiffs' claims in this action.

## II.   BACKGROUND

Plaintiffs have identified two distinct classes in this action: the "Forced Labor" class, whose claims allege a violation of the TVPA, and the "Voluntary Work Program Class," whose claims are styled as an unjust enrichment action. ECF 49 at 3; ECF 57 at 21.[1] Plaintiffs now move for summary judgment on GEO's immunity defenses in this action, specifically derivative sovereign immunity ("DSI"), on the alleged basis that ICE did not require or condone the policies underlying Plaintiffs' claims. *See generally* ECF 260. But, as the undisputed facts make clear, the two policies implemented at the Aurora ICE Processing Center ("AIPC") at issue in this case— (i)

---

[1] The Forced Labor Class period spans from October 22, 2004 to October 22, 2014 and the Voluntary Work Program Class period spans from October 22, 2011 to October 22, 2014, which will collectively be referred to in this motion as the "Class Period."

53343955;4

the disciplinary sanctions for a detainee's refusal to clean his or her living area and (ii) the VWP pay rate of one dollar per day—were explicitly authorized by ICE. Therefore, GEO is entitled to DSI, which applies whenever a federal contractor acts in accordance with authority validly conferred by the federal government. *See Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21-22 (1940); *see also Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672-73 (2016); *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 643 (4th Cir. 2018).

The Forced Labor Class alleges that GEO violated the TVPA by requiring detainees "to perform uncompensated janitorial labor under the threat of solitary confinement." ECF 49 at 3. To prevail on this claim, the Forced Labor Plaintiffs must prove that the *means* utilized to obtain their forced labor were unlawful. The TVPA prohibits the procurement of labor through force, threats of force, serious harm, or threats of serious harm. 18 U.S.C. § 1589(a). Here, Plaintiffs allege they were coerced into cleaning their living areas because they were informed (or "threatened") that the refusal to clean their living areas *could* result in the sanction of segregation for up to 72 hours. ECF 49 at 3. Even assuming *arguendo* that detainees were coerced into cleaning their living areas[2] under the "threat" of administrative or disciplinary segregation for up to 72 hours, and that the "threat" of that brief segregation constitutes serious harm under the TVPA, GEO is still entitled DSI. It is undisputed that ICE's disciplinary system, as set forth in ICE's Performance Based National Detention Standards ("PBNDS"), was expressly incorporated into GEO's contract with ICE and required GEO to provide notice to detainees that segregation for up to 72 hours was an authorized sanction for the refusal to clean their living areas. Further, the PBNDS explicitly require

---

[2] There can be no question that detainees are required to clean their living areas. ECF 260 (Plaintiffs' Undisputed Facts #31 and #62).

the ICE disciplinary severity scale that sets forth the sanction of segregation for the refusal to clean a living area be adopted by contractors without alteration. Because it is undisputed that ICE required and directed GEO to comply with the PBNDS (including its disciplinary system), and that in turn GEO complied with the PBNDS—GEO is entitled to summary judgment based upon DSI.[3]

The VWP Class alleges that GEO has been unjustly enriched by paying detainees who volunteer to participate in certain tasks as part of the VWP only $1.00 per day. The Department of Homeland Security ("DHS") and ICE, by contract, require that GEO administer the VWP at the AIPC. DHS and ICE validly conferred to GEO the authority to administer the VWP, in which detainees receive a $1.00 daily allowance for their participation. The $1.00 per day pay rate was set by Congress and adopted by ICE in the PBNDS.  Therefore, in this lawsuit where Plaintiffs' challenge the $1.00 per day pay rate under an unjust enrichment theory, GEO is entitled to DSI because the VWP is required by ICE and the $1.00 per day pay rate was explicitly set by Congress and adopted by ICE in the PBNDS. Accordingly, because GEO merely performed as the federal government lawfully directed, Plaintiffs' Motion should be denied. Furthermore, because the undisputed facts make clear that GEO has established the defense of DSI, this Court should enter summary judgment in GEO's favor on its DSI defense.

## III.   RESPONSE TO STATEMENT OF UNDISPUTED FACTS

In support of their Motion, Plaintiffs submitted 98 purportedly undisputed facts, most of which are immaterial to the issues before this Court. Thus, GEO identifies the relevant and material

---

[3] Furthermore, the fact that GEO was merely complying with the directives of ICE establishes that any alleged threat was not made "knowingly."

undisputed facts below, omitting impertinent information. Should the Court find any of Plaintiffs' other submitted facts to be relevant and material, GEO has submitted its response to each fact, as numbered in Plaintiffs' brief, as Exhibit A.[4] Insofar as the Court determines the disputed facts are relevant to Plaintiffs' motion, which it should not, summary judgment in Plaintiffs favor would be inappropriate.

### A.  Material Undisputed Facts from Plaintiffs' Motion

1. ICE is a federal agency tasked with enforcing U.S. immigration laws. 6 U.S.C. § 542. ECF 260 (Plaintiffs' Undisputed Fact #1).

2. ICE has the authority to detain foreign nationals suspected of entering the United States unlawfully. Immigration and Nationality Act, codified at 8 U.S.C. §§ 1101 et seq. ECF 260 (Plaintiffs' Undisputed Fact #2).

3. ICE contracts with GEO to house some of its detainees in detention facilities throughout the country. See https://www.geogroup.com/Locations. ECF 260 (Plaintiffs' Undisputed Fact #3).

4. Among GEO's portfolio of ICE detention facilities is the Aurora Facility. ECF 260 (Plaintiffs' Undisputed Fact #4).

5. GEO continuously operated the Aurora Facility, under contract[s] with ICE, from October 22, 2004 to October 22, 2014. ECF 260 (Plaintiffs' Undisputed Fact #5).

6. The Contract may be modified during its term by mutual consent of GEO and ICE. ECF 260 (Plaintiffs' Undisputed Fact #8).

---

[4] All exhibits referenced herein have been filed concurrently as attachments to the declaration of undersigned counsel.

7.  The Performance Based National Detention Standards ("PBNDS") are a series of minimum standards for detention facilities developed by ICE. ECF 260 (Plaintiffs' Undisputed Fact #24).

8.  The PBNDS are incorporated into the Contract. ECF 260 (Plaintiffs' Undisputed Fact #25).

9.  Pursuant to the Contract, GEO must abide by the PBNDS ECF 260 (Plaintiffs' Undisputed Fact #26)

10. A modification to the 2011 Contract incorporated the 2011 PBNDS into that contract. ECF 260 (Plaintiffs' Undisputed Fact #27).

11. The PBNDS authorize up to 72 hours of disciplinary segregation as punishment for certain offenses in what is designated as the "high moderate" offense category. ECF 260 (Plaintiffs' Undisputed Fact # 77). Among the "high moderate" offenses crafted by ICE is "Refusing to clean assigned living area." (Plaintiffs' Undisputed Fact # 79).

12. The PBNDS Require that staff and detainees maintain a high standard of facility sanitation and general cleanliness . . . All horizontal surfaces shall be dampdusted daily with an approved germicidal solution used according to the manufacturer's directions.  Windows, window frames, and windowsills shall be cleaned on a weekly schedule. Furniture and fixtures shall be cleaned daily. Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions. A clean mop head shall be used each time the floors are mopped. Waste containers shall weigh less than 50 lbs., be non-porous and lined with plastic bags; the liner shall be changed daily. Waste containers shall be washed weekly at a minimum, or as needed when they become soiled. Cubicle curtains shall be laundered

monthly or during terminal cleaning following treatment of an infectious patient. ECF 260 (Plaintiffs' Undisputed Fact #31).

13. Like the PBNDS, GEO's Aurora Detainee Handbook states that detainees are "required to keep [their] personal living area clean and sanitary." ECF 260 (Plaintiffs' Undisputed Fact #62).

14. The Aurora Detainee Handbook is issued to all detainees entering Aurora. ECF 260 (Plaintiffs' Undisputed Fact #60).

15. All of GEO's policies are reviewed and approved by an on-site ICE official. ECF 260 (Plaintiffs' Undisputed Fact #43).

