# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated*,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

**Exhibit A to GEO's Opposition to Plaintiffs' Motion for Summary Judgment**

---

| | Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|---|
| 1. | ICE is a federal agency tasked with enforcing U.S. immigration laws. 6 U.S.C. § 542 | Undisputed |
| 2. | ICE has the authority to detain foreign nationals suspected of entering the United States unlawfully. Immigration and Nationality Act, codified at 8 U.S.C. §§ 1101 *et seq.* | Undisputed. |
| 3. | ICE contracts with GEO to house some of its detainees in detention facilities throughout the country. *See* https://www.geogroup.com/Locations | Undisputed. |

1

| | **Plaintiffs' Statement of Undisputed Facts** | **GEO's Response and Supporting Evidence** |
|---|---|---|
| **4.** | Among GEO's portfolio of ICE detention facilities is the Aurora Facility. *Id.* | Undisputed. |
| **5.** | GEO continuously operated the Aurora Facility, under contract with ICE, from October 22, 2004 to October 22, 2014. Ex. A (A. Martin Dep. 58:1-6); Ex. K (Ely Decl. ¶ 7) | Undisputed. |
| **6.** | Operations for the Aurora Facility are governed by a contract between GEO and ICE. Ex. B (GEO_MEN 00019613 (2011 Contract)); Ex. C (GEO-MEN 00059635 (2006 Contract)); Ex. D (GEO-MEN 00059744 (2003 Contract)), (collectively "the Contract"); Ex. K (Ely Decl. ¶ 7)) | Disputed. GEO does not dispute that operations are governed between a contract between GEO and ICE in part, but disputes that GEO's contract with ICE is the *only* instrument governing the operations of the AIPC. |
| **7.** | The Contract has been renewed over time by mutual consent of GEO and ICE. Ex. A (A. Martin Dep. 58:1-10); *see also* Ex. I (Hill Dep. 29:22-30:6) | Disputed. GEO disputes that the contract has been "renewed over time." GEO has entered into a number of contracts with ICE during the class period, each with unique terms. *See* ECF 262-2 (2011 contract); ECF 262-3 (modification of 2011 contract); ECF 262-4 (2006 contract); ECF 262-5 (2003 contract). |
| **8.** | The Contract may be modified during its term by mutual consent of GEO and ICE. Ex. A (A. Martin Dep. 17:13-17) | Undisputed. |
| **9.** | The Contract is a "performance-based contract." Ex. B (GEO_MEN 00019625 (2011 Contract)); Ex. C (GEO-MEN 00059642 (2006 Contract)); Ex D (GEO-MEN 00059755 (2003 Contract)); Ex. K (Ely Decl. ¶ 1) | Disputed. GEO disputes this description of the contract. This term is not defined in the cited contracts, nor is it utilized to describe the contract as a whole. Instead, the contract is composed of mandatory objectives which constitute the performance required in exchange for the payments from ICE. *See* ECF 262-2 (2011 contract); ECF 262-3 (modification of 2011 contract); ECF 262-4 (2006 contract); ECF 262-5 (2003 contract). |
| **10.** | Performance-based contracting "is a results-oriented method of contracting focused on outputs, quality, and outcomes." Ex. E (Declaration of Tae D. Johnson, *State of Washington v. GEO Group, Inc.*, Case No. 17-cv-05806 (W.D. Wash), ECF No. 91 at ¶ 8) | Disputed. To the extent GEO's contract with ICE is described by ICE as "performance-based" GEO notes that the contract is not merely "results oriented" but also provides specific performance requirements including metrics and |

2

| Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|
| | methods of performance which GEO must meet to perform under the contract. *See* ECF 262-2 (2011 contract); ECF 262-3 (modification of 2011 contract); ECF 262-4 (2006 contract); ECF 262-5 (2003 contract). |
| **11.** "Performance-based contracts do not designate *how* a contractor is to perform the work, but rather establish[] the expected outcomes and results that the government expects. It is then the responsibility of the contractor to meet the government's requirements at the price the vendor quoted." *Id.* | Disputed. GEO disputes that its contracts with ICE do not instruct it *how* to perform its work. Throughout the contract there are specific instructions, with granular detail, as to *how* GEO must perform its work. As one example, the contracts lay out specific requirements for each employee who works at the AIPC, including that each employee have a social security card. ECF 262-2 (GEO_MEN 000019664). The contracts also provide explicit instructions for employee conduct. ECF 262-2 (GEO_MEN 000019664). Further, the contracts do not simply tell GEO to take care of the detainees without delineating *how* to do so, instead, they break down exactly how detainees must be cared for, including specific requirements for recreation opportunities, marriage, religious opportunities, work opportunities, and food service. *Id.* (GIEO_MEN 000019636-44).

To put a finer point on it, the contract does not simply state that GEO must reduce idleness in the facility by providing for activities, but instead describes *how* GEO must reduce idleness: through the Voluntary Work Program. |
| **12.** As a performance-based contract, the Contract requires GEO to develop "all plans, policies, and procedures" required by the Contract, and then submit them to ICE for "review and concurrence." Ex. C (GEO-MEN 00059643 (2006 Contract); *see also* Ex. B (GEO_MEN | Disputed. GEO does not dispute that the quotes appear in each contract, as reflected in the parentheticals, but disputes that the policies identified constitute *all* policies that govern GEO's performance under the contract. Instead, the contract is also |

| Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|
| 00019814 (2011 Contract) ("It is GEO's policy that each of our facilities develops a manual of uniform policies and procedures" which "appropriately reflect . . . contractual requirements.")); Ex. D (GEO-MEN 00059759 (2003 Contract) ("The Contractor shall prepare and submit all policies, plans, post orders and procedures to INS for review and approval.")) | governed by additional policies and regulations not drafted by GEO, including the PBNDS and the ACA. ECF 262-2 (GEO-Menocal_00019656) (listing additional policies, regulations, and standards that apply to the AIPC.). |
| **13.** The Contract makes GEO "responsible for all costs associated with and incurred as part of providing the services outlined in this contract." Ex. C (GEO-MEN 00059642 (2006 Contract)); *see also* Ex. B (GEO_MEN 00019614, 19657 (2011 Contract) (noting that ICE "shall provide fully burdened bed day rates only" and that any costs not covered by that rate are the contractor's to bear)); Ex. D (GEO-MEN 00059748 (2003 Contract) ("[T]he contractor shall provide a detention facility, and all labor, materials and equipment necessary to operate and maintain temporary residential care, and secure detention.")) | Disputed. GEO does not dispute that the quoted language appears in the contracts as quoted, but does dispute that the quotes can be read in a vacuum, without the surrounding language for context. |
| **14.** The Contract provides that detainee labor must be used "in accordance with the detainee work plan developed by" GEO. Ex F ((Ragsdale 30(b)(6) Dep. 25:1-18); Ex. C (GEO-MEN 00059662 (2006 Contract)); Ex. G (GEO_MEN 00038529 (2004 Detainee Work Plan)); Ex. H (GEO_MEN 00038563 (2014 Detainee Work Plan)) | Disputed. GEO does not dispute that it must operate a Voluntary Work Program, consistent with the PBNDS, and that it may develop a plan (which is approved by ICE) for what constitutes voluntary work as opposed to those tasks that constitute routine housekeeping. |
| **15.** The Contract requires that the detainee work plan "must be voluntary." Ex. C (GEO-MEN 00059662 (2006 Contract)); *see also* Ex. B (GEO_MEN 00019643 (2011 Contract) ("Detainees will be able to volunteer for work assignments.")); Ex. D (GEO-MEN 00059796 (2003 Contract) (incorporating 48 C.F.R. § 52.222-3 into contract, which requires work by those in federal custody to be performed "on a voluntary basis.")) | Disputed. GEO does not dispute that it must operate a Voluntary Work Program, consistent with the PBNDS. Further, GEO does not dispute that individuals may volunteer for positions within the Voluntary Work Program but are not required to do so. ECF 262-2 (GEO-Menocal_00019643). |

4

| | Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|---|
| **16.** | The Contract prohibits GEO from using forced labor in performance of the Contract by incorporating Federal Acquisition Regulation 52.222-50. Ex. B (GEO_MEN 00019697 (2011 Contract) (incorporating Federal Acquisition Regulation ("FAR") 52.222-50)); Ex. C (GEO-MEN 00059684 (2006 Contract) (same)) | Disputed. GEO does not dispute that FAR 52.222-50 is listed in its 2011 and 2006 contracts but states that the contracts speak for themselves. |
| **17.** | FAR 52.222-50(b) expresses "a policy prohibiting trafficking in persons," including the "[u]se [of] forced labor in the performance of [a government] contract." | Plaintiffs' fact number 17 is merely a summary of a legal authority, not a statement of fact and is therefore improperly included as an "undisputed fact." |
| **18.** | This regulation reflects the federal government's intent to "protect vulnerable individuals" and enforce its "zero-tolerance policy regarding Government employees and contractor personnel engaging in any form" of forced labor. *See* White House, Executive Order – Strengthening Protections Against Trafficking in Persons In Federal Contracts, No. 13627 (September 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/executive-order-strengthening-protections-against-trafficking-persons-fe | Plaintiffs fact number 18 purports to define the intent of the legislature in drafting FAR 52.222-50, as a matter of fact, not through a legal analysis. The intention of the legislature is not properly listed as an undisputed fact. |
| **19.** | GEO is responsible for the day-to-day performance of the Contract. Ex. F (Ragsdale 30(b)(6) Dep. 52:21-22) | Disputed. GEO does not dispute that it operates the AIPC and its day-to-day operations, but disputes that it alone is responsible for the operations as by contract, ICE is on-site and actively involved. ECF 262-2 (GEO-Menocal_00019652) (describing the responsibilities of the on-site ICE employee referred to as a "COTR"). |
| **20.** | GEO receives a fixed dollar amount from ICE per detainee it houses, per day, under the Contract. Ex. B (GEO_MEN 00019614 (2011 Contract)); Ex. C (GEO-MEN 00059636 (2006 Contract)); Ex. D (GEO-MEN 00059748 (2003 Contract)); Ex. F (Ragsdale | Disputed. GEO receives a set amount under its contract with ICE for the "bed day rate." ECF 262-2 GEO-Menocal_00019614). In its contract, ICE has agreed to a minimum number of bed day rates it will pay per day, regardless of |

5

| **Plaintiffs' Statement of Undisputed Facts** | **GEO's Response and Supporting Evidence** |
|---|---|
| 30(b)(6) Dep. 41:8-16 (defining "bed day rate" as "price per bed per day at Aurora.")) | actual occupancy. *Id.* GEO receives a different amount for each bed that is occupied above the minimum quantity. *Id.* at GEO-Menocal_00019615. GEO receives a separate stipend for detainee medical care and a pass-through reimbursement amount for the Voluntary Work Program. *Id.* at GEO-Menocal_00019616. Thus, there are a number of components of GEO's compensation from ICE which cannot simply be described as a "fixed dollar amount." |
| **21.** The profit GEO receives from the Aurora Facility is the difference between the amount it receives from ICE and the amount it spends, including on housing detainees and running the facility. Ex. I (Hill Dep. 59:18-24); Ex. J (Krumpelmann Dep. 23:23-24:4) | Disputed. GEO Disputes Plaintiffs' characterization. As clearly stated in the deposition testimony of Mr. Hill, as cited by Plaintiffs, the **estimated profit** is calculated by taking the revenue that is **expected** and subtracting out the expenses that are listed. ECF 261-5 (Hill Dep. 59:18-24). This does not describe or purport to represent how actual profits would be determined. |
| **22.** On April 18, 2018, GEO submitted to ICE a request for an "equitable adjustment" of its compensation for the 2011 Contract on the basis that the "contract requirements are incomplete because GEO reasonably believed it could perform these specifications and contract requirements without incurring legal fees to defend such specifications and contract requirements." Ex. K (Ely Decl. ¶ 27) | Disputed. GEO disputes that the Ely declaration is admissible for summary judgment or trial purposes. Ms. Ely will not testify at trial, nor appear for a deposition, and therefore the declaration is inadmissible. F.R.E. 802. Further, the declaration does not contain any of the documents it allegedly references and Ms. Ely does not explain how she has personal knowledge of their contents, thus it is also inadmissible for lack of foundation and personal knowledge.<br><br>In any event, GEO disputes that the quotes divorced from any context can be considered to be "undisputed fact." GEO did request an equitable adjustment but the reasons for its request go far beyond the |

