JOSEPH H. HUNT
Assistant Attorney General
ROBERT S. BREWER, JR.
United States Attorney
ALEXANDER K. HAAS
Director, Federal Programs Branch
JACQUELINE COLEMAN SNEAD
Assistant Director, Federal Programs Branch
STEPHEN EHRLICH
Trial Attorney (N.Y. Bar No. 5264171)
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Tel.: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

*Attorneys for the United States*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GAVIN NEWSOM, in his Official Capacity as Governor of California; XAVIER BECERRA, in his Official Capacity as Attorney General of California; THE STATE OF CALIFORNIA,<br><br>Defendants. | Case No. 3:20-cv-00154-JLS-WVG<br><br>**DECLARATION OF TAE D. JOHNSON IN SUPPORT OF PRELIMINARY AND PERMANENT INJUNCTION**<br><br>[Motion; Memorandum in Support; Declarations of John Sheehan, Pamela L. Jones, Jon Gustin, Tae D. Johnson, and Gregory J. Archambeault]<br><br>Hearing Date: April 23, 2020<br>Hearing Time: 1:30 p.m.<br>Courtroom: 4D |

I, TAE D. JOHNSON, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

**I.   Personal Background**

1. I am employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Office of Enforcement and Removal Operations (ERO), as the Assistant Director for the Custody Management Division at ICE Headquarters in Washington, D.C. I have held this position since January 2011.

2. The Custody Management Division in ERO provides policy and oversight for the administrative custody of ICE's highly transient and diverse population of immigration detainees. The Custody Management Division is composed of three divisions led by three Deputy Assistant Directors under my direct supervision: (1) the Alternatives to Detention Division; (2) the Detention Management Division; and (3) the Custody Programs Division. As Assistant Director for the Custody Management Division, I am responsible for the effective and proficient performance of these three Divisions and their various units, including the oversight of compliance with ICE's detention standards and conditions of confinement at ICE detention facilities generally.

3. Since 1992, I have worked in various other positions within ICE and the former Immigration and Naturalization Service. Throughout my career, I have served in operational and managerial positions in ERO Field Offices as a detention and deportation officer, a supervisory detention enforcement officer, and a supervisory immigration enforcement agent. Since 2007, I have been appointed to numerous policy and planning positions within ICE Headquarters, and I have provided general oversight and guidance to ERO Field Offices, ICE leadership, and other federal agencies in the implementation and administration of various detention

and removal statutes, regulations, policies, and programs. Specifically, I have served as a Unit Chief of the Detention Standards Compliance Unit, Chief of Staff for the Office of Detention Policy and Planning, Special Assistant to the Assistant Secretary for ICE, and Deputy Chief of Staff for the Executive Associate Director for ERO.

4. Due to my experience and the nature of my official duties, I am familiar with the contractual processes and detention space needs of ERO throughout the United States, including in California.

## II.  ICE's Detention Practices and Facilities Nationwide

5. ICE is charged with enforcement of more than 400 federal statutes, and its mission is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety through enforcement of the federal laws governing border control, customs, trade, and immigration. To carry out this mission, ICE focuses on enforcing federal immigration laws, preventing terrorism, and combating transnational criminal threats.

6. As an operational program of ICE, ERO is responsible for the planning, management, and direction of broad programs relating to the supervision, detention, and removal of aliens from the United States under the U.S. immigration laws. ERO's statutory responsibilities include detention of aliens during the pendency of proceedings to determine whether they will be removed from the United States, as well as aliens subject to an administratively final removal order, pending their removal from the United States. The immigration laws also mandate detention of certain categories of aliens, including "arriving aliens" and certain categories of criminal and terrorist aliens.

7. The length of an individual alien's detention depends on a number of factors, including whether the alien is subject to mandatory detention under the U.S. immigration laws, the duration of any removal proceedings before the Department of Justice's Executive Office for Immigration Review, appeals before the federal courts

of appeals, and issues regarding execution of a final removal order. ERO also transfers aliens in its custody for a number of legal and operational purposes such as attendance at immigration court hearings, to facilitate removal, provide for appropriate medical care, and transfers between facilities for other reasons. In Fiscal Year 2019, ICE housed an average daily population of 50,165 aliens nationwide.

8. ICE neither constructs nor operates its own immigration detention facilities. Due to significant fluctuations in the number and location of removable aliens apprehended by DHS and subject to detention, it is important for ICE to maintain flexibility with regard to its immigration detention facilities. Otherwise, ICE could invest heavily in its own facilities only to have them stand idle if a particular area later experiences a drastic decrease in demand for detainee housing.

9. ICE coordinates the acquisition of detention bed space for removable aliens through: (1) Service Processing Centers; (2) Contract Detention Facilities; and (3) Intergovernmental Service Agreement (IGSA) facilities (collectively, "immigration detention facilities"). Service Processing Centers are owned by ICE and staffed by a combination of federal and contract employees. Contract Detention Facilities are owned by private companies that contract directly with the government and are predominantly staffed by contract employees. Dedicated IGSAs can be public facilities or privately owned, and can be operated by local governments or private companies operating under contracts with local governments.

