```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF COLORADO
 2

 3   ALEJANDRO MENOCAL, MARCOS    .   Case No. 14-cv-02887-JLK-MEH
     BRAMBILA, GRISEL             .
 4   XAHUENTITLA, HUGO            .
     HERNANDEZ, LOURDES ARGUETA,  .
 5   JESUS GAYTAN, OLGA           .
     ALEXAKLINA, DAGOBERTO        .
 6   VIZGUERRA, DEMETRIO VALERGA,.
     on their own behalf and on   .
 7   behalf of all others         .   Alfred A. Arraj Courthouse
     similarly situated,          .   901 19th Street
 8                                .   Denver, CO  80294
                Plaintiffs,       .
 9                                .
     vs.                          .
10                                .
     THE GEO GROUP, INC.,         .
11                                .
                Defendants.       .
12                                .   February 18, 2020
     . . . . . . . . . . . . . .  .   1:15 p.m.
13

14        TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
            MICHAEL E. HEGARTY, UNITED STATES MAGISTRATE JUDGE
15

16   APPEARANCES:

17   For the Plaintiffs:          Outten & Golden, LLP
                                  By:  Michael J. Scimone*
18                                685 Third Avenue
                                  25th Floor
19                                New York, NY  10017
                                  (212) 245-1000
20
                                  Kelman Buescher Law Firm
21                                By:  Andrew H. Turner
                                  600 Grant Street
22                                Suite 825
                                  Denver, CO  80203
23                                (303) 333-7758

24   *By phone.

25
```

1   Appearances continued:

2   For the Defendant:              Akerman, LLP
                                    By:  Adrienne Scheffey
3                                   1900 Sixteenth Street
                                    Suite 1700
4                                   Denver, CO  80202
                                    (303) 260-7712
5
                                    Burns Figa & Will, P.C.
6                                   By:  Dana L. Eismeier
                                    6400 South Fiddlers Green Cir.
7                                   Suite 1000
                                    Greenwood Village, CO  80111
8                                   (303) 796-2626

9   For the United States of        United States Attorney's Office
    America:                        By:  Timothy B. Jafek
10                                  1225 17th Street
                                    Suite 700
11                                  Denver, CO  80202
                                    (303) 454-0100
12
    Court Recorder:                 Clerk's Office
13                                  U.S. District Court
                                    901 19th Street
14                                  Denver, CO  80294

15  Transcription Service:          AB Litigation Services
                                    216 16th Street, Suite 600
16                                  Denver, CO  80202
                                    (303) 296-0017

17
    Proceedings recorded by electronic sound recording;
18  transcript produced by transcription service.

19

20

21

22

23

24

25

 1                    (Time noted:   1:15 p.m.)

 2              THE COURT CLERK:   All rise.   Court is now in

 3    session.

 4              THE COURT:   Good afternoon.   Please be seated.

 5              Case number 14-cv-2887, a six year old case,

 6    Menocal et al. versus The GEO Group, Inc.

 7              Go ahead and make your appearances, please.

 8              MR. TURNER:   Good afternoon, Your Honor.   Andrew

 9    Turner of the Kelman Buesher Firm, appearing for the

10    Plaintiff class.

11              And with me on the phone, primary counsel today,

12    will be Mike Scimone.

13              THE COURT:   Okay, thank you.

14              MS. SCHEFFEY:   Adrienne Scheffey on behalf of The

15    GEO Group.   And I'm also here with Dana Eismeier.

16              THE COURT:   Old buddy.   So I did receive something

17    from Mr. Scimone, and I'll have -- who is going to speak for

18    the defense?

19              MS. SCHEFFEY:   I will, Your Honor.

20              THE COURT:   Ms. Scheffey?

21              MS. SCHEFFEY:   Yes.

22              THE COURT:   Okay.   Since the Plaintiff can't

23    possibly be correct that I ordered the Defendant to do

24    something and they didn't do that, I want you to address that

25    allegation.

