## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated*,

   Plaintiffs,

v.

THE GEO GROUP, INC.,

   Defendant.

---

## DEFENDANT THE GEO GROUP, INC.'S CROSS-MOTION FOR
## SUMMARY JUDGMENT

---

   Defendant The GEO Group, Inc. ("Defendant" or "GEO"), by and through its undersigned

counsel, hereby submits this Cross-Motion for Summary Judgment[1] and respectfully requests this

Court enter judgment in GEO's favor as to all of Plaintiffs' claims.

---

[1] GEO has also filed its Opposition to Plaintiffs' Motion for Summary Judgment. ECF 270. In it, GEO advances similar arguments to the ones detailed herein. It remains GEO's position that the undisputed material facts that relate to GEO's immunity defense are appropriate for summary judgment, either under Fed. R. Civ. P. 56(f) as argued in its Opposition, or as relief for the instant cross-motion under Fed. R. Civ. P. 56(a).

## I.    INTRODUCTION

Plaintiffs seek to hold GEO responsible for simply performing the work and disclosing disciplinary measures it is directed to do under its contracts with the federal government. This Court has certified two distinct classes in this action. The Forced Labor Class alleges a GEO policy allowing disciplinary sanctions where a detainee refuses to clean his or her living area violates the Trafficking Victims Protection Act, 18 U.S.C. § 1589 *et seq.* ("TVPA"). ECF 49 at 3; ECF 57 at 21. Specifically, Plaintiffs allege GEO violated the TVPA by asking them to clean their living areas after informing them their refusal *could* result in segregation for *up to* 72 hours. ECF 49 at 3. The "Voluntary Work Program Class" alleges GEO has been unjustly enriched by ICE's mandatory program that provides detainees an allowance of $1.00 per day for work done under a voluntary work program.[2] Both classes' claims arise from GEO's operation of the Aurora ICE Processing Center ("AIPC"). Plaintiffs' claims against GEO are barred in full by the doctrine of derivative sovereign immunity ("DSI") and their unjust enrichment claims are specifically barred by GEO's government contractor affirmative defense.

First, GEO is entitled to DSI because it is a federal contractor and because both policies are conducted with authority validly conferred by ICE. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21-22 (1940); *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672-73 (2016); *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 643 (4th Cir. 2018). The Forced Labor Class alleges GEO violated the TVPA by requiring detainees "to perform uncompensated janitorial labor **under the threat of solitary confinement**." ECF 49 at 3 (emphasis added). The

---

[2] The Forced Labor Class period spans from October 22, 2004 to October 22, 2014 and the Voluntary Work Program Class period spans from October 22, 2011 to October 22, 2014, which will collectively be referred to in this motion as the "Class Period."

TVPA prohibits the procurement of labor through force, threats of force, serious harm, or threats of serious harm. 18 U.S.C. § 1589(a). Here, Plaintiffs allege they were coerced into cleaning their living areas because they were informed their refusal *could* result in segregation for *up to* 72 hours. ECF 49 at 3. Even assuming *arguendo* that (1) detainees were coerced into cleaning their living areas under the "threat" of administrative or disciplinary segregation for up to 72 hours, and (2) such brief segregation rises to the level of "serious harm" under the TVPA, GEO is immune from suit under DSI because the U.S. Immigration and Customs Enforcement's ("ICE") *mandatory* performance standards provide for punishment up to and including 72 hours of disciplinary segregation for a detainee's "[r]efusal to clean assigned living area." ICE also *requires* its contractors, including GEO, to notify detainees in writing of prohibited acts and the corresponding potential discipline. Because it is undisputed ICE required and directed GEO to comply with the PBNDS (including its disciplinary system), and because it is undisputed GEO complied with the PBNDS, GEO is entitled to summary judgment based upon DSI.

Similarly, ICE's performance standards *required* a payment of exactly $1.00 per day for AIPC Voluntary Work Program ("VWP") participants for approximately half of the applicable three-year class period (October 22, 2011 through June 22, 2013). GEO's compliance with this requirement clearly gives rise to immunity during that period. For the VWP class period thereafter (June 23, 2013 through October 22, 2014), GEO continued to follow the explicit direction of ICE: that $1.00 per day was a permissible minimum payment for VWP participants. ICE validly conferred the authority to administer the VWP on GEO. Further, the $1.00 per day pay rate was set by Congress and adopted by ICE in the PBNDS. Therefore, because the VWP is required by

ICE and the pay rate was explicitly set by Congress and adopted by ICE in the PBNDS, DSI shields GEO from liability.

Second, the government contractor defense applies to GEO here because there is a uniquely federal interest in ICE's ability to contract for the housing and supervision of detained aliens and the application of Plaintiffs' state law unjust enrichment claim significantly conflicts with that uniquely federal interest. Summary judgment in favor of GEO on that claim is appropriate.

Accordingly, because there is no genuine dispute of material fact, GEO merely performed as the federal government lawfully directed, and the undisputed facts make clear GEO has established the defense of DSI, this Court should enter summary judgment in GEO's favor, disposing of Plaintiffs' TVPA and unjust enrichment claims. The Court should also enter summary judgment on Plaintiffs' unjust enrichment claim for the independent reason that there is no genuine dispute of material fact regarding GEO's government contractor defense, and the defense bars the claim as a matter of law.

