**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:14-cv-02887 JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY**
**JUDGMENT ON DEFENDANT'S AFFIRMATIVE DEFENSE**

---

## TABLE OF CONTENTS

I.   Reply Concerning Undisputed Material Facts ................................................................. 1

    A.   GEO's Contract to Operate the Aurora Detention Facility............................... 2

    B.   The Performance-Based National Detention Standards
        Govern GEO's Contract Performance ............................................................ 19

    C.   The PBNDS and Incorporated ACA Standards Contain
        Housekeeping and Voluntary Work Program Requirements......................... 22

    D.   GEO's Housekeeping Unit Sanitation Policy Is Not
        Required or Administered by ICE ................................................................. 27

    E.   GEO Tells Detainees That They Are Required to
        Clean Dorm Common Areas .......................................................................... 41

    F.   Solitary Confinement at Aurora. ................................................................... 50

    G.   The PBNDS Provide GEO A Wide Range of
        Options to Punish Offenses. .......................................................................... 54

    H.   GEO Places Detainees in Solitary Confinement for
        Refusing to Clean the Facility ...................................................................... 57

    I.   GEO Has Discretion to Set Wages For the
        Voluntary Work Program............................................................................... 64

II.  Response Concerning Additional Facts........................................................................ 70

    A.   GEO's Contracts with ICE............................................................................ 72

    B.   The ICE-Mandated Disciplinary Severity Scale ........................................... 76

    C.   The VWP........................................................................................................ 85

    D.   Plaintiffs' Allegations ................................................................................... 88

III. The Undisputed Record Demonstrates that GEO Designed and Implemented the
    HUSP and VWP with Minimal Substantive Oversight from ICE............................. 91

    A.   Derivative Sovereign Immunity Applies Only Where
        the Government Directed the Alleged Violation ........................................... 91

B.    The HUSP and its Corresponding Punishment Scheme
      Was GEO's Own Invention ........................................................... 93

C.    The COTR and ICE Audits Provided Limited Monitoring of GEO's
      Implementation of Specific Contractual Requirements. ................................ 98

D.    GEO Had Discretion Throughout the Class Period to
      Pay VWP Workers More Than $1.00 A Day................................................. 101

IV.  GEO's Arguments Under the Government Contractor Defense Fail for The Same
     Reasons As Its Derivative Sovereign Immunity Arguments.................................... 104

V.   Conclusion ................................................................................. 107

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                          **PAGE(S)**

*Bijeol v. Nelson*,
    579 F.2d 423 (7th Cir. 1978) ............................................................................. 95

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) ................................................................... 104, 105, 106

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
    797 F.3d 720 (9th Cir. 2015) ............................................................................. 99

*Campbell-Ewald Co. v. Gomez*,
    136 S. Ct. 663 (2016).................................................................. 100, 101, 107

*Chao Chen v. Geo Grp., Inc.*,
    287 F. Supp. 3d 1158 (W.D. Wash. 2017) ................................................... 107

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ............................................................................................ 92

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
    888 F.3d 640 (4th Cir. 2018) ..................................................................... 92, 93

*Glassco v. Miller Equip. Co., Inc.*,
    966 F.2d 641 (11th Cir. 1992) ................................................................ 106, 107

*Gomez v. Campbell-Ewald Co.*,
    No. 10 Civ. 2007, 2013 WL 655237 (C.D. Cal. Feb. 22, 2013) ................................. 101

*Hause v. Vaught*,
    993 F.2d 1079 (4th Cir. 1993) ........................................................................... 95

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
    804 F.3d 1090 (10th Cir. 2015) ............................................................... 104, 105

*In re Joint E. & S. Dist. N.Y. Asbestos Litig.*,
    897 F.2d 626 (2d Cir. 1990) ........................................................................... 106

*In re Kumar*,
    402 F. Supp. 3d 377 (W.D. Tex. 2019) ............................................................ 95

*Menocal v. GEO Grp., Inc.*,
    113 F. Supp. 3d 1125 (D. Colo. 2015) ...................................................... 101, 106

iv

*Montoya v. City of Albuquerque*,
  No. 03 Civ. 0261, 2004 WL 3426436 (D.N.M. May 10, 2004)...................................96

*Novoa v. GEO Grp., Inc.*,
  No. 17 Civ. 2514, 2018 WL 3343494 (C.D. Cal. June 21, 2018) ...............................107

*Novoa v. GEO Grp., Inc.*,
  No. 17 Civ. 2514, 2018 WL 4057814 (C.D. Cal. Aug. 22, 2018) ...............................102

*Nwauzor v. GEO Grp., Inc.*,
  No. 17 Civ. 5769, 2020 WL 1689728, (W.D. Wash. Apr. 7, 2020) .............93, 101, 102

*O'Melveny & Myers v. FDIC*,
  512 U.S. 79 (1994) ......................................................................................................105

*Salim v. Mitchell*,
  268 F. Supp. 3d 1132 (E.D. Wash. 2017)...............................................................96, 97

*Stevens v. United States Dep't of Homeland Sec., Immigration & Customs Enf't*,
  No. 14 C 3305, 2020 WL 1701882 (N.D. Ill. Apr. 8, 2020) .......................................107

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
  928 F.3d 42 (D.C. Cir. 2019)........................................................................................92

*Weaver v. Petray*,
  No. 08 Civ. 5195, 2010 WL 909589 (W.D. Ark. Mar. 11, 2010).................................95

**STATUTES**

6 U.S.C. § 542 ...................................................................................................................2

8 U.S.C. § 1101 .................................................................................................................2

8 U.S.C. § 1103 .........................................................................................................70, 72

8 U.S.C. § 1231 ...................................................................................................70, 71, 72

8 U.S.C. § 1555 .........................................................................................67, 70, 107

Pub. L. No. 95-431, 92 Stat. 1021 (1978) .......................................................................67

**RULES**

F.R.E. 802 ................................................................................................... 16, 17

F.R.E. 803 ......................................................................................................... 18

Fed. R. Civ. P. 56 .............................................................................................. 18

**REGULATIONS**

48 C.F.R. § 52.222-3 ......................................................................................... 10

Federal Acquisition Regulation 52.222-50 .................................................. 11, 12

GEO's opposition ("Opposition") to Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense ("Motion") relies upon a fundamental misunderstanding of Plaintiffs' claims, the facts in the record, and the governing law. The Court should grant Plaintiffs' Motion.

Plaintiffs allege, first, that GEO violated the Trafficking Victims Protection Act ("TVPA") by forcing detainees to clean common areas pursuant to GEO's Housing Unit Sanitation Policy ("HUSP"), and threatening them with solitary confinement if they did not comply. Complaint at ¶¶ 69-85. The HUSP – GEO's policy of requiring Plaintiffs and Class Members to perform unpaid janitorial work – was created by GEO without ICE involvement. It violates several explicit ICE standards, and is by no means a "legal requirement" with which GEO has to comply. GEO also chose, of its own discretion, to pay detainees $1.00 a day for their work under the Voluntary Work Program, *id*. ¶¶ 101-07, and GEO has pointed to no evidence to the contrary. Because ICE did not direct the legal violations Plaintiffs allege, neither derivative sovereign immunity nor the government contractor defense applies.

## I.    Reply Concerning Undisputed Material Facts

GEO's response to Plaintiffs' proposed Undisputed Facts attempts to conceal facts that are relevant to this Motion but harmful to GEO's position by burying GEO's response in an Appendix.[1]  To facilitate the Court's ability to determine facts and whether

---

[1]    This violates the Court's Pretrial and Trial Procedures Memorandum for Civil Cases ("Civil Memo"), and constitutes adequate grounds for striking GEO's brief. *See* Civil Memo III.E.2.(d).  Further violations of the Civil Memo include GEO's decision to (1) renumber Plaintiffs' proposed Undisputed Facts, (2) restate Plaintiffs' facts with

they are in fact materially disputed, Plaintiffs set forth all Undisputed Facts, along with GEO's response and, where relevant, Plaintiffs' reply, below.

### A. GEO's Contract to Operate the Aurora Detention Facility.

1. ICE is a federal agency tasked with enforcing U.S. immigration laws. 6 U.S.C. § 542.

   i. **GEO's response**: Undisputed

2. ICE has the authority to detain foreign nationals suspected of entering the United States unlawfully. Immigration and Nationality Act, codified at 8 U.S.C. §§ 1101 *et seq.*

   i. **GEO's response:** Undisputed

3. ICE contracts with GEO to house some of its detainees in detention facilities throughout the country. *See* https://www.geogroup.com/Locations

   i. **GEO's response:** Undisputed

4. Among GEO's portfolio of ICE detention facilities is the Aurora Facility. *Id.*

   i. **GEO's response**: Undisputed

---

GEO's interpretation (rather than presenting that interpretation in the argument; (3) cite entire documents rather than specific page numbers; and (4) repeatedly use "formulaic explanations repeatedly incanted." *Id.* at III.E.2.

5.      GEO continuously operated the Aurora Facility, under contract with ICE, from October 22, 2004 to October 22, 2014.  Ex. A (A. Martin Dep. 58:1-6); Ex. K (Ely Decl. ¶ 7)[2]

      i.      **GEO's response:** Undisputed

6.      Operations for the Aurora Facility are governed by a contract between GEO and ICE.  Ex. B (GEO_MEN 00019613 (2011 Contract)); Ex. C (GEO-MEN 00059635 (2006 Contract)); Ex. D (GEO-MEN 00059744 (2003 Contract)), (collectively "the Contract"); Ex. K (Ely Decl. ¶ 7))

      i.      **GEO's response**: Disputed. GEO does not dispute that operations are governed between a contract between GEO and ICE in part, but disputes that GEO's contract with ICE is the only instrument governing the operations of the AIPC.

      ii.      **Plaintiffs' reply**: GEO admits the substance of the stated fact and provides no contrary evidence.

7.      The Contract has been renewed over time by mutual consent of GEO and ICE.  Ex. A (A. Martin Dep. 58:1-10); *see also* Ex. I (Hill Dep. 29:22-30:6)

      i.      **GEO's response**: Disputed. GEO disputes that the contract has been "renewed over time." GEO has entered into a number of contracts with ICE during the class period, each

---

[2]      All exhibits referenced in Plaintiffs' Statement of Undisputed Facts are attached to the Declaration of Michael J. Scimone in Support of Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense, filed at ECF No. 261, or to the Notice of Filing of Restricted Exhibits, filed at ECF No. 262.

with unique terms. *See* ECF 262-2 (2011 contract); ECF 262-3 (modification of 2011 contract); ECF 262-4 (2006 contract); ECF 262-5 (2003 contract).

    ii.    **Plaintiffs' reply**: Plaintiffs agree with GEO's characterization, which is not substantively different from the stated fact.

8.    The Contract may be modified during its term by mutual consent of GEO and ICE.  Ex. A (A. Martin Dep. 17:13-17)

    i.    **GEO's response**: Undisputed.

9.    The Contract is a "performance-based contract."  Ex. B (GEO_MEN 00019625 (2011 Contract)); Ex. C (GEO-MEN 00059642 (2006 Contract)); Ex D (GEO-MEN 00059755 (2003 Contract)); Ex. K (Ely Decl. ¶ 1)

    i.    **GEO's response**: Disputed. GEO disputes this description of the contract. This term is not defined in the cited contracts, nor is it utilized to describe the contract as a whole. Instead, the contract is composed of mandatory objectives which constitute the performance required in exchange for the payments from ICE. *See* ECF 262-2 (2011 contract); ECF 262-3 (modification of 2011 contract); ECF 262-4 (2006 contract); ECF 262-5 (2003 contract).

    ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.  It cites no evidence that contradicts the Ely

declaration's statement that "ICE CDF contracts are performance-based contracts." Plaintiffs' Ex. K, ECF No. 261-7 (Ely Decl. ¶ 4).[3] GEO's statement that the cited term is not defined is not germane to the stated fact.

Moreover, GEO's statement is incorrect. The 2011 Contract does in fact describe itself as "performance-based" and defines that term. *See* Plaintiffs' Ex. B, ECF No. 262-2 (GEO_MEN 00019655) ("Under a performance-based contract, performance measures and metrics will be used extensively to monitor Contractor performance. ICE and the Contractor shall monitor progress using agreed-upon performance metrics.")

10.   Performance-based contracting "is a results-oriented method of contracting focused on outputs, quality, and outcomes." Ex. E (Declaration of Tae D. Johnson, *State of Washington v. GEO Group, Inc.*, Case No. 17-cv-05806 (W.D. Wash), ECF No. 91 at ¶ 8)

---

[3]   For ease of reference, all exhibits to the Declaration of Michael J. Scimone in Support of Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense, filed at ECF No. 261, are referred to as "Plaintiffs' Ex." All exhibits to the Declaration of Adrienne Scheffey in Support of Defendant The GEO Group, Inc.'s Response in Opposition to Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense, filed at ECF No. 271, are referred to as "GEO's Ex."

       i.      **GEO's response**: Disputed. To the extent GEO's contract with ICE is described by ICE as "performance-based" GEO notes that the contract is not merely "results oriented" but also provides specific performance requirements including metrics and methods of performance which GEO must meet to perform under the contract. *See* ECF 262-2 (2011 contract); ECF 262-3 (modification of 2011 contract); ECF 262- 4 (2006 contract); ECF 262-5 (2003 contract).

       ii.     **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.

11.     "Performance-based contracts do not designate *how* a contractor is to perform the work, but rather establish[] the expected outcomes and results that the government expects.  It is then the responsibility of the contractor to meet the government's requirements at the price the vendor quoted."  *Id.*

       i.      **GEO's response**: Disputed. GEO disputes that its contracts with ICE do not instruct it *how* to perform its work. Throughout the contract there are specific instructions, with granular detail, as to *how* GEO must perform its work. As one example, the contracts lay out specific requirements for each employee who works at the AIPC, including that each employee have a social security card. ECF 262-2 (GEO_MEN 000019664). The contracts also provide explicit

instructions for employee conduct. ECF 262-2 (GEO_MEN 000019664). Further, the contracts do not simply tell GEO to take care of the detainees without delineating *how* to do so, instead, they break down exactly how detainees must be cared for, including specific requirements for recreation opportunities, marriage, religious opportunities, work opportunities, and food service. *Id.* (GIEO_MEN 000019636-44). To put a finer point on it, the contract does not simply state that GEO must reduce idleness in the facility by providing for activities, but instead describes *how* GEO must reduce idleness: through the Voluntary Work Program.

ii.   **Plaintiffs' reply**: Plaintiffs do not dispute the specific facts set forth by GEO in response to this statement; however, they do not contradict the stated fact.

12.   As a performance-based contract, the Contract requires GEO to develop "all plans, policies, and procedures" required by the Contract, and then submit them to ICE for "review and concurrence."  Ex. C (GEO-MEN 00059643 (2006 Contract); *see also* Ex. B (GEO_MEN 00019814 (2011 Contract) ("It is GEO's policy that each of our facilities develops a manual of uniform policies and procedures" which "appropriately reflect . . . contractual requirements.")); Ex. D (GEO-MEN 00059759 (2003 Contract) ("The Contractor shall prepare and submit all policies, plans, post orders and procedures to INS for review and approval."))

i.      **GEO's response**: Disputed. GEO does not dispute that the quotes appear in each contract, as reflected in the parentheticals, but disputes that the policies identified constitute all policies that govern GEO's performance under the contract. Instead, the contract is also governed by additional policies and regulations not drafted by GEO, including the PBNDS and the ACA. ECF 262-2(GEO-Menocal_00019656) (listing additional policies, regulations, and standards that apply to the AIPC.).

ii.      **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.  Plaintiffs admit that the contract is also governed by the PBNDS and the ACA to the extent set forth in the contract, but that is not germane to the stated fact.

13.      The Contract makes GEO "responsible for all costs associated with and incurred as part of providing the services outlined in this contract." Ex. C (GEO-MEN 00059642 (2006 Contract)); *see also* Ex. B (GEO_MEN 00019614, 19657 (2011 Contract) (noting that ICE "shall provide fully burdened bed day rates only" and that any costs not covered by that rate are the contractor's to bear)); Ex. D (GEO-MEN 00059748 (2003 Contract) ("[T]he contractor shall provide a detention facility, and all labor, materials and equipment necessary to operate and maintain temporary residential care, and secure detention."))

i.      **GEO's response**: Disputed. GEO does not dispute that the quoted language appears in the contracts as quoted, but does dispute that the quotes can be read in a vacuum, without the surrounding language for context.

ii.     **Plaintiffs' reply**: GEO's response admits the substance of the stated fact and provides no contrary evidence.

14.     The Contract provides that detainee labor must be used "in accordance with the detainee work plan developed by" GEO.  Ex F ((Ragsdale 30(b)(6) Dep. 25:1-18); Ex. C (GEO-MEN 00059662 (2006 Contract)); Ex. G (GEO_MEN 00038529 (2004 Detainee Work Plan)); Ex. H (GEO_MEN 00038563 (2014 Detainee Work Plan))

i.      **GEO's response**: Disputed. GEO does not dispute that it must operate a Voluntary Work Program, consistent with the PBNDS, and that it may develop a plan (which is approved by ICE) for what constitutes voluntary work as opposed to those tasks that constitute routine housekeeping.

ii.     **Plaintiffs' reply**: GEO's response admits the substance of the stated fact; however, its responsive statement, which is not supported by evidence, is incorrect and misleading.  The requirement that GEO develop a Voluntary Work Program does not require GEO to define in that policy "what constitutes voluntary work as opposed to those tasks that

constitute routine housekeeping."  In fact, there is no need for GEO to do so, because the PBNDS define "personal housekeeping."  *See* Plaintiffs' Undisputed Fact No. 36. GEO's attempt to define personal housekeeping in a manner that is inconsistent with the standard required by ICE exceeds the authority that ICE allowed GEO under the contract, and is one of the issues at the heart of this motion.  *See* Plaintiffs' Undisputed Fact No. 39 (detainees "are not required to work except to do personal housekeeping").

