# Exhibit 9

```
         IN THE UNITED STATES DISTRICT COURT FOR THE
                    DISTRICT OF COLORADO

           CIVIL ACTION NO.:  1:14-CV-02887-JLK


ALEJANDRO MENOCAL, et al.,

        Plaintiffs,

-vs-

THE GEO GROUP, INC.,

        Defendant.
_____/




                 DEPOSITION OF AMBER MARTIN



                Friday, February 28, 2020
                  9:23 a.m. - 11:40 a.m.



                  SHAVITZ LAW GROUP, PA
                951 Yamato Road, Suite 285
                   Boca Raton, Florida




              Stenographically Reported By:
                    JULIE BRUENS, FPR
               Florida Professional Reporter
```

```
 1                        APPEARANCES

 2

 3   On behalf of the Plaintiffs:
         TOWARDS JUSTICE
 4       1410 High Street, Suite 300
         Denver, Colorado 80218
 5       720-441-2236
         juno@towardsjustice.org
 6       BY: JUNO TURNER, ESQUIRE

 7       OUTTEN & GOLDEN, LLP
         One California Street, 12th Floor
 8       San Francisco, California 94111
         415-638-8800
 9       akoshkin@outtengolden.com
         BY: ADAM KOSHKIN, ESQUIRE
10
     On behalf of the Defendant:
11       AKERMAN
         1900 Sixteenth Street, Suite 1700
12       Denver, Colorado 80202
         303-260-7712
13       colin.barnacle@akerman.com
         adrienne.scheffey@akerman.com
14       BY: COLIN BARNACLE, ESQUIRE
             ADRIENNE SCHEFFEY, ESQUIRE
15
         THE GEO GROUP, INC.
16       4955 Technology Way
         Boca Raton, Florida 33431
17       561-443-1786
         cwilke@geogroup.com
18       BY: CHERYL WILKE, ESQUIRE

19
                              -  -  -
20

21

22

23

24

25
```

```
 1      Q.   You mentioned a couple of times in your
 2   testimony this morning the GEO detainee handbook.  Do
 3   you recall that testimony?
 4      A.   Yes.
 5      Q.   Okay.  Do you know the process by which GEO
 6   drafts that handbook?
 7      A.   Yes.
 8      Q.   Can you describe it?
 9      A.   When the facility first opens, all the
10   policies, procedures, post orders, handbooks, etc., they
11   are all drafted during an activation phase, and they are
12   submitted to ICE for ICE's approval.  Any time there's a
13   change in any of those regulations, policies, etc., they
14   are again drafted and submitted to ICE for their
15   approval.
16      Q.   Okay.  And who on the GEO side handles that
17   process?
18      A.   It's handled at a local level.
19      Q.   Okay.  With the Aurora facility, are you aware
20   who is in charge of the detainee handbook?
21      A.   I don't know specifically who would be in
22   charge.  It would be a facility administrator's designee
23   most likely.
24      Q.   I'm sorry, a facility --
25      A.   The facility administrator's designee.
```

1  Probably the compliance person.

2       Q.   Is the facility administrator like the warden?

3       A.   Yes.

4       Q.   Okay.  Let's take a quick bathroom break, if

5  it that's okay.

6            (Off the record.)

7  BY MS. TURNER:

8       Q.   So we're back on the record.  I think earlier,

9  Ms. Martin, you testified that the PBNDS -- strike that.

10           You testified that ICE has revised the PBNDS

11 on a couple of occasions during the period covered by

12 this lawsuit; correct?

13      A.   Correct.

14      Q.   Okay.  And there was a change from 2000 --

15 strike that.

16           There was a revised PBNDS issued by ICE in

17 2011; correct?

18      A.   Yes.

19      Q.   And then again in 2016; correct?

20      A.   Yes.

21      Q.   Okay.  So I've handed you a document that has

22 been marked as Exhibit 9.  It is an e-mail and an

23 attachment with bates numbering GEO-Men5496 through 636.

