# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02887 JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S AFFIRMATIVE DEFENSE

---

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................. 1

II.   Plaintiffs' Response to GEO's Proposed Undisputed Material Facts ......................... 1

      A.   ICE's Role in Contracting for Immigration Detention Services.................... 1

      B.   GEO's Contracts with ICE.............................................................. 4

      C.   GEO's Application of Disciplinary Policies.................................... 9

      D.   The VWP............................................................................. 19

III.  Additional Facts that Preclude Summary Judgment in GEO's Favor....................... 22

      A.   The Housing Unit Sanitation Policy. ........................................... 22

      B.   The Voluntary Work Program. .................................................. 25

IV.   ARGUMENT........................................................................................ 26

      A.   Derivative Sovereign Immunity Does Not Protect Acts
           that the Government Did Not Direct................................................ 26

           1.   GEO's HUSP Required Work Prohibited by ICE. ............................ 30

           2.   ICE Did Not Direct the Dollar-A-Day Pay Rate Under the VWP...... 32

      B.   ICE Has No Authority to Require a $1/day Pay Rate.................................... 35

           1.   Federal Appropriations Law Requires Congress to Specifically
                Authorize Funds for a Given Purpose................................... 36

           2.   ICE Has No Authority to Set the VWP Rate. .................................... 38

      C.   GEO's Arguments Under the Government Contractor Defense Fail for The
           Same Reasons As Its Derivative Sovereign Immunity Arguments. .............. 40

      D.   Overwhelming Evidence Supports Plaintiffs' Contention that GEO's Threats
           of Solitary Confinement Were Intended to Compel Forced Work. .............. 42

V.    CONCLUSION ................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                    **PAGE(S)**

*In re Aiken Cty.*,
    725 F.3d 255 (D.C. Cir. 2013) ................................................................. 38

*Alvarado Guevara v. Imm. and Naturalization Serv.*,
    902 F.2d 394 (5th Cir. 1990) ................................................................. 40

*Babbitt v. Oglala Sioux Tribal Public Safety Dep't*,
    194 F.3d 1374 (Fed. Cir. 1999) ............................................................. 38

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) .............................................................................. 41

*California v. Trump*,
    379 F.Supp.3d 928 (N.D. Cal. 2019) ..................................................... 40

*California v. Trump*,
    963 F.3d 926 (9th Cir. 2020) ........................................................... 37, 40

*Campbell-Ewald Co. v. Gomez*,
    136 S. Ct. 663 (2016) ..................................................................... *passim*

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .............................................................................. 42

*Chen v. GEO Group, Inc.*,
    287 F. Supp. 3d 1158 (W.D. Wash. 2017) ............................................. 39

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ................................................................................ 26

*Cunningham v. General Dynamics Info. Tech.*,
    888 F.3d 640 (4th Cir. 2018) ..................................................... 28, 29, 30

*Gomez v. Campbell-Ewald Co.*,
    No. 10 Civ. 2007, 2013 WL 655237 (C.D. Cal. Feb. 22, 2013) .......... 28, 29

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
    804 F.3d 1090 (10th Cir. 2015) ............................................................. 41

*In re KBR, Inc., Burn Pit Litig.*,
    744 F.3d 326 (4th Cir. 2014) ................................................................. 28

*Main Comm. Health Options v. United States,*
  140 S. Ct. 1308 (2020)..................................................................................... 36

*Menocal v. GEO Grp., Inc.,*
  113 F. Supp. 3d 1125 (D. Colo. 2015) ............................................... 33, 34, 42

*Novoa v. GEO Group, Inc.,*
  No. 17 Civ. 2514, 2018 WL 3343494 (C.D. Cal. June 21, 2018) ................... 39

*Novoa v. GEO Grp., Inc.,*
  No. 17 Civ. 2514, 2018 WL 4057814 (C.D. Cal. Aug. 22, 2018) ................... 33

*Nwauzor v. GEO Grp., Inc.,*
  No. 17 Civ. 5769, 2020 WL 1689728 (W.D. Wash. Apr. 7, 2020) ................. 33

*In re Office of Pers. Mgmt. Data Sec. Breach Litig.,*
  928 F.3d 42 (D.C. Cir. 2019)........................................................................... 27

*Office of Pers. Mgmt. v. Richmond,*
  496 U.S. 414 .......................................................................................... 36, 37, 38

*O'Melveny & Myers v. FDIC,*
  512 U.S. 79 (1994) .......................................................................................... 41

*Paguirigan v. Prompt Nursing Emp't Agency LLC,*
  No. 17 Civ. 1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) ................. 45

*Ramah Navajo Chapter v. Salazar,*
  644 F.3d 1054 (10th Cir. 2011) ......................................................... 36, 37, 39

*Star–Glo Assocs., LP v. United States,*
  414 F.3d 1349 (Fed. Cir. 2005) ...................................................................... 36

*U.S. Dep't of Navy v. FLRA,*
  665 F.3d 1339 (D.C. Cir. 2012)........................................................................ 36

*United States v. Ary,*
  518 F.3d 775 (10th Cir. 2008) .................................................................. 33, 34

*United States v. Dann,*
  652 F.3d 1160 (9th Cir. 2011) ............................................................ 42, 43, 44

*Yearsley v. W.A. Ross Const. Co.,*
  309 U.S. 18 (1940) .................................................................................... 35, 40

iv

## STATUTES

6 U.S.C. § 542 .................................................................................................... 1

8 U.S.C. § 1101 .................................................................................................. 2

8 U.S.C. § 1103 .................................................................................................. 1

8 U.S.C. § 1231 .............................................................................................. 1, 2

8 U.S.C. § 1555 ............................................................................. 1, 38, 39, 40

31 U.S.C. § 3729 .............................................................................................. 34

Pub. L. No. 95-431, 92 Stat. 1021 (1978) ...................................................... 40

U.S. Const. art. I, § 9, cl. 7 ............................................................................. 36

U.S. Const. art. II, § 3 ..................................................................................... 39

## RULES

Fed. R. Civ. P. 56 ............................................................................................. 30

FRE 803 ..................................................................................................... 30, 34

FRE 807 ............................................................................................................ 34

## REGULATIONS

48 C.F.R. 32.006-1 .......................................................................................... 34

## OTHER AUTHORITIES

GAO, Principles of Federal Appropriations Law, 4th ed., 2016 rev., GAO-16-464SP
    (Washington, D.C.: Mar. 2016) .................................................................. 36

## I.    INTRODUCTION

GEO's motion fails in multiple respects.  It proceeds from a misunderstanding of the law of sovereign immunity, mischaracterizes the facts in the record, and does not satisfy the standard for summary judgment.  It should be denied in its entirety.

## II.    Plaintiffs' Response to GEO's Proposed Undisputed Material Facts

### A.    ICE's Role in Contracting for Immigration Detention Services

1.    ICE is a federal agency tasked with enforcing U.S. immigration laws.  6 U.S.C. § 542. ECF 270 at 5 (Material Undisputed Fact #1).

    i.    **Plaintiffs' response**: Admit.

2.    The United States Congress delegated to the Department of Homeland Security, and its agency ICE, the sole authority to arrange for all aspects of the detention of aliens pending the results of their immigration proceedings. 8 U.S.C. § 1231(g)(1) ("The [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.").

    i.    **Plaintiffs' response:** Admit that 8 U.S.C. § 1231(g) constitutes one source of the Secretary's detention authority. Dispute that it is the sole source, as other sources include 8 U.S.C. § 1103(a)(A)(11)(A) & (B), and 8 U.S.C. § 1555(d), and dispute that these enactments provide authority for ICE to arrange for "all aspects" of the detention of immigration detainees.  The text and history of 8 U.S.C. § 1555(d) and subsequent appropriations bills show that Congress withheld

funds relating to specific aspects of the detention of

immigration detainees.

3.      ICE has the authority to detain foreign nationals suspected of

entering the United States unlawfully.  8 U.S.C. §§ 1101 *et seq.*; ECF 270 at 5 (Material

Undisputed Fact #2).

        i.      **Plaintiffs' response:** Admit.

4.      In making these arrangements, ICE must consider the use of private

contractors to detain aliens prior to constructing its own facilities. 8 U.S.C. § 1231(g)(2)

("Prior to initiating any project for the construction of any new detention facility for the

Service, the Commissioner shall consider the availability for purchase or lease of any

existing prison, jail, detention center, or other comparable facility suitable for such use.").

        i.      **Plaintiffs' response:** Admit that ICE is required to consider

alternatives to building its own detention centers, and that

these may include subcontracts with private entities.  Dispute

that the text of 8 USC § 1231(g)(2) requires use of a private

subcontractor in every instance, as ICE also enters into

contracts with state and local governments.  Plaintiffs' Opp.

Ex. 1 (Venturella Dep. 162:13-18).

5.      As a result of Congress' directive, ICE neither constructs nor

operates its own immigration detention facilities, ECF 271-2 (Dec. of Tae Johnson, cited

as "Ex. B"), and therefore its state and private contractors are critical to carrying out the

federal function of immigration detention.

2

      i.      **Plaintiffs' response**: Dispute.  ICE owns and operates, at least in part, some of its own facilities, including the Krome detention center in South Florida. Plaintiffs' Reply Ex. 2, ECF No. 287-2 (Evans Dep. 48:13-49:6); GEO Ex. B, ECF No. 271-2 (Tae Johnson Decl. ¶ 9) ("Service Processing Centers are owned by ICE and staffed by a combination of federal and contract employees.")  The evidence GEO provides does not support the statement that ICE does not construct or operate its own immigration detention facilities, or the statement that it does not do so as "a result of Congress's directive," or the statement that state and private contractors are "critical."  Moreover, ICE could operate detention centers itself if it so desired.  Plaintiffs' Opp. Ex. 1 (Venturella Dep. 190:13-18).

