# Exhibit 1

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                        DISTRICT OF COLORADO
 2
                CIVIL ACTION NO.:  1:14-CV-02887-JLK
 3

 4    ALEJANDRO MENOCAL, et al.,

 5                      Plaintiffs,

 6    -vs-

 7    THE GEO GROUP, INC.,

 8                      Defendant.
      _____/
 9

10

11

12                  DEPOSITION OF DAVID VENTURELLA

13

14                    Tuesday, July 21, 2020
                       9:43 a.m. - 3:49 p.m.

15

16              ALL PARTIES APPEARED REMOTELY

17

18
                    Stenographically Reported By:
19                       JULIE BRUENS, FPR
                    Florida Professional Reporter
20

21

22

23

24

25
```

David Venturella
July 21, 2020                                                                2

```
1                          APPEARANCES

2

3    On behalf of the Plaintiffs:
                    OUTTEN & GOLDEN, LLP
4                   685 Third Avenue
                    New York, New York 10017
5                   212-245-1000
                    mscimone@outtengolden.com
6                   BY: MICHAEL J. SCIMONE, ESQUIRE
                        RACHEL DEMPSEY, ESQUIRE
7

8    On behalf of the Defendant:
                    AKERMAN
9                   1900 Sixteenth Street, Suite 1700
                    Denver, Colorado 80202
10                  303-260-7712
                    adrienne.scheffey@akerman.com
11                  BY: ADRIENNE SCHEFFEY, ESQUIRE

12                  THE GEO GROUP, INC.
                    4955 Technology Way
13                  Boca Raton, Florida 33431
                    561-443-1786
14                  cwilke@geogroup.com
                    BY: CHERYL WILKE, ESQUIRE
15
     ALSO PRESENT:
16
         DAN EISMEIER
17
         ANDREW FREE
18
         JOE RIVERA, VIDEOGRAPHER
19

20                           -   -   -

21

22

23

24

25
```

David Venturella
July 21, 2020                                    60

1      Q.   Okay.  And now if you turn to the very -- if

2  you were to scroll down to the very bottom of the PDF --

3      A.   The last page?

4      Q.   The very last page, yeah.  Let me know when

5  you're there.

6      A.   Okay.

7           MS. SCHEFFEY:  And is that the document that

8      it looks like it has 2555 on it -- 2755 on the

9      bottom?

10          MR. SCIMONE:  Yes.  So this has a stamp at the

11     bottom for the record 2018-ICLI00052 bates 2755.

12          MS. SCHEFFEY:  Thank you.

13          THE WITNESS:  Okay.  I'm at the bottom of the

14     document.

15  BY MR. SCIMONE:

16     Q.   All right.  And so looking at the signature

17  block, you'll see there's a box right over the space

18  where a signature would normally appear, but right below

19  that, you can see the title is unredacted, and it says

20  senior vice president of business development.  Do you

21  see that?

22     A.   I do.

23     Q.   And this is in February of 2018.  Was that

24  your job title at that time?

25     A.   Yes.

David Venturella
July 21, 2020                                                61

1        Q.    Okay.  And so although it's redacted here, did

2   you sign this letter?

3        A.    Yes.

4        Q.    Did you draft this letter personally?

5        A.    I did draft parts of it.  There were others

6   who reviewed it and made changes.

7        Q.    But all the original text was from you?

8        A.    Well, when you say -- I mean, it was

9   definitely reviewed and things were changed, so I'm not

10  sure what you mean by all the original text.

11       Q.    Sure.  I mean, so the first draft of the

12  letter as I understand was something that you wrote?

13       A.    Yes.

14       Q.    Were there other parts of the letter that

15  were -- the first draft was done by anyone else besides

16  you?

17       A.    Again, there were other people who reviewed

18  it, had input in it.  I don't know all of those

19  individuals, but like a lot of documents, it goes

20  through several iterations before the final one is

21  approved.

22       Q.    Sure.  And this is an official communication

23  to ICE; correct?

24       A.    Yes, it's official.

25       Q.    Through the company?

David Venturella
July 21, 2020                                          62

1        A.    Yes.

2        Q.    Okay.  So and essentially given that it's an

3   official communication from the GEO Group to the

4   government, you would want to be careful about the

5   information that goes into this document; correct?

6              MS. SCHEFFEY:  Object to form.

7              THE WITNESS:  We want it to be correct and

8         factual and accurate.

9   BY MR. SCIMONE:

10       Q.    So besides yourself, of the people who had

11  input into this letter, who else do you know of who had

12  input?

13       A.    I would imagine our general counsel or

14  individuals from our general counsel's office would have

15  had input in this.  Others, I don't know specifically

16  who had input.

17       Q.    Do you know whether there were other

18  executives at the GEO Group who had input into this

19  letter?

20             MS. SCHEFFEY:  Object to form, asked and

21        answered.

22             THE WITNESS:  I would assume.  That's kind of

23        our common practice that other people would have

24        input.

25  BY MR. SCIMONE:

David Venturella
July 21, 2020                                    63

1        Q.   Okay.  But you don't know for a fact whether

2   they did or not?

3        A.   No, I don't recall.

4        Q.   Okay.  Do you know for a fact whether the

5   general counsel's office had input into the letter?

6        A.   I would say I feel pretty strongly that they

7   had input in it.

8        Q.   So looking at the top of the letter now -- you

9   can scroll up to the top and we'll start up there.

10  Okay.  So you see at the top, this is dated February

11  14th, 2018?

12       A.   I do.

13       Q.   Okay.  And this is addressed to acting

14  director Thomas Homan; correct?

15       A.   Yes.

16       Q.   And at the time, did you know Mr. Homan

17  personally?

18       A.   Yes.

19       Q.   Have you interacted with him during your

20  employment with ICE?

21       A.   Yes.

22       Q.   While you were at ICE, what was his position

23  relative to yours?  Can you situate him within the

24  agency?

25            MS. SCHEFFEY:  Object to form.

