# Exhibit 5

```
                                                                  Page 1
 1           IN THE UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF COLORADO
 2

 3      Civil Action No.: 1:14-cv-02887-JLK
     _____
 4
             VIDEOCONFERENCE DEPOSITION OF: LUIS PAGAN
 5                        July 8, 2020
     _____
 6
        ALEJANDRO MENOCAL, et al.,
 7
        Plaintiffs,
 8
        vs.
 9
        THE GEO GROUP, INC.,
10
        Defendants.
11
     _____
12

13
                 PURSUANT TO NOTICE, the videoconference
14      deposition of LUIS PAGAN was taken on behalf of the
        Plaintiff remotely, on July 8, 2020 at 10:05 a.m.,
15      before Leeann L. Stellor, Registered Merit Reporter
        and Notary Public within Colorado.
16

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1          A P P E A R A N C E S
 2
 3   For the Plaintiffs by videoconference:
 4        ANDREW TURNER, ESQ.
          MATTHEW FRITZ-MAUER, ESQ.
 5        The Kelman Buescher Firm
          600 Grant Street, Suite 450
 6        Denver, Colorado  80203
          aturner@laborlawdenver.com
 7        mfritz.mauer@laborlawdenver.com
 8
     For the Defendants by videoconference:
 9
10        ADRIENNE SCHEFFEY, ESQ.
          Akerman, L.L.P.
11        1900 16th Street, Suite 1700
          Denver, Colorado  80202
12        adrienne.scheffey@akerman.com
13        DANA EISMEIER, ESQ.
          MICHAEL LEY, ESQ.
14        Burns, Figa & Will, P.C.
          1700 Broadway, Suite 2100
15        Denver, Colorado  80290
          deismeier@bfwlaw.com
16        mley@bfwlaw.com
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1               I N D E X
 2
     EXAMINATION OF LUIS PAGAN                     PAGE
 3   July 8, 2020
 4   By Mr. Turner                                5, 173
 5   By Ms. Scheffey                             168, 175
 6
 7   DEPOSITION EXHIBITS                        REFERENCE
 8   Exhibit 1   Prospective Detention Officer       12
                 Interview Questionnaire
 9               GEO-MEN00170800 - 170792
10   Exhibit 2   Detention Officer Job Description   24
                 GEO_MEN 00019940 - 19941
11
     Exhibit 3   September 29, 2014 Shift Supervisor 34
12               Daily Log/Post Assignments
                 GEO_MEN 00030666
13
     Exhibit 4   Detainee Handbook                   98
14
     Exhibit 5   August 3, 2014 Shift Supervisor    119
15               Daily Log/Post Assignments
                 GEO_MEN 00049870
16
     Exhibit 6   June 17, 2015 Shift Supervisor Daily 126
17               Log/Post Assignments
                 GEO_MEN 00048862
18
     Exhibit 7   Excerpt from Policy and Procedure  135
19               Manual - Detainee Work Program
                 GEO_MEN 00041155
20
     Exhibit 8   Performance-Based National Detention 168
21               Standards 2011
22
23
24
25
```

Page 4

```
 1        WHEREUPON, the following proceedings were taken
 2   pursuant to the Colorado Rules of Civil Procedure.
 3              *   *   *   *   *
 4        MS. COURT REPORTER:  All parties to
 5   this deposition are appearing remotely and have
 6   agreed to the witness being sworn in remotely.  Due
 7   to the nature of remote reporting, please pause
 8   briefly before speaking to ensure all parties are
 9   heard completely.
10              Counsel, will you please state
11   your appearances for the record.
12              MR. TURNER:  Good morning.  Andrew
13   Turner on behalf of the plaintiff class, Kelman
14   Buescher Firm.
15              MS. SCHEFFEY:  Good morning, Adrienne
16   Scheffey on behalf of Geo Group, and with me is Dana
17   Eismeier.
18              And, Dana, is Mickey going to be
19   on?
20              MR. EISMEIER:  He will be listening
21   intermittently.
22              Mickey, are you on?
23              MR. LEY:  Yeah.
24              MS. SCHEFFEY:  And Michael Ley will
25   be on intermittently.
```

