**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated*,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Defendant The GEO Group, Inc. ("Defendant" or "GEO"), by and through undersigned counsel, hereby moves for summary judgment on the merits of Plaintiffs' claims raised under the Trafficking Victims Protection Act ("TVPA") and unjust enrichment theory of liability.[1]

---

[1] Currently pending before the Court are cross-motions for summary judgment on GEO's defenses of derivative sovereign immunity and the federal contractor defense. ECF Nos. 260, 284. Should this Court enter judgment in GEO's favor, this motion will become moot. Alternatively, should the Court enter judgment in favor of GEO on the present motion, the pending cross-motions will become moot.

54238580;3

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 7
II.   PROCEDURAL HISTORY............................................................................. 8
III.  UNDISPUTED FACTS .................................................................................. 9
      A.    Policies Challenged By Plaintiffs. ........................................................ 9
      B.    Plaintiff's Experiences at the AIPC. ................................................... 12
      C.    GEO's Operations. ............................................................................. 15
IV.   LAW ............................................................................................................. 16
      A.    Summary Judgment Standard. ............................................................ 16
      B.    The Trafficking Victims Protection Act. ............................................ 17
      C.    Unjust Enrichment. ............................................................................. 22
V.    ANALYSIS.................................................................................................... 23
      A.    Plaintiffs' TVPA Claims..................................................................... 23
      B.    The Disciplinary Severity Scale in the AIPC Handbook Constitutes Warnings
            of Legitimate Consequences, Not A Threat........................................ 28
      C.    Plaintiffs Cannot Show GEO Acted With the Specific Intent To Threaten. ........ 30
      D.    Plaintiffs Cannot Establish Causation................................................. 32
      E.    Claims That Accrued Before December 23, 2008 Are Time Barred.................... 33
      F.    There is No Private Cause of Action For Injunctive Relief Under the TVPA. .... 34
      G.    Plaintiffs' Unjust Enrichment Claims. ............................................... 35
VI.   CONCLUSION.............................................................................................. 37
CERTIFICATE OF SERVICE ................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abarca v. Little*,
54 F. Supp. 3d 1064 (D. Minn. 2014) ..................................................................33

*Aguilera v. Aegis Communications Group*,
LLC, 72 F. Supp. 3d 975 (W.D. Mo. 2014) ..........................................................18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..............................................................................................17

*Barnett v. Surefire Med., Inc.*,
342 F. Supp. 3d 1167 (D. Colo. 2018) ..................................................................22

*Barrientos v. CoreCivic, Inc.*,
951 F.3d 1269 (11th Cir. 2020) ................................................................18, 19, 29

*Bayh v. Sonnenburg*,
573 N.E.2d 398 (Ind. 1991) ..................................................................................29

*United States v. Bradley*,
390 F.3d 145 (1st Cir. 2004), *overruled on other grounds*, 545 U.S. 1101, 125 S. Ct. 2543,
162 L. Ed. 2d 271 (2005) ........................................................................19, 21, 28

*c.f. Rossetti Assocs., Inc. v. Santa Fe 125 Denver, LLC*,
No. 09–cv–0033–- ................................................................................................23

*c.f. Velez v. Sanchez*,
693 F.3d 308 (2d Cir. 2012) ..................................................................................33

*United States v. Calimlim*,
538 F.3d 706 (7th Cir. 2008) ....................................................................19, 22, 28

*United States v. Callahan*,
801 F.3d 606 (6th Cir. 2015) ................................................................................27

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1985) ..............................................................................................16

*Channer v. Hall*,
112 F.3d 214 (5th Cir. 1997) ................................................................................29

54238580;3

*United States v. Dann*,
    652 F.3d 1160 (9th Cir. 2011) .................................................................................18, 21, 30

*David v. Signal Int'l, LLC*,
    No. CIV.A. 08-1220, 2012 WL 10759668 (E.D. La. Jan. 4, 2012)........................................32

*United States v. Djoumessi*,
    538 F.3d 547 (6th Cir. 2008) .........................................................................................26, 27

*Doe v. Siddig*,
    810 F.Supp.2d 127 (D.D.C. 2011) .........................................................................................33

*Echon*, 2017 WL 4181417, at \*13 (D. Colo. Sept. 20, 2017)................................................19, 20

*Fort Peck Hous. Auth. v. United States Dep't of Hous. & Urban Dev.*,
    367 F. App'x 884 (10th Cir. 2010) .........................................................................................35

*Garcia v. Curtright*,
    No. 6:11-06407-HO, 2012 WL 1831865 (D. Or. May 17, 2012).........................18, 20, 22, 30

*Garner v. FCA Chrysler*,
    No. 19-CV-00270-CMA-NYW, 2020 WL 1650450 (D. Colo. Apr. 3, 2020.........................36

*Gilbert v. United States Olympic Comm.*,
    423 F. Supp. 3d 1112 (D. Colo. 2019)...................................................................................33

*United States ex rel. Hawkins v. ManTech Int'l Corp.*,
    No. CV 15-2105 (ABJ), 2020 WL 435490 (D.D.C. Jan. 28, 2020) ......................................21

*Headley v. Church of Scientology Int'l*,
    687 F.3d 1173 (9th Cir. 2012) ...............................................................................19, 28, 30

*Indian Mountain Corp. v. Indian Mountain Metro. Dist.*,
    2016 COA 118M.................................................................................................................22, 35

*Jobson v. Henne*,
    355 F.2d 129 (2d Cir. 1966)...................................................................................................29

*United States v. Kalu*,
    791 F.3d 1194 (10th Cir. 2015) .............................................................................................20

*Lawry v. Palm*,
    192 P.3d 550 (Colo. App. 2008) ...........................................................................................22

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990)................................................................................................................17

*Martinez-Rodriguez v. Giles*,
   391 F. Supp. 3d 985 (D. Idaho 2019) ...............................................................20, 21, 25, 31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).................................................................................................................17

*Muchira v. Al-Rawaf*,
   850 F.3d 605 (4th Cir. 2017) ......................................................................... passim

*United States v. Nnaji*,
   447 F. App'x 558 (5th Cir. 2011) ........................................................................21

*O'Connor v. Check Rite, Ltd.*,
   973 F. Supp. 1010 (D. Colo. 1997).......................................................................16

*PayoutOne v. Coral Mortg. Bankers*,
   602 F. Supp. 2d 1219 (D. Colo. 2009)..................................................................36

*Pernick v. Computershare Tr. Co., Inc.*,
   136 F. Supp. 3d 1247 (D. Colo. 2015)......................................................23, 36, 37

*Pulte Home Corp. v. Countryside Cmty. Ass'n*,
   382 P.3d 821 (Colo. 2016)....................................................................................36

*Redd Iron, Inc. v. Int'l Sales & Servs. Corp.*,
   200 P.3d 1133 (Colo. App. 2008).........................................................................22

*United States v. Rivera*,
   799 F.3d 180 (2d Cir. 2015)..................................................................................20

*Salzman v. Bachrach*,
   996 P.2d 1263 (Colo. 2000)..................................................................................22

*St. Charles Inv. Co. v. Comm'r*,
   232 F.3d 773 (10th Cir. 2000) ..............................................................................35

*United States v. Toviave*,
   761 F.3d 623 (6th Cir. 2014) ......................................................................... passim

*Villanueva Echon v. Sackett*,
   No. 19-1099, 2020 WL 1696854 (10th Cir. Apr. 8, 2020)....................................17

**Statutes**

8 U.S.C § 1589 *et seq.*....................................................................................................7

54238580;3

18 U.S.C. § 1589(a) ....................................................................................................18

18 U.S.C § 1589(c) ....................................................................................................24

18 U.S.C. § 1589(c)(2) .....................................................................................18, 21, 30

18 U.S.C. § 1595(a) .............................................................................................34, 35

18 U.S.C. § 1595(c) .............................................................................................33, 34

18 U.S.C § 1595A(a) ...........................................................................................34, 35

Trafficking Victims Protection Act ...........................................................................17

**Rules**

Fed. R. Civ. P. 23(a) ...................................................................................................8

