## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 14-CV-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own behalf and on behalf of all others similarly situated*,

       Plaintiffs,

v.

THE GEO GROUP, INC.,

       Defendant.

---

## DEFENDANT THE GEO GROUP, INC.'S MOTION TO DISMISS FOR FAILURE TO JOIN REQUIRED PARTY

---

Defendant The GEO Group, Inc. ("GEO"), through its undersigned counsel, respectfully requests that the Court dismiss the class's claims for a violation of the Trafficking Victim's Protection Act ("TVPA") and unjust enrichment under Rule 19 and Rule 12(b)(7) based upon the class's failure to join a required party, namely, United States Immigration and Customs Enforcement ("ICE").[1]

---

[1] ICE is an agency of the Department of Homeland Security ("DHS"). Accordingly, references in this Motion to ICE should also be read to apply to DHS insofar as ICE cannot be joined without also joining DHS.

54243439;2

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................ 1

II.   BACKGROUND ......................................................................................... 2

    A. CONTRACTUAL AND REGULATORY OVERVIEW ........................................ 3

ICE'S ROLE AND GEO'S CONTRACT ................................................................ 3

PBNDS STANDARDS ...................................................................................... 5

ICE HANDBOOK ............................................................................................. 6

GEO POLICY ................................................................................................. 7

ICE AND ACA AUDITS ................................................................................. 7

ICE ONSITE ................................................................................................. 7

    B. ICE'S ROLE IN ENFORCING THE TVPA ............................................... 8

    C. THE VOLUNTARY WORK PROGRAM ..................................................... 10

III.   LEGAL STANDARD ............................................................................... 11

IV.   ICE IS A NECESSARY PARTY UNDER RULE 19(A)(1)(B). ....................... 14

    A. ICE'S CONTRACT WITH GEO IS AT THE HEART OF PLAINTIFFS' CLAIMS. ...... 14

    B. PLAINTIFFS' FAILURE TO JOIN ICE REQUIRES DISMISSAL OF THEIR TVPA CLAIM. ..... 16

        1.   *Complete relief is not available without joinder of ICE.* ................... 16

        2.   *Disposing of the TVPA claim in the absence of ICE would impair ICE's ability to protect its interests.* ..................................................................... 18

        3.   *Absent Joinder of ICE, GEO could be subject to inconsistent obligations.* ...... 24

    C. PLAINTIFFS' FAILURE TO JOIN ICE REQUIRES DISMISSAL OF THEIR UNJUST ENRICHMENT CLAIM. ...................................................................................... 25

        1.   *Disposing of the TVPA claim in the absence of ICE would impair ICE's ability to protect its interests.* ..................................................................... 26

        2.   *Absent Joinder of ICE, GEO could be subject to inconsistent obligations.* ...... 28

    D. JOINDER IS LIKELY NOT FEASIBLE BECAUSE ICE IS IMMUNE ......................... 28

    E. IN EQUITY AND GOOD CONSCIENCE, THIS ACTION CANNOT PROCEED WITHOUT ICE AND SHOULD BE DISMISSED. ......................................................................... 29

V.   CONCLUSION .......................................................................................... 32

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                        **Page(s)**

*Alabama-Quassarte Tribal Town v. United States*,
    899 F.3d 1121 (10th Cir. 2018) ............................................................................ 12

*Alvarado Guevara v. INS*,
    902 F.2d 394 (5th Cir. 1990) ................................................................................. 26

*Andrx Pharms., Inc v. Biovail Corp.*,
    276 F.3d 1368 (Fed. Cir. 2002) .............................................................................. 30

*Boles v. Greenville Hous. Auth.*,
    468 F.2d 476 (6th Cir. 1972) ....................................................... 13, 18, 20, 21, 25

*Burger King Corp. v. Am. Nat'l Bank of Trust Co. of Chicago*,
    119 F.R.D. 672 (N.D. Ill. 1988) ............................................................................ 15

*Center for Biological Diversity v. Pizarchik*,
    858 F. Supp. 2d 1221 (D. Colo. 2012) .................................................................. 28

*Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier*,
    17 F.3d 1292 (10th Cir. 1994) ............................................................................... 13

*Citizen Potawatomi Nation v. Norton*,
    248 F.3d 993 (10th Cir. 2001) .......................................................................... 21, 22

*Corsi v. Eagle Publ'g, Inc.*,
    No. 1:07-CV-02004ESH, 2008 WL 239581 (D.D.C. Jan. 30, 2008) ..................................... 14

*Davis ex rel. Davis v. United States*,
    343 F.3d 1282 (10th Cir. 2003) ............................................................................. 30

*Davis v. United States*,
    192 F.3d 951 (10th Cir. 1999) ............................................................................... 12

*Dawavendewa v. Salt River Project Agr. Improvement & Power Dist.*,
    276 F.3d 1150 (9th Cir. 2002) ............................................................................... 30

*Dep't of Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999) ............................................................................................... 27

*EEOC v. Peabody Western Coal Co.*,
    610 F.3d 1070 (9th Cir. 2010) .................................................................. 23, 24, 27, 28, 29, 30

*Ente Nazionale Idrocarburi v. Prudential Sec. Grp., Inc.*,
    744 F. Supp. 450 (S.D.N.Y. 1990) ......................................................................... 14

*Enterprise Mgmt. Consultants, Inc. v. United States ex rel. Hodel*,
    883 F.2d 890 (10th Cir. 1989) ............................................................................... 12

*Hernandez-Ceren v. Wolf*,
    No. 20-cv-01628-RM (D. Colo) .............................................................................. 19

*Ins. Co. of State of Penn. v. LNC Cmtys. II, LLC*,
    11-cv-649-MSK-KMT, 2011 WL 5548955 (D. Colo. Aug. 23, 2011),
    recommendation accepted by 2011 WL 5553808 (Nov. 15, 2011) ................................ 21, 22

*Jett v. Zink*,
    362 F.2d 723 (5th Cir. 1966) ................................................................................. 11

*Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*,
    43 F.3d 1491 (D.C. Cir. 1995) .......................................................................... 21, 29, 30

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n*,
    471 F.3d 377 (2d Cir. 2006) ................................................................................. 11

*McCowen v. Jamieson*,
    724 F.2d 1421 (9th Cir. 1984) ............................................................................... 13

*Mount v. Johnson*,
    36 F. Supp. 3d 74 (D.D.C. 2014) ............................................................................. 9

*Oregon v. Ashcroft*,
    192 F. Supp. 2d 1077 (D. Or. 2002) ......................................................................... 30

*Provident Tradesmens Bank & Trust Co. v. Patterson*,
    390 U.S. 102 (1968) ............................................................................................ 13

*Republic of Philippines v. Pimentel*,
    553 U.S. 851 (2008) ................................................................................. 1, 2, 13, 29, 30

*Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*,
    94 F.3d 1407 (10th Cir. 1996) ....................................................................... 11, 12, 13

iii

*Rivera Rojas v. Loewen Group Int'l, Inc.*,
178 F.R.D. 356 (D.P.R. 1998) ................................................................ 14

*Three Stars Prod. Co. v. BP Am. Prod. Co.*,
No. 11-cv-1162-WYD-MJW, 2012 WL 32916 (D. Colo. Jan. 6, 2012) ............................. 28

*Town of Okemah v. United States*,
140 F.2d 963 (10th Cir. 1944) ................................................................ 22

*Travelers Indem. Co. v. Household Int'l, Inc.*,
775 F. Supp. 518 (D. Conn. 1991) ................................................................ 14

*U.S. ex rel. Hall v. Tribal Dev. Corp.*,
100 F.3d 476 (7th Cir. 1996) ................................................................ 14

*United States v. Mitchell*,
445 U.S. 535 (1980) ................................................................ 27

*United States v. Sabhnani*,
599 F.3d 215 (2d Cir. 2010) ................................................................ 16

*United States v. Sweeny*,
418 F. Supp. 2d 492 (S.D.N.Y. 2006) ................................................................ 13

