## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated*,

       Plaintiffs,

v.

THE GEO GROUP, INC.,

       Defendant.

---

## MOTION FOR DECERTIFICATION OF CLASS

---

Defendant The GEO Group, Inc. ("Defendant" or "GEO"), by and through undersigned

counsel, hereby moves this Court for an order decertifying the "Forced Labor" class pursuant to

Fed. R. Civ. P. 23.[1]

---

[1] Currently pending before the Court are cross-motions for summary judgment on GEO's defenses of derivative sovereign immunity and the federal contractor defense. ECF Nos. 260, 284 Should this Court enter judgment in GEO's favor, this motion will become moot. That said, while derivative sovereign immunity is capable of classwide resolution (because GEO's instructions from ICE do not vary based upon each individual detainee's experience), as detailed herein, the merits of the Plaintiffs' claims under the TVPA are not well suited for class treatment because they involve individualized inquiries and findings that cannot be made on a class wide basis.

## TABLE OF CONTENTS

**Page**

I.........**INTRODUCTION**................................................................................ 1

II.......**RELEVANT FACTS AND PROCEDURAL HISTORY**............................. 2

    A.    Class Certification............................................................................. 2

    B.    New Evidence Since Class Certification. ............................................ 6

    Alejandro Menocal................................................................................ 10

    Hugo Hernandez .................................................................................. 12

    Olga Alexaklina .................................................................................. 14

    Demetrio Valerga................................................................................. 15

    Lourdes Argueta.................................................................................. 16

    Jesus Yepez Gaytan ............................................................................ 17

    Dagoberto Vizguerra........................................................................... 17

    Grisel Xahuentitla Flores .................................................................... 18

    Sergio Gallegos.................................................................................. 20

    Joyce Quezada ................................................................................... 21

    Martha Vasquez ................................................................................. 22

    Luis Pagan......................................................................................... 23

    Kevin Martin ...................................................................................... 24

III.......**Analysis.**........................................................................................ 29

    A.    Forced Labor Under The Trafficking Victims Protection Act.............. 31

IV.......**Individualized Issues Predominate Plaintiffs' TVPA Claims.**.................... 36

    A.    Despite Plaintiffs' Reference to GEO Policies, There Was Not A <u>Uniform</u> Policy Connecting the Refusal to Clean to 72 Hours of Segregation. ................. 36

    B.    Discovery has Revealed that Plaintiffs Had Different Motivations for Cleaning, Presenting Individual Questions that Would Predominate at Trial.............................................................................................. 40

    C.    Plaintiffs Cannot Establish, On a Classwide Basis, that the Alleged Threat was "Sufficiently Serious."............................................................... 44

    D.    There is No Evidence GEO "Knowingly" Acted Towards the Entire Class. ....... 48

    E.    Plaintiffs Have Framed Their Claims Such That GEO's Liability Turns On What Tasks Detainees Performed. ...................................................... 51

F.     Class Members Who Resided At AIPC Before December 23, 2008 Are Time-Barred And Should Be Excluded From The Class...................................... 53

G.     At A Minimum, All Female Detainees Must Be Excluded. ................................ 54

**V.** ........**CONCLUSION** ........................................................................................... 54

**CERTIFICATE OF SERVICE** ................................................................................. **56**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abarca v. Little*,
    54 F. Supp. 3d 1064 (D. Minn. 2014) ....................................................................53

*Barrientos v. CoreCivic, Inc.*,
    951 F.3d 1269 (11th Cir. 2020) ...........................................................................32

*Bayles v. American Medical Response*,
    950 F. Supp. 1053 (D. Colo. Dec. 31, 1996) ...............................................30, 36

*Blair v. Transam Trucking, Inc.*,
    309 F. Supp. 3d 977 (D. Kan. 2018) ....................................................................29

*United States v. Bradley*, 390 F.3d 145 (1st Cir. 2004), *overruled on other grounds*,
    545 U.S. 1101, 125 S. Ct. 2543, 162 L. Ed. 2d 271 (2005) ..............................33, 35

*c.f. Velez v. Sanchez*,
    693 F.3d 308 (2d Cir. 2012) ................................................................................53

*United States v. Calimlim*,
    538 F.3d 706 (7th Cir. 2008) ................................................................28, 33, 36

*CGC Holding Co., LLC v. Broad & Cassel*,
    773 F.3d 1076 (10th Cir. 2014) In *CGC* ..........................................................40, 43

*Chieftain Royalty Co. v. XTO Energy, Inc.*,
    528 Fed. Appx. 938 (10th Cir. 2013) .............................................................31, 36, 37

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ...............................................................................................30

*David v. Signal Int'l, LLC*,
    No. CIV.A. 08-1220, 2012 WL 10759668 (E.D. La. Jan. 4, 2012) ....................30, 34

*Doe v. Siddig*,
    810 F.Supp.2d 127 (D.D.C.2011) ........................................................................53

*Doll v. Chicago Title Ins. Co.*,
    246 F.R.D. 683 (D. Kan. 2007) ...........................................................................43

*Echon v. Sackett*,
    No. 14-CV-03420-PAB-NYW, 2017 WL 4181417 (D. Colo. Sept. 20, 2017) ............31, 33

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011) ............................................................30

*Garcia v. Curtright*,
    No. 6:11-06407-HO, 2012 WL 1831865 (D. Or. May 17, 2012) .....................................32, 36

*Gilbert v. United States Olympic Comm.*,
    423 F. Supp. 3d 1112 (D. Colo. 2019) .....................................................................................53

*United States ex rel. Hawkins v. ManTech Int'l Corp.*,
    No. CV 15-2105 (ABJ), 2020 WL 435490 (D.D.C. Jan. 28, 2020) .........................................34

*Headley v. Church of Scientology Int'l*,
    687 F.3d 1173 (9th Cir. 2012) .................................................................................................33

*United States v. Kalu*,
    791 F.3d 1194 (10th Cir. 2015) ...............................................................................................32

*Martinez-Rodriguez v. Giles*,
    391 F. Supp. 3d 985 (D. Idaho 2019) ...................................................................33, 36, 46, 51

*Menocal v. GEO Grp., Inc.*,
    882 F.3d 905 (10th Cir.), cert. denied, 139 S. Ct. 143, 202 L. Ed. 2d 34 (2018) ..........6, 40, 41

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017) ...............................................................................33, 34, 35, 51

*United States v. Nnaji*,
    447 F. App'x 558 (5th Cir. 2011) ............................................................................................34

*Poulos v. Caesars World, Inc.*,
    379 F.3d 654 (9th Cir. 2004) ...................................................................................................43

*United States v. Rivera*,
    799 F.3d 180 (2d Cir. 2015) ....................................................................................................33

*United States v. Sabhnani*,
    599 F.3d 215 (2d Cir. 2010) ....................................................................................................35

*Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*,
    319 F.3d 205 (5th Cir. 2003) ...................................................................................................43

*Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) .................................................................................................30

*United States v. Toviave*,
    761 F.3d 623 (6th Cir. 2014) ...................................................................................................32

iv

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*,
    848 F.3d 366 (5th Cir. 2017) ............................................................48, 49

*Villanueva Echon v. Sackett*,
    No. 19-1099, 2020 WL 1696854 (10th Cir. Apr. 8, 2020) ...................................................31

**Statutes**

18 U.S.C. § 1589(a) ...........................................................................31, 48

18 U.S.C. § 1589(c)(1)...........................................................................32

18 U.S.C. § 1589(c)(2).....................................................................32, 36, 44

18 U.S.C. § 1589 *et. seq.*....................................................................... passim

18 U.S.C. § 1595(c) ...........................................................................53

**Rules**

Fed. R. Civ. P. 23(a) .........................................................................4, 5, 30

Fed. R. Civ. P. 23(b)(3)........................................................................5, 29, 30

Fed. R. Civ., P. 23(c)(1)(C) ....................................................................29

## CERTIFICATE OF CONFERRAL

Pursuant to D.C.COLO.LCivR 7.1(a), undersigned counsel certifies counsel for Defendant conferred with counsel for Plaintiffs prior to filing this motion. Plaintiffs oppose the relief requested herein.

## I.       INTRODUCTION

At the class certification stage, Plaintiffs pointed to an array of policies and argued that Plaintiffs' claims were suitable for classwide resolution because Plaintiffs were subject to a *uniform* written policy. *See generally* ECF 49. According to Plaintiffs, the policy and its implementation at the Aurora ICE Processing Center ("AIPC") created common classwide proof that detainees were forced to clean in order to avoid the potential sanction of segregation. *Id.* Central to their argument was the notion that the use of segregation (and threats of the same) were widespread throughout the facility and that detainees did not clean for reasons other than fear of segregation. *Id.* On these bases, this Court certified a class under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq.*[2] ECF 57.

Following discovery, it is clear that Plaintiffs cannot rely upon a uniform policy at trial. While Plaintiffs all shared the common experience of being detained at AIPC while their cases proceeded through the immigration court system or they awaited deportation, their experiences, as they relate to this lawsuit were not defined by a pervasive fear of segregation. To the contrary, the sanction of segregation for the refusal to clean-up after meals was rarely used during the class period. In fact, most frequently, detainees who declined to clean faced no discipline at all. Further,

---

[2] This Court also certified a second unjust enrichment class, but that class is not at issue in this motion.

Plaintiffs cleaned for many different reasons, ranging from avoiding boredom to preferring to live in a clean living space. Moreover, their experiences varied vastly, changing based upon the GEO detention officers who they interacted with, the layout of the dorms where they lived, and even differing based upon their individual personalities. These individual issues would predominate at trial, with each Plaintiff subject to unique defenses and factual scenarios which would be determinative of liability. As a result, Plaintiffs TVPA claims are not well suited for classwide resolution and the class should be decertified.

## II.    RELEVANT FACTS AND PROCEDURAL HISTORY

### A.    Class Certification

On May 6, 2016, Plaintiffs filed their Motion for Class Certification ("Certification Motion"). Dkt. No. 49. In their motion they sought to certify two classes: (1) the "Forced Labor" class, alleging that that GEO violated the TVPA, and (2) the "Voluntary Work Program Class," which asserts a claim under the theory of unjust enrichment. This motion involves only the Forced Labor Class. In the Certification Motion, Plaintiffs alleged that Plaintiffs, and members of the purported class, performed "uncompensated janitorial labor under the threat of solitary confinement." ECF 49, 3. As support, Plaintiffs cited to a Policy and Procedure Manual, titled "Sanitation Procedures."[3] ECF 50-2. The Sanitation Procedures include a section titled "Detainee Sanitation Responsibilities," which Plaintiffs challenge in this lawsuit. *Id.* at 21. In relevant part the policy states:

---

[3] Plaintiffs have renamed this document the "HUSP" but no formal GEO Policy is designated or titled "HUSP." It appears that this phrase originates not from the sanitation procedures, but instead the ICE detainee handbook which contains a subsection called "Housing Unit Sanitation." See ECF 260 at 7.

> Each detainee will be responsible for the cleanliness of his or her cell or living area including, walls, floors, sink, toilet, windows, and other property within the cell, room or living area. Beds will be made neatly and tightly. Nothing will be placed over windows, lights, vents, bars or grilles. Shoes will be neatly lined up under the edge of the bed. All personal property will be stored in the locker/container provided. *Id.*

The Sanitation Procedures also contain a section titled "Inspection Program" which details the consequences for non-compliance, stating:

> The Housing Unit Officer will inspect all living areas daily and report any infraction of these regulations to the immediate supervisor. The officer will notify detainees of unsatisfactory conditions, in cases of continued noncompliance, staff will issue an incident report." *Id.*

The Sanitation Procedures provide for a single penalty for non-compliance: an officer can issue an incident report. While the general sanitation policies apply to all detainees and staff at AIPC, ECF 50-1 (Ceja Dep. 29:13-16), the Sanitation Procedures were not developed to assign tasks to any specific individuals, but rather to detail the process for cleaning and materials to be used. Ex. A (K. Martin Dep. 208:6-11); Ex. B (A. Martin 30(b)(6) Dep. 76:2-7).

