# EXHIBIT C

Alejandro Menocal  07/22/2020
ALEJANDRO MENOCAL vs GEO GROUP

1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 1:14-cv-02887-JLK-MEH
3    _____

4            VIDEOTAPE DEPOSITION OF:
          ALEJANDRO MENOCAL - July 22, 2020
5                Via RemoteDepoTM
     _____
6
     ALEJANDRO MENOCAL, MARCOS BRAMBILA,
7    GRISEL XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA,
     JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO VIZGUERRA,
8    and DEMETRIO VALERGA, on their own and on behalf of
     all others similarly situated,
9
     Plaintiffs,
10
     v.
11
     THE GEO GROUP, INC.,
12
     Defendant.
13   _____

14           PURSUANT TO NOTICE, the videotape
     deposition of ALEJANDRO MENOCAL was taken on behalf of
15   the Defendant in Denver County, Colorado, on July 22,
     2020, at 3:32 p.m. GMT, 9:32 a.m. MDT, before Tracy C.
16   Masuga, Registered Professional Reporter, Certified
     Realtime Reporter, and Notary Public within Colorado
17   appearing remotely from Arapahoe County, Colorado.

18

19

20

21

22

23

24

25

```
 1                    REMOTE APPEARANCES

 2   For the Plaintiffs:

 3              BRANDT P. MILSTEIN, ESQ.
                Milstein Law Offices
 4              1123 Spruce Street
                Boulder, Colorado 80302
 5              brandt@milsteinlawoffice.com

 6              ANDREW H. TURNER, ESQ.
                The Kelman Buescher Firm
 7              600 Grant Street
                Suite 825
 8              Denver, Colorado 80203
                aturner@laborlawdenver.com
 9

10   For the Defendant:

11              DANA L. EISMEIER, ESQ.
                MICHAEL Y. LEY, ESQ.
12              Burns, Figa & Will, P.C.
                6400 South Fiddlers Green Circle
13              Suite 1000
                Greenwood Village, Colorado 80111
14              deismeier@bfwlaw.com
                mley@bfwlaw.com
15
                ADRIENNE SCHEFFEY, ESQ.
16              Akerman LLP
                1900 16th Street
17              Suite 1700
                Denver, Colorado 80202
18              adrienne.scheffey@akerman.com

19
     Also Present:
20
                John Jensen, Videographer
21

22

23

24

25
```

```
 1                        I N D E X

 2    EXAMINATION OF ALEJANDRO MENOCAL:                   PAGE
      July 22, 2020
 3
      By Mr. Eismeier                                       7
 4
                                                        INITIAL
 5    DEPOSITION EXHIBITS:                              REFERENCE

 6    (Exhibits provided electronically to the reporter.)

 7    Exhibit 1    Plaintiff Alejandro Menocal Lepe's     26
                   Response to Defendant The GEO
 8                 Group, Inc.'s First Request for
                   Production to Plaintiffs and First
 9                 Set of Interrogatories to
                   Plaintiffs, 9/30/15
10
      Exhibit 2    Audio Recording, 6/18/14, No. 122     49
11
      Exhibit 3    Audio Recording, 7/16/14, No. 122     58
12
      Exhibit 4    Audio Recording, 7/21/14, No. 84      61
13
      Exhibit 5    Audio Recording, 7/16/14, No. 125     69
14
      Exhibit 6    Audio Recording, 7/23/14, No. 70      71
15
      Exhibit 7    Audio Recording, 6/14/14              81
16
      Exhibit 8    Service Processing Center/Contract    85
17                 Detention Facility The GEO Group,
                   Inc./Aurora ICE Processing Center
18                 Detainee Voluntary Work Program
                   Agreement for Menocal Lepe, 7/15/14
19
      Exhibit 9    Audio Recording, 7/27/14, No. 30      88
20
      Exhibit 10   Audio Recording, 7/28/14, No. 25      90
21
      Exhibit 11   Audio Recording, 7/28/14, No. 24      92
22
      Exhibit 13   Enforcement and Removal Operations    97
23                 National Detainee Handbook,
                   Detention Management Division
24

25
```

