# EXHIBIT D

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 1:14-cv-02887-JLK-MEH
3    _____

4                   VIDEOTAPE DEPOSITION OF:
           HUGO A. HERNANDEZ-CEREN - June 24, 2020
5                     Via RemoteDepoTM
             (NONCONFIDENTIAL ONLY TRANSCRIPT)
6    _____

7    ALEJANDRO MENOCAL, MARCOS BRAMBILA,
     GRISEL XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA,
8    JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO VIZGUERRA,
     and DEMETRIO VALERGA, on their own and on behalf of
9    all others similarly situated,

10   Plaintiffs,

11   v.

12   THE GEO GROUP, INC.,

13   Defendant.
     _____

14
                  PURSUANT TO NOTICE, the videotape
15   deposition of HUGO A. HERNANDEZ-CEREN was taken on
     behalf of the Defendant in La Salle Parish, Louisiana,
16   on June 24, 2020, at 3:11 p.m. GMT, 9:11 a.m. MDT,
     before Tracy C. Masuga, Registered Professional
17   Reporter, Certified Realtime Reporter, and Notary
     Public within Colorado appearing remotely from
18   Arapahoe County, Colorado.

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 1:14-cv-02887-JLK-MEH
3    _____

4              VIDEOTAPE DEPOSITION OF:
        HUGO A. HERNANDEZ-CEREN - June 24, 2020
5              Via RemoteDepoTM
          (NONCONFIDENTIAL ONLY TRANSCRIPT)
6    _____

7   ALEJANDRO MENOCAL, MARCOS BRAMBILA,
    GRISEL XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA,
8   JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO VIZGUERRA,
    and DEMETRIO VALERGA, on their own and on behalf of
9   all others similarly situated,

10  Plaintiffs,

11  v.

12  THE GEO GROUP, INC.,

13  Defendant.
    _____

14
              PURSUANT TO NOTICE, the videotape
15  deposition of HUGO A. HERNANDEZ-CEREN was taken on
    behalf of the Defendant in La Salle Parish, Louisiana,
16  on June 24, 2020, at 3:11 p.m. GMT, 9:11 a.m. MDT,
    before Tracy C. Masuga, Registered Professional
17  Reporter, Certified Realtime Reporter, and Notary
    Public within Colorado appearing remotely from
18  Arapahoe County, Colorado.

19

20

21

22

23

24

25

```
 1                    REMOTE APPEARANCES

 2    For the Plaintiffs:

 3                ADAM L. KOSHKIN, ESQ.
                  Outten & Golden, LLP
 4                One California Street
                  12th Floor
 5                San Francisco, California 94111
                  akoshkin@outtengolden.com
 6
                  R. ANDREW FREE, ESQ.
 7                Law Office of R. Andrew Free
                  2004 8th Avenue South
 8                Nashville, Tennessee 37204
                  andrew@immigrantcivilrights.com
 9

10    For the Defendant:

11                ADRIENNE SCHEFFEY, ESQ.
                  Akerman LLP
12                1900 16th Street
                  Suite 1700
13                Denver, Colorado 80202
                  adrienne.scheffey@akerman.com
14
                  DANA L. EISMEIER, ESQ.
15                MICHAEL Y. LEY, ESQ.
                  Burns, Figa & Will, PC
16                6400 South Fiddlers Green Circle
                  Suite 1000
17                Greenwood Village, Colorado 80111
                  deismeier@bfwlaw.com
18                mley@bfwlaw.com

19
      Also Present:
20
                  Daniel Whitten, Videographer
21

22

23

24

25
```

```
 1                    I N D E X

 2   EXAMINATION OF HUGO A. HERNANDEZ-CEREN:          PAGE
     June 24, 2020
 3
     By Ms. Scheffey                          7, 173, 209
 4
     By Mr. Koshkin                                    137
 5
     By Mr. Free                                       209
 6

 7   *    CONFIDENTIAL EXCERPT
          Page 103
 8
                                               INITIAL
 9   DEPOSITION EXHIBITS:                      REFERENCE

10   (Exhibits provided electronically to the reporter.)

11   Exhibit 1    The GEO Group, Inc., Resident        22
                  Account Summary, 7/15/15
12
     Exhibit 2    Excerpt from the Deposition of       32
13                Demetrio Valerga, 10/27/17

14   Exhibit 3    Plaintiff Hernandez Ceren's          42
                  Response to Defendant The GEO
15                Group, Inc.'s First Request for
                  Production to Plaintiffs and First
16                Set of Interrogatories to
                  Plaintiffs, 9/30/15
17
     Exhibit 4    Plaintiffs' Initial Disclosures      54
18
     Exhibit 5    The GEO Group, Inc., Aurora ICE      57
19                Processing Center Detainee
                  Handbook, Local Supplement, Revised
20                10/2013

21   Exhibit 6    GEO Corrections ICE Approval Aurora  64
                  Detention Center Policy and
22                Procedure Manual, Policy
                  12.1.4-AUR, Sanitation Policies and
23                Procedures, Revised 5/6/13

24   Exhibit 7    Trustee Safety Training document     69
                  for Hernandez-Ceren, 6/24/14, with
25                attachments
```

Case No. 1:14-cv-02887-JLK-CYC   Document 313-4   filed 08/19/20   USDC Colorado
pg 6 of 42

Hugo Hernandez-Ceren  06/24/2020          Non-ConfidentialPage 4
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

 1    Exhibit 8    Plaintiff Hugo Hernandez Ceren's          72
                   Objections and Responses to
 2                 Defendant The GEO Group, Inc.'s
                   Second Set of Written Discovery
 3                 Requests to Plaintiffs, 2/5/18

