# EXHIBIT J

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                    DISTRICT OF COLORADO
 2
    Civil Action No.: 1:14-cv-02887-JLK
 3  _____

 4              RULE 30(b)(6) DEPOSITION OF
                    SERGIO GALLEGOS
 5                THE GEO GROUP, INC.
                     June 30, 2020
 6                   via RemoteDepo

 7  _____

    ALEJANDRO MENOCAL, ET AL.,
 8
    Plaintiffs,
 9
    v.
10
    THE GEO GROUP, INC.,
11
    Defendant.
12  _____

13
               PURSUANT TO NOTICE, the Rule 30(b)(6)
14  deposition of SERGIO GALLEGOS was taken on behalf of
    the Plaintiffs by remote means, on June 30, 2020, at
15  10:03 a.m., before Shannon Clementi, Registered
    Professional Reporter, Colorado Realtime Certified
16  Reporter and Notary Public, appearing remotely from
    Arapahoe County, Colorado.
17

18

19

20

21

22

23

24

25
```

```
 1                    REMOTE APPEARANCES

 2   For the Plaintiffs and Class:

 3             ALEXANDER HOOD, ESQ.
               BRIANNE POWER, ESQ.
 4             Towards Justice
               1410 High Street, Suite 300
 5             Denver, Colorado 80218
               alex@towardsjustice.org
 6             brianne@towardsjustice.org

 7
     For the Defendant:
 8
               ADRIENNE SCHEFFEY, ESQ.
 9             Akerman, LLP
               1900 Sixteenth Street, Suite 1700
10             Denver, Colorado 80202
               adrienne.scheffey@akerman.com
11
               DANA EISMEIR, ESQ.
12             MICHAEL LEY, ESQ.
               Burns, Figa & Will
13             6400 South Fiddlers Green Circle
               Suite 1000
14             Greenwood Village, Colorado 80111
               deismeier@bfwlaw.com
15             mley@bfwlaw.com

16
     Also Present:
17
               Natasha Viteri
18             Daniel Perkins

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2   EXAMINATION OF SERGIO GALLEGOS:                PAGE
     June 30, 2020
 3
     By Mr. Hood                                    5
 4
     By Mr. Eismeier                                213
 5

 6                                            INITIAL
     DEPOSITION EXHIBITS:                     REFERENCE
 7   (Exhibits provided electronically to the reporter.)

 8   Exhibit 1    Letter from Max Holm to Sergio    57
                  Gallegos dated 9/12/11
 9
     Exhibit 2    Resume of Sergio Gallegos         103
10
     Exhibit 3    Excerpt from Policy and Procedure 106
11                Manual, "Standards of Employee
                  Conduct," dated 9/12/11
12
     Exhibit 4    Excerpt from Policy and Procedure 111
13                Manual entitled "Standards of
                  Employee Conduct," revised 2/23/09
14
     Exhibit 5    Detainee Handbook Receipt dated   139
15                9/12/11

16   Exhibit 6    Detainee Handbook Local Supplement 141
                  revised October 2013
17
     Exhibit 7    New Hire Personnel Checklist updated 169
18                7/13/11

19   Exhibit 8    Investigation report dated 12/10/12 169

20   Exhibit 9    Incident of Prohibited Acts and   170
                  Notice of Charges for Anthony
21                Perez-Montoya

22   Exhibit 10   Incident of Prohibited Acts and   188
                  Notice of Charges for Juan Nava-Ruiz
23
     Exhibit 11   Incident of Prohibited Acts and   187
24                Notice of Charges for Jeovany
                  Gonzalez-Donato
25
```

```
 1   Exhibit 12   Incident of Prohibited Acts and         197
                  Notice of Charges for Wifried Kaka
 2
     Exhibit 13   Incident of Prohibited Acts and         203
 3                Notice of Charges for Lowe Kolong

 4   Exhibit 14   Investigation Report                    --

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              WHEREUPON, the following proceedings

2    were taken pursuant to the Colorado Rules of Civil

3    Procedure.

4                    *      *      *      *      *

5              THE REPORTER:  The attorneys participating

6    in this deposition acknowledge that I am not physically

7    present in the deposition room and that I will be

8    reporting this deposition remotely.  They further

9    acknowledge that in lieu of an oath administered in

10   person, the witness will verbally declare his testimony

11   in this matter is under penalty of perjury.  The

12   parties and their counsel consent to this arrangement

13   and waive any objections to this manner of reporting.

