# EXHIBIT S

Executive Summary
Jeffrey Kropf, Ph.D.
June, 2020

In his expert statement, Dr. Grassian sets forth two primary
contentions. Stripped of artifice, the contentions are: 1.
Former detainees at the Aurora ICE Processing Center ("AIPC" or
the "Facility") suffered serious psychiatric harm as the result of
staff reminders that a potential sanction for failing to meet
cleaning responsibilities was placement in solitary confinement
for a period of up to 72 hours, and 2. Former detainees at the
AIPC were coerced to participate in the Voluntary Work Program by
depriving them of sustenance. He concludes his theretofore
measured statement with a scathing characterization of AIPC
custody staff.

Dr. Grassian's contentions are manifestly untrue. He offers no
objective evidence supporting his contentions, and he withholds
information exposing their falsity.

Dr. Grassian offers three sources of support for his first, core
contention. The sources are irrelevant research findings he
spuriously transfers to the population of former detainees, his
purported professional experience, and select statements made by
five of nine named plaintiffs, and one additional former detainee,
he reported having interviewed.

Appropriated largely from his prior work, Dr. Grassian provides
strong empirical evidence that brainwashing, profound sensory
deprivation, and/or confinement in solitary confinement including
confinement unrelated to institutional conduct for periods of
months and years caused serious psychiatric harm to prisoners of
war, political prisoners, and inmates. He attempts to support his
core contention by transferring evidence obtained from studies of
these populations and circumstances to the population and
circumstances of six former detainees.

Among these six former detainees, five of them had never been
placed in segregation. The sixth former detainee (Mr. Hernandez-
Torres) alleges to have spent more than 1400 hours in segregation
secondary to his multiple acts of institutional misconduct. It is
my understanding that these allegations are inconsistent with
GEO's records which show Mr. Hernandez-Torres was placed in
segregation only once for the offense of Fighting.

Dr. Grassian's transfer of research results obtained from studies
of populations and situations substantively different from the
population and circumstances of the former detainees is specious
and violates a cardinal precept of transferability.

The second source of support Dr. Grassian offers for his core
contention is his purported professional experience. His
purported experience is substantially different from my

1

professional experience. In my professional experience which includes evaluating and treating hundreds of persons contemporaneously placed in solitary confinement in segregated housing and evaluating thousands of confined persons including many hundreds contemporaneously or historically placed in solitary confinement in segregated housing, I do not recall having encountered even a single person who met the conditions of his primary contention. If my memory is imperfect, such a person would be among the extreme minority.

The third source of support Dr. Grassian offers for his core contention is select information he obtained from interviewing six former detainees. Of the five former detainees who had never been placed in solitary confinement, none of them reported the significant psychiatric disturbance that represents an essential element of his core contention. The sixth former detainee (Mr. Hernandez-Torres) reported his placement in solitary confinement caused him psychiatric harm, but did not specifically attribute the alleged harm to placement in solitary confinement. As noted, this former detainee has reported information inconsistent with GEO's records. Dr. Grassian did not explicate this information and either ignored or withheld information regarding former detainees' psychiatric histories and experiences of trauma which include physical abuse, sexual abuse, kidnapping, and torture.

Placement of detained persons in segregated housing as a consequence for institutional misconduct is a practice common to virtually all detention facilities. If Dr. Grassian's primary contention was true, then every person ever detained in a jail, prison, or any other type of detention facility virtually anywhere in the world would have suffered serious psychiatric harm. His primary contention is untrue, and further evidence of its falsity is the fact that, during their placements at the AIPC, not a single one of the seven named plaintiffs whose medical records were available for review reported, documented, or evidenced any psychological distress related to awareness or reminders that a sanction for institutional misconduct was placement in solitary confinement.

Dr. Grassian's broad contention that former detainees were coerced to participate in the Voluntary Work Program at the AIPC by depriving them of sustenance is based on the reports of two former detainees that they experienced chronic hunger and, lacking money with which to purchase food from the commissary, felt they must participate in the Voluntary Work Program to earn money with which to purchase food to satisfy their hunger. None of the other former detainees he reported having interviewed and none of the other former detainees whose medical records were available for review offered such reports.

While two former detainees may have experienced hunger during their placements at the AIPC, the experience of hunger is not necessarily evidence of deprivation. In most instances, the

detainees gained weight during their placements at the AIPC. Perceptions of hunger, like perceptions of threat and fear, are subjective and therefore most reasonably assessed individually.

Dr. Grassian filled the Conclusions section of his report with a scathingly negative characterization of AIPC custody staff. He cited the basis for this negative characterization as reports offered by former detainees. He withholds a positive characterization of custody staff offered by at least one former detainee.

Rebuttal of Dr. Grassian's statement
In his statement, Dr. Grassian sets forth two primary contentions. His core contention is that "threatened punishment" in "solitary confinement" causes serious psychiatric harm. His second primary contention is that former detainees were coerced to participate in the Voluntary Work Program at the Aurora ICE Processing Center ("AIPC" or the "Facility") by depriving them of sustenance.

Dr. Grassian utilized misleading words and needlessly vague terms throughout his statement including his core contention. In preparation for informed consideration of his contentions, the following two sections serve to clarify terms, yield a proper descriptive statement of his core contention, and provide relevant information regarding the former detainees.

I.  The former detainees/plaintiffs
There are nine plaintiffs named in the case of Menocal v. GEO. All of these individuals were previously detained at the AIPC. In his statement, Dr. Grassian offers information obtained from interviews of five of these individuals and one additional former detainee. He does not report whether or not he interviewed any or all of the four other named plaintiffs or, if he did interview any or all of them, why he chose to not include information from the interview(s) in his statement.

