# EXHIBIT U

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 1:14-cv-02887-JLK-MEH
3    _____

4                 VIDEOTAPE DEPOSITION OF:
           STUART GRASSIAN, M.D. - July 23, 2020
5                    Via RemoteDepoTM
           (Confidential Designations Pending)
6    _____

7    ALEJANDRO MENOCAL, MARCOS BRAMBILA,
     GRISEL XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA,
8    JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO VIZGUERRA,
     and DEMETRIO VALERGA, on their own and on behalf of
9    all others similarly situated,

10   Plaintiffs,

11   v.

12   THE GEO GROUP, INC.,

13   Defendant.
     _____

14
                    PURSUANT TO NOTICE, the videotape
15   deposition of STUART GRASSIAN, M.D., was taken on
     behalf of the Defendant in Middlesex County,
16   Massachusetts, on July 23, 2020, at 3:33 p.m. GMT,
     9:33 a.m. MDT, before Tracy C. Masuga, Registered
17   Professional Reporter, Certified Realtime Reporter,
     and Notary Public within Colorado appearing remotely
18   from Arapahoe County, Colorado.

19

20

21

22

23

24

25

```
 1                    REMOTE APPEARANCES

 2    For the Plaintiffs:

 3               RACHEL W. DEMPSEY, ESQ.
                 Outten & Golden, LLP
 4               One California Street
                 12th Floor
 5               San Francisco, California 94111
                 rdempsey@outtengolden.com
 6
                 MICHAEL J. SCIMONE, ESQ.
 7               Outten & Golden, LLP
                 685 Third Avenue
 8               25th Floor
                 New York, New York 10017
 9               mscimone@outtengolden.com

10               R. ANDREW FREE, ESQ.
                 Law Office of R. Andrew Free
11               2004 8th Avenue South
                 Nashville, Tennessee 37204
12               andrew@immigrantcivilrights.com

13
      For the Defendant:
14
                 ADRIENNE SCHEFFEY, ESQ.
15               Akerman LLP
                 1900 16th Street
16               Suite 1700
                 Denver, Colorado 80202
17               adrienne.scheffey@akerman.com

18               DANA L. EISMEIER, ESQ.
                 MICHAEL Y. LEY, ESQ.
19               Burns, Figa & Will, P.C.
                 6400 South Fiddlers Green Circle
20               Suite 1000
                 Greenwood Village, Colorado 80111
21               deismeier@bfwlaw.com
                 mley@bfwlaw.com
22

23    Also Present:

24               Robert Reitan, Videographer

25
```

```
 1                      I N D E X

 2   EXAMINATION OF STUART GRASSIAN, M.D.:            PAGE
     July 23, 2020
 3
     By Ms. Scheffey                              7, 297
 4
     By Ms. Dempsey                                  292
 5
                                                  INITIAL
 6   DEPOSITION EXHIBITS:                       REFERENCE

 7   (Exhibits provided electronically to the reporter.)

 8   Exhibit 1    Psychiatric Report of Stuart        80
                  Grassian, M.D., 5/1/20, with
 9                attachments

10   Exhibit 2    Articled titled "Psychiatric        95
                  Effects of Solitary Confinement at
11                Northern Correctional Institution
                  on Death Row and in Special
12                Circumstances Under CGS Section
                  18-10b," 3/2018, by Grassian, with
13                attachments

14   Exhibit 3    Journal of Abnormal Psychology     104
                  Article titled "Changes in EEG
15                Alpha Frequency and Evoked Response
                  Latency During Solitary
16                Confinement," by Gendreau, et al.,
                  1972
17
     Exhibit 4    Excerpt from the Deposition of     142
18                Demetrio Valerga, 10/27/17

19   Exhibit 5    Expert Report of Dr. Stuart        219
                  Grassian in Reply to Affidavits,
20                Brazeau and Kift v. Attorney
                  General of Canada, with attachments
21
     Exhibit 6    Typed Notes by Grassian, with      247
22                attachments

23   Exhibit 7    Excerpt from the Deposition of     252
                  Hugo A. Hernandez-Ceren, 6/24/20
24
     Exhibit 8    Excerpt from the Deposition of     256
25                Hugo A. Hernandez-Ceren, 6/24/20
```

