# EXHIBIT X

**Stuart Grassian, M.D.**
401 Beacon Street
Chestnut Hill, MA 02467
(617) 244-3315; fax (617) 244-2792
stgrassian@gmail.com

<u>**Response to Expert Reports of Drs. Graham Glancy and David Nussbaum in**</u>

<u>***Reddock v. Attorney General of Canada***</u>

**INTRODUCTION.**

I am a Board-certified psychiatrist, licensed to practice medicine in the Commonwealth of Massachusetts and was on the teaching faculty of the Harvard Medical School for over 25 years. In August 2017, I provided an expert report regarding the psychiatric effects of prolonged solitary confinement (defined as such confinement for more than 15 consecutive days) in Administrative Segregation in Canadian Federal Prisons.

I have now been forwarded the expert reports of Drs. Graham Glancy and David Nussbaum and have been requested to provide a response. I will not comment upon Drs. Glancy and Nussbaum's comments about the reports of Drs. Martin, Chaimowitz and Hannah-Moffat - the other plaintiff experts in this matter. I respond to their reports by:

    1. Addressing central arguments in this report, and ,

    2. Addressing arguments I view as being more peripheral in Appendix A and Appendix B of this report.

1

P00004771

218

1. **The Nature of Reliable Research.**

A central thesis of both of Drs. Glancy and Nussbaum's reports is that certain types of studies (which basically includes the studies they put forth as finding no psychiatric harm associated with solitary confinement) should be given strong weight, whereas others (basically, those finding that there is such harm, including my own) are weak and defective.   Drs. Glancy and Nussbaum laud one particular study – O'Keefe, M. et.al., (2010) *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*[1] - as being worthy of the greatest credit.  In addition, Dr. Glancy, among others, cites a "meta-analysis" by Robert Morgan et. al. as also being of exceptional value. The Morgan article is a review based upon analysis of 24 articles whose methodology the authors believed to be creditable and valid. In fact, the critical article, out of these 24, is the O'Keefe article mentioned above. My response will include a critique of 22[2] of these 24 articles, but for the sake of clarity and readability, I will place my discussion of most of these articles  - all but the ones most relied upon by Glancy in his various reports in similar litigation  -  into Appendix B of this reply.[3]

However, before undertaking this critique,  it should be noted that that the authors culled these 24 articles  as being the only "scientifically valid" articles from a pool of approximately 170 articles on the subject which they had compiled;  the excluded articles

---

[1] www.Ncjrs.gov/pdffiles1/nij/grants/232973.pdf.
  Later published in hard copy (2013) *J. Am. Acad. Psychiatry & Law* 41(1):49-60.
[2] I review only 22 of the 24 articles as I was not able to locate the other two; those two have never been published.
[3] Dr. Nussbaum does not undertake the same literature review as Dr. Glancy. However, in his critique of my work, he refers to articles all of which are contained in the Morgan review. Thus, my critique of those articles will also comment upon Dr. Nussbaum's discussion of them.

2

in fact included <u>all</u> of the articles written by the three most well-known authors who have described solitary confinement as causing psychiatric harm (Drs. Craig Haney, Terry Kupers and myself). It is thus important to understand the reasoning behind the authors' decision-making in choosing those 24 articles, while rejecting so many others.

In my opinion, this decision-making is based upon a limited understanding of the ways in which we can gain reliable knowledge in science, and in medicine in particular. In general, there are two methods by which reliable knowledge accrues in these fields: 1. direct observation of the phenomenon to be studied, or 2. the use of a model believed to reflect the phenomenon.

