IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated*,

   Plaintiffs,

v.

THE GEO GROUP, INC.,

   Defendant.

---

## DEFENDANT THE GEO GROUP, INC.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

---

  Defendant The GEO Group, Inc. ("Defendant" or "GEO"), by and through its undersigned counsel, hereby submits its Reply in Support of its Cross-Motion for Summary Judgment and respectfully requests this Court enter judgment in GEO's favor as to all of Plaintiffs' claims.

## I.  INTRODUCTION

  Despite a lengthy Response, Plaintiffs fail to identify a material issue of disputed fact with respect to the dispositive issue; ICE instructed GEO to place the disciplinary sanctions (drafted by ICE) into the detainee handbook, including the sanction of up to 72 hours of segregation for the

54306826;1

refusal to clean. ECF 286 at 102 n.14 ("Plaintiffs do not contest that ICE required the disciplinary severity scale . . .").  Without the sanctions required by ICE, there is no violation of the Trafficking Victims Protection Act ("TVPA"). 18 U.S.C. § 1589(a), Despite conceding that the disciplinary severity scale was required by ICE, Plaintiffs argue, without support that "ICE *prohibited* GEO from requiring detainees to clean all but a limited space directly around their beds." ECF 298 at 35. There is simply no support for this position. To the contrary, ICE's own words belie Plaintiffs' claim:

> Will I get paid for keeping my living area clean? No. **You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined**.

ECF 310-1, 37 (ICE National Detainee Handbook) (emphasis added); ECF 262-2,62 (ICE contract requiring each detainee to receive a copy of the ICE National Detainee Handbook). From there, ICE's Performance Based National Detention Standards ("PBNDS") provide the specific disciplinary severity scale which applies to a detainee who does not clean. This disciplinary scale includes a list of possible sanctions for the refusal to clean, including the possibility of segregation. (Undisputed Fact 21). Rather than limiting the discipline to situations where a detainee refuses to clean certain areas in his or her living area or to only incidents involving to certain enumerated tasks, the disciplinary severity scale provides for broad discipline related to a detainee's "refusal to clean assigned living area." *Id.* There can be no question that a detainee who refuses to wipe down a table after eating a meal is refusing to clean his or her assigned living area. Accordingly, ICE's directives were clear and GEO merely carried them out. Plaintiffs cannot establish that there is an issue of disputed fact as to whether ICE directed GEO to incorporate the disciplinary severity

2

scale into its local handbook. Accordingly, summary judgment is appropriate as to the TVPA claims.

As for Plaintiffs' Voluntary Work Program ("VWP") claims, Plaintiffs fail to present a colorable dispute of fact that ICE did not instruct GEO to pay detainees $1.00 per day. While Plaintiffs attempt to parse the date upon which the instruction changed to "at least" $1.00 per day, there is no genuine dispute of material fact that each of GEO's contracts with ICE instructed GEO to implement a program where $1.00 per day was a permissible stipend. Plaintiffs cannot unilaterally change the meaning of GEO's unambiguous contract with ICE by referring to extrinsic evidence. Without extrinsic evidence, Plaintiffs cannot point to a disputed material fact, as the interpretation of a contract is a question of law. Accordingly. summary judgment is equally appropriate as to the unjust enrichment claims.

## II.    RELEVANT FACTS

GEO has provided responses to Plaintiffs' additional facts and GEO's previously asserted facts, in the attached Exhibit A. That said, the relevant facts remain undisputed:

1.     ICE has authority to detain individuals pending the results of their immigration proceedings. (Undisputed Facts 1-3).

2.     ICE contracts with GEO to house detainees at the Aurora ICE Processing Center ("AIPC"). (Undisputed Facts 6-8).

3.     ICE required GEO to incorporate the disciplinary severity scale as it is written in the PBNDS into its handbooks, without alteration. (Undisputed facts 19-20).

4.     GEO incorporated the sanctions for the "refusal to clean assigned living area" into its handbooks without alteration. (Undisputed fact 21).

