1

1              UNITED STATES DISTRICT COURT
                  DISTRICT OF COLORADO
2

3    ALEJANDRO MENOCAL, MARCOS    .    Case No. 14-cv-02887-JLK-MEH
     BRAMBILA, GRISEL             .
4    XAHUENTITLA, HUGO            .
     HERNANDEZ, LOURDES ARGUETA,  .
5    JESUS GAYTAN, OLGA           .
     ALEXAKLINA, DAGOBERTO        .
6    VIZGUERRA, DEMETRIO VALERGA,.
     on their own behalf and on   .
7    behalf of all others         .    Alfred A. Arraj Courthouse
     similarly situated,          .    901 19th Street
8                                 .    Denver, CO  80294
                                  .
9              Plaintiffs,        .
                                  .
     vs.                          .
10                                .
     THE GEO GROUP, INC.,         .
11                                .
               Defendants.        .
12                                .    October 1, 2020
     . . . . . . . . . . . . . .  .    2:07 p.m.
13

14        TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
            MICHAEL E. HEGARTY, UNITED STATES MAGISTRATE JUDGE
15

16   APPEARANCES:

17   For the Plaintiffs:          Outten & Golden, LLP
                                  By:  Adam L. Koshkin*
18                                By:  Rachel W. Dempsey*
                                  One California Street
19                                12th Floor
                                  San Francisco, CA  94111
20                                (415) 638-8800

21                                Outten & Golden, LLP
                                  By:  Michael J. Scimone*
22                                685 Third Avenue
                                  25th Floor
23                                New York, NY  10017
                                  (212) 245-1000

24

25   *By phone.

```
 1  Appearances continued:

 2  For the Defendant:              Akerman, LLP
                                    By:  Adrienne Scheffey
 3                                  1900 Sixteenth Street
                                    Suite 1700
 4                                  Denver, CO  80202
                                    (303) 260-7712
 5
                                    Burns Figa & Will, P.C.
 6                                  By:  Dana L. Eismeier
                                    By:  Michael Y. Ley
 7                                  6400 South Fiddlers Green Cir.
                                    Suite 1000
 8                                  Greenwood Village, CO  80111
                                    (303) 796-2626
 9
    For the United States of        United States Attorney's Office
10  America:                        By:  Timothy B. Jafek
                                    1225 17th Street
11                                  Suite 700
                                    Denver, CO  80202
12                                  (303) 454-0100

13  Court Recorder:                 Clerk's Office
                                    U.S. District Court
14                                  901 19th Street
                                    Denver, CO  80294
15
    Transcription Service:          AB Litigation Services
16                                  216 16th Street, Suite 600
                                    Denver, CO  80202
17                                  (303) 296-0017

18  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.
19

20

21

22

23

24

25
```

1            (Time noted:  2:07 p.m.)

2            THE COURT CLERK:  All rise.  Court is now in

3   session.

4            THE COURT:  Please be seated.

5            Call in the case that may outlive me, number 14-

6   cv-2887, Alejandro Menocal et al. versus GEO Group, Inc.

7            For the Plaintiff, please make your appearance.

8            MS. DEMPSEY:  This is Rachel Dempsey with Outten &

9   Golden for the Plaintiff.  And I'm hear with my colleague on

10  the phone, Adam Koshkin, also with Outten & Golden for the

11  Plaintiff.  And Mike Scimone, who is also with Outten &

12  Golden for the Plaintiff.

13           THE COURT:  Thank you.  And in the courtroom for

14  the defense, please?

15           MS. SCHEFFEY:  Adrienne Scheffey on behalf of

16  Defendant The GEO Group, and I'm here with Akerman.  Also

17  here is Dana Eismeier from Burns Figa, also on behalf of The

18  GEO Group.

19           THE COURT:  Thank you.  Let's see.  And this is

20  something we don't need the United States on, I assume?

21       (No response)

22           THE COURT:  Oh, you're here.  I mean, give me some

23  credit.  I can't recognize you except for maybe the beard

24  hanging underneath that mask.

25           Okay, so who wants to take the lead here?

1    MS. SCHEFFEY:  Which issue do you prefer we start

2  with?

3    MS. DEMPSEY:  I'm sorry, Your Honor.  I'm having a

4  little bit of trouble hearing you.

5    THE COURT:  I said who wanted to take the lead.  I

6  just asked anybody who wants to take the floor, please

7  proceed.

8    MS. SCHEFFEY:  GEO is prepared to begin.  We're

9  here for two issues today.

10    The first of which are Plaintiffs' untimely

11  discovery responses that were served after the close of

12  discovery after summary judgment motions had been briefed,

13  and that were inconsistent with prior deposition testimony.

14    The second of which is Plaintiffs are seeking a

15  document that they believe should have been produced in

16  response to one of their discovery requests.

17    GEO has reviewed the document.  It was not

18  responsive to any of the search terms.  GEO does not believe

19  it's responsive anyway.

20    And, additionally, it is work product.  It was a

21  document that was created in connection with a settlement

22  conference that was before this Court in 2018.

23    THE COURT:  And that's how they became aware of

24  it, was that --

25    MS. SCHEFFEY:  Plaintiffs became aware of it

1  because they -- there is -- it's not exactly clear in their

2  briefing.  But there was a FOIA request in 2018 that was

3  made.  That's what all of the documents on the FOIA say.  ICE

4  produced the document, but redacted the information that GEO

5  would also have maintained the redactions on.

6              THE COURT:  Okay.  So --

7              MS. DEMPSEY:  Your Honor, if I may, I actually

8  need to correct that.

9              We became -- Plaintiff became aware of this

10  document because it was subject to a FOIA request in a

11  different case.  We actually didn't become aware of it until

12  a separate case when it became at issue in that other case.

13              So we did not -- it was not -- we learned of it

14  from a different case.  We did not receive it through a FOIA

15  request.

16              THE COURT:  I'm sorry, you received it in

17  discovery?

18              MS. DEMPSEY:  It was filed on the docket in the

19  GEO versus Washington State case, which was how we received

20  it, because it was publicly filed there.

21              THE COURT:  Filed by whom?

22              MS. DEMPSEY:  By, I believe, the State of

23  Washington.

24              THE COURT:  Okay.  Well, so I guess with regard to

25  that document, we need to discuss, I suppose, whether it's

1   responsive?  Is that the first thing we need to decide?

2              MS. SCHEFFEY:  Yeah.  I think the first question

3   would be whether it's responsive and whether there is any

4   justified reason for raising it at this point.

5              THE COURT:  Okay.  Now, so we only need to discuss

6   that because you're resisting its production?

7              MS. SCHEFFEY:  Yes, Your Honor.

8              THE COURT:  Okay.  So my understanding, then, it's

9   an analysis of additional amount of funds the Government

10  would have to pay if the work presently performed by

11  detainees were performed instead by employees.  Is that

12  accurate?

13             MS. SCHEFFEY:  It's actually a letter, and I have

14  a copy here if Your Honor does not.  It's a letter to ICE

15  from GEO, and the last sentence is "we urgently implore DOJ

16  to take over the defense of these lawsuits and reimburse GEO

17  for its costs."

18             So our description of it would be it is a letter

19  to ICE asking them to get involved in this lawsuit, and

20  others.  The redacted portion contains an assessment of the

21  potential liability that was conducted by GEO so that ICE

22  could make --

23             MS. DEMPSEY:  And I would just -- I would disagree

24  a little bit with the characterization of the redacted

25  portion.  The testimony of Brian Evans, which, again, is also

1  from that Washington State case, he testified that the

2  calculations were performed because GEO intended to make a

3  claim against the Government for any payments that GEO was

4  found liable for under the voluntary work program, which

5  would be the basis for an action against ICE for an equitable

6  adjustment.

