# EXHIBIT B

DECLARATION OF JAY M. BROOKS
SUPERVISORY DETENTION AND DEPORTATION OFFICER,
CUSTODY MANAGEMENT DIVISION
ENFORCEMENT AND REMOVAL OPERATIONS
UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT
DEPARTMENT OF HOMELAND SECURITY

I, Jay M. Brooks, pursuant to 28 U.S.C. § 1746, declare the following statement to be true and correct to the best of my knowledge and belief and make this declaration under the penalty for perjury:

**I. PERSONAL BACKGROUND**

1. I am employed by the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), Office of Enforcement and Removal Operations ("ERO"), as a supervisory detention and deportation officer ("SDDO") within the Custody Management Division ("CMD"), at ICE Headquarters in Washington, District of Columbia I have been employed with ICE since its inception on March 1, 2003. Prior to the establishment of ICE, I was employed by the Office of Detention and Removal Operations ("DRO"), U.S. Immigration and Naturalization Service ("INS"), since April 1996.

2. CMD provides policy and oversight for the administrative custody of ICE detainees, one of the most highly transient and diverse populations of any correctional or detention system in the world. CMD manages ICE detention operations efficiently and effectively to provide for the safety, security, and care of all individuals in its custody. CMD is comprised of the Detention Management Division ("DMD"), Alternatives to Detention Division ("ATDD"), and Custody Programs Division ("CPD").

3. Prior to coming to CMD, I served in various positions within the agency as a District Adjudications Officer ("DAO"), Deportation Officer ("DO"),

Program Manager ("PM"), Detention and Deportation Officer ("DDO"), and SDDO. Since 2000, I have been appointed to several supervisory positions at legacy INS and ICE Headquarters and have provided general oversight to staff, ERO field offices, senior leadership, and other federal agencies in the implementation and administration of various detention regulations, policies and programs.

4. From January 2011 to August 2020, I served as the Deputy Assistant Director ("DAD") for DMD. As the DAD, I oversaw the Detention Standards Compliance Unit ("DSCU"), Detention Monitoring Unit ("DMU"), and Detention Planning and Acquisitions Unit ("DPAU").

5. Through a robust inspections program, the DSCU ensures detention facilities used to detain aliens in immigration proceedings or awaiting removal to their countries do so in accordance with ICE national detention standards, and ensures that detainees are housed in the least restrictive environment consistent with the safety and security of the detainees and orderly facility operations. The DSCU oversees ICE's third-party facility inspections contract and the Detention Management Compliance Program ("DMCP") for all ICE authorized detention facilities. ICE contract inspectors typically spend three to four days auditing each facility.

6. The DMU operates ERO's on-site detention monitoring program, which consists of over 40 federal detention service managers that monitor detention conditions and day-to-day operations at 57 key facilities through daily compliance reviews and "on the spot" resolution of detainee issues and concerns. On-site monitoring increases facility transparency, reduces the length of time required to implement corrective actions, and provides leadership regular reporting on facility issues that occur between or are not identified during annual inspections or formal reviews.

7. The DPAU is responsible for policy and planning at the national level

as it relates to bed space capacity and ICE's average daily detention population. DPAU coordinates national detention-related requirements with input from ERO field offices, senior leadership and other agency stakeholders, and then works with the ICE Office of Acquisition Management to develop and post requirements aligned with the overarching goals of immigration detention. These collaborative efforts result in the acquisition of safe and secure detention facilities that can comply with ICE detention standards at a fair and reasonable cost to the government.

**II. Standards Applicable to Nationwide HUSP Class**

8. I am familiar with the ICE 2011 Performance-Based National Detention Standards ("PBNDS"), released in February 2012 and most recently revised December 2016 to ensure the PBNDS 2011 remains consistent with federal legal and regulatory requirements, as well as with prior ICE policies and policy statements. PBNDS 2011 is the governing set of ICE detention standards at the 11 GEO facilities cited in the Nationwide HUSP class.

9. I am familiar with PBNDS 2011 *(5.8) Voluntary Work Program,* which establishes ICE requirements, as well as expected practices and outcomes, for service providers that make a voluntary work program available to ICE detainees. ICE requires GEO to adhere to *(5.8) Voluntary Work Program* when operating the program at these facilities.

10. The statements contained in this declaration are based upon my personal knowledge or information provided to me in my official capacity. Not all ICE facilities are run the exact same way; each facility has its own contract and its own local oversight by the Field Office Director. ICE may have had some input and may have reviewed GEO HUSPs at the various facilities in the Nationwide HUSP Class; however, ICE is not the initial drafter of the GEO HUSP as those documents appear to be GEO policies used in GEO's operation of the facility and performance of the required services.

