**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:14-cv-02887 JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

---

## **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................... 1

II.  PLAINTIFFS' RESPONSE TO GEO'S PROPOSED UNDISPUTED MATERIAL FACTS .......................................................................................................... 1

III. PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS .................................. 30

    A.   The Housing Unit Sanitation Policy ............................................................. 30

    B.   Solitary Confinement ................................................................................... 38

    C.   Conditions of Confinement at GEO ............................................................. 39

    D.   GEO's Contracting Practices ...................................................................... 44

IV.  LEGAL STANDARD .................................................................................... 46

    A.   Summary Judgment ..................................................................................... 46

    B.   The TVPA .................................................................................................. 47

V.   ARGUMENT ............................................................................................... 48

    A.   Material Disputes of Fact Preclude Summary Judgment on the Class's TVPA Claims. ............................................................................................. 48

        1.   GEO's Forced Labor Scheme Included Threats of Serious Harm and Physical Restraint. ............................................................................ 50

        2.   GEO's Threats of Serious Harm Were Pervasive. ............................ 53

        3.   Detainees' Uniform Conditions of Confinement Made them Especially Vulnerable to Coercion. ................................................... 54

        4.   Placement in Solitary Confinement Is Not a "Legitimate Consequence" of Refusing to Perform Unpaid Labor. ................... 57

        5.   A Jury Could Conclude That GEO Intended its Threats to Compel Unpaid Labor. .................................................................................. 60

      6.     The Jury Can Infer That Class Members Cleaned Because of Fear of Solitary Confinement. ........................................................................ 63

B.    Class Members' TVPA Claims Benefit from the TVPA's 10-Year Statute of Limitations. ............................................................................ 64

C.    Plaintiffs Do Not Seek Injunctive Relief........................................... 67

D.    Material Disputes of Fact Preclude Summary Judgment on Plaintiffs' Unjust Enrichment Claims. ........................................................... 67

      1.     The Record Shows That GEO Obtained a Benefit From Paying Detainees $1 per Day for Their Labor. ............................................ 67

      2.     GEO's Contract Defense Fails ......................................................... 70

          i.     GEO Waived Its Contract Defense......................................... 70

          ii.    The Contract GEO Relies On Is Unconscionable. ................. 70

VI.    CONCLUSION .................................................................................... 74

# <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                      **PAGE(S)**

*Abarca v. Little*,
   54 F. Supp. 3d 1064, 1069 (D. Minn. 2014) ................................................................. 66

*Adler v. Wal-Mart Stores, Inc.*,
   144 F.3d 664 (10th Cir. 1998) .................................................................................... 46

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................... 46

*Barrientos v. CoreCivic, Inc.*,
   951 F.3d 1269 (11th Cir. 2020) ........................................................................... 59, 60

*Bernall v. Burnett*,
   793 F. Supp. 2d 1280 (D. Colo. 2011) ....................................................................... 72

*Bonanno v. Quizno's Franchise Co., LLC*,
   No. 06 Civ 2358, 2009 WL 1068744 (D. Colo. Apr. 20, 2009) ................................. 72

*Bridges v. Poe*,
   No. 19 Civ. 1399, 2020 WL 5408915 (N.D. Ala. Sept. 9, 2020) ............................... 50

*Burke v. Regalado*,
   935 F.3d 960 (10th Cir. 2019) .................................................................................... 70

*Camayo v. John Peroulis & Sons Sheep, Inc.*,
   Nos. 10 Civ. 772, 11 Civ. 1132, 2013 WL 3927677 (D. Colo. July 20,
   2013) ...................................................................................................................... 65-66

*Contreras v. Corinthian Vigor Ins. Brokerage, Inc.*,
   25 F. Supp. 2d 1053 (N.D. Cal. 1998) ....................................................................... 73

*Cruz v. Maypa*,
   773 F.3d 138 (4th Cir. 2014) ............................................................................... 64, 65

*Davis v. M.L.G. Corp.*,
   712 P.2d 985 (Colo. 1986) ............................................................................. 71, 72, 73

*DCB Const. Co. v. Cent. City Dev. Co.*,
   965 P.2d 115 (Colo. 1998) .......................................................................................... 67

*Doe v. Siddig*,
   810 F.Supp.2d 127 (D.D.C. 2011) .............................................................................. 66

*Gilbert v. United States Olympic Comm.*,
    423 F. Supp. 3d 1112 (D. Colo. 2019) ........................................................ 65

*Headley v. Church of Scientology Int'l*,
    687 F.3d 1173 (9th Cir. 2012) .................................................................. 58

*Hughes Aircraft Co. v. United States ex rel. Schumer*,
    520 U.S. 939 (1997) ................................................................................ 64

*Interbank Invests., LLC v. Eagle River Water & Sanitation Dist.*,
    77 P.3d 814 (Colo. App. 2003) ........................................................... 70-71

*Lama v. Malik*,
    192 F. Supp. 3d 313 (E.D.N.Y. 2016) ..................................................... 65

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ........................................................................... 64, 66

*Lantec, Inc. v. Novell, Inc.*,
    306 F.3d 1003 (10th Cir. 2002) ............................................................. 50

*Menocal v. GEO Grp., Inc.*,
    320 F.R.D. 258 (D. Colo. 2017) ............................................................. 63

*Menocal v. GEO Grp., Inc.*,
    882 F.3d 905 (10th Cir. 2018) ......................................................... 61, 63

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017) ..................................................... 55, 56, 58

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
    790 F. Supp. 2d 1134 (C.D. Cal. 2011) ................................................. 51

*Radio Corp. Of Am. v. Radio Station KYFM, Inc.*,
    424 F.2d 14 (10th Cir. 1970) ................................................................. 70

*United States v. Bradley*,
    390 F.3d 145 (1st Cir. 2004) ........................................................... 47, 57

*United States v. Callahan*,
    801 F.3d 606 (6th Cir. 2015) ........................................................... 56, 59

*United States v. Calimlim*,
    538 F.3d 706 (7th Cir. 2008) ........................................................... 57, 62

*United States v. Dann*,
  652 F.3d 1160 (9th Cir. 2011) ................................................................ 47, 60

*United States v. Kozminski*,
  487 U.S. 931 (1988) ............................................................................... 47, 59

*United States v. Thompson*,
  109 F.3d 639 (9th Cir. 1997) ....................................................................... 50

*United States v. Toviave*,
  761 F.3d 623 (6th Cir. 2014) ................................................................. 51, 59

*Velez v. Sanchez*,
  693 F.3d 308 (2d Cir. 2012) ........................................................................ 66

*Williams v. Walker-Thomas Furniture Co.*,
  350 F.2d 445 (D.C. Cir. 1965) ..................................................................... 73

**Statutes**

8 U.S.C. § 1555 ............................................................................................... 45

18 U.S.C. § 1589 ..................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 56 ........................................................................................... 46

**Other Authorities**

H.R. Rep. No. 106-939, at 101 (2000) (Conf. Rep.),
  *as reprinted in* 2000 U.S.C.C.A.N. 1380, 1392-93 ..................................... 47

Victims of Trafficking and Violence Protection Act of 2000, PL 106–386,
  tit. XVIII, § 1589, 114 Stat. 1464 (2000) .................................................... 66

## I.       INTRODUCTION

Summary judgment is appropriate in cases where there are no genuine issues of material fact, making the role of a factfinder at trial unnecessary.  GEO's motion makes abundantly clear that this is not such a case.  To the contrary, GEO has identified numerous issues of material fact that are properly determined at trial by a jury, including but not limited to (1) whether a reasonable person would find placement in solitary confinement to be "serious harm" under the Trafficking Victims' Protection Act ("TVPA"), (2) whether threats of solitary confinement caused detainees to perform cleaning work for GEO, (3) whether detainees' uniform conditions of confinement made them more susceptible to coercion, (4) whether GEO financially benefited from paying detainees a dollar a day under the Voluntary Work Program ("VWP"), and (5) whether the agreement GEO required VWP workers to sign was an enforceable contract.  The Court should deny GEO's motion for summary judgment, and allow this case to proceed to trial.

## II.      PLAINTIFFS' RESPONSE TO GEO'S PROPOSED UNDISPUTED MATERIAL FACTS

### A.      Policies Challenged By Plaintiffs

1.        At the class certification stage Plaintiffs cited to a Policy and Procedure Manual, titled "Sanitation Procedures" in support of their claims.[1]  ECF 50-2.

---

[1]       [GEO's footnote] Plaintiffs have renamed this document the "HUSP," but no formal GEO policy is designated or titled "HUSP." It appears that this phrase originates

    i.  **Plaintiffs' Response:** Admit that the "Sanitation Procedures" section of the Aurora Policy and Procedure Manual was an exhibit to Plaintiffs' Motion for Class Certification.  Deny the contention in the footnote that Plaintiffs "have renamed this document the 'HUSP'" or that "no formal GEO policy is designated or titled 'HUSP.'"  As GEO acknowledges, the Housing Unit Sanitation policy ("HUSP") is set forth in the Detainee Handbook under the heading "Housing Unit Sanitation."

2.    The Sanitation Procedures were not developed to assign tasks to any specific individuals, but rather to detail the process for cleaning and materials to be used.  ECF 289 (Undisputed Fact 31).

    i.  **Plaintiffs' Response:** Admit.[2]

3.    Detainees do not receive a copy of the Sanitation Procedures during their stay at AIPC.  ECF 50-1, 29:13-18 (30(b)(6) Deposition of Ceja).

    i.  **Plaintiffs' Response:** Admit.

4.    Plaintiffs no longer rely upon the Sanitation Procedures as a policy that underlies their TVPA claim. Ex. A. (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories, Responses to Interrogatory No. 39).

---

not from the Sanitation Procedures, but instead the Detainee Handbook which contains a subsection called "Housing Unit Sanitation." *See* ECF 260 at 7.

[2]    ECF No. 289 is a notice filed by non-party ICE to correct inaccurate statements made about the conditions of Plaintiff Hugo Hernandez Ceren's confinement.  GEO's citations to ECF No. 289 appear to refer to ECF No. 298.

      i.   **Plaintiffs' Response:** Deny. The referenced interrogatory does not mention policies; rather, it states: "Describe all actions taken by GEO that You allege constitute force, threats of force, physical restraint, or threats of physical restraint" under 18 U.S.C. § 1589(a)(1).

5.     Plaintiffs also cited the AIPC Handbook at the class certification stage as support for their TVPA claims. ECF 50-3.

      i.   **Plaintiffs' Response:** Admit.

6.     Unlike the Sanitation Procedures, the AIPC Handbook is issued to all detainees entering the facility. ECF 289 (Undisputed Fact 23).

      i.   **Plaintiffs' Response:** Admit.

7.     The only classwide polices that Plaintiffs challenge as part of their TVPA claim are the AIPC Handbook and an Orientation video shown to detainees upon arrival. Ex. A. (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories Responses to Interrogatory No. 39).

      i.   **Plaintiffs' Response:** Deny.  Plaintiffs challenge GEO's classwide HUSP, which is described in the Detainee Handbook and orientation video.  The Detainee Handbook and orientation video contain evidence of that policy, but are not the only evidence of that policy. The referenced interrogatory does not mention policies; rather, it states: "Describe all actions taken by GEO that You allege constitute

force, threats of force, physical restraint, or threats of physical restraint" under 18 U.S.C. § 1589(a)(1).

8.     More specifically, Plaintiffs challenge the meal clean-up policy in the AIPC Handbook whereby 6 detainees (2 of which are paid "Trustees" under the VWP) assist in cleaning up the housing unit after each meal. ECF 49; ECF 261-17, 20.

   i.  **Plaintiffs' Response:** Deny. Plaintiffs challenge the HUSP, which provides:

> Each and every detainee must participate in the facility's sanitation program.  A list of detainees is developed each day by staff and is posted daily for viewing.  During a general cleanup all detainees must participate.  The assigned Housing Unit [or Dorm] Officer will be responsible for assuring this general cleanup is done on a regular basis.

ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook, GEO_MEN 00054151-222) at 49; ECF No. 273-3 (2008 Detainee Handbook, GEO_MEN 00054224-52) at 19; ECF No. 273-4 (2010 Detainee Handbook, GEO_MEN 00054253-77) at 16-17; ECF No. 273-5 (2011 Detainee Handbook, GEO-MEN 00065783-808) at 17; ECF

No. 261-17 (2013 Detainee Handbook, PL000029-55) at 20.[3]  The evidence GEO cites does not support calling the policy a "meal clean-up policy" and does not support that 2 of the 6 detainees assigned to housing unit sanitation duties were VWP workers. Further evidence related to the HUSP is also set forth in Plaintiffs' Statement of Additional Facts ("SAF"), Nos. 1-13.

9.      The meal clean up section of the handbook provides for the following sanction if not followed:

> If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any - activities/programs until the housing unit is cleaned. Continued refusal to clean will result in further disciplinary action.
> ECF 261-17, 20.

  i.   **Plaintiffs' Response:** Admit that the Detainee Handbook includes the quoted language.  Deny that the quoted section of the handbook specifically references meal clean-up.

10.     GEO is required to comply with ICE's PBNDS under its contract. ECF 289 (Undisputed Facts 11-14, 16,18).

---

[3]      Minor variations between handbooks are noted in brackets.  In some versions of the handbook, this policy is referred to as Dormitory Sanitation and not Housing Unit Sanitation, but the substantive policy remains the same.

      i.   **Plaintiffs' Response:** Admit.

11.    All applicable versions of ICE's National Detention Standards ("NDS") and PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale and incorporate it into the AIPC Handbook. ECF 289 (Undisputed Fact 19).

      i.   **Plaintiffs' Response:** Admit.

12.    All applicable versions of ICE's NDS and PBNDS require GEO to provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 289 (Undisputed Fact 21).

      i.   **Plaintiffs' Response:** Admit.

13.    The ICE disciplinary severity scale included in the AIPC Handbook provides for up to 12 other sanctions as a possible consequence for refusing to clean one's living area. These sanctions include warning, reprimand, and loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.). ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17.

      i.   **Plaintiffs' Response:** Admit.

14.    GEO included this sanction in the AIPC Handbook, as required by ICE. ECF 289 (Undisputed Facts 11-14, 16, 18, 19, 21).

      i.   **Plaintiffs' Response:** Admit.

15.    The detainee orientation video provides:

You will be protected from personal abuse, corporal punishment, personal injury, disease, and damage to your property and harassment to the fullest extent possible. Each and every detainee must participate in the sanitation program. A list of detainee's [sic] is developed each day and is posed for viewing. During a general clean-up all detainees must participate.

\*\*\*\*\*

Disciplinary Process[.] Refer to your local supplement for more detailed information about the rules infractions that you must avoid and the established disciplinary actions that will be taken.

\*\*\*\*\*

<u>High Moderate</u>- and a few examples are . . . Indecent exposure, staling [sic], refusing to obey a staff member, insolence to staff member, lying or providing false statement to staff, being in an unauthorized area, not standing for count, interfering with count, gambling, destroying altering or damaging property"

*See* ECF 262-10 (emphasis in original).

    i.   **Plaintiffs' Response:** Admit.

16.    In addition to the AIPC Handbook and orientation video, GEO is required to provide all detainees with the ICE National Handbook. Like the AIPC handbook, the ICE Handbook also warns detainees that they could face disciplinary consequences if they refuse to clean, stating "Will I get paid for keeping my living area clean? No. You must keep areas that you use clean,

including your living area and any general-use areas that you use. If you do

not keep your areas clean, you may be disciplined." Ex. B. (ICE National

Handbook). Despite this being materially similar to the AIPC Handbook,

Plaintiffs do not allege that ICE's National Handbook constituted a threat

as defined by the TVPA. ECF 49; Ex. A (Plaintiffs' Supplemental

Responses to GEO's Sixth Set of Interrogatories, Responses to

Interrogatory No. 39) (omitting any reference to the ICE National

Handbook).

    i.    **Plaintiffs' Response:** Admit that the ICE National Handbook

        includes the quoted language.  Deny that cleaning general-use areas

        is the same as keeping general-use areas clean, or that the language

        in the ICE handbook is "materially similar" to the HUSP as set forth

        in the Detainee Handbook.  Compare ECF No. 310-1 (ICE Detainee

        Handbook, GEO-MEN 00141667-702) at 18 ("Will I get paid for

        keeping my living area clean? No. You must keep areas that you use

        clean, including your living area and any general-use areas that you

        use. If you do not keep your areas clean, you may be disciplined.")

        with ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN

        00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook) at

        49; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4

        (2010 Detainee Handbook) at 16-17; ECF No. 273-5 (2011 Detainee

        Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20.

("Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate.").

17. Plaintiffs also challenge the VWP daily stipend. ECF 1, ECF 49,3.

    i. **Plaintiffs' Response:** Admit.

18. All detainees are offered the opportunity to participate in the VWP. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17.

    i. **Plaintiffs' Response:** Admit.

19. All detainees who participate in the VWP are told that their participation is voluntary. Ex. C. (Plaintiffs' VWP applications).

    i. **Plaintiffs' Response:** Admit, but note that that the cited documents only do so by referring to the program as the "voluntary work program" and "the volunteer work program."

20. All detainees who participate in the VWP are told in advance that "compensation shall be $1.00 per day." Ex. C. (Plaintiffs' VWP applications.).

    i. **Plaintiffs' Response:** Admit.

21. All detainees must sign an agreement to participate in the VWP, acknowledging that their compensation will be limited to $1 per day. Ex. C. (Plaintiffs' VWP applications).

    i.  **Plaintiffs' Response:** Admit, but dispute that the agreement is an enforceable contract. *See* § V.E.2, *infra*.

22.    Some VWP participants receive additional incentives for their participation including candy or ice cream. Ex. D (Ceja 30(b)(6) Dep.162-163).

    i.  **Plaintiffs' Response:** Admit.

**B.**    **Plaintiff's Experiences at the AIPC.**

23.    Plaintiff Menocal described a typical day at AIPC as follows:

I wake up, get dressed, do my bed, wait for breakfast, eat breakfast, clean up, maybe exercise, walk around, read a book, draw. It depends. Again, wait for lunch to eat, clean up, maybe shower, maybe do some sports, maybe talk on the phone with someone, maybe write a letter, walk around, exercise, wait for dinner. Same thing, eat dinner, relax a while, maybe watch TV, read a book, draw, and, you know, wait for bedtime.

Ex. E (Menocal Dep. 121:5-13).

    i.  **Plaintiffs' Response:** Admit.

24.    While detained, Plaintiff Menocal described AIPC to a friend as follows:

[T]hey've got pretty good grub, considering it's, you know, a detention center. And we got three televisions, a bunch of tables, a bunch of people, and we all get along. Pretty nice. I mean, it's – for being incarcerated, it's not bad at all, not compared to – not compared to Denver County or the other one where I was at. This is like Camp Snoopy. It's pretty easy.

Ex. E (Menocal Dep. 54:5-12).

    i. **Plaintiffs' Response:** Admit, but deny that this statement accurately describes Plaintiff Menocal's experience at Aurora.  Plaintiff Menocal testified that this statement was not true, and that he told family and friends that GEO was a nice place and that the food was good only so his friends and family would not worry about him. Ex. 1 (Menocal Tr.) 48:20-24; 67:12-68:5; 167:17-168:6.  In response to this recording, Plaintiffs' expert Dr. Grassian stated: "A person can experience a sense of dread and fear and still try to present a good face to their friends and family and to themselves. You know, that doesn't change anything."  Ex. 2 (Grassian Tr.) 272:3-24.

25.    Plaintiff Hugo Hernandez described a typical day as follows:

    I would wake up for breakfast at 5:00 in the morning. I will walk out, store my food, bring it back to the cell, and go to sleep only if it was not my time to clean. But if I was assigned to clean, I have to stay outside and clean. I couldn't go back to sleep. So[,] I will store my food. I will wake up when I wake up, and brush my teeth, do my coffee, and make sure that all my cellies get the coffee because that's my one main thing. Then we will all sit at the table. I will do my legal work, go through my documents, and see what else I need to put in or something, watch a little bit of TV. I can go to the phone a little bit. If -- if I will get someone to answer, I will go to the phone. Wait for count time, wait for lunch. After lunch, I will do a cleanup

again, which is cleanup time, and wait to see who's assigned for the

cleanup, and if I'm not assigned, then I just go to my cell or I go

against the wall just like everybody else. And once everything gets

reopened, go back into the table again and do some workout while

waiting -- doing my workout. I wait for chow again and wait for the

cleanup, and, of course, shower. Yeah, after the workout, shower,

get back. Wait for chow, clean up, and then eventually wait for the

GEO guard, Officer Blacknick, to come and pick me up so we can

go to the law library and collect all detainees who wanted to go to

the library. We'll go to the law library, get a pat-down, go inside the

law library. And in there, I will help detainees with their documents,

printouts, making sure they understood what the immigration judge

was asking them to bring back, translations, looking for any specific

application they were looking for. And then once we were done, like

an hour later or an hour and a half later, I get another pat-down, get

taken back to the cell, and wait for count time.  Ex. F (Hernandez

Dep. 107-108).

i. **Plaintiffs' Response:** Admit.  The above omits the last two

sentences of Plaintiff Hernandez Ceren's answer, which state: "And

after count time, the last count time, you have to be inside your cell

and the doors got to be locked in already.  And then it's another

day."

26.     While at AIPC, every detainee had the ability to communicate with ICE at

any time. Ex. B (ICE Detainee Handbook, pg. 2) ("ICE officers will

routinely visit the housing units at your facility. If you have questions about

your case or how the facility has treated you, let the ICE officers know. . .

[y]ou may also submit a request for information in writing."); Ex. E

(Menocal Dep. 56:1-10); Ex. F (Hernandez Dep. 97:15-22).

   i.  **Plaintiffs' Response:** Deny.  While Plaintiffs acknowledge that the

       ICE Detainee handbook suggests that detainees should have

       "routinely" had an opportunity to communicate with ICE officers,

       the cited evidence does not establish that "every detainee had the

       ability to communicate with ICE at any time." (emphasis added).

       The documents do suggest that detainees would have the opportunity

       to speak to ICE officials during their "routine[] visits" to the housing

       units.  It is unclear what the handbook means by "submit a request

       for information in writing."  The cited testimony from Plaintiffs

       Menocal and Hernandez Ceren suggests that detainees could file a

       complaint or "kite", though it is not clear whether the complaint

       would go to ICE or GEO.  Plaintiff Menocal did not know if the

       kites he filed went to ICE or GEO personnel.  Ex. 1 (Menocal Tr.)

       56:16-20.  In Plaintiff Hernandez Ceren's deposition, a "kite" was

       described as "a way that you could file a grievance or bring an issue

to the attention of the facility." Ex. 3 (Hernandez Ceren Tr.) 97:15-20.

27.    Some detainees elected to be placed in segregation voluntarily, seeing it not as a punishment, but instead a location where they could receive peace and quiet. Ex. D (Ceja 30(b)(6) Dep. 55:7-19).

      i.    **Plaintiffs' Response:** Deny. The cited testimony describes "protective custody," which is not synonymous with "segregation," despite the fact that both practices use the same space. Detainees who feel threatened, afraid, or unsafe in general population are placed in protective custody. Ex. 4 (Gallegos Tr.) 74:7-76:23; *see also* ECF No. 262-11 (Special Management Unit ("SMU") Operations policy, GEO_MEN00037770-84) at 3 ("Protective custody (PC) may be initiated at the detainee's request or ordered to protect the detainee from harm."). GEO's segregation logs show that the detainees who sought "peace and quiet" were sent to protective custody. Ex. 5 (Segregation Activity Sheet, GEO-MEN 00070692-93).

28.    None of the named Plaintiffs were placed in segregation for refusing to clean. Ex. A (Brambila's Responses to GEO's Sixth Interrogatories); Ex. E (Menocal Dep. 100:16-19); Ex. F (Hernandez Dep. 181:1-7); Ex. G (Valerga Dep. 141:24-142:2, 140:12-13); Ex. H (Lourdes Argueta Second Set of Discovery, Interrogatory No. 27; Yepez Gaytan Second Set of

Discovery, Interrogatory No. 27; Alexaklina Second Set of Discovery, Interrogatory No. 27); Ex. I (Vizguerra Dep. 42:5-7); Ex. J (Xahuentitla Dep. 70:11-17).

     i.  **Plaintiffs' Response:** Admit.

29.    Plaintiff Menocal did not receive direct threats for refusing to clean. Ex. H (Menocal's Second Set of Discovery, Interrogatory No. 27).

     i.  **Plaintiffs' Response:** Deny.  Plaintiff Menocal testified that GEO guards, as well as other detainees, told him that he had to clean or be sent to solitary confinement.  Ex. 1 (Menocal Tr.) 96:5-97:3. Plaintiff Menocal also witnessed other detainees taken to solitary confinement for refusing to clean and understood that refusal to clean could lead him to the same fate.  *Id*. 102:14-25.

30.    Plaintiff Olga Alexaklina was never threatened by GEO employees with disciplinary or administrative segregation for failing to clean. Ex. H (Alexaklina Second Set of Discovery, Interrogatory No. 27).

     i.  **Plaintiffs' Response:** Admit.

31.    Upon being informed that he would be placed in segregation if he did not clean, Plaintiff Valerga responded with "go ahead." Ex. G (Valerga Dep. 136:16-137:19).  Yet, Plaintiff Valerga was not placed in segregation on that occasion or any other occasion. *Id*. Valerga Dep. 141:24-142:2, 140:12-13.

      i.   **Plaintiffs' Response:** Admit that Plaintiff Valerga testified to the incident above but deny that he was not sent to segregation on "any other occasion." Plaintiff Valerga spent three weeks in segregation at Aurora. Ex. 6 (Valerga Tr.) 8:22-9:13.

32.    Plaintiff Hernandez testified in his deposition that he did not, and does not, consider the AIPC Handbook to be threatening. Ex. F (Hernandez Dep. 58:12-24).

      i.   **Plaintiffs' Response:** Admit that Plaintiff Hernandez Ceren testified he did not find portions of the handbook threatening, but deny that he did not find the HUSP, which was described in the handbook, threatening. Plaintiff Hernandez Ceren testified that he knew cleaning was mandatory because "the GEO guard would tell you that it's in the handbook, and if you refuse, you were going to be sent to the hole." Ex. 3 (Hernandez Ceren Tr.) 159:10-15.

33.    Plaintiff Dagoberto Vizguerra does not recall receiving the AIPC Handbook, let alone being threatened by it. Ex. I (Vizguerra Dep. 90:24-91:4).

      i.   **Plaintiffs' Response:** Admit that Plaintiff Vizguerra does not recall receiving the handbook, but deny that he did not find the HUSP, which was described in the handbook, threatening. Plaintiff Vizguerra testified that he was aware of the cleaning requirement and its consequences because he saw a detainee get sent to

segregation on his second or third day at Aurora for refusing to clean.  Ex. 7 (Vizguerra Tr.) 48:9-49:9.  In addition, the record reflects that all detainees receive and acknowledge the handbook upon entry to the facility, regardless of Plaintiff Vizguerra's specific recollection.  Ex. 8 (Ceja 30(b)(6) Tr. I) 88:7-23.

34. Plaintiffs are not making a claim for "mental anguish, emotional distress, or other similar related conditions." Ex. H (Plaintiffs Responses to Interrogatory No. 32).

    i. **Plaintiffs' Response:** Admit.

35. Plaintiffs' expert, Dr. Stuart Grassian, did not diagnose any of the plaintiffs with psychological conditions. Ex. K (Grassian Dep. 37:22-23; 237:20-238:24).

    i. **Plaintiffs' Response:** Admit.  Issuing such diagnoses is beyond the scope of Dr. Grassian's report.

36. Detainees had varying motivations for cleaning:

    a. Plaintiff Menocal preferred to clean up after himself while living at AIPC because he preferred to "live and hang out in a clean environment." Ex. E (Menocal Dep. 81:6-10).

        i. **Plaintiffs' Response**: Deny.  GEO takes this testimony out of context: Plaintiff Menocal testified that generally he prefers a clean environment; the testimony was not specific to Aurora.  Plaintiffs further

17

deny that this testimony expresses his motivation for cleaning up after others in the Aurora Facility.  Mr. Menocal testified that he cleaned because "we had to clean and if not . . . we would be punished. . . . The hole is not a pretty place."  Ex. 1 (Menocal Tr.) 104:25-105:3.

b.      Indeed, while living at AIPC Plaintiff Menocal asked for permission to clean the recreation area without an expectation of remuneration simply because he spent a lot of time there and wanted to "hang out in a clean environment." Ex. E (Menocal Dep. 86:22-87:5).

i.      **Plaintiffs' Response**: Deny.  Plaintiff Menocal testified that he cleaned the rec yard as a precursor to obtaining a job in the VWP, and that he eventually was offered a job in the VWP because of this cleaning.  Ex. 1 (Menocal Tr.) 86:3-87:14.

c.      Plaintiff Hernandez liked to keep his area clean. Ex. F (Hernandez Dep. 49:24-50:1).

i.      **Plaintiffs' Response**: Admit.  However, the cited testimony relates to Plaintiff Hernandez Ceren's time in a different facility.

    d.    To avoid the loss of TV time, detainees would often volunteer to help clean up the living area, even if not asked or assigned by GEO officers. Ex. F (Hernandez Ceren Dep. 78:2-9).

        i.    **Plaintiffs' Response**: Admit, except as to GEO's characterization of this as "volunteer" work. The threat of losing privileges, such as use of televisions and phones, preceded threats of solitary confinement, and the threats were often made together. Ex. 3 (Hernandez Ceren Tr.) 74:22-77:13.

    e.    Plaintiff Gaytan received access to X-Box gaming systems, movies, and ice cream as an incentive to keep his dorm clean. Ex. L (Gaytan Dep. 124:3-16).

        i.    **Plaintiffs' Response**: Admit. These incentives were not his motivation for cleaning in the HUSP; Plaintiff Gaytan testified that he never complained about cleaning because he was afraid that if he did so "they will use that against me." Ex. 9 (Gaytan Tr.) 37:5-9. He also understood from GEO's guards that if he did not follow the rules he would be sent to solitary confinement. *Id*. 143:25-144:1.

f.  During the meal clean-up, two trustees in each of the housing units would be paid under the VWP to assist with meal cleanup. Ex. M (Quezada Dep. 64:9-19).

  i.  **Plaintiffs' Response**: Admit that these trustees worked alongside the six additional unpaid detainees that participated in the clean-up.  Ex. 10 (Pagan Tr.) 106:17-21; Ex. 11 (Vasquez Tr.) 75:12-17.

g.  Once a week, the cleanest housing unit is rewarded with ice cream or cookies. Ex. D Dawn Ceja 30(b)(6) Dep. 163:12-16 (3/29/16).

  i.  **Plaintiffs' Response:** Deny.  Ceja testified that VWP workers who have done the best work each week are rewarded with ice cream and cookies, not the entire housing unit for its performance in the HUSP.  Ex. 8 (Ceja 30(b)(6) Tr. I) 163:12-25.

37.  Plaintiffs' expert, Dr. Grassian, is unaware of any literature that stands for the proposition that a threat of 72-hours in segregation could cause psychological harm. Ex. K (Grassian Dep. 243:14-21).

  i.  **Plaintiffs' response:** Admit.  Dr. Grassian testified that the actual imposition of 72 hours in segregation could cause psychological harm.  Studies show a change in EEG readings after 72-hours in solitary confinement, and that many people experience severe psychological symptoms shortly after

placement in solitary confinement.  Ex. 2 (Grassian Tr.) 175:25-180:3, 209:13-211:10.

**C.   GEO's Operations.**

38.   ICE's Disciplinary Severity Scale (incorporated into the AIPC Handbook) allows for a graduated scale of offenses. ECF 289 (Undisputed Fact 19).

> i.   **Plaintiffs' Response**: Admit.  The Disciplinary Severity Scale in some versions of the AIPC handbook differs from the scale as printed in the PBNDS.  *See* ECF No. 298 at 16 (Response to Fact 24).

39.   The PBNDS instruct detention officers to resolve disciplinary infractions in an informal manner where possible. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17.

> i.   **Plaintiffs' Response**: Deny.  None of the citations offered include an instruction to resort to "informal" discipline.  Instead, GEO cites to the PBNDS' discussion of the High Moderate Offense Category, which states the types of offenses and sanctions available for such offenses, including "disciplinary segregation (up to 72 hours)" for "refusal to clean assigned living area."  ECF No. 261-10 (INS Detention Standard, GEO-MEN 00063671-4017 (excerpted)) at 24; ECF No. 261-9 (2008 PBNDS, GEO-MEN 00062905-298 (excerpted)) at 56; ECF No. 261-8 (2011 PBNDS, GEO-MEN 00064018-414 (excerpted)) at 47.

40.    GEO's detention officers did not routinely or uniformly enforce segregation for the failure to clean. Ex. N.

    i.    **Plaintiffs' Response**: Deny.  GEO guards sent detainees to solitary confinement for refusing to clean on multiple occasions.  ECF No. 262-12 (incident reports (compilation)); Ex. 12 (Hernandez Torres Tr.) 81:20-82:3; Ex. 4 (Gallegos Tr.) 170:13-191:23 (verifying that he wrote detainees up several times for "failure to obey my orders for cleaning details," resulting in their placement in segregation). GEO guards also threatened to send detainees to solitary confinement on a regular basis if they did not clean.  Ex. 13 (Xahuentitla Tr.) 73:19-74:9, 83:7-19; Ex. 3 (Hernandez Ceren Tr.) 74:23-75:11, 78:10-79:5; Ex. 12 (Hernandez Torres Tr.) 60:8-14; *infra* at SAF No. 13.  The guards' testimony that cleaning was not mandatory is contradicted by that of GEO's 30(b)(6) designee, Assistant Warden Dawn Ceja, that officers were expected to enforce the rules in the handbook, and that detainees were expected to obey officers' commands.  Ex. 14 (Ceja 30(b)(6) Tr. II) 105:12-24, 138:6-139:12 (testifying that facility rules and the disciplinary severity scale were posted in every dorm, and that the "expectation is that those rules are going to be enforced").  Moreover, the guards' testimony that they enforced every single rule in the handbook except the one that is at issue in this litigation is implausible and

should be tested before a jury.  *See, e.g.*, Ex. 15 (Quezada Tr.) 84:21-92:4.

41.   It would be a very rare occurrence for a detention officer tell a detainee that they would be sent to segregation if they did not clean. Ex. N.

    i.   **Plaintiffs' Response**: Deny.  Detainees testified that guards threatened to send them to solitary confinement on a regular basis if they did not clean.  *See, e.g.*, Ex. 13 (Xahuentitla Tr.) 73:19-74:9, 83:7-19; Ex. 3 (Hernandez Ceren Tr.) 74:23-75:11, 78:10-79:5; Ex. 12 (Hernandez Torres Tr.) 60:8-14; *infra* at SAF No. 13.  The statements to the contrary in the declarations GEO has submitted contradict the guards' own testimony at their depositions, where they testified that they would explain to detainees that facility rules required them to clean and that detainees could be sent to solitary confinement for refusing.  Ex. 10 (Pagan Tr.) 174:2-175:6; *see also* Ex. 4 (Gallegos Tr.) 137:10-19 (testifying that he had never written anyone up for refusing to clean); 170:7-174:3; 179:15-187:14; 188:8-189:25; 192:5-8; 197:6-200:25; 203:4-206:25 (acknowledging that he had issued numerous write-ups for "failure to obey my orders for cleaning details").  The threats of solitary confinement were so pervasive and the knowledge that solitary confinement was the punishment for refusing to clean was so widespread that detainees communicated that information to one another.  *See, e.g.*, Ex. 1

(Menocal Tr.) 95:16-97:3; Ex. 6 (Valerga Tr.) 168:13-169:13 (testifying that his cellmate told him that the punishment for refusing to clean was solitary confinement).

42.    When a detainee was placed in segregation for the refusal to clean, it was typically because the refusal to clean was in concert with another disciplinary infraction. *Id*. Ex. N.

    i.   **Plaintiffs' Response**: Deny.  Some detainees were sent to solitary confinement only for refusing to clean.  ECF No. 262-12 (incident reports) at 2-3, 14.  Even where GEO sent detainees to solitary confinement for refusing to clean and other charges, the sole underlying conduct was refusal to clean.  For example, the record shows that GEO sent detainees to solitary confinement for refusing to clean and for refusing to obey an officer's order or "insolence" to staff members.  But in each of these incidents the order the detainees refused to obey was the order to clean and the insolence was the conduct used to express the refusal.  *Id*. at 4-10, 12.  In other incidents detainees were sent to solitary confinement for refusing to clean without being charged with that specific infraction, but the underlying conduct described in the incident report indicates the order not followed or insolence expressed was related to the refusal to clean.  *Id*. at 11, 13; *see also* Ex. 4 (Gallegos Tr.) 170:7-174:3, 179:15-187:14, 188:8-189:25, 192:5-8, 197:6-200:25, 203:4-206:25

(discussing incident in which he wrote up detainees for failing to "obey my orders for cleaning details").

43.   Consistent with the PBNDS, detention officers worked to resolve issues informally wherever possible. Ex. N.

    i.   **Plaintiffs' Response**: Admit.  Detention officers testified that they dealt with rule violations by explaining the infraction and potential consequences to detainees, and if the infraction persisted guards would issue a "write-up" which could lead to disciplinary segregation.  Ex. 4 (Gallegos Tr.) 121:21-122:20.  One of the potential consequences guards explained was that detainees could be sent to solitary confinement for failing to comply.  Ex. 10 (Pagan Tr.) 174:2-175:6.  This is reflected in the HUSP, which states that initial sanctions for refusal to clean include turning off the television and being prohibited from participating in activities, and that "[c]ontinued refusal to clean the area will result in further disciplinary action."  ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 50; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20.

44.   Where formal sanctions were necessary, officers imposed lesser sanctions
      as permitted by the disciplinary severity scale wherever possible. *Id*.; Ex. O
      (Ceja 30(b)(6) Dep. 113:13-17).

      i.   **Plaintiffs' Response**: Admit.  As relevant to the HUSP, the threat of
           losing privileges, such as use of televisions and phones, preceded
           threats of solitary confinement, and the threats were often made
           together.  ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN
           00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook) at
           50; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4
           (2010 Detainee Handbook) at 17; ECF No. 273-5 (2011 Detainee
           Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20;
           Ex. 3 (Hernandez Ceren Tr.) 74:22-77:13; *see also* Plaintiffs'
           response to GEO's Undisputed Fact No. 43.

45.   The detention officers were not trained to tell detainees they could be sent
      to segregation or to utilize segregation as a response to the failure to clean
      absent additional disciplinary concerns. Ex. N.

      i.   **Plaintiffs' Response**: Deny.  The cited declarations are inconsistent
           with the guards' deposition testimony.  Guards were trained that the
           AIPC Handbook was a source of rules and discipline that apply
           when detainees refuse to act or commit a violation in the disciplinary
           scale.  Ex. 11 (Vasquez Tr.) 73:14-20, 82:5-23; Ex. 10 (Pagan Tr.)
           95:15-21; Ex. 4 (Gallegos Tr.) 118:7-23, 121:1-122:25; Ex. 15

26

(Quezada Tr.) 19:15-20:13, 82:3-98:12.  Guards understood that the handbook established a rule requiring detainees to clean common areas.  Ex. 10 (Pagan Tr.) 104:21-105:16; Ex. 11 (Vasquez Tr.) 74:1-25, 105:10-106:7; Ex. 4 (Gallegos Tr.) 163:14-17; Ex. 15 (Quezada Tr.) 81:8-82:2, 101:20-102:23.  Guards were also trained to enforce facility rules by using the disciplinary measures set forth in the handbook.  Ex. 4 (Gallegos Tr.) 121:21-122:16; Ex. 10 (Pagan Tr.) 174:2-175:6.

46.   Importantly, none of the detention officers intended to scare or intimidate any individual into performing labor. *Id.* Ex. N.

   i.   **Plaintiffs' Response**: Admit, but deny this fact is material.  It is GEO's knowledge, not its employees' intent, that is material to TVPA claims.  *See* § V.B.3, *infra*.

47.   When a detainee would refuse to clean, the detention officers would typically ask another detainee to assist with cleaning instead. *Id.*

   i.   **Plaintiffs' Response**: Deny.  The cited declarations are inconsistent with the declarants' deposition testimony.  At deposition, the declarant guards testified that the Detainee Handbook was a source of rules to be enforced, including with respect to cleaning.  Ex. 10 (Pagan Tr.) 99:17-100:10, 104:21-105:16; Ex. 11 (Vasquez Tr.) 74:20-75:24, 105:11-106:7; Ex. 4 (Gallegos Tr.) 141:8-16; 161:16-164:7.  Joyce Quezada testified that she enforced the HUSP "as

written." Ex. 15 (Quezada Tr.) 102:1-23.  Luis Pagan admitted that

he enforced the HUSP by telling detainees that they could be sent to

solitary confinement if they did not comply.  Ex. 10 (Pagan Tr.)

174:2-175:6.  In fact, detainees were actually sent to solitary

confinement for refusing to clean.  ECF No. 262-12 (incident

reports); Ex. 12 (Hernandez Torres Tr.) 81:20-82:3; *infra*, SAF No.

13.  When one detainee, Grisel Xahuentitla, offered to clean in place

of a sick detainee who could not clean, she was told to go back to

her cell and that the sick detainee had to do the work or "be sent to

the hole."  Ex. 13 (Xahunetitla Tr.) 73:19-74:9.  Moreover, the cited

declarations are contradicted by GEO's 30(b)(6) witness Dawn Ceja,

who testified that there was no alternative discipline policy for

violations related to cleaning during the class period.  Ex. 14 (Ceja

30(b)(6) Tr. II) 170:13-174:20.

48.    If no detainees performed any work in the Aurora facility, GEO would

make more money, not less. Ex. P (Ragsdale 30(b)(6) Dep. 168:4-10).

   i.   **Plaintiffs' Response**: Deny.  GEO estimates that "replacing all GEO

ICE detainees with full-time employees" would cause it to incur a

substantial cost across its immigration detention business

nationwide.  Ex. 16 (GEO-MEN 00187770) (May 30, 2018 Letter).

Further, without detainee labor, the cost to the government for

GEO's services would increase.  If a contractor's bid to the

government is too high – even if there is no competition for the

project – the government may not award the contract.  Ex. 17

(Venturella Tr.) 166:1-4.  The government will only award the

contract to a contractor whose bid price is "reasonable" and not "too

high."  *Id*. 165:5-23.

49.   At AIPC the $1.00 daily allowance is a pass through from the government

at the actual rate. Ex. P (Ragsdale 30(b)(6) Dep. 166:20-167:6)

  i.   **Plaintiffs' Response**: Admit.

50.   "[T]here's no incentive financially for GEO to use any voluntary work

person to do anything, particularly when you have to, again, incentivize

them . . . beyond a dollar a day. It's sort of cost neutral at a dollar a day but

it gets – it becomes a cost to us if it goes beyond that." Ex. P (Ragsdale

30(b)(6) Dep. 168:12-17).

  i.   **Plaintiffs' Response**: Admit.  *See also* Ex. 18 (A. Martin Tr.)

   107:18-22 (if GEO had to pay more than $1/day to VWP workers, it

   would do so "on its own dime" because the government would not

   reimburse the added cost).

51.   If ICE did not mandate the VWP as a requirement of its contracts, GEO

would "build the staff [in]to [its] cost estimate and then [] mark that cost

up." Ex. Q (Evans Dep. 75:3-10).

  i.   **Plaintiffs' Response**: Admit that Evans made this hypothetical

   claim, but note that GEO has previously admitted that ICE mandates

that GEO operate a VWP.  ECF No. 286 (Pls.' DSI SJ Reply Br.) ¶ 35.

52.     GEO's markup would be a fee of up to 15% of the labor cost. Ex. Q (Evans Dep. 29:2-21; 62:16-63:14).

   i. **Plaintiffs' Response:** Admit.

## III.    PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

### A.    The Housing Unit Sanitation Policy

1.     All detainees at Aurora receive the Aurora ICE Processing Center Detainee Handbook Local Supplement ("Detainee Handbook") upon arrival at the Facility.  Ex. 8 (Ceja 30(b)(6) Tr. I) 29:19-24; *see also* ECF No. 286 (Pls.' DSI SJ Reply Br.) ¶¶ 60-61.

2.     The Detainee Handbook states that detainees "will be held accountable for [their] actions while in custody at [Aurora]" and that "[t]herefore, it is each detainee's responsibility to become familiar with the contents of this handbook."  ECF No. 273-1 (2005 Detainee Handbook) at 3; ECF No. 273-2 (2007 Detainee Handbook) at 6; ECF No. 273-3 (2008 Detainee Handbook) at 3; ECF No. 273-4 (2010 Detainee Handbook) at 3; ECF No. 273-5 (2011 Detainee Handbook) at 3; ECF No. 261-17 (2013 Detainee Handbook) at 5.

3.     GEO's detention officers are expected to enforce the rules set forth in the Detainee Handbook.  Ex. 14 (Ceja 30(b)(6) Tr. II) 139:2-12.

4.    The Detainee Handbook contains a "Housing Unit Sanitation" policy,

which states:

> Each and every detainee must participate in the facility's sanitation
>
> program. A list of detainees is developed each day by staff and is
>
> posted daily for viewing. During a general cleanup all detainees
>
> must participate. The assigned Housing Unit [or Dorm] Officer will
>
> be responsible for assuring this general cleanup is done on a regular
>
> basis.

*See supra*, Plaintiffs' Response to GEO's Undisputed Fact No. 8.

5.    Immediately under the "Housing Unit Sanitation" heading, in a section

titled "Day Space," the handbook provides:

> All detainees in a housing unit [or dorm] are required to keep clean
>
> and sanitary all commonly accessible areas of the housing unit [or
>
> dorm], including walls. floors, windows, window ledges, showers,
>
> sinks, toilets, tables, and chairs.
>
> Detainees will take turns cleaning the area [or day space]. If a
>
> detainee feels that everyone is not doing their fair share, the detainee
>
> should inform the housing unit officer of the problem. Action will be
>
> taken to resolve this problem.

ECF No. 273-1 (2005 Detainee Handbook) at 18; ECF No. 273-2 (2007

Detainee Handbook) at 49; ECF No. 273-3 (2008 Detainee Handbook) at

19; ECF No. 273-4 (2010 Detainee Handbook) at 16-17; ECF No. 273-5

(2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20 (emphasis added).

6.     The handbook then repeats that "[t]he day room area will be kept clean at all times," and sets forth a brief summary of the punishments that may be imposed on disobedient detainees under the facility's progressive discipline system:

> Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit [or dorm] do not clean the area after being instructed to do so, the televisions will be turned off and the detainees will not be permitted to participate in any activities/programs until the housing unit [or dorm] is cleaned. Continued refusal to clean the area will result in further disciplinary action.

*Id.*

7.     The Detainee Handbook also sets forth the disciplinary scale at the Aurora Facility, which defines "refusal to clean" as a 300-level, or high-moderate, offense.  ECF No. 273-1 (2005 Detainee Handbook) at 25-26; ECF No. 273-2 (2007 Detainee Handbook) at 68-69; ECF No. 273-3 (2008 Detainee Handbook) at 29; ECF No. 273-4 (2010 Detainee Handbook) at 23-24; ECF No. 273-5 (2011 Detainee Handbook) at 24-25; ECF No. 261-17 (2013 Detainee Handbook) at 27.

8.   Punishments for 300-level offenses include placement in solitary confinement. *Id.*

9.   Pursuant to the HUSP, GEO guards in each housing unit developed a list of unpaid detainees each day, who were required to clean the housing unit common areas after each meal. Ex. 8 (Ceja 30(b)(6) Tr. I) 36:13-37:20, 83:9-84:24.

10.  This work involved scrubbing tables and chairs, sweeping mopping floors, and cleaning common use equipment such as microwaves, phones, showers, and toilets. *Id.* 36:24-37:9; Ex. 19 (Ragsdale 30(b)(6) Tr.) 16:14-18; Ex. 3 (Hernandez Ceren Tr.) 162:24-165:20.

11.  HUSP cleaning was distinct from the personal housekeeping requirements enumerated in the PBNDS, which require detainees to "maintain their immediate living area in a neat and orderly manner by 1. making their bunk beds daily; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture." ECF No. 261-8 (2011 PBNDS) at 51; ECF No. 261-9 (2008 PBNDS) at 61-62; ECF No. 261-10 (2000 NDS) at 3; Ex. 20 (A. Martin 30(b)(6) Tr.) 25:25-26:24.

12.  The HUSP at the Aurora Facility is "a GEO policy, created by GEO. The GEO HUSP is not created by ICE nor is it a requirement of the contract.

ICE did not draft or negotiate GEO's HUSP."  ECF No. 261-7 (Ely Decl.) ¶ 22.

13.    Guards frequently threatened detainees with solitary confinement for refusing to clean.  For example:

i.    A detainee in Hugo Hernandez Ceren's pod refused to clean, telling the guards that he was no janitor and that they needed to pay someone for that type of job.  Ex. 3 (Hernandez Ceren Tr.)  74:16-77:19.  In response, a guard took out a plastic trash bag and told the detainee "Just pack your stuff because you're going to go to the hole."  *Id*.  The detainee "started cleaning right away" in response to the threat.  *Id*.  On another occasion, one detainee in Hernandez Ceren's dorm refused to clean and others, including Hernandez Ceren and other named plaintiffs, supported him, leading the guard on duty to call a sergeant.  *Id*. 78:10-80:12.  The sergeant told everyone that if they continued refusing to clean, they would be sent to the hole, which he described as cold and lonely.  *Id*.  He also told them that GEO would inform the immigration court that they had been disobedient.  *Id*.  Hernandez Ceren testified that he witnessed similar threats "multiple times with multiple guards."  *Id*. 161:13-19.

ii.    Dagoberto Vizguerra observed someone being sent to solitary confinement for refusing to clean on the second or third day he was at Aurora.  Ex. 7 (Vizguerra Tr.) 48:9-22.  He described the officer

in his dorm who enforced the HUSP as "screaming at the detainees in his pod about cleaning. *Id*. 97:20-98:10.

iii.    Grisel Xahuentitla saw a woman in her dorm try to refuse to clean because she was feeling ill.  The guard on duty told her that if she did not work she would be sent to the hole, and that "it wasn't going to be . . . pleasant." Ex. 13 (Xahuentitla Tr.) 73:19-75:22.  She explained that when guards threatened detainees with solitary confinement, "they're not – they're, of course, not – they're not whispering you to your ear.  They're loud, and so they – so you feel a little intimidated." *Id*. 137:4-13.

iv.     Alejandro Menocal was informed about the HUSP upon arrival at the Aurora Facility, and told by guards and other detainees that failure to clean could result in being placed in segregation.  Ex. 1 (Menocal Tr.) 95:16-97:3.  On one occasion, he witnessed other detainees being removed from an adjacent pod, and was told that they were being taken to segregation for that reason.  *Id*. 100:16-109:2.

v.      Alejandro Hernandez Torres tried to resist HUSP cleaning, telling the guard on duty, "[W]hy should I clean all of the tables if I didn't use all of the tables?"  In response, the guard took him to segregation.  Ex. 12 (Hernandez Torres Tr.) 60:8-14, 81:20-82:3, 141:9-19.

vi.  Jesus Yepez Gaytan testified that when new detainees arrived at the facility, they would often push back on the HUSP cleaning requirement, which frequently led to guards telling them that continued resistance would land them in solitary confinement.  Ex. 9 (Gaytan Tr.) 112:1-113:4, 142:23-144:1.

vii.  Demetrio Valerga testified that when he first arrived at the Aurora facility, his cellmate told him that he had to participate in the HUSP or he would be put in solitary confinement.  Ex. 6 (Valerga Tr.) 168:13-169:12.  Towards the end of his stay, he resisted cleaning and was threatened with segregation and handcuffed by a guard, although he did not end up being taken there.  *Id*. 155:18-156:6.

14.  GEO guards were trained to enforce facility rules and to carry out the disciplinary scale as written in the Detainee Handbook.  Ex. 11 (Vasquez Tr.) 82:5-23; Ex. 10 (Pagan Tr.) 95:15-21; Ex. 4 (Gallegos Tr.) 118:7-23; Ex. 15 (Quezada Tr.) 81:8-83:9.

15.  It is "imperative" that detainees follow the commands of guards implementing the Detainee Handbook's rules, and GEO guards were trained to use progressive discipline to gain compliance from detainees who failed to do so.  Ex. 14 (Ceja 30(b)(6) Tr. II) 105:12-24, 205:1-206:6.

16.  At least one guard acknowledged that solitary confinement was a potential sanction for refusing to clean.  Ex. 10 (Pagan Tr.) 173:18-175:9.

17.    Guards further understood that threats of solitary confinement were an effective and legitimate way to gain compliance with facility rules, driven by detainees' fear of solitary confinement.  Ex. 15 (Quezada Tr.) 141:13-142:8; Ex. 10 (Pagan Tr.) 174:2-175:6; *see also* Ex. 4 (Gallegos Tr.) 121:21-122:16 (describing solitary confinement as a legitimate method for disciplining detainees).

18.    Detainees cleaned because of threats of solitary confinement.  Ex. 3 (Hernandez Ceren Tr.) 63:9-18 ("I cleaned because of fear."); Ex. 12 (Hernandez Torres Tr.) 77:25-78:13 (cleaned because "being that I had been through segregation, I didn't want to go through the same"); Ex. 1 (Menocal Tr.) 104:21-105:7 ("[W]e had to clean and if not we would be punished. . . . Everybody knew it."); Ex. 9 (Gaytan Tr.) 142:23-144:1 ("The procedure was if you don't follow [the rules], you go to the hole."); Ex. 13 (Xahuentitla Tr.) 137:14-19 ("[I]f they tell you 'clean, because you're going to the hole,' . . . I'm going to clean. I don't want to go to the hole."); Ex. 6 (Valerga Tr.) 168:13-169:13 (when he arrived at Aurora, he participated in the HUSP "[b]ecause my cellie told me if we didn't clean, we'd go to the hole").

19.    GEO followed through on these threats and sent detainees to solitary confinement for refusing to clean.  ECF No. 262-12 (incident reports); Ex. 4 (Gallegos Tr.) 170:13-191:23 (verifying that he wrote detainees up

several times for "failure to obey my orders for cleaning details," resulting in their placement in segregation).

**B.    Solitary Confinement**

20.    Solitary confinement "imposes a devastating triad of emotional and neuropsychiatric deprivations: social isolation, a barren perceptual environment, and deprivation of meaningful mental activity." Ex. 21 (Grassian Report) at 10.

21.    These deprivations can manifest in anxiety, depression, self-harm, stupor or delirium, impairments in thinking, concentration, and memory, hyper-responsivity to external stimuli, obsessive-compulsive behavior, hallucinations, paranoia, delusions, and problems with impulse control. *Id.* at 10-14.

22.    Although not everyone becomes "psychiatrically ill" from relatively short stays in solitary confinement, all people who experience solitary confinement "suffer from it." Ex. 2 (Grassian Tr.) 290:3-8. Put differently, solitary confinement causes "a certain baseline of psychiatric harm" in those who experience it. *Id.* 102:4-13.

23.    Peer-reviewed studies show that relatively short periods in solitary confinement – as little as 72 hours – can cause people to experience significant distress, including changes to brain-wave patterns and self-harm or suicide. Ex. 21 (Grassian Report) at 10 n.6 (citing Ex. 22 (Fatos Kaba, "Solitary Confinement and Risk of Self-Harm Among Jail Inmates") at

442-47 (finding that the risk of self-harm was strongly associated with being in solitary confinement, and that self-harm peaked around the time of entry to solitary confinement)); *id*. at 13 n.10 (citing Ex. 23 (Paul Gendreau, "Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement") at 56-57 (finding a consistent decline in EEG results of subjects in solitary confinement over the course of seven days, with 77% of the decline happening in the first four days)); *id*., Ex. D (Stuart Grassian, "Psychopathological Effects of Solitary Confinement") at 1451 (quoting one patient as saying "As soon as I got in, I started cutting my wrists.  I figured it was the only way to get out of here.").

24.    These effects can be long lasting and can include social withdrawal to "escape the buzzing confusion of life."  Ex. 21 (Grassian Report) at 15.

25.    Plaintiff Olga Alexakhina observed how solitary confinement affected other detainees, recounting that detainees returning from solitary confinement "would take a shower and just lay down.  They didn't want to talk to anyone, just laying down."  *Id*. at 25-26.  She remembered one woman in particular who was so depressed after returning from solitary confinement that other detainees consistently had to rouse her for meals.  *Id*.

**C.    Conditions of Confinement at GEO**

26.    Immigration detainees at GEO were taken from their homes and families and placed in a prison-like environment to await either deportation or the

outcome of immigration proceedings that could end in deportation.  ECF
No. 261-8 (2011 PBNDS) at 3.

27.    Detainees were allowed to keep only small photos of family members,
softbound reading material, wedding bands (but not engagement rings),
small religious items, one pair of glasses and dentures, and personal address
books.  All other personal items were considered illegal contraband.  ECF
No. 273-1 (2005 Detainee Handbook) at 6; ECF No. 273-2 (2007 Detainee
Handbook) at 14-15; ECF No. 273-3 (2008 Detainee Handbook) at 5; ECF
No. 273-4 (2010 Detainee Handbook) at 5-6; ECF No. 273-5 (2011
Detainee Handbook) at 6; ECF No. 261-17 (2013 Detainee Handbook) at 8.

28.    Detainees were housed in bunk beds either in windowless cells or in large
open rooms, alongside dozens or scores of strangers in front of whom they
had to eat, sleep, shower, and defecate.  Ex. 24 (ICE 0000123 (men's cell),
ICE 0000142 (women's unit)); Ex. 3 (Hernandez Ceren Tr.) 143:5-17:13.

29.    Showers were communal, and toilets were either located within detainees'
shared cells or in a designated bathroom area separated from the rest of the
room by a low wall.  Ex. 24 (ICE 0000128 (men's toilets), ICE 0000116
(men's showers), ICE 0000139 (women's toilets and showers)).

30.    Detainees had access to a single television set per dorm, which was
controlled by the guards.  ECF No. 273-1 (2005 Detainee Handbook) at 13-
14; ECF No. 273-2 (2007 Detainee Handbook) at 36-37; ECF No. 273-3
(2008 Detainee Handbook) at 14; ECF No. 273-4 (2010 Detainee

Handbook) at 12; ECF No. 273-5 (2011 Detainee Handbook) at 13; ECF No. 261-17 (2013 Detainee Handbook) at 15.

31. Detainee contact with their spouses, children, friends, and family members was limited to three hour-long non-contact visits per week.  ECF No. 273-1 (2005 Detainee Handbook) at 11-12; ECF No. 273-2 (2007 Detainee Handbook) at 30-32; ECF No. 273-3 (2008 Detainee Handbook) at 11-12; ECF No. 273-4 (2010 Detainee Handbook) at 10-11; ECF No. 273-5 (2011 Detainee Handbook) at 10-11; ECF No. 261-17 (2013 Detainee Handbook) at 12-13.

32. Contact visitation, in which detainees could briefly hug their visitor upon greeting them and saying goodbye, was available only upon special request. ECF No. 273-1 (2005 Detainee Handbook) at 11; ECF No. 273-5 (2011 Detainee Handbook) at 11; ECF No. 261-17 (2013 Detainee Handbook) at 13.[4]

33. Detainees had access to telephones, but calls were limited to 20 minutes, and had to be made from payphones located in the middle of dorm common areas.  ECF No. 273-1 (2005 Detainee Handbook) at 12; ECF No. 273-2 (2007 Detainee Handbook) at 32-33; ECF No. 273-3 (2008 Detainee Handbook) at 12-13; ECF No. 273-4 (2010 Detainee Handbook) at 11-12;

---

[4]      The 2007, 2008, and 2010 Detainee Handbooks included no information about contact visitation.

ECF No. 273-5 (2011 Detainee Handbook) at 11-12; ECF No. 261-17 (2013 Detainee Handbook) at 14.

34.    Up to two 80-person pods shared a small concrete recreation space that had a single basketball hoop, and either one or two exercise machines.  Ex. 24 (ICE 0000102 (men's exercise room), ICE 0000152 (women's exercise room)); *see also* Ex. 3 (Hernandez Ceren Tr.) 144:5-13; Ex. 12 (Hernandez Torres Tr.) 50:21-51:14.

35.    Detainees found the experience of being in detention frightening and isolating.  *See* Ex. 9 (Gaytan Tr.) 28:22-29:2, 48:20-50:2 ("[I]t was scary to be in there . . . with a bunch of people you don't even know," many of whom were older than him); Ex. 13 (Xahuentitla Tr.) 137:4-19 (being in detention, "you feel this pressure, you feel . . . very depressed for the situation you're in at the moment"); Ex. 12 (Hernandez Torres Tr.) 29:1-6, 15:20-23 (being separated from his daughters caused "a lot of suffering."), 49:8-52:20 (explaining that the guards "would put us all together like animals, like shit. . . and they say, 'Well, now you do what I want,'" and noting that it was very stressful having to share small space with loud, messy strangers); Ex. 1 (Menocal Tr.) 48:13-24, 67:8-69:9 (told family members that conditions at Aurora were good, but in truth "it was not the prettiest place" – for example, the food made people ill and the showers were moldy).

36.   GEO did not always serve detainees enough food or provide them with enough basic supplies, like toiletries, and detainees had to augment the inadequate diet and supplies with purchases from the commissary.  Ex. 9 (Gaytan Tr.) 9:19-10:11; Ex. 3 (Hernandez Ceren Tr.) 148:24-149:21.

37.   The orientation video shown to detainees at least through 2007 informed them that failure to follow facility rules could lead to disciplinary action causing "a negative effect on your case before the government, <u>so the best rule is to stay out of trouble during your stay here</u>."  Ex. 25 (Orientation Video Script, GEO_MEN 00056575-81) at GEO_MEN 00056576 (emphasis in original); Ex. 26 (Orientation Video Script, GEO-MEN 00075173-83) at GEO-MEN 00075174 (emphasis in original).  Although this statement was removed from orientation materials, the threat remained present throughout the class period.  Ex. 14 (Ceja 30(b)(6) Tr. II) 95:25-96:10; *see also* Ex. 3 (Hernandez Ceren Tr.) 78:10-80:24 (describing an incident where detainees refused to clean and a GEO sergeant threatened that the refusal and resulting discipline was "not going to look good when this gets to the judge").

38.   Detainees were aware that not following the rules could impact the outcome of their immigration cases.  Ex. 3 (Hernandez Ceren Tr.) 167:1-170:13 (going to solitary confinement "was going to destroy my immigration case if I went there"); Ex. 9 (Gaytan Tr.) 12:1-13 (avoided getting in trouble

because "I was afraid that it was going to be against my case for doing something against GEO").

**D.      GEO's Contracting Practices**

39.    When bidding a contract, GEO seeks to offer a price that is both fair to the government and less than it would cost the government to operate the facility itself.  Ex. 27 (Evans Tr.) 36:4-6, 50:18-21.  In other words, one of GEO's goals in developing its bid price is to offer a price the government is willing to pay.  *Id*. 72:13-16.

40.    GEO's total bid amount represents the costs to execute the contract as well as GEO's desired profit margin, typically an additional 15% of the total cost.  *Id*. 63:18-25.

41.    The largest of these costs is the labor required to operate the facility.  Ex. 17 (Venturella Tr.) 155:21-25.

42.    Cost is an important component of the contract because during the class period ICE's practice was to accept the lowest bid offered, provided the contractor had a satisfactory performance record.  *Id*. 154:6-16.

43.    Keeping costs, and thus the total bid price, low retains its importance even when GEO is the only entity bidding on the contract, as with the Aurora facility, because the government provides extra scrutiny to such "sole source bids."  Ex. 27 (Evans Tr.) 22:10-23:18, 24:3-17.

44.    Recognizing that keeping the total bid price low and offering the government a fair price is important even in the context of a sole source

bid, GEO uses the same pricing strategy regardless of whether the bid is sole source or competitive. Ex. 17 (Venturella Tr.) 164:23-165:23.

45. When GEO wins a contract with ICE, the amount of money that ICE pays GEO during each year of the contract is set at the time the contract is executed. Ex. 27 (Evans Tr.) 74:10-21.

46. Once the contract terms and pricing are set, GEO bears the risk of any increased costs to operating the facility beyond what is provided for in the contract, including increased costs of labor. *Id*. 76:11-22.

47. This risk is to GEO's profit: for GEO to make the profit that it anticipates on a contract, it must maintain the costs of running the facility at the amount set forth in the contract at the time of execution. *Id*. 76:23-77:5.

48. ICE will not reimburse GEO for more than $1 per day in detainee wages. 8 U.S.C. § 1555(d); Appropriations Act, Immigration and Naturalization Service Salaries and Expenses, Pub. L. No. 95-431, 92 Stat. 1021 (1978).

49. ICE does not prohibit its contractors from paying more than $1.00 per day for work performed in the VWP. Ex. 18 (A. Martin Tr.) 106:11-107:22, 110:10-13; ECF No. 261-8 (2011 PBNDS) at 53 (compensation for VWP work is "at least $1.00 (USD) per day" (emphasis added)); *see also* ECF No. 261-18 (VWP Pay Rates, GEO-MEN 00170339); ECF No. 287-13 (VWP Pay Rates at GEO's South Texas Facility) at 11-12.

50.     As a result, GEO could pay detainees more than $1 per day but must bear the costs of doing so.  Ex. 18 (A. Martin Tr.) 107:18-22; Ex. 19 (Ragsdale 30(b)(6) Tr.) 167:4-6.

51.     GEO estimates that replacing detainee labor with full time employees at all of its ICE-contracted facilities nationwide would cost a substantial amount of money.  Ex. 16 (GEO-MEN 00187770) (May 30, 2018 Letter).

52.     Detainees understood that once GEO set the rate of pay for the VWP at $1 per day, the rate was not negotiable.  Ex. 3 (Hernandez Ceren Tr.) 158:10-15.

53.     The "Detainee Voluntary Work Program Agreement" is not an employment contract and does not create any rights or obligations for either GEO or the detainee who signs it.  Ex. 8 (Ceja Tr. I) 147:20-150:18.

## IV.     LEGAL STANDARD

### A.     Summary Judgment

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material when "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  A dispute of material fact is genuine and precludes summary judgment where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Courts applying the summary judgment standard "view the factual record and draw all

reasonable inferences therefrom most favorably to the nonmovant."   *Adler*, 144 F.3d at 670.

**B.     The TVPA**

Congress enacted the Trafficking Victims' Protection Act in 2000 to combat the "increasingly subtle" means of coercion used to compel modern-day forced labor.   *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting H.R. Rep. No. 106-939, at 101 (2000) (Conf. Rep.), *as reprinted in* 2000 U.S.C.C.A.N. 1380, 1392-93); *see also United States v. Bradley,* 390 F.3d 145, 150 (1st Cir. 2004) (noting that the statute encompasses "not only physical violence, but also more subtle psychological methods of coercion"), *judgment vacated on other grounds,* 545 U.S. 1101 (2005).   In furtherance of this goal, the TVPA prohibits defendants from "knowingly . . . obtain[ing] the labor or services of a person by means of" one or a combination of:

> (1) . . . force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) . . . serious harm or threats of serious harm to that person or another person;
> (3) . . . the abuse or threatened abuse of law or legal process; or
> (4) . . . any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).

The statute was enacted in response to the Supreme Court's holding in *United States v. Kozminski*, 487 U.S. 931 (1988), which had "limited the definition of involuntary servitude to 'physical' or 'legal' coercion."   *Dann*, 652 F.3d at 1169 (quoting *Kozminski*, 487 U.S. at 952).   In accordance with the intent to broaden the definition of trafficking, the TVPA "defines harm broadly," *see id*, to include:

any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2).

## V.    ARGUMENT

### A.    Material Disputes of Fact Preclude Summary Judgment on the Class's TVPA Claims.

Throughout the class period, GEO systematically compelled detainee Class Members to perform unpaid janitorial work under its HUSP, using the threat of solitary confinement to ensure uniform compliance.  GEO guards in each housing unit developed a list of unpaid detainees each day who were required to clean the housing unit common areas after each meal.  SAF ¶ 9.  Class Members scrubbed tables and chairs, swept and mopped floors, and cleaned common-use equipment such as microwaves, phones, showers, and toilets.  *Id*. ¶ 10.  Despite GEO's attempts to muddle the record, the HUSP cleaning tasks are distinct from the personal housekeeping requirements in the PBNDS, which limit the unpaid tasks detainees may perform to "maintain[ing] their immediate living areas in a neat and orderly manner by" 1. making their beds; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.  *Id*. ¶ 11.  Plaintiffs' TVPA claims center on the

additional cleaning required by the HUSP, beyond those personal housekeeping requirements.[5]   ECF No. 1 (Complaint) at ¶ 54.

Although GEO persistently misrepresents in its motion that the sole evidence of the HUSP and attendant threats of solitary confinement is contained in the Detainee Handbook, *see, e.g.*, ECF No. 305 (Def.'s SJ Br.) at 23, that is just one piece of evidence of a broader course of conduct.  Detainees received the Detainee Handbook when they first arrived at Aurora.  SAF ¶ 1.  The Handbook describes the HUSP, telling detainees:

> Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit Officer will be responsible for assuring this general cleanup is done on a regular basis.

*Id*. ¶ 4.  It also sets forth a series of escalating punishments for non-participation, starting with a television shutoff and a prohibition on "any programs/activities."  Statement of Undisputed Facts ("SUF") ¶ 9.[6]  If that fails to gain compliance, detainees are told, "[c]ontinued refusal to clean will result in further disciplinary action."  *Id*.

Elsewhere, the handbook sets out the disciplinary scale, which makes clear that "further disciplinary action" includes placement in solitary confinement.  *Id*. ¶ 12. Threats of solitary confinement for failure to clean were repeated by GEO guards, who

---

[5]    GEO attempts to sow confusion by also conflating the HUSP with work under the VWP, but these programs are distinct, and the TVPA claims do not concern VWP work. *See* ECF No. 1 (Complaint) ¶ 54.  Detainees participating in the VWP were part of a distinct work program where workers were paid $1/day, which Plaintiffs contend unjustly enriched GEO.  *Id*.

[6]    This sanction is specifically for refusal to clean up after other detainees, not VWP work or personal housekeeping work.

would, for example, pull out a roll of trash bags and tell non-compliant detainees, "pack your stuff. You're going to the hole." SAF ¶ 13.i. These threats were carried out in front of entire 80-bed dormitories, leaving detainees with little doubt that the threats had teeth. *See id.* ¶ 13. GEO guards were trained to carry out the disciplinary scale in the handbook. *Id.* ¶ 14.[7] Guards acknowledged in deposition testimony that threats of solitary confinement were a legitimate way to gain compliance from unwilling detainees, and that the mere threat of solitary confinement was sufficient to motivate detainees to follow facility rules, because they were afraid of it. *Id.* ¶ 17. These threats were not theoretical: GEO actually sent detainees to solitary confinement for refusing to clean under the HUSP throughout the class period. *Id.* ¶ 19.

### 1.    GEO's Forced Labor Scheme Included Threats of Serious Harm and Physical Restraint.

GEO's argument that Plaintiffs will be unable to show that they suffered "serious harm" under the TVPA misinterprets the law and misrepresents the facts. The TVPA requires some combination of serious harm *or* restraint, *or* threats of the same. 18 U.S.C. § 1589(a). GEO does not argue (and it is hard to imagine how it could) that solitary confinement does not constitute physical restraint. *See, e.g.*, *Bridges v. Poe*, No. 19 Civ. 1399, 2020 WL 5408915, at *7 (N.D. Ala. Sept. 9, 2020) ("'Confinement' to a jail cell that restricts an inmate's freedom of movement certainly meets the ordinary meaning of

---

[7]     To the extent that guards' rehabilitative declarations contradict this testimony, the declarations may be excluded under the sham affidavit rule. *See, e.g.*, *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1016 (10th Cir. 2002). However, since the declarations *themselves* create an issue of fact when held alongside the same witnesses' deposition testimony, they preclude summary judgment even if the Court chooses to consider them.

'physical restraint.'"); *see also United States v. Thompson*, 109 F.3d 639, 641 (9th Cir. 1997) ("physical restraint" as used in sentencing guidelines means, *inter alia*, "tied, bound, or locked up").  This alone is sufficient for the Court to deny GEO's Motion for Summary Judgment on this aspect of Plaintiffs' TVPA claims.

Even as to the one prong of the TVPA that GEO squarely addresses, disputes of material fact preclude summary judgment as to whether detainees suffered or were threatened with serious harm.  The TPVA provides a far more expansive definition of serious harm than GEO concedes: such harm can be "physical or non-physical, including psychological, financial, or reputational," as long as it would compel a reasonable person under similar circumstances to work.  18 U.S.C. § 1589(c)(2).  "[T]he extremity of force is . . . not a determinant of forced labor[.]"  *United States v. Toviave*, 761 F.3d 623, 626–27 (6th Cir. 2014).  As a result, courts routinely reject the argument GEO makes here, that the TVPA "only protects victims from the most heinous human trafficking crimes."  *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1145 (C.D. Cal. 2011); *see also Toviave*, 761 F.3d at 626-27 ("[P]aradigmatic forced labor, such as prostitution, forced sweatshop work, or forced domestic service, may be federally criminal even though the force is not physical at all, but merely psychological, such as isolation and pretended threats to the victim's friends or relations.").

GEO's argument to the contrary conflates two prongs of the TVPA.  *See* ECF No. 306 (Def.'s SJ Br.) at 24.  A defendant violates the TVPA when they cause serious harm *or* when they threaten serious harm.  As noted above, serious harm is defined broadly under the TVPA as conduct that would cause a reasonable person to work to *avoid*

experiencing it; actually *suffering* serious harm is not a prerequisite for liability.  18 U.S.C. § 1589(c)(2).  To prevail on their claims, what Plaintiffs must show is that solitary confinement *itself*, rather than threats of solitary confinement, is a serious harm.

Discovery has revealed more than enough evidence from which the jury can conclude that it is.  GEO guards were trained to use escalating forms of persuasion and discipline to gain compliance from detainees.  SAF ¶ 15.  And detainees testified that they were frightened of being placed in solitary confinement for refusing to perform HUSP work, and that their fear motivated them to comply with guards' orders.  *Id.* ¶ 18.  As Grisel Xahuentitla testified: "they're, of course, not – they're not whispering you to your ear.  They're loud, and so they – so you feel a little intimidated . . . . if they tell you 'clean, because you're going to the hole,' . . . I'm going to clean.  I don't want to go to the hole."  *Id*.  Guards recognized the coercive effect of this fear.  *Id.*

This fear of solitary confinement was objectively reasonable.  Solitary confinement is associated with symptoms such as anxiety, depression, self-harm, stupor or delirium, impairments in thinking, concentration, and memory, hyper-responsivity to external stimuli, obsessive-compulsive behavior, hallucinations, paranoia, delusions, and problems with impulse control.  *Id*. ¶ 21.  Peer-reviewed studies show that many of these symptoms can appear within 72 hours or less of solitary confinement.  *Id*. ¶ 23.  Effects can be long-lasting, and can include social withdrawal to "escape the buzzing confusion of life."  *Id.* ¶ 24.  Plaintiff Olga Alexakhina witnessed these effects in other detainees whom GEO placed in solitary confinement; Dr. Grassian recounts that in her interview with him, she reported that detainees returning from confinement "would take a shower

and just lay down.  They didn't want to talk to anyone, just laying down."  *Id.* ¶ 25.  She recalled that one woman who returned from solitary confinement was so depressed that other detainees consistently had to rouse her for meals.  *Id.*[8]

## 2.     GEO's Threats of Serious Harm Were Pervasive.

GEO also appears to argue that Plaintiffs and Class Members could not have been threatened with serious harm because they were only rarely placed in solitary confinement for refusing to clean.  ECF No. 306 (Def.'s SJ Br.) at 25-26.  This argument raises the key dispute of material fact that the jury must resolve at trial: whether Class Members worked to *avoid* solitary confinement.  *Supra*, § IV.A.1.  A reasonable jury could easily find that although most detainees were not placed in solitary confinement, they performed labor under the HUSP precisely because the threats worked.

Although GEO makes broad claims that refusal to clean "most often . . . resulted in no consequence," or that "none of the detainees were sent to segregation, despite many of them refusing to clean," ECF No. 306 (Def.'s SJ Br.) at 26, these contentions are misleading and, at the very least, in conflict with other facts in the record.  The testimony of GEO's guards is directly contrary to Plaintiffs' testimony.  Plaintiffs' Response to SUF ¶ 40; *see also* SAF ¶¶ 18-19.  And even the guards testified that they were trained to

---

[8]     After being detained at GEO, Olga Alexakhina was deported to Russia, which does not permit the taking of voluntary depositions of willing witnesses.  *See* https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/RussianFederation.html.  Efforts to depose Alexakhina in another country that is not subject to these logistical hurdles have been hindered by the COVID-19 pandemic.  Scimone Decl. ¶ 10.  GEO is aware of these circumstances and has not suggested alternatives.  *Id.* ¶¶ 9-11.  Plaintiffs remain prepared to present Alexakhina for deposition if and when it becomes possible.  *Id.* ¶ 12.

enforce the rules and punishments in the handbook, SAF ¶ 14, and applied the handbook's progressive discipline scale, starting with a verbal warning/reprimand or loss of privileges, when a detainee refused to clean.   *Id.* ¶ 15.   Their superior, Assistant Warden and 30(b)(6) witness Dawn Ceja, also testified that guards were expected to enforce the rules in the Detainee Handbook.   *Id.* ¶ 3.   The handbook itself says both that "The assigned Housing Unit [or Dorm] Officer will be responsible for assuring this general cleanup is done on a regular basis," *id.* ¶ 4, and that if detainees do not "do their share," then "Action will be taken to resolve this problem."   *Id.* ¶ 5.

Finally, documentary evidence makes clear that guards not only threatened but actually sent detainees to solitary confinement for refusing to clean throughout the class period.   *Id.* ¶ 19.   The record contains more than enough evidence for a reasonable jury to reject GEO's characterization of the facts.

### 3.   Detainees' Uniform Conditions of Confinement Made them Especially Vulnerable to Coercion.

The evidence that solitary confinement is a form of serious harm is bolstered by detainees' conditions of confinement.   Detainee Class Members were taken from their homes and families and placed in a prison-like environment to await possible deportation to countries to which they did not wish to return.   SAF ¶ 26.   They were housed in bunk beds either in windowless cells or in large open rooms, alongside dozens of strangers in front of whom they had to eat, sleep, shower, and defecate.   *Id.* ¶ 28.   All detainees in a dorm unit shared communal television sets, and a small recreation space containing a basketball hoop and one or two weight machines.   *Id.* ¶¶ 30, 34.   Although GEO argues

that detainees were "not deprived of social opportunities," *see* ECF No. 306 (Def.'s SJ Br.) at 27, they could socialize only with the other strangers with whom they were imprisoned.  SAF ¶¶ 28, 31-32, 35.  Their contact with the outside world, including their spouses, children, parents, and friends, was limited to one-hour non-contact visits three times a week and 20-minute phone calls made from communal payphones, which were located in the middle of the dorms and shared among all detainees.  *Id.* ¶¶ 31-33.  This environment took a toll.  Plaintiff Gaytan, who was arrested two weeks after graduating from high school and sent to Aurora shortly thereafter, testified that "it was scary to be in there . . . with a bunch of people you don't even know," many of whom were far older than him.  *Id.* ¶ 35.  Plaintiff Xahuentitla captured a similar sentiment, expressing that, "[w]hen you are inside, you . . . feel this pressure, you feel this emotional[] depress[ion]." *Id.*  And those feelings were exacerbated by the lack of connection to family: Class Member Alejandro Hernandez Torres testified about his efforts to keep his hope of release alive, saying "I made great efforts to be busy most of the time staying away from problems for people who had conflict in my wish and hope to be released.  I had the hope to see my family and my daughters." *Id.*

In this context, GEO's contention that detainees were "largely free to do what they wanted during the day" is a subjective characterization that the jury should evaluate for itself.  *See* ECF No. 306 (Def.'s SJ Br.) at 27.  And contrary to GEO's argument that the conditions at Aurora are a far cry from the circumstances that the Fourth Circuit described as "[t]ypical[]" forced labor situations in *Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017), the analysis in that case is remarkably fitting:

55

> "[F]orced labor" situations involve circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are "used to prevent [vulnerable] victims from leaving and to keep them bound to their captors."

*Id.* at 618-19 (quoting *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015)).  A jury could easily conclude that being forced to share a cramped cell with strangers is an "intolerable living condition[]"; or that being imprisoned constitutes "isolation []from family and the outside world."  While none of these conditions is *necessary* under the TVPA for liability to attach, *see supra* § V.A.1, they all inform the analysis of whether hearing threats of solitary confinement was likely to keep detainees from resisting or refusing to perform unpaid labor.

In addition, all Detainee Class Members were exposed to the possibility of deportation by the nature of their confinement.  The jury could conclude not only that this fact heightened their vulnerability to threats, but also that GEO knew of this vulnerability and specifically sought to exploit it.  For example, until at least 2007, the video shown to detainees upon their arrival at the Aurora facility told them that failure to follow facility rules could lead to disciplinary action causing "a negative effect on your case before the government, so the best rule is to stay out of trouble during your stay here."  SAF ¶ 37.  Guards, too, ensured that detainees were acutely aware of the connection between discipline and deportation; Plaintiff Hernandez Ceren described an instance where a GEO sergeant told an entire housing pod that if detainees refused to clean, "I'm going to make sure that GEO sends their documents to the court . . . . and the judge is going to see if she

wants to leave you here in the country, so you can go back to your family . . . . you're not going to look good when this gets to the judge."  *Id.*

> ### 4.  Placement in Solitary Confinement Is Not a "Legitimate Consequence" of Refusing to Perform Unpaid Labor.

GEO's argument that a "warning of legitimate consequences" is not actionable under the TVPA fundamentally misinterprets legal precedent in an attempt to turn substantive law into a meaningless tautology.  It is true that courts have observed that factual statements of lawful consequences for refusing to perform labor may not rise to the level of a TVPA violation, depending on the context.  But whether or not a consequence is "legitimate" is a fact-bound determination that hinges on the way the threats are deployed as well as the surrounding circumstances – in other words, a quintessential jury question.

Indeed, many of the cases GEO relies on upheld a jury's verdict under the TVPA *despite* the defendants' protestations that they had merely given neutral warnings of potential negative outcomes.  For example, while the court in *Bradley* noted that it might not violate the TVPA to inform workers that they will stop earning wages if they stop working, the panel rejected the defendant's argument that he had provided only "innocent warnings" where the record showed that he had taken his employees' passports, threatened them with violence, and restricted their local travel.  390 F.3d at 151-52 ("[I]n an appropriate case we think that the court *in instructing the jury* would be required to draw a line between improper threats or coercion and permissible warnings of adverse but legitimate consequences." (emphasis added)).  Similarly, in *Calimlim*, the Seventh

Circuit upheld a jury verdict finding employers guilty of violating the TVPA for providing "warnings" to their employee that she was in the United States illegally and therefore subject to deportation. 538 F.3d 706, 714, 718 (7th Cir. 2008). Although these statements were true, they could also "reasonably be viewed as a scheme to make [the employee] believe that she or her family would be harmed if she tried to leave." *Id*. at 713. The judgment as to whether the statements were threats was therefore properly left to the jury. *Id*.

Courts that have granted summary judgment for defendants have done so where the negative consequences of failing to work were simply objective facts outside the employer's control, or were unrelated to the work itself. For example, in *Muchira*, there was no evidence that the plaintiff's employers had even warned her of the possibility of deportation; she just understood that was a potential consequence under the terms of her visa. 850 F.3d at 624. In *Headley v. Church of Scientology Int'l*, 687 F.3d 1173 (9th Cir. 2012), the record "overwhelmingly" showed that the plaintiffs worked for the Church of Scientology because "they believed that it was the right thing to do, because they enjoyed it, and because they thought that by working they were honoring the commitment that they each made and to which they adhered." *Id*. at 1179-80. The consequences of which they complained – that they would lose contact with family, friends, or each other – were associated with leaving their church, not their jobs, and were constitutionally protected as "shunning" under the Constitution's Free Exercise Clause. *Id*. at 1180.

Moreover, the distinction between a "legitimate consequence" and a violation of the TVPA is not, as GEO would have it, a question of the severity of the punishment or

threatened punishment for refusing to work.[9]  This is made explicit in *Toviave*, which, contrary to GEO's position, "did *not* hold that household chores do not constitute labor or services."  *United States v. Callahan*, 801 F.3d 606, 620 (6th Cir. 2015), or that beating people with broomsticks (as the defendant did in that case) is a legitimate consequence for a violation of "seemingly arbitrary rules."  *See* ECF No. 306 (Def.'s SJ Br.) at 28.  Rather, *Toviave* held that the TVPA did not apply to matters implicating "the rights of parents and guardians to the custody of their minor children and wards," *id*. at 626 (quoting *Kozminski,* 487 U.S. at 944), which is not relevant to this case.

At its core, GEO's argument that solitary confinement is a legitimate consequence for failing to clean rehashes the argument it made in the context of the parties' cross-motions for summary judgment on the issue of derivative sovereign immunity: that the labor compelled under the HUSP was merely "basic housekeeping tasks" permitted under the PBNDS.  *See* ECF No. 260 (Pls.' DSI MSJ Br.), 284 (Def.'s DSI MSJ Br.).  As Plaintiffs set forth in detail in that briefing, undisputed evidence shows that the work compelled under the HUSP went far beyond the PBNDS, and was explicitly prohibited under GEO's contract.  ECF No. 260 (Pls.' DSI MSJ Br.) at 33-36.  The decision in *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269 (11th Cir. 2020), acknowledges the significance of the distinction between basic housekeeping and forced labor, holding that while the disciplinary measures set forth in the ICE disciplinary severity scale do not, "*on their own*," give rise to liability under the TVPA, *id*. at 1277 n.5 (emphasis added), a

---

[9]     Even if it were, substantial evidence supports Plaintiffs' position that solitary confinement is a severe punishment.  *Supra* § V.A.1.

government contractor may violate the TVPA if it forces detainees to perform forced labor beyond personal housekeeping tasks. *Id*. at 1277. Notably, the *Barrientos* court interpreted the PBNDS according to its plain meaning to limit permissible unpaid labor to "basic required tasks," such as detainees "'making their bunk beds daily,' 'stacking loose papers,' and 'keeping the floor free of debris.'" *Id*. at 1272. "Beyond these basic required tasks," the court noted, "detainees 'shall not be required to work.'" *Id*. (quoting the PBNDS).

### 5. A Jury Could Conclude That GEO Intended its Threats to Compel Unpaid Labor.

To prevail on claims under the "threats of serious harm" prong of the TVPA, plaintiffs must show that the defendant "not just threaten[ed] serious harm but . . . intended [detainees] to believe that such harm would befall [them]." *Dann*, 652 F.3d at 1170. There is ample evidence in the record from which a jury could conclude that GEO intended detainees to believe its threats of solitary confinement, because GEO actually *did* place detainees in solitary confinement for refusing to clean. SAF ¶ 19. Even when guards did not ultimately need to place resistant detainees in solitary, they made it clear that they would do so: Plaintiff Hugo Hernandez Ceren testified that when detainees refused to clean, he witnessed guards pull out a roll of trash bags and tell them to "pack your stuff. You're going to the hole." *Id.* ¶ 13.i. Similar confrontations happened "multiple times with different guards." *Id*.

While it may be true that guards sometimes did not *need* to impose – or even threaten – solitary confinement to compel detainees to work, this does not compel

summary judgment or absolve GEO of liability.  To the contrary, it is entirely consistent with Plaintiffs' theory of the case: detainees who refused to work were subject to a range of discipline, including solitary confinement.  *See* ECF No. 1 (Complaint) ; *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 911 (10th Cir. 2018) ("Under the disciplinary system, detainees who refused to perform their cleaning assignments faced a range of possible sanctions.").  The Detainee Handbook makes clear that if milder punishments, such as turning off the television or prohibiting detainees from participating in activities, do not compel detainees to work, then guards will resort to harsher punishments.  SAF ¶ 6.  Solitary confinement was listed among those punishments.  *Id*. ¶¶ 8-9.  The Detainee Handbook also states that detainees "will be held accountable for [their] actions while in custody at [Aurora]" and that "[t]herefore, it is each detainee's responsibility to become familiar with the contents of this handbook."  *Id*. ¶ 2.

GEO guards and administrators confirmed that they intended detainees to believe that facility rules – including that detainees could be placed in solitary confinement for refusing to clean – would be enforced.  GEO guards confirmed in their depositions that solitary confinement was an appropriate punishment for continued noncompliance.  *Id*. ¶ 16; Plaintiffs' Response to SUF ¶ 43.  And GEO's 30(b)(6) witness confirmed that it was "imperative" that detainees "respond to every command and directive" made to them, including respecting the commands of detention officers.  *Id*. ¶ 15.  In fact, in its own motion, GEO states that "[a]s a matter of logic and reason, detention facilities must have the ability to impose some level of discipline in order to preserve a safe and secure environment for those housed there."  ECF No. 306 (Def.'s SJ Br.) at 29.  This statement

highlights the *illogic* of GEO's theory of the case – that the sanitation policy, despite the wording in the handbook, was optional, even though guards enforced every single other rule – underscoring the need to have a jury test the credibility of GEO's position.

To the extent that GEO's argument relies on the position that GEO subjectively did not intend detainees to find the looming threat of solitary confinement threatening, that is not a summary judgment issue.  In *Calimlim*, 538 F.3d at 713, the defendants argued on appeal that "nothing they said or did to [the victim] amounted to a threat.  To the contrary . . . they meant her no harm and were only telling her these things in her best interest."  *Id*.  The Seventh Circuit held that a "reasonable person" could have viewed the defendants' statements as a threat, and held: "Perhaps another jury might have accepted this story, but the one that heard their case did not."  *Id*.  The jury here deserves the opportunity to weigh the evidence and make that evaluation itself.

Finally, and once again: The HUSP was a GEO program, developed by GEO.  ICE did not draft or negotiate the HUSP, and it was not required by GEO's contract with ICE.  SAF ¶ 12.  Not only did ICE (via the PBNDS) not require that detainees be forced to clean common areas without pay, it prohibited such cleaning.  *Id*. ¶ 11.  GEO's argument that it was only following ICE's orders when it published and implemented the disciplinary severity scale is not only irrelevant to whether it intended detainees to believe serious harm might befall them, it is also controverted by undisputed evidence.

### 6.   The Jury Can Infer That Class Members Cleaned Because of Fear of Solitary Confinement.

This Court has previously held that, to prevail on their claims under the TVPA, Plaintiffs must demonstrate that "a reasonable person would respond [to threats] in a similar way as the victims" and that they must show that the victims "actually labored *because of* the perpetrator's conduct." *Menocal*, 320 F.R.D. at 266-67.[10]  The Tenth Circuit has made clear that the causation element is subject to classwide proof in the form of common circumstantial evidence.  *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 918 (10th Cir. 2018).  For example, the jury could conclude that threats of solitary confinement compelled detainees to work via evidence that: (1) detainees "received notice of the Sanitation Policy's terms, including the possible sanctions for refusing to clean," and (2) that detainees "performed housing unit cleaning work for GEO when assigned to do so."  *Id.* at 919-20.

There is evidence in the record both that detainees received notice of the HUSP and attendant consequences for refusing to participate, and that detainees participated in the HUSP.  SAF ¶¶ 1, 6-8, 18.   Moreover, as discussed in greater detail in Plaintiffs' contemporaneously-filed opposition to GEO's decertification motion, the testimony that GEO has cherry-picked from Plaintiffs' depositions does not show that they participated in the HUSP for reasons other than the fear that they would be placed in solitary

---

[10]     Recent authority since the Court's ruling on class certification calls into question the Court's prior conclusion that there is a subjective element to TVPA causation.  This argument is set forth in more detail in Plaintiffs' contemporaneously-filed opposition to GEO's decertification motion.  Pls.' Decert. Opp. Br. at 25-33.

confinement if they refused.  *See* Pls.' Decert. Opp. Br. at 39-45.  To the contrary, the

named Plaintiffs testified uniformly that they performed HUSP work *because of* those

threats.  SAF ¶ 18.  A jury is entitled to believe that testimony.

### B.    Class Members' TVPA Claims Benefit from the TVPA's 10-Year Statute of Limitations.

GEO's attempt to shorten the class period misstates the law.  Retroactive

application of a statute is only impermissible where "the new provision attaches new

legal consequences to events completed before its enactment."  *Landgraf v. USI Film

Prods*., 511 U.S. 244, 269-70 (1994).  In the civil context, retroactivity concerns are

present when a statute creates a new cause of action, or eliminates a defense to a cause of

action, holding civil defendants liable where previously they were not.  *See Hughes

Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 948-51 (1997).  Where, as

here, the amendments merely "increase[] [the] likelihood that an existing cause of action

will be pursued," *id.* at 50, the amendment may be applied retroactively.

Here, GEO is correct that when Congress first enacted the TVPA in 2000, the

statute provided for a four-year limitations period, and Congress amended the TVPA in

2008 to include a ten-year limitations period for civil actions.  *See* ECF No. 306 (Def.'s

SJ Br.) at 33.  But this change affects only a two-month portion of the Class's claims.

Numerous courts have concluded that the TVPA's ten-year statute of limitations applies

if the plaintiff's claims were live when Congress lengthened the statute of limitations on

December 23, 2008.  *See, e.g.*, *Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014) ("We

therefore hold that applying the TVPRA's extended limitations period to claims that were

unexpired at the time of its enactment does not give rise to an impermissible retroactive effect."); *Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d 1112, 1129 (D. Colo. 2019) ("By applying the ten-year statute of limitations, the Court does not expose [defendant] to any new legal consequences; it 'merely prolongs the time during which legal consequences can occur'" (quoting *Cruz*, 773 F.3d at 145)); *Lama v. Malik*, 192 F. Supp. 3d 313, 322-23 (E.D.N.Y. 2016) (collecting cases). Therefore, the claims of all Class Members that accrued after December 23, 2004 – four years prior to the 2008 amendments – are timely. Here, Plaintiffs have pled a class period running from October 22, 2004 to October 22, 2014. ECF No. 1 (Complaint) ¶ 55. Thus, only the first two months of the Class's claims are barred by the statute of limitations.

GEO's claim that this case is distinguishable from *Gilbert* because the *Gilbert* plaintiffs' claims arose under the 2003 amendments to the TVPA falls flat. *See* ECF No. 306 (Def.'s SJ Br.) at 33. Nothing in the *Gilbert* court's analysis hinged on the fact that the plaintiffs' claims fell within the 2003 amendments. The court concluded that "the TVPA's existing ten-year statute of limitations applies – even to claims based on conduct that allegedly occurred when the TVPA had a four-year limitations period (before December 23, 2008), so long as the claim had not yet been barred by the four-year limitation when the ten-year limitation was passed into law." 423 F. Supp. 3d at 1128; *see also Camayo v. John Peroulis & Sons Sheep, Inc.*, Nos. 10 Civ. 772, 11 Civ. 1132, 2013 WL 3927677, *2 (D. Colo. July 20, 2013) (applying amended limitations period since it "merely extended the time in which a plaintiff may assert claims for violations of already-existing rights").

GEO likewise errs by relying on inapposite cases where, at the time of the alleged violation, the TVPA contained no private right of action. *See, e.g.*, *Velez v. Sanchez*, 693 F.3d 308, 324-25 (2d Cir. 2012) (rejecting retroactive application of TVPA's civil cause of action because "all of the alleged trafficking and forced labor took place before the [2003] civil cause of action under the TVPRA was enacted"); *Doe v. Siddig*, 810 F.Supp.2d 127, 135 (D.D.C. 2011) (same).[11]  Retroactive application of *that* change in the law, unlike the expansion of the statute of limitations, would "attach[] new legal consequences to events completed before" the amendments were enacted. *See Landgraf*, 511 U.S. at 269-70.

Finally, to the extent GEO suggests that the 2008 Amendment created a new "section and theory of liability," it is mistaken. *See* ECF No. 306 (Def.'s SJ Br.) at 33. Rather than provide for "new or expanded liability," the forced labor prohibition has always included "scheme, plan, or pattern" liability. *See* Victims of Trafficking and Violence Protection Act of 2000, PL 106–386, tit. XVIII, § 1589, 114 Stat. 1464 (2000) (making it unlawful for anyone to "knowingly provide[] or obtain[] the labor or services

---

[11]     GEO also relies on *Abarca v. Little*, but in that case, although the statute of limitations was in question, the Plaintiff also sought to bring civil claims that were only added by the 2008 amendments, which "significantly broaden[ed] the basis for civil liability under the TVPRA." 54 F. Supp. 3d 1064, 1069 (D. Minn. 2014). Those claims – for peonage, enticement into slavery, and involuntary servitude – are different from the forced-labor claim Plaintiffs bring here. *See id.*  Even if the *Abarca* court's holding on the retroactivity of the statute of limitations had been the sole basis for its decision, Plaintiffs respectfully submit that the decision is poorly reasoned and not binding on this Court, and that the several decisions from this district cited above provide a more persuasive analysis of this question.

of a person … (2) by means of any scheme, plan, or pattern intended to cause the person to believe that . . . person or another person would suffer serious harm or physical restraint").

### C.      Plaintiffs Do Not Seek Injunctive Relief.

As GEO notes, Plaintiffs do not seek injunctive relief for their claims under the TVPA.  *See* ECF Doc. 305 at 34.  Plaintiffs' request for relief has not changed.  Because Plaintiffs are not seeking injunctive relief under the TVPA, the Court need not enter summary judgment on this question.

### D.      Material Disputes of Fact Preclude Summary Judgment on Plaintiffs' Unjust Enrichment Claims.

GEO offers two reasons that Plaintiffs' unjust enrichment claims should be disposed of on summary judgment: (1) that Plaintiffs cannot show that GEO benefitted from the $1/day program; and (2) that an express contract bars the unjust enrichment claim.  Each is subject to disputes of material fact that preclude summary judgment.

#### 1.      The Record Shows That GEO Obtained a Benefit From Paying Detainees $1 per Day for Their Labor.

To recover for unjust enrichment, a plaintiff must show that "(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying."  *DCB Const. Co. v. Cent. City Dev. Co.*, 965 P.2d 115, 119-20 (Colo. 1998).  GEO argues that Plaintiffs cannot, as a matter of law, satisfy the second element of this test, but its argument relies on a hypothetical that ignores the facts of the case, including its own witnesses' testimony.

GEO benefits from the $1/day program because limiting detainee wages to $1/day allows GEO to earn the return on investment it needs to make its Aurora contract viable from a business standpoint.  When developing its bid for a contract, GEO totals up the costs it would incur in executing the contract and adds the profit it desires on top of those costs, all of which it charges to the government.  SAF ¶ 40.  But GEO cannot include the cost of detainee wages above the $1/day reimbursement rate because that is all that ICE will pay; GEO must bear additional costs, if any, on its own.  *Id.* ¶¶ 48-50.  Were GEO to pay detainees more than $1/day for their labor and bear this cost, the cost to operate the facility would increase, cutting into GEO's return.  *Id.* ¶ 50.  Accordingly, GEO benefits from paying just $1/day to detainees for work in the VWP by keeping its costs low and maintaining its desired profit margins.

Additionally, GEO's hypothetical in which there was no VWP, ECF No. 306 (Def.'s SJ Br.) at 35-36, is at odds with how immigration detention works.  As GEO has argued in support of its Derivative Sovereign Immunity defense, ICE *requires* it to operate the VWP.  ECF No. 284 (Def.'s Cross DSI MSJ) at 12.  And Plaintiffs allege that GEO's practice of paying $1/day unjustly enriches the company, not that the *existence* of the VWP does so.  Evidence in the record shows that the VWP does *not* require GEO to pay detainees exactly $1/day, SUF ¶ 49, and that GEO could pay more at its own expense.  SAF ¶ 50.  But it is to GEO's benefit to keep detainee wages at $1/day because the amount ICE pays GEO during each year of the contract is set at the time the contract is signed.  *Id.* ¶ 45.  As a result, GEO bears the risk of having its profits offset by an increase in the cost of operating the facility, such as paying more for detainee labor.  *Id.* ¶

68

46.  This is confirmed by the testimony of GEO's 30(b)(6) witness Daniel Ragsdale, who explained that the VWP is "cost neutral at a dollar a day but it gets − it becomes a cost to us if it goes beyond that."  SUF ¶ 50.  Because an increase in cost causes a decrease in profit, GEO's decision to limit detainee pay to $1/day benefits and enriches the company.

Even if the Court were to entertain GEO's hypothetical where the VWP does not exist and GEO can mark up the cost of employee labor for additional profit, GEO would still benefit from building $1/day detainee labor into its contracts because doing so allows GEO to bid on the contract at a rate low enough for ICE to accept.  GEO strives to provide a fair price to the government for its services, and seeks to provide those services for less than it would cost the government to do so itself.  SAF ¶ 39.  The largest component of the price GEO charges ICE is labor, and using cheap detainee labor is one method of keeping prices down.  *Id.* ¶¶ 41, 51.  Even if GEO could profit more from additional employee labor billed to ICE at a markup, this would increase the total cost to the government, making GEO's bid less competitive.  *Id.* ¶ 42.  GEO's own estimates indicate that replacing all GEO ICE detainees with full-time employees nationwide would constitute a substantial cost.  *Id.* ¶ 51.  GEO's incentive to keep its bid down is true even to the extent GEO's Aurora contract bid is a "sole source bid" – i.e., where GEO is the only contractor that can provide the services – because the government applies extra scrutiny to a sole source bidder's prices and finances to ensure they are providing a fair price.  *Id.* ¶ 43.   Indeed, GEO uses the same pricing strategy for sole source and competitive bids.  *Id.* ¶ 44.  Put simply, GEO will always have an incentive to

use detainee labor to ensure that the price it charges the government is low enough to meet what the government is willing to pay.  *Id.* ¶¶ 42-44.

### 2.    GEO's Contract Defense Fails.

### i.    GEO Waived Its Contract Defense.

GEO raises the affirmative defense that Plaintiffs' unjust enrichment claims are barred by a contract for the first time in its motion for summary judgment.  Because geo did not assert this affirmative defense in its answer, ECF No. 26 (answer) at 13-16 (listing affirmative defenses), the defense is waived.  *See Burke v. Regalado*, 935 F.3d 960, 1040 (10th Cir. 2019) ("As a general rule, a defendant waives an affirmative defense by failing to plead it."); *Radio Corp. Of Am. v. Radio Station KYFM, Inc.*, 424 F.2d 14, 17 (10th Cir. 1970) ("[D]efenses [that] are not affirmatively pleaded . . . are deemed to have been waived and may not thereafter be considered as triable issues in the case.").

Moreover, GEO could not plead the existence of a contract as an affirmative defense because it has admitted that the VWP forms signed by detainees are not a contract.  Dawn Ceja, one of GEO's 30(b)(6) witnesses, agreed that the document GEO now relies was not an employment contract and that it did not create any rights or obligations.  SAF ¶ 53.

### ii.    The Contract GEO Relies On Is Unconscionable.

Even if GEO could argue that detainees signed a contract to participate in the VWP, it is not entitled to summary judgment because a contract does not bar an unjust enrichment claim when it is unenforceable.  *See Interbank Invests., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003).  Here, a jury could find

that the purported contract between GEO and detainees is unconscionable, rendering Plaintiffs' unjust enrichment claims triable.

Under Colorado law, a contract is unconscionable when there is "evidence of some overreaching on the part of one of the parties such as that which results from an inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties *together with* contract terms which are unreasonably favorable to that party." *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986) (emphasis added). Courts weigh seven factors to guide their analysis of whether an overreach indicating unconscionability is present:

> [1] a standardized agreement executed by parties of unequal bargaining strength; [2] lack of opportunity to read or become familiar with the document before signing it; [3] use of fine print in the portion of the contract containing the provision; [4] absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated; [5] the terms of the contract, including substantive unfairness; [6] the relationship of the parties, including factors of assent, unfair surprise and notice; and [7] all the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect.

*Id.* (internal citations omitted).

The "contract" GEO cites – the form detainees sign to be eligible to work in the VWP – is a quintessential case of overreach by a party with far superior bargaining power. The relationship of the "parties," where GEO maintains control over every aspect of Class Members' day-to-day existence, lends itself to perhaps the greatest disparity in bargaining power possible.[12] Detainees were isolated from family, lived intimately with

---

[12]    A jury may evaluate this inquiry in light of the same facts that preclude summary judgment on the question of whether GEO threatened detainees, and whether such threats caused them to perform work in violation of the TVPA – e.g., that the Class Members

strangers, and relied on GEO for all of their basic necessities.  SAF ¶¶ 26, 28, 36.  These

conditions deprived Plaintiffs of any meaningful choice: if they wanted to earn money

while in GEO's custody for phone calls to their family or items from the commissary,

there is no other option but to work in the $1/day program on GEO's terms.[13]  *Cf. Bernall*

*v. Burnett*, 793 F. Supp. 2d 1280, 1287 (D. Colo. 2011) (finding the existence of a

meaningful choice where the plaintiff school applicant could reject the contract terms and

apply instead to another institution).  Refusal to accept GEO's terms does not lead to a

negotiation; rather, it leads to the detainee losing the opportunity to earn money while

jailed, a fact Class Members understood.  SAF ¶ 52; *see Bonanno v. Quizno's Franchise*

*Co., LLC*, No. 06 Civ 2358, 2009 WL 1068744, at *18 (D. Colo. Apr. 20, 2009)

(recognizing that the plaintiffs' inability to "truly negotiate or re-write any provisions of

the franchise agreement" weighed in favor of finding unconscionability); *Bernall*, 793 F.

Supp. 2d at 1287 (crediting plaintiffs' affidavits stating "they did not believe they had the

ability to negotiate the terms of their contracts" as sufficient to establish the existence of

an unconscionable form contract).  This imbalance in bargaining power alone could

support a finding of unconscionability, but when combined with the fact that GEO used

this bargaining advantage to impose a $1/day wage on detainees, it is clear that the terms

of the contract are unconscionable as well.  *See Davis*, 712 P.2d at 991 (describing

---

faced deportation, a consequence that GEO explicitly reminded them of in telling them to
do what they were told.  *See* § V.A.3, *supra.*
[13]     The jury could conclude that commissary items were not luxuries, but necessities
caused by the inadequacy of the diet GEO provided detainees.  SAF ¶ 36.

"substantive unfairness" factor and citing *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 450 (D.C. Cir. 1965) for same).

Paying $1/day is, on its face, not "commercially reasonable." *See Davis*, 712 P.2d at 991. GEO may argue that $1/day wages are commercially reasonable because they are consistent with detainee wages set by ICE and serve a commercial purpose of keeping detainees active while in custody, but neither argument is persuasive. Though ICE will only reimburse GEO $1/day for detainee labor, it does not forbid GEO from paying more and leaves the determination of the appropriate wage to GEO. SAF ¶ 48-500 GEO chose not to pay more than $1/day and, as explained above, did so for its own benefit. *See* § V.D.1, *supra*. In addition, it may be the case that ICE's purpose in requiring the VWP is to decrease idleness, but making detainees easier to control is not a commercial purpose; it is a coercive one, i.e., one that is unconscionable. And GEO's real purpose in limiting detainee wages to $1/day is to save money. *See id*. Limiting business costs is, in general, a legitimate commercial purpose, but it ceases to be so when the method of limiting costs is exploiting a workforce. *See Contreras v. Corinthian Vigor Ins. Brokerage, Inc.*, 25 F. Supp. 2d 1053, 1056 (N.D. Cal. 1998) (recognizing public policy against "economic incentive" that "permits employers to underpay" workers).

In sum, the unconscionability analysis highlights what is apparent from the parties' relationship: at best, GEO, Plaintiffs' jailor, offered them an adhesive "contract" to work while jailed on the condition that they accept only $1/day for that work. This is the archetype of an unconscionable contract. And, because the contract is not enforceable, it does not preclude Plaintiffs' unjust enrichment claim.

73

## VI.     CONCLUSION

Because the record contains numerous disputes of material fact, the Court should

deny GEO's Motion for Summary Judgment in its entirety.

Dated: New York, NY
        October 26, 2020

Respectfully submitted,

By: */s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
E-Mail: mscimone@outtengolden.com

Rachel Dempsey
Adam Koshkin
**OUTTEN & GOLDEN LLP**
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
E-Mail: rdempsey@outtengolden.com
E-Mail: akoshkin@outtengolden.com

Alexander Hood
David Seligman
Juno Turner
**TOWARDS JUSTICE**
1410 High St., Suite 300
Denver, CO 80218
(720) 441-2236
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org

74

R. Andrew Free

**LAW OFFICE OF R. ANDREW FREE**

P.O. Box 90568

Nashville, TN 37209

T: (844) 321-3221

Andrew@ImmigrantCivilRights.com

Brandt Milstein

**MILSTEIN LAW OFFICE**

1123 Spruce Street

Boulder, CO 80302

(303) 440-8780

brandt@milsteinlawoffice.com

Andrew Turner

**THE KELMAN BUESCHER FIRM, P.C.**

600 Grant St., Suite 825

Denver, CO 80203

(303) 333-7751

aturner@laborlawdenver.com

Hans Meyer

**MEYER LAW OFFICE, P.C.**

P.O. Box 40394

Denver, CO 80204

(303) 831-0817

hans@themeyerlawoffice.com

*Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 26, 2020, a copy of the foregoing document was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
E-Mail: mscimone@outtengolden.com

**List of Exhibits Attached to Opposition to Motion for Summary Judgment**

**Ex. 1**: Decl. of Michael J. Scimone ("Scimone Decl.") in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, dated October 26, 2020

**Ex. 2**: Att. 1 to Scimone Decl., Pls.' Opposition Ex. 1, excerpts from the July 22, 2020 deposition of Alejandro Menocal.

**Ex. 3**: Att. 2 to Scimone Decl., Pls.' Opposition Ex. 2, excerpts from the July 23, 2020 deposition of Stuart Grassian.

**Ex. 4**: Att. 3 to Scimone Decl., Pls.' Opposition Ex. 3, excerpts from the June 24, 2020 deposition of Hugo A. Hernandez Ceren.

**Ex. 5**: Att. 4 to Scimone Decl., Pls.' Opposition Ex. 4, excerpts from the June 30, 2020 deposition of Sergio Gallegos.

**Ex. 6**: Att. 5 to Scimone Decl., Pls.' Opposition Ex. 5, Segregation Unit Activity Sheet, Bates labeled GEO-MEN 00070692-93.

**Ex. 7**: Att. 6 to Scimone Decl., Pls.' Opposition Ex. 6, excerpts from the October 27, 2017 deposition of Demetrio Valerga.

**Ex. 8**: Att. 7 to Scimone Decl., Pls.' Opposition Ex. 7, excerpts from the February 21, 2018 deposition of Dagoberto Vizguerra.

**Ex. 9**: Att. 8 to Scimone Decl., Pls.' Opposition Ex. 8, excerpts from the March 29, 2016 30(b)(6) deposition of Dawn Ceja.

**Ex. 10**: Att. 9 to Scimone Decl., Pls.' Opposition Ex. 9, excerpts from the November 16, 2017 deposition of Jesus Yepez Gaytan.

**Ex. 11**: Att. 10 to Scimone Decl., Pls.' Opposition Ex. 10, excerpts from the July 8, 2020 deposition of Luis Pagan.

**Ex. 12**: Att. 11 to Scimone Decl., Pls.' Opposition Ex. 11, excerpts from the June 29, 2020 deposition of Martha Vasquez.

**Ex. 13**: Att. 12 to Scimone Decl., Pls.' Opposition Ex. 12, excerpts from the July 16, 2020 deposition of Alejandro Hernandez Torres.

**Ex. 14**: Att. 13 to Scimone Decl., Pls.' Opposition Ex. 13, excerpts from the October 26, 2017 deposition of Grisel Xahuentitla.

**Ex. 15**: Att. 14 to Scimone Decl., Pls.' Opposition Ex. 14, excerpts from the September 16, 2020 30(b)(6) deposition of Dawn Ceja.

**Ex. 16**: Att. 15 to Scimone Decl., Pls.' Opposition Ex. 15, excerpts from the July 28, 2020 deposition of Joyce Quezada.

**Ex. 17**: Att. 16 to Scimone Decl., Pls.' Opposition Ex. 17, excerpts from the July 21, 2020 deposition of David Venturella.

**Ex. 18**: Att. 17 to Scimone Decl., Pls.' Opposition Ex. 18, excerpts from the October 9, 2019 deposition of Amber Martin.

**Ex. 19**: Att. 18 to Scimone Decl., Pls.' Opposition Ex. 19, excerpts from the February 27, 2020 30(b)(6) deposition of Daniel Ragsdale.

**Ex. 20**: Att. 19 to Scimone Decl., Pls.' Opposition Ex. 20, excerpts from the February 28, 2020 30(b)(6) deposition of Amber Martin.

**Ex. 21**: Att. 20 to Scimone Decl., Pls.' Opposition Ex. 21, Psychiatric Report of Plaintiffs' expert Dr. Stuart Grassian, M.D.

**Ex. 22**: Att. 21 to Scimone Decl., Pls.' Opposition Ex. 22, Fatos Kaba, "Solitary Confinement and Risk of Self-Harm Among Jail Inmates," 104 Am. J. Pub. Health 442 (2014).

**Ex. 23**: Att. 22 to Scimone Decl., Pls.' Opposition Ex. 23, Paul Gendreau, "Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement," 79 J. Abnormal Psych. 54 (1972).

**Ex. 24**: Att. 23 to Scimone Decl., Pls.' Opposition Ex. 27, excerpts from the June 10, 2020 deposition of Brian Evans.

### List of Exhibits Attached to Notice of Restriction

**Ex. 1**: Att. 1 to Notice of Restriction, Pls.' Opposition Ex. 16, May 30, 2018 letter from GEO to ICE, Bates labeled GEO-MEN 00187770.

**Ex. 2**: Att. 2 to Notice of Restriction, Pls.' Opposition Ex. 24, photographs of the Aurora ICE Processing Center, Bates labeled ICE 0000102, 105, 116, 123, 128, 139, 142, 145, 152.

**Ex. 3**: Att. 3 to Notice of Restriction, Pls.' Opposition Ex. 25, Detainee Orientation Video Script 042705, Bates labeled GEO_MEN 00056575-81.

**Ex. 4**: Att. 4 to Notice of Restriction, Pls.' Opposition Ex. 26, Detainee Orientation Video Script 082507, Bates labeled GEO-MEN 00075173-83.