# Exhibit 1

Alejandro Menocal  07/22/2020
ALEJANDRO MENOCAL vs GEO GROUP

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 1:14-cv-02887-JLK-MEH
3    _____

4              VIDEOTAPE DEPOSITION OF:
              ALEJANDRO MENOCAL - July 22, 2020
5                   Via RemoteDepoTM
     _____
6
     ALEJANDRO MENOCAL, MARCOS BRAMBILA,
7    GRISEL XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA,
     JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO VIZGUERRA,
8    and DEMETRIO VALERGA, on their own and on behalf of
     all others similarly situated,
9
     Plaintiffs,
10
     v.
11
     THE GEO GROUP, INC.,
12
     Defendant.
13   _____

14              PURSUANT TO NOTICE, the videotape
     deposition of ALEJANDRO MENOCAL was taken on behalf of
15   the Defendant in Denver County, Colorado, on July 22,
     2020, at 3:32 p.m. GMT, 9:32 a.m. MDT, before Tracy C.
16   Masuga, Registered Professional Reporter, Certified
     Realtime Reporter, and Notary Public within Colorado
17   appearing remotely from Arapahoe County, Colorado.

18

19

20

21

22

23

24

25

1          A.   Sure.

2          Q.   Okay.  Let's do that just so we're on

3    the same page.  That's great.  So the sleeping living

4    area and the pod or the day living area, good?  Okay.

5               So let me -- let's take it one at a

6    time.  In the -- in the cell, or the sleeping living

7    area, were any of the class representatives in this

8    lawsuit in the sleeping living area or the cell with

9    you?

10         A.   No.

11         Q.   No.  Okay.  Let's -- then I'm going to

12   go back to the pod, the bigger area with the tables

13   and everything, okay?

14         A.   Okay.

15         Q.   All right.  So -- so if I mention

16   Mr. Brambila, he was in the pod at A2?

17         A.   I believe so.

18         Q.   Okay.  And there weren't any women in

19   your pod.  I'm pretty sure of that.  So let's skip to

20   the next one.  How about Mr. Hugo Hernandez, was he --

21         A.   No.

22         Q.   How about Jesus Gaytan?

23         A.   I -- he could have been.  I don't

24   recall.  The only person I recall being there is the

25   first name you mentioned.

1          Q.    Marcos Brambila?

2          A.    Yes, sir.

3          Q.    All right.  Was -- how about Demetrio

4    Valerga, was he --

5          A.    He could have been.  I don't recall,

6    sir.  Like I said, the only person I recall being in

7    the pod is Marcos.

8          Q.    Great.  Do you recall the name Dagoberto

9    Vizguerra?

10         A.    No, sir.

11         Q.    You don't recall if he was in the pod?

12         A.    No.

13         Q.    All right.  Since you were at least for

14   a period of time in different correctional facilities

15   in Denver and Adams and Jefferson County, would you

16   believe that the conditions at the Aurora Detention

17   Center were better than they were in those jails?

18         A.    No, on the contrary.

19               MR. MILSTEIN:  Object to form.

20         Q.    (BY MR. EISMEIER)  Okay.  Didn't you

21   tell people that the conditions at GEO were better

22   than they were in jail?

23         A.    To my family so they wouldn't worry

24   about me, but I don't recall telling anybody else.

25         Q.    Okay.  You recall that while you were at

 1    GEO that you made some phone calls?

 2          A.   Yes.

 3          Q.   And so what I'm going to do is at

 4    various times I may put up a record of a phone call,

 5    okay?

 6          A.   Okay.

 7          Q.   And then we'll listen to it, and then I

 8    may ask you a question about it and I may not, but I

 9    would like to listen to it and see if it either sparks

10    a recollection or else prompts another question, okay?

11          A.   Okay.

12               MR. EISMEIER:   Okay.  So I'm going to

13    take -- drop Exhibit 2 into the chat room, and that --

14    and I'll just explain -- I've already talked about

15    this with Tracy, our court reporter, but, Brandt, all

16    these will be in the record, but I'm going to play it

17    here, parts of it, for Mr. Menocal, okay?

18               MR. MILSTEIN:   Dana, these are all

19    recordings that you have identified to us?

20               MR. EISMEIER:   Yes, yeah.  Every one of

21    these was identified previously -- previously per our

22    agreement to get them to you over a week in advance.

23               MR. MILSTEIN:   When you put them up, can

24    you identify them by either Bates number or recording

25    number?

1    technical difficulties also about ICE, ICE being

2    located at the Aurora facility.

3              A.    Yes.

4              Q.    Okay.  And I asked you if ICE officials

5    ever came to the pod where you were staying.  Do you

6    recall?

7              A.    Yes, sir.

8              Q.    And do you recall any ICE officials

9    coming to the pod?

10             A.    Very seldom.  Maybe once or twice, from

11   what I could recall.

12             Q.    Okay.  What do you recall about those

13   instances?

14             A.    I just saw people in uniform, not like

15   the guards, so I figured they were ICE employees or

16   ICE members or ICE.

17             Q.    What was it about them that led you to

18   believe they were ICE?

19             A.    A different uniform.  They had a badge,

20   and they did not wear the regular uniforms that the

21   guards wear.

22             Q.    So you assumed that they were ICE?

23             A.    Yes, sir, or non-GEO employees, somebody

24   else.

25             Q.    Did you ever talk to them?

```
 1          A.    I don't recall talking to them, no, sir.
 2          Q.    Do you know if you could file a formal
 3   complaint with ICE while you were in the pod?
 4          A.    Okay.
 5          Q.    Well, do you know if you could?
 6                MR. MILSTEIN:   Form.
 7          A.    Yeah, sure.
 8          Q.    (BY MR. EISMEIER)  How would you file a
 9   complaint with ICE?
10          A.    By writing a kite, a complaint letter.
11          Q.    Okay.  You mentioned a kite?
12          A.    Yes, sir.  That is a piece of paper that
13   goes to whoever you are, you know, sending it to.
14          Q.    But you can send it to ICE, right?
15          A.    I believe so, yes, sir.
16          Q.    Do you think you ever sent a kite to
17   ICE?
18          A.    I'm not sure if it was to ICE who I sent
19   it to or GEO personnel, but, yes, sir, I sent several
20   kites.
21          Q.    Okay.  All right.  I want to go back to
22   the break, just a few minutes ago.  You were talking
23   on a phone to someone.  Do you remember who you were
24   talking to?
25          A.    To Ly Warren, you mean?
```

```
 1              Q.   No, no, no.  I'm sorry.  You had a cell

 2    phone sitting at your desk here.

 3              A.   Yes, sir.

 4              Q.   Who were you talking to?

 5              A.   Just earlier?  Now I'm -- I'm not sure

 6    if I was talking or lowering the volume -- I'm not

 7    sure -- or turning it up.

 8              Q.   I lost -- I'm sorry.  There was a

 9    glitch.  You kind of froze there for a second.

10              MR. MILSTEIN:  Dana, I'll represent to

11    you that I called him.  He was making notes, and I

12    instructed him not to make notes during the

13    deposition.

14              MR. EISMEIER:  Okay.  Thank you for

15    clarifying, Counsel.  Okay.

16              Q.   (BY MR. EISMEIER)  Let's go -- let's go

17    back to kites.  How did you know what a kite was?

18              A.   I was told that if I sent a kite, I

19    would get a response -- a response or a request,

20    whatever the kite was about, yes, sir.

21              Q.   Do you remember who told you that?

22              A.   I do not.  One of the detainees, I'm

23    sure, or one of the guards.  I don't recall.

24              Q.   Okay.  Do you call them "guards" or

25    "detention officers"?
```

```
 1                  MR. MILSTEIN:  Object to the form,

 2     foundation.

 3          Q.   (BY MR. EISMEIER)  Can you explain why?

 4                  MR. MILSTEIN:  Same objection.

 5          A.   Maybe their attitudes, maybe their

 6     language.  I'm not sure, but, yeah, I'm sure that

 7     they -- they got along better with others, sure.

 8          Q.   (BY MR. EISMEIER)  Is it fair to say

 9     that some detainees got along better with the

10     detention officers than maybe you did -- or strike

11     that.

12          A.   Of course, yes.

13                  MR. MILSTEIN:  Object to form.

14          Q.   (BY MR. EISMEIER)  People are different.

15          A.   That, they are.

16          Q.   Right.  The detainees were different,

17     so --

18          A.   Sure.  So were the guards, yes, sir.

19                  MR. MILSTEIN:  Same objection.

20          Q.   (BY MR. EISMEIER)  So were the guards.

21     Okay.  Can you tell me what your daily recreational

22     activities were while you were in detention?

23          A.   Get up, eat breakfast, walk around, read

24     a book, draw, watch TV, communicate with other

25     detainees, eat lunch, clean up a little, and either
```

1    work out at the rec area or draw or read a book, walk

2    around, talk to the detainees, see them at dinner, you

3    know, maybe take a nap, then again, you know, eat

4    dinner, clean up, et cetera, hang out with detainees

5    and try to make the best of the time in there.

6            **Q.    Great.  Was the food okay?**

7            A.    No, not at all, sir.

8            **Q.    Did you ever tell people that the food**

9    **was good?**

10            A.    People that I talked to on the phone?

11            **Q.    Yeah.**

12            A.    Yeah, because they're my friends and

13    family, and I don't -- I didn't want them to worry

14    about me, so I, you know, presented it to be real nice

15    in there when it really wasn't.

16                    I just didn't want to -- because I

17    love -- like my friend Ly Warren, I love the guy and

18    he loves me, and I don't want him worried about me.

19    And the same with Tom and the same with my family.

20    You know, I told them it was great in there so they

21    wouldn't, you know, worry about me and be concerned of

22    my staying there.  So I pictured it real pretty when

23    it really wasn't.

24                    The food was very awful.  People got

25    sick in groups lots of times.  We would complain and

1    nothing would really change.  The moldy shower

2    curtains, I sent them several kites telling them they

3    were unhealthy, et cetera, et cetera, and they never

4    responded.  And I could go on and on, but, yeah, it

5    was not the prettiest place.

6        **Q.    You're saying that you sent kites to ICE**

7    **about the showers?**

8            MR. MILSTEIN:  Objection.

9        A.    I don't know if it was ICE or the guards

10   from GEO, but almost every day, I would send a kite

11   complaining about the moldy showers, about the bad

12   food.  And, of course, nothing got done.

13       **Q.    (BY MR. EISMEIER)  However --**

14       A.    In the three months I was there, they

15   never replaced the moldy shower curtains.  Very

16   unhealthy.

17       **Q.    I just want to clarify.  You're saying**

18   **you sent a written complaint almost every day; is that**

19   **right?**

20       A.    Yes, sir.  And not just myself but other

21   detainees.  We would sit down and make a complaint

22   about "Please change the shower curtains.  Somebody is

23   going to get real sick, if they already aren't."  And

24   nothing got done.  I believe their response was

25   "They're on back order."  And for the three months I

1    was there, I've never seen a new -- new curtain being

2    installed.

3         **Q.   Okay.**

4         A.   So we've got to shower in pretty bad

5    situations.

6         **Q.   But you recall making a written**

7    **complaint about the showers, specifically, on many**

8    **occasions, right?**

9         A.   Yes, sir, and the food.

10        **Q.   Okay.  Let's go back -- let's go back to**

11   **the food for a second.  Let's look -- let's listen to**

12   **another recording.**

13             (Deposition Exhibit 5 was remotely

14   introduced.)

15             (At this time an audiotape was played.)

16             TELMATE OPERATOR:  This is a Telmate

17   automated operator with a free call from --

18             MR. MENOCAL:  Alex Menocal.

19             TELMATE OPERATOR:  -- a detainee at

20   Aurora ICE Processing Center.  This call is subject to

21   recording and monitoring.  Press 1 or star to accept

22   the call.  To . . .  Thank you for using Telmate.

23             MR. MENOCAL:  Hello.

24             MS. ALEXIS MENOCAL:  Hello.

25             MR. MENOCAL:  Hi.

```
 1            Q.    Okay.

 2            MR. MILSTEIN:  Foundation.

 3            Q.    (BY MR. EISMEIER)  Mr. Menocal, we've

 4   been going a while.  I know we've had a couple of

 5   breaks.  Do you want to take a break?

 6            A.    I'm okay.  I mean, if you guys want one,

 7   that's okay with me.

 8            Q.    I'm more concerned about our court

 9   reporter than anybody else because she has to --

10            A.    Well, there you go.  Ask her.

11            MR. EISMEIER:  How are you doing, Tracy?

12            THE REPORTER:  I'm fine.

13            MR. EISMEIER:  Let's keep going, then.

14            Q.    (BY MR. EISMEIER)  I would like to ask

15   you about the Voluntary Work Program.  I dropped in

16   Exhibit 8.  Mr. Menocal, I'm going to try to bring it

17   up on your screen.  All right.

18            (Deposition Exhibit 8 was remotely

19   introduced.)

20            Q.    Mr. Menocal, can you --

21            A.    Yes, sir.

22            Q.    -- can you see the document on your

23   screen now?

24            A.    No, sir.

25            Q.    Let's try it now.  See if it comes up.
```

```
 1   Tell me if you can -- hopefully you can see it.

 2          A.   I see a document now, yes.

 3          Q.   Okay.  Thank you.  All right.  You see

 4   this says "Detainee Voluntary Work Program Agreement."

 5   Do you see that?

 6          A.   Yes, sir.

 7          Q.   All right.  Have you ever seen this

 8   document before?

 9          A.   Yes, sir.

10          Q.   Where did you see it?

11          A.   Probably when I was detained at GEO.

12          Q.   All right.  Did you sign a document like

13   this to join the Voluntary Work Program?

14          A.   Probably, yes, sir.

15          Q.   All right.  When you signed up for the

16   Voluntary Work Program, I believe you signed up in the

17   middle of July.  Does that sound right?

18          A.   Yeah.

19          Q.   And so you had been there for, what, a

20   month and ten days or something at that point?

21          A.   Probably, yes.

22          Q.   All right.  And when you signed up for

23   it, you -- why did you sign up for it?

24          A.   First, I just asked if I could clean the

25   recreation area, and I didn't sign any kind of paper.
```

1    They asked me why.  I said because I spend a lot of

2    time there, and I want to exercise, walk around, jog,

3    and clean the area, so they allowed me to, you know,

4    wipe down bars, wipe down doorknobs, sweep, et cetera,

5    so I could hang out in a clean environment.

6         **Q.    Okay.  And then eventually you got a job**

7    **at the Voluntary Work Program as a trustee; is that**

8    **right?**

9         A.    Yes.  I believe somebody got released,

10   went somewhere else, and they asked me, since I was

11   already volunteering to clean the recreation yard, if

12   I was interested in serving food or -- or, I believe,

13   either clean up for the detainees after they ate or

14   set up, and I said -- I accepted.

15        **Q.    Okay.  And you were -- is it fair to say**

16   **you were pleased to get -- to get that job?**

17        A.    I don't know about pleased, but, you

18   know, it made time in there go quicker.  And, yeah, I

19   was doing my everyday regular routine.  I would do

20   something different, like serve food or whatever I was

21   assigned to do.

22        **Q.    And when you signed up, did you**

23   **understand that you would get paid a dollar a day?**

24        A.    Yes, sir.  And that's not why I did it.

25   I mean, I had money on my books.  I didn't do it for

 1    the money.  I just, like I said, did it to pass time

 2    so it could go by quicker and, you know, break the

 3    old routine of everyday routine.

 4          **Q.    Okay.  Okay.  I'm going to take this**

 5    **document down.**

 6                **Okay.  And I'm going to play a few phone**

 7    **calls now which had to do with -- it's around July 27**

 8    **or 28.  Do you -- do you recall actually becoming a**

 9    **trustee around July 27 or 28 of 2014?**

10          A.    If that's what they call the employees

11    that serve food, yeah, I guess I was a trustee.  I

12    don't recall the date, but, yeah, somewhere around

13    that area.

14          **Q.    I'm going to just play a couple of**

15    **recordings just to see if that -- if this confirms**

16    **that recollection, okay?**

17          A.    Sure.

18                (Deposition Exhibit 9 was remotely

19    introduced.)

20          **Q.    I'm going to play Exhibit 9, which is**

21    **from July 27, 2014, which is denominated No. 30.**

22                (At this time an audiotape was played.)

23                TELMATE OPERATOR:  This is a Telmate

24    automated operator with a free call from --

25                MR. MENOCAL:  Alex Menocal.

```
 1                  (At this time the audiotape was

 2      concluded.)

 3            Q.   (BY MR. EISMEIER)  Mr. Menocal, is that

 4      you in this recording, which is Exhibit 11?

 5            A.   Yes, sir.

 6            Q.   And who were you talking to?

 7            A.   I have no idea.  I couldn't recognize

 8      the voice.

 9            Q.   Okay.  But not -- it's not a family

10      member?

11            A.   No, sir.

12            Q.   Okay.  Is it fair to say based on

13      Exhibit 11 --

14                  MR. MILSTEIN:  Objection.  Can we go off

15      the record for a second?

16                  THE VIDEOGRAPHER:  Going off the record.

17      The time is 5:39 p.m. Greenwich Mean Time, 11:39 a.m.

18      Mountain Time.

19                  (Recess taken, 5:39 p.m. to 6:02 p.m.

20      GMT; 11:39 a.m. to 12:02 p.m. MDT.)

21                  THE VIDEOGRAPHER:  We are back on the

22      record.  The time is 6:02 p.m. Greenwich Mean Time,

23      12:02 p.m. Mountain Time.

24            Q.   (BY MR. EISMEIER)  Hello, Mr. Menocal.

25            A.   Hello, sir.  I'm back.
```

1          Q.    We're back.  Did you talk to anybody

2    over the break?

3          A.    Very little.  Just my daughter to switch

4    computers, but that's all.

5          Q.    Okay.  You didn't talk about this

6    lawsuit?

7          A.    Oh, no, not at all.

8          Q.    Okay.  Let's switch topics a little bit.

9    And remember at the beginning of the deposition we

10   talked about how you got a sleeping living area and a

11   day living area, right?

12         A.    Yes, sir.

13         Q.    And the day living area is where the

14   tables are and the TVs and that sort of thing, right?

15         A.    Yes, correct.

16         Q.    When you first got to the GEO Aurora

17   facility, what were you told about how the day living

18   area would be cleaned?

19         A.    They had a schedule.  You know, you

20   would -- after each meal, you know, people would clean

21   up, but there was a rotation where (inaudible) -- your

22   cell we (inaudible) -- the area three times a day, in

23   the morning -- or after each meal, I should say.

24   And -- and, yeah.  So one cell would do that one day.

25   The next cell would do it the next day, and so on and

```
 1   so forth.  And that's where if we didn't do the work

 2   that they told us to do, then they would put us in

 3   isolation.  And that's why I thought it was very

 4   unfair.

 5        Q.   Let me ask you a question.  When you

 6   first got to GEO, what were you told by anyone at ICE

 7   or anybody at GEO about cleaning the day living area?

 8             MR. MILSTEIN:  Object to form, asked and

 9   answered.

10             THE REPORTER:  Mr. Menocal, could I

11   please have you get closer to the microphone?

12             THE DEPONENT:  Yeah.  I'm sorry.  Yes.

13        A.   But, yeah, that's what I was told

14   that -- that, you know, we rotate, and each cell has

15   to clean the area when it's their turn, and if you

16   guys didn't do it, you would go to the hole,

17   isolation.

18        Q.   (BY MR. EISMEIER)  Who told you that?

19        A.   The detainees, and I'm sure the guards

20   too, but for sure the detainees told me that.  You

21   know, it's not like you have a choice not to do it.

22        Q.   You don't recall specifically a guard

23   telling you that, do you?

24        A.   It could have been, but I know for sure

25   one of -- you know, some of the detainees, we all knew
```

 1    that -- you know, that it was a rotation thing, and if

 2    one or the whole cell did not do their cleaning, they

 3    would be punished.

 4            **Q.   Okay.  Did you see an orientation video**

 5    **when you arrived at the GEO facility?**

 6            A.   No, sir, I don't recall seeing a video.

 7    I recall seeing a handbook, a rule book, but I don't

 8    recall seeing a video.

 9            **Q.   Okay.  Here.  Let's -- I'm going to show**

10    **you a handbook here, and I want to see if you**

11    **recognize it, so give me a second.**

12            (Deposition Exhibit 13 was remotely

13    introduced.)

14            **Q.   Mr. Menocal, tell me when you can see a**

15    **document on your screen.**

16            A.   I do see it, yes, sir.

17            **Q.   Okay.  And there's a picture -- I'm**

18    **showing you a picture right now, and I'm scrolling**

19    **down, and it says "National Detainee Handbook."  Do**

20    **you see that?**

21            A.   I do.

22            MR. MILSTEIN:  Dana, could you scroll

23    down further?  I can't see if this is marked.

24            MR. EISMEIER:  Deposition Exhibit 13.

25            MR. MILSTEIN:  Okay.

```
 1            Q.    (BY MR. EISMEIER)  Do you see that,

 2    Mr. Menocal?

 3            A.    I do.

 4                  MR. EISMEIER:  And, Brandt, you should

 5    be able to open it in the chat room.

 6                  MR. MILSTEIN:  Yeah.  I'm hesitant to

 7    because I -- it's glitched my computer if I open any

 8    of the files you put in chat.

 9                  MR. EISMEIER:  Okay.  But you can see --

10    you can see it on the screen share now?  Can you see

11    that?

12                  MR. MILSTEIN:  I can, thank you, yeah.

13                  MR. EISMEIER:  Okay.  Good.

14            Q.    (BY MR. EISMEIER)  All right.

15    Mr. Menocal, do you recognize Exhibit 13?

16            A.    Yes.

17            Q.    Is this the detainee handbook you

18    mentioned a bit ago?

19            A.    Yeah.  Yes, sir, it is.

20            Q.    And were you given this when you arrived

21    at the GEO facility?

22            A.    I believe so, yes, sir.

23            Q.    Did you -- when you -- you got it, did

24    you read it?

25            A.    Yes.
```

1        Q.    Okay.  And you received it in English,

2    right?

3        A.    Yes, sir, I believe so.

4        Q.    And you read -- you read and write

5    English, right?

6        A.    Yes, sir.

7        Q.    And was there -- did you believe that

8    there was anything in this particular handbook that

9    provided any possible discipline for failing to clean

10   in the day living area?

11       A.    I don't recall specifically.  I remember

12   reading it, but I don't recall it saying that or not.

13       Q.    Sitting here today, do you recall

14   anything in here having to do with discipline for

15   failing to clean a day living area?

16       A.    Yeah.  Like I said, everybody knew that

17   if we didn't follow the procedures, we would be -- you

18   know, we would be put in the hole if we didn't do what

19   we were told, basically.

20       Q.    Okay.  But is it fair to say what you

21   knew about that came from other detainees and not from

22   this handbook?

23             MR. MILSTEIN:  Object to form.

24       A.    I recall the detainees telling me, yeah,

25   what I just told you.  I don't recall the book stating

 1    any of that, no.

 2         Q.    (BY MR. EISMEIER)  Okay.  Just a second.

 3              Is there anything in this particular

 4    handbook that you saw that was threatening to you,

 5    Mr. Menocal?

 6         A.    Can you repeat that, please?

 7         Q.    Sure.  Was there anything in this

 8    handbook that was threatening to you?

 9              MR. MILSTEIN:  Objection.  He hasn't had

10    a chance to look through the whole handbook today.

11         A.    Yeah, I don't recall exactly what it

12    said, and I don't recall what I thought about it at

13    the time, to be honest with you.  It's been a long

14    time.  And I know I read it, but I don't recall if I

15    agreed with whatever they wrote in there or not.

16         Q.    (BY MR. EISMEIER)  Okay.  Were you

17    personally ever disciplined for failing to clean in

18    the day living area?

19         A.    Not personally, no.

20         Q.    Okay.  Were you aware of anyone who was

21    disciplined for failing to clean in the day living

22    area?

23         A.    Yes.  I actually witnessed a group of

24    people that did not follow the procedure, the rules,

25    and they were taken away, and they were put in

```
 1   isolation.  And they came back, I believe, a week

 2   later, with a different colored uniform.  And I asked

 3   people what's up, and they said that they got a new

 4   charge for not obeying or following the rules, I

 5   believe a higher risk detainee and different colors,

 6   whatever it was, from green to red, and I do recall

 7   that.  I witnessed it through a glass window from one

 8   pod to the other.  I noticed when they took them away

 9   and I noticed when they came back.

10          Q.   Okay.  You've just said a lot, so can we

11   break that down a little bit?

12          A.   What --

13          Q.   I can take the handbook off here --

14          A.   Oh.

15          Q.   -- by the way, so that, yeah, we can see

16   better.

17               Okay.  So can you tell me who was

18   involved that was -- that you say was taken away?  Do

19   you remember any of the names?

20          A.   I do not know.  Like I said, it was a

21   different pod.  I didn't know any of them or knew

22   their names.  I never even talked to them because

23   there was glass partitions or walls in between us, but

24   you could see through the window what was going on in

25   the other pod.
```

```
 1              Q.    Okay.  So you were in -- in your pod,

 2    right?

 3              A.    Correct.

 4              Q.    And you saw through the glass to a

 5    different pod, right?

 6              A.    Yes, sir.

 7              MR. MILSTEIN:  Objection, cumulative.

 8              Q.    (BY MR. EISMEIER)  And could you --

 9    could you hear through the glass pod [sic] what was

10    being said?

11              A.    No, sir.

12              Q.    Okay.  So tell me what you -- tell me --

13    just bit by bit, tell me exactly what you saw.

14              A.    I saw a group of people.  I saw the

15    guards come in and take a group of four people,

16    maybe -- it could have been six.  You know, they put

17    them together and then they took them away, and I

18    asked, you know, people in there what's going on.

19    They said the reason they're taking them away is

20    because they didn't do their daily cleanup.  And, you

21    know, you're supposed to do it, so they put them in

22    isolation to make an example, I guess, out of them,

23    so, you know, we would notice or we would know that --

24    you know, that it's part of the procedure to clean or

25    be sent to the hole, basically.
```

1          Q.    Okay.  You said someone said this to

2    you, right?

3          A.    Yeah, one of the detainees.  I don't

4    recall their name or which one it was, but yeah.

5          Q.    Okay.

6          A.    But everybody knew after a while when

7    you're in there, you know, and word gets around that,

8    you know (inaudible), and obviously, that was a big

9    one, to do it or go to the hole.

10         Q.    So all of your knowledge on this point

11   was what someone said happened in this incident,

12   right?  Another detainee said?

13         A.    Yeah.  And, again, like I said,

14   everybody knew, you know, and the word gets around.

15   You know, important stuff like that, you know, going

16   to the hole is not a pretty place to go, so,

17   obviously, you know, it takes to (inaudible) but,

18   yeah, that's a no-no, or, you know, you better comply

19   or --

20         Q.    Okay.

21               THE REPORTER:  I'm sorry.  I'm having a

22   really hard time hearing you, Mr. Menocal.

23               THE DEPONENT:  I'm sorry.

24         A.    Yeah, that's the reason we all did it,

25   because we all knew that if we didn't follow the

 1    rules, that would happen to us, so . . .

 2          Q.    (BY MR. EISMEIER)   Okay.   And just to be

 3    clear, you didn't know any of the people in the other

 4    pod who were taken away, right?

 5          A.    Right.

 6          MR. MILSTEIN:   Objection, asked and

 7    answered.

 8          Q.    (BY MR. EISMEIER)   And you couldn't hear

 9    anything having to do with that particular incident,

10    right?

11          MR. MILSTEIN:   Objection, cumulative,

12    asked and answered.

13          MR. EISMEIER:   Let's please keep the

14    speaking objections down.

15          Q.    (BY MR. EISMEIER)   And so the knowledge

16    that you have is based upon what other detainees told

17    you as opposed to what a guard told you or someone

18    from ICE or GEO; is that right?

19          MR. MILSTEIN:   Objection, compound,

20    asked and answered.

21          A.    Again, from what I can recall, yeah,

22    the -- everybody knew that that was the procedure, so,

23    yeah, I don't know if it was the guards or both the

24    detainees and the guards told me, and that's how I

25    found out where they were headed or why -- we had to

 1   clean and if not, you know, we would be punished.  So

 2   like I said, everybody knew it, you know.

 3          The hole is not a pretty place, so, you

 4   know people would basically do everything, and, you

 5   know, if you didn't, you would go to the hole, so,

 6   yeah, it was very well known that, you know, you had

 7   to follow the rules or you would be punished.

 8          **Q.   (BY MR. EISMEIER)  And -- okay.  And you**

 9   **don't know if the people who were -- that you saw**

10   **through the glass were being taken away because they**

11   **were in a fight, right?**

12          MR. MILSTEIN:  Objection.

13          A.   No, they were -- it was their turn to

14   clean, and they didn't do it, and so they took them

15   away to isolation, basically.

16          **Q.   (BY MR. EISMEIER)  But you didn't have**

17   **personal knowledge of it.  You didn't watch through --**

18   **you didn't watch through the walls.  You couldn't hear**

19   **what was going on in the other pod, correct?**

20          A.   Through the glass window.

21          MR. MILSTEIN:  Objection, compound.

22          A.   You could see the guards come in.  I

23   could see the guys being gathered.  I could see the

24   guards take those detainees that didn't do their work

25   away.  And, yeah, maybe a week or some days later,

1    they came back, and I could see them through the glass

2    wall -- window, I'm sorry.  And they were back, and

3    like I said, they were in different suits -- colored

4    suits.  And, again, I asked somebody, and they told me

5    that, yeah, the reason they're in different suits is

6    because they -- they got a new charge, I believe, and

7    that's why they put them in, you know, red suits,

8    higher risk detainees, is what I was told.

9            Q.   (BY MR. EISMEIER)   Okay.  Did you

10   witness the four people who were taken away before the

11   guards took them out?

12              MR. MILSTEIN:  Objection, misstates

13   prior testimony.

14              MR. EISMEIER:  Brandt, really, please,

15   it's coaching.

16              MR. MILSTEIN:  Well, you're telling him

17   four, and he testified earlier it was either four or

18   six.

19          A.   There might have -- there were some

20   cells that had four people in it; there were some

21   cells that have six to eight and maybe even more.

22   But, yeah, that's -- I just said a number four because

23   I do not recall if it was four or six or eight.

24          Q.   (BY MR. EISMEIER)   Right.  Did you spend

25   a lot of time seeing what went on in other dorms?

 1          A.   I walked around a lot.  You know, I
 2   cleaned the rec yard, so I could see.  Yeah, I -- I
 3   would notice other pods.  And the way the building is
 4   laid out, like an octagon, almost, and you could see
 5   more than one pod from your pod.
 6          Q.   Right.  Was -- now, you understand that
 7   a detainee could be sent to segregation for fighting,
 8   right?
 9          A.   Of course, for fighting, for, yeah,
10   different situations, sure.
11          Q.   For being insolent or insulting to
12   others?
13               MR. MILSTEIN:  Compound.
14          A.   Or a threat or having contraband, sure,
15   there's a number of things why they would send you to
16   isolation.
17          Q.   (BY MR. EISMEIER)  Right.  And, in fact,
18   I think you became a trustee when one of the other
19   trustees got in a fight, right?
20          A.   Yes, sir.
21          Q.   Okay.  And in your lawsuit, you're not
22   complaining that sending someone to segregation for
23   getting in a fight is wrong; is that correct?
24               MR. MILSTEIN:  Objection.
25          A.   I don't know about isolation, but, yeah,

1    I'm sure that we have to be reprimanded if -- if part

2    of the rule is not to fight or not to do something,

3    I'm sure they're going to, you know, follow the -- the

4    procedure, so yeah.

5            **Q.    (BY MR. EISMEIER)    That's not part of**

6    **the class action lawsuit, detainees that were sent to**

7    **segregation for fighting or being insolent; is that**

8    **right?**

9            A.    Yeah.    From what I recall, no, that --

10    that is not part of the lawsuit, no.

11           **Q.    It's -- instead it's about failure to**

12    **clean; is that your understanding?**

13           MR. MILSTEIN:    Objection, misstates the

14    prior testimony.

15           A.    Basically, yeah, the -- I don't think

16    it's fair that if we didn't do what you were told, you

17    would be sent to isolation.    You know, it's a private

18    company.    Why do we have to do the cleaning?    I think

19    it's very unfair, and that's why we're suing them for

20    unfairness.    We are not slaves.    We are detainees.

21    And we should be not forced to clean.    That's wrong.

22    If I don't want to clean, I don't want to clean.

23    Don't send me to isolation.    You know, I'm sure

24    there's other ways of trying to make us do what

25    they're supposed to do, but, yeah, isolation is not

 1   the answer.  It's horrible in there.  It's inhumane.

 2   It's -- it's not right.

 3          Q.   (BY MR. EISMEIER)  Let me ask you a

 4   question about that.  You were never sent to

 5   segregation; is that right?

 6          A.   The hole?  Like I said, I believe it's

 7   the same thing, medical isolation and, you know,

 8   regular isolation.  It's a room with a window looking

 9   to the hallway where no one walks, and you have

10   nothing, no book, no television, no -- no contact with

11   anybody.  Maybe you'll see a guard once in a while to

12   drop your meal off, but it's pretty -- pretty lonely,

13   pretty -- pretty hard.

14          Q.   Let's put aside the medical facility,

15   okay?

16          A.   Sure.

17          Q.   Okay.  Putting aside the medical

18   facility, you were never in segregation.  I say

19   "segregation"; you say "the hole."  You were never in

20   segregation; is that right?

21          A.   No.

22               MR. MILSTEIN:  Object, misstates

23   testimony.

24          A.   Well, solitary confinement, I believe,

25   is the same cell where they keep medical isolation

 1   people.  I think it's the same thing as -- you know,

 2   whether you did something wrong or got in a fight or

 3   didn't follow the rules, it's in the same area.  It's

 4   just, like I said, a cell with a window and a bed and

 5   maybe a toilet and a sink, and that's all.

 6       **Q.   (BY MR. EISMEIER)   Okay.  Well, you**

 7   **talked about the medical facilities earlier, right?**

 8       A.   The medical isolation where I was held,

 9   yeah.

10       **Q.   If you got in a fight, you wouldn't be**

11   **sent to the medical unit for isolation, correct?**

12       A.   Like I said, I think they're the same

13   thing.  Maybe across -- in the same hallway you've got

14   all these rooms that are isolation rooms and, you

15   know, more than one person.  So one guy could be there

16   for a medical reason and another guy could be there

17   for a fight.  But, again, you don't see each other.

18   They're isolated.

19       **Q.   You don't -- I'm sorry.**

20          **You don't know if -- if medical**

21   **isolation and segregation are the same thing, do you?**

22          MR. MILSTEIN:  Objection, argumentative,

23   asked and answered.

24       A.   I think that's what I was trying to say,

25   that it's the same thing.  You know, it's just a room

 1                    (At this time an audiotape was played.)

 2                    TELMATE OPERATOR:  This is a Telmate

 3      automated operator with a free call from --

 4                    MR. MENOCAL:  Alex Menocal.

 5                    TELMATE OPERATOR:  -- a detainee at

 6      Aurora ICE Processing Center.  This call is subject to

 7      recording and monitoring.  Press 1 or star to accept

 8      the call.  To deny this call, press 2.  Thank you for

 9      using Telmate.

10                    MR. JONES:  Hey, what's up, bro?

11                    MR. MENOCAL:  Nothing.  What the hell

12      are you doing?

13                    MR. JONES:  I just got my hair cut.

14      I've got my 30-year reunion coming up this weekend.

15                    MR. MENOCAL:  Nice.

16                    (At this time the audiotape was

17      concluded.)

**18             Q.   (BY MR. EISMEIER)  Mr. Menocal, who --**

**19      was that your voice?**

20             A.   That is my voice.

**21             Q.   And who are you talking to?**

22             A.   Sounds like my good friend Chad Jones.

**23             Q.   Chad Jones?  Okay.  I'm going to go up**

**24      to minute 3:25 to 3:47.**

25                    (At this time an audiotape was played.)

```
 1              MR. MENOCAL:  And I did a month in

 2   Jeffco, a month in Adams, and here I am doing a

 3   month -- three weeks here so far.  But, yeah, like I

 4   said, there's no niggers, no white boys, and the grub

 5   is good, and --

 6              MR. JONES:  You don't -- you don't --

 7   not (inaudible).  I believe 10 bucks, maybe 20 bucks

 8   on Thursday.

 9              MR. MENOCAL:  Whatever you can.  But

10   write me a letter too and you just --

11              (At this time the audiotape was

12   concluded.)

13              MR. EISMEIER:  All right.

14              MR. MILSTEIN:  I'll put an objection on

15   the record as to the relevancy of this recording,

16   obviously prejudicial, and we'll move to strike.

17         Q.   (BY MR. EISMEIER)  Mr. Menocal, would

18   you agree with me that at least you were telling third

19   parties and nonfamily members that the grub was good?

20         A.   Again, I did, but the reason I told him

21   that is so they wouldn't worry about me.  I consider

22   Mr. Chad Jones like a brother to me.  I love him, he

23   loves me a lot, and I don't want him to be worried.

24   I'm not going to tell him that I get sick every time I

25   eat the food, or the other detainees the same.  So of
```

1  course I smother and tell him I'm doing great in

2  there.  I don't want him to be worried about me.  I

3  really love my family and my close friends, so that's

4  the reason I -- you know, I painted that picture so

5  pretty, so they could think I'm doing well in there,

6  sir.

7            MR. EISMEIER:  It's -- we've been going

8  about an hour.  Let's take a break.  I'm going to wrap

9  up here before much longer.  So I'll see what I've got

10  and then we'll come back.  I don't think it will be a

11  whole lot longer, okay?

12            MR. MILSTEIN:  How much time do you

13  need, Dana?

14            MR. EISMEIER:  Let's take ten minutes.

15            MR. MILSTEIN:  Okay.

16            THE VIDEOGRAPHER:  Going off the record.

17  The time is 8:26 p.m. Greenwich Mean Time, 2:26 p.m.

18  Mountain Time.

19            (Recess taken, 8:26 p.m. to 9:05 p.m.

20  GMT; 2:26 p.m. to 3:05 p.m. MDT.)

21            THE VIDEOGRAPHER:  We are back on the

22  record.  The time is 9:05 p.m. Greenwich Mean Time,

23  3:05 p.m. Mountain Time.

24       Q.   (BY MR. EISMEIER)  Okay.  Mr. Menocal, I

25  just want to clear up something related to what your

 1    attorney and I talked about a little bit ago.  Earlier

 2    today we reviewed a discovery response from you which

 3    you had signed.  Do you recall that?

 4          A.    Yes.

 5          Q.    And in that one -- I read you this.  In

 6    that one, that discovery response that you signed, you

 7    said that you did not have a mental injury and aren't

 8    making a claim for mental injury, right?

 9          A.    Like I said, maybe it's not in the

10    lawsuit, but it sure -- it -- that time I did spend in

11    there, it did disturb me, and I'm sure I'll never

12    forget about it, so there is something there.

13          Q.    All I'm asking you to do is confirm what

14    your attorney --

15          A.    It just -- yeah, it will be with me

16    forever.

17          Q.    I'm just asking you to confirm what your

18    attorney and I stipulated to, that you're not making a

19    claim in this lawsuit for mental injury.  Can you

20    confirm that?

21          A.    Yes.

22          Q.    All right.  Thank you.

23                All right.  During the various breaks

24    today and having talked about the various class

25    representatives and any of the names, you remember all

```
 1              REPORTER'S CERTIFICATE

 2   STATE OF COLORADO          )
                                )  ss.
 3   ARAPAHOE COUNTY            )

 4

 5          I, TRACY C. MASUGA, Registered
     Professional Reporter, Certified Realtime Reporter,
     and Notary Public 19924005553, State of Colorado, do
 6   hereby certify that previous to the commencement of
     the examination, the said ALEJANDRO MENOCAL declared
 7   his testimony in this matter is under penalty of
     perjury; that the said examination was taken in
 8   machine shorthand by me remotely and was thereafter
     reduced to typewritten form; that the foregoing is a
 9   true transcript of the questions asked, testimony
     given, and proceedings had.
10
            I further certify that I am not employed
11   by, related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of
12   this litigation.

13          IN WITNESS WHEREOF, I have affixed my
     signature this 27th day of July, 2020.
14
            My commission expires April 24, 2024.
15

16   __X__ Reading and Signing was requested.

17   _____ Reading and Signing was waived.

18   _____ Reading and Signing is not required.

19

20

21   _____
     Tracy C. Masuga
22   Registered Professional Reporter
     Certified Realtime Reporter
23

24

25
```