# Exhibit 2

Stuart Grassian 07/23/2020                          Confidential
ALEJANDRO MENOCAL vs GEO GROUP

1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
2
      Civil Action No. 1:14-cv-02887-JLK-MEH
3     _____

4                     VIDEOTAPE DEPOSITION OF:
              STUART GRASSIAN, M.D. - July 23, 2020
5                       Via RemoteDepoTM
              (Confidential Designations Pending)
6     _____

7     ALEJANDRO MENOCAL, MARCOS BRAMBILA,
      GRISEL XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA,
8     JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO VIZGUERRA,
      and DEMETRIO VALERGA, on their own and on behalf of
9     all others similarly situated,

10    Plaintiffs,

11    v.

12    THE GEO GROUP, INC.,

13    Defendant.
      _____

14
                      PURSUANT TO NOTICE, the videotape
15    deposition of STUART GRASSIAN, M.D., was taken on
      behalf of the Defendant in Middlesex County,
16    Massachusetts, on July 23, 2020, at 3:33 p.m. GMT,
      9:33 a.m. MDT, before Tracy C. Masuga, Registered
17    Professional Reporter, Certified Realtime Reporter,
      and Notary Public within Colorado appearing remotely
18    from Arapahoe County, Colorado.

19

20

21

22

23

24

25

1    **ways:  It indicates both the rates of self-harm in**

2    **segregation, but also indicates that self-harm is**

3    **present outside of solitary confinement; is that**

4    **correct?**

5            A.    Yeah.  I mean, certainly it's no

6    surprise that there's a certain incidence of

7    self-harming behavior that occurs in any population.

8    But when you -- this paragraph speaks to the fact that

9    the stress of solitary confinement creates a risk

10   that's seven or eight times as great as it is for

11   those who have not been housed in solitary.

12           **Q.    Okay.**

13           A.    But I can't -- it doesn't help you to

14   know whether the incidence of self-harming behavior in

15   the general population in a prison is greater than the

16   incidence for that population when they're not in

17   prison.  We don't have any information about that.

18           **Q.    But this study does say that -- it**

19   **conducted a study, and there are individuals who**

20   **commit self-harm in general population, correct?**

21           A.    Right.  Of course.  I mean, there are

22   individuals who commit self-harming behavior in

23   general population.  There are people who commit

24   self-harming behavior out in the community.  We know

25   that, of course.

Stuart Grassian 07/23/2020                    ConfidentialPage 102
ALEJANDRO MENOCAL vs GEO GROUP

1      **Q.   And there are individuals in segregation**

2   **who do not commit self-harm?**

3          A.   Absolutely.

4      **Q.   Okay.  So is it fair to say that each**

5   **individual's reaction to segregation is different?**

6          MS. DEMPSEY:   Object to form.

7          A.   Certainly some people are far more

8   severely affected by solitary than others.  However,

9   there's a certain baseline of psychiatric harm that's

10  associated with being in the condition.  But there is

11  significant difference.  I mean, some people tolerate

12  it and do not engage in self-harming behavior or

13  become psychotic, certainly.

14     **Q.   (BY MS. SCHEFFEY)  All right.  And then**

15  **I'm going to turn to page 19 of the report, which, for**

16  **the record, is P00004079.**

17         A.   Okay.

18     **Q.   So there it states, "[Even after] a few**

19  **days of confinement," do you see that, "of solitary**

20  **confinement"?**

21         A.   Yes.

22     **Q.   "The brain wave (EEG) demonstrates an**

23  **exaggerated response to external stimuli."  Did I read**

24  **that correctly?**

25         A.   Yes, you did.

U.S. LEGAL SUPPORT, INC
303-832-5966

1          Q.    And footnote 29 appears at the end of

2    that sentence, correct?

3          A.    Yes.

4          Q.    And in footnote 29 you cite an article

5    called "Changes in EEG alpha frequency and response

6    latency during solitary confinement"; is that correct?

7          A.    Yes, I do.  Yes.

8          Q.    How long were the individuals in

9    segregation in the study cited in footnote 29?

10         A.    Well, footnote 29 follows the statement

11   "After even a few days of solitary

12   confinement . . . ."  So I don't know, as I sit

13   here -- I mean, Gend- -- this was a study by Gendreau.

14   So you have the baseline EEG, and then at a certain

15   period of time -- I don't know how many days -- they

16   did another EEG and showed this exaggerated response

17   to external stimuli.  I don't remember, as I sit here,

18   how many days that was before they did that second

19   EEG.

20         Q.    Would it refresh your recollection if

21   you had the study in front of you?

22         A.    I rather would -- I mean, I certainly

23   could read the -- if I had the study in front of me, I

24   could find out how many days it was before they did

25   that second study, second EEG study, of course.

```
 1    conditions.  Well, of course.  How could it be

 2    anything else?  How could it not be that?  That's a --

 3    there's no substance to that question.

 4             Q.   (BY MS. SCHEFFEY)  Okay.  You've

 5    previously likened severe restriction to wintering

 6    over in the Antarctic.  Do you remember that from your

 7    Washington article?

 8             MS. DEMPSEY:  Object to form.

 9             A.   Right.  I did not liken severe

10    restriction to wintering over.  What I said is that

11    people who wintered over in the Antarctic had

12    experienced enough restriction of environmental and

13    social stimulation that many became troubled and ill

14    from it, and there's a body of literature concerning

15    that.

16             Q.   (BY MS. SCHEFFEY)  Okay.  And so how

17    long do people who winter over in the Antarctic stay

18    in a -- in a state of severe restriction?

19             MS. DEMPSEY:  Object to form.

20             A.   People who winter over in the Antarctic

21    workstations, or who did, had those -- had restrictive

22    environmental stimulation during the duration of the

23    time that they were kind of stuck in -- in their

24    little, you know, environment, generally during the

25    winter.  I can't -- I can't tell you whether that was
```

1   exactly six months or -- I don't know.  But, you know,

2   during the winter.

3        Q.   (BY MS. SCHEFFEY)  So you would say more

4   than --

5        A.   I'm sorry.  The articles that are

6   written about wintering over in the Antarctic don't

7   describe exactly how many months or days these folks

8   were in those conditions.  But I do describe that

9   literature in my Washington University article, by the

10  way.

11       Q.   Okay.  I think we're going to move on to

12  page (inaudible.)

13       A.   Hello?

14       Q.   Yes.  Are you there?

15       A.   What did you say, moving on to

16  page what?

17       Q.   10 of the report.

18       A.   Okay.  Okay.

19       Q.   Okay.  So do you see Section 2.3.1?

20       A.   Yes.

21       Q.   Okay.  So in there it states,

22  "Individuals in solitary confinement often become

23  seriously depressed."  Do you see that?

24       A.   Yes.

25       Q.   "There is overwhelming empirical

```
 1    evidence that solitary confinement causes many

 2    people -- even those with no prior history of mental

 3    illness -- to become suicidal and/or self-destructive,

 4    especially in the first days of such confinement."

 5    Did I read that correctly?

 6         A.   Yes.

 7         Q.   Okay.  Is your only support for that

 8    proposition the literature cited in footnote 6?

 9              MS. DEMPSEY:  Object to form.

10         A.   I cite several studies in footnote 6.

11    I'm sure there are others that I could have cited,

12    but, you know, yeah.

13         Q.   (BY MS. SCHEFFEY)  But there aren't

14    others that you intend to rely upon in this

15    litigation; is that fair to say?

16         A.   I'm sorry?

17              MS. DEMPSEY:  Object to form.

18         Q.   (BY MS. SCHEFFEY)  For purposes of this

19    litigation, these are the only citations you intend to

20    rely upon?

21              MS. DEMPSEY:  Object to form.

22         A.   As best I'm aware.

23         Q.   (BY MS. SCHEFFEY)  Do you have, sitting

24    here today, knowledge of what the Kaba study is about,

25    which is "Solitary Confinement and Risk of Self-Harm
```

Stuart Grassian 07/23/2020                        ConfidentialPage 177
ALEJANDRO MENOCAL vs GEO GROUP

1    Among Jail Inmates"?

2            A.    Certainly is -- yes.  In general, yes.

3            Q.    Okay.  And how many days -- what was the

4    shortest number of days in which that study found that

5    an individual engaged in self-harm or the other

6    incidents as you describe in the report?

7            A.    I don't --

8            MS. DEMPSEY:  Object to form.

9            A.    I don't recall.

10           Q.    (BY MS. SCHEFFEY)  Okay.  So what's the

11   basis for your statement that this behavior happens in

12   the, quote, first days?

13           A.    There's a lot of literature describing

14   that.  I -- you know, I don't remember if the Kaba

15   study states that or doesn't.  I don't -- I don't

16   know.  But as I sit here, I mean, it's been a while

17   since I've reviewed that article.

18           But, you know, there's several articles

19   that describe the risk of suicide as being much more

20   severe, much worse in the first days.  That doesn't

21   seem to be a very controversial proposition.

22           Q.    So is that the conclusion that the Kaba

23   study stands for, or does it stand for the conclusion

24   you summarized in footnote 6?

25           MS. DEMPSEY:  Object to form.

U.S. LEGAL SUPPORT, INC
303-832-5966

1        A.    Can you -- what is the two alternatives

2   you're posing?

3        Q.    (BY MS. SCHEFFEY)  So footnote 6, okay,

4   says that the Kaba study, and I think we went over it

5   earlier today in one of your prior records, analyzed

6   about a quarter million incarcerations in New York

7   City jails and found that of 2,182 acts of self-harm,

8   approximately 50 percent occurred among the 7 percent

9   of housed inmates -- 7 percent of inmates housed in

10  solitary confinement.  Do you see that, that you wrote

11  that there?

12       A.    Yes.

13       Q.    Does that say anything about how quickly

14  that happened, the acts of self-harm?

15            MS. DEMPSEY:  Object to form.

16       A.    The footnote does not state how quickly

17  it happened.  I do not recall, as I sit here, whether

18  the Kaba study paid any attention to that issue.  I

19  just don't remember.

20       Q.    (BY MS. SCHEFFEY)  Okay.  Do you know,

21  sitting here, whether the -- there's another one in

22  here -- the Haney study paid attention to that issue?

23       A.    You're asking whether the Haney study

24  paid attention to the issue of how quickly -- of

25  whether there was a particular incidence of suicidal

1    behavior in the first days of solitary?

2            Q.   Yes.

3            A.   I don't remember.  I don't recall.  I

4    mean, I haven't read these articles in the last couple

5    days.  I don't remember.

6            Q.   Okay.

7            A.   What I can tell you is that there's a

8    lot of stuff out there, and I don't recall

9    specifically which ones, that speak about that as --

10   as being a fact.  And it doesn't seem to be a very

11   controversial fact at all.

12           Q.   Are there -- can you point out the --

13   looking at the -- I think there's about 20 citations

14   in your report.  Can you point out what citations you

15   provided us with to support that fact?

16           A.   That it occurs quickly?  I don't

17   remember.  I don't know.

18           Q.   Do you know, sitting here today, of a

19   scholar who focuses on that area or who would have had

20   a -- released a report on that issue?

21           A.   There are articles that -- published

22   articles that describe that -- that have -- that have

23   studied this phenomenon and found that the incidence

24   of suicidal behavior was especially high in the first

25   days of such confinement.  But I don't recall which

```
 1  ones they are, and I don't know if they're included in

 2  the 20.  My guess is they are, but -- you know, some

 3  of them are.  I don't remember.

 4          Q.   Okay.  Do you know how long these

 5  symptoms persist after removal from segregation, based

 6  on the literature?

 7               MS. DEMPSEY:  Object to form.

 8          A.   I don't know what you're referring to,

 9  what symptoms.  You were talking about self-harm?

10          Q.   (BY MS. SCHEFFEY)  Yeah.  So it says

11  "even those with no prior history of mental illness --

12  to become suicidal and/or self-destructive, especially

13  in the first days of confinement."  If removed from

14  solitary confinement, do those symptoms persist?

15          A.   Does the tendency towards

16  self-destructive behavior persist?  Is that what

17  you're saying, the increased tendency to

18  self-destructive behavior?

19          Q.   Sure.

20          A.   Is that what you're asking?

21          Q.   I'm -- I'm trying to understand what

22  your opinion is in this report.  So I'm trying to find

23  out what supports the "first days," and if not, how

24  long did that -- those ailments last.  So if that's

25  what your report is saying, is that it lasts for a
```

1    certain period of time, I want to understand that.

2         A.   "It" lasts --

3              MS. DEMPSEY:  Object to form.

4         A.   What is the "it" that you're asking

5    about?  Are you asking about self-destructive

6    behavior?

7         Q.   (BY MS. SCHEFFEY)  Affective

8    disturbances, anxiety, depression, and self-harm.

9         A.   So you're asking whether once a person

10   is removed from solitary confinement, whether these

11   problems persist.

12        Q.   Yes.

13        A.   Is that correct?

14        Q.   Yes.

15        A.   Okay.  There are studies that have

16   indicated -- that have demonstrated that individuals

17   who have experienced solitary confinement have a

18   higher incidence of death after their release,

19   including suicidal behavior, even after release from

20   prison.  So, yeah, I mean, that's -- there are studies

21   that -- that have shown that.

22        Q.   For what period of time?

23             MS. DEMPSEY:  Object to form.

24        A.   I don't recall whether articles have

25   described how -- what period of time.  But certainly

 1          A.    I've never -- I've never undertaken such

 2    an evaluation, no.

 3          Q.    Okay.  Okay.  So can you turn to page 18

 4    of the report.

 5          A.    Did you say 18?

 6          Q.    Yeah, 18.

 7          A.    Okay.

 8          Q.    It states, "[Even after] a few days of

 9    solitary confinement, the brain wave (EEG) becomes

10    deranged . . . ."

11          A.    Right.

12          Q.    Okay.  And footnote 16 cites to your

13    reference for that.  Do you see that?

14          A.    Okay.

15          Q.    And that's the Gendreau study again; is

16    that correct?

17          A.    Actually, I believe that's a different

18    study by Gendreau.  As I said, Gendreau did more than

19    one publication regarding EEG findings.  This is

20    alpha -- changes in -- is that the same -- there was

21    more than one article that he wrote, so I don't -- I'm

22    not sure.

23          Q.    So if I -- I could open Exhibit 3 and

24    read you the title in the citation, if you would like.

25          A.    I'm sorry?  Go ahead.

1          Q.    I have opened Exhibit 3, which is the

2    prior Gendreau article we looked at.

3          A.    Was that this particular article?

4          Q.    It appears to be to me.  It's still

5    Volume 79, No. 1.

6          A.    Yeah, I do have it.  Right.  That's --

7    that's the particular article.  Right.

8          Q.    Yes.  Okay.  So we went over that

9    before.  You're stating that the brain wave becomes

10   deranged.  Can you explain to me what "deranged"

11   means?

12         A.    Abnormal.

13         Q.    Okay.  And as we discussed before, that

14   study looked at a set -- effects after seven days; is

15   that correct?

16         A.    Right.  Well, the study was over the

17   course of seven days, but I think, as we noticed in

18   reviewing Figure 2, it looks like the EEGs were

19   actually done on a daily basis, actually, if I recall.

20   We have 24, 48, 72 hours.  I hadn't recalled that, but

21   it appears that way from the figure.

22         Q.    And do you recall that there was no

23   statistically significant change until the 72-hour

24   mark?

25         A.    I'm sorry.  Say that again.

1        Q.    Do you recall that we went over how

2    there was not a statistical -- statistically

3    significant change until the 72-hour mark?

4        A.    I think you're confusing two different

5    issues.  One was whether there was a significant

6    difference between the control group and the confined

7    group, versus whether the confined group had --

8    whether there was a change in the confined group over

9    the course of 72 hours that was -- or whatever, that

10   was statistically significant.  I don't think they

11   actually provided that information in the study.

12       Q.    So when you reference "a few days" in

13   your article here, where you say "[Even after] a few

14   days in your report," are you referring to three days?

15   Are you referring to seven days?

16       A.    Well, I mean, the article itself

17   demonstrates that after two days or three days, you're

18   having diminution in the latency of -- for response to

19   visual stimulation, so -- but I don't think they

20   actually -- I don't recall them doing statistically

21   significant -- you know, studies of statistical

22   significance regarding those individuals in the

23   confined group.  Perhaps I'm not remembering.

24       Q.    Yeah.  So here it said, "From Hour 72

25   on, the solitary-confined-S's VEP latency decreased

1    while the VEP latency of the controls increased

2    slightly.  This change over days . . . of the VEP for

3    solitary-confined Ss, compared to the controls, was

4    statistically significant."

5          A.   Yes, compared to the controls, but you

6    asked a different question.  You asked whether the

7    change for the confined group was statistically

8    significant after how many hours or days, and I don't

9    think the study actually had any data about that, if I

10   recall correctly.

11         Q.   Is there any statistically significant

12   data that you're aware of --

13              THE REPORTER:  I'm sorry.  Is there

14   what?

15         Q.   (BY MS. SCHEFFEY)  -- statistically

16   significant data or studies that you're aware of that

17   indicate that these symptoms happen within days?

18         A.   Well, I mean, I'm not sure what you're

19   asking.  I don't believe the Gendreau study actually

20   looked at the change over time for the confined group

21   to determine whether the changes were statistically

22   significant in the confined group.  But if you look at

23   Figure 2, you would see quite clearly that there's a

24   gradual diminished response time over -- over time.

25   It seems pretty clear just from the figure itself.

1        But again, I mean, you're asking

2   questions, what statistical analyses did they do, and

3   I don't think they did that particular statistical

4   analysis.

5        **Q.   Okay.  And I would like to understand**

6   **your criticism about the control group, but I guess**

7   **I'm -- in terms of the -- what you relied upon in this**

8   **report, how many days were you referring to when you**

9   **said "after a few days"?**

10        A.   Well, again, after a few days.  You

11   know, we don't -- we don't know exactly how many days.

12   But what we do know is that that Gendreau study showed

13   that over time, one saw a gradual decrease in latency,

14   and, you know, I mean, a decrease from 24 hours to 48,

15   from 48 to 72, and then beyond that, it decreased

16   further.

17        MS. SCHEFFEY:  Okay.

18        THE REPORTER:  Could we -- could we stop

19   for one second?

20        MS. SCHEFFEY:  Yes.

21        THE REPORTER:  Could we go off the

22   record for one second?

23        MS. SCHEFFEY:  Yeah.

24        THE VIDEOGRAPHER:  The time 9:06 p.m.

25   GMT time, 3:06 p.m. Mountain Time, and we are off the

1    can affect brain function, and I'm pretty certain

2    there -- yeah, there are studies that have indicated

3    that there's brain damage associated with chronic

4    stress, especially changes in the hippocampus.

5         **Q.   And how many years were the individuals**

6    **in solitary confinement in those studies?**

7         A.   Those were not solitary confinement

8    studies.

9         **Q.   Okay.  So those didn't have anything to**

10   **do with solitary confinement?**

11        A.   That's not -- no, I mean it's --

12             MS. DEMPSEY:  Object to form.

13        A.   That's not -- to correct, what we're

14   talking about here is chronic stress.  Now, we know

15   that solitary confinement is a very stressful

16   situation.

17             But if you're asking a corollary

18   question, which is, do I think that three days of

19   solitary confinement is likely to cause permanent

20   brain damage or shrinkage of the hippocampus, I doubt

21   it.

22        **Q.   (BY MS. SCHEFFEY)  Okay.  Is it your**

23   **position that the duration of segregation impacts the**

24   **psychological effects on an individual in solitary**

25   **confinement?**

1          MS. DEMPSEY:  Object to form.

2          A.    People can become symptomatic very

3    quickly; others become -- tolerate conditions for long

4    periods of time without becoming overtly ill.  So it's

5    certainly variable.  In general, the prolonged -- the

6    further prolongation, the longer the period in

7    solitary confinement, the more likely it is that

8    people are going to become quite -- quite ill.

9          **Q.    (BY MS. SCHEFFEY)  Okay.  Would you say**

10   **that if someone is confined in segregation for three**

11   **days, the psychological impact is the same as someone**

12   **who is confined in segregation for five years?**

13         A.    Well, generally, I think a person who is

14   in solitary confinement for three days would not have

15   as -- nearly as severe an impact as if they were in

16   solitary confinement for five years, but this again

17   would depend on the individual.

18         **Q.    Okay.  So there -- in your opinion, it**

19   **would be better if someone was taken out after three**

20   **days than after five years?**

21         A.    Yes.

22         MS. DEMPSEY:  Object to form.

23         **Q.    (BY MS. SCHEFFEY)  So duration plays**

24   **into the severity of the mental response or**

25   **psychological response?**

```
 1              MS. DEMPSEY:  Object to form.

 2        A.   Many -- there are individuals who become

 3   quite ill quite quickly, and other individuals who can

 4   tolerate three days of solitary confinement with

 5   less -- less damage being done.

 6        Q.   (BY MS. SCHEFFEY)  Okay.  So I know

 7   there's a lot of citations in this report.  To your

 8   knowledge, do any of these studies involve a nonpenal

 9   atmosphere?

10              MS. DEMPSEY:  Object to form.

11        A.   I don't know.  I mean, we just talked

12   about Dr. Akil's work, and, of course, that was a

13   nonpenal atmosphere.  That was a report about animal

14   studies.  So I don't know.

15              But in any event, I incorporate, I

16   believe, into this report my Washington University

17   study article, which describes a lot of conditions

18   of -- of restricted environmental stimulation that

19   aren't penal in nature.

20        Q.   (BY MS. SCHEFFEY)  Right.  So some of

21   those -- if I'm remembering correctly, one of those is

22   prisoners of war; is that correct?

23        A.   That's one of them.  I mean, that's

24   certainly a penal situation of an extreme sort.  But

25   it also describes other situations which are -- don't
```

 1   deportation is -- is still present.  So when you ask a

 2   person, "Well, how did you get through the day?  What

 3   did you do?" you're not asking them about what their

 4   internal experience was like being in a detention

 5   center and facing the possibility of deportation.

 6   You're not asking them about that.

 7           Q.   (BY MS. SCHEFFEY)  Did you listen to any

 8   of the recordings of the detainees from their phone

 9   calls with their family during the time while they

10   were in detention?

11           A.   No, I did not.

12                MS. DEMPSEY:  Object to form.

13                MS. SCHEFFEY:  I'm going to introduce --

14   are we on 8, Tracy?

15                THE REPORTER:  9.

16                MS. SCHEFFEY:  9.  Okay.

17                (Deposition Exhibit 9 was remotely

18   introduced.)

19           Q.   (BY MS. SCHEFFEY)  This is an excerpt

20   from Menocal's rough transcript, which includes a

21   section of his recorded phone call that was taken

22   contemporaneously with his time in detention.  You can

23   scroll to page 49 and go to line 16.

24           A.   Yeah.

25           Q.   So if you read from line 17 through 25,

 1    let me know when you're finished.

 2          A.   Okay.

 3          Q.   So he states, "they've got pretty good

 4    grub, considering, you know, it's a detention center.

 5    And we've got three televisions, a bunch of tables, a

 6    bunch of people.  We all get along.  Pretty nice.  I

 7    mean, it's -- for being incarcerated, it's not bad at

 8    all compared to -- not compared to Denver County or

 9    the other one where I was at.  This is like Camp

10    Snoopy.  It's pretty easy."  Is that what you read?

11          A.   Yeah.  This is -- this is a conversation

12    with family, right?

13          Q.   No.  It's with a friend, I believe.

14          A.   Okay.

15          Q.   It's -- at line 11, "A good friend of

16    mine."

17          A.   I see.

18          Q.   So is that consistent with an

19    omnipresent feeling of dread?

20               MS. DEMPSEY:  Object to form.

21          A.   A person can experience a sense of dread

22    and fear and still try to present a good face to their

23    friends and family and to themselves.  You know, that

24    doesn't change anything.

25          Q.   (BY MS. SCHEFFEY)  And is that

```
 1    literature in your report?

 2            A.   What?

 3            Q.   Is literature to support that position

 4    in your report?

 5            A.   It's not literature.

 6            MS. DEMPSEY:  Object to form.

 7            A.   It's clinical experience.  I mean,

 8    how -- what people talk about, how they experience

 9    themselves, how they describe themselves to others,

10    that's -- that's not the kind of thing that would be

11    in articles or literature.

12            Q.   (BY MS. SCHEFFEY)  Okay.  So let's go

13    back to your report, page 32.  You state, "They

14    revealed how terrified they were of those in

15    authority . . . ."  Do you see that?

16            A.   Hold on.  Yeah.  I'm sorry.  What were

17    you asking?

18            Q.   It says, "They revealed how terrified

19    they were of those in authority . . . ."  Do you see

20    that?

21            A.   Yeah.

22            Q.   Why didn't you provide the counterpoint

23    that some people got along well with guards?

24            A.   I don't know.  I mean, I'm trying to

25    describe what -- you know, the fact that their
```

1    and created by the demand that they clean

2    involuntarily or be faced with the hole, and that's

3    what I end up concluding.

4           **Q.   (BY MS. SCHEFFEY)  But do you address**

5    **how -- the fact that most detainees said that it was a**

6    **small number of guards who were bad in your**

7    **conclusions?**

8              MS. DEMPSEY:  Object to form.

9           A.   First of all, it doesn't take a lot of

10   bad guards if they have all the power.  But I don't

11   know how -- what percentage of all the detainees felt

12   what percentage of the guards were bad and what

13   percentage were good to them.  I don't have that

14   information.

15          **Q.   (BY MS. SCHEFFEY)  Have you ever**

16   **provided testimony for a case where you found that the**

17   **use of segregation was appropriate?**

18          A.   That's not -- that's not for me to say

19   whether it's appropriate.  All I can talk about is the

20   psychiatric effects of solitary confinement and -- and

21   in this particular case, whether the threat of being

22   placed in solitary confinement is a meaningful

23   punishment, is a fearful punishment.  And, you know,

24   so that's what my report centers on.

25          **Q.   Have you ever commented on a set of**

1   **facts where you concluded that segregation did not**

2   **lead to psychiatric harm?**

3           A.   I think that, at best, people in

4   segregation, people in solitary suffer from it.  But

5   whether it causes them to become psychiatrically ill,

6   I do -- I have not concluded that every inmate --

7   every person who goes into solitary confinement

8   becomes psychiatrically ill.

9           And I've so stated, actually.  If you

10  look at my testimony in the Madrid case, I actually

11  have a certain percentage of the people -- I can't

12  remember how many -- who I did not feel became

13  psychiatrically ill as a result, but they suffered.

14          Q.   **Have you ever provided testimony on a**

15  **set of facts where you concluded that an individual**

16  **did not suffer in solitary confinement?**

17          A.   I'm sorry.  Did I ever testify about a

18  case in which I found an individual did not suffer?

19          Q.   **While in solitary confinement, correct.**

20          A.   I mean, by design, I mean, you're taking

21  away privileges; you're taking away opportunities.  Of

22  course people suffer.  That wouldn't really make any

23  sense.  That's the whole point of, you know, solitary

24  confinement.

25          MS. SCHEFFEY:  Okay.  I think I am done.

```
 1    I just need about two minutes.  Do you want a

 2    two-minute break, Rachel?  And then we'll be done,

 3    unless you have recross.

 4              MS. DEMPSEY:  We can take a quick break.

 5    I do also have some questions.

 6              MS. SCHEFFEY:  Okay.

 7              THE VIDEOGRAPHER:  The time is

 8    10:55 p.m. GMT time, 4:55 p.m. Mountain Time, and we

 9    are off the record.

10              (Recess taken, 10:55 p.m. to 11:04 p.m.

11    GMT; 4:55 p.m. to 5:04 p.m. MDT.)

12              THE VIDEOGRAPHER:  The time is

13    11:04 p.m. GMT time, 5:04 p.m. Mountain Time, and we

14    are back on the record.

15         Q.   (BY MS. SCHEFFEY)  Mr. Grassian, I was

16    finishing up my questioning.  During the break did you

17    talk to Ms. Dempsey?

18         A.   No.

19         Q.   Do you know what the PBNDS are?

20         A.   The what?  I'm sorry.

21         Q.   The PBNDS.

22         A.   No.

23              MS. SCHEFFEY:  Okay.  No further

24    questions.

25
```

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF COLORADO          )
                                )   ss.
 3   ARAPAHOE COUNTY            )

 4
                   I, TRACY C. MASUGA, Registered
 5   Professional Reporter, Certified Realtime Reporter,
     and Notary Public 19924005553, State of Colorado, do
 6   hereby certify that previous to the commencement of
     the examination, the said STUART GRASSIAN, M.D.,
 7   declared his testimony in this matter is under penalty
     of perjury; that the said examination was taken in
 8   machine shorthand by me remotely and was thereafter
     reduced to typewritten form; that the foregoing is a
 9   true transcript of the questions asked, testimony
     given, and proceedings had.

10
                   I further certify that I am not employed
11   by, related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of
12   this litigation.

13                 IN WITNESS WHEREOF, I have affixed my
     signature this 28th day of July, 2020.

14
                   My commission expires April 24, 2024.

15

16   __X__  Reading and Signing was requested.

17   _____  Reading and Signing was waived.

18   _____  Reading and Signing is not required.

19

20

21   _____
     Tracy C. Masuga
22   Registered Professional Reporter
     Certified Realtime Reporter

23

24

25
```