# Exhibit 4

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                       DISTRICT OF COLORADO
 2
      Civil Action No.: 1:14-cv-02887-JLK
 3    _____

 4    DEPOSITION OF:  SERGIO GALLEGOS, June 30, 2020
                          via RemoteDepo
 5    _____

 6    ALEJANDRO MENOCAL, ET AL.,

 7    Plaintiffs,

 8    v.

 9    THE GEO GROUP, INC.,

10    Defendant.
      _____
11

12            PURSUANT TO NOTICE, the deposition of
      SERGIO GALLEGOS was taken on behalf of the Plaintiffs
13    by remote means, on June 30, 2020, at 10:03 a.m.,
      before Shannon Clementi, Registered Professional
14    Reporter, Colorado Realtime Certified Reporter and
      Notary Public, appearing remotely from Arapahoe County,
15    Colorado.

16

17

18

19

20

21

22

23

24

25
```

       1              Q.    (BY MR. HOOD)    Sure.

       2              Is disciplinary segregation a potential

       3    sanction for violating a rule or regulation at the

       4    Aurora Detention Facility?

       5              A.    Yes.

       6              Q.    Are the detainees at the Aurora Detention

       7    Facility made aware that disciplinary segregation is a

       8    potential sanction for violating rules and regulations?

       9              MR. EISMEIER:    Object to the form of the

      10    question.

      11              Q.    (BY MR. HOOD)    I'm sorry.    I couldn't hear

      12    you over GEO's attorney's objection.    Can you just

      13    restate your response?

      14              A.    We also have a handbook.

      15              Q.    You have a handbook.    Are they made aware

      16    any other way that disciplinary segregation is a

      17    potential sanction for violating rules and regulations?

      18              A.    Not that I know.

      19              Q.    You mentioned that there's a video at the

      20    Guadalupe Correctional Facility; is that correct?

      21              A.    Yes.

      22              Q.    Is there a video at the Aurora Detention

      23    Facility?

      24              A.    Not that I know.

      25              Q.    Okay.    You mentioned that officers might

Sergio Gallegos
June 30, 2020                                              47

1    be one way that detainees -- I'm sorry -- inmates at

2    the Guadalupe Correctional Facility were made aware

3    that disciplinary segregation could be a potential

4    consequence for violating rules and regulations.  Could

5    the same be true at the Aurora Detention Facility?

6         A.   I don't know.  I don't think so.

7         Q.   Why not?

8         A.   It's a different setting.

9         Q.   I'm sorry?

10         A.   It's a different setting.

11         Q.   So officers wouldn't inform detainees at

12   the Aurora Detention Facility of potential sanctions

13   for violating rules and regulations?

14              MR. EISMEIER:  Object to the form of the

15   question.

16         A.   Yeah, I think so.  It could happen.

17   Someone -- if they have a question, yes.

18         Q.   (BY MR. HOOD)  Have you ever talked to

19   detainees at the Aurora Detention Facility about

20   potential sanctions for violating rules and

21   regulations?

22         A.   Yes.

23         Q.   Let's talk about each of those times.

24              What's the first time that you talked to a

25   detainee about potential sanctions for violating rules

 1  and regulations?

 2          A.   I don't know what would be the first time,

 3  but --

 4          Q.   Let's talk about each time you remember.

 5  So what is one time?

 6          A.   If somebody is pushing somebody, like

 7  hitting or threatening or --

 8          Q.   Okay.

 9          A.   -- stealing his clothes or something,

10  bullying the person, yelling at him.

11          Q.   Okay.  And then what did you say?

12          A.   That -- stop.  To stop.  To stop doing

13  what he's doing.

14          Q.   Did you mention that there could be a

15  consequence if he keeps doing what he's doing?

16          A.   Yes.

17          Q.   What did you say?

18          A.   "Just stop because -- stop doing what

19  you're doing because that's against the rules and

20  regulations."

21          Q.   But you said that there could be a

22  potential consequence.  What potential consequence did

23  you mention?

24          A.   I'll give -- I can give him a write-up for

25  doing what he's doing.

Gallegos
June 30, 2020                                                73

1          A.   Have I ever sent?

2          Q.   Yeah.

3          A.   No.  I don't have the power to do that.

4          Q.   Who has the power?

5          A.   The detention -- the -- Ms. Shook.

6          Q.   Ms. Shook.

7          A.   Or a supervisor.

8          Q.   Everything you said about disciplinary

9    segregation at the Aurora Detention Facility, have all

10   of those things been true from when you started working

11   there in 2011 to the present, or has disciplinary

12   segregation changed during that time?

13         A.   It's been truth.

14         Q.   I'm sorry?

15         A.   It's been truth what I said.

16         Q.   I understand it's the truth, but has it

17   been the same for that whole period of time?

18         A.   Yes.

19         Q.   From when you started -- and I understood

20   you took the break at Hudson.  But let's say from when

21   you got back from Hudson at the beginning of 2013 to

22   the present, has it been the same?

23         A.   Yes.

24         Q.   What's the purpose of protective

25   segregation at the Aurora Detention Facility?

 1              MR. EISMEIER:  Object to the form of the

 2   question, foundation.

 3         Q.   (BY MR. HOOD)  Okay.  Have you received

 4   any training regarding the purpose of protective

 5   segregation at the Aurora Detention Facility?

 6         A.   Yes.

 7         Q.   Based on your training, what is the

 8   purpose of protective segregation at the Aurora

 9   Detention Facility?

10         A.   Some people like to be there.  Some people

11   don't like to be with many other people or big crowds.

12         Q.   Okay.  Are -- okay.  Could you elaborate

13   on that?

14              So you said some people don't like to be

15   with big crowds.  What do you mean by that?

16         A.   Some people feels better when they're

17   alone.  They feel less threatened.  So they feel more

18   secure.

19         Q.   If people who feel threatened or want to

20   feel more secure -- I'm sorry -- detainees who feel

21   threatened or want to feel more secure, can they ask to

22   be put into protective segregation?

23         A.   Yes.  Also people, if they're afraid to be

24   in the dorm.

25         Q.   So a detainee can affirmatively ask to be

1    put into protective segregation if they're afraid to be

2    in the dorm or for some other reason they feel like it

3    would be helpful to them; is that correct?

4          A.    Yes.

5          Q.    Are people put in -- ever put into

6    protective segregation without asking to be put there?

7                I'm sorry.  Are detainees ever put into

8    protective segregation without asking to be put there?

9                MR. EISMEIER:  Objection.  Foundation.

10               You can answer.

11         A.    Can you ask me again the question?

12         Q.    (BY MR. HOOD)  Sure.  You said that

13   detainees can be put into protective segregation

14   because they ask to be put there because they're

15   uncomfortable in the dorms or some other reason.

16               So now I'm asking whether detainees can

17   ever be put into protective segregation even if they

18   don't ask to be put there?

19               MR. EISMEIER:  Same objection.

20               But you can answer.

21         A.    Yes.

22         Q.    (BY MR. HOOD)  So what would some examples

23   be of detainees being -- or what would some of the

24   reasons be that detainees are put into protective

25   segregation even though they didn't ask to be put

 1    there?

 2            A.    Like they can be in danger.

 3            Q.    What kind of danger?

 4            A.    Other detainees.

 5            Q.    Of other detainees?

 6            A.    Yes.

 7            Q.    Is there any other reason --

 8            A.    Well, not necessarily in segregation, but

 9    in a separate place, like in medical or somewhere else

10    where we can conduct an investigation and try to find

11    out what happened, why the person is in danger, or it

12    was suspected of danger.

13            Q.    Okay.  Is there any other reason that a

14    detainee might be put into protective segregation

15    without asking to be put into protective segregation?

16            A.    If he belongs to a -- if he's related to a

17    gang, we don't have a place for that, like a room for

18    anybody in the housing unit that belongs to the gang

19    for some protection.

20            Q.    Okay.  Is there any other reason that a

21    detainee could be put into protective segregation

22    without asking to be put into protective segregation?

23            A.    Not that I remember.

24            Q.    Okay.  You mentioned that you received

25    training on protective segregation and received

Reginot Gallegos
June 30, 2020                                              77

```
 1  training on disciplinary segregation.

 2            Based on that training, could you describe

 3  the difference between the two.

 4       A.   Disciplinary segregation, they come out to

 5  recreation one hour a day, and they go to the showers

 6  one hour a day, or whatever they want to stay there

 7  until they're ready to go back to their cell.

 8       Q.   Um-hum.

 9       A.   And protective, they come out of the room

10  whenever we're done with the disciplinary showers and

11  recreations.

12       Q.   So could you elaborate on that, coming out

13  of the room.  What do you mean by that?

14       A.   They live in the same place.  It's

15  disciplinary one side.

16       Q.   Um-hum.

17       A.   And then protective custody on the other

18  side.  And when we're finished showers and recreation

19  for disciplinary --

20       Q.   Um-hum.

21       A.   -- then the dayroom is free for the -- to

22  come out and sit down and watch TV and play cards, or

23  play with our games or Nintendos, or watch TV or play

24  chess or checks [sic] or chat with the other detainees.

25            Q.   All right.  And just going back to
```

 1   disciplinary segregation a minute.  You mentioned

 2   before that you said detainees were out of their cells

 3   for about two hours a day.

 4              Do you remember that?

 5        A.   Yes.

 6        Q.   Okay.  And just now you mentioned that

 7   they went to recreation for one hour a day and then

 8   showers for one hour a day, or however long it takes

 9   them.

10              Do you remember that?

11        A.   Yes.

12        Q.   So in disciplinary segregation, is

13   recreation limited to one hour a day?

14        A.   Yes.

15        Q.   Okay.  And then that additional hour that

16   they're allowed out of their cell is just an hour where

17   they're allowed to go to the shower?

18        A.   Yes.

19        Q.   Does it typically take the inmates an hour

20   to go to the shower?

21        A.   No.  It's whenever they want to get out.

22        Q.   Okay.  But could it -- sorry.  Go ahead.

23        A.   They go to the shower, and they take a

24   shower, and they tell you, "Officer, I'm ready to go

25   back to my room," I say, "Okay."

```
 1          Q.   So is an inmate allowed to spend an hour

 2    in the shower?

 3          A.   If he wants to, yeah.

 4               MR. EISMEIER:  Object to the form of the

 5    question.  I'm sorry.  You used the word "inmate" and

 6    I --

 7               MR. HOOD:  I'm sorry.  No inmates at the

 8    Aurora Detention Facility.

 9          Q.   (BY MR. HOOD)  Is a detainee in

10    disciplinary segregation allowed to spend an hour in

11    the shower?

12          A.   Yeah.  If he wants to, yes.

13          Q.   So back to protective segregation.  You

14    mentioned that when you're done with the hour of

15    recreation and the hour, or however long it takes, for

16    showering for disciplinary segregation, that the people

17    in protective segregation are allowed out of their

18    cells; is that correct?

19          A.   Yes.

20          Q.   And you mentioned that they can play cards

21    and watch TV; is that correct?

22          A.   Yes.

23          Q.   Are the people in disciplinary segregation

24    permitted to play cards or watch TV?

25          A.   No.
```

 1          Q.   Are they allowed to interact --

 2          A.   They could play cards themselves,

 3  solitary.

 4          Q.   They're limited to Solitaire, I would

 5  expect.  But I guess I don't know.

 6               So that's one difference.  And how much

 7  time then are the detainees in protective segregation

 8  permitted out of their cells approximately each day?

 9          A.   I will say from four hours for up to five.

10          Q.   Four to five?

11          A.   Um-hum.

12          Q.   And are their cells just open for them to

13  go in and out during that time?

14          A.   No, we open it, they get what they need,

15  and we close the cell doors.

16          Q.   You mentioned that if you were a detainee,

17  sometimes you might like going to segregation because

18  of the peace and quiet.

19               Do you remember that?

20          A.   Yes.

21          Q.   Would you rather go to disciplinary

22  segregation or protective segregation?

23               MR. EISMEIER:  Object to the form of the

24  question.

25          A.   I can't really answer that.  I don't know.

Geist Gallegos
June 30, 2020                                          81

1    I've never been in that situation.  If I was looking

2    for peace and quiet, I would go to a cell myself.

3              Q.   (BY MR. HOOD)  You'd rather go to

4    disciplinary segregation?

5              A.   If I wanted to be by myself -- if I wanted

6    to be all by myself, yes.

7              Q.   Okay.  When you were working in the

8    segregation unit, have you ever asked -- have you ever

9    been asked by a detainee how much longer he or she has

10   to stay in segregation?

11             A.   Yes.

12             Q.   Has a detainee ever asked you to be -- if

13   he or she can be let out early from segregation?

14             A.   Yes.

15             Q.   If it's so nice -- if segregation is so

16   nice and offers so much peace and quiet, why might a

17   detainee want to be let out early from segregation?

18             MR. EISMEIER:  Object to the form of the

19   question.  And lack of foundation as well.

20             MR. HOOD:  Sure.

21             Q.   (BY MR. HOOD)  Can you answer the

22   question?

23             A.   I didn't say it was nice.  I said if you

24   wanted peace and quiet.

25             Q.   Peace and quiet sounds nice.

 1   to go -- we have to go through it.  They give one for

 2   us, and they also -- we have policies and procedures in

 3   every post.

 4          Q.   (BY MR. HOOD)  Okay.  And I'm going to go

 5   back because GEO's attorney objected.

 6               Did you ever receive training on the rules

 7   and regulations that govern detainees?

 8          A.   We talk about it.  We talk about the

 9   things that they can have, they can do, they cannot.

10          Q.   Okay.  When did you talk about the rules

11   and regulations that govern the detainees at the Aurora

12   Detention Facility?

13          A.   In the preservice.

14          Q.   Okay.

15          A.   Yeah, I misunderstood.  I worded it wrong.

16          Q.   No, no, you're fine.  I am asking the same

17   questions again, and the only reason I'm asking again

18   is because GEO's attorney objected before, and I'm

19   trying to make a clean record.

20               This isn't meant as a trick.  These are in

21   my mind the same questions, and I'm just going to go

22   through them one by one, okay?

23          A.   (Witness nodded head.)

24          Q.   All right.  So I'm going to start again,

25   and I apologize.

```
 1                  Did you ever receive training on the rules

 2    and regulations that govern the detainees at the Aurora

 3    Detention Facility?

 4            A.    Yes.

 5            Q.    When?

 6            A.    Preservice.

 7            Q.    What training did you receive regarding

 8    the rules and regulations that govern the detainees at

 9    the Aurora Detention Facility during preservice?

10            A.    The things that they supposed to do, how

11    they supposed to do it, where they supposed to be.

12            Q.    Okay.  Did you look at any documents

13    during this training regarding detainee rules and

14    regulations?

15            A.    I think only the detainee handbook.

16            Q.    What is the detainee handbook?

17            A.    A book that they hand the detainees when

18    they walk in the facility.

19            Q.    Were you provided a copy of the detainee

20    handbook?

21            A.    Yes.

22            Q.    When?

23            A.    Preservice.

24            Q.    So do all detention officers have a copy

25    of the detainee handbook?
```

```
 1         A.   I don't know whether all officers.  I have

 2    mine.

 3         Q.   Okay.  Were the other officers that were

 4    in preservice -- sorry.

 5              Were the other detention officers who did

 6    preservice with you -- did they receive copies of the

 7    detainee handbook?

 8         A.   I think so.

 9         Q.   Okay.  Do you currently have a copy of the

10    detainee handbook?

11         A.   Yes.

12         Q.   I don't mean currently like in that room

13    with you, but somewhere in your possession somewhere?

14         A.   My lunch box.

15         Q.   In your lunch box.  That's a good place to

16    keep it.

17              What is the detainee handbook?

18         A.   The rules and regulations what tells them

19    when to do laundry, when they send their clothes, when

20    they going to eat, when they can use the phone, when

21    they come in the dayroom.  It's everything they're

22    supposed to be doing when they're there.  The

23    visitation, lawyer calls, medical.  It's information

24    about everything happening there.

25         Q.   What -- go ahead.
```

```
 1              A.    Things not to have, like weapons, alcohol

 2     beverages, like drugs.  Like how to treat other

 3     detainees.  Everything how to behave.

 4              Q.    Okay.  So it's a general code of behavior

 5     for detainees at the Aurora Detention Facility?

 6              A.    Yes.

 7              Q.    Who writes the detainee handbook?

 8              A.    ICE.

 9              Q.    Are you sure about that?

10              A.    Not 100 percent, but tending to the higher

11     upper, like 90 percent.

12              Q.    Is it possible that GEO writes the

13     detainee handbook?

14              A.    I don't -- I don't think so.  I think ICE

15     tells it to GEO.

16              Q.    Does ICE write the standards of employee

17     conduct?

18              A.    For this specific thing, yes.  ICE is

19     there with us in the same building, so . . .

20              Q.    Okay.  And you're sure that ICE writes

21     both the employee standards of conduct and the detainee

22     handbook?

23              A.    Like I told you, I'm not 100 percent sure,

24     but I tend to believe that.

25              Q.    Okay.  That's fine.
```

 1              You described the detainee handbook as

 2  a -- as rules and regulations for detainees at the

 3  Aurora Detention Facility; is that correct?

 4        A.    There's some there, but it's mostly more

 5  than rules and regulations.  It's information for them.

 6  It's information of everything that is going on in

 7  there.

 8        Q.    Okay.  But does it also include rules and

 9  regulations?

10        A.    Yes.

11        Q.    Are those rules and regulations optional?

12        A.    Optional?

13        Q.    Let me ask it a different way.

14              Can a detainee at the Aurora Detention

15  Facility decide whether or not to follow the rules and

16  regulations in the detainee handbook?

17              MR. EISMEIER:  Object to the form of the

18  question.

19        A.    They can decide whatever they want to

20  decide.  I mean, we're all individuals.

21        Q.    (BY MR. HOOD)  If a detainee violates a

22  rule or regulation, is there a consequence?

23        A.    You talk to them first.

24        Q.    Okay.  And then what?

25        A.    If they do it again, you talk to them

1    then.

2            Q.    Okay.  And then what?

3            A.    They do it again, you give them a

4    write-up.

5            Q.    Okay.  What happens after a write-up?

6            A.    You might have to give them another

7    write-up, and then another write-up, and then another

8    write-up.  And then they have to -- they have to be

9    consistently doing the wrong thing for them to find

10   corrective disciplinary on the end.

11           Q.    What is a "corrective disciplinary" --

12   what did you say?  "Corrective disciplinary"?

13           A.    Corrective disciplinary.

14           Q.    Corrective disciplinary.  What is

15   "corrective disciplinary"?

16           A.    Segregation time, I guess.

17           Q.    Okay.

18           A.    Many other things, too.  You don't

19   necessarily have to go to segregation.  You can lose

20   your privilege to order commissary.

21           Q.    You as a guard -- I'm sorry.  You're not a

22   guard, and I apologize.

23                 You as a detention officer -- and I

24   apologized -- are you permitted to write up a detainee

25   for any reason you want?

Menocal Gallegos
June 30, 2020                                                123

```
 1              A.    No.  You can write up a detainee for any

 2    reason you want, but it doesn't mean if I write you up

 3    because you're too handsome, you're going to be guilty

 4    of that.

 5              Q.    How about you as a practice?  Why do you

 6    write up -- why do you write up detainees?

 7                    Strike that.

 8                    Have you ever written up a detainee?

 9              A.    Yes.

10              Q.    Why -- have you written up more than one

11    detainee?

12              A.    Rephrase the question?

13              Q.    Have you written up more than one

14    detainee?

15              A.    Yes.

16              Q.    As a general matter, why do you write up

17    detainees?

18              A.    To report their behavior to -- when

19    they -- before I first write up anybody, I'll talk to

20    them.

21              Q.    All right.  But you said you've written up

22    more than one detainee.  As a general matter, why do

23    you write up a detainee?

24              A.    Insolence, weapons, alcohol, fighting.

25              Q.    Are these -- go ahead.  I'm sorry.
```

```
 1          A.    Yes.

 2          Q.    Okay.  Sorry about that.

 3                The six people who were put on the list to

 4    provide the cleaning, did they volunteer to be put on

 5    the list?

 6          A.    Some of them do.  Some of them you just

 7    put them on the list starting with cell 3.

 8                To give you an example, we have a new

 9    unit, and we have let's say 30 detainees.

10          Q.    Um-hum.

11          A.    We got two trustees.  Those guys don't go

12    in the cell because they're more than likely going to

13    be doing the stuff.

14                We go to the first cell, we get four

15    detainees, and then go to the next cell and get two

16    detainees.  So that's six.

17          Q.    Okay.

18          A.    But any of the detainees has like a work

19    duty, like he works in the kitchen or the laundry or

20    anything, they don't go on the list.

21          Q.    So it's detainees who are not trustees are

22    put on the list?

23          A.    Yes.

24          Q.    So is one of the benefits of being a

25    trustee that you're not put on the -- the six-person
```

```
 1   list to clean?
 2          A.   I don't know if it's a benefit or not, but
 3   they don't get to get on the list because they're
 4   working somewhere else.
 5          Q.   Okay.  So is it because they're physically
 6   not there to help, or is it simply because they're a
 7   trustee, they get skipped over?
 8          A.   Because they're a trustee, they get
 9   skipped, I guess.
10          Q.   Okay.  If someone -- if you put someone on
11   a list to clean, one of the six people, and they don't
12   want to clean, what happens?
13          A.   You go to the next person.
14          Q.   So nothing -- nothing bad happens to
15   someone who refuses to clean?
16          A.   No.
17          Q.   Have you ever written someone up for
18   refusing to clean?
19          A.   No.
20          Q.   And then with respect to -- you know,
21   we've been talking about the pods with cells.  Am I --
22   how many -- how many pods with cells are there?
23          A.   12.
24          Q.   12.
25               And then we talked about pods without
```

```
 1   cells, where there was a sleeping area and a common

 2   area, separated.  Do you remember that?

 3         A.   Yeah.

 4         Q.   All right.  How many of those pods are

 5   there?

 6         A.   One.

 7         Q.   One.  Okay.

 8              So with respect to this one pod that does

 9   not have cells, do -- how did the cleaning work in that

10   pod?  How does the cleaning work in that pod?

11         A.   Same way.

12         Q.   Okay.  And are detainees responsible for

13   cleaning the sleeping area in the pod without the

14   cells?

15         A.   They clean their bed.

16         Q.   Okay.  So it's each individual detainee

17   responsible for his or her bed?

18         A.   Yeah.

19         Q.   Okay.  And then who is responsible for

20   cleaning the common area in the pod without cells?

21         A.   Six -- six beds, six detainees.

22         Q.   Okay.

23         A.   Two, three, four, five and six and the two

24   trustees.

25         Q.   Okay.  And is -- sorry.  Are you finished?
```

Luis Gallegos
June 30, 2020                                          140

```
 1   Mr. Gallegos.

 2          A.   Yes.

 3          Q.   Okay.  Have you ever seen this document

 4   marked as Exhibit 5 before?

 5          A.   I signed that paper.  Yeah, I seen it

 6   before.

 7          Q.   And where -- do you see where it's got a

 8   line that says "Signature"?

 9          A.   Yes.

10          Q.   Is that your signature?

11          A.   Yes.

12          Q.   I'm going to drop another document into

13   the chat.  And if you could just let me know when

14   you've got it open in front of you.

15               Now, this document, I tried like heck to

16   make it not sideways like this.  I will project it on

17   the screen as the right way.

18               Mr. Gallegos, are you able to rotate the

19   view so that it's not sideways to you?

20               MR. HOOD:  Dana, is it possible that

21   someone could help Mr. Gallegos rotate the PDF?

22               MR. EISMEIER:  It's going to take a few

23   seconds.  I've got to walk across the office, but I'll

24   be there in a second.

25               MR. HOOD:  Why don't we go off the record.
```

                              Hugo Gallegos
                            June 30, 2020                          141

```
 1                 (Discussion off the record.)

 2                 MR. HOOD:  And I'd like to mark the PDF

 3   with the file name Exhibit 6 as Exhibit 6 to the

 4   deposition.

 5                 (Exhibit 6 was remotely introduced and

 6                 provided electronically to the court

 7                 reporter.)

 8         Q.   (BY MR. HOOD)  Mr. Gallegos, have you ever

 9   seen this document before?

10         A.   Yes.

11         Q.   What is it?

12         A.   Detainee handbook.

13         Q.   And this is a document that we discussed

14   before that describes the expected conduct and the

15   rules and regulations of detainees; is that correct?

16         A.   Yes.

17         Q.   Can you please go to page 22 and 23 -- I'm

18   sorry, just page 23.  And it's -- the Bates stamp is

19   PL000053.  Let me know when you're there.  And I'll

20   also display it, Mr. Gallegos.

21                 MR. EISMEIER:  PL000053.

22                 MR. HOOD:  53.  PL000053, and the page

23   number in the lower right is 23.

24         Q.   (BY MR. HOOD)  And I'll put it up.  I'll

25   share the screen, too, Mr. Gallegos, if that's helpful.
```

```
 1              Are you able to see it on the screen in

 2   front of you?

 3        A.    Yes, I have it now.

 4        Q.    Do you see where it says "Disciplinary

 5   Severity Scale And Prohibited Acts"?

 6        A.    "Disciplinary Scale..." yes.

 7        Q.    And then underneath that it starts off

 8   with a list with numbers.  Do you see that?

 9        A.    Yes.  "100.  Killing"?

10        Q.    Yeah.

11              What is the -- are you familiar with the

12   disciplinary severity scale and prohibited acts?

13        A.    Yes.

14        Q.    What is it?

15        A.    It's a classification of disciplinary

16   categories.

17        Q.    Okay.  And I note that -- I'm going to

18   flip through it here, if I can figure out how -- that

19   it goes on for a few pages onto the next page.

20              Do you see that?

21        A.    Yes.

22              Page 24?

23        Q.    Yes.  And then it's followed by something

24   called "Sanctions."  Do you see that?

25              I should say actually every -- every
```

```
 1              Sometimes that write-up, they need to get
 2   four, five, six write-ups in order to get sanctions.
 3   Anyway they have come back and they said that they were
 4   sorry, they were mad; they don't know where to take it
 5   out, they take it out on me.  I say, "Don't worry about
 6   it.  It's a new day.  Let's start again."
 7         Q.    Okay.  I'm going to put Exhibit 6 back up
 8   on the screen.  I'm going to go back -- and feel free
 9   to look at the screen-share or your own version of
10   Exhibit 6, okay, Mr. Gallegos?
11              I'm going to go to the page that's
12   Bates-stamped PL000047, page 17 -- oops.  I went
13   forward.
14              And let me know when you're ready to talk
15   about this page, okay?
16         A.    What page?
17         Q.    Are you on the page Bates-stamped
18   PL000047?
19         A.    Correct.
20         Q.    Okay.  And it says page 17 at the bottom?
21         A.    Yes.
22         Q.    Okay.  Do you see on the left-hand side of
23   the page, there's a heading that says, "Housing Unit
24   Sanitation"?
25         A.    Yes.
```

 1          Q.    Could you read that, and then let me

 2    know -- read the writing underneath that heading, and

 3    then let me know when you're ready to talk about it.

 4          A.    (Reviewing document.)

 5                Yes.  Go ahead

 6          Q.    Okay.  And do you see on the first line of

 7    the writing underneath "Housing Unit Sanitation," it

 8    references the facility's sanitation program?  Do you

 9    see that?

10          A.    Yes.

11          Q.    Are you familiar with the Aurora

12    facility's sanitation program?

13          A.    I guess so.

14          Q.    Sorry.  Go ahead.

15          A.    The cleanup?  Sanitation, cleaning?

16          Q.    I don't know.  You tell me.

17                This is the employee -- I'm sorry -- the

18    detainee handbook that you described as including rules

19    and regulations for detainees, and I'm just wondering

20    if you're familiar with this particular part of it.

21          A.    Yes.

22          Q.    Okay.  What is the facility's sanitation

23    program?

24          A.    To make the facility sanitized clean.

25          Q.    And can you elaborate on that?  What does

Reyes Gallegos
June 30, 2020                                              162

1   that mean?

2           A.    The sanitation program is to keep the

3   facility clean.

4           Q.    Okay.  Do you see where it says:

5                 "Each and every detainee must

6                 participate..."?

7           A.    Yes.

8           Q.    Okay.  So does the sanitation program

9   include only trustees, or does it also include unpaid

10  detainees?

11          A.    Unpaid detainees, too, I guess.  Yes.

12                "Each and every detainee must

13                participate..."

14          Q.    Okay.  If a detainee doesn't participate

15  in the facility's sanitation program, would that be a

16  violation of a rule or regulation of the Aurora

17  Detention Facility?

18                MR. EISMEIER:  Objection.  Form.

19                You can answer.

20          A.    We'll just go to the next person.

21          Q.    (BY MR. HOOD)  Okay.  It says "must."  Are

22  you allowed to decide that a detainee doesn't have to

23  participate?

24          A.    We're not making the detainee participate

25  if he doesn't want to participate.  We just go to the

 1   next person.

 2          Q.   You told me before that it was a detention

 3   officer's job to implement the policies of -- of a

 4   detention facility.

 5          Do you remember that?

 6          A.   Yes.

 7          MR. EISMEIER:  Objection.  Form.

 8          Q.   (BY MR. HOOD)  Is it a detention officer's

 9   job to implement the policies -- strike that.

10          Is it a detention officer's job to

11   implement the rules and regulations of a detention

12   facility?

13          A.   Yes.

14          Q.   Okay.  Is it a rule or regulation of the

15   Aurora Detention Facility that each and every detainee

16   must participate in the facility's sanitation program?

17          A.   Yes, it's there.

18          Q.   I'm sorry.  I didn't mean to take it down.

19   Hold on one second.

20          And do you see under the "Housing Unit

21   Sanitation" policy on page 17 of Exhibit 6 -- do you

22   see the heading that says "Day Space"?

23          A.   Yes.

24          Q.   Okay.  And in the third paragraph under

25   there -- well, let me ask you this:  Do you know what

```
 1   the day space is?

 2            A.    Common area.

 3            Q.    The common area in the pods?

 4            A.    The dayroom, yes.

 5            Q.    Okay.  Is that just another way of saying

 6   the common area?

 7            A.    Yes.

 8            Q.    Do you see the third paragraph under "Day

 9   Space," it says:

10                  "Detainees will take turns cleaning the

11                  area.  If a detainee feels that everyone

12                  is not doing their fair share, the

13                  detainee should inform the housing unit

14                  officer of the problem.  Action will be

15                  taken to resolve this problem"?

16                  Do you see that?

17            A.    Yes.

18            Q.    Do you know what the detainee handbook

19   means when it says:

20                  "Action will be taken to resolve this

21                  problem"?

22            A.    Yes.

23            Q.    What does it mean?

24            A.    We will get somebody else to take his

25   place.  One of the trustees will pick up what he was
```

 1  doing.

 2          Q.    It doesn't mean --

 3          A.    Either wiping the tables or sweeping or

 4  mopping.

 5          Q.    So what does it mean when it says:

 6                "If a detainee" --

 7                Do you know what it means when it says:

 8                "If a detainee fails -- feels that

 9                everyone is not doing their fair

10                share..."?

11                Do you know what it means?

12          A.    I don't know what it means, but I -- the

13  action that we take, when somebody doesn't want to be

14  part of the day cleanup, we'll put somebody else.

15          Q.    So the action -- so the action that will

16  be taken when a detainee is not doing his or her fair

17  share is just moving on to the next detainee?

18          A.    Yes.

19          Q.    And no other action would ever be taken in

20  that circumstance?

21          A.    No.

22          Q.    Have you ever taken any action in that

23  circumstance?

24          A.    Yes.  I have somebody else -- I ask

25  somebody else, either the trustee or even myself.

Rodrigo Gallegos
June 30, 2020                                        169

```
 1        Q.   But are these offense categories --

 2   sorry -- in Exhibit 6, on pages 23 and 24 -- well,

 3   strike that.

 4             Do you have a general understanding of the

 5   offense categories at the Aurora Detention Facility?

 6        A.   Yes.

 7        Q.   The offense categories on pages 23 and 24

 8   of Exhibit 6, are they consistent with your general

 9   understanding of the offense categories at the Aurora

10   Detention Facility?

11        A.   Yes.

12        Q.   Have the offense categories at the Aurora

13   Detention Facility changed substantially during your

14   time working at the Aurora Detention Facility?

15        A.   Not that I know.

16             MR. HOOD:  Okay.  I'm going to pull up

17   another exhibit.  And just because I think it's easier

18   to be consistent with the file numbers for the court

19   reporter, I'm going to be skipping over Exhibit 7 and 8

20   and moving on to Exhibit 9.

21             (Exhibits 7 and 8 were remotely

22             introduced and provided electronically to

23             the court reporter.)

24             MR. HOOD:  All right.  I'm dropping it

25   into the chat.
```

 1              And I'll ask that the court reporter mark

 2    the file named Exhibit 9 as Exhibit 9 in the

 3    deposition.

 4              (Exhibit 9 was remotely introduced and

 5              provided electronically to the court

 6              reporter.)

 7         Q.   (BY MR. HOOD)  Mr. Gallegos, I'd ask that

 8    you open up that exhibit, review it, and let me know

 9    when you're ready to talk about it.

10         A.   Yes.

11         Q.   Are you ready to talk about Exhibit 9?

12         A.   Yes.

13         Q.   Okay.  Have you seen a form like this

14    before?

15         A.   Yes.  Not like this.

16         Q.   What do you mean, "Yes.  Not like this"?

17    What does that mean?

18         A.   Not like this.  I mean, sort of like this,

19    but not like this.  Different.

20         Q.   How would it have been different?

21         A.   The format of the form.  The form is just

22    with different lines, different -- same information on

23    the form, but different places for that.

24         Q.   Okay.  Do you see at the bottom where it

25    says "Reporting Officer"?

```
 1          A.   Yes.

 2          Q.   And it says "S. Gallegos"?

 3          A.   Yes.

 4          Q.   Is that you?

 5          A.   Yes.

 6          Q.   And the signature over on the right --

 7   there are a couple of signatures, but are any of those

 8   signatures yours?

 9          A.   Yes.

10          Q.   Which one?

11          A.   The one on top.

12          Q.   The one -- so there are two signatures,

13   one on top of the other, and it's the one -- the upper

14   signature that's yours?

15          A.   Yes.

16          Q.   So let's talk about this form for a

17   second.  You said you'd never seen it before, one like

18   this, but you also told me that you signed it.

19               So is it true that you've never seen a

20   form like this before?

21          A.   I don't remember this form.

22          Q.   Okay.  Do you remember any sort of form

23   called an "Incident of Prohibited Acts and Notice of

24   Charges"?

25          A.   Yes.
```

```
 1          Q.    What is that form?

 2          A.    A write-up.

 3          Q.    So when we've been talking about

 4   "write-ups" so far at the Aurora Detention Facility, is

 5   this what you mean by a "write-up"?

 6          A.    Yes.

 7          Q.    Okay.  Have you reviewed a description

 8   of -- the text under "Description of Incident"?

 9          A.    Yes.  Yes, I read it.

10          Q.    Do you remember this incident?

11          A.    Very, very seldomly, but yeah, I remember

12   this incident.

13          Q.    What happened?

14          A.    The thing is I believe it's too long ago.

15   It's very long ago, 2012.

16                The thing is we're cleaning the dayroom,

17   and the detainee that got the write-up was yelling in

18   the middle of the room.  He was shouting at everybody

19   to, "Don't listen to the officer.  We don't have to do

20   this.  We don't have to do that."  And he started

21   cursing at me.

22                And then I called for the lieutenant.

23   Lieutenant came in, talked to me, talked to the

24   detainee, and he took the detainee to seg.

25          Q.    Okay.  All right.  It says that the
```

 1    detainee -- one of the prohibited acts of the rules

 2    violations that the detainee committed was "failure to

 3    obey my orders for cleaning details."

 4                 Do you see that?

 5         A.   Yes, I see it.

 6         Q.   Okay.  You testified earlier that you

 7    never wrote anybody up for refusing to clean.  Do you

 8    remember that?

 9         A.   Yes.

10         Q.   Here you're -- you're writing someone up

11    for "failure to obey my orders for cleaning details";

12    is that correct?

13         A.    Correct.

14                 MR. EISMEIER:  Object.  Form of the

15    question.

16         Q.   (BY MR. HOOD)  Can you explain why you

17    previously testified that you've never written someone

18    up for refusing to clean, while here you're writing

19    someone up for "failure to obey my orders for cleaning

20    details"?

21         A.    Because I didn't remember.

22         Q.   Okay.  Would you like to amend your

23    testimony?

24         A.    No.

25         Q.   Do you believe this form to be inaccurate?

 1          A.    The form is not inaccurate, but I remember

 2    this incident.  The detainee was disruptive in the

 3    dayroom.

 4          Q.    It says one of the reasons that you wrote

 5    him up is "failure to obey my orders for cleaning

 6    details."  Do you believe that's inaccurate?

 7          A.    "Creating a disruption of the orderly

 8    operations of the security" of the institutions.

 9                I told the detainee to put things away.

10    He was waving a broom or a mop.  I don't remember what

11    he was waving.  I told him just to put it down, he has

12    to go back to his cell.  And he started chanting and

13    shouting and yelling in the dorm, and I called for a

14    supervisor.

15          Q.    Did you instruct the detainee to perform

16    the general cleanup?

17          A.    No.

18          Q.    Then why was he cleaning?

19          A.    He was with a broom, and he was chanting

20    and yelling and disrupting the operation.  It was

21    really late at night.

22          Q.    So this was not during the cleanup after a

23    meal?

24          A.    No.

25          Q.    What did you mean by "general cleanup"?

Grisel Xahuentitla Gallegos
June 30, 2020                                                    175

```
 1          A.    I don't remember.  Probably he was

 2   cleaning his room or something.  I don't remember.  I

 3   can't answer that because I don't remember that good.

 4   But at this time it's not even dinnertime.

 5          Q.    Okay.

 6          A.    But I remember he had a broom and he was

 7   shouting in the dayroom.

 8          Q.    Okay.  Why was he cleaning in the dayroom

 9   with a broom?

10          A.    I don't remember that.

11          Q.    You previously testified that the only

12   time that there was a general cleanup was after meals.

13   Do you remember that?

14          A.    Yes.

15          Q.    Do you see where it says that you were

16   performing a general cleanup on this form at 2240

17   hours?

18          A.    Yes.

19          Q.    When is dinnertime at the Aurora Detention

20   Facility?

21          A.    5:00 p.m.

22          Q.    Which would be 1700 hours, right, military

23   time?

24          A.    Yes.

25          Q.    This is more than five hours later; is
```

```
 1    that correct?

 2           A.    Yeah, 2240.

 3           Q.    Do you generally supervise a general

 4    cleanup of the dayroom --

 5           A.    No.

 6           Q.    -- at 2200 hours?

 7           A.    No.

 8           Q.    Have you ever supervised a general cleanup

 9    of a dayroom at 2200 hours?

10           A.    I can't remember that.  I can't remember

11    back then --

12           Q.    Okay.

13           A.    -- whether they were cleaning, but I

14    remember he was really -- I remember that the detainee

15    was really disruptive.

16                 I don't remember his face or nothing like

17    that.  I just kind of remember.  Like I said, that

18    happened long ago.

19           Q.    Is it possible there are other write-ups

20    that you made for other detainees who refused to clean

21    that you don't remember?

22                 MR. EISMEIER:  Objection.  Form of the

23    question.

24           A.    I don't remember.  I can't answer that.

25           Q.    (BY MR. HOOD)  I'm sorry.  So you
```

Hugo Gallegos
June 30, 2020                                                    177

 1   mentioned before that you had never written up a

 2   detainee for refusing to clean.

 3              Do you remember that testimony?

 4        A.   Yes.

 5        Q.   Okay.  Is this -- in front of you, is this

 6   a write-up of a detainee for refusing to clean?

 7              MR. EISMEIER:  Objection.  Form of the

 8   question.

 9        A.   He was disrupting the daily operation.  He

10   was yelling, shouting.  And some people was cleaning.

11   I called the supervisor.  The supervisor instructed me

12   to write him up.

13        Q.   (BY MR. HOOD)  Okay.  Is one of the

14   reasons you wrote him up for refusing to clean?

15        A.   Don't remember.

16        Q.   Okay.  Was this the only detainee who was

17   refusing to clean?

18              I'm sorry.  During this particular

19   incident, was this the only detainee who was refusing

20   to clean?

21        A.   He was the only detainee creating a

22   disturbance.  He was yelling and shouting and

23   disruptive.

24        Q.   Okay.  And there were no other detainees

25   creating a disturbance?

Menocal Gallegos
June 30, 2020                                          178

```
 1            A.   I don't remember.  I don't think so.

 2            Q.   Okay.  Were there any other detainees

 3   refusing to clean?

 4            A.   I don't remember.

 5            Q.   I'm going to drop in Exhibit -- actually,

 6   you know what, just one -- just so we remember here, do

 7   you see the detainee's name in the upper left-hand

 8   corner?

 9            A.   Yes.

10            Q.   What is it?

11            A.   Perez-Montoya.

12            Q.   In the last paragraph, under "Description

13   of Incident," it says:

14                      "Detainee was screened by medical staff

15                 prior to his placement in the SHU."

16            Do you see that?

17            A.   No.

18            Q.   So do you see the third sort of box?  It

19   says "Description of Incident."  Do you see that?

20            A.   Yes.

21            Q.   Okay.  And then the last paragraph of the

22   "Description of Incident" says:

23                      "Upon supervisor and staff support

24                 on-site..."

25            Do you see that?
```

Jesus Gallegos
June 30, 2020                                              179

```
 1          A.   Yes.

 2          Q.   "...detainee was placed in hand restraints

 3               and placed in segregation pending rules

 4               violations listed in this report."

 5               Do you see that?

 6          A.   Yes.

 7          Q.   So this detainee was placed in segregation

 8   as a result of your write-up; is that correct?

 9          A.   Appears so.  Pending investigation.

10          Q.   Does that surprise you?

11          A.   Yeah.  It's so long ago, it surprises me.

12          Q.   Why does it surprise you?

13          A.   Because I don't remember -- I didn't

14   remember this incident.

15          Q.   Okay.  I'm going to drop in another

16   exhibit.  If you could open it up, review it and let me

17   know when you're ready to talk about it.

18          A.   Yes.

19          Q.   Let me just -- are you ready to talk about

20   it, Mr. Gallegos?  And I'll share it to the screen.

21          A.   Yes.

22          Q.   Okay.  Is this another write-up?

23          A.   Yes.

24          Q.   Is that your signature in the lower

25   right-hand corner, the sort of the upper signature of
```

```
1   the two signatures?

2           A.    Correct.

3           Q.    Okay.  Do you remember this write-up?

4           A.    Yes.

5           Q.    Did you remember it before you just looked

6   at it, or was your memory refreshed by looking at it?

7           A.    My memory refreshed.

8           Q.    Okay.  Can you tell me what happened.

9                 I'm sorry.  Strike that.  That was a bad

10  question.

11                Can you tell me -- can you describe the

12  incident that occurred that resulted in this write-up.

13          A.    Yeah.  I remember -- I think it was the

14  same incident with the other guy.  He was riling up the

15  whole dorm.

16          Q.    Okay.

17          A.    I think that's what happened.  It was a

18  few -- it was three or four guys.

19          Q.    Okay.  What were they doing?

20          A.    They were shouting in the dorm.  They

21  were -- they were just being insolent.  They were

22  shouting in the dorm, yelling, I know.

23          Q.    Okay.  Under the "Description of

24  Incident," it says, again, that one of the prohibited

25  acts of rules violations was "failure to obey my orders
```

 1  for cleaning details."  What does that mean?

 2          A.    Failure to follow orders for cleaning

 3  details.  That he failed the orders to clean.

 4          Q.    To clean the -- the common area?

 5                MR. EISMEIER:  Objection.  Form of the

 6  question.

 7          Q.    (BY MR. HOOD)  Where were they cleaning?

 8          A.    I think everybody -- that day, I think

 9  everybody, all the detainees, were cleaning the top

10  rails.

11          Q.    The top rails?

12          A.    Where they put their hands.

13          Q.    Why would --

14          A.    Whenever you have a rail, you put your

15  hands on it, and everybody was cleaning, wiping that

16  up.  And these guys started shouting.  They were

17  sitting at a table, and they started telling everybody

18  not to do this, not to do that.  And then they start

19  saying bad words and yelling and screaming, and then I

20  called the lieutenant.

21          Q.    Okay.

22          A.    I was instructed by the lieutenant to

23  write them up, give them a write-up.

24          Q.    Okay.  Were these trustees cleaning the

25  top rails or detainees?

Reyes Gallegos
June 30, 2020                                                  182

```
 1          A.    Everybody.

 2          Q.    Were they paid for cleaning the top rails?

 3          A.    I don't think so.

 4          Q.    Okay.  So we talked before about the

 5   unpaid detainee work --

 6          A.    Um-hum.

 7          Q.    -- in the pods, and you mentioned just

 8   only cleaning up after the meals.  Do you remember

 9   that?

10          A.    Yes.

11          Q.    Okay.  But now they're cleaning the top

12   rails in the pod.

13                Is there anything else that the detainees

14   clean and are not paid for?

15          A.    No.

16          Q.    The only thing that the detainees clean in

17   the pod other than cleaning up after meals is the

18   rails?

19          A.    The trust -- the trustees clean the rails

20   and everything, but everybody was helping them.

21   Everybody was helping the trustees to clean the rails.

22                And these guys, they were in a corner

23   table.  I remember, like I said, now.  They were in a

24   corner table.  They start shouting to everybody, "Stop

25   doing that.  Stop doing that."  And a detainee got a
```

1    broom in his hand, and one of them picked it up, and

2    they were yelling.

3                And I told them to stop the disruption and

4    they didn't obey.  I called on the radio for a

5    supervisor because it was getting out of hand.

6           Q.   Okay.

7           A.   The supervisor went to the dorm and --

8           Q.   So -- go ahead.

9                MR. EISMEIER:  He's not finished.

10               MR. HOOD:  Yeah, I apologize, Dana.  I

11   thought he was done.

12          Q.   (BY MR. HOOD)  Please continue,

13   Mr. Gallegos.

14          A.   The supervisor went to my call.  The

15   supervisor heard what was going on.  The supervisor

16   order another -- another officer, not me -- he order

17   somebody else to put those detainees in restraints for

18   disrupting the dormitory.  And then he ordered me -- he

19   told me that he wanted all write-ups for them.

20          Q.   Okay.  The unpaid detainees who were

21   helping clean the guardrails -- and by "guardrails,"

22   are we just talking like -- I think you called them

23   "handrails."

24                Are these handrails on the stairs and

25   around the upper landing where the stairs are?

Juan Gallegos
June 30, 2020                                          184

```
 1        A.    Correct.

 2        Q.    The unpaid detainees who were helping to

 3   clean, they were just -- why were they helping to

 4   clean?

 5        A.    Because they want -- they wanted to help

 6   them.  They always help them.

 7        Q.    Could they have just been sitting and

 8   watching TV at the time?

 9        A.    I don't think so, no.

10        Q.    Why not?

11        A.    Because they weren't watching TV.  They

12   were yelling and disrupting.

13        Q.    No, no, no.  I don't mean the detainees

14   who you wrote up.  I mean the detainees -- the unpaid

15   detainees who were helping to clean, why -- I'm

16   wondering if another option other than cleaning could

17   have been watching TV.

18        A.    Yes.

19        Q.    But instead they chose to clean?

20        A.    Some -- yeah, most of them did.

21        Q.    Okay.  And when you describe "failure to

22   obey my orders for cleaning details," what -- what does

23   that mean?

24        A.    I don't remember.

25        Q.    Had you ordered them to clean?
```

 1          A.    I tell the truth, I don't remember.

 2          Q.    Is it possible that you ordered them to

 3   clean?

 4                MR. EISMEIER:  Objection to form of the

 5   question.

 6          Q.    (BY MR. HOOD)  I'm sorry, Mr. Gallegos.

 7   I'm assuming that you're trying to remember, but could

 8   you answer the question, or are you unable to answer

 9   the question?

10          A.    I'm not able to answer that question.

11   It's too long, and I don't remember.

12                But I remember the lieutenant, Gutierrez,

13   went to the call, the radio call, and he talked to the

14   detainees, and he order another officers to take the

15   detainees to medical, to segregation for disrupting the

16   dormitory.

17          Q.    Okay.  And I understand that, and that's

18   the 399 violation that you wrote.  But I want to know

19   why you wrote the 307 violation under the description

20   of the incident, "failure to obey my orders for

21   cleaning details."

22                Do you remember why you assigned a 307

23   violation for Mr. Juan Nava-Ruiz?

24          A.    I don't remember.

25          Q.    Okay.  Is it possible that that 307

```
 1   violation was for refusing an order to clean?

 2           A.   No, I don't think so.

 3           Q.   What do you think it was?

 4           A.   I know it was disruption of the -- of the

 5   dormitory, but I don't remember if I wrote them up for

 6   that.

 7           Q.   Well, I'm confused, Mr. Gallegos, because

 8   a 307 offense category, as we discussed previously in

 9   the detainee handbook, is refusing to obey a staff

10   member or officer's order; is that correct?

11           A.   Yes.

12           Q.   What was your order that they -- that

13   Mr. Nava-Ruiz refused to obey?

14           A.   I told you, I wrote him up because I was

15   instructed by Lieutenant Gutierrez to give him a

16   write-up for that.

17           Q.   Did Lieutenant Gutierrez instruct you to

18   write him up for refusing to obey orders for cleaning

19   details?

20           A.   Don't remember.  He just told me to write

21   him up.

22           Q.   Did he say why he wanted you to write them

23   up?

24           A.   Because they were disrupting the dayroom.

25   I don't remember.
```

```
 1          Q.   Okay.  You don't remember what you meant

 2   when you say "failure to obey my orders for cleaning

 3   details"?

 4          A.   No, I don't remember what he told me to

 5   write him up for.  But I know one of them, it was for

 6   disobeying -- not disobeying -- disrupting the daily

 7   duties of the dorm.

 8          Q.   Okay.  And that's a 399 offense category,

 9   like we discussed, but you put a 307 category in here,

10   too, and said, "failure to obey my orders for cleaning

11   details."

12               You don't have any memory of why you wrote

13   that down?

14          A.   No.

15          Q.   Okay.  I'm going to drop another exhibit

16   into the "Comments" section.  If you could open that up

17   and let me know when you're prepared to talk about it,

18   Mr. Gallegos.

19          A.   Yes.

20               MR. HOOD:  Let me do the screen-share.

21   And I'd ask the court reporter mark the file with the

22   name Exhibit 11 as Exhibit 11 to the deposition.

23               (Exhibit 11 was remotely introduced and

24               provided electronically to the court

25               reporter.)
```

```
 1              MR. HOOD:  And I can't remember whether I

 2  asked prior, so I'll just belt and suspenders ask that

 3  the file name Exhibit 10 be marked as Exhibit 10 to the

 4  deposition.

 5              (Exhibit 10 was remotely introduced and

 6              provided electronically to the court

 7              reporter.)

 8       Q.   (BY MR. HOOD)  Mr. Gallegos, is this

 9  another write-up?

10       A.   Yes, the same incident.

11       Q.   Okay.  And this is a third detainee who

12  was involved in the incident?  Or was this about a

13  third detainee who was involved in the incident?

14       A.   They were the same detainees that were

15  sitting at the table.

16       Q.   Okay.  How many detainees were there at

17  the table?

18       A.   Four.  Three or four.

19       Q.   Three or four.

20              Do you see in the -- is that your

21  signature on the bottom right-hand corner?

22       A.   Yes, sir.

23       Q.   Did you type up the description of the

24  incident?

25       A.   Excuse me?
```

1          Q.    Did you type up this write-up?

2          A.    I don't remember, but I signed it.

3          Q.    If you signed it -- did you sign write-ups

4    that other people wrote?

5          A.    No.

6          Q.    So given that your signature is at the

7    bottom, is it fair to assume that you wrote this

8    write-up?

9          A.    Yes.

10         Q.    Do you see that this write-up describes

11   Mr. Gonzalez-Donato as committing a 307 offense for

12   "failure to obey my orders for cleaning details"?

13         A.    Yeah.

14         Q.    What does that mean?

15         A.    Can you please repeat the question?

16         Q.    Do you see that this write-up describes

17   Mr. Gonzalez-Donato as committing a 307 offense for

18   "failure to obey my orders for cleaning details"?

19         A.    Yes.

20         Q.    What does that mean?

21         A.    I probably told him to pick up the other

22   guy's cleaning.

23         Q.    You told him to pick up the other guy's

24   cleaning?

25         A.    Probably.  I don't remember.

Rene Gallegos
June 30, 2020                                                      190

```
 1          Q.   Okay.  What did you mean when you said
 2   "pick up the other guy's cleaning"?
 3          A.   Where did I say that?  Did I say that?
 4          Q.   I thought you did.  I might have misheard
 5   it.
 6               MR. HOOD:  Could I have the court reporter
 7   read back his response to my question regarding that
 8   307 failure to obey.
 9               (The record was read back as follows:
10               "Question:  What does that mean?
11               "Answer:  I probably told him to pick up
12               the other guy's cleaning.
13               "Question:  You told him to pick up the
14               other guy's cleaning?
15               "Answer:  Probably.  I don't remember.
16               "Question:  Okay.  What did you mean when
17               you said 'pick up the other guy's
18               cleaning'?")
19          Q.   (BY MR. HOOD)  So I'll ask you again, what
20   did you mean when you said "pick up the other guy's
21   cleaning"?
22          A.   I just word it.  I didn't mean to say
23   that.  I probably told him to help the other guys
24   clean.  But I don't remember.  I'm speculating over
25   here.
```

```
 1            Q.   Okay.  That's fine.  But you said, "I
 2   probably told him to pick up the other guy's cleaning,"
 3   and I honestly don't know what that means.  And I'm
 4   just asking what "pick up the other guy's cleaning
 5   means."
 6                 MR. EISMEIER:  I would object.  He already
 7   said he misspoke.
 8                 MR. HOOD:  I don't think he did say that.
 9   I think he said he's not sure he remembers.  And I said
10   when he said the words "pick up the other guy's
11   cleaning," what does that mean.
12            A.   I probably word it wrong.  I don't
13   remember.
14            Q.   (BY MR. HOOD)  Okay.  When you said "pick
15   up the other guy's cleaning," does that mean that you
16   probably asked him to help with the cleaning?
17                 MR. EISMEIER:  Objection.  Form of the
18   question.
19            A.   I don't remember.
20            Q.   (BY MR. HOOD)  Is it possible that's what
21   you meant by "pick up the other guy's cleaning"?
22                 MR. EISMEIER:  Same objection.
23            A.   I don't remember.
24                 The thing that I remember about that day,
25   because it's been too long ago, that those guys were
```

 1  inciting the other detainees to start disruption in the

 2  dorm.  They were yelling and shouting, and one was

 3  taking a broom.

 4          Q.    What do you mean by "taking" -- go ahead.

 5          A.    I told you I called the supervisor,

 6  supervisor came to the dorm.  It was his decision, not

 7  mine, to take those guys to segregation via medical.

 8  And lieutenant told me to write him up.

 9          Q.    Okay.  What do you mean -- what did you

10  mean by -- you said something about taking a broom.

11  What did you mean by that?

12          A.    I told you he got a broom and he was

13  swinging the broom.

14          Q.    Why did he have a broom if he wasn't

15  helping to clean?

16          A.    He was close to the closet where we have

17  the materials, the water, the soap, the brooms.

18          Q.    So was he helping to clean or wasn't he

19  helping to clean?

20          A.    I don't remember.

21          Q.    Is it possible that --

22          A.    They were all on the table, on the corner

23  table, when they started shouting and they started

24  yelling to all the detainees in there, they start

25  howling.  And I called the supervisor myself at that

1    time.

2         Q.   Okay.  And all the other detainees were

3    cleaning the handrails?

4         A.   Yes.

5         Q.   All of them?

6         A.   I don't remember all of them, but it was a

7    few cleaning.  They were helping the trustees.

8         Q.   Okay.  And they were helping them because

9    they wanted to help them?

10              MR. EISMEIER:  Objection.  Foundation.

11        A.   Yes.

12        Q.   (BY MR. HOOD)  Could you answer the

13   question?

14        A.   What was the question?

15        Q.   Why were the unpaid detainees helping the

16   trustees?

17              MR. EISMEIER:  Form and foundation.

18        A.   Because they wanted to help them.

19        Q.   (BY MR. HOOD)  Why did they want to help

20   them?

21              MR. EISMEIER:  Same objection.

22        A.   I don't know.  I can't think for them.

23        Q.   (BY MR. HOOD)  Okay.  Did the unpaid

24   detainees voluntarily help do other cleaning with the

25   trustees in the pods?

```
 1          A.   No.  Like I tell you, I don't remember.

 2    Mr. Kaka was really an aggressive detainee.  I don't

 3    know what to tell you.

 4          Q.   Okay.  But you don't remember him during

 5    this incident?

 6          A.   I remember him being there.

 7          Q.   Do you remember speaking to him during

 8    this incident at all?

 9          A.   I remember he cursing at me.

10          Q.   Do you remember why he was cursing at you?

11          A.   No.

12          Q.   Okay.  Do you remember why you assigned

13    Mr. Kaka a 307-level offense for "failure to obey my

14    orders for cleaning details"?

15          A.   No.

16          Q.   Is it possible that you gave an order for

17    Mr. Kaka to clean, which caused the 307 offense, he

18    failed to obey, and then he swore at you when he --

19    when he indicated that he would not obey?

20               MR. EISMEIER:  Objection.  Form of the

21    question.  Asked and answered.

22          A.   I don't know.

23          Q.   (BY MR. HOOD)  I'm sorry?  What was your

24    response?

25          A.   I don't remember.
```

1          Q.    Okay.  Do you remember assigning a

2    399-level offense to Mr. Kaka for creating a

3    disruption?

4          A.    I remember they were disrupting the

5    dayroom.

6          Q.    Okay.  Was he disrupting the dayroom by

7    refusing to clean?

8          A.    No, by shouting and yelling and saying bad

9    words and just inciting a riot.  He was getting out of

10   hand.  I called the supervisor to assist.

11         Q.    Were some of the bad words he said that he

12   would not "fucking clean" for you?

13         A.    I don't recall.

14         Q.    Was Mr. Kaka sent to seg as a result of

15   this write-up?

16         A.    He went to seg as a result of lieutenant

17   ordering them to go to segregation.  When they went to

18   segregation, lieutenant told me -- before they went to

19   segregation, they were going to medical, he told me, "I

20   need you give me write-ups for those guys."  I say,

21   "Yes, sir."

22         Q.    Did all the other detainees in the pod see

23   Mr. Kaka, Mr. Perez, Mr. Nava-Ruiz and Mr. Gonzalez

24   being taken to seg after this incident?

25         A.    The ones that were all cleaning, yes.

Jesus Gallegos
June 30, 2020                                                   201

```
 1              MR. HOOD:  All right.  I'm going to drop
 2  in Exhibit 13.
 3              THE WITNESS:  Can we take a break?  Can I
 4  go to the bathroom?
 5              MR. HOOD:  Why don't we finish with this
 6  document and then we'll take a break.  We're almost
 7  done, Mr. Gallegos.  There's just one document that's a
 8  similar document, and then we'll be ready for a break.
 9  And then I would suspect only 15 minutes more after
10  that.  GEO's attorney might also have questions for
11  you, too.
12              Could we look at this document that I just
13  dropped in and then we'll take a break.
14              THE WITNESS:  Can I take a break?
15              MR. HOOD:  If you want to, you can.  My
16  preference would be to look at this document first and
17  then we'll take a break.
18              THE WITNESS:  I need to go to the
19  bathroom.
20              MR. HOOD:  That's fine.  Let's go off the
21  record, please.
22              (Recess taken, 4:19 p.m. to 4:36 p.m.)
23       Q.   (BY MR. HOOD)  Mr. Gallegos, before we
24  took a break -- well, let me ask you this:  During the
25  break, did you talk to anybody?
```

```
 1                    (Exhibit 13 was remotely introduced and

 2                    provided electronically to the court

 3                    reporter.)

 4          Q.    (BY MR. HOOD)  Mr. Gallegos, are you ready

 5    to discuss Exhibit 13?

 6          A.    Yes, sir.

 7          Q.    Let me screen-share it, too.

 8                Is this another write-up?

 9          A.    Yes.

10          Q.    Okay.  Is that your signature on the

11    bottom right-hand corner?

12          A.    Yes.

13          Q.    Did you write this write-up?

14          A.    I believe it was for the same thing.

15          Q.    Okay.  And did you write this write-up?

16          A.    Yes.  I signed it.

17          Q.    Okay.  And typically if you sign a

18    write-up, did you write the write-up?

19          A.    Yes.

20          Q.    Okay.  Under the "Description of

21    Incident," do you see that you assigned rule violations

22    for offense category 307, 308 and 399?

23          A.    Yes.

24          Q.    Do you see that this detainee, Mr. Kolong,

25    was written up for "verbally cursing me out and stating
```

```
 1   he was not fucking cleaning for me"?

 2        A.   Yes.

 3        Q.   Do you remember this?

 4        A.   I remember the incident.  Like I said

 5   before, I remember they were really loud and

 6   disruptive, and I called the supervisor.

 7        Q.   Okay.  And -- go ahead.  Go ahead.  Yep.

 8        A.   He told me -- he told somebody else, and

 9   other officers, too, "Take the detainees to medical and

10   then segregation."

11        Q.   Did the lieutenant tell you what offense

12   categories to assign for each detainee?

13        A.   No, no, just disrupting the facility.

14        Q.   Okay.  Why did you assign a 307 offense

15   level for "failure to obey my orders for cleaning

16   details"?

17        A.   I don't remember.  I probably -- I don't

18   remember, but I probably when everybody was cleaning

19   went to the table and they were shouting.  I told them

20   to stop shouting; instead of being disruptive, they

21   should help those guys clean to finish sooner.

22             That's what I'm thinking I said probably.

23   But they just got out of hand.  They were too loud

24   and --

25        Q.   Okay.  No, go ahead and finish.  I'm sorry
```

1    to interrupt.

2          A.   Like I said, they were too loud.  They

3    were disruptive.  The unit was getting out of hand.

4          Q.   Okay.  And you probably told them to clean

5    rather than sit at the table?

6          A.   I probably told them to help the other

7    guys finish faster, but I don't remember.  I'm

8    speculating on that.

9          Q.   Okay.  What were the other guys doing?

10         A.   Cleaning.

11         Q.   Okay.  So you told them to help the other

12   guys cleaning?

13         A.   It wasn't everybody.  It was just a few

14   detainees cleaning.  The trustees were cleaning and a

15   few other guys were helping them.

16         Q.   Okay.  And then Mr. Kolong responded that

17   he was not "fucking cleaning" for you; is that correct?

18         A.   Yeah.  I can't even remember Mr. Kolong,

19   to be honest with you.

20         Q.   Okay.  You don't remember him at all?

21         A.   No.

22         Q.   And you said that the lieutenant did not

23   tell you to assign these offense categories, the 307,

24   308 and 399; is that correct?

25         A.   He just told me to write them up.

Grisel Xahuentitla-Gallegos
June 30, 2020                                              212

 1   officers.  I don't know how many.  I don't remember.

 2   It's too long.

 3        Q.   (BY MR. HOOD)  Okay.  And were you

 4   implementing the rules of the Aurora Detention Facility

 5   during this incident?

 6             MR. EISMEIER:  Same objection.

 7        A.   I wasn't implementing the rules.  The

 8   lieutenant, he's the one who order the detainees to go

 9   to segregation, not me.

10        Q.   (BY MR. HOOD)  Was the lieutenant

11   implementing the rules of the Aurora Detention Facility

12   when he sent the detainees to detention?

13        A.   I don't know.

14        Q.   Were you implementing the rules of the

15   Aurora Detention Facility when you completed these

16   write-ups?

17             MR. EISMEIER:  Object to form of the

18   question.

19        A.   Was I what?

20        Q.   (BY MR. HOOD)  Implementing the rules of

21   the Aurora Detention Facility when you wrote these

22   write-ups.

23        A.   Yeah, I remember writing the write-ups,

24   but I only remember the charge for disrupting the

25   place.

```
 1        Q.   Okay.  And were you implementing the rules

 2   of the Aurora Detention Facility when you wrote the

 3   write-ups?

 4        A.   Yes, I believe so.

 5             MR. HOOD:  Okay.  That's all I have,

 6   Mr. Gallegos.  Thank you very much.

 7             Dana -- don't sign off.  Dana I think has

 8   some questions for you, and then I might have some

 9   follow-up questions after that, but we should be very

10   nearly done, okay?

11             THE WITNESS:  Okay.

12             MR. EISMEIER:  Thank you.

13                       EXAMINATION

14   BY MR. EISMEIER:

15        Q.   Mr. Gallegos, just a few questions.

16             Did you ever write up someone in a dorm

17   for failing to clean and based only on a failure to

18   clean?

19        A.   Don't recall.  I don't think so.  I don't

20   recall.

21        Q.   In a write-up, any write-up that you've

22   made, has there been some amount of insolence or

23   fighting or some other element which caused the event

24   to be written up?

25             MR. HOOD:  Objection.  Form and
```

1   foundation.

2        A.   Yes.  Nobody just got a write-up for not

3   cleaning.  You have to be elevated to something.

4        Q.   (BY MR. EISMEIER)  After meal service,

5   during the days, for example, if someone said, "I don't

6   want to clean," what did you do?

7        A.   Go to the next person, ask somebody else

8   if they want to clean.

9        Q.   Okay.  You've been asked several questions

10  by Mr. Hood about the last few exhibits, which I'm sure

11  you remember.  We just finished.

12            Were any of those five people trustees, to

13  your knowledge?

14       A.   No, I don't remember.  It's been too long.

15       Q.   You just don't remember one way or the

16  other?

17       A.   No.

18       Q.   Okay.  The incident that we were -- you

19  were just talking about in response to Mr. Hood's

20  questions, this occurred at night; is that right?

21       A.   Yes.

22       Q.   This did not occur with respect to cleanup

23  after meals; is that correct?

24       A.   No.

25       Q.   In other words, did it occur after meals

```
 1                    REPORTER'S CERTIFICATE

 2  STATE OF COLORADO        )
                             )  ss.
 3  CITY AND COUNTY OF DENVER )

 4            I, Shannon Clementi, Registered
    Professional Reporter, Colorado Realtime Certified
 5  Reporter and Notary Public ID 20004025632, State of
    Colorado, do hereby certify that previous to the
 6  commencement of the examination, the said
    SERGIO GALLEGOS verbally declared his/her testimony in
 7  this matter is under penalty of perjury; that the said
    deposition was taken in machine shorthand by me at the
 8  time and place aforesaid and was thereafter reduced to
    typewritten form; that the foregoing is a true
 9  transcript of the questions asked, testimony given, and
    proceedings had.

10

11            I further certify that I am not employed
    by, related to, nor of counsel for any of the parties
    herein, nor otherwise interested in the outcome of this
12  litigation.

13            IN WITNESS WHEREOF, I have affixed my
    signature this 5th day of August, 2020.

14

15            My commission expires June 3, 2021.

16
    __X__  Reading and Signing was requested.
17
    _____  Reading and Signing was waived.
18
    _____  Reading and Signing is not required.
19
                  _____
20                Shannon Clementi
                  Registered Professional Reporter
21                Colorado Realtime Certified Reporter

22

23

24

25
```