# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02887-JLK

_____

RULE 30(b)(6) DEPOSITION OF:
DAWN CEJA - March 29, 2016
The GEO Group, Inc.

_____

ALEJANDRO MENOCAL, et al.,

Plaintiffs,

v.

THE GEO GROUP, INC.,

Defendant.

_____

        PURSUANT TO NOTICE, the Rule 30(b)(6)
deposition of DAWN CEJA, THE GEO GROUP, INC., was
taken on behalf of the Plaintiffs at 600 Grant Street,
Suite 450, Denver, Colorado 80203, on March 29, 2016,
at 9:34 a.m., before Darcy Curtis, Registered
Professional Reporter and Notary Public within
Colorado.

 1   Aurora.

 2          Q.    That's all I want you to discuss for the

 3   purposes of this question.

 4          A.    Okay.

 5          Q.    I'm asking:  Do you know the name of the

 6   person or the people, names of the people, who take

 7   these three sources of the policy and put them

 8   together?

 9          A.    It changes.  Currently we have our

10   accreditation manager that does our policy review.

11          Q.    Anybody else?

12          A.    Everybody will review a policy, and if

13   they have additions or things that need to be deleted,

14   that's what I refer to as a policy review.  It's a

15   group.  Then the final policy is reviewed by the

16   warden and signed off when it's done by the warden and

17   by immigration.

18          Q.    Who is "we" in the policy review group?

19          A.    Usually the department heads, so it could

20   be myself, the program manager, the accreditation

21   manager, the chief of security.  Usually people more

22   in the upper echelon.

23          Q.    How often does that happen?

24          A.    Annually.

25          Q.    Who at ICE signs off on the policy?

Case No. 1:14-cv-02887-JLK-CYC   Document 336-9   filed 10/26/20   USDC Colorado
pg 4 of 29
Menocal v. The Geo Group, Inc.                    DAWN CEJA                         3/29/2016

Page 29

1         A.    The COTAR, the contracting officer's

2    technical representative.

3         Q.    Do you know which version of the

4    Performance-Based National Detention Standards the

5    policy is currently drawn from?

6         A.    Currently we are going off of the 2011,

7    and then I think there's been some adjustments on

8    there that are from 2013.

9         Q.    Do you happen to know which version of

10   the Performance-Based National Detention Standard

11   governs the current contract between ICE and GEO?

12        A.    The same ones that I just said.

13        Q.    Okay.  The housing unit sanitation policy

14   applies to all ICE detainees at the Aurora Detention

15   Facility, correct?

16        A.    Yes.

17        Q.    Are they provided a copy of this policy?

18        A.    No.

19        Q.    What are they provided in order to know

20   how they need to comply?

21        A.    They, upon initial admission, review a

22   PowerPoint presentation as an orientation video.  They

23   receive a handbook, a local supplement handbook, and

24   they also receive an ICE handbook.  In each housing

25   unit are bulletin boards, and we post notices and

```
 1   things along such as that on those housing unit

 2   bulletin boards.

 3           Q.    Is it a separate PowerPoint and video?

 4           A.    Yes.

 5           Q.    Okay.  And that PowerPoint includes

 6   information about the housing unit sanitation policy,

 7   correct?

 8           A.    Yes.

 9           Q.    Have you seen the video?

10           A.    I initially put the original one

11   together, yes.

12           Q.    You were responsible for compiling it.

13   Do you know if that's the one that's used right now?

14           A.    There have been updates to it.

15           Q.    Okay.  Do you know what information it

16   provides detainees regarding the housing unit

17   sanitation policy?

18           A.    I would have to review it again to give

19   you accurate information.

20           Q.    Okay.  Can you remember anything about

21   what it says?

22           A.    No.

23           Q.    Do you know what languages it's brought

24   in?

25           A.    English and Spanish.
```

 1          A.    Correct, the voluntary work program with

 2    the detainees.

 3          Q.    **So when you read this second sentence,**

 4    **you are understanding the organized, supervised**

 5    **continuous program of daily cleaning by all detainees**

 6    **to mean the voluntary work program; is that right?**

 7          A.    It's all encompassing.  So you have your

 8    voluntary work program, which covers areas in laundry

 9    or kitchen, and then you have your housing unit

10    sanitation, which we discussed earlier.

11          Q.    **Okay.  What else does the voluntary work**

12    **program cover that is not covered by the housing unit**

13    **sanitation policy?**

14          A.    I don't follow your question.

15          Q.    **It's because I've been trying to sort of**

16    **separate these things out into topics, because I want**

17    **us to be in one lane, if we can, mentally.**

18          A.    Okay.

19          Q.    **Because we have a topic about the**

20    **voluntary work program; we have a topic about the**

21    **housing sanitation policy.  It seems to me that you've**

22    **described it as two programs, the voluntary work**

23    **program and then the obligations of the detainees.  Is**

24    **that a fair understanding?**

25          A.    I see it as your housing unit where you

Case No. 1:14-cv-02887-JLK-CYC    Document 336-9    filed 10/26/20    USDC Colorado
pg 7 of 29
Menocal v. The Geo Group, Inc.                    DAWN CEJA                                3/29/2016

Page 36

1    do your housing unit sanitation, and then there is as

2    well your voluntary work program where they put in an

3    application and are chosen to work in other areas of

4    the facility.

5              Q.    But sometimes the voluntary work program

6    detainees work in the housing unit; is that right?

7              A.    Yes.

8              Q.    If you'll turn the page to the next part

9    of the exhibit, it's page 56.  Do you see on the

10   left-hand column where it says, "Housing Unit

11   Sanitation"?

12             A.    Yes.

13             Q.    It says, "Each and every detainee must

14   participate in the facility's sanitation program.  A

15   list of detainees is developed each day by staff and

16   is posted daily for viewing.  During a general cleanup

17   all detainees must participate.  The assigned housing

18   unit officer will be responsible for assuring this

19   general cleanup is done on a regular basis."  Do you

20   see that?

21             A.    Yes.

22             Q.    Is that the current policy of GEO?

23             A.    Yes.

24             Q.    What's a general cleanup?

25             A.    After meals they have a day room area,

1    which is a common area, where all of the TVs and

2    tables are located.  They all eat at these tables, so

3    after meal service, they will clean up the tables,

4    wipe down the tables, and sweep and mop the floors.

5            Q.    And that is -- according to this policy,

6    all detainees are required to participate?

7            A.    In that common area cleanup.

8            Q.    So that's every meal?

9            A.    Yes.

10            Q.    So when it says, "this general cleanup is

11    done on a regular basis," that's one of the examples.

12    A meal time is one of the examples; is that right?

13            A.    Yes.

14            Q.    Are there any other examples of when a

15    general cleanup happens?

16            A.    No.  The general cleanup that that is

17    discussing is after the meal service.

18            Q.    Okay.  So there's never another time when

19    there's a general cleanup?

20            A.    Not in the common area, no.

21            Q.    Okay.  What about anywhere else?

22            A.    No.

23            Q.    All right.  Every single detainee at the

24    Aurora Detention Facility who is detained under the

25    ICE contract is bound by this housing unit sanitation

Case No. 1:14-cv-02887-JLK-CYC    Document 336-9    filed 10/26/20    USDC Colorado
pg 9 of 29
Menocal v. The Geo Group, Inc.                    DAWN CEJA                              3/29/2016

Page 38

1    policy; is that right?

2            A.    If they're housed in a housing unit.

3            Q.    **Where else could they be housed if**

4    **they're an ICE detainee?**

5            A.    Medical.

6            Q.    **So if you're in medical, you're not**

7    **subject to those cleanup requirements?**

8            A.    If there's a medical condition or some

9    type of contagious disease that they may have, then,

10   no.

11           Q.    **Okay.  How many people can be housed in**

12   **medical at a time?**

13           A.    I believe there's 11 beds in there.

14           Q.    **Okay.  What's the current bed count at**

15   **the facility for ICE detainees?**

16           A.    Today?

17           Q.    **Yes.  How many available beds do you**

18   **have?**

19           A.    The contract is up to 525.

20           Q.    **So the maximum number of beds that you**

21   **can supply to ICE under your contract?**

22           A.    Yes.

23           Q.    **If you could, I now would like you to**

24   **take a look at pages 46 and 51 -- excuse me -- 46**

25   **through 51.  So you're going to go backwards and**

1          MS. FELTON:  Object to form.

2          A.   Not necessarily, but in some cases, there

3    are people who do not know how to clean up after

4    themselves.

5          Q.   (BY MR. FREE)  As far as GEO is

6    concerned, does it matter, when you're looking at a

7    disciplinary action, whether it poses a health or like

8    a life safety issue?

9          MS. FELTON:  Object to form.

10         A.   I don't understand.

11         Q.   (BY MR. FREE)  Circle back to that.

12   Fair?

13         A.   Okay.

14         Q.   I'm going to hand you what we'll mark as

15   Exhibit 4 to today's deposition.

16         (Deposition Exhibit 4 was marked.)

17         Q.   I apologize that it is not already in

18   your binder.  I'm going to hand it to your counsel and

19   to you.  If you would just plug it in, or I can do it,

20   behind Tab No. 17.  Have you had a chance to look at

21   the document that I just handed you that we marked as

22   Exhibit 4?  And in the bottom right-hand corner, it

23   says, "PL 59, PL 60, PL 61."  Have you had a chance to

24   look at that?

25         A.   Yes.

     1                    (At this time Mr. Turner entered the

     2       room.)

     3              Q.    Do you recognize this document?

     4              A.    Yes.

     5              Q.    Or these documents?

     6              A.    Yes.

     7              Q.    What are they?  Let's start with the

     8       first page.

     9              A.    They are all different versions of the

    10       cleanup list over the years that has been used to

    11       specify who is going to clean up after meal service.

    12              Q.    Who created these documents?

    13              A.    I do not know who created any of these

    14       versions.

    15              Q.    Okay.  How often are they distributed to

    16       detainees?

    17              A.    Usually --

    18                    MS. FELTON:  Object to form.

    19              A.    They're not distributed to detainees, but

    20       usually what happens is the assigned officer on the

    21       graveyard shift will fill out the names and the person

    22       who will be responsible for the following day's meals,

    23       so when dayshift comes on, it will be ready to go.

    24              Q.    (BY MR. FREE)  Okay.  And then where is

    25       this posted, if it's posted?

Case No. 1:14-cv-02887-JLK-CYC    Document 336-9    filed 10/26/20    USDC Colorado
Menocal v. The Geo Group, Inc.                DAWN CEJA    90.12 of 29                            3/29/2016

Page 84

1          A.    Usually it's posted right by the detainee

2    mailboxes.  They fold it and hang it over the edge.

3          Q.    **As far as you know, is this the way that**

4    **the detainees find out that they're responsible for**

5    **cleaning up after meals pursuant to the housing unit**

6    **sanitation policy?**

7          A.    Yes.

8          Q.    **Okay.  This falls -- I just want to make**

9    **sure I understand.  This falls outside of the realm of**

10   **the voluntary work program; is that right?**

11         A.    This is for all of the common area, yes.

12         Q.    **This is within the housing unit**

13   **sanitation policy and not the voluntary work program?**

14         A.    It's part of the living area.

15         Q.    **How does that answer my question?**

16         A.    What I referred to before, when we had

17   the same discussion, that the common area is part of

18   the living area.  It's all connected.

19         Q.    **Let's try this a different way.  Do**

20   **people get paid for doing these jobs?**

21         A.    No.

22         Q.    **Are they required to do these jobs?**

23         A.    To keep the area clean, we assign them,

24   yes.

25         Q.    **The answer is, yes, they're required to**

1    do these jobs?

2            A.    Yes.

3            Q.    If they don't do these jobs, they can

4    potentially be charged with a disciplinary infraction,

5    a 300-level infraction?

6            A.    Possibly, yes.

7            Q.    And that could possibly lead to solitary

8    confinement?

9                MS. FELTON:  Object to form.

10            Q.    (BY MR. FREE)  Excuse me.  Administrative

11    segregation; is that right?

12            A.    Yes.

13            Q.    And this is something that is explained

14    to the detainees when they come in?

15            A.    It's in the handbook, yes.

16            Q.    And this is a uniform policy throughout

17    all of the tiers in which ICE detainees are kept?

18                MS. FELTON:  Object to form.

19            A.    I don't know.

20            Q.    (BY MR. FREE)  Let me clarify.  In each

21    place where an ICE detainee is housed, does GEO use a

22    cleanup list, like the ones we've just reviewed, to

23    notify the detainees of their responsibilities for

24    cleaning?

25            A.    I do not --

Case No. 1:14-cv-02887-JLK-CYC    Document 336-9    filed 10/26/20    USDC Colorado
pg 14 of 29
Menocal v. The Geo Group, Inc.                    DAWN CEJA                                    3/29/2016

Page 87

1   place?

2           A.   Yes.   The system was in place when I

3   started as a detention officer in 1995.

4           Q.   Maybe this first design may have dated

5   back to that.

6           A.   No.

7           Q.   Okay.   I kid.   So let's now take a look

8   at what we're going to mark as Exhibit 5 to this

9   deposition.

10              (Deposition Exhibit 5 was marked.)

11          Q.   Again, I'm sorry, but we do not have it

12  in your binder, if you'll just slide that in at Tab 18

13  of your deposition notebook.   Take a look and review

14  that, please, and let me know when I can ask you some

15  questions about it.

16              MS. FELTON:   Is this 5?

17              MR. FREE:   It's Exhibit 5, correct.

18          Q.   (BY MR. FREE)   At the bottom of the page,

19  this is Plaintiffs 51, 52, 53, 54, and 55.   Have you

20  had a chance to look at that?

21          A.   Yes.

22          Q.   Do you recognize this document?

23          A.   Yes.

24          Q.   What is it?

25          A.   It is part of the detainee handbook local

 1    supplement.

 2              Q.    And is this one of the things or part of

 3    one of the handbooks that you testified earlier is

 4    provided to a detainee when he or she is admitted to

 5    the Aurora facility?

 6              A.    Yes.

 7              Q.    This section, Section VIII, at the bottom

 8    left-hand corner and what follows is the formal

 9    document that puts the detainee on notice of his or

10    her obligations and rights under the discipline

11    policy; is that right?

12              A.    Yes.

13              MS. FELTON:  Object to form.

14              Q.    (BY MR. FREE)  Do they get this every

15    time, this section of the handbook?

16              MS. FELTON:  Object to form.

17              A.    Yeah.

18              Q.    (BY MR. FREE)  Every time a detainee is

19    admitted --

20              A.    Yes, and they sign for it.

21              Q.    -- he or she signs memorializing that he

22    or she received this policy?

23              A.    Yes.

24              Q.    Now, the only reason I wanted you to look

25    at this, because I want to make sure I'm clear, if

Page 89

```
 1    you'll turn to PL 54, the 300-level offense that you

 2    were referring to earlier, would that have been 306,

 3    refusal to clean assigned living area?

 4         A.   Yes.

 5         Q.   Okay.  And that's in the high moderate

 6    offense category; is that right?

 7         A.   Yes.

 8         Q.   There are low moderate offense

 9    categories, but this is not in them; is that right?

10         A.   Yes.  If you're referring to the 400

11    level, yes.

12         Q.   That is right.  And in the list of

13    sanctions that apply to high moderate offenses,

14    detainees are informed through this document that GEO

15    could initiate criminal proceedings?

16              MS. FELTON:  Object to form.

17         Q.   (BY MR. FREE)  Is that right?

18         A.   That's what is listed, yes.

19         Q.   I'm going to ask whether these other

20    sanctions could follow from a 306 violation.  I think

21    the one we talked about earlier was a disciplinary

22    segregation, up to 72 hours, right?

23         A.   Yes.

24         Q.   They could lose a job; is that right?

25         A.   Yes.
```

 1    GEO believes the company can require detainees to do a

 2    lot more than that.  At least in the examples I've

 3    given, this sentence is not limited to the four things

 4    that come after the word "by" colon.  What is the

 5    basis for that?

 6              A.   Because it says immediate living area.

 7    And I know I keep saying that, but that's what it is.

 8    And it may be hard for you to understand because

 9    you've never been to the facility to see what it looks

10    like.  But when you walk into a unit, that is their

11    living area.  I guess you would have to see it to

12    understand what I'm saying.

13              Q.   Well, I want my child to clean his room.

14    Okay.  But I don't want him to clean his room by

15    getting out a wax floor stripper and, you know,

16    operating a dangerous piece of machinery outside of my

17    supervision.  I want my child to clean his room.  In

18    fact, I'm able to require my child to clean his room

19    by making his bunk bed, stacking the papers, keeping

20    his floor clean, and not hanging stuff on the walls.

21    Okay.  If I have that stipulation and I'm stuck with

22    that, then why is it fair to make my child do all of

23    these other things, to do this wax floor stripping,

24    all of these other things?  What is the limiting

25    principle here, I guess, is what I'm asking.  What is

**Menocal v. The Geo Group, Inc.**                    DAWN CEJA                    **3/29/2016**

Page 139

 1    the limiting principle?

 2                   MS. FELTON:  I'm going to object to form.

 3                   MR. FREE:  Fair.

 4                   MS. FELTON:  There's no waxing the

 5    floors.

 6                   MR. FREE:  Well, it's a hypothetical

 7    question anyway, so there's no anything.  Let's back

 8    up.

 9        Q.    (BY MR. FREE)  By your logic, GEO, what

10    can't you require a detainee to do within an immediate

11    living area?

12                   MS. FELTON:  Object to form.

13        A.    I really don't understand.

14        Q.    (BY MR. FREE)  What is it that GEO,

15    according to your reading of the PBNDS, cannot require

16    a detainee to do within the immediate living area?

17        A.    I would say they're not going to be

18    stripping the floor.

19        Q.    Okay.  Anything else?

20        A.    Are you limiting this only to the ones

21    that are on that list or --

22        Q.    No.

23        A.    -- what?  Because then I'm not sure if

24    you're asking under the voluntary work program which

25    are the paid positions.

Case No. 1:14-cv-02887-JLK-CYC    Document 336-9    filed 10/26/20    USDC Colorado
pg 19 of 29
Menocal v. The Geo Group, Inc.                    DAWN CEJA                                    3/29/2016

Page 140

1     Q.    That's the whole point, right?  Because

2  work assignments are voluntary.  You can have them do

3  what you want within the limits?

4     A.    Yes.

5     Q.    But the personal housekeeping is a

6  requirement.  And you're telling me that you can

7  require them to do a lot more than the things that are

8  in this list in the name of personal housekeeping?

9     A.    Right, like wiping down tables after meal

10  service, yes.

11     Q.    What is the legal basis of GEO's position

12  there?

13          MS. FELTON:  Object to form.

14     A.    I don't know.

15     Q.    (BY MR. FREE)  What is the factual basis

16  of GEO's position there?

17     A.    Based on what it says.

18     Q.    And that's it?

19     A.    Yes.

20     Q.    Okay.  Now, do GEO employees get training

21  on the Performance-Based National Detention Standards?

22     A.    Yes.

23     Q.    Is the position you have just articulated

24  to me uniformly applied within the Aurora facility?

25     A.    Yes.

1    program?

2              A.    Yeah.   It's still a job application.

3              Q.    All right.  Do you see where it asks, "If

4    all paid positions are filled, would you be interested

5    in working on a voluntary basis"?  Do you see that?

6              A.    Yes.

7              Q.    Under which program described in the

8    PBNDS or in any other document is there any sort of

9    authority or policy for GEO to run a second voluntary

10   work program?

11             A.    I don't understand your question.

12             Q.    Well, you've said there are 40 paid

13   positions, this was false, but you didn't -- it could

14   have been an old form.  And then you ask if he wants

15   to work voluntarily and he says no.  If he had said

16   yes, where is the policy I can look to to see what the

17   program he is working for is?

18             A.    Just what we have in the contract and in

19   the PBNDS.  There's no set amount.  So even if we went

20   over and he was approved, which he was for a housing

21   unit, he would still get paid.

22             Q.    I don't know that that necessarily

23   answers my question, or maybe I just don't understand

24   your answer.  I'm assuming for a moment that you don't

25   have enough spots in the voluntary work program and

Menocal v. The Geo Group, Inc.                    DAWN CEJA                                    3/29/2016

Page 147

1    that he elects that he'll work for this -- he'll work

2    voluntarily, he would be interested in working on a

3    voluntary basis.

4              A.    Okay.

5              Q.    First of all, it's already voluntary,

6    right, the work program has to be voluntary?

7              A.    Yes.

8              Q.    But really what you're saying is a

9    voluntary unpaid basis?  That's what this question is

10   about.

11             A.    Correct, such as a special detail.

12             Q.    Okay.  So there's a special detail that

13   he could work for if he had said yes?

14             A.    Yes.

15             Q.    And you're telling me the place that I

16   could find out how that's run, how it's administered,

17   what standards govern it, that's either the contract

18   or the PBNDS?

19             A.    Correct.

20             Q.    Okay.  Look at page 62, please.  What is

21   this document?

22             A.    This appears to be the second page of the

23   work application.

24             Q.    Do you see at the top where it says,

25   "Detainee Voluntary Work Program Agreement"?

 1              A.   Yes.

 2              Q.   And then at the bottom it says, "Work

 3    Detail Orientation"?

 4              A.   Yes.

 5              Q.   Do you see that?  Okay.  Is this a

 6    contract?

 7                   MS. FELTON:  Object to form.

 8              Q.   (BY MR. FREE)  As far as GEO's policy and

 9    practice, is this a contract?

10                   MS. FELTON:  Object to form.

11              A.   I would have to double-check, but I

12    believe this came out of the PBNDS and was attached to

13    the voluntary work program standard.

14              Q.   (BY MR. FREE)  Okay.  In this form as it

15    appears in this?

16              A.   I would have to double-check, but I

17    believe so.

18              Q.   As far as GEO is concerned, does

19    Mr. Menocal's signature on this form, page 62, create

20    a contract between him and GEO?

21                   MS. FELTON:  Object to form.

22                   MR. FREE:  What's the objection to form?

23                   MS. FELTON:  That there are legal

24    standards for -- legal elements for a contract and she

25    does not have the background to be answering that.

1          MR. FREE:  So it calls for a legal

2   conclusion?

3          MS. FELTON:  Yes.

4          MR. FREE:  Thanks.

5      Q.   (BY MR. FREE)  In practice if Mr. Menocal

6   had signed this form and been accepted to work in the

7   voluntary work program and then someone decided they

8   didn't want him in there anymore, could he take this

9   form to his supervisor and say, hey, look, I'm

10  entitled to work in the voluntary work program, in

11  practice?

12         MS. FELTON:  Object to form.

13     A.   I don't know.

14     Q.   (BY MR. FREE)  Okay.  In terms of the

15  practice and the policy of GEO, the fact that

16  Mr. Menocal signed this document at 62, does that

17  create any rights for him?

18     A.   I don't know, but I don't see his

19  signature on here.

20     Q.   Fair enough.  Let's assume he had signed

21  it.  Thank you very much for pointing that out.  He

22  didn't sign it, at least this one.  Assume he signed

23  it.

24     A.   Okay.

25     Q.   Would he have any greater rights than he

 1  had the moment before he signed it according to GEO's

 2  practice?

 3          A.    I don't think so.

 4          Q.    Okay.  It's GEO's position he's not an

 5  employee of GEO, right?

 6          A.    No, not at all.

 7          Q.    So it's not an employment contract as far

 8  as GEO's practice and the policy of the corporation;

 9  this detainee voluntary work program agreement doesn't

10  make him GEO's employee, right?

11          A.    No.

12          Q.    Okay.  Does it obligate GEO to continue

13  to hold his spot in the voluntary work program?

14          A.    I'm not sure I understand, because he can

15  be removed.

16          Q.    Right.  He can be removed at any time,

17  right?

18          A.    Yes.

19          Q.    And according to this form, this is form

20  62 -- the form at page 62, No. 7 at the bottom, it

21  says, "Work detail members will receive $1.00 per work

22  day.  The maximum paid out will be $1.00 per day."  Is

23  that right?

24          A.    Yes.

25          Q.    Okay.  And he must sign the pay sheet on

Menocal v. The Geo Group, Inc.                    DAWN CEJA                              3/29/2016

Page 151

```
 1    the day the work is performed, right?

 2                    (At this time Mr. Turner left the room.)

 3          A.    Yes.

 4          Q.    It says, "All work detail members serve

 5    at the pleasure of the facility and may be removed

 6    from their work status without prior notice or

 7    justification."  That's sort of what we were talking

 8    about before, right?

 9          A.    Yes.

10          Q.    I would like you to turn to page 70,

11    please, within Tab 7.  This is another document

12    produced by GEO for another one of the plaintiffs in

13    this case.  It appears to me that this is the job

14    description for a laundry sanitation worker.  Is that

15    how it looks to you?

16          A.    Yes.

17          Q.    Is this a document that would have been

18    given to Agoberto Vizguerra, the person who signed it,

19    upon his entry into the voluntary work program?

20          A.    It's possible he received a copy.  I

21    don't know for sure.

22          Q.    But GEO has a copy, right?

23          A.    Yes.  It would be in his detention file.

24          Q.    Excuse me.  It's Dagoberto, but thank

25    you.  This explains all of the things that Dagoberto
```

Case No. 1:14-cv-02887-JLK-CYC    Document 336-9    filed 10/26/20    USDC Colorado
pg 26 of 29
Menocal v. The Geo Group, Inc.                    DAWN CEJA                                    3/29/2016

Page 162

 1    Details."  Okay.  That doesn't -- when you say,

 2    "Detainees may volunteer for temporary work details

 3    that occasionally arise.  The work, which generally

 4    lasts from several hours to several days may involve

 5    labor-intensive work," what you're saying is that this

 6    policy tracks with this part of the PBNDS?

 7            A.   I'm not sure I understand.

 8            Q.   8.1.8, the language in 8.1.8.

 9            A.   Under D.

10            Q.   Yes.

11            A.   Yes.

12            Q.   It tracks part E of the PBNDS?

13            A.   Yes.

14            Q.   Great.  Okay.  And that's at 48.  Are

15    people paid for the special details?

16            A.   Yes.  We also give them goody bags.

17            Q.   Like what?

18            A.   We give all trustees goody bags.

19            Q.   And by "trustees," you mean someone who

20    has applied for and been accepted to the PBNDS or a

21    person who is doing a special detail or what do you

22    mean?

23            A.   Yes.

24            Q.   Yes.  Okay.  What's in a goody bag?

25            A.   They get bags of chips, candy bars, drink

**Menocal v. The Geo Group, Inc.**                    DAWN CEJA                    3/29/2016

1    mixes.  It's just extra stuff.

2            Q.    Why do you do that?

3            A.    Because we do.  We give them Xboxes.  We

4    give them a lot of things that we don't have to do.

5            Q.    When they are in the voluntary work

6    program?

7            A.    Yes.

8            Q.    Huh.

9            A.    Well, the whole population gets the

10   Xboxes and some of the other stuff, but the workers,

11   we do.

12           Q.    What do the workers get, other than the

13   goody bags, that the other people don't get?

14           A.    Sometimes they do get them.  We actually

15   give ice cream and cookies and stuff once a week on

16   those that have the cleanest units.

17           Q.    I'm just talking about the voluntary work

18   program participants versus the detainees who are not

19   participants in the voluntary work program.

20           A.    But some of those that do clean, like the

21   housing unit people, they are included with that, so

22   like they would get the ice cream and stuff too.

23           Q.    What housing unit people?

24           A.    The trustees under the voluntary work

25   program.

```
 1        Q.   Okay.  So who doesn't get the ice cream?

 2        A.   The ones that don't like have good

 3   sanitation in their cells, in the common areas.

 4        Q.   Okay.  Do you see page 1397?

 5        A.   Yes.

 6        Q.   Would you agree that it lists a number of

 7   general work assignments and times?

 8        A.   Yes.

 9        Q.   Would you agree that it doesn't list the

10   number of workers; is that right?

11        A.   Correct.

12        Q.   Okay.  So can you, without mathematical

13   precision, just estimate how many people are in each

14   of these eight categories on any given day in the

15   voluntary work program?  We'll just call it a weekday.

16        A.   Off the top of my head, I don't know.

17   Some of these, like food service, I don't know for

18   sure.  Living area, usually it's maybe two for each

19   unit.

20        Q.   And then you have area cleaning for

21   inside the facility and that's three shifts.  You have

22   area cleaning outside the facility, that's just one

23   shift.  You have evening workers, building janitorial,

24   that looks like from 3:30 to 8:30.  Do you see that?

25        A.   Yes.
```

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                          ) ss.
CITY AND COUNTY OF DENVER  )

       I, Darcy Curtis, Registered Professional
Reporter and Notary Public ID 20064016972, State of
Colorado, do hereby certify that previous to the
commencement of the examination, the said DAWN CEJA
was duly sworn by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.

       I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

       IN WITNESS WHEREOF, I have affixed my
signature this 12th day of April, 2016.


       My commission expires May 2, 2018.


___X_ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.