# Exhibit 10

```
                                                                    Page 1
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                       DISTRICT OF COLORADO
 2

 3     Civil Action No.: 1:14-cv-02887-JLK
      _____
 4
            VIDEOCONFERENCE DEPOSITION OF: LUIS PAGAN
 5                        July 8, 2020
      _____
 6
       ALEJANDRO MENOCAL, et al.,
 7
       Plaintiffs,
 8
       vs.
 9
       THE GEO GROUP, INC.,
10
       Defendants.
11
      _____
12

13
                  PURSUANT TO NOTICE, the videoconference
14     deposition of LUIS PAGAN was taken on behalf of the
       Plaintiff remotely, on July 8, 2020 at 10:05 a.m.,
15     before Leeann L. Stellor, Registered Merit Reporter
       and Notary Public within Colorado.
16

17

18

19

20

21

22

23

24

25
```

Page 94

1   A.   24/7 if he's in there for that reason.
2   Q.   So every 15 minutes?
3   A.   Yes.
4   Q.   And you said you have to look in there.
5   Does that mean the lights stay on?
6   A.   There is an -- if it's nighttime, there
7   is a night light where you can still see them. If
8   it's during the day, there's the daylight, sun,
9   where there's more light in there.
10  Q.   You said you check the cell door?
11  A.   Yes. We come up to the door and look
12  inside. The door is locked, and we look inside.
13  There's a window where you can see them.
14  Q.   And you say you communicate with them
15  verbally?
16  A.   Yes.
17  Q.   And you do that every time?
18  A.   Yes.
19  Q.   Do you need to touch the door?
20  A.   We normally tap on the door, get his
21  attention if he's sleeping.
22  Q.   Okay.
23  A.   If his head is under the covers or
24  something, make sure he's --
25  Q.   The door's locked, right?

Page 95

1   A.   I'm sorry?
2   Q.   The door's locked?
3   A.   Yes.
4   Q.   Okay. So we covered the Job Description.
5   You said that, you know, suicide watch might be a
6   thing that hasn't been mentioned there that you do
7   as a detention officer.
8        Is there anything else you can
9   think of that you, as a detention officer, are given
10  the power and authority to do at ADC, other than
11  what's listed here?
12  A.   No. I think we covered everything.
13  Q.   Nothing else?
14  A.   Not at the top of my head, no.
15  Q.   We spoke earlier about the rules that
16  applied to detainees. You get trained in the
17  detainee rules in your training, right?
18  A.   There's a handbook that we -- we look at
19  and see what the rules and regulations are, and we
20  try to make sure that that's what they're doing,
21  they're following them.
22  Q.   You don't write that handbook as DOs,
23  right, as detention officers?
24  A.   No. I believe it comes from ICE, ICE
25  standards. It's through them.

Page 96

1   Q.   Do you look at that handbook regularly?
2   A.   No.
3   Q.   Would you recognize it if you saw it?
4   A.   Yes.
5   Q.   Do you keep a copy for reference
6   somewhere?
7   A.   No. Well, they -- in the podiums in the
8   dorms, they do have a copy there. But not
9   personally on me, no.
10  Q.   And the podiums of the dorms, are you
11  talking about kind of like a guard station?
12  A.   Yeah, where an officer keeps --
13       MS. SCHEFFEY: Objection.
14  A.   -- logbooks, and while he's putting it in
15  there.
16  Q.   I see. So that's apart from the detainee
17  rooms, right? You're talking about a different
18  space?
19  A.   Yes.
20  Q.   Kind of in the common area?
21       MS. SCHEFFEY: Object to form.
22  Foundation.
23  A.   Yes, that's...
24  Q.   How would you describe where that podium
25  is?

Page 97

1   A.   Just as you walk in, it's right there.
2   Q.   And then when you say as you walk in, you
3   mean the doorway out of the pod?
4   A.   Yes.
5        MS. SCHEFFEY: Object to form.
6   Q.   Okay. And you said that you keep a copy
7   of the handbook up there?
8   A.   There may be one in there.
9   Q.   And logbook?
10  A.   The logbook.
11  Q.   Okay. We were talking about that
12  handbook as a place that has the detainee rules.
13  You don't have the power to change those rules,
14  right?
15  A.   That's correct.
16  Q.   It's your job to enforce those rules that
17  you're given equally and without discrimination,
18  right?
19  A.   Yes, we're supposed to enforce them.
20  Q.   If we look back at the document we've
21  marked as Exhibit 1.
22  A.   Where am I at? Okay.
23  Q.   That goes way back to your first job
24  interview questionnaire with Geo, right?
25  A.   Yes.

Page 98

1  Q.  And there it's stated, it asked you, "Are
2  you willing to follow all policy, procedures,
3  contract obligations, and rules of the company and
4  facility at all times."  Right?
5  A.  Yes.
6  Q.  That was all policies at all times,
7  right?
8  A.  Yes.
9  Q.  Not some policies sometimes, right?
10  A.  Right, all policies.
11  Q.  So you don't have the authority to make
12  exceptions or play favorites with the rules, right?
13  A.  No.
14  Q.  You just have to apply the rules as
15  they're written, right?
16  A.  Yes.
17  Q.  I'd like to show you what we'll mark as
18  Exhibit 4.
19      (Exhibit No. 4 was marked.)
20  Q.  Take your time to review that document.
21  A.  I might need help on this.  I don't know
22  where I'm at.  Down here?
23  Q.  I can share it with you on the screen.
24  That might help you out.
25      MR. EISMEIER:  Hold on a second.

Page 99

1  I'll come and help you open it up.  It's a fairly
2  long document.
3      MR. TURNER:  Do you guys want to go
4  off for a second?
5      THE WITNESS:  Yeah.  It's opened up
6  on the other screen.
7      MR. EISMEIER:  Do you want me to come
8  in?
9      THE WITNESS:  Yes.
10      MR. EISMEIER:  I'll be right back.
11  Okay.
12      MR. TURNER:  We'll go off a second.
13  Thank you.
14      (Break from 12:23 p.m. to
15      12:24 p.m.)
16  BY MR. TURNER:
17  Q.  Officer Pagan, do you recognize the
18  document we've marked as Exhibit 4 here?
19  A.  The Detainee Handbook.
20  Q.  Is that the handbook you were discussing
21  before?
22  A.  Yes.
23  Q.  Okay.  And that's the one you said that
24  contains the detainee rules, right?
25      MS. SCHEFFEY:  Object to form.

Page 100

1  A.  I believe that the rules are in there.
2  Q.  Is this the book that you were stating
3  can be kept at the podium?
4  A.  Yes.
5  Q.  And that's the one you were thinking of?
6  A.  That's the one.
7  Q.  So that's where you get the rules that
8  you're enforcing with respect to detainees, right?
9  A.  That's -- these are the rules we expect
10  them to follow.
11  Q.  Let's look at page 23 of the exhibit,
12  please.  It has a Bates No. PL000053 at the bottom.
13  It says page 23 of the handbook in the bottom right
14  corner, and you'll see it on the shared screen of
15  the video.  Do you see that?
16  A.  Yes.
17  Q.  And when you talked about the rules
18  violations and said they had number codes, is this
19  what you were talking about?
20  A.  Yes.
21  Q.  Okay.  So here we see "Disciplinary
22  Severity Scale and Prohibited Acts"?
23  A.  Yes.
24  Q.  So those prohibited acts are the rules
25  that you have to enforce, right?

Page 101

1  A.  Correct.
2  Q.  And you see here we've got 100 codes, 200
3  codes, 300 codes, right?
4  A.  Yes.
5  Q.  So this is where the detainee rules are,
6  right?
7      MS. SCHEFFEY:  Object to form.
8  A.  I believe so, yes.
9  Q.  Are they anywhere else that you're
10  thinking of?
11  A.  No.
12  Q.  No other source of rules.  These are the
13  ones?
14  A.  Yes.
15  Q.  So these are what you're enforcing on the
16  floor, right?
17  A.  Correct.
18  Q.  Do the detainees get a copy of that book?
19  A.  Yes, they do.
20  Q.  Are some of them not literate?
21  A.  They're Spanish and English.
22  Q.  Do some folks not read in any language?
23  A.  I believe we may have that.  Yes,
24  there's -- like I said, we get them from all over
25  the world, so we can't provide...

Page 102

1  Q.  Sure.  Sure.  A lot of variation in
2  education, right?
3  A.  Yes.
4  Q.  How do the people who can't read get
5  informed of the rules they have to follow?
6  A.  Sometimes they'll get a -- they'll put in
7  a request for help on that.
8  Q.  A request for help.  Who do they request
9  help from?
10 A.  ICE, mostly.
11 Q.  To help them understand the rules?
12 A.  Yeah.  They usually go to ICE for
13 everything.
14 Q.  Is it part of a detention officer's job
15 to explain the rules?
16 A.  If we can explain, sure, we try.
17 Q.  So, you know, if people can't read the
18 handbook or if they don't read the handbook, you
19 would tell them what the rules are, right?
20       MS. SCHEFFEY:  Object to form.
21 Misstates prior testimony.
22 Q.  Is that right?
23 A.  We try to explain to them, you know, what
24 we can.
25 Q.  Is that part of your job, to explain to

Page 103

1  them?
2        MS. SCHEFFEY:  Object to form.
3  A.  I believe so.  If we -- if we see that
4  they're doing something that they're not supposed to
5  be doing, we let them know that it's in the
6  handbook.  We point it out to them that they can't
7  be doing this.
8  Q.  Do they also get a video presentation
9  that might tell people who can't read?
10       MS. SCHEFFEY:  Object to form.
11 Foundation.
12 A.  No.
13 Q.  You're not aware of them watching a
14 video?
15 A.  They have -- they have a video in the
16 dorm that they watch every day on -- on the -- you
17 know, the running of the facility, what goes on,
18 what they can do to get help on certain things, what
19 to apply for.  It's like a -- just to give them a
20 heads up on what's going on.
21 Q.  But you don't think that video really
22 goes into the rules so much?
23 A.  I --
24       MS. SCHEFFEY:  Object to form.
25 A.  I don't believe it talks about the rules

Page 104

1  and regulations.  I believe it may state there's a
2  handbook for them to inform them self on what's
3  going on.
4  Q.  You stated earlier that you apply those
5  rules as they're written in here, right?
6  A.  Yes.
7  Q.  If we can look at the 19th page of the
8  exhibit, and I will pull it up on the shared screen
9  to make sure we're in the same spot.
10 A.  Yes, I'm there.
11 Q.  So it says page 17.
12 A.  Oh, 17.
13 Q.  In the bottom right corner.  It says
14 PL0000047 in the middle.
15 A.  Yes.
16 Q.  Okay.  And you'll see it's the 19th page
17 of Exhibit 4, which is now displayed on the screen
18 in front of you, I believe.  I'll make it a little
19 bigger.  The print is not so large.
20 A.  Okay.
21 Q.  It says here, "Housing Unit Sanitation.
22 Each and every detainee must participate in the
23 facility's sanitation program.  A list of detainees
24 is developed each day by staff and is posted daily
25 for viewing.  During a general cleanup all detainees

Page 105

1  must participate.  The assigned housing unit officer
2  will be responsible for assuring this general
3  cleanup is done on a regular basis."
4        Do you see that?
5  A.  Yes.
6  Q.  Did I read that correctly?
7  A.  You did.
8  Q.  You're aware of that rule?
9  A.  Yes.
10 Q.  And you've been the housing unit officer,
11 right?
12 A.  Yes.
13 Q.  And so you've been responsible for
14 ensuring this general cleanup is done on a regular
15 basis?
16 A.  Yes.
17 Q.  When we say a regular basis, does that
18 mean daily?
19 A.  Yes.
20 Q.  Okay.  So that happens daily?
21 A.  Yes.
22 Q.  And it says a list of detainees is
23 developed each day and it's posted daily for
24 viewing.  Is that right?
25 A.  Yes.

Page 106
1  Q. Do you post a list in your housing unit?
2  A. We do.
3  Q. Do you develop the list?
4  A. I'm sorry?
5  Q. Do you develop the list personally? Is
6  that a thing you do?
7  A. Yes.
8  Q. How do you make the list?
9  A. We have -- we go by our -- it's a book we
10 have in the drawer, and we go by cell, each cell.
11 We move on from cell to cell every day.
12 Q. And that's how you make the list, is
13 rotating cell to cell as to whose turn it is to
14 clean; is that right?
15         MS. SCHEFFEY: Object to form.
16 A. Yes.
17 Q. How many people in the group?
18 A. Excuse me. It could be two cells at a
19 time because we need eight detainees cleaning.
20 Q. So it would be up to eight?
21 A. It could be, yes.
22 Q. Have you seen more than eight?
23 A. No.
24 Q. Okay. Are there four in a cell?
25 A. Yes.

Page 107
1         MS. SCHEFFEY: Object to form.
2  Q. And you said it might be up to two
3  cleaning?
4  A. Yes.
5         MS. SCHEFFEY: Object to form.
6  Q. Is this the same list of six people you
7  referenced on a cleanup crew before?
8         MS. SCHEFFEY: Object to form.
9  A. Can you clarify that question again?
10 Q. Sure.
11         Earlier we talked about a wax
12 crew, and you also said that you supervised the
13 cleanup crew.
14 A. Yes. I -- yes.
15 Q. And we talked about those people all
16 getting paid for the work and being on the pay
17 sheet; is that right?
18 A. Yes.
19 Q. This is different, isn't it?
20         MS. SCHEFFEY: Object to form.
21 A. It is different.
22 Q. Okay. There's no pay sheet for the
23 housing unit sanitation, right?
24 A. Not -- there is for the detainees that
25 are assigned for that housing.

Page 108
1  Q. Okay. So there you're talking about
2  trustees, right?
3         MS. SCHEFFEY: Object to form.
4  Q. Am I right that you're talking about
5  trustees there?
6  A. They're called dorm trustees.
7  Q. Okay. So you have some dorm trustees who
8  do get paid for the work they do in the housing unit
9  sanitation?
10 A. Correct.
11 Q. How many dorm trustees do you have?
12 A. Two.
13 Q. Two at a time. How many are in the pod?
14 A. It varies. It can be a full house. It
15 can be half.
16 Q. What's a full house?
17 A. 80.
18 Q. So when you say it could be half, you
19 mean 40, right?
20 A. Yes.
21 Q. So we're talking 40 to 80 people. Two of
22 them would be trustees?
23 A. Yes.
24 Q. Do you always keep two trustees?
25 A. We try.

Page 109
1         MS. SCHEFFEY: Object to form.
2  Q. I'm sorry, what did you say?
3  A. We try to keep at least two.
4  Q. How many have you seen maximum?
5  A. Two.
6  Q. So you try to keep at least two?
7  A. Yes. Sometimes they get deported so we
8  have one, so...
9  Q. Sure. And then you hire them through the
10 Voluntary Work Program to add to the dorm trustee?
11         MS. SCHEFFEY: Object to form.
12 Q. Is that right?
13 A. Yes.
14 Q. Do you, as the housing unit officer,
15 decide who that's going to be?
16 A. No.
17 Q. Do you know who does?
18 A. Classification.
19 Q. Okay. But everybody has to participate
20 in housing unit sanitation, right?
21         MS. SCHEFFEY: Object to form.
22 A. We try to get everybody to help out and
23 clean.
24 Q. It says here each and every detainee must
25 participate, right?

Page 122
1  up, and all extra supplies put away."
2     A.  Yes.
3     Q.  Okay.  Now you see one incident listed
4  here.  You had told me earlier that your supervisor
5  would explain incidents in writing here, right?
6     A.  Well, he's probably just noted that
7  something occurred during that shift.
8     Q.  Okay.  And what I see here is, "Detainee:
9  Adam-Villalobos, Diego 206528359 sent to seg. for
10 refusing to clean and insolence to staff."
11        Do you see that?
12    A.  Yes.
13    Q.  And so we understand that to mean that
14 one of the detainees was disciplined for refusing to
15 clean and being insolent, right?
16        MS. SCHEFFEY:  Object to form.
17    A.  Like I said, I don't know.  It's
18 whatever's documented there.  I don't know what
19 would have occurred.  It looks like he was -- it was
20 more than just not cleaning.  He probably
21 disrespected or cussed out the officer.  Could have
22 been put to seg. for that reason.  I don't know.
23    Q.  So you see refusing to clean and
24 insolence to staff, right?
25    A.  I see it, yes.  But like I said, I don't

Page 123
1  know exactly what occurred.  I wasn't there.
2     Q.  If you were the escort officer, would you
3  have taken detainee Diego Villalobos to segregation?
4        MS. SCHEFFEY:  Object to form.
5     A.  Maybe.  There might be more than one
6  escort officer.  So I might have been the one, or
7  the other officer.
8     Q.  Were you the officer who wrote up this
9  detainee for refusing to clean and being insolent?
10       MS. SCHEFFEY:  Object to form.
11    A.  I don't recall that.  It doesn't specify
12 what dorm he was in.
13    Q.  Might you have been the officer who would
14 have written him up for being insolent and refusing
15 to clean?
16    A.  No.
17    Q.  You know it wasn't you?
18    A.  I would remember that.
19    Q.  Have you written up some detainees for
20 being insolent and refusing to clean?
21    A.  No.
22    Q.  You've never done that yourself?
23    A.  No.
24    Q.  You see on this roster who else was on
25 your shift.  Please take a moment to review that.

Page 124
1     A.  Okay.  Okay.  Yes.
2     Q.  Do you recall any of those officers being
3  disciplined for what they did, sending this detainee
4  to segregation?
5     A.  Do I recall them sending the detainee to
6  segregation?
7     Q.  Do you recall that any of those officers,
8  any of those detention officers, were disciplined
9  for what they did in sending this detainee to
10 segregation?
11    A.  No.
12    Q.  No.  You would have heard about that if
13 that happened, right?
14    A.  Yes.  That's why I question it because it
15 didn't sound familiar at all about that.
16    Q.  Right.  If they had been disciplined, you
17 would have known it?
18    A.  Yes.
19    Q.  So sitting here today, you have no reason
20 to believe that those detention officers did
21 anything wrong on that shift in the way they handled
22 that detainee, right?
23    A.  I believe they didn't do anything wrong,
24 no.
25    Q.  You believe those detention officers did

Page 125
1  right?
2     A.  I believe so.
3     Q.  That's within their powers, right?
4     A.  Right.
5        MR. TURNER:  Did we just lose
6  Adrienne?
7        MR. EISMEIER:  I think we might have.
8            Adrienne, are you on?
9            Hang on for a second.
10       MR. TURNER:  Pause right there, but
11 we're going to stay on the record.
12       THE WITNESS:  Okay.
13       MR. EISMEIER:  Adrienne, are you
14 back?
15       MS. SCHEFFEY:  Looks like I'm back
16 now.  Getting video now.
17       MR. EISMEIER:  We noticed you were
18 going, and we held up when you were gone.
19       MR. TURNER:  We can have some
20 questions read back for you.  How long do you think
21 you were gone?
22       MS. SCHEFFEY:  About five, ten
23 seconds, I don't know.  I was disconnected from our
24 VPM, which seems to be part of the problem.  Maybe
25 the last two questions would be good to have read

Page 170
1   A.   It's the offense categories.
2   Q.   Okay. What is this -- who drafts the
3   offense categories? Can you see this document that
4   says "Performance-Based National Detention
5   Standards"?
6   A.   I don't see that on here.
7   Q.   Is my screen tied to his?
8        MR. EISMEIER: Can I go in and open
9   it, download it real quick?
10       MS. SCHEFFEY: Yeah. Let's go off
11  for a moment so he can download it.
12          (Break from 3:09 p.m. to
13              3:10 p.m.)
14  BY MS. SCHEFFEY:
15  Q.   Mr. Pagan, do you know what this document
16  is, now that you've had your technical issues
17  resolved?
18  A.   Yes.
19  Q.   What is it?
20  A.   This is the Performance-Based National
21  Detention Standards.
22  Q.   And who drafts this document, if you
23  know?
24  A.   I think ICE.
25  Q.   I'm going to go to page, I believe it was

Page 171
1   288. That was -- I'm going to scroll to page 228.
2   Have you seen this portion of the document before?
3   A.   Page 228?
4   Q.   Yeah.
5   A.   I'm on page 2 here. You want me to go
6   down to 228?
7   Q.   Yeah. You might be able to type it in
8   the top of the pdf. If not, you can look at my
9   screen share.
10  A.   Okay. I see yours, uh-huh.
11  Q.   And what is this?
12  A.   It's the offense categories.
13  Q.   And have you seen this before?
14  A.   Yes.
15  Q.   Is this document available in the dorms
16  for detainees?
17  A.   Yes.
18  Q.   And do you know if this document is
19  similar to the Detainee Handbook?
20  A.   I believe I've seen this on a board.
21  Q.   Okay. And what is the board?
22  A.   The information board where they have --
23  they post stuff on there.
24  Q.   Okay. And to your knowledge, do these
25  categories differ from the ones in the Detainee

Page 172
1   Handbook?
2   A.   This looks like they're pretty much the
3   same.
4   Q.   Okay. I also wanted to go back. Do you
5   remember that you discussed with Mr. Turner that you
6   supervised detainees in the laundry?
7   A.   Yes.
8   Q.   Okay. Can you describe to me anything
9   else that they may have done, other than helping
10  with the laundry while they were with you there?
11  A.   They have social time in there while the
12  laundry's being washed. They get to watch TV and
13  listen to music, eat some snacks and stuff. You
14  know, sit there and look like they're having a good
15  time, by me.
16  Q.   Okay. Did you ever have a problem
17  finding enough volunteers for the laundry?
18  A.   No.
19  Q.   Was it your impression that detainees
20  enjoyed working in the laundry?
21  A.   Everybody wants to work in laundry.
22  Q.   Okay. And then we also talked about how
23  you used to work in the dorms; is that correct?
24  A.   Yes.
25  Q.   Okay. And when you worked in the dorms,

Page 173
1   you supervised the general cleanup of the living
2   area; is that correct?
3   A.   Yes.
4   Q.   If someone didn't want to clean on a day,
5   did you ever threaten any detainee with segregation
6   for failing to clean?
7   A.   No.
8   Q.   Okay. Did you ever send a detainee to
9   segregation for failing to clean?
10  A.   No.
11       MS. SCHEFFEY: Okay. That's it for
12  me.
13       MR. TURNER: I want to take two
14  minutes to organize myself here. Just a moment.
15       MS. SCHEFFEY: Yeah.
16          FURTHER EXAMINATION
17  BY MR. TURNER:
18  Q.   Officer Pagan, you just testified that
19  you never threatened to send a detainee to
20  segregation for violating the cleaning rule, right?
21  A.   I never have.
22  Q.   But you would explain the cleaning rule
23  to them, right?
24  A.   I have.
25  Q.   It's different than threatening, right?

```
                                                 Page 174                                                  Page 176
 1      A.   Yes.                                           1      A.   Yes.
 2      Q.   But you would explain to them that that's      2      Q.   And here it explains the sanitation
 3   the requirement?                                       3   program that detainees participate in each day; is
 4      A.   It's required for them to clean.  It's         4   that correct?
 5   for personal hygiene reasons.                          5      A.   Yes.
 6      Q.   And you would explain to them that if          6      Q.   Okay.  I'm going to scroll up here.
 7   they don't do it there could be sanctions, so they     7   Right here, do you see where it says, "The dayroom
 8   should, right?                                         8   area will be kept clean at all times.  Should an
 9      A.   I never said that to them.                     9   officer notice that the area is not clean, the
10      Q.   I'm sorry, what was that?                     10   officer will make available necessary cleaning
11      A.   Are you saying I threatened to put them       11   supplies.  If the detainees in the housing unit do
12   in segregation if they don't clean?                   12   not clean the area after being instructed to do so,
13      Q.   No.  I understand you didn't do that.         13   the televisions will be turned off."
14           I'm asking whether you told them              14           Do you see that portion?
15   that there could be consequences if they didn't, so   15      A.   Yes.
16   you really ought to do it.                            16      Q.   Okay.  So in the handbook, if you told
17           MS. SCHEFFEY:  Object to form.                17   the detainee to look at the consequences, is this
18      A.   No.                                           18   one of the consequences a detainee might have seen?
19      Q.   You never explained the sanctions that        19      A.   Yes.
20   could go with that?                                   20      Q.   Did you ever turn off the TVs when the
21      A.   Well, I told them it's in the handbook.       21   detainees failed to clean?
22   They -- they should clean.  It's required for them    22      A.   Yes.
23   to do it.                                             23      Q.   Okay.
24      Q.   And you said earlier that, you know,          24           MS. SCHEFFEY:  I have no further
25   sometimes you just got to tell people, like, it's a   25   questions.

                                                 Page 175                                                  Page 177
 1   rule and there's consequences if you don't do it,      1           MR. TURNER:  Nothing further.  Thank
 2   right?                                                 2   you for your time today, Officer Pagan.
 3      A.   I -- I think I might have told them that       3           THE WITNESS:  You're welcome, sir.
 4   they could be sent to segregation, according to        4           MS. COURT REPORTER:  Counsel, do you
 5   rules and regulations.  I might have told them that    5   both have standing orders on this case?
 6   in the past.  I don't remember.                        6           MR. TURNER:  I believe we do.  We
 7           MR. TURNER:  Okay.  Nothing further.           7   don't need to expedite this one from plaintiffs'
 8   Thank you for your time.                               8   side.
 9           THE WITNESS:  You're welcome.                  9           MS. SCHEFFEY:  What is your
10           MR. TURNER:  Adrienne, do you have           10   turnaround looking like?
11   anything?                                             11           MS. COURT REPORTER:  Ten business
12               FURTHER EXAMINATION                       12   days.
13   BY MS. SCHEFFEY:                                      13           MS. SCHEFFEY:  Would it be possible
14      Q.   I'm going to ask one follow-up question,      14   for us to have it by next week?
15   Luis.  Here it is.  I'm going to share Exhibit 4      15           MS. COURT REPORTER:  Sure.  Just give
16   with you so you don't have to pull it back up,        16   me a date.
17   hopefully.                                            17           MS. SCHEFFEY:  Let's try and get it
18           Okay.  So tell me when you can see           18   by the 14th.
19   this document.  This is Exhibit 4.  Have you seen     19           MR. TURNER:  I'm sorry, the 14th?
20   this document before?  Do you remember looking at it  20   Okay.  No need to expedite it on our end.
21   earlier today?  Can you see my screen, Mr. Pagan?     21           WHEREUPON, the within proceedings were
22      A.   Yes, I do.                                    22   concluded at the approximate hour of 3:20 p.m. on
23      Q.   Okay.  So this is page 17, which was          23   the 8th day of July, 2020.
24   PL000047 of Exhibit 4, which is the Detainee          24                *   *   *   *   *
25   Handbook.  Do you see it?                             25
```

```
                                            Page 178
 1   I, LUIS PAGAN, do hereby certify that I have read
 2   the above and foregoing deposition and that the same
 3   is a true and accurate transcription of my
 4   testimony, except for attached amendments, if any.
 5   Amendments attached ( ) Yes ( )No
 6
 7   _____
 8   LUIS PAGAN
 9
10
11
12
13   The signature above of LUIS PAGAN was subscribed and
14   sworn to before me in the county of
15   _____, state of _____,
16   this _____ day of _____, 2020.
17
18
19
20   _____
21   Notary public
22   My Commission expires:
23
24
25   LUIS PAGAN 7/8/20 (lk)
```

```
                                            Page 179
 1              REPORTER'S CERTIFICATE
 2        I, LEEANN L. STELLOR, Registered Merit
 3   Reporter and Certified Realtime Reporter within
 4   Colorado, ID 200401669, appointed to take the remote
 5   deposition of LUIS PAGAN, do hereby certify that
 6   before the deposition he was duly sworn by me to
 7   testify to the truth; that the deposition was taken by
 8   me then reduced to typewritten form herein; that the
 9   foregoing is a true transcript of the questions asked,
10   testimony given and proceedings had.
11
12        I further certify that I am not related to
13   any party herein or their Counsel, and have no
14   interest in the result of this litigation.
15
16        In witness hereof I have hereunto set my
17   hand this 14th day of July, 2020.
18
19                    _____
                       Leeann L. Stellor
20                     Registered Merit Reporter
                       Certified Realtime Reporter
21                     and Notary Public
22
23   My commission expires June 8, 2024
24
25
```

```
                                            Page 180
 1              E R R A T A   S H E E T
 2     I, LUIS PAGAN, do hereby certify that I
 3   have read the foregoing transcript of my testimony, and
 4   further certify that it is a true and accurate record
 5   of my testimony (with the exception of the corrections
 6   listed below).
 7   PAGE  LINE             CORRECTION
 8   ____  ____   _____
 9   ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19   ____  ____   _____
20   ____  ____   _____
21   ____  ____   _____
22   ____  ____   _____
23   ____  ____   _____
24
     _____        _____
25   Date                   LUIS PAGAN
```