# Exhibit 14

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3    Civil Action No. 1:14-cv-02887-JLK-MEH

      _____
 4
                    RULE 30(b)(6) DEPOSITION OF:
 5             DAWN CEJA, VOLUME I - August 5, 2020
                       The GEO Group, Inc.
 6                      (Via RemoteDepo)

      _____
 7
      ALEJANDRO MENOCAL, MARCOS BRAMBILA, GRISEL
 8    XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA,
      JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO
 9    VIZGUERRA, and DEMETRIO VALERGA, on their own and
      on behalf of all others similarly situated,
10
      Plaintiffs,
11
      v.
12
      THE GEO GROUP, INC.,
13
      Defendant.
14
      _____
15
                    PURSUANT TO NOTICE, the Rule 30(b)(6)
16    deposition of DAWN CEJA, THE GEO GROUP, INC., Volume
      I, was taken on behalf of the Plaintiffs by remote
17    means in Arapahoe County, Colorado, on August 5, 2020,
      at 9:04 a.m. MDT, before Sherry Wallin, Certified
18    Realtime Reporter, Registered Merit Reporter and
      Notary Public within Colorado, appearing remotely from
19    Adams County, Colorado.

20

21

22

23

24

25
```

1    video was subsequently replaced by a PowerPoint, a set

2    of PowerPoint slides.  Did the purpose remain the

3    same?

4            A.   Yes.  And it's a required standard

5    that -- at this point, that we have that type of

6    orientation video upon their arrival.

7            Q.   Okay.  And during the time period

8    covered by this case, when were detainees shown this

9    orientation video?

10           A.   Upon their arrival while they were being

11   processed.  So it would have been in intake, in a

12   holding cell, and if for some reason they had missed

13   it, I know that years ago we would also show that -- I

14   believe on VHS in the housing unit we would wheel a --

15   like a TV in or show it, you know, into the units.

16           Q.   You said that was years ago.

17   Approximately when did you stop wheeling the VHS

18   player into the housing unit?

19           A.   That's where I'd have to check, but this

20   was on VHS.  So that --

21           Q.   Old-timey days.

22           A.   Yes.

23           Q.   And then what about once you moved to

24   the PowerPoint format, where did detainees see the

25   PowerPoint presentation?

1          A.    They saw that in the holding cells while

2    they were waiting to be processed.

3          Q.    And was that PowerPoint presentation

4    displayed in the housing units at any time?

5          A.    No, I don't believe so.

6          Q.    And so then directing your attention to

7    the second page of the document, 56576?

8          A.    Okay.

9          Q.    At the top, the first bullet point says,

10   "While you are here, you are not required to work

11   except in the dormitories, where you will be assigned

12   cleanup duties by staff in rotation with other

13   detainees."  Do you see that?

14         A.    Yes.

15         Q.    And so is that referring to the program

16   that we discussed earlier where detainees are assigned

17   to clean after meals?

18         A.    Yes.

19         Q.    And then the next paragraph makes

20   reference to paid worker positions.  Do you see that?

21         A.    Yes.

22         Q.    And is that referring to the voluntary

23   work program?

24         A.    Yes.

25         Q.    And then if you look at the third bullet

```
 1   point down, it says, "It is your responsibility to

 2   respect the property of other detainees and the

 3   institution at all times.  Failure to do so may result

 4   in disciplinary action being taken against you, and

 5   that could have a negative effect on your case before

 6   the government.  So the best rule is to stay out of

 7   trouble during your stay here."  Do you see that?

 8        A.   Yes.

 9        Q.   And do you agree with that statement?

10        A.   Yes.

11        Q.   Looking on the next page, 56577, the

12   third paragraph down makes reference to -- again, I

13   believe this is referring to the VWP program.  It

14   says, "Facility paid trustees."  Do you see that?

15        A.   Yes.

16        Q.   And "trustees" means workers in the VWP,

17   correct?

18        A.   Yes.  But I do want to point out one

19   thing.

20        Q.   Yes.

21        A.   That because of the age of this

22   document, I would want to verify when this actually

23   came out, like I said previously.  Because PBNDS, I am

24   not sure if this was at the same time that PBNDS came

25   out or PBNDS came out after that.
```



```
 1          Q.   Okay.  And what is that relevant to, to

 2   my question about the trustees referring to the VWP?

 3          A.   Because prior to PBNDS, I'm not sure

 4   what document talked about a voluntary work program.

 5          Q.   And when did the PBNDS come out?

 6          A.   I would have to verify the date on when

 7   we received the first ones that we had to be compliant

 8   with and the date we had to be compliant with.

 9          Q.   In the absence of a voluntary work

10   program being required by PBNDS, did GEO pay workers

11   in the facility a dollar a day?

12               MS. SCHEFFEY:  Object to form and

13   outside of the scope insofar as it asks for a time

14   period that was not on the notice topics.  You may

15   answer if you know.

16          A.   I don't know.

17          Q.   (BY MS. TURNER)  And then at the end of

18   this paragraph it says, "You may work a maximum of six

19   hours per day on any given day."  Do you see that?

20          A.   Yes.

21          Q.   And do you know where that requirement

22   came from?

23          A.   Like I stated earlier, I would need to

24   check on the dates of when this document came out and

25   when PBNDS came out.
```

 1   sense of when between the time that you participated

 2   in the making of the video and the time that you

 3   participated in the making of the original version of

 4   the orientation PowerPoint, if you have a sense of

 5   when that was.

 6          A.   I can only, again, speculate, but it's

 7   probably going to be around, probably, 2010, after we

 8   moved in.

 9          Q.   So you said after 2010.  So you

10   participated both in the original making of this prior

11   to 2010 and in subsequent versions after you moved to

12   the new building; is that your testimony?

13                MS. SCHEFFEY:  Object to form.

14          A.   I participated in some of the updates.

15          Q.   (BY MS. TURNER)  And what topics in the

16   orientation video were updated, that you can recall?

17          A.   I'd have to look.  I don't know off the

18   top of my head.

19          Q.   Where would you look to find that

20   information?

21          A.   I could see if it's still on my

22   computer.

23          Q.   Prior versions, you mean?

24          A.   Or any version.

25          Q.   Or a subsequent version?  Fair enough,

```
 1     okay.

 2               Let's take a look at this one.  I'd like

 3     to direct your attention to page 108460.

 4          A.   Okay.

 5          Q.   So this makes reference to -- at the top

 6     it says, "A few words from Warden Gilkey."  Do you

 7     know who that refers to?

 8          A.   Yes.

 9          Q.   And who is that?

10          A.   He was the warden sometime around 2010,

11     2011, I think.

12          Q.   And so here, under the first bullet

13     point, it states, "It is imperative" -- this is at the

14     bottom of the bullet point -- "It is imperative that

15     you respond to every command and directive that is

16     made to you because it is in your best interests."  Do

17     you see that?

18          A.   Yes.

19          Q.   Do you agree with that statement?

20          A.   Yes.

21          Q.   And it's important that detainees

22     respect the commands of the detention officers,

23     correct?

24          A.   Yes.

25          Q.   And then likewise, on 104 -- no, sorry,
```

Case No. 1:14-cv-02887-JLK-CYC    Document 336-15    filed 10/26/20    USDC Colorado
page 9 of 26 30(b)(6)
August 05, 2020                              106

```
 1    108468 -- are you there?

 2            A.    Almost.

 3            Q.    Okay.

 4            A.    Okay.

 5            Q.    It says, "It can't be emphasized enough

 6    how important it is to listen to the detention staff

 7    both in your housing unit and as you are moved about

 8    the facility."  Do you see that?

 9            A.    Yes.

10              MS. SCHEFFEY:  Object to form.

11            Q.    (BY MS. TURNER)  Do you agree with that

12    statement?

13            A.    Wait.  Repeat the question?

14            Q.    Sure.  I'm just asking if you agree with

15    the statement that's in the first sentence of this

16    bullet point.

17            A.    I want to make sure I'm on the right

18    page.

19            Q.    Sure.  It's 108468, page 17 of the PDF.

20            A.    Yes.  And the first bullet point about

21    "It can't be emphasized"?

22            Q.    Yes.  Do you agree with that statement?

23            A.    Yes.

24            Q.    Is it fair to say that GEO expects the

25    detainees to follow the rules?
```

 1    this policy paragraph, it makes reference to a set of

 2    rules and regulations.  What rules and regulations is

 3    that referring to?

 4            A.    The ones that come out of PBNDS.

 5            Q.    I understand the PBNDS is a very large

 6    document.  Are there particular rules and regulations

 7    that you're referring to?

 8            A.    It's the whole standard, you know, as a

 9    whole.  It lists the rules that you have to follow,

10    but it also lists, you know, the hearing procedures as

11    well.

12            Q.    Okay.  And what about, in terms of the

13    rules that detainees have to follow, where are those

14    set forth?

15            A.    In the handbook.

16            Q.    So are you referring to the handbook as

17    a whole?

18            A.    Yes.

19            Q.    And if you take a look on the next page,

20    38947, item 4 actually makes reference to the detainee

21    handbook.  Do you see that?

22            A.    Yes.

23            Q.    And it says, "The detainee handbook. . .

24    shall provide notice of the facility's rules of

25    conduct and of the sanctions imposed for violations of

```
 1   the rules," right?

 2          A.   Yes.

 3          Q.   And GEO's handbook does, in fact, do

 4   that, right?

 5          A.   Yes.

 6          Q.   And then it says, "Copies of the rules

 7   of conduct and disciplinary sanctions will be posted

 8   in English, Spanish, and/or other languages spoken by

 9   significant numbers of detainees as follows," and then

10   there are three items listed, a, b, and c.  Do you see

11   that?

12          A.   Yes.

13          Q.   Where are those items posted?

14          A.   They're posted in each housing unit on

15   the bulletin board.

16          Q.   Okay.  So there's a -- the disciplinary

17   severity scale, the list of prohibited acts, and the

18   potential sanctions are posted in full in each housing

19   unit on the bulletin board?

20          A.   Yes.  In English and Spanish.

21          Q.   And was that true for the duration of

22   the period covered by this case?

23          A.   Yes.

24          Q.   "Yes"?  Okay.  Sorry.  Sometimes you cut

25   out just a little bit.  So apologies if I'm repeating
```

1    what you say back to you.

2                    And so you testified that the items

3    listed here on page 38947 under a, b, and c are posted

4    in the housing units.  And so detainees are aware of

5    those rules and -- of conduct and disciplinary

6    sanctions, right?

7            A.    Yes.

8            Q.    And GEO staff are likewise aware?

9            A.    Yes.

10           Q.    Okay.  And the expectation is that those

11   rules are going to be enforced, right?

12           A.    Yes.

13           Q.    And directing your attention back to the

14   prior page, 38946, at the bottom of the page there

15   under Guidelines, it says that "Disciplinary action

16   may not be capricious or retaliatory."  Do you see

17   that?

18           A.    Yes.

19           Q.    And would you agree that disciplinary

20   action needs to be consistent with the rules?

21           A.    Yes.

22           Q.    I think you said earlier that detention

23   officers may have some discretion to decide to what

24   degree they should escalate relating to a particular

25   incident, correct?

Case No. 1:14-cv-02887-JLK-CYC    Document 336-15    filed 10/26/20    USDC Colorado
Page 13 of 26
Day 1 of 26    30(b)(6)
August 05, 2020                                          140

 1          A.   Yes.  Hopefully it will be resolved at

 2    the informal level, but they do have that discretion.

 3          Q.   Right.  So there might be some occasions

 4    where, you know, they're able to resolve it

 5    informally; but on other occasions they may need to

 6    enforce the rules as written, right?

 7          A.   Yes.

 8               MS. SCHEFFEY:  Object to form.

 9          Q.   (BY MS. TURNER)  And in doing so they --

10    in their attempts to informally resolve issues, they

11    may remind detainees what punishments are possible,

12    correct?

13               MS. SCHEFFEY:  Object to form,

14    foundation.

15          A.   It's possible.

16          Q.   (BY MS. TURNER)  I just want to talk

17    about some of the paperwork that ties in to the

18    disciplinary process.  So I'm going to give you kind

19    of a large document, which hopefully won't take too

20    long to open up.  So stand by.

21               MS. SCHEFFEY:  Can we close the other

22    one?

23               MS. TURNER:  You can put it to the side

24    for now.

25               MS. SCHEFFEY:  Yeah.

 1    okay with not seeing our faces for a minute, I just

 2    have a couple questions to ask you.  Is that okay?

 3            A.   Sure.

 4            Q.   Okay.  So if you look at the -- so this,

 5    again, appears to me to be the PowerPoint slides for

 6    an orientation video, correct?

 7            A.   Yes.

 8            Q.   And if you look at the second slide,

 9    this appears to identify the location as the new

10    building for the Aurora facility; is that right?

11            A.   It does, but not -- the picture is an

12    old one before it was fully finished.

13            Q.   Okay.  The picture almost looks to me

14    like an architectural rendering.  And so then -- could

15    I just ask you to scroll through and see if you see

16    anything else that suggests to you that this is an

17    incomplete version of the orientation video?

18            A.   This one was probably done sometime in

19    2012.

20            Q.   Okay.  Does it appear complete to you?

21            A.   Hold on.  I'm still kind of scrolling

22    through.

23                 It looks updated.

24            Q.   And there's a photo of you on slide 11.

25    Do you see that?

Case No. 1:14-cv-02887-JLK-CYC    Document 336-15    filed 10/26/20    USDC Colorado
page 15 of 26
Day 1 of 30(b)(6)
August 05, 2020                                    170

 1          A.   I do.  Thank you.

 2          Q.   You know, sometimes you can tell what

 3  year it was by your hairstyle.

 4          A.   Yes.  This looks like a version that

 5  would have been sometime around mid-to-late 2012.

 6          Q.   Okay.  And you don't see any obvious

 7  discrepancies in this one like you did in the other

 8  version that we reviewed?

 9          A.   No.

10          Q.   Okay.  You can close out of that for

11  now.

12          A.   Okay.

13               MS. TURNER:  So I've shared in the chat

14  a document that we're going to mark as Exhibit 13,

15  right, Sherry?

16               THE REPORTER:  Yes.

17               (Deposition Exhibit 13 was remotely

18  introduced.)

19          Q.   (BY MS. TURNER)  Okay.  It's

20  Bates-stamped GEO_MEN 186865.

21               Are you familiar with this document?

22          A.   No.  I believe the first time I saw this

23  was the other day -- or when I met with the attorneys

24  yesterday.

25          Q.   Okay.  So this was not -- you were not

1   involved in drafting this policy?

2          A.   No.  This looks like a corporate policy.

3          Q.   Yeah.  It doesn't specify the Aurora

4   facility at the top, correct?

5          A.   Correct.

6          Q.   Was this policy circulated within the

7   Aurora facility, to your knowledge?

8          A.   I would have to check with our

9   compliance department on site.  I'm not familiar with

10  this specific one.

11             MS. SCHEFFEY:  I would just note for the

12  record this is outside of the class period as well.

13         Q.   (BY MS. TURNER)  And you -- this is not

14  something that you were trained on specifically, the

15  content of this policy?

16             MS. SCHEFFEY:  Object to form.

17         A.   Let me just scroll through it real

18  quick.

19         Q.   (BY MS. TURNER)  Sure thing.

20         A.   Yeah.  It looks like a blanket policy

21  for all ICE facilities.

22         Q.   Okay.  And attached to it appears to be

23  the ICE National Detainee Handbook dated April 2016,

24  correct?

25         A.   Yes.

 1        Q.   Okay.

 2             MS. SCHEFFEY:  I can -- I can state,

 3   just to clarify for the record, this looks to be an

 4   entire production, not necessarily two documents that

 5   were provided to each other -- or to the facility

 6   together.  This is just a production.

 7             MS. TURNER:  Okay.

 8        Q.   (BY MS. TURNER)  So we can focus our

 9   questions just on the first three pages, the policy.

10             So you don't specifically recall,

11   Ms. Ceja, receiving any instruction or training about

12   this policy, correct?

13        A.   No.

14        Q.   Okay.  And I just want to direct your

15   attention to the very last line of the policy under

16   item G.

17        A.   Okay.

18        Q.   And it says, "As outlined in the GEO

19   Detainee Handbook, no detainee can be placed in a

20   special management unit for failure or refusal to

21   clean assigned living area.  Other sanctions would be

22   applied in this instance."  Do you see that?

23        A.   I do.

24        Q.   And is that a policy that you have been

25   trained on?

Case No. 1:14-cv-02887-JLK-CYC    Document 336-15    filed 10/26/20    USDC Colorado
Page 18 of 26 30(b)(6)
August 05, 2020                              173

1          A.    I haven't seen this policy.  This is

2    dated July 1st of 2019, and to my recollection, I have

3    not received a copy of this.

4          Q.    And it says -- makes reference to the

5    GEO Detainee Handbook, and it says that this policy is

6    outlined in the GEO Detainee Handbook.

7                To your knowledge, does this policy

8    exist in the GEO Detainee Handbook?

9          A.    I would have to check a current

10   handbook, but I can't say without seeing one.

11         Q.    Okay.  You don't have -- overseeing the

12   content of the GEO Detainee Handbook isn't part of

13   your duties?

14         A.    To review it, yes.  But corporate did

15   one to kind of go to all ICE facilities, and then I

16   think that -- depending on the contract, I don't know

17   if any of those were adjusted or not, but they were

18   trying to make it as one whole handbook.

19         Q.    Okay.  And when was that process,

20   approximately?

21         A.    Maybe within the last 18 to 24 months.

22         Q.    And the GEO Detainee Handbook that we

23   reviewed a short while ago, this policy is not

24   reflected in that handbook, is it?

25                MS. SCHEFFEY:  Object to form.  And,

1   again, on the record, that was a 2011 handbook, and

2   this is a 2019 policy.

3          MS. TURNER:  Right.  I understand that.

4   But, you know, your other witnesses have testified

5   that this policy has always existed.  So I would like

6   to ask this witness whether it is reflected in the

7   detainee handbook that we reviewed.

8          A.   The handbook that I reviewed today was

9   from 2011.

10          Q.   (BY MS. TURNER)  Right.  And it doesn't

11   say, in that handbook, that no detainee can be placed

12   in the SMU for failure or refusal to clean their

13   assigned living area, right?

14          MS. SCHEFFEY:  Object to form.

15          A.   No, it didn't, because the PBNDS didn't

16   state that.  The PBNDS stated that -- under the 306,

17   that those were the sanctions.

18          Q.   (BY MS. TURNER)  Right.  Has the PBNDS

19   changed, to your knowledge?

20          A.   No.

21          MS. SCHEFFEY:  Object to form and

22   outside of the topics.

23          Q.   (BY MS. TURNER)  I'm sorry.  What was

24   your response?

25          A.   No.  The last time that it was updated

 1    was the 2011 version with 2016 updates.

 2          Q.   Right.  And that's what's reflected in

 3    the GEO handbook that we reviewed, correct?

 4          A.   Yes.

 5          MS. TURNER:  I would just ask for

 6    production of any GEO handbooks that actually reflect

 7    what this policy says.  And we can follow up with that

 8    after the deposition.

 9          MS. SCHEFFEY:  We can follow up.  Yeah,

10    I think the fact that we're asking about a document

11    that is, you know, at best, five years removed from

12    the class period is not appropriate.

13          MS. TURNER:  Adrienne, you-all referred

14    to this in your discovery responses and, you know,

15    your witness talked about it.

16          MS. SCHEFFEY:  You specifically asked --

17          MS. TURNER:  We can have the discussion

18    later, but --

19          MS. SCHEFFEY:  You guys specifically

20    asked for it, and we objected to its relevance but did

21    provide it as part of the discovery responses to your

22    questions specifically asking for a document outside

23    of the class period.

24          So if that is going to be your position,

25    we can certainly withhold any documents next time.

Donna Ceja 30(b)(6)
August 05, 2020                                        176

```
 1                    MS. TURNER:  Right.  We can talk about

 2      this later.

 3                    Okay.  So I've shared in the chat a

 4      document that will be Exhibit 14, right, Sherry?

 5                    THE REPORTER:  Yes.

 6                    MS. TURNER:  Okay.

 7                    (Deposition Exhibit 14 was remotely

 8      introduced.)

 9           Q.    (BY MS. TURNER)  And Ms. Ceja, do you

10      recognize this document?

11           A.    It's a General Incident Report.

12           Q.    So is this -- earlier you testified that

13      there is a document that's sort of short of the

14      incident and notification of charges.  Is this the

15      form that you were describing in that testimony?

16           A.    Yes.

17           Q.    Okay.  And so this is something that GEO

18      staff could complete in the event of a variety of

19      incidents; is that fair to say?

20           A.    Yes.

21           Q.    Okay.  And so who completes this form?

22           A.    Any of the staff could complete this

23      form.

24           Q.    Any of the staff who witnessed the

25      incident?
```

 1    time, but yes, the majority of them are accurate.

 2          Q.   Recognizing that some may have changed

 3    over time, are there any that jump out at you as being

 4    not something that were included among staff training

 5    during the time period covered by this case at Aurora?

 6          A.   No.

 7          Q.   No, okay.  And is there anything that is

 8    missing that you can see here, any topics that you

 9    would expect to be included that are not listed here?

10          A.   No.

11          Q.   And so looking on page 47834, at the end

12    of that first block of training topics there are

13    several lines that make reference to on-the-job

14    training.  Do you see that?

15               MS. SCHEFFEY:  47834?

16               MS. TURNER:  Yes.

17          A.   I see -- I see a line that says,

18    "Initial on-the-job training, 40 hours."

19          Q.   (BY MS. TURNER)  Right.  Yeah.  So there

20    is initial on-the-job training, 40 hours, then there

21    is SMU on-the-job training for 8 hours, and then

22    master control on-the-job training to be completed

23    after 6 months, as is the case of the SMU training as

24    well, right?

25          A.   Yes.

1           Q.   Okay.  And so is that the on-the-job

2   training that you made reference to earlier in your

3   testimony?

4           A.   Yes.  With an officer or field training

5   officer.

6           Q.   Got it.  Okay.  And so this -- sorry.

7                Just to back up to the prior page,

8   47833, at the top of that page it indicates that the

9   training listed on that page and the top of the

10  following page is applicable to detention officers,

11  correct?

12          A.   Yes.

13          Q.   What training do officers receive --

14  detention officers receive on how to achieve

15  compliance from detainees?

16               MS. SCHEFFEY:  Object to form.

17          A.   I believe the majority of that is under

18  "Communication Skills," and -- where they list all of

19  the bullets?

20          Q.   (BY MS. TURNER)  Um-hum.  So active

21  listening, anger and defusing techniques, giving

22  directions, saying no, and nonviolent crisis

23  intervention, those types of topics?

24          A.   Yes.

25          Q.   And to the extent that they receive

```
 1   training on progressive discipline, is it your

 2   understanding that it would come in under

 3   communications skills as well?

 4         A.   I believe some of that's also covered

 5   under inmate rules and regulations, rights and

 6   responsibilities of offenders, the very first one.

 7         Q.   Got it.  Okay.  And the -- in terms of

 8   the detention officer training, in what context does

 9   that training occur?  Is there a classroom?  Is it

10   online?  What's the physical location?

11         A.   It's a classroom at the facility.

12         Q.   And so it's taught with a live

13   instructor?

14         A.   Yes.

15         Q.   Is there a test or anything at the end?

16         A.   I believe so, yes.

17         Q.   And who conducts the training?

18         A.   The training manager and --

19         Q.   Sorry.

20         A.   -- and sometimes field training

21   officers.

22         Q.   Okay.  And those are GEO employees?

23         A.   Yes.

24         Q.   Are they employed at the Aurora facility

25   or do they come from corporate?
```

30(b)(6)
August 05, 2020                                207

```
 1            A.    They're employed at the facility.

 2                  MS. TURNER:  So I want to come back

 3    to -- I just want to point out, Adrienne, we can

 4    circle back on this, but it sort of looks like at

 5    least some pages might be missing from this document.

 6                  MS. SCHEFFEY:  Do you want to show me

 7    what you're talking about?

 8                  MS. TURNER:  Sure.  If you look at

 9    the -- we can go off the record for a second, Sherry.

10                  THE REPORTER:  Okay.

11                  (Recess taken, 3:16 p.m. to 3:17 p.m.)

12            Q.    (BY MS. TURNER)  So I've added something

13    in the chat.  It's a document Bates-stamped GEO_MEN

14    47842.

15                  (Deposition Exhibit 19 was remotely

16    introduced.)

17            Q.    Just take a look and let me know when

18    you're ready.

19            A.    Okay.

20            Q.    Do you know what this document is?

21                  MS. TURNER:  Sorry, Sherry, what number

22    is this?

23                  THE REPORTER:  19.

24                  MS. TURNER:  19, okay.

25            Q.    (BY MS. TURNER)  Do you recognize
```

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF COLORADO        )
                              )  ss.
 3   CITY AND COUNTY OF DENVER )

 4
              I, SHERRY WALLIN, Certified Realtime
 5   Reporter, Registered Merit Reporter and Notary Public
     ID 19874212873, State of Colorado, do hereby certify
 6   that previous to the commencement of the examination,
     the said DAWN CEJA verbally declared her testimony in
 7   this matter is under penalty of perjury; that the said
     deposition was taken in machine shorthand by me at the
 8   time and place aforesaid and was thereafter reduced to
     typewritten form; that the foregoing is a true
 9   transcript of the questions asked, testimony given,
     and proceedings had.

10
              I further certify that I am not employed
11   by, related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of
12   this litigation.

13            IN WITNESS WHEREOF, I have affixed my
     signature this 10th day of August, 2020.

14
              My commission expires May 14, 2023.
15

16   __X__  Reading and Signing was requested.

17   _____  Reading and Signing was waived.

18   _____  Reading and Signing is not required.

19
                         _____
20
21                       Sherry Wallin
                         Certified Realtime Reporter
22                       Registered Merit Reporter

23

24

25
```