# Exhibit 15

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
      Civil Action No.: 1:14-cv-02887-JLK
 3    _____

 4                       DEPOSITION OF
                  JOYCE QUEZADA - July 28, 2020
 5                      via RemoteDepo

      _____
 6
      ALEJANDRO MENOCAL, ET AL.,
 7
      Plaintiffs,
 8
      v.
 9
      THE GEO GROUP, INC.,
10
      Defendant.
11    _____

12
                   PURSUANT TO NOTICE, the deposition of
13    JOYCE QUEZADA was taken on behalf of the Plaintiffs by
      remote means, on July 28, 2020, at 9:32 a.m., before
14    Shannon Clementi, Registered Professional Reporter,
      Colorado Realtime Certified Reporter and Notary Public,
15    appearing remotely from Arapahoe County, Colorado.

16

17

18

19

20

21

22

23

24

25
```

```
 1          A.   Yes.

 2          Q.   (BY MR. TURNER)  Okay.  What is on the

 3   third page of this exhibit, the document I'm showing

 4   you now?

 5          A.   The employee file.

 6          Q.   Personnel file checklist?

 7          A.   Yes.

 8          Q.   Did you check those off?

 9          A.   Yes, I did.

10          Q.   And what were you checking to say?

11          A.   If I had copies of everything.

12          Q.   Okay.  And so you provided some of these

13   things with your application; is that right?

14          A.   Yes, I did.

15          Q.   Like a birth certificate, for example?

16          A.   Yes.

17          Q.   And then you checked off receiving other

18   things, right?

19               MS. SCHEFFEY:  Object to form.

20          Q.   (BY MR. TURNER)  Is that correct?

21          A.   Where does it say receiving?

22          Q.   For example, there's a checkmark next to

23   "Receipt of Employee Handbook."

24          A.   Yes.

25          Q.   So you were checking to indicate that you
```

 1  got the employee handbook when you applied?

 2          A.    Yes.

 3          Q.    And what is the employee handbook?

 4          A.    It comes from ICE.

 5          Q.    Okay.  What do you use it for?

 6          A.    Just you -- you read it, and it tells you

 7  all that -- how it's ran.  And I don't recall.  I

 8  haven't read it for a while.

 9          Q.    I'm sorry.  You read it and it tells you

10  all of the what?  I didn't hear your answer well.

11          A.    The standards.

12          Q.    The standards.  Okay.

13          A.    It's been a while since I read it.

14          Q.    Sure.

15                You also check off that you received the

16  detainee handbook, right?

17          A.    Yes.

18          Q.    Okay.  Now, what is the detainee handbook?

19          A.    It comes from ICE.  And I haven't read

20  that also for a while.  It's given to the detainees,

21  and it comes from ICE, when they first come in.

22          Q.    You've been a detention center officer,

23  right?

24          A.    Yes.

25                MS. SCHEFFEY:  Form.

 1          Q.   (BY MR. TURNER)  What do detention

 2   officers do with the detainee handbook?

 3          A.   Well, I never worked in intake, but when

 4   they first come in, they're given one.

 5          Q.   Why are they given one?

 6          A.   So they can understand what's the

 7   procedures.

 8          Q.   Okay.  To understand the rules?

 9          A.   Yes.

10          Q.   So that's where the rules for the

11   detainees are; is that right?

12               MS. SCHEFFEY:  Object to form.

13          A.   Yes.

14          Q.   (BY MR. TURNER)  What were you doing for

15   work before you made this application?

16          A.   I was in New Mexico and moved up here, and

17   I wasn't working at the time.

18          Q.   Had you ever worked in corrections before

19   you joined Wackenhut?

20          A.   No.

21          Q.   Had you ever worked in immigration

22   detention before you joined Wackenhut?

23          A.   No.

24          Q.   Had you ever worked in a jail?

25          A.   No.

Cyokee Quezada
July 28, 2020                                                    21

```
 1            Q.   Okay.  In your time at Aurora Detention

 2    Center, have you held any union offices?

 3            A.   Have I what?

 4            Q.   Held any union offices.

 5            A.   No.

 6            Q.   No.

 7                 Are you a member of the union?

 8            A.   Yes.

 9            Q.   And what union is that?

10            A.   You know, I don't recall the name of it.

11            Q.   Do you know the number associated with it?

12            A.   No.

13            Q.   Do you know who the president is?

14            A.   Yes.

15            Q.   Who's that?

16            A.   Chesshir.

17            Q.   I'm sorry?  Tell me again?

18            A.   Chesshir.

19            Q.   Is that spelled with a "C"?  How would you

20    spell that if you had to guess?

21                 MS. SCHEFFEY:  Object to form.

22            Q.   (BY MR. TURNER)  Do you know how to spell

23    that name?

24            A.   H-e-s [sic] -- no, I do not know how to

25    spell it.
```

```
 1                 MS. SCHEFFEY:  Is it Exhibit 6 or 7?

 2                 MR. TURNER:  7.  I skipped one.

 3                 MS. SCHEFFEY:  Okay.

 4                 Shannon, can you just note that we've

 5    skipped 6.  Thank you.

 6                 (Exhibit 6 was skipped.)

 7                 (Exhibit 7 was marked.)

 8        Q.   (BY MR. TURNER)  Please take your time to

 9    review this document.  It is longer, 27 pages.  I'll

10    let you go off record to review it for a minute, if

11    you'd like to.

12                 MS. SCHEFFEY:  Are you able to open it on

13    your computer, Joyce?

14                 THE WITNESS:  Yes.  On this one, it's too

15    small, but on this one, it's fine.

16                 MR. TURNER:  You've got a copy you can

17    read?

18                 THE WITNESS:  Yes.

19                 MR. TURNER:  Okay.

20                 MS. SCHEFFEY:  Is there a specific area

21    you want her to be looking at?

22                 MR. TURNER:  I'd like to know if she

23    recognizes the document, and then we'll talk about

24    particular parts.

25        A.   Yes, I recognize it.  It's been a while
```

```
 1   since I actually had it or read it.

 2                Yes, I do recognize it.

 3        Q.   (BY MR. TURNER)  As a detention officer,

 4   you have annual in-services, right, training?

 5                MS. SCHEFFEY:  Object to form.

 6   Foundation.

 7        A.   Annual, yes.

 8        Q.   (BY MR. TURNER)  You get trained every

 9   year?

10        A.   Yes.

11        Q.   You get trained on rules applicable to

12   detainees, right?

13                MS. SCHEFFEY:  Object to form.

14   Foundation.

15        A.   Could you repeat the question?

16        Q.   (BY MR. TURNER)  You get trained on the

17   rules that are applicable to the detainees, don't you?

18        A.   Yes.

19        Q.   And it's your job as a detention officer

20   to enforce those rules, right?

21        A.   Yes.

22                MS. SCHEFFEY:  Object to form.

23        Q.   (BY MR. TURNER)  Now, you don't get to

24   make the rules, right?

25                MS. SCHEFFEY:  Object to form.
```

```
 1          A.   No.

 2          Q.   (BY MR. TURNER)  You have to enforce the

 3   ones that are written, right?

 4               MS. SCHEFFEY:  Object to form.

 5          A.   Yes.

 6          Q.   (BY MR. TURNER)  And this is the document

 7   that has the detainee rules as far as you know, right?

 8               MS. SCHEFFEY:  Object to form.

 9          A.   Yes.

10          Q.   (BY MR. TURNER)  So when you're an officer

11   on the floor enforcing the rules, these are the ones

12   you're enforcing, right?

13               MS. SCHEFFEY:  Object to form.

14          A.   Yes.

15          Q.   (BY MR. TURNER)  For the rules to be fair,

16   the detainees have to understand what they are, right?

17          A.   Yes.

18          Q.   How do they know what they are?

19          A.   They've read their books, I'm sure.

20          Q.   So this is how they know what the rules

21   are, because it's in the document?

22               MS. SCHEFFEY:  Object to form.

23          A.   Yes.

24          Q.   (BY MR. TURNER)  Are there clear rules for

25   them to follow?
```

```
 1              MS. SCHEFFEY:  Object to form.

 2        A.   Yes, they are.

 3        Q.   (BY MR. TURNER)  These rules are basically

 4   for the detainees' safety and security, right?

 5        A.   Yes.

 6        Q.   I'd like to draw your attention to page 24

 7   of the document -- I'm sorry, I mean 23 -- page 23 of

 8   the document, which also has the number PL 53 on the

 9   bottom.

10        A.   Yes.  Okay.

11        Q.   Do you see where we are?

12              MS. SCHEFFEY:  Can you read that, Joyce?

13   Can you read the letter?

14              THE WITNESS:  Yes, all except on the last

15   right because I see --

16        Q.   (BY MR. TURNER)  Would you like it blown

17   up bigger?  Does that help?

18        A.   Just put it down.  Down.

19        Q.   I'm sorry.  Like so?

20        A.   Down.  Okay.

21        Q.   Do you see the section that is called

22   "Disciplinary Severity Scale and Prohibited Acts"?

23        A.   Is it -- which one?

24        Q.   So when we look on the left-hand side on

25   the page before you --
```

```
 1          A.   Yes, I see that.

 2          Q.   Do you see that killing is a 100-level

 3    offense that is impermissible?

 4          A.   Yes, greatest offense.

 5          Q.   You'd have to enforce that rule?

 6          MS. SCHEFFEY:  Object to form.

 7          A.   Of course.

 8          Q.   (BY MR. TURNER)  Assaulting any person,

 9    including sexual assault, that's something you take

10    very seriously, right?

11          A.   Yes.

12          Q.   Let's see.  Moving down onto the next

13    page, high moderate level offenses, number 300 is

14    "Indecent exposure," and that's against the rules?

15          A.   Yes.

16          Q.   And you know that because it's written

17    here, right?

18          A.   Yes.

19          Q.   And the detainees know that because it's

20    written here, right?

21          MS. SCHEFFEY:  Object to form.

22          A.   Yes.

23          Q.   (BY MR. TURNER)  And you would take that

24    seriously, right?

25          A.   Yes.
```

 1          Q.   You see below that 301 offense is

 2   "Stealing (theft)."  It would be a problem if people

 3   could just do that, right?

 4               MS. SCHEFFEY:  Object to form.

 5          A.   Yes.

 6          Q.   (BY MR. TURNER)  You have to enforce the

 7   rule, right?

 8          A.   Yes.

 9          Q.   And detainees know they can't do that,

10   right?

11          A.   Yes.

12          Q.   And they know that because it's written

13   here, right?

14               MS. SCHEFFEY:  Object to form.

15          A.   Yes.

16          Q.   (BY MR. TURNER)  I imagine the next

17   offense listed at 302, "Misuse of authorized

18   medication," is dangerous to permit, right?

19          A.   Yes.

20          Q.   You would have to enforce that rule as a

21   detention officer, wouldn't you?

22               MS. SCHEFFEY:  Object to form.

23          A.   Yes.

24          Q.   (BY MR. TURNER)  And you don't get to

25   choose as a detention officer that you would just let

```
 1   that slide, do you?

 2              MS. SCHEFFEY:  Object to form.

 3   Foundation.

 4        A.   No.

 5        Q.   (BY MR. TURNER)  You would have to enforce

 6   the rules in here, right?

 7        A.   Yes.

 8        Q.   So the detainees can be confident that

 9   what they find in here are the real rules, right?

10              MS. SCHEFFEY:  Object to form.

11        A.   Yes.

12        Q.   (BY MR. TURNER)  And they can have

13   confidence that those rules are going to be enforced

14   for the well-being of the facility, right?

15              MS. SCHEFFEY:  Object to form.

16        A.   And they would be what?

17        Q.   (BY MR. TURNER)  They can be confident

18   those rules will be enforced for their security, right?

19        A.   Yes.

20        Q.   And you apply the rules as they're written

21   in here, right?

22        A.   Yes.

23              MS. SCHEFFEY:  Form.

24        Q.   (BY MR. TURNER)  Now, Rule 307, "Refusing

25   to obey a staff member's order," is against the rules,
```

 1   right?

 2             MS. SCHEFFEY:  Object to form.

 3        A.   Yes.

 4        Q.   And "Insolence toward a staff member,"

 5   308, is also against the rules, right?

 6        A.   Yes.

 7        Q.   And "Refusal to clean assigned living

 8   area," 306, is also a rules violation, isn't it?

 9        A.   Well, you know what, that is voluntary

10   work, and if they don't want to do it, we don't make

11   them.  We don't force them.  We say, "That's fine, you

12   don't need to clean."

13             They're not getting paid for it.  They

14   didn't sign no application.  So on the voluntary work,

15   if they don't want to do it, it's good, it's fine.

16        Q.   I see.  That one we understand is a

17   pretend rule, right?

18             MS. SCHEFFEY:  Object to form.

19   Argumentative.

20        Q.   (BY MR. TURNER)  Is that pretend or real?

21        A.   That one's just voluntary.

22             What number was that again you were

23   showing me?

24        Q.   306, "Refusal to clean assigned living

25   area."  I believe you're telling me that that one is

1    not a real rule, right?

2              MS. SCHEFFEY:  Object to form.  Misstates

3    prior testimony.  Argumentative.

4         Q.   (BY MR. TURNER)  You may answer.

5         A.   You know, it says, "Refusal to clean

6    assigned living area."  We don't force them to clean.

7    If they don't want to clean, we don't.

8         Q.   So there's no consequence to that

9    particular rule, right?

10             MS. SCHEFFEY:  Object to form.

11   Foundation.

12        A.   To a point.

13        Q.   (BY MR. TURNER)  To a point.

14             How did you decide that?

15             MS. SCHEFFEY:  Object to form.

16        A.   How did I decide?  Well, when I'm a dorm

17   officer and it's voluntary work and they tell me they

18   don't want to clean, I don't force it on them and all.

19   It depends.

20        Q.   (BY MR. TURNER)  Okay.  So you're telling

21   me that rule isn't really applied, right?

22             MS. SCHEFFEY:  Object to form.

23   Foundation.  Argumentative.

24        Q.   (BY MR. TURNER)  Is Rule 306, making it a

25   high moderate offense to refuse to clean an assigned

 1   living area, applied or is it not applied?

 2              MS. SCHEFFEY:  Form.

 3        A.    It depends, I guess, because -- on their

 4   form -- their -- we don't force them to clean.  If they

 5   don't want to clean, you know, we can't force them.  We

 6   can't --

 7        Q.    (BY MR. TURNER)  Which other rules here do

 8   we also believe are pretend?

 9              MS. SCHEFFEY:  Form.  Argumentative.

10        Q.    (BY MR. TURNER)  Let's look at these

11   together.

12              What about "Indecent exposure"?  Is that

13   one also pretend?

14              MS. SCHEFFEY:  Object to form.

15        A.    No.

16        Q.    (BY MR. TURNER)  That's a real rule,

17   right?

18              MS. SCHEFFEY:  Object to form.

19        A.    Yes.

20        Q.    (BY MR. TURNER)  Is that one real?  Okay.

21              And then "Stealing (theft)," is that a

22   real rule or pretend rule?

23              MS. SCHEFFEY:  Object to form.

24   Argumentative.

25        Q.    (BY MR. TURNER)  You can answer.

 1          A.    That's true.

 2          Q.    That one's real.  Okay.  What about 302,

 3  "Misuse of authorized medication"?  Is that a real rule

 4  or a pretend one?

 5              MS. SCHEFFEY:  Object to form.

 6          A.    Real rule.

 7              MS. SCHEFFEY:  Argumentative.

 8          Q.    (BY MR. TURNER)  I'm sorry.  That's a real

 9  rule?

10          A.    Yeah.

11          Q.    How do I know that?  When I look at this

12  document and I see "Misuse of authorized medication"

13  here, that's a real rule.

14              I look down at 306 and see "Refusal to

15  clean assigned living area," how do I know the

16  difference?

17              MS. SCHEFFEY:  Form and harassing.

18          Q.    (BY MR. TURNER)  You may answer.

19          A.    Well, you know what, 300 and 301 and 302

20  that you pointed out to me is a lot different than the

21  306.

22              This, on the refusal to clean their

23  assigned living area, we don't force them to clean.  If

24  they don't want to clean, you know, you can't force

25  them.  And you don't threaten them, no nothing, you

Grijoe Quezada
July 28, 2020                                    92

1    know.

2              But 300 and 301 and 302, those are major.

3    "Indecent," of course, you got to do -- you know, you

4    got to go by the rules and all.

5         Q.   I see.

6              Those are coded as high moderate offense

7    category, right, the ones you just told me are really

8    important, right?

9              MS. SCHEFFEY:  Object to form.

10        Q.   (BY MR. TURNER)  300, 301, 302, high

11   moderate offense, right?

12        A.   Yes.

13        Q.   Is 306 also a high moderate offense

14   category?

15        A.   To a point.  Because of course let's just

16   say if their area was real dirty and nobody would be

17   cleaning, we'd get -- I'd call the watch commander and

18   have a talk with them.  They know their place has to be

19   cleaned.

20             And they know themselves, keeping their

21   day area clean, the major comes in, inspects, and they

22   get a treat at the end of the week for keeping -- and

23   knowing that they keep their area clean, they get a

24   treat at the end of the week.

25             So they don't pretty much argue or -- they

 1   don't.

 2          Q.   So those are reasons why you might just do

 3   it voluntarily, right?

 4              MS. SCHEFFEY:  Object to form.

 5   Argumentative.

 6          A.   I think so.  They're pretty good.  The

 7   detainees are pretty good at all that.  I've never --

 8          Q.   (BY MR. TURNER)  Another reason why you

 9   might --

10              MS. SCHEFFEY:  Hold on.  She was finishing

11   her sentence.  You interrupted her.

12          Q.   (BY MR. TURNER)  Finish, please.

13          A.   You know, when I worked in the dorm with

14   them all, if you talk to them right, I don't ever --

15   you know, there's probably been one or two that says,

16   "I don't feel like cleaning."  Pretty much they keep

17   their place clean because they want it clean and they

18   want that treat at the end of the week.

19          Q.   (BY MR. TURNER)  So you have the

20   discretion not to enforce the rules in this book; is

21   that what you're telling me?

22              MS. SCHEFFEY:  Object to form.  Misstates

23   prior testimony.

24          A.   No.

25          Q.   (BY MR. TURNER)  Okay.  So you do have to

 1   enforce the rules in this book?

 2        A.   Yes, of course.

 3        Q.   You, as a detention officer, are not

 4   empowered to rewrite it, are you?

 5        A.   No.

 6        Q.   And you told me earlier that the way the

 7   detainees know what the rules are is because of this

 8   book, right?

 9        A.   Pretty much, yes.  Yes.

10        Q.   I'd like to look, if you would, at page

11   23.

12             Now, let's talk a little more about

13   "Refusal to clean," 306.

14             I just want to get clear on this.  When

15   did you learn this was a unique rule you were not going

16   to enforce?

17             MS. SCHEFFEY:  Object to form.  Misstates

18   prior testimony.

19        Q.   (BY MR. TURNER)  You do enforce it?  You

20   enforce 306?

21             MS. SCHEFFEY:  Object to harassing the

22   witness.

23        Q.   (BY MR. TURNER)  Do you enforce 306 as

24   written?

25        A.   Well, they -- I haven't read this book for

 1  a long time and all, and I don't remember all that.

 2  But of course I enforce all the rules and everything,

 3  but I don't force them to clean.  If they don't want to

 4  clean, you know, there's other detainees that

 5  volunteer, and they do it.

 6          Q.    So how did you learn that 306 was not a

 7  rule you had to enforce?

 8              MS. SCHEFFEY:  Object to form.  Misstates

 9  prior testimony.

10          A.    You know what --

11          Q.    (BY MR. TURNER)  Did you decide that on

12  your own, or were you told it was okay not to enforce

13  306?

14              MS. SCHEFFEY:  Object to form.

15  Harassing.

16          A.    You know, in briefings and stuff, it says

17  if they don't want to clean, you know, you can't force

18  them.  You don't get after them.  You just -- it's not

19  we're making up a new rule or anything, but, you know,

20  you don't force the detainees.

21          Q.    (BY MR. TURNER)  So that discussion in

22  briefing happened within the last five years, didn't

23  it?

24              MS. SCHEFFEY:  Object to form.

25  Foundation.

```
 1          Q.   (BY MR. TURNER)  You claim to have heard

 2   that in a briefing.  When was it?

 3          A.   I don't recall.  I know I've heard it, but

 4   I don't remember the first beginning and all when they

 5   did say it.

 6          Q.   It was discussed in relationship to this

 7   lawsuit, wasn't it?

 8               MS. SCHEFFEY:  Object to form.

 9   Foundation.

10          Q.   (BY MR. TURNER)  Did you hear that

11   cleaning rule discussed in briefing in relationship to

12   a lawsuit that had been filed?

13          A.   No.  I never even heard of that lawsuit,

14   to be truthful.

15          Q.   Okay.  Was it within the last five years

16   that you were told not to enforce that rule?

17               MS. SCHEFFEY:  Objection.  Asked and

18   answered.

19          A.   No.  When I first went on the floor, and

20   that was -- how long ago? -- eight, nine years, they

21   always said, "You don't force them.  If they don't want

22   to clean, that's fine."  I've heard that.

23          Q.   (BY MR. TURNER)  What other rules in the

24   book did they tell you not to enforce?

25               MS. SCHEFFEY:  Object to form.  Misstates
```

1   prior testimony.

2          Q.   (BY MR. TURNER)  Any?

3          A.   No.

4          Q.   So that one's unique, right?

5               MS. SCHEFFEY:  Object to form.

6          Q.   (BY MR. TURNER)  That one's unique?

7               MS. SCHEFFEY:  Object to form.

8          A.   It depends.

9               No, no, it's not unique.

10         Q.   (BY MR. TURNER)  So there are others then?

11  Are there pretend rules in here?

12         A.   No, there isn't.

13         Q.   So it's unique?

14              MS. SCHEFFEY:  Object to form.  Move to

15  strike testimony of counsel.

16         Q.   (BY MR. TURNER)  Did you ever tell a

17  detainee that they don't have to follow the rules in

18  this book?

19         A.   No, I didn't.

20         Q.   Did you ever tell a detainee that some of

21  the rules in that book are pretend?

22              MS. SCHEFFEY:  Object to form.

23         A.   No.

24         Q.   (BY MR. TURNER)  How are they going to

25  know that the rules are pretend?

 1              MS. SCHEFFEY:  Object to form.

 2    Argumentative.

 3          A.    And what do you mean by "pretend"?  I'm

 4    sure they read the rules.

 5              I haven't read this book, and if I have,

 6    it's been years.  But --

 7          Q.    (BY MR. TURNER)  The detainees are

 8    entitled to believe the rules in the book are true,

 9    right?

10              MS. SCHEFFEY:  Object to form.

11    Foundation.  602.

12          A.    Yes.  They know it is, yes.

13          Q.    (BY MR. TURNER)  I'd like to draw your

14    attention to page 23, the prior page.

15              MS. SCHEFFEY:  I'm going to note it's

16    11:52.  I think we should shoot for a noon lunch break.

17          Q.    (BY MR. TURNER)  I'm sorry.  I meant to

18    draw your attention to page 21.  You'll see an area

19    that says "Section VIII, Disciplinary Procedure."

20    Please let me know when you've got that on your screen.

21          A.    Yes.

22          Q.    I want to make it big enough for you to

23    read it.

24          A.    I can read it.

25          Q.    So "Section VIII, Disciplinary Procedure"

 1   says:

 2                  "To provide a safe and orderly living

 3            environment, facility authorities will

 4            impose disciplinary sanctions on any

 5            detainee whose behavior is not in

 6            compliance with facility rules and

 7            procedures."

 8            Do you see that?

 9      A.   Yes.

10      Q.   Is that true or is that false?

11      A.   That's true.

12      Q.   So detainees are entitled to believe that

13   is true, right?

14            MS. SCHEFFEY:  Object to form.

15      A.   Yes.

16      Q.   (BY MR. TURNER)  Now, you've written

17   detainees up, right?

18            MS. SCHEFFEY:  Object to form.

19   Foundation.

20      A.   Repeat the question?

21      Q.   (BY MR. TURNER)  Yeah.  Have you ever

22   written up a detainee for a violation of a rule?

23      A.   To be truthful, I don't recall, no.

24      Q.   You don't usually have to write anybody up

25   to get compliance, do you?

Grisel Xahil Quezada
July 28, 2020                                                    100

```
 1              MS. SCHEFFEY:  Object to form.

 2   Foundation.

 3         Q.   (BY MR. TURNER)  Usually people will do

 4   what an officer says without getting written up, right?

 5              MS. SCHEFFEY:  Object to form.

 6   Foundation.

 7         A.   Yes.

 8         Q.   (BY MR. TURNER)  Did you ever have to

 9   explain to a detainee what the consequences of not

10   following a rule would be?

11         A.   There's been times they've asked me, and I

12   explained to them, yes.

13         Q.   Okay.  So you've told them about what the

14   sanctions could be for not doing the right thing,

15   right?

16         A.   Or they'll come up -- there's been times

17   they came up and asked me to explain what that meant,

18   and I'll explain it, that it's not -- that's it.

19         Q.   What are you referring to?  Explain what

20   that meant.

21         A.   Something that's in the book that they

22   didn't understand.

23         Q.   I see.

24              Have you ever had any detainee decline to

25   do what you asked them?
```

Grijselda Quezada
July 28, 2020                                        101

```
 1           A.   No.

 2           Q.   Seven years on the floor, you never once

 3   had a detainee resist your initial command?

 4                MS. SCHEFFEY:  Object to form.

 5           Q.   (BY MR. TURNER)  Is that right?

 6           A.   Not that I recall, no.

 7           Q.   And 19 years in the facility, have you

 8   ever had a detainee resist your command?

 9                MS. SCHEFFEY:  Object to form.

10           A.   Let me think.

11                Not that I recall.  I think if you talk to

12   them the right way and treat them good, they have

13   respect for you, and you have respect for them.  Pretty

14   much, it's pretty good.

15                MS. SCHEFFEY:  It's 11:57.  Is it a good

16   time for a lunch break now?

17                MR. TURNER:  I'd like to ask about one

18   more provision, and then we'll take a lunch break.

19                MS. SCHEFFEY:  Okay.

20           Q.   (BY MR. TURNER)  Let's look at page 19,

21   which also bears PL 49 as a number.

22           A.   And which one are you talking about?

23           Q.   I'm sorry.  47, not 49.  PL 47, page 17.

24           A.   Is it "Housing Unit Sanitation"?

25           Q.   "Housing Unit Sanitation."
```

Grizel Quezada
July 28, 2020                                          102

```
 1            I'd like to ask whether you see where the

 2   book says:

 3               "Each and every detainee must

 4               participate in the facility's sanitation

 5               program.  A list of detainees is developed

 6               each day by staff and is posted for

 7               viewing.  During a general cleanup all

 8               detainees must participate.  The assigned

 9               Housing Unit Officer will be responsible

10               for assuring this general cleanup is done

11               on a regular basis."

12            Do you see that?

13      A.   Yes.

14      Q.   Is that a real rule or is that a fake

15   rule?

16      A.   That's a real rule, yes.

17            MS. SCHEFFEY:  Object.

18      Q.   (BY MR. TURNER)  That's one that's

19   enforced as written, right?

20            MS. SCHEFFEY:  Object to form.

21      A.   Yes.

22      Q.   (BY MR. TURNER)  Was that a "yes"?

23      A.   Yes.

24            MR. TURNER:  Let's take a lunch break.

25   How long would you all like to take?
```

```
 1              MS. SCHEFFEY:  Do you want 45 minutes?  Do

 2   you need to go get something, Joyce?

 3              THE WITNESS:  No.

 4              MS. SCHEFFEY:  What do you want, 30 or 40?

 5              MR. TURNER:  Let's take at least 45 here.

 6   12:45.  Let's do that.  Thank you.

 7              MS. SCHEFFEY:  All right.  Thanks.

 8              (Recess taken, 11:59 a.m. to 12:48 p.m.)

 9        Q.   (BY MR. TURNER)  Officer Quezada, we've

10   just had a 45-minute lunch break; is that right?

11        A.   Yes.

12        Q.   Whom did you speak with during that break?

13        A.   Dana, but I did all the talking, about my

14   aunt.

15        Q.   Were you discussing a privilege?

16        A.   A privilege?  No.  We were discussing -- I

17   live with my aunt, and she's 98, and I was just talking

18   about her.

19              MS. SCHEFFEY:  Beyond that, I'm going to

20   instruct you not to discuss your conversations with

21   Mr. Eismeier.

22              MR. TURNER:  Adrienne, do you want to just

23   get a clear yes-or-no answer whether the substance of

24   the case was even discussed so we know if there was

25   even an issue to be instructing about?  Do you want to
```

1   risk of suicide in segregation?

2         A.   I would be aware, yes.

3         Q.   When you do 15-minute checks in

4   segregation, what are you checking for?

5         A.   That's right.  That he won't hurt himself,

6   yes.

7         Q.   And when you do 30-minute checks in

8   segregation, what are you checking for?

9         A.   To make sure that they're all safe and

10  secure.

11        Q.   No self-harm, right?

12        A.   They're all safe.

13        Q.   You recall looking at the sanctions in the

14  detainee handbook, right?  Do you recall us looking at

15  that together?

16        A.   Yes.

17        Q.   Segregation is used as a punishment for

18  serious offenses, isn't it?

19             MS. SCHEFFEY:  Object to form.

20        A.   Yes.

21        Q.   (BY MR. TURNER)  Segregation isn't

22  pleasant, is it?

23             MS. SCHEFFEY:  Object to form.

24        A.   It depends on them, how they feel about

25  it.

 1          Q.    (BY MR. TURNER)  I see.

 2                You saw that it's used as a penalty for

 3    serious things, right?

 4                MS. SCHEFFEY:  Object to form.

 5          A.    Yes.

 6          Q.    (BY MR. TURNER)  And you just said that

 7    you have to make 15- and 30-minute checks for suicide,

 8    right?

 9          A.    If there is one, yes.

10          Q.    You have to make that check on anybody

11    who's in segregation, right?

12          A.    Every 30 minutes, yes.

13          Q.    You have 19 years of experience at ADC.

14    Several of them have been working in segregation units.

15    What is your understanding of why segregation exists?

16          A.    For disciplinary.

17          Q.    Okay.  And in your experience, is

18    segregation effective in getting detainees to follow

19    the rules?

20          A.    Yes.

21          Q.    Most detainees are afraid to go to

22    segregation, aren't they?

23                MS. SCHEFFEY:  Object to form.

24    Foundation.

25          A.    Yes.

```
 1          Q.   (BY MR. TURNER)  Was that a "yes"?

 2          A.   Yes.

 3          Q.   In fact, even mentioning the possibility

 4  of segregation gets detainees to follow the rules,

 5  right?

 6          MS. SCHEFFEY:  Object to form.

 7  Foundation.

 8          A.   Yes.

 9          Q.   (BY MR. TURNER)  Is there anything else

10  you think I should know about the voluntary work

11  program?

12          A.   Oh, the detainees in the dorm is who

13  you're talking about?

14          Q.   Yeah, the hired workers.  The detainees

15  who get hired to do a job.

16          Is there anything else about that program

17  you think it's important for me to understand?

18          MS. SCHEFFEY:  Object to form.

19          A.   No, no.

20          Q.   (BY MR. TURNER)  Is there anything else

21  you know about the housing unit sanitation program you

22  think is important for me to understand?

23          MS. SCHEFFEY:  Object to form.

24          A.   On the sanitation and cleaning and all?

25          Q.   (BY MR. TURNER)  Yeah.  Anything else you
```

 1    think is important about that?

 2           A.    Well, I know that I mentioned if they

 3    don't want to clean -- there was this one incident

 4    where I worked in the -- "David" -- D with the females,

 5    and there was one where the cleanup crew didn't want to

 6    mop.  And, you know, I talked to her and told her that

 7    was her job for the day, but if she didn't want to do

 8    it, I did it for her.  I think she felt pretty bad and

 9    all and she came back and did it.

10           But if you talk to them the right way and

11    let them know exactly, you know, the way it's got to be

12    and all, they do a better job, and they do it.

13           It's not like -- you hardly ever hear

14    anybody saying, "I'm not going to do it."  There's

15    probably one in 50 that doesn't want to do it.  But

16    it's not like every time.  The next time it's his turn,

17    he'll do it.  It's not like every time they all say no

18    or --

19           Like there was that one time when it was

20    time for count and they didn't want to go in.  They

21    were just sitting there.  I told them, "Okay.  Listen,

22    I'm going to turn off the TVs if you don't go in."  And

23    right away they got up and they did it.  They went to

24    their pods.

25           It's just how you talk to them and treat

1                        REPORTER'S CERTIFICATE

2    STATE OF COLORADO          )
                                )  ss.
3    CITY AND COUNTY OF DENVER )

4                I, Shannon Clementi, Registered
     Professional Reporter, Colorado Realtime Certified
5    Reporter and Notary Public ID 20004025632, State of
     Colorado, do hereby certify that previous to the
6    commencement of the examination, the said JOYCE QUEZADA
     verbally declared his/her testimony in this matter is
7    under penalty of perjury; that the said deposition was
     taken in machine shorthand by me at the time and place
8    aforesaid and was thereafter reduced to typewritten
     form; that the foregoing is a true transcript of the
9    questions asked, testimony given, and proceedings had.

10               I further certify that I am not employed
     by, related to, nor of counsel for any of the parties
11   herein, nor otherwise interested in the outcome of this
     litigation.

12

13               IN WITNESS WHEREOF, I have affixed my
     signature this 12th day of August, 2020.

14               My commission expires June 3, 2021.

15

16   __X__ Reading and Signing was requested.

17   _____ Reading and Signing was waived.

18   _____ Reading and Signing is not required.
                     _____
19                   Shannon Clementi
                     Registered Professional Reporter
20                   Colorado Realtime Certified Reporter

21

22

23

24

25