# Exhibit 17

```
 1           IN THE UNITED STATES DISTRICT COURT FOR THE
                         DISTRICT OF COLORADO
 2
               CIVIL ACTION NO.:  1:14-CV-02887-JLK
 3


 4   ALEJANDRO MENOCAL, et al.,

 5                 Plaintiffs,

 6   -vs-


 7   THE GEO GROUP, INC.,

 8                 Defendant.
     _____/
 9


10


11
                    DEPOSITION OF DAVID VENTURELLA
12


13

                    Tuesday, July 21, 2020
14                   9:43 a.m. - 3:49 p.m.


15


16            ALL PARTIES APPEARED REMOTELY


17


18

                  Stenographically Reported By:
19                     JULIE BRUENS, FPR
                  Florida Professional Reporter

20


21


22


23


24


25
```

```
 1   GEO's?  You just don't know one way or the other;
 2   correct?
 3            MS. SCHEFFEY:  Object to form, foundation.
 4            THE WITNESS:  That's correct, I don't know.
 5   BY MR. SCIMONE:
 6       Q.   Okay.  All right.  I'm going to give you
 7   another document to take a look at.  It should be in the
 8   chat window.
 9            (Thereupon, the document was marked as
10   Plaintiff's Exhibit 8 for identification.)
11            MS. SCHEFFEY:  And Rachel, just to keep the
12        bandwidth low, can you just keep audio on and not
13        video if that's possible?  Thank you, Rachel.
14   BY MR. SCIMONE:
15       Q.   Do you have the exhibit up?
16       A.   I do.
17       Q.   Okay.  Great.  Okay.  Do you recognize this
18   document?
19       A.   Honestly, I don't.  I'm reading it now.
20       Q.   Okay.  All right.  The date on this is 2015,
21   and I'm looking at the last page of the document.  Do
22   you see the signature there?
23       A.   Yeah.  I'm scrolling down.  It's 2015.  Yeah.
24   It just doesn't look familiar, but I mean, I'm looking
25   at the last page.
```

1    Q.   And that's your signature on the last page;
2    right?
3    A.   Yeah.  Yes, it is.  I'm sorry.
4    Q.   All right.  And the first page says
5    declaration of David J. Venturella.  Do you see that?
6    A.   Yes.
7    Q.   Okay.  And so do you remember giving a
8    statement that was submitted as testimony in a case
9    brought by Detention Watch Network and the Center for
10   Constitutional Rights?
11   A.   Well, again, I don't recall, but obviously
12   this document does that -- is proof of that.  But I
13   don't remember it.
14   Q.   Okay.  You have no reason to think that this
15   wasn't your declaration?
16   A.   Right.
17   Q.   Okay.  Turn to paragraph 16 in the
18   declaration.
19   A.   Okay.
20   Q.   So paragraph -- are you there?
21   A.   I am.
22   Q.   Okay.  All right.  So paragraph 16 says the
23   winning proposal in almost every Federal procurement
24   competition is awarded to the lowest priced bidder
25   unless that bidder has an unsatisfactory performance

```
 1   record.  Do you see that?
 2        A.   I do.
 3        Q.   Okay.  So did you believe that to be true at
 4   the time that this was submitted to the court?
 5        A.   At that time, yes.
 6        Q.   And so has something changed between then and
 7   now that changes your view about this subject?
 8        A.   Well, again, in that -- in the proposals that
 9   we've submitted, we don't believe that the price was
10   based on lowest, it was based on competitive, and again,
11   being able to meet all the criteria in the RFP.
12        Q.   But as between those companies that met the
13   criteria of the RFP, is this statement in this
14   declaration still true, that the winning proposal in
15   those instances is almost always awarded to the lowest
16   bidder?
17        A.   Currently, no.  I don't think that that
18   statement is accurate based on current history.
19        Q.   So when do you believe that changed?
20             MS. SCHEFFEY:  Object to form, foundation.
21             THE WITNESS:  I don't know exactly when that
22        changed, but as we've, you know, competed in the
23        RFP process, you know, we -- again, it wasn't based
24        on the lowest price, but best value, overall
25        performance, history, etc., and price was not a
```

1          deciding factor.
2                  There were other criteria structured in the
3          valuation of the RFP which indicated that price
4          would not be the factor -- the deciding factor.
5    BY MR. SCIMONE:
6          Q.   Okay.  Given the dates in this declaration, is
7    it fair to say that that was a development that occurred
8    after 2015?
9          A.   I think that would be fair to say.
10         Q.   Okay.  So prior to 2015, and specific to
11   contract detention facilities, this is a true statement
12   then that the winning proposal almost always went to the
13   lowest priced bidder unless they had an unsatisfactory
14   performance record?
15                 MS. SCHEFFEY:  Object to form.
16                 THE WITNESS:  At that time, it was accurate.
17   BY MR. SCIMONE:
18         Q.   Okay.  I'm going to ask about a couple other
19   things in here.  So if you turn to page -- or to
20   paragraph 12 of this declaration, the heading that says
21   pricing information and staffing plan.  Let me know when
22   you're there.
23         A.   Okay.  I'm there.
24         Q.   Okay.  So the first sentence here refers to a
25   bed-day or per diem rate.  And so just for foundation

```
 1   purposes, what is that?
 2        A.   It's the cost to be able to provide all of the
 3   services, facility, food, medical, etc., all of that,
 4   that's what it costs per individual per day.
 5        Q.   And that's a common metric that's used in the
 6   facility management industry; right?
 7             MS. SCHEFFEY:  Object to form, foundation.
 8             THE WITNESS:  Per diem rate is a very typical
 9        term.
10   BY MR. SCIMONE:
11        Q.   Okay.  And that's used generally in government
12   -- or I meant for detention services; right?  That
13   metric is used to price the contract typically?
14             MS. SCHEFFEY:  Object to form.
15             THE WITNESS:  It's one of the criteria,
16        correct.
17   BY MR. SCIMONE:
18        Q.   And take a moment to read the text in
19   paragraph 12.
20        A.   Okay.  I'm finished.
21        Q.   Okay.  So you refer to some of the components
22   of that bed-day rate here.  My question is it still true
23   that the largest single cost that makes up the bed day
24   rate is more personnel?
25        A.   Correct.
```

```
 1        Q.    And you say here at the time you were writing
 2   this that that represents approximately 65 percent of
 3   the total costs.  Is that still approximately correct?
 4        A.    That's approximately correct.
 5        Q.    And was that percentage still approximately
 6   accurate in the 2004 to 2014 time period?
 7              MS. SCHEFFEY:  Object to form.
 8              THE WITNESS:  Yes.
 9   BY MR. SCIMONE:
10        Q.    Actually, okay.  I was actually going to ask a
11   narrower question, which is the 2011 to 2014 time
12   period.  Generally about the same percentage during that
13   time?
14        A.    Yes.
15        Q.    Okay.  And then take a look at paragraph 15.
16        A.    Okay.
17        Q.    It says solicitations for contract detention
18   services typically require bidders to submit a
19   comprehensive technical response to include operational
20   procedures and policies, detailed staffing plans,
21   facility design plans, and physical plant descriptions,
22   closed parentheses, detailed pricing/cost information,
23   and past performance information.  When all other
24   factors are more or less equal, the government will base
25   the award on the overall cost.
```

1           MS. SCHEFFEY:  Object to form.
2           THE WITNESS:  So typically -- so the short
3      answer is yes, they do, in that they have already
4      existing space that they have paid for, financed
5      through the county, through the city, whatever.  So
6      it's existing, and they make that space available
7      to ICE generally at a lower cost because the
8      facility has been paid for, it has been staffed,
9      and they just have available beds that they can
10     offer at a much lower rate.
11           Now, the downside to that is with the ever
12     changing and evolving standards, those facilities
13     are less likely to make those changes to meet those
14     standards.  So in some cases, they have an
15     advantage, and in other cases, they don't.
16  BY MR. SCIMONE:
17     Q.   Take a look at paragraph 27.  Before we get
18  there, actually, let me ask a different question.  Are
19  you aware of any legal authority that allows ICE to
20  contract directly with private prison companies absent
21  an IGSA?
22           MS. SCHEFFEY:  Object to form and calls for a
23      legal conclusion.
24           THE WITNESS:  Am I aware of any authority?
25           MR. SCIMONE:  Yes.

1            MS. SCHEFFEY:  Same objection.
2            THE WITNESS:  Yeah.  So I mean, my assumption
3      is that ICE and DHS have contract authority to
4      purchase the services and equipment they need to
5      carry out their mission, so I can't cite a specific
6      authority, but again, assumption is that they have
7      it either through enabling legislation that created
8      the Department of Homeland Security, and it
9      trickles down from there.
10   BY MR. SCIMONE:
11      Q.   Okay.  All right.  So we were taking a look at
12   paragraph 27 in this declaration.
13      A.   27.  Yes.
14      Q.   So you write here in some procurements, GEO
15   has no competition for CDF solicitations and in other
16   procurements for CDF solicitations, it faces
17   competition.  In both situations, GEO's pricing strategy
18   based on proprietary staffing plan is the same.  So why
19   is that?
20            MS. SCHEFFEY:  Object to form.
21            THE WITNESS:  I don't understand the question.
22   BY MR. SCIMONE:
23      Q.   Yeah.  So you're saying here that, if I'm
24   reading it correctly, that GEO uses the same pricing
25   strategy regardless of whether or not there's

1    competition.  So my question is why is that?  Why follow

2    the same pricing strategy if there's less competitive

3    pressure?

4            MS. SCHEFFEY:  Object to form.

5            THE WITNESS:  Well, I believe the Federal

6        acquisition regulations do have some guidance on

7        pricing for particular type of procurements, and so

8        all of your costs have to be justified, and even

9        the amount of profit that you're seeking has to be

10       in compliance with the Federal acquisition

11       regulations.

12           So, you know, we need to be aware of all of

13       those factors.  Again, everything that we provide

14       in particular when there is no competition is

15       audited prior to award -- to ensure that all of the

16       costs are justified and are reasonable.

17           So you don't change your strategy because you

18       don't have competition, you have to meet the

19       requirements, you have to have the right number of

20       staff, and your costs will all have to be

21       reasonable, and you'll be audited before there's an

22       award.  And if you're too high, they will tell you

23       you're too high.

24   BY MR. SCIMONE:

25       Q.   So -- okay.  So that last -- so you're saying

1    even if there's no competition, if the price is set too

2    high, a bidder might not get the contract even if

3    there's no competition?

4         A.   Right.  That's correct.

5         Q.   Okay.  You mentioned I think the Federal

6    acquisition regulations.  Did I get that right?

7         A.   Yes.

8         Q.   Are you generally familiar with those

9    regulations?  Do you have a working knowledge?

10             MS. SCHEFFEY:  Object to form.

11             THE WITNESS:  Yeah.  That's pretty voluminous.

12        I mean, there's parts of it that I have some

13        familiarity with.  But no, it's too voluminous to

14        do.

15   BY MR. SCIMONE:

16        Q.   Okay.  But there are some that impact directly

17   on what you -- is that fair to say?

18             MS. SCHEFFEY:  Object to form, foundation.

19             THE WITNESS:  Sure.  Sorry.  Yes.

20   BY MR. SCIMONE:

21        Q.   Okay.  All right.  And so in this paragraph

22   27, you refer to a proprietary staffing plan, and

23   there's more in the declaration about staffing plans

24   generally, but just can you explain then -- just

25   summarize why the staffing plans are considered

1   proprietary.

2       A.   Well, they are going to be based on our

3   designs of the facility, and so that's proprietary as

4   well, and so you know, we -- again, we look at the

5   requirements, and we'll design a facility that meets

6   those requirements that are efficient, provides the

7   appropriate levels of safety and security, and then

8   maximizes the staffing.

9            So it includes technology and facility design

10  and layout.  So that's why we label it as proprietary.

11  There's not a cookie cutter approach to this.

12      Q.   Okay.  Am I right that generally speaking, the

13  wage rates paid to staff for a contract detention

14  facility are governed by government regulation?

15           MS. SCHEFFEY:  Object to form, foundation.

16           THE WITNESS:  I think they are governed by the

17      Department of Labor who produces the local wage

18      determination, and it's also addressed in the

19      Federal acquisition regulations, the service

20      contract act.  So that's my knowledge.

21  BY MR. SCIMONE:

22      Q.   Okay.  That's fair.  So that's an important

23  one, though.  So if I'm right, though, what that means

24  is that if let's say CoreCivic and GEO are competing on

25  a contract, they are going to have to end up paying the

```
1                    CERTIFICATE OF REPORTER
2
3    THE STATE OF FLORIDA,
4    COUNTY OF PALM BEACH.
5
6              I, Julie Bruens, Florida Professional
7    Reporter, certify that I was authorized to and did
8    stenographically report the deposition of BRIAN EVANS;
9    pages 1 through 109; that a review of the transcript was
10   requested; and that the transcript is a true record of
11   my stenographic notes.
12             I further certify that I am not a
13   relative, employee, attorney, or counsel of any of the
14   parties, nor am I a relative or employee of any of the
15   parties' attorneys or counsel connected with the action,
16   nor am I financially interested in the action.
17
18             Dated this 24th day of July, 2020.
19
20
21
22             _____
               Julie Bruens, FPR
23             Florida Professional Reporter
24
25
```