# Exhibit 19

```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2

 3          CIVIL ACTION NO.: 1:14-cv-02887-JLK

 4
    ALEJANDRO MENOCAL, et al.,
 5

 6          Plaintiffs,

 7   -vs-

 8
    THE GEO GROUP, INC.,
 9

10          Defendant.
    _____/
11

12
                 DEPOSITION OF DANIEL RAGSDALE
13

14
               Thursday, February 27, 2020
15                 9:20 a.m. - 3:14 p.m.

16
                  Shavitz Law Group, P.A.
17                 951 Yamato Road, #285
                  Boca Raton, Florida 33431
18

19

20           Stenographically Reported By:
              JOYCE L. BLUTEAU, RPR, FPR
21          Registered Professional Reporter
             Florida Professional Reporter
22

23

24

25
```

1    Q.   How long were you employed with ICE all
2    together?
3    A.   Twenty-one years.
4    Q.   And prior to working for ICE, where did you
5    work?
6    A.   The Department of Justice, the Immigration and
7    Naturalization Service.
8    Q.   Were you an attorney with them?
9    A.   I was.
10   Q.   What's the highest level of education that
11   you've attained?
12   A.   I have a juris doctorate.
13   Q.   From where?
14   A.   Fordham University.
15   Q.   Me too.
16        What year did you graduate?
17   A.   I don't want to say.  1993.
18   Q.   Okay.  I was class of '06.
19        MR. BARNACLE:  That's why you don't want to
20   say.
21        THE WITNESS:  Exactly.
22        MS. TURNER:  I was still in high school.
23   BY MS. TURNER:
24   Q.   Okay.  Are you aware that there are some
25   housekeeping tasks that all detainees at GEO's Aurora

1  facility are required to perform?

2       A.   Yes.

3       Q.   And are those tasks generally referred to as

4  the Housing Unit Sanitation Policy?

5       A.   I've never heard it referred to.  I had to ask

6  what the HUSP is, so I know there's lots of acronyms that

7  float around.  I know there is a policy to clean the

8  immediate living area in Aurora, yes.

9       Q.   Okay.  And what is your understanding of what

10  that policy is?

11      A.   That folks will clean their immediate living

12  area, meaning making their bed, dealing with their own

13  personal property in their immediate living area.  And

14  they also share sort of a common obligation to clean, you

15  know, where the microwave is, where the, you know, game

16  boards are, video games, to keep things in place in a

17  reasonable cleanliness; the bathroom, you know, the

18  areas, the communal areas is the word I'm looking for.

19      Q.   And that would include the day room area?

20      A.   Correct.

21      Q.   And is it consistent with your understanding

22  that there's a rotation of folks who are assigned to do

23  that?

24      A.   I understand it does rotate.  The precise

25  nature of how they do those rotations, I don't know.

```
 1      Q.   Okay.  For purposes of today's deposition, can
 2   we agree that when we refer to the Housing Unit
 3   Sanitation Policy or HUSP, we're referring to the
 4   requirement for detainees to clean the common areas on a
 5   rotating basis?
 6      A.   Again, I don't know precisely how they rotate.
 7   I know it's shared so --
 8      Q.   Um-hmm.
 9      A.   -- to the extent "rotation" is a term of art,
10   you know, yes, we can agree.  Again, I can't vouch for
11   the specifics at Aurora.
12      Q.   I understand that.
13           Okay.  And then are you aware of a policy at
14   the Aurora facility called the Voluntary Work Program?
15      A.   I am.
16      Q.   And what is your understanding of what that
17   entails?
18      A.   The Voluntary Work Program is an ICE detention
19   standard requirement, so there's a, what essentially is a
20   local policy implementing ICE's detention standard at
21   Aurora.
22      Q.   And what is the detention standard that is
23   being implemented?
24      A.   The Voluntary Work Program.
25      Q.   What does the Voluntary Work Program entail?
```

1   thing.  I mean, ICE would have to be consulted with.  And

2   so, I mean, to the extent it is similar in kind to what's

3   already getting done and it's only a question of

4   quantity, I think that's something that sort of could be

5   done in the ordinary course of business.

6           If it's something that is, you know, materially

7   different than sort of what's contemplated by the list in

8   the VWP standard, that I think it obviously would require

9   a discussion with ICE.

10          And the other thing I would say it's also

11  important to note is a discussion with ICE between the

12  facility administrator and the AFOD or OIC is not, you

13  know, a binding discussion where it changes the contract,

14  the scope of work, the performance work, any of those

15  things.  Can't change a standard so, you know, that is

16  where, you know, if there's something that's, you know,

17  again, a material new start change, that requires going

18  to the COTR, COTR getting the CO involved, the

19  contractor, et cetera.

20      Q.   I mean, is it fair to say that in a situation

21  like what we're talking about it is less costly for GEO

22  to use VWP workers as opposed to an outside contractor?

23      A.   It is absolutely not less costly for GEO to use

24  voluntary worker folks.

25      Q.   How is that?

1    A.   Well, as we talked about before, and the math

2    is pretty straightforward.  It's a dollar a day when it's

3    a dollar a day, and that's sort of passed through to GEO.

4    But to the extent GEO has to pay anything more than a

5    dollar a day and it is not reimbursed for it is a cost to

6    GEO.

7         As you can imagine, and any government

8    contractor that is involved in forced augmentation --

9    Q.   Sorry, that is involved in...

10   A.   Forced augmentation, meaning hands, you know,

11   so if we -- so every federal agency probably has some

12   amount of support service contracts, whether they're

13   accountants, whether they're folks that enter things in

14   databases.  They could be telephone operators where the

15   government has decided it's not inherently government

16   work that has to get done -- let's put this it way:  The

17   Federal Protective Service is a good example.  The

18   Federal Protective Service only has maybe, say, 2,000

19   employees but there may be 11,000 contract guards that

20   guard federal buildings that are contract guards working

21   for the Federal Protective Service, but they're not

22   federal employees, right.

23   Q.   Um-hmm.

24   A.   So anybody that supplies those contract guards

25   has a margin on each one of those guards.  So if you have

1    a hundred guards, you make X.  If you have 110 guards,

2    you make that additional margin on that 10 percent.  GEO

3    is no different.

4         So, in other words, if we had our folks,

5    meaning GEO employees who are on our staffing plan which

6    we charge ICE for and make money on that in a reasonable

7    way --

8        Q.   Um-hmm.

9        A.   -- we would make more, not less because we're

10   charged at the actual rate.

11       Q.   Um-hmm.

12       A.   So there's no incentive financially for GEO to

13   use any voluntary work person to do anything,

14   particularly when you have to, again, incentivize them,

15   as we talked before, beyond a dollar a day.  It's sort of

16   cost neutral at a dollar a day but it gets -- it becomes

17   a cost to us if it goes beyond that.

18       Q.   And what about, though, as opposed to using not

19   GEO employees but an outside contractor, so if you were

20   able to use dollar-a-day workers for, you know, work,

21   maintenance work in the yards as opposed to paying, you

22   know, a yard guy to come and clean it up?

23       A.   We use vendors all the time for things so, in

24   other words, there's, you know -- that's not the business

25   model.  I don't -- you know, there's, as you can imagine

1          CERTIFICATE OF REPORTER

2
    THE STATE OF FLORIDA,       )
3
    COUNTY OF PALM BEACH.       )
4

5
             I, Joyce L. Bluteau, Registered Professional
6   Reporter, Florida Professional Reporter, certify that I
    was authorized to and did stenographically report the
7   deposition of DANIEL RAGSDALE; pages 1 through 183; that
    a review of the transcript was requested; and that the
8   transcript is a true record of my stenographic notes.

9
             I further certify that I am not a relative,
10  employee, attorney, or counsel of any of the parties, nor
    am I a relative or employee of any of the parties'
11  attorneys or counsel connected with the action, nor am I
    financially interested in the action.
12

13           DATED this 3rd day of March, 2020.

14

15

16

17

18

19

20  _____
    Joyce L. Bluteau,
21  Registered Professional Reporter
    Florida Professional Reporter
22

23

24

25