# Exhibit 21

**Stuart Grassian, M.D.**
401 Beacon Street
Chestnut Hill, MA 02467
(617) 244-3315; fax (617) 244-2792
stgrassian@gmail.com

In re: ***Menocal et al. v. The GEO Group, Inc.***
US Dist Ct., Colorado. Civ. No. 1:14-cv-02887-JLK

### Psychiatric Report of Stuart Grassian, M.D.

I am a Board-certified psychiatrist, licensed to practice medicine in the Commonwealth of Massachusetts. In December 2018, attorneys for the Plaintiffs in the above-captioned matter contacted me. They asked me to provide an expert opinion regarding individuals in immigration detention in Aurora, Colorado who allege that they had been forced to clean the housing area in the facility under the threat that they would otherwise be punished by being "sent to the hole" – that is, placed in solitary confinement. I was retained to provide an expert opinion as to the psychiatric effects of this form of threatened punishment, and to evaluate the psychiatric impact on these detainees as they experienced this threat, including their experience and perception of the threat as they encountered other detainees who returned to their housing unit after being confined in solitary.

The sources of information I reviewed for this purpose are typical of the types of information that form the basis of such psychiatric evaluations. They include a number of documents, a list of which is attached, and also interviews of the following individuals who had been confined at the Aurora facility: Alejandro Menocal; Jesus Gaytan; Grisel Xahuentitla; Olga Alexakhina; Hugo Hernandez; and Alejandro Hernandez Torres. These interviews provided both

1

factual information and also the opportunity to clinically appreciate their psychiatric experience of the coercive threat of solitary confinement.

My professional fee is $500/hour. My compensation is not contingent on my opinions or on the outcome of this case. A copy of my c.v. and a testimony list are attached.

## 1. Qualifications.

### 1.1. Clinical

As noted in my c.v., attached, I have had a full-time clinical practice in psychiatry since completing my residency in 1977. My clinical experience has included evaluation and treatment in both outpatient and inpatient settings. I have also provided supervision to other clinicians in inpatient, outpatient and emergency room settings.

### 1.2.  Regarding Psychiatric Effects of Solitary Confinement

During the course of my professional career, I have had extensive experience evaluating people in confinement who were experiencing, or had experienced, confinement in solitary. In 1983, I published an article in the American Journal of Psychiatry ("AJP") describing a particular psychiatric syndrome associated with solitary confinement.[1] My article noted that this syndrome had been previously described in the psychiatric literature. That article is attached hereto and incorporated herein.

My observations and conclusions generally regarding the psychiatric effects of solitary confinement have been cited in a number of federal court decisions, including: *Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir. 1988); *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995); *Brown v. Plata*, 131 S. Ct. 1910 (2011); *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal.

---

[1] Grassian, S., *Psychopathological Effects of Solitary Confinement*, Am. J. Psychiatry, 140:1450-1454 (1983).

1995); in the concurring opinion of Justice Kennedy in *Davis v. Ayala*, 135 S. Ct. 2187 (2015);

and in the statement of Justice Sotomayor concurring with the denial of certiorari in *Apodaca v.

Raemisch*, 586 U.S. _____ (2018). I prepared a written declaration for *Madrid* describing the

medical literature and historical experience concerning the psychiatric effects of restricted and

isolated conditions of confinement as well as of other conditions of restricted environmental and

social stimulation, and subsequently compiled the general (non-institution, non-inmate specific)

portions of that declaration into an article published in 2006.[2] This article is also attached hereto

and incorporated herein. This article describes the extensive body of literature, including clinical

and experimental literature, regarding the effects of decreased environmental and social

stimulation, especially in relation to the effects of segregated confinement on prisoners.

I have given lectures and seminars regarding these issues. Although I do not have a

complete list of those lectures and seminars, they include, but are not limited to, lectures at

Harvard Law School and Harvard Medical School-Beth Israel Hospital in Boston, Harvard

Medical School-Center for Bioethics, at meetings of the Nova Scotia, Virginia and New York

State Bar Associations, the Office of Military Commissions of the U.S. Department of Defense

(regarding Guantánamo detainees), the Federal Capital Defenders Habeas Unit, the John Jay

College of Criminal Justice, and the American Correctional Association. I have also been

invited to provide testimony before state legislative hearings in New York, Massachusetts and

Maine.

In the United States I have been retained as an expert in class-action investigations and

lawsuits regarding the psychiatric consequences of solitary confinement in Massachusetts (2),

---

[2] Grassian, S., *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. Journal of Law & Policy,
327-383 (2006).

New Jersey, New York (3), California (2), Kentucky, Michigan, Ohio (2), Pennsylvania, Texas,
Florida, Wisconsin and Iowa, as well as in individual cases in other states, including Alaska,
Arizona, California, Connecticut, Florida, Georgia, Kansas, Kentucky, Louisiana, Maine,
Massachusetts, Mississippi, New Mexico, New York, Oregon, Pennsylvania, South Carolina,
Tennessee, Texas, Vermont, Virginia and the State of Washington.  These latter include
evaluations of a number of individuals who were then, or had been in the past, confined in
solitary on death row.

In addition, I have been retained and have testified in several class-action lawsuits
regarding solitary confinement in Canada involving the federal prison system and Ontario's
Provincial System, including the major federal court ruling in *British Columbia Civil Liberties
Assn. and The John Howard Society of Canada v. Attorney General of Canada* (SCBC
Vancouver Registry No. S-150415).

I have also been consulted by federal public defenders regarding the confinement of a
number of individuals who were deemed to be "enemy combatants" and/or were either charged
with or convicted of conspiring against the United States.  These include individuals who were
confined in Guantánamo, in the Navy Brig in Charleston, S.C., in the federal ADX prison in
Florence, Colorado, and in the SeaTac facility in Seattle, Washington, as well as in federal
detention centers in New York City and Miami, Florida.

More recently, I have been retained as an expert regarding the psychiatric effects of the
imprisonment and solitary confinement of several individuals of American or Iranian-American
joint citizenship, three of whom (Jason Rezaian, Saeed Abedini, Amir Hekmati) were released in
2015 with the passage of the U.S.-Iran nuclear treaty.

I have been consulted on issues concerning the psychiatric effects of solitary confinement by a variety of public advocacy groups in the United States, including the Legal Aid Society of New York, Prisoner's Legal Services of New York, the Center for Constitutional Rights, The Massachusetts Correctional Legal Services, the Massachusetts Civil Liberties Union, the National Prison Project of the American Civil Liberties Union, the United States Department of Justice, the Juvenile Justice Law Center, Children's Rights, Inc., Disability Rights Iowa, Disability Rights New York, the Department of Corrections of the State of Florida, and various religious organizations.

I also serve on the Advisory Committee of the New York State Commission on Quality of Care & Advocacy for Persons with Disabilities, and have served on the Advisory Board of the Correctional Association of New York.

## 2. Solitary Confinement, Generally.

### 2.1. Conditions of Confinement in Solitary.

Solitary confinement is variously designated as "Segregation," "Disciplinary Segregation," "Administrative Segregation," "Protective Custody," "Behavior Management Unit," and "Psychiatric Observation."   From the interviews I conducted with named plaintiffs in the present lawsuit, I conclude that the conditions prevailing in segregated confinement experienced by these plaintiffs are consistent with the following general description:

Conditions in solitary confinement generally comprise the housing of an individual alone in a relatively small cell (usually in the range of 80-100 square feet) for upwards of 22-23 hours a day, with minimal opportunity for mental activity or for social and perceptual stimulation. Generally the confined person is allowed out to exercise one or two hours a day.  Outdoor exercise is generally alone, usually in a small area enclosed by concrete walls or chain link

fencing.  The chain link fenced areas are typically long and narrow; they are often described as being like "a dog run."  In such an arrangement, if more than one person is allowed out at the same time, they can speak with each other through the chain link fencing.  In inclement weather, exercise is indoors, and generally there is some minimal opportunity for large muscle and aerobic exercising.

The walls, floor and ceiling of such cells generally are of cement and concrete.  The cell usually contains a sink and toilet (most often a stainless steel sink and toilet combination) and a platform (either a concrete slab or a metal frame) on which is placed a relatively thin mattress.  There is usually a narrow window looking out onto the outside world.  In particularly harsh conditions of confinement, either there is no such window or the window is frosted/painted or otherwise altered so that the inmate cannot see through the window.  The segregation cells in Aurora have no window to the outside world.

The door is typically a solid steel door on a sliding track; the door typically contains a horizontal slot in which food may be passed and hands shackled, and a second small window facing onto the tier.  The food slot is typically closed and opened with latch outside the cell, and in particularly harsh conditions of confinement, the window facing the tier may also have a cover that can be latched from outside the cell.

There is often, but not always, a stainless steel shelf/small desk that is bolted to the wall, and a stool or other place to sit by the shelf/desk.  Other than the thin mattress, pillow and bedding, which are almost always provided, items allowed in the cell vary.  People confined to such cells generally are allowed some legal material and a limited amount of other reading material in their cell.  Television and/or radio and/or personal devices (e.g. video games, iPods, etc.) may or may not be allowed, though the number of television and/or radio stations available

is generally limited.  Almost always paper, a writing instrument, envelopes and stamps are permitted.  Other personal items (e.g. clothing, photographs and so on) may or may not be allowed.  Social phone calls to family are almost always allowed, though with limits on their frequency and duration.

In short, solitary confinement imposes harsh and sterile conditions which provide extremely little stimulation or opportunity for productive engagement.  They impose perceptual deprivation,[3] forced idleness and social isolation.

Not surprisingly, people exposed to such conditions experience such confinement as punitive, cruel, even sadistic.  As a psychiatric matter, solitary confinement inevitably creates feelings of helplessness, powerlessness, as well as intense fear and paranoia.  The experience of being so totally overpowered and helpless inevitably also creates a deep sense of shame and humiliation, feelings that will lead to some combination of depression and rage.

### 2.2.  The Historical Experience with Solitary Confinement.

It has long been known that severe restriction of environmental and social stimulation has a profoundly deleterious effect on both mental and physical functioning.  A discussion of literature regarding such conditions of restricted environmental stimulation is found in the

---

[3] The term "sensory deprivation" has sometimes been used to describe the perceptual deprivation associated with such conditions, but that term is actually a misnomer. What is lacking in solitary is *not* the absence of *all* stimulation, but rather the lack of *meaningful*, *anchoring*, stimulation.  The stimulation of, for example, steel doors banging and people yelling does *not* ameliorate the effects of environmental deprivation, nor do the brief interactions through the cell door with staff making rounds or providing meal trays.  Indeed, noxious stimulation has been shown to *worsen* the effects of perceptual deprivation.  For example, in various interrogation situations, such as that used by the British in interrogating suspected IRA members, and that used by the United States military and CIA in interrogation at Guantánamo, noxious stimulation – especially high decibel noise – was intentionally used to worsen the psychiatric effects of solitary confinement.

Appendices of the article cited above that was published in the Washington University legal

journal.

The United States introduced prolonged incarceration and solitary confinement as a

means of dealing with criminal behavior, introducing the penitentiary system in the early

nineteenth century.  This system, originally embodied as the "Philadelphia System," involved

almost an exclusive reliance upon segregated confinement as a means of incarceration and also

became the predominant mode of incarceration in several European prison systems emulating the

American model at the time.

The results were catastrophic.  The incidence and severity of mental disturbances among

prisoners so detained was so great that the system fell into disfavor and was ultimately

abandoned.  During this process, a major body of clinical literature was developed that

documented the psychiatric disturbances created by such stringent conditions of confinement.

The paradigmatic disturbance was an overt disruption of brain function – an agitated confusional

state, which, in more severe cases, had the characteristics of a florid psychotic delirium,

characterized by severe confusion, paranoia, and hallucinatory features, and also by intense

agitation and random, impulsive violence – whether directed at others or self-directed.

As noted, the American system was emulated in a number of other countries, and its

impact became a major administrative and medical problem in prisons employing it.  Between

1854 and 1909, thirty-seven articles appeared in the German medical literature describing

thousands of cases of psychotic illnesses that emerged during incarceration in solitary

confinement.[4]  And even though psychiatric diagnosis was still in its infancy during that period,

---

[4] Nitsche, P. & Wilmanns K., *The History of the Prison Psychoses*, New York, Nervous and
Mental Disease Publishing Company (1912).

clinicians were very aware that these psychiatric disturbances had "a particular stamp" – they were different from the disturbances seen in psychiatric clinical practice.  As described in Appendix B of my Washington University article, descriptions of the psychiatric disturbances in the nineteenth century literature were strikingly consistent with the clinical observations made more recently.  These clinical observations were set forth in my AJP article.

The disruption of brain function and consequent psychiatric harm caused by solitary confinement became exceedingly apparent during the nineteenth century.  Indeed, by 1890, in *In re Medley*, 134 U.S. 160, 168 (1890), the United States Supreme Court explicitly recognized the massive psychiatric harm caused by solitary confinement:

> This matter of solitary confinement is not ... a mere unimportant regulation as to the safekeeping of the prisoner .... [E]xperience [with solitary confinement] demonstrated that there were serious objections to it.  A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

Concerns about the profound psychiatric effects of such conditions of isolated confinement continued into the twentieth century, giving rise to a major body of medical and scientific literature concerning the effects of sensory deprivation and social isolation, including a substantial body of experimental research.  This research was funded by the U.S. Central Intelligence Agency and the Canadian Department of Defense, and was conducted at Harvard and McGill Universities.  The research model utilized briefly imposed profound sensory deprivation (soundproof, lightproof rooms, cushioning of limbs and body, etc.) for a relatively short period of time (in the range of hours).  The findings from this experimental research (described in Appendix C of my Washington University article) are consistent with those in the

more recent medical literature studying the effects of solitary confinement. These observations from such disparate sources all comport with the findings regarding the effects of solitary confinement among political prisoners and prisoners of war.[5]

### 2.3. The Psychiatric Effects of Solitary Confinement.

Solitary confinement imposes a devastating triad of emotional and neuropsychiatric deprivations: social isolation, a barren perceptual environment, and deprivation of meaningful mental activity. The effect of these deprivations will be heightened if the individual subjected to them perceives his conditions of confinement as the product of the exertion of arbitrary power. Such perception deprives the individual of any sense of order, of justice, of rules that might protect him. Thus, such perception will inevitably magnify the individual's experience of fear and humiliation. Although it is clear that longer exposure to solitary will increase the severity of psychological harm, I have observed such harm in the course of my psychiatric work regarding the effects of solitary confinement– including overt delirium and suicidality – occurring within hours of such confinement.

### 2.3.1. Affective Disturbances: Anxiety, Depression and Self-Harm.

Individuals in solitary confinement often become seriously depressed. There is overwhelming empirical evidence that solitary confinement causes many people – even those with no prior history of mental illness – to become suicidal and/or self-destructive, especially in the first days of such confinement.[6]

---

[5] *See* Appendix D of my Washington University article.

[6] Statistical studies have shown that suicide among those in solitary confinement is seven times as common as it is among those in general population. One major study (Kaba, F., et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, Am. J. Public Health, 104(3):442-447 (2014)) analyzed medical records of 244,699 incarcerations in New York City jails and found that of 2,182 acts of self-harm, approximately 50% occurred among the 7% of inmates housed in

In addition, people placed in solitary confinement often develop, even within hours or days, severe panic attacks, marked by intense fear, dread of impending death, and with somatic manifestations that include tachycardia (racing pulse), diaphoresis (intense sweating), shortness of breath, and tremulousness. Sleep disorders, disruption of circadian rhythm and headaches are also common. In addition, individuals in solitary soon become intolerant of ordinary levels of stimulation.[7]

### 2.3.2.  Characteristic Neuropsychiatric Syndrome:  Stupor and Delirium

In addition to the physical and psychiatric effects mentioned above, there is also a unique neuropsychological syndrome associated with solitary confinement, a syndrome not seen in the ordinary course of clinical psychiatric practice. It is instead a syndrome more typically seen among severely medically ill patients in the Intensive Care Unit (patients with sepsis, severe hypoxia or heart failure, kidney or liver failure, and so on).

---

solitary confinement. Another study (Haney, C. & Lynch, M., *Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement*, NYU Review L. and Soc. Change 23, 477-570 (1997)) analyzed episodes of self-mutilation in North Carolina's prisons, revealing that nearly 50% occurred among the small proportion of inmates housed in solitary; similarly, 51% of self-mutilating behaviors in Virginia prisons occurred among inmates in solitary. In Texas solitary confinement units, suicide is five times more likely than in the general prison population, and self-harm is eight times more likely than it is in the community outside prison. (American Civil Liberties Union of Texas, *A Solitary Failure: The Waste, Cost and Harm of Solitary Confinement in Texas* (2015): https://www.aclutx.org/sites/default/files/field_documents/SolitaryReport_2015.pdf.)

[7] Several other medical problems have been observed with longer-term isolation. These include visual impairment, gastrointestinal disorders, urological difficulties, and orthopedic problems (weakness, spasticity, chronic pain conditions, arthralgias and myalgias). Solitary confinement has been shown to be a major risk factor for the development of hypertension, dyslipidemia and cardiovascular disease. *See* Williams, B., et al., *The Cardiovascular Health Burdens of Solitary Confinement,* J. Gen. Intern. Med., 34(10):1977-80 (2019). There is also evidence that it is a significant risk factor for the development of dementia.

Medical and experimental literature, as well as my own experience and observations, demonstrates that even within a few hours individuals subject to solitary confinement typically become incapable of maintaining an adequate state of alertness and attention to the environment. Their thinking and reactions become clouded, their actions either lethargic or agitated. Electroencephalogram ("EEG") studies have provided corroboration of this impairment, showing that even a few days of solitary confinement will shift an individual's brain wave pattern into an abnormal pattern characteristic of stupor and delirium. In other words, solitary confinement will demonstrably harm an individual's brain patterns. Individuals subjected to solitary confinement often suffer from a syndrome characterized by several symptoms that are not typical of the psychiatric symptoms found in ordinary clinical practice.[8] They include, among others: (i) impairments in thinking, concentration and memory; (ii) hyper-responsivity to external stimulation; (iii) hallucinations; (iv) obsessive ruminations; and (v) paranoia, delusions and problems with impulse control. I discuss each of these symptoms in turn below.

### 2.3.3. Impairments in Thinking, Concentration and Memory.

After even a relatively brief period in segregation, individuals will typically begin to descend into a mental torpor – a "fog" – in which alertness, attention and concentration all become impaired. In particularly severe cases, these impairments can result in massive confusion and disorientation, and in some cases, this can develop even within hours of confinement in solitary.[9] Even individuals less severely affected typically experience difficulties with thinking, concentration, and memory.

---

[8] *Supra*, note 2.

[9] *Id.*

### 2.3.4.  Hyper-Responsivity to External Stimulation.

Over time, the restriction of environmental stimulation in solitary confinement tends to cause the brain to become increasingly incapable of processing external stimuli.  In such a setting, individuals become "hyper-responsive" to even ordinary levels of stimulation; for example, a sudden noise or light jars the individual and becomes intensely unpleasant.

In my experience with individuals who have been released from solitary confinement into general population or back into the community at large, I have found that this hyper-responsivity to external stimulation persists after release from solitary.  It becomes a major source of functional impairment for such individuals.  Individuals who have been confined in solitary have great difficulty managing external stimulation.  Social stimulation is perhaps the most complex and difficult of all.  Individuals tend to withdraw from social engagement.  Even formerly gregarious individuals can become loners, withdrawing into themselves and almost recreating the barren solitude of their former confinement.[10]

### 2.3.5.  Obsessive Compulsive Symptoms.

An adequate state of responsiveness to the environment requires both the ability to focus attention and the ability to shift attention.  The impairment of alertness and concentration in solitary confinement leads to two related abnormalities.  One, the inability to focus attention is

---

[10] EEG studies have findings consistent with these clinical observations.  Experimental studies have demonstrated not only that solitary confinement causes a generalized slowing of the brain wave patterns, but also that when exposed to a visual stimulus, individuals who have been confined in solitary show an abnormally sharp spike in electrical discharges in the region of the brain that processes visual stimuli.  In some cases, this has persisted even many months after release.  Gendreau, P., et al., *Changes in EEG Alpha Frequency and Response Latency During Solitary Confinement,* J. Abnormal Psych., 79(1):54-59 (1972); Vrca, A., et al., *Visual Evoked Potentials in Relation to Factors of Imprisonment in Detention Camps,* Int. J. Legal Med., 109(3):114-117 (1996).

experienced as the mental "fog" described above.   Two, some people subjected to solitary

confinement develop a coping strategy of maintaining a rigid routine of mental and physical

activity in an effort to ward off this mental torpor, but this strategy creates its own burdens.  The

confined person becomes unable to shift away from those routines; their thinking pattern

becomes obsessional, and their daily routine becomes compulsive.

Moreover, the inability to shift attention results in a kind of "tunnel vision" in which the

individual's attention becomes obsessively stuck – often on something intensely unpleasant –

and he cannot stop thinking about that matter.  Instead, he obsessively fixates on it.  Individuals

in solitary confinement easily become preoccupied with some thought or irritation that becomes

overwhelmingly painful or maddening.[11]

### 2.3.6.   Hallucinations.

It is well-known that situations of restricted environmental stimulation such as solitary

confinement can cause hallucinations.  Even when an individual is aware that he is hallucinating,

he may still experience the hallucination as something real and coming from outside his own

head.  Such experiences are often terrifying for individuals housed in solitary confinement.  This

phenomenon is also well-known among critically ill patients experiencing delirium.

### 2.3.7.   Paranoia, Delusions, Problems with Impulse Control.

In the context of a fearful situation, and with so little to keep the individual anchored to

reality, many people in solitary confinement develop paranoid thoughts, and some develop

delusional beliefs.  Those in solitary confinement also often have increasing difficulty

maintaining impulse control.  Chaotic, often violent and often self-destructive behaviors are one

---

[11] Such obsessional symptoms are manifest in EEG studies as repetitive circular electrical brain
discharges involving subcortical regions.

14

of the most serious management problems observed by staff working with people in solitary

confinement.

### 2.4. Increasing Recognition of the Psychiatric Toxicity of Solitary Confinement.

During the course of my four decades of professional life, I have had the opportunity to

interview and evaluate a number of individuals who had been transferred back into general

population or released to the community after serving time in solitary confinement. They

universally described continuing psychological impairments as a result of their confinement in

solitary, impairments that render them incapable of accommodating to life in the larger

community. Individuals describe themselves as unable to tolerate ordinary levels of stimulation

they encounter in everyday life. They cannot tolerate the noise, the bustle, the constant stream of

stimuli that one normally experiences. Social stimulation is perhaps the most complex of all, and

it is the most difficult for such individuals. I have evaluated individuals – even formerly

gregarious individuals – who, after release from prison, literally spent almost all of their time

alone in their room. Unable to even join their family for a meal, they venture into the kitchen

only to fill their plate and then disappear again to eat their meal alone, sitting on their bed in their

room – the only place they can escape the buzzing confusion of life. Similarly, I have evaluated

individuals who were released from solitary confinement into the general population and could

not manage to integrate into this larger community; they ended up spending almost all of their

time alone in their cell. Families suffer greatly, wanting so much to embrace their loved one but

unable to reach him.

In the course of my professional work, I have seen many individuals whose experience of

solitary confinement was so psychologically traumatic that they were left suffering chronic Post-

Traumatic Stress Disorder ("PTSD"). Other researchers have reached similar conclusions,

finding that prolonged solitary confinement may cause psychological damage severe enough to

cause near-permanent mental and emotional damage.[12]  Many prisoners who have experienced

solitary confinement continue to experience enormous anxiety being around other people, to the

extent that their adjustment is severely impaired even to being in the prison's general population,

let alone their adjustment back to the community at large after release from prison.[13]  A

Canadian study found that over 50% of formerly isolated people experienced at least some of

these long-term psychological impairments.[14]

There has, indeed, been a great deal of research in the medical literature, as well as

articles in law journals, court opinions, and position papers of medical organizations and

international organizations, all reaching similar conclusions, that solitary confinement is

psychologically toxic.  A handful of articles claim to demonstrate no substantial harm from

solitary.  But those articles have been severely criticized because their methodology is fatally

flawed, and in some cases, their conclusions are inconsistent with the actual data upon which the

article is based.[15]

---

[12] Vasiliades, E., *Solitary Confinement & International Human Rights: Why the U.S. Prison System Fails Global Standards*, 21 Am. Univ. Int'l L. Rev. 71, 76-77 (2005).

[13] *Id.*

[14] Martel, J., *Solitude and Cold Storage: Women's Journeys of Endurance in Segregation*, Elizabeth Fry Society of Edmonton 85-86 (1999).

[15] There are basically three such articles.  Of these, one is not itself a direct study but purports to analyze twenty-four research articles.  (Morgan, R., et al., *Quantitative Syntheses of the Effects of Administrative Segregation on Inmates' Well-Being,* Psychology, Public Policy, and Law (2016), on-line publication http://dx.doi.org/10.1037/law0000089).  The Morgan article selection criteria for the articles to analyze is questionable.  Most of the articles cited are either *irrelevant* to the issue of whether solitary causes psychiatric harm (11 articles – e.g., discussing the personal characteristics of individuals who end up in solitary or the recidivism rate of various groups) or actually *support* the conclusion that solitary is harmful (8 articles, or arguably 10 articles – the other two being Gendreau's EEG studies, discussed below).  Thus, only three of the twenty-four articles relied upon could be said in some fashion to support the idea that solitary is not harmful,

and they are all enormously flawed.

The article most critical to the conclusions drawn in the Morgan paper is a study from Colorado: O'Keefe, M., et al., *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*, www.ncjrs.gov/pdffiles1/nij/grants/232973.pdf (2010), later published in hard copy as O'Keefe, et al., *A Longitudinal Study of Administrative Segregation*, J. Am. Acad. Psychiatry & Law, 41(1):49-60 (2013).  Morgan cites this as "the most scientifically rigorous" and "the most sophisticated longitudinal study" in this field.  Indeed, that *one* article accounted for about two-thirds of all of the "effect sizes" calculated by Morgan.

But that article has been widely discredited as fatally flawed in its methodology.  I published a critique of the article, *"Fatal Flaws" in the Colorado Solitary Confinement Study*, Solitary Watch (2010), http://solitarywatch.org/2010/11/15/fatal-flaws-in-the-colorado-solitary-confinement-study, that identifies these flaws, such as that an unknown number of inmates were classified as though they were still in administrative segregation even though they were transferred out of segregation during the study period.  However, the most serious flaw is that the study employed self-report rating scales and there was little to no reason to believe that they were a valid measure of actual – objective – psychiatric status.  To the extent that the article had data in it that *was* objective, that data squarely contradicted the data from the self-reports.  For example, it demonstrated that, comparing those in solitary to those in general population, it was seven times as likely for an individual in solitary to have a psychiatric crisis during the study period than it was for those who were not.

There are two other studies purporting to support Morgan's conclusions.  The first article, Suedfeld, P., et al., *Reactions and Attributes of Prisoners in Solitary Confinement,* Crim. Justice Behav. 9(3):303-340 (1982), is similarly flawed.  For example, like O'Keefe, Suedfeld also used self-reports not validated by any objective measure.  His subjects were inmate volunteers who were no longer in solitary, and in the article he actually acknowledges that they might well have been motivated to give invalid responses, minimizing the psychiatric distress they experienced in solitary: "The interviewers reported that many of the respondents spoke about … their adjustment to [administrative segregation] with some pride, and indicated that having been sent to [administrative segregation] and dealing with it successfully would add to their status among the other inmates."  In fact, it is extremely common for inmates to understate the psychological suffering they experienced in solitary.

Moreover, Suedfeld biased his sample because he actually *excluded* inmates from his study "who were completely unable to adapt to [administrative segregation]."  Lastly, his results did *not* demonstrate a lack of harm; he found that those who spent more time in solitary were "inhibited, anxious, cautious, dissatisfied, dull, submissive to authority and lacking in self insight," and, moreover, that they "scored higher on depression … and hostility."

The remaining article purporting to support Morgan's conclusions (Zinger, I., et al., *The Psychological Effects of 60 Days in Administrative Segregation,* Can. J. of Criminology 47-83 (2001)) is similarly flawed.  It also uses self-report rating scales without any attempt at external validation.  Moreover, Zinger mixed together data from inmates who were involuntarily housed in administrative segregation with those who had volunteered to be so housed (*e.g.*, out of fear of

17

As noted before, medical research has confirmed the observations that solitary confinement is toxic to brain function.  After even a few days of solitary confinement, the brain wave (EEG) becomes deranged, demonstrating the slowing of brain activity that is characteristic of the stupor and delirium seen in extremely medically ill patients, and an exaggerated electrical response (spike discharges) to external stimuli.[16]

Advances in brain research have shown that solitary confinement may fundamentally and permanently alter brain function.  Dr. Huda Akil has studied the effects of emotions and stress on brain function and structure.  She reports that, separately, each characteristic of solitary confinement (lack of physical activity and lack of environmental, occupational and social

harm by other inmates).  Yet he acknowledges that this latter group would have a major incentive to minimize the harm they reported experiencing in administrative segregation (because of their fear of the alternative).  Moreover, of the 91 inmates in administrative segregation whom Zinger approached for the research, only 51 consented, and of these 51, nine became belligerent or refused to continue with the study, while another 32 left administrative segregation (for some other unit, for protective custody, or for general population – no figures are provided) before the completion of the study.  In the end, only 10 inmates involuntarily housed in administrative segregation (about 11% of those approached) actually completed the Zinger study.

[16] Gendreau, P., et al., *Changes in EEG Alpha Frequency and Response Latency During Solitary Confinement,* J. Abnormal Psych., 79(1):54-59 (1972).  A study of former prisoners of war in the Balkan conflict reached similar conclusions.  *See* Vrca, A., et al., *Visual Evoked Potentials in Relation to Factors of Imprisonment in Detention Camps,* Int. J. Legal Med., 109(3):114-117 (1996).  Gendreau found that the EEG of individuals who had spent significant time in solitary confinement demonstrated abnormal, hyper-responsive (spike discharges) in the EEG to visual stimuli.  The only other experience that predicted this hyper-responsivity to external stimulation was overt brain injury, reflected as a history of head trauma to the point of unconsciousness.  Other factors, such as length of imprisonment, semi-starvation, beatings, and so forth were not predictive of this EEG abnormality.

stimulation) is sufficient to dramatically alter brain function.[17]  The neurotoxic effects of solitary

confinement may create permanent damage to brain function.[18]

As discussed briefly earlier in this report, and in more detail in my Washington

University article, the fact that solitary confinement has a particular, severe psychiatric toxicity

was clearly known well before the end of the nineteenth century, and became a source of

international alarm in the 1950s.

**3.  The Aurora Detention Facility.**

Information regarding the Aurora Facility comes from depositions, photographs and other

documents, as well as from my interviews with plaintiffs in this matter.

The Aurora Facility houses individuals who are facing possible deportation.  During the

class period, the facility had the capacity for up to 525 detainees.  The main living areas for male

ICE detainees are two "pods," each of which are separated into dormitories arrayed around a

central control tower.  The dormitories are comprised of 4 and 8-person bunk-bedded cells

arranged around a central area filled with tables.  Each of the tables has four chairs bolted to it.

---

[17] Ramlagan, N., *Solitary Confinement Fundamentally Alters the Brain, Scientists Say*, American Academy for the Advancement of Science (2014), https://www.aaas.org/news/solitary-confinement-fundamentally-alters-brain-scientists-say.

[18] Among other findings, Dr. Akil's studies reveal that chronic stress can shrivel the brain – including the hippocampus, the part of the brain responsible for memory and involved in emotional control.  There is also evidence that this brain damage may become permanent; studies have shown that individuals who have experienced chronic stress have an increased likelihood of developing dementia in later years.  As described in Appendix A of my Washington University article, there have been a number of experimental animal studies where rats, mice, or monkeys have been subjected to settings of social and environmental deprivation.  In those studies, the subjects have been found to have both "simpler" neurons with fewer synaptic connections and also atrophied cerebral cortices as compared with controls.  *See also,* American Civil Liberties Union, *Briefing Paper: The Dangerous Overuse of Solitary Confinement in the United States* (2014), https://www.aclu.org/report/dangerous-overuse-solitary-confinement-united-states.  In short, after solitary confinement the brain shrinks and the neural connectedness essential for brain functioning is substantially reduced.

Recreation areas are shared by two dormitories each.  One dormitory can be out in the recreation area during the morning, the other in the afternoon.

Women are housed in a separate, smaller unit, comprised of a single large room with bunk beds in one area and tables in another area.  Each of the tables has six chairs bolted to it. The women's unit also has an attached recreation area.

Interviews with the detainees reflect that for the most part, they either sit in their cell or on their bed, or congregate in the central area, sitting at the tables.

The ICE facility also contains a medical unit and administrative offices.

There is also a segregation wing with cells on both sides of a hallway, and a small exercise yard.  One side is denoted as "administrative segregation," the other as "disciplinary segregation."  The physical features are the same on the two sides.  The cells are typically small (the tour notes estimate that they are approximately 6 feet x 12 feet) and quite barren, lacking any window to the outside world, and containing only a metal frame bed attached to the wall, a toilet and sink, and two small shelves.  There are televisions in the hallway facing the cells; detainees may have to peer out of their cell to be able to view the screen.  Detainees in administrative segregation are allowed to have social phone calls but detainees in disciplinary segregation are not.  Only attorney phone calls are allowed for detainees in disciplinary segregation.

On either side of the segregation wing, facility policies require that the detainee is allowed one to two hours per day in a small exercise yard.  The policy provides that staff may at times allow two detainees in administrative segregation to be in adjacent exercise yards simultaneously, while use of the exercise yard is always alone for those in disciplinary segregation.

Detainees who refused to clean were typically confined in administrative segregation, under conditions that were marginally less harsh than those prevailing in disciplinary segregation. However, from the interviews that I conducted, it was clear that the detainees were generally unaware that there was any difference between the (administrative) segregation of a detainee for not cleaning and the (disciplinary) segregation of a detainee who, for example, was confined as a form of punishment.

Detainees were involved in two different work situations:

  • On some form of rotating basis, a group of detainees was forced to clean the common living area of the pod – the tables, chairs, floor – three times a day, after meals. According to the people I interviewed, this work in total took about 3-4 hours a day. In my conversations with detainees, they indicated that generally this demand would be imposed on an individual about twice a week. Detainees reported that they were told by the guards they had no choice but to comply and they were told by the guards that if they refused, they would be sent to "the hole" – that is, to solitary confinement.

  • A detainee could "volunteer" for a work assignment that might be for example doing the laundry for the facility or cleaning the floors and walls of the administrative area of the detention center. Such work was often done in the middle of the night, and might take up to 6 hours or more, depriving the detainee of any normal nighttime sleep. For this work, the detainee would be paid $1.00 a day. During the early years, a detainee who "volunteered" to work would not be forced to be on rotation for cleaning the pod, but according to detainees whom I interviewed, this accommodation was eliminated later on.

**4. The Experience of and Impact on the Detainees.**

In what follows I describe how several detainees learned about solitary and how this knowledge impacted them.  Information regarding the experience of the detainees is primarily based upon the interviews listed at the beginning of this report, as well as information contained in the materials that I reviewed, including declarations and depositions.

One of the detainees whom I interviewed had been confined in solitary as a consequence of refusing to clean the living area, and all interviewees were very aware of the threat that a detainee who refused to do that work would be sent to "the hole."  They and their fellow detainees were intimidated by the threat.

### A. Hugo Hernandez

In my interview with him, Hugo Hernandez recalled that the detainees were told by the guards that if anyone refused to do the cleaning, his belongings would be thrown into a garbage bag and he would be sent to "the hole," where he would lose all his privileges.  There would be no visits, no commissary, no phone calls, no exercise yard, no daily shower.  Detainees were told that they would be confined in a small box and fed cold food, and would not see any daylight.  Mr. Hernandez understood that in "the hole," a detainee would be stressed out, all by himself with no one to talk to: "The point was to get you all scared, and it worked.  People would protest, say they wouldn't do it.  But then they [the guards] would bring out a roll of garbage bags, and no one would refuse."  He recalled that the detainees were always angry about it but felt powerless to refuse: "It was humiliating.  We were powerless.  It was so much worse because we were there facing possible deportation.  We were scared."

Mr. Hernandez did know of detainees who were sent to the hole for fighting.  He recalled that they lost weight while in solitary confinement.  They seemed scared.  They would talk about their experience in the hole, about how cold and dark it was: the light in the cells was a small

light instead of a regular light, and they had only a small blanket to cover themselves. Detainees who returned to the general population would describe how stressed they were; Mr. Hernandez recalled observing: "It messes you up mentally, makes you think different. They would just go around in circles. Sometimes they would want to bang their heads on the walls because they had nothing to do."

### B. Alejandro Menocal

When Alejandro Menocal first arrived at the Aurora facility, he was very ill and was placed into medical isolation, a cell within the medical unit of the facility. He remained there for almost two days. He saw no one but the nurse. There was no window to the outside world, just a window to hallway, facing nothing. Mr. Menocal described his cell as a barren 10 x 10 foot cell, with only a metal frame mattress, very thin pillow, sheets and a thin blanket, a toilet and a sink. He had nothing to distract myself. There were no other people around; he could not hear anything. There was nothing for him to do. He would pace back and forth in the cell, whistling or singing to himself.

Mr. Menocal said that especially because of this experience the threat of solitary caused fear, forcing him and others to comply with the cleaning assignments. He spoke about the intense feelings of helplessness, fear and humiliation caused by the forced cleaning, and even by the "voluntary" work. He stated that people complied because they were afraid of isolation. He recalled that many times his fellow detainees would say that it was not right for them to have to clean, but they still did because of their fear of being sent to isolation. He expressed his anger to me in our interview: "It wasn't fair. We ran the facility – the landscape, the laundry, the kitchen; we washed the floor. They were using us like slaves. One dollar a day. Unfair. Treating us like dirt."

Although Mr. Menocal himself was never confined in solitary for refusing to work, in his declaration, he stated that he did see others punished in this way. He did witness a group of six detainees who refused to clean the common living areas and were put into the hole for refusing to work.

### C.  Jesus Yepez Gaytan

Jesus Gaytan stated in his interview that he complied with the demands to clean the pod because of his fear of "the hole." This forced cleaning required several hours each day for those who were picked by the guards for this assignment. Mr. Gaytan recalled how powerful the message was – that you either clean or you would be confined in solitary. People would tell him: "You don't want to go there, so just do what they say." He recalled one detainee who refused to do the cleaning; the guards took him out and he never came back to their pod. Other detainees, including two people who had been in the hole before Mr. Gaytan arrived at the detention facility, told him that it was dark in the hole, and they didn't have contact with anybody while they were in there. They didn't know when they were going to get out, and all they could do was sleep. Mr. Gaytan recalled that he was frightened by these descriptions and didn't want to be by himself in solitary. And so he, and almost all others, complied with the cleaning requirement. He felt that it wasn't right. The detainees were angry about it, but they had their immigration cases to fight; they did not feel that they could afford to fight the guards.

Several detainees experienced the voluntary work and the forced work as being two forms of a similar abuse. Several described the food provided by the detention center as inadequate, leaving them chronically hungry. The voluntary work was effectively coercive for those who had no money to buy food from commissary. Mr. Gaytan felt he had no choice; his family did not have the resources to help him and he had no other source of money; he had to

work to feed himself, and to buy other necessities such as shampoo and cleaning supplies. He recalled that the meals the facility provided were inadequate, and he was hungry much of the time.

Mr. Gaytan worked in the laundry, which he recalled as being very hard work. The laundry job entailed getting the dirty clothes from the pods, washing, drying and folding them. Mr. Gaytan described himself and his fellow detainees as angry and humiliated, but helpless. They would complain to each other that they were doing a lot of work for one dollar a day, and realized they were being taken advantage of, but they were powerless to protest. Mr. Gaytan noted that this sense of powerlessness made him feel bad about and mad at himself, describing it as humiliating. It would go through his mind that the guards were laughing at the detainees. As he noted: "It got stuck in my head that we were getting mistreated because we were in a situation where we could lose everything."

Even though Mr. Gaytan took part in the voluntary work program, he still was forced to do the unpaid cleaning about twice a week. He observed that early on only those who were not working voluntarily were forced to clean for free, but this changed during his detention at Aurora.

### D. Olga Alexakhina

Olga Alexakhina's fear of the hole was all the worse because she knew people who had been confined in the hole and came back injured and changed. Her description was very powerful: "I knew several people who they sent to the hole. You are just sitting there without seeing the sun. It's a hole. It was horrible. … Some were there for 1, or 3, or 5 days. When they came back they would take a shower and just lay down. They didn't want to talk to anyone, just laying down. It was very scary. I was scared of going to the hole. Being in detention is already

scary and hole is so much worse – without talking to each other or seeing light or the sun."

In her interview, Ms. Alexakhina recalled one woman in particular who was sent to the hole for refusing to clean.  The woman had said she was not going to clean that day because she had just cleaned the previous day.  Ms. Alexakhina recalled that when this woman finally returned to the pod from the hole, she was so depressed that other detainees had to help get her up just so that she would eat.  This woman described the hole as a very small, dark room, with only a bed and toilet.  Ms. Alexakhina remarked that the fear of being sent to the hole was always there – that fear of the hole was their biggest weapon.  She was always scared, tense: "You could never be at peace."

During her detention at Aurora, Ms. Alexakhina came to believe that the guards hated the detainees.  She recalled that once a month, a particular, high-ranked guard would come to the pod.  This guard seemed particularly eager to find fault, to punish.  For example, if it was really cold and a detainee had two blankets instead of just one, this guard would send the detainee to the hole.  Olga stated that she witnessed many detainees being punished by being sent to the hole for almost anything at all.  Olga stated that everyone who had been confined in the hole came back depressed, crying, withdrawn, just laying in their bed for days.  She could see the fear in them.

Ms. Alexakhina also described the coercive effect of not having enough food to eat. Detainees who agreed to work would receive sandwiches and sometimes some fruit.  If the detainees didn't clean, they would be hungry; the meals they were provided were not enough. Those who did the work shared the food they received with others.  Ms. Alexakhina recalled that the work was hard, such as cleaning the halls from midnight to 6:30 in the morning.  She noted again that the detainees had no choice but to do this work because there was not enough food.

26

### E.  Grisel Xahuentitla

In her deposition in this case, Grisel Xahuentitla described an incident where a young woman was on the daily list of detainees required to perform involuntary cleaning.  The young woman was in bad pain with a kidney stone.  Ms. Xahuentitla and another detainee both volunteered to work in place of the young woman, but the guard refused because the woman's name was on the board.

Ms. Xahuentitla described other instances where guards would perform periodic shakedowns, confiscating anything they declared to be contraband – even such benign items as an extra sugar packet from breakfast a detainee kept for later, or salt packets, or some paper.  She described the fear and helplessness this induced, which was compounded because guards told the detainees that they were not welcome in the United States, warned them not to feel comfortable, and threatened them against thinking they would be able to remain in the country.  She also reported that the threats of being sent to the hole were constant.

### F.  Alejandro Hernandez Torres

Alejandro Hernandez Torres was detained at the Aurora facility for three years, from 2012 to 2015.  He has limited English proficiency and was interviewed with the help of an interpreter.  During our interview, he stated that he was confined in solitary four times while detained at the Aurora facility.  His experience of solitary was severe and destructive.

The first of Mr. Hernandez Torres's periods in solitary confinement followed his refusal to clean and polish the facility floors one night.  He stated that the demand to clean and polish the floors was constant, and that detainees had to work every day.  He explained that there was always a reason that the facility had to be cleaned, such as an inspection of the facility once a month, or visitation every weekend.  Mr. Hernandez Torres stated that immigration detainees

also had to polish the floors for the federal detainees, who were housed in a separate area of the facility. All this was in addition to having to clean the dormitory after the meals about once a week.

Mr. Hernandez Torres explained that in this instance, he refused to clean the floors, and as a result was handcuffed and taken into solitary confinement, where he remained for eight days. He became tearful during our interview as he recounted the experience, especially when he described how cold he was while housed there. He described the cell as small, with only a bed, table and a toilet. The air conditioning was on all the time and all he had to cover himself with was one sheet; the mattress was plasticized and very thin, and he could feel the metal of the bed frame through the mattress. He recalled how inadequate the food was. Mr. Hernandez Torres cried as he recalled that he was there for eight days, that the light was kept on all day, and that there was not even a window to see the outside world.

He said that whether he got a chance to exercise depended upon the guard on duty, and that if a guard did allow him out, it was for only for 20 to 30 minutes in a room that was about 3 to 4 meters square. Even there, he was all alone, with no one to talk with. All he had in his cell was a Bible, and he got through the day by trying to read the Bible and to exercise in his cell. Sometimes he was so desperate to find something to do that he would count the blocks on the cell wall. Mr. Hernandez Torres stated that on the administrative segregation half of the wing, there were televisions in the hallway, but it depended upon the guard whether the television would be turned on. He stated that mostly they were off, and that even when they were on, it was difficult – or in some cases impossible – to see what was on the screen or to hear the audio. He was offered a shower daily, but it was at 7 a.m., and he had to undress in front of guards, some of whom were female. If he accepted the shower, he would be cuffed, first the right hand

to the right foot, so that he could only clean one side of his body, and then the left hand to the left
foot, so that he could then clean the other side of his body.  Due to the humiliation of forced
nudity before female guards, and the degradation associated with cleaning himself in view of
guards while cuffed hand-to-foot, he usually refused to shower.

During that first period of confinement, Mr. Hernandez Torres spent some of his eight
days in solitary on the disciplinary side, as punishment for becoming so desperate that he started
kicking his cell door and yelling.  He said he believes that the disciplinary side was even colder
than the administrative segregation side.  There, there was no exercise yard, no television, and
just a sheet to cover himself, with no blanket even though it was winter.  Mr. Hernandez Torres
stated that the guards banged on the doors every half hour or so, even throughout the night,
making sleep almost impossible.  He stated that this was worse on the disciplinary side, but
occurred on both sides.

In the interview, Mr. Hernandez Torres explained the circumstances of the other three
times he was confined in solitary at the Aurora facility.  One of these was after he was so tired
from working every day that one day he paid another detainee to take his place polishing the
floors that night.  A guard came in and demanded he go to work.  He explained that he paid this
other person to work for him.  Mr. Hernandez Torres stated that without any further discussion –
without then giving him a chance to agree to do the cleaning, and despite his protestation that he
would do the work – the guard handcuffed him and took him to solitary, where he remained for
twelve days.

The other two times Mr. Hernandez Torres was sent to solitary had nothing to do with
cleaning.  One had to do with two detainees getting into a fight.  Mr. Hernandez Torres said he
stayed off to the side and did not participate, but a guard came in, handcuffed him and took him

to solitary. In the interview, he stated that he was there for one month.[19] The other time he went
to solitary was when another detainee in his four-person room was found with a cell phone,
which counted as contraband in the facility. Despite no evidence that Mr. Hernandez Torres had
anything to do with its presence, he was again handcuffed and confined in solitary for a month.

Mr. Hernandez Torres has suffered continuing harm from his experience of solitary at
Aurora. He explained that after release from the facility, he was so burdened by intrusive images
of his ordeal that he became distraught, tried to take his own life, and was psychiatrically
hospitalized. During our interview, he repeated several times how hard it was for him to have
those memories of being confined in solitary at Aurora. And, indeed, he was crying during much
of the interview as he spoke of his experience.[20]

## 5. Conclusions.

As described in the body of this report, solitary confinement is a very harsh,
psychiatrically toxic form of punishment. It can have severe psychiatric effects within hours,
and one to three days of solitary confinement will certainly have a major psychiatric impact.

From my clinical interviews with detainees, it was clear that the threat of solitary was
extremely coercive and frightening for them, and not less so for those who had never been
housed in solitary – or even seen the segregation wing. Indeed, being threatened with a
punishment they could not fully understand, if anything, increased their fear.

---

[19]     Documents in Mr. Hernandez Torres' detention file suggest that he was in segregation for
around two weeks before being released from segregation. It is not unusual for people who have
experienced traumatic situations to misremember details such as lengths of time. Indeed, one of
the defining characteristics of Post-Traumatic Stress Disorder concerns memory – both
hypermnesia for some details, and amnesia for others.

[20]     These reactions are typical of people who are experiencing Post-Traumatic Stress
Disorder.

The detainees whom I interviewed consistently described that they performed the cleaning chores as a direct result of their fear of being sent to "the hole."  Even for detainees who never experienced solitary, the descriptions of solitary they were given by the guards and by fellow detainees, as well as in some cases the observation of other detainees who had come back from solitary, meant that the threat of being sent to "the hole" created a great feeling of helplessness and fear.

Clinical interviews of the detainees revealed that the context of this threat greatly magnified its psychological effects.  The detainees were in a situation in which they were virtually without any sense of personal "agency" – powerless and faced with the possibility of a catastrophic change in their lives.  "Learned helplessness," a term introduced by Dr. Martin Seligman,[21] is a much-researched concept in psychiatry that describes well the experience of the detainees whom I interviewed.  Research regarding this phenomenon has shown that where an individual experiences himself as powerless to prevent aversive consequences, this may produce in him the loss of will to resist negative consequences.  The resulting feelings of paralysis, passivity, anxiety and depression have neurobiological correlates.[22]  But when combined with emotional abuse and dehumanization from those in power, as was experienced by those detainees I interviewed, those effects would be, and were, far worse.  And people in such a situation of powerlessness are exceedingly vulnerable to being abused and coerced by those who do have

---

[21] Seligman, M., *Learned Helplessness,* Ann. Rev. Med. 23:407-412 (1972).

[22] *See e.g.*, Hammack, S., et al., *Overlapping Neurobiology of Learned Helplessness and Conditioned Defeat; Implications for PTSD and Mood Disorders*, Neuropharmacology 62, 565-575 (2012); Maier, S. & Seligman, M., *Learned Helplessness at Fifty: Insights from Neuroscience*, Psych. Rev 123(4):349-367 (2016).

power.  Incarceration itself will tend to create a pattern of learned helplessness.[23]  But when combined with emotional abuse and dehumanization by those in power, its effects will be far worse.[24]

The detainees whom I interviewed described the threat of solitary confinement as being imbedded in a situation that they experienced as overwhelmingly frightening, coercive, and humiliating.[25]  From the interviews I conducted, I learned as well that the detainees experienced the guards as using their fear and helplessness as a form of intense coercive pressure to comply.

The detainees whom I interviewed described their situation as one of utter desperation. They were faced with possible deportation, being separated from their families and all they had in their lives.  In many cases, they faced deportation to a country they were entirely unfamiliar with, even, for some, with a language they did not speak.  In the context of such a fearful situation, the detainees were so primed with fear and a pervasive sense of helplessness that they were exquisitely vulnerable to any additional threat or coercion.  They revealed how terrified they were of those in authority, fearing even that their disciplinary records during detention could affect the ultimate disposition of their deportation hearing.

---

[23] Schill, R. & Marcus, D., *Incarceration and Learned Helplessness*, Int'l J. Offender Therapy & Comp. Criminology, 42(3):224-232 (1998).

[24] *See, e.g.*, Bastian, B., *A Dehumanization Perspective on Dependence in Low-Satisfaction (Abusive) Relationships*, J. of Soc. & Personal Rels., 36(5):1421-1440 (2019).

[25] Psychiatrically, humiliation – shame – is one of the most destructive of human emotions. "Shame" is often confused with "guilt," but in fact shame is far more shattering.  Guilt is the experience of having made the choice to do something wrong – there was a *choice* made; the decision was under the person's control.  Shame is the experience of having no control, no autonomy, no personal integrity at all.  The experience of shame is the experience of being laughed at, made into a mockery.

Their fear and helplessness was compounded by the fact that many of the detainees came to believe that the guards felt malice towards them, dehumanized them, and hated them as foreigners, telling them that they were not welcome in "our country." Several detainees believed that the guards enjoyed the exercise of arbitrary power and even cruelty. Many experienced the guards as treating the detainees with contempt.

The detainees described being in a situation where all they could do was to try to survive day by day. They were truly helpless; they had no power to resist coercive treatment and humiliation. Their daily lives in detention were barren, affording almost no opportunity to distract themselves from their fears or to restore their sense of self. Even the "voluntary" work had aspects that were coercive (it was often the only way to deal with chronic hunger) and being paid a dollar a day for many hours of hard work was something that they experienced as deeply humiliating and dehumanizing.

As revealed in the interviews, the detainees' experience was one that would crush the spirit of a person of ordinary mental fitness; facing the possibility that their entire lives would be upended, they were already very frightened and basically helpless. And then, in that context, they experienced the guards as cruel, exploitative, and degrading, forcing them to do work at the guards' bidding. They described an experience of utter helplessness, fear and humiliation.

Signed this _1st_ day of May, 2020.

_[signature]_

Stuart Grassian, M.D.

33

# Exhibit D

# Psychopathological Effects of Solitary Confinement

## Stuart Grassian, M.D.

*Psychopathological reactions to solitary confinement were extensively described by nineteenth-century German clinicians. In the United States there have been several legal challenges to the use of solitary confinement, based on allegations that it may have serious psychiatric consequences. The recent medical literature on this subject has been scarce. The author describes psychiatric symptoms that appeared in 14 inmates exposed to periods of increased social isolation and sensory restriction in solitary confinement and asserts that these symptoms form a major, clinically distinguishable psychiatric syndrome.*

(Am J Psychiatry 140:1450–1454, 1983)

There have been several legal challenges to the use of solitary confinement in the United States penal system based on allegations that such confinement can cause serious psychopathological reactions (1–3). The present article describes clinical observations of 14 prisoner plaintiffs in a lawsuit alleging that the conditions they were exposed to in solitary confinement were violations of Eighth Amendment protection against "cruel and unusual punishment."

### REVIEW OF THE LITERATURE

Despite the obvious legal and humanitarian importance of this issue, there has been a scarcity of recent medical literature on the subject beyond a flurry of theoretical interest generated by concerns about "brainwashing" of American prisoners of war in Korea and the experimentation on profound sensory deprivation precipitated by those concerns (4–8). In the recent literature, reports of clinical observations of prisoners in solitary confinement have been virtually nonexistent. However, with the exception of the only

*experimental* study in the literature (9), these reports (10–12) have indicated psychopathological effects. One report noted "restlessness, yelling, banging and assaultiveness" in some prisoners and in others "a kind of regressed, dissociated, withdrawn hypnoid state" (10). Another report cited two cases of reactive psychosis marked by initial agitation and behavioral dyscontrol, leading to a hallucinatory, incoherent, confusional state (11).

There was, however, extensive interest in the problem of psychopathological syndromes among prisoners in late nineteenth- and early twentieth-century Europe. During that period, solitary confinement was extensively used in both Europe (13) and the United States (14); in many prisons it was the exclusive mode of incarceration. Indeed, the American penitentiary became world famous; important visitors journeyed to the United States specifically to observe this system and bring it back to Europe for emulation. Perhaps the best known of these visits, that of Alexis de Tocqueville, gave rise to a classic study of American social institutions (15).

This enchantment with solitary confinement was relatively short-lived, however. As early as the 1830s statistical evidence began to indicate an increased incidence of physical morbidity and mortality, as well as of insanity, among prisoners exposed to especially rigid forms of solitary confinement (14, p. 87). The system's openness to public scrutiny brought forth vivid descriptions of the effects of such confinement. Charles Darwin, for example, observed inmates "dead to everything but torturing anxieties and horrible despair. . . . The first man . . . answered . . . with a strange kind of pause . . . [he] fell into a strange stare as if he had forgotten something. . . . [Of another] Why does he stare at his hands and pick the flesh open, . . . and raise his eyes for an instant . . . to those bare walls? (8, p. 66). By 1890, the United States Supreme Court entered an opinion explicitly condemning solitary confinement on psychiatric grounds, indicating that "a considerable number of prisoners . . . fell into a semi-fatuous condition . . . and others became violently insane" (1).

In the United States, unfortunately, these experiences did not give rise to a body of clinical literature. However, in Germany, whose penal system had emulated the American model, major clinical concern developed about the incidence of psychotic disturbances among prisoners. Between 1854 and 1909, 37 articles on this subject appeared in German journals,

Received Oct. 24, 1980; revised March 5 and Oct. 20, 1982; accepted Nov. 30, 1982. From the Department of Psychiatry, New England Memorial Hospital, Stoneham, Mass.; Tufts University School of Medicine, Boston, Mass.; and Harvard Medical School, Boston. Address reprint requests to Dr. Grassian, 401 Beacon St., Chestnut Hill, MA 02167.

The author thanks Dr. Dan Buie for his review of the manuscript. Dr. Frank Rundle conducted half of the psychiatric evaluations on which this report is based.

Copyright © 1983 American Psychiatric Association.

collectively describing hundreds of cases of psychoses that were deemed to be reactive to the conditions of imprisonment. A review of this literature appeared in 1912 (13) and will be only summarized here.

The literature described a hallucinatory, paranoid, confusional psychosis in which characteristic symptoms included 1) extremely vivid hallucinations in multiple sensory modalities, including the visual, auditory, tactile, and olfactory; 2) dissociative features, including sudden recovery "as from a dream," with subsequent amnesia for the events of the psychosis; 3) agitation and "motor excitement" with aimless violence; and 4) delusions, usually described as persecutory. Onset was often described as sudden and, in some reports, as precipitating at night. In other cases, initial manifestations included "humming and buzzing, unpleasant noises and inarticulate sounds [leading to] hallucinations." Rarer, only occasionally noted symptoms included *Vorbereiden* ("the symptom of approximate answers," usually associated with Ganser [16], although described as well by others) and hysterical conversion symptoms.

Of this large body of literature, only Ganser's contribution (16) remains well-known, and Ganser failed to comment on the form of imprisonment to which his prisoner subjects were exposed. However, in more than half the total body of literature, solitary forms of confinement were specifically cited as responsible for precipitating the psychosis, and rapid recovery was often noted when the prisoner's solitary confinement was terminated.

CIRCUMSTANCES OF THE CLINICAL OBSERVATIONS

The present observations developed as a consequence of a court order mandating psychiatric evaluation of 15 inmates at the Massachusetts Correctional Institution at Walpole, all of whom were plaintiffs in a class action suit against the Department of Corrections that alleged violations of Eighth Amendment protection against "cruel and unusual punishment" because of the conditions to which the prisoners were exposed in solitary confinement.

The correctional institution at Walpole is the maximum security state prison for the Commonwealth of Massachusetts. It is divided into 13 cell blocks. Block 10 is reserved for solitary confinement and is divided into four tiers, each housing 15 cells approximately 1.8 m × 2.7 m in size, each cell containing an open toilet and sink, a steel bed, and a small, fixed steel table and stool. The cells in the lower tiers have double doors. The inner door is barred; the outer door is solid steel except for a small Plexiglas window. There are no other windows in the cells; each cell has one 60-watt light bulb to provide light.

While these structural features have remained constant, administrative decisions have determined other features of the confinement. Until August 20, 1979, the outer steel doors were left open, permitting natural light and air to enter the cell and permitting inmates to speak with other inmates in adjoining cells; on August 20 the steel doors were closed on the cells of all inmates in isolation. At the same time, correctional officers removed personal belongings from the cells, including radios, television sets, and all reading materials except a Bible.

Suit was brought not against the conditions in Block 10 generally but specifically against the conditions prevailing in the lower tiers since August 20, 1979. Of the 15 plaintiffs in the suit, 14 were interviewed; the 15th was no longer in Block 10 at the time of the interviews and was not available. All of the plaintiffs were men, and their mean age was 28 years (range, 22–38 years). Median duration of confinement in isolation was 2 months (range, 11 days to 10 months). Each prisoner was interviewed for approximately one-half hour by one of two psychiatrists, with the exception of one prisoner who, because of concern over his clinical state, was seen twice over a 3-week period. History was obtained of incarcerations, previous experience with solitary confinement, and previous and current psychiatric symptoms and treatment. Due to the pressure of time, we made no active attempt to cover other areas of a full clinical history, e.g., assessment of object relations, defenses, and family history.

In the interviews, conducted in an open-ended manner, careful attention was paid so that suggesting possible symptoms was avoided. The circumstances of the interviews, however, were clearly seen by the prisoners and guards as adversarial. Access to the prisoners for the interviews was obtained only through court order; all prisoners interviewed were informed of the purpose of the interviews and told that data from them might be used in court testimony. In addition, there were several guards stationed just outside the interview room, prompting several prisoners to resort to whispering as a means of avoiding being overheard.

FINDINGS

It might be expected that the adversarial circumstances of the interviews would have biased the prisoners' reports in the direction of exaggeration of whatever symptoms they might have experienced. Such was not the case. In fact, contrary to expectation, the prisoners appeared to mobilize multiple defensive operations—rationalization, avoidance, denial, distortion, and repression—in an effort to minimize the quality of their reactions to isolation. The interviewer was required, therefore, actively to encourage disclosure of information, to provide reassurance, and persistently to confront and explore gaps in the reported accounts. Numerous interviews began with statements such as "Solitary doesn't bother me" or "Some of the guys can't take it—not me," or even with the mention of a symptom and simultaneous denial of its significance: "As soon as I got in, I started cutting my wrists. I figured it was the only way to get out of here." As the

EFFECTS OF SOLITARY CONFINEMENT

interviews progressed, these facile, superficial accounts gave way to descriptions of experiences that were troublesome. For example, one inmate was unable to describe the events of the several days surrounding his wrist slashing, nor could he describe his thoughts or feelings at the time. His overt anxiety increased markedly upon questioning, and only after some time was he able to describe an apparent acute confusional state, panic, and subsequent partial amnesia for those events. Similarly, the prisoner who said he could "take it" eventually came to describe panic, fears of suffocation, and paranoid distortions while he had been in isolation.

Indeed, the general pattern was for inmates initially to downplay reactions to the solitary confinement situation, then, after being carefully questioned, to become overtly anxious and, frequently, overtly reluctant to elaborate on significant details. Upon confrontation, several inmates acknowledged the reasons for their reluctance. They feared that the guards would discover their primitive fantasies of revenge or that the guards were waiting to see a weakness that they could exploit to make the inmate "crack up." Furthermore, in several cases, the inmate's dread was that he was in fact going insane.

The specific psychiatric symptoms reported were strikingly consistent among the inmates.

### Perceptual Changes

*Generalized hyperresponsivity to external stimuli.* This symptom was most commonly associated with dysesthetic responses to certain stimuli (11 prisoners). Instances of this included "You get sensitive to noise—the plumbing system. Someone in the tier above me pushes the button on the faucet, the water rushes through the pipes—it's too loud, gets on your nerves. I can't stand it—I start to holler. Are they doing it on purpose?" "Everything gets exaggerated. After a while, you can't stand it. Meals—I used to eat everything they served. Now I can't stand the smells—the meat—the only thing I can stand to eat is the bread." "What really freaks me out is when a bee gets into the cell—such a small thing." "Difficult to breathe, stale, awful smell from the toilets—the stench starts to feel unbearable." All 11 inmates denied ever having experienced such symptoms except during confinement in isolation.

*Perceptual distortions, hallucinations, and derealization experiences.* These symptoms were experienced by seven prisoners and are grouped together because under the peculiar circumstances of solitary confinement there were often inadequate means to distinguish them. Thus, experiences described by five of these seven prisoners included hearing voices—often in whispers, often saying frightening things to them—but usually the prisoners had no means by which to corroborate what they thought they heard; for example, "I hear sounds—guards saying, 'They're going to cut it [his nerve-damaged leg] off.' I'm not sure. Did

they say it, or is it my imagination?" If they did say it, the prisoner is suffering from derealization; if they said something else, or something not directed at him, he is suffering a (paranoid) perceptual distortion; if they said nothing, he is having a hallucination. There is no independent corroboration. Another inmate described the dilemma poignantly: "I overhear the guards talking. Did they say that? Yes? No? It gets confusing. I tried to check it out with ___ [the prisoner in the adjoining cell]; sometimes he hears something and I don't. I know one of us is crazy, but which one? Am I losing my mind?"

There were, in addition, two reports of noises taking on increasing meaning and frightening significance; for example, "I hear noises, can't identify them—starts to sound like sticks beating men. But I'm pretty sure no one is being beaten. . . . I'm not sure."

Perceptual illusions with loss of perceptual constancy were more readily identifiable in the visual sphere (three cases), and there were reports such as "The cell walls start wavering," and "Melting, everything in the cell starts moving; everything gets darker, you feel you are losing your vision."

In one of the prisoners the illusions became more complex and personalized: "They come by [for breakfast] with four trays; the first has big pancakes—I think I'm going to get them. Then someone comes up and gives me tiny ones—they get real small, like silver dollars. I seem to see movements—real fast motions in front of me. Then seems like they're doing things behind your back—can't quite see them. Did someone just hit me? I dwell on it for hours." This prisoner also described overt, frightening, visual hallucinations: "There's a guard in my cell; he's holding a noose." He acknowledged having experienced perceptual distortion with psychedelic drug abuse. Otherwise, all seven inmates denied ever experiencing perceptual symptoms like those they described, except during confinement in isolation.

### Affective Disturbances

Ten prisoners described massive free-floating anxiety during their incarceration in solitary, accompanied in eight cases by recurrent acute episodes of tachycardia, diaphoresis, shortness of breath, panic, tremulousness, and dread of impending death. One prisoner reported "shortness of breath a lot. My heart pumps real fast. I feel like I don't get enough oxygen. Get frantic." Another said, "I start to feel dizzy. I can't breathe," and another, "I start to dwell on things—too many roaches—get scared one might get into my ear. Start to feel hot—extreme heat—then I can barely breathe, start sweating, heart races, can't sit still, shaking, get a headache—real bad."

Of these 10 prisoners, three had experienced acute anxiety reactions prior to confinement in isolation, and they reported intensification of symptoms. The other seven denied any previous history of such symptoms.

### Difficulties With Thinking, Concentration, and Memory

Of the eight inmates who mentioned these symptoms, four reported acute confusional states with subsequent partial amnesia for events during the episode. There was, again, a problem with independent corroboration of these symptoms, especially important because the prisoners were only vaguely aware of what had happened to them. However, one prisoner slashed his wrists during such a state, and thus his confusion and disorientation were noted in the prison medical record.

One prisoner's description particularly suggested dissociative features with mutism: "I went to a standstill psychologically once—lapse of memory. I didn't talk for 15 days. I couldn't hear clearly. You can't see—you're blind—block everything out—disoriented, awareness is very bad. Did someone say he's coming out of it? I think what I'm saying is true—not sure. I think I was drooling—a complete standstill."

Four others reported milder symptoms of difficulty in concentration and memory; for example, "I can't concentrate, can't read. . . . Your mind's narcotized . . . sometimes can't grasp words in my mind that I know. Get stuck, have to think of another word. Memory is going. You feel you are losing something you might not get back."

Several described attempts they made to focus their concentration by self-discipline: "Got to try to concentrate. Remember list of the presidents. Memorize the states, capitals, five boroughs, seven continents, nine planets."

### Disturbances of Thought Content

*Emergence of primitive, ego-dystonic fantasies.* Six prisoners reported the emergence of primitive aggressive fantasies of revenge, torture, and mutilation of the prison guards. In each case, the fantasies were described as ego-dystonic, frightening, and uncontrollable; for example, "I try to sleep 16 hours a day, block out my thoughts—muscles tense—think of torturing and killing the guards—lasts a couple of hours. I can't stop it. Bothers me. Have to keep control. This makes me think I'm slipping my mind. Lay in bed too much—scare yourself with thoughts in bed. I get panicky—thoughts come back—picture throwing a guard in lime—eats away at his skin, his flesh—torture him. Try to block it out, but I can't."

*Ideas of reference, paranoia.* Six prisoners reported ideas of reference associated with persecutory fears; e.g., "Sometimes get paranoid—think they meant something else. Like a remark about Italians. Dwell on it for hours. Get frantic. Like when they push the buttons on the sink. Think they did it just to annoy me." The prisoner's reality testing in this instance was especially shaky: "Spaced out. Hear singing, people's voices—'Cut your wrists and go to Bridgewater and the Celtics are playing tonight.' I doubt myself—is it real? . . . I suspected they're putting drugs in my cell. . . . the reverend, the priest—even you—you're all in cahoots in the Sacred Straight program. Drive them crazy."

### Problems With Impulse Control

Five prisoners reported episodes of lack of impulse control with random violence. One prisoner said, "I snap off the handle over absolutely nothing. Have torn up mail and pictures, throw things around. Try to control it. Know it only hurts myself." Three of these prisoners reported impulsive self-mutilation; for example, "I cut my wrists—cut myself many times when in isolation. Now, it seems crazy. But every time I did it, I wasn't thinking—lost control—cut myself without knowing what I was doing."

### Rapid Subsidence of Symptoms on Termination of Isolation

The legal statute in Massachusetts requires relief from isolation status with closed solid steel doors for at least 24 hours each 15 days. Certain prisoners had additional periods of relief for medical consultation and, in one case (peroneal nerve injury), hospitalization.

All prisoners interviewed reported a very rapid (usually within the first few hours) diminution of their symptoms during periods of relief. No correlation was apparent between severity of symptoms and the time required for them to subside.

### DISCUSSION

The observations reported here suggest that rigidly imposed solitary confinement may have substantial psychopathological effects and that these effects may form a clinically distinguishable syndrome. The full syndrome described here has not been previously reported in the recent medical literature, although there have been observations consistent with those that I have reported.

The present observations are, however, strikingly consistent with earlier German reports. The German literature reported only on prisoners who suffered gross psychotic symptoms, some of whom were observed in hospitals or "insane departments" of prisons. The Walpole population, on the other hand, was not preselected by overt psychiatric status. Despite this, all of the major symptoms reported by the German clinicians, except *Vorbereiden* and hysterical conversion symptoms, were observed in the Walpole population. In addition, less severe forms of this solitary confinement syndrome were observed in the Walpole population, including 1) sensory disturbances: perceptual distortions and loss of perceptual constancy, in some cases without hallucinations; 2) ideas of reference and paranoid ideation short of overt delusions; 3) emer-

gence of primitive aggressive fantasies, which remained ego-dystonic and with reality-testing preserved; 4) disturbances of memory and attention short of overt disorientation and confusional state; and 5) derealization experiences without massive dissociative regression.

The observations at Walpole also suggest that solitary confinement cannot be viewed as a single entity. The effects of solitary confinement situations vary substantially with the rigidity of the sensory and social isolation imposed.

## CONCLUSIONS

The present observations, coupled with those in the earlier German literature, suggest strongly that the use of solitary confinement carries major psychiatric risks. I have not attempted in this paper to define or classify this psychopathological syndrome, but, as mentioned earlier, there have been speculations in the literature linking solitary confinement with the formal experiments on profound sensory deprivation. A review of this literature and an elaboration of the variables that may explain the particular pathogenicity of rigidly imposed solitary confinement will be presented in another paper.

## REFERENCES

1. In Re Medley, 134 US 160, 167–168 (1890)
2. Bono v Saxbe, 450 F Supp 934–948 (1978)
3. Libby v Hogan, Suffolk Superior Ct, Mass, Civil No 37699 (1979)
4. Brownfield C: Isolation: Clinical and Experimental Approaches. New York, Random House, 1965
5. Biderman A, Zimmer H (eds): The Manipulation of Human Behavior. New York, John Wiley & Sons, 1961
6. Solomon P, Kubzansky P, Liederman P, et al: Sensory Deprivation: A Symposium Held at Harvard Medical School. Cambridge, Mass, Harvard University Press, 1961
7. Scott GD, Gendreau P: Psychiatric implications of sensory deprivation in a maximum security prison. Can Psychiatr Assoc J 14:337–341, 1969
8. Liederman P: Man alone: sensory deprivation and behavior change. Correctional Psychiatry and Journal of Social Therapy 8:64–74, 1962
9. Walters RH, Callagan JE, Newman AF: Effect of solitary confinement on prisoners. Am J Psychiatry 119:771–773, 1963
10. Meltzer M: Solitary confinement, in Group for the Advancement of Psychiatry Symposium Number 3: Factors Used to Increase the Susceptibility of Individuals to Forceful Indoctrination, Observations and Experiments. New York, GAP, 1956
11. Suedfeld P, Roy C: Using social isolation to change the behavior of disruptive inmates. International Journal of Offender Therapy and Comparative Criminology 19:90–99, 1975
12. Kaufman E: The violation of psychiatric standards of care in prisons. Am J Psychiatry 137:566–570, 1980
13. Nitsche P, Williams K: The History of the Prison Psychoses, Nervous and Mental Disease Monograph Series, number 13. New York, Journal of Nervous and Mental Disease Publishing Co, 1913
14. Rothman D: The Discovery of the Asylum. Boston, Little, Brown and Co, 1971
15. de Tocqueville A: Democracy in America. New York, Vintage Books, 1945
16. Ganser J: Uber einen eigenartigen hysterischen dammerzustand. Arch Psychiatr Nervenkr 30:633–640, 1898