# Exhibit 1

**Plaintiffs' Response to GEO's Statement of Facts**

A.      **Contractual and Regulatory Overview**

**ICE's Role and GEO's Contract.**

1. ICE is a federal agency tasked with enforcing U.S. immigration laws. 6 U.S.C. § 542.

    i. **Plaintiffs' response**: Admit.

2. The United States Congress delegated to the Department of Homeland Security, and its agency, ICE, sole authority to arrange for all aspects of the detention of aliens pending the results of their immigration proceedings. 8 U.S.C. § 1231(g)(1) ("The [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.").

    i. **Plaintiffs' response**: Admit that 8 U.S.C. § 1231(g) constitutes one source of the Secretary's detention authority. Dispute that it is the sole source, as other sources include 8 U.S.C. § 1103(a)(A)(11)(A) & (B), and 8 U.S.C. § 1555(d), and dispute that these enactments provide authority for ICE to arrange for "all aspects" of the detention of immigration detainees. The text and history of 8 U.S.C. § 1555(d) and subsequent appropriations bills show that Congress withheld funds relating to specific aspects of the detention of immigration detainees.

3. ICE has the authority to detain foreign nationals suspected of entering the United States unlawfully. 8 U.S.C. §§ 1101 et seq.

    i. **Plaintiffs' response**: Admit.

    4.      In making these arrangements, ICE must consider the use of private contractors to detain aliens prior to constructing its own facilities. 8 U.S.C. § 1231(g)(2) ("Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.").

        i.      **Plaintiffs' response**: Admit that ICE is required to consider alternatives to building its own detention centers, and that these may include subcontracts with private entities. Dispute that the text of 8 U.S.C. § 1231(g)(2) requires use of a private subcontractor in every instance, as ICE also enters into contracts with state and local governments. ECF No. 299-1 (Venturella Tr.) 162:13-18.

    5.      As a result of Congress' directive, ICE neither constructs nor operates many of its immigration detention facilities, ECF 271-2 at 4 (Dec. of Tae Johnson), and therefore its state and private contractors are critical to carrying out the federal function of immigration detention.

        i.      **Plaintiffs' response**: Dispute. ICE owns and operates, at least in part, some of its own facilities, including the Krome detention center in South Florida. *See* ECF No. 287-2 (Evans Tr.) 48:13-49:6; ECF No. 271-2 (Tae Johnson Decl.) ¶ 9 ("Service Processing Centers are owned by ICE and staffed by a combination of federal and contract employees."). The evidence GEO provides does not support the statement that ICE does not construct or operate its own immigration

detention facilities, or the statement that it does not do so as "a result of Congress's directive," or the statement that state and private contractors are "critical." Moreover, ICE could operate detention centers itself if it so desired. ECF No. 299-1 (Venturella Tr.) 190:13-18.

6. ICE chose to contract with GEO to detain aliens at AIPC pending the resolution of their immigration proceedings. ECF 298 at 8 (Plaintiffs' Response to Undisputed Fact #6).

    i. **Plaintiffs' response**: Admit.

7. GEO owns and has continuously operated AIPC, under contracts with ICE, from October 22, 2004 to October 22, 2014. ECF 298 at 8 (Plaintiffs' Response to Undisputed Fact #9).

    i. **Plaintiffs' response**: Admit.

8. GEO's operation of AIPC is governed first by GEO's contract with ICE, which is a sub-agency of DHS. That contract provides that "[d]etainees will be able to volunteer for work assignments," that "[e]ssential operations and services will be enhanced through productivity from detainees," and that "[t]he negative impact of confinement will be reduced through less idleness." (Ex. A, AIPC Contract, p. 30.)

    i. **Plaintiffs' response**: Admit, except with respect to the characterization that the operation of AIPC is governed "first" by the contract; the contract incorporates additional standards, policies, and regulations identified below.

9. Elsewhere, the contract identifies other industry standards GEO that must follow including, but not limited to: (1) the American Correctional Association ("ACA") Standards for Adult Detention Facilities; (2) the PBNDS; and (3) ICE policies, which include the ICE National Detainee Handbook. (Id. pp. 32, 43–44.) If a standard conflicts with ICE policy, GEO is required to follow ICE policy. (Id. p. 45.)

    i. **Plaintiffs' response**: Admit.

### PBNDS Standards

10. ICE creates and publishes its own national detention standards. Since 2008, those standards have been called the PBNDS. See U.S. Immigration and Customs Enforcement, 2011 Operations Manual ICE Performance-Based National Detention Standards, www.ice.gov/detention-standards/2011. Prior to 2008, they were called National Detention Standards ("NDS"). See U.S. Immigration and Customs Enforcement, 2000 Detention Operations Manual, www.ice.gov/detention-standards/2000.

    i. **Plaintiffs' response**: Admit.

11. In each contract GEO entered into with ICE for the operation of AIPC, the 2000 NDS, 2008 PBNDS, or the 2011 PBNDS, as applicable, were incorporated into the contract and GEO was required to comply with the same. ECF 298 at 10 (Plaintiffs' Response to Undisputed Fact #13).

    i. **Plaintiffs' response**: Admit. The parties dispute the mechanism by which the operative version of the PBNDS were "incorporated" into the contract. *See* ECF No. 298 (Pls.' Opp. Br. to Def.'s DSI MSJ) ¶¶ 14-15, 17-18.

4

12. The 2000 NDS and all applicable versions of the PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale. ECF 261-10 at 17 (2000 NDS) (Contract Detention Facilities "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-9 at 45 (2008 PBNDS) (Contract Detention Facilities "shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section."); ECF 261-8 at 39 (2011 PBNDS) ("All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section."). The class does not contest that ICE required the disciplinary severity scale. ECF 298 at 14 (Plaintiffs' Response to Undisputed Fact #19).

    i. **Plaintiffs' response**: Admit.

13. The 2000 NDS and all versions of the PBNDS require GEO to provide notice to detainees, in the local detainee handbook, of the ICE-mandated disciplinary severity scale. ECF 261-10 at 10 (2000 NDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"); ECF 261-9 at 44 (2008 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"); ECF 261-8 at 38 (2011 PBNDS) ("The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of … the disciplinary severity scale …"). ECF 298 at 14 (Plaintiffs' Response to Undisputed Fact #20).

    i. **Plaintiffs' response**: Admit.

14. Likewise, the 2000 NDS and all versions of the PBNDS explicitly provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 298 at 14-15 (Plaintiffs' Response to Undisputed Fact #21).

    i.    **Plaintiffs' response**: Admit.

15. The 2000 NDS and all versions of the PBNDS also explicitly provide a disciplinary severity scale that lists "[r]efusing to obey the order of a staff member or officer" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 298 at 15 (Plaintiffs' Response to Undisputed Fact #22).

    i.    **Plaintiffs' response**: Admit.

### ICE Handbook

16. ICE's contract for AIPC requires that each detainee receive a copy of ICE's own National Detainee Handbook. (Ex. A, p. 32.)

    i.    **Plaintiffs' response**: Admit.

17. That handbook instructs each detainee to "[k]eep yourself, your clothes, and your living area clean[.]" (Ex. B, ICE Handbook, p. 2.)

    i.    **Plaintiffs' response**: Admit.

18. Like AIPC handbook's policy at the heart of this case, the ICE Handbook also warns detainees that they could face disciplinary consequences if they refuse to clean, stating "Will I get paid for keeping my living area clean? No. You must keep areas

6

that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined." (Ex. B, ICE Handbook, p. 15).

    i.    **Plaintiffs' response**: Admit.

### GEO Policy

19. GEO adopts facility-specific policies to integrate the various rules under which each facility operates.

    i.    **Plaintiffs' response**: Admit.

20. All of GEO's policies are reviewed and approved by an on-site ICE official. ECF 298 at 16 (Plaintiffs' Response to Undisputed Fact #25); (Ex. C, Declaration of Dawn Ceja.)

    i.    **Plaintiffs' response**: Admit.

21. GEO has never maintained a separate policy or practice of placing a detainee in segregation for the refusal to clean a living area. Id.; (Ex. D) (Amber Martin Dep., pp. 134, 135.).

    i.    **Plaintiffs' response**: Dispute. Although not formally documented in a single written policy, GEO maintained a practice throughout the class period of requiring detainees to clean the common living areas without pay (the "Housing Unit Sanitation Policy," or "HUSP"), and of threatening them with solitary confinement if they did not comply. *See* ECF No. XX (Pls.' Opp. Br. to Def.'s Decert. Mot.) at XX. GEO's own 30(b)(6) witness admitted the scope of the HUSP, and that solitary

7

confinement was a possible sanction for noncompliance.  ECF No. 261-12 (Ceja 30(b)(6) Tr. I) 36:8-37:9, 84:3-85:15; ECF No. 287-5 (Ceja 30(b)(6) Tr. I) 79:19-25.  Both the sanitation requirements and the penalties for noncompliance are referenced in the orientation video that GEO shows detainees when they arrive at the AIPC.  ECF No. 262-10 (Detainee Orientation Video) at 3, 8.  And in fact, GEO did impose solitary confinement on detainees who refused to perform HUSP duties.  ECF No. 262-12 (disciplinary charges and reports).  GEO also threatened detainees with solitary confinement on a regular basis when they refused to clean pursuant to the HUSP.  *See, e.g.*, ECF No. 287-10 (Xahuentitla-Flores Tr.) 73:19-74:9, 83:7-19; ECF No. 299-2 (Hernandez-Ceren Tr.) 74:23-75:11, 78:10-79:5; ECF No. 299-3 (Hernandez-Torres Tr.) 60:8-14.

### ICE Audits

22. ICE routinely audits GEO to ensure GEO follows all applicable rules and standards. As part of each inspection, the auditor reviews compliance with each PBNDS requirement. ECF 298 at 15-16 (Plaintiffs' Response to Undisputed Fact ## 35-36).

   i. **Plaintiffs' response**: Admit that ICE audits GEO to ensure that it complies with certain requirements of its contract, including PBNDS obligations, but dispute that these audits review or capture all such requirements, or all aspects of the PBNDS. The audits review specific

8

components of PBNDS requirements, which are listed on the audit documents themselves. *See* ECF No. 273-6 (Denver Contract Detention Facility Annual Reviews); ECF No. 287-12 (Ragsdale 30(b)(6) Tr.) 36:1-38:10 (acknowledging that ICE audits do not cover "the requirement that [detainees] clean the common areas").

23. GEO has passed each audit since 2004 (i.e. the beginning of the relevant period of this lawsuit). ICE correspondence indicating completion of the audits is attached as Exhibit E.

  i. **Plaintiffs' response**: Admit

### ICE Onsite

24. To top it off, ICE has its own offices and personnel inside AIPC. (Ex. C, Ceja Dec., p. 2.)

  i. **Plaintiffs' response**: Admit.

25. The ICE Handbook provides that "ICE officers will visit all housing units weekly. You should discuss any issues of concern with those officers." (Ex. B, p. 4.)

  i. **Plaintiffs' response**: Admit.

26. Indeed, one of the class representatives in this case—Demetrio Valerga—admitted during his deposition that ICE officers themselves have taken steps to enforce the very policies challenged in this suit. After claiming that one of GEO's detention officers told Mr. Valerga that he could be taken to segregation for not cleaning when he had preferred to stay in bed rather than help clean his own common area, (Ex. F, Demetrio Valerga Dep., pp. 135:15-137:19), Mr. Valerga then explained that ICE officers

9

woke him up, pulled him out of his housing unit, and spoke to him directly. (Id. at 138:2-13). During that conversation, ICE officers told Mr. Valerga that he could, in fact, be taken to segregation for refusing to help clean his living area. (Id. at 138:15-23).[1]

      i.    **Plaintiffs' response**: Admit the events stated above; however, Plaintiffs dispute that the ICE officers onsite at Aurora were authorized to condone acts that deviate from the requirements of the Contract, as GEO's implementation of the HUSP does. ECF No. 261-2 (A. Martin Tr.) 198:22-199:10; ECF No. 297-2 (Contracting Officer's Representative ("COR") Appointment Letter) at 3-4 (listing functions and actions the COR "shall not" undertake, including "direct the contractor . . . to operate in conflict with the contract terms and conditions" and "[c]hange or modify any of the terms and conditions . . . of a contract").

27.    In sum, the cleaning practices that the class challenges are required, reviewed, and approved by ICE and GEO's government contract.

      i.    **Plaintiffs' response**: Dispute. "The Housing Unite Sanitation Policy is a GEO Policy, created by GEO. The GEO HUSP is not created by ICE nor is it a requirement of the Contract. ICE did not draft or negotiate GEO's HUSP." ECF No. 261-7 (Ely Decl.) ¶ 22. Moreover,

---

[1] [GEO's Footnote] Even after the ICE Officer's warning, Mr. Valerga refused to clean and later refused again several times. (See Ex. F, pp. 139:6-24, 140:2-20). Mr. Valerga was never placed in segregation for refusing to clean. (Id.)

10

ICE's review of GEO policies and facilities did not detect the fact that the HUSP is inconsistent with the PBNDS. *See* Response to Fact No. 22, *supra*.

### B. ICE's Role in Enforcing the TVPA

28. DHS, through its agency ICE, is one of the agencies charged with enforcing the TVPA. See 18 U.S.C. § 1589(d); 22 U.S.C. § 7103(b). See also Exec. Order No. 13257, 67 Fed. Reg. 7259 (Feb. 13, 2002), as amended in Exec. Order No. 13286, 68 Fed. Reg. 10619 (Feb. 28, 2003); Exec. Order. No. 1333, 69 Fed. Reg. 13455 (Mar. 18, 2004).

   i. **Plaintiffs' response**: Admit.

29. Most recently, Congress appropriated "$10,000,000 for each of the fiscal years 2018 through 2021, to remain available until expended, for investigations by the Bureau of Immigration and Customs Enforcement of severe forms of trafficking in persons." 22 U.S.C. § 7110(i). Past appropriations for the same purpose include $18,000,000 each year from 2006 through 2011 and $10,000,000 each year from 2014 through 2017. (Pub. L. No. 109-164, § 301 (2006); Pub. L. No. 110-457, § 301 (2008); Pub. L. No. 113-4, § 1251 (2013)). Since 2006, then, ICE has received at least $188,000,000 for the sole purpose of ICE's role in investigating human trafficking.

   i. **Plaintiffs' response**: Admit.

30.     These investigations are carried out by the ICE subdivision called Homeland Security Investigations. See *Mount v. Johnson*, 36 F. Supp. 3d 74, 76 n.3 (D.D.C. 2014).

      i.     **Plaintiffs' response**: Admit.

31.     Immigration officers are statutorily empowered not only to investigate but also to make arrests "for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony." 8 U.S.C. § 1357(a)(5)(B); 8 C.F.R. § 287.5(c)(4).

      i.     **Plaintiffs' response**: Admit.

32.     ICE claims that, in FY 2019 alone, "HSI initiated 1,024 investigations with a nexus to human trafficking and recorded 2,197 arrests, 1,113 indictments, and 691 convictions; 428 victims were identified and assisted. HSI continues to make human trafficking cases a top investigative priority by connecting victims to resources to help restore their lives and bringing traffickers to justice." ICE, https://www.ice.gov/features/human-trafficking (last visited August 14, 2020); see also Ex. G (website capture from May 30, 2018).

      i.     **Plaintiffs' response**: Admit.

33.     Further, Congress established a program within DHS called the "Blue Campaign" to "unify and coordinate Department efforts to address human trafficking." 6 U.S.C. § 242(c). The Blue Campaign provides guidance and training to federal and state personnel regarding, inter alia, "programs to help identify instances of human trafficking"

and how to "increase public awareness of human trafficking." Id. § 242(e); see also

Homeland Security, Blue Campaign, http://www.dhs.gov/blue-campaign. ICE includes a

description of the Blue Campaign on the second page of its ICE Detainee Handbook.

National Detainee Handbook, at 2 (Apr. 2016),

https://www.ice.gov/sites/default/files/documents/Document/2017/detainee-

handbook.PDF.

   i. **Plaintiffs' response**: Admit.

 **C.** **The Voluntary Work Program**

 34. GEO's contract with ICE required GEO to implement ICE's VWP. (Ex. A,

pp. 4, 5, 7, 9, 11, 31.)

   i. **Plaintiffs' response**: Admit.

 35. The 2000 NDS and all applicable versions of the PBNDS require that GEO

provide detainees the opportunity to participate in a VWP. ECF 298 at 24 (Plaintiffs'

Response to Undisputed Fact #42).

   i. **Plaintiffs' response**: Admit.

 36. The 2000 NDS, with which AIPC was contractually obligated to comply

from March 27, 2003 to April 28, 2010, required GEO to provide "compensation" and

stated that "the stipend is $1.00 per day, to be paid daily." ECF 261-10, 5 (2000 NDS);

ECF 298 at 24 (Plaintiffs' Response to Undisputed Fact #43).

   i. **Plaintiffs' response**: Admit except for GEO's use of the phrase

    "directed that," which implies that the quoted statement in the PBNDS

    is an instruction about how GEO must pay VWP workers, as opposed to

13

a statement about the amount that ICE would reimburse GEO for VWP labor. ECF No. 261-2 (A. Martin Tr.) 106:6-107:22. Plaintiffs also note that GEO was required to comply with the 2008 PBNDS when they were published, *see* ECF No. 298 (Pls.' Opp. Br. to Def.'s DSI MSJ) ¶ 15, which occurred during the stated period, although the quoted text is nearly identical in both the 2000 NDS and the 2008 PBNDS. *See* ECF No. 261-9 (2008 PBNDS) at 63 ("the compensation is $1.00 per day").

37. Likewise, the 2008 PBNDS, with which AIPC was contractually obligated to comply from April 28, 2010 to June 22, 2013, stated that "the compensation is $1.00 per day." ECF 261-9 at 63 (2008 PBNDS). ECF 298 at 25 (Plaintiffs' Response to Undisputed Fact #44).

    i. **Plaintiffs' response**: Admit that the cited document contains the quoted text; however dispute GEO's statement that this constituted a "mandate[]," as opposed to a statement about the reimbursement offered from ICE to GEO. GEO paid more than $1.00 a day to detainees at other ICE facilities, including paying up to $3.00 a day to detainees at its South Texas Detention Facility in 2009, and was therefore well aware that higher pay was an option. ECF No. 287-13 (South Texas 2009 detainee pay) at 7-13. In addition, GEO can and does request modifications of the Contract when it needs to. ECF No. 261-2 (A. Martin Tr.) 106:8-108:10. GEO did not request a contract modification to pay detainees more than $1.00 per day at the AIPC. *Id*. 105:3-12.

38. Beginning on June 23, 2013, AIPC was bound by the 2011 PBNDS, which state that participants in the VWP will be compensated with "at least $1.00 (USD) per day." ECF 261-8 at 53 (2011 PBNDS). Thus, the "at least" language upon which the VWP Class relies was not implemented at AIPC until approximately halfway through the VWP Class Period. ECF 298 at 25-26 (Plaintiffs' Response to Undisputed Fact #45).

    i. **Plaintiffs' response**: Admit the quoted content of the document, and that the 2011 PBNDS was formally incorporated into the Contract on June 23, 2013. Plaintiffs do not agree with GEO's implication that the option to pay more than $1 per day did not exist prior to it formally agreeing to incorporate portions of the 2011 PBNDS into its contract. GEO had an obligation under the relevant contract to be "knowledgeable of any changes to the [PBNDS] and perform in accordance with the most current version of the [PBNDS]." ECF No. 262-2 (2011 Contract) at 37. In addition, GEO can and does request modifications of the Contract when it needs to. ECF No. 261-2 (A. Martin Tr.) 106:8-108:10. GEO did not request a contract modification to pay detainees more than $1.00 per day. *Id.* 105:3-12.

39. Before the 2011 PBNDS were implemented at AIPC, GEO paid the amount it was explicitly directed by ICE to pay to VWP participants: $1.00 per day. ECF 298 at 26-27 (Plaintiffs' Response to Undisputed Fact #46).

      i.    **Plaintiffs' response**: Admit that GEO paid VWP participants $1.00 prior to the implementation of the 2011 PBNDS; dispute that ICE "explicitly directed" GEO to pay this amount.

40.    Thereafter, GEO continued to pay members of the VWP Class $1.00 per day, the minimum payment explicitly permitted by the 2011 PBNDS. ECF 298 at 27 (Plaintiffs' Response to Undisputed Fact #47).

      i.    **Plaintiffs' response**: Admit.

41.    GEO's contract with ICE for the AIPC states that the stipend for the VWP "will be at actual cost of $1.00 per day per detainee." (Ex. A, pp. 5-6) (emphasis added).

      i.    **Plaintiffs' response**: Admit.

42.    ICE reimburses its contractors no more than $1.00 per day for work performed in the VWP. ECF 298 at 27 (Plaintiffs' Response to Undisputed Fact #47).

      i.    **Plaintiffs' response**: Admit.

43.    The VWP has been audited each year and has passed each audit since 2004. ECF 298 at 27 (Plaintiffs' Response to Undisputed Fact #47).

      i.    **Plaintiffs' response**: Admit.