# Exhibit 4

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                          DISTRICT OF COLORADO
 2
                 CIVIL ACTION NO.:  1:14-CV-02887-JLK
 3

 4   ALEJANDRO MENOCAL, et al.,

 5                   Plaintiffs,

 6   -vs-

 7   THE GEO GROUP, INC.,

 8                   Defendant.
     _____/
 9

10

11

12                DEPOSITION OF DAVID VENTURELLA

13

14                  Tuesday, July 21, 2020
                    9:43 a.m. - 3:49 p.m.

15

16              ALL PARTIES APPEARED REMOTELY

17

18

19              Stenographically Reported By:
                     JULIE BRUENS, FPR
20              Florida Professional Reporter

21

22

23

24

25
```

 1    there.  And if you click on that, you should be able to

 2    open it up, and let me know if you're able to do that.

 3         A.   You're going to have to help me out.  I have

 4    no idea here.

 5         Q.   Down at the bottom, there should be a little

 6    -- it looks like a speech bubble and says chat.  Hover

 7    over that.  Click on that, and you should be able to

 8    open a window.

 9         A.   Okay.  I have it.

10         Q.   Okay.  You've got the PDF open?

11         A.   Yes.

12         Q.   Okay.  Great.  So we're going to mark this as

13    Venturella Exhibit 1.  And take a look at this exhibit

14    and let me know when you familiarize yourself with it.

15    You don't need to read the entire thing.  I'll direct

16    your attention to the specific parts.  But the first

17    question is going to be whether or not you recognize the

18    document.

19              (Thereupon, the document was marked as

20    Plaintiff's Exhibit 1 for identification.)

21         A.   I do recognize it.

22         Q.   Okay.  What do you recognize it to be?

23         A.   The written communication that I referenced

24    earlier that I sent to Mr. Homan regarding this

25    particular case we're discussing today.

David Venturella
July 21, 2020                                              60

```
 1        Q.   Okay.  And now if you turn to the very -- if

 2   you were to scroll down to the very bottom of the PDF --

 3        A.   The last page?

 4        Q.   The very last page, yeah.  Let me know when

 5   you're there.

 6        A.   Okay.

 7             MS. SCHEFFEY:  And is that the document that

 8        it looks like it has 2555 on it -- 2755 on the

 9        bottom?

10             MR. SCIMONE:  Yes.  So this has a stamp at the

11        bottom for the record 2018-ICLI00052 bates 2755.

12             MS. SCHEFFEY:  Thank you.

13             THE WITNESS:  Okay.  I'm at the bottom of the

14        document.

15   BY MR. SCIMONE:

16        Q.   All right.  And so looking at the signature

17   block, you'll see there's a box right over the space

18   where a signature would normally appear, but right below

19   that, you can see the title is unredacted, and it says

20   senior vice president of business development.  Do you

21   see that?

22        A.   I do.

23        Q.   And this is in February of 2018.  Was that

24   your job title at that time?

25        A.   Yes.
```

 1      Q.    Okay.  And so although it's redacted here, did

 2   you sign this letter?

 3      A.    Yes.

 4      Q.    Did you draft this letter personally?

 5      A.    I did draft parts of it.  There were others

 6   who reviewed it and made changes.

 7      Q.    But all the original text was from you?

 8      A.    Well, when you say -- I mean, it was

 9   definitely reviewed and things were changed, so I'm not

10   sure what you mean by all the original text.

11      Q.    Sure.  I mean, so the first draft of the

12   letter as I understand was something that you wrote?

13      A.    Yes.

14      Q.    Were there other parts of the letter that

15   were -- the first draft was done by anyone else besides

16   you?

17      A.    Again, there were other people who reviewed

18   it, had input in it.  I don't know all of those

19   individuals, but like a lot of documents, it goes

20   through several iterations before the final one is

21   approved.

22      Q.    Sure.  And this is an official communication

23   to ICE; correct?

24      A.    Yes, it's official.

25      Q.    Through the company?

 1      A.    Yes.

 2      Q.    Okay.  So and essentially given that it's an

 3  official communication from the GEO Group to the

 4  government, you would want to be careful about the

 5  information that goes into this document; correct?

 6            MS. SCHEFFEY:  Object to form.

 7            THE WITNESS:  We want it to be correct and

 8        factual and accurate.

 9  BY MR. SCIMONE:

10      Q.    So besides yourself, of the people who had

11  input into this letter, who else do you know of who had

12  input?

13      A.    I would imagine our general counsel or

14  individuals from our general counsel's office would have

15  had input in this.  Others, I don't know specifically

16  who had input.

17      Q.    Do you know whether there were other

18  executives at the GEO Group who had input into this

19  letter?

20            MS. SCHEFFEY:  Object to form, asked and

21        answered.

22            THE WITNESS:  I would assume.  That's kind of

23        our common practice that other people would have

24        input.

25  BY MR. SCIMONE:

David Venturella
July 21, 2020                                    63

```
 1        Q.   Okay.  But you don't know for a fact whether

 2   they did or not?

 3        A.   No, I don't recall.

 4        Q.   Okay.  Do you know for a fact whether the

 5   general counsel's office had input into the letter?

 6        A.   I would say I feel pretty strongly that they

 7   had input in it.

 8        Q.   So looking at the top of the letter now -- you

 9   can scroll up to the top and we'll start up there.

10   Okay.  So you see at the top, this is dated February

11   14th, 2018?

12        A.   I do.

13        Q.   Okay.  And this is addressed to acting

14   director Thomas Homan; correct?

15        A.   Yes.

16        Q.   And at the time, did you know Mr. Homan

17   personally?

18        A.   Yes.

19        Q.   Have you interacted with him during your

20   employment with ICE?

21        A.   Yes.

22        Q.   While you were at ICE, what was his position

23   relative to yours?  Can you situate him within the

24   agency?

25             MS. SCHEFFEY:  Object to form.
```

David Venturella
July 21, 2020                                    64

```
 1            THE WITNESS:  Well, that changed a number of

 2       times throughout the year, or the years, I should

 3       say, that we were in the agency together.

 4  BY MR. SCIMONE:

 5       Q.   Do you remember what his position was at the

 6  time that you left relative to yours?

 7       A.   He was the deputy executive assistant director

 8  for ERO at the time.

 9       Q.   All right.  So he was within the same division

10  that you were at the time that you left; is that right?

11            MS. SCHEFFEY:  Object to form.

12            THE WITNESS:  Yes.  Correct.

13  BY MR. SCIMONE:

14       Q.   Were you friendly with Thomas Homan during

15  that time?

16       A.   Yes.

17       Q.   And did that relationship have any impact on

18  the decision by the GEO Group to have this letter come

19  from you?

20            MS. SCHEFFEY:  Object to form.

21            THE WITNESS:  No.

22  BY MR. SCIMONE:

23       Q.   Did you have discussions about who the letter

24  should come from?

25            MS. SCHEFFEY:  Object to form, and I'm going
```

David Venturella
July 21, 2020                                                  65

```
 1          to instruct him not to answer to the extent that

 2          those discussions were with general counsel.

 3               THE WITNESS:  You're asking did we have

 4          discussions internally at GEO?

 5   BY MR. SCIMONE:

 6       Q.   So -- yeah.  So let me break it down a little

 7   bit.  So did -- and the first question will be just

 8   factually whether or not you had conversations with

 9   anybody at the GEO Group about who would send this

10   letter.

11       A.   About who would send the letter?  I -- no, I

12   don't think there was any discussions about who would

13   send the letter.  That typically would be me.

14       Q.   Was it your idea to send the letter?

15       A.   I don't know if it was my idea only, but I

16   know as an organization, we thought it was necessary to

17   send a letter to the leadership of that agency.

18       Q.   And I'll draw your attention to the subject

19   line.  It says request for equitable adjustments, and

20   then there's an amount listed, and below that, legal

21   assistance from ICE/DOJ.  What is an equitable

22   adjustment?  What's your understanding of that term?

23       A.   It's to reimburse a vendor for costs that were

24   unanticipated.  Again, it's a request.  Documentation is

25   provided to show how you arrived to that particular
```

David Venturella
July 21, 2020                                    66

```
 1    amount, the reasons why you're requesting it.

 2            But yeah, it's a request for -- to be

 3    reimbursed for costs that were unanticipated in delivery

 4    of your services is my understanding.  Again, I'm not a

 5    contract expert.

 6        Q.   Uh-huh.  If GEO believes that it has

 7    unanticipated costs that should give rise to an

 8    equitable adjustment, does it have -- is there a way for

 9    it to pursue that claim in court?

10            MS. SCHEFFEY:  Object to form, and I'm going

11        to note that he's here in his individual capacity

12        and cannot answer on behalf of GEO.  You may answer

13        if you know.

14    BY MR. SCIMONE:

15        Q.   I'm asking him.  Just your understanding.

16        A.   Listen, I'm not a lawyer, so I don't know what

17    your recourse or avenues are to pursue this.

18        Q.   But you don't know one way or another whether

19    an equitable adjustment can be pursued in court?

20        A.   I do not know.

21        Q.   Was this letter the first time that GEO had

22    requested an equitable adjustment related to these

23    lawsuits?

24        A.   I don't believe so.  I believe Amber Martin,

25    who is the head of our contracts administration, may
```

```
 1    have made a request previously.

 2         Q.   Do you know when that was?

 3         A.   I don't.  I --

 4         Q.   Are you done?  Sorry.  I wasn't sure if you

 5    were finished answering.

 6         A.   I'm finished.  I don't know when that was.

 7         Q.   Did you have any involvement in that earlier

 8    request?

 9         A.   I'm sorry.

10         Q.   Did you have any involvement in that earlier

11    request?

12              MS. SCHEFFEY:  Object to form.

13              THE WITNESS:  No.

14    BY MR. SCIMONE:

15         Q.   Do you know what the outcome of the earlier

16    request was?

17         A.   I believe it was denied.

18         Q.   And do you know what form that earlier request

19    from Amber Martin took?

20              MS. SCHEFFEY:  Object to form.

21              THE WITNESS:  I do not.  That's something she

22         could probably best answer.

23    BY MR. SCIMONE:

24         Q.   Fair enough.  Okay.  So I'm going to draw your

25    attention to -- on the first page, under the heading
```

 1    that you were at ICE --

 2         A.   I don't know.

 3         Q.   -- prior to 2012?

 4         A.   I don't know.

 5         Q.   Okay.  So now if you'll draw your attention to

 6    the top of that paragraph.

 7         A.   Okay.

 8         Q.   You'll see there in the second sentence there

 9    there's a reference to 8 USC, Section 1555D.  Do you

10    recognize that citation?

11         A.   Yes.

12         Q.   What do you recognize it as?

13              MS. SCHEFFEY:  Object to form.  And again, I'm

14         going to instruct you that you can answer but

15         please don't disclose any of your conversations

16         with counsel or your information gained from

17         counsel.

18              MR. SCIMONE:  Adrienne, it's a factual

19         question.

20    BY MR. SCIMONE:

21         Q.   Mr. Venturella, you testified you recognized

22    the citation.  In your understanding -- based on your

23    understanding, what do you recognize it to be?

24         A.   It's a section of the US Code.

25         Q.   Do you -- at the time you drafted this letter,

 1   prior to receiving input on it from the general counsel

 2   at GEO, did you have an understanding of what that

 3   section of the US Code described or what it was?

 4        A.   No, because I don't think, based on my lack of

 5   legal knowledge, I would not put that sentence in there

 6   on my own as I initially drafted that.

 7        Q.   Okay.  So it's your understanding that that

 8   was added by someone else?

 9        A.   Yes, that would be my assumption that someone

10   else added that.

11        Q.   Okay.  If you'll now turn to the last page of

12   the letter, very last paragraph.  Let me know when

13   you're there.

14        A.   Yes.  I'm there.

15        Q.   And so at the end of this letter, you

16   requested a meeting to discuss the matters in the

17   letter; correct?

18        A.   That is correct.

19        Q.   And did that meeting take place?

20        A.   Yes, it did.

21        Q.   And is that the meeting that you referred to

22   earlier when I was asking about meetings related to the

23   subject matter of this lawsuit?

24        A.   Yes.  Yes.

25        Q.   Who attended that meeting on behalf of the GEO

1    Group?

2         A.   Myself, George Zoley, John Bolfin.  I know --

3    definitively, I know they attended.  I'm a little fuzzy

4    on the other GEO attendees.

5         Q.   But you do recall that there were other people

6    besides you and those other two?

7         A.   Yes.

8         Q.   Okay.  Do you know approximately how many

9    other people from the GEO Group attended?

10        A.   I think two additional people.

11        Q.   And who attended the meeting on behalf of ICE?

12        A.   If my memory serves me right, Mr. Homan

13   attended, his chief of staff attended, an individual

14   representing his procurement shop, and an individual

15   representing their legal department or individuals.  I

16   just don't remember the names and the numbers.

17        Q.   Did anyone else attend from DHS outside of

18   ICE?

19        A.   Not to my knowledge.

20        Q.   Did anyone else from the government outside of

21   the agency attend, any elected officials or anyone else?

22        A.   No.

23        Q.   I think you mentioned earlier there was

24   someone at GEO who was a vice president for government

25   relations, Adam Hasner.  Did he attend the meeting?

 1        A.    No.

 2        Q.    Did anyone else from GEO whose -- with

 3   responsibility for communicating with government

 4   officials attend the meeting besides the people we

 5   already mentioned?

 6        A.    No.

 7        Q.    Was Tracy Vallario there?

 8        A.    No.

 9        Q.    Was Anne Rose -- did Anne Rose attend the

10   meeting?

11        A.    I don't know who Anne Rose is.

12        Q.    Fair enough.  Okay.  So of the people that

13   you've mentioned who attended, were all those people

14   there physically in person?

15        A.    Yes.

16        Q.    Okay.  Did anyone call into the meeting by

17   phone or video chat?

18        A.    Not that I recall.

19        Q.    Okay.  So how does the meeting open?  What was

20   the first thing that you remember happening in the

21   meeting?

22        A.    Like a typical meeting.  Introductions,

23   thanking them.

24        Q.    Small talk?

25        A.    Yeah, just thanking them for taking the

1  meeting and, like I said, just general introductions.

2      Q.   What was the first subject that you discussed

3  in the meeting after those preliminaries?

4      A.   I mean, I don't recall the specifics, but

5  again, I think we would have focused on what's contained

6  in this letter and the points and issues we phrased.

7      Q.   Uh-huh.  Who did the most talking in the

8  meeting?

9      A.   I recall Mr. Bolfin doing most of the talking.

10      Q.   He's the general counsel for GEO Group at the

11  time?

12      A.   Yes.  Correct.  I was going to add that.  He

13  was the general counsel at the time.

14      Q.   And did anyone from ICE -- did anyone from ICE

15  participate actively in the meeting, make statements

16  about the government's reaction to the letter, anything

17  else?

18      A.   No.  I mean, there was an exchange, but ICE

19  wasn't in a position to let their position be known at

20  that time.  I think they were more in the receiving

21  posture, receiving information, maybe asking some

22  clarification questions, but it wasn't a meeting where

23  they were making a decision or telling us what their

24  position was.

25      Q.   Okay.  So did they tell you that they would

 1   get back to you with their position at a later time?

 2            MS. SCHEFFEY:  Object to form.

 3            THE WITNESS:  Yes.  Yes.

 4            MR. SCIMONE:  Okay.  Keep an eye out in the

 5       chat window.  We're going to put in Exhibit 4.

 6            (Thereupon, the document was marked as

 7       Plaintiff's Exhibit 4 for identification.)

 8            MS. SCHEFFEY:  We're going to get Cheryl now.

 9       Thank you Cheryl.

10            MR. SCIMONE:  And for the record, this is a

11       document bate stamped GEO MEN 166865 through 66.

12            MS. WILKE:  Just to make sure I've got the

13       right letter, it's June 21st, 2018?

14            MR. SCIMONE:  That's correct.

15   BY MR. SCIMONE:

16       Q.   So Mr. Venturella, take a look at this

17   document.  Take enough time to familiarize yourself with

18   what it is.  My first question will just be whether you

19   recognize it.  Take as much time as you need to be able

20   to answer that question.

21       A.   No, I recognize it.

22       Q.   All right.  What do you recognize this

23   document to be?

24       A.   ICE's official denial of our request for an

25   equitable adjustment.

 1      Q.   And in the subject line, it says what you just

 2   did basically, denial of request for equitable

 3   adjustment, and it says at the end dated April 18th,

 4   2018.

 5           So the letter we looked at that you sent was

 6   from February 2018.  Was there a second admission that

 7   happened in April related to that?

 8      A.   I'm not aware of any additional correspondence

 9   that may have been sent back and forth.  I know I

10   didn't.

11      Q.   Okay.  You do understand this letter to be a

12   response to the equitable adjustment requested in the

13   letter that you sent over?

14      A.   I mean, let me just read real quick.

15      Q.   Sure.  Yeah.

16      A.   So I would say it's -- the letter that was

17   sent on February 14th kind of laid out our issues and

18   concerns and a request was for a meeting.  Again, I

19   don't know what then took place after that meeting and

20   until this letter was issued if some other actions were

21   taken to formally submit the request for equitable

22   adjustment.  I don't believe our letter qualifies as an

23   official request for equitable adjustment.  So I --

24      Q.   You remember at the meeting --

25      A.   Go ahead.

1      Q.    Sorry.

2            MS. SCHEFFEY:  I tried to send a chat.  Mine

3      had -- I had lost volume and video when you were

4      asking the question about the letter.

5            MR. SCIMONE:  Are you back now?

6            MS. SCHEFFEY:  I'm back now, yes.  Can the

7      reporter read back what happened?  The question

8      that started the last letter we looked at was dated

9      -- and then it cut off.

10           (Thereupon, the court reporter read back the

11     questions and answers.)

12 BY MR. SCIMONE:

13     Q.    At the end of the meeting that took place

14 after the February letter -- well, first of all, when

15 was that meeting?

16     A.    I know we requested February 22nd.  I don't

17 know if that was the actual date the meeting occurred.

18     Q.    Do you recall whether the meeting was soon

19 after the letter was sent?

20     A.    I think it was closer to the proposed February

21 22nd date, but again, I don't know if the meeting

22 occurred on that date or another date.

23     Q.    Okay.  So at that meeting in or about late

24 February, did ICE ask GEO to submit anything further

25 related to its request for an equitable adjustment?

```
 1   other steps to follow up on this request since receiving

 2   this letter denying the request in 2018?

 3            MS. SCHEFFEY:  Object to form.

 4            THE WITNESS:  Any steps with ICE?

 5   BY MR. SCIMONE:

 6        Q.  Any steps at all.

 7        A.  Pretty open-ended, but no, I'm not aware of

 8   any steps that we've taken.

 9        Q.  Okay.  I think this is probably a great or

10   good time for a lunch break.

11            MS. SCHEFFEY:  Okay.

12            MR. SCIMONE:  So let's take a break.  And how

13        long do you need?  45 minutes?

14            THE WITNESS:  Yeah, 45 minutes is --

15            MR. SCIMONE:  Okay.

16            THE VIDEOGRAPHER:  Stand by.  The time --

17            MS. SCHEFFEY:  Hold on.  We'll go off the

18        record and then finish.

19            THE VIDEOGRAPHER:  The time is 12:45 p.m. and

20        we're going off the record.

21            (Thereupon, a lunch recess was held.)

22            THE VIDEOGRAPHER:  The time is 1:34 p.m. and

23        we're back on record.

24            MS. SCHEFFEY:  Hold on.  David, you're muted.

25   BY MR. SCIMONE:
```

 1        Q.    Okay.  Welcome back, Mr. Venturella.  We're

 2   after lunch.  And sorry to do this, but I'm going to

 3   start out with another exhibit, so stand by.

 4              (Thereupon, the document was marked as

 5   Plaintiff's Exhibit 5 for identification.)

 6              MS. SCHEFFEY:  Cheryl, you're going to get

 7        your steps in.

 8              MS. WILKE:  I'm good as long as I don't have

 9        to sit in a chair all day.  It's fine.

10              MS. SCHEFFEY:  Is this Exhibit 5, Michael?

11   BY MR. SCIMONE:

12        Q.    I believe so.  Let me know when you have the

13   exhibit open.

14        A.    I have it open.

15        Q.    Okay.  Great.  All right.  Do you recognize

16   the document we've marked as Exhibit 7 -- sorry, Exhibit

17   5, Mr. Venturella?

18        A.    Yes.

19        Q.    Okay.  What do you recognize this document to

20   be?

21        A.    This is a letter from members of Congress

22   to at the time, the US attorney general, the labor

23   secretary, and acting director Tom Homan of ICE.

24        Q.    And this is from -- if you look at the

25   letterhead at the very top, from the office of

```
 1    representative Steve King, congressional representative

 2    for Iowa; correct?

 3         A.   Correct.

 4         Q.   Okay.  Is this the letter that you mentioned

 5    earlier today that had been sent out related to this

 6    lawsuit?

 7         A.   Yes.

 8         Q.   Okay.  Forgive me if I cover some of the same

 9    ground, I just want to be sure I have the information I

10    need about it.  So how did you come to be familiar with

11    this letter?

12         A.   We had decided to reach out to members of

13    Congress and brief them on the issue, determine if they

14    had any interest in inquiring about this particular

15    topic with the Federal agencies, ICE and DHS in

16    particular.

17         Q.   Okay.  And when you say we decided, who

18    participated in that decision?

19         A.   That would have been myself and Mr. Adam

20    Hasner, the gentleman I referenced earlier.

21         Q.   All right.  And did you -- who -- between the

22    two of you, whose idea was it in the first instance?

23              MS. SCHEFFEY:  Object to form.

24              THE WITNESS:  I would say it was my idea.

25    BY MR. SCIMONE:
```

1      Q.   And other than the letter, itself, did you

2  have any other communications with the offices of either

3  Mr. King or the other legislatures who signed on to this

4  letter about the letter, itself?

5           MS. SCHEFFEY:  Object to form.

6           THE WITNESS:  No.  Aside from the letter, no.

7  BY MR. SCIMONE:

8      Q.   So how did the idea go from being something

9  that you discussed with Mr. Hasner to being something

10 that Representative King sent out?

11     A.   Well, so Mr. Hasner and some of our registered

12 lobbyists scheduled meetings to meet with either their

13 individual members or their staff to brief them on the

14 issue and asked if they would be interested in writing a

15 letter to the governing agency inquiring about our

16 issue.

17     Q.   Okay.  And just a couple of background

18 questions.  I apologize if these seem basic, but they

19 are sort of just for the record.  So the attorney

20 general is the head of the Department of Justice;

21 correct?

22          MS. SCHEFFEY:  Object to form, foundation.

23          THE WITNESS:  Yes.

24 BY MR. SCIMONE:

25     Q.   And one function of the Department of Justice,

David Venturella
July 21, 2020                                    118

```
 1   among others, is that it represents government agencies

 2   when they are involved in litigation; is that your

 3   understanding?

 4           MS. SCHEFFEY:  Object to form, foundation.

 5           THE WITNESS:  That's my understanding.

 6   BY MR. SCIMONE:

 7      Q.   Okay.  So fair to say that they act in that

 8   capacity as a kind of law firm for the government; is

 9   that a fair characterization?

10           MS. SCHEFFEY:  Object to form, foundation.

11           THE WITNESS:  Yes.

12   BY MR. SCIMONE:

13      Q.   Okay.  Were you or Mr. Hasner involved in

14   actually coming up with the text of this letter,

15   drafting it or editing it or in any other way coming up

16   with the content?

17           MS. SCHEFFEY:  Object to form.

18           THE WITNESS:  No.  Sorry.

19   BY MR. SCIMONE:

20      Q.   Was -- sorry.  Go ahead.  Was there anyone

21   else at GEO who participated in drafting or editing this

22   letter to your knowledge?

23      A.   No.

24      Q.   And what was the intended goal of the letter?

25           MS. SCHEFFEY:  Object to form.
```

```
 1                   CERTIFICATE OF REPORTER

 2

 3   THE STATE OF FLORIDA,

 4   COUNTY OF PALM BEACH.

 5

 6             I, Julie Bruens, Florida Professional

 7   Reporter, certify that I was authorized to and did

 8   stenographically report the deposition of BRIAN EVANS;

 9   pages 1 through 109; that a review of the transcript was

10   requested; and that the transcript is a true record of

11   my stenographic notes.

12             I further certify that I am not a

13   relative, employee, attorney, or counsel of any of the

14   parties, nor am I a relative or employee of any of the

15   parties' attorneys or counsel connected with the action,

16   nor am I financially interested in the action.

17

18             Dated this 24th day of July, 2020.

19

20

21

22   _____
                 Julie Bruens, FPR
23               Florida Professional Reporter

24

25
```