# Exhibit 8

1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2
      Case No. 14-cv-2887-JLK-MEH
3     _____

4     ALEJANDRO MENOCAL, et al.,

5          Plaintiffs,

6     vs.

7     GEO GROUP, INC., THE,

8          Defendant.
      _____
9

10             Proceedings before MICHAEL E. HEGARTY, United

11    States Magistrate Judge, United States District Court for the

12    District of Colorado, commencing at 10:42 a.m., October 18,

13    2019, in the United States Courthouse, Denver, Colorado.

14    _____

15             WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17    _____

18                         APPEARANCES

19             BRANDT MILSTEIN, DAVID SELIGMAN and MICHAEL

20    SCIMONE, Attorneys at Law, appearing for the Plaintiff.

21             ALLISON ANGEL, MELISSA CIZMORRIS and MICHAEL LEY,

22    Attorneys at Law, appearing for the Defendant.

23    _____

24                     DISCOVERY CONFERENCE

25
```

```
 1                    P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5              THE COURT:  Case Number 14-cv-02887, Menocal vs.

 6    GEO Group, Inc.  Guys should have taken my advice how many

 7    years ago telling you to settle, but, no, here you are still

 8    messing around.

 9              UNIDENTIFIED SPEAKER:  (Inaudible - not speaking

10    into mic).

11              THE COURT:  Well, we'll see.  Got to listen to me

12    next time.

13              UNIDENTIFIED SPEAKER:  (Inaudible - not speaking

14    into mic).

15              THE COURT:  Oh, and, by the way, so every

16    proceeding is a public proceeding.  I don't care who appears

17    by phone in the public.  I mean, it -- just because they

18    can't be here, I mean -- you know what I mean?  That was kind

19    of a no-brainer.  If somebody wants to listen into a hearing,

20    they can listen in, as long as we have the technology.  Make

21    sense?

22              UNIDENTIFIED SPEAKER:  Sure.

23              THE COURT:  Yeah.  Good morning.  Who's on the

24    phone?

25              MS. TURNER:  Hi, good morning.  This is Juno
```

1    Turner, Towards Justice.

2            THE COURT:  Okay, thank you.  Go ahead and make

3    your appearances, please, starting with plaintiffs.

4            MR. SCIMONE:  Michael Scimone of Outten & Golden

5    for the plaintiffs, Your Honor.

6            THE COURT:  Okay.

7            MR. MILSTEIN:  Good morning, Your Honor.  Brandt

8    Milstein.

9            THE COURT:  Thank you.

10           MR. SELIGMAN:  Good morning, David Seligman from

11   Towards Justice.

12           THE COURT:  Thank you.  And for the defense?

13           MS. ANGEL:  Good morning, Your Honor.  Allison

14   Angel from Akerman for defendant.

15           THE COURT:  Okay.

16           MS. CIZMORRIS:  Good morning, Your Honor.  Melissa

17   Cizmorris.

18           THE COURT:  Thank you.

19           MR. LEY:  Good morning, Your Honor.  Michael Ley.

20           THE COURT:  Okay.  Let's see, pending disputes.

21   First, a motion to compel 30(b)(6) deposition and inspection

22   with video recording.  Scope of topics, is that our first

23   issue that you want to address?

24           MR. SCIMONE:  I think so, Your Honor, yes.

25           THE COURT:  Please proceed.

4

1           MR. SCIMONE:  So I don't want to belabor too much

2    the arguments we've already made.  You know, the 30(b)(6)

3    deposition notice at issue here is one that we served over a

4    year ago at this point and we would like to have that

5    30(b)(6) scheduled.

6           The question of the scope of the topics was raised,

7    I think, in theory, but not actually substantively engaged by

8    -- prior to us filing the motion, because the position the

9    defendants took at the time was that we were not entitled to

10   take a 30(b)(6) deposition a second time.  We disagreed, we

11   tried to work through that issue.  At that point, we still

12   had not received substantive objections to the scope of the

13   topics and then, eventually, we were told that we reached

14   impasse and that GEO was not going to produce a witness.

15          THE COURT:  Well, so rewind a little bit.

16          MR. SCIMONE:  Yeah.

17          THE COURT:  Remember, I was on this case for one

18   purpose.  Judge Kane has had it otherwise.  So I'm a

19   newcomer.  What was the prior 30(b)(6) deposition?

20          MR. SCIMONE:  So earlier in the case, we had --

21   discovery had been bifurcated into class certification

22   discovery and merits discovery to come afterwards.  So the

23   first deposition was limited to class certification topics.

24          THE COURT:  Explicitly?

25          MR. SCIMONE:  Explicitly.

5

```
 1              THE COURT:  Okay.  And now this one you want to be

 2   on the merits?

 3              MR. SCIMONE:  That's correct.

 4              THE COURT:  Okay, let's stop there.  Why do you

 5   think that that's not a good reason for an additional

 6   30(b)(6) and what authority are you relying on that they only

 7   get one?

 8              MS. ANGEL:  That's -- that's not the position we're

 9   taking, Your Honor.

10              THE COURT:  Okay.

11              MS. ANGEL:  And then in the subsequent briefing --

12              THE COURT:  You can sit down.

13              MS. ANGEL:  Sorry.  In the subsequent briefing, GEO

14   --

15              THE COURT:  No, you can sit down too.

16              MS. ANGEL:  Okay, thank you.

17              THE COURT:  Everybody can sit.  If you want to

18   stand, stand.  Do whatever is comfortable to you.

19              MS. ANGEL:  Thank you.

20              In subsequent briefing on this topic, GEO has

21   conceded that it will provide another 30(b)(6) depo -- a

22   deponent.

23              THE COURT:  No, but did GEO take the position at

24   any time that solely on the basis that they've had one bite,

25   they don't get another?  That's what I'm asking.
```

6

1          MS. ANGEL:  At some point prior counsel did take

2     that position on the grounds that the 30(b)(6) depositions

3     that did already occur exceeded the scope of just pure class

4     discovery and that they did cover topics that we would --

5     that would be a merits discovery.

6          THE COURT:  Okay.

7          MS. ANGEL:  However, they've since -- we've since

8     changed course and are willing to produce a 30(b)(6) witness;

9     that's not at issue here.  The only pushback we had was the

10    scope of the topics in the 30(b)(6) notice and we have --

11    prior counsel suggested certain revisions to limit the scope

12    and make -- and target them to more relevant topics that

13    actually address the issues in this case.  They're fairly

14    broadly written as served and so that's the only remaining

15    issue, the scope of the topics.

16         THE COURT:  Well, phrased like that, you can hardly

17    argue with your position.

18         MS. ANGEL:  Thank you.

19         THE COURT:  So it looks like she thinks that you

20    want to ask a lot of material way outside the scope of the

21    case.

22         MR. SCIMONE:  We disagree, Your Honor.  We -- I

23    mean, going through the redline of the notice that we

24    received from GEO, I think we substantively disagree with

25    most of the limitations.  I'm happy to walk through why that

7

1    is for each of them.

2           There are one or two changes I think that we could

3    agree to, but they're minor, you know, where -- and really

4    just a question of whether we're talking about the same

5    thing.  So --

6           THE COURT:  What -- do you have that redline as an

7    exhibit?

8           MR. SCIMONE:  Yes, that was a -- it's at 187-5.  I

9    believe that was a -- an exhibit to defendant's --

10          MS. ANGEL:  Yes, yeah.

11          MR. SCIMONE:  -- opposition.

12          THE COURT:  Okay.  So, I mean, if I have to go

13   through topic by topic, I will, I guess.  So is that what we

14   need to do?

15          MR. SCIMONE:  Well, we think that there's ample

16   reason to deem the objections waived, simply because of the

17   way they arose, but if that's --

18          THE COURT:  Why?  Explain that.

19          MR. SCIMONE:  Well, because they weren't -- this

20   wasn't raised until the evening after -- the evening that

21   GEO's opposition to our motion was due.  So we were pushed

22   into filing a motion raising a discovery dispute, whether or

23   not the deposition would take place at all, and the position

24   didn't change until the eve of the opposition.  That's when

25   we got the redline and we began -- and GEO tried to initiate

8

1    negotiations over it.

2         We looked at the redline and our feeling was that

3    the topics, as drafted, were appropriate and we disagreed

4    substantively with them and at the time our position was we

5    think that the motion should just proceed.  If it's going to

6    become a motion to compel testimony on the notice as written,

7    then that's the direction that I -- I suppose it will -- it

8    will develop as a motion, but substantively, most --

9         MS. ANGEL:  Can I -- can I make a quick comment on

10   that, Your Honor?  I mean, I'm certainly happy to let you

11   continue right after, but it's my understanding that, yes,

12   this did arise when GEO's opposition was due, but GEO

13   requested from plaintiff's counsel a seven-day extension to

14   file their opposition so that these issues could be worked

15   out so that they could work through these proposed revisions

16   before -- to see if the issue could be mooted before their

17   opposition would be filed and that plaintiffs did not consent

18   to that request.  So it's my --

19        THE COURT:  Well, in any event, I'll decide what

20   should go forward and I'll have a broad view of it.  So how

21   about I apply not waiver but a rule that discovery is broad,

22   which it is anyway.  Let's dive into it.

23        MR. SCIMONE:  I think the principal -- one sort of

24   background thing that I think will cut across the objections,

25   Your Honor, is that the principal affirmative defense in this

1    case is the government contractor defense, speeches of

2    derivative sovereign immunity, and so what's at issue there

3    is what ICE instructed GEO to do and what ICE approved.

4           A lot of the issues in this case stem from the

5    standards that ICE has stablished, the -- the PBNDS, the

6    Performance Based National Detention Standards.  And so how

7    GEO was instructed by ICE to apply those standards is at

8    issue in the case.  So where that comes in specifically is

9    with respect to testimony about things that happened outside

10   of the Aurora facility.  A lot of the limitations here are to

11   limit the testimony to the Aurora Detention Center.

12          However, if there was a communication between ICE

13   and GEO about how it was implementing its policies at a

14   different facility and it's the same set of standards that

15   applies, those communications would be relevant to the

16   derivative --

17          THE COURT:  So it's a set of national standards?

18          MR. SCIMONE:  That's correct.

19          THE COURT:  It's not per facility?

20          MR. SCIMONE:  That's correct.

21          THE COURT:  Agreed?

22          MS. ANGEL:  There are some national standards,

23   there are some local standards, and each facility that GEO

24   operates in accordance with -- or in connection with ICE is

25   -- has its own contract and some of them differ.  There are

10

1    national standards, but there are also local standards.

2           THE COURT:  Okay.  So this sounds similar to the

3    way that Federal Bureau of Prisons operates.  They have local

4    policies and they have national policies.  National policies

5    apply to every facility.

6           MR. SCIMONE:  Right.

7           THE COURT:  Local policies are tailored to

8    limitations and specifics of a given detention facility.

9           MS. ANGEL:  That's accurate.

10          THE COURT:  All right.  Well, I can deal with that.

11          MS. ANGEL:  And the local policies are approved by

12   ICE.

13          THE COURT:  Understood.  Okay, go ahead.

14          MR. SCIMONE:  So the -- our understanding is --

15          THE COURT:  So what you're saying is, if there was

16   a conversation with regard to a different facility and they

17   were -- GEO was seeking an interpretation of how they should

18   apply, do you -- your argument would be GEO would then, in

19   their mind, believe, Oh, well that's the way ICE wants it and

20   that's the way we'll do it everywhere?

21          MR. SCIMONE:  That's correct.

22          THE COURT:  Unless there's some local, specific

23   policy that would otherwise countermand what they're saying?

24          MR. SCIMONE:  That's right.

25          THE COURT:  That's -- it makes logical sense.  So

1    do you want to say anything in response to that?

2            MS. ANGEL:  Sure.  Well, the larger picture, I

3    suppose that makes sense, but when you tie it to our

4    derivative sovereign immunity defense, it -- it doesn't quite

5    hold up, Your Honor, because the derivative sovereign

6    immunity defense, which is the grounds on which opposing

7    counsel is basing this need to find out about what's done at

8    other facilities is very contract specific and you -- here,

9    I'll just read what I wrote here:

10           Federal contractors is derivatively immune from

11   liability unless they exceed their authority or the authority

12   was not validly conferred.  So to the extent that the

13   contract in Aurora with ICE says that you can pay detainees

14   at least $1 a day and GEO does not violate those terms and/or

15   exceed their authority.  So they are paying, in fact, $1 a

16   day, they're still entitled to derivative sovereign immunity.

17   It doesn't matter what other facilities are paying because

18   there's -- each contract -- each has their own contract and

19   you can have derivative sovereign immunity for one facility

20   that does -- that is in accordance with their contracts and

21   doesn't exceed their authority and not necessarily have it in

22   another scenario or another facility that did exceed their

23   authority.

24           So to the extent that you need to ask about if

25   other facilities were paying more, it doesn't shed any light

1    or have any impact on the derivative sovereign immunity

2    defense for GEO and its operations of this Aurora facility.

3         THE COURT:  So other than logic, do you have a

4    specific example you could give me in which a conversation

5    occurred outside of the context of a specific facility that

6    impacted the operation of that facility?

7         MR. SCIMONE:  I -- I think the counsel -- the

8    example that defense counsel just gave is a perfect one and I

9    would like to address that specifically.

10        THE COURT:  Go ahead.

11        MR. SCIMONE:  So Judge Kane ruled on motions to

12   dismiss on this defense earlier in the case and denied the

13   motion to dismiss on the grounds that there's an open

14   question here about whether or not GEO was permitted to pay

15   more than $1 a day.  And so if ICE said, explicitly, you are

16   limited to paying no more than $1 per day, that is it, that

17   would arguably support a derivative sovereign immunity

18   defense.  However, the contract says, At least $1 a day and

19   so --

20        THE COURT:  Those are the exact words?

21        MR. SCIMONE:  Those are the exact words.

22        THE COURT:  Okay.

23        MR. SCIMONE:  And so the -- and so the motion was

24   denied and there was a question about whether or not GEO had

25   the discretion to pay more than $1 a day.  That would obviate

13

1   the DSI debts.  So we have another facility --

2           THE COURT:  Well, wait a second.  If the contract

3   said, At least $1 --

4           MR. SCIMONE:  Yes.

5           THE COURT:  -- why wouldn't they have discretion to

6   pay more?  I don't understand.

7           MR. SCIMONE:  That's exactly what we argue, Your

8   Honor, and that's why I don't think that the defense --

9           THE COURT:  Well, on pure contract interpretation,

10  they have the discretion to pay more.

11          MR. SCIMONE:  Agree.

12          THE COURT:  Do you disagree?

13          MS. ANGEL:  No, but GEO is reimbursed at the actual

14  rate of $1 a day.  So they -- they pay the amount that they

15  are reimbursed from ICE.

16          THE COURT:  That may be, in fact, a business model

17  --

18          MS. ANGEL:  Yes.

19          THE COURT:  -- but maybe if they want happy people,

20  they pay $1.10 and eat 10 cents.  Are you authorized to --

21  are they authorized to do that if they wanted to?

22          MS. ANGEL:  It would require ICE approval and so

23  they couldn't just do it without ICE approval.

24          THE COURT:  So the exact dollar amount requires ICE

25  approval?

14

1          MS. ANGEL:  Yes.

2          THE COURT:  Do you disagree?

3          MR. SCIMONE:  No, and that's precisely why this is

4    the discovery that we need.  So if there was a conversation

5    relating to another facility in which GEO sought permission

6    to pay more than $1 a day and ICE said, That's fine, we'll --

7    we'll agree to that, you can, then that would be an example

8    showing that, in fact, there is no instruction by ICE

9    limiting GEO.

10          THE COURT:  Okay.  And because the government would

11   be required to -- because I think I agree with you, that that

12   would be an official government policy if they sought it

13   somewhere else and they were approved, that sounds like a

14   policy that should apply broadly and, therefore, I tend to

15   agree with the plaintiff on this as far as what the scope of

16   a 30(b)(6) should be.  All right?

17          MS. ANGEL:  But, Your Honor, that wouldn't impact

18   the derivatives on an immunity defense for this particular

19   facility, this particular contract, because it's not --

20   whether or not they exercise or have the ability to exercise

21   discretion is not a relevant question; it's whether they

22   exceeded their authority.  And paying $1 a day, as the

23   contract authorizes them to do, they're not exceeding their

24   authority.

25          And I have this -- this very specific issue was

15

1    recently from a State of Washington case, which there are

2    similar issues and it's another pay grade case against GEO,

3    and we did extensive briefing on it and so we're very

4    familiar with the case law here and I can --

5              THE COURT:  Right, but what you're trying to do is

6    limit the course of discovery to the confines of your precise

7    defense.  They would like to have discovery consistent with

8    their claims.  It's passed a motion to dismiss.  You're at

9    least going to go to summary judgment or trial.  Judge Kane

10   will determine what's admissible or not.

11             My job is to make sure they have the information

12   that they need to try to introduce at trial and the scope of

13   discovery is broad.

14             MS. ANGEL:  I understand --

15             THE COURT:  So it goes beyond what you think the

16   precise limits of this derivative immunity is to what they

17   would want to introduce at trial with regard to their claims.

18   That's what the scope of discovery is.  It's claims or

19   defenses, material to a claim or a defense.  They have a

20   claim that if the United States Government authorizes $1.10

21   somewhere else, that GEO could pay $1.10 in that facility.

22   Is that your argument?

23             MR. SCIMONE:  Exactly right.

24             THE COURT:  And that might be good, it might be

25   bad.  That's not my decision, but my obligation is to make

16

1    sure they have the material to present to Judge Kane to

2    support their argument, okay.

3              MS. ANGEL:  I understand, Your Honor, but we -- we

4    inquired as to what the relevance was for them (inaudible -

5    not speaking into mic) facilities and their response was it's

6    directly relevant to your DSI defense.  So that was what --

7    that was --

8              THE COURT:  I agree that's not a very good response

9    to your inquiry.  So you all have been a little bit

10   circumspect, that's regrettable, but we're here and this is

11   -- that's how I'll interpret the 30(b)(6), okay.

12             So is there another broad topic I can address?

13             MR. SCIMONE:  I think so.  So there -- another

14   question is whether the topic should be limited to written

15   communications and that there are various types of written

16   communications.  So one is written communications with ICE --

17   between ICE and GEO.  We also want to discover --

18             THE COURT:  Wait a second.  You want to do a

19   30(b)(6) on written communications?

20             MR. SCIMONE:  So our request was for all

21   communications and the limitation requested was that it be

22   limited to written communications.

23             THE COURT:  Why don't you just acquire the

24   communications?  Why do you have to do a 30(b)(6) on

25   communications?

1          MR. SCIMONE:  We are -- I mean, we have requested

2     those documents in discovery and so what's important to us is

3     anything that wasn't written, oral communications.  We also

4     may have questions about the written communications

5     themselves, but the point here is that we need discovery

6     about any other kinds of communications; for example, a

7     meeting between the contracting officer at ICE and the

8     relevant executives at the GEO group.  And so if there was a

9     conversation there in which ICE instructed GEO to proceed in

10    a certain way, then that would be relevant, again, to the

11    DSI defense.

12          We shouldn't be limited, in other words, to only

13    focusing on written communications, which I agree, we could

14    probably discern from the documents.

15          THE COURT:  Well, so it seems to me that a proper

16    30(b)(6) might be an identification of all communications

17    that occurred, but not the content because they're only

18    required to designate somebody and educate that person.  That

19    person does not have had to engage in any conversation, so

20    you would be getting hearsay within hearsay within hearsay in

21    that context.  Wouldn't it make sense just to find out

22    whether any conversations occurred, who participated in them

23    and then go take discovery against the people who were

24    actually participating in the communications?

25          MR. SCIMONE:  I think that's right, Your Honor.  To

18

1    the extent that the witness wasn't prepared to testify to the

2    content of those conversations, that's what we would want to

3    do, but that deposition would be the way we would identify

4    some of those conversations.  I mean, there are other ways --

5    we could do it, also, with a contention interrogatory and I

6    think we'll get to that later, but --

7                THE COURT:  No.

8                MR. SCIMONE:  -- or some other means, but --

9                THE COURT:  So how would you expect them to have a

10   record of oral communications?  What -- what would that look

11   like?

12               MR. SCIMONE:  Well, a lot of it would be there are

13   meetings that occur regularly between ICE and GEO.  There are

14   minutes of those meetings and so there's at least a reference

15   to some of the --

16               THE COURT:  Again --

17               MR. SCIMONE:  -- oral communications.

18               THE COURT:  -- ask for -- have you asked for the

19   production of all those minutes?

20               MR. SCIMONE:  Yes, and --

21               THE COURT:  And have you gotten them?

22               MR. SCIMONE:  Most of them, yes.  There's another

23   set that I think is underway still.

24               THE COURT:  Okay.

25               MR. SCIMONE:  And so, yeah, we have sought all of

1    these communications.  One of the things we're trying to

2    determine is whether there's anything else outside of those

3    communications.  We do also have questions about the

4    communications themselves and so there -- if there's a

5    reference in the minutes to a conversation about the scope of

6    housekeeping, for example, and this is a hypothetical

7    document, we would certainly want to ask what the scope of

8    that discussion was and whether that led to authorization

9    from ICE or didn't.

10           THE COURT:  Well, why do you want to do that in a

11    30(b)(6) context instead of a -- a deposition of a person who

12    actually either participated in a meeting or wrote the notes?

13           MR. SCIMONE:  Well, I think we would, Your Honor.

14    Part of the -- part of the idea of the 30(b)(6) is to

15    identify what other communications there might have been.  We

16    don't have a complete listing of all of the communications.

17    I think we are getting close to that in discovery.  We -- we

18    have some testimony from fact witnesses on it, but I want to

19    be sure that GEO isn't going to rely on some other

20    communication that we don't yet know about.  Something that

21    -- and whether -- there are some, again, documents that we're

22    waiting on and so we don't necessarily know the content of

23    what's been not yet produced, but to the extent that GEO is

24    going to rely on a meeting that happened, we would want to

25    know that that's the basis of the defense and that's

20

1  something that we would want to explore in a 30(b)(6).

2          THE COURT:  These are meetings in which ICE

3  participated?

4          MR. SCIMONE:  Yes.

5          THE COURT:  And what are you doing with regard to

6  discovery against the United States Government?

7          MR. SCIMONE:  We have subpoenas pending, Your

8  Honor.  We've sought a 30(b)(6) deposition from ICE and also

9  documents.  We are still, I think, technically in the process

10  of meeting and conferring about those.

11          THE COURT:  With?

12          MR. SCIMONE:  With ICE.

13          THE COURT:  With whom?

14          MR. SCIMONE:  Department of Justice.

15          THE COURT:  With whom?

16          MR. SCIMONE:  Timothy -- Tim Javek (ph)

17  Principally.

18          THE COURT:  And I used to be the chief of that

19  office, so --

20          MR. SCIMONE:  Right.

21          THE COURT:  -- I know the people involved.

22          MR. SCIMONE:  Sure.

23          THE COURT:  Are they telling you to go through

24  Touhy?

25          MR. SCIMONE:  Yes, although we've been doing that

1    in an informal way.  They've essentially told us they

2    understand the scope of the Touhy doctrine to be --

3    essentially overlap with Rule 45.  We have a disagreement

4    about which standard is -- necessarily applies here, given

5    the history of the briefing on that issue in the case, but

6    we've been conferring, basically, about burden issues.

7             So they're currently reviewing documents to produce

8    to us.  I don't know if we yet have impasse and whether or

9    not they're going to produce a witness.

10            THE COURT:  Well, they probably realize Judge Kane

11   would take a broad view of Rule 45 against the United States

12   Government, so that's why they're negotiating with you,

13   because he'll hammer the United States Government any time he

14   needs to.

15            Okay.  So, well, I still am a little bit suspicious

16   of a 30(b)(6) that would seek a content of all oral

17   communications between GEO and ICE.  That sounds extremely

18   broad.  Now -- and, honestly, I -- have you propounded

19   discovery on that topic?  An identification of all

20   communications that occurred between GEO and ICE on any

21   relevant matter, have you done that?

22            MR. SCIMONE:  We have not yet.  We have a

23   contention interrogatory that we intend to propound, I think,

24   probably Monday.

25            THE COURT:  Well that's not a contention.  That's

1    just -- that's seeking facts.

2            MR. SCIMONE:  Yes.  But specifically facts that --

3    on which GEO will rely for its derivative sovereign immunity

4    defense.  We're trying to make it as targeted as possible.

5            THE COURT:  Okay.

6            MR. SCIMONE:  And -- and not have certain

7    interrogatory saying something like, Give us -- let us know

8    about all -- identify all communications with ICE.  That

9    would be overbroad.  So we're trying to target that.

10           And so, with respect to the 30(b)(6), their

11   obligation would only be to prepare the topic -- witness on

12   topics reasonably -- on information reasonably available, and

13   so to the extent that the exact content of a conversation

14   that happened many years ago is no longer available to the

15   corporation and may have been handled by another employee, we

16   can certainly take that fact deposition to discover the

17   content.

18           THE COURT:  Well, they're entitled to say, We have

19   no responsive information if they don't have it, so I'm just

20   -- I'm suspicious that that's not going to be a very fruitful

21   topic.  But I think you would be allowed to ask about any

22   meetings or, I guess, other communications, but I would hope

23   that you're getting discovery of memos and e-mails, but any

24   oral communications that occurred between GEO and the United

25   States or within GEO, I guess, involving the subject matter

23

1    of a case, so I -- that's fine.

2            Any objection -- any response on that?

3            MR. SCIMONE:  Your Honor, you put your thumb on the

4    dispute here of why GEO sought to limit the communications to

5    solely written communications due to the fact that I -- I had

6    questioned whether it would -- it would be feasible.  At the

7    very least, it would be extremely burdensome to prepare a

8    30(b)(6) designee on all oral conversations that had happened

9    between any employee --

10            THE COURT:  Yeah, I'm not going to -- I'm not going

11    to authorize a 30(b)(6) topic that seeks the content of all

12    oral communications.  Maybe the identification of dates and

13    participants and topics, but not content.

14            MR. SCIMONE:  And, Your Honor, I think you've

15    already noted that that would presumably be a much better

16    topic for a -- an interrogatory of identifying those because

17    --

18            THE COURT:  Well, and a supplemental -- and a

19    deposition of some -- one or more people who actually

20    participated in the communication.

21            MR. SCIMONE:  Right.  And the only way for a

22    designee to respond to that sort of a -- a 30(b)(6)

23    deposition topic would be to have a list of -- that you would

24    prepare in the same way if you were responding to an

25    interrogatory.

24

1          THE COURT:  True.  I mean, but I guess maybe they

2    would want to know more information than what would be

3    included on a list.  I don't know, a -- you know, what was

4    the -- what was the reason for the call, why did it occur

5    right then, who initiated the call, some things you might not

6    think about to put on the list, they might want to ask some

7    questions so that they could get some context.

8          Because, I assume -- well, timing of meetings might

9    be important in connection with things that were going on

10   within the facility.  I don't know.  Okay.

11         MR. SCIMONE:  All right.

12         MS. ANGEL:  Sorry.  (Inaudible -- not speaking into

13   the mic), the subject, the topic of the oral communications?

14         THE COURT:  Well, I mean --

15         MS. ANGEL:  (Inaudible - not speaking into mic) see

16   how we came down on that so I know --

17         THE COURT:  The -- the reason for the meeting --

18         MS. ANGEL:  Yes.

19         THE COURT:  -- and the topic of the meeting, yes,

20   but as far as who said what, no.

21         MS. ANGEL:  Okay.

22         THE COURT:  Okay?

23         MR. SCIMONE:  And I think, Your Honor, this is one

24   of those objections that may be more theoretical than real in

25   the -- in practice.  I -- we're really focused on

25

1    communications that GEO is going to rely on for its defense,

2    and so I -- I'm assuming we're talking about communications

3    that, if it's going to be a basis for the defense, are known

4    to the corporation, and if it's not something they're going

5    to rely on then --

6              THE COURT:  Sure.

7              MR. SCIMONE:  -- you know, we don't need that

8    content.  So I think that the limitation as --

9              THE COURT:  Well, I mean --

10             MR. SCIMONE:  -- as discussed here is --

11             THE COURT:  -- under Rule 26(a)(1), they would have

12   had to disclose any written materials about any of these

13   meetings that they're going to use to support their defense.

14   That's a mandatory disclosure, as are the witnesses who might

15   have participated in that meeting.

16             MR. SCIMONE:  Right.

17             THE COURT:  So they're already -- already under an

18   obligation to do that and they can supplement any time, which

19   they should.  So I agree, but, yeah, I think it would be a

20   far more clean deposition if the principal thing you're

21   seeking is communications that they believe support their

22   defense.

23             MR. SCIMONE:  That's right, and I think that's the

24   idea.

25             THE COURT:  All right.  What else?

26

1                MR. SCIMONE:  So there -- I -- this is -- this may

2    be a semantic difference, I don't know.  There are a couple

3    of places where we -- the topic includes communications and

4    contracts with ICE regarding the use of detainee labor.  We

5    had asked for agreements with ICE.  GEO redlined that to

6    contracts.  The contracts include other subcontractual

7    documents that are incorporated or attached or referenced.

8                To the extent that that constitutes an agreement

9    between the parties, we just want that to be part of the

10   topic as well.

11               THE COURT:  Well, I mean, the United States doesn't

12   legally engage in informal agreements.

13               MR. SCIMONE:  That --

14               THE COURT:  Every obligation that the contractors

15   have should be in writing, you know.

16               MR. SCIMONE:  Yes.

17               THE COURT:  So in my experience representing the

18   Government, oral contracts are a no-no.

19               MR. SCIMONE:  Right.  There will be, I think,

20   documents relating to all of that, but to the extent that it

21   might not be part of the contract per se, we just want to be

22   clear that that's within the scope of the topic, and so a

23   policy that was incorporated into the contract, I -- I think

24   that's probably part of the contract.

25               So again, this may be a semantic difference --

1              THE COURT:  It probably is.

2              MR. SCIMONE:  -- but --

3              THE COURT:  Do you agree?  Yeah, I think it's clear

4    that it has to be the contractor -- I don't know what you

5    would call it.  An amendment, codicil, whatever you want to

6    call anything that's appended to the contract and -- and an

7    obligation which GEO believes it has.

8              MR. SCIMONE:  Yeah.

9              THE COURT:  Right?

10             MS. ANGEL:  Yes.  Any modifications or changes or

11   amendments are supposedly in writing, any of the various

12   rules and regulations that are incorporated in or

13   incorporated by reference (inaudible - not speaking into

14   mic).

15             THE COURT:  Right.  And -- well, are you seeking

16   the identification of the contracting officer for ICE?

17             MR. SCIMONE:  I think we have that information

18   already.

19             THE COURT:  You do?

20             MR. SCIMONE:  Yeah.

21             THE COURT:  Because that's very important.

22             MR. SCIMONE:  Yes.

23             THE COURT:  I mean, the contracting officer for ICE

24   is going to be maybe the most important person in this case.

25             MR. SCIMONE:  Yes.

28

1              THE COURT:  Okay.

2              MR. SCIMONE:  It's a few people.  It's a fairly

3    long time period, but, yes.

4              THE COURT:  Okay.

5              MS. ANGEL:  Well, I (inaudible - not speaking into

6    mic).

7              THE COURT:  Sure.

8              MS. ANGEL:  They -- there was time class periods

9    and --

10             THE COURT:  What is a class period?

11             MS. ANGEL:  Well, for the PBTA claim, it's 10/22/04

12   to 10/22/14.  For unjust enrichment, 10/22/11 to 10/22/14.

13   And their 30(b)(6) notice doesn't limit the topics to that

14   timeframe; it -- it lets them go to the present.  And the

15   reason they provide for that is that, and I quote, subsequent

16   remedial measures are admissible to prove feasibility of

17   precautionary measures, which is just kind of regurgitating

18   the standard.  Any changes to policy, which I think that they

19   are getting at, and seeking what they refer to as subsequent

20   remedial measures.

21             (Inaudible) changes happen regularly, they're not

22   necessarily remedial, and it doesn't -- they say, you know,

23   indicate GEO's ability to, you know -- to exercise its own

24   discretion because changes in policy are approved at best.

25   So I don't understand the relevance or why they would be

29

1      entitled to information post-2014, the end of the class

2      period.

3             THE COURT:  Right.  Well, remember discoverability

4      is different than admissibility.  Again, I'm not saying it's

5      either admissible or not, but in order for even Judge Kane to

6      make that decision and not have to -- you guys not have to go

7      back and do discovery that I didn't allow, they have to have

8      the information to present to him.  He might exclude it.

9             Like you said, there are some evidentiary basis for

10     the admissibility of subsequent measures that involve a

11     change.  So, you know, yeah, just discovery is broader than

12     admissible evidence.  So --

13            MS. ANGEL:  Well, I -- I do understand that, Your

14     Honor, and I'm not arguing now that it has to meet the

15     standard of admissibility at trial, but it -- it does need to

16     have some relevance, and I don't see what the relevance is if

17     they're interpreting being anything that -- and to the extent

18     that they -- their sole basis for relevance here is

19     subsequent remedial measures, than that should be limited --

20     that should be what they are limited to in asking key

21     witnesses about anything post-2014.

22            THE COURT:  Well, not every topic should -- should

23     be post-2014.  Only topics that are potentially relevant to

24     the case.  So this communications, for example, I don't see

25     why they -- you would be able to ask to communications up to

30

1    today.  That doesn't seem relevant to me, because if there's

2    a close period of damages, then probably most of the topics

3    should be limited to the end of that period, but there might

4    be topics for which they want to make an argument such as

5    feasibility, legality, constitutionality, those kinds of

6    things, that they want to put in front of Judge Kane, but I

7    would have to see topic by topic whether you should be

8    permitted to exceed the date limitation of 2014.

9            So, I mean, you need to -- you can't just have the

10   whole deposition be unlimited in time

11           MR. SCIMONE:  And that's certainly not our intent.

12           THE COURT:  Okay.

13           MR. SCIMONE:  I mean, I think there's a small

14   number of questions that we're going to be asking about the

15   post-2014 time period.  So I think, again, this is an area

16   where we don't --

17           THE COURT:  Well, I would like you to tell them in

18   advance.

19           MR. SCIMONE:  Yeah.

20           THE COURT:  So I want you to identify the topics

21   maybe sometime in the next week -- when is this deposition

22   scheduled?  Is it scheduled?

23           MS. ANGEL:  It's not yet scheduled.

24           THE COURT:  Okay.  So give them -- tell them in the

25   next week which topics you believe might reasonably exceed

1   2014 and that would give them opportunity to at least bring

2   it back here for a very short conference, if needed.

3          MS. ANGEL:  Thank you.  I was going to suggest

4   that, if it would be easier for you, if we address the

5   various 30(b)(6) notice revisions in writing more clearly if

6   that would be a better use of your time.  If you want us to

7   submit something in writing to you after the conference as

8   opposed to going through one by one, I'm happy to do so, but

9   whatever you find more expeditious.

10          THE COURT:  Well, if you want -- it depends on if

11   you want a decision soon or late.  So if you want a decision

12   right now, let's do it right now.  I have until, I don't

13   know.  I mean, I don't think I have anything else set today,

14   so I'm good and you're here and I'm here, so.

15          MR. SCIMONE:  We appreciate it, Your Honor, and we

16   would like a decision sooner because it -- it -- the

17   scheduling hinges on these issues, so --

18          THE COURT:  Yeah, so --

19          MS. ANGEL:  Well, it does seem like they still have

20   to submit certain things to us in writing anyways, so.

21          THE COURT:  Absolutely.  So, yeah, you'll get

22   another bite in case what you think what they submit exceeds

23   what we talked about today.

24          MS. ANGEL:  Thank you.

25          THE COURT:  And that may be in writing, but if it's

32

1    in writing, it's going to be decided within a day also, so.

2           MS. ANGEL:  Thank you.

3           THE COURT:  I mean, now that I've had you guys here

4    and I've had context, I don't have any problem with deciding

5    something on some kind of written record, okay.

6           MR. SCIMONE:  I'm trying to identify things that

7    are -- are real issues here, Your Honor.  So one -- one

8    question -- one topic we had was the origins and objectives

9    of the use of the voluntary work program, that's the $1 a day

10   program, and GEO took that out.  Perhaps this wasn't the best

11   worded.  The origins, I think is less what we're interested

12   in.

13          MS. ANGEL:  Sorry.  Can you just tell me which

14   number you're looking in?

15          MR. SCIMONE:  Yeah, that's 3 -- 3(e).

16          MS. ANGEL:  Thank you.

17          MR. SCIMONE:  Yeah.  The objectives and use of --

18   of the use of the voluntary work program, you know, goes to

19   willfulness.  And so one issue that's going to come up in

20   this case is the -- the kinds of jobs done by detainees in

21   this program and whether those are jobs that would ordinarily

22   -- ordinarily have been done by GEO employees.  That goes to

23   the unjust enrichment claim, it goes to the damages in that

24   claim, and so --

25          THE COURT:  Yeah, but so I -- well --

33

1            MR. SCIMONE:  The --

2            THE COURT:  Well, I -- yeah.  So the origins, I

3    kind of agree with the defense on that.

4            MR. SCIMONE:  I can see that.

5            THE COURT:  Objectives -- okay, so you think there

6    might be some other objective other than to have the work

7    done?

8            MR. SCIMONE:  The profit motive.  Well, yes, that

9    is the objective that we think is -- is at issue here.

10            MS. ANGEL:  It's an ICE-mandated program, Your

11    Honor.

12            MR. SCIMONE:  (Inaudible).

13            THE COURT:  I understand, but what do you think the

14    motive is?

15            MR. SCIMONE:  Well, I think it's that, to save

16    money, but GEO's contention would be that it's to provide

17    opportunities to detainees, to improve their skills and give

18    them ways to occupy their time and other things.  This is

19    going to be just a narrative that the jury hears, competing

20    areas about what the purpose of the program is.

21            THE COURT:  Right, but can't there be both motives

22    present at the same time?

23            MR. SCIMONE:  I suppose that's right, Your Honor,

24    and -- but the parties are going to present them differently

25    at trial and so we would like to just explore this topic,

1    generally.  I think it's going to be a difference in how the

2    parties characterize the facts, and I think, you know, those

3    facts are going to come in at trial, and to tell the story,

4    we need to ask some questions about it and about

5    correspondence that shows both motives.

6              MS. ANGEL:  It's congressionally and ICE mandated,

7    actually.  So it's a program that if -- if GEO contracts with

8    ICE, it has to be implemented at their facility, but the

9    objectives and -- and origins are clear.

10             THE COURT:  No, I understand that --

11             MS. ANGEL:  It's to comply with the ICE mandate.

12             THE COURT:  -- some contractors may apply it with

13   more enthusiasm than other contractors, so that's probably

14   what they're getting into is, you know, getting into the

15   weeds about how the national policy was actually applied.

16             MS. ANGEL:  I understand that there are benefits to

17   the detainees and -- and, you know, it gives them things to

18   do and opportunities --

19             THE COURT:  Absolutely, that's what I think.

20             MS. ANGEL:  I do -- I do understand that and I'm

21   not diminishing that in any way, but I'm just saying that

22   especially in this case in terms of, say, the -- the DSI

23   defense, it's following the terms of the contract; it's

24   fairly straightforward.  So I don't understand what origins

25   and objectives even gets at.  The objective is to abide by

35

1    the terms of the contract.

2            THE COURT:  Well, and no government contractor has

3    ever exceeded the scope of a government contract or does

4    something in violation of a government contract, right?

5            MS. ANGEL:  Not us.  Certainly not GEO.

6            THE COURT:  So, I'm sorry, you know, I just got to

7    factor in human behavior here and so this is not all machines

8    that are implementing this contract.  It's human beings who

9    may have prejudices and vices and that's what you're allowed

10   to explore at trial is exactly the way a policy was

11   implemented.  That's why we have -- I mean, the Constitution

12   is clear on what you can and can't do and yet every day we

13   have constitutional torts against federal actors who were

14   found to have violated the Constitution.  The Constitution is

15   a lot stronger than the contract and yet that gets violated

16   all the time.  Just look at all the 1983 Bivens cases we

17   have.

18           So they're allowed to explore that, absolutely.

19           MS. ANGEL:  I understand that, but the

20   implementation of the policy is not the same as the origins

21   and objectives, which again I think --

22           THE COURT:  But I do --

23           MR. SCIMONE:  -- Your Honor --

24           THE COURT:  Did you hear me say I agree with you on

25   the origins?

36

1           MS. ANGEL:  Oh, okay, I'm sorry.

2           THE COURT:  Yeah, I agree with you on the origins.

3  Objectives, I think it's not as artfully worded as I would

4  say.  Motivations, purposes, that's allowable, okay.

5           MR. SCIMONE:  That's what we're getting at with

6  that topic, Your Honor, yes.

7           I think the last -- well, there's a couple of

8  things.  So this is now 4(c) and (d).  The topics here were

9  the staffing needs for work performance by paid employees or

10  contractors that overlaps with the duties done by detainees

11  and that's in two different programs:  The sanitation policy

12  and the voluntary work program.  And GEO asked that this be

13  limited from staffing needs to the method of determining

14  staffing needs.

15           I -- I'm not sure that that's much different from

16  what we're asking.  I just want to be clear that we may --

17  our -- our questioning may also touch on the content of

18  actual budgets, which we have, and how those budgets were

19  determined and whether or not GEO is factoring in, so I think

20  that is the method of determining.  I don't think there's a

21  real disagreement.  I just don't want to be unduly limited in

22  asking about the actual staffing needs that we have reflected

23  in documents that will be exhibits in deposition.

24           THE COURT:  Well, to the extent you can't refuse to

25  answer a question in a deposition, except for privilege,

1  which is the rule, they'll be able to state a relevance

2  objection and you'll be able to get your answer.  So I don't

3  -- I'm not sure what you're asking me.

4        MR. SCIMONE:  In every 30(b)(6) deposition I've

5  ever taken, Your Honor, if there's a question about the scope

6  of the notice, defendants often say that's outside of the

7  scope of the 30(b)(6) deposition, please focus your questions

8  on the topics within the scope and then we have a back and

9  forth.

10       THE COURT:  It's a perilous objection because the

11 person would get -- you would get another bite at the apple

12 on their dime if they're wrong on that.  So, I mean, you

13 proceed at your own risk on that one, but -- and I'm not

14 saying you can't do that.  It's just if you're wrong and they

15 get to retake the deposition, it's going to be at GEO's

16 expense.

17       MR. SCIMONE:  Right.

18       THE COURT:  So -- but is there something for me to

19 decide here on (c) and (d)?

20       MR. SCIMONE:  I don't think so.  I think we're --

21 we're just trying to be clear that there isn't some other

22 limitation here, you know, the method of determining but, you

23 know, it -- that's going to mean also that we may ask about

24 certain specific exhibits and staffing plans that are in

25 discovery and in the record already.  So I just --

38

 1                THE COURT:  Well --

 2                MR. SCIMONE:  I think I'm clarifying in a sense,

 3     but --

 4                THE COURT:  Yeah, just give them adequate notice of

 5     what you're going to be asking and the documents you're going

 6     to be using.  I mean, it's, in my opinion, the best practice

 7     to provide documents ahead of time so that the witness

 8     doesn't spin your wheels looking at a document for ten

 9     minutes and eating up your 30(b)(6) time, but that's your

10     call.

11                MR. SCIMONE:  Uh-huh.

12                THE COURT:  Because we really don't promote

13     ambushes anymore in -- in federal litigation, so there's

14     nothing wrong with you giving them a heads-up about all the

15     documents you're going to be using, right?

16                MR. SCIMONE:  I think so.

17                Then under topic 4, we have (e) through -- I guess

18     it's (e) through (h).  These were topics we originally

19     included that GEO asked to take out, and I think there are a

20     couple of things where we can concede that --

21                THE COURT:  Well, I think current staffing -- I

22     mean, honestly --

23                MR. SCIMONE:  No, that's a concession.

24                THE COURT:  -- we're in kind of an immigration

25     crisis here, so what's happening today has nothing to do with

39

1    five years ago.

2              MR. SCIMONE:  I -- I would agree on that one, Your

3    Honor.

4              THE COURT:  Okay.

5              MR. SCIMONE:  Yes.  We're not interested in current

6    staffing.  We're interested in staffing, I think, during the

7    relevant time period.

8              THE COURT:  Okay.

9              MR. SCIMONE:  But otherwise, the rest of this

10   topic, I think, is relevant.

11             THE COURT:  Okay, hold on a second.

12             MS. ANGEL:  So (f) and --

13             THE COURT:  Go ahead.

14             MS. ANGEL:  (e) or --

15             MR. SCIMONE:  That's with respect to (e).

16             MS. ANGEL:  Yeah.  Sorry, the -- the letters got

17   messed up with the editing, sorry.  Just wanted to make sure.

18             THE COURT:  I'm looking at (e),(f),(g) and (h).

19   There are strike-throughs everywhere.

20             MS. ANGEL:  That's -- yeah, that's why I was

21   getting the letters --

22             THE COURT:  Yeah.  And then (h) has an (e) beside

23   it, I don't know why, but -- because there's nothing left in

24   it that's not crossed out.  So I'll go ahead -- what's your

25   position?

40

1          MS. ANGEL:  I just wanted to make sure I knew which

2     one we were looking at as we went through it, because --

3          THE COURT:  So we're -- we're crossing out current

4     staffing.

5          MS. ANGEL:  Uh-huh, that one I got.

6          THE COURT:  Okay.

7          MS. ANGEL:  And I agree.

8          THE COURT:  And what about the rest, (f),(g),(h)?

9          MR. SCIMONE:  Well, let -- to be clear on (e), I

10    think we do want to keep the topic as it pertains to the

11    relevant time period but not to the current time period.  So

12    I --

13         THE COURT:  Right, but the only -- the whole -- the

14    totality of (e) seeks current.  You don't say current and

15    historical, so do you want to amend that?

16         MR. SCIMONE:  I -- I think that is the

17    understanding.  (F) through (h) I think -- I think do speak

18    to the historical more than the current and I -- I think it

19    was perhaps a -- not artful drafting, but that was the

20    intent.

21         THE COURT:  Okay.

22         MR. SCIMONE:  One way that I think the current may

23    relate is simply -- well, I -- to the extent that there were

24    changes in staffing and that sheds some light on how the

25    staffing was determined during the time period, I think

1    that's somewhat relevant, but that relates to (c) and (d) so

2    --

3            THE COURT:  Yeah.  No, I would say not on current,

4    because we are so far distant from 2014.

5            MR. SCIMONE:  Yeah.

6            THE COURT:  And so -- but if you're going to ask

7    for historical staffing, what's your position on that,

8    during the relevant time period?

9            MS. ANGEL:  Well, Your Honor, the thing with the

10   voluntary work program is I think they're assuming that --

11   that the position -- or that GEO's position is that, Oh, we

12   have all of this basically free, $1 a day labor, so we don't

13   need to hire our own staff.  I think that's essentially the

14   underlying position they're trying to get at here, but that's

15   -- it's not how it works with the voluntary work force.

16           It's -- it's not a steady, reliable stream of

17   volunteers.  Sometimes people all want to be in the kitchen

18   and so there's no people volunteering to do janitorial work

19   or vice-versa, and so the staffing is done without factoring

20   in whether there is a volunteer work force, because sometimes

21   there is and sometimes there isn't.  Sometimes there is less

22   people in the facility to begin with.  Sometimes there's

23   more, depending on, as you said, the -- the immigration

24   climate, et cetera.

25           So I don't see what the relevance is of this and I

1    understand that they're going to say relevance and it's --

2    it's admissible and the -- whether or not it's admissible

3    doesn't affect relevance here or whether they can discover

4    it, but to the extent they want to ask, Is staffing affected

5    by the existence of a voluntary work program, they -- I

6    suppose they can ask that, but I don't think it needs to be

7    all of this detailed, multiple topics.  I think it's going to

8    wind up being a waste of time.

9            MR. SCIMONE:  Your Honor, these facts are not in

10    evidence, the ones just stated by counsel.  That -- that is a

11    fact contention --

12            THE COURT:  What facts?

13            MR. SCIMONE:  That -- that the staffing is -- is

14    fluid and, therefore, it's not taken into account by GEO.  We

15    very much disagree.  We think this is a fact issue that's

16    going to go -- be part of what the jury is considering, and

17    so we think we need -- we have the opportunity -- we have the

18    right to inquire about that.  To the extent that GEO's

19    contention is, We don't staff the facility based on how much

20    detainee labor is available, we very much disagree.

21            THE COURT:  Well --

22            MR. SCIMONE:  And we think there's evidence --

23            THE COURT:  -- here's what I can imagine.  There's

24    some expert out there in the world who is more than willing

25    to say a facility of this size that has this many inmates

43

1    requires this amount of staffing.  We'll say 350 full-time

2    employees.  Oh, GEO only has 200.  They're saving 150

3    employees by incorporating slave labor.  I assume that's what

4    they're going to be arguing.

5            So the amount of staffing at any given point of

6    time during the relevant time period is material to that sort

7    of a -- a theory.  I don't want to make up your theory for

8    you, but this screams out as logical.  Is that what you're

9    saying?

10           MR. SCIMONE:  Yes.

11           MS. ANGEL:  No, I -- I understand that, and I think

12   from a broader perspective that you're looking at it with

13   that that makes sense.  My issue is more with -- and which is

14   why I think method of determining staffing needs and, you

15   know, staffing numbers are covered in (c) and (d).  The --

16   the later half of this page, so (f), (g) and (h), gets into

17   costs and -- and calculations and estimates and it's all sort

18   of speculative because I think what they're asking is what

19   things would cost --

20           THE COURT:  Well, you don't have to create

21   information to respond --

22           MS. ANGEL:  That's --

23           THE COURT:  -- to a 30(b)(6).

24           MS. ANGEL:  Okay, that's what that would require is

25   what I'm saying.

44

1          THE COURT:  Then you don't have to.  All you have

2     to do is we -- say that, We have no responsive information

3     and, therefore, we will not -- we do not intend to produce a

4     witness on this topic.

5          MS. ANGEL:  Okay.  Well, that's what we are doing

6     here and they are disagreeing with our --

7          THE COURT:  They don't have to create information

8     for you.

9          MR. SCIMONE:  No, but there is information that we

10    have in the form of documents that I think would be part of

11    this.  And so we have documents, for example, where GEO is

12    internally discussing certain costs to the facility and

13    whether or not they should be done by detainees.

14         THE COURT:  Well, why don't you provide those

15    documents and say, We would like a witness on those -- on

16    this document too?

17         MR. SCIMONE:  We can do that.  It may -- yes.

18         THE COURT:  That would -- I mean, that seems the

19    most logical way to proceed, but you're not required to

20    create any cost analysis of employees that you don't already

21    have.

22         MS. ANGEL:  Thank you, yes.

23         MR. SCIMONE:  And I think that anticipates (g),

24    Your Honor, where we ask specifically any studies conducted.

25    The objection here was that we don't have to create evidence,

1  which we agree with and -- but then the question is simply,

2  Was there ever a study done, and the answer is, No.  So

3  that's the topic --

4            THE COURT:  Okay.

5            MR. SCIMONE:  And that's what the witness should be

6  prepared on if that's the case.

7            THE COURT:  And you'll be able to produce somebody

8  who will say, No?

9            MS. ANGEL:  I'm sure we can.

10           THE COURT:  Okay.

11           MR. SCIMONE:  And then I think -- I think the last

12 one, (h), has been resolved.  As I understand it, GEO has

13 withdrawn this defense in the answer about the setoff --

14           THE COURT:  Okay.

15           MR. SCIMONE:  -- of benefits.  So assuming that's

16 true, we don't need to cover it.

17           MS. ANGEL:  Yes.  I think there was another topic

18 that pops up throughout at least all of 2.  I think that

19 might be the (inaudible).  We want to -- you'll see it.  It's

20 the same edit over and over for pretty much every sub-bullet

21 in Number 2, I guess starting on page 3.  The -- limit these

22 topics to -- and they're asking, you know, vaguely about

23 discipline at the facility and we want to limit it to

24 discipline in connection with violations of the specific

25 policies that are at issue in this case.

46

```
 1             THE COURT:  So what does discipline have to do with

 2    your case?

 3             MR. SCIMONE:  So one of the allegations is that GEO

 4    threatens detainees with solitary confinement if they refuse

 5    to clean.  That's the Trafficking Victims Protection Act

 6    claim.

 7             THE COURT:  Okay.

 8             MR. SCIMONE:  And so the reason that discipline for

 9    other purposes is relevant is because we want to see if the

10    way that they treat this disciplinary infraction is

11    consistent with the way that they treat other disciplinary

12    infractions.

13             THE COURT:  So disparate treatment is what you're

14    getting at?

15             MR. SCIMONE:  Yes, effectively.

16             THE COURT:  So I -- sorry, so your argument would

17    be that they treated more harshly someone who wouldn't do the

18    work for them as opposed to someone who may have had

19    contraband or something else?

20             MR. SCIMONE:  Yeah.  What -- yeah, the allegation

21    in the case is that there's effectively a pattern and

22    practice of using segregation to coerce labor, and so to the

23    extent that there are people that are being routinely sent

24    into segregation without a hearing to enforce this policy,

25    which is our allegation --
```

1              MS. ANGEL:  Which --

2              MR. SCIMONE:  -- but that's not being done in other

3    cases.

4              MS. ANGEL:  Which policy, though?

5              MR. SCIMONE:  To -- the housing and sanitation

6    policy.

7              MS. ANGEL:  Right.  So I think that's an important

8    clarification to make here.  Just because they both -- both

9    policies at issue here sort of involve labor.  There's no

10   allegation that -- that a refusal to participate in the

11   voluntary work program results in this sort of disciplinary

12   action.  This is strictly limited to the housing sanitation

13   policy so that if the detainees won't clean the areas that

14   they're expected to clean, meaning their living facility and

15   their common areas that they use, then that's where the

16   discipline issue comes from.

17             THE COURT:  So they're not getting paid for that?

18   That's just part of their obligation of being an inmate?

19             MS. ANGEL:  No, and that's authorized -- yes, and

20   that's authorized --

21             THE COURT:  All right.

22             MS. ANGEL:  -- at various places in the PBNDS, as

23   well as the discipline for failure to clean --

24             THE COURT:  Okay.

25             MS. ANGEL:  -- because at PBNDS Section 3 allows

48

1    disciplinary segregation for refusal to clean, so --

2              THE COURT:  And cleaning is not part of the

3    voluntary work program?

4              MS. ANGEL:  More in-depth cleaning is.  Like, you

5    know, scrubbing of walls and it -- and it was explained to me

6    like --

7              THE COURT:  No, I understand.  I don't mean

8    cleaning broadly, but tidying your area and keeping it

9    sanitary.

10             MS. ANGEL:  That is not part of the voluntary work

11   program.

12             THE COURT:  Okay.  So what do you say about that?

13             MS. ANGEL:  That's the housing --

14             MR. SCIMONE:  We disagree.  So the -- the

15   contention in this case is that, in fact, the sanitation --

16   sanitation policy does include deep cleaning far beyond the

17   limited housekeeping that the PBNDS permits.

18             THE COURT:  For which even the $1 an hour wasn't

19   paid?

20             MR. SCIMONE:  Correct.  And so that's the

21   Sanitation Policy that's at issue.  And there's -- and there

22   are -- I mean, this has been admitted that the policy -- that

23   the scope of the cleaning duties covers scrubbing the floors,

24   scrubbing the walls.

25             THE COURT:  So your topic is the type of

49

1    infractions and the type of discipline for those infractions?

2          MR. SCIMONE:  That's correct, and how that practice

3    compares with how discipline is applied generally.

4          MS. ANGEL:  That's --

5          MR. SCIMONE:  So we're not really -- the voluntary

6    work program, the $1 a day program, I don't think we're -- I

7    don't -- I'm not aware of any discipline related to that and

8    so I don't think that would be cut -- that would really enter

9    into the questions about discipline.

10          But if someone is not routinely brought to -- so,

11    for example, in the deposition we recently took, the witness

12    argued -- said, We don't believe that putting people in

13    segregation for refusing to clean their room rises to the

14    level of what would be permitted.  Now, we very much disagree

15    that that was -- about whether or not that happened.  We

16    think it did happen and we have documents showing that it

17    happened.  So that's what we're going to be asking about.

18          Now, if -- if Geo is saying, and their witness has

19    admitted, that there is not a valid reason to put someone in

20    -- in administrative segregation if they simply refuse to

21    clean their room and, yet, it's being done anyway, then part

22    of the topic is going to be, well, what are people trained

23    on?  When are they permitted to send people to administrative

24    segregation?  What are the kinds of examples that do rise to

25    that level?  Those are the kinds of topics that I expect will

50

1    be explored.

2        THE COURT:  Well, no, but you just talked about

3    several broad topics.  So one of them that you just mentioned

4    was the scope of training for people --

5        MR. SCIMONE:  Yes.

6        THE COURT:  -- who are actually implementing the

7    discipline and whether they were trained in this or whether

8    they were just permitted to do it willy-nilly, whatever they

9    felt.  That is a huge topic and an important one, by the way,

10   but it's huge.

11       MR. SCIMONE:  Uh-huh.

12       THE COURT:  Training is always relevant in that

13   context.

14       MR. SCIMONE:  Yes.

15       THE COURT:  But what do you say about that?

16       MS. ANGEL:  Well, I agree with you that the way

17   they're framing it is very broad, which is why we sought to

18   make limitations on the broadly worded --

19       THE COURT:  Well, no, I didn't say it was very

20   broad.  I said it was very important.

21       MS. ANGEL:  On training?

22       THE COURT:  Yeah, training.  So --

23       MS. ANGEL:  Well, I understand.  That's not the --

24       THE COURT:  -- whether the individual GEO employees

25   were trained on specific discipline to be used for specific

51

1    infractions or whether they were just given general carte

2    blanche to impose discipline as they see fit, that's very

3    relevant to their claims, I think.  Would you agree?

4          MS. ANGEL:  Well, I guess I'm not quite

5    understanding the parameters of what that would entail,

6    because it's -- I -- I don't think anyone is saying they're

7    giving -- they're carte blanche able to decide who goes to

8    seg and when and why.  It's authorized -- discipline levels

9    are authorized under the PBNDS.  So that's what's followed.

10          THE COURT:  So you say it's very strictly

11    controlled what kind of infractions result in certain levels

12    of discipline?

13          MS. ANGEL:  Yes.

14          THE COURT:  And he's saying that's violated in the

15    main, so --

16          MR. SCIMONE:  Yeah.

17          MS. ANGEL:  But it's not violated --

18          MR. SCIMONE:  But --

19          MS. ANGEL:  -- because disciplinary segregation for

20    refusal to clean is specifically authorized under the PBNDS.

21          THE COURT:  But what he's saying, or what I thought

22    I heard him say was your definition of clean and -- in the

23    contract and as applied are two different things.  So he -- I

24    think he said as you guys applied the definition of cleaning,

25    you're including deep scrubbing and -- and manual labor far

52

1    beyond keeping your area clean.

2              MS. ANGEL:  Well, that's his position.  That's part

3    of the case.

4              THE COURT:  Sure, yeah.

5              MS. ANGEL:  But this -- also, we've just had -- as

6    he mentioned, we just had someone, a GEO witness named Amber

7    Martin, testify that GEO had an informal policy from 2004 to

8    2014 that refusal to clean would not result in a disciplinary

9    segregation and she was unaware of it ever happening.

10             THE COURT:  What was her position?

11             MS. ANGEL:  Contract compliance.

12             MR. SCIMONE:  Executive vice-president for contract

13   compliance.

14             MS. ANGEL:  Yes.

15             THE COURT:  Okay.  So authorized to state the

16   policy of the company, obviously.

17             MS. ANGEL:  So he's going -- they want to go back

18   into, with other witnesses, topics that have been covered

19   now.

20             THE COURT:  Right.

21             MR. SCIMONE:  But we don't believe that that's

22   correct.  We don't believe that there really was an informal

23   policy or that it was actually practiced, and so that's what

24   we need to find out, because we have documents that squarely

25   contradict her testimony.

```
 1              THE COURT:  Well, write out the topic right now
 2     that you think you're entitled to and I want to see it, okay?
 3              MR. SCIMONE:  Okay.
 4              MS. ANGEL:  And -- and, Your Honor --
 5              THE COURT:  Unless you think one of these already
 6     clearly enough describes it.  So which -- which letter are we
 7     talking about?
 8              MR. SCIMONE:  So it's -- it's -- I think the
 9     entirety of 2 is trying to articulate aspects of this line of
10     questions.
11              MS. ANGEL:  Can we make this easy and say we -- we
12     are happy to have our witness testify on how discipline was
13     implemented with respect to violations of the housing unit
14     sanitation policy?  That was the only -- that's really what
15     these edits are intended to make limits to.  They want to ask
16     how everyone was disciplined under any policy and any --
17              THE COURT:  Well, you can't ask that, but you can
18     ask policy.  So you can have a 30(b)(6) on the -- since your
19     position is this is clearly governed by a contract in a black
20     and white way, this will be easy for a witness to testify
21     about the application of discipline to specific infractions.
22     So that's a topic that's permissible but, you know, I guess
23     which sub-section are we talking about at the moment?
24              MS. ANGEL:  Are you asking me or him?
25              THE COURT:  No.  Him.
```

54

1          MS. ANGEL:  Okay.

2          MR. SCIMONE:  Yeah, I -- I mean, I think -- I think

3   it cuts across all of these, and, you know, a lot of these

4   are -- are stating --

5          THE COURT:  All of -- all of what?  All of two?

6          MR. SCIMONE:  Yes.  So I think the one that -- so

7   we talked about training, that's (g), so that's a specific

8   example.  But policies and practices relating to discipline

9   or relating to the -- regarding the use of detainee labor --

10  so some of these are --

11         MS. ANGEL:  So we didn't object to (g) or -- or

12  make any edits to that.

13         MR. SCIMONE:  No, that's -- that's right.

14         MS. ANGEL:  The training, we understand, as you

15  said, is important.

16         THE COURT:  Right.

17         MS. ANGEL:  It's just these various other --

18         THE COURT:  So --

19         MS. ANGEL:  These are like --

20         THE COURT:  So the cross-outs are yours?

21         MS. ANGEL:  Yes.  The redlines are ours.

22         THE COURT:  So you're -- you're okay up to (i)?  I

23  don't have any cross-outs between (a) and (i).

24         MS. ANGEL:  I think you're looking at 1, or --

25         MR. SCIMONE:  It's the --

55

1          MS. ANGEL:  -- are you looking at 2?

2          THE COURT:  No, I'm looking at 2.

3          MR. SCIMONE:  It's the addition of --

4          MS. ANGEL:  It's -- it's the additions.  The

5    underlined words are our additions as well.  So we tried to

6    limit when -- what they want to ask about.

7          THE COURT:  Okay.  But, otherwise, nothing's

8    crossed out between (a) and (i), correct?

9          MS. ANGEL:  Nothing's crossed out.  We added -- we

10   added narrowing language, but, yes, no cross-outs.

11         THE COURT:  And so as presented with the underlines

12   is what you're prepared to do?

13         MS. ANGEL:  Yes.  That was the --

14         THE COURT:  Okay.

15         MS. ANGEL:  -- offer that --

16         THE COURT:  And so --

17         MS. ANGEL:  -- that prior counsel made and we're

18   not going to renege on that.

19         THE COURT:  All right.  Do you want to address

20   anything between (a) and (i)?

21         MR. SCIMONE:  Yes.  So with respect to -- so (c),

22   the policies regarding administrative segregation and

23   disciplinary segregation.  So we -- we don't want to limit

24   that to simply housing unit sanitation policy.  That's the

25   principal issue in the case, but how administrative

56

1    segregation is used generally in the facility and what kinds

2    of infractions rise to the level that would permit it, that

3    is the scope of the topic that I think we -- we want to

4    explore.

5            MS. ANGEL:  Read the PBNDS.  It tells you what --

6            MR. SCIMONE:  But -- but what's in the PBNDS does

7    not reflect the practice of the facility and so that's --

8            THE COURT:  No, I understand.  Well, so -- but your

9    topic is policies, it's not practices.  So look at (c), it's

10   only policies.  So policies, in my view, are either written

11   down --

12           MS. ANGEL:  Uh-huh.

13           THE COURT:  -- or uniformly applied and I -- and I

14   suspect they're going to say whatever is written down is what

15   we uniformly apply, so it would be the same.  You're --

16   you're not talking about actual practices.

17           MR. SCIMONE:  Well, other topics here do relate to

18   practices, Your Honor, and I think -- so (i), for example,

19   and, you know, there's no objection to that.

20           THE COURT:  Sure, but we're talking about (c).

21           MR. SCIMONE:  That's right.

22           THE COURT:  So (c), I mean, I'll authorize it.

23           MS. ANGEL:  With our addition?

24           THE COURT:  No.  I mean, so are you familiar with

25   the policy?

57

1            MS. ANGEL:  The housing unit sanitation policy?

2    Yes.  I don't have it with me --

3            THE COURT:  The disciplinary policy.

4            MS. ANGEL:  Oh, yes.

5            THE COURT:  And how many pages is it that lists

6    infractions for which segregation can be imposed?

7            MS. ANGEL:  That I apologize.  I don't have the

8    information off my head.  I have it at my desk, I can get --

9    I can certainly submit it to you afterwards if that would be

10   helpful.

11           THE COURT:  Yeah.  So anyway, I mean, on (c),

12   policies, is this a regurgitation of what's probably written

13   down in a policy?  That didn't seem like it would be a good

14   use of 30(b)(6) time, but you haven't objected, so I'm --

15           MS. ANGEL:  Well, if they want to spend their --

16           THE COURT:  But I'll --

17           MS. ANGEL:  -- seven hours asking the witness to

18   read policy, that's fine with us.

19           THE COURT:  Right.  Well, I don't want them to read

20   it, but the person needs to be familiar with it, so I'll

21   authorize --

22           MS. ANGEL:  Yeah.  I --

23           THE COURT:  -- some questioning on the general

24   policy for admin seg, okay.  So it -- it can't be -- is that

25   what you're calling isolation?

58

1                MR. SCIMONE:  Yes.

2                THE COURT:  Describe it.

3                MR. SCIMONE:  Well, so there's administrative

4     segregation and disciplinary segregation.

5                THE COURT:  Right.

6                MR. SCIMONE:  GEO's contention is that

7     administrative segregation is -- is what's -- is the only one

8     that's actually used or, actually, I think there's a --

9     there's a contention about what is used.

10               THE COURT:  I know, but I want you to describe it

11    and what it looks like in the facility.

12               MR. SCIMONE:  So there are two cell blocks right --

13    facing each other across the hall from one another.

14               THE COURT:  Okay.

15               MR. SCIMONE:  People are placed there alone.

16               THE COURT:  In a single cell?

17               MR. SCIMONE:  In a single cell.  In disciplinary

18    segregation, there are some additional -- more restrictions

19    on what people are allowed to do.  There's no television,

20    they're restricted in use of commissary items.  They have

21    only one hour of recreation per day.

22               In administrative segregation, they do have access

23    to a television, there are I think two hours of recreation

24    per day, they're allowed some use of commissary items,

25    including a radio.  So those are some of the substantive

1   differences between --

2           THE COURT:  But how -- in your --

3           MR. SCIMONE:  How are they used?

4           THE COURT:  In your understanding, what's a typical

5   sentence to segregation?

6           MR. SCIMONE:  So -- well, so disciplinary

7   segregation comes after a hearing.  Administrative

8   segregation is basically holding, but that's how it's used.

9           THE COURT:  Okay.  How long do they last?

10          MR. SCIMONE:  Generally, a few days.  A -- a day to

11  three days is my understanding of it.

12          THE COURT:  Okay.

13          MR. SCIMONE:  Administrative segregation.

14          THE COURT:  That's not too bad.

15          MR. SCIMONE:  That's for the jury to decide.

16          THE COURT:  I had a case I dealt with it where they

17  were in there for 17 years in a single cell all by

18  themselves, so -- so they -- it's not too bad.  I mean, I'm

19  just -- that's just a side comment.  It has nothing to do

20  with anything else, but -- all right.

21          So yeah, I mean, to the extent you believe or are

22  arguing that this segregation is a remarkable and onerous

23  discipline level, you can talk about what it is and their

24  policies that would land them in segregation, okay.

25          MR. SCIMONE:  That's pretty much it.

60

1               THE COURT:  All right.  What else?

2               MR. SCIMONE:  I -- I think that covers --

3               MS. ANGEL:  (Inaudible -- not speaking into mic).

4               THE COURT:  But you'll get a new notice.

5               MS. ANGEL:  Yeah, obviously we'll have a new notice

6    --

7               THE COURT:  Okay.

8               MS. SUAREZ:  -- and (inaudible) to the extent that

9    any are unresolved (inaudible)

10              THE COURT:  Right.  Now you had to travel today?

11              MS. ANGEL:  I'm -- we are local.

12              THE COURT:  You are local?  Okay, good.

13              All right.  So now that I'm on the case, it's going

14   to be -- well, maybe it was before, but certainly it will now

15   be actively managed, because it's old for goodness sakes.

16   It's over five years old.  So we got to get you guys some

17   kind of a decision as soon as we possibly can.

18              I assume Judge Kane doesn't have a trial date set?

19              MR. SCIMONE:  No.

20              THE COURT:  So what are -- are there any motions

21   that are pending?

22              MS. ANGEL:  Yes.  There's another issue about video

23   review of the Aurora facility site inspection that is not --

24              THE COURT:  Okay, but that's not a formal motion.

25   I don't see any formal motions pending.

61

1          MS. ANGEL:  That's in the --

2          MR. SCIMONE:  That is the one that was taken off,

3  but it -- but it was part of the 30(b)(6) motion.

4          THE COURT:  All right.  So the videotape, go ahead.

5          MS. ANGEL:  Plaintiffs requested to use videotape

6  at the Aurora site inspection.  That has not yet been

7  scheduled, so I'm just -- to happen in the future, just for

8  your reference.  ICE initially -- GEO had to consult with

9  ICE.  ICE initially said, No, it's not permitted.

10          Plaintiffs brought to our attention that FOX31

11  Denver had been permitted to use -- to bring videography and

12  video cameras on a media tour of the facility and asked that

13  we go back to ICE and ask if their position had changed in

14  light of the fact that other people had been given access to

15  use video in the -- in the -- the detention center.

16          And ICE came back and sent the letter, which I

17  believe was copied to the Court, but if not, I'm happy -- I

18  brought a copy for you saying that you -- plaintiffs can have

19  video access to the same extent that the media was granted

20  video access and they -- that's -- they want more than that.

21          And GEO's position is that we are, you know, bound

22  by what ICE dictates is of the parameters of where video can

23  be used, and it -- I think it's a fair balance of their

24  access -- their need to access information with the

25  legitimate safety and privacy concerns that ICE has

62

1    repeatedly advanced and explained.

2              So some video is allowed now, which was a

3    concession on ICE's part, and -- but they want more video

4    access.  So -- and I will let them explain the parameters of

5    what they think they're entitled to to you themselves, but if

6    you'd like, I can give you a copy of the letter that ICE

7    sent.

8              THE COURT:  I would like that.

9              MS. ANGEL:  Sure, I have it.  Just let me -- it's

10   in one of my multiple folders.  Just give me one second.

11             THE COURT:  I just like the name Carlin -- Colin

12   Barnacle, okay?  Can I just say that out loud?

13             MS. ANGEL:  Yes.  I'm sure you'll meet him in the

14   near future.

15             THE COURT:  No, I've met him.

16             MS. ANGEL:  Oh, you have?

17             THE COURT:  Yes.

18             MS. ANGEL:  Yes.

19             THE COURT:  You don't forget that kind of a name.

20             MS. ANGEL:  He's in a mediation at the moment or he

21   would be here as well.

22             THE COURT:  All right.

23             MS. ANGEL:  It's actually almost better than mine.

24   I usually get comments on mine.  My last name is Angel.

25             THE COURT:  I almost said something.

63

1            UNIDENTIFIED SPEAKER:  And Dana Eismeier

2    (inaudible).

3            THE COURT:  Oh, good.  I haven't talked to Dana for

4    a long time.  We had a very interesting bunch of clients

5    called the Cowgirls a long time ago.

6            UNIDENTIFIED SPEAKER:  That's the Women's

7    Professional Rodeo Association?

8            THE COURT:  Yes.  Women's Professional Rodeo

9    Association and he did well.

10           UNIDENTIFIED SPEAKER:  That's cool.

11           THE COURT:  I think he got $6,000,000 down in -- in

12   Colorado Springs in a lawsuit against the boys.

13           MS. ANGEL:  It's -- it's -- I don't know if it was

14   filed.  Oh, thank you.  (Inaudible).  It was -- they sent you

15   a copy, so I'm --

16           MR. SCIMONE:  I have it.

17           MS. ANGEL:  Do you need a copy of it?

18           MR. SCIMONE:  I think I have it.  Thank you.

19           THE COURT:  All right.  So my inclination -- well,

20   first, let me understand.  Do you -- is it your understanding

21   that your ability to authorize a video whatsoever is --

22   relies completely on the authority of the United States

23   Government?

24           MS. ANGEL:  Yes, that's my understanding.

25           THE COURT:  All right.  Do you disagree?

64

1          MR. SCIMONE:  Well, we -- they're contractually

2     obligated, we don't disagree with that --

3          THE COURT:  Okay.

4          MR. SCIMONE:  -- but we also think they're subject

5     to discovery.

6          THE COURT:  So my inclination is to authorize a

7     videotape as unobtrusive as possible of whatever you want to

8     look at, but it would be under a Level 2 restriction.  That's

9     -- well, it would be under a restriction that only attorneys

10    --

11         MR. SCIMONE:  Yes.

12         THE COURT:  -- on your side have access, because

13    there are legitimate penological and security reasons why a

14    videotape of that facility should never be disseminated

15    outside to people who potentially could be in there and have

16    nefarious intentions with regard to that.

17         I don't think you're going to find anybody who will

18    disagree with that on the federal judiciary.  You might.

19         MR. SCIMONE:  We have agreed to that already, Your

20    Honor.

21         THE COURT:  But that would be the restriction and,

22    therefore, any dissemination -- well, that would be a

23    contempt of court to let anybody other than attorneys.  And I

24    would also authorize GEO to present to you anybody who has

25    access to that video a signed form that acknowledges that

1    under oath.  So they could do that.

2         And then beyond that, if the videotape exists, you

3    could just require it to be destroyed at the end of this

4    proceeding and Judge Kane then would have the authority to

5    decide whatever use could be made of it, but before you ever

6    even attempted to submit it as part of any court filing, you

7    would have to get permission in advance.

8         Under those restrictions, I think it's something

9    that might be necessary for your case.  So that would be my

10   position.  Of course, the United States has the right to come

11   in and object and they could intervene solely for the purpose

12   of an objection which, you know, they can do.

13        MS. ANGEL:  Well, I just -- I want to make sure I

14   understand, Your Honor, because ICE is authorizing video and

15   -- and a lot of these conditions that you are astutely

16   picking up on have been agreed to, such as AEO and

17   designation, but -- so whether or not they can use video is

18   -- is not necessarily in -- contested at the moment.  It's

19   just their right to take video beyond the areas that ICE has

20   expressly said they could use it in.

21        THE COURT:  Right.

22        MS. ANGEL:  It's -- so that's what I want to just

23   make sure if -- if I understand.

24        THE COURT:  Right.  So my view is, the scope of

25   what they should be authorized to do in a federal -- what --

1     what laws do you bring your claim under, again?

2              MR. SCIMONE:  Trafficking Victim Protection Act.

3              THE COURT:  Okay.  Under a federal statute, in a

4     federal lawsuit, are broader than what the media should

5     generally be permitted.  Does that make sense?

6              MS. ANGEL:  Understood.

7              THE COURT:  Okay.  So it -- but it's still limited

8     to relevance.  So you can still only video -- take a video of

9     the areas within the facility that are relevant to your

10    claims and, therefore, I don't want a dispute to occur on the

11    day of.  So you will be required to -- and do you have a

12    schematic, a blueprint or anything of the facility?

13             MR. SCIMONE:  We have some -- we have a layout, but

14    we've agreed, I think, on the areas that we'll be allowed to

15    inspect.  It's just a question of whether we get to videotape

16    all of them.  So I don't think there's a disagreement about

17    the relevance of those areas.

18             THE COURT:  Okay.  So there's no disagreement on

19    what you can inspect?

20             MS. ANGEL:  Correct.

21             THE COURT:  You just want to have the videotape

22    commensurate with what you can expect?  You can come forward

23    if you want.

24             MS. SUAREZ:  So we've got DOJ here --

25             THE COURT:  Okay.

67

1          MS. SUAREZ:  -- so they might want to chime in.

2          THE COURT:  Yeah, that's fine.  Good morning, go

3    ahead and make your appearance.

4          MR. KELLEN:  Good morning, Judge.  Ian Kellen from

5    the US Attorney's Office.

6          THE COURT:  Nice to have you.

7          MR. KELLEN:  I'm just here on duty week.  Mr.

8    Javek has been dealing with this case, but --

9          THE COURT:  Understood.

10         MR. KELLEN:  -- he had the good fortune of being

11   out of town today.  And I just wanted to weigh in briefly, if

12   I could.  You know, we have been, I hope, trying to be

13   helpful to both sides in terms of moving this along.

14         THE COURT:  I think you would be, yeah.

15         MR. KELLEN:  And I will say, in terms of access,

16   that the access that you mentioned relative to the media, the

17   access that has already been agreed to was agreed to back in

18   June -- excuse me -- I believe is already far greater than

19   what the media tour encompassed.

20         THE COURT:  Well, then that was inconsistent with

21   what she said, because she said the authority granted was

22   commensurate with what the media --

23         MS. ANGEL:  Video.

24         MR. KELLEN:  The -- the video authority, excuse me.

25         THE COURT:  Yeah.  Yeah.

68

1          MR. KELLEN:  Yeah, no.  The access authority that,

2    I think, has been agreed to back since June is greater than

3    --

4          THE COURT:  Okay.  But we're not dealing with that,

5    we're dealing with video.

6          MR. KELLEN:  Right, right.  So just for the video,

7    I think that the -- the current -- what is on agreement from

8    ICE so far is as reflected in that letter.  I don't have

9    anything new to offer beyond that.

10          I mean, I would suggest that it might be good for

11    everyone to go in and take the all-access tour with pad and

12    pen and see what is to be seen and then go back and, you

13    know, everyone has access to all of the media footage, all of

14    the ICE footage, plus the schematics, plus, obviously, you

15    know, plaintiffs have access to their clients and then see

16    what -- you know, bump that up against the actual claims in

17    the case and see if there really is -- or if there really are

18    any pieces of evidence that are missing for which additional

19    video or still photos are needed which can be dealt with at

20    that time would be my respectful suggestion of how we might

21    proceed.

22          THE COURT:  Understood.  And if the plaintiffs want

23    to do that, that's fine.  They may save themselves some

24    trouble, but at least my order would be what I said.  So if

25    they -- if they persist in wanting to accept what I would

69

1    authorize, then you'll be permitted to file an objection on

2    the behalf of the Department of Justice --

3            MR. KELLEN:  Okay.

4            THE COURT:  -- and we would have to litigate that

5    independently and we'll do it fast, okay.  And, frankly,

6    Judge Kane may not refer that to me.  That may not be within

7    my -- he has the right in every case, in the first instance,

8    to have every motion, even if it's referred to me for

9    discovery.  So my -- my jurisdiction is derivative of

10   whatever he says I have.

11           Therefore, I understand and I agree that that

12   should be the process, but I'm not going to require it.  It's

13   just you guys proceed at your own risk if you -- if you don't

14   engage in that.  Does that make sense?

15           MR. SCIMONE:  I think so, Your Honor.

16           THE COURT:  Okay.  So, in other words, he's

17   offering you a process --

18           MR. SCIMONE:  Uh-huh.

19           THE COURT:  -- to -- to consider, and if you go

20   through that process first and still want to videotape more

21   broadly than what they want you to, then at least you've

22   cooperated with them as far as you possibly could, but my

23   order is you're allowed to videotape commensurate with your

24   authority to inspect --

25           MR. SCIMONE:  Okay.

70

```
 1            THE COURT:  -- under the conditions that I said,

 2   which is a -- a restriction on its use to Attorney's Eyes

 3   Only signed -- signed -- everybody who will have access to

 4   the video will have to sign whatever permission document that

 5   DOJ or the GEO Group drafts up that gives you notice of your

 6   obligations to not disseminate and that it's part of the

 7   court order and anybody with access to the video would have

 8   to sign that to make a record that, in fact, that they were

 9   aware of the order.

10            So that's -- that's what I think should happen.

11   Okay?

12            MR. SCIMONE:  Understood.

13            THE COURT:  Make sense?  Thank you.

14            MR. KELLEN:  And, Your Honor?  One additional

15   consideration that I would like you to consider is whether

16   the date and time of the inspection should be subject to some

17   level of confidentiality to preserve the integrity of what

18   the video is seeing such that members of the public or

19   detainees in the facility are not behaving differently than

20   they would on a normal day.

21            THE COURT:  I agree.  Sure, that's -- that's common

22   sense.  So it shouldn't be publicized to anybody outside of

23   litigation.  That's what you're saying?

24            MR. KELLEN:  Yeah.  And to -- to the extent that

25   certain of the class members have contacts with detainees who
```

1    are currently in the facility such that the date and time of

2    the inspection could be made known to those in the facility.

3                THE COURT:  Yeah.  So I'll order that again, that's

4    on an as-needed basis only -- and as far as I'm concerned,

5    only attorneys need to know, and you don't need to put it in

6    a document, you can agree orally if you want to so that it

7    wouldn't be disseminated.  Keep it as secret as -- as you

8    want.

9                MR. KELLEN:  Thank you, Your Honor.

10               THE COURT:  Okay?

11               MR. SCIMONE:  No objection.

12               MR. KELLEN:  Did you have a timeline in mind for

13   objection?  I don't -- we'll have to check with Mr. Javek.

14               THE COURT:  I would say -- when will you guys

15   expect the videotape to be made?  In -- in the next month?

16               MR. SCIMONE:  I think we're a little unsure because

17   there's also a background check that we have to go through

18   ICE and we've agreed to do that.  So I'm not quite sure how

19   long that process will take and the logistics, but --

20               MR. KELLEN:  Yeah.  My understanding is it takes a

21   little while, but I also understand that they haven't been --

22               THE COURT:  Okay.  I would say that if you could do

23   it at least 14 days prior to the date of the proposed

24   inspection?

25               MR. KELLEN:  Sure.  Have you guys submitted names

72

1    of attendees yet?

2              MR. SCIMONE:  Not yet.

3              MR. KELLEN:  Okay, that -- that's what will get

4    that process started.

5              MR. SCIMONE:  Sure.

6              MR. KELLEN:  The sooner you do that, the sooner --

7              THE COURT:  And when you -- if you would file an

8    objection --

9              MR. KELLEN:  Yep.

10             THE COURT:  -- you don't have to say in the factual

11   background that the videotape is going to be made on such and

12   such a date.

13             MR. KELLEN:  Sure, sure.

14             THE COURT:  You can just say it's anticipated that

15   they will be there within the next month.

16             MR. KELLEN:  Okay.

17             THE COURT:  I'll know what that codeword means.

18   Okay?

19             MR. KELLEN:  Okay.  Thank you, Your Honor.

20             THE COURT:  Thank you for your appearance.

21             MR. KELLEN:  You bet.

22             THE COURT:  What else can I do?

23             MR. SCIMONE:  So this may -- we may have to bring

24   Mr. Kellen back up.

25             So documents that have been submitted to ICE for

73

1   review, I think, is the other motion that has been pending.

2   This is an issue that's come up several times in this

3   litigation.  GEO originally wanted an order saying that they

4   didn't need to produce any documents, that we would have to

5   seek all of them directly through ICE.  Judge Kane rejected

6   that position.

7         THE COURT:  Well, they did need to produce any

8   documents even within their possession, custody and control?

9         MR. SCIMONE:  Yes.  And that -- we're past that now

10  --

11        THE COURT:  All right.

12        MR. SCIMONE:  -- but that was the original

13  position.

14        So -- but Judge Kane's order also said that ICE

15  review should not create an obstacle to discovery, it should

16  not delay discovery, and to the extent that GEO feels it

17  needs to run documents by ICE before producing them, GEO

18  should bare any inconvenience that results, not plaintiffs.

19        Now, practically speaking, if there's a reason to

20  submit documents to ICE, we understand that's going to hold

21  things up.  What it's actually become is a month's-long speed

22  bump that has delayed the production of documents that we

23  didn't know until relatively recently were being submitted.

24        And we understand -- at this point, we now have

25  those documents produced, so to be practical, looking ahead,

74

1   there's another court-ordered documents that we -- we

2   understand are going to be submitted to ICE for review.  And

3   the purpose of the review, as I understand it, is to

4   determine whether to assert a privilege; governmental

5   privilege, law enforcement privilege or deliberative process.

6           THE COURT:  There's all kinds of them.

7           MR. SCIMONE:  Sure.  We just want to be sure that

8   we can get discovery done in a reasonable timeframe, and that

9   if those privileges really are going to be asserted, that we

10  can deal with them quickly, practically speaking.

11          THE COURT:  Well, have privileges been asserted to

12  date?

13          MR. SCIMONE:  No.

14          THE COURT:  Okay.  Well, now they have a track

15  record.

16          MR. SCIMONE:  So I -- and practically speaking, I

17  don't see these really coming up, Your Honor, but I -- we

18  don't want to be in a position where there's an assertion

19  that deliberative process shields documents from discovery

20  that we think are squarely at issue in the case, such as the

21  privilege should be invaded.  That would most likely be our

22  position.

23          THE COURT:  Do you have a protective order in the

24  case already?

25          MR. SCIMONE:  Yes.

75

 1          THE COURT:  Okay.

 2          MR. SCIMONE:  And that -- and that that would

 3   become something that we would end up dealing with in the

 4   last weeks of discovery and that there's a trove of documents

 5   that we end up getting that we then need to take depositions

 6   on.  So we just want to get this production, I think, moved

 7   along so that we can proceed.

 8          THE COURT:  Well, I understand.  I -- it's not my

 9   inclination, as a general matter, to assert the federal

10   judiciary's authority to move everything at the top of my

11   line -- to the top of the pile because they have a big pile;

12   but in light of what you said about Judge Kane, it's clear

13   that he did not want a review by the government to add months

14   to the production.  That -- I would interpret it that way if

15   that's what he said.

16          MS. ANGEL:  They did it very quickly, Your Honor.

17          THE COURT:  Yeah.

18          MS. ANGEL:  They -- they went through 4500

19   documents in about a month.  We got it to them, and I

20   understand that there was some delay on our end in getting

21   the documents that ICE needed to review to ICE, and it was

22   through no fault of ICE.  I think it was one of those things

23   that --

24          THE COURT:  That won't happen again, right?

25          MS. ANGEL:  It won't happen again.  I can't

76

1    necessarily speak --

2            THE COURT:  There you go.

3            MS. ANGEL:  -- to how it was handled by prior

4    counsel, but --

5            THE COURT:  Sure.  Well that's water under the

6    bridge, but --

7            MS. ANGEL:  -- we got it -- as soon as we took the

8    case, we got the documents to ICE, they reviewed it very

9    quickly and we thanked them for that and now the issue is

10   pretty much moot.  We've been producing documents.

11           THE COURT:  Well, he just doesn't want -- he's just

12   trying to fend off any --

13           MS. ANGEL:  Well, the position they took is that

14   ICE didn't have the right to review these documents and we

15   disputed that in the -- which is the motions that are before

16   you.  We said that, you know, that Judge Kane's prior June

17   6th order about Touhy's inapplicability doesn't review ICE's

18   -- doesn't prohibit or remove ICE's ability to review and

19   assert privilege.

20           THE COURT:  I don't think he asserted that and I'm

21   going to not interfere with the United States Government's

22   desire to look at documents before they go out --

23           MS. ANGEL:  Thank you.

24           THE COURT:  -- and on -- based on your assurance

25   that it's going to be done very quickly and I'm sure you'll

77

1  say the same thing.  Your problem has been noted of record,

2  and if you think that it's taking too long, I'm available on

3  a moment's notice.

4          MR. SCIMONE:  I -- I think, Your Honor, the only --

5  the reason this issue still is live is because, as I

6  understand it, there's another 1200 documents that were

7  identified a long time ago that still have not been submitted

8  to ICE for review.  I may be wrong about that.

9          MS. ANGEL:  And, Your Honor, there was a request

10  from opposing counsel to do an analysis of documents.  Some

11  of those documents -- it was a body of 1200 documents.  Some

12  of them have been produced already, some of them are not

13  responsive to their request.  There's a very small number of

14  those that need to be submitted to ICE and those will be

15  submitted in the next few days.

16          THE COURT:  By Monday?

17          MS. ANGEL:  Yes.

18          THE COURT:  Okay.

19          MR. SCIMONE:  Okay, news to me.  I was just going

20  to say that, as far as I know, there was nothing more to be

21  or that will be submitted and that everything that has been

22  submitted has been reviewed.

23          And then just one note.  My understanding is that

24  the review that's being conducted, sure, it's for law

25  enforcement and delivered, perhaps, and that sort of thing,

78

1    but the main thing is for the statutory prohibitions on

2    disclosure of things that even with a productive order in

3    place, can't disclose.

4              THE COURT:  What's that example?

5              MR. SCIMONE:  It's -- I don't know, you guys may

6    know better than I.  It's something to deal with --

7              THE COURT:  And what -- what statute are you on?

8              MS. ANGEL:  (Inaudible).

9              MR. SCIMONE:  If -- if somebody's seeking

10   protection under the Violence Against Women Act.

11             MS. ANGEL:  Yeah.

12             THE COURT:  (Inaudible).

13             MR. SCIMONE:  Yeah.  Most of those documents would

14   not be responsive and I think would have been screened out on

15   a responsiveness review.

16             THE COURT:  Okay.  Yeah, I don't see any dispute

17   here, so --

18             MR. SCIMONE:  Okay, great.

19             THE COURT:  All right.  Anything else from you

20   guys?

21             MR. SCIMONE:  Your Honor, I mean, we have a few

22   other, I think, small issues that the parties have been

23   meeting and conferring about.  We'd just like to be sure that

24   they don't bubble up into another dispute and I think --

25             THE COURT:  Okay, make it quick.  We're all hungry.

```
1              MR. SCIMONE:  I'm sorry?

2              THE COURT:  I said, make it quick, we're all

3    hungry.

4              MR. SCIMONE:  Okay.  So there's this dispute again.

5    This -- this relates, I think, to an issue we talked about

6    earlier.  Documents sufficient to show the wage rates paid to

7    detainees at other facilities.  We talked about how this

8    relates to the derivative sovereign immunity defense.  We

9    think it's relevant.  GEO disagrees.  It's document

10   sufficient to show, it's a targeted request.  We just want to

11   know if people are being paid more than $1 a day at other

12   facilities.  That's a document request.  It's out there.

13   Hasn't yet been resolved.

14             THE COURT:  So that's --

15             MR. SCIMONE:  Section II(1) -- roman numeral II,

16   sub-issue (1) in the status report.

17             THE COURT:  Plaintiffs have requested documents

18   sufficient to show wage rates at facilities other than

19   Aurora, relevance -- we've already talked about that general

20   topic, but can -- can't you just -- how many facilities does

21   GEO operate?

22             MS. ANGEL:  I don't know the number off the top of

23   my head.

24             THE COURT:  Okay.  And within a particular

25   facility, is the wage rate uniform among everybody?
```

80

1          MS. ANGEL:  It is my understanding that it is, Your

2    Honor.

3          THE COURT:  Okay.  So then that's -- there's no

4    burden involved.  It's just relevance, I think.  And if you

5    are objecting at all -- are you objecting?

6          MS. ANGEL:  Yes.  We --

7          THE COURT:  Okay.

8          MS. ANGEL:  And again, it was a -- we went through

9    our direct (inaudible - not speaking into mic).

10         THE COURT:  Right.

11         MS. ANGEL:  (Inaudible) I think it doesn't affect,

12   you know --

13         THE COURT:  Okay, I understand.  So all -- all I

14   would require you to produce -- I think you're looking at

15   historical, not current, right?

16         MR. SCIMONE:  That's -- yes.

17         THE COURT:  Okay.  So all I would require you to do

18   is if you have the information -- has GEO had the contract

19   for that long?  All the way back to '04?

20         MS. ANGEL:  Yes.

21         THE COURT:  Okay.  So just produce a document --

22   you can create one if you want -- that shows the wage rates

23   at the facilities for the dates between '04 and '04 -- and

24   '14.

25         MS. ANGEL:  In all facilities?

81

1               THE COURT:  Well, you said there's only 15 or 20.

2               MS. ANGEL:  Yes, but of -- but all of them?

3               THE COURT:  Yeah.

4               MR. SCIMONE:  Thank you, Your Honor, that's it.

5               Section 2 -- Number 2 is somewhat related.  This is

6      a --

7               MS. ANGEL:  Can I clarify?

8               THE COURT:  Yes.

9               MS. ANGEL:  This is at the facilities operating

10     under ICE contracts?  There are --

11              MR. SCIMONE:  Yes.

12              MS. ANGEL:  -- GEO facilities that are not --

13              THE COURT:  Well, yeah.

14              MR. SCIMONE:  That's all we're seeking.

15              MS. ANGEL:  -- ICE contract.

16              THE COURT:  Yeah.

17              MS. ANGEL:  Okay.

18              THE COURT:  Good.

19              MR. SCIMONE:  We've requested documents showing --

20     regarding compliance with ICE requirements at other GEO

21     facilities, so these are essentially audit findings related

22     to the specific programs at issue here, Sanitation policy and

23     the $1 a day program.  So if there's an audit that said, Wait

24     a minute, the scope of the housekeeping here is not in

25     compliance with the PBNDS at a different facility and that's

1    the same scope that's being applied at our facility, we think

2    that that's relevant.

3                THE COURT:  Okay.  I agree with the defense on

4    that.

5                MS. ANGEL:  Thank you.  Nevermind.

6                MR. SCIMONE:  With defense?

7                THE COURT:  Yeah.

8                MR. SCIMONE:  Okay.

9                THE COURT:  I mean, we're -- the wage rate, I can

10   see.  I don't see that part.  That seems like a fairly

11   facility specific issue, so.

12               MS. ANGEL:  And burdensome.

13               MR. SCIMONE:  Well, what we're saying, Your Honor,

14   is -- so for example, if -- if ICE says at the Adelanto in

15   the California facility, you're not allowed to make people

16   work outside of the four items that are specified in the

17   PBNDS, which is what our contention is, and ICE knew that

18   during the time period because of something that happened in

19   Adelanto and continued to do that at Aurora because it's the

20   same scope, effectively -- it's not -- it's not cite

21   specific -- we think that that communication would relate to

22   the derivative sovereign immunity defense.

23               THE COURT:  And do you believe that any such

24   documents exist?

25               MS. ANGEL:  Not to my knowledge.  And, again, the

83

1    -- they -- they are impacted by local policies, which ICE has

2    approved.  So ICE is not going to be saying that you can do

3    it there and not here or vice-versa.

4           THE COURT:  Yeah, I agree that --

5           MR. SCIMONE:  (Inaudible) different.

6           MS. ANGEL:  Yeah.

7           THE COURT:  Right.  And again, I think that's so

8    facility -- facility specific that I'll -- as opposed to

9    wages, that I will -- I agree with the defense on that.  What

10   else?

11          MS. ANGEL:  Thank you.

12          MR. SCIMONE:  There's a specific document, Your

13   Honor.  This is a -- there's a Union dispute related to

14   whether -- to a janitor supervising detainees working in the

15   program, essentially, whether or not they were doing

16   bargaining unit work, as I understand it.  We think that's

17   relevant to the questions about whether or not detainees are

18   doing essential functions in the facility.

19          THE COURT:  So whether VWP workers are doing work

20   that would be within the scope of a Union contract?

21          MR. SCIMONE:  Right.

22          THE COURT:  That sounds relevant and it's a single

23   document?

24          MR. SCIMONE:  Yes.

25          MS. ANGEL:  Yeah, I mean, it's just -- it's just

84

1    not a relevant document.  We have it here, you can look at

2    it, it doesn't -- you can look at it in camera.

3              THE COURT:  Okay.

4              MS. ANGEL:  You can take a look at it.  It's just

5    not a relevant document is all.  It's -- it's not like trying

6    to hide the ball or --

7              THE COURT:  I understand.  It seems close enough.

8    I'll authorize production of that.  What else?

9              MS. ANGEL:  (Inaudible).

10             MR. SCIMONE:  And then the last one, Your Honor, is

11   just a work product question.  There were documents reviewed

12   by two witnesses that we deposed.  We called for production

13   of the documents.  They reviewed to prepare for the

14   deposition, there was a work product objection to that.  The

15   argument being, I think, that the selection of documents

16   would --

17             THE COURT:  And I understand -- I mean, maybe -- I

18   haven't dealt with this issue, maybe, since I was a lawyer,

19   but I understand that a questioning attorney is entitled to

20   look at whatever the witness looked at unless the document

21   itself was privileged, but the assembly would not be.  So do

22   you have a different view?

23             MS. ANGEL:  Yes.

24             THE COURT:  Okay.  Is it based on case law?

25             MS. ANGEL:  Yes, actually, which I -- let's see, I

85

1    thought I had it here.  This I can -- happy to put in

2    writing.  It could be a short letter, but we did -- I did

3    look into the case law and, essentially, there are some that

4    go both ways.

5            If I'm being frank, there are cases that require it

6    to be disclosed, there are cases that say there are -- you

7    know, it is the attorney's mental impressions and reflect

8    their opinions on how to use the documents relating to the

9    issues in their case.

10            THE COURT:  Anything by Judge Kane?

11            MS. ANGEL:  Not that I've seen, but I can do a

12    deeper search.

13            THE COURT:  Anything by Judge Kane?

14            MR. SCIMONE:  Not that I've seen, Your Honor.

15            THE COURT:  Okay.  I mean, whether it's privileged

16    or not, I never found it very useful, but what do you think

17    you can gain from that?

18            MR. SCIMONE:  Well, it -- it would show us what the

19    witness was -- he understood and -- and knew going into the

20    deposition.  It's an --

21            THE COURT:  No, it wouldn't.  It would show you

22    what they looked at.

23            MR. SCIMONE:  Sure.

24            MS. ANGEL:  And this is attorney's --

25            MR. SCIMONE:  And -- and to the extent that that

86

1    sheds light on -- on areas that were within their knowledge,

2    it would save us some time at the deposition, frankly.  I

3    understand at least one or two of these documents are

4    documents that may not have been produced in discovery, but

5    were --

6              MS. ANGEL:  Wait.  To the extent that you're saying

7    it would save you time.  The deposition is over.  So I don't

8    --

9              THE COURT:  Well, no.  I -- I think you're talking

10   about prospective?

11             MR. SCIMONE:  Yeah, I think prospective is more

12   important at this point.

13             MS. ANGEL:  Well, but --

14             THE COURT:  Yeah, I'm not going to authorize

15   another deposition just because you didn't get a chance to

16   look at the documents, but he's talking about prospectively.

17             MS. ANGEL:  And again, the very specific reason

18   that he wants these documents underscores why they are

19   protected as attorney work product, because he's saying I

20   want to know what the -- what opposing counsel showed them

21   because it would shed light on the areas that they think are

22   important and that itself is --

23             MR. SCIMONE:  No.

24             THE COURT:  Well, no.  I think there's also the

25   argument that it would disclose the limits of the information

1    that the witness looked at and was educated on and --

2            MS. ANGEL:  Well, there wasn't --

3            THE COURT:  -- there might be areas that they

4    weren't educated on and now they can answer the questions

5    because they really weren't prepped.  That's sort of what I

6    would view it, but why don't you go ahead and, if you can, by

7    let's say close of business Tuesday --

8            MS. ANGEL:  Sure.

9            THE COURT:  -- just e-mail in a short summary of

10   your positions and I'll e-mail back what my ruling is.  Okay?

11           MS. ANGEL:  Sure.  Thank you.  Do you want that in

12   motion form, letter form?

13           THE COURT:  No, no, no.

14           MS. ANGEL:  Just like in an actual e-mail?

15           THE COURT:  Just a -- yeah, just --

16           MS. ANGEL:  Okay.

17           THE COURT:  -- you can give me cases and --

18           MS. ANGEL:  Sure.

19           THE COURT:  -- brief summaries, no more than like

20   three pages --

21           MS. ANGEL:  Okay.

22           THE COURT:  -- and you guys can do the same.  Okay?

23           MR. SCIMONE:  Sure.  Thank you, Your Honor.

24           THE COURT:  All right.

25           MR. SCIMONE:  And then I think scheduling is the

88

1    last matter.

2              THE COURT:  Go ahead.

3              MR. SCIMONE:  So we -- we want to get the discovery

4    -- remaining discovery done, but we want to get it done in a

5    relatively -- relatively tight time frame.  The case has

6    essentially been pending --

7              THE COURT:  Well, when -- when is your discovery

8    deadline?

9              MR. SCIMONE:  It's currently set at, I think,

10   November 21st?

11             MS. ANGEL:  Okay, we just bumped it.

12             MR. SCIMONE:  Current cutout -- cutoff that we just

13   requested, but we --

14             THE COURT:  Okay.

15             MR. SCIMONE:  I think both sides want to take some

16   additional discovery.  I think that we both agree that it

17   will take a bit more time.  You know, so we want to just

18   confer back how much time we think it's going to take to get

19   that done.

20             I think, you know, generally speaking, we -- so

21   looking ahead, I think the documents can all be produced

22   probably within the next one to two weeks.  I don't see any

23   reason why that -- just being given what I know about the

24   number that are out there and -- and I don't know if you

25   could tell me --

89

1          MS. ANGEL:  Well, you just propounded new requests

2    on us post-depositions, which is in the past --

3          MR. SCIMONE:  Oh.

4          MS. ANGEL:  Your -- your document requests, is that

5    what you're talking about?  Our ability to produce documents

6    to you, is that what you're asking about?

7          MR. SCIMONE:  Yeah.  No --

8          MS. ANGEL:  Oh.

9          MR. SCIMONE:  -- those were specific documents that

10   were called --

11         MS. ANGEL:  Well, they -- they weren't necessarily

12   as specific as, Can you produce this one thing.  It was, Can

13   you produce all -- this set of working papers and it's

14   actually not as straight forward as -- all I'm saying is --

15         THE COURT:  Okay.

16         MS. ANGEL:  -- I don't know that the one to two --

17   I don't want to commit to the one to two weeks because some

18   of it requires searching for handwritten documents, which

19   again brings up the issue of whether they're OCI searchable,

20   and I don't want to then be late if it takes longer than two

21   weeks.  I can't make that representation.

22         THE COURT:  What's Judge Kane's next deadline

23   besides discovery?  I assume dispositive motions?

24         MR. SCIMONE:  There is also expert discovery after

25   the fact discovery.

90

1            THE COURT:  Okay, but does he have a pretrial

2     conference set?

3            MR. SCIMONE:  No.

4            THE COURT:  Okay.  So when does expert discovery

5     cease?

6            MR. SCIMONE:  It's, I think, an additional 45 day

7     -- I'm --

8            MS. ANGEL:  I don't have the order in front of me,

9     I'm sorry.

10           THE COURT:  Okay.  Well, I'm going to make your

11    discovery deadline coterminous with your expert deadline, so

12    you can have fact discovery up to the end of the expert

13    discovery.  Okay?

14           MS. ANGEL:  We -- we might wind up needing longer

15    than that, Your Honor, because we have -- we have noticed

16    depositions of the plaintiffs.  They are all spread out.

17    There is one that is in Honduras and, at plaintiff's

18    counsels' request, they asked that we issue a subpoena to

19    help her facilitate entry into the United States.  Not sure

20    when that is going to occur, but we did issue the subpoena.

21    There's one in Colorado, which is obviously easier to

22    schedule.  There's another one in Alabama, I believe it -- it

23    was the facility where this -- so they require some travel

24    and the -- and the plaintiff depositions haven't happened

25    yet.

91

1          Plaintiffs have also indicated that they might want

2    to take additional fact witness depositions.  They sent us an

3    interrogatory on the more recent side where they asked us to

4    give them employment status of 242 individuals and -- which

5    we did, recently.  It took a little bit to compile, but we

6    got that over to them.  And they've since indicated that they

7    may or may not want to depose some people on that list.  We

8    don't know how many or when --

9          THE COURT:  Okay, well, hold on.  So your

10   dispositive motion deadline is April 20th.  Do you have a

11   problem with April 20 also being the discovery deadline?

12         MR. SCIMONE:  I think that's fine.

13         THE COURT:  That's -- that's huge.  I mean, that's

14   --

15         MS. ANGEL:  I think that's okay.  That's fine.

16         MR. SCIMONE:  That's far than we need, Your Honor.

17         THE COURT:  All right.

18         MR. SCIMONE:  I think we would like it to be done

19   sooner.  I think -- I -- I think --

20         THE COURT:  Well, no, no, no.  So there's no

21   purpose of being done sooner.  If I keep the dispositive

22   motion deadline, it's not delaying the case whatsoever to

23   have it equal to the discovery deadline.  It just -- you

24   know, most people like 30 days' separation between those, but

25   otherwise your case is on the exact track it would otherwise

92

1    be, because the final pretrial is going to be driven by

2    dispositive motions, trial is going to be driven by final

3    pretrial and so it's not going to delay the case at all.

4            MR. SCIMONE:  I -- I think, Your Honor, it'll --

5    it'll make for a more orderly discovery process if we

6    continue with it -- with fact witness discovery -- fact

7    discovery completed -- being completed first before expert

8    discovery and then a period of expert discovery, and I think

9    that we want to just be sure that we're done with the fact

10   witness discovery, because much of the expert testimony is

11   going to relate to the facts.  If facts are still unfolding

12   as we're dealing with experts, I think it's going to be

13   messy, to put it --

14           THE COURT:  This case is messy already, sorry.

15           MR. SCIMONE:  I -- I know.

16           THE COURT:  That ship has sailed.

17           MS. ANGEL:  Also, the extent to which discovery

18   gets wrapped up quickly or not is -- seems more dependent on

19   your side at the moment, which is when we --

20           THE COURT:  Yeah, so I agree.  I mean, you're in

21   charge of your own destiny in that regard, so if you want to

22   complete discovery in the next 45 days and then file your own

23   motion -- are you going to file a motion on summary judgment

24   on liability and then file your own motion, you could do that

25   this year.  You don't have to wait at all.

93

 1            So all I'm doing is giving the outside deadline,

 2      because I don't want to see you guys again asking for an

 3      extension, and since Judge Kane has a dispositive motion

 4      deadline of, unfortunately, 4/20, which was an interesting

 5      date, obviously, you guys can conduct discovery up to that

 6      time as far as I'm concerned.

 7            MS. ANGEL:  Thank you.

 8            THE COURT:  Okay?  But you don't have to.  You can

 9      do it as soon as you want.  What else?

10            MR. SCIMONE:  I just want make sure it doesn't drag

11      on, Your Honor.

12            THE COURT:  What?

13            MR. SCIMONE:  If we have -- if we have another six

14      months, I'm -- experience suggests it will -- it will take

15      six months to get everything.

16            THE COURT:  Well, my experience is that when you

17      have the United States Government involved on whether you can

18      have certain things and not certain things, that delay is

19      going to be built in anyway.  So I would --

20            MR. SCIMONE:  We're trying to minimize that.

21            THE COURT:  -- encourage you not to rely on the

22      fact that it's 4/20, but just assume that it's as soon as

23      possible and, you know, do whatever you need to do.  But if

24      you think they're delaying and they've had late discovery

25      requests, then that's something that I will not appreciate.

94

1          I mean, this doesn't give you carte blanche again

2    to just wait.  I want you to be timely with your discovery,

3    and if they give you discovery requests that could have been

4    easily made months earlier, I'll strike it.  Okay?

5          MR. SCIMONE:  I -- the one thing we've been talking

6    about, Your Honor, is the stipulation about -- to -- to sort

7    out the issue of -- of depositions and trial witnesses and to

8    be sure that they get done.  And I think we can probably

9    stipulate to the timing of that and it may be done, I think,

10   far sooner than April 20th.

11         So I think we -- if we continue with that, we may

12   end up stipulating to a shorter discovery -- discovery time

13   frame and I -- I think it would be helpful if that's done for

14   us to close discovery at that point, you know, if -- if the

15   parties are in agreement that it's been completed.  So --

16         THE COURT:  Well, when it's completed, it's

17   completed, regardless of the deadline.

18         MS. ANGEL:  You can file motions before the

19   deadline.

20         THE COURT:  Right.  I don't understand -- I don't

21   understand where you're going.  Once you're completed with

22   discovery, discovery is completed --

23         MR. SCIMONE:  Uh-huh.

24         THE COURT:  -- even if the deadline is beyond that.

25   You can file dispositive motions whenever they're ready.

95

1           MR. SCIMONE:  Uh-huh.

2           THE COURT:  So I'm -- all I'm doing is making sure

3      you don't ask for another extension --

4           MR. SCIMONE:  I had no --

5           THE COURT:  But otherwise, I mean, with the

6      dispositive motion deadline not being changed, and that's his

7      deadline, not mine, so it's not going to be changed, you're

8      on course for whatever course you're on.  Does that make

9      sense?

10          MR. SCIMONE:  I think so, Your Honor.  We just want

11     to get to the finish line in this case and --

12          THE COURT:  Right.

13          MR. SCIMONE:  -- would like it.

14          THE COURT:  Understood.  Anything further from the

15     plaintiffs?

16          MR. SCIMONE:  No, Your Honor.  I don't think so.

17          THE COURT:  How about from you guys?

18          MS. ANGEL:  Not at this time.

19          THE COURT:  All right.  Good working with you.

20          MS. ANGEL:  Thank you.

21          THE COURT:  Let's get this thing going and tried

22     and --

23          MR. SCIMONE:  One -- one other matter, Your Honor,

24     and maybe this is outside the discovery -- the status

25     conference, but we did mention settlement and I don't know if

96

 1  that's something that we should maybe discuss off --

 2          THE COURT:  Well, we have new counsel.  I don't

 3  remember these guys the last time I tried to settle the case.

 4          MS. ANGEL:  We were not here at that time.

 5          THE COURT:  So --

 6          MS. ANGEL:  That was probably several counsels ago.

 7          THE COURT:  You know, it wouldn't be my first big

 8  class case I've settled recently, right?  Huh?  So it's up to

 9  you guys.  I mean, Judge Kane referred it for that purpose.

10  That's up to me.  I don't have to confer with him anymore, so

11  you know, let's party.

12          MR. SCIMONE:  Yeah.  And we -- so we have been --

13  we had at one point been having settlement discussions with

14  prior counsel and had a fairly substantive proposal.  I mean,

15  I think the ball is in defendant's court.  You know, we

16  haven't heard anything since the change in counsel,

17  substantively, other than a generalized, We're open to

18  settlement, but -- but no counter or -- or response to that

19  and --

20          THE COURT:  I think a response would be good.

21  Could you do that maybe in the next two to three weeks?

22          MS. ANGEL:  Sure.

23          THE COURT:  Do you know what he's referring to?

24          MS. ANGEL:  It would be helpful -- I was going to

25  say, I know that there were settlement discussions going on,

97

1    but it would be helpful if you could reiterate where you

2    think they left off.

3              THE COURT:  Send them a letter --

4              MS. ANGEL:  Exactly, and then we can respond.

5              THE COURT:  -- and refresh them.  And then I'm --

6              MS. ANGEL:  When we took over, there were discovery

7    issues left and right, so we --

8              THE COURT:  No, I understand.

9              MS. ANGEL:  -- put out a lot of fires, and now that

10   things have kind of been wrapped up, we can probably get into

11   more substantive talks like that.  So if you send a letter,

12   we'll definitely take a look at --

13             THE COURT:  They'll respond within two weeks of any

14   letter that you send, okay?

15             MR. SCIMONE:  Okay.

16             MS. ANGEL:  There you go.

17             THE COURT:  All right.  You guys good?  I'll see

18   you next week.  Friday?  Is that next Friday?

19             MR. SCIMONE:  First a scheduling conference, then a

20   settlement conference.

21             THE COURT:  Right.  Is that next Friday?

22             MR. SCIMONE:  The scheduling conference is --

23             THE COURT:  No.  When's the settlement conference?

24             MR. SCIMONE:  Friday.  But we didn't need to talk

25   at the scheduling conference if the other (inaudible).

98

1           THE COURT:  Oh, okay, understood.

2           MR. SCIMONE:  (Inaudible).

3           THE COURT:  You did?

4           MR. SCIMONE:  I hope that you didn't. (Inaudible).

5           THE COURT:  I didn't, no.  Government -- you just

6    go on the website and the government gives you whatever you

7    want, unfortunately.  Let's print some more money, you know?

8    Okay.  We'll put in an order to Treasury on that one.  Yeah,

9    it's not a big deal and I'd probably drive over.  I don't

10   know if you -- are you flying or driving?

11          MR. SCIMONE:  No, I'm driving.

12          THE COURT:  Okay.  Okay, thank you, guys.  You know

13   where I am if you need me.  Thank you back there from our

14   local U.S. Attorney's Office.  Have a nice weekend, okay.

15          (Whereupon, the within hearing was then in

16   conclusion at 12:22 p.m.)

17

18

19

20

21

22

23

24

25

99

```
 1                    TRANSCRIBER'S CERTIFICATION

 2    I certify that the foregoing is a correct transcript to the

 3    best of my ability to hear and understand the audio recording

 4    and based on the quality of the audio recording from the

 5    above-entitled matter.

 6

 7    /s/ Dyann Labo                      October 24, 2019

 8    Signature of Transcriber                   Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```