# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02887 JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA
on their own behalf and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR DECERTIFICATION

---

## **TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................... 1

II.     FACTUAL BACKGROUND ...................................................................... 2

    A.    The Housing Unit Sanitation Policy Exists. ................................... 2

    B.    The Housing Unit Sanitation Policy Was Enforced. ...................... 8

    C.    Detainees Experienced Uniform Conditions of Confinement. ....... 15

    D.    The Toxic Effects of Solitary Confinement Are Widely Recognized. ....... 18

III.    PROCEDURAL HISTORY ...................................................................... 21

IV.     ARGUMENT ........................................................................................... 23

    A.    Legal Standard ............................................................................... 23

        1.    Decertification ...................................................................... 23

        2.    Trafficking Victims' Protection Act .................................... 25

            i.    Both Precedent and the Plain Language of the Statute Support the Conclusion that Causation Under the TVPA Is Subject to a Reasonable-Person Standard. ........................ 27

            ii.   Analysis Under the TVPA Must Consider the Totality of Plaintiffs' Circumstances. ...................................................... 32

    B.    Plaintiffs' Claims Are Well-Suited to Classwide Adjudication. ................. 33

        1.    Discovery Has Not Altered the Existence of GEO's Uniform Sanitation Policy. .............................................................. 33

            i.    The HUSP, As Laid Out in the Detainee Handbook, Constitutes a Uniform Policy. ............................................... 34

        2.    GEO's Uniform Policy Compelled Class Members to Work. ......... 39

        3.    Serious Harm Under the TVPA Is Well-Suited to Classwide Adjudication. ................................................................... 46

        4.    GEO Was Well Aware of the HUSP and its Consequences. ........... 51

        5.    The Distinction Between HUSP and Other Cleaning Tasks Is Clear. ................................................................................. 52

        6.    The TVPA's Statute of Limitations Does Not Impact Class Certification. ........................................................................ 54

       7.     GEO Has Disciplinary Segregation for Female Detainees. ............. 54

V.     CONCLUSION .......................................................................................... 55

# <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                 **PAGE(S)**

*Adamson v. Bowen*,
    855 F.2d 668 (10th Cir. 1988) ............................................................................... 45

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ............................................................................................. 24

*Barrientos v. CoreCivic, Inc.*,
    951 F.3d 1269 (11th Cir. 2020) ........................................................................... 26

*CGC Holding Co., LLC v. Broad & Cassel*,
    773 F.3d 1076 (10th Cir. 2014) ........................................................................... 23

*Copeland v. C.A.A.I.R., Inc.*,
    No. 17 Civ. 564, 2019 WL 4307125 (N.D. Okla. Sept. 11, 2019) ................................ 32

*David v. Signal Int'l, LLC*,
    No. 08 Civ. 1220, 2012 WL 10759668 (E.D. La. Jan. 4, 2012) .................................. 44

*DG ex rel. Stricklin v. Devaughn*,
    594 F.3d 1188 (10th Cir. 2010) ...................................................................... 24, 43

*Francis v. APEX USA, Inc.*,
    406 F. Supp. 3d 1206 (W.D. Okla. 2019) ................................................................ *passim*

*Gortat v. Capala Bros.*,
    No. 07 Civ. 3629, 2012 WL 1116495 (E.D.N.Y. Apr. 3, 2012) .................................. 24

*In re Integra Realty Res., Inc.*,
    354 F.3d 1246 (10th Cir. 2004) ........................................................................... 24

*Martinez-Rodriguez v. Giles*,
    391 F. Supp. 3d 985 (D. Idaho 2019) ................................................................... 49

*Mednick v. Precor, Inc.*,
    320 F.R.D. 140 (N.D. Ill. 2017) .......................................................................... 48

*Menocal v. GEO Grp., Inc.*,
    320 F.R.D. 258 (D. Colo. 2017) ......................................................................... *passim*

*Menocal v. GEO Grp., Inc.*,
    882 F.3d 905 (10th Cir. 2018) ........................................................................... *passim*

iv

*Morris v. Davita Healthcare Partners, Inc.*,
    308 F.R.D. 360 (D. Colo. 2015)........................................................................43

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017)...................................................................33, 50

*New York State Nurses Association v. Albany Medical Center*,
    No. 19 Civ. 1265, 2020 WL 4001056 (N.D.N.Y. July 15, 2020)...................28

*Novoa v. GEO Grp., Inc.*,
    No. 17 Civ. 2514, 2019 WL 7195331 (C.D. Cal. Nov. 26, 2019)............29, 45, 53

*Owino v. CoreCivic, Inc.*,
    No. 17 Civ. 1112, 2020 WL 1550218 (S.D. Cal. Apr. 1, 2020)..........28, 31, 39, 48

*Paguirigan v. Prompt Nursing Emp't Agency LLC*,
    No. 17 Civ. 1302, 2018 WL 4347799 (E.D.N.Y. Sept. 12, 2018)........................*passim*

*Paguirigan v. Prompt Nursing Emp't Agency LLC*,
    No. 17 Civ. 1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019)...................35

*Rosas v. Sarbanand Farms, LLC*,
    329 F.R.D. 671 (W.D. Wash. 2018).......................................................29, 48

*Strauch v. Computer Scis. Corp.*,
    No. 14 Civ. 956, 2017 WL 5972886 (D. Conn. Nov. 30, 2017)...................45

*Tanedo v. E. Baton Rouge Parish Sch. Bd.*,
    2011 WL 7095434 (C.D. Cal. Dec. 12, 2011) ...........................................29

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ........................................................................44, 46, 47

*United States v. Bradley*,
    390 F.3d 145 (1st Cir. 2004) ...............................................................25, 26, 35

*United States v. Calimlim*,
    538 F.3d 706 (7th Cir. 2008)...............................................................27, 49

*United States v. Callahan*,
    801 F.3d 606 (6th Cir. 2015)...............................................................26

*United States v. Dann*,
    652 F.3d 1160 (9th Cir. 2011).....................................................25, 26, 28, 49

*United States v. Kalu*,
   791 F.3d 1194 (10th Cir. 2015)...................................................................29

*United States v. Kaufman*,
   546 F.3d 1242 (10th Cir. 2008)............................................................25, 32

*United States v. Kozminski*,
   487 U.S. 931 (1988) .............................................................25, 30, 31, 32

*United States v. Rivera*,
   799 F.3d 180 (2d Cir. 2015)........................................................28, 32, 33, 49

*United States v. Toviave*,
   761 F.3d 623 (6th Cir. 2014).................................................................26, 43

*In re Urethane Antitrust Litig.*,
   768 F.3d 1245 (10th Cir. 2014)..............................................................43

*Vallario v. Vandehey*,
   554 F.3d 1259 (10th Cir. 2009)................................................................24

**STATUTES**

18 U.S.C. § 1584 ..............................................................................32

18 U.S.C. § 1589 ....................................................................*passim*

**RULES**

Fed. R. Civ. P. 23................................................................................23, 24

**OTHER AUTHORITIES**

1 McLaughlin on Class Actions § 3:12 (16th ed.) .........................................25

3 Newberg on Class Actions § 7:37 (5th ed.)................................................24

Victims of Trafficking and Violence Protection Act of 2000,
   H.R. Rep. No. 106-939 (2000), 2000 WL 1479163.................................25, 26

## I.    INTRODUCTION

Over three years ago, this Court certified the Class based on evidence that GEO's
Aurora Detention Center had a uniform Housing Unit Sanitation Policy ("HUSP"),
acknowledged by GEO, with two components: (1) the requirement that detainees clean
common areas, and (2) disciplinary consequences that included solitary confinement as a
punishment for failure to clean. *Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258, 262 (D.
Colo. 2017).  A year later, the Tenth Circuit affirmed this Court's grant of class
certification on these facts, holding that the HUSP "provides the 'glue' that holds
together the class members' reasons for performing housing unit cleaning duties assigned
by GEO." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 920 (10th Cir. 2018), *cert. denied*,
139 S. Ct. 143 (2018).

After two years of discovery, these facts remain unchanged.  Detainees at Aurora
were all subject to the Housing Unit Sanitation Policy, which stated that failure to clean
could lead to discipline, including solitary confinement.  Detainees cleaned the common
areas of their dorms every day, and Plaintiffs and GEO both agree that solitary
confinement was held out as a punishment for noncompliance.

GEO's decertification motion rehashes arguments that this Court and the Tenth
Circuit rejected years ago, which are as unpersuasive now as they were then.  The only
new development is GEO's strategy of trying to deny that the HUSP is a uniform written
policy, despite having acknowledged it previously.  This new strategy cannot obscure the
fact that the key merits question in this case – whether GEO violated the TVPA by

threatening detainees with solitary confinement to force them to clean common areas –

remains well-suited to classwide adjudication.

## II.    FACTUAL BACKGROUND

### A.    The Housing Unit Sanitation Policy Exists.

GEO's Housing Unit Sanitation Policy[1] is set forth in the Aurora ICE Processing

Center Detainee Handbook Local Supplement ("Detainee Handbook"), which is provided

to all detainees upon their admission to the Aurora Facility.[2]  On the second page of the

handbook, right after the introduction, detainees are told that they "have the responsibility

to know and abide by the rules, regulations, procedures and schedules of the facility."[3]

One such rule is the HUSP, found on page 17, which states:

> Each and every detainee *must* participate in the facility's sanitation program.  A
> list of detainees is developed each day by staff and is posted [daily] for viewing.
> During a general cleanup all detainees *must* participate. The assigned Housing
> Unit [or Dorm] Officer will be responsible for assuring this general cleanup is
> done on a regular basis.[4]

---

[1]    Although GEO now denies that there is such a thing as the Housing Unit
Sanitation policy, that is what the policy is titled in the handbook.  GEO's references to a
"meal clean-up policy" describe the HUSP, *see* ECF No. 312 (Def.'s Decert. Br.) at 15,
although nothing in the policy specifically mentions meal clean-up.

[2]    *See* ECF No. 286 (Pls.' DSI MSJ Reply Br.), Statement of Facts ¶¶ 60-61 (citing
ECF No. 261-1 (Ceja 30(b)(6) I Tr.) 29:19-24); *see also* Ex. 1 (Ceja 30(b)(6) Tr. I) 88:7-
23 (every detainee admitted to the Aurora Facility must sign a form confirming they
received the Detainee Handbook).

[3]    ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-96) at 4; ECF
No. 273-2 (2007 Detainee Handbook, GEO_MEN 00054151-222) at 8; ECF No. 273-4
(2010 Detainee Handbook, GEO_MEN 00054253-77) at 4; ECF No. 273-5 (2011
Detainee Handbook, GEO-MEN 00065783-808) at 4; ECF No. 261-17 (2013 Detainee
Handbook, PL000029-55) at 6.

[4]    ECF No. 273-1 (2005 Detainee Handbook) at 18; ECF No. 273-2 (2007 Detainee
Handbook) at 49; ECF No. 273-3 (2008 Detainee Handbook, GEO_MEN 00054223-52)
at 19; ECF No. 273-4 (2010 Detainee Handbook) at 16-17; ECF No. 273-5 (2011

Immediately after the "Housing Unit Sanitation" heading, in a section titled "Day Space,"

the handbook provides:

> All detainees in a housing unit [or dorm] are required to keep clean and sanitary
> all commonly accessible areas of the housing unit [or dorm], including walls,
> floors, windows, window ledges, showers, sinks, toilets, tables, and chairs.
>
> Detainees will take turns cleaning the area[ or day space].  If a detainee feels that
> everyone is not doing their fair share, the detainee should inform the housing unit
> officer of the problem.  *Action will be taken to resolve this problem.*[5]

The handbook then repeats that "[t]he day room area will be kept clean at all times," and

sets forth a brief summary of the punishments that may be imposed on disobedient

detainees under the Aurora Facility's progressive discipline system:

> Should an officer notice that the area is not clean, the officer will make available
> necessary cleaning supplies.  If the detainees in the housing unit [or dorm] do not
> clean the area after being instructed to do so, the televisions will be turned off and
> the detainees will not be permitted to participate in any activities/programs until
> the housing unit [or dorm] is cleaned.  *Continued refusal to clean the area will
> result in further disciplinary action.*[6]

What constitutes "further disciplinary action" is clarified in the disciplinary scale

included in the Detainee Handbook, which lists both "[r]efusal to clean assigned living

area" and "[r]efusal to obey a staff member/officer's order" as 300-level, or "high

---

Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20 (emphasis
added).  The brackets denote changes in the handbook language over the ten years of the
class period.  *See* ECF No. 286 (Pls.' DSI MSJ Reply Br.), Statement of Facts ¶ 64.

[5]    *Id.* (emphasis added)

[6]    *Id.* (emphasis added).  GEO cites this policy, but seeks to focus the Court's
attention only on the suspension of television privileges, characterizing the cleaning
requirement as "distinct" from the escalating consequences that follow.  *See* ECF No. 312
(Def.'s Decert. Br.) at 43.  GEO omits the final sentence, which explicitly refers to
further discipline.

3

moderate" offenses.[7]  Punishments for a 300-level offense include "[r]emov[al] from

program and/or group activity" and "[l]oss of privileges."[8]  Above loss of privileges, the

disciplinary sanctions list solitary confinement for up to 72 hours.[9]

The sections of the handbook describing the HUSP comprise a clear statement of

the basic elements of the policy Plaintiffs challenge under the TVPA.  This policy was

simple: (1) detainees were required to take turns cleaning common areas of their housing

pod when instructed to do so by guards, and (2) detainees who resisted were subject to

escalating penalties, culminating in solitary confinement.[10]

Additional common evidence, including written policies, GEO's records, and

witness testimony that is consistent and describes common facts, provides further proof

that the HUSP was implemented, and that the threat of solitary confinement was

enforced.[11]  Detainees entering the Aurora Facility were shown an orientation video or

---

[7]    ECF No. 273-1 (2005 Detainee Handbook) at 25-26; ECF No. 273-2 (2007 Detainee Handbook) at 68; ECF No. 273-3 (2008 Detainee Handbook) at 29; ECF No. 273-4 (2010 Detainee Handbook) at 23; ECF No. 273-5 (2011 Detainee Handbook) at 24-25; ECF No. 261-17 (2013 Detainee Handbook) at 27.

[8]    *Id.*

[9]    *Id.*

[10]    As set forth in greater detail in Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defense, ECF No. 260, the work required under the HUSP was prohibited under the relevant ICE detention standards.  *Id*. at 30-36.

[11]    The Court should reject GEO's footnoted suggestion, ECF No. 312 (Def.'s Decert. Br.) at 16 n.8, that Plaintiffs should be estopped from relying on detainee testimony. Although Plaintiffs previously objected to GEO's attempt to take depositions of 100 absent class members, they did so because the principal evidence proving their claims consists of "persuasive class-wide evidence, not individual class member experiences." ECF No. 144 (Pls.' Discovery Order Br.) at 12.  That is still true.  Plaintiffs never represented that they did not intend to introduce *any* testimony from detainees; to the contrary, they argued that testimony from class representatives (as well as from three

slideshow that emphasized the potential consequences associated with violating Facility

rules.  A video shown to detainees early in the class period[12] informed them, "[w]hile you

are here, you are not required to work, **except** in the dormitories where you will be

assigned clean-up duties by staff in rotation with other detainees."[13]  It also stated: "It is

your responsibility to respect the property of other detainees and the institution at all

times.  Failure to do so may result in disciplinary action being taken against you and that

could have a negative effect on your case before the government – <u>so the best rule is to

stay out of trouble during your stay here</u>."[14]  In addition to being shown to detainees upon

arrival, this video was played in the housing units on a continuous loop.[15]

    That video was later replaced by a Powerpoint deck,[16] which told detainees: "It is

imperative that you respond to every command and directive that is made to you, because

it is in your best interest."[17]  It also stated that "[e]ach and every detainee must participate

in the sanitation program.  A list of detainee's [sic] is developed each day and is posted

---

detainees who provided declarations in support of class certification) would be sufficient.
*Id.* at 8-9, 14.

[12]    GEO is attempting to verify the precise time period this video was in effect.
Scimone Decl. ¶¶ 16-17.

[13]    *See* Ex. 2 (Ceja 30(b)(6) Tr. II) 88:21-92:4; ECF No. 337-3 (Orientation Video
Script, GEO_MEN 00056575-81) at GEO_MEN 00056576 (emphasis in original); ECF
No. 337-4 (Orientation Video Script, GEO-MEN 00075173-83) at GEO-MEN 00075174
(emphasis in original).

[14]    *Id*. (emphasis in original).

[15]    Ex. 2 (Ceja 30(b)(6) Tr. II) 94:7-15; Ex. 3 (K. Martin Tr.) 214:10-22.

[16]    *See* Ex. 2 (Ceja 30(b)(6) Tr. II) 88:21-94:15.  While it is unclear when GEO began
using this slide deck, document metadata shows that it was created on October 19, 2010.

[17]    Ex. 24 (Detainee Orientation Video, GEO-MEN 00108452) at GEO_MEN
00108460.

for viewing.  During a general clean-up *all detainees must participate*."[18]  This

Powerpoint was played for all detainees upon their arrival at the Aurora Facility.[19]  It

followed the description of cleaning with information about the disciplinary process,

including that refusing to obey a staff member was a high-moderate offense, and referred

detainees to the Detainee Handbook for "more detailed information about the rules

infractions that you must avoid and the established disciplinary actions that will be

taken."[20]

Under the HUSP, detainees were required to clean and wipe down tables and

sweep and mop the floors after each meal.[21]  In addition, detainees were expected to

clean "communal areas," including "where the microwave is, where the . . . game boards

are, video games, . . . [and] the bathroom."[22]  The testimony of GEO's witnesses is

consistent with testimony from both detainees[23] and guards.[24]  The tasks detainees

performed under the HUSP are also listed in an internal GEO policy document titled

"Sanitation Procedures."[25]  That document states: "[e]ach detainee will be responsible for

---

[18]    *Id*. at GEO-MEN 00108485 (emphasis added).
[19]    Ex. 2 (Ceja 30(b)(6) Tr. II) 94:23-95:2.
[20]    Ex. 24 (Detainee Orientation Video) at GEO-MEN 000108516-19.
[21]    Ex. 2 (Ceja 30(b)(6) Tr. I) 36:24-37:9.
[22]    Ex. 4 (Ragsdale 30(b)(6) Tr.) 16:11-18.
[23]    *See, e.g.,* Ex. 5 (Vizguerra Tr.) 106:20-25 (had to clean his pod and restrooms using a mop and buckets pursuant to HUSP); Ex. 6 (Menocal Tr.) 95:16-97:3; Ex. 7 (Hernandez Torres Tr.) 134:19-135:3; Ex. 8 (Hernandez Ceren Tr.) 162:24-165:20.
[24]    *See, e.g.,* Ex. 9 (Vasquez Tr.) 75:2-24 (detainees would sweep, mop, and wipe down tables after every meal); Ex. 10 (Gallegos Tr.) 131:8-14 (same).
[25]    ECF No. 262-8 (2004 Sanitation Procedures, GEO_MEN 00038687-98) at 2; *id*. (2004-05 Sanitation Procedures, GEO_MEN 00038653-64) at 14; *id*. (2005-06 Sanitation Procedures, GEO_MEN 00038676-86) at 26; *id*. (2006-07 Sanitation Procedures,

the cleanliness of his or her cell or living area, including walls, floors, sink, toilet, windows, and other property within the cell, room, or living areas."[26]

This HUSP work clearly exceeds the unpaid work permitted under ICE's Performance Based National Detention Standards ("PBNDS"), which stated that all work must be voluntary, except that in their "immediate living area," detainees must: 1. make their beds daily; 2. stack loose papers; 3. keep the floor free of debris and dividers free of clutter; and 4. refrain from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.[27]  Notably, the section of the Detainee Handbook that describes this responsibility, which is titled Living Area/Bed Assignment, is separate from the section that describes the HUSP.[28]  HUSP work is also distinguishable from jobs assigned in the Voluntary Work Program ("VWP"), which

---

GEO_MEN 00038628-31) at 37; *id.* (2007-08 Sanitation Procedures, GEO_MEN 00038665-75) at 41; *id.* (2008-09 Sanitation Procedures, GEO_MEN 00038632-39) at 52; (2009-2010 Sanitation Procedures, GEO_MEN 00038613-15) at 60; *id.* (2010 Sanitation Procedures, GEO_MEN 00038625-27) at 63; *id.* (2010-11 Sanitation Procedures, GEO_MEN 00007203-06) at 66; *id.* (2011-12 Sanitation Procedures, GEO_MEN 00038649-52) at 70; *id.* (2012-13 Sanitation Procedures, GEO-MEN 00099980-83) at 74; *id.* (2013-14 Sanitation Procedures, GEO-MEN 00088208-11) at 78.
[26]    *Id.*
[27]    ECF No. 261-8 (2011 PBNDS, GEO-MEN 00064018-414 (excerpted)) at 51; ECF No. 261-9 (2008 PBNDS, GEO-MEN 00062905-298 (excerpted)) at 61-62; ECF No. 261-10 (INS Detention Standard, GEO-MEN 00063671-4017 (excerpted)) at 3.
[28]    ECF No. 273-1 (2005 Detainee Handbook) at 18 ("You are required to keep your personal living area clean and sanitary.  This includes your bunk and immediate floor area under and around your bunk, locker, and any personal items."); ECF No. 273-2 (2007 Detainee Handbook) at 48 (same); ECF No. 273-3 (2008 Detainee Handbook) at 19 (same); ECF No. 273-4 (2010 Detainee Handbook) at 16 (same); ECF No. 273-5 (2011 Detainee Handbook) at 17 (same); ECF No. 261-17 (2013 Detainee Handbook) at 19 (same).

were paid at the rate of $1/day, and which also were presented to detainees in a different section of the handbook than the HUSP.[29]

### B.    The Housing Unit Sanitation Policy Was Enforced.

Dawn Ceja, GEO's 30(b)(6) designee and the Assistant Warden at Aurora, testified that the Detainee Handbook "clearly set[s] forth" GEO policies, including the HUSP, and puts detainees on notice that they can be placed in solitary confinement if they do not follow those policies.[30]  As a detention facility, Ceja explained that it was crucial for Aurora to maintain order and cleanliness, and "imperative" for detainees to respect the commands of detention officers.[31]  Trainings used at Aurora confirm that thinking; a presentation called "Anatomy of a Con Game," used to train officers about ways detainees might try to manipulate them, taught that one initial step a manipulative detainee might use is to "violate a minor rule to test what sort of stand the employee will take," along the road to potentially using sexual favors and/or blackmail to obtain more

---

[29]    ECF No. 273-1 (2005 Detainee Handbook) at 7; ECF No. 273-2 (2007 Detainee Handbook) at 17; ECF No. 273-3 (2008 Detainee Handbook) at 6; ECF No. 273-4 (2010 Detainee Handbook) at 7; ECF No. 273-5 (2011 Detainee Handbook) at 7; ECF No. 261-17 (2013 Detainee Handbook) at 9; *see also* ECF No. 286 (Pls. DSI MSJ Reply Br.), Statement of Facts ¶ 93.

[30]    Ex. 1 (Ceja 30(b)(6) Tr. I) 79:19-80:25 ("Q. Okay. Now, the detainee handbook puts detainees on notice that they could actually be put in disciplinary segregation for up to 72 hours if they violate the requirement that they clean up; is that right?  A. Yes.").

[31]    Ex. 2 (Ceja 30(b)(6) Tr. II) 105:12-24, 136:6-9; ECF No. 51 (Def.'s Cert. Opp Br.) at 11-12 (citing Ex. 1 (Ceja 30(b)(6) Tr. I) 81:11-23); *see also* Ex. 1 (Ceja 30(b)(6) Tr. I) 34:13-19 (Aurora's sanitation policy required the facility to "maintain the highest sanitation standards at all times in all locations without exception.  There will be an organized, supervised and continuous program of daily cleaning by all detainees to maintain those standards.").

favorable treatment.[32]  And guards were evaluated based on how effectively they

enforced the rules; for example, guard Joyce Quezada's supervisor denied her a

promotion because, "she does not impress upon me that she has the ability to deal with

detainees in more difficult situations."[33]  Ceja testified that GEO "[a]bsolutely" expected

that detainees would review the rules set forth in the handbook and follow them.[34]

To that end, GEO used an escalating series of responses to detainees who resisted

cleaning.  As noted in the policy, the first step after a detainee refused an officer's

instruction to clean was that televisions were turned off, phone service was cut,[35] and

detainees were not allowed to participate in activities or programs,[36] such as recreation

time, classes, or visitation.[37]  As noted in the handbook, continued refusal would lead to

further action; this might begin with a warning, sometimes in the form of a guard taking

out a roll of garbage bags, which detainees understood to mean that their belongings

would be bagged while they were taken to the solitary confinement wing.[38]  Detainees

---

[32]     Ex. 11 (Anatomy of a Con Game, GEO-MEN 00106711) at 9.

[33]     Ex. 12 (Quezada Job Application, GEO-MEN00171282-83) at
GEO_MEN00171283; Ex. 13 (Quezada Tr.) 76:18-25.

[34]     Ex. 2 (Ceja 30(b)(6) Tr. II) 100:4-11.

[35]     Ex. 8 (Hernandez Ceren Tr.) 77:8-13.

[36]     ECF No. 273-1 (2005 Detainee Handbook) at 18; ECF No. 273-2 (2007 Detainee
Handbook) at 49; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010
Detainee Handbook) at 16-17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No.
261-17 (2013 Detainee Handbook) at 20.

[37]     Ex. 14 (Aurora ICE Processing Center Building Schedule, GEO-MEN 00072830-
31).

[38]     Ex 8 (Hernandez Ceren Tr.) 159:10-160:7 ("[T]he first thing to that is [the guard
is] going to show you that two bags or give you a bag so you can pack your stuff and go
to the hole."); *see also id.* at 78:15-79:18 (sergeant told group of detainees who were
refusing to clean that, "if you refuse to clean, you will be sent to the hole.  If you refuse

who still refused to clean could be written up in an incident report, which was referred to a disciplinary committee.  The disciplinary committee decided which of the sanctions listed in the handbook – which included solitary confinement – should apply.[39]

GEO guards' testimony largely corroborates that there was an escalating sequence of consequences for detainees who did not follow the rules.  They all testified that they were trained to use the Detainee Handbook as a reference for Aurora Facility rules and permissible punishments.[40]  They understood the handbook to establish a rule requiring detainees to clean common areas.[41]  They testified that explaining the rules to detainees was part of their job,[42] and at least one understood this to include the rule that failure to clean could result in being sent to solitary confinement.[43]  Guard Luis Pagan described this practice as "coaching," wherein guards "explain to [detainees] what they're doing

---

to listen to the guard, you will be sent to the hole.  And that's not a place where you want to be at . . . .").

[39]    Ex. 3 (K. Martin Tr.) 68:9-12, 69:2-3, 73:1-14.  If guards believed that a detainee posed an "immediate, significant threat to safety, security or good order," the detainee could be "immediately controlled by staff, for cause, and with supervisory approval, placed in Administrative Segregation."  ECF No. 262-2 (2011 Aurora Contract, GEO_MEN 00019613-20037 (excerpted)) at 21, ¶ 3.  In these cases, a disciplinary hearing would not be required before placement in segregation, although one would typically be conducted after the fact.

[40]    Ex. 9 (Vasquez Tr.) 73:14-20, 86:20-24; Ex. 10 (Gallegos Tr.) 118:7-23; Ex. 13 (Quezada Tr.) 81:8-83:9; Ex. 15 (Pagan Tr.) 95:15-21.

[41]    Ex. 9 (Vasquez Tr.) 74:20-75:24, 105:11-106:7; Ex. 10 (Gallegos Tr.) 141:8-16, 161:16-164:7; Ex. 13 (Quezada Tr.) 81:8-82:2, 101:20-102:23; Ex. 15 (Pagan Tr.) 99:17-100:1, 104:21-105:16.

[42]    Ex. 15 (Pagan Tr.) 135:6-20 ("That's what we're there for . . . . we've got to get them to follow the rules."); *see also* Ex. 10 (Gallegos Tr.) 29:24-30:3 (an officer's job is to "[i]mplement the rules, make sure the rules are followed").

[43]    Ex. 15 (Pagan Tr.) 173:18-175:9 ("I think I might have told them that they could be sent to segregation, according to rules and regulations.").

wrong or what they're saying, it's wrong. And if they continue, if they don't change their

ways, they can be written up and possibly put in segregation."[44] Guard Sergio Gallegos

agreed that if a detainee refused to comply after a warning or reprimand, he would

escalate the discipline by issuing a write-up, which could result in solitary confinement.[45]

Solitary confinement was used as a tool to "correct . . . behavior."[46] Similarly, guard

Joyce Quezada testified that when a detainee violated the rules she would describe the

contents of the handbook, tell the detainee to comply because "[y]ou don't want to get in

trouble," and explain the consequences for further failure to comply.[47] She testified that

if the verbal warning or reprimand was not effective she would progress to threatening

detainees with a loss of privileges.[48] And she recognized that detainees were afraid of

solitary confinement, so much so that even the mention of it was effective in making

them follow the rules.[49]

---

[44]    Ex. 15 (Pagan Tr.) 133:5-134:9; *see also* Ex. 10 (Gallegos Tr.) 121:21-122:16 (the first step for a detainee who violated a rule or regulation was to talk to them, followed by a write-up, followed by "corrective disciplinary" (i.e., solitary confinement)).
[45]    Ex. 10 (Gallegos Tr.) 121:21-122:20, 146:16-19.
[46]    *Id*. at 68:10-15.
[47]    Ex. 13 (Quezada Tr.) 145:21-146:8.
[48]    *Id*. at 148:18-149:14. The fourth testifying guard, Martha Vasquez, was primarily a classification officer stationed in the intake area during the class period. Ex. 9 (Vasquez Tr.) 30:13-19, 32:4-20, 33:22-34:25. However, she was familiar with the HUSP, and on those occasions when she picked up an overtime shift in the housing pods, she also implemented it. *Id.* at 73:21-74:25. She was trained to respond to rule violations by involving supervisors, who decided whether to charge a detainee using the rules in the Detainee Handbook. *Id.* at 85:7-86:9, 88:13-8:25, 91:18-21. She never filled out an incident report herself. *Id.* at 87:10-23.
[49]    Ex. 13 (Quezada Tr.) 141:13-142:8.

Nor was the sanction of solitary confinement theoretical.  Gallegos did, in fact, issue multiple write-ups that resulted in solitary confinement for detainees who refused to clean.[50]  In doing so, Gallegos understood himself to be implementing the rules of the Aurora Facility.[51]  Similarly, Luis Pagan was on duty (though not present for the incident) when a different guard sent a detainee to solitary confinement for refusing to work, and Pagan recognized that the guard who did so complied with his training and Aurora Facility rules.[52]  Additional documentary evidence shows that GEO sent detainees to solitary confinement for refusing to clean throughout the class period.[53]  Through depositions or discovery responses, Plaintiffs testified, as they did in support of their prior class certification motion, that they either witnessed guards threatening detainees who tried to refuse to clean, or were personally threatened themselves.  For example:

- A detainee in **Hugo Hernandez Ceren's** pod refused to clean, telling the guards that he was no janitor and that GEO needed to pay someone for that type of job.[54] In response, a guard took out a plastic trash bag and told the detainee, "Just pack your stuff because you're going to go to the hole"; the detainee "started cleaning right away" in response to the threat.[55]  On another occasion, one detainee in Hernandez Ceren's dorm refused to clean and others, including Hernandez Ceren

---

[50]    Ex. 10 (Gallegos Tr.) 170:11-173:13, 179:15-187:14, 188:8-189:25, 192:5-8, 197:6-200:25, 203:4-206:25.
[51]    *Id.* at 213:1-4.
[52]    Ex. 15 (Pagan Tr.) 122:8-125:4.
[53]    ECF No. 262-12 (Incident Reports (compilation)).
[54]    Ex. 8 (Hernandez Ceren Tr.) 74:16-77:19.
[55]    *Id.*

and other named plaintiffs, supported him, leading the guard on duty to call a

sergeant.[56]  The sergeant responded,

> Okay. If you refuse to clean, you will be sent to the hole.  If you refuse
> to listen to the guard, you will be sent to the hole.  And that's not a
> place where you want to be at because it's cold in there.  You're going
> to lose your privileges. No commissary, no visitation, no rec yard.
> You're not going to get enough showers in there.  You're going to be
> lonely.  It's pretty cold.  But the most important thing about this is that
> I'm going to make sure that GEO sends their documents to the court,
> and you're fighting your cases, so you do not want to look bad.
> Already you look bad with the red uniform on, and now you're going
> to look even worse because you're coming from the hole.  And we're
> going to make sure that those documents get there to the judge, and the
> judge is going to see if she wants to leave you here in the country, so
> you can go back to your family, or they can remove you.  But you're
> not going to look good when this gets to the judge.[57]

- **Dagoberto Vizguerra** observed someone being sent to solitary confinement for

  refusing to clean on the second or third day he was at Aurora.[58]  He described the

  officer in his dorm who enforced the HUSP as "screaming" at the detainees in his

  pod about going to solitary confinement for not cleaning.[59]

- **Grisel Xahuentitla** saw a woman in her dorm try to refuse to clean because she

  was feeling ill.  The guard on duty told her that if she did not work she would be

  sent to the hole, and that "it wasn't going to be . . . pleasant."[60]

---

[56]    *Id*. at 78:10-80:24.
[57]    *Id*.
[58]    Ex. 5 (Vizguerra Tr.) 48:9-22.
[59]    *Id*. at 97:20-98:10.
[60]    Ex. 16 (Xahuentitla Tr.) 73:19-75:22.

- **Alejandro Menocal** was informed about the HUSP upon arrival at Aurora, and told by guards and detainees that failure to clean could result in solitary confinement.[61]  On one occasion, he witnessed detainees being removed from an adjacent pod, and was told that they were being taken to solitary confinement for refusing to clean.[62]

- **Alejandro Hernandez Torres** tried to resist HUSP cleaning, telling the guard on duty, "[W]hy should I clean all of the tables if I didn't use all of the tables?"  In response, the guard took him to solitary confinement.[63]

- **Jesus Yepez Gaytan** testified that when new detainees arrived at the Aurora Facility, they would often push back on the HUSP cleaning requirement, which frequently led to guards telling them that continued resistance would land them in solitary confinement.[64]

- **Demetrio Valerga** testified that when he first arrived at the Aurora Facility, his cellmate told him that he had to participate in the HUSP or he would be put in solitary confinement.[65]  Towards the end of his stay, he resisted cleaning and was threatened with solitary confinement and handcuffed by a guard, although he did not end up being taken there.[66]

---

[61]    Ex. 6 (Menocal Tr.) 95:16-97:8.
[62]    *Id*. at 100:16-109:2.
[63]    Ex. 7 (Hernandez Torres Tr.) 57:20-60:14, 81:20-82:3, 141:9-19.
[64]    Ex. 17 (Yepez Gaytan Tr.) 112:1-113:4, 142:23-144:1.
[65]    Ex. 18 (Valerga Tr.) 168:13-169:13.
[66]    *Id*. at 155:18-156:5.

In addition, Lourdes Argueta and Olga Alexakhina either witnessed guards threatening detainees with solitary confinement for refusing to clean or learned from other detainees that solitary confinement was a punishment for failing to clean.[67]

Every detainee who was asked about their motivations for performing HUSP work testified that they cleaned out of fear of being placed in solitary confinement.[68]

## C.   Detainees Experienced Uniform Conditions of Confinement.

The daily lives of Class Members at Aurora were marked by close quarters and strict regimentation.  All detainees were facing the possibility of imminent deportation.[69]

---

[67]   Argueta and Alexakhina were deported after their detention at GEO.  Alexakhina was deported to Russia, which does not permit the taking of voluntary depositions of willing witnesses.  *See* Russian Federation, U.S. Department of State – Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/legal/ Judicial-Assistance-Country-Information/RussianFederation.html (last visited Oct. 24, 2020).  Argueta was deported to Honduras, which prohibits depositions of non-U.S. citizens without the assistance of local judicial authorities, which must be secured through letters rogatory. *See* Depositions, U.S. Embassy Tegucigalpa, Honduras, https://hn.usembassy.gov/wp-content/uploads/sites/109/2016/05/deposition_acs.pdf (last visited Oct. 24, 2020). Efforts to depose Argueta and Alexakhina in other countries that are not subject to these logistical hurdles have been hindered by the COVID-19 pandemic.  Despite its feigned surprise in its motion, GEO is aware of these circumstances and has not suggested alternatives.  Scimone Decl. ¶¶ 6-11.  Plaintiffs remain prepared to present Alexakhina and Argueta for deposition if and when it becomes possible.  *Id.* at ¶ 12.

[68]   Ex. 6 (Menocal Tr.) 104:25-105:7 ("[W]e had to clean and if not, you know, we would be punished. . . . [E]verybody knew it."); Ex. 7 (Hernandez Torres Tr.) 77:25-78:13 (cleaned because "being that I had been through segregation, I didn't want to go through the same"); Ex. 8 (Hernandez Ceren Tr.) 63:9-18 ("I cleaned because of fear."); Ex. 16 (Xahuentitla Tr.) at 137:15-19 ("[I]f they tell you 'clean, because you're going to the hole,' . . . I'm going to clean. I don't want to go to the hole."); Ex. 17 (Yepez Gaytan Tr.) 142:23-144:1 ("The procedure was if you don't follow [the rules], you go to the hole."); Ex. 18 (Valerga Tr.) 168:13-169:13 (when he arrived at Aurora, he participated in the HUSP "[b]ecause my cellie told me if we didn't clean, we'd go to the hole").

[69]   ECF No. 261-8 (2011 PBNDS) at 3 ("ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal.").

Upon admittance, their civilian clothing was confiscated, and they were provided with two uniforms that were color-coded based on how dangerous they were perceived to be.[70] Nearly all personal items were confiscated, with exceptions for small photos of family members, softbound reading material, wedding bands (but not engagement rings), small religious items, one pair of glasses and dentures, and personal address books.[71]

Detainees were housed in "pods" of up to 80 people, either in small cells that they shared with three to seven other detainees, or in large open rooms filled with bunk beds.[72] A group of plastic tables with round plastic stools served as both the common area and the dining area,[73] and detainees who wanted to exercise did so in concrete exercise yards that contained one or two exercise machines and one basketball hoop.[74]  Showers were

---

[70]    ECF No. 273-1 (2005 Detainee Handbook) at 5-6; ECF No. 273-2 (2007 Detainee Handbook) at 13; ECF No. 273-3 (2008 Detainee Handbook) at 4-5; ECF No. 273-4 (2010 Detainee Handbook) at 5; ECF No. 273-5 (2011 Detainee Handbook) at 5; ECF No. 261-17 (2013 Detainee Handbook) at 7.

[71]    ECF No. 273-1 (2005 Detainee Handbook) at 6; ECF No. 273-2 (2007 Detainee Handbook) at 15; ECF No. 273-3 (2008 Detainee Handbook) at 5; ECF No. 273-4 (2010 Detainee Handbook) at 6; ECF No. 273-5 (2011 Detainee Handbook) at 6; ECF No. 261-17 (2013 Detainee Handbook) at 8.

[72]    ECF No. 337-2 (men's cell, ICE 0000123); *id.* (women's unit, ICE 0000142); *see also* ECF No. 273-1 (2005 Detainee Handbook) at 5; ECF No. 273-4 (2010 Detainee Handbook) at 5; ECF No. 273-5 (2011 Detainee Handbook) at 5; ECF No. 261-17 (2013 Detainee Handbook) at 7.

[73]    *Id.* (men's common area, ICE 0000105); *id.* (women's common area, ICE 0000145).

[74]    *Id.* (men's exercise room, ICE 0000102); *id.* (women's exercise room, ICE 0000152); *see also* Ex. 8 (Hernandez Ceren Tr.) 144:5-13 (the men's exercise room "is all concrete," "only has one basketball court," and while "you can get air" from the part of the roof that is open to the sky, "it's just extremely cold, so you don't want to be there neither."); Ex. 7 (Hernandez Torres Tr.) 50:21-51:14.

communal,[75] and toilets were either located within detainees' shared cells or in a

designated bathroom area separated from the rest of the room by a low wall.[76]  Plaintiffs'

expert, Dr. Stuart Grassian, who has toured several prisons in his career, including Sing

Sing, Attica, and Pelican Bay, said that based on the photos he viewed, the conditions of

confinement at the Aurora Facility, "compared with general population settings in

prisons, [were] much more restrictive and tighter" than he was used to seeing.[77]

   Detainee contact with the outside world was limited to three hour-long non-

contact visits per week.[78]  Contact visitation, in which detainees could briefly hug their

visitor upon greeting them and saying goodbye, was available only on special request.[79]

Detainees had access to payphones, but calls were limited to 20 minutes, and had to be

made from the middle of dorm common areas.[80]  All detainees in a dorm shared

---

[75]   *Id.* (men's showers, ICE 0000116); *id.* (women's toilets and showers, ICE
0000139); *see also* ECF No. 273-1 (2005 Detainee Handbook) at 5; ECF No. 273-4
(2010 Detainee Handbook) at 5; ECF No. 273-5 (2011 Detainee Handbook) at 5; ECF
No. 261-17 (2013 Detainee Handbook) at 7.

[76]   *Id*. (men's toilets, ICE 0000128); *id*. (women's toilets and showers, ICE 0000139);
*see also* ECF No. 273-1 (2005 Detainee Handbook) at 5; ECF No. 273-4 (2010 Detainee
Handbook) at 5; ECF No. 273-5 (2011 Detainee Handbook) at 5; ECF No. 261-17 (2013
Detainee Handbook) at 7; Ex. 8 (Hernandez Ceren Tr.) 143:5-144:13 (noting that there
was no privacy when he used the restroom).

[77]   Ex. 19 (Grassian Tr.) 294:15-295:18, 297:3-300:16.

[78]   ECF No. 273-1 (2005 Detainee Handbook) at 11; ECF No. 273-2 (2007 Detainee
Handbook) at 30-32; ECF No. 273-3 (2008 Detainee Handbook) at 11-12; ECF No. 273-
4 (2010 Detainee Handbook) at 10-11; ECF No. 273-5 (2011 Detainee Handbook) at 10-
11; ECF No. 261-17 (2013 Detainee Handbook) at 12-13.

[79]   ECF No. 273-1 (2005 Detainee Handbook) at 11; ECF No. 273-5 (2011 Detainee
Handbook) at 10-11; ECF No. 261-17 (2013 Detainee Handbook) at 12-13.

[80]   ECF No. 273-1 (2005 Detainee Handbook) at 12-13; ECF No. 273-2 (2007
Detainee Handbook) at 32-25; ECF No. 273-3 (2008 Detainee Handbook) at 12-13; ECF

televisions, which were controlled by Aurora Facility guards.[81]  Detainees were not

allowed to keep "excessive" personal items in their bed area, a determination which was

subject to the discretion of the guards.[82]  Once detainees made their beds – which they

were required to do by 7:30 am – they were not permitted to nap under the covers.[83]

Decoration of any kind was strictly prohibited.[84]

### D.    The Toxic Effects of Solitary Confinement Are Widely Recognized.

Solitary confinement generally refers to the confinement of an individual alone in

a small cell (generally around 80 to 100 square feet) for upwards of 22 hours a day.[85]  At

Aurora, solitary confinement was called either administrative or disciplinary

"segregation,"[86] although the cells for both types of confinement were the same.[87]

---

No. 273-4 (2010 Detainee Handbook) at 11-12; ECF No. 273-5 (2011 Detainee
Handbook) at 11-12; ECF No. 261-17 (2013 Detainee Handbook) at 14.
[81]    ECF No. 273-1 (2005 Detainee Handbook) at 13; ECF No. 273-2 (2007 Detainee
Handbook) at 36-37; ECF No. 273-3 (2008 Detainee Handbook) at 14; ECF No. 273-4
(2010 Detainee Handbook) at 12; ECF No. 273-5 (2011 Detainee Handbook) at 13; ECF
No. 261-17 (2013 Detainee Handbook) at 15.
[82]    ECF No. 273-1 (2005 Detainee Handbook) at 18; ECF No. 273-2 (2007 Detainee
Handbook) at 48; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010
Detainee Handbook) at 16; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No.
261-17 (2013 Detainee Handbook) at 19-20.
[83]    *Id.*
[84]    *Id.*
[85]    ECF No. 336-21 (Grassian Report) at 5.
[86]    In addition, some people at Aurora were housed in the solitary confinement wing
for protective custody.  Detainees could be placed in protective custody if they were in
danger in general population, or otherwise were too overwhelmed or frightened to remain
in a dorm.  Ex. 1 (Ceja 30(b)(6) Tr. I) 55:7-56:11; *see also* ECF No. 262-11 (Special
Management Unit ("SMU") Operations policy, GEO_MEN00037770-84) at 4
("Protective custody (PC) may be initiated at the detainee's request or ordered to protect
the detainee from harm.").  It is not at issue in this case.
[87]    Ex. 2 (Ceja 30(b)(6) Tr. II) 111:15-112:9.

Detainees placed in administrative confinement at Aurora were awaiting the resolution of
disciplinary charges, which could either result in release or in additional time in
disciplinary confinement.[88]  Detainees in disciplinary confinement had been found guilty
of a rule violation after a hearing.[89]  In administrative confinement, detainees were
confined to their cells for approximately 22 hours a day, with two hours a day for
recreation.[90]  In disciplinary confinement, recreation was limited to one hour a day.[91]

In accordance with Aurora policy, detainees in both administrative and
disciplinary confinement were handcuffed whenever they left their cells, including while
they showered.[92]  Detainees could also be taken in handcuffs to a small fenced-in
recreation area, which Plaintiff Demetrio Valerga described as "a fenced out dog
kennel."[93]  In administrative confinement, detainees could see a television mounted on
the wall outside their cells if they stood at the cell window.[94]  Detainees in disciplinary
confinement did not have access to TV.[95]

As set forth in Dr. Stuart Grassian's expert report, solitary confinement has long
been recognized as "a very harsh, psychiatrically toxic form of punishment."[96]  While

---

[88]    *Id*. at 192:17-193:5.
[89]    Ex. 1 (Ceja 30(b)(6) Tr. I) 57:5-58:5.
[90]    ECF No. 262-11 (SMU Operations policy) at 7.
[91]    *Id*. at 11.
[92]    Ex. 2 (Ceja 30(b)(6) Tr. II) 191:14-192:7; *see also* ECF No. 262-11 (SMU
Operations Policy) at 3 ("Any detainee movement out of a cell will be in restraints.").
[93]    Ex. 18 (Valerga Tr.) 13:5-25.
[94]    *Id*. at 12:5-10; Ex. 1 (Ceja 30(b)(6) Tr. I) 77:14-20.
[95]    *Id*.
[96]    Ex. 19 (Grassian Tr.) 127:11-13; *see also* ECF No. 336-21 (Grassian Report) at
30.

"some people are far more severely affected by solitary than others . . . there's a certain baseline of psychiatric harm that's associated with being in the condition."[97]  In other words, the best-case scenario is that "people in solitary suffer from it"; under some circumstances people become "psychiatrically ill."[98]  Dr. Grassian's opinion is informed by numerous peer-reviewed studies – including his own – which have found that subjects begin to demonstrate measurably abnormal brain patterns and other symptoms of psychiatric distress within hours or days of placement in solitary.[99]  Dr. Grassian interviewed several Plaintiffs, and concluded that while their more general experiences of confinement were "somewhat variable . . . . the expectation, this requirement that people work to clean the place was pretty uniform."[100]  Based on interviews with the Plaintiffs in this case, as well as his own research and experience in studying people's reactions to solitary confinement, Dr. Grassian concluded that threats of placement in solitary were "extremely coercive and frightening" for Class Members, and that they created "a great

---

[97]      *Id*. at 102:4-13.

[98]      *Id*. at 290:2-8.

[99]      *See, e.g.*, ECF No. 336-21 (Grassian Report) at 10 n.6 (citing ECF No. 336-22 (Fatos Kaba, "Solitary Confinement and Risk of Self-Harm Among Jail Inmates") at 442-47 (finding that the risk of self-harm was strongly associated with being in solitary confinement, and that self-harm peaked around the time of entry to solitary confinement)); *id*. at 13 n.10 (citing ECF No. 336-23 (Paul Gendreau, "Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement") at 56-57 (finding a consistent decline in EEG results of subjects in solitary confinement over the course of seven days, with 77% of the decline happening in the first four days)); *id*., Ex. D (Stuart Grassian, "Psychopathological Effects of Solitary Confinement") at 1451 (quoting one patient as saying "As soon as I got in, I started cutting my wrists.  I figured it was the only way to get out of here.").

[100]      Ex. 19 (Grassian Tr.) 239:5-240:19.

feeling of helplessness and fear."[101]  This was particularly true because detainees were in

a situation of "learned helplessness," in which they were "powerless to prevent aversive

consequences" due to the circumstances of their detention.[102]

GEO staff who worked in GEO's solitary confinement unit recognized the

dangers.  For example, Luis Pagan noted that, when he worked in the solitary

confinement unit, he was required to check on all detainees every 30 minutes to look for

signs of self-harm, except for high-risk detainees, who needed a check-in every 15

minutes.[103]  Pagan testified that the risk of self-harm in solitary confinement is highest

around the holidays, when detainees get depressed.[104]  GEO's compliance officer, Kevin

Martin, testified:

> [S]egregation was always a big subject, not just at our facility, in all facilities.
> My wife's retired law enforcement, worked in jails for 25 years . . . . Seg is
> always a huge, huge area.  Unfortunately, there are instances where detainees
> hurt themselves in segregation; they're not watched.

He went on to describe an incident in which an Aurora detainee had cut himself with a

razor while held in solitary confinement.[105]

## III.    PROCEDURAL HISTORY

Plaintiffs moved for class certification on May 6, 2016, seeking to represent two

classes of current and former detainees: a "Forced Labor" class and a "Voluntary Work

Program" class.  See ECF No. 49 (Pls.' Cert. Br.) at 10, 19.  In opposition, GEO

---

[101]    ECF No. 336-21 (Grassian Report) at 30-31.
[102]    Id. at 31.
[103]    Ex. 15 (Pagan Tr.) 112:15-114:18; see also Ex. 13 (Quezada Tr.) 139:25-10.
[104]    Id. at 116:19-24.
[105]    Ex. 3 (K. Martin Tr.) 277:7-278:9.

acknowledged "the requirement that detainees perform household chores," arguing that the policy was both lawful and "crucial" to maintaining sanitation at the facility. ECF No. 51 (Def.'s Cert. Opp. Br.) at 11-12; *see also id*. at 21 ("[t]he requirement that detainees perform the housekeeping chores was and remains categorically lawful and provides no basis for certifying a class"). GEO also acknowledged that punishments for resisting the required cleaning included placement in solitary confinement. *Id*. at 13. However, it argued that placement in segregation for refusal to clean "was not the routine experience," and that most issues were resolved informally. *Id*. at 29. It also argued that the existence of multiple possible sanctions for refusing to clean, *id*. at 30, and the inherently subjective nature of how people perceive threats and individual motivations for cleaning, *id*. at 36, 40-42, precluded certification.

The Court rejected these arguments, and on February 27, 2017, granted Plaintiffs' motion, certifying the two classes and appointing Class Counsel. *See* ECF No. 57 (Order Granting Class Cert.); *Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258, 270-71 (D. Colo. 2017). The Court held that GEO's "specific, uniformly applicable Sanitation Policy" was "the glue that holds the allegations of the Representatives and putative class members together." *Id*. at 264. The Court held that Plaintiffs could show that Class Members labored because of GEO's policy based on a classwide inference of causation, which was particularly appropriate because of the "unique" nature of detention, which "allows the detainer to almost fully control the experience of the detainee." *Id*. at 265.

GEO appealed, *see* ECF Nos. 58 (Notice of 23(f) Petition), 63 (Order Granting Petition), and the Tenth Circuit affirmed this Court's decision. *Menocal v. GEO Grp.,*

*Inc.*, 882 F.3d 905 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 143 (2018).  Once again,

GEO argued on appeal that predominance under Rule 23(b)(3) could not be met because

Plaintiffs could not prove on a classwide basis that detainees performed HUSP work as a

result of GEO's threats of solitary confinement for refusal to work.  *Id.* at 918.  The Tenth

Circuit concluded that this Court "reasonably determined that the class members could

show causation through class-wide inference," "that individual damage assessments

would not predominate over the class's common issues," and that this Court's findings on

the Rule 23 elements "were likewise reasonable and fell within its discretion."  *Id.* at 923.

## IV.    ARGUMENT

### A.    Legal Standard

#### 1.    Decertification

Certifying a class under Rule 23(a) "requires numerosity of class members,

commonality of at least one question of fact or law among the class, typicality of named

plaintiffs' claims or defenses to the class's claims or defenses, and adequacy of the

named plaintiffs and their attorneys as class representatives."  *DG ex rel. Stricklin v.

Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).  "If the class meets the four criteria

under Rule 23(a), then the court must consider whether the class satisfies at least one of

the three alternative class-types under Rule 23(b)."  *CGC Holding Co., LLC v. Broad &

Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014).  The Class in this case was certified under

Rule 23(b)(3), which requires that: "(1) the 'questions of law or fact common to class

members [must] predominate over any questions affecting only individual members' (the

'predominance' requirement), and (2) a class action must be 'superior to other available

methods for fairly and efficiently adjudicating the controversy' (the 'superiority'

requirement)." *Menocal*, 882 F.3d at 914 (quoting Fed. R. Civ. P. 23(b)(3)).

While courts "retain[] the ability to monitor the appropriateness of class

certification throughout the proceedings and to modify or decertify a class at any time

before final judgment," *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1261 (10th Cir.

2004), "decertification is a 'drastic step,' not to be taken lightly," 3 Newberg on Class

Actions § 7:37 (5th ed.). This is particularly true where defendants seek to decertify a

class late in litigation, as absent Class Members who were relying on the action may be

left unable to protect their own interests. *Id.* (citing *Gortat v. Capala Bros.*, No. 07 Civ.

3629, 2012 WL 1116495, at *2 (E.D.N.Y. Apr. 3, 2012)).

Although "the merits of a movant's claims may not serve as the focal point of [a

court's] class certification analysis," a court is not "categorically prohibited from

considering any factor, in conjunction with its Rule 23 analysis, that touches upon the

merits of a movant's claims." *Vallario v. Vandehey*, 554 F.3d 1259, 1266 (10th Cir.

2009). Courts must evaluate whether Rule 23's requirements have been met through a

"rigorous analysis," even when "these findings necessarily overlap with issues on the

merits." *Id.* (internal quotation marks omitted). Although class certification and the

merits of the case may overlap, merits determinations may be reached "only to the extent

[] that they are relevant to determining whether the Rule 23 prerequisites . . . are

satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). The

"doctrinal basis" for this limited inquiry into the merits is the "preservation of the right to

have a jury resolve disputed factual issues on legal claims."  1 McLaughlin on Class

Actions § 3:12 (16th ed.).

**2.     Trafficking Victims' Protection Act**

The Trafficking Victims' Protection Act was enacted in 2000 to combat the

"increasingly subtle" means of coercion used to compel modern-day forced labor.  *United*

*States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting H.R. Rep. No. 106-939, at

101, (2000) (Conf. Rep.), *as reprinted in* 2000 U.S.C.C.A.N. 1380, 1392-93, 2000 WL

1479163, at *91); *see also United States v. Bradley,* 390 F.3d 145, 150 (1st Cir. 2004),

*judgment vacated on other grounds,* 545 U.S. 1101 (2005) (noting that the statute

encompasses "not only physical violence, but also more subtle psychological methods of

coercion").  The TVPA prohibits defendants from "knowingly . . . obtain[ing] the labor or

services of a person . . . by means of" one or a combination of:

> (1) force, threats of force, physical restraint, or threats of physical restraint to that
> person or another person;
> (2) serious harm or threats of serious harm to that person or another person;
> (3) the abuse or threatened abuse of law or legal process; or
> (4) any scheme, plan, or pattern intended to cause the person to believe that, if that
> person did not perform such labor or services, that person or another person would
> suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).

Congress enacted the statute in response to the Supreme Court's decision in

*United States v. Kozminski*, 487 U.S. 931 (1988), to provide tools to "combat severe

forms of worker exploitation that do not rise to the level of involuntary servitude as

defined in *Kozminski*."  *See* H.R. Rep. No. 106-939, 2000 WL 1479163, at *91; *see also*

*United States v. Kaufman*, 546 F.3d 1242, 1261 (10th Cir. 2008) (same).  In accordance

25

with these purposes, the TVPA defines serious harm "broadly," *Dann*, 652 F.3d at 1169,

to include:

> any harm, whether physical or nonphysical, including psychological, financial, or
> reputational harm, that is sufficiently serious, under all the surrounding
> circumstances, to compel a reasonable person of the same background and in the
> same circumstances to perform or to continue performing labor or services in
> order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2).  Because "paradigmatic forced labor, such as prostitution, forced

sweatshop work, or forced domestic service" often depends on psychological coercion

"such as isolation and pretended threats to the victim's friends or relations" rather than

physical harm, "the extremity of force is . . . not a determinant of forced labor, one way

or the other."  *United States v. Toviave*, 761 F.3d 623, 626 (6th Cir. 2014).[106]  Courts

have cautioned that juries may have to distinguish between "improper threats or coercion

and permissible warnings of adverse but legitimate consequences," *Bradley*, 390 F.3d at

151, but even factually or legally accurate statements (such as a statement to an

undocumented employee that she could suffer immigration consequences) may be

improperly coercive if they are made for the purpose of compelling labor.  *See, e.g.*,

---

[106]    As Plaintiffs explain in greater detail in their contemporaneously-filed Opposition
to GEO's Motion for Summary Judgment, contrary to GEO's arguments, the TVPA does
not exclude chores or housekeeping tasks from the definition of forced labor.  *See* Pls.' SJ
Opp. Br. at 59-59.  To the contrary, "domestic tasks . . . certainly constitute labor or
service under the ordinary meaning of those words."  *United States v. Callahan*, 801 F.3d
606, 620 (6th Cir. 2015).  In the specific context of ICE detention, the Eleventh Circuit
has held that there can be no TVPA liability for detention contractors that require
detainees to perform "basic required tasks" such as "'making their bunk beds daily,'
'stacking loose papers,' and 'keeping the floor free of debris,'" but that a government
contractor may violate the TVPA if it forces detainees to perform labor outside those
enumerated categories.  *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1272, 1277 (11th
Cir. 2020).

*United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008); *see also* Pls.' SJ Opp. Br. at

57-60.

> **i.    Both Precedent and the Plain Language of the Statute
> Support the Conclusion that Causation Under the TVPA
> Is Subject to a Reasonable-Person Standard.**

When this Court granted class certification in 2017, it found that the TVPA

contained "both an objective and a subjective component." *Menocal*, 320 F.R.D. at 266-

67. Consistent with the definition of "serious harm" in 18 U.S.C. § 1589(c)(2), the

objective component of "serious harm" under the TVPA goes to the question of "whether

a reasonable person would respond in a similar way as the victims." *Id.* at 267. The

subjective component, on the other hand, goes to the question of causation: "whether the

victims actually labored *because of* the perpetrator's conduct." *Id.* The Court noted that

the subjective component may be "satisfied by inferring from classwide proof that

putative class members labored because of GEO's improper means of coercion." *Id.* In

this case, such an inference would be particularly appropriate "[g]iven the climate in

which [class members] were detained," wherein they were "directed by GEO's staff

when, where, and how to perform their sanitation duties." *Id.* Due to the uniform

conditions of confinement, the Court held, a jury could reasonably infer classwide

causation "even despite some class members' purported willingness to work" given the

level of control GEO maintained over detainees. *Id.*

In light of evolving case law holding that the TVPA includes only an *objective*

standard, Plaintiffs respectfully request that the Court reconsider its prior holding that the

TVPA contains a subjective causation requirement. The courts that have directly faced

this question in the years since this Court's decision have uniformly held that causation under the TVPA is defined with reference to a reasonable person and not the individual trafficking victim. For example, in *Owino v. CoreCivic, Inc.*, No. 17 Civ. 1112, 2020 WL 1550218 (S.D. Cal. Apr. 1, 2020), the court rejected the defendant's argument that the TVPA required an "individualized, subjective inquiry" into causation, concluding that, to the contrary, Ninth Circuit precedent in *Dann*, 652 F.3d at 1170, established that "a TVPA claim requires the plaintiff to establish that the employer intended to cause the victim to believe that he or she would suffer serious harm by means of an objectively, sufficiently serious threat of harm." *Id*. at *27. Similarly, in *New York State Nurses Association v. Albany Medical Center*, No. 19 Civ. 1265, 2020 WL 4001056 (N.D.N.Y. July 15, 2020), the court rejected the defendant's contention that each plaintiff would be required to prove he or she "felt 'subjectively coerced into providing labor,'" holding instead that "[t]he question is not whether each individual felt compelled to continue her employment as a result of defendants' conduct, but whether a reasonable person of the same background and in the same circumstances would find that conduct a threat of serious harm sufficient to compel continued work." *Id*. at *4 (quoting *Paguirigan v. Prompt Nursing Emp't Agency LLC*, No. 17 Civ. 1302, 2018 WL 4347799, *8 (E.D.N.Y. Sept. 12, 2018)). The *New York State Nurses Association* court relied on the Second Circuit's opinion in *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015), which held that it was error (albeit harmless error) for the court to fail to instruct the jury that TVPA

causation hinged on a "reasonable person" standard rather than the subjective experience of the victim.[107]

Notably, in the appeal of this Court's certification decision, the Tenth Circuit explicitly declined to reach the question of whether the TVPA contains a subjective element for purposes of establishing causation, leaving that issue unresolved in this circuit. *Menocal*, 882 F.3d at 918.[108] However, at least one district court in this circuit has recently observed that causation in a TVPA class action may be proven based on allegations of a "single, common scheme," without analyzing individually the motivations of each class member. *Francis v. APEX USA, Inc.*, 406 F. Supp. 3d 1206, 1214 (W.D. Okla. 2019) (quoting the holding in *Paguirigan*, 2018 WL 4347799 at *8, that the question under the TVPA is "not whether each individual felt compelled to continue her employment as a result of defendant's conduct, but whether a reasonable person of the same background and of the same circumstances would find that conduct a threat of serious harm").

---

[107]    *See also Novoa v. GEO Grp., Inc.*, No. 17 Civ. 2514, 2019 WL 7195331, at *16 (C.D. Cal. Nov. 26, 2019) (accepting plaintiffs' contention that "the legal question is common to all: a reasonable person analysis, such that one could determine whether the Defendant's scheme compelled Plaintiffs, who were in a like situation as immigration detainees, to work" (citing *Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 2011 WL 7095434 (C.D. Cal. Dec. 12, 2011))); *Rosas v. Sarbanand Farms, LLC*, 329 F.R.D. 671, 689 (W.D. Wash. 2018) ("Contrary to Defendants' assertions that individual inquiries will be necessary to determine whether individual members perceived Growers' statements as threats, the inquiry under the statute focuses on whether a reasonable person in the same circumstances would be compelled to continue to work.").

[108]    GEO cites *United States v. Kalu*, 791 F.3d 1194, 1212 (10th Cir. 2015) for the proposition that the TVPA requires causation, but that case does not address whether causation is appropriately assessed through the "reasonable person" standard or a combination of subjective and objective considerations.

This prevailing interpretation of the TVPA is consistent with both the language and the intent of the statute. The requirement that labor be obtained "by means of," *inter alia*, serious harm must be read in context of § 1589(c)(2), which defines serious harm in a way that shows that it is inseparable from the causation inquiry: harm is sufficiently serious if threatening it would *"compel a reasonable person of the same background and in the same circumstances"* to work. 18 U.S.C. § 1589(c)(2) (emphasis added). In other words, causation is tied to the definition of "serious harm" – not the victim's subjective state of mind – and explicitly defined with reference to the reasonable person. It does not conflict with the "by means of" language, which is not otherwise defined. In contrast, interpreting "by means of" to require a showing of individualized causation would undermine the express language of 18 U.S.C. § 1589(a)(4), which prohibits "any scheme, plan, or pattern *intended to cause* the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." *Id*. (emphasis added). If Congress intended subjective causation to be an element of the claim, it could have drafted Section 1589(a)(4) to simply prohibit "any scheme . . . *that caused* the person to believe" that they would suffer harm. To read this language otherwise would render a scheme that was intended to have coercive effect lawful if the victim did not believe the perpetrator's threats – even though the text of the statute explicitly prohibits that conduct.

This language shows that the TVPA is focused on the conduct of the defendant. The alternative would cause the "type of coercion prohibited [to] depend entirely upon the victim's state of mind." *Kozminski*, 487 U.S. at 949. As the *Kozminski* Court noted,

this is an untenable result.  *Id.* at 951.  The oral argument on this case at the Tenth Circuit

illustrates why: GEO's lawyers there argued that detainees "make a decision each time

whether they're going to consent to work or not."[109]  Judge Bacharach noted that if this

were the standard, "slaves had a choice."  As courts across the country have recognized,

the TVPA was drafted to prevent a defendant from arguing that they are innocent because

they threatened victims who enjoyed objectively coercive working environments or were

particularly resilient to abuse.  The statue should be interpreted to protect against this

result.

Even if the Court maintains that there is a subjective element to the "reasonable

person" standard under the TVPA, the subjective element can be proven through

evidence that permits a classwide inference of causation, as this Court previously held

and the Tenth Circuit affirmed.  *Menocal*, 882 F.3d at 920.  Such an inference is

particularly appropriate where, as here, Class Members were subject to uniform

conditions of detention.  *Menocal*, 320 F.R.D. at 267 ("Given the climate in which they

were detained, it is possible that an inference of causation would be appropriate even

despite some class members' purported willingness to work for reasons other than GEO's

improper means of coercion."); s*ee also Owino*, 2020 WL 1550218, at *28 (citing this

Court's *Menocal* decision and noting that an inference of caution is appropriate where

"the putative class members share a large number of common attributes, including that

---

[109]    Ex. 20 (Transcript of Tenth Circuit hearing).

they are immigrants who are or were involuntarily detained in Defendant's facilities and

subjected to common sanitation and disciplinary policies.").

> ## ii.    Analysis Under the TVPA Must Consider the Totality of
> Plaintiffs' Circumstances.

The TVPA requires courts to consider serious harm in light of "all the surrounding

circumstances" from the perspective of a "reasonable person of the same background and

in the same circumstances."  18 U.S.C. § 1589(c)(2).  This requirement reflects that

circumstances such as "a victim's age or special vulnerability may be relevant in

determining whether a particular type or a certain degree of . . . coercion is sufficient to

hold that person."  *Kozminski*, 487 U.S. at 948.  Thus, for example, in *Kaufman*, the

Tenth Circuit held that a victim's mental illness, which made him "highly susceptible" to

direction, could support a jury's finding of a TVPA violation.  546 F.3d at 1265; *cf.*

*Copeland v. C.A.A.I.R., Inc.*, No. 17 Civ. 564, 2019 WL 4307125, at *7 (N.D. Okla. Sept.

11, 2019) (under 18 U.S.C. § 1584, "the threat of deportation to an immigrant can

constitute a threat of legal concern that induces involuntary servitude, even though such a

threat made to an adult citizen of normal intelligence would be too implausible to

produce involuntary servitude").

GEO attempts to spin this requirement into a rule that "courts review each

individual's claims on a case-by-case basis."  ECF No. 312 (Def.'s Decert. Br.) at 39.

But the cases GEO cites in support of this proposition stand for something much

different: they acknowledge that the reasonable-person standard must be adjusted based

on the specific circumstances of the victims.  For example, in *Rivera*, the Second Circuit

identified a "hybrid" standard under the TVPA that "permits the jury to consider the particular vulnerabilities of a person in the victim's position but also requires that her acquiescence be objectively reasonable under the circumstances." 799 F.3d at 186-87. In *Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017), the court observed that "known objective conditions that make the victim especially vulnerable to pressure (such as youth or immigration status) bear on whether the employee's labor was obtained by forbidden means." *Id*. at 618;[110] *see also, e.g.*, *Francis*, 406 F. Supp. 3d at 1211 (noting that the heavy debts owed by putative class members made them more susceptible to forced labor).

### B.    Plaintiffs' Claims Are Well-Suited to Classwide Adjudication.

#### 1.    Discovery Has Not Altered the Existence of GEO's Uniform Sanitation Policy.

GEO's primary argument for decertification – that Plaintiffs have failed to identify a uniform policy requiring detainees to clean on punishment of solitary confinement –

---

[110]    In an attempt to manufacture support for its position, GEO modifies a quote from *Muchira* to say threats must be considered from the perspective of "a reasonable person in [each individual plaintiff's] position." ECF No. 312 (Def.'s Decert. Br.) at 40. The unaltered quote reads:

> Muchira must present sufficient evidence upon which a jury could reasonably conclude that the Saudi family *knowingly* or *intentionally* engaged in actions or made threats that were sufficiently serious to compel a reasonable person in Muchira's position to *remain* in the Saudi family's employ, against her will and in order to avoid such threats of harm, when she otherwise would have left.

*Muchira*, 850 F.3d at 620. Not only does *Muchira* not hold that the backgrounds and surrounding circumstances of TVPA victims cannot be assessed on a classwide basis, it holds that, as Plaintiffs argue, the proper standard of coercion considers the mental state of a reasonable person under the circumstances of the victim and does not take into account whether the victim *herself* worked because of impermissible actions or threats.

requires the Court to determine that GEO's policies have somehow changed since class

certification, or were not real policies. Yet, nothing about the classwide applicability of

the HUSP has changed over the course of three years of discovery, nor could it have.

> **i.     The HUSP, As Laid Out in the Detainee Handbook,
> Constitutes a Uniform Policy.**

Both at the time of class certification and now, GEO's Detainee Handbook

described a uniform policy requiring detainees to clean common areas on threat of up to

72 hours in disciplinary confinement. *See supra* Part II.A. That policy was distributed to

detainees and described consistently in orientation materials. *Id.* The handbook and

orientation materials are not ambiguous about the fact that such cleaning is mandatory,

specifically emphasizing that there are consequences for noncompliance, ranging from

eliminating recreational activities up through solitary confinement. *Id*.

These are precisely the facts that this Court and the Tenth Circuit held were

sufficient to show that common questions of fact predominated over individual questions.

*Menocal*, 882 F.3d at 920; *Menocal*, 320 F.R.D. at 264. Both courts reached the

conclusion that a uniform policy existed because GEO told them so in its briefing. *See*

ECF No. 51 (Def.'s Cert. Opp. Br.) at 12-13. Rather than dispute that the policy existed

or that it was enforced, GEO instead made arguments about whether disciplinary or

administrative confinement was the appropriate punishment for failing to clean. *Id.* It

repeated this strategy on appeal, focusing its arguments on the type of solitary

confinement a detainee could be subject to rather than on the existence of a policy it

could not dispute.[111]

Despite having admitted that a uniform policy exists in two different courts, GEO

now tries to walk that admission back, claiming that "the threat of segregation is not clear

on the face of the policy," or that solitary confinement is only one of many possible

sanctions.  ECF No. 312 (Def.'s Decert. Br.) at 43-44.  This granular reading of the

Detainee Handbook misses the forest for the trees.  Reading the handbook's description

of the Aurora Facility's rules as separate and unrelated to the consequences for failing to

follow the rules is absurd; it would make the rules meaningless, which makes little sense

in the context of a detention environment where the structure of consistent rules is a

paramount concern.[112]  And it is belied by the fact that detainees were constantly

reminded of the need to follow the rules.[113]

Nor does the existence of multiple sanctions make the policy any less uniform.

The fact that a TVPA defendant switches tactics to obtain labor does not absolve them of

liability for using coercive means; many TVPA cases involve employers who combine

"legitimate" means of obtaining labor (such as paying wages) with unlawful coercion.

See, e.g., Bradley, 390 F.3d at 154 (affirming jury instruction that payment of a salary is

not determinative of forced labor); Paguirigan v. Prompt Nursing Emp't Agency LLC,

---

[111]    Ex. 21 (GEO Tenth Circuit Br.) at 7-8.
[112]    Ex 2 (Ceja 30(b)(6) Tr. II) 135:17-136:9, 159:6-23.
[113]    Ex. 3 (K. Martin Tr.) 214:10-22; see also Ex. 15 (Pagan Tr.) 135:6-20 ("That's
what we're there for . . . . we've got to get them to follow the rules."); see also Ex. 10
(Gallegos Tr.) 29:24-30:3 (an officer's job is to "[i]mplement the rules, make sure the
rules are followed").

No. 17 Civ. 1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) (granting summary

judgment for class plaintiffs under the TVPA where plaintiffs earned $29 an hour).  Nor

does the existence of such varied tactics pose a predominance problem, because the two

can be mutually reinforcing; GEO's "good cop" approach of resolving issues

"informally" preceded the "bad cop" approach of turning off TVs; eliminating access to

phones, visitation, or recreation; and ultimately, issuing a write-up with the possible

sanction of solitary confinement.  Just as in law enforcement interrogations, the two

approaches worked hand-in-hand by making the compliance with the demands of the

"good cop" more attractive by contrast.  Even if solitary confinement was only rarely

imposed, the threat of it remained omnipresent.

Although each of GEO's guards – all of them current employees – claimed, with

varying degrees of conviction, that the HUSP was "not really enforced,"[114] that "it's not

mandatory,"[115] that "[i]f they didn't want to work, they didn't have to,"[116] and that

"[w]e'll just go to the next person,"[117] each in turn also squarely contradicted themselves.

Martha Vasquez backpedaled rapidly when asked to explain how she learned that the

HUSP was not mandatory; she could not, and eventually admitted that she was only

referring to a single incident, which occurred after the class period, in which she made a

"judgment call" to not force a sick detainee to clean.[118]  She was never told – certainly

---

[114]    Ex. 15 (Pagan Tr.) 109:19-110:14.
[115]    Ex. 9 (Vasquez Tr.) 76:2-4.
[116]    Ex. 13 (Quezada Tr.) 66:3-6.
[117]    Ex. 10 (Gallegos Tr.) 162:14-163:13.
[118]    Ex. 9 (Vasquez Tr.) 102:20-106:7.

not prior to 2014 – that the HUSP was not mandatory, or that she could allow detainees to opt out.[119]  In fact, her training was just the opposite: to use the Detainee Handbook as the source of rules to be enforced.[120]  Sergio Gallegos claimed he had never written up a detainee for refusing to clean[121] – until confronted with five incident reports showing that he had.[122]  Similarly, Pagan acknowledged that the HUSP *was* enforced – directly contradicting himself – when shown an incident that occurred on his shift, and said that the officer involved handled it correctly.[123]  And Joyce Quezada, the only guard who claimed to remember a briefing where she was told that detainees were not required to clean,[124] also testified that it was against the rules to disobey an officer;[125] that detainees knew the rules because they were in the handbook;[126] that detainees could have confidence that the rules were real and would be enforced;[127] that every *other* rule contained in the handbook was enforced,[128] and even that she enforced the HUSP "as written."[129]  Most importantly, she never told detainees that they were free to disregard

---

[119]    *Id*. at 80:8-82:4.
[120]    *Id*. at 82:5-23, 86:21-24, 87:10-88:12.
[121]    Ex. 10 (Gallegos Tr.) 137:17-19.
[122]    *Id*. at 170:7-174:3, 179:15-187:14, 188:8-189:25, 192:5-8, 197:6-200:25, 203:4-206:25.
[123]    Ex. 15 (Pagan Tr.) 109:19-110:14, 119:11-121:6, 122:8-125:4.
[124]    Ex. 13 (Quezada Tr.) 95:6-96:22.
[125]    *Id*. at 79:5-9, 87:24-88:3.
[126]    *Id*. at 83:15-84:2.
[127]    *Id*. at 87:8-19.
[128]    *Id*. at 96:23-97:12.
[129]    *Id*. at 102:1-21.

the rules; she was sure detainees had read the rules, and when asked if detainees were

entitled to believe that the handbook's rules were real, she said, "They know it is."[130]

In addition to being riddled with internal contradictions, this testimony also

contradicts the contemporaneous testimony of GEO's 30(b)(6) witness, Dawn Ceja – an

Assistant Warden at Aurora with authority over the guards.  She testified that the rules

and sanctions in the handbook were posted in the housing units, and agreed that the

expectation was that they would be enforced.[131]  According to her, GEO "[a]bsolutely"

expected detainees to follow the rules in the Detainee Handbook,[132] including the

cleaning requirements,[133] and GEO staff were expected to enforce those rules.[134]  And

contrary to the guards' assertion that cleaning was optional, even when guards told

detainees to do it, Ceja agreed with the statement that detainees should "respond to every

command and directive" and "respect the commands of the detention officers."[135]

---

[130]    *Id.* at 97:16-98:12.  Kevin Martin, whom GEO also cites, was not a guard.  He was
a compliance officer responsible for writing policies, overseeing audits, and writing
articles for a GEO newsletter from 2006 to 2014.  Ex. 3 (K. Martin Tr). 29:4-13, 51:22-
52:7.  Before 2006 he was an administrative lieutenant who spent most of his time
creating employee schedules and doing paperwork; he only supervised a shift 1-2 days
per week.  *Id.* at 51:5-21.  He conceded that he "was never in a position to where I would
have had to have forced a detainee to – to do any kind of cleaning," *id.* at 199:3-5, 200:1-
7, and testified that because he did not work in the housing pods, he would not – and in
fact, did not – have knowledge of detainees being sent to solitary confinement, *id.* at
287:9-288:23.
[131]    Ex. 2 (Ceja 30(b)(6) Tr. II) 138:6-139:12.
[132]    *Id.* at 100:4-11.
[133]    *Id.* at 166:5-167:5.
[134]    *Id.* at 139:2-12
[135]    *Id.* at 105:5-24.

These guards' contentions are exactly the kind of credibility-based factual issue that must be tested before a jury. But regardless of which party's narrative the jury finds persuasive, that narrative will be one that is common to the Class, and thus lends itself to a class proceeding. *See Owino*, 2020 WL 1550218, at *21 (certifying a forced labor class based on a similar policy against GEO competitor CoreCivic where the defendant argued that there was an issue of fact as to whether a uniform policy existed, because "the Court cannot resolve factual disputes of this nature at this stage in the litigation"). If the guards are correct that the HUSP was optional, that fact will be true as to all Class Members, and the jury may conclude that the TVPA was not violated. Alternatively, if the jury finds the guards' testimony not credible, and finds it more likely than not that the policies were really enforced "as written,"[136] it may find for the Class. In either scenario, predominance is not defeated by the guards' testimony because "GEO could introduce this same testimony against *all* class members at trial." *Menocal*, 882 F.3d at 921 n.12 (emphasis added).

## 2. GEO's Uniform Policy Compelled Class Members to Work.

Whether GEO's threats of solitary confinement caused Plaintiffs and members of the Class to perform work under the HUSP is a common question. This is true regardless of whether causation under the TVPA is assessed under a subjective, objective, or hybrid standard. As this Court held and the Tenth Circuit affirmed, causation may be proven with circumstantial evidence. *Menocal*, 320 F.R.D. at 267. In this case, the evidence

---

[136]    Ex. 13 (Quezada Tr.) 102:1-21.

needed to support an inference of causation on a classwide basis is: "(1) the detainee

received notice of the Sanitation Policy's terms, including the possible sanctions for

refusing to clean; and (2) the detainee performed housing unit cleaning work for GEO

when assigned to do so." *Menocal*, 882 F.3d at 919-20.

Three years ago, this Court noted that "the nature of detention is unique in that it

allows the detainer to almost fully control the experience of the detainee." *Menocal*, 320

F.R.D. at 267. It also found that "in this case, Representatives and the putative class

members were all subject to and impacted by the Sanitation policy, and the duties they

performed under the Policy were at the direction of GEO's staff." *Id*. The subsequent

two years of discovery have borne this out. As discussed in greater detail in Part II,

*supra*, the detainees at Aurora received notice of the HUSP, including the requirement to

clean and the sanction of solitary confinement for refusing to do so.[137] This policy was

"clearly set forth" in the Detainee Handbook.[138] The importance of following the rules

was repeated to detainees over and over – in the handbook, which informed detainees

they "have the responsibility to know and abide by the rules, regulations, procedures and

schedules of the facility,"[139] in the orientation video and slideshow, which emphasized

---

[137]    *See, e.g.*, Ex. 1 (Ceja 30(b)(6) Tr. I) 79:19-80:25.
[138]    *Id*.
[139]    ECF No. 273-1 (2005 Detainee Handbook) at 4; ECF No. 273-2 (2007 Detainee
Handbook) at 8; ECF No. 273-4 (2010 Detainee Handbook) at 4; ECF No. 273-5 (2011
Detainee Handbook) at 4; ECF No. 261-17 (2013 Detainee Handbook) at 6.

the importance of knowing and following the facility's rules to avoid punishment,[140] and in the detainees' everyday interactions with guards, who considered their jobs to include both "coaching" detainees about the consequences of a rule violation[141] and placing detainees in solitary confinement for refusing to clean when necessary.[142]

GEO's evidence that detainees cleaned for reasons other than fear of solitary confinement is misleading. Nearly all the evidence it cites refers to personal cleaning that was outside the scope of the HUSP; detainees uniformly testified that they performed HUSP work because they were afraid of being punished with solitary confinement for refusing. For example, Menocal testified that he generally cleans up after *himself* because he prefers a clean environment,[143] but that he cleaned up after *other people* under the HUSP because "everybody knew" that if they didn't, they would be punished with solitary confinement.[144] Hernandez Ceren similarly testified that he would keep his own cell clean, and clean the tables after he personally used them, but that he cleaned up after strangers under the HUSP "because of fear."[145] Jesus Yepez Gaytan testified that he applied to work in the VWP, where he was paid $1/day to work in laundry; this is not relevant to why he performed unpaid work under the HUSP.[146] And while he testified

---

[140]    ECF No. 337-3 (Orientation Video Script) at GEO_MEN 00056576; ECF No. 337-4 (Orientation Video Script) at GEO-MEN 00075174; Ex. 24 (Detainee Orientation Video) at GEO_MEN 00108460.
[141]    *See* Ex. 15 (Pagan Tr.) 133:1-21.
[142]    *Id*. at 124:2-125:4.
[143]    Ex. 6 (Menocal Tr.) 81:6-10.
[144]    *Id*. at 104:25-105:7.
[145]    Ex. 8 (Hernandez Ceren Tr.) 53:18-54:1, 63:9-18.
[146]    Ex. 17 (Yepez Gaytan Tr.) 87:15-90:22.

that detainees received access to video games and ice cream as a reward for having a

clean dorm, he did not testify that this was why he performed HUSP work.[147]  To the

contrary, it was clearly an insufficient enticement, as Yepez Gaytan also testified that

guards regularly had to threaten people in his dorm to get new detainees to perform

HUSP work.[148]  Grisel Xahuentitla testified that she once attempted to step in to do

HUSP cleaning for another detainee who was suffering from kidney stones, but instead of

allowing the substitution, the guard told the ill detainee that if she did not clean herself

she would be sent to solitary confinement.[149]  This is hardly persuasive evidence that

Xahuentitla cleaned for reasons other than fear of solitary confinement.[150]  She in fact

testified that she cleaned because she feared going "to the hole."[151]

GEO also attempts to use an isolated incident described by Demetrio Valerga to

argue that threats did not coerce detainees to clean, but the context shows that the threat

was omnipresent.  Although Valerga described an instance where a guard did not follow

through on a threat, he did, in fact, make the threat, and even went so far as to handcuff

Valerga.[152]  Valerga also testified that, for nearly all of his time at Aurora, he cleaned

---

[147]    *Id*. at 124:3-16.
[148]    *Id*. at 112:1-113:4, 142:23-144:1.
[149]    Ex. 16 (Xahuentitla Tr.) 73:15-76:11.
[150]    If anything, Xahuentitla's willingness to intervene in this situation appears to have been driven by her fear that the other detainee would be subjected to solitary confinement, reinforcing the inference that Xahuentitla viewed solitary confinement as a form of serious harm.
[151]    Ex. 16 (Xahuentitla Tr.) 137:15-19.
[152]    Ex. 18 (Valerga Tr.) 154:4-156:15, 168:13-169:6.

because he was afraid of being put in solitary confinement.[153]  This incident is simply one where Valerga did not suffer damages; it does not suggest lack of causation (much less classwide causation).  This Court already rejected GEO's claim that "any damages inquiry would have to be specific to each class member," and concluded that "the possible need for specific damages determinations does not predominate."  *Menocal*, 320 F.R.D. at 267 (citing *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014)).[154]

The evidence GEO presents creates a dispute of material fact that is properly addressed at trial but does not preclude class certification or defeat predominance.  For example, GEO cites administrator Kevin Martin for the proposition that "there were a lot of other detainees that just volunteered to [clean] because . . . the quicker it was done, the quicker they could start watching TV."  ECF No. 312 (Def.'s Decert. Br.) at 47.  But the jury could just as easily conclude that detainees understood that when the TVs were turned off, the progressive discipline process, which ended in solitary confinement, was already underway.  And this evidence is similar to the testimony GEO presented in opposition to Plaintiffs' previous class certification motion from Dawn Ceja, who testified that "detainees may 'help out' with housing unit cleaning because '[s]ometimes

---

[153]    *Id.* at 168:13-169:6.

[154]    It is uncontroversial that "a class will often include persons who have not been injured by the defendant's conduct. . . . Such a possibility or indeed inevitability does not preclude class certification." *DG ex rel. Stricklin*, 594 F.3d at 1194; *see also Morris v. Davita Healthcare Partners, Inc.*, 308 F.R.D. 360, 368 (D. Colo. 2015) ("[T]his circuit has suggested that—in any context—plaintiffs need not show that . . . every member of a proposed class has been injured at the class certification stage."); *cf. Toviave*, 761 F.3d at 626-27 (6th Cir. 2014) (TVPA criminalizes threats and "pretended threats" of harm).

people just like to keep busy' and '[i]t makes the time go by faster.'" *Menocal*, 882 F.3d at 921 n.12. As the Tenth Circuit noted, "this testimony does not raise concerns about individual issues predominating because GEO could introduce this same testimony against all class members at trial." *Id.* That remains true now. GEO also repeats the argument that Plaintiffs could not have voluntarily participated in the VWP in exchange for a dollar a day but performed similar work under the HUSP only as a result of coercion. As the Tenth Circuit stated, there is "no inconsistency" between these two facts. *Id.*

At most, the evidence GEO points to suggests that some detainees may have performed HUSP work without needing an explicit directive from guards. But GEO's forced-labor scheme was designed to achieve exactly that outcome, by conditioning detainees to understand that there were escalating consequences for not cleaning, which ended in solitary confinement. *See supra* Part II.B. Moreover, as the Court noted in the prior class certification order, "[g]iven the climate in which they were detained, it is possible that an inference of causation would be appropriate even despite some class members' purported willingness to work for reasons other than GEO's improper means of coercion." *Menocal*, 320 F.R.D. at 267 (citing *David v. Signal Int'l, LLC*, No. 08 Civ. 1220, 2012 WL 10759668, at *21 (E.D. La. Jan. 4, 2012)). And as the Tenth Circuit noted on appeal, "the same considerations could lead a reasonable factfinder to conclude by a preponderance of the evidence that each TVPA class member would *not* have performed his or her assigned cleaning duties without being subject to the Sanitation Policy." *Menocal*, 882 F.3d at 922 (emphasis added); *cf. Tyson Foods, Inc. v.*

44

*Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016) (deciding whether generalized evidence is probative of classwide facts is the "near-exclusive province of the jury"). Causation is therefore a common question, susceptible to common answers.

Finally, GEO's argument that Class Representatives are not a "randomized sample" of the Class fundamentally misunderstands the class action mechanism and the burden of proof. GEO has cited no authority for this proposition because there is none, and courts have rejected similar arguments. *See Strauch v. Computer Scis. Corp.*, No. 14 Civ. 956, 2017 WL 5972886, at *4 (D. Conn. Nov. 30, 2017) (Rule 23 does "not hold Plaintiffs' trial plan to the degree of exacting scrutiny that Defendant urges"). To the extent that GEO is arguing that the Class Representatives are not typical, it has offered no such evidence. And, as this Court previously noted, "[t]he commonality and typicality requirements of Rule 23(a) do not require that every member of the class share a fact situation *identical* to that of the named plaintiff." *Menocal*, 320 F.R.D. at 265. What matters for typicality is that "the claims of the class representative and class members are based on the same legal or remedial theory." *Id.* (quoting *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988)); *see also Novoa*, 2019 WL 7195331, at *13 ("[a]lthough [the plaintiffs'] situations were not identical," what matters for typicality is that "they all have the same theory of injury"). And here, the facts supporting each side's theory of the case *are* typical; neither party relies on statistical evidence, but rather on common facts showing that Plaintiffs "were detained in the same facility, did the same work, and faced the same potential sanctions [or in GEO's view, lack thereof] for refusing to work under the same Sanitation Policy." *Menocal*, 882 F.3d at 920 n.10. If GEO believes those

common facts are not probative of Class Members' actual experiences, it may make that argument to the jury. *See Tyson Foods*, 136 S. Ct. at 1049.

### 3.     Serious Harm Under the TVPA Is Well-Suited to Classwide Adjudication.

Serious harm under the TVPA is defined as any harm "that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). This is a reasonable-person standard. *See supra* Part IV.A.2. Accordingly, regardless of whether the Court revisits its earlier conclusion that the TVPA requires a showing that acts prohibited by the statute *actually caused* a victim to work, the definition of serious harm is, pursuant to the clear terms of the statute, an objective one, and well-suited to classwide adjudication.

The evidence supports this conclusion. As GEO previously admitted, all detainees were informed that failure to perform HUSP work could result in up to 72 hours of disciplinary segregation. *See supra* Part II.A; ECF No. 51 (Def.'s Cert. Opp. Br.) at 13. The named Plaintiffs in this case, as noted above, all experienced threats of placement in segregation, and everyone who was asked about their motivations for performing HUSP work confirmed that they did that work out of fear of solitary confinement. *See supra* Part II.B.[155] This is strong evidence that a reasonable person would react similarly under

---

[155]     GEO attempts to manufacture individualized issues surrounding how Plaintiffs knew of GEO's uniform policy. *See* ECF No. 312 (Def.'s Decert. Br.) at 51. But these factual differences are not new evidence, and in fact GEO made this same argument in its previous class certification opposition. *Menocal*, 882 F.3d at 917 n.5 ("The only factual

similar circumstances. And Plaintiffs' expert, Dr. Grassian, has testified that the best-case scenario is that "people in solitary suffer from it," while some people may also develop serious long-term psychiatric disorders.[156] GEO may attempt to rebut Dr. Grassian's testimony that solitary confinement is harmful, but the evidence GEO relies on is *also* common to the Class. For example, GEO's expert Dr. Jeffrey Kropf states in his report that "there is no empirical evidence indicating or even implying that placement in a segregated housing unit . . . for a period of 72 hours or less causes serious psychological harm."[157] That contention is stated as general proposition – not one specific to any member of the Class. And GEO itself implies that the threat of 72 hours of disciplinary segregation does not constitute "'sufficiently serious' harm to provide a cause of relief under the TVPA." ECF No. 312 (Def.'s Decert. Br.) at 50; *see also id.* at 52 n.24 (arguing that "the actual language of the policies is not sufficient to constitute serious harm under the TVPA" and pointing the Court to its request for classwide summary judgment on that issue). This is a perfect example of a merits question common to all Class Members that can be resolved effectively and efficiently in a class action. *See Tyson Foods*, 136 S. Ct. at 1049.

---

differences among the class representatives' experiences pertain to their specific interactions with Aurora Facility guards and whether they witnessed firsthand other individual detainees being sanctioned or threatened with solitary confinement for refusal to clean."). Now as then, these differences do not defeat class certification. *Id.*

[156]    Ex. 19 (Grassian Tr.) 290:3-13.

[157]    Ex. 22 (Kropf Report) at 3. Plaintiffs reserve the right to move to exclude Dr. Kropf's opinion prior to trial.

GEO's citation to Dr. Grassian's statements about how he diagnoses and treats psychiatric ailments have no bearing on the question that matters here,[158] which is whether a reasonable person would continue working to avoid being placed in solitary confinement. Again, serious harm is defined around a reasonable-person standard, which makes it particularly appropriate for classwide adjudication. *See, e.g.*, *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 148 (N.D. Ill. 2017) ("Because the reasonable person standard calls for an objective analysis, whether Precor engaged in representations or omissions that were likely to deceive a reasonable consumer is a question capable of classwide proof."). And, contrary to GEO's representation that this is an issue of first impression, ECF No. 312 (Def.'s Decert. Br.) at 50, it is well-established that TVPA claims alleging "serious harm" can be adjudicated on a classwide basis. *See, e.g.*, *Owino*, 2020 WL 1550218, at *22, *26-28 (certifying a class action in a case alleging forced labor claims against GEO under the TVPA); *Francis*, 406 F. Supp. 3d at 1214-15 (denying motion to strike class allegations in a TVPA action); *Rosas*, 329 F.R.D. at 687 (certifying class action in a case alleging forced labor under the TVPA); *Paguirigan*,

---

[158] GEO's list of things Dr. Grassian does not testify to misses the point entirely. Not testifying to an affirmative fact is not the same thing as testifying to its opposite. And none of the conclusions GEO faults Dr. Grassian for failing to draw are appropriate expert testimony. See ECF No. 312 (Def.'s Decert. Br.) at 50-51. For example, it is true that Dr. Grassian did not testify that the HUSP policy would coerce the class into cleaning, because that is a legal conclusion. But he did testify that solitary confinement causes a baseline level of psychiatric harm to everyone who is exposed to it. *See supra* Part II.D. And he did not make a medical diagnosis of any named Plaintiff or class member because that is not what he was retained to do; a medical diagnosis is not necessary to prove a TVPA violation.

2018 WL 4347799, at *8-10 (same).  In fact, both this Court and the Tenth Circuit have already decided that they can be, in this very case.

Moreover, despite GEO's emphasis on parsing the various possible dictionary definitions of a "threat," the relevant definition comes from the statute itself: a statement is a threat if it is made by an employer "to cause a person in his employ to believe that if she does not continue to work, she will suffer the type of serious harm—physical or nonphysical, including psychological, financial, reputation harm—that would compel someone in her circumstances to continue working to avoid that harm."  *Dann*, 652 F.3d at 1169-70 (quoting 18 U.S.C. § 1589(c)(2)); *see also Calimlim*, 538 F.3d at 712, 217 (finding threat to stop paying victim's poor family members constitutes serious harm). This is not an individualized determination.  The only case GEO cites to support its position to the contrary actually undermines it: in *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 993-97 (D. Idaho 2019), the court considered the threat of serious harm "from the vantage point of a reasonable person," and based on that standard, granted summary judgment to the defendant against all six plaintiffs despite their varying personal circumstances – one plaintiff, for example, had diabetes and was denied a place to store insulin; half of the plaintiffs left work of their own accord while the other half were fired for performance issues.  *Id*. at 993 & n.2, 994.

As noted above, subjective considerations can influence the "reasonable person" standard for serious harm if the victim has "particular vulnerabilities," which may include factors like immigration status.  *See Muchira*, 850 F.3d at 618; *Rivera*, 799 F.3d at 186-87.  But such considerations are not inherently individualized in an immigration detention

49

facility, and, as the Court has previously observed, it is particularly appropriate to assess

them on a classwide basis here given the "distinctive conditions" of confinement.

*Menocal*, 320 F.R.D. at 269.  All of the circumstances that Plaintiffs intend to argue

impact the application of the reasonable-person standard in this case pertain to *uniform*

conditions: Class Members had all been taken from their homes and families and locked

up in jail-like[159] dorms or pods while they waited to learn whether they would be

deported.[160]  While confined, they spent 24 hours a day in the company of up to 80

strangers.[161]  They were forced to shower and use the restroom in front of these strangers

(both guards and other detainees),[162] and told on arrival that violating the rules or

disobeying an officer could result in punishments up to and including solitary

confinement.[163]  Visits with their families were limited to three hours a week; they

---

[159]    The Aurora Facility houses detainees for the U.S. Marshals Service who have been charged with or convicted of federal crimes and are awaiting trial or sentencing.  These detainees are placed in housing identical to the housing used for detainees.  Ex. 3 (K. Martin Tr.) 150:2-7.

[160]    ECF No. 261-8 (2011 PBNDS) at 3.

[161]    Ex. 15 (Pagan Tr.) 108:13-17; Ex. 8 (Hernandez Ceren Tr.) 143:5-17; ECF No. 337-2 (men's cell, ICE 0000123); *id*. (women's unit, ICE 0000142); *see also* ECF No. 273-1 (2005 Detainee Handbook) at 5; ECF No. 273-4 (2010 Detainee Handbook) at 5; ECF No. 273-5 (2011 Detainee Handbook) at 5; ECF No. 261-17 (2013 Detainee Handbook) at 7.

[162]    Ex. 8 (Hernandez Ceren Tr.) 143:5-144:13 (noting that there was no privacy when he used the restroom); ECF No. 337-2 (men's showers, ICE 0000116); *id*. (men's toilets, ICE 0000128); *id*. (women's toilets and showers, ICE 0000139); ECF No. 273-1 (2005 Detainee Handbook) at 5; ECF No. 273-4 (2010 Detainee Handbook) at 5; ECF No. 273-5 (2011 Detainee Handbook) at 5; ECF No. 261-17 (2013 Detainee Handbook) at 7.

[163]    ECF No. 337-3 (Orientation Video Script) at GEO_MEN 00056576; ECF No. 337-4 (Orientation Video Script) at GEO-MEN 00075174; Ex. 24 (Detainee Orientation Video) at GEO-MEN 000108516-19; ECF No. 273-1 (2005 Detainee Handbook) at 25-26; ECF No. 273-2 (2007 Detainee Handbook) at 68; ECF No. 273-3 (2008 Detainee

needed to apply for special permission just to hug their spouses and children.[164]  Plaintiffs

intend to show at trial that these conditions, which applied to all Class Members, would

have increased a reasonable person's vulnerability to coercion.  Nothing about that

showing requires an individualized inquiry.

### 4.    GEO Was Well Aware of the HUSP and its Consequences.

GEO's argument that it lacks knowledge of the HUSP disregards that GEO wrote

the policy,[165] repeatedly and pointedly communicated it to detainees, and enforced the

policy by placing detainees who resisted the HUSP in solitary confinement.  *See supra*

Parts II.A & B.  GEO's own 30(b)(6) representative testified that the policy is clearly set

forth in the Detainee Handbook, and that the handbook "puts detainees on notice" that

they can be sent to solitary for refusing to clean.[166]

GEO's new attempt to argue that its agents or officers were unaware of the HUSP

is unsupported by the record.  *Supra* Part IV.B.1.  Rather, the record reflects precisely

what it did when this Court granted class certification three-and-a-half years ago: that the

HUSP is conveyed clearly by GEO to Class Members in written GEO policy documents,

which also state "that failure to perform one's duties under the Sanitation Policy is a

---

Handbook) at 29; ECF No. 273-4 (2010 Detainee Handbook) at 23; ECF No. 273-5 (2011 Detainee Handbook) at 24-25; ECF No. 261-17 (2013 Detainee Handbook) at 27.
[164]    ECF No. 273-1 (2005 Detainee Handbook) at 11; ECF No. 273-2 (2007 Detainee Handbook) at 30-32; ECF No. 273-3 (2008 Detainee Handbook) at 11-12; ECF No. 273-4 (2010 Detainee Handbook) at 10-11; ECF No. 273-5 (2011 Detainee Handbook) at 10-11; ECF No. 261-17 (2013 Detainee Handbook) at 12-13.
[165]    ECF No. 261-7 (Declaration of Shannon Ely) ¶ 22.
[166]    Ex. 1 (Ceja 30(b)(6) Tr. I) 79:19-80:25.

'high-moderate' offense for which detainees can be punished by the initiation of criminal proceedings, termination from their jobs, and up to 72 hours in disciplinary segregation, among other sanctions." *Menocal*, 320 F.R.D. at 262.  That solitary confinement was not always imposed, or that most Class Members cleaned without needing the threats repeated, does not remove the existence of a uniform policy or the existence of the omnipresent *threat*.[167]  Nor does the fact that refusal to clean was sometimes resolved "informally" before imposing formal discipline.[168]  As the HUSP makes clear, while initial sanctions include things like turning off TVs, "continued refusal to clean" results in more severe sanctions, including solitary confinement.[169]  It is apparent on the face of the policy that informal reprimands and low-level sanctions were a precursor to the higher-level sanction of solitary confinement for detainees who maintained their resistance to cleaning.[170]  GEO wrote this policy and disseminated it to every detainee.  It cannot now pretend that it did not know what the policy said.

> **5.     The Distinction Between HUSP and Other Cleaning Tasks Is Clear.**

GEO's argument that individual questions predominate as to the type of cleaning detainees performed misreads the nature of Plaintiffs' claims and GEO's own policies.

---

[167]     *See supra* Part IV.B.2.

[168]     Ex. 2 (Ceja 30(b)(6) Tr. II) 125:9-129:18.

[169]     ECF No. 273-1 (2005 Detainee Handbook) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 49; ECF No. 273-3 (2008 Detainee Handbook, GEO_MEN 00054223-52) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 16-17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20.

[170]     *Id.*

The housekeeping tasks required by the PBNDS are beyond the scope of Plaintiffs'

claims.  *See generally* ECF No. 260 (Pls.' DSI MSJ Br.).  The line between those tasks

and the HUSP is not hard to draw.  The PBNDS require that all detainees make their

beds, stack loose papers, keep the floor of their cell free of clutter, and remove items

hung from furniture or light fixtures in their "immediate living area."[171]  The HUSP tasks

are performed in "commonly accessible areas of the housing unit," and require detainees

to sweep, mop, and clean tables.[172]

Courts have not struggled to grasp this distinction.  In certifying the Class in the

first instance, this Court recognized that whether work performed as part of the HUSP

violates the TVPA is a common question.  *See Menocal*, 320 F.R.D. at 264-65.  The

Tenth Circuit affirmed this understanding.  *See Menocal*, 882 F.3d at 916-17.  In *Novoa*

*v. GEO Group, Inc.*, a court presented with essentially the same policies ably analyzed

the differences between three different types of work – HUSP work, VWP work, and

unpaid work akin to VWP work – and found class certification appropriate for claims

surrounding each type of work.  2019 WL 7195331, at *16-17.  As in this case, the

*Novoa* court did not require an individualized analysis of the tasks performed by each

detainee.  *Id.*

---

[171]    ECF No. 261-8 (2011 PBNDS) at 51; ECF No. 261-9 (2008 PBNDS) at 61-62;
ECF No. 261-10 (INS Detention Standard) at 3.
[172]    ECF No. 273-1 (2005 Detainee Handbook) at 18; ECF No. 273-2 (2007 Detainee
Handbook) at 49; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010
Detainee Handbook) at 16-17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No.
261-17 (2013 Detainee Handbook) at 20; Ex. 1 (Ceja 30(b)(6) Tr. I) 36:24-37:9; Ex. 4
(Ragsdale 30(b)(6) Tr.) 16:14-18.

6.    **The TVPA's Statute of Limitations Does Not Impact Class Certification.**

Plaintiffs address GEO's arguments regarding the TVPA's statute of limitations in their opposition to GEO's Motion to Summary Judgment, filed concurrently with this brief.  In summary, the claims of all Class Members that accrued after December 23, 2004 are timely.  *See* Pls.' SJ Opp. Br. at 64-67.  While there may be a small number of class members who cannot recover for the period of October 22, 2004 to December 23, 2004, this does not create individualized issues, and GEO has provided no examples, aside from characterizing the statute of limitations as a "fact-based defense."

7.    **GEO Has Disciplinary Segregation for Female Detainees.**

GEO's attempt to exclude female detainees from the Class falls flat.  GEO is incorrect that there was no solitary confinement for female detainees.  As guard Joyce Quezada testified, GEO does have a female segregation unit, "but it's in a different area . . . . the females have their own segregation" in unit D.[173]  Even if GEO's claim were true, it is also true that GEO led female detainees to *believe* they could be sent to solitary confinement for rule violations, including failure to clean.  Male and female detainees were presented with the same orientation materials, including the Detainee Handbook and the orientation video/slideshow.[174]  Regardless of whether presented to a male or female detainee, the Detainee Handbook and the orientation video/slideshow described the

---

[173]    Ex. 13 (Quezada Tr.) 112:16-113:12; Ex. 15 (Pagan Tr.) 42:17-25, 43:12-17; *see also* ECF No. 336-6 (Segregation Activity Sheet, GEO-MEN 00070692-93) (allowing space to identify female detainees in segregation).

[174]    Ex. 23 (Ceja Tr. III) 67:16-68:4.

Aurora Facility's rules, including the cleaning requirements, as well as the possible punishments for failing to follow those rules, including solitary confinement.[175]  Because female detainees were told they could be sent to solitary confinement for failing to follow the Aurora Facility's cleaning rules, they worked under the same threat as male detainees. For example, Grisel Xahuentitla testified that when "they tell you 'clean, because you're going to the hole,' . . . I'm going to clean.  I don't want to go to the hole."[176]

Because male and female detainees were subject to the same threats under GEO's HUSP, the same common merits questions for the jury, such as whether the HUSP is an improper means of coercion under the TVPA, apply regardless of the Class Member's gender.  *See Menocal*, 320 F.R.D. at 264-65.

## V.    CONCLUSION

This Class may be maintained as a class action for all of the same reasons that made class certification appropriate when the Court first analyzed the question, and when the Tenth Circuit affirmed that order.  GEO's attempt to walk back its admission that the Class was subject to a uniform policy is unpersuasive and should not result in decertification.

---

[175]    *Id.*
[176]    Ex. 16 (Xahuentitla Tr.) 137:15-19.

Dated: New York, NY
      October 26, 2020

Respectfully submitted,

By: */s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
E-Mail: mscimone@outtengolden.com

Rachel Dempsey
Adam Koshkin
**OUTTEN & GOLDEN LLP**
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
E-Mail: rdempsey@outtengolden.com
E-Mail: akoshkin@outtengolden.com

Alexander Hood
David Seligman
Juno Turner
**TOWARDS JUSTICE**
1410 High St., Suite 300
Denver, CO 80218
(720) 441-2236
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org

R. Andrew Free
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
T: (844) 321-3221
Andrew@ImmigrantCivilRights.com

Brandt Milstein
**MILSTEIN LAW OFFICE**
1123 Spruce Street
Boulder, CO 80302

(303) 440-8780
brandt@milsteinlawoffice.com

Andrew Turner
**THE KELMAN BUESCHER FIRM,
P.C.**
600 Grant St., Suite 825
Denver, CO 80203
(303) 333-7751
aturner@laborlawdenver.com

Hans Meyer
**MEYER LAW OFFICE, P.C.**
P.O. Box 40394
Denver, CO 80204
(303) 831-0817
hans@themeyerlawoffice.com

*Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 26, 2020, a copy of the foregoing document was

filed electronically.  Service of this filing will be made on all ECF-registered counsel by

operation of the court's electronic filing system.  Parties may access this filing through

the Court's system.

*/s/ Michael J. Scimone*
Michael J. Scimone
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
E-Mail: mscimone@outtengolden.com

**List of Exhibits Attached to Opposition to Decertification Motion**

**Ex. 1**: Decl. of Michael J. Scimone ("Scimone Decl.") in support of Plaintiffs' Opposition to Defendant's Motion for Decertification, dated October 26, 2020.

**Ex. 2**: Att. 1 to Scimone Decl., Pls.' Opposition Ex. 1, excerpts from the March 29, 2016 30(b)(6) deposition of Dawn Ceja.

**Ex. 3**: Att. 2 to Scimone Decl., Pls.' Opposition Ex. 2, excerpts from the August 5, 2020 30(b)(6) deposition of Dawn Ceja.

**Ex. 4**: Att. 3 to Scimone Decl., Pls.' Opposition Ex. 3, excerpts from the November 19, 2019 deposition of Kevin Martin.

**Ex. 5**: Att. 4 to Scimone Decl., Pls.' Opposition Ex. 4, excerpts from the February 27, 2020 30(b)(6) deposition of Daniel Ragsdale.

**Ex. 6**: Att. 5 to Scimone Decl., Pls.' Opposition Ex. 5, excerpts from the February 21, 2018 deposition of Dagoberto Vizguerra.

**Ex. 7**: Att. 6 to Scimone Decl., Pls.' Opposition Ex. 6, excerpts from the July 22, 2020 deposition of Alejandro Menocal.

**Ex. 8**: Att. 7 to Scimone Decl., Pls.' Opposition Ex. 7, excerpts from the July 16, 2020 deposition of Alejandro Hernandez Torres.

**Ex. 9**: Att. 8 to Scimone Decl., Pls.' Opposition Ex. 8, excerpts from the June 24, 2020 deposition of Hugo A. Hernandez-Ceren.

**Ex. 10**: Att. 9 to Scimone Decl., Pls.' Opposition Ex. 9, excerpts from the June 29, 2020 deposition of Martha Vasquez.

**Ex. 11**: Att. 10 to Scimone Decl., Pls.' Opposition Ex. 10, excerpts from the June 30, 2020 deposition of Sergio Gallegos.

**Ex. 12**: Att. 11 to Scimone Decl., Pls.' Opposition Ex. 13, excerpts from the July 28, 2020 deposition of Joyce Quezada.

**Ex. 13**: Att. 12 to Scimone Decl., Pls.' Opposition Ex. 15, excerpts from the July 8, 2020 deposition of Luis Pagan.

**Ex. 14**: Att. 13 to Scimone Decl., Pls.' Opposition Ex. 16, excerpts from the October 26, 2017 deposition of Grisel Xahuentitla.

**Ex. 15**: Att. 14 to Scimone Decl., Pls.' Opposition Ex. 17, excerpts from the November 16, 2017 deposition of Jesus Gaytan.

**Ex. 16**: Att. 15 to Scimone Decl., Pls.' Opposition Ex. 18, excerpts from the October 27, 2017 deposition of Demetrio Valerga.

**Ex. 17**: Att. 16 to Scimone Decl., Pls.' Opposition Ex. 19, excerpts from the July 23, 2020 deposition of Stuart Grassian.

**Ex. 18**: Att. 17 to Scimone Decl., Pls.' Opposition Ex. 20, transcript of the November 15, 2017 oral argument before the Tenth Circuit in *Menocal v. GEO Grp., Inc.*, No. 17-1125 (10th Cir.).

**Ex. 19**: Att. 18 to Scimone Decl., Pls.' Opposition Ex. 21, Opening Brief for Appellant filed in Menocal v. GEO Grp., Inc., No. 17-1125 (10th Cir.).

**Ex. 20**: Att. 19 to Scimone Decl., Pls.' Opposition Ex. 22 Segregated Housing & Solitary Confinement report of GEO expert Dr. Jeffrey Kropf.

**Ex. 21**: Att. 20 to Scimone Decl., Pls.' Opposition Ex. 23, excerpts from the September 16, 2020 30(b)(6) deposition of Dawn Ceja.

### List of Exhibits Attached to Notice of Restriction

**Ex. 1**: Att. 1 to Notice of Restriction, Pls.' Opposition Ex. 11, Powerpoint titled "Anatomy of a Con Game," Bates stamped GEO-MEN 00106711.

**Ex. 2**: Att. 2 to Notice of Restriction, Pls.' Opposition Ex. 12, excerpts from the personnel file of Joyce Quezada, Bates stamped GEO-MEN0017282-83.

**Ex. 3**: Att. 3 to Notice of Restriction, Pls.' Opposition Ex. 14, "Aurora ICE Processing Center Building Schedule," Bates stamped GEO-MEN 00072830-31.

**Ex. 4**: Att. 4 to Notice of Restriction, Pls. Opposition Ex. 24, "Detainee Orientation Video," Bates stamped GEO-MEN 00108452-521.