# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02887-JLK

_____

RULE 30(b)(6) DEPOSITION OF:
DAWN CEJA - March 29, 2016
The GEO Group, Inc.

_____

ALEJANDRO MENOCAL, et al.,

Plaintiffs,

v.

THE GEO GROUP, INC.,

Defendant.

_____

PURSUANT TO NOTICE, the Rule 30(b)(6)
deposition of DAWN CEJA, THE GEO GROUP, INC., was
taken on behalf of the Plaintiffs at 600 Grant Street,
Suite 450, Denver, Colorado 80203, on March 29, 2016,
at 9:34 a.m., before Darcy Curtis, Registered
Professional Reporter and Notary Public within
Colorado.

                    A P P E A R A N C E S

    For the Plaintiffs:

            ANDREW FREE, ESQ.
            Law Office of R. Andrew Free
            1212 7th Avenue North
            Nashville, Tennessee 37208

            ALEXANDER HOOD, ESQ.
            Towards Justice
            1535 High Street
            Suite 300
            Denver, Colorado 80218

            ANDREW H. TURNER, ESQ.
            Buescher, Kelman, Perera & Turner, P.C.
            600 Grant Street
            Suite 450
            Denver, Colorado 80203

            BRANDT P. MILSTEIN, ESQ.
            Milstein Law Office
            595 Canyon Boulevard
            Boulder, Colorado 80302

    For the Defendant:

            SHELBY A. FELTON, ESQ.
            Vaughan & DeMuro
            720 South Colorado Boulevard
            Penthouse, North Tower
            Denver, Colorado 80246

 1    Aurora.

 2          Q.    That's all I want you to discuss for the

 3    purposes of this question.

 4          A.    Okay.

 5          Q.    I'm asking:  Do you know the name of the

 6    person or the people, names of the people, who take

 7    these three sources of the policy and put them

 8    together?

 9          A.    It changes.  Currently we have our

10    accreditation manager that does our policy review.

11          Q.    Anybody else?

12          A.    Everybody will review a policy, and if

13    they have additions or things that need to be deleted,

14    that's what I refer to as a policy review.  It's a

15    group.  Then the final policy is reviewed by the

16    warden and signed off when it's done by the warden and

17    by immigration.

18          Q.    Who is "we" in the policy review group?

19          A.    Usually the department heads, so it could

20    be myself, the program manager, the accreditation

21    manager, the chief of security.  Usually people more

22    in the upper echelon.

23          Q.    How often does that happen?

24          A.    Annually.

25          Q.    Who at ICE signs off on the policy?

Case No. 1:14-cv-02887-JLK-CYC    Document 339-2    filed 10/26/20    USDC Colorado
pg 5 of 24
Menocal v. The Geo Group, Inc.              DAWN CEJA                                3/29/2016

Page 29

 1          A.    The COTAR, the contracting officer's

 2    technical representative.

 3          Q.    Do you know which version of the

 4    Performance-Based National Detention Standards the

 5    policy is currently drawn from?

 6          A.    Currently we are going off of the 2011,

 7    and then I think there's been some adjustments on

 8    there that are from 2013.

 9          Q.    Do you happen to know which version of

10    the Performance-Based National Detention Standard

11    governs the current contract between ICE and GEO?

12          A.    The same ones that I just said.

13          Q.    Okay.  The housing unit sanitation policy

14    applies to all ICE detainees at the Aurora Detention

15    Facility, correct?

16          A.    Yes.

17          Q.    Are they provided a copy of this policy?

18          A.    No.

19          Q.    What are they provided in order to know

20    how they need to comply?

21          A.    They, upon initial admission, review a

22    PowerPoint presentation as an orientation video.  They

23    receive a handbook, a local supplement handbook, and

24    they also receive an ICE handbook.  In each housing

25    unit are bulletin boards, and we post notices and

Case No. 1:14-cv-02887-JLK-CYC    Document 339-2    filed 10/26/20    USDC Colorado
pg 6 of 24
Menocal v. The Geo Group, Inc.                    DAWN CEJA                          3/29/2016

Page 30

```
 1    things along such as that on those housing unit

 2    bulletin boards.

 3            Q.   Is it a separate PowerPoint and video?

 4            A.   Yes.

 5            Q.   Okay.  And that PowerPoint includes

 6    information about the housing unit sanitation policy,

 7    correct?

 8            A.   Yes.

 9            Q.   Have you seen the video?

10            A.   I initially put the original one

11    together, yes.

12            Q.   You were responsible for compiling it.

13    Do you know if that's the one that's used right now?

14            A.   There have been updates to it.

15            Q.   Okay.  Do you know what information it

16    provides detainees regarding the housing unit

17    sanitation policy?

18            A.   I would have to review it again to give

19    you accurate information.

20            Q.   Okay.  Can you remember anything about

21    what it says?

22            A.   No.

23            Q.   Do you know what languages it's brought

24    in?

25            A.   English and Spanish.
```

 1  annual basis and make changes as needed.

 2          Q.   And the policy review committee has

 3  always been GEO or its corporate predecessor; is that

 4  correct?

 5          A.   Local Aurora staff, yes.

 6          Q.   The local GEO folks in Aurora?

 7          A.   Yes.

 8          Q.   Again, I'm not asking about any GEO

 9  office anywhere else for the purpose of this next line

10  of questions.  Section V on page 55, do you see that

11  section?

12          A.   Yes.

13          Q.   And what does that say?  It says, "The

14  center will maintain the highest sanitation standards

15  at all times in all locations without exception.

16  There will be an organized, supervised and continuous

17  program of daily cleaning by all detainees to maintain

18  those standards."

19          A.   Yes.

20          Q.   Is this part of your housing unit

21  sanitation policy?

22          A.   To have high sanitation levels, yes.

23          Q.   And indeed, to have an organized,

24  supervised and continuous program of daily cleaning by

25  all detainees to maintain those standards?

1        A.   Correct, the voluntary work program with

2   the detainees.

3        Q.   **So when you read this second sentence,**

4   **you are understanding the organized, supervised**

5   **continuous program of daily cleaning by all detainees**

6   **to mean the voluntary work program; is that right?**

7        A.   It's all encompassing.  So you have your

8   voluntary work program, which covers areas in laundry

9   or kitchen, and then you have your housing unit

10  sanitation, which we discussed earlier.

11       Q.   **Okay.  What else does the voluntary work**

12  **program cover that is not covered by the housing unit**

13  **sanitation policy?**

14       A.   I don't follow your question.

15       Q.   **It's because I've been trying to sort of**

16  **separate these things out into topics, because I want**

17  **us to be in one lane, if we can, mentally.**

18       A.   Okay.

19       Q.   **Because we have a topic about the**

20  **voluntary work program; we have a topic about the**

21  **housing sanitation policy.  It seems to me that you've**

22  **described it as two programs, the voluntary work**

23  **program and then the obligations of the detainees.  Is**

24  **that a fair understanding?**

25       A.   I see it as your housing unit where you

```
 1   do your housing unit sanitation, and then there is as

 2   well your voluntary work program where they put in an

 3   application and are chosen to work in other areas of

 4   the facility.

 5          Q.   But sometimes the voluntary work program

 6   detainees work in the housing unit; is that right?

 7          A.   Yes.

 8          Q.   If you'll turn the page to the next part

 9   of the exhibit, it's page 56.  Do you see on the

10   left-hand column where it says, "Housing Unit

11   Sanitation"?

12          A.   Yes.

13          Q.   It says, "Each and every detainee must

14   participate in the facility's sanitation program.  A

15   list of detainees is developed each day by staff and

16   is posted daily for viewing.  During a general cleanup

17   all detainees must participate.  The assigned housing

18   unit officer will be responsible for assuring this

19   general cleanup is done on a regular basis."  Do you

20   see that?

21          A.   Yes.

22          Q.   Is that the current policy of GEO?

23          A.   Yes.

24          Q.   What's a general cleanup?

25          A.   After meals they have a day room area,
```

1    which is a common area, where all of the TVs and

2    tables are located.  They all eat at these tables, so

3    after meal service, they will clean up the tables,

4    wipe down the tables, and sweep and mop the floors.

5            Q.    And that is -- according to this policy,

6    all detainees are required to participate?

7            A.    In that common area cleanup.

8            Q.    So that's every meal?

9            A.    Yes.

10           Q.    So when it says, "this general cleanup is

11   done on a regular basis," that's one of the examples.

12   A meal time is one of the examples; is that right?

13           A.    Yes.

14           Q.    Are there any other examples of when a

15   general cleanup happens?

16           A.    No.  The general cleanup that that is

17   discussing is after the meal service.

18           Q.    Okay.  So there's never another time when

19   there's a general cleanup?

20           A.    Not in the common area, no.

21           Q.    Okay.  What about anywhere else?

22           A.    No.

23           Q.    All right.  Every single detainee at the

24   Aurora Detention Facility who is detained under the

25   ICE contract is bound by this housing unit sanitation

Menocal v. The Geo Group, Inc.                     DAWN CEJA                              3/29/2016

 1    policy; is that right?

 2              A.    If they're housed in a housing unit.

 3              Q.    **Where else could they be housed if**

 4    **they're an ICE detainee?**

 5              A.    Medical.

 6              Q.    **So if you're in medical, you're not**

 7    **subject to those cleanup requirements?**

 8              A.    If there's a medical condition or some

 9    type of contagious disease that they may have, then,

10    no.

11              Q.    **Okay.  How many people can be housed in**

12    **medical at a time?**

13              A.    I believe there's 11 beds in there.

14              Q.    **Okay.  What's the current bed count at**

15    **the facility for ICE detainees?**

16              A.    Today?

17              Q.    **Yes.  How many available beds do you**

18    **have?**

19              A.    The contract is up to 525.

20              Q.    **So the maximum number of beds that you**

21    **can supply to ICE under your contract?**

22              A.    Yes.

23              Q.    **If you could, I now would like you to**

24    **take a look at pages 46 and 51 -- excuse me -- 46**

25    **through 51.  So you're going to go backwards and**

 1          A.    They are all single cell units.

 2          Q.    What about in disciplinary segregation?

 3     Is anybody else in the cell with a person who is

 4     detained in disciplinary segregation?

 5          A.    No.  It's one unit.  So one side is

 6     disciplinary, one is administrative.

 7          Q.    What's the purpose of administrative

 8     segregation?

 9          A.    That can vary also.  So there's

10     protective custody.  A detainee can request to be

11     placed on protective custody.  We could say, hey, you

12     need to be put on protective custody, based on threats

13     that are being made, for that person's safety.  ICE

14     can request somebody be placed in administrative seg

15     for protective custody purposes.  A lot of people just

16     like to go back there for the peace and quiet.  We

17     only average about four people back there, so it's

18     very quiet.  They get to watch TV.  Some people really

19     enjoy it back there.

20          Q.    I don't understand.  You just told me

21     that a lot of people like to go to administrative

22     segregation for the peace and quiet.  And I think I

23     understood you to testify that there are only four

24     people back there during a given day?

25          A.    On average.

Case No. 1:14-cv-02887-JLK-CYC    Document 339-2    filed 10/26/20    USDC Colorado
pg 13 of 24
Menocal v. The Geo Group, Inc.                    DAWN CEJA                    3/29/2016

Page 56

 1          Q.   You have 500 beds that at some point are
 2    in some level of being filled; is that right?
 3          A.   525.
 4          Q.   So if it's so popular, why doesn't
 5    everybody go back there during the day?
 6          A.   Some of them do for short periods of
 7    time.
 8          Q.   Like how long?
 9          A.   It depends.  Some go back there for a
10    week.  Some go back there for a few days.  Some just
11    say they can't handle general population living.
12          Q.   They go to administrative segregation,
13    not disciplinary segregation?
14          A.   Correct.  Only -- and I'm only discussing
15    administrative segregation.
16          Q.   Let's talk about disciplinary
17    segregation.  Same explanation that you gave for
18    administrative segregation as far as the purpose, or
19    does it have a different purpose?
20          A.   As I stated earlier, if you get charged
21    with a violation, depending on the level, usually 100
22    and 200 levels, you're automatically going to be taken
23    back there and be put on the administrative
24    segregation side pending your hearing.
25          Q.   I don't know that that answers my

 1    question.  I'm asking about what the purpose of

 2    disciplinary segregation is.  Do you understand that

 3    question?

 4         A.   Yes.

 5         Q.   Okay.  What's the purpose of disciplinary

 6    segregation?

 7         A.   So disciplinary segregation, if they're

 8    found guilty of a rule violation after a hearing,

 9    that's where they will be housed as like a punitive

10    measure based on their behavior.  If they get into a

11    fight, which is a high-level offense, especially if

12    there's injuries, they're going to spend time in

13    disciplinary segregation based off of what the hearing

14    officer says.

15         Q.   And according to the disciplinary policy,

16    if you are charged with a 300-level offense, for

17    instance, not cleaning your area and complying with

18    the housing unit sanitation policy, one of the things

19    that you can suffer is up to 72 hours in segregation;

20    is that right?

21              MS. FELTON:  Object to form.

22         A.   They could go back there to the

23    administrative segregation side based on their

24    hearing.  So what happens a lot of times is if

25    somebody goes back there on a 300-level offense, they

 1   would go back there.  And I'm not just saying on the

 2   306 or anything, but on any 300 or 400-level offense,

 3   if they go back there, by the time their hearing is

 4   done, they get time served and they get moved out.

 5   Usually the turnaround is about two days.

 6          Q.    (BY MR. FREE)  So the hearing is such

 7   that they don't even have time to contest their time

 8   in administrative segregation because it's not

 9   happening immediately; is that right?

10          MS. FELTON:  Object to form.

11          A.    That's the way the PBNDS is written.  We

12   have so many hours to do the investigation and get the

13   UDC done.

14          Q.    (BY MR. FREE)  How many hours do you

15   have?

16          A.    24 hours and then another 24 hours to get

17   the UDC done.  The UDC is done for all four levels,

18   but the IDP is done for 100 and 200 levels.

19          Q.    Just so we're clear when we're reading

20   the transcript, can you tell us what an IDP and a UDC

21   are, please.

22          A.    So the UDC is the Unit Disciplinary

23   Committee.  That's for low-level offenses.  And the

24   IDP is the Interdisciplinary Panel for the high-level

25   offenses.

1          Q.    (BY MR. FREE)  The tier is --

2                MR. FREE:  And by answer, I just want to

3    clarify, you're instructing your witness not to

4    diagram?

5                MS. FELTON:  Diagram.

6          Q.    (BY MR. FREE)  And it's just one tier of

7    a segregation unit, is my understanding, based on your

8    testimony so far?

9          A.    Correct.  ICE does not utilize -- we do

10   not house ICE detainees on the second tier, just on

11   the lower tier.

12         Q.    So it's just the lower floor of one tier?

13         A.    Correct.

14         Q.    Okay.  You said there are TVs on one

15   side, right?

16         A.    The TVs face the administrative

17   segregation side.

18         Q.    Okay.  They don't face the disciplinary

19   segregation side?

20         A.    Correct.

21         Q.    And you said in administrative

22   segregation, you get two hours of social time?

23         A.    Yes.

24         Q.    Where are you when you're not doing

25   social time?

```
 1              A.   In the cell or outside in recreation.

 2    They still get recreation time.

 3              Q.   How much time of recreation do you get?

 4              A.   Up to two hours.

 5              Q.   Is that overlapping with social time, or

 6    is that separate from it?

 7              A.   Separate.

 8              Q.   Out of a 24-hour day, you're talking

 9    about 20 hours in the cell; is that right?

10              A.   Correct.

11              Q.   And you're physically restrained in the

12    cell?

13              MS. FELTON:  Object to form.

14              Q.   (BY MR. FREE)  Let me rephrase.  Is the

15    door shut?

16              A.   Yes.

17              Q.   Is the cell door locked?

18              A.   Yes.

19              Q.   You're physically not able to get out of

20    the cell for that 20 hours?

21              A.   Correct.

22              Q.   Do the detainees understand you're going

23    to be physically restrained in the cell when you go to

24    administrative segregation?  Is that something that's

25    explained to them?
```

```
 1              MS. FELTON:  Object to form.

 2       A.    They're not physically restrained inside

 3  the cell, but the door is closed, yes.

 4       Q.    (BY MR. FREE)  The door physically

 5  prevents them from going out of the cell like they

 6  would in their pod; is that right?

 7       A.    Correct.

 8       Q.    And is that part of the explanation that

 9  you're giving to detainees about the consequences of

10  violating the disciplinary rules?

11              MS. FELTON:  Object to form.

12       A.    I don't understand.

13       Q.    (BY MR. FREE)  Do the detainees know what

14  administrative segregation is or seg, whatever you're

15  calling it, solitary, is this something that is

16  explained to a detainee when he or she enters the

17  facility?

18       A.    Yes.

19       Q.    Okay.  It's fair to say that when looking

20  at all of these policies, including the housing unit

21  sanitation policy, the detainee is on notice that if

22  he or she doesn't comply, he or she could be taken to

23  administrative segregation; is that right?

24       A.    Correct.  And that's clearly set forth in

25  the detainee handbook.
```

```
 1          Q.    Nobody is springing this on them at the

 2   last minute as a surprise?

 3          A.    Correct.

 4                MS. FELTON:   Object to form.

 5          Q.    (BY MR. FREE)   And they know they're

 6   going to be limited in their movement in

 7   administrative segregation?

 8          A.    Yes.

 9                MS. FELTON:   Object to form.

10          A.    Yes.

11          Q.    (BY MR. FREE)   Okay.   At least that is

12   the information that you're providing to detainees so

13   they can comply with the policies; is that right?

14          A.    Yes.

15          Q.    Okay.   By that, I mean, that their

16   movement is going to be limited and they're going to

17   be limited in their amount of social time, rec time;

18   is that right?

19          A.    Yes.

20          Q.    Okay.   Now, the detainee handbook puts

21   detainees on notice that they could actually be put in

22   disciplinary segregation for up to 72 hours if they

23   violate the requirement that they clean up; is that

24   right?

25          A.    Yes.
```

1  place?

2      A.   Yes.  The system was in place when I

3  started as a detention officer in 1995.

4      Q.   **Maybe this first design may have dated**

5  **back to that.**

6      A.   No.

7      Q.   **Okay.  I kid.  So let's now take a look**

8  **at what we're going to mark as Exhibit 5 to this**

9  **deposition.**

10          (Deposition Exhibit 5 was marked.)

11     Q.   **Again, I'm sorry, but we do not have it**

12 **in your binder, if you'll just slide that in at Tab 18**

13 **of your deposition notebook.  Take a look and review**

14 **that, please, and let me know when I can ask you some**

15 **questions about it.**

16          MS. FELTON:  Is this 5?

17          MR. FREE:  It's Exhibit 5, correct.

18     Q.   **(BY MR. FREE)  At the bottom of the page,**

19 **this is Plaintiffs 51, 52, 53, 54, and 55.  Have you**

20 **had a chance to look at that?**

21     A.   Yes.

22     Q.   **Do you recognize this document?**

23     A.   Yes.

24     Q.   **What is it?**

25     A.   It is part of the detainee handbook local

```
 1   supplement.

 2          Q.    And is this one of the things or part of

 3   one of the handbooks that you testified earlier is

 4   provided to a detainee when he or she is admitted to

 5   the Aurora facility?

 6          A.    Yes.

 7          Q.    This section, Section VIII, at the bottom

 8   left-hand corner and what follows is the formal

 9   document that puts the detainee on notice of his or

10   her obligations and rights under the discipline

11   policy; is that right?

12          A.    Yes.

13                MS. FELTON:  Object to form.

14          Q.    (BY MR. FREE)  Do they get this every

15   time, this section of the handbook?

16                MS. FELTON:  Object to form.

17          A.    Yeah.

18          Q.    (BY MR. FREE)  Every time a detainee is

19   admitted --

20          A.    Yes, and they sign for it.

21          Q.    -- he or she signs memorializing that he

22   or she received this policy?

23          A.    Yes.

24          Q.    Now, the only reason I wanted you to look

25   at this, because I want to make sure I'm clear, if
```

Case No. 1:14-cv-02887-JLK-CYC   Document 339-2   filed 10/26/20   USDC Colorado
pg 22 of 24
Menocal v. The Geo Group, Inc.                    DAWN CEJA                        3/29/2016

Page 89

 1    you'll turn to PL 54, the 300-level offense that you

 2    were referring to earlier, would that have been 306,

 3    refusal to clean assigned living area?

 4         A.   Yes.

 5         Q.   Okay.  And that's in the high moderate

 6    offense category; is that right?

 7         A.   Yes.

 8         Q.   There are low moderate offense

 9    categories, but this is not in them; is that right?

10         A.   Yes.  If you're referring to the 400

11    level, yes.

12         Q.   That is right.  And in the list of

13    sanctions that apply to high moderate offenses,

14    detainees are informed through this document that GEO

15    could initiate criminal proceedings?

16              MS. FELTON:  Object to form.

17         Q.   (BY MR. FREE)  Is that right?

18         A.   That's what is listed, yes.

19         Q.   I'm going to ask whether these other

20    sanctions could follow from a 306 violation.  I think

21    the one we talked about earlier was a disciplinary

22    segregation, up to 72 hours, right?

23         A.   Yes.

24         Q.   They could lose a job; is that right?

25         A.   Yes.

        I, DAWN CEJA, do hereby certify that I
have read the above and foregoing deposition and that
the same is a true and accurate transcription of my
testimony, except for attached amendments, if any.

        Amendments attached    ( ) Yes  ( ) No


_____
DAWN CEJA



        The signature above of DAWN CEJA was
subscribed and sworn to before me in the County of
_____, State of Colorado, this _____ day of
_____, 2016.



_____
Notary Public
My commission expires



Alejandro Menocal 3/29/16 (dc)

REPORTER'S CERTIFICATE

STATE OF COLORADO        )
                         ) ss.
CITY AND COUNTY OF DENVER  )

       I, Darcy Curtis, Registered Professional
Reporter and Notary Public ID 20064016972, State of
Colorado, do hereby certify that previous to the
commencement of the examination, the said DAWN CEJA
was duly sworn by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.

       I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

       IN WITNESS WHEREOF, I have affixed my
signature this 12th day of April, 2016.


       My commission expires May 2, 2018.


___X_  Reading and Signing was requested.

_____  Reading and Signing was waived.

_____  Reading and Signing is not required.