# Exhibit 2

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3    Civil Action No. 1:14-cv-02887-JLK-MEH

     _____
4
                  RULE 30(b)(6) DEPOSITION OF:
5              DAWN CEJA, VOLUME I - August 5, 2020
                      The GEO Group, Inc.
6                      (Via RemoteDepo)

     _____
7
     ALEJANDRO MENOCAL, MARCOS BRAMBILA, GRISEL
8    XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA,
     JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO
9    VIZGUERRA, and DEMETRIO VALERGA, on their own and
     on behalf of all others similarly situated,

10
     Plaintiffs,

11
     v.

12
     THE GEO GROUP, INC.,

13
     Defendant.

14
     _____

15
                   PURSUANT TO NOTICE, the Rule 30(b)(6)
16   deposition of DAWN CEJA, THE GEO GROUP, INC., Volume
     I, was taken on behalf of the Plaintiffs by remote
17   means in Arapahoe County, Colorado, on August 5, 2020,
     at 9:04 a.m. MDT, before Sherry Wallin, Certified
18   Realtime Reporter, Registered Merit Reporter and
     Notary Public within Colorado, appearing remotely from
19   Adams County, Colorado.

20

21

22

23

24

25

```
 1          A.   Yes.

 2          Q.   And so looking at the tasks listed here,

 3   are any of these tasks performed by anyone other than

 4   workers in the voluntary work program?

 5          A.   No, it's all under VWP.

 6          Q.   Okay.  And I know you testified earlier

 7   that the facility employs one janitor, correct?

 8          A.   Yes.

 9          Q.   What areas of the facility does the

10   janitor clean, if any?

11          A.   What time period are you talking?

12          Q.   Let's say from 2004 to 2014.

13          A.   First, I would have to verify when we

14   actually got a janitor added to our staffing plan.

15   I'm not sure what year that was.  But the janitor that

16   I recall from around maybe 2010 to 2014 was cleaning

17   the administrative areas of GEO, ICE, and the courts.

18          Q.   And when you say "administrative areas,"

19   do you mean, like, office suites, essentially?

20          A.   Office areas.

21          Q.   Was the janitor that you recall named

22   Ms. Deets?

23          A.   Yes.

24          Q.   And you said that there was a time when

25   the facility did not have a janitor as part of its
```

```
 1   staffing plan?

 2         A.   Correct.

 3         Q.   And during those times who cleaned the

 4   administrative areas in the facility?

 5         A.   We typically would clean our own

 6   offices -- excuse me -- and -- but, again, I'd have to

 7   check and see exactly when we had a janitor added to

 8   the staffing plan.

 9         Q.   Is there a janitor on the staffing plan

10   now?

11         A.   Yes.

12         Q.   Was there ever a time that the facility

13   employed more than one janitor at the same time?

14         A.   I don't believe so, no.

15         Q.   Okay.  You can put Exhibit 4 aside for

16   now.  And I've put into the chat a document that I'd

17   like to ask the court reporter to mark as Exhibit 5.

18   It's Bates-stamped GEO_MEN 56575.

19              (Deposition Exhibit 5 was remotely

20   introduced.)

21         Q.   Please take a look at that and let me

22   know when you're ready.

23         A.   Yes.

24         Q.   Are you familiar with this document?

25         A.   Yes.  I have seen this before.
```

 1          Q.   Okay.  When have you seen it before?

 2          A.   I saw it yesterday and years ago, when

 3  it was developed.

 4          Q.   And what is this document?

 5          A.   It is a document that was read to make

 6  an orientation video when technology wasn't so

 7  upgraded.

 8          Q.   And so when you make reference to an

 9  orientation video, was this an orientation video that

10  was shown to detainees?

11          A.   Shown to detainees upon their arrival.

12          Q.   And so would all detainees -- well, let

13  me back up.

14               Do you remember approximately when this

15  orientation video was made?

16          A.   I don't recall.  It was a long time ago.

17          Q.   More than 10 years ago?

18          A.   Probably, yes.

19          Q.   Do you know, is the orientation video

20  still in use?

21          A.   Yes.

22          Q.   And does it have the same voiceover, so

23  to speak?

24          A.   No.  It's a PowerPoint presentation.

25          Q.   Okay.  So the current orientation video

     1    is a PowerPoint presentation.  What was it prior to

     2    that?

     3            A.   It was what's on the screen, but it was

     4    made via handheld video recorder.

     5            Q.   When you say, "It was what's on the

     6    screen," what do you mean?

     7            A.   Your exhibit.

     8            Q.   Okay.  So was it like -- for instance,

     9    taking a look at the first page of 56575, at the

    10    beginning it says, "Warden's opening statement," and

    11    then it says, "I am warden," blank.  Do you remember

    12    who was the warden at that time?

    13            A.   I don't.

    14            Q.   Would the warden himself or herself have

    15    been sort of standing there reading in the orientation

    16    video?  I'm trying to understand what was on the

    17    screen for the orientation video.

    18            A.   If memory serves me correct, somebody

    19    had a handheld video recorder, and each person on this

    20    script would read their part, and then somebody

    21    spliced it together.

    22            Q.   So each individual would actually stand

    23    there and their face would be shown on the screen

    24    while they read their portion of the script; is that

    25    correct?

Case No. 1:14-cv-02887-JLK-CYC    Document 339-3    filed 10/26/20    USDC Colorado
30(7(b)f6)    Dawn Ceja 30(b)(6)
August 05, 2020                    91

```
 1          A.   Yes.

 2          Q.   And at some point, The GEO Group stopped

 3   using that orientation video and began using the

 4   PowerPoint that you mentioned?

 5          A.   Yes.

 6          Q.   Do you know approximately when The GEO

 7   Group began using that PowerPoint?

 8          A.   I don't recall.

 9          Q.   Is there a way that you could figure

10   that out?

11          A.   Yes.  It's possible.

12          Q.   And how would you go about figuring that

13   out?

14          A.   I could see if I still have a copy on my

15   computer, an original one.

16          Q.   A copy of what?

17          A.   Of the PowerPoint.

18          Q.   Okay.  Were you involved in developing

19   the PowerPoint?

20          A.   Yes.

21          Q.   And you were also involved in developing

22   the predecessor to the PowerPoint, which is the video,

23   the script of which we're looking at as Exhibit 5,

24   correct?

25          A.   No.  Just the scripted part.
```

 1          Q.    You read a portion of the script in the

 2   video, though, correct?

 3               MS. SCHEFFEY:  Object to form.

 4          A.    I believe so.

 5          Q.    (BY MS. TURNER)  Yeah.  And if you --

 6   I'll direct your attention to page 56577, which is the

 7   third page of the document.

 8          A.    Yes.

 9          Q.    And a little less than halfway down the

10   page it says, "Hello, my name is Captain Ceja."  Do

11   you see that?

12          A.    Yes.

13          Q.    Is that you?

14          A.    Yes.

15          Q.    Okay.

16          A.    But --

17          Q.    Go ahead.

18          A.    So just to put a reference on time for

19   this, when I was captain, it was previous to 2005,

20   2004.  So this might have been outside of the time

21   frame for the class, because I didn't become a captain

22   until the middle of 2005.

23          Q.    And how long did you remain a captain?

24          A.    For about five years.

25          Q.    Okay.  So -- and so the class period for

 1    this case, for portions of it, goes back to 2004.  So

 2    the approximately five years that you would have been

 3    identified as Captain Ceja was from approximately

 4    mid-2005 until sometime in 2010, correct?

 5            A.    No.  I was captain up until --

 6            Q.    Oh, I see.

 7            A.    -- August of 2005.

 8            Q.    Okay.  I misunderstood.

 9            A.    And I -- this is very old.  So this

10    might have been early 2000s.

11            Q.    And is there a way that you can learn

12    for sure the time period when this script was in use?

13            A.    I can try to, but I don't know if this

14    is something that still is on any computer.

15            Q.    Well, it was produced to us as part of

16    the litigation so it must be on a computer somewhere.

17    So I'll just put a pin in that for us to follow up

18    with counsel about that.

19                  But so this was -- can you tell me the

20    purpose of the orientation video that the script was

21    used for?

22            A.    To let detainees know, that were newly

23    incoming and getting booked into the facility, rules,

24    regulations, and procedures.

25            Q.    Okay.  And I know you mentioned that the

```
 1   video was subsequently replaced by a PowerPoint, a set

 2   of PowerPoint slides.  Did the purpose remain the

 3   same?

 4        A.   Yes.  And it's a required standard

 5   that -- at this point, that we have that type of

 6   orientation video upon their arrival.

 7        Q.   Okay.  And during the time period

 8   covered by this case, when were detainees shown this

 9   orientation video?

10        A.   Upon their arrival while they were being

11   processed.  So it would have been in intake, in a

12   holding cell, and if for some reason they had missed

13   it, I know that years ago we would also show that -- I

14   believe on VHS in the housing unit we would wheel a --

15   like a TV in or show it, you know, into the units.

16        Q.   You said that was years ago.

17   Approximately when did you stop wheeling the VHS

18   player into the housing unit?

19        A.   That's where I'd have to check, but this

20   was on VHS.  So that --

21        Q.   Old-timey days.

22        A.   Yes.

23        Q.   And then what about once you moved to

24   the PowerPoint format, where did detainees see the

25   PowerPoint presentation?
```

Case No. 1:14-cv-02887-JLK-CYC    Document 339-3    filed 10/26/20    USDC Colorado
page 11 of 50 30(b)(6)
August 05, 2020                              95

 1            A.    They saw that in the holding cells while

 2    they were waiting to be processed.

 3            Q.    And was that PowerPoint presentation

 4    displayed in the housing units at any time?

 5            A.    No, I don't believe so.

 6            Q.    And so then directing your attention to

 7    the second page of the document, 56576?

 8            A.    Okay.

 9            Q.    At the top, the first bullet point says,

10    "While you are here, you are not required to work

11    except in the dormitories, where you will be assigned

12    cleanup duties by staff in rotation with other

13    detainees."  Do you see that?

14            A.    Yes.

15            Q.    And so is that referring to the program

16    that we discussed earlier where detainees are assigned

17    to clean after meals?

18            A.    Yes.

19            Q.    And then the next paragraph makes

20    reference to paid worker positions.  Do you see that?

21            A.    Yes.

22            Q.    And is that referring to the voluntary

23    work program?

24            A.    Yes.

25            Q.    And then if you look at the third bullet

 1    point down, it says, "It is your responsibility to

 2    respect the property of other detainees and the

 3    institution at all times.  Failure to do so may result

 4    in disciplinary action being taken against you, and

 5    that could have a negative effect on your case before

 6    the government.  So the best rule is to stay out of

 7    trouble during your stay here."  Do you see that?

 8            A.   Yes.

 9            Q.   And do you agree with that statement?

10            A.   Yes.

11            Q.   Looking on the next page, 56577, the

12    third paragraph down makes reference to -- again, I

13    believe this is referring to the VWP program.  It

14    says, "Facility paid trustees."  Do you see that?

15            A.   Yes.

16            Q.   And "trustees" means workers in the VWP,

17    correct?

18            A.   Yes.  But I do want to point out one

19    thing.

20            Q.   Yes.

21            A.   That because of the age of this

22    document, I would want to verify when this actually

23    came out, like I said previously.  Because PBNDS, I am

24    not sure if this was at the same time that PBNDS came

25    out or PBNDS came out after that.

Rule 30(b)(6)
August 05, 2020                                   99

```
 1    regulations that are to be followed while you're

 2    staying here."  Do you see that?

 3           A.    Which Bates number are you on?

 4           Q.    Sure.  It's 56578.

 5           A.    And what paragraph?

 6           Q.    Second full paragraph on that page.

 7           A.    Starting with "contraband"?

 8           Q.    Yeah.  The last sentence of that

 9    paragraph makes reference to the detainee handbook?

10           A.    Okay.

11           Q.    Okay.  And it says that you will receive

12    that during your intake processing.  Do you see that?

13           A.    Yes.

14           Q.    And so did detainees at the Aurora

15    facility typically receive a detainee handbook during

16    their intake processing?

17           A.    Yes.

18           Q.    Do they get both the ICE national

19    detainee handbook as well as GEO's local supplement?

20           A.    They currently do.  I would have to

21    check and see when ICE started providing a national

22    handbook.

23           Q.    So was there -- there was a time period

24    when the only handbook they received was the GEO local

25    supplement handbook?
```

 1            MS. SCHEFFEY:  Object to form and

 2    foundation.  You may answer.

 3            A.   I believe so, yes.

 4            Q.   (BY MS. TURNER)  And it says, "You can

 5    review all of the rules and regulations that are to be

 6    followed while you're staying here."  Do you see that?

 7            A.   Yes.

 8            Q.   And was it GEO's expectation that

 9    detainees would review the handbook for the rules and

10    regulations that they had to follow?

11            A.   Absolutely.

12            Q.   And then if you could turn to the last

13    page of Exhibit 5, page 56581.

14            A.   Okay.

15            Q.   At the top there it says, "Sanitation."

16    And it says, "Sanitation is a big part of safety."  Do

17    you agree with that statement?

18            A.   Yes.

19            Q.   And then it says, "You are responsible

20    for cleaning your living area and the area around your

21    bed."  Do you see that?

22            A.   Yes.

23            Q.   And do you agree that that was something

24    that detainees were responsible for?

25            A.   Yes.

Case No. 1:14-cv-02887-JLK-CYC   Document 339-3   filed 10/26/20   USDC Colorado
Page 15 of 50   30(b)(6)
August 05, 2020                                          101

```
 1            Q.   You can put that aside for now.  And

 2    then I've added Exhibit 6 to the chat.

 3                 (Deposition Exhibit 6 was remotely

 4    introduced.)

 5            Q.   Once you're able to open it, take a look

 6    and let me know when you're ready.

 7            A.   Okay.  It's downloading now.

 8            Q.   Okay.  Are you able to see it?

 9            A.   Yes.

10            Q.   Okay.

11                 MS. SCHEFFEY:  Mine's still downloading.

12    If you could just give me one second.  Sorry.

13                 MS. TURNER:  Sure.  No problem.  Just

14    let me know.

15                 MS. SCHEFFEY:  Okay.  I'm open.  Thanks.

16                 MS. TURNER:  Sure.

17            Q.   (BY MS. TURNER)  So Ms. Ceja, are you

18    familiar with the document that's been marked as

19    Exhibit 6?

20            A.   Yes.

21            Q.   And what is it?

22            A.   It is an orientation PowerPoint

23    presentation.

24            Q.   Okay.  And so the first slide says

25    "Detainee Orientation Video," but it's more accurately
```

1    sense of when between the time that you participated

2    in the making of the video and the time that you

3    participated in the making of the original version of

4    the orientation PowerPoint, if you have a sense of

5    when that was.

6         A.   I can only, again, speculate, but it's

7    probably going to be around, probably, 2010, after we

8    moved in.

9         Q.   So you said after 2010.  So you

10   participated both in the original making of this prior

11   to 2010 and in subsequent versions after you moved to

12   the new building; is that your testimony?

13             MS. SCHEFFEY:  Object to form.

14        A.   I participated in some of the updates.

15        Q.   (BY MS. TURNER)  And what topics in the

16   orientation video were updated, that you can recall?

17        A.   I'd have to look.  I don't know off the

18   top of my head.

19        Q.   Where would you look to find that

20   information?

21        A.   I could see if it's still on my

22   computer.

23        Q.   Prior versions, you mean?

24        A.   Or any version.

25        Q.   Or a subsequent version?  Fair enough,

1    okay.

2                   Let's take a look at this one.  I'd like

3    to direct your attention to page 108460.

4          A.    Okay.

5          Q.    So this makes reference to -- at the top

6    it says, "A few words from Warden Gilkey."  Do you

7    know who that refers to?

8          A.    Yes.

9          Q.    And who is that?

10         A.    He was the warden sometime around 2010,

11   2011, I think.

12         Q.    And so here, under the first bullet

13   point, it states, "It is imperative" -- this is at the

14   bottom of the bullet point -- "It is imperative that

15   you respond to every command and directive that is

16   made to you because it is in your best interests."  Do

17   you see that?

18         A.    Yes.

19         Q.    Do you agree with that statement?

20         A.    Yes.

21         Q.    And it's important that detainees

22   respect the commands of the detention officers,

23   correct?

24         A.    Yes.

25         Q.    And then likewise, on 104 -- no, sorry,

```
 1   108468 -- are you there?

 2          A.   Almost.

 3          Q.   Okay.

 4          A.   Okay.

 5          Q.   It says, "It can't be emphasized enough

 6   how important it is to listen to the detention staff

 7   both in your housing unit and as you are moved about

 8   the facility."  Do you see that?

 9          A.   Yes.

10               MS. SCHEFFEY:  Object to form.

11          Q.   (BY MS. TURNER)  Do you agree with that

12   statement?

13          A.   Wait.  Repeat the question?

14          Q.   Sure.  I'm just asking if you agree with

15   the statement that's in the first sentence of this

16   bullet point.

17          A.   I want to make sure I'm on the right

18   page.

19          Q.   Sure.  It's 108468, page 17 of the PDF.

20          A.   Yes.  And the first bullet point about

21   "It can't be emphasized"?

22          Q.   Yes.  Do you agree with that statement?

23          A.   Yes.

24          Q.   Is it fair to say that GEO expects the

25   detainees to follow the rules?
```

 1          A.   Yes.

 2          Q.   And then it also says -- the next

 3   sentence says, "The staff is duty bound to abide by

 4   our own rules and regulations which will not be

 5   explained to you."

 6               Do you agree that the GEO staff also

 7   need to follow the rules?

 8          A.   Yes.

 9          Q.   I just want to direct your attention to

10   page 108462, which is page 11 of the PDF.

11          A.   Yes.

12          Q.   And so this has, I guess it's a redacted

13   photo of you, and it lists you as the assistant warden

14   of operations.  So approximately -- and that's the

15   role that you currently hold, correct?

16          A.   Yes.

17          Q.   And how long -- when did you assume that

18   role?

19          A.   August of 2005.

20          Q.   So this PowerPoint was made sometime

21   after August of 2005, we can assume, based on that?

22          A.   No.  As I stated earlier, I can tell

23   from also -- not only just from the picture on 8453,

24   but if you scroll back down to 8459 and 8460, this

25   particular one was in the process of being updated

Case No. 1:14-cv-02887-JLK-CYC    Document 339-3    filed 10/26/20    USDC Colorado
pg 20 of 50
Deposition of 30(b)(6)
August 05, 2020                                                    108

 1   because it has two different wardens listed.

 2              So Gilkey was the first warden when we

 3   moved into the new facility, and Matt Holm came after

 4   Gilkey.  So this version that you have as your exhibit

 5   was in the process of an update at some point probably

 6   around 2010, 2011.

 7        Q.   Would it have been shown to detainees in

 8   this form?

 9        A.   No.

10        Q.   So let me know, do you believe -- all

11   right.  Well, let's go back -- or let's take a look at

12   108461.

13              And so here on this slide the last

14   sentence says, "You will be receiving an ICE handbook

15   and local supplement that provides more detailed

16   information."

17              And so was it generally GEO's practice

18   to provide detainees with an ICE handbook and a local

19   supplement once the ICE handbook was in effect?

20        A.   Yes.

21        Q.   And although you mentioned that you

22   thought that this particular version of the PowerPoint

23   was in a state of flux, do you believe that there is

24   anything in this slide that's inaccurate?

25        A.   In this particular slide?

 1          Q.   And included in the last bullet point

 2   are sanctions that will be imposed and the

 3   disciplinary process that will follow if the detainee

 4   conducts themselves in unacceptable activities,

 5   correct?

 6          A.   Yes.

 7          Q.   And, again, I know you mentioned that

 8   this version of the orientation slide show seemed to

 9   be sort of an in-flux version, but is there anything

10   in this slide that you believe is inaccurate?

11          A.   No.

12          Q.   Is this information typically provided

13   to detainees as part of their orientation at the

14   facility?

15          A.   Yes.

16          Q.   If you could turn to page 108485, which

17   is page 34 of the PDF.

18          A.   Okay.

19          Q.   And the third bullet point there says,

20   "Each and every detainee must participate in the

21   sanitation program.  A list of detainees is developed

22   each day and is posted for viewing."  Do you see that?

23          A.   Yes.

24          Q.   And does that refer to the list of

25   individual detainees assigned to do the post-meal

 1    cleanup each day about which you testified earlier?

 2              A.    Yes.

 3              Q.    And then if you could turn to

 4    page 1085 -- actually, sorry, before you do that, same

 5    question about this slide.  Is this -- is the

 6    information in this slide typically presented to

 7    detainees upon their entry into the facility?

 8              A.    Yes.

 9              Q.    Is there anything here that you find

10    inaccurate?

11              A.    No.

12              Q.    And then if you can turn to page 108512,

13    please.

14              A.    Okay.

15              Q.    So this makes reference to special

16    management unit housing, correct?

17              A.    Yes.

18              Q.    And what is the special management unit?

19              A.    That's housing where people, whether

20    they go there for protective custody, administrative

21    time or disciplinary time, that is the special

22    management unit.

23              Q.    Okay.  It's a segregation unit; is that

24    correct?

25                    MS. SCHEFFEY:  Object to form.

Case No. 1:14-cv-02887-JLK-CYC    Document 339-3    filed 10/26/20    USDC Colorado
Page 23 of 50    Rule 30(b)(6)
August 05, 2020                                      112

1          A.    It was called the special management

2     unit.

3          Q.    (BY MS. TURNER)  But are detainees who

4     are in administrative segregation held there?

5          A.    Yes.  That's what I just said.

6          Q.    Or disciplinary segregation, right?

7          A.    Yes, as stated.

8          Q.    I think you used the word "time," so I

9     just wanted to clarify that.

10              And in the second bullet point it says,

11    "The detainees assigned to this type of housing are

12    placed there for administrative purposes or due to the

13    infringement of rules and regulations of the facility

14    which impacts either the security or orderly

15    operations."  Do you see that?

16         A.    Yes.

17         Q.    Okay.  And is that a true statement of

18    one of the reasons that detainees might be placed in

19    this unit?

20         A.    Yes.

21              MS. SCHEFFEY:  Object to form.

22         Q.    (BY MS. TURNER)  And then the next

23    bullet point says, "To avoid placement into

24    disciplinary housing segregation, read the local

25    supplement detainee handbook section regarding

 1    'Disciplinary Process.'"  Do you see that?

 2          A.    Yes.

 3          Q.    And is it fair to say that GEO expected

 4    detainees to review the disciplinary process?

 5          A.    Yes.

 6          Q.    Is it fair to say that being placed in

 7    the segregation unit is a serious sanction?

 8          A.    I think that's a broad statement.

 9          Q.    Is it incorrect?

10          A.    I think it all depends on each

11    individual case and why somebody is being placed back

12    there.

13          Q.    But it's -- generally is it GEO's policy

14    to attempt lesser measures to control a detainee

15    before sending them to segregation?

16          A.    Yes.  Most issues, we try to ensure that

17    they are resolved informally.

18          Q.    And, again, is there anything on this

19    slide about special management using [sic] housing

20    that is inaccurate?

21          A.    It's not inaccurate for the old facility

22    as it relates to the first bullet, last sentence.

23    But, again, this was a version that was being updated

24    in between the two buildings.

25          Q.    So you point out the last sentence in

Rule 30(b)(6)
August 05, 2020                                        124

```
 1          A.    Yes.

 2          Q.    Okay.  Then the next section makes

 3   reference to "day space."  Do you see that?

 4          A.    Yes.

 5          Q.    Okay.  And then it says, "Dayrooms are

 6   open spaces in the housing units that are utilized for

 7   watching television, playing board games, dominos or

 8   cards, as well as for socializing among detainees."

 9   Is that correct?

10          A.    Yes.

11          Q.    So is this the sort of common area

12   that's in the center of where the cells are in the

13   pod?

14          A.    Yes.  It's -- it's a common area, a

15   general use area where everybody's at.

16          Q.    Okay.  And is that where they take their

17   meals as well?

18          A.    Yes.

19          Q.    And then it says -- the next paragraph

20   states that "All detainees in a housing unit are

21   required to keep clean and sanitary all commonly

22   accessible areas of the housing unit, including walls,

23   floors, windows, window ledges, showers, sinks,

24   toilets, tables and chairs."  Do you see that?

25          A.    Yes.
```

```
 1          Q.   Is that accurate?

 2          A.   Yes.

 3          Q.   Okay.  And then the next paragraph says,

 4    "Detainees will take turns cleaning the area."

 5          A.   Yes.

 6          Q.   And so does that refer to the rotation

 7    that we discussed earlier today?

 8          A.   Yes.

 9          Q.   And it states that "If a detainee feels

10    everyone is not doing their fair share, they should

11    inform the housing unit officer," right?

12          A.   Yes.

13          Q.   And then it says, "Action will be taken

14    to resolve this problem," right?

15          A.   Yes.

16          Q.   And so the housing unit officer is

17    empowered to take whatever action is necessary to

18    resolve their problem, correct?

19          A.   Right.

20               MS. SCHEFFEY:  Object to form.

21          A.   I would -- I would believe that the

22    officer would try to resolve that through, you know,

23    communicating with the detainees and working through

24    that informally.

25          Q.   (BY MS. TURNER)  Sure.  But if they are
```

 1    unable to resolve it informally, GEO has a formal

 2    disciplinary process, correct?

 3            A.    Correct.

 4            Q.    And in the next paragraph it says that

 5    should an officer notice that the dayroom area is not

 6    clean, the officer will make available necessary

 7    cleaning supplies, correct?

 8            A.    Yes.

 9            Q.    And then it says, "If the detainees in

10    the housing unit do not clean the area after being

11    instructed to do so, the televisions will be turned

12    off and the detainees will not be permitted to

13    participate in any activities or programs until the

14    dorm is cleaned," right?

15            A.    Yes.

16            Q.    And so might that be an example of an

17    informal resolution, as you referred to?

18                  MS. SCHEFFEY:  Object to form,

19    foundation.

20            A.    That could be one of the informal

21    resolutions, yes.

22            Q.    (BY MS. TURNER)  Okay.  And then states,

23    "Continued refusal to clean the area will result in

24    further disciplinary action."  Correct?

25            A.    Yes.

Case No. 1:14-cv-02887-JLK-CYC    Document 339-3    filed 10/26/20    USDC Colorado
page 28 of 50
Deposition of 30(b)(6)
August 05, 2020                                127

1          Q.    And so, again, GEO maintains a

2    disciplinary system that the officer could make use of

3    in this circumstance, right?

4          A.    Yes.

5                MS. SCHEFFEY:  Object to form and

6    foundation.

7          Q.    (BY MS. TURNER)  And GEO is advising the

8    detainees accordingly, correct?

9                MS. SCHEFFEY:  Object to form,

10   foundation.

11         A.    Yes.  This is right in the handbook.  So

12   they do have access to this information.

13         Q.    (BY MS. TURNER)  Okay.  If I could

14   direct your attention to page 56956.  So I want to

15   direct your attention to section VIII, Disciplinary

16   Procedure?

17               And so is it correct that this sort of

18   explains to detainees what the disciplinary process in

19   the facility consists of?

20         A.    Yes.

21         Q.    And it provides them with information

22   about what that process looks like, correct?

23         A.    Yes.

24         Q.    And then if you can turn to 56957, at

25   the bottom of the right-hand column there is a

```
 1   reference there to "Disciplinary Severity Scale and

 2   Prohibited Acts."  Do you see that?

 3         A.   Yes.

 4         Q.   And then it lists out the -- well, it

 5   indicates that there are four categories of prohibited

 6   acts, correct?

 7         A.   Yes.

 8         Q.   And then on the following pages it lists

 9   out the categories of offenses and the different code

10   numbers that apply to all of those offenses, correct?

11         A.   Yes.

12         Q.   And then after each category of offense

13   it lists the sanctions that are available for that

14   offense, correct?

15         A.   Yes.  And all of this is directly out of

16   the PBNDS, and some of it is also in the ICE national

17   handbook.

18         Q.   Right.  And so GEO is required to follow

19   these -- both the categories of offenses and the

20   potential sanctions, correct?

21         A.   Yes.

22         Q.   And so, for example, the high moderate

23   offense category is listed on page 56959, correct?

24         A.   Yes.

25         Q.   And those are the so-called 300-level
```

 1    offenses, correct?

 2              A.   Yes.

 3              Q.   And the sanctions that are available for

 4    those categories of offense are on page 56960,

 5    correct?

 6              A.   Yes.

 7              Q.   And those range from a warning, item M,

 8    all the way up to item A, initiating criminal

 9    proceedings, correct?

10              A.   Yes.

11              Q.   And, again, this is all information

12    that's conveyed to detainees upon their arrival at the

13    facility, right?

14              A.   Yes.  They receive the handbook upon

15    their arrival to the facility.

16              Q.   And GEO instructs them to review the

17    handbook, correct?

18              A.   Yes.

19                   MS. TURNER:  So I know that it's coming

20    up on 12:30 there.  This is kind of a good stopping

21    point.  So do you guys want to break for lunch now?

22                   MS. SCHEFFEY:  That would be great.

23                   MS. TURNER:  Okay.  How long do you

24    need?

25                   MS. SCHEFFEY:  Do you want 30 or 45,

```
 1   Dawn?

 2              THE DEPONENT:  It doesn't matter to me.

 3              MS. SCHEFFEY:  Okay.  Do you want to

 4   come back -- I have 12:18.  Do you want to just come

 5   back at 1:00?

 6              MS. TURNER:  Sure.  That's fine.  We're

 7   off the record.

 8              (Recess taken, 12:18 p.m. to 1:07 p.m.)

 9       Q.   (BY MS. TURNER) Ms. Ceja, we're back on

10   the record.  I'll just remind you that you are still

11   under oath.

12              Before the lunch break, we were talking

13   about the -- GEO's local detainee handbook, and you

14   had raised some concerns about whether or not this

15   version that we were looking at that's been marked as

16   Exhibit 7 was the final version.

17              MS. TURNER:  And I think Ms. Scheffey

18   and I have agreed that for current purposes GEO will

19   stipulate to its authentication.  Is that right,

20   Adrienne?

21              MS. SCHEFFEY:  Yeah, we'll stipulate

22   that this is authentic, and then we will -- if we find

23   any differences between a signed version, we will

24   highlight them and provide the opportunity for

25   additional questions, if necessary, if they're
```

 1    Exhibit 9.

 2            (Deposition Exhibit 9 was remotely

 3    introduced.)

 4        Q.    So you can open that up and just let me

 5    know when you're ready.

 6        A.    I'm ready.

 7        Q.    Great.  Are you familiar with this

 8    document?

 9        A.    Yes.

10        Q.    And what is it?

11        A.    It is a GEO policy on hearing board and

12    disciplinary issues relating to detainees.

13        Q.    And at the top of the first page of

14    Exhibit 9 there's a reference to an Aurora Detention

15    Center Policy and Procedure Manual.  Do you see that?

16        A.    Yes.

17        Q.    And is that a physical manual?

18            MS. SCHEFFEY:  Object to form.

19        A.    There's hard copy, and then I believe

20    it's also electronic.

21        Q.    (BY MS. TURNER)  And where is the hard

22    copy maintained?

23        A.    Usually a hard copy is in our

24    accreditation or compliance office.

25        Q.    Okay.  And if somebody on GEO's staff

30(b)(6)
August 05, 2020                                    135

```
 1   wanted to consult this manual, how would they go about

 2   doing so?

 3        A.   They could ask to look at it.  Or if

 4   they wanted to go ask their supervisor for a copy,

 5   they could get them a copy as well.

 6        Q.   And so does this document contain the

 7   general procedures for the disciplinary system that's

 8   in place at the Aurora facility?

 9             MS. SCHEFFEY:  Object to form.

10        A.   Yes.  It comes out of the PBNDS mostly.

11        Q.   (BY MS. TURNER)  And there at the top,

12   under Purpose, it says its purpose is "To describe the

13   disciplinary system that will be used in the facility

14   to enforce institutional rules and regulations,"

15   correct?

16        A.   Yes.

17        Q.   And under item II there it says

18   "Policy," and then it says, "It is the policy of the

19   facility to have in place a system of detainee

20   discipline that will serve to protect the public

21   detainees and staff and maintain order in the facility

22   through the impartial application of a fully

23   developed, well-understood set of rules and

24   regulations and a hearing procedure that incorporates

25   all applicable due process requirements."  Do you see
```

Rule 30(b)(6)
August 05, 2020                                     136

```
 1   that?

 2            A.   Yes.

 3            Q.   And do you agree that that's the policy

 4   of the Aurora facility?

 5            A.   Yes.

 6            Q.   Is it fair to say that it's important

 7   for everyone's safety to maintain order in the

 8   facility?

 9            A.   Yes.

10            Q.   And after the word "requirements" there

11   are brackets and then a series of letters and numbers.

12   Do you know what that refers to?

13            A.   Yes.

14            Q.   What is it?

15            A.   That is the applicable accreditation

16   standard of 3A-02, and the ALDF stands for Adult Local

17   Detention Facilities.

18            Q.   Okay.  And those are American

19   Correctional Association standards; is that right?

20            A.   Yes.

21            Q.   And is GEO required by its contracts

22   with ICE to follow those standards?

23            A.   Yes.

24                 MS. SCHEFFEY:  Object to form.

25            Q.   (BY MS. TURNER)  Okay.  And under -- in
```

 1    this policy paragraph, it makes reference to a set of

 2    rules and regulations.  What rules and regulations is

 3    that referring to?

 4            A.    The ones that come out of PBNDS.

 5            Q.    I understand the PBNDS is a very large

 6    document.  Are there particular rules and regulations

 7    that you're referring to?

 8            A.    It's the whole standard, you know, as a

 9    whole.  It lists the rules that you have to follow,

10    but it also lists, you know, the hearing procedures as

11    well.

12            Q.    Okay.  And what about, in terms of the

13    rules that detainees have to follow, where are those

14    set forth?

15            A.    In the handbook.

16            Q.    So are you referring to the handbook as

17    a whole?

18            A.    Yes.

19            Q.    And if you take a look on the next page,

20    38947, item 4 actually makes reference to the detainee

21    handbook.  Do you see that?

22            A.    Yes.

23            Q.    And it says, "The detainee handbook. . .

24    shall provide notice of the facility's rules of

25    conduct and of the sanctions imposed for violations of

DEORE OF 30(b)(6)
August 05, 2020                                    138

```
 1    the rules," right?

 2              A.    Yes.

 3              Q.    And GEO's handbook does, in fact, do

 4    that, right?

 5              A.    Yes.

 6              Q.    And then it says, "Copies of the rules

 7    of conduct and disciplinary sanctions will be posted

 8    in English, Spanish, and/or other languages spoken by

 9    significant numbers of detainees as follows," and then

10    there are three items listed, a, b, and c.  Do you see

11    that?

12              A.    Yes.

13              Q.    Where are those items posted?

14              A.    They're posted in each housing unit on

15    the bulletin board.

16              Q.    Okay.  So there's a -- the disciplinary

17    severity scale, the list of prohibited acts, and the

18    potential sanctions are posted in full in each housing

19    unit on the bulletin board?

20              A.    Yes.  In English and Spanish.

21              Q.    And was that true for the duration of

22    the period covered by this case?

23              A.    Yes.

24              Q.    "Yes"?  Okay.  Sorry.  Sometimes you cut

25    out just a little bit.  So apologies if I'm repeating
```

Dhawan Rule 30(b)(6)
August 05, 2020                                      139

 1    what you say back to you.

 2                    And so you testified that the items

 3    listed here on page 38947 under a, b, and c are posted

 4    in the housing units.  And so detainees are aware of

 5    those rules and -- of conduct and disciplinary

 6    sanctions, right?

 7          A.   Yes.

 8          Q.   And GEO staff are likewise aware?

 9          A.   Yes.

10          Q.   Okay.  And the expectation is that those

11    rules are going to be enforced, right?

12          A.   Yes.

13          Q.   And directing your attention back to the

14    prior page, 38946, at the bottom of the page there

15    under Guidelines, it says that "Disciplinary action

16    may not be capricious or retaliatory."  Do you see

17    that?

18          A.   Yes.

19          Q.   And would you agree that disciplinary

20    action needs to be consistent with the rules?

21          A.   Yes.

22          Q.   I think you said earlier that detention

23    officers may have some discretion to decide to what

24    degree they should escalate relating to a particular

25    incident, correct?

```
 1          A.   Yes.  Hopefully it will be resolved at
 2   the informal level, but they do have that discretion.
 3          Q.   Right.  So there might be some occasions
 4   where, you know, they're able to resolve it
 5   informally; but on other occasions they may need to
 6   enforce the rules as written, right?
 7          A.   Yes.
 8               MS. SCHEFFEY:  Object to form.
 9          Q.   (BY MS. TURNER)  And in doing so they --
10   in their attempts to informally resolve issues, they
11   may remind detainees what punishments are possible,
12   correct?
13               MS. SCHEFFEY:  Object to form,
14   foundation.
15          A.   It's possible.
16          Q.   (BY MS. TURNER)  I just want to talk
17   about some of the paperwork that ties in to the
18   disciplinary process.  So I'm going to give you kind
19   of a large document, which hopefully won't take too
20   long to open up.  So stand by.
21               MS. SCHEFFEY:  Can we close the other
22   one?
23               MS. TURNER:  You can put it to the side
24   for now.
25               MS. SCHEFFEY:  Yeah.
```

 1    referring to on what happened, and then it's a bunch

 2    of lines with -- you can put the detainee name and ID

 3    number.  And then all of the lines, you just write

 4    your report, and then you sign the bottom of it.

 5            Q.   And what happens to it after it's

 6    completed?

 7            A.   It just gets filed.

 8            Q.   Filed where?

 9            A.   If it is detainee related, then it would

10    go into the detainee file.  And if it's not detainee

11    related, usually a supervisor just keeps a copy of it.

12            Q.   Got it.  Okay.  And so this -- does the

13    process that's outlined in Exhibit 9, the detainee

14    issues policy -- or excuse me, it's the Hearing Board

15    and Disciplinary Procedures policy.  Is it fair to say

16    that it involves a fair bit of paperwork?

17                 MS. SCHEFFEY:  Object to form.

18            A.   Yes.

19            Q.   (BY MS. TURNER)  And so being able to

20    resolve issues informally sort of at the time that

21    they occur is desirable in some respects, right?

22            A.   I think each individual situation should

23    be based on its own merits.

24            Q.   So the detention officers have some

25    discretion in that regard?

 1          A.   Yes.

 2          Q.   Do you find the disciplinary system

 3   that's set forth in Exhibit 9 to be effective?

 4               MS. SCHEFFEY:  Object to form.

 5          A.   Yes.

 6          Q.   (BY MS. TURNER)  GEO uses the system

 7   because it works, right?

 8          A.   It works.  It's also tied into the

 9   PBNDS, and it also helps for instances when we have,

10   like, accreditation audits or anything like that,

11   because it shows that it's a fair and equitable system

12   and we have all of our bases covered.

13          Q.   Right.  You can't just have a

14   free-for-all, right?

15               MS. SCHEFFEY:  Object to form.

16               THE REPORTER:  I didn't hear the answer.

17               THE DEPONENT:  Yes.

18               THE REPORTER:  Thank you.

19          Q.   (BY MS. TURNER)  Do you think that

20   having this fair and equitable system helps you obtain

21   compliance with the rules of the facility?

22          A.   I think that's a broad question, but

23   overall, yes, I do.

24          Q.   So I've shared a file Bates-stamped

25   GEO_MEN 71634.  If the court reporter could mark that

     1     as Exhibit 11, please.

     2                   (Deposition Exhibit 11 was remotely

     3     introduced.)

     4          Q.    And Ms. Ceja, just let me know when

     5     you're able to open that up and take a look at it.

     6          A.    I'm ready.

     7          Q.    So this is a memorandum dated

     8     February 19, 2008, correct?

     9          A.    Yes.

    10          Q.    Okay.  And it's addressed to Teresa

    11     Hunt, who is listed as the warden, right?

    12          A.    Yes.

    13          Q.    And Teresa Hunt was the warden of the

    14     facility at that time?

    15          A.    Yes.

    16          Q.    And then on the cc line it lists you and

    17     Barbara Krumpelmann, correct?

    18          A.    Yes.

    19          Q.    And it's from someone named Tonya

    20     Andrews, correct?

    21          A.    Yes.

    22          Q.    And she's listed as the training

    23     coordinator.  Is Ms. Andrews still employed by The GEO

    24     Group?

    25          A.    Yes.

 1              MS. TURNER:  Okay.  I can change it.

 2          Q.   (BY MS. TURNER)  Is it the opinion of

 3   The GEO Group that Ms. Gonzales handled herself in an

 4   appropriate manner when confronted with the situation

 5   of the detainees who refused to make their beds?

 6              MS. SCHEFFEY:  I would say that wasn't a

 7   noticed topic.  You may answer if you know, in your --

 8              MS. TURNER:  This is well within the

 9   topics that we've noticed.

10              MS. SCHEFFEY:  Whether --

11          Q.   (BY MS. TURNER)  You can answer,

12   Ms. Ceja.

13              MS. SCHEFFEY:  Whether GEO believed that

14   this specific situation was appropriately handled was

15   not within the topics.

16              MS. TURNER:  That's -- I mean, your

17   characterization of the subject of this line of

18   questioning is inappropriate.

19          Q.   (BY MS. TURNER)  Anyway, Ms. Ceja, would

20   this be consistent with The GEO Group's practices in

21   terms of informally resolving disputes of detainees?

22          A.   I think this could be utilized as one

23   example of that.

24          Q.   And so in the event that a detainee

25   declines to clean their assigned living area, a

1    detention officer of The GEO Group has a variety of

2    options available to them, correct?

3              MS. SCHEFFEY:  Object to form.

4         A.   Yes.

5         Q.   (BY MS. TURNER)  Okay.  And refusal to

6    clean assigned living area is a 300-level offense,

7    correct?

8         A.   Yes.

9         Q.   And so that's the high moderate offense

10   category, right?

11        A.   Yes.

12        Q.   And so one step that a detention officer

13   could take in that circumstance is to try to resolve

14   the situation informally, correct?

15        A.   Yes.  At their discretion.

16        Q.   They also have the option to escalate

17   it, correct?

18        A.   Yes.  As I stated earlier, each

19   situation should be based on its own merits.

20        Q.   Okay.  And if the detention officer, in

21   their discretion, decides that the refusal to clean

22   the assigned living area is inappropriate and should

23   be escalated, they could complete an incident report

24   for that conduct, right?

25        A.   Yes.

Rule 30(b)(6)
August 05, 2020                                          167

```
 1            Q.    And they could -- one consequence of

 2    violation of that particular rule could be the

 3    detainee could be sent to segregation, correct?

 4            A.    Under that 300 level, that is one of the

 5    sanctions listed.

 6            Q.    And under a 300-level offense, one of

 7    the potential sanctions is up to 72 hours in

 8    disciplinary segregation, correct?

 9            A.    Yes.

10            Q.    So I just want to go back.  Earlier,

11    when we were talking about the orientation video,

12    Ms. Ceja, you had expressed some concern that the

13    version of the PowerPoint slides that I showed you was

14    not complete, like it appeared to sort of reflect some

15    transitions.  Do you recall that?

16            A.    It appeared as if it was one that was in

17    the middle of being updated.

18            Q.    So I want to show you another version to

19    see whether it has the same concerns.  I have it just

20    as a -- as an actual PowerPoint document.  So I hope

21    you're able to look at that on your end.

22                  (Deposition Exhibit 12 was remotely

23    introduced.)

24            Q.    I just dropped it into the chat.  Are

25    you able to see that?
```

 1          A.   It's downloading.

 2          Q.   So this is 52387 -- I'm sorry.

 3              MS. TURNER:  And, Sherry, what exhibit

 4   number will this be?

 5              THE REPORTER:  12.

 6              MS. TURNER:  12.  Okay.

 7          A.   It's actually opening on the Zoom

 8   screen.

 9              MS. SCHEFFEY:  Oh, is it -- she has two

10   screens in front of her.  Is it opening in front of

11   our faces?

12              THE DEPONENT:  It is on mine.

13              MS. TURNER:  Okay.  It did on mine too,

14   and I was able to move it over to the second screen.

15   I don't know if you are too.

16              THE DEPONENT:  Let me try it.  Oh, I did

17   it.

18              MS. TURNER:  Believe me, I spent, like,

19   20 minutes setting up my two screens this morning and

20   practicing.  So I feel you.

21              THE DEPONENT:  It went to the other

22   screen, and now it will only open on the other screen.

23   So hold on.  Let me -- let me see if I can -- it's

24   only opening on the one screen, on the Zoom screen.

25          Q.   (BY MS. TURNER)  Okay.  Well, if you're

1          Q.   And at the bottom there, item G actually

2    defines the special management unit as the housing

3    unit for detainees in administrative or disciplinary

4    segregation.  Do you see that?

5          A.   Yes.

6          Q.   And is that consistent with your

7    understanding of what the special management unit is?

8          A.   Yes.

9          Q.   And under A, where it lists

10   "Administrative Segregation," it states that

11   administrative segregation can be used "when the

12   continued presence of the detainee in the general

13   population would pose a threat to life, property,

14   self, other detainees, or staff, or to the security or

15   orderly running of the facility."  Do you see that?

16         A.   Yes.

17         Q.   And is that consistent with your

18   understanding of the use of administrative segregation

19   in the Aurora facility?

20         A.   Yes.

21         Q.   And then under "Disciplinary

22   Segregation" it states, "Confinement in a cell removed

23   from the general population after a serious violation

24   of facility rules," correct?

25         A.   Yes.

```
 1              Q.   And in order to be sent to disciplinary

 2   segregation a detainee must be convicted, so to speak,

 3   by the Institutional Disciplinary Panel; is that

 4   right?

 5              A.   Well, not convicted, because that's --

 6   it's not --

 7              Q.   That --

 8              A.   -- administrative.  So they're found

 9   guilty.

10              Q.   Found guilty of committing a prohibited

11   offense, correct?

12              A.   Yes.

13              MS. SCHEFFEY:  Object to form.

14              Q.   (BY MS. TURNER)  Okay.  I want to direct

15   your attention to the second page of Exhibit 16,

16   37771, under C, "Operating Procedures."  And in the

17   second paragraph there it states, "Any detainee

18   movement out of a cell will be in restraints."  Do you

19   see that?

20              A.   Yes.

21              Q.   And so I know you testified earlier that

22   there were some revisions made to the PBNDS that

23   affected this policy regarding when detainees would be

24   in restraints moving out of their cell, correct?

25              A.   Yes.
```

 1          Q.   And so this document is dated June 2013,

 2    correct?

 3          A.   Yes.

 4          Q.   So at least as of that date, detainees

 5    in SMU were still required to be cuffed when they

 6    moved out of their cell, correct?

 7          A.   Yes.

 8          Q.   In your experience, when are detainees

 9    placed in administrative segregation?

10          A.   It varies.  Sometimes for protective

11    custody reasons.  If they can't stay in a general

12    population unit, if they request that they don't want

13    to be housed in general population, which a lot of

14    them at times have said, they just go back there kind

15    of for the peace and the quiet.  So it really just

16    varies.

17          Q.   Okay.  But they can be placed there in

18    order to maintain order of the facility, right?

19          A.   Yes.

20          Q.   And, in fact, sometimes they are placed

21    there for that reason?

22          A.   If they're pending disciplinary charges.

23          Q.   Okay.  And how long can they remain in

24    administrative seg while the disciplinary charges are

25    pending?

         1              MS. SCHEFFEY:  Object to form.

         2         A.   I'd have to refer to the policy to give

         3    you the exact answer, but if they go back there on the

         4    day that there is a charge made, they go through the

         5    motion, usually it's within, you know, 72 hours.

         6         Q.   (BY MS. TURNER)  And when you say you'd

         7    have to refer to the policy, what's the policy?

         8         A.   The IBP one.  Because they have 24 hours

         9    to conduct the investigation from the time the

        10    report's written and then, moving along there, up to

        11    the 24 hours.  So I would say within 48 hours you

        12    would probably know what's going to happen.

        13         Q.   Okay.  And if you turn to page 4 of this

        14    exhibit Bates-stamped 37773, that sets out some of the

        15    procedures regarding administrative segregation,

        16    correct?

        17         A.   Yes.

        18              MS. SCHEFFEY:  Object to form.

        19         Q.   (BY MS. TURNER)  Just turning your

        20    attention back to the second page of this exhibit,

        21    page 37771, near the top of the page reference is made

        22    to a medical assessment?

        23         A.   Yes.

        24         Q.   And it states that when a detainee is

        25    transferred into seg, health care personnel are

```
 1                    REPORTER'S CERTIFICATE

 2    STATE OF COLORADO        )
                               )  ss.
 3    CITY AND COUNTY OF DENVER )


 4

             I, SHERRY WALLIN, Certified Realtime
 5    Reporter, Registered Merit Reporter and Notary Public
      ID 19874212873, State of Colorado, do hereby certify
 6    that previous to the commencement of the examination,
      the said DAWN CEJA verbally declared her testimony in
 7    this matter is under penalty of perjury; that the said
      deposition was taken in machine shorthand by me at the
 8    time and place aforesaid and was thereafter reduced to
      typewritten form; that the foregoing is a true
 9    transcript of the questions asked, testimony given,
      and proceedings had.

10

             I further certify that I am not employed
11    by, related to, nor of counsel for any of the parties
      herein, nor otherwise interested in the outcome of
12    this litigation.

13           IN WITNESS WHEREOF, I have affixed my
      signature this 10th day of August, 2020.

14
             My commission expires May 14, 2023.

15

16    __X__  Reading and Signing was requested.

17    _____  Reading and Signing was waived.

18    _____  Reading and Signing is not required.

19
                      _____
20

21                    Sherry Wallin
                      Certified Realtime Reporter
22                    Registered Merit Reporter

23

24

25
```