# Exhibit 3

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3    _____

4

     ALEJANDRO MENOCAL, et al.,              )
5                                            )
                                             )
6              Plaintiffs,                   ) Case No.
                                             )
7         vs.                                ) 1:14-cv-
                                             ) 02887-JLK
8    THE GEO GROUP, INC.,                    )
                                             )
9                                            )
               Defendant.                    )
10                                           )

11

12   _____

13

             VIDEOTAPED DEPOSITION OF KEVIN MARTIN
14
                      November 19, 2019
15
                        9:31 a.m.
16
                   205 North First Street
17
                   La Conner, Washington
18

19

20

21

22

23   Reported by:
     Connie Recob, CCR, RMR, CRR
24   CCR No. 2631
     Job No. 854755 - NE 288153
25

Kevin Martin
November 19, 2019                                        28

 1        A.   That one was less than six months also.

 2        Q.   Okay.  So you were promoted rapidly?

 3        A.   Uh-huh.  Yes.

 4        Q.   After you were -- and you're saying this,

 5   this resume dates from the time you were a lieutenant,

 6   you believe?

 7        A.   Well, now that I look on that last page, it

 8   does say compliance manager.

 9        Q.   I see.

10        A.   And accreditation administrator and

11   compliance manager.

12        Q.   I see.  So then after you were a lieutenant

13   for another roughly six months, what was your next

14   position?

15        A.   I don't recall if I was the intake officer or

16   classification officer.  Actually, intake officer.  I

17   was intake officer first.

18        Q.   How long did you hold that position?

19        A.   Maybe -- again, maybe six months.

20        Q.   And following that, what was your next

21   position with The GEO Group?

22        A.   Classification officer.

23        Q.   How long did you hold that position?

24        A.   I'm going to guess, six months also.

25        Q.   About every six months, you got a promotion?

Kevin Martin
November 19, 2019                                              29

    1          A.  Some -- something would come up and

    2    opportunities were available to -- to move around.  I

    3    wanted to learn as much as possible.

    4          Q.  So after you were classification officer,

    5    what was your next title?

    6          A.  I went back to becoming a lieutenant.  I was

    7    the administrative lieutenant.

    8          Q.  How long did you hold that position?

    9          A.  I'm going to say close to two years.

   10          Q.  And then what was your next title?

   11          A.  I was the compliance manager.  At the time,

   12    it was two positions:  Compliance manager as well as

   13    fire safety manager.

   14          Q.  How long did you hold that position?

   15          A.  That one was close to -- I think it might

   16    have been a little over nine years.

   17          Q.  And then following that, did you hold another

   18    position?

   19          A.  Programs manager.

   20          Q.  And how long did you hold that position?

   21          A.  I want to say maybe three years.  In total, I

   22    was there over 18 years, so some of the dates might be

   23    a little...

   24          Q.  Yeah, I understand.

   25              And then were -- did you hold a position

```
 1    after that --

 2         A.  No.  When I --

 3         Q.  -- a different title?

 4         A.  When I left in September, I was programs

 5    manager.

 6         Q.  Okay.  So let's start just with your time as

 7    a detention officer.

 8              When you were a full-time detention officer,

 9    what were your responsibilities?

10         A.  When I first started, I was working

11    graveyards.  Detainees would go to bed about 11.  Our

12    shift started at 10:45, so we had limited detainee

13    contact even though it was a dormitory-style setting.

14    They were in bed.

15              We would wake -- the detainees that worked in

16    the kitchen, we would wake them up around 3:30 in the

17    morning, or the detainees also that needed to go to

18    medical in the morning, we would wake them up.  We

19    would do security checks every 30 minutes.

20              Graveyards was pretty relaxed back, back

21    then, but then there was a lot of overtime, so I'd

22    either come in early or stay late.  So then you're

23    dealing with meal service, taking detainees to

24    visitation, taking detainees to court, going to intake

25    to process detainees that came in.  Or detainees that
```

1            And again, the standards back then, when I

2     first started, we did not have the extensive

3     classification process that they have now.  It

4     literally was some questions that we would ask the

5     detainee.  We did not get what was called a 213 from

6     Immigration, their -- their history, so we would

7     classify them based off their answers to determine

8     where they were going to be housed in the facility.

9        Q.  And when was that that you're referring to

10    where you would classify them based on sort of a GEO

11    policy rather than the Immigration standards?

12            MS. ANGEL:  Objection.

13            THE WITNESS:  Well, it -- it wasn't -- it was

14    an Immigration, but it wasn't as extensive as their

15    standard is now because back then, they -- and I can't

16    even get into how Immigration worked.  But the

17    document that they had wasn't as detailed as what

18    Immigration does now as far as every detainee that

19    comes in now has an entire history that they provide:

20    Where they were contacted, if they had any criminal

21    charges, if -- you know, anything and everything that

22    they can provide us.

23            Back then, before -- ironically, but before a

24    lot of the computer processes, we would wait until we

25    would get their file transferred up from -- I believe

```
 1      it was Houston.  But we would classify the detainee,

 2      and I want to say that was probably 2000 -- 2000,

 3      maybe early 2001.

 4      BY MS. STORK:

 5          Q.  And after that, you were an administrative

 6      lieutenant?

 7          A.  Yes.

 8          Q.  And what were your duties in that role?

 9          A.  Duties in that role, one to two days a week,

10      I would be the shift supervisor, but the majority of

11      my time, I would be doing employee schedules.  I would

12      be working on ACA files.  Each department had a large

13      number of files, you know, files related to American

14      Correctional Association.  So I would have to go pull

15      documents, print, scan documents for files, whatever

16      other projects that either the warden or assistant

17      warden needed -- needed done.

18          Q.  Okay.  So it was a mix of being a shift

19      supervisor over other detention officers and

20      administrative, like, back-office work?

21          A.  Correct.

22          Q.  And then when you were compliance manager

23      after that for about nine years, what were your duties

24      in that role?

25          A.  I was in charge of writing all policies.  I
```

1    oversaw all the audits that we had.  Again, wrote

2    quite a few articles for newsletter.  It sounds pretty

3    boring, but I was extremely busy.  There was one year

4    we had seven different audits, so it was -- I mean, we

5    had a tremendous amount of oversight, so it was

6    preparing for those audits.  And then we also had

7    internal audits.

8         The Immigration standards have audit tools

9    attached to them and -- I haven't flipped through this

10   whole document to see if it has the audit tools, but

11   we would have internal audits that we would do just to

12   make sure that we were -- we were in compliance.

13   Q.  So you oversaw all audits, both internal GEO

14   audits, ICE audits, American Correctional Association

15   audits.

16        Were there other kinds of audits that you

17   were in charge of?

18        MS. ANGEL:  Objection.  Just audits at

19   Aurora?

20        MS. STORK:  Sorry?

21        MS. ANGEL:  I said objection.  Just audits at

22   Aurora?

23        MS. STORK:  At Aurora, excuse me, yes.

24        THE WITNESS:  We had the Immigration audits.

25   American Correctional Association was every three

```
 1    years.  Immigration audits were -- sometimes we would

 2    have two a year, sometimes we might have more.  It

 3    depends on what ICE's schedule was.  And then we

 4    had -- sometimes we would have two regional audits

 5    where our corporate office would come in.

 6            For the corporate audit, it was a little

 7    different because we would have our regional

 8    compliance administrator and an audit team that would

 9    come in that would do the audit.  I was just basically

10    their go-to person if they needed additional documents

11    or they needed to see a specific department head or

12    whatever it may be.  As far -- well, ultimately the

13    same thing with the ACA and ICE audits.  I was kind of

14    the go-to person for collecting documents.

15    BY MS. STORK:

16        Q.  Did you have responsibility for following up

17    where there were audit findings also and -- and

18    developing corrective action plans?

19        A.  Yes.

20        Q.  What were your responsibilities with respect

21    to that specifically?

22        A.  We -- we would -- once an audit finding was

23    made, we would sit down with the department head and

24    then either -- depending on which department it was,

25    either the assistant warden or the warden to determine
```

```
 1        Q.  But as fire safety manager, you were

 2   responsible for -- you were the department head

 3   responsible for the sanitation policy, correct?

 4        A.  Correct.

 5        Q.  Okay.  And in addition to the sanitation

 6   policy, did you develop, review or revise any policies

 7   regarding the Voluntary Work Program?

 8        A.  As fire safety or --

 9        Q.  At any time during your tenure at GEO.

10        A.  Definitely, I would have when I was in

11   compliance.  Again, specifically when we moved from

12   the old facility to the new facility, there were new

13   positions that were added.  Again, the -- the layout

14   in general of the facility, there were changes that

15   were made, so the voluntary program, Voluntary Work

16   Program changed in that aspect.

17        Q.  And then it also says -- below the bullet

18   point we were just discussing, the next bullet point

19   is:  "Responsible for conducting disciplinary hearings

20   in accordance with policy and procedure."

21        Do you see that?

22        A.  Yes.

23        Q.  What was your role in conducting disciplinary

24   hearings?

25        A.  Again, that would vary depending on the
```

1      position that I was in.  When I was a lieutenant,

2      depending on when the detainee was charged with a --

3      an infraction, if I was the on-duty lieutenant, I

4      would do the initial investigation.  If I was the next

5      oncoming lieutenant, I might do -- again, it depends

6      on the charge, because you had IDP and UDC and 100

7      level and 400 level, so it kind of varies.

8              So I would do either the initial

9      investigation or I could do the UDC level.  If it was

10     a 300- or 400-level charge, I would do the UDC level

11     and determine if they did commit that infraction and

12     then I would impose sanctions.  If it was a 100- or a

13     200-level charge, I would still do the UDC, but it

14     would be referred to the IDP.

15             Now, when I became fire safety or compliance

16     or even programs, there were times where if it was an

17     IDP -- if it was a 100- or 200-level infraction, there

18     was a panel of -- of three staff members.  Typically

19     one was the chief of security and then two other staff

20     members.  So it could have been myself.  It could have

21     been the kitchen super.  It could have been any

22     department head sitting in on -- on -- on those

23     hearings.

24        Q.  So you actually were a member of the IDP at

25     times?

 1        A.   Yes.

 2        Q.   And what does the "UDC" stand for again?

 3        A.   Unit Disciplinary Committee.

 4        Q.   Were you ever a member of that committee?

 5        A.   Yes.

 6        Q.   How often were you a member of the UDC during

 7   your entire time at GEO?

 8        A.   It could have been dozens.

 9        Q.   And specifically within the period 2004 to

10   2014, how many times would -- do you think you were a

11   member of that committee?

12        A.   Again, it -- it could have been -- well, 2004

13   to 2014, when I was compliance and fire safety, not

14   too frequently for UDCs, but say 2004 to 2006, I would

15   have been a lieutenant, so I could have done -- again,

16   it could have been dozens.

17        Q.   And then with respect to the IDP, how often

18   were you a member of that panel?

19        A.   Again, it could have been -- it could have

20   been dozens.  I mean, there could have been two times

21   a week.  There could have been 10 times a week.  It

22   just kind of varied depending on how many infractions

23   there were during those time periods.

24        Q.   So --

25        A.   So there wasn't a schedule of -- of who was

```
 1    going to be on it.  It was kind of, Do you have time

 2    to sit in on an IDP?  Are you busy tomorrow?  Or you

 3    know, the chief -- I worked with several chiefs of

 4    security when I was there, so they would work with us

 5    and say, Hey, I've got to get -- because there were

 6    time frames that certain things had to be done.  So it

 7    was Hey, can you make time Tuesday, or whatever it may

 8    be, to help me do a couple IDPs.

 9         Q.  So you said it could be a couple times a

10    week.  It could be 10 times?  Was it at least once a

11    week were you on an IDP?

12              MS. ANGEL:  Objection.

13              THE WITNESS:  No.  I mean, there could have

14    been months where I wasn't.  I mean, it was a coin

15    toss.  It was just one of those things -- again,

16    depending on, like, if we were getting ready for an

17    audit, they might not bother me at all because they

18    know I was busy, or -- and especially when we moved to

19    the new facility, when I was in compliance, I did not

20    sit on that many of them just because my office was

21    actually in admin.  So they would usually get somebody

22    down -- what was referred to as "lieutenants' row"

23    where the lieutenants' offices were, chief of

24    security, somebody more on the -- inside the building.

25    Probably a little more convenient just because the
```

1    chief of security's office was right there, so he

2    would pass programs, PREA -- he would pass four or

3    five other offices and be able to get them.

4    BY MS. STORK:

5        Q.  And a department head had to be a member of

6    the IDP along with the chief of security?

7        A.  As I recall, it was always a department head.

8        Q.  And for the UDC, what was the composition?

9    What was required in terms of the composition of the

10   committee?

11       A.  The UDC was all -- predominantly, it was a

12   lieutenant.  I believe I may have helped out.  I

13   definitely -- I definitely did UDCs when I was in

14   compliance, just helping out the lieutenants or what

15   may -- there were times where -- again, there were

16   time frames that had to -- that had to -- things had

17   to be done within a certain time period.

18            If the lieutenant that was on duty had done

19   the investigation, he couldn't do the UDC and it may

20   needed to have been done before the end of the shift.

21   Again, the time periods, I'm sure I did -- I know I

22   did UDCs.  I can't give you the exact specifics on why

23   I did them, but that would be some examples of why.

24       Q.  And just tell me:  What was your actual role

25   in the UDC?

1           MS. ANGEL:  Objection.

2    BY MS. STORK:

3        Q.  When you were on a UDC?

4        A.  Right.  For a UDC, you would have a copy of

5    the disciplinary packet that would include the

6    officer's statement of what the detainee allegedly

7    did; if there was any additional officer statements,

8    detainee statements, if there were witnesses.  It

9    would be the entire packet of what transpired.

10          You would then bring -- depending on what it

11   was, you would bring the detainee into the office, sit

12   down with the detainee, go over, get their side of the

13   story, and then based on the reports, based on the

14   detainee's statement, determine if there was an

15   infraction committed.  We may review video.  It just

16   kind of depended on what the infraction was.

17       Q.  And I'm sorry if you already explained this,

18   but how many members would there be on a UDC or

19   would --

20       A.  UDC was --

21       Q.  -- it just be one person?

22       A.  -- typically one person.

23       Q.  So you were essentially the judge deciding

24   whether the infraction had been committed?

25          MS. ANGEL:  Objection.

1              THE WITNESS:  I don't know if you want to say

2      judge.  I mean, you -- I don't know if that would be

3      the correct word, but I'm -- ultimately you were

4      determining, yeah, whether or not the -- the

5      infraction, based on the -- the -- again, whether

6      there was a video or the detainee's statement, officer

7      statements, you would determine whether or not the --

8      the infraction occurred.

9      BY MS. STORK:

10          Q.  And would you also assess sanctions?

11          A.  Yes.

12          Q.  Okay.  And what was your guide for what

13     sanctions to assess?

14          A.  The PBNDS.

15          Q.  And I know we looked at the PBNDS earlier,

16     Exhibit 2, and pointed out that there are levels of

17     offenses, 100- through 400-level offenses, and then

18     each level has a series of sanctions that are

19     permitted; is that right?

20          A.  Yes.

21          Q.  So how did you choose between -- you know,

22     how did you choose which sanction would be

23     appropriate --

24              MS. ANGEL:  Objection.

25     ////

1    BY MS. STORK:

2         Q.  -- for the offense?

3              MS. ANGEL:  Objection.  Foundation.

4    BY MS. STORK:

5         Q.  As a UDC member or as a -- would you call it

6    a -- I'm trying to get the terminology right, if it's

7    a committee of one essentially, but it's --

8         A.  Well, it was ironic that it's a committee,

9    but you're the committee to one.

10        Q.  Right.

11        A.  In the -- and I'd have to go through the ICE

12   Center, but in this standard, it says if -- depending

13   on which level -- like here, let's see.  Perfect.  I

14   just found the page.

15             So like on Page 194, it breaks down the --

16   UDC's responsibility and it would say:  "Impose minor

17   sanctions E through M."  So if we look through --

18   let's see if I can even find it.  It's been a while.

19   Now it's confusing because it says E through M, but

20   I'm not seeing a...

21        Q.  E through M?

22        A.  -- breakdown of E through M.  It says:

23   "Impose sanctions E through M."

24        Q.  Yeah.

25        A.  But I'm -- I'm seeing the sanctions, but

Kevin Martin
November 19, 2019                            149

 1    on.

 2         Q.  Oh, I see now.  So it's around the counts.

 3    Detainee escorted movement stops --

 4         A.  Correct.

 5         Q.  -- a count happens, it begins again?

 6         A.  Correct, correct.

 7         Q.  I see.  And what is -- turning the page to

 8    the one ending 4748, "Watch calls begin."  What are

 9    watch calls?

10         A.  Watch calls are done from 6:00 at night until

11    6 o'clock in the morning.  The master control room

12    officer has a checklist of every single person that's

13    on duty, and they would call them over the radio just

14    to make sure that they're safe.  So they would check,

15    you know, they would call everybody on -- on duty and

16    just put a check every half-hour.

17         Q.  Okay.  Turning to the organizational chart

18    and the page ending 47549, is this an accurate

19    representation of the organization of the Aurora

20    facility between 2004 and 2014?

21              MS. ANGEL:  Objection.

22              THE WITNESS:  This would have been specific

23    to the United States Marshals.

24    BY MS. STORK:

25         Q.  Okay.  Meaning -- well, the warden is the

```
 1    warden of the same facility, correct?

 2         A.  Correct.  Well, we had -- so Immigration

 3    could care less what the marshals -- because we had

 4    both Immigration and U.S. Marshal detainees in the

 5    building.  So we had different staffing plans, and

 6    this one just happens on the bottom corner.  It

 7    talks -- it says United States Marshals.

 8              But basically, yes, the highlighted items,

 9    the highlighted ones are the U.S. Marshal employees.

10         Q.  I see.

11         A.  And then the other would fall under ICE.  So

12    yes, in 2015, this would have been an accurate

13    assessment of the staffing plan.

14         Q.  And are there any significant changes --

15    well, let me put another way.

16              Is this the staffing plan that was roughly in

17    place from 2004 to 2014?  And if not, what differences

18    were there in that time period?

19              MS. ANGEL:  Objection.  This isn't a staffing

20    plan.  It's an organizational chart.

21              MS. STORK:  He said it reflected -- he said

22    it accurately reflected the staffing plan.  I'm just

23    following up on that.

24              THE WITNESS:  There were definitely changes.

25    The assistant -- we didn't have a PREA compliance
```

Kevin Martin
November 19, 2019                                              151

 1    manager that falls under the assistant warden on this

 2    staffing plan.  That position was not in existence,

 3    say, in 2004.  2004, we did not have an armory

 4    officer.  We -- I don't believe we had transportation

 5    at that time.  I don't see perimeter officers.

 6            Again, 2004 the environmental specialist

 7    would have been a joint position with ACA.  So there's

 8    just a few -- you know, it -- it would -- let's see;

 9    medical records.  I don't believe we had a recreation

10    tech -- no, we did have a recreation technician.  It's

11    close, but there are some changes from 2004.  We

12    didn't have a mailroom clerk because we didn't have a

13    mailroom.

14    BY MS. STORK:

15        Q.  Are any ICE employees reflected on this

16    chart?

17        A.  No, these are strictly GEO employees.

18        Q.  Okay.  And which ICE staff were on site at

19    Aurora?  I think you mentioned the contracting

20    officer's technical representative, or the COTR,

21    earlier?

22        A.  Correct.

23        Q.  Was she on site?

24        A.  Yes.

25        Q.  Amelia Sanchez was the person referred to --

1     compensated by -- with good time, for example?

2               MS. ANGEL:  Objection.

3               THE WITNESS:  Because they're not serving

4     sentences.

5     BY MS. STORK:

6          Q.   Right.  Because they're civil detainees?

7          A.   Correct.

8          Q.   Right.

9          A.   So if you're in a county jail and you're

10    sentenced to 30 days or whatever it may be, if you're

11    working, you can get, and just like another facility,

12    you can get good time.  You're not getting compensated

13    financially; you're just getting time off of your

14    sentence.  Obviously, Immigration's different

15    because --

16         Q.   You don't get good time?

17              MS. ANGEL:  Can you let him finish, please.

18              THE WITNESS:  -- they're, they're not serving

19    a specific standard -- or excuse me, they're not

20    serving a specific sentence.

21    BY MS. STORK:

22         Q.   So you said that's why it's more important

23    that it be clear that detainees -- you know, what

24    they're doing that's voluntary versus what they're

25    doing that's coerced?

1           MS. ANGEL:  Objection.  Misstates his

2    testimony.

3           THE WITNESS:  I was never in a position to

4    where I would have had to have forced a detainee to --

5    to do any kind of cleaning.

6    BY MS. STORK:

7       Q.  Okay.  And then -- but just going back to

8    my -- my questions earlier about the cleaning of the

9    general living area, how -- where was it defined what

10   cleaning -- what the after-meal cleaning encompassed

11   and what it didn't encompass because you're saying --

12   you're telling me like there's a line.

13          Some work is done by the trustees and some

14   work is done by the crew, the three-man or the

15   five-man crew.  Where was that actually defined so

16   that the detention officers would know?

17      A.  I don't know if it was ever actually in

18   writing.  I mean, it was -- I mean, it's just kind of

19   like there's no map on where the employee bathrooms

20   are.  It's just kind of the -- it's been there

21   forever, word of mouth, you know, just it's passed on.

22   And it was -- again, the entire time I worked there,

23   it was -- that's the way it was.  You know, that after

24   meal service, cleaned up, done and then moved on.  So,

25   yeah.

1              In over 18 years, I don't ever recall an

2     issue, not a single time, whether it was when I was an

3     officer, a lieutenant or compliance or sitting in

4     disciplinary of ever hearing issues of detainees

5     cleaning up after -- after meal service or of them

6     having an issue or being forced to clean up.  I don't

7     ever recall that as an issue.

8          Q.  Okay.  If we just turn to the next page,

9     Page 3 of 5 in the Housekeeping Maintenance Plan

10    ending 1506 -- or I'm sorry, 1507.

11         A.  Yes.

12         Q.  Do you see where it says:  "Pod Cleaning"?

13         A.  Pod cleaning I see, yes.

14         Q.  Okay.  So I'm trying to make sense of this

15    chart here.  What -- what is this chart showing, A

16    pod, B pod, C pod?

17         A.  This was -- again, I don't -- on a weekly

18    basis.  Off the top of my head, I'm not familiar with

19    it.

20         Q.  The second sentence under pod cleaning says:

21    "The responsibility for cleaning each pod will be

22    shared by second and third shifts as follows" -- "as

23    followed."

24              Do you see that?

25         A.  Yes.

 1          Q.   What are second and third shifts?

 2          A.   Second and third shift would be the day

 3     shift.

 4          Q.   Okay.

 5          A.   And then the swing shift.

 6          Q.   Okay.  And are those referring to Voluntary

 7     Work Program shifts?

 8          A.   Again, I'm not familiar with that, with who

 9     would have been doing this, if this was a -- if this

10     was just the dorm cleanup or volunteers or what this

11     would have been.

12          Q.   Okay.  Then looking, I guess, further down:

13     "Facility cleanup schedule," "daily cleaning

14     schedule."

15               Do you see that?

16          A.   Yes.

17          Q.   So which -- which of these areas -- well,

18     actually, let's just take them one by one.

19               So on the left-hand column it says:  "Area."

20     Then the next column says:  "Cleaners and

21     Disinfectants Used," and "Special Instructions."

22               Were these just instructions on how to clean

23     these different parts of the facility?

24          A.   That's what it looks like, yes.

25          Q.   Okay.  And then looking at the areas, and it

1          A.   No, this should just be dorm cleaning.

2    Housekeeping days and housekeeping nights, let's see,

3    would be 6619, facility cleanup.

4          Q.   Okay.  Facility cleanup worker is,

5    corresponds -- this job description for facility

6    cleanup worker corresponds to housekeeping days and

7    housekeeping nights in the positions list?

8          A.   Correct.

9          Q.   Okay.  And just referring back to the

10   housekeeping maintenance plan in Exhibit 10, again,

11   you're saying that because the -- the job description,

12   the document that explained the scope of what would be

13   trustee work and not five-man cleanup crew work was

14   defined in the -- the trustee job descriptions; is

15   that what you said?

16              MS. ANGEL:  Objection.

17              THE WITNESS:  For the trustee, correct.  So

18   the trustee knows on the job description and then also

19   a training that they -- that they sign off on.

20   BY MS. STORK:

21        Q.   Okay.  But in terms of a detention officer's

22   knowledge of which tasks should be completed by which

23   detainees, how would they know?

24        A.   Just in -- in on-the-job training when they

25   were trained by their field training officer.

1      Q.  Just like common knowledge at the facility?

2      A.  Correct.

3              (Exhibit No. 12 marked

4                for identification.)

5   BY MS. STORK:

6      Q.  The court reporter just handed you

7   Exhibit 12.  Do you recognize this document?

8      A.  Detainee orientation video, yes.

9      Q.  Yes.  So what is this?

10     A.  This was a video that was played in intake

11  and all the housing units that basically just gave an

12  overview of the facility to the detainees.

13     Q.  And you said a video.  This is a PowerPoint

14  presentation, right?

15     A.  It was on a loop, correct, so it came out as

16  a video.

17     Q.  Okay.

18     A.  Okay.

19     Q.  It's been referred to as -- alternatively as

20  like a presentation and a video, so I was confused?

21     A.  Okay.  It was a -- it was a PowerPoint

22  presentation that was just on a continuous loop.

23     Q.  Okay.

24     A.  So there was this video in English and

25  Spanish.  Then there was PREA videos and there were a

```
 1    few other -- I can't remember everything that was

 2    required, but everything that was required by ICE to

 3    be shown.  Know your rights videos that would be shown

 4    in intake.

 5         Q.  Okay.

 6         A.  And then when we were in the old facility, it

 7    was also played on one of the channels continuously.

 8         Q.  Okay.  So this was shown to every detainee

 9    when they entered the facility, correct, from 2004 to

10    2014?

11              MS. ANGEL:  Objection.

12    BY MS. STORK:

13         Q.  It didn't change?

14         A.  It definitely would have changed, because I

15    can tell by the pictures and the people that are here

16    and the -- you know what?  I have to go back and look

17    at the standards at that time of what were required

18    versus, you know.  At the time that this was sent in

19    2014, this was updated with regards to the standards

20    at that time.

21         Q.  Got it.  Okay.  If you turn to --

22    unfortunately, there's no page numbers.  There's a

23    slide like halfway through that's titled:  "Safety and

24    Dorm Sanitation."

25              Just let me know when you get there.
```

Kevin Martin
November 19, 2019                                                    276

1    BY MS. STORK:

2        Q.  Yeah.

3        A.  So then it's a matter of not necessarily just

4    revising a policy, but making sure that whoever's

5    responsibility that was, and a lot of these -- a lot

6    of the responses that I had were to get with that

7    department head whether or not -- for this one, it

8    would have been the chief of security, saying, Look,

9    your lieutenants need to do X, Y, Z.  They're not --

10   it's not being done.

11       So then sometimes what would happen is now

12   it's the chief's responsibility to do weekly reviews

13   to make sure that the lieutenants are doing 72-hour

14   reviews.  And again, without seeing all the documents,

15   I couldn't tell you because not that there were tons

16   of deficiencies, but there's enough deficiencies that

17   trying to keep track of every single little one of

18   them, after, I mean, seven years, I can't recall the

19   exact verbiage that would have been used on one like

20   that.

21       Q.  Do you know why it was important that -- that

22   these reviews of detainees placed in admin seg be

23   conducted and documented?

24       A.  Well, one is that the ICE Center required it,

25   and two, for the safety of the detainees, to make sure

Kevin Martin
November 19, 2019                                                    277

 1    that detainees aren't just being thrown into

 2    segregation and forgot about.  We -- even though

 3    GEO -- ultimately that facility became a larger

 4    facility, it was still very, very small and

 5    Immigration was very involved in everything that

 6    happened in that facility.

 7            So, yeah, segregation was always a big

 8    subject, not just at our facility, in all facilities.

 9    My wife's retired law enforcement, worked in jails for

10    25 years.

11        Q.  Yeah.

12        A.  Seg is always a huge, huge area.

13    Unfortunately, there are instances where detainees

14    hurt themselves in segregation; they're not watched.

15    I mean, you look at the very high profile case that

16    had some issues today about it.  You know, knock on

17    wood, it never happened while I was there, and as far

18    as I know, it's never happened at that facility,

19    but...

20        Q.  It never happened that someone hurt

21    themselves while in seg while you were there?

22        A.  That -- that hung themselves or killed

23    themselves, or, you know, correct, while I was there.

24        Q.  Did it ever happen that someone hurt

25    themselves?

```
 1            MS. ANGEL:  Objection.

 2            THE WITNESS:  In segregation?  In the old

 3      facility when I was lieutenant, we had a detainee

 4      that -- that cut himself when he was locked in a

 5      shower with a razor, which was the time that he was

 6      provided the opportunity to use a razor.

 7      BY MS. STORK:

 8         Q.  And he had been in seg before that?

 9         A.  He was in segregation at that time.

10         Q.  Okay.

11         A.  So, yeah, I mean, there's -- people --

12      detainees in segregation are there for a variety of

13      reasons.  There's detainees that can't function with

14      other people, whether or not it be mental health

15      issues or whether or not it's, you know, that --

16      whatever it may be.

17         Q.  Yeah.

18         A.  You know, so there's a little more care

19      that's taken while they're back there.  You've got

20      staff on duty 24/7; they don't leave the area.  So

21      there's a little more with the standards, a little

22      more emphasis on -- you know, even when you look at

23      the -- the handwritten logs that are required by -- by

24      Immigration, we still have the pipe system where an

25      officer goes around every 30 minutes, and they're
```

```
 1     doing a pipe at every single door to ensure that

 2     they're checking on the detainee.

 3             In addition to that, they're making

 4     handwritten notes.  So it's not just somebody sitting

 5     behind a computer or a desk saying Yep, Yep, We're

 6     good, We're good, We're good.  There's a lot of

 7     personal interaction.

 8         Q.   What is the pipe system?  I'm sorry.

 9         A.   The pipe system is, there's a sensor on every

10     door in segregation, and the officer has -- it looks

11     like a small pipe.  And basically, when they walk by,

12     they stick the pipe to the door and it sends a signal

13     to a computer to track that that door was checked by

14     that officer at that exact time.

15             There's also obviously, you know, cameras,

16     and that pipe system is checked every morning.  The

17     log checked every morning by the chief of security.

18         Q.   And by "checked," you mean the officer's

19     looking in --

20         A.   Correct.

21         Q.   -- and seeing that the detainee has --

22         A.   Correct.

23         Q.   -- not hurt themselves?

24         A.   And that's why when we go back to -- we had

25     the log by the actual door.  So they're piping and
```

 1    We looked earlier at the deficiency noted here with

 2    respect to the special management units?

 3         A.  Yes.

 4         Q.  Do you recall that?

 5              And does this, again, say that the

 6    observation was discussed during a weekly meeting on

 7    which the COTR was present, that being John Jameson?

 8         A.  Yes.

 9         Q.  So again, the ICE COTR was aware of this

10    deficiency?

11         A.  Yes.

12         Q.  Do you recall any -- strike that.  Sorry.

13              Did any of the deficiencies that we looked

14    to -- looked at today -- there were a number of audits

15    that we looked at and opposing counsel pointed out a

16    number of deficiencies to you in their questions.

17              Did any of them ever relate to how much

18    detainees were being paid in the Voluntary Work

19    Program?

20         A.  No.

21         Q.  Did any of them ever relate to the type of

22    work that the detainees were actually doing in the

23    Voluntary Work Program?

24              MS. STORK:  Objection to form.

25              THE WITNESS:  Not that I recall, no.

```
 1                    MS. ANGEL:  Okay.  That's all for me.

 2

 3                         FURTHER EXAMINATION

 4      BY MS. STORK:

 5          Q.  I just have a few more follow-up questions

 6      based on --

 7          A.  Okay.

 8          Q.  -- counsel's examination.

 9              We discussed this earlier, but you said that

10      from 2006 through 2014 and beyond, you were compliance

11      manager, correct?

12          A.  Correct.

13          Q.  And that meant that you weren't a lieutenant

14      supervising detention officers on the ground in the

15      housing units with the detainees, correct?

16          A.  Correct.

17          Q.  So it's possible that a -- a detainee could

18      have been sent to segregation for failing to clean and

19      you just didn't know about it, correct?

20                    MS. ANGEL:  Objection.

21                    THE WITNESS:  It's possible.

22                    MS. STORK:  Okay.  Sorry.  One second.  I'm

23      looking for an exhibit.

24                    MS. ANGEL:  Is this within the scope of my

25      cross?
```

```
 1              MS. STORK:  Yes.  Sorry.  Sorry about that.

 2                   (Exhibit No. 23 marked

 3                    for identification.)

 4     BY MS. STORK:

 5          Q.  Okay.  Mr. Martin, you've just been handed

 6     Exhibit 23.  It's an e-mail with the subject line:

 7     "Segregation placement" and then a list of names.

 8              Do you see that?

 9          A.  I do.

10          Q.  Are you on this e-mail?

11          A.  Let's see.  John, Jaime Davis, Amelia, Carl.

12     No.

13          Q.  And what is this e-mail regarding?

14          A.  Let's see.  It's regarding placement of one,

15     two, three, four, five, six detainees in segregation

16     for refusing to clean a housing unit.

17          Q.  Okay.  So this is an instance where detainees

18     were, in fact, placed in segregation for refusing an

19     order to clean, correct?

20          A.  Correct.

21          Q.  And you didn't recall it because you didn't

22     know about it, correct?

23          A.  Correct.

24          Q.  Okay.

25              MS. ANGEL:  Is that all?
```

 1              MS. STORK:  No.

 2       BY MS. STORK:

 3              Q.  I think that opposing counsel just asked you

 4       whether the sanitation policy that we were discussing

 5       that requires detainees to keep their general living

 6       area clean was approved by ICE.

 7              Do you recall that?

 8              A.  Correct, yes.

 9              Q.  And you said that it was?

10              A.  Correct.

11              Q.  But is the scope of general living area

12       defined anywhere in that policy?

13              A.  I'd have to look at the actual policy.  I

14       want to say no, but I'd have to look at the actual

15       policy.

16              Q.  Okay.  Let's look back at the policy then.

17       Let me just find the exhibit number.  I think it has a

18       blue cover.

19              A.  Okay.  Exhibit 10.

20              Q.  And I think, as we were discussing

21       previously, there's the policy and there's a

22       housekeeping plan that the fire and safety manager

23       drafted that's part of the policy, correct?

24              A.  Correct.

25              Q.  And the housekeeping plan just, as you said,

Kevin Martin
November 19, 2019                                              302

```
 1                    REPORTER'S CERTIFICATE

 2

 3         I, CONNIE A. RECOB, the undersigned Certified

 4    Court Reporter, pursuant to RCW 5.28.010 authorized to

 5    administer oaths and affirmations in and for the State

 6    of Washington, do hereby certify that the sworn

 7    testimony and/or proceedings, a transcript of which is

 8    attached, was given before me at the time and place

 9    stated therein; that any and/or all witness(es) were

10    duly sworn to testify to the truth; that the sworn

11    testimony and/or proceedings were by me

12    stenographically recorded and transcribed under my

13    supervision, to the best of my ability; that the

14    foregoing transcript contains a full, true, and

15    accurate record of all the sworn testimony and/or

16    proceedings given and occurring at the time and place

17    stated in the transcript; that a review of which was

18    requested; that I am in no way related to any party to

19    the matter, nor to any counsel, nor do I have any

20    financial interest in the event of the cause.

21         WITNESS MY HAND and SIGNATURE this 3rd day of

22    December, 2019.

23

      _____
24    CONNIE A. RECOB, RMR, CRR
      Washington Certified Court Reporter, CCR 2631
25    c.recob@gmail.com
```