# Exhibit 6

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
        Civil Action No. 1:14-cv-02887-JLK-MEH
 3      _____

 4                 VIDEOTAPE DEPOSITION OF:
                ALEJANDRO MENOCAL - July 22, 2020
 5                     Via RemoteDepoTM
        _____
 6
        ALEJANDRO MENOCAL, MARCOS BRAMBILA,
 7      GRISEL XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA,
        JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO VIZGUERRA,
 8      and DEMETRIO VALERGA, on their own and on behalf of
        all others similarly situated,
 9
        Plaintiffs,
10
        v.
11
        THE GEO GROUP, INC.,
12
        Defendant.
13      _____

14              PURSUANT TO NOTICE, the videotape
        deposition of ALEJANDRO MENOCAL was taken on behalf of
15      the Defendant in Denver County, Colorado, on July 22,
        2020, at 3:32 p.m. GMT, 9:32 a.m. MDT, before Tracy C.
16      Masuga, Registered Professional Reporter, Certified
        Realtime Reporter, and Notary Public within Colorado
17      appearing remotely from Arapahoe County, Colorado.

18

19

20

21

22

23

24

25
```

Alejandro Menocal  07/22/2020                                    Page 80
ALEJANDRO MENOCAL vs GEO GROUP

```
 1                 Court Reporter, are my -- are you

 2      hearing my objections and getting them on the record?

 3                 THE REPORTER:  Yes.

 4                 MR. MILSTEIN:  Thank you.

 5            Q.   (BY MR. EISMEIER)  Mr. Menocal, do you

 6      think the fact that people had different customs and

 7      dialects affected their ability to interact with the

 8      guards, for example?

 9                 MR. MILSTEIN:  Form and foundation.

10            A.   Sure, yes.  I'm sure the language and

11      traditions and et cetera, religion preferences, got in

12      the way, I'm sure.

13                 MR. MILSTEIN:  I want to put a standing

14      objection on the record as to the relevance of all of

15      these questions.

16                 MR. EISMEIER:  That's a speaking

17      objection.  And I know we've been lax, but that's

18      bordering on coaching, so let's -- let's keep this to

19      form and foundation, if we can.

20                 MR. MILSTEIN:  No.

21            Q.   (BY MR. EISMEIER)  Mr. Menocal, some of

22      them participated in the Voluntary Work Program and

23      some of them didn't; is that right?

24            A.   Yes, sir.

25                 MR. MILSTEIN:  Object to foundation.
```

```
 1            Q.    (BY MR. EISMEIER)  And some of them had

 2   legal U.S. residency status, as you did, and some

 3   didn't?

 4                  MR. MILSTEIN:  Form and foundation.

 5            A.    Yes.

 6            Q.    (BY MR. EISMEIER)  Do you think you

 7   usually clean up after yourself just as a matter of

 8   personal habit?

 9            A.    I do, myself, personally, yes.  I like

10   to live and hang out in a clean environment.

11            Q.    And some of the detainees there may not

12   have been as -- as neat as you; is that fair?

13            A.    Sure.

14                  MR. MILSTEIN:  Object to foundation.

15            A.    That's fair to say.

16            Q.    (BY MR. EISMEIER)  So that's another

17   difference in -- between the detainees; is that fair?

18            A.    Yes.

19                  (Deposition Exhibit 7 was remotely

20   introduced.)

21            Q.    I'm going to -- Mr. Menocal, I've added

22   to the chat room Exhibit 7, which is dated June 14,

23   2014.  I'm just going to play it and make sure that I

24   understand who is speaking here, okay?

25                  (At this time an audiotape was played.)
```

1              TELMATE OPERATOR:  This is a Telmate

2      automated operator with a free call from --

3              MR. MENOCAL:  Alex Menocal.

4              TELMATE OPERATOR:  -- a detainee at

5      Aurora ICE Processing Center.  This call is subject to

6      recording and monitoring.  Press 1 or star to accept

7      the call.  To deny this call, press 2.  Press 1

8      or . . .  Thank you for using Telmate.

9              MR. MENOCAL:  What up?

10             MR. SMITH:  What's up, dog?  How's it

11     going?

12             MR. MENOCAL:  Oh, all right.  I'm over

13     here in immigration.  What does the recording say when

14     I call you?

15             MR. SMITH:  It says (inaudible).

16             MR. MENOCAL:  All right.  Anyway, are

17     you working or what?

18             MR. SMITH:  I'm in the (inaudible).

19             MR. MENOCAL:  Nice, nice.

20             (At this time the audiotape was

21     concluded.)

22        **Q.   (BY MR. EISMEIER)  Mr. Menocal, is that**

23     **your voice?**

24        A.   Yes, sir.

25        **Q.   Do you know who you're talking to?**

Alejandro Menocal  07/22/2020                              Page 94
ALEJANDRO MENOCAL vs GEO GROUP

1              (At this time the audiotape was

2      concluded.)

3              Q.   (BY MR. EISMEIER)  Mr. Menocal, is that

4      you in this recording, which is Exhibit 11?

5              A.   Yes, sir.

6              Q.   And who were you talking to?

7              A.   I have no idea.  I couldn't recognize

8      the voice.

9              Q.   Okay.  But not -- it's not a family

10     member?

11             A.   No, sir.

12             Q.   Okay.  Is it fair to say based on

13     Exhibit 11 --

14             MR. MILSTEIN:  Objection.  Can we go off

15     the record for a second?

16             THE VIDEOGRAPHER:  Going off the record.

17     The time is 5:39 p.m. Greenwich Mean Time, 11:39 a.m.

18     Mountain Time.

19             (Recess taken, 5:39 p.m. to 6:02 p.m.

20     GMT; 11:39 a.m. to 12:02 p.m. MDT.)

21             THE VIDEOGRAPHER:  We are back on the

22     record.  The time is 6:02 p.m. Greenwich Mean Time,

23     12:02 p.m. Mountain Time.

24             Q.   (BY MR. EISMEIER)  Hello, Mr. Menocal.

25             A.   Hello, sir.  I'm back.

 1          Q.    We're back.  Did you talk to anybody

 2    over the break?

 3          A.    Very little.  Just my daughter to switch

 4    computers, but that's all.

 5          Q.    Okay.  You didn't talk about this

 6    lawsuit?

 7          A.    Oh, no, not at all.

 8          Q.    Okay.  Let's switch topics a little bit.

 9    And remember at the beginning of the deposition we

10    talked about how you got a sleeping living area and a

11    day living area, right?

12          A.    Yes, sir.

13          Q.    And the day living area is where the

14    tables are and the TVs and that sort of thing, right?

15          A.    Yes, correct.

16          Q.    When you first got to the GEO Aurora

17    facility, what were you told about how the day living

18    area would be cleaned?

19          A.    They had a schedule.  You know, you

20    would -- after each meal, you know, people would clean

21    up, but there was a rotation where (inaudible) -- your

22    cell we (inaudible) -- the area three times a day, in

23    the morning -- or after each meal, I should say.

24    And -- and, yeah.  So one cell would do that one day.

25    The next cell would do it the next day, and so on and

 1  so forth.  And that's where if we didn't do the work

 2  that they told us to do, then they would put us in

 3  isolation.  And that's why I thought it was very

 4  unfair.

 5          Q.   Let me ask you a question.  When you

 6  first got to GEO, what were you told by anyone at ICE

 7  or anybody at GEO about cleaning the day living area?

 8                MR. MILSTEIN:  Object to form, asked and

 9  answered.

10                THE REPORTER:  Mr. Menocal, could I

11  please have you get closer to the microphone?

12                THE DEPONENT:  Yeah.  I'm sorry.  Yes.

13          A.   But, yeah, that's what I was told

14  that -- that, you know, we rotate, and each cell has

15  to clean the area when it's their turn, and if you

16  guys didn't do it, you would go to the hole,

17  isolation.

18          Q.   (BY MR. EISMEIER)  Who told you that?

19          A.   The detainees, and I'm sure the guards

20  too, but for sure the detainees told me that.  You

21  know, it's not like you have a choice not to do it.

22          Q.   You don't recall specifically a guard

23  telling you that, do you?

24          A.   It could have been, but I know for sure

25  one of -- you know, some of the detainees, we all knew

1    that -- you know, that it was a rotation thing, and if

2    one or the whole cell did not do their cleaning, they

3    would be punished.

4          **Q.   Okay.  Did you see an orientation video**

5    **when you arrived at the GEO facility?**

6          A.   No, sir, I don't recall seeing a video.

7    I recall seeing a handbook, a rule book, but I don't

8    recall seeing a video.

9          **Q.   Okay.  Here.  Let's -- I'm going to show**

10   **you a handbook here, and I want to see if you**

11   **recognize it, so give me a second.**

12          (Deposition Exhibit 13 was remotely

13   introduced.)

14          **Q.   Mr. Menocal, tell me when you can see a**

15   **document on your screen.**

16          A.   I do see it, yes, sir.

17          **Q.   Okay.  And there's a picture -- I'm**

18   **showing you a picture right now, and I'm scrolling**

19   **down, and it says "National Detainee Handbook."  Do**

20   **you see that?**

21          A.   I do.

22          MR. MILSTEIN:  Dana, could you scroll

23   down further?  I can't see if this is marked.

24          MR. EISMEIER:  Deposition Exhibit 13.

25          MR. MILSTEIN:  Okay.

```
 1            Q.   (BY MR. EISMEIER)  Do you see that,

 2    Mr. Menocal?

 3            A.   I do.

 4                 MR. EISMEIER:  And, Brandt, you should

 5    be able to open it in the chat room.

 6                 MR. MILSTEIN:  Yeah.  I'm hesitant to

 7    because I -- it's glitched my computer if I open any

 8    of the files you put in chat.

 9                 MR. EISMEIER:  Okay.  But you can see --

10    you can see it on the screen share now?  Can you see

11    that?

12                 MR. MILSTEIN:  I can, thank you, yeah.

13                 MR. EISMEIER:  Okay.  Good.

14            Q.   (BY MR. EISMEIER)  All right.

15    Mr. Menocal, do you recognize Exhibit 13?

16            A.   Yes.

17            Q.   Is this the detainee handbook you

18    mentioned a bit ago?

19            A.   Yeah.  Yes, sir, it is.

20            Q.   And were you given this when you arrived

21    at the GEO facility?

22            A.   I believe so, yes, sir.

23            Q.   Did you -- when you -- you got it, did

24    you read it?

25            A.   Yes.
```

 1          Q.    Okay.  And you received it in English,

 2    right?

 3          A.    Yes, sir, I believe so.

 4          Q.    And you read -- you read and write

 5    English, right?

 6          A.    Yes, sir.

 7          Q.    And was there -- did you believe that

 8    there was anything in this particular handbook that

 9    provided any possible discipline for failing to clean

10    in the day living area?

11          A.    I don't recall specifically.  I remember

12    reading it, but I don't recall it saying that or not.

13          Q.    Sitting here today, do you recall

14    anything in here having to do with discipline for

15    failing to clean a day living area?

16          A.    Yeah.  Like I said, everybody knew that

17    if we didn't follow the procedures, we would be -- you

18    know, we would be put in the hole if we didn't do what

19    we were told, basically.

20          Q.    Okay.  But is it fair to say what you

21    knew about that came from other detainees and not from

22    this handbook?

23                MR. MILSTEIN:  Object to form.

24          A.    I recall the detainees telling me, yeah,

25    what I just told you.  I don't recall the book stating

 1   any of that, no.

 2          Q.   (BY MR. EISMEIER)  Okay.  Just a second.

 3               Is there anything in this particular

 4   handbook that you saw that was threatening to you,

 5   Mr. Menocal?

 6          A.   Can you repeat that, please?

 7          Q.   Sure.  Was there anything in this

 8   handbook that was threatening to you?

 9               MR. MILSTEIN:  Objection.  He hasn't had

10   a chance to look through the whole handbook today.

11          A.   Yeah, I don't recall exactly what it

12   said, and I don't recall what I thought about it at

13   the time, to be honest with you.  It's been a long

14   time.  And I know I read it, but I don't recall if I

15   agreed with whatever they wrote in there or not.

16          Q.   (BY MR. EISMEIER)  Okay.  Were you

17   personally ever disciplined for failing to clean in

18   the day living area?

19          A.   Not personally, no.

20          Q.   Okay.  Were you aware of anyone who was

21   disciplined for failing to clean in the day living

22   area?

23          A.   Yes.  I actually witnessed a group of

24   people that did not follow the procedure, the rules,

25   and they were taken away, and they were put in

 1   isolation.  And they came back, I believe, a week

 2   later, with a different colored uniform.  And I asked

 3   people what's up, and they said that they got a new

 4   charge for not obeying or following the rules, I

 5   believe a higher risk detainee and different colors,

 6   whatever it was, from green to red, and I do recall

 7   that.  I witnessed it through a glass window from one

 8   pod to the other.  I noticed when they took them away

 9   and I noticed when they came back.

10        Q.   Okay.  You've just said a lot, so can we

11   break that down a little bit?

12        A.   What --

13        Q.   I can take the handbook off here --

14        A.   Oh.

15        Q.   -- by the way, so that, yeah, we can see

16   better.

17             Okay.  So can you tell me who was

18   involved that was -- that you say was taken away?  Do

19   you remember any of the names?

20        A.   I do not know.  Like I said, it was a

21   different pod.  I didn't know any of them or knew

22   their names.  I never even talked to them because

23   there was glass partitions or walls in between us, but

24   you could see through the window what was going on in

25   the other pod.

1          Q.   Okay.  So you were in -- in your pod,

2     right?

3          A.   Correct.

4          Q.   And you saw through the glass to a

5     different pod, right?

6          A.   Yes, sir.

7               MR. MILSTEIN:  Objection, cumulative.

8          Q.   (BY MR. EISMEIER)  And could you --

9     could you hear through the glass pod [sic] what was

10    being said?

11         A.   No, sir.

12         Q.   Okay.  So tell me what you -- tell me --

13    just bit by bit, tell me exactly what you saw.

14         A.   I saw a group of people.  I saw the

15    guards come in and take a group of four people,

16    maybe -- it could have been six.  You know, they put

17    them together and then they took them away, and I

18    asked, you know, people in there what's going on.

19    They said the reason they're taking them away is

20    because they didn't do their daily cleanup.  And, you

21    know, you're supposed to do it, so they put them in

22    isolation to make an example, I guess, out of them,

23    so, you know, we would notice or we would know that --

24    you know, that it's part of the procedure to clean or

25    be sent to the hole, basically.

1          Q.   Okay.  You said someone said this to

2    you, right?

3          A.   Yeah, one of the detainees.  I don't

4    recall their name or which one it was, but yeah.

5          Q.   Okay.

6          A.   But everybody knew after a while when

7    you're in there, you know, and word gets around that,

8    you know (inaudible), and obviously, that was a big

9    one, to do it or go to the hole.

10          Q.   So all of your knowledge on this point

11    was what someone said happened in this incident,

12    right?  Another detainee said?

13          A.   Yeah.  And, again, like I said,

14    everybody knew, you know, and the word gets around.

15    You know, important stuff like that, you know, going

16    to the hole is not a pretty place to go, so,

17    obviously, you know, it takes to (inaudible) but,

18    yeah, that's a no-no, or, you know, you better comply

19    or --

20          Q.   Okay.

21               THE REPORTER:  I'm sorry.  I'm having a

22    really hard time hearing you, Mr. Menocal.

23               THE DEPONENT:  I'm sorry.

24          A.   Yeah, that's the reason we all did it,

25    because we all knew that if we didn't follow the

```
 1   rules, that would happen to us, so . . .

 2         Q.   (BY MR. EISMEIER)   Okay.  And just to be

 3   clear, you didn't know any of the people in the other

 4   pod who were taken away, right?

 5         A.   Right.

 6              MR. MILSTEIN:  Objection, asked and

 7   answered.

 8         Q.   (BY MR. EISMEIER)  And you couldn't hear

 9   anything having to do with that particular incident,

10   right?

11              MR. MILSTEIN:  Objection, cumulative,

12   asked and answered.

13              MR. EISMEIER:  Let's please keep the

14   speaking objections down.

15         Q.   (BY MR. EISMEIER)  And so the knowledge

16   that you have is based upon what other detainees told

17   you as opposed to what a guard told you or someone

18   from ICE or GEO; is that right?

19              MR. MILSTEIN:  Objection, compound,

20   asked and answered.

21         A.   Again, from what I can recall, yeah,

22   the -- everybody knew that that was the procedure, so,

23   yeah, I don't know if it was the guards or both the

24   detainees and the guards told me, and that's how I

25   found out where they were headed or why -- we had to
```

```
 1   clean and if not, you know, we would be punished.  So
 2   like I said, everybody knew it, you know.
 3             The hole is not a pretty place, so, you
 4   know people would basically do everything, and, you
 5   know, if you didn't, you would go to the hole, so,
 6   yeah, it was very well known that, you know, you had
 7   to follow the rules or you would be punished.
 8        Q.   (BY MR. EISMEIER)  And -- okay.  And you
 9   don't know if the people who were -- that you saw
10   through the glass were being taken away because they
11   were in a fight, right?
12             MR. MILSTEIN:  Objection.
13        A.   No, they were -- it was their turn to
14   clean, and they didn't do it, and so they took them
15   away to isolation, basically.
16        Q.   (BY MR. EISMEIER)  But you didn't have
17   personal knowledge of it.  You didn't watch through --
18   you didn't watch through the walls.  You couldn't hear
19   what was going on in the other pod, correct?
20        A.   Through the glass window.
21             MR. MILSTEIN:  Objection, compound.
22        A.   You could see the guards come in.  I
23   could see the guys being gathered.  I could see the
24   guards take those detainees that didn't do their work
25   away.  And, yeah, maybe a week or some days later,
```

 1   they came back, and I could see them through the glass

 2   wall -- window, I'm sorry.  And they were back, and

 3   like I said, they were in different suits -- colored

 4   suits.  And, again, I asked somebody, and they told me

 5   that, yeah, the reason they're in different suits is

 6   because they -- they got a new charge, I believe, and

 7   that's why they put them in, you know, red suits,

 8   higher risk detainees, is what I was told.

 9        Q.   (BY MR. EISMEIER)  Okay.  Did you

10   witness the four people who were taken away before the

11   guards took them out?

12             MR. MILSTEIN:  Objection, misstates

13   prior testimony.

14             MR. EISMEIER:  Brandt, really, please,

15   it's coaching.

16             MR. MILSTEIN:  Well, you're telling him

17   four, and he testified earlier it was either four or

18   six.

19        A.   There might have -- there were some

20   cells that had four people in it; there were some

21   cells that have six to eight and maybe even more.

22   But, yeah, that's -- I just said a number four because

23   I do not recall if it was four or six or eight.

24        Q.   (BY MR. EISMEIER)  Right.  Did you spend

25   a lot of time seeing what went on in other dorms?

 1          A.   I walked around a lot.  You know, I

 2   cleaned the rec yard, so I could see.  Yeah, I -- I

 3   would notice other pods.  And the way the building is

 4   laid out, like an octagon, almost, and you could see

 5   more than one pod from your pod.

 6          **Q.   Right.  Was -- now, you understand that**

 7   **a detainee could be sent to segregation for fighting,**

 8   **right?**

 9          A.   Of course, for fighting, for, yeah,

10   different situations, sure.

11          **Q.   For being insolent or insulting to**

12   **others?**

13               MR. MILSTEIN:  Compound.

14          A.   Or a threat or having contraband, sure,

15   there's a number of things why they would send you to

16   isolation.

17          **Q.   (BY MR. EISMEIER)  Right.  And, in fact,**

18   **I think you became a trustee when one of the other**

19   **trustees got in a fight, right?**

20          A.   Yes, sir.

21          **Q.   Okay.  And in your lawsuit, you're not**

22   **complaining that sending someone to segregation for**

23   **getting in a fight is wrong; is that correct?**

24               MR. MILSTEIN:  Objection.

25          A.   I don't know about isolation, but, yeah,

 1   I'm sure that we have to be reprimanded if -- if part

 2   of the rule is not to fight or not to do something,

 3   I'm sure they're going to, you know, follow the -- the

 4   procedure, so yeah.

 5           **Q.   (BY MR. EISMEIER)   That's not part of**

 6   **the class action lawsuit, detainees that were sent to**

 7   **segregation for fighting or being insolent; is that**

 8   **right?**

 9           A.   Yeah.  From what I recall, no, that --

10   that is not part of the lawsuit, no.

11           **Q.   It's -- instead it's about failure to**

12   **clean; is that your understanding?**

13           MR. MILSTEIN:  Objection, misstates the

14   prior testimony.

15           A.   Basically, yeah, the -- I don't think

16   it's fair that if we didn't do what you were told, you

17   would be sent to isolation.  You know, it's a private

18   company.  Why do we have to do the cleaning?  I think

19   it's very unfair, and that's why we're suing them for

20   unfairness.  We are not slaves.  We are detainees.

21   And we should be not forced to clean.  That's wrong.

22   If I don't want to clean, I don't want to clean.

23   Don't send me to isolation.  You know, I'm sure

24   there's other ways of trying to make us do what

25   they're supposed to do, but, yeah, isolation is not

1   the answer.  It's horrible in there.  It's inhumane.

2   It's -- it's not right.

3           Q.   (BY MR. EISMEIER)  Let me ask you a

4   question about that.  You were never sent to

5   segregation; is that right?

6           A.   The hole?  Like I said, I believe it's

7   the same thing, medical isolation and, you know,

8   regular isolation.  It's a room with a window looking

9   to the hallway where no one walks, and you have

10  nothing, no book, no television, no -- no contact with

11  anybody.  Maybe you'll see a guard once in a while to

12  drop your meal off, but it's pretty -- pretty lonely,

13  pretty -- pretty hard.

14          Q.   Let's put aside the medical facility,

15  okay?

16          A.   Sure.

17          Q.   Okay.  Putting aside the medical

18  facility, you were never in segregation.  I say

19  "segregation"; you say "the hole."  You were never in

20  segregation; is that right?

21          A.   No.

22          MR. MILSTEIN:  Object, misstates

23  testimony.

24          A.   Well, solitary confinement, I believe,

25  is the same cell where they keep medical isolation

```
 1    people.  I think it's the same thing as -- you know,

 2    whether you did something wrong or got in a fight or

 3    didn't follow the rules, it's in the same area.  It's

 4    just, like I said, a cell with a window and a bed and

 5    maybe a toilet and a sink, and that's all.

 6         Q.   (BY MR. EISMEIER)  Okay.  Well, you

 7    talked about the medical facilities earlier, right?

 8         A.   The medical isolation where I was held,

 9    yeah.

10         Q.   If you got in a fight, you wouldn't be

11    sent to the medical unit for isolation, correct?

12         A.   Like I said, I think they're the same

13    thing.  Maybe across -- in the same hallway you've got

14    all these rooms that are isolation rooms and, you

15    know, more than one person.  So one guy could be there

16    for a medical reason and another guy could be there

17    for a fight.  But, again, you don't see each other.

18    They're isolated.

19         Q.   You don't -- I'm sorry.

20              You don't know if -- if medical

21    isolation and segregation are the same thing, do you?

22              MR. MILSTEIN:  Objection, argumentative,

23    asked and answered.

24         A.   I think that's what I was trying to say,

25    that it's the same thing.  You know, it's just a room
```

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF COLORADO          )
                                )   ss.
 3   ARAPAHOE COUNTY            )

 4

 5            I, TRACY C. MASUGA, Registered
     Professional Reporter, Certified Realtime Reporter,
 6   and Notary Public 19924005553, State of Colorado, do
     hereby certify that previous to the commencement of
 7   the examination, the said ALEJANDRO MENOCAL declared
     his testimony in this matter is under penalty of
 8   perjury; that the said examination was taken in
     machine shorthand by me remotely and was thereafter
 9   reduced to typewritten form; that the foregoing is a
     true transcript of the questions asked, testimony
10   given, and proceedings had.

11            I further certify that I am not employed
     by, related to, nor of counsel for any of the parties
12   herein, nor otherwise interested in the outcome of
     this litigation.

13            IN WITNESS WHEREOF, I have affixed my
     signature this 27th day of July, 2020.
14
              My commission expires April 24, 2024.
15

16   __X__  Reading and Signing was requested.

17   _____  Reading and Signing was waived.

18   _____  Reading and Signing is not required.

19

20

21   _____
     Tracy C. Masuga
22   Registered Professional Reporter
     Certified Realtime Reporter
23

24

25
```