# Exhibit 9

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                    DISTRICT OF COLORADO
2

Civil Action No.: 1:14-cv-02887-JLK
3 _____

4                       DEPOSITION OF
              MARTHA VASQUEZ - June 29, 2020
5                     via RemoteDepo

_____
6

ALEJANDRO MENOCAL, et al.,
7

Plaintiffs,
8

v.
9

THE GEO GROUP, INC.,
10

Defendant.
11 _____

12

            PURSUANT TO NOTICE, the deposition of
13 MARTHA VASQUEZ was taken on behalf of the Plaintiffs
and Class by remote means, on June 29, 2020, at
14 9:59 a.m., before Shannon Clementi, Registered
Professional Reporter, Colorado Realtime Certified
15 Reporter and Notary Public, appearing remotely from
Arapahoe County, Colorado.

16

17

18

19

20

21

22

23

24

25

 1    classification officer, was that a promotion over your

 2    old title?

 3           A.    Yes.

 4           Q.    So what did -- what did that mean?  Were

 5    there new responsibilities that came with it?

 6           A.    Yes.

 7           Q.    What were those?

 8           A.    Just reports.

 9           Q.    What kind of reports?

10           A.    Like monthly reports that I would have to

11    do.

12           Q.    And what do those report on?

13           A.    Just different factors.  Like, for

14    example, how many detainees we got at that time, how

15    many disciplinaries, that sort of stuff.

16           Q.    And where were those reports sent after

17    you -- after you completed them?

18           A.    Um-hum.  I would send them to my

19    supervisor.

20           Q.    Who was that?

21           A.    I'm sorry?

22           Q.    Who's your supervisor?

23           A.    I would send them to the major at that

24    time.

25           Q.    Okay.  And at this time in 2009 and 2008,

1  who was the -- who was the major at that time?  Do you

2  remember?

3          A.   I do not.

4          Q.   Who -- was the major in charge of just

5  your department, or were they in charge of other

6  departments as well?

7          A.   They're in charge of other departments.

8          Q.   Which ones?  Do you know what other

9  departments they were in charge of?

10         A.   Security.

11         Q.   Any others?  Any other departments?

12         A.   No.  I do not know.

13         Q.   Okay.  So you became a classification

14 officer in or about 2006 or 2007, and then in 2008 you

15 were promoted to lead classification officer?

16         A.   I believe so.

17         Q.   Okay.  And you've been a lead

18 classification officer since that time?

19         A.   Correct.

20         Q.   Okay.  Let me give you a new document to

21 take a look at.

22         A.   Um-hum.

23         Q.   Let me know when you have that open.

24         A.   I have it open.

25         Q.   Okay.  So Exhibit 6, I believe -- yeah.

```
 1              So Exhibit 6 is a document Bates-stamped
 2  GEO-MEN 49796.
 3              (Exhibit 6 was remotely introduced and
 4              provided electronically to the court
 5              reporter.)
 6       Q.   Does this look familiar to you?
 7       A.   Yes.
 8       Q.   What are we looking at?  What is this?
 9       A.   It's just a roster.
10       Q.   And what is this used for?
11       A.   It just tells you the post that that --
12  that particular person might be in.
13       Q.   When you say "that particular person,"
14  what are you -- are you referring to someone specific?
15              MS. SCHEFFEY:  Object to form.
16       A.   Just different officers.
17       Q.   (BY MR. SCIMONE)  Okay.  And so is one of
18  these completed every day at Aurora?
19       A.   Yes.
20       Q.   All right.  And so each one of these lines
21  is a different post; is that right?
22       A.   Yes.
23       Q.   And if you look right in the middle of the
24  table, there's a "Lead Class. Officer," and then your
25  name appears to the right of that.  So that's showing
```

Marcos Vasquez
June 29, 2020                                    32

```
 1   that you were the lead classification officer of that

 2   day, right?

 3            A.    Yes.

 4            Q.    Okay.  So where -- where physically in the

 5   facility do you -- are you stationed when -- as the

 6   lead classification officer?

 7            A.    So when we were in the south building, it

 8   was by intake.  Now I'm also by intake.

 9            Q.    Okay.  So do you stay in that position

10   during the day?

11            A.    Yes.

12            Q.    And what sort of area is it?  Is it an

13   office area?  Is it an open reception area?  What does

14   it look like?

15                  MS. SCHEFFEY:  Object to form.

16            A.    So at that time, we did have our own

17   office.  Now it's just an open area.

18            Q.    (BY MR. SCIMONE)  And that's what you

19   refer to as the "intake area"?

20            A.    Yes.

21            Q.    Okay.  So tell me a little bit about this

22   process of the -- well, strike that.  Let me ask a

23   different question.

24                  Apart from filling out the classification

25   forms, do you do anything else related to intake for
```

 1   new people arriving at the facility?

 2                MS. SCHEFFEY:  Object to form.

 3        A.    Well, that -- classify them as a new

 4   book-in.  That's pretty much my main -- the main job.

 5        Q.    (BY MR. SCIMONE)  Okay.  Do you conduct

 6   any kind of orientation with them?

 7        A.    Myself, no.

 8        Q.    Is there someone else who does that?

 9        A.    The intake officer would do the -- there's

10   a video that they do.

11        Q.    Do they do that before or after you do the

12   classification form?

13        A.    It's actually during.  Depends on how many

14   bookings it might be.  So if it's one, it might be

15   before.  If it's more than that, you know, it varies.

16        Q.    And if you look back at Exhibit 6, the

17   "Daily Log/Post Assignments."

18        A.    Um-hum.

19        Q.    So looking at this and using this for

20   reference, are there other posts that you worked at

21   between 2004 and 2014?

22        A.    Well, I do overtime, and so I work the

23   dorms and just different positions.

24        Q.    And are those the housing unit posts?

25        A.    Yes.

```
 1              MS. SCHEFFEY:  Object to form.

 2         A.   Yes.

 3         Q.   (BY MR. SCIMONE)  So housing.  Are there

 4    other positions besides those that you fill?

 5         A.   Just as needed.  So I could do like the

 6    lobby.  I do not know how to work control, so . . .

 7         Q.   Okay.  How often do you fill one of those

 8    other posts?

 9         A.   You mean by now?

10         Q.   Let's ask -- well, the time period of this

11    case is 2004 to 2014.

12         A.   Um-hum.

13         Q.   So I'm more interested in that time

14    period.  Can you generalize how often you would fill in

15    a different post during that time.

16         A.   Maybe once a week.

17         Q.   Was that a regular occurrence, like every

18    week you would do that once a week or frequently?

19         A.   Honestly, I wouldn't know from 2014 how

20    frequent it was.

21         Q.   Okay.  Your best recollection is that on

22    average, you would fill a different post about once a

23    week?

24              MS. SCHEFFEY:  Object to form.

25         A.   Correct.
```

 1          Q.   (BY MR. SCIMONE)  Okay.  All right.

 2   There's another document coming to you through the chat

 3   now.

 4          A.   Okay.

 5               (Exhibit 7 was remotely introduced and

 6               provided electronically to the court

 7               reporter.)

 8          Q.   So let me know when you have it open.

 9          A.   Um-hum.

10               I have it open.

11          Q.   Is it the right way up for you?

12          A.   No, it's sideways.

13          Q.   Okay.  So if you go up and you click on

14   view, it should have an option to rotate view

15   counterclockwise.

16          A.   Okay.  I have it right now.

17          Q.   Okay.  Do you recognize Exhibit 7?

18          A.   Yes.

19          Q.   What do you -- what is this?

20          A.   It's just the -- a schedule for the

21   in-service or preservice.

22          Q.   And what is "preservice"?

23          A.   So every year you just have a refresher of

24   training.

25               Q.   Is that given to all detention officers at

Maria Vasquez
June 29, 2020                                                    72

1          Q.   So these were paid VWP positions, correct?

2          A.   Yes.

3               MS. SCHEFFEY:  Object to form.

4               MR. SCIMONE:  All right.  We've been going

5   about an hour and a half.  Would you like to take a

6   short break?

7               THE WITNESS:  Yes.

8               MR. SCIMONE:  Why don't we take a break,

9   and then we can come back at -- I guess it will be

10  11:45 Mountain Time.  Does that work?

11              MS. SCHEFFEY:  That works for me.  Does

12  that give you enough time to get around the facility

13  and get to the bathroom?

14              MR. SCIMONE:  We're going off the record.

15  See you back in a few.

16              (Recess taken, 11:35 a.m. to 11:53 a.m.)

17              (Exhibit 16 was remotely introduced and

18              provided electronically to the court

19              reporter.)

20         Q.   (BY MR. SCIMONE)  Back record.

21              Okay.  Ms. Vasquez, Exhibit 16 should be

22  coming up in the chat window.

23         A.   Okay.

24         Q.   This is a document Bates-stamped PL 29

25  through 55.  And this is a long document, and so I

```
 1    don't expect you to read the whole thing.  I'll point

 2    you to the parts I want to ask about.

 3              But if you'd look at the first few pages,

 4    and let me know when you've familiarized yourself with

 5    it.

 6         A.   Okay.

 7         Q.   Okay.  Do you recognize this document?

 8         A.   Yes.

 9         Q.   Okay.  What is it?

10         A.   It's a detainee handbook.

11         Q.   Where have you seen this before?

12         A.   They're given to the detainees as a new

13    book-in.

14         Q.   Do you ever refer to this handbook, or to

15    a version of it, in your work as a detention officer?

16         A.   Yes.

17         Q.   And what do you use it for?  What do you

18    refer to it for?

19         A.   Everything, honestly.  From rules to

20    everything.

21         Q.   So let me draw your attention to -- all

22    right.  I'm going to draw your attention to -- it's

23    page 17.  The Bates stamp is PL000047.  Let me know

24    when you're there.

25         A.   I'm there.
```

1           Q.    Okay.  So on the left-hand side, there's a

2    section titled "Housing Unit Sanitation."  Do you see

3    that?

4           A.    Yes.

5           Q.    And it's a short section.  It says:

6                    "Each and every detainee must

7                    participate in the facility's sanitation

8                    program.  A list of detainees is developed

9                    each day by staff and is posting daily for

10                   viewing.  During a general cleanup all

11                   detainees must participate.  The assigned

12                   Housing Unit Officer will be responsible

13                   for assuring this general cleanup is done

14                   on a regular basis."

15          I know generally you said you're a

16   classification officer, but you said earlier at times

17   you have also worked in a housing unit post, correct?

18          A.    Yes.

19          Q.    And at those times have you seen this

20   housing unit sanitation policy being carried out?

21                MS. SCHEFFEY:  Object to form.

22          A.    Yes.

23          Q.    (BY MR. SCIMONE)  And have you been

24   involved in implementing this policy?

25          A.    Yes.

```
 1              Q.    So can you tell me how that works.

 2              A.    It's just a list of cleanup pretty much

 3    after every meal.  And it's a list of detainees that

 4    would have to clean certain areas.

 5              Q.    And how many detainees are on that list

 6    each day?

 7              A.    About six.

 8              Q.    Would that change at times throughout the

 9    last -- well, from 2004 to 2014, has that number

10    changed?

11              A.    I don't think so.

12              Q.    So it's six people, to your recollection?

13              A.    I didn't hear you on the last.

14              MS. SCHEFFEY:  I didn't here that.  Sorry.

15              Q.    (BY MR. SCIMONE)  Your best memory is it

16    was always six people per day?

17              A.    Yes.

18              Q.    And that list of people rotates among the

19    people in the housing unit?

20              A.    Yes.

21              Q.    And what do the people on that list do?

22    What are the tasks that they have to complete?

23              A.    Two would sweep, two would mop, two would

24    wipe down the table.

25              Q.    Anything else?
```

```
 1          A.    That's it.  Two, two and two.

 2          Q.    And this is -- and that work is mandatory

 3   for the people on the list, correct?

 4          A.    It's not mandatory.

 5                MS. SCHEFFEY:  Object to form.

 6          Q.    (BY MR. SCIMONE)  Okay.  It says here in

 7   this paragraph:

 8                    "Each and every detainee must

 9                participate in the facility's sanitation

10                program."

11                You saw that, right?

12          A.    Yes.

13                MS. SCHEFFEY:  Object to form.

14          Q.    (BY MR. SCIMONE)  Okay.  So you're saying

15   that's not true?

16          A.    I'm just saying that, you know, they don't

17   have to do it.

18          Q.    So people are allowed to opt out of that?

19          A.    Yes.

20          Q.    How often does that happen that people

21   choose not to clean when their name is on the list?

22          A.    On my situation, I normally don't have

23   any.

24          Q.    Have you ever seen it happen?

25          A.    Maybe once since I've been here.
```

 1          Q.    And what happened when that happened at
 2   that time that you remember?
 3          A.    So in my situation, that particular person
 4   said that he didn't want to clean.  I went and talked
 5   to him and asked him what was the reason, and he said
 6   he wasn't feeling good.  So pretty much I just skipped
 7   to the next person.
 8          Q.    When you say "the next person," what do
 9   you mean?
10          A.    So the next bed.  Normally we would go by
11   the bed.
12          Q.    So there's a list that's posted, right?
13          A.    Yes.
14          Q.    And this person's name was on the list?
15          A.    Yes.
16          Q.    And how -- how is that list chosen?  Is
17   that everyone who shares a cell?
18                MS. SCHEFFEY:  Object to form.
19          A.    So yes.
20          Q.    (BY MR. SCIMONE)  And then -- so your
21   testimony is that people can choose not to do that, and
22   then you just go to the next bed?
23          A.    That's what I did.
24          Q.    So what happens to the other people who
25   are on that list at that time?

 1   way to handle this situation?

 2            MS. SCHEFFEY:  Form.

 3        A.   In my situation, yeah.

 4        Q.   (BY MR. SCIMONE)  Have you ever received

 5   any guidance about how you should handle a situation

 6   like that?

 7        A.   No.

 8        Q.   So you've never been told what you should

 9   do if someone says they don't want to be a part of the

10   general housing unit cleanup that day?

11        A.   Well, if you have any issues, you can call

12   a supervisor and make them aware.  But like I said, in

13   my situation, that person wasn't feeling good, so, you

14   know, I'm not going to, you know, be there when I know

15   they're not feeling good.

16        Q.   So my question is there's no policy about

17   that that you've been told to follow?

18            MS. SCHEFFEY:  Object to form.

19        A.   I don't know there's a policy.

20        Q.   (BY MR. SCIMONE)  You don't know if

21   there's a policy about what to do if someone says they

22   don't want to clean?

23        A.   I don't know if it's on a policy.

24        Q.   And you've never been trained on what to

25   do in a situation like that?

Martha Vasquez
June 29, 2020                                    81

```
 1                  MS. SCHEFFEY:  Object to form.

 2           A.    Trained?  No.

 3           Q.    (BY MR. SCIMONE)  Okay.  And no one has

 4    ever told you, "Okay.  If this happens, here's how you

 5    should handle it"?

 6                  MS. SCHEFFEY:  Object to form.

 7           A.    If something like that was to happen, the

 8    best method would be to call a supervisor and let that

 9    person handle it.

10           Q.    (BY MR. SCIMONE)  Is that what you were

11    told to do, to call a supervisor if someone refuses to

12    clean?

13           A.    If you have any issues.

14           Q.    About any issues, not specific to that

15    situation?

16           A.    Any issues, it would be the best -- it

17    would be the best to do.

18           Q.    All right.  So you haven't received any

19    training or any guidance on how you should handle that

20    specific situation?

21           A.    I have not.

22           Q.    Did you ever receive any training or

23    guidance about how to handle it before 2014?

24           A.    I don't remember.

25           Q.    Okay.  You're not aware of any policy
```

```
 1    before 2014 instructing dorm officers what to do in

 2    those situations?

 3              MS. SCHEFFEY:  Object to form.

 4         A.   I don't remember a policy.

 5         Q.   (BY MR. SCIMONE)  Okay.  So you said

 6    before --

 7         A.   Um-hum.

 8         Q.   -- with the handbook, that you would refer

 9    to this for some rules, correct?

10         A.   Yes.

11         Q.   Okay.  Have you ever used this when you

12    were serving on a post in the dorm unit to figure out

13    how to handle a particular situation that came up?

14         A.   What type of situation?

15         Q.   I'm asking you.

16              So you said you refer to this for rules,

17    and I'm just wondering if there are any rules in the

18    housing unit that you've used this to look up or to --

19         A.   Yeah, um-hum.

20         Q.   Okay.  Can you give an example.

21         A.   Well, I mean, if they don't do anything,

22    they could get a -- I don't know.  Like I mean, it

23    tells you all the rules in there.  I don't know.

24              I'm kind of confused.  I'm sorry.

25         Q.   Okay.  I'm just asking you if you can give
```

1  an example of a rule that you've looked up in this

2  handbook.

3          A.   Um-hum.

4          Q.   If you can't think of an example now, I

5  will direct you to a different page.  But if you have

6  one, go ahead.

7               MS. SCHEFFEY:  Object to form.

8          A.   I don't have an example.

9               (BY MR. SCIMONE)  Okay.  Turn to page 23.

10 It's PL 53, is the Bates stamp.

11         A.   You said page 23?

12         Q.   Yes.

13         A.   Okay.

14         Q.   So this says -- the Bates stamp is

15 PL000053.  Let me know when you're there.

16         A.   I'm there.

17         Q.   So this has a list here of something

18 called "Disciplinary Severity Scale and Prohibited

19 Acts."  Do you see that?

20         A.   Yes.

21         Q.   And this is a list of things -- of rules

22 that detainees are not allowed to break.  Is that fair

23 to say?

24         A.   Just different offenses.

25         Q.   And that continues onto the next couple of

Marco Vasquez
June 29, 2020                                        84

```
 1   pages, right?

 2          A.    Right.

 3          Q.    So is this -- have you referred to this

 4   list of offenses when you work in the dorms?

 5                MS. SCHEFFEY:  Object to form.

 6          A.    Yes.

 7          Q.    (BY MR. SCIMONE)  So how do you -- what do

 8   you use it for?  How do you use it?

 9          A.    So, for example, if somebody is fighting,

10   you can charge them with fighting, for example.  Or,

11   you know, depends on the situation.

12          Q.    So let's use that example.  So in that

13   case where someone is fighting, what are you supposed

14   to do as a detention officer in the dorm on duty?

15          A.    You're supposed to call for responders.

16   Once the responders arrive, then you try to separate

17   them, for example.  A supervisor will show up and tell

18   you what else to do.

19          Q.    Is there -- is responder a particular post

20   assignment that someone is given on a given day?

21          A.    No.

22          Q.    So what -- is that a permanent position?

23          A.    No.

24          Q.    So what makes someone a responder?

25          A.    If you're available to respond.  So you
```

1    would respond to a situation, if needed.

2           Q.    So that can be any detention officer?

3           A.    Yes.

4           Q.    Have you ever acted as a responder in a

5    situation where somebody called for responders?

6           A.    No, not really.

7           Q.    So in the situation -- in the example you

8    gave where someone is fighting, you call for

9    responders, and then you said the supervisor makes a

10   decision about how to handle it?

11          A.    Yes.

12          Q.    Is there any kind of report that you have

13   to fill out?

14          A.    If a supervisor tells you to charge a

15   person, then yeah.

16          Q.    So that supervisor --

17          A.    It depends on the situation.

18          Q.    When you say, "It depends on the

19   situation," is that something that the supervisor

20   decides how to handle?

21          A.    Yes.

22          Q.    So when you say charge someone with

23   something, is that one -- is that referring to one of

24   the offenses listed in this handbook?

25          A.    Yes.

```
 1              Q.   And how does that work if you're told

 2   to -- if they decide to charge someone with something?

 3   What do you need to do then?

 4                   MS. SCHEFFEY:  Object to form.

 5              A.   You would just do a charging packet and

 6   then whatever category it would go.

 7              Q.   (BY MR. SCIMONE)  And you would use this

 8   handbook to look up that category?

 9              A.   Yes.

10              Q.   Okay.  Is that how you were trained to

11   handle situations like this?

12              A.   What do you mean?  Like to write a report?

13              Q.   Yeah.  Is that how you were trained to

14   fill out reports, you know, if a supervisor told you to

15   do so?

16                   MS. SCHEFFEY:  Object to form.

17              Q.   (BY MR. SCIMONE)  Does that make sense?

18   Do you understand the question?

19              A.   Yes.

20              Q.   Okay.  So let me just ask it again.

21                   So the question is, so were you trained to

22   use this handbook as the -- as a resource when you're

23   writing up reports?

24              A.   Yes.

25              Q.   Let's see if I can find an example here.
```

```
 1          A.    Um-hum.

 2          Q.    Okay.  Sorry.  Just bear with me.

 3                So here's Exhibit 17.

 4                (Exhibit 17 was remotely introduced and

 5                provided electronically to the court

 6                reporter.)

 7          A.    Um-hum.

 8          Q.    Let me know when you have that opened.

 9          A.    Okay.

10          Q.    Okay.  So this is a one-page document

11   Bates-stamped GEO-MEN 65095.

12                So at the top it says "Incident of

13   Prohibited Acts and Notice of Charges."  Is this the

14   charging -- you referred to a "charging packet."  Is

15   this a part of that?

16          A.    Yes.

17          Q.    Have you ever had to fill out one of

18   these?

19          A.    Normally we fill them out by hand.  So it

20   looks a little bit different.

21          Q.    Have you ever had to fill out one of

22   these?

23          A.    No, not that I remember.

24          Q.    So in this box that says "Prohibited" --

25   well, let me ask you this:  Have you been trained to
```

1    fill out a report like this if you need to?

2          A.    Yes.

3          Q.    Okay.  So this section in the middle that

4    says "Prohibited Acts," do you see that?

5          A.    Yes.

6          Q.    So this lists out whatever offenses the

7    detainee is being charged with?

8          A.    Yes.

9          Q.    And then there are codes over to the

10   right.  Is that referring to this list that's in the

11   detainee handbook we looked at?

12         A.    Yes.

13         Q.    And then what -- what other parts -- you

14   said there's a charging packet.  What are the other

15   parts of it besides this charge?

16              MS. SCHEFFEY:  Object to form.

17         A.    Just like the investigation that a

18   supervisor might need to do.

19         Q.    (BY MR. SCIMONE)  Okay.  All right.  So

20   let's look at another document.  This is going to be

21   18.

22              (Exhibit 18 was remotely introduced and

23              provided electronically to the court

24              reporter.)

25         Q.    Take a look at that.

1        A.    Okay.  Yeah.  So that would be the

2   following paperwork.

3        Q.    Okay.  So this is the investigation report

4   that you referred to?

5        A.    Yes.

6        Q.    And this is filled out by a -- by the

7   supervisor?

8        A.    Yes.

9        Q.    And here, there's a "Name of Investigating

10  Officer," and we see "LT. Teixeira."  Does "LT" stand

11  for "lieutenant"?

12       A.    Yes.

13       Q.    And so this is not something that you

14  would have had to fill out if you had a detainee who

15  committed some sort of offense, right?

16       A.    No.

17       Q.    All right.  With these two documents, we

18  have the charging document and then the investigation

19  report.  What happens after they're filled out?  Do you

20  know where they go?

21       A.    Well, it depends.  If the charges were

22  dropped, they're just put on -- on a file just for, you

23  know -- for just paperwork, you know.  But if they're

24  found guilty, then it would be put on their file.  A

25  copy of it would be put.

```
 1              Q.    So if they're not found guilty, what
 2   happens to the paperwork?
 3              A.    You put them in a file just for -- like I
 4   said, just for paperwork, in case somebody asks, "What
 5   happened to so and so report?" or . . .
 6              Q.    What file do they go into?
 7              A.    It's a binder that we have.
 8              Q.    So it's not the detainee's file?
 9              A.    No, no, no.
10              MS. SCHEFFEY:  Object to form.
11              Q.    (BY MR. SCIMONE)  If they're found guilty
12   of an offense, then where does the paperwork go?
13              A.    So there's also another binder where you
14   would put the original, and then a copy would go into
15   their file.
16              Q.    Okay.  So the -- do you know where those
17   binders are maintained?
18              A.    So there's so many in intake, and then the
19   rest might get stored away.
20              Q.    And how long are those retained?
21              MS. SCHEFFEY:  Object to form.
22              A.    I do not know.
23              Q.    (BY MR. SCIMONE)  So you work in intake
24   now, right?
25              A.    Yes.
```

 1          Q.    So some of the binders are kept there?

 2          A.    Yes.

 3          Q.    How far back are the binders that are

 4   there currently?  How far back do they go?

 5          A.    I do not know, honestly.

 6          Q.    Is that the oldest set, or are older ones

 7   kept somewhere else?

 8          A.    Somewhere else.

 9          Q.    Do you know where that is?

10                MS. SCHEFFEY:  Object to form.

11          Q.    (BY MR. SCIMONE)  Do you know where those

12   are kept?

13          A.    I couldn't hear you.  I'm sorry.

14          Q.    Sorry.  I said do you know where those

15   older forms are kept?

16          A.    I think now they're using Iron Mountain.

17   I think that's where they're taking them to.

18          Q.    All right.  And would a copy -- if the

19   person is found guilty of the charge, does a copy of it

20   go in their detainee file?

21          A.    Yes.

22          Q.    Okay.  But if they're not found guilty,

23   then it doesn't necessarily go in the detainee file?

24          A.    It does not go.

25          Q.    It doesn't.  Okay.

Marco Vasquez
June 29, 2020                                             92

```
 1              Okay.  I'm going to give you two more
 2  exhibits now, and these two are related again.  You'll
 3  see what I mean.
 4              (Exhibits 19 and 20 were remotely
 5              introduced and provided electronically to
 6              the court reporter.)
 7       Q.   Okay.  So this first one is GEO-MEN 129440
 8  and then the one that goes with it is 441.  So you can
 9  open up 440 first.
10       A.   First.  Okay.
11       Q.   Okay.  So this is an email chain that
12  begins with you on December 10th, 2012, sending an
13  email to a group of people.
14              Do you see that?
15       A.   Yes.
16       Q.   And there's an attachment referred to in
17  Dawn Ceja's email following and then the attachment is
18  titled "SEG Accountability New Facility.doc."
19              Do you recognize that title?
20       A.   I don't.
21       Q.   Okay.  So now I'll ask you to open up the
22  second document.  This is the one that's 129441.
23       A.   Okay.
24       Q.   Okay.  Does this document look familiar to
25  you?
```

```
 1              MS. SCHEFFEY:  Object to form.

 2         A.   Like I said, it would be on the paperwork.

 3         Q.   (BY MR. SCIMONE)  What paperwork are you

 4    referring to?

 5         A.   The paperwork that's in seg.

 6         Q.   Can you explain the paperwork you're

 7    referring to.

 8         A.   Everybody would have a file in there, and

 9    it would tell you what -- you know, what they're

10    allowed to or not to or . . .

11         Q.   Okay.  And there are policies that dictate

12    what privileges people are allowed to have, right?

13              MS. SCHEFFEY:  Object to form.

14         A.   I don't understand.

15         Q.   (BY MR. SCIMONE)  Okay.  You said earlier

16    that there are policies that say what privileges people

17    are allowed to have when they're in the segregation

18    unit, right?

19         A.   Right.

20              MS. SCHEFFEY:  Object to form.  Misstates

21    prior answer.

22              You may answer.

23         Q.   (BY MR. SCIMONE)  Is it true that there

24    are policies that say that?

25              MS. SCHEFFEY:  Object to form.
```

Marco Vasquez
June 29, 2020                                            102

```
 1        A.   For the differences of stuff that they can

 2   have, you mean?

 3        Q.   (BY MR. SCIMONE)  Yes.

 4        A.   Yes.

 5        Q.   Okay.  Do you know what those policies

 6   say?

 7        A.   No, I wouldn't be able to unless I have it

 8   in front of me.  So no.

 9        Q.   Okay.  Fair enough.

10             But it's your understanding that if

11   someone is in protective custody, they have different

12   privileges than someone who is pending a hearing?

13        A.   Yes.

14        Q.   So bear with me.  I'm going to go over

15   some of your earlier testimony just because, speaking

16   with my co-counsel, we wanted to be sure I got -- we

17   had a disagreement about the audio and what we heard.

18   So I just want to go back a little bit.

19        A.   Okay.

20        Q.   So you spoke a little bit earlier about

21   someone within -- you thought sometime within the last

22   five years, someone who was sick and asked to be

23   excused from the housing unit cleanup that day.

24             Do you remember that?

25        A.   Yes.
```

Martha Vasquez
June 29, 2020                                    103

1          Q.    So other than that example, you've never

2    dealt with someone who didn't want to do that cleaning?

3          A.    Correct.

4               MS. SCHEFFEY:  Object to form.

5          Q.    (BY MR. SCIMONE)  Okay.  And you've never

6    witnessed that happen other than that example?

7               MS. SCHEFFEY:  Object to form.

8          A.    No.

9          Q.    (BY MR. SCIMONE)  So you haven't?

10         A.    No.

11         Q.    Okay.  And you said before that the

12   cleaning is not mandatory.  How do you know that?

13         A.    We just refer to the ICE policies.

14         Q.    What ICE policy says that it's not

15   mandatory?

16         A.    So I mean, like I said, you would call --

17   it would be more of a -- how can I say it?  A judgment,

18   I guess.  Does that make sense?  A judgment call.  No?

19         Q.    So it's --

20         A.    I'm sorry.

21         Q.    Don't be sorry.  Let me ask --

22         A.    Um-hum.

23         Q.    -- are you saying that it's your judgment

24   call that it's not mandatory?

25         A.    That's exactly what I did in that

 1   situation.  I didn't feel I had to contact the

 2   supervisor with something I could handle myself.  Like

 3   I said, I would just skip to the next person.

 4        Q.   So then does that mean there isn't a

 5   policy saying that it's not mandatory?

 6        A.   I don't know if there's a policy or not.

 7   I just know that, like I said, at that time I made my

 8   own judgment.

 9        Q.   Okay.  So in that situation where, you

10   know, you had someone who was sick and you used your

11   judgment to say that you would let that person off, as

12   a general matter, are people required to do the

13   housekeeping?

14             MS. SCHEFFEY:  Object to form.

15        A.   I don't know if that's just a general

16   matter or like if that's just what happened in my

17   situation.  I don't know if it has happened to somebody

18   else.

19        Q.   (BY MR. SCIMONE)  As a general matter,

20   there is a post that -- a list that gets posted every

21   day of people who clean up, right?

22        A.   Correct.

23        Q.   And generally, people are required to do

24   that, right, the people on that list?

25             MS. SCHEFFEY:  Form.

Maria Vasquez
June 29, 2020                                          105

```
 1        A.    Okay.  Sorry?

 2        Q.    (BY MR. SCIMONE)  You got the question?

 3        A.    Yeah.

 4        Q.    Can you answer it?

 5        A.    Well, I'm sorry.  I thought you were going

 6   to repeat it.  I apologize.

 7              MR. SCIMONE:  Can you read back the

 8   question, Shannon.

 9              (The question was read back as follows:

10              "Question:  And generally, people are

11              required to do that, right, the people on

12              that list?")

13              MR. SCIMONE:  Can you answer that

14   question?

15              MS. SCHEFFEY:  Same objection.

16        A.    So like is it normally they'll do a list,

17   and then, you know, it would just go through whoever is

18   on that list.  And I guess . . .

19        Q.    (BY MR. SCIMONE)  And generally people who

20   are on that list are required to do the cleaning that

21   day?

22              MS. SCHEFFEY:  Object to form.

23        A.    Yes.

24        Q.    (BY MR. SCIMONE)  Okay.  And it's the

25   responsibility of the officers in charge of the dorm
```

Marcela Vasquez
June 29, 2020                                              106

```
 1   that day to make sure that that cleaning gets done,

 2   correct?

 3              MS. SCHEFFEY:  Form.

 4        A.   Correct.

 5        Q.   (BY MR. SCIMONE)  Was that true prior to

 6   2014?

 7        A.   I think so, yes.

 8        Q.   Okay.  I know I asked this question

 9   earlier in the day, at the start, but I'll ask it now.

10              Other than the documents we've looked at

11   today, did you review any documents to prepare for this

12   deposition?

13        A.   No.

14        Q.   Okay.  And what's your understanding of

15   what this case is about?

16        A.   My understanding would be that I guess the

17   trustees that were at one period of time wanted minimum

18   wage.  That's all I know.

19        Q.   When you say "trustees" -- I know I asked

20   this question before -- you're referring to people in

21   the voluntary work program?

22        A.   Yes.

23              MS. SCHEFFEY:  Object to form.

24        Q.   (BY MR. SCIMONE)  And people who have been

25   given a job in the voluntary work program?
```

Marcela Vasquez
June 29, 2020                                          107

```
 1          A.    Yes.

 2          Q.    So they've been cleared to work, for

 3   example?

 4          A.    Yes.

 5                MS. SCHEFFEY:  Object to form.

 6          Q.    (BY MR. SCIMONE)  How did you find out

 7   about this case?

 8          A.    I actually saw it on TV.

 9          Q.    And how did you find out that you were

10   going to be called as a witness in this case?

11          A.    The lawyers asked me if I wanted to

12   testify, I guess.

13          Q.    Did anyone that you report to, like a

14   supervisor or anyone in the management of the facility,

15   tell you that you needed to talk to the lawyers?

16                MS. SCHEFFEY:  Object to form.

17          A.    Yes.

18          Q.    (BY MR. SCIMONE)  Who directed you to talk

19   to the lawyers?

20          A.    The assistant warden, Ceja.

21          Q.    Did she say why?

22          A.    No.  Actually, no.

23          Q.    And when you spoke to the lawyers, did you

24   volunteer to be a witness, or was it something that

25   they asked you to do?
```

Martha Vasquez
June 29, 2020                                          114

1                    REPORTER'S CERTIFICATE

2  STATE OF COLORADO        )
                            )  ss.
3  CITY AND COUNTY OF DENVER )

4           I, Shannon Clementi, Registered
   Professional Reporter, Colorado Realtime Certified
5  Reporter and Notary Public ID 20004025632, State of
   Colorado, do hereby certify that previous to the
6  commencement of the examination, the said
   MARTHA VASQUEZ verbally declared his/her testimony in
7  this matter is under penalty of perjury; that the said
   deposition was taken in machine shorthand by me at the
8  time and place aforesaid and was thereafter reduced to
   typewritten form; that the foregoing is a true
9  transcript of the questions asked, testimony given, and
   proceedings had.

10

11          I further certify that I am not employed
   by, related to, nor of counsel for any of the parties
   herein, nor otherwise interested in the outcome of this
12 litigation.

13          IN WITNESS WHEREOF, I have affixed my
   signature this 7th day of July, 2020.

14

15          My commission expires June 3, 2021.

16

   __X__ Reading and Signing was requested.
17

   _____ Reading and Signing was waived.
18

   _____ Reading and Signing is not required.
19

                       _____
20                     Shannon Clementi
                       Registered Professional Reporter
21                     Colorado Realtime Certified Reporter

22

23

24

25