# Exhibit 10

1              IN THE UNITED STATES DISTRICT COURT FOR THE
                        DISTRICT OF COLORADO
2

Civil Action No.: 1:14-cv-02887-JLK
3     _____

4     DEPOSITION OF:   SERGIO GALLEGOS, June 30, 2020
                         via RemoteDepo
5     _____

6     ALEJANDRO MENOCAL, ET AL.,

7     Plaintiffs,

8     v.

9     THE GEO GROUP, INC.,

10    Defendant.
      _____

11

12            PURSUANT TO NOTICE, the deposition of
      SERGIO GALLEGOS was taken on behalf of the Plaintiffs
13    by remote means, on June 30, 2020, at 10:03 a.m.,
      before Shannon Clementi, Registered Professional
14    Reporter, Colorado Realtime Certified Reporter and
      Notary Public, appearing remotely from Arapahoe County,
15    Colorado.

16

17

18

19

20

21

22

23

24

25

1    think you're probably being perfectly clear in the

2    room.  Just the microphone's a little funny, so I

3    apologize.

4              Destroying property, having drugs,

5    anything else?

6         A.   Making hooch.

7         Q.   What's "hooch"?  Is that like booze?

8         A.   (Witness nodded head.)

9         Q.   Making hooch.  That sounds very Shawshank

10   Redemption.

11             Making hooch.  Anything else?

12        A.   Having weapons.

13        Q.   Having weapons.  Anything else?

14        A.   Insolence.

15        Q.   Insolence?  What's "insolence"?

16        A.   When they say bad words to another person,

17   another inmate, an officer.

18        Q.   Okay.  Anything else?

19        A.   For having an incident.

20        Q.   So -- I'm sorry.  Go ahead.  I interrupted

21   you.  What did you say?

22        A.   Many things.  Many, many things.  Many,

23   many rules and regulations.  We can write up book of

24   things they cannot do.

25        Q.   Did you have a book of rules and

```
 1   regulations?

 2          A.   (Witness shook head.)

 3          Q.   "No"?

 4          A.   I don't work there no more.

 5          Q.   But at the time did you have a book of the

 6   rules and regulations?

 7          A.   Yes.

 8          Q.   Did you get to make up new rules and

 9   regulations, or did you have to follow the ones in the

10   book?

11          A.   We follow the ones in the book.

12          Q.   What would happen if an officer just came

13   up with a fake rule?

14          A.   I don't know.

15          Q.   Okay.

16          A.   It never happened to me.

17          Q.   Would that be permitted?

18          A.   I don't think so.

19          Q.   Is it a guard's job to implement -- I'm

20   sorry, not a guard -- an officer's job to implement --

21          A.   Because I'm not a guard.

22          Q.   I understand.  I made that mistake, and I

23   apologize.

24               Is it an officer's job to implement rules

25   and regulations from GEO, or is it an officer's job to
```

Sergio Gallegos
June 30, 2020                              30

```
 1   create rules and regulations?

 2           A.    Implement the rules, make sure the rules

 3   are followed.

 4           Q.    Would you ever write someone up for

 5   something that wasn't included in the rules and

 6   regulations provided by GEO?

 7           A.    No.

 8           Q.    Okay.  Did the inmates at the Guadalupe

 9   Correctional Facility -- did they have to do any work

10   at the facility?

11           A.    Yes.

12           Q.    What kind of work did they do?

13           A.    They clean the units.  They clean medical.

14           Q.    Clean the units, clean medical.  Anything

15   else?

16           A.    They work in the food service.

17           Q.    And what's that mean?  Did they prepare

18   the food, serve the food?  What did they do?

19           A.    They prepared the food.

20           Q.    Okay.  Did they serve the food?

21           A.    No, we do.

22           Q.    The officers did?

23           A.    Yes.

24           Q.    Okay.  Anything else?  I'm sorry.

25                 Did the inmates at the Guadalupe
```

1    Correctional Facility do any other work other than

2    cleaning units, cleaning medical and working in food

3    service?

4            A.    Maintenance.

5            Q.    What kind of maintenance?

6            A.    All kinds of maintenance.  I mean, they

7    work in the maintenance department --

8            Q.    Okay.

9            A.    -- with the maintenance officers.  So they

10   fix fans, they unplug a toilet, mop.  Just --

11           Q.    Probably some of that sort of overlapped

12   with cleaning, too, right?

13           A.    (Witness nodded head.)

14           Q.    So other than cleaning, working in food

15   service and maintenance, did the inmates provide any

16   other work at the Guadalupe Correctional Facility?

17           A.    Cleaning medical, work the chapel.

18           Q.    Working in the sharp -- what?

19           A.    Chapel.

20           Q.    Oh, "chapel."  Got it.

21                 Anything else?

22           A.    They were clerks, helped the teachers.

23           Q.    Okay.  Anything else?  I'm sorry?

24           A.    Library.

25           Q.    Library.  Anything else?

 1          Q.   (BY MR. HOOD)  Sure.

 2               Is disciplinary segregation a potential

 3   sanction for violating a rule or regulation at the

 4   Aurora Detention Facility?

 5          A.   Yes.

 6          Q.   Are the detainees at the Aurora Detention

 7   Facility made aware that disciplinary segregation is a

 8   potential sanction for violating rules and regulations?

 9               MR. EISMEIER:  Object to the form of the

10   question.

11          Q.   (BY MR. HOOD)  I'm sorry.  I couldn't hear

12   you over GEO's attorney's objection.  Can you just

13   restate your response?

14          A.   We also have a handbook.

15          Q.   You have a handbook.  Are they made aware

16   any other way that disciplinary segregation is a

17   potential sanction for violating rules and regulations?

18          A.   Not that I know.

19          Q.   You mentioned that there's a video at the

20   Guadalupe Correctional Facility; is that correct?

21          A.   Yes.

22          Q.   Is there a video at the Aurora Detention

23   Facility?

24          A.   Not that I know.

25          Q.   Okay.  You mentioned that officers might

 1   be one way that detainees -- I'm sorry -- inmates at

 2   the Guadalupe Correctional Facility were made aware

 3   that disciplinary segregation could be a potential

 4   consequence for violating rules and regulations.  Could

 5   the same be true at the Aurora Detention Facility?

 6         A.   I don't know.  I don't think so.

 7         Q.   Why not?

 8         A.   It's a different setting.

 9         Q.   I'm sorry?

10         A.   It's a different setting.

11         Q.   So officers wouldn't inform detainees at

12   the Aurora Detention Facility of potential sanctions

13   for violating rules and regulations?

14              MR. EISMEIER:  Object to the form of the

15   question.

16         A.   Yeah, I think so.  It could happen.

17   Someone -- if they have a question, yes.

18         Q.   (BY MR. HOOD)  Have you ever talked to

19   detainees at the Aurora Detention Facility about

20   potential sanctions for violating rules and

21   regulations?

22         A.   Yes.

23         Q.   Let's talk about each of those times.

24              What's the first time that you talked to a

25   detainee about potential sanctions for violating rules

 1  and regulations?

 2          A.   I don't know what would be the first time,

 3  but --

 4          Q.   Let's talk about each time you remember.

 5  So what is one time?

 6          A.   If somebody is pushing somebody, like

 7  hitting or threatening or --

 8          Q.   Okay.

 9          A.   -- stealing his clothes or something,

10  bullying the person, yelling at him.

11          Q.   Okay.  And then what did you say?

12          A.   That -- stop.  To stop.  To stop doing

13  what he's doing.

14          Q.   Did you mention that there could be a

15  consequence if he keeps doing what he's doing?

16          A.   Yes.

17          Q.   What did you say?

18          A.   "Just stop because -- stop doing what

19  you're doing because that's against the rules and

20  regulations."

21          Q.   But you said that there could be a

22  potential consequence.  What potential consequence did

23  you mention?

24          A.   I'll give -- I can give him a write-up for

25  doing what he's doing.

1    what the purpose of disciplinary segregation and

2    protective segregation were?

3            A.    Informed of the purpose?

4            Q.    Yes.

5            A.    Informed of the purpose?  Yes.

6            Q.    What were you told about the purpose of

7    disciplinary segregation?

8            A.    Disciplinary segregation is when somebody

9    break a rule and just he is put there to serve out the

10   term, the policy and procedures, wherever that officer,

11   Ms. Shook, that disciplinary officer, gives a person to

12   stay.

13           Q.    Okay.  So it's meant as a punishment when

14   a detainee is found guilty of violating a policy and

15   procedure; is that correct?

16                 MR. EISMEIER:  Object to the form of the

17   question.

18           A.    I don't think it's a punishment.  It's a

19   corrective disciplinary, to correct it.

20           Q.    (BY MR. HOOD)  Okay.  Earlier when we were

21   talking about the Guadalupe detention facility, you

22   spoke about segregation as a sanction.  Would you

23   consider disciplinary segregation at the Aurora

24   Detention Facility as a sanction for violating a policy

25   and procedure?

```
 1                    MR. EISMEIER:  Object to the form of the

 2   question.

 3             A.    No, I don't think so.  A sanction?

 4             Q.    (BY MR. HOOD)  Well, why did you -- why

 5   did you call it a sanction at the Guadalupe

 6   Correctional Facility?

 7                    MR. EISMEIER:  I'll object to the form of

 8   the question again.

 9             A.    I don't remember I call it a sanction.

10             Q.    (BY MR. HOOD)  Okay.  Well, you pick a

11   word.  What's the purpose of disciplinary segregation

12   at the Aurora Detention Facility?

13             A.    For corrective disciplinary.  Corrective

14   discipline.  Or correct the behavior, I think is a

15   better word.

16             Q.    You know, some people talk sometimes

17   about, you know, particularly with kids, like

18   disciplining kids.  They talk about carrots and sticks;

19   in other words, providing incentives and disincentives

20   for -- to correct behavior.

21                    Have you ever heard people talking about

22   stuff like that?

23             A.    No.  Never.

24             Q.    You never heard someone talk about a

25   carrot and a stick?
```

Rosa Gallegos
June 30, 2020                                    69

```
 1          A.    Never in my life.

 2          Q.    Yeah, it's kind of a saying.  All right.

 3                Is disciplinary segregation at the Aurora

 4   Detention Facility meant as a reward for good behavior

 5   or discipline for bad behavior?

 6                MR. EISMEIER:  Object to the form of the

 7   question.

 8          A.    It's to correct that behavior.

 9          Q.    (BY MR. HOOD)  Is it meant as a reward for

10   good behavior?

11          A.    No.

12          Q.    Given all you know about the Aurora

13   Detention Facility and disciplinary segregation, if you

14   were a detainee, would you want to go to disciplinary

15   segregation?

16                MR. EISMEIER:  Object to the form of the

17   question on several grounds.

18          A.    Do I have to answer that?

19          Q.    (BY MR. HOOD)  Yeah, please.

20                MR. EISMEIER:  You can answer it if you

21   can.

22          A.    Yeah, I would like to go to seg.

23          Q.    (BY MR. HOOD)  Why?

24          A.    It's peaceful, quiet.

25          Q.    Are there cells in the disciplinary
```

1    to go -- we have to go through it.  They give one for

2    us, and they also -- we have policies and procedures in

3    every post.

4          Q.    (BY MR. HOOD)  Okay.  And I'm going to go

5    back because GEO's attorney objected.

6                Did you ever receive training on the rules

7    and regulations that govern detainees?

8          A.    We talk about it.  We talk about the

9    things that they can have, they can do, they cannot.

10         Q.    Okay.  When did you talk about the rules

11   and regulations that govern the detainees at the Aurora

12   Detention Facility?

13         A.    In the preservice.

14         Q.    Okay.

15         A.    Yeah, I misunderstood.  I worded it wrong.

16         Q.    No, no, you're fine.  I am asking the same

17   questions again, and the only reason I'm asking again

18   is because GEO's attorney objected before, and I'm

19   trying to make a clean record.

20               This isn't meant as a trick.  These are in

21   my mind the same questions, and I'm just going to go

22   through them one by one, okay?

23         A.    (Witness nodded head.)

24         Q.    All right.  So I'm going to start again,

25   and I apologize.

```
 1              Did you ever receive training on the rules

 2   and regulations that govern the detainees at the Aurora

 3   Detention Facility?

 4         A.    Yes.

 5         Q.    When?

 6         A.    Preservice.

 7         Q.    What training did you receive regarding

 8   the rules and regulations that govern the detainees at

 9   the Aurora Detention Facility during preservice?

10         A.    The things that they supposed to do, how

11   they supposed to do it, where they supposed to be.

12         Q.    Okay.  Did you look at any documents

13   during this training regarding detainee rules and

14   regulations?

15         A.    I think only the detainee handbook.

16         Q.    What is the detainee handbook?

17         A.    A book that they hand the detainees when

18   they walk in the facility.

19         Q.    Were you provided a copy of the detainee

20   handbook?

21         A.    Yes.

22         Q.    When?

23         A.    Preservice.

24         Q.    So do all detention officers have a copy

25   of the detainee handbook?
```

```
 1            A.    I don't know whether all officers.  I have

 2     mine.

 3            Q.    Okay.  Were the other officers that were

 4     in preservice -- sorry.

 5                  Were the other detention officers who did

 6     preservice with you -- did they receive copies of the

 7     detainee handbook?

 8            A.    I think so.

 9            Q.    Okay.  Do you currently have a copy of the

10     detainee handbook?

11            A.    Yes.

12            Q.    I don't mean currently like in that room

13     with you, but somewhere in your possession somewhere?

14            A.    My lunch box.

15            Q.    In your lunch box.  That's a good place to

16     keep it.

17                  What is the detainee handbook?

18            A.    The rules and regulations what tells them

19     when to do laundry, when they send their clothes, when

20     they going to eat, when they can use the phone, when

21     they come in the dayroom.  It's everything they're

22     supposed to be doing when they're there.  The

23     visitation, lawyer calls, medical.  It's information

24     about everything happening there.

25            Q.    What -- go ahead.
```

 1          A.   Things not to have, like weapons, alcohol

 2   beverages, like drugs.  Like how to treat other

 3   detainees.  Everything how to behave.

 4          Q.   Okay.  So it's a general code of behavior

 5   for detainees at the Aurora Detention Facility?

 6          A.   Yes.

 7          Q.   Who writes the detainee handbook?

 8          A.   ICE.

 9          Q.   Are you sure about that?

10          A.   Not 100 percent, but tending to the higher

11   upper, like 90 percent.

12          Q.   Is it possible that GEO writes the

13   detainee handbook?

14          A.   I don't -- I don't think so.  I think ICE

15   tells it to GEO.

16          Q.   Does ICE write the standards of employee

17   conduct?

18          A.   For this specific thing, yes.  ICE is

19   there with us in the same building, so . . .

20          Q.   Okay.  And you're sure that ICE writes

21   both the employee standards of conduct and the detainee

22   handbook?

23          A.   Like I told you, I'm not 100 percent sure,

24   but I tend to believe that.

25          Q.   Okay.  That's fine.

```
 1              You described the detainee handbook as

 2  a -- as rules and regulations for detainees at the

 3  Aurora Detention Facility; is that correct?

 4         A.   There's some there, but it's mostly more

 5  than rules and regulations.  It's information for them.

 6  It's information of everything that is going on in

 7  there.

 8         Q.   Okay.  But does it also include rules and

 9  regulations?

10         A.   Yes.

11         Q.   Are those rules and regulations optional?

12         A.   Optional?

13         Q.   Let me ask it a different way.

14              Can a detainee at the Aurora Detention

15  Facility decide whether or not to follow the rules and

16  regulations in the detainee handbook?

17              MR. EISMEIER:  Object to the form of the

18  question.

19         A.   They can decide whatever they want to

20  decide.  I mean, we're all individuals.

21         Q.   (BY MR. HOOD)  If a detainee violates a

22  rule or regulation, is there a consequence?

23         A.   You talk to them first.

24         Q.   Okay.  And then what?

25         A.   If they do it again, you talk to them
```

 1   then.

 2           Q.    Okay.  And then what?

 3           A.    They do it again, you give them a

 4   write-up.

 5           Q.    Okay.  What happens after a write-up?

 6           A.    You might have to give them another

 7   write-up, and then another write-up, and then another

 8   write-up.  And then they have to -- they have to be

 9   consistently doing the wrong thing for them to find

10   corrective disciplinary on the end.

11           Q.    What is a "corrective disciplinary" --

12   what did you say?  "Corrective disciplinary"?

13           A.    Corrective disciplinary.

14           Q.    Corrective disciplinary.  What is

15   "corrective disciplinary"?

16           A.    Segregation time, I guess.

17           Q.    Okay.

18           A.    Many other things, too.  You don't

19   necessarily have to go to segregation.  You can lose

20   your privilege to order commissary.

21           Q.    You as a guard -- I'm sorry.  You're not a

22   guard, and I apologize.

23                 You as a detention officer -- and I

24   apologized -- are you permitted to write up a detainee

25   for any reason you want?

```
 1          A.    No.  You can write up a detainee for any

 2  reason you want, but it doesn't mean if I write you up

 3  because you're too handsome, you're going to be guilty

 4  of that.

 5          Q.    How about you as a practice?  Why do you

 6  write up -- why do you write up detainees?

 7                Strike that.

 8                Have you ever written up a detainee?

 9          A.    Yes.

10          Q.    Why -- have you written up more than one

11  detainee?

12          A.    Rephrase the question?

13          Q.    Have you written up more than one

14  detainee?

15          A.    Yes.

16          Q.    As a general matter, why do you write up

17  detainees?

18          A.    To report their behavior to -- when

19  they -- before I first write up anybody, I'll talk to

20  them.

21          Q.    All right.  But you said you've written up

22  more than one detainee.  As a general matter, why do

23  you write up a detainee?

24          A.    Insolence, weapons, alcohol, fighting.

25          Q.    Are these -- go ahead.  I'm sorry.
```

```
 1           A.    The trustees.
 2           Q.    Okay.  All right.  And meaning -- and I'll
 3   just ask this a different way.
 4                 Are the detainees that clean the showers
 5   in the pods with cells -- are they paid to clean the
 6   showers?
 7           A.    Yes.
 8           Q.    Do you know how much they're paid?
 9           A.    I believe it's one dollar a day.  I think
10   so.
11           Q.    Okay.  And then, again, in the pods with
12   cells, who cleans the common space that we talked about
13   earlier?
14           A.    All the detainees and the trustees, too.
15           Q.    Okay.  So are the detainees that clean the
16   common space in the pods with cells -- are they paid or
17   not paid for that cleaning?
18           A.    I don't believe they're paid.
19           Q.    Okay.
20           A.    They only clean after they eat.
21           Q.    Okay.  How many times a day do they eat?
22           A.    Three times:  Breakfast, lunch and dinner.
23           Q.    Approximately how much time do they spend
24   cleaning after eating?
25           A.    Five, ten minutes.  Everybody watch the
```

```
 1   TVs, so . . . they clean pretty fast.

 2            Q.   Okay.  And do they all clean together?

 3            A.   No.  Usually six detainees and the two

 4   trustees.

 5            Q.   So some detainees are paid for cleaning

 6   after -- after a meal?

 7            A.   The trustees only.

 8            Q.   So what are the detainees doing during

 9   this post-meal cleaning in the common area?

10            A.   Everybody goes to the top tier to watch

11   TV, or they go close their door.  That way they let

12   everybody -- let the other guys sweep and wipe the

13   tables and mop, and everybody goes to sit back down to

14   do what they were doing.

15            Q.   Okay.  And it's both trustees who are paid

16   and detainees who aren't paid who are providing this

17   work?

18            A.   Yes.

19            Q.   How many trustees are there that provide

20   this common space cleaning after a meal?

21            A.   Two.

22            Q.   How many unpaid detainees are there that

23   provide this cleaning service after a meal?

24            A.   There's six.

25            Q.   So let's talk about the two trustees.  Are
```

 1   their job duties the same as the unpaid detainees or

 2   different?

 3          A.   Different.

 4          Q.   What do they do?

 5          A.   The trustees?

 6          Q.   Yes.

 7          A.   They -- the trustees maintain the showers.

 8   They throw out trash.

 9          Q.   I'm sorry.  I didn't mean in general; I

10   mean during this cleanup time after a meal.

11               You said there were two trustees who

12   helped with the cleaning, and then you said they do

13   different work than the unpaid detainees.  So I'm just

14   wondering what the difference is between the work

15   provided by the trustees after clean -- or during that

16   cleaning and detainees during that cleaning.

17          A.   The detainees, that they're not trustees?

18   Two at the tables, two sweep and two mop.

19          Q.   Okay.  Maybe I misunderstood you earlier,

20   and that's probably the source of this.

21               Do the detainees help with the cleaning

22   after a meal?

23          A.   Yes.

24          Q.   What do they do?

25               I said "detainees," didn't I?  Now I'm

 1          A.   Yes.

 2          Q.   Okay.  Sorry about that.

 3               The six people who were put on the list to

 4     provide the cleaning, did they volunteer to be put on

 5     the list?

 6          A.   Some of them do.  Some of them you just

 7     put them on the list starting with cell 3.

 8               To give you an example, we have a new

 9     unit, and we have let's say 30 detainees.

10          Q.   Um-hum.

11          A.   We got two trustees.  Those guys don't go

12     in the cell because they're more than likely going to

13     be doing the stuff.

14               We go to the first cell, we get four

15     detainees, and then go to the next cell and get two

16     detainees.  So that's six.

17          Q.   Okay.

18          A.   But any of the detainees has like a work

19     duty, like he works in the kitchen or the laundry or

20     anything, they don't go on the list.

21          Q.   So it's detainees who are not trustees are

22     put on the list?

23          A.   Yes.

24          Q.   So is one of the benefits of being a

25     trustee that you're not put on the -- the six-person

Gregory Gallegos
June 30, 2020                                          137

 1    list to clean?

 2            A.    I don't know if it's a benefit or not, but

 3    they don't get to get on the list because they're

 4    working somewhere else.

 5            Q.    Okay.  So is it because they're physically

 6    not there to help, or is it simply because they're a

 7    trustee, they get skipped over?

 8            A.    Because they're a trustee, they get

 9    skipped, I guess.

10            Q.    Okay.  If someone -- if you put someone on

11    a list to clean, one of the six people, and they don't

12    want to clean, what happens?

13            A.    You go to the next person.

14            Q.    So nothing -- nothing bad happens to

15    someone who refuses to clean?

16            A.    No.

17            Q.    Have you ever written someone up for

18    refusing to clean?

19            A.    No.

20            Q.    And then with respect to -- you know,

21    we've been talking about the pods with cells.  Am I --

22    how many -- how many pods with cells are there?

23            A.    12.

24            Q.    12.

25                  And then we talked about pods without

 1   cells, where there was a sleeping area and a common

 2   area, separated.  Do you remember that?

 3           A.   Yeah.

 4           Q.   All right.  How many of those pods are

 5   there?

 6           A.   One.

 7           Q.   One.  Okay.

 8                So with respect to this one pod that does

 9   not have cells, do -- how did the cleaning work in that

10   pod?  How does the cleaning work in that pod?

11           A.   Same way.

12           Q.   Okay.  And are detainees responsible for

13   cleaning the sleeping area in the pod without the

14   cells?

15           A.   They clean their bed.

16           Q.   Okay.  So it's each individual detainee

17   responsible for his or her bed?

18           A.   Yeah.

19           Q.   Okay.  And then who is responsible for

20   cleaning the common area in the pod without cells?

21           A.   Six -- six beds, six detainees.

22           Q.   Okay.

23           A.   Two, three, four, five and six and the two

24   trustees.

25           Q.   Okay.  And is -- sorry.  Are you finished?

1   Mr. Gallegos.

2        A.   Yes.

3        Q.   Okay.  Have you ever seen this document

4   marked as Exhibit 5 before?

5        A.   I signed that paper.  Yeah, I seen it

6   before.

7        Q.   And where -- do you see where it's got a

8   line that says "Signature"?

9        A.   Yes.

10        Q.   Is that your signature?

11        A.   Yes.

12        Q.   I'm going to drop another document into

13   the chat.  And if you could just let me know when

14   you've got it open in front of you.

15             Now, this document, I tried like heck to

16   make it not sideways like this.  I will project it on

17   the screen as the right way.

18             Mr. Gallegos, are you able to rotate the

19   view so that it's not sideways to you?

20             MR. HOOD:  Dana, is it possible that

21   someone could help Mr. Gallegos rotate the PDF?

22             MR. EISMEIER:  It's going to take a few

23   seconds.  I've got to walk across the office, but I'll

24   be there in a second.

25             MR. HOOD:  Why don't we go off the record.

Roy Gallegos
June 30, 2020                                                    141

```
 1                    (Discussion off the record.)

 2                    MR. HOOD:  And I'd like to mark the PDF

 3    with the file name Exhibit 6 as Exhibit 6 to the

 4    deposition.

 5                    (Exhibit 6 was remotely introduced and

 6                    provided electronically to the court

 7                    reporter.)

 8         Q.    (BY MR. HOOD)  Mr. Gallegos, have you ever

 9    seen this document before?

10         A.    Yes.

11         Q.    What is it?

12         A.    Detainee handbook.

13         Q.    And this is a document that we discussed

14    before that describes the expected conduct and the

15    rules and regulations of detainees; is that correct?

16         A.    Yes.

17         Q.    Can you please go to page 22 and 23 -- I'm

18    sorry, just page 23.  And it's -- the Bates stamp is

19    PL000053.  Let me know when you're there.  And I'll

20    also display it, Mr. Gallegos.

21                    MR. EISMEIER:  PL000053.

22                    MR. HOOD:  53.  PL000053, and the page

23    number in the lower right is 23.

24         Q.    (BY MR. HOOD)  And I'll put it up.  I'll

25    share the screen, too, Mr. Gallegos, if that's helpful.
```

```
 1                Are you able to see it on the screen in

 2    front of you?

 3          A.   Yes, I have it now.

 4          Q.   Do you see where it says "Disciplinary

 5    Severity Scale And Prohibited Acts"?

 6          A.   "Disciplinary Scale..." yes.

 7          Q.   And then underneath that it starts off

 8    with a list with numbers.  Do you see that?

 9          A.   Yes.  "100.  Killing"?

10          Q.   Yeah.

11                What is the -- are you familiar with the

12    disciplinary severity scale and prohibited acts?

13          A.   Yes.

14          Q.   What is it?

15          A.   It's a classification of disciplinary

16    categories.

17          Q.   Okay.  And I note that -- I'm going to

18    flip through it here, if I can figure out how -- that

19    it goes on for a few pages onto the next page.

20                Do you see that?

21          A.   Yes.

22                Page 24?

23          Q.   Yes.  And then it's followed by something

24    called "Sanctions."  Do you see that?

25                I should say actually every -- every
```

1   "'High Moderate' Offense Category"?

2          A.   Yes.

3          Q.   And do you see "Sanctions" immediately

4   after that list of 300-level offense category?

5          A.   Yes.

6          Q.   What is the relation of those sanctions to

7   the 300-level offense category?

8          A.   These are sanctions for the offense of the

9   300s.

10         Q.   Okay.  Do you see where it says

11  "Disciplinary segregation" as a sanction for the

12  300-level offense category?

13         A.   Yes.

14         Q.   Are you aware that disciplinary

15  segregation -- are you aware other than by looking at

16  this document that disciplinary segregation, up to 72

17  hours, is a sanction for a 300-level offense category?

18         A.   Yes.

19         Q.   To your knowledge, are detainees aware

20  that discipline up to 72 hours is a sanction for a

21  300-level offense category?

22         A.   I don't know if they're aware or not.  I

23  don't know if they read the handbook.

24         Q.   Are detainees provided the handbook?

25         A.   Yes.

```
 1           Q.   Are detainees aware that disciplinary

 2    segregation, up to 72 hours, is a sanction for some

 3    sort of violation of the rules and regulations?

 4           A.   I don't know.  Probably.  I don't know.

 5           Q.   Have you ever talked about disciplinary

 6    segregation, up to 72 hours, as a sanction with a

 7    detainee?

 8           A.   No.

 9           Q.   Have you ever talked about disciplinary

10    segregation, up to 72 hours, as a sanction with another

11    detention officer?

12           A.   No.

13           Q.   Have you ever talked about disciplinary

14    segregation, up to 72 hours, as a sanction with anyone?

15           A.   I might have.  I don't remember.

16           Q.   Okay.  Has a write-up from you ever

17    resulted in disciplinary segregation, up to 72 hours,

18    for a detainee?

19           A.   I believe so.

20           Q.   Did you say, "I believe so," or you don't

21    believe so?

22           A.   I do believe so, but I don't know the

23    time.  I know sometimes I have to write people up, and

24    they do segregation time, but I don't know how much.

25           Q.   Okay.  Have you ever written someone up
```

 1   for a 300-level offense?

 2          A.   Yes.

 3          Q.   Have you ever written someone up for

 4   refusing to obey a staff member/officer, a 307 offense

 5   category?

 6          A.   Yes.

 7          Q.   Let's talk about the different times

 8   you've written someone up for a 307 offense category.

 9               What's the first time you remember writing

10   someone up for a 307-level offense category?

11          A.   I don't recall now, but I'm pretty sure I

12   wrote up a few.

13          Q.   Okay.  Do you remember what the detainee

14   did that resulted in being written up for a 307 offense

15   category?

16          A.   I think indecent exposure, and 307 was

17   refusing an order.

18          Q.   "Refusing to obey a staff member/officer's

19               order."

20               You should be able to see it on the screen

21   in front of you, Mr. Gallegos.

22          A.   You said 307:

23                 "Refuse to obey staff

24               member/officer's..."

25               Yes.

```
 1              Sometimes that write-up, they need to get
 2   four, five, six write-ups in order to get sanctions.
 3   Anyway they have come back and they said that they were
 4   sorry, they were mad; they don't know where to take it
 5   out, they take it out on me.  I say, "Don't worry about
 6   it.  It's a new day.  Let's start again."
 7         Q.   Okay.  I'm going to put Exhibit 6 back up
 8   on the screen.  I'm going to go back -- and feel free
 9   to look at the screen-share or your own version of
10   Exhibit 6, okay, Mr. Gallegos?
11              I'm going to go to the page that's
12   Bates-stamped PL000047, page 17 -- oops.  I went
13   forward.
14              And let me know when you're ready to talk
15   about this page, okay?
16         A.   What page?
17         Q.   Are you on the page Bates-stamped
18   PL000047?
19         A.   Correct.
20         Q.   Okay.  And it says page 17 at the bottom?
21         A.   Yes.
22         Q.   Okay.  Do you see on the left-hand side of
23   the page, there's a heading that says, "Housing Unit
24   Sanitation"?
25         A.   Yes.
```

 1          Q.    Could you read that, and then let me

 2   know -- read the writing underneath that heading, and

 3   then let me know when you're ready to talk about it.

 4          A.    (Reviewing document.)

 5                Yes.  Go ahead

 6          Q.    Okay.  And do you see on the first line of

 7   the writing underneath "Housing Unit Sanitation," it

 8   references the facility's sanitation program?  Do you

 9   see that?

10          A.    Yes.

11          Q.    Are you familiar with the Aurora

12   facility's sanitation program?

13          A.    I guess so.

14          Q.    Sorry.  Go ahead.

15          A.    The cleanup?  Sanitation, cleaning?

16          Q.    I don't know.  You tell me.

17                This is the employee -- I'm sorry -- the

18   detainee handbook that you described as including rules

19   and regulations for detainees, and I'm just wondering

20   if you're familiar with this particular part of it.

21          A.    Yes.

22          Q.    Okay.  What is the facility's sanitation

23   program?

24          A.    To make the facility sanitized clean.

25          Q.    And can you elaborate on that?  What does

 1  that mean?

 2          A.    The sanitation program is to keep the

 3  facility clean.

 4          Q.    Okay.  Do you see where it says:

 5                "Each and every detainee must

 6                participate..."?

 7          A.    Yes.

 8          Q.    Okay.  So does the sanitation program

 9  include only trustees, or does it also include unpaid

10  detainees?

11          A.    Unpaid detainees, too, I guess.  Yes.

12                "Each and every detainee must

13                participate..."

14          Q.    Okay.  If a detainee doesn't participate

15  in the facility's sanitation program, would that be a

16  violation of a rule or regulation of the Aurora

17  Detention Facility?

18                MR. EISMEIER:  Objection.  Form.

19                You can answer.

20          A.    We'll just go to the next person.

21          Q.    (BY MR. HOOD)  Okay.  It says "must."  Are

22  you allowed to decide that a detainee doesn't have to

23  participate?

24          A.    We're not making the detainee participate

25  if he doesn't want to participate.  We just go to the

R. Gallegos
June 30, 2020                                    163

1    next person.

2          Q.   You told me before that it was a detention

3    officer's job to implement the policies of -- of a

4    detention facility.

5               Do you remember that?

6          A.   Yes.

7               MR. EISMEIER:  Objection.  Form.

8          Q.   (BY MR. HOOD)  Is it a detention officer's

9    job to implement the policies -- strike that.

10              Is it a detention officer's job to

11   implement the rules and regulations of a detention

12   facility?

13         A.   Yes.

14         Q.   Okay.  Is it a rule or regulation of the

15   Aurora Detention Facility that each and every detainee

16   must participate in the facility's sanitation program?

17         A.   Yes, it's there.

18         Q.   I'm sorry.  I didn't mean to take it down.

19   Hold on one second.

20              And do you see under the "Housing Unit

21   Sanitation" policy on page 17 of Exhibit 6 -- do you

22   see the heading that says "Day Space"?

23         A.   Yes.

24         Q.   Okay.  And in the third paragraph under

25   there -- well, let me ask you this:  Do you know what

1    the day space is?

2           A.    Common area.

3           Q.    The common area in the pods?

4           A.    The dayroom, yes.

5           Q.    Okay.  Is that just another way of saying

6    the common area?

7           A.    Yes.

8           Q.    Do you see the third paragraph under "Day

9    Space," it says:

10                  "Detainees will take turns cleaning the

11                 area.  If a detainee feels that everyone

12                 is not doing their fair share, the

13                 detainee should inform the housing unit

14                 officer of the problem.  Action will be

15                 taken to resolve this problem"?

16                 Do you see that?

17          A.    Yes.

18          Q.    Do you know what the detainee handbook

19    means when it says:

20                  "Action will be taken to resolve this

21                 problem"?

22          A.    Yes.

23          Q.    What does it mean?

24          A.    We will get somebody else to take his

25    place.  One of the trustees will pick up what he was

Peter Gallegos
June 30, 2020                                                      165

```
 1   doing.

 2          Q.   It doesn't mean --

 3          A.   Either wiping the tables or sweeping or

 4   mopping.

 5          Q.   So what does it mean when it says:

 6               "If a detainee" --

 7               Do you know what it means when it says:

 8               "If a detainee fails -- feels that

 9               everyone is not doing their fair

10               share..."?

11               Do you know what it means?

12          A.   I don't know what it means, but I -- the

13   action that we take, when somebody doesn't want to be

14   part of the day cleanup, we'll put somebody else.

15          Q.   So the action -- so the action that will

16   be taken when a detainee is not doing his or her fair

17   share is just moving on to the next detainee?

18          A.   Yes.

19          Q.   And no other action would ever be taken in

20   that circumstance?

21          A.   No.

22          Q.   Have you ever taken any action in that

23   circumstance?

24          A.   Yes.  I have somebody else -- I ask

25   somebody else, either the trustee or even myself.
```

 1          Q.   But are these offense categories --

 2   sorry -- in Exhibit 6, on pages 23 and 24 -- well,

 3   strike that.

 4               Do you have a general understanding of the

 5   offense categories at the Aurora Detention Facility?

 6          A.   Yes.

 7          Q.   The offense categories on pages 23 and 24

 8   of Exhibit 6, are they consistent with your general

 9   understanding of the offense categories at the Aurora

10   Detention Facility?

11          A.   Yes.

12          Q.   Have the offense categories at the Aurora

13   Detention Facility changed substantially during your

14   time working at the Aurora Detention Facility?

15          A.   Not that I know.

16               MR. HOOD:  Okay.  I'm going to pull up

17   another exhibit.  And just because I think it's easier

18   to be consistent with the file numbers for the court

19   reporter, I'm going to be skipping over Exhibit 7 and 8

20   and moving on to Exhibit 9.

21                   (Exhibits 7 and 8 were remotely

22                   introduced and provided electronically to

23                   the court reporter.)

24               MR. HOOD:  All right.  I'm dropping it

25   into the chat.

 1              And I'll ask that the court reporter mark

 2    the file named Exhibit 9 as Exhibit 9 in the

 3    deposition.

 4              (Exhibit 9 was remotely introduced and

 5              provided electronically to the court

 6              reporter.)

 7         Q.   (BY MR. HOOD)  Mr. Gallegos, I'd ask that

 8    you open up that exhibit, review it, and let me know

 9    when you're ready to talk about it.

10         A.   Yes.

11         Q.   Are you ready to talk about Exhibit 9?

12         A.   Yes.

13         Q.   Okay.  Have you seen a form like this

14    before?

15         A.   Yes.  Not like this.

16         Q.   What do you mean, "Yes.  Not like this"?

17    What does that mean?

18         A.   Not like this.  I mean, sort of like this,

19    but not like this.  Different.

20         Q.   How would it have been different?

21         A.   The format of the form.  The form is just

22    with different lines, different -- same information on

23    the form, but different places for that.

24         Q.   Okay.  Do you see at the bottom where it

25    says "Reporting Officer"?

 1          A.    Yes.

 2          Q.    And it says "S. Gallegos"?

 3          A.    Yes.

 4          Q.    Is that you?

 5          A.    Yes.

 6          Q.    And the signature over on the right --

 7   there are a couple of signatures, but are any of those

 8   signatures yours?

 9          A.    Yes.

10          Q.    Which one?

11          A.    The one on top.

12          Q.    The one -- so there are two signatures,

13   one on top of the other, and it's the one -- the upper

14   signature that's yours?

15          A.    Yes.

16          Q.    So let's talk about this form for a

17   second.  You said you'd never seen it before, one like

18   this, but you also told me that you signed it.

19              So is it true that you've never seen a

20   form like this before?

21          A.    I don't remember this form.

22          Q.    Okay.  Do you remember any sort of form

23   called an "Incident of Prohibited Acts and Notice of

24   Charges"?

25          A.    Yes.

Sergio Gallegos
June 30, 2020                                          172

1          Q.    What is that form?

2          A.    A write-up.

3          Q.    So when we've been talking about

4    "write-ups" so far at the Aurora Detention Facility, is

5    this what you mean by a "write-up"?

6          A.    Yes.

7          Q.    Okay.  Have you reviewed a description

8    of -- the text under "Description of Incident"?

9          A.    Yes.  Yes, I read it.

10         Q.    Do you remember this incident?

11         A.    Very, very seldomly, but yeah, I remember

12   this incident.

13         Q.    What happened?

14         A.    The thing is I believe it's too long ago.

15   It's very long ago, 2012.

16              The thing is we're cleaning the dayroom,

17   and the detainee that got the write-up was yelling in

18   the middle of the room.  He was shouting at everybody

19   to, "Don't listen to the officer.  We don't have to do

20   this.  We don't have to do that."  And he started

21   cursing at me.

22              And then I called for the lieutenant.

23   Lieutenant came in, talked to me, talked to the

24   detainee, and he took the detainee to seg.

25         Q.    Okay.  All right.  It says that the

 1   detainee -- one of the prohibited acts of the rules

 2   violations that the detainee committed was "failure to

 3   obey my orders for cleaning details."

 4              Do you see that?

 5        A.   Yes, I see it.

 6        Q.   Okay.  You testified earlier that you

 7   never wrote anybody up for refusing to clean.  Do you

 8   remember that?

 9        A.   Yes.

10        Q.   Here you're -- you're writing someone up

11   for "failure to obey my orders for cleaning details";

12   is that correct?

13        A.   Correct.

14              MR. EISMEIER:  Object.  Form of the

15   question.

16        Q.   (BY MR. HOOD)  Can you explain why you

17   previously testified that you've never written someone

18   up for refusing to clean, while here you're writing

19   someone up for "failure to obey my orders for cleaning

20   details"?

21        A.   Because I didn't remember.

22        Q.   Okay.  Would you like to amend your

23   testimony?

24        A.   No.

25        Q.   Do you believe this form to be inaccurate?

```
 1          A.   The form is not inaccurate, but I remember

 2    this incident.  The detainee was disruptive in the

 3    dayroom.

 4          Q.   It says one of the reasons that you wrote

 5    him up is "failure to obey my orders for cleaning

 6    details."  Do you believe that's inaccurate?

 7          A.   "Creating a disruption of the orderly

 8    operations of the security" of the institutions.

 9               I told the detainee to put things away.

10    He was waving a broom or a mop.  I don't remember what

11    he was waving.  I told him just to put it down, he has

12    to go back to his cell.  And he started chanting and

13    shouting and yelling in the dorm, and I called for a

14    supervisor.

15          Q.   Did you instruct the detainee to perform

16    the general cleanup?

17          A.   No.

18          Q.   Then why was he cleaning?

19          A.   He was with a broom, and he was chanting

20    and yelling and disrupting the operation.  It was

21    really late at night.

22          Q.   So this was not during the cleanup after a

23    meal?

24          A.   No.

25          Q.   What did you mean by "general cleanup"?
```

 1          A.   I don't remember.  Probably he was

 2   cleaning his room or something.  I don't remember.  I

 3   can't answer that because I don't remember that good.

 4   But at this time it's not even dinnertime.

 5          Q.   Okay.

 6          A.   But I remember he had a broom and he was

 7   shouting in the dayroom.

 8          Q.   Okay.  Why was he cleaning in the dayroom

 9   with a broom?

10          A.   I don't remember that.

11          Q.   You previously testified that the only

12   time that there was a general cleanup was after meals.

13   Do you remember that?

14          A.   Yes.

15          Q.   Do you see where it says that you were

16   performing a general cleanup on this form at 2240

17   hours?

18          A.   Yes.

19          Q.   When is dinnertime at the Aurora Detention

20   Facility?

21          A.   5:00 p.m.

22          Q.   Which would be 1700 hours, right, military

23   time?

24          A.   Yes.

25          Q.   This is more than five hours later; is

```
 1    that correct?

 2            A.    Yeah, 2240.

 3            Q.    Do you generally supervise a general

 4    cleanup of the dayroom --

 5            A.    No.

 6            Q.    -- at 2200 hours?

 7            A.    No.

 8            Q.    Have you ever supervised a general cleanup

 9    of a dayroom at 2200 hours?

10            A.    I can't remember that.  I can't remember

11    back then --

12            Q.    Okay.

13            A.    -- whether they were cleaning, but I

14    remember he was really -- I remember that the detainee

15    was really disruptive.

16                  I don't remember his face or nothing like

17    that.  I just kind of remember.  Like I said, that

18    happened long ago.

19            Q.    Is it possible there are other write-ups

20    that you made for other detainees who refused to clean

21    that you don't remember?

22                  MR. EISMEIER:  Objection.  Form of the

23    question.

24            A.    I don't remember.  I can't answer that.

25            Q.    (BY MR. HOOD)  I'm sorry.  So you
```

 1    mentioned before that you had never written up a

 2    detainee for refusing to clean.

 3            Do you remember that testimony?

 4        A.   Yes.

 5        Q.   Okay.  Is this -- in front of you, is this

 6    a write-up of a detainee for refusing to clean?

 7            MR. EISMEIER:  Objection.  Form of the

 8    question.

 9        A.   He was disrupting the daily operation.  He

10    was yelling, shouting.  And some people was cleaning.

11    I called the supervisor.  The supervisor instructed me

12    to write him up.

13        Q.   (BY MR. HOOD)  Okay.  Is one of the

14    reasons you wrote him up for refusing to clean?

15        A.   Don't remember.

16        Q.   Okay.  Was this the only detainee who was

17    refusing to clean?

18            I'm sorry.  During this particular

19    incident, was this the only detainee who was refusing

20    to clean?

21        A.   He was the only detainee creating a

22    disturbance.  He was yelling and shouting and

23    disruptive.

24        Q.   Okay.  And there were no other detainees

25    creating a disturbance?

```
 1            A.    I don't remember.  I don't think so.

 2            Q.    Okay.  Were there any other detainees

 3    refusing to clean?

 4            A.    I don't remember.

 5            Q.    I'm going to drop in Exhibit -- actually,

 6    you know what, just one -- just so we remember here, do

 7    you see the detainee's name in the upper left-hand

 8    corner?

 9            A.    Yes.

10            Q.    What is it?

11            A.    Perez-Montoya.

12            Q.    In the last paragraph, under "Description

13    of Incident," it says:

14                  "Detainee was screened by medical staff

15                  prior to his placement in the SHU."

16            Do you see that?

17            A.    No.

18            Q.    So do you see the third sort of box?  It

19    says "Description of Incident."  Do you see that?

20            A.    Yes.

21            Q.    Okay.  And then the last paragraph of the

22    "Description of Incident" says:

23                  "Upon supervisor and staff support

24                  on-site..."

25            Do you see that?
```

 1        A.    Yes.

 2        Q.    "...detainee was placed in hand restraints

 3              and placed in segregation pending rules

 4              violations listed in this report."

 5              Do you see that?

 6        A.    Yes.

 7        Q.    So this detainee was placed in segregation

 8   as a result of your write-up; is that correct?

 9        A.    Appears so.  Pending investigation.

10        Q.    Does that surprise you?

11        A.    Yeah.  It's so long ago, it surprises me.

12        Q.    Why does it surprise you?

13        A.    Because I don't remember -- I didn't

14   remember this incident.

15        Q.    Okay.  I'm going to drop in another

16   exhibit.  If you could open it up, review it and let me

17   know when you're ready to talk about it.

18        A.    Yes.

19        Q.    Let me just -- are you ready to talk about

20   it, Mr. Gallegos?  And I'll share it to the screen.

21        A.    Yes.

22        Q.    Okay.  Is this another write-up?

23        A.    Yes.

24        Q.    Is that your signature in the lower

25   right-hand corner, the sort of the upper signature of

 1  the two signatures?

 2          A.   Correct.

 3          Q.   Okay.  Do you remember this write-up?

 4          A.   Yes.

 5          Q.   Did you remember it before you just looked

 6  at it, or was your memory refreshed by looking at it?

 7          A.   My memory refreshed.

 8          Q.   Okay.  Can you tell me what happened.

 9               I'm sorry.  Strike that.  That was a bad

10  question.

11               Can you tell me -- can you describe the

12  incident that occurred that resulted in this write-up.

13          A.   Yeah.  I remember -- I think it was the

14  same incident with the other guy.  He was riling up the

15  whole dorm.

16          Q.   Okay.

17          A.   I think that's what happened.  It was a

18  few -- it was three or four guys.

19          Q.   Okay.  What were they doing?

20          A.   They were shouting in the dorm.  They

21  were -- they were just being insolent.  They were

22  shouting in the dorm, yelling, I know.

23          Q.   Okay.  Under the "Description of

24  Incident," it says, again, that one of the prohibited

25  acts of rules violations was "failure to obey my orders

1  for cleaning details."  What does that mean?

2          A.    Failure to follow orders for cleaning

3  details.  That he failed the orders to clean.

4          Q.    To clean the -- the common area?

5                MR. EISMEIER:  Objection.  Form of the

6  question.

7          Q.    (BY MR. HOOD)  Where were they cleaning?

8          A.    I think everybody -- that day, I think

9  everybody, all the detainees, were cleaning the top

10 rails.

11         Q.    The top rails?

12         A.    Where they put their hands.

13         Q.    Why would --

14         A.    Whenever you have a rail, you put your

15 hands on it, and everybody was cleaning, wiping that

16 up.  And these guys started shouting.  They were

17 sitting at a table, and they started telling everybody

18 not to do this, not to do that.  And then they start

19 saying bad words and yelling and screaming, and then I

20 called the lieutenant.

21         Q.    Okay.

22         A.    I was instructed by the lieutenant to

23 write them up, give them a write-up.

24         Q.    Okay.  Were these trustees cleaning the

25 top rails or detainees?

 1          A.    Everybody.

 2          Q.    Were they paid for cleaning the top rails?

 3          A.    I don't think so.

 4          Q.    Okay.  So we talked before about the

 5    unpaid detainee work --

 6          A.    Um-hum.

 7          Q.    -- in the pods, and you mentioned just

 8    only cleaning up after the meals.  Do you remember

 9    that?

10          A.    Yes.

11          Q.    Okay.  But now they're cleaning the top

12    rails in the pod.

13                Is there anything else that the detainees

14    clean and are not paid for?

15          A.    No.

16          Q.    The only thing that the detainees clean in

17    the pod other than cleaning up after meals is the

18    rails?

19          A.    The trust -- the trustees clean the rails

20    and everything, but everybody was helping them.

21    Everybody was helping the trustees to clean the rails.

22                And these guys, they were in a corner

23    table.  I remember, like I said, now.  They were in a

24    corner table.  They start shouting to everybody, "Stop

25    doing that.  Stop doing that."  And a detainee got a

 1  broom in his hand, and one of them picked it up, and

 2  they were yelling.

 3          And I told them to stop the disruption and

 4  they didn't obey.  I called on the radio for a

 5  supervisor because it was getting out of hand.

 6      Q.   Okay.

 7      A.   The supervisor went to the dorm and --

 8      Q.   So -- go ahead.

 9          MR. EISMEIER:  He's not finished.

10          MR. HOOD:  Yeah, I apologize, Dana.  I

11  thought he was done.

12      Q.   (BY MR. HOOD)  Please continue,

13  Mr. Gallegos.

14      A.   The supervisor went to my call.  The

15  supervisor heard what was going on.  The supervisor

16  order another -- another officer, not me -- he order

17  somebody else to put those detainees in restraints for

18  disrupting the dormitory.  And then he ordered me -- he

19  told me that he wanted all write-ups for them.

20      Q.   Okay.  The unpaid detainees who were

21  helping clean the guardrails -- and by "guardrails,"

22  are we just talking like -- I think you called them

23  "handrails."

24          Are these handrails on the stairs and

25  around the upper landing where the stairs are?

```
 1          A.    Correct.

 2          Q.    The unpaid detainees who were helping to

 3   clean, they were just -- why were they helping to

 4   clean?

 5          A.    Because they want -- they wanted to help

 6   them.  They always help them.

 7          Q.    Could they have just been sitting and

 8   watching TV at the time?

 9          A.    I don't think so, no.

10          Q.    Why not?

11          A.    Because they weren't watching TV.  They

12   were yelling and disrupting.

13          Q.    No, no, no.  I don't mean the detainees

14   who you wrote up.  I mean the detainees -- the unpaid

15   detainees who were helping to clean, why -- I'm

16   wondering if another option other than cleaning could

17   have been watching TV.

18          A.    Yes.

19          Q.    But instead they chose to clean?

20          A.    Some -- yeah, most of them did.

21          Q.    Okay.  And when you describe "failure to

22   obey my orders for cleaning details," what -- what does

23   that mean?

24          A.    I don't remember.

25          Q.    Had you ordered them to clean?
```

```
 1          A.    I tell the truth, I don't remember.

 2          Q.    Is it possible that you ordered them to

 3    clean?

 4                MR. EISMEIER:  Objection to form of the

 5    question.

 6          Q.    (BY MR. HOOD)  I'm sorry, Mr. Gallegos.

 7    I'm assuming that you're trying to remember, but could

 8    you answer the question, or are you unable to answer

 9    the question?

10          A.    I'm not able to answer that question.

11    It's too long, and I don't remember.

12                But I remember the lieutenant, Gutierrez,

13    went to the call, the radio call, and he talked to the

14    detainees, and he order another officers to take the

15    detainees to medical, to segregation for disrupting the

16    dormitory.

17          Q.    Okay.  And I understand that, and that's

18    the 399 violation that you wrote.  But I want to know

19    why you wrote the 307 violation under the description

20    of the incident, "failure to obey my orders for

21    cleaning details."

22                Do you remember why you assigned a 307

23    violation for Mr. Juan Nava-Ruiz?

24          A.    I don't remember.

25          Q.    Okay.  Is it possible that that 307
```

1   violation was for refusing an order to clean?

2           A.    No, I don't think so.

3           Q.    What do you think it was?

4           A.    I know it was disruption of the -- of the

5   dormitory, but I don't remember if I wrote them up for

6   that.

7           Q.    Well, I'm confused, Mr. Gallegos, because

8   a 307 offense category, as we discussed previously in

9   the detainee handbook, is refusing to obey a staff

10  member or officer's order; is that correct?

11          A.    Yes.

12          Q.    What was your order that they -- that

13  Mr. Nava-Ruiz refused to obey?

14          A.    I told you, I wrote him up because I was

15  instructed by Lieutenant Gutierrez to give him a

16  write-up for that.

17          Q.    Did Lieutenant Gutierrez instruct you to

18  write him up for refusing to obey orders for cleaning

19  details?

20          A.    Don't remember.  He just told me to write

21  him up.

22          Q.    Did he say why he wanted you to write them

23  up?

24          A.    Because they were disrupting the dayroom.

25  I don't remember.

 1         Q.   Okay.  You don't remember what you meant

 2   when you say "failure to obey my orders for cleaning

 3   details"?

 4         A.   No, I don't remember what he told me to

 5   write him up for.  But I know one of them, it was for

 6   disobeying -- not disobeying -- disrupting the daily

 7   duties of the dorm.

 8         Q.   Okay.  And that's a 399 offense category,

 9   like we discussed, but you put a 307 category in here,

10   too, and said, "failure to obey my orders for cleaning

11   details."

12              You don't have any memory of why you wrote

13   that down?

14         A.   No.

15         Q.   Okay.  I'm going to drop another exhibit

16   into the "Comments" section.  If you could open that up

17   and let me know when you're prepared to talk about it,

18   Mr. Gallegos.

19         A.   Yes.

20              MR. HOOD:  Let me do the screen-share.

21   And I'd ask the court reporter mark the file with the

22   name Exhibit 11 as Exhibit 11 to the deposition.

23              (Exhibit 11 was remotely introduced and

24              provided electronically to the court

25              reporter.)

 1              MR. HOOD:  And I can't remember whether I

 2   asked prior, so I'll just belt and suspenders ask that

 3   the file name Exhibit 10 be marked as Exhibit 10 to the

 4   deposition.

 5              (Exhibit 10 was remotely introduced and

 6              provided electronically to the court

 7              reporter.)

 8         Q.   (BY MR. HOOD)  Mr. Gallegos, is this

 9   another write-up?

10         A.   Yes, the same incident.

11         Q.   Okay.  And this is a third detainee who

12   was involved in the incident?  Or was this about a

13   third detainee who was involved in the incident?

14         A.   They were the same detainees that were

15   sitting at the table.

16         Q.   Okay.  How many detainees were there at

17   the table?

18         A.   Four.  Three or four.

19         Q.   Three or four.

20              Do you see in the -- is that your

21   signature on the bottom right-hand corner?

22         A.   Yes, sir.

23         Q.   Did you type up the description of the

24   incident?

25         A.   Excuse me?

1           Q.   Did you type up this write-up?

2           A.   I don't remember, but I signed it.

3           Q.   If you signed it -- did you sign write-ups

4    that other people wrote?

5           A.   No.

6           Q.   So given that your signature is at the

7    bottom, is it fair to assume that you wrote this

8    write-up?

9           A.   Yes.

10          Q.   Do you see that this write-up describes

11   Mr. Gonzalez-Donato as committing a 307 offense for

12   "failure to obey my orders for cleaning details"?

13          A.   Yeah.

14          Q.   What does that mean?

15          A.   Can you please repeat the question?

16          Q.   Do you see that this write-up describes

17   Mr. Gonzalez-Donato as committing a 307 offense for

18   "failure to obey my orders for cleaning details"?

19          A.   Yes.

20          Q.   What does that mean?

21          A.   I probably told him to pick up the other

22   guy's cleaning.

23          Q.   You told him to pick up the other guy's

24   cleaning?

25          A.   Probably.  I don't remember.

 1          Q.    Okay.  What did you mean when you said

 2    "pick up the other guy's cleaning"?

 3          A.    Where did I say that?  Did I say that?

 4          Q.    I thought you did.  I might have misheard

 5    it.

 6                MR. HOOD:  Could I have the court reporter

 7    read back his response to my question regarding that

 8    307 failure to obey.

 9                (The record was read back as follows:

10                "Question:  What does that mean?

11                "Answer:  I probably told him to pick up

12                the other guy's cleaning.

13                "Question:  You told him to pick up the

14                other guy's cleaning?

15                "Answer:  Probably.  I don't remember.

16                "Question:  Okay.  What did you mean when

17                you said 'pick up the other guy's

18                cleaning'?")

19          Q.    (BY MR. HOOD)  So I'll ask you again, what

20    did you mean when you said "pick up the other guy's

21    cleaning"?

22          A.    I just word it.  I didn't mean to say

23    that.  I probably told him to help the other guys

24    clean.  But I don't remember.  I'm speculating over

25    here.

```
 1          Q.   Okay.  That's fine.  But you said, "I

 2  probably told him to pick up the other guy's cleaning,"

 3  and I honestly don't know what that means.  And I'm

 4  just asking what "pick up the other guy's cleaning

 5  means."

 6               MR. EISMEIER:  I would object.  He already

 7  said he misspoke.

 8               MR. HOOD:  I don't think he did say that.

 9  I think he said he's not sure he remembers.  And I said

10  when he said the words "pick up the other guy's

11  cleaning," what does that mean.

12          A.   I probably word it wrong.  I don't

13  remember.

14          Q.   (BY MR. HOOD)  Okay.  When you said "pick

15  up the other guy's cleaning," does that mean that you

16  probably asked him to help with the cleaning?

17               MR. EISMEIER:  Objection.  Form of the

18  question.

19          A.   I don't remember.

20          Q.   (BY MR. HOOD)  Is it possible that's what

21  you meant by "pick up the other guy's cleaning"?

22               MR. EISMEIER:  Same objection.

23          A.   I don't remember.

24               The thing that I remember about that day,

25  because it's been too long ago, that those guys were
```

 1   inciting the other detainees to start disruption in the

 2   dorm.  They were yelling and shouting, and one was

 3   taking a broom.

 4        Q.   What do you mean by "taking" -- go ahead.

 5        A.   I told you I called the supervisor,

 6   supervisor came to the dorm.  It was his decision, not

 7   mine, to take those guys to segregation via medical.

 8   And lieutenant told me to write him up.

 9        Q.   Okay.  What do you mean -- what did you

10   mean by -- you said something about taking a broom.

11   What did you mean by that?

12        A.   I told you he got a broom and he was

13   swinging the broom.

14        Q.   Why did he have a broom if he wasn't

15   helping to clean?

16        A.   He was close to the closet where we have

17   the materials, the water, the soap, the brooms.

18        Q.   So was he helping to clean or wasn't he

19   helping to clean?

20        A.   I don't remember.

21        Q.   Is it possible that --

22        A.   They were all on the table, on the corner

23   table, when they started shouting and they started

24   yelling to all the detainees in there, they start

25   howling.  And I called the supervisor myself at that

Rene Gallegos
June 30, 2020                                          193

```
 1   time.

 2         Q.   Okay.  And all the other detainees were

 3   cleaning the handrails?

 4         A.   Yes.

 5         Q.   All of them?

 6         A.   I don't remember all of them, but it was a

 7   few cleaning.  They were helping the trustees.

 8         Q.   Okay.  And they were helping them because

 9   they wanted to help them?

10              MR. EISMEIER:  Objection.  Foundation.

11         A.   Yes.

12         Q.   (BY MR. HOOD)  Could you answer the

13   question?

14         A.   What was the question?

15         Q.   Why were the unpaid detainees helping the

16   trustees?

17              MR. EISMEIER:  Form and foundation.

18         A.   Because they wanted to help them.

19         Q.   (BY MR. HOOD)  Why did they want to help

20   them?

21              MR. EISMEIER:  Same objection.

22         A.   I don't know.  I can't think for them.

23         Q.   (BY MR. HOOD)  Okay.  Did the unpaid

24   detainees voluntarily help do other cleaning with the

25   trustees in the pods?
```

```
 1              A.    Can you please repeat the question?

 2              Q.    Did the -- did unpaid detainees help

 3    trustees with other cleaning in the pods?

 4              A.    Yes, all the time.  All the time.

 5    Detainees help the trustees all the time because they

 6    want to.

 7              Q.    Do you know why?

 8              A.    Because they're bored.  They want to help

 9    them.  They're their friends.  They want -- they want

10    to do something.

11              Q.    But these detainees sitting in the corner

12    didn't want to help; is that correct?

13              MR. EISMEIER:  Objection.

14              A.    I told you I don't remember that.  I

15    remember that they were yelling and shouting and

16    cursing.  And I call the supervisor, and he take over,

17    and he order me -- he gave me an instruction to make

18    write-ups.

19              Q.    (BY MR. HOOD)  Did you speak to them at

20    all before they started yelling and cursing?

21              A.    I told them to stop.  I told them to stop

22    cursing and shouting.

23              Q.    Before they started cursing, did you speak

24    to them at all?

25              A.    I don't remember.
```

Reeg/Gallegos
June 30, 2020                                    195

 1          Q.   Is it possible that you spoke to them
 2   before they started cursing?
 3          A.   It's possible, but I don't remember.
 4          Q.   Okay.  Did they -- was the cursing
 5   spontaneous?  Did they just spontaneously start
 6   cursing?
 7          A.   No.  They started bringing up the level
 8   more, and I would tell them to come down, to stop
 9   shouting and yelling.  And they went more and more and
10   more, and then I called the supervisor immediately.
11          Q.   And had them sent to seg?
12               MR. EISMEIER:  Objection.  Form,
13   foundation.  We've gone over this now many times.  It's
14   asked and answered over and over.
15          A.   I told you already I don't have the power
16   to send someone to segregation.  It's not one of my
17   duties to send someone to segregation.
18               The lieutenant came, and he ordered other
19   officers to take them to segregation, and he told me to
20   write them up.
21          Q.   (BY MR. HOOD)  Did you think that the
22   300-level offense category sanction of disciplinary
23   segregation for up to 72 hours might result as a result
24   of you writing them up?
25          A.   No.

1          Q.    Did it result as a result of you writing

2    them up?

3          A.    No.

4          Q.    What happened?

5          A.    They -- they went back to the dorm in the

6    morning.

7          Q.    Okay.  You remember that?

8          A.    Yeah.

9          Q.    Okay.

10         A.    They took -- the lieutenant talked to

11   them, and he let them go back in the morning to the

12   dorm.

13         Q.    Okay.  You remember that very clearly.

14   But you continue to not remember what you meant when

15   you assigned the 307-level offense category?

16         A.    Yeah.

17         Q.    Okay.  And you continue to not remember

18   whether or not you ordered them to clean before they

19   refused to clean?

20         A.    Correct.

21         Q.    All right.  Look at a document labeled

22   Exhibit 12.  Let me know when you have that up and

23   you're ready to talk about it.

24              MR. HOOD:  And I'd ask the court reporter

25   to label the PDF with the file name Exhibit 12 as

1   Exhibit 12 to the deposition.

2                (Exhibit 12 was remotely introduced and

3                provided electronically to the court

4                reporter.)

5                THE WITNESS:  Yes.

6        Q.   (BY MR. HOOD)  Mr. Gallegos, is this

7   another write-up?

8        A.   It's the same incident.

9        Q.   Okay.  Is that your signature on the

10  bottom right-hand corner?

11       A.   Correct.

12       Q.   Do you see where you assigned this

13  detainee a 308-level offense for "verbally cursing me

14  out and stating he was not fucking cleaning for me"?

15       A.   I can read that.

16       Q.   Okay.  Do you remember assigning him that

17  offense?

18       A.   No.  I remember assigning -- I don't

19  remember assigning none of these offenses.

20       Q.   Okay.

21       A.   It was disrupting.  I remember that.

22       Q.   Do you have any memory of interacting with

23  Mr. Wilfried -- I'm sorry, it's actually Mr. Kaka --

24  before he cursed you out saying he would not "fucking

25  clean" for you?

 1          A.    No.   Mr. Kaka was -- I remember Mr. Kaka.

 2   He was a very aggressive detainee.

 3          Q.    Okay.

 4          A.    But I don't remember when I -- when I

 5   talked to him, or if I talked to him at the table or

 6   nothing.   I just remember they were really disruptive

 7   and I had to call for help.   I called lieutenant,

 8   lieutenant went to the same part -- the same table.

 9          Q.    Based on your memory of Mr. Kaka, would he

10   have told you that he wouldn't fucking clean for you if

11   you hadn't first asked him to clean for you?

12               MR. EISMEIER:   Objection.   Form of the

13   question.

14          A.    No, I don't remember.

15          Q.    (BY MR. HOOD)   Okay.   Do you have any

16   memory of instructing Mr. Kaka to clean for you before

17   he told you that he wouldn't clean for you?

18          A.    No.

19          Q.    Do you find it odd that he would tell you

20   he wouldn't clean for you unless you had first

21   instructed him to clean for you?

22               MR. EISMEIER:   Objection.   Form of the

23   question.   Argumentative.

24          Q.    (BY MR. HOOD)   Can you respond to the

25   question?

 1          A.    No.  Like I tell you, I don't remember.

 2    Mr. Kaka was really an aggressive detainee.  I don't

 3    know what to tell you.

 4          Q.    Okay.  But you don't remember him during

 5    this incident?

 6          A.    I remember him being there.

 7          Q.    Do you remember speaking to him during

 8    this incident at all?

 9          A.    I remember he cursing at me.

10          Q.    Do you remember why he was cursing at you?

11          A.    No.

12          Q.    Okay.  Do you remember why you assigned

13    Mr. Kaka a 307-level offense for "failure to obey my

14    orders for cleaning details"?

15          A.    No.

16          Q.    Is it possible that you gave an order for

17    Mr. Kaka to clean, which caused the 307 offense, he

18    failed to obey, and then he swore at you when he --

19    when he indicated that he would not obey?

20                MR. EISMEIER:  Objection.  Form of the

21    question.  Asked and answered.

22          A.    I don't know.

23          Q.    (BY MR. HOOD)  I'm sorry?  What was your

24    response?

25          A.    I don't remember.

1          Q.    Okay.  Do you remember assigning a

2    399-level offense to Mr. Kaka for creating a

3    disruption?

4          A.    I remember they were disrupting the

5    dayroom.

6          Q.    Okay.  Was he disrupting the dayroom by

7    refusing to clean?

8          A.    No, by shouting and yelling and saying bad

9    words and just inciting a riot.  He was getting out of

10   hand.  I called the supervisor to assist.

11         Q.    Were some of the bad words he said that he

12   would not "fucking clean" for you?

13         A.    I don't recall.

14         Q.    Was Mr. Kaka sent to seg as a result of

15   this write-up?

16         A.    He went to seg as a result of lieutenant

17   ordering them to go to segregation.  When they went to

18   segregation, lieutenant told me -- before they went to

19   segregation, they were going to medical, he told me, "I

20   need you give me write-ups for those guys."  I say,

21   "Yes, sir."

22         Q.    Did all the other detainees in the pod see

23   Mr. Kaka, Mr. Perez, Mr. Nava-Ruiz and Mr. Gonzalez

24   being taken to seg after this incident?

25         A.    The ones that were all cleaning, yes.

 1                 MR. HOOD:  All right.  I'm going to drop

 2    in Exhibit 13.

 3                 THE WITNESS:  Can we take a break?  Can I

 4    go to the bathroom?

 5                 MR. HOOD:  Why don't we finish with this

 6    document and then we'll take a break.  We're almost

 7    done, Mr. Gallegos.  There's just one document that's a

 8    similar document, and then we'll be ready for a break.

 9    And then I would suspect only 15 minutes more after

10    that.  GEO's attorney might also have questions for

11    you, too.

12                 Could we look at this document that I just

13    dropped in and then we'll take a break.

14                 THE WITNESS:  Can I take a break?

15                 MR. HOOD:  If you want to, you can.  My

16    preference would be to look at this document first and

17    then we'll take a break.

18                 THE WITNESS:  I need to go to the

19    bathroom.

20                 MR. HOOD:  That's fine.  Let's go off the

21    record, please.

22                 (Recess taken, 4:19 p.m. to 4:36 p.m.)

23         Q.   (BY MR. HOOD)  Mr. Gallegos, before we

24    took a break -- well, let me ask you this:  During the

25    break, did you talk to anybody?

```
 1          A.    I went to the bathroom and Mr. Dana was

 2    there.

 3          Q.    Okay.  Did you talk to -- go ahead.

 4          A.    He just told me I was doing good.

 5          Q.    Okay.  Did you talk to --

 6                MR. EISMEIER:  My admonition, please don't

 7    talk about what I say because --

 8                THE WITNESS:  All right.

 9          Q.    (BY MR. HOOD)  Right.  And without saying

10    what -- and I don't -- without saying what Dana said to

11    you, did you talk at all about your testimony or just

12    sort of broadly about how you were doing?

13          A.    Not about testimony.  Just broadly.

14          Q.    Okay.  All right.  That's fine.

15                Before the break, I dropped a document

16    with the file name Exhibit 13 into the chat.  Do you

17    see that?  I can drop it again.

18          A.    Yes.

19          Q.    Can you open that and let me know when

20    you're ready.

21                MR. HOOD:  And could the court reporter

22    please mark the document with the file name Exhibit 13

23    as Exhibit 13 to the deposition.

24                I'm sorry.  I got a little tongue-tied

25    there.
```

```
 1                  (Exhibit 13 was remotely introduced and

 2                  provided electronically to the court

 3                  reporter.)

 4          Q.   (BY MR. HOOD)  Mr. Gallegos, are you ready

 5   to discuss Exhibit 13?

 6          A.   Yes, sir.

 7          Q.   Let me screen-share it, too.

 8               Is this another write-up?

 9          A.   Yes.

10          Q.   Okay.  Is that your signature on the

11   bottom right-hand corner?

12          A.   Yes.

13          Q.   Did you write this write-up?

14          A.   I believe it was for the same thing.

15          Q.   Okay.  And did you write this write-up?

16          A.   Yes.  I signed it.

17          Q.   Okay.  And typically if you sign a

18   write-up, did you write the write-up?

19          A.   Yes.

20          Q.   Okay.  Under the "Description of

21   Incident," do you see that you assigned rule violations

22   for offense category 307, 308 and 399?

23          A.   Yes.

24          Q.   Do you see that this detainee, Mr. Kolong,

25   was written up for "verbally cursing me out and stating
```

```
 1   he was not fucking cleaning for me"?

 2         A.   Yes.

 3         Q.   Do you remember this?

 4         A.   I remember the incident.  Like I said

 5   before, I remember they were really loud and

 6   disruptive, and I called the supervisor.

 7         Q.   Okay.  And -- go ahead.  Go ahead.  Yep.

 8         A.   He told me -- he told somebody else, and

 9   other officers, too, "Take the detainees to medical and

10   then segregation."

11         Q.   Did the lieutenant tell you what offense

12   categories to assign for each detainee?

13         A.   No, no, just disrupting the facility.

14         Q.   Okay.  Why did you assign a 307 offense

15   level for "failure to obey my orders for cleaning

16   details"?

17         A.   I don't remember.  I probably -- I don't

18   remember, but I probably when everybody was cleaning

19   went to the table and they were shouting.  I told them

20   to stop shouting; instead of being disruptive, they

21   should help those guys clean to finish sooner.

22              That's what I'm thinking I said probably.

23   But they just got out of hand.  They were too loud

24   and --

25         Q.   Okay.  No, go ahead and finish.  I'm sorry
```

 1   to interrupt.

 2           A.   Like I said, they were too loud.  They

 3   were disruptive.  The unit was getting out of hand.

 4           Q.   Okay.  And you probably told them to clean

 5   rather than sit at the table?

 6           A.   I probably told them to help the other

 7   guys finish faster, but I don't remember.  I'm

 8   speculating on that.

 9           Q.   Okay.  What were the other guys doing?

10           A.   Cleaning.

11           Q.   Okay.  So you told them to help the other

12   guys cleaning?

13           A.   It wasn't everybody.  It was just a few

14   detainees cleaning.  The trustees were cleaning and a

15   few other guys were helping them.

16           Q.   Okay.  And then Mr. Kolong responded that

17   he was not "fucking cleaning" for you; is that correct?

18           A.   Yeah.  I can't even remember Mr. Kolong,

19   to be honest with you.

20           Q.   Okay.  You don't remember him at all?

21           A.   No.

22           Q.   And you said that the lieutenant did not

23   tell you to assign these offense categories, the 307,

24   308 and 399; is that correct?

25           A.   He just told me to write them up.

```
 1           Q.    Okay.  But previously you testified that

 2   he didn't say what offense categories to assign; is

 3   that correct?

 4           A.    Correct.

 5           Q.    Okay.  So you remember that, but you don't

 6   remember why you assigned the offense categories?

 7           A.    No.

 8           Q.    Okay.  And you remember that they were

 9   taken to segregation, but you don't remember why they

10   were assigned the offense categories?

11           A.    They were taken to segregation because

12   they were disruptive.  That's the only reason I know.

13           Q.    Okay.  I just -- I just feel like you have

14   a very detailed memory of this incident in general

15   except for this one key thing, which is why these

16   offense categories were assigned.  But you just don't

17   have a memory of that?

18                 MR. EISMEIER:  Objection to the form of

19   the question.

20           Q.    (BY MR. HOOD)  Okay.  Can you answer the

21   question?

22           A.    I don't remember much about this incident.

23   I only remember they were really disruptive, and I

24   tried to calm them down, and they just got out of hand,

25   and I called for a supervisor.
```

 1          Q.   And they were disruptive because they

 2   weren't cleaning?

 3          A.   I don't -- no, they were disruptive

 4   because they were yelling in the dorm.

 5          Q.   Were they yelling because they didn't want

 6   to clean?

 7          A.   They were yelling -- I don't know.

 8               MR. EISMEIER:  Objection.  Asked and

 9   answered.  It's argumentative.  We've been going

10   through this a dozen times.  Let's move on.

11               MR. HOOD:  Okay.

12          Q.   (BY MR. HOOD)  Can you answer the

13   question?

14          A.   What was the question?

15          Q.   Were they arguing because they didn't want

16   to clean?

17               MR. EISMEIER:  Same objection.

18          A.   No, they were just being loud.  Not

19   because they didn't want to clean.  They just -- I

20   think --

21          Q.   (BY MR. HOOD)  Okay.

22          A.   I think they were saying, "Fuck you," or

23   something like that, and they told -- they started

24   being -- they start yelling at me and start telling me

25   stuff, this and that, and that's why I called a

 1   supervisor.

 2         Q.   Okay.  Does being insolent mean refusing

 3   to clean?

 4         A.   No.

 5         Q.   Does being insolent include a failure to

 6   obey your orders for cleaning details?

 7         A.   No.

 8         Q.   Does being insolent include telling you

 9   that they will not fucking clean for you?

10         A.   No.

11         Q.   Okay.  Then why did you assign these

12   offense categories?

13             MR. EISMEIER:  Objection.  We've reached

14   the point where this is going beyond just asked and

15   answered.  It's really becoming abusive beyond

16   argumentative.  Let's move on.

17             MR. HOOD:  I've been talking about

18   different detainees each time.  This is the last one,

19   and I'm certainly entitled to an answer to that

20   question.

21             So could the court reporter please read

22   back the question.

23             (The last question was read back as

24             follows:

25             "Question:  Okay.  Then why did you assign

 1              these offense categories?")

 2         A.   I don't remember.  I already told you.  I

 3    remember that they were really disruptive.  I called

 4    for help.  Help arrived.  Lieutenant order other

 5    officers to take the detainees to segregation, told me

 6    to write them up.  I wrote them up, and then that was

 7    it.  Next morning they were back in the dorm.

 8         Q.   (BY MR. HOOD)  When you called for the

 9    lieutenant, did you describe what happened?

10         A.   "I need help."  I told him, "I need help

11    in the dorm."

12         Q.   Okay.  And did you describe to him what

13    was going on?

14         A.   I told him that -- he saw it.  He saw for

15    himself they were still disruptive.

16         Q.   And what did the lieutenant see when he

17    came to the dorm?

18         A.   I don't have his eyes.  I can tell you

19    what I was seeing, not his.

20         Q.   Okay.  What happened when the lieutenant

21    returned to the dorm?

22         A.   When he arrived?

23         Q.   Yeah.

24         A.   What I was watching?

25         Q.   Sure.  Yeah.

 1   officers.  I don't know how many.  I don't remember.

 2   It's too long.

 3        Q.  (BY MR. HOOD)  Okay.  And were you

 4   implementing the rules of the Aurora Detention Facility

 5   during this incident?

 6             MR. EISMEIER:  Same objection.

 7        A.   I wasn't implementing the rules.  The

 8   lieutenant, he's the one who order the detainees to go

 9   to segregation, not me.

10        Q.  (BY MR. HOOD)  Was the lieutenant

11   implementing the rules of the Aurora Detention Facility

12   when he sent the detainees to detention?

13        A.   I don't know.

14        Q.   Were you implementing the rules of the

15   Aurora Detention Facility when you completed these

16   write-ups?

17             MR. EISMEIER:  Object to form of the

18   question.

19        A.   Was I what?

20        Q.  (BY MR. HOOD)   Implementing the rules of

21   the Aurora Detention Facility when you wrote these

22   write-ups.

23        A.   Yeah, I remember writing the write-ups,

24   but I only remember the charge for disrupting the

25   place.

 1          Q.    Okay.  And were you implementing the rules

 2     of the Aurora Detention Facility when you wrote the

 3     write-ups?

 4          A.    Yes, I believe so.

 5                MR. HOOD:  Okay.  That's all I have,

 6     Mr. Gallegos.  Thank you very much.

 7                Dana -- don't sign off.  Dana I think has

 8     some questions for you, and then I might have some

 9     follow-up questions after that, but we should be very

10     nearly done, okay?

11                THE WITNESS:  Okay.

12                MR. EISMEIER:  Thank you.

13                        EXAMINATION

14     BY MR. EISMEIER:

15          Q.    Mr. Gallegos, just a few questions.

16                Did you ever write up someone in a dorm

17     for failing to clean and based only on a failure to

18     clean?

19          A.    Don't recall.  I don't think so.  I don't

20     recall.

21          Q.    In a write-up, any write-up that you've

22     made, has there been some amount of insolence or

23     fighting or some other element which caused the event

24     to be written up?

25                MR. HOOD:  Objection.  Form and

Joe Gallegos
June 30, 2020                                    214

```
 1   foundation.

 2          A.   Yes.  Nobody just got a write-up for not

 3   cleaning.  You have to be elevated to something.

 4          Q.   (BY MR. EISMEIER)  After meal service,

 5   during the days, for example, if someone said, "I don't

 6   want to clean," what did you do?

 7          A.   Go to the next person, ask somebody else

 8   if they want to clean.

 9          Q.   Okay.  You've been asked several questions

10   by Mr. Hood about the last few exhibits, which I'm sure

11   you remember.  We just finished.

12               Were any of those five people trustees, to

13   your knowledge?

14          A.   No, I don't remember.  It's been too long.

15          Q.   You just don't remember one way or the

16   other?

17          A.   No.

18          Q.   Okay.  The incident that we were -- you

19   were just talking about in response to Mr. Hood's

20   questions, this occurred at night; is that right?

21          A.   Yes.

22          Q.   This did not occur with respect to cleanup

23   after meals; is that correct?

24          A.   No.

25          Q.   In other words, did it occur after meals
```

U.S. LEGAL SUPPORT
(877) 479-2484

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF COLORADO        )
                              )  ss.
 3   CITY AND COUNTY OF DENVER )

 4            I, Shannon Clementi, Registered
     Professional Reporter, Colorado Realtime Certified
 5   Reporter and Notary Public ID 20004025632, State of
     Colorado, do hereby certify that previous to the
 6   commencement of the examination, the said
     SERGIO GALLEGOS verbally declared his/her testimony in
 7   this matter is under penalty of perjury; that the said
     deposition was taken in machine shorthand by me at the
 8   time and place aforesaid and was thereafter reduced to
     typewritten form; that the foregoing is a true
 9   transcript of the questions asked, testimony given, and
     proceedings had.

10

11            I further certify that I am not employed
     by, related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of this
12   litigation.

13            IN WITNESS WHEREOF, I have affixed my
     signature this 5th day of August, 2020.

14

15            My commission expires June 3, 2021.

16

17   __X__ Reading and Signing was requested.

18   _____ Reading and Signing was waived.

19   _____ Reading and Signing is not required.

20            _____
              Shannon Clementi
21            Registered Professional Reporter
              Colorado Realtime Certified Reporter

22

23

24

25
```