# Exhibit 13

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2

Civil Action No.: 1:14-cv-02887-JLK
3    _____

4                        DEPOSITION OF
                  JOYCE QUEZADA - July 28, 2020
5                        via RemoteDepo

     _____
6

ALEJANDRO MENOCAL, ET AL.,
7

Plaintiffs,
8

v.
9

THE GEO GROUP, INC.,
10

Defendant.
11   _____

12

             PURSUANT TO NOTICE, the deposition of
13   JOYCE QUEZADA was taken on behalf of the Plaintiffs by
     remote means, on July 28, 2020, at 9:32 a.m., before
14   Shannon Clementi, Registered Professional Reporter,
     Colorado Realtime Certified Reporter and Notary Public,
15   appearing remotely from Arapahoe County, Colorado.

16

17

18

19

20

21

22

23

24

25

```
 1          Q.   Okay.  Bathrooms as well?

 2          A.   In the dorms?

 3          Q.   Yeah.

 4          A.   No.

 5          Q.   Is that because they're contained in the

 6   cell?

 7          A.   Yes.

 8          Q.   So everybody cleans their own cell?

 9               MS. SCHEFFEY:  Object to form.

10          A.   Yes.

11          Q.   (BY MR. TURNER)  Now, you just called the

12   group of six the "cleanup crew," right?

13          A.   Yes.

14          Q.   You referenced earlier a cleanup crew that

15   applied for the job, right?

16          A.   No.  Those would be voluntary.

17          Q.   So as you understand it, these people

18   applied for the job?

19               MS. SCHEFFEY:  Object to form.

20          A.   Just the dorm trustees, and these ones

21   would be voluntary to help clean up after the meal

22   service.

23          Q.   (BY MR. TURNER)  Do you understand whether

24   that cleanup crew was paid for their work?

25          A.   No.
```

Goyce Quezada
July 28, 2020                                              66

```
 1          Q.    You don't know, or you think they were

 2    not?

 3          A.    No, they weren't.  But it was voluntary.

 4    If they didn't want to work, they didn't have to.  If

 5    they wanted to help, they could.  But they would all

 6    take turns.

 7          Q.    I see.

 8                Let's talk about the trustees.  How many

 9    were there in your dorm?

10          A.    Two.

11          Q.    They would do meal service and meal

12    cleanup; is that right?

13                MS. SCHEFFEY:  Object to form.

14          A.    I would be the one, as the officer,

15    serving the trays, and they would just stand there

16    while I served the trays.  And then after the trays

17    were served, they ate lunch.  They put their trays back

18    on the cart, and they would -- I would -- they would

19    just empty the trash.

20                And the volunteer six guys that would

21    help, they would be the ones cleaning up.  And they

22    help take the trays out of the dorm.  And they

23    supervise the six to clean.

24          Q.    (BY MR. TURNER)  You supervised the six

25    who were cleaning, right?
```

```
 1                 MS. SCHEFFEY:  Object to form.

 2           A.    Both, yes.

 3           Q.    (BY MR. TURNER)  What do you do with the

 4   floor wax crew when you supervise them?

 5                 MS. SCHEFFEY:  Object to form.

 6           A.    I would just be with them there.  I would

 7   show them what all needed to -- the wax, where it went

 8   and help them get all their equipment.

 9                 When they would do the floors, I would

10   supervise them.

11           Q.    (BY MR. TURNER)  Did you train them in how

12   to use the equipment?

13           A.    No.

14           Q.    They knew?

15           A.    They knew already, because it was done --

16   that was their job already, and I . . .

17           Q.    Were you not the primary supervisor of

18   floor wax?

19           A.    No.

20           Q.    Somebody else was the primary supervisor?

21           A.    Yes.

22           Q.    And somebody else would have taught them

23   how to do it?

24           A.    Yes.

25           Q.    When does floor waxing happen?  What time
```

Joyce Quezada
July 28, 2020                                            75

1    mistake.

2                What is a "spot award"?

3         A.    A spot award is when they give you a spot

4    award for doing a good job.

5         Q.    So it's kind of a recognition that's less

6    than Officer of the Year, but it's --

7         A.    Yes.

8         Q.    -- similar?

9         A.    Yes.

10        Q.    You applied for the DO job before you

11   ultimately got it, right?

12        A.    To go on the floor?

13        Q.    Yeah.  You got passed over for that

14   promotion the first time, right?

15             MS. SCHEFFEY:  Object to form.

16        A.    I don't recall that.  It might . . .

17        Q.    (BY MR. TURNER)  Do you recall applying

18   for a DO job back in 2005 when you were still a cook

19   supervisor?

20             MS. SCHEFFEY:  Object to form.

21        A.    I don't remember on 2005 I ever put in for

22   floor.  I'm sorry.

23        Q.    (BY MR. TURNER)  I'd like to show you what

24   we'll mark as Exhibit 5.

25             (Exhibit 5 was marked.)

Joyce Quezada
July 28, 2020                                          76

 1          Q.    Just take a minute to review that document

 2   dated October 24th, 2005.

 3          A.    Okay.  And I don't remember.  It might

 4   have -- I might have, but at the time I don't remember.

 5                Oh, I do recall now.  I remember, yes, I

 6   did.

 7          Q.    Take your time to review that document, if

 8   you would.

 9          A.    Can you go up?

10                I remember now.

11          Q.    Okay.  Do you remember why you were passed

12   over for the detention officer position when you first

13   applied for it?

14                MS. SCHEFFEY:  Object to form.

15   Foundation.

16          Q.    (BY MR. TURNER)  Do you recall, or no?

17          A.    You know what, no.

18          Q.    I'd like to draw your attention to the

19   last two printed lines here that state:

20                     "Although Ms. Quezada has been here for

21                4 1/2 years, she does not quite possess

22                the ability or did not impress upon me

23                that she has the ability to deal with

24                detainees in more difficult situations."

25                Do you see that?

 1          A.    Yes.  I guess maybe it was my answers.

 2   I'd never been an officer before.  Just being in the

 3   kitchen, I learned a lot more, picked up a lot more.

 4          Q.    Do you think you were perceived as not

 5   tough enough to be an officer at first?

 6                MS. SCHEFFEY:  Object to form.

 7   Foundation.

 8          A.    No.  I'd learned a lot and gotten more

 9   stronger.  This is my first time working at a

10   correction facility.

11          Q.    (BY MR. TURNER)  You sometimes have to

12   deal with detainees in more difficult situations, don't

13   you?

14                MS. SCHEFFEY:  Object to form.

15   Foundation.

16          A.    Yes.

17          Q.    (BY MR. TURNER)  Have you ever had to --

18   have you had to overcome the perception that you aren't

19   tough enough with the detainees?

20          A.    Would you repeat that question?

21          Q.    Sure.

22                Sometimes you do have to deal with the

23   detainees in difficult situations.  How have you done

24   that?

25          A.    Yes.

Ceyoe Quezada
July 28, 2020                                                 78

```
 1          Q.   So how have you done that when detainees
 2   are resistant?
 3          A.   We call a code.  The watch commander and
 4   first responders, they come to the kitchen.
 5          Q.   Let's talk about your time in the
 6   detention officer job on the floor.  Now we're not
 7   talking about the kitchen.
 8          A.   Okay.
 9          Q.   What do you do when you've got resistant
10   detainees there?
11               MS. SCHEFFEY:  Object to form.
12          A.   Resisting in which way?
13          Q.   (BY MR. TURNER)  Well, have you ever had
14   them not to follow the rules?
15               MS. SCHEFFEY:  Object to form.
16          A.   No.  The only -- when -- like I said, the
17   volunteer workers, if they didn't want to work, I told
18   them it was fine, they don't need to work.  We're not
19   forcing them; they don't have to.  And they wouldn't
20   cause a big old scene or no nothing.  I would just talk
21   to them.
22          Q.   (BY MR. TURNER)  What do you tell them
23   when you talk to them?
24          A.   If they tell me that they don't want to
25   work, I tell them, "That's fine.  Don't worry about it.
```

Reyes Quezada
July 28, 2020                                    79

```
 1   I can do it."
 2              Or another detainee sometimes volunteers,
 3   and they want to do it, I say, "Sure."
 4              But no.
 5        Q.   So is it against the rules to disobey an
 6   officer's command?
 7              MS. SCHEFFEY:  Object to form.
 8   Foundation.
 9        A.   Yes.
10        Q.   (BY MR. TURNER)  And you have to enforce
11   those rules, don't you?
12              MS. SCHEFFEY:  Object to form.
13        A.   Yeah, but we're not forcing them to work
14   or no nothing.  So if they don't want to work, we don't
15   enforce it on them.  If they don't want to do it, we
16   say, "That's fine.  We'll get somebody else," or I can
17   do it.  I can help them a lot.
18        Q.   (BY MR. TURNER)  Would you agree that to
19   maintain order in the facility, it's important that the
20   detainees know there are rules?
21              MS. SCHEFFEY:  Object to form.
22   Foundation.
23        A.   Yes.
24        Q.   (BY MR. TURNER)  They don't get to just
25   choose not to follow the rules, right?
```

                              Tyler Quezada
                         July 28, 2020                           80

     1              MS. SCHEFFEY:  Object to form.

     2    Foundation.

     3         A.    Yes.

     4         Q.    (BY MR. TURNER)  "Yes," they get to choose

     5    not to follow the rules, or "yes," they must follow the

     6    rules?

     7         A.    Yes, they must follow the rules.

     8         Q.    And that's your job as a detention

     9    officer, to secure compliance, right?

    10         A.    Yeah.

    11              MS. SCHEFFEY:  Object to form.

    12    Foundation.

    13         Q.    (BY MR. TURNER)  Was that a "yes"?

    14         A.    Yes.

    15         Q.    You told me earlier that the detainee

    16    handbook is where we have the rules, right?

    17              MS. SCHEFFEY:  Object to form.  Misstates

    18    prior testimony.

    19         A.    Yes.

    20         Q.    (BY MR. TURNER)  Anywhere else?

    21         A.    Not that I recall, no.

    22         Q.    I'd like to show you what we'll mark as

    23    Exhibit 7 -- I'm sorry.  Drop it in the box for you.

    24    It's a lengthy document that will take a second to

    25    load, and I'll give you a minute to review it now.

Joyce Quezada
July 28, 2020                                                  81

```
 1                    MS. SCHEFFEY:  Is it Exhibit 6 or 7?

 2                    MR. TURNER:  7.  I skipped one.

 3                    MS. SCHEFFEY:  Okay.

 4                    Shannon, can you just note that we've

 5   skipped 6.  Thank you.

 6                    (Exhibit 6 was skipped.)

 7                    (Exhibit 7 was marked.)

 8        Q.   (BY MR. TURNER)  Please take your time to

 9   review this document.  It is longer, 27 pages.  I'll

10   let you go off record to review it for a minute, if

11   you'd like to.

12                    MS. SCHEFFEY:  Are you able to open it on

13   your computer, Joyce?

14                    THE WITNESS:  Yes.  On this one, it's too

15   small, but on this one, it's fine.

16                    MR. TURNER:  You've got a copy you can

17   read?

18                    THE WITNESS:  Yes.

19                    MR. TURNER:  Okay.

20                    MS. SCHEFFEY:  Is there a specific area

21   you want her to be looking at?

22                    MR. TURNER:  I'd like to know if she

23   recognizes the document, and then we'll talk about

24   particular parts.

25        A.   Yes, I recognize it.  It's been a while
```

 1  since I actually had it or read it.

 2            Yes, I do recognize it.

 3       Q.   (BY MR. TURNER)  As a detention officer,

 4  you have annual in-services, right, training?

 5            MS. SCHEFFEY:  Object to form.

 6  Foundation.

 7       A.   Annual, yes.

 8       Q.   (BY MR. TURNER)  You get trained every

 9  year?

10       A.   Yes.

11       Q.   You get trained on rules applicable to

12  detainees, right?

13            MS. SCHEFFEY:  Object to form.

14  Foundation.

15       A.   Could you repeat the question?

16       Q.   (BY MR. TURNER)  You get trained on the

17  rules that are applicable to the detainees, don't you?

18       A.   Yes.

19       Q.   And it's your job as a detention officer

20  to enforce those rules, right?

21       A.   Yes.

22            MS. SCHEFFEY:  Object to form.

23       Q.   (BY MR. TURNER)  Now, you don't get to

24  make the rules, right?

25            MS. SCHEFFEY:  Object to form.

Troy Quezada
July 28, 2020                                          83

```
 1        A.   No.

 2        Q.   (BY MR. TURNER)  You have to enforce the

 3   ones that are written, right?

 4             MS. SCHEFFEY:  Object to form.

 5        A.   Yes.

 6        Q.   (BY MR. TURNER)  And this is the document

 7   that has the detainee rules as far as you know, right?

 8             MS. SCHEFFEY:  Object to form.

 9        A.   Yes.

10        Q.   (BY MR. TURNER)  So when you're an officer

11   on the floor enforcing the rules, these are the ones

12   you're enforcing, right?

13             MS. SCHEFFEY:  Object to form.

14        A.   Yes.

15        Q.   (BY MR. TURNER)  For the rules to be fair,

16   the detainees have to understand what they are, right?

17        A.   Yes.

18        Q.   How do they know what they are?

19        A.   They've read their books, I'm sure.

20        Q.   So this is how they know what the rules

21   are, because it's in the document?

22             MS. SCHEFFEY:  Object to form.

23        A.   Yes.

24        Q.   (BY MR. TURNER)  Are there clear rules for

25   them to follow?
```

 1                  MS. SCHEFFEY:  Object to form.

 2          A.    Yes, they are.

 3          Q.    (BY MR. TURNER)  These rules are basically

 4   for the detainees' safety and security, right?

 5          A.    Yes.

 6          Q.    I'd like to draw your attention to page 24

 7   of the document -- I'm sorry, I mean 23 -- page 23 of

 8   the document, which also has the number PL 53 on the

 9   bottom.

10          A.    Yes.  Okay.

11          Q.    Do you see where we are?

12                  MS. SCHEFFEY:  Can you read that, Joyce?

13   Can you read the letter?

14                  THE WITNESS:  Yes, all except on the last

15   right because I see --

16          Q.    (BY MR. TURNER)  Would you like it blown

17   up bigger?  Does that help?

18          A.    Just put it down.  Down.

19          Q.    I'm sorry.  Like so?

20          A.    Down.  Okay.

21          Q.    Do you see the section that is called

22   "Disciplinary Severity Scale and Prohibited Acts"?

23          A.    Is it -- which one?

24          Q.    So when we look on the left-hand side on

25   the page before you --

Trejo Quezada
July 28, 2020                                    85

```
 1          A.   Yes, I see that.

 2          Q.   Do you see that killing is a 100-level

 3   offense that is impermissible?

 4          A.   Yes, greatest offense.

 5          Q.   You'd have to enforce that rule?

 6               MS. SCHEFFEY:  Object to form.

 7          A.   Of course.

 8          Q.   (BY MR. TURNER)  Assaulting any person,

 9   including sexual assault, that's something you take

10   very seriously, right?

11          A.   Yes.

12          Q.   Let's see.  Moving down onto the next

13   page, high moderate level offenses, number 300 is

14   "Indecent exposure," and that's against the rules?

15          A.   Yes.

16          Q.   And you know that because it's written

17   here, right?

18          A.   Yes.

19          Q.   And the detainees know that because it's

20   written here, right?

21               MS. SCHEFFEY:  Object to form.

22          A.   Yes.

23          Q.   (BY MR. TURNER)  And you would take that

24   seriously, right?

25          A.   Yes.
```

```
 1           Q.    You see below that 301 offense is

 2    "Stealing (theft)."  It would be a problem if people

 3    could just do that, right?

 4                 MS. SCHEFFEY:  Object to form.

 5           A.    Yes.

 6           Q.    (BY MR. TURNER)  You have to enforce the

 7    rule, right?

 8           A.    Yes.

 9           Q.    And detainees know they can't do that,

10    right?

11           A.    Yes.

12           Q.    And they know that because it's written

13    here, right?

14                 MS. SCHEFFEY:  Object to form.

15           A.    Yes.

16           Q.    (BY MR. TURNER)  I imagine the next

17    offense listed at 302, "Misuse of authorized

18    medication," is dangerous to permit, right?

19           A.    Yes.

20           Q.    You would have to enforce that rule as a

21    detention officer, wouldn't you?

22                 MS. SCHEFFEY:  Object to form.

23           A.    Yes.

24           Q.    (BY MR. TURNER)  And you don't get to

25    choose as a detention officer that you would just let
```

1   that slide, do you?

2            MS. SCHEFFEY:  Object to form.

3   Foundation.

4        A.   No.

5        Q.   (BY MR. TURNER)  You would have to enforce

6   the rules in here, right?

7        A.   Yes.

8        Q.   So the detainees can be confident that

9   what they find in here are the real rules, right?

10           MS. SCHEFFEY:  Object to form.

11       A.   Yes.

12       Q.   (BY MR. TURNER)  And they can have

13  confidence that those rules are going to be enforced

14  for the well-being of the facility, right?

15           MS. SCHEFFEY:  Object to form.

16       A.   And they would be what?

17       Q.   (BY MR. TURNER)  They can be confident

18  those rules will be enforced for their security, right?

19       A.   Yes.

20       Q.   And you apply the rules as they're written

21  in here, right?

22       A.   Yes.

23           MS. SCHEFFEY:  Form.

24       Q.   (BY MR. TURNER)  Now, Rule 307, "Refusing

25  to obey a staff member's order," is against the rules,

 1    right?

 2              MS. SCHEFFEY:  Object to form.

 3         A.   Yes.

 4         Q.   And "Insolence toward a staff member,"

 5    308, is also against the rules, right?

 6         A.   Yes.

 7         Q.   And "Refusal to clean assigned living

 8    area," 306, is also a rules violation, isn't it?

 9         A.   Well, you know what, that is voluntary

10    work, and if they don't want to do it, we don't make

11    them.  We don't force them.  We say, "That's fine, you

12    don't need to clean."

13              They're not getting paid for it.  They

14    didn't sign no application.  So on the voluntary work,

15    if they don't want to do it, it's good, it's fine.

16         Q.   I see.  That one we understand is a

17    pretend rule, right?

18              MS. SCHEFFEY:  Object to form.

19    Argumentative.

20         Q.   (BY MR. TURNER)  Is that pretend or real?

21         A.   That one's just voluntary.

22              What number was that again you were

23    showing me?

24         Q.   306, "Refusal to clean assigned living

25    area."  I believe you're telling me that that one is

Grijalva-Quezada
July 28, 2020                                        89

```
 1   not a real rule, right?

 2               MS. SCHEFFEY:  Object to form.  Misstates

 3   prior testimony.  Argumentative.

 4          Q.   (BY MR. TURNER)  You may answer.

 5          A.   You know, it says, "Refusal to clean

 6   assigned living area."  We don't force them to clean.

 7   If they don't want to clean, we don't.

 8          Q.   So there's no consequence to that

 9   particular rule, right?

10               MS. SCHEFFEY:  Object to form.

11   Foundation.

12          A.   To a point.

13          Q.   (BY MR. TURNER)  To a point.

14               How did you decide that?

15               MS. SCHEFFEY:  Object to form.

16          A.   How did I decide?  Well, when I'm a dorm

17   officer and it's voluntary work and they tell me they

18   don't want to clean, I don't force it on them and all.

19   It depends.

20          Q.   (BY MR. TURNER)  Okay.  So you're telling

21   me that rule isn't really applied, right?

22               MS. SCHEFFEY:  Object to form.

23   Foundation.  Argumentative.

24          Q.   (BY MR. TURNER)  Is Rule 306, making it a

25   high moderate offense to refuse to clean an assigned
```

 1  living area, applied or is it not applied?

 2              MS. SCHEFFEY:  Form.

 3          A.   It depends, I guess, because -- on their

 4  form -- their -- we don't force them to clean.  If they

 5  don't want to clean, you know, we can't force them.  We

 6  can't --

 7          Q.   (BY MR. TURNER)  Which other rules here do

 8  we also believe are pretend?

 9              MS. SCHEFFEY:  Form.  Argumentative.

10          Q.   (BY MR. TURNER)  Let's look at these

11  together.

12              What about "Indecent exposure"?  Is that

13  one also pretend?

14              MS. SCHEFFEY:  Object to form.

15          A.   No.

16          Q.   (BY MR. TURNER)  That's a real rule,

17  right?

18              MS. SCHEFFEY:  Object to form.

19          A.   Yes.

20          Q.   (BY MR. TURNER)  Is that one real?  Okay.

21              And then "Stealing (theft)," is that a

22  real rule or pretend rule?

23              MS. SCHEFFEY:  Object to form.

24  Argumentative.

25          Q.   (BY MR. TURNER)  You can answer.

Tyroe Quezada
July 28, 2020                                      91

```
 1           A.    That's true.

 2           Q.    That one's real.  Okay.  What about 302,

 3  "Misuse of authorized medication"?  Is that a real rule

 4  or a pretend one?

 5                 MS. SCHEFFEY:  Object to form.

 6           A.    Real rule.

 7                 MS. SCHEFFEY:  Argumentative.

 8           Q.    (BY MR. TURNER)  I'm sorry.  That's a real

 9  rule?

10           A.    Yeah.

11           Q.    How do I know that?  When I look at this

12  document and I see "Misuse of authorized medication"

13  here, that's a real rule.

14                 I look down at 306 and see "Refusal to

15  clean assigned living area," how do I know the

16  difference?

17                 MS. SCHEFFEY:  Form and harassing.

18           Q.    (BY MR. TURNER)  You may answer.

19           A.    Well, you know what, 300 and 301 and 302

20  that you pointed out to me is a lot different than the

21  306.

22                 This, on the refusal to clean their

23  assigned living area, we don't force them to clean.  If

24  they don't want to clean, you know, you can't force

25  them.  And you don't threaten them, no nothing, you
```

Grajeda Quezada
July 28, 2020                                              92

1   know.

2              But 300 and 301 and 302, those are major.

3   "Indecent," of course, you got to do -- you know, you

4   got to go by the rules and all.

5         Q.   I see.

6              Those are coded as high moderate offense

7   category, right, the ones you just told me are really

8   important, right?

9              MS. SCHEFFEY:  Object to form.

10        Q.   (BY MR. TURNER)  300, 301, 302, high

11   moderate offense, right?

12        A.   Yes.

13        Q.   Is 306 also a high moderate offense

14   category?

15        A.   To a point.  Because of course let's just

16   say if their area was real dirty and nobody would be

17   cleaning, we'd get -- I'd call the watch commander and

18   have a talk with them.  They know their place has to be

19   cleaned.

20              And they know themselves, keeping their

21   day area clean, the major comes in, inspects, and they

22   get a treat at the end of the week for keeping -- and

23   knowing that they keep their area clean, they get a

24   treat at the end of the week.

25              So they don't pretty much argue or -- they

 1  don't.

 2       Q.   So those are reasons why you might just do

 3  it voluntarily, right?

 4            MS. SCHEFFEY:  Object to form.

 5  Argumentative.

 6       A.   I think so.  They're pretty good.  The

 7  detainees are pretty good at all that.  I've never --

 8       Q.   (BY MR. TURNER)  Another reason why you

 9  might --

10            MS. SCHEFFEY:  Hold on.  She was finishing

11  her sentence.  You interrupted her.

12       Q.   (BY MR. TURNER)  Finish, please.

13       A.    You know, when I worked in the dorm with

14  them all, if you talk to them right, I don't ever --

15  you know, there's probably been one or two that says,

16  "I don't feel like cleaning."  Pretty much they keep

17  their place clean because they want it clean and they

18  want that treat at the end of the week.

19       Q.   (BY MR. TURNER)  So you have the

20  discretion not to enforce the rules in this book; is

21  that what you're telling me?

22            MS. SCHEFFEY:  Object to form.  Misstates

23  prior testimony.

24       A.   No.

25       Q.   (BY MR. TURNER)  Okay.  So you do have to

```
 1    enforce the rules in this book?

 2           A.   Yes, of course.

 3           Q.   You, as a detention officer, are not

 4    empowered to rewrite it, are you?

 5           A.   No.

 6           Q.   And you told me earlier that the way the

 7    detainees know what the rules are is because of this

 8    book, right?

 9           A.   Pretty much, yes.  Yes.

10           Q.   I'd like to look, if you would, at page

11    23.

12                Now, let's talk a little more about

13    "Refusal to clean," 306.

14                I just want to get clear on this.  When

15    did you learn this was a unique rule you were not going

16    to enforce?

17                MS. SCHEFFEY:  Object to form.  Misstates

18    prior testimony.

19           Q.   (BY MR. TURNER)  You do enforce it?  You

20    enforce 306?

21                MS. SCHEFFEY:  Object to harassing the

22    witness.

23           Q.   (BY MR. TURNER)  Do you enforce 306 as

24    written?

25           A.   Well, they -- I haven't read this book for
```

1   a long time and all, and I don't remember all that.

2   But of course I enforce all the rules and everything,

3   but I don't force them to clean.  If they don't want to

4   clean, you know, there's other detainees that

5   volunteer, and they do it.

6           Q.   So how did you learn that 306 was not a

7   rule you had to enforce?

8               MS. SCHEFFEY:  Object to form.  Misstates

9   prior testimony.

10          A.   You know what --

11          Q.   (BY MR. TURNER)  Did you decide that on

12  your own, or were you told it was okay not to enforce

13  306?

14              MS. SCHEFFEY:  Object to form.

15  Harassing.

16          A.   You know, in briefings and stuff, it says

17  if they don't want to clean, you know, you can't force

18  them.  You don't get after them.  You just -- it's not

19  we're making up a new rule or anything, but, you know,

20  you don't force the detainees.

21          Q.   (BY MR. TURNER)  So that discussion in

22  briefing happened within the last five years, didn't

23  it?

24              MS. SCHEFFEY:  Object to form.

25  Foundation.

 1          Q.   (BY MR. TURNER)  You claim to have heard

 2    that in a briefing.  When was it?

 3          A.   I don't recall.  I know I've heard it, but

 4    I don't remember the first beginning and all when they

 5    did say it.

 6          Q.   It was discussed in relationship to this

 7    lawsuit, wasn't it?

 8               MS. SCHEFFEY:  Object to form.

 9    Foundation.

10          Q.   (BY MR. TURNER)  Did you hear that

11    cleaning rule discussed in briefing in relationship to

12    a lawsuit that had been filed?

13          A.   No.  I never even heard of that lawsuit,

14    to be truthful.

15          Q.   Okay.  Was it within the last five years

16    that you were told not to enforce that rule?

17               MS. SCHEFFEY:  Objection.  Asked and

18    answered.

19          A.   No.  When I first went on the floor, and

20    that was -- how long ago? -- eight, nine years, they

21    always said, "You don't force them.  If they don't want

22    to clean, that's fine."  I've heard that.

23          Q.   (BY MR. TURNER)  What other rules in the

24    book did they tell you not to enforce?

25               MS. SCHEFFEY:  Object to form.  Misstates

Grisel Xahuentitla Quezada
July 28, 2020                                    97

 1    prior testimony.

 2            Q.   (BY MR. TURNER)   Any?

 3            A.   No.

 4            Q.   So that one's unique, right?

 5                 MS. SCHEFFEY:  Object to form.

 6            Q.   (BY MR. TURNER)   That one's unique?

 7                 MS. SCHEFFEY:  Object to form.

 8            A.   It depends.

 9                 No, no, it's not unique.

10            Q.   (BY MR. TURNER)   So there are others then?

11    Are there pretend rules in here?

12            A.   No, there isn't.

13            Q.   So it's unique?

14                 MS. SCHEFFEY:  Object to form.  Move to

15    strike testimony of counsel.

16            Q.   (BY MR. TURNER)   Did you ever tell a

17    detainee that they don't have to follow the rules in

18    this book?

19            A.   No, I didn't.

20            Q.   Did you ever tell a detainee that some of

21    the rules in that book are pretend?

22                 MS. SCHEFFEY:  Object to form.

23            A.   No.

24            Q.   (BY MR. TURNER)   How are they going to

25    know that the rules are pretend?

Grisel Xahuentitla Quezada
July 28, 2020                                        98

```
 1              MS. SCHEFFEY:  Object to form.

 2   Argumentative.

 3         A.   And what do you mean by "pretend"?  I'm

 4   sure they read the rules.

 5              I haven't read this book, and if I have,

 6   it's been years.  But --

 7         Q.   (BY MR. TURNER)  The detainees are

 8   entitled to believe the rules in the book are true,

 9   right?

10              MS. SCHEFFEY:  Object to form.

11   Foundation.  602.

12         A.    Yes.  They know it is, yes.

13         Q.   (BY MR. TURNER)  I'd like to draw your

14   attention to page 23, the prior page.

15              MS. SCHEFFEY:  I'm going to note it's

16   11:52.  I think we should shoot for a noon lunch break.

17         Q.   (BY MR. TURNER)  I'm sorry.  I meant to

18   draw your attention to page 21.  You'll see an area

19   that says "Section VIII, Disciplinary Procedure."

20   Please let me know when you've got that on your screen.

21         A.   Yes.

22         Q.   I want to make it big enough for you to

23   read it.

24         A.   I can read it.

25         Q.   So "Section VIII, Disciplinary Procedure"
```

1   says:

2              "To provide a safe and orderly living

3              environment, facility authorities will

4              impose disciplinary sanctions on any

5              detainee whose behavior is not in

6              compliance with facility rules and

7              procedures."

8              Do you see that?

9       A.   Yes.

10      Q.   Is that true or is that false?

11      A.   That's true.

12      Q.   So detainees are entitled to believe that

13   is true, right?

14              MS. SCHEFFEY:  Object to form.

15      A.   Yes.

16      Q.   (BY MR. TURNER)  Now, you've written

17   detainees up, right?

18              MS. SCHEFFEY:  Object to form.

19   Foundation.

20      A.   Repeat the question?

21      Q.   (BY MR. TURNER)  Yeah.  Have you ever

22   written up a detainee for a violation of a rule?

23      A.   To be truthful, I don't recall, no.

24      Q.   You don't usually have to write anybody up

25   to get compliance, do you?

 1              MS. SCHEFFEY:  Object to form.

 2  Foundation.

 3         Q.   (BY MR. TURNER)  Usually people will do

 4  what an officer says without getting written up, right?

 5              MS. SCHEFFEY:  Object to form.

 6  Foundation.

 7         A.   Yes.

 8         Q.   (BY MR. TURNER)  Did you ever have to

 9  explain to a detainee what the consequences of not

10  following a rule would be?

11         A.   There's been times they've asked me, and I

12  explained to them, yes.

13         Q.   Okay.  So you've told them about what the

14  sanctions could be for not doing the right thing,

15  right?

16         A.   Or they'll come up -- there's been times

17  they came up and asked me to explain what that meant,

18  and I'll explain it, that it's not -- that's it.

19         Q.   What are you referring to?  Explain what

20  that meant.

21         A.   Something that's in the book that they

22  didn't understand.

23         Q.   I see.

24              Have you ever had any detainee decline to

25  do what you asked them?

Orr Quezada
July 28, 2020                                                      101

```
 1         A.    No.
 2         Q.    Seven years on the floor, you never once
 3  had a detainee resist your initial command?
 4              MS. SCHEFFEY:  Object to form.
 5         Q.    (BY MR. TURNER)  Is that right?
 6         A.    Not that I recall, no.
 7         Q.    And 19 years in the facility, have you
 8  ever had a detainee resist your command?
 9              MS. SCHEFFEY:  Object to form.
10         A.    Let me think.
11              Not that I recall.  I think if you talk to
12  them the right way and treat them good, they have
13  respect for you, and you have respect for them.  Pretty
14  much, it's pretty good.
15              MS. SCHEFFEY:  It's 11:57.  Is it a good
16  time for a lunch break now?
17              MR. TURNER:  I'd like to ask about one
18  more provision, and then we'll take a lunch break.
19              MS. SCHEFFEY:  Okay.
20         Q.    (BY MR. TURNER)  Let's look at page 19,
21  which also bears PL 49 as a number.
22         A.    And which one are you talking about?
23         Q.    I'm sorry.  47, not 49.  PL 47, page 17.
24         A.    Is it "Housing Unit Sanitation"?
25         Q.    "Housing Unit Sanitation."
```

```
 1                    I'd like to ask whether you see where the

 2     book says:

 3                         "Each and every detainee must

 4                    participate in the facility's sanitation

 5                    program.  A list of detainees is developed

 6                    each day by staff and is posted for

 7                    viewing.  During a general cleanup all

 8                    detainees must participate.  The assigned

 9                    Housing Unit Officer will be responsible

10                    for assuring this general cleanup is done

11                    on a regular basis."

12                    Do you see that?

13          A.   Yes.

14          Q.   Is that a real rule or is that a fake

15     rule?

16          A.   That's a real rule, yes.

17                    MS. SCHEFFEY:  Object.

18          Q.   (BY MR. TURNER)  That's one that's

19     enforced as written, right?

20                    MS. SCHEFFEY:  Object to form.

21          A.   Yes.

22          Q.   (BY MR. TURNER)  Was that a "yes"?

23          A.   Yes.

24                    MR. TURNER:  Let's take a lunch break.

25     How long would you all like to take?
```

```
 1              MS. SCHEFFEY:  Do you want 45 minutes?  Do

 2   you need to go get something, Joyce?

 3              THE WITNESS:  No.

 4              MS. SCHEFFEY:  What do you want, 30 or 40?

 5              MR. TURNER:  Let's take at least 45 here.

 6   12:45.  Let's do that.  Thank you.

 7              MS. SCHEFFEY:  All right.  Thanks.

 8              (Recess taken, 11:59 a.m. to 12:48 p.m.)

 9        Q.   (BY MR. TURNER)  Officer Quezada, we've

10   just had a 45-minute lunch break; is that right?

11        A.   Yes.

12        Q.   Whom did you speak with during that break?

13        A.   Dana, but I did all the talking, about my

14   aunt.

15        Q.   Were you discussing a privilege?

16        A.   A privilege?  No.  We were discussing -- I

17   live with my aunt, and she's 98, and I was just talking

18   about her.

19              MS. SCHEFFEY:  Beyond that, I'm going to

20   instruct you not to discuss your conversations with

21   Mr. Eismeier.

22              MR. TURNER:  Adrienne, do you want to just

23   get a clear yes-or-no answer whether the substance of

24   the case was even discussed so we know if there was

25   even an issue to be instructing about?  Do you want to
```

```
 1                I think the count is 414, and the U.S.

 2   Marshal is 86, so a total of 511.

 3          Q.    And you've answered my question already.

 4   You would cook for all 511 if you were in the kitchen?

 5                MS. SCHEFFEY:  Object to form.

 6          A.    Yes.

 7          Q.    (BY MR. TURNER)  On this particular day,

 8   where do you see yourself posted?

 9          A.    Unit E2, with the females.

10          Q.    It says "Females," "Seg," right?

11          A.    Yes.  They weren't in segregation

12   actually, because our count was big, and they had

13   nowhere to put them.  So they put them in seg with the

14   doors open at all times out of the -- in the day area

15   and all, yes.

16          Q.    Okay.  So let's understand that.

17                You recall that on that day in August of

18   2014, that was true?

19          A.    I was what?

20          Q.    You recall that on August 8, 2014, that

21   was true, that the doors were open?

22                MS. SCHEFFEY:  Object to form.  Asked and

23   answered.

24          A.    Yes, because at that time -- they weren't

25   in segregation itself.  They were just in there, in
```

1    that.

2              Q.    (BY MR. TURNER)  How do you know that,

3    ma'am?

4              A.    Because I was there working and all, and

5    their doors were all open.  It was just we didn't have

6    room to put them, and so we put them in there for a

7    little bit.  But their doors were left open; they were

8    able to come in and out.  They weren't in actually

9    segregation.

10             Q.    Was that always true?

11                   MS. SCHEFFEY:  Object to form.

12             A.    For the females?

13             Q.    (BY MR. TURNER)  Yeah.

14             A.    Yes.  We never had segregation in there,

15   no.

16             Q.    So during your time on the floor we're

17   talking about, 2012 to '19 --

18             A.    Yes.

19             Q.    -- there's never been a female segregation

20   unit?

21             A.    Yes, we have, but it's in a different

22   area.

23             Q.    I see.  So E2 is not used that way?

24             A.    E2 and E1 is segregation, but it's for the

25   males.  The females have their own segregation, and

1   it's only two cells.

2            Q.   Where is that?

3            A.   It's out -- it's out across from

4   segregation in a whole different area.

5            Q.   Is it near the medical area?

6            A.   No.

7            Q.   Where on this page would I see the actual

8   female segregation noted?

9            A.   Let's see.  Because I can't remember

10  the -- okay.  It would be in unit -- unit B, it had a

11  first door entrance, and then on the right side was for

12  the female segregation, which is only two cells.

13               And then out there in that little area is

14  the unit D housing.

15           Q.   I see.  And you said B, as in "boy,"

16  right?

17           A.   No, "David."

18           Q.   I'm sorry.  D, as in "David," is where the

19  female segregation would be; unit D, as in "David"?

20           A.   Yes.

21               No, unit D was for the females at that

22  time, just females.  And then out of that, there was a

23  dorm to your right which was segregation, with just two

24  cells.

25           Q.   Okay.  And you used a letter to refer to

Joyce Quezada
July 28, 2020                                            114

```
 1   that area.  What was the area?

 2           A.   It was probably D2.

 3           Q.   All right.  Well, now we're talking D, as

 4   in "dog," right?

 5           A.   Yes.

 6           Q.   Okay.  Got it.

 7                There's no posting for D2; is that right?

 8           A.   If we had somebody in segregation, there

 9   was a post, but at that time, no.

10           Q.   So you would see shift posting sheets like

11   this that say "D2" somewhere?

12           A.   Yes.

13           Q.   Would you see that up in this regular

14   roster or would it be down below in this special piece?

15           A.   It probably -- let me see.  Okay.  Hang

16   on.

17                You know where it has segregation for unit

18   E1 and then E2, it would probably be under there.

19           Q.   The next line below that reminds me of

20   something.  Have you ever been the laundry officer?

21           A.   No, I haven't.

22           Q.   Okay.  In the time period relevant to this

23   lawsuit, so concluding in 2014, where was female

24   segregation there?

25                   MS. SCHEFFEY:  Object to form.
```

Jesus Quezada
July 28, 2020                                          139

```
 1          Q.   One of them is dated '09, the other one

 2    2017; is that right?

 3          A.   Yes.

 4          Q.   So you have continuing training on suicide

 5    prevention; is that right?

 6          A.   Yes.

 7          Q.   What part of the facility are you trained

 8    to be most vigilant for watching for suicide attempts

 9    in?

10          A.   Repeat the question?

11          Q.   Sure.

12               Where in the facility are you trained to

13    be most vigilant watching for suicide attempts?

14          A.   Right there in medical, in the suicide.

15          Q.   Did you say "in seg"?  Is that what you

16    said?

17          A.   No, medical.

18          Q.   In medical?

19          A.   Yes.  I received my training in medical.

20          Q.   I see you received your training in

21    medical.  Did they tell you that there's a particular

22    suicide danger in segregation?

23          A.   I don't recall anybody on suicidal in

24    segregation.

25          Q.   Okay.  Are you aware of there being any
```

 1   risk of suicide in segregation?

 2          A.   I would be aware, yes.

 3          Q.   When you do 15-minute checks in

 4   segregation, what are you checking for?

 5          A.   That's right.  That he won't hurt himself,

 6   yes.

 7          Q.   And when you do 30-minute checks in

 8   segregation, what are you checking for?

 9          A.   To make sure that they're all safe and

10   secure.

11          Q.   No self-harm, right?

12          A.   They're all safe.

13          Q.   You recall looking at the sanctions in the

14   detainee handbook, right?  Do you recall us looking at

15   that together?

16          A.   Yes.

17          Q.   Segregation is used as a punishment for

18   serious offenses, isn't it?

19               MS. SCHEFFEY:  Object to form.

20          A.   Yes.

21          Q.   (BY MR. TURNER)  Segregation isn't

22   pleasant, is it?

23               MS. SCHEFFEY:  Object to form.

24          A.   It depends on them, how they feel about

25   it.

```
 1              Q.    (BY MR. TURNER)  I see.

 2                    You saw that it's used as a penalty for

 3   serious things, right?

 4                    MS. SCHEFFEY:  Object to form.

 5              A.    Yes.

 6              Q.    (BY MR. TURNER)  And you just said that

 7   you have to make 15- and 30-minute checks for suicide,

 8   right?

 9              A.    If there is one, yes.

10              Q.    You have to make that check on anybody

11   who's in segregation, right?

12              A.    Every 30 minutes, yes.

13              Q.    You have 19 years of experience at ADC.

14   Several of them have been working in segregation units.

15   What is your understanding of why segregation exists?

16              A.    For disciplinary.

17              Q.    Okay.  And in your experience, is

18   segregation effective in getting detainees to follow

19   the rules?

20              A.    Yes.

21              Q.    Most detainees are afraid to go to

22   segregation, aren't they?

23                    MS. SCHEFFEY:  Object to form.

24   Foundation.

25              A.    Yes.
```

Grijolva Quezada
                           July 28, 2020                        142

```
 1              Q.    (BY MR. TURNER)   Was that a "yes"?

 2              A.    Yes.

 3              Q.    In fact, even mentioning the possibility

 4    of segregation gets detainees to follow the rules,

 5    right?

 6                    MS. SCHEFFEY:   Object to form.

 7    Foundation.

 8              A.    Yes.

 9              Q.    (BY MR. TURNER)   Is there anything else

10    you think I should know about the voluntary work

11    program?

12              A.    Oh, the detainees in the dorm is who

13    you're talking about?

14              Q.    Yeah, the hired workers.   The detainees

15    who get hired to do a job.

16                    Is there anything else about that program

17    you think it's important for me to understand?

18                    MS. SCHEFFEY:   Object to form.

19              A.    No, no.

20              Q.    (BY MR. TURNER)   Is there anything else

21    you know about the housing unit sanitation program you

22    think is important for me to understand?

23                    MS. SCHEFFEY:   Object to form.

24              A.    On the sanitation and cleaning and all?

25              Q.    (BY MR. TURNER)   Yeah.   Anything else you
```

 1   think is important about that?

 2        A.   Well, I know that I mentioned if they

 3   don't want to clean -- there was this one incident

 4   where I worked in the -- "David" -- D with the females,

 5   and there was one where the cleanup crew didn't want to

 6   mop.  And, you know, I talked to her and told her that

 7   was her job for the day, but if she didn't want to do

 8   it, I did it for her.  I think she felt pretty bad and

 9   all and she came back and did it.

10              But if you talk to them the right way and

11   let them know exactly, you know, the way it's got to be

12   and all, they do a better job, and they do it.

13              It's not like -- you hardly ever hear

14   anybody saying, "I'm not going to do it."  There's

15   probably one in 50 that doesn't want to do it.  But

16   it's not like every time.  The next time it's his turn,

17   he'll do it.  It's not like every time they all say no

18   or --

19              Like there was that one time when it was

20   time for count and they didn't want to go in.  They

21   were just sitting there.  I told them, "Okay.  Listen,

22   I'm going to turn off the TVs if you don't go in."  And

23   right away they got up and they did it.  They went to

24   their pods.

25              It's just how you talk to them and treat

 1   them.

 2        Q.   Do you recall any other specific

 3   occasions, other than the D2 female mopping incident,

 4   in which you did the cleanup work for the detainee?

 5        A.   Yeah.  There was times if they were

 6   shorthanded or one happened to go to the library, and

 7   it was right after court and their name was on there, I

 8   would help them clean.  One of the other detainees

 9   would clean for them.

10        Q.   The incident you just described regarding

11   being in D2 with a female who didn't want to mop, when

12   was that?

13        A.   That was when I first started on the floor

14   as a detention officer.  I started off -- I was in

15   "David."

16        Q.   Do you think you can tell me a month?

17        A.   Oh, gosh.  I should know.

18             I sure can't.  I don't remember.  Let me

19   think.

20             It was still in the summer, sometime

21   before winter.  Just before winter.  But what month,

22   no.  I'm sorry.

23        Q.   Do you have any other information you

24   believe would help the jury in deciding this case?

25        A.   I think me -- I can only speak for myself,

1   you know, and I feel that I treated them fairly, helped

2   them if they ever needed help.  And they were always

3   treated good.  We didn't -- I didn't ever force them or

4   have them do anything that they didn't want to.

5           And I know I treated the detainees with a

6   lot of respect, and they treated me back and always

7   said how good I treated them, and, you know, that I had

8   respect for them, and they liked when I worked in the

9   dorm.

10          Or even in medical when I worked, they

11  always said how good I was, and they were happy I was

12  there working with them -- in there with them because I

13  always treated them fair and . . .  I never let them

14  get away with anything because they had respect for me

15  and I had respect for them.

16      Q.   So you could enforce the rules without

17  yelling or threatening?

18      A.   Yes, talk to them in the right manner,

19  way, just like you do with your kids at home or your

20  friends or your family.

21      Q.   So you just kind of explain the rule?

22      A.   Yes.  And if, you know, there was times

23  they didn't understand the handbook, I explain it to

24  them, you know.  And if they -- if there was something

25  you seen that they did wrong, you just go talk to them.

1   You put them aside and explain, you know, "You don't

2   want to get in trouble.  This is the way it goes, and

3   you can't do this," or "you can do this."

4              They were always good, and they'd say,

5   "Thank you."  You know, I treated them good.

6         Q.   You explained to them what the consequence

7   was if they didn't straighten up?

8         A.   Yes, and they understood all that.

9         Q.   Do you think your kitchen workers' work

10  was worth more than a dollar a day?

11             MS. SCHEFFEY:  Object to form.

12        A.   You know, working at -- you know, being

13  where you're at -- and I hear other facilities, it pays

14  a lot less -- but them working in the kitchen, we

15  always gave them -- before they went back to their --

16  to their dorm, would give them an ice cream.

17             And then every Friday, for all the cleanup

18  crew, all the workers in the facility, every Friday

19  they would get potato chips, a soda and a candy bar of

20  their liking, and that's for -- you know, a thank you

21  for working, doing a good job.

22        Q.   (BY MR. TURNER)  Would you have done the

23  amount of work those kitchen workers did for $1 and an

24  ice cream?

25             MS. SCHEFFEY:  Object to form.

 1          A.   If that's the way it was, yes, I would.

 2    But then I'm a workaholic.

 3          Q.   (BY MR. TURNER)  I'm sorry.  I didn't hear

 4    the rest of your answer.  Then what?

 5          A.   I'm a workaholic.  I'd do a lot of things

 6    for nothing.

 7              MR. TURNER:  Give me just a second to

 8    review my notes.

 9              Do you guys want to take five?

10              MS. SCHEFFEY:  Yes.

11              MR. TURNER:  Thanks.

12              (Recess taken, 2:04 p.m. to 2:12 p.m.)

13          Q.   (BY MR. TURNER)  Officer Quezada, we've

14    just come back from a short break.  Did you speak with

15    anyone during break?

16          A.   Well, Dana was out there, but I just --

17    "Hi."

18          Q.   Did you talk about the substance of your

19    testimony?

20          A.   No.

21              MR. TURNER:  Okay.  I have no further

22    questions, unless Ms. Scheffey has anything for you.

23              MS. SCHEFFEY:  I just have a few

24    follow-ups.

25

```
 1                    EXAMINATION

 2  BY MS. SCHEFFEY:

 3       Q.   Hi, Ms. Quezada.

 4            I think there might have been some

 5  confusion earlier when we talked about the detainee

 6  handbook.

 7            Do you remember your testimony about the

 8  handbook?

 9       A.   Yes.

10       Q.   I'm going to try and share what was

11  Exhibit 7 with you so we're on the same page.

12            Are you able to see what is marked as

13  PL00054?

14       A.   Yes.

15       Q.   Okay.  So earlier you testified that you

16  didn't force people to clean; is that correct?

17       A.   Yes.

18       Q.   Okay.  And when you said that you didn't

19  force people to clean, did you mean you didn't enforce

20  the rules?

21       A.   No.  What -- there was a time when one

22  didn't want to clean, and you tell them, "If you don't

23  want to clean, then you won't get your ice cream and

24  your candy bar at the end of the week."  And I would

25  talk to them and show them.
```

 1              I never threatened them with segregation

 2  or anything, but I just told them what the -- you know,

 3  what the good is about all that.

 4        Q.    And when you told someone they wouldn't

 5  get their ice cream, would you consider that to be a

 6  loss of privileges?

 7        A.    It would, yes.

 8        Q.    And do you see here on the screen where it

 9  says "Sanctions," "Loss of privileges"?

10        A.    Yes.

11        Q.    Is it your understanding that these

12  sanctions are all permissible consequences for failing

13  to follow a rule in the high moderate category?

14        A.    Yes.

15        Q.    And how do you decide which sanction to

16  use?

17        A.    Which sanction to use?

18        Q.    So A through M, do you have discretion to

19  decide which sanction to use?

20        A.    Yes.  It depends on what it is and all,

21  yes.

22        Q.    And earlier you testified that some people

23  may not do certain things because they're afraid of the

24  consequences of segregation.

25              Do you remember that?

 1        A.    Yes.

 2        Q.    Is it -- have you ever had people

 3   cooperate with you because you threatened to turn off

 4   the TV?

 5        A.    Well, there was one time when they didn't

 6   want to go in their door at count time, and I told

 7   them, "Okay.  If you don't go to your dorms, I'm going

 8   to shut off the TVs."  I didn't threaten them or

 9   anything.  They all know, "Okay.  We'll go to the dorms

10   to ourselves," which they did right away.  And I left

11   the TVs on for them.

12              I didn't threaten them or anything.  I

13   just let them know they got to go to their dorms so we

14   can do count.  And if they didn't, I would turn off the

15   TVs, but I would leave it on if they did.

16              And that was it.  And they did it right

17   away.  They didn't argue.  They didn't -- anything.

18   They went.

19        Q.    In your experience, do detainees want to

20   cooperate?

21        A.    Yes, they did.  They were real good.

22              MS. SCHEFFEY:  No further questions.

23              MR. TURNER:  I have a few follow-ups,

24   please.

25

```
 1                  REPORTER'S CERTIFICATE

 2  STATE OF COLORADO        )
                             )  ss.
 3  CITY AND COUNTY OF DENVER )

 4          I, Shannon Clementi, Registered
    Professional Reporter, Colorado Realtime Certified
 5  Reporter and Notary Public ID 20004025632, State of
    Colorado, do hereby certify that previous to the
 6  commencement of the examination, the said JOYCE QUEZADA
    verbally declared his/her testimony in this matter is
 7  under penalty of perjury; that the said deposition was
    taken in machine shorthand by me at the time and place
 8  aforesaid and was thereafter reduced to typewritten
    form; that the foregoing is a true transcript of the
 9  questions asked, testimony given, and proceedings had.

10          I further certify that I am not employed
    by, related to, nor of counsel for any of the parties
11  herein, nor otherwise interested in the outcome of this
    litigation.
12
            IN WITNESS WHEREOF, I have affixed my
13  signature this 12th day of August, 2020.

14          My commission expires June 3, 2021.

15
    __X__  Reading and Signing was requested.
16
    _____  Reading and Signing was waived.
17
    _____  Reading and Signing is not required.
18          _____
19          Shannon Clementi
            Registered Professional Reporter
20          Colorado Realtime Certified Reporter

21

22

23

24

25
```