# Exhibit 15

```
                                                                   Page 1
 1         IN THE UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF COLORADO
 2

 3    Civil Action No.: 1:14-cv-02887-JLK
      _____
 4
            VIDEOCONFERENCE DEPOSITION OF: LUIS PAGAN
 5                       July 8, 2020
      _____
 6
      ALEJANDRO MENOCAL, et al.,
 7
      Plaintiffs,
 8
      vs.
 9
      THE GEO GROUP, INC.,
10
      Defendants.
11
      _____
12

13
               PURSUANT TO NOTICE, the videoconference
14    deposition of LUIS PAGAN was taken on behalf of the
      Plaintiff remotely, on July 8, 2020 at 10:05 a.m.,
15    before Leeann L. Stellor, Registered Merit Reporter
      and Notary Public within Colorado.
16

17

18

19

20

21

22

23

24

25
```

```
                                    Page 38                                          Page 40
 1      Q.   So thinking back to that list of      1      A.   Yes.
 2   positions we talked about in the job          2      Q.   Okay.  And have you worked over in those
 3   description, you see a lot of things here     3   units?
 4   in the schedule document.                     4      A.   Yes.
 5           As you look down the postings, do     5      Q.   So is that the C pod?  Is that what that
 6   you see any that you have not done in your    6   is?
 7   14 years?                                     7      A.   C pod, yes.
 7      A.   On this particular document?          8      Q.   Okay.  And you see C1, C2, C3, C4 on the
 8      Q.   Yeah.  You see a lot of different     9   document; is that right?
 9   positions; master control 1, master          10      A.   Yes.
10   control 2, housing Unit A1, housing Unit    11      Q.   Okay.  Now, you've been assigned like
     A2, right?                                  12   that in a housing unit, right?
11      A.   Yes.                                13      A.   Yes.
12      Q.   I'm wondering if there are any      14      Q.   Are those different places, or does that
13   that you see on this document that you      15   just indicate to me that there are three different
     have not performed?                         16   officers on the C housing unit on this day in
14      A.   Armory officer.                     17   Exhibit 3?
15      Q.   Anything else?                      18           MS. SCHEFFEY:  Object to form.
16      A.   I guess lead class officer.  I      19   Vague.
17   don't recall that.                          20      A.   At that time there were more than one
18      Q.   Is that a classification officer?   21   unit open.
19      A.   Right.                              22      Q.   I see.
20      Q.   And you haven't been that, am I     23      A.   Now there's just one today, just C2 is
     right?                                      24   open.
21           MS. SCHEFFEY:  Object to form.      25      Q.   Is C3, for example, a different place
22      Q.   Have you been a classification
     officer?
23      A.   No.
24      Q.   Okay.  And you haven't been a lead
25   classification officer either, I take it?

                                    Page 39                                          Page 41
 1      A.   No.                                  1   than C2, or does it just mean that you've got more
 2      Q.   Anything else you see there that     2   than one person there?
 3   you have not done?                           3           MS. SCHEFFEY:  Object to form.
 4      A.   Intake officer.                      4      A.   It's a different pod with a different --
 5      Q.   You said that you have not done      5   they're detainees in there.  They're not Marshals.
 6   transport, right?                            6      Q.   I see.  Is that true when we talk about,
 7      A.   Right.  Intake officer, I            7   like, housing Unit A1, A2?  Those also different
 8   mentioned that.  I haven't done that one     8   pods?
     before.                                     9      A.   They're different pods, yes.
 9      Q.   Okay.  What about in the far right  10      Q.   Okay.  How many total pods do we have at
10   column there's "USMS," which is the         11   Geo?
11   Marshals Service detainees, right?          12      A.   Let's see.  12, I believe.  12.
12      A.   Marshal inmates, yes.               13      Q.   Okay.  I noticed that Unit D does not
13      Q.   Yeah.  And so US Marshals have one  14   have a number like all the others?
14   pod at Geo; is that right?                  15      A.   Yeah.  D is different.  We have a D pod,
15      A.   Yes.                                16   which is a small one, in the building.  It houses,
16      Q.   Okay.  Are those the detainees      17   like, 30 people.  It used to be a female pod.
17   that are clothed in red to mark their       18      Q.   Below that I see segregation Unit E1.  Is
     classification?                             19   that still referred to as the E pod?
18      A.   No, those are inmates and they're   20      A.   You're looking to the left?  Okay.  Yes.
19   in green.                                   21   No, that's segregation E1, that's restricted housing
20      Q.   Green.  Okay.                       22   unit, separate.
21      A.   Yes.                                23      Q.   And you've worked there -- in the course
22      Q.   And that's only one of the pods;    24   of the time period 2004 to 2014 you've been in
23   is that right?                              25   segregation at times?
24      A.   Yes.
25      Q.   Is that all male?
```

Page 42

1  MS. SCHEFFEY: Object to form and
2  foundation.
3  A. No, we -- yes. Yes. Uh-huh.
4  Q. So you have staffed the segregation unit
5  yourself between 2004 and '14 at times?
6  MS. SCHEFFEY: Object to form.
7  A. At this building?
8  Q. I'm asking about the Aurora Detention
9  Center. Have you ever worked in the segregation
10 unit in the time period 2004 to 2014?
11 A. I have.
12 Q. Okay. More than once?
13 A. Yes.
14 Q. So you're familiar with the segregation
15 unit; is that right?
16 A. Yes.
17 Q. I noticed below that "Seg Unit E2
18 Females," it's not staffed on this day. What can
19 you tell me about the female segregation?
20 A. It's completely separate away from the E.
21 The schedule here is different now than what it
22 pertains to today. But the segregation for female,
23 it's over in the D unit, which is -- that's where
24 they keep the females. E2 is -- segregation E2 is
25 males segregation. Then we have E1 segregation,

Page 43

1  which is the Marshals are in there.
2  Q. Okay. So there's a segregation unit that
3  has administrative segregation on the one side of a
4  common area and disciplinary segregation on the
5  other side of the common area; is that right?
6  A. Yes.
7  MS. SCHEFFEY: Object to form.
8  Foundation.
9  You can answer, Luis.
10 A. If we're speaking in regards to the same
11 place.
12 Q. Okay. Where is female segregation? It's
13 not in the same pod?
14 A. We have it over in the older building.
15 Q. Okay.
16 A. We have the segregation over there, a
17 small one where they keep the females.
18 Q. Does that have an administrative and
19 disciplinary part, or does that just have one
20 section?
21 A. Just one section in there for discipline.
22 Q. Is it smaller?
23 A. Smaller, yes.
24 Q. How many cells?
25 A. Oh, about maybe 20 cells, I believe,

Page 44

1  yeah.
2  Q. Okay. I want to back up and ask about
3  this document, this Exhibit 3 Post Assignments
4  document. You called it a schedule.
5  A. Yes.
6  Q. Do you see these regularly?
7  A. Every day.
8  Q. Okay. Where do you see them?
9  A. The watchman brings them out of his
10 office. He posts them on his wall by the key watch,
11 and everybody checks their schedule, where they're
12 going to be for the day.
13 Q. So when you arrive for the day, is that
14 where you punch in?
15 A. Yes.
16 MS. SCHEFFEY: Object to form.
17 Q. Okay. And so punch in and you see where
18 do they need me today, and that's when you find out?
19 A. Yes.
20 MS. SCHEFFEY: Object to form.
21 Q. Might you find out the day before, or
22 would you just sort of always check your schedule in
23 the morning?
24 A. No, it's posted every morning.
25 Q. So that's how you learn where to go,

Page 45

1  right?
2  A. Yes.
3  Q. You'd look at that every day?
4  A. I do.
5  Q. Who creates this document?
6  A. The lieutenant.
7  Q. Okay. In your experience, are they
8  accurate, these documents?
9  A. Yes.
10 Q. Who's the lieutenant that signed off
11 here? I can't read the signature on Exhibit 3.
12 A. Lieutenant Evans.
13 Q. Evans, okay. How many lieutenants did
14 you work under during the time period we're talking
15 about? Is it a couple of people or a whole lot?
16 A. Per shift?
17 Q. Your direct report is to a lieutenant,
18 right?
19 MS. SCHEFFEY: Object to form.
20 Foundation.
21 A. It depends on what shift. If it's
22 graveyards, it's usually one lieutenant.
23 Q. Okay. There might be more than one at a
24 time, is what you're telling me?
25 A. Not on breaks. Maybe two during the day.

Page 94
1   A.   24/7 if he's in there for that reason.
2   Q.   So every 15 minutes?
3   A.   Yes.
4   Q.   And you said you have to look in there.
5   Does that mean the lights stay on?
6   A.   There is an -- if it's nighttime, there
7   is a night light where you can still see them.  If
8   it's during the day, there's the daylight, sun,
9   where there's more light in there.
10  Q.   You said you check the cell door?
11  A.   Yes.  We come up to the door and look
12  inside.  The door is locked, and we look inside.
13  There's a window where you can see them.
14  Q.   And you say you communicate with them
15  verbally?
16  A.   Yes.
17  Q.   And you do that every time?
18  A.   Yes.
19  Q.   Do you need to touch the door?
20  A.   We normally tap on the door, get his
21  attention if he's sleeping.
22  Q.   Okay.
23  A.   If his head is under the covers or
24  something, make sure he's --
25  Q.   The door's locked, right?

Page 95
1   A.   I'm sorry?
2   Q.   The door's locked?
3   A.   Yes.
4   Q.   Okay.  So we covered the Job Description.
5   You said that, you know, suicide watch might be a
6   thing that hasn't been mentioned there that you do
7   as a detention officer.
8        Is there anything else you can
9   think of that you, as a detention officer, are given
10  the power and authority to do at ADC, other than
11  what's listed here?
12  A.   No.  I think we covered everything.
13  Q.   Nothing else?
14  A.   Not at the top of my head, no.
15  Q.   We spoke earlier about the rules that
16  applied to detainees.  You get trained in the
17  detainee rules in your training, right?
18  A.   There's a handbook that we -- we look at
19  and see what the rules and regulations are, and we
20  try to make sure that that's what they're doing,
21  they're following them.
22  Q.   You don't write that handbook as DOs,
23  right, as detention officers?
24  A.   No.  I believe it comes from ICE, ICE
25  standards.  It's through them.

Page 96
1   Q.   Do you look at that handbook regularly?
2   A.   No.
3   Q.   Would you recognize it if you saw it?
4   A.   Yes.
5   Q.   Do you keep a copy for reference
6   somewhere?
7   A.   No.  Well, they -- in the podiums in the
8   dorms, they do have a copy there.  But not
9   personally on me, no.
10  Q.   And the podiums of the dorms, are you
11  talking about kind of like a guard station?
12  A.   Yeah, where an officer keeps --
13       MS. SCHEFFEY:  Objection.
14  A.   -- logbooks, and while he's putting it in
15  there.
16  Q.   I see.  So that's apart from the detainee
17  rooms, right?  You're talking about a different
18  space?
19  A.   Yes.
20  Q.   Kind of in the common area?
21       MS. SCHEFFEY:  Object to form.
22  Foundation.
23  A.   Yes, that's...
24  Q.   How would you describe where that podium
25  is?

Page 97
1   A.   Just as you walk in, it's right there.
2   Q.   And then when you say as you walk in, you
3   mean the doorway out of the pod?
4   A.   Yes.
5        MS. SCHEFFEY:  Object to form.
6   Q.   Okay.  And you said that you keep a copy
7   of the handbook up there?
8   A.   There may be one in there.
9   Q.   And logbook?
10  A.   The logbook.
11  Q.   Okay.  We were talking about that
12  handbook as a place that has the detainee rules.
13  You don't have the power to change those rules,
14  right?
15  A.   That's correct.
16  Q.   It's your job to enforce those rules that
17  you're given equally and without discrimination,
18  right?
19  A.   Yes, we're supposed to enforce them.
20  Q.   If we look back at the document we've
21  marked as Exhibit 1.
22  A.   Where am I at?  Okay.
23  Q.   That goes way back to your first job
24  interview questionnaire with Geo, right?
25  A.   Yes.

Page 98
1   Q.   And there it's stated, it asked you, "Are
2   you willing to follow all policy, procedures,
3   contract obligations, and rules of the company and
4   facility at all times."  Right?
5   A.   Yes.
6   Q.   That was all policies at all times,
7   right?
8   A.   Yes.
9   Q.   Not some policies sometimes, right?
10  A.   Right, all policies.
11  Q.   So you don't have the authority to make
12  exceptions or play favorites with the rules, right?
13  A.   No.
14  Q.   You just have to apply the rules as
15  they're written, right?
16  A.   Yes.
17  Q.   I'd like to show you what we'll mark as
18  Exhibit 4.
19           (Exhibit No. 4 was marked.)
20  Q.   Take your time to review that document.
21  A.   I might need help on this.  I don't know
22  where I'm at.  Down here?
23  Q.   I can share it with you on the screen.
24  That might help you out.
25           MR. EISMEIER:  Hold on a second.

Page 99
1   I'll come and help you open it up.  It's a fairly
2   long document.
3            MR. TURNER:  Do you guys want to go
4   off for a second?
5            THE WITNESS:  Yeah.  It's opened up
6   on the other screen.
7            MR. EISMEIER:  Do you want me to come
8   in?
9            THE WITNESS:  Yes.
10           MR. EISMEIER:  I'll be right back.
11  Okay.
12           MR. TURNER:  We'll go off a second.
13  Thank you.
14           (Break from 12:23 p.m. to
15           12:24 p.m.)
16  BY MR. TURNER:
17  Q.   Officer Pagan, do you recognize the
18  document we've marked as Exhibit 4 here?
19  A.   The Detainee Handbook.
20  Q.   Is that the handbook you were discussing
21  before?
22  A.   Yes.
23  Q.   Okay.  And that's the one you said that
24  contains the detainee rules, right?
25           MS. SCHEFFEY:  Object to form.

Page 100
1   A.   I believe that the rules are in there.
2   Q.   Is this the book that you were stating
3   can be kept at the podium?
4   A.   Yes.
5   Q.   And that's the one you were thinking of?
6   A.   That's the one.
7   Q.   So that's where you get the rules that
8   you're enforcing with respect to detainees, right?
9   A.   That's -- these are the rules we expect
10  them to follow.
11  Q.   Let's look at page 23 of the exhibit,
12  please.  It has a Bates No. PL000053 at the bottom.
13  It says page 23 of the handbook in the bottom right
14  corner, and you'll see it on the shared screen of
15  the video.  Do you see that?
16  A.   Yes.
17  Q.   And when you talked about the rules
18  violations and said they had number codes, is this
19  what you were talking about?
20  A.   Yes.
21  Q.   Okay.  So here we see "Disciplinary
22  Severity Scale and Prohibited Acts"?
23  A.   Yes.
24  Q.   So those prohibited acts are the rules
25  that you have to enforce, right?

Page 101
1   A.   Correct.
2   Q.   And you see here we've got 100 codes, 200
3   codes, 300 codes, right?
4   A.   Yes.
5   Q.   So this is where the detainee rules are,
6   right?
7            MS. SCHEFFEY:  Object to form.
8   A.   I believe so, yes.
9   Q.   Are they anywhere else that you're
10  thinking of?
11  A.   No.
12  Q.   No other source of rules.  These are the
13  ones?
14  A.   Yes.
15  Q.   So these are what you're enforcing on the
16  floor, right?
17  A.   Correct.
18  Q.   Do the detainees get a copy of that book?
19  A.   Yes, they do.
20  Q.   Are some of them not literate?
21  A.   They're Spanish and English.
22  Q.   Do some folks not read in any language?
23  A.   I believe we may have that.  Yes,
24  there's -- like I said, we get them from all over
25  the world, so we can't provide...

Page 102

1   Q.   Sure.  Sure.  A lot of variation in
2   education, right?
3   A.   Yes.
4   Q.   How do the people who can't read get
5   informed of the rules they have to follow?
6   A.   Sometimes they'll get a -- they'll put in
7   a request for help on that.
8   Q.   A request for help.  Who do they request
9   help from?
10  A.   ICE, mostly.
11  Q.   To help them understand the rules?
12  A.   Yeah.  They usually go to ICE for
13  everything.
14  Q.   Is it part of a detention officer's job
15  to explain the rules?
16  A.   If we can explain, sure, we try.
17  Q.   So, you know, if people can't read the
18  handbook or if they don't read the handbook, you
19  would tell them what the rules are, right?
20       MS. SCHEFFEY:  Object to form.
21  Misstates prior testimony.
22  Q.   Is that right?
23  A.   We try to explain to them, you know, what
24  we can.
25  Q.   Is that part of your job, to explain to

Page 103

1   them?
2       MS. SCHEFFEY:  Object to form.
3   A.   I believe so.  If we -- if we see that
4   they're doing something that they're not supposed to
5   be doing, we let them know that it's in the
6   handbook.  We point it out to them that they can't
7   be doing this.
8   Q.   Do they also get a video presentation
9   that might tell people who can't read?
10       MS. SCHEFFEY:  Object to form.
11  Foundation.
12  A.   No.
13  Q.   You're not aware of them watching a
14  video?
15  A.   They have -- they have a video in the
16  dorm that they watch every day on -- on the -- you
17  know, the running of the facility, what goes on,
18  what they can do to get help on certain things, what
19  to apply for.  It's like a -- just to give them a
20  heads up on what's going on.
21  Q.   But you don't think that video really
22  goes into the rules so much?
23  A.   I --
24       MS. SCHEFFEY:  Object to form.
25  A.   I don't believe it talks about the rules

Page 104

1   and regulations.  I believe it may state there's a
2   handbook for them to inform them self on what's
3   going on.
4   Q.   You stated earlier that you apply those
5   rules as they're written in here, right?
6   A.   Yes.
7   Q.   If we can look at the 19th page of the
8   exhibit, and I will pull it up on the shared screen
9   to make sure we're in the same spot.
10  A.   Yes, I'm there.
11  Q.   So it says page 17.
12  A.   Oh, 17.
13  Q.   In the bottom right corner.  It says
14  PL0000047 in the middle.
15  A.   Yes.
16  Q.   Okay.  And you'll see it's the 19th page
17  of Exhibit 4, which is now displayed on the screen
18  in front of you, I believe.  I'll make it a little
19  bigger.  The print is not so large.
20  A.   Okay.
21  Q.   It says here, "Housing Unit Sanitation.
22  Each and every detainee must participate in the
23  facility's sanitation program.  A list of detainees
24  is developed each day by staff and is posted daily
25  for viewing.  During a general cleanup all detainees

Page 105

1   must participate.  The assigned housing unit officer
2   will be responsible for assuring this general
3   cleanup is done on a regular basis."
4       Do you see that?
5   A.   Yes.
6   Q.   Did I read that correctly?
7   A.   You did.
8   Q.   You're aware of that rule?
9   A.   Yes.
10  Q.   And you've been the housing unit officer,
11  right?
12  A.   Yes.
13  Q.   And so you've been responsible for
14  ensuring this general cleanup is done on a regular
15  basis?
16  A.   Yes.
17  Q.   When we say a regular basis, does that
18  mean daily?
19  A.   Yes.
20  Q.   Okay.  So that happens daily?
21  A.   Yes.
22  Q.   And it says a list of detainees is
23  developed each day and it's posted daily for
24  viewing.  Is that right?
25  A.   Yes.

Page 106
1   Q.   Do you post a list in your housing unit?
2   A.   We do.
3   Q.   Do you develop the list?
4   A.   I'm sorry?
5   Q.   Do you develop the list personally? Is
6   that a thing you do?
7   A.   Yes.
8   Q.   How do you make the list?
9   A.   We have -- we go by our -- it's a book we
10  have in the drawer, and we go by cell, each cell.
11  We move on from cell to cell every day.
12  Q.   And that's how you make the list, is
13  rotating cell to cell as to whose turn it is to
14  clean; is that right?
15       MS. SCHEFFEY:  Object to form.
16  A.   Yes.
17  Q.   How many people in the group?
18  A.   Excuse me.  It could be two cells at a
19  time because we need eight detainees cleaning.
20  Q.   So it would be up to eight?
21  A.   It could be, yes.
22  Q.   Have you seen more than eight?
23  A.   No.
24  Q.   Okay.  Are there four in a cell?
25  A.   Yes.

Page 107
1        MS. SCHEFFEY:  Object to form.
2   Q.   And you said it might be up to two
3   cleaning?
4   A.   Yes.
5        MS. SCHEFFEY:  Object to form.
6   Q.   Is this the same list of six people you
7   referenced on a cleanup crew before?
8        MS. SCHEFFEY:  Object to form.
9   A.   Can you clarify that question again?
10  Q.   Sure.
11       Earlier we talked about a wax
12  crew, and you also said that you supervised the
13  cleanup crew.
14  A.   Yes.  I -- yes.
15  Q.   And we talked about those people all
16  getting paid for the work and being on the pay
17  sheet; is that right?
18  A.   Yes.
19  Q.   This is different, isn't it?
20       MS. SCHEFFEY:  Object to form.
21  A.   It is different.
22  Q.   Okay.  There's no pay sheet for the
23  housing unit sanitation, right?
24  A.   Not -- there is for the detainees that
25  are assigned for that housing.

Page 108
1   Q.   Okay.  So there you're talking about
2   trustees, right?
3        MS. SCHEFFEY:  Object to form.
4   Q.   Am I right that you're talking about
5   trustees there?
6   A.   They're called dorm trustees.
7   Q.   Okay.  So you have some dorm trustees who
8   do get paid for the work they do in the housing unit
9   sanitation?
10  A.   Correct.
11  Q.   How many dorm trustees do you have?
12  A.   Two.
13  Q.   Two at a time.  How many are in the pod?
14  A.   It varies.  It can be a full house.  It
15  can be half.
16  Q.   What's a full house?
17  A.   80.
18  Q.   So when you say it could be half, you
19  mean 40, right?
20  A.   Yes.
21  Q.   So we're talking 40 to 80 people.  Two of
22  them would be trustees?
23  A.   Yes.
24  Q.   Do you always keep two trustees?
25  A.   We try.

Page 109
1        MS. SCHEFFEY:  Object to form.
2   Q.   I'm sorry, what did you say?
3   A.   We try to keep at least two.
4   Q.   How many have you seen maximum?
5   A.   Two.
6   Q.   So you try to keep at least two?
7   A.   Yes.  Sometimes they get deported so we
8   have one, so...
9   Q.   Sure.  And then you hire them through the
10  Voluntary Work Program to add to the dorm trustee?
11       MS. SCHEFFEY:  Object to form.
12  Q.   Is that right?
13  A.   Yes.
14  Q.   Do you, as the housing unit officer,
15  decide who that's going to be?
16  A.   No.
17  Q.   Do you know who does?
18  A.   Classification.
19  Q.   Okay.  But everybody has to participate
20  in housing unit sanitation, right?
21       MS. SCHEFFEY:  Object to form.
22  A.   We try to get everybody to help out and
23  clean.
24  Q.   It says here each and every detainee must
25  participate, right?

Page 110
1    A.    Yes.
2          MS. SCHEFFEY:  Object to form.
3    Q.    Was that a yes?
4    A.    Yes.
5    Q.    That's the rule, right?
6    A.    Well --
7          MS. SCHEFFEY:  Object to form.
8    A.    We indicate that they need to help clean,
9    yes.  It's not really enforced, but we ask them to
10   clean.
11   Q.    Didn't you tell me earlier that it's your
12   job to enforce all rules at all times, right?
13         MS. SCHEFFEY:  Object to form.
14   A.    Yes.
15   Q.    I'd like to show you --
16         MS. SCHEFFEY:  And, Andrew, while
17   you're shifting gears, I wanted to say at some point
18   we should discuss lunch.  I see it's 12:37, just so
19   you know.
20         MR. TURNER:  Okay.  Maybe now would
21   be a good time to take lunch.  Do you guys want to
22   take an hour?
23         MS. SCHEFFEY:  I think that's fine.
24         Dana, do you have food ordered?
25         MR. EISMEIER:  Yes, I've got it

Page 111
1    covered.
2          MS. SCHEFFEY:  Luis, is an hour good?
3    Do you need more or less?
4          MR. TURNER:  Mr. Pagan?
5          THE WITNESS:  45 minutes is good.
6          MS. SCHEFFEY:  Okay.  Andrew, 45 or
7    an hour is fine with me, whatever you choose.  We'll
8    do an hour.
9          MR. TURNER:  We'll see you back on at
10   1:38.
11         Again I would instruct the witness
12   that you're under oath and you're not to consult
13   about the substance of your testimony during the
14   break.
15         THE WITNESS:  Okay.
16         MS. SCHEFFEY:  And I would say I
17   disagree with that.  I think there's strong case law
18   to the opposite, as long as a question's not
19   pending.
20         MR. TURNER:  Well, I'm going to
21   inquire when you come back who you've consulted with
22   and what they've said.
23         Thank you.  We'll see you in an
24   hour.
25         THE WITNESS:  Okay.

Page 112
1          (Whereupon, a lunch break was had
2           from 12:38 p.m. to 1:41 p.m.
3          EXAMINATION (CONTINUED)
4    BY MR. TURNER:
5    Q.    Welcome back from the break, Officer
6    Pagan.
7    A.    Thank you.
8    Q.    I want to ask you, during the lunch break
9    did you consult with anyone regarding the substance
10   of your testimony?
11   A.    No.
12   Q.    You didn't discuss your testimony with
13   anyone?
14   A.    No.
15   Q.    Okay.  Before we took the break you were
16   explaining to me a little bit about your experience
17   as the officer on duty in the segregation unit.  Do
18   you recall that?
19   A.    Yes.
20   Q.    We had discussed suicide checks for
21   people who are identified as being a risk for
22   suicide; is that right?
23   A.    Yes.
24   Q.    And you recall doing those every 15
25   minutes; is that right?

Page 113
1    A.    Yes.
2    Q.    And if I recall correctly, you were
3    explaining that you have to look into the cell and
4    you kind of tap the door; is that right?
5    A.    Yes.
6    Q.    Do you get a verbal confirmation from
7    them every time?
8    A.    No, they look at you and maybe give you a
9    thumbs up or something.
10   Q.    Okay.  And that's for people who are
11   identified as a risk for suicide by medical; is that
12   right?
13   A.    Yes, by a psychiatrist, psychologist.
14   Q.    Okay.  How does that information come to
15   you?  Does the lieutenant tell you, hey, this
16   person's a risk, or how do you learn that?
17         MS. SCHEFFEY:  Object to form.
18   A.    Well, if you're working in segregation,
19   they bring this guy from medical and they give you
20   the paperwork on him and let you know what's going
21   on.
22   Q.    Did you tell me earlier there's a list
23   posted of who you have to do 15-minute checks on?
24         MS. SCHEFFEY:  Object to form.
25   A.    When you take over the segregation,

Page 114

1  you're briefed by the officer that you have one in
2  one of the cells, which cell is a 15-minute watch.
3      Q.   That's for suicide risks that are
4  identified to you.  But everybody in seg. gets a
5  30-minute check, right?
6           MS. SCHEFFEY:  Object to form.
7      A.   Yes.
8      Q.   So whether it's administrative seg. or
9  disciplinary seg., you check those cells every 30
10 minutes, right?
11     A.   Correct.
12     Q.   What are you checking for when you do
13 those?
14     A.   Making sure they're okay.
15     Q.   Same kind of check?
16     A.   Same kind.
17     Q.   So you're looking for self-harm, right?
18     A.   Yes.
19          MS. SCHEFFEY:  Object to form.
20     Q.   Before you bring anybody to seg. -- let
21 me -- let me back up.
22          You have been a transport -- an
23 escort officer who would take people around the
24 facility, right?
25     A.   Yes.

Page 115

1           MS. SCHEFFEY:  Object to form.
2      Q.   Okay.  So you've been an escort officer
3  that would take people around.
4           You would sometimes end up taking
5  people from a dorm to seg., right?
6           MS. SCHEFFEY:  Object to form.
7      A.   Yes, I have.
8      Q.   I'm sorry, I couldn't hear that answer.
9      A.   Yes, I have.  I've escorted them to seg.,
10 yes.
11     Q.   Okay.  When you do that, you have to stop
12 by medical, right?
13     A.   They have to go to medical first and then
14 to segregation.
15     Q.   And that's true whether they're going to
16 segregation as a suicide risk or not, right?
17          MS. SCHEFFEY:  Object to form.
18     A.   They wouldn't be going to segregation if
19 they were a suicide risk.
20     Q.   So anybody who's going to segregation
21 gets a medical check first?
22     A.   Correct.
23     Q.   Why is that?
24     A.   It's to make sure they're okay as far as
25 being locked up in segregation, that it's not going

Page 116

1  to be a problem.
2      Q.   To make sure they're not going to be a
3  suicide risk, right?
4      A.   Or --
5           MR. TURNER:  Object to form.
6  Foundation.
7      A.   Maybe not a suicide risk, but make sure
8  that it's okay with them being locked up in a
9  10-by-10 cell.  You know, it's some people can't do
10 that.
11     Q.   To make sure they're okay locked up in a
12 10-by-10 cell, you said?
13     A.   Yes.
14     Q.   Are detention officers like you trained
15 about when the suicide risk is highest in seg.?
16          MS. SCHEFFEY:  Object to form.
17     A.   No, not really.  That's determined by the
18 psychologist.
19     Q.   Have you been told when the risk is
20 highest for someone arriving in seg.?
21     A.   It's just during holidays we have to
22 watch out for anything like that.  They get
23 depressed a little bit maybe when they're in
24 segregation.
25     Q.   Have you been given any other information

Page 117

1  about timing of suicide risk, other than holidays?
2      A.   No.
3      Q.   Okay.  Back to the 15-minute suicide
4  checks we were talking about earlier.
5           If some detention officer had
6  failed to do that, what would happen?
7           MS. SCHEFFEY:  Object to form.
8      A.   To make his checks?
9      Q.   Yeah.
10     A.   He would be disciplined, up to
11 termination.
12     Q.   Okay.  Are you aware of that ever having
13 happened?
14     A.   No.
15     Q.   If the checks weren't being made
16 properly, the DOs would be informed about how to do
17 them right, wouldn't they?
18          MS. SCHEFFEY:  Object to form.
19     A.   Yes.  We're trained to do them properly.
20     Q.   And if there was a problem, Geo would
21 tell you, right?
22          MS. SCHEFFEY:  Object to form.
23     A.   Yes, it would be brought to our
24 attention.
25     Q.   If there was a violation of policy, it

Page 118
1  would be corrected, right?
2           MS. SCHEFFEY:  Object to form.
3       A.  Yes.
4       Q.  Even if it was a different detention
5  officer, you would probably be re-educated about how
6  to do it right to make sure you got it in the
7  future?
8           MS. SCHEFFEY:  Object to form.
9       A.  Yes.
10      Q.  So even if somebody else had messed that
11 up, you'd probably hear about it, right?
12          MS. SCHEFFEY:  Object to form.
13      A.  Well, if you -- if somebody messed up in
14 segregation without doing the proper checks, we
15 would get briefed on it, yes.
16      Q.  You said you'd get briefed on it?
17      A.  Yes, we'll get briefed that someone's not
18 doing their checks right, don't get caught doing
19 this because you could be disciplined or terminated.
20      Q.  Is that part of the lieutenant briefing
21 you were talking about before?  Is that where you'd
22 expect to hear that kind of thing?
23      A.  Yes.
24      Q.  Okay.  But not necessarily just talking
25 about seg. there.  I mean, if there was just some

Page 119
1  issue about compliance, the lieutenant would tell
2  you guys, right?
3       A.  Right.
4           MS. SCHEFFEY:  Object to form.
5       Q.  Is that right?
6       A.  Yes.
7       Q.  And you'd hear that kind of thing in
8  briefing, about how to do it better?
9       A.  Yes.
10          MS. SCHEFFEY:  Objection.
11      Q.  I'd like to show you now what I'll mark
12 as Exhibit 5, please.
13          (Exhibit No. 5 was marked.)
14      Q.  Just take a minute to look that document
15 over and let me know if you recognize that as
16 familiar?
17      A.  Is there another download I have to do
18 here?
19      Q.  I can try to give it to you a couple
20 different ways.
21      A.  Okay.  "Shift Supervisor Daily Log."
22      Q.  Do you see yourself on this log?
23      A.  No.  I'm sorry, yes, I do.
24      Q.  Okay.  So this is a day you were
25 scheduled on, right?

Page 120
1       A.  Yes.
2       Q.  What roles do you see yourself in?
3       A.  It looks like I'm B1.  That was the dorm.
4       Q.  I also see you listed on escort officer;
5  is that right?
6           MS. SCHEFFEY:  Object to form.
7       A.  That would be in case I would have to be
8  changed out, I could be an escort.  But at the time
9  I was assigned to B1.
10      Q.  And we were talking about escort earlier.
11 That was kind of like if somebody needed moving from
12 place to place, right?
13      A.  Correct.
14      Q.  You're not driving a van.  You're just
15 taking someone from pod to pod or something like
16 that?
17      A.  Right.
18      Q.  Changing housing, right?
19      A.  Changing housing or taking them to
20 medical or legal visit or assign them, whatever we
21 need to get them to.
22      Q.  If you look at this document here, can
23 you recognize for me which shift supervisor it is
24 that created this report?
25      A.  What year is this?  Does it have a date

Page 121
1  up top?
2       Q.  I believe you'll see August 3, 2014; is
3  that correct?
4       A.  2014, yes.  Yes.
5       Q.  You do see that date?
6       A.  Yes.
7       Q.  Do you recognize that particular
8  supervisor's signature, or no?
9       A.  It could have been McCuen.
10      Q.  You're not sure?
11      A.  It's hard -- it looks like it starts with
12 an "M."
13      Q.  Okay.  You see here on this particular
14 shift the sick call was completed, right?
15      A.  Yes.
16      Q.  And the shakedown searches were
17 completed, right?  Do you see that?
18      A.  Yes.
19          MS. SCHEFFEY:  Object to form.
20      Q.  Do you see that all post logs are
21 reviewed and signed?
22      A.  Yes.
23          MS. SCHEFFEY:  Object to form.
24      Q.  And where we have a notation on the,
25 "Institution Cleanliness:  Clean core, trash picked

Page 122

1  up, and all extra supplies put away."
2      A.  Yes.
3      Q.  Okay.  Now you see one incident listed
4  here.  You had told me earlier that your supervisor
5  would explain incidents in writing here, right?
6      A.  Well, he's probably just noted that
7  something occurred during that shift.
8      Q.  Okay.  And what I see here is, "Detainee:
9  Adam-Villalobos, Diego 206528359 sent to seg. for
10 refusing to clean and insolence to staff."
11         Do you see that?
12     A.  Yes.
13     Q.  And so we understand that to mean that
14 one of the detainees was disciplined for refusing to
15 clean and being insolent, right?
16         MS. SCHEFFEY:  Object to form.
17     A.  Like I said, I don't know.  It's
18 whatever's documented there.  I don't know what
19 would have occurred.  It looks like he was -- it was
20 more than just not cleaning.  He probably
21 disrespected or cussed out the officer.  Could have
22 been put to seg. for that reason.  I don't know.
23     Q.  So you see refusing to clean and
24 insolence to staff, right?
25     A.  I see it, yes.  But like I said, I don't

Page 123

1  know exactly what occurred.  I wasn't there.
2      Q.  If you were the escort officer, would you
3  have taken detainee Diego Villalobos to segregation?
4          MS. SCHEFFEY:  Object to form.
5      A.  Maybe.  There might be more than one
6  escort officer.  So I might have been the one, or
7  the other officer.
8      Q.  Were you the officer who wrote up this
9  detainee for refusing to clean and being insolent?
10         MS. SCHEFFEY:  Object to form.
11     A.  I don't recall that.  It doesn't specify
12 what dorm he was in.
13     Q.  Might you have been the officer who would
14 have written him up for being insolent and refusing
15 to clean?
16     A.  No.
17     Q.  You know it wasn't you?
18     A.  I would remember that.
19     Q.  Have you written up some detainees for
20 being insolent and refusing to clean?
21     A.  No.
22     Q.  You've never done that yourself?
23     A.  No.
24     Q.  You see on this roster who else was on
25 your shift.  Please take a moment to review that.

Page 124

1      A.  Okay.  Okay.  Yes.
2      Q.  Do you recall any of those officers being
3  disciplined for what they did, sending this detainee
4  to segregation?
5      A.  Do I recall them sending the detainee to
6  segregation?
7      Q.  Do you recall that any of those officers,
8  any of those detention officers, were disciplined
9  for what they did in sending this detainee to
10 segregation?
11     A.  No.
12     Q.  No.  You would have heard about that if
13 that happened, right?
14     A.  Yes.  That's why I question it because it
15 didn't sound familiar at all about that.
16     Q.  Right.  If they had been disciplined, you
17 would have known it?
18     A.  Yes.
19     Q.  So sitting here today, you have no reason
20 to believe that those detention officers did
21 anything wrong on that shift in the way they handled
22 that detainee, right?
23     A.  I believe they didn't do anything wrong,
24 no.
25     Q.  You believe those detention officers did

Page 125

1  right?
2      A.  I believe so.
3      Q.  That's within their powers, right?
4      A.  Right.
5          MR. TURNER:  Did we just lose
6  Adrienne?
7          MR. EISMEIER:  I think we might have.
8              Adrienne, are you on?
9              Hang on for a second.
10         MR. TURNER:  Pause right there, but
11 we're going to stay on the record.
12         THE WITNESS:  Okay.
13         MR. EISMEIER:  Adrienne, are you
14 back?
15         MS. SCHEFFEY:  Looks like I'm back
16 now.  Getting video now.
17         MR. EISMEIER:  We noticed you were
18 going, and we held up when you were gone.
19         MR. TURNER:  We can have some
20 questions read back for you.  How long do you think
21 you were gone?
22         MS. SCHEFFEY:  About five, ten
23 seconds, I don't know.  I was disconnected from our
24 VPM, which seems to be part of the problem.  Maybe
25 the last two questions would be good to have read

Page 126

1  back.
2         (Record read.)
3  BY MR. TURNER:
4     Q.  Officer Pagan, I would like to show you
5  another exhibit we'll mark as Exhibit 6 to this
6  deposition.  I'll open it up for you in a couple
7  different ways, and you can have a moment to look at
8  Exhibit 6, a one-page document.
9         (Exhibit No. 6 was marked.)
10    A.  Okay.
11    Q.  Do you see it popping up as a one-pager?
12    A.  Yes.
13    Q.  Okay.  Please take a moment to review
14 this document and let me know if you recognize it.
15    A.  Yes, I do.
16    Q.  Is this another one of those post
17 assignments?
18    A.  Yes.
19    Q.  Is that like the kind of document you
20 told me you'd see every morning?
21    A.  Yes.
22    Q.  Okay.  Again, if we scroll down to the
23 bottom here under "Incidents," I'd like to draw your
24 attention to the last paragraph, where the document
25 says, "On 6-18-15 at approximately 0600 hours

Page 127

1  detainee B-4-205-4 was placed in seg./SMU pending an
2  investigation, rules violation No. 306, refusing to
3  clean assigned living area."
4         Do you see that?
5     A.  Yes, I do.
6     Q.  Okay.  And do you recognize that shift
7  supervisor's signature?
8     A.  I don't.
9     Q.  Okay.  Please take a minute to review the
10 roster.
11        Well, let me first ask you.  You
12 don't think it was you?
13        MS. SCHEFFEY:  Andrew, I'm just going
14 to note for the record this is outside the class
15 period as well.
16        MR. TURNER:  Your objection's noted.
17    A.  It looks like I wasn't there that day.
18    Q.  I see you're listed on call-offs.  Does
19 that mean that you were ill during the day or before
20 the day?
21        MS. SCHEFFEY:  Object to form.
22    A.  The reason I was off is -- that was five
23 years ago.
24    Q.  Right.  And I'm asking generally when you
25 see your name in call-off, does that mean you had to

Page 128

1  leave at some point during the shift or does that
2  mean you didn't come in at all?
3     A.  I didn't come in at all for that shift.
4     Q.  At all.  Okay.
5         So this was your regular shift,
6  right, but you didn't make it?
7     A.  Correct.
8     Q.  Okay.  Take a minute, please, to review
9  the names of the officers on the roster on duty that
10 day, and let me know when you've finished.  I see
11 Hill at the top.
12        (Witness peruses document.)
13    A.  Okay.
14    Q.  Okay.  You've been able to review?
15    A.  Yes.
16    Q.  Do you recall any of those officers being
17 disciplined for what they did, sending this detainee
18 to segregation?
19    A.  Are we speaking about (inaudible)?
20    Q.  No.
21        MS. SCHEFFEY:  Object to form.
22    A.  This incident here?
23    Q.  We're talking about two years later,
24 right, 6-18-15.  Do you recall any of those officers
25 being disciplined for sending --

Page 129

1     A.  No.
2     Q.  -- this detainee to seg./SMU pending an
3  investigation, rules violation 306, refusing to
4  clean assigned living area?
5         MS. SCHEFFEY:  Object to form.
6     Q.  Do you remember anybody being disciplined
7  for that?
8         MS. SCHEFFEY:  And asked and
9  answered.
10    A.  No.
11    Q.  You don't recall anybody being
12 disciplined for that?
13    A.  I don't.
14    Q.  So sitting here today, you have no reason
15 to believe that those detention officers did
16 anything wrong on your shift in the way they handled
17 that detainee, right?
18        MS. SCHEFFEY:  Object to form, and
19 object to misclassifies his shift when he just said
20 he was not there.
21    Q.  This is your regular shift, right?  These
22 are the people you would have been with had you not
23 called out, right?
24        MS. SCHEFFEY:  Object to form.
25    Q.  Is that a yes?

Page 130

1   A.   Yes.
2   Q.   Do you recall any of them being
3   disciplined for this?
4   A.   No.
5   Q.   And sitting here today, you have no
6   reason to believe that they did anything wrong in
7   the way they handled that detainee?
8        MS. SCHEFFEY:  Object to form.
9   A.   I don't recall the incident, to be honest
10  with you.
11  Q.   Okay.  But you never heard about it being
12  a problem, did you?
13  A.   No.
14       MS. SCHEFFEY:  Object to form and
15  asked and answered.
16  Q.   Let's look at Exhibit 4, if you would.
17  I'm putting it back in the chat.  It seems that we
18  lost the exhibits from earlier in the deposition
19  when we closed out.
20            If you can look at what is marked
21  as page 24 of that handbook.  Do you see the page
22  No. 24 in the bottom right corner?
23  A.   Yes.
24  Q.   PL000054 in the middle?
25  A.   Yes.

Page 131

1   Q.   If you look at the left-hand side, we see
2   the "'High Moderate' Offense Category," right?
3   A.   Yes.
4   Q.   And 306 is "Refusal to clean assigned
5   living area," right?
6   A.   On page 24.
7   Q.   Yes.  Do you see offense number 306?
8   A.   Yes.
9   Q.   Refusal to clean assigned living area?
10  A.   Yes.
11  Q.   Okay.  So that's a high moderate offense,
12  right?
13  A.   Right.
14  Q.   And 307 is "Refusal to obey a staff
15  member or officer's order," right?
16  A.   Yes.
17  Q.   308 is "Insolence toward a staff member"?
18  A.   Yes.
19  Q.   Okay.  And on the right-hand side here we
20  see the sanctions that can pertain to a high
21  moderate offense, right?
22  A.   Yes.
23  Q.   So in the rule book, those are all three
24  offenses that people can be disciplined for, right?
25       MS. SCHEFFEY:  Object to form.

Page 132

1   A.   Yeah, they can be.
2   Q.   And the sanctions go all the way from
3   warning or reprimand all the way up to initiate
4   criminal proceedings, right?
5   A.   Yes.
6   Q.   Disciplinary transfer, and then we see
7   disciplinary segregation up to 72 hours is
8   Sanction C, right?
9   A.   Yes.
10  Q.   So you understand that to be a sanction
11  that could be imposed for refusal to clean assigned
12  living area, right?
13  A.   Yes.
14  Q.   So the officers that impose this
15  discipline on the detainees in Exhibits 5 and 6 just
16  followed the rule book, right?
17       MS. SCHEFFEY:  Object to form.
18  A.   Correct.
19  Q.   They didn't do anything that was outside
20  the rules, right?
21       MR. EISMEIER:  Form and foundation.
22       MR. TURNER:  How many counsel are we
23  going to have on this thing here?
24       MS. SCHEFFEY:  You guys had about
25  five at the last deposition of Mr. Hernandez, so...

Page 133

1   A.   Yes, they're going to go by the rule
2   book.  It doesn't necessarily mean that they're
3   going to -- it's going to happen, but they're going
4   to write it up.
5   Q.   You wouldn't always write up an offense,
6   right?
7        MS. SCHEFFEY:  Object to form.
8   Foundation.
9   A.   I usually give them -- it depends on the
10  offense, and I can give them a warning.
11  Q.   Okay.
12  A.   I can talk to them about it.  And if they
13  continue, then they will be written up.
14  Q.   What do you say when you talk to them
15  about it?
16  A.   It's coaching, is what they call it.
17  It's explain to them what they're doing or what
18  they're saying, it's wrong.  And if they continue,
19  if they don't change their ways, they can be written
20  up and possibly put in segregation, depending what
21  they're doing.
22  Q.   So you just explain to them, like, the
23  rule and the consequences?
24  A.   Sometimes they don't read their
25  handbooks.

Page 134
1  Q.  I'm sure, right?  I mean, it's a long --
2  long document.
3        MS. SCHEFFEY:  Object to form.
4  Q.  But you can just explain to them the rule
5  and explain to them the consequences, right, and not
6  actually write it up?
7  A.  Yes.  Uh-huh.  I mean, it's happened, you
8  know.  I mean, I'm not that quick to put pen to
9  paper.  I try to work with them, reason with them.
10 Q.  Right.  If you actually wrote up every
11 time anybody kind of fusses, you'd have an
12 unworkable system, right?  You've got to communicate
13 with people?
14 A.  Segregation would be full.
15       MS. SCHEFFEY:  Object to form.  If
16 that's a question, object to the question.
17 A.  Yes, sir.
18 Q.  So if a -- if a DO told a detainee, you
19 know, "Look, you can go to the hole if you don't do
20 the cleaning work," they'd be telling the truth,
21 right?  They'd be telling the truth about the rules,
22 right?
23       MS. SCHEFFEY:  Object to form.
24 A.  Well, I mean, it's what is written in the
25 rules, the Detainee Handbook, you know.  It's a

Page 135
1  possibility that -- we try not to enforce that.
2  Even though it's on there, we work with them.  We
3  try to get them to clean and talk to them and let
4  them know the reason they should clean, it can cause
5  problems.  Sometimes they go on and they do it.
6  Q.  Most people aren't going to dig in and
7  not do it if you talk to them, right?
8        MS. SCHEFFEY:  Object to form.
9  A.  No, they -- they -- most of them do clean
10 after you have a word with them.  Once in a while
11 you get somebody that just won't do it.  They get
12 stubborn.  You may just write them up, write an
13 incident report on it.
14 Q.  But more common than actually writing
15 somebody up would just be to talk to them about it
16 and the rule and the consequence, right?
17 A.  Yes.  That's what we're there for.  We're
18 there to monitor them, make sure they're doing good,
19 health and welfare, and we've got to get them to
20 follow the rules.
21 Q.  I'd like to show you what we will mark as
22 Exhibit 7.
23       (Exhibit No. 7 was marked.)
24 Q.  Take a minute to look at Exhibit 7,
25 please.  It's a one-page document, but it has a lot

Page 136
1  of text.  I want to give you a little time to look
2  it through.
3        (Witness peruses document.)
4  A.  Okay.
5  Q.  Okay.  So this document, do you recognize
6  what this concerns?
7  A.  Yes.
8  Q.  What is it?
9  A.  What they expect detainees to do, as far
10 as they're required to clean and cleaning areas.
11 Q.  You see that at the bottom, right, the
12 "Required Work Assignments"?
13 A.  Right.
14 Q.  Above that we have the Voluntary Work
15 Program, right?
16 A.  Yes.
17 Q.  And I think we discussed the difference
18 earlier.  You have jobs people apply for, right?
19 A.  Yes.
20 Q.  And that's the Voluntary Work Program?
21 A.  Yes.
22 Q.  You can apply for that or not, right?
23 A.  Yes.
24       MS. SCHEFFEY:  Object to form.
25 Q.  I'd like to look through the list here of

Page 137
1  the types of Voluntary Work Program jobs available
2  and see what you have knowledge of.
3        Starting with No. 1, "Kitchen
4  worker," have you ever supervised those folks?
5  A.  Not kitchen workers.
6  Q.  Okay.  Have you had them sign out of your
7  dorm?
8  A.  Yes.
9  Q.  Kitchen workers has two groups, right,
10 two shifts?
11       MS. SCHEFFEY:  Object to form.
12 Q.  Is that right?
13 A.  Morning and afternoon, yes.
14 Q.  When they sign out of your dorm, what
15 time do you expect the morning shift to leave?
16 A.  About 5:00 in the morning.
17 Q.  When do you expect to have them back in?
18 A.  By noon.
19 Q.  And you say there's a second shift that
20 might also leave your dorm too, right?
21 A.  Yes.
22       MS. SCHEFFEY:  Object to form.
23 Foundation.
24 Q.  If you had second-shift kitchen workers
25 leaving your dorm, when would you expect them to

Page 170
1   A.   It's the offense categories.
2   Q.   Okay.  What is this -- who drafts the
3   offense categories?  Can you see this document that
4   says "Performance-Based National Detention
5   Standards"?
6   A.   I don't see that on here.
7   Q.   Is my screen tied to his?
8        MR. EISMEIER:  Can I go in and open
9   it, download it real quick?
10       MS. SCHEFFEY:  Yeah.  Let's go off
11  for a moment so he can download it.
12       (Break from 3:09 p.m. to
13        3:10 p.m.)
14  BY MS. SCHEFFEY:
15  Q.   Mr. Pagan, do you know what this document
16  is, now that you've had your technical issues
17  resolved?
18  A.   Yes.
19  Q.   What is it?
20  A.   This is the Performance-Based National
21  Detention Standards.
22  Q.   And who drafts this document, if you
23  know?
24  A.   I think ICE.
25  Q.   I'm going to go to page, I believe it was

Page 171
1   288.  That was -- I'm going to scroll to page 228.
2   Have you seen this portion of the document before?
3   A.   Page 228?
4   Q.   Yeah.
5   A.   I'm on page 2 here.  You want me to go
6   down to 228?
7   Q.   Yeah.  You might be able to type it in
8   the top of the pdf.  If not, you can look at my
9   screen share.
10  A.   Okay.  I see yours, uh-huh.
11  Q.   And what is this?
12  A.   It's the offense categories.
13  Q.   And have you seen this before?
14  A.   Yes.
15  Q.   Is this document available in the dorms
16  for detainees?
17  A.   Yes.
18  Q.   And do you know if this document is
19  similar to the Detainee Handbook?
20  A.   I believe I've seen this on a board.
21  Q.   Okay.  And what is the board?
22  A.   The information board where they have --
23  they post stuff on there.
24  Q.   Okay.  And to your knowledge, do these
25  categories differ from the ones in the Detainee

Page 172
1   Handbook?
2   A.   This looks like they're pretty much the
3   same.
4   Q.   Okay.  I also wanted to go back.  Do you
5   remember that you discussed with Mr. Turner that you
6   supervised detainees in the laundry?
7   A.   Yes.
8   Q.   Okay.  Can you describe to me anything
9   else that they may have done, other than helping
10  with the laundry while they were with you there?
11  A.   They have social time in there while the
12  laundry's being washed.  They get to watch TV and
13  listen to music, eat some snacks and stuff.  You
14  know, sit there and look like they're having a good
15  time, by me.
16  Q.   Okay.  Did you ever have a problem
17  finding enough volunteers for the laundry?
18  A.   No.
19  Q.   Was it your impression that detainees
20  enjoyed working in the laundry?
21  A.   Everybody wants to work in laundry.
22  Q.   Okay.  And then we also talked about how
23  you used to work in the dorms; is that correct?
24  A.   Yes.
25  Q.   Okay.  And when you worked in the dorms,

Page 173
1   you supervised the general cleanup of the living
2   area; is that correct?
3   A.   Yes.
4   Q.   If someone didn't want to clean on a day,
5   did you ever threaten any detainee with segregation
6   for failing to clean?
7   A.   No.
8   Q.   Okay.  Did you ever send a detainee to
9   segregation for failing to clean?
10  A.   No.
11       MS. SCHEFFEY:  Okay.  That's it for
12  me.
13       MR. TURNER:  I want to take two
14  minutes to organize myself here.  Just a moment.
15       MS. SCHEFFEY:  Yeah.
16       FURTHER EXAMINATION
17  BY MR. TURNER:
18  Q.   Officer Pagan, you just testified that
19  you never threatened to send a detainee to
20  segregation for violating the cleaning rule, right?
21  A.   I never have.
22  Q.   But you would explain the cleaning rule
23  to them, right?
24  A.   I have.
25  Q.   It's different than threatening, right?

Page 174
1   A.   Yes.
2   Q.   But you would explain to them that that's
3   the requirement?
4   A.   It's required for them to clean.  It's
5   for personal hygiene reasons.
6   Q.   And you would explain to them that if
7   they don't do it there could be sanctions, so they
8   should, right?
9   A.   I never said that to them.
10  Q.   I'm sorry, what was that?
11  A.   Are you saying I threatened to put them
12  in segregation if they don't clean?
13  Q.   No.  I understand you didn't do that.
14       I'm asking whether you told them
15  that there could be consequences if they didn't, so
16  you really ought to do it.
17       MS. SCHEFFEY:  Object to form.
18  A.   No.
19  Q.   You never explained the sanctions that
20  could go with that?
21  A.   Well, I told them it's in the handbook.
22  They -- they should clean.  It's required for them
23  to do it.
24  Q.   And you said earlier that, you know,
25  sometimes you just got to tell people, like, it's a

Page 175
1   rule and there's consequences if you don't do it,
2   right?
3   A.   I -- I think I might have told them that
4   they could be sent to segregation, according to
5   rules and regulations.  I might have told them that
6   in the past.  I don't remember.
7       MR. TURNER:  Okay.  Nothing further.
8   Thank you for your time.
9       THE WITNESS:  You're welcome.
10      MR. TURNER:  Adrienne, do you have
11  anything?
12          FURTHER EXAMINATION
13  BY MS. SCHEFFEY:
14  Q.   I'm going to ask one follow-up question,
15  Luis.  Here it is.  I'm going to share Exhibit 4
16  with you so you don't have to pull it back up,
17  hopefully.
18       Okay.  So tell me when you can see
19  this document.  This is Exhibit 4.  Have you seen
20  this document before?  Do you remember looking at it
21  earlier today?  Can you see my screen, Mr. Pagan?
22  A.   Yes, I do.
23  Q.   Okay.  So this is page 17, which was
24  PL000047 of Exhibit 4, which is the Detainee
25  Handbook.  Do you see it?

Page 176
1   A.   Yes.
2   Q.   And here it explains the sanitation
3   program that detainees participate in each day; is
4   that correct?
5   A.   Yes.
6   Q.   Okay.  I'm going to scroll up here.
7   Right here, do you see where it says, "The dayroom
8   area will be kept clean at all times.  Should an
9   officer notice that the area is not clean, the
10  officer will make available necessary cleaning
11  supplies.  If the detainees in the housing unit do
12  not clean the area after being instructed to do so,
13  the televisions will be turned off."
14      Do you see that portion?
15  A.   Yes.
16  Q.   Okay.  So in the handbook, if you told
17  the detainee to look at the consequences, is this
18  one of the consequences a detainee might have seen?
19  A.   Yes.
20  Q.   Did you ever turn off the TVs when the
21  detainees failed to clean?
22  A.   Yes.
23  Q.   Okay.
24      MS. SCHEFFEY:  I have no further
25  questions.

Page 177
1       MR. TURNER:  Nothing further.  Thank
2   you for your time today, Officer Pagan.
3       THE WITNESS:  You're welcome, sir.
4       MS. COURT REPORTER:  Counsel, do you
5   both have standing orders on this case?
6       MR. TURNER:  I believe we do.  We
7   don't need to expedite this one from plaintiffs'
8   side.
9       MS. SCHEFFEY:  What is your
10  turnaround looking like?
11      MS. COURT REPORTER:  Ten business
12  days.
13      MS. SCHEFFEY:  Would it be possible
14  for us to have it by next week?
15      MS. COURT REPORTER:  Sure.  Just give
16  me a date.
17      MS. SCHEFFEY:  Let's try and get it
18  by the 14th.
19      MR. TURNER:  I'm sorry, the 14th?
20  Okay.  No need to expedite it on our end.
21      WHEREUPON, the within proceedings were
22  concluded at the approximate hour of 3:20 p.m. on
23  the 8th day of July, 2020.
24          *   *   *   *   *
25

Page 178

1  I, LUIS PAGAN, do hereby certify that I have read
2  the above and foregoing deposition and that the same
3  is a true and accurate transcription of my
4  testimony, except for attached amendments, if any.
5  Amendments attached ( ) Yes ( )No
6
7  _____
8  LUIS PAGAN
9
10
11
12
13 The signature above of LUIS PAGAN was subscribed and
14 sworn to before me in the county of
15 _____, state of _____,
16 this _____ day of _____, 2020.
17
18
19
20 _____
21 Notary public
22 My Commission expires:
23
24
25 LUIS PAGAN 7/8/20 (lk)

Page 179

1              REPORTER'S CERTIFICATE
2           I, LEEANN L. STELLOR, Registered Merit
3  Reporter and Certified Realtime Reporter within
4  Colorado, ID 200401669, appointed to take the remote
5  deposition of LUIS PAGAN, do hereby certify that
6  before the deposition he was duly sworn by me to
7  testify to the truth; that the deposition was taken by
8  me then reduced to typewritten form herein; that the
9  foregoing is a true transcript of the questions asked,
10 testimony given and proceedings had.
11
12         I further certify that I am not related to
13 any party herein or their Counsel, and have no
14 interest in the result of this litigation.
15
16         In witness hereof I have hereunto set my
17 hand this 14th day of July, 2020.
18
19                    _____
                      Leeann L. Stellor
20                    Registered Merit Reporter
                      Certified Realtime Reporter
21                    and Notary Public
22
23 My commission expires June 8, 2024
24
25

Page 180

1              E R R A T A   S H E E T
2    I, LUIS PAGAN, do hereby certify that I
3  have read the foregoing transcript of my testimony, and
4  further certify that it is a true and accurate record
5  of my testimony (with the exception of the corrections
6  listed below).
7  PAGE  LINE              CORRECTION
8  ____  ____   _____
9  ____  ____   _____
10 ____  ____   _____
11 ____  ____   _____
12 ____  ____   _____
13 ____  ____   _____
14 ____  ____   _____
15 ____  ____   _____
16 ____  ____   _____
17 ____  ____   _____
18 ____  ____   _____
19 ____  ____   _____
20 ____  ____   _____
21 ____  ____   _____
22 ____  ____   _____
23 ____  ____   _____
24
   _____          _____
25 Date                           LUIS PAGAN