# Exhibit 18

# *MENOCAL*

# *VS.*

# *THE GEO GROUP*

### Deposition

## *DEMETRIO VALERGA*

*10/27/2017*

_____

## *AB Court Reporting & Video*
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-CV-02887-JLK

_____

VIDEO DEPOSITION OF DEMETRIO VALERGA
October 27, 2017

_____

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
on their own behalf and on behalf of all others
similarly situated,

Plaintiffs,

vs.

THE GEO GROUP, INC.,

Defendant.

_____

APPEARANCES:

    TOWARDS JUSTICE-DENVER
        By David Seligman, Esq.
           1535 High Street, Suite 300
           Denver, Colorado  80218
           and
    THE KELMAN BUESCHER FIRM
        By Andrew H. Turner, Esq.
           600 Grant Street, Suite 450
           Denver, Colorado  80203
              Appearing on behalf of Plaintiffs

1     Q     Your -- Your room is not the same?

2     A     No, it's not. It's for one individual.

3     Q     Okay. One --

4     A     Just one person, one bed, one desk,
5  one bath- -- one toilet. And over there in the
6  pod, it's four beds, one toilet, one desk. Here,
7  it's just you're by yourself.

8     Q     Okay. And -- All right. So the
9  difference is you're by yourself?

10    A     Correct.

11    Q     Okay. And now tell me about -- How
12  does that contrast with disciplinary segregation?

13    A     From -- If you're convicted of their
14  write-up or whatever they want to call it, their
15  disciplinary action, they take your canteen, they
16  take your radio, and you have limited access to go
17  out to the yard, to the -- They'll -- They'll
18  escort you to the yard, but you have only one hour
19  of recreation on the other side.

20          When you're sitting on the other side
21  waiting to be -- your disposition or whatever
22  they're doing, you can go to the yard twice, three
23  times a day over there. And over there, it's
24  different. You can only go one time.

25    Q     Okay.

1    A    They take the canteen.  They take the
2  radio.  You can't see the TV.  That's what they
3  were doing on the administrative side -- or the
4  disciplinary side.  Excuse me.
5    Q    Okay.  So on the administrative side,
6  you --
7    A    You could see the TV --  You could see
8  the TV.  You could stand there and watch.  They'll
9  bring you the phone.  I mean, they still give you
10 the phone on the disciplinary side, so . . .
11   Q    Okay.  And what's the canteen?  I'm
12 sorry.
13   A    Canteen is commissary.
14   Q    Okay.
15   A    Just soups, just coffee, stuff like
16 that, you know what I mean?  Stuff that you can
17 still get on that administrative side.  When you
18 go on disciplinary, you can't have coffee, you
19 can't have soups.  The three meals a day that they
20 bring you is -- that's what you have.  The radio
21 that they supply, they take that from you.  So
22 that's what you don't have on the other side.
23   Q    Okay.  And the showers are in both?
24   A    Oh, showers --  You can have showers --
25 You know, if you want to shower, they will not --

1   you know, you can go to the shower.  "Hey, I need
2   to go to the shower."
3           "Okay.  Turn around, cuff up.  We'll
4   take you to the shower."
5       Q   Okay.  And in administrative
6   segregation, you're -- you're allowed to go out in
7   the --
8       A   No.
9       Q   -- the yard three times.
10      A   You --  You can go --  They have to
11  escort you.
12      Q   Yes.
13      A   There's a little --  It's a --  It's a
14  dog kennel.
15      Q   Uh-huh.
16      A   So they put you in a dog kennel.  So
17  what it is, it's just a fenced out dog kennel.
18  There's two --  That's what it really looks like.
19  It's a really big dog kennel.  So they escort
20  you handcuffed.  And they make you turn around,
21  they take the handcuffs and they just close the
22  little door like that.  They had you handcuffed
23  up, so . . .
24      Q   So you got inside?
25      A   They --  They --  They --  The guard

1   escorts you outside, yeah.

2   Q   Okay.

3   A   I don't --  They don't --  I don't go
4   outside.  I don't have --  I have to ask them to
5   take me outside, so . . .

6   Q   That's what I'm saying.

7   A   Yeah.

8   Q   But you --  Three times a day they --
9   A   Yeah, it's --  They --  They let you --
10  You know, they'll ask you, "Hey, you want to go to
11  the yard?"

12         "Yeah, take me to the yard."  And it's
13  a little -- just a little yard, just a little dog
14  kennel, so . . .

15  Q   Okay.  And --  Now, contrasting with
16  disciplinary segregation, you only go out once a
17  day?

18  A   Once a day, correct.  And it's every --
19  From what I recall, I would think it was, like,
20  once --  Like, they'll ask you in the morning, and
21  if you say no, then you can't go again.

22  Q   Okay.  Now, let's go back to
23  administrative segregation.  You mentioned your
24  canteen and you have coffee, soups, whatever.  Is
25  that stuff that you would have -- that you brought

1   anything that happened at Aurora?

2       A    I called the hotline, but there was no
3   complaints about Aurora.

4       Q    What were you calling the hotline for?

5       A    To find out what was going on with my
6   removal.

7       Q    Okay.  So you -- Where was that phone
8   located?

9       A    In the pod.

10      Q    Okay.  And was there a sign that had a
11  number where you could call?

12      A    Yes.

13      Q    All right.  And was that something --
14  available to you 24 hours a day, 7 days a week?

15      A    It was available from their times that
16  they listed.

17      Q    Okay.  And that's the only time you
18  used that hotline?

19      A    Yes.

20      Q    Why are you suing my client, The Geo
21  Group?

22      A    Because of them forcing us to work.

23      Q    Well --

24      A    To quit.

25      Q    Well, do you know whether are not they

*DEMETRIO VALERGA 10/27/2017*                              153

1  were following the policies of ICE?
2      A    As far as I knew, I thought it was
3  their policy.
4      Q    Okay.  If it was ICE policy, do you
5  still think you should be suing The Geo Group?
6      A    Yes.
7      Q    Why?
8      A    Because they were threatening us -- to
9  take us to segregation.
10     Q    But you said you didn't care.
11     A    At that point, towards the end, I
12 didn't care.  At the beginning, I did care about
13 going to segregation.
14     Q    But I thought you had already been in
15 segregation for the altercation with the other
16 detainee?
17     A    But the altercation has nothing to do
18 with me cleaning.  That was something that we --
19 me and somebody had an argument about, and we
20 started spitting on each other.  So one thing has
21 nothing to do with the other.
22     Q    I understand, but I thought the time
23 that you told me about --  The only time that
24 someone --  And you described it as a black guard,
25 heavyset, about 5 - 7, 5 - 8, told you that he

```
 1   would send you to segregation if you didn't clean
 2   your area, right?
 3        A     Correct.
 4        Q     And then ICE came in and talked to you
 5   and said, "Yeah, that's right.  You could, if you
 6   didn't get" --  And you said "I don't care."
 7        A     I didn't care at that point.
 8        Q     Okay.  And that was after you were
 9   already in segregation for the altercation,
10   correct?
11        A     Correct.
12        Q     All right.  And that was the only time
13   that that was ever said to you, right?
14        A     Yes.
15        Q     And that was --  Whatever the guard
16   told you was backed up by ICE, correct?
17        A     Yes.
18        Q     And at no time, though, were you ever
19   placed in segregation for not cleaning your area?
20        A     They put me in handcuffs and were ready
21   to take me.
22        Q     But they didn't?
23        A     No.
24        Q     All right.  And you still refused to
25   clean?
```

1   A   Yes.

2   Q   And you -- in fact, you refused to
3   clean on multiple occasions?

4   A   Towards the end when I was getting
5   ready to walk out.

6   Q   How did you know you were getting ready
7   to walk out?

8   A   Because my habeas was in the federal
9   court; that's why.

10  Q   Who told you that if your habeas was in
11  federal court, you'd be able to walk out?

12  A   When I talked to my appeals attorney,
13  after he researched the -- my habeas, he said,
14  "You're most likely going to walk" -- "you're
15  walking out."

16  Q   Did anybody tell you that was the
17  reason why you walked out?

18  A   No.  Nobody told me anything.  They
19  just -- They couldn't get their -- They couldn't
20  get their documents, and they had to let me go.

21  Q   Who couldn't get their documents?

22  A   ICE.

23  Q   What documents are you --

24  A   From the consulate.

25  Q   From . . .

1    A    The Argentine consulate.

2    Q    Okay.  What documents were they waiting
3  for?

4    A    My travel documents, my passport.

5    Q    Oh, okay.  So that's why you didn't get
6  sent back to Argentina.  You never got your
7  passport or travel documents?

8    A    Correct.

9    Q    Okay.  Going back to you suing
10 Geo Group, do you know whether or not ICE requires
11 detainees to clean at -- and not get paid for it
12 at their other centers?

13   A    Not that I'm aware of.  I don't know.

14   Q    You don't know one way or the other?

15   A    No.

16   Q    All right.  Is there anything unique
17 about Aurora processing center that you believe
18 that sets it apart from any other ICE detention or
19 processing center?

20   A    I've never been to any other processing
21 centers, so I really don't know.

22   Q    Has anybody ever told you that there's
23 something different at Aurora than any other ICE
24 manual -- ICE facility?

25   A    No.

1  questions now on redirect.  You're aware of
2  asserting two different claims in this lawsuit; is
3  that correct?
4       A     Yes.
5       Q     And what are you asserting for.  What
6  are the two things you're talking about?
7       A     The two claims we're suing is for the
8  pay and for the -- being threatened to go to
9  segregation.
10      Q     When you say "the pay," what do you
11 mean?
12      A     What we were being paid by Geo.
13      Q     And when you're talking about "being
14 paid by Geo," you're not talking about the
15 cleaning work, right?
16      A     No.
17      Q     What are you talking about?
18      A     About the $1.
19      Q     The $1 a day work program?
20      A     Yes.
21      Q     You just testified that you didn't
22 remember suing for that, right?
23      A     Yes.
24      Q     Why?
25      A     I was a little upset.

1      Q      What -- What upset you?

2      A      About Mr. Hill -- Officer Hill.

3      Q      So recounting your relationship with
4  Officer Hill kind of upset you?

5      A      Yes, it did.

6      Q      And you forgot?

7      A      To be honest with you, yes.

8      Q      Okay.  Before that, you had given
9  testimony about, shortly before you left the Geo
10 facility, refusing to clean.

11            Do you remember that?

12     A      Yes.

13     Q      Okay.  And when you refused to clean,
14 you were threatened with being sent to the hole
15 but not sent at that point; is that right?

16     A      Yes, that's correct.

17     Q      You said they cuffed you and got you
18 ready, but you didn't get sent?

19     A      They didn't send me, no.

20     Q      Before that, did you clean common
21 areas?

22     A      Yes.

23     Q      Why?

24     A      Because my cellie told me if we didn't
25 clean, we'd go to the hole.  That's when I

1   first -- first got there.

2   Q    So that's what your cellmates told you?

3   A    My cellmate told me.

4   Q    So that's how you first became aware of
5   the hole?

6   A    Yes.

7   Q    You've been in segregation?

8   A    Yes.

9   Q    Is -- Is it bad to be there?

10  A    It sucks.

11  Q    So it's something you want to avoid?

12  A    Yes.

13       MR. TURNER:  I don't think I have
14  anything further.  Thank you.

15                    EXAMINATION
16  BY MR. DEACON:

17  Q    So it was your cellmate or the cellie
18  that told you if you did not clean, then you would
19  go to segregation?

20  A    Yes.  Correct.

21  Q    Did he ever go to segregation?

22  A    No.

23  Q    And this -- When I asked you about
24  what you were suing for, and I specifically asked
25  you about the voluntary work program and being

1  paid $1 a day, you said you weren't suing for
2  that.
3           Do you recall that?
4       A    I recall that, but I was upset in the
5  same token, so . . .
6       Q    But then we took a break, and you got
7  to meet with your attorney, correct?
8       A    Correct.
9       Q    And then you came in, and now you're
10 saying you're suing over the pay?
11      A    Yes.
12      Q    But you knew when you signed up for
13 that that you were only going to be paid $1 a day,
14 correct?
15      A    Correct.
16      Q    And you signed up for that, and you
17 didn't have to do it if you didn't want to, right?
18      A    Correct.
19      Q    And if you decided you didn't want --
20 you did it for a week and you decided, "You know
21 what?  I'm not going to do this anymore," you
22 didn't have to, did you?
23      A    No.
24      Q    All right.  And you were told that the
25 maximum you'd get was $1 a day, correct?

```
 1   STATE OF COLORADO)
 2                   )ss.    REPORTER'S CERTIFICATE
 3   COUNTY OF DENVER )
 4         I, Tracy L. Harris, do hereby certify that I
 5   am a Certified Realtime Reporter, Registered Merit
 6   Reporter, and Notary Public within the State of
 7   Colorado; that previous to the commencement of the
 8   examination, the deponent was duly sworn to
 9   testify to the truth.
10         I further certify that this deposition was
11   taken in shorthand by me at the time and place
12   herein set forth, that it was thereafter reduced
13   to typewritten form, and that the foregoing
14   constitutes a true and correct transcript.
15         I further certify that I am not related to,
16   employed by, nor of counsel for any of the parties
17   or attorneys herein, nor otherwise interested in
18   the result of the within action.
19         In witness whereof, I have affixed my
20   signature this 7th day of November, 2017.
21         My commission expires July 30, 2021.
22
23
                     _____
24                   Tracy L. Harris, CRR, RMR, RPR
                     216 - 16th Street, Suite 600
25                   Denver, Colorado  80202
```