# Exhibit 19

1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 1:14-cv-02887-JLK-MEH
3    _____

4                  VIDEOTAPE DEPOSITION OF:
              STUART GRASSIAN, M.D. - July 23, 2020
5                    Via RemoteDepoTM
              (Confidential Designations Pending)
6    _____

7    ALEJANDRO MENOCAL, MARCOS BRAMBILA,
     GRISEL XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA,
8    JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO VIZGUERRA,
     and DEMETRIO VALERGA, on their own and on behalf of
9    all others similarly situated,

10   Plaintiffs,

11   v.

12   THE GEO GROUP, INC.,

13   Defendant.

14   _____

15           PURSUANT TO NOTICE, the videotape
     deposition of STUART GRASSIAN, M.D., was taken on
16   behalf of the Defendant in Middlesex County,
     Massachusetts, on July 23, 2020, at 3:33 p.m. GMT,
17   9:33 a.m. MDT, before Tracy C. Masuga, Registered
     Professional Reporter, Certified Realtime Reporter,
18   and Notary Public within Colorado appearing remotely
     from Arapahoe County, Colorado.

19

20

21

22

23

24

25

1    **ways:  It indicates both the rates of self-harm in**

2    **segregation, but also indicates that self-harm is**

3    **present outside of solitary confinement; is that**

4    **correct?**

5          A.    Yeah.  I mean, certainly it's no

6    surprise that there's a certain incidence of

7    self-harming behavior that occurs in any population.

8    But when you -- this paragraph speaks to the fact that

9    the stress of solitary confinement creates a risk

10   that's seven or eight times as great as it is for

11   those who have not been housed in solitary.

12         **Q.    Okay.**

13         A.    But I can't -- it doesn't help you to

14   know whether the incidence of self-harming behavior in

15   the general population in a prison is greater than the

16   incidence for that population when they're not in

17   prison.  We don't have any information about that.

18         **Q.    But this study does say that -- it**

19   **conducted a study, and there are individuals who**

20   **commit self-harm in general population, correct?**

21         A.    Right.  Of course.  I mean, there are

22   individuals who commit self-harming behavior in

23   general population.  There are people who commit

24   self-harming behavior out in the community.  We know

25   that, of course.

1        Q.    And there are individuals in segregation

2    who do not commit self-harm?

3        A.    Absolutely.

4        Q.    Okay.  So is it fair to say that each

5    individual's reaction to segregation is different?

6            MS. DEMPSEY:  Object to form.

7        A.    Certainly some people are far more

8    severely affected by solitary than others.  However,

9    there's a certain baseline of psychiatric harm that's

10   associated with being in the condition.  But there is

11   significant difference.  I mean, some people tolerate

12   it and do not engage in self-harming behavior or

13   become psychotic, certainly.

14       Q.    (BY MS. SCHEFFEY)  All right.  And then

15   I'm going to turn to page 19 of the report, which, for

16   the record, is P00004079.

17       A.    Okay.

18       Q.    So there it states, "[Even after] a few

19   days of confinement," do you see that, "of solitary

20   confinement"?

21       A.    Yes.

22       Q.    "The brain wave (EEG) demonstrates an

23   exaggerated response to external stimuli."  Did I read

24   that correctly?

25       A.    Yes, you did.

1          Q.    And footnote 29 appears at the end of

2    that sentence, correct?

3          A.    Yes.

4          Q.    And in footnote 29 you cite an article

5    called "Changes in EEG alpha frequency and response

6    latency during solitary confinement"; is that correct?

7          A.    Yes, I do.  Yes.

8          Q.    How long were the individuals in

9    segregation in the study cited in footnote 29?

10         A.    Well, footnote 29 follows the statement

11   "After even a few days of solitary

12   confinement . . . ."  So I don't know, as I sit

13   here -- I mean, Gend- -- this was a study by Gendreau.

14   So you have the baseline EEG, and then at a certain

15   period of time -- I don't know how many days -- they

16   did another EEG and showed this exaggerated response

17   to external stimuli.  I don't remember, as I sit here,

18   how many days that was before they did that second

19   EEG.

20         Q.    Would it refresh your recollection if

21   you had the study in front of you?

22         A.    I rather would -- I mean, I certainly

23   could read the -- if I had the study in front of me, I

24   could find out how many days it was before they did

25   that second study, second EEG study, of course.

```
 1          A.   I'm sorry?

 2          Q.   Sitting here today, what opinion is

 3   it -- are you offering in this case?

 4          A.   I think the report speaks for itself.

 5   If you have a specific question in mind about it, but

 6   the opinion I offer in this case is my report.  I'm

 7   not sure what to say beyond that.

 8          Q.   Okay.  So assume that the report was not

 9   in front of me.  What is your opinion in this case?

10          A.   I'm going to -- I mean, you know, I'm

11   going to end up reading to you the Conclusions section

12   of this document.

13          Q.   You've testified before in cases at

14   trial, correct?

15          A.   Sure.

16          Q.   And in those cases, you did not have

17   your report in front of you when you testified?

18          A.   Generally not, no, but I would have, of

19   course, preferred to have it in front of me, but I

20   don't think I've ever been asked, "Well, what is your

21   opinion in this case?"  That's much too broad a

22   question.  I would be asked very specific questions.

23          Q.   So you --

24          A.   So if you have specific questions, I

25   mean -- you know, if you look at the Conclusions
```

1    section of my report, it starts with "solitary

2    confinement is a very harsh, psychiatrically toxic

3    form of punishment."

4        **Q.   Okay.  So starting with that, is that**

5    **your opinion in this case that all forms of solitary**

6    **confinement are a harsh form of punishment?**

7            MS. DEMPSEY:  Objection to form.

8        A.   You said "all forms of solitary

9    confinement"?

10       **Q.   (BY MS. SCHEFFEY)  Uh-huh.**

11       A.   I'm not sure what you mean by "all

12   forms."  But in general, solitary confinement is a

13   very harsh, psychiatrically toxic form of punishment.

14       **Q.   Okay.  So the opinion you're offering in**

15   **this case is that solitary punishment is a harsh form**

16   **of psychiatric punishment; is that correct?**

17       A.   It's --

18           MS. DEMPSEY:  Object to form.

19       A.   It's harsh and psychiatrically toxic, is

20   the way I put it.

21       **Q.   (BY MS. SCHEFFEY)  Are there any other**

22   **opinions you're providing in this case?**

23       A.   Yeah.  The threat of solitary was

24   extremely coercive and frightening for the -- for

25   them, for the detainees, and not less for those who

1    had not experienced it.  Then I go on --

2        Q.   And so then just to -- I'm sorry.  Go

3    ahead.

4             MS. DEMPSEY:  Please let him finish.

5        Q.   (BY MS. SCHEFFEY) Go ahead,

6    Mr. Grassian.  I'm sorry.

7        A.   Then I go on to describe the fear that

8    people had of being sent to -- what they described as

9    "the hole."  And I also go on to talk about that sense

10   of learned helplessness, the lack of a sense of

11   personal agency that these individuals had.  The

12   context of being in the detention facility with the

13   fear of deportation, you're really creating tremendous

14   vulnerability here to a coercive effect of the threat

15   of solitary.  So I think those are -- yeah, those are

16   the --

17       Q.   Was it your opinion that the threat of

18   solitary confinement is extremely coercive and

19   frightening as to the detainees you interviewed or as

20   to all detainees?

21            MS. DEMPSEY:  Object to form.

22       A.   It's my conclusion that the description

23   that I had of the detainees whom I interviewed

24   strongly leads to a conclusion that this was a very

25   coercive situation for them and would have been for

1   can affect brain function, and I'm pretty certain

2   there -- yeah, there are studies that have indicated

3   that there's brain damage associated with chronic

4   stress, especially changes in the hippocampus.

5            Q.   And how many years were the individuals

6   in solitary confinement in those studies?

7            A.   Those were not solitary confinement

8   studies.

9            Q.   Okay.  So those didn't have anything to

10  do with solitary confinement?

11           A.   That's not -- no, I mean it's --

12           MS. DEMPSEY:  Object to form.

13           A.   That's not -- to correct, what we're

14  talking about here is chronic stress.  Now, we know

15  that solitary confinement is a very stressful

16  situation.

17           But if you're asking a corollary

18  question, which is, do I think that three days of

19  solitary confinement is likely to cause permanent

20  brain damage or shrinkage of the hippocampus, I doubt

21  it.

22           Q.   (BY MS. SCHEFFEY)  Okay.  Is it your

23  position that the duration of segregation impacts the

24  psychological effects on an individual in solitary

25  confinement?

1          MS. DEMPSEY:  Object to form.

2          A.    People can become symptomatic very

3     quickly; others become -- tolerate conditions for long

4     periods of time without becoming overtly ill.  So it's

5     certainly variable.  In general, the prolonged -- the

6     further prolongation, the longer the period in

7     solitary confinement, the more likely it is that

8     people are going to become quite -- quite ill.

9          Q.    (BY MS. SCHEFFEY)  Okay.  Would you say

10    that if someone is confined in segregation for three

11    days, the psychological impact is the same as someone

12    who is confined in segregation for five years?

13         A.    Well, generally, I think a person who is

14    in solitary confinement for three days would not have

15    as -- nearly as severe an impact as if they were in

16    solitary confinement for five years, but this again

17    would depend on the individual.

18         Q.    Okay.  So there -- in your opinion, it

19    would be better if someone was taken out after three

20    days than after five years?

21         A.    Yes.

22         MS. DEMPSEY:  Object to form.

23         Q.    (BY MS. SCHEFFEY)  So duration plays

24    into the severity of the mental response or

25    psychological response?

 1          MS. DEMPSEY:  Object to form.

 2      A.   Many -- there are individuals who become

 3  quite ill quite quickly, and other individuals who can

 4  tolerate three days of solitary confinement with

 5  less -- less damage being done.

 6      **Q.   (BY MS. SCHEFFEY)  Okay.  So I know**

 7  **there's a lot of citations in this report.  To your**

 8  **knowledge, do any of these studies involve a nonpenal**

 9  **atmosphere?**

10          MS. DEMPSEY:  Object to form.

11      A.   I don't know.  I mean, we just talked

12  about Dr. Akil's work, and, of course, that was a

13  nonpenal atmosphere.  That was a report about animal

14  studies.  So I don't know.

15          But in any event, I incorporate, I

16  believe, into this report my Washington University

17  study article, which describes a lot of conditions

18  of -- of restricted environmental stimulation that

19  aren't penal in nature.

20      **Q.   (BY MS. SCHEFFEY)  Right.  So some of**

21  **those -- if I'm remembering correctly, one of those is**

22  **prisoners of war; is that correct?**

23      A.   That's one of them.  I mean, that's

24  certainly a penal situation of an extreme sort.  But

25  it also describes other situations which are -- don't

1   patients -- on these people.

2       Q.   Okay.  And you aren't -- do you know if

3   these de- -- six to eight detainees' demographics are

4   representative of the larger class?

5            MS. DEMPSEY:  Object to form.

6       A.   Again, I don't know.  My effort was to

7   try to get a sense, a feeling for what the place was

8   like, what it was, you know, like to be there, and

9   that's why I spoke to those detainees.  But I did not

10  make diagnoses of those detainees or extrapolate to

11  others.

12      Q.   (BY MS. SCHEFFEY)  Okay.  So your report

13  does not attempt to extrapolate to others; is that

14  correct?

15      A.   No, the --

16           MS. DEMPSEY:  Objection, form.

17      A.   No, the report does.  The report talks

18  about what it -- the experience was like, what it was

19  like to be there.  But it certainly does not attempt

20  to talk about what kind of psychiatric harm was done

21  to one individual or another.  I don't make diagnoses

22  in my report, but I -- what I do describe, try to

23  bring to life, is what the experience was like being

24  there.

25      Q.   (BY MS. SCHEFFEY)  Okay.  But did you --

1    did you make any attempt to validate the questions you

2    asked to ensure they could be extrapolated to a larger

3    population?

4              MS. DEMPSEY:  Object to form.

5         A.    Again, the -- the information I obtained

6    from the interviews had to do with what the experience

7    was like to be in that setting.  It was not an attempt

8    at making a psychiatric diagnosis.

9         Q.    (BY MS. SCHEFFEY)  Do you know if the

10   experiences of the individuals you interviewed are

11   representative of the larger class?

12        A.    Well --

13             MS. DEMPSEY:  Object to form.

14        A.    -- the experiences that they had were

15   actually somewhat variable.  They weren't all the

16   same.  And it does seem that, you know, some of the --

17   I mean, I gather that things changed over time, and --

18   you know, like the whole thing about whether a person

19   could be forced to do the involuntary labor even if

20   they were in the Voluntary Work Program, that seemed

21   to change over time.

22             So my effort in evaluating -- or in

23   interviewing those people was to get some overall

24   sense of what it was like there, but I am perfectly

25   aware that things were not uniform.  Not everyone

 1    experienced the same thing; that, you know, there were

 2    different staff involved, you know, over different

 3    years.  So -- you know, so I don't try to go beyond

 4    that.

 5           Q.   (BY MS. SCHEFFEY)  So you're not trying

 6    to extrapolate the six individuals' experiences to the

 7    population of 30,000, then?

 8           A.   I --

 9           MS. DEMPSEY:  Object to form.

10           A.   I think that their experience of the

11    place is pretty representative, and there's a lot of

12    typicality to it in -- you know, that they described.

13    I mean, I was asking about their experience of this

14    work program and things of that sort.

15           And my understanding is that this

16    expectation, this requirement that people work to

17    clean the place was pretty uniform.  I mean, that

18    occurred during the whole period of time that this

19    lawsuit was involved with.

20           Q.   (BY MS. SCHEFFEY)  Do you have any

21    theory or piece of literature that would support your

22    extrapolation of six individuals' experiences, based

23    upon the interviews you conducted, to a population of

24    30,000 individuals in a scientifically valid way?

25           MS. DEMPSEY:  Object to form.  Asked and

1    answered.

2          A.    This is not a scientific study.  My --

3    my opinions in this case have to do with the

4    coercive -- the nature of the -- of the punishment

5    that was being threatened and how people experienced

6    it, how people experienced that threat.  So that's all

7    that it -- that it was.  It wasn't an attempt at some

8    exhaustive analysis of how everyone fared at that

9    place.

10         **Q.    (BY MS. SCHEFFEY)  Okay.  Do any of the**

11   **studies in your report reference or discuss the threat**

12   **of segregation as opposed to the actual imposition of**

13   **it as a sanction?**

14         MS. DEMPSEY:  Object to form.

15         A.    The studies that I cite and my own

16   studies are not about the threat of segregation.  They

17   are about the actual experience of segregation.  So

18   that -- in that sense, this is different.  This is --

19   for most of these people, it was simply the threat.

20   And some of these people had -- didn't really know

21   anyone who had been in segregation.  Others knew

22   people who were and had, you know, bad reactions to

23   it, et cetera.  So, no, I mean, this -- my own studies

24   and this -- the literature is about the effects of

25   segregation, not the --

1    and created by the demand that they clean

2    involuntarily or be faced with the hole, and that's

3    what I end up concluding.

4        Q.   (BY MS. SCHEFFEY)  But do you address

5    how -- the fact that most detainees said that it was a

6    small number of guards who were bad in your

7    conclusions?

8            MS. DEMPSEY:  Object to form.

9        A.   First of all, it doesn't take a lot of

10   bad guards if they have all the power.  But I don't

11   know how -- what percentage of all the detainees felt

12   what percentage of the guards were bad and what

13   percentage were good to them.  I don't have that

14   information.

15       Q.   (BY MS. SCHEFFEY)  Have you ever

16   provided testimony for a case where you found that the

17   use of segregation was appropriate?

18       A.   That's not -- that's not for me to say

19   whether it's appropriate.  All I can talk about is the

20   psychiatric effects of solitary confinement and -- and

21   in this particular case, whether the threat of being

22   placed in solitary confinement is a meaningful

23   punishment, is a fearful punishment.  And, you know,

24   so that's what my report centers on.

25       Q.   Have you ever commented on a set of

1   **facts where you concluded that segregation did not**

2   **lead to psychiatric harm?**

3           A.   I think that, at best, people in

4   segregation, people in solitary suffer from it.  But

5   whether it causes them to become psychiatrically ill,

6   I do -- I have not concluded that every inmate --

7   every person who goes into solitary confinement

8   becomes psychiatrically ill.

9           And I've so stated, actually.  If you

10  look at my testimony in the Madrid case, I actually

11  have a certain percentage of the people -- I can't

12  remember how many -- who I did not feel became

13  psychiatrically ill as a result, but they suffered.

14          Q.   **Have you ever provided testimony on a**

15  **set of facts where you concluded that an individual**

16  **did not suffer in solitary confinement?**

17          A.   I'm sorry.  Did I ever testify about a

18  case in which I found an individual did not suffer?

19          Q.   **While in solitary confinement, correct.**

20          A.   I mean, by design, I mean, you're taking

21  away privileges; you're taking away opportunities.  Of

22  course people suffer.  That wouldn't really make any

23  sense.  That's the whole point of, you know, solitary

24  confinement.

25          MS. SCHEFFEY:  Okay.  I think I am done.

1    I just need about two minutes.  Do you want a

2    two-minute break, Rachel?  And then we'll be done,

3    unless you have recross.

4              MS. DEMPSEY:  We can take a quick break.

5    I do also have some questions.

6              MS. SCHEFFEY:  Okay.

7              THE VIDEOGRAPHER:  The time is

8    10:55 p.m. GMT time, 4:55 p.m. Mountain Time, and we

9    are off the record.

10              (Recess taken, 10:55 p.m. to 11:04 p.m.

11    GMT; 4:55 p.m. to 5:04 p.m. MDT.)

12              THE VIDEOGRAPHER:  The time is

13    11:04 p.m. GMT time, 5:04 p.m. Mountain Time, and we

14    are back on the record.

15         **Q.   (BY MS. SCHEFFEY)  Mr. Grassian, I was**

16    **finishing up my questioning.  During the break did you**

17    **talk to Ms. Dempsey?**

18         A.   No.

19         **Q.   Do you know what the PBNDS are?**

20         A.   The what?  I'm sorry.

21         **Q.   The PBNDS.**

22         A.   No.

23              MS. SCHEFFEY:  Okay.  No further

24    questions.

25

U.S. LEGAL SUPPORT, INC
303-832-5966

1          A.   I don't think one could conclusively

2     predict that, no.

3          Q.   (BY MS. DEMPSEY)  Okay.  There's also

4     been some discussion about the circumstances of

5     solitary confinement at the Aurora facility.  And I

6     wanted to know, does solitary confinement in the -- in

7     prisons typically involve 24 hours of cell time?

8          MS. SCHEFFEY:  Object to form,

9     foundation.

10         A.   No, usually not.  I mean, solitary

11    confinement conditions vary significantly -- you know,

12    vary a fair amount, but it would be very atypical for

13    a person not to have some time outside of the cell.

14         Q.   (BY MS. DEMPSEY)  Is it typical for

15    people in solitary confinement to have one or two

16    hours a day outside of their cells?

17         A.   That's -- that's typical.

18         Q.   Okay.  And you didn't see -- let's see.

19         Oh, there was one piece of testimony I

20    wanted to clarify.  Is it your understanding that the

21    solitary cells in Aurora have no windows to the

22    outside world?

23         MS. SCHEFFEY:  Object to form.

24         A.   That was my understanding, yes.

25         Q.   (BY MS. DEMPSEY)  Okay.  Is it your

1    understanding -- do you have an understanding of

2    whether the recreation area in Aurora has -- with --

3    the solitary recreation area in Aurora has exposure to

4    the outside world?

5            MS. SCHEFFEY:  Object to form.

6        A.   My unders- -- my understanding is that

7    it is an outdoor -- an outdoor kind of dog kennel kind

8    of facility that probably was a heavy chain-link fence

9    or something of that sort.

10           Q.   (BY MS. DEMPSEY)  Okay.  And have you --

11   you haven't seen images of solitary -- the solitary

12   confinement wing at Aurora; is that right?

13           MS. SCHEFFEY:  Object to form.

14       A.   No, I have not.

15           Q.   (BY MS. DEMPSEY)  Have you seen images

16   of the general population at Aurora?

17       A.   Yes.

18           Q.   And what was your impression of those

19   facilities?

20       A.   Well, I was surprised that the -- the

21   detainees, the male detainees, were housed in these

22   four-bedded small cells that didn't have -- that

23   didn't have windows in them to the outside world, and

24   were bunk beds.  So there was very little in the way

25   of any kind of privacy, very tight quarters, and there

1    was one toilet and a sink combination in that -- in

2    that cell.

3              And then outside of the cell were all

4    these tables, so there wasn't a lot of room to move

5    around.  You know, so I -- it was a very tight space,

6    much more -- much tighter than you would usually see

7    in a prison, for example.

8              And then between two pods, there was a

9    fairly narrow recreation area that one pod could go to

10   at a time.  And I remember one of the detainees said

11   something about only a few people could play

12   basketball.  There was a basketball hoop, I guess.  I

13   don't remember seeing that.  But it was a relatively

14   small area, it seemed, for all those people who were

15   in the pod.

16             So compared with general population

17   settings in prisons, it was much more restrictive and

18   tighter than I would have anticipated.

19        **Q.   Okay.  The last question that I have is**

20   **just about the -- about clinical interviews as a mode**

21   **of study.  And my question is just what -- what are**

22   **you looking for -- what -- what -- what does a**

23   **psychiatrist look for in conducting clinical**

24   **interviews?**

25             MS. SCHEFFEY:  Object to form.

1         A.    Well, when you're interviewing somebody,

2    you're getting information from them.  You're asking

3    them questions.  But at the same time that you're

4    doing that, you're observing their reaction, the way

5    their -- their expression, their affect, whether

6    they're being defensive, angry at your inquiry, or how

7    they're responding to the -- to the process itself.

8         So at the same time that you're

9    developing information, you're also doing what's the

10   psychiatric equivalent of a physical exam.  You're --

11   you're seeing the person's mental state in front of

12   you and their relationship -- the relationship of what

13   they're saying to how they're feeling and what they're

14   experiencing at the time.

15        **Q.    (BY MS. DEMPSEY)  And is that process a**

16   **generally accepted mode of analysis in the psychiatric**

17   **community?**

18             MS. SCHEFFEY:  Object to form.

19        A.    It's generally what psychiatrists do.

20             MS. DEMPSEY:  Thank you.  I don't have

21   any further questions.  There's a couple of parts

22   of -- we want to designate it confidential.

23             MS. SCHEFFEY:  I have two more,

24   Rachel --

25             MS. DEMPSEY:  Oh, go ahead.

```
 1              MS. SCHEFFEY:  -- for cross.  Okay.

 2                        EXAMINATION

 3  BY MS. SCHEFFEY:

 4        Q.    So you just spoke about how you looked

 5  at pictures of the Aurora facility, correct?

 6        A.    Yes.

 7        Q.    And your interpretation -- your opinion

 8  was that it was tighter than prisons; is that correct?

 9        A.    Yeah.  Prison general population, yeah.

10        Q.    How many square feet is the average

11  prison?

12              MS. DEMPSEY:  Object to form.

13        A.    What I can tell you is what prisons look

14  like, you know.  If you look at general population

15  areas, there are these very large open spaces where

16  people can congregate and -- you know, separate from

17  the cells themselves.

18              And the Aurora facility schematic,

19  actually, will show you that these tables in this area

20  are so tight that, you know, you can't, like -- you

21  can't move around a lot.  The recreation area is

22  really quite small compared with -- I mean, if you

23  look at a general population setting in a prison, you

24  know, people can go out and run and do stuff and --

25        Q.    (BY MS. SCHEFFEY)  How many square
```

1    feet --

2              A.    It's designed to allow people to have

3    some avenue for mobility, for -- and the Aurora

4    facility seems like it's more designed to be a

5    facility that would not house people for any extended

6    period of time at all because it's just so tight.

7              Q.    Are you aware that there are federal

8    prisoners in the Aurora facility?

9              A.    I was aware of that, yeah.  I don't know

10   much about it, but I just was aware of that.

11             Q.    Are you aware that they're kept in the

12   same size pod as the ICE detainees?

13             A.    I assume so.

14             Q.    When you're making the determination

15   that -- that the prisons are tighter than the ICE

16   facilities [sic], did you look at the schematics of a

17   prison and compare them to Aurora?

18             A.    I've seen many schematics of prisons,

19   and I've been -- of course, I've actually toured

20   prisons, a number of prisons.  And as I said, the

21   Aurora facility is much tighter than --

22             Q.    Have you ever toured the Aurora facility

23   in person?

24             A.    No.

25             Q.    Did you compare the square footage at

1    the Aurora facility to the schematics and the square

2    footage at a prison?

3            A.    No, I didn't do that.  I looked at the

4    schematics at the Aurora facility.  I have looked at

5    schematics of prisons, and I've -- as I said, I've

6    actually toured prisons and general population areas

7    that really don't have the tightness that you said --

8    you see here.

9            Q.    Are the size of prisons set by National

10   Detention Standards, to your knowledge?

11           A.    I don't know that.

12           Q.    Are you aware of the ACA standards?

13           A.    Regarding how many square feet a

14   prisoner should have?

15           Q.    Yes.

16           A.    I'm aware there are standards.  I don't

17   specifically know what they are.

18           Q.    Okay.  Did you know that the same ACA

19   standards apply to ICE facilities?

20           A.    I would assume so.

21           Q.    You also mentioned that the -- you

22   discussed the conditions in solitary confinement in a

23   number of prisons.  Can you list the prisons you were

24   discussing when you detailed those conditions?

25           A.    No.  I mean, I -- I have toured a number

1    of prisons and written about or testified about a

2    number of different prison settings.  It's -- I mean,

3    you know, you have to go back -- like we could look at

4    my testimony list and I could tell you about the

5    prisons that were involved, but there's -- there's

6    quite a number.

7         **Q.   Can you name even one prison that you're**

8    **familiar with the conditions of confinement for?**

9         A.   Well, sure.  I mean, I just mentioned,

10   for example, during the deposition, the Red Onion

11   facility, the Pelican Bay facility.  But there's so

12   many.  I mean, you know, facilities in New York state,

13   even -- well, there's -- I mean, God, there's so many.

14   Shirley facility in Massachusetts, Walpole facility in

15   Massachusetts, Attica, Sing Sing in New York, Auburn.

16   I mean, there's just a lot.

17        **Q.   And sitting here today, you know all of**

18   **the conditions of confinement and solitary confinement**

19   **at those locations?**

20             MS. DEMPSEY:  Object to form.

21        A.   Can I -- can I recite the conditions of

22   confinement in each and every one of those?

23        **Q.   (BY MS. SCHEFFEY)  Yes.**

24        A.   Of course not.

25        **Q.   Are you aware of them generally?**

1          A.    I'm not sure what your question is.

2    There is -- I testified here that there are

3    variations; that some are harsher than others.  And I

4    can give you, you know, a sense of that variation, but

5    to -- you know, to be able to tell you exactly which

6    facility had which physical properties and which

7    administrative properties, I don't have that level of

8    knowledge of detail.  You know, I would have to go

9    back and look at my own reports.

**10          Q.    Okay.  And then my last question is now,**

**11   Ms. Dempsey just mentioned clinical analyses.  You**

**12   didn't perform a clinical analysis in this case, did**

**13   you?**

14         A.    She did not mention clinical analysis.

15   She asked about clinical observation.

16             And a psychiatrist is always -- when a

17   psychiatrist is involved in his work, he's always

18   observing as he's getting information.  He's doing a

19   clinical observation.  He's watching what -- how

20   people are interacting with them or how they're

21   reacting.  So that's intrinsic to any psychiatrist's

22   work.

23             MS. SCHEFFEY:  Okay.  No further

24   questions.

25             MS. DEMPSEY:  So we would like to flag

```
 1              REPORTER'S CERTIFICATE

 2  STATE OF COLORADO        )
                             )   ss.
 3  ARAPAHOE COUNTY          )

 4
              I, TRACY C. MASUGA, Registered
 5  Professional Reporter, Certified Realtime Reporter,
    and Notary Public 19924005553, State of Colorado, do
 6  hereby certify that previous to the commencement of
    the examination, the said STUART GRASSIAN, M.D.,
 7  declared his testimony in this matter is under penalty
    of perjury; that the said examination was taken in
 8  machine shorthand by me remotely and was thereafter
    reduced to typewritten form; that the foregoing is a
 9  true transcript of the questions asked, testimony
    given, and proceedings had.
10
              I further certify that I am not employed
11  by, related to, nor of counsel for any of the parties
    herein, nor otherwise interested in the outcome of
12  this litigation.

13            IN WITNESS WHEREOF, I have affixed my
    signature this 28th day of July, 2020.
14
              My commission expires April 24, 2024.
15

16  __X__ Reading and Signing was requested.

17  _____ Reading and Signing was waived.

18  _____ Reading and Signing is not required.

19

20

21  _____
    Tracy C. Masuga
22  Registered Professional Reporter
    Certified Realtime Reporter
23

24

25
```