# Exhibit 20

**Media File Name:** 2017-11-15 10th Cir. Hearing Audio.mp3
**Media File ID:** 2613201
**Media Duration:** 33:17
**Order Number:** 1914757
**Date Ordered:** 2017-12-12



Transcription by Speechpad
www.speechpad.com
Support questions: support@speechpad.com
Sales questions: sales@speechpad.com

Judge: Versus the GEO Group numbers 17-1125. Counsel, you may proceed.

Mark: Good morning, and may I please the court. My name is Mark Emery. I'm here on behalf of the GEO Group. I'd like to dive right in and go to the heart of what I think this appeal is about , and the reason why I think that the class certification order, it cannot stand, that it's TVPA predominance.

This is rule 23 of the most demanding standard, yet it's precisely the standard in which the district court indulged the most expansive presumptions and in inferences. I'd like to walk through why I think it's an abuse of discretion, but I wanna make one very quick note first on the posture of the case here. GEO does not traffic anyone to the Aurora facility.

Every single detainee at the Aurora facility is there for one reason and one reason only. That's because, ISIS, the federal agency has put them there. They're in the custody of the United States government. Because they're there in U.S. custody, they're housed under ISIS' detention rules. Those rules explicitly hold out that disciplinary segregation can be used as a sanction for their refusal to work.

So we've taken a position. We understand the merits issue that the TVPA does not apply here. So for purposes of this appeal, we are assuming the disciplinary, just assuming for the sake of argument that disciplinary segregation could be an offense that's actionable under the TVPA. As such, it is not fit for class-wide resolution.

The TVPA and I'm going from the courts, the variance insightful analysis and the signal case. The TVPA demands that the defendants conduct is the driving force in any plaintiff's decision to work. In other words, the TVPA does not override consent, the TVPA permits in every single instance an analysis of whether a plaintiff actually consented to the action, and whether there's actually a TVPA violation.

Judge: Which case did you just mention?

Mark: A signal versus David, it's a district court from Louisiana.

Judge: David?

Mark: Mm-hmm. Mm. Okay. So the TVPA does not override consent.

What's necessary to show a TVPA violation is that the defendants took an action that caused labor by means of some action that violated the TVPA.

Judge: If there is some evidence that would permit but not require a class-wide inference of causation, would that be within a district judge's discretion on the predominance factor to conclude that the class issues predominate over individualized issues?

Mark: Your Honor, courts have been, including this court, have been very begrudging with using any kind of inferences or permitting inferences, and I point the court particularly to the XDO energy case.

Judge: Well, what about NRay [SP], your thing, litigation? There were localized issues, but this court sustained class certification even though they were individualized issues because there was a permissible class-wide inference.

Mark: There was an inference regarding the time, for example, for dining and docking equipment, but that's something that this...

Judge: That's much of [SP] your thing, litigation, that's the Tyson Foods case.

Mark: Oh, sorry. I'm sorry. Oh, price fixing, that's, that right, and you're at the end. Right. We were talking about price fixing, and there the court had very specific reasons for why the individualized issues, for example, negotiations, you know, relying on extensive prior case law that we don't have here, negated, you know, permitted an inference and didn't negate it through the individualized instances.

But XTO is a much more similar case. The court essentially asked for the pricing mechanism in the case to be...to play the part of what the, what the plaintiff asserted the standard uniform policy here, and the court didn't accept that. The court said that, "You need to show that in the...that the 430-some contracts, there are a number of different well scenarios, and you need to look at each one of those." They're individualized instances, and the court refused to extend an inference in that case.

Female: But here we have a uniform policy. We have uniform conditions of confinement, and we have uniform penalties for not working, right?

Transcription by www.speechpad.com                            Page **3** of **16**

Mark: Your Honor, I would disagree with that characterization, and here's why. It's very important to understand the context of what happens in a detention facility. Okay. We have up to 500 some detainees that are in the facility at any given time. They live in a communal manner, they take meals together, they watch TV together, they co-recreation together.

It's necessary to sustain life, what you're doing from day-to-day. So ISIS policy has set forth what the housekeeping policy that describes why house, why detainees, should be a part of a regular housekeeping program as well as the Voluntary Work Program. There are all kinds of reasons that detainees could choose to work that would not result from the disciplinary segregation sanction that's in the policy, and we've identified some of these.

Female: In CGC Holding, there were probably all kinds of reasons why someone would or wouldn't rely on statements from a bank. But this court said that you could...that it was appropriate to treat it as a class-wide issue because it was fairly easy to infer from the general facts there that people would not have entered into a loan that the lender never had any intention of funding.

Oddly, similar here that there's an inference. It's very easy to be made here, that when the people were detained and they're under a policy where they can be disciplined, including in isolation segregation, that they worked because they didn't want to be punished.

Mark: It wasn't easy inference in NCVC, but it's not here. There was a simple matter of whether you can infer that people don't wanna be, you know, the subject of misrepresentation. Here, it's a very human calculus. We're talking about detainees who say in the house keeping program, might be put on a list of six to clean once a week or something like that. They make a decision each time whether they're going to consent to work or not.

Judge: Or eat, or be put in isolation, right? I mean, yeah, it's, I mean, slaves had a choice, right?

Mark: Your Honor, there's no slavery happening here. We're talking about...

Judge: Well, but your point, and I'm not trying to argue with you, but your point in answering judgment queue [SP] is, "Well, they had a choice."

Well, the sanitation policy didn't give them a choice. Now, they might have had a choice whether we're gonna face the consequences of violating sanitation policy, but that sanitation policy, would you agree was mandatory?

Mark: No, the sanitation, the sanitation policy is something that, yes, all detainees are subject to. However, what we're talking about the end of the day is whether these plaintiffs are entitled to damages in a court, whether a court is gonna order GEO to pay damages for it. If this...if any of these...

Judge: That might be later down the road on the merit.

Mark: No, Your Honor...

Judge: You know, I think you started about talking about predominance, and so with predominance, you know, how does their entitlement eventually do damages relate to whether or not the sanitation policy was mandatory, and if it was mandatory, how that's not under CGC Holdings, does that create a permissible class-wide inference?

Mark: No, the inference that the district court jury here was really unaccepted. Well, I mean, it supposed that there was [crosstalk 00:08:46].

Judge: Can I just jump in?

Mark: Sure.

Judge: I don't think it was the district court that drew the actual inference. The district court said a jury could draw an inference. Am I missing something there?

Mark: That's fair, Your Honor. That's [inaudible 00:09:00], yes. But what I wanna draw attention to is that if any of the named plaintiffs, in this case, and this is highly relevant to class certification, if any of the named plaintiffs in this case were to take their claims to trial individually, that trial would be entirely about on what particular instance they worked. And whether they consented to work, or whether they did it for reasons or because of the disciplinary segregation. Take a look at the declarations, the record here is very weak.

Judge: Let me answer for off of the record. Is there anything in the

record that suggests the existence of an individualized proof that some of the detainees work for reasons other than the policy, anything in the record?

Mark: Yes, Your Honor. I point to two things. One is a fairly brief one. On page 43 of the appendix, the 30(b)(6) deponent for GEO, there's an experience administrator of the facility explains that sometimes detainees are engaged in housekeeping activities simply because they wanna pass time, they want something to do. If that's true, and if that's why a detainee performed housekeeping chores on any particular time...

Judge: But that was no reason why that in reference, though, to those who'd been selected under the policy?

Mark: Yes, I believe it was, Your Honor. The second thing I would point to would be the declarations on the records submitted by the named plaintiffs and by the class...and other class members. Take a close look at these declarations because every one of them contain two paragraphs. One is the paragraph that says, "I performed housekeeping chores because I didn't wanna get put in disciplinary segregation."

The second paragraph says, "I volunteered to work one or more jobs in the Volunteer Work Program." Does that make sense? Does that make sense that the same detainees would be volunteering to step up and work a variety of jobs, in food service and laundry for $1 a day, but yet at the same time say that they only performed occasional housekeeping chores that they...

Judge: But they're different programs.

Mark: I'm sorry.

Judge: They're different programs.

Mark: But on the ground, there's really not a difference. I mean, if it...does the $1 a day make a complete difference? I mean, it's a really kind of a lawyer's distinction.

Judge: But the whole thing, choose not to work or they're not faced with going to disciplinary segregation, right? I mean, they don't face disciplinary consequences by not voluntarily participating in the VWP program?

Mark: No, absolutely not. So the VWP [SP] is entirely voluntary?

Judge: Yeah. There was an opportunity to take class certification discovery and you've mentioned that the 30(b)(6) of the GEO person, but do anything with any of the detainees?

Mark: Your Honor, I would emphasize that in the 20...in the rule of 23 context, the burden is entirely [crosstalk 00:11:45]...

Judge: I know, I know what the burden is, but you had a discovery opportunity, and you're saying that the record shows that this is an individualized prove situation, and I'm asking you where is it in the record, and why didn't you make a record?

Mark: There was a very limited opportunity, actually, because there were only about two months that past between the time when the district court denied [crosstalk 00:12:04]...

Judge: It only takes a couple of depositions. I mean, you can take a deposition within a two-month period.

Mark: Your Honor, I've come back to the point that this burden was entirely on the plaintiff.

Judge: I know where the burden is, but I don't see where in the record, you're making an argument that there's a predominance problem here because of individualized motivations to work, but all you're giving us are the declarations that talk about the two programs, and someone from GEO. That isn't a lot to go on for us to say that the district court abused its discretion.

Mark: But the question is whether rule 23 is rigorous...rigorous requirements that they made. Your Honor, if you don't mind, I'd like to reserve the remainder of my time for a rebuttal.

Judge: Thank you.

David: Good morning. David Lopez for Appellees, Alejandro Menorca at L [SP]. I wanna to start at the beginning with the cause I merits argument with respect to the TVPA, and just point out that any effort to direct the court's attention to ISIS imprimatur actually raises a common issue.

That is a common issue, and that's one thing that you see throughout the briefing in this case is that, many of the arguments that are raised by appellants, raise common issues of law and common issues of fact. Second point I wanna make is, there is a discussion about David versus Signal, and the requirements under the TVPA.

David versus Signal is a district court case, and David v. Signal does not, does not exclude the possibility of class certification in the TVPA case. In fact, David versus Signal sightful language from Justice Brennan in Kaczynski that at certain points consent is irrelevant in the workplace context. Secondly, Appellees do not agree with the districts court conclusion that there is a subjective element under the TVPA.

And we think that if you look at the case Tumido [SP] versus Banda school district, which we cited, and look more importantly at this specific language of the statute that the TVPA requires an objective test exclusively. And if the court agrees with that, and that is a threshold question, then it's gonna...class certification must be affirmed.

Judge: Could you elaborate a little on how the objective test would work in practice?

David: Yes, I mean, I think the objective test would look at the actual policy and the intent of GEO. Serious harm is defined objectively under the statute, and talks about objective circumstances.

Judge: Okay, I make... The reason I asked you about that is, seems to me the statute speaks to GEO when it says knowingly, you know, GEO, that the employer knowingly obtains labor by means of… But I thought that the question of a subjective versus objective test had to do with the plaintiffs on the receiving end of this, that is the detainees who worked under the program. Would the...is the test whether they in fact, subjectively work out of fear of discipline or would a reasonable person in a detainee's position work because of the sanctions and the policies? I mean, I think isn't that what this, this is about?

David: Yes, I mean, I think that the proper test is the latter formulation, but I think that the way that the district court formulated the test, it included both objective and subjective elements, and focused in on causation, and I can address that Your Honor.

Judge: I understood the district court to be relying on inference of subjective causation. Isn't that what it relied upon?

David: Yes. That is correct Your Honor. And what I'm just saying as a threshold matter is that is not...if the court disagrees with the district court, the court needs to affirm the class certification order, but I will address that point. I will address what the district court did. What the district court did was well within the range of reasonable choices, well within the discretion of the court. In fact, it was the only choice.

What the district court did is really apply common sense to the facts of this case, and drew a... Instead, a fact-finder can find a class-wide inference that GEO's policy that said that if you did not work you would be subject to a range of punishments, including solitary confinement, that that policy worked as it was designed, that that policy worked as it was designed. That's very much of a commonsense inference, just like you can infer that when I walk through security this morning, I did so because it was the rule of the court.

Judge: Well, my understanding, I may have it wrong. But I'm just gonna say it anyway, that Mr. Emery is saying, "Look, people do things for all kinds of reasons, and detainees who worked in the program might have been worried about discipline, and the others worked in the program for other reasons, and we're looking at a class of tens of thousands of people." And in terms of a class-wide inference, does it have to be a class-wide inference that applies to everybody? Is that...

David: I mean, I think what the court did with the record before it is, the court looked at the common conditions of detention, which means that every aspect of the detainees' life is controlled and looked at the policy, which said that if he did not do this, you would be subject to punishment. Okay, what appellants are raising are hypothetical detainees performing work for hypothetical reasons.

Okay, appellants have the opportunity, not only to discovery, but every single day to get declarations from the detainees from its own people that would indicate that they in fact worked for reasons other than the policy. Okay, and courts have been very, very reluctant to deny class certification based on hypotheticals and conjecture. And if you think about what GEO is asking here, GEO's basically taken the position that in order to prove up a TVPA claim, you will always be direct evidence of causation.

Judge: What about the CGC case? And in particular, there's a passage where Judge [inaudible 00:19:02] says in the RICO context, class

certification is proper when causation can be established to an inference of reliance when the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct.

So does that passage in CGC Holdings suggest that we should apply a standard that if mandatory policy can create permissible class what inference only when the individual's conduct cannot otherwise be reasonably explained for different reasons?

David: Well, Your Honor, I think CGC is very supportive of this case, and I actually think the inference of this case is stronger than in CGC, because individuals typically do not donate their labor for free, particularly, to a private employer.

Judge: [crosstalk 00:19:53]. Can I ask you question again? And I don't mean to interrupt you, but that's the second time you talked about labor, and I thought you were talking about this...are you segwaying into the VWP?

David: No, I'm not.

Judge: You're talking about labor in terms of cleaning up your area?

David: Right, right, sorry. And so, you know, I think really following the same rationale of the CGC case, I don't think there is any other explanation for the fact of individual's work. And let me just mention one thing...

Female: Well, but that's when the hypothetical come in, right? Because they're saying there might be all kinds of explanations why people might clean up their own living space. Maybe they don't like to live in filth, and they want it clean.

And so, it does seem somewhat different to me, the inference that you're asking to draw on a class-wide basis here than for example in Tyson Foods, where it's not what people were thinking. It was a situation of how long does it take you to take...put on and take off your protective equipment, and there was no other way to prove it because they hadn't recorded it or timed it in the past.

David: Okay. As I mentioned, there's absolutely no record in the...no evidence in the record indicating that individuals worked for other

reasons. And what the district court in fact said, is that the record indicated that the individuals only worked as they were scheduled, and that there was no evidence of individuals working autonomously. And let me say something else about the hypothetical detainees working for hypothetical reasons. They haven't been proven to exist.

It's more important the hypothetical doesn't exactly fit, because you also need to demonstrate that the hypothetical detainee may have worked because he or she didn't wanna lose movie nights, but also the solitary confinement was not a contributing factor at all to that decision, right?

That the hypothetical detainee worked in different to solitary confinement, because if solitary confinement was a contributing factor, you still have the basis for a class-wide inference even for this unicorn. It really is a unicorn, because these individuals had not been shown to exist.

Judge: Well, what would happen if the case goes to trial as a certified class-action, and at that point, the GEO presents evidence that many of the detainees performed labor under this program for reasons other than fear of discipline, what would happen then?

David: The district court always has the discretion to decertify the class at that point, Your Honor. It's within the court's discretion. But what the district court did here was look at the record that it had before it, and looked at that universal policy, the uniform conditions of detention, the declarations, the deposition of GEO's representative, and based on that record, concluded that it would be appropriate that the whole issue of causation is susceptible to common proof.

And so, but the district court always has the discretion to decertify if at some point these unicorns are, you know, brought into court in sufficient numbers, you know, then arguably, that might be a basis for decertification, but that's not what we have before us at this point.

Mark: And remember this is not a marriage. Excuse me, Your Honor, I'm sorry. Yeah, yeah, I'm sorry, really. If let's say there is not a class issue, there was just one individual, let's say Mr. Menorca sues under the sanitation policy, and the sole evidence that's presented in the plaintiff's case in chief is the sanitation policy offers it into evidence its plaintiff's Exhibit One. It's admitted, and there is one question, let's say that Mr. Menorca, "Did the sanitation policy apply to you?" "Yes." And then the plaintiff rests. Does the plaintiff survive a role 50 motion?

David: Right. And I think what you have here is one of the thing, I mean, I think you have the fact that Mr. Menorca worked, and worked only at the times that he was assigned to work. Right? And then you also have declarations from other individuals who indicated that this was not an idle threat, this was a real threat. And, yes, we would survive a in role a 50.

Judge: Well, okay, when you answered the question, were you answering your question or my question?

Mark: I notice that, but, yeah.

David: I was trying to answer the question based on the record before the court, Your Honor. But I still think that you can go on inference, yes, yes.

Female: Before you run out of time, I kinda like to move on to the unjust enrichment class. That unjust enrichment in Colorado is a very fact-intensive inquiry based on the case law. Don't you have a harder road here in terms of common, commonality and predominance, where you have a situation where you have to look at whether under the particular circumstances it was unjust?

David: I don't think so, Your Honor. And I think, you know, I think that appellants argue that expectations are an element, but we've cited cases to the contrary, and I think what the district court did, again, is looked at the universal policy in the common conditions of employment as an immigrant detainee, every aspect of your life is controlled. When you pray, when you eat, what undergarments you wear, every single aspect of your life is controlled.

And I think it's also notable that in many respects, GEO makes the case for us, because GEO says two times in this brief, the record shows any expectation in the access to data allowance would likely have been reasonable, and they say that over and over again.

That as a class on a class-wide basis that the class was provided notice, that they have an imprimatur, somehow have an imprimatur of the federal government inside all these common reasons, and say that there is no basis for anyone in the class to have reasonably expected to be paid more than the $1 a day. And those are all common issues of fact in common issues of law.

In the conditions, under the conditions that Judge Kaye [SP] noted of detention, where every aspect of your life is controlled, and this policy has been...it's universal policy that's been applied consistently.

Female: Well, what about even in terms of what would be just compensation in the sanitation policy, everyone's doing the same job essentially? In the Voluntary Work Program, you have a whole lot of different jobs. And, you know, your assumption is that we're gonna just treat everybody the same, assume they're all volunteering through the policy, and that they all should be paid more than a $1 a day.

But there might be a lot of variance on what you would pay a person to do one job as opposed to a different job. And it might be dependent upon what their skills are, too. What if you have a detainee who's actually capable of fixing broken electronic equipment, that person might be entitled to more compensation.

David: Well, they'd start out with the record, Your Honor. In the deposition of Dante, the assistant warden, Dante has says that if the individuals did not work in the Voluntary Work Program, that the detention officers would perform the work. Okay. And so as a measure of damages, it could be as simple as applying the detention officers hourly rates to each of these individuals.

That even if there is some individual variation, that would not defeat class certification under the circumstances of this case. Because what you would do is you would look at the prevailing wage, whether it's how much the detention officer made, how much a barber wade...made, and then you'd look at the, you know, the records in terms of the number of hours work, and that would be the basis for damages.

It's not really a complicated damages formula. Certainly, not, you know, sufficient to defeat classification, particularly if you look at a case like Tyson Foods, where, you know, the Supreme Court recognized that there were some individuals who were not even injured and who had not suffered violations.

So I think that class certification, I think the district court appropriately exercised its discretion here based on the record before it, and certainly did not abuse its discretion.

Judge: Council, can I just ask for a clarification about the record on the

Transcription by www.speechpad.com                    Page **13** of **16**

sanitation program?

David: Yes.

Judge: Is it correct that the way it was implemented is that certain detainees are identified or there's a list for those who are going to work on a particular day? Is that generally how it's done?

David: Yes.

Judge: And, I guess, I was curious whether given the definition of the class, whether everyone in the class was actually selected to work in the program?

David: Yes, everyone who was in detention was selected to work.

Judge: Every person.

David: Yes. That's the testimony of GEO's representative. Thank you, Your Honor.

Judge: Thank you. You had some extra time to Mr. Emery, yes. I'm going to give you another minute because he bent over.

Mark: Thank you very much. I'd like to read really quickly the definition of the TVPA class as adopted by the district court. This is signed on page 12 of the appellants read. It says, "All persons detained in Defendants Aurora Detention Facility in the 10 years prior to the filing of this action." So my question is whether you've been convinced that every single detainee since 2004 until the filing of this case in 2015 worked for no other reason than the threat of disciplinary segregation? I can give you one, one prominent example.

Judge: Is that the test, 1 out of 60,000, and then there's no class certification?

Mark: I'm confident, it's far more than one person. I mean, I can give you...

Judge: No, I asked for an exact...that seemed to be what you were framing the question. I mean, how many are we talking about? What if the...what if it's, you know, just 1% or 2%, maybe worked for different reasons, but the vast majority of them you couldn't infer they worked

because they were worried about discipline?

Mark: Well, You Honor, I had to look at it from the point of view of my client, which is that even if it's 20% or 30% of people who worked consensually or for some other reason, why should a court order GEO to pay damages under the statute? And I think, its a weighty question. And Mr. Menorca himself in his declaration said that he wanted to volunteer in the VPW right out of the gate.

When he couldn't, he went and volunteered himself because he wanted to work. This is a common thing when detainees are there again, GEO's not keeping anybody captive, detainees are there because ISIS said they are. And while they're there, they wanna do something, they don't wanna sit around idle.

The work provides a lot of opportunities, and ISIS has given this rationale over and over in its policies. To switch really quickly to the unjust enrichment claim. There's one main point I wanna make. In the Menorca decision, the Colorado Supreme Court said that when deciding the unjust benefit portion of unjust enrichment, a court must look at the intentions, the expectations, and the behavior of the parties.

The district court here said exactly the opposite. The court said it's not necessary to look at the intensions, expectations, and benefits because of the overall context of detention. So again, these primarily I would submit because there's a weak record put together by the movements, the court drew inference after inference in this case.

And rather than demanding that there's actually a basis for the class, we've argued that reasonable certifications is required by Colorado law. I think we're right on that. And the reason is because you have to show under the common law, unjust enrichment is a quasi-contract action. You have to look to the course of dealing between the parties, this is the way it's always worked as a common law claim.

Here, what the plaintiffs are asking you to do is say, "Here's detainees who worked for a $1. Here's the policy, and without any resort to the course of dealing, to simply say that it's unjust. That can't be the law, and that can't be the basis for, I mean, you'll create a little monster for a claim if that's what the law is. Thank you, Your Honor.

Judge: Well, thank you, counsel, for your arguments. The case will be submitted and counsel are excused.