# Exhibit 21

No. 17-1125

═══════════════════════════════

IN THE

# United States Court of Appeals for the Tenth Circuit

─────────────

ALEJANDRO MENOCAL, MARCOS BRAMBILA, GRISEL XAHUENTITLA, HUGO HERNANDEZ, LOURDES ARGUETA, JESUS GAYTAN, OLGA ALEXAKLINA, DAGOBERTO VIZGUERRA, and DEMETRIO VALEGRA, on their own behalf and on behalf of all others similarly situated,

Plaintiffs-Appellees,

v.

THE GEO GROUP, INC.,

Defendant-Appellant.

─────────────────

Appeal from the U.S. District Court for the District of Colorado,
Civil Action No. 1:14-cv-02887-JLK, Judge John L. Kane, Presiding

─────────────

## OPENING BRIEF FOR APPELLANT

─────────────

Dana Eismeier
BURNS, FIGA & WILL
6400 S. Fiddlers Green Circle
Greenwood Village, Colorado 80111
(303) 796-2626
deismeier@bfwlaw.com

Mark Emery
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW
Washington, DC 20001
(202) 662-0210
mark.emery@nortonrosefulbright.com

Charles A. Deacon
NORTON ROSE FULBRIGHT US LLP
300 Convent Street
San Antonio, Texas 78205
(210) 270-7133
charlie.deacon@nortonrosefulbright.com

June 5, 2017                    Counsel for Appellant

## ORAL ARGUMENT REQUESTED

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, The GEO Group, Inc.

states that it is a publicly-traded corporation (NYSE: GEO) that has no parent

company, and that The Vanguard Group, Inc. and BlackRock Fund Advisors own

more than 10% of GEO's stock.


_____/s/ Mark Emery_____
Counsel for Appellant

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................................. iv

STATEMENT OF RELATED CASES ................................................................. ix

GLOSSARY.......................................................................................................... ix

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT ........................................................................5

STATEMENT OF THE ISSUES.............................................................................5

STATEMENT OF THE CASE.................................................................................5

    A.    The Legal And Factual Frameworks For GEO's
    Administration Of The Housekeeping Program And
    Voluntary Work Program ..........................................................5

        1.    ICE's Contracting With Private Detention
        Facilities.........................................................................5

        2.    GEO's Administration Of The Housekeeping
        Program At Aurora ........................................................6

        3.    GEO's Administration Of The VWP At Aurora ............9

    B.    An Overview Of The Proceedings Below And Class
    Claims ......................................................................................14

        1.    The District Court Partially Denies GEO's Motion
        To Dismiss And Request For Interlocutory Review .....14

        2.    The TVPA Claim...........................................................15

        3.    The Unjust Enrichment Claim.......................................19

        4.    The Ruling Under Review..............................................21

        5.    The Court Grants Interlocutory Review Of Class
        Certification .................................................................26

STANDARDS OF REVIEW .................................................................................27

SUMMARY OF THE ARGUMENT .....................................................................29

ARGUMENT ........................................................................................................34

I.    THE TVPA CLAIM IS UNFIT FOR CLASSWIDE
ADJUDICATION ................................................................34

A.    There Are No Questions Of Law Or Fact Common To
The Class....................................................................34

B.    The Plaintiffs' TVPA Claims Are Not Typical Of A
Class ..........................................................................38

C.    There Are No Common Questions Of Law Or Fact That
Predominate Over Individual Questions...................40

D.    Class Action Is Not The Superior Method For
Adjudicating The TVPA Claim ...............................44

II.    THE UNJUST ENRICHMENT CLAIM IS UNFIT FOR
CLASSWIDE ADJUDICATION .......................................46

A.    Unjust Enrichment Class Is Not Based On
Common Questions Or Facts....................................46

B.    The Class Representatives' Unjust Enrichment Claims
Are Not Typical Of A Class.....................................49

C.    There Are No Common Questions Of Law Or Fact That
Predominate Over Individual Questions...................50

D.    Class Action Is Not The Superior Method For
Adjudicating The Unjust Enrichment Claims..........53

CONCLUSION......................................................................54

REQUEST FOR ORAL ARGUMENT ................................54

CERTIFICATE OF COMPLIANCE WITH WORD VOLUME
LIMITATION...................................................................56

CERTIFICATE OF DIGITAL SUBMISSION ....................56

CERTIFICATE OF SERVICE .............................................57

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Alexander v. CCA*,
   No. 10-1956, 2010 WL 4723435 (D.D.C. Nov. 16, 2010)............................18

*Alvarado Guevara v. INS*,
   902 F.2d 394 (5th Cir. 1990) ..................................................................13, 54

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)..........................................................................28, 40, 42

*Baricuatro v. Ind. Personnel & Mgmt. Servs., Inc.*,
   Civ. No. 11-2777, 2013 WL 6072702 (E.D. La. Nov. 18, 2013).............36, 43

*Bayh v. Sonnenburg*,
   573 N.E.2d 398 (Ind. 1991) ............................................................................9

*Bijeol v. Nelson*,
   579 F.2d 423 (7th Cir. 1978) ......................................................................8, 9

*Britvar v. Shainuck*,
   791 P.2d 1183 (Colo. App. 1989)......................................................20, 46, 51

*CGC Holding Co., LLC v. Broad & Cassel*,
   773 F.3d 1076 (10th Cir. 2014) ...............................................27, 28, 34, 42, 51

*Channer v. Hall*,
   112 F.3d 214 (5th Cir. 1997) ......................................................................8, 9

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013).........................................................................27, 28

*David v. Signal Int'l, LLC*,
   No. 08-1220, 2012 WL 10759668 (E.D. La. Jan. 4, 2012) ....23, 36, 41, 42, 43

*DCB Constr. Co., Inc. v. Cent. City Dev. Co.*,
   965 P.2d 115 (Colo. 1998).......................................................................20, 46

iv

*DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.,*
   No. 10-CV-1341, 2012 WL 748760 (E.D.N.Y. Mar. 7, 2012) ....................19

*Ellis v. Spectranetics Corp.,*
   No. 15-cv-01857, 2015 WL 9259928 (D. Colo. Dec. 18, 2015)...................38

*Ford v. Nassau Cty. Exec.,*
   41 F. Supp. 2d 392 (E.D.N.Y. 1999) ..............................................................9

*Friedman v. Dollar Thrifty Auto. Grp., Inc.,*
   304 F.R.D. 601 (D. Colo. 2015) ...................................................................49

*Guevara v. INS,*
   954 F.2d 733, 1992 WL 1029 (Fed. Cir. Jan. 6, 1992) .................................13

*Harding v. Tambrands Inc.,*
   165 F.R.D. 623 (D. Kan. 1996) ....................................................................40

*Hause v. Vaught,*
   993 F.2d 1079 (4th Cir. 1993) ....................................................................8, 9

*Headley v. Church of Scientology Int'l,*
   687 F.3d 1173 (9th Cir. 2012) ................................................................18, 37

*Holy Trinity Church v. United States,*
   143 U.S. 457 (1892)......................................................................................16

*In re Motions to Certify Classes Against Court Reporting Firms,*
   715 F. Supp. 2d 1265 (S.D. Fla. 2010).........................................................49

*Jackson v. Siringas,*
   No. 12-15474, 2013 WL 3810301 (E.D. Mich. July 23, 2013) ......................9

*Jobson v. Henne,*
   355 F.2d 129 (2d Cir. 1966) ...........................................................................8

*Lewis v. Lewis,*
   189 P.3d 1134 (Colo. 2008)....................................................................20, 46

*Loving v. Kelly*,
　　No. 11–355, 2011 WL 4344109 (M.D. La. July 27, 2011) ............................9

*Magoon v. Tex. Dep't of Criminal Justice*,
　　Nos. 99-40897 & 99-41060, 2001 WL 43533
　　(5th Cir. Jan. 5, 2001) ......................................................................9

*Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.,*
　　287 P.3d 842 (Colo. 2012) ..........................................20, 46, 49, 51

*Panwar v. Access Therapies*,
　　No. 1:12-cv-00619, 2015 WL 329013 (S.D. Ind. Jan. 22, 2015) .............36, 43

*Pasamba v. HCCA Int'l, Inc.*,
　　No. CV-08-0247, 2008 WL 2562928 (D. Ariz. June 24 2008) ......................19

*Pliego v. Los Arcos Mexican Rests., Inc.*,
　　313 F.R.D. 117 (D. Colo. 2016) ....................................................39

*Ricchio v. McLean*,
　　853 F.3d 553 (1st Cir. 2017) ........................................................16

*Shook v. El Paso Cty.*,
　　386 F.3d 963 (10th Cir. 2004) .....................................................27

*Stender v. Archstone-Smith Operating Trust*,
　　No. 07-cv-02503, 2015 WL 5675304 (D. Colo. Sept. 28, 2015) ...................44

*Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
　　No. LA CV10-01172 JAK, 2011 WL 7095434 (C.D. Cal.
　　Dec. 12, 2011) ...........................................................................42, 43

*United States v. Afolabi*,
　　508 F. App'x 111 (3d Cir. 2013) ...................................................16

*United States v. Bradley*,
　　390 F.3d 145 (1st Cir. 2004) ........................................................19

*United States v. Calimlim*,
   538 F.3d 706 (7th Cir. 2008) ..........................................................19

*United States v. Kaufman*,
   546 F.3d 1242 (10th Cir. 2008) .....................................................15

*United States v. Todd*,
   627 F.3d 329 (9th Cir. 2010) ..........................................................15

*Vallario v. Vandehey*,
   554 F.3d 1259 (10th Cir. 2009) .....................................................28

*Vega v. T-Mobile USA, Inc.*,
   564 F.3d 1256 (11th Cir. 2009) .....................................................39

*Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*,
   725 F.3d 1213 (10th Cir. 2013) ........................................ 28, 29, 34, 42, 44, 51

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)...............................................................22, 27, 34, 39

*Wilcox v. Commerce Bank*,
   474 F.2d 336 (10th Cir. 1973) .....................................................28, 44

*Zapata v. IBP, Inc.*,
   167 F.R.D. 147 (D. Kan. 1996) .....................................................38

**STATUTES:**

8 U.S.C. § 1103................................................................................6

8 U.S.C. § 1225................................................................................5

8 U.S.C. § 1226................................................................................5

8 U.S.C. § 1226a..............................................................................5

8 U.S.C. § 1231................................................................................5

8 U.S.C. § 1555(d) ........................................................................12

18 U.S.C. § 1589 .................................................................................*passim*

22 U.S.C. § 7101 ................................................................................15

28 U.S.C. § 1292(e) .............................................................................5

28 U.S.C. § 1331 ..................................................................................5

28 U.S.C. § 1367 ..................................................................................5

Dep't of Justice Appropriations Authorization Act, 1979, Pub. L.
No. 96-132, § 2(10), 93 Stat. 1040 (1979) ......................................12

Dep't of Justice Appropriation Act, 1979, Pub. L. No. 95-431, 92
Stat. 1021 (Oct. 18, 1978).................................................................12

**REGULATIONS:**

48 C.F.R. § 52.222-50 ..........................................................................17

**RULES:**

Fed. R. App. P. 5(d)(2) .........................................................................5

Fed. R. Civ. P. 23 ...............................................................................*passim*

**AUTHORITIES:**

INS, *Your CO 243-C Memorandum of November 15, 1991; DOD
Request for Alien Labor*, General Counsel Op. No. 92-63, 1992
WL 1369402 (Nov. 13, 1992) ........................................................13

INS General Counsel, *The Applicability of Employer Sanctions to
Alien Detainees Performing Work in INS Detention Facilities*,
General Counsel Op. No. 92-8, 1992 WL 1369347
(Feb. 26, 1992)...............................................................................14

*Validity, Construction, and Application of Section 112 of*
    *Trafficking Victims Protection Act of 2000 and Subsequent*
    *Reauthorizing Provisions amending Chapter 77 of Title 18,*
    *United States Code*, 75 A.L.R. Fed. 2d 467 ...................................................15

## STATEMENT OF RELATED CASES

In *The GEO Group v. Menocal*, No. 17-701, this Court granted GEO's

petition for permission to appeal, pursuant to Federal Rule of Civil Procedure

23(f).

## GLOSSARY

| | |
|---|---|
| App. | Appellant's Appendix |
| Aurora or Facility | Aurora Detention Facility |
| DHS | Department of Homeland Security |
| ICE | U.S. Immigration and Customs Enforcement |
| INS | Immigration and Naturalization Service |
| TVPA | Trafficking Victims Protection Act |
| VWP | Voluntary Work Program |

# INTRODUCTION

This appeal has become the bellwether for two experimental claims that should not have survived this long and are unfit for classwide adjudication.

For more than three decades, The GEO Group, Inc. ("GEO") has operated the Aurora Detention Facility ("Aurora") under contracts with the U.S. Immigration and Customs Enforcement ("ICE") and its predecessor.[1]  Through this contractual relationship, GEO helps ICE carry out its federally-mandated duties within the federal immigration system, including the operation of facilities that house federal immigration detainees while they await a hearing, deportation or release.  As a federal contractor, GEO is subject to robust statutory and regulatory frameworks, as well as extensive policies, contractual requirements, and oversight by and from ICE and the Department of Homeland Security ("DHS").

When GEO administers the programs to which the alleged classes object—a longstanding program requiring detainees to perform housekeeping chores in their living areas, and the federally-created and funded Voluntary Work Program ("VWP")—GEO is carrying out federal law and federally-approved policy to which it is bound as a federal contractor.  In light of this, the claims certified for classwide treatment in this case—first, that GEO obtains "forced labor" from

---

[1]    *See* The GEO Group, Aurora Detention Facility, available at (www.geogroup.com/FacilityDetail/FacilityID/31).

1

detainees in violation of the Trafficking Victims Protection Act ("TVPA"), 18

U.S.C. § 1589, and second, that GEO is "unjustly enriched" by labor supposedly

extracted from detainees who agreed to work in the VWP—are misguided

descriptions of an alternative universe. In the current regulatory world, GEO is

performing contractual obligations and helping ICE to carry out federal mandates.

In Plaintiffs' alternative universe, GEO is profiteering from a forced labor camp.

GEO understands that the Court has only granted interlocutory review of the

class certification order, noting "the complexity and difficulty of the issues

presented." *The GEO Group, Inc. v. Menocal et al.*, No. 17-701 (Apr. 11, 2017);

Appellant's Appendix ("App.") 828-29. But there is no clean line between the

profound flaws in the underlying claims and the class certification issues. One—

and only one—court in the United States has sustained a claim by detainees that a

private contractor operating an ICE detention facility violates the TVPA by

enforcing the housekeeping requirement, or that such a contractor is unjustly

enriched by VWP work. That is the court below, which abused its discretion in

doing so. And the court further denied GEO's motion for interlocutory review that

would have permitted this Court to review the merits before these classes were

certified.

The claims are invalid. Congress enacted the TVPA to combat human

trafficking and protect victims of those crimes. It is absurd to read the TVPA to

2

authorize a detainee to obtain damages or restitution for participating in a
housekeeping program sanctioned by DHS and ICE, some of the very agencies
charged with preventing human trafficking and enforcing the TVPA. The
housekeeping requirement has been upheld for decades.

With respect to unjust enrichment, Colorado law requires a plaintiff to show
a reasonable expectation of payment for allegedly unjustly enriching work.
Plaintiffs do not even allege, and there is no evidence to prove, that any Plaintiff
expected more than $1 per day for work, which has been the recognized standard
for decades. In many instances, detainees expressly agreed, in writing, to do VWP
jobs for $1 per day.

These flaws did not vanish when presented for class certification. There are
no exemplars from which to glean how the experimental TVPA claim would be
tried, but the statute, which requires proof that a defendant knowingly obtained
labor "by means of" some coercive act prohibited by the TVPA, demands an
irreducibly subjective and individualized determination. To warrant classwide
relief, Plaintiffs would need to prove that each class member claiming restitution or
damages was compelled by means of a coercive act by GEO, rather than a host of
other common sense reasons, such as boredom, peer pressure, or respect for the
rules. Rather than demanding such proof, the district court presumed that "all
[detainees] share the experience of having been detained in the Facility and

subjected to uniform policies that purposefully eliminate nonconformity," App.
808, and unreasonably inferred from this premise that no detainee could ever
choose a reason to work, rather than be coerced in violation of the TVPA.  This is
not the rigorous analysis required by Fed. R. Civ. P. 23, especially as this causation
question may determine whether GEO must face a massive class action or not.

 Class certification on the unjust enrichment claim founders for other reasons.
Plaintiffs did not demonstrate that any detainee at Aurora ever had a reasonable
expectation of being paid more than $1 per day for VWP jobs.  Most expressly
agreed to work for $1 per day.  That $1 daily allowance has been upheld for
decades.  But in the unlikely event it could be shown that some detainee held a
contrary and unfulfilled expectation—*e.g.*, payment of a market wage—no such
proof was delivered here, and it would necessarily be an individualized
determination.

 Ultimately, the classes and their counsel disapprove of ICE's policies as
administered by GEO at Aurora.  They dislike ICE's housekeeping requirement
and the VWP's $1 daily allowance.  This policy agenda can and should be carried
out in a different forum—through efforts to change Congress's directives,
petitioning for changes to agency rulemaking or policy, or even a suit against the
relevant government policymakers.  These claims are not fit as a class action
seeking monetary relief for detainees based on individualized questions.

## JURISDICTIONAL STATEMENT

Plaintiffs alleged that the district court had jurisdiction under 28 U.S.C.

§ 1331 based on the Plaintiffs' allegation of a violation of the TVPA and

supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

App. 21. This court has jurisdiction over GEO's interlocutory appeal under 28

U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f). The Court's April 11,

2017 order granting the petition serves as the date of the timely filed notice of

appeal. App. 828-29; Fed. R. App. P. 5(d)(2).

## STATEMENT OF THE ISSUES

1.    Whether the district court properly certified a Rule 23 class on the

claim that GEO violated the TVPA.

2.    Whether the district court properly certified a Rule 23 class on the

claim that GEO was unjustly enriched by paying $1 per day to detainees who

participated in VWP.

## STATEMENT OF THE CASE

**A.    The Legal And Factual Frameworks For GEO's Administration
Of The Housekeeping Program And Voluntary Work Program.**

**1.    ICE's Contracting With Private Detention Facilities.**

The Immigration and Nationality Act ("INA") confers on ICE broad

authority to detain aliens pending removal or a removal hearing, and mandates that

ICE detain certain categories of aliens. *See* 8 U.S.C. §§ 1225, 1226, 1226a, 1231.

5

ICE has responsibility to provide safe, secure, and humane confinement for aliens in the United States who may be subject to removal.  *See id.*  ICE, in turn, has authority to contract with private sector entities, such as GEO, to provide secure facilities, 8 U.S.C. § 1231(g), and to disburse funds at the discretion of the Secretary of the DHS.  8 U.S.C. §§ 1103(a), (c).  Since activation in 1987, GEO has operated the facility in Aurora, Colorado, pursuant to a contract with ICE, and its predecessor Immigration and Naturalization Service ("INS").  App. 226-27.

### 2. GEO's Administration Of The Housekeeping Program At Aurora.

ICE requires that detention facilities "maintain the highest sanitation standards at all times in all locations without exception."  *See* App. 714, 730-31, 761.  This is done through "an organized, supervised and continuous program of daily cleaning by all detainees[.]"  App. 714.[2]   GEO administers and supervises an ICE-approved program for implementing these requirements.  App. 540-42.

The housekeeping program involves two overlapping types of detainee duties: cleaning personal areas and cleaning of common living areas.  *See* App. 715, 468 (39:17-40:25).  First, all detainees are required to keep their "personal

---

[2]   Not all of the housekeeping in common areas of Aurora is done by detainees.  Aurora's maintenance department performs upkeep and preventative maintenance on the facility's HVAC systems and rooftop units, changes filters and lightbulbs, and janitorial staff cleans some areas.  App. 463 (19:21-20:13), 484 (101:6-16).

living area clean and sanitary," including the bunk and immediate floor area about
and under the bunk, locker and any personal items.  App. 714, 738-39.  Second,
detainees also clean their common living areas.  App. 761 (ICE Detainee
Handbook notifying detainees "You are required to perform basic cleaning tasks
within your living unit."); App. 467 (36:24-37:22), 490-92 (125:24-134:25)
(testifying that ICE's policy authorizes cleaning of common areas).

ICE requires that "[e]ach and every detainee must participate in the facility's
sanitation program."  App. 715, 730-31 ("[S]taff and detainees must maintain a
high standard of facility sanitation and general cleanliness").   ICE specifies that
the facility Housing Unit Officer is responsible for assuring that a general cleanup
is done regularly, and "all detainees" must participate during a general cleanup.
App. 714-15.  A list of detainees selected to clean is developed each day by staff
and is posted daily for viewing by detainees.  App. 715.  The "[h]ousing units and
all common areas must be kept clean and should be ready for inspection at any
time."  App. 714; *see also* App. 468 (40:7-25).

Under ICE policy, "[r]efusal to clean [an] assigned living area" constitutes a
300-level "high moderate" offense, which could result in the typical sanctions of a
warning or reprimand.  *See* App. 722, 734-35, 471 (57:12-52:23).  A permissible,
but rare, step is to place a detainee in disciplinary segregation.  App. 722, 480-81
(88:24-90:3), 485 (108:15-25).  If this rare step is taken, the detainee is initially

7

placed in administrative segregation while awaiting a hearing. App. 473 (57:15-58:5). In administrative segregation, detainees are still allowed to watch television, although their amount of social time is reduced to 2 hours. App. 472 (54:4-12, 55:15-19). GEO's corporate representative, Ms. Dawn Ceja, could recall only one instance where a detainee "complained about being put into seg for a cleaning issue." App. 476 (69:5-22, 71:12-18). In fact, those who are placed in administrative segregation (if found "guilty") are usually sentenced to "time-served" and never spend any time in disciplinary segregation. App. 473 (57:15-58:5).

It is well-established that federal detainees can be required to perform housekeeping chores without pay (or for minimal pay), even in communal living areas. *See Channer v. Hall*, 112 F.3d 214, 219 (5th Cir. 1997) (holding that "the federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks"); *Hause v. Vaught*, 993 F.2d 1079, 1081, 1085 (4th Cir. 1993) (holding that pretrial detainees may be required to "assist in cleaning the common areas of their cell-block"); *Bijeol v. Nelson*, 579 F.2d 423, 424-25 (7th Cir. 1978) (holding that a pretrial detainee "may constitutionally be compelled to perform simple housekeeping tasks in his or her own cell and community areas"); *Jobson v. Henne*, 355 F.2d 129, 131-32 (2d Cir. 1966) (explaining that detained patients may be required to perform "chores of a

normal housekeeping type and kind"); *Jackson v. Siringas*, No. 12-15474, 2013

WL 3810301, at *10 (E.D. Mich. July 23, 2013) ("[R]equiring a pretrial detainee

to help clean his living unit, including common areas, does not amount to

involuntary servitude as prohibited by the Thirteenth Amendment.").[3]

### 3.  GEO's Administration Of The VWP At Aurora.

As an "Expected Practice," ICE states that detainees "shall be provided the

opportunity to participate in a voluntary work program."  App. 738.  This program

"provides detainees opportunities to work and earn money while confined, subject

to the number of work opportunities available and within the constraints."  App.

737.

---

[3]     General housekeeping duties have been deemed to include a wide range of
activities beyond the cleaning of personal spaces, including fixing and distributing
meals, scrubbing dishes, laundering the sheets and clothing of other inmates,
cleaning communal bathrooms and shower stalls, removing trash from common
areas, and sweeping, mopping, and vacuuming general-use hallways and rooms.
*See Magoon v. Tex. Dep't of Criminal Justice*, Nos. 99-40897 & 99-41060, 2001
WL 43533, at *2 (5th Cir. Jan. 5, 2001) ("shower squad and laundry"); *Channer*,
112 F.3d at 219 (kitchen service); *Hause*, 993 F.2d at 1081, 1085 (cleaning
common areas of a cell-block); *Bijeol*, 579 F.2d at 424-25 (dusting, vacuuming,
and emptying ashtrays in common areas); *Jackson*, 2013 WL 3810301, at *10
(cleaning communal toilets that had overflowed); *Loving*, 2011 WL 4344109, at
*1-2 (sweeping and mopping hallways and a patient day room, disinfecting a
patient bathroom and shower stall, and removing trash from the ward); *Ford v.
Nassau Cnty. Exec.*,  41 F. Supp. 2d 392, 394-95, 397 (E.D.N.Y. 1999) (pushing a
food cart, distributing trays of food, mopping, and sweeping); *Bayh v. Sonnenburg*,
573 N.E. 2d 398, 411-12 (Ind. 1991) (fixing meals, scrubbing dishes, cutting grass,
washing sheets and clothing, and cleaning floors).

The ICE contract for Aurora directs GEO's administration of the VWP.
App. 79.  As lawfully done at other ICE detention facilities, GEO "utilizes
detainees to perform such functions as painting, food services, laundry services,
barbershop and sanitation" through the VWP.  App. 704; *see also* App. 714, 737,
761.  Apart from providing detainees opportunities for compensation, the VWP has
additional objectives, including promoting gainful employments and reducing
inactivity-induced idleness and disciplinary-code violations.  App. 571, 737.  GEO
administers the VWP at Aurora pursuant to ICE-approved policies.  *See* App. 571-
75 (Aurora policy manual bearing signature of approval from ICE officer), 704.

All VWP work is voluntary.  App. 571-72, 738.[4]    Detainees apply to
participate in the VWP at Aurora, specifying which jobs interest them.  App. 778-
79.  Aurora's Classification Officer assigns workers to jobs, based on numerous
factors including classification level, criminal history, escape history and medical
status.  App. 704.  Up to 80 people per day work in the VWP at Aurora.  App. 597
(12:5-8).  No detainee is allowed to work more than one shift (or eight hours) per

---

[4]     Within the PBNDS context of this discussion of VWP policy, ICE notes that
all work is voluntary, but that "[d]etainees are required to maintain their immediate
living areas in a neat and orderly manner by: (1) making their bunk beds daily; (2)
stacking loose papers; (3) keeping the floor free of debris and dividers free of
clutter; and (4) refraining from hanging/draping clothing, pictures, keepsakes, or
other objects from beds, overhead lighting fixtures or other furniture."   App. 738-
39.  This provision merely specify duties that are not incorporated into the VWP,
but does not delimit the scope of what housekeeping duties may be required.

day, and no more than 40 hours per week.  App. 605 (42:7-9), 740.  Detainees may

be removed from the program for unexcused absences, unsatisfactory performance

or specified inappropriate behavior.  App. 740.  All rules pertaining to the VWP

are communicated to each participant in a language or manner the detainee can

understand.  *Id.*

ICE states that "[d]etainees shall receive monetary compensation for work

completed in accordance with the facility's standard policy.  The compensation is

at least $1.00 (USD) per day."  *Id.*  Thus, a facility may, consistent with the policy,

provide an allowance of $1.00 per day under ICE policy, and is not required by

ICE to pay more.  ICE's National Detainee Handbook states categorically to

detainees that "[y]ou will be paid $1 per day worked,"  App. 761, and that this is

what is carried out at Aurora. App. 605 (44:2-5), 573.

To ensure it is up-to-date on payments and that detainees are paid before

they leave Aurora, GEO pays the amount directly to detainees on a daily basis, and

then GEO is reimbursed by ICE.  App. 603 (34:24-35:8), 605 (42:22-43:6).  GEO's

contract for Aurora provides that reimbursement for the program "will be at actual

cost of $1 per day per detainee," and "[t]he contractor shall not exceed the quantity

shown without prior approval by the [ICE] Contracting Officer."  App. 70.  Thus,

the $1.00 per day allowance accords with the reimbursement rate for VWP work

determined by the contract between ICE and GEO.  App. 505 (185:14-22),505

11

(187:1-8), 604 (39:12-40:10), 606 (46:5-12).  To raise the reimbursement for a rate

of $1 per day per detainee, GEO must obtain ICE's permission, and the

Contracting Officer is the only person authorized to approve changes under the

contract.  App. 70, 81.

The $1 daily allowance has been a settled expectation for decades.  From

1950 to 1979, Congress specially authorized "payment of allowances . . . to aliens,

while held in custody under the immigration laws, for work performed."  8 U.S.C.

§ 1555(d); Act of July 28, 1950, 64 Stat. 380, ch. 503, § 6.  But, the amount to be

paid was left to be "specified from time to time in the appropriation Act involved"

for each fiscal year.  *Id*.  The appropriations bills for this time period authorized

reimbursement for the VWP program "at a rate not in excess of $1.00 per day."

*See, e.g.*, Dep't of Justice Appropriation Act, 1979, Pub. L. No. 95-431, 92 Stat.

1021, 1027 (Oct. 18, 1978).

After the 1979 appropriation, Congress ceased specifically appropriating

monies for the VWP program, opting instead to provide more general

appropriations authorization.  *See* Dep't of Justice Appropriations Authorization

Act, 1979, Pub. L. No. 96-132, § 2(10), 93 Stat. 1040, 1042 (1979).  Under this

more general authority, INS (and now ICE) retained authority to reimburse VWP

detainees, but without the requirement that "Congress [] set the rate of

compensation for each fiscal year."  *See* INS, *Your CO 243-C Memorandum of*

*November 15, 1991; DOD Request for Alien Labor*, General Counsel Op. No. 92-63, 1992 WL 1369402, *1 (Nov. 13, 1992) (citing 93 Stat. at 1042).  Today, the rate for VWP reimbursement is typically dictated—as it is here—by the contract between ICE and each individual detention facility.  The $1.00 per day allowance is "a matter of legislative discretion."  *See Guevara v. INS*, 954 F.2d 733, 1992 WL 1029, *2 (Fed. Cir. Jan. 6, 1992).  It is now delegated as a matter of ICE agency discretion.   App. 70, 81.

The $1.00 daily allowance has withstood legal challenges for decades.  In *Alvarado Guevara v. INS*, 902 F.2d 394 (5th Cir. 1990), current and former detainees brought an action challenging the $1.00 per day allowance as a violation of the minimum wage provisions of the Fair Labor Standards Act and as a violation of the U.S. Constitution.  The Fifth Circuit held that "[d]espite this apparent exchange of money for labor," the plaintiffs were not covered by the FLSA, because the congressional motive for enacting the FLSA was to protect the "standard of living" and "general well-being" of the worker in American industry.  *Id*. at 396.  By contrast, alien detainees are "removed from American industry," they are "not within the group that Congress sought to protect in enacting the FLSA." *Id*.  Thus, the allowance is "a valid exercise of the congressional power to regulate the conduct of aliens." *Id*. at 397.  *See also* INS General Counsel, *The Applicability of Employer Sanctions to Alien Detainees Performing Work in INS*

13

*Detention Facilities*, General Counsel Op. No. 92-8, 1992 WL 1369347, at *1

(Feb. 26, 1992) ("[a]lien detainees who perform work for the INS . . . are not

considered 'employees' for purposes of employer sanctions;" "[a] detainee

performs work for institution maintenance, not compensation").  Recently, a

Massachusetts court also rejected an ICE detainee's claim for more than $1 per

day.  *See Whyte v. Suffolk County Sherriff's Dep't*, No. 15-00444-E (Sup. Ct.

Mass. Jan. 8, 2016); App. 769-76.

### B.    An Overview Of The Proceedings Below And Class Claims.

#### 1.    The District Court Partially Denies GEO's Motion To Dismiss And Request For Interlocutory Review.

Plaintiffs filed their class complaint in late 2014, alleging the TVPA claim,

the unjust enrichment claim, and a claim for minimum wage claim under Colorado

law.  App. 17-37.  GEO moved to dismiss all claims.  App. 45-61.  The district

court dismissed the minimum wage claim on the grounds that the Plaintiffs were

not considered "employees" and GEO was not an "employer."  App. 276-80.

However, the court refused to dismiss the TVPA and unjust enrichment claims.

App. 282-83.

GEO sought both reconsideration, App. 305-35, and permission to bring an

interlocutory appeal from the denial of the motion to dismiss,  App. 344-68.  The

court denied both motions.  App. 341-43, 396-99.  Thus, although presented with

the option, the district court denied this Court the opportunity to review the claims

prior to granting class certification.

### 2. The TVPA Claim.

Congress enacted the TVPA "to combat trafficking in persons, a

contemporary manifestation of slavery whose victims are predominantly women

and children, to ensure just and effective punishment of traffickers, and to protect

their victims." 22 U.S.C. § 7101(a). Congress based the statute on "a substantial

amount of evidence on the traffic in the sexual services of women based on

importing women from around the world by force or fraud." *United States v.*

*Todd*, 627 F.3d 329, 333 (9th Cir. 2010). Congress supported the statute by

making twenty-four separate findings of fact that included that at least 700,000

persons are trafficked over international borders each year. 22 U.S.C. § 7101(b).

Section 1589 does not deviate from this core purpose. *See United States v.*

*Kaufman*, 546 F.3d 1242, 1261 (10th Cir. 2008); *Validity, Construction, and*

*Application of Section 112 of Trafficking Victims Protection Act of 2000 and*

*Subsequent Reauthorizing Provisions amending Chapter 77 of Title 18, United*

*States Code*, 75 A.L.R. Fed. 2d 467 ("the TVPA criminalizes and seeks to prevent

human trafficking of women and children for exploitation in the sex trade. New

federal offenses were enacted and codified at 18 U.S.C.A. §§ 1589 to 1594 to this

end.").  Section 1589 prohibits persons from knowingly obtaining labor "by means

of" specified actions:

> Whoever knowingly provides or obtains the labor or services of a
> person by any one of, or by any combination of, the following
> means—
>
> (1) **by means of** force, threats of force, physical restraint, or threats of
> physical restraint to that person or another person;
>
> (2) **by means of** serious harm or threats of serious harm to that person
> or another person;
>
> (3) **by means of** the abuse or threatened abuse of law or legal process;
> or
>
> (4) **by means of** any scheme, plan, or pattern intended to cause the
> person to believe that, if that person did not perform such labor or
> services, that person or another person would suffer serious harm or
> physical restraint, shall be punished as provided under subsection (d).

18 U.S.C. § 1589(a) (emphasis added).

As GEO argued below, given the statute, legislative findings, history, and

precedent, it is absurd to interpret Section 1589 apply to a private detention facility

contractor.  *See Rector, Etc. of Holy Trinity Church v. United States*, 143 U.S. 457,

472 (1892).  The class claims are fundamentally different from the kinds of cases

in which courts have applied the TVPA to prevent actual trafficking.  *See*, *e.g*.,

*Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017) (plaintiff stated claim against

motel owner and associate that kept plaintiff as sex slave and used force to prevent

her from leaving); *United States v. Afolabi*, 508 Fed. App'x 111 (3d Cir. 2013)

16

(five victims promised schooling in U.S., but forced to work 60-100 hours per week for years, under threat of deportation to Africa and physical beatings).

Moreover, GEO's contract for Aurora ensures that it does not engage in human trafficking.  DHS is one of the agencies that is directly involved in combatting human trafficking.  18 U.S.C. § 1589(d); 22 U.S.C. § 7103(b).  The Aurora contract with ICE incorporates 48 C.F.R. § 52.222-50, which requires contractors to annually certify that they are aware of and are in compliance with the TVPA and federal law combating trafficking in persons, and requires the contractor to notify the ICE Contracting Officer and DHS Inspector General if it becomes aware of credible information that trafficking activity is occurring.  App. 85.  If a contractor does not comply with the regulation, it could face a number of measures or sanctions, including termination of the contract and debarment.  *Id*. There is no evidence that ICE has taken any action to notify GEO that it is not in compliance with anti-trafficking laws at Aurora or undertaken any enforcement proceedings in relation to non-compliance with this regulation.

Plaintiffs allege that GEO is liable under the TVPA for knowingly providing or obtaining labor from Aurora detainees by means of conduct prohibited by Section 1589.  App. 29-31.  Plaintiffs and some non-plaintiff declarants submitted brief, cookie cutter declarations stating that they were required to perform housekeeping work in private and common living areas without pay and did so

17

under the perceived threat of being put "in the hole," or in disciplinary segregation.

*See* App. 437-55 (paragraph 3 of Dkts. 49-2 to 49-9).    None of these declarants

state that they themselves were placed in disciplinary segregation.

The Plaintiffs' claims that they labored under the threat of disciplinary

segregation, which is entirely permitted by ICE regulations, is more like those

presented in other cases that do not arise in the trafficking context.  For example,

the TVPA is not proper for challenging conditions of confinement.  *See*, *e.g*.,

*Alexander v. CCA*, No. 10-1956, 2010 WL 4723435 (D.D.C. 2010) (dismissing

prison inmate's TVPA complaint for millions of dollars in damages, construing it

as a challenge to conditions of confinement that must be brought as habeas corpus

action).   Nor does the TVPA apply in circumstances where, as here, the coercive

conduct is legitimate and was not proven to be the cause of the labor provided.

App. 772 (authorizing sanctions for refusal to perform housekeeping work).  In

*Headley v. Church of Scientology International*, 687 F.3d 1173 (9th Cir. 2012),

plaintiffs were members of a religious order that imposed strict discipline on

members.  The Ninth Circuit concluded that the TVPA's requirement that an

employer obtain another's labor "by means of" coercive acts under the TVPA was

"a problem" for the plaintiffs because the record contained little evidence that the

defendants obtained the labor "by means of" such coercion, rather than other

reasons, such as enjoyment, or believing it was the right thing to do.  *Id*. at 1179.

The court emphasized that in applying the TVPA, a court "must distinguish

between 'improper threats or coercion and permissible warnings of ***adverse but***

***legitimate consequences***." *Id*. at 1180 (quoting *United States v. Bradley*, 390 F.3d

145, 151 (1st Cir. 2004), *vacated on other grounds*, 545 U.S. 1101 (2005))

(emphasis added); *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc*., No.

10-CV-1341, 2012 WL 748760, *7 (E.D.N.Y. Mar. 7, 2012) (no TVPA claim

where threats of losing job were "merely [] threats of adverse but legitimate

consequences" and did not constitute forced labor); *id*. (noting plaintiffs "had not

cited a single case to support their novel theory" that threats of firing or berating

constituted forced labor).[5]

### 3.    The Unjust Enrichment Claim.

To state an unjust enrichment claim under Colorado law, a plaintiff must

show (1) that the defendant received a benefit; and (2) at the plaintiff's expense;

---

[5]    In *Bradley*, the First Circuit rejected laborers' claims that their employers' conduct, which included a "threat" not to pay for passage home if an employee left early, noting that "[d]epending on the contract, surely such a 'threat' could be a legitimate stance for the employer and not criminal conduct."  390 F.3d at 151. *See also United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) (no plain error in jury instruction in Section 1589 case that "[w]arnings of legitimate but adverse consequences or credible threats of deportation, standing alone, are not sufficient to violate the forced labor statute"); *Pasamba v. HCCA Int'l, Inc*., No. CV-08-0247, 2008 WL 2562928, *6 (D. Ariz. June 24, 2008) (nurse did not allege sufficient facts to establish that her employer had committed the predicate act of forced labor because warning of adverse but legitimate consequences of terminating her employment prematurely would not constitute the abuse or threat of abuse of law or the legal process under Section 1589).

and (3) in circumstances under which it would be unjust for the defendant to keep that benefit without paying for it. *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008). Whether keeping a benefit would be unjust is "a fact-intensive inquiry in which courts look to, among other things, the intentions, expectations, and behavior of the parties." *Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 287 P.3d 842, 847 (Colo. 2012). This inquiry requires "extensive factual findings" and "careful consideration of particular circumstances." *Lewis*, 189 P.3d at 1140; *see also DCB Constr. Co., Inc. v. Cent. City Dev. Co.*, 965 P.2d 115, 120-21 (Colo. 1998) ("The notion of what is or is not 'unjust' is an inherently malleable and unpredictable standard."). Importantly here, Colorado courts have denied unjust enrichment claims when plaintiffs have not shown any reasonable expectation of compensation. *Britvar v. Shainuck*, 791 P.3d 1183, 1185 (Colo. App. 1989) ("A plaintiff cannot recover for unjust enrichment on a quasi-contractual claim for services rendered absent proof of circumstances indicating that compensation is reasonably expected.").

Plaintiffs claim that the operative questions of law and fact regarding GEO's liability are "whether [GEO's] retention of any benefit collected directly and indirectly from Plaintiffs' and others' labor violated principles of justice, equity, and good conscience, and whether Plaintiffs and the class members were paid $1 per day for their labor." App. 33-34, 36.

20

As discussed, GEO did not unjustly receive any benefit that a detainee could reasonably expect to claim.  The $1 per day rate has been consistently appropriated or applied in the VWP for decades.  *See supra* at 12-14.  Participating detainees sign a form that expressly states that "work detail members will receive $1.00 per work day.  The maximum paid out will be $1.00 per day."  App. 779.  Detainees state on the form that they "have read, understand, and agree to[] comply" with the terms of the program, including that "Compensation shall be $1.00 per day," and may also check a box agreeing that, if there are no VWP positions available, that they are interested in working on a voluntary basis. App. 778-79. Each of the declarants claim to have participated in the VWP and received $1 per day, and some also volunteered to work without pay.  *See*, *e.g*., App. 437, 440, 444, 446, 448, 778-79.  Some declarants inquired about the possibility of receiving more than $1 per day, and others filed grievances inquiring about higher pay, but each were told that GEO pays only the $1 daily allowance.  *See* App. 450, 455, 636-39.

### 4.    The Ruling Under Review.

On February 27, 2017, the district court granted Plaintiffs' motion for class certification, certifying classes on both TVPA and unjust enrichment claims.  App. 807-27.  The district court held that the Plaintiffs satisfied the numerosity and adequacy requirements of Rule 23(a).  App. 812.    The court focused largely on

21

the elements of commonality and typicality under Rule 23(a) and predominance
and superiority under Rule 23(b).

In the district court's view, the Plaintiffs and putative class members have
"circumstances" that "are uniquely suited for a class action." App. 808. "All share
the experience of having been detained in [Aurora] and subjected to uniform
policies that purposefully eliminate nonconformity." *Id*. Thus, the "complex and
novel" questions presented by this case have "answers" that "can be provided on a
classwide basis." *Id*. This premise runs throughout the court's order.

The court recognized that Section 1589's requirement that a defendant
obtain labor "by means of" the defendant's improper coercion is "central to the
parties' dispute." App. 812. However, it rejected GEO's argument that class
members could have labored for reasons other than coercive disciplinary sanctions.
Instead, it held:

> GEO has a specific, uniformly applicable Sanitation Policy that is the
> subject of Representatives' TVPA claim. This Policy is the glue that
> holds the allegations of the Representatives and putative class
> members together, [footnote omitted] creating a number of crucial
> questions with common answers. For example: Does GEO employ a
> Sanitation Policy that constitutes improper means of coercion under
> the forced labor statute? Does GEO knowingly obtain detainees' labor
> using that Policy? Is there a civic duty exception to the forced labor
> statute that makes the Policy acceptable? Representatives have
> demonstrated the existence of common questions that can resolve
> issues "central to the validity" of its TVPA claim "in one stroke."

App. 814 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

22

With respect to typicality, the court found that "[t]he nature of detention is unique in that it allows the detainer to almost fully control the experience of the detainee. In this case, Representatives and the putative class members were all subject to and impacted by the Sanitation Policy, and the duties they performed under the Policy were at the direction of GEO's staff." App. 815. Thus, the court found it "irrelevant" that no Plaintiff "was actually disciplined with segregation for violating the Policy, since the forced labor statute includes threats, schemes, plans, and patterns as improper means of coercion." *Id.* Because the Sanitation Policy had been in effect since 1995, the court extrapolated the same dynamic back for ten years, based only on the presumption that the coercive atmosphere could never vary from detainee to detainee. *Id.*

With respect to predominance and superiority under Rule 23(b)(3), the district court recognized that the "by means of" element of Section 1589 required a subjection determination of whether a plaintiff "actually labored because of the perpetrator's conduct." App. 818-19 (citing *David v. Signal International, LLC*, No. 08-1220, 2012 WL 10759668, at *20 (E.D. La. Jan. 4, 2012)). However, the district court found that there is "nothing preventing" the inference that the "by means of" element can be satisfied by inferring from classwide proof that the putative class members labored because of GEO's improper means of coercion. App. 819. "[G]iven the climate in which they were detained," the court continued,

23

"it is possible that an inference of causation would be appropriate even despite some class members' purported willingness to work for reasons other than GEO's improper means of coercion. *Id.* It therefore "need only conclude that the 'by means of' element could be established by classwide circumstantial evidence." App. 820. "The circumstances here—namely the class members' detainment, the imposition of a uniform policy, and the numerous other questions common to the class—certainly make it beneficial to permit such an inference." *Id.*

With respect to damages, the court held that "the possible need for specific damages determinations does not predominate." *Id.* The court also concluded that class action was the superior way to resolve the TVPA claim, noting the unlikelihood that class members "would individually bring these innovative claims against GEO." App. 821.

With respect to the unjust enrichment claim, the district court found that Plaintiffs satisfied the Rule 23(a) commonality requirement because they "demonstrated the existence of at least a single common question—whether GEO received a benefit from VWP participants' labor—the determination of which will resolve an issue central to the validity of the unjust enrichment claim in one stroke." App. 822. The court iterated its theme, "[a]s noted throughout this order, detainment presents distinctive conditions" and Plaintiffs worked in the VWP "in

24

an environment GEO controlled.  GEO dictated the jobs they performed, the rate

they were paid, and the alleged savings it experienced."   App. 823.

The district court also found predominance and superiority with respect to

the unjust enrichment claim.  The court concluded "[i]t is not necessary to analyze

the intentions, expectations, and behavior of each individual class member; it is

enough to consider the overall context based on classwide proof."  App. 824.

"GEO's treatment of participants in the VWP was based on uniform policies and,

therefore, it is likely that, if its retention of a benefit was unjust with respect to one

class member, it was unjust with respect to all class members."  *Id.*  The court

concluded that in this case "there is a consistent policy under which detained

individuals worked and were paid the same amount," and while "the extent to

which GEO was unjustly enriched would require, individualized inquiries, but

whether it was unjust at all could be determined on a classwide basis."  App. 825.

Although it acknowledged that Plaintiffs "have not provided a detailed

model or expert opinion on calculating damages," the court found that Plaintiffs

"have demonstrated that individual damages in this case should be easily

calculable using a simple formula."  App. 825.  Finally, the court found that class

action is the superior method for adjudicating the unjust enrichment claim, again

concluding that "it is very likely that these claims would not be brought by

individual detainees, especially considering the case's innovative nature."  App. 826.

The district court adopted without amendment the class definitions as proposed in the Plaintiffs' class certification motion.  App. 826.  The TVPA class consists of "[a]ll persons detained in [GEO's] Aurora Detention Facility in the ten years prior to the filing of this action,"  App. 809; *see also* App. 31.  The TVPA class seeks restitution and/or compensatory and punitive damages, and attorney's fees under 18 U.S.C. §§ 1593, 1595.  App. 35.  The unjust enrichment class consists of "[a]ll people who performed work [at] defendant's Aurora detention facility under defendant's VWP policy in the three years prior to the filing of this action," App. 810, 30-31.  The unjust enrichment class seeks compensatory and exemplary damages, and other relief as appropriate.  App. 35-36.  In neither case does the order more specifically limit the claim of injury that class members must have in common.

### 5.   The Court Grants Interlocutory Review Of Class Certification.

GEO sought interlocutory review of the district court's order.  On April 11, 2017, the Court (by Chief Judge Tymkovich, and Judges Hartz and Matheson) granted the petition for permission to appeal, noting "the complexity and difficulty of the issues presented."  App. 828-29.

## STANDARDS OF REVIEW

As the Supreme Court recently explained, "[t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart*, 564 U.S. at 348. Thus, a party seeking to represent a class must affirmatively demonstrate compliance with all of Rule 23's requirements. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). "When addressing class certification, the district court must undertake a "rigorous analysis" to satisfy itself that the prerequisites of Rule 23 are met. *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014). To meet this burden, a party must support its certification motion by satisfying not only all elements of Rule 23(a), but also the elements described in at least one provision of Rule 23(b). *Shook v. El Paso Cty.*, 386 F.3d 963, 968 (10th Cir. 2004).

Under Rule 23(a), the parties requesting certification must first show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

Rule 23(b)(3) allows a court to certify a class only if it "finds that the questions of law or fact common to class member predominate over any questions affecting only individual members, and that a class action is superior to other

27

available methods for fairly and efficiently adjudicating the controversy."
Predominance tests whether putative classes are "sufficiently cohesive to warrant
adjudication by representation." *CGC Holding*, 773 F.3d at 1087. The Supreme
Court has called this provision an "adventuresome innovation" that was "designed
for situations in which class-action treatment is not as clearly called for." *Comcast
Corp.*, 133 S. Ct. at 1432. Accordingly, "the predominance criterion is far more
demanding" than the commonality element. *Amchem Prods., Inc. v. Windsor*, 521
U.S. 591, 623-24 (1997). Even when a party satisfies the commonality element, it
may still fail to carry its burden to show predominance. Rule 23(b)(3) also
requires that the class action be "superior to other available methods for the fair
and efficient adjudication of the controversy." *Wilcox v. Commerce Bank*, 474
F.2d 336, 346 (10th Cir. 1973); Fed. R. Civ. P. 23(b)(3)(A)-(D).

A district court must rigorously analyze a plaintiff's showings; it errs by
relaxing or shifting the burden of proof, by liberally construing the certification
requirements, or by resolving doubts in favor of certification. *Wallace B. Roderick
Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1217-18 (10th Cir.
2013). "Actual, not presumed, conformance with Rule 23 remains indispensable."
*CGC Holding*, 773 F.3d at 1086.

The Court reviews the district court's legal standard in granting certification
de novo and the merits of such grant for abuse of discretion. *Vallario v. Vandehey*,

28

554 F.3d 1259, 1264 (10th Cir. 2009).  Material misapplication of the Rule 23

factors constitutes an abuse of discretion.  *XTO Energy, Inc.*, 725 F.3d at 1217.

## SUMMARY OF THE ARGUMENT

In GEO's view, neither the TVPA claim nor the unjust enrichment claim is

valid.  Nonetheless, the district court's decision to deny interlocutory review of the

merits puts GEO in the position of straining to discern how these unprecedented

claims might be tried individually or as a class.  It is clear that both claims are unfit

for classwide resolution.

**TVPA – No Commonality.**  Section 1589 requires the Plaintiffs to prove

that GEO knowingly provided or obtained labor from them "by means of" a

coercive action prohibited by the Section 1589, which requires, at a minimum, an

examination of the subjective reasons why a particular detainee labored.

Plaintiffs never provided this proof.  The district court erroneously

concluded that the "Sanitation Policy" provided the "glue" of commonality among

all class members subject to it.  But a policy alone does not coerce anyone to do

anything in violation of Section 1589.  The statute requires a determination of, for

example, whether GEO "knowingly" through its agents administered the

housekeeping program in a manner that caused detainees to labor by means

prohibited by the TVPA.  The statute requires a court to examine a real, human

connection: what did GEO (knowingly, through its agents) do, if anything, to cause

29

Aurora detainees to labor "by means of" an action prohibited by the TVPA.  This

is an irreducibly individualized question that cannot produce common answers.

**TVPA – No Typicality.**  The district court presumed or liberally inferred

typicality because "[t]he nature of detention is unique in that it allows the detainer

to almost fully control the experience of the detainee."  App. 815.  But the

evidence does not show typicality.  For example, none of the declarants had

actually been placed in segregation (but merely claimed other class members

were).  Declarants claimed they worked only because of the threat of disciplinary

segregation, but the Plaintiffs' complaint alleges a much broader range of alleged

coercive activity by GEO.  Under the broad class definition, which reaches all

detainees over the last ten years, there is no proof that the class representatives are

typical of a class of detainees that in every instance labored solely because of an

act or threat by GEO that violates the TVPA.

**TVPA – No Predominance.**  In finding predominance, the district court

made improper presumptions and inferences, rather than demand the proof a

rigorous analysis requires.  It concluded that there was "nothing preventing" an

inference that "putative class members labored because of GEO's improper means

of coercion" and an "inference of causation" about "the climate in which they were

detained."  App. 819.  These inferences go too far, essentially concluding that the

conditions of detainee confinement are so uniformly coercive as to guarantee that labor is provided or obtained by GEO only through a TVPA violation.

Detainees could choose to perform housekeeping chores for any number of reasons other than a sanction prescribed by the ICE-approved Aurora policy, such as preferring a clean living area, boredom, sociability, or simple respect for the rules. To establish commonality, Plaintiffs must be able to prove that each detainee, in every instance for which restitution or damages is claimed, provided labor knowingly obtained by GEO by some coercive means prohibited in Section 1589. Plaintiffs did not provide such proof in support of their motion for class certification. Instead, the court presumed this link through generalities about the "climate" of detention eliminating all motivations to work other than coercion by GEO. Additionally, Plaintiffs did not produce, and the district court did not require, any model for how damages or restitution would be calculated.

**TVPA – No Superiority**. Class action is a poor way to litigate experimental claims that have never been recognized by another court, and are yet to be reviewed by any appellate court. Plaintiffs' claims really target a federally-approved housekeeping program that Plaintiffs could attempt to challenge through other means, such as an APA action or through injunctive relief. A classwide suit for monetary relief is not the superior way to challenge a private contractor's administration of a program that is federally approved.

31

**Unjust Enrichment – No Commonality.**  The type of unjust enrichment claim Plaintiffs raise does not yield common questions appropriate for classwide resolution.  Colorado law requires that Plaintiffs show they had a reasonable expectation to be paid money that they allege unjustly enriches GEO.  But the record and legal framework establish the opposite: no detainee was likely to have a reasonable expectation of an allowance in excess of the $1.00 daily amount, which is enshrined in numerous statutes and policies.  ICE reimburses GEO for the $1 daily allowances under Aurora's contract, and that rate cannot be changed without ICE approval.

Within the facility's population, most detainees agree to do VWP work for $1 per day or for free.  To the extent any Plaintiff or class member could be proven to have a reasonable expectation that he or she would be paid more than $1 per day for VWP work (*e.g.*, a market wage for services), that would be an individualized expectation that must be proven by individualized evidence.

**Unjust Enrichment – No Typicality.**  The record does not demonstrate that the Plaintiffs have an unjust enrichment claim typical of class status.  Only a few detainees indicate that they inquired about whether daily pay could exceed $1, or filed grievances, and in every instance the detainees were informed that they would be paid only $1 per day.  None of the Plaintiffs aver that they expected a market

32

wage or analogous compensation, and thus there is no basis to conclude that there
was any such classwide expectation.

**Unjust Enrichment – No Predominance.** Unjust enrichment claims are
notoriously unfit for classwide resolution because they depend so extensively on
individualized interactions and expectations. In this case, all signs point to the fact
that a reasonable detainee would expect nothing other than $1 per day for VWP
work, and many expressly agreed to this amount before participating in the
program. If any exceptions exist (and Plaintiffs have not demonstrated this), it
would be proven through factual evidence that an agreement or entitlement existed
that GEO did not honor and was thereby "unjustly enriched." There is no such
evidence here.

**Unjust Enrichment – No Superiority.** It is clear that the Plaintiffs' claims
really target the federally-approved VWP, which is structured to pay detainees a $1
per day allowance. Plaintiffs have not availed themselves of options such as
challenging the validity of this policy through a suit against the federal government
for declaratory or injunctive relief. Plaintiffs have chosen the inapt route of
classwide monetary relief for unjust enrichment claims, which falter because they
require individualized proof of the intentions, expectations and behavior of the
parties to the transaction alleged to result in an unjust benefit.

## ARGUMENT

## I.     THE TVPA CLAIM IS UNFIT FOR CLASSWIDE ADJUDICATION.

The TVPA claim is an experimental claim and the district court failed to
provide the "rigorous analysis" necessary to determine that all of Rule 23's
prerequisites are met.  *CGC Holding*, 773 F.3d at 1086.  Instead, at every key
juncture in its analysis, the district court did not require sufficient evidence,
relaxed standards in the Plaintiffs' favor, shifted burdens of proof, liberally
construed requirements, and resolved doubts in favor of certification.  *XTO
Energy, Inc.*, 725 F.3d at 1217-18.  Certification must be reversed.

### A.     There Are No Questions Of Law Or Fact Common To The Class.

Rule 23(a)(2) requires a party to show "questions of law or fact [that are]
common to the class."  Putative class members must do more than allege "that they
have all suffered a violation of the same provision of law," they must allege that
they "have suffered the same injury." *See Wal-Mart*, 564 U.S. at 350.  A claim
"must be of such a nature that it is capable of classwide resolution—which means
that determination of its truth or falsity will resolve an issue that is central to the
validity of each one of the claims in one stroke."  *Id.* (emphasis added).

In *Wal-Mart*, the Supreme Court found that a proposed class of female
employees alleging Title VII discrimination lacked even a single question common
to the class and thus failed the commonality requirement.  *Id*. at 342, 359.  The

34

Court stated that "[w]ithout some glue holding the alleged reasons for all those decisions together, it [would] be impossible to say that examination of all the class members' claims for relief [would] produce a common answer . . . ." *Id.* at 352.

According to the district court, "a uniform policy can be the glue that holds the allegations of a class together," App. 813, and the "Sanitation Policy" was the glue that holds the representatives and putative class allegations together. App. 814. This is not the rigorous analysis required in certifying a class. A "Sanitation Policy" by itself does not coerce anyone to do anything. The district court implicitly acknowledged this in identifying supposed common questions: "Does GEO *employ* a Sanitation Policy that constitutes improper means of coercion under the forced labor statute?" or ""Does GEO knowingly obtain detainees' labor *using* that Policy?" App. 814 (emphasis added).

The statute proscribes obtaining labor or services of a person "by means of" threats or other harm. 18 U.S.C. § 1589(a). This language describes a causation element that focuses on the purported victim's response to an alleged threat. The statute requires a court to examine a human interaction and make a subjective inquiry—which would be readily present in any legitimate TVPA trafficking action—whether there is something GEO (knowingly, through its agents) did in violation of the TVPA to cause an individual detainee to labor at a particular time

35

and place. This is an irreducibly individualized question that does not produce
common answers.

In *David*, the court explained that to show coercion, a plaintiff needed to
show that the defendant's conduct was "the driving force behind the victim's
'choice' to render the labor." 2012 WL 10759668, at *20; *see also Panwar v.
Access Therapies*, No. 1:12-cv-00619, 2015 WL 329013, at *7 (S.D. Ind., Jan. 22,
2015) (noting that class member's "subjective beliefs and intentions" was a
contributing factor to denying class certification for a TVPA claim).

The vague declarations submitted here state that detainees participated in the
housekeeping program because of the threat to be put "in the hole," or disciplinary
segregation. App. 437-55 (paragraph 3 of Dkts. 49-2 to 49-9).[6] For claims based
on such evidence to have commonality within a class, Plaintiffs needed to establish
that, for every single injury for which class members would seek restitution or
damages, GEO knowingly provided or obtained that detainee's labor solely due to
the threat of disciplinary segregation.

---

[6] The declarations are nearly identical, reflecting drafting by lawyers, and
little detail that would enable a factfinder to discern the cause of the choices made
by the declarants. *See Baricuatro v. Ind. Personnel & Mgmt Servs., Inc.*, Civ. No.
11-2777, 2013 WL 6072702, at *21 (E.D. La. Nov. 18, 2013) (declining to certify
a Rule 23(b)(2) class partly because plaintiffs' only evidence of a classwide injury
came from "cookie-cutter, lawyer-drafted declarations" and isolated instances
reported by specific persons).

No commonality was established.  Detainees—like all persons—may have their own motivations for working that are not the result of alleged coercion in violation of the TVPA.  They may like to have a sanitary environment.  They may like to be social while working, or participate because of peer pressure.  They may willingly obey the facility's policy out of respect for it.  Or they may simply wish to stay busy.

Relying on the "Sanitation Policy" to provide causation with respect to all class members is insufficient.  Sanctions for refusal to participate in the housekeeping program, while adverse, are legitimate, and reflect ICE policies that Plaintiffs have not independently challenged.  *See* App. 722 (listing permissible sanctions). In *Headley*, the Ninth Circuit upheld summary judgment for a defendant in an TVPA action when the record showed that the plaintiffs had "joined and voluntarily worked … because they believed that it was the right thing to do, because they enjoyed it, and because they thought that by working they were honoring the commitment that they each made and to which they adhered."  687 F.3d at 1179-80.  Here, there are numerous reasons why a detainee might work in the housekeeping program that involves no sanction or threat of sanction at all.

Finally, there is no common question as to whether GEO "knowingly obtain[s]" detainee labor.  App. 814.  Plaintiffs have argued that GEO obtains labor through the housekeeping program because otherwise it would have to hire

37

employees to do the work.  This does not reflect the purposes, design or history of

the housekeeping program.  Detainees are not at Aurora because GEO put them

there to work; detainees are in the lawful custody of the federal government.  It is

long established that working detainees are not "employees," are not part of a

"workforce," and can be required to perform housekeeping chores, even without

pay, as institutional maintenance pursuant to their detention.  *See* 1992 WL

1369347, at *1; *supra* at 8-9.  ICE requires housekeeping and approves the

program administered by GEO at Aurora.  App. 540-42.  Thus, GEO does not

"knowingly . . . obtain" labor like the trafficker of a domestic servant in a typical

TVPA case.  Nobody "knowingly . . . obtain[s]" detainees' labor under the TVPA,

but even if that were the case, it is unclear why it would be GEO, rather than ICE

or even the public at large.  The TVPA in this context simply does not yield

common questions that are appropriate for classwide resolution.

### B.    The Plaintiffs' TVPA Claims Are Not Typical Of A Class.

Rule 23(a)(3) requires that "the claims or defenses of the representative

parties are typical of the claims or defenses of the class."  *See Ellis v. Spectranetics

Corp.*, No. 15-cv-01857, 2015 WL 9259928, at *2 (D. Colo. Dec. 18, 2015).

"Typicality determines whether a sufficient relationship exists between the injury

to the named plaintiff and the conduct affecting the class so that the court may

properly attribute a collective nature to the challenged conduct."  *Zapata v. IBP,*

*Inc.*, 167 F.R.D. 147, 160 (D. Kan. 1996). For a plaintiff's claim to be typical, it must "challenge the same conduct that would be challenged by the class," *Pliego v. Los Arcos Mexican Rests, Inc.*, 313 F.R.D. 117, 126 (D. Colo. 2016), such that there is a "sufficient nexus … between the claims of the named representatives and those of the class at large," *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1275 (11th Cir. 2009).

The district court presumed or liberally inferred the kind of factual predicates that the Plaintiffs were required to prove, finding typicality because "[t]he nature of detention is unique in that it allows the detainer to almost fully control the experience of the detainee." App. 815. The court assumed that the Plaintiffs would be typical of any class of detainees because the "nature of detention" renders the detainees' experiences uniform.

The court's approach to typicality under the TVPA would not ensure a nexus between the class representatives and other putative class members. The declarants all claim that they performed housekeeping chores due to the perceived threat of being put in disciplinary segregation. That would make them typical only of a class of detainees who ***all*** worked ***only*** based on the ***threat*** of disciplinary segregation. This is far narrower than the complaint, which alleged violations based on a variety of actual or threatened discipline (including segregation), restraints and "serious harm." *See* App. 29-31. Yet the district court defined the

TVPA class as "[a]ll persons detained in [Aurora] in the ten years prior to the filing of this action," without limiting the class only to those that GEO allegedly compelled by threats of disciplinary segregation.  App. 809, 827.  Again, the manifold problems of certifying a class when the representatives are so a-typical are obvious; the alleged injuries are highly individualized.

### C.    There Are No Common Questions Of Law Or Fact That Predominate Over Individual Questions.

Rule 23(b)(3) predominance inquiry tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *see also Harding v. Tambrands, Inc.*, 165 F.R.D. 623, 629 (D. Kan. 1996) ("The predominance requirement ensures that claims of class members will be so similar that prosecution by a few members of the class will be fair").  The district court failed to provide a rigorous analysis of the "far more demanding" Rule 23(b)(3) predominance requirement.  *Amchem*, 521 U.S. at 623-24.

Being a detainee or former detainee may be a common issue, but each individual's reasons for performing housekeeping chores from one day to the next is not.  *David* involved a claim by foreign nationals who traveled to the United States to work in a shipyard.  2012 WL 10759668, at *1.  The crux of the complaint was that the defendants had promised that they could get permanent-residence status but charged them exorbitant recruiting fees that forced plaintiffs to keep jobs that subjected them to "segregated housing, severe discrimination, and

40

adverse working and living conditions." *Id.* They sought to represent a class of roughly five hundred similarly situated persons. *Id.*

The court denied their class certification motion on the grounds that individual causation elements would predominate. *Id.* at *22. The court held that coercion could not be determined "***without looking to the specific victim involved***," *id.* at *19 (emphasis added); that considering the specific alleged victim was "even more crucial" when overt coercion such as severe beatings or torture were not alleged, *id.* at *20; that it would be "inimical to the concept of damage recovery in civil litigation to simply ignore the question of whether the individual plaintiff was in fact injured by the defendant's conduct," *id.*, and that even characteristics shared by the class—such as immigration status, payment of exorbitant fees, and poor living conditions—did not suffice to establish predominance, *id.* at *21.

While the district court agreed with *David* that the TVPA requires the plaintiff to show "whether the victims actually labored because of the perpetrator's conduct," it otherwise diverged sharply from that rule:

> Representatives argue, as an alternative to eliminating the subjective component of the statu[t]e, that the 'by means of' element can be satisfied by inferring from classwide proof that the putative class members labored because of GEO's improper means of coercion. Representatives are correct that ***there is nothing preventing such an inference***. I have not found and GEO has not provided any authority requiring that, for TVPA claims, causation must be proven by direct and not circumstantial evidence.

41

App. 819 (emphasis added). The court further added that "[g]iven the climate in which they were detained, ***it is possible that an inference of causation*** would be appropriate even despite some class members' purported willingness to work for reasons other than GEO's improper means of coercion." *Id.* (emphasis added).[7]

This is not the rigorous predominance analysis required by Rule 23. Rather than demanding proof that the "proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 623, the district court posited an unsupported social-psychological profile of the "climate" of detention, which made it "possible" to create an "inference of causation" on a circumstantial basis. This brittle string of presumptions and inferences cannot support the weight of class action for restitution and damages covering upwards of 60,000 putative class members when Section 1589 requires an examination of subjective, individual decisions about what caused each detainee to work in each instance. *See XTO Energy*, 725 F.3d at 1218; *CGC Holding*, 773 F.3d at 1086.

Plaintiffs relied largely on *Tanedo v. East Baton Rouge Parish School Board*, No. LA CV10-01172 JAK, 2011 WL 7095434 (C.D. Cal. Dec. 12, 2011),

---

[7] The court improperly relied on dicta from *David* that "there may be cases where consent becomes irrelevant." *Id.* at 13 (citing *David*, 2012 WL 10759668, at *21). However, the court stated that only in the context of the awful facts of that case, involving severe beatings or being tortured with egregious forms of physical abuse. That scenario is far removed from the one Plaintiffs have alleged here, involving adverse, but legitimate, ICE-approved sanctions for not performing housekeeping chores.

which is clearly distinguishable and illustrates why no TVPA claim should be

certified here. *Tanedo* involved a trafficking scheme in which the defendants

recruited foreign nationals to teach in American schools, required a substantial

initial payment from each foreign applicant, and then tricked those applicants to

have their immigration paperwork improperly sent to the recruiters instead of the

applicants directly. *Id.* at *1-2. The recruiters would then withhold that paperwork

from the applicants unless they agreed to pay substantial further fees from their

teaching work in America over the next two years. *Id.* at *2.

*Tanedo* involved actual human trafficking. The defendants ransomed the

plaintiffs' immigration papers for large sums of money. *Id.* at *1-2. The scheme

was facially extortionate, not (as here) the administration of a federal agency

policy, and the manner in which the defendants' illegal conduct caused the

plaintiffs to labor could be shown by the evidence. In any event, *Tanedo* departs

sharply from other cases, like *David*, that deny TVPA class certifications because

individualized issues predominated. *See also Panwar*, 2015 WL 329013, at *7; *cf.*

*Baricuatro*, 2013 WL 6072702, at *21.

Finally, a court must engage in a rigorous analysis to ensure evidentiary

proof of damages at the class certification stage, including a method to determine

possible damages on a classwide basis. *Behrend*, 133 S. Ct. at 1432-33. A court

must consider the extent to which material differences in damages determinations

will require individualized inquiries. *XTO Energy*, 725 F.3d at 1220. It is Plaintiffs' burden to "present[] 'a common formula to the class' that 'approximate[s] damages,'" if it wishes to avoid a case-by-case damages assessment. *Stender v. Archstone-Smith Operating Trust*, No. 07-cv-02503, 2015 WL 5675304, *11 (D. Colo. Sept. 28, 2015).

Here, court summarily concluded that "considering the numerous common questions to the class, I find that the possible need for specific damages determinations does not predominate." App. 820. Yet Plaintiffs have never demonstrated how they would calculate damages or restitution that would not require individual determinations. To the extent they may seek to analogize damages or restitution to a wage claim, Plaintiffs provide no basis for valuing the household chores performed by detainees outside the workforce. The district court failed to undertake the rigorous analysis of predominance required by Rule 23.

### D.    Class Action Is Not The Superior Method For Adjudicating The TVPA Claim.

The district court was required to find that the TVPA class is "superior to other available methods for the fair and efficient adjudication of the controversy." *Wilcox*, 474 F.2d at 346. The court held that class action was the superior way to litigate the TVPA claims, noting that putative class members reside around the world and lack English proficiency or knowledge of the U.S. legal system, and that it was "unlikely that they would individually bring these innovative claims against

44

GEO," and if they did so "each detainee would have to litigate the same exact issues regarding GEO's Sanitation Policy." *Id.* The district court's holding, while incorrect, hits upon a key issue: a true target of this litigation is the Sanitation Policy itself, not just GEO's administration of it. Although this case is styled as a suit for money damages under the TVPA, it is, and always has been, an agenda-driven challenge to ICE's housekeeping program, and the use of private contractors to operate federal detention facilities.

Plaintiffs have conjured up images of "slavelike conditions" and the "master's whip and the power of the State to compel one human to labor for another." App. 416. But despite this rhetorical urgency, there is no indication Plaintiffs have taken any steps to try to have this policy changed by the agency, declared invalid, or enjoined. Instead, Plaintiffs have contorted the TVPA from its purpose as a statute to combat human trafficking (which in the typical case is not administered as a federal government policy) into a basis for a money-seeking class action that ultimately would not even alter or prevent the continuing administration of the housekeeping program. And as discussed, under the Aurora contract and federal regulations, if ICE determined that GEO was actually engaged in some kind of trafficking activity (which, even with an ICE contract monitor on-site, it has not), it could terminate the contract and take other remedial measures. Thus, class action is not a superior vehicle for resolving this dispute.

## II.    THE UNJUST ENRICHMENT CLAIM IS UNFIT FOR CLASSWIDE ADJUDICATION.

### A.    The Unjust Enrichment Class Is Not Based On Common Questions Or Facts.

Plaintiffs claim to present two questions that could satisfy the commonality requirement: "(1) whether the class provided GEO with a benefit in the form of substantially discounted labor, and (2) whether, under the circumstances of this case, it would be unjust for GEO to retain that benefit."  App. 822.  The district court held that "whether GEO received benefits from VWP participants' labor" was a question common to the class.   App. 822-23.

Neither the Plaintiffs nor the district court, however, have identified the right legal standard for evaluating whether a class can be certified on the issue of GEO's alleged unjust enrichment.  *See supra* at 19-20 (discussing standards under Colorado law).  Whether keeping a benefit would be unjust is "a fact-intensive inquiry in which courts look to, among other things, the intentions, expectations, and behavior of the parties."  *Melat*, 287 P.3d at 847.  This requires "extensive factual findings" and "careful consideration of particular circumstances,"  *Lewis*, 189 P.3d at 1140, and invokes an "inherently malleable and unpredictable standard."  *DCB Constr.*, 965 P.2d at 120-21.  There is no unjust enrichment unless a plaintiff can show a reasonable expectation of compensation.  *Britvar*, 791 P.3d at 1184.

46

The district court did not address the "reasonable expectations" requirement at all. Instead, it reverted to the order's flawed central theme: that "detainment presents distinctive conditions," and Plaintiffs and class members working in the VWP "in an environment GEO controlled," made the Plaintiffs' experience typical and the class questions common. App. 823. The court concluded that "[i]t is not necessary to analyze the intentions, expectations, and behavior of each individual class member; it is enough to consider the overall context based on classwide proof." App. 824.

It was not enough just to "consider the overall context." As discussed, the $1 daily allowance has been the settled expectation for decades, even predating Aurora's 1987 activation. *Supra* at 11-14. The record shows that any expectation of payment in excess of the daily allowance would likely have been unreasonable. The amount that detainees could expect to be paid for participating in the VWP was disclosed to all detainees upon arrival at Aurora and again when they applied to participate in the Program. App. 761, 778-79.

If a detainee hypothetically asked a GEO employee whether additional pay could be earned and was told that he or she would receive that pay, and GEO did not pay it, then detainee could perhaps show a reasonable expectation of payment in excess of the daily allowance. That is not the case here, where detainees stated

that they were aware that they would be paid $1 daily.  App. 437-55 (generally

paragraph 4 of Dkts. 49-2 to 49-9).

    Some detainees claimed to have inquired about whether they could receive

more than that.  *See* App. 450, 455.  But their declarations show that no such

expectation was reasonable.  *See*, *e.g*., App. 450 (explaining that one guard "told

[him] that GEO could only pay one dollar per day, no more").  Detainees that filed

a grievance inquiring about additional payment were told that $1 daily is the

amount GEO can pay under the contract.  App. 636-39, 505 (185:14-19), 604

(39:2-40:10).

    Plaintiff Menocal's declaration states that he was willing to work even when

he knew he would not be paid.  *See* App. 437.  He explained that he voluntarily

"worked in the voluntary work program" even when he "did not have a $1/day

job."  *Id.*  He cleaned the "rec yard for a few hours each day," although he was not

paid the daily allowance.  *Id.*  Thus, even if Plaintiff Menocal could prove that this

work conferred a benefit on GEO by reducing its maintenance costs, he could not

possibly show he was injured by being deprived of a reasonable expectation of

payment, or that GEO was unjustly enriched by failing to make fulfill any such

expectation.  Because this kind of individualized determination is required for each

detainee, there is no common question for a class.

As the declarations indicate, the question of unjust enrichment, even if it were valid in the context the VWP, is a "fact-intensive" inquiry, *Melat*, 287 P.3d at 847, and accordingly "courts generally find that unjust enrichment claims are not appropriately certified for class treatment, as common questions will rarely, if ever, predominate." *Melat*, 287 P.3d at 847 (emphasis added). *See also In re Motions to Certify Classes Against Court Reporting Firms*, 715 F. Supp. 2d 1265, 1284 (S.D. Fla. 2010) ("courts generally find that unjust enrichment claims are not appropriately certified for class treatment, as common questions will rarely, if ever, predominate"), *aff'd*, 439 Fed. App'x 849 (11th Cir. 2011); *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, 304 F.R.D. 601, 611 (D. Colo. 2015) (same).

### B.    The Class Representatives' Unjust Enrichment Claims Are Not Typical Of A Class.

The district court held that the representatives were typical of the class, continuing its central theme, that because GEO "dictated the jobs [Plaintiffs] performed, the rate they were paid, and the alleged savings [GEO] experienced," Plaintiffs' "unjust enrichment claim challenge[d] the same conduct under the same legal theories as any unjust enrichment claim putative class members would bring." App. 823.[8]

---

[8] The court rejected the Plaintiffs argument that alleged "misrepresentations" by GEO regarding the maximum it could pay for VWP work was relevant. *Id.*

As discussed, Plaintiffs failed to show that their unjust enrichment claims
are typical of their putative class.  Only some Plaintiffs inquired about higher pay;
others apparently did not.  *Compare* App. 450, 636-39 *with* App. 446.  There is
only scarce information on any of their expectations.  If Plaintiffs' unjust
enrichment theory rests on allegations that are not even shared among all of the
named Plaintiffs, Plaintiffs' claims are not typical of a class comprising thousands
of other detainees.

### C.    There Are No Common Questions Of Law Or Fact That Predominate Over Individual Questions.

The district court held that class unjust enrichment claims predominate over
individual claims, concluding that it was "not persuaded" that it was "necessary to
analyze the intentions, expectations, and behavior of each individual class
member," and that it was "enough to consider the overall context based on
classwide proof."  App. 824.  The court found that "GEO's treatment of
participants in the VWP was based on uniform policies and, therefore, it is likely
that, if its retention of a benefit was unjust with respect to one class member, it was
unjust with respect to all class members."  *Id*.  Additionally, the district court
flipped the burden of proof to GEO, concluding that GEO "failed to explain why it
would be equitable for it to retain [the benefit conferred by] some of the putative
class members, but inequitable to retain [the benefit] from others."  *Id*. (citation
omitted).

50

This district court's holding on predominance shows a fundamental misunderstanding of the unjust enrichment claim in a class action context.   For any individual detainee to prove an unjust enrichment claim, Colorado law would require him to establish that he participated in the VWP under the individual and reasonable expectation that he would be paid more than the stated allowance.  *See Melat*, 287 P.3d at 847; *Britvar*, 791 P.3d at 1184-85.  But, under Plaintiffs' approach, that same detainee could avoid any inquiry into his reasonable expectations so long as he alleges that he, along with numerous other detainees, thinks that the VWP itself is unjust.  Aggregating unjust enrichment claims into a class action may be possible in rare instances, but such aggregation will not—indeed cannot—**lower** Plaintiffs' burden to prove their case.  It was improper to make it GEO's burden to prove that there individual determinations.  *XTO Energy, Inc.*, 725 F.3d at 1218.

The purported class claims present just the sort of highly individualized issues relating to "expectations" and "intentions" that raise "non-common, aggregation defeating, individual issues" that are "more prevalent [and] important" than common ones.  *See CGC Holding*, 773 F.3d at 1087.  As discussed, it would be necessary for a plaintiff seeking compensation to establish that he or she had a reasonable expectation that GEO would pay more than $1 per day for VWP work, and that GEO unjustly failed to pay contrary to this expectation.  At a trial,

51

Plaintiffs would need to prove that there was, indeed, something "unjust" that "enriched" GEO with respect to each and every Plaintiff's reasonable expectations. None of the declarants in this case even make that claim. They simply state that they participated in the VWP for $1 per day. The Plaintiffs that inquired were told unequivocally that the payment is $1 per day. *Supra* at 48.

In the unlikely event that any detainee would ever be able to prove that such an expectation between the detainee and GEO existed for something akin to a market wage, and that GEO was unjustly enriched by failing to pay it, that case would be proven by the specific circumstances, intentions and expectations in which it arose. In any event, what the record shows is that GEO administered the VWP in compliance with ICE's directives, obtained written agreements from detainees consenting to participate in the program, paid the $1 per day on a timely basis, and that its contract provided that ICE would only reimburse GEO for the $1 per day rate unless provided specific approval by ICE to raise that reimbursement rate. *See supra* 11-12.

Finally, the district court failed to conduct the rigorous analysis of damages required to show predominance. The district court acknowledged that Plaintiffs "have not provided a detailed model or expert opinion on calculating damages." App. 825. And while it recognized at least two individualized issues that would complicate damages—the VWP participants worked varying hours and did not all

perform the same type of work, *id*., it missed the critical third element where any unjust enrichment must be tied to the reasonable expectations that an individual plaintiff could prove.  Yet, the court concluded that the "Representatives have demonstrated that individual damages in this case should be easily calculable using a simple formula." *Id*.  No such demonstration has been made, and GEO remains in the dark as to how Plaintiffs intend to prove damages with respect to any VWP job and any time, or what and how Plaintiffs intend to assert as the appropriate compensation (e.g., a market rate); the record is devoid of any illumination on this issue.  If the damages are really "easily calculable," which GEO has no reason to believe is true, there is no reason why the district court should not have demanded this analysis prior to certifying a class.  The district court improperly let the Plaintiffs defer their proof for tomorrow.

### D.    Class Action Is Not The Superior Method For Adjudicating The Unjust Enrichment Claims.

The district court concluded that class action was superior to other litigation, finding "[i]t is very likely that these claims would not be brought by individual detainees, especially considering the case's innovative nature."  App. 826.

Classwide resolution of the unjust enrichment claim is not superior for many of the same reasons the TVPA claim is not.  Plaintiffs question the legitimacy of the longstanding federal policy that VWP participants receive only a $1 daily allowance, and the use of private contractors to administer this federal program.

53

As discussed, the allowance is "a valid exercise of the congressional power to regulate the conduct of aliens." *Alvarado Guevara*, 902 F.2d at 397. Plaintiffs, or any class members, can challenge ICE's underlying policy authorizing the $1 per day practice as violating some federal law or constitutional right. Such suits have been tried before, and are likely to fail. *See supra* 13-14. But that could conceivably permit a remedy to the Plaintiffs' real complaint in one swoop, without becoming mired in the insurmountable individualized determinations about liability and damages that make this case unfit for classwide determination.

## CONCLUSION

The Court should reverse the district court's class certification and grant other appropriate relief in GEO's favor.

## REQUEST FOR ORAL ARGUMENT

The Court has already noted "the complexity and difficulty of the issues presented." The Court would benefit from the opportunity to question counsel on why the certification order should be reversed.

Dated: June 5, 2017                    Respectfully submitted,

                                        /s/ *Mark Emery*
                                        Mark Emery
                                        NORTON ROSE FULBRIGHT US LLP
                                        799 9th Street, NW, Suite 1000
                                        Washington, DC 20001
                                        (202) 662-0210
                                        mark.emery@nortonrosefulbright.com

Charles A. Deacon
NORTON ROSE FULBRIGHT US LLP
300 Convent Street, Suite 2100
San Antonio, Texas 78205-3792
(210) 270-7133
charlie.deacon@nortonrosefulbright.com

Dana Eismeier
BURNS, FIGA, & WILL
6400 S. Fiddlers Green Circle
Suite 1000
Greenwood Village, Colorado 80111
(303) 796-2626
deismeier@bfwlaw.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE
## WITH WORD VOLUME LIMITATION

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,877 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman typeface.

Dated: June 5, 2017

*/s/ Mark Emery*
Counsel for Appellant

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing document:

a. all required privacy redactions have been made per 10th Cir. R. 25.5;

b. if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

c. The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, McAfee antivirus software, version 4.8.0.1938, last updated June 4, 2017, and according to the program is free of viruses.

Dated: June 5, 2017

*/s/ Mark Emery*
Counsel for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2017, I filed the foregoing through the

Court's CM/ECF system, which served the document on the following counsel for

Appellees:

Alexander N. Hood
alex@towardsjustice.org

Andrew H. Turner
aturner@laborlawdenver.com

Hans C. Meyer
hans@themeyerlawoffice.com

Brandt Milstein
brandt@milsteinlawoffice.com

Dated: June 5, 2017

*/s/ Mark Emery*
Counsel for Appellant

57

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALEGRA,
on their own behalf and on behalf of all others similarly situated,

        Plaintiffs,

v.

THE GEO GROUP, INC.,

        Defendant.

---

ORDER GRANTING MOTION FOR CLASS CERTIFICATION UNDER RULE 23(b)(3)
AND APPOINTMENT OF CLASS COUNSEL UNDER RULE 23(g) (ECF NO. 49)

---

Kane, J.

      Plaintiffs Alejandro Menocal, Marcos Brambila, Grisel Xahuentitla, Hugo Hernandez,

Lourdes Argueta, Jesus Gaytan, Olga Alexaklina, Dagoberto Vizguerra, and Demetrio Valerga

(Representatives) are current and former detainees of the Aurora Detention Facility (Facility), a

private immigration detention center in Aurora, Colorado, owned and operated by Defendant The

GEO Group, Inc. (GEO).  Representatives originally brought three claims against GEO for: (1)

noncompliance with the Colorado Minimum Wages of Workers Act, Colo. Rev. Stat. § 8-6-101,

*et seq.*; (2) violations of the forced labor provision of the Trafficking Victims Protection Act

(TVPA), 18 U.S.C. §§ 1589, 1595; and (3) unjust enrichment. Representatives brought the

1

Case No. 1:14-cv-02887-JLK-CYC   Document 372-19   filed 10/26/20   USDC Colorado
pg 71 of 90
Case 1:14-cv-02887-JLK   Document 57   Filed 02/27/17   USDC Colorado   Page 2 of 21
Appellate Case: 17-1125   Document: 01019820087   Date Filed: 06/05/2017   Page: 70

claims on their own behalf and on behalf of proposed classes of similarly-situated current and former detainees of the Facility. GEO moved to dismiss the claims, and I granted its motion as to only the Colorado minimum wage claim. Representatives now seek certification of the proposed classes for their remaining TVPA and unjust enrichment claims.

Although Representatives and putative class members have diverse backgrounds, their circumstances are uniquely suited for a class action. All share the experience of having been detained in the Facility and subjected to uniform policies that purposefully eliminate nonconformity. The questions posed in this case are complex and novel, but the answers to those questions can be provided on a classwide basis. Appreciating that the class action is "a valuable tool to circumvent the barriers to the pursuit of justice," Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 25:24 (4th ed.), I GRANT the Motion for Class Certification Under Rule 23(b)(3) and Appointment of Class Counsel under Rule 23(g) (ECF No. 49).

## I. Background

Representatives take issue with two aspects of GEO's operation of the Aurora Detention Facility. First, they allege that, in carrying out its Housing Unit Sanitation Policy, GEO violated the Trafficking Victims Protection Act by requiring detainees to clean the private and common areas of the Facility without any compensation and under the threat of solitary confinement and other punishments. Second, they claim that GEO was unjustly enriched by paying detainees who participated in its Voluntary Work Program (VWP) only $1 per day.

GEO, a for-profit, multinational corporation, operates the Facility pursuant to a contract with U.S. Immigration and Customs Enforcement (ICE). ICE's Performance Based National Detention Standards mandate that all detainees perform personal housekeeping. Specifically,

> *[d]etainees are required to maintain their immediate living areas in a neat and orderly manner by: 1. making their bunk beds daily; 2. stacking loose papers; 3.*

> keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.

Def.'s Opp. Class Certification Ex. 2 at 15-16, ECF No. 51-2. GEO combined these responsibilities with portions of the American Correctional Association standards and its own corporate policy to develop the Facility's Housing Unit Sanitation Policy, which has been in effect since 1995. Mot. Class Certification Ex. 1 at 15:23-25, 27:9-14, 86:22-87:3, ECF No. 50-1. Representatives claim that the detainees' compulsory duties under the Sanitation Policy, such as sweeping and mopping floors and cleaning toilets and showers, fall outside the scope of ICE's personal housekeeping requirement. The GEO Detainee Handbook Local Supplement, with which all detainees at the Facility are provided, states that failure to perform one's duties under the Sanitation Policy is a "high-moderate" offense for which detainees can be punished by the initiation of criminal proceedings, termination from their jobs, and up to 72 hours in disciplinary segregation, among other sanctions. Mot. Class Certification Ex. 1 at 29:13-30:2, 79:13-25; Ex. 4 at 18, 26, ECF No. 50-3. Representatives and other detainees were aware of the Sanitation Policy during their detention and claim that they performed the required duties to avoid solitary confinement. *See* Mot. Class Certification Ex. 5 ¶ 3, ECF No. 49-2; Ex. 6 ¶ 3, ECF No. 49-3; Ex. 7 ¶ 3, ECF No. 49-4; Ex. 8 ¶ 3, ECF No. 49-5; Ex. 9 ¶ 3, ECF No. 49-6; Ex. 10 ¶ 3, ECF No. 49-7; Ex. 11 ¶ 3, ECF No. 49-8; Ex. 12 ¶ 3, ECF No. 49-9. Based on these allegations, Representatives assert that the labor performed by detainees at the Facility pursuant to the Sanitation Policy is forced labor in violation of the TVPA. They request that I certify a TVPA class of "[a]ll persons detained in Defendant's Aurora Detention Facility in the ten years prior to the filing of this action." Mot. Class Certification at 10, ECF No. 49.

Separately, GEO offers a Voluntary Work Program that allows detainees to work in various positions around the Facility and earn $1 per day. As part of the program, detainees perform tasks such as maintaining the on-site medical facility, doing laundry, preparing meals, and cleaning the Facility. ICE's Performance Based National Detention Standards require that detainees be compensated "at least $1.00 (USD) per day" for work completed under the facility's VWP. Mot. Dismiss, Ex. 1 at 5, ECF No. 11-1. Representatives allege that GEO misled VWP participants to believe it could pay them no more than $1 per day under the ICE standards. Representatives also stress that GEO employs only a single outside custodian and that detainees are unable to seek other employment in a competitive market. Mot. Class Certification at 9. As a result, they claim that GEO derives significant economic benefit from its VWP and has been unjustly enriched because of it. Representatives propose certification of an unjust enrichment class comprised of "[a]ll people who performed work [at] Defendant's Aurora Detention Facility under Defendant's [Voluntary Work Program] Policy in the three years prior to the filing of this action."

## II. Legal Standard

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). The exception is appropriate when the party seeking certification can establish the four threshold requirements set forth in Federal Rule of Civil Procedure 23(a) and fulfillment of at least one of the provisions in Rule 23(b). "When addressing class certification, the district court must undertake a 'rigorous analysis' to satisfy itself that the prerequisites of Rule 23 . . . are met." *CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014). Under Rule 23(a), the party requesting

certification must first show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." If successful, the party must then demonstrate, pursuant to Rule 23(b), one of the following: (1) individual adjudication would create a risk of incompatible standards of conduct for the party opposing the class or would impair other members' ability to protect their interests; (2) injunctive or declaratory relief is appropriate for the class as a whole due to the action or inaction of the party opposing the class; or (3) common questions of law or fact predominate over any individual questions and a class action is the superior method for "fairly and efficiently adjudicating the controversy."

Here, Representatives rely on Rule 23(b)(3), which requires *predominance* of questions of law or fact common to the class and *superiority* of the class action method. The conditions of predominance and superiority were added "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23 advisory committee's note). In determining if these requirements are met, I must consider, among other factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

III. Discussion

GEO challenges Representatives' satisfaction of almost all of the Rule 23 considerations.

Preliminarily, I find that Representatives have demonstrated that the proposed classes satisfy the

numerosity[1] and adequacy requirements. As to the remaining factors—commonality and

typicality under Rule 23(a) and predominance and superiority under Rule 23(b)(3), GEO's most

compelling, but ultimately unconvincing, argument is that elements of both claims necessitate

inquiries specific to each class member.

A. Trafficking Victims Protection Act Claim

The forced labor provision of the TVPA makes it unlawful for anyone to:

knowingly provide[] or obtain[] the labor or services of a person. . . (1) *by means of* force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) *by means of* serious harm or threats of serious harm to that person or another person; (3) *by means of* the abuse or threatened abuse of law or legal process; or (4) *by means of* any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589 (emphasis added). The element that the labor be obtained "by means of" the

defendant's improper coercion is central to the parties' dispute. GEO claims that evaluating

whether this element is fulfilled requires an individualized assessment of what caused each

---

[1]Representatives have carried their burden by offering "'some evidence of established, ascertainable numbers constituting the class.'" *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1214-15 (10th Cir. 2014) (citing *Rex v. Owens ex rel. Okla.*, 585 F.2d 432, 436 (10th Cir. 1978)). With respect to the TVPA class, GEO's Assistant Warden of Operations estimated that, in the past ten years, 50,000 to 60,000 individuals had been detained at the Facility and subject to the Sanitation Policy. Mot. Class Certification Ex. 1 at 49:24-50:2. As for the unjust enrichment class, GEO's records show that 787 detainees participated in the Voluntary Work Program in November 2012 alone. Mot. Class Certification Ex. 15 at 7, ECF No. 50-6. Representatives approximate that there will be 2,000 total members of the class. GEO argues that Representatives cannot simply rely on the presumption that classes with greater than 40 putative members satisfy the numerosity requirement. Representatives do not just depend on that presumption, however; they have also shown that joinder would be impracticable due to the unique characteristics of the class members, namely that many are spread around the world and are not fluent in English or the U.S. legal system.

putative class member to perform labor under the Sanitation Policy. Consequently, GEO asserts that the commonality, typicality, predominance, and superiority requirements are not met for the TVPA class.

*Federal Rule of Civil Procedure 23(a): Commonality & Typicality*

To fulfill the commonality requirement, Representatives must demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(1). A qualifying question must be "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. The analysis must not focus on the mere existence of common questions but on "'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* at 350 (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Nevertheless, "[i]t is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that the answers to those common questions be dispositive." *CGC Holding Co., LLC*, 773 F.3d at 1087 (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013)).

Representatives submit that the common questions putative class members share are: "(1) whether GEO obtains the labor of class members; (2) whether GEO threatens class members with physical restraint, serious harm, or abuse of the legal process; and (3) whether GEO 'knowingly' obtains class members' labor 'by . . . means of' these threats." Mot. Class Certification at 11. GEO argues that these questions fail to demonstrate, as required by *Wal-Mart Stores, Inc. v. Dukes*, that an issue central to the validity of Representatives' claim is susceptible to classwide resolution.

In *Wal-Mart*, the Supreme Court found that a proposed class of female employees alleging discrimination under Title VII lacked even a single question common to the class and thus did not satisfy the commonality requirement. 564 U.S. at 342, 359. Relying on the fact that the defendant had no specific discriminatory employment policy or biased evaluation method, the Court found that the central question of why each class member was disfavored could not produce a common answer. *Id.* at 352-55, 59. The defendant's local supervisors were given discretion over employment decisions such that it was unlikely that each manager exercised their discretion in a common discriminatory manner. *Id.* at 355-56. The Court stated that "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it [would] be impossible to say that examination of all the class members' claims for relief [would] produce a common answer . . . ." *Id.* at 352.

Unlike in *Wal-Mart*, GEO has a specific, uniformly applicable Sanitation Policy that is the subject of Representatives' TVPA claim. This Policy is the glue that holds the allegations of the Representatives and putative class members together,[2] creating a number of crucial questions with common answers. For example: Does GEO employ a Sanitation Policy that constitutes improper means of coercion under the forced labor statute? Does GEO knowingly obtain detainees' labor using that Policy? Is there a civic duty exception to the forced labor statute that makes the Policy acceptable? Representatives have demonstrated the existence of common questions that can resolve issues "central to the validity" of its TVPA claim "in one stroke." *Wal-Mart Stores, Inc*, 564 U.S. at 350.

---

[2]GEO argues that each class member could have labored due to different parts of the Policy so the Policy as a whole cannot be the glue. The text of the statute contradicts that assertion. The statue provides that "a scheme, plan, or pattern" can constitute improper means without requiring determination of which specific part of the scheme, plan, or pattern motivated the laborer. 18 U.S.C. § 1589. Thus, a uniform policy can be the glue that holds the allegations of a class together.

"The commonality and typicality requirements of Rule 23(a) do not require that every member of the class share a fact situation *identical* to that of the named plaintiff." *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014) (citation omitted). Furthermore, "differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988).

GEO contends that Representatives' experiences could not be typical, because perception of a threat is subjective and because none of Representatives were actually placed in segregation for refusing to clean. GEO also points out that Representatives detention at the Facility only spans back to May 2011, while the proposed class goes back ten years. The nature of detention is unique in that it allows the detainer to almost fully control the experience of the detainee. In this case, Representatives and the putative class members were all subject to and impacted by the Sanitation Policy, and the duties they performed under the Policy were at the direction of GEO's staff.[3] Mot. Class Certification Ex. 2 at 1-3, ECF No. 50-2. I find it irrelevant that no Representative was actually disciplined with segregation for violating the Policy, since the forced labor statute includes threats, schemes, plans, and patterns as improper means of coercion. As for the time period covered by the class, GEO's Assistant Warden of Operations testified that its Sanitation Policy had been in effect since 1995, when she began working for the company. Mot. Class Certification Ex. 1 12:23-13:1, 23:8-16, 86:22-87:3. Representatives and the proposed class of individuals detained during the ten years prior to the filing of the Complaint

---

[3]One way in which GEO implements the Policy is by posting a list of detainees who are required to perform additional cleanup of the common areas each day. Mot. Class Certification Ex. 4 at 19. GEO does not allege and there is nothing in the record to show that detainees who are not on the daily list still choose to perform the additional duties or that detainees work autonomously.

could, therefore, bring claims based on the same legal or remedial theory. Representatives have

shown that the typicality requirement is met for their Proposed TVPA class.

*Federal Rule of Civil Procedure 23(b)(3): Predominance and Superiority*

While the class undoubtedly satisfies the Rule 23(a) factors, the Rule 23(b)(3)

"predominance criterion is far more demanding." *Amchem Prods., Inc.*, 521 U.S. at 623–24. Its

"inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by

representation." *Id.* at 623.  In considering whether questions of law or fact common to class

members predominate, I look to the specific elements of the underlying claim. *See Erica P. John*

*Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

GEO contends that, to satisfy the "by means of" element of the forced labor statute, each

class member would need to show what specifically compelled him or her to perform the

sanitation duties at the Facility. It suggests that some detainees labored just because they desired

to stay occupied. And, with respect to those hypothetical detainees, GEO claims it could not have

violated the TVPA because it did not obtain their labor "by means of" improper coercion.

Representatives refute this argument, stating that, instead of individually inquiring as to why

each detainee labored, a reasonable person standard should be used. According to

Representatives, "the language and structure of the forced labor statute . . . call for an objective

inquiry that turns on whether a reasonable person would provide labor to[] GEO if placed in the

position of the person providing such labor." Mot. Class Certification at 15.

Representatives cite *Nuñag-Tanedo v. East Baton Rouge Parish School Board*, No. LA

CV 10-01172 JAK (MLGx), 2011 WL 7095434 (C.D. Cal. Dec. 12, 2011), as support for their

assertion that a reasonable person standard should be used. *Nuñag-Tanedo* involved a class of

Filipino nationals who were recruited to work as teachers in Louisiana public schools and felt

compelled to teach in order to repay the exorbitant debts they incurred as part of the recruitment process. *Id.* at *1. Construing the forced labor statute, the court in *Nuñag-Tanedo* found that the putative class members shared the same background and circumstances such that a reasonable person standard could be used to determine whether it was the defendants' scheme that ultimately compelled the plaintiffs to work. *Id.* at *1.

In turn, GEO relies on *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619, 2015 WL 329013 (S.D. Ind. Jan. 22, 2015), and *David v. Signal International, LLC*, No. 08-1220, 2012 WL 10759668, at *15 (E.D. La. Jan. 4, 2012), to challenge the use of a reasonable person standard. The proposed classes in *Panwar* and *David*, as in *Nuñag-Tanedo*, were comprised of foreign citizens who were recruited to work in the United States and then were allegedly coerced by improper means to continue laboring. Unlike in *Nuñag-Tanedo*, however, the courts in both *Panwar* and *David* determined that the use of a classwide reasonable person standard was not appropriate. *Panwar*, 2015 WL 329013, at *1; *David*, 2012 WL 10759668, at *1-2.

In *Panwar*, the court found that the backgrounds and circumstances of the plaintiffs and class members varied too greatly to apply a uniform reasonable person standard. 2015 WL 329013, at *6. The class members had different contracts, worked in different states, and faced different working conditions. *Id.* The court reasoned that it was likely that "a significant number" of putative class members did not labor due to improper coercion as they never sought to terminate their contracts, were not threatened by deportation, or would not be seriously harmed by having to pay damages for breach of their employment contracts. *Id.* The facts in this case are distinct from those in *Panwar* given that Representatives and the putative class members here were all subject to a universal policy under uniform conditions.

The second case GEO cites, *David v. Signal International, LLC*, goes beyond looking at the similarities and differences of class members' circumstances and meticulously analyzes the "by means of" element of the forced labor statute. The plaintiffs in *David* asserted, as Representatives do here, that the statute concerns only the defendant's conduct and whether a reasonable person in the plaintiffs' shoes would have been compelled to provide labor against his or her will. 2012 WL 10759668, at *17.  For guidance on the proper query under the statute, the court looked to *United States v. Kozminski*, 487 U.S. 931 (1988). *Id.* at *17-19. The Supreme Court held in *Kozminski* that, for the purposes of criminal prosecution, involuntary servitude under 18 U.S.C. § 1584 is limited to the "compulsion of services by the use or threatened use of physical or legal coercion." 487 U.S. at 952-53. The forced labor statute was enacted in response to that holding in order to combat the exploitation of workers via means other than physical or legal coercion, including through threats of and actual non-physical "serious harm." H.R. Conf. Rep. 106-939, 3-5. In *Kozminski*, the Supreme Court alluded to causation, stating: "[T]he vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve." 487 U.S. at 952. The court in *David* consequently determined that "the forced labor analysis cannot be confined solely to the defendant's conduct but necessarily must take into account the particular victim's vulnerabilities." *David*, 2012 WL 10759668, at *19. It additionally concluded that whether the defendants' coercive conduct caused the plaintiffs to labor could not "be answered via generalized class-wide proof but rather must be answered individually based upon individualized proof." *Id.* at *21.

I find the analysis in *David* to be persuasive in that the forced labor statute does contain both an objective and a subjective component. The subjective component is whether the victims

actually labored *because of* the perpetrator's conduct, while the objective component is whether

a reasonable person would respond in a similar way as the victims. *See id.* at *20.

Representatives' proposal that the subjective component be eliminated by using only a

reasonable person standard does not coincide with the statute.[4]

Nevertheless, the holding in *David* does not foreclose certification of the proposed class

in this case. Representatives argue, as an alternative to eliminating the subjective component of

the statue, that the "by means of" element can be satisfied by inferring from classwide proof that

the putative class members labored because of GEO's improper means of coercion.

Representatives are correct that there is nothing preventing such an inference. I have not found

and GEO has not provided any authority requiring that, for TVPA claims, causation must be

proven by direct and not circumstantial evidence. Were a jury deciding the individual merits of

Representatives claims, it surely would be permitted to make such an inference. Thus, it should

be allowed on a classwide basis as well. *See CGC Holding Co., LLC*, 773 F.3d at 1092.

Representatives and the putative class members in this case were directed by GEO's staff

when, where, and how to perform their sanitation duties. Given the climate in which they were

detained, it is possible that an inference of causation would be appropriate even despite some

class members' purported willingness to work for reasons other than GEO's improper means of

coercion. *See David*, 2012 WL 10759668, at *21 ("[B]ased on the type of coercion used, there

may be cases where consent becomes irrelevant."). For class certification purposes, though, I

---

[4]Representatives highlight that individuals can also be convicted of or held civilly liable for
*attempting* to violate the forced labor statute under 18 U.S.C. § 1594. They claim that, even if
some putative class members labored for reasons other than GEO's improper means of coercion,
GEO still attempted to obtain their labor via those means. As a result, Representatives argue that
such class members would be entitled to the same civil remedy, making an individual inquiry
regarding causation unnecessary. Their Complaint, however, does not assert a claim for attempt
under 18 U.S.C. § 1594.

13

need only conclude that the "by means of" element could be established by classwide

circumstantial evidence.

Representatives reference *CGC Holding Co., LLC v. Broad and Cassel* as an example of

when circumstantial evidence can be used to show causation on a classwide basis. In *CGC*

*Holding*, the Tenth Circuit held that certification of a class of real estate borrowers bringing

claims under the Racketeer Influenced and Corrupt Organizations (RICO) Act was appropriate

even though actual and proximate causation were elements of the claim. 773 F.3d at 1080-81.

The court found that, under certain circumstances, "it is beneficial to permit a commonsense

inference . . . applicable to the entire class to answer a predominating question as required by

Rule 23." *Id.* at 1089. The circumstances here—namely the class members' detainment, the

imposition of a uniform policy, and the numerous other questions common to the class—

certainly make it beneficial to permit such an inference.[5]

In a final effort to show that individual questions predominate as to the TVPA claim,

GEO asserts that any damages inquiry would have to be specific to each class member. But,

considering the numerous questions common to the class, I find that the possible need for

specific damages determinations does not predominate. *In re Urethane Antitrust Litig.*, 768 F.3d

1245, 1255 (10th Cir. 2014); *see also* Fed. R. Civ. P. 23 advisory committee's note ("[A] fraud

perpetrated on numerous persons by the use of similar misrepresentations may be an appealing

situation for a class action, and it may remain so despite the need, if liability is found, for

separate determination of the damages suffered by individuals within the class."). Since

causation under the forced labor statute "can be found through generalized, classwide proof,"

common questions predominate in this case and "class treatment is valuable in order to take

---

[5]GEO argues that the rationale applied in the RICO context in *CGC Holding* cannot be extended
to TVPA claims. I disagree. The analysis in *CGC Holding* may not dictate the outcome in this
matter, but it is instructive.

14

advantage of the efficiencies essential to class actions." *CGC Holding Co., LLC*, 773 F.3d at 1089 (citations omitted).

"[C]lass status is appropriate as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation." *Id.* at 1087. In including Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Amchem Prods., Inc.*, 521 U.S. at 617 (quoting Kaplan, A Prefatory Note, 10 B.C. Ind. & Com. L. Rev. 497, 497 (1969)). In this case, the putative class members reside in countries around the world, lack English proficiency, and have little knowledge of the legal system in the United States. It is unlikely that they would individually bring these innovative claims against GEO. Further, if they were to do so, each detainee would have to litigate the same exact issues regarding GEO's Sanitation Policy. The class action is the superior method for adjudicating the TVPA claim. Representatives have thus demonstrated that their proposed TVPA class fulfills the requirements of Rule 23(a) & (b)(3) such that certification is appropriate.

B. Unjust Enrichment Claim

Turning to Representatives unjust enrichment claim, GEO's arguments against certification similarly involve whether an element of the claim compels individualized inquiries. To succeed on a claim of unjust enrichment, a plaintiff must prove "(1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (citing *Salzman v. Bachrach*, 996 P.2d 1263, 1266-67 (Colo. 2000)). Determining whether retention of the benefit is unjust involves "careful consideration of

Case No. 1:14-cv-02887-JLK   Document 329-19   filed 10/26/20   USDC Colorado   Page 16 of 20
Case No. 1:14-cv-02887-JLK-CYC   Document 57   filed 02/27/17   USDC Colorado   Page 85 of 90
pg 85 of 90
Appellate Case: 17-1125      Document: 01019820087      Date Filed: 06/05/2017      Page: 84

particular circumstances," *Lewis*, 189 P.3d at 1140 (citation omitted), and "a fact-intensive inquiry in which courts look to, among other things, the intentions, expectations, and behavior of the parties," *Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 287 P.3d 842, 847 (Colo. 2012) (citing *Lewis*, 189 P.3d at 1140, 1143). The analysis "often will turn on whether a party engaged in some type of wrongdoing." *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 445 (Colo. 2000).

GEO argues that the "unjust" element, dependent on the intentions, expectations, and behavior of the parties, requires an inquiry specific to each putative class member and cannot be demonstrated on a classwide basis. As with the TVPA claim, GEO contends that the necessity of an individualized inquiry for one of the elements of the claim prevents the commonality, typicality, predominance, and superiority requirements from being met.

*Federal Rule of Civil Procedure 23(a): Commonality and Typicality*

Again, I start the certification analysis with the Rule 23(a) commonality requirement that there be at least one question common to the class that will resolve an issue central to the validity of the claim "in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350, 359. Representatives assert that the questions common to the proposed class are: "(1) whether the class provided GEO with a benefit in the form of substantially discounted labor, and (2) whether, under the circumstances of this case, it would be unjust for GEO to retain that benefit." Consistent with its overarching argument, GEO states that the second question regarding the "unjust" element is not a question common to the class as it requires an individualized inquiry.[6] I address this argument further

---

[6]GEO's other arguments purportedly addressing commonality for the unjust enrichment class relate more to the merits of the claim than the existence of common questions. Citing *Alvarado Guevara v. Immigration and Naturalization Service*, 902 F.2d 394, 396-96 (5th Cir. 1990), GEO asserts that detainees are not participants in the same market as other persons who could become employed by ICE since they are removed from the American industry. According to GEO, detainees could not reasonably expect that they would be paid more than $1.00 per day. It is

below in discussing the predominance factor. For the purposes of the commonality requirement,

though, I find that Representatives have demonstrated the existence of at least a single common

question—whether GEO received a benefit from VWP participants' labor—the determination of

which will resolve an issue central to the validity of the unjust enrichment claim in one stroke.

GEO also claims that Representatives' experiences are not typical of the class because its

representation that ICE dictates the $1.00 per day pay rate was only made to specific individuals

and not on a classwide basis. According to GEO, Representatives and putative class members

would not be challenging the same conduct under the same legal theories as required for

typicality. Representatives respond by stating that their unjust enrichment claim does not turn on

class members' individualized reliance on GEO's explanation of the pay rate, but instead, that

the misrepresentation contributes to the context of GEO's enrichment. As noted throughout this

order, detainment presents distinctive conditions. Representatives, like the putative class

members, worked under the Voluntary Work Program in an environment GEO controlled. GEO

dictated the jobs they performed, the rate they were paid, and the alleged savings it experienced.

Representatives' unjust enrichment claim challenges the same conduct under the same legal

theories as any unjust enrichment claim putative class members would bring. Thus, with respect

to that claim, Representatives have demonstrated the proposed class fulfills the Rule 23(a)

prerequisites.

*Federal Rule of Civil Procedure 23(b)(3): Predominance and Superiority*

The more stringent predominance factor demands that I look to the elements of the claim

and fully consider GEO's argument regarding the necessity of individualized inquiries in

determining whether its enrichment is unjust. The "unjust" element of the claim calls for an

---

unclear how this line of reasoning relates to the commonality analysis. If anything, the question
of whether detainees should be paid in line with the market seems to support the existence of
questions that can be answered on a classwide basis.

analysis of "the intentions, expectations, and behavior of the parties" to determine when

retention of the benefit becomes unjust. *Melat, Pressman & Higbie*, 287 P.3d at 847 (citing

*Lewis*, 189 P.3d at 1140, 1143). GEO insists that such expectations and intentions are highly

individualized and could not be consistent classwide. I am not persuaded. It is not necessary to

analyze the intentions, expectations, and behavior of each individual class member; it is enough

to consider the overall context based on classwide proof. GEO "has failed to explain why it

would be equitable for it to retain [the benefit conferred by] some of the putative class members,

but inequitable to retain [the benefit] from others." *James D. Hinson Elec. Contr. Co. v.

BellSouth Telecomms., Inc.*, 275 F.R.D. 638, 647 (M.D. Fla. 2011). GEO's treatment of

participants in the VWP was based on uniform policies and, therefore, it is likely that, if its

retention of a benefit was unjust with respect to one class member, it was unjust with respect to

all class members.

　　GEO quotes *Friedman v. Dollar Thrifty Automotive Group, Inc.*, 304 F.R.D. 601 (D.

Colo. 2015), twice to support the proposition that class certification is inappropriate for unjust

enrichment claims, because "common questions will rarely, if ever, predominate." Def.'s Opp.

Class Certification at 40, 42 (quoting *Friedman*, 304 F.R.D. at 611). In *Friedman*, however, the

court determined that whether the defendant's enrichment from its sales were unjust turned on

the circumstances of the sales, "implicat[ing] 2.58 million face-to-face individualized

transactions in which customers with varying circumstances, preferences, and levels of

knowledge . . . engaged with thousands of [the defendant's] agents . . . ." *Friedman*, 304 F.R.D.

at 609, 611. Those interactions were unscripted and each could differ based on what was told to

or understood by the consumer about purchasing the defendant's products. *Id.* at 609-10. Under

those circumstances, it is logical that the answers to the common questions could not be

established by common evidence and would not predominate, but those are not the facts of this case. Here, there is a consistent policy under which detained individuals worked and were paid the same amount. Perhaps the extent to which GEO was unjustly enriched would require individualized inquiries, but whether it was unjust at all could be determined on a classwide basis.

Observing that the extent inquiry would likely be particular to each class member, GEO argues that individualized damages questions predominate over any common questions. Since VWP participants worked varying hours and did not all perform the same type of work,[7] any award to them would need to account for those individual factors. Representatives assert that damages could be determined by a formula and statistical sampling taking into account the number of hours worked, type of work performed, and fair market value of such work. However, they have not provided a detailed model or expert opinion on calculating damages, which GEO claims is necessary for them to sufficiently carry their burden. I agree with Representatives that there is no requirement that they produce expert testimony at this stage on the precise formula to be used for the calculation of damages. *See* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 12:4 (5th ed.) (explaining that, in many class actions such as wage and hour cases, individual damages are easily calculable, while other more complex cases require the proponents of class certification to provide a classwide method for calculating individual damages). I find that Representatives have demonstrated that individual damages in this case should be easily calculable using a simple formula. If this proves untrue, decertification or amendment of the class for damages determinations may be appropriate at a later juncture.

---

[7] GEO also contends that, for the damages analysis, participants would need individualized proof of whether it made misrepresentations to them specifically. Def.'s Opp. Class Certification at 42-43. Any misrepresentations, however, should not be relevant in determining the extent to which a particular participant enriched GEO.

Additionally, the class action is the superior method for adjudicating Representatives'

unjust enrichment claim. I am not aware of any other suit asserting the claims brought in this

case and no other class member has demonstrated an interest in controlling the litigation. As

stated above, many of the putative class members are immigrant detainees who lack English

proficiency. They have limited financial resources and reside in countries around the world. It is

very likely that these claims would not be brought by individual detainees, especially considering

the case's innovative nature.

Representatives have demonstrated that the Rule 23(a) and (b)(3) requirements are

satisfied with respect to their TVPA and unjust enrichment claims despite GEO's arguments that

elements of each claim require individualized inquiries that preclude certification. In light of the

pervasive character of the common issues and the *de minimis* nature of any individualized issues,

I conclude that this case is an exception to the rule and class certification for both claims is

appropriate. *See In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006).

C. Appointment of Representatives' Counsel as Class Counsel

Upon certifying a class, class counsel must also be appointed. Fed. R. Civ. P. 23(g)(1). In

doing so, I "must consider: (i) the work counsel has done in identifying or investigating potential

claims in the action; (ii) counsel's experience in handing class actions, other complex litigation,

and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law;

and (iv) the resources that counsel will commit to representing the class . . . ." *Id.*

Representatives' counsel have invested significant time, energy, and resources into this case.

They have uniquely relevant experience with the client base and with bringing complex claims

against detention facilities. Many of the attorneys and their staff are also Spanish speakers,

making it easier for them to communicate with some members of the classes. I find that

Representatives' counsel are well-suited to represent the classes and appoint them to do so.

## IV. Conclusion

For the foregoing reasons, I GRANT the Motion for Class Certification Under Rule

23(b)(3) and Appointment of Class Counsel Under Rule 23(g) (ECF No. 49). The classes as

proposed in the Motion are certified for Representatives' TVPA and unjust enrichment claims.

Alejandro Menocal, Marcos Brambila, Grisel Xahuentitla, Hugo Hernandez, Lourdes Argueta,

Jesus Gaytan, Olga Alexaklina, Dagoberto Vizguerra, and Demetrio Valerga are named as

representatives of the classes. Attorneys Brandt Milstein, Andrew Turner, Andrew Free,

Alexander Hood, David Seligman, Andrew Schmidt, and Hans Meyer are appointed as counsel

for the classes. To proceed with this case, the parties shall file a revised Proposed Stipulated

Scheduling and Discovery Order by March 27, 2017.

DATED this 27th day of February, 2017.

_____

JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE