# Exhibit 22

Jeffrey Kropf, Ph.D.
7/29/20
SC
5

## Segregated Housing & Solitary Confinement

Jeffrey Kropf, Ph.D.
May, 2020

My opinions as set forth in this document are predicated on my professional experience and my review of various handbooks, manuals, and empirical research literature. Works contributing to my opinions and referenced herein are cited at the conclusion of this document.

I obtained licensure to practice as a Psychologist in 1992 and have maintained active licensure to practice continuously since that time. My professional experience includes evaluating and/or treating persons confined to State Hospitals, county jails, and State correctional facilities and developing and implementing programs to promote the mental health of confined persons.

For a period of more than six years, I conducted clinical and forensic mental health evaluations and provided mental health treatment services to a progression of hundreds of offenders housed in an Administrative Segregation Unit involving solitary confinement. During that time, I also developed and implemented mental health treatment programs for the benefit of those persons. From inside my office (nee storeroom) located on the living unit adjacent to detainee cells, I developed familiarity with the unfiltered psychology (and vocabulary) of detained persons that augmented expertise I developed from work activities outside that office.

For the past twenty-one years, I have conducted face-to-face forensic mental health evaluations of more than four thousand (4000) persons confined in State Hospitals, county jails, and, primarily, State prisons. Many hundreds of these individuals have been contemporaneously and/or historically housed in administrative segregation units.

During this period, I have participated in effecting legislation and developing and implementing programs to promote the well-being of mentally ill confined persons. I have trained, supervised, and/or managed professional mental health staff engaged in evaluating and treating confined persons. I have provided training to attorneys, physicians, nurses, correctional administrators, and custodial staff involved in delivering services to mentally ill confined persons. I co-authored a recently published article addressing forensic mental health evaluation. I have attested to forensic mental health-related issues as an expert witness in hearings and trials throughout California.

Executive Summary
Since 1986, the GEO Group, Inc. (GEO) has operated the Aurora ICE Processing Center ("AIPC" or the "Facility") located in Aurora, CO

under contracts with the U.S. Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE).  The Facility provides detention services and medical, dental, and mental health care services to detained aliens awaiting hearings or removal. Practices are governed by applicable contractual, regulatory, and statutory requirements.

Detainees at the AIPC are advised of the Facility's rules of conduct, prohibited acts, and sanctions in writing, language, and/or another manner they can understand.  Detainees who violate rules of conduct, engage in prohibited acts, or who are being investigated for violating rules of conduct or engaging in prohibited acts are subject to a variety of potential disciplinary sanctions depending on the type and severity of the offending act or behavior.  Placement in a restricted housing unit, referred to hereafter as a segregated housing unit, is one of the many disciplinary sanctions for certain offending acts and behaviors.

In detention facilities including the AIPC, all detainee housing arrangements involve confinement.  Solitary confinement refers to the housing of a detainee alone in a cell, generally on a segregated housing unit.  Congregate housing refers to the housing of a relatively small number of detainees (e.g., two to six persons) in a cell and housing of a large number of detainees in a dormitory-like setting.

Not all detainees housed in segregated housing units are so confined due to misconduct:  some detainees prefer and request solitary housing.  Empirical evidence indicates placement in segregated housing including segregated housing involving solitary confinement does not cause serious psychological harm and even affords psychological benefit to persons so confined.

The duration of a detainee's placement in a segregated housing unit at the AIPC as a potential sanction for misconduct is predicated on the Offense Category into which the misconduct falls.  The duration of the placement ranges from up to 72 hours for misconduct falling within the "High Moderate" category (e.g. Refusal to clean assigned living area) to up to 60 days for misconduct falling within the "Greatest" Category (e.g., Killing).

While housed in a segregated housing unit at the AIPC, detainees' access to some activities and privileges may be restricted.  Their access to essential services including medical, dental, and mental health care is not restricted.

The AIPC is governed by applicable contractual, regulatory, and statutory requirements.  As set forth in these requirements, practices are implemented that obviate and/or mitigate factors that may negatively impact the psychological well-being of detainees placed in segregated housing units.  Such practices include information sharing and regular monitoring.  Other such practices include provision of safe and familiar environmental

conditions, continuity of care, and unrestricted access to mental health treatment.

Detainees housed in segregated units at the AIPC are housed in solitary confinement. Many objections to the practice of solitary confinement are qualitative and based on anecdotal evidence and perceptions of the practice as degrading and inhumane. Most non-qualitative objections to the practice pertain to "indefinite" placements and "prolonged" or "extended" placements, defined by even the most vocal critics of the practice as placements of fourteen days or more.

Empirical evidence derived from methodologically rigorous research and from data meta-analyses indicates that placement in solitary confinement in an administrative segregation unit does not cause serious mental illness or exacerbate existing mental illness over a period of at least one year (8760 hours). There is no empirical evidence indicating or even implying that placement in a segregated housing unit with or without solitary confinement for a period of 72 hours or less causes serious psychological harm.

Detention, whether at the AIPC or another detention facility, can be a stressful event. Placement in a segregated housing unit at a detention facility, whether at the AIPC or another detention facility, can be a stressful event. Stress is not a mental illness, however, and the experience of stress does not inevitably cause serious psychological harm. Like the psychological impact of detention, the psychological impact of placement in a segregated housing unit varies across individuals; the impact of the experience on one person; whether positive, negative, or negligible, can not be generalized to all other individuals.

Empirical research indicates a disproportionately high rate of mental illness among persons placed in segregated housing units. Research indicates the relationship between the incidence of mental illness and placement in segregated housing is correlational, not causative. Placement in segregated housing does not cause mental illness; a disproportionately high percentage of persons placed in segregated housing were mentally ill at the time of their placement.

### Psychological effects of short-term placement in a segregated housing unit/Solitary Confinement

Placement in a segregated housing unit with or without solitary confinement can be a stressful event for detainees. Stress is an unwelcome, but unavoidable fact of life for all people, detained or not. Stress is not a mental illness, however, and the experience of stress does not inevitably cause serious psychological harm or exacerbate pre-existing mental illness.

Segregated housing units represent one type of housing unit within a detention facility. In detention facilities including the AIPC,

Ad-Seg/Solitary Confinement Kropf                                3

all detainee housing arrangements involve confinement.

Segregated housing units provide a secure, closely supervised setting for detainees who are at high risk of victimization, can not be adequately controlled, or exhibit misconduct in a congregate (i.e., General Population) setting. Placement in segregated housing may include solitary confinement: the housing of a detainee alone in a cell. Congregate housing refers to the housing of a relatively small number of detainees (e.g., two to six) in a cell and housing of a large number of detainees in a dormitory-like setting.

Although there is no research specifically comparing the intensity of stress associated with being detained in a detention facility to the intensity of stress associated with being transferred from a congregate housing unit to a segregated housing unit within a detention facility, research regarding the two subjects, and my professional experience, lead me to conclude that the intensity of stress associated with the former is likely greater than with the latter: loss of liberty and the prospect of potential deportation are likely more stressful than transfer from one type of confined housing unit to another type of confined housing unit and the loss of non-essential privileges. A vast majority of detainees do not report or evidence clinically-significant psychological distress related to being detained, and it is therefore improbable that a detainee who did not report or evidence clinically-significant psychological distress related to detention and possible deportation would experience clinically-significant psychological distress related to transfer from a congregate housing unit to a segregated housing unit within a detention facility, especially for a short period of time.

Segregated housing is a feature of nearly all, if not all, correctional systems. Forms of segregated housing include cells, units, and entire facilities, and may or may not involve solitary confinement. Types of segregated housing include Administrative Segregation, Disciplinary Segregation, and Protective Custody.

Persons subject to placement in segregated housing units are, by definition, already detained. Not all detainees housed in segregated housing units are so confined due to misconduct: some detainees prefer and request solitary housing.

Since 1986, the GEO Group, Inc. (GEO) has operated the AIPC located in Aurora, CO under contracts with the U.S. Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE). The 1500-bed Facility provides services to detained aliens awaiting hearings or removal.

The AIPC has Administrative Segregation and Disciplinary Segregation housing units. Detainees placed in segregated housing units at the AIPC are housed in solitary confinement. As explicated in the ICE Performance Based National Detention

Ad-Seg/Solitary Confinement Kropf                                          4

Standards Operations Manual (referred to hereafter as PBNDS), detainees can be placed in a segregated housing unit while awaiting an investigation or a hearing related to allegations of their violating rules of conduct or engaging in prohibited acts.

Detainees at the AIPC are presented a handbook at the time of their detention.  Developed by ICE, the handbook is entitled, "National Detainee Handbook" (referred to hereafter as "the handbook").  It contains information and guidelines extracted from manuals and documents including the PBNDS and the American Correctional Association's Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition.  Detainees are also given a facility-specific supplement to the handbook.

The importance of the handbook is reflected in the measures taken to ensure detainees understand the information it contains.  The handbook is printed and available to detainees in multiple languages, and detainees also have the right to have the contents of the handbook presented to them verbally or another manner they can understand.

The importance of the handbook relates to the breadth and depth of information it contains.  It contains information regarding topics ranging from Responsibilities and Rights to Rules and Procedures.

The handbook contains information related to segregated housing. The handbook explicates the two types of segregated housing, conditions which may result in a detainee's placement in segregated housing, the duration of placements in segregated housing, detainee appeal rights, and services available to detainees in segregated housing.

I.   Factors that may impinge on detainees' psychological well-being during placement in segregated housing:  Discussion and Illustration.

As noted, placement in a segregated housing unit can be a stressful event for detainees.  Factors that can impinge on the psychological well-being of detainees placed in segregated housing units include uncertainty regarding the basis for the placement and/or duration of the placement, environmental conditions, and changes in access to services including health care services.

Also as noted, detainees placed in a segregated housing unit at the AIPC are housed in solitary confinement.  Insofar as a substantial body of empirical evidence indicates that short-term institutional segregation including short-term segregation involving solitary confinement does not cause serious psychological harm or exacerbate pre-existing mental illness, the issue of solitary confinement will not be addressed in this section which addresses factors that can produce or exacerbate psychological distress.  Despite the robustness of the research evidence, but in consideration of the controversy surrounding the
Ad-Seg/Solitary Confinement Kropf                                      5

practice, Solitary Confinement will be addressed separately following this section.

A. Uncertainty regarding basis for placement/duration of placement in segregated housing unit.

Any negative psychological impact associated with placement in a segregated housing unit could be exacerbated for detainees if they did not know that the behavior they exhibited resulting in their placement in a segregated housing unit represented misconduct, did not know what behavior they exhibited or allegedly exhibited that resulted in their placement in segregated housing, and/or did not know that consequences of the misconduct included placement in a segregated housing unit.  Not knowing the duration of their placement in a segregated housing unit could also represent a source of distress.

At the AIPC, proactive and timely measures are taken to advise detainees of institutional rules of conduct, prohibited acts, and the sanctions attendant to rules violations.  These measures are taken to mitigate the possibility detainees do not understand what behaviors represent infractions, the bases for placement in a segregated housing unit, or the duration of placement in a segregated housing unit.

As noted, detainees are presented a handbook containing information regarding behavioral expectations and the consequences attendant to not meeting those expectations.  They are presented this handbook at the time of their detention which would naturally precede their placement in a segregated housing unit.

As explicated in the 2008 version of the PBNDS (substantively similar in content and language to previous and subsequent versions of the document), Section Disciplinary System indicates, "The Detainee Handbook, or supplement, issued to each detainee upon admittance, shall provide notice of the facility's rules of conduct and prohibited acts, the sanctions imposed for violations of the rules, the disciplinary severity scale, the disciplinary process and the procedure for appealing disciplinary findings."  The section indicates additionally, "Copies of the rules of conduct, rights, and disciplinary sanctions shall be provided to all detainees and posted in English, Spanish, and/or other languages spoken by significant numbers as follows:  1. Disciplinary Severity Scale, 2.  Prohibited Acts, [and] 3. Sanctions."

To eliminate the stressor of not knowing which rule(s) they may have violated that resulted in their placement in segregated housing, intermediate measures assure dissemination of the information to detainees.  Detainees having exhibited behaviors representing "low" or "moderate" infractions as defined in the handbook are involved in a multi-step process that includes preparation and presentation of a written Incident Report and

Ad-Seg/Solitary Confinement Kropf                                     6

Notice of Charges describing the infraction, investigation of the Incident Report, and an adjudication process. Detainees are advised of sanctions attendant to infractions during the adjudication process, and they are advised of any sanctions that may be imposed at the conclusion of the process.

Placements of detainees in segregated housing units at the AIPC are governed by applicable contractual, regulatory, and statutory requirements. Detainees are advised of behavioral expectations and sanctions attendant to violations of those expectations at the time of their detention. Should detainees exhibit misconduct resulting in placement in a segregated housing unit, they are advised of the specific misconduct and associated sanctions including duration of such placement both verbally and in writing.

The AIPC is governed by applicable contractual, regulatory, and statutory requirements. As set forth in the PBNDS, the AIPC provides detainees information regarding the basis for and duration of any placement in a segregated housing unit in a timely fashion, and this practice mitigates the stress associated with such placement.

B.  Environmental Conditions.

Any negative psychological impact associated with placement in a segregated housing unit could be exacerbated for detainees if the environmental conditions of the units were hostile, unsafe, and/or unfamiliar.

Theatrical depictions notwithstanding, segregated housing units at most institutions including the AIPC are not dungeons, holes in the ground, elevated cages, or sensory deprivation chambers. Segregated housing units at the AIPC are architecturally similar to congregate housing units.

The standards for maintaining the cleanliness, orderliness, safety, security, and operation of segregated housing units are no less rigorous than the standards applying to congregate housing units. As explicated in the PBNDS, Section Detention Standard/Special Management Units (SMUs), "Detainees in SMUs will be afforded basic living conditions that approximate those provided to the general population, consistent with the safety and security considerations that are inherent in more controlled housing, and in consideration of the purpose for which each detainee is segregated."

The AIPC is governed by applicable contractual, regulatory, and statutory requirements. As set forth in the PBNDS, the AIPC program provides safe and familiar environmental conditions to detainees placed in segregated housing units, and this practice mitigates the stress associated with such placement.

C.  Detainee access to Services.

Ad-Seg/Solitary Confinement Kropf                                    7

Any negative psychological impact associated with placement in a segregated housing unit could be exacerbated for detainees if such placement featured service deprivation that created or aggravated a condition or conditions correlated with psychological distress.

1.    Detainee programming and access to non-health care activities/resources.

As explicated in the handbook and PBNDS, detainees placed in segregated housing units are subject to potential reductions in some services and activities based on safety and/or security concerns.  The handbook notes, "You will receive the same extent of access to mail, legal telephone calls, legal visitation, and health care services."

The handbook also specifies detainees' access to other services. It indicates that detainees placed in segregated housing units will continue to receive showers, recreation, access to the law library, access to presentations by legal rights groups, general telephone calls, general visitation, and personal property and materials (including legal, religious, and personal reading materials), albeit to a potentially "lesser degree."

While the frequency and/or duration of their access may be reduced, detainees placed in segregated housing units maintain access to activities outside their cells each day.  For detainees placed in a segregated housing unit as a sanctioned consequence for committing a "low" or "moderate" infraction, the likelihood of incurring serious psychological harm due to extended continuous confinement in a cell is effectively precluded by the brevity of their placement:  seventy-two hours or less.

2.  Detainee access to medical and dental services.

Detainees suffering from medical and/or dental conditions are identified prior to their placement in segregated housing units. Per PBNDS Section Medical Care, "Each newly admitted detainee, including transfers, will receive a documented medical, dental, and mental health screening upon intake and, within 14 days of arrival, a comprehensive health appraisal by qualified personnel in a private setting as practicable to ensure safety."

Detainees in segregated housing units maintain the same access to medical and dental care they would have if placed in congregate housing units.  As noted, the handbook advises detainees that, while housed in segregated housing units, "You will receive the same extent of access to mail, legal telephone calls, legal visitation, and health care services."  The PBNDS indicates similarly, "Detainees in Special Management Units will have access to the same health care services as detainees in the general population."

Ad-Seg/Solitary Confinement Kropf                                          8

Detainees receiving ongoing medical and/or dental treatment receive that treatment (including pharmacological treatment, if applicable) without disruption during their placement in segregated housing units. Additionally, per PBNDS Section Special Management Units, "A health care provider shall visit every detainee in an SMU at least once daily. Detainees shall be provided medications as prescribed for them. Detainees will have access to regularly scheduled sick call regardless of housing assignment."

3. Detainee mental health treatment needs and access to mental health treatment.

a. Detainee mental health treatment needs.

The needs for the timely identification and treatment of mentally ill detainees are essential. Results of empirical research indicate the incidence of mental illness among confined populations (i.e., persons confined in jails, prisons, and detention facilities) is approximately 15% to 30%, significantly higher than the incidence rate of approximately 6% among the general public. The variance among estimates of the incidence of "serious mental illness" among confined populations is largely attributable to different operational definitions of the term.

Results of empirical research indicate that, within confined populations, the incidence of serious mental illness is greater among persons placed in segregated housing units than in congregate housing units. Estimates of the incidence of serious mental illness among confined persons housed in administrative segregation units range from approximately 25% to 40%. These statistics suggest that, from among 100 randomly selected detainees confined in segregated housing units at the AIPC, a number between approximately 25 and 40 will be found to be suffering from pre-existing mental illness.

A prevailing theory to explain the higher incidence of mental illness among confined persons housed in segregation units than in congregate housing units is that mentally ill confined persons, often by reason of their mental illness, experience greater difficulty complying with institutional rules and regulations than non-mentally ill confined persons and so are more likely to violate institutional rules and be placed in administrative segregation units (Cunningham et al. 2011). The validity of this theory notwithstanding, empirical research indicates the finding is correlational, not causative. Placement in segregated housing does not cause mental illness; a disproportionately high percentage of persons placed in segregated housing were mentally ill at the time of their placement.

b. Detainee access to mental health services.

Prior to any prospective placement in a segregated housing unit,
Ad-Seg/Solitary Confinement Kropf                                    9

detainees at the AIPC will have been evaluated to assess their mental health. Detainees found to be in need of mental health treatment receive that treatment pursuant to a written treatment plan for as long as clinically indicated including uninterrupted while housed in segregated housing units. Detainees whose mental health needs are so great that they can not be met in the facility are transferred to a mental health facility, obviating the possibility that an acutely mentally ill detainee will ever be placed in a segregated housing unit without access to appropriate mental health treatment.

Per PBNDS Section Medical Care, "Initial medical, dental, and mental health screening shall be done within 12 hours of arrival by a health care provider or a detention officer specially trained to perform this function...Screening shall include observation and interview items related to the detainee's potential suicide risk and possible mental disabilities, including mental illness...If at any time during the screening process there is an indication of need, or request for, mental health services, the health authority must be notified within 24 hours. The clinical medical authority will ensure a full mental health evaluation if indicated."

Also per this Section, "Any detainee referred for mental health treatment shall receive a comprehensive evaluation by a licensed mental health treatment provider as clinically necessary, but not later than 14 days of the referral. The provider shall develop an overall treatment/management plan that may include transfer to a mental health facility if the detainee's mental illness or developmental disability needs exceed the treatment capability of the facility. The health administrative authority/clinical medical authority shall ensure due process in compliance with applicable laws."

Regardless of the results of the initial evaluation and any subsequent evaluation(s), detainees are evaluated proximate to the time of their admission to a segregated housing unit. Per PBNDS Section Special Management Units, "Health care personnel will be immediately informed when a detainee is admitted to an SMU to provide assessment and review as indicated by health care authority protocols."

During their placement in segregated housing units, mentally ill detainees are regularly monitored and are visited by a health care provider at least once daily. Continuity of care is maintained, and they receive mental health treatment including psychoactive medications (if prescribed) in accordance with a treatment plan. Their access to both routine and emergency mental health care services is not restricted.

Per PBNDS Section Special Management Units, "Detainees in SMUs will have regular access to supervisory, management, program, and health care staff...Detainees in SMUs shall be personally observed at least every 30 minutes on an irregular schedule. For cases

Ad-Seg/Solitary Confinement Kropf                                    10

that warrant increased observation, the SMU personnel will personally observe them accordingly." Also per this Section, "A health care provider shall visit every detainee in an SMU at least once daily. Detainees shall be provided medications as prescribed for them. Detainees will have access to regularly scheduled sick call regardless of housing assignment." Per the handbook, "You [detainees] will still receive the same extent of access to mail, legal telephone calls, legal visitation, and health care services."

The AIPC is governed by applicable contractual, regulatory, and statutory requirements. As set forth in the PBNDS, the AIPC implements procedures to identify detainees with medical, dental, and/or mental health conditions proximate to the time of their admission to the Facility and proximate to the time of their admission to a segregated housing unit. Per guidelines, the AIPC provides treatment as needed pursuant to a written treatment plan. Detainees whose mental health needs are so great that they can not be met in the Facility are transferred to a mental health facility, obviating the possibility that an acutely mentally ill detainee is placed in a segregated housing unit without access to appropriate care. During their placement in segregated housing, detainees are regularly monitored and assessed. Continuity of care is maintained, and detainees' access to routine and emergency medical, dental, and mental health care services is not restricted. These practices mitigate any psychological distress associated with placement in a segregated housing unit for detainees suffering from a medical, dental, and/or mental health condition.

D. Application of policies, procedures, and provisions: An Illustration.

This section will discuss the implementation of the policies and procedures described above in the context of a scenario involving a detainee who fails to meet the responsibility of maintaining cleanliness of personal surroundings.

As are detainees at other detention facilities, detainees at the AIPC are assigned basic housekeeping responsibilities related to their personal surroundings.

The responsibility is reasonable, practical, and of benefit to detainees. Many of the benefits including a clean, sanitary living environment are self-evident. Less obvious, but also meaningful benefits for detainees include exercising a level of control over their environment, engaging in a productive activity and realizing the satisfaction associated with accomplishing a task, developing or refining skills and habits that can enrich their lives and enhance their employability following their release from detention, and assuring retention of personal property that may not appear of value to others and so could be unwittingly discarded.

Meeting this responsibility is within the limits of ability of most detainees. Evaluations conducted of all detainees following their detention identify those who have conditions that may render them unable to meet the responsibility, and accommodations are provided for them. Detainees who experience physical or psychological discomfort or distress associated with meeting the responsibility have ready access to medical and mental health care, and accommodations are provided to them, if warranted.

For detainees, meeting the housekeeping responsibility does not impose a financial burden or pose a logistical challenge. Per Facility policy, cleaning materials and articles for cleaning are issued to them by Dormitory Officers at no cost.

Specific information regarding the responsibility and possible disciplinary consequences attendant to not meeting the responsibility is presented to detainees in the handbook, verbally, and/or another manner they can understand. This practice obviates the stressor of not knowing that failing to meet this responsibility may result in sanctions including placement in segregated housing.

Detainees who neglect their housekeeping responsibility for maintaining cleanliness may be reminded of the responsibility and attendant disciplinary consequences by other detainees and by staff. Providing factual information to others that encourages them to exhibit appropriate behavior and allows them to avoid negative consequences is reasonable and neither coercive nor threatening.

Detainees are involved in the disciplinary process and advised verbally and in writing of their behavioral infraction and the associated sanctions. This practice obviates the stressor of not knowing the reason for placement in segregated housing.

The architecture of segregated and congregate housing units at the AIPC is similar, and standards for cleanliness, orderliness, safety, security, and operation in segregated housing units are no less rigorous than in congregate housing units. These provisions obviate the stressor of placement in a hostile, unsafe, and/or unfamiliar environment.

Detainees placed in segregated housing continue to participate in programming and to receive services. They are regularly monitored and visited. Their access to medical, dental, and mental health services is not restricted, and continuity of care is maintained. These provisions obviate the stressor of deprivation that creates or aggravates a condition or conditions correlated with psychological distress.

Detainees placed in segregated housing for this particular infraction are so housed for a period of 72 hours or less. There

Ad-Seg/Solitary Confinement Kropf                                    12

is no empirical evidence indicating placement in segregated housing for such a duration causes serious psychological harm.

II. Solitary Confinement

In detention facilities, "solitary confinement" refers to the enforced confinement of a detainee alone in a cell. Placement in solitary confinement in a segregated housing unit is a consequence or sanction commonly applied to confined persons who violate certain rules of conduct or engage in specific prohibited activities.

At the AIPC, placement in solitary confinement in a segregated housing unit is a possible sanction for detainees who exhibit prohibited behaviors falling within specific Offense Categories. One possible sanction for misconduct falling within the "High Moderate" category (e.g. Refusal to clean assigned living area) is placement in solitary confinement in a segregated housing unit for a period of up to 72 hours, and a possible sanction for misconduct falling within the "Greatest" Category (e.g., Killing) is placement in solitary confinement in a segregated housing unit for a period of up to 60 days, for examples.

The practice of placing incarcerated persons in solitary confinement as a consequence for misconduct has long been controversial. Some individuals and entities including some civil rights and inmate advocacy groups object to the practice on general principle and seek to abolish its use entirely.

Many objections to solitary confinement are based on anecdotal information (i.e., case studies and autobiographical accounts including accounts from non-detained, isolated elderly persons), observational data, and subjective perceptions of the practice as cruel, degrading, and inhumane. While well-intended and thus deserving of consideration, these objections are without a meaningful objective foundation.

Nomothetic objections to the practice of solitary confinement are based on research findings that persons placed in solitary confinement for extended periods can experience declines in medical and/or mental health. The subjects of these studies have typically been prison inmates housed continuously in solitary confinement in "supermax" disciplinary segregation units with minimal "out-of-cell" time and with restricted access to educational, work, and other program activities for periods of many years. The duration of placement in solitary confinement for some subjects was "open ended," and some subjects were confined for reasons unrelated to their institutional conduct (e.g., gang affiliation).

In response (or coincident) to the growing body of empirical evidence indicating that while placement in solitary confinement for periods of years can cause psychological harm, short- and

Ad-Seg/Solitary Confinement Kropf                                    13

moderate-term placements in solitary confinement do not cause such harm, objections to solitary confinement have evolved. Most current non-qualitative objections are to "indefinite" solitary confinement and "prolonged" or "extended" solitary confinement.

While definitions of "prolonged" and "extended" periods vary, they generally refer to periods of fourteen days or more. There is no empirical evidence indicating that placement in a segregated housing unit with or without solitary confinement for a period of 72 hours or less causes serious psychological harm.

No research has been conducted to specifically assess the psychological impact of placement in solitary confinement on detainees at the AIPC. Research of the impact of solitary confinement on similar populations at similar facilities has been conducted, however.

Among this research is a study conducted by O'Keefe and colleagues (2011). The study, entitled, "One Year Longitudinal Study of the Psychological Effects of Administrative Segregation" (referred to hereafter as "The Colorado Study"), was methodologically rigorous. The results of the Colorado Study are particularly relevant to the issue of the psychological impact of solitary confinement on detainees housed in a segregated housing unit at the AIPC because the study investigated the issue of such impact using a similar population as subjects.

The stated objective of the Colorado Study was to improve understanding of the psychological effects of solitary confinement on inmates housed in administrative segregation units at the Colorado State Penitentiary. The study was funded by the U.S. Department of Justice, and the results of the study were published in a 164-page report.

Based on suppositions that placement in solitary confinement in administrative segregation units would cause and/or exacerbate psychological symptoms, the authors generated three hypotheses:

"1. Offenders in AS [Administrative Segregation] would develop an array of psychological symptoms consistent with the security housing unit (SHU) syndrome,

2. Offenders with and without mental illness would deteriorate over time in AS, but at a rate more rapid and extreme for the mentally ill, and

3. Inmates in AS would experience greater psychological deterioration over time than the comparison groups."

To assess the validity of their hypotheses, the researchers tested and collected data from hundreds of inmates housed in administrative segregation, the general population, and a specialized mental health unit at three month intervals over the

course of one year. As recounted in the following excerpt from the Abstract of the study, all three hypotheses that placement in solitary confinement in administrative segregation units would cause and/or exacerbate psychological symptoms were not supported:

"Similar to other research, our study found that segregated offenders were elevated on multiple psychological and cognitive measures when compared to normative adult samples. However, elevations were present among the comparison groups too, suggesting that high degrees of psychological disturbance are not unique to the AS environment. In examining change over time patterns, there was initial <u>improvement</u> [emphasis added] in psychological well-being across all study groups, with the bulk of the improvements occurring between the first and second testing periods, followed by relative stability for the remainder of the study. Patterns indicated that the MI [Mental Illness] groups tended to be similar to one another but were significantly elevated compared to the NMI [No Mental Illness] groups, regardless of their setting. Contrary to our hypothesis, offenders with mental illness did not deteriorate over time in AS at a rate more rapid and more extreme than for those without mental illness. Finally, although AS inmates in this study were found to possess traits believed to be associated with long-term segregation, these features cannot be attributed to AS confinement because they were present at the time of placement and also occurred in the comparison study groups."

In sum, the results of the Colorado Study include the finding that placement in solitary confinement in an administrative segregation unit does not cause subjects to develop psychological symptoms. A corollary finding was that such placement yielded improvement in the psychological well-being of both mentally ill and non-mentally ill subjects. Pathological traits present in subjects who were placed in solitary confinement in administrative segregation units were noted to have been present prior to their placement in solitary confinement and also present in subjects in comparison study groups.

As is not uncommon after a study offering unexpected or controversial findings is published, many critiques of the Colorado Study and challenges to its findings have been made since its publication. In their review of the critiques and challenges, Gendreau and Theriault (2011) opined, "none of the work we are aware of that has been cited by those who contend that prisons produce serious psychological trauma comes close to the Colorado study in terms of its methodological rigor (e.g., repeated measures, comparison group design, and the choice of constructs to assess psychopathology)."

Visceral responses to the findings of the Colorado Study notwithstanding, the findings of the study are not anomalous. Previous research yielded similar findings, and the results of subsequent meta-analyses have also been consistent with the

Ad-Seg/Solitary Confinement Kropf                                    15

findings of the Colorado Study.

Meta-analytic reviews conducted by Morgan et al. (2014) and by Smith et al. (2015) did not find support for the contention that solitary confinement has lasting psychological effects. In his study entitled, "The Effect of Solitary Confinement on Institutional Misconduct: A Longitudinal Evaluation" and published by the U.S. Department of Justice, Lebrecque (2015) referenced recent empirical research and concluded, "[The results of the research] cast some doubts about SC [Solitary Confinement] being as devastating to inmates as has often been portrayed in the media and by some human rights organizations, activists, and scholars who vehemently oppose the practice on moral/ethical grounds...[T]hese findings serve as a caution to reviewers about making judgments regarding the effects of SC too hastily, especially when they are based on qualitative rather than quantitative evidence."

Works Cited

American Correctional Association (2004). _Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition_.

Cunningham, M. Sorensen, M., Vigen, M., Woods, O. (2011). Correlates and Actuarial Models of Assaultive Prison Misconduct among Violence-Predicted Capital Offenders. _Criminal Justice and Behavior_, 38(1), 5-25.

Gendreau, P., & Theriault, Y. (2011). Bibiotherapy for cynics revisited: Commentary on One Year Longitudinal Study of Psychological Effects of Administrative Segregation. _Corrections and Mental Health: An Update of the National Institute of Corrections_.

Immigration and Customs Enforcement (3/11, 5/13). _National Detainee Handbook_.

Immigration and Customs Enforcement (2008). _Operations Manual ICE Performance Based National Detention Standards_.

Labrecque, R.M. (2015). _The Effect of Solitary Confinement on Institutional Misconduct: A Longitudinal Evaluation_. Washington DC: U.S. Department of Justice.

Morgan, R.D., Van Horn, S.A., MacLean, N., Bolanos, A., Gray, A.L., Batastini, A., & Mills, J.F. (2014). _Administrative Segregation: Is it a Harmful Correctional Practice?_ Paper presented at the Annual Meeting of the American Psychology-Law Society, New Orleans, LA.

O'Keefe, M.L., Klebe, K.J., Stucker, A., Sturm, K., & Leggett, W. (2011). _One Year Longitudinal Study of the Psychological Effects of Administrative Segregation_. Final report to the

Ad-Seg/Solitary Confinement Kropf                                    16

　　　　U.S. Department of Justice.  Washington, DC:  U.S. Department of Justice.

Smith, Gendreau, P., & Labrecque, R.M. (2015). <u>The Impact of Solitary Confinement on Inmate Behavior:  A Meta-Analytic Review</u>.  Paper presented at the North American Correctional and Criminal Justice Psychology (N3) Conference, Ottowa, Canada.

<u>Materials Received from Counsel</u>
Amended Protective Order

Complaint

Answer

ACA Standards

2000 ICE Detention Operations Manual

2008 Performance Based National Detention Standards

2011 Performance Based National Detention Standards (revised 2013)

ICE National Detainee Handbook (03-11)

ICE National Detainee Handbook (05-13)

ICE National Detainee Handbook (04-16)

Aurora ICE Processing Center Detainee Handbook (2007-2014)

Aurora ICE Processing Center Overall Facility Plan (A100)

Deposition Transcript of Demetrio Valerga (10/27/2017)

Plaintiffs' Responses to GEO's Sixth Set of Interrogatories and First set of Requests for Admission

Voluntary Work Program Agreements for named plaintiffs

Voluntary Work Program Applications for named plaintiffs

GEO Policy 8.1.8-AUR

GEO Policy 12.1.4-AUR

*[signature]*

Jeffrey Kropf, Ph.D.

Ad-Seg/Solitary Confinement Kropf　　　　　　　　　　　　　　　　17