# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated*,

Plaintiffs,

v.

THE GEO GROUP, INC.,

Defendant.

---

## DEFENDANT THE GEO GROUP, INC.'S REPLY IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

Defendant The GEO Group, Inc. ("Defendant" or "GEO"), by and through its undersigned

counsel, hereby submits its Reply in Support of its Motion for Summary Judgment (ECF 305) and

respectfully requests this Court enter judgment in GEO's favor as to all of Plaintiffs' claims.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................ 2

III.  ELEMENTS OF THE TRAFFICKING VICTIMS PROTECTION ACT ...................... 55

IV.   THE MEAL CLEANUP POLICY DOES NOT VIOLATE THE TVPA ........................ 57

      A.    The PBNDS Do Not Limit Detainee Cleanliness to Four Categories. ................. 58

      B.    Requiring Civilly Confined Individuals To Clean Up After Meals or Face
            Consequences is Legitimate.................................................................. 62

V.    PLAINTIFFS FAIL TO IDENTIFY EVIDENCE OF GEO'S SCIENTER.................... 67

VI.   72-HOURS OF SEGREGATION IS NOT SERIOUS HARM UNDER THE
      TVPA ................................................................................................. 69

VII.  PLAINTIFFS' ADDITIONAL FACTS ARE NOT MATERIAL.................................. 72

VIII. PLAINTIFFS' UNJUST ENRICHMENT CLAIMS ARE BARRED BY
      EXPRESS CONTRACTS.......................................................................... 73

      A.    GEO Did Not Waive Its Defense............................................................ 73

      B.    Contracts of Adhesion are Not *Per Se* Unconscionable. ............................ 74

IX.   CONCLUSION....................................................................................... 76

CERTIFICATE OF SERVICE ............................................................................ 77

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ahmad v. Furlong*,
   435 F.3d 1196 (10th Cir. 2006) ............................................................72

*Barrientos v. CoreCivic, Inc.*,
   951 F.3d 1269 (11th Cir. 2020) ...............................................61, 63, 64

*Bentley v. Cleveland Cnty. Bd. of Cnty. Cmmr's*,
   41 F.3d 600 (10th Cir. 1994) ...............................................................72

*Bijeol v. Nelson*,
   579 F.2d 423 (7th Cir.1978) ...........................................................62, 63

*Bridges v. Poe*,
   No. 6:19-CV-01399-LSC, 2020 WL 5408915 (N.D. Ala. Sept. 9, 2020) ..................64, 67, 68

*Echon v. Sackett*,
   No. 14-CV-03420-PAB-NYW, 2017 WL 4181417 (D. Colo. Sept. 20, 2017).....................54

*Expertise, Inc. v. Aetna Fin. Co.*,
   810 F.2d 968 (10th Cir. 1987) ...............................................................72

*Hause v. Vaught*,
   993 F.2d 1079 (4th Cir.1993) ...............................................................61

*Headley v. Church of Scientology Int'l*,
   687 F.3d 1173 (9th Cir. 2012) .........................................................54, 55, 61

*Jackson v. Siringas*,
   No. 12–15474, 2013 WL 3810301 (E.D.Mich. July 23, 2013) ............................62

*Jobson v. Henne*,
   355 F.2d 129 (2d. Cir. 1966).................................................................62

*Martinez-Rodriguez v. Giles*,
   391 F. Supp. 3d 985 (D. Idaho 2019) ................................................54, 65, 67

*Mendez v. Haugen*,
   No. CV 14-4792.........................................................................61, 62

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017), *as amended* (Mar. 3, 2017) ...............................53, 61

*Roman v. Tyco Simplex Grinnell*, No. 8:16-CV-3449-T-33AEP, 2017 WL 3394295
    (M.D. Fla. Aug. 8, 2017), *aff'd*, 732 F. App'x 813 (11th Cir. 2018)................................55, 61

*United States v. Callahan*,
    801 F.3d 606 (6th Cir. 2015) ...........................................................................69, 70

*United States v. Kozminski*,
    487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988)..........................................61

*United States v. Toviave*,
    761 F.3d 623 (6th Cir. 2014) ...........................................................................54, 61

*Vernon v. Qwest Communications Intern., Inc.*,
    925 F. Supp. 2d 1185 (D. Colo. 2013)................................................................73

*Villescas v. Richardson*,
    124 F. Supp. 2d 647 (D. Colo. 2000).................................................................72

*Weller v. HSBC Mortgage Services, Inc.*,
    971 F. Supp. 2d 1072 (D. Colo. 2013)................................................................73

**Statutes**

U.S.C. § 1555(d) ...........................................................................................53

18 U.S.C. § 1589(a)(1)....................................................................................35

**Rules**

Federal Rules of Evidence 802 .........................................................................35

Rule 8(c)....................................................................................................72

**Other Authorities**

Durango Herald, https://durangoherald.com/articles/59930
    (last visited November 15, 2020)......................................................................53

5 Fed. Prac. & Proc. § 1278 (3d ed. Sept. 2018) ..................................................72

iii

# I.    INTRODUCTION

Plaintiffs' response does not identify disputes of material fact that would prevent this Court from resolving the issues before it on the briefs. While Plaintiffs attempt to muddy the waters by reciting dozens of extraneous facts, they do not point to any genuine or material factual issues before this Court that would preclude it from holding that the meal cleanup at the Aurora ICE Processing Center ("AIPC") does not violate the Trafficking Victims Protection Act ("TVPA"). The undisputed facts make plain:

(1) The disciplinary severity scale contained within the Performance Based National Detention Standards ("PBNDS") and the Aurora ICE Processing Center Handbook ("AIPC Handbook"), as written, constitutes a warning of legitimate consequences, not a threat of serious harm under the TVPA;

(2) There is no evidence that GEO had the requisite scienter required for a TVPA violation;

(3) There is no evidence that, absent individual and unique circumstances, 72-hours of solitary confinement constitutes serious harm; and

(4) Written contracts exist and bar Plaintiffs' unjust enrichment claim.

Indeed, Plaintiffs concede that whether the PBNDS permit the meal clean up policy is a matter of "undisputed evidence." ECF 336 at 65. Plaintiffs do not point to any evidence suggesting the implementation of a government-mandated disciplinary policy that includes the potential sanction for 72-hours of segregation is in any way illegitimate. Based upon that fact alone, GEO is entitled to summary judgment. Insofar as the Court concludes that the PBNDS disciplinary severity scale, which is used at detention facilities nationwide, does not constitute a warning of legitimate consequences, Plaintiffs claims still fail. Despite reciting over 50 additional facts in their

Response, Plaintiffs cannot identify sufficient evidence that would permit a fact finder to resolve

the case in their favor. Accordingly, summary judgment is appropriate.

## II.    STATEMENT OF FACTS

In accordance with this Court's practice standards, GEO provides the following responses

to Plaintiffs' additional statement of facts and responses to GEO's proposed undisputed facts. For

ease of the Court's review, GEO has included each fact in a table format.

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| 1. | At the class certification stage Plaintiffs cited to a Policy and Procedure Manual, titled "Sanitation Procedures" in support of their claims.[1] ECF 50-2. | Admit that the "Sanitation Procedures" section of the Aurora Policy and Procedure Manual was an exhibit to Plaintiffs' Motion for Class Certification. Deny the contention in the footnote that Plaintiffs "have renamed this document the 'HUSP'" or that "no formal GEO policy is designated or titled 'HUSP'. As GEO acknowledges, the Housing Unit Sanitation policy ("HUSP") is set forth in the Detainee Handbook under the heading "Housing Unit Sanitation." | Plaintiffs admit that the "Sanitation Procedures" document is no longer part of the term "HUSP" as they have defined it in this lawsuit. |
| 2. | The Sanitation Procedures were not developed to assign tasks to any specific individuals, but rather to detail the process for cleaning and materials to | Undisputed. | |

---

[1] Plaintiffs have renamed this document the "HUSP," but no formal GEO policy is designated or titled "HUSP." It appears that this phrase originates not from the Sanitation Procedures, but instead the detainee handbook which contains a subsection called "Housing Unit Sanitation." See ECF 260 at 7.

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | be used. ECF 289 (Undisputed Fact 31). | | |
| **3.** | Detainees do not receive a copy of the Sanitation Procedures during their stay at AIPC. ECF 50-1, 29:13-18 (30(b)(6) Deposition of Ceja). | Undisputed. | |
| **4.** | Plaintiffs no longer rely upon the Sanitation Procedures as a policy that underlies their TVPA claim. **Ex. A.** (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories, Responses to Interrogatory No. 39). | Deny. The referenced interrogatory does not mention policies; rather, it states: "Describe all actions taken by GEO that You allege constitute force, threats of force, physical restraint, or threats of physical restraint" under 18 U.S.C. § 1589(a)(1). | In Undisputed Fact #1, Plaintiffs admit that the "Sanitation Procedures" document is no longer part of the term "HUSP" as they have defined it in this suit. "[T]his interrogatory is phrased in terms of Plaintiffs' allegations, which are not styled as individual claims, but rather as classwide claims and allegations that **derive from GEO's policies and practices** that were common to the TVPA Class." ECF 306-1 at 3 (emphasis added). |
| **5.** | Plaintiffs also cited the AIPC Handbook at the class certification stage as support for their TVPA claims. ECF 50-3. | Undisputed. | |
| **6.** | Unlike the Sanitation Procedures, the AIPC Handbook is issued to all detainees entering the facility. ECF 289 (Undisputed Fact 23). | Undisputed. | |
| **7.** | The only classwide polices that Plaintiffs challenge as part of their TVPA claim | Deny. Plaintiffs challenge GEO's classwide HUSP, which is described in the | Plaintiffs' response does not provide evidence of other policies which they |

3

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| are the AIPC Handbook and an Orientation video shown to detainees upon arrival. **Ex. A**. (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories Responses to Interrogatory No. 39). | Detainee Handbook and orientation video. The Detainee Handbook and orientation video contain evidence of that policy, but are not the only evidence of that policy. The referenced interrogatory does not mention policies; rather, it states: "Describe all actions taken by GEO that You allege constitute force, threats of force, physical restraint, or threats of physical restraint" under 18 U.S.C. § 1589(a)(1). | challenge, and therefore does not create a dispute of fact. Further, Plaintiffs' response inaccurately describes Plaintiffs' own interpretation of the interrogatories at issue as seeking information about what policies and practices Plaintiffs challenge:<br><br>"[T]his interrogatory is phrased in terms of Plaintiffs' allegations, which are not styled as individual claims, but rather as classwide claims and allegations that **derive from GEO's policies and practices** that were common to the TVPA Class." ECF 306-1 at 3 (emphasis added). |
| **8.** | More specifically, Plaintiffs challenge the meal clean-up policy in the AIPC Handbook whereby 6 detainees (2 of which are paid "Trustees" under the VWP) assist in cleaning up the housing unit after each meal. ECF 49; ECF 261-17, 20. | Deny. Plaintiffs challenge the HUSP, which provides:<br><br>Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit [or Dorm] Officer will be responsible for assuring this general cleanup is done on a regular basis. | Plaintiffs' denial is contrary to their prior representations to this Court.<br><br>Plaintiffs previously presented as undisputed:<br><br>"During a general cleanup, GEO requires detainees clean up the tables , wipe down the tables and sweep and mop the floors." ECF 260 at 18 (Fact #48).<br><br>After describing the general cleanup, Plaintiffs presented as undisputed: |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| | ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 0005487196) at 18; ECF No. 273-2 (2007 Detainee Handbook, GEO_MEN 00054151-222) at 49; ECF No. 273-3 (2008 Detainee Handbook, GEO_MEN 00054224-52) at 19; ECF No. 273-4 (2010 Detainee Handbook, GEO_MEN 00054253-77) at 16-17; ECF No. 273-5 (2011 Detainee Handbook, GEO-MEN 00065783-808) at 17; ECF No. 261-17 (2013 Detainee Handbook, PL000029-55) at 20.3 The evidence GEO cites does not support calling the policy a "meal clean-up policy" and does not support that 2 of the 6 detainees assigned to housing unit sanitation duties were VWP workers.

Further evidence related to the HUSP is also set forth in Plaintiffs' Statement of Additional Facts ("SAF"), Nos. 1-13. | "The post-meal cleanup of tables, floors, and other communal areas that GEO requires is called the Housing Unit Sanitation Policy or HUSP." ECF 260 at 18 (Fact #51).

Plaintiff Menocal's testimony confirmed the same: "They had a schedule. You know, you would—after each meal, you know, people would clean up, but there was a rotation where (inaudible) – your cell we (inaudible) the areas three times a day, in the morning or after each meal, I should say. And—and, yeah. So one cell would do that one day. The next cell would do it the next day, and so on and so forth." ECF 339-7 at 7 (Menocal Dep. 95:16-25; 96:1-4).

The written policy to which Plaintiffs cite does not dispute this fact, but rather merely shows a difference between the policy in practice and the policy as written. This does not constitute a dispute of fact. |
| 9. | The meal clean up section of the handbook provides for the following sanction if not followed: | Admit that the Detainee Handbook includes the quoted language.

Deny that the quoted section of the handbook | GEO admits that the quoted section of the handbook does not specifically reference meal clean-up, but denies that the policy cited in the |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean will result in further disciplinary action.<br><br>ECF 261-17, 20. | specifically references meal cleanup. | handbook does not refer to a meal cleanup.<br><br>Plaintiffs previously presented as undisputed:<br><br>"During a general cleanup, GEO requires detainees clean up the tables , wipe down the tables and sweep and mop the floors." ECF 260 at 18 (Fact #48).<br><br>After describing the general cleanup, Plaintiffs presented as undisputed:<br><br>"The post-meal cleanup of tables, floors, and other communal areas that GEO requires is called the Housing Unit Sanitation Policy or HUSP." ECF 260 at 18 (Fact #51). |
| **10.** GEO is required to comply with ICE's PBNDS under its contract. ECF 289 (Undisputed Facts 11-14, 16,18). | Undisputed. | |
| **11.** All applicable versions of ICE's National Detention Standards ("NDS") and PBNDS require GEO to adopt, without alteration, the ICE disciplinary severity scale and incorporate it into the AIPC Handbook. ECF 289 (Undisputed Fact 19). | Undisputed. | |

6

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| 12. | All applicable versions of ICE's NDS and PBNDS require GEO to provide a disciplinary severity scale that includes the "[r]efusal to clean assigned living area" as an offense which can be sanctioned by "[d]isciplinary segregation (up to 72 hours)." ECF 289 (Undisputed Fact 21). | Undisputed. | |
| 13. | The ICE disciplinary severity scale included in the AIPC Handbook provides for up to 12 other sanctions as a possible consequence for refusing to clean one's living area. These sanctions include warning, reprimand, and loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.). ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17. | Undisputed. | |
| 14. | GEO included this sanction in the AIPC Handbook, as required by ICE. ECF 289 (Undisputed Facts 11-14, 16, 18, 19, 21). | Undisputed. | |
| 15. | The detainee orientation video provides:

You will be protected from personal abuse, corporal punishment, personal | Undisputed. | |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| injury, disease, and damage to your property and harassment to the fullest extent possible. Each and every detainee must participate in the sanitation program. A list of detainee's [sic] is developed each day and is posed for viewing. During a general clean-up all detainees must participate. ***** Disciplinary Process[.] Refer to your local supplement for more detailed information about the rules infractions that you must avoid and the established disciplinary actions that will be taken. **** **High Moderate**- and a few examples are . . . Indecent exposure, staling, refusing to obey a staff member, insolence to staff member, lying or providing false statement to staff, being in an unauthorized area, not standing for count, interfering with count, gambling, destroying altering or damaging property" *See* ECF 262-10 (emphasis in original). | | |

8

| | **GEO's Statement of Undisputed Facts** | **Plaintiffs' Response and Supporting Evidence** | **GEO's Reply to Plaintiffs' Response** |
|---|---|---|---|
| **16.** | In addition to the AIPC Handbook and orientation video, GEO is required to provide all detainees with the ICE National Handbook. Like the AIPC handbook', the ICE Handbook also warns detainees that they could face disciplinary consequences if they refuse to clean, stating "Will I get paid for keeping my living area clean? No. **You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined.**" **Ex. B**. (ICE National Handbook). Despite this being materially similar to the AIPC Handbook, Plaintiffs do not allege that ICE's National Handbook constituted a threat as defined by the TVPA. ECF 49; **Ex. A** (Plaintiffs' Supplemental Responses to GEO's Sixth Set of Interrogatories, Responses to Interrogatory No. 39) (omitting any reference to the ICE National Handbook). | Admit that the ICE National Handbook includes the quoted language.<br><br>Deny that cleaning general-use areas is the same as keeping general-use areas clean, or that the language in the ICE handbook is "materially similar" to the HUSP as set forth in the Detainee Handbook. Compare ECF No. 310-1 (ICE Detainee Handbook, GEO-MEN 00141667-702) at 18 ("Will I get paid for keeping my living area clean? No. You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas clean, you may be disciplined.") with ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 49; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 16-17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20.<br><br>("Each and every detainee must participate in the facility's sanitation | Plaintiffs admit that the language is contained within the cited document. Plaintiffs provide no evidence that the phrase "cleaning general-use areas" has a different meaning from "keeping general-use areas clean." |

9

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | | program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate."). | |
| 17. | Plaintiffs also challenge the VWP daily stipend. ECF 1, ECF 49,3. | Undisputed. | |
| 18. | All detainees are offered the opportunity to participate in the VWP. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17. | Undisputed. | |
| 19. | All detainees who participate in the VWP are told that their participation is voluntary. **Ex. C.** (Plaintiffs' VWP applications). | Admit, but note that the cited documents only do so by referring to the program as the "voluntary work program" and "the volunteer work program." | |
| 20. | All detainees who participate in the VWP are told in advance that "compensation shall be $1.00 per day." **Ex. C.** (Plaintiffs' VWP applications.). | Undisputed. | |

10

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| **21.** | All detainees must sign an agreement to participate in the VWP, acknowledging that their compensation will be limited to $1 per day. **Ex. C.** (Plaintiffs' VWP applications). | Admit, but dispute that the agreement is an enforceable contract. *See* § V.E.2, *infra*. | Plaintiffs dispute does not call into question the cited facts, but instead a legal conclusion. |
| **22.** | Some VWP participants receive additional incentives for their participation including candy or ice cream. **Ex. D** (Ceja 30(b)(6) Dep.162-163). | Undisputed. | |
| **23.** | Plaintiff Menocal described a typical day at AIPC as follows: I wake up, get dressed, do my bed, wait for breakfast, eat breakfast, clean up, maybe exercise, walk around, read a book, draw. It depends. Again, wait for lunch to eat, clean up, maybe shower, maybe do some sports, maybe talk on the phone with someone, maybe write a letter, walk around, exercise, wait for dinner. Same thing, eat dinner, relax a while, maybe watch TV, read a book, draw, and, you know, wait for bedtime. | Undisputed. | |

11

| | **GEO's Statement of Undisputed Facts** | **Plaintiffs' Response and Supporting Evidence** | **GEO's Reply to Plaintiffs' Response** |
|---|---|---|---|
| **24.** | While detained, Plaintiff Menocal described AIPC to a friend as follows: [T]hey've got pretty good grub, considering it's, you know, a detention center. And we got three televisions, a bunch of tables, a bunch of people, and we all get along. Pretty nice. I mean, it's -- for being incarcerated, it's not bad at all, not compared to -- not compared to Denver County or the other one where I was at. This is like Camp Snoopy. It's pretty easy. **Ex. E** (Menocal Dep. 54:5-12). | Admit, but deny that this statement accurately describes Plaintiff Menocal's experience at Aurora. Plaintiff Menocal testified that this statement was not true, and that he told family and friends that GEO was a nice place and that the food was good only so his friends and family would not worry about him. Ex. 1 (Menocal Tr.) 48:20-24; 67:12-68:5; 167:17-168:6. In response to this recording, Plaintiffs' expert Dr. Grassian stated: "A person can experience a sense of dread and fear and still try to present a good face to their friends and family and to themselves. You know, that doesn't change anything." Ex. 2 (Grassian Tr.) 272:3-24. | GEO denies that the testimony of Dr. Grassian can be used to change or alter Mr. Menocal's testimony. GEO does not dispute that Plaintiff Menocal tried to recharacterize his own recorded statements in his deposition. |
| **25.** | Plaintiff Hugo Hernandez described a typical day as follows: I would wake up for breakfast at 5:00 in the morning. I will walk out, store my food, bring it back to the cell, and go to sleep only if it was not my time to clean. But if I was assigned to clean, I have to stay outside and clean. I couldn't go back to sleep. So[,] I will store my food. I will wake up when I | Admit. The above omits the last two sentences of Plaintiff Hernandez Ceren's answer, which state: "And after count time, the last count time, you have to be inside your cell and the doors got to be locked in already. And then it's another day." | GEO does not dispute the additional information from Plaintiffs. |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| wake up, and brush my teeth, do my coffee, and make sure that all my cellies get the coffee because that's my one main thing. Then we will all sit at the table. I will do my legal work, go through my documents, and see what else I need to put in or something, watch a little bit of TV. I can go to the phone a little bit. If -- if I will get someone to answer, I will go to the phone. Wait for count time, wait for lunch. After lunch, I will do a cleanup again, which is cleanup time, and wait to see who's assigned for the cleanup, and if I'm not assigned, then I just go to my cell or I go against the wall just like everybody else. And once everything gets reopened, go back into the table again and do some workout while waiting -- doing my workout. I wait for chow again and wait for the cleanup, and, of course, shower. Yeah, after the workout, shower, get back. Wait for chow, clean up, and then eventually wait for the GEO guard, Officer Blacknick, to come and pick me up so we can go to the law library and collect | | |

13

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| all detainees who wanted to go to the library. We'll go to the law library, get a pat-down, go inside the law library.·And in there, I will help detainees with their documents, printouts, making sure they understood what the immigration judge was asking them to bring back, translations, looking for any specific application they were looking for. And then once we were done, like an hour later or an hour and a half later, I get another pat-down, get taken back to the cell, and wait for count time. **Ex. F** (Hernandez Dep. 107-108. | | |
| **26.** | While at AIPC, every detainee had the ability to communicate with ICE at any time. **Ex. B** (ICE Detainee Handbook, pg. 2) ("ICE officers will routinely visit the housing units at your facility. If you have questions about your case **or how the facility has treated you**, let the ICE officers know. . . [y]ou may also submit a request for information in writing."); **Ex. E** (Menocal Dep. 56:1-10); **Ex. F** (Hernandez Dep. 97:15-22). | Deny. While Plaintiffs acknowledge that the ICE Detainee handbook suggests that detainees should have "routinely" had an opportunity to communicate with ICE officers, the cited evidence does not establish that "every detainee had the ability to communicate with ICE at any time." (emphasis added). The documents do suggest that detainees would have the opportunity to speak to ICE officials during their "routine[] visits" to the housing units. | GEO disputes that detainee testimony can alter the written policies and practices at the AIPC.

GEO further disputes that Plaintiffs accurately characterize Plaintiff Menocal's testimony. **Ex. E** (Menocal Dep. 56:1-15).

Mr. Menocal testified:

"Q. Do you know if you could file a formal complaint with ICE while you were in the pod? |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| | It is unclear what the handbook means by "submit a request for information in writing." The cited testimony from Plaintiffs Menocal and Hernandez Ceren suggests that detainees could file a complaint or "kite", though it is not clear whether the complaint would go to ICE or GEO. Plaintiff Menocal did not know if the kites he filed went to ICE or GEO personnel. Ex. 1 (Menocal Tr.) 56:16-20. In Plaintiff Hernandez Ceren's deposition, a "kite" was described as "a way that you could file a grievance or bring an issue to the attention of the facility." Ex. 3 (Hernandez Ceren Tr.) 97:1520. | … A. Yeah, sure. Q. How would you file a complaint with ICE? A. By writing a kite, a complaint letter. … Q. But you can send it to ICE, right? A. I believe so, yes, sir." Likewise, Mr. Hernandez never testified that he did not know he could raise issues with ICE, as outlined in the handbook. |
| 27. | Some detainees elected to be placed in segregation voluntarily, seeing it not as a punishment, but instead a location where they could receive peace and quiet. **Ex. D** (Ceja 30(b)(6) Dep. 55:7-19). | Deny. The cited testimony describes "protective custody," which is not synonymous with "segregation," despite the fact that both practices use the same space. Detainees who feel threatened, afraid, or unsafe in general population are placed in protective custody. Ex. 4 (Gallegos Tr.) 74:7-76:23; see also ECF No. 262-11 (Special Management Unit ("SMU") | Plaintiffs do not cite to evidence that a detainee in "protective custody" is not a detainee living in the segregation unit voluntarily. As Ms. Ceja explained, the Special management unit at AIPC is "one unit" with one side consisting of disciplinary segregation and the other administrative. ECF 339-2 at 9-10 (Ceja 55:2-6). Some detainees request to be placed in the segregation unit for peace |

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | | Operations policy, GEO_MEN00037770-84) at 3 ("Protective custody (PC) may be initiated at the detainee's request or ordered to protect the detainee from harm."). GEO's segregation logs show that the detainees who sought "peace and quiet" were sent to protective custody. Ex. 5 (Segregation Activity Sheet, GEO-MEN 00070692-93). | and quiet. *Id.* (Ceja 55:9-19). All detainees, whether they are in segregation for peace and quiet or disciplinary reason, are in the same housing unit. ECF 339-3 (Ceja Dep. 111:15-22). The segregation logs which Plaintiffs refer to, also support GEO's position, showing that in keeping track of who is in segregation, GEO logs detainees who are in "protective custody" or "peace and quiet" as detainees in segregation. |
| 28. | None of the named Plaintiffs were placed in segregation for refusing to clean. **Ex. A** (Brambila's Responses to GEO's Sixth Interrogatories); **Ex. E** (Menocal Dep. 100:16-19); **Ex. F** (Hernandez Dep. 181:1-7); **Ex. G** (Valerga Dep. 141:24-142:2, 140:12-13); **Ex. H** (Lourdes Argueta Second Set of Discovery, Interrogatory No. 27; Yepez Gaytan Second Set of Discovery, Interrogatory No. 27; Alexaklina Second Set of Discovery, Interrogatory No. 27); **Ex. I** (Vizguerra Dep. 42:5-7); **Ex. J** | Undisputed. | |

16

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| (Xahuentitla Dep 70:11-17). | | |
| **29.** Plaintiff Menocal did not receive direct threats for refusing to clean. **Ex. H** (Menocal's Second Set of Discovery, Interrogatory No. 27). | Deny. Plaintiff Menocal testified that GEO guards, as well as other detainees, told him that he had to clean or be sent to solitary confinement. Ex. 1 (Menocal Tr.) 96:5-97:3. Plaintiff Menocal also witnessed other detainees taken to solitary confinement for refusing to clean and understood that refusal to clean could lead him to the same fate. *Id.* 102:14-25. | Plaintiff not testify that a GEO officer directly threatened him with segregation for refusing to clean, instead stating only that he knew from other detainees that segregation was a possible consequence. ECF 336-2 at 19-20 (Menocal Dep 96:22-25, 96:1. As for the description of other detainees being taken to segregation, Mr. Menocal testified that his basis for believing the detainees were taken to segregation for not cleaning was not from his own first-hand knowledge, as he could not hear the incident transpire. Rather, he surmised the circumstances based upon hearsay statements from other individuals. ECF 336-2 (Menocal Dep. 104:1-25).

Further, Plaintiffs discovery responses are unambiguous, stating: "Plaintiff does not recall receiving direct threats from any GEO employee regarding administrative or disciplinary segregation for failing to clean." ECF 306-7 at 5 (Menocal's Second Set of Discovery, Interrogatory No. 27). |

17

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | | | |
| **30.** | Plaintiff Olga Alexaklina was never threatened by GEO employees with disciplinary or administrative segregation for failing to clean. **Ex. H** (Alexaklina Second Set of Discovery, Interrogatory No. 27). | Undisputed. | |
| **31.** | Upon being informed that he would be placed in segregation if he did not clean, Plaintiff Valerga responded with "go ahead." **Ex. G** (Valerga Dep. 136:16-137:19). Yet, Plaintiff Valerga was not placed in segregation on that occasion or any other occasion. *Id.* Valerga Dep. 141:24-142:2, 140:12-13. | Admit that Plaintiff Valerga testified to the incident above but deny that he was not sent to segregation on "any other occasion." Plaintiff Valerga spent three weeks in segregation at Aurora. Ex. 6 (Valerga Tr.) 8:22-9:13. | GEO does not dispute that Plaintiff Valerga was sent to segregation for an incident unrelated to cleaning. GEO clarifies that Plaintiff Valgera was never asked to clean at Aurora and does not know of anyone who was ever sent to segregation for not cleaning. ECF 306-6 at 12 (Valerga Dep. 141:13-142:2). |
| **32.** | Plaintiff Hernandez testified in his deposition that he did not, and does not, consider the AIPC Handbook to be threatening. **Ex. F** (Hernandez Dep. 58:12-24). | Admit that Plaintiff Hernandez Ceren testified he did not find portions of the handbook threatening, but deny that he did not find the HUSP, which was described in the handbook, threatening. Plaintiff Hernandez Ceren testified that he knew cleaning was mandatory because "the GEO guard would tell you that it's in the handbook, and if you refuse, you were going to be sent to the hole." Ex. 3 (Hernandez Ceren Tr.) 159:10-15. | Mr. Hernandez's testimony left no room for ambiguity as to whether he found the written policy in the handbook to be threatening:

"Q. And so do you consider this policy [HUSP] to be threatening?

A. No."

ECF 306-5 at 13 (Hernandez Dep. 58:12-24). |

18

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| **33.** | Plaintiff Dagoberto Vizguerra does not recall receiving the AIPC Handbook, let alone being threatened by it. **Ex. I** (Vizguerra Dep. 90:24-91:4). | Admit that Plaintiff Vizguerra does not recall receiving the handbook, but deny that he did not find the HUSP, which was described in the handbook, threatening. Plaintiff Vizguerra testified that he was aware of the cleaning requirement and its consequences because he say a detainee get sent to segregation on his second or third day at Aurora for refusing to clean. Ex. 7 (Vizguerra Tr.) 48:9-49:9. In addition, the record reflects that all detainees receive and acknowledge the handbook upon entry to the facility, regardless of Plaintiff Vizguerra's specific recollection. Ex. 8 (Ceja 30(b)(6) Tr. I) 88:7-23. | Plaintiff Vizguerra testified that an unidentified person was placed in administrative segregation for not cleaning, but never testified that he was aware of or was threatened by the AIPC Handbook. ECF 336-8 at 4-5 (Vizguerra Tr.) 48:9-49:9.<br><br>Indeed, his testimony makes clear he does not recall the detainee handbook:<br><br>"Q. Do you remember getting this [AIPC Handbook]?<br><br>A. I don't remember."<br><br>ECF 306-8 at 7 (Vizguerra Dep. 91:3-4). |
| **34.** | Plaintiffs are not making a claim for "mental anguish, emotional distress, or other similar related conditions." **Ex. H** (Plaintiffs Responses to Interrogatory No. 32). | Undisputed. | |
| **35.** | Plaintiffs' expert, Dr. Stuart Grassian, did not diagnose any of the plaintiffs with psychological conditions. **Ex. K** (Grassian Dep. 37:22-23; 237:20-238:24). | Admit. Issuing such diagnoses is beyond the scope of Dr. Grassian's report. | |

19

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| **36.** | Detainees had varying motivations for cleaning:<br><br>a. Plaintiff Menocal preferred to clean up after himself while living at AIPC because he preferred to "live and hang out in a clean environment." **Ex. E** (Menocal Dep. 81:6-10<br><br>b. Indeed, while living at AIPC Plaintiff Menocal asked for permission to clean the recreation area without an expectation of remuneration simply because he spent a lot of time there and wanted to "hang out in a clean environment." **Ex. E** (Menocal Dep. 86:22-87:5).<br><br>c. Plaintiff Hernandez liked to keep his area clean. **Ex. F** (Hernandez Dep. 49:24-50:1).<br><br>d. To avoid the loss of TV time, detainees would often volunteer to help clean up the living area, even if not asked or assigned by GEO officers. **Ex. F** (Hernandez Dep. 78:2-9).<br><br>e. Plaintiff Gaytan received access to X-Box gaming systems, movies, | a. Deny. GEO takes this testimony out of context: Plaintiff Menocal testified that generally he prefers a clean environment; the testimony was not specific to Aurora. Plaintiffs further deny that this testimony expresses his motivation for cleaning up after others in the Aurora Facility. Mr. Menocal testified that he cleaned because "we had to clean and if not . . . we would be punished. . . . The hole is not a pretty place." Ex. 1 (Menocal Tr.) 104:25-105:3.<br><br>b. Deny. Plaintiff Menocal testified that he cleaned the rec yard as a precursor to obtaining a job in the VWP, and that he eventually was offered a job in the VWP because of this cleaning. Ex. 1 (Menocal Tr.) 86:3-87:14).<br><br>c. Admit, however, the cited testimony relates to Plaintiff Hernandez Ceren's time in a different facility.<br><br>d. Admit, except as to GEO's characterization of this as "volunteer" work. The threat of losing privileges, such as use of televisions and phones, preceded threats of solitary | a. Plaintiff Menocal's testimony was specific to AIPC: "I just asked if I could clean the recreation area [at AIPC] … so I could hang out in a clean environment." ECF 306-4 at 12 (Menocal Dep. 86:22-87:5).<br><br>b. Plaintiff Menocal did not testify that he cleaned the rec yard as a precursor to obtaining a job, rather he asked to clean the yard "because I spend a lot of time there [in the recreation area.]" ECF 306-4 at 12 (Menocal Dep. 86:22-87:5).<br><br>c. [No reply]<br><br>d. GEO denies that there is any evidence the individuals who volunteered to help did so because of threats of any kind.<br><br>e. GEO denies the quoted text, changes the plain explanation from Mr. Gaytan about why he cleaned.<br><br>f. [No reply necessary]<br><br>g. Ms. Ceja testified that the <u>only</u> people who do <u>not</u> get the ice cream are the detainees "that don't like have good sanitation in their cells . . ." ECF 336-9 at 28 |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| and ice cream as an incentive to keep his dorm clean. **Ex. L** (Gaytan Dep. 124:3-16).<br><br>f. During the meal clean-up, two trustees in each of the housing units would be paid under the VWP to assist with meal cleanup. **Ex. M** (Quezada Dep. 64:9-19).<br><br>g. Once a week, the cleanest housing unit is rewarded with ice cream or cookies. **Ex. D** Dawn Ceja 30(b)(6) Dep. 163:12-16 (3/29/16). | confinement, and the threats were often made together. Ex. 3 (Hernandez Ceren Tr.) 74:22-77:13)<br><br>e. Admit. These incentives were not his motivation for cleaning in the HUSP; Plaintiff Gaytan testified that he never complained about cleaning because he was afraid that if he did so "they will use that against me." Ex. 9 (Gaytan Tr.) 37:5-9. He also understood from GEO's guards that if he did not follow the rules he would be sent to solitary confinement. *Id.* 143:25-144:1.<br><br>f. Admit that these trustees worked alongside the six additional unpaid detainees that participated in the clean-up. Ex. 10 (Pagan Tr.) 106:17-21; Ex. 11 (Vasquez Tr.) 75:12-17.<br><br>g. Deny. Ceja testified that VWP workers who have done the best work each week are rewarded with ice cream and cookies, not the entire housing unit for its performance in the HUSP. Ex. 8 (Ceja 30(b)(6) Tr. I) 163:12-25. | (Ceja Dep. 164:1-3). As the transcript makes clear, she provided this testimony to clarify that the treats are provided to everyone, not just detainee workers. |
| **37.** Plaintiffs' expert, Dr. Grassian, is unaware of *any literature* that stands | Admit. Dr. Grassian testified that the actual imposition of 72 hours in | Plaintiffs additional cited testimony does not dispute the admitted fact. Nor does it |

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | for the proposition that a threat of 72-hours in segregation could cause psychological harm. **Ex. K** (Grassian Dep. 243:14-21). | segregation could cause psychological harm. Studies show a change in EEG readings after 72-hours in solitary confinement, and that many people experience severe psychological symptoms shortly after placement in solitary confinement. Ex. 2 (Grassian Tr.) 175:25-180:3, 209:13-211:10. | address the consequences of segregation up to the 72 hour mark. |
| **38.** | ICE's Disciplinary Severity Scale (incorporated into the AIPC Handbook) allows for a graduated scale of offenses. ECF 289 (Undisputed Fact 19). | Admit. The Disciplinary Severity Scale in some versions of the AIPC handbook differs from the scale as printed in the PBNDS. *See* ECF No. 298 at 16 (Response to Fact 24). | Plaintiffs have previously conceded that any minor differences are not material:<br><br>"Plaintiffs do not contest that ICE required the disciplinary severity scale, whether and when the disciplinary severity scale was incorporated into the Detainee Handbook is immaterial . . . . GEO has not alleged and cannot allege that the material terms from the Handbooks . . . varied throughout the relevant time period." ECF 286 at 102 n.14. |

22

| | | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|---|
| **39.** | | The PBNDS instruct detention officers to resolve disciplinary infractions in an informal manner where possible. ECF 261-10 at 24 (2000 NDS); ECF 261-9 at 56 (2008 PBNDS); 261-8 at 47 (2011 PBNDS); ECF 260 at 17. | Deny. None of the citations offered include an instruction to resort to "informal" discipline. Instead, GEO cites to the PBNDS' discussion of the High Moderate Offense Category, which states the types of offenses and sanctions available for such offenses, including "disciplinary segregation (up to 72 hours)" for "refusal to clean assigned living area." ECF No. 261-10 (INS Detention Standard, GEO-MEN00063671-4017 (excerpted)) at 24; ECF No. 261-9 (2008 PBNDS, GEO-MEN 00062905-298. (excerpted)) at 56; ECF No. 261-8 (2011 PBNDS, GEO-MEN 00064018-414 (excerpted)) at 47. | The cited sections of the PBNDS all provide for informal resolution of disciplinary incidents, including through a "warning." Nevertheless, to the extent Plaintiffs argue that Section 3.1 of the PBNDS, does not include an instruction to use "informal" resolution, where possible, they are mistaken.

The 2011 PBNDS provide: "Where permitted by facility policy, staff shall informally settle minor transgressions through mutual consent, whenever possible." ECF 261-8 at 36.

The 2008 PBNDS provide: "Where permitted by facility policy, staff will informally settle minor transgressions by mutual consent, whenever possible." ECF 261-9 at 42.

The 2000 NDS provide: "*In SPCs/CDFs, minor transgressions will be settled informally, by mutual consent, whenever possible. If, however, the officer involved thinks an informal resolution inappropriate or unachievable, he/she shall prepare an Incident Report and Notice of Charges, forwarding it to the* |

23

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | | | *appropriate supervisor before the end of the assigned shift.*" ECF 261-10 at 11 (emphasis in original). |
| **40.** | GEO's detention officers did not routinely or uniformly enforce segregation for the failure to clean. **Ex. N** | Deny. GEO guards sent detainees to solitary confinement for refusing to clean on multiple occasions. ECF No. 262-12 (incident reports (compilation)); Ex. 12 (Hernandez Torres Tr.) 81:20-82:3; Ex. 4 (Gallegos Tr.) 170:13-191:23 (verifying that he wrote detainees up several times for "failure to obey my orders for cleaning details," resulting in their placement in segregation). GEO guards also threatened to send detainees to solitary confinement on a regular basis if they did not clean. Ex. 13 (Xahuentitla Tr.) 73:19-74:9, 83:7-19; Ex. 3 (Hernandez Ceren Tr.) 74:23-75:11, 78:10-79:5; Ex. 12 (Hernandez Torres Tr.) 60:8-14; *infra* at SAF No. 13. The guards' | None of Plaintiffs' cited testimony indicates that GEO Officers routinely or uniformly enforced segregation. To the contrary, the cited testimony provides individualized evidence of isolated events. GEO's witnesses have testified in detail that these incidents are not representative of the general policy.

Indeed, not a single Plaintiff in this action was sent to segregation for refusing to clean. (GEO's Undisputed Fact #28).

Further, GEO's corporate and 30(b)(6) witnesses testified consistently with the cited declarations. GEO's 30(b)(6) witness testified that it is generally GEO's policy to resolve disciplinary issues |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| | testimony that cleaning was not mandatory is contradicted by that of GEO's 30(b)(6) designee, Assistant Warden Dawn Ceja, that officers were expected to enforce the rules in the handbook, and that detainees were expected to obey officers' commands. Ex. 14 (Ceja 30(b)(6) Tr. II) 105:12-24, 138:6139:12 (testifying that facility rules and the disciplinary severity scale were posted in every dorm, and that the "expectation is that those rules are going to be enforced"). Moreover, the guards' testimony that they enforced every single rule in the handbook except the one that is at issue in this litigation is implausible and should be tested before a jury. *See, e.g.*, Ex. 15 (Quezada Tr.) 84:24-92:4. | informally, not with warnings or placement in segregation. ECF 306-13 at 9 (Ceja 30(b)(6) Dep. 113:13-17). Amber Martin, GEO's Executive Vice President of Contract Administration, also testified that it has always been an informal policy that GEO did not use segregation as a consequence for refusing to clean up their living area. ECF 271-6 at 8 (Amber Martin Dep. 134: 11-24).<br><br>To the extent Plaintiffs cite testimony from Plaintiffs that unnamed and unidentified officers told them that the refusal to clean could lead to segregation, these statements are inadmissible hearsay when offered to prove that GEO Officers routinely threatened detainees, as they are offered for the truth of the matter asserted. FRE 802. The analysis may be different if the statements were only offered to show the effect on the listener, which is not the case here.<br><br>To the extent that Plaintiffs cite to the incomplete incident reports at 262-12, they are not complete |

25

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| | | | disciplinary reports and do not establish whether those detainees were ever actually sanctioned with segregation. Indeed, Ms. Ceja has noted that she reviewed the files of those detainees and only one was ultimately sanctioned with segregation. ECF 313-16 at ¶ 8. Further, the incident reports are inadmissible under the Parties' stipulation as none of the individuals therein have been made available for their deposition. ECF 228 (precluding witnesses from trial who are not presented for a deposition). |
| 41. | It would be a very rare occurrence for a detention officer tell a detainee that they would be sent to segregation if they did not clean. **Ex. N.** | Deny. Detainees testified that guards threatened to send them to solitary confinement on a regular basis if they did not clean. *See, e.g.,* Ex. 13 (Xahuentitla Tr.) 73:19-74:9, 83:7-19; Ex. 3 (Hernandez Ceren Tr.) 74:23-75:11, 78:10-79:5; Ex. 12 (Hernandez Torres Tr.) 60:8-14; *infra* at SAF No. 13. The statements to the contrary in the declarations GEO has submitted contradict the guards' own testimony at their depositions, where they testified that they | None of Plaintiffs' cited testimony indicates that GEO Officers routinely or uniformly enforced segregation. Ms. Quezada testified that when detainees did not want to work, she would simply tell them "[d]on't worry about it, I can do it. ECF 313-11 at 7-8 (Quezada Dep. 78:20-79:1). In her 19 years working at AIPC she never told a detainee they would go to segregation if they did not clean. *Id.* at 11-12(Quezada Dep. 149:1-3;150:7-15). In Ms. Vasquez's 19 year tenure, she only ever had one |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| | would explain to detainees that facility rules required them to clean and that detainees could be sent to solitary confinement for refusing. Ex. 10 (Pagan Tr.) 174:2-175:6; *see also* Ex. 4 (Gallegos Tr.) 137:10-19 (testifying that he had never written anyone up for refusing to clean); 170:7-174:3; 179:15-187:14; 188:8-189:25; 192:5-8; 197:6-200:25; 203:4-206:25 (acknowledging that he had issued numerous write-ups for "failure to obey my orders for cleaning details"). The threats of solitary confinement were so pervasive and the knowledge that solitary confinement was the punishment for refusing to clean was so widespread that detainees communicated that information to one another. *See, e.g.*, Ex. 1 (Menocal Tr.) 95:16-97:3; Ex. 6 (Valerga Tr.) 168:13-169:13 (testifying that his cellmate told him that the punishment for refusing to clean was solitary confinement). | detainee who did not want to clean, on that occasion she did not threaten to send the detainee to segregation. ECF 313-12 at 12(Vasquez Dep. 102-103). Officer Pagan testified that he "hardly ever" had to write up a detainee. ECF 339-10 at 30-31 (Pagan Dep. 75:10-20). Officer Gallegos testified that the occasions where he wrote up detainees were rare and did not relate to meal cleanup. ECF 339-11 at 37, 43 (Gallegos Dep 165:15-21;174:1-21).

To the extent Plaintiffs cite testimony from Plaintiffs that unnamed and unidentified officers or detainees told them that the refusal to clean could lead to segregation, these statements are inadmissible hearsay when offered to prove that GEO Officers told detainees of the consequences of segregation on multiple occasions, as they are offered for the truth of the matter asserted. FRE 802. |
| 42. | When a detainee was placed in segregation for the refusal to clean, it was typically because the refusal to clean was in | Deny. Some detainees were sent to solitary confinement only for refusing to clean. ECF No. 262-12 (incident reports) at 2-3, 14. Even | Officer Gallegos testified that the incidents about which he was asked involved more than simply a refusal to clean. In the highlighted |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| concert with another disciplinary infraction. *Id.* **Ex. N.** | where GEO sent detainees to solitary confinement for refusing to clean and other charges, the sole underlying conduct was refusal to clean. For example, the record shows that GEO sent detainees to solitary confinement for refusing to clean and for refusing to obey an officer's order or "insolence" to staff members. But in each of these incidents the order the detainees refused to obey was the order to clean and the insolence was the conduct used to express the refusal. *Id.* at 4-10, 12. In other incidents detainees were sent to solitary confinement for refusing to clean without being charged with that specific infraction, but the underlying conduct described in the incident report indicates the order not followed or insolence expressed was related to the refusal to clean. *Id.* at 11, 13; *see also* Ex. 4 (Gallegos Tr.) 170:7-174:3, 179:15-187:14, 188:8-189:25, 192:5-8, 197:6-200:25, 203:4-206:25 (discussing incident in which he wrote up detainees for failing to "obey my orders for cleaning details"). | instance, a detainee was not simply refusing to clean, but instead, "swinging a broom" and "yelling to all the detainees in there." ECF 313-10 at 29 (Gallegos Dep 192:9-25).<br><br>To the extent that Plaintiffs cite to the incomplete incident reports at 262-12, they are not complete disciplinary reports and do not establish whether those detainees were ever actually sanctioned with segregation. Indeed, Ms. Ceja has noted that she reviewed the files of those detainees and only one was ultimately sanctioned with segregation. ECF 313-16 at ¶ 8. Further, the incident reports are inadmissible under the Parties' stipulation as none of the individuals therein have been made available for their deposition. ECF 228 (precluding witnesses from trial who are not presented for a deposition). |

| | **GEO's Statement of Undisputed Facts** | **Plaintiffs' Response and Supporting Evidence** | **GEO's Reply to Plaintiffs' Response** |
|---|---|---|---|
| **43.** | Consistent with the PBNDS, detention officers worked to resolve issues informally wherever possible. **Ex. N.** Where formal sanctions were necessary, officers imposed lesser sanctions as permitted by the disciplinary severity scale wherever possible. *Id.*; **Ex. O** (Ceja 30(b)(6) Dep. 113:13-17). | Admit. Detention officers testified that they dealt with rule violations by explaining the infraction and potential consequences to detainees, and if the infraction persisted guards would issue a "write-up" which could lead to disciplinary segregation. Ex. 4 (Gallegos Tr.) 121:21-122:20. One of the potential consequences guards explained was that detainees could be sent to solitary confinement for failing to comply. Ex. 10 (Pagan Tr.) 174:2-175:6. This is reflected in the HUSP, which states that initial sanctions for refusal to clean include turning off the television and being prohibited from participating in activities, and that "[c]ontinued refusal to clean the area will result in further disciplinary action." ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 50; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20. | Because Plaintiffs admit the fact, GEO need not address the additional citations which Plaintiffs provide. |

29

| | **GEO's Statement of Undisputed Facts** | **Plaintiffs' Response and Supporting Evidence** | **GEO's Reply to Plaintiffs' Response** |
|---|---|---|---|
| **44.** | Where formal sanctions were necessary, officers imposed lesser sanctions as permitted by the disciplinary severity scale wherever possible. *Id.*; **Ex. O** (Ceja 30(b)(6) Dep. 113:13-17). | Admit. As relevant to the HUSP, the threat of losing privileges, such as use of televisions and phones, preceded threats of solitary confinement, and the threats were often made together. ECF No. 273-1 (2005 Detainee Handbook, GEO_MEN 00054871-96) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 50; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 17; ECF No. 273-5 (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20; Ex. 3 (Hernandez Ceren Tr.) 74:22-77:13; *see also* Plaintiffs' response to GEO's Undisputed Fact No. 43. | While Plaintiffs admit the fact, they improperly add additional extraneous facts. GEO denies that the additional facts are accurate. Indeed, there is no evidence in the handbook that phones would <u>ever </u>be turned off. Further, there is no evidence that detainees are sanctioned with "threats of solitary confinement." Further, the AIPC Handbook makes plain that the sanctions constitute a range of possible options, not an escalating disciplinary policy. ECF 261-17 at 25 ("[Sanctions] range from the withholding of privilege(s) to segregation."). Further, Officers cannot impose disciplinary segregation, only the IDP can. *Id.* at 24.<br><br>To the extent Plaintiffs cite testimony from Plaintiff Hernandez, these statements are inadmissible hearsay when offered to prove that GEO Officers told detainees of the consequences for not cleaning as they are offered for the truth of the matter asserted. FRE 802. |
| **45.** | The detention officers were not trained to tell detainees they could be sent to segregation or to utilize segregation as a response to the failure to | Deny. The cited declarations are inconsistent with the guards' deposition testimony. Guards were trained that the AIPC | The officers declarations are not inconsistent with their deposition testimony and Plaintiffs do not specifically identify inconsistencies. Indeed, a review of the |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| clean absent additional disciplinary concerns. **Ex. N.** | Handbook was a source of rules and discipline that apply when detainees refuse to act or commit a violation in the disciplinary scale. Ex. 11 (Vasquez Tr.) 73:14-20, 82:5-23; Ex. 10 (Pagan Tr.) 95:15-21; Ex. 4 (Gallegos Tr.) 118-7-23, 121:1-122:25; Ex. 15 (Quezada Tr.) 19:15-20:13, 82:3-98:12. Guards understood that the handbook established a rule requiring detainees to clean common areas. Ex. 10 (Pagan Tr.) 104:21-105:16; Ex. 11 (Vasquez Tr.) 74:1-25, 105:10-106:7; Ex. 4 (Gallegos Tr.) 163:14-17; Ex. 15 (Quezada Tr.) 81:8-82:2, 101:20-102:23. Guards were also trained to enforce facility rules by using the disciplinary measures set forth in the handbook. Ex. 4 (Gallegos Tr.) 121:21-122:16; Ex. 10 (Pagan Tr.) 174:2-175:6. | testimony cited by Plaintiffs does not support a conclusion that detention officers were trained to tell detainees that the refusal to clean alone could lead to a sanction of segregation.<br><br>It appears that Plaintiffs' denial is based upon a reading of the AIPC handbook that requires segregation to be the singular sanction for the failure to clean. This interpretation is inaccurate. The AIPC Handbook provides for multiple possible sanctions for the refusal to clean. ECF 261-17 at 27. It further instructs GEO staff to "informally resolve cases involving 'high moderate' or 'low moderate' charges [including the refusal to clean.]" ECF 261-17 at 25. |
| 46. | Importantly, none of the detention officers intended to scare or intimidate any individual into performing labor. *Id.* **Ex. N.** | Admit, but deny this fact is material. It is GEO's knowledge, not its employees' intent, that is material to TVPA claims. *See* § V.B.3, *infra.* |  |
| 47. | When a detainee would refuse to clean, the detention officers would typically ask another detainee to assist with cleaning instead. *Id.* | Deny. The cited declarations are inconsistent with the declarants' deposition testimony. At deposition, the declarant guards | The officers declarations are not inconsistent with their deposition testimony and Plaintiffs do not specifically identify inconsistencies. Ms. Quezada testified that when |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| | testified that the Detainee Handbook was a source of rules to be enforced, including with respect to cleaning. Ex. 10 (Pagan Tr.) 99:17-100:10, 104:21-105:16; Ex. 11 (Vasquez Tr.) 74:20-75:24, 105:11-106:7; Ex. 4 (Gallegos Tr.) 141:8-16; 161:16164:7. Joyce Quezada testified that she enforced the HUSP "as written." Ex. 15 (Quezada Tr.) 102:1-23. Luis Pagan admitted that he enforced the HUSP by telling detainees that they could be sent to solitary confinement if they did not comply. Ex. 10 (Pagan Tr.) 174:2-175:6. In fact, detainees were actually sent to solitary confinement for refusing to clean. ECF No. 262-12 (incident reports); Ex. 12 (Hernandez Torres Tr.) 81:20-82:3; *infra*, SAF No. 13. When one detainee, Grisel Xahuentitla, offered to clean in place of a sick detainee who could not clean, she was told to go back to her cell and that the sick detainee had to do the work or "be sent to the hole." Ex. 13 (Xahunetitla Tr.) 73:19-74:9. Moreover, the cited declarations are contradicted by GEO's 30(b)(6) witness Dawn Ceja, who testified that | detainees did not want to work, she would simply tell them "[d]on't worry about it, I can do it. CF 313-11 at 7-8 (Quezada Dep. 78:20-79:1). In her 19 years working at the AIPC she never told a detainee they would go to segregation if they did not clean. *Id.* at 11-1 (Quezada Dep. 149:1-3;150:7-15). In Ms. Vasquez's 19 year tenure, she only ever had one detainee who did not want to clean, on that occasion she did not threaten to send the detainee to segregation. ECF 313-12 at 12 (Vasquez Dep. 102-103). Officer Pagan testified that he "hardly ever" had to write up a detainee. CF 339-11 at 37,43 (Pagan Dep. 75:10-20).<br><br>It appears that Plaintiffs' denial is based upon a reading of the AIPC Handbook that requires segregation to be the singular sanction for the failure to clean. This interpretation is inaccurate. The AIPC Handbook provides for multiple possible sanctions for the refusal to clean. ECF 261-17 at 27. It further instructs GEO staff to "informally resolve cases involving 'high moderate' or 'low moderate' charges |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| | there was no alternative discipline policy for violations related to cleaning during the class period. Ex. 14 (Ceja 30(b)(6) Tr. II) 170:13-174:20. | [including the refusal to clean.]" ECF 261-17 at 25.<br><br>To the extent Plaintiffs cite testimony from detainees that unnamed and unidentified officers told them that the refusal to clean could lead to segregation, these statements are inadmissible hearsay when offered to prove that GEO Officers threatened detainees, as they are offered for the truth of the matter asserted. FRE 802.<br><br>To the extent that Plaintiffs cite to the incomplete incident reports at 262-12, they are not complete disciplinary reports and do not establish whether those detainees were ever actually sanctioned with segregation. Indeed, Ms. Ceja has noted that she reviewed the files of those detainees and only one was ultimately sanctioned with segregation. ECF 313-16 at ¶ 8. Further, the incident reports are inadmissible under the Parties' stipulation as none of the individuals therein have been made available for their deposition. ECF 228 (precluding witnesses from trial who are not presented for a deposition). |

33

| | GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|---|
| **48.** | If no detainees performed any work in the Aurora facility, GEO would make more money, not less. **Ex. P** (Ragsdale 30(b)(6) Dep. 168:4-10). | Deny. GEO estimates that "replacing all GEO ICE detainees with full-time employees" would cause it to incur a substantial cost across its immigration detention business nationwide. Ex. 16 (GEO-MEN 00187770) (May 30, 2018 Letter). Further, without detainee labor, the cost to the government for GEO's services would increase. If a contractor's bid to the government is too high – even if there is no competition for the project – the government may not award the contract. Ex. 17 (Venturella Tr.) 166:1-4. The government will only award the contract to a contractor whose bid price is "reasonable" and not "too high." *Id.* 165:5-23. | Plaintiffs do not offer any evidence that GEO would make more money, not less, if detainees did not perform work in the VWP.<br><br>Plaintiffs misstate the evidence in the May 30, 2018 letter to ICE. The letter does not estimate a substantial cost to GEO, but rather, a cost to *ICE*. Indeed, rather than prove Plaintiffs' denial, it provides further support for GEO's position that it would make more money, not less, because the additional costs would be borne by ICE. ECF 337-1.<br><br>Furthermore, the letter undercuts Plaintiffs argument that the government would not award the contract at the higher price, as the letter makes clear that the lawsuits would result in changes to all 33,000 of ICE's beds nationwide. ECF 337-1. |
| **49.** | At AIPC the $1.00 daily allowance is a pass through from the government at the actual rate. **Ex. P** (Ragsdale 30(b)(6) Dep. 166:20-167:6). | Undisputed. | |

| GEO's Statement of Undisputed Facts | Plaintiffs' Response and Supporting Evidence | GEO's Reply to Plaintiffs' Response |
|---|---|---|
| **50.** "[T]here's no incentive financially for GEO to use any voluntary work person to do anything, particularly when you have to, again, incentivize them . . . beyond a dollar a day. It's sort of cost neutral at a dollar a day but it gets − it becomes a cost to us if it goes beyond that." **Ex. P** (Ragsdale 30(b)(6) Dep. 168:12-17). | Admit. *See* also Ex. 18 (A. Martin Tr.) 107:18-22 (if GEO had to pay more than $1/day to VWP workers, it would do so "on its own dime" because the government would not reimburse the added cost). | |
| **51.** If ICE did not mandate the VWP as a requirement of its contracts, GEO would "build the staff [in]to [its] cost estimate and then [] mark that cost up." **Ex. Q** (Evans Dep. 75:3-10). | Admit that Evans made this hypothetical claim, but note that GEO has previously admitted that ICE mandates that GEO operate a VWP. ECF No. 286 (Pls.' DSI SJ Reply Br.) ¶ 35. | Plaintiffs do not dispute the fact as stated. |
| **52.** GEO's markup would be a fee of up to 15% of the labor cost. **Ex. Q** (Evans Dep. 29:2-21; 62:16-63:14). | Undisputed. | |

35

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| All detainees at Aurora receive the Aurora ICE Processing Center Detainee Handbook Local Supplement ("Detainee Handbook") upon arrival at the Facility. Ex. 8 (Ceja 30(b)(6) Tr. I) 29:19-24; see also ECF No. 286 (Pls.' DSI SJ Reply Br.) ¶¶ 60-61. | Admit.<br><br>GEO notes that the parties have already admitted this fact is undisputed. See ECF 298 at 15 (Undisputed Fact #23). |
| **2.** The Detainee Handbook states that detainees "will be held accountable for [their] actions while in custody at [Aurora]" and that "[t]herefore, it is each detainee's responsibility to become familiar with the contents of this handbook." ECF No. 273-1 (2005 Detainee Handbook) at 3; ECF No. 273-2 (2007 Detainee Handbook) at 6; ECF No. 273-3 (2008 Detainee Handbook) at 3; ECF No. 273-4 (2010 Detainee Handbook) at 3; ECF No. 273-5 (2011 Detainee Handbook) at 3; ECF No. 261-17 (2013 Detainee Handbook) at 5. | Admit. |
| **3.** GEO's detention officers are expected to enforce the rules set forth in the Detainee Handbook. Ex. 14 (Ceja 30(b)(6) Tr. II) 139:2-12. | GEO admits that Officers are expected to enforce the rules set forth in the AIPC Handbook and PBNDS, but denies that this statement indicates that minor infractions cannot be resolved informally, as stated in the handbook and PBNDS.<br><br>The 2011 PBNDS provide:<br>"Where permitted by facility policy, staff shall informally settle minor transgressions through mutual consent, whenever possible." ECF 261-8 at 36.<br><br>The 2008 PBNDS provide:<br>"Where permitted by facility policy, staff will informally settle minor transgressions by mutual consent, whenever possible." ECF 261-9 at 42. |

36

| **Plaintiffs' Statement of Additional Facts** | **GEO Response** |
|---|---|
| | The 2000 NDS provide: *"In SPCs/CDFs, minor transgressions will be settled informally, by mutual consent, whenever possible. If, however, the officer involved thinks an informal resolution inappropriate or unachievable, he/she shall prepare an Incident Report and Notice of Charges, forwarding it to the appropriate supervisor before the end of the assigned shift."* ECF 261-10 at 11 (emphasis in original). |
| **4.** The Detainee Handbook contains a "Housing Unit Sanitation" policy, which states:  Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate.  The assigned Housing Unit [or Dorm] Officer will be responsible for assuring this general cleanup is done on a regular basis. See supra, Plaintiffs' Response to GEO's Undisputed Fact No. 8. | Admit that the handbook contains the quoted language but note that Plaintiffs previously presented as undisputed the following:  "During a general cleanup, GEO requires detainees clean up the tables , wipe down the tables and sweep and mop the floors." ECF 260 at 18 (Fact #48).  "The post-meal cleanup of tables, floors, and other communal areas that GEO requires is called the Housing Unit Sanitation Policy or HUSP." ECF 260 at 18 (Fact #51). |
| **5.** Immediately under the "Housing Unit Sanitation" heading, in a section titled "Day Space," the handbook provides: All detainees in a housing unit [or dorm] are required to keep clean and sanitary all commonly accessible areas of the housing unit [or dorm], including walls. floors, windows, window ledges, showers, sinks, toilets, tables, and chairs. Detainees will take turns cleaning the area [or day space]. If a detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit officer of the problem. Action will be taken to resolve this problem. | GEO admits the quoted language appears in the AIPC Handbook (absent the bracketed alterations). GEO further states that Plaintiffs previously presented as undisputed:  "During a general cleanup, GEO requires detainees clean up the tables , wipe down the tables and sweep and mop the floors." ECF 260 at 18 (Fact #48).  "The post-meal cleanup of tables, floors, and other communal areas that GEO requires is called the Housing Unit Sanitation Policy or HUSP." ECF 260 at 18 (Fact #51). |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| | ECF No. 273-1 (2005 Detainee Handbook) at 18; ECF No. 273-2 (2007 Detainee Handbook) at 49; ECF No. 273-3 (2008 Detainee Handbook) at 19; ECF No. 273-4 (2010 Detainee Handbook) at 16-17; ECF No. 273-5. (2011 Detainee Handbook) at 17; ECF No. 261-17 (2013 Detainee Handbook) at 20 (emphasis added). | |
| 6. | The handbook then repeats that "[t]he day room area will be kept clean at all times," and sets forth a brief summary of the punishments that may be imposed on disobedient detainees under the facility's progressive discipline system: Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit [or dorm] do not clean the area after being instructed to do so, the televisions will be turned off and the detainees will not be permitted to participate in any activities/programs until the housing unit [or dorm] is cleaned. Continued refusal to clean the area will result in further disciplinary action. *Id.* | Admit that the handbook states:

"The day room area will be kept clean at all times. Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean the area will result in further disciplinary action."

GEO denies that the handbook contains a progressive disciplinary system. Rather, the AIPC handbook makes plain that the sanctions constitute a range of possible options, not an escalating disciplinary policy. ECF 261-17 at 25 ("[Sanctions] range from the withholding of privilege(s) to segregation."). Further, Officers cannot impose disciplinary segregation, only the IDP can. *Id.* at 24 |
| 7. | The Detainee Handbook also sets forth the disciplinary scale at the Aurora Facility, which defines "refusal to clean" as a 300-level, or high-moderate, offense. ECF No. 273-1 (2005 Detainee Handbook) at 25-26; ECF No. 273-2 (2007 Detainee Handbook) at 68-69; ECF No. 273-3 (2008 Detainee | GEO admits that the AIPC Handbook contains possible sanctions for the offense titled "refusal to clean assigned living area." |

38

| | Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|---|
| | Handbook) at 29; ECF No. 273-4 (2010 Detainee Handbook) at 23-24; ECF No. 273-5 (2011 Detainee Handbook) at 24-25; ECF No. 261-17 (2013 Detainee Handbook) at 27. | |
| 8. | Punishments for 300-level offenses include placement in solitary confinement. *Id.* | GEO admits that a 300 level offense may be sanctioned with up to 72-hours in segregation. |
| 9. | Pursuant to the HUSP, GEO guards in each housing unit developed a list of unpaid detainees each day, who were required to clean the housing unit common areas after each meal. Ex. 8 (Ceja 30(b)(6) Tr. I) 36:13-37:20, 83:9-84:24. | To the extent Plaintiffs deem the "HUSP" to refer to the "post-meal cleanup" as previously stated, ECF 260 at 18 (Fact #51), GEO admits that a list of detainees is created each day to help clean up after each meal. GEO denies that all detainees selected are unpaid, as Plaintiffs have themselves admitted that each day two of the detainees selected were paid trustees. Undisputed Fact #36(f). |
| 10. | This work involved scrubbing tables and chairs, sweeping mopping floors, and cleaning common use equipment such as microwaves, phones, showers, and toilets. Id. 36:24-37:9; Ex. 19 (Ragsdale 30(b)(6) Tr.) 16:14-18; Ex. 3 (Hernandez Ceren Tr.) 162:24-165:20. | Deny that the meal cleanup involves anything other than wiping tables, sweeping floors, and mopping.<br><br>Dan Ragsdale explicitly stated that he could not "vouch for the specifics [of the meal cleanup] at Aurora." ECF 336-19 at 5 (Ragsdale Dep. 17:10-11). He was not designated to testify to the specifics in his 30(b)(6) capacity. *Id.*<br><br>Witnesses have uniformly testified that the challenged policy in practice involves assigning six detainees per day to help wipe down tables and clean the floors after each meal, including GEO's 30(b)(6) witness on this topic, Ms. Ceja. ECF 339-2 at 9-10 (Ceja 30(b)(6) Dep. 36:13-25-37:1-17); ECF 339-10 (Vasquez Dep. 75:2-24); see also ECF 339-2 at 9-10 (Ceja 36:25-37:1-4) ("[Detainees have a] day room area, which is a common area, where all of the TVs and tables are located. They all eat at these tables, so after meal service, they will clean up the tables, wipe down the tables, and sweep and mop the floors."). This clean-up takes approximately 5 to 10 minutes after each meal. ECF 339-11 at 21 (Gallegos Dep. 130:25). |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
|  | Plaintiffs have already offered as undisputed: "During a general cleanup, GEO requires detainees clean up the tables , wipe down the tables and sweep and mop the floors." ECF 260 at 18 (Fact #48). |
| **11.** HUSP cleaning was distinct from the personal housekeeping requirements enumerated in the PBNDS, which require detainees to "maintain their immediate living area in a neat and orderly manner by 1. making their bunk beds daily; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture." ECF No. 261-8 (2011 PBNDS) at 51; ECF No. 261-9 (2008 PBNDS) at 61-62; ECF No. 261-10 (2000 NDS) at 3; Ex. 20 (A. Martin 30(b)(6) Tr.) 25:25-26:24. | GEO denies this statement as seeking a legal interpretation of the PBNDS. Further, ICE's 30(b)(6) declarant has provided clarity on Section 5.8 of the PBNDS, which is "not intended by ICE to be an exhaustive list of facility scenarios in which a detainee may be expected to participate in housekeeping . . . there was no intent by the working group to establish a conclusive list of personal housekeeping activities or to preclude detainees from participating in maintaining the cleanliness of common or shared living areas. ECF 335-2 ¶ 14. |
| **12.** The HUSP at the Aurora Facility is "a GEO policy, created by GEO. The GEO HUSP is not created by ICE nor is it a requirement of the contract. ICE did not draft or negotiate GEO's HUSP." ECF No. 261-7 (Ely Decl.) ¶ 22. | GEO denies that Ms. Ely's declaration refers to the "HUSP" as defined in this lawsuit. As Plaintiffs admit in GEO's Undisputed Fact #1, the "HUSP" refers to the policy found within the detainee handbook. Ms. Ely did not review the detainee handbook to prepare her declaration. ECF 317-3 at 2. Therefore her use of the term "HUSP" is not consistent with the term as defined by Plaintiffs in this ligation. |
| **13.** Guards frequently threatened detainees with solitary confinement for refusing to clean.<br><br>i. A detainee in Hugo Hernandez Ceren's pod refused to clean, telling the guards that he was no janitor and that they needed to pay someone for | Deny that employees "frequently threatened detainees with solitary confinement for refusing to clean." Plaintiffs' anecdotal accounts do not establish a "frequent" course of conduct.<br><br>As GEO stated in their Proposed Undisputed Material Facts, "it would be a very rare occurrence for a detention officer tell a detainee that they would be sent to segregation if they did not clean." *See* ECF 306-12 |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| that type of job. Ex. 3 (Hernandez Ceren Tr.) 74:16- 77:19. In response, a guard took out a plastic trash bag and told the detainee "Just pack your stuff because you're going to go to the hole." *Id.* The detainee "started cleaning right away" in response to the threat. *Id.* On another occasion, one detainee in Hernandez Ceren's dorm refused to clean and others, including Hernandez Ceren and other named plaintiffs, supported him, leading the guard on duty to call a sergeant. *Id.* 78:10-80:12. The sergeant told everyone that if they continued refusing to clean, they would be sent to the hole, which he described as cold and lonely. *Id.* He also told them that GEO would inform the immigration court that they had been disobedient. *Id.* Hernandez Ceren testified that he witnessed similar threats "multiple times with multiple guards." *Id.* 161:13-19.<br><br>ii. Dagoberto Vizguerra observed someone being sent to solitary confinement for refusing to clean on the second or third day he was at Aurora. Ex. 7 (Vizguerra Tr.) 48:9-22. He described the officer in his dorm who enforced the HUSP as "screaming at the detainees in his pod about cleaning. Id. 97:20-98:10.<br><br>iii. Grisel Xahuentitla saw a woman in her dorm try to refuse to clean because she was feeling ill. The guard on duty told her that if she did not work she would be sent to the hole, and that "it | (Gallegos Declaration ¶¶3-6); (Pagan Dec. ¶¶4-7) (Quezada Declaration ¶¶ 3-7) (Ceja Declaration ¶¶ 17-20). When a detainee would refuse to clean, the detention officers would typically ask another detainee to assist with cleaning instead. *Id.* When a detainee was placed in segregation for the refusal to clean, it was typically because the refusal to clean was in concert with another disciplinary infraction. *Id.*<br><br>GEO's corporate and 30(b)(6) witnesses testified consistently with the cited declarations. GEO's 30(b)(6) witness testified that it is generally GEO's policy to resolve disciplinary issues informally, not with warnings or placement in segregation. ECF 306-13 at 9 (Ceja 30(b)(6) Dep. 113:13-17). Amber Martin, GEO's Executive Vice President of Contract Administration, also testified that it has always been an informal policy that GEO did not use segregation as a consequence for refusing to clean up their living area. ECF 271-6 at 8 (Amber Martin Dep. 134: 11-24). |

41

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| wasn't going to be . . . pleasant." Ex. 13 (Xahuentitla Tr.) 73:19-75:22. She explained that when guards threatened detainees with solitary confinement, "they're not – they're, of course, not – they're not whispering you to your ear. They're loud, and so they – so you feel a little intimidated." *Id*. 137:4-13.<br><br>iv. Alejandro Menocal was informed about the HUSP upon arrival at the Aurora Facility, and told by guards and other detainees that failure to clean could result in being placed in segregation. Ex. 1 (Menocal Tr.) 95:16-97:3. On one occasion, he witnessed other detainees being removed from an adjacent pod, and was told that they were being taken to segregation for that reason. Id. 100:16- 109:2.<br><br>vi. Jesus Yepez Gaytan testified that when new detainees arrived at the facility, they would often push back on the HUSP cleaning requirement, which frequently led to guards telling them that continued resistance would land them in solitary confinement. Ex. 9 (Gaytan Tr.) 112:1-113:4, 142:23-144:1.<br><br>vii. Demetrio Valerga testified that when he first arrived at the Aurora facility, his cellmate told him that he had to participate in the HUSP or he would be put in solitary confinement. Ex. 6 (Valerga Tr.) 168:13-169:12. Towards the end of his stay, he resisted cleaning | |

55424240;1

| **Plaintiffs' Statement of Additional Facts** | **GEO Response** |
|---|---|
| | and was threatened with segregation and handcuffed by a guard, although he did not end up being taken there. *Id.* 155:18-156:6. | |
| **14.** | GEO guards were trained to enforce facility rules and to carry out the disciplinary scale as written in the Detainee Handbook. Ex. 11 (Vasquez Tr.) 82:5-23; Ex. 10 (Pagan Tr.) 95:15-21; Ex. 4 (Gallegos Tr.) 118:7-23; Ex. 15 (Quezada Tr.) 81:8-83:9. | Admit, but further state that the PBNDS instruct detention officers to resolve disciplinary infractions in an informal manner where possible.

The 2011 PBNDS provide:
"Where permitted by facility policy, staff shall informally settle minor transgressions through mutual consent, whenever possible." ECF 261-8 at 36.

The 2008 PBNDS provide:
"Where permitted by facility policy, staff will informally settle minor transgressions by mutual consent, whenever possible." ECF 261-9 at 42.

The 2000 NDS provide:
"*In SPCs/CDFs, minor transgressions will be settled informally, by mutual consent, whenever possible. If, however, the officer involved thinks an informal resolution inappropriate or unachievable, he/she shall prepare an Incident Report and Notice of Charges, forwarding it to the appropriate supervisor before the end of the assigned shift.*" ECF 261-10 at 11 (emphasis in original). |
| **15.** | It is "imperative" that detainees follow the commands of guards implementing the Detainee Handbook's rules, and GEO guards were trained to use progressive discipline to gain compliance from detainees who failed to do so. Ex. 14 (Ceja 30(b)(6) Tr. II) 105:12-24, 205:1-206:6. | Deny characterization of training. AIPC detention officers "are instructed to resolve issues with detainees informally whenever possible." ECF 306-12 at 8 (Quezada Dec., at ¶ 4).

Where formal sanctions were necessary, officers imposed lesser sanctions as permitted by the disciplinary severity scale wherever possible. ECF 306-13 at 9(Ceja 30(b)(6) Dep. 113:13-17). |
| **16.** | At least one guard acknowledged that solitary confinement was a potential sanction for refusing to clean. Ex. 10 (Pagan Tr.) 173:18-175:9. | Deny. The cited testimony does not support the alleged fact, but instead cites to repeated denials that Mr. Pagan ever raised the possible sanction of segregation with detainees in connection with their refusal to clean. |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| | Further, Officer Pagan testified that he never threatened to send a detainee to segregation for violating the cleaning rule. ECF 336-11 at 9 (Pagan Tr. 173:18-21.) |
| **17.** Guards further understood that threats of solitary confinement were an effective and legitimate way to gain compliance with facility rules, driven by detainees' fear of solitary confinement. Ex. 15 (Quezada Tr.) 141:13-142:8; Ex. 10 (Pagan Tr.) 174:2-175:6; see also Ex. 4 (Gallegos Tr.) 121:21-122:16 (describing solitary confinement as a legitimate method for disciplining detainees). | Deny. Officer Quezada testified that mentioning segregation could get detainees to follow the rules. ECF 336-16 at 142:3-8. But, she further testified that in her 19 years working at AIPC she never told a detainee they would go to segregation if they did not clean. ECF 339-12 at 49(Quezada Dep. 149:1-3;150:7-15).<br><br>The other cited testimony does not support Plaintiffs' asserted fact. |
| **18.** Detainees cleaned because of threats of solitary confinement. Ex. 3 (Hernandez Ceren Tr.) 63:9-18 ("I cleaned because of fear."); Ex. 12 (Hernandez Torres Tr.) 77:25-78:13 (cleaned because "being that I had been through segregation, I didn't want to go through the same"); Ex. 1 (Menocal Tr.) 104:21-105:7 ("[W]e had to clean and if not we would be punished. . . . Everybody knew it."); Ex. 9 (Gaytan Tr.) 142:23-144:1 ("The procedure was if you don't follow [the rules], you go to the hole."); Ex. 13 (Xahuentitla Tr.) 137:14-19 ("[I]f they tell you 'clean, because you're going to the hole,' . . . I'm going to clean. I don't want to go to the hole."); Ex. 6 (Valerga Tr.) 168:13-169:13 (when he arrived at Aurora, he participated in the HUSP "[b]ecause my cellie told me if we didn't clean, we'd go to the hole"). | Deny. Detainees had varying motivations for cleaning:<br><br>Plaintiff Menocal preferred to clean up after himself while living at AIPC because he preferred to "live and hang out in a clean environment." ECF 306-4 at 11(Menocal Dep. 81:6-10).<br><br>Indeed, while living at AIPC Plaintiff Menocal asked for permission to clean the recreation area without an expectation of remuneration simply because he spent a lot of time there and wanted to "hang out in a clean environment." ECF 306-4 at 12 (Menocal Dep. 86:22-87:5).<br><br>Plaintiff Hernandez liked to keep his area clean. ECF 306-5 at 11 (Hernandez Dep. 49:24-50:1).<br><br>Plaintiff Gaytan received access to X-Box gaming systems, movies, and ice cream as an incentive to keep his dorm clean. ECF 306-10 at 9 (Gaytan Dep. 124:3-16)<br><br>Plaintiff Valerga was told he could be sent to segregation if he refused to clean, but chose not to clean on |

44

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| | numerous occasions, unphased by the possible consequence. ECF 336-7 at 8 (Valerga Dep 155-156). |
| **19.** GEO followed through on these threats and sent detainees to solitary confinement for refusing to clean. ECF No. 262-12 (incident reports); Ex. 4 (Gallegos Tr.) 170:13-191:23 (verifying that he wrote detainees up several times for "failure to obey my orders for cleaning details," resulting in their placement in segregation). | Deny that detainees were sent to segregation for *only* refusing to clean their living area. Not a single Plaintiff in this action was sent to segregation for refusing to clean. (GEO's Undisputed Fact #28).<br><br>Further, GEO's corporate and 30(b)(6) witnesses testified consistently with the cited declarations. GEO's 30(b)(6) witness testified that it is generally GEO's policy to resolve disciplinary issues informally, not with warnings or placement in segregation. ECF 306-13 at 9 (Ceja 30(b)(6) Dep. 113:13-17). Amber Martin, GEO's Executive Vice President of Contract Compliance, also testified that it has always been a informal policy that GEO did not use segregation as a consequence for refusing to clean up their living area. ECF 271-6 at 8 (Amber Martin Dep. 134: 11-24).<br><br>To the extent that Plaintiffs cite to the incomplete incident reports at 262-12, they are not complete disciplinary reports and do not establish whether those detainees were ever actually sanctioned with segregation. Indeed, Ms. Ceja has noted that she reviewed the files of those detainees and only one was ultimately sanctioned with segregation. ECF 313-16 at ¶ 8. Further, the incident reports are inadmissible under the Parties' stipulation as none of the individuals therein have been made available for their deposition. ECF 228 (precluding witnesses from trial who are not presented for a deposition). |
| **20.** Solitary confinement "imposes a devastating triad of emotional and | GEO admits that Dr. Grassain's report contains the quoted text but denies that it is an undisputed fact. As Dr. Kropf has explained while there is a "growing body |

45

| | Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|---|
| | neuropsychiatric deprivations: social isolation, a barren perceptual environment, and deprivation of meaningful mental activity." Ex. 21 (Grassian Report) at 10. | of empirical evidence indicating that … placement in solitary confinement for periods of years can cause psychological harm . . [t]here is no empirical evidence indicating that the placement in a segregated housing unit with or without solitary confinement for a period 72 hours or less causes serious psychological harm" ECF 339-20 at 14,15. |
| 21. | These deprivations can manifest in anxiety, depression, self-harm, stupor or delirium, impairments in thinking, concentration, and memory, hyperresponsivity to external stimuli, obsessive-compulsive behavior, hallucinations, paranoia, delusions, and problems with impulse control. Id. at 10-14. | GEO admits that Dr. Grassain's report contains the quoted text but denies that it is an undisputed fact. As Dr. Kropf has explained while there is a "growing body of empirical evidence indicating that … placement in solitary confinement for periods of years can cause psychological harm . . [t]here is no empirical evidence indicating that the placement in a segregated housing unit with or without solitary confinement for a period 72 hours or less causes serious psychological harm" ECF 339-20 at 14,15. |
| 22. | Although not everyone becomes "psychiatrically ill" from relatively short stays in solitary confinement, all people who experience solitary confinement "suffer from it." Ex. 2 (Grassian Tr.) 290:3-8. Put differently, solitary confinement causes "a certain baseline of psychiatric harm" in those who experience it. Id. 102:4-13. | GEO admits that Dr. Grassain's report contains the quoted text but denies that it is an undisputed fact. As Dr. Kropf has explained while there is a "growing body of empirical evidence indicating that … placement in solitary confinement for periods of years can cause psychological harm . . [t]here is no empirical evidence indicating that the placement in a segregated housing unit with or without solitary confinement for a period 72 hours or less causes serious psychological harm" ECF 339-20 at 14,15. |
| 23. | Peer-reviewed studies show that relatively short periods in solitary confinement – as little as 72 hours – can cause people to experience significant distress, including changes to brain-wave patterns and self-harm or suicide. Ex. 21 (Grassian Report) at 10 n.6 (citing Ex. 22 (Fatos Kaba, "Solitary Confinement and Risk of Self-Harm Among Jail Inmates") at 442-47 (finding that the risk of self-harm was strongly associated with | Deny. As Dr. Kropf has explained while there is a "growing body of empirical evidence indicating that … placement in solitary confinement for periods of years can cause psychological harm . . [t]here is no empirical evidence indicating that the placement in a segregated housing unit with or without solitary confinement for a period 72 hours or less causes serious psychological harm" ECF 339-20 at 14,15. |

46

| | **Plaintiffs' Statement of Additional Facts** | **GEO Response** |
|---|---|---|
| | being in solitary confinement, and that self-harm peaked around the time of entry to solitary confinement)); id. at 13 n.10 (citing Ex. 23 (Paul Gendreau, "Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement") at 56-57 (finding a consistent decline in EEG results of subjects in solitary confinement over the course of seven days, with 77% of the decline happening in the first four days)); id., Ex. D (Stuart Grassian, "Psychopathological Effects of Solitary Confinement") at 1451 (quoting one patient as saying "As soon as I got in, I started cutting my wrists. I figured it was the only way to get out of here."). | |
| 24. | These effects can be long lasting and can include social withdrawal to "escape the buzzing confusion of life." Ex. 21 (Grassian Report) at 15. | GEO admits that Dr. Grassain's report contains the quoted text but denies that it is an undisputed fact. As Dr. Kropf has explained while there is a "growing body of empirical evidence indicating that … placement in solitary confinement for periods of years can cause psychological harm . . [t]here is no empirical evidence indicating that the placement in a segregated housing unit with or without solitary confinement for a period 72 hours or less causes serious psychological harm" ECF 339-20 at 14,15. |
| 25. | Plaintiff Olga Alexakhina observed how solitary confinement affected other detainees, recounting that detainees returning from solitary confinement "would take a shower and just lay down. They didn't want to talk to anyone, just laying down." *Id.* at 25-26. She remembered one woman in particular who was so depressed after returning from solitary confinement that other detainees | Deny.    Plaintiff    Alexaklina's    testimony    is uncorroborated hearsay. Indeed, it is unclear how Dr. Grassian could obtain any reliable testimony from Ms. Alexaklina given her whereabouts and her home country's rules regarding civil litigation abroad. *See* ECF 339-1 at 2, Decl. of Scimone (noting that even voluntary depositions are not permitted under any circumstances in Russia and providing no information about otherwise participating in discovery abroad). As Plaintiffs concede, Ms. Alexahina cannot give sworn testimony from her current location. *Id.* Further, her |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| | testimony is currently subject to exclusion under the Parties' stipulation as she has not yet been made available for a deposition. ECF 228 (precluding witnesses from trial who are not presented for a deposition). As Mr. Scimone concedes in his declaration, GEO has diligently sought Ms. Alexaklina's deposition but been denied the same due to her country of residence. ECF 339-1 at 3 -4 (Decl. of Scimone). |
| **26.** Immigration detainees at GEO were taken from their homes and families and placed in a prison-like environment to await either deportation or the outcome of immigration proceedings that could end in deportation. ECF No. 261-8 (2011 PBNDS) at 3. | Deny. First, GEO was not responsible for any of the circumstances or details surrounding each Plaintiffs' arrival at AIPC. That said, there is no way to state that all "immigration detainees" at AIPC had the same experience, as each individual had a unique circumstances relating to their detention. Indeed, even among the named Plaintffs, their reasons for arriving at AIPC differed. For example, Plaintiff Xahuentitla was not "taken from" her home and family, but rather was detained after the attempted murder of her children. *See* Shane Benjamin, Woman to face attempted murder charges, Durango Herald, https://durangoherald.com/articles/59930 (last visited November 15, 2020). In contrast, Plaintiff Hernandez's stay in AIPC came his first removal from the country. **Exhibit R** (Hernandez Dep. 14-16). After he was removed he "reentered the country, ICE picked me up and put me in a removal proceedings and started transferring me around, and finally I reached Colorado." *Id.* As for whether Plaintiffs were facing deportation, there are no facts in the record as Plaintiffs have declined to provide any such information in discovery. **Exhibit S** (Plaintiffs' Responses to Discovery, Interrogatory 1(c)). |
| **27.** Detainees were allowed to keep only small photos of family members, softbound reading material, wedding bands (but not engagement rings), small religious items, one pair of glasses and dentures, and personal address books. All other personal items were considered illegal contraband. ECF | GEO admits that the personal effects that detainees may keep on their person, but denies that these limits apply uniformly and categorically. As the AIPC Handbook states, detainees may also keep other items so long as they are "authorized" by the Chief of Security. ECF 261-17 at 8. |

48

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| No. 273-1 (2005 Detainee Handbook) at 6; ECF No. 273-2 (2007 Detainee Handbook) at 14-15; ECF No. 273-3 (2008 Detainee Handbook) at 5; ECF No. 273-4 (2010 Detainee Handbook) at 5-6; ECF No. 273-5 (2011 Detainee Handbook) at 6; ECF No. 261-17 (2013 Detainee Handbook) at 8. | |
| **28.** Detainees were housed in bunk beds either in windowless cells or in large open rooms, alongside dozens or scores of strangers in front of whom they had to eat, sleep, shower, and defecate. Ex. 24 (ICE 0000123 (men's cell),ICE 0000142 (women's unit)); Ex. 3 (Hernandez Ceren Tr.) 143:5-17:13. | GEO admits that detainees lived in communal living situations, but states that the photos speak for themselves. |
| **29.** Showers were communal, and toilets were either located within detainees' shared cells or in a designated bathroom area separated from the rest of the room by a low wall. Ex. 24 (ICE 0000128 (men's toilets), ICE 0000116 (men's showers), ICE 0000139 (women's toilets and showers)). | GEO states that the photos speak for themselves. |
| **30.** Detainees had access to a single television set per dorm, which was controlled by the guards. ECF No. 273-1 (2005 Detainee Handbook) at 13-14; ECF No. 273-2 (2007 Detainee Handbook) at 36-37; ECF No. 273-3 (2008 Detainee Handbook) at 14; ECF No. 273-4 (2010 Detainee Handbook) at 12; ECF No. 273-5 (2011 Detainee Handbook) at 13; ECF No. 261-17 (2013 Detainee Handbook) at 15. | Deny. Detainees have access to multiple televisions, as is depicted in the photo located at ECF 337-2 at 9. |
| **31.** Detainee contact with their spouses, children, friends, and family members was limited to three hour-long non-contact visits per week. ECF No. 273- | Deny. Detainee visitation was authorized from 8 A.M. to 9 P.M. seven days per week. ECF 261-17 at 13; 273-1 at 11. Detainees could have one visit per day for up to an hour. ECF 261-17 at 13; 273-1 at 11. Contact visits |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| 1 (2005 Detainee Handbook) at 11-12; ECF No. 273-2 (2007 Detainee Handbook) at 30-32; ECF No. 273-3 (2008 Detainee Handbook) at 11-12; ECF No. 273-4 (2010 Detainee Handbook) at 10-11; ECF No. 273-5 (2011 Detainee Handbook) at 10-11; ECF No. 261-17 (2013 Detainee Handbook) at 12-13. | were limited to 30 minutes per visit. ECF 261-17 at 13; 273-1 at 11. Any detainee could get approval for additional visitation time from the Chief of Security. ECF 261-17 at 13; 273-1 at 11. Additionally, detainees could correspond with their families via mail, ECF 261-17 at 11, 273-1 at 10. Further, Detainees were permitted to call their families at any time other than count or during an emergency. ECF 261-17 at 14; 273-1 at 12. |
| **32.** Contact visitation, in which detainees could briefly hug their visitor upon greeting them and saying goodbye, was available only upon special request. ECF No. 273-1 (2005 Detainee Handbook) at 11; ECF No. 273-5 (2011 Detainee Handbook) at 11; ECF No. 261-17 (2013 Detainee Handbook) at 13.4 | Deny. Detainee visitation was authorized from 8 A.M. to 9 P.M. seven days per week. ECF 261-17 at 13; 273-1 at 11. Detainees could have one visit per day for up to an hour. ECF 261-17 at 13; 273-1 at 11. Contact visits were limited to 30 minutes per visit. ECF 261-17 at 13; 273-1 at 11. Any detainee could get approval for additional visitation time from the Chief of Security. ECF 261-17 at 13; 273-1 at 11. All visits, contact or not, were approved by ICE. ECF 261-17 at 13; 273-1 at 11 |
| **33.** Detainees had access to telephones, but calls were limited to 20 minutes, and had to be made from payphones located in the middle of dorm common areas. ECF No. 273-1 (2005 Detainee Handbook) at 12; ECF No. 273-2 (2007 Detainee Handbook) at 32-33; ECF No. 273-3 (2008 Detainee Handbook) at 12-13; ECF No. 273-4 (2010 Detainee Handbook) at 11-12; ECF No. 273-5 (2011 Detainee Handbook) at 11-12; ECF No. 261-17 (2013 Detainee Handbook) at 14. | Deny. Calls were only limited to 20 minutes per detainee "[d]uring times of high use by housing unit residents." 273-1 at 12. By way of example, Plaintiff Hernandez's call log shows that he frequently spent more than 20 minutes on the phone. **Exhibit T** (Hernandez Deposition Exhibit 12) (Entries 26 and 42). |
| **34.** Up to two 80-person pods shared a small concrete recreation space that had a single basketball hoop, and either one or two exercise machines. Ex. 24 (ICE 0000102 (men's exercise room), ICE 0000152 (women's exercise room)); see also Ex. 3 (Hernandez Ceren Tr.) 144:5-13; Ex. 12 (Hernandez Torres Tr.) 50:21-51:14. | GEO states that the photos speak for themselves. |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| **35.** Detainees found the experience of being in detention frightening and isolating. See Ex. 9 (Gaytan Tr.) 28:22-29:2, 48:20-50:2 ("[I]t was scary to be in there . . . with a bunch of people you don't even know," many of whom were older than him); Ex. 13 (Xahuentitla Tr.) 137:4-19 (being in detention, "you feel this pressure, you feel . . . very depressed for the situation you're in at the moment"); Ex. 12 (Hernandez Torres Tr.) 29:1-6, 15:20-23 (being separated from his daughters caused "a lot of suffering."), 49:8-52:20 (explaining that the guards "would put us all together like animals, like shit. . . and they say, 'Well, now you do what I want,'" and noting that it was very stressful having to share small space with loud, messy strangers); Ex. 1 (Menocal Tr.) 48:13-24, 67:8-69:9 (told family members that conditions at Aurora were good, but in truth "it was not the prettiest place" – for example, the food made people ill and the showers were moldy). | GEO admits that the quoted text is in Plaintiffs' depositions but denies that it describes the entirety of their experience. While detained, Plaintiff Menocal described AIPC to a friend as follows: [T]hey've got pretty good grub, considering it's, you know, a detention center. And we got three televisions, a bunch of tables, a bunch of people, and we all get along. Pretty nice. I mean, it's -- for being incarcerated, it's not bad at all, not compared to -- not compared to Denver County or the other one where I was at. This is like Camp Snoopy. It's pretty easy. ECF 306-4 at 9 (Menocal Dep. 54:5-12). |
| **36.** GEO did not always serve detainees enough food or provide them with enough basic supplies, like toiletries, and detainees had to augment the inadequate diet and supplies with purchases from the commissary. Ex. 9 (Gaytan Tr.) 9:19-10:11; Ex. 3 (Hernandez Ceren Tr.) 148:24-149:21. | Deny. For example, Plaintiff Menocal described a typical day at AIPC as follows: "I wake up, get dressed, do my bed, wait for breakfast, eat breakfast, clean up, maybe exercise, walk around, read a book, draw. It depends. Again, wait for lunch to eat, clean up, maybe shower, maybe do some sports, maybe talk on the phone with someone, maybe write a letter, walk around, exercise, wait for dinner. Same thing, eat dinner, relax a while, maybe watch TV, read a book, draw, and, you know, wait for bedtime." *See* GEO's Statement of Undisputed Material Facts, 23. |
| **37.** The orientation video shown to detainees at least through 2007 informed them that failure to follow | Deny. This document has not been authenticated as applicable during the class period. As Ms. Ceja testified in her deposition, the VHS transcript which refers to her |

51

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| facility rules could lead to disciplinary action causing "a negative effect on your case before the government, so the best rule is to stay out of trouble during your stay here." Ex. 25 (Orientation Video Script, GEO_MEN 00056575-81) at GEO_MEN 00056576 (emphasis in original); Ex. 26 (Orientation Video Script, GEO-MEN00075173-83) at GEO-MEN 00075174 (emphasis in original). Although this statement was removed from orientation materials, the threat remained present throughout the class period. Ex. 14 (Ceja 30(b)(6) Tr. II) 95:25-96:10; see also Ex. 3 (Hernandez Ceren Tr.) 78:10-80:24 (describing an incident where detainees refused to clean and a GEO sergeant threatened that the refusal and resulting discipline was "not going to look good when this gets to the judge"). | as "Captain Ceja" (ECF 337-3) would have been used prior to August 2005, but no later, more likely it was used in the "early 2000s." ECF 339-3 at 7-9 (Ceja Dep. 91-93). Plaintiffs did not introduce GEO-MEN0007517 in Ms. Ceja's deposition and it has not been authenticated as a document that was used during the class period. |
| **38.** Detainees were aware that not following the rules could impact the outcome of their immigration cases. Ex. 3 (Hernandez Ceren Tr.) 167:1-170:13 (going to solitary confinement "was going to destroy my immigration case if I went there"); Ex. 9 (Gaytan Tr.) 12:1-13 (avoided getting in trouble because "I was afraid that it was going to be against my case for doing something against GEO"). | Admit that Gayatan and Hernandez so testified but deny that they represent all detainees housed at AIPC. |
| **39.** When bidding a contract, GEO seeks to offer a price that is both fair to the government and less than it would cost the government to operate the facility itself. Ex. 27 (Evans Tr.) 36:4-6, 50:18-21. In other words, one of | GEO admits that it strives to provide a fair price to the government. ECF 336-24 at 9 (Evans Dep. 36:4-6). GEO admits it strives to provide "better quality services at the same price or lower cost than the government can, especially in the state side of our business." ECF 336-24 at 24 (Evans Dep. 50:18-22). GEO admits that one of its goals is to offer a price the government is willing to pay. |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| | GEO's goals in developing its bid price is to offer a price the government is willing to pay. *Id*. 72:13-16. | |
| **40.** GEO's total bid amount represents the costs to execute the contract as well as GEO's desired profit margin, typically an additional 15% of the total cost. *Id*. 63:18-25. | Deny. The quoted text does not describe how GEO builds up a bid, but rather how to meet its "ROI at the facility level." ECF 336-24 at 15 (Evans Dep. 63:9-10).When looking at ROI targets, GEO seeks to support "13 to 15 percent ROI." *Id*.at 63:23-24. |
| **41.** The largest of these costs is the labor required to operate the facility. Ex. 17 (Venturella Tr.) 155:21-25. | Deny. The quoted paragraph refers to the largest portion of the "bed day rate" and did not ask Mr. Venturella about the largest portion of all of GEO's costs, including acquisition and maintenance of property. ECF 336-17 at 7. |
| **42.** Cost is an important component of the contract because during the class period ICE's practice was to accept the lowest bid offered, provided the contractor had a satisfactory performance record. *Id*. 154:6-16. | Deny. Mr. Venturella testified "in the proposals that we've submitted, we don't believe that the price was based on lowest, it was based on competitive, and again being able to meet all the criteria in the RFP." ECF 336-17 at 5 (Venturella dep. 153:8-11). |
| **43.** Keeping costs, and thus the total bid price, low retains its importance even when GEO is the only entity bidding on the contract, as with the Aurora facility, because the government provides extra scrutiny to such "sole source bids." Ex. 27 (Evans Tr.) 22:10-23:18, 24:3-17. | Deny. The cited portion refers to a definition of a "sole source bid' which Mr. Evans testifies GEO has not had "any recent sole source bids." Mr. Evans did not testify that the Aurora contract was a sole source bid. Further, Mr. Evans did not testify about the need to keep the Aurora price "low." |
| **44.** Recognizing that keeping the total bid price low and offering the government a fair price is important even in the context of a sole source bid, GEO uses the same pricing strategy regardless of whether the bid is sole source or competitive. Ex. 17 (Venturella Tr.) 164:23-165:23. | Deny. The cited text does not support the proposition or even mention sole source bids. |
| **45.** When GEO wins a contract with ICE, the amount of money that ICE pays GEO during each year of the contract is set at the time the contract is executed. Ex. 27 (Evans Tr.) 74:10-21. | Deny. The cited text explicitly says "the amount the government pays us could fluctuate up and down." ECF 336-24 (Evans Dep. 74:12-14). |

53

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| **46.** Once the contract terms and pricing are set, GEO bears the risk of any increased costs to operating the facility beyond what is provided for in the contract, including increased costs of labor. *Id.* 76:11-22. | Deny. The cited text states that GEO bears the risk that their profit or fee could fluctuate compared to what they proposed. It does not state GEO would bear the risk of <u>any</u> increased costs. |
| **47.** This risk is to GEO's profit: for GEO to make the profit that it anticipates on a contract, it must maintain the costs of running the facility at the amount set forth in the contract at the time of execution. *Id.* 76:23-77:5. | Deny. The cited text does not support the proposition and does not discuss whether GEO can modify the contract after execution. |
| **48.** ICE will not reimburse GEO for more than $1 per day in detainee wages. 8 U.S.C. § 1555(d); Appropriations Act, Immigration and Naturalization Service Salaries and Expenses, Pub. L. No. 95-431, 92 Stat. 1021 (1978). | No response required. Legal conclusions are not appropriate for undisputed facts. |
| **49.** ICE does not prohibit its contractors from paying more than $1.00 per day for work performed in the VWP. Ex. 18 (A. Martin Tr.) 106:11-107:22, 110:10-13; ECF No. 261-8 (2011 PBNDS) at 53 (compensation for VWP work is "at least $1.00 (USD) per day" (emphasis added)); see also ECF No. 261-18 (VWP Pay Rates, GEO-MEN 00170339); ECF No. 287-13 (VWP Pay Rates at GEO's South Texas Facility) at 11-12. | GEO admits that it is not aware of a *categorical* prohibition on paying more than $1.00 per day to detainee VWP participants. |
| **50.** As a result, GEO could pay detainees more than $1 per day but must bear the costs of doing so. Ex. 18 (A. Martin Tr.) 107:18-22; Ex. 19 (Ragsdale 30(b)(6) Tr.) 167:4-6. | The statement which Plaintiffs offer is a hypothetical, not a fact. That said, GEO does not deny that Ms. Martin testified GEO would bear the costs over $1.00 under its current agreements with ICE. |
| **51.** GEO estimates that replacing detainee labor with full time employees at all of its ICE-contracted facilities nationwide would cost a substantial | GEO admits that it estimates that the cost *to* ICE would be substantial if the VWP were replaced with non-detainee employees and the attendant costs of employees (including GEO's fee). GEO denies that the costs would be borne by GEO, if no detainees performed |

| Plaintiffs' Statement of Additional Facts | GEO Response |
|---|---|
| amount of money. Ex. 16 (GEO-MEN 00187770) (May 30, 2018 Letter). | any work in the Aurora facility, GEO would make more money, not less. ECF 306-14 at 9 (Ragsdale 30(b)(6) Dep. 168:4-10). |
| **52.** Detainees understood that once GEO set the rate of pay for the VWP at $1 per day, the rate was not negotiable. Ex. 3 (Hernandez Ceren Tr.) 158:10-15. | Deny. Plaintiff Hernandez's testimony is not representative of all detainees or all circumstances. |
| **53.** The "Detainee Voluntary Work Program Agreement" is not an employment contract and does not create any rights or obligations for either GEO or the detainee who signs it. Ex. 8 (Ceja Tr. I) 147:20-150:18. | GEO does not respond as legal conclusions are not appropriately dressed up as facts for dispute. Whether a document constitutes a contract is a question of law. |

### III.    ELEMENTS OF THE TRAFFICKING VICTIMS PROTECTION ACT

Plaintiffs bear the burden to present evidence sufficient to establish a violation of the TVPA. *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017), *as amended* (Mar. 3, 2017). To do so, Plaintiffs must first establish that GEO had the requisite scienter. "The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the [defendant] intended the victim to believe that such harm would befall her . . . ." *Id.* (emphasis added) (internal quotations omitted). The issue of scienter turns not on whether a TVPA violation should be assessed under an objective, subjective, or hybrid standard, but instead on the sufficiency of Plaintiffs' evidence that GEO acted knowingly. In addition to scienter, Plaintiffs must establish that the harm or threat of harm relayed by the defendant was "sufficiently serious" to compel the victim to provide his or her labor. *Id.* The second prong is assessed by considering the totality of a victim's circumstances from the vantage point of a reasonable person in the place of the victim.

55

*Id.* This second element has been described as requiring a "hybrid" test, wherein the victim's decision to provide his or her labor must be "*objectively reasonable* under the circumstances," *Id.* Courts in this District have determined that, in assessing the second prong of the TVPA analysis, "recognizing that what constitutes serious harm for that plaintiff must be determined by considering the totality of the circumstances presented." *Echon v. Sackett*, No. 14-CV-03420-PAB-NYW, 2017 WL 4181417, at *14 (D. Colo. Sept. 20, 2017), report and recommendation adopted, No. 14-CV-03420-PAB-NYW, 2017 WL 5013116 (D. Colo. Nov. 1, 2017), *aff'd sub nom. Villanueva Echon v. Sackett*, 809 F. App'x 468 (10th Cir. 2020) (emphasis added). As such, in considering the totality of the circumstances presented, a factfinder must consider the subjective element of the particular vulnerabilities of a person in the victim's position. *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 996 (D. Idaho 2019).

A warning of a legitimate but adverse consequence is not a threat under the TVPA. *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012). Therefore, in determining whether harm is "sufficiently serious," a plaintiff must show conduct that goes beyond legitimate but adverse consequences and instead constitutes an improper threat or coercive measure. *United States v. Toviave*, 761 F.3d 623, 626 (6th Cir. 2014). Whether particular conduct constitutes a warning of an adverse but legitimate consequence as opposed to a threat under the TVPA is a decision for the Court that can be resolved at the summary judgment phase. *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 992 (D. Idaho 2019) (stating that "it is the Court's responsibility to distinguish between improper threats or coercion and permissible warnings of adverse but legitimate consequences.") (quotations omitted); *see also Headley*, 687 F.3d at 1180 (dismissing at summary judgment a TVPA claim and finding that a statement that church members would lose

access to their friends and families and would be ex-communicated from the church if they did not continue their work was a warning of a legitimate consequence); *Roman v. Tyco Simplex Grinnell*, No. 8:16-CV-3449-T-33AEP, 2017 WL 3394295, at *5 (M.D. Fla. Aug. 8, 2017), *aff'd*, 732 F. App'x 813 (11th Cir. 2018) (accepting all of plaintiff's allegations as true and finding no violation of the TVPA because the purported threat was merely a warning of a legitimate consequence that the employee would be fired if he did not complete his job tasks). As applied here, whether ICE's PBNDS disciplinary severity scale, as written, constitutes a warning of legitimate consequences does not turn on detainees' specific experiences with GEO Officers. Nor does it turn on how detainees perceived the warnings in the context of their surroundings. Rather, this court must determine whether, in the context of a detention facility generally, an operator can implement a government-mandated disciplinary scale that includes the consequence of up to 72-hours of segregation. If the disciplinary policy within the PBNDS is legitimate, then its implementation does not violate the TVPA.

## IV.   THE MEAL CLEANUP POLICY DOES NOT VIOLATE THE TVPA

Central to Plaintiffs' claims is their allegation that the meal cleanup rotation or, as they call it, the "HUSP," violates the TVPA. GEO argued that the disciplinary policy a legally permissible warning of a legitimate consequence. In their Opposition, plaintiffs disagree based upon a strained, and impractical, construction of the PBNDS. Specifically, Plaintiffs argue that detainees in an ICE detention facility cannot be asked broadly to clean up after themselves or be subject to consequences. Instead, Plaintiffs argue that detainees can only be subject to discipline for failing to clean *some* portions of their living areas, as are listed in PBNDS § 5.8. The PBNDS contain no such limitation on cleaning. Indeed, beyond the PBNDS, policies requiring civil detainees to

57

participate in cleaning their own living areas are permissible under longstanding federal court precedent. Thus, Plaintiffs cannot establish the meal cleanup is unlawful.

> ### A.      The PBNDS Do Not Limit Detainee Cleanliness to Four Categories.

Plaintiffs have long argued for a narrow and unreasonable construction of Section 5.8 of the PBNDS. Plaintiffs claim that Section 5.8, which describes the Voluntary Work Program ("VWP"), limits the tasks that detainees may perform without compensation and subject to the disciplinary severity scale prescribed by ICE. ECF 336 at 65. Specifically, Plaintiffs claim that Section 5.8 of the PBNDS, which sets forth the contours of the VWP, prescribes an exhaustive list of tasks that may be compelled as part of a detainee's "personal housekeeping" obligation. ECF 260 at 35; ECF 336 at 39 (Plaintiffs' Additional Fact 11). There is no support for this interpretation. Plaintiffs' reading of the PBNDS first requires the reader to ignore that, on its face, Section 5.8 does not cross-reference to the disciplinary policy. Next, one must ignore that Section 5.8 mentions "personal housekeeping," while the provisions of the disciplinary policy at issue refers to "assigned living area." Further, one must ignore the fact that there is no definition section that provides that "personal housekeeping" is synonymous with "living area." Only after one clears these hurdles can they reach Plaintiffs' conclusion that detainees may only be subject to sanctions for "refusal to clean assigned living area" if the task they were asked to perform in their living area is explicitly enumerated in Section 5.8. Under this theory, any task other than (1) making beds daily, (2) stacking loose papers, (3) keeping the floor free of debris and the dividers free of clutter, and (4) refraining from hanging clothing or objects in housing units, is exempt from all possible sanctions, including a reprimand. ECF 261-8 at 51 (PBNDS 5.8 V.C). Put differently, despite the broad language in the violation of "refusing to clean assigned living area," Plaintiffs state that its

58

breadth is limited by the four items enumerated in Section 5.8, even though the two sections are wholly unrelated.

Plaintiffs' interpretation cannot gain traction because it (i) ignores the plain language of the PBNDS, (ii) ignores the construction of the PBNDS, and (iii) creates an unworkable standard.[2] First, Plaintiffs' assumption that "personal housekeeping" is synonymous with "living area" ignores the plain language of the PBNDS. Had the PBNDS intended to limit discipline to only those instances of personal housekeeping listed in Section 5.8, it would have so stated. At a minimum, the drafters would have used consistent language and definitions. Instead, they chose to use divergent language: "personal housekeeping" versus "assigned living area." Further, it is clear that the drafters did not intend to narrow the personal cleaning tasks for which detainees are responsible. In addition to the sanction for "refusal to clean assigned living area," the PBNDS also provide sanctions for "failing to follow safety or sanitation regulations" and "being unsanitary or untidy; failing to keep self and living area in accordance with posted standards." ECF 261-8 at 49. Had the drafters intended discipline to be limited to the four items in Section 5.8, they could have simply replaced "posted standards" with a reference to Section 5.8 of the PBNDS or a recitation of the four limitations therein. It is unlikely the drafters would have permitted sanctions for the broad category of "sanitation regulations," which are not in any way tied to one's bunk or personal items.  But they did not do so, instead choosing to use different terminology throughout, providing

---

[2] Plaintiffs attempt to cast their interpretation of the PBNDS as a matter of fact, not law. ECF 336 at 39 (Plaintiffs' Additional Fact 11); ECF 336 at 63 (describing the issue as "a fact-bound determination that hinges on the way threats are deployed"). This is inaccurate. Whether the PBNDS limit the areas in which detainees may clean, subject to potential discipline, may be resolved as a matter of law, as Plaintiffs have already argued in their own affirmative motion for summary judgment (ECF 260 at 35). Plaintiffs make the same argument in the instant motion, ECF 336 at 63, which presents a similar contradictory argument that "undisputed evidence shows that the work compelled under the HUSP went far beyond the PBNDS, and was explicitly prohibited under GEO's contract."

for sanctions through multiple different phraseologies for refusing to clean. Thus, any argument that the term "living area" is synonymous with "personal housekeeping" cannot stand.

Second, under Plaintiffs' construction of the PBNDS, multiple sections would be rendered meaningless. PBNDS Section 5.8(IV) explicitly provides for a listing of cross-references of standards that are related or impacted where the drafted listed other sections of the PBNDS that were affected by the standards in Section 5.8. ECF 261-8. The "References" Section identifies PBNDS Section 1.2 "Environmental Health and Safety" and PBNDS 4.1 "Food Service." It does not list Section 3.1—the disciplinary severity scale:

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-5C-06, 5C-08, 5C-11(M), 6B-02.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "1.2 Environmental Health and Safety"; and
- "4.1 Food Service."

ECF 261-8 at 51. There is no evidence this was an oversight. Instead, it is clear that the drafters intentionally excluded any reference to Section 3.1 because they did not intend Section 5.8 to have any impact on Section 3.1. Likewise, the "References" Section in 3.1, the disciplinary severity scale, does not include any cross-reference to Section 5.8:

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-3A-01, 3A-02, 6B-05, 6C-01 through 6C-19.

55424240;1

ECF 261-8 at 37. Because the drafters intentionally excluded any cross reference between the two sections, despite a clear mechanism for doing so, reading in such a reference would be inconsistent with the plain language and standard construction of the PBNDS.

Indeed, Plaintiffs' interpretation of the PBNDS would create an unworkable standard. Plaintiffs allege that it is permissible under the PBNDS to require detainees to make their beds subject to the disciplinary policy in Section 3.1, but that asking the same detainee to clean up milk that he spilled next to his bed, under the same circumstances, would violate the TVPA. Indeed, a detainee could pour milk on the floor every day simply to watch others clean it up—without consequence. Likewise, a detainee who consistently did not rinse his or her toothpaste down the sink could not be verbally reprimanded (a sanction under Section 3.1) that when living in a communal living environment, it is best to clean up any mess you make. Such a construction would lead to a deterioration in personal hygiene and sanitation; surely that would not effectuate the aims of the PBNDS.

In fact, Plaintiffs' proposed interpretation is inconsistent with ICE's understanding of the PBNDS. ECF 335-2.[3] Ms. Jay Brooks, one of the members of the ICE working group that drafted the PBNDS, makes clear that PBNDS Section 5.8 V(C) was never intended by ICE to be an exhaustive list of scenarios in which a detainee may be expected to participate in cleaning his or

---

[3] Plaintiffs recently filed an argumentative response to GEO's notice of supplemental authority, disclosing the declaration of Jay Brooks, which counsel for Plaintiffs, Andrew Free, obtained. ECF 335-1; 335-2. In it, Plaintiffs argue that the Brooks declaration is hearsay because it is based upon Ms. Brooks' personal knowledge *and* information provided to Ms. Brooks in her official capacity. ECF 335-2 at ¶10. Plaintiffs' position that this constitutes hearsay is inconsistent with their prior assertion that the Ely declaration is *not* hearsay, despite also being based upon information she received in her official capacity. *Compare* ECF 335-2 at ¶10; *with* ECF 261-7 at ¶1. To the extent the Court considers the Ely declaration (Plaintiffs' Additional Fact # 12), must also consider the Brooks declaration. To the extent Plaintiffs claim the declaration is not relevant to the claims at issue, the instant motion makes the relevance clear.

61

her assigned living area without compensation. ECF 335-2 ¶ 14. Rather, Section 5.8 serves to "emphasize that irrespective of whether a detainee chooses to join a work program, all detainees must participate in personal housekeeping and maintaining clean and orderly living areas." *Id.* To that end, Section 5.8 "provides examples of personal housekeeping, but there was no intent by the working group to establish a conclusive list of personal housekeeping activities or to preclude detainees from participating in maintaining the cleanliness of common or shared living areas." *Id.* Ms. Brooks clarifies that, in ICE's view, "[e]veryone living in a group housing unit shares a co-responsibility to keep the dormitory, dayroom, shower and bathroom areas tidy and clean." *Id.* at ¶ 17.

Accordingly, because the PBNDS provide for broad sanctions for refusing to clean one's living area, and those sanctions are not limited to the items in Section 5.8, the meal cleanup policy at issue in this lawsuit is in accord with the PBNDS. Thus, Plaintiffs cannot establish that the PBNDS preclude consequences related to a detainees' refusal to participate in meal cleanup. Nor can they rely upon an argument of noncompliance with the PBNDS to establish that the disciplinary severity scale is not a legitimate warning of consequences.

### B.    Requiring Civilly Confined Individuals To Clean Up After Meals or Face Consequences is Legitimate.

The disciplinary severity scale contained in PBNDS Section 3.1 is a warning of an adverse but legitimate consequence, not a threat of serious harm under the TVPA. Just as a "church is entitled to stop associating with someone who abandons it," *Headley*, 687 F.3d at 1180, or an employer can fire an employee for refusing to perform his or her work, *Roman*, 732 F. App'x at 817; an immigration detention facility can implement the "basic disciplinary measures" in PBNDS

Section 3.1 without giving rise to TVPA liability. *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1278 at n.5 (11th Cir. 2020).

Indeed, the TVPA was "passed to implement the Thirteenth Amendment against slavery or involuntary servitude." *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017), *as amended* (Mar. 3, 2017). In enacting the TVPA, Congress did not intend to overturn longstanding precedent under the Thirteenth Amendment that certain actions are permissible and do not constitute human trafficking, such as parents who require their children to perform household chores. *United States v. Kozminski*, 487 U.S. 931, 944, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988); *see also United States v. Toviave*, 761 F.3d 623, 628 (6th Cir. 2014).

Here, extensive precedent makes clear that civil detainees' housekeeping duties fall outside of the bounds of the Thirteenth Amendment and, in turn, outside of the TVPA. Under federal precedent, the requirement that a detainee clean his or her housing unit, subject to potential disciplinary sanctions is one of "the type[s] of normal housekeeping duties that fall outside the Thirteenth Amendment." *Mendez v. Haugen*, No. CV 14-4792 ADM/BRT, 2015 WL 5718967, at *5 (D. Minn. Sept. 29, 2015), aff'd (Feb. 22, 2016); *see Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) (explaining that pretrial detainees may be compelled, under threat of administrative segregation, "to perform general housekeeping chores"); *Channer v. Hall*, 112 F.3d 214, 219 (5th Cir. 1997) ("[T]he federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks...."); *Hause v. Vaught*, 993 F.2d 1079, 1081, 1085 (4th Cir.1993) (holding that pretrial detainees may be required to "assist in cleaning the common areas of their cell-block"); *Bijeol v. Nelson*, 579 F.2d 423, 424–25 (7th Cir.1978) (holding that a pretrial detainee may be compelled to perform "general housekeeping responsibilities" in his own cell and

community areas); *Jobson v. Henne*, 355 F.2d 129, 131–32 (2d. Cir. 1966) (explaining that committed mental patients may be required to perform "chores of a normal housekeeping type and kind," provided that they are not "so ruthless in the amount of work demanded, and in the conditions under which the work must be performed, ... that a court justifiably could conclude that the inmate had been subjected to involuntary servitude"); *Jackson v. Siringas*, No. 12–15474, 2013 WL 3810301, at *10 (E.D.Mich. July 23, 2013) ("[R]equiring a pretrial detainee to help clean his living unit, including common areas, does not amount to involuntary servitude as prohibited by the Thirteenth Amendment."). As the District of Minnesota recently recognized, a claim that "pretrial and civil detainees may not be required to perform any type of work outside their own cells or immediate living quarters is not supported by existing precedent." *Id.*

In *Mendez,* the plaintiff claimed "that his Thirteenth Amendment rights were violated when he was forced, under threat of administrative segregation, to clean communal restrooms in his housing unit." *Mendez*, 2015 WL 5718967 at *3. The court disagreed, finding that as a civilly detained individual, "Mendez can be directed to perform general housekeeping duties, including those at communal areas beyond the confines of his cell." *Id.* at *1. The Court clarified that "[g]eneral housekeeping chores have been deemed to include fixing and distributing meals, scrubbing dishes, laundering the sheets and clothing of other inmates, cleaning communal bathrooms and shower stalls, removing trash from common areas, and sweeping, mopping, and vacuuming general-use hallways and rooms." *Id.* at *5.

In a similar case, the Seventh Circuit found that a detainee who was required to perform certain housekeeping tasks or be subject to discipline could not state a plausible claim under the Thirteenth Amendment. *Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978). In *Bijeo*l, "[i]n

64

addition to keeping their own room clean, pretrial detainees were assigned one regular chore in the common areas. The possible assignments included dusting, vacuuming, or emptying ashtrays in the television area three times daily; setting up and cleaning tables after meals; and vacuuming the general purpose area after each meal and prior to retiring." *Id.* The plaintiff claimed that the policy violated the Thirteenth Amendment. The court disagreed, finding that pretrial detainees could be required to perform housekeeping tasks while detained. *Id.* This requirement, among other things, allowed detention centers to maintain "some stability and discipline." *Id.*

Indeed, Plaintiffs mischaracterize the holding in *Barrientos*, arguing that Eleventh Circuit adopted Plaintiffs' interpretation of the PBNDS as limiting detainees' responsibilities to clean their living areas to the four items enumerated in Section 5.8 of the PBNDS. ECF 336 at 66. *Barrientos* made no such finding. Instead, the Eleventh Circuit held that the "nothing in the text of the statute excludes federal contractors providing immigration detention services from liability under the TVPA, even when that liability might arise out of the operation of a federally mandated work program." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1277 (11th Cir. 2020). To avoid "unintended consequences" of its holding, the court limited its scope: "To be clear, our opinion should not be read to call into question the legality of voluntary work programs in federal immigration detention facilities, **or to call into question longstanding requirements that detainees or inmates be required to perform basic housekeeping tasks**." *Id.* at 1277–78 (emphasis added). Contrary to Plaintiffs' briefing, the court did <u>not</u> limit its definition of "basic housekeeping tasks" to those enumerated in Section 5.8. Instead, the court included a footnote directly following the phrase "basic housekeeping tasks." The footnote made plain that the Court's ruling could not be read as questioning the legitimacy of the disciplinary severity scale included

in the PBNDS: "As discussed above, in the interest of maintaining order in an immigration detention facility, the PBNDS authorize punishments for detainees who, among other things, refuse to complete basic personal housekeeping tasks or organize work stoppages. *See generally* PBNDS § 3.1. Our decision should likewise not be read to imply that these basic disciplinary measures, on their own, give rise to TVPA liability." *Id.* at n.5.

Thus, the weight of authority makes clear that disciplinary policies that apply to civil detainees in the context of keeping their living area clean constitute legitimate warnings of consequences, not threats of serious harm in violation of the TVPA. Plaintiffs have not pointed to any caselaw to the contrary. Nor have they identified any authority that would support the proposition that segregation is not a legitimate consequence in the detention context. Thus, the disciplinary consequences that a detainee may face for not participating in the meal cleanup do not violate the TVPA.

To be sure, this construction does not mean that all housekeeping would be permissible, regardless of the consequence. Indeed, if a facility were to develop a disciplinary policy that was not consistent with the PBNDS, such a policy may not be legitimate. For example, in *Bridges*, female inmates alleged that they were told they would lose their positions in the facility's work program if they did not provide sexual favors to the guards working there. *Bridges v. Poe*, No. 6:19-CV-01399-LSC, 2020 WL 5408915, at *7 (N.D. Ala. Sept. 9, 2020). Such a consequence is not only clearly illegitimate, but also unlawful. Yet, here there is no air of illegitimacy or illegality the challenged disciplinary policies were drafted by ICE employees and stakeholders and published by the federal agency that has been tasked by Congress to enforce violations of the TVPA. ECF 261-8 at 3. Indeed, the PBNDS were drafted in accordance with a "commitment to

66

transform the immigration detention system" and detain individuals "in the most humane manner possible." *Id.* Plaintiffs have offered no evidence to the contrary. Thus, this Court should find that the disciplinary policy, which includes a sanction of up to 72-hours in segregation for the refusal to clean one's assigned living area, is a warning of a legitimate consequence and therefore not actionable under the TVPA.

## V.  PLAINTIFFS FAIL TO IDENTIFY EVIDENCE OF GEO'S SCIENTER

To create a triable issue for a jury, Plaintiffs must point to sufficient evidence to establish that GEO "intended to deceive the group collectively from the beginning in furtherance of a forced labor scheme." *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 992 (D. Idaho 2019). Plaintiffs fail to present evidence from which a jury could conclude GEO acted knowingly.

In their Response, Plaintiffs admit that none of GEO's detention officers intended to intimidate detainees such that they would perform labor. GEO's Undisputed Fact #46. Plaintiffs attempt to limit the application of this fact by arguing that GEO's officers' knowledge is not imputed to the company. GEO agrees. Nevertheless, Plaintiffs argue that the element of scienter can be met because GEO <u>officers</u> intended for detainees to believe that the facility rules would be enforced. ECF 336 at 67.  Plaintiffs want it both ways, arguing on one hand that GEO Officers' isolated acts satisfy the scienter element of a TVPA claim, while on the other hand arguing that "it is GEO's knowledge, not its employee's intent, that is material to the TVPA claims." ECF 336 at 33, Fact 46 (Plaintiffs' response to Fact 46). Plaintiffs cannot have it both ways.

Plaintiffs also point to evidence that some detainees were, in fact, sent to segregation for refusing to clean. ECF 339 at 66 (citing to Plaintiffs' Additional Fact #16). But the fact that detainees were placed in segregation briefly does not provide any insight into GEO's reasons for

doing so. It does not explain <u>why</u> detainees were placed in segregation. The evidence before this Court is clear that, when detainees were sent to segregation, GEO was motivated by a concern that the detainees posed a threat to the safety and security of other detainees and GEO employees—not that GEO was motivated to obtain uncompensated help cleaning up the dorm. GEO's Undisputed Fact 42; *see also* ECF 339-11 at 37,43 (Gallegos Dep 165:15-21;174:1-21).

To be sure, Plaintiffs provide <u>no</u> evidence of GEO's knowledge. Nor do they point to any evidence of how GEO implemented the polices in the PBNDS with the intention of obtaining detainee labor. After years of discovery, it is clear that no such evidence exists. To the contrary, GEO's corporate and 30(b)(6) witnesses testified that GEO's policy is to resolve disciplinary issues involving the refusal to clean informally, not with warnings or placement in segregation. ECF 306-13 at 9 (Ceja 30(b)(6) Dep. 113:13-17).  Amber Martin, GEO's Executive Vice President of Contract Administration, also testified that it has always  been an informal policy that GEO did not use segregation as a consequence for refusing to clean up their living area. ECF 271-6 at 8 (Amber Martin Dep. 134: 11-24). Plaintiffs do not point to evidence to rebut this testimony.

Furthermore, even if the Court were inclined to consider the GEO officers' actions to be probative of GEO's scienter, the officers' actions were so varied that they fail to establish a unified motivation for imposing discipline other than to maintain order and security within AIPC. GEO's Officers testified that each disciplinary incident was handled on its own merits. GEO's Undisputed Facts 43,44. Thus, each decision as to what sanction was appropriate was unique to each person's situation and how the detainee's reaction impacted other detainees who lived with them. Further, Plaintiffs do not provide evidence that GEO ratified the specific actions of any of its employees which Plaintiffs challenge. Thus, the evidence Plaintiffs cite fails to establish that because in <u>some</u>

situations GEO officers found segregation to be appropriate, those situations amounted to a forced

labor scheme. *Giles*, 391 F. Supp. 3d at 992 (D. Idaho 2019) ("[T]he reasons Funk Dairy withheld

some of these benefits were unique to each person's situation. The Court cannot make the leap

from the idea that just because certain Plaintiffs did not receive all of the promised benefits to the

idea that Funk Dairy intended to deceive the group collectively from the beginning in furtherance

of a forced labor scheme.").

## VI.    72-HOURS OF SEGREGATION IS NOT SERIOUS HARM UNDER THE TVPA

In their Response, Plaintiffs argue, somewhat incredulously, that the consequence of

segregation violates the TVPA because it constitutes a threat of "restraint." ECF 336 at 56. In

support, Plaintiffs cite to a case that holds that confinement to a jail cell constitutes "physical

restraint." *Id.* Yet, Plaintiffs were already confined within AIPC, a government detention facility.

Thus, they were already under "physical restraint," regardless of whether they chose to clean up

their living area. Further, the case to which Plaintiffs cite does not provide a basis for liability in

this case. In *Bridges v. Poe*, No. 6:19-CV-01399-LSC, 2020 WL 5408915, at *7 (N.D. Ala. Sept.

9, 2020), an incarcerated woman was told by a guard that if she did not perform sex acts, he would

remove her from her position as a trustee who was able to work and earn money. *Id.* The court

concluded at the motion to dismiss stage, that these allegations were sufficient to state a claim of

a TVPA violation. *Id.* The facts are relevant because not every physical restraint or threat violates

the TVPA; rather, only those that are "sufficiently serious" violate the statute. Here, unlike in

*Bridges*, there is no evidence that the use of segregation as prescribed by the PBNDS would

constitute a "sufficiently serious" threat. Thus, Plaintiffs cannot prevail based upon the theory that

they can show that solitary confinement constitutes "physical restraint."

Additionally, whether a warning of 72-hours of segregation constitutes serious harm for *any* civilly confined individual can be resolved without turning to Plaintiffs newly recited, disputed facts.[4] To meet their burden, Plaintiffs must show that to the average person, a warning of 72-hours in segregation was so psychologically coercive as to make them more likely to labor than risk segregation. Plaintiffs themselves seem to agree with this burden, arguing that "[t]he fear of solitary confinement was objectively reasonable." ECF 336 at 58. But, as support, Plaintiffs point not to evidence that people generally fear a brief period of segregation or even that the circumstances of segregation are well enough understood by an average person to invoke a uniform or similar response. To the contrary, Plaintiffs' expert, Dr. Grassian, concedes that he is unaware of <u>any</u> literature that stands for the proposition that a threat of 72-hours in segregation could cause psychological harm. GEO's Undisputed Fact # 32. Plaintiffs do not dispute this fact. Thus, absent an assessment of individualized perceptions of segregation,[5] Plaintiffs cannot present any evidence that a reasonable person, in the detainees' circumstances, would feel compelled to labor to avoid segregation.

Plaintiffs' reliance *United States v. Callahan*, 801 F.3d 606 (6th Cir. 2015), does not change the inquiry. Indeed, in *Callahan* the threatened consequences did not require expert testimony to understand. Instead, they could be understood by any juror. In *Callahan*, two individuals, a developmentally disabled woman and her toddler daughter, were locked in a basement by their

---

[4] Indeed, to the extent this Court entertains Plaintiffs' argument that individualized circumstances or allegations that are not common to the class create disputes of fact that preclude summary judgment, the Court should likewise grant GEO's motion to decertify (ECF 312) such that each Plaintiff's individual claims can be tried on their own merits.

[5] Plaintiffs are steadfast that this case does not present individualized issues. Yet, they have not provided any evidence that Plaintiffs experiences are similar to others in the class. Thus, they cannot rely upon Plaintiffs' own subjective impressions of the possibility of segregation to prove their point on a classwide basis.

roommates and forced to clean the apartment, perform yardwork, routinely clean dog feces and urine, suffer beatings to obtain prescription narcotics from physicians, and perform other tasks at their captor's will. *Id* at 614. If the woman refused, her captors would shove her face in dog urine and feces, stab between her fingers with knives, hold her at gunpoint, and otherwise beat her. *Id*. In addition, they forced her to beat her daughter while they took a video of the beating— threatening to show the video to the authorities if she spoke with any strangers. *Id.* at 620. Her daughter would be locked in a dog cage and forced to eat dog food—if she didn't comply, she was shot with a BB gun. *Id.*at 614. Even if they obeyed the individuals who held them, their living conditions were inhumane: the two slept on the concrete floor with dirty blankets. The two were rarely allowed to bathe and only received one meal per day—typically unheated canned food. *Id*

   While there is no ambiguity that people may fear physical harm to themselves or their loved ones when faced with a threat of physical violence, a gun, or a raised fist as in *Callahan*; here, the purported threat is more nuanced. Indeed, Plaintiffs point to EEG readings and studies of psychological symptoms of those who are placed in segregation as evidence of harm. Plaintiffs' Response to GEO's Undisputed Fact #32; Plaintiffs Additional Disputed Facts 20-23. The average layperson has no perception of what it means to have an abnormal EEG reading resulting from segregation. Acknowledging that a layperson would not readily understand or conceptualize these purported harms, Plaintiffs present this evidence in the form of expert testimony (thereby conceding that it is not commonly known to an average layperson). *Id.* Other than the report of GEO's expert, Dr. Kropf (ECF 339-20), the record is silent as to the average person's perception of segregation. And, many detainees prefer to be in segregation for the peace and quiet or

protection from others in the housing units. GEO's Undisputed Fact #29.[6] Thus, there is no evidence on which a factfinder could conclude that a warning of segregation would lead an average person to labor to avoid the consequence.

## VII. PLAINTIFFS' ADDITIONAL FACTS ARE NOT MATERIAL

By Plaintiffs' own admission, they claim that they can prove the existence of a TVPA violation based upon two considerations (1) that detainees were informed of the meal clean-up and disciplinary policy; and (2) detainees performed meal clean up when assigned to do so. ECF 336 at 69. Thus, under Plaintiffs' own theory, any additional circumstances or considerations are not necessary for a finding that GEO violated the TVPA. Accordingly, here, the only factual issues before the Court are: (1) whether detainees performed meal cleanup services; and (2) whether detainees received the detainee handbook which enumerated the policies for discipline and general cleanup. The parties do not dispute that every detainee receives the AIPC Handbook. ECF 270 (Fact 14); ECF 260 (Fact #60). The parties also do not dispute that this handbook contains the consequences for refusing to clean. GEO's Undisputed Fact #9. Nor do they dispute that the PBNDS authorize up to 72-hours of disciplinary segregation as a sanction for refusing to clean one's assigned living area. ECF 270 at 6 (Fact #11); ECF 260 (Fact #79). While GEO disputes that detainees cleaned on every occasion they were asked, GEO does not dispute that, after each meal, detainees helped clean the tables and floors on a rotating basis. GEO's Undisputed Fact #8. Thus, under Plaintiffs' own theory (one which they insist confirms the propriety of class certification, ECF 339), no additional facts are necessary to determine whether GEO has violated the TVPA.

---

[6] *See also* Corey Devon Arthur, I Hate My Prison Dorm So Much, I Enjoyed COVID-19 Quarantine in the Box, The Marshall Project, *available at* https://www.themarshallproject.org/2020/09/24/i-hate-my-prison-dorm-so-much-i-enjoyed-covid-19-quarantine-in-the-box (last visited November 12, 2020).

This Court must look only to the enumerated policies and determine whether those polices constitute a threat in violation of the TVPA. Accordingly, Plaintiffs' additional facts have no bearing on the case.[7] Regardless of the number of visits each detainee had with their family, how many phone calls they made each day, or their general comfort in a group living environment, what matters is whether the written policies themselves constituted a threat of serious harm. This lawsuit is not about challenging the conditions of confinement in ICE detention centers generally, but instead, about a specific meal cleanup policy. As discussed *supra*, the policies do not constitute a threat but instead a warning of a legitimate consequence. Summary judgment is warranted.

## VIII.   PLAINTIFFS' UNJUST ENRICHMENT CLAIMS ARE BARRED BY EXPRESS CONTRACTS

### A.       GEO Did Not Waive Its Defense.

First, Plaintiffs argue that GEO waived its contract defense by failing to raise it in its Answer.  ECF 336 at 76. Plaintiffs cannot show waiver because GEO raised its contract defense in the parties scheduling order over two years ago. ECF 146 at 20. Notwithstanding a party's failure to plead an avoidance or affirmative defense, Tenth Circuit courts have held that there is no waiver if the defense is included in a pretrial order.  *Bentley v. Cleveland Cnty. Bd. of Cnty. Cmmr's*, 41 F.3d 600, 605 (10th Cir. 1994) (noting the defendant waived potential immunity defense "by failing to raise the issue in its answer, the Pre-Trial Order, or at trial"); *Expertise, Inc. v. Aetna Fin. Co.*, 810 F.2d 968, 973 (10th Cir. 1987) ("When an issue is set forth in a pretrial order, it is not necessary to amend previously filed pleadings."); *Villescas v. Richardson*, 124 F. Supp. 2d 647,

---

[7] To the extent the Court determines Plaintiffs additional proposed facts preclude summary judgment, such a finding would provide additional support for GEO's motion to decertify the class. Indeed, how much contact each detainee received with their family, their immigration status, and how they came to be at AIPC, whether they had criminal history, all vary depending upon their individual history. No single set of circumstances applied to all detainees.

653 (D. Colo. 2000) (citing *Bentley* and *Expertise* and stating that "[u]nder Tenth Circuit authority,

inclusion of affirmative defenses in pretrial orders satisfies Rule 8(c)").  Additionally, Wright &

Miller note that "the substance of many unpleaded Rule 8(c) affirmative defenses may be asserted

by pretrial motions, particularly in the absence of any showing of prejudice to the opposing party

and assuming it has had an opportunity to respond."  5 Fed. Prac. & Proc. § 1278 (3d ed. Sept.

2018).

Where a party is put on notice of a defense with sufficient time before trial, the defense is

not waived. *Ahmad v. Furlong*, 435 F.3d 1196, 1201-02 (10th Cir. 2006) (affirmative defense is

not waived when the plaintiff is put on notice sufficiently in advance of trial) (compiling cases).

Plaintiffs have been on notice of this defense since, at the latest, September 11, 2018. ECF 146 at

20.  In the parties' amended scheduling order, GEO explicitly stated that "GEO may file a

dispositive motion arguing that express contracts preclude Plaintiffs' unjust enrichment claim." *Id*.

That is exactly what GEO has done here. Thus, there can be no question that the defense was not

waived.

### B.     Contracts of Adhesion are Not *Per Se* Unconscionable.

Plaintiffs' claim is essentially that the VWP contracts are unenforceable because they are

contracts of adhesion; however, contracts of adhesion "are not per se unconscionable" under

Colorado law.  *Weller v. HSBC Mortgage Services, Inc.*, 971 F. Supp. 2d 1072, 1081 (D. Colo.

2013) (emphasis in original). The existence of a "standardized agreement between parties with

unequal bargaining power . . . by itself is not enough for a finding of procedural unconscionability."

*Vernon v. Qwest Communications Intern., Inc.*, 925 F. Supp. 2d 1185, 1195 (D. Colo. 2013)

(contracts offered on a "take it or leave it basis" do not without more make agreements

unenforceable). Plaintiffs argue that, because the terms of VWP contract were not negotiable and because the individuals who chose to participate in the voluntary program were detained, the contracts were unconscionable because of the uneven bargaining power between GEO and detainees, as detainees were under GEO's care at AIPC. Yet, Plaintiffs provide no legal support that a detainee is unable to enter into a valid contract with a detention facility where they are housed.[8] And, Plaintiffs concede that all detainees who chose to participate in the VWP are told their participation is voluntary. Undisputed Fact #19. Thus, any detainee who does not want to participate does not have to. This alone undermines any claim that the contracts are unenforceable simply because of the unequal bargaining power.

Acknowledging that participation was voluntary, Plaintiffs also argue that detainees had no source of income other than the VWP and therefore their decision to enter into the contract indicates that it was unconscionable. Yet, Plaintiffs cite no evidence to support this claim. ECF 336 at 78. Indeed, to the contrary, each detainee's financial circumstances were different. For example, Plaintiff Hernandez testified that the VWP was not his only source of commissary funding, but that he also received funds from his family and friends. ECF 336-4 at 22 (Hernandez Dep. 147:7-10). Further, despite having months to file their response, Plaintiffs have failed to provide evidence from even *one* Plaintiff about the reason he or she chose to participate in the VWP. To the contrary, the detainees' applications show they genuinely wanted the opportunity, with some detainees applying multiple times until they were selected for a position. ECF 306-2. Thus, Plaintiffs have failed to present an issue of disputed fact as to whether the contracts are

---

[8] As for Plaintiffs' claim that any agreement to pay an ICE detainee $1 per day is "commercially unreasonable," the argument ignores ample federal law to the contrary. *See Channer v. Hall*, 112 F.3d 214, 219 (5th Cir. 1997) ("[T]he federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks...."); 8 U.S.C. § 1555(d).

55424240;1

unconscionable. Accordingly, Plaintiffs' unjust enrichment claims are barred by the contracts that

detainees signed to participate in the VWP.

## IX.    CONCLUSION

Because the issues raised in GEO's motion for summary judgment are ripe for adjudication

and there are no disputed issues of *material* fact that preclude their resolution, this Court should

enter summary judgment in GEO's favor.

Respectfully submitted, this the 18th day of November, 2020.

> **AKERMAN LLP**
> *s/ Adrienne Scheffey*
> Colin L. Barnacle
> Adrienne Scheffey
> Christopher J. Eby
> Melissa L. Cizmorris
> 1900 Sixteenth Street, Suite 1700
> Denver, Colorado 80202
> Telephone:  (303) 260-7712
> Facsimile:   (303) 260-7714
> Email: colin.barnacle@akerman.com
> Email: adrienne.scheffey@akerman.com
> Email: christopher.eby@akerman.com
> Email: melissa.cizmorris@akerman.com
>
> **BURNS, FIGA & WILL, P.C.**
> Dana L. Eismeier
> Michael Y. Ley
> 6400 S. Fiddlers Green Circle, Suite 1000
> Greenwood Village, CO 80111
> Telephone:  (303) 796-2626
> Facsimile:   (303) 796-2777
> Email: deismeier@bfwlaw.com
> Email: mley@bfwlaw.com
>
> *Attorneys for Defendant The GEO Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify on this 18th day of November, 2020, a true and correct copy of the foregoing **DEFENDANT THE GEO GROUP, INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was filed and served electronically via the Court's CM/ECF system on the following:

### Counsel for Plaintiffs:

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
TOWARDS JUSTICE
PO Box 371680
PMB 44465
Denver, CO 80237-5680
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Matthew Fritz-Mauer
KELMAN BUESCHER FIRM
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com
mfritzmauer@laborlawdenver.com

Hans C. Meyer
MEYER LAW OFFICE, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
OUTTEN & GOLDEN, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
OUTTEN & GOLDEN, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
OUTTEN & GOLDEN, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
LAW OFFICE OF R. ANDREW FREE
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
MILSTEIN LAW OFFICE
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

*s/ Nick Mangels*
Nick Mangels

55424240;1

**LIST OF EXHIBITS TO GEO'S REPLY IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**ECF No. 351**: Declaration of Adrienne Scheffey dated November 18, 2020

**Ex. R**: Att. 1 to Scheffey Declaration – Excerpts of Deposition of Hugo Hernandez Ceren dated June 24, 2020

**Ex. S**: Att. 2 to Scheffey Declaration – Plaintiffs' Responses to GEO's First Set of Written Discovery Requests

**Ex. T**: Att. 3 to Scheffey Declaration – Exhibit 12 to the Deposition of Hugo Hernandez Ceren dated June 24, 2020

55424240;1