# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 1:14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own and on behalf of all others similarly situated,*

Plaintiffs,

v.

THE GEO GROUP, INC.,

Defendant.

---

## DEFENDANT THE GEO GROUP, INC.'S REPLY IN SUPPORT OF
## MOTION FOR DECERTIFICATION OF CLASS

---

Defendant The GEO Group, Inc. ("Defendant" or "GEO"), by and through its undersigned

counsel, hereby submits its Reply in Support of its Motion for Decertification of Class (ECF 312)

and respectfully requests this Court decertify the class.

55167079;8

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...................................................................................................2

II.     LAW ......................................................................................................................3

      A.      Standard for Decertification........................................................................3

      B.      The Trafficking Victims Protection Act .....................................................4

      C.      Plaintiffs Challenge a Myriad of Policies and Practices............................8

III.    THE "HOUSING UNIT SANITATION POLICY"...............................................9

      A.      The Disciplinary Severity Scale................................................................11

      B.      The Practice Challenged By Plaintiffs......................................................16

      C.      Unwritten Policies.....................................................................................18

      D.      Plaintiffs Have Failed to Identify Circumstantial Evidence of
              Classwide Causation. .................................................................................20

IV.     PLAINTIFFS HAVE NOT IDENTIFIED CIRCUMSTANTIAL EVIDENCE THAT THE
       SANCTION OF SEGREGATION (OR WARNING OF THE SAME) WAS COMMON.
       .....................................................................................................................21

              (i)      Detainee Testimony Does Not Establish a Classwide Inference of
                     Causation............................................................................... 24

              (ii)     GEO Officer Testimony Does Not Establish A Classwide Inference of
                     Causation............................................................................... 28

              (iii)    Extraneous Evidence............................................................. 31

      B.      Plaintiffs Cannot Prove that the Disciplinary Polices Were
              Uniformly "Unlawful."..............................................................................33

      C.      Plaintiffs Cannot Establish A Common Response To Segregation. ......................37

      D.      Plaintiffs Have Not Established Classwide Evidence of Scienter. ........................43

      E.      Plaintiffs Have Not Established That their Experience Can Be
              Extrapolated to The Class. .........................................................................44

      F.      GEO's Defenses Require Individualized Trial Evidence. ....................................46

V.      CONCLUSION....................................................................................................48

CERTIFICATE OF SERVICE ........................................................................................50

## I.    INTRODUCTION

In their Opposition to GEO's Motion for Decertification of the Class ("Response"), ECF 339, Plaintiffs fail to meet their burden to show certification continues to be appropriate. Instead, Plaintiffs provide a robust description of their individual and varying claims, but fail to establish why such individual and anecdotal accounts are appropriate for a classwide inference. In so doing, they paint their individual experiences not as differing accounts, but instead as credibility issues for trial. The issue before this Court is not whether there is a credibility issue for a jury, but rather, whether the credibility issues are so varied and numerous that it would be unwieldy to try them all at once in front of the *same* jury. *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir.1982) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."). Here, the credibility determinations are so numerous, and the factual claims so individualized, that trying the case in the aggregate would inevitably devolve into a protracted series of mini trials. Thus, decertification is warranted.

Contrary to Plaintiffs' allegation that the facts remain unchanged since certification was initially granted,[1] discovery has revealed that the "HUSP" or "meal cleanup" policy was implemented differently in practice than as written. As described herein and in GEO's initial motion, detainees were not subject to a uniform threat of segregation. Rather, discipline varied greatly based upon the specific circumstances of the violation at issue. Even so, the default response to a detainee's refusal to participate in the meal clean-up policy was simply to ask another

---

[1] Plaintiffs' claim that the facts are unchanged is belied by the fact that they present nearly twenty pages of facts, the majority of which derive from discovery that followed class certification.

detainee to assist. These facts obtained through discovery, which show how the policies were implemented in practice differently than in the written policies, make clear that Plaintiffs can no longer establish a classwide inference of causation based upon a written policy. Thus, decertification is warranted because individualized issues will predominate over class issues.

## II.    LAW

### A.    Standard for Decertification

"Whether a case should be allowed to proceed as a class action involves intensely practical considerations, most of which are purely factual or fact-intensive. Each case must be decided on its own facts, on the basis of practicalities and prudential considerations." *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir.1988); *see also Monreal v. Potter*, 367 F.3d 1224, 1238 (10th Cir. 2004) ("Granting or denying class certification is a highly fact-intensive matter of practicality"). When faced with a motion to decertify—that is, even after the Court has granted a motion for class certification—the party seeking certification continues to bear the burden of meeting the requirements of Rule 23. *Sibley v. Sprint Nextel Corp.*, 315 F.R.D. 642, 651 (D. Kan. 2016) (citing *Arkalon Grazing Ass'n v. Chesapeake Operating, Inc.*, 2014 WL 3089556 at *1 (D. Kan. July 7, 2014) ("[I]t remains the plaintiff's burden to prove that the requirements of Rule 23 are met.") (citing *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213 (10th Cir. 2013). The Court must engage in a "rigorous analysis of whether the threshold requirements of Rule 23(a) are satisfied." *Shook v. El Paso County*, 3865 F.3d 963, 968 (10th Cir. 2004*); XTO Energy, Inc.*, 725 F.3d at 1218. This is not a pleading standard, and Plaintiff must "affirmatively demonstrate" compliance with the rules. *Lavigne v. First Cmty. Bancshares, Inc.*, No. 1:15-CV-00934-WJ/LF, 2018 WL 2694457, at *3 (D.N.M. June 5, 2018) (quoting *Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551 (2011)); *cf. XTO Energy, Inc.*, 725 F.3d at 1218

(describing that the plaintiff has a "strict burden of proof").

Rule 23(b)(3) requires a "rigorous analysis" into whether common questions predominate

over individual ones. *XTO Energy, Inc.*, 725 F.3d at 1220. The predominance inquiry is "far more

demanding than Rule 23(a)'s commonality requirement*." Id*. "Predominance is satisfied when

common questions represent a significant aspect of a case and can be resolved for all members of

a class in a single adjudication." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016). "It

is not necessary that all of the elements of the claim entail questions of fact and law that are

common to the class, nor that the answers to those common questions be dispositive. Put

differently, the predominance prong asks whether the common, aggregation-enabling, issues in the

case are more prevalent or important than the non-common, aggregation-defeating, individual

issues." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) (internal

citations and quotation marks omitted).

Given the evidence developed in this case through discovery, Plaintiffs can no longer meet

their burden. Unlike at the initial class certification stage, Plaintiffs now seek to prove their case

not through a common written policy, but instead through anecdotal evidence of the named

Plaintiffs interactions with GEO officers and a number of unwritten and unsupported practices.

### B.    The Trafficking Victims Protection Act

As an initial matter, Plaintiffs challenge GEO's proposed legal standard under the

Trafficking Victims Protection Act ("TVPA". In their Response, Plaintiffs argue for this Court to

abandon the legal conclusions it reached at the class certification stage in favor of a standard that

Plaintiffs previously proposed and that this Court rejected. *Compare* ECF 339 at 33 (advocating

for eliminating from the TVPA claims, any consideration of a subjective element) *with* ECF 57 at 13 ("Representatives' proposal that the subjective component be eliminated by using only a reasonable person standard does not coincide with the statute."). In so arguing, Plaintiffs claim that even though this Court correctly concluded that a hybrid test applies, recent case law has eliminated the subjective test. This is inaccurate.

Recently, the Fourth Circuit enumerated the legal standard for a TVPA violation. *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017), *as amended* (Mar. 3, 2017). The court explained that assessing whether a TVPA violation has occurred involves two inquiries. *Id.* First, the TVPA includes an express scienter requirement, and therefore a party must present evidence from which the fact finder could conclude that the defendant *intended* the victim to believe harm would befall the victim if he or she did not work. *Id.* ("The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her if she left her employment[.]") (emphasis added) (internal quotations omitted). Second, the factfinder must determine that the harm or threat of harm relayed by the defendant was "sufficiently serious" to compel the victim to continue to work, from the vantage point of a reasonable person in the place of the victim. *Id.* This second element has been described as requiring a "hybrid" test, wherein the victim's decision to provide his or her labor must be "*objectively reasonable* under the circumstances" but that the factfinder must also consider "the particular vulnerabilities of the person" in the victim's position. *Id.* Courts in this District have adopted the standard set forth in *Muchira* and concluded that a subjective component should be considered, explaining that: "Courts look to whether a defendant's 'misconduct has created a situation where ceasing labor would cause a plaintiff serious harm,' recognizing that what

55167079;8

constitutes serious harm for that plaintiff must be determined by considering the totality of the circumstances presented." *Echon v. Sackett*, No. 14-CV-03420-PAB-NYW, 2017 WL 4181417, at *14 (D. Colo. Sept. 20, 2017), *report and recommendation adopted*, No. 14-CV-03420-PAB-NYW, 2017 WL 5013116 (D. Colo. Nov. 1, 2017), *aff'd sub nom. Villanueva Echon v. Sackett*, 809 F. App'x 468 (10th Cir. 2020) (emphasis added). Likewise, the District of Idaho adopted the standard expressed in *Muchria*, explaining that, in considering the totality of the circumstances, a factfinder must consider the particular vulnerabilities of a person in the victim's position. *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 996 (D. Idaho 2019). The Second Circuit has reached the same conclusion, finding that "[t]he correct standard is a hybrid: it permits the jury to consider the particular vulnerabilities of a person in the victim's position but also requires that her acquiescence be objectively reasonable under the circumstances." *United States v. Rivera*, 799 F.3d 180, 186–87 (2d Cir. 2015). Plaintiffs ask this Court to disregard this hybrid standard and instead conclude that, in assessing whether a threat is "sufficiently serious," the factfinder is precluded from considering the particular vulnerabilities of the victim. ECF 339 at 33-35. The case law does not support Plaintiffs' proposed standard.

Plaintiffs ask this Court to find that the "TVPA includes only an *objective* standard[.]" ECF 339 at 33. Under Plaintiffs' proposed standard, the Court would look at only "whether a reasonable person would respond in a similar way to the victims." *Id.* The cases that Plaintiffs cite do not support the adoption of the purely objective test urged by Plaintiffs. First, *New York State Nurses* addressed whether a union had standing to bring a TVPA claim on behalf of its members, not the appropriate test for a TVPA claim on the merits. *New York State Nurses Ass'n v. Albany Med. Ctr.*, No. 119CV1265FJSCFH, 2020 WL 4001056, at *4 (N.D.N.Y. July 15, 2020). In resolving the

55167079;8

issue of standing, the court stated in dicta that while the factfinder *may* consider "the victim's subjective beliefs" such a consideration was not mandatory in all cases. *Id*. The court did not ultimately resolve the issue on the merits, but instead dismissed the plaintiffs' claims for lack of standing. *Id.* at *6. Likewise, *Owino* did not resolve the standard for a TVPA claim but instead assumed, without resolving, that a subjective inquiry was appropriate. *Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS (NLS), 2020 WL 1550218, at *28 (S.D. Cal. Apr. 1, 2020). The final case Plaintiffs cite, *Francis*, also does not support their position. *Francis v. APEX USA, Inc.*, 406 F. Supp. 3d 1206, 1211 (W.D. Okla. 2019) ("In making this determination, the Court takes into account the particular vulnerabilities of the Plaintiffs and the circumstances surrounding their recruitment and employment by Defendants.").

Additionally, this Court should reject Plaintiffs' proposed standard because it eliminates a required element of a TVPA violation. Plaintiffs' proposed test excludes a separate analysis of the scienter element, which is inappropriate as the TVPA limits liability to only those violations committed *knowingly*. *Muchira*, 850 F.3d at 618 ("The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her."); *see also Echon*, 2017 WL 4181417, at *14 (same). In order to establish a violation of the TVPA, there must be evidence from which the jury could find that GEO "intended to cause the victim to believe that she would suffer serious harm—from the vantage point of the victim—if she did not continue to work." *Muchira*, 850 F.3d at, 618 (4th Cir. 2017). Plaintiffs' proposal that the only inquiry should consider "the conduct of the defendant" from the vantage point of a reasonable person, ECF 339 at 36, fails to capture the crucial element of scienter. Thus, this Court should reject the legal analysis for which Plaintiffs advocate.

Even if this Court were to adopt Plaintiffs' new standard, it would not eliminate the individualized fact patterns required to resolve the issues raised by Plaintiffs. The objective test still requires that the jury consider a reasonable person's actions *under the circumstances*. Indeed, the plain text of Section 1589 states that the term "serious harm" means any harm that is sufficiently serious "under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). Because the circumstances varied for each disciplinary infraction, the case cannot be resolved without individualized evidence that would predominate over any issues common to the class.

### C.    Plaintiffs Challenge a Myriad of Policies and Practices.

Plaintiffs argue that there is a written "HUSP" policy that on its face describes the practices that Plaintiffs challenge. ECF 33958-59. This is not so. Plaintiffs rely upon excerpts from different policies, and individualized testimony, to craft the concept of an overarching practice whereby detainees are subject to "progressive" discipline, cumulating in segregation, for declining to participate in the meal clean-up rotation.[2] ECF 339 at 15-16; *see also* ECF 336. In reality, no such policy exists, and Plaintiffs do not identify any. Both the written policy and the testimony of GEO's officers make clear that the prevailing sanction for the refusal to clean was no sanction at all. When sanctions were appropriate, the use of segregation would have been rare. And there is no evidence that lesser sanctions were a "precursor" for higher level sanctions. To the extent they conflict with

---

[2] It is worth noting that while Plaintiffs argue that the facts have not changed over the course of discovery, this is the first time they have asserted that an escalating policy exists. Previously, Plaintiffs had argued that a single disciplinary sanction was utilized for the refusal to participate in meal clean-up: segregation.

55167079;8

the written policies and descriptions of GEOs' employees who have worked in the dorms for years, Plaintiffs claims are based upon individualized perceptions of the policy.

### III.    THE "HOUSING UNIT SANITATION POLICY"

Plaintiffs argue that a *single* policy exists which constitutes the "Housing Unit Sanitation Policy" or "HUSP." ECF 339 at 57-58. To arrive at this argument, Plaintiffs cross-reference excerpts from multiple, different polices to construct a single, uniform policy that can be challenged on a class-wide basis. ECF 339 at 10 ("The sections of the handbook describing the HUSP. . ."). Thus the "policy" that Plaintiffs challenge is not a uniform written policy, but instead an amalgamation of different policies that, as combined by Plaintiffs, do not reflect the actual practices at Aurora ICE Processing Center ("AIPC").[3] According to Plaintiffs, the policy they challenge in this lawsuit entitled "Housing Unit Sanitation" states:

> Each and every detainee *must* participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted [daily] for viewing. During a general cleanup all detainees *must* participate. The assigned Housing Unit [or Dorm] Officer will be responsible for assuring this general cleanup is done on a regular basis.

ECF 339 at 9. But Plaintiffs do not challenge this policy and this policy alone. Indeed, this policy has no stated consequence or discipline, making it impossible to determine on a classwide basis (and based upon the written policy alone) whether detainees were subject to a common injury. Accordingly, Plaintiffs combine additional policies in the handbook with the policy titled

---

[3] Plaintiffs incorrectly state that GEO has previously conceded that a uniform policy exists. This is not correct. Plaintiffs cite GEO's appellate brief, ECF 339-19 at 18. The brief does not make any concession but instead, states that certain disciplinary sanctions arise "under ICE Policy" that "ICE Requires . . ." citing compliance with multiple different sections of the PBNDS. ECF 339-19 at 18. Likewise, GEO's Opposition to Class Certification, ECF 51, similarly references multiple different policies from AIPC and refers to the collection of policies as creating "overlapping" duties. ECF 51 at 12.

"Housing Unit Sanitation," without conceding those policies may be separate and distinct,[4] in order

to craft what they call the "HUSP," which is not recognized in its final form as a policy of GEO.

More specifically, in addition to the "Housing Unit Sanitation" section, Plaintiffs add the

section of the handbook entitled "Day Space," which, according to Plaintiffs, states:

> All detainees in a housing unit [or dorm] are required to keep clean and sanitary all
> commonly accessible areas of the housing unit [or dorm], including walls, floors, windows,
> window ledges, showers, sinks, toilets, tables, and chairs.
>
> *****
>
> Detainees will take turns cleaning the area [or day space]. If a detainee feels that everyone
> is not doing their fair share, the detainee should inform the housing unit officer of the
> problem. Action will be taken to resolve this problem.
>
> *****
>
> Should an officer notice that the area is not clean, the officer will make available necessary
> cleaning supplies. If the detainees in the housing unit [or dorm] do not clean the area after
> being instructed to do so, the televisions will be turned off and the detainees will not be
> permitted to participate in any activities/programs until the housing unit [or dorm] is
> cleaned. Continued refusal to clean the area will result in further disciplinary action.

ECF 339 at 9. Plaintiffs construe this policy as cross-referencing the ICE disciplinary severity

scale in the detainee handbook.

From there, Plaintiffs turn to the "Disciplinary Procedure," as the next portion of their

"HUSP." But Plaintiffs do not contend that the entire disciplinary policy is incorporated by

reference, as they disregard written sections of the policy that do not support their claims.

Specifically, Plaintiffs pointedly ignore the portion of the disciplinary policy that states that all

incidents should be resolved informally, where possible. *See* ECF 261-17 at 24 (stating that

disciplinary incidents involving "high moderate" or "low moderate" charges should be resolved

---

[4] Interestingly, Plaintiffs acknowledge in their brief that different headings within the handbook
signify different policies, noting that the VWP appears in a differently titled section of the handbook than
the meal cleanup policy, and arguing that they should be treated as separate policies for that reason. ECF
339 at 13.

55167079;8

informally "to the extent possible."). They also disregard the extensive due process protections

afforded to detainees accused of committing a rule violation. Instead, they go directly to the section

that sets forth the disciplinary consequences for "refusal to clean assigned living area" which is

offense number 306. ECF 261-17 at 27. From there, they do not state that the so-called "HUSP"

allows detainees to be sanctioned with only "warning" or "reprimand," both of which are listed in

the policy, but instead argue that all violations "culminate[ed] in solitary confinement." ECF 339

at 10, 15. While Plaintiffs claim the written policy controls, they exclude from their narratives that

the "Disciplinary Procedures" also includes the offenses of "410 failure to follow safety or

sanitation regulations" and "413 Being unsanitary or untidy, failing to keep self and living area in

accordance with posted standards," neither of which may be sanctioned with segregation. ECF

261-17 at 28. Plaintiffs make no effort to explain how their "HUSP" is consistent with the policies

actually described in the handbook, including the numerous written policies that indicate that

segregation would not be a likely consequence for not following sanitation regulations. In short,

Plaintiffs' "HUSP," which was created by selectively combining excerpts from a number of

policies, intentionally excludes specific written policies that contradict their claims. This contrived

policy, which disregards key language in the written policies, does not exist.

A.      **The Disciplinary Severity Scale.**

Despite the fact that the disciplinary severity scale permits over *thirteen* potential sanctions

for Rule 306 violations, including no sanction at all, Plaintiffs attempt to paint a picture whereby

every (or the vast majority) of Rule 306 violations would be addressed similarly and uniformly.

To support this theory, Plaintiffs concoct for the first time an "escalating" policy, whereby each

single violation of the disciplinary policy is subject to graduated disciplinary consequences,

cumulating in 72 hours of segregation for every single violation. ECF 339 at 15. This mischaracterizes the policy.

Plaintiffs argue that the policy, "on its face," is an escalating discipline policy, whereby each detainee can be sanctioned with *all* of the different possible sanctions, for a single infraction. ECF 339 at 58. This is not so. Instead, the severity scale provides for a *range* of possible sanctions which may be appropriate. ECF 261-17 at 25 ("[Sanctions] range from the withholding of privilege(s) to segregation."). There is no progressive or escalating nature of the sanctions. Rather the policy simply presents different options that may be appropriate, depending upon the severity of the offense.

The ICE disciplinary severity scale, which is drafted and proscribed by ICE, and incorporated into the AIPC handbook, is a multi-step process. After a GEO officer believes that a detainee has committed a violation, the officer can attempt to resolve the issue informally or write-up[5] the detainee for a disciplinary infraction and a proposed sanction. ECF 261-17 at 25. If a violation is alleged, "an appropriate investigation will begin within 24 hours of the time the violation is reported." ECF 261-17 at 24. Thereafter, the write-up is sent to the Unit Disciplinary Committee ("UDC"). Under the written policy, the UDC will "to the extent possible, informally resolve cases involving 'high moderate' or 'low moderate' charges, in accordance with the list of charges and related sanctions." ECF 261-17 at 24. Not all sanctions are available to the UDC, only sanctions "E" through "M." *Id.*; *see also* ECF 339-11 at 64 (explaining that detention officers do not have the power to send a detainee to segregation, that a lieutenant must make that decision).

---

[5] Plaintiffs disregard this important step in the disciplinary severity scale, instead attempting to cast a GEO officer's choice to simply ask a different detainee to clean, rather than write-up an infraction report, as disregarding facility rules. This is not so.

The UDC, which is comprised of one to three members, typically a lieutenant (ECF 339-4 at 14),
has the authority to do any of the following for a 306 violation (as it at issue here):

- Resolve the incident informally, ECF 261-17 at 24

- Make a finding the detainee did or did not commit the rule violation(s) or prohibited
  acts, *Id*.

- Loss of privileges, ECF 261-17 at 27, Sanction "E"

- Change of Housing, *Id*., Sanction "F"

- Remove from Program and/or group activity, *Id*., Sanction "G"

- Loss of job, *Id*., Sanction "H"

- Impound and store detainee's personal property, *Id*., Sanction "I"

- Confiscate contraband, *Id*., Sanction "J"

- Restrict to housing unit, *Id*., Sanction "K"

- Reprimand, *Id*., Sanction "L"

- Warning, *Id*., Sanction "M"

Before sanctioning a detainee, the UDC would review any officer's statement, the disciplinary
packet, and witness statements. ECF 339-4 at 15 (Kevin Martin Dep. 72:1-16) In addition, the
UDC would "bring the detainee into the office, sit down the detainee, go over, get their side of the
story, and then based on the reports, based on the detainee's statement, determine if there was an
infraction committed." ECF 339-4 at 15 (Kevin Martin Dep. 72:1-16). From there, the detainee
could  be the subject of a general write up or a write up that recommends imposing one of the

above-listed sanctions. For example, a detainee could be written up and given a "warning."[6] Alternatively, a detainee could both be written up *and* temporarily lose a privilege as detailed in the write-up. Alternatively, the UDC can determine no sanction at all should issue. ECF 261-17 at 24. The UDC did not have authority to place detainees in disciplinary segregation for a Rule 306 violation. Instead, only the Institutional Disciplinary Panel ("IDP") "can place a detainee in disciplinary segregation." ECF 261-17 at 24. As for administrative segregation, a "written order shall be completed and approved by a supervisory officer before a detainee is placed in administrative segregation except when exigent circumstances make this impracticable." ECF 261-17 at 28.

Following the UDC, the IDP allows for review by a different individual or group of individuals who did not participate in the UDC. ECF 261-17 at 24 ("The panel shall not include the reporting officer, the investigating officer, and any member of the referring UDC, or anyone who witnessed or was directly involved in the incident."). The IDP must conduct a hearing within 24-hours of receiving the referral from the UDC (or shorter if the detainee waives the 24-hour period) and then must consider all evidence and determine whether the detainee committed the rule violation. ECF 261-17 at 25. It must document the evidence considered, the decision, and the sanctions imposed. *Id.* The IDP can either reduce or enhance sanctions recommended by the UDC. ECF 261-17 at 24-25. From there, the decision is sent to the Warden who may concur, end the proceedings, or impose more lenient sanctions. ECF 261-17 at 25. All detainees have the right to

---

[6] Contrary to Plaintiffs' description of a warning as a consequence that begins the write up procedure, a warning in the context of the ICE disciplinary policy could also be the final outcome of any investigation.

a staff representative to help them with the IDP process. In addition to the sanctions that the UDP

may impose, the IDP can impose the following:

- Initiate criminal proceedings, ECF 261-17 at 27, Sanction "A"

- Disciplinary transfer (recommend), *Id*., Sanction "B"

- Disciplinary segregation (up to 72 hours), *Id*., Sanction "C"

- Make monetary restitution, if funds are available, *Id*., Sanction "D"

To put in context why these elevated sanctions are available to the IDP, it is important to keep in

mind that the sanctions for violation 306 are the same as for all "300" level "High Moderate"

offenses which include violations such as "indecent exposure," "stealing (theft)," "counterfeiting,"

"making, possessing, or using intoxicants," "gambling," or "destroying, altering or damaging

facility or another person's property." *Id.* As Officer Quezada explained in her deposition, stealing

and indecent exposure are "major" incidents which are of a greater severity than refusing to clean.

ECF 339 -12 at 23.

After a decision is made about which of the above sanctions (if any) is appropriate, there

are additional variables at play. Namely, each detainee is provided a disciplinary hearing where

the incident is investigated. From there, the IDP or UDP can determine, in their own discretion,

whether to reduce the sanction to a lesser option, eliminate the sanction all together, or uphold the

sanction. ECF 339-3 47 (Ceja Dep. 191:1-11). This review process varies depending upon the

charge and the ultimate decision of the individuals selected for the panel. ECF 339-4 (Kevin Martin

Dep. 68-69).

Prior to initiating the formal disciplinary process described above, GEO officers must

approach the situation with the aim of resolving the violation informally. ECF 261-8 at 36 ("Where

permitted by facility policy, staff shall <u>informally settle</u> minor transgressions through mutual

consent, whenever possible."); ECF 261-17 at 24 (Instructing GEO staff to "informally resolve

cases involving 'high moderate' or 'low moderate' charges, in accordance with the list of charges,

and related sanctions."). Thus, rather than imposing formal sanctions such as the loss of television

or segregation, officers must first determine whether the infraction can be resolved without

incident.

### B.     The Practice Challenged By Plaintiffs.

Plaintiffs challenge the section of the detainee handbook that describes a "general cleanup,"

in which detainees must participate without providing specifics as to when it occurs or what is

cleaned. ECF 261-17 at 20 ("Each and every detainee must participate in the facility's sanitation

program. A list of detainees is developed each day by staff and is posted daily for viewing. During

a general cleanup all detainees must participate."). During discovery, witnesses have consistently

testified that the "general cleanup" referenced in the written policy described a more narrow

practice than Plaintiffs represented at the initial class certification stage. Rather than a directive

for detainees to clean the entirety of the dorm without pay, every witness testified that the "general

cleanup," which Plaintiffs call a "HUSP," refers to a practice at AIPC for dividing up the

responsibilities of wiping down tables and cleaning crumbs off of the floor after each meal.[7] In

---

[7] Witnesses have uniformly testified that the challenged policy in practice involves assigning six
detainees per day to help wipe down tables and clean the floors after each meal. ECF 339-10 (Vasquez Dep.
75:2-24) ECF 313-11 at 6 (Quezada Dep. 64:10-16) ECF 313-1 at 13-14 (Kevin Martin Dep. 144-145); *see
also* ECF 339-2 at 9-10 (Ceja 36:25-37:1-4) ("[Detainees have a] day room area, which is a common area,
where all of the TVs and tables are located. They all eat at these tables, so after meal service, they will clean
up the tables, wipe down the tables, and sweep and mop the floors."); ECF 339-7 at 7 (Menocal Dep. 95:16-
25; 96:1-4) ("They had a schedule. You know, you would—after each meal, you know, people would clean
up, but there was a rotation where (inaudible) – your cell we (inaudible) the areas three times a day, in the
morning or after each meal, I should say. And—and, yeah. So one cell would do that one day. The next cell
would do it the next day, and so on and so forth."). This clean-up takes approximately 5 to 10 minutes after

practice, the "general clean-up" as described by Ms. Ceja, the Assistant Facility Administrator for the Facility who has worked there for over 25 years, is a method for cleaning up after every meal. ECF 339-2. Six people are asked to help clean up after meals each day, two sweep, two mop, and two wipe down the tables.[8] ECF 260 at 18 (Fact #48) ("During a general cleanup, GEO requires detainees clean up the tables , wipe down the tables and sweep and mop the floors."). Detainees who do not participate in the meal clean-up typically watch TV from a location that is not in the way of the cleanup. ECF 339-11 at 21 (Gallegos Dep. 131:10-11). No additional unpaid cleaning is part of the "general clean-up" other than basic cleaning after meal service. ECF 339-2 at 9-10 (Ceja 37:14-16); ECF 339-11 at 20 (Gallegos Dep. 129:24-130:1) (trustees are paid to clean the showers). Two of the selected detainees are individuals who have volunteered to assist with housekeeping tasks in exchange for a stipend under the VWP. ECF 336 at 26 (Undisputed Fact #36(f)). The remainder are selected each day based upon their bed assignments, to ensure there is a rotation where everyone contributes to keeping the common living space clean. ECF 313-12 at 9 (Vasquez Dep. 75:18-20); ECF 339-7 at 7 (Menocal Dep. 95:16-25; 96:1-4). Additional detainees are always welcome to volunteer if they so choose. ECF 313-1 at 13 (Kevin Martin Dep. 144:8-11); ECF 313-11 at 7-8 (Quezada Dep. 78:22-79:3). At issue here is what happens when someone is selected to help clean up after a meal, but does not want to. The written policy indicates that, as an initial matter, the TVs may be turned off. After that, if detainees still decline to clean,

---

each meal. ECF 339-11 at 21 (Gallegos Dep. 130:25). The clean-up is not mandatory and detainees may opt-out if they wish. ECF 339-10 at 14-15 (Vasquez 76:2-23; 77:1-11). Indeed, Plaintiffs themselves have admitted the "HUSP" as a meal cleanup policy: "The post-meal cleanup of tables, floors, and other communal areas that GEO requires is called the Housing Unit Sanitation Policy or HUSP." ECF 260 at 18 (Fact #51).

[8] *See supra* n.7.

additional discipline may issue. ECF 261-17 at 20; ECF 339 at 9. However, in practice, if a detainee does not want to clean-up after meals, the further "action" that is typically taken is that the GEO officer will simply ask a different detainee to assist. ECF 339-11 (Gallegos Dep. 164:18-25; 165:12-18). Even so, GEO generally tries to obtain cooperation without resulting to formal warnings or discipline. ECF 339-3 (Ceja Dep. 113:13-17). Plaintiffs admit that this post-meal clean-up practice is the policy they challenge in this lawsuit. ECF 260 at 18, Fact # 51 (Plaintiffs' Motion for Summary Judgment) ("The post-meal cleanup of tables, floors, and other communal areas that GEO requires is called the Housing Unit Sanitation Policy, or HUSP.").

      **C.**    **Unwritten Policies.**

      In addition to the meal clean-up practice, Plaintiffs also present myriad of individualized allegations about additional cleaning that purportedly forms the basis of their claims and purportedly constitute part of the amorphous "HUSP." These additional allegations are not only absent from the written policy, they also run contrary to the testimony of all GEO witnesses about the practices related to meal clean-up. *See supra* n.7. In their Response, Plaintiffs allege that detainees who cleaned up after meals did not simply wipe down tables and clean up the floors, but instead also completed additional cleaning tasks. ECF 339 at 12. Specifically, Plaintiffs allege that the "HUSP" included cleaning bathrooms, microwaves, and video games. ECF 339 at 12. These claims are not derived from written policies but instead statements of detainees. *Id.* There is no classwide evidence – and certainly Plaintiffs cite none -- that GEO implemented a general clean-up that involved more than basic cleaning after meals. *See supra* n.7; *see also* ECF 260 at 18 (Fact #48) ("During a general cleanup, GEO requires detainees clean up the tables , wipe down the tables and sweep and mop the floors."). Further, GEO disputes that these additional cleaning tasks were

performed by unpaid detainees as opposed to VWP trustees. Because each of the additional challenged policies is not defined in a uniform written policy, they would be subject to individualized evidence and defenses at trial. While such evidence may be appropriate for individual trials, it is not consistent with trying the instant case as a class action.

Moreover, Plaintiffs also assert for the first time[9] in their Response that they challenge a sanction that does not appear in *any* written policy, *i.e.*, that telephones would be turned off until detainees completed their tasks. ECF 339-15. The written policies do not state that telephones in the dorms will be turned off (simultaneously with the television) if a detainee refuses to clean. ECF 339 at 9; ECF 261-17 at 20. Yet, Plaintiffs now allege that it was a common disciplinary policy that applied to the entire class. ECF 339 at 15. As support, Plaintiffs rely not upon a written policy or common practice, but instead <u>exclusively</u> on the uncorroborated testimony of <u>a single named</u> Plaintiff. ECF 339 at 15 at n.35 (referencing only Mr. Hernandez' deposition transcript.). Plaintiffs cite to testimony from Mr. Hernandez that the telephones and televisions would be turned off during post-meal clean-up (regardless of whether a detainee declined to clean). *Id.* (citing ECF 339-9 at 14) ("The TVs don't go on [i]f the detainee doesn't start cleaning[.]"). No other detainee so testified. And GEO denies that such a practice ever existed. Indeed, no such practice is contained in *any* of the written procedures. ECF 339 at 9; ECF 261-17 at 20. Further, the claim is inconsistent with the written policy that the TV will remain on unless and until an officer determines that it should be turned off. ECF 261-17 at 20 As Mr. Gallegos testified, during the fifteen-minute post-meal clean-up, other detainees would go to the top tier of the pods to watch TV. ECF 339-11 at 21

---

[9] This claim is noticeably absent from Plaintiffs' prior summary judgment briefing. *See generally* ECF 260.

(Gallegos Dep. At 131:8-14). And Plaintiffs have pointed to no evidence that GEO officers have the ability (let alone authority) to turn off the phones at any time. GEO disputes that individual officers could turn off the phones without a supervisor's approval and the support of the intake team.

Thus, at trial, GEO would present an individualized defense to Mr. Hernandez's claim that the phones were never turned off. For example, Mr. Hernandez' claims are rebutted by his own phone logs that show calls made shortly before and after meals. Indeed, Mr. Hernandez has been housed at more than 20 ICE detention facilities across the country, as such GEO would also present a defense that he may be conflating different facilities' policies. These are exactly the type of "divergent fact patterns" which make this case "inappropriate for class action status." *Trevizo v. Adams*, 455 F.3d 1155, 1163 (10th Cir. 2006).

**D.    Plaintiffs Have Failed to Identify Circumstantial Evidence of Classwide Causation.**

At trial, "plaintiffs must prove that an <u>unlawful</u> means of coercion caused them to render labor." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 918 (10th Cir.), cert. denied, 139 S. Ct. 143, 202 L. Ed. 2d 34 (2018) (emphasis added). Plaintiffs argued at the class certification stage that they planned to present evidence that would establish a classwide inference that detainees were coerced to clean, and that the coercion was unlawful, through evidence of a common and uniform *written* policy. ECF 49 at 11-12. The Tenth Circuit found certification was appropriate because a class-wide inference could be drawn from "common evidence pertaining to the uniform Sanitation Policy." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 921 (10th Cir.), *cert. denied*, 139 S. Ct. 143, 202 L. Ed. 2d 34 (2018). At the time, Plaintiffs argued that they could establish on a classwide

basis that they cleaned because the Sanitation Procedures, as implemented, created an omnipresent threat of segregation.

Now, after discovery, it is clear that Plaintiffs cannot meet their burden to show that a uniform piece of circumstantial evidence controls the causation analysis. "The permissibility of a class-wide inference depends on whether the class members' claims are 'solvable with a uniform piece of circumstantial evidence' or instead 'involve significant individualized or idiosyncratic elements.'" *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 921 (10th Cir.), cert. denied, 139 S. Ct. 143, 202 L. Ed. 2d 34 (2018) (quoting *CGC Holding*, 773 F.3d at 1092). Now that discovery is closed, Plaintiffs can no longer rely upon allegations, but instead must identify specific classwide evidence that would create an inference of causation. Plaintiffs have not met their burden to identify evidence of a classwide inference.

### IV.    PLAINTIFFS HAVE NOT IDENTIFIED CIRCUMSTANTIAL EVIDENCE THAT THE SANCTION OF SEGREGATION (OR WARNING OF THE SAME) WAS COMMON.

As the Tenth Circuit explained, class certification in the instant case is inappropriate if GEO could present "evidence that could rebut the Plaintiffs' common inference of [causation] on an individualized basis" as that rebuttal evidence "would predominate at trial." *Menocal*, 882 F.3d at 921. As this Court made clear when it reviewed the initial class certification order, the "glue" that held the case together was that Plaintiffs challenged a "specific uniformly applicable" written policy, such that reliance upon individualized testimony was not necessary. ECF 57 at 8. But, because the policy, as testified to by GEO employees, did not involve frequent use of segregation (or warnings of the same) for refusing to clean, Plaintiffs now turn to their own anecdotal testimony to establish a purportedly classwide inference. It is widely understood that a "[p]laintiff's anecdotal

evidence cannot be the basis to infer that the entire company operated under a general policy …". *Romo v. GMRI, Inc.,* 2014 WL 12588646, * 14 (C.D. Cal. Aug. 12, 2014) (denying certification because evidence did not show a general policy of pressuring employees to interrupt their meal period and work off the clock).

Plaintiffs must establish that the possible sanction of segregation was so prevalent as to create a "uniform piece of circumstantial evidence" that detainees labored not because of boredom or a desire to stay clean, but instead due to fear of a brief period of segregation.[10] At class certification, Plaintiffs argued that detainees "were uniformly aware of GEO's requirement that they perform uncompensated cleaning and maintenance work and that the consequence of a refusal to perform this labor was solitary confinement." ECF 49 at 7.[11] In support, Plaintiffs relied upon their own anecdotal experiences. *Id.* Following discovery, there is ample evidence that GEO generally tries to obtain cooperation without resulting to formal warnings or discipline. ECF 339-3 (Ceja Dep. 113:13-17). Any use of segregation would have been rare and would have depended upon the particular circumstances of the refusal to clean, including other enumerated prohibited acts committed with the refusal to clean. ECF 306-12. Thus, no classwide assumption that segregation was the prevalent consequence can be made.

---

[10] Plaintiffs claim that whether a detainee was threatened with segregation goes to "damages" as opposed to the issue of causation. ECF 339 at 49("This incident is simply one where Valerga did not suffer damages; it does not suggest lack of causation (much less classwide causation"). This is incorrect. Whether a detainee labored because of the possible consequence of segregation or instead determined that the consequence was too remote goes directly to the issue of causation.

[11] To the extent Plaintiffs now challenge every sanction in the disciplinary severity scale, each possible sanction would need to be separately analyzed for a determination about whether that consequence was unlawful under the TVPA (or if, instead it was merely a legitimate consequence). Such varied inquiries are not well suited for a class action trial. *See Monreal v. Potter,* 367 F.3d 1224, 1237 (10th Cir. 2004) ("The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).")

Plaintiffs' Response makes clear that their theory does in fact rely upon individual interactions with GEO staff and their specific knowledge of what sanctions were utilized for a refusal to clean the assigned living area. ECF 339 15-17. Indeed, in their Response, Plaintiffs cite to their own testimony and that of GEO as evidence that *discipline* (not necessarily segregation) was likely if detainees did not clean. ECF 339 at 17-18. The testimony they cite does not demonstrate that the consequences uniformly involved segregation. *Id.* To the contrary, Plaintiffs admitted in their depositions and discovery responses that, at most, a warning of segregation was sporadic—not a routine threat. Plaintiffs have also conceded that the GEO Officers did not uniformly use segregation as a sanction for refusing to clean, but instead that when it was mentioned, it involved circumstances where multiple detainees were causing a disturbance. ECF 339-11 at 37 (Gallegos Dep 165:15-21;174:1-21).

GEO's 30(b)(6) witness testified that GEO generally tries to obtain cooperation without resulting to formal warnings or discipline. ECF 339-3 (Ceja Dep. 113:13-17). Likewise, GEO officers testified that the use of segregation (or warning of the same) was rare and would typically be reserved for a circumstance involving more than just a refusal to clean. *See e.g.*, ECF 306-12. Because the evidence does not reflect regular or routine warnings, Plaintiffs' testimony "could still be overwhelmed by an antecedent question, namely, whether any particular class member actually [was told they would be placed in segregation for not cleaning]—or in other words, whether a claimant actually falls within the class definition . . . . [O]n this record, individual issues would predominate in any Rule 23(b)(3) damages class, and certification is therefore inappropriate." *Lyall v. City of Denver*, 319 F.R.D. 558, 567 (D. Colo. 2017). Thus, because Plaintiffs' proposed evidence fails to establish a classwide presumption that segregation was prevalent. At best, it

establishes that some detainees were subject to more harsh sanctions than others. When application

of a policy or practice is not uniform across the proposed class, common questions do not

predominate. *See Wright v. Renzenberger, Inc.*, 656 F. App'x 835, 838 (9th Cir. 2016) (denying

certification where the employer's policies "do not uniformly deprive employees of rest breaks").

Accordingly, Plaintiffs' class should be decertified.

> **(i)     Detainee Testimony Does Not Establish a Classwide Inference of Causation.**

At class certification, Plaintiffs argued that detainees learned of the possible consequence

of segregation[12] based upon reading the detainee handbook and watching the orientation video,

not individual interactions with GEO Officers. ECF 49. Discovery did not bear this theory out.

**Exhibit Y** (Valerga Dep. 96:2-9) (Valerga did not read the detainee handbook) **Exhibit Z**

Vizguerra Dep. 37:11-19 (Vizguerra did not read the handbook); **Exhibit AA** (Xahuentitla Dep.

66: 18-20, 115:8-17) (Does not recall an orientation video); **Exhibit BB** (Gaytan Dep. 94) (does

not recall an orientation video); ECF 306-5 at 13 (Hernandez Dep. 58:12-24) (the detainee

handbook was not threatening). Instead, Plaintiffs seek to establish classwide causation through

testimony from named Plaintiffs describing their interactions with GEO Officers. See ECF 339 at

19-20, 52-53; *see also* ECF 336 at 28, 29 (Plaintiffs Response to Facts #40 & 41). However,

Plaintiffs' anecdotal accounts do not support an inference regular or routine threats of segregation.

To the contrary, Plaintiffs' own discovery responses demonstrate that, at most, the sanction of

---

[12] In their Complaint, Plaintiffs alleged that GEO violated the TVPA by "threatening to put those who refused to work for no pay in 'the hole' or solitary confinement[.]" ECF 1 at 2; *see also* ECF 1 at 6 ("forced Plaintiffs and other civil immigration detainees to clean the facility's pods for no pay and under threat of solitary confinement as punishment for any refusal to work.").

segregation was enforced on rare occasions, but do not establish that the sanction of segregation

was omnipresent or even common.

Detainees were assigned to clean up after meals every day three times per day. ECF 339-2

at 9-10 (Ceja 30(b)(6) Dep. 36:13-25-37:1-17). Yet, in the four months that Plaintiff Menocal was

detained in AIPC, he does not recall a single "direct threat[] from any GEO employee regarding

administrative or disciplinary segregation for failing to clean." ECF 306-7 at 5 (Menocal's

Responses to GEO's Second Set of Written Discovery). His only basis for believing detainees

could be sent to segregation for refusing to clean was a hearsay statement of another detainee or

officer. *Id.*; *see also* ECF 336-2 at 18 (Menocal Dep. 95-96). Indeed, the entirety of his perception

of the challenged policy was derived from word of mouth from other detainees. ECF 339-7 at 15

(Menocal Dep. 103:10-19); ECF 339-7 at 16 (Menocal Dep. 104:15-21).

In her five-month stay, Plaintiff Alexaklina[13] was never threated with segregation for

refusing to clean. ECF 306-7 at 101; ECF 306-7 at 101. In her over five months at the GEO facility,

spanning approximately 450 meals, Ms. Xahuentitla was never personally told that she could be

placed in segregation if she refused to clean. Instead, she observed an incident where another

---

[13] Plaintiffs spell Ms. Alexaklina's name as "Alexakhina" in their decertification briefing (but not their summary judgment briefing). GEO continues to refer to Ms. Alexaklina as she is listed in the caption of this case as Plaintiffs have never amended the caption or other pleadings in this case. Insofar as Ms. Alexaklina has submitted discovery responses in this action, GEO relies upon these responses as they were certified by counsel in this case. Upon review of the international rules related to discovery in Russia, it does not appear that there is any mechanism through which Ms. Alexaklina can participate in the instant lawsuit as Plaintiffs have pointed out that Russia has not agreed to cooperate in civil discovery matters abroad. ECF 339 at n.67. While Plaintiffs state that Ms. Alexaklina cannot be deposed in Russia, they do not provide the authority thorough which she is submitting updated discovery responses. Indeed, the links Plaintiffs cite provide no mechanism for conducting written discovery of civil litigants in Russia. GEO reiterates that it is Plaintiffs' obligation to make themselves available to participate in the instant litigation, not GEO's obligation. To the extent that Ms. Alexaklina's discovery responses cannot be verified (as with Ms. Argueta's) the allegations therein must be excluded at trial or otherwise.

detainee was told if she did not clean, segregation was a possible consequence. The detainee did not clean and was not disciplined. Ms. Xahuentitla also offered to clean for that detainee, but was not taken up on her offer. Thus, no "labor" was obtained, coerced or not. ECF 312 at 24. In the five months that Plaintiff Gaytan was at AIPC, there was only a single occasion when he was allegedly told he could be placed in segregation for refusing to clean. ECF 312 at 23; ECF 306-7 at 82. In addition, Plaintiff Valerga was detained in AIPC for almost an entire year, during which time he recalls only a single GEO Officer telling him that the refusal to clean could lead to segregation. ECF 306-7 at 139. Similarly, Mr. Hernandez recalls one occasion when Mr. Menocal, Mr. Brambila, Mr. Valerga and himself *all* refused to clean under the potential threat of segregation, seemingly aware that the consequence would not come to fruition. ECF 313-4 at 28 (Hernandez Dep. 80:13-24). Adding another unique circumstance, Mr. Vizguerra cannot testify that he cleaned out of fear, as he does not recall whether he was warned that segregation was a consequence for not cleaning before he cleaned, or after he cleaned. ECF 312 at 23. As he cannot remember the sequence, he certainly cannot say that he was *coerced* to clean. While he remembered someone going to segregation for refusing to clean, it was an isolated incident, and he cannot remember what officer acted or who the individual was that was placed in segregation. ECF 339-6 at 4-5 (Vizguerra 48-49). In each instance, the perception of possible segregation (or another consequence) was derived not from the written handbook, but from interactions with GEO officers or other detainees.

Concrete support for Plaintiffs allegations, even including anecdotal testimony, is few and far between. As a result, there is no basis to claim a *classwide* injury. This is not a matter of

damages, but rather a question of causation. In the absence of clear classwide evidence to support

Plaintiffs' theory, individualized issues will make a unified class action trial impractical.

And, despite Plaintiffs' Response incorrectly painting the picture of an escalating discipline

policy, starting with the TV being turned off and escalating to being placed in segregation, not one

detainee described such a policy. Instead, that new policy was derived exclusively from disjointed

testimony from Mr. Hernandez'. ECF 339 at 15 n.35. One individual's testimony is certainly not

sufficient to establish a classwide policy. Despite each detainee testifying that GEO Officers

sporadically warned that one consequence for refusing to clean was segregation, this is not enough

to establish a classwide policy. Detainees were exposed to many GEO Officers each week and the

sparse nature of the warnings makes clear that they were limited to rare situations and particular

officers. Plaintiff Menocal recalls at least 20 GEO Officers who worked in his housing unit while

he was detained. ECF 313-3 at 14. Plaintiff Hernandez testified that he interacted with a number

of GEO Officers during his stay, yet the only one to ever raise segregation was Officer Sanchez.

ECF 313-4 at 28 (Hernandez Dep. 80:1-5). Furthermore, Plaintiffs cannot provide any insight as

to what experiences were like outside of their dorms. Indeed, Plaintiffs Hernandez, Menocal,

Brambila, and Valerga all lived together and thus likely recount their personal versions of the same

events. ECF 313-4 at 28 (Hernandez Dep. 80:13-24). Even so, they identify only sporadic instances

where GEO officers raised the issue of possible segregation (a permissible sanction under the

PBNDS), not constant or regular warnings. Further, they cannot provide any insight into what

occurred in other dorms, with different officers, or different time periods.

In short, Plaintiffs' experiences, which point to isolated experiences during their stay, fail

to establish a classwide policy whereby every detainee was regularly warned that segregation was

a potential consequence for not participating in post-meal clean-up. While their own experiences could form the basis of individual claims that could be assessed on their own merit, they do not provide a basis for a classwide policy. Accordingly, Plaintiffs fail to present the "standardized course of conduct" necessary to try the case on a classwide basis. *Tech Instrumentation Inc. v. Eurton Elec. Co. Inc.*, No. 16-CV-2981-MSK-KMT, 2018 WL 3382914, at *2 (D. Colo. May 29, 2018) ("In doing so, Eurton is relying on a standardized course of conduct, which other courts have found is sufficient to establish commonality and typicality").

| (ii) | **GEO Officer Testimony Does Not Establish A Classwide Inference of Causation.** |

Plaintiffs also intend to introduce testimony from GEO officers to establish that detainees cleaned to avoid the sanction of segregation. ECF 339 at 16-18. Yet, like Plaintiffs' own testimony, the testimony from GEO's employees with knowledge of how the post-meal clean-up was *actually implemented* does not establish a classwide inference that detainees were subject to segregation if they did not participate.[14]

Martha Vasquez explained that in the nearly 20 years she has worked at AIPC, she has only ever seen one detainee who did not want to help clean up after meals (and never during the class period). ECF 339-10 at 14 (Vasquez Dep. 76:20-25). On that occasion, consistent with the PBNDS and the AIPC Handbook, Officer Vasquez resolved the issue informally: "I went and talked to him and asked him what was the reason and he said he wasn't feeling good. So pretty much I just

---

[14] Plaintiffs argue that GEO's Officer's "contradicted themselves" when asked about how the disciplinary policy was enforced, but provide no concrete citations to contradictions. Instead, it appears that Plaintiffs' theory is that the officer's testimony that the disciplinary policies were enforced contradicts statements that GEO Officers typically resolved incidents related to meal cleanup informally. This is not so. As the policy itself states, GEO Officers are encouraged to resolve incidents informally where possible. ECF 261-17 at 24 (explaining that "high moderate" charges, which are 300 level charges should be resolved informally "to the extent possible.").

skipped to the next person." ECF 339-10 at 15 (Vasquez Dep. 77:1-7). Officer Vasquez explained

that if a situation rose that could not be informally resolved, she would call her supervisor and let

the supervisor handle it. ECF 339-10 at 17 (Vasquez Dep. 81:3-13). From there, whether a detainee

is formally written-up for a rule violation depends upon the situation and the supervisor's direction.

ECF 339-10 at 21 (Vasquez Dep. 85:12-25).

Officer Gallegos explained that if a detainee was breaking the rules, such as stealing

another detainee's items, hitting another detainee, or bullying someone, he would first tell them to

stop what they were doing. ECF 339-11 at 9 (Gallegos Dep. 48:6-13). The same would happen for

any other offense. ECF 339-11 at 17 (Gallegos Dep. 121:14-25). If that was not effective, Mr.

Gallegos may have written-up the detainee for breaking the rules. ECF 339-11 at 9 (Gallegos Dep.

48:24-25). From there, a supervisor would review the write-up and speak with the detainee.

Whether the detainee ultimately was sanctioned would depend upon what a supervisor would want

to do, but typically a supervisor would simply talk to a detainee. In Officer Gallegos's experience,

a detainee could be written-up five or six times before the detainee was sanctioned. ECF 339-11

at 32 (Gallegos Dep. 160:1-6). Most commonly, detainees would be written up for insolence,

weapons, alcohol, destroying property, or fighting. ECF 339-11 at 19 (Gallegos Dep. 123:21-24);

ECF 313-10 at 13 (Gallegos Dep. 124:61-9). Mr. Gallegos testified that if someone refused to help

with the meal clean up in their living area, he would simply ask someone else. ECF 339-11 at 24,

34 (Gallegos Dep. 137:10-16; 162:14-25). It was not Officer Gallegos' practice to write up a

detainee who refused to clean. *Id.*; *see also* ECF 339-11 at 81 (Gallegos Dep. 214:2-3) ("Nobody

just got a write-up for not cleaning. You have to be elevated to something.").

Joyce Quezada explained that if detainees "didn't want to work, they didn't have to. If they wanted to help, they could. But they would all take turns." ECF 339-12 at 4 (Quezada Dep. 66:3-6). Officer Quezada did not require detainees selected for the meal clean-up to participate; if they did not want to do it, she would simply get someone else or do it herself. ECF 339-12 at 10 (Quezada Dep. 79:13-17). If "they tell me they don't want to clean, I don't force it on them and all." ECF 339-12 at 20 (Quezada dep. 89:17-18). This was consistent with her training as a detention officer. ECF 339-12 at 27 (Quezada Dep. 96:19-22). While Plaintiffs attempt to characterize her approach as inconsistent with the rules, it is not. Indeed, GEO officers have a variety of options under the ICE disciplinary scale for each different circumstance to ensure that order and safety is maintained, while also resolving issues informally wherever is feasible. ECF 261-17 at 24 (explaining that "high moderate" charges, which are 300 level charges should be resolved informally "to the extent possible."). If there were a situation where a detainee was "real dirty" and would not clean, Ms. Quezada would ask the supervisor to talk to the detainee. ECF 339-12 at 23 (Quezada Dep. 92:15-19). Such a situation would have been rare because Officer Quezada found most detainees wanted to keep their area clean and wanted a treat at the end of the week, which they would get for cleaning their dorm. ECF 339-12 at 24, 45 (Quezada Dep. 93:13-18; 145:5-20). As she explained "I think if you talk to them the right way and treat them good, they have respect for you, and you have respect for them. Pretty much, it's pretty good." ECF 339-12 at 32 (Quezada Dep. 101:11-14).

Plaintiffs argue that the testimony of GEO Officers should be presented to a jury for "credibility-based" findings. ECF 339 at 45. Plaintiffs state that this type of evidence "lends itself to a class proceeding." *Id.* This is inaccurate. The Officers' testimony indicates that each

circumstance would require a case-by-case analysis to determine whether a detainee would have been subject to segregation for non-compliance. Thus, if the factfinder found the GEO Officer's testimony to be credible, liability would turn on the specific circumstances in which each detainee did not want to clean. It would not establish a common or uniform policy. Even among Plaintiffs, their circumstances vary significantly. Thus, each instance would need to be assessed on its own merits. Indeed, absent uniform application of the policy, common questions do not predominate. *See Wright*, 656 F. App'x at 838. Moreover, as discussed *infra*, not every warning of segregation would be considered unlawful, even under Plaintiffs' own theory. Thus, Plaintiffs have failed to meet their burden to establish common evidence of causation.

> ### (iii)    Extraneous Evidence.

In addition to evidence from eyewitness detainees and officers, Plaintiffs also offer the following evidence that detainees were subject to segregation:

- Testimony from GEO's Assistant Facility Administrator that maintaining order is an important aspect of operating the detention facility, ECF 339 at 14, as well as testimony from GEO employees that Officers were expected to enforce the rules in the handbook. *See* ECF 336 at 28 (Plaintiffs Response to Fact #40).

- A training lesson on how to identify signs of sexual harassment or assault, entitled "Anatomy of a Con Game." ECF 339 at 14.

- Evidence from an individual GEO Officer's employee file of a rejection from a position as a dorm officer (which she later re-applied for an obtained), because her supervisor was worried about her ability to deal with detainees in more difficult situations. ECF 339 at 15.

- Incomplete disciplinary incident forms from detainees who have not been disclosed as trial witnesses or deposed in this case. *See* ECF 339 at n. 52l; *see also* ECF 336 at 28 (Plaintiffs Response to Fact #40 (citing ECF 262-12)).[15] The forms demonstrate that some detainees were written-up for refusing to clean in connection with other infractions, but do not provide any detail about whether the detainees were sanctioned beyond a write-up upon review by the UDC.

Initially, it is not clear that these pieces of evidence are relevant to Plaintiffs' claims. But even if they are, each involves individualized rebuttal evidence'. Indeed, GEO would rebut each of the points above through individualized evidence. For example, to rebut Plaintiffs' claim based upon the incident reports of absent class members,[16] GEO would present evidence of their entire disciplinary files to establish they were not sent to segregation on the occasions where they were written up. ECF 313-16 at 3 (Ceja Dep. ¶8). GEO would also present evidence that the incidents did not involve post-meal cleaning. For example, during Officer Gallegos' deposition, Plaintiffs introduced a disciplinary incident wherein a detainee was written up for the failure to follow orders of the facility and disorderly conduct. ECF 339-11 at 42 (Gallegos Dep. 173:10-13). The document

---

[15] Dawn Ceja's review of these incidents has indicated that the detainees were not placed in segregation for refusing to clean

[16] In their Response, despite citing evidence from absent class members, Plaintiffs claim that the testimony of named Plaintiffs will be sufficient to establish their claims. ECF 339 at 10 n.11. Perplexingly, despite arguing now that the named Plaintiffs can offer sufficient evidence in support of their claims, both in decertification and in their affirmative summary judgment brief, Plaintiffs rely upon incomplete disciplinary records related to detainees who have not been made available for deposition. Plaintiffs have not disclosed these individuals nor made them available for a deposition, as required by the parties' stipulation. ECF 228 (precluding witnesses from trial who are not presented for a deposition); *see also* ECF 144 at 13 ("[I]n accordance with Federal Rule of Civil Procedure 26 and the parties' stipulated and proposed scheduling order [ECF No. 139], should Plaintiffs intend to introduce any absent class member witnesses at trial, Plaintiffs will disclose such witnesses no later than sixty (60) days prior to trial, and if Defendant has not had the opportunity to depose such witnesses, will offer such witnesses for deposition prior to trial.").

explained that a detainee created a disruption in the dorm during a clean-up. *Id*. Officer Gallegos

explained that the detainee caused a disruption by waiving a broom or mop and yelling in the dorm.

(Gallegos Dep. 174:4-17). This instance had nothing to do with meal clean-up nor a consequence

for the same—and thus it was not relevant to the instant lawsuit. *Id.* (Gallegos Dep. 174-175).

GEO would have to introduce evidence of each detainee's full disciplinary file to demonstrate that

the detainees in those incident reports were not sent to segregation. For instance, to establish that

Ms. Quezada's denial of a position change was not related to meal clean-up or her demeanor

compared to other officers, GEO would present evidence of her individualized strengths and

weaknesses as an employee. To the extent Plaintiffs intend to pursue these theories at trial, their

evidence will be unwieldy on a classwide basis, as there is no common way to know what might

have happened on any occasion when a detainee refused to clean. There is no predictable inference

because the responses varied widely.

### B.     Plaintiffs Cannot Prove that the Disciplinary Polices Were Uniformly "Unlawful."

To establish that a case can be tried on a classwide basis, it is not enough to show a common

policy; it must be unlawful as applied in practice to each member of the class. *Davidson v. O'Reilly

Auto Enterprises, LLC*, 968 F.3d 955 (9th Cir. Aug. 3, 2020) ("[T]he mere existence of a facially

defective written policy – without any evidence that it was implemented in an unlawful manner –

does not constitute 'significant proof.'" (citation omitted). Where a plaintiff's evidence implicates

individual or localized instances of improper conduct or mistreatment, certification is improper.

*Willis v. City of Seattle*, 943 F.3d 882, 885 (9th Cir. 2019) ("Allegations of individual instances of

mistreatment . . . do not constitute a systemic deficiency or overarching policy of wrongdoing");

*Cf. Dominguez v. UPS Co.*, No. EDCV 18-1162 JGB (SPx), 2020 WL 4390376 (C.D. Cal. June

12, 2020) (denying class certification for claim that employer's policies resulted in a failure to schedule required breaks because individual questions of proof were necessary to determine how a particular supervisor applied the policy on a given day, whether the break was waived, and whether the employee was paid a premium). A "class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011).

Here, to establish the policy is <u>unlawful</u>, plaintiffs must present evidence that the ICE-mandated disciplinary severity scale, used in ICE facilities across the country, is not simply a warning of legitimate but adverse consequences, but instead an improper threat or coercive measure. *United States v. Toviave*, 761 F.3d 623, 626 (6th Cir. 2014). Plaintiffs concede they bear this burden. ECF 339 at 32. Thus, Plaintiffs must not only establish a uniform policy applied for the entirety of the class period, but also, that policy they challenge was uniformly "unlawful." Here, the possibility of segregation is not categorically unlawful; in most detention contexts it is instead a legitimate consequence. This is particularly true in this case because the consequence comes with robust due process protections. ECF 339-2 (79:19-25, 80:1-3). Indeed, the disciplinary policy that details the possibility of segregation aims "to protect the public, detainees, and staff and maintain order in the facility through the impartial application of a fully developed, well-understood set of rules and regulations and a hearing procedure that incorporates all applicable due process requirements." ECF 339-3 at 33-34 (Ceja Dep. 135:20-25, 136:1-5).

Under Plaintiffs' theory, whether the disciplinary sanctions were legitimate consequences turns on a reading of Section 5.8 of the Performance Based National Detention Standards ("PBNDS"). ECF 339 at 13; *see also* ECF 261-8 at 51 (Section 5.8 of the 2011 PBNDS).

Specifically, Plaintiffs argue that cleaning tasks can be mandated (and therefore be subject to disciplinary sanctions) if the cleaning involves: (1) making a bed; (2) stacking loose papers; (3) keeping the floor free of debris and dividers free of clutter; and (4) refraining from hanging clothing or blankets on furniture. ECF 339 at 13.[17] Under Plaintiffs' tortured theory, whether an officer can legitimately impose disciplinary sanctions turns not upon whether the sanction is segregation, but instead upon what type of cleaning a detainee was performing. Indeed, Plaintiffs concede that GEO can "require" (through disciplinary sanctions) a detainee to clean debris on the floor or make his or her bed. ECF 260 at 35.

GEO vigorously disputes that this theory is accurate and would argue that the post-meal clean-up policy and its associated consequences are legitimate. However, assuming *arguendo* Plaintiffs are correct, a determination of whether the consequence of segregation was unlawful would require consideration of individualized inquiries. As it applies to the decertification analysis, determining whether the use of segregation is "unlawful" will turn on what task a detainee was performing as part of the meal cleanup. The daily cleanup consisted of three tasks: wiping down tables, sweeping the floors, and mopping the floors. *Supra* n.7. Sweeping and mopping floors both arguably fall within the ambit of "keeping the floor free of debris." Thus, even if detainees were subject to disciplinary sanctions for declining to sweep or mop, under Plaintiffs' own interpretation of the PBNDS, such a policy would be legitimate and would not form the basis of a

---

[17] GEO disputes this reading of the PBNDS is reasonable or accurate. Rather, the section of the PBNDS that Plaintiffs' cite to nowhere states that it is providing an exhaustive list of tasks as opposed to representative examples. Indeed, ICE recently clarified through a 30(b)(6) declarant that PBNDS Section 5.8 V(C) was never intended by ICE to be an exhaustive list of scenarios in which a detainee may be expected to participate in cleaning his or her assigned living area without compensation. ECF 335-2 at ¶ 14. Rather, Section 5.8 serves to "emphasize that irrespective of whether a detainee chooses to join a work program, all detainees must participate in personal housekeeping and maintaining clean and orderly living areas." *Id.*

TVPA violation. On the other hand, insofar as the policy compelled detainees to wipe down the tables to avoid disciplinary segregation, the policy would be *unlawful*. Yet, the class definition does not draw any distinction between those who cleaned the floors and those who wiped the tables. Additionally, at *every single* meal, at least two of six detainees participated in the meal clean up not because of the threat of segregation but, instead, because they had volunteered to do so in exchange for the VWP stipend. ECF 339-11 at 21 (Gallegos Dep. 131:19-21); ECF 339-11 at 25 (Gallegos Dep. 138:19-24); ECF 339-13 at 8 (Pagan Dep. 108:6-12). Thus, in order to resolve whether each class member has a plausible claim under the TVPA, it would need to be possible, on a classwide basis, to separate those who could state a claim for relief from those who cannot. In other words, there would need to be a mechanism to identify only those detainees who were assigned the task of wiping down the tables *and* were not VWP participants.

In addition, Plaintiffs cannot establish that <u>all</u> possible sanctions under the disciplinary policy were unlawful. Plaintiffs allege that the meal clean-up policy is unlawful because 72 hours of segregation constitutes an unlawful means of coercion. While GEO disputes that 72 hours of segregation itself constitutes "serious harm" as defined by the TVPA, even assuming *arguendo* that it does, the fact that one of over *thirteen* possible sanctions could have been unlawful does not establish a classwide policy of unlawful conduct. Plaintiffs have not identified a meaningful way to separate out those individuals who were subject to legitimate consequences from those who faced allegedly unlawful consequences.

In a case where "any class member may be uninjured, . . . [t]he need to identify those individuals will predominate and render an adjudication unmanageable absent evidence . . . or some other mechanism that can manageably remove uninjured persons from the class in a manner

55167079;8

that protects the parties' rights." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018). This is the case here. There is no mechanism for manageably removing uninjured individuals from the class. Indeed, any detainee could be uninjured, either because they were not warned of the possible sanction of segregation or because the cleaning tasks that they performed were expressly permitted under Plaintiffs' interpretation of PBNDS 5.8. Because Plaintiffs cannot establish a uniformly <u>unlawful</u> policy, class certification is no longer appropriate.

### C.    Plaintiffs Cannot Establish A Common Response To Segregation.

"Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy. Having to engage in separate threshold inquiries for each class member prior to reaching the common issues does not promote such economy.... [It] will create judicial *dis* economy." *Cortez v. Nebraska Beef, Inc.*, 266 F.R.D. 275, 293 (D. Neb. 2010) (quoting *Valentino v. Carter–Wallace, Inc*., 97 F.3d 1227, 1234 (9th Cir.1996) (emphasis in original).

Plaintiffs argue that it is possible for a jury to conclude that every single instance where a detainee is warned of the possible consequence of 72 hours of segregation would lead a reasonable person to believe the detainee was the victim of psychological coercion in violation of the TVPA. ECF 339 at 52. Yet, Plaintiffs do not present any evidence that would allow a jury to determine that detainees reacted uniformly to segregation, nor that they had a uniform concept of segregation. ECF 339 at 24. Instead, they rely upon expert testimony and the knowledge of GEO's employees about the conditions of segregation. *Id*. Plaintiffs provide no evidence that these impressions of segregation were held by detainees. *Id.* Thus, detainees' perception of the consequence of 72 hours in segregation cannot be resolved without individualized testimony.

55167079;8

Plaintiffs had different perceptions of segregation. Plaintiff Xahuentitla, for example, did not know what disciplinary or administrative segregation were. ECF 339-14 at 4 (Xahuentitla Dep. 71:5-14). Likewise, she did not know any detainees who had been placed in segregation and therefore did not even have second-hand knowledge of segregation. ECF 339-14 at 5-6 (Xahuentitla Dep. 72-73). She cannot say what segregation looked like. ECF 339-14 at 6, 8 (Xahuentitla Dep. 73:3-6; 75:4-6). Thus, her perception of the possibility of segregation was not based upon the actual conditions of confinement in AIPC segregated housing unit, but instead her own personal (and speculative) perception. The jury would need to determine if her *perception* of the possible consequence of segregation (considering the totality of *her* circumstances) would cause a reasonable person to make a choice between laboring or psychological harm. In contrast, Plaintiff Valerga had been sent to segregation for fighting and no less than three days later was unphased by a warning that he would be placed segregation. ECF 313-5 (Valerga Dep. 11-12). Plaintiff Hernandez was not aware of what segregation was like. ECF 339-9 at 31 (Hernandez. Dep. 166:16-18). To the extent he gained any knowledge of segregation, his perception of segregation was not based upon any common question, but instead a description from a single GEO Officer. ECF 313-4 (Hernandez Dep. 117:1-22). Plaintiffs have offered no common evidence that detainees had a similar concept of segregation. Nor have they presented evidence that, on a classwide basis, a jury could determine a reasonable person would believe that the potential of 72 hours of segregation (with the opportunity to appeal) constituted unlawful psychological coercion. Indeed, even based just upon the named plaintiffs' experiences, it is clear that a jury cannot determine that a reasonable person in detention would clean tables to avoid segregation.

55167079;8

In an effort to try to establish a uniform response to the warning of 72 hours of segregation, Plaintiffs reference two sets of facts: (i) that their conditions of confinement were similar, and (ii) excerpts from Dr. Grassian. But this evidence does not eliminate the need for individualized evidence, nor does it resolve the issues before this Court. The fact that detainees were given uniforms for detention, had limits on what items they could maintain in their living units, and had limits on visitation does not resolve whether those detainees had a uniform perception of segregation, or if detainees would have uniformly reacted to the possibility of 72 hours in segregation. Plaintiffs Valerga and Hernandez both refused to clean despite the possible consequence of segregation. In contrast, other detainees claim to have cleaned because of their concerns of segregation. From this sample alone, it is clear that there are other unique circumstances at issue that determine the impact of the possibility of segregation. These additional circumstances cannot be proven through classwide evidence of the conditions of confinement or the general feelings of immigrants detained in custody, because even when controlling for those variables, detainees reacted differently.

Plaintiffs' list of purported common attributes of detainees also does not provide a basis for classwide resolution, but rather raises further areas for individualized dispute. Plaintiffs argue that all class members had "been taken from their homes and families." ECF 339 at 56. Yet, this is not even accurate for all of the named Plaintiffs, let alone the entirety of the class. Plaintiff Xahuentitla was not "taken from" her home and family, but rather was detained after the attempted murder of her children.[18] She was transferred from the jail, an arguably more restrictive

---

[18] *See* Shane Benjamin, Woman to face attempted murder charges, Durango Herald, https://durangoherald.com/articles/59930 (last visited November 15, 2020).

environment, to AIPC. Likewise, Plaintiff Hernandez's stay in AIPC followed stays at a number of other jails and detention centers. ECF 351-1 at 11 (Hernandez Dep. 15:22-25). Indeed, a large portion of detainees at AIPC are transferred directly from local jails and prisons. Plaintiffs also claim that they will prove that all detainees were subject to deportation. ECF 339 at 56. But Plaintiffs have declined to provide information related to their immigration status throughout the case. ECF 351-2 (Plaintiffs' Responses to GEO's First Discovery Requests, Interrogatory 1(c)) (Objecting to providing citizenship, immigration, and residency status as irrelevant). As such, there is no way to establish that all detainees (or even just the named plaintiffs) were subject to the threat of deportation. It is GEO's understanding that the immigration status of detainees in AIPC varies vastly among the population. To the extent that Plaintiffs were previously confined in more restrictive settings or under more harsh conditions of confinement, those individual experiences would cut against Plaintiffs' proposed inference that detainees were vulnerable because of the circumstances of how they came to be at AIPC. Thus, Plaintiffs fail to establish that detainees' attendant circumstances can be resolved on a classwide basis.

Plaintiffs similarly cannot rely upon expert testimony to resolve this issue on behalf of the class. Dr. Grassian, like most of the named Plaintiffs, has never been to AIPC's segregated housing unit. ECF 303-1 (Grassian Tr. at 297:3-298:24). And, he cannot say on a classwide basis whether or how detainees would have reacted to segregation (or the idea of the same). Rather, Dr. Grassian concedes that whether a detainee would feel psychological coercion from a warning of segregation varies based upon the individual. 313-21 at 113 (Grassian Dep. 138-139). Indeed, Dr. Grassian cannot "answer generically" how someone would assess the psychological impact on an individual. ECF 313-12 at 9-10 (Grassian Dep 75-76). Further, Dr. Grassian makes clear that the

effect that segregation may have upon an individual depends upon specific circumstances in segregation. ECF 313-21 at 113 (Grassian Dep. 138-139). And he cannot "make predictions based on the conditions of confinement." *Id.*at 15 (Grassian Dep 205:21-22). To that end, each analysis is individualized.

Plaintiffs' reliance upon Dr. Kropf's statement that there is no evidence that 72 hours of segregation can cause serious psychological harm does not bear at all on *Plaintiffs'* burden to demonstrate the opposite. Indeed, Plaintiffs bear the burden to show that regardless of individualized circumstances, it would be reasonable for a detainee to feel psychological coercion based upon the mere possibility of 72-hours of segregation. It is uncontested that Dr. Grassian cannot so testify. ECF 336 at 26 (Undisputed Fact 37). Without classwide evidence that individuals would likely feel psychological coercion based upon the thought of segregation, Plaintiffs must resort introducing individualized responses and reactions to the possible questions of certification.

Even so, Plaintiffs excerpt only a portion of Dr. Kropf's report and give no credence to the remainder. Indeed, Dr. Kropf's report explains that, to the extent segregation could cause a negative psychological impact, the extent of any impact depends upon the particular circumstances, including whether the detainee is mentally ill or if the detainee was aware of the consequences. ECF 339-20 at 6-8. Were detainees to introduce evidence at trial that they felt psychological coercion to clean, based upon a fear of segregation, GEO would be entitled to challenge those opinions based upon its expert's position that any psychological coercion would stem not from 72 hours of segregation, but instead unique circumstances, such as a preexisting mental illness.

Even in the context of prisons, one cannot simply say all prisoners will react uniformly to segregation. For example, in some jails, people prefer to have an opportunity to have privacy to reduce the stress of living with a group of strangers.[19] But it is certainly not clear all prisoners feel this way. There, like here, the only way to determine whether a specific person or detainee felt compelled to clean to avoid segregation requires an individualized inquiry.

There can be no question that a "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Tuft v. McDonnell Douglas Corp.,* 581 F.2d 1304, 1308 (8th Cir. 1978). As none of the Plaintiffs in this action ever went to segregation for refusing to clean, the "common injury" that they share with other class members is the possibility of segregation as a sanction. ECF 336 at 20 (GEO's Undisputed Fact #28). Here, there is no classwide method for determining how detainees reacted to the disciplinary severity scale, in particular the possibility of segregation. Each detainee could have reacted differently based upon their own perceptions of the sanction or their prior history. Some detainees would not have felt coerced into cleaning. Others may very well have felt coerced, not because of the possibility of segregation, but because of the fact that they were in detention and facing immigration consequences. Others may have truly feared segregation. While many of these

---

[19] *See* ECF 336-6 (logs of individuals who requested to be in segregation; *see also* Corey Devon Arthur, I Hate My Prison Dorm So Much, I Enjoyed COVID-19 Quarantine in the Box, The Marshall Project, *available at* https://www.themarshallproject.org/2020/09/24/i-hate-my-prison-dorm-so-much-i-enjoyed-covid-19-quarantine-in-the-box (last visited November 12, 2020) ("Now I live in an open dormitory with 30 other men. Only 4-foot shelving units separate us from one other. The showers, toilets, recreational day rooms and cooking facilities are wide open, as opposed to being regulated by guards. Sharing space typically means cleaning up after other people . . . My personal security has also been compromised. How am I supposed to sleep with killers, robbers, rapists and drug addicts having free access to me? I have to be fully clothed at all times. What little privacy the cell afforded me has been obliterated.").

reactions could be considered "reasonable" by a jury, each must be resolved on their own merit and cannot be resolved on a classwide basis.

### D.    Plaintiffs Have Not Established Classwide Evidence of Scienter.

In addition to demonstrating classwide causation evidence, Plaintiffs must identify circumstantial evidence that would establish that GEO acted *knowingly* on a classwide basis, as opposed to simply establishing a series of individualized acts of GEO's employees. In so doing, Plaintiffs identify evidence that GEO "intended to cause the victim to believe that she would suffer serious harm—from the vantage point of the victim—if she did not continue to work." *Muchira*, 850 F.3d at 618. Plaintiffs must point to evidence that would demonstrate that, in incorporating the disciplinary severity scale into the AIPC Handbook, GEO did not intend to follow ICE's direction to create order and security in the facility, but rather intended all along to use the disciplinary severity scale, which it did not write, to obtain the labor of the detainees. *See e.g. Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 991 (D. Idaho 2019) ("Specifically, Plaintiffs allege that even though Funk Dairy recruited them as professionals it knew, and intended all along, to simply use them as menial laborers.").

Plaintiffs rely wholesale on the disciplinary severity scale as evidence of knowledge. ECF 339 at 57. Plaintiffs argue that the existence of the policy alone, is sufficient to constitute scienter This is inaccurate. The disciplinary policy which Plaintiffs challenge was drafted by ICE and a number of stakeholders, including those from immigrants' rights organizations. ECF 261-8 at 3. It was not drafted by GEO. Thus, the mere fact that a government-mandated disciplinary scale exists does not create a classwide inference. Further, the implementation of the disciplinary severity scale was not sufficiently uniform so as to give rise to an inference that segregation was routinely used.

55167079;8

Rather, each situation with each individual Officer varied based upon the Officer's assessment of the specific refusal to clean.

In order to demonstrate scienter, Plaintiffs must show that GEO was aware that the policy would coerce labor from detainees. Plaintiffs do not point to any evidence of this claim, instead relying on threadbare allegations that GEO generally knew its practices were unlawful. Indeed, despite the fact that detainees were free to raise concerns or grievances at any time, Plaintiffs do not point to any grievance putting GEO on notice of the effect of the ICE disciplinary severity scale. Nor do they point to any audit or communication from ICE, the entity tasked with enforcing violations of the TVPA, that GEO's policies required cleaning beyond what was merited by the PBNDS. The same disciplinary severity scale is used at ICE detention facilities across the country, subject to the same audits. This cuts against a finding that GEO acted with knowledge. Plaintiffs do not point to any evidence that would lead a reasonable person to believe the policy was unduly coercive. Thus, Plaintiffs have failed to meet their burden as to the scienter element.

### E.     Plaintiffs Have Not Established That their Experience Can Be Extrapolated to The Class.

In their Response, Plaintiffs argue that there is no authority for the proposition that evidence introduced by class members must be sufficiently validated in order to be extrapolated to a class. This is not so. For example, in *Reynoso v. All Power Mfg. Co.*, No. SACV161037JVSJCGX, 2018 WL 5906645, at *1 (C.D. Cal. Apr. 30, 2018), the court granted a motion for reconsideration of the order denying the defendant's motion for decertification of a class comprised of all hourly, non-exempt employees of the defendant's Santa Ana facility. The court concluded that the testimony of class members that the plaintiff "seeks to present at trial is insufficient to establish liability to the Class as a whole without some basis to extrapolate, through

an expert witness or otherwise." *Id.*; *see also Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050 SC, 2011 WL 2682967, at *9 (N.D. Cal. July 8, 2011); *C.f. Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 944 (9th Cir. 2011) (decertifying a class where the only data presented was from a survey of employees and Plaintiffs could not establish the survey was based upon a reliable methodology).

Similarly, in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 343 (2011), the Supreme Court reviewed the certification of a class consisting of all women employed by Walmart since 1998 who were subject to Walmart's pay and promotion practices. Attempting to establish commonality under Rule 23(a), the plaintiff relied, in part, on "anecdotal reports of discrimination from about 120 of Walmart's female employees." *Id.* In reviewing the reports, the court concluded that the anecdotal evidence was "too weak to raise any inference that all the individual, discretionary personnel decisions are discriminatory." *Id.* at 358. The court found that in a purported class size of 1.5 million employees, each of the 120 anecdotal reports would effectively represent 12,500 class members, relating only to 235 of Walmart's 3,400 stores, concentrated primarily in only 6 states. *Id.* The court concluded that "[e]ven if every single one of these accounts is true, that would not demonstrate that the entire company 'operates under a general policy of discrimination,' [citation omitted] which is what respondents must show to certify a companywide class." *Id.* (citing *General Telephone Co of Southwest v. Falcon*, 457 US 147, 159 (1982)). Indeed, under *Dukes*, the sample presented here cannot be extrapolated to the class as Plaintiffs intend to introduce testimony from (generously) 10 of the proposed 40,000 class members, meaning each of the 10 anecdotes would represent 4,000 class members. Of those accounts, the testimony of the detainees will not represent even half of the dorms in the facility. And, every single account will come from an individual identified by Plaintiffs during the same time Plaintiffs were detained at

AIPC. GEO was not permitted to conduct discovery into any detainees who did not directly interact with the named Plaintiffs in this case. Thus, even if each account is true, it is not sufficient to establish a general policy that detainees would be subject to segregation for refusing to clean. Indeed, as explained in GEO's opening brief, Plaintiffs' experiences cannot be extrapolated to a larger class, as explained in more detail by Dr. Hayter. ECF 312 at 34.

Further, none of the named Plaintiffs were detained in the original GEO detention facility which was used for the first six years of the class period (2004-2010). Rather, the Plaintiffs' experiences represent a narrow segment of time in the class period after the new building opened in 2010. Further, four of the named Plaintiffs' experiences were in the same dorm (of a total of 13), at the same time. ECF 339-9 at 17 (Hernandez Dep. 80). These limited experiences within a single housing unit in 2014 are not representative of the experiences of all other detainees.

### F.     GEO's Defenses Require Individualized Trial Evidence.

Regardless of the class status of this case, GEO retains its due process right to "contest every element of liability and present every colorable defense." *In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619, 625 (D.C. Cir. 2019). Consistent with this principle, defendants must be provided with a "meaningful opportunity to contest whether an individual would have, in fact," been injured by the allegedly wrongful conduct. *In re Asacol Antitrust Litig.*, 907 F.3d 42, 54 (1st Cir. 2018). Because neither Plaintiffs nor their experts can identify a method for reliably recognizing the uninjured members of the class, GEO is entitled to challenge whether each member of the class did, in fact, suffer an injury—an essential element of liability in Plaintiffs' case. These inquiries, however, would "predominate and render an adjudication unmanageable." *Id.*

Indeed, Plaintiffs intend to introduce the individualized experiences of Plaintiffs to try to establish whether it was "reasonable" to conclude that detainees would have cleaned to avoid segregation. And, for each individual incident about which Plaintiffs seek to testify, GEO intends to introduce individualized rebuttal evidence. Each Plaintiff's circumstance differed significantly including, among others, (1) the language the plaintiff speaks; (2) how long he or she was detained; (3) if the detainee had previously come from another confined setting such as jail; (4) if the detainee had any personal knowledge of segregation; (5) if the detainee cleaned before learning of the possible sanctions. How a Plaintiff answers each of these questions could change whether it was reasonable for the detainee to labor under a fear of segregation. Where an individualized determination of reasonableness is central to a class's claims, it is not well suited for classwide evidence. *Trevizo v. Adams*, 455 F.3d 1155, 1163 (10th Cir. 2006) ("The jury's determination of reasonableness [which is central to these plaintiffs' claims] will rely on numerous factors which differ significantly as to many plaintiffs such as (1) how long the plaintiffs were detained; (2) where the plaintiffs were detained; (3) whether the plaintiff is an owner, employer, customer, or bystander, and (4) the degree of force used with each plaintiff, among many others. It seems clear to the court that the jury may award damages to some of the plaintiffs but find that others are not entitled to damages.").

In their Response, Plaintiffs presuppose common experiences in all pods across 10 years and two different facility layouts—they do not identify any evidence that would create an inference of causation. This is not sufficient to establish classwide treatment. Plaintiffs do not provide evidence of how long most detainees were in detention, or explain what amount of time can be inferred. Plaintiffs do not provide evidence that the GEO Officers implemented the disciplinary

severity scale similarly. They do not provide evidence that all Officers operated under a uniform plan or scheme. Plaintiffs do not provide evidence that most detainees had similar backgrounds or education. Plaintiffs also do not provide evidence that detainees were more likely to help clean because they were fearful of segregation as opposed to because they were bored or preferred a clean living area. While Plaintiffs take this to an extreme, arguing that this standard seeks an individualized inquiry into each detainee's circumstance—it does not. Rather, it requires just some sort of commonality, which is noticeably absent here.

As GEO explained in its opening motion, one such individualized defense will be that Plaintiffs cleaned for reasons other than coercion. For example, Plaintiff Xahuentitla asked to perform janitorial work, and in her request noted, "I also like to keep everything clean". ECF 306-2 at 20. She explained that she sought a position with a VWP stipend and admitted that she had been *voluntarily* cleaning her dorm for two weeks. Plaintiff Xahuentitla's experience was not unique, as Officer Gallegos explained, "[d]etainees help the trustees all the time because they want to…they're bored. They want to help them. They're their friends. They want—they want to do something." ECF 339-11 at 63 (Gallegos Dep. 194:4-10). Indeed, to the extent Plaintiffs motivations to clean were different than those of other class members, GEO is entitled to present this individualized defense to defeat an inference of coercion.

## V.    CONCLUSION

At class certification, Plaintiffs presented the Court with claims based upon a single written policy in order to obtain class certification. Following discovery, it is clear that Plaintiffs' claims diverge significantly from any written policy or classwide practice. Instead, Plaintiffs' claims are based upon detainee's individual experiences. As no written policy underlies Plaintiffs'

allegations, there is no longer "glue" to hold the class together. Accordingly, the class should be decertified.

Respectfully submitted, this the 18th day of November, 2020.

**AKERMAN LLP**

_s/ Adrienne Scheffey_
Colin L. Barnacle
Adrienne Scheffey
Christopher J. Eby
Melissa L. Cizmorris
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  (303) 260-7712
Facsimile:   (303) 260-7714
Email: colin.barnacle@akerman.com
Email: adrienne.scheffey@akerman.com
Email: christopher.eby@akerman.com
Email: melissa.cizmorris@akerman.com

**BURNS, FIGA & WILL, P.C.**
Dana L. Eismeier
Michael Y. Ley
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, CO 80111
Telephone:  (303) 796-2626
Facsimile:   (303) 796-2777
Email: deismeier@bfwlaw.com
Email: mley@bfwlaw.com

_Attorneys for Defendant The GEO Group, Inc._

## CERTIFICATE OF SERVICE

I hereby certify on this 18th day of November, 2020, a true and correct copy of the foregoing **DEFENDANT THE GEO GROUP, INC.'S REPLY IN SUPPORT OF MOTION FOR DECERTIFICATION OF CLASS** was filed and served electronically via the Court's CM/ECF system on the following:

### Counsel for Plaintiffs:

Alexander N. Hood
David H. Seligman
Juno E. Turner
Andrew Schmidt
TOWARDS JUSTICE
PO Box 371680
PMB 44465
Denver, CO 80237-5680
alex@towardsjustice.org
david@towardsjustice.org
juno@towardsjustice.org
andy@towardsjustice.org

Andrew H. Turner
Matthew Fritz-Mauer
KELMAN BUESCHER FIRM
600 Grant St., Ste. 825
Denver, CO 80203
aturner@laborlawdenver.com
mfritzmauer@laborlawdenver.com

Hans C. Meyer
MEYER LAW OFFICE, P.C.
P.O. Box 40394
Denver, CO 80204
hans@themeyerlawoffice.com

P. David Lopez
OUTTEN & GOLDEN, LLP
601 Massachusetts Ave. NW
2nd Floor West Suite
Washington, DC 20001
pdl@outtengolden.com

Adam L. Koshkin
Rachel W. Dempsey
OUTTEN & GOLDEN, LLP
One California St., 12th Fl.
San Francisco, CA 94111
akoshkin@outtengolden.com
rdempsey@outtengolden.com

Michael J. Scimone
Ossai Miazad
OUTTEN & GOLDEN, LLP
685 Third St., 25th Fl.
New York, NY 10017
mscimone@outtengolden.com
om@outtengolden.com

R. Andrew Free
LAW OFFICE OF R. ANDREW FREE
P.O. Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com

Brandt P. Milstein
MILSTEIN LAW OFFICE
1123 Spruce St.
Boulder, CO 80302
brandt@milsteinlawoffice.com

_s/ Nick Mangels_
Nick Mangels

55167079;8

**LIST OF EXHIBITS TO GEO'S REPLY IN SUPPORT OF MOTION FOR
<u>DECERTIFICATION OF CLASS</u>**

**ECF No. 353**: Declaration of Adrienne Scheffey dated November 18, 2020

**Ex. Y**: Att. 1 to Scheffey Declaration – Excerpts of Deposition of Demetrio Valerga dated October 27, 2017

**Ex. Z**: Att. 2 to Scheffey Declaration – Excerpts of Deposition of Dagoberto Vizguerra dated February 21, 2018

**Ex. AA**: Att. 3 to Scheffey Declaration – Excerpts of Deposition of Grisel Xahuentitla dated October 26, 2017

**Ex. BB**: Att. 4 to Scheffey Declaration – Excerpts of Deposition of Jesus Gaytan dated November 16, 2017

55167079;8