# Exhibit A



1        UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF WASHINGTON AT TACOMA

3    _____

4                                    )
     UGOCHUKWO GOODLUCK NWAUZOR,      )
5    et al.,                         )
                                     )
6                  Plaintiffs,       ) 3:17-cv-05769-RJB
                                     ) 3:17-cv-05806-RJB
7    v.                              )
                                     ) Tacoma, Washington
8    THE GEO GROUP, INC.,            )
                                     ) June 14, 2021
9                  Defendant.        )
     _____    ) Jury Trial
10                                   )
     STATE OF WASHINGTON,            ) 9:00 a.m.
11                                   )
                   Plaintiff,        )
12                                   )
     v.                              )
13                                   )
     THE GEO GROUP, INC.,            )
14                                   )
                   Defendant.        )
15                                   )
     _____
16
                VERBATIM REPORT OF PROCEEDINGS
17         BEFORE THE HONORABLE ROBERT J. BRYAN
                UNITED STATES DISTRICT JUDGE
18   _____

19

20

21

22

23

24
          Proceedings stenographically reported and transcribed
25                With computer-aided technology

```
 1                         APPEARANCES

 2

 3    For the Plaintiff        JAMAL N. WHITEHEAD
      Nwauzor, et al.:         ADAM J. BERGER
 4                             Schroeter Goldmark & Bender
                               810 Third Avenue
 5                             Suite 500
                               Seattle, Washington
 6

 7
      For the Plaintiff        ANDREA BRENNEKE
 8    State of Washington:     LANE POLOZOLA
                               MARSHA J. CHIEN
 9                             800 Fifth Avenue
                               Suite 2000
10                             Seattle, Washington

11

12    For the Defendant        LAWRENCE D. SILVERMAN
      The GEO Group:           ADRIENNE SCHEFFEY
13                             Akerman LLP
                               1900 Sixteenth Street
14                             Suite 1700
                               Denver, Colorado
15
                               JOAN K. MELL
16                             III Branches Law PLLC
                               1019 Regents Boulevard
17                             Suite 204
                               Fircrest, Washington
18

19

20

21

22

23

24

25
```

1                          EXAMINATION INDEX

2     EXAMINATION OF:                                      PAGE

3      DANIEL RAGSDALE      DIRECT EXAMINATION
                           BY MS. SCHEFFEY                 10
4                          CROSS-EXAMINATION
                           BY MR. POLOZOLA                 18
5                          CROSS-EXAMINATION
                           BY MR. WHITEHEAD                37
6                          REDIRECT EXAMINATION
                           BY MS. SCHEFFEY                 39
7                          RECROSS-EXAMINATION
                           BY MR. WHITEHEAD                41
8      BRUCE SCOTT         DIRECT EXAMINATION
9                          BY MS. SCHEFFEY                 43
                           CROSS-EXAMINATION
10                         BY MR. WHITEHEAD                49

11

12

13                          EXHIBIT INDEX

14
      EXHIBITS ADMITTED                                    PAGE
15
       A-321                                               42
16

17

18

19

20

21

22

23

24

25

```
 1                              MORNING SESSION

 2                              JUNE 14, 2021

 3      (The following occurred outside the presence of the jury.)

 4           THE COURT:  I just wanted to ask you all about time

 5    here.  What are we looking at in terms of time to complete

 6    the defendant's case and any rebuttal?  I have to get

 7    cracking on jury instructions.

 8           MS. MELL:  Your Honor, we were actually going to

 9    touch base with you this morning on that.  I had an

10    opportunity to talk with Mr. Whitehead, and I think he spoke

11    with the other plaintiffs' counsel.  We are anticipating this

12    morning may go fairly quickly.  We have a few little issues

13    we need to bring up with regard to recalling Mr. Grice to get

14    in the current ESA policy.  Otherwise, this morning we are

15    looking at completing Mr. Ragsdale in not too much time,

16    recalling Mr. Grice just for a second to get in the ESA, then

17    we have two other agency people we may or may not call, and

18    then finally Mr. Scott will be on very briefly for probably

19    less than a half an hour.  We anticipate probably completing

20    our case, and we understand the opposite side has no rebuttal

21    witnesses, unless something comes up this morning they want

22    to do, and then we have both sides have to do the 50 motions

23    and then we need instructions, and then we were going to

24    recommend that we be able to close in the morning.

25           THE COURT:  You anticipate no rebuttal?
```

1    MS. MELL:  That is what we heard from yesterday.

2    MR. WHITEHEAD:  Your Honor, at this time I am not

3    anticipating a rebuttal case.  We need to see how this

4    morning plays out.  Based on what we have heard so far, I

5    don't anticipate one, Your Honor.  I will let Ms. Chien speak

6    for the State.

7    MS. CHIEN:  That's the same with the State,

8    Your Honor.

9    THE COURT:  Well, if I knew it was going to go that

10   fast, I would have worked yesterday on jury instructions.

11   Let's see where we get, and I will have to take some time to

12   work on instructions.  Okay.  I think the jury is all here.

13   Is Mr. Ragsdale here?

14   MS. CHIEN:  I think it might be prudent to discuss

15   Mr. Grice.  We don't believe he should be recalled.  He was

16   excused by the Court when he testified on Friday.  He is

17   honestly on parental leave, and we don't have an easy way of

18   contacting him.

19   MS. MELL:  It is highly prejudicial for the State to

20   take the position we can't recall Mr. Grice or,

21   alternatively, get a stipulation or agreement or available

22   witness to authenticate the current version of the ESA that

23   was admitted into evidence.

24   The State is deliberately prejudicing us on this question

25   because the ESA was modified, to which they did not disclose

1   to us which I learned when Mr. Grice was testifying to

2   include the cross references to detention centers so that it

3   broadly mirrors the actual exemption for private

4   corporations.

5       The ESA that is in front of the jury right now is limited

6   to correctional facilities.  The testimony from Mr. Grice is

7   they amended it to be more consistent with the statutory

8   exception to (k) for private corporations, and they were

9   incorporated even detention centers, that whole litany of

10  different kinds of detention or the exception to (k).  We

11  just need the current one into the record.

12          MS. CHIEN:  From the State's perspective, we don't

13  believe the ESA1 is admissible.  It does not have the force

14  of law.  In addition, to the idea that this prejudice -- the

15  State is prejudicing GEO, that's not true.  GEO had an

16  opportunity to ask Mr. Grice about all of these, about any

17  current ESAs on Friday.  They didn't, and he was excused.  We

18  don't believe his parental leave should be disturbed again to

19  come back and testify because GEO wasn't prepared for his

20  testimony.

21          MS. MELL:  That's wholly inaccurate.  I did ask him

22  on the stand.  He did say it had changed, which is the first

23  notice we received from the State even though the State has

24  an obligation -- continuing obligation to update us on that

25  kind of discovery.  It did not.  I asked him about it.  He

 1   said it didn't change.  I didn't have the ability in this

 2   venue to get an updated exhibit out while he was on the

 3   stand.

 4          MS. CHIEN:  It is a public policy.

 5          THE COURT:  Where is your proposed exhibit?

 6          MS. MELL:  I will upload it to you right now.  It is

 7   in the Box.  A-321.  The comparator exhibit is 308.  The

 8   language is highly critical to GEO's arguments in this case.

 9      It is an administrative policy that is published on the

10   L&I's website and to which Mr. Grice testified.  We could

11   just get it admitted as the policy that he testified to.

12          THE COURT:  I am trying to see it.

13          THE CLERK:  A-321.

14          MS. CHIEN:  Could you email it to us because I don't

15   think we have gotten a copy of it?

16          MS. MELL:  It is right on Labor & Industries' website

17   administrative for the the Minimum Wage Act applicability.  I

18   can read into the record the language change in the sentence

19   at issue if that is helpful.

20          THE COURT:  It would not be helpful.  I need to read

21   it.  I would like to get it here.  Rachel went to the printer

22   to see if it is on there.

23          MS. MELL:  Subsection (k), page 6 of 9 in the updated

24   policy.  The sentence has been expanded to include residents,

25   inmates or patients of state, county, municipal correctional,

1    detention, treatment or rehabilitative institutions.  Whereas

2    the exhibit --

3          THE COURT:  Just a minute.  Just a minute.  What is

4    the exhibit that is admitted, the number?

5          MS. MELL:  A-308.  The language on A-308 is on page 5

6    of 6, sub (k), last sentence.

7          THE COURT:  Why is that not just admissible by

8    stipulation?

9          MS. CHIEN:  We don't actually -- we don't -- we

10   didn't stipulate to the admission of A-308.  We don't believe

11   administrative policies should be provided to the jury in the

12   first place, so that's why we can't stipulate to the

13   admissibility of A-321 either.

14         THE COURT:  Is there any question about the -- about

15   this being the accurate policy that was revised in 2020?

16         MS. CHIEN:  I don't believe there is any question of

17   accuracy.  However, we have a concern about introducing an

18   exhibit for which there is no explanation that this exhibit

19   is actually the same as A-308.  It doesn't actually change

20   anything in terms of its applicability to private facilities

21   in the sense the Minimum Wage Act still applies to private

22   facilities regardless under A-308 and A-321.

23         MS. MELL:  Mr. Grice clarified the enforcement's

24   position of the agency did not change with any of the

25   changes.  He testified to that.

1     MS. CHIEN:  Which then would bring us to an

2 additional objection that this isn't necessary.

3     MS. MELL:  It is necessary because the language is

4 distinctly different, and they were going to argue it was

5 only applicable to correctional facilities which are

6 distinct.  The importance of the changes is it mirrors

7 exactly the subsection (k) exemption and includes detention

8 facilities.

9     THE COURT:  Detention facilities are mentioned in

10 A-308 as well.

11     MS. MELL:  It is not -- as it relates to private

12 facilities.

13     THE COURT:  The answer to this question is that you

14 can call Mr. Grice if there is no stipulation as to the

15 authenticity of the document.  It should be admitted to

16 clarify the record if the policy was testified to and it has

17 been changed.  You can either do it by interrupting the

18 witness's vacation or whatever he is doing or you can do it

19 by stipulation, which would simplify matters, but it is not

20 required.

21     All right.  Is Mr. Ragsdale here and ready to go?

22     THE WITNESS:  Good morning.  Yes, I am here.

23     THE COURT:  Good morning, Mr. Ragsdale.  All right,

24 bring the jury in.

25     (The following occurred in the presence of the jury.)

Ragsdale - Direct

```
 1          THE COURT:  That looks like the happy nine.  Good
 2   morning, folks.  We are ready to continue with Mr. Ragsdale's
 3   testimony this morning.  I guess you are all awake and ready
 4   to go.
 5       You may inquire, counsel.
 6                  DIRECT EXAMINATION (Resumed)
 7   BY MS. SCHEFFEY:
 8   Q   Mr. Ragsdale, when we left off on Friday we were talking
 9   about hygiene items.  Do you remember that?
10   A   Good morning.  Yes, I do.
11   Q   Is there anything detainees need to pay for while at a GEO
12   facility?
13   A   There is a specific detention standard that relates to
14   hygiene, and ICE requires its contractors to provide all the
15   items that a person would need to take care of themselves.
16   It is expressly called out in the standard.  No, all of that
17   is free.
18   Q   Who sets up the phone services at GEO facilities?
19   A   ICE has its own contractor separate from GEO that provides
20   the telephone service.
21   Q   You also testified on Friday that you were a compliance
22   officer for the GEO Group.  Do you recall that testimony?
23   A   Yes.
24   Q   I believe you explained that your team ensures that GEO
25   meets its contractual requirements as well as any standards
```

Ragsdale - Direct

1    appropriated; is that correct?

2    A    Yes, we audit.  We develop tool questions, as I mentioned

3    on Friday.  We pull samples at the facilities to see if we

4    are compliant with detention standards in the contract, yes.

5    Q    I would like to talk about how that works specifically at

6    the Northwest ICE Processing Center.  If my tech team could

7    pull up Exhibit 129, which we will be going to page 5 of the

8    document.  If we could call out the CLIN 0003.

9        Mr. Ragsdale, how does your team assess compliance with

10   detainee pay under the contract?

11   A    We develop tool questions or audit questions based on each

12   standard.  To the extent, as we looked at in Standard 5.8,

13   there are expected outcomes.  We would develop questions and

14   then pull samples of the files at the Northwest ICE

15   Processing Center to determine that the detainee work program

16   was administered according to the standard.  We would

17   physically pull a number of people's individual files to

18   check and make sure they -- if they wanted to participate in

19   the voluntary work program and they did, in fact, participate

20   in the voluntary work program, they were paid at least a

21   dollar a day.

22   Q    When you are looking at a file, what amount are you

23   looking at for a detainee to -- that a detainee is paid to

24   ensure compliance?

25   A    A least a dollar a day.

Ragsdale - Direct

1    Q    Does your audit consider whether detainees are paid

2    minimum wage?

3    A    No, that is outside the scope of what the standard

4    requires.

5    Q    Let's turn to pay GEO-State 036868, which is page 44 of

6    the document.  I would like to call out letter q, small q.

7         When you are performing your compliance duties, do you

8    read this section to include application of the Washington

9    Minimum Wage Act to detainees?

10   A    I don't see a section.  I don't see anything.

11   Q    Do you see section (q) on your screen, applicable --

12   A    I just see the folks.

13   Q    Do you have the contract in front of you?

14   A    Yes, I think I do.

15   Q    We are on page 44 of that document if it is easier.

16   A    44 of 203 pages?

17   Q    Yes, the Bates stamp at the bottom is GEO-State 036868?

18   A    I think I have a copy of the contract.  I don't think that

19   is what I am looking at here.

20   Q    Do you have on your screen -- is there someone that --

21   A    The tech gentleman just came in.

22   Q    For the tech person, we should have a split screen with

23   me, the jury.

24   A    Okay.  Now I see it.

25   Q    Do you see the section (q) of the contract?

Ragsdale - Direct

A    Yes.

Q    When you are performing your compliance duties, do you

read this section to include applying the Washington Minimum

Wage Act to detainees?

MR. POLOZOLA:  Objection, leading, Your Honor.

THE COURT:  Sustained.

BY MS. SCHEFFEY:

Q    When you are assessing compliance and you look at this

section, what do you check for?

A    This is a section that obviously is a layered approach.

There are certain laws and requirements that the federal

government requires, there are certain things obviously the

states require, and certain things like municipalities and

other entities can require.

    We would look at this, and particularly as it relates to

the detainee work program, the detainee work program is not

employment, again, as we talked about on Friday.  It is a

volunteer program that is, again, to allow folks to have a

normal schedule, earn a nominal amount of money, and give

them something to do.  Anything of like in terms of an

employee or employer relationship, particularly as relates to

folks that are not citizens, as we talked a little bit about

on Friday, is the section of the Immigration and Nationality

Act that relates to employing people that are not citizens is

ICE's responsibility along with another department, another

1   agency in DHS.  There is not a situation where we would look

2   on behalf of ICE to determine that somebody was paying

3   minimum wage as an employee.  It doesn't apply in this case.

4         MR. POLOZOLA:  Your Honor, I am going to object that

5   the witness's answer is non-responsive.  He is testifying to

6   what the law should be in this case.

7         THE COURT:  The answer may stand.

8   BY MS. SCHEFFEY:

9   Q   How do you comply with this section and also the dollar

10  per day payment?

11  A   We pull files that the facility maintains for the folks

12  that participate in the voluntary work program.  There is

13  around 15 or 20 questions.  We look at each element.  I think

14  as I mentioned on Friday, folks that have limited English

15  proficiency need to have an opportunity.  Folks -- it has to

16  be done and administered in a fair way.  Folks need to have a

17  certain amount of training to make sure if there is some

18  amount of technical use of equipment.

19      We would go through each of those elements to make sure

20  the program is being administered according to the standards

21  ICE requires and the outcomes.

22  Q   I would like to go to page GEO-State 036906, page 82 of

23  the document.  If we could call out the manage a detainee

24  work program section.  Can you see that on the screen?

25  A   Yes.

Ragsdale - Direct

Q    How does your compliance team measure whether GEO has
complied with the portion of this contract that prohibits it
from using detainees to perform the duties of an employee of
the contractor?

A    As we talked about Friday, the contract has a staffing
plan.  In other words, GEO proposes a number of employees
that ICE has to clear, give a background check and then bring
on.  It is five positions.  Everybody has a function.
Ultimately, everybody who works as a GEO employee is there to
make sure that we have a safe, secure, humane environment
that is appropriate under ICE's standards for the purpose of
the contract.

     Detainees are not doing things that GEO employee are
doing.  In other words, the GEO employees are the people that
are responsible for the department, responsible for making
decisions.  Again, in other words, the voluntary work program
standard explicitly says what the voluntary work program can
do.  It can be in laundry.  It can be in janitorial.  It can
be in the kitchen.  GEO can't take detainees and have them do
things that are outside the scope of the voluntary work
program.

Q    Have you ever seen a staffing plan that includes
detainees?

A    No.

Q    If we could clear Exhibit 129 off the screen.  I would

Ragsdale - Direct

1    like to look at Exhibit 127, which is the Performance-Based

2    National Standards.  I would like to go to GEO-Nwauzor

3    185199, which is page 407 at the bottom of the PDF.  If we

4    can call out the compensation section.

5         Can you see that on your screen?

6    A    I can.

7    Q    Could GEO pay minimum wage and still comply with this

8    requirement?

9    A    No, we would not pay minimum wage because it would so

10   materially change what ICE's requiring us to do that we

11   couldn't do that on our own.  It is an ICE decision.  ICE

12   requires us to pay at least a dollar, and that's what we

13   audit to.

14   Q    How would it change what ICE is requiring you to do?

15   A    We talked a little bit about on Friday, it would

16   materially change the amount of money that employees would

17   have in their -- sort of in their detainee banking system.

18   In terms of even just managing, in terms of having folks

19   wanting to participate, might be oversubscribed.  It just

20   would fundamentally change the purpose of the detainee work

21   program.

22        Again, it is something the agency gets to decide.  GEO is

23   not in a policy making decision.  We don't get to interpret

24   the standards.  We don't get to agree with some, disagree

25   with others, or materially change some.  We are supposed to

Ragsdale - Direct

1    follow the black letter standards.  That would be a material

2    change.

3    Q    I think you said it would change the purpose.  What is

4    your understanding of what the purpose of the voluntary work

5    program is?

6    A    Again, the voluntary work program, under the activities

7    section the standards is, I think, again, to give folks as

8    much a sense of sort of normalcy, normal schedule, give them

9    something meaningful to do.  Again, they can earn a nominal

10   amount of money.  It is not meant -- it is meant to, again,

11   sort of contribute to the good order of the facility, but it

12   is not meant to be anything other than an activity.

13   Q    If the voluntary work program were to be deemed employment

14   which requires minimum wages, would you recommend to GEO and

15   ICE the program continue?

16   A    I am not in a policy-making decision.  I think that is

17   such a material change it would have to be something that the

18   agency, the Department of Homeland Security, and probably

19   Congress would have to weigh in on.

20   Q    Do you think the voluntary work program in your opinion

21   benefits detainees?

22   A    I do.  Again, as I think I mentioned Friday, and I

23   believe, again, having a normal schedule, in other words, I

24   have been in detention facilities where you see folks who can

25   literally stay in their bed all day long.  They can play

Ragsdale - Cross

1   video games.  They can play soccer.  They can do those

2   things.  There are some folks, particularly that are indigent

3   and obviously would welcome the dollar, certainly in terms of

4   you see folks even in places in the Western hemisphere a

5   dollar of U.S. is a considerable amount of money.

6       It was part of our detention reform we expanded the work

7   program during the Obama administration.  It is helpful, and

8   it is entirely voluntary.  If they want to do it, they

9   certainly can do it.  If folks don't want to do it, they

10  absolutely don't have to.

11         MS. SCHEFFEY:  Thank you.  I have no further

12  questions.

13         MR. POLOZOLA:  May I proceed, Your Honor?

14         THE COURT:  You may.

15                   CROSS-EXAMINATION

16  BY MR. POLOZOLA:

17  Q   Good morning, Mr. Ragsdale.

18  A   Good morning.

19  Q   Nice to see you again.

20      In your role at GEO, you are not in charge of

21  negotiating contracts for GEO, are you?

22  A   I am not.

23  Q   You are not in charge of interpreting contracts for GEO,

24  are you?

25  A   In part, you know, my -- I am consulted on what the

```
 1   contract says.  In other words --

 2   Q   Mr. Ragsdale, it was a yes-or-no question.

 3   A   I will say no then.

 4   Q   Thank you.  Now, before joining GEO in 2017, you worked

 5   for ICE, I believe you said, correct?

 6   A   I did.

 7   Q   You were the number two person at ICE, I believe?

 8   A   From 2012 to 2017, yes.

 9   Q   Which made you a pretty important person at ICE?

10   A   I will say -- I am not sure what to say to that, but

11   probably.

12   Q   Now you work for GEO, correct?

13   A   I do.

14   Q   You report directly to GEO's CEO; isn't that right?

15   A   I do.

16   Q   In your current role, you make about $300,000 a year; is

17   that correct?

18           MS. SCHEFFEY:  Objection, relevance.

19           THE WITNESS:  I do.

20           MS. SCHEFFEY:  Foundation, facts not in evidence.

21           THE COURT:  He may answer.

22           THE WITNESS:  I do.

23   BY MR. POLOZOLA:

24   Q   Now, as part of your compensation working for GEO, you

25   also receive shares from GEO, GEO stock, correct?
```

1   A    I do.

2   Q    So you are a GEO shareholder as you sit here today,

3   correct?

4   A    Yes, I am.

5   Q    Does that mean you receive dividends from GEO each year?

6   A    Yes, I do.

7   Q    Now, last week counsel told you at one point to put your

8   GEO hat on.  Do you remember that statement?

9   A    I think so, yes.

10  Q    Okay.  Well, that's actually the only hat you have right

11  now, isn't it, because you don't work for ICE anymore,

12  correct?

13         MS. SCHEFFEY:  Objection, argumentative.

14         THE COURT:  Overruled.

15         THE WITNESS:  That is correct.

16  BY MR. POLOZOLA:

17  Q    You weren't here as an ICE employee or representative.  Do

18  I have that right?

19  A    Yes.

20  Q    You are not testifying for ICE in this case, are you?

21  A    No.

22  Q    And you are not here testifying under ICE's official

23  authorization, are you?

24  A    No.

25  Q    Because you work for GEO; is that right?

Ragsdale - Cross

1  A    Correct.

2  Q    GEO is not the federal government; isn't that right?

3  A    GEO is not the federal government, no.

4  Q    Now, do you remember when I took your deposition in this

5  case, it was back in June 2020, by Zoom?

6  A    I do.

7  Q    And do you remember that I asked you questions about

8  certain things about what ICE does?

9  A    You know, I know we covered a lot in the deposition.  I

10  can't say I have it memorized.  If you point me to something,

11  I am sure you can refresh my recollection.

12  Q    Well, I actually have a more general question.  Do you

13  recall when I asked you about certain things ICE does that

14  GEO's counsel actually objected and said you weren't prepared

15  to testify as to what ICE does and that you actually would be

16  prohibited from doing so.

17          MS. SCHEFFEY:  Objection, Your Honor, this is reading

18  in counsel's objections from a deposition, which is not

19  proper at trial.

20          THE COURT:  He may answer the question.

21          THE WITNESS:  Yeah, I don't remember precisely, no.

22  If you point me to something, I'll be happy to look at it,

23  but no, I don't remember.

24  BY MR. POLOZOLA:

25  Q    In any event, you understand because you don't work for

Ragsdale - Cross

1    ICE anymore, you can't legally speak for ICE; isn't that

2    correct?

3    A    I do understand that, yes.

4    Q    Okay.  So a moment ago I believe you said "when we did

5    something at ICE," I understood you to be expressing a

6    position about what ICE may have done.  You can't speak for

7    ICE in this case, correct?

8          MS. SCHEFFEY:  Objection, asked and answered.

9          THE WITNESS:  After 21 years, it is hard to do that,

10   but yes, I am not speaking for ICE.

11   BY MR. POLOZOLA:

12   Q    Now you testified to a few things on Friday and then

13   briefly this morning that I think we need to address.  First,

14   I believe you told the jury the compensation rate for

15   detainee workers of a dollar a day is, quote, set by the

16   agency or ICE, do you remember testimony to that effect?

17   A    I do.

18   Q    That's not accurate, is it?

19   A    It is my understanding, yes.

20   Q    You understand the contract only limits what ICE will

21   reimburse GEO, correct?

22   A    No.  In other words, as I think I explained Friday, the

23   budget formulation process at ICE, right, when I was there,

24   and even in the President's FY '22 budget, contemplates the

25   agency funding detainee pay.

1    Q    Mr. Ragsdale, you just said --

2           MS. SCHEFFEY:  Object, interrupting the witness.

3           THE COURT:  He is beyond the question.

4        What is the next question?

5    BY MR. POLOZOLA:

6    Q    The question, Mr. Ragsdale, is you understand ICE agreed

7    to reimburse GEO one dollar a day for each detainee work

8    shift; is that correct?

9    A    There is a contract line item number that says a dollar

10   for the detainee work program.  It is in the contract, yes.

11   Q    That says ICE will reimburse GEO one dollar per day,

12   correct?

13   A    Yes.

14   Q    There is nothing in that contract that says GEO can only

15   pay one dollar to detainee workers; isn't that correct?

16   A    It does not read only one dollar, no.

17   Q    There is nothing in the PBNDS, the standards, that limits

18   GEO to paying only one dollar per day to detainee workers; is

19   that correct?

20   A    As I said earlier, the standards we take as black letter.

21   We don't add our own sort of plusses and minuses.  We follow

22   the standards very precisely.  It is a dollar, which is why

23   it has been a dollar, and it is a dollar.

24   Q    Well, Mr. Ragsdale, it is not a dollar; isn't that right?

25   The standard says "at least one dollar," correct?

1          MS. SCHEFFEY:  Objection.  Asked and answered.

2          THE COURT:  Overruled.

3          THE WITNESS:  Again, I think as I told you, when we

4    developed our audit tools and the way we look at the

5    standard, we look to make sure people are paid at least a

6    dollar a day.

7    BY MR. POLOZOLA:

8    Q   You agree with me the ICE standard does not prevent GEO

9    detainee workers more than a dollar a day, correct?

10   A   No.

11   Q   The ICE standard does not prevent or limit GEO from paying

12   detainee workers the minimum wage for work performed?

13   A   As I already said, I think that is such a material change,

14   I don't think we would be allowed to do that, in my opinion.

15   Q   My question is:  Does the ICE standard, the PBNDS 5.8

16   limit GEO from paying detainee workers the minimum wage for

17   work they perform?

18   A   Again, does it say that in express terms?  No, it does not

19   contemplate minimum wage anywhere in the standard, no.

20   Q   You will agree with me that, for example, 13.69 per hour

21   is more than one dollar per day, correct?

22   A   Yes.

23   Q   That would be at least one dollar per day; is that right?

24   A   13.69 per hour is, yes, more than a dollar a day.

25   Q   Assuming you work for just a few minutes?

Ragsdale - Cross

A    Indeed.

Q    Now, we have been talking about the PBNDS.  Those are
ICE's standards, correct?

A    Yes.

Q    So those are standards that GEO agreed to follow when it
chose to do business with the federal government, correct?

A    Yes, they are in the contract, yes.

Q    That is part of deal when GEO decides it wants to do
business with ICE, it agrees to follow the standards,
correct?

A    Yes.

Q    Are you aware, Mr. Ragsdale, that GEO has already agreed
in this case that it had the option to pay more than a day to
detainee workers for work they do at the Northwest Detention
Center?

A    I'm sorry.  I don't think I understood your question.  Can
you repeat that.  I think you said "a day," and you meant "a
dollar a day."

Q    Sure.  Are you aware that GEO has already agreed that it
has the option to pay workers more than a dollar a day for
work they do at the Northwest Detention Center?

A    I don't know the nature of that agreement.  I am not
personally aware of it, no.

Q    Well, do you agree that GEO has the option to pay detainee
workers more than a dollar per day for work they do at the

1   Northwest Detention Center?

2   A   I do know it is possible for GEO to pay more than a

3   dollar.  I don't know that it has happened at the Northwest

4   ICE Processing Center.  I know it is possible, yes.

5   Q   You talked about the contract a moment ago with counsel.

6   So you understand that GEO's contract -- or in GEO's

7   contract, ICE told GEO to follow state and local labor laws,

8   correct?

9   A   I believe it is in the contract.  We just looked at that,

10  yes.

11  Q   Then I believe you also looked at the work program portion

12  of the contract.  Do you recall that a moment ago?

13  A   Yes.

14  Q   So you agree that in that portion of the contract ICE told

15  GEO specifically with respect to the work program that the

16  work program must comply with all applicable laws and

17  regulations, correct?

18  A   That is what the contract says, yes.

19  Q   Another thing you said on Friday, I believe, I believe you

20  told the jury that everybody is paid a dollar a day in the

21  program because that's the set rate.  My question is:  That's

22  not the set rate, correct?

23  A   I think it is the set rate.  I think it is a dollar a day.

24  That's my opinion.

25  Q   Are you aware GEO has paid detainees at the Northwest

Ragsdale - Cross

1   Detention Center more than a delay per day in the past for

2   work they have done in the work program?

3   A   Again, as I said, I didn't know precisely at the Northwest

4   ICE Processing Center.  I do know there have been occasions,

5   I think, again, for lack of participation or for whatever

6   reason, to incentive participation they pay more than a

7   dollar per day, yes, I am aware.

8   Q   If the jury heard from other folks that worked at the

9   Northwest Detention Center that workers have been paid, for

10  example, five dollars for working in the kitchen, you would

11  have no basis to disagree with that?

12  A   I have no knowledge of it, no personal knowledge of it,

13  no.

14  Q   And are you aware that in other GEO facilities where

15  immigration detainees work, GEO sometimes pays more than a

16  dollar to those workers, correct?

17  A   I am aware, yes.

18  Q   Are those facilities -- they include the Montgomery

19  facility in Texas?

20          MS. SCHEFFEY:  Objection, assumes facts not in

21  evidence.

22          THE WITNESS:  The Montgomery is the one I am aware

23  of.

24          THE COURT:  The objection is overruled.  When there

25  is an objection, Mr. Ragsdale, wait for a ruling before you

```
 1   respond.

 2          THE WITNESS:  Yes, sir.

 3   BY MR. POLOZOLA:

 4   Q   At that facility, GEO pays more than a dollar a day

 5   because of supply and demand?

 6   A   I am not sure supply and demand.  The voluntary work

 7   program and the activities that are part of the program are

 8   supposed to contribute to the running of the facility.  There

 9   is a staffing plan and there are some assumptions about, to

10   use your term, in terms of negotiation about the voluntary

11   work program is part of the way the facility runs and, again,

12   some level of participation.

13       To use your term in terms of the negotiations, to make the

14   facility work the way it is supposed to work, that is why

15   they have on occasion paid more than a dollar a day, as I

16   understand it.

17   Q   If I am understanding what you are saying, sometimes a

18   dollar a day isn't enough to make people want to work so you

19   have to pay a little more, correct?

20          MS. SCHEFFEY:  Objection, argumentative.

21          THE COURT:  Overruled.

22          THE WITNESS:  I can't speculate as to why people do

23   it.  In other words, I know that it has happened.

24   BY MR. POLOZOLA:

25   Q   It is up to GEO to pay more than a dollar in those
```

1    circumstances when it decides it needs to, correct?

2    A   GEO is responsible for the day-to-day function.  We have

3    to deliver meals to obviously everybody in the facility.

4    Again, the assumptions and the staffing plan assume there is

5    detainee participation in the work program working in the

6    kitchen.  Yes, it would be GEO's responsibility under the

7    performance-based contract to make sure that happened, let's

8    just say, laundry, et cetera.  Yes, it is GEO's decision.  Is

9    it a long-term, sustainable part of the negotiations?  No.

10   Q   You didn't negotiate the contract for the Northwest

11   Detention Center for GEO, did you?

12   A   No, but I think we talked about on Friday all of these --

13   Q   Mr. Ragsdale, it was a yes-or-no question.

14   A   Did I do it?  No.

15   Q   You didn't negotiate it on ICE's behalf either, did you?

16   A   No.

17   Q   You said you have been to the Northwest Detention Center

18   in the past, correct?

19   A   Yes.

20   Q   How many times?

21   A   I think probably three times, but again, it has been a

22   long time.  21 years is a long time.  I think at least three

23   times.

24   Q   When did you visit the Northwest Detention Center?

25   A   I have been there once since joining GEO.  Once that we

Ragsdale - Cross

```
 1    talked about in 2014, and I believe one time before that.
 2    Q   You have never been there with the goal of determining
 3    whether GEO is complying with its contractual obligations,
 4    have you, for auditing purposes?
 5    A   My team has.  I have employees that do that.  Not myself.
 6    Q   Not you.  Right.
 7          Now, I want to circle back to what you were talking
 8    about a moment ago, the nature of the work.  You agree that
 9    detainees perform legitimate work at the Northwest Detention
10    Center?
11    A   "Work" in the comments, the way we say it, yes, they
12    perform work.
13    Q   It is not made-up work?
14    A   By standard, it is not supposed to be made-up work.
15    Q   Not mere personal chores, is it?
16    A   I believe the standard does, for personal housekeeping,
17    folks' immediate living area, obviously, in other words, a
18    maid doesn't come in to change their sheets.  Their personal
19    area, they are supposed to clean up.  No, the work is
20    supposed to be meaningful.
21    Q   The work for which they are compensated through the work
22    program, those aren't chores, are they?
23              MS. SCHEFFEY:  Objection.
24              THE WITNESS:  No.  No.
25              THE COURT:  He may answer.
```

Ragsdale - Cross

1      THE WITNESS:  No.

2  BY MR. POLOZOLA:

3  Q   I do want to understand, if the detainee workers didn't do

4  that work that they are compensated for now, GEO would still

5  have to do that work, correct?

6  A   The functions would have to get done, yes.  Precisely how

7  would be probably something that GEO would go back to ICE to

8  discuss and renegotiate.

9  Q   We don't know that because it hasn't happened, correct?

10  A   It has not happened to my knowledge, no.

11  Q   In any event, GEO still has to serve thousands of meals

12  that detainees have to eat, correct?

13  A   Absolutely.

14  Q   Even if there are no detainee workers to help prepare and

15  serve those meals?

16  A   Again, performance-based contract, the requirements don't

17  change.

18  Q   Right, so up to GEO how the meals get served, but they got

19  to get served; isn't that right?

20  A   Yes.

21  Q   GEO still has to do all the laundry for everyone in the

22  facility?

23  A   Yes.

24  Q   Even if the detainee workers don't show up to work,

25  correct?

Ragsdale - Cross

1    A    Yes.

2    Q    Doesn't matter how GEO chooses to do that, the laundry

3    just has to get done, correct?

4    A    Correct.

5    Q    GEO still has to keep the entire facility clean even if

6    the detainee workers don't work, correct?

7    A    Correct.

8    Q    Doesn't matter how GEO does that, it has to get done?

9    A    Correct.

10   Q    Okay.  So on audits, you spoke a moment ago about your

11   team, the auditing team.  I believe you said last week that

12   your team makes sure GEO meets the contract requirements with

13   their clients and whatever standards are incorporated in the

14   contract; is that right?

15   A    Yes.

16   Q    As we just discussed, you know the Northwest Detention

17   Center requires GEO to follow all state -- federal, state and

18   local labor laws, correct?

19   A    I think you and I are probably going to disagree about

20   which laws apply as I understand them.  The answer is yes, to

21   the extent they apply, we are supposed to audit them, yes.

22   Q    So on that, I want to be clear that when you are going

23   around auditing facilities like the Northwest Detention

24   Center, you aren't checking to see whether workers make more

25   than a dollar per day, correct?

Ragsdale - Cross

1  A   We are checking to make sure they get paid at least a

2  dollar a day.

3  Q   So you are not looking to see whether GEO is complying

4  with Washington's Minimum Wage Act, are you?

5  A   As relates to the detainee work program, no.

6  Q   Your team is not checking to see whether GEO pays into

7  Washington's unemployment compensation fund, correct?

8  A   I don't think so, no.

9  Q   You are not asking whether GEO follows the rules about

10 paying into Washington's paid family and medical leave

11 programs like other businesses, are you?

12 A   No.

13 Q   I think you mentioned that ICE conducts audits of the

14 Northwest Detention Center.  I did hear you speak about that?

15 A   Yes, they do.

16 Q   You don't actually know what ICE audits with respect to

17 the work program, do you?

18 A   I don't know precisely what they audit.  They would audit

19 based on the outcomes and the standards in 5.8.  That's the

20 way the tools are built.

21 Q   Is it your understanding ICE is not auditing to see

22 whether GEO is paying workers the minimum wage at the

23 Northwest Detention Center?

24 A   You know, again, I don't want to speculate.  I don't think

25 so.

Ragsdale - Cross

1    Q    ICE isn't auditing to see whether GEO is complying with

2    Washington law; is that right?

3    A    I don't know.  That, I don't know.

4    Q    Because ICE doesn't enforce Washington law, does it?

5    A    Not that I am aware of.

6    Q    Mr. Ragsdale, do you who the the Department of Homeland

7    Security Office of the Inspector General is?

8    A    Yes, I do.

9    Q    The inspector general provides independent oversight and

10   accountability for ICE?

11   A    Yeah, I mean, I wouldn't quite phrase it that way.  They

12   have -- there are statutory IG Act office.  They are supposed

13   to help the secretary manage the department.

14   Q    They perform inspections at the Northwest Detention

15   Center?

16   A    The IG can visit any facility they wish.  I don't know

17   whether they have been to the Northwest ICE Processing

18   Center.

19   Q    So in your job, are you responsible for working with

20   ICE -- with the inspector general if they want to inspect the

21   Northwest Detention Center?

22   A    Certainly we would collaborate.  We certainly collaborate

23   with both -- we haven't worked, since the time I have been

24   here, so closely with the inspector general at DHS.  We have

25   done more with DOJ.  We certainly are responsive to any of

Ragsdale - Cross

```
 1    their requests, yes.
 2    Q   Did I understand your testimony a moment ago to be that
 3    you are not sure if the inspector general has ever done an
 4    inspection at the Northwest Detention Center?
 5    A   Yeah, I don't know off the top of my head.
 6    Q   If the inspector general had done an inspection at the
 7    Northwest Detention Center and determined that ICE's
 8    standards were violated, is that something you would know
 9    about in your position?
10         MS. SCHEFFEY:  Objection.  Assumes facts not in
11    evidence.
12         THE WITNESS:  I'll be honest with you, I don't
13    memorize every report at every facility.  There are a lot of
14    them.  If I checked and there was a report, yes -- we would
15    have --
16         THE COURT:  The objection is overruled.  If you would
17    wait when there is an objection, Mr. Ragsdale, for a ruling.
18         THE WITNESS:  Yes.  Sorry.
19    BY MR. POLOZOLA:
20    Q   Are you aware of any instances in which the Office of the
21    Inspector General has determined that GEO's facilities where
22    ICE detainees are held has violated the PBNDS?
23    A   Yes, there are several reports, I believe, to facilities
24    in California, a facility in Louisiana, so, yes, there have
25    been audits where the IG has found that we have not -- found
```

Ragsdale - Cross

1  areas of non-compliance, yes.

2  Q    Are you aware of any reports by the inspector general

3  critiquing the quality of ICE's auditing standards and

4  processes?

5  A    I have read reports over the years where the IG has made

6  those comments, yes.

7  Q    One moment, please.

8        Mr. Ragsdale, I think you testified at one point that

9  you had never visited a GEO detention facility where the

10  workers were paid the minimum wage; is that correct?

11  A    To the best of my knowledge, yes.

12  Q    Are you aware GEO is being sued over its detainee wage

13  payment practices in Colorado and California?

14  A    I am --

15        MS. SCHEFFEY:   Objection, outside the scope.

16        THE COURT:   The objection is sustained.

17  BY MR. POLOZOLA:

18  Q    Mr. Ragsdale, are you aware that GEO has asked ICE to step

19  in and defend this lawsuit?

20  A    I am aware that the agency and GEO have discussed the

21  litigation.   I know of no way that ICE can represent GEO.   I

22  don't think it really works that way.   I know the office --

23  litigation has been discussed between GEO and ICE.

24  Q    To your knowledge, ICE hasn't stepped in and taken over,

25  has it?

Ragsdale - Cross

```
 1   A   Right, but the Department of Justice litigates on behalf

 2   of the United States, not ICE.  It would be directed to DOJ,

 3   not ICE.

 4   Q   Sure.  Fair point.  The Department of Justice has never

 5   stepped in to defend these lawsuits, has it?

 6   A   Not to my knowledge, no.

 7   Q   That's because it is GEO's decision to pay only a dollar

 8   per day to detainee workers, not the federal government's;

 9   isn't that correct?

10   A   I don't agree with that, no.

11           MR. POLOZOLA:  No further questions, Your Honor.

12           MS. SCHEFFEY:  Your Honor, I have two brief redirect

13   questions.

14           THE COURT:  Just a minute.  Mr. Whitehead.

15           MR. WHITEHEAD:  Yes, Your Honor.  Thank you.

16                     CROSS-EXAMINATION

17   BY MR. WHITEHEAD:

18   Q   Good morning, Mr. Ragsdale.

19       Earlier today you answered there are laws that can

20   limit what you can say about your time with ICE.  Do I have

21   that correct?

22   A   Well, in other words, information that belongs to the

23   agency is the agency's.  They give an ethics letters.  I can

24   tell you about my experience, but I am not speaking on behalf

25   of ICE.
```

1   Q    You are not testifying today on behalf of ICE, correct?

2   A    Correct.

3   Q    You would have to seek prior approval, in fact, to share

4   information obtained from your time during your employment at

5   ICE, correct?

6   A    As relates to specific cases -- or, in other words, I

7   think I am perfectly able to talk about my experience.  I

8   can't talk about information the agency owns, like in a

9   system of record.

10  Q    That's so that former employees don't share sensitive

11  information, correct?

12  A    Of course.

13  Q    Also so that former employees don't misrepresent ICE

14  positions taken on any given subject?

15          MS. SCHEFFEY:  Objection, calls for speculation.

16          THE COURT:  He may answer.

17          THE WITNESS:  Former employees can't bind the agency,

18  yes, there is appropriate limits.

19  BY MR. WHITEHEAD:

20  Q    Earlier you answered questions from Ms. Scheffey about

21  hygiene items provided by GEO to detainees at the Northwest

22  Detention Center.  Do you remember that?

23  A    I do.

24  Q    You made a statement that the hygiene items are provided

25  free of charge.  Do I have that right?

Ragsdale - Redirect

```
 1   A    Yes.

 2   Q    Those hygiene items, they are paid for by ICE, correct?

 3   A    Yes, by ICE, not by the detainees.

 4   Q    Just like the food provided at the Northwest Detention

 5   Center, correct?

 6   A    Yes.

 7   Q    Clothing?

 8   A    All of the items that GEO provides are ultimately paid for

 9   by the agency.

10   Q    And GEO doesn't seek reimbursement from the detainees for

11   these items.  Do I have that right?

12   A    No, they do not seek reimbursement.

13   Q    That's because they are already paid for by ICE?

14   A    Correct.  They are provided to the detainee for their

15   benefit.

16   Q    At ICE's expense, correct?

17   A    Correct, yes.

18            MR. WHITEHEAD:  Thank you, sir.

19            MS. SCHEFFEY:  I have a few brief redirect,

20   Your Honor.

21            THE COURT:  Yes.

22                      REDIRECT EXAMINATION

23   BY MS. SCHEFFEY:

24   Q    I think you just testified that food, clothing and hygiene

25   items are ultimately paid for by ICE; is that correct?
```

Ragsdale - Redirect

```
 1   A    Yes.

 2   Q    Are those items contemplated at the outset of the contract

 3   between GEO and ICE?

 4   A    Yes.

 5   Q    Is minimum wage for detainees contemplated at the outset

 6   of the contract between GEO and ICE?

 7   A    Not to my knowledge, no.

 8   Q    You also testified about Montgomery where they pay two

 9   dollars per day.  Do you remember that?

10   A    I don't know that it was precisely two dollars.  I just

11   know anecdotally there have been occasions they paid more

12   than a dollar a day.

13   Q    Are you aware of detainees at Montgomery ever getting

14   minimum wage?

15   A    Not to my knowledge.

16   Q    Is there any facility across the country where GEO pays

17   minimum wages for the voluntary work program?

18   A    I have never heard of anybody making minimum wage, whether

19   GEO, ICE run.  Anybody.  I have never heard of it.

20   Q    Do the Performance-Based National Standards state that

21   detainees should be paid minimum wage anywhere in the

22   document?

23   A    No, it does not.

24   Q    Does the contract state that detainees should be paid

25   minimum wage anywhere in the document?
```

Ragsdale - Recross

1  A    No, it does not.

2        MS. SCHEFFEY:  Thank you.  No further questions.

3        MR. WHITEHEAD:  Your Honor, briefly.  See if I can do

4  it in three questions.

5                    RECROSS-EXAMINATION

6  BY MR. WHITEHEAD:

7  Q   Mr. Ragsdale I understood you to say you are not aware of

8  GEO paying the minimum wage at any of its facilities

9  nationwide.  Do I have that right?

10 A   As relates to the detainee work program.

11 Q   You understand that the voluntary work program is the

12 subject of litigation at other GEO facilities, correct?

13 A   Yes, I am aware.

14        MR. WHITEHEAD:  No further questions, Your Honor.

15        THE COURT:  Mr. Ragsdale, in your earlier testimony

16 describing your work background, it sounded like some of your

17 jobs were legal jobs.  Are you a lawyer?

18        THE WITNESS:  I am, Your Honor.  From '96 to 2008, I

19 was in the legal program at ICE and INS.

20        THE COURT:  Yes.  I take it you have retired from

21 federal government service?

22        THE WITNESS:  Yes, in 2017.

23        THE COURT:  Okay.  All right.  Thank you.  You may be

24 excused.

25        THE WITNESS:  Thank you very much.

1          MS. MELL:  GEO would recall Mr. Grice.

2          MS. CHIEN:  We stipulate to authenticity so we would

3    not have to call Mr. Grice back.

4          MS. MELL:  Based on the stipulation of the State, we

5    offer Exhibit A-321 into evidence.

6          THE COURT:  Any objection?  A-321 may be admitted.

7                (Exhibit A-321 was admitted.)

8          MS. MELL:  Your Honor, I ask to publish subsection

9    (k) of the updated policy.

10         MS. CHIEN:  We don't believe that is appropriate.

11   There is no witness to testify to subsection (k).

12         THE COURT:  The objection is sustained.

13         MS. MELL:  The jury will have this in their evidence

14   to look at?

15         THE COURT:  Certainly.

16         MS. MELL:  Thank you, Your Honor.

17      With that being said, I believe we will be calling

18   Mr. Scott.

19         MS. CHIEN:  Ms. Mell, does that mean you are not

20   calling Ms. Perrin?

21         MS. MELL:  The next witness is Mr. Scott.

22         MS. SCHEFFEY:  Mr. Campbell, Mr. Scott should be in

23   the waiting room now or momentarily.

24         THE CLERK:  He just joined.  He is on his way in

25   right now.

```
 1          THE COURT:  Here is Mr. Scott.  Mr. Scott, you were

 2    previously sworn.  You are still under oath.  Do you

 3    understand?  Okay.  You were muted there for a minute.  You

 4    are clear now.  You may inquire of Mr. Scott.

 5                      BRUCE SCOTT,

 6      having been previously sworn under oath, testified as

 7    follows:

 8                    DIRECT EXAMINATION

 9    BY MS. SCHEFFEY:

10    Q   Good morning, Mr. Scott.  What service does GEO provide to

11    ICE?

12    A   GEO provides services for the safe and secure detention of

13    detainees as they work through their immigration cases and

14    those services that allows them to work through their

15    immigration cases until the courts ultimately decide their

16    outcome.

17    Q   Who decides who is detained at the facility?

18    A   ICE.

19    Q   How do you know who ICE is sending to your facility?

20    A   There is a number of ICE forms that we get.  Most

21    importantly, the one ICE form particularly, the I-203, which

22    is the order to detain or release an individual that has to

23    be filled out by ICE as a law enforcement entity.

24    Q   Do you have the ability to fill out an I-203 detainee

25    form?
```

1    A    I do not.

2    Q    Does anyone as GEO have that authority?

3    A    No one at GEO has that authority.

4    Q    Do you need detainees in the voluntary work program to

5    keep the facility safe and secure?

6    A    We don't need detainees, no, to keep the facility safe and

7    secure.  That is strictly the job of officers, and detainees

8    don't need to do that.

9    Q    Does having detainees in the voluntary work program make

10   it easier to keep the facility safe and secure?

11   A    I would say no.  The best way to have any -- if you look

12   at the maximum security prison safe and secure, nobody leaves

13   their cell.  We don't do that, but it does add a level of

14   oversight that we have to watch detainees with tools and

15   equipment.  It adds a level of safety and security that we

16   have to look at.

17   Q    If your officers didn't have to watch VWP participants

18   with tools, would that free up time for them to do other

19   tasks?

20        MR. WHITEHEAD:  Objection, Your Honor, leading.

21        THE COURT:  I think it is a self-answering question,

22   Ms. Scheffey.  Ask another question.

23   BY MS. SCHEFFEY:

24   Q    In your experience, do the detainees at the facility clean

25   up after themselves?

Scott - Direct

1    A    Yes.

2    Q    Other than detainee volunteers, who cleans the facility?

3    A    Everyone that cares about the facility and the sanitation,

4    myself, my staff, detainees that have the responsibility

5    themselves to take care of their areas, clean up the

6    facility.

7    Q    Where do the janitors come in?

8    A    The janitors are there primarily for the areas that

9    detainees are not allowed to go to in accordance with the ICE

10   standards.

11   Q    When you talk about the areas detainees aren't allowed to

12   go to, does that include the ICE areas?

13   A    Includes the ICE offices, GEO administrative offices which

14   are outside the secure area, the court areas, EOIR, executive

15   office of immigration review, all the other government

16   agencies that provide services at the center, detainees are

17   not allowed in those areas.

18   Q    Why have you never paid minimum wages to detainees?

19   A    It has never come up before, prior to this lawsuit.  We

20   have never heard of or been inspected or issued any type of

21   direction to pay minimum wage.

22   Q    Other than the type of detainees your facility holds, is

23   it any different than other confinement facilities around the

24   state?

25         MR. WHITEHEAD:  Objection, foundation.

Scott - Direct

```
1          THE COURT:  Sustained.
2    BY MS. SCHEFFEY:
3    Q    Have you been to other jails, prisons, other facilities
4    across the state?
5    A    I did visit Monroe.
6    Q    And what is Monroe?
7    A    Monroe is a state correctional facility.
8    Q    How is -- is your facility the same or different than
9    Monroe?
10          MR. WHITEHEAD:  Objection, foundation.  I think it is
11   also vague.
12          THE COURT:  That is a very broad question,
13   Ms. Scheffey.  I don't know exactly what you are driving at.
14   The objection is sustained.
15   BY MS. SCHEFFEY:
16   Q    Is your facility layout similar to the facility layout at
17   Monroe?
18   A    Our facility layout is very inclusive of any secure type
19   setting -- confinement setting with detention centers and
20   correctional facilities throughout the state.
21   Q    Are detainee workers integral to your operations at the
22   facility?
23   A    I say they are not integral.  They are very important.  We
24   care about giving detainees opportunities to perform
25   activities that decreases their idleness.  GEO -- we can do
```

Scott - Direct

```
 1   all the essential functions of the job.
 2   Q    Would it change your operations if voluntary work program
 3   detainees became employees?
 4   A    It would change a lot logistically.  I really don't know
 5   how that would work.  We would have to keep different
 6   classification of detainees separate.  They can't move at the
 7   same time.  They can't go do the same phones at the same
 8   time.  Some of them can't leave their housing unit to go to
 9   other housing units.  I really don't know how that would
10   work.  It would drastically change the way the program was
11   intended to be laid out.
12   Q    Would those changes make your facility easier to operate
13   or more difficult to operate?
14   A    I think it would be extremely more difficult to operate.
15   If we had to pay minimum wages to some detainees, it would --
16   and not everybody got minimum wage, you would start getting
17   gangs that wanted to control where the money was coming from.
18   You would get more fights.  You would get more facility
19   violence.  That's exactly why corrections and confinement
20   centers don't run programs and work programs and pay minimum
21   wage.
22   Q    As it stands today, do you hold detainee volunteers to the
23   same standards as your employees?
24   A    No, I do not.
25   Q    Do you have the same type of control over detainee
```

Scott - Direct

1    volunteers as your employees?

2    A   I don't.  Detainees have a number of services they need to

3    attend to.  Courts.  I don't know when they are going to go

4    to court necessarily or have a doctor's appointment or want

5    to go to outdoor rec or want to stay in the unit and play

6    video games.  I have no control over those types of functions

7    with detainees.

8    Q   If one of your officers would want to play video games one

9    day and not come to work, how is it any different?

10   A   We have a leave program, progressive discipline program

11   for officers.  If he wanted to take vacation that day and he

12   has vacation allowable and we would permit that, he could

13   take the day off and play video games if he wanted to.

14   Q   Are you saying it is no different for detainees than

15   employees that want to take the day off?

16   A   There is a limit to how many times an employee can take a

17   day off.  If he was in a tournament and ran out of vacation

18   time and decided not to show up to work, we would start

19   looking at progressive discipline and potentially termination

20   of that employee for not showing up to work.  Detainees, they

21   don't have to participate in the voluntary work program.

22   They could say, "I don't want to do it today," and a week

23   later come back and say, "You know what, I want to volunteer

24   again."  They are allowed to do that.

25   Q   Are detainees subject to that progressive discipline you

1    just described?

2    A    No, that is strictly in the GEO policy for staff.

3    Detainees have a separate, in accordance with the ICE

4    standard, disciplinary procedure that is very formal.

5    Q    Is there a limit to the number of days a detainee can take

6    off from the voluntary work program?

7    A    No.

8    Q    Any restriction on how many times a detainee can leave the

9    program and ask to come back?

10   A    No.

11          MS. SCHEFFEY:   I have no further questions.

12                CROSS-EXAMINATION

13   BY MR. WHITEHEAD:

14   Q    Good morning, Mr. Scott.

15   A    Good morning, Mr. Whitehead.

16   Q    You have already testified at trial, correct?

17   A    Yes.

18   Q    In fact, your testimony straddled two days.  Do I have

19   that right?

20   A    Yes.

21   Q    I questioned you, what, last Monday?  Do I have that

22   right?

23   A    It has been a crazy week.  I believe it was Monday.

24   Q    You had a chance to think about your testimony overnight,

25   correct?

Scott - Cross

1   A   Yes.

2   Q   And you came back the following morning and I think you

3   answered Ms. Scheffey's questions.  Do I have that right?

4   A   To the best of my recollection.

5   Q   I asked you some follow-up questions, I think, as well.

6   Do you remember that?

7   A   Yes.

8   Q   You already had a chance to say your piece at this trial,

9   correct?

10          MS. SCHEFFEY:  Objection, argumentative.

11          THE COURT:  Sustained.

12  BY MR. WHITEHEAD:

13  Q   Well, nothing has changed since the last time we spoke.

14  For example, you are still the facility administrator at the

15  Northwest Detention Center, correct?

16  A   Yes.

17  Q   It is still your job to protect GEO's interest at the

18  Northwest Detention Center, right?

19  A   It is my job to follow the contract and do the services

20  required by the federal government.

21  Q   You offered new testimony this morning about your belief

22  that there would be an uptick in gang violence if detainee

23  workers were paid more money.  Do I have that right?

24  A   I don't think I said gang violence.  I think I said gangs

25  would likely want to control who got the money.

Scott - Cross

1   Q   You are aware that at the Northwest Detention Center that

2   GEO has on occasion paid more than a dollar a day for

3   detainee work.  Do I have that right?

4   A   Yes.

5   Q   On those occasions, there was no uptick in gang violence

6   experienced at the Northwest Detention Center.  Do I have

7   that right?

8   A   It is because the program was run in accordance with the

9   standard and voluntary, using a waiting list, and everybody

10  had the same opportunity.

11          MR. WHITEHEAD:  I don't think I have any further

12  questions.  Thank you, sir.

13          THE COURT:  Anything further for Mr. Scott?

14      Thank you, Mr. Scott.  You may be excused.

15          THE WITNESS:  Thank you, Your Honor.  Have a good

16  day, sir.

17          MS. MELL:  I just need a moment to confer with

18  counsel.  One quick moment.

19      GEO rests, Your Honor.

20          MR. WHITEHEAD:  Your Honor, we do have a motion that

21  should probably be discussed outside the presence of the

22  jury.

23          THE COURT:  Does either plaintiff have rebuttal

24  testimony to offer?

25          MS. CHIEN:  Not from the State.

1          MR. WHITEHEAD:  No, Your Honor.

2          THE COURT:  Do we need to hold the jury here for

3    whatever we have to do outside their presence?

4          MS. SCHEFFEY:  No, Your Honor.

5          MR. WHITEHEAD:  No, Your Honor.

6          THE COURT:  Ladies and gentlemen, I did not

7    anticipate that the evidence would be over so quickly today.

8    There is lots yet to do.  There are motions that the lawyers

9    will make and that I will have to rule on, and also there are

10   jury instructions to be prepared that are a little complex

11   and are going to take me some time and working with the

12   lawyers on jury instructions.

13      We are not going to have anything else for you until

14   tomorrow morning.  Let me excuse you for the rest of the day.

15   You can take the day off and do whatever you want.  I usually

16   tell jurors at this point that I won't report to your spouses

17   or employer that you got part of the day off.  You can do

18   what you want.

19      It is important that you keep your mind open.  You have

20   not heard everything yet.  There may be more testimony.  Even

21   though the parties have rested, sometimes there is a reason

22   to reopen.  You haven't heard the instructions on the law,

23   nor the arguments of counsel.  Of course, you have not

24   conferred with each other regarding deliberations and a

25   verdict.

1        The reason I recite those things is that it is important

2    for you to keep your minds open on all issues and not

3    conclude anything until you have heard everything.

4        Also, it is important that you don't discuss the case with

5    each other or anyone else.  Don't let anyone talk to you

6    about it.  Don't read, view or listen to any news accounts.

7    Don't do any independent research on any of the matters you

8    heard discussed in court.  We will work as fast as we and

9    hopefully we will be ready for you first thing tomorrow

10   morning.

11       I do have an 8:30 hearing tomorrow morning on another

12   matter, and I am hopeful that we will be ready otherwise

13   first thing in the morning.  I will try not to make you wait.

14   It could be that we wouldn't start until some time after

15   9:00.  We will try and be ready for you.

16       Okay.  You all may be excused until 9:00 tomorrow morning.

17       Thank you.

18     (The following occurred outside the presence of the jury.)

19            THE COURT:  Okay.  Who is first?

20            MR. SILVERMAN:  Judge, I presume each side has a Rule

21   50 motion.  We don't we start and say the first two sentences

22   so we preserved it, and we can talk about argument.

23       From the defendant's, we renew their motion under Rule 50

24   for judgment as a matter of law.

25            MS. CHIEN:  State of Washington would also move,

1    given the unrebutted facts and dismiss defense -- GEO's

2    assertion of the residential exemption, the government

3    facilities exemption, their assertion of intergovernmental

4    immunity, and would join private plaintiffs' motion regarding

5    the Minimum Wage Act on liability, and dismiss derivative

6    sovereign immunity.

7         MR. WHITEHEAD:  That is correct.  We anticipate

8    filing a motion here momentarily.  We would move on the MWA

9    claim, as well as GEO's defenses regarding intergovernmental

10   immunity, derivative sovereign immunity, and the application

11   of the MWA exemptions that GEO has identified.

12        MR. SILVERMAN:  Judge, on behalf of defendants, we

13   renew our motion, since we put on our defense case, we are

14   filing a short supplemental motion that deals with the

15   evidence presented on the intergovernmental immunity and

16   sovereign immunity issues.  On that basis, we renew as to our

17   previous motion, as well as we believe we have established

18   our affirmative defenses on those two defenses as a matter of

19   law.

20        THE COURT:  All right.  I have three motions pending.

21   The question on the certification of -- or decertification of

22   the class. When is that going to be ripe?

23        MR. WHITEHEAD:  We were going to file that motion on

24   Monday.  We can file sooner if Your Honor would like us to.

25        THE COURT:  I thought you all had agreed on resetting

1    that date from the 18th?

2            MS. SCHEFFEY:  It is --

3            MR. WHITEHEAD:  The motion is noted for next Friday,

4    June 25th, making our opposition due on Monday, June 21.  As

5    I have stated, if Your Honor would prefer us to complete the

6    briefing schedule sooner, we can certainly make that happen.

7            MS. SCHEFFEY:  GEO would work with private plaintiffs

8    on any schedule they propose for replies.

9            MR. WHITEHEAD:  By sooner, Your Honor, I mean

10   tomorrow.

11           THE COURT:  It appears to me that we don't have to

12   deal with that issue in this first phase of the case.  How a

13   verdict applies to the class would be subject to revision

14   after the fact, perhaps.  I don't think it has anything to do

15   as this point with this first phase.  I am not inclined to

16   adjust your schedule.

17      Now, you all want to be heard, and it is -- some of what

18   you mentioned you wanted to talk about has to do with jury

19   instructions.  I am willing to hear whatever you have to say

20   as long as it is entertaining argument.  So who goes first?

21           MR. SILVERMAN: I will start for defendants.  I

22   believe the objections to the jury instructions have been

23   fully briefed.  Just working backwards from the tentative

24   instructions that the Court had prepared, I think we have --

25   we have set forth from the defendant's perspective our views

1    on which -- starting with the question of whether there is

2    employment -- employee/employer status under the MWA.  You

3    have seen the briefing from defendants on the question of

4    which test applies.  We fully briefed that.  So from a --

5    from that perspective, we have put our objections to the

6    tentative until, again, they become the finals.

7         To the extent the Court then does issue jury instructions,

8    I presume both sides will then object to the ones that they

9    don't agree with to preserve that record.  In terms of an

10   oral argument of what each side has already briefed in the

11   objections, I think we have done that.

12        Unless Your Honor wants to rehear some of those issues, I

13   just want to preserve our arguments, which is that we have

14   put in our objections to what we call the tentative

15   instructions.  Once you issue them, we will renew them to

16   preserve them.

17             THE COURT:  Okay.

18             MR. SILVERMAN:  The only other issue I would raise is

19   there is one peculiar aspect from the defendant's perspective

20   on the jury instructions in which on the intergovernmental

21   immunity instruction, the verdict form says quote "unfair

22   discrimination." We just want to make sure, because the word

23   "unfair" is really a question under the jury instructions.

24   Either you find discrimination or you don't.  I don't want

25   there -- I don't want there to be a situation where the jury

1    finds there is discrimination and then goes to the verdict

2    form and then has a separate question of whether they were

3    unfair.  So I raise that on the verdict form.

4        I just want to make it abundantly clear we are not waiving

5    our objections.  Once you issue what you believe to be the

6    jury instructions as opposed to the tentative which nobody

7    was supposed to rely on, we need our opportunity to preserve

8    our objections to those, to the ones we object to.

9        THE COURT:  Yeah.  We are a long way from final

10   instructions.

11       MR. SILVERMAN:  If we can set some time so we can

12   argue about that when they come.

13       THE COURT:  Who is next?

14       MR. BERGER:  To the point of jury instructions,

15   although we did outline our primary concerns with the

16   discussion drafts in our submission, there are a few

17   additional items in the jury instructions that we would like

18   to be heard on both in terms of inclusion of some of the

19   proposed instructions, both agreed instructions and disputed

20   instructions that were not included in the discussion draft,

21   and that a couple of issues -- smaller issues with the

22   verbiage of some of the discussion drafts that we didn't

23   raise in the written responses, but, you know, have since

24   come to appreciate.  We would just want on opportunity to be

25   heard on those as well rather than the assumption that

1    everything was covered in our written submission.

2             THE COURT:  Okay.  State?

3             MR. POLOZOLA:  Yes, Your Honor.  We also have four

4    additional instructions that we would proposed adding to the

5    discussion draft -- or three for the State.

6        The first would be the parties agreed Instruction No. 17

7    that was about stipulations of fact.  We have since had

8    admitted into the record Exhibit 609 with the agreed facts.

9    We would request an instruction instructing the jury that

10   Exhibit 609 contains agreed facts that are to be deemed

11   proved in this case.  Additionally --

12            THE COURT:  Excuse me.  That's your instruction

13   number what?  17?

14            MR. POLOZOLA:  The parties agreed Instruction No. 17,

15   but contained a placeholder for the actual agreed facts.

16   That is now Exhibit 609.

17            THE COURT:  All right.  All right.

18            MR. POLOZOLA:  Additionally, we would request the

19   plaintiff's proposed Instruction No. 7, which set forth the

20   basic elements of a Minimum Wage Act claim.  We think this is

21   particularly important to include, given the amount of

22   testimony and suggestions by GEO that the ICE-GEO contract

23   defined who could be an employee.  It is Washington state law

24   that defines how "employee" is to be considered in this case.

25   We believe the proposed Instruction No. 7 clearly explains

1    that to the jury and would ask the Court to include that

2    instruction.

3          THE COURT:  That's your requested No. 7?

4          MR. POLOZOLA:  Yes, in the disputed instructions.

5      The third for the State, Your Honor, is the plaintiff's

6    proposed Instruction No. 10 that volunteers are not permitted

7    under state law for for-profit companies.  We think this is

8    extremely important given the name of the voluntary work

9    program and the amount of emphasis that GEO has placed on the

10   workers as volunteers.

11     To avoid prejudice to the State, the jury should have a

12   clear understanding that under state law law volunteers are

13   not permitted for-profit companies, and we request an

14   instruction to that effect.  That is our proposed Instruction

15   No. 10, Your Honor.

16     We have objections that have been lodged in writing to the

17   Court that was a join submission with the private class.  I

18   believe it was ECF 455 in the State's case.

19          THE COURT:  I have that in front of me.  I have not

20   analyzed all of that.  I have it.  I have read it once.

21          MR. POLOZOLA:  I won't walk you through that in

22   detail.  We do have objections that were contained in the

23   written submission as well as additional objections that we

24   would like to lodge for the record.

25     In particular, with the Court's proposed Instruction No. 4

1  on the burden of proof, we would lodge an objection to the

2  second sentence about intergovernmental immunity for the

3  reasons explained in our forthcoming JMOL motion.  We don't

4  believe that issue should be put to the jury.  It is a

5  question of law, and there hasn't been sufficient evidence

6  presented here to warrant putting it to the jury.

7      To the extent GEO continues to press and the Court allows

8  the jury to consider GEO's affirmative defenses on the

9  exemptions under the Minimum Wage Act, those exemptions are

10 issues on which GEO bears the burden because they are

11 affirmative defenses.  The instruction on its -- it is page

12 four of the Court's discussion draft would need to clearly

13 delineate that GEO bears the burden on any such exemptions if

14 they are put to the jury.

15     Your Honor, we also, for the proposed Minimum Wage Act

16 definitions instruction that the Court included in its

17 discussion draft, that was on page 15.  We briefed some of

18 these objections.  I do want to be clear that we object to

19 the exception -- or the definition of "employee" including

20 the exception for government facilities in the definition.

21 Part of that is for the reason I just explained, that it is

22 GEO's burden to prove entitlement to an exemption, and

23 putting them together muddles that for the jury.

24     Second, we don't believe GEO is entitled to assert that

25 exemption at all, so there is no need for it to be included

1    in the definition of "employee."  Including one exemption

2    rather than all of the exemptions in the Minimum Wage Act

3    suggest there is undue import for that one.  We don't believe

4    that is appropriate.

5            THE COURT:  Under this draft, it was drafted in mine

6    with one immunity offense available based on that one

7    exemption.  Where would the exemption go?

8            MR. POLOZOLA:  Your Honor, I believe if the

9    intergovernmental immunity issue is going to be put to the

10   jury, that exception or exemption (k) should be with the

11   immunity instruction so as not to suggest it is at issue

12   under the Minimum Wage Act because it should not be.  The

13   Court has already held repeatedly, and we are going to

14   explain this in our JMOL briefing in more detail, that GEO is

15   not entitled to exemption (k) because it is not a state,

16   local or municipal institution.

17       By including it in the definitions under the Minimum Wage

18   Act, it suggests to the jury that the Northwest Detention

19   Center might be.  That would be contrary to the Court's prior

20   rulings.

21       We would suggest the plain language of that exemption, if

22   it is to be included, be included only in the immunity

23   discussion so as to clearly frame that issue for the jury.

24           Additionally, Your Honor, for the instruction on page 17

25   of the discussion draft, these were the proposed factors for

1  the Minimum Wage Act.  Again, we have briefed the issue that

2  we don't believe factors are necessary.  We believe the

3  definitions under the Minimum Wage Act are clear and should

4  apply.

5      Insofar as the Court will instruct the jury on a

6  multifactor test, I would point out a few things here.

7  First, the language in the first sentence, Your Honor, that

8  refers to the detainees enrolled in the VWP, we believe

9  mischaracterizes the workers and the evidence in this case.

10  They don't enroll in the voluntary work program.  They are

11  workers at the Northwest Detention Center.  They should be

12  called detainee workers in the State's view.

13      Additionally, on the first factor that the Court proposes

14  to use, the nature and degree of control of the detainees by

15  GEO, we believe the issue is not control of the detainees,

16  but of the detainees' work.  By framing this first factor as

17  merely the degree of control, we believe that essentially

18  allows for a detention-specific Minimum Wage Act analysis

19  which the Court has held is not appropriate, and we believe

20  is not appropriate.  We believe that factor would need to

21  focus on the nature and degree of control of the detainees'

22  work by GEO.

23      We have briefed in ECF 455 objections related to the

24  Factors No. 6 and 9.  I will rest on those.

25      With respect to the intergovernmental immunity instruction

1    on page 18, that will be subject to our JMOL motion, and we

2    don't believe it should be put to the jury, but insofar as it

3    is, we have proposed additional language in our filing at ECF

4    455 that we believe would be appropriate if the issue is

5    going to be submitted.

6        The only final thing is on the verdict form, I will note

7    for the record that was briefed at ECF 455.  We have provided

8    additional proposed language consistent with those objections

9    in that filing as well.

10       Thank you, Your Honor.  I appreciate you letting me get it

11   all out there.

12           MR. SILVERMAN:  To put on the record, the defendant's

13   object to the proposed instructions that counsel has just

14   made.  Obviously, I believe that we need the opportunity to

15   respond once they put it in writing.  I think the Court has

16   indicated you will provide us that opportunity.

17           MR. BERGER:  Your Honor, I apologize for not being

18   clear about the substance of my additional requests and

19   objections earlier.  I didn't know we were going to get into

20   the substance at this point.

21       In addition to what Mr. Polozola laid out, the only two

22   additional things I would note is we do have a concern or

23   objection to the discussion draft at page 10 dealing with

24   corporations can only act through employees, agents or

25   officers.  Our concern is with the inclusion of classes in

```
 1   that instruction, because classes do not have employees,
 2   agents or officers in the same way.
 3           THE COURT:  I am aware of that.
 4           MR. BERGER:  Instead, we would propose giving the
 5   joint Instruction No. 1, which defines class actions.
 6           THE COURT:  Okay.
 7           MR. BERGER:  That's all I have to add.  Thank you.
 8           MR. SILVERMAN:  Again, Your Honor, we are
 9   anticipating that we are going to have a time to argue our
10   substantive objections once you come out with the proposed
11   instructions.
12           THE COURT:  Absolutely.  The problem is getting me
13   time to make the changes that are appropriate.  I have these
14   motions in front of me.  Any of you have anything else to say
15   on these, on the motions pending?
16           MR. SILVERMAN:  Yes, Ms. Mell has one note on the
17   issue that came up this morning, the L&I administrative
18   policy.
19           MS. MELL:  Your Honor, getting an instruction that
20   contains the ESA1 descriptor for sub (k) would be important,
21   particularly if the request or the Court is moved to put in a
22   provision or instruction that says "private corporations
23   can't have volunteers."  Private corporations can have
24   volunteers if they are operating and functioning within the
25   confines of state law mirrored to federal law where the
```

 1   detention is exempt from the Minimum Wage Act.

 2       It would be very prejudicial to GEO to have an instruction

 3   saying private corporations can't have volunteers when they

 4   are mandated to have volunteers by federal law, and under

 5   state law any private contractor operating at the direction

 6   of the state with regard to residents, inmates or patients of

 7   state, county or municipal correctional, detention, treatment

 8   or rehabilitative institutions can use volunteers.  The

 9   testimony was clear CI, Correctional Industries, is an

10   entirely volunteer program.

11           MS. CHIEN:  We object to any instruction as to ESA1.

12   As Mr. Grice testified, that's not the law.

13           MS. MELL:  It is the standard and guidelines given to

14   employers like GEO.

15           THE COURT:  Wait a minute.  Which of you speaks for

16   GEO on jury instructions?

17           MR. SILVERMAN:  I do.

18           THE COURT:  Okay.  I only want to hear from one

19   person on this subject from each party.  That includes you

20   too, Ms. Chien.  Mr. Polozola started this.

21           MS. CHIEN:  Got it.

22           THE COURT:  All right.  Anything else now?

23       On these motions, I am satisfied, as I was at the

24   conclusion of the plaintiffs' case, that there are issues of

25   fact on the subject matter of this case that require that it

1   go to the jury.  In regard to requests for judgment on
2   particular issues and defenses, those will be resolved in the
3   jury instruction process.
4       I am satisfied that the State's motion and the class's
5   motion for judgment -- that is for final judgment should not
6   be granted because there are issues of fact that remain for
7   the jury.
8       Now, is there anything else you want to talk to me about
9   before I get to do my work?  I have a heavy remaining day to
10  get these instructions in shape.  I need you to stand by to
11  come back to Court when I need you.  It will be afternoon.
12  Anything else now?
13          MR. SILVERMAN:  Nothing else from the defendant.
14          THE COURT:  You all go get your final arguments
15  ready.  You got time to prepare now.  That should make them
16  short.
17      Okay.  I will work as fast as I can to try and get these
18  prepared and that conform to law and the evidence.
19          MS. MELL:  Thank you, Your Honor.
20      (Recessed.)
21
22
23
24
25

1                                          AFTERNOON SESSION

2                                            JUNE 14, 2021

3      (The following occurred outside the presence of the jury.)

4          THE COURT:  This is an additional instruction

5    conference basically.  I have provided a draft set of

6    instructions.  I have not numbered them because there may be

7    more changes.  If you refer to them, you have to give us time

8    to catch up to the instruction you are talking about.

9          I read your submissions and made a lot of changes in what

10   I submitted before.

11         It is clear from the evidence, in my judgment, that the

12   defendant is not entitled to instructions on derivative

13   sovereign immunity or direct regulation intergovernmental

14   immunity or the resident exception to the Minimum Wage Act

15   because in the last matter the duties do not require the

16   detainees live at the detention center.  That's substantially

17   proven by all the evidence we have had that those jobs, those

18   duties could be conducted by GEO staff.  I don't think the

19   evidence supports an instruction on that defense.

20         I do think, as is reflected in the instructions, that the

21   defendant's have made out a case for immunity based on

22   discrimination.  That is the basis for these instructions.

23         Now, this is not the time for formal exceptions.  That

24   will come later.  I want to know what is left out and that

25   you think is necessary and any objections you have to these

```
 1    instructions. In other words, I am interested in correcting
 2    what we have here at this point.
 3        Who goes for the State?  Mr. Polozola?
 4            MR. POLOZOLA:  Yes.  Thank you, Your Honor.  Our
 5    primary point of discussion would be the intergovernmental
 6    immunity instruction, which perhaps is no surprise.  We have
 7    a number of issues that we would like to point out and
 8    address with the Court.
 9        I will let you catch up, per your request.  Are you there?
10            THE COURT:  I am caught up.
11            MR. POLOZOLA:  Starting with paragraph 1, Your Honor,
12    we believe that --
13            THE COURT:  Just a minute.  You are talking about the
14    affirmative defense instruction?
15            MR. POLOZOLA:  The intergovernmental immunity
16    instruction, Your Honor.  Yes, in the first paragraph, it
17    starts with, "It is an affirmative defense to plaintiffs'
18    claims."
19        We believe the second sentence is somewhat unclear and
20    could be revised to more accurately state the law which would
21    be, "Discrimination here means to treat GEO less favorably
22    than similarly situated state facilities."
23        Then from there, Your Honor, we believe the second
24    paragraph that begins with as applied here --
25            THE COURT:  Just a minute.  Give me the language you
```

1    propose again.

2           MR. POLOZOLA:  For the second sentence we would

3    propose, "Discrimination here means to treat GEO less

4    favorably than similarly situated state facilities."

5           THE COURT:  Change to "treat GEO less"?

6           MR. POLOZOLA:  "Less favorably than similarly

7    situated state facilities."

8           THE COURT:  Okay.  Go ahead.

9           MR. POLOZOLA:  Thank you, Your Honor.  The reason for

10   that is GEO is the defendant asserting the defense and

11   asserting that it is the entity that is being discriminated

12   against.  So the question must necessarily be framed as

13   whether GEO is being treated differently from similarly

14   situated entities in our view.

15      Going on to the second paragraph, Your Honor.  We would

16   propose striking that paragraph because it is unnecessary and

17   it assumes what is essentially the key issue about whether

18   the State and GEO are, in fact, similarly situated and

19   therefore proper comparators.

20      We believe the instruction would be clearer, more

21   accurate, and make more sense to the jury if it simply

22   proceeded to the third paragraph that defines how the jury

23   should determine similarity.  We do have some proposed

24   changes to that paragraph as well.

25           THE COURT:  What are those?

1          MR. POLOZOLA:  Those are similar to what we had

2    identified before, Your Honor.  In short, that the State has

3    no, quote, "voluntary work program," in all caps, the way

4    that GEO does.  So by drafting the instruction this way, it

5    suggests an equivalence that is not supported in the

6    evidence.

7       What I would propose on the third paragraph would be to

8    state that, "In determining similarity, you may consider

9    whether there are any significant differences between GEO and

10   other state facilities and work programs operated by each and

11   between detainees of each that justify the differential

12   treatment."  I'll repeat it for you.

13         THE COURT:  Go ahead, repeat it.

14         MR. POLOZOLA:  "In determining similarity, you may

15   consider whether there are any significant differences

16   between GEO and other state facilities,, work programs

17   operated by each --

18         THE COURT:  GEO and other -- between GEO and other

19   state facilities?

20         MR. POLOZOLA:  "And state facilities," Your Honor.

21         THE COURT:  All right.

22         MR. POLOZOLA: "Work programs operated by each and

23   between detainees of each that justify the differential

24   treatment of each."

25         THE COURT:  "Work programs operated by each."

1          MR. POLOZOLA:  "And between detainees of each."

2          THE COURT:  Okay.

3          MR. POLOZOLA:  "That justify the differential

4    treatment."

5          THE COURT:  Okay.  I got your suggestion.

6          MR. POLOZOLA:  On the related point, if I may, I

7    would like to address the verdict form on this

8    intergovernmental immunity issue as well.  In particular, to

9    really be clear on what the jury must determine here, the

10   question is whether there is unfair discrimination, not

11   merely whether GEO is treated differently from any other

12   entity.

13      We would propose a two-question verdict form on this issue

14   with the first being:  "Do GEO and Washington operate

15   similarly situated work programs?"

16          THE COURT:  "Operate"?

17          MR. POLOZOLA:  "Similarly situated work programs."

18          THE COURT:  Okay.

19          MR. POLOZOLA:  The second question:  "If so, does the

20   Minimum Wage Act discriminate against GEO because it is a

21   federal contractor?"

22          THE COURT:  I got it.

23          MR. POLOZOLA:  Thank you, Your Honor.  We propose

24   that because it really is a two-part inquiry.  There have to

25   be programs or facilities that are similarly situated before

1    you can determine whether the differential treatment, if any,

2    is due to GEO's status as federal contractor.  We believe

3    that would appropriately get to the issue.

4        I will turn it over to class counsel, if they have

5    additional things to add, if I may.

6            THE COURT:  You woke them up.

7            MR. BERGER:  I am here.  I am paying attention.

8        We would join the State's concerns and statements

9    regarding the intergovernmental immunity instruction and

10   question on the verdict form.

11       You know, in particular, the second paragraph of the

12   instruction drafted by the Court seems to be redundant of the

13   first and third paragraphs, and the reference to the

14   capitalized voluntary work program, you know, presupposes

15   facts, you know, that are not in evidence regarding the

16   different state programs.  Not all the state programs that

17   were discussed were voluntary.  For example, the Class III

18   programs in the correctional facilities and use of that

19   phrase, which is specific to the GEO program, suggests a

20   congruity that is not necessarily borne out by the evidence,

21   and therefore shouldn't be included in the jury instruction.

22       Beyond that, we have a few comments on some of the other

23   instructions.  The instruction providing definition under the

24   Minimum Wage Act that begins, "the law of the State of

25   Washington in the Minimum Wage Act."

1          THE COURT:  Just a minute.  Yes.

2          MR. BERGER:  We note the last sentence of that

3    instruction, "Any agreement between such employee and the

4    employer to work for less than such wage rate is no defense

5    to such action."  It is an accurate statement of law, but it

6    is redundant of the instruction -- two instructions later

7    that deal with agreements and volunteers.

8      To avoid that redundancy, might be easiest just to strike

9    that sentence from the last -- that last sentence in the

10   definitional instruction.  We just wanted to note that

11   redundancy.

12         THE COURT:  Right.

13         MR. BERGER:  Then turning to the instruction setting

14   forth the elements of the Minimum Wage Act claim.  So the

15   first parenthetical or the first element, I would just note

16   it seems that we should be talking -- even though the parties

17   are used Northwest Detention Center and Northwest ICE

18   Processing Center interchangeably throughout the case, I

19   believe at this point Northwest ICE Processing Center is the

20   proper --

21         THE COURT:  Wait a minute.  You are talking about

22   line 8 where I said "Northwest Detention Center"?

23         MR. BERGER:  Yes.

24         THE COURT:  And it is the Northwest?

25         MR. BERGER:  ICE Processing Center.

1          THE COURT:  Okay.

2          MR. BERGER:  Our bigger concern here, though, is that

3    we believe the verdict form should parallel the issues stated

4    in the instruction.  The first question on the verdict

5    form --

6          THE COURT:  Yes.

7          MR. BERGER:  First question on the verdict form we

8    believe should parallel the first elements on the instruction

9    and read, "Under the Washington State Minimum Wage Act, did

10   GEO employ detainee workers in the voluntary work program at

11   the Northwest ICE Processing Center?"

12         THE COURT:  All right.  I see that.  I have it down.

13   I don't know if Mr. Polozola was through.

14         MR. POLOZOLA:  I am, Your Honor.  We join

15   Mr. Berger's request and explanation.  We are done.  Thank

16   you.

17         MS. SCHEFFEY:  Your Honor, I would begin by stating

18   that GEO objects to the changes that the State and class

19   plaintiffs have just requested, as well as renewing our

20   objections in ECF 378-1 and ECF 349.

21      I wanted to discuss objections to this current draft.  I

22   want to start with the instruction that defines "employ,

23   employee and employer."  Says, "The law of the State of

24   Washington and the Minimum Wage Act provides."

25         THE COURT:  What is wrong with that?

```
1          MS. SCHEFFEY:  First, we would object to the fact
2    this does not include the exception to the Minimum Wage Act,
3    exception (k)  we believe it is unnecessarily confusing to
4    the jury to not explain to them there are exceptionS to the
5    phrase "employee," including for the State residents, inmates
6    of a correctional facility, detention center, and suddenly
7    spring it on them in the discrimination instruction.  Doesn't
8    make clear how the law works, and I don't think they will be
9    able to see how different exceptions play out.
10         We also object to the extent the only definition given to
11   the jury to consider about what an employee is, is just any
12   individual employed by an employer.  This instruction is
13   directly contrary to the controlling law in the State of
14   Washington and Anfinson vs FedEx, which has unambiguously
15   found that the statutory definition of employee is ambiguous
16   and it incorporates the economic dependence test evolved by
17   the federal courts.  The citation for that is Anfison vs
18   FedEx, 174 Wn.2d 851.  The pincite is page 868.
19         THE COURT:  Now, just let me ask you about that.  Are
20   there any cases that have defined employ and employer and
21   employee differently than they are defined in the statute?
22         MS. SCHEFFEY:  Yes.  I would state that Anfison and
23   also the other federal case law states that you look to the
24   multipart test, the economic dependence test which defines
25   what an employee is.  Especially in this case and --
```

1    THE COURT:  Does the -- are there any cases that

2   are -- other than differentiating between independent

3   contractors and employees in the State of Washington that

4   require just a simple definition of or just require these

5   considerations in a straight question of whether one is

6   employed?  I am not sure I am putting that very well.

7    MS. SCHEFFEY:  Your Honor, I think you are right, the

8   case law is not perfectly clear, that's what you are alluding

9   to.  We point to *Calhoun vs State*, 146 Wn.App. 877 where the

10   court talked about the fundamental purpose and looked at an

11   individual who was participating in the SCC's program and

12   just said this doesn't align with the definition of

13   employment, but they did it as a matter of law.

14    I understand it is more complicated here where Your Honor

15   has decided there are fact issues.  I think those fact issues

16   related to the each of the factors in the economic dependence

17   test.

18    THE COURT:  Wait a minute.  You are talking too fast.

19   Give me the citation to your case against.

20    MS. SCHEFFEY:  *Calhoun vs State*, 146 Wn.App. 877.

21    THE COURT:  146?

22    MS. SCHEFFEY:  146, yes, Wn.App. 877.

23    THE COURT:  What does it say?  Defines employment

24   relationship?

25    MS. SCHEFFEY:  It both applies the exception (k), but

1    also states further when looking at detained individuals in

2    other non-traditional employment situations you have to look

3    at the fundamental nature of the relationship as a whole, see

4    if it fits within the definition of employment context.

5        That is the first objection.  I know this isn't the place

6    for formal exceptions, so I will keep moving on the current

7    draft.

8        We would renew our objection to the citizenship

9    instruction as we last briefed in ECF 349.

10            THE COURT:  Wait a minute.  Wait a minute.  I don't

11   know which instruction you are talking about.  Tell me

12   what --

13            MS. SCHEFFEY:  The page right after the definition,

14   if that helps.  Starts, "The Minimum Wage Act requires

15   employers to pay employees the minimum wage."

16            THE COURT:  Okay.  What is wrong with that?

17            MS. SCHEFFEY:  We object to this as not relevant to

18   this phase of trial because it is applicable only to the

19   payment of back wages and has nothing to do with whether

20   detainees should be employees or classified as employees

21   going forward.  The State's claim is purely forward looking.

22       This implies and will confuse the jury that if they find

23   they are employees that somehow they could supersede federal

24   law and entitle the individuals to minimum wage on a

25   forward-looking basis.

1           THE COURT:  Okay.  What else?

2           MS. SCHEFFEY:  Next one we would go to is the

3   following instruction, which I will call the volunteer

4   instruction which starts with, "An agreement between employee

5   and employer."  Mr. Berger already noted our first objection,

6   which is that the first sentence is in here twice, both in

7   the definition section and in this separate instruction.  We

8   think that redundancy is prejudicial --

9           THE COURT:  Wait a minute.  I don't know what you are

10  talking about.  Where is it a duplication?

11          MS. SCHEFFEY:  The sentence that starts with, "An

12  agreement between an employee and employer".  You see that?

13  That also is on -- if you go two pages back to the definition

14  instruction, the very last paragraph says, "An employer who

15  pays an employee less than minimum wages," the second

16  sentence in that paragraph, "Any agreement between such

17  employee and employer to work for less than such wage is no

18  defense to such an action."

19          THE COURT:  Okay.  I see what you mean.

20          MS. SCHEFFEY:  Just twice says "an agreement is no

21  defense."

22          THE COURT:  Yep.  What next?

23          MS. SCHEFFEY:  We argue there is no basis in law for

24  this volunteer instruction.  The Minimum Wage Act explicitly

25  includes a volunteer exemption in its definition.  In the

1    definition sections proposed do not indicate they are going

2    to include any of those exemptions.  To the extent we are not

3    explaining exemption, there is no legal support for giving a

4    counter exemption essentially saying the opposite applies.

5        As we would state again under the economic realities test,

6    volunteering is relevant and has been relevant up to this

7    point in all of our briefing as a defense to the Minimum Wage

8    Act because it goes directly to the issue about an employer's

9    control over the individual.  Because all of the former

10   detainees testified about their understanding of the program

11   being voluntary.  That goes to whether they could have a set

12   schedule, whether they were supposed to show up every time,

13   if GEO could tell them which position to perform.  All of

14   that is relevant to the employment relationship and how we

15   would typically assess whether someone is an employee.

16       Without that, essentially, there is no distinction, and we

17   also think this essentially just instructs the jury what to

18   find, which is that it is a voluntary work program, means it

19   is employment.

20       So we would argue that if this instruction is to be given,

21   it must be made clear to the jury that it is a question of

22   fact for them to determine whether the voluntary work program

23   is employment or whether the detainees are employees of GEO,

24   and that they may consider the voluntary nature of the

25   program in reaching that conclusion because that is a fact

```
1    issue, Your Honor.
2           THE COURT:  Just a minute.  Let me think about that.
3    I want to hear from plaintiffs on that.
4           MS. SCHEFFEY:  I further state the statement,
5    "Volunteering is not a defense to the Minimum Wage Act claim"
6    is legally inaccurate because in some circumstances it is.
7       The next one we would --
8           THE COURT:  Under what circumstances here is it?
9           MS. SCHEFFEY:  Exemption (d), any individual who
10   volunteers for a governmental body or agency for a nominal
11   stipend is not an employee under the Minimum Wage Act.  If
12   someone volunteers for ICE -- that's exemption (d) to RCW
13   49.46.010.  That's why we -- and we briefed this in ECF 349.
14   We believe this instruction is not appropriate because there
15   is an explicit exemption.
16          THE COURT:  Just a minute.  Let me get the statute.
17          MS. SCHEFFEY:  Go to RCW 49.46.010, which is the
18   definition section of Minimum Wage Act, under section (3)(d),
19   which states that exceptions to the definition of employee
20   under the Act.  It explains --
21          THE COURT:  Wait a minute.  Subsection what?
22          MS. SCHEFFEY:  (3)(d), as in dog.
23          THE COURT:  There is no (3)(d(k)  (5)(d(k)
24          MS. SCHEFFEY:  Someone printed this for me.  It
25   starts, "With any individual engaged in the activities of
```

1    educational, charitable" --

2          THE COURT:  That's (5)(d(k)

3          MS. SCHEFFEY:  Okay.

4          THE COURT:  Unless -- you are right.  It is (3)(d) in

5    the pocket part.  What is your point with that now?

6          MS. SCHEFFEY:  We think this instruction goes too far

7    because it is one thing for this Court to determine that the

8    exception doesn't apply and therefore not instruct the jury

9    on it.  It is an entirely different thing to give them a

10   further instruction that the Court has found this doesn't

11   apply and volunteering has no weight.

12      We believe the appropriate way to deal with the

13   volunteering not applying is how you are dealing with every

14   other exception, which is you don't include it in the

15   definition.  We think all exceptions should be treated the

16   same.

17          THE COURT:  Ms. Scheffey, you talk very fast and in a

18   monotone.  It is very hard to follow you.  Slow it down and

19   take one thing at a time, and I will want to hear from the

20   defense on that issue.  What is next?

21          MS. SCHEFFEY:  The next thing would be the

22   instruction that begins, "Plaintiffs' allege that GEO's

23   practice of paying detainee workers one dollar per day for

24   work."

25      GEO objects to this instruction, again, as contrary to the

1    controlling law in *Anfison* as we just discussed.  There is no

2    definition of "employee," which the jurors are permitted to

3    apply as a matter of fact.  Gives them no instructions about

4    the facts.

5            THE COURT:  I will look at your case.

6            MS. SCHEFFEY:  We would further object that this

7    doesn't explain to the jury that they need to find whether

8    detainees are employees, which is what is in the verdict

9    form.  It should instruct them that that is their duty.

10   Their duty is not to find whether they -- what the amount is

11   that they should be paid or that they were employed.  They

12   have to find that detainees fall within the definition of

13   employee, and that GEO falls within the definition of their

14   employer.

15        Again, we would ask for some sort of instruction that that

16   is a question of fact for the jury to determine because right

17   now the phrasing already talks about paying detainee workers

18   one dollar per day for work performed, which tracks the

19   definition and does not seem to give the jury any discretion.

20   Presupposes that there was work performed.  An employ is to

21   permit to work.

22           THE COURT:  Go ahead.

23           MS. SCHEFFEY:  I think Mr. Berger, we would join his

24   request that the Northwest Detention Center be changed to the

25   Northwest ICE Processing Center for consistency.

1          THE COURT:  Yes.  I got that.

2          MS. SCHEFFEY:  Then the last one is that we would

3    object to the defenses not given.  GEO believe it has proven

4    through the evidence -- or presented evidence which a

5    reasonable jury could find it is entitled to derivative

6    sovereign immunity.  There has been extensive testimony that

7    each of the things it did with respect to the voluntary work

8    program were directed by ICE coming from job descriptions to

9    placement and where they place people in the program, amount

10   of pay.  Every element that we have gone through GEO has

11   presented some evidence that ICE directed it to do so.

12       We believe that remains a fact issue and we do not believe

13   the facts are decidably on one side or the other.

14       The last would be we maintain the jury should be

15   instructed as to the resident exception to the Minimum Wage

16   Act because it has presented evidence that one of the key

17   duties of the voluntary work program detainees was to be

18   available and detained at the facility when the task arose,

19   so they had to reside or sleep there.

20          THE COURT:  Okay.  All right.  Thank you.

21       Let me go back to plaintiffs regarding the definition of

22   employment and that case, if you have it.  I am going to ask

23   Rachel to bring it for me, 146 Wn.App.  Okay.  Who wants to

24   respond regarding the definition of employment and the

25   volunteer instruction?

1           MR. BERGER:  Your Honor --

2           THE COURT:  Nobody.

3           MR. BERGER:  To start, with respect to *Anfison*, that

4    was a test that was specifically developed first by the

5    federal courts and then adopted by the Washington court to

6    distinguish between independent contractors and employees.

7    It simply does not apply here where there is no -- there is

8    no question of independent contractor status.  Instead, the

9    definition in the RCW applies, and I think we have covered

10   that in our prior briefing.

11      With respect to -- there is no cases applying that test

12   outside of the independent contractor classification issue.

13      *Calhoun* is not even a Minimum Wage Act case.  It was a

14   case brought under the Washington Law Against Discrimination

15   and, in fact, the court states in that case -- specifically

16   states, "The state responds that neither the FLSA nor the MWA

17   applies to the present case.  We agree."

18      So that court -- that case doesn't tell us anything about

19   the test for employee status under the Minimum Wage Act.  The

20   court does go on to note the section (k) exemption, but the

21   basic holding is that the MWA doesn't even apply in that

22   situation because it was not a Minimum Wage Act case.

23           MS. SCHEFFEY:  If I may point you to the paragraph I

24   was referring to.  Paragraph 16 of that case, where the court

25   says, "The record provides insufficient indicia of employment

1    in this case."  It goes on to state, "That *Calhoun*'s

2    employment is optional, paid and supervised, however, does

3    not necessarily demonstrate that he is an employee for

4    purposes of this statute.  Rather, he is a pretrial detainee

5    attempting to adapt to life at the SCC.  It is healthy for

6    SCC residents to remain active and feel productive on a daily

7    basis.  For many of these residents, contributing to the

8    community in which they live undoubtly facilitates the

9    treatment process.  The SCC, which recognizes this, has

10    developed a treatment program into which these principles are

11    integrated.  Earning a living is the goal of most workers,

12    but the primary goal of work at SCC is to maintain a healthy

13    life-style and promote good habits for residents.  We are not

14    persuaded that Calhoun is an employee for purposes of Chapter

15    49.60 RCW.  That is not applying the exemption (k)  it is a

16    separate analysis.  We believe that tracks ^Naumde and the

17    other cases we have looked at, that at least consider the

18    alternate purposes of a program when individuals are confined

19    that may countervail the indicia of employment.

20            MR. BERGER:  Again, Your Honor, I think the critical

21    sentence there is, "We are not persuaded that Calhoun is an

22    employee for purposes of Chapter 49.60 RCW."  That's the

23    Washington Law Against Discrimination.  The Minimum Wage Act

24    is RCW 49.46.  The case is simply inapposite to the question

25    presented here.

1    MS. SCHEFFEY:  We would state the definition of

2    employee would be the same for either.  There is no

3    distinction between employees who can be discriminated

4    against and employees who can get the mainly.  People who are

5    employees both are entitled to minimum wage and to not be

6    discriminated against by their employer.  It is not a

7    dichotomy.

8        MR. BERGER:  The case law recognizes that the

9    definition of employee can vary from statute to statute which

10   is precisely why two paragraphs earlier the court says the

11   FLSA nor the Minimum Wage Act applies to the present case.

12       THE COURT:  Thank you.

13       MR. BERGER:  Turning to the other issue you asked

14   about, the instruction regarding volunteers.  I think it is

15   precisely because there has been so much stress on

16   "volunteer" and "voluntary" by the defense in this case that

17   is why this instruction is needed, because without this

18   instruction, the jury could easily misapprehend the law and

19   determine that individuals can volunteer for for-profit

20   corporations, and therefore be excluded or exempt from the

21   Minimum Wage Act when, in fact, subsection (d) exemption in

22   the Minimum Wage Act is very clearly and expressly limited to

23   government agencies and non-profit entities.

24       So to avoid confusion, possible jury confusion or

25   misapprehension or misapplication of the law, that is why the

1    instruction is needed, and it is relevant.  It is important

2    that it be given in this case.

3            MS. SCHEFFEY:  Your Honor, we state it may be one

4    thing if you were giving the jury factors to consider, ways

5    they can weigh various elements that they have heard

6    throughout the trial.  Here, in not giving them any elements,

7    any instruction of what they are considering, but then

8    telling them that volunteering is not a defense, you are

9    singling out a specific fact that we have presented evidence

10   of that we were not given notice of before trial would not be

11   something we could indicate as part of control, and excluding

12   it from the jury's purview.  We believe that would be

13   inaccurate as this is a voluntary program and that is a

14   critical element of why it may or may not be employment.

15   Obviously, GEO says it is not employment because the

16   voluntary nature shows it doesn't have the traditional

17   indicia of employment.  Doesn't have the same control, which

18   is what every other court has considered.

19           MR. BERGER:  Your Honor, all employment in the

20   United States is voluntary.  Otherwise, we have a Thirteenth

21   Amendment problem.  The point of calling it a voluntary work

22   program in the PBNDS is to distinguish it from compulsory

23   labor such as you might see in a prison setting like the

24   Class III, Category III work programs that were talked about

25   with Department of Corrections in this case where

1    incarcerated individuals can be required to work.  That's the
2    issue with voluntary here, not whether somebody choosing to
3    work or not choosing to work affects the definitional
4    question under the Minimum Wage Act as to whether GEO or the
5    employer suffered or permitted them to work.
6        MS. SCHEFFEY:  Your Honor, to the point that all
7    employment is voluntary in the United States, to the extent
8    that is true, then there is no need to instruct the jury.
9    They will be able to determine the voluntary nature and that
10   that is separate from employment.  Here, the thing that
11   Mr. Berger is disregarding, and the jury is not being told it
12   can consider, is that in typical employment, you are working
13   as *Calhoun* said, to turn a living.  That is the goal of why
14   you are working.  It is different when you have all of your
15   needs met.  We don't have any instructions about that despite
16   our request.  This just elevate plaintiffs' theory of the
17   case above all of the other exceptions, which are simply
18   being left out of the definition.
19       MR. BERGER:  Nothing in the volunteer instruction
20   prevents GEO's counsel from talking about control, from
21   talking about the ability of detainees to choose not to work
22   in the program, from talking about their ability to change
23   their mind from day-to-day on whether they want to
24   participate.
25     What is the problem here is, again, the possibility that

1    the jury will misapprehend the law to think that volunteers

2    for for-profit corporations can be exempt from the Minimum

3    Wage Act, and that clearly is not consonant with Washington

4    law.

5            MS. SCHEFFEY:  To the extent Washington law is any

6    individual employed by an employer, as we are instructing the

7    jury, that wouldn't be misapprehending it if they decided

8    that due to the voluntary nature it is not like employment.

9    I would just end with, you know, this specifically says that

10   volunteering is not a defense to the Minimum Wage Act and we

11   take issue with that because volunteering in terms of

12   control, which they are no longer being instructed on, is a

13   defense.

14           THE COURT:  Okay.  Let me point out to you that in

15   not listing considerations the jury should consider in

16   determining whether this is an employment relationship, I

17   have left it open for you to argue all of those elements that

18   have been covered by the evidence in the case.  This is not a

19   case where there is a decent definition of employment and

20   employer and employee.  It is what we are stuck with in the

21   statute.

22      I think on balance, after looking at these cases and

23   everything, I think it would be a mistake for me to try to

24   list those things that the jury should consider, because they

25   can consider everything in the evidence.  You can argue all

1    of those points that were in the original draft instruction

2    that I submitted.  I have not removed anything.  That

3    includes you can argue about the voluntary nature of this

4    relationship as indicating whether it was an employment

5    relationship or not.  That alone and by itself is not a

6    defense to the Minimum Wage Act.  I am satisfied with that

7    instruction as it stands.

8        Also, a quick look at this case tells me that it does not

9    establish a different -- that is the *Calhoun* case, it does

10   not establish some different definition of employment and

11   employee that is directly definitive of those terms in this

12   setting.  I don't think it adds much.  It is not a Minimum

13   Wage Act case in any event.  I don't think it changes the

14   definition at all.

15       Now, you have got to give me time to prepare these the way

16   I think they should be, which we will do right now and I will

17   consider your arguments and determine what, if anything,

18   should be changed.  Give us at least a half an hour to do

19   that.  I will ship the final proposed instructions and after

20   that and we will hear exceptions so we can argue in the

21   morning.  Thank you.

22                       (Recessed.)

23           THE COURT:  Counsel, we just sent a draft of the

24   instructions I propose to give.  Let me know when you are

25   ready to take exceptions, through Tyler.

```
 1                       (Recessed.)
 2           THE COURT:  Okay.  First, Ms. Scheffey suggested an
 3   additional instruction that I have received and read.  She
 4   asks for an instruction that says, "It is a question of fact
 5   for you, the jury, to determine if the ICE voluntary work
 6   program is employment and if GEO is the employer, considering
 7   all the evidence that has been presented."
 8       I would decline to give that additional instruction,
 9   Ms. Scheffey.  I think, certainly hope, that the jury would
10   understand that they are to consider all the evidence in the
11   case and answer the question of fact that is set out perhaps
12   a little differently than you set it out there, but it says
13   basically the same thing.  I don't think an additional
14   instruction is necessary.
15       I have provided to counsel proposed instructions numbering
16   1 through 20 and a proposed verdict form.  Now is the time to
17   present exceptions to those instructions.
18       Mr. Polozola.
19           MR. POLOZOLA:  Thank you, Your Honor.  The State
20   takes exception to Instruction No. 17 with respect to
21   intergovernmental immunity.  We don't believe it is an
22   accurate statement of the law, that it is unduly confusing to
23   the jury, and is unnecessary because the appropriate legal
24   test is whether the Minimum Wage Act discriminates against
25   the federal government, or with those with whom it deals.
```

1    And the relevant question is whether the law treats a

2    similarly situated entity better than GEO because GEO is a

3    federal contractor.

4        The appropriate comparator in that analysis would be a

5    private contractor that owns and operates a detention

6    facility or another similarly situated entity in the jury's

7    view.

8        We believe this instruction essentially makes that fact

9    determination for the jury by instructing them that the State

10   and GEO are to be compared directly against each other in

11   paragraph 2 as we discussed earlier.

12       We also note that we don't believe there are facts in

13   evidence that warrant instructing the jury on

14   intergovernmental immunity with discrimination.  We would

15   specifically point out that the Court has held previously

16   that the Minimum Wage Act treats private businesses like GEO

17   the same, whether or not they are doing business with the

18   federal government.  That is ECF 162.  We don't believe this

19   issue or this instruction, rather, is necessary.

20       Along the same lines, we, the State, would take exception

21   to the second question presented in the verdict form for the

22   reasons we discussed earlier.  We don't believe that this

23   question presented to the jury on immunity accurately sets

24   forth the question that needs to be resolved in this case in

25   order to resolve the intergovernmental immunity defense.

1          THE COURT:  Okay.  Thank you.

2      Mr. Berger.

3          MR. BERGER:  The private plaintiffs join the State's

4  exception to Instruction No. 17.  In addition to the

5  considerations stated by Mr. Polozola, we believe the second

6  paragraph implies or states a finding of fact that the State

7  and its work programs are comparable to GEO, and therefore is

8  an improper instruction.

9      In that respect, we also join the exception to the second

10  question of the verdict form for the same reasons, that it

11  does not, we believe, accurately set forth the question that

12  the jury needs to consider under the intergovernmental

13  immunity defense, which is whether GEO is being treated -- is

14  being discriminated against based on its status as a federal

15  contractor.

16          THE COURT:  Thank you.  Defense, Ms. Scheffey.

17          MS. SCHEFFEY:  Yes, as an initial matter, GEO takes

18  exception to the jury instructions that have been excluded

19  that were previously briefed at ECF 349 and 378-1.  It is

20  GEO's position those instructions should have been included.

21      GEO takes exception to lack of a derivative sovereign

22  immunity and an instruction on the resident exception to the

23  Minimum Wage Act.

24      GEO takes further exception to Instruction No. 13, in that

25  it does not include a full description of the law.  GEO

1    reiterates that the correct definition of employee must

2    follow some additional factors as set forth in *Anfison vs*

3    *FedEx,* which is binding case law.  GEO states the best

4    guidance ^*Naumde*, disclosed in ECF 349, which is a case out

5    of the Fourth Circuit, pincite is 990 F.3d at 372.

6         GEO takes exception to 14 as inappropriate at this time.

7    Damages are not an issue.

8         GEO takes exception to Instruction 15, particularly in

9    that it calls out the volunteer exception and twists it on

10   its head without legal authority.  There is no other

11   exception to the Minimum Wage Act that this Court has found

12   is inapplicable that it is getting its own exception to the

13   jury, instructing the jury specifically not to consider those

14   elements.

15        GEO takes exception to Instruction No. 16, specifically

16   when issued in connection with the instructions which state

17   that "employ includes to permit to work" and "employee is any

18   individual employed by an employer," this instruction

19   presupposes the result, talking about paying workers for one

20   dollar per day for work performed and asks if GEO employed

21   detainee workers without instructing them that they may

22   consider all evidence that has been presented or that this is

23   an issue of fact.

24        GEO further takes issue with Instruction 16 because it is

25   not an accurate statement of what the State must prove and

1  does not provide what the jury should consider, whether it be

2  all evidence that has been presented or a specific set of

3  factors.

4      Other than that, GEO still believes there should be

5  further instruction on what evidence the jury should consider

6  specifically with respect to its ability to consider the fact

7  that detainees volunteered, because as it stands, that has

8  been taken out of the consideration of the jury.  GEO would

9  object that the law has changed after summary judgment and

10 after the evidence has been presented, and GEO believes that

11 raises a due process issue.

12     That is all, I believe, other than renewing ECF 349 and

13 378-1.

14          THE COURT:  Thank you.  Who is going to be arguing

15 for plaintiff?

16          MR. WHITEHEAD:  I'll be arguing for private

17 plaintiffs.

18          MS. BRENNEKE:  Andrea Brenneke for the State of

19 Washington.

20          THE COURT:  For the defense.  Ms. Mell?  Okay.  I

21 think I told the jury to come back at 9:00.  I can't remember

22 that far back.  Okay.  Be here at 9:00 ready to go. I do have

23 a hearing at 8:30 or something.  I will try and be through

24 with that so we can start promptly.  We will hear argument

25 and see what the jury does.

1      I might tell you a couple of things.  One is that you

2   know, I come from a state court background, a long time ago

3   now.  But in the state court the judge can't comment on the

4   evidence.  I have never felt that was a bad thing, and I have

5   always tried to avoid commenting on the evidence.  The

6   instruction that was proposed that said you should consider

7   this, this, this, this and this in determining whether it was

8   an employment relationship, in my view is typical of the kind

9   of instructions that are simply comments on the evidence.  I

10  don't think the Court needs to pick out special things for

11  the jury to consider under ordinary circumstances, and

12  counsel can certainly point out all those things in argument

13  that you think are important in regard to an employment

14  relationship, provided, of course, that your argument is

15  supported by testimony or evidence.

16      I also wanted to make this comment.  We are faced here

17  with a bad state law that defines employment.  It is not a

18  complete definition in the statute, at least not as complete

19  as I would like, but it is what we have.  The jury will get

20  the law the way it is, not in the way that it probably should

21  be.  I think in the 18, nearly 18 years I was a state judge,

22  I was reversed 11 times, and one of those reversals was when

23  I instructed the jury on the -- and used the language of a

24  statute.  The appellate court, in its wisdom, reversed me on

25  that and said the statute was not complete and it shouldn't

1    have been the subject of an instruction without some

2    embellishment.  I never figured out what else I was supposed

3    to say because all I had was the law.  I think it was

4    something as simple as the criminal definition of intent or

5    something like that that was very poorly drafted in my view

6    in the jury instruction.  That was the only time I was

7    reversed on a jury instruction, I think, in the state court

8    in the years I served there.

9        That is not important to anybody.  It is just a little bit

10   of history that is there in the back of my mind that is

11   somewhat relevant to this statute that we are dealing with

12   here.

13       Okay.  I will see you in the morning.  Get a good rest.

14   Don't eat too much.  My dad always says a hungry dog hunts

15   best.  Have a light breakfast.  See you at 9:00.

16                    (The proceedings adjourned.)

17

18

19

20

21

22

23

24

25