# Exhibit A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | | |
|---|---|---|---|---|
| Case No. | **EDCV 17-2514 JGB (SHKx)** | | Date | January 25, 2022 |
| Title | ***Raul Novoa, et al. v. The GEO Group, Inc.*** | | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| MAYNOR GALVEZ | Not Reported |
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:     **Order (1) GRANTING IN PART AND DENYING IN PART Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 411); (2) DENYING Defendant's Motion for Summary Judgment (Dkt. No. 414); (3) GRANTING Plaintiffs' Application to File Exhibits Under Seal (Dkt. No. 407); and (4) GRANTING Defendant's Application to File Exhibits Under Seal (Dkt. No. 412) (IN CHAMBERS)**

Before the Court are Plaintiffs' motion for partial summary judgment ("Pls.' MSJ," Dkt. No. 411) and Defendant's motion for summary judgment ("GEO MSJ," Dkt. No. 414) (collectively, "Motions"). The Court held a hearing on the Motions on August 23, 2021. After considering the papers filed in support of and in opposition to these matters, as well as the parties' oral argument, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' MSJ, DENIES Defendant's MSJ, and GRANTS the parties' applications to file exhibits under seal.

## I.     BACKGROUND

On December 19, 2017, Plaintiff Raul Novoa ("Novoa") filed a putative class action complaint against Defendant The GEO Group, Inc. ("GEO"). (Dkt. No. 1.) Novoa filed a first amended complaint on July 6, 2018, (Dkt. No. 47), and a second amended complaint on December 24, 2018, which added Jaime Campos Fuentes ("Fuentes") as a Plaintiff, ("SAC," Dkt. No. 108). On August 16, 2019, Plaintiffs sought leave to file a third amended complaint. (Dkt. Nos. 167, 169.) The Court granted leave, (Dkt. No. 183), and Plaintiffs filed the third amended complaint, ("TAC," Dkt. No. 184), the operative complaint. The TAC added Abdiaziz Karim ("Karim") and Ramon Mancia ("Mancia") as Plaintiffs, amended the class definitions, and added two causes of action. (See Dkt. No. 183 at 2.)

Case No. 1:14-cv-02887-JLK-CYC   Document 378-1   filed 02/09/22   USDC Colorado
Case 5:17-cv-02514-JGB-SHK   Document 534-37 Filed 01/25/22   Page 2 of 36   Page ID
#:19328

The TAC alleges seven causes of action arising from Plaintiffs' detention at California's Adelanto Detention Center ("Adelanto"): (1) violation of California's Minimum Wage Law ("CMWL"), Cal. Labor Code §§ 1194, 1197, 1197.1; (2) unjust enrichment; (3) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; (4) violation of California's Trafficking Victims Protection Act ("CTVPA"), Cal. Civ. Code § 52.5; (5) forced labor under the Federal Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589(a), 1594(a); (6) forced and attempted forced labor under the TVPA; and (7) retaliation. (See TAC.)

On November 26, 2019, the Court granted Plaintiffs' motion for class certification, and certified the following three classes:

- <u>Adelanto Wage Class</u>: All civilly detained immigrants who (i) were detained at the Adelanto ICE Processing Center any time between December 19, 2014 and the date of final judgment in this matter, and either (ii) participated in the Voluntary Work Program at any point during their detention, or (iii) performed work for no compensation in the Uncompensated Work Program pending their participation in the Voluntary Work Program, or (iv) performed work for no compensation pursuant to the Adelanto Housing Unit Sanitation Policy.
- <u>Adelanto Forced Labor Class</u>: All civil immigration detainees who were detained at the Adelanto ICE Processing Center any time between May 1, 2011 and the date of final judgment in this matter.
- <u>Nationwide HUSP Class</u>: All civilly detained immigrants who (i) were detained at any civil immigration detention center owned or operated by GEO in the United States between December 19, 2007 and the date of final judgment in this matter, and (ii) were subject to a GEO Housing Unit Sanitation Policy (HUSP) at any point during their detention.

("Class Cert. Order," Dkt. No. 223.)

On September 30, 2021, the Court denied GEO's motion to decertify the Adelanto Forced Labor Class, but granted the motion to decertify the Nationwide HUSP Class. ("Decertification Order," Dkt. No. 524.)

## A. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs filed their MSJ on December 21, 2020. (See Pls.' MSJ.) In support of their MSJ, Plaintiffs filed a statement of undisputed fact ("PSUF," Dkt. No. 411-2), the Declaration of Daniel

H. Charest ("Charest Declaration," Dkt. No. 411-3), and supporting exhibits A through L (Dkt. Nos. 411-5 to 411-16).[1]

Defendant filed an opposition on January 11, 2021, ("Opp'n to Pls.' MSJ," Dkt. No. 434), along with a statement of genuine disputes of material fact ("DSGD," Dkt. No. 434-1), Defendant's own statement of undisputed facts ("DSUF," Dkt. No. 434-1 at 47), and evidentiary objections ("Def.'s Objs.," Dkt. No. 434-3).

Plaintiffs replied on January 18, 2021. ("Pls.' Reply," Dkt. No. 438.)  Plaintiffs filed a response to the DSGD ("Response to DSGD," Dkt. No. 438-1), a response to Defendant's evidentiary objections ("Response to Def.'s Objs.," Dkt. No. 438-2), and the Declaration of Daniel H. Charest ("Charest Reply Decl.," Dkt. No. 438-3), along with Exhibits A through F (Dkt. Nos. 458-5 to 458-10).

On August 20, 2021, Plaintiffs filed a notice of supplemental authority in support of their MSJ. ("Pls.' Suppl. Auth.," Dkt. No. 507.)

**B.  Defendant's Motion for Summary Judgment**

Defendant filed its motion for summary judgment on December 22, 2020. (See GEO MSJ.) In support of its MSJ, Defendant filed a statement of undisputed facts ("DSUF," Dkt. No. 414-1), a request for judicial notice ("RJN," Dkt. No. 414-3), and a compendium of exhibits (Dkt. No. 414-2).

Plaintiffs filed an opposition on January 11, 2021 ("Opp'n to GEO MSJ," Dkt. No. 432), along with a supplemental statement of undisputed facts ("Suppl. PSUF," Dkt. No. 432-1), a statement of disputed facts ("PSGD," Dkt. No. 432-2), the Declaration of Daniel H. Charest ("Charest Opp'n Declaration," Dkt. No. 432-3), and supporting exhibits A through M (Dkt. Nos. 434-4 to 434-16).

Defendant replied on January 15, 2021, ("GEO's Reply," Dkt. No. 436), along with evidentiary objections ("Def.'s Objs. to PSGD," Dkt. No. 436-1), and a response to the Supplemental PSUF ("Response to Suppl. PSUF," Dkt. No. 436-2).

**C.  Parties' Notices of Supplemental Authority**

On September 21, 2021, Plaintiffs filed a notice of supplemental authority with respect to the Motion. ("Pls.' 2d Suppl. Auth.," Dkt. No. 518.)  Defendant objected to the notice of supplemental authority on September 24, 2021. ("Objections to Pls.' 2d Suppl Auth.," Dkt. No. 522.)

---

[1] The parties move to file exhibits in support of Pls.' MSJ and GEO's MSJ under seal (Dkt. Nos. 407, 412.)  The Court finds good cause to keep the exhibits at issue under seal, and GRANTS the parties' applications.

Case No. 1:14-cv-02887-JLK-CYC   Document 378-1   filed 02/09/22   USDC Colorado
Case 5:17-cv-02514-JGB-SHK   Document 542   Filed 01/25/22   Page 4 of 36   Page ID
#:19330

On October 7, 2021, Defendant filed a notice of supplemental authority. ("Def.'s Suppl. Auth.," Dkt. No. 526.) Plaintiffs objected to the notice of supplemental authority on October 8, 2021. ("Objections to Def.'s Suppl. Auth.," Dkt. No. 527.)

On October 14, 2021, Plaintiffs filed a third and fourth notice of supplemental authority. (Dkt. Nos. 528, 529.) On October 29, 2021, Defendant objected to the fourth notice of supplemental authority. (Dkt. No. 531.) Plaintiffs filed a fifth notice of supplemental authority on November 11, 2021, to which Defendant objected on November 18, 2021. (Dkt. Nos. 534, 536.) On December 9, 2021, Plaintiffs filed a sixth notice of supplemental authority, to which Defendant objected on December 13, 2021. (Dkt. Nos. 537, 538.)

## II.    FACTS

This class action is brought by current and former immigration detainees against GEO Group, Inc., the operator of several immigration detention facilities across the country. The following material facts are sufficiently supported by admissible evidence and are uncontroverted, unless otherwise noted. They are "admitted to exist without controversy" for purposes of the Motions. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3. The Court considers the parties' objections only where necessary.[2] All other objections are OVERRULED AS MOOT.

## A. The GEO Group, Inc.

Defendant GEO is a for-profit, multinational corporation that provides correctional, detention, and community reentry services, pursuant to contracts with governmental entities. (PSUF ¶¶ 1-2.) GEO owns or operates at least fourteen civil immigration detention facilities in the United States under contracts with the U.S. Immigration and Customs Enforcement ("ICE"). (Id. ¶ 7.) At these facilities, GEO provides detention services and bed space to individuals awaiting removal proceedings. (Id. ¶ 8.)

GEO is a publicly traded real estate investment trust ("REIT").[3] (Id. ¶¶ 4-5.) Its revenues in 2016–2018 were over $2 billion. (Id. ¶ 3.)

---

[2] "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here. Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.") At the summary judgment stage, the Court focuses on the admissibility of the evidence's contents, not the admissibility of the evidence's form. Fed. Deposit Ins. Corp. v. N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir. 1991) ("[T]he nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.")

[3] GEO converted to a REIT in approximately 2014. (DSGD ¶ 5.)

## B. Contracting Practices

Generally, GEO bids for detention service contracts with ICE through an open competition process. (Dkt. No. 193-31, Venturella Decl. ¶ 11.) Solicitations require bidders to submit comprehensive proposals to be evaluated on: (1) demonstrated technical/management capability; (2) past performance; and (3) price-cost. (Id.) The winning proposal is generally awarded to the lowest bidder, unless that bidder has an unsatisfactory performance record. (PSUF ¶ 16.)

GEO's proposals include a bed-day or per diem rate, a daily rate paid by the government to a contractor for comprehensive secure residential care of detainees. (Venturella Decl. ¶ 12.) This rate includes daily operating costs of the facility, including personnel, food, health care, supplies, utilities, maintenance, infrastructure depreciation, cost of capital, overhead, and profit. The largest cost is for personnel, representing approximately 65% of the total facility costs. (Id.) GEO calculates these labor costs by applying the company's staffing plan to the design and operation of the facility. (Id.) In turn, the staffing plan includes every position that GEO intends to employ or retain for the operation of the facility, taking into account required shifts, whether the positions are fixed or static posts, the hourly or annual wage, and the payroll tax and benefit costs for each position. (Id. ¶ 14.)

The bed-day rates and staffing plans in the GEO's proposal or bid are incorporated into the final contract, unless they are revised after negotiations with ICE. (Id. ¶ 13; PSUF ¶ 18.) GEO may submit requests for equitable adjustments to its contracts with ICE to account for "out-of-scope costs" in performing its contracts. (PSUF ¶ 19.)

Typically, GEO's contracts with ICE include a profit margin of 10 to 15 percent of direct operating costs, as well as indirect operating costs or overhead costs associated with the project. (Evans Dep. Tr. at 113:2-23.) That profit margin includes the per diem or bed-day rate that ICE pays to GEO. (Venturella Dep. Tr. at 250:5-24.) The parties dispute whether the bed-day rate includes reimbursement for the detainee work program at $1 per day. (See DSGD ¶ 14.)

At least some of GEO's contracts with ICE are "performance-based" contracts, which include specific performance requirements with expected outcomes and results. (Brooks 30(b)(6) Dep. Tr. at 70:24-71:23; Valdez Decl. ¶ 8; Johnson Decl. ¶ 8.)

## C. Adelanto Facility

In May 2011, ICE entered into an intergovernmental service agreement ("IGSA") with the City of Adelanto to house detained immigrants ("Adelanto Facility"). (PSUF ¶ 38.) The City of Adelanto contracted with GEO to carry out the IGSA. (Id. ¶ 39.) Pursuant to that contract, GEO undertook the City of Adelanto's responsibilities and obligations as set forth in the IGSA. (Id. ¶ 40.)

//

---

On March 17, 2019, the City of Adelanto notified ICE and GEO that it would be terminating its contract with ICE, effective June 2019.  (Id. ¶ 41.)  On June 25, 2019, ICE entered into a temporary contract ("Bridge Contract") directly with GEO to continue operating the Adelanto Facility.  (Id. ¶ 42.)  On December 19, 2019, ICE entered into a new contract with GEO ("Direct Contract") to continue running the Adelanto Facility, with a period of performance starting on December 20, 2019 and ending on December 19, 2034.  (Id. ¶ 43.)

The IGSA, Bridge Contract, and Direct Contract are performance-based contracts which include mandatory objectives.  (Id. ¶ 44.)  While the parties agree that GEO's contracts to operate Adelanto include some fixed-price items, (DSGD ¶ 21), the parties dispute whether GEO's labor expenses would increase if the company did not use detained immigrants to clean, maintain, and feed Adelanto.  (Id. ¶ 24.)  The parties also dispute whether GEO uses detainee labor to perform duties that must otherwise be completed by GEO staff.  (Id. ¶ 25.)

### D.  The Voluntary Work Program

Under GEO's contracts with ICE, GEO is required to comply with the 2011 Performance Based National Detention Standards ("PBNDS") at every civil immigration facility it operates in the United States.  (PSUF ¶ 27.)  The PBNDS establish "performance outcomes" and "minimum requirements" that GEO must meet or exceed.  (Id. ¶ 28.)

Among these requirements, Section 5.8 of the PBNDS requires GEO to operate a Voluntary Work Program ("VWP").  (PSUF ¶ 30.)  Under the PBNDS, each detainee has an opportunity to volunteer for a position in the VWP.  (DSUF ¶ 6.)  If a detainee chooses to volunteer, he or she must sign a written consent before participating.  (Id.)

The 2011 PBNDS lists a series of expected outcomes, including that:

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.
2. Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping.
…
4. The negative impact of confinement shall be reduced through decreased idleness, improved morale and fewer disciplinary incidents.
…

(2011 PBNDS, Section 5.8.II.1-4.)  The PBNDS specifies that while participation in the VWP is voluntary, detainees are responsible for certain housekeeping tasks.  Specifically, Section 5.8.V.C. ("Personal Housekeeping Required") provides:

Work assignments are voluntary; however, all detainees are responsible for personal housekeeping. Detainees are required to maintain their immediate living areas in a neat and orderly manner by:

(1) making their beds daily;

(2) stacking loose papers;

(3) keeping the floor free of debris and dividers free of clutter; and

(4) refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.

(PSUF ¶ 32.) The PBNDS includes some additional expected practices as to how detainees are selected and assigned to work details, noting:

> The facility administrator shall develop site-specific rules for selecting work detail volunteers. These site-specific rules shall be recorded in a facility procedure that shall include a voluntary work program agreement. The voluntary work program agreement shall document the facility's program and shall be in compliance with this detention standard.

> The primary factors in hiring a detainee as a worker shall be his/her classification level and the specific requirements of the job.

(Id. ¶ 33, Section 5.8.V.D.)

The 2011 PBNDS requires that detainees "receive monetary compensation for work completed in accordance with the facility's standard policy." (Section 5.8.V.K, id. ¶ 34.) This compensation must be "at least $1.00 (USD) per day." (Id.) Further, facilities must have "an established system that ensures detainees receive the pay owed them before being transferred or released." (Id.) Similarly, the 2008 PBNDS states, "Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy. In SPCs and CDF, the compensation is $1.00 per day." (PSUF ¶ 35.) The parties dispute whether GEO could pay its detained workers higher wages. (DSGD ¶¶ 36-37.)

GEO maintains job descriptions for each position in the VWP. (PSUF ¶ 55.) Available work assignments at Adelanto include food service, laundry, dorm cleaning, cores/hallway, court/visit, recreation, floor crew, barbershop, intake, medical detail, and paint detail. (Id. ¶ 56.) The parties disagree as to whether there are VWP warehouse positions. (DSGD ¶ 56.)

Detained immigrants interested in participating in the VWP apply for the program by completing a Work Detail Application. (PSUF ¶ 57.) GEO classification officers review the Application to determine what VWP positions a detainee may qualify for. (Janecka 30(b)(6) Dep. Tr. at 245:16-18; Wise-McCormick Dep. Tr. at 95:11-96:1; 107:9-14; 131:7-133:17; 134:10-14; 156:21- 157:11; 160:1-25; 220:11-16.) Detainees are generally offered the first available position they have applied for, on a "first come, first served" basis. (Wise-McCormick Dep. Tr. at

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 378-1    Filed 01/25/22    Page 8 of 36    Page ID
#:19334
pg 9 of 37

134:13-14; 160:10; DSGD ¶ 58.)  GEO reminds detainees that they can apply to participate in the VWP.  (DSGD ¶ 59.)

GEO's Direct Contract with ICE states: "It will be the sole responsibility of ICE to determine whether a detainee will be allowed to perform on voluntary work details and at what classification level."  (Direct Contract, Dkt. No. 415-3, at 57.)

**E.  Operation of the VWP in Adelanto**

GEO operates a Voluntary Work Program at its Adelanto facility.  GEO maintains a record of the detainees who participate in the VWP each day.  (DSGD ¶ 72.)  Detainees are paid $1 a day for their participation in the VWP.  (Janecka Dep. Tr. at 118:3-25.)

GEO deposits payment for VWP participation into detainees' commissary or "trust" accounts, and then submits an invoice to ICE.  (PSUF ¶ 73; Janecka Dep. Tr. at 142:3-5.)  ICE then reimburses GEO for the detainee work program at the rate of $1 per day.  (PSUF ¶ 15.)  The parties dispute whether GEO or ICE pays detainees for their participation in the VWP – GEO asserts that that it merely facilitates ICE's payment by paying detainees and then collecting reimbursement from ICE, while Plaintiffs hold that GEO pays detainees.  (DSGD ¶ 73.)

GEO pays detained workers more than $1 per day at several of its civil immigration facilities.  (Venturella Dep. Tr. at 292:18-20; Martin Dep. Tr. at 65:1-17; 66:2-67:8; 67:4-8.)  The parties dispute whether GEO may pay detained workers more than $1 per day at Adelanto.

The parties also dispute whether GEO assigns VWP participants to shifts, or sets work schedules.  (DSGD ¶¶ 60-61.)  For instance, Plaintiffs point to Adelanto officer Mary Wise McCormick's testimony that she creates a weekly work schedule, titled "Authorized Weekly Work Schedule."  (McCormick Dep. Tr. at 165:17-168:2.)  GEO contends that detainees have full autonomy to choose to participate in any position, regardless of skill, pointing to McCormick's testimony that assignments are first come, first serve, and special skills or experience are not required.  (Id. at 159:1-160:17.)

GEO provides VWP participants with the equipment, tools, and supplies necessary for their position.  (DSGD ¶ 62.)  GEO also provides any protective clothing or equipment required by the VWP position, (id. ¶ 63), and offers at least some VWP participants some training and instructions (id. ¶¶ 64-65.)  GEO also supervises at least some VWP participants.  (Id. ¶ 66.)

While GEO's Work Detail Application states that "[t]here are 40 paid positions in the work member detail program[,]" (Work Detail Application, Dkt. No. 193-17), GEO contends that the form is incorrect, and there are many more available positions (Janecka Dep. Tr. at 126:21-127:2; McCormick Dep. Tr. at 196:12-17).  It is undisputed that hundreds of detained immigrants may participate in work crews each day.  (PSUF ¶ 78.)

//

---

**CIVIL MINUTES—GENERAL**            Initials of Deputy Clerk <u>MG</u>

Case No. 1:14-cv-02887-JLK-CYC   Document 378-1   filed 02/09/22   USDC Colorado
Case 5:17-cv-02514-JGB-SHK   Document 190 pg 10 of 237   Filed 01/25/22   Page 9 of 36   Page ID
#:19335

## F. Work Without Compensation

The parties do not dispute that detainees are responsible for cleaning their immediate living area for no compensation. (Response to Suppl. PSUF ¶ 1.) The parties dispute whether detainees are responsible for cleaning common use areas in their housing unit without compensation. (<u>Id.</u> ¶ 1.) The parties also dispute whether GEO permits detained immigrants at Adelanto to work in VWP details without compensation. (DSGD ¶ 76.) For instance, the Adelanto Housekeeping Plan provides that detained immigrants are responsible for cleaning common use areas in their housing units. (Dkt. No. 193-18, Adelanto Housekeeping Plan.) While Plaintiffs contend that this is without compensation, Defendant asserts that participants in the VWP clean the common areas in the housing units for the $1 per day stipend. (DSGD ¶ 81.)

### 1. Sanctions for Refusal to Clean

Upon entry to Adelanto, GEO provides each detainee the Adelanto Supplemental Detainee Handbook ("Handbook"). (Suppl. PSUF ¶ 4; Dkt. No. 193-16 (Adelanto Suppl. Detainee Handbook), at 30.) Detainees are informed that they are responsible to follow the requirements set forth in the Handbook. (<u>Id.</u> ¶ 5.)

The Handbook includes a series of rules, regulations, and sanctions for failing to meet such rules and regulations. Among these, the Handbook provides that "Refusal to clean assigned living area" is a Category III or High Moderate Offense for which the Discipline Committee "may impose any combination of penalties[,]" including:

(1) Initiate criminal proceedings
(2) Disciplinary transfer (recommended)
(3) Disciplinary restriction up to 72 hours
(4) Make monetary restitution, if funds are available
(5) Loss of privileges (e.g., commissary, movies, recreation, etc.)
(6) Change of housing
(7) Removal from program and/or group activity
(8) Loss of Job
(9) Impound and store personal property
(10) Confiscate contraband
(11) Restrict to living unit
(12) Reprimand
(13) Warning)

(Dkt. No. 193-16, Handbook at 30.) The Handbook further provides that "Being unsanitary or untidy, failing to keep self and living area in accordance with standards" is a Category VI or Low Moderate Offenses for which the Discipline Committee "may impose any combination of penalties[,]" which include:

//

---

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
pg 11 of 37
Case 5:17-cv-02514-JGB-SHK    Document 154    Filed 01/25/22    Page 10 of 36    Page ID
#:19336

    (1) Loss of privileges (e.g., commissary, movies, recreation, etc.)
    (2) Change housing
    (3) Removal from program and/or group activity
    (4) Loss of job
    (5) Impound and store detainee's personal property
    (6) Confiscate contraband
    (7) Restrict to housing unit
    (8) Reprimand
    (9) Warning

(Id. at 30.)  The parties dispute how these sanctions are imposed.  (Response to Suppl. PSUF ¶¶ 2-3.)

**G.  Employment Practices**

ICE requires all GEO employees to pass a background check, including providing proof of permanent residence or citizenship, before becoming a GEO employee with access to detainees. (DSUF ¶ 20.)  Each employee receives a preliminary fitness approval from the Office of Professional Responsibility, Personnel Security Unit before entering the Adelanto property.  (Id. ¶ 21.)  Each GEO employee at Adelanto must sign a statement agreeing not to have any outside contact with a detainee or a detainee's family "except for those activities which are part of the facility program."  (Id. ¶ 22.)  GEO employees must also meet certain minimum immigration standards.  (Id. ¶ 40.)  GEO does not determine its staffing needs by taking into account any set number of detainee VWP participants.  (Id. ¶ 30.)

**H.  Other Potentially Liable Parties**

Plaintiffs have acknowledged the City of Adelanto's liability for the claims brought in the instant action.  (DSUF ¶ 38.)  ICE is also statutorily charged with enforcing the criminal prohibitions in the Federal Trafficking Victims Protection Act ("TVPA"), having received at least $188,000,000 in appropriations since 2006 for the sole purpose of investigating severe human trafficking.  (Id. ¶ 39.)

### III.    LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of informing the district court of the basis for its motion and identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case.  Celotex, 477 U.S. at 325.  Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case.  Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

Case No. 1:14-cv-02887-JLK-CYC   Document 378-1   filed 02/09/22   USDC Colorado
Case 5:17-cv-02514-JGB-SHK   Document 1241 37 Filed 01/25/22   Page 11 of 36   Page ID
#:19337

The party seeking summary judgment must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Anderson, 477 U.S. at 252). The non-moving party must make this showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252.

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.   DISCUSSION

Plaintiffs move for partial summary judgment on Counts I (California Minimum Wage Law ("CMWL") claims), II (unjust enrichment under California common law), and III (California Unfair Competition Law ("UCL") claims) as to the Adelanto Wage Class, as well as on Defendant's affirmative defenses. (Pls.' MSJ at 9.) In particular, Plaintiffs assert that the undisputed evidence shows that (1) GEO is an employer under the CMWL, and the Class Members are its employees; (2) by failing to pay lawful wages, GEO engaged in unlawful business practices under the UCL; and (3) GEO is unjustly enriching itself by shortchanging its detained workforce. (Pls.' MSJ at 9-14.) Plaintiffs also seek to dismiss Defendant's affirmative defenses, including derivative sovereign immunity and intergovernmental immunity. (Id. at 15-27.)

Defendant separately moves for summary judgment on all Counts and on its affirmative defenses. Defendant argues that (1) GEO is not an employer under the CMWL, and the Adelanto Wage Class members do not fall within California's definition of "employees"; (2) the Nationwide HUSP Class claims fail because there is no private right of action for injunctive relief under the Trafficking Victims Protection Act ("TVPA"); (3) Plaintiffs' TVPA and California TVPA ("CTVPA") claims fail because GEO did not knowingly obtain Plaintiffs' labor by means of force, Plaintiffs did not suffer serious harm, and legitimate consequences were not unlawful means of coercion; (4) federal law preempts Plaintiffs' claims under the TVPA and the California Labor Code; (5) GEO was not unjustly enriched because it would have made more money had it hired employees to perform detainee tasks; (6) Plaintiffs' derivative UCL claims fail for the same reasons their wage and hour claims fail; (7) GEO is entitled to intergovernmental immunity; and (8) GEO is entitled to derivative sovereign immunity.

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 341    Filed 01/25/22    Page 12 of 36    Page ID
#:19338

The Court addresses the parties' arguments on each Count and affirmative defense in turn.

## A. California Minimum Wage Law Claims (Count I)

California Labor Code Section 1194 provides that "any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation[.]" Cal. Lab. Code § 1194(a). The Labor Code applies to "men, women and minors employed in any occupation, trade, or industry…[,]" and all protections, rights, and remedies "are available to all individuals regardless of immigration status who have applied for employment, or who are or who have been employed, in this state." Cal. Lab. Code §§ 1171, 1171.5. The California Labor Code does not define "employer" or "employee." However, to prevail on their CMWL claims, Plaintiffs must establish an employment relationship between GEO (as an employer) and Plaintiffs (as employees) under the California Labor Code.

### 1. Legal Standard

First, the parties dispute what legal standard applies to determine the existence of an employment relationship. Plaintiffs argue that the applicable standard here is set out in <u>Martinez v. Combs</u>, 49 Cal. 4th 35 (2010), <u>as modified</u> (June 9, 2010). In <u>Martinez</u>, the Supreme Court of California noted that"[t]he essential predicate of each employer's obligation to pay a minimum wage" is the Industrial Welfare Commission's (IWC) issuance of an applicable wage order fixing the minimum wage and providing the legal basis for an action by the employee to recover unpaid minimum wages. <u>Id.</u> at 56. <u>Martinez</u> further noted that the IWC's definition of "to employ" is: "(a) to exercise control over the wages, hours or working conditions, <u>or</u> (b) to suffer or permit to work, <u>or</u> (c) to engage, thereby creating a common law employment relationship." <u>Id.</u> at 64.

Defendants argue the <u>Martinez</u> test does not apply here. (Opp'n to Pls.' MSJ at 7.) They assert that the applicable standard is set out in <u>S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.</u>, 48 Cal. 3d 341 (1989), and <u>Talley v. Cty. of Fresno</u>, 51 Cal. App. 5th 1060 (2020). Under <u>Talley</u>, an individual in government custody is not an "employee" if they do not receive "financially significant and quantifiable" remuneration for their work. <u>Talley</u>, 51 Cal. App. 5th at 1086.[4]  !

//
//

---

[4] This also requires the application of the modified economic realities test. <u>Id.</u> Under that test, to determine whether detained individuals are employees, courts consider: (1) whether the detainee is working to turn a profit for the defendant; (2) whether the defendant and the detainee have an opportunity to bargain for mutual economic gain; and (3) whether the defendant provides the detainee with food, shelter, and clothing that employees would otherwise need to purchase. <u>Matherly v. Andrews</u>, 859 F.3d 264, 278 (4th Cir. 2017).

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk MG

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 344    Filed 01/25/22    Page 13 of 36    Page ID
#:19339

As Plaintiffs note, the Court has already resolved this legal question.  (See MTD Order at 11; Class Cert. Order at 10.)   The Court concluded that IWC Wage Order 5 applies to GEO.  (MTD Order at 11.)  And, as the MTD and Class Certification Orders explained, although Borello and its progeny articulate the general common law test for determining an employment relationship under California law, claims governed by the IWC's definition of employment are subject to a broader standard that "incorporates the common law definition as one alternative."  Martinez, 49 Cal. 4th at 64 (emphasis in original).  Thus, the Martinez standard applies to the relationship between Plaintiffs and GEO.

In its Opposition to Plaintiffs' MSJ, GEO re-hashes arguments the Court has considered and rejected.  GEO's only new argument is that after the Court's rulings, the California legislature amended the California Labor Code to provide a specific definition for "employee" which would apply to IWC wage orders, effective September 4, 2020.  (GEO MSJ at 18.)  Section 2775 provides:

> For the purposes of this code … and for the purposes of wage orders of the Industrial Welfare Commission, a person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied:
>
> (A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.
> (B) The person performs work that is outside the usual course of the hiring entity's business.
> (C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

Cal. Lab. Code § 2775(b)(1).  According to GEO, this statute overrules the Martinez definition applied to this case.  (GEO MSJ at 18.)

In particular, GEO argues that Section 2775 codifies a threshold remuneration test, holding that "a person providing labor or services for remuneration shall be considered an employee rather than an independent contractor" when the above factors are met.  Cal. Lab. Code § 2775.  GEO contends that this is consistent with Talley, where a California appeals court held that an individual in government custody is not an employee if they do not receive "minimum remuneration" for their work.  51 Cal. App. 5th at 1060.  (GEO MSJ at 18; GEO Reply at 12.)  The Court is unpersuaded.

//
//
//
//
//

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 154 of 37    Filed 01/25/22    Page 14 of 36    Page ID
#:19340

As an initial matter, <u>Talley</u> is not a wage and hour case. Rather, it concerns claims under the Fair Employment and Housing Act ("FEHA").[5] Its definition of employment does not apply broadly to all individuals in government custody regardless of their claims, but rather, its central question was whether the plaintiff was "an 'employee' of [the] county <u>within the meaning of the FEHA</u>." <u>Talley</u>, 51 Cal. App. 5th at 1069 (emphasis added). Thus, <u>Talley</u> considered cases in other antidiscrimination contexts or applying antidiscrimination statutes. While GEO argues that <u>Talley</u> looked to the Labor Code for guidance, such "guidance" concerned the applicability of the Workers' Compensation Program. Nowhere does <u>Talley</u> suggest that its "employment" definition extends to wage and hour claims. And for good reason: GEO's convenient application of that test to minimum wage claims would potentially incentivize wage abuses and undermine wage protections for the most vulnerable workers. As long as an employer avoids providing "financially significant and quantifiable" remuneration, it would be able to evade any liability for wage and hour claims. That is an untenable position.

GEO's argument also ignores the California Labor Code's narrow definition of "volunteer" as "an individual who performs work for civic, charitable, or humanitarian reasons for a public agency or corporation qualified under Section 501(c)(3) of the Internal Revenue Code as a tax-exempt organization, without promise, expectation, or receipt of any compensation for work performed." Cal. Lab. Code § 1720.4(a). Further, "[a]n individual shall be considered a volunteer only when his or her services are offered freely and without pressure and coercion, direct or implied, from an employer." <u>Id</u>. GEO is a for-profit REIT whose stock is publicly traded (PSUF ¶¶ 1, 4-5), and Plaintiffs provide some evidence that the VWP participants' services were not in fact free of pressure. (PSGD ¶ 15 (citing declarations and deposition testimony from Campos Fuentes, Novoa, Karim, and Mancia supporting claim that some detainees participated in the VWP to be able to buy daily necessities that GEO failed to provide).)

Second, as Plaintiffs note, Section 2775 merely codified the three-pronged "ABC" test in <u>Dynamex Operations W. v. Superior Ct.</u>, 4 Cal. 5th 903, 915 (2018), which concerns the distinction between an employee and an independent contractor. That is not the issue here. Indeed, GEO recognizes this distinction in its Opposition to Plaintiffs' MSJ, where it argues:

> Under California Labor Code § 2775 the ABC test applies to an inquiry into whether an individual is a detainee or an independent contractor. But whether detainees are independent contractors is not the operative question here. Instead, the question is whether the relationship between GEO and VWP participants resembles one of employment or simply custodian and detainee. As Lab. C. § 2775 makes clear, the latter questions are governed by precedent, not the ABC test.

---

[5] GEO points to <u>Hale v. State of Arizona</u>, 967 F.2d 1356, 1363 (9th Cir. 1992), <u>on reh'g</u>, 993 F.2d 1387 (9th Cir. 1993), for the proposition that cases construing provisions of Title VII (an anti-discrimination statute) are persuasive to interpret FLSA (a wage and hour statute) because the definition of "employee" is virtually identical. However, this Court has already explained that the IWC wage orders provide employees with greater protection than federal law, and are given independent effect from FLSA. (ECF 61 at 7, 44 at 21.)

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 164-2    Filed 01/25/22    Page 15 of 36    Page ID
#:19341

(Opp'n to Pls.' MSJ at 11, n.5.)

Defendant, however, suggests that Section 2775(b)(3) establishes that if <u>Dynamex</u> is not applicable to a particular context, the <u>Borello</u> test applies to determine whether there is an employment relationship. That is clearly not what Section 2775(b)(3) says. Section 2775(b)(3) provides, "If a court of law rules that the three-part test in paragraph (1) cannot be applied to a particular context … then <u>the determination of employee or independent contractor status</u> in that context shall be instead be governed by the California Supreme Court's decision in S.G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48 Cal.3d 341 (Borello) [sic]." Cal. Lab. Code § 2775(b)(3) (emphasis added). This sub-section thus still concerns "the determination of employee or independent contractor status[,]" i.e., whether an individual is an employee or an independent contractor.

As explained in <u>Martinez</u> (and in this Court's prior Orders), neither <u>Dynamex</u> nor <u>Borello</u> applies here. <u>See also</u> Cal. Prac. Guide Emp't Litig. Ch. 11-B (applying <u>Martinez</u> to define an employer under California wage and hour laws, while applying Section 2775 and the ABC test to determine whether a worker is an employee or an independent contractor). Therefore, Section 2775 has no bearing on this case. Defendant's arguments, both new and old, fail. For the reasons the Court has repeatedly explained, the <u>Martinez</u> standard is the correct standard here.

## 2. Application

### a. Exercise of control

Under <u>Martinez</u>, an employer includes "any person … who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." <u>Martinez</u>, 49 Cal. 4th at 71 (quoting Wage Order No. 14 (Cal. Code Regs., Tit. 8, § 11140, subd. 2(F)). Plaintiffs argue that GEO in fact controls all three:

> (1) GEO decides what to pay its detained workforce; (2) GEO processes detained worker payroll and pays some detained workers by periodically depositing money into their commissary accounts; (3) GEO creates work details and determines how many detained immigrants work in each detail; (4) GEO controls when and where detained immigrants work; (5) GEO evaluates VWP job candidates and determines their suitability for a job; (6) GEO determines which job a detained immigrant will work; (7) GEO evaluates the work performance of the detained workers; (8) GEO provides all job training and instruction to detained workers; (9) GEO provides all safety equipment, tools, and uniforms necessary for detained workers to complete their job assignments; (10) GEO directs and supervises detained workers for the duration of their shifts; and (11) GEO controls the decision of whether to suspend, terminate, and reassign detained workers.

(Pls.' MSJ at 11; Opp'n to GEO MSJ at 21 (citing PSUF ¶¶ 49-81).)

---

Case No. 1:14-cv-02887-JLK-CYC   Document 378-1   filed 02/09/22   USDC Colorado
Case 5:17-cv-02514-JGB-SHK   Document 174-1   Filed 01/25/22   Page 16 of 36   Page ID
#:19342

For the reasons below, the Court finds that there are no genuine disputes of material fact as to GEO's control over detainees' wages, hours, and working conditions.

### i.  Wages

First, Plaintiffs argue that the undisputed evidence shows Defendant controls Plaintiffs' wages by deciding what to pay workers, processing payroll, and depositing pay into workers' accounts.  Detainees are paid $1 per day for their participation in the VWP.  (PSUF ¶ 74.)  It is undisputed that the 2011 PBNDS requires detainees' compensation to be "at least $1.00 (USD) per day."  (PSUF ¶ 34 (emphasis added).)  ICE's Rule 30(b)(6) deponent, Jay Brooks, testified that this is a floor, rather than a cap, on pay.  (Brooks 30(b)(6) Dep. Tr. at 105:5-17.)  GEO's 30(b)(6) deponent, Amber Martin, testified that GEO pays detainees more than $1 per day at some of its other civil immigration facilities.  (Martin 30(b)(6) Dep. Tr. at 65:1-17; 66:2-67:8; 67:4-8.)  GEO would pay "more than a dollar a day at facilities [where it] had additional budget to be able to do so, as far as funds are concerned, and in high level skill sets that [it] thought could require more skills, such as … barber shop or food service."  (Id. at 66:12-17.)  Thus, Plaintiffs argue that deciding how much to pay detained workers is squarely within GEO's discretion.

### (a) Contract with ICE

Defendant counters that it lacks the requisite level of control over wages.  (Opp'n to Pls.' MSJ at 8.)  GEO argues that ICE contractually sets the rate at which detainees will be paid at $1.  Defendant points to the Performance Work Statement addendum to GEO's Direct Contract with ICE (dated December 19, 2019), which states: "The Contractor shall develop a detainee work program plan with the approval of the CO prior to receipt of the Notice to Proceed.  Detainee labor shall be used in accordance with the approved detainee work plan and will shall [sic] be paid $1 day."  (Dkt. No. 413-3, Martin Decl. Ex. E, Performance Work Statement for Detention Services ("PWS") at 57 (emphasis added).)  GEO asserts that whether it controls detainees' wages is a question of contract interpretation, and that the contract is unambiguous.  (Aug. 23, 2021 Oral Argument.)  The Court is not persuaded.

To interpret a federal contract, courts apply federal common law (also known as "federal contract law").  However, the Ninth Circuit has held that "[i]n practical terms, [the Court may] rely on California contract law" because the Ninth Circuit "discern[s] … no difference between [California] and federal contract law."  Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California, 618 F.3d 1066, 1073 (9th Cir. 2010).

Under California law, "the interpretation of a contract is a judicial function."  Id. (quoting Wolf v. Walt Disney Pictures & Television, 162 Cal. App. 4th 1107, 1113 (2008)).  In this function, courts must "give effect to the mutual intention of the parties as it existed" at the time the contract was executed.  Cal. Civ. Code § 1636.  This intent is generally ascertained by reference to the contract's terms alone.  Id. §§ 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible."); 1638 ("[The] language of a contract is to govern its interpretation.").

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk MG

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 184    filed 01/25/22    Page 17 of 36    Page ID
#:19343

!

The Court must first determine whether the contract is ambiguous.  Universal Green
Sols., LLC v. VII Pac Shores Invs., LLC, 2014 WL 1994880, at *3 (N.D. Cal. May 15, 2014).
"[W]hether a contract is ambiguous is a question of law."  Jones-Hamilton Co. v. Beazer
Materials & Servs., Inc., 973 F.2d 688, 692 (9th Cir. 1992).  Here, the parties proffer two
different interpretations of the contract.  As a result, the Court begins by examining the contract
to ascertain whether these two interpretations are "reasonable."

As noted above, Defendant suggests that the provision that "Detainee labor … will shall
[sic] be paid $1 day" must be construed as a mandate that GEO pay detainees exactly $1 per day
for their participation in the VWP – no more and no less.  Plaintiffs, on the other hand, suggest
that this language merely refers to the rate ICE will reimburse GEO, and has no bearing on the
rate GEO may pay detainees.  This Court previously adopted the latter interpretation, holding
that even if "ICE contracted to reimburse GEO at a rate of $1 per day per detainee, such contract
would not necessarily preclude GEO from paying detainees a higher rate."  (Second MTD Order
at 6.)  Still, the Court considers whether GEO's conflicting interpretation may also be reasonable.

The relevant provision is included in the Performance Work Statement addendum to
GEO's Direct Contract with ICE.  As described in the addendum, the objective of the contract is
"to obtain comprehensive detention services" as detailed therein.  (Dkt. No. 413-3, PWS at 12.)
The language at issue is in section "E. Detainee Voluntary Work Program (if applicable)," which
requires that the Contractor (here, GEO) create a VWP.[6]  (Id. at 57.)  Section E further sets
requirements for the Contractor's operation of the VWP, including the categories of allowable
work assignments and duties (e.g., detainees shall not be used to perform the duties of GEO
employees, be assigned to work around sensitive documents, or be assigned to dangerous or
hazardous work; the detainee work plan must be voluntary; work assignments may include
industrial, maintenance, custodial, service, or other jobs).  Defendant suggests that payment of
exactly $1 per day pay is another such requirement.

The only other reference to the $1 per day provision is in the Schedule of
Supplies/Services, which lists the Adelanto Detainee Work Program at a rate of $1 per day per
detainee, for 250,000 days.  (Id. at GEO-Novoa_00040878.)  While this supports Plaintiff's
interpretation of the provision to merely establish the rate ICE must reimburse GEO, it does not
definitely undermine Defendant's argument.  Although the Court finds Plaintiff's interpretation
of the contract to be far more persuasive, based solely on the language in the contract,
Defendant's interpretation may also be reasonable.  Because there are at least two reasonable,
conflicting interpretations of the contract provision at issue, the contract is ambiguous.

//

---

[6] Section E is listed under Part "V. Detention Services," which also includes standards
and requirements related to "A. Detention Site Standards"; "B. Language Access"; "C. Health
and Medical Care Policies"; and "D. Medical Services."  (Id. at 45-57.)  These provisions offer
limited context on the $1 per day provision at issue here.

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk MG

Case No. 1:14-cv-02887-JLK-CYC   Document 378-1   filed 02/09/22   USDC Colorado
Case 5:17-cv-02514-JGB-SHK   Document 194 of 37 Filed 01/25/22   Page 18 of 36   Page ID
#:19344

Where a contract is ambiguous, the Court may consider credible, extrinsic evidence concerning the parties' intentions to determine whether the language is "reasonably susceptible" to the interpretation urged by a party.  SCC Alameda Point LLC v. City of Alameda, 897 F. Supp. 2d 886, 893 (N.D. Cal. 2012) (quoting WYDA Associates v. Merner, 42 Cal. App. 4th 1702, 1710 (1996)).  If there is no material conflict over the extrinsic evidence, the Court may interpret an ambiguous term as a matter of law, even when conflicting inferences may be drawn from the undisputed extrinsic evidence.  Wolf, 162 Cal. App. 4th at 1126-27 (citations omitted).

### (b) Extrinsic Evidence

Here, there is credible evidence from one of the parties to the Contract that sheds light on the parties' intentions.  ICE's Rule 30(b)(6) witness repeatedly testified that ICE does not contractually restrict contractors such as GEO from paying more than a dollar a day to the detainees.  (Brooks Dep. Tr. at 100:1-4; 102:17-20; 103:18-22; 105:5-17; 107:4-16.)  Brooks testified, "ICE would not be opposed to a service provider paying more than $1 a day."  (Id. at 102:25-103:2; see also 103:6-10 ("Q. There is no provision in the contract, that you're aware of, that permits ICE to restrict the amount of money that the detainees make as long as it's more than $1 a day, right? A. Correct."); 103:18-22 ("There's -- there's literally no limit in the contract between ICE and GEO on the amount that GEO can pay detainees in the VWP, correct? A. Correct.").)  GEO objects that this testimony is not specific to the Adelanto facility.  (DSGD ¶ 36.)  But the Court finds no reason to question the applicability of this testimony to the Adelanto facility.

GEO also points to Adelanto Facility Administrator James Janecka's testimony that he asked ICE officials if he could pay detainees more than $1 at GEO's expense, but they informed him that he could not.  (DSGD ¶ 37 (Janecka Dep. Tr. at 118:13-25 ("I also asked ICE officials if detainees could be compensated more than $1 a day at the expense of GEO and the response was no.")).)  Plaintiffs object to this testimony as hearsay.  The Court agrees that, if offered for the truth of the matter asserted, Janecka's testimony about ICE officials' representations is inadmissible hearsay.  See Fed. R. Evid. 801(c).  In any event, Janecka's testimony only concerns his (and maybe unidentified ICE officials') interpretation of the contract, rather than the intention of the contracting parties.[7]

After considering the parties' evidence, the Court finds that the contract provision is not in fact "reasonably susceptible" to GEO's interpretation.  Neither the Direct Contract nor any other evidence supports GEO's claim that ICE retains all control over wages.  Thus, while GEO attempts to create issues of material fact as to GEO's control over wages, even construing the evidence in the light most favorable to GEO, the Court finds that there is no genuine dispute as to GEO's control over the wages of the detainees.  Martinez, 49 Cal. 4th at 71.  GEO points out

---

[7] While the Court does not rest its decision on the credibility of Janecka's testimony, the Court notes ICE's Rule 30(b)(6) deponent directly contradicts Janecka's interpretation, (Brooks Dep. Tr. at 103:6-10), as does GEO's Rule 30(b)(6) deponent's testimony that GEO paid higher rates at other detention facilities.

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 204 of 37 Filed 01/25/22    Page 19 of 36    Page ID
#:19345

that "[t]he question of whether an employment relationship exists is generally a question reserved for the trier of fact…. This remains true [w]here the evidence, though not in conflict, permits conflicting inferences." Aleksik v. 7-Eleven, Inc., 205 Cal. App. 4th 1176, 1187 (2012) (quoting Brassinga v. City of Mountain View, 66 Cal. App. 4th 195, 210 (1998)) (quotations omitted). But as Aleksik recognizes, "if neither the evidence nor inferences are in conflict, then the question of whether an employment relationship exists becomes a question of law which may be resolved by summary judgment.'" Id. That is the case here.

### ii.    Hours and Working Conditions

Second, Plaintiffs argue that GEO controls their hours and working conditions. Plaintiffs assert that GEO creates work details; controls when and where detained immigrants work; evaluates candidates and their suitability for a position; determines which job a detainee will work; evaluates detainees' performance; provides training and instruction, provides necessary safety equipment, tools, and uniforms; directs and supervises workers during their shifts; and decides whether to suspend, terminate, or reassign detained workers. (PSUF ¶¶ 49-81.)

GEO disputes that it controls the positions or hours worked by VWP participants. It points to Facility Administrator Janecka's testimony that detainees can set their own schedule, such that if they choose "to work for an hour and decide they want to go back to their living area, they can." (DSUF ¶ 16.) Janecka represents that detainees are free to leave at any time, or choose a different position. (Id.) And both Janecka and Adelanto officer Mary Wise-McCormick assert that detainees have significant options regarding their participation in the VWP: they choose whether they want to apply, they select which positions they wish to apply for, they can quit at any time, or they can choose not to participate. (McCormick Dep. Tr. at 80:17-24, 93:18-96:1, 131:7-132:2, 134:10-14, 135:13-15, 156:18-20, 212:12-21; Janecka 30(b)(6) Dep. Tr. at 54-57).

While Plaintiffs acknowledge that participation is voluntary, they point out that GEO assigns detainees to shifts and sets work schedules (PSGD ¶ 16), and poor attendance or inability to attend work can be cause for removal from the program (id. ¶ 15). Indeed, GEO's own "Detainee Work Detail Application" is the fatal blow to its claim. (Dkt. No. 193-17.) There, detainees must sign an agreement stating: "Detainees that participate in the volunteer work program **are required to work according to an assigned work schedule** and to participate in all work related training. Unexcused absence from work or unsatisfactory work performance could result on removal from the voluntary work program." (Id. (emphasis added).) In addition, the form includes an orientation on work details, which includes inflexible requirements and consequences for "rule violation[s]" or failure to "perform the job's expectation":

1. Work detail members will wear complete and clean uniforms.
2. **Work detail members will report directly to their job assignment on time. Work detail members will also remain on their job assignment (except as excused and escorted to the dorms or other location) until their work assignment is completed.**

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 254 of 37 Filed 01/25/22    Page 20 of 36    Page ID
#:19346

3. Work detail members will take extra care to follow all facility rules and job assignment requirements.

4. Work detail members will not aid anyone in passing notes or any other items form [sic] one detainee to another.

5. **Work detail members charged with a rule violation will be suspended pending the outcome of a disciplinary hearing.** You will be required to wait 60 days to reapply for a job assignment.

6. **Work detail members who fail to perform the job's expectation will be terminated from their job assignment.**

7. Work detail members will receive $1.00 per work day. The maximum paid out will be $1.00 per day. You must sign the detainee pay sheet on the day the work is performed. Failure to sign the sheet may result in not getting paid for the day.

8. All work detail members serve at the pleasure of the facility and may be removed from their work status without prior notice of justification.

(Id. (emphasis added).) Thus, as communicated to detainees from the moment they apply, GEO controls the use of uniforms, job assignments, attendance, expectations, and disciplinary consequences for failure to abide by these.

That detainees may be free to walk off the job whenever they want to, as Janecka and Wise-McCormick suggest, does not dispute GEO's control over their schedule and work conditions, where that dubious freedom is constrained by the possibility of severe consequences. Indeed, this "discretion" may be ascribed to employees in most settings, who may at any point decide to disregard work assignments or rules, but not without risking disciplinary action by their employer.[8] The standard is not slave labor. Through the imposition (or mere threat) of discipline to enforce set work schedules and requirements, GEO retains control. Thus, even construing the evidence in the light most favorable to GEO, there is no genuine dispute as to GEO's control over detainees' hours and working conditions.

### b. Suffer or permit to work

Under the second Martinez definition, "the basis of liability is the defendant's knowledge of and failure to prevent the work from occurring." Martinez, 49 Cal. 4th at 70. Plaintiffs argue that GEO knows detained immigrants work at Adelanto for subminimum wages (or no wages), but fails to prevent that unlawful condition, despite having the power to do so. (Pls.' MSJ at 12.)

//
//
//

---

[8] Moreover, named Plaintiffs attest that they participated in the VWP to be able to buy daily necessities that GEO did not provide to them. (PSGD ¶ 15 (citing declarations and deposition testimony from Campos Fuentes, Novoa, Karim, and Mancia).)

Case No. 1:14-cv-02887-JLK-CYC   Document 378-1   filed 02/09/22   USDC Colorado
Case 5:17-cv-02514-JGB-SHK   Document 234 of 37 Filed 01/25/22   Page 21 of 36   Page ID
#:19347

It is undisputed that the 2011 PBNDS does not impose a $1 cap on detained worker wages, but rather, it imposes a floor.  (PSUF ¶ 34.)  However, the parties dispute whether the contract between GEO and ICE sets a $1 rate per day, and whether the decision of how much to pay detained workers is squarely within GEO's discretion.  As explained above, the Court finds that Plaintiffs sufficiently show that GEO has discretion over detainee wages.  While GEO fails to directly address this second definition (and Plaintiffs only briefly do so), the Court is not persuaded that Defendant's control over detainees' wages amounts to its "knowledge of and failure to prevent [underpaid or unpaid] work."  Martinez, 49 Cal. 4th at 70.

Nonetheless, because Martinez defines an employer as one who "exercises control over the wages, hours, or working conditions[,]" 49 Cal. 4th at 71 (emphasis added), GEO's control over wages paid to detainees and/or their hours and working conditions is sufficient to establish its status as an employer.  Given that it is undisputed that detainees are paid $1 per day, regardless of the amount of time they work, to the extent that this amount is less than the legal minimum wage or overtime compensation detainees would be entitled to, Plaintiffs can establish a Cal. Lab. Code § 1194 violation.

The Court therefore GRANTS Plaintiffs' MSJ and DENIES Defendant's MSJ as to Count I.

## B.  Unjust Enrichment (Count II)

Both parties move for summary judgment on Plaintiffs' unjust enrichment claim.  Under California law, "[t]he elements of an unjust enrichment claim are the receipt of a benefit and [the] unjust retention of the benefit at the expense of another."  Tae Youn Shim v. Lawler, 2019 WL 2996443, at *20 (N.D. Cal. July 9, 2019).  While unjust enrichment is not an independent cause of action, courts "may construe [it] as a quasi-contract claim seeking restitution."  Price v. Synapse Group, Inc., 2017 WL 3131700, at *10 (S.D. Cal. July 24, 2017).

Plaintiffs argue that GEO obtained (and retained) economic benefit by paying detained workers $1 per day for their labor.  (PSUF ¶¶ 9-26.)  (Evans 30(b)(6) Dep. Tr. at 30:11-19 ("Q. … [I]f GEO did not have the benefit of those shifts, how would that affect the operating budget for the Adelanto Detention Facility?  A.  I'm not sure.  I mean, we'd have – I guess there would be more labor expense."); 33:3-10 ("Q.  Okay.  And when you say the labor expense would increase if those shifts didn't exist, how would you determine the price of that labor?  … A. Well, we'd have to go through a process to, you know, do a different staffing pattern" [in terms of non-detainee staffing]).)  Plaintiffs contend that GEO should disgorge the benefit it has retained at the expense of the Adelanto Wage Class.  (Pl.'s Mot. at 15.)

GEO counters that it does not gain a benefit from the VWP, which it is required to implement by ICE.  (DSUF ¶ 43.)  Defendant asserts that if it instead hired employees to perform the work, GEO would be able to realize additional profits on the markup to ICE of its increased labor costs.  (Evans 30(b)(6) Dep. Tr. at 50:6-19 ("But if we – if there was no voluntary work program at the facility, then … we would have hired more staff, so you would see an

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 234 7  Filed 01/25/22    Page 22 of 36    Page ID
#:19348

increase in the total labor costs, which also flows down to operation expenses…. So we would
maintain the same profit percentages and actually increase our profitability on the contract if we
had more costs."); Id. at 50:23-51:16 ("Q. You said that you would – your contract would be
more profitable if the costs went up; is that correct? A. More profitable in dollars. The
percentage would be the same. … So we are charging a certain percent of profit and a certain
overhead allocation percentage. So those two percents would stay the same. But since the direct
cost above, which include this additional labor that would theoretically be there because we
wouldn't have the voluntary work program, those costs would be higher.").)

Even if that were the case, Plaintiffs point out that by underpaying (or failing to pay)
detainees, GEO can improve its competitive advantage with ICE by reducing staffing and labor
costs. (Venturella Dep. Tr. at 269:25-270:18; Venturella 2015 Decl. ¶¶ 16-17, 25, 27.)

Based on the record, the Court cannot determine as a matter of law that Defendant has
received (and unjustly retained) a benefit at the expense of the detainees. Certainly, a reasonable
jury could find that Defendant has enjoyed increased profits (and/or competitive advantage) by
relying on detainee labor to maintain the Adelanto facility. But given the conflicting testimony
and records, a reasonable jury may also find that Defendant would instead benefit from not
operating the VWP, and instead increasing profits from labor costs the Government would have
to pay. The Court therefore DENIES both parties' MSJs as to Count II.

## C. Unfair Competition Law Claims (Count III)

Under California's Unfair Competition Law ("UCL"), "unfair competition" is defined
as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or
misleading advertising and any act prohibited by [the California False Advertising Law]." Cal.
Bus. & Prof. Code § 17200. By including "unlawful … business act[s] or practice[s]," the UCL
"permits violations of other laws to be treated as unfair competition that is independently
actionable." Kasky v. Nike, Inc., 27 Cal. 4th 939, 949 (2002).

Plaintiffs argue that because GEO violated the California Labor Code by failing to pay
detained workers the legal minimum wage, Plaintiffs are entitled to a finding of liability on Count
II as a matter of law, and to restitution. (Pls.' MSJ at 14.) Defendant argues that, as a derivative
claim of Plaintiffs' other claims, Count III fails for the same reasons. (GEO MSJ at 36.)

Because the Court finds that the evidence supports an employer-employee relationship
between GEO and detainees, such that GEO's payment of $1 per day contravenes California
minimum wage requirements, the Court GRANTS Plaintiffs' MSJ and DENIES Defendant's
MSJ as to Count III.

## D. Forced Labor Claims (Counts IV to VI)

Defendant seeks summary judgment on Plaintiffs' forced labor claims. For the reasons
discussed below, the Court DENIES Defendant's Motion as to these claims.

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 244 of 37 Filed 01/25/22    Page 23 of 36    Page ID
#:19349

## 1. Injunctive Relief

Defendant argues that while Plaintiffs exclusively seek injunctive relief in connection with the Nationwide HUSP Class, the TVPA does not include a private right of action for injunctive relief. (GEO MSJ at 10.)  Plaintiffs counter that (1) injunctive relief is not the sole relief Plaintiffs seek under the TVPA, and in any event, (2) victims of trafficking may seek injunctive relief.[9] Because the Court decertified the Nationwide HUSP Class, this argument is now moot.

## 2. Merits of Claim

Next, Defendant argues that Plaintiffs' TVPA and CTVPA claims for damages fail on the merits.  The TVPA proscribes a party from "knowingly provid[ing] or obtain[ing] the labor or services of a person" through force, physical restraint, serious harm, abuse of law or legal process, threats of any of those means, or any combination of those methods. 18 U.S.C. § 1589(a) (also prohibiting a party from securing labor "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint").  "Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."  18 U.S.C. § 1589(c)(2).  A party who "knowingly benefits, financially or by receiving anything of value, from participation in a venture" involving forced labor is also liable. 18 U.S.C. § 1589(b).

 GEO argues that: (1) its disciplinary policy constitutes a warning of legitimate consequences, rather than impermissible threats of serious harm; (2) there is no evidence that Plaintiffs suffered serious harm, as defined by the TVPA; and (3) there is no evidence that GEO acted with the requisite scienter to cause harm.  (GEO MSJ at 13.)

### a. Threats of Serious Harm

GEO first contends that Plaintiffs merely challenge warnings of adverse but legitimate consequences, rather than illicit threats. (GEO MSJ at 14.)   In applying the TVPA, courts distinguish between "improper threats of coercion and permissible warnings of adverse but legitimate consequences."  Headley v. Church of Scientology Int'l, 687 F.3d 1173, 1180 (9th Cir. 2012) (citing United States v. Bradley, 390 F.3d 145, 151 (1st Cir. 2004)).  Defendant asserts that requiring detainees to clean their living area or face disciplinary sanctions are "the type[s] of normal housekeeping duties that fall outside" of the scope of the TVPA.  (GEO MSJ at 14 (citing

---

[9] Plaintiffs also argue that the law of the case precludes GEO's argument, as the Court has recognized injunctive relief as an available remedy to the Nationwide HUSP Class for TVPA violations.  (Opp'n to GEO MSJ at 4.)  But in those Orders, the parties did not address (and the Court did not consider) a challenge to the availability of injunctive relief under the TVPA.

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 254 of 37 Filed 01/25/22    Page 24 of 36    Page ID
#:19350

Mendez v. Haugen, 2015 WL 5718967, at *5 (D. Minn. Sept. 29, 2015)).)  GEO adds that
Plaintiffs' contention that pretrial and civil detainees may not be required to perform any type of
work outside their own cells or immediate living quarters "is not supported by existing
precedent[,]" such that the disciplinary measures under the ICE PBNDS were acceptable
warnings of legitimate consequences, rather than impermissible threats.  (Id.)

Plaintiffs assert that punishment for failure to perform labor beyond personal
housekeeping tasks is not in fact legitimate.  Domestic tasks may constitute labor or service under
the TVPA.  United States v. Callahan, 801 F.3d 606, 620 (6th Cir. 2015).  According to the
PBNDS, detention centers may require detainees to "maintain their immediate living areas in a
neat and orderly manner" through "personal housekeeping tasks," such as:

> (1) making their beds daily; (2) stacking loose papers; (3) keeping the floor free of debris
> and dividers free of clutter; and (4) refraining from hanging/draping clothing, pictures,
> keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.

(PSUF ¶ 32 (citing 2011 PBNDS, Section 5.8.V.C.).)  But beyond "basic required tasks" such as
the above, the PBNDS provides that detainees "shall not be required to work," and all other
"[w]ork assignments are voluntary."  Barrientos v. CoreCivic, Inc., 951 F.3d 1269, 1272 (11th
Cir. 2020) (citing PBNDS §§ 5.8(II)(2), 5.8(V)(C)).

Defendant objects to Plaintiffs' interpretation of Section 5.8 as "an exhaustive list of
personal housekeeping tasks that may be performed without compensation."  (GEO Reply at 7
(citing Brooks Decl., Dkt. No. 422-1).)  The Court does not construe this list as exhaustive, but
finds that it is representative of the limited "personal housekeeping tasks" that detainees may be
required to perform without compensation.  In any event, the Court disagrees with GEO's over-
expansive definition of allowable tasks.  Performing janitorial and maintenance work in common
areas beyond detainees' bunk area certainly appears to exceed the scope of the "personal
housekeeping tasks" of "immediate living areas" that may be required without compensation.
2011 PBNDS, Section 5.8.V.C; Barrientos, 951 F.3d at 1277.

The Adelanto Supplemental Detainee Handbook lists several potential sanctions for a
detainee's "[r]efusal to clean assigned living area," "[b]eing unsanitary or untidy, failing to keep
self and living area in accordance with standards," "[r]efusal to obey a staff member Officer's
order," or "[i]nsolence towards a staff member."  (Handbook at 30.)  One such sanction is
"[d]isciplinary segregation (up to 72 hours)."[10]  (Id.)  Upon arrival, every detainee receives a
copy of the Handbook and is told that they are responsible to follow its requirements.  (Suppl.
PSUF ¶¶ 4-5.)  Plaintiffs argue that these threatened sanctions compel class members to perform
uncompensated janitorial and maintenance work in common areas, which go beyond the
"personal housekeeping tasks" sanctioned by the PBNDS.

---

[10] Other potential penalties include: initiating criminal proceedings, disciplinary transfer,
making monetary restitution, loss of privileges, change of housing, removal from program and/or
group activity, loss of job, restriction to living unit, reprimand, and warning.  (Id.)

Construing the evidence in the light most favorable to Plaintiffs, the Court finds that whether these potential sanctions are legitimate or may be construed as threats is a question for the jury. Indeed, a reasonable jury could find that these potential consequences constitute impermissible threats. Summary judgment is therefore inappropriate.

### b. Serious Harm

Defendant also argues, with scarce support, that placement in segregation for 72 hours (or a warning to that effect) does not constitute "serious harm" under the TVPA. (GEO MSJ at 15.) Defendant asserts that Plaintiffs fail to show that to the average person, a warning that they might spend up to 72 hours in segregation is so psychologically coercive as to make them more likely to work than risk segregation. (Id.)

Plaintiffs counter that Defendant misstates the standard. The TVPA does not require Plaintiffs to show they were subjected to serious harm, but rather, it requires some combination of serious harm or restraint or threats of the same sufficiently compel a reasonable person of the same background and in the same circumstances to work. 18 U.S.C. § 1589(a).

The Court joins the line of cases holding that "solitary confinement, or the threat of solitary confinement, sufficiently alleges the means to achieve forced labor[,]" as it "constitutes serious harm, which Congress defined to include psychological harm." Gonzales v. CoreCivic, Inc., 2019 WL 2572540, at *2 (W.D. Tex. Mar. 1, 2019); Owino v. CoreCivic, Inc., 2018 WL 2193644, at *11 (S.D. Cal. May 14, 2018). Whether detainees were actually disciplined with segregation or subjected to lesser (or no) sanctions is irrelevant, as the TVPA covers "threats, schemes, plans, and patterns as improper means of coercion." Menocal v. GEO Grp., Inc., 320 F.R.D. 258, 265 (D. Colo. 2017), aff'd, 882 F.3d 905 (10th Cir. 2018). And despite GEO's representations that its policy is not to send detainees to segregation for refusal to clean, Plaintiffs point to segregation records showing that at least some detainees were placed in administrative segregation for refusing to clean. (GEO-Novoa_00159160, GEO-Novoa_00159171 (daily segregation roster and segregation order for Aurora, documenting that detainee was placed in administrative segregation for: "Refusing to clean. Insolence to staff.").) The Court thus concludes that a reasonable jury could find that threats of solitary confinement would sufficiently compel a reasonable detainee to perform uncompensated work beyond the kinds of personal housekeeping tasks above. Defendant's argument fails.

### c. Scienter

Finally, Defendant argues that Plaintiffs cannot establish GEO acted with the requisite scienter to compel detainees to clean their living areas or participate in the VWP by, for example, placing them in segregation or depriving them of necessities. (GEO MSJ at 16.) Defendant asserts that Plaintiffs' only offers anecdotal accounts from a very small number of detainees, which fail to establish a pervasive policy or common practice. (Id. at 17.)

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 374    Filed 01/25/22    Page 26 of 36    Page ID
#:19352

To establish scienter, Plaintiffs must show "the employer intended to cause the victim[s] to believe that [they] would suffer serious harm—from the vantage point of the victim[s]—if [they] did not continue to work." United States v. Dann, 652 F.3d 1160, 1170 (9th Cir. 2011). The employer's "plan [must] be intended to cause the victim[s] to believe that harm will befall [them]." Id.

Here, the Court agrees with Plaintiffs that a reasonable jury may infer GEO intended detainees to believe they could be harmed for refusing to clean. (Opp'n to GEO MSJ at 16.) Plaintiffs submit declaration and deposition testimony from all named Plaintiffs attesting that they participated in the VWP to buy daily necessities GEO did not provide; that they were asked to clean areas beyond their immediate living area (such as bathrooms, showers, sinks, hallways, floors, furniture, visitation area, kitchen, dining hall, medical unit, and yard) without compensation; and that if they did not comply, GEO officials would threaten to lock them in their cells, threaten to suspend attorney or personal visits, or prohibit them from interacting with other immigrants. (ECF 192-4, Campos Fuentes Decl. at ¶¶ 11, 14-15; Campos Fuentes Dep. at 49:2-50:9; ECF 192-3, Novoa Decl. at ¶ 15; ECF 206-2, Novoa Dep. at 73:7-12; ECF 192-5, Karim Decl. at ¶¶ 10-11, 17; ECF 206-4, ECF 206-4 Karim Dep. at 27:14-28:15; 28:23-31:19; ECF 192-6, Mancia Decl. at ¶ 14; ECF 206-3, Mancia Dep. at 33:14-34:14, 37:17-21.) Plaintiffs testify that they understood disobeying GEO officials or refusing to clean could subject them to disciplinary action, including solitary confinement. (Campos Fuentes Decl. ¶ 15; Novoa Decl. ¶¶ 13-14; Karim Decl. ¶ 13; Mancia Decl. ¶ 11.) GEO argues that segregation reports do not show any detainee was placed in segregation for refusal to work. (GEO Reply at 10.) But Plaintiffs identify at least one such case, even if from another facility. (GEO-Novoa_00159160, GEO-Novoa_00159171.) Moreover, as noted above, threats of solitary confinement may constitute serious harm, and may be sufficient to compel a reasonable detainee to work.

Construing the evidence in the light most favorable to Plaintiffs, the Court finds that there are genuine issues of material fact as to whether GEO used threats (or other measures) to cause detainees to believe they would suffer serious harm, such as being subjected to solitary confinement, if they did not perform uncompensated work. Accordingly, the Court DENIES Defendant's Motion as to Plaintiffs' TVPA claims.

## E. Affirmative Defenses

### 1. Derivative Sovereign Immunity

Defendant asserts that it is immune from Plaintiffs' claims under the doctrine of derivative sovereign immunity ("DSI"). Pursuant to DSI, "[g]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 166 (2016), as revised (Feb. 9, 2016). "That immunity, however, unlike the sovereign's, is not absolute." Id.

//

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 284-1    Filed 01/25/22    Page 27 of 36    Page ID
#:19353

In <u>Yearsley v. W.A. Ross Constr. Co.</u>, 309 U.S. 18 (1940), the Supreme Court recognized derivative sovereign immunity for contractors who perform governmental functions pursuant to a federal contract. There, a contractor hired by the federal government to build dikes along the Missouri River asserted immunity from claims that the construction caused the erosion of local property. <u>Id.</u> at 19. The Court held that the contractor was immune from liability because the work leading to the erosion "was all authorized and directed by the Government of the United States." <u>Id.</u> at 20. The Court concluded that "if [the] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." <u>Id.</u> at 20-21. In contrast, where the Government agent "exceeded his authority" or that authority "was not validly conferred," there is no derivative sovereign immunity.

Plaintiffs assert that derivative sovereign immunity is also limited to cases where a contractor "had no discretion in the design process and completely followed government specifications." <u>Cabalce v. Thomas Blanchard & Assocs., Inc.</u>, 797 F.3d 720, 732 (9th Cir. 2015). Defendant argues that this dicta misstates the standard by conflating the government contractor defense with the derivative sovereign immunity doctrine. (Opp'n to Pls.' Mot. at 15.) The Court need not reach this argument, because it finds that there are genuine issues of material fact as to whether GEO meets the test articulated in <u>Yearsley</u> and <u>Campbell-Ewald</u>.

### a. Federal Direction

First, Plaintiffs argue that GEO's actions at issue exceeded what its contract with ICE compels. ICE requires GEO to pay for all detained immigrant labor. (PBNDS Section 5.8.V.K ("Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.").) ICE further requires GEO to comply with "all applicable laws and regulations" in operating Adelanto. (PSUF ¶ 48.) According to Plaintiffs, ICE "does not prohibit [GEO] from paying detainees in excess of $1/day in order to comply with [California] labor laws." <u>Menocal v. GEO Grp., Inc.</u>, 113 F. Supp. 3d 1125, 1135 (D. Colo. 2015). Rather, the 2011 PBNDS requires GEO to compensate detained workers "at least" a dollar per day. (PSUF ¶ 34.) The decision of how much to pay is up to GEO, (<u>Id.</u> ¶¶ 15, 36-37; 74-75), as GEO pays detainees more than $1 per day in other facilities. (Venturella Dep. Tr. at 292:18-20; Martin 30(b)(6) Dep. Tr. at 65:1-17; 66:2-67:8; 67:4-8.)

GEO counters that ICE directs its operation of the work program, including payment to detainees. ICE requires GEO to operate a VWP that complies with PBNDS 5.8. (PSUF ¶ 30.) ICE sets the minimum permissible payment for VWP participation at $1 per day. (<u>Id.</u> ¶ 34.) GEO also argues that the Adelanto contract requires GEO to pay exactly $1 per day to detainees. (DSUF ¶ 11.) As explained above, however, the evidence shows that GEO has discretion to pay detainees more than $1. As in <u>Nwauzor v. GEO Grp., Inc.</u>, GEO has not shown that ICE directed it to pay VWP participants only $1 per day. 2020 WL 1689728, at *9 (W.D. Wash. Apr. 7, 2020), <u>reconsideration denied</u>, 2020 WL 1955558 (W.D. Wash. Apr. 23, 2020). Indeed, GEO has paid detainees more than $1 a day in other facilities, and may request changes to its contracts,

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 294 of 37 Filed 01/25/22    Page 28 of 36    Page ID
#:19354

including modifications to be reimbursed more than was originally agreed upon. <u>Id.</u>   The Court thus rejects GEO's claims that its challenged actions were directed by the Federal Government.

### b.   Valid Conferral of Authority

Plaintiffs next point out that while only Congress has the power to set the wage rate, there is no Congressionally-mandated detained immigrant wage rate. (Pls.' Mot. at 19.)  Under 8 U.S.C. § 1555(d), appropriations for the Immigration and Naturalization Service ("INS") are available for "payment of allowances (<u>at such rate as may be specified from time to time in the appropriation Act involved</u>) to aliens, while held in custody under the immigration laws, for work performed[.]"  (emphasis added).  But "[a]t least since fiscal year 1979, Congress has abandoned direct appropriations payment of allowances, despite its awareness of how to do so." <u>Chen v. GEO Grp., Inc.</u>, 287 F. Supp. 3d 1158, 1166 (W.D. Wash. 2017).

Defendant counters that Congress has repeatedly acknowledged the PBNDS in drafting appropriations bills, and ordered ICE to comply with various versions of the PBNDS.  (Opp'n to Pls.' Mot. at 19.)  GEO argues that by instructing ICE to comply with the PBNDS, Congress instructed it to implement the VWP as expressed in the PBNDS.  (<u>Id.</u>)  But even if that were the case, as established above, the PBNDS do not set a wage rate.  Defendant therefore fails to show that any authority to set the wage rate was validly conferred.

Because there are no material issues of fact as to the extent to which GEO's actions are directed by the federal government, the Court GRANTS Plaintiff's MSJ and DENIES Defendant's MSJ as to Defendant's affirmative defense of derivative immunity.  Defendant's first affirmative defense is DISMISSED.

### 2.   Intergovernmental Immunity

Defendant also invokes intergovernmental immunity.  Under that doctrine, "a state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." <u>North Dakota v. United States</u>, 495 U.S. 423, 435 (1990).  Defendant notes that "[f]or purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself." <u>United States v. California</u>, 921 F.3d 865, 882 n.7 (9th Cir. 2019).  But, as Plaintiffs point out, that does not translate into wide sweeping immunity for all contractors.  GEO must still establish that the state regulation meets the <u>North Dakota</u> test.

### a.   Direct regulation of the federal government

The federal government is not "directly regulated" by the California Labor Code (in particular, California Minimum Wage Law ("CMWL")).  Indeed, GEO fails to show that CMWL would "directly interfere[] with the functions of the federal government." <u>Boeing Co. v. Movassaghi</u>, 768 F.3d 832, 840 (9th Cir. 2014).

Defendant argues that the IC Wage Orders define employer in such a way that includes the federal government, and by extension, its contractor GEO.  (GEO MSJ at 25.)  Because there is no exception for the federal government, GEO argues that the Labor Code directly regulates it "by mandating the amount of wages the government and its contractor must pay—and to whom."  (Id.)  The Court is not persuaded.

As an initial matter, the parties dispute whether the legal incidence test applies here.  Defendant argues that it only applies in the tax context, while Plaintiffs contend that it also applies to state regulations, like those at issue here.  Without reaching this question, the Ninth Circuit recently recognized that "whether a 'legal incidence' test or a 'substantially interference' analysis applies" to non-tax cases "appears unsettled."  GEO Group, Inc. v. Newsom, 15 F.4th 919, 939 (9th Cir. 2021).  The GEO Group, Inc. panel cited to competing plurality opinions in North Dakota, 495 U.S. at 423, 451–52, as well as to Boeing Co., 768 F.3d at 389–40, and California, 921 F.3d at 880, to demonstrate this ambiguity.  Id.  Upon review of this authority, the Court finds that sufficient support exists for application of tax cases to state regulation cases.  Accordingly, authorities applying the legal incidence test are applicable here.

While the Constitution immunizes the United States from taxation or regulation by the States, "it does not forbid a tax [or regulation] whose legal incidence is upon a contractor doing business with the United States, even though the economic burden of the tax [or regulation], by contract or otherwise, is ultimately borne by the United States."  United States v. Boyd, 378 U.S. 39, 44 (1964).  Thus, "the mere fact that non-discriminatory taxation or regulation of the contractor imposes an increased economic burden on the government is no[t] … regarded as bringing the contractor within any implied immunity of the government from state taxation or regulation."  Penn Dairies v. Milk Control Comm'n of Pennsylvania, 318 U.S. 261, 269 (1943).  Thus, it is not enough that the CMWL may indirectly impose higher detention costs on the Federal Government.  Rather, GEO must show that it serves as an "instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being [regulated] is concerned."  United States v. New Mexico, 455 U.S. 720, 735 (1982).  That is not the case here.

It is undisputed that GEO contracts with the federal government to offer detention services.  (PSUF ¶¶ 42-43.)  GEO suggests that it is an instrumentality of the Federal Government because it houses federal detainees and is subject to specific rules and regulations, including the PBNDS.  But that is not enough.  That a contractor simply performs tasks "that would otherwise b[e] performed by salaried employees of the Government" does not suffice to find that the contractor is an instrumentality of the Federal Government.  Logue v. United States, 412 U.S. 521, 532–33 (1973).  As Plaintiffs point out, GEO was not created by the United States, it is not owned or controlled by the federal government, and it does not contract exclusively with the federal government.  (Pls.' MSJ at 23.)  That ICE outsources work to private detention facilities like GEO does not make federal contractors instrumentalities, particularly as the latter pursue their "own private ends – in connection with commercial activities carried on for profit."  Boyd, 378 U.S. at 44.

Case No. 1:14-cv-02887-JLK-CYC   Document 378-1   filed 02/09/22   USDC Colorado
Case 5:17-cv-02514-JGB-SHK   Document 354-1   Filed 01/25/22   Page 30 of 36   Page ID
#:19356

Accordingly, the Court finds that the CMWL does not directly regulate the Federal Government.

**b. Discrimination against the federal government**

Intergovernmental immunity applies where a state law "discriminate[s] against the federal government <u>and</u> burden[s] it in some way." <u>United States v. California</u>, 921 F.3d 865, 880 (9th Cir. 2019) (emphasis added). "[A] state 'does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them.'" <u>Id.</u> at 881. The regulation must be "imposed on some basis unrelated to the object's status as a Government contractor or supplier, that is, … imposed equally on other similarly situated constituents of the State." <u>North Dakota</u>, 495 U.S. at 438; <u>California</u>, 921 F.3d at 882.

Defendant argues that CMWL discriminates against the Federal Government and its contractors by treating others better. Wage Order 5 states that "the provisions of th[e] order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district." Cal. Code Regs. tit. 8, § 11050(1)(C). Defendant contends that while two state entities (Orange County and Yuba County) implement the same PBNDS-authorized VWP that GEO implements at its facilities and also pay detainees $1 per day, these state entities would be shielded from a claim that detainees are employees. (Opp'n to Pls.' MSJ at 22; GEO MSJ at 26.)

Plaintiffs counter that California's requirement that an employer pay a minimum wage (and its prohibition of forced labor) applies equally to all actors, and that in any event, state prisons are not proper comparators to a contractor operating a privately-owned facility. (Opp'n to GEO MSJ at 26.) The Court agrees in part. "The nondiscrimination rule prevents states from meddling with federal government activities indirectly by singling out for regulation those who deal with the government." <u>In re Nat'l Sec. Agency Telecomm. Recs. Litig.</u>, 633 F. Supp. 2d 892, 903 (N.D. Cal. 2007). The Supreme Court has recognized that "[a] state provision that appears to treat the Government differently on the most specific level of analysis may, in its broader regulatory context, not be discriminatory." <u>North Dakota</u>, 495 U.S. at 438. Regulations must be "imposed equally on all similarly situated constituents of a state and not based on a constituent's status as a government contractor or supplier." <u>In re Nat'l Sec. Agency</u>, 633 F. Supp. 2d at 903 (citing <u>United States v. Cty. of Fresno</u>, 429 U.S. 452, 462-64 (1977)).

Here, the CMWL regulates minimum wages for all employers, making no distinctions based on the Federal Government's (or its contractors') involvement. <u>In re Nat'l Sec. Agency</u>, 633 F. Supp. 2d at 904. Indeed, it is "a neutral law of general application and is being imposed on GEO on a 'basis unrelated to [GEO's] status as a Government contractor." <u>State of Washington v. The GEO Group</u>, Dkt. No. 3:17-cv-05769-RJB, Order on Motions for Judgment as a Matter of Law at 6. Even if the Wage Order exempts State employees, GEO has not shown that the CMWL here treats similarly situated constituents, e.g., state contractors, better than federal contractors, such as GEO. <u>See, e.g.</u>, <u>Nwauzor</u>, 2020 WL 1689728, at *8 ("There are sufficient questions as to whether GEO points to a contractor that was sufficiently similar to it in either

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 340    Filed 01/25/22    Page 31 of 36    Page ID
#:19357

facility."). <u>GEO Group, Inc.</u>, to which Defendant points, does not hold to the contrary. <u>GEO Group, Inc.</u>, 15 F.4th at 938 n.13 (finding a law favors the state when it conditions the availability of an exemption on certain requirements that even "[i]f federal detention facilities" met, "they still would not qualify"). Accordingly, the Court finds that material disputes exist as to whether CMWL discriminates against the Federal Government by treating state contractors better than federal contractors. The Court DENIES the parties' MSJ as to this affirmative defense.

### 3. Statute of Limitations

In its third affirmative defense, GEO argues that Plaintiffs' claims are barred in part by the applicable statutes of limitations. (Dkt. No. 200 at 30.) Plaintiffs claim that this Court has already considered and rejected this defense as a matter of law. (Pls.' MSJ at 2; Pls.' Reply at 9.) In its Class Cert. Order, the Court held that the relevant statutes of limitations did not preclude a finding of typicality, as "GEO [did] not show that for each claim there [was] not at least one named Plaintiff whose claim [was] within the limitations period[.]" (Class Cert. Order at 21.) GEO argues that the Court's rejection of one of its limitations challenges in connection with the typicality requirement was not dispositive, and claims additional limitations challenges remain. (Opp'n to Pls.' MSJ at 22-23.) Plaintiffs fail to substantively address this argument, merely pointing to the Class Cert. Order. (Pls.' Reply at 9.) The Court agrees that its determination did not dispose of all statutes of limitations challenges, and that this defense may remain viable. The Court DENIES Plaintiffs' MSJ as to Defendant's statute of limitations defense.

### 4. Preemption

In its fourth affirmative defense, GEO asserts that "Plaintiffs' California Minimum Wage law claim, unjust enrichment claim, California Unfair Competition law claim, and California Trafficking Victims Protection Act claim are pre-empted by federal law." (Dkt. 200 at 30.)

The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land[,] . . . anything in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As the Court has previously explained (Dkt. No. 44), federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, or (3) obstacle/conflict preemption. <u>Nat'l Fed'n of the Blind v. United Airlines Inc.</u>, 813 F.3d 718, 724 (9th Cir. 2016). Preemption analysis begins with the "presumption that Congress does not intend to supplant state law." <u>Tillison v. Gregoire</u>, 424 F.3d 1093, 1098 (9th Cir. 2005) (quoting <u>N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.</u>, 514 U.S. 645, 654 (1995)). The power to "regulate employment of unauthorized aliens remains within the states' historic police powers," thus an assumption of non-preemption applies. <u>Chicanos Por La Causa, Inc. v. Napolitano</u>, 558 F.3d 856, 865 (9th Cir. 2009).

//
//
//
//

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 340-1 37 Filed 01/25/22    Page 32 of 36    Page ID
#:19358

GEO argues that the CTVPA and California Labor Code are preempted under obstacle preemption because the statutes would prohibit sanitation and disciplinary policies required by ICE and force federal contractors to pay detainees minimum wage. (GEO MSJ at 34.) The imposition of such requirements would deny federal immigration statutes their natural effects and frustrate their operations. (Id.) Moreover, GEO asserts that application of these laws would "impede[] the federal government's ability to contract." Student Loan Servicing All. v. District of Columbia, 351 F. Supp. 3d 26, 62 (D.D.C. 2018). (Id.)

As Plaintiffs note, the Court has already rejected various preemption arguments by Defendant, including a conflict preemption argument. (Dkt. No. 44 at 6-8.) GEO's preemption argument fails again. First, the Court finds GEO's premise that application of California's anti-trafficking law and state minimum wage "prohibit[] the sanitation and disciplinary policies required by ICE" unsupported. GEO presents no evidence that the CTVPA and California Labor Code would somehow ban GEO from following any PBNDS requirements. Similarly, GEO fails to demonstrate how compensation of detainees at the minimum wage rate would frustrate or conflict with federal immigration policies.

Second, Defendant's reliance on Gartrell Construction Inc. v. Aubry, 940 F.2d 437 (9th Cir. 1991) is unpersuasive. That case does not stand for the proposition that contractors are not subject to state regulations where that would potentially influence the Federal Government's contracting choices, even if indirectly. Rather, Gartrell concluded that state licensing requirements for a contractor working on a federal contract were preempted because they were in direct conflict with the specific requirements of the Federal Acquisition Regulation concerning federal procurement and selection of contractors. Gartrell, 940 F.2d at 438. Here, however, Defendant fails to show why state regulations on minimum wage rates or the prohibition of forced labor would conflict with federal immigration policy, or preclude ICE from contracting with detention services providers.

In its notice of supplemental authority, Defendant asserts that GEO Group, Inc. bars Plaintiffs' claims because they constitute "attempts to regulate or interfere with" the DHS Secretary's authority over immigration detention. (Def.'s Notice of Suppl. Auth. at 3.) The Court disagrees. In GEO Group, Inc., the Ninth Circuit held that "detention and removal of immigrants" are "areas of exclusive federal regulation" delegated to the DHS Secretary. 15 F.4th at 927, 929, 935. Importantly, however, the Court did not deem all state laws that impact immigration detention preempted. Relying on established precedent, the Court distinguished between state laws that directly regulate immigration detention and those that "just 'touch' upon the area of immigration detention." Id. at 929. The state law at issue, California's AB 32, "phase[d] out all private detention facilities within the state." Id. at 924. Because such a phase out amounted to a "ban [of] all the current immigration detention facilities in California" and a "ban [on] contractors [ ] contracting with the federal government altogether," the Court found that AB 32 improperly regulated immigration detention. Id. at 924, 929, 936.

//
//

The instant case is wholly inapposite to <u>GEO Group, Inc</u>. Unlike AB 32, the CTVPA and California Labor Code are anti-trafficking and employment laws that regulate labor. They do not prohibit immigrant detention or removal, on its face or as applied. While the statutes may incidentally "touch upon" immigration detention, GEO fails to show how their application interferes with the federal government's essential functions in immigration detention or removal. <u>See</u> <u>California</u>, 921 F.3d at 885 (finding that state law authorizing "the California's Attorney General to inspect detention facilities that house civil immigration detainees" did not "disturb any federal arrest or detention decision," such as "regulat[ing] whether or where an immigration detainee may be confined, require[ing] that federal detention decisions or removal proceedings conform to state law, or mandate[ing] that ICE contractors obtain a state license"); <u>Puente Arizona v. Arpaio</u>, 821 F.3d 1098, 1107 (9th Cir. 2016) (finding that state identity theft law that affected undocumented immigrants did not deprive the DHS Secretary's "prosecutorial discretion" over immigration law).

In sum, GEO fails to show why "compliance with both federal and state regulations is a physical impossibility," or how the CMWL and CTVPA "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." <u>Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n</u>, 461 U.S. 190, 203 (1983). Accordingly, GEO's conflict preemption claim fails. The Court GRANTS Plaintiffs' MSJ and DENIES Defendant's MSJ as to Defendant's preemption claim and DISMISSES Defendant's fourth affirmative defense.

### 5.   Liability of ICE and City of Adelanto

In its fifth affirmative defense, GEO claims that "Plaintiffs' alleged injuries and damages, if any, were caused by the acts of a third party who has not been named a party to this action and over whom Defendant had no control." (Dkt. No. 200 at 30.) Because the Court has determined that ICE is not a necessary party in this litigation (Dkt. No. 61 at 7), Plaintiffs seek to dismiss this affirmative defense. (Pls.' MSJ at 25.)

Defendant argues that the Court's holding did not take into account evidence uncovered during the discovery process, nor did it address the potential liability of the City of Adelanto, which also subcontracted Defendant. (Opp'n to Pls.' MSJ at 25-27.) Plaintiffs do not address these claims, other than positing that this affirmative defense has been correctly rejected. (Pls.' Reply at 9.) The Court thus finds that there are genuine issues of fact as to the potential liability of third parties ICE and the City of Adelanto. The Court DENIES Plaintiffs' MSJ as to GEO's fifth affirmative defense.

### 6.   Employment of Individuals Not Authorized to Work

Defendant's sixth affirmative defense asserts that detainees are unqualified to receive minimum wages:

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
Case 5:17-cv-02514-JGB-SHK    Document 374    Filed 01/25/22    Page 34 of 36    Page ID
#:19360

Plaintiffs' requested relief violates the law and is otherwise impossible to attain in conformance with the law. Neither the Plaintiffs nor putative class members have a legal right to work at minimum wage rates because none has sought approval from the U.S. Attorney General for employment with Defendant, and none are qualified to work for Defendant under ICE's contract terms and federal law. Plaintiffs' participating in the Voluntary Work Program was voluntary.

(Dkt. No. 200 at 31.) As Plaintiffs point out, this Court has already determined that the IRCA "does not forbid undocumented aliens from seeking or maintaining employment." (Dkt. No. 44 at 7.) The Court further held, "[o]nce the employer has committed IRCA violations, there is no conflict with California's MWL in compensating the unauthorized alien at the minimum wage rate for work performed." (Id.) These findings, however, concerned Defendant's claim that the IRCA preempts applicable state laws.

Defendant seeks to employ this affirmative defense to avoid potential liability under the IRCA, which prohibits employers from knowingly hiring persons not authorized to work in the United States, and requires that they verify employment eligibility for every person hired. See 8 U.S.C.A. § 1324a. Defendant contends that because Plaintiffs seek prospective relief for all VWP participants, GEO is entitled to argue that any prospective relief would not apply to those who it is contractually (or legally) prohibited from employing. (Opp'n to Pls.' MSJ at 28.) Plaintiffs do not address these arguments, but simply point to the Court's earlier determination that Plaintiffs may seek relief for minimum wage violations. (Pls.' Reply at 9-10.) The Court reaffirms this determination, but finds that Plaintiffs fail to establish that this affirmative defense is unavailable as a matter of law for purposes of limiting Defendant's prospective liability.

The Court DENIES Plaintiffs' MSJ as to Defendant's sixth affirmative defense.

**7. Standing for Injunctive Relief**

Defendant's seventh affirmative defense asserts that "Plaintiffs[] lack standing to represent the individuals they seek to represent under the claims asserted in the TAC." (Dkt. No. 200 at 31.) The Court has already appointed all four named Plaintiffs as class representatives (Dkt. No. 229 at 1), and found that Plaintiffs Mancia, Fuentes, and Karim "ha[ve] standing to bring declaratory and injunctive relief" (Dkt. No. 223 at 12).

As Defendant recognizes, it is well established that "plaintiff[s] must have standing at the time the complaint is filed." Nordstrom v. Ryan, 856 F.3d 1265, 1270 n.2 (9th Cir. 2017). Because standing is determined at the time the complaint is filed, the Court's finding that Plaintiffs were either "detained at the time of the filing of one of the complaints, or the amendments adding them as Plaintiffs related back to the time of the filing of the original complaint under Rule 15" still holds. (Dkt. No. 223 at 12.)

//
//

Case No. 1:14-cv-02887-JLK-CYC   Document 378-1   filed 02/09/22   USDC Colorado
Case 5:17-cv-02514-JGB-SHK   Document 364   Filed 01/25/22   Page 35 of 36   Page ID
#:19361
pg 35 of 37

Defendant claims that only Plaintiff Mancia was detained at Adelanto at the time the
TAC was filed. (Opp'n to Pls.' MSJ at 32.) Mancia, however, was released between September
15, 2019 and October 21, 2019, before this Court certified the classes on November 26, 2019.
(See Dkt. No. 223.) Thus, Defendant claims that Plaintiff's claim became moot, as did the class
action. Even if that were the case, Defendant blurs the separate doctrines of standing and
mootness.

Standing addresses whether the party invoking federal court jurisdiction has "[t]he
requisite personal interest" in the outcome of the case "at the commencement of the litigation."
Blair v. Shanahan, 38 F.3d 1514, 1519 (9th Cir. 1994) (internal quotations omitted). The doctrine
of mootness addresses whether the party's personal interests "continue[s] throughout [the
litigation's] existence." Id. (internal quotations omitted). In other words, "mootness [is] 'the
doctrine of standing set in a time frame.'" Id. at 1518–19 (quoting U.S. Parole Comm'n v.
Geraghty, 445 U.S. 388, 397 (1980)).

Here, as the Court has held, at least some of the named Plaintiffs have standing to seek
injunctive relief. See, e.g., Doe v. Wolf, 424 F. Supp. 3d 1028, 1036–37 (S.D. Cal. 2020).
Whether their claim for injunctive relief is moot is a separate question. Because Defendant raises
no genuine questions of material fact as to Plaintiffs' standing, the Court GRANTS Plaintiffs'
MSJ and DISMISSES Defendant's seventh affirmative defense.

## F. Defendant's Counterclaim

Finally, Plaintiffs seek to dismiss GEO's conditional counterclaim for declaratory relief.
(Pls.' MSJ at 27.) In its counterclaim, GEO seeks:

> (1) An order enjoining Counter-Defendants and the putative class members from claiming
> California's labor laws apply to them; (2) An order declaring California's labor laws do
> not apply to ICE detainees at the Adelanto Facility, including but not limited to laws
> requiring payment of minimum wage and overtime wages; (3) An order declaring that
> there is no employment relationship between GEO and detainees housed at the Adelanto
> Facility who participate in the Volunteer Work Program, specifically that GEO is not the
> employer of such detainees, and that such detainees are not employees of GEO; (4) An
> order declaring that GEO has not violated the TVPA or California TVPA; (5) An award
> of attorneys' fees and costs; and (6) Other and further relief as the Court deems just and
> equitable.

(Dkt. 200 at 36.) Plaintiffs argue that these claims are redundant, as the Court's determination
on Plaintiffs' claims (and Defendant's affirmative defenses) resolves questions (1)-(4) above.
(Pls.' MSJ at 28.) In the alternative, Plaintiffs request dismissal of the first four claims on the
merits. (Id.) The Court agrees that the above claims are redundant, and that in any event, its
determination on Section IV.A. above resolves most of Defendant's claims. The Court
GRANTS Plaintiffs' MSJ and DISMISSES GEO's counterclaim for declaratory relief on
questions (1)-(4).

Case No. 1:14-cv-02887-JLK-CYC    Document 378-1    filed 02/09/22    USDC Colorado
pg 36 of 37
Case 5:17-cv-02514-JGB-SHK    Document 341    Filed 01/25/22    Page 36 of 36    Page ID
#:19362

# V.    CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' MSJ, and DENIES Defendant's MSJ.  The Court's determinations are summarized below:

| Plaintiffs' Claims | | Holding |
|---|---|---|
| 1 | Violation of California's Minimum Wage Law | GRANT Plaintiffs' MSJ and DENY GEO MSJ |
| 2 | Unjust Enrichment | DENY Plaintiffs' MSJ and DENY GEO MSJ |
| 3 | Violation of California's Unfair Competition Law | GRANT Plaintiffs' MSJ and DENY GEO MSJ |
| 4-6 | Violation of California's Trafficking Victims Protection Act and the Federal Trafficking Victims Protection Act | DENY GEO MSJ |
| **GEO's Affirmative Defenses** | | **Holding** |
| 1 | Derivative Sovereign Immunity | GRANT Plaintiffs' Motion and DISMISS; DENY GEO MSJ |
| 2 | Intergovernmental Immunity | DENY Plaintiffs' MSJ and DENY GEO MSJ |
| 3 | Statutes of Limitation | DENY Plaintiffs' MSJ |
| 4 | Preemption | GRANT Plaintiffs' MSJ and DISMISS; DENY GEO MSJ |
| 5 | Liability of ICE and Adelanto | DENY Plaintiffs' MSJ |
| 6 | Employment of Individuals Not Authorized to Work | DENY Plaintiffs' MSJ |
| 7 | Standing for Injunctive Relief | GRANT Plaintiffs' MSJ and DISMISS |
| **GEO's Counterclaim** | | **Holding** |
| 1-4 | Declaratory Relief | GRANT Plaintiffs' MSJ and DISMISS |

**IT IS SO ORDERED.**