16. ACA Standard 4-ALDF-1A-04 requires that: "The facility is clean and in good repair. A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance." ECF 260 (Plaintiffs' Undisputed Fact #38).

17. ACA Standard 4-ALDF-5C-08 requires that: "Pretrial and unsentenced inmates are not required to work except to do personal housekeeping and to clean their housing area. Inmates are allowed to volunteer for work assignments." This standard is incorporated into the PBNDS. ECF 260 (Plaintiffs' Undisputed Facts #39 and #38).

18. ACA Standard 4-ALDF-1A-04 requires that: "The facility is clean and in good repair. A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance." ECF 260 (Plaintiffs' Undisputed Fact #33).

19. GEO's Sanitation Procedures do not specify which aspects of cleaning are the responsibility of HUSP workers and which are the responsibility of VWP workers. ECF 260 (Plaintiffs' Undisputed Fact #46).

20. The Voluntary Work Program ("VWP") section of the PBNDS provides that detainees "shall be provided the opportunity to participate in a voluntary work program." ECF 260 (Plaintiffs' Undisputed Fact #35)

21. GEO pays detainees who work in the VWP at the Aurora Facility $1.00 per day.  ECF 260 (Plaintiffs' Undisputed Fact #93).

22. ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP. ECF 260 (Plaintiffs' Undisputed Fact #94).

**B.  Statement of Additional Undisputed Facts.**

1. The United States Congress has delegated to DHS, and its agency ICE, the sole authority to arrange for all aspects of the detention of aliens pending the results of their immigration proceedings. *See* 8 U.S.C. § 1231(g)(1) ("The [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.").

2. In making these arrangements, ICE must consider the use of private contractors to detain aliens prior to constructing its own facilities. *See* 8 U.S.C. § 1231(g)(2) ("Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.").

3. As a result of Congress' directive, ICE neither constructs nor operates its own immigration detention facilities, Ex. B (Dec. of Tae Johnson), and therefore its state and private contractors are critical to carrying out the federal function of immigration detention.

4. Due to significant fluctuations in the number and location of removable aliens apprehended by DHS and subject to detention, it is important for ICE to maintain flexibility with regard to its immigration detention facilities. Otherwise, ICE could invest heavily in its own facilities only to have them stand idle if a particular geographic area later experiences a drastic decrease in demand for detainee housing. Ex. B.

**GEO's Contracts with ICE**

5. Consistent with this overall policy, ICE chose to contract with the AIPC to detain aliens pending the resolution of their immigration proceedings. ECF 260 at 2 (Plaintiffs' Undisputed Facts # 3, 4, and 5). GEO owns and operates the AIPC, and has operated it pursuant to a series of direct contracts between GEO and ICE. *Id.* (Plaintiffs' Undisputed Fact # 5). ICE is authorized by DHS and Congress to enter into these contracts. *See*, *e.g.*, 8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g).

6. All immigration detention processing centers, including the AIPC, must adhere to ICE's standards. In 2000, the Immigration and Naturalization Service ("INS"), ICE's predecessor, adopted the original National Detention Standards (the "2000 NDS"). ICE promulgated subsequent versions of the PBNDS in 2008 (the "2008 PBNDS"), and 2011 (later updated in 2016) (the "2011 PBNDS") (the 2000 NDS are located at https://www.ice.gov/detention-standards/2000; the 2008 PBNDS are located at: https://www.ice.gov/detention-standards/2008; the 2011 PBNDS are located at: https://www.ice.gov/detention-standards/2011).

7. In each contract GEO entered into with ICE for the operation of the AIPC, the 2000 NDS, 2008 PBNDS, or the 2011 PBNDS, as applicable, were incorporated into the contract and

GEO was required to comply with the same. ECF 260 at 7 (Plaintiffs' Undisputed Facts # 25 and 26).

8.  GEO's contract with ICE, number ACD-3-C-0008, required it to comply with the 2000 NDS from March 27, 2003 to September 28, 2006. ECF 262-5, 12 (GEO_MEN 00059754).

9.  GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, similarly required it to comply with the 2000 NDS. ECF 24-4, 11 (GEO_MEN 00059644); *see also* ECF 260 at 3 (proffering as undisputed the fact that HSCEOP-06-D-00010 was one of GEO's contracts with ICE during the class period); ECF 262-4 (incorporating the 2000 NDS into the contract).

10. On April 28, 2010, GEO entered into a contract modification with ICE (HSCEOP-06-D-00010/P00018) which required it to comply with the 2008 PBNDS, effective immediately. Ex. C ; ECF 261-9 (2008 PBNDS).

11. GEO's subsequent contract with ICE, number HSCEDM-11-D-00003, required it to continue to comply with the 2008 PBNDS. That contract was effective September 15, 2011. ECF 262-2, 38 (incorporating the 2008 PBNDS into the contract); *see also* ECF 260 at 3 (proffering as undisputed the fact that HSCEDM-11-D-00003 was one of GEO's contracts with ICE during the Class Period).

12. On May 23, 2013, GEO entered into a contract modification with ICE (HSCEDM-11-D-00003/P00005) agreeing that, effective June 23, 2013, GEO would comply with the 2011 PBNDS. Ex. D;  ECF 262-3, 2 (GEO-MEN 00020406; *see also* ECF 260 at 3 (proffering as undisputed the fact that HSCEDM-11-D-00003/P00005 was one of GEO's contracts with ICE during the Class Period).

**The ICE-Mandated Disciplinary Severity Scale**

13. The 2000 NDS and all applicable versions of the PBNDS require GEO to adopt, without
    alteration, the ICE disciplinary severity scale. ECF 261-10 at 17 (2000 NDS) (Contract
    Detention Facilities "shall adopt, without changing, the offense categories and disciplinary
    sanctions set forth in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention
    Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set
    forth in this section."); ECF 261-8 at 39 (2011 PBNDS) ("All facilities shall have graduated
    scales of offenses and disciplinary consequences as provided in this section.").

14. The 2000 NDS and all versions of the PBNDS require GEO to provide notice to detainees, in
    the local detainee handbook, of the ICE-mandated disciplinary severity scale. ECF 261-10 at
    10 (2000 NDS) ("The detainee handbook, or supplement, issued to each detainee upon
    admittance, shall provide notice of. . . the disciplinary severity scale…"); ECF 261-9 at 44
    (2008 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon
    admittance, shall provide notice of. . . the disciplinary severity scale…"); ECF 261-8 at 38
    (2011 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon
    admittance, shall provide notice of. . . the disciplinary severity scale…").

15. Likewise, the 2000 NDS and all versions of the PBNDS explicitly provide a disciplinary
    severity scale that includes the "[r]efusal to clean assigned living area" as an offense which
    can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000
    NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); *see also* ECF 260 at 17
    (Plaintiffs' Undisputed Facts #77 and #79).

53343955;4

16. The 2000 NDS and all versions of the PBNDS also explicitly provide a disciplinary severity scale that lists "[r]efusing to obey the order of a staff member or officer" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); *see also* ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

17. The AIPC's local detainee handbook's disciplinary severity scale does not deviate from the 2000 NDS or the applicable PBNDS. Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook) (Specifically identified in Plaintiffs discovery responses as the basis for their claims); Ex. J, Kevin Martin Dep. 40:21-24 ("Q. Do you know if there's any deviation from between the DB -- excuse me, between the GEO Detainee Handbook and the PBNDS as far as disciplinary requirements? A. Not as far as disciplinary requirements[.]").

18. The 2000 NDS and the applicable versions of the PBNDS provide for the exact graduated scales of offenses and disciplinary consequences for dedicated facilities, such as the AIPC. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS). The graduated scale of offenses (of which detainees must be made aware) are explicitly laid out in the 2000 NDS and the applicable PBNDS, providing GEO no discretion whatsoever to alter the disciplinary severity scale.

19. As required by the 2000 NDS and the applicable versions of the PBNDS, the disciplinary severity scale is copied verbatim into the local detainee handbook at the AIPC. Ex. J, Kevin

Martin Dep. 40:13-16 ("And does the Detainee Handbook lay out these exact rules from the PBNDS for the detainees as far as discipline goes? A: Yes."); 83:17-22 (same).

20. In addition to the disciplinary severity scale, GEO has detailed a Sanitation Procedures document that contains a section entitled "Detainee Sanitation Procedures." ECF 262-8; *see also* ECF 50-4 (the "<u>Sanitation Procedures</u>").

21. The Sanitation Procedures sets forth general standards for sanitation that must be followed by both GEO employees and detainees. *Id.* While the sanitation policies for detainees apply to those detainees housed at the AIPC who participate in cleaning tasks through the VWP or by cleaning their living area, ECF 50-1, 9 (Ceja Dep. 29:13-16), the Sanitation Procedures were not developed to assign tasks to specific individuals, but rather to detail the actual process for cleaning and materials and supplies to be used. Ex. J, Kevin Martin Dep. 208:6-11.

22. The Sanitation Procedures also contain a section detailing the consequences for non-compliance, stating: "The Dormitory/Unit Officer will inspect all living areas daily and report any infraction of these regulations to the immediate supervisor. The officer will notify detainees of unsatisfactory conditions, in cases of continued noncompliance, staff will issue an incident report." ECF 262-8, 4; *see also* ECF 50-4. The Sanitation Procedures do not provide for any other penalty for non-compliance. *Id.*

23. GEO has never maintained a separate policy or practice of placing a detainee in solitary confinement for the refusal to clean a living area. Ex. K (Amber Martin Dep., 134, 135.).

24. ICE audits GEO to ensure that GEO complies with all requirements of its contract, including its obligations under the PBNDS. Ex. L.

25. As part of each inspection, each audit reviews compliance with each PBNDS requirement. *Id.*

26. The materials provided to detainees at intake, including the handbook and orientation video, are regularly audited and have passed each audit since 2004. *Id.*

27. The audits specifically review intake procedures to ensure that the orientation information provides information about '[u]nacceptable activities and behavior, and corresponding sanctions" as well as the"detainee handbook." *Id.* (GEO-MEN 00131895).

28. The disciplinary severity scale is audited and has passed each audit since 2004. *Id.*

29. The audits review whether GEO provides notice of the disciplinary severity scale and have found GEO compliance based upon a review of its handbooks. *Id.* (GEO-MEN 00131936).

30. The VWP has been audited each year and has passed each audit since 2004. *Id.*

31. ICE has not only approved of the disciplinary severity scale but has also acted to implement and enforce the sanctions therein. One of the named Plaintiffs in this case—Demetrio Valerga—explained during his deposition that ICE officers also enforced the ICE sanctions. After claiming that one of GEO's corrections officers told Mr. Valerga that he could be placed in segregation if he did not help clean his own common area, Ex. M, Dep. of Demetrio Valerga, 135:15-137:19, Mr. Valerga then explained that ICE officers woke him up, pulled him out of his housing unit, and spoke to him directly. *Id.* at 138:2-13. During that conversation, ICE officers told Mr. Valerga that he could, in fact, be taken to segregation for refusing to help clean his living area. *Id.* at 138:15-23.[5]

**The VWP**

---

[5] Even after the ICE Officer's warning, Mr. Valerga refused to clean and later refused again several times. *See* Ex. M Dep. of Demetrio Valerga, 139:6-24, 140:2-20. Mr. Valerga was never placed in segregation for refusing to clean. *Id.*

32. The 2000 NDS and all applicable versions of the PBNDS require that GEO provide detainees the opportunity to participate in a VWP. (Plaintiffs' Undisputed Fact #35).

33. The 2000 NDS, with which the AIPC was contractually obligated to comply from March 27, 2003 to April 28, 2010, required GEO to provide "compensation" and explicitly directed that "the stipend is $1.00 per day, to be paid daily." ECF 261-10, 5 (2000 NDS).

34. Likewise, the 2008 PBNDS, with which the AIPC was contractually obligated to comply from April 28, 2010 to June 22, 2013, mandated that "the compensation is $1.00 per day." ECF 261-9 at 63 (2008 PBNDS).

35. Beginning on June 23, 2013, AIPC was bound by the 2011 PBNDS, which state that participants in the VWP will be compensated with "at least $1.00 (USD) per day." ECF 261-8 at 53 (2011 PBNDS). Thus, the "at least" language upon which the VWP Class relies was not implemented at the AIPC until approximately halfway through the VWP Class Period.

36. Before the 2011 PBNDS were implemented at the AIPC, GEO paid the amount it was explicitly directed by ICE to pay to VWP participants: $1.00 per day. (Plaintiffs' Undisputed Fact #93).

37. Thereafter, GEO continued to pay members of the VWP Class $1.00 per day the minimum payment explicitly permitted by the 2011 PBNDS. (Plaintiffs' Undisputed Fact #93).

**Plaintiffs' Allegations**

38. Plaintiffs allege that the PBNDS disciplinary severity scale forms the basis of their TVPA claim. ECF 50-3, 25; *see also* Ex. N (Plaintiffs' Sixth Supplemental discovery responses).

39. Plaintiffs claim that the Sanitation Procedures, when read together with the ICE-mandated disciplinary severity scale, violate the TVPA. *Id.*

53343955;4

40. Plaintiff Menocal was never threatened by a GEO employee with disciplinary or administrative segregation for the refusal to clean his living area. Ex. O (Plaintiffs' Second discovery responses Interrogatory No. 27). Rather, the only "threat" Menocal alleges was through the local AIPC detainee handbook and orientation video, which explained ICE's PBNDS disciplinary severity scale. Ex. N (Interrogatory No. 39).

41. The other named Plaintiffs likewise claim that ICE's PBNDS-mandated disciplinary severity scale in the local AIPC detainee handbook, as well as the same information provided to them during their AIPC orientation forms the basis for their TVPA claims. Ex. N; Ex. O.

42. In sum, Plaintiffs' TVPA claim is limited to the allegation that detainees cleaned their living areas "in order to avoid solitary confinement" or "segregation." ECF 47 at 7 (Plaintiffs' Class Certification Motion); *see also* ECF 1 at ¶¶ 6, 73 (Plaintiffs' Complaint).

43. Plaintiffs' claims do not rest on every single time they cleaned their living area, but rather, only those instances where cleaned up the tables in their living areas after meals.

44. The basis for Plaintiffs' unjust enrichment claim is that GEO was unjustly enriched by paying only $1.00 per day for completion of their VWP tasks. ECF 49 at 3.

## IV.   LAW AND ANALYSIS

### A.  Applicable Legal Standard.

In considering whether to grant a motion for summary judgment, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir.2008). Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled

53343955;4

to judgment as a matter of law. Fed.R.Civ.P. 56(c). *O'Connor v. Check Rite, Ltd.*, 973 F. Supp. 1010, 1014 (D. Colo. 1997) (Kane, J.). A fact is "material" if it "might affect the outcome of the suit under governing law*." Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a factual dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Id*. Although the motion for summary judgment before the Court was initiated by Plaintiffs, Fed. R. Civ. P. 56(f) allows the district court to grant summary judgment for a nonmovant where the material facts are undisputed.[6] Alternatively, GEO's opposition may be construed by this Court as a cross-motion for summary judgment and "assume that there is no evidence which needs to be considered other than that which has been filed by the parties." *Harrison W. Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir. 1981).

## B. Derivative Sovereign Immunity.

The U.S. Supreme Court recently reaffirmed that under that doctrine of derivative sovereign immunity, government contractors may "obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) (internal quotation marks omitted) (*quoting Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)).[7] A federal government contractor is entitled to

---

[6] The nonmoving party may establish it is entitled to summary judgment in response to a moving party's motion. *See e.g. Int'l Tele-Marine Corp. v. Malone & Assocs., Inc.*, 845 F. Supp. 1427, 1435 (D. Colo. 1994) (Kane, J.) (considering nonmoving party's claim that it was entitled to summary judgment as raised in its opposition papers).

[7] To avoid any confusion, following the filing of this lawsuit and GEO's Answer, the Supreme Court decided *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016). In *Campbell-Ewald*, the Supreme Court made clear that derivative sovereign immunity is distinct and separate from the "government contractor defense" enumerated in *Boyle v. United Techs. Corp.*, 487 U.S. 500, 508, 108 S. Ct. 2510, 2516, 101 L. Ed. 2d 442 (1988). In *Boyle*, the Court examined when a federal contractor may be held liable under state law for work performed under a contract with the federal government. *Id.* The Court explained that the government contractor defense involves the limited issue of whether state law is displaced because it conflicts with a contractual term in an area of

DSI when it performs work "authorized and directed by the Government of the United States" and the contractor "simply performed as the Government directed." *Campbell-Ewald Co.*, 136 S. Ct. at 673. In that way, DSI ensures that "'there is no liability on the part of the contractor' who simply performed as the Government directed." *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019) (quoting *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21 (1940)). Authorization is "validly conferred" on a contractor if Congress authorized the government agency to perform a task and empowered the agency to delegate that task to the contractor, provided it was within the power of Congress to grant the authorization. *See Yearsley*, 309 U.S. at 20, 60 S.Ct. 413. Put another way, a government contractor that "violates both federal law and the government's explicit instructions" loses the shield of DSI and is subject to suit by those adversely affected by the contractor's violations. *Campbell-Ewald Co.*, 136 S. Ct. at 672. The only requirements for DSI to apply are (1) that the federal contractor "perform[] as the Government directed," *Campbell-Ewald*, 136 S.Ct. at 673, and (2) that "authority to carry out the project was validly conferred" by the government, *Yearsley*, 309 U.S. at 20-21.[8] As explained

---

federal interest. *Id.* In contrast, *Campbell-Ewald* made clear that derivative sovereign immunity applies where a government contractor merely acted as authorized by the federal government. *Campbell-Ewald* did not mention *Boyle*, nor the "government contractor defense," and *Boyle* does not mention "derivative sovereign immunity." Adding further clarity, despite pleas from the appellant, *Campbell-Ewald* did not apply or mention the test enumerated in *Boyle,* making clear the doctrines are distinct. *Campbell-Ewald* confirmed that derivative sovereign immunity applies more broadly to afford a federal government contractor immunity for both state and federal law claims without any requirement that the contractor establish the grounds for displacement of state law. Cases decided after the Court's 2016 *Campbell-Ewald* decision have likewise treated derivative sovereign immunity as its own distinct defense, separate from the government contractor defense under *Boyle. See, e.g., Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98 (D.D.C. 2017) (applying derivative sovereign immunity to state and federal law claims separate from government contractor defense); *cf. In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019) (drawing a distinction between the legal principles enumerated in *Boyle* and *Campbell-Ewald*). And, Plaintiffs agree that the two doctrines are distinct. ECF 260 at n.5.

[8] Unlike the "government contractor defense" in *Boyle*, DSI does not consider "discretion" in the design. *Compare Cunningham,* 888 F.3d 640, 643 *with Boyle*, 487 U.S. at 508.

below, both requirements are satisfied here.

Recently, the Fourth Circuit addressed facts analogous to those here. In *Cunningham v. General Dynamics Information Technology*, Greg Cunningham received an autodialed call from General Dynamics (a government contractor), advertising the commercial availability of health insurance. 888 F.3d 640, 643 (4th Cir.), *cert. denied*, 139 S. Ct. 417 (2018). Cunningham filed suit on behalf of a putative collective, arguing that because he had not provided his express consent, General Dynamics had violated the Telephone Consumer Protection Act ("TCPA"). *Id.* In response, General Dynamics claimed that it was immune from suit under the principle of DSI. *Id.* General Dynamics called Cunningham in connection with its contract with the Department of Health and Human Services ("DHHS") wherein General Dynamics was required to make calls informing individuals about their ability to buy health insurance created by the Affordable Care Act ("ACA").[9] *Id.* at 643. Under the contract, General Dynamics was required to make phone calls during a specified timeframe to inform individuals about their ability to buy health insurance through the health insurance exchanges created by the ACA. *Id.* at 644. DHHS authorized General Dynamics to use an autodialer to make the calls, provided a script for each call, and provided a list of phone numbers for each call. *Id.* The contract also required General Dynamics follow all applicable laws. *Id.* at 647. DHHS provided Cunningham's phone number to General Dynamics, indicating he was an individual who should be notified of his right to purchase health insurance through the exchanges. *Id.* However, Cunningham had previously opted out of the communications and the instruction to call him despite his prior opt-out gave rise to liability under the TCPA. *Id.* Interpreting *Campbell-Ewald* the Fourth Circuit concluded that governmental immunity was precluded only where a contractor violates its contract with the federal government. Thus, in assessing whether DSI applied, the Fourth Circuit concluded that General Dynamics did not violate

---

[9] DHHS was authorized to establish a system informing applicants about their eligibility for a qualified health plan pursuant to 42 U.S.C. § 18083(a), (b)(2), (e).

its contract when it made the call to Cunningham, because the call was ***explicitly authorized*** under the contract. *Id.*  In so holding, the Fourth Circuit made clear that General Dynamics' failure to obtain Cunningham's consent prior to placing the phone call –as mandated by the TCPA – was insufficient to show a violation of the contract which required it to comply with "all applicable laws," where its actions were otherwise directed by the contract. *Id*. Thus, General Dynamics was entitled to DSI. *Id*.

Here, the parties do not dispute the applicable law. Plaintiffs rely upon *Campbell-Ewald* and *Cunningham* in bringing their Motion. ECF 260 at 26-27. Rather, the parties only dispute the application of the law to the facts. When viewed in its totality, there is no question GEO has "simply performed as [ICE] directed" and that ICE's authority to delegate the care of detainees, and attendant discipline, was validly conferred by Congress.

### C.  ICE's Authority to Contract with GEO for the Care, Supervision, and Discipline of Detainees was Validly Conferred. [10]

Congress has validly conferred on ICE the authority to provide for the custodial supervision of detainees using private contractors like GEO. ICE has broad discretion to determine where to house ICE detainees. *See e.g., Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986) ("Congress . . . placed the responsibility of determining where aliens are detained within the discretion of the Attorney General."); *Rios–Berrios v. I.N.S.*, 776 F.2d 859, 863 (9th Cir. 1985) (a decision to detain an alien arrested in California at a facility in Florida was within the province of ICE); *Sasso v. Milhollan*, 735 F. Supp. 1045, 1048 (S.D.Fla. 1990) (a decision to transfer an alien from one locale to another is within the sound discretion of ICE); *c.f. Demore v. Kim*, 538 U.S.

---

[10] While GEO addresses this element of its defense, it is worth noting that Plaintiffs' do not dispute that it is within ICE's authority to set the methods of discipline for ICE detainees and provide a $1.00 per day stipend to detainees who participate in the VWP.

510, 523 (2003) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001) (Kennedy, J.,dissenting))

(Congress's "considerable authority over immigration matters" includes the "power to detain

aliens in connection with removal."). *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952)

("[A]ny policy toward aliens" is "exclusively entrusted to the" Federal Government.). The parties

agree that Congress delegated to DHS and its agency, ICE, the authority to detain aliens placed

into removal proceedings. *See* ECF 260 at 2 (Plaintiffs' Undisputed Facts # 1 and 2); *see also* 8

U.S.C. §§ 1103, 1226, 1231. In carrying out that mandate, ICE is directed by Congress to contract

with state governments or private entities for the operation and lease of detention facilities before

constructing or acquiring new facilities. 8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g). The ICE contract

at issue here, between GEO and ICE for the operation of the AIPC, is therefore, authorized by

Congress's valid delegation of authority. Moreover, the parties do not dispute that compliance with

the 2000 NDS and all applicable versions of the PBNDS was contractually mandated by GEO's

contracts with ICE (and a valid exercise of ICE's authority). ECF 260 at 7 (facts 25 & 26). Thus,

the conduct about which Plaintiffs complain in this case has been prescribed by ICE as part of its

validly conferred authority to provide for the custodial supervision of alien detainees. Moreover,

there is no question that GEO has performed precisely as directed by ICE without violating its

contractual obligations or exceeding its delegated authority.

### D.  2000 NDS and PBNDS Disciplinary Standards.

Whether an individual or entity is liable under the TVPA turns not on what *type* of labor

an entity compels an individual to perform, but rather *the means used* to obtain the labor. If an

individual obtained the labor of another through the means of persuasion or incentives, but with

inadequate payment, the remedy does not lie with the TVPA.[11] Rather, to be entitled to protection under the TVPA, the *means* through which labor is compelled must be explicitly enumerated as nd arunlawful under the TVPA. As is relevant here, for Plaintiffs to prevail on their TVPA claim, they must establish GEO <u>knowingly</u> obtained Plaintiffs' labor by:

> (a) means of force, physical restraint, or threats of force or physical restraint;
>
> (b) by means of serious harm or threats of serious harm;
>
> (c) by means of abuse of the law or threats of abuse of the law or legal process;
>
> (d) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or other person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). Here, Plaintiffs challenge ICE's disciplinary severity scale (incorporated into GEO's contracts with ICE through the 2000 NDS and applicable versions of the PBNDS) as constituting unlawful means under the TVPA. Plaintiffs claim that ICE's disciplinary severity scale unlawfully coerced detainees into cleaning their living areas because the possible sanction of 72 hours in segregation constitutes a threat of serious harm (as well as actual serious harm if the sanction is implemented, not just threatened). Even if Plaintiffs could prove that a brief  (no more than 72 hour) stay in segregation (or a threat of the same) is prohibited by the TVPA as serious

---

[11] *See United States v. Toviave*, 761 F.3d 623, 625–26 (6th Cir. 2014) (holding that any construction of the TVPA must be "distinguishable from that of ordinary parents requiring chores"); *see also United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) ("To be sure, not all bad employer-employee relationships or even bad employer-immigrant nanny relationships will constitute forced labor.").

harm,[12]   the sanctions for a detainee who refuses to clean his or her living area are explicitly authorized and required by ICE and therefore GEO is immune from liability.

It is undisputed that the 2000 NDS and applicable versions of the PBNDS are part of GEO's contractual agreements with ICE. ECF 260 at 7 (Plaintiffs' Undisputed Facts #25 and 26). The disciplinary practices Plaintiffs allege give rise to the "Forced Labor" Class are expressly directed and authorized by the 2000 NDS and applicable versions of the PBNDS (and are, therefore, incorporated as part of GEO's contractual agreement with ICE). GEO's Additional Undisputed Facts #7-19; Plaintiffs' Undisputed Facts #17, #24, #25, #77, #79, ECF 260 at 17. Further, ICE mandates that GEO incorporate the disciplinary severity scale, without modification, into its local handbooks and provide additional notice of the sanctions where possible. GEO's Additional Undisputed Fact #13; ECF 261-10 at 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8 at 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section."). Neither party disputes that these sanctions were drafted by ICE and incorporated into ICE's contract with GEO through the PBNDS. Plaintiffs' Undisputed Facts #25, 26; GEO's Additional Undisputed Fact #7. The 2000 NDS and applicable PBNDS disciplinary

---

[12] GEO disputes that a brief stay of 72 hours or less in segregation constitutes serious harm. A significant body of case law support's GEO's position. But, the exact contours of serious harm need not be resolved in this Motion in order for the Court to find in GEO's favor because, even assuming that Plaintiffs can meet their burden to show serious harm, the disciplinary severity scale was drafted, authorized, and required by ICE.

53343955;4

severity scales, mandated by ICE, authorize (and direct GEO to adopt) the following disciplinary measures for the infraction of "[r]efusing to clean assigned living area":

    1. Initiate criminal proceedings

    2. Disciplinary transfer (recommend)

    3. Disciplinary segregation (up to 72 hours)

    4. Make monetary restitution, if funds are available

    5. Loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.)

    6. Change housing

    7. Remove from program and/or group activity

    8. Loss of job

    9. Impound and store detainee's personal property

    10. Confiscate contraband

    11. Restrict to housing unit

    12. Reprimand

    13. Warning

ECF 261-10, 17 (2000 NDS); 261-8,45 (2008 PBNDS); 261-8, 9 (2011 PBNDS); ECF 260 at 17 (Plaintiffs' Undisputed Fact #80). There is no question that under both the PBNDS and the AIPC handbook detainees must keep their living area clean and sanitary. ECF 260 (Plaintiffs' Undisputed Fact #62). The failure to do so *could* result in disciplinary segregation as mandated by INS and ICE in the 2000 NDS and each version of the PBNDS to which the AIPC has been contractually bound throughout the entire Class Period. Plaintiffs' Undisputed Facts #26, #26; GEO's Additional Undisputed Facts #6, #7, #13. Plaintiffs claim that GEO threatened them with

segregation by listing the disciplinary severity scale in the AIPC local handbook. Ex. M (Plaintiffs' discovery responses). Yet, that too was mandated by ICE. The 2000 NDS and all applicable versions of the PBNDS require GEO to provide notice to detainees, in the local detainee handbook, of the ICE-provided disciplinary severity scale. . ECF 261-10 at 10 (2000 NDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…"). GEO complied, copying the scale verbatim. Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook). Because all detainees are also required to receive the local handbook under both the 2000 NDS and the applicable versions of the PBNDS, to the extent the local handbook's section providing notice of the ICE disciplinary severity scale constitutes a threat, the complained of "threat' was explicitly directed by ICE. Further, ICE explicitly approved of GEO's handbook, orientation materials, and disciplinary scale year after year through annual audits. Therefore, even assuming *arguendo* that Plaintiffs could establish that the threat of solitary confinement for 72 hours or less is a threat of serious harm,[13] the sanction

---

[13] To date, no court has found that a mere 72 hours of disciplinary segregation would constitute serious harm under the TVPA. To the contrary, the only circuit court to address the issue concluded that the disciplinary sanctions, as enumerated in the PBNDS, would not (standing alone) give rise to TVPA liability. *Barrientos v. CoreCivic, Inc.*, --- F.3d ----, 2020 WL 964358 at 7 n.5 (11th Cir. Feb. 28, 2020) (finding that the disciplinary sanctions authorized by the PBNDS do not give rise to TVPA liability). Similarly, a detainee's brief placement in segregation in and of itself is not a violation of due process or a liberty interest—and therefore would be hard pressed to form the

was explicitly authorized and required by ICE.[14] Accordingly, GEO is entitled to DSI on any and all claims arising out of the disciplinary severity scale and/or sanctions which were mandated by the 2000 NDS or applicable versions of the PBNDS and incorporated verbatim into local handbooks. *See Campbell-Ewald Co.*, 136 S. Ct. at 673.

GEO anticipates that Plaintiffs' Reply will attempt to draw distinctions between different cleaning tasks detainee's performed while detained. For example, Plaintiffs may argue that they do not challenge being asked to make their bed every day (knowing the possible punishment of segregation exists for refusing to do so), but do take issue with mopping the floors (i.e., keeping them free from clutter) under the same circumstances—despite the fact that both tasks carry the same potential punishment under the ICE-mandated disciplinary severity scale. However, the undisputed facts make plain that detainees are **required** by the PBNDS to keep their living area clean. Plaintiffs Undisputed Fact # 62. There is no question that the entirety of where a detainee lives and sleeps is his or her "living area" while areas like the kitchen, library, or barbershop would be outside of a detainees "living area."

---

basis of a claim of "serious harm." *White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) ("the placement of an inmate in nonpunitive administrative segregation does not deprive him of a liberty interest protected by the Due Process Clause."). And, directly relevant here, a detention officer may require a civil detainee to clean any communal area he or she uses while detained under the threat of a brief period of solitary confinement and such an action is not punitive. *House v. Vaught*, 993 F.2d 1079, 1085-86 (4th Cir. 1993) (addressing a pre-trial detainee, the Fourth Circuit concluded that the threat of 48 hours of solitary confinement for the failure to clean a pod was not punitive and was instead permissible in the detention context).

[14] While Plaintiffs make varied allegations about the threat of possible solitary confinement for the refusal to clean their living areas, no detainee alleges that GEO has exceeded or surpassed its authority as enumerated in the PBNDS (i.e., threatening segregation for more than 72 hours, actually placing a detainee in segregation for more than 72 hours, etc.).

53343955;4

Further, the TVPA draws no such distinctions based upon the type of work performed as is at issue here,[15] and ICE has similarly not drawn such distinctions in its disciplinary severity scale. Nor was ICE required to draw such a distinction in developing the guidelines for detention facilities. Surely, there can be no question that if a detainee intentionally pours his or her milk on the floor, an officer could ask him or her to clean it up to maintain discipline and self-accountability in the facility. *Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978) ("deliberate untidiness compromises the health and safety of detainees and staff"). And, an officer could ask a detainee who left excessive crumbs after a meal to clean up after himself—all in the name of operating an orderly facility. *Weaver v. Petray*, No. CIV. 08-5195, 2010 WL 909589, at *6 (W.D. Ark. Mar. 11, 2010) ("A detention facility does not violate the Eighth Amendment standards by giving inmates access to cleaning supplies and requiring them to keep their own living areas clean"). Similarly, an officer can ask a civil detainee to clean up his or her communal living area as it becomes messy during the day. *Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993) ("Because none of the evidence indicates that the cleaning assignments here amounted to more than 'general housekeeping responsibilities,' we conclude the cleaning assignments were not inherently punitive. We also conclude that the cleaning assignments were related to the legitimate, non-punitive governmental objective of prison cleanliness."). To be sure, all of these activities would fall within the description of cleaning one's "assigned living area" [16] (a requirement for all

---

[15] Certainly, in other contexts, there are distinctions based upon work that involves coerced sexual acts but that is not at issue here.

[16] Had ICE wished to limit the sanction of segregation to only those situations where a detainee failed to clean only specific areas in the housing unit, it could have done so by addressing specifically the failure to participate in the specifically delineated "personal housekeeping" tasks set forth in Section 5.8 of the PBNDS or by enumerating the types of cleaning tasks that could be sanctioned. ICE chose not to do so, instead broadening the applicability of the sanction to

detainees under the PBNDS). ECF 260 (Plaintiffs' Undisputed Fact #62). Yet, none of these distinct scenarios would, in and of themselves, give rise to TVPA liability.  Rather, in order to fall within the purview of the TVPA, detainees who clean their living are must do so under the fear of the illegal means of coercion (including threats of serious harm). 15 U.S.C. § 1589 (requiring unlawful coercion  for liability); *Dann*, 652 F.3d at 1170 (TVPA liability requires more than allegations of unpaid work). That is where ICE steps in. Regardless of the exact factual scenario giving rise to the refusal to clean one's living area, ICE has directed GEO through the 2000 NDS and/or applicable versions of the PBNDS that 72 hours of disciplinary segregation is an authorized sanction (or possible sanction). It has further directed GEO to inform detainees of this possible consequence in advance of its imposition, specifically through the detainee handbook. Accordingly, because the sanction of disciplinary segregation for the refusal to clean one's living area is explicitly authorized  and directed by ICE, GEO is entitled to DSI as to the Forced Labor class' TVPA claim.[17]

### E.  VWP Stipend.

---

encompass all refusals to clean one's "living area." While the phrase "living area" is not defined in the PBNDS or the contract, it has a commonly accepted plain meaning in the detention context: a detainee's housing unit in which he or she occupies each day. *See e.g. VanPatten v. Allen Cty. Jail*, No. 1:11-CV-73-PPS, 2013 WL 2149447, at *2 (N.D. Ind. May 16, 2013) (describing the cleaning of "living areas" as including sweeping and wiping down tables); *Treadway v. Rushing*, No. 4:10 CV 2749, 2011 WL 13568, at *1 (N.D. Ohio Jan. 4, 2011) (describing civil pretrial detainees living area as their entire housing unit including sinks, drinking facilities, beds, and floors.); *Jones v. Wittenburg*, 509 F. Supp. 653, 702 (N.D. Ohio 1980) (describing the living area as all "modules and cells, including walls, ceiling, floor[s].")). Indeed, Section 2.13.V.A of the 2011 PBNDS describes a detainee's "pod" or entire living area including common areas as their "living area," indicating the two as synonyms. Ex. P.

[17] For the avoidance of doubt, GEO has never maintained a separate policy or practice of placing a detainee in solitary confinement for the refusal to clean. Ex. K (Amber Martin Dep., p. 134, 135.).

As detailed above, ICE is authorized to enter into contracts with private entities for the detention of individuals pending resolution of their immigration proceedings. Similarly, Congress has authorized ICE to provide for voluntary work programs that pay allowances to detainees of $1.00 per day. *See* 8 U.S.C. § 1555(d). In its contracts with GEO, ICE requires GEO to offer a VWP. ECF 260 (Plaintiffs' Undisputed Fact #35). ICE establishes the terms and conditions of the VWP, determines which detainees are eligible to participate and what work they are eligible to perform, and sets the maximum hours detainees are permitted to work. *Id.* ICE also determines the amount that it will pay detainees for participation in the VWP ($1.00) and a system for payment whereby GEO advances the allowance initially and is thereafter reimbursed by ICE. *Id.* From October 22, 2011 (the beginning of the VWP class period) to June 23, 2013, GEO was required by ICE to pay detainee participants in the VWP *exactly* $1.00 per day. ECF 261-10, 5 (2000 PBNDS); ECF 261-9, 63 (2008 PBNDS). GEO had no discretion. The PBNDS did not use the "at least" language that is contained in the 2011 version. ECF 261-9, 63 (2011 PBNDS). Plaintiffs do not allege that ICE's decision to set the payment amount at $1.00 per day is beyond the authority validly conferred upon ICE by Congress – nor could they: the $1.00 per day allowance is predicated on Congress's appropriation of $1.00 per day for ICE's payment of allowances to detainees for their work. *See* 8 U.S.C. § 1555(d).

In support of their Motion, however, Plaintiffs misleadingly cite only to a PBNDS section on VWP compensation that applied only from June 22, 2013 to October 22, 2014—less than half of the applicable class period, highlighting the "at least" language to argue that GEO had discretion to pay more than $1.00 per day. Plaintiffs make no mention of the prior versions of the PBNDS or how the language changed. Prior to June 23, 2013, the language of "at least" included in the 2011

PBNDS had not been incorporated into GEO's contract with ICE for the operation of the AIPC. Instead, under prior versions of the PBNDS (incorporated into the contract), GEO was required to pay exactly $1.00 per day. GEO had no discretion to pay more. When all applicable versions of the PBNDS are reviewed, it is clear that for the majority of the class period[18] there can be absolutely no factual dispute that GEO was required to pay exactly $1.00 per day to detainees participating in the VWP and that GEO complied with that directive. Thus, because GEO paid $1.00 per day to detainees participating in the VWP, as explicitly instructed by ICE, it is entitled to DSI.

The use of a minimum standard – at least $1.00 per day – does not obviate the determination by Congress and ICE that the payment of $1.00 per day is adequate. Nothing in the contract required GEO to pay more. In fact, GEO's contract provides that $1.00 per day must be the "***actual cost*** … per detainee," which GEO "***shall not exceed***" without the approval of ICE's Contracting Officer. ECF 262-2, 5 (GEO_MEN 00019616); (emphasis added). And, this exact amount was explicitly authorized by Congress when it set the rate for detainee allowances at "not in excess of $1 per day". Dep't of Justice Appropriations Act of 1979, Pub. L. 95-431, 92 Stat 1021, 1027 (Oct. 10, 1978). The later-adopted  "at least" language in the PBNDS, which sets the payment of $1.00 per day as a floor, does not preclude application of DSI with respect to allowances paid after June 23, 2013. There is no case law suggesting that the inclusion of minimum standards in a federal contract deprives a government contractor of claiming entitlement to DSI simply because the government contractor did not surpass those minimum standards by some undefined threshold. Indeed, under the precedent following *Campbell-Ewald* governmental immunity is precluded only

---

[18] The VWP class period spans from October 22, 2011 to October 22, 2014.

where a contractor **violates** the contract. *See Cunningham*, 888 F.3d 640, 643 (making clear that a violation is required to preclude the application of immunity).There is no legal authority to support Plaintiffs'' position that DIS is precluded where a contractor does not exceed minimum standards approved of and directed by the government. Here, there is no question that GEO has met the minimum standard of $1.00 per day. As a result, GEO is entitled to DSI as to Plaintiffs' unjust enrichment claim.

## V. *BOYLE* CONTRACTOR DEFENSE

In addition to seeking summary judgment on GEO's DSI defense under *Campbell-Ewald*, Plaintiffs also seek summary judgment as to GEO's government contractor defense under *Boyle*— but only as to the VWP class. *Boyle*, 487 U.S. at 508; ECF 260 at 30. Plaintiffs argue that GEO cannot invoke the *Boyle* defense because the 2011 PBNDS added the language of "at least" in front of $1.00 per day when describing detainees' VWP stipends. In support of their argument, Plaintiffs ignore that ICE set the rate of compensation (even if it set a floor) and *specifically authorized a payment of $1.00 per day* – it simply cannot be disputed that a payment of $1.00 per day complies with a requirement to pay at least $1.00 per day. Thus, insofar as Plaintiffs' claim for unjust enrichment would require GEO to pay detainees a *higher* base payment than $1.00 per day, *Boyle* immunity applies.

Under *Boyle*, a government contractor is not liable for violations of state law where a significant conflict exists between the application of that state law and an identifiable federal policy or interest. *See Boyle*, 487 U.S. at 507. The Court explained that a conflict is significant when the state law is contrary to a specific contract term selected by the federal government. Recently, the Tenth Circuit examined and clarified the *Boyle* government contractor defense in *Helfrich v. Blue*

*Cross and Blue Shield Association*, 804 F.3d 1090 (10th Cir. 2015). In *Helfrich*, the plaintiff, a federal government employee, was in an automobile accident and suffered injuries for which she made claims to her insurance provider. *Id.* at 1095. Her insurance provider paid out her medical claims. *Id.* Thereafter, she entered into a settlement with the driver of the other vehicle for a separate sum of money. *Id.* After the plaintiff obtained the settlement, her insurer invoked a contractual provision seeking subrogation of the benefits it had paid her. *Id.* The plaintiff responded that under state law, subrogation provisions, like the one in her benefits package, were prohibited. *Id.* The insurer thereafter asserted that the state law did not apply because it was displaced by federal law under *Boyle* as conflicting with a contractual term with the government. *Id.* The Tenth Circuit sided with the insurer, concluding that *Boyle* applied and had the effect of displacing state law. *Id.* at 1099.

In reaching its conclusion, *Helfrich* explained that *Boyle* "contractor immunity would be available when the [violation of state law] was the product of a discretionary decision by the government" to select a contract term for a contract dealing with a subject of uniquely federal interest. *Id.* at 1098. Applying this test, the Tenth Circuit first concluded that the provision of affordable healthcare benefits to federal government employees was a uniquely federal interest because the government had an interest in recruiting employees to the federal workforce. *Id.* The court also recognized a strong federal interest in a uniform benefits subrogation policy in all states—regardless of the differences in state law. *Id.* at 1099. The court next concluded that the law significantly conflicted with a contractual term, by rewriting the reimbursement plan between the insurer and the employee for benefits paid out under the healthcare plan—which would increase the cost of health insurance to the federal government through higher premiums on its

employees' policies. *Id.* In sum, *Helfrich* concluded that "[s]tate law – whether tort law or otherwise – must yield if it conflicts with such a contractual term in an area of uniquely federal interests." *Helfrich*, 804 F.3d at 1098.

Consistent with *Helfrich*, there can be little debate that the contracts between GEO and ICE governing the operation of the AIPC are matters of uniquely federal interest. Indeed, Congress has delegated to DHS and its agency ICE responsibility for detaining aliens awaiting removal and the authority to exercise custodial supervision over those detainees. 8 U.S.C. §§ 1103, 1226, 1231. The detention and supervision of aliens is uniquely within the purview of the federal government and there is no authority to the contrary. Plaintiffs' state law claim for unjust enrichment presents a significant conflict with the terms of ICE's contracts with GEO by <u>requiring</u> that payments under the VWP be some amount more than $1.00 per day, resulting in increased costs like in *Helfrich*. ICE required that GEO provide detainees participating in the VWP a stipend of "at least $1.00 per day". Plaintiffs' state law unjust enrichment claim seeks to uproot and supplant ICE's decision to allow a payment of exactly $1.00 per day, in favor of their own VWP stipend. If ICE wanted to require some other VWP stipend – something far in excess of $1.00 per day – it could have stated as such in the 2011 PBNDS. It did not – and *Boyle* immunity provides that state law unjust enrichment actions cannot substitute for ICE's decision-making.

As the court in *Helfrich* explained, state law must yield if it conflicts with a term in a federal contract, selected as a matter of federal discretion in an area of uniquely federal interests. *Helfrich*, 804 F.3d at 1098. That is precisely the circumstance here. Plaintiffs' effectively seek a judgment that a payment of $1.00 per day for VWP participation is unlawful. ICE allows this very thing. If this Court were to apply the state law of unjust enrichment to circumvent the federal government's

determination of the allowance to be paid to detainees, it would create a significant conflict with federal immigration policy. Further, it would interfere with the federal government's interest in uniform treatment of ICE detainees, regardless of the state in which they are housed, like in *Helfrich*. Certainly, if courts in each state were to determine the allowance for VWP participation based upon principles of unjust enrichment, the rates would vary all over the country. Thus, GEO is entitled to the *Boyle* contractor defense because unjust enrichment would significantly interfere with a unique function of the federal government.

Additionally, Plaintiffs' reliance upon this Court's prior rulings is misplaced. This Court previously considered GEO's motion to dismiss based on the *Boyle* government contractor defense and concluded that based upon the pleadings alone, GEO had not met its burden.ECF 23, 13.  But the Court previously had available to it only the language of the 2011 PBNDS. The Court found that the language "at least" in front of $1.00 per day did not prohibit GEO from paying more and, therefore, presented no significant conflict with the Plaintiffs' state claims for unjust enrichment. *Id.*  In support of this Motion, GEO has filed the prior versions of the ICE PBNDS standards that governed GEO's operation of the AIPC from 2011 until June 23, 2013. Prior to June 23, 2013, the "at least" language upon which the Court relied was absent from the contracts and standards. *Id.* Instead, the language required GEO to pay $1.00 per day. GEO had no discretion to pay more. *Id.* Accordingly, to the extent the Court relied on the later-adopted language to conclude there is no significant conflict, that conclusion is unsupported with respect to the allowances paid from 2011-June 2013. *See Helfrich*, 804 F.3d at 1098.

Moreover, even the later-adopted language, which sets a minimum payment of $1.00 per day, does not preclude application of the government contractor defense with respect to allowances

paid after June 23, 2013. In *Glassco v. Miller Equipment Co., Inc.*, 966 F.2d 641 (11th Cir. 1992), the Eleventh Circuit held that the government contractor defense barred state law claims premised on the contention that a manufacturer under contract with the federal government should have used materials that exceeded minimum standards set forth in the federal contract. *Id.* Applying the significant conflict prong of the *Boyle* government contractor defense, the Eleventh Circuit concluded that the inclusion of minimum standards in a federal contract presents a significant conflict with state laws suggesting a higher standard should have been met. The fact that the federal government would not have objected if the contractor met a higher standard does not obviate the federal government's discretionary determination that the minimum standard was adequate. *See id.* at 643. The same is true here. The fact that ICE provided a minimum standard in its contract does not change that ICE clearly authorized the payment of $1.00 per day to detainees. A state law unjust enrichment claim seeking to declare unlawful an amount *authorized* by ICE cannot withstand *Boyle* scrutiny. Thus, in addition to DSI, GEO is entitled to the *Boyle* government contractor defense as to the VWP class.

## VI.   WAIVER

Despite the fact that this matter is before the Court due to an affirmative motion by Plaintiffs that summary judgment should be granted <u>on the merits</u> of GEO's DSI defense, Plaintiffs assert in footnote 5 of their Motion that GEO has waived its affirmative defense[19] of DSI because

---

[19] GEO disputes that DSI is a defense rather than a jurisdictional bar. In *Cunningham*, after thorough analysis, the Fourth Circuit concluded that the *Yearsley* doctrine confers immunity from a suit, making it a jurisdictional bar rather than a defense to liability. *Cunningham*, 888 F.3d at 649–51. Thus, DSI may be raised under Rule 12(b)(1) at any time. *See id.* at 651; *see also* Fed. R. Civ. P. 12(h)(3).

it allegedly failed to plead it with sufficient specificity[20] in its Answer. ECF 260 at n.5. Yet, in their brief footnote, Plaintiffs admit that GEO raised the issue of DSI in its Rule 12 motion in a manner that was sufficient to place Plaintiffs on notice of GEO's defense (as is obvious from Plaintiffs' Motion which details the significant discovery Plaintiffs have conducted on GEO's DSI defense). *Id.* It is well-settled that raising a defense in a Rule 12 motion is sufficient to preserve it for review. *See Radio Corp. of Am. v. Radio Station KYFM, Inc.*, 424 F.2d 14, 17 (10th Cir. 1970). For that reason alone, GEO has not waived its defense.

Furthermore, "[u]nder Tenth Circuit authority, inclusion of affirmative defenses in pretrial orders satisfies Rule 8(c)." *Villescas v. Richardson,* 124 F. Supp. 2d 647, 653 (D. Colo. 2000); *see also Bentley v. Cleveland County Bd. of County Comm'rs*, 41 F.3d 600, 605 (10th Cir. 1994) (defendant "waived any limit on its liability afforded by that statute by failing to raise the issue in its answer, the Pre–Trial Order, or at trial.") (emphasis added); *Expertise, Inc. v. Aetna Fin. Co.*, 810 F.2d 968, 973 (10th Cir.1987) ("the [statute of] limitations defense was not waived because it was included in the pretrial order."). Nearly two years ago, GEO included its DSI defense in the Scheduling Order. ECF 149 at 5. Plaintiffs never sought to strike this claim from the Scheduling Order, nor did they otherwise raise the issue. Instead, they continued to conduct extensive discovery into GEO's defense. Thus, GEO has not waived its defense because it raised it in the Scheduling Order.

---

[20] Plaintiffs' claim rests on the theory that government contractor immunity has recently emerged as a distinct doctrine from derivative sovereign immunity. Not only did this distinction arise after GEO filed its Answer, the two terms are often used interchangeably, with courts often referring to *Campbell-Ewald* immunity as "contractor immunity." *See e.g. Adkisson v. Jacobs Eng'g Grp., Inc.*, No. 3:13-CV-505-TAV-HBG, 2017 WL 10188860, at *12 (E.D. Tenn. Feb. 15, 2017).

53343955;4

Finally, strict adherence to the pleading requirement is inappropriate when the purpose of the requirement has been fulfilled otherwise. *Ahmad v. Furlong*, 435 F.3d 1196, 1201 (10th Cir.2006). The purpose of pleading an affirmative defense is to place the opposing party on notice so that it can conduct discovery and raise the issue with the Court. As is clear from Plaintiffs' affirmative Motion, Plaintiffs were on notice of GEO's defense and conducted extensive discovery into the same. Thus, because Plaintiffs were clearly on notice of the defense, strict adherence to Rule 8(c) is inappropriate. *Id.* Accordingly, Plaintiffs' claim that GEO waived its right to assert DSI lacks merit.

## VII.    PLAINTIFFS' HAVE FAILED TO MEET THEIR BURDEN

Where, as here, the party moving for summary judgment "does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove." *Molina v. Ford Motor Co*., No. 18-CV-01954-MSK-KMT, 2020 WL 978742, at *4 (D. Colo. Feb. 28, 2020). Because GEO contends that all applicable policies were both authorized and directed by ICE, Plaintiffs bear the burden in their motion for summary judgment to show an absence of sufficient evidence to establish the government contractor and DSI defenses. In other words, Plaintiffs must demonstrate that there is <u>no</u> evidence that the policies at issue were expressly authorized by ICE. Plaintiffs have not met their burden.

Plaintiffs' claims cover a class period that spans from 2004 to 2014. In order to meet their burden they must establish that it is <u>undisputed</u> that the polices they allege form the foundation of their claims were applicable during the entirety of the class period <u>and</u> that there is no evidence those same policies were authorized by ICE. Plaintiffs have failed to do so here. Instead, they have provided two handbooks that purportedly contain the policies upon which they base their claims.

53343955;4

The handbooks do not span the entire class period, but instead consist of a handbook that was in place in 2002, a full two years before the class period began and a handbookwhich was implemented in October 2013, at best covering only a single year of the class period. ECF 261-17; ECF 262-9.  As to their TVPA claims, Plaintiffs argue that the ICE disciplinary severity scale which is incorporated into the October 2013 handbook contains a threat of solitary confinement for the failure to clean their assigned living area. ECF 260 at 36. Plaintiffs contend that this sanction is unauthorized because ICE only requires that GEO "maintain certain levels of sanitation and hygiene; [ICE does] not require it to use the threat of solitary confinement." *Id.*  As is clear from the undisputed facts before this Court, the sanction of solitary confinement is expressly authorized and directed by ICE and therefore, even assuming the 2013 handbook applies to the entire class period, Plaintiffs have failed to meet their burden. (Plaintiffs Undisputed Facts #25, #26, and #79).

The only other handbook Plaintiffs provide is from 2002 and is outside the class period. ECF 262-9. And, the 2002 handbook does not provide for the sanction of solitary confinement, a key allegation at the heart of Plaintiffs claims. Instead, it provides only for a "loss of privileges" including the loss of commissary, television, visitation, and telephone for up to five days. *Id.* at 45 (GEO-MEN 00040774). Thus, even if applicable, it would undermine the core of Plaintiffs allegations. Further, Plaintiffs have not established evidence that would show that by paying $1.00 per day to detainees, GEO violated its agreement with ICE or that they payment of $1.00 per day was not expressly authorized. To the contrary, the evidence submitted by Plaintiffs makes plain that the contract(s) and the PBNDS expressly authorized the payment of $1.00 per day. In short, Plaintiffs have failed to show "an absence of sufficient fact" that payment of $1.00 per day to VWP

detainees and the disciplinary policy were authorized and directed by ICE. To the contrary, and as detailed throughout this motion, there is ample evidence to support each element of GEO's DSI and Government Contractor defenses.

## VIII.   CONCLUSION

For the foregoing reasons, GEO respectfully requests that the Court deny Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense. Further, pursuant to Fed. R. Civ. P. 56(f)(1), GEO requests entry of judgment in its favor on GEO's of derivative sovereign immunity defense and government contractor defense.

Respectfully submitted, this 5th day of June, 2020.

**AKERMAN LLP**

*s/Adrienne Scheffey*
Colin L. Barnacle
Adrienne Scheffey
Christopher J. Eby
Melissa L. Cizmorris
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:(303) 260-7712
Facsimile: (303) 260-7714
Email: colin.barnacle@akerman.com
Email: christopher.eby@akerman.com
Email: melissa.cizmorris@akerman.com
Email: adrienne.scheffey@akerman.com

**BURNS, FIGA & WILL, P.C.**
Dana L. Eismeier
Michael Y. Ley
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, CO 80111
Phone: (303) 796-2626
Fax: (303) 796-2777
Email: deismeier@bfwlaw.com
Email: mley@bfwlaw.com
*Attorneys for Defendant The GEO Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify on this 5th day of June, 2020, a true and correct copy of the foregoing **DEFENDANT THE GEO GROUP, INC'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S AFFIRMATIVE DEFENSE** was filed and served electronically via the Court's CM/ECF system on the following:

### Counsel for Plaintiffs:

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
Towards Justice
1410 High St., Ste. 300
Denver, CO 80218
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Kelman Buescher Firm
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com

Hans C. Meyer
Meyer Law Office, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
Outten & Golden, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
Outten & Golden, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
Outten & Golden, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
Law Office of R. Andrew Free
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

R. Andrew Free
Law Office of R. Andrew Free
2004 8th Ave. South
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
Milstein Law Office
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

*s/ Nick Mangels*
Nick Mangels

53343955;4