6

| Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|
| | excerpted text provided by Plaintiffs. GEO does not further address the adjustment as it is both immaterial and irrelevant. |
| **23.** On June 21, 2018, ICE declined GEO's request for adjustment, stating that "GEO's defense of [this lawsuit] is a defense of its contract performance." *Id.* ¶ 28 | Disputed. GEO disputes that the Ely declaration is admissible for summary judgment or trial purposes. Ms. Ely will not testify at trial, nor appear for a deposition, and therefore the declaration is inadmissible. F.R.E. 802. Further, the declaration does not contain any of the documents it allegedly references and Ms. Ely does not explain how she has personal knowledge of their contents, thus it is also inadmissible for lack of foundation and personal knowledge.<br><br>In any event, GEO disputes that the quotes divorced from any context can be considered to be "undisputed fact." GEO did request an equitable adjustment but the reasons for its request go beyond the excerpted text provided as a double hearsay statement by Plaintiffs. |
| **24.** The Performance Based National Detention Standards ("PBNDS") are a series of minimum standards for detention facilities developed by ICE. Ex. L (GEO-MEN 00064019 (2011 PBNDS)); Ex. M (GEO-MEN 00062905 (2008 PBNDS)); Ex. A (A. Martin Dep. 96:19- 97:6; 99:5-101:9) | Undisputed. |
| **25.** The PBNDS are incorporated into the Contract. Ex. A (A. Martin Dep. 94:21-95:5); Ex. B (GEO_MEN 00019655-56 (2011 Contract) (identifying the PBNDS as part of the "statutory, regulatory, policy, and operational considerations that will affect the Contractor.")); Ex. C (GEO-MEN 00059644 (2006 Contract) (same, referring to "ICE Detention Standards")); Ex. D (GEO-MEN 00059754 (2003 Contract) ("[T]he contractor is required to perform in continual compliance | Undisputed. |

7

| | Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|---|
| | with the most current editions of the INS Detention Standards.")) | |
| 26. | Pursuant to the Contract, GEO must abide by the PBNDS. *Id.*; *see also* Ex. P (Ceja 30(b)(6) Dep. 90:17-20) | Undisputed. |
| 27. | A modification to the 2011 Contract incorporated the 2011 PBNDS into that contract. Ex. B.1 (GEO_MEN 00020406); Ex. P (Ceja 30(b)(6) Dep. 125:10-23) | Undisputed. |
| 28. | The PBNDS supersede other sources of authority for operating the Aurora Facility under ICE contract. Ex. P (Ceja 30(b)(6) Dep. 90:10-16) | Disputed. GEO disputes that the PBNDS "supersede" <u>all</u> other sources of authority that do not conflict with the PBNDS, as GEO is tasked with following all applicable standards incorporated into its contract. ECF 262-2 (GEO-Menocal_00019656) (2011 Contract). And, within the PBNDS certain ACA standards are incorporated, thus if a conflict arises, an individualized inquiry is necessary to identify which of the two standards controls. ECF 261-4 (Ragsdale 30(b)(6) 72-74). If there is no conflict between the standards, GEO must comply with both. |
| 29. | If there is a discrepancy between GEO's policy or practice and the PBNDS, the PBNDS control. Ex. P (Ceja 30(b)(6) Dep. 90:10-16); Ex. F (Ragsdale 30(b)(6) Dep. 66:20-67:1) | Disputed. Within the PBNDS certain ACA standards are incorporated, thus if a conflict arises, an individualized inquiry is necessary to identify which of the two standards controls. ECF 261-4 (Ragsdale 30(b)(6) 72-74). |
| 30. | The Contract between ICE and GEO provides that "[i]n cases where other standards conflict with DHS/ICE policy or standards, DHS/ICE policy and standards prevail." Ex. B (GEO_MEN 00019657 (2011 Contract)); Ex. C (GEO-MEN 00059644 (2006 Contract)); Ex. D (GEO_MEN 00059759 (2003 Contract)) | GEO does not dispute that the quoted language appears in the 2011 GEO/ICE contract, but clarifies that the PBNDS are not the only DHS/ICE standards that apply to the facility. |

8

| | Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|---|
| 31. | In the "Environmental Health and Safety" section, under the heading "General Housekeeping," the PBNDS state:<br>The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness. When possible, the use of non-toxic cleaning supplies is recommended.<br>a. All horizontal surfaces shall be dampdusted daily with an approved germicidal solution used according to the manufacturer's directions.<br>b. Windows, window frames, and windowsills shall be cleaned on a weekly schedule.<br>c. Furniture and fixtures shall be cleaned daily.<br>d. Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions.<br>e. A clean mop head shall be used each time the floors are mopped.<br>f. Waste containers shall weigh less than 50 lbs., be non-porous and lined with plastic bags; the liner shall be changed daily.<br>g. Waste containers shall be washed weekly at a minimum, or as needed when they become soiled.<br>h. Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.<br>Ex. L (GEO-MEN 00064042 (2011 PBNDS)); *see also* Ex. M (GEO-MEN 00062934-35 (2008 PBNDS)); Ex. N (GEO-MEN 00063790 (INS Detention Standard)) | Undisputed. |
| 32. | The Environmental Health and Safety section of the PBNDS references certain sections of the American Correctional Association ("ACA") Standards for Adult Local Detention Facilities. *See, e.g.,* Ex. L (GEO-MEN | Disputed. The standards mentioned are not simply referenced, but also incorporated into the standards. ECF 261-4 (Ragsdale 30(b)(6) 72-74). |

| Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|
| 00064041 (2011 PBNDS)); Ex. M (GEO-MEN 00062933 (2008 PBNDS)); Ex. N (GEO-MEN 00063797 (INS Detention Standard)) | |
| **33.** ACA Standard 4-ALDF-1A-04 requires that: "The facility is clean and in good repair. A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance." Ex. Q (ALDF-1A-04); Ex. R (A. Martin 30(b)(6) Dep. 16:11-17:23) | Undisputed. |
| **34.** ACA Standard 4-ALDF-1A-01 requires regular sanitation inspections of detention facilities. Ex. Q (ALDF-1A-01); Ex. R (A. Martin 30(b)(6) Dep. 18:8-19:4) | Disputed. Standard 4-ALDF-1A-01 requires "A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance by assigning specific duties and responsibilities to staff and inmates." ECF 261-13, 10. It further provides that there must be a written policy and procedure which describes detainee responsibilities. |
| **35.** The Voluntary Work Program ("VWP") section of the PBNDS provides that detainees "shall be provided the opportunity to participate in a voluntary work program." Ex. L (GEO-MEN 00064345 (2011 PBNDS)) | Undisputed. |
| **36.** The VWP section of the PBNDS states: "Work assignments are voluntary; however, all detainees are responsible for personal housekeeping. Detainees are required to maintain their immediate living areas in a neat and orderly manner by: 1. making their beds daily; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture." Ex. L (GEO-MEN 00064345 (2011 PBNDS); Ex. R (A. Martin 30(b)(6) Dep. 25:25-26:24); *see also* Ex. M (GEO-MEN | Undisputed that the quoted text appears in the 2011 PBNDS. |

10

| Plaintiffs' Statement of Undisputed Facts | | GEO's Response and Supporting Evidence |
|---|---|---|
| | 00063294-95 (2008 PBNDS); Ex. N (GEO-MEN 00063672 (INS Detention Standard)) | |
| 37. | The Voluntary Work Program section of the 2011 PBNDS requires that detainees in that program be paid "at least $1.00 (USD) per day." Ex. L (GEO-MEN 00064347 (2011 PBNDS)) | Disputed. Only the 2011 PBNDS contain the quoted text. All prior versions provided that compensation was exactly $1.00 per day. ECF 261-10, 5 (2000 NDS); ECF 261-9, 63 (2008 PBNDS). |
| 38. | The Voluntary Work Program section of the PBNDS references certain sections of the ACA Standards. Ex. L (GEO-MEN 00064345 (2011 PBNDS)); Ex. M (GEO-MEN 00063294 (2008 PBNDS)); Ex. N (GEO-MEN 00063677 (INS Detention Standard)) | Undisputed. |
| 39. | ACA Standard 4-ALDF-5C-08 requires that: "Pretrial and unsentenced inmates are not required to work except to do personal housekeeping and to clean their housing area. Inmates are allowed to volunteer for work assignments." Ex. S (4-ALDF-5C-08) | Undisputed. |
| 40. | GEO's Aurora Facility-level policies are developed by local GEO employees. Ex. O (K. Martin Dep. 51:22-25) | Disputed. All AIPC polices are developed by both GEO and ICE and ultimately approved of and signed off on by ICE. ECF 261-4 (Ragsdale 30(b)(6) 39:3-6;A63:6-8; 65:7-25; 66:1-10). |
| 41. | These policies are reviewed and amended by local GEO employees at Aurora on an annual basis. Ex. O (K. Martin Dep. 64:17-23); Ex. P (Ceja 30(b)(6) Dep. 33:22-34:1) | Disputed. All AIPC polices are amended by both GEO and ICE and ultimately approved of and signed off on by ICE. |

11

| | Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|---|
| | | ECF 261-4 (Ragsdale 30(b)(6) 39:3-6;63:6-8; 65:7-25; 66:1-10). |
| 42. | The annual policy review is conducted by the Aurora Facility's Policy Review Committee, which is made up of local Aurora GEO staff. Ex. A (A. Martin Dep. 70:20-25); Ex. P (Ceja 30(b)(6) Dep. 34:2-7) | Disputed. All AIPC polices are reviewed by both GEO and ICE and ultimately approved of and signed off on by ICE. ECF 261-4 (Ragsdale 30(b)(6) 39:3-6;63:6-8; 65:7-25; 66:1-10). |
| 43. | Each policy is also reviewed and approved by an on-site ICE official called the Contracting Officer's Technical Representative ("COTR"). Ex. T (Nelson Dep. 150:22-151:2) | Undisputed. |
| 44. | GEO's Policy Number 12.1.4 – AUR, titled "Sanitation Procedures," is intended to "provide staff and detainees with a clean sanitary living environment consistent with all applicable codes, standards and sound detention practices." Ex. U (GEO_MEN 00038687 (2004); GEO_MEN 00038653 (2004-05); GEO_MEN 00038676 (2005-06); GEO_MEN 00038628 (2006-07); GEO_MEN 00038665 (2007-08); GEO_MEN 00038632 (2008-09) GEO_MEN 00038613 (2009-10); GEO_MEN 00038625 (2010); GEO_MEN 00007203 (2010-11); GEO_MEN 00038649 (2011-12); GEO-MEN 00099980 (2012-13); GEO-MEN 00088208 (2013-14)) | Undisputed that the quoted text appears in the documents as quoted. |
| 45. | GEO's Sanitation Procedures document requires that "[e]ach detainee will be responsible for the cleanliness of his or her cell or living area, including walls, floors, sink, toilet, windows, and other property within the cell, room, or living areas." *Id.* | Undisputed that the quoted text appears in the documents as quoted. |

| Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|
| **46.** GEO's Sanitation Procedures do not specify which aspects of cleaning are the responsibility of HUSP workers and which are the responsibility of VWP workers. *See generally* Ex. U ((GEO_MEN 00038687-98 (2004); GEO_MEN 00038653-64 (2004-05); GEO_MEN 0003967676-86 (2005-06); GEO_MEN 00038628-31 (2006-07); GEO_MEN 00038665-75 (2007-08); GEO_MEN 00038632-39 (2008-09); GEO_MEN 00038613-15 (2009-10); GEO_MEN 00038625-27 (2010); GEO_MEN 00007203-06 (2010-11); GEO_MEN 00038649-52 (2011-12); GEO-MEN 00099980-83 (2012-13); GEO-MEN 00088208-11 (2013-14)) | Undisputed that the Sanitation Procedures do not specify which aspects of cleaning are assigned to VWP workers and which are the responsibility of detainees as part of cleaning their living area. GEO disputes that there is a policy termed the "HUSP." Ragsdale 30(b)(6) 16:1-8 (Mr. Ragsdale had never heard of the 'HUSP' before this lawsuit.). |
| **47.** In addition to the sanitation procedures described in Policy Number 12.1.4 – AUR, GEO requires detainees to perform a general cleanup after each meal. Ex. P (Ceja 30(b)(6) Dep. 37:5-9); Ex. O (K. Martin Dep. 142:24-143:1) | Disputed. GEO disputes that detainees are "required" to clean. Rather, most individuals volunteered to clean up after each meal, while a select few would be identified each day to clean and could choose not to participate if they wished. Ex. J Kevin Martin Dep. 143-145. |
| **48.** During a general cleanup, GEO requires detainees "clean up the tables, wipe down the tables, and sweep and mop the floors." Ex. P (Ceja 30(b)(6) Dep. 36:24-37:9) | Disputed. Detainees *could* participate in any of the items listed, but would likely not do each task in a day as the cleanup would take less than five minutes ager each meal. Ex. J Kevin Martin Dep. 143:3-8. |
| **49.** GEO also tells detainees that they have a "common obligation to clean . . . the communal areas," including the dayroom and bathrooms, on a rotating basis. Ex. F (Ragsdale 30(b)(6) Dep. 16:14-18) | Disputed. GEO disputes that the excerpted text is complete, as the entire quote from Mr. Ragsdale was as follows:<br><br>"That folks will clean their immediate living area, meaning making their bed, dealing with their own personal property in their immediate living area. And they also share sort of a common obligation to clean, you know, where the microwave is, where the, you know, game boards are, video games, to keep things in place in a reasonable cleanliness; the bathroom, you |

13

| Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|
| | know, the areas, the communal areas is the word I'm looking for." ECF 261-4, 6 (Ragsdale 30(b)(6) Dep. 16:14-18). |
| **50.** The general cleanup is not listed among the facility's sanitation procedures. *See generally* Ex. U ((GEO_MEN 00038687-98 (2004); GEO_MEN 00038653-64 (2004-05); GEO_MEN 0003967676-86 (2005-06); GEO_MEN 00038628-31 (2006-07); GEO_MEN 00038665-75 (2007-08); GEO_MEN 00038632-39 (2008-09); GEO_MEN 00038613-15 (2009-10); GEO_MEN 00038625-27 (2010); GEO_MEN 00007203-06 (2010-11); GEO_MEN 00038649-52 (2011-12); GEO-MEN 00099980-83 (2012-13); GEO-MEN 00088208-11 (2013-14)) | Disputed. The sanitation procedures require detainees to engage in a general cleanup of their facilities under "Detainee Sanitation Responsibilities" stating that detainees are responsible for keeping clean their living areas, which includes their shared dining tables and floors. ECF 262-8. |
| **51.** The post-meal cleanup of tables, floors, and other communal areas that GEO requires is called the Housing Unit Sanitation Policy, or HUSP. Ex. F (Ragsdale 30(b)(6) Dep. 15:24-16:25); Ex. P (Ceja 30(b)(6) Dep. 84:3-14); Ex. R (A. Martin 30(b)(6) Dep. 11:4-19) | Disputed. The general clean-up is not referred to as the "HUS"P internally by GEO, as it was a construct created by Plaintiffs' counsel. ECF 261-4, 6 (Ragsdale 30(b)(6) 16:1-8) (Mr. Ragsdale had never heard of the 'HUSP' before this lawsuit.). |
| **52.** GEO never verified with ICE whether communal areas are part of the "living area" described in the PBNDS. Ex. A (A. Martin Dep. 196:23-198:6) | Disputed. All GEO policies are approved by ICE. Ragsdale 30(b)(6) 39:3-6. The sanitation procedures are no different and were signed off on by ICE. Ex. Q. |
| **53.** Detainees do not receive payment for their work under the HUSP. Ex. P (Ceja 30(b)(6) Dep. 84:8-24) | Disputed. Detainees are not paid for the five minutes or so that they spend cleaning up after each meal unless they are a detainee trustee cleaning as part of their shift. Ex. J, Kevin Martin Dep. 143-146. |
| **54.** The HUSP is a "GEO policy, created by GEO." Ex K (Ely Decl. ¶ 22); Ex. P (Ceja 30(b)(6) Dep. 27:6-28:1) | Disputed. GEO drafted the sanitation procedures policy in connection with ICE. (Ragsdale 30(b)(6) 39:3-6; 63:6-8; 65:7-25; 66:1-10). Ex. Q. |
| **55.** The HUSP is not created by ICE. Ex. K (Ely Decl. ¶ 22.) | Disputed. GEO drafted the sanitation procedures policy cooperatively with ICE, following all requirements and direction in the Contract, ACA Standards, and ICE |

14

| | **Plaintiffs' Statement of Undisputed Facts** | **GEO's Response and Supporting Evidence** |
|---|---|---|
| | | directives. (Ragsdale 30(b)(6) 39:3-6; 63:6-8; 65:7-25; 66:1-10). Ex. Q. |
| **56.** | The HUSP is not required by the Contract. *Id.* | Disputed. The contract requires performance with the ACA standards, which in turn require GEO to develop a housekeeping plan. ECF 262-2 (GEO-Menocal_00019656); ECF 261-13 (ACA Standard 4-ALDF-1A-01). |
| **57.** | ICE did not draft or negotiate the HUSP. *Id.* | Disputed. GEO drafted the sanitation procedures policy cooperatively with ICE, following all requirements and direction in the Contract, ACA Standards, and ICE directives. ECF 261-4 (Ragsdale 30(b)(6) 39:3-6; 63:6-8; 65:7-25; 66:1-10). Ex. Q. |
| **58.** | GEO's local detainee handbook for the Aurora facility sets out rules for detainees' conduct and privileges within the Aurora facility. Ex. P (Ceja 30(b)(6) Dep. 29:19-24; 32:23-37:13); Ex. V (GEO_MEN 00040731-75 (Local Detainee Handbook (2002 version))); Ex. W (PL000029-55 (Local Detainee Handbook (2013 version))) | Disputed. GEO does not dispute that the detainee handbook sets forth standards for detainee conduct and privileges, but does dispute this fact to the extent that it purports to be the *exclusive* authority on detainee conduct. In connection with the ICE National Handbook and the PBNDS, the detainee handbook sets out rules for detainees' conduct within the AIPC. Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook). |
| **59.** | The Aurora Detainee Handbook has been in effect since at least 1995. Ex. P (Ceja 30(b)(6) Dep. 33:22-34:1) | Disputed. GEO does not dispute that there have been handbooks in place since approximately 1995, but disputes that there has been a single handbook that has governed detainee conduct for the entire time period. |
| **60.** | The Aurora Detainee Handbook is issued to all detainees entering Aurora. Ex. P (Ceja 30(b)(6) Dep. 29:21-24) | Undisputed. |
| **61.** | The Aurora Detainee Handbook communicates the rules and policies of the | Undisputed. |

15

| | **Plaintiffs' Statement of Undisputed Facts** | **GEO's Response and Supporting Evidence** |
|---|---|---|
| | Aurora Facility to detainees. Ex. P (Ceja 30(b)(6) Dep. 29:19-24) | |
| 62. | Like the PBNDS, GEO's Aurora Detainee Handbook states that detainees are "required to keep [their] personal living area clean and sanitary." Ex. V (GEO_MEN 00040757 (Local Detainee Handbook (2002 version))); Ex. W (PL000046 (Local Detainee Handbook (2013 version))) | Undisputed. |
| 63. | The Aurora Detainee Handbook defines "personal living area" as 1. the detainee's "bunk and immediate floor area around and under [the] bunk," 2. the detainee's locker, and 3. the detainee's personal items. *Id.* | Disputed. GEO disputes that the handbook cited by Plaintiffs in support of their motion for summary judgment is applicable to the present case. The handbook cited by Plaintiffs as "Exhibit V" is from February 25, 2002, over two years before the class period and during a period wherein different regulations applied. ECF 262-9 at 46 (GEO_MEN 00040734).Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case.<br><br>The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook) |

| Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|
| **64.** The HUSP in GEO's Aurora Detainee Handbook also provides: "Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted [daily] for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit [or Dorm] Officer will be responsible for assuring this general cleanup is done on a regular basis." Ex. V (GEO_MEN 00040758 (Local Detainee Handbook (2002 version) (under heading "Dormitory Sanitation"))); Ex. W (PL000047 (Local Detainee Handbook (2013 version) (under heading "Housing Unit Sanitation"))); *see also* Ex. X (GEO_MEN 00052387 (Detainee Orientation Video) at 2) | Disputed. GEO disputes that the handbook cited by Plaintiffs as "Exhibit V," from February 25, 2002 is applicable to the present case. The handbook is from over two years before the class period and during a period wherein different regulations applied. ECF 262-9 at 46 (GEO_MEN 00040734). Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case.

The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook)

GEO does not dispute that the 2013 Detainee Handbook contains the following quoted text: "Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit Officer will be responsible for assuring this general cleanup is done on a regular basis." ECF 261-17, 20. |
| **65.** The Aurora Detainee Handbook states "[a]ll detainees in a housing unit [or dorm] are required to keep clean and sanitary all commonly accessible areas of the housing unit [or dorm], including walls, floors, windows, windows ledges, showers, sinks, toilets, tables, and chairs." Ex. V (GEO_MEN 00040759 (Local Detainee Handbook (2002 | Disputed. GEO disputes that the handbook cited by Plaintiffs in support of their motion for summary judgment is applicable to the present case. The handbook cited by Plaintiffs as "Exhibit V" is from February 25, 2002, over two years before the class period and during a period wherein different regulations |

| Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|
| version))); Ex. W (PL000047 (Local Detainee Handbook (2013 version))) | applied. ECF 262-9 at 46 (GEO_MEN 00040734).Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case.<br><br>The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook)<br><br>Disputed. GEO does not dispute that the 2013 Detainee Handbook contains the following quoted text:<br><br>"All detainees in a housing unit are required to keep clean and sanitary all commonly accessible areas of the housing unit, including walls, floors, windows, windows ledges, showers, sinks, toilets, tables, and chairs . . . . If detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit office of the problem. Action will be taken to resolve this problem." ECF 261-17, 20. |
| 66. | That section also states that "Detainees will take turns cleaning the [day space]" and the "day room area will be kept clean at all times." *Id.* | Disputed. GEO disputes that the handbook cited by Plaintiffs as "Exhibit V," from February 25, 2002 is applicable to the present case. The handbook is from over two years before the class period and during a period wherein different regulations applied. ECF 262-9 at 46 (GEO_MEN 00040734). Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it |

53113342;1

| **Plaintiffs' Statement of Undisputed Facts** | **GEO's Response and Supporting Evidence** |
|---|---|
| | appears in the "Aurora Detainee Handbook" as it relates to this case.<br><br>The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook) |
| **67.** GEO policy describes segregation as "[c]onfinement in a cell isolated from the general population." Ex. Y (GEO-MEN 00037770 (Policy Number 10.2.11 – AUR)) | Disputed. GEO does not dispute that the quoted text appears in the document, but notes that the document is signed by both GEO and ICE and is not properly described merely as a "GEO policy." ECF 262-11. |
| **68.** Disciplinary and administrative segregation are both forms of segregation used at the Aurora Facility. *Id.* | Undisputed. |
| **69.** According to ICE standards, administrative segregation should be used only when "restricted conditions of confinement are required [] to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility." Ex. L (GEO_MEN 00064171 (2011 PBNDS)); Ex. M (GEO-MEN 00063097 (2008 PBNDS); *see also* Ex. N (GEO-MEN 00063863-64 (INS Standards)) | Disputed. GEO disputes that the out-of-context quote fully describes when administrative segregation is properly used. The PBNDS do not include the qualifiers added by Plaintiffs that the listed reasons constitute an exhaustive list of reasons why disciplinary segregation may be used. In direct contrast, the PBNDS state under "Reasons for Placement in Administrative Segregation" that a detainee may be placed in administrative segregation, for among other reasons, that the "detainee is awaiting an investigation or a hearing for violation of facility rules." ECF 261-8. The PBNDS further explain that the exemplars provided are non-exhaustive. *Id.* |
| **70.** Administrative segregation may be used to confine detainees prior to a hearing on whether disciplinary segregation will be imposed for a rule violation, but "only as | Disputed. GEO disputes the use of this quote as setting forth a hard and fast rule. The section cited is one example of when administrative segregation is permissible, |

19

| | Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|---|
| | necessary to prevent further violation of those rules or to protect the security and orderly operation of the facility." Ex. L (GEO-MEN 00064172 (2011 PBNDS)); Ex. M (GEO-MEN 00063097 (2008 PBNDS)); *see also* Ex. N (GEO-MEN 00063864 (INS Standards)) | but the list of exemplars is non-exhaustive. ECF 261-8. |
| **71.** | Administrative segregation "is not to be used as a punitive measure." *Id.* | Disputed. GEO disputes that this correctly describes the use of administrative segregation. As explained in the 2011 PBNDS, because of how it is designed, "Administrative Segregation status is a nonpunitive status…" ECF 261-8. Thus, the use of administrative segregation is nonpunitive. |
| **72.** | Disciplinary segregation, which involves punitive segregation for disciplinary reasons, may only be administered after a detainee has received a disciplinary hearing and been found guilty of an offense authorizing such punishment. Ex. L (GEO-MEN 00064169 (2011 PBNDS)); Ex. M (GEO-MEN 00063090 (2008 PBNDS)); Ex. N (GEO-MEN 00063883 (INS Standards)) | Disputed. GEO disputes that this accurately describes the cited material. As the PBNDS make clear, disciplinary segregation is only appropriate after a disciplinary hearing panel has determined that a detainee is guilty of a prohibited act for which the ICE disciplinary severity scale authorizes disciplinary segregation. ECF 261-8. |
| **73.** | Detainees in both administrative and disciplinary segregation are housed in a section of the detention facility called the Special Management Unit ("SMU"). Ex. L (GEO-MEN 00064169 (2011 PBNDS)); Ex. M (GEO-MEN 00063090 (2008 PBNDS)); Ex. N (GEO-MEN 00063863 (INS Standards)) | Undisputed. |
| **74.** | The SMU at Aurora consists entirely of single-occupancy cells. Ex. P (Ceja 30(b)(6) Dep. 54:17-55:6) | Undisputed. |
| **75.** | The PBNDS state that "each facility [shall] have graduated severity scales of prohibited acts and disciplinary consequences." Ex. L (GEO-MEN 00064209 (2011 PBNDS)); Ex. M (GEO-MEN 00063138 (2008 PBNDS)); *see also* Ex. N (GEO-MEN 00063726 (INS Standards)) | Disputed. The PBNDS not only require graduated severity scales of prohibited acts and disciplinary consequences, but they also set forth the appropriate scale for the same. ECF 261-10, 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense |

| Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|
| | categories and disciplinary sanctions set forth in this section."); ECF 261-9, 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8, 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section."). |
| **76.** The PBNDS allow GEO discretion in determining the severity scales that it applies to different offenses. Ex. A (A. Martin Dep. 146:16-147:3); Ex. O (K. Martin Dep. 73:12-80:8) | Disputed. GEO disputes that it has discretion to determine its own severity scale. The 2000 NDS and all applicable versions of the PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale. ECF 261-10, 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9, 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8, 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section."). |
| **77.** The PBNDS authorize up to 72 hours of disciplinary segregation as punishment for certain offenses in what is designated as the "high moderate" offense category. Ex L (GEO-MEN 00064221 (2011 PBNDS)); Ex. M (GEO-MEN 00063153 (2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards)) | Undisputed. |
| **78.** High moderate offenses are also referred to as "300-level" offenses because the code numbers for these offenses are in the 300s. Ex. L (GEO-MEN 00064220-21 (2011 PBNDS)); Ex. M (GEO-MEN 00063152-53 (2008 | Undisputed. |

21

| | Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|---|
| | PBNDS)); Ex. N (GEO-MEN 00063733-34 (INS Standards)); Ex. O. (K. Martin Dep. 75:3-76:15) | |
| 79. | "Refus[ing] to clean assigned living area" is among the 300-level offenses. Ex. L (GEO-MEN 00064220 (2011 PBNDS)); Ex. M (GEO-MEN 00063152 (2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards)) | Undisputed.<br><br>GEO notes that the sanction reads, without alteration, "Refusing to clean assigned living area."   ECF 261-8 (GEO-MEN 00064220).  Plaintiffs have incorrectly indicated that they have altered the text |
| 80. | The PBNDS list 13 different sanctions that could be applied to a high moderate offense: (1) initiate criminal proceedings; (2) recommend disciplinary transfer; (3) disciplinary segregation up to 72 hours; (4) make monetary restitution; (5) loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.); (6) change housing; (7) remove from program and/or group activity; (8) loss of job; (9) impound and store detainee's personal property; (10) confiscate contraband; (11) restrict to housing unit; (12) reprimand; (13) warning. Ex. L (GEO-MEN 00064221-22 (2011 PBNDS); Ex. M (GEO-MEN 00063153 (2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards)) | Undisputed. |
| 81. | The PBNDS provide that incidents involving "high moderate" offenses (i.e., 300-level offenses) shall be sent to a Unit Disciplinary Committee ("UDC"). Ex. L ((GEO-MEN 00064213-14 (2011 PBNDS); Ex. M (GEO-MEN 00063143 (2008 PBNDS)); Ex. N (GEO-MEN 00063721 (INS Standards)) | Undisputed. |
| 82. | At orientation, detainees receive an overview of the Aurora Facility's disciplinary process, including examples of various offenses that could lead to discipline. Ex. X (GEO_MEN 00052387 (Detainee Orientation Video) at 4-7; *see also* Ex. O (K. Martin Dep. 214:10-215:20 (noting that detainees received the | Disputed.   GEO   disputes   that   the orientation video provides any information about the types of discipline that may be imposed for any offense. Instead, it provides an overview and refers detainees to their handbook. ECF 262-10, 6. |

| Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|
| orientation video reflecting the prevailing ICE standards throughout the class period)) | |
| **83.** One of the specific examples detainees receive of an offense that can lead to discipline is "failure to follow safety or sanitation rules." Ex. X (GEO_MEN 00052387 (Detainee Orientation Video) at 7) | Disputed. GEO's orientation video lists some of the "Low Moderate" offenses from the PBNDS in its orientation video. ECF 262-10, 8. As an example, the video lists, among others, the ICE prohibited act number 410 "failing to follow safety or sanitation regulations," an offense for which disciplinary segregation is not listed. ECF 261-8, 49. |
| **84.** According to the Aurora Detainee Handbook, if a dormitory officer determines the day room area is not sufficiently clean, he or she can instruct the detainees to clean it, and "[c]ontinued refusal to clean the area will result in further disciplinary action." Ex. V (GEO_MEN 00040759 (Local Detainee Handbook (2002 version))); Ex. W (PL000047 (Local Detainee Handbook (2013 version))) | Disputed. GEO disputes that the handbook cited by Plaintiffs in support of their motion for summary judgment is applicable to the present case. The handbook cited by Plaintiffs as "Exhibit V" is from February 25, 2002, over two years before the class period and during a period wherein different regulations applied. ECF 262-9 at 46 (GEO_MEN 00040734).Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case. The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook) GEO does not dispute that the 2013 Detainee Handbook contains the following quoted text, which is improperly excerpted in Plaintiffs proffered fact: |

23

| Plaintiffs' Statement of Undisputed Facts | | GEO's Response and Supporting Evidence |
|---|---|---|
| | | "If detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit officer of the problem. Action will be taken to resolve this problem. The day room area will be kept clean at all times. Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean the area will result in further disciplinary action." ECF 261-17, 20 |
| 85. | The UDC has the discretion to choose whether to issue minor sanctions or refer the case to the Institution Disciplinary Panel for more serious sanctions. Ex. L (GEO-MEN 00064213-14 (2011 PBNDS); Ex. M (GEO-MEN 00063143 (2008 PBNDS)); Ex. N (GEO-MEN 00063721 (INS Standards)); Ex. O (K. Martin Dep. 73:12-80:8) | Disputed. The cited material does not provide for the discretion Plaintiffs describe. The 2011 and 2008 PBNDS explicitly state "The UDC Shall . . . refer to the IDP any incident involving a serious violation associated with an A-through-D range sanction. This includes code violations in the "greatest" and 'high" categories (100s and 200s)[.]" ECF 261-8, 41; ECF 261-9, 48, |
| 86. | If the UDC chooses to issue sanctions, the UDC staff member has discretion to choose which sanction to issue for the offense based on his or her knowledge and experience. Ex. O (K. Martin Dep. 77:8-80:8) | Disputed. All individuals participating in the disciplinary process are required to follow the disciplinary severity scale in the PBNDS. ECF 261-10, 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9, 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8, 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and |

24

| Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|
| | disciplinary consequences as provided in this section."). |
| **87.** The UDC has the authority to impose disciplinary segregation as punishment for a 300-level offense. Ex. O (K. Martin Dep. 76:16-77:1) | Disputed. Only the IDP has the authority to place a detainee in disciplinary segregation. ECF 261-8, 28 (2011 PBNDS); ECF 261-9, 38 (2008 PBNDS);ECF 261-10, 12 (2000 PBNDS). |
| **88.** GEO placed detainees in segregation many times during the class period for refusing to clean. Ex. Z (GEO_MEN 00057697, GEO_MEN 00047810, GEO_MEN 00047812-17, GEO-MEN 00065434, GEO-MEN 00065393, GEO-MEN 00065211, GEO-MEN 00065032-33 (disciplinary charges and reports)) | Disputed. Placement in segregation was rare during the class period. Indeed, Plaintiff Valerga was never sent to segregation for failing to clean, nor did he know of anyone who was. Valerga Dep. 141:24-25, 142:1-2, 140:12-13. Plaintiff Menocal was never placed in segregation for failing to clean. ECF 49-2 ¶ 3. Plaintiff Argueta was never even threatened with segregation. Lourdes Argueta Second Set of Discovery, Interrogatory No. 27. Plaintiff Alexklina was never even threatened by GEO with segregation for failing to clean. Alexaklina Second Set of Discovery, Interrogatory No. 27. Plaintiff Dagoberto Vizguerra was never placed in segregation, let alone for failing to clean. Dep. 42:5-7. Plaintiff Xahuentitla-Flores did not know anyone who was sent to segregation for the failure to clean, nor was she sent there herself. Xahuentitla-Flores Dep. 70:11-17; 120:16-25; 121:1-15. Ex. R. |
| **89.** GEO determines the types of jobs available in the VWP on a facility-by-facility basis, and the ICE COTR approves them at the facility level. Ex. A (A. Martin Dep. 120:1-9) | Disputed. Ms. Martin testified that both ICE and GEO determine what type of jobs are available. ECF 261-2, 32 (Amber Martin Dep. 119:6-14). |
| **90.** The Contract does not identify how many detainees will participate in the VWP. Ex. R (A. Martin 30(b)(6) Dep. 72:13-72:25) | Disputed. The Contract provides a line item for the number of VWP shifts it will reimburse at the "actual cost of $1.00 per day," thereby noting an expected number of shifts. ECF 262-2, 8 (GEO_MEN 00019619). |

53113342;1

| | Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|---|
| 91. | GEO has the discretion to develop the VWP based on its needs and the availability of detainee labor. *Id.* | Disputed. GEO must offer a VWP, regardless of the number of individuals who wish to volunteer to participate. ECF 262-2, 32 (2011 contract requiring that GEO offer a VWP as a "specific objective") ECF 261-8, 50 (2011 PBNDS stating that detainees "shall" be given the opportunity to volunteer for work.). Because of this mandatory directive, GEO cannot eliminate the program based upon the unavailability of detainee labor. *Id.* Nor can expand the program beyond what is permitted by ICE. *Id.* |
| 92. | The 2011 Contract provides that ICE will reimburse GEO $1.00 per day for each detainee working in the VWP. Ex. B (GEO_MEN 00019616 (2011 Contract)) | Undisputed. |
| 93. | GEO pays detainees who work in the VWP at the Aurora Facility $1.00 per day. Ex. A (A. Martin Dep. 104:23-25); Ex. AA (GEO_MEN 00057594 (Detainee Work Detail Application)) | GEO does not dispute that detainees who work in the VWP at the Aurora facility are paid $1.00 per day.  However, GEO disputes that it pays detainees" as it merely serves as the middleman between ICE and detainees. GEO advances the payment authorized by ICE to detainees and is thereafter reimbursed by ICE for the same. ECF 262-2, 5 (GEO_MEN 00019616). |
| 94. | ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP. 8 U.S.C. § 1555(d); Appropriations Act, Immigration and Naturalization Service Salaries and Expenses, Pub. L. No. 95-431, 92 Stat. 1021 (1978) | Undisputed. |
| 95. | ICE does not prohibit its contractors from *paying* more than $1.00 per day for work performed in the VWP. Ex. A (A. Martin Dep. 106:11-19; 110:10-13); Ex. L (GEO-MEN 00064347 (2011 PBNDS) (compensation for VWP work is "at *least* $1.00 (USD) per day" (emphasis added))) | Disputed. The 2000 NDS, with which the AIPC was contractually obligated to comply from March 27, 2003 to April 28, 2010, required GEO to provide "compensation" and explicitly directed that "the stipend is $1.00 per day, to be paid daily." ECF 261-10, 5 (2000 NDS). Likewise, the 2008 PBNDS, with which the AIPC was contractually obligated to |

26

| | Plaintiffs' Statement of Undisputed Facts | GEO's Response and Supporting Evidence |
|---|---|---|
| | | comply from April 28, 2010 to June 22, 2013, mandated that "the compensation is $1.00 per day." ECF 261-9, 63 (2008 PBNDS). There was no discretion for GEO to pay more. |
| 96. | GEO pays detainees more than $1.00 per day at other ICE facilities, including $1.00 to $3.00 per day at its South Texas Detention Facility, $1.00 to $2.50 per day at its Folkston ICE Processing Center, $1.00 to $3.00 per day at its Joe Corley Detention Facility, and $1.00 to $4.00 per day at its LaSalle Detention Facility. Ex. A (A. Martin Dep. 109:15-110:13); Ex. BB (GEO-MEN 00170339 (VWP Pay Rates)) | GEO does not dispute that some facilities pay more than $1 per day to detainees. GEO notes that this is not relevant evidence because the contracts at other facilities are not at issue here. The evidence submitted by Plaintiffs does not indicate which version of the PBNDS apply at each facility. Nor does it establish the ICE communications at the other facilities. |
| 97. | GEO pays detainees more than $1.00 per day at other facilities to incentivize detainee participation in the VWP, such as when the VWP is "undersubscribed." Ex. F (Ragsdale 30(b)(6) Dep. 155:5-17) | GEO does not dispute that this is one such reason it may work with ICE to pay a higher amount. |
| 98. | In facilities where GEO pays detainees more than $1.00 per day for VWP work, it does so "on [its] own dime." Ex. A (A. Martin Dep. 107:18-22) | Disputed. Ms. Martin did not testify about facilities that would pay more than $1 per day, but instead, provided speculative testimony about how she believed a facility could accomplish paying more than $1.00 per day, testifying "I guess we could do it on our own dime." ECF 261-2, 27. |