10. Many IGSAs house a very small ICE population compared to the local inmate population, while others are almost exclusively committed to housing ICE detainees. Other facilities used by ICE under various contractual arrangements include: facilities used by ICE through a contract awarded by the U.S. Marshals Service (USMS), facilities operated by the Federal Bureau of Prisons (BOP), staging facilities for transportation, holding facilities for temporary detention, and hospitals

for emergency care, among other types of facilities. ICE does not have any federally owned and operated detention facilities.

11. ICE used about 30 dedicated (or largely dedicated) immigration detention facilities throughout the United States in Fiscal Year 2019. Of these facilities, 13 were privately operated Contract Detention Facilities that are typically privately owned, housing an average daily population of 9,387 alien detainees; five were Service Processing Centers owned by the federal government and privately operated through contractors, housing an average daily population of 3,799 alien detainees; and 14 were dedicated (or largely dedicated) IGSAs, housing an average daily population of 12,635 alien detainees.[1]

12. Ordinarily, when ICE needs private contractors or privately owned detention facilities to assist ERO in its detention of removable aliens, ERO begins by identifying a requirement (i.e., an approximate amount of detention space in a certain geographic area) and creates a written performance work statement that describes in detail the detention services ERO wants to acquire. ICE then creates a solicitation package that is publicly posted, inviting interested contractors to submit offers. ICE then evaluates the offers against the evaluation criteria that were included in the solicitation package. Based on the final evaluation, ICE awards the contract to the offeror that represents the best value to the government. It typically takes 9 to 12 months from the beginning of preparation for ICE to award a contract, but this time can be longer or shorter depending on the circumstances.

---

[1] The remaining average daily population (approximately 24,344 alien detainees) was housed in other facilities that are not entirely dedicated to immigration detention, namely: 143 non-dedicated IGSA facilities, 121 facilities under intergovernmental agreements with other federal agencies, and 20 other facilities, such as BOP facilities.

### III. ICE's Detention Facilities and Contracts in California

13. In California, ICE does not operate any detention facilities; ICE currently uses four privately owned and privately operated Contract Detention Facilities: Mesa Verde ICE Processing Center, Adelanto ICE Processing Center, Imperial Regional Detention Facility, and the Otay Mesa Detention Center. In Fiscal Year 2019, these four Contract Detention Facilities housed an average of 3,721 ICE detainees each day, but they have a total capacity of approximately 5,000 detention beds, not including the additional beds that will become available in August 2020.

14. Although ICE currently owns a Service Processing Center in El Centro, California, ICE has not used this facility since October 2014. ICE recently agreed to allow the USMS to use the facility upon its renovation, which USMS completed in September 2019.

15. The Mesa Verde ICE Processing Center is owned and operated by The GEO Group, Inc. ICE awarded a contract for detention services at this Contract Detention Facility on December 19, 2019. The contract contemplates a total period of performance by the contractor extending from December 20, 2019 to December 19, 2034, with the base period of performance covering December 20, 2019 to December 19, 2024, and two subsequent five-year periods of performance that may be exercised by ICE at its option. The contract also contemplates that the contractor will provide detention services at two additional facilities, Golden State Modified Community Correctional Facility and Central Valley Modified Community Correctional Facility. The contract provides that up to 400 detention beds will be available at the Mesa Verde ICE Processing Facility. The contract further provides that up to 700 detention beds will be available at each of the Golden State Modified Community Correctional Facility and the Central Valley Modified Community Correctional Facility beginning on August 20, 2020. The detention services provided under this contract service the San Francisco area.

16. The Adelanto ICE Processing Center is also owned and operated by The GEO Group, Inc. ICE awarded a contract for detention services at this Contract Detention Facility on December 19, 2019. The contract contemplates a total period of performance by the contractor running from December 20, 2019 to December 19, 2034, with the base period of performance from December 20, 2019 to December 19, 2024, and two subsequent five-year periods of performance that may be exercised by ICE at its option. The contract also contemplates that the contractor will provide detention services at one additional facility, Desert View Modified Community Correctional Facility. The contract provides that up to 1,940 detention beds will be available at the Adelanto detention facility. The contract further provides that up to 750 detention beds will be available at the Desert View Modified Community Correctional Facility beginning on August 20, 2020. The detention services provided under this contract service the Los Angeles area.

17. The Imperial Regional Detention Facility is owned and operated by the Management and Training Corporation. ICE awarded a contract for detention services at this Contract Detention Facility on December 19, 2019. The contract contemplates a total period of performance by the contractor running from December 20, 2019 to December 19, 2034, with the base period of performance from December 20, 2019 to December 19, 2024, and two subsequent five-year periods of performance that may be exercised by ICE at its option. The contract provides that up to 704 detention beds will be available at the Imperial Regional Detention Facility. The detention services provided under this contract service the San Diego area.

18. The Otay Mesa Detention Center is owned and operated by CoreCivic. ICE awarded a contract for detention services at this Contract Detention Facility on December 19, 2019, which also provides that USMS may use the Otay Mesa Detention Center to house federal inmates. The contract contemplates a total period

of performance by the contractor running from December 20, 2019 to December 19, 2034, with the base period of performance from December 20, 2019 to December 19, 2024, and two subsequent five-year periods of performance that may be exercised by ICE at its option.  The contract provides that ICE will have up to 1,994 detention beds available in the Otay Mesa Detention Center.  The detention services provided under this contract service the San Diego area.

19. ICE does not lease and operate any detention facility in California that is privately owned.  ICE also does not contract, and has never contracted, with school facilities used for the disciplinary detention of a pupil in California.  Nor does ICE contract for facilities in California providing educational, vocational, medical, or other ancillary services to an inmate in the custody of, and under the direct supervision of, ICE personnel.  ICE houses only aliens subject to detention under its civil immigration detention authority in its immigration detention facilities.  It does not house inmates in such facilities.

### IV. Assembly Bill 32's Impact on ICE Contracts

20. On October 11, 2019, the Governor of California signed Assembly Bill 32 (A.B. 32).  Under A.B. 32, no private detention facility may be operated in California.  A.B. 32 further establishes that private detention facilities operating under a valid contract with a governmental entity that was in effect before January 1, 2020, such as the four contracts discussed above, may only continue operating for the duration of the contract, not to include any extensions made to or authorized by that contract.  The prohibitions established by A.B. 32 will adversely impact ICE's efforts to successfully enforce federal immigration laws.

21. Due to A.B. 32, ICE has been impaired from strategically planning at a national level for the contracts required to ensure there is sufficient capacity in California to enforce our nation's immigration laws.  Additionally, A.B. 32 prevents

Declaration of Tae D. Johnson | 7
3:20-cv-00154-JLS-WVG

ICE from quickly ramping up or down its bed-space requirements based on the actual need at any given time, costing ICE much needed flexibility in its operations.

22. A.B. 32's prohibition on privately operated immigration detention facilities in California will adversely affect ICE operations and could force ICE to relocate thousands of aliens to detention facilities outside of California. In Fiscal Year 2019, ICE arrested and detained 44,255 aliens in California. Without sufficient capacity in California, the transfer of thousands of aliens from California to detention facilities in other states throughout the year would strain capacity and resources in other locations. The required transfer of all such aliens from California to other states could also adversely impact conditions of detention, security for detained aliens across the United States, and create a greater strain on, and danger to, federal contractors and ICE personnel assigned to the facilities.

23. In addition, immigration detention facilities in other states could become overcrowded, which, in turn, would adversely impact case processing times and strain the federal resources of U.S. Citizenship and Immigration Services, the Department of Justice's Executive Office for Immigration Review, and ICE attorneys and officers assigned to adjudicate and manage these larger dockets.

24. Although A.B. 32 does not foreclose the *federal* operation of immigration detention facilities in California, this alternative is not a practical or legal possibility. ICE faces statutory requirements regarding the order in which it must consider detention options. *See* 8 U.S.C. § 1231(g)(2) ("Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use."). Contracts are awarded for a specific number of detention beds because the population of detained removable aliens in the United States increases and decreases every day.

25. If ICE is unable to contract for detention space with private detention facilities, it would be forced to purchase or construct immigration detention facilities. Constructing and opening a new facility would almost certainly be more expensive and time-consuming than entering into a contract with a private company for an existing facility and staff. Requiring ICE to construct and operate its own facilities would also mean that, should capacity needs decrease prior to construction completion, ICE would then be paying for space it does not use. The potential result of such a scenario is that facilities would be constructed at taxpayer expense to accommodate for a projected demand that may never materialize due to natural migration flows or other circumstances. Those facilities could then become idle, fall into disuse, and remain vacant for an extended period. And, if the demand for detention beds later increases, ICE would likely need to invest significant taxpayer dollars to prepare these facilities for use.

26. Accordingly, a responsible and efficient administration of public resources and funds requires awarding contracts based on bed space needs because, when the demand for immigration detention space is reduced, or when other unforeseen factors require ICE to adjust its detention operations in a particular area, ICE can rescind a contract awarded to a Contract Detention Facility or reduce its use of beds afforded by federal contractors.

27. If A.B. 32 is permitted to remain in place, ICE would need to begin planning for a lack of detention space in California long before its contracts expire. ICE would likely need to begin a competitive solicitation for new private contracts in other states to replace the lost capacity in California. And, as noted above, it typically takes 9 to 12 months from the beginning of preparation for ICE to award a contract. The new vendor would also require at least three months after the contract award to hire and train staff to operate the facility. If new construction is

Declaration of Tae D. Johnson| 9
3:20-cv-00154-JLS-WVG

required as part of the solicitation, it could take nearly three years before ICE is able to gain access to the beds at the new detention facilities.

Executed on this 23rd day of January, 2020.

_____
Tae D. Johnson
Assistant Director
ERO Custody Management Division