1          MS. SCHEFFEY:  Yes.  So the issue that's before

2    you today is an interrogatory that was served by Plaintiffs'

3    counsel on January 6, 2020.  So the response was not yet due

4    until after our January 21st conference.

5          I believe that Plaintiffs' counsel is addressing

6    your comment at the hearing that -- which is on page 6 of the

7    transcript of the January 21st hearing, that a plaintiff may

8    not be able to determine the square footage of certain areas

9    where detainees have access within the building, but so far

10   as raw square footage, that really, unless someone can prove

11   to me differently, would not be state secret.

12          The current interrogatory asks for the dimensions

13   and square footage of every single area down to the granular

14   level of restrictive housing units, the number of fixtures

15   and types of equipment in each room, the type of floor

16   covering, that kind of detail.

17          We have objected on relevance, and also security.

18          As a compromise, we've offered to provide a raw

19   square footage estimate of all of the areas as an aggregate

20   the detainees claim.

21          THE COURT:  Okay.  All right, well, that's about

22   quoting me accurately.

23          Mr. Scimone?

24          MR. SCIMONE:  Thank you, Your Honor.  We did think

25   this issue had been resolved.  The context at the time of the

1        conference, we were talking about a document request.

2                It is true this interrogatory is not yet due.

3                Imagine that the documents no longer exist, so the

4        interrogatory is the right vehicle for this.

5                The issue in the context of that was that we're

6        seeking the square footage of areas where detainees cleaned,

7        and then so then an expert can then weigh in on what the

8        costs to GEO would have been to use non-detainee labor.

9                And so we thought that was clear at the time that

10       we were seeking not the total square footage of the entire

11       facility, but specific square footage of the areas where

12       detainees clean.

13               And so that was the context for that discussion on

14       the January 21st conference.  That is still what we're

15       seeking.

16               There's another interrogatory that's not an issue

17       that we served, which identifies the specific areas within

18       the facility that were a part of the cleaning program.

19               And so we now have the ability to narrow the exact

20       areas that we need square footage for with that response so

21       we can be a little bit more tailored in terms of what we're

22       actually seeking.

23               But that remains the basic thrust of what we need.

24               The reason that the total aggregate square footage

25       is inadequate is because our expert is going to base the

1  estimate on things such as the floor covering.  So a linoleum

2  surface may need a different kind of cleaning than a carpeted

3  area, for example.

4       And so knowing the square footage in different

5  areas, what kind of surface is being cleaned, and what

6  fixtures need to be cleaned within the area, is kind of the

7  basic raw material for the expert's report.

8       THE COURT:  Okay.  But why didn't you press the

9  issue before?  I clearly said and focused on raw square

10  footage, and in response you said nothing.

11       So why didn't you make this clarification at the

12  time on January 21st?

13       MR. SCIMONE:  Your Honor, we thought it had been

14  made clear from the -- part of prior discussions and from the

15  submission made to the Court that we were seeking --

16       THE COURT:  Mr. Scimone, hold on a second.  I

17  don't doubt what you were seeking.  I'm telling you what I

18  said in response to what you were seeking.

19       Why didn't you press the issue then if you didn't

20  like my response?

21       MR. SCIMONE:  Well, Your Honor, we did like the

22  response.  We thought it was addressing the context that has

23  been described, and I think we had a misunderstanding as to

24  what the Court was ruling on.

25       We understood that -- the issue to be whether or

1   not that was -- that information was confidential and posed

2   security concerns.

3           The comment at the conference was that you didn't

4   believe the square footage -- raw square footage was

5   confidential.  We had offered attorneys' eyes only, and so

6   there was an added layer of protection, and so we thought

7   from the context that the Court meant that the information we

8   were seeking, which was about the square footage of the areas

9   being cleaned, was actually what was under discussion.

10          THE COURT:  Right.  Well, hold on a second.  So if

11  you read the transcript, what I said was square footage can

12  be determined by walking around the building just once, if

13  you wanted to.

14          So we were not on the same wavelength if you look

15  at the transcript.  I was focused on the square footage of

16  the entire building, and I don't think there was any more

17  discussion on that point anyway.

18          So that's water under the bridge.  We're back.

19  You want square footage of specific areas.  I wish you would

20  have brought it up then.  We wouldn't have had the delay in a

21  six year old case.

22          But let's talk about it.  How many areas, Mr.

23  Scimone, do you believe have been identified in which your

24  clients engaged in labor?

25          MR. SCIMONE:  There are ten areas identified by

1 the interrogatory response.

2          THE COURT:  And you want square footage for each

3 of those ten areas?

4          MR. SCIMONE:  Correct.

5          THE COURT:  And do you believe you already have

6 enough information as far as whether it's carpet, whether

7 it's linoleum, whether it's tile, whatever the surface of the

8 floor is, and whatever has to be cleaned, you have all that

9 you need.  All you want is square footage?

10          MR. SCIMONE:  No.  The interrogatory seeks both of

11 those pieces of information.  So both the square footage, the

12 surface covering, and the number and types of fixtures and

13 equipment in each area.

14          THE COURT:  Okay.  Did your clients have to dust

15 and wipe down?

16          MR. SCIMONE:  I believe so.  Yes, Your Honor.

17          THE COURT:  Okay.  Well, "I believe so" is not

18 entirely the answer I would want, but if you think that's

19 true, so we're talking about areas they have to wipe down or

20 dust, and areas they have to clean on the floor.

21          Did they get down on their hands and knees and

22 scrub, or did they just sweep with a broom?  What kind of

23 cleaning did they do?

24          MR. SCIMONE:  Your Honor, I have to cross-

25 reference that with some other documents to be certain.

1            But in general, I believe that the cleaning was

2   using mops and similar equipment.  There was a floor waxer I

3   know was involved in some areas.

4            THE COURT:  Like a buffer?  Did they use a buffing

5   machine?

6            MR. SCIMONE:  Right.  Yes.

7            THE COURT:  You know that, or you're guessing?

8            MR. SCIMONE:  I have seen references to a buffer

9   and floor waxer being used in some documents, Your Honor,

10  yes.

11           THE COURT:  Okay.  All right.  So we're talking

12  about -- now, I've been involved in the corrections business

13  since '92.  And I know that, you know, layouts, locations,

14  egress, ingress, wiring, other things like that, would give

15  people who mean to do harm information.

16           I'm not sure that the square footage falls in

17  those categories, if we're not talking dimensions.  He's not

18  asking for dimensions.  He's asking for square footage.

19           So --

20           MS. SCHEFFEY:  If I may?

21           THE COURT:  If somebody said it's 540 square feet,

22  they don't know if it's 10 by 54, or 22 by 25.

23           Go ahead.

24           MS. SCHEFFEY:  If I may clarify, they have asked

25  for -- in this schematic that's been provided, which is

1   confidential, and I have a copy if I could approach.

2          THE COURT:  Yes, go ahead.  You have to be near a

3   microphone, so just hand it to me and then you can go back.

4          Thank you.

5          MS. SCHEFFEY:  They have sought the dimensions and

6   square footage of each area depicted herein.

7          THE COURT:  Well, --

8          MS. SCHEFFEY:  That goes down to the granular

9   level of the cell, the restrictive housing unit, the

10  bathrooms, I mean, every single -- the medical unit, intake.

11  It's the entire facility.

12         THE COURT:  Did they clean the judge's area?

13         MS. SCHEFFEY:  No, they wouldn't have cleaned

14  every area, but it's -- I understand now that the

15  interrogatory has been limited by agreement here to areas

16  they cleaned.

17         THE COURT:  Right.

18         MS. SCHEFFEY:  But they did clean their own cells,

19  right, and their own living areas.

20         THE COURT:  Sure.

21         MS. SCHEFFEY:  They have cleaned -- that would

22  include restrictive housing.  They cleaned the hallways, and

23  I think --

24         THE COURT:  You can be seated if you want.

25         MS. SCHEFFEY:  Okay.  I think knowing the distance

1    of the hallway, for example, from the entrance all the way to

2    the first secure area, might be something that an individual

3    who has a --

4              THE COURT:  But they're not asking for distances

5    or dimensions.  They're asking for raw square footage.

6         MS. SCHEFFEY:  Well, no.  We've offered raw square

7    footage.  They have asked for the dimensions and square

8    footage, unless I'm misunderstanding.

9              THE COURT:  Why do you need the dimensions if you

10   have the square footage?

11             MR. SCIMONE:  I don't, Your Honor.

12             MS. SCHEFFEY:  Okay.

13             MR. SCIMONE:  Square footage is sufficient.

14             THE COURT:  I think dimensions would be --

15             MR. SCIMONE:  We just need the square footage.

16             THE COURT:  -- would be more of a security issue

17   than raw footage, because again it could be any shape at all,

18   and square footage just doesn't help that much as far as

19   somebody who wants to plan some kind of a -- unless they're

20   calculating how many people they need per square foot to do

21   the dirty deed, which I don't think they're smart enough to

22   do that kind of thing.

23             So anyway, --

24             MS. SCHEFFEY:  Just to clarify.  Would that be

25   aggregate of everywhere they clean?

1           THE COURT:  Well, I think it's probably per area.

2    Are you seeking it per area?  Because probably they're going

3    to say that if an area has carpet versus linoleum, different

4    labors is involved, different time, things like that.  You

5    don't use a buffer on carpets, so.

6           MS. SCHEFFEY:  Yeah, I get that.  I just think we

7    then turn in to -- I mean, the areas are these hallways,

8    which are the main hallways through the area.

9           You're getting to if you know that this hallway

10   is, you know, a hundred square feet, there's only so many

11   ways you slice that.

12          THE COURT:  Right.  So how many hallways do they

13   want?

14          MS. SCHEFFEY:  I think it looks like -- I don't --

15   they said every single one, but I imagine it's only going to

16   be four long ones, and then you're going to have --

17          THE COURT:  Okay, just provide them the aggregate

18   of all hallways.

19          MS. SCHEFFEY:  Aggregate of hallways, okay.

20          THE COURT:  Are all the hallways the same

21   composition as far as the floor?

22          MS. SCHEFFEY:  Yes.  And just to be clear, --

23          THE COURT:  And hallways don't have fixtures,

24   probably.  I mean, desks and things.

25          MS. SCHEFFEY:  Not much.  And they have

1  photographs from the ICE inspection that happened last week.

2            THE COURT:  Okay.

3            MS. SCHEFFEY:  So they should be able to

4  determine, you know, general floor type, that kind of thing,

5  for cleaning.

6            THE COURT:  Okay.  And do you know enough about

7  what they do to say that they're given a bottle of some kind

8  of disinfectant or furniture polish and a rag, and they do

9  furniture and they do things like that?  Do you know that?

10           MS. SCHEFFEY:  So, yeah, it depends.  In the

11 medical area, for example, they only do the floors.  That's

12 mops, sweeping.

13           Same with intake and just general hallways.

14           And then in their own units, they are given a mop

15 and a spray bottle to clean their tables and --

16           THE COURT:  Okay.  Do the Plaintiffs know this

17 already?  Do you know this already?  What she just said.

18           MR. TURNER:  I'm sorry, Judge?

19           THE COURT:  Do the Plaintiffs know that

20 information already?  What she just put on the record.

21           MR. TURNER:  What I think might be useful, so

22 we're not back for clarification, would be aggregate square

23 footage by floor type, right?

24           So we're talking about so much carpet, we're

25 talking about so much tile, we're talking about so much

 1  unfinished concrete, right?

 2          THE COURT:  That would be fine.  I think that

 3  would be even easier.

 4          MS. SCHEFFEY:  Yeah.

 5          MR. TURNER:  And if you can index that to an area

 6  in the aggregate, then we can know which crew was on it.

 7          THE COURT:  Right.

 8          MS. SCHEFFEY:  Right.

 9          MR. TURNER:  So that's the issue.

10          THE COURT:  So you believe that as to any one

11  floor type, the same type of work would have been performed

12  no matter where it is in the facility, except in the medical

13  area, which she said it is only the floor.

14          MR. TURNER:  I didn't mean to parse it too finely,

15  Your Honor.  But, you know, we've got kitchen workers doing

16  kitchen work.  We've got laundry workers doing laundry work.

17          THE COURT:  Right.

18          MR. TURNER:  I do want to defer to Mr. Scimone,

19  though.

20          THE COURT:  Okay.  Mr. Scimone?  You've heard our

21  discussion.  What kind of clarification do you seek beyond

22  what we've discussed?

23          MR. SCIMONE:  Your Honor, yeah, I think as long as

24  we're able to cross-reference what surface area is being

25  cleaned, you know, by square footage, that should be

1  sufficient for that part.

2           With respect to fixtures, anything that needed to

3  be cleaned by that particular work crew, I think is what we

4  need to know about.

5           And so, you know, again, we can cross-reference

6  this by work crew and what instructions they received with

7  other documents.  But, so that -- I think knowing this by

8  area is probably helpful.

9           THE COURT:  Wait.  Is it --

10           MR. SCIMONE:  For each of the areas they've

11  identified.

12           THE COURT:  Is the type of work performed a

13  material issue in the case, versus just the hours worked?

14           MR. SCIMONE:  No, just the hours worked is really

15  the issue.

16           THE COURT:  Right.  And so why does it matter what

17  they were doing, as long as you know how long they were doing

18  it?

19           MR. SCIMONE:  So, you know, an expert would be

20  able to give an estimate of the typical amount of man hours

21  needed for that kind of work.

22           I think what may change the outcome of that

23  estimate slightly would be if there are other kinds of

24  equipment that GEO might have invested in, that it needed to

25  pay service contract pay to do that work, and so it's

1  possible that there's a more updated model floor buffer that

2  they might have used, for example.  That would have been

3  cheaper in the aggregate.

4          And so that's another way of arriving at this

5  rather than just using the raw number of hours.

6          And so the point of it is to see sort of a couple

7  of different ways how you might value that work.

8          THE COURT:  So you're going to be estimating

9  damages based on an expert's testimony as to how long it

10  should have taken?  There's no actual evidence of hours

11  worked by the people who actually did the work or by the

12  Defendant?  Everything is going to be just expert testimony?

13          MR. SCIMONE:  There is little evidence of the

14  hours actually worked, Your Honor.  So we have shift times,

15  but not actual hours worked.

16          And so, you know, there are some inferences that

17  would need to be drawn, so the expert testimony is helpful in

18  that regard.

19          THE COURT:  Does your expert have experience in

20  that type of work done by detainees or inmates, versus out in

21  the general marketplace?

22          MR. SCIMONE:  His experience would be primarily in

23  the general marketplace, but I think the presumption is that

24  the labor should not be particularly different whether done

25  by a detainee or someone else.

1          THE COURT:  Okay.  Do you guys think you know what

2   to do?

3          MS. SCHEFFEY:  I think so.

4          THE COURT:  Okay.

5          MS. SCHEFFEY:  I think we will give aggregate

6   square footage, like floor covering --

7          THE COURT:  Per type of flooring.  Yeah.

8          MS. SCHEFFEY:  And if there's an objection, then

9   I've gotten it wrong.

10          THE COURT:  Have you guys had a chance to do a

11   walk through?

12          MR. TURNER:  We did that last week, Your Honor.

13          THE COURT:  Every area that inmates worked?

14          MS. SCHEFFEY:  Yes, Your Honor.

15          THE COURT:  So they had the opportunity to observe

16   whatever is in there as far as fixtures?

17          MS. SCHEFFEY:  And there are photographs that ICE

18   will be releasing at some point in the near future.

19          THE COURT:  Okay.  All right.  Sounds like there's

20   plenty of data out there to give an expert, so okay.

21          MR. SCIMONE:  And, Your Honor, just one point of

22   clarification --

23          THE COURT:  Sure.

24          MR. SCIMONE:  -- about the use of the term

25   aggregate.  You know, so because we do have those photographs

1  and we can determine things like fixtures, and we can

2  determine them for a particular room, and so if there's

3  aggregate square footage being given, for example, the

4  hallways are an aggregate of so many thousand square feet, --

5          THE COURT:  Sure.

6          MR. SCIMONE:  -- I think we would just ask that

7  that be identified as the hallway, per se, and that the pod

8  areas in the aggregate are so many square feet, so that we

9  can then match fixtures of those different areas.

10         MS. SCHEFFEY:  I guess I'm wondering which

11  fixtures need to be matched.  Would it be helpful to have an

12  aggregate number of showers, for example?  Is there any

13  reason they have to be matched?

14         MR. SCIMONE:  Yes as to the showers.  And I think

15  the general notion is anything that is part of the cleaning

16  crew's responsibilities, which I know does include showers.

17         I think, yes, that would be an efficient way to do

18  it.

19         MS. SCHEFFEY:  We can provide the aggregate number

20  of showers.

21         THE COURT:  Could you take some more down to the

22  ADX?  They really need more showers.

23         MS. SCHEFFEY:  I'll do my best.

24         THE COURT:  Inmates do not like the number of

25  showers that they get.

1           Okay.  All right.  Is that going to be

2   satisfactory, Mr. Scimone?

3           MR. SCIMONE:  I believe so, Your Honor.  Yes.

4           THE COURT:  Now, you have a motion pending.  And I

5   guess what I haven't checked on is whether Judge Kane has set

6   any new deadlines at all.  Has Judge Kane done any deadlines

7   at all for you guys that I have to be working within?

8           MS. SCHEFFEY:  Not that I'm aware of, Your Honor.

9           THE COURT:  Okay.  So, I mean, I just don't like

10  to stick my nose into things when you guys are all agreeing,

11  because you're the ones that have the interest in getting

12  this thing to trial on both sides.

13          So that's all fine with me, and docket 241 will be

14  granted.

15          What else can I do to make sure this doesn't

16  become an eight-to-ten year old case?  Anything?

17          MR. SCIMONE:  Your Honor, the only other issue

18  I'll raise, so we do have 30(b)(6) depositions coming up, and

19  so this is by way of a status report on some issues that were

20  discussed at the last conference with respect to whether ICE

21  has any privilege assertions that it wants to make in the

22  case.

23          So those depositions are next Thursday and Friday,

24  the 27th and 28th.  We've asked ICE whether they're asserting

25  any objection in advance, or any privilege claims as to

1   anticipated testimony, and whether it's going to send anyone

2   to the deposition.

3           The response we've gotten is that ICE is reviewing

4   the request.  So at this point, we don't know.

5           I will say I'm aware of other cases in which GEO

6   has been a party, with similar claims and similar defenses.

7   The practice generally is that ICE sends a letter a day or

8   two in advance of the deposition.

9           In this case, ICE had said that it will

10  communicate that information to GEO and expect that GEO will

11  communicate that information to us.

12          THE COURT:  Well, if I were a government lawyer,

13  I'd say "show me the questions you're going to ask me, and I

14  will tell you whether there is any privilege I'm going to be

15  asserting."

16          But I think without knowing what you're going to

17  ask, sure, some of us could figure out some of the things

18  you're going to ask, but not everything.

19          But if you've taken these kinds of depositions

20  before, Mr. Scimone, then you know what you're going to hear,

21  because although the government is not one monolithic all

22  knowing system, they are trained in the same privileges.

23          And I think you can probably do as good a job

24  anticipating the objections that -- or privileges that

25  they'll assert as they could in telling you.

1          But we do have an Assistant U.S. attorney.  Mr.

2    Jafek, do you know whether any lawyer will be appearing to

3    assert objections, since witnesses really shouldn't be doing

4    that?

5          MR. JAFEK:  I don't know yet.  As Mr. Scimone

6    said, our usual practice is to issue a *Touhy* response.

7          So our position is --

8          THE COURT:  Well, that's required by law.

9          MR. JAFEK:  That's right.  So our position is GEO

10   made the *Touhy* request, we'll respond to GEO.

11         THE COURT:  Are you within the ten days, still?

12   Is *Touhy* -- that's FOIA.  What's a *Touhy* response time?  I

13   don't remember.

14         MR. JAFEK:  You know, I'm not sure what those

15   deadlines are.

16         THE COURT:  Okay.

17         MR. JAFEK:  But we haven't -- it hasn't been that

18   long since specific dates and specific people have been

19   identified.

20         THE COURT:  Okay.

21         MR. JAFEK:  So we are going to go through the

22   30(b)(6) topics and talk about topic-by-topic.

23         THE COURT:  And you'll give a response?

24         MR. JAFEK:  Yes.

25         THE COURT:  So that's coming, Mr. Scimone.

 1            MR. JAFEK:  Yes.

 2            THE COURT:  Okay?

 3            MR. SCIMONE:  Good.

 4            THE COURT:  Very good.  What else can we do from

 5 the Plaintiff today?

 6            MR. SCIMONE:  Nothing further from us, Your Honor.

 7            THE COURT:  Thank you.  And on the defense side,

 8 anything you want to raise?

 9            MS. SCHEFFEY:  No.

10            THE COURT:  And where are you guys on mediation?

11 Is there something set?  Is that right?  Did I hear that

12 maybe in front of Judge Crews or something?

13            MS. SCHEFFEY:  I don't think anything is set.

14            THE COURT:  No.  That was a different case.

15            MS. SCHEFFEY:  But there is -- I know --

16            THE COURT:  I think --

17            MS. SCHEFFEY:  -- it's pending with our client.

18 There is a request.

19            THE COURT:  We have a demand.

20            MS. SCHEFFEY:  We have a demand, uh-huh.

21            THE COURT:  Okay.  Well, Judge Kane would be a big

22 fan of that, in case you wanted to know.

23            MR. SCIMONE:  If I could, Your Honor, we haven't

24 issued a demand.  There's a set of prospective injunctive

25 relief that the parties were speaking about in general terms,

1   but we haven't issued a demand per se.

2              THE COURT:  Okay.  So you're trying to get the

3   hard stuff out of the way, as far as injunctive relief and

4   working with the U.S. Government on that, what they would

5   agree to?

6              MS. SCHEFFEY:  Right.

7              THE COURT:  Yeah, okay.  All right, well if I can

8   be of any help on that, too, let me know.

9              So, okay.  Thank you guys.

10             MS. SCHEFFEY:  Thank you so much.

11             THE COURT:  Have a great rest of the week.

12             MS. SCHEFFEY:  We appreciate it.

13             THE COURT:  Take care.

14                    (Time noted:  1:38 p.m.)

15                         * * * * *

16                        CERTIFICATE

17        I, RANDEL RAISON, certify that the foregoing is a

18   correct transcript from the official electronic sound

19   recording of the proceedings in the above-entitled matter, to

20   the best of my ability.

21

22

23   _____        June 17, 2020

24   Randel Raison

25