## II.    STATEMENT OF UNDISPUTED FACTS

1.    ICE is a federal agency tasked with enforcing U.S. immigration laws. 6 U.S.C. § 542. ECF 270 at 5 (Material Undisputed Fact #1).

2.    The United States Congress delegated to the Department of Homeland Security, and its agency ICE, the sole authority to arrange for all aspects of the detention of aliens pending the results of their immigration proceedings. 8 U.S.C. § 1231(g)(1) ("The [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.").

3.      ICE has the authority to detain foreign nationals suspected of entering the United States unlawfully. 8 U.S.C. §§ 1101 *et seq.*; ECF 270 at 5 (Material Undisputed Fact #2).

4.      In making these arrangements, ICE must consider the use of private contractors to detain aliens prior to constructing its own facilities. 8 U.S.C. § 1231(g)(2) ("Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.").

5.      As a result of Congress' directive, ICE neither constructs nor operates its own immigration detention facilities, ECF 271-2 (Dec. of Tae Johnson, cited as "Ex. B"), and therefore its state and private contractors are critical to carrying out the federal function of immigration detention.

6.      ICE contracts with GEO to house some of its detainees in detention facilities throughout the country. *See* https://www.geogroup.com/Locations. ECF 270 at 5 (Material Undisputed Fact #3).

7.      Among GEO's portfolio of ICE detention facilities is AIPC. ECF 270 at 5 (Material Undisputed Fact #4).

**GEO Operates the AIPC Pursuant to Contracts with ICE**

8.      ICE chose to contract with the AIPC to detain aliens pending the resolution of their immigration proceedings. ECF 270 at 9 (Additional Undisputed Fact #5).

9.      GEO owns and has continuously operated AIPC, under contracts with ICE from October 22, 2004 to October 22, 2014. ECF 270 at 5 (Material Undisputed Fact #5).

53635272;1

10.    A contract between ICE and GEO may be modified during its term by mutual consent of GEO and ICE. ECF 270 at 5 (Material Undisputed Fact #6).

11.    All immigration detention processing centers, including the AIPC, must adhere to ICE's standards. In 2000, the Immigration and Naturalization Service ("INS"), ICE's predecessor, adopted the original National Detention Standards (the "2000 NDS").

12.    Subsequently, ICE promulgated similar standards in the form of the PBNDS in 2008 (the "2008 PBNDS") and 2011 (later updated in 2016) (the "2011 PBNDS"). (2000 NDS available at https://www.ice.gov/detention-standards/2000; 2008 PBNDS available at: https://www.ice.gov/detention-standards/2008; 2011 PBNDS available at: https://www.ice.gov/detention-standards/2011).

13.    In each contract GEO entered into with ICE for the operation of the AIPC, the 2000 NDS, 2008 PBNDS, or the 2011 PBNDS, as applicable, were incorporated into the contract and GEO was required to comply with the same. ECF 270 at 9-10 (Additional Undisputed Fact #7).

14.    GEO's contract with ICE, number ACD-3-C-0008, required it to comply with the 2000 NDS from March 27, 2003 to September 28, 2006. ECF 262-5 at 12 (GEO_MEN 00059754).

15.    GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, similarly required it to comply with the 2000 NDS. ECF 24-4 at 11 (GEO_MEN 00059644); ECF 260 at 3 (proffering as undisputed the fact that HSCEOP-06-D-00010 was one of GEO's contracts with ICE during the class period); ECF 262-4 (incorporating the 2000 NDS into the contract).

16.    On April 28, 2010, GEO entered into a contract modification with ICE (HSCEOP-06-D-00010/P00018) which required it to comply with the 2008 PBNDS, effective immediately.

6

ECF 270 at 10 (Additional Undisputed #10) (citing ECF 271-3, cited as "Ex. C"); ECF 261-9 (2008 PBNDS).

17.     GEO's subsequent contract with ICE, number HSCEDM-11-D-00003, required it to continue to comply with the 2008 PBNDS. That contract was effective September 15, 2011. ECF 262-2 at 38 (incorporating the 2008 PBNDS into the contract); ECF 270 at 10 (Additional Undisputed Fact #11, #12) (noting Plaintiffs proffer as undisputed the fact that HSCEDM-11-D-00003 was one of GEO's contracts with ICE during the Class Period).

18.     On May 23, 2013, GEO entered into a contract modification with ICE (HSCEDM-11-D-00003/P00005) agreeing that, effective June 23, 2013, GEO would comply with the 2011 PBNDS. ECF 270 at 10 (Additional Undisputed Fact #12) (citing ECF 271-4, cited as "Ex. D"); ECF 262-3, 2 (GEO-MEN 00020406; ECF 270 at 10 (Additional Undisputed Fact #11, #12) (noting Plaintiffs proffer as undisputed the fact that HSCEDM-11-D-00003/P00005 was one of GEO's contracts with ICE during the Class Period).

### The ICE-Mandated Disciplinary Severity Scale

19.     The 2000 NDS and all applicable versions of the PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale. ECF 261-10 at 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8 at 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.").

20.     The 2000 NDS and all versions of the PBNDS require GEO to provide notice to detainees, in the local detainee handbook, of the ICE-mandated disciplinary severity scale. ECF 261-10 at 10 (2000 NDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …").

21.     Likewise, the 2000 NDS and all versions of the PBNDS explicitly provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

22.     The 2000 NDS and all versions of the PBNDS also explicitly provide a disciplinary severity scale that lists "[r]efusing to obey the order of a staff member or officer" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

23.     The Aurora Detainee Handbook (the "AIPC Handbook") is issued to all detainees entering Aurora. ECF 270 at 7 (Material Undisputed Fact #14).

24.     The AIPC's Handbook's disciplinary severity scale does not deviate from the 2000 NDS or the applicable PBNDS. ECF 273-1 (2005 AIPC Handbook, cited as "Ex. E"); (GEO_MEN

00054151-222); ECF 273-2 (2007 AIPC Handbook, cited as "Ex. F"); ECF 273-3 (2008 AIPC Handbook, cited as "Ex. G"); ECF 273-4 (2010 AIPC Handbook, cited as "Ex. H"); ECF 273-5 (2011 AIPC Handbook, cited as "Ex. I"); ECF 261-17 (October 2013 AIPC Handbook) (Specifically identified in Plaintiffs discovery responses as the basis for their claims); ECF 271-5, Kevin Martin Dep. 40:21-24 ("Q. Do you know if there's any deviation from between . . . the GEO Detainee Handbook and the PBNDS as far as disciplinary requirements? A. Not as far as disciplinary requirements[.]") (cited as "Ex. J" to ECF 270).

25.      All of GEO's policies are reviewed and approved by an on-site ICE official. ECF 270 at 7 (Material Undisputed Fact #15).

26.      The 2000 NDS and the applicable versions of the PBNDS provide for the exact graduated scales of offenses and disciplinary consequences for dedicated facilities, such as the AIPC. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS).

27.      The graduated scale of offenses (of which detainees must be made aware) are explicitly laid out in the 2000 NDS and the applicable PBNDS, providing GEO no discretion whatsoever to alter the disciplinary severity scale. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS).

28.      As required by the 2000 NDS and the applicable versions of the PBNDS, the disciplinary severity scale is copied verbatim into the AIPC Handbook. ECF 271-5, Kevin Martin Dep. 40:13-16 ("And does the Detainee Handbook lay out these exact rules from the PBNDS for the detainees as far as discipline goes? A: Yes.") (cited as "Ex. J" to ECF 270); 83:17-22 (same).

29.     In addition to the disciplinary severity scale, GEO has detailed a Sanitation Procedures document that contains a section entitled "Detainee Sanitation Procedures." ECF 262-8; ECF 50-4 (the "Sanitation Procedures").

30.     The Sanitation Procedures set forth general standards for sanitation that must be followed by both GEO employees and detainees. *Id.*

31.     While the sanitation policies for detainees apply to those detainees housed at the AIPC who participate in cleaning tasks through the VWP or by cleaning their living area, ECF 50-1 at 9 (Ceja Dep. 29:13-16), the Sanitation Procedures were not developed to assign tasks to specific individuals, but rather to detail the actual process for cleaning and materials and supplies to be used. ECF 271-5, Kevin Martin Depo. 208:6-11 (cited as "Ex. J" to ECF 270).

32.     The Sanitation Procedures do not specify which aspects of cleaning are the responsibility of all detainees and which are the responsibility of VWP workers. ECF 270 at 7 (Material Undisputed Fact #19).

33.     The Sanitation Procedures also contain a section detailing the consequences for non-compliance, stating: "The Dormitory/Unit Officer will inspect all living areas daily and report any infraction of these regulations to the immediate supervisor. The officer will notify detainees of unsatisfactory conditions, in cases of continued noncompliance, staff will issue an incident report." ECF 262-8 at 4; ECF 50-4. The Sanitation Procedures do not provide for any other penalty for non-compliance. *Id.*

34.     GEO has never maintained a separate policy or practice of placing a detainee in solitary confinement for the refusal to clean a living area. Ex. _ (Amber Martin Dep., 134, 135).

35.     ICE audits GEO to ensure that GEO complies with all requirements of its contract, including its obligations under the PBNDS. ECF 270 at 13 (Additional Undisputed Fact #24) (citing ECF 273-6, cited as "Ex. L").

36.     As part of each inspection, each audit reviews compliance with each PBNDS requirement. *Id.*

37.     The materials provided to detainees at intake, including the handbook and orientation video, are regularly audited and have passed each audit since 2004. *Id.*

38.     The audits specifically review intake procedures to ensure that the orientation information provides information about '[u]nacceptable activities and behavior, and corresponding sanctions" as well as the detainee handbook. *Id.* (GEO-MEN 00131895).

39.     The disciplinary severity scale is audited and has passed each audit since 2004. *Id.*

40.     The audits review whether GEO provides notice of the disciplinary severity scale and have found GEO compliance based upon a review of its handbooks. *Id.* (GEO-MEN 00131936).

41.     ICE has not only approved of the disciplinary severity scale but has also acted to implement and enforce the sanctions therein. One of the named Plaintiffs in this case—Demetrio Valerga—explained during his deposition that ICE officers also enforced the ICE sanctions. After claiming that one of GEO's corrections officers told Mr. Valerga he could be placed in segregation if he did not help clean his own common area, ECF 272-7, Demetrio Valerga Dep., 135:15-137:19 (cited as "Ex. M" to ECF 270), Mr. Valerga then explained ICE officers woke him up, pulled him out of his housing unit, and spoke to him directly. *Id.* at 138:2-13. During that conversation, ICE

officers told Mr. Valerga that he could, in fact, be taken to segregation for refusing to help clean his living area. *Id.* at 138:15-23.[3]

## The VWP

42.    The 2000 NDS and all applicable versions of the PBNDS require that GEO provide detainees the opportunity to participate in a VWP. ECF 270 at 8 (Material Undisputed Fact #20).

43.    The 2000 NDS, with which the AIPC was contractually obligated to comply from March 27, 2003 to April 28, 2010, required GEO to provide "compensation" and explicitly directed that "the stipend is $1.00 per day, to be paid daily." ECF 261-10 at 5 (2000 NDS).

44.    Likewise, the 2008 PBNDS, with which the AIPC was contractually obligated to comply from April 28, 2010 to June 22, 2013, mandated that "the compensation is $1.00 per day." ECF 261-9 at 63 (2008 PBNDS).

45.    Beginning on June 23, 2013, AIPC was bound by the 2011 PBNDS, which state that participants in the VWP will be compensated with "at least $1.00 (USD) per day." ECF 261-8 at 53 (2011 PBNDS). Thus, the "at least" language upon which the VWP Class relies was not implemented at the AIPC until approximately halfway through the VWP Class Period.

46.    Before the 2011 PBNDS were implemented at the AIPC, GEO paid the amount it was explicitly directed by ICE to pay to VWP participants: $1.00 per day. ECF 270 at 15 (Additional Undisputed Fact #36).

---

[3] Even after the ICE Officer's warning, Mr. Valerga refused to clean and later refused again several times. ECF 271-7, Dep. of Demetrio Valerga, 139:6-24, 140:2-20 (cited as "Ex. M" to ECF 270). Mr. Valerga was never placed in segregation for refusing to clean. *Id.*

47.     Thereafter, GEO continued to pay members of the VWP Class $1.00 per day; the minimum payment explicitly permitted by the 2011 PBNDS. ECF 270 at 15 (Additional Undisputed Fact #37).

48.     ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP. ECF 270 at 8 (Material Undisputed Fact #22).

49.     The VWP has been audited each year and has passed each audit since 2004. ECF 270 at 14 (Additional Undisputed Fact #29) (citing GEO-MEN 00131936).

## III.     ARGUMENT

### A.     Summary Judgment Standard.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *O'Connor v. Check Rite, Ltd.*, 973 F. Supp. 1010, 1014 (D. Colo. 1997). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); Fed. R. Civ. P. 56 (d).

Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions

of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

**B.     GEO is Immune from Plaintiffs' Claims Under the Doctrine of Derivative Sovereign Immunity.**

Under the doctrine of derivative sovereign immunity, government contractors may "obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co.*, 136 S. Ct. at 672 (internal quotation marks omitted) (*quoting Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)). DSI shields a contractor from liability when the contractor performs work "authorized and directed by the Government of the United States" and the contractor "simply performed as the Government directed." *Id.* at 673; *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019) (quoting *Yearsley*, 309 U.S. at 21).

A contractor asserting DSI must satisfy a two-part inquiry. First, the contractor must show it "performed as the Government directed." *Campbell-Ewald*, 136 S.Ct. at 673. Authorization is "validly conferred" on a contractor if Congress authorized the government agency to perform a task and empowered the agency to delegate that task to the contractor, provided it was within the power of Congress to grant the authorization. *Yearsley*, 309 U.S. at 20.

Second, the contractor must show the "authority to carry out the project was validly conferred" by the government. *Yearsley*, 309 U.S. at 20-21. Authority is "validly conferred" if Congress authorized the government agency to perform a task and empowered the agency to delegate that task to the contractor, and it was within Congress's power to grant such authority. *Yearsley*, 309 U.S. at 20. DSI does not shield a contractor that "violates ***both*** federal law ***and*** the

government's explicit instructions." *Campbell-Ewald Co.*, 136 S. Ct. at 672 (emphasis added); *Cunningham*, 888 F.3d at 648-69 (contractor must violate the law *and* its contract with the federal government before DSI is precluded).

The Fourth Circuit recently issued a decision analogous to the facts here. In *Cunningham v. General Dynamics Info. Technology*, Greg Cunningham received an autodialed call from General Dynamics (a government contractor), advertising the commercial availability of health insurance. 888 F.3d 640, 643 (4th Cir.), *cert. denied*, 139 S. Ct. 417 (2018). Cunningham filed suit on behalf of a putative collective, arguing that because he had not provided his express consent, General Dynamics violated the Telephone Consumer Protection Act ("TCPA"). *Id*. In response, General Dynamics claimed it was immune from suit under the principle of DSI because it contacted Cunningham in connection with its contract with the Department of Health and Human Services ("DHHS"). *Id.* The contract required General Dynamics to make calls during a specified time frame to inform individuals about their ability to buy health insurance exchanges created by the Affordable Care Act ("ACA"). *Id.* at 643-44. DHHS authorized General Dynamics to use an autodialer to make the calls, provided a script for each call, and provided a list of phone numbers for each call. *Id.* at 644. The contract also required General Dynamics follow all applicable laws. *Id*. at 647. DHHS provided Cunningham's phone number to General Dynamics, indicating he was an individual who should be notified of his right to purchase health insurance through the exchanges. *Id.* However, Cunningham had previously opted out of the communications and the instruction to call him despite his prior opt-out gave rise to liability under the TCPA. *Id.*

Interpreting *Campbell-Ewald*, the Fourth Circuit concluded governmental immunity was precluded only where a contractor violates its contract with the federal government. Thus, in

53635272;1

assessing whether DSI applied, the Fourth Circuit concluded General Dynamics did not violate its contract when it made the call to Cunningham, because the call was ***explicitly authorized*** under the contract. *Id.* In so holding, the Fourth Circuit made clear that General Dynamics' failure to obtain Cunningham's consent prior to placing the phone call –as mandated by the TCPA – was insufficient to show a violation of the contract which required it to comply with "all applicable laws," where its actions were otherwise directed by the contract. *Id*. Thus, General Dynamics was entitled to DSI. *Id.* Here, when the facts of this case are applied to the law of DSI, there is no question GEO has "simply performed as [ICE] directed" and that ICE's authority to delegate the care of detainees and their discipline to GEO was validly conferred by Congress.

### 1.    DSI Shields GEO from TVPA Liability.

#### a.    ICE validly conferred authority to GEO to discipline detainees.

Congress validly conferred authority to ICE to provide (and contract) for the custodial supervision of detainees using private contractors like GEO. ICE has broad discretion to determine where to house ICE detainees. *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986) ("Congress … placed the responsibility of determining where aliens are detained within the discretion of the Attorney General."); *Rios–Berrios v. I.N.S.*, 776 F.2d 859, 863 (9th Cir. 1985) (affirming ICE's decision to detain an alien arrested in California at a facility in Florida); *Sasso v. Milhollan*, 735 F. Supp. 1045, 1048 (S.D. Fla. 1990) (the decision to transfer an alien from one locale to another is within the sound discretion of ICE); *c.f. Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001) (Kennedy, J., dissenting)) (Congress's "considerable authority over immigration matters" includes the "power to detain

aliens in connection with removal."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens" is "exclusively entrusted to the" Federal Government).

The parties agree Congress delegated to ICE the authority to detain aliens placed in removal proceedings. 8 U.S.C. §§ 1103, 1226, 1231. In connection with that authority, Congress directed ICE to contract with state governments or private entities for the operation and lease of detention facilities before constructing or acquiring new ones. 8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g). ICE's contract with GEO for the operation of the AIPC was therefore a valid exercise of authority delegated by Congress.

The parties also agree GEO's contracts with ICE mandated compliance with the 2000 NDS and all applicable versions of the PBNDS. ECF 270 at 9-10 (Additional Undisputed Fact #7). Thus, the conduct about which Plaintiffs complain in this case has been prescribed by ICE as part of its validly conferred authority to provide for the custodial supervision of alien detainees. *Yearsley*, 309 U.S. at 20-21.

> **b.    The federal government directs GEO's use of detainee discipline.**
>
> > **i.    ICE explicitly authorized and directed the activities of which the Forced Labor class complains.**

Plaintiffs allege GEO knowingly obtained Plaintiffs' labor through unlawful means in violation of the TVPA because GEO adhered to ICE's disciplinary severity scale (incorporated into GEO's contracts with ICE through the 2000 NDS and applicable versions of the PBNDS) and communicated it to detainees. 18 U.S.C. § 1589(a). Specifically, Plaintiffs suggest ICE's disciplinary severity scale unlawfully coerced detainees into cleaning their living areas because

*one possible* sanction for noncompliance – 72 hours in segregation – constitutes serious harm.[4] But the possible sanctions for a detainee's refusal to clean his or her living area – and the *communication* of those possible sanctions to detainees – were explicitly authorized and directed by ICE.

It is undisputed that under both the PBNDS and the AIPC handbook, detainees must keep their living area clean and sanitary. ECF 270 at 7 (Material Undisputed Fact #13). Failure to do so *could* result in disciplinary segregation in accordance with the 2000 NDS and each version of the PBNDS to which GEO has been contractually bound throughout the Class Period. ECF 270 at 6 (Material Undisputed Fact #11). Through those same standards – which the parties do not dispute are part of GEO's contracts with ICE – ICE authorizes and directs GEO to adopt the following disciplinary measures for the infraction of "[r]efusing to clean assigned living area":

1. Initiate criminal proceedings
2. Disciplinary transfer (recommend)
3. Disciplinary segregation (up to 72 hours)
4. Make monetary restitution, if funds are available
5. Loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.)
6. Change housing
7. Remove from program and/or group activity
8. Loss of job
9. Impound and store detainee's personal property
10. Confiscate contraband
11. Restrict to housing unit

---

[4] GEO disputes that a brief stay of 72 hours or less in segregation constitutes serious harm; to date, no court has found that a mere 72 hours of disciplinary segregation would constitute "serious harm" under the TVPA. To the contrary, the only circuit court to address the issue concluded the disciplinary sanctions enumerated in the PBNDS, would not (standing alone) give rise to TVPA liability. *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1278 n.5 (11th Cir. 2020); *cf. White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) ("the placement of an inmate in nonpunitive administrative segregation does not deprive him of a liberty interest protected by the Due Process Clause."). That said, the exact statutory contours of "serious harm" are not at issue here because even if 72 hours of segregation constitutes "serious harm," that sanction was "authorized and directed by" ICE via its disciplinary severity scale. *Campbell-Ewald Co.*, 136 S. Ct. at 673.

12. Reprimand
13. Warning

ECF 261-10 at 17 (2000 NDS); 261-8 at 45 (2008 PBNDS); 261-8, 9 (2011 PBNDS); ECF 260 at 17.

ICE also mandates GEO incorporate ICE's disciplinary severity scale, *without modification*, into the AIPC Handbook. ECF 261-10 at 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8 at 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.").

Thus, the disciplinary practices of which Plaintiffs complain are expressly directed, authorized, and required by ICE. *Campbell-Ewald Co.*, 136 S. Ct. at 673.

> **ii. ICE explicitly authorized and directed GEO's communication of its disciplinary practices to AIPC detainees.**

Plaintiffs allege GEO "threatened" them with segregation by simply listing the disciplinary severity scale in the AIPC local handbook. ECF 271-8 (Plaintiffs' discovery responses) (designated as "Ex. N" to ECF 270). Notwithstanding the issue of whether that notice constituted a "threat," notice was mandated by ICE.[5] The 2000 NDS and all applicable versions of the PBNDS

---

[5] GEO disputes that the mere possibility of a sanction being described or written in a handbook constitutes a threat. To the contrary, Plaintiffs' own expert, Dr. Grassian, suggests it is better to inform individuals of possible consequences in advance, because such information would provide them with a "sense of order, of justice, of rules…" and prevent the perception that the "conditions of confinement [are] the product of the exertion of arbitrary power." Ex. A (Excerpt from Stuart

require GEO to provide notice to detainees of the ICE-provided disciplinary severity scale in the local detainee handbook. ECF 261-10 at 10 (2000 NDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of . . . the disciplinary severity scale …"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"). GEO complied, copying the scale verbatim into each version of the AIPC Handbook. ECF 273-1 (2005 Handbook, cited as "Ex. E"); (GEO_MEN 00054151-222); ECF 273-2 (2007 Handbook, cited as "Ex. F"); ECF 273-3 (2008 Handbook, cited as "Ex. G"); ECF 273-4 (2010 Handbook, cited as "Ex. H"); ECF 273-5 (2011 Handbook, cited as "Ex. I"); ECF 261-17 (October 2013 Handbook, cited as "Ex. W" to ECF 261). Further, ICE explicitly approved the AIPC Handbook, as well as GEO's orientation materials and disciplinary scale year after year through annual audits. ECF 270 at 14 (Additional Undisputed Fact #29) (citing GEO-MEN 00131936).

ICE authorized 72 hours of disciplinary segregation as one of thirteen possible sanctions for a detainee's refusal to clean his or her living area. ECF 270 at 6 (Material Undisputed Fact #11); *id.* at 11 (Additional Undisputed Fact #15). ICE further directed GEO to inform detainees of this possible consequence, specifically through the detainee handbook. ECF 270 at 11 (Additional Undisputed Fact #14). Because there are no genuine disputes of material fact and GEO is entitled

Grassian Report, May 1, 2020).  Nevertheless, it is not necessary to resolve this issue in order for GEO to prevail on the merits of the instant motion.

immunity under the doctrine of derivative sovereign immunity, GEO is entitled to summary judgment on the Forced Labor class's TVPA claim. *Campbell-Ewald Co.*, 136 S. Ct. at 673.[6]

> ### i.  Because ICE directed GEO to impose the disciplinary severity scale, Plaintiffs cannot establish the scienter element of a TVPA claim.

The TVPA does not provide relief for all alleged threats, regardless of intent. Instead, the TVPA's scope is narrowed by the requirement of scienter. 18 U.S.C. § 1589(a). Thus, to establish a TVPA violation, the defendant must *intend* to cause the victim to believe that she would suffer serious harm if she did not continue to work. "In other words, under section 1589, the employer must not just threaten serious harm but have intended the victim to believe that such harm would befall her." *Garcia v. Curtright*, No. 6:11-06407-HO, 2012 WL 1831865, at *4, 2012 U.S. Dist. LEXIS 70454 (D. Or. May 17, 2012); *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) ("The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her.").

Here, Plaintiffs have provided no evidence whatsoever that GEO "intended [Plaintiffs] to believe that such harm" – that is, segregation – would befall them if they did not maintain the cleanliness of their living area. *Dann*, 652 F.3d at 1170. To the contrary, the evidence shows even a detainee who repeatedly refused to clean his living area was *not* placed in segregation. *See supra*, p. 12 n.4. The evidence also shows to the extent that detainee was "threatened" with segregation

---

[6] Plaintiffs have argued a component of DSI is whether the government contractor enjoys "discretion" in how it executes its contractual duties. ECF 260 at 16, ¶ 76. This is not part of the two-part DSI analysis. *Compare Cunningham*, 888 F.3d at 643 (DSI analysis) *with Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (government contractor defense).

for his noncompliance, any supposed "threat" came from ICE employees, not GEO. *Supra*, pp. 11-12.

Thus, Plaintiff have failed to carry their burden of establishing the TVPA's scienter requirement. Their TVPA claim therefore fails as a matter of law.

### 2. DSI Shields GEO from Liability for Unjust Enrichment.

#### a. ICE validly authorized GEO to create and administer the VWP.

As detailed *supra*, ICE is authorized to enter into contracts with private entities for the detention of individuals pending resolution of their immigration proceedings. ECF 270 at 9 (Additional Undisputed Fact #5) (citing 8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g).). Similarly, Congress authorized ICE to provide voluntary work programs that pay allowances to detainees of $1.00 per day. 8 U.S.C. § 1555(d). Moreover, Plaintiffs do not allege the payment amount of $1.00 per day is beyond the authority validly conferred upon ICE by Congress. *See generally* ECF 260. Accordingly, the authority to pay detainees $1.00 per day for participation in the VWP was validly conferred. *Yearsley*, 309 U.S. at 20-21.

#### b. GEO performed as the federal government directed.

##### i. ICE explicitly authorized and directed the activities of which the Voluntary Work Program Class complains.

ICE requires GEO to offer a voluntary work program in its contracts with GEO to operate the AIPC. ECF 270 at 15 (Additional Undisputed Fact #32). ICE establishes the terms and conditions of the work program offered, determines which detainees are eligible to participate, determines what work approved detainees are eligible to perform, and sets the maximum hours detainees are permitted to work. *Id.* ICE also determines the amount it will pay detainees for

participation in the VWP ($1.00) and authorizes a system for payment whereby GEO advances the allowance initially and is thereafter reimbursed by ICE. *Id.* From October 22, 2011 (the beginning of the VWP class period) to June 23, 2013, the 2008 PBNDS mandated that GEO pay detainee participants in the VWP *exactly* $1.00 per day. ECF 261-9 at 63 (2008 PBNDS). The 2008 PBNDS did not use the 2011 version's "at least" language. *Compare* ECF 261-9 at 63 (2008 PBNDS) *with* ECF 261-8 at 53 (2011 PBNDS).

As relevant here, the "at least" language only applied to ICE and GEO's contract from June 22, 2013 to October 22, 2014, a fraction of the class period. Thus, there can be no genuine dispute that ICE *required* GEO to pay *exactly* $1.00 per day to detainees participating in the VWP for the majority of the class period.[7] GEO complied with that directive.

Even so, nothing in the law requires preclusion of DSI where a contractor simply does not surpass *minimum* standards approved of and directed by the federal government by some undefined, *post facto*, subjective threshold set by a private litigant. In fact, ICE's contract with GEO for the AIPC still provides $1.00 per day must be the "***actual cost*** … per detainee," which GEO "***shall not exceed***" without the approval of ICE's Contracting Officer. ECF 262-2, 5 (GEO_MEN 00019616); (emphasis added). This exact amount was explicitly authorized by Congress when it set the rate for detainee allowances at "not in excess of $1 per day." Dep't of Justice Appropriations Act of 1979, Pub. L. 95-431, 92 Stat 1021, 1027 (Oct. 10, 1978).

Further, in order to defeat DSI, the law requires a contractor actually *violate* its contract with the federal government. *Cunningham*, 888 F.3d at 643. The only way for GEO to violate its contract with ICE is to not provide a VWP at all or to pay detainees more than $1.00 per day. There

---

[7] The VWP class period spans from October 22, 2011 to October 22, 2014.

is no question GEO met the minimum standard and it did not violate the contract by failing to exceed that minimum standard. GEO is therefore entitled to summary judgment on the Voluntary Work Program Class's unjust enrichment claim.

### C.   GEO is Also Entitled to Summary Judgment on its Government Contractor Affirmative Defense.

GEO is entitled to summary judgment on the Voluntary Work Program Class's unjust enrichment claims under its government contractor affirmative defense. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 508 (1988); ECF 260 at 30. Under *Boyle*, a government contractor is not liable for violations of state law where a "significant conflict" exists between the application of that state law and an identifiable federal policy or interest. *Boyle*, 487 U.S. at 507. A conflict is "significant" if the state law is contrary to a specific contract term selected by the federal government. *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090 (10th Cir. 2015).

In *Helfrich*, the plaintiff, a federal government employee, was in an automobile accident and suffered injuries for which she made claims to her insurance provider. *Id.* at 1095. The insurer paid out her medical claims. *Id.* Thereafter, she entered into a settlement with the driver of the other vehicle for a separate sum. *Id.* After the settlement, the plaintiff's insurer invoked a contractual provision seeking subrogation of the benefits it had paid her. *Id.* The plaintiff responded that state law prohibited such subrogation provisions. *Id.* The insurer thereafter asserted that the state law did not apply because it was displaced by federal law under *Boyle* as conflicting with a contractual term with the government. *Id.*

The Tenth Circuit agreed with the insurer, concluding that *Boyle* applied and had the effect of displacing state law. *Id.* at 1099. The court reasoned that under *Boyle*, "contractor immunity would be available when the [violation of state law] was the product of a discretionary decision by

the government" to select a contract term for a contract dealing with a subject of uniquely federal interest. *Id.* at 1098. Applying this test, the Tenth Circuit first concluded that the provision of affordable healthcare benefits to federal government employees was a uniquely federal interest. *Id*. The court also recognized a strong federal interest in a uniform subrogation policy in all states, regardless of the differences in state law. *Id.* at 1099. The court next concluded that the state law in question significantly conflicted with the federal interest because it effectively rewrote the reimbursement plan between the insurer and the employee—which would increase the cost of health insurance to the federal government through higher premiums on its employees' policies. *Id.* In sum, *Helfrich* concluded, "State law – whether tort law or otherwise – must yield if it conflicts with such a contractual term in an area of uniquely federal interests." *Helfrich*, 804 F.3d at 1098.

1. **ICE's contracts with GEO involved an area of uniquely federal interest.**

There can be little debate that the contracts between GEO and ICE governing the operation of the AIPC are matters of uniquely federal interest. Indeed, Congress delegated to ICE responsibility for detaining aliens awaiting removal and the authority to exercise custodial supervision over those detainees. 8 U.S.C. §§ 1103, 1226, 1231. The detention and supervision of aliens is uniquely within the purview of the federal government and there is no authority to the contrary.

2. **There is significant conflict between application of Plaintiffs' state law unjust enrichment claim and the terms of ICE's contract with GEO.**

Plaintiffs' state law claim for unjust enrichment presents a significant conflict with the terms of ICE's contracts with GEO because it would <u>require</u> VWP stipends to exceed the agreed-

upon minimum of $1.00 per day, resulting in increased costs like those in *Helfrich*. If ICE wanted to require a voluntary work program stipend far in excess of $1.00 per day – as Plaintiffs seek – it could have stated as much in the 2011 PBNDS. It did not.

State law must yield if it conflicts with a term in a federal contract, selected as a matter of federal discretion. *Helfrich*, 804 F.3d at 1098. That is precisely the circumstance here. Plaintiffs seek a judgment under state law that GEO's compliance with ICE's – and Congress's – explicitly authorized minimum voluntary work program stipend is unlawful. If this Court were to apply the state law of unjust enrichment to circumvent the federal government's determination of the allowance to be paid to detainees, it would create a significant conflict with federal immigration policy. Further, it would interfere with the uniformity of the federal government's treatment of ICE detainees, subjecting immigration policy to an inconsistent patchwork of state laws and regulations regarding the rate of VWP allowances all over the country. This is precisely the type of uniformity the court sought to protect in *Helfrich*.

Moreover, even the later-adopted language setting a $1.00 per day *minimum* does not preclude application of the government contractor defense with respect to allowances paid after June 23, 2013. In *Glassco v. Miller Equip. Co.*, the Eleventh Circuit held the government contractor defense barred state law claims premised on the contention that a manufacturer under contract with the federal government should have used materials that exceeded minimum standards set forth in the federal contract. 966 F.2d 641 (11th Cir. 1992). Addressing the "significant conflict" prong of the analysis, the court concluded the inclusion of *minimum* standards in a federal contract presents a significant conflict with state laws that suggest a *higher* standard should have been met. *Id.* at 643. The fact that the federal government would not have objected if the contractor

met a higher standard does not obviate the federal government's discretionary determination that the minimum standard was adequate. *Id.* The same is true here; the fact that ICE provided a *minimum* standard in its contract does not obviate Congress's and ICE's determination that $1.00 per day is adequate. Plaintiffs' state law unjust enrichment claim seeking to declare unlawful an amount *authorized* by ICE cannot withstand *Boyle* scrutiny. GEO is entitled summary judgment on its government contractor affirmative defense as to the Voluntary Work Program Class's unjust enrichment claim.

## IV.     CONCLUSION

Because GEO is immune from suit on the basis of derivative sovereign immunity and because Plaintiffs' unjust enrichment claims cannot withstand GEO's government contractor affirmative defense, GEO respectfully requests the Court grant its Motion for Summary Judgment.

Respectfully submitted, this 25th day of June, 2020.

**AKERMAN LLP**

*s/ Adrienne Scheffey*
Colin L. Barnacle
Adrienne Scheffey
Christopher J. Eby
Melissa L. Cizmorris
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  (303) 260-7712
Facsimile:   (303) 260-7714
Email: colin.barnacle@akerman.com
Email: christopher.eby@akerman.com
Email: melissa.cizmorris@akerman.com
Email: adrienne.scheffey@akerman.com

**BURNS, FIGA & WILL, P.C.**
Dana L. Eismeier
Michael Y. Ley
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, Colorado 80111
Telephone:  (303) 796-2626
Facsimile:   (303) 796-2777
Email: deismeier@bfwlaw.com
Email: mley@bfwlaw.com
*Attorneys for Defendant The GEO Group, Inc.*

53635272;1

## CERTIFICATE OF SERVICE

I hereby certify on this 25th day of June, 2020, a true and correct copy of the foregoing **DEFENDANT THE GEO GROUP, INC.'S CROSS-MOTION FOR SUMMARY JUDGMENT** was filed and served electronically via the Court's CM/ECF system on the following:

### Counsel for Plaintiffs:

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
Towards Justice
1410 High St., Ste. 300
Denver, CO 80218
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Kelman Buescher Firm
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com

Hans C. Meyer
Meyer Law Office, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
Outten & Golden, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
Outten & Golden, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
Outten & Golden, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
Law Office of R. Andrew Free
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

R. Andrew Free
Law Office of R. Andrew Free
2004 8th Ave. South
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
Milstein Law Office
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

*s/ Nick Mangels*
Nick Mangels

53635272;1