15.     The Contract requires that the detainee work plan "must be voluntary."  Ex. C (GEO-MEN 00059662 (2006 Contract)); *see also* Ex. B (GEO_MEN 00019643 (2011 Contract) ("Detainees will be able to volunteer for work assignments.")); Ex. D (GEO-MEN 00059796 (2003 Contract) (incorporating 48 C.F.R. § 52.222-3 into contract, which requires work by those in federal custody to be performed "on a voluntary basis."))

        i.     **GEO's response**: Disputed. GEO does not dispute that it must operate a Voluntary Work Program, consistent with the PBNDS. Further, GEO does not dispute that individuals may volunteer for positions within the Voluntary Work Program but are not required to do so. ECF 262-2 (GEOMenocal_00019643).

        ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.

16.    The Contract prohibits GEO from using forced labor in performance of the Contract by incorporating Federal Acquisition Regulation 52.222-50.  Ex. B (GEO_MEN 00019697 (2011 Contract) (incorporating Federal Acquisition Regulation ("FAR") 52.222-50)); Ex. C (GEO-MEN 00059684 (2006 Contract) (same))[4]

        i.    **GEO's response**: Disputed. GEO does not dispute that FAR 52.222-50 is listed in its 2011 and 2006 contracts but states that the contracts speak for themselves.

        ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact and provides no contrary evidence.

17.    FAR 52.222-50(b) expresses "a policy prohibiting trafficking in persons," including the "[u]se [of] forced labor in the performance of [a government] contract."

        i.    **GEO's response**: Plaintiffs' fact number 17 is merely a summary of a legal authority, not a statement of fact and is therefore improperly included as an "undisputed fact."

        ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact and provides no contrary evidence.

---

[4]    FAR 52.222-50 (codified at 48 C.F.R. § 52.222-50) became effective on April 19, 2006 and was thus not incorporated into the 2003 Contract.

18.    This regulation reflects the federal government's intent to "protect vulnerable individuals" and enforce its "zero-tolerance policy regarding Government employees and contractor personnel engaging in any form" of forced labor.  *See* White House, Executive Order – Strengthening Protections Against Trafficking in Persons In Federal Contracts, No. 13627 (September 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/executive-order-strengthening-protections-against-trafficking-persons-fe

　　　i.    **GEO's response**: Plaintiffs fact number 18 purports to define the intent of the legislature in drafting FAR 52.222-50, as a matter of fact, not through a legal analysis. The intention of the legislature is not properly listed as an undisputed fact.

　　　ii.   **Plaintiffs' reply**: GEO's response admits the substance of the stated fact and provides no contrary evidence.  The cited regulation was promulgated by the Executive branch, not "the legislature," and the cited statement is a statement of the Executive branch describing the intent of its own regulation.

19.    GEO is responsible for the day-to-day performance of the Contract. Ex. F (Ragsdale 30(b)(6) Dep. 52:21-22)

　　　i.    **GEO's response**: Disputed. GEO does not dispute that it operates the AIPC and its day-to-day operations, but disputes that it alone is responsible for the operations as by contract, ICE is on-site and actively involved. ECF 262-2

(GEOMenocal_00019652) (describing the responsibilities of the on-site ICE employee referred to as a "COTR").

ii.   **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.  The cited page, which does not appear in the cited document, states that the COTR "is designated to coordinate the technical aspects of this contract and inspect items/services/invoices furnished hereunder; however, he/she will not be authorized to change any terms and conditions of the resultant contract, including price. . . . The COTR is responsible for *monitoring* the performance of work under this contract."  Reply Ex. 1[5] (GEO_MEN 00019652) (emphasis added).  The contract also states that "[t]o be valid, technical direction by the COTR [m]ust be consistent with the general scope of work set forth the [sic] in this contract[, and m]ay not constitute new assignment of work nor change the expressed terms, conditions or specifications of this contract . . . ." *Id.*

20.   GEO receives a fixed dollar amount from ICE per detainee it houses, per day, under the Contract.  Ex. B (GEO_MEN 00019614 (2011 Contract)); Ex. C

_____

[5]   All Reply Exhibits are attached to the Declaration of Michael J. Scimone in Support of Plaintiffs' Reply in Support of Motion for Summary Judgment on Defendant's Affirmative Defense ("Scimone Reply Decl."), filed concurrently with this Reply.

(GEO-MEN 00059636 (2006 Contract)); Ex. D (GEO-MEN 00059748 (2003 Contract));

Ex. F (Ragsdale 30(b)(6) Dep. 41:8-16 (defining "bed day rate" as "price per bed per day

at Aurora."))

     i.    **GEO's response**: Disputed. GEO receives a set amount

under its contract with ICE for the "bed day rate." ECF 262-2

GEOMenocal_00019614). In its contract, ICE has agreed to a

minimum number of bed day rates it will pay per day,

regardless of actual occupancy. *Id.* GEO receives a different

amount for each bed that is occupied above the minimum

quantity. *Id.* at GEO-Menocal_00019615. GEO receives a

separate stipend for detainee medical care and a pass-through

reimbursement amount for the Voluntary Work Program. *Id.*

at GEOMenocal_00019616. Thus, there are a number of

components of GEO's compensation from ICE which cannot

simply be described as a "fixed dollar amount."

     ii.    **Plaintiffs' reply**: Plaintiffs do not dispute the additional facts

set forth by GEO, which do not directly contradict the stated

fact.

21.    The profit GEO receives from the Aurora Facility is the difference

between the amount it receives from ICE and the amount it spends, including on housing

detainees and running the facility.  Ex. I (Hill Dep. 59:18-24); Ex. J (Krumpelmann Dep.

23:23-24:4)

i.     **GEO's response**: Disputed. GEO Disputes Plaintiffs' characterization. As clearly stated in the deposition testimony of Mr. Hill, as cited by Plaintiffs, the **estimated profit** is calculated by taking the revenue that is **expected** and subtracting out the expenses that are listed. ECF 261-5 (Hill Dep. 59:18-24). This does not describe or purport to represent how actual profits would be determined.

ii.     **Plaintiffs' reply**: GEO's response argues the semantics of Mr. Hill's testimony but does not contradict the stated fact; and it does not rebut the cited testimony of Barbara Krumpelmann, which describes how GEO's *actual* profits from the Aurora facility are constituted: "Q: . . . the amount that GEO makes is the difference between whatever GEO spends and whatever they get from ICE; is that a fair characterization?  A: Yeah.  Their profit?  Q: Yeah.  A: Yes.").  Plaintiffs' Ex. J, ECF No. 261-6 (Krumpelmann Dep. 23:23-24:4); *see also* Reply Ex. 2 (Evans Dep. 101:19-102:7).

22.     On April 18, 2018, GEO submitted to ICE a request for an "equitable adjustment" of its compensation for the 2011 Contract on the basis that the "contract requirements are incomplete because GEO reasonably believed it could perform these specifications and contract requirements without incurring legal fees to defend such specifications and contract requirements."  Ex. K (Ely Decl. ¶ 27)

i.    **GEO's response**: Disputed. GEO disputes that the Ely declaration is admissible for summary judgment or trial purposes. Ms. Ely will not testify at trial, nor appear for a deposition, and therefore the declaration is inadmissible. F.R.E. 802. Further, the declaration does not contain any of the documents it allegedly references and Ms. Ely does not explain how she has personal knowledge of their contents, thus it is also inadmissible for lack of foundation and personal knowledge.

In any event, GEO disputes that the quotes divorced from any context can be considered to be "undisputed fact." GEO did request an equitable adjustment but the reasons for its request go far beyond the excerpted text provided by Plaintiffs. GEO does not further address the adjustment as it is both immaterial and irrelevant.

ii.   **Plaintiffs' reply**: GEO's response admits the substance of the stated fact – specifically that it requested an equitable adjustment, and that the stated reason appears in the text of that request.  GEO's attempt to dispute the admissibility of the Ely declaration fails to disclose the fact that the letter Ms. Ely describes has been produced in discovery and is known to GEO, which authored it; thus, its existence and contents are

not reasonably in dispute.  *See* Reply Ex. 3 (Request for Adjustment).  As to Ms. Ely's description of the reasons GEO cited in support of the requested adjustment, it is accurate, and GEO does not cite evidence supporting its claim that there were reasons for requesting the adjustment other than those stated in the cited text.

23.     On June 21, 2018, ICE declined GEO's request for adjustment, stating that "GEO's defense of [this lawsuit] is a defense of its contract performance." *Id.* ¶ 28

i.     **GEO's response**: Disputed. GEO disputes that the Ely declaration is admissible for summary judgment or trial purposes. Ms. Ely will not testify at trial, nor appear for a deposition, and therefore the declaration is inadmissible. F.R.E. 802. Further, the declaration does not contain any of the documents it allegedly references and Ms. Ely does not explain how she has personal knowledge of their contents, thus it is also inadmissible for lack of foundation and personal knowledge.

In any event, GEO disputes that the quotes divorced from any context can be considered to be "undisputed fact." GEO did request an equitable adjustment but the reasons for its request

go beyond the excerpted text provided as a double hearsay statement by Plaintiffs.

ii.    **Plaintiffs' reply**: GEO's response does not address the substance of the stated fact, and its attempt to dispute the admissibility of the Ely declaration fails on several levels. First, pursuant to Fed. R. Civ. P. 56(c)(4), the declaration is admissible because it states that it is made based on the declarant's "personal knowledge or information provided to [her] in [her] official capacity.  *See* Plaintiffs' Ex. K, ECF No. 261-7, (Ely Decl. ¶ 1).  Second, the declaration falls under the hearsay exception in F.R.E. 803(8)(A)(i), as it is a record or statement of ICE, a public office, setting out the office's own activities, and ICE has shown no circumstances indicating a lack of trustworthiness.  Third, the letter referenced in the declaration – which also meets the hearsay exception in FRE 803(8) – has been produced by ICE in FOIA litigation.  *See* Reply Ex. 4 (redacted letter).  Although it is heavily redacted, including as to the quoted language, Plaintiffs are involved in an ongoing effort to obtain the letter in unredacted form.[6]

---

[6]    Plaintiffs have sought discovery from ICE by way of a subpoena.  ICE produced approximately 5,000 pages of documents in response to that subpoena on June 5, 2020. Scimone Reply Decl. ¶ 4.  The documents ICE produced are so heavily redacted that it is

And third, while GEO has failed to produce this letter in discovery, it was sent to GEO and is therefore in GEO's possession and control.  Accordingly, GEO's failure to admit this fact is in bad faith, as GEO is aware that the stated fact is true.

**B.      The Performance-Based National Detention Standards Govern GEO's Contract Performance.**

24.     The Performance Based National Detention Standards ("PBNDS") are a series of minimum standards for detention facilities developed by ICE.  Ex. L (GEO-MEN 00064019 (2011 PBNDS)); Ex. M (GEO-MEN 00062905 (2008 PBNDS)); Ex. N (GEO-MEN 00063383 (INS Detention Standards));[7] Ex. A (A. Martin Dep. 96:19-97:6; 99:5-101:9)

i.      **GEO's response**: Undisputed.

25.     The PBNDS are incorporated into the Contract.  Ex. A (A. Martin Dep. 94:21-95:5); Ex. B (GEO_MEN 00019655-56 (2011 Contract) (identifying the PBNDS as part of the "statutory, regulatory, policy, and operational considerations that will affect the Contractor.")); Ex. C (GEO-MEN 00059644 (2006 Contract) (same, referring to "ICE Detention Standards")); Ex. D (GEO-MEN 00059754 (2003 Contract)

---

unclear whether or not this letter is among the documents produced.  *Id.*  Plaintiffs intend to challenge ICE's redactions and seek the unredacted production of this letter.  *Id.*

[7]     The INS Detention Standard manual was the precursor to the PBNDS. https://www.ice.gov/factsheets/facilities-pbnds.  For ease of reference, "PBNDS" in this Motion is inclusive of the INS Detention Standards unless otherwise specified.

("[T]he contractor is required to perform in continual compliance with the most current editions of the INS Detention Standards.")

      i.      **GEO's response**: Undisputed.

26.      Pursuant to the Contract, GEO must abide by the PBNDS. *Id.*; *see also* Ex. P (Ceja 30(b)(6) Dep. 90:17-20)

      i.      **GEO's response**: Undisputed.

27.      A modification to the 2011 Contract incorporated the 2011 PBNDS into that contract. Ex. B.1 (GEO_MEN 00020406); Ex. P (Ceja 30(b)(6) Dep. 125:10-23)

      i.      **GEO's response**: Undisputed.

28.      The PBNDS supersede other sources of authority for operating the Aurora Facility under ICE contract. Ex. P (Ceja 30(b)(6) Dep. 90:10-16)

      i.      **GEO's response**: Disputed. GEO disputes that the PBNDS "supersede" all other sources of authority that do not conflict with the PBNDS, as GEO is tasked with following all applicable standards incorporated into its contract. ECF 262-2 (GEOMenocal_00019656) (2011 Contract). And, within the PBNDS certain ACA standards are incorporated, thus if a conflict arises, an individualized inquiry is necessary to identify which of the two standards controls. ECF 261-4 (Ragsdale 30(b)(6) 72-74). If there is no conflict between the standards, GEO must comply with both.

ii.    **Plaintiffs' reply**: GEO's argument that additional sources of authority may also apply to the extent that they do not conflict with the PBNDS does not contradict the stated fact.  In further support of the undisputed fact, the 2011 Contract GEO cites provides that "[i]n cases where other standards conflict with DHS/ICE policy or standards, DHS/ICE policy and standards prevail."  Plaintiffs' Ex. B, ECF No. 262-2 (GEO_MEN00019657).  GEO's cited testimony does not support the statement that "an individualized inquiry is necessary" in the case of a conflict.

29.    If there is a discrepancy between GEO's policy or practice and the PBNDS, the PBNDS control.  Ex. P (Ceja 30(b)(6) Dep. 90:10-16); Ex. F (Ragsdale 30(b)(6) Dep. 66:20-67:1)

i.    **GEO's response**: Disputed. Within the PBNDS certain ACA standards are incorporated, thus if a conflict arises, an individualized inquiry is necessary to identify which of the two standards controls. ECF 261-4 (Ragsdale 30(b)(6) 72-74).

ii.    **Plaintiffs' reply**: GEO's response does not address the substance of the stated fact, which concerns conflicts between GEO policies and the PBNDS, not conflicts within the PBNDS or between the PBNDS and incorporated ACA standards.  GEO's cited testimony does not support the

21

statement that "an individualized inquiry is necessary" in the case of the latter type of conflict.

30.    The Contract between ICE and GEO provides that "[i]n cases where other standards conflict with DHS/ICE policy or standards, DHS/ICE policy and standards prevail."  Ex. B (GEO_MEN 00019657 (2011 Contract)); Ex. C (GEO-MEN 00059644 (2006 Contract)); Ex. D (GEO_MEN 00059759 (2003 Contract))

      i.    **GEO's response**: GEO does not dispute that the quoted language appears in the 2011 GEO/ICE contract, but clarifies that the PBNDS are not the only DHS/ICE standards that apply to the facility.

      ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.

## C.    The PBNDS and Incorporated ACA Standards Contain Housekeeping and Voluntary Work Program Requirements.

31.    In the "Environmental Health and Safety" section, under the heading "General Housekeeping," the PBNDS state:

The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness.  When possible, the use of non-toxic cleaning supplies is recommended.

    a.    All horizontal surfaces shall be dampdusted daily with an approved germicidal solution used according to the manufacturer's directions.

    b.    Windows, window frames, and windowsills shall be cleaned on a weekly schedule.

    c.    Furniture and fixtures shall be cleaned daily.

    d.    Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital

> disinfectant-detergent solution mixed according to the manufacturer's directions.
>
> e.     A clean mop head shall be used each time the floors are mopped.
>
> f.     Waste containers shall weigh less than 50 lbs., be non-porous and lined with plastic bags; the liner shall be changed daily.
>
> g.     Waste containers shall be washed weekly at a minimum, or as needed when they become soiled.
>
> h.     Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

Ex. L (GEO-MEN 00064042 (2011 PBNDS)); *see also* Ex. M (GEO-MEN 00062934-35 (2008 PBNDS)); Ex. N (GEO-MEN 00063790 (INS Detention Standard))

> i.     **GEO's response**: Undisputed.

32.     The Environmental Health and Safety section of the PBNDS references certain sections of the American Correctional Association ("ACA") Standards for Adult Local Detention Facilities.  *See, e.g.*, Ex. L (GEO-MEN 00064041 (2011 PBNDS)); Ex. M (GEO-MEN 00062933 (2008 PBNDS)); Ex. N (GEO-MEN 00063797 (INS Detention Standard))

> i.     **GEO's response**: Disputed. The standards mentioned are not simply referenced, but also incorporated into the standards. ECF 261-4 (Ragsdale 30(b)(6) 72-74).
>
> ii.     **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.  Plaintiffs do not dispute that the reference to the ACA standards operates to incorporate the specified sections into the PBNDS.

33.     ACA Standard 4-ALDF-1A-04 requires that: "The facility is clean and in good repair.  A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance."  Ex. Q (ALDF-1A-04); Ex. R (A. Martin 30(b)(6) Dep. 16:11-17:23)

     i.     **GEO's response**: Undisputed.

34.     ACA Standard 4-ALDF-1A-01 requires regular sanitation inspections of detention facilities.  Ex. Q (ALDF-1A-01); Ex. R (A. Martin 30(b)(6) Dep. 18:8-19:4)

     i.     **GEO's response**: Disputed. Standard 4-ALDF-1A-01 requires "A housekeeping and maintenance plan addresses all facility areas and provides for daily housekeeping and regular maintenance by assigning specific duties and responsibilities to staff and inmates." ECF 261-13, 10. It further provides that there must be a written policy and procedure which describes detainee responsibilities.

     ii.     **Plaintiffs' reply**: The language GEO quotes in its response does not appear in Standard 4-ALDF-1A-01 or at the cited docket number.  Standard 4-ALDF-1A-01 reads in full: "(MANDATORY) The facility complies with all applicable laws and regulations of the governing jurisdiction, and there is documentation by an independent, outside source that any

past deficiencies noted in annual inspections have been corrected.  The following inspections are implemented:

- weekly sanitation inspections of all facility areas by a qualified departmental staff member

- comprehensive and thorough monthly inspections by a safety/sanitation specialist

- at least annual inspections by federal, state, and/or local sanitation and health officials or other qualified person(s)."

Plaintiffs' Ex. Q, ECF No. ECF 261-13 (4-ALDF-1A-01).

35.     The Voluntary Work Program ("VWP") section of the PBNDS provides that detainees "shall be provided the opportunity to participate in a voluntary work program."  Ex. L (GEO-MEN 00064345 (2011 PBNDS))

i.     **GEO's response**: Undisputed.

36.     The VWP section of the PBNDS states: "Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.  Detainees are required to maintain their immediate living areas in a neat and orderly manner by: 1. making their beds daily; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture."  Ex. L (GEO-MEN 00064345 (2011 PBNDS); Ex. R (A. Martin 30(b)(6) Dep. 25:25-26:24);

*see also* Ex. M (GEO-MEN 00063294-95 (2008 PBNDS); Ex. N (GEO-MEN 00063672 (INS Detention Standard))

      i.    **GEO's response**: Undisputed that the quoted text appears in the 2011 PBNDS.

37.    The Voluntary Work Program section of the 2011 PBNDS requires that detainees in that program be paid "at least $1.00 (USD) per day."  Ex. L (GEO-MEN 00064347 (2011 PBNDS))

      i.    **GEO's response**: Disputed. Only the 2011 PBNDS contain the quoted text. All prior versions provided that compensation was exactly $1.00 per day. ECF 261-10, 5 (2000 NDS); ECF 261-9, 63 (2008 PBNDS).

      ii.    **Plaintiffs' reply**: GEO's response admits the substance of the fact.

38.    The Voluntary Work Program section of the PBNDS references certain sections of the ACA Standards.  Ex. L (GEO-MEN 00064345 (2011 PBNDS)); Ex. M (GEO-MEN 00063294 (2008 PBNDS)); Ex. N (GEO-MEN 00063677 (INS Detention Standard))

      i.    **GEO's response**: Undisputed.

39.    ACA Standard 4-ALDF-5C-08 requires that: "Pretrial and unsentenced inmates are not required to work except to do personal housekeeping and to clean their housing area.  Inmates are allowed to volunteer for work assignments."  Ex. S (4-ALDF-5C-08)

i.      **GEO's response**: Undisputed.

**D.**    <u>**GEO's Housekeeping Unit Sanitation Policy Is Not Required or Administered by ICE.**</u>

40.     GEO's Aurora Facility-level policies are developed by local GEO employees.  Ex. O (K. Martin Dep. 51:22-25)

i.      **GEO's response**: Disputed. All AIPC polices are developed by both GEO and ICE and ultimately approved of and signed off on by ICE. ECF 261-4 (Ragsdale 30(b)(6) 39:3-6; A63:6-8; 65:7-25; 66:1-10).

ii.     **Plaintiffs' reply**: GEO's response is incorrect and unsupported by the evidence it cites.  GEO provides no evidence for the contention that all Aurora Facility polices are developed by both GEO and ICE.  To the contrary, in the deposition testimony GEO cites,[8] Mr. Ragsdale testifies that "the facilities develop policies" and the ICE Contracting Officer's Technical Representative ("COTR") "review[s] and clear[s]" those policies.  GEO Ex. Q, ECF No. 271-11 (Ragsdale 30(b)(6) Dep. at 39:3-6).  Plaintiffs' Undisputed Fact No. 43, which GEO does not dispute, identifies the COTR's role.

---

[8]    GEO cites to the docket number for Plaintiffs' Ex. F (ECF No. 261-4), but the referenced pages appear to pertain to GEO's Ex. Q (ECF No. 271-11).

41.     These policies are reviewed and amended by local GEO employees at Aurora on an annual basis.  Ex. O (K. Martin Dep. 64:17-23); Ex. P (Ceja 30(b)(6) Dep. 33:22-34:1)

    i.    **GEO's response**: Disputed. All AIPC polices are amended by both GEO and ICE and ultimately approved of and signed off on by ICE. ECF 261-4 (Ragsdale 30(b)(6) 39:3-6; 63:6-8; 65:7-25; 66:1-10).

    ii.    **Plaintiffs' reply**: GEO's response is misleading and unsupported by the evidence it cites.  GEO attempts to conflate GEO's annual policy review and the COTR's "review[] and clear[ance]" of local Aurora policies.  GEO Ex. Q, ECF No. 271-11 (Ragsdale 30(b)(6) Dep. 39:3-6).  The cited testimony does not show that the COTR participates in the ongoing review or amendment of GEO policies. Plaintiffs' Undisputed Fact No. 43, which GEO does not dispute, identifies the COTR's role.

42.     The annual policy review is conducted by the Aurora Facility's Policy Review Committee, which is made up of local Aurora GEO staff.  Ex. A (A. Martin Dep. 70:20-25); Ex. P (Ceja 30(b)(6) Dep. 34:2-7)

    i.    **GEO's response**: Disputed. All AIPC polices are reviewed by both GEO and ICE and ultimately approved of and signed

off on by ICE. ECF 261-4 (Ragsdale 30(b)(6) 39:3-6; 63:6-8; 65:7-25; 66:1-10).

    ii.    **Plaintiffs' reply**:  GEO's response is misleading and not supported by the evidence it cites.  GEO attempts to conflate GEO employees' annual policy review and the COTR's "review[] and clear[ance]" of local Aurora policies.  GEO Ex. Q, ECF No. 271-11 (Ragsdale 30(b)(6) Dep. 39:3-6).   GEO provides no evidence that the COTR participates in the ongoing amendment of GEO policies.  Plaintiffs' Undisputed Fact No. 43, which GEO does not dispute, identifies the COTR's role.

43.    Each policy is also reviewed and approved by an on-site ICE official called the Contracting Officer's Technical Representative ("COTR").  Ex. T (Nelson Dep. 150:22-151:2)

    i.    **GEO's response**: Undisputed

44.    GEO's Policy Number 12.1.4 – AUR, titled "Sanitation Procedures," is intended to "provide staff and detainees with a clean sanitary living environment consistent with all applicable codes, standards and sound detention practices."  Ex. U (GEO_MEN 00038687 (2004); GEO_MEN 00038653 (2004-05); GEO_MEN 00038676 (2005-06); GEO_MEN 00038628 (2006-07); GEO_MEN 00038665 (2007-08); GEO_MEN 00038632 (2008-09) GEO_MEN 00038613 (2009-10); GEO_MEN

00038625 (2010); GEO_MEN 00007203 (2010-11); GEO_MEN 00038649 (2011-12);

GEO-MEN 00099980 (2012-13); GEO-MEN 00088208 (2013-14))

> i.  **GEO's response**: Undisputed that the quoted text appears in the documents as quoted.

45.  GEO's Sanitation Procedures document requires that "[e]ach detainee will be responsible for the cleanliness of his or her cell or living area, including walls, floors, sink, toilet, windows, and other property within the cell, room, or living areas." *Id.*

> i.  **GEO's response**: Undisputed that the quoted text appears in the documents as quoted.

46.  GEO's Sanitation Procedures do not specify which aspects of cleaning are the responsibility of HUSP workers and which are the responsibility of VWP workers.  *See generally* Ex. U ((GEO_MEN 00038687-98 (2004); GEO_MEN 00038653-64 (2004-05); GEO_MEN 0003967676-86 (2005-06); GEO_MEN 00038628-31 (2006-07); GEO_MEN 00038665-75 (2007-08); GEO_MEN 00038632-39 (2008-09) GEO_MEN 00038613-15 (2009-10); GEO_MEN 00038625-27 (2010); GEO_MEN 00007203-06 (2010-11); GEO_MEN 00038649-52 (2011-12); GEO-MEN 00099980-83 (2012-13); GEO-MEN 00088208-11 (2013-14))

> i.  **GEO's response**: Undisputed that the Sanitation Procedures do not specify which aspects of cleaning are assigned to VWP workers and which are the responsibility of detainees as part of cleaning their living area. GEO disputes that there is a

policy termed the "HUSP." Ragsdale 30(b)(6) 16:1-8 (Mr.

Ragsdale had never heard of the 'HUSP' before this lawsuit.).

ii.   **Plaintiffs' reply**: GEO's response does not dispute the

substance of the stated fact.  That Mr. Ragsdale, an executive

vice president who began working for the company in 2017,

has never heard of the HUSP in one location (where it was in

effect from, as relevant here, 2004-2014) does not

demonstrate that no such policy existed.  GEO's own 30(b)(6)

designee accepted the use of the term and testified about it

extensively as one of the topics on which she was officially

designated.  Reply Ex. 5 (Ceja 30(b)(6) Dep. 24:5-13).

47.     In addition to the sanitation procedures described in Policy Number

12.1.4 – AUR, GEO requires detainees to perform a general cleanup after each meal.  Ex.

P (Ceja 30(b)(6) Dep. 37:5-9); Ex. O (K. Martin Dep. 142:24-143:1)

i.   **GEO's response**: Disputed. GEO disputes that detainees are

"required" to clean. Rather, most individuals volunteered to

clean up after each meal, while a select few would be

identified each day to clean and could choose not to

participate if they wished. Ex. J Kevin Martin Dep. 143-145.

ii.   **Plaintiffs' reply**: GEO's response mischaracterizes the cited

testimony, which does not support the contention that "most

individuals volunteered to clean up" and does not state that

detainees "could choose not to participate."[9]

48.     During a general cleanup, GEO requires detainees "clean up the

tables, wipe down the tables, and sweep and mop the floors."  Ex. P (Ceja 30(b)(6) Dep.

36:24-37:9)

> i.      **GEO's response**: Disputed. Detainees *could* participate in
>
> any of the items listed, but would likely not do each task in a
>
> day as the cleanup would take less than five minutes ager
>
> each meal. Ex. J Kevin Martin Dep. 143:3-8
>
> ii.     **Plaintiffs' reply:** GEO's response mischaracterizes the
>
> testimony of its own 30(b)(6) designee, Dawn Ceja, who
>
> admitted that the specified tasks were mandatory for all
>
> detainees at Aurora.  Nothing in Ms. Ceja's testimony or the
>
> cited testimony of Kevin Martin suggests that such
>
> participation was optional, as suggested in GEO's response.
>
> Nor does the cited testimony of Kevin Martin support GEO's
>
> speculation that "Detainees . . . would likely not do each task
>
> in a day": Martin testified only that these job duties took 5 to
>
> 10 minutes.  Moreover, it is not clear that Martin is competent

---

[9]      Page 145 of Mr. Martin's deposition does not appear in Plaintiffs' Exhibit J, although GEO's citation indicates that it does.  For clarity, Plaintiffs have filed that page at Reply Ex. 7.

to testify to the duration of these tasks, because he went on to concede that he did not actually observe such meal cleanup in the ordinary course of his job duties, but "may have" observed the meal service that preceded cleanup in the course of conducting or facilitating audits.  Plaintiffs' Ex. O, ECF No. 261-11 (K. Martin Dep. 143:12-22).

49.     GEO also tells detainees that they have a "common obligation to clean . . . the communal areas," including the dayroom and bathrooms, on a rotating basis.  Ex. F (Ragsdale 30(b)(6) Dep. 16:14-18)

i.     **GEO's response**: Disputed. GEO disputes that the excerpted text is complete, as the entire quote from Mr. Ragsdale was as follows: "That folks will clean their immediate living area, meaning making their bed, dealing with their own personal property in their immediate living area. And they also share sort of a common obligation to clean, you know, where the microwave is, where the, you know, game boards are, video games, to keep things in place in a reasonable cleanliness; the bathroom, you know, the areas, the communal areas is the word I'm looking for." ECF 261-4, 6 (Ragsdale 30(b)(6) Dep. 16:14-18).

ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.

50.     The general cleanup is not listed among the facility's sanitation procedures.  *See generally* Ex. U ((GEO_MEN 00038687-98 (2004); GEO_MEN 00038653-64 (2004-05); GEO_MEN 0003967676-86 (2005-06); GEO_MEN 00038628-31 (2006-07); GEO_MEN 00038665-75 (2007-08); GEO_MEN 00038632-39 (2008-09) GEO_MEN 00038613-15 (2009-10); GEO_MEN 00038625-27 (2010); GEO_MEN 00007203-06 (2010-11); GEO_MEN 00038649-52 (2011-12); GEO-MEN 00099980-83 (2012-13); GEO-MEN 00088208-11 (2013-14))

i.     **GEO's response**: Disputed. The sanitation procedures require detainees to engage in a general cleanup of their facilities under "Detainee Sanitation Responsibilities" stating that detainees are responsible for keeping clean their living areas, which includes their shared dining tables and floors. ECF 262-8.

ii.     **Plaintiffs' reply**: GEO's response mischaracterizes the cited procedures.  The policy GEO cites makes no mention of a general cleanup and states only that detainees are "responsible for the cleanliness of his or her cell or living area, including walls, floors, sink, toilet, windows, and other property within the cell, room, or living area."  It does not define "cell, room, or living area" to include communal spaces such as shared dining tables and floors.  *See* Plaintiffs' Ex. U, ECF No. 262-8 (GEO_MEN 00038688 (2004);

34

GEO_MEN 00038654 (2004-05); GEO_MEN 0003967677

(2005-06); GEO_MEN 00038629 (2006-07); GEO_MEN

00038666 (2007-08); GEO_MEN 00038632 (2008-09)

GEO_MEN 00038613 (2009-10); GEO_MEN 00038625

(2010); GEO_MEN 00007203 (2010-11); GEO_MEN

00038649 (2011-12); GEO-MEN 00099980 (2012-13); GEO-

MEN 00088208 (2013-14)).

51.     The post-meal cleanup of tables, floors, and other communal areas

that GEO requires is called the Housing Unit Sanitation Policy, or HUSP.  Ex. F

(Ragsdale 30(b)(6) Dep. 15:24-16:25); Ex. P (Ceja 30(b)(6) Dep. 84:3-14); Ex. R (A.

Martin 30(b)(6) Dep. 11:4-19)

   i.     **GEO's response**: Disputed. The general clean-up is not

          referred to as the "HUSP" internally by GEO, as it was a

          construct created by Plaintiffs' counsel. ECF 261-4, 6

          (Ragsdale 30(b)(6) 16:1-8) (Mr. Ragsdale had never heard of

          the 'HUSP' before this lawsuit.).

   ii.    **Plaintiffs' reply**: That Mr. Ragsdale, an executive vice

          president who began working for the company in 2017, has

          never heard of the HUSP prior to this lawsuit does not

          demonstrate that such terminology is not used at the facility

          level or in other components of the company.  GEO's own

          30(b)(6) designee accepted the use of the term and testified

about it extensively as one of the topics on which she was officially designated.  Reply Ex. 5 (Ceja 30(b)(6) Dep. 24:5-13).

52.     GEO never verified with ICE whether communal areas are part of the "living area" described in the PBNDS.  Ex. A (A. Martin Dep. 196:23-198:6)

    i.     **GEO's response**: Disputed. All GEO policies are approved by ICE. Ragsdale 30(b)(6) 39:3-6. The sanitation procedures are no different and were signed off on by ICE. Ex. Q.

    ii.    **Plaintiffs' reply**: GEO provides no evidence that contradicts Plaintiffs' Undisputed Fact.  The sanitation procedures that GEO references do not specify that communal areas are part of the "cell, room, or living area," and GEO cites no evidence contradicting the testimony of its Vice President Amber Martin, who was responsible for GEO's policy and procedure committee, *see* Reply Ex. 6 (A. Martin Dep. 34:13-22), that GEO "never specifically sought to clarify [the definition of 'common living area'] because I thought it was clear through the review of the policy."  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Dep. 196:23-198:6); *see also* Plaintiffs' Reply re Undisputed Fact No. 50.  In fact, a 2017 report by the Department of Homeland Security's Office of Inspector General concluded that requiring detainees to clean common

36

areas violated the PBNDS because common areas are distinct

from detainees' "immediate living area." Reply Ex. 17 at p. 6

(Theo Lacy OIG report).

53.     Detainees do not receive payment for their work under the HUSP.

Ex. P (Ceja 30(b)(6) Dep. 84:8-24)

    i.     **GEO's response**: Disputed. Detainees are not paid for the

five minutes or so that they spend cleaning up after each meal

unless they are a detainee trustee cleaning as part of their

shift. Ex. J, Kevin Martin Dep. 143-146.

    ii.     **Plaintiffs' reply**: GEO's response admits the substance of the

stated fact.  Plaintiffs do not concede GEO's added

commentary that such tasks took "five minutes or so,"

because Kevin Martin, whose testimony GEO cites, is not a

competent witness to that fact.  Plaintiffs' Ex. O, ECF No.

261-11 (K. Martin Dep. 143:12-22) (Mr. Martin concedes that

he did not actually observe meal cleanup in the ordinary

course of his job duties, but "may have" observed the meal

service that preceded cleanup in the course of conducting or

facilitating audits).  Detainee trustees perform work under the

VWP, not the HUSP.  Reply Ex. 7 (K. Martin Dep. 145:12-

15).

54.     The HUSP is a "GEO policy, created by GEO."  Ex K (Ely Decl. ¶ 22); Ex. P (Ceja 30(b)(6) Dep. 27:6-28:1)

    i.    **GEO's response**: Disputed. GEO drafted the sanitation procedures policy in connection with ICE. (Ragsdale 30(b)(6) 39:3-6; 63:6-8; 65:7-25; 66:1-10). Ex. Q.

    ii.    **Plaintiffs' reply**: GEO's response conflates the sanitation procedures policy and the HUSP.  The HUSP is a policy that requires detainees to perform cleaning tasks beyond the scope of the cleaning laid out in GEO's sanitation procedures policy.  *See* Undisputed Fact Nos. 47-51.

Furthermore, as discussed in greater detail in Plaintiffs' Reply re Undisputed Fact Nos. 40-42, GEO has provided no evidence to support its contention that any of its policies were drafted "in connection with ICE."  The cited testimony of Daniel Ragsdale does not support this contention, as it describes only ICE approval of GEO policies.

55.     The HUSP is not created by ICE.  Ex. K (Ely Decl. ¶ 22.)

    i.    **GEO's response**: Disputed. GEO drafted the sanitation procedures policy cooperatively with ICE, following all requirements and direction in the Contract, ACA Standards, and ICE directives. (Ragsdale 30(b)(6) 39:3-6; 63:6-8; 65:7-25; 66:1-10). Ex. Q.

**Plaintiffs' reply**: GEO's response conflates the sanitation procedures policy and the HUSP.  The HUSP is a policy that requires detainees to perform cleaning tasks beyond the scope of the cleaning laid out in GEO's sanitation procedures policy.  *See* Undisputed Fact Nos. 47-51.

Furthermore, as discussed in greater detail in Plaintiffs' Reply re Undisputed Fact Nos. 40-42, GEO has provided no evidence to support its contention that any of its policies were drafted "in connection with ICE."  The cited testimony of Daniel Ragsdale does not support this contention, as it describes only ICE approval of GEO policies.

56.     The HUSP is not required by the Contract.  *Id.*

    i.     **GEO's response**: Disputed. The contract requires performance with the ACA standards, which in turn require GEO to develop a housekeeping plan. ECF 262-2 (GEOMenocal_00019656); ECF 261-13 (ACA Standard 4-ALDF-1A-01).

    ii.    **Plaintiffs' reply**: GEO's response does not address the substance of the fact, which is that the HUSP – the specific policy that GEO developed – is not required by the Contract. Plaintiffs do not dispute that GEO is required to develop a

housekeeping plan, but this fact is immaterial to Plaintiffs' claims.

57.     ICE did not draft or negotiate the HUSP.  *Id*.

    i.     **GEO's response**: Disputed. GEO drafted the sanitation procedures policy cooperatively with ICE, following all requirements and direction in the Contract, ACA Standards, and ICE directives. ECF 261-4 (Ragsdale 30(b)(6) 39:3-6; 63:6-8; 65:7-25; 66:1-10). Ex. Q.

    ii.     **Plaintiffs' reply**: GEO's response conflates the sanitation procedures policy and the HUSP.  The HUSP is a policy that requires detainees to perform cleaning tasks beyond the scope of the cleaning laid out in GEO's sanitation procedures policy.  *See* Undisputed Fact Nos. 47-51

Furthermore, as discussed in greater detail in Plaintiffs' Reply re Undisputed Fact Nos. 40-42, GEO has provided no evidence to support its contention that any of its policies were drafted "in connection with ICE."  The cited testimony of Daniel Ragsdale does not support this contention, as it describes only ICE approval of GEO policies.

E.    **GEO Tells Detainees That They Are Required to Clean Dorm Common Areas**.

58.    GEO's local detainee handbook for the Aurora facility sets out rules for detainees' conduct and privileges within the Aurora facility.  Ex. P (Ceja 30(b)(6) Dep. 29:19-24; 32:23-37:13); Ex. V (GEO_MEN 00040731-75 (Local Detainee Handbook (2002 version))); Ex. W (PL000029-55 (Local Detainee Handbook (2013 version)))

> i.    **GEO's response**: Disputed. GEO does not dispute that the detainee handbook sets forth standards for detainee conduct and privileges, but does dispute this fact to the extent that it purports to be the exclusive authority on detainee conduct. In connection with the ICE National Handbook and the PBNDS, the detainee handbook sets out rules for detainees' conduct within the AIPC. Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook).

> ii.    **Plaintiffs' reply**: GEO admits the substance of the stated fact.  Its purported "dispute" consists of a mischaracterization of the stated fact.

59.    The Aurora Detainee Handbook has been in effect since at least 1995.  Ex. P (Ceja 30(b)(6) Dep. 33:22-34:1)

i.    **GEO's response**: Disputed. GEO does not dispute that there have been handbooks in place since approximately 1995, but disputes that there has been a single handbook that has governed detainee conduct for the entire time period.

ii.    **Plaintiffs' reply**: Plaintiffs agree with GEO's characterization, which is not substantively different from the stated fact.

60.    The Aurora Detainee Handbook is issued to all detainees entering Aurora.  Ex. P (Ceja 30(b)(6) Dep. 29:21-24)

i.    **GEO's response**: Undisputed.

61.    The Aurora Detainee Handbook communicates the rules and policies of the Aurora Facility to detainees.  Ex. P (Ceja 30(b)(6) Dep. 29:19-24)

i.    **GEO's response**: Undisputed.

62.    Like the PBNDS, GEO's Aurora Detainee Handbook states that detainees are "required to keep [their] personal living area clean and sanitary."  Ex. V (GEO_MEN 00040757 (Local Detainee Handbook (2002 version))); Ex. W (PL000046 (Local Detainee Handbook (2013 version)))

i.    **GEO's response**: Undisputed.

63.    The Aurora Detainee Handbook defines "personal living area" as 1. the detainee's "bunk and immediate floor area around and under [the] bunk," 2. the detainee's locker, and 3. the detainee's personal items.  *Id*.

i.      **GEO's response**: Disputed. GEO disputes that the handbook cited by Plaintiffs in support of their motion for summary judgment is applicable to the present case. The handbook cited by Plaintiffs as "Exhibit V" is from February 25, 2002, over two years before the class period and during a period wherein different regulations applied. ECF 262-9 at 46 (GEO_MEN 00040734).  Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case.

The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook)

ii.     **Plaintiffs' reply**:  The language quoted in Plaintiffs' Undisputed Fact appears in identical form in every handbook cited by GEO, which GEO concedes cover the class period. *See* GEO Ex. E, ECF No. 273-1 (GEO_MEN 00054887 (Local Detainee Handbook (2005 version))); GEO Ex. F, ECF No. 273-2 (GEO_MEN 00054197 (Local Detainee

Handbook (2007 version))); GEO Ex. G, ECF No. 273-3
(GEO_MEN 00054240 (Local Detainee Handbook (2008
version))); GEO Ex. H, ECF No. 273-4 (GEO_MEN
00054267 (Local Detainee Handbook (2010 version))); GEO
Ex. I, ECF No. 273-5 (GEO-MEN 00056798 (Local Detainee
Handbook (2011 version))); *see also* Undisputed Fact No. 63
(citing Local Detainee Handbooks (2002 and 2013 versions)).
GEO does not substantively dispute this fact.

64.     The HUSP in GEO's Aurora Detainee Handbook also provides:
"Each and every detainee must participate in the facility's sanitation program.  A list of
detainees is developed each day by staff and is posted [daily] for viewing.  During a
general cleanup all detainees must participate.  The assigned Housing Unit [or Dorm]
Officer will be responsible for assuring this general cleanup is done on a regular basis."
Ex. V (GEO_MEN 00040758 (Local Detainee Handbook (2002 version) (under heading
"Dormitory Sanitation"))); Ex. W (PL000047 (Local Detainee Handbook (2013 version)
(under heading "Housing Unit Sanitation"))); *see also* Ex. X (GEO_MEN 00052387
(Detainee Orientation Video) at 2)

      i.     **GEO's response**: Disputed. GEO disputes that the handbook
cited by Plaintiffs as "Exhibit V," from February 25, 2002 is
applicable to the present case. The handbook is from over two
years before the class period and during a period wherein
different regulations applied. ECF 262-9 at 46 (GEO_MEN

00040734). Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case. The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook).

GEO does not dispute that the 2013 Detainee Handbook contains the following quoted text: "Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit Officer will be responsible for assuring this general cleanup is done on a regular basis." ECF 261-17, 20.

ii.   **Plaintiffs' reply**:  The language quoted in Plaintiffs' Undisputed Fact appears in nearly identical form in every handbook cited by GEO, with minor variations denoted in brackets.  *See* GEO Ex. E, ECF No. 273-1 (GEO_MEN 00054887 (Local Detainee Handbook (2005 version))); GEO

45

Ex. F, ECF No. 273-2 (GEO_MEN 00054198 (Local

Detainee Handbook (2007 version))); GEO Ex. G, ECF No.

273-3 (GEO_MEN 00054240 (Local Detainee Handbook

(2008 version))); GEO Ex. H, ECF No. 273-4 (GEO_MEN

00054268 (Local Detainee Handbook (2010 version))); GEO

Ex. I, ECF No. 273-5 (GEO-MEN 00056798 (Local Detainee

Handbook (2011 version))); *see also* Undisputed Fact No. 63

(citing Local Detainee Handbooks (2002 and 2013 versions)).

GEO concedes these handbooks cover the class period.  GEO

does not substantively dispute this fact.

65.     The Aurora Detainee Handbook states "[a]ll detainees in a housing

unit [or dorm] are required to keep clean and sanitary all commonly accessible areas of

the housing unit [or dorm], including walls, floors, windows, windows ledges, showers,

sinks, toilets, tables, and chairs."  Ex. V (GEO_MEN 00040759 (Local Detainee

Handbook (2002 version))); Ex. W (PL000047 (Local Detainee Handbook (2013

version))).

        i.     **GEO's response**: Disputed. GEO disputes that the handbook

cited by Plaintiffs in support of their motion for summary

judgment is applicable to the present case. The handbook

cited by Plaintiffs as "Exhibit V" is from February 25, 2002,

over two years before the class period and during a period

wherein different regulations applied.  ECF 262-9 at 46

(GEO_MEN 00040734). Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case.

The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook)

Disputed. GEO does not dispute that the 2013 Detainee Handbook contains the following quoted text: "All detainees in a housing unit are required to keep clean and sanitary all commonly accessible areas of the housing unit, including walls, floors, windows, windows ledges, showers, sinks, toilets, tables, and chairs . . . . If detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit office of the problem. Action will be taken to resolve this problem." ECF 261-17, 20.

ii.    **Plaintiffs' reply**:  The language quoted in Plaintiffs' Undisputed Fact appears in nearly identical form in every handbook cited by GEO, with minor variations denoted in

brackets.  *See* GEO Ex. E, ECF No. 273-1 (GEO_MEN 00054887 (Local Detainee Handbook (2005 version))); GEO Ex. F, ECF No. 273-2 (GEO_MEN 00054199 (Local Detainee Handbook (2007 version))); GEO Ex. G, ECF No. 273-3 (GEO_MEN 00054240 (Local Detainee Handbook (2008 version))); GEO Ex. H, ECF No. 273-4 (GEO_MEN 00054268 (Local Detainee Handbook (2010 version))); GEO Ex. I, ECF No. 273-5 (GEO-MEN 00056798 (Local Detainee Handbook (2011 version))); *see also* Undisputed Fact No. 63 (citing Local Detainee Handbooks (2002 and 2013 versions)). GEO concedes these handbooks cover the class period.  GEO does not substantively dispute this fact.

66.     That section also states that "Detainees will take turns cleaning the [day space]" and the "day room area will be kept clean at all times."  *Id.*

    i.     **GEO's response**: Disputed. GEO disputes that the handbook cited by Plaintiffs as "Exhibit V," from February 25, 2002 is applicable to the present case. The handbook is from over two years before the class period and during a period wherein different regulations applied. ECF 262-9 at 46 (GEO_MEN 00040734). Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case.

The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook).

ii.     **Plaintiffs' reply**:  The language quoted in Plaintiffs' Undisputed Fact appears in identical form in every handbook cited by GEO, with minor variations denoted in brackets.  *See* GEO Ex. E, ECF No. 273-1 (GEO_MEN 00054887 (Local Detainee Handbook (2005 version))); GEO Ex. F, ECF No. 273-2 (GEO_MEN 00054199 (Local Detainee Handbook (2007 version))); GEO Ex. G, ECF No. 273-3 (GEO_MEN 00054240 (Local Detainee Handbook (2008 version))); GEO Ex. H, ECF No. 273-4 (GEO_MEN 00054268 (Local Detainee Handbook (2010 version))); GEO Ex. I, ECF No. 273-5 (GEO-MEN 00056798 (Local Detainee Handbook (2011 version))); *see also* Undisputed Fact No. 63 (citing Local Detainee Handbooks (2002 and 2013 versions)).  GEO concedes these handbooks cover the class period.  GEO does not substantively dispute this fact.

F.     **Solitary Confinement at Aurora.**

67.     GEO policy describes segregation as "[c]onfinement in a cell isolated from the general population."  Ex. Y (GEO-MEN 00037770 (Policy Number 10.2.11 – AUR))

>      i.     **GEO's response**: Disputed. GEO does not dispute that the quoted text appears in the document, but notes that the document is signed by both GEO and ICE and is not properly described merely as a "GEO policy." ECF 262-11.
>
>      ii.    **Plaintiffs' reply**: GEO admits the substance of the stated fact and provides no contrary evidence.  *See also* Plaintiffs' Reply re Undisputed Fact Nos. 40-42 (discussing the COTR's role in signing off on GEO policy).

68.     Disciplinary and administrative segregation are both forms of segregation used at the Aurora Facility.  *Id*.

>      i.     **GEO's response**: Undisputed.

69.     According to ICE standards, administrative segregation should be used only when "restricted conditions of confinement are required [] to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility."  Ex. L (GEO_MEN 00064171 (2011 PBNDS)); Ex. M (GEO-MEN 00063097 (2008 PBNDS); *see also* Ex. N (GEO-MEN 00063863-64 (INS Standards))

>      i.     **GEO's response**: Disputed. GEO disputes that the out-of-context quote fully describes when administrative segregation

is properly used. The PBNDS do not include the qualifiers added by Plaintiffs that the listed reasons constitute an exhaustive list of reasons why disciplinary segregation may be used. In direct contrast, the PBNDS state under "Reasons for Placement in Administrative Segregation" that a detainee may be placed in administrative segregation, for among other reasons, that the "detainee is awaiting an investigation or a hearing for violation of facility rules." ECF 261-8. The PBNDS further explain that the exemplars provided are nonexhaustive. *Id*.

ii.     **Plaintiffs' reply**: GEO's response concedes that the stated fact describes permissible uses of administrative segregation; Plaintiffs do not dispute that the text quoted by GEO describes a specific application of those uses, but the text goes on to show that it is an example of maintaining "the security or good order of the facility," as it states that administrative segregation may be used when "[a] detainee is awaiting a violation or a hearing for a violation of facility rules.  Pre-disciplinary hearing detention shall be ordered only as necessary to prevent further violation of those rules or to protect the security and orderly operation of the facility." Plaintiffs' Ex. L, ECF No. 261-8 (GEO_MEN 00064171-72

(2011 PBNDS)); Plaintiffs' Ex. M, ECF No. 261-9 (GEO-MEN 00063097 (2008 PBNDS); Plaintiffs' Ex. N, ECF No. 261-10 (GEO-MEN 00063863-64 (INS Standards)).

70.    Administrative segregation may be used to confine detainees prior to a hearing on whether disciplinary segregation will be imposed for a rule violation, but "only as necessary to prevent further violation of those rules or to protect the security and orderly operation of the facility."  Ex. L (GEO-MEN 00064172 (2011 PBNDS)); Ex. M (GEO-MEN 00063097 (2008 PBNDS)); *see also* Ex. N (GEO-MEN 00063864 (INS Standards)).

        i.    **GEO's response**: Disputed. GEO disputes the use of this quote as setting forth a hard and fast rule. The section cited is one example of when administrative segregation is permissible but the list of exemplars is non-exhaustive. ECF 261-8.

        ii.    **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.  *See also* Plaintiffs' Reply re Undisputed Fact No. 69.

71.    Administrative segregation "is not to be used as a punitive measure." *Id*.

        i.    **GEO's response**: Disputed. GEO disputes that this correctly describes the use of administrative segregation. As explained in the 2011 PBNDS, because of how it is designed,

"Administrative Segregation status is a nonpunitive status…"
ECF 261-8. Thus, the use of administrative segregation is
nonpunitive.

    ii.    **Plaintiffs' reply**: GEO's response admits the substance of the
stated fact.

72.    Disciplinary segregation, which involves punitive segregation for
disciplinary reasons, may only be administered after a detainee has received a
disciplinary hearing and been found guilty of an offense authorizing such punishment.
Ex. L (GEO-MEN 00064169 (2011 PBNDS)); Ex. M (GEO-MEN 00063090 (2008
PBNDS)); Ex. N (GEO-MEN 00063883 (INS Standards))

    i.    **GEO's response**: Disputed. GEO disputes that this
accurately describes the cited material. As the PBNDS make
clear, disciplinary segregation is only appropriate after a
disciplinary hearing panel has determined that a detainee is
guilty of a prohibited act for which the ICE disciplinary
severity scale authorizes disciplinary segregation. ECF 261-8.

    ii.    **GEO's reply**: GEO's response admits the substance of the
undisputed fact.

73.    Detainees in both administrative and disciplinary segregation are
housed in a section of the detention facility called the Special Management Unit
("SMU").  Ex. L (GEO-MEN 00064169 (2011 PBNDS)); Ex. M (GEO-MEN 00063090
(2008 PBNDS)); Ex. N (GEO-MEN 00063863 (INS Standards))

      i.      **GEO's response**: Undisputed.

74.     The SMU at Aurora consists entirely of single-occupancy cells.  Ex. P (Ceja 30(b)(6) Dep. 54:17-55:6)

      i.      **GEO's response**: Undisputed.

**G.    The PBNDS Provide GEO A Wide Range of Options to Punish Offenses.**

75.     The PBNDS state that "each facility [shall] have graduated severity scales of prohibited acts and disciplinary consequences."  Ex. L (GEO-MEN 00064209 (2011 PBNDS)); Ex. M (GEO-MEN 00063138 (2008 PBNDS)); *see also* Ex. N (GEO-MEN 00063726 (INS Standards))

      i.      **GEO's response**: Disputed. The PBNDS not only require graduated severity scales of prohibited acts and disciplinary consequences, but they also set forth the appropriate scale for the same. ECF 261-10, 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9, 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8, 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.")

ii.    **Plaintiffs' reply**: GEO admits the substance of the stated

fact.

76.    The PBNDS allow GEO discretion in determining the severity scales

that it applies to different offenses.  Ex. A (A. Martin Dep. 146:16-147:3); Ex. O (K.

Martin Dep. 73:12-80:8)

i.    **GEO's response**: Disputed. GEO disputes that it has

discretion to determine its own severity scale. The 2000 NDS

and all applicable versions of the PBNDS require GEO to

adopt, without alteration, the ICE disciplinary severity scale.

ECF 261-10, 17 (2000 NDS) (Contract Detention Facilities

"shall adopt, without changing, the offense categories and

disciplinary sanctions set forth in this section."); ECF 261-9,

45 (2008 PBNDS) (Contract Detention Facilities "shall adopt,

without alteration, the offense categories and disciplinary

sanctions set forth in this section."); ECF 261-8, 39 (2011

PBNDS) ("All facilities shall have graduated scales of

offenses and disciplinary consequences as provided in this

section.").

ii.    **Plaintiffs' reply**: Plaintiffs concede GEO's response.

77.    The PBNDS authorize up to 72 hours of disciplinary segregation as

punishment for certain offenses in what is designated as the "high moderate" offense

category.  Ex L (GEO-MEN 00064221 (2011 PBNDS)); Ex. M (GEO-MEN 00063153

(2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards))

>   i.   **GEO's response**: Undisputed.

78.    High moderate offenses are also referred to as "300-level" offenses

because the code numbers for these offenses are in the 300s.  Ex. L (GEO-MEN

00064220-21 (2011 PBNDS)); Ex. M (GEO-MEN 00063152-53 (2008 PBNDS)); Ex. N

(GEO-MEN 00063733-34 (INS Standards)); Ex. O. (K. Martin Dep. 75:3-76:15)

>   i.   **GEO's response**: Undisputed.

79.    "Refus[ing] to clean assigned living area" is among the 300-level

offenses.  Ex. L (GEO-MEN 00064220 (2011 PBNDS)); Ex. M (GEO-MEN 00063152

(2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards))

>   i.   **GEO's response**: Undisputed.  GEO notes that the sanction
>
>   reads, without alteration, "Refusing to clean assigned living
>
>   area." ECF 261-8 (GEO-MEN 00064220). Plaintiffs have
>
>   incorrectly indicated that they have altered the text.
>
>   ii.   **Plaintiffs' reply**: The brackets in the undisputed fact reflect
>
>   that the 2011 PBNDS say "Refusing" and earlier editions of
>
>   the PBNDS say "Refusal."  *See* Plaintiffs' Ex. L, ECF No.
>
>   261-8 (GEO-MEN 00064220 (2011 PBNDS)); Plaintiffs' Ex.
>
>   M, ECF No. 261-9 (GEO-MEN 00063152 (2008 PBNDS));
>
>   Plaintiffs' Ex. N, ECF No. 261-10 (GEO-MEN 00063733
>
>   (INS Standards)).

80.     The PBNDS list 13 different sanctions that could be applied to a high moderate offense: (1) initiate criminal proceedings; (2) recommend disciplinary transfer; (3) disciplinary segregation up to 72 hours; (4) make monetary restitution; (5) loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.); (6) change housing; (7) remove from program and/or group activity; (8) loss of job; (9) impound and store detainee's personal property; (10) confiscate contraband; (11) restrict to housing unit; (12) reprimand; (13) warning.  Ex. L (GEO-MEN 00064221-22 (2011 PBNDS); Ex. M (GEO-MEN 00063153 (2008 PBNDS)); Ex. N (GEO-MEN 00063733 (INS Standards))

        i.      **GEO's response**: Undisputed.

81.     The PBNDS provide that incidents involving "high moderate" offenses (i.e., 300-level offenses) shall be sent to a Unit Disciplinary Committee ("UDC").  Ex. L ((GEO-MEN 00064213-14 (2011 PBNDS); Ex. M (GEO-MEN 00063143 (2008 PBNDS)); Ex. N (GEO-MEN 00063721 (INS Standards))

        i.      **GEO's response**: Undisputed.

**H.    GEO Places Detainees in Solitary Confinement for Refusing to Clean the Facility.**

82.     At orientation, detainees receive an overview of the Aurora Facility's disciplinary process, including examples of various offenses that could lead to discipline.  Ex. X (GEO_MEN 00052387 (Detainee Orientation Video) at 4-7); *see also* Ex. O (K. Martin Dep. 214:10-215:20 (noting that detainees received the orientation video reflecting the prevailing ICE standards throughout the class period))

i.   **GEO's response**: Disputed. GEO disputes that the orientation video provides any information about the types of discipline that may be imposed for any offense. Instead, it provides an overview and refers detainees to their handbook. ECF 262-10, 6.

ii.   **Plaintiffs' reply**: GEO admits the substance of the stated fact and provides no contrary evidence. It mischaracterizes the stated fact, which refers to "examples of various offenses," and not "the types of discipline that may be imposed for any offense."

83.   One of the specific examples detainees receive of an offense that can lead to discipline is "failure to follow safety or sanitation rules." Ex. X (GEO_MEN 00052387 (Detainee Orientation Video) at 7)

i.   **GEO's response**: Disputed. GEO's orientation video lists some of the "Low Moderate" offenses from the PBNDS in its orientation video. ECF 262-10, 8. As an example, the video lists, among others, the ICE prohibited act number 410 "failing to follow safety or sanitation regulations," an offense for which disciplinary segregation is not listed. ECF 261-8, 49.

ii.   **Plaintiffs' reply**: GEO's response admits the substance of the stated fact.

84.     According to the Aurora Detainee Handbook, if a dormitory officer determines the day room area is not sufficiently clean, he or she can instruct the detainees to clean it, and "[c]ontinued refusal to clean the area will result in further disciplinary action."  Ex. V (GEO_MEN 00040759 (Local Detainee Handbook (2002 version))); Ex. W (PL000047 (Local Detainee Handbook (2013 version)))

i.     **GEO's response**: Disputed. GEO disputes that the handbook cited by Plaintiffs in support of their motion for summary judgment is applicable to the present case. The handbook cited by Plaintiffs as "Exhibit V" is from February 25, 2002, over two years before the class period and during a period wherein different regulations applied. ECF 262-9 at 46 (GEO_MEN 00040734).  Therefore, any quoted text therein is inapplicable to the present case and GEO disputes that it appears in the "Aurora Detainee Handbook" as it relates to this case.

The applicable detainee handbooks for the class period are attached with GEO's Opposition as follows: Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook)

GEO does not dispute that the 2013 Detainee Handbook contains the following quoted text, which is improperly excerpted in Plaintiffs proffered fact: "If detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit officer of the problem. Action will be taken to resolve this problem. The day room area will be kept clean at all times. Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean the area will result in further disciplinary action." ECF 261-17, 20.

ii.   **Plaintiffs' reply**: The language quoted in Plaintiffs' Undisputed Fact and GEO's Response appears in nearly identical form in every handbook cited by GEO, although some handbooks refer to a "detention officer" and others to a "housing officer," and some refer to the housing unit as a "dorm." *See* GEO Ex. E, ECF No. 273-1 (GEO_MEN 00054887 (Local Detainee Handbook (2005 version))); GEO Ex. F, ECF No. 273-2 (GEO_MEN 00054199 (Local

Detainee Handbook (2007 version))); GEO Ex. G, ECF No. 273-3 (GEO_MEN 00054240 (Local Detainee Handbook (2008 version))); GEO Ex. H, ECF No. 273-4 (GEO_MEN 00054268 (Local Detainee Handbook (2010 version))); GEO Ex. I, ECF No. 273-5 (GEO-MEN 00056798 (Local Detainee Handbook (2011 version))); *see also* Undisputed Fact No. 63 (citing Local Detainee Handbooks (2002 and 2013 versions)). GEO concedes these handbooks cover the class period. GEO does not substantively dispute this fact.

85.     The UDC has the discretion to choose whether to issue minor sanctions or refer the case to the Institution Disciplinary Panel for more serious sanctions. Ex. L (GEO-MEN 00064213-14 (2011 PBNDS); Ex. M (GEO-MEN 00063143 (2008 PBNDS)); Ex. N (GEO-MEN 00063721 (INS Standards)); Ex. O (K. Martin Dep. 73:12-80:8)

     i.    **GEO's response**: Disputed. The cited material does not provide for the discretion Plaintiffs describe. The 2011 and 2008 PBNDS explicitly state "The UDC Shall . . . refer to the IDP any incident involving a serious violation associated with an A-through-D range sanction. This includes code violations in the "greatest" and 'high' categories (100s and 200s)[.]" ECF 261-8, 41; ECF 261-9, 48[.]

  ii.  **Plaintiffs' reply**: GEO's response does not state any material

difference from the fact as stated; this fact is undisputed.

86. If the UDC chooses to issue sanctions, the UDC staff member has

discretion to choose which sanction to issue for the offense based on his or her

knowledge and experience.  Ex. O (K. Martin Dep. 77:8-80:8)

  i.  **GEO's response**: Disputed. All individuals participating in

the disciplinary process are required to follow the disciplinary

severity scale in the PBNDS. ECF 261-10, 17 (2000 NDS)

(Contract Detention Facilities "shall adopt, without changing,

the offense categories and disciplinary sanctions set forth in

this section."); ECF 261-9, 45 (2008 PBNDS) (Contract

Detention Facilities "shall adopt, without alteration, the

offense categories and disciplinary sanctions set forth in this

section."); ECF 261-8, 39 (2011 PBNDS) ("All facilities shall

have graduated scales of offenses and disciplinary

consequences as provided in this section.").

  ii.  **Plaintiffs' reply**: Plaintiffs concede the substance of GEO's

response.

87. The UDC has the authority to impose disciplinary segregation as

punishment for a 300-level offense.  Ex. O (K. Martin Dep. 76:16-77:1)

  i.  **GEO's response**: Disputed. Only the IDP has the authority to

place a detainee in disciplinary segregation. ECF 261-8, 28

62

(2011 PBNDS); ECF 261-9, 38 (2008 PBNDS); ECF 261-10, 12 (2000 PBNDS).

    ii.    **Plaintiffs' reply**: Plaintiffs concede the substance of GEO's response.

88.    GEO placed detainees in segregation many times during the class period for refusing to clean.  Ex. Z (GEO_MEN 00057697, GEO_MEN 00047810, GEO_MEN 00047812-17, GEO-MEN 00065434, GEO-MEN 00065393, GEO-MEN 00065211, GEO-MEN 00065032-33 (disciplinary charges and reports))

    i.    **GEO's response**: Disputed. Placement in segregation was rare during the class period. Indeed, Plaintiff Valerga was never sent to segregation for failing to clean, nor did he know of anyone who was. Valerga Dep. 141:24-25, 142:1-2, 140:12-13. Plaintiff Menocal was never placed in segregation for failing to clean. ECF 49-2 ¶ 3. Plaintiff Argueta was never even threatened with segregation. Lourdes Argueta Second Set of Discovery, Interrogatory No. 27. Plaintiff Alexk[h]ina was never even threatened by GEO with segregation for failing to clean. Alexak[h]ina Second Set of Discovery, Interrogatory No. 27. Plaintiff Dagoberto Vizguerra was never placed in segregation, let alone for failing to clean. Dep. 42:5-7. Plaintiff Xahuentitla-Flores did not know anyone who was sent to segregation for the failure to clean,

nor was she sent there herself. Xahuentitla- Flores Dep. 70:11-17; 120:16-25; 121:1-15. Ex. R.

ii.   **Plaintiffs' reply**: GEO does not provide any evidence to rebuts the specific examples of detainees being placed in segregation for refusing to clean.  Its response consists of a different characterization of the frequency of this occurrence, based on incomplete descriptions of the cited witnesses' testimony, which is not at issue in this Motion.

I.   **GEO Has Discretion to Set Wages For the Voluntary Work Program.**

89.   GEO determines the types of jobs available in the VWP on a facility-by-facility basis, and the ICE COTR approves them at the facility level.  Ex. A (A. Martin Dep. 120:1-9)

i.   **GEO's response**: Disputed. Ms. Martin testified that both ICE and GEO determine what type of jobs are available. ECF 261-2, 32 (Amber Martin Dep. 119:6-14).

ii.   **Plaintiffs' reply**: GEO's response mischaracterizes the cited testimony.  Ms. Martin testified that determination of job assignments is "done at the facility level and approved by ICE COTR at the facility level," as reflected in Plaintiffs' stated fact.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Dep. 119:6-120:9).  For further discussion of the role of the ICE COTR, see Plaintiffs' Undisputed Fact Nos. 40-43.

90. The Contract does not identify how many detainees will participate in the VWP. Ex. R (A. Martin 30(b)(6) Dep. 72:13-72:25)

> i. **GEO's response**: Disputed. The Contract provides a line item for the number of VWP shifts it will reimburse at the "actual cost of $1.00 per day," thereby noting an expected number of shifts. ECF 262-2, 8 (GEO_MEN 00019619).
>
> ii. **Plaintiffs' reply**: GEO's response is not substantively different from the stated fact, which concerns the actual participation rate in the VWP, not the maximum reimbursement. The contract line item GEO cites is a maximum VWP stipend, not an expected number of shifts: "Reimbursement for this line item will be at actual cost of $1.00 per day per detainee. The contractor shall not exceed the quantity shown without prior approval by the Contracting Officer." Plaintiffs' Ex. B, ECF No. 262-2 (GEO_MEN 00019619); *see also* Plaintiffs' Undisputed Fact No. 92.

91. GEO has the discretion to develop the VWP based on its needs and the availability of detainee labor. *Id.*

> i. **GEO's response**: Disputed. GEO must offer a VWP, regardless of the number of individuals who wish to volunteer to participate. ECF 262-2, 32 (2011 contract requiring that GEO offer a VWP as a "specific objective) ECF 261-8, 50

(2011 PBNDS stating that detainees "shall" be given the opportunity to volunteer for work.). Because of this mandatory directive, GEO cannot eliminate the program based upon the unavailability of detainee labor. *Id.* Nor can expand the program beyond what is permitted by ICE. *Id.*

ii.   **Plaintiffs' reply**: GEO's response misrepresents Plaintiffs' undisputed fact and does not provide contrary evidence.  The stated fact does not refer to the existence of the VWP, but to the content of its design.

92.   The 2011 Contract provides that ICE will reimburse GEO $1.00 per day for each detainee working in the VWP.  Ex. B (GEO_MEN 00019616 (2011 Contract)).

i.   **GEO's response**: Undisputed.

93.   GEO pays detainees who work in the VWP at the Aurora Facility $1.00 per day.  Ex. A (A. Martin Dep. 104:23-25); Ex. AA (GEO_MEN 00057594 (Detainee Work Detail Application))

i.   **GEO's response**: GEO does not dispute that detainees who work in the VWP at the Aurora facility are paid $1.00 per day. However, GEO disputes that it pays detainees" as it merely serves as the middleman between ICE and detainees. GEO advances the payment authorized by ICE to detainees

and is thereafter reimbursed by ICE for the same. ECF 262-2, 5 (GEO_MEN 00019616).

    ii.    **Plaintiffs' reply**: GEO admits the substance of the stated fact and provides no contrary evidence.

94.    ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP.  8 U.S.C. § 1555(d); Appropriations Act, Immigration and Naturalization Service Salaries and Expenses, Pub. L. No. 95-431, 92 Stat. 1021 (1978)

    i.    **GEO's response**: Undisputed.

95.    ICE does not prohibit its contractors from *paying* more than $1.00 per day for work performed in the VWP.  Ex. A (A. Martin Dep. 106:11-19; 110:10-13); Ex. L (GEO-MEN 00064347 (2011 PBNDS) (compensation for VWP work is "at *least* $1.00 (USD) per day" (emphasis added)))

    i.    **GEO's response**: Disputed. The 2000 NDS, with which the AIPC was contractually obligated to comply from March 27, 2003 to April 28, 2010, required GEO to provide "compensation" and explicitly directed that "the stipend is $1.00 per day, to be paid daily." ECF 261-10, 5 (2000 NDS). Likewise, the 2008 PBNDS, with which the AIPC was contractually obligated to comply from April 28, 2010 to June 22, 2013, mandated that "the compensation is $1.00 per day." ECF 261-9, 63 (2008 PBNDS). There was no discretion for GEO to pay more.

ii.       **Plaintiffs' reply**: Disputed. Plaintiffs do not dispute that the 2000 NDS and the 2008 PBNDS state that the compensation for VWP work is $1.00 a day. However, GEO's contracts with ICE require GEO to continually comply with the most current editions of the NDS and PBNDS. ECF 262-5, 12 (GEO_MEN 00059754) (2003 contract); ECF 24-4, 11 (GEO_MEN 00059644) (2006 contract); ECF 262-2 (GEO-MEN 00059848-49) (2011 contract). The 2011 PBNDS were issued on February 27, 2012. Reply Ex. 8 at p. 9 (ICE report re PBNDS).  GEO does not dispute that the 2011 PBNDS states that compensation for VWP work is "at *least* $1.00 (USD) per day." Ex. L (GEO-MEN 00064347) (emphasis added).  In addition, GEO can and does request modifications of the Contract when it needs to.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Tr. 106:8-108:10).  GEO did not request a contract modification to pay detainees more than $1.00 per day.  *Id*. at 105:3-12.

96.       GEO pays detainees more than $1.00 per day at other ICE facilities, including $1.00 to $3.00 per day at its South Texas Detention Facility, $1.00 to $2.50 per day at its Folkston ICE Processing Center, $1.00 to $3.00 per day at its Joe Corley Detention Facility, and $1.00 to $4.00 per day at its LaSalle Detention Facility.  Ex. A (A. Martin Dep. 109:15-110:13); Ex. BB (GEO-MEN 00170339 (VWP Pay Rates))

68

i. **GEO's response**: GEO does not dispute that some facilities pay more than $1 per day to detainees. GEO notes that this is not relevant evidence because the contracts at other facilities are not at issue here. The evidence submitted by Plaintiffs does not indicate which version of the PBNDS apply at each facility. Nor does it establish the ICE communications at the other facilities.

ii. **Plaintiffs' reply**: GEO admits the substance of the stated fact and provides no contrary evidence.

97.    GEO pays detainees more than $1.00 per day at other facilities to incentivize detainee participation in the VWP, such as when the VWP is "undersubscribed."  Ex. F (Ragsdale 30(b)(6) Dep. 155:5-17)

i. **GEO's response**: GEO does not dispute that this is one such reason it may work with ICE to pay a higher amount.

98.    In facilities where GEO pays detainees more than $1.00 per day for VWP work, it does so "on [its] own dime."  Ex. A (A. Martin Dep. 107:18-22)

i. **GEO's response**: Disputed. Ms. Martin did not testify about facilities that would pay more than $1 per day, but instead, provided speculative testimony about how she believed a facility could accomplish paying more than $1.00 per day, testifying "I guess we could do it on our own dime." ECF 261-2, 27.

69

ii.    **Plaintiffs' reply**: Ms. Martin went on to testify specifically that at the LaSalle detention facility in Louisiana, where GEO pays as much as $4.00 per day for VWP work, but is only reimbursed $1.00 per day by ICE, the difference in the daily rate is paid by GEO.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Dep. 109:1-112:2 (agreeing that at the LaSalle detention facility GEO opted to pay more than it was getting reimbursed by ICE)).

## II.    RESPONSE CONCERNING ADDITIONAL FACTS

1.    The United States Congress has delegated to DHS, and its agency ICE, the sole authority to arrange for all aspects of the detention of aliens pending the results of their immigration proceedings. See 8 U.S.C. § 1231(g)(1) ("The [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.")

i.    **Plaintiffs' response**: Admit that 8 U.S.C. § 1231(g) constitutes one source of the Secretary's detention authority. Dispute that it is the sole source, as other sources include 8 U.S.C. § 1103(a)(A)(11)(A) & (B), and 8 U.S.C. § 1555(d), and dispute that these enactments provide authority for ICE to arrange for "all aspects" of the detention of immigration detainees.  The text and history of 8 U.S.C. § 1555(d) and

subsequent appropriations bills withheld funds relating to

specific aspects of the detention of immigration detainees.

2.      In making these arrangements, ICE must consider the use of private

contractors to detain aliens prior to constructing its own facilities. See 8 U.S.C. §

1231(g)(2) ("Prior to initiating any project for the construction of any new detention

facility for the Service, the Commissioner shall consider the availability for purchase or

lease of any existing prison, jail, detention center, or other comparable facility suitable

for such use.").

       i.      **Plaintiffs' response**: Admit

3.      As a result of Congress' directive, ICE neither constructs nor

operates its own immigration detention facilities, Ex. B (Dec. of Tae Johnson), and

therefore its state and private contractors are critical to carrying out the federal function

of immigration detention.

       i.      **Plaintiffs' response**: Dispute.  ICE owns and operates, at

least in part, some of its own facilities, including the Krome

detention center in South Florida.  Reply Ex. 2 (Evans Dep.

48:13-49:6); GEO Ex. B, ECF No. 271-2 (Tae Johnson Decl.

¶ 6) ("The ICE detention system [includes] ICE-owned

facilities known as Service Processing Centers.")  The

evidence GEO provides neither supports the statement that

ICE does not construct or operate its own immigration

detention facilities, nor the statements that it does not do so as

"a result of Congress's directive," or that state and private

contractors are "critical."

4.      Due to significant fluctuations in the number and location of

removable aliens apprehended by DHS and subject to detention, it is important for ICE to

maintain flexibility with regard to its immigration detention facilities. Otherwise, ICE

could invest heavily in its own facilities only to have them stand idle if a particular

geographic area later experiences a drastic decrease in demand for detainee housing. Ex.

B.

i.      **Plaintiffs' response**: Admit.

A.      **GEO's Contracts with ICE**

5.      Consistent with this overall policy, ICE chose to contract with the

AIPC to detain aliens pending the resolution of their immigration proceedings. ECF 260

at 2 (Plaintiffs' Undisputed Facts # 3, 4, and 5). GEO owns and operates the AIPC, and

has operated it pursuant to a series of direct contracts between GEO and ICE. *Id.*

(Plaintiffs' Undisputed Fact # 5). ICE is authorized by DHS and Congress to enter into

these contracts. *See*, *e.g.*, 8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g).

i.      **Plaintiffs' response**: Admit.

6.      All immigration detention processing centers, including the AIPC,

must adhere to ICE's standards. In 2000, the Immigration and Naturalization Service

("INS"), ICE's predecessor, adopted the original National Detention Standards (the

"2000 NDS"). ICE promulgated subsequent versions of the PBNDS in 2008 (the "2008

PBNDS"), and 2011 (later updated in 2016) (the "2011 PBNDS") (the 2000 NDS are

located at https://www.ice.gov/detentionstandards/2000; the 2008 PBNDS are located at: https://www.ice.gov/detentionstandards/2008; the 2011 PBNDS are located at: https://www.ice.gov/detentionstandards/2011).

> i.      **Plaintiffs' response**: Admit.

7.      In each contract GEO entered into with ICE for the operation of the AIPC, the 2000 NDS, 2008 PBNDS, or the 2011 PBNDS, as applicable, were incorporated into the contract and GEO was required to comply with the same. ECF 260 at 7 (Plaintiffs' Undisputed Facts # 25 and 26).

> i.      **Plaintiffs' response**: Admit.

8.      GEO's contract with ICE, number ACD-3-C-0008, required it to comply with the 2000 NDS from March 27, 2003 to September 28, 2006. ECF 262-5, 12 (GEO_MEN 00059754).

> i.      **Plaintiffs' response**: Dispute.  Plaintiffs admit that GEO's contract with ICE, number ACD-3-C-0008, required that, "[u]nless otherwise specified by an authorized INS representative," GEO "perform in continual compliance *with the most current* editions of the INS Detention Standards and the American Correctional Association, Standards for Adult Local Detention Facilities (ACA ALDF)."  Plaintiffs' Ex. D, ECF 262-5, 12 (GEO_MEN 00059754) (emphasis added). Plaintiffs admit that the 2000 NDS were the most current

edition of the INS Detention Standards during the stated period.

9.      GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, similarly required it to comply with the 2000 NDS. ECF 24-4, 11 (GEO_MEN 00059644); *see also* ECF 260 at 3 (proffering as undisputed the fact that HSCEOP-06-D-00010 was one of GEO's contracts with ICE during the class period); ECF 262-4 (incorporating the 2000 NDS into the contract).

i.      **Plaintiff's response**: Dispute. GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, does not explicitly incorporate the 2000 NDS.  Plaintiffs admit that GEO's contract with ICE, number HSCEOP-06-D-00010, effective September 29, 2006, required that, "[u]nless otherwise specified by the CO," GEO "perform in accordance with the most current Functional Areas (as outlined in the Performance Requirement Summary), ICE Detention Standards, and American Correctional Association (ACA) Performance-Based Standards for Adult Local Detention Facilities (ALDF)."  Plaintiffs' Ex C., ECF 262-4 (GEO_MEN 00059644).  Plaintiffs admit that the 2000 NDS were the most current ICE Detention Standards at the time the contract was signed.

10.     On April 28, 2010, GEO entered into a contract modification with ICE (HSCEOP-06-D-00010/P00018) which required it to comply with the 2008 PBNDS, effective immediately. Ex. C; ECF 261-9 (2008 PBNDS).

       i.      **Plaintiffs' response**: Admit.

11.     GEO's subsequent contract with ICE, number HSCEDM-11-D-00003, required it to continue to comply with the 2008 PBNDS. That contract was effective September 15, 2011. ECF 262-2, 38 (incorporating the 2008 PBNDS into the contract); *see also* ECF 260 at 3 (proffering as undisputed the fact that HSCEDM-11-D-00003 was one of GEO's contracts with ICE during the Class Period).

       i.      **Plaintiffs' response**: Dispute.  HSCEDM-11-D-00003 incorporated the "DHS/ICE PBNDS (Performance Based National Detention Standards)," and stated that "a copy of the current version is obtainable on the internet Website: http://www.ice.gov/detention-standards/2008/."  The contract also required that "these constraints may change over time; the Contractor shall be knowledgeable of any changes to the constraints and perform in accordance with the most current version of the constraints." ECF 262-2, 37-38 (GEO-MEN 00019655-56).  The 2011 PBNDS were published on February 27, 2012, and were thus the "most current" version of the PBNDS after that date.  Reply Ex. 8 at p. 9 (ICE report re PBNDS).

12.      On May 23, 2013, GEO entered into a contract modification with ICE (HSCEDM-11-D-00003/P00005) agreeing that, effective June 23, 2013, GEO would comply with the 2011 PBNDS. Ex. D; ECF 262-3, 2 (GEO-MEN 00020406; *see also* ECF 260 at 3 (proffering as undisputed the fact that HSCEDM-11-D-00003/P00005 was one of GEO's contracts with ICE during the Class Period).

       i.     **Plaintiffs' response**: Admit.  Plaintiffs note that GEO was required to remain aware of and perform in accordance with ongoing changes to the PBNDS under its existing contract, and in fact began implementing changes associated with the 2011 PBNDS long before the contract modification. Reply Ex. 9 (A. Martin 30(b)(6) Dep. 43:23-46:6) (describing an email sent April 4, 2012 that included an attachment regarding the major changes between the 2008 and 2011 PBNDS and explicitly mentioning the new language stating that compensation for VWP work is "at least $1.00").

## B.      The ICE-Mandated Disciplinary Severity Scale

13.      The 2000 NDS and all applicable versions of the PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale. ECF 261-10 at 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8 at 39 (2011

PBNDS)("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.").

      i.    **Plaintiffs' response**: Admit.

14.     The 2000 NDS and all versions of the PBNDS require GEO to provide notice to detainees, in the local detainee handbook, of the ICE-mandated disciplinary severity scale. ECF 261-10 at 10 (2000 NDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of. . . the disciplinary severity scale…").

      i.    **Plaintiffs' response**: Admit.

15.     Likewise, the 2000 NDS and all versions of the PBNDS explicitly provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); *see also* ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

      i.    **Plaintiffs' response**: Admit.

16.     The 2000 NDS and all versions of the PBNDS also explicitly provide a disciplinary severity scale that lists "[r]efusing to obey the order of a staff member or officer" as an offense which can be sanctioned by "[d]isciplinary segregation

(up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); *see also* ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

        i.      **Plaintiffs' response**: Admit.

17.      The AIPC's local detainee handbook's disciplinary severity scale does not deviate from the 2000 NDS or the applicable PBNDS. Ex. E (2005 Handbook); (GEO_MEN 00054151-222); Ex. F (2007 Handbook); Ex. G (2008 Handbook); Ex. H (2010 Handbook); Ex. I (2011 Handbook); ECF 261-17 (October 2013 Handbook) (Specifically identified in Plaintiffs discovery responses as the basis for their claims); Ex. J, Kevin Martin Dep. 40:21-24 ("Q. Do you know if there's any deviation from between the DB -- excuse me, between the GEO Detainee Handbook and the PBNDS as far as disciplinary requirements? A. Not as far as disciplinary requirements[.]").

        i.      **Plaintiffs' response**: Dispute. The severity scales listed in the GEO handbooks deviate from the NDS and PBNDS. For example, the 2005 Handbook adds additional possible sanctions for "greatest" offenses. *Compare* GEO Ex. E, ECF 273-1 (GEO_MEN 00054894 (Local Detainee Handbook (2005 version))) (listing seven potential sanctions for "greatest" offenses) *with* Plaintiffs' Ex. N, ECF 261-10 (GEO_MEN 00063729 (INS Standards)) (listing four potential sanctions for "greatest" offenses).

18.    The 2000 NDS and the applicable versions of the PBNDS provide for the exact graduated scales of offenses and disciplinary consequences for dedicated facilities, such as the AIPC. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS). The graduated scale of offenses (of which detainees must be made aware) are explicitly laid out in the 2000 NDS and the applicable PBNDS, providing GEO no discretion whatsoever to alter the disciplinary severity scale.

    i.    **Plaintiffs' response**: Admit.

19.    As required by the 2000 NDS and the applicable versions of the PBNDS, the disciplinary severity scale is copied verbatim into the local detainee handbook at the AIPC. Ex. J, Kevin Martin Dep. 40:13-16 ("And does the Detainee Handbook lay out these exact rules from the PBNDS for the detainees as far as discipline goes? A: Yes."); 83:17-22 (same).

    i.    **Plaintiffs' response**: Dispute. Kevin Martin's testimony is incorrect; the severity scales listed in the GEO handbooks deviate from the NDS and PBNDS.  *Compare* GEO Ex. E, ECF 273-1 (GEO_MEN 00054894 (Local Detainee Handbook (2005 version))) (listing seven potential sanctions for "greatest" offenses) *with* Plaintiffs' Ex. N, ECF 261-10 (GEO_MEN 00063729 (INS Standards)) (listing four potential sanctions for "greatest" offenses").

20.     In addition to the disciplinary severity scale, GEO has detailed a Sanitation Procedures document that contains a section entitled "Detainee Sanitation Procedures." ECF 262-8; *see also* ECF 50-4 (the "Sanitation Procedures").

    i.     **Plaintiffs' response**: Admit that ECF 262-8 is a GEO document about Sanitation Procedures; it is entitled "Sanitation Procedures" and is a different document from ECF 50-4, which is a GEO policy describing the Voluntary Work Program.

21.     The Sanitation Procedures sets forth general standards for sanitation that must be followed by both GEO employees and detainees. *Id.* While the sanitation policies for detainees apply to those detainees housed at the AIPC who participate in cleaning tasks through the VWP or by cleaning their living area, ECF 50-1, 9 (Ceja Dep. 29:13-16), the Sanitation Procedures were not developed to assign tasks to specific individuals, but rather to detail the actual process for cleaning and materials and supplies to be used. Ex. J, Kevin Martin Dep. 208:6-11.

    i.     **Plaintiffs' response**: Admit.

22.     The Sanitation Procedures also contain a section detailing the consequences for noncompliance, stating: "The Dormitory/Unit Officer will inspect all living areas daily and report any infraction of these regulations to the immediate supervisor. The officer will notify detainees of unsatisfactory conditions, in cases of continued noncompliance, staff will issue an incident report." ECF 262-8, 4; *see also*

ECF 50-4. The Sanitation Procedures do not provide for any other penalty for non-compliance. *Id*.

> i.   **Plaintiffs' response**: Admit.

23.    GEO has never maintained a separate policy or practice of placing a detainee in solitary confinement for the refusal to clean a living area. Ex. K (Amber Martin Dep., 134, 135.).

> i.   **Plaintiffs' response**: Dispute.  GEO maintained a practice throughout the time period covered by this case of requiring detainees to clean the common living areas without pay, and of threatening them with solitary confinement if they did not comply.  GEO's own 30(b)(6) witness admitted the scope of the HUSP, and that solitary confinement was a possible sanction for noncompliance.  Plaintiffs' Ex. P, ECF No. 261-12 (Ceja 30(b)(6) Dep. 36:8-37:9; 84:3-85:15); Reply Ex. 5 (Ceja 30(b)(6) Dep. 79:19-25).  In fact, GEO did impose solitary confinement on detainees who refused to perform HUSP duties.  Plaintiffs' Ex. Z, ECF No. 262-12 (GEO_MEN 00057697, GEO_MEN 00047810, GEO_MEN 00047812-17, GEO-MEN 00065434, GEO-MEN 00065393, GEO-MEN 00065211, GEO-MEN 00065032-33 (disciplinary charges and reports)).  And GEO threatened detainees with solitary confinement on a regular basis when they refused to clean

81

pursuant to the HUSP.  *See, e.g.*, Reply Ex. 10 (Xahuentitla-Flores Dep. 73:19-74:9; 83:7-19); Reply Ex. 11 (Hernandez-Ceren Dep. (rough transcript) 70:7-18; 73:21-74:21).

24.    ICE audits GEO to ensure that GEO complies with all requirements of its contract, including its obligations under the PBNDS. Ex. L.

      i.    **Plaintiffs' response**: Admit that ICE audits GEO to ensure that it complies with certain requirements of its contract, including PBNDS obligations, but dispute that these audits review or capture all such requirements, or all aspects of the PBNDS.  The audits review specific components of PBNDS requirements, which are listed on the audit documents themselves.  *See* GEO Ex L., ECF No. 273-6 (Denver Contract Detention Facility Annual Review); Reply Ex. 12 at 36:1-38:10 (Ragsdale 30(b)(6) Dep.) (acknowledging that ICE audits do not cover "the requirement that [detainees] clean the common areas").

25.    As part of each inspection, each audit reviews compliance with each PBNDS requirement. *Id.*

      i.    **Plaintiffs' response**: Admit that certain audits review compliance with PBNDS requirements; however, Plaintiffs dispute that the audits comprehensively review compliance with "each" PBNDS requirement.  The audits review specific

components of PBNDS requirements, which are listed on the audit documents themselves.  *See* GEO Ex L., ECF No. 273-6 (Denver Contract Detention Facility Annual Review); Reply Ex. 12 (Ragsdale 30(b)(6) Dep. 36:1-38:10).

26.     The materials provided to detainees at intake, including the handbook and orientation video, are regularly audited and have passed each audit since 2004. *Id.*

i.     **Plaintiffs' response**: Admit; however, the audit reviews only whether the orientation includes: "Unacceptable activities and behavior; and corresponding sanctions; How to contact ICE; The availability of *pro bono* legal services, and how to pursue such services; Schedule of programs, services, daily activities, including visitation, telephone usage, mail service, religious programs, count procedures, access to and use of the law library and the general library; sick-call procedures, etc., and the detainee handbook."  GEO Ex. L, ECF No. 273-6 (GEO-MEN 00131895 (10/5/2007); GEO_MEN 00014353 (10/22/2009); GEO_MEN 00058413 (10/21/2010); GEO_MEN 00014797 (9/29/2011)).

27.     The audits specifically review intake procedures to ensure that the orientation information provides information about '[u]nacceptable activities and

behavior, and corresponding sanctions" as well as the "detainee handbook." *Id.* (GEO-MEN 00131895).

      i.    **Plaintiffs' response**: Admit.

28.    The disciplinary severity scale is audited and has passed each audit since 2004. *Id.*

      i.    **Plaintiffs' response**: Dispute that the "disciplinary severity scale is audited." The audit reviews whether the facility *has* a "written disciplinary system using progressive levels of reviews and appeals." GEO Ex. L., ECF No. 273-6 (GEO-MEN 00131936 (10/5/2007); GEO_MEN 00014391 (10/22/2009); GEO_MEN 00058458 (10/21/2010); GEO_MEN 00014843 (9/29/2011); GEO-MEN 00165165 (9/29/2016)); *see also* Additional Fact No. 29.

29.    The audits review whether GEO provides notice of the disciplinary severity scale and have found GEO compliance [sic] based upon a review of its handbooks. *Id.* (GEO-MEN 00131936).

      i.    **Plaintiffs' response**: Admit.

30.    The VWP has been audited each year and has passed each audit since 2004. *Id.*

      i.    **Plaintiffs' response**: Admit.

31.    ICE has not only approved of the disciplinary severity scale but has also acted to implement and enforce the sanctions therein. One of the named Plaintiffs in

this case—Demetrio Valerga—explained during his deposition that ICE officers also enforced the ICE sanctions. After claiming that one of GEO's corrections officers told Mr. Valerga that he could be placed in segregation if he did not help clean his own common area, Ex. M, Dep. of Demetrio Valerga, 135:15-137:19, Mr. Valerga then explained that ICE officers woke him up, pulled him out of his housing unit, and spoke to him directly. *Id.* at 138:2-13. During that conversation, ICE officers told Mr. Valerga that he could, in fact, be taken to segregation for refusing to help clean his living area. *Id.* at 138:15-23.[10]

   i.   **Plaintiffs' response**: Admit the events stated above; however, Plaintiffs dispute that the ICE officers onsite at Aurora were authorized to condone acts that deviate from the requirements of the Contract, as GEO's use of the HUSP does.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Dep. 198:22-199:10); Reply Ex. 6 (A. Martin Dep. 81:22-82:13).

**C.   <u>The VWP</u>**

   32.   The 2000 NDS and all applicable versions of the PBNDS require that GEO provide detainees the opportunity to participate in a VWP. (Plaintiffs' Undisputed Fact #35).

   i.   **Plaintiffs' response:** Admit.

---

[10]   Even after the ICE Officer's warning, Mr. Valerga refused to clean and later refused again several times. *See* Ex. M Dep. of Demetrio Valerga, 139:6-24, 140:2-20. Mr. Valerga was never placed in segregation for refusing to clean. *Id.*

33.     The 2000 NDS, with which the AIPC was contractually obligated to comply from March 27, 2003 to April 28, 2010, required GEO to provide "compensation" and explicitly directed that "the stipend is $1.00 per day, to be paid daily." ECF 261-10, 5 (2000 NDS).

> i.     **Plaintiffs' response**: Admit except for GEO's use of the phrase "directed that," which implies that the quoted statement in the PBNDS is an instruction about how GEO must pay VWP workers, as opposed to a statement about the amount that ICE would reimburse GEO for VWP labor. Plaintiff Ex. A, ECF No. 261-2 (A. Martin Dep. 106:6-107:22).

34.     Likewise, the 2008 PBNDS, with which the AIPC was contractually obligated to comply from April 28, 2010 to June 22, 2013, mandated that "the compensation is $1.00 per day." ECF 261- 9 at 63 (2008 PBNDS).

> i.     **Plaintiffs' response**: Admit that the cited document contains the quoted text; however dispute GEO's statement that this constituted a "mandate[]," as opposed to a statement about the reimbursement offered from ICE to GEO.  GEO paid more than $1.00 a day to detainees at other ICE facilities, including paying up to $3.00 a day to detainees at its South Texas Detention Facility in 2009, and was therefore well aware that higher pay was an option.  Reply Ex. 13 (South

Texas 2009 detainee pay).  In addition, GEO can and does
request modifications of the Contract when it needs to.
Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Tr. 106:8-
108:10).  GEO did not request a contract modification to pay
detainees more than $1.00 per day.  *Id.* at 105:3-12.

35.    Beginning on June 23, 2013, AIPC was bound by the 2011 PBNDS,
which state that participants in the VWP will be compensated with "at least $1.00 (USD)
per day." ECF 261-8 at 53 (2011 PBNDS). Thus, the "at least" language upon which the
VWP Class relies was not implemented at the AIPC until approximately halfway through
the VWP Class Period.

   i.    **Plaintiffs' response**: Admit the quoted content of the
document, and that the 2011 PBNDS was incorporated into
the Contract on June 23, 2013.  Plaintiffs do not agree with
GEO's implication that the option to pay more than $1 per
day did not exist prior to it formally agreeing to incorporate
portions of the 2011 PBNDS into its contract.  GEO had an
obligation under the relevant contract to be "knowledgeable
of any changes to the [PBNDS] and perform in accordance
with the most current version of the [PBNDS]."  *See*
Response to Additional Fact ¶ 11.  In addition, GEO can and
does request modifications of the Contract when it needs to.
Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Tr. 106:8-

108:10).  GEO did not request a contract modification to pay

detainees more than $1.00 per day.  *Id*. at 105:3-12.

36.     Before the 2011 PBNDS were implemented at the AIPC, GEO paid

the amount it was explicitly directed by ICE to pay to VWP participants: $1.00 per day.

(Plaintiffs' Undisputed Fact #93).

      i.     **Plaintiffs' response**: Admit that GEO paid VWP participants

$1.00 prior to the implementation of the 2011 PBNDS;

dispute that ICE "explicitly directed" GEO to pay this

amount.

37.     Thereafter, GEO continued to pay members of the VWP Class $1.00

per day the minimum payment explicitly permitted by the 2011 PBNDS. (Plaintiffs'

Undisputed Fact #93).

      i.     **Plaintiff's response**: Admit.

**D.**    **Plaintiffs' Allegations**

38.     Plaintiffs allege that the PBNDS disciplinary severity scale forms the

basis of their TVPA claim. ECF 50-3, 25; *see also* Ex. N (Plaintiffs' Sixth Supplemental

discovery responses).

      i.     **Plaintiffs' response**: Dispute.  Plaintiffs allege that GEO

misused the disciplinary scale in the PBNDS by applying it to

work that the PBNDS did not authorize.

39.     Plaintiffs claim that the Sanitation Procedures, when read together with the ICE-mandated disciplinary severity scale, violate the TVPA. *Id.*

       i.    **Plaintiffs' response**: Dispute.  Plaintiffs allege that GEO misused the disciplinary scale in the PBNDS by applying it to work that the PBNDS did not authorize.

40.     Plaintiff Menocal was never threatened by a GEO employee with disciplinary or administrative segregation for the refusal to clean his living area. Ex. O (Plaintiffs' Second discovery responses Interrogatory No. 27). Rather, the only "threat" Menocal alleges was through the local AIPC detainee handbook and orientation video, which explained ICE's PBNDS disciplinary severity scale. Ex. N (Interrogatory No. 39).

       i.    **Plaintiffs' response**: Admit that Plaintiff Menocal was never personally threatened by a GEO employee in this manner; however, GEO guards told Menocal that other detainees had been sent to solitary confinement for refusing to clean, and he observed detainees being sent to solitary confinement on such occasions.  Reply Ex. 14 at p. 4 (Pl. Alex Menocal's Responses and Objections to Defendant's Second Set of Written Discovery).

41.     The other named Plaintiffs likewise claim that ICE's PBNDS-mandated disciplinary severity scale in the local AIPC detainee handbook, as well as the same information provided to them during their AIPC orientation forms the basis for their TVPA claims. Ex. N; Ex. O.

> **i.**   **Plaintiffs' response**: Dispute.  While Plaintiffs allege that the information in the AIPC handbook and orientation video form a part of GEO's "scheme, plan, or pattern intended to cause" the Class Members to work without pay, their claims are also based on the threats of solitary confinement that they either received or observed being directed by GEO guards to detainees.  Reply Ex. 15 at p. 4 (Pl. Grisel Xahuentitla Flores' Responses and Objections to Defendant's Second Set of Written Discovery); Reply Ex. 16 at p. 4 (Pl. Lourdes Argueta's Responses and Objections to Defendant's Second Set of Written Discovery).

42.   In sum, Plaintiffs' TVPA claim is limited to the allegation that detainees cleaned their living areas "in order to avoid solitary confinement" or "segregation." ECF 47 at 7 (Plaintiffs' Class Certification Motion); *see also* ECF 1 at ¶¶ 6, 73 (Plaintiffs' Complaint).

> i.   **Plaintiffs' response**: Dispute; while GEO's threats of solitary confinement were the principal means by which it violated the TVPA, detainees cleaned their living areas both to avoid solitary confinement and to avoid the possibility of adverse consequences for their immigration proceedings.  Reply Ex. 11 (Hernandez-Ceren Dep. (rough transcript) 160:7-18).

43.     Plaintiffs' claims do not rest on every single time they cleaned their living area, but rather, only those instances where cleaned up the tables in their living areas after meals.

       i.    **Plaintiffs' response**: Dispute.  There is no evidence cited for this statement, which appears to be an argumentative and inaccurate re-casting of Plaintiffs' claims.  Plaintiffs' claims allege recovery for all work performed under the HUSP.

44.     The basis for Plaintiffs' unjust enrichment claim is that GEO was unjustly enriched by paying only $1.00 per day for completion of their VWP tasks. ECF 49 at 3.

       i.    **Plaintiffs' response**: Admit.

## III.   The Undisputed Record Demonstrates that GEO Designed and Implemented the HUSP and VWP with Minimal Substantive Oversight from ICE.

### A.   <u>Derivative Sovereign Immunity Applies Only Where the Government Directed the Alleged Violation.</u>

GEO's defense to summary judgment fundamentally misunderstands the law of derivative sovereign immunity.  For the government's sovereign immunity to attach to a private contractor, it is not enough that the contractor does not explicitly *violate* its contract with the federal government, *see* Opposition at 19, and GEO provides no legal authority for this proposition.  Certainly, acts that violate a government contract would not enjoy derivative sovereign immunity – and GEO did violate the terms of its contract, as argued in Part III.B below – but even acts that are not prohibited by a contract do not enjoy sovereign immunity unless they constitute one of those "special circumstances"

where "the government has directed a contractor to do the very thing that is the subject of the claim." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001); *see also In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.* ("*In re OPM*"), 928 F.3d 42, 71 (D.C. Cir. 2019) (noting that sovereign immunity is intended "to prevent the contractor from being held liable when the government is actually at fault but is otherwise immune from liability" (quoting *In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 560 (S.D.N.Y. 2006)).

GEO ignores this precedent, instead attempting to argue that ICE authorized its unlawful practices by delegating to GEO the authority to design them. *See* Opposition at 3, 18 n.8. In support of this position, it cites only to *Cunningham v. General Dynamics Information Technology, Inc.*, 888 F.3d 640, 647-49 (4th Cir. 2018), which does not support GEO's argument. As discussed in greater detail in Plaintiffs' Motion, *Cunningham* reflects that derivative sovereign immunity applies when the government *explicitly directs* the specific acts being challenged in a lawsuit against the contractor who implemented them. *See* Motion at 26-27. Nowhere does it state, as GEO claims, that "governmental immunity was precluded *only* where a contractor violates its contract with the federal government," *see* Opposition at 19 (emphasis added; no pincite provided), although that is one example of a situation where derivative sovereign immunity does not apply. As *Cunningham* itself recognizes, derivative sovereign immunity also does not apply when a contractor performs "acts 'over and beyond acts required to be performed'" by the government contract – *i.e.*, when the contractor's liability stems from acts that were neither required nor prohibited by the contract, but

were performed by the contractor in carrying out its duties.  888 F.3d at 647 (quoting

*Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963)).  In fact, the court in *Nwauzor*

*v. GEO Group, Inc.*, No. 17 Civ. 5769, 2020 WL 1689728, (W.D. Wash. Apr. 7, 2020),

rejected this exact argument in denying GEO's motion for summary judgment on

derivative sovereign immunity as to its VWP program because "GEO has not shown that

it had 'no discretion in the design process and completely followed government

specifications.'"  *Id*. at *9 (quoting *Cabalce v. Thomas E. Blanchard & Associates, Inc.*,

797 F.3d 720, 732 (9th Cir. 2015)).

### B.      The HUSP and its Corresponding Punishment Scheme Was GEO's Own Invention.

Of course, GEO *did* violate its contract with ICE, because the HUSP does not

comply with any version of the PBNDS.  GEO cannot enjoy derivative sovereign

immunity as to Plaintiffs' TVPA claim for this reason alone.  GEO's opposition entirely

ignores this problem, and focuses instead on the irrelevant argument that ICE mandated

the disciplinary severity scale incorporated into GEO's policies.  In service of this

strategy, GEO attempts to bury the Undisputed Facts establishing the core contention of

Plaintiffs' Motion: that the scope of the cleaning GEO required under the HUSP went far

beyond the limited personal housekeeping permitted under the PBNDS, and by doing so

explicitly violated ICE directives against unpaid labor.

The PBNDS provide explicitly that "[w]ork assignments are voluntary."

Statement of Undisputed Facts ("SUF") ¶ 36.  The sole exception to this rule is "personal

housekeeping," which the PBNDS defines as requiring detainees to "maintain their immediate living areas in a neat and orderly manner by:

1.      making their beds daily;

2.      stacking loose papers;

3.      keeping the floor free of debris and dividers free of clutter; and

4.      refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture."

*Id*.  In contrast to these limited requirements, GEO requires detainees to perform extensive janitorial labor under the HUSP, which imposes a "common obligation to clean . . . the communal areas," and "clean up the tables, wipe down the tables, and sweep and mop the floors" in the common dining area, and to clean the shared dorm showers.  *Id*. ¶¶ 48-49; 66.

GEO's conclusory arguments that the HUSP falls within the definition of personal housekeeping, and that it was therefore *required* to threaten detainees with solitary confinement for refusing to clean, are entirely unsupported by the Undisputed Facts.  For example, GEO argues without citation that "[t]here is no question that the entirety of where a detainee lives and sleeps is his or her 'living area,'" (excluding the word "immediate" that appears in the PBNDS) and – stretching credulity even further – argues that mopping floors is the same thing as "keeping them free from clutter."  Opposition at

94

26.[11]  These readings push the definition of "personal housekeeping" beyond its logical limits and well into the absurd.  Refraining from pouring milk or crumbs on the floor of one's cell is one thing; mopping pieces of other peoples' food off the floor of a dining room is something different.[12]  The PBNDS explicitly require that detainees do only the former, and explicitly *prohibit* GEO from requiring detainees to do the latter.  *See* Plaintiffs' Reply re SUF ¶ 52 (citing, at Reply Ex. 17, p. 6, the DHS OIG's conclusion that "requiring detainees to clean common areas used by all detainees is in violation of ICE standards, as detainees are only required to clean their immediate living area.").

Because refusing to participate in the extensive work required by the HUSP is distinct from "[r]efus[ing] to clean assigned living area" in the specific respects allowed by the PBNDS, it is not a 300-level offense.  *See* SUF ¶ 79; *see also* Additional Fact ¶ 15.[13]  And because an order to participate in the HUSP itself violates the PBNDS,

---

[11]      Even if this were a plausible understanding of how housekeeping works, the PBNDS require that detainees keep only *dividers* – not floors – free from clutter.  SUF ¶ 36.

[12]      The case law that GEO cites to support its proposition that compulsory cleaning work is permissible in civil detention is entirely inapposite, as it all addresses whether prisoners in pretrial detention can be required to perform housekeeping tasks under the United States Constitution.  *See Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978) (not reflecting the quote GEO attributed to it in is briefing and addressing claims only under the First, Fifth, Eighth, and Thirteenth Amendments); *Weaver v. Petray*, No. 08 Civ. 5195, 2010 WL 909589, at *6 (W.D. Ark. Mar. 11, 2010) (addressing Eighth Amendment claim); *Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993) (addressing Thirteenth Amendment claim).  Plaintiffs have not brought constitutional claims in this case.  Moreover, inmates in pretrial detention facing possible conviction for a crime are differently situated than immigrants in civil detention.  *See, e.g.*, *In re Kumar*, 402 F. Supp. 3d 377, 384 (W.D. Tex. 2019) (distinguishing immigration detention "from even pre-trial detention, where there is a possibility of incarceration").

[13]      GEO argues unpersuasively that the disciplinary infraction for "[r]efus[ing] to clean assigned living area" should be read separately from, and more broadly than, the

refusing to obey such an order is also not a sanctionable offense.  *See* Additional Fact ¶ 16.  The fact that ICE authorized solitary confinement for certain defined 300-level offenses is not *carte blanche* – much less a specific directive – to use the same punishment to enforce GEO policies that deviate from the PBNDS.  *Cf. Montoya v. City of Albuquerque*, No. 03 Civ. 0261, 2004 WL 3426436, at *5 (D.N.M. May 10, 2004) ("A police officer cannot give an unlawful order and then base probable cause for an arrest on a citizen's refusal to obey that unlawful order.").  ICE's specific disciplinary standards do not confer sovereign immunity if GEO places people in solitary confinement for any conceivable violation of any rule GEO might invent, much less one that violates ICE directives.[14]

Moreover, even if the Court were to conclude that refusing to participate in the HUSP were a 300-level offense, GEO does not and cannot argue that ICE ever specifically *directed* the use of solitary confinement for any given offense.  Rather, the Undisputed Facts show that ICE allows but does not direct solitary confinement as a sanction for 300-level offenses.  SUF ¶ 80; *see Salim v. Mitchell*, 268 F. Supp. 3d 1132,

---

section of the PBNDS that delineates the housekeeping tasks that detainees may be required to perform.  *See* Opposition at 27 n.16.  This reading does not make sense, as it would allow guards to place detainees in solitary confinement for refusing to perform work that the PBNDS explicitly states must be voluntary.

[14]     Because Plaintiffs do not contest that ICE required the disciplinary severity scale, whether and when the disciplinary severity scale was incorporated into the Detainee Handbook is immaterial.  *See* Opposition at 37-38 (arguing that Plaintiffs' Motion for fails because one of the handbooks Plaintiffs cited was from 2002 and did not incorporate ICE's disciplinary severity scale).  GEO has not alleged and cannot allege that the material terms from the Handbooks that are cited in Plaintiffs' Undisputed Facts varied throughout the relevant time period.  *See* SUF ¶¶ 63-66.

1150 (E.D. Wash. 2017) (derivative sovereign immunity did not apply where defendants did not act "merely and solely as directed by the Government," because they "had a role in the design of the [challenged] Program, trained interrogators for the Program, and exercised some discretion in the application of the Program."). The PBNDS also limits the use of solitary confinement regardless of the offense level to circumstances where it is necessary "to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility." SUF ¶ 69. Therefore, GEO cannot argue that it was simply complying with the contract when it threatened detainees with solitary confinement for refusing to clean under the HUSP.

Finally, GEO's argument that only the means used to obtain labor matters for a TVPA claim, and not the type of labor obtained, *see* Opposition at 27, misapprehends the nature of Plaintiffs' Motion. Plaintiffs are not seeking summary judgement on the merits of their claim; whether GEO used force, threats of force, or an abuse of legal proceedings to obtain detainee labor will be decided by a jury at trial. Plaintiffs' Motion seeks summary judgment only on the issue of whether GEO can hide behind derivative sovereign immunity or the government contractor defense to avoid liability. If Plaintiffs can show that the design and implementation of the HUSP, including the scope of labor performed, exceeded GEO's authority under its contract with ICE – and Plaintiffs have done so – then Plaintiffs prevail on summary judgment.

C.    **The COTR and ICE Audits Provided Limited Monitoring of GEO's Implementation of Specific Contractual Requirements.**

GEO fundamentally mischaracterizes ICE's role in directing its development of the HUSP and the VWP.  As set forth in Plaintiffs' Undisputed Facts, GEO's facility-level policies are developed and amended as needed by local GEO employees, not by ICE.  SUF ¶¶ 40-41.  With respect to the HUSP, ICE has explicitly stated in a declaration that the HUSP was not required by the contract between GEO and ICE; rather, it was a "GEO policy, created by GEO."  SUF ¶ 54.

GEO attempts to muddy the waters by noting that an ICE representative, the Contracting Officer's Technical Representative, signed off on GEO policies.  See SUF ¶¶ 40-43, 89.  It also argues that GEO's policies were audited yearly by third-party auditors who largely found them compliant.  Additional Facts ¶¶ 24-30.  But even taken as true, neither of these facts establish that ICE had any role in directing the policies at issue in this case.  The COTR "is designated to coordinate the technical aspects of this contract and inspect items/services/invoices furnished hereunder."  See Reply to SUF ¶ 19 (citing GEO_MEN 00019652).  However, the COTR "will not be authorized to change any terms and conditions of the resultant contract."  Id.  "To be valid, technical direction by the COTR [m]ust be consistent with the general scope of work set forth the [sic] in this contract[, and m]ay not constitute new assignment of work nor change the expressed terms, conditions or specifications of this contract . . . ."  Id.  This renders the COTR powerless to authorize the HUSP, which is contrary to the PBNDS (and therefore, the Contract).

98

Moreover, the evidence GEO cites does not support its claim that the COTR helped develop the policies Plaintiffs challenge – rather, that evidence is consistent with the COTR's limited inspection role described above.  GEO's 30(b)(6) representative Daniel Ragsdale testified that GEO develops local policies at the facility level, and the COTR "review[s] and clear[s]" them once the policies are completed.  SUF ¶¶ 40-42. That does not constitute the kind of active government direction that confers sovereign immunity.  See, e.g., *Cabalce*, 797 F.3d at 732 (holding that derivative sovereign immunity "is limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications.'").  And even if there were evidence that the COTR helped GEO develop the challenged policies, that would not confer immunity, as the contract makes clear that policies that "constitute new assignment of work" or change the "terms, conditions or specifications of this contract" are beyond the COTR's authority.  See Reply to SUF ¶ 19.  Thus, GEO cannot rely on the COTR's approval as the basis for its argument that ICE directed the violations Plaintiffs seek to prove at trial.

Meanwhile, the audits GEO cites are cursory checklists, and none of the audits from within the class period make any mention of the specific policies at issue in this action.  For example, the audit form GEO relies on to argue that "[t]he disciplinary severity scale is audited and has passed each audit since 2004" requires simply that "[t]he facility has a written disciplinary system using progressive levels of reviews and appeals" to get a passing grade.  Additional Fact 28.  And the VWP audit forms from within the class period make no mention of the rate of pay for VWP workers or the types of work

performed.  Additional Fact No. 30, GEO Ex. L, ECF No. 273-6 (GEO-MEN 0013923 (2007 audit); GEO_MEN 00014378 (2008 audit); GEO_MEN 00058508 (2010 audit); GEO_MEN 00014908 (2011 audit)).15  Instead, the audit forms ask only general questions such as, "Does the facility have a voluntary work program?" and "Detainee housekeeping meets neatness and cleanliness standards."  Id.  These audits do not even reach the policies Plaintiffs challenge in this lawsuit, much less require GEO to adopt them.  And, as Plaintiffs set forth in the Motion, the scope of unpaid housekeeping work that the HUSP required was not even evident on the face of GEO's formal written policy documents.  Motion at 32.  Accordingly, even if the audits had required a substantive review of the portions of the policies relevant to Plaintiffs' claims, a passing score would not have indicated ICE's knowing participation in the alleged scheme.

GEO concedes that derivative sovereign immunity is governed by the Supreme Court's opinion in Campbell-Ewald, which reiterated the principle that derivative sovereign immunity attaches to contractors who "simply performed as the Government directed."  136 S. Ct. at 673.  Notably, the Campbell-Ewald Court held that the contractor's use of phone numbers that were barred under the Telephone Consumer Protection Act in a text message campaign was not subject to derivative sovereign immunity because the selection of those specific phone numbers was not "authorized and

---

15      Exhibit L includes an excerpt from a September 29, 2016 audit that includes the item: "Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy of *at least* $1.00 (USD) per day."  GEO Ex. L, ECF No. 273-6 (GEO-MEN 00165238) (emphasis added).  Not only is this audit from nearly two years after the end of the class period in this case, but it clearly does not direct GEO to pay only $1.00 per day for VWP work.  *See infra*, Section IV.

directed" by the government (specifically, the Navy).  Id. at 673-74.  And yet, a review of the district court record in that case demonstrates that the Navy "worked closely with [Campbell-Ewald] on the Navy's May 2006 text message recruiting campaign, and provided Navy oversight and approval."  *Gomez v. Campbell-Ewald Co.*, No. 10 Civ. 2007, 2013 WL 655237, at *2 (C.D. Cal. Feb. 22, 2013).  The Navy approved both Campbell-Ewald's text messaging plan and its use of the subcontractor that ultimately provided the unauthorized phone numbers to whom texts were sent.  Id.

The facts here bear substantial parallels to the facts in Campbell-Ewald: as in that case, ICE provided some level of "oversight and approval" as to the policies GEO developed.  2013 WL 655237, at *2.  And, as in that case, the specific practices for which Plaintiffs seek a recovery were GEO's alone.  These parallel facts compel a parallel result: GEO is liable for its legal violations, and ICE's oversight cannot shield it.

### D.    GEO Had Discretion Throughout the Class Period to Pay VWP Workers More Than $1.00 A Day

GEO does not dispute that the 2011 PBNDS, which require VWP workers to be paid "at least" $1 per day, were binding on it after May 23, 2013.  *See* GEO's Fact No. 12.  Its argument for derivative sovereign immunity falls apart in the face of this language, as this Court and every other court to have considered the defense have held. *See Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1135 (D. Colo. 2015) (holding that derivative sovereign immunity did not apply because GEO was not "*prohibit[ed]* . . . from paying detainees in excess of $1/day"); *Nwauzor v. GEO Grp., Inc.*, No. 17 Civ. 5769, 2020 WL 1689728, at *8-9 (W.D. Wash. Apr. 7, 2020) (denying GEO's motion for

summary judgment on derivative sovereign immunity and noting that "GEO has, in the past, paid workers more than $1 a day and has the ability to, and has requested, changes to the contracts"); *cf. Novoa v. GEO Grp., Inc.*, No. 17 Civ. 2514, 2018 WL 4057814, at *3 (C.D. Cal. Aug. 22, 2018) (noting that GEO's derivative sovereign immunity defense hinged on what "discretion GEO had, if any, in implementing and administering the Work Program").  The underlying legal argument GEO makes in support of this position – that derivative sovereign immunity only applies where a contractor violates a contract – is simply incorrect.  *Supra* Section III.A.  And indeed, GEO appears to concede that this Court's prior ruling governs at least the period that the 2011 PBNDS were in effect.  *See* Opposition Br. at 34 ("[T]he Court previously had available to it only the language of the 2011 PBNDS.").

GEO's primary argument with respect to the period prior to May 23, 2013 is that it was required to comply with the 2008 version of the PBNDS, which lacked the "*at least*" language, and therefore it had no discretion to pay VWP workers more than $1.00 per day.  This is wrong.  GEO's contract states that it incorporates "[t]he DHS/ICE PBNDS (Performance Based National Detention Standards)," and then provides that "a copy of the current version is obtainable on the internet Website: http://www.ice.gov/detention-standards/2008/."  Additional Fact No. 11.  The contract also states that "these constraints may change over time; the Contractor shall be knowledgeable of any changes to the constraints and perform in accordance with the most current version of the constraints." *Id*.  At the time the 2011 Contract was executed, the 2008 version of the PBNDS was the most recent version.

In February 2012, however, the 2011 PBNDS were published.  Additional Fact ¶ 11.  While full compliance with the 2011 PBNDS was not explicitly incorporated into GEO's contract until May 23, 2013, GEO was on notice of the 2011 PBNDS in early 2012 at the latest, and was well aware of the new language regarding the VWP work.  See Plaintiffs' Response Additional Fact ¶ 12.  There is no support for the interpretation GEO urges, that it was not permitted to comply with the 2011 PBNDS until the formal contract modification.  In fact, GEO began to discuss and implement changes right away.  *Id.*

Moreover, Plaintiffs dispute GEO's contention that its contract prohibited it from paying more than $1.00 per day prior to the release of the 2011 PBNDS.  Although the "at least" language did not appear in the PBNDS until 2011, the 2008 PBNDS stated that compensation was $1.00 per day but did not forbid payment at a higher rate.  SUF ¶ 95.  And at least one other GEO-operated detention processing center, the South Texas Detention Facility, paid detainees as much as $3.00 per day for VWP work as far back as 2009.  *See* Additional Fact ¶ 34.  Therefore, at least two years prior to the start of the class period and during the period in which the 2008 PBNDS were in effect, ICE permitted payments under the VWP of more than $1.00 per day, and GEO could and did make higher payments at other facilities.  *Id.*  It never even tried to do the same at Aurora.  *Id.*

IV.    **GEO's Arguments Under the Government Contractor Defense Fail for The Same Reasons As Its Derivative Sovereign Immunity Arguments.**

GEO's attempt to avoid summary judgment under the government contractor defense fares no better than its attempts to avoid summary judgment for its derivative sovereign immunity defense.[16]  As noted in Plaintiffs' Motion, the test for government contractor immunity – as applied in products liability cases – has three prongs, and applies only if "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).  In *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090 (10th Cir. 2015), the primary case on which GEO rests its argument, the Tenth Circuit noted that the defense applies "when state law [is] contrary to a contract term actually selected by the federal agency (a 'discretionary' decision)." *Id*. at 1098.  With respect to the contract at issue in *Helfrich*, the court found that the state law under which the plaintiff had brought her case "outright forbids [the defendant] from fulfilling its contractual obligation," which meant that the government contractor defense applied. *Id*. at 1099.  The *Helfrich* court also found that

---

[16]    GEO does not appear to disagree that the government contractor defense is unavailable as to Plaintiffs' TVPA claims.

there was a "strong federal interest in uniformity that is undermined by allowing state law to override the subrogation and reimbursement requirements of the federal contract." *Id.*

GEO faces no such conundrum here. As set forth above and in Plaintiffs' Motion, it is entirely possible for GEO to comply with its contract with ICE and also pay workers in the VWP an amount that is consistent with Colorado common law. *See supra* at Section III; Motion at 33-36. And in fact, ICE itself has rejected GEO's attempt to characterize its liability as stemming from the contract terms themselves, stating instead that GEO's defense of this case is a "defense of its contract performance." SUF ¶ 23. Furthermore, GEO's argument that Plaintiffs' position could lead VWP rates to vary all over the country is both disfavored as a federal interest and unpersuasive in light of the fact that VWP rates already vary. SUF ¶ 96; *see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 88 (1994) (calling an interest in uniformity "that most generic (and lightly invoked) of alleged federal interests").

To the extent that GEO argues that government contractor immunity should apply here because increased costs to the government could result if Plaintiffs prevail on their claims, this argument also fails. First, it is unsupported by the facts. When GEO does pay VWP workers more than $1.00 per day, it does so "on its own dime." SUF ¶ 98; *see also* Additional Fact ¶ 34 (showing, at Reply Ex. 13, separate entries for "ICE Pay" ($1.00) and "GEO Pay" (up to $2.00) for each day of detainee pay). And second, it is unsupported by the law. The Supreme Court itself observed in *Boyle* that the potential for increased costs in government contracting makes contractor tort liability an area of "uniquely federal interest," but that only "establishes a necessary, not a sufficient,

condition for the displacement of state law" and "does not . . . end the inquiry." *Boyle*, 487 U.S. at 507.  *Boyle* rejected the idea that the possibility of increased costs *per se* compelled the application of the government contractor defense, noting that adoption of that rule would result in an overly broad ban on *all* claims against government contractors.  *Id.* at 510 (rejecting the reasoning of lower courts that extended the government's blanket immunity to private contractors on the basis that allowing some contractor liability "would be added to the price of the contract"); *see also In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 631 (2d Cir. 1990) ("Although the desire to limit pass-through costs motivated the Court's decision in *Boyle* . . . it is not the dispositive consideration." (internal citation omitted)).

Finally, GEO again attempts to ignore that this Court has already concluded that the government contractor defense does not apply, because "there is no 'significant conflict' between a federal interest and state law as required for the assertion of the government contractor defense." *Menocal*, 113 F. Supp. 3d at 1135.  Moreover, as the Court noted, "the contract specifically contemplates that the Defendant will perform under the contract in accordance with '[a]pplicable federal, state and local labor laws and codes.'" *Id*.  As Plaintiffs establish above, this was the case throughout the VWP class period. [17]  Therefore, GEO cannot rely on the government contractor defense.

---

[17]     Other than *Helfrich*, the only case GEO cites in support of its argument on the government contractor defense, *Glassco v. Miller Equip. Co., Inc.*, 966 F.2d 641 (11th Cir. 1992), is inapposite.  *Glassco* is out-of-circuit and involved a failed tool belt that conformed to government specifications that exceeded 11 pages in length, plus detailed drawings.  *Id*. at 643.  In that context, the court held that "the mere fact that the figures for width and thickness are designated as minimums does not render the specifications

## V.   CONCLUSION

Despite GEO's best efforts, it cannot point to any explicit governmental command that it use threats of solitary confinement to force immigration detainees to work well beyond the limited "personal housekeeping" requirements of the PBNDS.  Nor can it identify such a command requiring it to pay only $1.00 per day for other work.  This leaves GEO unable to establish the core elements of its immunity defenses, and warrants summary judgment in Plaintiffs' favor. [18]

---

imprecise," and that "the contractor was required to conform to the width and thickness dimensions and in fact did so."  *Id.*  GEO has not made and cannot make any comparable showing here.

[18]     GEO's cross-motion for summary judgment, made in the course of its opposition brief, violates D.C. Colo. L. Civ. R. 56.1(b) ("A cross motion for summary judgment shall be filed as a separate motion").  The day prior to this filing, GEO filed a separate cross-motion in compliance with the Local Rules.  ECF No. 284.  That motion largely duplicates GEO's showing here, and should be denied for substantially the same reasons that this motion should be granted.  Moreover, GEO's argument regarding the language of the pre-2011 PBNDS implicates the question of whether the authority to pay $1 per day was *ever* "validly conferred" upon GEO.  *Campbell-Ewald Co.*, 136 S. Ct. at 672.  While the fact that GEO paid more than $1 per day at facilities other than Aurora (Additional Fact ¶ 34) calls this into question, and while it has always been questionable whether Congress's 1978 authorization of funds at 8 U.S.C. § 1555(d) conferred any authority upon the executive branch to set rates of pay in private contract detention facilities (*see* Opposition at 29); *see also Chao Chen v. Geo Grp., Inc.*, 287 F. Supp. 3d 1158, 1165-66 (W.D. Wash. 2017) ("Congress could delegate the authority to create a framework regulating detainee wages to ICE, but Defendant has not made this showing . . . . [T]he Voluntary Work Program is an ICE policy with *no preemptive force at law*." (emphasis added)); *Novoa v. GEO Grp., Inc.*, No. 17 Civ. 2514, 2018 WL 3343494, at *4 (C.D. Cal. June 21, 2018) ("Congress' abandonment of such appropriations refutes any reasonable inference that Congress left no room for states to supplement the field."), documents recently produced pursuant to FOIA, *see Stevens v. United States Dep't of Homeland Sec., Immigration & Customs Enf't*, No. 14 C 3305, 2020 WL 1701882, at *1 (N.D. Ill. Apr. 8, 2020)), show unequivocally that ICE itself recognized that it had no such authority given Congress's prerogative to control the expenditure of

Dated: New York, NY
      June 26, 2020

Respectfully submitted,

By: */s/ Michael J. Scimone*

Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
E-Mail: mscimone@outtengolden.com

Rachel Dempsey
Adam Koshkin
**OUTTEN & GOLDEN LLP**
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
E-Mail: rdempsey@outtengolden.com
E-Mail: akoshkin@outtengolden.com

David Lopez
**OUTTEN & GOLDEN LLP**
601 Massachusetts Avenue NW
Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
E-Mail: pdl@outtengolden.com

Alexander Hood
David Seligman
Andrew Schmidt
Juno Turner
**TOWARDS JUSTICE**
1410 High St., Suite 300
Denver, CO 80218
(720) 441-2236
alex@towardsjustice.org
david@towardsjustice.org

---

revenues.  Plaintiffs will address this issue at greater length in their opposition to GEO's cross-motion for summary judgment.

andy@towardsjustice.org
juno@towardsjustice.org

R. Andrew Free
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
T: (844) 321-3221
Andrew@ImmigrantCivilRights.com

Brandt Milstein
**MILSTEIN LAW OFFICE**
1123 Spruce Street
Boulder, CO 80302
(303) 440-8780
brandt@milsteinlawoffice.com

Andrew Turner
**THE KELMAN BUESCHER FIRM,
P.C.**
600 Grant St., Suite 825
Denver, CO 80203
(303) 333-7751
aturner@laborlawdenver.com

Hans Meyer
**MEYER LAW OFFICE, P.C.**
P.O. Box 40394
Denver, CO 80204
(303) 831-0817
hans@themeyerlawoffice.com

*Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2020, a copy of the foregoing document was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
E-Mail: mscimone@outtengolden.com