24           My first questions are just going to be about

25 who the folks are that are on the e-mail, but feel free

```
 1   to take a moment and let me know when you're ready.
 2              (Thereupon, the document was marked as
 3   Plaintiff's Exhibit 9 for identification.)
 4        A.    I'm ready.
 5        Q.    Do you know who Kevin Martin is?
 6        A.    It appears he's the quality control
 7   administrator for the facility.
 8        Q.    For the Aurora facility?
 9        A.    Yes.
10        Q.    Okay.  And it appears from this cover e-mail
11   he says attachment is a breakdown of the major changes
12   within the new ICE standards.  Do you see that?
13        A.    Yes.
14        Q.    And this e-mail was sent on April 4th, 2012;
15   correct?
16        A.    Yes.
17        Q.    Okay.  And if you take a look on page 54597,
18   the title of the attachment is summary of major changes
19   between the 2008 and 2011 performance-based national
20   detention standards.  Do you see that?
21        A.    Yes.
22        Q.    Okay.  And so is it fair to say that it
23   appears that Mr. Martin is sending out this information
24   to facility staff?
25        A.    It appears.
```

```
 1        Q.   Okay.  And I want to direct your attention to
 2   page 54629.  Actually, let's start with 54628.
 3        A.   Okay.
 4        Q.   And so at the bottom of 54628, it makes
 5   reference to the Voluntary Work Program; correct?
 6        A.   Correct.
 7        Q.   And GEO has operated a Voluntary Work Program
 8   at the Aurora facility since at least 2008; correct?
 9        A.   Correct.
10        Q.   And detainees who participate in the Voluntary
11   Work Program are paid a dollar per day; correct?
12        A.   Yes.
13        Q.   Okay.  And that was true for the duration of
14   the period covered by this lawsuit; correct?
15        A.   I believe so, yes.
16        Q.   Okay.  So if you take a look underneath where
17   it says 5.8, Voluntary Work Program, it says the
18   following are the major changes made to the Voluntary
19   Work Program detention standard.
20             So is it fair to conclude from this that Mr.
21   Martin is summarizing changes in the Voluntary Work
22   Program standard from the 2008 to the 2011 PBNDS?
23        A.   Yes.
24        Q.   Okay.  And at the top of page 629, it says
25   compensation, the required compensation for work was
```

```
 1  increased from one dollar per day to "at least one

 2  dollar per day".  Do you see that?

 3       A.   Yes.

 4       Q.   Okay.  Was GEO aware of this change to the

 5  PBNDS?

 6       A.   Yes.

 7       Q.   And did GEO make any changes to the

 8  compensation it pays to detainees as a result of this

 9  change to the PBNDS?

10       A.   Not at Aurora, no.

11       Q.   What about at other facilities?

12       A.   I don't believe there was any changes made.

13  There are different compensations at different

14  facilities, but there's no changes made, no.

15       Q.   So to the extent that the compensation was

16  more at other facilities, it wasn't because of this

17  change to the PBNDS?

18       A.   Correct.

19       Q.   When, as in this document, ICE has made

20  changes to the PBNDS that effects GEO's operations, how

21  does that -- how does GEO sort of account for those

22  changes in operating the Aurora facility?

23       A.   Well, this change here had several different

24  layers.  There was optimal standards, and there was

25  standards, and we had a negotiation back and forth with
```

Amber Martin
February 28, 2020                                                    47

1    ICE on which standards they wanted us to use.  When
2    those standards were memorialized, we changed any
3    handbooks, policies, and procedures that were
4    applicable.
5        Q.   Okay.  So ICE rolls out this new set of
6    standards, and GEO and ICE have a conversation about the
7    degree to which GEO's operations need to adjust to
8    reflect those new standards; is that correct?
9        A.   Correct.  There were several standards that
10   had financial impact, and so there was discussions
11   whether, you know, those standards wanted to be changed
12   by ICE.  That's why they sub-categoried them.
13       Q.   And you say whether those standards wanted to
14   be changed by ICE.  What does that mean?
15       A.   Like I said, there's optimal standards, and
16   then I can't remember the other word, but there were
17   provisional standards, and any time there was a
18   financial impact that was significant to the government,
19   then we decided -- you know, we had discussions on
20   whether or not to -- ICE would enforce those standards.
21   That's why they had two categories of standards.
22       Q.   And the two categories again were --
23       A.   Optimal, and I can't remember the other word.
24       Q.   Was one of them mandatory?
25       A.   It may have been.

```
 1                      CERTIFICATE OF OATH

 2

 3

 4   THE STATE OF FLORIDA,

 5   COUNTY OF PALM BEACH.

 6

 7

 8

 9              I, Julie Bruens, Florida Professional

10   Reporter, Notary Public, State of Florida, certify that

11   AMBER MARTIN personally appeared before me on the

12   28th of February, 2020 and was duly sworn.

13

14              Signed this 4th day of March, 2020.

15

16

17                      [signature]

18

19              _____
                Julie Bruens, FPR
20              Notary Public, State of Florida
                Commission No.:  #GG186376
21              Commission Expires:  April 13, 2022

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3   THE STATE OF FLORIDA,

 4   COUNTY OF PALM BEACH.

 5

 6            I, Julie Bruens, Florida Professional

 7   Reporter, certify that I was authorized to and did

 8   stenographically report the deposition of AMBER MARTIN;

 9   pages 1 through 77; that a review of the transcript was

10   requested; and that the transcript is a true record of

11   my stenographic notes.

12            I further certify that I am not a

13   relative, employee, attorney, or counsel of any of the

14   parties, nor am I a relative or employee of any of the

15   parties' attorneys or counsel connected with the action,

16   nor am I financially interested in the action.

17

18            Dated this 4th day of March, 2020.

19

20            [signature]

21

22            _____
              Julie Bruens, FPR
23            Florida Professional Reporter

24

25
```