6.      ICE contracts with GEO to house some of its detainees in detention facilities throughout the country.  *See* https://www.geogroup.com/Locations. ECF 270 at 5 (Material Undisputed Fact #3).

      i.      **Plaintiffs' response:** Admit.

7.      Among GEO's portfolio of ICE detention facilities is AIPC. ECF 270 at 5 (Material Undisputed Fact #4).

> i.      **Plaintiffs' response**: Admit.[1]

**B.      GEO's Contracts with ICE**

8.      ICE chose to contract with the AIPC to detain aliens pending the resolution of their immigration proceedings. ECF 270 at 9 (Additional Undisputed Fact #5).

> i.      **Plaintiffs' response:** Admit.

9.      GEO owns and has continuously operated AIPC, under contracts with ICE, from October 22, 2004 to October 22, 2014.  ECF 270 at 5 (Material Undisputed Fact #5).

> i.      **Plaintiffs' response:** Admit.

10.      A contract between ICE and GEO may be modified during its term by mutual consent of GEO and ICE. ECF 270 at 5 (Material Undisputed Fact #6).

> i.      **Plaintiffs' response:** Admit.

11.      All immigration detention processing centers, including the AIPC, must adhere to ICE's standards. In 2000, the Immigration and Naturalization Service ("INS"), ICE's predecessor, adopted the original National Detention Standards (the "2000 NDS").

> i.      **Plaintiffs' response:** Admit.

12.      Subsequently, ICE promulgated similar standards in the form of the PBNDS in 2008 (the "2008 PBNDS") and 2011 (later updated in 2016) ("2011

---

[1]      GEO's motion defines "AIPC" to mean the Aurora ICE Processing Center.  Def.'s Mot. 2.

PBNDS"). (2000 NDS available at https://www.ice.gov/detention-standards/2000; 2008

PBNDS available at: https://www.ice.gov/detention-standards/2008; 2011 PBNDS

available at: https://www.ice.gov/detention-standards/2011).

     i.     **Plaintiffs' response:** Admit.

13.     In each contract GEO entered into with ICE for the operation of the

AIPC, the 2000 NDS, 2008 PBNDS, or the 2011 PBNDS, as applicable, were

incorporated into the contract and GEO was required to comply with the same. ECF 270

at 9-10 (Additional Undisputed Fact #7).

     i.     **Plaintiffs' response:** Admit.  The parties dispute the

mechanism by which the operative version of the PBNDS

were "incorporated" into the contract.  *See* Fact Nos. 14-15,

17-18.

14.     GEO's contract with ICE, number ACD-3-C-0008, required it to

comply with the 2000 NDS from March 27, 2003 to September 28, 2006. ECF 262-5 at

12 (GEO_MEN 00059754).

     i.     **Plaintiffs' response:** Admit.  GEO's contract with ICE,

number ACD-3-C-0008, required that, "[u]nless otherwise

specified by an authorized INS representative," GEO

"perform in continual compliance *with the most current*

editions of the INS Detention Standards and the American

Correctional Association, Standards for Adult Local

Detention Facilities (ACA ALDF)."  Plaintiffs' Ex. D, ECF

262-5 at 12 (emphasis added).  The 2000 NDS were the most

current edition of the INS Detention Standards during the

stated period.

15.     GEO's contract with ICE, number HSCEOP-06-D-00010, effective

September 29, 2006, similarly required it to comply with the 2000 NDS. ECF 24-4 at 11

(GEO_MEN 00059644); ECF 260 at 3 (proffering as undisputed the fact that HSCEOP-

06-D-00010 was one of GEO's contracts with ICE during the class period); ECF 262-4

(incorporating the 2000 NDS into the contract).

ii.      **Plaintiffs' response:** Dispute. GEO's contract with ICE,

number HSCEOP-06-D-00010, effective September 29, 2006,

does not explicitly incorporate the 2000 NDS.  Plaintiffs

admit that GEO's contract with ICE, number HSCEOP-06-D-

00010, effective September 29, 2006, required that, "[u]nless

otherwise specified by the CO," GEO "perform in accordance

with the most current Functional Areas (as outlined in the

Performance Requirement Summary), ICE Detention

Standards, and American Correctional Association (ACA)

Performance-Based Standards for Adult Local Detention

Facilities (ALDF)."  Plaintiffs' Ex. C., ECF 262-4 at 11.

Plaintiffs admit that the 2000 NDS were the most current ICE

Detention Standards at the time the contract was signed, but

6

other versions of the PBNDS were published during the term
of the above-cited contract.

16.    On April 28, 2010, GEO entered into a contract modification with
ICE (HSCEOP06-D-00010/P00018) which required it to comply with the 2008 PBNDS,
effective immediately. ECF 270 at 10 (Additional Undisputed #10) (citing ECF 271-3,
cited as "Ex. C"); ECF 261-9 (2008 PBNDS).

         i.    **Plaintiffs' response:** Admit.

17.    GEO's subsequent contract with ICE, number HSCEDM-11-D-
00003, required it to continue to comply with the 2008 PBNDS. That contract was
effective September 15, 2011. ECF 262-2 at 38 (incorporating the 2008 PBNDS into the
contract); ECF 270 at 10 (Additional Undisputed Fact #11, #12) (noting Plaintiffs proffer
as undisputed the fact that HSCEDM-11-D00003 was one of GEO's contracts with ICE
during the Class Period).

         i.    **Plaintiffs' response:** Dispute.  HSCEDM-11-D-00003
incorporated the "DHS/ICE PBNDS (Performance Based
National Detention Standards)," and stated that "a copy of the
current version is obtainable on the internet Website:
http://www.ice.gov/detention-standards/2008/."  The contract
also required that "these constraints may change over time;
the Contractor shall be knowledgeable of any changes to the
constraints and perform in accordance with the most current
version of the constraints."  ECF No. 262-2 at 37-38.  The

7

2011 PBNDS were published on February 27, 2012, and were
thus the "most current" version of the PBNDS after that date.
Reply Ex. 8, ECF No. 287-8 at 10 (ICE report re PBNDS).

18.    On May 23, 2013, GEO entered into a contract modification with
ICE (HSCEDM11-D-00003/P00005) agreeing that, effective June 23, 2013, GEO would
comply with the 2011 PBNDS. ECF 270 at 10 (Additional Undisputed Fact #12) (citing
ECF 271-4, cited as "Ex. D"); ECF 262-3, 2 (GEO-MEN 00020406; ECF 270 at 10
(Additional Undisputed Fact #11, #12) (noting Plaintiffs proffer as undisputed the fact
that HSCEDM-11-D-00003/P00005 was one of GEO's contracts with ICE during the
Class Period).

            i.    **Plaintiffs' response:** Admit.  Plaintiffs note that GEO was
required to remain aware of and perform in accordance with
ongoing changes to the PBNDS under its existing contract,
and in fact began implementing changes associated with the
2011 PBNDS long before the contract modification. Reply
Ex. 9, ECF No. 287-9 (A. Martin 30(b)(6) Dep. 43:23-46:6)
(describing an email sent April 4, 2012 that included an
attachment regarding the major changes between the 2008
and 2011 PBNDS and explicitly mentioning the new
language stating that compensation for VWP work is "at least
$1.00").

**C.      GEO's Application of Disciplinary Policies**

19.      The 2000 NDS and all applicable versions of the PBNDS require

GEO to adopt, without alteration, the ICE disciplinary severity scale. ECF 261-10 at 17

(2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense

categories and disciplinary sanctions set forth in this section."); ECF 261-9 at 45 (2008

PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense

categories and disciplinary sanctions set forth in this section."); ECF 261-8 at 39 (2011

PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary

consequences as provided in this section.").

> i.      **Plaintiffs' response:** Admit.

20.      The 2000 NDS and all versions of the PBNDS require GEO to

provide notice to detainees, in the local detainee handbook, of the ICE-mandated

disciplinary severity scale. ECF 261-10 at 10 (2000 NDS) ("The detainee handbook, or

supplement, issued to each detainee upon admittance, shall provide notice of … the

disciplinary severity scale …"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee

handbook, or supplement, issued to each detainee upon admittance, shall provide notice

of … the disciplinary severity scale …"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee

handbook, or supplement, issued to each detainee upon admittance, shall provide notice

of … the disciplinary severity scale …").

> i.      **Plaintiffs' response:** Admit.

21.      Likewise, the 2000 NDS and all versions of the PBNDS explicitly

provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living

area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

      i.    **Plaintiffs' response:** Admit.

22.    The 2000 NDS and all versions of the PBNDS also explicitly provide a disciplinary severity scale that lists "[r]efusing to obey the order of a staff member or officer" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17 (Plaintiffs' Undisputed Facts #77 and #79).

      i.    **Plaintiffs' response:** Admit.

23.    The Aurora Detainee Handbook (the "AIPC Handbook") is issued to all detainees entering Aurora. ECF 270 at 7 (Material Undisputed Fact #14).

      i.    **Plaintiffs' response:** Admit.

24.    The AIPC's Handbook's disciplinary severity scale does not deviate from the 2000 NDS or the applicable PBNDS. ECF 273-1 (2005 AIPC Handbook, cited as "Ex. E"); (GEO_MEN 00054151-222); ECF 273-2 (2007 AIPC Handbook, cited as "Ex. F"); ECF 273-3 (2008 AIPC Handbook, cited as "Ex. G"); ECF 273-4 (2010 AIPC Handbook, cited as "Ex. H"); ECF 273-5 (2011 AIPC Handbook, cited as "Ex. I"); ECF 261-17 (October 2013 AIPC Handbook) (Specifically identified in Plaintiffs discovery responses as the basis for their claims); ECF 271-5, Kevin Martin Dep. 40:21-24 ("Q. Do you know if there's any deviation from between . . . the GEO Detainee Handbook and the

10

PBNDS as far as disciplinary requirements? A. Not as far as disciplinary

requirements[.]") (cited as "Ex. J" to ECF 270).

> i. **Plaintiffs' response:** Dispute. The severity scales listed in the
> GEO handbooks do deviate from the NDS and PBNDS. For
> example, the 2005 Handbook adds additional possible
> sanctions for "greatest" offenses. *Compare* GEO Ex. E, ECF
> No. 273-1 at 25 (Local Detainee Handbook (2005 version))
> (listing seven potential sanctions for "greatest" offenses) *with*
> Plaintiffs' Ex. N, ECF 261-10 at 20 (INS Standards) (listing
> four potential sanctions for "greatest" offenses").

25.    All of GEO's policies are reviewed and approved by an on-site ICE

official. ECF 270 at 7 (Material Undisputed Fact #15).

> i. **Plaintiffs' response:** Admit.

26.    The 2000 NDS and the applicable versions of the PBNDS provide

for the exact graduated scales of offenses and disciplinary consequences for dedicated

facilities, such as the AIPC. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008

PBNDS); 261-8 at 47 (2011 PBNDS).

> i. **Plaintiffs' response:** Admit.

27.    The graduated scale of offenses (of which detainees must be made

aware) are explicitly laid out in the 2000 NDS and the applicable PBNDS, providing

GEO no discretion whatsoever to alter the disciplinary severity scale. ECF 261-10 at 24

(2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS).

i.    **Plaintiffs' response:** Admit.

28.    As required by the 2000 NDS and the applicable versions of the PBNDS, the disciplinary severity scale is copied verbatim into the AIPC Handbook. ECF 271-5, Kevin Martin Dep. 40:13-16 ("And does the Detainee Handbook lay out these exact rules from the PBNDS for the detainees as far as discipline goes? A: Yes.") (cited as "Ex. J" to ECF 270); 83:17-22 (same).

i.    **Plaintiffs' response:** Dispute.  Kevin Martin's testimony is incorrect; the severity scales listed in the GEO handbooks deviate from the NDS and PBNDS.  *Compare* GEO Ex. E, ECF No. 273-1 at 25 (Local Detainee Handbook (2005 version)) (listing seven potential sanctions for "greatest" offenses) *with* Plaintiffs' Ex. N, ECF No. 261-10 at 20 (INS Standards) (listing four potential sanctions for "greatest" offenses").

29.    In addition to the disciplinary severity scale, GEO has detailed a Sanitation Procedures document that contains a section entitled "Detainee Sanitation Procedures." ECF 262- 8; ECF 50-4 (the "Sanitation Procedures").

i.    **Plaintiffs' response:** Admit that ECF No. 262-8 is a GEO document about Sanitation Procedures; it is entitled simply, "Sanitation Procedures" and is a different document from ECF No. 50-4, which is a GEO policy describing the Voluntary Work Program.

12

30.    The Sanitation Procedures set forth general standards for sanitation that must be followed by both GEO employees and detainees. *Id.*

      i.    **Plaintiffs' response:** Admit as to ECF No. 262-8.

31.    While the sanitation policies for detainees apply to those detainees housed at the AIPC who participate in cleaning tasks through the VWP or by cleaning their living area, ECF 50- 1 at 9 (Ceja Dep. 29:13-16), the Sanitation Procedures were not developed to assign tasks to specific individuals, but rather to detail the actual process for cleaning and materials and supplies to be used. ECF 271-5, Kevin Martin Depo. 208:6-11 (cited as "Ex. J" to ECF 270).

      i.    **Plaintiffs' response:** Admit.

32.    The Sanitation Procedures do not specify which aspects of cleaning are the responsibility of all detainees and which are the responsibility of VWP workers. ECF 270 at 7 (Material Undisputed Fact #19).

      i.    **Plaintiffs' response:** Admit.

33.    The Sanitation Procedures also contain a section detailing the consequences for non-compliance, stating: "The Dormitory/Unit Officer will inspect all living areas daily and report any infraction of these regulations to the immediate supervisor. The officer will notify detainees of unsatisfactory conditions, in cases of continued noncompliance, staff will issue an incident report." ECF 262-8 at 4; ECF 50-4. The Sanitation Procedures do not provide for any other penalty for non-compliance. *Id.*

      i.    **Plaintiffs' response:** Admit.

13

34.     GEO has never maintained a separate policy or practice of placing a detainee in solitary confinement for the refusal to clean a living area. Ex. _ (Amber Martin Dep., 134, 135).

     i.     **Plaintiffs' response:** Dispute.  Although not formally documented in a single written policy, GEO maintained a practice throughout the time period covered by this case of requiring detainees to clean the common living areas without pay (the "Housing Unit Sanitation Policy," or "HUSP"), and of threatening them with solitary confinement if they did not comply.  GEO's own 30(b)(6) witness admitted the scope of the HUSP, and that solitary confinement was a possible sanction for noncompliance.  Plaintiffs' Ex. P, ECF No. 261-12 (Ceja 30(b)(6) Dep. 36:8-37:9; 84:3-85:15); Reply Ex. 5, ECF No. 287-5 (Ceja 30(b)(6) Dep. 79:19-25).  Both the sanitation requirements and the penalties for noncompliance are referenced in the orientation video that GEO shows detainees when they arrive at the AIPC.  Plaintiffs' Ex. X, ECF No. 262-10 at 3, 8 (Detainee Orientation Video).  And in fact, GEO did impose solitary confinement on detainees who refused to perform HUSP duties.  Plaintiffs' Ex. Z, ECF No. 262-12 (disciplinary charges and reports).  GEO also threatened detainees with solitary confinement on a regular

14

basis when they refused to clean pursuant to the HUSP. *See, e.g.*, Reply Ex. 10, ECF No. 287-10 (Xahuentitla-Flores Dep. 73:19-74:9; 83:7-19); Plaintiffs' Opp. Ex. 2 (Hernandez-Ceren Dep. 74:23-75:11, 78:10-79:5); Plaintiffs' Opp. Ex. 3 (Hernandez-Torres Dep. 60:8-14).

35.     ICE audits GEO to ensure that GEO complies with all requirements of its contract, including its obligations under the PBNDS. ECF 270 at 13 (Additional Undisputed Fact #24) (citing ECF 273-6, cited as "Ex. L").

       i.     **Plaintiffs' response:** Admit that ICE audits GEO to ensure that it complies with certain requirements of its contract, including PBNDS obligations, but dispute that these audits review or capture all such requirements, or all aspects of the PBNDS.  The audits review specific components of PBNDS requirements, which are listed on the audit documents themselves.  *See* GEO Ex L., ECF No. 273-6 (Denver Contract Detention Facility Annual Review); Reply Ex. 12, ECF No. 287-12 (Ragsdale 30(b)(6) Dep. 36:1-38:10) (acknowledging that ICE audits do not cover "the requirement that [detainees] clean the common areas").

36.     As part of each inspection, each audit reviews compliance with each PBNDS requirement. *Id.*

i.    **Plaintiffs' response:** Admit that certain audits review compliance with certain PBNDS requirements; however, Plaintiffs dispute that the audits comprehensively review compliance with "each" PBNDS requirement.  The audits review specific components of PBNDS requirements, which are listed on the audit documents themselves.  *See* GEO Ex L., ECF No. 273-6 (Denver Contract Detention Facility Annual Review); Reply Ex. 12, ECF No. 287-12 (Ragsdale 30(b)(6) Dep. 36:1-38:10).

37.    The materials provided to detainees at intake, including the handbook and orientation video, are regularly audited and have passed each audit since 2004. *Id.*

i.    **Plaintiffs' response:** Admit; however, the audit reviews only whether the orientation includes sections covering: "Unacceptable activities and behavior; and corresponding sanctions; How to contact ICE; The availability of *pro bono* legal services, and how to pursue such services; Schedule of programs, services, daily activities, including visitation, telephone usage, mail service, religious programs, count procedures, access to and use of the law library and the general library; sick-call procedures, etc., and the detainee

handbook."  GEO Ex. L, ECF No. 273-6 at 3 (10/5/2007), 12 (10/22/2009), 26 (10/21/2010), 38 (9/29/2011).

38.     The audits specifically review intake procedures to ensure that the orientation information provides information about '[u]nacceptable activities and behavior, and corresponding sanctions" as well as the detainee handbook. *Id.* (GEO-MEN 00131895).

    i.     **Plaintiffs' response:** Admit.

39.     The disciplinary severity scale is audited and has passed each audit since 2004. *Id.*

    i.     **Plaintiffs' response:** Dispute that the "disciplinary severity scale is audited."  The audit reviews whether the facility *has* a "written disciplinary system using progressive levels of reviews and appeals."  GEO Ex. L., ECF No. 273-6 at 6 (10/5/2007), 14 (10/22/2009), 28 (10/21/2010), 40 (9/29/2011), 58 (9/29/2016).

40.     The audits review whether GEO provides notice of the disciplinary severity scale and have found GEO compliance based upon a review of its handbooks. Id. (GEO-MEN 00131936).

    i.     **Plaintiffs' response:** Admit.

41.     ICE has not only approved of the disciplinary severity scale but has also acted to implement and enforce the sanctions therein. One of the named Plaintiffs in this case—Demetrio Valerga—explained during his deposition that ICE officers also

enforced the ICE sanctions. After claiming that one of GEO's corrections officers told

Mr. Valerga he could be placed in segregation if he did not help clean his own common

area, ECF 272-7, Demetrio Valerga Dep., 135:15-137:19 (cited as "Ex. M" to ECF 270),

Mr. Valerga then explained ICE officers woke him up, pulled him out of his housing unit,

and spoke to him directly. *Id.* at 138:2-13. During that conversation, ICE officers told Mr.

Valerga that he could, in fact, be taken to segregation for refusing to help clean his living

area. *Id.* at 138:15-23.[2]

> i.  **Plaintiffs' response:** Admit the events stated above;
>     however, Plaintiffs dispute that the ICE officers onsite at
>     Aurora were authorized to condone acts that deviate from the
>     requirements of the Contract, as GEO's implementation of the
>     HUSP does.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin
>     Dep. 198:22-199:10); Reply Ex. 6, ECF No. 287-6 (A. Martin
>     Dep. 81:22-82:13); GEO's Second Notice of Supplemental
>     Authority Ex. B, ECF No. 297-2 at 3-4 (Contracting Officer's
>     Representative ("COR") Appointment Letter) (listing
>     functions and actions the COR "shall not" undertake,
>     including "direct the contractor . . . to operate in conflict with

---

[2] [continued from GEO's Fact #41:] Even after the ICE Officer's warning, Mr. Valerga refused to clean and later refused again several times. ECF 271-7, Dep. of Demetrio Valerga, 139:6-24, 140:2-20 (cited as "Ex. M" to ECF 270). Mr. Valerga was never placed in segregation for refusing to clean. *Id.*

the contract terms and conditions" and "[c]hange or modify

any of the terms and conditions . . . of a contract").

**D.      The VWP**

42.     The 2000 NDS and all applicable versions of the PBNDS require

that GEO provide detainees the opportunity to participate in a VWP. ECF 270 at 8

(Material Undisputed Fact #20).

i.      **Plaintiffs' response:** Admit.

43.     The 2000 NDS, with which the AIPC was contractually obligated to

comply from March 27, 2003 to April 28, 2010, required GEO to provide

"compensation" and explicitly directed that "the stipend is $1.00 per day, to be paid

daily." ECF 261-10 at 5 (2000 NDS).

i.      **Plaintiffs' response:** Admit except for GEO's use of the

phrase "directed that," which implies that the quoted

statement in the PBNDS is an instruction about how GEO

must pay VWP workers, as opposed to a statement about the

amount that ICE would reimburse GEO for VWP labor.

Plaintiff Ex. A, ECF No. 261-2 (A. Martin Dep. 106:6-

107:22).  Plaintiffs also note that GEO was required to

comply with the 2008 PBNDS when they were published, *see*

Fact No. 15, which occurred during the stated period,

although the quoted text is nearly identical in both the 2000

NDS and the 2008 PBNDS.  *See* ECF 261-9 at 63 (2008

PBNDS) ("the compensation is $1.00 per day")

44.     Likewise, the 2008 PBNDS, with which the AIPC was contractually

obligated to comply from April 28, 2010 to June 22, 2013, mandated that "the

compensation is $1.00 per day." ECF 261-9 at 63 (2008 PBNDS).

i.     **Plaintiffs' response:** Admit that the cited document contains

the quoted text; however dispute GEO's statement that this

constituted a "mandate[]," as opposed to a statement about

the reimbursement offered from ICE to GEO.  GEO paid

more than $1.00 a day to detainees at other ICE facilities,

including paying up to $3.00 a day to detainees at its South

Texas Detention Facility in 2009, and was therefore well

aware that higher pay was an option.  Reply Ex. 13, ECF No.

287-13 at 7-13 (South Texas 2009 detainee pay).  In addition,

GEO can and does request modifications of the Contract

when it needs to.  Plaintiffs' Ex. A, ECF No. 261-2 (A.

Martin Tr. 106:8-108:10).  GEO did not request a contract

modification to pay detainees more than $1.00 per day at the

AIPC.  *Id*. at 105:3-12.

45.     Beginning on June 23, 2013, AIPC was bound by the 2011 PBNDS,

which state that participants in the VWP will be compensated with "at least $1.00 (USD)

per day." ECF 261- 8 at 53 (2011 PBNDS). Thus, the "at least" language upon which the

20

VWP Class relies was not implemented at the AIPC until approximately halfway through the VWP Class Period.

      i.    **Plaintiffs' response:** Admit the quoted content of the document, and that the 2011 PBNDS was formally incorporated into the Contract on June 23, 2013.  Plaintiffs do not agree with GEO's implication that the option to pay more than $1 per day did not exist prior to it formally agreeing to incorporate portions of the 2011 PBNDS into its contract. GEO had an obligation under the relevant contract to be "knowledgeable of any changes to the [PBNDS] and perform in accordance with the most current version of the [PBNDS]." *See* Response to Additional Fact ¶ 11.  In addition, GEO can and does request modifications of the Contract when it needs to.  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Tr. 106:8-108:10).  GEO did not request a contract modification to pay detainees more than $1.00 per day.  *Id*. at 105:3-12.

46.    Before the 2011 PBNDS were implemented at the AIPC, GEO paid the amount it was explicitly directed by ICE to pay to VWP participants: $1.00 per day. ECF 270 at 15 (Additional Undisputed Fact #36).

      i.    **Plaintiffs' response:** Admit that GEO paid VWP participants $1.00 prior to the implementation of the 2011 PBNDS;

dispute that ICE "explicitly directed" GEO to pay this amount.

47.     Thereafter, GEO continued to pay members of the VWP Class $1.00 per day; the minimum payment explicitly permitted by the 2011 PBNDS. ECF 270 at 15 (Additional Undisputed Fact #37).

      i.     **Plaintiffs' response:** Admit.

48.     ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP. ECF 270 at 8 (Material Undisputed Fact #22).

      i.     **Plaintiffs' response:** Admit.

49.     The VWP has been audited each year and has passed each audit since 2004. ECF 270 at 14 (Additional Undisputed Fact #29) (citing GEO-MEN 00131936).

      i.     **Plaintiffs' response:** Admit.

## III.     Additional Facts that Preclude Summary Judgment in GEO's Favor.

### A.     The Housing Unit Sanitation Policy.

1.     The "HUSP is not created by ICE nor is it a requirement of the Contract."  Plaintiffs' Ex. K, ECF No. 261-7 ¶ 22 (Ely Decl.).

2.     "ICE did not draft or negotiate GEO's HUSP."  *Id.*

3.     The HUSP is "a GEO Policy, created by GEO."  *Id.*

4.     On February 14, 2018 GEO sent a letter to ICE requesting an equitable adjustment to its contract for the Aurora facility to assist it in paying its legal

fees in connection with this litigation.  Plaintiffs' Reply Ex. 3, ECF No. 287-3 (February 14 letter).

5.      The February 14 letter was signed by GEO's Senior Vice President of Business Development, David Venturella, and drafted in collaboration between Venturella, GEO's legal department and other GEO officials, including GEO's General Counsel or other representatives from the General Counsel's Office.  Plaintiffs' Opp. Ex. 1 (Venturella Dep. 61:1-21; 62:10-63:7).

6.      GEO did not disclose the full scope of the mandatory cleaning required under the HUSP in the February 14 letter, describing the policy as requiring only that detainees "perform basic housekeeping chores."  Plaintiffs' Reply Ex. 3, ECF No. 287-3 (February 14 letter).

7.      In a letter dated June 21, 2018, ICE denied GEO's request for an equitable adjustment, explaining that "GEO's defense of these private lawsuits is a defense of its contract performance."  Plaintiffs' Opp. Ex. 4 (GEO-MEN00186866 (June 21 letter)).

8.      The housing pods in the Aurora facility house up to 80 detainees. Plaintiffs' Opp. Ex. 5 (Pagan Dep. at 108:13-17)

9.      The Aurora housing pods include both cells where detainees sleep and common areas where they eat, use the phone, and shower.  Plaintiffs' Opp. Ex. 2 (Hernandez-Ceren Dep. at 25:3-17); Plaintiffs' Ex. P, ECF No. 261-12 (Ceja 30(b)(6) Dep. 36:25-37:4)

10.     GEO told detainees that they have a "common obligation to clean . . . the communal areas" of the housing pods, including the dayroom and bathrooms, on a rotating basis.  Plaintiffs' Ex. F, ECF No. 261-4 (Ragsdale 30(b)(6) Dep. 16:14-18)

11.     GEO guards threatened to send detainees to solitary confinement for failing to clean under the HUSP.  Plaintiffs' Opp. Ex. 2 (Hernandez-Ceren Dep. 74:23-75:11, 78:10-18); Plaintiffs' Reply Ex. 10, ECF No. 287-10 (Xahuentitla-Flores Dep. 73:19-74:9; 83:7-19)

12.     Sending detainees to solitary confinement for failing to clean under the HUSP was within the regular authority of GEO guards.  Plaintiffs' Opp. Ex. 5 (134:18-135:20)

13.     GEO placed detainees in segregation during the class period for refusing to clean.  Plaintiffs' Ex. Z, ECF No. 262-12 (disciplinary charges and reports); Plaintiffs' Opp. Ex. 3 (Hernandez-Torres Dep. 60:8-14); Plaintiffs' Opp. Ex. 5 (Pagan Dep. at 124:19-125:4)

14.     The HUSP requires detainees to "clean up the tables, wipe down the tables, and sweep and mop the floors" in the common areas, Plaintiffs' Ex. P., ECF No. 261-12 (Ceja 30(b)(6) Dep. at 36:24-37:9), as well as "clean the rec yard, wipe the [] phones, clean the microwave, change the garbage bag, clean the showers, disinfect the showers, [and] pick up all the trash."  Plaintiffs' Opp. Ex. 2 (Hernandez-Ceren Dep. at 163:3-6)

15.     These tasks go beyond the basic housekeeping chores permitted by the PBNDS, which states: "Work assignments are voluntary; however, all detainees are

24

responsible for personal housekeeping.  Detainees are required to maintain their

*immediate* living areas in a neat and orderly manner by: 1. making their beds daily; 2.

stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and

4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from

beds, overhead lighting fixtures or other furniture."   *See* Plaintiffs' Ex. L, ECF No. 261-8

at 51 (GEO-MEN 00064345 (2011 PBNDS)) (emphasis added); *see also* Plaintiffs' Ex.

M, ECF No. 261-9 at 61-62 (GEO-MEN 00063294-95 (2008 PBNDS)); Plaintiffs' Ex. N,

ECF No. 261-10 at 3 (GEO-MEN 00063672 (INS Detention Standard))

     16.    GEO never verified with ICE whether common areas of the housing

pods are part of the "living area" described in the PBNDS.  Plaintiffs' Ex. A, ECF No.

261-2 (A. Martin Dep. 196:23-198:6)

     17.    The Department of Homeland Security's Office of Inspector General

concluded that "requiring detainees to clean common areas used by all detainees is in

violation of ICE standards, as detainees are only required to clean their immediate living

area."  Reply Ex. 17, ECF No. 287-17 at 8 (Theo Lacy OIG report)

**B.**    **The Voluntary Work Program.**

     18.    The ICE/GEO contract incorporated the "DHS/ICE PBNDS

(Performance Based National Detention Standards)," and stated that "a copy of the

current version is obtainable on the internet Website: http://www.ice.gov/detention-

standards/2008/."  The contract also required that "these constraints may change over

time; the Contractor shall be knowledgeable of any changes to the constraints and

perform in accordance with the most current version of the constraints." Plaintiffs' Ex. B,

ECF No. 262-2, 37-38 (GEO-MEN 00019655-56).  The 2011 PBNDS were published on February 27, 2012, and were thus the "most current" version of the PBNDS after that date.  Reply Ex. 8, ECF No. 287-8 at 8 (ICE report re PBNDS)

19.     GEO pays detainees more than $1.00 per day at other ICE facilities, including $1.00 to $3.00 per day at its South Texas Detention Facility, $1.00 to $2.50 per day at its Folkston ICE Processing Center, $1.00 to $3.00 per day at its Joe Corley Detention Facility, and $1.00 to $4.00 per day at its LaSalle Detention Facility. Plaintiffs' Reply Ex. 13, ECF No. 287-13 at 11 (South Texas Detention Center Invoices); Plaintiffs' Ex. A, ECF No., 261-2 (A. Martin Dep. 109:15-110:13); Plaintiffs' Ex. BB, ECF No. 261-18 (GEO-MEN 00170339 (VWP Pay Rates))

20.     In these facilities where GEO pays detainees more than $1.00 per day for VWP work, it does so "on [its] own dime."  Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Dep. 107:18-22; 109:15-110:13)

## IV.   ARGUMENT

### A.   Derivative Sovereign Immunity Does Not Protect Acts that the Government Did Not Direct.

Derivative sovereign immunity applies only in those "special circumstances" where "the government has directed a contractor to do the very thing that is the subject of the claim."  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001); *see also Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 671 (2016) (derivative sovereign immunity applies to a contractor that "simply performed as the Government directed"). The "driving purpose" of the doctrine "is to prevent the contractor from being held liable

when the government is actually at fault but is otherwise immune from liability." *In re Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 70 (D.C. Cir. 2019) (quoting *In re World Trade Center Disaster Site Litig.*, 456 F. Supp. 2d 520, 560 (S.D.N.Y. 2006)); *see also* Plaintiffs' Motion for Summary Judgment ("Plaintiffs' MSJ"), ECF No. 260 at 23-27.

GEO argues for a much broader construction of derivative sovereign immunity, stating that it is "precluded only where a contractor violates its contract with the federal government." GEO's Motion for Summary Judgment ("GEO MSJ"), ECF No. 284 at 15. That is wrong. Certainly, as set forth in *Campbell-Ewald*, one way that a contractor may lose derivative sovereign immunity is where it "violates both federal law and the government's explicit instructions." *Campbell-Ewald Co.*, 136 S. Ct. at 672. And, as Plaintiffs explain in detail in their Motion for Summary Judgment and below, GEO did both in this case. *See infra* §IV.A.1-2; Plaintiffs' MSJ, ECF No. 260 at 27-33.

But while compliance with a contract is a necessary condition of derivative sovereign immunity, it is not sufficient, which renders GEO's major premise invalid: namely, that even if GEO did violate the TVPA and Colorado law, it would face no liability under the doctrine of derivative sovereign immunity so long as the specific acts leading to those violations were not explicitly prohibited by its contract with ICE. If this were correct, it would provide a free pass for a wide range of contractor misconduct that the government did not foresee and explicitly prohibit. That cannot be, and is not, the law. Rather, derivative sovereign immunity is available only to contractors who "simply performed as the Government *directed*." *Campbell-Ewald Co.*, 136 S. Ct. at 672

(emphasis added).  It does not protect a contractor that takes steps "over and beyond acts required to be performed by it under the contract." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) (quoting *Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963)).  Here, the undisputed facts show that both the VWP and the HUSP went "over and beyond" the requirements of GEO's contract with ICE.  Therefore, there is no derivative sovereign immunity.

*Cunningham v. General Dynamics Information Technology*, 888 F.3d 640, 643 (4th Cir. 2018), does not direct a different result.  To the contrary, as discussed in greater detail in Plaintiffs' motion for summary judgment, Plaintiffs' MSJ, ECF No. 260 at 32-33, *Cunningham* illustrates that derivative sovereign immunity applies only in the limited circumstance where the government *requires* a contractor to take an action that becomes the subject of a subsequent lawsuit.  This distinction becomes clear when one compares the facts of *Campbell-Ewald* and *Cunningham*, both lawsuits against government contractors under the Telephone Consumer Protection Act ("TCPA"), which prohibits certain types of phone calls and text messages to people who have not opted into receiving them.  In *Campbell-Ewald*, the Navy worked with a contractor to develop a text message campaign that was challenged by the plaintiff's lawsuit.  136 S. Ct. at 672; *see also Gomez v. Campbell-Ewald Co.*, No. 10 Civ. 2007, 2013 WL 655237, at *2 (C.D. Cal. Feb. 22, 2013) (the Navy "worked closely with [Campbell-Ewald] on the Navy's May 2006 text message recruiting campaign, and provided Navy oversight and approval").  But significantly, the specific action that allegedly violated the TVPA – the development of a contact list that included off-limits phone numbers – was delegated to

the contractor, so the government's oversight and approval did not confer immunity. *Campbell-Ewald*, 136 S. Ct. at 673-74.  By contrast, in *Cunningham*, the government *provided* the list of phone numbers – which included numbers that could not be contacted under the TVPA – and explicitly required the contractor to call them.  This did confer immunity.  888 F.3d at 647.

GEO argues that the kind of "oversight and approval" that was *insufficient* to support derivative sovereign immunity in *Campbell-Ewald*, 2013 WL 655237, at *2, is sufficient to immunize GEO's actions here.  As the undisputed facts here demonstrate, nothing in GEO's contract with ICE required it to engage in the legal violations it is accused of.  The best GEO can offer as to the HUSP is that ICE reviewed its policies, Fact No. 25; but it admits that those policies are not explicit about whether housing unit cleaning work was voluntary or mandatory.  Fact No. 32.  And while ICE audits GEO's facilities and communications, Facts No. 35-40, GEO can point to no part of those audits that identified the scope of mandatory cleaning duties, *see* Part IV.A.1. *infra*, and specifically approved them – much less explicitly *directed* them, as *Campbell-Ewald* requires.  136 S. Ct. at 673.[3]  Regardless of whether ICE approved (or knew about)

---

[3]     Even if *Campbell-Ewald* allowed oversight (as opposed to direction) to confer immunity, GEO's argument would require the Court to draw an inference in GEO's favor, as it may not do on a motion for summary judgment: GEO argues that because ICE authorized a written policy, it must have had full knowledge of how that policy was implemented.  This inference is not only impermissible as a legal matter; it is a stretch, as a factual matter.  Nothing in the policies explicitly identifies the wide array of cleaning duties under the HUSP as mandatory requirements, Fact No. 32, making it unlikely that ICE would identify their inconsistency with the PBNDS.  Add. Fact No. 15.  In fact, the record shows that ICE's audits sometimes miss discrepancies between GEO policies and

GEO's legal violations, the fact that GEO, not ICE, drafted the policies, Add. Fact 2, makes this case "vastly distinguishable" from *Cunningham*.  888 F.3d at 648 (noting that in *Campbell-Ewald* the contractor, not the government, developed the list of numbers that formed the basis for liability).  The HUSP and the discipline used to enforce it was "a GEO policy, created by GEO," Add. Fact No. 3,[4] and GEO must face the legal consequences.

### 1.    GEO's HUSP Required Work Prohibited by ICE.

Just as in its opposition to Plaintiffs' motion for summary judgment, ECF No. 270, GEO's motion for summary judgment on Plaintiffs' TVPA claims hinges on a fundamental misunderstanding of what those claims are about.  As set forth in greater detail in Plaintiffs' reply to their summary judgment motion, ECF No. 286, ICE cannot have mandated that GEO threaten detainees with solitary confinement for failing to clean common areas, because ICE did not mandate that detainees clean the common areas in the first place.  Add. Fact No. 1.  To the contrary, ICE *prohibited* GEO from requiring detainees to clean all but a limited space directly around their beds.  Add. Fact No. 15.

---

ICE requirements.  *See* Facts No. 22, 24-28.  A jury could infer that the audits failed to identify the contract violation challenged by this case.

[4]    In opposing Plaintiffs' motion for summary judgment, GEO has argued that the Ely declaration is hearsay.  Putting aside that Fed. R. Civ. P. 56(c)(4) allows out-of-court statements in declarations to be used to support facts on summary judgment, the Ely declaration is a statement of a public office setting out the office's activities, and is thus excepted from the hearsay rule under FRE 803(8).  GEO's attempts to cast ICE's declaration as untrustworthy are unpersuasive.  *See* ECF No. 294 (Plaintiffs' Response to GEO's Notice of Supplemental Authority).

Under the PBNDS, all "[w]ork assignments are voluntary," except that "[d]etainees are required to maintain their *immediate* living areas in a neat and orderly manner by:

1. making their beds daily;

2. stacking loose papers;

3. keeping the floor free of debris and dividers free of clutter; and

4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture."

*Id*. (emphasis added).

Work under the HUSP went far beyond these four enumerated categories, imposing a "common obligation to clean . . . the communal areas," "clean up the tables, wipe down the tables, and sweep and mop the floors" in the common dining area, and to clean the shared dorm showers.  Add Facts No. 10, 14.  Plaintiffs anticipate that GEO will argue on reply, as it did in opposing Plaintiffs' motion for summary judgment, that the "entirety of where a detainee lives and sleeps is his or her 'living area,'" and that mopping floors and scrubbing communal showers is the same as keeping them "free of clutter."  *See* GEO's Opposition to Plaintiffs' MSJ, ECF No. 270 at 26.  These positions are not reasonable.  Even if one ignored the word "immediate" and construed "living area" to mean the entirety of an 80-person dormitory, the structure of ICE's instructions leaves no room for doubt.  The instructions only allow GEO to require that detainees clean the immediate living area "by" doing four specific things – thus implicitly excluding mopping, scrubbing, and other deep cleaning that is typically done by full-time janitors.

31

Indeed, in a subsequent audit of another GEO facility in 2017, the Office of the Inspector General, a division of the Department of Homeland Security, identified a similar policy as a violation of ICE standards, stating that, "requiring detainees to clean common areas used by all detainees [such as showers] is in violation of ICE standards, as detainees are only required to clean their immediate living area." *See* Add. Fact 17.

The unreasonableness of GEO's position is illustrated by the fact that its own Vice President, David Venturella, agreed that GEO's sanitation policy was inconsistent with the PBNDS when the policy was described to him last week in his deposition. In a letter asking ICE to intervene in this case, Venturella characterized the required work as "basic housekeeping chores," Add. Fact 6, but when asked in his deposition if the PBNDS permitted GEO to require work beyond the four chores explicitly listed therein, he agreed with the statement that work assignments "have to be voluntary with the exception of these four [chores],"[5] Plaintiffs' Opp. Ex. 1 (Venturella Dep. 72:16-21).

## 2.    ICE Did Not Direct the Dollar-A-Day Pay Rate Under the VWP.

GEO's argument that it can enjoy derivative sovereign immunity for Plaintiffs' unjust enrichment claim repeats its mischaracterizations of the law, the facts of the case,

---

[5]    Venturella was not responsible for PBNDS compliance and evidently lacks firsthand knowledge of the facts on the ground at Aurora; however, the fact that GEO's letter to ICE mischaracterizes its policies illustrates the lengths to which it has gone to conceal its violations from the agency, which further undermines its argument that ICE authorized the policy. GEO's general counsel also had input into the letter, Add. Fact No. 5, and by 2018 should have been well aware that the suit involved more than "basic housekeeping chores," given that this aspect of the case had been extensively explored in a 30(b)(6) deposition two years earlier. Plaintiffs' Ex. P., ECF No. 261-12 (Ceja 30(b)(6) Dep. at 36:24-37:9). A jury could infer from these facts that GEO deliberately sought to conceal the true scope of its policy from ICE because it feared ICE would not condone it.

and the nature of its relationship with ICE.  First, as noted above, there is no support for

GEO's position that all government contractors who do not violate an explicit term of

their contract enjoy the government's immunity.  *Supra* § IV.A.  Second, as Plaintiffs

noted in their reply brief to their own motion for summary judgment, ECF No. 286 at

101-02, every court to have considered whether the 2011 PBNDS provide GEO with the

immunity it seeks – including this one – has concluded they do not.  *See Menocal v. GEO*

*Grp., Inc.*, 113 F. Supp. 3d 1125, 1135 (D. Colo. 2015) (holding that derivative sovereign

immunity did not apply because GEO was not "*prohibit[ed]* . . . from paying detainees in

excess of $1/day"); *Nwauzor v. GEO Grp., Inc.*, No. 17 Civ. 5769, 2020 WL 1689728, at

*8-9 (W.D. Wash. Apr. 7, 2020) (denying GEO's motion for summary judgment on

derivative sovereign immunity and noting that, "GEO has, in the past, paid workers more

than $1 a day and has the ability to, and has requested, changes to the contracts"); *cf.*

*Novoa v. GEO Grp., Inc.*, No. 17 Civ. 2514, 2018 WL 4057814, at *3 (C.D. Cal. Aug.

22, 2018) (noting that GEO's derivative sovereign immunity defense hinged on what

"discretion GEO had, if any, in implementing and administering the Work Program").

The practice of the contracting parties supports this Court's (and others')

interpretation.  GEO *did* pay more than $1 per day to detainee workers in other facilities:

records from the South Texas Detention Facility, for example, show that detainees were

paid as much as $3 per day there, with ICE reimbursing GEO for the first $1 per day and

GEO footing the rest.  Add. Fact No. 19.[6]  This practice goes back to 2009.  *Id*.  This

---

[6]     Plaintiffs' Exhibit 13 to their reply in support of their Motion for Summary
Judgment, ECF No. 287-13, showing the pay practices at the South Texas Detention

disposes of GEO's contention that the language of the 2008 PBNDS, which did not

include the "at least" language present in the subsequent 2011 PBNDS, constitutes a

specific command by ICE.  Assuming that ICE *had* the authority to direct a particular pay

rate – which it did not, *see* Section IV.C *infra* – this language does not prohibit GEO

from paying more than $1 per day as needed to comply with the law of the localities in

which it operates (the Colorado law of unjust enrichment, for the purposes of this case).

*See Menocal*, 113 F. Supp. 3d at 1135.

Moreover, even if the 2008 PBNDS supported GEO's argument, it is not correct

that GEO was required to follow those standards until June 23, 2013.  The 2008 PBNDS

were replaced by the 2011 PBNDS towards the beginning of the VWP class period, in

February 2012.  Add. Fact No. 18.  And although the 2011 PBNDS were not *formally*

incorporated into the contract between ICE and GEO until June 2013, that contract

required GEO to remain aware of changes to the PBNDS and "perform in accordance

with the most current version of the constraints."  *Id.*  Regardless of the fact that the 2011

contract cited the 2008 PBNDS as the version that was current at the time the contract

---

Facility, was authenticated as a GEO invoice submitted to ICE by David Venturella.
Plaintiffs' Opp. Ex. 1 (Venturella Dep. at 86:11-87:1).  Although Venturella claimed to
lack sufficient knowledge to verify that the invoice met the criteria for a business record
under FRE 803(6), it has equivalent guarantees of trustworthiness that weigh in favor of
its admission under FRE 807(a).  GEO is under a legal and contractual obligation to
submit accurate invoices to the government pursuant to its contracts, *see* 48 C.F.R.
32.006-1(b) (allowing the government to suspend payments to a contractor when "the
contractor's request for . . . payments is based on fraud"), and indeed, to do otherwise
would expose it to liability under the False Claims Act, 31 U.S.C. § 3729 *et seq.*  This
kind of "business duty to provide accurate information" is a strong indicator of
evidentiary reliability.  *United States v. Ary*, 518 F.3d 775, 787 (10th Cir. 2008).

was executed, *id.*, the change in the language of the PBNDS after 2011 made clear that GEO was not barred from paying more (as it already did in South Texas) where state law required it to do so.  Even if GEO construed the 2008 PBNDS to command a $1/day rate before the 2011 PBNDS were published (which it did not; GEO was already paying more in the South Texas Detention Facility), the withdrawal of that command should have caused GEO to take steps to follow its legal compliance obligations under the contract by reevaluating its pay rate.  Thus, GEO's attempt to hide behind derivative sovereign immunity for Plaintiffs' VWP claims fails.

      **B.**     **ICE Has No Authority to Require a $1/day Pay Rate.**

Even assuming *arguendo* that GEO were correct that the 2008 PBNDS constituted a command from ICE that it pay VWP workers $1 per day, it still would not enjoy derivative sovereign immunity.  Its defense would fail at the first prong of the *Yearsley* test, because the authority to set a specific rate of VWP wages was not "validly conferred" by the government.  *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940). This is true because ICE did not have – and has never had – the authority to set a specific rate of pay for detainee labor.  Congress reserved that authority to itself and stopped exercising it more than 30 years before Plaintiffs' claims accrued.  If the PBNDS were in fact a command by ICE to pay a specific rate, that command would be *ultra vires* and without valid Constitutional authority.

1. **Federal Appropriations Law Requires Congress to Specifically Authorize Funds for a Given Purpose.**

The Appropriations Clause of the Constitution grants Congress the exclusive authority to make appropriations and bars the government from spending money except "in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  The "fundamental and comprehensive purpose" of the Appropriations clause "[i]s to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents."  *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427-28.

In accordance with this purpose, "Congress's control over federal expenditures is absolute."  *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (internal quotation marks omitted).  "[A]ll uses of appropriated funds must be affirmatively approved by Congress," and "the mere absence of a prohibition is not sufficient" to authorize a use of funds.  *FLRA*, 665 F.3d at 1348.  An "appropriation cannot be inferred or made by implication."  GAO, Principles of Federal Appropriations Law, 4th ed., 2016 rev., ch. 2, § B.4.d, at 2-23, GAO-16-464SP (Washington, D.C.: Mar. 2016) ("GAO Redbook") (citing 50 Comp. Gen 863 (1971)).[7]

---

[7]      "In considering the effect of appropriations language both the Supreme Court and [other] court[s] have recognized that the General Accounting Office's publication, Principles of Federal Appropriations Law . . . provides significant guidance."  *Star–Glo Assocs., LP v. United States,* 414 F.3d 1349, 1354 (Fed. Cir. 2005); *see also Main Comm. Health Options v. United States,* 140 S. Ct. 1308, 1320 (2020); *Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1064 n.5 (10th Cir. 2011).

36

Congress creates appropriations in a two-step process.  First, it authorizes the

Executive Branch, via statute, to undertake certain activities that may involve spending

funds, sometimes referred to as "budget authority."  GAO Redbook, ch. 2 § A.1, at 2-1, 2.

This authorization is typically durable and persists from year to year.  *See Ramah Navajo*

*Chapter v. Salazar*, 644 F.3d 1054, 1058-59 (10th Cir. 2011), *aff'd* 567 U.S. 182 (2012)

(explaining permanence of Congressional authorization to fund "contract support costs").

Second, Congress appropriates funds to be used for that activity and directs their

payment.  *See* GAO Redbook, ch. 2, § B.4.d, at 2-24 ("[A] specific direction to pay and a

designation of funds to be used [] must be present.").  This step, appropriation, is just as

important as the authorization of the agency action; Executive Branch agencies cannot

spend funds when they are not appropriated for that purpose by Congress.  *See California*

*v. Trump*, 963 F.3d 926 (9th Cir. 2020) (holding that Trump Administration could not

spend funds appropriated to the Department of Defense on a wall along the U.S.-Mexico

border because Congress had not appropriated them for that purpose).  Unlike

authorization, appropriations are not durable; funding appropriated by Congress must be

used within the time period for which it was appropriated.  GAO Redbook, ch 2, § B.5.c,

at 2-29 ("[A]n appropriation 'dies' in a sense at the end of its period of obligational

availability.").

What Congress can give, it can also take away.  "Any exercise of a power granted

by the Constitution to one of the other branches of Government is limited by a valid

reservation of congressional control over funds in the Treasury."  *Richmond*, 496 U.S. at

425.  One way that Congress can exercise its power of the purse is by choosing not to act

– by not appropriating funds – and that choice is binding on the other branches of government.  *See Babbitt v. Oglala Sioux Tribal Public Safety Dep't*, 194 F.3d 1374, 1380 (Fed. Cir. 1999) ("Although [a government entity] may have expected to receive full funding . . . based on past experiences, . . . subject-to-availability-of-appropriations language . . . prevents [the entity] from asserting that it was entitled to full funding as a matter of right."); *In re Aiken Cty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[I]f Congress appropriates no money for a statutorily mandated program, the Executive obviously cannot move forward.").

### 2.      ICE Has No Authority to Set the VWP Rate.

Although Congress authorized payments for work programs in immigration detention in 1950, it reserved to itself the right to set the amount of those payments.  8 U.S.C. § 1555(d) provides that "[a]ppropriations now or hereafter provided for [ICE][8] shall be available for . . .  payment of allowances . . . to aliens, while held in custody under the immigration laws, for work performed."  8 U.S.C. § 1555(d).  But Congress limited that authorization by providing that those payments would be made "at such rate as may be specified from time to time in the appropriation Act involved."  *Id.*; *see Richmond*, 496 U.S. at 425 (acts of "Government [are] limited by a valid reservation of congressional control over funds in the Treasury").  By conditioning the rate of pay for detainees on the amount set "in the appropriation Act involved," and requiring that it be "specified from time to time," Congress rendered that rate of pay contingent on the

---

[8]      The statute references ICE's predecessor agency, Immigration and Naturalization Services.

amount specified in each year's appropriation – and withheld from ICE (then INS) the discretion to set that rate itself. *See Ramah Navajo Chapter*, 644 F.3d at 1060 (language stating that, "[s]ubject to the availability of appropriations, the Secretary shall make available" certain payments only required those payments if Congress appropriated funds for that purpose); *cf.* U.S. Const. art. II, § 3 (requiring the President to provide information on the state of the union "from time to time," meaning annually).

After 1979, Congress exercised its reserved authority by declining to appropriate funds for VWP workers. *See Chen v. GEO Group, Inc.*, 287 F. Supp. 3d 1158, 1165-66 (W.D. Wash. 2017) ("Congress has not specified any rate for detainee work since fiscal year 1979."); *Novoa v. GEO Group, Inc.*, No. 17 Civ. 2514, 2018 WL 3343494, at *4 (C.D. Cal. June 21, 2018) ("8 U.S.C. § 1555(d) permits appropriations for the payment of allowances for work performed. Congress however, has not directly appropriated such funds since 1979."). Once the 1979 appropriation expired at the end of that fiscal year, it ceased to exist. *See* GAO Redbook, ch 2, § B.5.c, at 2-29.

But ICE continued to spend agency funds to reimburse contractors for detainee work programs for over 30 years, including during the period covered by Plaintiffs' claims here. Although the source of the funds ICE spent is unclear, they were not appropriated for work programs, and ICE was not free to spend them as it saw fit.[9] By

---

[9] "Agencies may transfer funds only when expressly authorized by law." *See* GAO Redbook, ch. 2, § B.7.a, at 2-38. No such express authorization exists here. Similarly, ICE also cannot reprogram funds into the VWP, as reprogramming of funds is only permissible if "the resulting obligations and expenditures are consistent with the purpose restrictions applicable to the appropriation." *Id.* at 2-44.

doing so, ICE went "beyond what [8 U.S.C. § 1555] permits." *California v. Trump*, 379 F. Supp. 3d 928, 943 (N.D. Cal. 2019). When Congress exercises its Constitutional power to cut off funding, the Executive Branch is not free to ignore it – "'[n]o' means no." *Trump*, 963 F.3d at 949.

A comparison of the language in the 2011 PBNDS with the last Congressional authorization of funds illustrates that the latter provides no support for the former. The 1978 appropriations bill for fiscal year 1979 provides that allowances for work programs shall be "at a rate *not in excess of* $1 per day." PL 95–431 (HR 12934), PL 95–431, Oct. 10, 1978, 92 Stat 1021 (emphasis added). The 2011 PBNDS, in contrast, provides that the rate shall be "at least" $1 per day. Whatever authority ICE may claim for this provision, it cannot be the 1978 appropriations language – and no other source of valid authority from Congress has filled the gap.

Because ICE lacked authority to set VWP rates, it could not "validly confer[]" authority to pay such allowances onto GEO. *Yearsley*, 309 U.S. at 20. In the absence of such validly conferred authority, GEO's derivative sovereign immunity defense fails.[10]

## C. GEO's Arguments Under the Government Contractor Defense Fail for The Same Reasons As Its Derivative Sovereign Immunity Arguments.

---

[10]    GEO may cite *Alvarado Guevara v. Imm. and Naturalization Serv.*, 902 F.2d 394, 396 (5th Cir. 1990) for the proposition that the detainee allowance rate set in the 1978 Appropriations Act confers authority on ICE to use appropriated funds to pay detainees $1 per day for their work. However, that case is not binding on this Court, and was wrongly decided. Although it reached the conclusion that the $1 per day rate set in 1978 authorized VWP work in 1990, it only cited the language of 8 U.S.C. § 1555(d); it did not analyze it or the appropriations acts that followed. *See id.*

GEO's argument that it can also avoid liability under the government contractor defense is a condensed version of the argument it set forth in its opposition to Plaintiffs' Motion for Summary Judgment, and fails for the same reasons Plaintiffs identified in their reply to that brief.  *See* ECF No. 286 at 104-106.  The government contractor defense applies where it is impossible for a contractor to "comply with both its contractual obligation and the state-prescribed duty" it is alleged to have violated.  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 509 (1988).  *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090 (10th Cir. 2015), on which GEO rests its argument, presented just such a situation: there, the state law under which the plaintiff had brought her case "outright forb[ade the defendant] from fulfilling its contractual obligation."  *Id*. at 1099.

In contrast, as set forth above, nothing prevented GEO here from both fulfilling its contractual obligation to the federal government and following the law.  ICE itself rejects GEO's argument that the VWP claims arise from an obligation set forth in GEO's contract with ICE.  Add. Fact No. 1.  GEO's purported concern that a favorable result for Plaintiffs could lead VWP rates to vary all over the country ignores that VWP rates already *do* vary all over the country.   Add. Fact No. 19; *see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 88 (1994) (calling an interest in uniformity "that most generic (and lightly invoked) of alleged federal interests").  And the potential for increased costs, standing alone, is not enough to confer immunity from state-law claims.  *See Boyle*, 487 U.S. at 507.  Moreover, GEO's argument elides the fact that where VWP wages are more than $1 per day, it is GEO, not ICE, that foots the bill.  Add. Fact No. 20; *see also* Add.

Fact No. 19 (showing, at Reply Ex. 13, separate entries for "ICE Pay" ($1.00) and "GEO Pay" (up to $2.00) for each day of detainee pay).

Finally, as with its argument on the derivative sovereign immunity defense, GEO neglects to mention that this Court has already considered whether GEO's contract with ICE presents a "significant conflict" with the law on which Plaintiffs base their claims, and concluded that it does not. *Menocal*, 113 F. Supp. 3d at 1135. For the reasons stated above, GEO's motion provides no basis to revisit this determination.

### D. Overwhelming Evidence Supports Plaintiffs' Contention that GEO's Threats of Solitary Confinement Were Intended to Compel Forced Work.

GEO, somewhat puzzlingly, also seeks summary judgment on Plaintiffs' TVPA claims on the basis that Plaintiffs "have provided no evidence whatsoever" that they are able to meet the scienter requirement under the TVPA. GEO MSJ, ECF No. 284 at 21. This argument misconceives the standard on summary judgment; Plaintiffs do not bear the burden of production to prove their claims at this stage, and GEO's motion can only succeed by showing that Plaintiffs *cannot* meet an element of their claims at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). This argument appears suited to an *opposition* to a summary judgment motion on the scienter requirement, which Plaintiffs did not file. In any case, the record reveals an ample basis for a jury to conclude that GEO intended detainees to believe they could be placed in solitary confinement for refusing to clean.

To find for the plaintiff in a TVPA claim, the factfinder must determine "that the employer intended to cause the victim to believe that she would suffer serious harm –

from the vantage point of the victim – if she did not continue to work." *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011).  Evidence of intent can be inferred from the circumstances. *Id*. at 1171 (upholding jury's verdict based on "reasonable inferences" drawn from the evidence); *id.* 1173 (when there were "two reasonable interpretations" of a single statement – one threatening and one non-threatening – a juror could reasonably conclude that the defendant intended the threatening one).

Here, the record strongly supports the inference – which here must be drawn in favor of Plaintiffs, as the nonmoving party – that GEO intended its threats of solitary confinement to compel detainee labor.  GEO guards threatened on numerous occasions to put detainees in solitary confinement for refusing to clean.  For example, named Plaintiff Hugo Hernandez-Ceren described an incident where a GEO sergeant gathered detainees in his pod and told them "If you refuse to clean, you will be sent to the hole . . . And that's not a place where you want to be at because it's cold in there [and] you're going to lose your privileges."  Plaintiffs' Opp. Ex. 2 (Hernandez-Ceren Dep. 78:21-79:5). Similarly, named Plaintiff Grisel Xahuentitla testified that she witnessed multiple such threats, including one incident where a fellow detainee was too sick to clean and the guard pointed to the solitary confinement unit and told the sick detainee "that if she didn't do the work, she was going to be sent to the hole."  Plaintiffs' Reply Ex. 10, ECF No. 287-10 (Xahuentitla-Flores Dep. 73:19-74:9).

Further, Class Member Plaintiff Alejandro Hernandez Torres was sent to the hole for refusing to clean.  He testified that after he told a guard, "No, I'm not going to clean,"

the guard "turned [Mr. Torres] by [his] shoulder, put the handcuffs on [him] and took [him] to segregation."  Plaintiffs' Opp. Ex. 3 (Hernandez-Torres Dep. 60:8-14).

Indeed, Luis Pagan, himself a GEO guard, admitted that guards made such threats to enforce compliance with facility rules, including the HUSP.  Plaintiffs' Opp. Ex. 5 (Pagan Dep. 122:3-125:4).  Mr. Pagan testified that guards who sent detainees to the hole for refusing to clean "didn't do anything wrong" and had acted "within their powers" as GEO guards.  *Id*.  This underscores the fact that the whole point of "disciplinary segregation" is the same as for all forms of discipline, which by definition is "the practice of training people to obey rules or a code of behavior, using punishment to correct disobedience."[11]  Intent is implicit in this definition.

Disregarding this evidence, GEO misleadingly suggests that the only evidence of a threat comes from the testimony of Named Plaintiff Demetrio Valerga, then mischaracterizes the testimony as reflecting that the threats of segregation came from ICE and not GEO employees.  In fact, Mr. Valerga testified that a GEO guard woke him up one morning with an order to clean, and when Mr. Valerga declined to do so, the guard "told me if I don't clean, he's going to take me to the hole."  GEO Ex. M, ECF No. 271-7 (Valerga Dep. 137:12-14).  When Mr. Valerga continued to resist, the guard involved ICE personnel.  *Id*. at 138:2-139:19.[12]  Although Mr. Valerga was not placed in the hole

---

[11]     Oxford University Press (2020 discipline in: Lexico.com) *available at*: https//www.lexico.com/definition/discipline (last accessed July 28, 2020).

[12]     To the extent ICE personnel stationed at Aurora also threatened detainees with solitary confinement for refusing to work, that does not affect the derivative sovereign immunity analysis.  ICE officers onsite at Aurora were not authorized to condone acts that deviate from the requirements of the ICE-GEO contract, as GEO's forced-cleaning

for refusing to clean that day, the undisputed evidence in the record shows that many of his fellow detainees were.  Add. Fact No. 13.[13]  A jury can infer GEO's knowledge from these facts.

## V.  CONCLUSION

GEO's motion for summary judgment founders on the law of derivative sovereign immunity, the facts of this case, and the summary judgment standard.  GEO cannot meet any element of the derivative sovereign immunity or government contractor defenses, and its motion should accordingly be denied.

Dated: New York, NY
       July 31, 2020

Respectfully submitted,

By: */s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000

---

regime does.  *See* Plaintiffs' Ex. A, ECF No. 261-2 (A. Martin Dep. 198:22-199:10); Reply Ex. 6, ECF No. 287-6 (A. Martin Dep. 81:22-82:13); GEO's Second Notice of Supplemental Authority Ex. B, ECF No. 297-2 at 3-4 (Contracting Officer's Representative ("COR") Appointment Letter) (listing functions and actions the COR "shall not" undertake, including "direct the contractor . . . to operate in conflict with the contract terms and conditions," "[c]hange or modify any of the terms and conditions . . . of a contract," or "specify[] how the Contractor will accomplish performance").

[13]     GEO appears to suggest that this one instance, where threats of solitary confinement were unsuccessful in compelling detainee labor, proves conclusively that such threats did not constitute serious harm.  That argument is based on a misunderstanding of the TVPA, which "will not look at how each Plaintiff perceived the Defendants' actions or whether he or she subjectively felt compelled to work." *Paguirigan v. Prompt Nursing Employment Agency LLC*, No. 17 Civ. 1302, 2019 WL 4647648, at *16 (E.D.N.Y. Sept. 24, 2019) (quoting *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2011 WL 7095434, at *8 (C.D. Cal. Dec. 12, 2011)).  Rather, "the inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions." *Id.*

Facsimile: (646) 509-2060
E-Mail: mscimone@outtengolden.com

Rachel Dempsey
Adam Koshkin
**OUTTEN & GOLDEN LLP**
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
E-Mail: rdempsey@outtengolden.com
E-Mail: akoshkin@outtengolden.com

Alexander Hood
David Seligman
Juno Turner
**TOWARDS JUSTICE**
1410 High St., Suite 300
Denver, CO 80218
(720) 441-2236
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org

R. Andrew Free
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
T: (844) 321-3221
Andrew@ImmigrantCivilRights.com

Brandt Milstein
**MILSTEIN LAW OFFICE**
1123 Spruce Street
Boulder, CO 80302
(303) 440-8780
brandt@milsteinlawoffice.com

Andrew Turner
**THE KELMAN BUESCHER FIRM,
P.C.**
600 Grant St., Suite 825
Denver, CO 80203

46

(303) 333-7751
aturner@laborlawdenver.com

Hans Meyer
**MEYER LAW OFFICE, P.C.**
P.O. Box 40394
Denver, CO 80204
(303) 831-0817
hans@themeyerlawoffice.com

*Class Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2020, a copy of the foregoing document was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
E-Mail: mscimone@outtengolden.com