```
 1              THE WITNESS:  Well, that changed a number of

 2        times throughout the year, or the years, I should

 3        say, that we were in the agency together.

 4   BY MR. SCIMONE:

 5        Q.   Do you remember what his position was at the

 6   time that you left relative to yours?

 7        A.   He was the deputy executive assistant director

 8   for ERO at the time.

 9        Q.   All right.  So he was within the same division

10   that you were at the time that you left; is that right?

11              MS. SCHEFFEY:  Object to form.

12              THE WITNESS:  Yes.  Correct.

13   BY MR. SCIMONE:

14        Q.   Were you friendly with Thomas Homan during

15   that time?

16        A.   Yes.

17        Q.   And did that relationship have any impact on

18   the decision by the GEO Group to have this letter come

19   from you?

20              MS. SCHEFFEY:  Object to form.

21              THE WITNESS:  No.

22   BY MR. SCIMONE:

23        Q.   Did you have discussions about who the letter

24   should come from?

25              MS. SCHEFFEY:  Object to form, and I'm going
```

David Venturella
July 21, 2020                                    70

```
 1   open now?
 2        A.   I do.
 3        Q.   Okay.  So looking at the cover of this
 4   document, is it familiar to you?
 5        A.   It is.
 6        Q.   All right.  And do you recognize this as the
 7   cover of the Performance-Based National Detention
 8   Standards for 2011?
 9        A.   Yes, it is.
10        Q.   And so what we've done here, this was all part
11   of one document, so I'm just going to represent to you
12   what we have here.  I just tried to cut down the size of
13   the files so we could open it in the chat window.
14             So it has the cover and preface through the
15   table of contents, and then it jumps to a couple of
16   sections.  There's Section 3.1, disciplinary system, and
17   then there's another jump from there to -- starting at
18   bates number 62798 to Section 5.8 titled Voluntary Work
19   Program.
20             So I would like you to turn to that section,
21   the Voluntary Work Program, and it's going to be on the
22   page bate stamps GEO MEN 62798.  Let me know when you're
23   there.
24        A.   Sorry.  This is a little slow.
25        Q.   It's okay.
```

David Venturella
July 21, 2020                                          71

1          A.    Okay.  Voluntary Work Program.  I got it.

2          Q.    Okay.  So is this the Voluntary Work Program

3    that you mentioned earlier, the VWP?

4          A.    The standard for it, sure.

5          Q.    And I'll draw your attention to the text

6    underneath that first section, purpose and scope, that

7    begins in italics right underneath the bullet points.

8    Do you see that?

9          A.    I do.

10         Q.    Okay.  And it says there procedures in italics

11   are specifically required for SPCs, CDFs, and dedicated

12   IGSA facilities.  What is a CDF?

13              MS. SCHEFFEY:  Object to form, foundation.

14              THE WITNESS:  A contract detention facility

15        for these purposes.

16   BY MR. SCIMONE:

17         Q.    And that's what the Aurora Detention Facility

18   is, correct, a CDF?

19         A.    Correct.

20         Q.    All right.  And so is it your understanding

21   that the italicized text in these standards is mandatory

22   for a facility like Aurora?

23         A.    Yes.

24         Q.    Okay.  So now if you'll turn to the next page,

25   I'll draw your attention to Section C, where it says

David Venturella
July 21, 2020                                          72

1    personal housekeeping required.

2         A.   Uh-huh.

3         Q.   Do you see that?

4         A.   I do.

5         Q.   Okay.  All right.  And it says work

6    assignments are voluntary, however, all detainees are

7    required for personal housekeeping.  And then it

8    continues detainees are required to maintain their

9    immediate living areas in a neat and orderly manner

10   by -- and then it lists four things.  Do you see that

11   text?

12        A.   I do.

13        Q.   Okay.  And just take a minute to read through

14   those four items and let me know when you're done.

15        A.   Okay.  Done.

16        Q.   Okay.  So is it your understanding that work

17   assignments in a contract detention facility under the

18   PBNDS are -- have to be voluntary with the exception of

19   these four things?

20             MS. SCHEFFEY:  Object to form.

21             THE WITNESS:  Yes.

22   BY MR. SCIMONE:

23        Q.   Okay.  So now if you'll turn back to Exhibit 1

24   and scroll down to --

25        A.   Hold on.  I'm going to need assistance from

David Venturella
July 21, 2020                                    73

```
 1    Cheryl here.  I'm not able to pull it up.

 2            MS. WILKE:  That's okay.  What page would you

 3        like him to do go to, sir?

 4            MR. SCIMONE:  2754.

 5            MS. WILKE:  On document one?

 6            MR. SCIMONE:  Yes.  Correct.

 7    BY MR. SCIMONE:

 8        Q.   Let me know when you're ready.

 9        A.   Okay.  I'm ready.

10        Q.   Okay.  So you see the section titled concerted

11    challenges to ICE authority and Federal law?

12        A.   Yes.

13        Q.   Okay.  In that first paragraph, I would like

14    to draw your attention to the last sentence.  It says to

15    the extent that plaintiffs allege that disciplinary

16    segregation is an unlawful threat for refusal to work,

17    this section comes directly from ICE policies, which I

18    should assist in defending.  Do you see that?

19        A.   I do.

20        Q.   Okay.  So in this letter, when you refer to

21    disciplinary segregation as a sanction for refusing to

22    work, is that referring to refusal to do those four

23    mandatory things that are stated in the PBNDS?

24            MS. SCHEFFEY:  Object to form, misstates prior

25        testimony.  You may answer.
```

David Venturella
July 21, 2020                                    74

```
 1            THE WITNESS:  I think it could be any work

 2      assignment.

 3  BY MR. SCIMONE:

 4      Q.    Okay.  Let's turn back to document number two,

 5  Exhibit Number 2.

 6      A.    Okay.  Sorry.

 7      Q.    Okay.  Sorry about all the back and forth.

 8            MS. WILKE:  What particular page, sir?

 9            MR. SCIMONE:  Yeah.  62631.  The fourth page

10      of the PDF, if that's helpful.

11            MS. WILKE:  62631.  Okay.

12  BY MR. SCIMONE:

13      Q.    All right.

14      A.    Okay.

15      Q.    Okay.  So -- all right.  So just looking at

16  this page, it says at the top 3.1, disciplinary system.

17  So you recognize this to be the section of the PBNDS

18  that deals with discipline?

19      A.    Yes.

20      Q.    Okay.  And so if you scroll down now to -- all

21  right.  Page 62642.

22      A.    62642.  Is that what you said?

23      Q.    That's right.  Yes.

24      A.    Okay.

25      Q.    All right.  You see the section high moderate
```

David Venturella
July 21, 2020                                          84

 1        would have discussed with counsel.

 2   BY MR. SCIMONE:

 3        Q.   Mr. Venturella, let me ask you a different

 4   question.  This sentence here about the one dollar per

 5   day rate and the idea that it can't be increased without

 6   ICE's authorization, was that a sentence that you

 7   drafted when you wrote this letter?

 8        A.   I do not recall.

 9        Q.   Do you recall whether that sentence was added

10   to the letter by GEO's counsel?

11        A.   I don't recall.

12        Q.   At the time that you wrote this letter, did

13   you have any understanding in your mind about whether or

14   not the VWP rate could be increased?  And I'm talking

15   when you drafted the letter but before you received

16   input on it from counsel.

17        A.   The way I would answer that question is that

18   any changes to anything we do on an ICE contract

19   requires ICE's authorization.

20             So whether it's that particular line or any

21   other activity, if ICE previously approved it and we

22   wanted to change it, then ICE has to approve that

23   change.

24        Q.   Okay.  I think we covered this earlier, but

25   when you were at ICE, decisions about whether or not to

David Venturella
July 21, 2020                                      85

1    approve a change like that, that wouldn't be something

2    that came before you in your capacity at ICE; correct?

3         A.   That's correct.

4         Q.   Okay.  Based on your understanding, though,

5    and at the time you wrote this letter, is it true that

6    ICE can approve an increase in the VWP rate that the

7    contractor pays to detainees in a Voluntary Work

8    Program?

9              MS. SCHEFFEY:  Object to form.

10             THE WITNESS:  ICE can authorize an increase.

11   BY MR. SCIMONE:

12        Q.   Okay.  All right.  I'm going to drop a new

13   exhibit into the chat window, so look out for that.  It

14   will be Exhibit 3.

15             (Thereupon, the document was marked as

16   Plaintiff's Exhibit 3 for identification.)

17             MS. SCHEFFEY:  Cheryl will need to help you

18        with that.

19             THE WITNESS:  She's sliding over as we speak.

20             MR. SCIMONE:  It's a smaller document, so

21        hopefully this one won't be as difficult as the

22        last.

23             MS. WILKE:  That was an easy one.

24             MR. SCIMONE:  Sorry, I didn't hear that.

25             MS. WILKE:  That was an easy one.  Which page

David Venturella
July 21, 2020                                          86

1        would you like him to go to, sir?

2              THE WITNESS:  Just start on the first page.

3              MS. WILKE:  Okay.

4              MS. SCHEFFEY:  And has this been disclosed in

5        this litigation or produced?

6              MR. SCIMONE:  Yes.  If you look at the top,

7        you'll see there's ECF information.  You'll see

8        this lawsuit on June 26th, and the docket number is

9        287-13.

10   BY MR. SCIMONE:

11       Q.   Okay.  Mr. Venturella, take a look at this

12   document.  And my question for you is going to be

13   whether you recognize the general form and format of it.

14   Not with respect to specific contents, but just the form

15   of the document.

16       A.   All right.  It's not a document that I'm

17   familiar with.  I don't produce invoices, so I can't say

18   that I've seen this before.

19       Q.   Okay.  You do recognize this as an invoice

20   though?

21       A.   I can read the words on the PDF here, so yes,

22   it says invoice.

23       Q.   Okay.  And it's an invoice directed from the

24   GEO Group, that comes from the GEO Group; correct?

25              MS. SCHEFFEY:  Object to form.

David Venturella
July 21, 2020                                              87

```
 1              THE WITNESS:  Yes.

 2   BY MR. SCIMONE:

 3       Q.   And you see the GEO Group -- that's the GEO

 4   Group's logo in the upper right-hand corner; correct?

 5       A.   Yes.

 6       Q.   And there's an address right underneath the

 7   logo in Texas, and it's -- and that address is for the

 8   South Texas Detention Complex.  Do you recognize that as

 9   a GEO facility?

10       A.   Yes.

11       Q.   Okay.  Now, if you look over to the left,

12   underneath the date and the invoice and client number,

13   there's an address for DHS ICE.  Do you see that?

14       A.   Yes.

15       Q.   And that's directed to the Burling Finance

16   Center in Vermont.  Do you -- are you familiar with the

17   fact that DHS has a finance center in Vermont?

18       A.   Yes.

19       Q.   And do you understand that finance center to

20   be a place that processes ICE payments to contractors?

21       A.   Yes.

22       Q.   All right.  And is it your understanding that

23   GEO regularly sends invoices to ICE for payments related

24   to its contract detention facilities?

25       A.   Yes.
```

David Venturella
July 21, 2020                                    88

```
 1        Q.    Who prepares those invoices?

 2        A.    I would have to defer to Amber Martin on that.

 3   I don't know who does.

 4        Q.    Is it your understanding that those invoices

 5   are prepared by people who have knowledge about the

 6   information that's put in the invoice, the dollar

 7   amounts and the type category and that sort of thing?

 8        A.    Again, I'm not familiar with the process and

 9   who does it, and I think Ms. Martin would be the best

10   person to ask that question.

11        Q.    Okay.  But just in general, when -- the

12   question I'm asking is just when GEO sends invoices to

13   ICE, they are prepared by people who have knowledge of

14   the things that they are invoicing the agency for; is

15   that fair to say?

16             MS. SCHEFFEY:  Object to form, asked and

17        answered.

18             THE WITNESS:  Honestly, I don't know.

19   BY MR. SCIMONE:

20        Q.    Is it your understanding that GEO just has

21   people with no knowledge about the subject matter make

22   up invoices?

23             MS. SCHEFFEY:  Object to form.

24             THE WITNESS:  I'm not going to answer that.

25        That's ridiculous.
```

David Venturella
July 21, 2020                                    89

1    BY MR. SCIMONE:

2        Q.   Okay.  Well, sir, you're under oath here at a

3    deposition.  I'm afraid you have an obligation to answer

4    my questions.  So the question I'm asking is --

5            MS. SCHEFFEY:  Michael, he can answer your

6        factual questions.  He doesn't have to answer

7        argumentative questions.

8            MR. SCIMONE:  Okay.  Adrienne, let me make my

9        record please.

10   BY MR. SCIMONE:

11       Q.   The question I'm asking is in your experience

12   as an executive working for the GEO Group, you know that

13   the company submits invoices to ICE and to the

14   Department of Homeland Security.  My question is just

15   whether those invoices are prepared by people who have

16   knowledge about the things that are being invoiced.

17           MS. SCHEFFEY:  Objection to form and misstates

18       prior testimony.

19   BY MR. SCIMONE:

20       Q.   Is that something that you have knowledge

21   about?

22           THE WITNESS:  Right, and I'm answering I don't

23       know what those individuals have knowledge of.  If

24       that's what you're asking me, I do not know that.

25   BY MR. SCIMONE:

```
 1      didn't know about given the way I just released this

 2      information?

 3              MS. SCHEFFEY:  Object to form.

 4              THE WITNESS:  So in a procurement for

 5          detention services, even state, city, or local

 6          entities can compete in those competitions.  So we

 7          only knew of those three companies, for example, in

 8          the Houston area, but that didn't preclude anybody

 9          else to submit a proposal.

10      BY MR. SCIMONE:

11          Q.   And ICE --

12          A.   So I can't know all of the competitors, but

13      typically, we know of the three or four or five

14      companies that compete in that space.  But again, it's

15      not limited to just the private sector.

16          Q.   So in these instances, how did you come to

17      know that these companies were competing for those

18      contracts?

19              MS. SCHEFFEY:  Object to form.

20              THE WITNESS:  Well, we knew that MTC and

21          CoreCivic, as they are now known, already had an

22          existing facility in Houston.  We were aware of

23          Emerald having facilities -- I think it was

24          probably multiple facilities at the time -- and we

25          had a facility that was within the area of
```

David Venturella
July 21, 2020                                              162

```
 1        competition.
 2   BY MR. SCIMONE:
 3        Q.   Okay.  And you referred to state and local
 4   governments bidding on contracts as well.  Is that
 5   what's referred to as an IGSA?  Is that what you're
 6   talking about?
 7             MS. SCHEFFEY:  Object to form.
 8             THE WITNESS:  Correct.
 9   BY MR. SCIMONE:
10        Q.   And that's intergovernmental services
11   agreement?
12        A.   That's correct.
13        Q.   And so tell me if I have this right.
14   Generally speaking, IGSA is where there's a facility
15   provided by a municipality or a state or some other
16   government entity, and so they offer to contract with
17   ICE to provide that space; is that correct?
18        A.   Correct.
19             MS. SCHEFFEY:  Object to form.
20   BY MR. SCIMONE:
21        Q.   Is that generally right?
22        A.   Correct.
23        Q.   Okay.  Do IGSAs have any kind of competitive
24   advantage over, you know, contract detention facilities
25   and those kinds of procurements?
```

David Venturella
July 21, 2020                                    163

```
 1            MS. SCHEFFEY:  Object to form.

 2            THE WITNESS:  So typically -- so the short

 3       answer is yes, they do, in that they have already

 4       existing space that they have paid for, financed

 5       through the county, through the city, whatever.  So

 6       it's existing, and they make that space available

 7       to ICE generally at a lower cost because the

 8       facility has been paid for, it has been staffed,

 9       and they just have available beds that they can

10       offer at a much lower rate.

11            Now, the downside to that is with the ever

12       changing and evolving standards, those facilities

13       are less likely to make those changes to meet those

14       standards.  So in some cases, they have an

15       advantage, and in other cases, they don't.

16  BY MR. SCIMONE:

17       Q.   Take a look at paragraph 27.  Before we get

18  there, actually, let me ask a different question.  Are

19  you aware of any legal authority that allows ICE to

20  contract directly with private prison companies absent

21  an IGSA?

22            MS. SCHEFFEY:  Object to form and calls for a

23       legal conclusion.

24            THE WITNESS:  Am I aware of any authority?

25            MR. SCIMONE:  Yes.
```

David Venturella
July 21, 2020                                          189

1    you questions about when you were at the agency, but

2    given your experience in dealing with members of

3    Congress at the GEO Group, the cost of detention

4    services is something that is sometimes discussed when

5    legislatures are considering these issues; correct?

6              MS. SCHEFFEY:  Objection.

7              THE WITNESS:  Our discussions with

8         legislature, members of Congress, that's what

9         you're -- you're asking our discussions with

10        members of Congress?

11   BY MR. SCIMONE:

12        Q.   Let me ask -- well, we can withdraw the

13   question.  I understand this really isn't your area.

14             But there are people at the GEO Group who are

15   responsible for communicating with legislatures about

16   matters that are important to GEO's business; right?

17             MS. SCHEFFEY:  Objection.

18             THE WITNESS:  Yes.

19   BY MR. SCIMONE:

20        Q.   And generally, is it your understanding that

21   the cost of detention services is one of the things that

22   legislatures are concerned about?

23             MS. SCHEFFEY:  Objection.

24             THE WITNESS:  Yes, I believe cost is a factor

25        or concern.

David Venturella
July 21, 2020                                    190

```
 1    BY MR. SCIMONE:

 2        Q.   Okay.  There are some detention centers that

 3    are owned by ICE; is that right?

 4              MS. SCHEFFEY:  Objection.

 5              THE WITNESS:  There are -- yeah, there are I

 6         think four or five that are -- the buildings are

 7         owned by ICE, correct, or the Federal government.

 8    BY MR. SCIMONE:

 9        Q.   And are they managed by private companies?

10              MS. SCHEFFEY:  Objection.

11              THE WITNESS:  Based on my understanding, yes.

12    BY MR. SCIMONE:

13        Q.   All right.  But what -- is it fair to say that

14    one alternative that the agencies could consider but

15    haven't, don't currently, is that that they could

16    operate detention centers themselves?  ICE could operate

17    detention centers themselves?

18              MS. SCHEFFEY:  Objection.

19              THE WITNESS:  That is certainly one option.

20    BY MR. SCIMONE:

21        Q.   And in general, isn't one of the reasons for

22    private contracting that it's generally considered to be

23    more cost effective than having the government provide

24    services itself?

25              MS. SCHEFFEY:  Objection.
```

David Venturella
July 21, 2020                                        191

```
 1              THE WITNESS:  Correct.

 2   BY MR. SCIMONE:

 3      Q.   If that changed, if the cost of providing

 4   detention services went up to the point that it became

 5   more expensive, and significantly more expensive, is it

 6   fair to say that that might have an impact on the

 7   political decisions that are made about using

 8   immigration detention as opposed to one of the other

 9   alternatives that we talked about?

10              MS. SCHEFFEY:  Objection.

11              THE WITNESS:  It would be a -- certainly a

12         consideration.

13   BY MR. SCIMONE:

14      Q.   When did GEO first win the Aurora contract, do

15   you know?

16      A.   I want to say 1986.

17      Q.   Do you know if it was a competitive bid at the

18   time?

19      A.   I don't know.  I wasn't there.

20      Q.   Fair enough.  I know we're talking ancient

21   history now.  The contract has been renewed from time to

22   time, right, for Aurora?

23              MS. SCHEFFEY:  Objection.

24              THE WITNESS:  Yes.

25   BY MR. SCIMONE:
```

David Venturella
July 21, 2020                                              196

```
 1                    CERTIFICATE OF REPORTER

 2

 3   THE STATE OF FLORIDA,

 4   COUNTY OF PALM BEACH.

 5

 6              I, Julie Bruens, Florida Professional

 7   Reporter, certify that I was authorized to and did

 8   stenographically report the deposition of BRIAN EVANS;

 9   pages 1 through 109; that a review of the transcript was

10   requested; and that the transcript is a true record of

11   my stenographic notes.

12              I further certify that I am not a

13   relative, employee, attorney, or counsel of any of the

14   parties, nor am I a relative or employee of any of the

15   parties' attorneys or counsel connected with the action,

16   nor am I financially interested in the action.

17

18              Dated this 24th day of July, 2020.

19

20

21

22   _____
     Julie Bruens, FPR
23   Florida Professional Reporter

24

25
```

```
 1                    WITNESS NOTIFICATION LETTER

 2
      July 24th, 2020
 3

 4    DAVID VENTURELLA
      C/O
 5    CHERYL WILKE, ESQUIRE
      THE GEO GROUP, INC.
 6    4955 Technology Way
      Boca Raton, Florida 33431
 7    561-443-1786
      cwilke@geogroup.com
 8
      IN RE:  ALEJANDRO MENOCAL, et al. Vs. THE GEO GROUP,
 9    INC.
                       Deposition, taken on July 21, 2020
10         U.S. Legal Support Job No. 2211505

11

12    The transcript of the above proceeding is now available
      for your review.
13
      Please call to schedule an appointment between the hours
14    of 9:00 a.m. and 4:00 p.m., Monday through Friday, at a
      U.S. Legal Support office located nearest you.
15
      We respectfully request that the witness complete their
16    review within a reasonable time, and return the errata
      sheet to our
17    office. You need not return the entire transcript.

18
      Sincerely,
19

20

21

22    _____
      Julie Bruens, FPR
23    U.S. Legal Support, Inc.
      444 West Railroad Avenue, Suite 300
24    West Palm Beach, Florida  33401
      561.835.0220
25
```