Page 5

```
 1              MR. LEY:  I'm going to just be on
 2   mute and turn off my video so I'm not distracting
 3   anyone.
 4              MR. TURNER:  I should note that
 5   Matthew Fritz-Mauer will also be observing silently,
 6   without a microphone, for plaintiffs.
 7              LUIS PAGAN,
 8   having been first duly sworn to state the whole
 9   truth, testified as follows:
10              EXAMINATION
11   BY MR. TURNER:
12        Q.   Good morning, Officer Pagan.
13        A.   Good morning.
14        Q.   My name is Andrew Turner.  I'm an
15   attorney with the Kelman Buescher Firm in Denver.
16   I'm counsel for the detainee workers in this case.
17   I believe you understand that we have several
18   attorneys on the line whose names have been recorded
19   in the record.
20              Can I ask who's with you this
21   morning?
22        A.   What's that?
23        Q.   Can I ask who is with you this morning,
24   for the record?  Are you alone?
25        A.   In this room, I'm by myself.
```

Page 106

1  Q.  Do you post a list in your housing unit?
2  A.  We do.
3  Q.  Do you develop the list?
4  A.  I'm sorry?
5  Q.  Do you develop the list personally?  Is
6  that a thing you do?
7  A.  Yes.
8  Q.  How do you make the list?
9  A.  We have -- we go by our -- it's a book we
10 have in the drawer, and we go by cell, each cell.
11 We move on from cell to cell every day.
12 Q.  And that's how you make the list, is
13 rotating cell to cell as to whose turn it is to
14 clean; is that right?
15     MS. SCHEFFEY:  Object to form.
16 A.  Yes.
17 Q.  How many people in the group?
18 A.  Excuse me.  It could be two cells at a
19 time because we need eight detainees cleaning.
20 Q.  So it would be up to eight?
21 A.  It could be, yes.
22 Q.  Have you seen more than eight?
23 A.  No.
24 Q.  Okay.  Are there four in a cell?
25 A.  Yes.

Page 107

1      MS. SCHEFFEY:  Object to form.
2  Q.  And you said it might be up to two
3  cleaning?
4  A.  Yes.
5      MS. SCHEFFEY:  Object to form.
6  Q.  Is this the same list of six people you
7  referenced on a cleanup crew before?
8      MS. SCHEFFEY:  Object to form.
9  A.  Can you clarify that question again?
10 Q.  Sure.
11         Earlier we talked about a wax
12 crew, and you also said that you supervised the
13 cleanup crew.
14 A.  Yes.  I -- yes.
15 Q.  And we talked about those people all
16 getting paid for the work and being on the pay
17 sheet; is that right?
18 A.  Yes.
19 Q.  This is different, isn't it?
20     MS. SCHEFFEY:  Object to form.
21 A.  It is different.
22 Q.  Okay.  There's no pay sheet for the
23 housing unit sanitation, right?
24 A.  Not -- there is for the detainees that
25 are assigned for that housing.

Page 108

1  Q.  Okay.  So there you're talking about
2  trustees, right?
3      MS. SCHEFFEY:  Object to form.
4  Q.  Am I right that you're talking about
5  trustees there?
6  A.  They're called dorm trustees.
7  Q.  Okay.  So you have some dorm trustees who
8  do get paid for the work they do in the housing unit
9  sanitation?
10 A.  Correct.
11 Q.  How many dorm trustees do you have?
12 A.  Two.
13 Q.  Two at a time.  How many are in the pod?
14 A.  It varies.  It can be a full house.  It
15 can be half.
16 Q.  What's a full house?
17 A.  80.
18 Q.  So when you say it could be half, you
19 mean 40, right?
20 A.  Yes.
21 Q.  So we're talking 40 to 80 people.  Two of
22 them would be trustees?
23 A.  Yes.
24 Q.  Do you always keep two trustees?
25 A.  We try.

Page 109

1      MS. SCHEFFEY:  Object to form.
2  Q.  I'm sorry, what did you say?
3  A.  We try to keep at least two.
4  Q.  How many have you seen maximum?
5  A.  Two.
6  Q.  So you try to keep at least two?
7  A.  Yes.  Sometimes they get deported so we
8  have one, so...
9  Q.  Sure.  And then you hire them through the
10 Voluntary Work Program to add to the dorm trustee?
11     MS. SCHEFFEY:  Object to form.
12 Q.  Is that right?
13 A.  Yes.
14 Q.  Do you, as the housing unit officer,
15 decide who that's going to be?
16 A.  No.
17 Q.  Do you know who does?
18 A.  Classification.
19 Q.  Okay.  But everybody has to participate
20 in housing unit sanitation, right?
21     MS. SCHEFFEY:  Object to form.
22 A.  We try to get everybody to help out and
23 clean.
24 Q.  It says here each and every detainee must
25 participate, right?

Page 110

1  A.  Yes.
2      MS. SCHEFFEY:  Object to form.
3  Q.  Was that a yes?
4  A.  Yes.
5  Q.  That's the rule, right?
6  A.  Well --
7      MS. SCHEFFEY:  Object to form.
8  A.  We indicate that they need to help clean,
9  yes.  It's not really enforced, but we ask them to
10 clean.
11 Q.  Didn't you tell me earlier that it's your
12 job to enforce all rules at all times, right?
13     MS. SCHEFFEY:  Object to form.
14 A.  Yes.
15 Q.  I'd like to show you --
16     MS. SCHEFFEY:  And, Andrew, while
17 you're shifting gears, I wanted to say at some point
18 we should discuss lunch.  I see it's 12:37, just so
19 you know.
20     MR. TURNER:  Okay.  Maybe now would
21 be a good time to take lunch.  Do you guys want to
22 take an hour?
23     MS. SCHEFFEY:  I think that's fine.
24     Dana, do you have food ordered?
25     MR. EISMEIER:  Yes, I've got it

Page 111

1  covered.
2      MS. SCHEFFEY:  Luis, is an hour good?
3  Do you need more or less?
4      MR. TURNER:  Mr. Pagan?
5      THE WITNESS:  45 minutes is good.
6      MS. SCHEFFEY:  Okay.  Andrew, 45 or
7  an hour is fine with me, whatever you choose.  We'll
8  do an hour.
9      MR. TURNER:  We'll see you back on at
10 1:38.
11     Again I would instruct the witness
12 that you're under oath and you're not to consult
13 about the substance of your testimony during the
14 break.
15     THE WITNESS:  Okay.
16     MS. SCHEFFEY:  And I would say I
17 disagree with that.  I think there's strong case law
18 to the opposite, as long as a question's not
19 pending.
20     MR. TURNER:  Well, I'm going to
21 inquire when you come back who you've consulted with
22 and what they've said.
23     Thank you.  We'll see you in an
24 hour.
25     THE WITNESS:  Okay.

Page 112

1      (Whereupon, a lunch break was had
2      from 12:38 p.m. to 1:41 p.m.
3      EXAMINATION (CONTINUED)
4  BY MR. TURNER:
5  Q.  Welcome back from the break, Officer
6  Pagan.
7  A.  Thank you.
8  Q.  I want to ask you, during the lunch break
9  did you consult with anyone regarding the substance
10 of your testimony?
11 A.  No.
12 Q.  You didn't discuss your testimony with
13 anyone?
14 A.  No.
15 Q.  Okay.  Before we took the break you were
16 explaining to me a little bit about your experience
17 as the officer on duty in the segregation unit.  Do
18 you recall that?
19 A.  Yes.
20 Q.  We had discussed suicide checks for
21 people who are identified as being a risk for
22 suicide; is that right?
23 A.  Yes.
24 Q.  And you recall doing those every 15
25 minutes; is that right?

Page 113

1  A.  Yes.
2  Q.  And if I recall correctly, you were
3  explaining that you have to look into the cell and
4  you kind of tap the door; is that right?
5  A.  Yes.
6  Q.  Do you get a verbal confirmation from
7  them every time?
8  A.  No, they look at you and maybe give you a
9  thumbs up or something.
10 Q.  Okay.  And that's for people who are
11 identified as a risk for suicide by medical; is that
12 right?
13 A.  Yes, by a psychiatrist, psychologist.
14 Q.  Okay.  How does that information come to
15 you?  Does the lieutenant tell you, hey, this
16 person's a risk, or how do you learn that?
17     MS. SCHEFFEY:  Object to form.
18 A.  Well, if you're working in segregation,
19 they bring this guy from medical and they give you
20 the paperwork on him and let you know what's going
21 on.
22 Q.  Did you tell me earlier there's a list
23 posted of who you have to do 15-minute checks on?
24     MS. SCHEFFEY:  Object to form.
25 A.  When you take over the segregation,

Page 118

1  would be corrected, right?
2           MS. SCHEFFEY: Object to form.
3       A.  Yes.
4       Q.  Even if it was a different detention
5  officer, you would probably be re-educated about how
6  to do it right to make sure you got it in the
7  future?
8           MS. SCHEFFEY: Object to form.
9       A.  Yes.
10      Q.  So even if somebody else had messed that
11 up, you'd probably hear about it, right?
12          MS. SCHEFFEY: Object to form.
13      A.  Well, if you -- if somebody messed up in
14 segregation without doing the proper checks, we
15 would get briefed on it, yes.
16      Q.  You said you'd get briefed on it?
17      A.  Yes, we'll get briefed that someone's not
18 doing their checks right, don't get caught doing
19 this because you could be disciplined or terminated.
20      Q.  Is that part of the lieutenant briefing
21 you were talking about before? Is that where you'd
22 expect to hear that kind of thing?
23      A.  Yes.
24      Q.  Okay. But not necessarily just talking
25 about seg. there. I mean, if there was just some

Page 119

1  issue about compliance, the lieutenant would tell
2  you guys, right?
3       A.  Right.
4           MS. SCHEFFEY: Object to form.
5       Q.  Is that right?
6       A.  Yes.
7       Q.  And you'd hear that kind of thing in
8  briefing, about how to do it better?
9       A.  Yes.
10          MS. SCHEFFEY: Objection.
11      Q.  I'd like to show you now what I'll mark
12 as Exhibit 5, please.
13          (Exhibit No. 5 was marked.)
14      Q.  Just take a minute to look that document
15 over and let me know if you recognize that as
16 familiar?
17      A.  Is there another download I have to do
18 here?
19      Q.  I can try to give it to you a couple
20 different ways.
21      A.  Okay. "Shift Supervisor Daily Log."
22      Q.  Do you see yourself on this log?
23      A.  No. I'm sorry, yes, I do.
24      Q.  Okay. So this is a day you were
25 scheduled on, right?

Page 120

1       A.  Yes.
2       Q.  What roles do you see yourself in?
3       A.  It looks like I'm B1. That was the dorm.
4       Q.  I also see you listed on escort officer;
5  is that right?
6           MS. SCHEFFEY: Object to form.
7       A.  That would be in case I would have to be
8  changed out, I could be an escort. But at the time
9  I was assigned to B1.
10      Q.  And we were talking about escort earlier.
11 That was kind of like if somebody needed moving from
12 place to place, right?
13      A.  Correct.
14      Q.  You're not driving a van. You're just
15 taking someone from pod to pod or something like
16 that?
17      A.  Right.
18      Q.  Changing housing, right?
19      A.  Changing housing or taking them to
20 medical or legal visit or assign them, whatever we
21 need to get them to.
22      Q.  If you look at this document here, can
23 you recognize for me which shift supervisor it is
24 that created this report?
25      A.  What year is this? Does it have a date

Page 121

1  up top?
2       Q.  I believe you'll see August 3, 2014; is
3  that correct?
4       A.  2014, yes. Yes.
5       Q.  You do see that date?
6       A.  Yes.
7       Q.  Do you recognize that particular
8  supervisor's signature, or no?
9       A.  It could have been McCuen.
10      Q.  You're not sure?
11      A.  It's hard -- it looks like it starts with
12 an "M."
13      Q.  Okay. You see here on this particular
14 shift the sick call was completed, right?
15      A.  Yes.
16      Q.  And the shakedown searches were
17 completed, right? Do you see that?
18      A.  Yes.
19          MS. SCHEFFEY: Object to form.
20      Q.  Do you see that all post logs are
21 reviewed and signed?
22      A.  Yes.
23          MS. SCHEFFEY: Object to form.
24      Q.  And where we have a notation on the,
25 "Institution Cleanliness: Clean core, trash picked

Page 122

1  up, and all extra supplies put away."
2       A.   Yes.
3       Q.   Okay.  Now you see one incident listed
4  here.  You had told me earlier that your supervisor
5  would explain incidents in writing here, right?
6       A.   Well, he's probably just noted that
7  something occurred during that shift.
8       Q.   Okay.  And what I see here is, "Detainee:
9  Adam-Villalobos, Diego 206528359 sent to seg. for
10 refusing to clean and insolence to staff."
11           Do you see that?
12      A.   Yes.
13      Q.   And so we understand that to mean that
14 one of the detainees was disciplined for refusing to
15 clean and being insolent, right?
16           MS. SCHEFFEY:  Object to form.
17      A.   Like I said, I don't know.  It's
18 whatever's documented there.  I don't know what
19 would have occurred.  It looks like he was -- it was
20 more than just not cleaning.  He probably
21 disrespected or cussed out the officer.  Could have
22 been put to seg. for that reason.  I don't know.
23      Q.   So you see refusing to clean and
24 insolence to staff, right?
25      A.   I see it, yes.  But like I said, I don't

Page 123

1  know exactly what occurred.  I wasn't there.
2       Q.   If you were the escort officer, would you
3  have taken detainee Diego Villalobos to segregation?
4            MS. SCHEFFEY:  Object to form.
5       A.   Maybe.  There might be more than one
6  escort officer.  So I might have been the one, or
7  the other officer.
8       Q.   Were you the officer who wrote up this
9  detainee for refusing to clean and being insolent?
10           MS. SCHEFFEY:  Object to form.
11      A.   I don't recall that.  It doesn't specify
12 what dorm he was in.
13      Q.   Might you have been the officer who would
14 have written him up for being insolent and refusing
15 to clean?
16      A.   No.
17      Q.   You know it wasn't you?
18      A.   I would remember that.
19      Q.   Have you written up some detainees for
20 being insolent and refusing to clean?
21      A.   No.
22      Q.   You've never done that yourself?
23      A.   No.
24      Q.   You see on this roster who else was on
25 your shift.  Please take a moment to review that.

Page 124

1       A.   Okay.  Okay.  Yes.
2       Q.   Do you recall any of those officers being
3  disciplined for what they did, sending this detainee
4  to segregation?
5       A.   Do I recall them sending the detainee to
6  segregation?
7       Q.   Do you recall that any of those officers,
8  any of those detention officers, were disciplined
9  for what they did in sending this detainee to
10 segregation?
11      A.   No.
12      Q.   No.  You would have heard about that if
13 that happened, right?
14      A.   Yes.  That's why I question it because it
15 didn't sound familiar at all about that.
16      Q.   Right.  If they had been disciplined, you
17 would have known it?
18      A.   Yes.
19      Q.   So sitting here today, you have no reason
20 to believe that those detention officers did
21 anything wrong on that shift in the way they handled
22 that detainee, right?
23      A.   I believe they didn't do anything wrong,
24 no.
25      Q.   You believe those detention officers did

Page 125

1  right?
2       A.   I believe so.
3       Q.   That's within their powers, right?
4       A.   Right.
5            MR. TURNER:  Did we just lose
6  Adrienne?
7            MR. EISMEIER:  I think we might have.
8                Adrienne, are you on?
9                Hang on for a second.
10           MR. TURNER:  Pause right there, but
11 we're going to stay on the record.
12           THE WITNESS:  Okay.
13           MR. EISMEIER:  Adrienne, are you
14 back?
15           MS. SCHEFFEY:  Looks like I'm back
16 now.  Getting video now.
17           MR. EISMEIER:  We noticed you were
18 going, and we held up when you were gone.
19           MR. TURNER:  We can have some
20 questions read back for you.  How long do you think
21 you were gone?
22           MS. SCHEFFEY:  About five, ten
23 seconds, I don't know.  I was disconnected from our
24 VPM, which seems to be part of the problem.  Maybe
25 the last two questions would be good to have read

Page 126

1  back.
2              (Record read.)
3  BY MR. TURNER:
4     Q.   Officer Pagan, I would like to show you
5  another exhibit we'll mark as Exhibit 6 to this
6  deposition.  I'll open it up for you in a couple
7  different ways, and you can have a moment to look at
8  Exhibit 6, a one-page document.
9              (Exhibit No. 6 was marked.)
10    A.   Okay.
11    Q.   Do you see it popping up as a one-pager?
12    A.   Yes.
13    Q.   Okay.  Please take a moment to review
14 this document and let me know if you recognize it.
15    A.   Yes, I do.
16    Q.   Is this another one of those post
17 assignments?
18    A.   Yes.
19    Q.   Is that like the kind of document you
20 told me you'd see every morning?
21    A.   Yes.
22    Q.   Okay.  Again, if we scroll down to the
23 bottom here under "Incidents," I'd like to draw your
24 attention to the last paragraph, where the document
25 says, "On 6-18-15 at approximately 0600 hours

Page 127

1  detainee B-4-205-4 was placed in seg./SMU pending an
2  investigation, rules violation No. 306, refusing to
3  clean assigned living area."
4              Do you see that?
5     A.   Yes, I do.
6     Q.   Okay.  And do you recognize that shift
7  supervisor's signature?
8     A.   I don't.
9     Q.   Okay.  Please take a minute to review the
10 roster.
11             Well, let me first ask you.  You
12 don't think it was you?
13            MS. SCHEFFEY:  Andrew, I'm just going
14 to note for the record this is outside the class
15 period as well.
16            MR. TURNER:  Your objection's noted.
17    A.   It looks like I wasn't there that day.
18    Q.   I see you're listed on call-offs.  Does
19 that mean that you were ill during the day or before
20 the day?
21            MS. SCHEFFEY:  Object to form.
22    A.   The reason I was off is -- that was five
23 years ago.
24    Q.   Right.  And I'm asking generally when you
25 see your name in call-off, does that mean you had to

Page 128

1  leave at some point during the shift or does that
2  mean you didn't come in at all?
3     A.   I didn't come in at all for that shift.
4     Q.   At all.  Okay.
5              So this was your regular shift,
6  right, but you didn't make it?
7     A.   Correct.
8     Q.   Okay.  Take a minute, please, to review
9  the names of the officers on the roster on duty that
10 day, and let me know when you've finished.  I see
11 Hill at the top.
12            (Witness peruses document.)
13    A.   Okay.
14    Q.   Okay.  You've been able to review?
15    A.   Yes.
16    Q.   Do you recall any of those officers being
17 disciplined for what they did, sending this detainee
18 to segregation?
19    A.   Are we speaking about (inaudible)?
20    Q.   No.
21            MS. SCHEFFEY:  Object to form.
22    A.   This incident here?
23    Q.   We're talking about two years later,
24 right, 6-18-15.  Do you recall any of those officers
25 being disciplined for sending --

Page 129

1     A.   No.
2     Q.   -- this detainee to seg./SMU pending an
3  investigation, rules violation 306, refusing to
4  clean assigned living area?
5            MS. SCHEFFEY:  Object to form.
6     Q.   Do you remember anybody being disciplined
7  for that?
8            MS. SCHEFFEY:  And asked and
9  answered.
10    A.   No.
11    Q.   You don't recall anybody being
12 disciplined for that?
13    A.   I don't.
14    Q.   So sitting here today, you have no reason
15 to believe that those detention officers did
16 anything wrong on your shift in the way they handled
17 that detainee, right?
18            MS. SCHEFFEY:  Object to form, and
19 object to misclassifies his shift when he just said
20 he was not there.
21    Q.   This is your regular shift, right?  These
22 are the people you would have been with had you not
23 called out, right?
24            MS. SCHEFFEY:  Object to form.
25    Q.   Is that a yes?

```
                                          Page 178                                          Page 180
 1   I, LUIS PAGAN, do hereby certify that I have read    1            E R R A T A  S H E E T
 2   the above and foregoing deposition and that the same 2     I, LUIS PAGAN, do hereby certify that I
 3   is a true and accurate transcription of my           3   have read the foregoing transcript of my testimony, and
 4   testimony, except for attached amendments, if any.   4   further certify that it is a true and accurate record
 5   Amendments attached ( ) Yes ( )No                    5   of my testimony (with the exception of the corrections
 6                                                        6   listed below).
 7   _____                           7   PAGE  LINE              CORRECTION
 8   LUIS PAGAN                                           8   ____  ____   _____
 9                                                        9   ____  ____   _____
10                                                       10   ____  ____   _____
11                                                       11   ____  ____   _____
12                                                       12   ____  ____   _____
13   The signature above of LUIS PAGAN was subscribed and 13   ____  ____   _____
14   sworn to before me in the county of                  14   ____  ____   _____
15   _____, state of _____,    15   ____  ____   _____
16   this _____ day of _____, 2020.  16   ____  ____   _____
17                                                       17   ____  ____   _____
18                                                       18   ____  ____   _____
19                                                       19   ____  ____   _____
20   _____                           20   ____  ____   _____
21   Notary public                                        21   ____  ____   _____
22   My Commission expires:                               22   ____  ____   _____
23                                                       23   ____  ____   _____
24                                                       24
25   LUIS PAGAN 7/8/20 (lk)                               25   Date                    LUIS PAGAN

                                          Page 179
 1              REPORTER'S CERTIFICATE
 2        I, LEEANN L. STELLOR, Registered Merit
 3   Reporter and Certified Realtime Reporter within
 4   Colorado, ID 200401669, appointed to take the remote
 5   deposition of LUIS PAGAN, do hereby certify that
 6   before the deposition he was duly sworn by me to
 7   testify to the truth; that the deposition was taken by
 8   me then reduced to typewritten form herein; that the
 9   foregoing is a true transcript of the questions asked,
10   testimony given and proceedings had.
11
12        I further certify that I am not related to
13   any party herein or their Counsel, and have no
14   interest in the result of this litigation.
15
16        In witness hereof I have hereunto set my
17   hand this 14th day of July, 2020.
18
19                          _____
                            Leeann L. Stellor
20                          Registered Merit Reporter
                            Certified Realtime Reporter
21                          and Notary Public
22
23   My commission expires June 8, 2024
24
25
```