Fed. R. Civ. P. 56(c) .................................................................................................16

Fed. R. Civ. P. 56 (d) ...............................................................................................17

**Other Authorities**

H.R. Conf. Rep. 106–939, at 1 (2000) .......................................................................19

54238580;3

## I.      INTRODUCTION

Plaintiffs are all former detainees who were held under the authority of Immigration and Customs Enforcement ("ICE") at the Aurora ICE Processing Center ("AIPC") between 2004 and 2014. Plaintiffs seek redress under the TVPA, 8 U.S.C § 1589 *et seq.*, and common law unjust enrichment. However, the facts presented in this case do not come close to the definition of human trafficking as used in the TVPA. Plaintiffs seek a precedential decision that would put every detention facility, jail, mental health facility, and juvenile detention center at risk of being credibly accused of forced labor by simply providing their residents with a listing of the facility's rules and regulations. Such a ruling would be contrary to all precedent. Indeed, Plaintiffs' claims rest on the allegation that the mere mention of 72 hours of segregation as one of many ICE-mandated potential sanctions in a facility handbook, constitutes a threat of serious harm. But a finding of serious harm requires more than a warning of legitimate consequences. Accordingly, summary judgment is appropriate as to Plaintiffs' TVPA claim.

Additionally, Plaintiffs seek redress under the common law principles of unjust enrichment, arguing that GEO profited off their labor by paying them a $1 per day stipend to participate in a Voluntary Work Program ("VWP") when GEO would have otherwise incurred higher costs. In making this argument, Plaintiffs rely upon the fundamentally flawed assumption that GEO would have seen a decrease in profits had it hired additional employees. To the contrary, uncontroverted evidence dispels this notion. Had GEO hired employees of its own choosing (and skill levels) to complete the tasks that are performed in the VWP, GEO would have made **additional** profit on that labor. Thus, Plaintiffs claim for unjust enrichment fails. Further, even if Plaintiffs could establish GEO was enriched by a program designed to keep detainees busy and

reduce disciplinary infractions, Plaintiffs claims are barred because a claim for unjust enrichment is improper where a valid contract exists. Here, all Plaintiffs signed a valid contract for their participation in the VWP. This Court should accordingly enter an order granting summary judgment in favor of GEO.

## II.    PROCEDURAL HISTORY

On May 6, 2016, Plaintiffs filed their Motion for Class Certification ("Certification Motion"). ECF 49. In their motion, they sought to certify two classes: (1) the "Forced Labor Class," alleging that that GEO violated the TVPA, and (2) the "VWP Class," which asserts a claim under the theory of unjust enrichment. In the Certification Motion, Plaintiffs alleged that Plaintiffs, and members of the Forced Labor Class, performed "uncompensated janitorial labor under the threat of solitary confinement." ECF 49, 3. They argued that Plaintiffs in the VWP Class performed work for $1.00 per day, unjustly enriching GEO by the "millions of dollars it would otherwise pay outside contractors." *Id.* at 4.

In support their TVPA claim, Plaintiffs argued that because the Aurora ICE Processing Center Handbook ("AIPC Handbook") was provided to every detainee the commonality prong of Fed. R. Civ. P. 23(a) was satisfied. ECF 49, 11. More specifically, Plaintiffs argued their case was suitable for classwide resolution because it was based upon a written policy—not the individual actions of different GEO employees or unique experiences of various detainees. ECF 49 at 11-12[2]. Similarly, Plaintiffs asserted that the VWP Class was suitable for classwide resolution because all

---

[2] "This case is about a **written** Forced Labor Policy set out clearly for the employees responsible for enforcing it and the detainees responsible for abiding by it. That policy provides that class members must perform housing unit sanitation work or be subject to an administrative legal process that could result in up to 72 hours in solitary confinement." (emphasis added).

detainees worked for a rate of $1 per day, regardless of the tasks they performed. *Id.* at 7. Based upon Plaintiffs' representations about their claims and the availability of classwide proof, this Court granted Plaintiffs' motion. ECF 57.

Following extensive discovery, Plaintiffs have failed to establish that the AIPC Handbook constitutes an improper means of coercion under the TVPA. Plaintiffs do not and cannot present sufficient evidence to meet their burden to show that: (1) their conditions of confinement were "sufficiently serious" to give rise to liability under the TVPA; (2) the disciplinary severity scale is not simply a warning of a legitimate consequence; (3) GEO acted knowingly; or (4) that the disciplinary severity scale was the driving factor in detainees deciding to clean-up after meals. As to the unjust enrichment claims, Plaintiffs have failed to present evidence that would support a claim of unjust enrichment based upon the VWP; GEO would have realized a higher profit if it had hired more employees in lieu of detainees and Plaintiffs signed contracts for participation in the VWP preclude any unjust enrichment claim.

## III.     UNDISPUTED FACTS

### A.     Policies Challenged By Plaintiffs.

1.   At the class certification stage Plaintiffs cited to a Policy and Procedure Manual, titled "Sanitation Procedures" in support of their claims.[3] ECF 50-2.

2.   The Sanitation Procedures were not developed to assign tasks to any specific individuals, but rather to detail the process for cleaning and materials to be used. ECF 289 (Undisputed Fact 31).

3.   Detainees do not receive a copy of the Sanitation Procedures during their stay at AIPC. ECF 50-1, 29:13-18 (30(b)(6) Deposition of Ceja).

---

[3] Plaintiffs have renamed this document the "HUSP," but no formal GEO policy is designated or titled "HUSP." It appears that this phrase originates not from the Sanitation Procedures, but instead the detainee handbook which contains a subsection called "Housing Unit Sanitation." See ECF 260 at 7.

4. Plaintiffs no longer rely upon the Sanitation Procedures as a policy that underlies their TVPA claim. **Ex. A.** (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories, Responses to Interrogatory No. 39).

5. Plaintiffs also cited the AIPC Handbook at the class certification stage as support for their TVPA claims. ECF 50-3.

6. Unlike the Sanitation Procedures, the AIPC Handbook is issued to all detainees entering the facility. ECF 289 (Undisputed Fact 23).

7. The only classwide polices that Plaintiffs challenge as part of their TVPA claim are the AIPC Handbook and an Orientation video shown to detainees upon arrival. **Ex. A**. (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories Responses to Interrogatory No. 39).

8. More specifically, Plaintiffs challenge the meal clean-up policy in the AIPC Handbook whereby 6 detainees (2 of which are paid "Trustees" under the VWP) assist in cleaning up the housing unit after each meal. ECF 49; ECF 261-17, 20.

9. The meal clean up section of the handbook provides for the following sanction if not followed:

> If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean will result in further disciplinary action.

ECF 261-17, 20.

10. GEO is required to comply with ICE's PBNDS under its contract. ECF 289 (Undisputed Facts 11-14, 16,18).

11. All applicable versions of ICE's National Detention Standards ("NDS") and PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale and incorporate it into the AIPC Handbook. ECF 289 (Undisputed Fact 19).

12. All applicable versions of ICE's NDS and PBNDS require GEO to provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 289 (Undisputed Fact 21).

13. The ICE disciplinary severity scale included in the AIPC Handbook provides for up to 12 other sanctions as a possible consequence for refusing to clean one's living area. These sanctions include warning, reprimand, and loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.). ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17.

14. GEO included this sanction in the AIPC Handbook, as required by ICE. ECF 289 (Undisputed Facts 11-14, 16, 18, 19, 21).

15. The detainee orientation video provides:

> You will be protected from personal abuse, corporal punishment, personal injury, disease, and damage to your property and harassment to the fullest extent possible. Each and every detainee must participate in the sanitation program. A list of detainee's [sic] is developed each day and is posed for viewing. During a general clean-up all detainees must participate.
> *****
> Disciplinary Process[.] Refer to your local supplement for more detailed information about the rules infractions that you must avoid and the established disciplinary actions that will be taken.
> *****
> **High Moderate**- and a few examples are . . . Indecent exposure, staling, refusing to obey a staff member, insolence to staff member, lying or providing false statement to staff, being in an unauthorized area, not standing for count, interfering with count, gambling, destroying altering or damaging property"

*See* ECF 262-10 (emphasis in original).

16. In addition to the AIPC Handbook and orientation video, GEO is required to provide all detainees with the ICE National Handbook. Like the AIPC handbook', the ICE Handbook also warns detainees that they could face disciplinary consequences if they refuse to clean, stating "Will I get paid for keeping my living area clean? No. **You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined.**" **Ex. B**. (ICE National Handbook). Despite this being materially similar to the AIPC Handbook, Plaintiffs do not allege that ICE's National Handbook constituted a threat as defined by the TVPA. ECF 49; **Ex. A** (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories, Responses to Interrogatory No. 39) (omitting any reference to the ICE National Handbook).

17. Plaintiffs also challenge the VWP daily stipend. ECF 1, ECF 49,3.

18. All detainees are offered the opportunity to participate in the VWP. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17.

19. All detainees who participate in the VWP are told that their participation is voluntary. **Ex. C.** (Plaintiffs' VWP applications).

20. All detainees who participate in the VWP are told in advance that "compensation shall be $1.00 per day." **Ex. C.** (Plaintiffs' VWP applications.).

21. All detainees must sign an agreement to participate in the VWP, acknowledging that their compensation will be limited to $1 per day. **Ex. C.** (Plaintiffs' VWP applications).

22. Some VWP participants receive additional incentives for their participation including candy or ice cream. **Ex. D** (Ceja 30(b)(6) Dep.162-163).

**B.      Plaintiff's Experiences at the AIPC.**

23. Plaintiff Menocal described a typical day at AIPC as follows:
> I wake up, get dressed, do my bed, wait for breakfast, eat breakfast, clean up, maybe exercise, walk around, read a book, draw. It depends. Again, wait for lunch to eat, clean up, maybe shower, maybe do some sports, maybe talk on the phone with someone, maybe write a letter, walk around, exercise, wait for dinner. Same thing, eat dinner, relax a while, maybe watch TV, read a book, draw, and, you know, wait for bedtime.

> **Ex. E** (Menocal Dep. 121:5-13).

24. While detained, Plaintiff Menocal described AIPC to a friend as follows:
> [T]hey've got pretty good grub, considering it's, you know, a detention center. And we got three televisions, a bunch of tables, a bunch of people, and we all get along. Pretty nice. I mean, it's -- for being incarcerated, it's not bad at all, not compared to -- not compared to Denver County or the other one where I was at. This is like Camp Snoopy. It's pretty easy.

> **Ex. E** (Menocal Dep. 54:5-12).

25. Plaintiff Hugo Hernandez described a typical day as follows:
> I would wake up for breakfast at 5:00 in the morning. I will walk out, store my food, bring it back to the cell, and go to sleep only if it was not my time to clean. But if I was assigned to clean, I have to

stay outside and clean. I couldn't go back to sleep. So[,] I will store my food. I will wake up when I wake up, and brush my teeth, do my coffee, and make sure that all my cellies get the coffee because that's my one main thing. Then we will all sit at the table. I will do my legal work, go through my documents, and see what else I need to put in or something, watch a little bit of TV. I can go to the phone a little bit. If -- if I will get someone to answer, I will go to the phone. Wait for count time, wait for lunch. After lunch, I will do a cleanup again, which is cleanup time, and wait to see who's assigned for the cleanup, and if I'm not assigned, then I just go to my cell or I go against the wall just like everybody else. And once everything gets reopened, go back into the table again and do some workout while waiting -- doing my workout. I wait for chow again and wait for the cleanup, and, of course, shower. Yeah, after the workout, shower, get back. Wait for chow, clean up, and then eventually wait for the GEO guard, Officer Blacknick, to come and pick me up so we can go to the law library and collect all detainees who wanted to go to the library. We'll go to the law library, get a pat-down, go inside the law library.·And in there, I will help detainees with their documents, printouts, making sure they understood what the immigration judge was asking them to bring back, translations, looking for any specific application they were looking for. And then once we were done, like an hour later or an hour and a half later, I get another pat-down, get taken back to the cell, and wait for count time.

**Ex. F** (Hernandez Dep. 107-108).

26. While at AIPC, every detainee had the ability to communicate with ICE at any time. **Ex. B** (ICE Detainee Handbook, pg. 2) ("ICE officers will routinely visit the housing units at your facility. If you have questions about your case **or how the facility has treated you**, let the ICE officers know. . . [y]ou may also submit a request for information in writing."); **Ex. E** (Menocal Dep. 56:1-10); **Ex. F** (Hernandez Dep. 97:15-22).

27. Some detainees elected to be placed in segregation voluntarily, seeing it not as a punishment, but instead a location where they could receive peace and quiet. **Ex. D** (Ceja 30(b)(6) Dep. 55:7-19).

28. None of the named Plaintiffs were placed in segregation for refusing to clean. **Ex. A** (Brambila's Responses to GEO's Sixth Interrogatories); **Ex. E** (Menocal Dep. 100:16-19); **Ex. F** (Hernandez Dep. 181:1-7); **Ex. G** (Valerga Dep. 141:24-142:2, 140:12-13); **Ex. H** (Lourdes Argueta Second Set of Discovery, Interrogatory No. 27; Yepez Gaytan Second Set of Discovery, Interrogatory No. 27; Alexaklina Second Set of Discovery, Interrogatory No. 27); **Ex. I** (Vizguerra Dep. 42:5-7); **Ex. J** (Xahuentitla Dep 70:11-17).

29. Plaintiff Menocal did not receive direct threats for refusing to clean. **Ex. H** (Menocal's Second Set of Discovery, Interrogatory No. 27).

30. Plaintiff Olga Alexaklina was never threatened by GEO employees with disciplinary or administrative segregation for failing to clean. **Ex. H** (Alexaklina Second Set of Discovery, Interrogatory No. 27).

31. Upon being informed that he would be placed in segregation if he did not clean, Plaintiff Valerga responded with "go ahead." **Ex. G** (Valerga Dep. 136:16-137:19). Yet, Plaintiff Valerga was not placed in segregation on that occasion or any other occasion. *Id*. Valerga Dep. 141:24-142:2, 140:12-13.

32. Plaintiff Hernandez testified in his deposition that he did not, and does not, consider the AIPC Handbook to be threatening. **Ex. F** (Hernandez Dep. 58:12-24).

33. Plaintiff Dagoberto Vizguerra does not recall receiving the AIPC Handbook, let alone being threatened by it. **Ex. I** (Vizguerra Dep. 90:24-91:4).

34. Plaintiffs are not making a claim for "mental anguish, emotional distress, or other similar related conditions." **Ex. H** (Plaintiffs Responses to Interrogatory No. 32).

35. Plaintiffs' expert, Dr. Stuart Grassian, did not diagnose any of the plaintiffs with psychological conditions. **Ex. K** (Grassian Dep. 37:22-23; 237:20-238:24).

36. Detainees had varying motivations for cleaning:

    a. Plaintiff Menocal preferred to clean up after himself while living at AIPC because he preferred to "live and hang out in a clean environment." **Ex. E** (Menocal Dep. 81:6-10).

    b. Indeed, while living at AIPC Plaintiff Menocal asked for permission to clean the recreation area without an expectation of remuneration simply because he spent a lot of time there and wanted to "hang out in a clean environment." **Ex. E** (Menocal Dep. 86:22-87:5).

    c. Plaintiff Hernandez liked to keep his area clean. **Ex. F** (Hernandez Dep. 49:24-50:1).

    d. To avoid the loss of TV time, detainees would often volunteer to help clean up the living area, even if not asked or assigned by GEO officers. **Ex. F** (Hernandez Dep. 78:2-9).

e.   Plaintiff Gaytan received access to X-Box gaming systems, movies, and ice cream as an incentive to keep his dorm clean. **Ex. L** (Gaytan Dep. 124:3-16).

f.   During the meal clean-up, two trustees in each of the housing units would be paid under the VWP to assist with meal cleanup. **Ex. M** (Quezada Dep. 64:9-19).

g.   Once a week, the cleanest housing unit is rewarded with ice cream or cookies. **Ex. D** Dawn Ceja 30(b)(6) Dep. 163:12-16 (3/29/16).

37. Plaintiffs' expert, Dr. Grassian, is unaware of *any literature* that stands for the proposition that a threat of 72-hours in segregation could cause psychological harm. **Ex. K** (Grassian Dep. 243:14-21).

## C.   GEO's Operations.

38. ICE's Disciplinary Severity Scale (incorporated into the AIPC Handbook) allows for a graduated scale of offenses. ECF 289 (Undisputed Fact 19).

39. The PBNDS instruct detention officers to resolve disciplinary infractions in an informal manner where possible. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17.

40. GEO's detention officers did not routinely or uniformly enforce segregation for the failure to clean. **Ex. N.**

41. It would be a very rare occurrence for a detention officer tell a detainee that they would be sent to segregation if they did not clean. **Ex. N.**

42. When a detainee was placed in segregation for the refusal to clean, it was typically because the refusal to clean was in concert with another disciplinary infraction. *Id.* **Ex. N.**

43. Consistent with the PBNDS, detention officers worked to resolve issues informally wherever possible. **Ex. N.**

44. Where formal sanctions were necessary, officers imposed lesser sanctions as permitted by the disciplinary severity scale wherever possible. *Id.*; **Ex. O** (Ceja 30(b)(6) Dep. 113:13-17).

45. The detention officers were not trained to tell detainees they could be sent to segregation or to utilize segregation as a response to the failure to clean absent additional disciplinary concerns. **Ex. N.**

46. Importantly, none of the detention officers intended to scare or intimidate any individual into performing labor. *Id.* **Ex. N.**

47. When a detainee would refuse to clean, the detention officers would typically ask another detainee to assist with cleaning instead. *Id.*

48. If no detainees performed any work in the Aurora facility, GEO would make more money, not less. **Ex. P** (Ragsdale 30(b)(6) Dep. 168:4-10).

49. At AIPC the $1.00 daily allowance is a pass through from the government at the actual rate. **Ex. P** (Ragsdale 30(b)(6) Dep. 166:20-167:6)

50. "[T]here's no incentive financially for GEO to use any voluntary work person to do anything, particularly when you have to, again, incentivize them . . . beyond a dollar a day. It's sort of cost neutral at a dollar a day but it gets − it becomes a cost to us if it goes beyond that." **Ex. P** (Ragsdale 30(b)(6) Dep. 168:12-17).

51. If ICE did not mandate the VWP as a requirement of its contracts, GEO would "build the staff [in]to [its] cost estimate and then [] mark that cost up." **Ex. Q** (Evans Dep. 75:3-10).

52. GEO's markup would be a fee of up to 15% of the labor cost. **Ex. Q** (Evans Dep. 29:2-21; 62:16-63:14).

## IV. LAW

### A. Summary Judgment Standard.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *O'Connor v. Check Rite, Ltd.*, 973 F. Supp. 1010, 1014 (D. Colo. 1997). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56 (d).

Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### B. The Trafficking Victims Protection Act.

To prevail on their claim under the TVPA.[4] Plaintiffs must establish that:

(1) [GEO] <u>knowingly</u> obtained Plaintiffs' labor by one of or combination of the following means:

    (a) means of force, physical restraint, or threats of force or physical restraint;
    (b) by means of serious harm or threats of serious harm;
    (c) by means of abuse of the law or threats of abuse of the law or legal process;
    (d) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or other person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a) (emphasis added). The statute defines "serious harm" as:

[A]ny harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the

---

[4] As the Honorable Magistrate Judge Wang recently observed, "[t]here is limited case law from the Tenth Circuit discussing the types of acts and conduct that qualify as means of serious harm or abuse of law or legal process for purposes of TVPA liability. Therefore, the court considers cases from other jurisdictions that have encountered the question." *Echon*, 2017 WL 4181417, at *13 (D. Colo. Sept. 20, 2017), *report and recommendation adopted*, No. 14-CV-03420-PAB-NYW, 2017 WL 5013116 (D. Colo. Nov. 1, 2017), *aff'd sub nom. Villanueva Echon v. Sackett*, No. 19-1099, 2020 WL 1696854 (10th Cir. Apr. 8, 2020). For these same reasons, GEO relies upon case law from other jurisdictions throughout this motion.

> same circumstances to perform or to continue performing labor or services in order
> to avoid incurring that harm.

18 U.S.C. § 1589(c)(2). Under the statutory definitions, a court cannot simply conflate poor working conditions with a TVPA violation. *Muchira v. Al-Rawaf*, 850 F.3d 605, 619-20 (4th Cir. 2017), as amended (Mar. 3, 2017) (affirming award of summary judgment to defendants where plaintiff's claim of "forced labor" was "based solely upon her assertion that the Saudi cultural 'house rules,' coupled with her long work hours and verbal reprimands, caused her to experience serious psychological harm in the form of depression, acute stress, and panic attacks."); *see also United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) ("To be sure, not all bad employer-employee relationships or even bad employer-immigrant nanny relationships will constitute forced labor."); *Aguilera v. Aegis Communications Group*, LLC, 72 F. Supp. 3d 975, 978 (W.D. Mo. 2014) ("[N]ot all bad employer-employee relationships constitute forced labor."); *Garcia v. Curtright*, No. 6:11-06407-HO, 2012 WL 1831865, at *4 (D. Or. May 17, 2012) ("[N]ot all bad employer-employee relationships constitute forced labor."). Similarly, any construction must be distinguishable "from that of ordinary parents requiring chores," *United States v. Toviave*, 761 F.3d 623, 625–26 (6th Cir. 2014). In the ICE detention context, any construction of the TVPA should not "call into question longstanding requirements that detainees or inmates be required to perform basic housekeeping tasks." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1278 (11th Cir. 2020). Likewise, the disciplinary severity scale in ICE's PBNDS, which provides sanctions for detainees who "among other things, refuse to complete basic personal housekeeping tasks or organize work stoppages . . . [does not on its] own, give rise to TVPA liability." *Id.* This is consistent with longstanding TVPA case law which provides that an assessment of whether a TVPA violation has occurred requires a court to differentiate between legitimate warnings of

possible consequences and "illicit threat[s]." *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) ("In applying the Act, we must distinguish between [i]improper threats or coercion and permissible warnings of adverse but legitimate consequences.");*United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) ("[W]arnings of legitimate but adverse consequences or credible threats of deportation, standing alone, are not sufficient to violate the forced labor statute."); *United States v. Bradley*, 390 F.3d 145, 151 (1st Cir. 2004), *overruled on other grounds*, 545 U.S. 1101, 125 S. Ct. 2543, 162 L. Ed. 2d 271 (2005).

Rather, in order to determine whether a certain set of circumstances constitutes "serious harm," courts consider whether considering all of the "surrounding circumstances" a reasonable person in the <u>same circumstances</u> would have felt compelled or coerced into providing labor or services. *Echon*, 2017 WL 4181417, at *13. "The harm or threat of harm, considered from the vantage point of a reasonable person in the place of the victim, must be sufficiently serious to compel that person to remain in her condition of servitude when she otherwise would have left." *Muchira*, 850 F.3d at 618 (quoting *Dann,* 652 F.3d at 1170). In considering all of the circumstances, courts have found "serious harm" for purposes of the TVPA where the conditions are inhumane—truly mirroring Congress' intention to eliminate "slavery[] and slavery-like conditions." H.R. Conf. Rep. 106–939, at 1 (2000). As the Fourth Circuit explained,

> Typically . . . forced labor situations involve circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are used to prevent [vulnerable] victims from leaving and to keep them bound to their captors.

*Muchira*, 850 F.3d at 618–19 (*quoting United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015) and collecting cases).

Although the statute does not use the word "cause" as an element for a § 1589 violation, Plaintiffs must prove that the unlawful means of coercion <u>caused them</u> to render labor. *See United States v. Kalu*, 791 F.3d 1194, 1211-12 (10th Cir. 2015) (affirming a jury instruction on § 1589 that advised the jury to consider whether "as a result of [the defendant's] use of . . . unlawful means, the [victim rendered labor] where, if [the defendant] had not resorted to those unlawful means, the [victim] would have declined to" (quotations omitted)). Importantly, it is not enough that an individual or entity obtain the labor of another through persuasion or compulsion, but rather the labor must be obtained through the illegal coercive means detailed in the statute. *Garcia*, 2012 WL 1831865, at *4 ("[N]ot all bad employer-employee relationships constitute forced labor.").

To determine whether a threat is "sufficiently serious," courts review each individual's claims on a case-by-case basis, considering the totality of the circumstances, including a plaintiff's unique vulnerabilities. *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 996 (D. Idaho 2019) ("Courts look to whether a defendant's 'misconduct has created a situation where ceasing labor would cause a plaintiff serious harm,' recognizing that what constitutes serious harm for that plaintiff must be determined by considering the totality of the circumstances presented."). To that end, in assessing an alleged threat of serious harm, courts must "consider the particular vulnerabilities of a person in the victim's position." *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015); *see also Muchira*, 850 F.3d at 618; *Echon*, 2017 WL 4181417, at *14. While the Fifth Circuit has previously held that serious harm can include "psychological coercion," *United States v. Nnaji*, 447 F. App'x 558, 559 (5th Cir. 2011), it is not sufficient to merely "present[] evidence

that [Plaintiffs'] employment environment caused [them] to experience psychological harm. Rather, [Plaintiffs] must present sufficient evidence upon which a jury could reasonably conclude that [GEO] knowingly or intentionally engaged in actions or made threats that were sufficiently serious to compel a reasonable person in [each individual plaintiff's] position to remain in [GEO's] employ, against [their] will and in order to avoid such threats of harm[.]" *Muchira*, 850 F.3d at 620. In considering the particular sensitivities of an individual, a finder of fact should consider whether the victim's acquiescence was objectively reasonable under the circumstances in light of the victim's unique vulnerabilities. *Id.*; *see also United States ex rel. Hawkins v. ManTech Int'l Corp.*, No. CV 15-2105 (ABJ), 2020 WL 435490, at *18 (D.D.C. Jan. 28, 2020). Of course, the vulnerabilities must be known to the defendant at the time the actions are taken. "[T]o rely upon some hidden emotional flaw or weakness unknown to the employer would raise various problems (e.g., scienter). But ... known objective conditions that make the victim especially vulnerable to pressure (such as youth or immigration status) bear on whether the employee's labor was obtained by forbidden means." *Bradley*, 390 F.3d at 153.

In addition to limiting liability to only those violations that are "sufficiently serious" to compel the individual to remain working, the scope of the statute is further narrowed by the requirement of scienter. 18 U.S.C § 1589(c)(2); *see also Dann* 652 F.3d at 1170 (*citing Calimlim*, 538 F.3d at 711–12); *Martinez-Rodriguez*, 391 F. Supp. 3d at 991 ("in order to show that someone violated the Federal Forced Labor Statute, it must be demonstrated that first, the threat of harm was serious; and second, that the defendant had the requisite scienter, or bad state of mind."). The defendant "must intend to cause the victim to believe that she would suffer serious harm if she did not continue to work. In other words, under section 1589, the [defendant] must not just threaten

serious harm but have intended the victim to believe that such harm would befall her." *Garcia*, 2012 WL 1831865, at *4. "A statement is a threat if a reasonable person would believe that the intended audience would receive it as a threat, regardless of whether the statement was intended to be carried out." *Calimlim*, 538 F.3d at 713.

### C.  Unjust Enrichment.

Unjust enrichment is a judicially created remedy designed "to avoid benefit to one to the unfair detriment of another." *Lawry v. Palm*, 192 P.3d 550, 564 (Colo. App. 2008). A person is unjustly enriched when he or she benefits as a result of an unfair detriment to another. *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000). The proper remedy when unjust enrichment occurs is to restore the harmed party "to the position he [or she] formerly occupied either by the return of something which he [or she] formerly had or by the receipt of its equivalent in money." Restatement (First) of Restitution § 1 cmt. a (Am. Law Inst. 1937); *see also Redd Iron, Inc. v. Int'l Sales & Servs. Corp.*, 200 P.3d 1133, 1136 (Colo. App. 2008) ("[T]he party who has received the benefit is ordinarily required to make restitution in the amount of the enrichment received."). "To succeed on a claim of unjust enrichment, the moving party must establish that (1) the nonmoving party received a benefit (2) at the moving party's expense (3) under circumstances that would make it unjust for the nonmoving party to retain the benefit without commensurate compensation to the moving party." *Indian Mountain Corp. v. Indian Mountain Metro. Dist.*, 2016 COA 118M, ¶ 28, 412 P.3d 881, 888, *as modified on denial of reh'g* (Oct. 20, 2016); *see also Barnett v. Surefire Med., Inc.*, 342 F. Supp. 3d 1167, 1175 (D. Colo. 2018). However, where a party has entered into an express contract, insofar as the unjust enrichment claim touches on the same subject matter, the express contract precludes a summary judgment claim. *Pernick v. Computershare Tr. Co., Inc.*,

136 F. Supp. 3d 1247, 1268 (D. Colo. 2015); *c.f. Rossetti Assocs., Inc. v. Santa Fe 125 Denver, LLC*, No. 09–cv–0033--WJM–BNB, 2011 WL 834177, at *7 (D. Colo. March 4, 2011) (dismissing breach of contract claim and concluding that, "because there is an enforceable contract between the two parties, the express contract precludes the unjust enrichment claim").

## V.     ANALYSIS

### A.     Plaintiffs' TVPA Claims.

Plaintiffs contend that GEO violated the TVPA when it purportedly obtained Plaintiffs' labor "through threats that those who refused to perform such uncompensated work would be subjected to discipline, up to and including solitary confinement." ECF 1, ¶ 73. They claim that the "threats" came via the AIPC Handbook detailing that detainees could be disciplined for the refusal to clean their living area. [5] Putting aside the absurdity of Plaintiffs' claim that ICE engaged a contractor to purportedly violate the very statute which ICE is provided millions of dollars annually to enforce, the facts of this case do not rise to the level of a TVPA violation. AIPC is a lawfully run contract facility carrying out ICE-appointed duties, not a trafficking scheme.

Accordingly, Plaintiffs claims must fail for four principal reasons. First, there is no evidence that Plaintiffs were subjected to serious harm as defined by the statute. Second, legitimate warnings of disciplinary consequences for those in the custody of the federal government is not what Congress envisioned in enacting a statute to combat slavery and sex trafficking. Third, Plaintiffs cannot show that GEO acted "knowingly" as defined by the TVPA. Finally, Plaintiffs cannot establish that the sanctions in the AIPC Handbook resulted in detainees deciding to clean

---

[5] The Orientation video incorporates the AIPC Handbook by reference and does not provide any information that differs from the AIPC Handbook. Therefore, this motion treats them as one and the same.

54238580;3

the facility. In short, detainees' claims fall short of establishing human trafficking. The mere fact that detainees were held in an ICE processing center and asked to participate in basic tenets of cleanliness does not provide a basis to determine that standard principles of communal living coupled with disciplinary policies used in detention centers across the nation constitute the equivalent of modern-day slavery.

### (1)   Plaintiffs Cannot Establish They Suffered "Serious Harm" As Defined by the TVPA.

The reasonable person standard for serious harm was codified in the 2008 amendments to the TVPA when Congress added a definition for "serious harm" to 18 U.S.C § 1589(c). Under this standard, in order to prevail on their claims, Plaintiffs must establish that the AIPC Handbook's meal clean-up policies including the warning that 72-hours of segregation is a **possible** sanction for failure to clean one's living area, was as an objective matter "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform and to continue performing labor or services in order to avoid incurring that harm." *Id.* Plaintiffs can make no such claim.

First, no factfinder could conclude that the statements in the AIPC Handbook, reviewed objectively, constitute threats of serious harm. The handbook indicates that detainees must help with meal clean-up. *Supra* Fact 8. Thereafter, it states that the failure to clean-up could result in the loss of television privileges until the living area is clean. *Supra* Fact 9. There can be no question that the temporary loss of television privileges is not a threat of "serious harm," in any sense of the word. To determine whether an action constitutes serious harm, "courts look to whether a defendant's misconduct has created a situation where ceasing labor would cause a plaintiff serious harm, recognizing that what constitutes serious harm for that plaintiff must be determined by

considering the totality of the circumstances presented." *Martinez-Rodriguez*, 391 F. Supp. 3d at 996 (internal quotations omitted). A temporary loss of television privileges is not a consequence that would lead a reasonable person to fear serious harm if he or she did not clean. To the contrary, it is a punishment frequently doled out by parents to young children. Certainly, there is no colorable argument that such a consequence is in contravention of the TVPA. *Toviave*, 761 F.3d at 625-26. Routine disciplinary practices that ensure that detainees complete their chores do not create liability under the TVPA. *Id.* And, the ICE-mandated disciplinary severity scale does not state that every single time a detainee refuses to clean, he or she will be subjected to segregation. *Supra* Facts 13, 39. Rather it sets forth no less than 13 possible sanctions, including a mere warning or a reprimand. *Id.* Fact 13. Thus, it would be unreasonable to believe every single refusal to clean would lead to segregation. Thus, the statements in the AIPC Handbook cannot objectively be construed as threats of serious harm.[6]

Second, the possibility of 72 hours in segregation is not sufficiently serious to compel a reasonable person to provide labor. In over six years of litigation, Plaintiffs have failed to uncover any evidence that the potential sanction of 72 hours in segregation constitutes a threat of serious harm. Likewise, they have failed to establish that their own experiences with segregation amount to serious harm. To the contrary, Plaintiffs concede their claims are not rooted in a claim for "mental anguish, emotional distress, or other similar related questions," eliminating a claim that the warning of segregation resulted in psychological harm. *Supra* Fact 34. And Plaintiffs' own

---

[6] Interestingly, none of the detainees allege that the ICE National Handbook which contains an unequivocal warning that detainees could be disciplined for refusing to clean their living area, including any common use areas, constitutes a threat. If GEO's handbook alone can be construed as a threat, it would defy logic and reason for ICE's near identical warning not to similarly constitute a threat.

expert has made no diagnosis of psychological harm for any of the Plaintiffs. *Supra* Fact 35. In fact, Dr. Grassian, is unaware of *any literature* that stands for the proposition that a threat of 72 hours in segregation could cause psychological harm—negating any claim that the class suffered from a known condition in the field of psychology. *Supra* Fact 37. Thus, Plaintiffs cannot meet their burden to establish that 72 hours in segregation (or the threat of the same) is sufficiently serious to constitute a violation of the TVPA. Additionally, Plaintiffs cannot establish that the use of segregation was so prevalent as to lead a reasonable person to believe it was a likely consequence. *Supra* Facts 40-47. To the contrary, most often the refusal to clean resulted in no consequence at all. *Supra* Facts 39, 45. Even where a sanction was imposed for the refusal to clean, it was rare that the sanction selected was segregation. *Supra* Facts 43,47. To that end, none of the detainees were sent to segregation, despite many of them refusing to clean on at least one occasion. *Supra* Fact 28. Without more evidence, their claims must fail. It is simply not enough to demonstrate that the meal clean-up was inconvenient, frustrating, tedious, or even unfair. Plaintiffs have the burden to establish "sufficiently serious harm," which they cannot do.

Third, Plaintiffs cannot rely upon the surrounding circumstances at AIPC to support their claims. To be sure, "other cases in which forced labor has been found in the household context are also distinguishable in crucial ways. Most involve defendants that subjected their victims to more extreme isolation [and mistreatment]." *Toviave*, 761 F.3d at 629. For example, in *United States v. Djoumessi*, 538 F.3d 547 (6th Cir. 2008), a family brought a fourteen-year-old Cameroonian girl to Detroit to work as a domestic servant. *Id.* at 549. The victim worked sixteen hours a day, did all of the housework, and provided all of the childcare for the defendants. *Id.* The defendants never paid the victim, allowed her to leave the home only as part of her childcare duties, beat her, and

even sexually abused her on three occasions. *Id*. In contrast, Plaintiffs at AIPC described their conditions of confinement as "pretty nice . . . for being incarcerated." *Supra* Fact 24. Indeed, it was better than a county detention center. *Id.*

Plaintiffs' daily routines were not defined by long periods of hard labor, a relative lack of freedom, or "squalid living conditions, extreme isolation, threat of legal process, and violence." *Callahan*, 801 F.3d at 606. Rather detainees' routines included three meals a day, time for exercise, television, and reading books supplied by GEO, and the opportunity to speak to their families on the phone, as well as access to legal materials in a law library. *Supra* Facts 23, 25. Detainees were largely free to do what they wanted during the day and were not deprived of social opportunities. *Id.* And, the fact that Plaintiffs claims here rest on an allegation that they allegedly cleaned the living areas routinely, Plaintiffs' own allegations belie any argument that AIPC could be fairly described as "squalid." Thus, the conditions of confinement fall far short of the coercive conditions found to be a violation of the TVPA.

Finally, there is no question that here, as in *Muchira*, Plaintiffs may have felt "legitimately anxious or fearful" while at AIPC because they did not have "assurances that they would be able to remain in the United States, and . . . faced the prospect of [deportation.]" *Muchira*, 850 F.3d at 624. However, that "pressure was not brought to bear by [GEO.]" *Id.* Instead, it was a result of the United States immigration laws and the enforcement authority of ICE and the immigration courts.[7] Like in *Muchira*, this general fear of deportation for not complying with GEO's facility rules is

---

[7] Indeed, to the extent the Plaintiffs at the facility had Orders of Removal while detained at Aurora, it was ICE, not GEO, who had informed detainees of this impending reality.

insufficient to establish that GEO knowingly coerced Plaintiffs into providing labor and services so as to withstand summary judgment. *Id.* Accordingly, summary judgment is appropriate.

**B.     The Disciplinary Severity Scale in the AIPC Handbook Constitutes Warnings of Legitimate Consequences, Not A Threat.**

Under the TVPA, a warning of a legitimate consequence is not actionable. *Headley*, 687 F.3d at1180; *see also Calimlim*, 538 F.3d at 714 (7th Cir. 2008) ("[W]arnings of legitimate but adverse consequences or credible threats of deportation, standing alone, are not sufficient to violate the forced labor statute."); *Bradley*, 390 F.3d at 151 (A Court must differentiate between legitimate warnings of possible consequences and "illicit threat[s]."). For example, the threat of deportation by ICE officials, where consistent with the law, is a legitimate consequence, not a threat under the TVPA. *Muchira*, 850 F.3d at 624. Likewise, even a parent who "demanded absolute obedience from [his] children and was quick to beat them . . . [hitting] the children with his hands, and with plunger sticks, ice scrapers, and broomsticks, often for minor oversights or violations of seemingly arbitrary rules" was found to have enforced legitimate consequences for household chores thereby not violating the TVPA. *Toviave*, 761 F.3d at 624. Accordingly, to prevail on their claims which stem from the disciplinary consequences laid out in the AIPC Handbook, Plaintiffs must establish that the handbook constitutes more than a warning of legitimate consequences. Because the threats alleged here fall well short of the circumstances in *Muchira* and *Toviave* which were found not to violate the TVPA, Plaintiffs cannot meet their burden.

Plaintiffs have provided no evidence that ICE's disciplinary severity scale is in any way "illegitimate" or a "threat." Indeed, they cannot make such a showing as the disciplinary severity scale is drafted and revised by the very agency tasked with enforcing the TVPA—ICE. Further, the Eleventh Circuit recently explained that in the ICE detention context, any construction of the

TVPA should not "call into question longstanding requirements that detainees or inmates be required to perform basic housekeeping tasks." *Barrientos*, 951 F.3d at 1278. Likewise, the disciplinary severity scale in the PBNDS, which provides sanctions for detainees who "among other things, refuse to complete basic personal housekeeping tasks or organize work stoppages . . . [does not on its] own, give rise to TVPA liability." *Id.*

Here, there can be no question that federal immigration detainees may be compelled to perform basic housekeeping tasks. *Channer v. Hall*, 112 F.3d 214, 218-19 (5th Cir. 1997) ("We hold that the federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks..."); *Jobson v. Henne*, 355 F.2d 129, 131-32 (2d Cir. 1966) (inmates in mental hospitals can be required to perform housekeeping chores); *Bayh v. Sonnenburg*, 573 N.E.2d 398, 410-12 (Ind. 1991) (reversing $28 million judgment in favor of mental hospital patients who performed work at facilities in the 1970s); *Supra* Fact 16. Under *Barrientos*, a warning of the potential consequence of a brief stay in segregation for failing to complete these basic cleaning tasks is not a threat under the TVPA. *Barrientos,* 951 F.3d at 1278. Rather, such a consequence is permissible in an immigration detention center.

To the extent Plaintiffs also claim their living environment involved strict disciplinary rules and verbal reprimands, *Muchira*, makes clear that such claims are insufficient to establish liability under the TVPA and that such claims can be resolved at summary judgment. 850 F.3d at 619-20. As a matter of logic and reason, detention facilities must have the ability to impose some level of discipline in order to preserve a safe and secure environment for those housed there. In this case, ICE has drafted the disciplinary severity scale and implemented it nationwide through its PBNDS. *Supra* Facts 10-14. In addition to being less severe than the physical beating described in *Toviave*,

the possible consequence of a brief period of segregation is much less severe than that in *Headley*, where the plaintiff faced the loss of all contact with her family and friends as a consequence for breaking the church's rules. *Headley*, 687 F.3d at 1180. And there, the rules involved the plaintiff's agreement to obtain an abortion, not to clean a table after eating. Therefore, if the unquestionably more severe consequences in *Hedley* did not violate the TVPA, a warning that a detainee faced the *possible* consequence of a brief stay in segregation does not violate the TVPA. Indeed, a detainee in segregation would remain able to contact his or her friends and family and would be restored to his or her prior housing status within 72 hours. No such opportunity was available in *Headley* or *Toviave.* Accordingly, Plaintiffs' claims are not sufficient to constitute a threat under the TVPA and summary judgment is appropriate.

### C.    Plaintiffs Cannot Show GEO Acted With the Specific Intent To Threaten.

In order to prevail on a claim under the TVPA, Plaintiffs bear the burden to establish GEO acted with knowledge. 18 U.S.C. § 1589(c)(2); *see also Dann*, 652 F.3d at 1170. "In other words, under section 1589, the employer must not just threaten serious harm but have intended the victim to believe that such harm would befall her." *Garcia*, 2012 WL 1831865, at *4; *Dann*, 652 F.3d at 1170 ("The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her."). Thus, Plaintiffs must show that in placing the disciplinary severity scale in the AIPC Handbook, GEO had a specific intent to threaten detainees. Plaintiffs cannot meet their burden.

It is undisputed that GEO did not draft the disciplinary severity scale. *Supra* Fact 10-13. It is also undisputed that GEO did not incorporate the disciplinary severity scale, including the possible sanction of segregation for failing to clean, into its handbook based upon its own

motivations. *Supra* Facts 10-13. Instead, it did so to fulfill a contractual obligation to ICE. Further, the GEO detention officers' testimony in this case has made clear that they did not have an intent to threaten detainees, but rather the opposite: they sought to resolve issues informally where possible. *Supra* Fact 43. There is no evidence in the record to the contrary. Accordingly, Plaintiffs cannot meet their burden.

GEO anticipates that Plaintiffs will argue in response that their claims are rooted in a "common plan or scheme" by GEO to coerce detainees to clean-up after their meals. This too fails to establish liability. Indeed, a mere belief that a defendant "pre-planned its scheme . . . intended to coerce" is insufficient to establish liability under the TVPA. *Martinez-Rodriguez*, 391 F. Supp.3d at 992. While Plaintiffs' claims may rely on a belief that there was a scheme or plan by GEO, all evidence points to the contrary. GEO detention officers are unaware of any uniform policy that would have served to coerce the labor of the detainees. *Supra* Facts 39-45. Instead, if a detainee did not want to clean, the most common response was to simply ask another detainee to clean instead. *Supra* Fact 47. The GEO detention officers shared a common goal to resolve all incidents informally where possible. *Supra* Facts 43. Further, because ICE was the entity which drafted and required the disciplinary severity scale, GEO had no input into its drafting. In enforcing the disciplinary severity scale, GEO did not do so with an intent to coerce detainees as part of a common or uniform practice. Rather, GEO's only intention was to follow the terms of its contact with ICE. Despite years of discovery, Plaintiffs have failed to uncover sufficient evidence to establish the scienter element of their TVPA claim, and summary judgment is appropriate.

### D.    Plaintiffs Cannot Establish Causation.

Even if Plaintiffs could establish that GEO acted knowingly, they would be unable to establish that GEO's actions caused them to actually render labor. "[T]he defendant's conduct must be the driving force behind the victim's 'choice' to render the labor." *David v. Signal Int'l, LLC*, No. CIV.A. 08-1220, 2012 WL 10759668, at *20 (E.D. La. Jan. 4, 2012). As applied here, Plaintiffs would have to show that the driving force behind their decision to clean-up after each meal was the AIPC Handbook. They cannot make such a showing. Indeed, some detainees did not feel threatened by the handbook. *Supra* Facts 32, 33. Other detainees made clear that they cleaned for reasons other than the possible sanctions in the handbook, including to preserve television privileges, that they personally enjoyed cleaning, and they wanted treats such as ice cream. *Supra* Facts 36a-g. Even assuming *arguendo* that Plaintiffs could convince this Court, despite all contrary evidence, that the placement in segregation for 72 hours (or the threat thereof) could constitute the type of harm that is akin to slavery or "dire consequences," their claims would still fail. The named Plaintiffs' evidence is insufficient to establish that the threats of a brief confinement in segregation provided the driving motivation for their participation in meal clean-up. Indeed, to prevail on their claims, Plaintiffs must establish that the alleged harm or threats are "sufficiently serious to compel that person to remain in her condition of servitude when she otherwise would have left." *Muchira*, 850 F.3d at 618 (quoting *Dann*, 652 F.3d at 1170). Despite nearly six years of discovery, Plaintiffs have not demonstrated that absent a fear of discipline, they would not have cleaned up after themselves for reasons other than the disciplinary policy. Thus, there is insufficient evidence to establish that the AIPC Handbook was the "driving force" behind detainees' decisions to clean and summary judgment should be granted in GEO's favor.

**E.      Claims That Accrued Before December 23, 2008 Are Time Barred.**

When Congress first enacted the TVPA in 2000, the statute provided for a four-year limitations period. On December 23, 2008, Congress amended the TVPA to include a ten-year limitations period for civil actions. 18 U.S.C. § 1595(c). "Congress did not expressly state or otherwise indicate that the [TVPA] limitations period applies retroactively." *Abarca v. Little*, 54 F. Supp. 3d 1064, 1068 (D. Minn. 2014). Further, the prior version of the TVPA did not provide for the same scope of civil liability, which was expanded under the 2008 amendments. *Id.* Indeed, Plaintiffs seek relief under the section of the TVPA that provides for liability based upon a "scheme, plan, or pattern[.]" **Ex. A.** This section and theory of liability was not added until the 2008 Amendments. For this reason, the instant case is distinguishable from *Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d 1112, 1130 (D. Colo. 2019), where the plaintiffs' claims were based upon the 2003 iteration of the TVPA and therefore there was no risk of new or expanded liability. Therefore, the statute cannot be applied retroactively. *Id.*; *see also Doe v. Siddig*, 810 F.Supp.2d 127, 135 (D.D.C. 2011) (rejecting proposed retroactive application of the TVPA because doing so would "increase a party's liability for past conduct"); *c.f. Velez v. Sanchez*, 693 F.3d 308, 325 (2d Cir. 2012) (holding that the TVPA does not apply retroactively because the amendments changed the substantive law). Accordingly, all individuals whose claims allegedly accrued prior to December 23, 2008 would have been subject to a four-year limitations period and could not have sought relief under the expanded causes of action added to the TVPA in the 2008 amendments. This lawsuit was filed on October 22, 2014, and therefore the claims of those detained before December 23, 2008, would have expired in 2012—over two years prior to the

filing of the lawsuit. Accordingly, those claims are time-barred, and summary judgment is appropriate.

**F.      There is No Private Cause of Action For Injunctive Relief Under the TVPA.**

While it remains unclear the exact parameters of relief that Plaintiffs seek in this case, over the six years this litigation has been pending, it has become clear that Plaintiffs believe that in addition to monetary damages, they may seek injunctive relief as to the class's alleged TVPA violations. While GEO would argue Plaintiffs have waived this relief, as it was not stated in their Complaint, even if this Court were to consider such a request on the merits, injunctive relief is not available under the TVPA.

Under the TVPA, an individual may bring "a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney fees. 18 U.S.C. § 1595(a). The section establishing the right to bring a private civil action further provides for a 10-year limitations period. 18 U.S.C. § 1595(c). The section establishing the right to bring a private civil action does not include the right to injunctive relief. In contrast, 18 U.S.C § 1595A(a) provides that whenever a violation of the act has occurred, or is about to occur, "the Attorney General may bring a civil action in a district court of the United States seeking an order to enjoin such act." Section 1595A proceeds to explain the procedure should a criminal and civil case be brought simultaneously.

Under the principles of statutory construction, courts look to the plain language of the law to determine its meaning. *St. Charles Inv. Co. v. Comm'r*, 232 F.3d 773, 776 (10th Cir. 2000). "In

so doing, [courts] will assume that Congress's intent is expressed correctly in the ordinary meaning of the words it employs." *Id.* Here, the plain language of Section 1595A, permitting civil injunctions, provides only that the Attorney General may bring such an action. 18 U.S.C § 1595A(a). It does not provide for a private party to bring a case for injunctive relief. To the contrary, Congress set forth private right of action in Section 1589. That section provides only for monetary damages, including attorneys' fees. 18 U.S.C. § 1595(a). There is no ambiguity in the plain language of these provisions. *Fort Peck Hous. Auth. v. United States Dep't of Hous. & Urban Dev.*, 367 F. App'x 884, 889 (10th Cir. 2010) ("Statutory interpretation begins with the words Congress has chosen. The inquiry ends if that language is clear. We merely enforce the statute's plain meaning."). Therefore, it is clear that there is no private right of action for injunctive relief under the TVPA. Plaintiffs here are not represented by the Attorney General. Accordingly, insofar as Plaintiffs seek injunctive relief, it is unavailable under the TVPA and GEO is entitled to summary judgment.

### G.    Plaintiffs' Unjust Enrichment Claims.

#### (1)    Plaintiffs Cannot Establish That GEO Was Enriched By Their Participation in The VWP.

To prevail on their claim of unjust enrichment, as a threshold issue, Plaintiffs must establish that GEO received a benefit from the VWP. *Indian Mountain Corp*, 2016 COA 118M, ¶ 28. Plaintiffs claim they can establish this element by demonstrating that GEO realized cost savings by implementing the VWP rather than hiring additional employees. With discovery concluded, it is now clear that Plaintiffs' claim lacks any evidentiary support. Indeed, GEO does not gain a benefit from the VWP. Rather, it must implement the program (accounting for all costs associated with doing so) and provide the detainees with a pass-through stipend of $1 per day. *Supra* Fact 49.

In addition, GEO expends additional funds to provide supplemental incentives to those participating in the program. *Supra* Fact 22. If it instead hired employees to perform the work, it would be able to realize an additional profit of up to 15% of the increased labor costs. *Supra* Facts 50-52. Accordingly, summary judgment is proper because Plaintiffs cannot show GEO obtains benefit, much less under circumstances which would make it unjust for them to do so.

### (2)   Express Contract Bars Unjust Enrichment.

A party generally cannot recover for unjust enrichment—an equitable claim-- when there is "an express contract addressing the subject of the alleged obligation to pay." *Pulte Home Corp. v. Countryside Cmty. Ass'n*, 382 P.3d 821, 833 (Colo. 2016); *see also Pernick v. Computershare Trust Co.*, 136 F. Supp. 3d 1247, 1267–69 (D. Colo. 2015) (holding that the plaintiff's unjust enrichment claim was precluded by a written agreement). Under Colorado contract law, all that is required for a valid contract is an offer, acceptance, consideration, and "meeting of the minds." *Garner v. FCA US, LLC*, No. 19-CV-00270-CMA-NYW, 2019 WL 9240241, at *4 (D. Colo. Nov. 27, 2019), *report and recommendation adopted sub nom*, *Garner v. FCA Chrysler*, No. 19-CV-00270-CMA-NYW, 2020 WL 1650450 (D. Colo. Apr. 3, 2020); *PayoutOne v. Coral Mortg. Bankers*, 602 F. Supp. 2d 1219, 1224 (D. Colo. 2009). Plaintiffs here entered into valid contracts with GEO for participation in the VWP. At AIPC, all detainees are offered the opportunity to participate in the VWP on a voluntary basis. *Supra* Fact 18. Should a detainee choose to participate, he or she is provided with an agreement detailing the terms and conditions of the VWP. *Supra* Fact 19-21. The detainee is offered a stipend of $1 per day for his or her participation. *Supra* Fact 20. In return, GEO receives consideration as it is able to comply with its contract with ICE. GEO also obtains promises from each detainee who volunteers that their behavior will conform to certain

standards. A detainee who signs the agreement therefore expressly agrees to participate for $1.00 per day. Once a detainee signs the agreement, all elements of contract formation are met, and a valid contract is formed.

Named Plaintiffs entered into valid contracts for their participation in the VWP. *Supra* Fact 21. In so doing, they made clear that the appropriate remedy under that agreement was an action resting in contract law, not in equity. Accordingly, Plaintiff's unjust enrichment claims are precluded by their written contracts stating they would be paid $1 per day for participating in the VWP. *Pernick*, 136 F. Supp. 3d at 1247.

## VI.   CONCLUSION

In sum, for all the reasons stated herein, GEO respectfully requests the Court grant summary judgment in its favor as to all of Plaintiffs' claims.

Respectfully submitted, this 17th day of August, 2020.

**AKERMAN LLP**

*s/ Adrienne Scheffey*
Colin L. Barnacle
Adrienne Scheffey
Christopher J. Eby
Melissa L. Cizmorris
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  (303) 260-7712
Facsimile:  (303) 260-7714
Email: colin.barnacle@akerman.com
Email: christopher.eby@akerman.com
Email: melissa.cizmorris@akerman.com
Email: adrienne.scheffey@akerman.com

**BURNS, FIGA & WILL, P.C.**
Dana L. Eismeier
Michael Y. Ley
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, CO 80111
Telephone:  (303) 796-2626
Facsimile:   (303) 796-2777
Email: deismeier@bfwlaw.com
Email: mley@bfwlaw.com

*Attorneys for Defendant The GEO Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify on this 17th day of August, 2020, a true and correct copy of the foregoing

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was filed and served

electronically via the Court's CM/ECF system on the following:

### Counsel for Plaintiffs:

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
TOWARDS JUSTICE
1410 High St., Ste. 300
Denver, CO 80218
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Matthew Fritz-Mauer
KELMAN BUESCHER FIRM
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com
mfritzmauer@laborlawdenver.com

Hans C. Meyer
MEYER LAW OFFICE, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
OUTTEN & GOLDEN, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
OUTTEN & GOLDEN, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
OUTTEN & GOLDEN, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
LAW OFFICE OF R. ANDREW FREE
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
MILSTEIN LAW OFFICE
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

*s/ Nick Mangels*
Nick Mangels

54238580;3