*Whyte v. Suffolk County Sheriff's Dep't*,
86 N.E.3d 249 (Mass. Ct. App. 2017) ................................................................ 26

**Statutes**

6 U.S.C. § 242(c) ------------------------------------------------------------------------ 9

6 U.S.C. § 242(e) ------------------------------------------------------------------------ 9

8 U.S.C. § 1231(g)(1) -------------------------------------------------------------------- 3

8 U.S.C. § 1231(g)(2) -------------------------------------------------------------------- 3

8 U.S.C. § 1357(a)(5)(B) ----------------------------------------------------------------- 9

8 U.S.C. §§ 1101 ------------------------------------------------------------------------- 3

18 U.S.C. § 1589 ------------------------------------------------------------------------- 2

iv

18 U.S.C. § 1589(b)------------------------------------------------------------------------------16

18 U.S.C. § 1589(d)------------------------------------------------------------------------------ 8

22 U.S.C. § 7103(b)------------------------------------------------------------------------------ 8

22 U.S.C. § 7110(i) ------------------------------------------------------------------------------ 8

Pub. L. No. 109-164, § 301 (2006) ---------------------------------------------------------- 8

Pub. L. No. 110-457, § 301 (2008) ---------------------------------------------------------- 8

Pub. L. No. 113-4, § 1251 (2013)------------------------------------------------------------- 8

**Other Authorities**

7 Fed. Prac. & Proc. § 1617 (3d ed. 2018)------------------------------------------------13

7 Wright & Miller, Fed. Prac. & Proc. § 1609 ------------------------------------------13

National Detainee Handbook, at 2 (Apr. 2016),
    https://www.ice.gov/sites/default/files/documents/Document/2017/detainee-handbook.PDF -- 9

U.S. Immigration and Customs Enforcement, 2000 Detention Operations Manual,
    www.ice.gov/detention-standards/2000 ------------------------------------------------- 4

U.S. Immigration and Customs Enforcement, 2011 Operations Manual ICE Performance-Based
    National Detention Standards, www.ice.gov/detention-standards/2011---------------------------- 4

**Rules**

Fed. R. Civ. P. 19(a) -----------------------------------------------------------------------------12

Fed. R. Civ. P. 19(b) -----------------------------------------------------------------------------12

Fed. R. Civ. P. 19(b)(1)-------------------------------------------------------------------------12

**Regulations**

8 C.F.R. § 287.5(c)(4) --------------------------------------------------------------------------- 9

Exec. Order No. 13257, 67 Fed. Reg. 7259 (Feb. 13, 2002)---------------------------------- 8

Exec. Order No. 13286, 68 Fed. Reg. 10619 (Feb. 28, 2003) -------------------------------- 8

Exec. Order. No. 1333, 69 Fed. Reg. 13455 (Mar. 18, 2004)-------------------------------------------- 8

54243439;2

## I.       Introduction

ICE is the author, auditor, and authority behind the policies and practices that the class alleges violate the TVPA. ICE is also statutorily charged with enforcing the criminal prohibitions in the TVPA, having received since 2006 at least $188,000,000 in appropriations for the sole purpose of investigating severe human trafficking. The class therefore alleges not only that ICE's own policies violate the TVPA, but also that ICE has failed to honor its statutory mandate of prosecuting an alleged TVPA violator (GEO) and instead, over the course of three Presidential administrations, has created, overseen, and participated in a massive human trafficking operation. Under Rule 19, that cannot be decided in the absence of ICE.

The class also claims that GEO was unjustly enriched by only paying detainees in ICE's Voluntary Work Program ("VWP") $1.00 per day. In a recent filing, the class argues—for the first time—that ICE's VWP lacks Congressional authorization. That argument, if accepted, would end ICE's VWP and upset the status quo that has existed in ICE's immigration facilities around the country for at least the past thirty years. ICE must be allowed to defend its own practices and address the nationwide implications of the class's arguments.

However, ICE's sovereign immunity bars it from being joined to defend against the class's claims. Therefore, the case must be dismissed under Rule 19. In *Republic of Philippines v. Pimentel*, 553 U.S. 851, 866-67 (2008), the Supreme Court summarized its jurisprudence "involving the intersection of joinder and the governmental immunity of the United States" as follows: "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." The Supreme Court recognized that "[d]ismissal under Rule 19(b) will mean,

in some instances, that plaintiffs will be left without a forum for definitive resolution of their claims." *Id.* at 872. "But," the Court concluded, "that result is contemplated under the doctrine of foreign sovereign immunity." *Id.* The same is true for the sovereign immunity of the United States and its agencies. ICE cannot be joined, so the class's claims should be dismissed.

## II.    Background

GEO operates the Aurora ICE Processing Center ("AIPC") under ICE's strict control and oversight. The class apparently (and incorrectly) believes that GEO operates AIPC in secrecy and seclusion and has *carte blanche* authority to establish policies aimed at increasing its profit margin. To the contrary, AIPC operates under a vast array of ICE-promulgated standards and ICE-approved policies, and is audited for compliance with these standards multiple times each year. AIPC serves as an office for over 20 ICE employees, who are physically present at the facility in a supervisory role. Immigration judges are also on-site, as one of Colorado's two immigration courts is located at the facility.

The class alleges that GEO violated the TVPA, 18 U.S.C. § 1589, by including the ICE-mandated discipline policy in its local AIPC Handbook, which also contains a meal clean-up policy.[2] The class claims that when read together, the policies allegedly threaten detainees with a number of sanctions, including up to 72-hours of segregation, if a detainee refuses to clean his or her housing area. But the class fails to acknowledge that the ICE discipline policy and AIPC Handbook are required, approved, audited, and overseen by ICE.

Additionally, GEO's contract with ICE for operation of AIPC requires GEO to operate the VWP wherein detainees may volunteer to complete modest tasks for a stipend of $1.00 per day.

---

[2] The class refers to this policy as the "Housing Unit Sanitation Policy" or "HUSP."

54243439;2

ICE builds this program into its contract, specifically including a line-item for the program and specifying that the amount each detainee will be compensated is $1.00 per day. In addition, ICE's nationwide Performance Based National Detention Standards ("PBNDS"), specifically endorse a minimum stipend of $1.00 per day. These standards are used across the country to ensure uniformity in conditions of confinement among the various detention facilities. The class alleges that these uniform standards are unlawful as they claim that a stipend of $1.00 per day, regardless of the task, is <u>always</u> unjust. They further claim that ICE (not GEO) <u>is without authority</u> to require that its contractors implement the VWP because ICE has not properly requested appropriations from Congress. Because this program is mandated by ICE, is presented in the PBNDS as a benefit to detainees in custody, and is overseen by ICE, the program simply cannot be dismantled without ICE.

>    A.    **Contractual and Regulatory Overview**

**ICE's Role and GEO's Contract**

1.    ICE is a federal agency tasked with enforcing U.S. immigration laws. 6 U.S.C. § 542.

2.    The United States Congress delegated to the Department of Homeland Security, and its agency, ICE, sole authority to arrange for all aspects of the detention of aliens pending the results of their immigration proceedings. 8 U.S.C. § 1231(g)(1) ("The [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.").

3.    ICE has the authority to detain foreign nationals suspected of entering the United States unlawfully. 8 U.S.C. §§ 1101 *et seq.*

54243439;2

4.      In making these arrangements, ICE must consider the use of private contractors to detain aliens prior to constructing its own facilities. 8 U.S.C. § 1231(g)(2) ("Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.").

5.      As a result of Congress' directive, ICE neither constructs nor operates many of its immigration detention facilities, ECF 271-2 at 4 (Dec. of Tae Johnson), and therefore its state and private contractors are critical to carrying out the federal function of immigration detention.

6.      ICE chose to contract with GEO to detain aliens at AIPC pending the resolution of their immigration proceedings. ECF 298 at 8 (Plaintiffs' Response to Undisputed Fact #6).

7.      GEO owns and has continuously operated AIPC, under contracts with ICE, from October 22, 2004 to October 22, 2014. ECF 298 at 8 (Plaintiffs' Response to Undisputed Fact #9).

8.      GEO's operation of AIPC is governed first by GEO's contract with ICE, which is a sub-agency of DHS. That contract provides that "[d]etainees will be able to volunteer for work assignments," that "[e]ssential operations and services will be enhanced through productivity from detainees," and that "[t]he negative impact of confinement will be reduced through less idleness." (Ex. A, AIPC Contract, p. 30.)

9.      Elsewhere, the contract identifies other industry standards GEO that must follow including, but not limited to: (1) the American Correctional Association ("ACA") Standards for Adult Detention Facilities; (2) the PBNDS; and (3) ICE policies, which include the ICE National Detainee Handbook. (*Id.* pp. 32, 43–44.) If a standard conflicts with ICE policy, GEO is required to follow ICE policy. (*Id.* p. 45.)

4

**PBNDS Standards**

10.     ICE creates and publishes its own national detention standards. Since 2008, those standards have been called the PBNDS. *See* U.S. Immigration and Customs Enforcement, 2011 Operations Manual ICE Performance-Based National Detention Standards, www.ice.gov/detention-standards/2011. Prior to 2008, they were called National Detention Standards ("NDS"). *See* U.S. Immigration and Customs Enforcement, 2000 Detention Operations Manual, www.ice.gov/detention-standards/2000.

11.     In each contract GEO entered into with ICE for the operation of AIPC, the 2000 NDS, 2008 PBNDS, or the 2011 PBNDS, as applicable, were incorporated into the contract and GEO was required to comply with the same. ECF 298 at 10 (Plaintiffs' Response to Undisputed Fact #13).

12.     The 2000 NDS and all applicable versions of the PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale. ECF 261-10 at 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8 at 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section."). The class does not contest that ICE required the disciplinary severity scale. ECF 298 at 14 (Plaintiffs' Response to Undisputed Fact #19).

13.     The 2000 NDS and all versions of the PBNDS require GEO to provide notice to detainees, in the local detainee handbook, of the ICE-mandated disciplinary severity scale. ECF

261-10 at 10 (2000 NDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"). ECF 298 at 14 (Plaintiffs' Response to Undisputed Fact #20).

14.     Likewise, the 2000 NDS and all versions of the PBNDS explicitly provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 298 at 14-15 (Plaintiffs' Response to Undisputed Fact #21).

15.     The 2000 NDS and all versions of the PBNDS also explicitly provide a disciplinary severity scale that lists "[r]efusing to obey the order of a staff member or officer" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 298 at 15 (Plaintiffs' Response to Undisputed Fact #22).

**ICE Handbook**

16.     ICE's contract for AIPC requires that each detainee receive a copy of ICE's own National Detainee Handbook. (Ex. A, p. 32.)

17.     That handbook instructs each detainee to "[k]eep yourself, your clothes, and your living area clean[.]" (Ex. B, ICE Handbook, p. 2.)

6

18.     Like AIPC handbook's policy at the heart of this case, the ICE Handbook also warns detainees that they could face disciplinary consequences if they refuse to clean, stating "Will I get paid for keeping my living area clean? No. **You must keep areas that you use clean**, including your living area and any general-use areas that you use. **If you do not keep your areas clean, you may be disciplined**." (Ex. B, ICE Handbook, p. 15).

### GEO Policy

19.     GEO adopts facility-specific policies to integrate the various rules under which each facility operates.

20.     All of GEO's policies are reviewed and approved by an on-site ICE official. ECF 298 at 16 (Plaintiffs' Response to Undisputed Fact #25); (Ex. C, Declaration of Dawn Ceja.)

21.     GEO has never maintained a separate policy or practice of placing a detainee in segregation for the refusal to clean a living area. *Id.*; (Ex. D) (Amber Martin Dep., pp. 134, 135.).

### ICE Audits

22.     ICE routinely audits GEO to ensure GEO follows all applicable rules and standards. As part of each inspection, the auditor reviews compliance with each PBNDS requirement. ECF 298 at 15-16 (Plaintiffs' Response to Undisputed Fact ## 35-36).

23.     GEO has passed each audit since 2004 (*i.e.* the beginning of the relevant period of this lawsuit). ICE correspondence indicating completion of the audits is attached as Exhibit E.

### ICE Onsite

24.     To top it off, ICE has its own offices and personnel inside AIPC. (Ex. C, Ceja Dec., p. 2.)

7

25.     The ICE Handbook provides that "ICE officers will visit all housing units weekly. You should discuss any issues of concern with those officers." (Ex. B, p. 4.)

26.     Indeed, one of the class representatives in this case—Demetrio Valerga—admitted during his deposition that ICE officers themselves have taken steps to enforce the very policies challenged in this suit. After claiming that one of GEO's detention officers told Mr. Valerga that he could be taken to segregation for not cleaning when he had preferred to stay in bed rather than help clean his own common area, (Ex. F, Demetrio Valerga Dep., pp. 135:15-137:19), Mr. Valerga then explained that ICE officers woke him up, pulled him out of his housing unit, and spoke to him directly. (*Id.* at 138:2-13). During that conversation, ICE officers told Mr. Valerga that he could, in fact, be taken to segregation for refusing to help clean his living area. (*Id.* at 138:15-23).[3]

27.     In sum, the cleaning practices that the class challenges are required, reviewed, and approved by ICE and GEO's government contract.

**B.      ICE's Role in Enforcing the TVPA**

28.     DHS, through its agency ICE, is one of the agencies charged with enforcing the TVPA. *See* 18 U.S.C. § 1589(d); 22 U.S.C. § 7103(b). *See also* Exec. Order No. 13257, 67 Fed. Reg. 7259 (Feb. 13, 2002), *as amended in* Exec. Order No. 13286, 68 Fed. Reg. 10619 (Feb. 28, 2003); Exec. Order. No. 1333, 69 Fed. Reg. 13455 (Mar. 18, 2004).

29.     Most recently, Congress appropriated "$10,000,000 for each of the fiscal years 2018 through 2021, to remain available until expended, for investigations by the Bureau of Immigration and Customs Enforcement of severe forms of trafficking in persons." 22 U.S.C.

---

[3] Even after the ICE Officer's warning, Mr. Valerga refused to clean and later refused again several times. (*See* Ex. F, pp. 139:6-24, 140:2-20). Mr. Valerga was never placed in segregation for refusing to clean. (*Id.*)

§ 7110(i). Past appropriations for the same purpose include $18,000,000 each year from 2006 through 2011 and $10,000,000 each year from 2014 through 2017. (Pub. L. No. 109-164, § 301 (2006); Pub. L. No. 110-457, § 301 (2008); Pub. L. No. 113-4, § 1251 (2013)). Since 2006, then, ICE has received at least $188,000,000 for the sole purpose of ICE's role in investigating human trafficking.

30.     These investigations are carried out by the ICE subdivision called Homeland Security Investigations. *See Mount v. Johnson*, 36 F. Supp. 3d 74, 76 n. 3 (D.D.C. 2014).

31.     Immigration officers are statutorily empowered not only to investigate but also to make arrests "for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony." 8 U.S.C. § 1357(a)(5)(B); 8 C.F.R. § 287.5(c)(4).

32.     ICE claims that, in FY 2019 alone, "HSI initiated 1,024 investigations with a nexus to human trafficking and recorded 2,197 arrests, 1,113 indictments, and 691 convictions; 428 victims were identified and assisted. HSI continues to make human trafficking cases a top investigative priority by connecting victims to resources to help restore their lives and bringing traffickers to justice." ICE, https://www.ice.gov/features/human-trafficking (last visited August 14, 2020); *see also* Ex. G (website capture from May 30, 2018).

33.     Further, Congress established a program within DHS called the "Blue Campaign" to "unify and coordinate Department efforts to address human trafficking." 6 U.S.C. § 242(c). The Blue Campaign provides guidance and training to federal and state personnel regarding, *inter alia*, "programs to help identify instances of human trafficking" and how to "increase public awareness of human trafficking." *Id.* § 242(e); *see also* Homeland Security, Blue Campaign,

http://www.dhs.gov/blue-campaign. ICE includes a description of the Blue Campaign on the second page of its ICE Detainee Handbook. National Detainee Handbook, at 2 (Apr. 2016), https://www.ice.gov/sites/default/files/documents/Document/2017/detainee-handbook.PDF.

###### C.   The Voluntary Work Program

34.   GEO's contract with ICE required GEO to implement ICE's VWP. (Ex. A, pp. 4, 5, 7, 9, 11, 31.)

35.   The 2000 NDS and all applicable versions of the PBNDS require that GEO provide detainees the opportunity to participate in a VWP. ECF 298 at 24 (Plaintiffs' Response to Undisputed Fact #42).

36.   The 2000 NDS, with which AIPC was contractually obligated to comply from March 27, 2003 to April 28, 2010, required GEO to provide "compensation" and stated that "the stipend is $1.00 per day, to be paid daily." ECF 261-10, 5 (2000 NDS); ECF 298 at 24 (Plaintiffs' Response to Undisputed Fact #43).

37.   Likewise, the 2008 PBNDS, with which AIPC was contractually obligated to comply from April 28, 2010 to June 22, 2013, stated that "the compensation is $1.00 per day." ECF 261-9 at 63 (2008 PBNDS). ECF 298 at 25 (Plaintiffs' Response to Undisputed Fact #44).

38.   Beginning on June 23, 2013, AIPC was bound by the 2011 PBNDS, which state that participants in the VWP will be compensated with "at least $1.00 (USD) per day." ECF 261-8 at 53 (2011 PBNDS). Thus, the "at least" language upon which the VWP Class relies was not implemented at AIPC until approximately halfway through the VWP Class Period. ECF 298 at 25-26 (Plaintiffs' Response to Undisputed Fact #45).

39.     Before the 2011 PBNDS were implemented at AIPC, GEO paid the amount it was explicitly directed by ICE to pay to VWP participants: $1.00 per day. ECF 298 at 26-27 (Plaintiffs' Response to Undisputed Fact #46).

40.     Thereafter, GEO continued to pay members of the VWP Class $1.00 per day, the minimum payment explicitly permitted by the 2011 PBNDS. ECF 298 at 27 (Plaintiffs' Response to Undisputed Fact #47).

41.     GEO's contract with ICE for the AIPC states that the stipend for the VWP "will be at **actual cost of** $1.00 per day per detainee." (Ex. A, pp. 5-6) (emphasis added).

42.     ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP. ECF 298 at 27 (Plaintiffs' Response to Undisputed Fact #47).

43.     The VWP has been audited each year and has passed each audit since 2004. ECF 298 at 27 (Plaintiffs' Response to Undisputed Fact #47).

### III.     Legal Standard.

Under Rule 19(a), dismissal is appropriate where a necessary party to the action cannot be joined. *Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir. 1996).[4] Determining whether an absent party is indispensable requires a two-part analysis. *Id.* The court must first determine, under Rule 19(a), whether the party is necessary to the suit. *Id.* If the party is necessary, and should be joined, the court must then determine under Rule 19(b) whether the party is indispensable. *Id.* An absent party is necessary to a suit if: (1) "in that person's absence, the

---

[4] A court has an independent obligation to raise the issue of indispensable parties *sua sponte*, if need be, as the issue bears on a court's federal jurisdiction. *See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n*, 471 F.3d 377, 382–83 (2d Cir. 2006) (citing cases); *Jett v. Zink*, 362 F.2d 723, 726 (5th Cir. 1966).

54243439;2

court cannot accord complete relief among the existing parties" or (2) "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may" either "as a practical matter impair or impede the person's ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a). *Alabama-Quassarte Tribal Town v. United States*, 899 F.3d 1121, 1123 (10th Cir. 2018).

However, a required party cannot always be joined to an action. In such cases, a court must determine whether, in equity and good conscience, the action can proceed among the existing parties or should be dismissed. Fed. R. Civ. P. 19(b)(1). Accordingly, once a court determines a party is necessary, the court must also consider:

> (1) The extent to which a judgment rendered in the party's absence might be prejudicial to the already joined parties;
> (2) the existence of protective measures in the judgment can be utilized to reduce or avoid prejudice;
> (3) whether a judgment entered in the absence of the party will be adequate; and
> (4) whether the plaintiffs will have an adequate remedy if the action is dismissed for nonjoinder.

Fed. R. Civ. P. 19(b); *Davis v. United States*, 192 F.3d 951, 957-58 (10th Cir. 1999); *Rishell*, 94 F.3d at 1411.

The analysis under Rule 19(b) takes a different form when a required absent party is protected by sovereign immunity. In that scenario, the Tenth Circuit has observed that "there is very little room for balancing of other factors set out in Rule 19(b) where a necessary party under Rule 19(a) is immune from suit because immunity may be viewed as one of those interests compelling by themselves." *Enterprise Mgmt. Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir. 1989) (internal citations omitted). And while the Tenth Circuit advised

that courts should still consider the Rule 19(b) factors even when sovereign parties are absent, *Davis*, 192 F.3d at 960, the Supreme Court later clarified its prior decisions "involving the intersection of joinder and the governmental immunity of the United States" as follows: "A case may not proceed when a required-entity sovereign is not amenable to suit. These cases instruct us that where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Pimentel*, 553 U.S. at 866-67. As Wright and Miller observe: "When the United States has not expressly or impliedly consented to be sued and thus cannot be brought in, and its presence has been regarded as indispensable, the suit has been dismissed." 7 Fed. Prac. & Proc. § 1617 (3d ed. 2018).

Federal Rule of Civil Procedure 12(b)(7) governs a motion to dismiss for failure to join a party under Federal Rule of Civil Procedure 19. "The moving party has the burden of persuasion in arguing for dismissal" for failure to join a required party. *Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir. 1996) (internal quotation marks and citation omitted). The moving party can meet its burden by relying on extra-pleading evidence, such as affidavits. *Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994). Failure to join a necessary party "is sufficiently important that it can be raised at any stage of the proceedings—even sua sponte." *McCowen v. Jamieson*, 724 F.2d 1421, 1424 (9th Cir. 1984) (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968)).

Rule 19 motions follow a burden-shifting approach. A movant must make a *prima facie* showing that an absent party is required to be joined. *Boles v. Greenville Hous. Auth.*, 468 F.2d

13

476, 478 (6th Cir. 1972); *United States v. Sweeny*, 418 F. Supp. 2d 492, 499 (S.D.N.Y. 2006); *see also* 7 Wright & Miller, Fed. Prac. & Proc. § 1609. If the movant makes that showing, the burden shifts to the nonmovant to negate it. *Id.* If the nonmovant does not, the court should dismiss the case. *See id.*

## IV.    ICE is a necessary party under Rule 19(a)(1)(B).

Under Rule 19(a)(1)(B), ICE is a necessary party because (1) absent joinder of ICE, complete relief will not be available to the parties already in the suit; (2) ICE has an interest related to the suit which as a practical matter would be impaired; and (3) a judgment in ICE's absence would damage ICE's interest and leave GEO "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of [ICE's] interest."

### A.    ICE's contract with GEO is at the heart of Plaintiffs' claims.

Where a contract between a sovereign entity and a defendant is implicated in a lawsuit, the sovereign entity is a necessary party under Rule 19(a). *U.S. ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 479 (7th Cir. 1996). This principle is consistent with the longstanding "proposition that a contracting party is the paradigm of an indispensable party." *Travelers Indem. Co. v. Household Int'l, Inc.*, 775 F. Supp. 518, 527 (D. Conn. 1991); *see also Corsi v. Eagle Publ'g, Inc.*, No. 1:07-CV-02004ESH, 2008 WL 239581, at *3 (D.D.C. Jan. 30, 2008) ("Thus, each claim in this case implicates Regnery's conduct under the contracts, and any findings involving these contracts will necessarily affect Regnery's rights."); *Rivera Rojas v. Loewen Group Int'l, Inc*., 178 F.R.D. 356, 362 (D.P.R. 1998) (subsidiary was a necessary party in a suit against a parent where it "has an interest in the litigation of these issues which pertain to contracts to which [the subsidiary] is a party ... [and][i]t should be afforded the opportunity to defend against these allegations."); *Ente*

*Nazionale Idrocarburi v. Prudential Sec. Grp., Inc.*, 744 F. Supp. 450, 458 (S.D.N.Y. 1990) (holding that absent party had "real interests that are clearly at stake in this action" where absent party "has clear rights and affirmative obligations under the contract which [the court] must construe"); *Burger King Corp. v. Am. Nat'l Bank of Trust Co. of Chicago*, 119 F.R.D. 672, 675 (N.D. Ill. 1988) ("If the absent party has a legally protected interest in the subject matter of the action—i.e., he is a party to a contract at issue—he falls squarely within the terms of Rule 19(a)(2).").

There can be no question that the claims here involve interpretation of GEO's contract with ICE, including a determination of whether the PBNDS—ICE's nationwide detention standards which are expressly incorporated into its contract with GEO—violate state and federal laws. Plaintiffs' lawsuit is based primarily upon its own interpretation of the ICE policies incorporated into GEO's contract with ICE. Plaintiffs ask this Court to take their interpretations of ICE's PBNDS and ICE's contract with GEO and determine that GEO's performance did not comply with those contractual requirements. *See generally* ECF Nos. 260, 286 at 93 (arguing GEO violated its contract with ICE), 289 at 30 n.3 (seeking a determination regarding the "contract violation challenged by this case"). For example, Plaintiffs challenge the date upon which GEO was contractually required to comply with the 2008 PBNDS—despite GEO's explicit agreement with ICE to a date certain in a contract modification document. ECF 286, 108-109. Further, Plaintiffs attempt to define GEO's course of dealing with ICE, arguing that approval of the on-site ICE contracting representative was insufficient to establish ICE approval of policies—despite the on-site individual's obligation to report any non-conforming work to others at ICE with contracting authority and the parties' known course of dealing. ECF 286 104-107. Plaintiffs also seek to

invalidate a portion of ICE's disciplinary severity scale as violating the TVPA, despite the fact that GEO is contractually obligated to comply with the scale. And, most critically, Plaintiffs seek to interpret GEO's contract with ICE regarding the requirements of the VWP. ECF 286 107-112. Specifically, Plaintiffs seek a determination that GEO is *legally obligated* to pay more than $1.00 per day to detainees in the VWP, thereby invalidating a portion of ICE's contract with GEO that sets the payment of $1.00 as a permissible floor (and invalidating the nationwide PBNDS which govern ICE's contractors across the country). Because Plaintiffs seek an interpretation of the PBNDS and standard contractual terms that ICE uses across the country, ICE is a necessary party to this litigation, as any determination could not only have an effect upon this case, but also in other cases across the country which may seek an interpretation of the same contractual provisions.

### B.   Plaintiffs' failure to join ICE requires dismissal of their TVPA claim.

#### 1.   Complete relief is not available without joinder of ICE.

Plaintiffs seek relief for alleged violations of the TVPA, specifically claims arising under Section 1589. Under Section 1589(b), liability is extended to anyone who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the [unlawful] means described in subsection (a)[.]" 18 U.S.C. § 1589(b). The imposition of liability upon those who are involved in a joint venture that results in a TVPA violation is mandatory, not permissive, requiring that any entity or individual so involved "shall be punished as provided in subsection (d)." *Id.* Under the TVPA, even a single act may be sufficient to show an inference of involvement, if the act indicates knowledge of the broader allegations. *See e.g.*, *United States v. Sabhnani*, 599 F.3d 215, 244 (2d Cir. 2010). Here, there is no question that ICE was aware of the operations at AIPC, ICE

drafted the disciplinary severity scale, ICE incorporated the disciplinary severity scale into its *nationwide* standards for performance, and also implemented the same disciplinary scale across the country.[5] Further, there is no question that ICE personnel were situated onsite and had the opportunity to review each policy. (Ex. C, p. 2.) ICE personnel were also made aware of how the disciplinary severity scale was implemented and could raise an issue at any time. (*Id.*) In addition, ICE audited and reviewed the performance of AIPC *multiple times every year*. During these reviews, ICE was provided unfettered access to AIPC along with printed copies of the polices at issue here and an opportunity to observe the operations and ask detainees about the same. (*Id.*) Far from secret, GEO's operations were well known to ICE and were found at all times to be in compliance with ICE's standards and requirements. (*Id.*; *see also* Ex. E.) Under these facts, if a Court were to find GEO liable for any violation of the TVPA, based upon the policies at AIPC that were negotiated, drafted, and required by ICE, complete relief would not be possible absent joinder of ICE. Indeed, to the extent GEO's liability arises from its fulfillment of its contractual obligations

---

[5] "[The PBNDS] reflect ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose while maintaining a safe and secure detention environment for staff and detainees, and represent an important step in detention reform. They were drafted with the input of many ICE personnel across the nation, as well as the perspectives of nongovernmental organizations. PBNDS 2011 is crafted to improve medical and mental health services, increase access to legal services and religious opportunities, improve communication with detainees with limited English proficiency, improve the process for reporting and responding to complaints, reinforce protections against sexual abuse and assault, and increase recreation and visitation.

Different versions of these three sets of national detention standards currently apply to ICE's various detention facilities. ICE has begun implementing PBNDS 2011 across its detention facilities, with priority initially given to facilities housing the largest populations of ICE detainees." ICE Detention Standards, February 24, 2012, *available at* https://www.ice.gov/factsheets/facilities-pbnds (last visited August 16, 2020).

to the federal government, without ICE's joinder, Plaintiffs could not be whole—as fault would be apportioned in part or in full to an absent non-party.

> ### 2.   Disposing of the TVPA claim in the absence of ICE would impair ICE's ability to protect its interests.

ICE has several interests in the class's TVPA claim. First, the class alleges that ICE's own policies violate federal law. ICE has an interest in defending its own policies, including its disciplinary severity scale contained within the PBNDS. Second, class counsel has publicly stated in press releases that this lawsuit is part of their "larger battle" to change ICE's policies. ICE's policies cannot be affected without its participation. Third, the class members and class counsel have used the trafficking allegations in this lawsuit to apply for T-visas on behalf of at least one class representative—thus alleging that DHS (through its agency U.S. Citizenship and Immigration Services ("USCIS")) should issue a T-visa based on trafficking that allegedly happened while the applicant was in DHS custody (through its agency ICE). And fourth, the class alleges that ICE has overseen a massive forced labor operation for several decades despite its statutory mandate to combat such practices. ICE has an interest in defending itself against these serious allegations.

First, as explained in detail above, the practices that the class challenges are required by GEO's contract with ICE and the PBNDS. *See supra* Section II. ICE has unilaterally determined that up to 72-hours in segregation is an appropriate sanction for the refusal to clean in some instances and has incorporated this sanction into its contract with GEO. (*Supra* Section II, ¶¶ 11, 14.) ICE has not authorized GEO to draft and implement its own disciplinary severity scale. (*Id.*) Indeed, at least one named plaintiff explained that ICE officers referenced the sanction of possible segregation when he refused to clean his living area. (Ex. F.) By claiming that a TVPA violation results from GEO implementing an ICE-required policy that includes disciplinary segregation as

one of many possible sanctions for refusing to clean, the class is unavoidably claiming that ICE's *own* policies (and actions) violate the TVPA. Such a claim cannot proceed without ICE being present to defend itself.

In a similar case before the Sixth Circuit, a class sued their local housing authority for administering an Urban Renewal Plan approved by the Department of Housing and Urban Development ("HUD"), arguing that the Plan violated HUD guidelines and the Urban Renewal Act. *Boles v. Greenville Hous. Auth.*, 468 F.2d 476, 477–79 (6th Cir. 1972). Despite the parties neither litigating the issue nor briefing it on appeal, the Sixth Circuit raised Rule 19 *sua sponte*, found HUD to be a required party, and declared itself "most hesitant to set the precedent of allowing the policies and practices of HUD or any other federal agency to be overhauled by the judiciary without at least affording the agency the opportunity to be heard in support of its present operation." *Id.* at 479. The same reasoning applies here to ICE.

Second, class counsel's numerous statements to the media show that a primary goal of this lawsuit is to increase the cost of running private detention facilities and thereby frustrate ICE's ability to contract with private companies for detention services. For example, in a February 28, 2017, press release, class counsel stated:

> American immigration policy is too often driven by the profit motives of the private corporations that we pay to round up and detain our immigrants. . . . For years the GEO Group has profiteered at taxpayer expense from mandatory detention laws that private prison corporations lobbied to pass. Today's decision granting class certification is an important step in the larger battle to stand up to the brutality and rapaciousness of the Trump administration's mass deportation agenda.

(Ex. H.) Contrary to class counsel's press release, this case has nothing to do with the Trump administration, as the class period extends from October 2004 (President George W. Bush) through October 2014 (President Barack Obama). Plainly, class counsel is using this case as a tool in the

"larger battle" to change ICE policy—particularly policies implemented by the Trump administration—but that cannot occur in ICE's absence.

Third, class counsel is using the trafficking allegations in this case to file for T nonimmigrant status (*i.e.*, temporary immigration relief to non-citizen victims of severe human trafficking, also known as a T-visa) on behalf of the class members. *See Hernandez-Ceren v. Wolf*, No. 20-cv-01628-RM (D. Colo). T-visas are one component of the TVPA which allow victims of severe human trafficking, who are working with ICE or another law enforcement agency to assist in the prosecution of those violations, to remain in the United States. 8 C.F.R. § 214.11. In *Hernandez-Ceren*, class representative Hugo Hernandez-Ceren, through class counsel Andrew Free, sued the Acting Director of DHS and the Acting Director of ICE, seeking to enjoin Mr. Hernandez-Ceren's removal from the United States based on his pending application for a T-visa. The complaint against DHS and ICE expressly stated that the action was "a Related Case to *Menocal v. The GEO Group, Inc.*, No. 1:14-cv-2887-JLK ('*Menocal*') pursuant to D.C. Colo. LCivR 3.2(b) because these cases have common facts and claims regarding the TVPA forced labor provisions and have at least one party—Mr. Hernandez—in common." *Hernandez-Ceren*, No. 20-cv-01628, Dkt. No. 1, p. 2, ¶ 4. The Complaint further alleged that ICE was "attempting to shortchange" Mr. Hernandez-Ceren's T-visa application by deporting him. *Id.* at p. 17, ¶ 58. In short, Mr. Hernandez-Ceren and class counsel sought a T-visa from USCIS, an agency of DHS, based on alleged trafficking that happened while Mr. Hernandez-Ceren was in DHS/ICE custody. In so doing, the class makes clear that *Menocal* could form the basis for thousands of individuals to potentially seek a modified immigration status pending a decision in this action. ICE clearly has

an interest in whether visas should issue based upon the operation of the AIPC, particularly when AIPC's operation follows ICE's own nationwide standards.

Fourth, the class tacitly acknowledges ICE's interest in this action by repeatedly attempting to characterize ICE's position in recent filings and making efforts to state—as fact—that ICE operates in a deficient manner. *See supra* Section IV(A). Indeed, Plaintiffs argue that the ICE audits are allegedly insufficient to uncover TVPA violations. ECF 286 at 104. In so arguing, Plaintiffs assert that ICE's comprehensive audits are nothing more than "cursory checklists." *Id.* at 105. Surely, ICE does not share Plaintiffs' view of its audits, given that it implements a uniform audit process across the nation which is designed to maintain the safety and security of detainees. Further, Plaintiffs argue that GEO "violate[ed] its contract with ICE" based upon an interpretation of the contract that runs far afield of GEO and ICE's intent in entering into the contract. *Id.* at 99. The class cannot step into ICE's shoes to argue a violation of Ice contract with GEO, as they do not have standing nor do they have common interests with ICE. And, if neither ICE nor GEO believes a violation of the contract has occurred, any ruling on the same would be improper (and unlikely to reflect the parties' intent or the plain language of the contract). Therefore, ICE is unquestionably necessary to any interpretation of the parties' contract, particularly if it purports to go beyond the plain language of the contract and to the parties' intent.

Fifth and perhaps most importantly, the class not-so-indirectly alleges that ICE has abdicated and contravened its statutory responsibilities to enforce the criminal prohibitions in the TVPA. The class alleges that, instead of prosecuting an alleged TVPA violator (GEO), ICE is participating in and overseeing a massive, decades-long human trafficking operation. A court or jury cannot issue such a sweeping condemnation against an absent ICE.

54243439;2

In similar circumstances, the *Boles* court observed that "[i]n order to grant the relief sought by the appellants this court would be compelled to hold in effect that not only did HUD misinterpret its own guidelines, but that it also misconceived its function and prerogatives under the Urban Renewal Act." 468 F.2d at 479. Likewise, for the class to prevail, a jury "would be compelled to hold in effect that not only did [ICE] misinterpret its own guidelines, but that it also misconceived its function and prerogatives under the [TVPA]." The *Boles* court determined that "[t]o make such a determination without joining HUD is to deprive it of the right to defend the integrity of its administrative decisions in these areas which so intimately affect its policies and procedures." *Id.* The same is true for ICE in this case.

Additionally, ICE's unwillingness to intervene in this case does not affect its status as an interested party. Unlike some other Circuits, the Tenth Circuit does not require an absent party to intervene in a suit or otherwise affirmatively claim an interest to qualify as a required party under Rule 19(a)(1)(B). *See Ins. Co. of State of Penn. v. LNC Cmtys. II, LLC*, 11-cv-649-MSK-KMT, 2011 WL 5548955, at *7–8 (D. Colo. Aug. 23, 2011), *recommendation accepted by* 2011 WL 5553808 (Nov. 15, 2011); *see also Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491, 1498 (D.C. Cir. 1995) ("Failure to intervene is not a component of the prejudice analysis where intervention would require the absent party to waive sovereign immunity."). Rather, "the Tenth Circuit has construed Rule 19's requirement that an absent party 'claims an interest' to mean that the interest need not be demonstrably and legally valid." *LNC*, 2011 WL 5548955, at *8. *See also Citizen Potawatomi Nation v. Norton*, 248 F.3d 993, 998 (10th Cir. 2001) (quoting prior Tenth Circuit precedent for the rule that Rule 19 "does not require the

absent party to actually *possess* an interest" and only excludes "interests that are patently frivolous").

In *LNC*, for example, the plaintiff argued that "for a party to be necessary, it must *claim* an interest in the litigation." 2011 WL 5548955, at *7. Magistrate Judge Tafoya rejected that argument, concluding that "[w]hile an absent party may be required to affirmatively 'claim' its interest in the Second Circuit and the Ninth Circuit, there does not appear to be any such requirement in the Tenth Circuit." *Id.* (internal citations omitted). She further noted the illogic of requiring an absent party to affirmatively claim an interest in the lawsuit, as that approach "would seemingly offer Rule 19(a)(1)(B)(i)'s protections only to those absent parties who actually know of the litigation where they were not named as a party." *Id.* In the Tenth Circuit, the question is whether the absent party has an interest that is not patently frivolous. And such an interest need not be pecuniary. *Town of Okemah v. United States*, 140 F.2d 963, 964 (10th Cir. 1944).[6]

Under these principles, ICE's interest in this case is plain. The class's TVPA claim aims to impair ICE's interests in defending its own nationwide contracts and policies (PBNDS), controlling the process whereby its policies and contracts are changed, and defending itself against allegations that it has failed to investigate and disrupt human trafficking and instead has

---

[6] In a similar case before the Eleventh Circuit Court of Appeals, the United States filed an amicus brief asserting that the "United States criminally prosecutes violations of the Trafficking Victims Protection Act, and thus has significant interests in the proper interpretation of the scope of the statute" and "the United States oversees congressionally authorized voluntary work programs in immigration detention facilities nationwide, and has strong interests in ensuring that those programs are properly administered." (Ex. I, United States Amicus Brief.) The amicus brief also sets forth the government's position with respect to the class's TVPA claim: "A facility may take legitimate steps consistent with the PBNDS to maintain order in the facility, and those steps do not give rise to liability under the TVPA, even if they relate to labor performed by detainees." (*Id.* p. 9.)

participated in a massive human trafficking operation. These interests are far from the "patently frivolous" interests that courts should exclude under Rule 19, *Citizen*, 248 F.3d at 998, making ICE a required party under Rule 19(a)(1)(B)(i).

### 3.    Absent Joinder of ICE, GEO could be subject to inconsistent obligations.

Even apart from ICE's own interest, ICE is a required party because a judgment in its absence will likely subject GEO to inconsistent obligations. If the class were to prevail on its TVPA claim, GEO would be subject to money damages for violating the TVPA and simultaneously contractually required by ICE to continue implementing the very policies that resulted in the TVPA violation. These are inconsistent obligations.

Indeed, a party is likely to face inconsistent obligations when it is sued for actions it took that were mandated by absent parties. The Ninth Circuit addressed this problem in *EEOC v. Peabody Western Coal Co*., which involved a suit that focused on the enforceability of the terms of a lease. 610 F.3d 1070 (9th Cir. 2010). The EEOC filed a lawsuit against a coal company, claiming that the company engaged in preferential hiring practices that violated federal law. *Id.* at 1075. But those practices were required under the coal company's lease with the Native American nation ("Nation") that owned the land, and the offending contract term had been approved by the Department of the Interior ("DOI"). The Nation was a required party to the action because a judgment against the coal company in the absence of the Nation would put the company "between the proverbial rock and a hard place—comply with the injunction prohibiting the hiring preference policy or comply with the lease requiring it." *Id.* at 1078.

Crucially, the Ninth Circuit further held that the DOI was a required party to the case because (1) a decision in the EEOC's favor would subject the company to "pay damages for having

engaged in conduct that was mandated by the [DOI]" for which it would not be able to seek indemnification in the DOI's absence, and (2) injunctive relief granted against the coal company would mean that the company would be required by a court order to disregard the lease provision but the DOI would be free to enforce it "upon pain of losing the leases." *Id.* at 1081. The DOI had a direct interest in the case even though it was not a signatory to the leases because a judgment against the coal company would either require the DOI to modify its lease-approval processes or to continue to enforce them and leave the coal company with conflicting obligations. Thus, the DOI was a required party under Rule 19 and the Ninth Circuit dismissed the EEOC's claim for damages against the coal company. *Id.* at 1083.

Like the coal company in *Peabody*, a TVPA judgment against GEO would subject GEO to the inconsistent obligations of facing liability for violating a federal statute, yet being required by the federal government to continue the conduct giving rise to that liability—namely the provisions in the PBNDS and ICE National Detainee Handbook that require detainees to be responsible for the cleanliness of their own "living areas" and "general use areas" subject to the potential range of sanctions in ICE's disciplinary policy. Unless ICE itself is also bound by any judgment against GEO, ICE can require GEO to continue to fulfill its contractual obligations, thereby subjecting GEO to inconsistent obligations. Indeed, ICE operates as both GEO's contractual counterparty *and* the party tasked with enforcement of the federal law underlying the class's TVPA claim in this case, such that its presence doubly required under *Peabody's* logic. Therefore, ICE is a required party under Rule 19(a)(1)(B)(ii).

**C.**    **Plaintiffs' failure to join ICE requires dismissal of their unjust enrichment claim.**

1. **Disposing of the TVPA claim in the absence of ICE would impair ICE's ability to protect its interests.**

In a recent filing, the class requests—for the first time—a ruling from this Court that ICE has no authorization from Congress to carry out its VWP. ECF 298 at 35-40. Specifically, the class argues that GEO is not entitled to derivative sovereign immunity on the class's unjust enrichment claim because Congress has not appropriated funds to ICE for the VWP since 1979. *Id.* Thus, the class argues, "ICE continued to spend agency funds to reimburse contractors for detainee work program for over 30 years" despite having no Congressional authority to do so. *Id.* The class directly alleges that ICE's funds "were not appropriated for work programs, and ICE was not free to spend them as it saw fit." *Id.* If the Court were to rule in Plaintiffs favor, not only would it put an end to the VWP, but also it would find that ICE had acted *ultra vires* for decades.

ICE undoubtedly has an interest in defending its use of funds and its representations to Congress. At best, the class is arguing that ICE was not forthcoming in its requests to Congress, at worst the class seems to allege that ICE intentionally withheld the details of the VWP from Congress. There is no question that the VWP was a program required by ICE. *See supra* Section II(C). And, ICE incorporated specific funding for the VWP into each of its contracts with GEO. *Id.* Further, because the class's allegations go to ICE's appropriations bids and internal determinations about how funds were apportioned, GEO is not as well suited as ICE would be to defend ICE's appropriations. Thus, ICE's interests are squarely at issue.

As noted, in similar circumstances, the Sixth Circuit observed in *Boles* that "[i]n order to grant the relief sought by the appellants this court would be compelled to hold in effect that not only did HUD misinterpret its own guidelines, but that it also misconceived its function and prerogatives under the Urban Renewal Act." 468 F.2d at 479. The *Boles* court determined that

"[t]o make such a determination without joining HUD is to deprive it of the right to defend the integrity of its administrative decisions in these areas which so intimately affect its policies and procedures." *Id.* Here, the class invites the Court "to hold in effect that not only did [ICE] misinterpret its own guidelines," but that it also funded a detainee voluntary work program without authorization for over thirty years. As in *Boles*, making that determination without joining ICE "is to deprive it of the right to defend the integrity of its administrative decisions in these areas which so intimately affect its policies and procedures."

The class's argument would also subject ICE to potential liability nationwide. ICE contractually requires its partners, like GEO, to implement ICE's VWP. In doing so, ICE represented, whether implicitly or explicitly, that the VWP was within ICE's authority. Further, ICE expended significant funds nationwide to implement the VWP. To the extent such actions were in violation of its Congressional appropriations (which GEO does not believe they were), ICE's liability would extend far beyond this case.

Finally, the class's argument would upset the nationwide standards of detainee confinement. Even if the Court rejects the class's argument that the VWP lacks Congressional authorization, the unjust enrichment claim, if successful, would upend decades of precedent upholding ICE's $1.00 per day VWP allowance. *See, e.g.*, *Alvarado Guevara v. INS*, 902 F.2d 394 (5th Cir. 1990) (ruling detainees are not subject to the FLSA); *Whyte v. Suffolk County Sheriff's Dep't*, 86 N.E.3d 249 (Mass. Ct. App. 2017). Similarly, this Court has already determined that immigration detainees are not subject to the Colorado Minimum Wage Order. ECF 23 at 3-4. If the decades-old $1.00 per day allowance authorized and directed by ICE is not a legal safe harbor, and if state and federal minimum wage laws do not apply, then detention facilities like AIPC have

27

no way to know how much to pay detainees to avoid class action unjust enrichment claims like this one. That uncertainty will undoubtedly threaten the continued viability of ICE's VWP around the country.

These decisions cannot be adjudicated in ICE's absence. Whether authorized or not, the VWP has been a hallmark of ICE's facilities for the past thirty years. That status quo cannot be upset without ICE's involvement.

> **2.      Absent Joinder of ICE, GEO could be subject to inconsistent obligations.**

The class's argument that ICE's VWP lacks congressional authorization would subject GEO to the conflicting obligations of being contractually required to carry out a government program that is not Congressionally authorized. As in *Peabody*, under the class's argument, GEO could be ordered to act in a manner inconsistent with its contractual obligations. 610 F.3d at 1078.

> **D.      Joinder is likely not feasible because ICE is immune**.

Federal agencies are immune from suit unless Congress has specifically authorized suits against them. "It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (alterations omitted). Thus, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). Like any other federal agency, ICE is protected by sovereign immunity apart from any express statutory waiver.

54243439;2

GEO is unaware of any explicit waiver of sovereign immunity for TVPA and unjust enrichment claims. Thus, ICE's sovereign immunity bars it from being joined to defend against the class's TVPA and unjust enrichment claims. Accordingly, ICE cannot be joined as a party.

### E.      In equity and good conscience, this action cannot proceed without ICE and should be dismissed.

Courts in this District have recognized that the Tenth Circuit's decision in *Enterprise* and the Supreme Court's decision in *Pimentel* "reinforced the primacy of sovereign immunity" in the Rule 19(b) analysis and thus a court's discretion under Rule 19(b) "is to a great degree circumscribed." *Center for Biological Diversity v. Pizarchik*, 858 F. Supp. 2d 1221, 1228 (D. Colo. 2012); *see also Three Stars Prod. Co. v. BP Am. Prod. Co.*, No. 11-cv-1162-WYD-MJW, 2012 WL 32916, at * 6 (D. Colo. Jan. 6, 2012). The Rule 19(b) factors weigh against proceeding in ICE's absence, especially in light of the primacy of ICE's sovereign immunity.

Under Rule 19(b), the Court considers several factors to determine if it can proceed without a required party: (1) the extent of the prejudice to any party from proceeding without the required party; (2) whether that prejudice could be lessened or avoided by tailoring relief or taking other equivalent measures; (3) whether any judgment could be adequate without the required party; and (4) whether the plaintiff has another remedy if the action were dismissed.

These factors favor dismissing the TVPA and unjust enrichment claims. First, any judgment on the merits without ICE's joinder would subject GEO to substantial prejudice. In *Peabody*, the Ninth Circuit held that a plaintiff's money damages claim could not justly proceed without joining the federal agency because the defendant's liability was incurred only by following the agency's policies. The court explained that the defendant's "only sin, if indeed it was a sin, was to comply with [a contract provision] inserted in its lease at the insistence of the Secretary [of

a federal agency]. It would be profoundly unfair for a court to award damages against [the defendant] while allowing [the defendant] no redress against the government." 610 F.3d at 1084.

So too here: the class seeks money from GEO for allegedly violating the TVPA and state law, even though ICE's standards and the ICE-GEO contract require GEO to perform the very acts that allegedly violate the law, and even though *ICE itself* has engaged in the conduct underlying the class claim. As in *Peabody*, the TVPA and unjust enrichment claims must be dismissed. And while federal agencies may be subject to injunctive claims under the Administrative Procedure Act, the class has not taken that route. S*ee id.* at 1085–86. The class created the problem by trying to indirectly topple longstanding federal agency practice by attacking the agency's contractor. GEO is prejudiced if this claim proceeds without ICE.

ICE would also suffer prejudice if not joined. The class alleges that ICE, over the course of three presidential administrations, has participated in (and approved of through its audits) a huge human trafficking operation in dereliction of ICE's statutory mandate to *combat* human trafficking. The class further alleges that ICE's longstanding VWP lacks authorization and has been wrongfully administered for over three decades. In good conscience, such allegations should not proceed in ICE's absence. That ICE has not intervened in this case does not affect the analysis. *Kickapoo*, 43 F.3d at 1498 ("Failure to intervene is not a component of the prejudice analysis where intervention would require the absent party to waive sovereign immunity.").

Second, the prejudice cannot be avoided by any tailored remedy. For the class to be entitled to the relief it seeks under the TVPA, ICE's own policies must be found to violate the TVPA. That would penalize GEO for complying with ICE policies, and it would penalize ICE by declaring that ICE's policies are illegal and that ICE mandated, rather than prevented, human trafficking. Any

54243439;2

finding in favor of the class will raise this problem. Likewise, if the class prevails on its unjust enrichment claim, ICE detention centers around the country will face uncertainty with respect to detainee VWP allowances. With no safe harbor VWP allowance amount, the continued viability of the VWP would be thrown into doubt.

Third, a judgment in ICE's absence would not be adequate. While the class can possibly win a money judgement against GEO without ICE, adequacy means more than satisfying a class's monetary claims. *Pimentel*, 553 U.S. at 870. Rather, "adequacy refers to the public stake in settling disputes by wholes, wherever possible," and the "social interest in the efficient administration of justice and the avoidance of multiple litigation." *Id.* (internal citations omitted). The class's own relief cannot be complete without an order that binds ICE because only ICE can change the practices that the class challenges. ICE's freedom to continue requiring the practices challenged here therefore opens the door to further suits by detainees.

Fourth and finally, the class has other adequate remedies. This question "is different from whether the plaintiff can obtain precisely the same relief elsewhere." *Kickapoo*, 43 F.3d at 1499. As in *Peabody*, the class may be able to file an APA claim or declaratory action to challenge ICE's policies directly. *See* 610 F.3d at 1085-87; *see also Andrx Pharms., Inc v. Biovail Corp.*, 276 F.3d 1368, 1378-39 (Fed. Cir. 2002); *Oregon v. Ashcroft*, 192 F. Supp. 2d 1077, 1087 (D. Or. 2002). If anything, such a suit would provide ***more*** complete relief than this action against GEO alone. (*See* Ex. H) (noting this case is part of the "larger battle"). But it is not equitable or in good conscience to allow the class to pursue its claims against GEO alone, without joining the federal agency that sets, reviews, and audits the challenged policies. *Dawavendewa v. Salt River Project Agr. Improvement & Power Dist.*, 276 F.3d 1150, 1162–63 (9th Cir. 2002). Further, the class's inability

to obtain a money judgment "is not as weighty a factor when the source of that inability is a public policy that immunizes the absent person from suit." *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1293–94 (10th Cir. 2003).

As observed by the Supreme Court, "[d]ismissal under Rule 19(b) will mean, in some instances, that plaintiffs will be left without a forum for definitive resolution of their claims." *Pimentel*, 553 U.S. at 872. "But," the Court concluded, "that result is contemplated under the doctrine of foreign sovereign immunity." *Id.* The same is true for the sovereign immunity of the United States and its agencies. ICE cannot be joined, so the class's claims should be dismissed.

## V.     Conclusion

The Court should issue an order dismissing the class's TVPA and unjust enrichment claims because ICE is a required party that cannot feasibly be joined.

Respectfully submitted this 17th day of August 2020.

**AKERMAN LLP**

*s/ Adrienne Scheffey*
Colin L. Barnacle
Adrienne Scheffey
Christopher J. Eby
Melissa L. Cizmorris
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  (303) 260-7712
Facsimile:   (303) 260-7714
Email: colin.barnacle@akerman.com
Email: christopher.eby@akerman.com
Email: melissa.cizmorris@akerman.com
Email: adrienne.scheffey@akerman.com

**BURNS, FIGA & WILL, P.C.**
Dana L. Eismeier
Michael Y. Ley
6400 S. Fiddlers Green Circle, Suite 1000

Greenwood Village, CO 80111
Telephone:  (303) 796-2626
Facsimile:   (303) 796-2777
Email: deismeier@bfwlaw.com
Email: mley@bfwlaw.com

*Attorneys for Defendant The GEO Group, Inc.*

54243439;2

## **CERTIFICATE OF SERVICE**

I hereby certify on this 17th day of August, 2020, a true and correct copy of the foregoing

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DISMISS FOR FAILURE TO**

**JOIN REQUIRED PARTY** was filed and served electronically filed via the Court's EM/ECF

system on the following:

### **Counsel for Plaintiffs:**

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
TOWARDS JUSTICE
1410 High St., Ste. 300
Denver, CO 80218
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Matthew Fritz-Mauer
KELMAN BUESCHER FIRM
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com
mfritzmauer@laborlawdenver.com

Hans C. Meyer
MEYER LAW OFFICE, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
OUTTEN & GOLDEN, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
OUTTEN & GOLDEN, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
OUTTEN & GOLDEN, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
LAW OFFICE OF R. ANDREW FREE
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
MILSTEIN LAW OFFICE
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

*s/ Nick Mangels*
Nick Mangels

34

54243439;2