In addition to the Sanitation Procedures, Plaintiffs cited the AIPC Detainee Handbook ("AIPC Handbook")[4] as a policy and procedure that supported their bid for class certification and their allegations in their Complaint. ECF 49 at 6; ECF 1 at 3. Specifically, Plaintiffs allege that the policy in the AIPC handbook whereby six detainees are asked to help clean up after each meal in the dorms ("meal clean-up") is a violation of the TVPA because of the possible sanctions available for noncompliance with the facility's rules. ECF 1, 3 ¶ 5. The specific policy which Plaintiffs challenge, however, clearly states that the sanction for non-compliance is that "the televisions will

---

[4] The handbook version referenced by Plaintiffs in support of their claim has been filed with this Court at ECF 261-17. This version is from 2013. Plaintiffs have not pointed to other versions as a basis for their claims.

be turned off[.]" ECF 50-3, 19. Thus, to craft a TVPA claim, Plaintiffs also rely upon a different portion of the AIPC Handbook—the ICE-mandated disciplinary severity scale—which is copied verbatim from ICE's Performance-Based National Detention Standards ("PBNDS"). ECF 50-3, 25. ICE requires GEO to inform all detainees of ICE's disciplinary severity scale which delineates the sanctions for each prohibited act. ECF 50-3, 25. For example, under the "Greatest" offense category, the offense of "killing" is listed. *Id.* The permissible sanctions for killing are listed thereafter, including the initiation of criminal proceedings, disciplinary segregation for up to 60 days, or disciplinary transfer. *Id.* As is relevant here, the "High Moderate" offense category lists the offense of "[r]efusal to clean assigned living area." *Id* at 26. The thirteen enumerated sanctions for the refusal to clean, include a warning, reprimand, loss of job, disciplinary segregation of up to 72 hours and the initiation of criminal proceedings. *Id.* Nine lesser sanctions are possible, where the offense is not the willful refusal to clean, as provided in the "Low Moderate Offense" section. *Id.* at 27. Specifically, a detainee who is "unsanitary or untidy" who fails to keep his or her living area clean in accordance with posted standards may be sanctioned with a reprimand, warning, monetary restitution, loss of privileges, change of housing, or loss of job. *Id.*

Plaintiffs argued that class certification of the TVPA claim was appropriate because the fact that the AIPC Handbook, containing the policies discussed above, was provided to every detainee was sufficient to satisfy the commonality prong of Fed. R. Civ. P. 23(a). ECF 49, 11. Plaintiffs made clear that their case was suitable for classwide resolution because it was based upon a written policy—not the individual actions of different GEO employees or unique experiences of various detainees. ECF 49 at 11-12.

> This case is about a **written** Forced Labor Policy set out clearly for the employees responsible for enforcing it and the detainees responsible for abiding by it. That

4

> policy provides that class members must perform housing unit sanitation work or
> be subject to an administrative legal process that could result in up to 72 hours in
> solitary confinement.

*Id*. (emphasis added).

Plaintiffs argued that under Fed. R. Civ. P 23(b)(3), the predominance factor for a class action could be met for the same reasons. Plaintiffs claimed that the element of scienter could be shown on a classwide basis, more specifically, that GEO "knowingly" obtained labor through threats of serious harm. *Id.*at 18. Plaintiffs explained that they would be able to establish on a classwide basis that GEO "knowingly" obtained Plaintiff's labor through the threat of segregation as expressed in the handbook—not the actions of individual GEO employees. *Id.*

Based upon Plaintiffs' representations about their claims and the availability of classwide proof, this Court granted Plaintiffs' motion. ECF 57. In its Order, this Court explained that the "glue that holds the allegations" of the class together, was that Plaintiffs alleged a "specific, uniformly applicable sanitation policy." *Id.* at 8. In certifying the class, this Court noted that based upon the evidence before it, the issue of whether GEO "employ[ed] a Sanitation Policy that constitutes improper means of coercion [under the TVPA]" could be decided on a classwide basis. *Id.* The Court explained that classwide treatment was proper because, at that stage of the proceedings, it appeared all class members were subject to a "uniform policy under uniform conditions." *Id.* at 11.

GEO appealed the decision to the Tenth Circuit. In affirming this Court's certification order, the Tenth Circuit identified the following questions that, because they could be answered as to the whole class, satisfied the commonality element: "(1) whether the [AIPC Handbook] 'constitutes improper means of coercion' under § 1589, (2) whether GEO 'knowingly obtain[s]

detainees' labor using [the AIPC Handbook]', and (3) whether a civic duty exception exempts the Sanitation Policy from § 1589." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 917 (10th Cir.), cert. denied, 139 S. Ct. 143, 202 L. Ed. 2d 34 (2018). But, the Tenth Circuit explicitly left open whether the meal clean-up procedures in the AIPC Handbook qualify as an unlawful means of coercion under the TVPA, and whether that question could be answered on a classwide basis. *Id.* at 19 n.7 ("For purposes of deciding the class certification question, we do not address the merits of whether the Sanitation Policy qualifies as an unlawful means of coercion under § 1589."). Following extensive discovery, it is clear that there was no uniform policy of imposing segregation for refusing to clean. Thus, the question of whether the AIPC Handbook constitutes unlawful means of coercion is not capable of resolution on a classwide basis. Nor is the question of whether GEO acted "knowingly" in its interactions with the named Plaintiffs. It is clear that Plaintiffs' claims rest largely on individualized evidence that is not common to all members of the class, rendering the case inappropriate for classwide resolution.

> ### B.    New Evidence Since Class Certification.

Following certification of the class, the Parties engaged in extensive discovery, including over 24 depositions, numerous rounds of written discovery, and extensive document production. The evidence that emerged during discovery makes clear that: (1) GEO did not have a uniform policy of imposing segregation or warnings of segregation as a sanction for the refusal to clean; (2) detainees' motivations for cleaning varied significantly; and (3) detainees' reactions to the possible sanctions for the refusal to clean varied significantly.

Additionally, while Plaintiffs unequivocally stated at the certification stage that they would prove their case based upon uniformly applied written policies, Plaintiffs have since made clear

that their claims rely largely on the individual actions of different GEO detention officers. *Compare* ECF 49 at 12 ("This case is about a **written** Forced Labor Policy set out clearly for the employees responsible for enforcing it and the detainees responsible for abiding by it.") *with* ECF 286 at 96 ("[Plaintiffs'] claims are also based on the threats of solitary confinement that they either received or observed being directed by GEO guards to detainees."). Further complicating the classwide analysis, the merits of Plaintiffs' claims turn on what type of cleaning each detainee was asked to do when warned that he or she could be placed in segregation—requiring an individualized inquiry for each instance described by the named Plaintiffs.[5] This is particularly true where many of the cleaning tasks detailed in the Sanitation Procedures are completed by individuals who are compensated for their work under the VWP. Ex. B Amber Martin 30(b)(6) Dep. 19:8-11. Here, **none** of the named plaintiffs were ever placed in segregation for the failure to clean. In fact, only one of the nine named Plaintiffs was ever placed in segregation while at AIPC, but for fighting, not refusing to clean. Further, whether it was *objectively reasonable* for each named plaintiff to construe certain statements and policies as "threatening" turns on an individualized analysis of their unique circumstances. Accordingly, the issue of serious harm cannot be resolved on a classwide basis.

---

[5] Under Plaintiffs' theory, some forms of cleaning, such as the requirement that detainees clean the dorm floors, was permissible even under the possible sanction of segregation while other tasks, such as wiping down tables could not be the subject of a sanction of segregation.

(1) **Policies Identified by Plaintiffs.**

Through the discovery process, Plaintiffs have consistently[6] referred to two documents that purportedly include "threats" that were communicated to the TVPA class: (1) the AIPC Handbook's meal-clean up policies and (2) the detainee orientation video.[7]

The detainee orientation video provides:

> You will be protected from personal abuse, corporal punishment, personal injury, disease, and damage to your property and harassment to the fullest extent possible. Each and every detainee must participate in the sanitation program. A list of detainee's [sic] is developed each day and is posed for viewing. During a general clean-up all detainees must participate.

> *****

> Disciplinary Process[.] Refer to your local supplement for more detailed information about the rules infractions that you must avoid and the established disciplinary actions that will be taken.

> *****

> **High Moderate**- and a few examples are . . . Indecent exposure, stealing, refusing to obey a staff member, insolence to staff member, lying or providing false statement to staff, being in an unauthorized area, not standing for count, interfering with count, gambling, destroying altering or damaging property.

*See* ECF 262-10 (emphasis in original).

The orientation video merely incorporates portions of the AIPC Handbook by reference and does not add any additional information about discipline that differs from the AIPC handbook.

___

[6] Upon learning that the Sanitation Procedures, submitted in support of class certification, do not include any sanction for failing to clean other than an incident report and that the Sanitation Procedures were not provided to detainees, Plaintiffs appear to no longer rely upon the written Sanitation Procedures document as one of the "threats" Plaintiffs received.

[7] The detainee orientation video cited by Plaintiffs as support for their claims has been filed with this Court at ECF 262-10.

The AIPC Handbook provides the following meal clean-up policy for detainees' housing

units:

> Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit Officer will be responsible for assuring this general cleanup is done on a regular basis.
>
> \*\*\*\*\*
>
> Day rooms are open spaces in the housing units that are utilized for watching television, playing board games, dominos or cards, as well as for socializing among detainees. Tables with chairs are provided for your use in the dayroom. All detainees are required to keep clean and sanitary all commonly accessible areas of the housing unit . . .
>
> \*\*\*\*\*
>
> Detainees will take turns cleaning the area. If a detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit officer of the problem. Action will be taken to resolve this problem. The day room area will be kept clean at all times. Should an officer notice that the area is not clean the officer will make available necessary cleaning supplies. **<u>If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned.</u>** Continued refusal to clean will result in further disciplinary action.

ECF 261-17, 20 (PL000047) (emphasis added).

Several pages later, the detainee handbook outlines the ICE disciplinary procedures, explaining,

"[t]o provide a safe and orderly living environment, facility authorities will impose disciplinary

sanctions on any detainee whose behavior is not in compliance with facility rules and procedures."

ECF 261-17, 24. The handbook further explains that, as an initial matter, any sanctions will be

resolved by the Unit Disciplinary Committee, or "UDC." *Id.* In the context of failing to clean, the

UDC has authority to impose only the following sanctions: loss of privileges, change of housing,

remove from program and/or group activity, loss of job, impound and store detainee's personal

property, confiscate contraband, restrict to housing unit, reprimand the detainee, or provide a warning. *Id.* (stating that the UDC has authority to institute minor sanction E-M). Any other sanctions must be imposed by the Institutional Disciplinary Panel or "IDP." *Id.* "Only the disciplinary panel can place a detainee in disciplinary segregation." *Id.* The IDP conducts a hearing and does not include the "reporting officer." *Id.*

According to Plaintiffs, the above excerpts[8] from the AIPC Handbook constitute a threat of harm which is serious enough to give rise to liability under the TVPA.

(2)    **Named Plaintiffs' Testimony.**

In addition to a better understanding of the written policies upon which Plaintiffs intend to rely, depositions of the named Plaintiffs have also shed light on their experience at AIPC. The deposition testimony makes clear that there was not a uniform experience at AIPC—rather each detainee's experience varied from whether they felt threatened by the written policies to whether they got along well with GEO officers.

**<u>Alejandro Menocal</u>**

Mr. Menocal explained that every detainee had a different experience at AIPC because of their own unique personalities and cultural differences. Ex. C (Menocal Dep. 66:5-18). For, Mr. Menocal, his experience at AIPC was not defined by a fear of GEO detention officers, but instead,

---

[8] Plaintiffs previously represented to this Court that "Plaintiffs plan to prove their claims through persuasive classwide evidence—not individual class member experiences[,]" ECF 144, 8, in order to prevent GEO from obtaining discovery from detainees other than the named Plaintiffs. Recently, however, Plaintiffs' have indicated that they intend to rely upon each Plaintiff's own unique or individualized experiences to prove their claims. To the extent this Court denies this motion, which it should not, Plaintiffs should be estopped from introducing individual experiences of class members who are not named Plaintiffs to avoid trial devolving into a number of smaller mini-trials and to avoid undue prejudice to GEO.

Mr. Menocal appreciated and respected almost all of the officers and they showed him the same respect in return. *Id.* (Menocal Dep. 58:2-6; 60:11-61:13). Mr. Menocal did not view the officers as oppressive, "like police"; rather, he believed they were "cool" or "like babysitters." *Id* 63:2-13. At worst, approximately five of the twenty officers Mr. Menocal remembers were "rude" or "had bad attitudes." *Id.* 64:11-65:2. Importantly, despite believing that some of the Officers were rude, Menocal did **not** receive **any** direct threats from any GEO employees related to administrative or disciplinary segregation for the failure to clean. ECF 306-7 at 5 (Menocal's Second Set of Discovery, Interrogatory No. 27). Instead, it was *other detainees* who told Mr. Menocal he faced the possibility of segregation if he did not clean up after meals. Menocal Dep. 96:18-20; 99:20-100:1. Nor was he ever disciplined—in any way—for declining to clean up his living area. Ex. C (Menocal Dep. 100:16-19). While he was never threatened with segregation for the failure to clean, he nevertheless participated in the sanitation procedures approximately one day a week for three months. ECF 306-7 at 6 (Menocal's Second Set of Discovery Interrogatory No. 29).

Mr. Menocal was not motivated to clean because of facility rules. Instead, Mr. Menocal preferred to clean up after himself while at AIPC because he preferred to "live and hang out in a clean environment." Ex. C (Menocal Dep. 81:6-10). Indeed, Mr. Menocal asked for permission to clean the recreation area without an expectation of remuneration simply because he spent a lot of time there and wanted to "hang out in a clean environment." *Id.* (Menocal Dep. 86:22-87:5). And, separate and apart from the meal clean-up, Mr. Menocal spent between an hour and an hour and a half each day cleaning up his cell. *Id.* (Menocal Dep. 115:11-15). On occasion, he would make his cellmates beds "just so the place would look neat." *Id.* (Menocal Dep. 116:17-18).

11

**Hugo Hernandez**

Much like Mr. Menocal, Mr. Hernandez's detention was not defined by pervasive threats of segregation. Rather, Mr. Hernandez would spend half of his day with his friends sitting around a table eating snacks and watching TV and the other half in the library and eating meals. Ex. D (Hernandez Dep. 26:22-27:6; 31:1-14). Mr. Hernandez did not have expectations that others would clean up after him, but instead believed that it was his personal responsibility to clean up after himself. *Id.* (Hernandez Dep. 29:20-22; 50:4-23; 64:1-3). Indeed, Mr. Hernandez liked to keep his area clean. *Id.* (Hernandez Dep. 49:24-50:1). Mr. Hernandez testified that he did not, and does not, consider the meal cleanup detailed in the handbook to be threatening. *Id.* (Hernandez Dep. 58:12-24). Consistent with the policy expressed in the handbook, the television would occasionally be turned off if a detainee refused to clean his or her living area. *Id.* (Hernandez Dep. 59:19-60:22). And, even the officer who Mr. Hernandez perceived as doling out the harshest punishments would only take away TV privileges for the failure to clean, consistent with the handbook. *Id.* (Hernandez Dep. 77:8-16). To avoid the loss of TV time, detainees would often volunteer to help clean up the living area, even if not asked or assigned by GEO officers. *Id.* (Hernandez Dep. 78:2-9).

Mr. Hernandez's perception of the sanctions for failing to clean did not rest on a uniform policy in the handbook,[9] but rather a few anecdotal incidents with GEO officers and his prior experiences. *Id.* (Hernandez Dep. 111:1-15) (explaining that his understanding that segregation was a possible sanction stemmed from other facilities where he had been housed). It was Mr. Hernandez's experience that he was treated differently by each officer at GEO. *Id.* (Hernandez

---

[9] Mr. Hernandez had never before seen the Sanitation Procedures—the other document underlying Plaintiffs' class certification motion. Ex. D (Hernandez Dep. 65:2-3).

Dep. 38:15-20; 39:5-20; 176:20-22) (differentiating between male and female officers). While Plaintiff Hernandez was detained for nearly a year, he recalls only two times where he or another detainee was threatened with segregation for the failure to clean. ECF 306-7 at 43 (Hernandez's Second Set of Discovery, Interrogatory No. 27); Ex. D Hernandez Dep. 75, 78. Both instances involved the **same** GEO officer. Ex. D (Hernandez Dep. 80:4-5). On one occasion, his entire pod/housing unit refused to clean and they were not sent to segregation. *Id.* (Hernandez Dep. 131:15-23). On the other occasion, the same Officer—Officer Sanchez—allegedly told a detainee (not Mr. Hernandez) that he would go to segregation if he did not clean—but ultimately did not send anyone to segregation. *Id.* (Hernandez Dep. 75-77). But, his interactions with Officer Sanchez were significantly different from those with three other officers, who Mr. Hernandez remembered (Officers Thornton, Moreno, and Blacknick), who never raised the issue of segregation in connection with a detainee declining to clean. *Id.* (Hernandez Dep. 38:15-17, 39:5-20. 117:10-22).

Hernandez was not coerced into cleaning because of the fear of segregation. Rather, for the first two months of his time at AIPC, he was not told that he could be sent to segregation for refusing to clean, but chose to clean anyway. *Id. (*Hernandez Dep. 175:22-176:6). Later, after Hernandez was allegedly directly confronted with the possibility of segregation for failing to clean, Hernandez did just that—he refused to clean. *Id.* (Hernandez Dep. 96:20-97:9). When he refused, he was not placed in segregation. *Id.* Indeed, the only punishment he ever faced for failing to clean was that he lost privileges to the TV for the short period of time while the area was cleaned. *Id.* (Hernandez Dep. 181:1-7). By his own description, his day-to-day interactions were not permeated in any way with a sense of fear. Instead, on a day where he was not asked to clean, the only difference was that he could sleep later into the morning. *Id.* (Hernandez Dep. 109:10-13). In fact,

Hernandez also remembered other detainees who would help with the daily cleaning just to help speed the process along. *Id.* (Hernandez Dep 135:25-136:3).

Furthermore, Hernandez felt as though he had a relationship with Officer Blacknick where he could have raised concerns he had about the facility. *Id.* (Hernandez Dep. 37:22-38-3). But he never did so. *Id.* Hernandez also knew he could file a written grievance (called a "kite") and have his grievance reviewed by GEO and ICE. *Id.* (Hernandez Dep. 97:15-22). Yet he never filed a kite complaining about his cleaning tasks. *Id.* (Hernandez Dep. 98:9-15). Further, Hernandez was well aware of how to receive medical care at the facility if he needed it. *Id.* (Hernandez Dep. 98:5-7). Yet he never sought mental health treatment because he did not believe he needed it. *Id.* 8-12.

Mr. Hernandez was only aware of other detainees being placed in disciplinary segregation for fighting, a consequence which is not at issue in this case, but which also shaped his perspective of whether segregation was a likely consequence. *Id.* Had Mr. Hernandez felt that he had concerns about his treatment in the dorm, he felt as though he could have confided in Officer Blacknick about his concerns—but never did so. *Id.* Hernandez Dep. 37:22-38:3.

### Olga Alexaklina[10]

Olga Alexaklina was never threatened by GEO employees with disciplinary or administrative segregation for failing to clean. ECF 306-7 at 101 (Alexaklina Second Set of Discovery, Interrogatory No. 27). Nor was she informed by GEO that segregation was a possible

---

[10] Despite the already limited scope of discovery into Plaintiffs' experiences, GEO has been denied the opportunity to depose Ms. Alexaklina because of restrictions that Plaintiffs allege are present in Russia—preventing her deposition. Nevertheless, Ms. Alexaklina has apparently been able to freely provide unsworn testimony in support of her claims to Plaintiffs' counsel and their experts.

sanction for failing to clean.[11] *Id.* Rather, she recalls *only* that another detainee told her that disciplinary or administrative segregation was a possible punishment for the failure to clean. *Id.* Instead, she claims her fear of segregation derived from an experience where she allegedly witnessed an individual in her dorm who became depressed after returning from segregation.[12]

### Demetrio Valerga

Despite the classwide allegations that the threat of segregation was so frequent as to be a constant source of coercion for all detainees, Plaintiff Valerga recalls only a single time that a GEO officer (whose identity he cannot recall) told him that segregation was a punishment for failing to clean. ECF 306-7 at 139 (Valerga's Second Set of Discovery, Interrogatory No. 27, Pg. 4). At his deposition, he described an instance when he refused to clean. One morning, he slept in and did not feel like cleaning and told the Officer he would not clean. Ex. E (Valerga Dep. 137:24-138:1). The officer told Plaintiff Valerga that if he did not clean, he would be sent to "the hole" and Valerga responded, "go ahead." *Id.* (Valerga Dep. 136:16-137:19). Thereafter, Mr. Valerga (who lived with three of the named Plaintiffs) refused to clean but was **not** taken to segregation. *Id.* Thus, on the

---

[11] Ms. Alexaklina's discovery responses are vague. She claims that she was not told by GEO that she could be placed in segregation for failing to clean, presumably referring to an individual, not a policy. She does, however, in a later-served response allege that she reviewed the AIPC Handbook and learned that she could be subjected to discipline, including segregation, for refusing to clean. ECF 306-7 at 153 (Alexaklina's Supplemental Responses to GEO's Sixth Set of Interrogatories No. 39,). Further, she alleges that the mere mention in the orientation video that she could have been subject to discipline for failing to clean, without reference to segregation, also constituted a threat. *Id.* Nevertheless, she participated in the sanitation procedures for over two months.

[12] GEO has been unable to test the veracity of this statement, as according to Ms. Alexaklina's counsel, she cannot be deposed where currently resides, but remains able to provide unsworn testimony to her counsel and retained experts. GEO disputes Ms. Alexaklina's account because during her stay, there was no Special Management Unit within the facility where female detainees could be held in segregation. Ex. F (Ceja 30(b)(6) Dep.).

only occasion that he was allegedly threatened, he pointedly did not clean his living area or otherwise provide his labor in return.[13] And, he continued to refuse to clean on numerous occasions following the threat—nonplussed by the possible consequences. *Id*. Further, Mr. Valerga admitted he did not know anyone who was sent to segregation for failing to clean, and he himself was not sent for failing to clean. *Id*. (Valerga Dep. 141:24-142:2, 140:12-13). As a result, he never cleaned because of the possibility of segregation. *Id*. (Valerga Dep. 140:2-7, 159:2-3).

### Lourdes Argueta[14]

Plaintiff Lourdes Argueta claims she was told by an unnamed GEO individual that detainees *could* be placed in segregation for refusing to clean. ECF 306-7 at 62 (Lourdes Argueta Second Set of Discovery, Interrogatory No. 27). But she did not recall the warnings being pervasive, rather she only recalls "several occasions" when detainees were warned of that consequence. *Id.* In addition, she alleges that she was threatened by GEO in contravention of the TVPA when GEO provided her with the AIPC Handbook which stated that she could be subjected to discipline, including segregation, for refusing to clean. ECF 306-1 at 71 (Lourdes' Supplemental Responses to GEO's Sixth Set of Interrogatories No. 39). Further, she alleges that the mere mention in the orientation video that she could have been subject to discipline for failing to follow the rules at the facility, without reference to segregation, also constituted a threat. *Id.*

---

[13] Plaintiff Valerga alleges that ICE threatened him subsequently, but this is not relevant for purposes of establishing GEO's scienter as ICE's actions cannot be imputed to GEO. Ex. E (Valerga Dep. 138:9-21).

[14] GEO has not had the opportunity to depose Ms. Argueta as she is not located within the United States and has not been made available for a deposition.

52741187;14

**Jesus Yepez Gaytan**

Plaintiff Jesus Yepez Gaytan recalls being "told on at least one occasion" that he could be sent to segregation for failing to clean. ECF 306-7 at 82 (Yepez Gaytan Second Set of Discovery, Interrogatory No. 27). He cannot recall whether the individual who told him about the potential sanction of segregation was an ICE employee or GEO employee as he did not know the difference between the two. *Id.* at 5. Mr. Gaytan also claims that he reviewed the AIPC Handbook and learned that he could be subjected to discipline, including segregation, for refusing to clean. ECF 306-1 at 88 (Gaytan's Supplemental Responses to GEO's Sixth Set of Interrogatories No. 39). Further, he alleges that the mere mention in the orientation video that he could have been subject to discipline for failing to clean, without reference to segregation, also constituted a threat. *Id.* Mr. Gaytan was never disciplined in any form while at the AIPC. Ex. G (Gaytan Dep. 123:21-23).

Mr. Gaytan's own testimony made clear that he cleaned in order to obtain certain benefits. For example, Mr. Gaytan volunteered to clean the dorms as part of the VWP in order to get a small stipend. Ex. G (Gaytan Dep. 90:17-22). Additionally, he received access to X-Box gaming systems, movies, and ice cream as an incentive to keep his dorm clean. Ex. G (Gaytan Dep. 124:3-16).

**Dagoberto Vizguerra**

Plaintiff Dagoberto Vizguerra was never placed in segregation, let alone for failing to clean. Ex. H (Vizguerra Dep. 42:5-7). While he was never sanctioned, Plaintiff Dagoberto Vizguerra recalls being warned that if he did not clean, he could be placed in segregation. ECF 306-7 at 120 (Dagoberto Vizguerra's Second Set of Discovery, Interrogatory No. 27). He does not recall specifically when he was warned of the possible consequences, including whether the

warning was expressed *prior* to his participation in the meal clean-up or after he had already decided, for a different reason, to clean up after meals. ECF 306-7 at 120 (Dagoberto Vizguerra's Second Set of Discovery, Interrogatory No. 27). Despite these warnings, however, Mr. Vizguerra does not recall the televisions being turned off as a sanction for failing to clean. Ex. H (Vizguerra Dep. 94:1-5). Unlike Ms. Argueta, Mr. Vizguerra does not recall receiving the AIPC Handbook, let alone being threatened by it. Ex. H (Vizguerra Dep. 90:24-91:4). Nor does he remember the detainee orientation video, let alone whether it was threatening. Ex. H (Vizguerra Dep. 92:1-5).

### Grisel Xahuentitla Flores

Ms. Xahuentitla Flores alleges that she reviewed the Detainee Handbook and learned that she could be subjected to discipline, including segregation, for refusing to clean. ECF 306-1 at 37 (Xahuentitla's Supplemental Responses to GEO's Sixth Set of Interrogatories No. 39). She also claimed that the mere mention in the orientation video that she could have been subject to discipline for failing to clean, without reference to segregation, also constituted a threat. *Id.* Nevertheless, she was never disciplined while at AIPC. Ex. I (Xahuentitla Dep 70:11-17).[15] Plaintiff Xahuentitla Flores's discovery responses indicated that she recalled a single time where she was told by a GEO officer that segregation was a potential consequence for the failure to clean. ECF 306-7 at 24 (Xahuentitla Flores's Second Set of Discovery, Interrogatory No. 27). Yet, when asked about the incident in her deposition, she instead described a circumstance where another detainee did not feel well and did not want to clean so she volunteered to clean in her place. Ex. I

---

[15]   And, Ms. Xahuentitla made clear that she is unaware what the terms "administrative segregation" and "disciplinary segregation" mean, Ex. I (Xahuentitla Dep. Tr. 71:5-13), indicating that insofar as her allegations are based upon threats, her allegations do not rely upon written policies referencing administrative or disciplinary segregation.

(Xahuentitla Dep. 73:19-74:9). She did not describe volunteering to clean out of a compulsion to avoid segregation, or another punishment, but instead based upon a desire to help the other detainee. *Id.* Ms. Xahuentitla Flores claims that while nothing came of her offer to volunteer, the Officers threatened the other detainee who refused to clean with being sent to "the hole." *Id.* Ultimately though, the other detainee was not sent to segregation, as Ms. Xahuentitla Flores also testified that she didn't know anyone who had ever been sent to segregation. Ex. I (Xahuentitla Dep. 120:16-121:15).

(3) <strong>Officers' Testimony.</strong>

In addition to the testimony of Plaintiffs, discovery has provided a window into a number of GEO officer's experiences during the class period. As shown in the declarations and deposition excerpts submitted to this Court, GEO's detention officers did not routinely enforce segregation for the failure to clean. ECF 306-12 . Nor did they tell detainees that if they did not clean, they would be sent to segregation. *Id.* Rather, a detainee being sent to segregation for refusing to clean was incredibly rare. ECF 306-12 . Consistent with the PBNDS, officers worked to resolve issues informally wherever possible. ECF 306-12 . Where more formal sanctions were necessary, officers imposed lesser sanctions as permitted by the disciplinary severity scale wherever possible. *Id.* The officers were not trained to tell detainees they could be sent to segregation, or utilize segregation as a response to the failure to clean absent additional disciplinary concerns. ECF 306-12. Importantly, none of the officers intended to scare or intimidate any individual into performing labor. *Id.* To that end, officers often recalled simply moving on to ask another detainee to assist with cleaning when another detainee refused. *Id.* And, all but one officer could not recall a single instance a detainee was sent to segregation for refusing to clean. *Id.* The single officer who did

19

recall such an incident noted that segregation was imposed because the circumstances involved danger to other detainees and insolence towards officers. *Id.*

### Sergio Gallegos

Officer Gallegos described the post-meal cleanup as a five- to ten-minute task that would be distributed amongst approximately eight detainees, two of whom are paid under the VWP. Ex. J (Gallegos Dep 130:23-131:7, 15-18). While some individuals were asked by the officers to participate on any given day, others volunteered to be placed on the list. *Id.* (Gallegos Dep. 136:3-7). If someone did not want to clean, Officer Gallegos would simply ask another detainee to clean. *Id.* (Gallegos Dep. 137:10-13; 162:11-163:1; 165:5-21). On occasion, the post-meal cleaning has been performed exclusively by the paid trustees or by Officer Gallegos himself. *Id.* (Gallegos Dep. 139:2-3). Gallegos explained that "nothing bad happens to someone who refuses to clean," and that, in fact, he has never written someone up for simply refusing to clean. *Id.* (Gallegos Dep. 137:14-19). On rare occasions, he did write detainees up for creating unsafe conditions in the dorm in connection with cleaning including a single incident that involved a number of detainees creating an unsafe situation in the dorm. *Id.* (Gallegos Dep. 174:9-14; 188:8-19; 192:12-13).

In Officer Gallegos' experience, when a detainee violated a rule or regulation, his first response would be to talk to them about the violation and give them another chance to comply. *Id.* (Gallegos Dep. 121:21-25). If a detainee violated the rule a second time, he or she would be written up for the violation. *Id.* (Gallegos Dep. 122:2-4.) Typically, a detainee would not be written up unless the violation involved insolence, weapons, contraband, or fighting. *Id.* (Gallegos Dep. 123:24). No one would ever be written up for a reason other than those listed in the detainee handbook and PBNDS. *Id.* (Gallegos Dep. 124:20). Consistent with the PBNDS directive to

resolve disciplinary incidents informally, where possible, Officer Gallegos would first speak with detainees who violated a rule or regulation, rather than write them up. *Id.* (Gallegos Dep. 121:21-23; 158:19-159:16); PBNDS § 3.1. Detainees frequently requested, of their own volition, to clean their living areas—requesting that Officer Gallegos open the closet so they could get the materials necessary to clean. *Id.* (Gallegos Dep. 125:24-126:7).

Officer Gallegos explained that during the Class Period,[16] there was not one single person who acted as the disciplinary officer, but rather the role was filled by a number of individuals, all of whom were lieutenants *Id.* (Gallegos Dep. 52:22-53:9). He also explained that not all detainees had the same impression of segregation. More specifically, he described how some detainees requested to live in the segregation unit under a classification of "protective custody" because "some people don't like to be with many other people or big crowds." *Id.* (Gallegos Dep. 74:10-11).

### Joyce Quezada

During the class period, Officer Quezada supervised the meal clean-up described in the AIPC Handbook. She described the post-meal clean-up as fully voluntary, stating that no one had to clean unless they wanted to. Ex. K (Quezada Dep. 64:10-19). She would ask six detainees to help clean up after meals along with the two paid trustees. *Id.* In addition, she helped complete the post-meal cleaning. *Id.* When detainees did not want to clean or work, she would "just talk to them" and tell them "Don't worry about it, I can do it." *Id.* (Quezada Dep. 78:20-79:1). When one detainee would not want to clean, another detainee would often volunteer to help clean up after

---

[16] Officer Gallegos worked in the dorms from early 2012 through the end of the Class Period in 2014. Ex. J (Gallegos Dep. 135:23-136:1).

the meals. *Id*. 2-3. Ms. Quezada would not force any detainee to clean; if they didn't want to do it, she would simply do it herself or ask a different detainee. Ex. K (Quezada Dep. 79:13-17; 144:2-9). Indeed, it was rare for a detainee to not want to participate in cleaning, but if they did, she could typically resolve any issue by simply talking to the detainee or stating that she would turn off the televisions. Ex. K (Quezada Dep. 143:6-144:1). In her over 19 years working at AIPC, Ms. Quezada never told a detainee that they would go to segregation if they did not clean and never sent a detainee to segregation for refusing to clean. ECF 306-12 at 12 (Quezada Declaration); Ex. K Quezada Dep. 149:1-3; 150:7-15. Nor did she witness any other officer ever tell a detainee he or she would go to segregation if they didn't clean. ECF 306-12. Had such an incident occurred, it would have been rare, and certainly not the result of a pervasive policy at AIPC. ECF 306-12.

### Martha Vasquez

Officer Vasquez has been employed at the AIPC since 2001. Ex. L (Vasquez Dep. 11:5-12). In that time, she has worked both in the housing units supervising detainees and as a classification officer assisting with administering the VWP. Ex. L (Vasquez Dep. 11:5-12, 74:15-25). During her time working in the housing units, Officer Vazquez supervised detainees cleaning up their living areas. *Id.* Each day, six detainees would be asked to help clean up after meals. Ex. L (Vasquez Dep. 75:12-17). The cleanup was not mandatory as detainees were permitted to opt-out. Ex. L (Vasquez Dep. 76:2-16). In her experience, most detainees wanted to clean their living areas and did not object to doing so. Ex. L (Vasquez Dep. 103:1-10). She recalls a single time when a detainee did not want to clean because he was not feeling well, the detainee was not sanctioned or written up, but instead Officer Vasquez simply asked another detainee if he wanted to help. Ex. L (Vasquez Dep. 77:1-23). In fact, in her over 19 year tenure at the facility, working

inside and outside of the housing units, Officer Vasquez never witnessed a GEO officer send a detainee to segregation because he or she refused to clean or tell a detainee they would go to segregation if they did not clean. And, it was her understanding that not all detainees were hesitant to go to segregation. Indeed, in her experience in the segregation unit, she recalled that a number of detainees requested to be placed in segregation rather than living in the housing units. Ex. L (Vasquez Dep. 100:2-14).

### Luis Pagan

Officer Pagan has worked for GEO as a detention officer since 2006. Ex. M (Pagan Dep. 15:1-13; 26:2-14). In his position, he is responsible for the safety and security of detainees. *Id.* During his deposition, he was asked about his experience initiating disciplinary reports for detainees. Ex. M Pagan Dep. 75:2-7. He explained that he "hardly ever" has the need to write up a detainee. *Id.* at 75:10-20. Even where he writes up a detainee, he does not determine what sanction is appropriate, as that determination would be made by the disciplinary officer. *Id.* 78:23-25-99:1-5. During the meal cleanup, there are typically two dorm trustees who are paid to help with the cleaning. *Id.* 108:4-12. Mr. Pagan explained that while the AIPC Handbook stated that every detainee must help with meal-cleanup, that in reality "that is not really enforced." *Id.* 109-110. Mr. Pagan has never written up a detainee for refusing to clean. *Id.* 125:19-23. While up to 72 hours of segregation is permitted by the detainee handbook, officers did not have a common practice of implementing that sanction, instead they would try to have a conversation with non-complaint detainees about the benefits of keeping the living area clean. *Id.* 134:18-135:13. In those conversations, Mr. Pagan never threatened to place a detainee in segregation if he or she did not clean. *Id.* 173:4-7.

**Kevin Martin**

At his deposition, Kevin Martin (a former AIPC employee who worked at AIPC for over 18 years) testified he was not aware of any detainee ever being sent to segregation (administrative or disciplinary) for refusing to clean his or her living area. Ex. A (K. Martin Dep. 120:1-5; 282:2-9). Nor did he recall a single time a detainee was threatened with segregation for failing to clean his or her living area. *Id.* (Kevin Martin Dep. 283:3-11). More broadly, Mr. Martin explained at this deposition that:

> In over 18 years, I don't ever recall an issue, not a single time, whether it was when I was an officer, a lieutenant or compliance or sitting in disciplinary of ever hearing issues of detainees cleaning up after -- after meal service or of them having an issue or being forced to clean up.·I don't ever recall that as an issue.

*Id.* (Kevin Martin Dep. 200:1-7).

In short, the evidence from GEO's current and former employees makes clear that there was not a pervasive culture or practice of placing detainees in segregation for refusing to clean their living area, nor was there a ubiquitous threat of the same.

(4)   **Absent Class Members.**

Plaintiffs previously represented to this Court that they would not rely upon the individual experiences of detainees to prove their case thereby successfully limiting GEO's discovery to only that of named Plaintiffs. ECF 144, 8 ("Here, Plaintiffs have not listed any absent class members as potential witnesses to support their claims . . . *Roberts* and other cases like it are distinguishable from this case because Plaintiffs **plan to prove their claims through persuasive classwide evidence—not individual class member experiences**." (emphasis added)). Nevertheless, Plaintiffs are now relying upon a few random disciplinary incidents obtained in discovery that are

unrelated to the named Plaintiffs' experiences. GEO presumes Plaintiffs have abruptly changed course because *not a single named Plaintiff was sent to segregation for declining to clean*.

First, there is absent class member Alejandro Hernandez-Torres. Unlike the majority of detainees in AIPC during the class period, Mr. Hernandez-Torres had an unusually long stay, spanning over two years.[17] Also unlike the majority of the named Plaintiffs, Mr. Hernandez-Torres was sent to segregation for fighting, which shaped his experience at AIPC. Ex. N.  In fact, Mr. Hernandez-Torres struggled in his transition from a state jail (where he had been incarcerated for two years) to GEO's facility because he preferred to live where there were more rules and fewer freedoms. Ex. O (Torres Dep. 55:12-16). Indeed, Mr. Hernandez-Torres explained that at GEO there was "no discipline, everybody comes in there and does whatever they want." Ex. O (Torres Dep. 55:12-16). With that preference, it is no surprise that Mr. Hernandez-Torres did not find the AIPC Handbook to be threatening in any way. *Id.* (Torres Dep. 61:8-13). And while Mr. Hernandez-Torres did not get along well with every GEO officer, there were some he found to be "very nice." *Id.* (Torres Dep. 97:12-13).

Second, in support of their motion for summary judgment, Plaintiffs introduced evidence of a large group of individuals who caused a disturbance in the dorms during the meal-clean-up and were written up for sanctions. ECF 262-12. Ms. Ceja, at her 30(b)(6) deposition explained that officer John Good, the dorm officer at the time, recalls the incident. Ex. F (Ceja Deposition 19:19-21-7). He was supervising meal clean-up cell that held six male detainees started creating a disturbance that appeared to be about to escalate into a riot. *Id.* Officer Good recalls that other

---

[17] GEO has no control over the speed with which the immigration courts operate and dispense of individual case.

detainees became fearful and retreated to their cells. Ex. P (Ceja Declaration). Officer Good called for backup and the five detainees causing the disturbance were removed from the dorm to dispel the disturbance. *Id.* While the participating detainees were written-up for segregation, ultimately only one was placed in segregation. *Id.* The remainder of the detainees received only a warning. *Id.*

Third, during the deposition of Ms. Vazquez, Plaintiffs introduced a disciplinary report for absent class member Vanks who was written up for a number of concerns, including refusing to clean his assigned living area and disrupting the orderly operation of the facility. Ex. Q. Mr. Vanks refused to clean up his cell and made derogatory remarks about the Mexican detainees in his housing unit. *Id.* Because of the diversity inside AIPC, derogatory and racist remarks are not tolerated. Record evidence shows Mr. Vanks was not sent to segregation for refusing to clean. *Id.* Instead, Mr. Vanks' incident was investigated by the disciplinary panel, he was found to have committed the violations, and the disciplinary panel imposed the sanctions of a warning and a change of housing unit for the incident. Ex. R .

(5) **Expert Testimony.**

In addition to factual discovery, both parties have retained experts to opine upon the psychological impact of brief segregation on detainees. GEO's expert, Dr. Jeffery Kropf, has made unequivocally clear that "[p]erceptions of threat are mediated by multiple factors. Such factors include personal experience, culture, and context. Perceptions of threat are subjective and therefore most reasonably assessed individually." Ex. S .

Likewise, Dr. Stuart Grassian, Plaintiffs' expert, has expressed in this case, through published materials attached to his report, that "[t]here are substantial differences in the effects of

solitary confinement upon different individuals." Ex. T; Ex. U (Grassian Dep. 214-215) (making clear that different individuals react differently to segregation). For example, while some people may be able to alleviate the concerns and potential harms with television, others would not. *Id.* (Grassian Dep. 138:10-20). Indeed, "individuals are more or less susceptible to varying degrees of restriction of environmental and social stimulation." *Id.*( Grassian Dep. 166:17-20).

This is consistent with Dr. Grassian's prior analyses. *See* Am J Psychiatry 140:11, November 1983. ("[S]olitary confinement cannot be viewed as a single entity. The effects of solitary confinement situations vary substantially . . ."); Ex. V. ("There are substantial differences in the effects of solitary confinement upon different individuals."). Dr. Grassian is unable to provide any diagnosis or other professional opinion without first conducting an interview and/or reviewing an individual's medical records. Ex. U (Grassian Dep. 79-80). Dr. Grassian conceded he does not "make predictions based on the conditions of confinement," but rather only evaluates "what actually happens," indicating that he could not make classwide predictions but rather would need to individually analyze each detainee's resulting medical conditions (if any). *Id.* (Grassian Dep. 205:18-22). Even so, Dr. Grassian's standard practice "is so variable" that he is unable to even describe a generic process for assessing a group of individuals because the actual evaluation process and procedures would differ based upon the "particular person." *Id.* (Grassian Dep. 75:13-76:22).

While both experts agree upon the individualized nature of psychological analysis, they fervently disagree about whether the conditions of confinement at issue here could cause

psychological harm.[18] And, Plaintiffs have offered **no** evidence that all individuals, regardless of their background, would read the AIPC Handbook and interpret it as a threat, rather than a warning of legitimate consequences.[19] To the contrary, a number of the named Plaintiffs have made unequivocally clear that they did not find the handbook to be threatening. ECF 306-7 at 2, (Menocal's Second Set of Discovery Responses); Ex. D (Hernandez Dep. 58:12-24). Instead, their experiences varied significantly. *See supra* Plaintiffs' Discovery Summaries.

Indeed, even if the named Plaintiffs experiences had not varied, they would not represent a uniform experience that can be extrapolated to a larger class. GEO's statistical expert, Dr. Anthony Hayter, has provided an opinion about permissible statistical methods for extrapolating data from a subset of a specific population to a larger population. Ex. W . Prior to extrapolating the data from a small subset of individuals (such as the named Plaintiffs) to the entire class, the underlying data must first be obtained in a scientifically valid manner. *Id.* To ensure the data is scientifically valid, among other considerations, the data must be collected in a manner that avoids improper selection bias and non-response bias. *Id.* Consistent with Dr. Hayter's analysis regarding statistically valid extrapolations, Dr. Grassian's publications make clear that data must be validly collected prior to drawing conclusions from the same. In Dr. Grassian's opinion, in assessing the impacts of conditions of confinement on a population, it is critical to have a "fairly large number of individuals" representing the group and thereafter to have each individual analyzed in a clinical

---

[18] The Court need not resolve any *Daubert* issues at this juncture because even taking both experts opinions as true—the issues are not well suited for classwide resolution. That said, it can consider as persuasive the fact that both experts agree that the case presents a myriad of individualized issues that cannot be resolved on a representative basis.

[19] "[W]arnings of legitimate but adverse consequences or credible threats of deportation, standing alone, are not sufficient to violate the forced labor statute." *United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008).

setting by a physician. Ex. X. Here, the Plaintiffs do not meet the criteria for a statistically valid sample that can be extrapolated to the entire class. Therefore, even assuming the named Plaintiffs had a uniform experience, the experiences of the individual Plaintiffs cannot be extrapolated either.

Consistent with these generally accepted standards, Dr. Grassian's report does not attempt to draw scientifically valid extrapolations from the individuals he interviewed to the larger class. Ex. U (Grassian Dep. 237:20-238:11; 241:1-9). Indeed, he did not even attempt to identify whether the individuals he interviewed were representative of the larger class. *Id.* Rather, he merely summarizes the experiences of those he interviewed. *Id.* Dr. Grassian concedes that after interviewing a small number of detainees there is no question that "the experiences that [the detainees] had were actually somewhat variable. They weren't all the same . . . I am perfectly aware that things were not uniform." Ex. U (Grassian Dep. 239:14-25).

## III.    Analysis.

"The Court has discretion under Rule 23(c)(1)(C) to amend an order that previously granted class certification." *Blair v. Transam Trucking, Inc.*, 309 F. Supp. 3d 977, 1013-14 (D. Kan. 2018) (citing *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010)). A class may be decertified "*where new facts have been developed to justify such a redetermination*, as where issues the court has identified as substantial later appear insufficient to justify the class procedure." *Id.*, *11-12 (citing 6A <u>Federal Procedure</u> § 12:296 (Lawyer's ed. 2008)) (footnotes omitted) (emphasis added). Where, as here, a class was certified pursuant to Rule 23(b)(3), decertification may be warranted if predominance is destroyed. *See, e.g.*, *Blair*, 309 F. Supp. 3d at 1014 ("The predominance question asks whether common issues are more prevalent or important than individual issues. '[P]redominance may be destroyed if individualized issues will overwhelm those

questions common to the class.'" (quoting *Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013) (alteration original). "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

In considering the predominance issue, "the court must identify the substantive issues that will control the outcome, assessing which issues will predominate, and then determine whether the issues are common to the class—a process that ultimately prevents the class from degenerating into a series of individual trials." *David v. Signal Int'l, LLC*, No. CIV.A. 08-1220, 2012 WL 10759668, at *15 (E.D. La. Jan. 4, 2012). "The court must go beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id.* "[A] common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, classwide proof.'" *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (*quoting Tyson Foods v. Bouaphakeo*, ––– U.S. –––, 136 S.Ct. 1036, 1045 (2016)). Thus, the analysis of whether a common question of law or fact predominates "begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011).

Decertification is appropriate where Plaintiffs claims rest upon individual experiences—not a classwide policy. *Bayles v. American Medical Response*, 950 F. Supp. 1053, 1061 (D. Colo. Dec. 31, 1996) (decertifying class where "Plaintiffs vary dramatically in their accounts of whether defendant followed the stated policy, and the evidence appears to reflect that only certain management personnel of defendant may have strayed from that policy. Accordingly, each

plaintiff's proof of violation will be individualized because it depends upon how or whether defendant's policy was implemented by individual managers with regard to individual plaintiffs, not what the policy was."); *see also Chieftain Royalty Co. v. XTO Energy, Inc.*, 528 Fed. Appx. 938, 943-44 (10th Cir. 2013) (reversing class certification where individualized questions were likely to arise). Likewise, here, decertification is appropriate because individualized questions will predominate.

### A.      Forced Labor Under The Trafficking Victims Protection Act.

In order to understand why Plaintiffs' claims cannot be resolved on a classwide basis, it is important to review the elements that must be pled and proven under the TVPA.[20] As is relevant here, for Plaintiffs to prevail on their claim they must establish that:

> (1)      [GEO] knowingly obtained Plaintiffs' labor by means of:
>     (a)      force, physical restraint, or threats of force or physical restraint;
>     (b)      serious harm or threats of serious harm;
>     (c)      abuse of the law or threats of abuse of the law or legal process;
>     (d)      any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or other person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a) (emphasis added). The statute defines "serious harm" as:

> [A]ny harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the

---

[20] As the Honorable Magistrate Judge Wang recently observed, "[t]here is limited case law from the Tenth Circuit discussing the types of acts and conduct that qualify as means of serious harm or abuse of law or legal process for purposes of TVPRA liability. Therefore, the court considers cases from other jurisdictions that have encountered the question." *Echon v. Sackett*, No. 14-CV-03420-PAB-NYW, 2017 WL 4181417, at *13 (D. Colo. Sept. 20, 2017), report and recommendation adopted, No. 14-CV-03420-PAB-NYW, 2017 WL 5013116 (D. Colo. Nov. 1, 2017), aff'd sub nom. *Villanueva Echon v. Sackett*, No. 19-1099, 2020 WL 1696854 (10th Cir. Apr. 8, 2020). For these same reasons, GEO relies upon case law from other jurisdictions throughout this motion.

> same circumstances to perform or to continue performing labor or services in order
> to avoid incurring that harm.

18 U.S.C. § 1589(c)(2). The statute further defines "abuse or threatened abuse of law or legal

process" as:

> [T]he use or threatened use of a law or legal process, whether administrative, civil,
> or criminal, in any manner or for any purpose for which the law was not designed,
> in order to exert pressure on another person to cause that person to take some action
> or refrain from taking some action.

18 U.S.C. § 1589(c)(1).

Although the statute does not contain the word "cause," to establish a § 1589 violation,

Plaintiffs must prove that an unlawful means of coercion caused them to render labor. *See United*

*States v. Kalu*, 791 F.3d 1194, 1211-12 (10th Cir. 2015) (affirming a jury instruction on § 1589

that advised the jury to consider whether "as a result of [the defendant's] use of . . . unlawful

means, the [victim rendered labor] where, if [the defendant] had not resorted to those unlawful

means, the [victim] would have declined to" (quotations omitted)). Importantly, it is not enough

that an individual or entity obtain the labor of another through persuasion or compulsion, but rather

the labor must be obtained through the illegal coercive means detailed in the statute. *Garcia v.*

*Curtright*, No. 6:11-06407-HO, 2012 WL 1831865, at *4 (D. Or. May 17, 2012) ("[N]ot all bad

employer-employee relationships constitute forced labor."). To that end, any construction must be

distinguishable "from that of ordinary parents requiring chores," *United States v. Toviave*, 761

F.3d 623, 625–26 (6th Cir. 2014). In the ICE detention context, any construction of the TVPA

should not "call into question longstanding requirements that detainees or inmates be required to

perform basic housekeeping tasks." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1278 (11th Cir.

2020). Likewise, the disciplinary severity scale in the ICE-mandated PBNDS, which provides

sanctions for detainees who "among other things, refuse to complete basic personal housekeeping tasks or organize work stoppages . . . [does not on its] own, give rise to TVPA liability." *Id.* This is consistent with longstanding TVPA caselaw which provides that assessment of whether a TVPA violation has occurred requires a court to differentiate between legitimate warnings of possible consequences and "illicit threat[s]." *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) "(In applying the Act, we must distinguish between [i]improper threats or coercion and permissible warnings of adverse but legitimate consequences.")"; *United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) ("[W]arnings of legitimate but adverse consequences or credible threats of deportation, standing alone, are not sufficient to violate the forced labor statute."); *United States v. Bradley*, 390 F.3d 145, 151 (1st Cir. 2004), *overruled on other grounds*, 545 U.S. 1101, 125 S. Ct. 2543, 162 L. Ed. 2d 271 (2005).

To determine whether a threat is "sufficiently serious," courts review each individual's claims on a case-by-case basis, considering the totality of the circumstances, including a plaintiff's unique vulnerabilities. *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 996 (D. Idaho 2019) ("Courts look to whether a defendant's 'misconduct has created a situation where ceasing labor would cause a plaintiff serious harm,' recognizing that what constitutes serious harm for that plaintiff must be determined by considering the totality of the circumstances presented."). To that end, in assessing an alleged threat of serious harm, courts must "consider the particular vulnerabilities of a person in the victim's position." *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015); *see also Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017), as amended (Mar. 3, 2017); *Echon v. Sackett*, No. 14-CV-03420-PAB-NYW, 2017 WL 4181417, at *14 (D. Colo. Sept. 20, 2017). While the Fifth Circuit has previously held that serious harm can include "psychological

coercion," *United States v. Nnaji*, 447 F. App'x 558, 559 (5th Cir. 2011), it is not sufficient to merely "present[] evidence that [Plaintiffs'] employment environment caused [them] to experience psychological harm. Rather, [Plaintiffs] must present sufficient evidence upon which a jury could reasonably conclude that [GEO] knowingly or intentionally engaged in actions or made threats that were sufficiently serious to compel a reasonable person in [each individual plaintiff's] position to remain in [GEO's] employ, against [their] will and in order to avoid such threats of harm[.]" *Muchira v. Al-Rawaf*, 850 F.3d 605, 620 (4th Cir. 2017), as amended (Mar. 3, 2017). In considering the particular sensitivities of an individual, a finder of fact should consider whether the victim's acquiescence was objectively reasonable under the circumstances in light of the victim's unique vulnerabilities. *Id.*; *see also United States ex rel. Hawkins v. ManTech Int'l Corp.*, No. CV 15-2105 (ABJ), 2020 WL 435490, at *18 (D.D.C. Jan. 28, 2020). As explained in *David*, where, as here, Plaintiffs allege threats of psychological coercion, the considerations under the TVPA become inherently more individualized:

> The need to consider the specific alleged victim becomes even more crucial when the subtler forms of psychological coercion are involved, which the new § 1589 allows and which Plaintiffs rely upon in this case. Most human beings would likely choose to provide labor in lieu of receiving severe beatings or being tortured so with egregious forms of physical abuse the specific victim's vulnerabilities may become less important. But with more subtle types of coercion, particularly psychological coercion, the vulnerabilities and characteristics of the specific victim become extremely important because one individual could be impervious to some types of coercion that cause another to acquiesce in providing forced labor.

*David*, 2012 WL 10759668, at *20. Of course, the vulnerabilities must be known to the defendant at the time the actions are taken. "[T]o rely upon some hidden emotional flaw or weakness unknown to the employer would raise various problems (e.g., scienter). But . . . known objective conditions that make the victim especially vulnerable to pressure (such as youth or immigration

34

status) bear on whether the employee's labor was obtained by forbidden means." *United States v. Bradley*, 390 F.3d 145, 153 (1st Cir. 2004), vacated on other grounds, 545 U.S. 1101, 125 S.Ct. 2543, 162 L.Ed.2d 271 (2005).

Indeed, Courts have reached different outcomes based upon different vulnerabilities of a victim. For example, the Second and Fourth Circuits reached different conclusions based, in part on the individual plaintiffs' vulnerabilities, when considering whether immigrant maids' circumstances were sufficient to establish TVPA violations. In both cases, the immigrant maids obtained visas to live and work for families in the United States and upon arriving, learned that the circumstances of their employment were not what they had envisioned. *Compare Muchira*, 850 F.3d at 620 *with United States v. Sabhnani*, 599 F.3d 215, 228 (2d Cir. 2010). The Fourth Circuit, considering the particular circumstances of the plaintiff, concluded that a 32 year old immigrant from Kenya, who was not in the United States illegally, who was proficient in reading and writing English, and who had previously held a similar role in a Saudi household—was not particularly vulnerable to coercive tactics allegedly implemented by a Saudi family with whom she lived because of her age, experience, and knowledge. *Muchira*, 850 F.3d at 620. Therefore, the court found that no TVPA violation had occurred. *Id.* In contrast, the Second Circuit affirmed a TVPA verdict, in part because of the specific vulnerabilities of the plaintiff, who did not know how to drive a car, use a telephone, had completed only the first grade, and spoke no English. *United States v. Sabhnani*, 599 F.3d 215, 228 (2d Cir. 2010). As these cases exemplify, the particular vulnerabilities of the individual alleging a TVPA violation are a key consideration the liability analysis.

In addition to limiting liability to only those violations that are "sufficiently serious" to compel the individual to remain working, the scope of the statute is further narrowed by the requirement of scienter. 18 U.S.C § 1589(c)(2); *see also Dann* 652 F.3d at 1170 (*citing U.S. v. Calimlim*, 538 F.3d 706, 711–12 (7th Cir.2008)); *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 991 (D. Idaho 2019) ("in order to show that someone violated the Federal Forced Labor Statute, it must be demonstrated that first, the threat of harm was serious; and second, that the defendant had the requisite scienter, or bad state of mind."). The defendant "must intend to cause the victim to believe that she would suffer serious harm if she did not continue to work. In other words, under section 1589, the [defendant] must not just threaten serious harm but have intended the victim to believe that such harm would befall her." *Garcia v. Curtright*, No. 6:11-06407-HO, 2012 WL 1831865, at *4 (D. Or. May 17, 2012). "A statement is a threat if a reasonable person would believe that the intended audience would receive it as a threat, regardless of whether the statement was intended to be carried out." *Calimlim*, 538 F.3d at 713.

## IV. Individualized Issues Predominate Plaintiffs' TVPA Claims.

### A. Despite Plaintiffs' Reference to GEO Policies, There Was Not A <u>Uniform</u> Policy Connecting the Refusal to Clean to 72 Hours of Segregation.

Decertification is appropriate where Plaintiffs cannot establish a uniform policy that applied to the entire class. *Bayles*, 950 F. Supp. at 1061 (decertifying class where "[a]ccounts of whether defendant followed the stated policy, and the evidence appears to reflect that only certain management personnel of defendant may have strayed from that policy. Accordingly, each plaintiff's proof of violation will be individualized because it depends upon how or whether defendant's policy was implemented by individual managers with regard to individual plaintiffs, not what the policy was."); *see also Chieftain Royalty Co. v. XTO Energy, Inc*., 528 Fed. Appx.

938, 943-44 (10th Cir. 2013) (reversing class certification where individualized questions were likely to arise).

In support of their motion for class certification, Plaintiffs cited the Sanitation Procedures and the AIPC Handbook as policies that were provided uniformly to class members informing them of their responsibility to clean their living areas. Plaintiffs alleged that these policies established that all detainees cleaned under the threat of serious harm. However, the plain text of the policies does not support this position. The Sanitation Procedures provide for a single penalty for non-compliance: an officer can issue an incident report. ECF 50-2. They do not mention segregation as a sanction. *Id.* Further, detainees do not receive the Sanitation Procedures, so it is unclear how the policy could have caused any detainee to believe he or she would be placed in segregation for not cleaning, when the policy did not so state, and detainees did not review the policy. ECF 50-1 (Ceja Dep. 29:13-18).

In a second attempt to identify a classwide policy, Plaintiffs point to the meal clean-up portion of the AIPC Handbook, which provides for a post-meal clean-up procedure to ensure the living area stays sanitary for all detainees. The policy explains that if detainees refuse to clean, the TVs will be turned off until the area is cleaned. Like the Sanitation Procedures, the threat of segregation is not clear on the face of the policy. Instead, Plaintiffs rely upon a distinct section of the AIPC handbook, the disciplinary policies. ECF 50-3, 19. Plaintiffs argue that because *one* of the *many* possible sanctions for the refusal to clean is 72 hours in segregation, that a reasonable construction of the post-meal cleanup procedure in the handbook is that any and all times that a detainee refuses to clean, segregation, and not the lesser sanctions such as a warning, reprimand, or loss of privileges would apply—creating an inherently coercive environment. ECF 49, 17. This

contrived reading is not only inconsistent with the written policy, but also does not constitute a uniform policy that was applied to the entire class. Rather, GEO officers did not use segregation, or a warning or threat of segregation, as a typical response to a detainee declining to clean. *Supra* Section II.B. Instead, officers would most frequently ask for another detainee to volunteer or would simply perform the cleaning themselves. *Id.* Furthermore, Plaintiffs did not uniformly construe the handbook as threatening. *Id.* Indeed, Plaintiff Hernandez did not find the detainee handbook threatening. Ex. D (Hernandez Dep. 58:12-24). Plaintiff Menocal does not even remember reviewing the handbook, let alone being threatened by it. Ex. C.

Because Plaintiffs are unable to establish that any GEO policy uniformly threatened all detainees who did not clean with segregation, Plaintiffs turn to the actions of the GEO officers to prove their case. ECF 286 at 96 ("[Plaintiffs] claims are also based on the threats of solitary confinement that they either received or observed being directed by GEO guards to detainees."). Yet, despite years of discovery opportunity, Plaintiffs did not identify any GEO officers whose testimony supports Plaintiffs claim that a uniform policy applies to the class. Plaintiffs concede that there were many officers who worked each week and that their personalities and disciplinary styles varied. *Supra* Section II.B. For the most part, detainees recall only a small portion of the GEO officers suggesting that the refusal to clean could lead to segregation, while the vast majority of officers would not make such suggestions, nor would they impose segregation for the refusal to clean. *Id.* Indeed, of the five officers deposed in this case, only one had ever been involved with sending a detainee to segregation for refusing to clean, and he had done so not because the detainee had refused to clean, but rather because the detainee was acting in a threatening manner, waving a broom around, and causing a disruption to the order in the housing unit and security of other

detainees. Ex. J (Gallegos Dep. 174:9-14; 188:8-19; 192:12-13). The other four officers cannot recall a single time a detainee was sent to segregation for not wanting to clean. *Supra* Section II.B. Those same officers, in their years at the facility, have never sent a detainee to segregation for failing to clean—nor do they recall a pervasive culture of punishment for refusing to clean. *Supra* Section II.B. Instead, the officers uniformly recall that if someone did not want to clean, they would simply ask someone else to participate. *Supra* Section II.B. If a violation involved more than simply a refusal to clean, but instead also involved insolence or a disturbance to the safety of other detainees, the officers believed a sanction might have been necessary, but could not so determine without looking at each situation on a case-by-case basis. *Supra* Section II.B. In this way, the actions of officers also did not create a uniform policy for discipline wherein each detainee would know that the most likely consequence for refusing to clean would be segregation. *Supra* Section II.B. Instead, it depended upon the officer and the circumstances, with the vast majority of situations leading to no sanction at all. *Supra* Section II.B. As there was no uniform reaction to a detainee's refusal to clean, a jury could determine that liability turns on whether a detainee faced no consequence for refusing to clean, was told he or she would go to segregation for failing to clean on one occasion, or faced some other sanction such as the temporary loss of television privileges. Similarly, liability may turn on whether the potential sanctions were communicated by another detainee, a GEO officer, or a review of the detainee handbook. Because discovery has revealed that there is no uniform policy to "glue" the class together, the action should be decertified.

**B.**     **Discovery has Revealed that Plaintiffs Had Different Motivations for Cleaning, Presenting Individual Questions that Would Predominate at Trial.**

Plaintiffs cannot show that the class members had the same motivations for cleaning their living areas. At the class certification stage, this Court noted that GEO had not presented any evidence that detainees who are not selected for meal cleanup still choose to clean-up their living area autonomously. ECF 57, 9 at n.3 ("GEO does not allege and there is nothing in the record to show that detainees who are not on the daily list still choose to perform the additional duties or that detainees work autonomously."). To that end, the Court concluded that it could rely upon classwide proof to establish motivations for cleaning, because the experiences of the named plaintiffs were typical of all class members based upon the application of *a uniform* policy.

The Tenth Circuit has recognized that a common piece of proof could establish classwide causation. *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1092 (10th Cir. 2014) In *CGC Holding*, the plaintiffs alleged that defendants had induced them to pay an upfront fee for a loan that defendants never had the intent or ability to fund. *Id.* The Court found class certification was permissible because the payment of the fee coupled with the proof the defendants would not have funded the loan could have established classwide liability. *Id.* At the class certification stage, the Tenth Circuit analogized this case to *CGC Holding*, finding that Plaintiffs could establish their claim by simply showing that detainees received notice of a *uniform* policy and thereafter that detainees performed the cleaning work when faced with the consequences in the policy. Critically, the policy requiring detainees to clean was the "'glue' that holds together the class members' reasons for performing the housing unit cleaning duties assigned by GEO." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 920 (10th Cir.), *cert. denied*, 139 S. Ct. 143 (2018). The Tenth Circuit further explained that if GEO presented individualized rebuttal evidence, decertification could be proper.

*Id.* While Plaintiffs' theory of classwide proof may have been viable at the class certification stage, following extensive discovery, it is clear that individualized issues predominate.

With the advantage of discovery, it is clear that there was no uniform policy, and also that not all detainees cleaned simply to avoid segregation. Indeed, some detainees, mindful of the potential consequences, did not clean at all. *See e.g.* Ex. E (Valerga Dep. 136:16-137:19). Others cleaned to stay busy; while some cleaned to earn their daily stipend in the VWP. *See supra* Section II.B. Furthermore, even the potential sanction or consequence that allegedly motivated detainees to clean was not uniform. Some detainees cleaned to avoid losing television privileges. Ex. D (Hernandez Dep. 181:1-7). Others cleaned to help out other detainees who did not wish to clean. Ex. I (Xahuentitla Dep. 73:19-25). Each of these individualized circumstances will be the focus of a trial on TVPA liability, because there is no uniform policy upon which Plaintiffs can rely without assessing how that policy was carried out in practice along with each detainee's personal motivations for cleaning.

While only a small number of detainees would be asked to clean up after the meals each day, "there were a lot of other detainees that just volunteered to do it because, again, the quicker it was done, the quicker they could start watching TV." Ex. A (K. Martin Dep. 144:9-11). In addition to those who helped clean to be able to watch television sooner, in each housing unit "there were also two paid dorm trustees that also cleaned the whole area the – in addition to – their responsibility was cleaning the entire day area—excuse me, day area, but—and they would also help after meal service." *Id.* (145:7-11). Plaintiff Xahuentitla testified in her deposition that she would do anything to "help [] kill time in a good way" and that she would rather be busy than sitting idle. Ex. I (Xahuentitla Dep. Tr. 30:8-16). And, she explained that regardless of where she

41

lived, be it a cell or a bedroom, she "like[s] to have my room clean and neat. It doesn't matter where you are." Ex. I (Xahuentitla Dep. Tr. 31:15-19). In other words, she liked to keep her living space tidy. *Id.* (31:20-25; 93:18-19) ("I like to be a clean person."). This sentiment was shared by Plaintiffs Hernandez and Menocal. Ex. C (Menocal 81:6-10); Ex. D (Hernandez 49:24-50:1). In contrast, Mr. Valerga did not feel a desire to clean—let alone feel coerced. Ex. E  (Valerga Dep. 136:16-25). Mr Valerga testified that he routinely refused to clean, even when threatened with segregation for doing so. *Id.*

Furthermore, each named Plaintiff <u>voluntarily</u> participated in the VWP during their stay at AIPC. ECF 306-2. They have specifically pled that their participation in the VWP was not the result of coercion, and therefore they do not extend their TVPA claims to the tasks performed in the VWP. ECF 49, 7-10. But, many of the tasks included in the VWP positions were **identical** to the housekeeping tasks that Plaintiffs claim were coerced by **all** members of the class. Ex. B (A. Martin 30(b)(6) Dep. 19:8-11). Thus, Plaintiffs' admission that VWP participation was not the result of coercion conclusively establishes that there were many class members who performed meal clean up willingly, not to avoid disciplinary sanctions. Accordingly, because detainees did not share the same motivations for cleaning up their living areas, the issue of whether those cleaning tasks amount to a violation of the TVPA is not appropriate for classwide treatment and the class should be decertified.

While Plaintiffs may argue that these experiences and unique motivations can be considered in the aggregate as representative of the class, Plaintiffs do not represent a diverse cross-section of the class, but instead a narrow snapshot of a class that spans 10 years. All experts agree that the named Plaintiffs do not represent a randomized sample from which classwide

inferences can be drawn. *See supra* Section II.C. Thus, the jury could not properly assume that the experiences of the named Plaintiffs are representative of the class. Importantly, they could not determine that their motivations for cleaning were consistent with the prevailing motivations of other class members who cleaned.

This new evidence requires decertification. Because each decision to clean was based upon unique considerations and varied circumstances, this case is more like an assessment of an individual's choice to use a slot machine in a casino than it is the decision to pay the loan fees in *CGC Holding*—there is no single explanation for the decision that can be extrapolated to a larger group. *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 668 (9th Cir. 2004) ("Indeed, there may be no single, logical explanation for gambling—it may be an addiction, a form of escape, a casual endeavor, a hobby, a risk-taking money venture, or scores of other things. The vast array of knowledge and expectations that players bring to the machines ensures that the 'value' of gambling differs greatly from player to player, with some people playing for 'entertainment value' or for any number of other reasons as much as to win."). As such, there is no classwide circumstantial evidence that could suffice to prove causation in this case. *Id.*; *see also Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*, 319 F.3d 205, 220 (5th Cir. 2003) ("A class cannot be certified when evidence of individual reliance will be necessary."). Indeed, the motivation of each detainee for cleaning is materially relevant to the issue of liability. A jury could find differently on each Plaintiff's TVPA claim depending upon whether the detainee cleaned to pass the time or only because of the threat of segregation. Such factual issues would defeat predominance and therefore make class certification inappropriate. *See e.g. Doll v. Chicago Title Ins. Co.*, 246 F.R.D. 683, 690 (D. Kan. 2007).

### C.    Plaintiffs Cannot Establish, On a Classwide Basis, that the Alleged Threat was "Sufficiently Serious."

Plaintiffs allege that the mere disclosure in the detainee handbook of the fact that the PBNDS disciplinary severity scale permits up to 72 hours of segregation as a possible sanction for the refusal to clean, constitutes a "threat of serious harm" under the TVPA. ECF 49 at 3;[21] ECF 306-7. The TVPA, 18 U.S.C. § 1589(c)(2), defines "serious harm" as:

> [A]ny harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

To date, no Court has analyzed whether either the threat of, or the actual placement in, 72 hours of disciplinary segregation constitutes "sufficiently serious" harm to provide for a cause of relief under the TVPA. Nor has any Court resolved whether such a determination may be resolved on a classwide basis. Thus, this is an issue of first impression before this Court.

To establish that the handbook itself constituted a threat of serious harm to any individual who reviewed it, regardless of his or her prior experiences, Plaintiffs have disclosed an expert report of Dr. Grassian. While Dr. Grassian makes clear that he believes actual placement in 72 hours of segregation *could lead to* psychological harm, he does not express an opinion that the AIPC Handbook and related policies would constitute psychological coercion over any and all class members, regardless of their personal circumstances. Ex. U. Nor does he indicate that any individual would suffer a psychological harm or coercion by simply reviewing the policies in the handbook (which makes clear that the first consequence for refusing to clean is that the televisions

---

[21] This motion addresses only the Forced Labor Class and not the Voluntary Work Program Class.

will be turned off). Ex. U (Grassian Dep. 243:14-21). Rather, his assessment of the purported threat relies upon an individualized analysis of each individual. *Supra* Expert Testimony. Mr. Grassian has not made any finding as to whether the Plaintiffs in this case suffered psychological harm because they believed they faced the possibility of 72 hours of disciplinary or administrative segregation if they refused to clean. Ex. U.[22] Accordingly, even if Plaintiffs' expert is presented at trial, his opinion would make clear that Plaintiffs' claims are not suitable for collective treatment and would likely lead to a series of mini-trials on each Plaintiff's claim.

Plaintiffs cannot establish their claims without raising individualized issues that cannot be extrapolated to the class. For example, some, but not all, Plaintiffs also argue that they were told verbally that they could go to segregation for 72 hours if they did not clean-up after themselves.[23] Others claim to have never been so threatened. Without a case-by-case analysis of the impact these statements had on each detainee, including a consideration of the actual phrasing of the warning, it is impossible to determine whether those individual conversations with GEO officers constituted "sufficiently serious" harm. There is no evidence that every person would react similarly to a warning of a consequence. Further, a jury would need to assess whether the offhand comments by

---

[22] For purposes of this Motion, GEO considers the individual evidence that Plaintiffs seek to present in support of their case, as it demonstrates how, if considered, individual experiences are not well-suited for class resolution. That said, GEO believes that Plaintiffs should be estopped from relying upon individual class member's experiences, as Plaintiffs previously represented (in a successful bid to deny GEO discovery of absent class members) that "Plaintiffs plan to prove their claims through persuasive classwide evidence—not individual class member experiences." ECF 144, 12.

[23] While Plaintiffs make these claims, they are vague and non-specific. Not one Plaintiff has named a specific GEO employee who allegedly threatened them. It is unclear how Plaintiffs intend to prove that GEO had the requisite scienter, on a classwide basis, without identifying even one individual and explaining why his or her actions can be imputed to GEO. Certainly, not every action of every single employee can be construed as GEO's intent.

some officers were reasonably considered a threat in light of the conflicting behavior of other officers.

In *Giles*, the District of Idaho grappled with whether a verbal threat was enough to constitute serious harm under the TVPA. *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 997 (D. Idaho 2019). There, the defendant had allegedly stated: "Plaintiff should be grateful he was not sent back for failing to show up at work" *Id.* The court concluded that even if true, that the statement was merely "incendiary" and "intimidating," but was "insufficient to constitute a threat under the [TVPA]." *Id.* In reaching this conclusion, the Court relied upon the plaintiff's unique reaction to the purported threat. *Id.* Under the evidence presented to the court, it was clear the statement did not have any "lasting effects on Plaintiffs" based upon their individual reactions. *Id.* Accordingly, looking at the totality of the circumstances, the *Giles* language did not rise to the level necessary to support a claim of forced labor. To that end, whether Plaintiffs' claims that the mere mention of a possible sanction of 72 hours of segregation could constitute serious harm requires an individualized inquiry into each Plaintiff, including whether the "threat" was enhanced by statements made by GEO officers or if, instead, those statements were merely incendiary but not sufficient to warrant liability under the TVPA.

Critically here, each individual Plaintiff's experiences shape whether it is even plausible that the sanction of 72 hours of segregation could constitute serious harm.[24] Both Plaintiffs and

---

[24] It is GEO's position that the actual language of the policies is not sufficient to constitute serious harm under the TVPA. Certainly, a reasonable person could not find that the threat of loss of television privileges constitutes serious harm. Nor could a reasonable person find that the disciplinary severity scale, as drafted and implemented by ICE, is a threat of serious harm. However, as this motion addresses decertification, GEO has already addressed this argument in more detail in its motion for summary judgment. ECF 305.

52741187;14

Defendant's experts agree on this much. *Supra* Expert Testimony. The detainees' experiences bear this out. Plaintiff Valerga was allegedly threatened with segregation and invited the sanction. He thereafter continued to refuse to clean, making objectively clear his indifference towards the possible sanction and establishing that segregation was not a coercive factor in whether he would clean up after himself.  In contrast, Plaintiff Menocal was **never** threatened with segregation, but claims to have been fearful of the possible sanction because of his unique and personal experience in medical isolation when he was sick.  It is clear from Mr. Grassian's report that Mr. Menocal's unique sensitivities are a critical consideration in whether he felt coerced to clean-up his living area when asked. Similarly, Ms. Alexaklina was not threatened by the handbook alone, but instead felt threatened because of an experience she had where she believed another detainee had become despondent while in segregation. While GEO contests the veracity of Ms. Alexaklina's account, her individual experience would still be a key factor in considering whether the disciplinary severity scale led her to feel coerced to clean up after herself. In contrast, Mr. Hernandez claimed that his experience with the sanction of segregation came from his background being detained at other immigration facilities and jails.  Each Plaintiffs' unique background and sensitivities would shape the application of the reasonable person standard. Thus, there can be no argument that these individual circumstances are relevant to an objective review of Plaintiffs' interpretation of the ICE disciplinary severity scale. Significantly, none of the Plaintiffs have pointed to actual language in the written policies that it is objectively threatening. So, Plaintiffs are unable to simply argue that all detainees objectively felt threatened by the words in the handbook. Indeed, Mr. Hernandez stated that he never felt threatened by the handbook. Therefore, the issue of whether the written policies identified by named Plaintiffs, including the AIPC Handbook and the orientation video

(which incorporates the handbook by reference), constitute serious harm, cannot be resolved on a classwide basis because the documents, in and of themselves, are not objectively coercive. The AIPC Handbook states that television privileges will be taken away before any other consequence is imposed. The orientation video provides no indication that a detainee could be taken to segregation for failing to clean. Neither of these statements are objectively threatening. Rather, the Plaintiffs' individual sensitives and experiences provide the critical context for understanding why they may or may not have felt coerced. And, because the Plaintiffs do not represent a statistically valid sample that can be extrapolated to the larger class, as discussed by Dr. Hayter in his report, the individual experiences cannot be imputed to the class. Thus, the issue of serious harm is not appropriate for classwide resolution.

**D.      There is No Evidence GEO "Knowingly" Acted Towards the Entire Class.**

The forced labor provision of the Trafficking Victim Protection Act requires whoever obtains services or labor in violation of the act to have done so "knowingly" to incur liability. 18 U.S.C. § 1589(a). A corporation's "knowledge" for purposes of intent comes down to a fact-specific inquiry based on agency principles of imputed knowledge. *See* 3 Fletcher Cyclopedia of the Law of Corporations § 807. Generally, for a corporation to have "knowledge" for purposes of intent, the knowledge must be imputed to the entity through its agents or officers. *Id.* In a case involving the federal anti-kickback statute, which also contains a knowledge requirement for civil liability, the Fifth Circuit carefully explained the principles of imputed knowledge. *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 374 (5th Cir. 2017). The court held that for an employee to impute knowledge to the employer for the statute's intent requirement, that employee must have actual authority to act on behalf of the company. *Id.* at 373. If an employee

has actual authority, then the employee's knowledge may be deemed to be the company's knowledge but "a court may deem only the knowledge of officers and employees at a certain level of responsibility imputable to the corporation . . . knowledge of a mere employee of the corporation ordinarily is not imputed to the company." *Id*. at 374. Thus, to show knowledge in this case, Plaintiffs will need to establish that GEO's corporate officers both had knowledge of the alleged policies at issue and that those individuals had actual authority to act on behalf of the company. As the class period spans 10 years, and Plaintiffs allegations are not clearly tied to a policy imposed by a corporate officer or agent of GEO, Plaintiffs will have to engage in this individualized factual inquiry for numerous different individuals—an extremely fact-intensive inquiry .

Plaintiffs' collective claims rely upon an incorrect assumption that GEO combines its Sanitation Procedures Policy, with the ICE disciplinary standards, to create a third policy wherein all detainees would be uniformly and routinely threatened with segregation if they were to refuse to clean their living areas, including refusal to participate in the rotating meal clean-up crew. Following extensive discovery, it is clear that no such uniform policy exists. To the contrary, GEO's general policy, and that prescribed by ICE, was to resolve all infractions informally where possible. *Supra* Officer Testimony. And, it was the typical policy and practice of GEO detention officers <u>not</u> to enforce segregation for the failure to clean where permitted by the ICE disciplinary severity scale and PBNDS. *Id.* Therefore, any bad acts of individual employees would not rise to the level of a uniform classwide policy. To the extent Plaintiffs wanted to impute the acts of any individual GEO detention officer to the company for purposes of knowledge, they would have to go through the individualized fact-based inquiry for each officer. This analysis would likely result in an inability to bind the company unless the detention officer was a supervisor. As the AIPC

49

Handbook and officers' testimony make plain, only supervisory officers could impose discipline on detainees.. And, that discipline is subject to further review upon appeal by the detainee—making it difficult, if not impossible, to determine whether the ultimate decision maker could bind GEO.  Even if Plaintiffs could establish that the actions of one officer could be imputed to GEO, Plaintiffs would also need to establish that officer had contact with a substantial percentage of the class—an issue that would involve inquiries into each Plaintiff and whether he or she may have come into contact with the particular officer. To date, Plaintiffs have not identified even one officer who they believe had a relationship with a significant number of individuals in the class.

Even if Plaintiffs were to present evidence of anecdotal acts by detention officers, there is no question that the disciplinary sanctions are drafted and implemented by ICE; ICE's intentions cannot be imputed to GEO. Nevertheless, Amber Martin testified in her deposition, that while the PBNDS endorse up to 72 hours of segregation as one of the many possible penalties for failing to clean, GEO has its own internal policy not to utilize segregation where the only offense is the failure to clean. Ex. B (A. Martin Dep. 141:8-13; 146:7-14). Besides this testimony, there is no evidence that GEO acted knowingly with the intention to threaten detainees with serious harm.

At the class certification stage, this Court noted that the knowledge element of the TVPA could be established through classwide proof of a uniform policy that would cause a reasonable person to respond in the way described by the named Plaintiffs. ECF 57 12-13. Thus, Plaintiffs' class certification hinges upon establishing a uniform policy of which GEO had knowledge. Because Plaintiffs cannot show that here, but rather have established that their claims are highly individualized, the class should be decertified.

**E.      Plaintiffs Have Framed Their Claims Such That GEO's Liability Turns On What Tasks Detainees Performed.**

While GEO vigorously disputes that liability under the TVPA turns on the *type*[25] of cleaning that a detainee was performing at any given moment, as opposed to the *means*[26] utilized to obtain the detainees labor, Plaintiffs disagree. ECF Nos. 298 at 31. But even assuming *arguendo* that Plaintiffs' theory that TVPA liability turns on the *type* of labor performed is accepted by this Court, Plaintiffs' claims would not be suitable for resolution in the aggregate because any liability determination would turn on an individualized analysis of the *type* of cleaning that each detainee was performing (or refusing to perform) at any given moment.

Under Plaintiffs' theory, GEO's inclusion of the ICE disciplinary severity scale into the AIPC Handbook, which includes the mere possibility of 72 hours of segregation for refusing to clean, is a violation of the TVPA—*only insofar as it directed detainees to perform cleaning tasks above and beyond four enumerated items*: (1) a detainee making his or her bed; (2) stacking loose papers; (3) keeping the floor free of debris and dividers free of clutter; and (4) refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting

---

[25] Other than in situations involving sex trafficking, the TVPA draws no distinction between whether someone is sweeping the floor or performing veterinary services in assessing whether a TVPA violation occurred. *Compare Martinez-Rodriguez*, 391 F. Supp. 3d at 996 (considering whether veterinary services rendered were the result of threats of harm in violation of the TVPA and placing no weight on the type of labor rendered) *with Muchira*, 850 F.3d at 620 (considering whether in-home maid services were rendered as a result the illicit coercive means prohibited by the TVPA and placing no weight on the type of labor rendered).

[26] The means utilized refers to an individuals' motivation for performing work. Not all consequences constitute improper means under the TVPA. For example, whether someone cleaned so as not to lose video game privileges as opposed to cleaning to avoid a threat of grievous bodily harm would change whether there was liability under the TVPA.

fixtures or other furniture. ECF 298, 31.[27] Alternatively, Plaintiffs argue that there is some unspoken line of demarcation outside of each detainee's bed wherein it is their "immediate" living area and beyond that invisible line, detainees do not have a responsibility to clean up. Under this unworkable interpretation, it would have been permissible for GEO to tell detainees they would be subject to segregation for not making their bed or mopping and sweeping the floor (i.e. keeping it free of debris), but not for wiping down a table in the common area where the detainee had just left crumbs from his meal. The latter would be a TVPA violation while the former was not. If the Court were to adopt this incorrect and unreasonable interpretation of the PBNDS, it would need to assess every single detainee's claims individually to determine what specific tasks they were performing (or refusing to perform) when they were told by an officer that they could go to segregation for failing to clean. It would not be enough to simply determine that a detainee was participating in the meal cleanup, but one would have to determine whether the detainee was assigned to wipe tables or clean up debris on the floor. GEO's potential liability would change depending on each Plaintiffs' response. Further, an inquiry into the dorm layout would need to be made to decide whether the cleaning task was in the "immediate living area" or simply the "living area." Alternatively, Plaintiffs would have to prove that the distinction was clearly set forth in the AIPC Handbook which underlies their claims. But, the AIPC Handbook makes no such distinction. Rather, it simply states that a detainee who refuses to clean his or her "living area" may be subject

---

[27] As stated above, GEO thoroughly disputes this assessment as being factually accurate (beyond whether it creates liability under the TVPA) as ICE's own handbook, created and distributed without GEO's input or approval, requires detainees to clean all common-use areas that they use and states that detainees may be disciplined for not doing so. It further requires detainees to clean up after themselves in the bathroom and generally maintain the sanitation in the dorms. ECF 310-1.

to up to 72 hours in segregation. Because such individualized analysis would be required, mini-trials into the merits of each detainee's experience would predominate over the collective issues and therefore the class should be decertified.

**F.      Class Members Who Resided At AIPC Before December 23, 2008 Are Time-Barred And Should Be Excluded From The Class.**

When Congress first enacted the TVPA in 2000, the statute provided for a four-year limitations period. On December 23, 2008, Congress amended the TVPA to include a ten-year limitations period for civil actions. 18 U.S.C. § 1595(c). "Congress did not expressly state or otherwise indicate that the [TVPA] limitations period applies retroactively." *Abarca v. Little*, 54 F. Supp. 3d 1064, 1068 (D. Minn. 2014). Further, the prior version of the TVPA did not provide for the same scope of civil liability,[28] which was expanded under the 2008 amendments. *Id.* Therefore, the statute cannot be applied retroactively. *Id.*; *see also Doe v. Siddig*, 810 F.Supp.2d 127, 135 (D.D.C.2011) (rejecting proposed retroactive application of the TVPA because doing so would "increase a party's liability for past conduct"); *c.f. Velez v. Sanchez*, 693 F.3d 308, 325 (2d Cir. 2012) (holding that the TVPA does not apply retroactively because the amendments changed the substantive law). Accordingly, all individuals whose claims accrued prior to December 23, 2008 would have been subject to a four-year limitations period and could not have sought relief under the expanded causes of action added to the TVPA in the 2008 amendments. This lawsuit

---

[28] Indeed, Plaintiffs seek relief under the section of the TVPA that provides for liability based upon a "scheme, plan, or pattern[.]" ECF 306-1 at 5, (Menocal's Supplemental Responses to the GEO Group, Inc's Sixth Set of Interrogatories). This section and theory of liability was not added until the 2008 Amendments. For this reason, the instant case is distinguishable from *Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d 1112, 1130 (D. Colo. 2019), where Plaintiffs claims were based upon the 2003 iteration of the TVPA and therefore there was no risk of new or expanded liability.

was filed on October 22, 2014, and therefore the claims of those detained before December 23, 2008, would have expired over two years prior to the filing of the lawsuit. Because those individuals would be subject to a different limitations period,[29] they would be subject to different fact-based defenses and should be decertified from the class.

### G.      At A Minimum, All Female Detainees Must Be Excluded.

Through the course of discovery, it has become clear that GEO does not have disciplinary or administrative segregation for women at AIPC. Ex. F (Ceja 30(b)(6) Dep.). Rather, if someone were to act so egregiously as to require segregation, GEO would need to alert ICE so that ICE could transfer the individual. In fact, on one occasion, a female detainee was transferred to AIPC who could not be housed with other detainees who were of a lower classification (she was the highest), so in order to accommodate her, an *entire housing unit* had to be emptied until she could be transferred to another facility. Ex. A (K. Martin Dep. 136:17-25). And, the two cells that could be used for female segregation have only been used to house detainees classified as high risk until they could be transferred to another facility by ICE. Ex. F (Ceja 30(b)(6) Dep. ). Accordingly, any reference to segregation by female detainees would not refer to a reality in AIPC. Because there was no true female segregation at the facility, undermining any claim that segregation could have been a reasonable threat, the scope of the class should not include women.

## V.      CONCLUSION

Accordingly, GEO respectfully requests that this Court issue an order decertifying the class and granting any other relief this Court deems just and proper.

---

[29] While equitable tolling should not apply, even if it did, such an inquiry requires an inherently individualized analysis about when each detainee's claim accrued. Such determinations are not appropriate for classwide certification.

Respectfully submitted, this the 19th day of August, 2020.

**AKERMAN LLP**

*s/ Adrienne Scheffey*
Colin L. Barnacle
Adrienne Scheffey
Christopher J. Eby
Melissa L. Cizmorris
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:    (303) 260-7712
Facsimile:     (303) 260-7714
Email: colin.barnacle@akerman.com
Email: christopher.eby@akerman.com
Email: melissa.cizmorris@akerman.com
Email: adrienne.scheffey@akerman.com


**BURNS, FIGA & WILL, P.C.**

Dana L. Eismeier
Michael Y. Ley
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, CO 80111
Telephone:    (303) 796-2626
Facsimile:     (303) 796-2777
Email: deismeier@bfwlaw.com
Email: mley@bfwlaw.com

*Attorneys for Defendant The GEO Group, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 19th day of August, 2020, a true and correct copy of the foregoing

**MOTION FOR DECERTIFICATION OF CLASS** was filed and served electronically via the

Court's CM/ECF system on the following:

### <u>Counsel for Plaintiffs:</u>

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
TOWARDS JUSTICE
1410 High St., Ste. 300
Denver, CO 80218
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Matthew Fritz-Mauer
KELMAN BUESCHER FIRM
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com
mfritzmauer@laborlawdenver.com

Hans C. Meyer
MEYER LAW OFFICE, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
OUTTEN & GOLDEN, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
OUTTEN & GOLDEN, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
OUTTEN & GOLDEN, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
LAW OFFICE OF R. ANDREW FREE
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
MILSTEIN LAW OFFICE
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

*s/ Nick Mangels*
Nick Mangels