1   Exhibit 15   The GEO Group, Inc., Aurora ICE        117
                 Processing Center Detainee
2                Handbook, Local Supplement, Revised
                 10/2013
3
    Exhibit 16   Audio Recording, 7/31/14, No. 1        125
4
    Exhibit 17   Audio Recording, 9/6/14                139
5
    Exhibit 18   Plaintiff Alejandro Menocal Lepe's     145
6                Objections and Responses to
                 Defendant The GEO Group, Inc.'s
7                Second Set of Written Discovery
                 Requests to Plaintiffs, 1/19/18
8
    Exhibit 21   Audio Recording, 6/17/14, No. 125      163
9
    Exhibit 22   Audio Recording, 6/23/14, No. 70       165
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            WHEREUPON, the following proceedings

2    were taken pursuant to the Federal Rules of Civil

3    Procedure.

4            *        *        *        *        *

5            THE VIDEOGRAPHER:  We are now on the

6    record.  Participants should be aware that this

7    proceeding is being recorded, and as such, all

8    conversations held will be recorded unless there is a

9    request and agreement to go off the record.  Private

10   conversations and/or attorney-client interactions

11   should be held outside the presence of the remote

12   interface.

13           A link to the recording will be

14   available to all parties to the case for up to 90 days

15   from today's date provided the requesting party has

16   purchased a certified copy of the transcript.

17           This is the remote video-recorded

18   deposition of Alejandro Menocal being taken by counsel

19   for the defendant.  Today is July 22, 2020, and the

20   time now is 3:32 p.m. Greenwich Mean Time, 9:32 a.m.

21   Mountain Time.  We are here in the matter of Alejandro

22   Menocal, et al. v. The GEO Group, Inc.

23           My name is John Jensen, remote video

24   technician on behalf of U.S. Legal Support, located at

25   1900 Grant Street, Suite 1025, Denver, Colorado.  I am

1  not related to any party in this action nor am I

2  financially interested in the outcome.

3             At this time, will the reporter, Tracy

4  Masuga, on behalf of U.S. Legal Support, please enter

5  the statement for remote proceedings into the record.

6             THE REPORTER:  The attorneys

7  participating in this deposition acknowledge that I am

8  not physically present in the deposition room and that

9  I will be reporting this deposition remotely.  They

10  further acknowledge that in lieu of an oath

11  administered in person, the witness will verbally

12  declare his testimony in this matter is under penalty

13  of perjury.

14             The parties and their counsel consent to

15  this arrangement and waive any objections to this

16  manner of reporting.

17             Counsel, please indicate your agreement

18  by stating your name and your agreement on the record.

19             MR. EISMEIER:  Dana Eismeier for GEO

20  Group.  We agree.

21             MR. MILSTEIN:  Brandt Milstein, class

22  counsel for the plaintiff class, and we also agree.

23             THE REPORTER:  Mr. Menocal, do you

24  solemnly state that the testimony you are about to

25  give in the cause now pending will be the truth, the

 1   whole truth, and nothing but the truth?

 2            THE DEPONENT:  I do.

 3                    ALEJANDRO MENOCAL,

 4   having sworn to state the whole truth, testified as

 5   follows:

 6                    EXAMINATION

 7   BY MR. EISMEIER:

 8        Q.   Perfect.  Good morning, Mr. Menocal.

 9        A.   Good morning.

10        Q.   To get this started, could I ask you to

11   give us your full name and address, please.

12        A.   Yes.  It's Alejandro Menocal Lepe.  My

13   address is 1340 C Street in Golden, Colorado 80401.

14        Q.   Thanks, Mr. Menocal.  Have you had your

15   deposition taken previously?

16        A.   No, I have not.

17        Q.   Have you ever given trial testimony

18   under oath before?

19        A.   No, sir.

20        Q.   Okay.  I'm going to go over a few sort

21   of ground rules for depositions in terms of how they

22   work, okay?

23        A.   Yes, sir.

24        Q.   The court reporter just swore you in

25   remotely, and so you understand you're under oath,

```
 1            A.    Guards.

 2            Q.    Okay.  Did you generally get along with

 3    the guards?

 4            A.    Yeah.

 5            Q.    Okay.  Did you respect them?

 6            A.    Of course.

 7            Q.    Did they respect you?

 8            A.    For the most part, yes.

 9            Q.    Okay.  I'm going to play a couple

10    other -- a couple other recordings.

11                 (Deposition Exhibit 3 was remotely

12    introduced.)

13            Q.    And I dropped Exhibit 3 into the chat

14    room.  Exhibit 3 is July 16, 2014.  It is also

15    No. 122, but it is from July 20 -- July 16, 2014.

16                 Mr. Menocal, I'm going to go ahead and

17    play this.

18                 (At this time an audiotape was played.)

19                 TELMATE OPERATOR:  This is a Telmate

20    automated operator with a free call from --

21                 MR. MENOCAL:  Alex Menocal.

22                 TELMATE OPERATOR:  -- a detainee at

23    Aurora ICE Processing Center.  This call is subject to

24    recording and monitoring.  Press 1 or star to accept

25    the call.  To deny this call, press . . .  Thank you
```

```
 1          A.   No, sir.  He lives in Wyoming.  And I

 2   mention it a lot, but not really talk to him about it,

 3   no.

 4          Q.   Okay.  I'm going to -- I'm going to play

 5   a clip here for you from 55 seconds to a minute 48

 6   seconds, okay?

 7          A.   Okay.

 8          Q.   So bear with me while I --

 9          A.   Sure.

10          (At this time an audiotape was played.)

11          MR. MENOCAL:  Hey, I thought it was way

12   cool because I respect, you know, all the guards here.

13   And I tell them "Yes, sir," "No, sir," and people

14   don't really do that.  But anyway, that guard

15   (inaudible) -- the guard called me over like, "Come

16   here," talk to her.  And so I talked to her for like

17   ten minutes, no glass behind us, in front of us, or

18   nothing, so -- and, you know, we talked.  I asked her

19   about my mom because she said (inaudible).  And it was

20   awesome.  And it was --

21          MR. JONES:  Awesome.

22          MR. MENOCAL:  Yeah.  So I told one of

23   the guards, and the guard took me back to my holding

24   tank, and I said, "Thank you so much, sir."  He

25   goes -- and says, "Respect, bro.  You show me respect,
```

 1    I'll show you respect."

 2                MR. JONES:  Right on.

 3                MR. MENOCAL:  So even -- he even told --

 4    he even told Alexis the same thing here.  "Dad,

 5    they're very respectful in there."  And, yeah,

 6    she asked them to -- for real -- they let us hang out

 7    for a minute, so -- yeah, but -- yeah, my mom is --

 8                (At this time the audiotape was

 9    concluded.)

10         Q.   (BY MR. EISMEIER)  So, Mr. Menocal, this

11    recording is consistent with what you just talked

12    about about respect for the guards?

13         A.   Yes.

14                (Deposition Exhibit 4 was remotely

15    introduced.)

16         Q.   I'm going to play one more clip for you.

17    This is Exhibit 4, July 21, 2014.  It's designated as

18    recording No. 84, okay?

19         A.   Okay.

20                (At this time an audiotape was played.)

21                TELMATE OPERATOR:  This is a Telmate

22    automated operator with a free call from --

23                MR. MENOCAL:  Alex Menocal.

24                TELMATE OPERATOR:  -- a detainee at

25    Aurora ICE Processing Center.  This call is subject to

 1        A.    Okay.

 2              (At this time an audiotape was played.)

 3              MR. MENOCAL:  Yeah, yeah, and the guards

 4   are cool.  They're not police.  They're just --

 5   they're just sub -- you know, they sub them out.

 6   They're not -- they're not with Homeland Security or

 7   anything.  They're just department from -- they're

 8   like babysitters.  They don't -- yeah, they don't

 9   carry guns or mace or -- there's no incidents, no

10   fights here.  It's pretty mellow.  We've got -- we've

11   got rooms.  They're like cells, but they don't lock us

12   in.  They're -- the doors are always open, but you

13   could close them yourself.

14              And we've got three big TVs.  This

15   weekend we had a Ping-Pong table, a big-screen TV to

16   watch movies, and ice cream and cookies because we are

17   the king of pods.  We have, like, a competition to see

18   who is king of pods, and we happened to be the king of

19   pods this week, so we got the pool -- yeah, we got --

20   it's just a picnic table, a big-screen movie, and ice

21   cream and goodies.

22              And I clean the recreation yard every

23   day.  I get paid a buck a day, woohoo.  But I get

24   extra meals sometimes.  And, yeah, that's what's going

25   on, bro.  I go to court on Wednesday.

1                    (At this time the audiotape was

2      concluded.)

3              Q.    (BY MR. EISMEIER)  So the beginning of

4      that tape, Mr. Menocal, you mentioned that the guards

5      are cool.  I take it that also confirms what you said

6      earlier about respect for the guards?

7              A.    Sure.

8              Q.    Okay.  Do you recall the names of any of

9      the guards at the Aurora facility?

10             A.    I do not.

11             Q.    Were there any guards there that you

12     didn't like?

13             A.    There were some that had bad attitudes.

14     And it's not that I didn't like them, but, yeah, they

15     were -- a power trip, they would, yeah, have a bad

16     attitude, not say hi, maybe, just very rude.

17             Q.    Do you recall the names of any of those

18     guards?

19             A.    I do not, sir.

20             Q.    Are you -- are you talking about one,

21     two, three, four guards?  How many?

22             A.    I'm going to guess, from all the guards

23     I met, maybe four, five that had bad attitudes, power

24     trips, stuff like that.

25             Q.    And how many guards total do you think

    1    you met during your time at Aurora?

    2            A.    I'm going to guess 20.

    3            Q.    Okay.  All right.  You don't recall the

    4    names of any of the guards that you didn't get along

    5    with or you thought had bad attitudes?

    6            A.    I do not.

    7                  MR. MILSTEIN:  Same objection.

    8            A.    I don't recall any names of any guards

    9    at all.

   10            Q.    (BY MR. EISMEIER)  Would you call any of

   11    the guards tyrants?

   12            A.    Pirates?

   13            Q.    Tyrants.

   14            A.    I don't know what you mean by that.

   15            Q.    Like tyrant.

   16            A.    Pirates?

   17            Q.    No, tyrant, with a T.

   18            A.    I'm not sure what that is.

   19            Q.    Okay.  Did any of the guards ever help

   20    you clean up in the day living area?

   21            A.    No, sir.

   22            Q.    Do you think some of the detainees got

   23    along better with some of the detention officers and

   24    some of them didn't?

   25            A.    Yes.

```
 1                    MR. MILSTEIN:  Object to the form,

 2    foundation.

 3             Q.   (BY MR. EISMEIER)  Can you explain why?

 4                    MR. MILSTEIN:  Same objection.

 5             A.   Maybe their attitudes, maybe their

 6    language.  I'm not sure, but, yeah, I'm sure that

 7    they -- they got along better with others, sure.

 8             Q.   (BY MR. EISMEIER)  Is it fair to say

 9    that some detainees got along better with the

10    detention officers than maybe you did -- or strike

11    that.

12             A.   Of course, yes.

13                    MR. MILSTEIN:  Object to form.

14             Q.   (BY MR. EISMEIER)  People are different.

15             A.   That, they are.

16             Q.   Right.  The detainees were different,

17    so --

18             A.   Sure.  So were the guards, yes, sir.

19                    MR. MILSTEIN:  Same objection.

20             Q.   (BY MR. EISMEIER)  So were the guards.

21    Okay.  Can you tell me what your daily recreational

22    activities were while you were in detention?

23             A.   Get up, eat breakfast, walk around, read

24    a book, draw, watch TV, communicate with other

25    detainees, eat lunch, clean up a little, and either
```

1          Q.    (BY MR. EISMEIER)  And some of them had

2     legal U.S. residency status, as you did, and some

3     didn't?

4               MR. MILSTEIN:  Form and foundation.

5          A.    Yes.

6          Q.    (BY MR. EISMEIER)  Do you think you

7     usually clean up after yourself just as a matter of

8     personal habit?

9          A.    I do, myself, personally, yes.  I like

10    to live and hang out in a clean environment.

11         Q.    And some of the detainees there may not

12    have been as -- as neat as you; is that fair?

13         A.    Sure.

14               MR. MILSTEIN:  Object to foundation.

15         A.    That's fair to say.

16         Q.    (BY MR. EISMEIER)  So that's another

17    difference in -- between the detainees; is that fair?

18         A.    Yes.

19               (Deposition Exhibit 7 was remotely

20    introduced.)

21         Q.    I'm going to -- Mr. Menocal, I've added

22    to the chat room Exhibit 7, which is dated June 14,

23    2014.  I'm just going to play it and make sure that I

24    understand who is speaking here, okay?

25               (At this time an audiotape was played.)

```
 1    Tell me if you can -- hopefully you can see it.

 2           A.    I see a document now, yes.

 3           Q.    Okay.  Thank you.  All right.  You see

 4    this says "Detainee Voluntary Work Program Agreement."

 5    Do you see that?

 6           A.    Yes, sir.

 7           Q.    All right.  Have you ever seen this

 8    document before?

 9           A.    Yes, sir.

10           Q.    Where did you see it?

11           A.    Probably when I was detained at GEO.

12           Q.    All right.  Did you sign a document like

13    this to join the Voluntary Work Program?

14           A.    Probably, yes, sir.

15           Q.    All right.  When you signed up for the

16    Voluntary Work Program, I believe you signed up in the

17    middle of July.  Does that sound right?

18           A.    Yeah.

19           Q.    And so you had been there for, what, a

20    month and ten days or something at that point?

21           A.    Probably, yes.

22           Q.    All right.  And when you signed up for

23    it, you -- why did you sign up for it?

24           A.    First, I just asked if I could clean the

25    recreation area, and I didn't sign any kind of paper.
```

1    They asked me why.  I said because I spend a lot of

2    time there, and I want to exercise, walk around, jog,

3    and clean the area, so they allowed me to, you know,

4    wipe down bars, wipe down doorknobs, sweep, et cetera,

5    so I could hang out in a clean environment.

6          **Q.    Okay.  And then eventually you got a job**

7    **at the Voluntary Work Program as a trustee; is that**

8    **right?**

9          A.    Yes.  I believe somebody got released,

10   went somewhere else, and they asked me, since I was

11   already volunteering to clean the recreation yard, if

12   I was interested in serving food or -- or, I believe,

13   either clean up for the detainees after they ate or

14   set up, and I said -- I accepted.

15         **Q.    Okay.  And you were -- is it fair to say**

16   **you were pleased to get -- to get that job?**

17         A.    I don't know about pleased, but, you

18   know, it made time in there go quicker.  And, yeah, I

19   was doing my everyday regular routine.  I would do

20   something different, like serve food or whatever I was

21   assigned to do.

22         **Q.    And when you signed up, did you**

23   **understand that you would get paid a dollar a day?**

24         A.    Yes, sir.  And that's not why I did it.

25   I mean, I had money on my books.  I didn't do it for

1    so forth.  And that's where if we didn't do the work

2    that they told us to do, then they would put us in

3    isolation.  And that's why I thought it was very

4    unfair.

5            **Q.   Let me ask you a question.  When you**

6    **first got to GEO, what were you told by anyone at ICE**

7    **or anybody at GEO about cleaning the day living area?**

8                 MR. MILSTEIN:  Object to form, asked and

9    answered.

10                THE REPORTER:  Mr. Menocal, could I

11   please have you get closer to the microphone?

12                THE DEPONENT:  Yeah.  I'm sorry.  Yes.

13          A.   But, yeah, that's what I was told

14   that -- that, you know, we rotate, and each cell has

15   to clean the area when it's their turn, and if you

16   guys didn't do it, you would go to the hole,

17   isolation.

18          **Q.   (BY MR. EISMEIER)  Who told you that?**

19          A.   The detainees, and I'm sure the guards

20   too, but for sure the detainees told me that.  You

21   know, it's not like you have a choice not to do it.

22          **Q.   You don't recall specifically a guard**

23   **telling you that, do you?**

24          A.   It could have been, but I know for sure

25   one of -- you know, some of the detainees, we all knew

1          Q.    Okay.  And you received it in English,

2    right?

3          A.    Yes, sir, I believe so.

4          Q.    And you read -- you read and write

5    English, right?

6          A.    Yes, sir.

7          Q.    And was there -- did you believe that

8    there was anything in this particular handbook that

9    provided any possible discipline for failing to clean

10   in the day living area?

11         A.    I don't recall specifically.  I remember

12   reading it, but I don't recall it saying that or not.

13         Q.    Sitting here today, do you recall

14   anything in here having to do with discipline for

15   failing to clean a day living area?

16         A.    Yeah.  Like I said, everybody knew that

17   if we didn't follow the procedures, we would be -- you

18   know, we would be put in the hole if we didn't do what

19   we were told, basically.

20         Q.    Okay.  But is it fair to say what you

21   knew about that came from other detainees and not from

22   this handbook?

23               MR. MILSTEIN:  Object to form.

24         A.    I recall the detainees telling me, yeah,

25   what I just told you.  I don't recall the book stating

 1    any of that, no.

 2              Q.   (BY MR. EISMEIER)  Okay.  Just a second.

 3              Is there anything in this particular

 4    handbook that you saw that was threatening to you,

 5    Mr. Menocal?

 6              A.   Can you repeat that, please?

 7              Q.   Sure.  Was there anything in this

 8    handbook that was threatening to you?

 9              MR. MILSTEIN:  Objection.  He hasn't had

10    a chance to look through the whole handbook today.

11              A.   Yeah, I don't recall exactly what it

12    said, and I don't recall what I thought about it at

13    the time, to be honest with you.  It's been a long

14    time.  And I know I read it, but I don't recall if I

15    agreed with whatever they wrote in there or not.

16              Q.   (BY MR. EISMEIER)  Okay.  Were you

17    personally ever disciplined for failing to clean in

18    the day living area?

19              A.   Not personally, no.

20              Q.   Okay.  Were you aware of anyone who was

21    disciplined for failing to clean in the day living

22    area?

23              A.   Yes.  I actually witnessed a group of

24    people that did not follow the procedure, the rules,

25    and they were taken away, and they were put in

1          A.    Where I slept, I tried to keep that

2    clean all day.  So, you know, it was basically clean

3    all the time, so I didn't have to do too much dusting

4    or mopping because we kept it pretty clean.  And,

5    timewise, actually living area, I'm going to say --

6          **Q.    I'm just asking about -- I don't want --**

7    **I'm just asking about the sleeping area, the area --**

8               MR. MILSTEIN:  Dana, please don't

9    interrupt the witness.

10         A.    Yeah.  And like I said, maybe an hour,

11   half-hour a day, you know, cleaning my cell again,

12   picking up trash or -- you know, if I was drawing or

13   if I had made a mess or something, I would clean.  So

14   about a half-hour to an hour a day for my sleeping

15   area, yes.

16         **Q.    (BY MR. EISMEIER)  In the sleeping area.**

17              **How many people were there in the**

18   **sleeping area with you?**

19         A.    That particular cell I was at, I'm going

20   to say six, about six people on and off.

21         **Q.    All right.  Did you ever have to clean**

22   **up after anybody in the sleeping area, in the -- sort**

23   **of in the cell area?**

24         A.    Can you repeat that?  I didn't

25   understand.

 1          Q.   When I say "the sleeping area," I'm

 2   talking about where your beds were.

 3          A.   Yes.  The cell, not the general

 4   population pod.

 5          Q.   Right.  Right.  And you -- and how many

 6   people were there within the cell?

 7          A.   Like I said, four to six to eight.  It

 8   varied, but, yeah, approximately six people in our --

 9   in the cell I was staying in.

10          Q.   Okay.  Did you ever have to pick up

11   after other people inside the cell area?

12          A.   Not really.  We all respected, you know,

13   our living quarters there, and so we all pretty much

14   picked up after ourselves.  But I could have done it

15   on occasion, but I -- you know, maybe he was in a

16   medical facility and he didn't make his bed or

17   something, sure, I would make his bed just so the

18   place would look neat.

19          Q.   Okay.  And, again, how many hours a day

20   did you spend cleaning up that cell area, the sleeping

21   area?

22          A.   Half an hour.

23          MR. MILSTEIN:  Asked and answered.

24          Q.   (BY MR. EISMEIER)  Did you say an hour?

25          A.   From a half-hour to an hour.  I'm sure

 1                    REPORTER'S CERTIFICATE

 2   STATE OF COLORADO            )
                                  )   ss.
 3   ARAPAHOE COUNTY              )

 4

             I, TRACY C. MASUGA, Registered
 5   Professional Reporter, Certified Realtime Reporter,
     and Notary Public 19924005553, State of Colorado, do
 6   hereby certify that previous to the commencement of
     the examination, the said ALEJANDRO MENOCAL declared
 7   his testimony in this matter is under penalty of
     perjury; that the said examination was taken in
 8   machine shorthand by me remotely and was thereafter
     reduced to typewritten form; that the foregoing is a
 9   true transcript of the questions asked, testimony
     given, and proceedings had.

10

             I further certify that I am not employed
11   by, related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of
12   this litigation.

13           IN WITNESS WHEREOF, I have affixed my
     signature this 27th day of July, 2020.
14
             My commission expires April 24, 2024.
15

16   __X__  Reading and Signing was requested.

17   _____ Reading and Signing was waived.

18   _____ Reading and Signing is not required.

19

20

21   _____

     Tracy C. Masuga
22   Registered Professional Reporter
     Certified Realtime Reporter
23

24

25