 4    Exhibit 9    Plaintiff Hugo Hernandez's               85
                   Supplemental Responses to Defendant
 5                 The GEO Group, Inc.'s Sixth Set of
                   Interrogatories, 6/22/20
 6
      Exhibit 10   Declaration of Alejandro Hernandez       87
 7                 Torres, 4/11/16

 8    Exhibit 11   PowerPoint of Detainee Orientation       90
                   Video, The GEO Group, Inc., Aurora
 9                 Detention Center

10    Exhibit 12   Confidential Document                   101

11    Exhibit 13   Memorandum to File from Power and       116
                   Dempsey, 3/5/20, Re:  Observations
12                 regarding facility conditions of
                   Aurora segregation unit
13
      Exhibit 14   Aurora Detention Center Historical      171
14                 Segregation Report, 6/3/14

15    Exhibit 15   Excerpt from the Deposition of          181
                   Demetrio Valerga, 10/27/17
16
      *    Pursuant to protective order, confidential
17         material is filed under separate cover.

18

19

20

21

22

23

24

25

ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

 1              WHEREUPON, the following proceedings

 2    were taken pursuant to the Federal Rules of Civil

 3    Procedure.

 4              *        *        *        *        *

 5              THE VIDEOGRAPHER:  We are now on the

 6    record.  Participants should be aware that this

 7    proceeding is being recorded, and as such, all

 8    conversations held will be recorded unless there is a

 9    request and agreement to go off the record.  Private

10    conversations and/or attorney-client interactions

11    should be held outside the presence of the remote

12    interface.

13              A link to the recording will be

14    available to all parties to the case for up to 90 days

15    from today's date providing the requesting party has

16    purchased a certified copy of the transcript.

17              This is the remote video-recorded

18    deposition of Hugo Hernandez-Ceren.  Today is

19    Wednesday, June 24, 2020.  The time is now 3:11 p.m.

20    in the Greenwich Mean Time Zone.  We are here in the

21    matter of Alejandro Menocal, et al. v. The GEO Group,

22    Incorporated.

23              My name is Daniel Whitten, remote video

24    technician on behalf of U.S. Legal Support, located at

25    1900 Grant Street, Suite 1025, in Denver, Colorado.

1    I'm not related to any party in this action, nor am I

2    financially interested in the outcome.

3            At this time, will the reporter, Tracy

4    Masuga, on behalf of U.S. Legal Support, please enter

5    the statement for remote proceedings into the record.

6            THE REPORTER:  The attorneys

7    participating in this deposition acknowledge that I am

8    not physically present in the deposition room and that

9    I will be reporting this deposition remotely.  They

10   further acknowledge that in lieu of an oath

11   administered in person, the witness will verbally

12   declare his testimony in this matter is under penalty

13   of perjury.

14           The parties and their counsel consent to

15   this arrangement and waive any objections to this

16   manner of reporting.

17           Counsel, please indicate your agreement

18   by stating your name and your agreement on the record.

19           MS. SCHEFFEY:  Adrienne Scheffey, and I

20   agree.

21           MR. KOSHKIN:  Adam Koshkin, and I agree.

22           MR. FREE:  Andrew Free, and I agree.

23           THE REPORTER:  Mr. Hernandez, do you

24   solemnly state that the testimony you are about to

25   give in the cause now pending will be the truth, the

 1    whole truth, and nothing but the truth?

 2                 THE DEPONENT:  I do.

 3                   HUGO A. HERNANDEZ-CEREN,

 4    having first duly sworn to state the whole truth,

 5    testified as follows:

 6                      EXAMINATION

 7    BY MS. SCHEFFEY:

 8         **Q.   Hi, Mr. Hernandez.  My name is Adrienne**

 9    **Scheffey, and I represent GEO.**

10               **Before we get started, I know you have a**

11    **few surnames, both Hernandez and Ceren.  Which one do**

12    **you prefer I call you for today?**

13         A.   Whichever is best for you.  I really

14    don't mind.

15         **Q.   So if I refer to you as "Mr. Hernandez,"**

16    **that's okay?**

17         A.   That's okay.

18         **Q.   Okay.  I'm going to be asking you a**

19    **series of questions today about your lawsuit against**

20    **GEO.  My questions and your answers are going to be**

21    **written down by the court reporter, Ms. Tracy, who's**

22    **in the video that you can see.**

23               **The purpose of this deposition is to**

24    **record your responses to these questions for use at**

25    **trial and other purposes in this case.  It's important**

```
 1            A.    Nica -- well, we usually don't go by

 2       names.  We go by nicknames.

 3            Q.    Okay.

 4            A.    So there's a -- Nica was one of them,

 5       Sanchez was one of them.  There's Nica and Sanchez.

 6       And then my bunkee Guerrero, he -- he was my bunkee.

 7       So it was Nica, Sanchez, and Guerrero.

 8            Q.    Okay.  Tell me about Mr. Sanchez.

 9            A.    I don't understand.  What -- what do you

10       want me to tell you about him?

11            Q.    How did you two become friends?

12            A.    Through our cell living.

13            Q.    Okay.  Did you two participate in any

14       activities together?

15            A.    Do our workout together sometimes.

16       Mostly we'll sit down at the table and eat and

17       conversate, watch TV.

18            Q.    Okay.  And was that table that you're

19       talking about in your living area?

20            A.    No.  That was in the common area

21       outside.

22            Q.    Okay.  And so that was -- how often do

23       you spend in that area with the table?

24            A.    About maybe -- let me see.  Almost half

25       a day we'll be in that table.
```

ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1          Q.    Okay.  And the other half of the day,

2     where would you be?

3          A.    I will go to the law library, then the

4     other will be count.  I'll be in the cell for count.

5     I'll be at the library.  I'll be eating either chow,

6     could be breakfast, lunch, dinner.

7          Q.    Okay.  And so describe to me how far

8     those tables were from where your cell was, as you

9     described it.

10         A.    It was, let me see, maybe like about --

11    it was about maybe 18 feet away from the door.

12         Q.    Okay.  And were there TVs near the

13    tables?

14         A.    Usually there were two; two, I believe.

15         Q.    And then Guerrero, I think, is the other

16    person you said you lived with; is that correct?

17         A.    Yes.

18         Q.    How did you meet him?

19         A.    Well, he was assigned to our cell.  He

20    was assigned to our cell, became our celly.

21         Q.    And you became friends with people who

22    lived with you in the cell?

23         A.    Yes.

24         Q.    And did you also spend time with him in

25    the area with the tables?

```
 1    eat.
 2           Q.   Okay.  So would he prepare food for all
 3    of you?
 4           A.   Sometimes.
 5           Q.   And what kind of food would he prepare?
 6           A.   A spread.
 7           Q.   What -- was that spread part of what GEO
 8    offered at normal mealtime, or was that part of
 9    commissary?
10           A.   That was part of commissary.
11           Q.   Okay.  And you guys would share the
12    commissary food?
13           A.   Yes.
14           Q.   Okay.  And you would eat those at the
15    tables outside?
16           A.   Yes.
17           Q.   Okay.  And would you clean up after
18    yourselves after you ate the snack?
19           A.   Yes.
20           Q.   Okay.  Did you expect anyone else to
21    clean up after yourself -- after you when you ate
22    those snacks?
23           A.   No.
24           Q.   Okay.  Did you know others in your pod
25    who didn't live in your cell?
```

1       Q.    Okay.  And was that just regularly

2   scheduled meals, or was that commissary food?

3       A.    Mostly commissary.

4       Q.    Okay.  And so when you guys would eat a

5   meal or a commissary meal, that was kind of a social

6   event, or am I misunderstanding?

7       A.    Yeah, you can call it that.  I mean,

8   we'll make something so we can pass through the day,

9   yeah.

10      Q.    Okay.  When you say "pass the day," what

11  do you mean?

12      A.    So we can -- sometimes there's nothing

13  to watch on TV, so we'll make something to eat and,

14  you know, start talking, start conversating.

15      Q.    Okay.  Did you know Demetrio Valerga?

16      A.    No.

17      Q.    He testified that he lived two doors

18  down from you.  Would that -- do you have any reason

19  to doubt that?

20      MR. KOSHKIN:  I'm just going to object

21  to the extent that Mr. Valerga's testimony is not in

22  evidence here.

23      Q.    (BY MS. SCHEFFEY)  Okay.  Would it be

24  helpful, Mr. Hernandez, to see Mr. Valerga's

25  testimony?

1        Q.   Okay.  So was he primarily stationed in

2    the law library, or did he also work in your pod?

3        A.   Sometimes when -- usually he's from the

4    law library, but when they were short-staffed, I

5    believe, he will come in and come to the pod.

6        Q.   And what were your interactions with

7    Mr. Blacknick like?

8        A.   It was pretty good.  I mean, very

9    understanding.  He's -- he's a great guy.  He's an

10   ex-Marine, which is something that I really love, you

11   know, very mellow, pretty chill.  He believes that

12   people that's been here for a long time should not be

13   getting deported, so that's -- that's pretty -- that's

14   pretty good.

15       Q.   He told you that?

16       A.   Yes.

17       Q.   Okay.  Did you feel comfortable raising

18   concerns with him?

19       A.   I don't --

20            MR. KOSHKIN:  Objection.  That's vague.

21       A.   Yeah, I don't know.

22       Q.   (BY MS. SCHEFFEY)  Would you have felt

23   comfortable asking him for help if you were having a

24   problem in the dorm?

25       A.   Yes.

1          Q.    Okay.  Did you ever ask for his help

2     with any problems?

3          A.    No.

4          Q.    Okay.  Tell me about Officer Sanchez.

5          A.    Officer Sanchez, he's one of the mean

6     GEO guards.  He's one of the GEO guards that would

7     show you the bag most of the times if you refused to

8     follow the rules in -- in the -- in the pod, and if

9     you kept arguing with him, then you picked up this

10    personal issue with him where now it just became too

11    personal, that every time that he will come into the

12    pod, he will come and destroy your cell every time for

13    cell checks.  So he's -- he's one of the ones that you

14    don't want to mess with.

15         Q.    So Mr. Sanchez's behavior was different

16    than Mr. Blacknick's behavior?

17         A.    Yes.

18         Q.    And you wouldn't say that they both

19    treated you the same?

20         A.    Yes, yeah.

21         Q.    Okay.  Tell -- can you tell me about

22    your interactions with Officer Moreno?

23         A.    Just a few hi and byes and how are you.

24         Q.    And where was Officer Moreno in the

25    facility?  Was that the law library as well, or was

1    that in your pod?

2         A.    Sometimes she will be in the pod or

3    she'll be mostly in -- bringing in the -- the dinner

4    or lunch.  She'll be in the kitchen, I believe.

5         Q.    Okay.  And Officer Moreno, she acted

6    differently or treated you differently than Officer

7    Sanchez did?

8         A.    Yes.

9         Q.    Okay.  And then Officer Thornton, can

10   you tell me about your interactions with Officer

11   Thornton?

12        A.    Same, tied by, "What are you eating?"

13   She liked what we used to make to eat, so she will --

14   she will -- she will ask us to describe what was in --

15   in the spread, so she kind of liked it, so she would

16   just ask us about our -- what we were eating most of

17   the time.

18        Q.    Okay.  Did she treat you differently

19   than Officer Sanchez?

20        A.    Yes.

21        Q.    Okay.  Do you remember Dawn Ceja?

22        A.    No.

23        Q.    Martha Vasquez?

24        A.    No.

25        Q.    Joyce Quezada?

1          Q.    (BY MS. SCHEFFEY)  Mr. Hernandez, you

2    can respond.

3          A.    Can you repeat the question, please?

4          Q.    Yeah.  Was the Lancaster, California,

5    facility similar or different to the Aurora facility?

6                MR. KOSHKIN:  Same objection.

7          A.    Different.

8          Q.    (BY MS. SCHEFFEY)  And how was it

9    different?

10         A.    Well, on the layout only.

11         Q.    What was different about the layout?

12         A.    The beds are right in front of the

13   common area.  Everything is all in one -- in one room,

14   all together, without being separated.

15         Q.    Is it similar to the San Antonio

16   facility?

17         A.    Yes.

18         Q.    Okay.  And do you have any lawsuit

19   pending against that facility?

20         A.    No.

21         Q.    Were you asked to clean up after

22   yourself in Lancaster?

23         A.    I mean, we just do it on our own.

24         Q.    Okay.  You liked to keep your area clean

25   or --

Case No. 1:14-cv-02887-JLK-CYC    Document 313-4    filed 08/19/20    USDC Colorado
pg 18 of 42

Hugo Hernandez-Ceren   06/24/2020        Non-ConfidentialPage 50
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1          A.   Yes.

 2          Q.   And you would do it on your own?

 3               MR. KOSHKIN:  Objection.

 4          Q.   (BY MS. SCHEFFEY)  What was the reason

 5     you would clean up on your own?

 6          A.   Well --

 7               MR. KOSHKIN:  Objection.

 8          A.   Well, because, I mean, why wouldn't you

 9     clean right after you -- you just finish eating there?

10     We used it.  We -- we cleaned -- we cleaned our own

11     because we just used it, our own table.

12          Q.   (BY MS. SCHEFFEY)  Okay.  And did you

13     expect other detainees in the pod to do the same?

14          A.   Not really.  Everyone is different.

15          Q.   Okay.  And when you say "everyone is

16     different," what do you mean by that?

17          A.   I don't know.  Some like to clean after

18     themselves; some don't.

19          Q.   Okay.  And if those are the two

20     categories, some like to clean up and some don't,

21     which one do you fall into?

22               MR. KOSHKIN:  Objection.

23          A.   I -- I clean.

24          Q.   (BY MS. SCHEFFEY)  Okay.  So the Orange

25     County, California, facility, what was that like?  Was
```

 1          Q.   So I'm going to give you the remote
 2     control.  Can you show me where in the handbook the
 3     Housing Unit Sanitation Policy is?
 4               MR. KOSHKIN:   Objection.   The document
 5     speaks for itself.
 6          Q.   (BY MS. SCHEFFEY)  Can you tell me what
 7     page it is on?
 8          A.   Let me check.   On page 17.
 9          Q.   Okay.  Do you mind if I scroll to that
10     page so we can all see it?  Is this easier to read if
11     we do it this way?
12               So this is the Housing Unit Sanitation
13     Policy right here; is that correct?
14          A.   Correct.
15          Q.   And so do you consider this policy to be
16     threatening?  Mr. Hernandez, did you hear the
17     question?
18          A.   No.
19          Q.   Did you consider this policy to be
20     threatening?
21               MR. KOSHKIN:   Same objection.
22          A.   No.
23          Q.   (BY MS. SCHEFFEY)  No?
24          A.   No.
25          Q.   And so I'm going to read you a portion

1    of this policy.  It says, "Detainees will take turns

2    cleaning the area."  Can you see my mouse here?  I

3    don't know if it shows you my mouse.  "If a detainee

4    feels that everyone is not doing their fair share, the

5    detainee should inform the housing unit officer of the

6    problem."  Did you ever tell a housing unit officer or

7    a GEO officer that you felt cleaning wasn't being

8    followed?

9            A.    Yes.  One time, I did.

10           Q.    Can you tell me about that?

11           A.    I told one of the GEO guards that I was

12    not a janitor, and that it was not my job to do that;

13    that they had to hire workers for that, for that

14    specific job; that I was not a janitor.

15           Q.    Okay.  So you complained about needing

16    to clean, but you didn't complain, necessarily, about

17    the area not being cleaned; is that correct?

18           A.    Correct.

19           Q.    Okay.  And then further, this document

20    says, "If a detainee" -- "If the detainees in the

21    housing unit do not clean the area after being

22    instructed to do so, the televisions will be turned

23    off, and the detainees will not be permitted to

24    participate in any activities/programs until the

25    housing unit is cleaned."  Do you remember any time

1    when the TV was turned off because people were not --

2    or because individuals were not willing to clean?

3           A.   Yes.

4           Q.   Can you tell me about that?

5           A.   One time when one detainee said the same

6    thing and said that he was not going to clean up

7    because he was not a janitor, and what the GEO guard

8    said, "Well, because you don't want to clean, nobody

9    gets the phones, nobody gets the TVs, and it's all up

10   to you.  Once you finish cleaning, everything will go

11   back on.  If you don't clean, nothing will go back

12   on."

13          Q.   Okay.  And was that a usual practice for

14   the GEO officers to say that?

15               MR. KOSHKIN:  Object to form.

16               MR. FREE:  Objection.

17          A.   I don't understand the question.

18          Q.   (BY MS. SCHEFFEY)  Did that happen on

19   more than one occasion?

20          A.   Yes.

21          Q.   About how many occasions, would you say?

22          A.   In a month, maybe -- maybe five times.

23          Q.   Okay.  Did the dorm trustees --

24   actually, let's start over.

25               Do you know what a dorm trustee is?

1      Q.   Did you expect someone else to clean up

2   after you?

3      A.   No.

4      Q.   Okay.  I'm going to go to the next

5   document.  I'm going to close this one.  I'm going to

6   send it to be marked here.  Tell me when you're able

7   to see the screen share.

8           (Deposition Exhibit 6 was remotely

9   introduced.)

10          MR. KOSHKIN:  Is this 6?  Is that right?

11          MS. SCHEFFEY:  I have 6.  Is that

12   correct?

13          THE REPORTER:  Yes.

14          MS. SCHEFFEY:  Thank you.

15      Q.   (BY MS. SCHEFFEY)  Okay.  Can you see

16   the document, Mr. Hernandez?

17      A.   Yes.

18      Q.   And just looking at this portion, have

19   you ever seen this document before?

20      A.   Can I read it?

21      Q.   Yeah, of course.  I don't -- let me make

22   sure you have the remote control.  Try now.

23          And as you review this, I can tell you

24   that it will be similar because it's the similar

25   document for a different year.

1          A.    Okay.

2          Q.    **Have you seen this document before?**

3          A.    No.

4          Q.    **Okay.  After just reviewing it, what was**

5    **your understanding that this document does?**

6                MR. KOSHKIN:  Objection.

7          A.    It tells you about the cleaning.

8          Q.    **(BY MS. SCHEFFEY)  Okay.  And did you**

9    **see in this document any consequence for failing to**

10   **clean?**

11               MR. KOSHKIN:  Objection.

12               MR. FREE:  Object to form.

13               MR. KOSHKIN:  It speaks for itself.

14         A.    Yes.

15         Q.    **(BY MS. SCHEFFEY)  Where did -- can you**

16   **point me to that, either by page number or you can**

17   **scroll and we can view it.**

18         A.    Okay.  Can you repeat the question?

19         Q.    **Yeah.  Can you point me to the**

20   **consequence for failing to clean reflected in this**

21   **document?**

22               MR. KOSHKIN:  Same objection.

23         A.    I can't -- I can't find it here.  I

24   cannot -- I cannot find it.

25         Q.    **(BY MS. SCHEFFEY)  Okay.  So reviewing**

 1    that type of job and that they had to hire someone to

 2    do that.

 3              And the GEO guard took out a bag, a

 4    trash bag, and shown it to him and rolled it out the

 5    roll, and stretched it out, and said, "Well, let's

 6    make it easier.  Here's your bags," trying to give it

 7    to him.  And he said, "Just pack your stuff because

 8    you're going to go to the hole.  Because this is on

 9    the handbook.  This is on the handbook, so it's not

10    something that you can fight for.  Just here's your

11    bag and go to the hole."  And --

12              Q.   What was the name of the detainee?

13              MR. FREE:  Counsel, I don't think he was

14    finished with his answer.

15              MS. SCHEFFEY:  Okay.  I'm sorry.

16              A.   And there was actually a second time

17    where --

18              Q.   (BY MS. SCHEFFEY)  Can you -- can we

19    table the second time so we can just go through the

20    first one and then we'll go to the second one?

21              A.   Okay.

22              Q.   Because I want to just talk about this

23    one instance here where it says there's one instance.

24    So what was the name of the detainee at that one

25    instance?

1          A.   I don't remember.

2          Q.   **Was it Mr. Valerga?**

3          A.   No.

4          Q.   **Was it Mr. Menocal?**

5          A.   No.

6          Q.   **Was it Mr. Brambila?**

7          A.   No.

8          Q.   **Okay.  And do you know the name of the**

9  **guard or officer?**

10         A.   Yeah.  The name of the guard is Officer

11  Sanchez.

12         Q.   **Okay.  Is that the same Mr. Sanchez you**

13  **mentioned earlier?**

14         A.   Yes.

15         Q.   **Do you know his first name?**

16         A.   No.  They only carry their last names.

17  We don't know their first names.

18         Q.   **Could you describe him to me?**

19         A.   He's Mexican.  He's like about

20  five-four, light-skinned, kind of chunky.

21         Q.   **Okay.**

22         A.   Yeah.

23         Q.   **Were there any other Officer Sanchezes**

24  **that you remember?**

25         A.   No.

1          Q.    I asked just because that's a, you know,

2    maybe a common last name.

3          A.    Yeah.

4          Q.    So it was Mr. Sanchez.  Was the detainee

5    sent to segregation?

6          A.    No, because he started cleaning right

7    away.

8          Q.    Okay.  And did Mr. Sanchez threaten to

9    turn off the TV before or any other threatened

10   punishment before threatening segregation?

11         A.    Yes.  I mean, the TVs don't go on.  If

12   the detainee doesn't start cleaning or doesn't -- they

13   refuse to clean, the TVs and the phones don't go on.

14         Q.    Okay.  So after everyone finishes

15   cleaning, then they turn on the TVs and you can watch?

16         A.    Yes, correct.

17         Q.    Were there certain shows that you liked

18   to watch?

19               MR. FREE:  Objection, relevance.

20         A.    No, just any random thing on TV.

21         Q.    (BY MS. SCHEFFEY)  Okay.  So was there a

22   rush to get, you know -- I don't know, Judge Judy is

23   on at 9:00, and everyone wants to get in.

24         A.    No.

25         Q.    No?

ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1          A.    No.  Not like that, no.  But --

2          **Q.    Okay.  Would other detainees volunteer**

3    **to clean, if someone refused, in order to get the TVs**

4    **turned on?**

5                MR. FREE:  Objection, form.

6          A.    To the best of my knowledge, yeah,

7    sometimes they will -- somebody will jump in just so

8    we can get the TVs on and phones and, you know,

9    take -- take care of it.

10         **Q.    (BY MS. SCHEFFEY)  Okay.  So then I know**

11   **you wanted to tell me about a second instance.  Can**

12   **you tell me what happened on that instance, and if**

13   **possible, tell me the name of the detainee, if you**

14   **remember, and the name of any officers.**

15         A.    Well, there was this other incident with

16   this detainee where he was refusing, and then everyone

17   got involved, and it was like, oh, well, nobody really

18   wants to clean, and the GEO guard felt like he -- he

19   didn't know what to do, so he called a sergeant.  And

20   this is a GEO sergeant.

21              And the sergeant came in and called a

22   meeting for everyone and got everybody together, and

23   stated that, "Okay.  If you refuse to clean, you will

24   be sent to the hole.  If you refuse to listen to the

25   guard, you will be sent to the hole.  And that's not a

1        Q.    Well, you described an officer first who

2   called the sergeant.  Do you remember that name?

3        A.    Yeah, that was Sanchez.

4        Q.    Okay.  So that was Sanchez again?

5        A.    Yeah.

6        Q.    And do you know the name of the sergeant

7   who was called?

8        A.    No, I don't remember his name.

9        Q.    And do you know the name of any of the

10  detainees who were refusing to clean?

11       A.    Well, it was mostly everyone.  Everyone

12  just felt that they didn't want to clean.

13       Q.    Was Mr. Menocal refusing to clean?

14       A.    Yes.

15       Q.    Was Mr. Brambila refusing to clean?

16       A.    Yes.

17       Q.    Was Mr. Valerga refusing to clean?

18       A.    Yes.

19       Q.    Were you refusing to clean?

20       A.    Yes.

21       Q.    Okay.  And that was a time when you guys

22  all were housed together in the A Pod; is that

23  correct?

24       A.    Yes.

25       Q.    So we went over a little bit here that

 1          A.   No.

 2          Q.   Okay.  So then No. 43, there's another

 3     description here of a meeting with a sergeant.  Is

 4     that the same meeting you described earlier?

 5          A.   Yes.

 6          Q.   So this meeting, to your knowledge, only

 7     happened on one occasion?

 8          A.   Yes.

 9          Q.   And was there a reason that everyone was

10     refusing to clean at that point?

11          A.   I don't remember the reason why.  They

12     just -- they were just refusing.  I believe they were

13     new detainees that had come in brand-new, and most of

14     them didn't want to clean, and then everybody just

15     joined in, and just everybody didn't want to clean.

16          Q.   And do you know if that was before or

17     after this lawsuit was filed?

18          A.   To the best of my recollection, it was

19     before.

20          Q.   Okay.  And approximately what month do

21     you think this happened?

22          A.   Maybe a month or two when I got there.

23          Q.   Okay.  So about a month or two after you

24     got there, there was a meeting where you were told of

25     this consequence?

 1          A.   Yes.

 2          Q.   And on that occasion, you refused to

 3    clean?

 4          A.   Yes.

 5          Q.   And were you placed in solitary

 6    confinement or segregation?

 7               MR. KOSHKIN:   Objection, asked and

 8    answered.

 9          A.   No.

10          Q.   (BY MS. SCHEFFEY)   Okay.   And I think we

11    can be done with this document for now, then.

12               So I'm going to just talk to you for a

13    minute and get away from documents because I'm sure

14    you've had enough of seeing them for a bit.

15               While you were detained, was there a way

16    that you could file a grievance or bring an issue to

17    the attention of the facility?

18          A.   Yes.

19          Q.   And is that called a kite?

20          A.   Yes.

21          Q.   Did you ever file any kites?

22          A.   Yes.

23          Q.   Why did you file kites?

24          A.   Kites is when you're requesting like

25    paper, batteries, you want postage to be placed on

1    your mail, or when you're asking for information.

2         Q.   When you say "asking for information,"

3    what -- what would that entail?  What kind of

4    information would you be asking for?

5         A.   Let's say when you needed, like, an

6    address, and you -- like you need an address or for a

7    court or something, and they will write you back with

8    an address on it.

9         Q.   Okay.  Did you ever file a kite to

10   complain about being required to clean up after

11   yourself?

12        A.   No.

13        Q.   Did you ever file a kite to complain

14   about having to clean up after meals?

15        A.   No.

16        Q.   Did you ever file a kite about the

17   amount you were paying -- being paid in the Voluntary

18   Work Program?

19        A.   No.

20        Q.   Okay.  And what about medical care:  Did

21   you receive medical care while you were detained?

22        A.   Yes.

23        Q.   Okay.  What kind of medical care did you

24   get?

25        A.   I have asthma, so I will get my inhaler;

1        Q.    Okay.  So there was a lot of that -- it

2    sounds like you had --

3        A.    Yeah.

4        Q.    -- you had a routine that you created,

5    is that --

6        A.    Yes.

7        Q.    Did anyone tell you you have to watch TV

8    at this time?

9        A.    No.

10        Q.    Okay.  And so on a day without cleaning,

11    the only difference was that you might sleep some

12    more; is that correct?

13        A.    Yes.  I can go to sleep, yeah.

14        Q.    Okay.  Okay.  All right.  That's

15    helpful.  I appreciate you helping me understand.

16              Was that experience similar to the other

17    facilities where you stayed?

18        A.    That was similar, yes.

19        Q.    Okay.  So we discussed a bit ago the

20    orientation video, and we didn't see anything on the

21    portion you were shown that said anything about

22    segregation, right?

23              MR. FREE:  Object to mischaracterizes

24    the testimony.

25        Q.    (BY MS. SCHEFFEY)  Do you remember

1          Q.   Which portion of that refers to

2    segregation?  Can you read it to me?

3          A.   Well, they use -- we -- discipline and

4    actions will be taken.

5          Q.   Okay.  And you understood that to be

6    segregation?

7          A.   Yes.  Mostly -- most of the time it's --

8    usually goes with segregation.

9          Q.   And was your understanding based upon

10   prior facilities where you've been housed?

11         A.   Yes.

12         Q.   Okay.  So your understanding wasn't

13   based upon anything that happened at Aurora at that

14   point when you had seen this orientation video?

15         A.   Yes.

16         Q.   Okay.  And I know we've talked about

17   that you were not sent to segregation for failing to

18   clean at any point in Aurora.  Were you sent to

19   segregation for any other reason?

20         A.   No.

21         Q.   Okay.  Were you sent to segregation ever

22   at any of the other facilities you were at?

23         A.   No.

24         Q.   Okay.  So where did you derive your

25   understanding of what segregation is like?

1    it correctly.  I'm going to share this exhibit with

2    you.

3              MR. KOSHKIN:  What exhibit is this?

4              MS. SCHEFFEY:  I believe it's 3.  Is

5    that correct, Ms. Masuga, or was it 2?

6              THE REPORTER:  I'm looking real quick.

7              MS. SCHEFFEY:  Okay.

8              THE REPORTER:  Yes, Exhibit 2.

9              MS. SCHEFFEY:  Okay.

10             Q.   (BY MS. SCHEFFEY)  Okay.  So here it

11   says, "you . . . spent time in administrative

12   segregation, correct?"  And he says, "Three weeks."

13   Do you see that, Mr. Hernandez?

14             A.   Yes.

15             Q.   Okay.  And then it also says, "you . . .

16   spent time in disciplinary segregation," do you see

17   that?

18             A.   Yes.

19             Q.   Okay.  So I'm going to scroll down, and

20   they say, "Describe for me what it is or what it looks

21   like compared to where you would be in the pod," okay?

22             And Mr. Valerga said, "in the pod you

23   were living with three other people.  It's four --

24   there's four-men's rooms and there's eight-men's

25   rooms, so that you're living with three other people

```
 1              MR. KOSHKIN:  Objection.

 2         A.   Well, based on what the -- the GEO guard

 3    told me and told others, I didn't know there were TVs

 4    in there.

 5         Q.   (BY MS. SCHEFFEY)  And what was the name

 6    of that guard?

 7         A.   Well, I'm telling you it's just mostly

 8    the -- the male guards will describe the hole as what

 9    I described it.  It's a terrible place to be in.

10         Q.   Did Mr. Blacknick describe it that way?

11         A.   I'm sorry, who?

12         Q.   Did Mr. Blacknick, Officer Blacknick.

13              MR. FREE:  Objection, foundation.

14         A.   No.  We never discussed nothing about

15    the hole.

16         Q.   (BY MS. SCHEFFEY)  Okay.  Did Ms. Moreno

17    describe it that way?

18         A.   No.

19         Q.   Did Ms. Thornton describe it that way?

20         A.   No.

21         Q.   Did Mr. Sanchez describe it that way?

22         A.   Yes.

23              MR. FREE:  Objection.  Excuse me.  Go

24    ahead.

25         A.   Yes.
```

Hugo Hernandez-Ceren  06/24/2020    Non-ConfidentialPage 131
ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

 1        A.   He didn't tell me specifically, but he

 2   said there was a -- he was doing a lawsuit that

 3   involved the one dollar, and that we were being forced

 4   to clean, and I said, "Well, I fall in that too

 5   because I am a worker," and -- you know, and I asked

 6   him if I could join because I'm -- I'm in the same

 7   situation.

 8        Q.   Okay.  And was that before or after the

 9   entire pod refused to clean?

10             MR. FREE:  Asked and answered.

11        A.   What was the question again?

12        Q.   (BY MS. SCHEFFEY)  Was that before or

13   after the entire pod refused to clean?

14        A.   That was after.

15        Q.   It was after.  And so it's your

16   testimony today that you've seen -- at one point, at

17   least, because I know there was a changeover in

18   detainees frequently, you saw your entire pod refuse

19   to clean; is that correct?

20        A.   Yes.

21        Q.   And was your entire pod sent to

22   segregation that day?

23        A.   No.

24             MR. KOSHKIN:  Objection.

25        Q.   (BY MS. SCHEFFEY)  Have you

1   it takes like about an hour, an hour and 20 minutes,

2   and if we have to wait to dry the floor, probably like

3   an hour 30 minutes, so it's different from, like,

4   three minutes.

5        Q.   But for cleaning each table, would it

6   still take three minutes for that portion of the

7   cleanup?

8        A.   It depends.  I mean, it depends on who

9   is doing it or -- I mean, if it's dirty enough, you

10  know.

11       Q.   Were there different numbers of

12  volunteers to clean each day?

13       MR. KOSHKIN:  Objection.  Objection,

14  misstates the prior testimony.

15       A.   No.

16       Q.   (BY MS. SCHEFFEY)  Was it always the

17  same number of people?

18       A.   It's because no one was volunteering.

19  They were being told by the GEO guard that they had

20  to.  It wasn't volunteer.

21       Q.   So I understand that you're talking

22  about the individuals who were assigned by GEO guards,

23  correct?

24       A.   Correct.

25       Q.   Were there other individuals who were

1    just cleaning up after themselves or helping so that

2    they could speed the process along?

3          A.    Oh, yes.

4          Q.    And was that regular?  Did that happen

5    on a regular basis?

6          A.    That was sometimes.

7          Q.    Okay.

8          A.    Yes.

9          MS. SCHEFFEY:  All right.  No further

10   questions from me.

11          MR. KOSHKIN:  All right.  I think we

12   have a few questions we would like to ask him.  Maybe

13   we could take a quick break just to organize

14   ourselves, and then we could come back in, I don't

15   know, maybe 15 minutes.  Is that all right?

16          MS. SCHEFFEY:  Yeah.  We can go off the

17   record.

18          THE VIDEOGRAPHER:  The time is 7:35 p.m.

19   GMT, and we are off the record.

20          (Recess taken, 7:35 p.m. to 7:49 p.m.

21   GMT; 1:35 p.m. to 1:49 p.m. MDT.)

22          THE VIDEOGRAPHER:  The time is 7:49 p.m.

23   GMT, and we are back on the record.

24          MR. KOSHKIN:  All right.  Thank you.

25

 1          A.   No.

 2          Q.   And if you need to go across the room

 3     and go to the bathroom, you can still do that?

 4          A.   There are no bathrooms outside, so --

 5     the bathrooms are inside your cell.

 6          Q.   Okay.  So you can still use the

 7     restroom.  You can still move around a bit is what

 8     I'm --

 9          A.   Only directly to your cell, but not in

10     the common area.

11          Q.   Okay.  And then the trash bag incident

12     that we just discussed with Mr. Sanchez, was that

13     before or after the meeting with all the detainees

14     where you were told this was a possibility?

15          A.   To the best of my recollection, I

16     believe it was before.

17          Q.   Okay.  And before that first trash bag

18     incident, there was no other trash bag incident or

19     meeting about segregation; is that correct?

20               MR. KOSHKIN:  Objection.

21          A.   Correct.

22          Q.   (BY MS. SCHEFFEY)  So for the first two

23     months of your stay, approximately, no GEO officer

24     made a statement to you about segregation or the hole

25     related to cleaning; is that correct?

1           MR. KOSHKIN:  Objection.

2       A.   Correct.

3       Q.   (BY MS. SCHEFFEY)  And did you clean

4  during those -- that period, the first two months you

5  were there?

6       A.   Yes.

7       Q.   Okay.  And then after the trash bag

8  incident, is that when you refused to clean?

9       A.   Yes.

10      Q.   Okay.  So you did that after hearing --

11  or after observing the officer getting the trash bag

12  out?

13          MR. KOSHKIN:  Objection.

14      A.   Yes.

15      Q.   (BY MS. SCHEFFEY)  Okay.  And then

16  chronologically, when was the next time you saw an

17  officer get the trash bag out?

18      A.   It was multiple times.  I mean, I won't

19  be able to remember exact dates or times.

20      Q.   Can you tell me which -- which officers,

21  other than Officer Sanchez, you saw do that?

22      A.   Only male officers.

23      Q.   Only male officers.  Do you remember any

24  of their names other than Mr. Sanchez?

25      A.   No.

ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

1        Q.    Were you punished in any other way for

2    failing to clean?

3              MR. KOSHKIN:   Objection, misstates the

4    testimony.

5        A.    No.   Just the TVs wouldn't go on and the

6    phones wouldn't go on, the common area wouldn't be

7    able to be accessed.

8        Q.    (BY MS. SCHEFFEY)   Did you witness

9    anyone else refuse to clean who did not get sent to

10   segregation?

11             MR. KOSHKIN:   Objection.

12       A.    Yes.   The one I -- the one I already

13   said, that he refused to clean, and, I mean, once they

14   showed him the bag, he started cleaning again.

15       Q.    (BY MS. SCHEFFEY)   Did you witness

16   Mr. Valerga refuse to clean?

17             MR. KOSHKIN:   Objection.

18       A.    I don't remember.

19       Q.    (BY MS. SCHEFFEY)   Okay.   I believe this

20   makes Exhibit 13 because I think Adam did 12.

21             MR. KOSHKIN:   I think it's 15.

22             MS. SCHEFFEY:   Oh, 15.   I'm sorry.

23             MR. KOSHKIN:   Ms. Masuga, do you --

24             THE REPORTER:   Yes, that's correct.

25             (Deposition Exhibit 15 was remotely

ALEJANDRO MENOCAL, ET AL. v. THE GEO GROUP, INC.

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF COLORADO          )
                                )  ss.
 3   ARAPAHOE COUNTY            )


 4

              I, TRACY C. MASUGA, Registered
 5   Professional Reporter, Certified Realtime Reporter,
     and Notary Public 19924005553, State of Colorado, do
 6   hereby certify that previous to the commencement of
     the examination, the said HUGO A. HERNANDEZ-CEREN
 7   declared his testimony in this matter is under penalty
     of perjury; that the said examination was taken in
 8   machine shorthand by me remotely and was thereafter
     reduced to typewritten form; that the foregoing is a
 9   true transcript of the questions asked, testimony
     given, and proceedings had.

10

              I further certify that I am not employed
11   by, related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of
12   this litigation.

13            IN WITNESS WHEREOF, I have affixed my
     signature this 30th day of June, 2020.
14
              My commission expires April 24, 2024.
15

16   __X__ Reading and Signing was requested.

17   _____ Reading and Signing was waived.

18   _____ Reading and Signing is not required.

19

20

21
              Tracy C. Masuga
22

23

24

25
```