14              Please indicate your agreement by stating

15   your name and agreement on the record.

16              THE WITNESS:  Sergio Gallegos.

17                      EXAMINATION

18   BY MR. HOOD:

19        Q.    All right.  Could you one more time just

20   state your full name on the record, sir.

21        A.    Sergio Gallegos.

22        Q.    Thank you.

23              And, actually, you know what, moving a

24   little closer to the computer would help with audio.

25   That might help.

```
 1              A.    Her last name is Shook.  Ms. Shook.

 2              Q.    And do you have a sense of how long she's

 3   been a disciplinary officer?

 4              A.    Well, I'm going to say three years.  I

 5   don't really remember, but I think around there.

 6   Three, four years.

 7              Q.    Do you remember who the disciplinary

 8   officer was before Ms. Shook?

 9              A.    It was one of the supervisors.

10              Q.    Do you remember that person's name?

11              A.    No.  I think it was -- it was the

12   lieutenant, or the guy who was a lieutenant, but there

13   are so many lieutenants, so . . .

14              Q.    I understand.

15                    And that disciplinary officer before

16   Ms. Shook, how long was that person the disciplinary

17   officer?

18              A.    I don't know.

19              Q.    Was that person the disciplinary officer

20   in 2014?

21              A.    Yes.

22              Q.    Was that person the disciplinary officer

23   in 2013?

24              A.    Like I tell you, it was many different

25   lieutenants.
```

```
 1            Q.    Maybe I misunderstood you.

 2                  Were many different lieutenants the

 3    disciplinary officer, or was there one person who was

 4    the disciplinary officer?

 5            A.    It was the lieutenants.  It was not one

 6    person.  It was the supervisors.

 7            Q.    So there are multiple people at any given

 8    time who would be the disciplinary officer?

 9            A.    Yes.

10            Q.    Are there multiple people right now who

11    are the disciplinary officer?

12            A.    No.

13            Q.    When did that change?

14            A.    Like three, four years ago.

15            Q.    Do you know why it changed?

16            A.    No.

17            Q.    Do you know if that change was because of

18    this lawsuit?

19            A.    No.

20            Q.    So three or four years ago, many people

21    were the disciplinary -- disciplinary -- let me start

22    again.  I got all garbled.

23                  So three or four years ago, there were

24    many people, many different lieutenants I think you

25    said, who were the disciplinary officer who could
```

1              MR. EISMEIER:  Object to the form of the

2   question, foundation.

3        Q.    (BY MR. HOOD)  Okay.  Have you received

4   any training regarding the purpose of protective

5   segregation at the Aurora Detention Facility?

6        A.    Yes.

7        Q.    Based on your training, what is the

8   purpose of protective segregation at the Aurora

9   Detention Facility?

10        A.    Some people like to be there.  Some people

11   don't like to be with many other people or big crowds.

12        Q.    Okay.  Are -- okay.  Could you elaborate

13   on that?

14              So you said some people don't like to be

15   with big crowds.  What do you mean by that?

16        A.    Some people feels better when they're

17   alone.  They feel less threatened.  So they feel more

18   secure.

19        Q.    If people who feel threatened or want to

20   feel more secure -- I'm sorry -- detainees who feel

21   threatened or want to feel more secure, can they ask to

22   be put into protective segregation?

23        A.    Yes.  Also people, if they're afraid to be

24   in the dorm.

25        Q.    So a detainee can affirmatively ask to be

1              You described the detainee handbook as

2    a -- as rules and regulations for detainees at the

3    Aurora Detention Facility; is that correct?

4         A.   There's some there, but it's mostly more

5    than rules and regulations.  It's information for them.

6    It's information of everything that is going on in

7    there.

8         Q.   Okay.  But does it also include rules and

9    regulations?

10        A.   Yes.

11        Q.   Are those rules and regulations optional?

12        A.   Optional?

13        Q.   Let me ask it a different way.

14              Can a detainee at the Aurora Detention

15   Facility decide whether or not to follow the rules and

16   regulations in the detainee handbook?

17              MR. EISMEIER:  Object to the form of the

18   question.

19        A.   They can decide whatever they want to

20   decide.  I mean, we're all individuals.

21        Q.   (BY MR. HOOD)  If a detainee violates a

22   rule or regulation, is there a consequence?

23        A.   You talk to them first.

24        Q.   Okay.  And then what?

25        A.   If they do it again, you talk to them

1    then.

2          Q.    Okay.  And then what?

3          A.    They do it again, you give them a

4    write-up.

5          Q.    Okay.  What happens after a write-up?

6          A.    You might have to give them another

7    write-up, and then another write-up, and then another

8    write-up.  And then they have to -- they have to be

9    consistently doing the wrong thing for them to find

10   corrective disciplinary on the end.

11         Q.    What is a "corrective disciplinary" --

12   what did you say?  "Corrective disciplinary"?

13         A.    Corrective disciplinary.

14         Q.    Corrective disciplinary.  What is

15   "corrective disciplinary"?

16         A.    Segregation time, I guess.

17         Q.    Okay.

18         A.    Many other things, too.  You don't

19   necessarily have to go to segregation.  You can lose

20   your privilege to order commissary.

21         Q.    You as a guard -- I'm sorry.  You're not a

22   guard, and I apologize.

23               You as a detention officer -- and I

24   apologized -- are you permitted to write up a detainee

25   for any reason you want?

```
 1            A.    No.  You can write up a detainee for any

 2   reason you want, but it doesn't mean if I write you up

 3   because you're too handsome, you're going to be guilty

 4   of that.

 5            Q.    How about you as a practice?  Why do you

 6   write up -- why do you write up detainees?

 7                 Strike that.

 8                 Have you ever written up a detainee?

 9            A.    Yes.

10            Q.    Why -- have you written up more than one

11   detainee?

12            A.    Rephrase the question?

13            Q.    Have you written up more than one

14   detainee?

15            A.    Yes.

16            Q.    As a general matter, why do you write up

17   detainees?

18            A.    To report their behavior to -- when

19   they -- before I first write up anybody, I'll talk to

20   them.

21            Q.    All right.  But you said you've written up

22   more than one detainee.  As a general matter, why do

23   you write up a detainee?

24            A.    Insolence, weapons, alcohol, fighting.

25            Q.    Are these -- go ahead.  I'm sorry.
```

```
 1          A.    Really just --

 2          Q.    Okay.  Any other reasons?

 3          A.    Destroying property.

 4          Q.    Any other reasons?

 5          A.    For insolence.

 6          Q.    Okay.  Any other reasons?

 7          A.    No.

 8          Q.    Okay.

 9          A.    That I recall, I mean.

10          Q.    No.  That's okay.

11                This list of things, stealing, fighting,

12    insolence -- and I even think I'm missing some of the

13    good list you gave me -- are these violations of the

14    rules and regulations that govern detainees at the

15    Aurora Detention Facility?

16          A.    Yes.

17          Q.    Would you ever write up someone for

18    something that was not a violation of the rules and

19    regulations at the Aurora Detention Facility?

20          A.    No.

21          Q.    At the Guadalupe Correctional Facility

22    that we talked about earlier, your previous -- we'll

23    call that a posting, too, with GEO -- you had mentioned

24    that inmates were required to clean.

25                Do you remember that?
```

```
 1            A.    They have -- they had trustees, yeah, to

 2    clean the dorms, but everybody helps.

 3            Q.    Okay.  Were detainees at the Aurora

 4    Detention Facility required to clean?

 5            A.    Only the trustees.

 6            Q.    And can you refresh my memory?  When you

 7    say "trustee," what do you mean?

 8            A.    They have a job assignment.

 9            Q.    And what's a job assignment?

10            A.    Dorm housekeeping.  I think that's the

11    name of it.  I don't remember, but I think that's the

12    name of it.

13            Q.    What is -- what is housekeeping?

14            A.    Cleaning the showers and maintaining the

15    trash, keeping the place clean.

16            Q.    Are there any other cleaning jobs that

17    detainees did at the Aurora Detention Facility?

18            A.    Other cleaning jobs?

19            Q.    Yeah.  So you mentioned cleaning the

20    showers and taking out the trash.  Anything else?

21            A.    In the dorms you mean or where?

22            Q.    Sure.  Let's do the dorms.  Any other

23    cleaning jobs in the dorms?

24            A.    They all clean their own cells.  They're

25    always asking you for the stuff to clean because
```

1   everything is in a closet, and they always coming up --

2   and they call you COs.  Because instead of DO,

3   detention officer, they call you COs, because I think

4   it's easier for them.

5           They come and tell you, "Hey, CO, can you

6   open the cleaning room?  I need a mop and water, this

7   and that, to clean my room."  You go get it open and

8   they clean their room.  And then somebody says, "I'm

9   next," and then, "I'm next," and then, "I'm next," and

10  then they get a list and everybody cleans up.

11          Q.    What do you mean a list?

12          A.    They say, I'm first," "I'm second," "I'm

13  third," "I'm fourth," "I'm fifth."

14          Q.    You mean a list of people who use cleaning

15  supplies to clean cells?

16          A.    Yes.

17          Q.    Is the dormitory or pod -- is it composed

18  only of cells, or is there any other space in the

19  dormitory pod?

20          A.    They're composed of cells.  And some of

21  them are open space.

22          Mostly all of them, they're cells, but a

23  couple of them, they're dormitory spaces.

24          Q.    And I've been through the Aurora Detention

25  Facility.  I understand what you're saying, but I have

```
 1          A.    The trustees.

 2          Q.    Okay.  All right.  And meaning -- and I'll

 3    just ask this a different way.

 4                Are the detainees that clean the showers

 5    in the pods with cells -- are they paid to clean the

 6    showers?

 7          A.    Yes.

 8          Q.    Do you know how much they're paid?

 9          A.    I believe it's one dollar a day.  I think

10    so.

11          Q.    Okay.  And then, again, in the pods with

12    cells, who cleans the common space that we talked about

13    earlier?

14          A.    All the detainees and the trustees, too.

15          Q.    Okay.  So are the detainees that clean the

16    common space in the pods with cells -- are they paid or

17    not paid for that cleaning?

18          A.    I don't believe they're paid.

19          Q.    Okay.

20          A.    They only clean after they eat.

21          Q.    Okay.  How many times a day do they eat?

22          A.    Three times:  Breakfast, lunch and dinner.

23          Q.    Approximately how much time do they spend

24    cleaning after eating?

25          A.    Five, ten minutes.  Everybody watch the
```

1    TVs, so . . . they clean pretty fast.

2            Q.    Okay.  And do they all clean together?

3            A.    No.  Usually six detainees and the two

4    trustees.

5            Q.    So some detainees are paid for cleaning

6    after -- after a meal?

7            A.    The trustees only.

8            Q.    So what are the detainees doing during

9    this post-meal cleaning in the common area?

10           A.    Everybody goes to the top tier to watch

11   TV, or they go close their door.  That way they let

12   everybody -- let the other guys sweep and wipe the

13   tables and mop, and everybody goes to sit back down to

14   do what they were doing.

15           Q.    Okay.  And it's both trustees who are paid

16   and detainees who aren't paid who are providing this

17   work?

18           A.    Yes.

19           Q.    How many trustees are there that provide

20   this common space cleaning after a meal?

21           A.    Two.

22           Q.    How many unpaid detainees are there that

23   provide this cleaning service after a meal?

24           A.    There's six.

25           Q.    So let's talk about the two trustees.  Are

 1  still clean up.  They're still doing the same thing.

 2          Q.    When was the last time that you ran a

 3  dorm?

 4          A.    Probably two years -- two, three years

 5  ago.  I'm usually a rover because I speak Spanish.

 6          Q.    Right.

 7          A.    So helping everywhere.

 8          Q.    You said maybe two or three years back.

 9  So maybe 2017 or 2018?

10          A.    Um-hum.

11          Q.    And you ran dorms between early 2013 when

12  you came back from Hudson and 2017 and 2018?

13          A.    Yes.

14          Q.    And as you described this pod cleaning,

15  was it the same during that whole time?

16          A.    Yes.

17          Q.    Okay.  Now, let's -- one second.  Now I'm

18  worried that I may have made a mistake in describing --

19  when did you come back from Hudson?

20          A.    12th [sic].

21          Q.    Early 2012.  Okay.  All right.  So let me

22  correct that.  I said early 2013.

23              So the cleaning in the pods as you

24  described, is it the same from when you returned from

25  Hudson in early 2012 until 2017 or 2018?

Sergio Gallegos 30(b)(6)
June 30, 2020                                    136

```
 1          A.    Yes.

 2          Q.    Okay.  Sorry about that.

 3                The six people who were put on the list to

 4    provide the cleaning, did they volunteer to be put on

 5    the list?

 6          A.    Some of them do.  Some of them you just

 7    put them on the list starting with cell 3.

 8                To give you an example, we have a new

 9    unit, and we have let's say 30 detainees.

10          Q.    Um-hum.

11          A.    We got two trustees.  Those guys don't go

12    in the cell because they're more than likely going to

13    be doing the stuff.

14                We go to the first cell, we get four

15    detainees, and then go to the next cell and get two

16    detainees.  So that's six.

17          Q.    Okay.

18          A.    But any of the detainees has like a work

19    duty, like he works in the kitchen or the laundry or

20    anything, they don't go on the list.

21          Q.    So it's detainees who are not trustees are

22    put on the list?

23          A.    Yes.

24          Q.    So is one of the benefits of being a

25    trustee that you're not put on the -- the six-person
```

1    list to clean?

2             A.   I don't know if it's a benefit or not, but

3    they don't get to get on the list because they're

4    working somewhere else.

5             Q.   Okay.  So is it because they're physically

6    not there to help, or is it simply because they're a

7    trustee, they get skipped over?

8             A.   Because they're a trustee, they get

9    skipped, I guess.

10            Q.   Okay.  If someone -- if you put someone on

11   a list to clean, one of the six people, and they don't

12   want to clean, what happens?

13            A.   You go to the next person.

14            Q.   So nothing -- nothing bad happens to

15   someone who refuses to clean?

16            A.   No.

17            Q.   Have you ever written someone up for

18   refusing to clean?

19            A.   No.

20            Q.   And then with respect to -- you know,

21   we've been talking about the pods with cells.  Am I --

22   how many -- how many pods with cells are there?

23            A.   12.

24            Q.   12.

25                 And then we talked about pods without

```
 1    I apologize.  I didn't mean to interrupt.

 2         A.   Sometimes the trustee clean it on their

 3    own, or either I help or do it myself.

 4         Q.   Okay.  Is there -- so does the cleaning of

 5    the common area occur in the same way as the cleaning

 6    of the common area in the pods with the cells?

 7         A.   Yes.

 8         Q.   And then who cleans the showers and

 9    bathrooms in the pod without cells?

10         A.   Trustees.

11         Q.   Trustees.

12              MR. HOOD:  I could use a quick ten-minute

13    break.  Can we go off the record, Court Reporter.

14              (Recess taken, 2:21 p.m. to 2:37 p.m.)

15              MR. HOOD:  I'm going to drop another

16    exhibit into the chat.  And this will be Exhibit 5.

17    And I'd ask the court reporter to please mark the file

18    named Exhibit 5 as Exhibit 5 for the deposition.

19              (Exhibit 5 was remotely introduced and

20               provided electronically to the court

21               reporter.)

22         Q.   (BY MR. HOOD)  Mr. Gallegos, when you have

23    it opened and you've had a moment to review, if you

24    could let me know.

25              I'll also display this for you,
```

 1    I can tell you it happened before.

 2          Q.   Do you remember what would have happened

 3    that would have led to you writing up a detainee for

 4    offense category 308?

 5          A.   Yes.

 6          Q.   What?

 7          A.   Insolence, called me a "motherfucker."

 8          Q.   Okay.  So swearing at you?

 9          A.   Um-hum.  Insolence.

10          Q.   Other than swearing at you, do you recall

11    any reason why you would have written up a detainee for

12    a offense category 308?

13          A.   No, because the only way you can write

14    somebody up with that 308 is they're insolent to you or

15    to anyone else, to another detainee.

16          Q.   Do you write every detainee that swears at

17    you up for that offense category?

18          A.   I talk to them first.  I would talk to

19    them to see what's going on first.  Before I write

20    anybody up, I have to talk to see what's going on.

21          Q.   Okay.  And then -- go ahead.  I'm sorry.

22          A.   I have to -- before I write anybody up, I

23    have to find the issue, what's going on.  It might be

24    more than that.

25          Q.   Okay.  And then what would happen during

1    that discussion that would lead you to writing them up

2    for that incident category --

3           A.    They --

4           Q.    -- offense category?

5           A.    They do it for the whole purpose of being

6    disrespectful.

7                 Sometimes they have another issue,

8    whatever, in their lives happening or whatever, and I

9    go talk to them.  And most of the time, they apologize.

10                But if they're not apologetic, they tell

11   you, "Fuck you because I don't like you, piece of

12   shit," whatever --

13          Q.    Sure.

14          A.    -- then I tell them, "Let's try to be

15   civilized."  We talk.  We talk like adults.  Most of

16   the time it works, I don't have to write nobody up.

17          Q.    Okay.  Has anyone ever been sanctioned

18   with disciplinary segregation, up to 72 hours, after

19   you wrote them up for a 308 offense category?

20          A.    I don't know.  I don't think so.  I don't

21   follow up on those.

22          Q.    Okay.

23          A.    But they come back, and before, they're

24   insolent and we couldn't fix it talking, I give them a

25   write-up.

1   that mean?

2          A.    The sanitation program is to keep the

3   facility clean.

4          Q.    Okay.  Do you see where it says:

5                "Each and every detainee must

6                participate..."?

7          A.    Yes.

8          Q.    Okay.  So does the sanitation program

9   include only trustees, or does it also include unpaid

10  detainees?

11         A.    Unpaid detainees, too, I guess.  Yes.

12               "Each and every detainee must

13               participate..."

14         Q.    Okay.  If a detainee doesn't participate

15  in the facility's sanitation program, would that be a

16  violation of a rule or regulation of the Aurora

17  Detention Facility?

18               MR. EISMEIER:  Objection.  Form.

19               You can answer.

20         A.    We'll just go to the next person.

21         Q.    (BY MR. HOOD)  Okay.  It says "must."  Are

22  you allowed to decide that a detainee doesn't have to

23  participate?

24         A.    We're not making the detainee participate

25  if he doesn't want to participate.  We just go to the

Sergio Gallegos 30(b)(6)
June 30, 2020                                          163

1   next person.

2          Q.   You told me before that it was a detention

3   officer's job to implement the policies of -- of a

4   detention facility.

5          Do you remember that?

6          A.   Yes.

7          MR. EISMEIER:  Objection.  Form.

8          Q.   (BY MR. HOOD)  Is it a detention officer's

9   job to implement the policies -- strike that.

10         Is it a detention officer's job to

11  implement the rules and regulations of a detention

12  facility?

13         A.   Yes.

14         Q.   Okay.  Is it a rule or regulation of the

15  Aurora Detention Facility that each and every detainee

16  must participate in the facility's sanitation program?

17         A.   Yes, it's there.

18         Q.   I'm sorry.  I didn't mean to take it down.

19  Hold on one second.

20         And do you see under the "Housing Unit

21  Sanitation" policy on page 17 of Exhibit 6 -- do you

22  see the heading that says "Day Space"?

23         A.   Yes.

24         Q.   Okay.  And in the third paragraph under

25  there -- well, let me ask you this:  Do you know what

```
 1   doing.

 2          Q.   It doesn't mean --

 3          A.   Either wiping the tables or sweeping or

 4   mopping.

 5          Q.   So what does it mean when it says:

 6               "If a detainee" --

 7               Do you know what it means when it says:

 8               "If a detainee fails -- feels that

 9               everyone is not doing their fair

10               share..."?

11               Do you know what it means?

12          A.   I don't know what it means, but I -- the

13   action that we take, when somebody doesn't want to be

14   part of the day cleanup, we'll put somebody else.

15          Q.   So the action -- so the action that will

16   be taken when a detainee is not doing his or her fair

17   share is just moving on to the next detainee?

18          A.   Yes.

19          Q.   And no other action would ever be taken in

20   that circumstance?

21          A.   No.

22          Q.   Have you ever taken any action in that

23   circumstance?

24          A.   Yes.  I have somebody else -- I ask

25   somebody else, either the trustee or even myself.
```

1          A.    The form is not inaccurate, but I remember

2    this incident.  The detainee was disruptive in the

3    dayroom.

4          Q.    It says one of the reasons that you wrote

5    him up is "failure to obey my orders for cleaning

6    details."  Do you believe that's inaccurate?

7          A.    "Creating a disruption of the orderly

8    operations of the security" of the institutions.

9                I told the detainee to put things away.

10   He was waving a broom or a mop.  I don't remember what

11   he was waving.  I told him just to put it down, he has

12   to go back to his cell.  And he started chanting and

13   shouting and yelling in the dorm, and I called for a

14   supervisor.

15         Q.    Did you instruct the detainee to perform

16   the general cleanup?

17         A.    No.

18         Q.    Then why was he cleaning?

19         A.    He was with a broom, and he was chanting

20   and yelling and disrupting the operation.  It was

21   really late at night.

22         Q.    So this was not during the cleanup after a

23   meal?

24         A.    No.

25         Q.    What did you mean by "general cleanup"?

```
 1                    MR. HOOD:  And I can't remember whether I

 2    asked prior, so I'll just belt and suspenders ask that

 3    the file name Exhibit 10 be marked as Exhibit 10 to the

 4    deposition.

 5                    (Exhibit 10 was remotely introduced and

 6                    provided electronically to the court

 7                    reporter.)

 8           Q.    (BY MR. HOOD)  Mr. Gallegos, is this

 9    another write-up?

10           A.    Yes, the same incident.

11           Q.    Okay.  And this is a third detainee who

12    was involved in the incident?  Or was this about a

13    third detainee who was involved in the incident?

14           A.    They were the same detainees that were

15    sitting at the table.

16           Q.    Okay.  How many detainees were there at

17    the table?

18           A.    Four.  Three or four.

19           Q.    Three or four.

20                    Do you see in the -- is that your

21    signature on the bottom right-hand corner?

22           A.    Yes, sir.

23           Q.    Did you type up the description of the

24    incident?

25           A.    Excuse me?
```

1  inciting the other detainees to start disruption in the

2  dorm.  They were yelling and shouting, and one was

3  taking a broom.

4        Q.   What do you mean by "taking" -- go ahead.

5        A.   I told you I called the supervisor,

6  supervisor came to the dorm.  It was his decision, not

7  mine, to take those guys to segregation via medical.

8  And lieutenant told me to write him up.

9        Q.   Okay.  What do you mean -- what did you

10 mean by -- you said something about taking a broom.

11 What did you mean by that?

12       A.   I told you he got a broom and he was

13 swinging the broom.

14       Q.   Why did he have a broom if he wasn't

15 helping to clean?

16       A.   He was close to the closet where we have

17 the materials, the water, the soap, the brooms.

18       Q.   So was he helping to clean or wasn't he

19 helping to clean?

20       A.   I don't remember.

21       Q.   Is it possible that --

22       A.   They were all on the table, on the corner

23 table, when they started shouting and they started

24 yelling to all the detainees in there, they start

25 howling.  And I called the supervisor myself at that

```
 1                    REPORTER'S CERTIFICATE

 2  STATE OF COLORADO        )
                             )  ss.
 3  CITY AND COUNTY OF DENVER )

 4           I, Shannon Clementi, Registered
    Professional Reporter, Colorado Realtime Certified
 5  Reporter and Notary Public ID 20004025632, State of
    Colorado, do hereby certify that previous to the
 6  commencement of the examination, the said
    SERGIO GALLEGOS verbally declared his/her testimony in
 7  this matter is under penalty of perjury; that the said
    deposition was taken in machine shorthand by me at the
 8  time and place aforesaid and was thereafter reduced to
    typewritten form; that the foregoing is a true
 9  transcript of the questions asked, testimony given, and
    proceedings had.

10
             I further certify that I am not employed
11  by, related to, nor of counsel for any of the parties
    herein, nor otherwise interested in the outcome of this
12  litigation.

13           IN WITNESS WHEREOF, I have affixed my
    signature this _____ day of _____, 2020.
14

15           My commission expires June 3, 2021.

16
    __X__ Reading and Signing was requested.
17
    _____ Reading and Signing was waived.
18
    _____ Reading and Signing is not required.
19
             _____
20           Shannon Clementi
             Registered Professional Reporter
21           Colorado Realtime Certified Reporter

22

23

24

25
```