Of the six former detainees Dr. Grassian reported having interviewed, five of them were never placed in administrative segregation. The sixth former detainee, Mr. Hernandez-Torres, alleges he was placed in segregated housing on four occasions.

As recounted in Dr. Grassian's statement, Mr. Hernandez-Torres' alleged initial placement in segregated housing was placement in administrative segregation as a sanction for failing to meet behavioral expectations related to cleaning. Mr. Hernandez-Torres exhibited inappropriate conduct following his placement in administrative segregation and was transferred to disciplinary segregation.

Dr. Grassian does not specify the number of hours Mr. Hernandez-Torres was housed in administrative segregation before exhibiting inappropriate behavior resulting in his transfer to disciplinary segregation. He reports the cumulative duration of Mr. Hernandez-

3

Torres' consecutive placements in administrative segregation and disciplinary segregation to have been eight days.

Also as recounted in Dr. Grassian's report, Mr. Hernandez-Torres would be placed in disciplinary segregation secondary to misconduct on three subsequent occasions. Dr. Grassian reports the durations of Mr. Hernandez-Torres' subsequent placements in disciplinary segregation as, sequentially, twelve days, "around two weeks," and "a month."

In sum, the only one of the six former detainees reported to have been interviewed by Dr. Grassian and placed in segregated housing was Mr. Hernandez-Torres. He alleges to have spent approximately 61 days (1464 hours) in disciplinary segregation. Again, these allegations are inconsistent with GEO's records.

## II. Definitions of terms

### A. "Detainees"

In his statement, Dr. Grassian occasionally refers to the six individuals he reported having interviewed as "detainees." Given that these individuals have not been detained at the AIPC for many years and are presumably not currently detained there, each of these individuals will be hereafter referenced in this document either by name or as a "former detainee." The term "detainees" will be reserved for persons currently housed in a detention facility.

### B. "Threat"

In his core contention and throughout his statement, Dr. Grassian uses the word "threat" and offers opinions regarding the psychiatric impact of having been subjected to "threats" on former detainees. He offers no evidence indicating that any threat was ever made. His use of the word is unjustified and misleading.

The Merriam-Webster dictionary defines "threat" as "an expression of intention to inflict evil, injury, or damage." Other dictionaries provide substantively similar definitions.

In using this word to describe communications between AIPC custody staff and former detainees, Dr. Grassian implies without evidence that staff of the AIPC engaged in inappropriate behavior. As noted, he provides no objective information indicating that any AIPC staff member made any threat to any of the former detainees.

For most people, being threatened is a distressing experience. By wrongfully applying the term, Dr. Grassian presupposes and implies without evidence that former detainees suffered psychological harm by having been subjected to actions that are inherently inappropriate.

While the definition of "threat" is clear, the perception and experience of threat is subjective. To illustrate, consider a hypothetical scenario involving three different people walking

4

down a street when suddenly approached by a stray dog. Person 1, a lover of animals, scoops up the dog, hugs it, and brings it home; for this person, the experience was perceived as positive. Person 2, indifferent toward animals, walks past the dog without breaking stride; for this person, the experience was perceived as neutral. Person 3, who was mauled by a dog in the past, feels a rush of terror and flees; for this person, the experience was perceived as threatening.

The subjective element of the perception of threat means that a person can perceive a threat when no threat was made or actually existed. As applied to the matter at hand, it is possible that a former detainee perceived a staff member's words or actions as threatening even when no threat was made or actually existed.

Perceptions of threat are mediated by multiple factors. Such factors include personal experience, culture, and context. Perceptions of threat are subjective and therefore most reasonably assessed individually.

In reference to the former detainees, information contained in their records indicates that at least some of them experienced trauma prior to their placements at the AIPC. Former detainees reported having experienced trauma including physical abuse, sexual abuse, and, in the case of one former detainee, beating by police. The experience of trauma can precipitate hypervigilance, hypersensitivity, heightened responsiveness, and contribute to negative interpretations of neutral events.

English is not the native language of at least some of the former detainees, and concomitant limited fluency may have caused misunderstanding or misinterpretation of English-language communications. The former detainees were pending possible deportation when they may have been reminded by staff of sanctions attendant to not meeting behavioral expectations, and such neutral information may have been misinterpreted as negative within the context of existing concerns regarding potential negative future events.

For reasons including mitigating the potential impact of such factors, detainees are presented a handbook at the time of their detention. This handbook, entitled, "National Detainee Handbook" (and referenced hereafter as "the handbook") contains information and guidelines extracted from manuals and documents including the Immigration and Customs Enforcement's Performance Based National Detention Standards Operations Manual and the American Correctional Association's Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition. Detainees are advised of the Facility's rules of conduct, prohibited acts, and sanctions in writing, language, and/or another manner they can understand.

The handbook contains information regarding institutional rules of conduct, prohibited acts, and the sanctions attendant to rules

violations, sanctions which can include placement in segregated housing. The handbook explicates the two types of segregated housing, the duration of placements in segregated housing, detainee appeal rights, and services available to detainees in segregated housing. Having been made aware at the time of their detention of behavioral expectations related to cleaning and the sanctions attendant to not meeting those expectations, any subsequent communications of information regarding the behavioral expectations received by detainees cannot be uniformly termed a "threat." To establish an objective "threat," one would need to know additional and individualized information such as who was conveying the information, exactly what was said, the tone and mannerisms of the speaker, and past incidents between the speaker and detainee.

In presenting information obtained from his interviews of the former detainees he reported having interviewed, Dr. Grassian states that former detainees reported feeling threatened by staff reminding them that placement in segregation was a sanction for not meeting behavioral expectations related to cleaning. He makes no reference to any of the former detainees having reported that staff made statements indicating they would be made to experience a sanction unrelated to misconduct. He makes no reference to any of the former detainees having reported that staff made "an expression of intention to inflict evil, injury, or damage" (the definition of "threat"). Again, it is possible that a former detainee perceived a threat even when no threat was made or actually existed.

Much as individual differences mediate the process of how information is perceived, the nature of the information itself contributes to how it is perceived. While it is in fact neutral, information regarding negative consequences attendant to misconduct can be perceived as threatening because it references negative consequences. Being advised or reminded that failure to meet behavioral expectations will result in a negative consequence may be perceived as threatening, but the perception of threat does not mean a threat was made or existed.

Staff communication of information to detainees including information that may be perceived negatively is essential. Reminding detainees of behavioral expectations and consequences attendant thereto affords them the opportunity to abstain from potential misconduct and avoid attendant sanctions. Although it may be perceived otherwise by some depending on the circumstances, providing factual information to others that encourages them to exhibit appropriate behavior and allows them to avoid negative consequences is not threatening.

The alternative to communicating information to detainees is withholding information from detainees. In practice, withholding information from detainees could result in their experiencing negative consequences for exhibiting prohibited behaviors (or not

6

exhibiting expected behaviors) they did not know or remember were prohibited (or expected). While withholding information would obviate possible negative perceptions of the information or the person presenting it, the practice is unreasonable and unjust and so is not implemented.

Whatever Dr. Grassian's reasons for using the word "threat" throughout his statement, there is no objective evidence to support or justify its use. In this document, communication of information from staff members to former detainees at the AIPC will be henceforth referred to as "communication," not "threat," and information received by former detainees from staff members regarding behavioral expectations and sanctions known to them will be referred to as "reminders."

C. "Solitary confinement"
In his core contention and throughout his statement, Dr. Grassian uses the words "solitary confinement" and offers opinions regarding the psychiatric impact of placement in "solitary confinement" on former detainees. His use of these words is incomplete and commensurately misleading.

Solitary confinement is a condition of confinement in both administrative segregation and more restrictive disciplinary segregation units. Unqualified references to "solitary confinement" are as suggestive of placement in disciplinary segregation as placement in administrative segregation.

The duration of a detainee's placement in a particular type of segregated housing unit at the AIPC as a sanction for misconduct is predicated on the Offense Category into which the misconduct falls. The sanction for misconduct falling within the "High Moderate" Category (e.g., Refusal to clean assigned living area) is placement in disciplinary segregation for a period of up to 72 hours. The sanction for misconduct falling within the "Greatest" Category (e.g., Killing) is placement in disciplinary segregation for a period of up to 60 days. Unqualified references to placement in solitary confinement are as suggestive of extended placement in disciplinary segregation as brief placement in administrative segregation.

3. Descriptive statement of Dr. Grassian's core contention

For reasons presented above, Dr. Grassian's core contention is most reasonably stated as, "Reminders of placement in solitary confinement in administrative or disciplinary segregation for a period of up to 72 hours as a sanction for failing to meet behavioral expectations related to cleaning cause significant psychiatric harm."

III. Contention 1: Reminders of placement in solitary confinement in administrative or disciplinary segregation for a period of up to 72 hours as a sanction for failing to meet behavioral

expectations related to cleaning cause significant psychiatric harm.

Dr. Grassian's expert statement begins with his explaining the reason for his formulating his opinions, sources of information he used in formulating his opinions, and his credentials, publications, and experience addressing the psychiatric effects of solitary confinement. This section of his report starts on page 1 and ends in the middle of page 5 and contains two references to his published work.

From the middle of page 5 through the middle of page 19 of his statement, Dr. Grassian presents information regarding general conditions of solitary confinement, the historical experience with solitary confinement, and, beginning on page 10, the psychiatric effects of solitary confinement. These sections include references to conditions in the United States penitentiary system in the 19th century, articles published in German medical literature between 1854 and 1909, studies of political prisoners and prisoners of war, and contemporary studies involving "profound sensory deprivation" and "prolonged solitary confinement." These sections, largely appropriated from other of his work, contain 14 of his 20 references to research.

In these sections, Dr. Grassian presents empirical evidence indicating that extended placement (i.e., months or years) in solitary confinement involving extreme sensory deprivation can cause significant psychiatric harm. He devotes nearly two full single-spaced pages to critiquing the results of research studies concluding that extended confinement in solitary confinement does not cause significant psychiatric impairment.

From presenting empirical evidence regarding the effects of extended placement in solitary confinement, Dr. Grassian proceeds to offer information regarding the effects of shorter-term placement in solitary confinement. Discounting his references to studies of the effects of placement in solitary confinement for vaguely defined durations (e.g., "brief," "over time)," he references but a single study suggesting negative consequences associated with solitary confinement for a period of 72 hours or less. The study, "Changes in EEG Alpha Frequency and Response Latency During Solitary Confinement," was published by Gendreau et al.

Dr. Grassian describes the results of this study as "showing that even a few days of solitary confinement will shift an individual's brain wave pattern into an abnormal pattern of stupor and delirium." He does not state if or how a "shift in an individual's brain wave patterns" represents or causes severe psychiatric harm.

Dr. Grassian's citation of this study indicates it was published in 1972. Given his active involvement in offering expert opinions related to the psychiatric effects of solitary confinement, Dr.

Grassian would be aware of research conducted during the past 48 years that would support his unequivocal proposition that brief placement in administrative segregation causes serious psychological harm.

A. Transferability

At this juncture, if not before, the reader of Dr. Grassian's statement may well wonder why Dr. Grassian chose to devote so much time and effort to presenting information regarding the psychiatric effects of extended placements in solitary confinement including placements featuring profound sensory deprivation given that his core contention is that reminders of possible placement in solitary confinement for a period of up to 72 hours as a sanction for failing to meet behavioral expectations related to cleaning caused significant psychiatric harm to former detainees of the AIPC.

Stated baldly, the reason is either incompetence, which I do not believe to be the case, or obfuscation. By misuse of the practice of transferability, Dr. Grassian attempts to offer support or the appearance of support for his core contention by transferring findings from the research he has cited to the population of former detainees which includes persons who spent absolutely no time in solitary confinement.

Transferability refers to the practice of transferring or applying results of research obtained from study of one population or situation to another population or situation. The practice is reasonable only if the populations or circumstances are substantively similar.

In support of his core contention, Dr. Grassian transfers the results of research studying populations and sets of circumstances to the population and circumstances of the former detainees. He asserts that populations including political prisoners, prisoners of war, and inmates whose situations included subjection to profound sensory deprivation and/or solitary confinement in disciplinary segregation for periods of years are substantively similar to the population of six former detainees at the AIPC, five of whom were never placed in solitary confinement for even one moment.

The populations are not substantively similar. The circumstances are not substantively similar.

The primary support Dr. Grassian provides in support of his core contention is based on transferability. Transferability in this instance is unjustified.

B. Personal experience

Dr. Grassian also references his purported personal experience

evaluating "people in confinement" in support of his core contention. He describes his experience as "extensive" and defines the number of persons he has evaluated as "many."

Dr. Grassian writes, "During the course of my four decades of professional life, I have had the opportunity to interview and evaluate a number of individuals who had been transferred back into general population or released to the community after serving time in solitary confinement. They <u>universally</u> [emphasis added] described continuing psychological impairment as a result of their confinement in solitary, impairments that render them incapable of accommodating to life in the larger community." He offers similarly universal and declarative assertions including, "It [solitary confinement] can have severe psychiatric effects within hours, and one to three days of solitary confinement will <u>certainly</u> [emphasis added] have a major psychiatric impact" and, "As a psychiatric matter, solitary confinement <u>inevitably</u> [emphasis added] creates feelings of helplessness, powerlessness, as well as intense fear and paranoia."

Refutation of Dr. Grassian's initial assertion exists in the form of even a single person who spent even a single moment in solitary confinement who was not rendered "incapable of accommodating to life in the larger community." Refutation of his other assertions can similarly be found in the form of even a single person who was placed in solitary confinement for a period of 72 hours or less and did not suffer the "major psychiatric impact" that is "certain" or the "intense fear and paranoia" that is "inevitable." My professional experience indicates both that such individuals are plentiful and that Dr. Grassian's absolute assertions are simply wrong.

-Professional Experience/California Youth Authority

From 1993 through 1999, I worked as a Staff Psychologist at the Heman G. Stark Youth Correctional Facility (nee Youth Training School) in Chino, CA. During this period, I worked on the Opportunity and Restructuring Unit (O/R).

O/R was the institution's segregated housing unit. It housed male offenders (wards) generally ranging in age from 18 years through 25 years. With a nominal capacity of 100 wards, the need to maintain available cells to accommodate unpredictable placements or transfers of wards from General Population or from other institutions resulted in the typical census being approximately 85 wards. The length of a ward's placement on O/R typically ranged from 7 days to 90 days. Wards on O/R were housed in solitary confinement.

My duties on O/R included conducting clinical and forensic mental health evaluations of wards and, primarily, providing individual and group therapy to wards. During my work on the O/R, I estimate I provided therapy services to more than five hundred (500) wards

contemporaneously placed in solitary confinement on this
segregated housing unit.

Many of the wards with whom I worked reported that they preferred
being housed alone in a cell to being housed with other wards in a
cell or housed on a dormitory-style living unit.  I worked with
wards who had requested placement on O/R, wards who admitted to
having fabricated safety concerns to realize placement on O/R, and
wards who admitted to having engaged in inappropriate conduct they
knew to be inappropriate in order to effect or extend their
placement on O/R.

Some of the wards I evaluated and to whom I provided treatment
were suffering from longstanding severe mental disorders (e.g.,
psychotic disorders, major mood disorders).  A larger number of
wards reported emotional distress related to their confinement and
consequences attendant to their confinement.

Like wards housed on General Population units, many wards reported
distress associated with their loss of liberty.  Other commonly
reported sources of distress included separation from family and
friends, strained or estranged interpersonal relationships, and
the practical implications of a criminal history.  Some wards
reported distress related to possible or actual extension of their
earliest parole release dates as consequence for the misconduct
that resulted in their placement on O/R.

Among the hundreds of wards with whom I worked, the number who
reported or evidenced distress related to awareness or reminder
that placement in solitary confinement on a segregated housing
unit was a sanction for institutional misconduct was precisely
zero.

-Professional Experience/California Department of Corrections and
Rehabilitation

Since 1999, I have worked for the California Department of
Corrections and Rehabilitation's Mentally Disordered Offender
(MDO) Unit.  My job titles have included Staff Psychologist,
Senior Psychologist, Supervisor, and, at present,
Psychologist/Retired Annuitant.

My duties have included developing and providing MDO training to
clinical and custody staff of the California Department of
Corrections and Rehabilitation (CDCR), the Board of Parole
Hearings (BPH), and the Department of State Hospitals (DSH),
developing policies and procedures for the operation of the MDO
Unit, and, primarily, conducting evaluations of offenders pursuant
to the MDO statute (California Penal Code sections 2960-81 except
2974).

In essence, the MDO statute sets forth provisions that allow the
members of the BPH to impose treatment by the DSH as a condition

of parole for offenders who meet specific criteria and are certified as Mentally Disordered Offenders. In practical terms, offenders who are certified as Mentally Disordered Offenders are released from prison directly to a State Hospital for mental health treatment rather than released directly to the community. Intents of the statute include providing treatment to mentally ill offenders that promotes their ability to function effectively in the community and promoting public safety.

While they are nuanced, there are three basic criteria for referring offenders for MDO evaluation. The criteria are: offender has definitive release date within the next six months; offender is currently imprisoned for perpetrating a crime involving the use or threat of force or violence; offender has received 90 days or more of mental health treatment within the year prior to scheduled release.

In practice, the first MDO referral criterion excludes inmates committed to a life prison term because most of them do not have and will not have a definitive release date. In practice, determinations regarding the issue presented by the second criterion are made by Peace Officers. In practice, while mental health treatment received in county jail facilities and State Hospitals applies toward the threshold presented by the third referral criterion, most offenders referred for MDO evaluation have received at least the minimum specified number of days of mental health treatment as participants in the CDCR's Mental Health Services Delivery System (MHSDS).

In necessarily abbreviated terms, the MHSDS is the CDCR's program for delivering mental health treatment services to inmates who report and/or evidence psychiatric disturbance. As with detainees at the AIPC, inmates in the CDCR can be placed in segregation as a consequence for misconduct. A CDCR inmate who reported and/or evidenced psychiatric disturbance related to awareness or reminder that he or she could be placed in segregation as a consequence for misconduct would be enrolled in the MHSDS on that basis.

Elements of the standard procedure for conducting an MDO evaluation include thoroughly reviewing documents from the offender's Central File (correctional file) and Health Record (medical chart) and interviewing the offender. The interview process naturally includes assessing the offender's mental status and gathering information regarding issues contributing to any mental health disturbance.

Since 1999, I have evaluated more than 4,000 (four thousand) offenders pursuant to the MDO statute, many of whom were contemporaneously or historically housed in solitary confinement in segregated housing units. I have evaluated male, female, and transgender offenders in State Hospitals, county jails, and, primarily, prisons throughout California. As Senior Psychologist, Supervisor for the CDCR MDO unit from 2000 through my retirement

in 2017, I regularly consulted with MDO evaluators employed or contracted by the CDCR, the DSH, and the BPH. I estimate that I consulted with fellow MDO evaluators regarding more than 500 (five hundred) MDO evaluations independent of evaluations I personally conducted.

Among the hundreds of cases on which I consulted, the number of inmates reported to have expressed or evidenced distress related to awareness or reminder that placement in a segregated housing unit was a sanction for institutional misconduct was precisely zero. Among the thousands of inmates I personally interviewed over a period of more than two decades, the number who reported or evidenced distress related to awareness or reminder that placement in solitary confinement on a segregated housing unit was a sanction for institutional misconduct was precisely zero.

C. Dr. Grassian's interviews of former detainees.

1.   Former detainees Hernandez, Menocal, Gaytan, Alexakhina, Xahuentitla.

From the middle of page 19 through the bottom of page 21 of his statement, Dr. Grassian describes facilities, features, programs, and operations at the AIPC. From the bottom of page 21 through the middle of page 30, he offers select information obtained from his interviews of five former detainees: former detainees Hernandez, Menocal, Gaytan, Alexakhina, and Xahuentitla. These sections contain no references. The select information he offers from the interviews represents the third form of support for his core contention.

As elsewhere throughout his statement, Dr. Grassian's presentation of information from his interviews of the former detainees features misleading words, needlessly vague terms, and substantive omissions. The following six paragraphs will serve to clarify and identify relevant information.

a.   Dr. Grassian interviewed five of the nine named plaintiffs, and one non-named plaintiff (Mr. Hernandez-Torres). He does not explain why he may not have interviewed any or all of the four other named plaintiffs or, if he did interview any or all of them, why he chose to not include information from the interview(s) in his statement.

b.   Dr. Grassian uses the words "threat" and "threatened" throughout his summaries of his interviews of the five named plaintiffs and Mr. Hernandez-Torres. For reasons explicated earlier in this report (see section entitled, "Threat"), while it may be that one or more of the former detainees he interviewed perceived a staff member's words or actions as threatening, perceptions are subjective and the perception of threat does not mean a threat was made or existed. Beyond referencing former detainees' perceptions of threat, Dr. Grassian does not present

information in his interview summaries justifying use of the word "threat."

c.    Like his potentially misleading references to "solitary confinement" that do not distinguish between brief solitary confinement in an administrative or disciplinary segregation unit and extended confinement in a disciplinary segregation unit, Dr. Grassian uses the term "the hole" throughout his summaries of his interviews of the six former detainees. Despite differences between them, he uses the term to represent both the administrative segregation unit and the disciplinary segregation unit.

d.    At the AIPC, there is an administrative segregation unit and a disciplinary segregation unit. Restrictions on detainee programming and activities are greater in the disciplinary segregation unit than in the administrative segregation unit. The duration of a detainee's placement in a disciplinary segregation unit is generally of greater duration than the duration of placement in an administrative segregation unit.

e.    At the AIPC, detainees may be placed in a segregated housing unit as sanction for misconduct. The sanction for misconduct falling within the "High Moderate" category (e.g., Refusal to clean assigned living areas) is placement in disciplinary segregation for up to 72 hours. Detainees are advised of the Facility's rules of conduct, prohibited acts, and sanctions in writing, language, and/or another manner they can understand.

f.    Perceptions of what represents acceptable cleanliness of personal possessions and surroundings are subjective. The element of subjectivity regarding what represents acceptable cleanliness at the AIPC is removed by implementing clearly-defined standards derived from applicable contractual, regulatory, and statutory requirements.

Dr. Grassian presupposes that no detainee would voluntarily participate in cleaning activities. He offers no evidence to support this presupposition.

In addition to the objective and subjective benefits associated with living in a clean environment and contributing to maintaining a clean environment for oneself and others including fellow detainees, participating in cleaning is a productive, pro-social activity that affords opportunities to detainees including, but not limited to, interacting collaboratively and developing and/or refining skills that can increase their employability and the quality of their personal lives following their release from detention. Perceptions of participation in cleaning activities are subjective and therefore most reasonably assessed individually.

As noted, former detainees Hernandez, Menocal, Gaytan, Alexakhina,

and Xahuentitla were never placed in administrative or
disciplinary segregation at the AIPC. In his summaries of his
interviews of these individuals, Dr. Grassian reports that all
five of them developed "fear" of "the hole" and that their fear
contributed to their meeting the behavioral expectation of
cleaning assigned living areas. He reports their fears were based
on their interactions with other (also presumably former)
detainees who had been placed in "the hole."

Much as there is a subjective element to the experience of threat,
so too is there a subjective element to the experience of fear. A
person may experience fear in the absence of real threat; such
fear is unfounded. A person may experience fear based on
unrealistic expectations of negative events or outcomes; such fear
is exaggerated.

Dr. Grassian makes no reference to any of the former detainees
having reported that they or other detainees were placed or
informed that they would be placed in segregated housing for
meeting behavioral expectations including expectations related to
cleaning. Fears of arbitrary placement in segregated housing were
unfounded.

Dr. Grassian cites former detainees Alexakhina and Xahuentitla as
having also reported experiencing fear related to Facility staff's
practice of confiscating contraband. Regardless of how the former
detainees perceived the contraband ("benign" or otherwise),
possession of contraband is explicitly prohibited.

Confiscation of contraband is an essential staff function at
detention facilities. Staff failure to perform this function
represents grounds for termination and, more importantly,
jeopardizes the welfare and safety of every person at the
institution. Any fear experienced by former detainees related to
staff at the AIPC performing a known and essential function of
their job that promotes the safety of staff and detainees
including themselves is unwarranted.

Dr. Grassian reports that some former detainees perceived the
clearly defined responsibility of participating in cleaning
assigned living areas as onerous. Perceptions of the ease or
onerousness of work are subjective. That some former detainees
may have perceived a task as onerous does not mean it was in fact
onerous. Dr. Grassian's report does not reference any of the
former detainees having utilized the grievance process or other
available means to communicate their perception of meeting work-
related responsibilities as onerous.

More conspicuously absent from Dr. Grassian's summaries of his
interviews of these five former detainees is information regarding
any of them having reported or evidenced psychiatric disturbance
during or even following their placement at the AIPC.

If Dr. Grassian's core contention and deterministic assertions in support of that contention are valid, then all of the former detainees he interviewed would have suffered some measure of enduring psychological harm from the reminders of their cleaning responsibilities. Dr. Grassian presents no such information.

Dr. Grassian makes no reference to any of these five former detainees having documented, reported, or evidenced significant psychiatric disturbance related to cleaning responsibilities during their placement at the AIPC. Information contained in medical records available for four of the five former detainees indicates that the number of them who contemporaneously documented, reported, or evidenced any psychological distress related to cleaning expectations was zero.

Much as he speciously misapplies the practice of transferability, Dr. Grassian speciously misapplies the process of generalization. As defined by the American Psychological Association, generalization is the process of deriving a concept, judgment, principle, or theory from a limited number of specific cases and applying it more widely, often to an entire class of objects, events, or people. From reports of alleged harm offered retrospectively and without evidence by a small number of former detainees, Dr. Grassian misapplies generalization to contend that all former detainees suffered harm. Determinations of harm are most reasonably made individually.

2. Former Detainee Hernandez-Torres

The sixth former detainee interviewed by Dr. Grassian is Alejandro Hernandez-Torres. Distilled from his summary of his interview of this individual, Dr. Grassian reports that Mr. Hernandez-Torres was housed at the AIPC for three years (2012-2015). He reports that, during that period, Mr. Hernandez-Torres alleged he was placed in administrative segregation as sanction for failing to meet his cleaning responsibilities. He reports that Mr. Hernandez-Torres exhibited inappropriate behavior following his placement in administrative segregation and was transferred to the first of his four placements in disciplinary segregation.

Dr. Grassian does not specify the number of hours Mr. Hernandez-Torres was housed in administrative segregation before exhibiting misconduct resulting in his transfer to disciplinary segregation. The number of hours would necessarily be fewer than 72 hours.

As recounted in Dr. Grassian's report, Mr. Hernandez-Torres would allegedly be placed in disciplinary segregation secondary to misconduct on three subsequent occasions. In discussing one of his placements in disciplinary segregation with Dr. Grassian, Mr. Hernandez-Torres exaggerated the duration of that placement by approximately 100 percent: although he reported to Dr. Grassian that the placement was for "one month," Dr. Grassian identifies the duration of the placement as having been in fact "around two weeks." Presuming the information presented by Dr. Grassian to be

accurate, the durations of Mr. Hernandez-Torres' four placements in disciplinary segregation were, sequentially, no less than five days, twelve days, "around two weeks," and "a month," yielding a total of time spent in disciplinary segregation of approximately 61 days or 1464 hours.

The final paragraph of Dr. Grassian's summary of his interview of Mr. Hernandez-Torres (and the final paragraph of the section summarizing his interviews of all six former detainees) states, "Mr. Hernandez Torres has suffered continuing harm from his experience of solitary at Aurora. He explained that after release from the Facility, he was so burdened by intrusive images of his ordeal that he became distraught, tried to take his own life, and was psychiatrically hospitalized. During our interview, he repeated several times how hard it was for him to have those memories of being confined in Aurora. And, indeed, he was crying during much of the interview as he spoke of his experience."

Given the absence of information supporting Dr. Grassian's core contention in his summaries of his interviews of the other five former detainees, the information contained in this final paragraph represents the only potential source of support for the contention from among his interviews of former detainees. However, I understand that Mr. Hernandez-Torres' factual allegations regarding the number and duration of his placements in segregated housing are inconsistent with GEO's records.

As relates to this information:

Dr. Grassian's core contention pertains specifically to psychiatric harm in the context of brief placement in solitary confinement. His statement, "Mr. Hernandez Torres has suffered continuing harm from his experience of solitary at Aurora" does not distinguish between the former detainee's alleged multiple placements in segregation.

Dr. Grassian presents no evidence indicating that the purported harm was caused by or during the first 72 hours Mr. Hernandez-Torres spent in solitary confinement. Furthermore, the issue of whether or not more than 1500 hours spent in solitary confinement causes psychiatric harm is distinctly different from the issue of whether or not a reminder of potential placement or an actual placement in solitary confinement for 72 hours or less causes psychiatric harm.

The limitations identified above also apply to Dr. Grassian's reports of Mr. Hernandez-Torres crying during his interview, his having "repeated several times how hard it was for him to have those memories of being confined at Aurora," and his having reportedly "tried to take his own life" and been psychiatrically hospitalized. Dr. Grassian does not offer any information or cite any report from Mr. Hernandez-Torres indicating that the former detainee's psychiatric distress or suicidality were the result of

fewer than 72 hours in segregation.

Dr. Grassian's summary of his interview of Mr. Hernandez-Torres is as notable for the information he chose to not include as it is for the information he chose to include. Although it is customary to provide such information in summaries of mental health interviews, Dr. Grassian's summary provides no information regarding the former detainee's psychiatric history prior to, during, or, with the exception of the vaguely described suicide attempt and subsequent psychiatric hospitalization, following his release from the AIPC.

IV.  Contention 2:  Former detainees at the AIPC were coerced to participate in the Voluntary Work Program by depriving them of sustenance

Most scholarly compositions feature a common format.  The format involves the author setting forth a clear hypothesis or contention, presenting relevant information both supporting and not supporting the hypothesis or contention, reviewing and/or analyzing the relevant information, and offering a conclusion regarding the validity of the hypothesis or contention based on that review and/or analysis.

In presenting his second primary contention, Dr. Grassian does not utilize this common format.  He presents the contention in the next-to-last paragraph on the final page of his 33 page statement in a section he entitled, "Conclusions."

Dr. Grassian's second contention is that former detainees at the AIPC were coerced to participate in the Voluntary Work Program by depriving them of sustenance.  The falsity of the contention is exposed by facts.

The sparse support Dr. Grassian offers for the contention is scattered throughout previous pages of his statement.  A retrospective reading of the statement is necessary to locate information he means to serve as support for the contention.  The information consists of statements from three of the six former detainees he reported having interviewed.

In his summary of his interview of Mr. Hernandez-Torres, Dr. Grassian recounts the former detainee's description of the first of his four placements in segregated housing.  Dr. Grassian notes, "He recalled how inadequate the food was."

In his summaries of his interviews of Mr. Gaytan and Ms. Alexakhina, Dr. Grassian reports both former detainees informed him that they felt they were not provided enough food and experienced chronic hunger at the AIPC.  He cites them as having stated further that, lacking money to purchase food from the commissary to satisfy their hunger, they felt coerced to participate in the Voluntary Work Program to obtain money with which to purchase food.

Without disputing the validity of the reports of the two former
detainees that they experienced hunger during their placements at
the AIPC, it is important to note that the experience of hunger is
not necessarily evidence of deprivation. At one time or another,
many if not most people have found themselves feeling hungry a
short time after consuming a large meal. What is disputable is
the contention that detainees are deprived of sustenance.

As support for his broad contention that former detainees at the
AIPC are deprived of sustenance so as to coerce them to
participate in the Voluntary Work Program to earn money with which
to purchase food, Dr. Grassian cites reports from three former
detainees. His summaries of his interviews of the three other
former detainees make no reference to their having reported food-
related or hunger-related issues, and it seems reasonable to infer
from this that these individuals did not share the perceptions or
experiences of the two former detainees who reported feeling
hungry or the former detainee who described the food served to him
as "inadequate" (Dr. Grassian did not indicate if the perceived
inadequacy pertained to quantity or quality).

Given the threshold of "three out of six" that he used as the
basis for his contention that the AIPC deprives detainees of food,
Dr. Grassian could have equally well referenced his interviews of
the three former detainees who did not report deprivation or
hunger during their placement at the AIPC and offered the opposite
contention.

Information contained in medical records available for seven of
the nine named plaintiffs indicates that none of them documented
or reported chronic hunger or feeling deprived of food during
their placements at the AIPC. Information contained in medical
records available for four of the six former detainees interviewed
by Dr. Grassian indicates that all of them gained weight during
their placements at the AIPC.

Finally, the AIPC is governed by applicable contractual,
regulatory, and statutory requirements. Detainees at the AIPC are
provided food and drink that meet or exceed established
nutritional guidelines.

V.  Dr. Grassian's Conclusions

Dr. Grassian entitled the final section of his statement
"Conclusions." This section starts in the middle of page 30, and
both the section and the statement conclude on page 33.

This section begins with Dr. Grassian reiterating his core
contention. It contains two citations, neither of which pertain
to his core contention. The citations pertain to learned
helplessness, discussed below (see Section entitled, "Learned
helplessness"). Following reiteration of his core contention, Dr.
Grassian devotes the remainder of the Conclusions section of his

report to offering negative characterizations of the staff and environment at the AIPC, also discussed below (see Section entitled, "Institutional staff conduct and environment").

A. Learned helplessness
Dr. Grassian presents information regarding learned helplessness in the Conclusions section of his statement. He writes, "Research regarding this phenomenon has shown that where an individual experiences himself as powerless to prevent aversive consequences, this may produce in him the loss of will to resist negative consequences." His final two citations relate to this phenomenon.

Dr. Grassian does not directly assert that he believes the former detainees he reported having interviewed had developed learned helplessness. His ambiguous statement that learned helplessness "describes well the experience of the detainees whom I interviewed" and his multiple subsequent references to the phenomenon in relation to the former detainees imply such a belief, however.

Per Dr. Grassian's description, learned helplessness "may" develop when "an individual experiences himself as powerless to prevent aversive consequences." Insofar as the aversive consequence to which he referred throughout the preceding 30 pages of his statement was placement in solitary confinement, it seems reasonable to consider that consequence in relation to learned helplessness.

Dr. Grassian does not offer any information indicating that any of the six former detainees he reported having interviewed were placed in solitary confinement arbitrarily. Similarly, none of these individuals stated that they were placed in solitary confinement arbitrarily. As noted, five of the six former detainees he interviewed had never been placed in solitary confinement, and the sixth individual had been so placed as sanction for violating rules of conduct.

Accordingly, the evidence indicates that each of the former detainees had the power to prevent the aversive consequence of placement in solitary confinement. Five of them exercised that power by choosing to not engage in behaviors that violated well-defined rules of conduct and so prevented the aversive consequence. The sixth former detainee also had that power, but chose to not exercise it.

B. Institutional staff conduct and environment
Dr. Grassian presents information related to the staff and environment at the AIPC in the Conclusions section of his statement. Using pejorative language, he references staff of the AIPC as malicious, dehumanizing, hateful, cruel, coercive, and contemptuous. He references the environment at AIPC as barren and the experience of detention at the AIPC as "one that would crush the spirit of a person of ordinary fitness."

The only basis for the emotionally charged language is the
reported experiences of the former detainees he interviewed. He
withholds information regarding positive perceptions of custody
staff offered to him by at least one former detainee. In the
absence of any evidence supporting the references other than
select statements made by former detainees currently named as
plaintiffs in a lawsuit against the AIPC, and given the
fundamental precept that experiences are processed subjectively,
the use of such inflammatory language is unsupported and
inappropriate.

<u>Addendum</u>
The following information was obtained from review of GEO medical
records. Records were available for the following seven former
detainees:

Alexakhina
Argueta-Avelar
Hernandez-Ceren
Menocal-Lepe
Valerga
Vizguerra
Xahuentitla

All seven of the former detainees received mental health
evaluations upon their admissions to AIPC. Four of them received
mental health treatment during their placements at the AIPC. Of
these four, at least three of them had histories of pre-existing
psychiatric disturbance.

During their placements at the AIPC, all seven of the former
detainees utilized form HS-154 (SP) entitled, "Request for Health
Services." This form is used to document and request treatment of
medical complaints, dental complaints, and/or psychological
complaints. Former detainees utilized the form to document
complaints including, but not limited to, gum inflammation,
heartburn, constipation, hemorrhoids, knee pain, back pain, "boil
on inner thigh," and "anus itch."

Reference to the broad range of complaints offered by the former
detainees is not intended to trivialize the complaints. The
reference is made to illustrate that all of the former detainees
were aware of and utilized the form for documenting dental,
medical, and psychological complaints.

-Among the seven former detainees, the number who utilized the
form to document a complaint of distress related to awareness that
placement in solitary confinement/segregated housing is a sanction
for failing to meet behavioral expectations (including cleaning
responsibilities): Zero.

-Among the seven former detainees, the number who utilized the

form to document a complaint of distress related to perception of cleaning responsibilities as onerous or objectionable in any way: Zero.

-Among the seven former detainees, the number who utilized the form to document feeling distressed by participating or compelled to participate in the Voluntary Work Program by means of deprivation (or any other reason): Zero.

-Among the seven former detainees, the number who utilized the form to document distress related to perception of custody staff as threatening or hostile: Zero.

-Among the seven former detainees, the number who utilized the Detainee Grievance Form to lodge a complaint against custody staff: Zero.

(Only one former detainee utilized the Detainee Grievance Form. This individual submitted a grievance against a nurse for perceived unprofessional conduct).

-Among the four former detainees who received mental health treatment during their placements at the AIPC, the number who reported any distress related to any of the aforementioned issues to any treatment provider at any time: Zero.

-Among the seven former detainees, the number who lost more than a negligible percentage of body weight during placement at the AIPC (if claims of deprivation were true, then most or all would be reasonably expected to suffer significant weight loss): Zero.

Among the seven former detainees, the number who gained weight: Five. Of the two former detainees who did not gain weight, their weights remained essentially unchanged. One of these individuals was diagnosed with Obesity.



Highly Confidential -- Attorneys' Eyes Only