U.S. LEGAL SUPPORT, INC
303-832-5966

 1    Exhibit 8A   Excerpt from the Deposition of      264
               Hugo A. Hernandez-Ceren, 6/24/20
 2
      Exhibit 9    Rough Draft Excerpt from the        271
 3                 Deposition of Alejandro Menocal,
                   7/22/20
 4
      Exhibit 10   The Durango Herald article titled   278
 5                 "Mother charged with attempted
                   murder," 9/18/13
 6
      Exhibit 11   Declaration of Alejandro Hernandez  281
 7                 Torres, 4/11/16

 8    Exhibit 12   Declaration of Dawn Ceja Pursuant   282
                   to 28 U.S.C. Section 1746, 5/31/16
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              WHEREUPON, the following proceedings

 2    were taken pursuant to the Federal Rules of Civil

 3    Procedure.

 4              *       *       *       *       *

 5              THE VIDEOGRAPHER:  We are now on the

 6    record.  Participants should be aware that this

 7    proceeding is being recorded, and as such, all

 8    conversations held will be recorded unless there is a

 9    request and agreement to go off the record.  Private

10    conversations and/or attorney-client interactions

11    should be held outside of the presence of the remote

12    interface.

13              A link to the recording will be

14    available to all parties to the case for up to 90 days

15    from today's date provided the requesting party has

16    purchased a certified copy of the transcript.

17              This is the remote video-recorded

18    deposition of Stuart Grassian.  Today is Thursday,

19    July 23, 2020, and the time is 3:33 p.m. GMT time,

20    9:33 a.m. Mountain Time.  We are here in the matter of

21    Alejandro Menocal, et al. v. The GEO Group.

22              My name is Robert Reitan, remote video

23    technician on behalf of U.S. Legal Support, located at

24    1900 Grant Street, Suite 1025, in Denver, Colorado.

25    I'm not related to any party in this action, nor am I

 1  financially interested in the outcome.

 2              At this time, will the reporter, Tracy

 3  Masuga, on behalf of U.S. Legal Support, please enter

 4  the statement for remote proceedings into the record.

 5              THE REPORTER:  The attorneys

 6  participating in this deposition acknowledge that I am

 7  not physically present in the deposition room and that

 8  I will be reporting this deposition remotely.  They

 9  further acknowledge that in lieu of an oath

10  administered in person, the witness will verbally

11  declare his testimony in this matter is under penalty

12  of perjury.

13              The parties and their counsel consent to

14  this arrangement and waive any objections to this

15  manner of reporting.

16              Counsel, please indicate your agreement

17  by stating your name and your agreement on the record.

18              MS. SCHEFFEY:  Adrienne Scheffey on

19  behalf of The GEO Group, and I agree.

20              MS. DEMPSEY:  Rachel Dempsey on behalf

21  of plaintiffs, and I agree.

22              THE REPORTER:  Dr. Grassian, do you

23  solemnly state that the testimony you are about to

24  give in the cause now pending will be the truth, the

25  whole truth, and nothing but the truth?

```
 1              THE DEPONENT:  I do.

 2                   STUART GRASSIAN, M.D.,

 3    having sworn to state the whole truth, testified as

 4    follows:

 5                        EXAMINATION

 6    BY MS. SCHEFFEY:

 7         Q.    Dr. Grassian, my name is Adrienne

 8    Scheffey, and I represent GEO.  I'm going to be asking

 9    you a series of questions about a lawsuit captioned

10    Menocal v. GEO for which you provided a report.  Are

11    you familiar with that case?

12         A.    Yes, I am.

13         Q.    And have you been deposed before?

14         A.    Yes, I have.

15         Q.    Okay.  So I'm going to go through a few

16    ground rules, but you're probably very, very familiar

17    with all of them.  Feel free to stop me if you have

18    any questions.

19              The first thing I want to go through

20    with you is that even though we're on videoconference

21    today, this proceeding has the same effect as if we

22    were in the court of law.  Do you understand that?

23         A.    Yes, I do.

24         Q.    And do you understand that you've sworn

25    to tell the truth today?
```

1    standard approach would be that you could explain to

2    others in your field that "This is the process I would

3    go through," and they could say, "Oh, I would go

4    through the same process" or "I would go through a

5    different process."

6            MS. DEMPSEY:  Object to form.

7        A.    Again, the process would depend upon the

8    individual situation.  But typically, the first thing

9    I do is I hear a little bit about why the person, you

10   know, is being referred to me from whoever is

11   referring the person, and then I sit down and talk to

12   the individual, interview them.

13       Q.    (BY MS. SCHEFFEY)  And then after the

14   interview, what would you do?

15       A.    I don't know.  It's so variable.  It

16   would depend on the situation.  I don't know.

17       Q.    So every --

18       A.    Not generically.

19       Q.    Every circumstance is different

20   depending on the individual?

21           MS. DEMPSEY:  Object to form.

22       A.    Well, every individual is an individual.

23   I mean, most patients who I see -- I don't know.  I

24   have to -- I don't -- I can't answer it generically.

25   You know, I would have to, like, think of a situation

1  and the particular person.

2        Q.   (BY MS. SCHEFFEY)  So is there a

3  standard process that could be applied to every single

4  person?

5        A.   I just said --

6             MS. DEMPSEY:  Object to form.

7        A.   I'm sorry.  I just said no.  I mean, you

8  know, for example, sometimes I -- you know, sometimes

9  I go right for what -- what a person's, you know,

10 suffering.  Sometimes I -- I really just try to make a

11 relationship with the person because I can see that

12 they're uncomfortable.  You know, sometimes I even kid

13 around.  I mean, it's -- a lot of it is clinical

14 experience and intuition about how you proceed with a

15 particular patient.

16       Q.   (BY MS. SCHEFFEY)  Are there different

17 variables you consider with different individuals?

18            MS. DEMPSEY:  Object to form.

19       A.   Different variables?  I mean, I don't

20 know.  You know, I mean, if you asked me, you know --

21 I don't know.  I mean, there are all kinds of things.

22 I can't answer generically.

23            You know, if you were asking about

24 anxiety and Valium, in my experience, people tend to

25 pretty neatly divide themselves into two groups.  It's

1    **Q.    Have you ever diagnosed someone with any**

2    **of the diagnoses in the DSM without either**

3    **interviewing that person or reviewing his or her**

4    **medical records?**

5              MS. DEMPSEY:  Object to form.

6         A.    You're asking if there are people I've

7    diagnosed with a psychiatric disorder without the

8    benefit of clinical interview or records?

9         **Q.    (BY MS. SCHEFFEY)  Yes.**

10        A.    Just for my understanding, what data did

11   I base my decision on?  If I didn't have those things,

12   what do I have?

13        **Q.    You tell me.**

14        A.    I have no idea.  I can't imagine.  I

15   can't imagine a situation like that.

16        **Q.    You don't recall any situation where you**

17   **would have done that?**

18        A.    I mean, you're -- I can't think of

19   any -- you seem to be indicating, have I ever

20   prescribed medication without having any information

21   at all.  And the answer is no, of course not.

22        **Q.    Or not just prescribe medication but**

23   **made a diagnosis.**

24        A.    Without having any information?

25              MS. DEMPSEY:  Form.

1          Q.    (BY MS. SCHEFFEY)   Without medical

2     records or an interview.

3          A.    I'm trying to think about situations

4     where that could possibly occur.  And what occurs to

5     me is that it could only occur, not in a clinical or

6     treatment setting, but in a forensic setting.  Like I

7     have reviewed cases of individuals who committed

8     suicide while in prison, for example.

9               And have I ever made a diagnosis on the

10    patient?  I mean, first of all, the patient is

11    deceased.  But, I mean, generally, I can't think of a

12    case where I wouldn't have had access to their medical

13    records in order to have some insight into what was

14    going on with the individual.

15               So I don't know.  I can't think of a

16    situation like that.  I mean, you know, there -- there

17    are certainly situations where, you know -- yeah, I

18    can't -- I can't imagine that situation.  I'm not

19    sure.  Maybe I'm not thinking of one, but . . .

20          Q.   All right.  Thank you.  I am going to

21    introduce Exhibit 1, which is going to be your report.

22    If you have a copy there that you prefer to review,

23    that's fine.  I will represent it's the same one we

24    received.  I just want to make sure you have it in

25    front of you.

1      A.   Communicating with others?

**2      Q.   Yeah, conversing with others.**

3      A.   Yeah.  Sure.  That would be a form of

4    perceptual stimulation.  And, of course, it also

5    speaks to the issue of social isolation.  You know, if

6    you're communicating with others, you know, that's

7    diminishing whatever social isolation you might

8    experience otherwise.

**9      Q.   What about watching TV?**

10      A.   It's variable.  It depends on the

11    situation.  There are people who find having a TV to

12    be very helpful, and, you know, in some -- there are

13    some situations in solitary confinement where people

14    are allowed to have TVs.  And generally, most

15    typically, that's been helpful, though there are

16    situations that -- where people have actually started

17    to become incredibly upset at their TVs, you know, and

18    even thrown the thing and smashed it.  So -- but

19    generally, I think, you know, having the ability to

20    watch a television is -- is beneficial.

21          And I do know that in Aurora, in the

22    detention facility, people in administrative

23    segregation, there was a couple of TVs out in the

24    hall, and I gather that, depending on what cell you

25    were in, you could hear it and see it to some extent.

```
 1   improper under the rules, I'm going to continue to

 2   object to them.

 3              MS. SCHEFFEY:  Right.  You can object to

 4   them under form.  We've agreed it's preserved.  We're

 5   in Colorado; we're doing a Colorado deposition; that's

 6   the proper practice here.

 7              MS. DEMPSEY:  I don't think describing

 8   the form of the objection is a speaking objection.

 9              MS. SCHEFFEY:  Okay.  Well, we're way

10   past it.  Can the witness answer, Rachel?

11              MS. DEMPSEY:  Sure.

12      A.   Your question doesn't really make any

13   sense.  Obviously, there are variations in how much

14   environmental and social stimulation is deprived in

15   any particular circumstance.  I mean, how could you

16   have literature about that?

17              What I can tell you is that different

18   individuals are more or less susceptible to varying

19   degrees of restriction of environmental and social

20   stimulation.  For example, people with very limited

21   intellectual capacity tend to be much more vulnerable,

22   and the reason for that is that they're not really

23   able to generate stimulation internally by thinking

24   and whatever, daydreaming.  So that group of people

25   will tend to be -- to have more severe effects from
```

Stuart Grassian  07/23/2020                    ConfidentialPage 205
ALEJANDRO MENOCAL vs GEO GROUP

1    conditions of confinement.  I mean, I can't be

2    specific.  I mean, I've seen -- I've evaluated

3    hundreds of prisoners.  I can't define it with that

4    kind of precision.

5         **Q.  What would you have to have from an**

6    **individual in order to know what conditions of**

7    **confinement might bring these symptoms on?**

8         A.  You're asking what I would need to know

9    about an individual in order to decide?  Is that what

10   you said?  I think you need to rephrase your question.

11   I'm a little confused by what you're actually asking.

12        **Q.  Yeah.  A moment ago you said that**

13   **whether an individual is likely to fall into this fog**

14   **depends on their individual circumstances or who they**

15   **are.  So I'm trying to find out what things would you**

16   **look for to find out whether this was more likely in**

17   **one individual versus another individual.**

18        A.  That isn't the -- I mean, when I

19   evaluate individuals, I mean, I evaluate what actually

20   happens, whatever happened to them, not -- I don't

21   make predictions based on the conditions of

22   confinement.

23             What I can tell you is that the

24   experience, the harsher the conditions of confinement,

25   the worse the psychiatric difficulties that people

1    can affect brain function, and I'm pretty certain

2    there -- yeah, there are studies that have indicated

3    that there's brain damage associated with chronic

4    stress, especially changes in the hippocampus.

5          **Q.    And how many years were the individuals**

6    **in solitary confinement in those studies?**

7          A.    Those were not solitary confinement

8    studies.

9          **Q.    Okay.  So those didn't have anything to**

10   **do with solitary confinement?**

11         A.    That's not -- no, I mean it's --

12               MS. DEMPSEY:  Object to form.

13         A.    That's not -- to correct, what we're

14   talking about here is chronic stress.  Now, we know

15   that solitary confinement is a very stressful

16   situation.

17               But if you're asking a corollary

18   question, which is, do I think that three days of

19   solitary confinement is likely to cause permanent

20   brain damage or shrinkage of the hippocampus, I doubt

21   it.

22         **Q.    (BY MS. SCHEFFEY)  Okay.  Is it your**

23   **position that the duration of segregation impacts the**

24   **psychological effects on an individual in solitary**

25   **confinement?**

1          MS. DEMPSEY:  Object to form.

2          A.   People can become symptomatic very

3     quickly; others become -- tolerate conditions for long

4     periods of time without becoming overtly ill.  So it's

5     certainly variable.  In general, the prolonged -- the

6     further prolongation, the longer the period in

7     solitary confinement, the more likely it is that

8     people are going to become quite -- quite ill.

9          **Q.   (BY MS. SCHEFFEY)  Okay.  Would you say**

10    **that if someone is confined in segregation for three**

11    **days, the psychological impact is the same as someone**

12    **who is confined in segregation for five years?**

13         A.   Well, generally, I think a person who is

14    in solitary confinement for three days would not have

15    as -- nearly as severe an impact as if they were in

16    solitary confinement for five years, but this again

17    would depend on the individual.

18         **Q.   Okay.  So there -- in your opinion, it**

19    **would be better if someone was taken out after three**

20    **days than after five years?**

21         A.   Yes.

22         MS. DEMPSEY:  Object to form.

23         **Q.   (BY MS. SCHEFFEY)  So duration plays**

24    **into the severity of the mental response or**

25    **psychological response?**

```
 1  a valid way?  Well, probably not.  I mean, why would

 2  they?  You know, what incentive would they have to do

 3  so?  You know, if you reveal that you're depressed in

 4  prison, you can be exploited, you can be treated as

 5  weak, or you can be made fun of.  You know, this may

 6  not help you at all.  So there wouldn't be any

 7  incentive for the person to -- you know, to give valid

 8  responses.

 9           I mean, if you -- I'm sure you've

10  reviewed my critique of the O'Keefe study in Colorado,

11  and that's a major problem with the study.  The

12  biggest problem with the study is that they never

13  validated for those people, for those prisoners that

14  the self-report rating scales were -- were valid for

15  that, for that group.

16           Q.  (BY MS. SCHEFFEY)  Okay.  And so in this

17  case, how many individuals did you interview?

18           A.  I don't know.  It was like five or six,

19  something like that.

20           Q.  Okay.  And are you aware that that's out

21  of a class of over 30,000 individuals?

22           A.  Yeah, but I wasn't -- I wasn't doing a

23  test or anything.  I was trying to get a feeling for

24  what the situation was like and what it was like for

25  people being there.  I made no diagnoses on these
```

1    patients -- on these people.

2         Q.    Okay.  And you aren't -- do you know if

3    these de- -- six to eight detainees' demographics are

4    representative of the larger class?

5              MS. DEMPSEY:  Object to form.

6         A.    Again, I don't know.  My effort was to

7    try to get a sense, a feeling for what the place was

8    like, what it was, you know, like to be there, and

9    that's why I spoke to those detainees.  But I did not

10   make diagnoses of those detainees or extrapolate to

11   others.

12        Q.    (BY MS. SCHEFFEY)  Okay.  So your report

13   does not attempt to extrapolate to others; is that

14   correct?

15        A.    No, the --

16             MS. DEMPSEY:  Objection, form.

17        A.    No, the report does.  The report talks

18   about what it -- the experience was like, what it was

19   like to be there.  But it certainly does not attempt

20   to talk about what kind of psychiatric harm was done

21   to one individual or another.  I don't make diagnoses

22   in my report, but I -- what I do describe, try to

23   bring to life, is what the experience was like being

24   there.

25        Q.    (BY MS. SCHEFFEY)  Okay.  But did you --

1    did you make any attempt to validate the questions you

2    asked to ensure they could be extrapolated to a larger

3    population?

4                    MS. DEMPSEY:  Object to form.

5              A.    Again, the -- the information I obtained

6    from the interviews had to do with what the experience

7    was like to be in that setting.  It was not an attempt

8    at making a psychiatric diagnosis.

9              Q.    (BY MS. SCHEFFEY)  Do you know if the

10   experiences of the individuals you interviewed are

11   representative of the larger class?

12             A.    Well --

13                    MS. DEMPSEY:  Object to form.

14             A.    -- the experiences that they had were

15   actually somewhat variable.  They weren't all the

16   same.  And it does seem that, you know, some of the --

17   I mean, I gather that things changed over time, and --

18   you know, like the whole thing about whether a person

19   could be forced to do the involuntary labor even if

20   they were in the Voluntary Work Program, that seemed

21   to change over time.

22                    So my effort in evaluating -- or in

23   interviewing those people was to get some overall

24   sense of what it was like there, but I am perfectly

25   aware that things were not uniform.  Not everyone

1    answered.

2              A.    This is not a scientific study.  My --

3    my opinions in this case have to do with the

4    coercive -- the nature of the -- of the punishment

5    that was being threatened and how people experienced

6    it, how people experienced that threat.  So that's all

7    that it -- that it was.  It wasn't an attempt at some

8    exhaustive analysis of how everyone fared at that

9    place.

**10              Q.    (BY MS. SCHEFFEY)   Okay.  Do any of the**

**11   studies in your report reference or discuss the threat**

**12   of segregation as opposed to the actual imposition of**

**13   it as a sanction?**

14             MS. DEMPSEY:   Object to form.

15             A.    The studies that I cite and my own

16   studies are not about the threat of segregation.  They

17   are about the actual experience of segregation.  So

18   that -- in that sense, this is different.  This is --

19   for most of these people, it was simply the threat.

20   And some of these people had -- didn't really know

21   anyone who had been in segregation.  Others knew

22   people who were and had, you know, bad reactions to

23   it, et cetera.  So, no, I mean, this -- my own studies

24   and this -- the literature is about the effects of

25   segregation, not the --

1  (inaudible).

2            THE REPORTER:  I'm sorry.  I could not

3  hear that.

4            MS. SCHEFFEY:  I'm sorry.  It froze.

5       Q.   (BY MS. SCHEFFEY)  You were saying, "I

6  was trying to get a sense of," and we all lost you for

7  a moment.

8       A.   I was trying to get a sense of what it

9  was like being in that situation and being confronted

10 with that threat.  I was --

11      Q.   Okay.

12      A.   -- not trying to make diagnoses or offer

13 treatment.

14      Q.   Okay.  Have you ever looked into

15 literature on reminders that a potential sanction for

16 misconduct could cause psychological harm?

17           MS. DEMPSEY:  Object to form.

18      A.   I'm not aware of any literature

19 discussing whether the threat of a punishment can

20 itself cause psychiatric harm, and no such studies

21 were cited in my report.

22      Q.   (BY MS. SCHEFFEY)  Okay.  Let's -- I

23 want to talk a little bit about the detainee

24 interviews.  Can you tell me how you came to speak

25 with the detainees who you spoke with?

1                    REPORTER'S CERTIFICATE

2    STATE OF COLORADO              )
                                    )   ss.
3    ARAPAHOE COUNTY                )

4

                I, TRACY C. MASUGA, Registered
5    Professional Reporter, Certified Realtime Reporter,
     and Notary Public 19924005553, State of Colorado, do
6    hereby certify that previous to the commencement of
     the examination, the said STUART GRASSIAN, M.D.,
7    declared his testimony in this matter is under penalty
     of perjury; that the said examination was taken in
8    machine shorthand by me remotely and was thereafter
     reduced to typewritten form; that the foregoing is a
9    true transcript of the questions asked, testimony
     given, and proceedings had.

10

                I further certify that I am not employed
11   by, related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of
12   this litigation.

13              IN WITNESS WHEREOF, I have affixed my
     signature this 28th day of July, 2020.

14
                My commission expires April 24, 2024.

15

16   __X__ Reading and Signing was requested.

17   _____ Reading and Signing was waived.

18   _____ Reading and Signing is not required.

19

20

21   _____
     Tracy C. Masuga
22   Registered Professional Reporter
     Certified Realtime Reporter

23

24

25