In what follows, I am using the fact pattern of two cases that came before the United States Supreme Court *(Daubert v Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), and *Kumho Tire v.Carmichael,* 526 U.S. 137 (1997).) Their fact patterns are good illustrations of this issue

**1.1. The Use of a Model (*Daubert* fact pattern) .**

In *Daubert,* animal studies were undertaken to study whether the drug Bendectine could cause birth defects in humans; one group of rats received the drug, the other (the control group) did not. Rats given the drug had a higher rate of birth defects than those not given the drug, and the results were said to demonstrate that Bendectine was dangerous for pregnant women. But this was true <u>only</u> if the animal model was a valid predictor of what would happen in humans. The Court pointed this out, acknowledging that the model

3

220

would be useful if, but only if, there was evidence that the animal model was in fact valid– that the result in animals was a useful test of danger in humans. Any study using a model, not the real thing, must be validated.

In medicine, the Daubert mode of inquiry – often employing animal models - is commonly used to study causes of disease and proposed treatments of disease, and is at least arguably appropriate. For example, large-scale animal studies are often used to study the effect of a new drug treatment before human trials begin, but it is only finally when those human trials do begin that we learn whether the animal model was a valid indicator of the effect on humans. And yes, the results are often very disappointing – a drug efficacious and safe for a rat may be utterly ineffective and/or toxic in humans. The poor validity of animal studies of drugs has led many animal rights groups to condemn their use as gratuitously inhumane.

Because the results from animal models are so suspect – so lacking in validity - they provide little real basis for predicting the results in humans. Thus, when the new drug (say, an antidepressant) is finally tested on humans, it is done as a controlled study; half of a large number of patients receive the drug, the other half receive an inactive placebo. The researchers then look to see if the drug had a positive effect. In the best clinical trials, neither the physician nor the patient know whether the patient is receiving the study drug or a placebo; such studies are referred to as "double-blind" and "placebo controlled".

4

This method of inquiry is well-established and often the appropriate means of gaining reliable information. But while it <u>starts</u> by employing a model, it reaches credibility only after direct clinical observation of the effect on patients.

### 1.2. Direct Observation (*Kumho Tire* fact pattern).

<u>Kumho Tire,</u> on the other hand, considered the question of gaining reliable information through direct observation of the phenomenon to be studied. In *Kumho,* an individual who had spent his professional life studying car tire wear patterns was allowed to testify as an expert regarding tire wear patterns from which he reached reliable conclusions regarding the cause of tire failure resulting in a fatal automobile accident.

There are major situations in medicine in which direct clinical observation is the appropriate means of obtaining reliable knowledge. This is often the case in the identification of new disease entities. Consider for example how AIDS was identified. It only took a handful of patients who had developed a very unique set of symptoms (e.g. Karposi's Sarcomas, Pneumocystis Carinii Pneumonias, a very low T-cell count, HIV virus in their blood, etc.) and who all apparently shared causal factors (primarily - the sharing of bodily fluids through transfusion or sexual contact) in order to decisively identify a new disease.[4]

### 1.3. Application to Psychiatry.

---

[4] This is a situation in which neither a model of disease nor a placebo-controlled study has any place. (Regarding a controlled study; you simply cannot infect half your patients with HIV and the other half not in order to see who gets sick!)

5

222

### 1.3.1. Psychological tests and self-report rating scales.

In general, the articles Morgan, Glancy and Nussbaum favor come from a research tradition in clinical psychology in which assessment of clinical status is attempted by employing a model - some form of question-and-answer test or a self-report rating of the subject's psychological adjustment.

One advantage of this method is that typically such data is "standardized" and can be reduced to some numeric form. For example, the subject (patient) may be asked to fill out the Beck Depression Inventory (BDI). It is a self-report; the patient (or "subject" if it is a research study) responds to a series of questions relevant to an assessment of depressed mood. The number of positive responses is used to decide if there <u>is</u> depression, and if so whether it is mild, moderate, or severe.

However, the critical problem with any such data is one of <u>validity</u>. Does the resulting number reflect the actual clinical reality? For example, how is an instrument like the BDI validated? This is done by having a fairly large number of individuals take the test and then the results are compared with those obtained by direct clinical evaluation by a seasoned clinician. If the assessments basically match, then we conclude that the test is valid – <u>for that group.</u>

But valid for <u>whom,</u> for what subset of the population? For example, the BDI and other rating scales have been validated for patients seeking psychiatric treatment. That is not

6

223

terribly surprising; the patient's incentive is to be as accurate as possible so that he can be helped.

But what if a rating scale is administered in a study of how prisoners are psychologically adjusting to prison life? There is virtually no incentive in that situation for the inmate to answer truthfully, and likely there are major disincentives against his doing so: (He might appear weak and vulnerable, and someone might exploit that. He might appear hostile and angry, and this might have a major adverse effect when he faces the Parole Board someday, etc.)

<u>The fact that a test/rating scale has been validated for one group, does not mean that it will be valid for all</u>. For example, those seeking psychiatric treatment are likely to attempt to respond accurately to the self-report questions. However, <u>incarcerated individuals have tremendous incentives **not** to answer truthfully.</u>

Moreover, even an individual's <u>truthful</u> response to such questions may very much be affected by his current psychosocial situation. For example, if a person seeking psychotherapy responds "True" to the MMPI-2 question: "I feel I am being followed", there is a significant probability that he suffers from a paranoid disorder. But if a person seeking to obtain disability income responds in the same way to that question, he may well simply be *correct* (the insurer may well have retained a private investigator to record his daily functioning). Individuals in the midst of litigation will truthfully respond in a somewhat different fashion than individuals seeking psychotherapy.

7

P00004777

224

Similarly, if given by a person seeking outpatient psychotherapy the following answers may well indicate severe paranoia: "My conduct is largely controlled by the behavior of those around me", or "I hear strange things when I am alone", or "I am afraid of losing my mind". On the other hand, such responses might well be quite common among individuals in solitary confinement.

The problem here is that Drs. Nussbaum and Glancy rely upon studies that use tests and rating scales that are <u>not</u> validated for individuals who are incarcerated, and especially for individuals incarcerated in solitary confinement. As will be further discussed below, there is substantial reason to conclude that those tests and scales do not realistically reflect the actual psychiatric status of such individuals. Yet this important fact is ignored in many of the studies that Morgan, Glancy and Nussbaum endorse.

### 1.3.2. Direct Observation.

Since the only way to validate a test or rating scale is by direct examination by a seasoned clinician, one might think that such examination is likely to be the more accurate assessment. After all, such an examination is likely to have far greater subtlety and depth than some self-report rating scale.

But of course, there are problems with direct observation, too. The clinician may be biased, <u>looking</u> for results that match his preconceived notions. Even without such bias, one clinician might come to a different conclusion than another. But when,

8

independently, clinician after clinician reports similar findings – ultimately hundreds, or even thousands of them, and some from entirely different areas of interest – we develop great confidence in the information obtained.

I attach hereto and incorporate herein an article I published – *Psychiatric Effects of Solitary Confinement,* (2006), Wash. U. Jl. of Law & Policy, 22, 325-383 – that describes the vast historical experience with solitary confinement, the medical literature that resulted from that experience. The article demonstrates that there is a strikingly consistent literature regarding not only the psychiatric effects of solitary confinement, but more generally the psychiatric effects of a host of conditions in which the individual is exposed to significantly restricted environmental stimulation. In short, there are a myriad of studies of the effects of restricted environmental stimulation – both in prisons and elsewhere – and they have all found basically the same pattern of psychiatric and neuropsychiatric symptoms.

### 1.3.3. The Delineation of a Unique Syndrome.

As regards my own research, there is an even more fundamental issue. In 1983, I published *Psychopathological Effects of Solitary Confinement* in The American Journal of Psychiatry (AJP), which is arguably the most prestigious peer-reviewed psychiatric journal in the North America. The Morgan article excludes it from analysis as not having sufficient validity, and similarly, Drs. Glancy and Nussbaum choose to dismiss this work as among the merely "anecdotal" and "unscientific" studies. However, they fail to