5.      Each year, GEO is audited by ICE and that audit specifically reviews the detainee handbook. (Undisputed fact 38).

6.      ICE's auditors reviewed whether GEO provided notice of its disciplinary severity scale in its handbooks.  (Undisputed fact 40).

7.      All applicable versions of the PBNDS require that GEO provide detainees with the opportunity to participate in the VWP. (Undisputed fact 42).

8.      The 2008 PBNDS mandated that "the compensation [for VWP participation] is $1.00 per day." (Undisputed fact 44).

9.      The 2011 PBNDS explicitly direct GEO that $1.00 per day may be paid to detainees who participate in the VWP. (Undisputed fact 44).

10.     ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP. (Undisputed fact 48).

11.     The VWP has been audited each year and has passed each audit since 2004. (Undisputed fact 49).

### III.     ADDITIONAL FACTS

It remains GEO's position that the fact that the federal government, through its contract with GEO, *expressly directed* GEO to implement the disciplinary severity scale exactly as listed in the PBNDS is sufficient to establish that GEO is entitled to derivative sovereign immunity. Nevertheless, in the unlikely event that this Court determines it is necessary to identify the scope of ICE's approval of GEO's policies, GEO provides the following additional facts which are directly responsive to the new facts raised in Plaintiffs' Response:

4

1.      ICE's National Detainee Handbook advises detainees that they will be disciplined for refusing to clean their living areas:

> Will I get paid for keeping my living area clean? No. **You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined**.

ECF 310-1, 37 (ICE National Handbook) (emphasis added).

2.      Dozens of ICE employees have offices at AIPC. ECF 308-1 ¶ 4.

3.      One such ICE employee reviewed GEO's policies for compliance with the PBNDS and the GEO-ICE contract. ECF 308-1 ¶ 12-13.

4.      During an audit, ICE's auditors are provided copies of all of GEO's policies and procedures. ECF 308-1 ¶ 6.

5.      Auditors have full access to the building and all detainees and may interview detainees about their experiences and observe any policy or practice as implemented. ECF 308-1 ¶ 8,9.

6.      ICE is sent a copy of all write-ups for discipline. Ex. B (Ceja 30(b)(6) 232:9-25-233:1-13 (8/5/20)).

7.      ICE attended weekly meetings with GEO's Assistant Facility Administrator and other GEO personnel where it could have raised any issue about the implementation of the disciplinary severity scale. Ex. B (Ceja 30(b)(6) 233:14-23 (8/5/20)).

8.      ICE reviewed the use of segregation as part of its Contractor Assessment Reports. Ex. C (Contractor Assessment Reports).

9.      Neither the on-site ICE representative nor the auditors have ever expressed the opinion that GEO's meal clean up policy was inconsistent with the directives in the PBNDS or the GEO-ICE contract. ECF 308-1 ¶ 11, 16.

## IV.      Derivative Sovereign Immunity

Under the doctrine of derivative sovereign immunity, government contractors may "obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) (internal quotation marks omitted) (*quoting Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)). Derivative sovereign immunity shields a contractor from liability when the contractor performs work "authorized and directed by the Government of the United States" and the contractor "simply performed as the Government directed." *Id.* at 673; *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019) (quoting *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21 (1940)). A contractor asserting derivative sovereign immunity must satisfy a two-part inquiry. First, the contractor must show it "performed as the Government directed." *Campbell-Ewald*, 136 S. Ct. at 673. Second, the contractor must show the "authority to carry out the project was validly conferred" by the government. *Yearsley*, 309 U.S. at 20-21.

Plaintiffs do not challenge the second prong in their Response. Instead, they concede that ICE had the authority to direct GEO to care for detainees who were detained pending resolution of their immigration proceedings. (Undisputed Facts 1-3; 6-8). As part of ICE's broad authority, ICE was authorized to direct GEO to implement the disciplinary severity scale contained within the PBNDS. Plaintiffs only challenge whether GEO "performed as the Government directed."

6

**A.     Plaintiffs Do Not Dispute That ICE Required GEO to Incorporate The Disciplinary Severity Scale Into Its Detainee Handbook.**

Whether GEO violated the TVPA turns on a simple inquiry: whether GEO threatened Plaintiffs by providing each with a list of rules and responsibilities governing AIPC. GEO reiterates that the means utilized to obtain labor are a critical element of Plaintiffs' claims. To prevail on a TVPA claim, at trial, Plaintiffs must show that the means used to compel the labor were unlawful—they cannot simply show that the labor was not adequately compensated. *See United States v. Kalu*, 791 F.3d 1194, 1211-12 (10th Cir. 2015) (affirming a jury instruction on § 1589 that advised the jury to consider whether "as a result of [the defendant's] use of . . . unlawful means, the [victim rendered labor] where, if [the defendant] had not resorted to those unlawful means, the [victim] would have declined to" (quotations omitted));  *see also Aguilera v. Aegis Communications Group*, *LLC*, 72 F. Supp. 3d 975, 978 (W.D. Mo. 2014) ("[N]ot all bad employer-employee relationships constitute forced labor."). Here, ICE clearly instructed GEO to place i the disciplinary severity scale in the AIPC Handbook, including a sanction that detainees could be placed in segregation for refusing to clean. ECF 286 at 102 n.14; ECF 262-2, 62. Thus, the means—the ICE disciplinary severity scale contained in the AIPC Handbook—were the result of an express direction from ICE and therefore GEO is entitled to derivative sovereign immunity.

In *Cunningham*, whether the contractor was entitled to immunity turned on whether the contractor was instructed to "generate a list of phone numbers" or whether the government provided the contractor with a list of numbers and instructed them to call everyone on the list. *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 648 (4th Cir. 2018), cert. denied, 139 S. Ct. 417 (2018). Where the government provided the list of phone numbers, immunity was proper. *Id.* But where the contractor was responsible for generating a list, there could be no

immunity as the government would not have instructed the contractor to call each number on an unknown list. *Id.* Like *Cunningham*, here, ICE did not simply tell GEO to develop and implement a disciplinary severity scale with unknown sanctions and consequences. Rather, it instructed GEO to implement the *exact* disciplinary severity scale that it had drafted. (Undisputed fact 19) (requiring GEO to adopt the disciplinary severity scale without alteration). Here, the circumstances are analogous to *Cunningham* because ICE provided the list of possible discipline. Thus, immunity is appropriate.

Plaintiffs have not raised a genuine issue of material fact as to whether the possible consequence of 72 hours in segregation was explicitly directed by ICE. Plaintiffs admit that ICE required GEO to implement the disciplinary severity scale. ECF 286 at 102 n.14.  They also admit that the scale was incorporated into GEO's handbooks. *Id.* (arguing that all handbooks contained the ICE disciplinary severity scale). Because they do not and cannot dispute this fact, Plaintiffs instead argue that GEO should have done more to make ICE aware of *how* it was implementing the disciplinary severity scale to ensure that in applying it as explicitly written, GEO was not misinterpreting the policy. There is no legal support for this new added obstacle to derivative sovereign immunity. All that GEO must show is that it did as the government directed. GEO has done so here.

Should this Court entertain Plaintiffs' argument that the scope of cleaning is relevant (which it should not), GEO is still entitled to summary judgment. Plaintiffs' interpretation of ICE's policies is in direct conflict with the written expectations from ICE.  Even if GEO had not provided its own handbook to detainees, detainees at the AIPC still would have been told that they would face discipline if they did not clean their living areas (including common areas) in the ICE National

Detainee Handbook. ECF 310-1, 37; ECF 262-2, 62 (requiring that all detainees receive a copy of the ICE National Detainee Handbook). Thus, there can be no doubt ICE instructed GEO to implement the policy that detainees could be disciplined for not cleaning their own "living area," including "any general-use areas" that a detainee used.  ECF 310-1, 37. ICE's PBNDS explicitly delineate what sanctions may apply if a detainee refuses to clean. Plaintiffs cannot simply take their own skewed interpretation and thrust the authority of ICE behind it. Instead, at the summary judgment stage, Plaintiffs must present evidence that could convince a reasonable jury of their position. At bottom, Plaintiffs cannot escape the fact that ICE's own words instruct GEO to do exactly the acts in question here: inform detainees that they must clean their living areas and are subject to ICE's disciplinary severity scale and ask detainees to clean-up their living areas. Plaintiffs' difference of opinion about how ICE's directives should be implemented at the AIPC is not enough to defeat summary judgment.

### B.     Plaintiffs' Misrepresent ICE's Role at the AIPC.

Acknowledging that the disciplinary severity scale was directed by ICE and incorporated without alteration by GEO, Plaintiffs instead argue that even though ICE directed GEO how to act—it simply did not provide *enough* direction as to how to act. Plaintiffs argue that under the doctrine of derivative sovereign immunity there is some nebulous requirement that the government not only direct the contractor to operate in a certain way, but also that the government contractor cannot obtain immunity unless the government explicitly condoned the actions of the contractor a second or third time—after the initial direction. This argument lacks both legal and factual support.

As an initial matter, there is no legal requirement that the government follow-up with the contractor about its performance to entitle the contractor to immunity. Plaintiffs have cited no such

54306826;1

law and GEO has not found any. Further, even if the law required such a showing, Plaintiffs cannot demonstrate as a factual matter, with evidentiary support, that ICE was unaware of the operations at the AIPC. Without pointing to evidence in support, Plaintiffs' motion argues that ICE's involvement in the AIPC operations was limited to a cursory review of its policies. ECF 298 at 34. It further argues that ICE was unaware of the meal clean-up policy and possible sanctions for the same. *Id.* However, the uncontroverted evidence demonstrates that ICE audited GEO's facility every year and conducted a review of its handbook. (Undisputed facts 38, 40). The AIPC handbook was consistent with the scope of cleaning in ICE's National Handbook and was never found to be noncompliant—further establishing that GEO acted as ICE directed. *Compare* ECF 310-1, 37 (ICE National Handbook) *with* ECF 261-17. Indeed, rather than constituting a reasonable inference in Plaintiffs' favor, it strains credulity to believe that ICE was unaware of the meal clean-up procedures that for years has taken place three times daily in multiple housing units. Dozens of ICE staff were on site each day, the on-site contracting representative was present, and the auditors observed the operations during their visits. ECF 308-1. Further, ICE was sent a copy of all write-ups for discipline which would have included any write up related to the meal clean-up policy. (GEO's Additional Fact 6). Thus, not only was ICE aware, but through its actions further acknowledged that the meal clean-up did not go beyond what ICE had explicitly authorized and directed GEO to do. *Id.* In short, the undisputed evidence shows that ICE was aware of the meal clean up policy <u>and</u> the disciplinary severity scale. ICE audited GEO's handbook once every year. (Undisputed Facts 38,40). In doing so, it reviewed the policies therein. *Id.* ICE never raised an issue with the meal clean up policy. (GEO's Additional Fact 9).

In any event, it is undisputed that ICE explicitly directed GEO to incorporate the disciplinary severity scale into its handbook. (Undisputed facts 19-20). GEO did just that. (Undisputed fact 21). Despite alleging that ICE's level of oversight over the AIPC was deficient, Plaintiffs have offered **no** evidence that GEO did not act exactly as ICE directed. Nor have they presented evidence that ICE directed GEO to act differently than it did. Because GEO incorporated the ICE disciplinary severity scale into its handbook, and that same disciplinary severity scale that is contained within the handbook now forms the basis for Plaintiffs' claim that they were threatened in violation of the TVPA, GEO is entitled to immunity.

      **C.**    **Because ICE directed the Disciplinary Severity Scale, Plaintiffs Cannot Establish Scienter.**

In Plaintiffs' motion for class certification, Plaintiffs explained that the scienter element of their TVPA claim could be established on a classwide basis by "asking a factfinder whether GEO implemented the Forced Labor Policy to obtain labor from detainees, knowing or intending that a reasonable person in the detainees' position would feel compelled to provide that labor. That question would be answered based on a consideration of the uniformly applicable Forced Labor Policy." ECF 49 at 17 (emphasis added). Plaintiffs further explained that "[i]n this case, evidence that all class members were informed that they would be subject to the possibility of solitary confinement if they declined to labor for GEO gives rise, at the very least, to an inference that class members provided labor to GEO because of the possibility of solitary confinement." *Id.* at 18. Thus, the element of scienter turns on what GEO intended by "inform[ing detainees] that they would be subject to the possibility of [segregation] if they declined to [clean.]" It is undisputed here that ICE required GEO to inform detainees of the potential consequence of segregation for refusing to clean. ICE did not limit this consequence by providing further detail about what the

"refusal to clean" entailed and, consistent with its contractual obligations, neither did GEO.[1] In their response, Plaintiffs have failed to point to concrete evidence that would demonstrate GEO's knowledge that it was acting improperly when it implemented a written policy drafted by and required by ICE. While Plaintiffs indicate that the policy was implemented as written, they do not point to any evidence that GEO knew or should have known that the policy should not have been so implemented. For example, Plaintiffs have not pointed to a communication with ICE, or anyone else, indicating that GEO knew it should have acted differently but intentionally chose not to.[2] Instead, the best they can do is to state that GEO should have assumed that any review by ICE was cursory or ineffective. This is not enough to establish scienter under the TVPA.

Because Plaintiffs have already represented to this Court that their claims rest upon a written policy and not the individual decisions of GEO detention officers, they should not be permitted to change course now.[3] That said, even if the officers' actions are considered, GEO is still entitled to derivative sovereign immunity. That GEO officers occasionally implemented the disciplinary severity scale during meal clean-up or occasionally reminded detainees of the consequences for not cleaning does not defeat derivative sovereign immunity. Putting aside

---

[1] Plaintiffs cite to Section 5.8 of the PBNDS as support for their position that the disciplinary severity scale was limited in certain ways. Section 5.8 does not mention discipline and does not contain a cross-reference to the disciplinary severity scale despite having a specific section titled "References" which includes internal cross references to other sections of the PBNDS. There is no colorable argument that Section 5.8 instructs detainees that they can make a mess at each meal without the personal obligation to clean-up before moving on to their next activity without facing the potential consequence of a reprimand or warning.

[2] Indeed, even if the Ely Declaration were admissible (which it is not) it does not state that GEO was ever put on notice that ICE had concerns about any of its policies during the class period. Further, the declaration does not address the policies at issue, namely, the detainee handbook, so it does not provide helpful guidance regarding ICE's review and approval of the meal clean-up procedures. Ex. D.

[3] If the Plaintiffs are permitted to change course and focus on the individual decisions of GEO detention officers, the justification for class certification is eroded and the class should be decertified. *See* ECF 312 (Motion for Order to Decertify Class).

whether the acts of non-managerial employees could bind the company, because GEO's officers were merely acting as the government directed, Plaintiffs cannot show the element of scienter. There is no evidence that the GEO officers referenced in Plaintiffs' Response had any reason to believe that ICE had not authorized the disciplinary severity scale for use in connection with a detainee's refusal to clean after a meal. To the contrary, Plaintiffs concede that the officers did not believe any of their actions were wrong in any way. ECF 298 at 49 (discussing how Mr. Pagan did not believe other officers had done anything wrong); ECF 306-12 (declarations of GEO's officers). Thus, their actions could not have been knowing. *See e.g., U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 950 (10th Cir. 2008). Plaintiffs have failed to show that GEO's officers understood that the policies that were drafted by and implemented by ICE were in any way unlawful. Thus, Plaintiffs cannot show that those officers (or GEO) acted with reckless disregard in light of ICE's instructions. Indeed, the "driving purpose of derivative sovereign immunity 'is to prevent the contractor from being held liable when the government is actually at fault but is otherwise immune from liability.'" *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 70 (D.C. Cir. 2019). Therefore, GEO is entitled to derivative sovereign immunity.

### D.      ICE's Authority to Direct the Dollar a Day Rate

#### (1)      Waiver

As an initial matter, GEO notes that Plaintiffs waived the argument that ICE lacked authority to set the VWP rate by not raising it in its initial motion for summary judgment. ECF 260. Plaintiffs sought summary judgment on GEO's defenses far before discovery cutoff, risking that new theories and facts could arise that would change their strategy. When Plaintiffs filed their initial motion, they did not question ICE's authority, even though, at that time the appropriations

records were available to Plaintiffs as a matter of public record. To the contrary, Plaintiffs argued that ICE indeed had authority *which it delegated* to GEO. ECF 260 at 39 ("GEO's contract with ICE required it to have a VWP, but ICE delegated the authority to design that program at the Aurora Facility to GEO."). In fact, Plaintiffs sought to rely upon the very appropriations they now challenge to establish that ICE pays only $1.00 per day to detainees. *Compare* ECF 260 at 26 (citing to the Appropriations Act of 1978 as support for proposed Undisputed Fact Number 4) *with* ECF 298 at 45 ("Whatever Authority ICE may claim for this provision, it cannot be the 1978 appropriations language…"). Because Plaintiffs already represented to this Court that the 1978 appropriations act is a reliable source upon which they intend to prove their claims, they cannot now reverse course simply because it is expedient to do so. Thus, the Court should not address Plaintiffs' belated argument.

### (2)    ICE's Appropriations Authority.

Even if the Court decides to address Plaintiffs claim that ICE lacked appropriations authority, it must fail because Plaintiffs' assertions are contrary to Congress' own appropriations history. Congress has repeatedly acknowledged the PBNDS in drafting its appropriations bills. Indeed, it has specifically ordered ICE to comply with various versions of the PBNDS on multiple occasions. *See e.g.,* H. Rept. 112-91 - Department Of Homeland Security Appropriations Bill, 2012; H. Rept. 112-492 - Department Of Homeland Security Appropriations Bill, 2013; H. Rept. 114-215 - Department Of Homeland Security Appropriations Bill, 2016 ("The Committee expects ICE to refrain from entering into new contracts or intergovernmental service agreements that do not require adherence to the PREA and 2011 PBNDS standards."). In instructing ICE to comply with the PBNDS at its facilities, Congress effectively instructed ICE to implement the VWP as

54306826;1

expressed in the PBNDS. There can be no argument that Congress would not have reviewed the PBNDS before incorporating them into its appropriations bills. Furthermore, members from both parties are well aware of the VWP and its requirements. Ex. E ; Ex. F; Ex. K. There is no authority to support Plaintiffs' argument that Congress was required to specifically appropriate funds for the VWP each year—rather than including it as part of its lump-sum amount earmarked for detention services.

Additionally, Plaintiffs arguement that ICE did not have authority to set the rate of reimbursement undermines their own argument as to this issue.  Plaintiffs argue that detainees should have been paid more than $1.00 per day because *ICE's PBNDS allowed for payments in excess of $1.00* per day. ECF 260.  But, to the extent ICE had *no authority* to set the detainee pay rate or reimburse GEO for the same, it would mean that detainees should have been paid *less* than they were paid for their participation, not more. Indeed, ICE would not have been authorized to pay anything for detainee's volunteer activities. Nor would it have been authorized to promulgate the section of the PBNDS which requires detainees to be compensated for their participation in the VWP (thus eliminating Plaintiffs ability to rely upon Section 5.8 to establish their TVPA claims). Instead, each activity would have simply been a way to pass the time or get an additional treat—not an activity that resulted in a stipend of $1.00 per day. Indeed, demonstrating the absurdity of Plaintiffs' argument, each detainee to have participated in the VWP since 1979 would have been enriched (at the taxpayers' expense) in the amount of $1.00 for each day they participated in the VWP—all without Congress's knowledge.  Such a conclusion would not only defy logic, but also the ample evidence that Congress was and is aware of the PBNDS, which contain the parameters of the VWP, and that Congress has explicitly expressed its desire to have the PBNDS control ICE

detention centers. Ex. F ; Ex. K. Accordingly, this Court should not adopt Plaintiffs argument that, at best, ICE acted without Congressional authority for decades and, at worst, ICE intentionally misled Congress.

> (3) **GEO is Not the Proper Party to Defend ICE's Appropriations Authority.**

Finally, as noted in GEO's recent Rule 19 motion, GEO is not the proper party to defend ICE's appropriations decisions. ECF 307. GEO does not have access to the information upon which ICE relied during ICE's appropriations process, the information that it submitted to Congress for approval, nor ICE's internal reasoning for what information it chose to submit to Congress in support of its appropriations. Further, the ramifications of such a finding as to ICE would stretch far beyond the instant case. Accordingly, the proper party to defend ICE's appropriations is not GEO, but ICE.

> E. **GEO's Contract With ICE Expressly Directed GEO to Pay Detainees One Dollar Per Day.**

Like with the TVPA claims, GEO is entitled to derivative sovereign immunity as to Plaintiffs' unjust enrichment claim because GEO simply did as ICE instructed in implementing the VWP. It is undisputed that ICE requires GEO to offer a voluntary work program in its contracts with GEO to operate the AIPC. ECF 270 at 15; (Undisputed fact 42). For a significant portion of the class period, the 2008 PBNDS mandated that "the compensation [for VWP participation] is $1.00 per day." (Undisputed fact 44). Thereafter, the 2011 PBNDS explicitly directed GEO that $1.00 per day may be paid to detainees who participate in the VWP. (Undisputed fact 44). Regardless of the version of the PBNDS that applied, ICE reimburses GEO no more than $1.00 per day for work performed in the VWP. (Undisputed Fact 48). More specifically, ICE's contract

with GEO for the AIPC still provides $1.00 per day must be the "***actual cost*** … per detainee," which GEO "***shall not exceed***" without the approval of ICE's Contracting Officer. ECF 262-2, 5 (GEO_MEN 00019616); (emphasis added). This exact amount was explicitly authorized by Congress when it set the rate for detainee allowances at "not in excess of $1.00 per day." Dep't of Justice Appropriations Act of 1979, Pub. L. 95-431, 92 Stat 1021, 1027 (Oct. 10, 1978). With these undisputed facts, this Court must determine whether GEO simply complied with the terms of its contract providing detainees with the ICE stipend of $1.00 per day for their participation in the VWP.

Under Colorado law, the purpose of contract interpretation is to ascertain the intent of the parties by ensuring that contracts are construed "consistently with the well-established principles of interpretation." *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 973 (Colo. 2005). As a starting point, courts examine the contractual terms in an attempt to determine the parties' intent. *Id.*; *see also Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008); *Pirkey v. Hosp. Corp. of Am.*, 483 F.Supp. 770 (D.Colo.1980). "The Court must construe a contract in a manner that avoids an absurd result and should avoid any interpretation that would be inconsistent with the purpose of the contract." *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1085 (D. Colo. 2013), aff'd, 841 F.3d 827 (10th Cir. 2016). When a contractual term "unambiguously resolves the parties' dispute, the interpreting court's task is over" because "in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence." *Level 3 Commc'ns, LLC,* 535 F.3d. at 1154.

Here, looking at GEO's contract with ICE, the clear intent was to have GEO implement and operate a VWP on ICE's behalf. (Undisputed Fact 42). GEO's contract anticipates that it will

facilitate this pass-through relationship between ICE and the detainees. Because this item was not one on which GEO could obtain a mark-up, but instead was a pass-through system for ICE to provide detainees with a stipend, the parties explicitly agreed to an "actual cost" for that contractual requirement: $1.00 per day. ECF 262-2, 5. There is no ambiguity that the "actual cost" represents the amount of ICE's stipend that GEO advanced to participating detainees. Indeed, this was the parties' intent, as evidenced by the fact that the VWP has been audited each year and has passed each audit since 2004. (Undisputed fact 49). Surely, had there been a misunderstanding, ICE would have raised its belief that GEO was not performing satisfactorily under the contract. Any interpretation that GEO was required to pay more for the VWP would be "inconsistent with the purpose of the contract." *SolidFX, LLC*, 935 F. Supp. 2d at 1085. Indeed, the purpose of the contract was for ICE to pay GEO to provide for the care of detainees, including the costs of all necessary services under a "fully burdened" rate. In contrast, the VWP line item is a "reimbursement" to GEO for advancing the actual cost of the stipend on ICE's behalf. To interpret the GEO-ICE contracts as stating that the parties intended to have GEO pay above and beyond the amount ICE agreed to pay for the VWP would therefore be inconsistent with the parties' intent. Accordingly, there can be no question that by entering into the contract, ICE instructed GEO to advance detainees $1.00 per day for their participation in the VWP.

Because there is no ambiguity in the contract, this Court should not turn to extrinsic evidence to interpret the meaning of ICE's directive to GEO. Furthermore, even if it did turn to extrinsic evidence, how the parties interacted as to different contracts for different facilities is not relevant here. Indeed, this Court does not have those contracts in front of it and the parties have not conducted discovery into why the different agreements may have been reached at those

18

facilities. There is no evidence in the record about how or why differences might exist among ICE facilities around the country. Thus, the mere fact that the terms were different at facilities that are not the subject of this lawsuit provides no insight into the specific contractual terms at issue here.

Accordingly, because GEO and ICE intended to contract for a VWP which would allow ICE to provide detainees who participated a stipend of $1.00 per day, Plaintiffs cannot show that GEO did not act exactly as the government directed or that it violated its contract in any way. Thus, GEO is entitled to immunity on Plaintiffs' unjust enrichment claim.

## IV.    CONCLUSION

Because GEO is immune from suit on the basis of derivative sovereign immunity and the government contractor defense, as set forth herein and in its initial motion, GEO respectfully requests the Court grant its Motion for Summary Judgment.

Respectfully submitted, this 21st day of August, 2020.

**AKERMAN LLP**

*s/ Adrienne Scheffey*
Colin L. Barnacle
Adrienne Scheffey
Christopher J. Eby
Melissa L. Cizmorris
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  (303) 260-7712
Facsimile:   (303) 260-7714
Email: colin.barnacle@akerman.com
Email: christopher.eby@akerman.com
Email: melissa.cizmorris@akerman.com
Email: adrienne.scheffey@akerman.com

54306826;1

**BURNS, FIGA & WILL, P.C.**
Dana L. Eismeier
Michael Y. Ley
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, Colorado 80111
Telephone:  (303) 796-2626
Facsimile:   (303) 796-2777
Email: deismeier@bfwlaw.com
Email: mley@bfwlaw.com
*Attorneys for Defendant The GEO Group, Inc.*

54306826;1

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify on this 21st day of August, 2020, a true and correct copy of the foregoing

**DEFENDANT THE GEO GROUP, INC.'S REPLY IN SUPPORT OF GEO'S CROSS-**

**MOTION FOR SUMMARY JUDGMENT** was filed and served electronically via the Court's

CM/ECF system on the following:

<u>**Counsel for Plaintiffs:**</u>

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
TOWARDS JUSTICE
1410 High St., Ste. 300
Denver, CO 80218
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Matthew Fritz-Mauer
KELMAN BUESCHER FIRM
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com
mfritzmauer@laborlawdenver.com

Hans C. Meyer
MEYER LAW OFFICE, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
OUTTEN & GOLDEN, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
OUTTEN & GOLDEN, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
OUTTEN & GOLDEN, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
LAW OFFICE OF R. ANDREW FREE
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
MILSTEIN LAW OFFICE
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

*s/ Nick Mangels*
Nick Mangels

54306826;1