7         THE COURT:  Well, the letter that she just talked

8  about is generally a precursor to a demand.  It's a nice

9  opening way to say "will you go ahead and take this over?"

10        But it could turn into a demand for reimbursement

11  or indemnification, I guess, at some point.

12        In any event, tell me why -- tell me which request

13  it is responsive to.

14        MS. DEMPSEY:  So, responses to our request number

15  40, which requested all documents referring to and/or

16  relating to communication between Defendant and ICE,

17  including, but not limited to, reports, alerts, memoranda,

18  and/or emails, that refer or relate to the use of detainee

19  labor at any GEO-owned or GEO-operated facility.

20        So I think just on the plain terms of that

21  request, it's pretty clearly responsive.

22        And the request was subsequently -- Plaintiff

23  subsequently clarified that the request was limited to

24  communications about detainee labor relating to contracts and

25  operation after October 22, 2004.

1          Again, I think the document pretty clearly falls

2     within those parameters because it is about the contracts

3     that are in place currently and were in place during the

4     class period.

5          And potential changes to those contracts and/or

6     equitable adjustments and obligations that arise under those

7     contracts.

8          THE COURT:  Subject to that being a very broad

9     request, it sounds like it falls within the ordinary meaning

10    of the request.  Do you disagree?  And, if so, why?

11         MS. SCHEFFEY:  Yes, Your Honor.  So we -- prior

12    counsel, I should say, negotiated search terms and custodians

13    to identify documents that were responsive to that request.

14         The custodians were sent to Mr. Koshkin, Mr.

15    Scimone, and Ms. Dempsey, on May 2, 2019, by prior counsel,

16    Patrick McCabe.  They were agreed upon, as were the search

17    terms.

18         This document is not responsive to both the

19    custodians and the search terms.

20         THE COURT:  Okay.  So that I wouldn't necessarily

21    agree or disagree with.  I'm wondering how relevant that is,

22    though.

23         Are you saying that Plaintiffs' counsel agreed

24    that the only documents that would be produced would be

25    pursuant to those search terms and no other effort would be

1  made at any time to look for documents that might be

2  responsive to the request?

3          MS. SCHEFFEY:  No.  It was my understanding that

4  they would review those that they thought were comprehensive

5  because of the process that was about four months that they

6  went through in crafting these search terms, and that they

7  would come back if they found out about anything that was

8  insufficient, or if they identified another document that

9  they thought should have fallen within that.

10          THE COURT:  Right.  But do you believe the

11  Defendant's obligation was only to look for documents that

12  were responsive to those search terms, not responsive to the

13  actual request?  That's what you're saying?

14          MS. SCHEFFEY:  I think that it was our obligation

15  to review the documents that hit on those search terms if

16  other documents, let's say in different searches, were

17  responsive to those requests, I think we also would have had

18  an obligation to produce those.

19          But even then, I wouldn't have seen this document

20  as responsive.  It doesn't --

21          THE COURT:  No, no, nobody is throwing stones at

22  you, at least I'm not throwing any.  All I'm asking is:  Do

23  you agree that this document would fall within the terms of

24  that request, not what you subsequently agreed would be the

25  search terms pursuant to that request, but do you agree that

1  it appears to fall within the request itself?

2          MS. SCHEFFEY:  Yeah.  So I would agree it appears

3  to fall within the first broad request.

4          THE COURT:  Right.

5          MS. SCHEFFEY:  But I think the more narrow request

6  about GEO's contracts with ICE, because this isn't discussing

7  any of the contracts, and there were two separate letters set

8  before that that did discuss the contract, that it doesn't

9  fall within that.

10          THE COURT:  So what would be the source of ICE's

11  obligation to either come in and take over the case, or

12  indemnify, if it wasn't contract?

13          MS. SCHEFFEY:  Yeah, so without giving too much

14  away, I believe that this letter also said ICE, you know, by

15  showing its numbers, we believe that if this applies to the

16  GEO facilities, it's also going to apply to call ICE

17  facilities, so we think you have an interest in this.

18          THE COURT:  No, no, I know.  But you just said

19  this was part of the letter from ICE to -- from GEO to ICE.

20          MS. SCHEFFEY:  Right.

21          THE COURT:  And you said it was GEO asking ICE to

22  take this case over.

23          MS. SCHEFFEY:  Yes.

24          THE COURT:  And you were relying on that request

25  just because you thought ICE would be nice guys, or because

1  you thought there was a legal obligation for ICE to do so?

2          MS. SCHEFFEY:  I think it was both.  Maybe I

3  wouldn't say because ICE would be nice guys, but I think both

4  there was a question about whether they had some sort of duty

5  under the contract, but also more of an interest in the

6  policies that are being litigated, because they could affect

7  many facilities outside of GEO's control.

8          THE COURT:  I agree.

9          MS. SCHEFFEY:  But ICE might want the right

10 result.

11          THE COURT:  Very well said.  But at least in part

12 GEO would have been relying on contract language to believe

13 that ICE should come in and do something.  So, therefore,

14 again, literally, this communication is about a contract

15 between ICE and GEO.  Right?

16          MS. SCHEFFEY:  Yeah, I think under that I would

17 have to agree, Your Honor.

18          THE COURT:  Okay.  So I've got to find that it's

19 if not responsive sounds relevant unless protected by some

20 privilege or otherwise should not be discoverable.

21          Are you relying on anything in that regard?

22          MS. SCHEFFEY:  Yeah.  So we believe that the

23 redacted portion, it was redacted by ICE, but this is the

24 same redaction we would have made, is work product because --

25          THE COURT:  Can I see the redaction?  Do you have

1  a side-by-side for the redacted and non-redacted?

2          MS. SCHEFFEY:  I did not bring the non-redacted,

3  but I could have someone email it to your Chambers if you

4  want.

5          THE COURT:  Does the redacted show -- is it

6  completely blacked out?

7          MS. SCHEFFEY:  It shows everything except for the

8  numbers that are blacked out.

9          THE COURT:  Let me go ahead and take a look at

10 that.  Maybe I -- do I have it as part of your submission?

11         MS. SCHEFFEY:  You do.

12         THE COURT:  I do.  Okay.

13         MS. SCHEFFEY:  But you could still --

14         THE COURT:  Okay, never mind.  Is it June 1, 2018?

15         MS. SCHEFFEY:  Yep.

16         THE COURT:  All right.  And it only has amounts,

17 right?

18         MS. SCHEFFEY:  Yes.

19         THE COURT:  Okay.  And so what relevance is it --

20 if you're ever involved in insurance cases, for example, that

21 there's lots of reasons why somebody might talk about

22 potential exposure, these are maybe reserves that an

23 insurance company has, or things like that, that aren't

24 really relevant to the case.  What is relevant is what the

25 damages are, not what GEO thinks they might be.

1    And so what's the relevance of those numbers?

2    MS. DEMPSEY:  Your Honor, I think the relevance of

3 those numbers is that, as Mr. Evans described them in his

4 deposition, they reflect the sort of calculation of the

5 amount of -- the number of employees that GEO would have to

6 hire in order to replace detainee labor.

7    And that is sort of the crux of the unjust

8 enrichment claim.  I think that --

9    THE COURT:  Well, they would address what GEO

10 thinks might be the number, right?

11    MS. DEMPSEY:  They would.  So, and yes, they would

12 address what GEO thinks might be the number.  We have expert

13 testimony as to what we think might be the number, but GEO

14 has made clear that they're going to challenge that expert

15 testimony based on what they think might be the number.

16    THE COURT:  Right.

17    MS. DEMPSEY:  And so evidence to that is relevant

18 to the case and to calculating damages.

19    THE COURT:  So really the only reason you want it

20 is credibility, because they are going to give you an

21 eventual number, it sounds like, either by attacking yours

22 and substituting their own, or by putting forth an expert

23 with their own number.  They are going to give you a number.

24    And you might want to say "hey, you said it was

25 this when you're talking to the Government, but now you're

1  saying it's this."  That's the only possible relevance I can

2  see is you're testing the credibility of some eventual number

3  that they will give you.

4       Let me ask the defense counsel:  Are you going to

5  put forward a position as to this is the number of employees

6  this would take to cover the work done by inmates?

7       MS. SCHEFFEY:  I'm not sure that's what we would

8  put forward.  I mean, it's a little complicated because the

9  numbers here are dollar amounts.  I can represent that to

10  you.  You know, looks at this, ICE, this is the potential

11  dollar amount that it will cost you to handle it.

12       THE COURT:  So you don't in any of these blacked

13  out sections talk about numbers that potential FTEs,

14  employees, or whatever?

15       MS. SCHEFFEY:  No, Your Honor.  It only includes

16  dollar amounts.

17       THE COURT:  Okay.

18       MS. SCHEFFEY:  For 12 facilities, and then for all

19  of ICE's facilities.

20       THE COURT:  Which would take some significant

21  explaining to do on how you got there, which is not contained

22  in these documents, and so they would want you to actually go

23  back and recreate stuff that you did, that's potentially work

24  product.

25       MS. SCHEFFEY:  Yes, Your Honor, that's where it

1   goes.

2               THE COURT:  Okay.

3               MS. SCHEFFEY:  And just to clarify, their experts

4   have not provided dollar numbers.  They have provided numbers

5   of employees they think it would take to perform certain

6   tasks.  So these aren't really even apples and oranges.  Any

7   attack we would have would be on their analysis of, you know,

8   it takes 10 people to clean a table, as opposed to 2 people

9   to clean the table.

10              THE COURT:  Okay.  But articulate specifically why

11  you're redacting.  Every single reason why you're redacting.

12              MS. SCHEFFEY:  Yeah.  So the numbers that were

13  created and put in here are based on the assessment that GEO

14  did to participate in the settlement conference in front of

15  this Court in May 2018.

16              THE COURT:  So you produced them at my request to

17  advise me of your position so I could determine what a

18  reasonable settlement would be?

19              MS. SCHEFFEY:  Yes, Your Honor.  And Dana was

20  here, so I might actually turn it over to him.  But yes, my

21  understanding is they put them together for the settlement

22  conference, and then there was an agreement that ICE was

23  necessary.

24              THE COURT:  Okay.  So you'll have to speak into a

25  microphone.

1           MR. EISMEIER:  The settlement conference was on

2   May 2nd, as you'll recall.  At that time, you were only

3   acting in the capacity as a settlement judge.

4           And at that conference, without going into what

5   was said, you know, attorney-client, but it was all by saying

6   we're going -- nothing will happen without ICE.

7           And one of the issues that went on through May, as

8   you know, that conference stayed open for some time to decide

9   whether ICE could get involved and whether that would work.

10          So GEO's position is:  It went back, and only

11  because of the settlement conference, generated numbers which

12  were based upon obviously calculations that would have been

13  only within GEO, in response to the settlement conference.

14          But for that settlement conference, we wouldn't be

15  having this discussion about this document today.

16          THE COURT:  Okay.  So why isn't this covered by

17  Rule 408?

18          MR. EISMEIER:  From GEO's point of view, it is.

19  It isn't just privilege.  It's also 408.  So there are layers

20  here.

21          THE COURT:  Okay.

22          MS. DEMPSEY:  And I would just point the Court to,

23  again, to the testimony of Brian Evans, who was GEO's CFO.

24  He was obviously under oath when he gave that testimony, and

25  he did not say in any way that these calculations were

 1   prepared related to settlement.

 2            It was, and I quote, "to calculate what the

 3   Government could owe us if the Court decided unfavorably

 4   against us, because we have a claim under the law against the

 5   federal Government for implementing their program."

 6            And I can point you to the page number where he

 7   gives that testimony.  But I think that's entirely consistent

 8   with what Mr. Eismeier is representing.

 9            THE COURT:  Right.  But if it was done in

10   connection -- directly connected to an effort to settle the

11   case in front of a judicial officer, and done at my

12   suggestions that they come up with a number to help me be

13   educated and negotiate a settlement, and that's the purpose

14   of it, it's straight up 408 as far as I can see.

15            MS. DEMPSEY:  Well, so, for one thing, this is the

16   first time you've heard this argument.  And again --

17            THE COURT:  No, it's not an argument.  I was the

18   first one to mention 408 because it screams 408 if it was

19   produced as part of a settlement effort that I engaged in.

20   This is pretty pedestrian stuff that happens all the time.

21            And you produce a lot of numbers for me in a

22   settlement conference that you never intend to see the light

23   of day, because you're doing it just for purposes of

24   discussion and negotiation, and not for purposes of using it

25   in the litigation.

1          MS. DEMPSEY:  Right.  That makes sense.  Thank

2 you.  Thank you for clarifying.

3          Again, though, the testimony that we have from

4 GEO, who is the people that actually created these numbers,

5 was that it was not that it was for settlement.  It was that

6 it was for an equitable adjustment, and what the sort of

7 potential exposure in the case was.

8          I would note that the part of the letter that we

9 have, we have most of the letter, and no where does it say

10 that this is a settlement-related communication.

11          So I just don't -- I think that representation is

12 contradicted by a lot of the evidence that we have.

13          THE COURT:  Okay.  So if this were a document

14 created by GEO for purposes of providing information to me,

15 it just is not discoverable.

16          However, the different issue is:  Do you waive

17 that by voluntarily re-producing that information in a

18 disclosure to the United States Government, and how didn't

19 you waive it?

20          MS. SCHEFFEY:  Yeah.  So we pointed in our

21 statement to -- I apologize.  *Martin v. Monfort,* which is 150

22 F.R.D. 172 (D. Colo. 1993).  And in that case, in-house

23 counsel received kind of an inquiry from DOL indicating that

24 the Department of Labor was looking into off-the-clock work

25 that was happening at the facility.

1          That in-house counsel then directed certain

2   employees to conduct a study of how long people were spending

3   doing certain tasks.

4          Based on that study, in-house counsel wrote a

5   letter to the DOL saying "we don't think you're right," you

6   know, "from our calculations, it's much less than that."

7   Some sort of aggregate number.

8          And the Court found that that remained protected,

9   because the studies were work product because the in-house

10  counsel directed them to be done, and that because she didn't

11  disclose the underlying study, just kind of an aggregate

12  position, it wasn't waived, because there was no reason to

13  believe the DOL in that case.

14          THE COURT:  The underlying study wasn't waive.

15          MS. SCHEFFEY:  They also, I believe, and I would

16  have to double check, I believe they also said that the

17  letter didn't waive anything.

18          THE COURT:  That's a pretty important difference.

19          MS. SCHEFFEY:  Yeah.  I would have to -- I don't

20  have it in my notes.

21          THE COURT:  So I can understand the underlying

22  study.  I need to know whether the Court actually found that

23  there was no waiver by providing it to the United States

24  Government, because, as you know, documents that end up in

25  the hands of the United States Government are generally

1  subject to production under FOIA.

2      MS. DEMPSEY:  Your Honor, I would also just

3  clarify that *Monfort* is about a dispute between only the

4  United States Government and the producing party.  So the

5  numbers were sort of by definition in the letter to the

6  United States Government.  Those were the only two parties

7  involved.

8      I think this case is much closer to the *In Re*

9  *Quest* case where the person seeking the discovery was a third

10  party, like us, that was not involved in the communication.

11      THE COURT:  No, no, I think the better distinction

12  there is:  In that case, a private business was trying to

13  avoid either criminal or civil liability in dealing directly

14  with a Government agency that was investigating them.  There

15  might be privileges associated with that because in that

16  situation it was the conduct of the United States Government

17  that required the private business to create information and

18  respond back.

19      I'm not sure that's the case here.  This sounds

20  like a voluntary disclosure as a means of persuasion by the

21  private business in reaching out and initiating the contact

22  with the United States Government.

23      So there's a distinction there.  I would have to

24  take a look at that.  I'm just inclined to believe that this

25  might have been at least a waiver with regard to the actual

1   numbers, although maybe not the underlying calculations.  But

2   I would have to --

3            MS. DEMPSEY:  Your Honor, I would just clarify.

4   The Court in *In Re Quest* actually found that even under the

5   circumstances in that case, that there had been a waiver and

6   that the information provided to the Government was

7   discoverable.

8            THE COURT:  I don't know how it's not discoverable

9   here, because you voluntarily, without request from the

10  United States Government, provided information to them.

11  That's generally subject to disclosure under FOIA.

12           Mr. Jafek is here from the United States

13  Attorney's Office.  Would you come forwaard, Mr. Jafek?

14           MS. SCHEFFEY:  And if I may just note --

15           THE COURT:  Yes.

16           MS. SCHEFFEY:  -- the FOIA -- it was requested

17  through a FOIA request, and the Government marked it B4,

18  which is confidential or privileged information.

19           THE COURT:  Okay, so they refused to produce it?

20           MS. SCHEFFEY:  Yeah, they have refused to produce

21  it.

22           THE COURT:  What is that exception, please?

23           MS. SCHEFFEY:  B4.  I do not have it in front of

24  me.

25           THE COURT:  Mr. Jafek, do you know what B4

1  exception is?

2          MR. JAFEK:  I don't.  It sounds like confidential

3  business information.

4          THE COURT:  Okay.

5          MR. JAFEK:  It sounds like that's what --

6          MS. SCHEFFEY:  Yeah.  I looked it up, and it said

7  confidential or privileged on there.

8          THE COURT:  Sure.  Is there a protective order in

9  this case?

10          MS. SCHEFFEY:  Yes, Your Honor.

11          THE COURT:  Okay.  So we can effectively deal with

12  the issue of the confidential nature of the business

13  information because it couldn't be disclosed outside of the

14  confines of the litigation without permission from the Court

15  if it was under a confidentiality or protective order.

16          So --

17          MS. SCHEFFEY:  But I just think, you know, because

18  the Government also didn't disclose it, that does say

19  something about they held it confidential, as well, and work

20  product doctrine does make a distinction between when you

21  disclose something to a third party that is likely to re-

22  disclose it, as opposed to someone who will keep that

23  information confidential, which is exactly what the

24  Government did here.

25          THE COURT:  Right.  Yeah.  I wouldn't have guessed

1  it was likely the Government was going to keep it

2  confidential, because they are pretty open book, you know,

3  except when they have that exception.

4              MS. SCHEFFEY:  Yeah.

5              THE COURT:  Because the Court holds their feet to

6  the fire on those all the time.

7              MS. SCHEFFEY:  Yeah.

8              THE COURT:  But I guess I'm wanting to understand,

9  again, the need for this, I suppose, from the Plaintiffs?

10             MS. DEMPSEY:  So, again, we have provided

11 estimates as to what we believe the benefit from using

12 employees is in this case.

13             And we know the discovery period is over.  We had

14 disclosed an expert, and GEO has not disclosed an expert.  So

15 we have no information from them at all on what they

16 understand the unjust enrichment to be.

17             And, of course, they are going to challenge our

18 expert.  And so we have a need to be able to, you know, to

19 the extent we're able to, be able to anticipate what those

20 challenges are and be able to respond to them.

21             I think this is pretty clearly within the bounds

22 of reasonable discovery.

23             THE COURT:  And so do you anticipate that defense

24 will put on a witness, although not expert, but maybe a

25 business person within the corporation who has responsibility

1   for budget or that sort of thing, who would opine -- who

2   would put some information forward that either challenges

3   Plaintiffs' calculations and/or puts forward an approximate

4   defense calculation of what the level of damage is?

5          MS. SCHEFFEY:  Yeah.  So what we've briefed

6   already, and this is before Judge Kane, but our position is

7   that there is no unjust enrichment because every time GEO

8   gets a new employee, it gets to add a Government permissible

9   profit fee to each employee between 10 and 15 percent.

10          So Mr. Evans will testify that he believes that

11  regardless of the number of employees, the more employees you

12  say you need, the more profit to GEO.  So this isn't a matter

13  of GEO minimizing its profits.

14          THE COURT:  I know, but do you plan to address in

15  any manner the Plaintiffs' calculations as to damages?

16          MS. SCHEFFEY:  Yes, Your Honor.  And I think this

17  is why it's a little confusing not having those documents in

18  front of me.  And I apologize for not bringing them.

19          But Plaintiffs' calculations for damages come from

20  two experts who, based on the square footage of the facility

21  and the tasks performed, estimate how many employees it would

22  take.  But they don't attach dollar amounts to those

23  estimates.

24          I do think that based on their own methodologies

25  and some other things that we think weren't quite consistent

1    in their reports, we might bring challenges to those experts.

2    But that wouldn't necessarily be in the form of something one

3    of our witnesses would testify to other than "we have this

4    many people, and this is how it gets done correctly."

5           THE COURT:  Right.

6           MS. DEMPSEY:  So to clarify, we -- I think it's

7    probably sort of self-evident that the number of employees

8    you have to pay is a part of the calculation -- of the

9    ultimate damages calculation.

10          There are different possible rates that we will

11   apply to the number of employees that we've identified in our

12   expert reports in order to reach the ultimate number, but

13   obviously that isn't -- the number of employees is sort of

14   one of the inputs.

15          And, again, GEO has already made very clear that

16   they are going to challenge the underlying assumptions in

17   that report.

18          And to the extent that sort of GEO's ultimate

19   numbers, say, is bigger than ours or is comparable to ours or

20   is much smaller than ours, that provides us with useful

21   information in terms of what their fact rebuttals are going

22   to be, because they have made it very clear that they are

23   going to challenge the assumptions that went into our expert

24   reports.

25          MS. SCHEFFEY:  And, Your Honor, if I may briefly

 1   respond?

 2          THE COURT:  Well, tell me the case number first

 3   that you're referring to.

 4          MS. SCHEFFEY:  For which one?

 5          THE COURT:  The citation to that F.R.D. case.

 6          MS. SCHEFFEY:  Oh.  150 F.R.D. 172.

 7          THE COURT:  150?

 8          MS. SCHEFFEY:  F.R.D. 172.

 9          THE COURT:  Thanks.

10          MS. SCHEFFEY:  And I just want to briefly respond.

11   I don't know that this letter in itself would be helpful in

12   Plaintiffs' efforts, because it is an aggregate for all 12

13   GEO facilities.  It doesn't break it down.

14          THE COURT:  Yeah.  I'm sure they're going to say

15   it's not up to you to decide what's helpful to them, or not.

16   That's usually something that Plaintiffs' counsel is not

17   willing to give over to defense counsel to decide.

18          But I want to look at this case.

19          MS. SCHEFFEY:  Okay.

20          THE COURT:  So I can see what it says, and not

21   that it's dispositive unless I wrote it, and I didn't write

22   it, because it's too old for me.

23          MS. SCHEFFEY:  No.  You've cited it before,

24   though, and I have one of yours relying on it as giving me

25   the standard.  2015 W.L. 5915415, where you treated it

1  favorably.

2          THE COURT:  Okay.  So I think I might ask more

3  questions about that, but at the moment I'm sufficiently

4  apprised pending my reading of that case, which is going to

5  be brought out to me.

6          What's the next issue?

7          MS. SCHEFFEY:  The next issue is Plaintiffs'

8  untimely discovery responses.

9          THE COURT:  Go ahead.

10          MS. SCHEFFEY:  So we had discovery close on August

11  14th by agreement of the parties.  All of summary judgment

12  was briefed by August 17th per the deadline.  Decertification

13  was filed --

14          THE COURT:  You mean the initial briefs?

15          MS. SCHEFFEY:  Yeah, initial briefs filed a little

16  bit later that week.  And in early September, so September

17  1st through September 14th, we got supplemental discovery

18  responses to GEO's requests from March that changed

19  Plaintiffs' allegations, and contradict their own deposition

20  testimony.

21          More specifically, each of the Plaintiffs

22  answering in their own capacity in a response that

23  specifically states that they understand that GEO is seeking

24  -- let me look at the quote.

25          THE COURT:  Well, let me ask you this:  Clearly

1    you agree -- you have to agree that parties are always under

2    a continuing obligation to supplement responses to discovery,

3    even up to the time of trial.

4            MS. SCHEFFEY:  Yes, Your Honor, with new

5    information.  Yes.

6            THE COURT:  Or if information was wrong.  I mean,

7    if they know something different than what they said, aren't

8    they under an obligation to correct it?

9            MS. SCHEFFEY:  Yes, Your Honor.  And this cannot

10   be that, because they both say they see a PowerPoint that

11   replaced the video in these responses, and a video that

12   didn't -- wasn't in use at the time that they were there, and

13   they unequivocally testified that they did not recall a

14   video.

15           So to now say they suddenly recall that they were

16   threatened by that video, and that it was a type of

17   immigration harm, at a minimum we need to re-depose them.

18           THE COURT:  You mean the same people who are

19   saying they were unaware of a video now say they were aware

20   of a video?

21           MS. SCHEFFEY:  Yes, Your Honor.  And so --

22           THE COURT:  Same person?

23           MS. SCHEFFEY:  For example, this --

24           MR. KOSHKIN:  Your Honor, this is Adam Koshkin on

25   behalf of the Plaintiffs.  That's not quite right.

1          I think some of this confusion comes from the fact

2   that GEO issued a vague and compound interrogatory, which we

3   objected to at the time.

4          The interrogatory asks for all facts that you

5   allege a certain prong of the PVPA.  And so since this is a

6   class action, we read that to seek all facts that we would

7   present at trial on behalf of the class.

8          GEO later asked us to provide individual

9   responses, but ultimately didn't revise the interrogatory to

10  clarify that "you" meant any of the individuals and not the

11  class.

12         So the response isn't inconsistent.  The

13  testifying witnesses testified to their experience and what

14  they saw and what happened to them, and this document was in

15  use earlier in the class period.  But because the operative

16  responses were -- you know, per the meet and confer, the

17  operative responses, we responded on behalf of each

18  Plaintiff.  We supplemented those because those were the

19  operative responses.

20         THE COURT:  Do you have a side-by-side for me so I

21  can compare the two?

22         MS. SCHEFFEY:  Yes, Dana has them.  And, Your

23  Honor, just so you know, the responses themselves say

24  "Plaintiffs respond to this interrogatory based on the

25  understanding it seeks acts that were directly experienced by

1  the individual named Plaintiffs based on GEO's

2  representations."

3           And I myself had a significant conferral with Mr.

4  Scimone about this in that we were seeking the facts, because

5  while it is easy to allege that something is class wide, GEO

6  has the right to conduct discovery and find out if all of the

7  Plaintiffs experienced it, only some of them, and then file

8  motions as to that effect.

9           THE COURT:  So are you saying that because of this

10 new information, it changes something you would have filed in

11 summary judgment?

12          MS. SCHEFFEY:  Yes, Your Honor, and

13 decertification, because it effectively brings a brand new

14 class wide claim saying that all Plaintiffs experienced the

15 same reaction to a video that none of the named Plaintiffs

16 remembered seeing.

17          THE COURT:  Okay.

18          MS. SCHEFFEY:  And it's contrary to their motion

19 that says we're challenging solitary confinement.

20          THE COURT:  So point out the conflict to me

21 directly, please.  I have the documents in front of me.

22          MS. SCHEFFEY:  Yeah.  It's going to be

23 interrogatory 43.

24          THE COURT:  So I'm looking at both -- well, give

25 me the names of the documents I'm going to be looking at.

1           MS. SCHEFFEY:  Did you give him each of them?

2           MR. EISMEIER:  Each one.

3           MS. SCHEFFEY:  Why don't you just -- I have Mr.

4    Menocal's in front of me.

5           THE COURT:  Okay, and I have him.

6           MS. SCHEFFEY:  So his sixth supplemental set of

7    interrogatories.

8           THE COURT:  Okay.

9           MS. SCHEFFEY:  If you'll go to number -- what did

10   you say?

11          MR. EISMEIER:  Page 6.

12          MS. SCHEFFEY:  Page 6.

13          THE COURT:  Okay, I'm there.

14          MS. SCHEFFEY:  Okay.  So previously he had said

15   that Menocal responds to this interrogatory --

16          THE COURT:  Wait.  Are you talking -- what

17   interrogatory?

18          MS. SCHEFFEY:  It's 43.

19          THE COURT:  Okay.  And then --

20          MS. SCHEFFEY:  Page 6 he answers.

21          THE COURT:  It's the red underline?

22          MS. SCHEFFEY:  The red underlined is the newly

23   added information.

24          THE COURT:  Okay.  And then I'm looking at --

25          MS. SCHEFFEY:  The black text was previously

 1  there.

 2              THE COURT:  Let me find Menocal's previous.

 3              MS. SCHEFFEY:  You can see it by just seeing the

 4  red underlined.  That's what was added.

 5              THE COURT:  Okay.  Hold on.

 6         (Pause)

 7              THE COURT:  Okay.  But where does he disclaim

 8  knowledge of it?

 9              MS. SCHEFFEY:  So in his deposition he testified

10  "did you see an orientation video when you arrived at the GEO

11  facility?"  "No, sir, I don't recall seeing a video.  I

12  recall seeing a handbook, a rule book, but I don't recall

13  seeing a video."

14              THE COURT:  What page, please?

15              MS. SCHEFFEY:  So that was his deposition

16  transcript.  Did you bring that?

17              MR. EISMEIER:  No, I didn't.

18              MS. SCHEFFEY:  I didn't bring it.  No.

19              MR. KOSHKIN:  Your Honor, while we're looking at

20  these responses, I would also just point you towards the

21  objection that Plaintiffs made to this interrogatory.  It is

22  -- we've incorporated the objection to interrogatory number

23  39, which specifically deals with the ambiguity in the term

24  "you" and what GEO was referring to with the term

25  "Plaintiff."

1          So to the extent that GEO is arguing that this

2     particularly is stating that this Plaintiff recalls or

3     alleges, I would just refer you back to the objection that we

4     made there.  It's on page 3 of the document that I'm looking

5     at.  I don't know for sure --

6          THE COURT:  But are you saying that you weren't

7     responding in these interrogatories on behalf of the person

8     named Alejandro Menocal personally?

9          MR. KOSHKIN:  Well, were responding on behalf of

10    him and on behalf of the class.  GEO asked us to issue

11    individual responses on behalf of each named Plaintiff.

12         We had originally, in April of 2020, issued a

13    response, sort of a general on behalf of the class response.

14    GEO asked us to issue subsequent individual responses, so the

15    operative responses to the interrogatories at the time we

16    supplemented them to add this document were the ones on

17    behalf of the individual class members.

18         MR. LEY:  Your Honor, this is Michael Ley on

19    behalf of the GEO Group.

20         I just might have something to add here, because I

21    participated in the conferrals.

22         A couple of quick facts that may help your

23    analysis.

24         The first one being:  GEO issued 9 sets of written

25    discovery.  One to each of the named Plaintiffs.  It wasn't

1  like there was one set of discovery issued that said "you."

2  There were 9 sets specifically addressed to each of the class

3  representatives.

4           Second, these second supplemental responses that

5  came in, like the earlier interrogatory responses that came

6  in, were separately verified by the individual class

7  representatives to whom the interrogatories were issued.

8           THE COURT:  Well, in any event, the first sentence

9  in this paragraph says that Plaintiff Menocal responds, so

10  I'm going to take that at face value.

11           Read the deposition testimony, please?

12           MS. SCHEFFEY:  Yeah.  "Okay.  Did you see an

13  orientation video when you arrived at the GEO facility?"

14  "No, sir.  I don't recall seeing a video.  I recall seeing a

15  handbook, a rule book, but I don't recall seeing a video."

16           THE COURT:  Okay.  Now, how is his response

17  contradictory to that?

18           MS. SCHEFFEY:  Yeah.  So if you look at the red

19  portion, they say "Plaintiff alleges that GEO communicated

20  this information in the detainee orientation video, the audio

21  for which contained the statement that failure to respect the

22  property of other detainees in the institution may result in

23  disciplinary action taken against you, and that could have a

24  negative effect on your case before the Government.  So the

25  best rule is to stay out of trouble during your stay here."

1          THE COURT:  I'll repeat my question:  How does

2    that contradict his testimony?

3          MS. SCHEFFEY:  If he didn't see a video, how could

4    he recall that this information was communicated to him?

5          THE COURT:  He doesn't say that he recalled it

6    was.  Read it carefully.

7          MS. SCHEFFEY:  Right.  But it's saying -- he

8    responds to it by saying GEO knowingly caused him to believe

9    that refusal to comply --

10          THE COURT:  Wait a minute.  I don't see that.

11          MS. SCHEFFEY:  The black part starts with --

12    because it's an addition, --

13          THE COURT:  Okay.

14          MS. SCHEFFEY:  -- GEO knowingly caused him to

15    believe that the disciplinary infractions, including refusal

16    to comply with GEO's house, could have adverse consequences

17    in his immigration proceedings.

18          THE COURT:  So that was already issued before the

19    discovery deadline?

20          MS. SCHEFFEY:  Yes, and then we --

21          THE COURT:  The black was.

22          MS. SCHEFFEY:  The black was.  And then we took

23    his deposition, and we concluded this was conclusory, we had

24    our evidence.

25          THE COURT:  Right.  So I do not read this red as

1  stating he's aware of the video personally.  He was probably

2  informed by counsel that that video exists, and so he's

3  regurgitating the allegations of the Plaintiff class and

4  himself, but not every allegation in the complaint.

5          MS. SCHEFFEY:  This isn't in the complaint, Your

6  Honor.

7          THE COURT:  It's personally known by the Plaintiff

8  himself.  He can make allegations, I believe, on -- what term

9  do lawyers usually use.  On understanding and belief.

10          MS. SCHEFFEY:  Upon information and belief.

11          THE COURT:  Information and belief.

12          MS. SCHEFFEY:  Yeah.  But then we get to

13  investigate those and discover those.  This wasn't in the

14  complaint, Your Honor.  This is a brand new claim that hasn't

15  been in their summary judgment --

16          THE COURT:  Well, let me ask Plaintiffs' counsel

17  directly.  Is it your understanding Plaintiff Menocal recalls

18  a video of this nature?

19          MR. EISMEIER:  No, Your Honor, it's not our

20  understanding that he does.  The comment that you made just

21  now about the sort of nature of pleading and class

22  representative is accurate.

23          And furthermore, this is not a new claim.  You

24  know, as GEO mentioned in its statement, you know, the stress

25  of solitary confinement are sort of the main portion of our

1   claim.

2           But the PVPA also, you know, makes illegal a

3   scheme or a pattern and practice on these sort of threats,

4   and this all falls within that.  So it's all within the

5   claims that we've been litigating this entire time.

6           And, you know, this information, the part about

7   the abuse of legal process, this is in our interrogatory

8   responses all the way back to April, as well.

9           THE COURT:  So I just don't see -- I mean, I don't

10  -- I'm not reading it the way you are, and they've just

11  represented that he cannot testify a recollection of the

12  video.

13          What the cite is, though, is to GEO MAN 56575.

14  What is GEO MAN 56575?

15          MS. SCHEFFEY:  Right.  So that's a video script

16  that was for a -- essentially they had a script that was read

17  into a VHS -- a recorder that was played on VHS for a very

18  narrow portion of the class.

19          THE COURT:  Did they accurately quote that script

20  in this?

21          MS. SCHEFFEY:  They accurately quote that.  But

22  the problem is, Your Honor, is that they have now submitted

23  this same response under each Plaintiff, creating a new class

24  allegation we never got to do discovery on.

25          They never let us ask about the immigration

1  proceedings.  They declined to respond to questions about

2  immigration status in prior discovery responses.

3          THE COURT:  Well, let me ask this question to the

4  Plaintiffs' counsel:  Do you know whether any of your class

5  representatives would have a personal recollection of

6  watching that video and the contents of it?

7          MR. KOSHKIN:  We don't know.  We're still

8  discussing with GEO to get -- nail down the time period that

9  the video was in use.

10          But to be clear, GEO's 30(b)(6) witness has

11  testified about this video, about -- there's testimony saying

12  exactly what Ms. Scheffey just said about how the video was a

13  script that was read into a VHS that was shown to detainees

14  during -- and she placed it in the class period, you know, in

15  her deposition testimony.

16          So this isn't some, you know, document that has

17  come out of the woodwork.  This is a document that GEO

18  produced, that's GEO's custodial information that it produced

19  years ago, that's been asked about at depositions and GEO's

20  30(b)(6) witness.

21          THE COURT:  I understand.  But what it be your

22  educated guess that none of your folks will have a direct

23  memory of this video?

24          MR. KOSHKIN:  As we understand the timing of

25  everything, you're correct, none of our witnesses would have

 1  a direct recollection because none of them were in the

 2  facility at the time.

 3           THE COURT:  Okay.  So the bigger issue, then, is

 4  not that this is a contradiction, this is a new sub-theory of

 5  liability, and it's unfairly prejudicial.  Is that what

 6  you're saying?

 7           MS. SCHEFFEY:  Yes, Your Honor.

 8           THE COURT:  And although I accept the

 9  representation that this has been in the production a long

10  time -- by the way, when was 56575 produced?

11           MS. SCHEFFEY:  It was November 2017.

12           THE COURT:  November 2016?

13           MS. SCHEFFEY:  2017.

14           THE COURT:  2017.  Okay.  So --

15           MR. KOSHKIN:  That's my understanding, as well.

16           THE COURT:  Is there any place prior to these

17  responses, these supplemental responses to discovery, where

18  you disclosed that this was part of your theory of the case?

19           MR. KOSHKIN:  Yes, Your Honor.  Prior to the

20  deposition of GEO's 30(b)(6) witness, we identified a list of

21  documents and policies that we wanted to ask her about.  This

22  document was included in that list, and is an exhibit to her

23  deposition.

24           We also, in the very first set of responses to

25  these interrogatories in April of 2020, we identified this

1   sort of sub-theory about the abuse of legal process.  That

2   was in those interrogatory responses.

3                THE COURT:  As I'm reading this, I'm going to have

4   to maybe disagree a little bit with the defense.

5                I don't see this as a new theory at all.  The

6   theory is:  If you don't do what GEO says, it could have

7   adverse consequences.  That's already in the black that's the

8   prior response.

9                All that second sentence does is give an example

10  of when -- of the proof that they're going to use to support

11  the allegation.

12               And unless asked for in discovery directly,

13  neither of you has to show every piece of evidence you're

14  going to rely on until it's time to exchange exhibits.

15               So I'm not sure I get your drift here.

16               MR. EISMEIER:  Here's the drift, Your Honor.

17  Going back to the original motions to Judge Kane having to do

18  with certification, the question was, under the TDPA you have

19  to show a threat of force.

20               The threat of force throughout this case to Judge

21  Kane and as mentioned by the Tenth Circuit, is that if you

22  refuse to clean your dormitory area, you can be sent to

23  solitary confinement, otherwise known as segregation.

24               That is the class-wide allegation that formed the

25  basis for this case.

1         Now that's being sent -- keep in mind segregation

2    for refusal to clean.  Now, after the discovery cutoff, after

3    dispositive motions are filed, this new allegation comes out

4    about a whole different threat, which is:  In this

5    orientation video, it's not about refusal to clean.  It's

6    about we may mess up -- if you don't follow the rules.  Not

7    cleaning.  The rules.  We may mess up your immigration

8    proceedings.

9         And at that point, everything is done.  We've

10   never heard this theory before.  It's a back door way to

11   amend the complaint to include a class-wide allegation that

12   was never part of this case, or at least never specifically

13   part of this case.

14        THE COURT:  So heretofore you thought that the

15   damages arose solely from the threat to --

16        MS. SCHEFFEY:  If I may use --

17        THE COURT:  -- put in solitary confinement, and

18   now you're understanding that the damages also arise from the

19   threat of you may be kicked out of this country quicker than

20   you want if you don't play ball.

21        MR. EISMEIER:  Yes.  And it isn't just what we

22   believe.  This comes from Plaintiffs themselves.

23        MS. SCHEFFEY:  Plaintiffs' own summary judgment

24   brief started with "this lawsuit challenges two policies

25   developed and implemented by the GEO Group by its ICE

1   contract detention facility in Aurora, Colorado."

2            "First, Plaintiffs allege that pursuant to an

3   internal policy called the housekeeping unit sanitation

4   policy, GEO compelled detainees at the Aurora facility to

5   perform necessary janitorial work, without pay, by

6   threatening anyone who tried to refuse a solitary

7   confinement."

8            "Second, Plaintiffs allege" --

9            THE COURT:  Hold on.  But threatening can have

10  lots of different aspects to it.

11           MS. SCHEFFEY:  Right.  But it says "by threatening

12  anyone who tried to refuse with solitary confinement."  It's

13  limited to "with solitary confinement."

14           THE COURT:  Oh, okay.  Sorry, I didn't hear that.

15  Go ahead.

16           MS. SCHEFFEY:  Yeah.  "By threatening anyone who

17  tried to refuse with solitary confinement."  And "second,

18  Plaintiffs allege that GEO unjustly enriched itself by paying

19  detainees only $1.00 a day to perform much of the other work

20  necessary to run the facility."

21           THE COURT:  So you're saying they haven't even

22  raised this theory in any brief?

23           MS. SCHEFFEY:  Yes, Your Honor.

24           THE COURT:  But if they haven't and they don't,

25  what's the beef?

1          MS. SCHEFFEY:  Well, Your Honor, our concern is

2    that we have filed summary judgment and decertification, and

3    that this is going to be used to --

4          THE COURT:  Hold on.  Hold on.  Do you intend to

5    raise this aspect, this potential adverse immigration

6    consequences, in any briefing before the Court prior to a

7    trial?

8          MR. KOSHKIN:  Yes, Your Honor, we do.

9          THE COURT:  So hold on.  Why didn't you raise it

10   in your initial brief?

11         MR. KOSHKIN:  Your Honor, we haven't filed our

12   initial brief in the current round of summary judgment.  The

13   brief that Ms. Scheffey was reading from was our motion for

14   summary judgment on GEO's affirmative derivative sovereign

15   immunity defense, a separate issue from the one that we plan

16   to use it on.

17         THE COURT:  Hold on.

18         MR. KOSHKIN:  And, again, GEO has been --

19         THE COURT:  Hold on.  Hold on.  What did you just

20   read from?

21         MS. SCHEFFEY:  I read from Plaintiffs' motion for

22   summary judgment.  What Mr. Koshkin is talking about is a

23   response to GEO's motion for summary judgment.

24         THE COURT:  I understand.  If you put that element

25   of harm in your motion for summary judgment, why didn't you

1  put this element of harm?

2         MR. KOSHKIN:  Again, Your Honor, GEO has been

3  aware of this.

4         THE COURT:  No, no, no.  You're not answering my

5  question.  You can say that after you answer my question.

6         MR. KOSHKIN:  Oh, I apologize.  We don't -- that

7  brief is not about the harm that occurred in this case.  That

8  motion was about the degree to which ICE directed the conduct

9  of that issue in the case, and not the actual harm that was

10  caused.

11         So these allegations that we're discussing right

12  now about this sort of abuse of legal process weren't

13  necessary relevant to the DSI motion.

14         GEO has --

15         THE COURT:  Hold on.  Read that again.  What

16  paragraph is that in, and under what kind of a theory?

17         MS. SCHEFFEY:  It's the introduction to their

18  motion for summary judgment.

19         THE COURT:  Okay.

20         MS. SCHEFFEY:  To try and dismiss GEO's defense,

21  which would obviously also, if GEO had the opportunity, apply

22  to the threat of immigration harm.

23         And it says:  "This lawsuit challenges two

24  policies developed and implemented by the GEO Group."

25         THE COURT:  Hold on.  So you heard that.  Your

1  words were "this lawsuit challenges" these things.  Are you

2  now expanding that?  Yes or no.  Are you going to remain with

3  your theory of what this lawsuit challenges?  That's the

4  question I have for you.

5          MR. KOSHKIN:  Your Honor, this isn't an expansion

6  of the theory.  We allege that GEO's housing unit sanitation

7  policy, which involved various threats to coerce detainees

8  into cleaning areas of the dorm outside of what's allowed

9  under ICE rules.

10          We allege that that violates the TVPA.

11          THE COURT:  All right, I don't need to hear

12  anymore.  There's nothing I can do for you.  This relates to

13  whether an issue is before the Court.  This doesn't relate to

14  discovery anymore.

15          And I promise you I only have authority up to this

16  line.  I cannot go a centimeter about that line.

17          And I think you're into the line -- above the line

18  where it's going to be Judge Kane -- it's still Judge Kane,

19  isn't it?

20          MS. SCHEFFEY:  Yes, Your Honor.

21          THE COURT:  Judge Kane who decides whether the

22  theory is precluded.  So I don't think this is a discovery

23  issue at all.  This is a dispositive issue.

24          For me to say a theory is excluded would be

25  dispositive in my world.  It would have to be by a report and

1    recommendation, because any ruling that a Magistrate Judge

2    makes on referral that actually bars something from coming in

3    front of the District Judge is what we call in our world

4    dispositive, and we can only do it by recommendation.

5            So the best I could do for you is issue a big dog

6    recommendation, and you guys issue humongous briefs, where

7    you might as well do that in the first place in front of

8    Judge Kane.

9            And so what I think would be the appropriate

10   procedure is if they try to raise this -- first of all, you

11   know you can't raise matters for the first time in a reply

12   brief.  So if they tried to raise it in a reply brief on that

13   motion for summary judgment, and didn't mention it in their

14   opening brief, then that violates the rules of briefing.

15           So black letter law in the Tenth Circuit on that.

16           If they do it in response to your motion for

17   summary judgment, then you'll just have to in your reply

18   state that that's a theory that's never been discovered,

19   never been briefed, never been the subject of any analysis,

20   and they've waived it, or whatever argument you can come up

21   with.

22           But I think this is beyond my pay grade.  Okay.

23           MS. SCHEFFEY:  And, Your Honor, just so I'm clear,

24   my research shows that this might be subject to a Rule 37

25   motion because it was raised for the first time in a

1    discovery response.

2              Would that be something we would file with Judge

3    Kane, and then if he referred it to you, you would handle it?

4              THE COURT:  Well, no, that's something you file,

5    period.

6              MS. SCHEFFEY:  Yeah.

7              THE COURT:  Any motion you file, you don't file it

8    before me or Judge Kane.  You file it in the case.

9              MS. SCHEFFEY:  Yeah.

10             THE COURT:  Every single motion.  I mean, even if

11   you know it's going to be mine, you just file it with the

12   Court.  And then in order for it to become mine, there is a

13   specific referral after that entry that says "this is

14   referred to the Magistrate Judge."

15             So if he thinks it's something that belongs to me,

16   he will let me know.  But as you may know, Judge Kane uses

17   Magistrate Judges sparingly, and it would be extremely

18   unusual for a Magistrate Judge to reach out and do something

19   that might affect what's presented at trial, because that's

20   his prerogative.

21             So if you do file such a motion, he may refer it

22   to me, he may not, but that's his decision.  Okay?

23             MS. SCHEFFEY:  Okay.

24             MR. EISMEIER:  Your Honor, could I ask a question?

25             THE COURT:  Yes.

1          MR. EISMEIER:  Essentially what we're -- the

2   reason that we're here is because this was raised in our

3   opinion for the first time in a discovery response.  And you

4   understand that.

5          THE COURT:  Yes.

6          MR. EISMEIER:  And so this isn't about excluding

7   evidence at trial.  At trial is what Judge Kane gets to

8   decide, or the Article III Judge, and we understand that.

9          THE COURT:  Right.

10          MR. EISMEIER:  But to the extent -- the reason

11   we're here, in large part, is because this was raised at the

12   time we didn't get to ask any of the deponents that we did --

13          THE COURT:  That I can handle.  That I can handle.

14   Okay?

15          MR. EISMEIER:  And so one of the issues is because

16   this was raised in a discovery response after the discovery

17   deadline, we now didn't get to ask Mr. Menocal, or all of the

18   other people who signed these things, we didn't get to ask

19   them about "did you see this?  Did you consider this a

20   threat?"

21          Because if they don't consider it a threat, it's

22   not anything.  So therefore, our concern is not just that

23   it's a new theory, but we've been deprived the ability to do

24   discovery.

25          THE COURT:  Right.  And so my remedy for that

 1  would be this, and Plaintiffs' counsel please listen

 2  carefully.

 3          Number one:  I would give the Plaintiffs' counsel

 4  a chance to represent to you in writing that each of the

 5  named representatives, anybody you've taken a deposition of,

 6  would each testify that they do not recall seeing the video.

 7          They probably can't say they never saw it, because

 8  that might be a lie.  All they can say is "we have no

 9  recollection of this video."  Therefore, it wouldn't have had

10  an impact -- who knows if wouldn't have had impact.

11          But, you know, their knowledge of it might have an

12  impact now because they've been informed after the fact "this

13  is what that video said."  They were probably dozing off

14  during the time it was shown to them, if it was shown to

15  them.

16          So if they acknowledge that they have no

17  recollection, each of them, about the video, I think you have

18  all you need.

19          If they don't do that, then you get to depose each

20  one at Plaintiffs' expense.  Okay?

21          MR. EISMEIER:  Thank you.

22          THE COURT:  All right.  And as to the other

23  matter, after reading the opinion provided to me, that did

24  rely very heavily on investigation by a federal agency

25  presents more than a remote respect of future litigation and

 1   provides reasonable grounds for anticipating litigation.

 2              This is not what we have here.  Unfortunately, we

 3   have you reaching out to the United States rather than

 4   responding to a threat from the United States.

 5              So I think they are fundamentally differently

 6   situated.  I think you've waived at least what's in that

 7   letter.  You have not waived the underlying analysis and work

 8   product.

 9              You don't have to do Plaintiffs' work for them,

10   but you would have to disclose information that you freely

11   provided without compulsion to the United States Government.

12              That's my view of it.  Okay?

13              MS. SCHEFFEY:  Okay.

14              THE COURT:  All right.

15              MS. SCHEFFEY:  Thank you, Your Honor.

16              THE COURT:  All right.  What else do we have?

17              MS. SCHEFFEY:  That's it, Your Honor, I think.

18              THE COURT:  Okay.  Anything else from the

19   Plaintiffs?

20              MS. DEMPSEY:  No, that's it, Your Honor.  Thank

21   you.

22              THE COURT:  Mr. Jafek, thank you for coming in.

23              MR. JAFEK:  Sure.  Thank you.

24              THE COURT:  Take care, everyone.

25              MS. SCHEFFEY:  Thank you, Your Honor.

1           THE COURT:  All right.  Bye.

2           MR. KOSHKIN:  Thank you, Your Honor.

3           MR. EISMEIER:  Thank you.

4           THE COURT:  Bye.

5                  (Time noted:  3:02 p.m.)

6                       * * * * *

7                       CERTIFICATE

8       I, RANDEL RAISON, certify that the foregoing is a

9   correct transcript from the official electronic sound

10  recording of the proceedings in the above-entitled matter, to

11  the best of my ability.

12

13

14  _____         October 13, 2020

15  Randel Raison

16

17

18

19

20

21

22

23

24

25