-3-

### III. Voluntary Work Program and Personal Housekeeping

11. (5.8) *Voluntary Work Program* provides the framework for ICE detainees housed in PBNDS 2011 facilities to work and earn money while in custody, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility. Where possible, service providers should provide detainees the opportunity to participate in a voluntary work program because the negative impact of detention can be reduced through decreased idleness, increased opportunity for social interaction, improved morale and fewer disciplinary incidents.

12. On March 6, 2017, the DHS Office of Inspector General ("OIG") did issue (*OIG-17-43-MA*), *Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange, California*. During an unannounced inspection, the Theo Lacy Facility in Orange, California, which was operated by the Orange County Sheriff's Department ("OCSD") and required to comply with the PBNDS 2008, was found to have problems with food handling, lack of cleanliness in shower stalls and detainee cells in two modular housing units, as well as concerns related to detainee classification, segregation and grievances. The OIG recommended that ICE ensure that OCSD follows the U.S. Department of Agriculture safe food handling guidelines to prevent health risks to detainees; undertake a full review and inspection of Theo Lacy and OCSD management to ensure compliance to PBNDS 2008; and also develop a comprehensive oversight plan to ensure OCSD's long-term compliance with the intent of PBNDS 2008. ICE concurred with the three recommendations. ICE did not address or provide comments related to the following statement found on page 6 of the report: "Additionally, requiring detainees to clean common areas used by all detainees is in violation of ICE standards, as detainees are only required to clean their immediate living area."

13. Section V(C) of *(5.8) Voluntary Work Program,* <u>Personal</u>

-4-

<u>Housekeeping Required</u>, states "Work assignments are voluntary; however, all detainees are responsible for personal housekeeping. *Detainees are required to maintain their immediate living areas in a neat and orderly manner by: (1) making their bunk beds daily; (2) stacking loose papers; (3) keeping the floor free of debris and dividers free of clutter; and (4) refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.*" [The italicized language is in the PBNDS text. Procedures in italics are required for service processing centers ("SPCs") and contract detention facilities ("CDFs"). IGSAs may adopt, adapt or establish alternatives to the italicized procedures, provided they meet or exceed the intent represented by those procedures.]

14. Section V(C) is not intended by ICE to be an exhaustive list of facility scenarios in which a detainee may be expected to participate in housekeeping. I was a participating member of the ICE working group that drafted the PBNDS 2011. A primary reason for including a "personal housekeeping" section in a detention standard on voluntary work program, rather than in a detention standard on environmental health and safety, was to emphasize that irrespective of whether a detainee chooses to join a work program, all detainees must participate in personal housekeeping and maintaining clean and orderly living areas. Section V(C) provides examples of personal housekeeping, but there was no intent by the working group to establish a conclusive list of personal housekeeping activities or to preclude detainees from participating in maintaining the cleanliness of common or shared living areas.

**IV. Immediate versus Shared Living Area**

15. The PBNDS 2011 does not define "immediate living area," nor does it speak to shared living areas or detainee common areas in a facility. Based on my participation in the PBNDS 2011 working group and my overall familiarity with the ICE detention standards, as well as discussion with ERO subject matter experts

-5-

who drafted ICE's first set of national detention standards issued in 2000, I believe this to be an oversight or inadvertent omission within the standards that would benefit greatly from clarification. Clarification of the meaning of a component of the ICE detention standards is accomplished by a published Change Notice to a standard.

16. I am not aware of any component of the ICE detention standards that exempts or expressly forbids detainees from performing basic housekeeping and light cleaning. It is an expectation accepted in most group living environments. The ICE detention standards are silent as to how group-living cleaning gets done; however, the ICE National Detainee Handbook (April 2016), in its Question and Answer ("QA") section on Voluntary Work Program (page 12), states the following, in part: "Will I get paid for keeping my living area clean? No. You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined. It is up to you to know the rules for the work program. Also see your facility's local rules."

17. The ICE Detainee Handbook, which is provided to each detainee as part of orientation, is clear that all detainees, including those not participating in a Voluntary Work Program, are expected to participate in keeping general-use or detainee common areas clean and orderly. Additionally, Section V(A)(3) of PBNDS 2011 *(1.2) Environmental Health and Safety*, <u>General Housekeeping</u>, states, in part, "The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness. When possible, the use of non-toxic cleaning supplies is recommended." Everyone living in a group housing unit shares a co-responsibility to keep the dormitory, dayroom, shower and bathroom areas tidy and clean. Cleaning of recreation areas, dining rooms, multi-purpose rooms that are subject to facility-wide use are different and are not expected to be cleaned by detainees, unless part of a signed voluntary work agreement that offers compensation.

## V. Signature

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21nd day of October, 2020, in Washington, District of Columbia.

_Jay M. Brooks_
Jay M. Brooks
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement