**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  14-cv-02887-JLK-MEH

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALEGRA,
on their own behalf and on behalf of all others similarly situated,

       Plaintiffs,

v.

THE GEO GROUP, INC.,

       Defendant.

---

**ORDER ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 260, 284, & 305) AND DEFENDANT'S MOTIONS TO DISMISS (ECF NO. 307) AND FOR DECERTIFICATION OF CLASS (ECF NO. 312)**

---

Kane, J.

      Plaintiffs in this case are former immigration detainees at the Aurora Detention Facility

in Aurora, Colorado, a private immigration detention center owned by Defendant The GEO

Group, Inc. ("GEO") and operated pursuant to a contract with U.S. Immigration and Customs

Enforcement ("ICE"). The parties have filed a handful of motions related to the sufficiency and

type of the evidence supporting Plaintiffs' claims, GEO's status as a government contractor, and

ICE's role in the challenged conduct. After wading through the parties' exhaustive arguments, I

determine GEO's motions are without merit and find neither derivative sovereign immunity nor

the government contractor defense protect it from liability.

## I.  Background

Plaintiffs originally brought three claims against GEO for: (1) noncompliance with the

Colorado Minimum Wages of Workers Act, Colo. Rev. Stat. § 8-6-101, *et seq*.; (2) violations of

the forced labor provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§

1589, 1595; and (3) unjust enrichment. GEO filed a motion to dismiss, and I granted its motion

as to the Colorado minimum wage claim. *Menocal v. GEO Grp., Inc.*, 113 F.Supp.3d 1125, 1135

(D. Colo. 2015) ("*Menocal I*"). Plaintiffs remaining claims challenge two separate policies

implemented by GEO at the Aurora Detention Facility (the "Facility"). First, Plaintiffs assert

that, by forcing detainees at the Facility to clean up the common areas and after other detainees

under the threat of segregation, GEO has violated the TVPA. Second, Plaintiffs claim that GEO

has been unjustly enriched by paying detainees only $1.00 per day for their participation in the

Facility's Voluntary Work Program (the "VWP").

Plaintiffs sought to proceed with their TVPA and unjust enrichment claims on behalf of

two classes of similarly situated individuals. I granted Plaintiffs' request, finding both proposed

classes fulfilled the requirements set out in Federal Rule of Civil Procedure 23. *Menocal v. GEO*

*Grp., Inc.*, 320 F.R.D. 258, 270 (D. Colo. 2017) ("*Menocal II*"). For Plaintiffs' claim brought

under the TVPA, the certified class includes: all persons detained in the Facility in the ten years

preceding the filing of this action, i.e., from October 22, 2004, to October 22, 2014. *Id.* at 262.

For Plaintiffs' unjust enrichment claim, the certified class includes: all people who performed

work at the Facility under GEO's VWP in the three years preceding the filing of this action, i.e.,

from October 22, 2011, to October 22, 2014. *Id.* Convinced certification of the two classes was

in error, GEO filed an interlocutory appeal of the Certification Order, which the Tenth Circuit

affirmed, *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 927 (10th Cir. 2018) ("*Menocal III*").

**A. Specific Motions at Issue**

This Order addresses four motions filed by GEO and a single motion filed by Plaintiffs:

- The parties' cross motions for summary judgment on GEO's assertion of derivative sovereign immunity and its government contractor defense (ECF Nos. 260 & 284);

- GEO's Motion to Dismiss (ECF No. 307) based on Plaintiffs' purported failure to join ICE, which GEO contends is a necessary and indispensable party;

- GEO's Motion for Summary Judgment (ECF No. 305), in which it argues that judgment as a matter of law on Plaintiffs' TVPA and unjust enrichment claims is appropriate because Plaintiffs cannot establish the requisite elements of their claims; and

- GEO's Motion for Decertification of Class (ECF No. 312), asserting that the TVPA class should be decertified because the evidence in the record demonstrates that class members' individual circumstances predominate.

**B. GEO's Operation of the Aurora Detention Facility**

**1. The Relevant Contracts**

During the period covering the certified classes, the Facility was operated by GEO pursuant to a series of three contracts with ICE: the first in effect from March 27, 2003 (the "2003 Contract"), the second from September 29, 2006 (the "2006 Contract"), and the third from September 15, 2011 (the "2011 Contract"). *See* 2003 Contract, ECF No. 262-5; 2006 Contract, ECF No. 262-4; 2011 Contract, ECF No. 262-2.[1] ICE is an agency within the Department of

---

[1] The docket in this case became so cluttered with declarations and exhibits that I directed the parties to follow a specific procedure for future filings. *See* Order re: Mots. to Restrict at 2, ECF No. 320. Still, some of the parties' later filings reflected old habits and continued to make review of the submitted evidence an unnecessarily tedious task. *See, e.g.*, ECF Nos. 326, 351, 353.

Homeland Security that is primarily tasked with enforcing the nation's immigration laws. One aspect of ICE's responsibility is arranging for the detention of individuals who are awaiting the results of their immigration proceedings or removal. ICE frequently contracts with private entities to house these individuals in privately owned facilities, like the Aurora Detention Facility.

The relevant ICE-GEO contracts provide that GEO is to receive payment for a certain number of beds, regardless of actual occupancy, and an additional rate for each bed that is occupied above that minimum number. 2003 Contract, ECF No. 262-5 at 6; 2006 Contract, ECF No. 262-4 at 3-4; 2011 Contract, ECF No. 262-2 at 3-4. GEO's profits are the difference between what it spends and the payments it receives from ICE under their contracts. Krumpelmann Dep. 23:23-24:4, ECF No. 261-6.

GEO produced Dan Ragsdale, Executive Vice President for Contract Compliance, as its corporate designee under Federal Rule of Civil Procedure 30(b)(6) to testify about its contracts with ICE as they relate to GEO's policies at issue in this case. Mr. Ragsdale explained that detention facilities develop policies and ICE "review[s] and clear[s]" those policies. Ragsdale Dep. 39:3-6, ECF No. 271-11. ICE does so through its on-site Contracting Officer's Technical Representative ("COTR").[2] Nelson Dep. 150:18-151:2, ECF No. 261-16. The ICE-GEO contracts specify that, "[t]o be valid, technical direction by the COTR [m]ust be consistent with the general scope of work set forth . . . in th[e] contract" and it "[m]ay not . . . change the

_____

[2] Apparently, this title was used interchangeably with "Contracting Officer's Representative" for the individual who held the position for the Facility during the relevant contract periods. GEO Second Notice of Suppl. Auth. at 2, ECF No. 297. The letter appointing that Contracting Officer's Representative states that the Representative shall not "[c]hange or modify any of the terms and conditions . . . of a contract" and shall not "direct the contractor . . . to operate in conflict with the contract terms and conditions." COR Appointment Letter at 3-4, ECF No. 297-2.

expressed terms, conditions or specifications of th[e] contract." 2011 Contract, ECF No. 288-1 at 41. ICE also has annual reviews of the Facility conducted to determine whether it meets specific standards imposed by the contracts. *See* Annual Review Mems., ECF No. 273-6. Over the periods covered by the certified classes, ICE rated the Facility as acceptable or as meeting the assessed standards. *See id.*

The ICE-GEO contracts reference and incorporate many external policies and standards. As relevant here, Federal Acquisition Regulation 52.222-50, relating to the U.S. Government's "policy prohibiting trafficking in persons," is incorporated into the 2006 and 2011 Contracts. 2006 Contract, ECF No. 262-4 at 21; 2011 Contract, ECF No. 262-2 at 51. The Regulation states: "Contractors, contractor employees, and their agents shall not . . . [u]se forced labor in the performance of the contract." 48 C.F.R. § 52.222-50(b). Additionally, the contracts reference the American Correctional Association ("ACA") standards. 2003 Contract, ECF No. 262-5 at 12; 2006 Contract, ECF No. 262-4 at 11; 2011 Contract, ECF No. 262-2 at 38. ACA Standard 4-ALDF-5C-08 provides that: "Pretrial and unsentenced inmates are not required to work except to do personal housekeeping and to clean their housing area." ACA Performance-Based Standards, ECF No. 261-15 at 10.

Most significantly, the contracts require compliance with the ICE Performance Based National Detention Standards ("PBNDS")[3] and clarify that ICE policies and standards prevail if ever other standards conflict with them. 2003 Contract, ECF No. 262-5 at 12, 15, 17; 2006 Contract, ECF No. 262-4 at 11; 2011 Contract, ECF No. 262-2 at 38-39. Three versions of the PBNDS are relevant in this case: those promulgated in 2000, 2008, and 2011.

---

[3] Before 2008, these were known as just the National Detention Standards. *See* 2003 Contract, ECF No. 262-5 at 15. For simplicity, I refer to them all as the PBNDS.

The parties dispute when GEO was required to comply with the 2011 PBNDS, which were published on February 27, 2012, ICE Report on 2011 PBNDS, ECF No. 287-8 at 8. The 2011 ICE-GEO Contract cites to the 2008 PBNDS, stating "[a] copy of the current version is obtainable on the Internet website: http://www.ice.gov/detention-standards/2008/." 2011 Contract, ECF No. 262-2 at 38. But the Contract explains that the listed "constraints may change over time" and "the Contractor shall be knowledgeable of any changes to the constraints and perform in accordance with the most current version of the constraints." 2011 Contract, ECF 262-2 at 37. After the 2011 PBNDS were published, GEO and ICE executed a contract modification, specifically incorporating into their contract the 2011 PBNDS, among other policies. 2013 Contract Modification, ECF No. 262-3 at 2. The modification provides that "[w]ithin 30 days of [its] execution . . . the facility shall be compliant with all PBNDS 2011 Standards stated herein." 2013 Contract Modification, ECF No. 262-3 at 3.[4]

### 2. The Voluntary Work Program

Under the ICE-GEO contracts and the PBNDS, GEO is required to administer a Voluntary Work Program for detainees. *See* 2000 PBNDS, ECF No. 261-10 at 2-3; 2008 PBNDS, ECF No. 261-9 at 60; 2011 PBNDS, ECF No. 261-8 at 50. The 2011 Contract, which covers the period of the unjust enrichment class, provides a stipend for the Program, under which GEO is to be reimbursed at "actual cost" of $1.00 per day of detainee labor provided under the Program and is not to seek reimbursement for more than the specified total amount. 2011

---

[4] GEO contends it was not required to comply with the 2011 PBNDS until the 2011 contract was modified in 2013. Plaintiffs say immediate compliance was required based on the language in the Contract requiring the Contractor to "perform in accordance with the most current version of the constraints." 2011 Contract, ECF 262-2 at 37. Plaintiffs also point to an email sent April 4, 2012, mentioning the new language regarding reimbursement for VWP work. Amber Martin Dep. 44:10-46:6, ECF No. 287-9. My rulings below obviate the need to resolve this dispute.

Contract, ECF No. 262-2 at 5. For at least the first part of the 2011 Contract's term, the 2008 PBNDS applied and directed that, for detainees who perform work in accordance with a facility's standard policy, "the compensation is $1.00 per day." 2008 PBNDS, ECF 261-9 at 63. As mentioned, the parties dispute when GEO was required to comply with the 2011 PBNDS under its contract. At some point, though, the 2011 PBNDS required that detainees who participated in the VWP receive compensation of "at least $1.00 (USD) per day." 2011 PBNDS, ECF No. 261-8 at 53.

The PBNDS lists a handful of "expected outcomes" or "objectives" of the VWP. *See* 2000 PBNDS, ECF No. 261-10 at 3; 2008 PBNDS, ECF No. 261-9 at 60; 2011 PBNDS, ECF No. 261-8 at 50. The applicable versions of the PBNDS describe the following as ICE's expected outcomes of the VWP, among others: (1) "[d]etainees may have opportunities to work and earn money while confined"; (2) "[e]ssential operations and services will be enhanced through productivity from detainees"; (3) "[t]he negative impact of confinement will be reduced through less idleness, improved morale and fewer disciplinary incidents"; and (4) "[d]etainee working conditions will comply with all applicable federal, state, and local work safety laws and regulations." 2008 PBNDS, ECF No. 261-9 at 60; *see also* 2011 PBNDS, ECF No. 261-8 at 50.

Over the relevant period, GEO paid participants in the VWP at the Facility $1.00 per day. Participants in the VWP signed a document that indicated they would be compensated this amount. *See* Detainee VWP Agreement, ECF No. 306-2 at 3. Dawn Ceja, the Assistant Warden at the Facility and GEO's corporate designee, stated that this document was not an employment contract and did not create any rights for the detainee who signed it. Ceja Dep. 149:25-150:11, ECF No. 336-9. In addition to the $1.00-per-day compensation, some VWP participants received extra rewards, like candy or ice cream. *Id.* 162:14-163:25, ECF No. 306-3.

GEO has paid detainees more than $1.00 per day at some of its other facilities, but the record does not establish that those other facilities are subject to identical contract terms. At the LaSalle Processing Center—an ICE detention facility operated by GEO where the same PBNDS provisions have applied—GEO has paid as much as $4.00 per day to VWP participants, even though GEO is only reimbursed $1.00 per day by ICE. Amber Martin Dep. 109:1-110:6, ECF No. 261-2. When asked how GEO could pay detainees more than $1.00 per day under the VWP, Amber Martin, GEO's Executive Vice President of Contract Administration, stated: "I guess we could do it on our own dime." *Id.* 107:22, ECF No. 261-2.

Mr. Ragsdale testified that there was no financial incentive for GEO to use detainees through the VWP to do anything because their work is cost neutral at a dollar a day but becomes a cost to GEO when detainees have to be incentivized beyond that. Ragsdale Dep. 168:12-17, ECF No. 306-14. He explained that GEO would make more money if it could charge ICE an additional margin for employees on its staffing plan. *Id.* 168:4-10, ECF No. 306-14. But there is other testimony in the record that, even if there is no competition, GEO might not be awarded a contract if its price was set too high. Venturella Dep. 165:25-166:4, ECF No. 336-17.

### 3.  Policies Relevant to Plaintiffs' TVPA Claim

Several policies written and/or implemented by GEO are relevant to Plaintiffs' TVPA claim. First, the PBNDS incorporated into the controlling ICE-GEO contracts listed circumstances in which detainees were expected to clean and provided a disciplinary framework. The PBNDS explained:

> [A]ll detainees are responsible for personal housekeeping. . . . [D]etainees are required to maintain their immediate living areas in a neat and orderly manner by:
>
> 1. making their bunk beds daily;

    2. stacking loose papers;

    3. keeping the floor free of debris and dividers free of clutter; and

    4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.

2000 PBNDS, ECF No. 261-10 at 3; 2008 PBNDS, ECF No. 261-9 at 61-62; 2011 PBNDS, ECF No. 261-8 at 51.[5] The Declaration of Jay Brooks, an ICE supervisory detention and deportation officer, asserts that the tasks set out above were "not intended by ICE to be an exhaustive list of facility scenarios in which a detainee may be expected to participate in housekeeping." Brooks Decl. ¶ 14, ECF No. 335-2.[6] ICE did not, however, specify any other housekeeping tasks detainees were expected to perform.

    The ICE National Detainee Handbook, which is provided to detainees at the Facility, includes the following question and response: "Will I get paid for keeping my living area clean? No. You must keep areas that you use clean, including your living area and any general use areas that you use. If you do not keep your areas clean, you may be disciplined." 2013 ICE Handbook, ECF No. 310-1 at 18.

    Additionally, GEO was obligated to adopt ICE's disciplinary severity scale found in the PBNDS and to provide notice of that scale to detainees through the local detainee handbook.

---

[5] Although the three PBNDS versions contain slightly different wording, the language quoted throughout this Order is materially the same in each of the PBNDS, unless it is otherwise noted.
[6] Ms. Brooks' Declaration was submitted in response to an information request in another case—*Novoa v. GEO Grp., Inc.*, No. 17-cv-2514 (C.D. Cal.). GEO filed Ms. Brooks' Declaration with its October 26, 2020 Notice of Supplemental Authority (ECF No. 335). Plaintiffs object to Ms. Brooks' interpretation of this section of the PBNDS because she only participated in drafting the 2011 PBNDS and the language she describes was present in the prior versions as well. Resp. to Notice of Supp. Auth. at 5, ECF No. 345. Plaintiffs request that, to the extent I find Ms. Brooks' Declaration probative, I grant them "leave to depose Ms. Brooks, at GEO's expense, to eliminate any prejudice caused by GEO's disclosure of her declaration after the close of discovery." *Id.* at 9 n.4. While Ms. Brooks' Declaration provides useful background information, I agree with Plaintiffs that it does not conclusively provide support for any of GEO's Motions, and thus I deny without prejudice Plaintiffs' request to depose Ms. Brooks.

2000 PBNDS, ECF No. 261-10 at 9-10, 17; 2008 PBNDS, ECF No. 261-9 at 44-45; 2011 PBNDS, ECF No. 261-8 at 38-39. Under the PBNDS disciplinary scale, "[r]efusal to clean assigned living area" and "[r]efusing to obey a staff member/officer's order" were both considered "high moderate" offenses subject to the following sanctions:

A. Initiate criminal proceedings

B. Disciplinary transfer (recommend)

C. Disciplinary segregation (up to 72 hours)

D. Make monetary restitution, if funds are available

E. Loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.)

F. Change housing

G. Remove from program and/or group activity

H. Loss of job

I. Impound and store detainee's personal property

J. Confiscate contraband

K. Restrict to housing unit

L. Reprimand

M. Warning

2000 PBNDS, ECF No. 261-10 at 24; 2008 PBNDS, ECF No. 261-9 at 56-57; 2011 PBNDS, ECF No. 261-8 at 47-48. Disciplinary segregation involves segregating detainees from the general population for punitive reasons and may only be imposed after a disciplinary hearing panel has found a detainee is guilty of a prohibited act or violation for which disciplinary segregation is an authorized punishment. 2000 PBNDS, ECF No. 261-10 at 70; 2008 PBNDS, ECF No. 261-9 at 28; 2011 PBNDS, ECF No. 261-8 at 27. Disciplinary segregation differs from

administrative segregation, which may be used for protective custody or when a detainee is an immediate safety threat. *See, e.g.*, 2011 PBNDS, ECF No. 261-8 at 22. The PBNDS disciplinary scale also included the offenses of "[f]ailure to follow safety or sanitation regulations" and "[b]eing unsanitary or untidy, failing to keep self and living area in accordance with posted standards," which were classified as "low moderate" offenses for which segregation was not a potential sanction. 2000 PBNDS, ECF No. 261-10 at 27-28; 2008 PBNDS, ECF No. 261-9 at 58-59; 2011 PBNDS, ECF No. 261-8 at 49.

Pursuant to the PBNDS, Officers who witnessed a prohibited act were to complete an incident report. 2000 PBNDS, ECF No. 261-10 at 11; 2008 PBNDS, ECF No. 261-9 at 45; 2011 PBNDS, ECF No. 261-8 at 39. Minor transgressions were to be settled informally whenever possible, unless the involved officer believed informal resolution was inappropriate or unachievable. 2000 PBNDS, ECF No. 261-10 at 11; 2008 PBNDS, ECF No. 261-9 at 46; 2011 PBNDS, ECF No. 261-8 at 39. After an incident report was investigated, the Unit Disciplinary Committee ("UDC") conducted hearings and, for low moderate and high moderate offenses, again attempted to accomplish an informal resolution. 2000 PBNDS, ECF No. 261-10 at 12; 2008 PBNDS, ECF No. 261-9 at 47; 2011 PBNDS, ECF No. 261-8 at 40-41. The UDC could not impose disciplinary segregation. 2000 PBNDS, ECF No. 261-10 at 13; 2008 PBNDS, ECF No. 261-9 at 47; 2011 PBNDS, ECF No. 261-8 at 41. If a matter was not resolved by the UDC or involved serious charges, it was forwarded to the Institutional Disciplinary Panel ("IDP"), which held a more formal hearing. 2000 PBNDS, ECF No. 261-10 at 12, 15-16; 2008 PBNDS, ECF No. 261-9 at 47-51; 2011 PBNDS, ECF No. 261-8 at 41-43. Only the IDP could place a detainee in disciplinary segregation. 2000 PBNDS, ECF No. 261-10 at 15; 2008 PBNDS, ECF No. 261-9 at 50; 2011 PBNDS, ECF No. 261-8 at 43.

ICE's annual reviews of the Facility assessed the PBNDS requirements listed on the review forms. *See* Annual Review Mems., ECF No. 273-6. The forms included whether the facility had a "written disciplinary system using progressive levels of reviews and appeals," *id.*, ECF No. 273-6 at 6, 14, 28, 40, 58, 75, but they did not cover "the requirement that [detainees] clean the common areas," Ragsdale Dep. 38:7-8, ECF No. 287-12.

The Facility's Detainee Handbook (the "Handbook") provides the foundation for Plaintiffs' TVPA claim. The Handbook communicated the rules and policies of the Facility, including ICE's disciplinary severity scale as well as GEO's own cleaning requirements, and it was issued to all detainees at the Facility. Ceja Dep. 29:21-23, ECF No. 336-9; *see* 2005 Handbook, ECF No. 273-1 at 24; 2007 Handbook, ECF No. 273-2 at 64; 2008 Handbook, ECF No. 273-3 at 25-26; 2010 Handbook, ECF No. 273-4 at 21-22; 2011 Handbook, ECF No. 273-5 at 22; Oct. 2013 Handbook, ECF No. 261-17 at 26. GEO expected that detainees would review the Handbook for the rules and regulations they were required to follow. Ceja Dep. 100:8-11, ECF No. 339-3. The Handbook put detainees "on notice" that if they did not clean as directed, they could be taken to segregation. Ceja Dep. 79:19-25, 80:20-25, ECF No. 339-2.

Specifically, the Handbook required detainees "to keep [their] personal living area clean and sanitary," which included their "bunk and immediate floor area around and under [their] bunk, locker, and any personal items." 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 48; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 16; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 19.[7] The Handbook's cleaning requirements did not stop there, though. The Handbook also stated: "[a]ll

_____

[7] As with the PBNDS, the wording in the Facility's Detainee Handbooks differs slightly, but the language quoted throughout this Order is materially the same in each Handbook, unless it is otherwise noted.

detainees in a housing unit are required to keep clean and sanitary all commonly accessible areas of the housing unit, including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs." 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 50; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. The Handbook went on to explain:

> The day room area will be kept clean at all times. Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean the area will result in further disciplinary action.

2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 50; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20.

> Then, under the heading "Housing Unit Sanitation,"[8] the Handbook instructed:

> Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit Officer will be responsible for assuring this general cleanup is done on a regular basis.

2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 49; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. The Declaration of Shannon Ely, an ICE contracting officer, states that the "Housing Unit Sanitation Policy . . . is a GEO policy, created by GEO" and "is not created by ICE nor is it a requirement of the contract." Ely Decl. ¶¶ 2, 22,

---

[8] The title in the 2007 and 2008 Handbooks is "Dormitory Sanitation."

ECF No. 261-7.[9] In contrast, Ms. Brooks' Declaration explains that, at other facilities, "ICE [wa]s not the initial drafter of the GEO [Housing Unit Sanitation Policy]," but "ICE may have had some input and may have reviewed [the Housing Unit Sanitation Policy]." Brooks Decl. ¶ 10.

Ms. Ceja described the "general cleanup," in which detainees were obligated to participate, as occurring after meal service and involving "clean[ing] up the tables, wip[ing] down the tables, and sweep[ing] and mop[ping] the floors" in the day room area. Ceja Dep. 36:24-37:4, ECF No. 261-12. But, again, the Handbook mandated that detainees "keep clean and sanitary all commonly accessible areas of the housing unit, including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs." 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 50; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. In line with these specifications, Plaintiff Hugo Hernandez testified that detainees were expected to "clean the rec yard, wipe the []phones, clean the microwave, change the garbage bag, clean the showers, disinfect the showers, pick up all the trash, like the toothpaste, []the shampoo bottles." Hugo Hernandez Dep. 162:24-163:7, ECF No. 336-4; *see also* Vizguerra Dep. 106:19-22 (reporting that he "[c]leaned the whole pod and the restrooms"), ECF No. 339-6. Similarly, Mr. Ragsdale confirmed that the detainees "share sort of a common

---

[9] Plaintiffs are correct that Ms. Ely's Declaration falls under the hearsay exception in Federal Rule of Evidence 803(8)(A)(i), as it sets out ICE's activities. GEO argues that Ms. Ely's Declaration is untrustworthy because the COTR "signed off on the GEO housekeeping policy" each year. GEO Notice of Suppl. Auth. at 2, ECF No. 291; 4/13/17 ICE Email at 2, ECF No. 291-1; GEO Second Notice of Suppl. Auth. at 2-3, ECF No. 297. The COTR's review does not establish that Ms. Ely's Declaration is untrustworthy since ICE could have known about the policy and still not created it or required it as part of the ICE-GEO contracts. Likewise, Ms. Brooks' declaration is insufficiently definite to establish that Ms. Ely's Declaration is untrustworthy. *See* Brooks Decl. ¶ 10.

obligation to clean . . . where the microwave is, where the . . . game boards are, video games, to keep things in place in a reasonable cleanliness; the bathroom, you know, . . . the communal areas." Ragsdale Dep. 16:14-18, ECF No. 336-19.[10]

In addition to providing copies of the Detainee Handbook, GEO communicated many of its policies to detainees by showing them a video or a slideshow upon their arrival at the Facility. The video stated: "[w]hile you are here, you are not required to work, **except** in the dormitories where you will be assigned clean-up duties by staff in rotation with other detainees." Orientation Video 1 Tr., ECF No. 337-3 at 3; Orientation Video 2 Tr. ECF No. 337-4 at 3. The video cautioned that failure to respect the property of other detainees and that of the Facility "may result in disciplinary action being taken against you and that could have a negative effect on your case before the government—so the best rule is to stay out of trouble during your stay here." *Id.*; Orientation Video 1 Tr., ECF No. 337-3 at 3. Similarly, the slideshow advised: "Each and every detainee must participate in the sanitation program. A list of detainee's [sic] is developed each day and is posted for viewing. During a general clean-up all detainees must participate." Orientation Slideshow, ECF No. 340-4 at 35. The slideshow also informed detainees that refusing to obey a staff member was a high moderate offense, and "[t]o avoid placement into disciplinary housing segregation, [they should] read the local supplement detainee handbook section regarding 'Disciplinary Process.'" *Id.*, ECF No. 340-4 at 62, 68.

Separate from the PBNDS and the Handbook but also relevant is the Sanitation Section of the Facility's Policy and Procedure Manual. *See* 2004 Sanitation Policy, ECF No. 262-8 at 2; 2004-05 Sanitation Policy, ECF No. 262-8 at 14; 2005-06 Sanitation Policy, ECF No. 262-8 at 26; 2006-07 Sanitation Policy, ECF No. 262-8 at 37; 2007-08 Sanitation Policy, ECF No. 262-8

---

[10] GEO disputes that the tasks—beyond just wiping down tables and cleaning the floors—were performed by unpaid detainees.

at 41; 2008-09 Sanitation Policy, ECF No. 262-8 at 52; 2009-10 Sanitation Policy, ECF 262-8 at 60; 2010 Sanitation Policy, ECF No. 262-8 at 63; 2010-11 Sanitation Policy, ECF No. 262-8 at 66; 2011-12 Sanitation Policy, ECF No. 262-8 at 70; 2012-13 Sanitation Policy, ECF No. 262-8 at 74; 2013-14 Sanitation Policy, ECF No. 262-8 at 78. The Policy applied to detainees at the Facility but was not provided to them. Ceja Dep. 29:13-18, ECF No. 50-1. It was purportedly developed to identify the materials to be used for cleaning. Kevin Martin Dep. 208:6-11, ECF No. 271-5. Nevertheless, it commanded: "Each detainee will be responsible for the cleanliness of his or her cell or living area, including walls, floors, sink, toilet, windows, and other property within the cell, room, or living area." 2004 Sanitation Policy, ECF No. 262-8 at 3. And, pursuant to the Sanitation Section, daily inspections were to take place, and staff were to issue an incident report "in cases of continued noncompliance." *Id.*, ECF No. 262-8 at 4.

### 4. The Imposition of Segregation for Detainees' Failure to Clean

During the TVPA class period, detainees at the Facility were threatened with being sent to segregation when they refused to clean as directed. *See, e.g.*, Xahuentitla Dep. 73:19-74:9; 83:14-19, ECF No. 287-10; Hugo Hernandez Dep. 70:7-18; 73:21-74:21, ECF No. 287-11. And some were placed in segregation for refusing to clean. *See* Incident Reports at 3-10, 12-14, ECF No. 262-12; Ceja Decl. ¶¶ 4-8, ECF 313-16.

It was expected that the disciplinary scale and associated rules set forth in the Facility's Detainee Handbook would be enforced. Ceja Dep. 139:2-12, ECF No. 336-15. However, Amber Martin testified that it has always been an informal policy for GEO not to use segregation as a consequence for detainees' refusal to clean up their living area. Amber Martin Dep. 134:11-135:8, ECF No. 271-6. The Declarations of GEO Officers Sergio Gallegos, Luis Pagan, and

Joyce Quezada support this claim. Officer Declarations, ECF No. 306-12 at 3, 5, 8.[11] According to Ms. Martin, GEO formalized the policy a few years ago. Amber Martin Dep. 134:20-21, ECF No. 271-6.

In August 2014, there was an incident in which multiple detainees refused to clean. Ms. Ceja reported that she reviewed the files of the detainees involved and only one was sent to segregation. Ceja Decl. ¶¶ 4-8, ECF 313-16. Ms. Ceja also described how some detainees elected to be placed in protective custody or administrative segregation where they could receive "peace and quiet." Ceja Dep. 55:7-19, ECF No. 306-3. As clarified above, administrative segregation is distinct from disciplinary segregation, but detainees subject to either are placed in the same housing unit at the Facility. Ceja Dep.111:15-22, ECF No. 339-3.

A handful of GEO's Officers provided deposition testimony regarding their experiences. Officer Martha Vasquez testified that, on the one occasion she encountered a detainee who did not want to clean, she just skipped to the next person. Vasquez Dep. 76:20-77:11, ECF No. 313-12. Officer Quezada testified that, in her 19 years of working at the Facility, she never told a detainee they would go to segregation if they did not clean. Quezada Dep. 149:1-3, ECF No. 313-11. She claimed that instead she would tell detainees who did not want to clean, "[d]on't worry about it, I can do it." *Id.* 78:20-79:1, ECF No. 313-11. There were not, however, any other rules in the Handbook that she remembered being told not to enforce. *Id.* 96:23-97:3, ECF No. 339-12. And Ms. Quezada acknowledged that detainees were afraid of segregation and that it was an effective way to get detainees to follow the Facility's rules. *Id.* 141:17-142:8, ECF No. 336-16.

---

[11] Plaintiffs assert that these declarations should be excluded under the sham affidavit rule. Pls.' Resp. to Mot. for Summ. J., ECF No. 336 at 56 n.7 (citing *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1016 (10th Cir. 2002)). I consider the declarations and afford them the appropriate weight given the context.

Other officers also recognized that segregation could be used to encourage compliance. Officer Pagan testified that he may have explained to detainees that they were required to clean and could be sent to segregation because it was in the Facility's Detainee Handbook. Pagan Dep. 174:19-175:6, ECF No. 336-11. Officer Gallegos testified that, when someone did not want to clean, he would just move on to the next detainee or even do it himself. Gallegos Dep. 165:12-25, ECF No. 339-11. Yet, he accepted that he wrote up a few detainees for "failure to obey [his] orders for cleaning details" resulting in the detainees being placed in segregation. *Id.* 170:13-205:25, ECF No. 336-5.

### 5. The Potential Effects of Segregation

To describe the potential effects of segregation, Plaintiffs submitted the expert opinions of Dr. Stuart Grassian, and GEO submitted those of Dr. Jeffrey Kropf. *See* Grassian Report, ECF No. 336-21; Kropf Report, ECF No. 339-20. According to Dr. Grassian's Report, solitary confinement "imposes a devastating triad of emotional and neuropsychiatric deprivations: social isolation, a barren perceptual environment, and deprivation of meaningful mental activity." Grassian Report, ECF No. 336-21 at 11. His Report explains that, even in the first days of solitary confinement, suicide is much more common than in the general population and people often develop "severe panic attacks, marked by intense fear, dread of impending death, and with somatic manifestations that include tachycardia (racing pulse), diaphoresis (intense sweating), shortness of breath, and tremulousness." *Id.* at 11-12. Dr. Grassian specifically testified that the imposition of 72 hours in segregation can cause psychological damage. *See, e.g.*, Grassian Dep. 216:2-5, ECF No. 336-3 ("[T]here are individuals who become quite ill quite quickly, and other individuals who can tolerate three days of solitary confinement with less[] damage being done.").

In contrast, Dr. Kropf's report states: "There is no empirical evidence indicating or even implying that placement in a segregated housing unit with or without solitary confinement for a period of 72 hours or less causes serious psychological harm." Kropf Report, ECF No. 339-20 at 4.

## C. Detainee Experiences at the Facility

During the period covered by the classes, detainees at the Facility were housed in windowless cells or in large open rooms with bunk beds. Facility Photos, ECF No. 337-2 at 6, 8. Detainees were generally strangers and had no privacy, even when using the restroom. Gaytan Dep. at 29:1-2, ECF No. 336-10; Hugo Hernandez Dep. 143:5- 17, ECF No. 336-4. Unless detainees received authorization for other items, detainees were only allowed to keep legal documents, 5x7 or smaller family photos, a pair of prescription glasses, dentures, a personal address book, a wedding band, a small religious item, and softbound reading material. 2005 Handbook, ECF No. 273-1 at 6; 2007 Handbook, ECF No. 273-2 at 14-15; 2008 Handbook, ECF No. 273-3 at 5; 2010 Handbook, ECF No. 273-4 at 6; 2011 Handbook, ECF No. 273-5 at 6; Oct. 2013 Handbook, ECF 261-17 at 8. Without approval for additional visitation time, detainees were permitted one visit per day for 30 minutes or an hour. 2005 Handbook, ECF No. 273-1 at 11; 2007 Handbook, ECF No. 273-2 at 31; 2008 Handbook, ECF No. 273-3 at 11; 2010 Handbook, ECF No. 273-4 at 10; 2011 Handbook, ECF No. 273-5 at 10-11; Oct. 2013 Handbook, ECF 261-17 at 12-13. Detainees were otherwise permitted to use the phone for calls lasting less than 20 minutes. 2005 Handbook, ECF No. 273-1 at 12; 2007 Handbook, ECF No. 273-2 at 33; 2008 Handbook, ECF No. 273-3 at 12; 2010 Handbook, ECF No. 273-4 at 11; 2011 Handbook, ECF No. 273-5 at 12; Oct. 2013 Handbook, ECF 261-17 at 14.

Plaintiff Alejandro Menocal described his typical day at the Facility:

> I wake up, get dressed, do my bed, wait for breakfast, eat breakfast, clean up, maybe exercise, walk around, read a book, draw. It depends. Again, wait for lunch to eat, clean up, maybe shower, maybe do some sports, maybe talk on the phone with someone, maybe write a letter, walk around, exercise, wait for dinner. Same thing, eat dinner, relax a while, maybe watch TV, read a book, draw, and, you know, wait for bedtime.

Menocal Dep. 121:5-13, ECF No. 306-4. While detained, Mr. Menocal summarized his experience in the Facility to a friend, stating:

> [T]hey've got pretty good grub, considering it's, you know, a detention center. And we got three televisions, a bunch of tables, a bunch of people, and we all get along. Pretty nice. I mean, it's—for being incarcerated, it's not bad at all, not compared to—not compared to Denver County or the other one where I was at. This is like Camp Snoopy. It's pretty easy.

*Id.* 54:5-12, ECF No. 306-4. But Mr. Menocal explained that he only told his friends and family that it was nice there so that they would not worry about him. *Id.* 48:20-24, 67:12-23, ECF No. 336-2. In fact, he testified that "[t]he food was very awful" and "[p]eople got sick in groups lots of times." *Id.* 67:24-25, ECF No. 336-2. He remembered that four or five of the maybe 20 officers he interacted with at the Facility had bad attitudes, were rude, or were on a power trip. *Id.* 64:11-65:2, ECF No. 313-3.

When he first arrived at the Facility, Mr. Menocal was informed about the detainee schedule for how the day area would be cleaned and was told by officers and other detainees that if he did not clean as ordered he would be put in isolation. *Id.* 95:16-97:3, ECF No. 336-2. Mr. Menocal knew if he did not clean he would be punished and "would go to the hole," which "is not a pretty place." *Id.* 104:25-105:7, ECF No. 336-2. On one occasion, he witnessed other detainees being taken away by officers and put in isolation and was told it was because the detainees did not do their daily cleanup. *Id.* 100:20-106:23, ECF No. 336-2. However, Mr. Menocal "does not recall receiving direct threats from any GEO employee regarding

administrative or disciplinary segregation for failing to clean." Menocal Responses to Second

Disc. Requests, ECF No. 287-14 at 5. Mr. Menocal generally cleans up after himself as a matter

of habit because he likes "to live and hang out in a clean environment." Menocal Dep. 81:6-10,

ECF No. 306-4. He testified that he spent between a half hour and an hour[12] each day cleaning

up his cell or sleeping area, specifically if he was drawing or had made a mess. *Id.* 115:10-15,

116:24-25, ECF No. 313-3. He also began cleaning the recreation area because he spent a lot of

time there and wanted to hang out in a clean space. *Id.* 86:24-87:5, ECF No. 336-2. This cleaning

led to him being offered a job in the VWP. *Id.* 87:6-14, ECF No. 336-2.

> Plaintiff Hugo Hernandez described his typical day at the Facility, stating:
>
> I would wake up for breakfast at 5:00 in the morning. I will walk out, store my food, bring it back to the cell, and go to sleep only if it was not my time to clean. But if I was assigned to clean, I have to stay outside and clean. I couldn't go back to sleep.
>
> So I will store my food. I will wake up when I wake up, and brush my teeth, do my coffee, and make sure that all my cellies get the coffee because that's my one main thing.
>
> Then we will all sit at the table. I will do my legal work, go through my documents, and see what else I need to put in or something, watch a little bit of TV.
>
> I can go to the phone a little bit. If—if I will get someone to answer, I will go to the phone. Wait for count time, wait for lunch.
>
> After lunch, I will do a cleanup again, which is cleanup time, and wait to see who's assigned for the cleanup, and if I'm not assigned, then I just go to my cell or I go against the wall just like everybody else.
>
> And once everything gets reopened, go back into the table again and do some workout while waiting—doing my workout. I wait for chow again and wait for the cleanup, and, of course, shower. Yeah, after the workout, shower, get back.

---

[12] GEO misstates this testimony, asserting that Mr. Menocal "spent between an hour and an hour and a half each day cleaning up his cell." Mot. for Decertification, ECF No. 312 at 17 (citing Menocal Dep. 115:11-15). Likewise, GEO claims Mr. Menocal stated that "[o]n occasion, he would make his cellmates['] beds," *id.* (citing Menocal Dep. 116:17-18), when the testimony is that he would occasionally make a single cellmate's bed, Menocal Dep. 116:14-18, ECF No. 313-3.

> Wait for chow, clean up, and then eventually wait for the GEO guard, Officer Blacknick, to come and pick me up so we can go to the law library and collect all detainees who wanted to go to the library.
>
> We'll go to the law library, get a pat-down, go inside the law library. And in there, I will help detainees with their documents, printouts, making sure they understood what the immigration judge was asking them to bring back, translations, looking for any specific application they were looking for.
>
> And then once we were done, like an hour later or an hour and a half later, I get another pat-down, get taken back to the cell, and wait for count time.
>
> And after count time, the last count time, you have to be inside your cell and the doors got to be locked in already. And then it's another day.

Hugo Hernandez Dep. 107:2-108:22, ECF No. 306-5.

Hugo Hernandez testified that he knew cleaning the common area was mandatory "[b]ecause the GEO guard would tell you that it's in the handbook, and if you refuse, you were going to be sent to the hole." *Id.* 159:8-12, ECF No. 336-4. He avoided going to the hole because he was afraid it would destroy his immigration case. *Id.* 166:4-15, 167:19-168:1, 170:10-13, ECF No. 336-4. Nevertheless, he stated that he did not consider the language in the Facility's Detainee Handbook under the heading "Housing Unit Sanitation" to be threatening. *Id.* 58:12-24, ECF No. 306-5. Hugo Hernandez recalled one detainee telling the officers that he was not going to clean because he was not a janitor and that they needed to hire someone to do that. *Id.* 74:23-75:2, ECF No. 336-4. A GEO officer then took out a trash bag and said, "Just pack your stuff because you're going to go to the hole. . . . Just here's your bag and go to the hole." *Id.* 75:3-11, ECF No. 336-4. But the detainee was not sent to segregation because he "started cleaning right away." *Id.* 77:4-7, ECF No. 336-4. Hugo Hernandez testified that he witnessed the garbage bag routine "multiple times with different guards." *Id.* 161:15-19, ECF No. 336-4. He recounted another incident in which one detainee refused to clean and other detainees, including himself

and Plaintiffs Alejandro Menocal, Marcos Brambila, and Demetrio Valerga, then refused as well. *Id.* 78:15-18, 80:9-20, ECF No. 336-4. In response, a GEO sergeant was called, and the sergeant advised that if they refused to clean, they would be sent to the hole, which he said was not a place they wanted to be because it was cold and they would lose their privileges and be lonely. *Id.* 78:19-79:5, ECF No. 336-4. The sergeant also told the detainees that GEO would make sure the judge received documents showing they were "coming from the hole." *Id.* 79:6-18, ECF No. 336-4. Hugo Hernandez also remembered that other detainees would sometimes jump in to help clean in order for everyone to have access to the TVs and phones. Hugo Hernandez Dep. 78:2-9, ECF No. 336-4.

Plaintiff Jesus Gaytan testified that it was scary and intimidating to be in the Facility with a bunch of people he did not know and who were older than him. Gaytan Dep. 28:11-29:2, 48:20-50:2, ECF No. 336-10. He was also afraid of getting in trouble there because he thought it would hurt his immigration case. *Id.* 12:1-13, ECF No. 336-10. Mr. Gaytan explained that new detainees at the Facility often refused to clean and the officers would tell them if they did not clean the pod they would have to go to solitary confinement. *Id.* 113:5-17, 142:23-144:1, ECF No. 336-10. As incentives to clean, Mr. Gaytan received Xboxes, ice cream, and other treats. *Id.* 124:3-16, ECF No. 306-10.

When Plaintiff Valerga first arrived at the Facility, his cellmate informed him that he could be put in solitary confinement if he did not clean. Valerga Dep. 168:20-169:6, ECF No. 339-16. A GEO officer later told Mr. Valerga the same. *Id.* 135:15-20, 137:12-14, ECF No. 271-7. Mr. Valerga nevertheless refused to clean. *Id.* 137:8-9, ECF No. 271-7. Yet, he was not taken to segregation. *Id.* 138:2-5, ECF No. 271-7. Instead, ICE officers woke him up, pulled him out of the unit, and advised him that GEO could put him in segregation if he did not clean. *Id.* at 138:9-

23, ECF No. 271-7. Despite these warnings, Mr. Valerga was never sent to segregation for refusing to clean. *Id.* 140:8-13, ECF No. 271-7.

Plaintiff Dagoberto Vizguerra does not remember receiving the Facility's Detainee Handbook or viewing the orientation video. Vizguerra Dep. 90:24-91:22, 92:1-5, ECF No. 313-8. But the second or third day he was at the Facility he saw a detainee being placed in administrative segregation for refusing to clean. *Id.* 48:9-19, ECF No. 336-8. He also described how officers sometimes screamed at detainees about not cleaning and being sent to segregation. *Id.* 98:2-10, ECF No. 336-8.

Plaintiff Grisel Xahuentitla similarly testified:

When you are inside, you—you have—you feel this pressure, you feel this emotionally depressed, besides me suffering from depression. Besides that, you feel very depressed for the situation where you're in at the moment. And—And they tell you, "This is what you have to do." And they're not—they're, of course, not— They're not whispering you to your ear. They're loud, and so they—so you feel a little intimidated. Of course, it is their job, and so you feel like you don't have rights in there. You—Like I said, you feel intimidated. And if they tell you "clean, because you're going to the hole," first, I'm going to clean. I don't want to go to the hole.

Xahuentitla Dep. 137:4-19, ECF No. 336-14. Additionally, Ms. Xahuentitla recalled how a woman in her dorm was assigned to clean but was sick, and so she offered to clean for the woman. *Id.* 73:19-25, ECF No. 336-14. But a GEO officer told them that the woman had to clean and, if she did not, she would be sent to segregation, which "wasn't going to be . . . pleasant." *Id.* 74:4-9, ECF No. 336-14. In the end, the woman was not placed in segregation, and Ms. Xahuentitla did not experience anyone else being sent there. *Id.* 120:23-121:15, ECF No. 313-9.

When class member Alejandro Hernandez was detained at the Facility, he asked a GEO officer, "[W]hy should I clean all of the tables if I []did not use all of the table[s]?" Alejandro

Hernandez Dep. 60:8-12, ECF No. 336-13.[13] He then stated he would only clean the area where he ate. *Id.* As a result, he was handcuffed and taken to segregation. *Id.* 60:12-14, 81:22-82:3, 141:15-19, ECF No. 336-13.

I am guided by this careful review of the record as I analyze the pending motions, which again are: (1) the parties' Cross Motions for Summary Judgment on GEO's assertion of derivative sovereign immunity and its government contractor defense; (2) GEO's Motion to Dismiss for Plaintiffs' failure to join ICE as a party; (3) GEO's Motion for Summary Judgment on the merits of Plaintiffs' claims; and (4) GEO's Motion for Decertification of the TVPA class.

## II. Cross Motions for Summary Judgment on GEO's Assertion of Derivative Sovereign Immunity and Government Contractor Defense (ECF Nos. 260 & 284)[14]

GEO generally argues that its policies at issue in this case were required by its contract with ICE and, as a result, that it should be covered by the government's sovereign immunity. The

---

[13] In a footnote, GEO argues "Plaintiffs should be estopped from introducing individual experiences of class members who are not named Plaintiffs to avoid trial devolving into a number of smaller mini-trials and to avoid undue prejudice to GEO." Mot. for Decertification ECF No. 312 at 16 n.8. Plaintiffs respond that they "never represented that they did not intend to introduce *any* testimony from detainees; to the contrary, they argued that testimony from class representatives (as well as from three detainees who provided declarations in support of class certification) would be sufficient." Resp. to Mot. for Decertification, ECF No. 339 at 10 n.11 (citing Pls.' Discovery Order Br., ECF No. 144 at 12-13). At this time, I will not rule that Plaintiffs are estopped from presenting the testimony of class members who are not named Plaintiffs, as Plaintiffs did not definitively state that no such testimony would be relied on at trial. However, this issue may be more appropriate for a motion *in limine*.

[14] GEO's Response to Plaintiffs' Motion for Summary Judgment is ECF No. 270, and Plaintiffs' Reply in Support of their Motion is ECF No. 286. As Plaintiffs note, GEO's Opposition Brief should be stricken since its response to Plaintiffs' statement of the undisputed material facts fails to follow my practice standards. *See* Pls.' Reply in Supp. of Mot. for Summ. J. at 7 n.1, ECF No. 286. However, Plaintiffs' Reply sufficiently corrects for GEO's error and clearly sets out the parties' disputes. Plaintiffs' Response to GEO's Cross Motion is ECF No. 298, and GEO's Reply in Support of its Cross Motion is ECF No. 316. GEO has filed two related Notices of Supplemental Authority (ECF Nos. 291 & 335), and Plaintiffs have responded to those Notices (ECF Nos. 294 & 345). GEO also filed a "Second Notice of Supplemental Authority" (ECF No. 297) to clarify its earlier Notice (ECF No. 294). Plaintiffs, for their part, have filed three

parties' related cross motions for summary judgment dispute whether both of Plaintiffs' claims are barred by derivative sovereign immunity[15] and whether Plaintiffs' unjust enrichment claim is barred by GEO's government contractor defense. I find that GEO cannot avail itself of the protection of either legal theory because they each require government direction for the allegedly unlawful activity, not simply acquiescence.

## A.  Legal Standards

The United States and its agencies enjoy unqualified sovereign immunity from civil actions absent an express waiver. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Those who contract with the United States are not encompassed within the definition of a federal agency, 28 U.S.C. § 2671, and federal contractors therefore do not share the government's absolute immunity from liability, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016). However, "government contractors obtain [some] immunity in connection with work which they do pursuant to their contractual undertaking with the United States." *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943). This immunity, known as "derivative sovereign immunity," protects

---

pertinent Notices of Supplemental Authority (ECF Nos. 367, 374, & 378). GEO has responded to Plaintiffs' most recent Notices (ECF Nos. 375 & 379) but filed a Motion to Strike the first of Plaintiffs' Notices (ECF No. 368). None of my reasoning in this order relies on the disputed authority attached to Plaintiffs' first Notice (ECF No. 367-1), and so I deny GEO's Motion as moot.

[15] Plaintiffs argue in passing that by failing to specifically plead the affirmative defense of derivative sovereign immunity, GEO has waived it. Pls.' Mot. for Summ. J., ECF No. 260 at 29 n.5. I disagree. First, I question whether derivative sovereign immunity is an affirmative defense. *See Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650 (4th Cir. 2018) (holding derivative qualified immunity operates "as a jurisdictional bar to suit and not as a merits defense to liability"). Second, GEO included derivative sovereign immunity in the Scheduling Order issued in October 2018, *see* Am. Stipulated Scheduling & Disc. Order at 5, 19, ECF No. 149, and Plaintiffs did not seek to strike that aspect of the Order. Plaintiffs have since conducted discovery related to derivative sovereign immunity and filed an associated Motion for Summary Judgment. Thus, a finding that GEO waived its ability to raise derivative sovereign immunity is not appropriate.

government contractors, as agents of the government, from liability for actions that were directed or required by the federal government, so long as the government's authority to carry out the contracted-for services was validly conferred by Congress. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20-22 (1940). In other words, a contractor cannot be held liable for executing the government's will. *Id.* at 21. But, when a contractor's actions were neither directed nor required by the government, the contractor will not be shielded by derivative sovereign immunity and can be held liable under state or federal law for conduct causing injury. *Campbell-Ewald*, 577 U.S. at 166-67.

Similarly, but distinctly, the government contractor defense is grounded in principals of federalism. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988). Just as government actors are protected from liability when federal common law preempts state law to protect in areas of "uniquely federal interests," *id.* (citation omitted), contractors are protected by the government contractor defense for violations of state law "[w]here the government has directed a contractor to do the very thing that is the subject of the claim," *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001). As justification for the defense, the Supreme Court has explained that "an independent contractor performing its obligation under a . . . contract, rather than an official performing his duty as a federal employee, . . . obviously implicate[s] the same interest in getting the Government's work done." *Boyle*, 487 U.S. at 505. The defense is only proper when the operation of state law results in either (1) a "significant conflict" with "an identifiable federal policy or interest," *id.* at 507 (quotation marks omitted) (quoting *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68 (1966)), or (2) the frustration of "specific objectives of federal legislation," *id.* (quotation marks omitted) (quoting *U.S. v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979)).

A party asserting the defense must first show that a contract concerns an area of "uniquely federal interests." *Id.* at 504 (citation omitted). Next, it must establish a clash between a state law and a federal policy or objective. *Id.* at 507. Finally, the party seeking its protection must satisfy "the three limiting criteria for contractor immunity." *Id.* at 510. To do so, the contractor must prove that "(1) the government approved reasonably precise specifications; (2) the contractor's performance conformed to those specifications; and (3) the contractor alerted the government to dangers known to the contractor but not to the United States." *Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 255 (4th Cir. 2021) (quotation marks, brackets, and citation omitted).

### B. Analysis

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For purposes of the present analysis, the parties have filed cross motions for summary judgment, so I am "entitled to assume that no evidence needs to be considered other than that filed by the parties." *James Barlow Fam. Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997). Because I find ICE neither directed nor required GEO to improperly compel detainees' labor or to compensate VWP participants only $1.00 per day, an extension of the government's immunity through either derivative sovereign immunity or the government contractor defense is inappropriate as a matter of law.

1. **Derivative Sovereign Immunity**

The derivative sovereign immunity analysis articulated in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. at 20-22, can be reduced to the following two inquiries: First, was the authority exercised by ICE in contracting with GEO validly conferred on ICE by Congress? Second, were GEO's challenged actions required by its contractual obligations?

*TVPA Claim*

For Plaintiffs' TVPA claim, the first of the two inquiries for derivative sovereign immunity can be answered in the affirmative. *See* 8 U.S.C. §§ 1103, 1226, 1231. On the second inquiry, however, I come to the opposite conclusion.

GEO claims it is protected by derivative sovereign immunity because its disciplinary practices and purported threats were required by ICE's PBNDS. But GEO's cleaning policies, which it independently developed and implemented, far exceeded its contractual obligations with ICE. Under GEO's policies, all detainees were required to regularly clean "all commonly accessible areas" in their housing units. *See, e.g.*, 2005 Handbook, ECF No. 273-1 at 18. Those areas included "walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs." *Id.* The day room area was to be "kept clean at all times." *Id.* If detainees refused to participate in this effort, they faced disciplinary segregation. *See, e.g.*, *id.*

In comparison, the relevant ICE-GEO contracts, through their incorporation of the PBNDS, only required detainees to tend to their "personal housekeeping." *See, e.g.*, 2000 PBNDS, ECF No. 261-10 at 3. By that, it meant keeping any "immediate living areas . . . neat and orderly" through simple tasks such as making beds, stacking papers, and removing clutter

from the floor. *Id.*[16] ICE's National Detainee Handbook similarly limited the scope of a

detainee's cleaning duties to only those areas that a detainee used himself, informing detainees:

"[Y]ou must keep areas that *you* use clean, including *your* living area and any general-use areas

that *you* use." 2013 ICE Handbook, ECF No. 310-1 at 18 (emphasis added). And by

distinguishing between a detainee's living area and "any general-use areas," the ICE Handbook

confirms the phrase "living area" does not encompass the entire pod. *Id.* The enforcement

mechanism for these provisions is found in the PBNDS' disciplinary scale, which references

"[r]efusal to clean assigned living area" as a "high moderate" offense for which disciplinary

segregation is a potential sanction. 2000 PBNDS, ECF No. 261-10 at 24; 2008 PBNDS, ECF No.

261-9 at 56-57; 2011 PBNDS, ECF No. 261-8 at 47-48.

GEO attempts to stretch the meaning of "living area" so that its policies fit within the

PBNDS. Specifically, GEO contends, "[w]hile the phrase 'living area' is not defined in the

PBNDS or the contract, it has a commonly accepted plain meaning in the detention context: a

detainee's housing unit in which he or she occupies each day." Resp. to Pls.' Mot. for Summ. J.

at 27-28 n.16, ECF No. 270; *see also id.* at 26 ("There is no question that the entirety of where a

detainee lives and sleeps is his or her 'living area.'"). In support of this expansive definition,

GEO cites several cases in which courts describe prisoner and pretrial detainee living areas to

include common areas. *See id.* at 27-28 (citing *VanPatten v. Allen Cty. Jail*, No. 1:11-CV-73-

---

[16] The parties dispute the extent of personal housekeeping requirement found within the PBNDS.
Plaintiffs seek to limit such housekeeping to the four tasks specifically mentioned, while
Defendants argue the four tasks constitute a non-exclusive list. The scope of the government-
directed personal housekeeping requirement is significant because GEO may be entitled to
derivative sovereign immunity for its enforcement of that requirement. This dispute need not be
resolved, however, because Plaintiffs do not make the claim that detainees' personal
housekeeping tasks constitute forced labor in violation of the TVPA. Resp. to Mot. for
Decertification, ECF No. 339 at 59. Thus, the fact of any derivative sovereign immunity against
such a claim is irrelevant.

PPS, 2013 WL 2149447, at *2 (N.D. Ind. May 16, 2013); *Treadway v. Rushing*, No. 4:10 CV 2749, 2011 WL 13568, at *1 (N.D. Ohio Jan. 4, 2011); *Jones v. Wittenburg*, 509 F. Supp. 653, 702 (N.D. Ohio 1980); *Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993)). But none of the cited cases concern the PBNDS or a privately run ICE detention facility, so they have little relevance to an interpretation of the ICE-GEO contract.

GEO also points to a provision of the PBNDS that states: "The same information shall be posted in the living areas (or 'pods') of the facilities." 2011 PBNDS, ECF No. 271-10 at 3. But this use of "living areas" is not proceeded by the word "your," "assigned," or "immediate" as when it is used in the disciplinary scale and in discussing the cleaning requirements. If anything, the PBNDS's requirement that information be posted in the "pods" for widespread communication draws further distinction between the housekeeping of the detainees' personal living areas and general housekeeping in the common areas. *See, e.g.*, 2000 PBNDS, ECF No. 261-10 at 3 ("Work assignments are voluntary. However, all detainees are responsible for personal housekeeping.").

The PBNDS did not mandate that detainees clean the common areas or clean up after others. Yet, GEO's policies clearly did, and GEO extended the PBNDS disciplinary scale to cover its expanded cleaning mandates. As Plaintiffs state: "The fact that ICE authorized solitary confinement for certain defined [high moderate] offenses is not *carte blanche*—much less a specific directive—to use the same punishment to enforce GEO policies that deviate from the PBNDS." Pls.' Reply in Supp. of Mot. for Summ. J., ECF No. 286 at 102. One can imagine a situation in which solitary confinement may be an appropriate sanction for a detainee who obstinately refuses to tend to his personal space and, by doing so, places Facility staff and other detainees at risk. Such a situation falls far afield of the Facility's desire to have detainees clean

up after others, and its corresponding threats of punishment for detainees who refuse to assist in efforts to clean common areas. GEO likewise cannot claim it is protected simply because ICE officials "reviewed and cleared" its policies. *See* Ragsdale Dep. 39:3-6, ECF No. 271-11. The audit forms used by ICE are not specific enough to show that it directed or required GEO's cleaning policies and their implementation. And the COTR did not have the authority to approve changes to the ICE-GEO contracts.

To derive sovereign immunity from the federal government, GEO must prove it was "simply perform[ing] as the Government directed." *Campbell-Ewald Co.*, 577 U.S. at 167; *see also Cabalce v. Thomas E. Blanchard & Associates*, 797 F.3d 720, 732 (9th Cir. 2015) (holding derivative sovereign immunity "is limited to cases in which a contractor 'had no discretion . . . and completely followed government specifications'" (citation omitted)). GEO's arguments and citations to case law do not carry it far enough to place it within the penumbra of ICE's sovereign immunity for purposes of this suit.

*Unjust Enrichment Claim*

GEO asserts ICE's sovereign immunity bars Plaintiffs' unjust enrichment claim because ICE required it to pay "exactly $1.00 per day" from October 22, 2011, to June 22, 2013, while the 2008 PBNDS was in force, and then established $1.00 per day as a minimum from June 22, 2013, through the end of the class period. GEO's Cross Mot. for Summ. J. at 22-23, ECF No. 284. In essence, GEO claims it simply did as it was told or complied with the "minimum standards . . . directed by the federal government." *Id.* at 23 (emphasis omitted).

To begin, GEO's statement of the law on derivative sovereign immunity is incorrect. It states that "the law requires a contractor [to] actually *violate* its contract with the federal

government" for the contractor to lose its derivative immunity. *Id.* (citing *Cunningham*, 888 F.3d at 643). At no point does the Fourth Circuit in *Cunningham*—much less the Supreme Court—suggest an injured party must prove a contractual violation as a prerequisite to overcoming a government contractor's derivative sovereign immunity. Instead, the *Cunningham* Court describes a violation of "both federal law and the Government's explicit instructions" as a sufficient, but not necessary, condition for finding that a contractor is not entitled to derivative sovereign immunity. *Cunningham*, 888 F.3d at 647 (quoting *Campbell-Ewald*, 577 U.S. at 166). So, even if I were to conclude GEO did not violate its contract with ICE, as GEO insists, my inquiry would not be over.

To enjoy the vast protection of derivative sovereign immunity, GEO must show (1) ICE was authorized by Congress to dictate compensation for VWP participants (2) GEO's challenged actions were required by its contractual obligations. Plaintiffs dispute whether ICE's authority was validly conferred. I find GEO has not satisfied the second showing, and so decline to address Plaintiffs' arguments related to the first.

GEO must establish that it acted as ICE's agent in paying VWP class members $1.00 per day during the class period. *Yearsley*, 309 U.S. at 20-21 ("The action of the agent is the act of the government." (quotation marks and citation omitted)). Put differently, if GEO's agency did not require it to pay VWP class members only $1.00 per day, then GEO can be held liable for any consequential injury to the class. *See Campbell-Ewald*, 577 U.S. at 167.

The 2011 contract did not direct or require GEO to compensate VWP workers $1.00 per every eight hours worked under the program. Rather, it set the outer boundaries of the program and permitted GEO to implement the program through its discretionary decision-making within those boundaries. Among the boundaries enumerated by ICE were the requirements that GEO

was to: (1) permit detainees to work no longer than "8 hours daily, 40 hours weekly," 2008 PBNDS, ECF No. 261-9 at 63; (2) provide compensation for which it would be reimbursed at $1.00 per day per detainee, 2011 Contract, ECF No. 262-2 at 5; and (3) comply with "[a]pplicable federal, state and local labor laws and codes," 2011 Contract, ECF No. 262-2 at 38. While this distinction is nuanced and perhaps difficult to parse at first blush, it is nevertheless significant: it is the distinction between the government expressing its will in the form of a contractual directive and the government permitting GEO to determine what is appropriate as an exercise of discretion. In other words, it is the distinction between an agent and an independent contractor. "[U]nder the agency principles underlying *Yearsley* immunity, courts have looked to see if the contractor is hired as an 'independent contractor,' expected to use its expertise and discretion to decide how best to get the job done, or as something more akin to an agent of the United States, just following orders." Kate Sablosky Elengold & Jonathan D. Glater, *The Sovereign Shield*, 73 Stan. L. Rev. 969, 1001 (2021). Here, GEO was not just following orders.

GEO disagrees, claiming its hand was forced by the terms of its contract with ICE, but there is no evidence that ICE prohibited GEO from compensating its workers more than $1.00 per day. Instead, the evidence suggests the participants' compensation was left to GEO's discretion.

By listing the "actual cost" of $1.00 per day for reimbursement purposes, ICE was setting out one of the defining features of the VWP: its willingness to reimburse GEO $1.00 per day for detainees' participation. The 2008 PBNDS stated an amount of $1.00 per day, and later the 2011 PBNDS provided "at least $1.00 (USD) per day," as an appropriate minimum to bring about ICE's desired outcomes: the enhancement of essential operations and services and the reduction of "[t]he negative impact of confinement . . . through less idleness, improved morale and fewer

disciplinary incidents." 2008 PBNDS, ECF No. 261-9 at 60; *see also* 2011 PBNDS, ECF No. 261-8 at 50. But GEO provides no reason for its suggestion that ICE directed it to pay *no more than* $1.00 per day. ICE's decision to permit GEO to establish specific VWP compensation terms is logical. The government has no interest in directing a private entity to maximize its profits, and the amount paid to VWP workers directly affected GEO's profits.[17] Krumpelmann Dep. 23:23-24:4, ECF No. 261-6; Amber Martin Dep. 107:22, ECF No. 261-2.

As before, GEO cannot assert derivative immunity simply because ICE officials "reviewed and cleared" its policies. *See* Ragsdale Dep. 39:3-6, ECF No. 271-11. The audit forms do not mention the rate of pay, the hours, works, or whether the compensation terms applied with state and local laws and regulations. And again, the COTR did not have the authority to approve changes to the ICE-GEO contract.

I conclude ICE left the payment amount to GEO's discretion, and "nothing in *Yearsley* extended immunity to [government] contractors exercising a discretionary governmental function," *Cabalce*, 797 F.3d at 732 (brackets and citation omitted). The Supreme Court has described the critical aspect of *Yearsley's* derivate qualified immunity as a "contractor's performance in compliance with all federal directions." *Campbell-Ewald*, 577 U.S. at 167 n.7. Because GEO was not complying with any federal direction or contractual requirement to

---

[17] Mr. Ragsdale, GEO's Executive Vice President for Contract Compliance, testified the detainees' work through the VWP is cost neutral at $1.00 per day—that its profits would go down if it paid VWP workers more and that they would go up if it added additional cleaning staff. Ragsdale Dep. 167:24-168:17, ECF No. 306-14. But the 2008 and 2011 PBNDS do not envision VWP participants serving as a substitute for cleaning staff. Instead, they are meant to "enhance[]" the "[e]ssential operations and services" provided by GEO. 2008 PBNDS, ECF No. 261-9 at 60; 2011 PBNDS, ECF No. 261-8 at 50. Mr. Ragsdale's testimony further supports my determination that ICE's interest in requiring the VWP is separate and apart from GEO's profitability concerns.

compensate VWP participants $1.00 per day and no more, but was instead exercising its discretion, GEO cannot escape liability on the grounds that it is immune from suit.

### 2. Government Contractor Defense

Having found that derivative sovereign immunity does not bar either of Plaintiffs' claims, I turn to GEO's government contractor defense. GEO initially raised the defense in a Motion to Dismiss. At that time, I found that for the period in which the 2011 PBNDS were applicable to the ICE-GEO contract, "there is no 'significant conflict' between a federal interest and state law as required for the assertion of the government contractor defense." *Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1135 (D. Colo. 2015). I now consider GEO's arguments regarding the 2008 PBNDS and extend my previous holding to the time covered by the earlier PBNDS.

Before applying *Boyle's* three-part test, I must first decide whether the contract between GEO and ICE involves "uniquely federal interests." *Boyle*, 487 U.S. at 504. If it does, then I must determine whether GEO has established a significant clash between state law and a federal policy objective. A conflict between state law and federal policy is significant "when state law [is] contrary to a contract term actually selected by [a] federal agency." *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1098 (10th Cir. 2015). The detention of immigrants in removal proceedings is undoubtedly a uniquely federal interest as a necessary part of the government's efforts to enforce immigration laws and regulations. However, GEO cannot properly avail itself of the government contractor defense because it cannot prove that the operation of state law results in a "significant conflict" with federal policy or that it frustrates some specific federal objective. *Boyle*, 487 U.S. at 507.

In arguing that Plaintiffs' unjust enrichment claim poses a conflict between Colorado law and the federal government's interest in detaining immigrants in removal proceedings, GEO primarily relies on the Tenth Circuit's opinion in *Helfrich v. Blue Cross & Blue Shield Association*. GEO's Cross Mot. for Summ. J. at 24-26, ECF No. 284. In that case, the plaintiff was a federal employee who received benefits through her federal health insurance plan for treatment related to injuries sustained in a car accident. *Helfrich*, 804 F.3d at 1094. After settling with the other driver, her insurer sought reimbursement for benefits it had paid in accordance with a subrogation provision in the contract governing her health care plan. *Id.* The plaintiff filed suit on the grounds that Kansas law prohibited subrogation and reimbursement clauses in insurance contracts. *Id.* The Tenth Circuit held that federal common law preempted the Kansas antisubrogation regulation because the regulation conflicted with uniquely federal interests. *Id.* at 1098-99. The court emphasized two particularly adverse outcomes if it were to allow Kansas state law to override the health care plan's subrogation provision: (1) the plan premiums, which were "paid largely by the government," were likely to increase, and (2) it "would create unfairness within the ranks of government employees." *Id.* at 1099. The *Helfrich* Court noted that the force of the interests was "especially strong" because the insurer "act[ed] as only a service agent between the federal government and its own employees." *Id.* at 1100.

In stark contrast to the significant conflict between state law and federal policy in *Helfrich*, the application of Colorado unjust enrichment law to GEO's VWP (1) will not have a direct impact on government expenditures; (2) will have no significant impact on the government's contractual obligations and rights; and (3) will not affect the government's interest in detaining certain immigrants during the pendency of their immigration court proceedings.

First, the only pecuniary interests directly implicated in the decision to pay more than $1.00 per day are GEO's profit margins. *See* Krumpelmann Dep. 23:23-24:4, ECF No. 261-6; Amber Martin Dep. 107:22, ECF No. 261-2. GEO may argue that the increased costs will be passed on to the government, but GEO has managed to pay its workers as much as $4.00 per day at another detention facility—while being reimbursed only $1.00 per day. Amber Martin Dep. 109:15-110:13, ECF No. 261-2. And if GEO tried to pass a significant increase in cost on to the government, the ICE-GEO contract might not be renewed. *See* Venturella Dep. 165:25-166:4, ECF No. 336-17.

Second, there is no basis to conclude Plaintiffs' unjust enrichment claim will impact ICE because the VWP does not concern federal employees and additional compensation under the VWP does not affect federal contractual rights or obligations. GEO states that it would "violate its contract with ICE" if it "pa[id] detainees more than $1.00 per day," but GEO does not explain how that violation would impact ICE's contractual rights. In any case, GEO contradicts itself by admitting—in response to Plaintiffs' assertion that "ICE does not prohibit its contractors from paying more than $1.00 per day for work performed in the VWP"—that is not aware of a *categorical* prohibition on paying more than $1.00 per day to detainee VWP participants." GEO's Reply in Supp. of Mot. for Summ. J., ECF No. 350 at 58.

Third, the federal interests expressed in the form of ICE's stated objectives can all be accomplished with payments greater than $1.00 per day, and likely to a greater extent. *See* 2008 PBNDS, ECF No. 261-9 at 60; 2011 PBNDS, ECF No. 261-8 at 50. In short, GEO's potential compliance with state law would not have generated a conflict with federal policy or the frustration of federal objectives because ICE did not mandate a pay rate for VWP participants.

GEO also mentions the interest in "the uniformity of the federal government's treatment of ICE detainees." GEO's Cross Mot. for Summ. J. at 26. However, the language of the ICE-GEO contract does not indicate that uniformity in participant compensation was an important federal objective. Instead, independent contractors such as GEO have varying obligations in their administration of the VWP, depending on the states and localities in which they operate. In making the VWP a contractual requirement, ICE listed objectives such as enhancing essential operations and improving morale that are inherently context-specific and bound to differ based on the needs of a particular facility. If, in its discretion, ICE considered uniformity in VWP worker conditions to be important, it could have provided more granular guidance for the terms of the program. Moreover, ICE explicitly instructed that the program was required to comply with the varying obligations of state and local labor laws. The inclusion of that condition in both the contract and the PBNDS is evidence that ICE envisioned the "inconsistent patchwork of state laws and regulations" that GEO urges this court to protect against. *Id.* The evidence shows the government merely determined the minimum compensation adequate for contracting purposes but did not go so far as to confirm that compensation complied with all applicable laws or to mandate uniformity across all federal detention facilities. It is no surprise, then, that VWP rates do vary from facility to facility. *See* Amber Martin Dep. 109:1-110:6, ECF No. 261-2.

Even if I were to conclude Plaintiffs' unjust enrichment claims clashed with the relevant ICE-GEO contract provisions, application of *Boyle's* three-part test would lead me to the same conclusion. I have already found GEO's contract with ICE granted it discretion regarding the amount and terms of payment under the VWP. It follows that the government did not approve "reasonably precise specifications" as to those aspects of the VWP. *Express Scripts*, 996 F.3d at 255 (citation omitted).

Although the ICE-GEO contract required some compensation and prescribed that GEO would be reimbursed $1.00 per day, it did not require any specific work schedule or payment. In other words, the details of the VWP compensation scheme were not contract terms "actually selected by [ICE]." *Helfrich*, 804 F.3d at 1098. "[S]tripped to its essentials," the argument that *Boyle's* three-part test does not limit a contractor's immunity "is fundamentally a claim that '[t]he Government made me do it.'" *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 465 (5th Cir. 2010) (quoting *In re Joint E. & S. Dist. New York Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990)); *see also Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1482 (5th Cir. 1989) ("[T]he purpose of the [*Boyle*] test is to deny the defense to a government contractor that is itself ultimately responsible for the []defect.") (quotation marks and citation omitted)). GEO cannot show that the government made it pay VWP workers $1.00 per day and no more.

Consequently, I find that while federal interests are clearly implicated by the ICE-GEO contract, there is no obvious clash between federal policies or objectives and the state law underlying Plaintiffs' unjust enrichment claim. Nor was GEO required by ICE to pay only $1.00 per day. The government contractor defense is therefore inapplicable and cannot shield GEO from liability.

## C.  Ruling on Cross Motions for Summary Judgment

The record shows that GEO has not simply performed as ICE directed. GEO went beyond its contract with ICE in requiring detainees to clean up all common areas and after other detainees under the threat of segregation. And GEO's contract with ICE gave GEO discretion to decide how much to pay VWP participants at the Facility. Thus, GEO is not entitled to derivative

sovereign immunity, and its government contractor defense fails. As a result, Plaintiffs' Motion

for Summary Judgment is granted, and GEO's Cross Motion is denied.

### III. GEO's Motion to Dismiss for Failure to Join a Required Party (ECF No. 307)[18]

GEO's Motion to Dismiss for Failure to Join a Required Party argues that, even if GEO is

not entitled to derivative sovereign immunity or protection as a government contractor,

Plaintiffs' claims should be dismissed because ICE was not joined as a party. I find ICE is not a

necessary party under Federal Rule of Civil Procedure 19(a), and therefore deny the Motion.

### A. Legal Standard

Federal Rule of Civil Procedure 19 governs when a party must be joined. The Rule

provides that joinder is necessary if:

> (A)   in that person's absence, the court cannot accord complete relief among
>         existing parties; or
> (B)   that person claims an interest relating to the subject of the action and is so
>         situated that disposing of the action in the person's absence may:
>> (i)    as a practical matter impair or impede the person's ability to protect
>>         the interest; or
>> (ii)   leave an existing party subject to a substantial risk of incurring double,
>>         multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a). If a required party cannot be joined, the court then determines "whether, in

equity and good conscience, the action should proceed among the existing parties or should be

dismissed." Fed. R. Civ. P. 19(b). In effect, the analysis involves two questions: First, is the party

necessary to the suit? And if so, is the party indispensable? *Rishell v. Jane Phillips Episcopal*

*Mem'l Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir. 1996). If the absent party is both necessary and

---

[18] Plaintiffs' Response to GEO's Motion to Dismiss is ECF No. 338, and GEO's Reply in
Support of its Motion is ECF No. 348. GEO has filed a related Notice of Supplemental Authority
(ECF No. 361), and Plaintiffs have responded to that Notice (ECF No. 362).

indispensable but cannot be joined, "the suit must be dismissed." *Id.* "The moving party has the burden of persuasion in arguing for dismissal." *Id.* (citation omitted). I find ICE is not a necessary party and therefore need only conduct the initial inquiry to determine that dismissal is not proper in this case.

## B.  Analysis

To determine whether ICE is a necessary party under Rule 19(a), I must assess three factors: "(1) whether complete relief would be available to the parties already in the suit, (2) whether [ICE] has an interest related to the suit which as a practical matter would be impaired, and (3) whether a party already in the suit would be subjected to a substantial risk of multiple or inconsistent obligations." *Rishell*, 94 F.3d at 1411. GEO argues all three of these factors render ICE a necessary party. But for the same reasons GEO is not protected by derivative sovereign immunity or the government contractor defense, GEO's arguments for dismissal miss the mark.

### 1.  Complete Relief is Available to the Parties

GEO characterizes the ICE-GEO contracts as being "at the heart of Plaintiffs' claims" because GEO's allegedly unlawful actions were made in the course of its performance under the contracts. Mot. to Dismiss, ECF No. 307 at 21. Without ICE's joinder, GEO contends, there will be no accountability for ICE's involvement in any violations of the TVPA.

But as I explained in my analysis of GEO's claims to derivative sovereign immunity and the government contractor defense, the ICE-GEO contracts did not direct or require GEO's challenged actions. Consequently, the cases cited by GEO in which the contract is central to the

dispute are inapposite. *See Travelers Indem. Co. v. Household Int'l, Inc.*, 775 F. Supp. 518 (D. Conn. 1991) (finding contracting party indispensable in breach of contract action); *Rivera Rojas v. Loewen Group Int'l, Inc.*, 178 F.R.D. 356 (D.P.R. 1998) (subsidiary was a necessary party where plaintiffs alleged parent corporation used subsidiary to breach contract); *Ente Nazionale Idrocarburi v. Prudential Sec. Grp., Inc.*, 744 F. Supp. 450 (S.D.N.Y. 1990) (holding contracting party indispensable in tortious interference claim due to possibility of inconsistent adjudications in suits pending elsewhere and because absent party had "real interests that [were] clearly at stake").

Plaintiffs do not seek to set aside or recover under the ICE-GEO contracts. Instead, they challenge GEO's interpretation of and performance outside the contract. They allege GEO unlawfully employed ICE's disciplinary scale to implement a cleaning policy that GEO devised without ICE's involvement (i.e. the TVPA claim), and they allege GEO was unjustly enriched by its failure to appropriately compensate participants of its VWP (i.e. the unjust enrichment claim). Plaintiffs do not challenge any actions taken by ICE or assert that the contract itself is the source of their harm.

GEO accurately points out that Plaintiffs seek a legal determination that it is obligated to pay more than $1.00 per day to detainees participating in the VWP, but GEO is wrong that such a determination would "invalidat[e] a portion of ICE's contract with GEO that sets the payment of $1.00 as a permissible floor." Mot. to Dismiss, ECF No. 307 at 23. While the contractual provision mentions $1.00 as a minimum compensation amount, it is not the only applicable provision. Instead, it is one aspect of the program's required framework within which GEO was expected to exercise its discretion. Other provisions of the relevant contract required compliance with federal and state labor laws. *See* 2011 Contract, ECF No. 262-2 at 38. Likewise, I have no

occasion to "invalidate a portion of ICE's disciplinary severity scale as violating the TVPA, despite the fact that GEO is contractually obligated to comply with the scale." Mot. to Dismiss, ECF No. 307 at 23. Plaintiffs do not claim the personal housekeeping tasks constitute forced labor, and ICE's disciplinary severity scale only applies to those tasks. *See* Resp. to Mot. for Decertification, ECF No. 339 at 59. While the terms of the ICE-GEO contracts are relevant, they are nevertheless peripheral to Plaintiffs' claims. Thus, complete relief is available to Plaintiffs despite ICE's absence.

### 2.   ICE Has No Legally Protected Interest in the Suit

GEO primarily relies on three interests that could be impaired if ICE is not a party to the suit: (1) ICE's interest in defending against allegations that its policies violate federal law; (2) ICE's contracts with other private parties; and (3) ICE's reputational interests. But Plaintiffs' claims do not depend on a finding that ICE's policies violated federal law. Instead, they allege GEO's interpretation and expansion of the policies violate federal law. Similarly, ICE's contracts with other parties are not impacted by a judicial determination that GEO's actions—which were neither required nor directed by ICE—violated state or federal law. Finally, GEO has identified no specific legal protections to any reputational interests ICE may have. *Cf. Burger King Corp. v. Am. Nat. Bank & Tr. Co. of Chicago*, 119 F.R.D. 672, 677 (N.D. Ill. 1988) (finding subtenant's "ability to protect his interests obviously could be severely impaired by this lawsuit"); *see also Ward v. Apple Inc.*, 791 F.2d 1041, 1053 (9th Cir. 2015). GEO has failed to identify any legally protected interest ICE has that relates to the subject matter of the present action.

On the other hand, ICE is a governmental entity that does have a clear interest in the enforcement of federal laws. That interest, however, is protected without ICE joining the suit as a party.[19] Moreover, even if ICE's legally protected interests were somehow implicated, ICE is aware of the claims in this case and has not affirmatively asserted any interest. Instead, it has only participated in discovery proceedings and to intervene in opposition to a motion for writ of habeas corpus filed by one of the named Plaintiffs. *See, e.g.*, ICE Mot. for Reconsideration, ECF No. 281.

GEO articulates a sweeping rule that "[w]here a contract between a sovereign entity and a defendant is implicated in a lawsuit, the sovereign entity is a necessary party under Rule 19(a)." Mot. to Dismiss, ECF No. 307 at 21 (citing *U.S. ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 479 (7th Cir. 1996)). There is no such rule. In *U.S. ex. Rel. Hall v. Tribal Dev. Corp.*, the plaintiffs alleged that a contract for goods and services between the Menominee Tribe and a private corporation violated several federal statutes, but the Tribe was unwilling to join the suit. 100 F.3d at 478. The Seventh Circuit affirmed the district court's dismissal of the action under Rule 19 based on the reasoning that "a judgment in favor of the plaintiffs undoubtedly would be prejudicial to the [sovereign entity] while the plaintiffs' interest in the subject matter of the action was tenuous and indirect." *Id.* (quotation marks and citation omitted). Here, the opposite is true. A judgment in Plaintiffs' favor would have no bearing on ICE's rights or obligations. Also, Plaintiffs in this case have an interest that is anything but tenuous and indirect: they allege they have been the victims of forced labor in violation of federal law while held in federal

---

[19] There is merit to GEO's contention that a judicial determination that ICE acted without Congressional authority would directly implicate ICE's legal interests, but thus far I have had no need to make any findings regarding ICE's authorization from Congress for any aspect of the VWP.

immigration custody and that a large private corporation was unjustly enriched by labor performed on a voluntary basis.

GEO insists I must determine "whether the PBNDS . . . violate state and federal laws," reinforcing its argument by pointing to Plaintiffs' assertion that GEO's challenged cleaning policies violate its contract with ICE. Mot. to Dismiss, ECF No. 307 at 22 (citing Pls.' Mot. for Summ. J., ECF No. 260 at 33-35). However, GEO's cleaning policy was "not created by ICE." Ely Decl. ¶ 22, ECF No. 261-7.[20] GEO unilaterally extended the PBNDS disciplinary scale to cover cleaning mandates that were not required by ICE, and it made the discretionary decision to reimburse VWP workers only $1.00 per day.

In a similar argument, GEO maintains that the practices Plaintiffs challenge under the TVPA "are required by GEO's contract with ICE and the PBNDS." Mot. to Dismiss, ECF No. 307 at 25. GEO relies heavily on *Boles v. Greenville Housing Authority*, 468 F.2d 476 (6th Cir. 1972). In *Boles*, the Sixth Circuit determined that it could not grant the relief sought without a concomitant holding that the Department of Housing and Urban Development "misinterpret[ed] its own guidelines . . . [and] misconceived its function and prerogatives under the Urban Renewal Act." 468 F.2d at 479. Because GEO's challenged policies were not required by ICE, *Boles* provides no legal support to GEO's contention that ICE has any legally protected interest in this suit.

As Plaintiffs have made clear, their claims in this case "do not challenge ICE's rules or decisions, but rather GEO's policies that skirt those rules." Resp. to Mot. to Dismiss, ECF No. 338 at 20. Moreover, the determination that ICE did not require or direct GEO's cleaning

---

[20] GEO contends Ms. Ely's "use of the term 'HUSP' is not consistent with the term as defined by Plaintiffs in this litigation." GEO Reply in Supp. of Mot. for Summ. J., ECF No. 350 at 40. However, no evidence in the record contradicts Ms. Ely's assertion that ICE did not draft the policies relevant to Plaintiffs' claims, other than as set out in this Order.

policies or the associated use of the disciplinary scale fortifies ICE's rights. ICE's interests are not directly implicated by Plaintiffs' claims, and any interests ICE does have in the outcome of the suit are not impaired by its absence.

### 3. GEO Would Not Be Subjected to a Risk of Multiple or Inconsistent Obligations

GEO contends a judgment in Plaintiffs favor may subject it to inconsistent obligations because (1) GEO may be found guilty of violating the TVPA while "simultaneously contractually required by ICE to continue implementing the very policies that resulted in the TVPA violation," and (2) a determination that ICE has acted *ultra vires* in carrying out the VWP would obligate GEO to comply with a program that lacks Congressional authorization. Mot. to Dismiss, ECF No. 307 at 31-33. I dispensed with both contentions above. First, the ICE-GEO contracts do not require GEO to implement the disciplinary policies in the manner alleged. On the contrary, GEO's contract with ICE requires it to comply with the law. *See, e.g.*, 2011 Contract, ECF No. 262-2 at 38. Any doubt on this point is resolved by GEO's decision to formalize an internal policy against placing detainees in solitary confinement for refusing to clean. *See* Amber Martin Dep. 134:13-21, ECF No. 271-6. Second, Plaintiffs' claims do not necessitate a finding regarding ICE's Congressional authorization. As such, there is no risk that GEO will be subjected to inconsistent obligations based on the outcome of the present lawsuit.

### C. Ruling on GEO's Motion to Dismiss

GEO has failed to demonstrate that ICE is a necessary party to this litigation, and thus, its Motion to Dismiss pursuant to Federal Rule of Civil Procedure 19 is denied.

**IV. GEO's Motions for Summary Judgment[21] and for Decertification of Class[22]**
**(ECF Nos. 305 & 312)**

I turn now to GEO's motions relating to the merits of Plaintiffs' claims: its Motions for Summary Judgment and for Decertification. GEO's Motion for Summary Judgment argues that judgment as a matter of law is appropriate on both Plaintiffs' unjust enrichment claim and TVPA claim. GEO asserts Plaintiffs' unjust enrichment claim must fail because a valid contract existed between GEO and VWP participants and GEO actually lost profits due to the mandated VWP. Regarding Plaintiffs' TVPA claim, GEO insists Plaintiffs cannot show: (1) they were subjected to serious harm under the Act; (2) that GEO possessed the requisite mental state; and (3) that GEO's purported threats caused the detainees to clean. Additionally, GEO contends Plaintiffs' TVPA claim is partially barred by the applicable statute of limitations.[23]

GEO's Motion for Decertification maintains—just as its opposition to Plaintiffs' Motion for Certification did—that Plaintiffs TVPA claim cannot be prosecuted on behalf of the certified class because individual issues predominate. Specifically, GEO argues class members were not subjected to a uniform forced-labor policy, had various motivations for cleaning other than any threats GEO made, and performed various types of cleaning tasks, some permissible under the TVPA and some impermissible. GEO's Decertification Motion also repeats two of the points raised in GEO's Motion for Summary Judgment, namely that Plaintiffs cannot establish they

---

[21] Plaintiffs' Response to GEO's Motion for Summary Judgment is ECF No. 336, and GEO's Reply in Support of its Motion is ECF No. 350. The Notice of Supplemental Authorities GEO filed in ECF No. 335 pertains to its Motion for Summary Judgment as well. GEO later filed another Notice of Supplemental Authorities (ECF No. 361), and Plaintiffs responded to that Notice (ECF No. 362).

[22] Plaintiffs' Response to GEO's Motion for Decertification is ECF No. 339, and GEO's Reply in Support of its Motion is ECF No. 352.

[23] Another argument GEO raises is that Plaintiffs cannot seek injunctive relief under the TVPA. In their Response to GEO's Motion, Plaintiffs confirm that their TVPA claim does not seek injunctive relief.

were subjected to serious harm or that GEO acted knowingly. Lastly, the Motion seeks exclusion of female detainees from the class, claiming that no female segregation unit existed at the Facility.

GEO's TVPA-related arguments in its Summary Judgment and Decertification Motions substantially overlap, and so I consider them first. I conclude Plaintiffs have put forward sufficient evidence to establish the disputed elements of their TVPA claim and common issues continue to predominate such that decertification is not warranted. I then evaluate GEO's contentions regarding Plaintiffs' unjust enrichment claim. I determine that whether GEO benefited from the VWP involves genuine disputes of material fact and that the VWP agreement does not prohibit Plaintiffs' claim.

## A. TVPA Claim and Class

GEO's overall premise is that Plaintiffs cannot prove specific elements of their TVPA claim without relying on evidence that is unique to individual Plaintiffs, undermining the basis for certification. The majority of GEO's objections to certification are ones it raised previously that were rejected both in my Certification Order and in the Tenth Circuit's opinion affirming that Order. The few new developments it highlights are exaggerated and insufficient to warrant decertification. After a thorough review of the transcripts, declarations, and documents submitted by the parties, I find Plaintiffs can sustain their TVPA claim with common and representative evidence.

**1. The TVPA**

The forced labor provision of the TVPA makes it unlawful for anyone to:

knowingly provide[] or obtain[] the labor or services of a person. . .

    (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

    (2) by means of serious harm or threats of serious harm to that person or another person;

    (3) by means of the abuse or threatened abuse of law or legal process; or

    (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). Plaintiffs' TVPA claim asserts that GEO obtained detainees' labor by physical restraint or threatening physical restraint, by causing them serious harm or threatening serious harm, and via a scheme, plan, or pattern intended to cause them to believe that they would suffer serious harm or physical restraint if they did not labor. Compl. ¶¶ 76-78, ECF No. 1.

**2. Summary Judgment Standard**

As already stated, summary judgment is appropriate when a party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if a reasonable jury could return a verdict for Plaintiffs. *Id.* In determining whether such genuine disputes of material fact exist, I must view the facts recited above in the light most favorable to

Plaintiffs and resolve all disputed facts in their favor. *See McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018).

### 3. Decertification Standard

The order granting class certification in this case may be altered or amended at any time before final judgment. Fed. R. Civ. P. 23(c)(1)(C). However, "decertification is a drastic step, not to be taken lightly." 3 Newberg on Class Actions § 7:37 (6th ed.) (quotation marks omitted).

Proceeding with the class action is appropriate when the party seeking certification can establish the four threshold requirements set forth in Federal Rule of Civil Procedure 23(a) and fulfillment of at least one of the provisions in Rule 23(b). Under Rule 23(a), the party requesting certification must first show that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). If successful, the party must then demonstrate, one of the Rule 23(b) factors. Here, Plaintiffs relied on and I certified the classes under Rule 23(b)(3), which requires a showing that common questions of law or fact predominate over any individual questions and that a class action is the superior method for "fairly and efficiently adjudicating the controversy." I found that some of the common questions in this case were: whether GEO employed policies that constituted an improper means of coercion under the forced labor statute and whether GEO knowingly obtained detainees' labor using those policies. *See Menocal II*, 320 F.R.D. at 264-65.

GEO contends discovery has revealed that common questions do not predominate over individual concerns for the TVPA class and that the class consequently fails to meet the

requirements of Rule 23. I address GEO's enmeshed decertification and summary judgment arguments jointly, applying the relevant standard to each.

### 4.  Existence of a Uniform Policy

The first question that must be answered based on the parties' framing of the issues is whether there was a uniform policy applicable to the detainees. GEO asserts the policy on which Plaintiffs' TVPA claim is founded is a "contrived policy, which disregards key language in the written policies" and "does not exist." Reply in Supp. of Mot. for Decertification, ECF No. 352 at 12. Considering GEO's policies as a whole, I find Plaintiffs have sufficiently shown the existence of a uniform policy, plan, or scheme. That this policy is made up of portions of various documents and materials is inconsequential because its message was conveyed to detainees and GEO officers.

GEO insists that, although the constituent policies were universally provided to officers and detainees as set out in the Background Section above, they should be disregarded based on the Facility's unwritten policies and practices. To establish that its challenged policies were not applied uniformly (if at all), GEO repeatedly cites its employees' testimony that, when detainees refused to clean, the officers simply asked other detainees to help and that segregation was never imposed for such refusals. *See, e.g.*, Mot. for Decertification, ECF No. 312 at 44 ("GEO officers did not use segregation, or a warning or threat of segregation, as a typical response to a detainee declining to clean."). But Plaintiffs' experiences paint a different picture, one in which the threat of segregation was made both via the written policies and verbally—and was always looming.

GEO is dismissive of Plaintiffs' accounts, stating: "Plaintiffs' experiences, which point to isolated experiences during their stay, fail to establish a classwide policy whereby every detainee

was regularly warned that segregation was a potential consequence for not participating in post-meal clean-up." Reply in Supp. of Mot. for Decertification, ECF No. 352 at 28-29. GEO's policies are not established by Plaintiffs' testimony, though; the policies are documented. Plaintiffs' reports of their individual experiences are used to counter GEO's arguments, based on the testimony of its employees and officers, that the policies are not applied. Moreover, regularly warning every detainee of the consequences for not laboring is not a requirement of the TVPA.

Viewing the evidence in the light most favorable to Plaintiffs, GEO's policies threaten detainees with 72 hours in segregation if they refuse to participate in the general cleanup or fail to clean as directed by a GEO staff member or officer. GEO contends the threat of segregation is not clear because the portion of the Facility's Detainee Handbook that discusses cleaning the day room area states only that "the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs" if the detainees do not clean as instructed. 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 50; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. GEO disregards key language in the written policy. Immediately after warning that the televisions will be turned off, the Handbook states "[c]ontinued refusal to clean the area will result in further disciplinary action." 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 50; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. Logically, "further disciplinary action" covers the disciplinary scale included in the Handbook. As Plaintiffs assert, "[t]he [H]andbook and orientation materials are not ambiguous about the fact that [cleaning common areas] is mandatory, specifically emphasizing that there are consequences for noncompliance, ranging from eliminating

recreational activities up through solitary confinement." Resp. to Mot. for Decertification, ECF No. 339 at 40.

Any defense GEO raises as to how its policies were implemented involves disputes of material facts that must be resolved by a jury. And Plaintiffs' reliance on individual testimony to counter GEO's defenses does not undermine the grounds for class certification.[24]

### 5. Serious Harm and Physical Restraint

As set out above, the TVPA makes it unlawful for anyone to knowingly obtain the labor of a person by physically restraining or threatening to physically restrain the person, by causing the person serious harm or threatening serious harm, or via a scheme, plan, or pattern intended to cause the person to believe he would suffer serious harm or physical restraint if he did not perform the labor. 18 U.S.C. § 1589(a). The TVPA defines "serious harm" as:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

Id. § 1589(c)(2). The serious-harm standard "is a hybrid: it permits the jury to consider the particular vulnerabilities of a person in the victim's position but also requires that [his or] her

---

[24] GEO asserts that "Plaintiffs seek a precedential decision that would put every detention facility, jail, mental health facility, and juvenile detention center at risk of being credibly accused of forced labor by simply providing their residents with a listing of the facility's rules and regulations." GEO's Mot. for Summ. J. at 7, ECF No. 305. Plaintiffs' goals beyond the relief requested in this case are irrelevant to my rulings. But if a facility's rules and regulations improperly compel individuals in its custody to provide labor, credible accusations of forced labor may follow.

acquiescence be objectively reasonable under the circumstances." *United States v. Rivera*, 799 F.3d 180, 186–87 (2d Cir. 2015). [25]

*Summary Judgment*

GEO insists Plaintiffs were merely warned of legitimate consequence sand therefore cannot establish "serious harm," as it is defined in the TVPA. However, the statute makes clear that a showing of serious harm is not required to prove a violation; physical restraint and threats of physical restraint are sufficient. *See* 18 U.S.C. § 1589(a)(1), (a)(4). Increasing the level of confinement for already detained individuals—as Plaintiffs allege GEO's policies threaten to do—can constitute physical restraint. *See Bridges v. Poe*, 487 F. Supp. 3d 1250, 1261 (N.D. Ala. 2020). In *Bridges v. Poe*, a guard at the jail where the plaintiff was held threatened to revoke her status as a trustee worker if she failed to perform sex acts with him. *Bridges*, 487 F. Supp. 3d at 1261. If her trustee status was revoked, she would have been confined to her cell for twenty-three hours a day. *Id.* The court held that "[c]onfinement to a jail cell that restricts an inmate's freedom of movement certainly meets the ordinary meaning of physical restraint." *Id.* (quotation marks omitted). Attempting to distinguish *Bridges*, GEO contends Plaintiffs were already confined within the Facility and so were already under physical restraint. GEO's Reply in Supp. of Mot. for Summ. J., ECF No. 350 at 73. But the plaintiff in *Bridges* was as well. GEO then suggests

---

[25] In describing Plaintiffs' burden under this standard, GEO doctors a sentence from *Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017). GEO quotes the court as stating: "[Plaintiffs] must present sufficient evidence upon which a jury could reasonably conclude that [GEO] knowingly or intentionally engaged in actions or made threats that were sufficiently serious to compel a reasonable person in [each individual plaintiff's] position to remain in [GEO's] employ, against [their] will and in order to avoid such threats of harm[.]" Mot. for Decertification, ECF No. 312 at 40 (alterations in original) (ostensibly quoting *Muchira*, 850 F.3d at 620). The actual text in *Muchira* says nothing about "each individual plaintiff's" position or the necessity of an individualized inquiry, and GEO's insertion of this language is deceptive.

that the threats of physical restraint must be "sufficiently serious" and argues that the threats in *Bridges* were more serious than those here. *Id.* I see no appreciable difference in the threats. The imposition of segregation is physical restraint. Plaintiffs' TVPA claim may therefore be proven based on physical restraint and threats of physical restraint without a showing of serious harm.

Still, Plaintiffs allege that threats of 72 hours in solitary confinement constitute threats of serious harm. To establish their claim based on this theory, Plaintiffs' must show that the harm incurred or threatened was "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). I cannot find as a matter of law that 72 hours in solitary confinement is not a serious harm.

Plaintiffs have presented evidence that the threat of 72 hours in segregation would compel a reasonable person in the detainees' position to perform labor. Specifically, Dr. Grassian testified that 72 hours in segregation can cause psychological damage. *See, e.g.*, Grassian Dep. 216:2-5.[26] And his Report explains how solitary confinement "imposes a devastating triad of emotional and neuropsychiatric deprivations: social isolation, a barren perceptual environment, and deprivation of meaningful mental activity." Grassian Report, ECF No. 336-21 at 11. The testimony in the record from Plaintiffs as well as GEO's officers supports the conclusion that detainees sought to avoid time in segregation. *See* Hugo Hernandez Dep. 166:4-15, 167:19-168:1, 170:4-13, ECF No. 336-4; Xahuentitla Dep. 137:4-19, ECF No. 336-14; Quezada Dep. 141:17-142:8, ECF No. 336-16. Plaintiffs also underscore the detainees' circumstances that

---

[26] GEO criticizes Dr. Grassian for not pointing to any Plaintiff who suffered psychological harm. Plaintiffs are correct, however, that "actually *suffering* serious harm is not a prerequisite for liability." Pls.' Resp. to Mot. for Summ. J., ECF No. 336 at 58.

could make them more vulnerable to threats of segregation: they were confined to the Facility, unable to leave, separated from their family and loved ones, and facing removal.

In reviewing GEO's arguments regarding serious harm, I must first comment that GEO's tone and arrogance are not well taken. GEO ignores the circumstances of its detainees and offers flippant comparisons. An example:

> Plaintiffs' daily routines were not defined by long periods of hard labor, a relative lack of freedom, or squalid living conditions, extreme isolation, threat of legal process, and violence. Rather detainees' routines included three meals a day, time for exercise, television, and reading books supplied by GEO, and the opportunity to speak to their families on the phone, as well as access to legal materials in a law library. Detainees were largely free to do what they wanted during the day and were not deprived of social opportunities. And, the fact that Plaintiffs claims here rest on an allegation that they allegedly cleaned the living areas routinely, Plaintiffs' own allegations belie any argument that [the Facility] could be fairly described as squalid. Thus, the conditions of confinement fall far short of the coercive conditions found to be a violation of the TVPA.

GEO's Mot. for Summ. J. at 27, ECF No. 305 (quotation marks and citations omitted).  This view blinds GEO from honest argument.

GEO discounts the threatened harm in this case, stating: "While there is no ambiguity that people may fear physical harm to themselves or their loved ones when faced with a threat of physical violence, a gun, or a raised fist . . .; here, the purported threat is more nuanced." GEO's Reply in Supp. of Mot. for Summ. J., ECF No. 350 at 75. But that is exactly why the TVPA was enacted—to combat the more nuanced ways in which labor may be coerced today. *See United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (explaining that Congress "enacted § 1589 to address 'traffickers [who] use more subtle means'" (quoting H.R. Rep. No. 106-939, at 101 (2000) (Conf. Rep.), as reprinted in 2000 U.S.C.C.A.N. 1380, 1393)).

Digging itself deeper, GEO insinuates that its policies resemble "ordinary parents requiring chores." GEO's Mot. for Summ. J. at 18 (quoting *United States v. Toviave*, 761 F.3d

623, 625-26 (6th Cir. 2014)). Certainly, though, it would be improper for any parent to place a child in segregation for 72 hours or to even threaten to do so. Moreover, the Facility is not a household, and GEO is not in a familial relationship with the detainees. In *United States v. Toviave*, the Sixth Circuit stated: "[W]e should not—without a clear expression of Congressional intent—transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse a federal crime." 761 F.3d at 629. The court's emphasis was not on the nature of the work performed, i.e., household chores, but on the relationship between the party compelling the labor and the laborer. *Id.* at 625-626. In fact, in *United States v. Callahan*, the Sixth Circuit later clarified: "In *Toviave*, we held that a parent or guardian who requires children to perform household chores and also abuses the children does not necessarily violate the forced labor statute; we did not hold that household chores do not constitute labor or services." 801 F.3d 606, 620 (6th Cir. 2015).

GEO also looks for support in *Headley v. Church of Scientology International*, 687 F.3d 1173 (9th Cir. 2012). There, two ministers of the Church of Scientology claimed that the Church forced them to provide labor in violation of the TVPA. *Id.* at 1174. In addition to experiencing verbal and physical abuse, one plaintiff testified that she had two abortions because she was told, if she did not, she would be required to perform manual labor and face other consequences. *Id.* at 1176. The Ninth Circuit, however, found that "the record contain[ed] little evidence that the defendants obtained the [plaintiffs] labor 'by means of' serious harm, threats, or other improper methods." *Id.* at 1179. Instead, the record supported the conclusion that plaintiffs' labor was voluntarily given due to their belief that involvement in the church "was the right thing to do," and that the "discipline, lifestyle, and familial constraints" the plaintiffs' attacked were what

caused them to leave the organization and stop providing their labor. *Id.* at 1179-80. The court held that the potential consequences plaintiffs faced in leaving—being declared "suppressive persons" and losing contact with their friends and family—did not constitute serious harm or a related threat under the TVPA. *Id.* at 1180.

GEO argues that, "if the unquestionably more severe consequences in *Hedley* [sic] did not violate the TVPA, a warning that a detainee faced the *possible* consequence of a brief stay in segregation does not violate the TVPA." GEO's Mot. for Summ. J. at 30. Ignoring GEO's comment that 72 hours in segregation is a "brief stay," it still misconstrues the analysis in *Headley*. Other than the potential to be declared "suppressive persons," the Ninth Circuit did not consider whether the consequences plaintiffs faced were serious enough that they could have coerced the plaintiffs to labor. The court merely concluded that those consequences were not the cause of the plaintiffs' decision to labor. *Headley*, 687 F.3d at 1176. The focus of the court's analysis is the plaintiffs' freedom to leave. *Id.* at 1180 ("We emphasize that the [plaintiffs] had innumerable opportunities to leave the defendants.").[27] Detainees at the Facility had no such freedom.

In reaching its conclusion, the court in *Headley* explained that it must "distinguish between [i]mproper threats or coercion and permissible warnings of adverse but legitimate consequences." *Headley*, 687 F.3d at 1180 (citation omitted). GEO makes this principle the theme of its argument, reciting that the detainees at the Facility faced only legitimate consequences. But what makes consequences legitimate? That they are lawful, if nothing else.

---

[27] The plaintiff's ability to leave was similarly emphasized by the Fourth Circuit in *Muchira v. Al-Rawaf*. *See, e.g.*, 850 F.3d at 621 ("[The plaintiff] had innumerable opportunities to walk out of the Saudi home without triggering the alarm.").

GEO cannot avoid liability under the TVPA by declaring its consequences to be legitimate when Plaintiffs have presented evidence showing the opposite.

Because a jury could conclude that the threat of 72 hours in segregation would compel a reasonable person in the detainees' position to provide labor in order to avoid that harm, Plaintiffs have sufficiently demonstrated that detainees labored under the threat of serious harm.

*Decertification*

In its Decertification Motion, GEO argues that serious harm cannot be shown on a class-wide basis because (1) 72 hours of segregation is not likely to have the same impact on all individuals, (2) the class members' particular vulnerabilities must be considered, and (3) each had different interactions with GEO's officers. GEO is wrong on all accounts.

GEO claims that, per Dr. Grassian's opinion, the potential harm caused by 72 hours of segregation is dependent on an individual's unique circumstances. Although individuals are likely to have varying responses to segregation, the pertinent question for Plaintiffs' TVPA claim is not whether each individual would be sufficiently harmed by 72 hours in segregation. The standard is whether a reasonable person would be compelled to provide labor in order to avoid 72 hours in segregation. The analysis cannot be based on a prediction of the extent to which each class member would be harmed by actually suffering the consequence of segregation. It bears further comment that the gravamen, i.e., the material part, of  the class members' grievance is the threat of isolation and not the perhaps idiosyncratic harms suffered as a consequence. All class members claim the same threat.

As explained above, in addition to the objective question, the serious-harm standard permits the jury to consider the particular vulnerabilities of a person in the victim's position.

*Rivera*, 799 F.3d at 186–87. GEO contends that Plaintiffs' sensitivities cannot be extrapolated to the entire class, as the class members differed significantly in that they speak different languages, were detained for various lengths of time, and came from distinct environments. First, consideration of the victims' particular circumstances for the purposes of the serious harm inquiry is permitted but not mandatory. *New York State Nurses Ass'n v. Albany Med. Ctr.*, 473 F. Supp. 3d 63, 69 (N.D.N.Y. 2020) (referencing the Second Circuit's opinion in *Rivera*, 799 F.3d at 186-87). And second, the class members have many shared vulnerabilities that can be presented to a jury via class-wide evidence. For example, all of the class members were detained in the same institution subject to universal policies; they were fighting immigration cases; they were not free to leave; they lived in the company of mostly strangers; their ability to see and communicate with their family and loved ones was restricted; and they had little—if any—privacy. A jury could find that these class-wide characteristics made the class members more vulnerable to the threatened harm. As such, the subjective analysis of the serious-harm standard does not support decertification.

Each class member, of course, had different experiences with GEO's officers. GEO downplays the class members' experiences, insisting "a jury would need to assess whether the offhand comments by some officers were reasonably considered a threat in light of the conflicting behavior of other officers." Mot. for Decertification, ECF No. 312 at 51-52. Again, the question is whether a reasonable person would have been compelled to provide his labor under all the surrounding circumstances. Plaintiffs' allegations describe a systematic effort on the part of the officers to force compliance with their cleaning demands, not "offhand" comments. What is more, any comments made by GEO's officers were underwritten by its

universally distributed policies. GEO raised this same argument before the Tenth Circuit, and the court was unambiguous:

> The only factual differences among the class representatives' experiences pertain to their specific interactions with Aurora Facility guards and whether they witnessed firsthand other individual detainees being sanctioned or threatened with solitary confinement for refusal to clean. But these factual differences do not defeat typicality because the class members' legal theory—that GEO knowingly obtained their labor through the uniform Sanitation Policy—does not change based on their personal interactions with GEO staff or their knowledge of specific instances in which GEO threatened or carried out the threat of solitary confinement.

*Menocal III*, 882 F.3d at 917 n.5. It likewise does not matter that segregation was rarely imposed or that on occasion class members faced no consequences for refusing to clean, as GEO's policies ensured the threat was pervasive.

The serious harm element, therefore, presents a common question that can be answered with class-wide evidence.


### 6. Causation

Another element Plaintiffs must prove for their TVPA claim is causation, or that GEO obtained the detainees labor "by means of" its improper coercive conduct. *See* 18 U.S.C. § 1589(a). In my Order certifying the classes, I resolved that there is both an objective and subjective component to the forced labor statute's causation requirement. *Menocal II*, 320 F.R.D. at 266-67. I explained: "The subjective component is whether the victims actually labored because of the perpetrator's conduct, while the objective component is whether a reasonable person would respond in a similar way as the victims." *Id.* at 267. In reaching this conclusion, I considered the case law cited by the parties and relied heavily on the analysis in *David v. Signal International, LLC*, No. 08-1220, 2012 WL 10759668 (E.D. La. Jan. 4, 2012). Additionally, I determined the causation element can be satisfied by class-wide circumstantial evidence, noting

that, "[g]iven the climate in which [Plaintiffs and class members] were detained, it is possible that an inference of causation would be appropriate even despite some class members' purported willingness to work for reasons other than GEO's improper means of coercion." *Menocal II*, 320 F.R.D. at 267. On appeal, the Tenth Circuit declined to decide whether such a subjective showing is necessary, but if it is required, the court found—as I did—that it can be demonstrated through class-wide, circumstantial evidence. *Menocal III*, 882 F.3d at 918 ("But we need not decide which of these standards applies to § 1589's causation requirement in resolving the class certification question. Even assuming GEO's proposed standard applies, the causation element is susceptible to class-wide proof and thus does not preclude the TVPA class from satisfying the predominance requirement.").

Plaintiffs now ask me to reconsider my determination that the causation element requires a subjective showing. Misinterpreting Plaintiffs' request, GEO argues that the Fourth Circuit set out the appropriate legal standard in *Muchira v. Al-Rawaf*. According to GEO, that standard involves two inquiries:

> First, the TVPA includes an express scienter requirement, and therefore a party must present evidence from which the fact finder could conclude that the defendant *intended* the victim to believe harm would befall the victim if he or she did not work . . . . Second, the factfinder must determine that the harm or threat of harm relayed by the defendant was 'sufficiently serious' to compel the victim to continue to work, from the vantage point of a reasonable person in the place of the victim.

Reply in Supp. of Mot. for Decertification, ECF No. 352 at 6 (citing *Muchira*, 850 F.3d at 618). GEO explains the second element is a "hybrid" test because it requires that the victim's decision to provide his labor be objectively reasonable but also takes into account the particular vulnerabilities of a person in the victim's position. *Id.*

Contrary to GEO's rendering, Plaintiffs do not ask that I disregard this hybrid standard for serious harm, the second part of which I have already applied. Their reconsideration request

instead relates to causation and whether they are required to establish why the class members provided their labor. Admittedly, this distinction is tricky. The definition of serious harm includes a causation component—the threatened harm must be sufficiently serious to compel a reasonable person in the victim's circumstances to provide his labor. But the causation element I described in the Certification Order derives from the "by means of" language in the statute and covered not just serious harm but the other improper means of compelling labor under the TVPA (i.e., physical restraint and abuse of law or legal process).

I have reconsidered the analysis in *David* and studied the more recent cases cited by Plaintiffs. While the reasoning in *David* remains valid, most of the cases Plaintiffs cite conflate the serious harm and causation elements and consequently are of little value. *See, e.g.*, *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-01302 (NG) (JO), 2018 WL 4347799, at *8 (E.D.N.Y. Sept. 12, 2018); *N.Y. State Nurses Ass'n*, 473 F. Supp. 3d at 69; *Owino v. CoreCivic, Inc.*, No. 17-cv-01112 JLS (NLS), 2020 WL 1550218, at *27 (S.D. Cal. Apr. 1, 2020). Without any other basis for reconsideration, I stand by my previous statement of the law on causation.[28] However, I remain convinced that the subjective component may be satisfied via circumstantial evidence and that it can be proven on a class-wide basis in this case.

*Summary Judgment*

GEO's arguments regarding causation implicate obvious disputes of material fact such that summary judgment is inappropriate. According to GEO, "Plaintiffs have not demonstrated that absent a fear of discipline, they would not have cleaned up after themselves for reasons other

---

[28] Despite this conclusion, I agree that perpetrators of forced labor should not benefit from fortuitously choosing the "right" victim, one who, despite the perpetrator's coercive intent, labors for unrelated reasons. Further, it cannot be expected or required that all victims of forced labor be available to provide direct evidence of their subjective reasons for laboring.

than the disciplinary policy." GEO's Mot. for Summ. J. at 32. As I have explained throughout

this order, the labor at issue is not just Plaintiffs "clean[ing] up after themselves." The

consideration is whether detainees would have cleaned up the common areas and after other

detainees absent the ever-present threat of segregation. Plaintiffs have presented evidence that

they would not have done so. GEO's arguments and evidence in opposition are issues for the

jury.

*Decertification*

GEO maintains the causation element mandates individualized inquiries because some

class members were not compelled to work by the threat of segregation and some provided their

labor for other reasons personal to them. GEO contends that some detainees actually preferred

segregation for peace and quiet and some liked to clean to stay busy, to help others, or for the

incentives they received. The Tenth Circuit specifically considered Ms. Ceja's testimony that

detainees may clean because they prefer to stay busy and determined it was "conjectural" and

"d[id] not raise concerns about individual issues predominating because GEO could introduce

th[e] same testimony against all class members at trial." *Menocal III*, 882 F.3d at 921 n.12. That

reasoning applies to all similar evidence GEO has submitted in support of decertification.

Pointing to portions of Plaintiffs' testimony, GEO argues that all class members did not

know about the written policies or uniformly view the Facility's Detainee Handbook as

threatening and some may have cleaned before being warned of the possible sanction of

segregation. For Plaintiffs to succeed on their TVPA claim, they are not required to show that

each class member labored as a result of a direct threat, either from an officer or via the

Handbook or Orientation Videos. A reasonable jury could find the looming threat of segregation

created by GEO's policies is sufficient to infer causation. The inference is permitted even if a class member does not remember explicitly being warned of the possible threat of segregation before cleaning. Class members may have perceived the threat without remembering when or how it was made or they may have continued to clean after the threat was made known. Regardless, as I found in certifying the TVPA class initially, an inference of causation might still be appropriate even if some class members purportedly labored for reasons other than GEO's improper coercion. *See Menocal II*, 320 F.R.D. at 267.

GEO also claims that, because Plaintiffs performed much of the same work voluntarily under the VWP, they cannot say it was GEO's cleaning policies that compelled them to do the work. The Tenth Circuit addressed this exact argument and found there was no inconsistency in Plaintiffs' position. *Menocal III*, 882 F.3d at 921 n.12.

Twisting Plaintiffs' contentions once again, GEO criticizes Plaintiffs for focusing on the coercive nature of segregation when a lesser sanction would usually be imposed if a detainee refused to clean. GEO claims:

> Plaintiffs argue that because *one* of the *many* possible sanctions for the refusal to clean is 72 hours in segregation, that a reasonable construction of the post-meal cleanup procedure in the handbook is that any and all times that a detainee refuses to clean, segregation, and not the lesser sanctions such as a warning, reprimand, or loss of privileges would apply—creating an inherently coercive environment.

Mot. for Decertification, ECF No. 312 at 43 (citing Mot. for Class Certification, ECF No. 49 at 17). But GEO's citation for that claim states nothing of the sort. Instead, Plaintiffs assert that the inference could be made that class members labored because of "the possibility of solitary confinement" and that "[t]he choice between solitary confinement and work is no choice at all." Mot. for Class Certification, ECF No. 49 at 18. The TVPA does not require that the serious harm or physical restraint be likely; the threat of it need only be sufficient to compel a victim to

provide labor. To the extent GEO contends the possibility of segregation was so unlikely that it could not have compelled class members to clean, it can make that case to the jury.

GEO's last challenge asserts that Plaintiffs do not represent a diverse cross-section of the certified class, and so a class-wide inference of causation cannot be made based on their testimony. For support, GEO cites *Cruz v. Dollar Tree Stores, Inc.*, Nos. 07-2050 SC & 07-4012 SC, 2011 WL 2682967 (N.D. Cal. July 8, 2011). But *Cruz* is distinguishable because the plaintiffs in the case admitted that the evidence they intended to rely on as common proof was "wrought with problems and . . . provided an unreliable basis by which to establish eligibility for class membership." *Id.* at *7 (citation omitted). Besides, the inference of causation does not depend solely on Plaintiffs' testimony; the jury may consider evidence of GEO's universal policies and the class members' common circumstances.

### 7.  Knowingly

The final disputed element of Plaintiffs' TVPA claim is whether GEO acted knowingly. *See* 18 U.S.C. § 1589(a). "The scienter element requires proof that the defendant knew (1) that the enumerated 'circumstance existed' and (2) that the defendant was obtaining the labor in question as a result." *Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1156 (9th Cir. 2022) (quoting *United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008)). As GEO explains, "Plaintiffs must show that [it] was aware that the policy would coerce labor from detainees." Reply in Supp. of Mot. for Decertification, ECF No. 352 at 45. GEO "may be charged with the combined knowledge of its employees and agents." 3 Fletcher Cyc. Corp. § 807. Whether this knowledge should be imputed to GEO depends on a "highly fact-intensive analysis." *Id.*

*Summary Judgment*

GEO insists Plaintiffs cannot show it acted knowingly since it only sought to fulfill its contractual obligations with ICE. I have already explained how GEO's actions went beyond its contracts with ICE; it did not just fulfill the obligations of its contracts. The testimony from GEO's representatives, including Dawn Ceja, Amber Martin, and Dan Ragsdale, substantiates that they had detailed knowledge of the ICE-GEO contracts and GEO's independent policies. GEO identified these individuals as its representatives who could testify regarding its contractual obligations and policies. Based on the contents of GEO's written policies and the testimony of its agents, a reasonable jury could find that it acted knowingly.

GEO claims that its informal policy of not imposing segregation for detainees' refusal to clean shows that it lacked the requisite scienter. GEO uses knowledge and intent interchangeably in referring to this state of mind. Under the text of the forced labor statute, knowledge is required for any violation, while a showing of intent is only necessary for violations of the scheme, plan, or pattern provision. 18 U.S.C. § 1589(a); *see also United States v. Dann*, 652 F.3d 1160, 1169-70 (9th Cir. 2011). Nonetheless, I agree with Plaintiffs: "To the extent that GEO's argument relies on the position that [it] subjectively did not intend detainees to find the looming threat of solitary confinement threatening, that is not a summary judgment issue." Pls.' Resp. to Mot. for Summ. J., ECF No. 336 at 68.

*Decertification*

Once more, GEO's arguments on decertification point to the interactions between its officers and individual class members. GEO contends that an individualized, fact-intensive inquiry is necessary for any of the officer's actions to be imputed to it. As GEO would have it,

the jury would need to assess whether the actions of each officer were subject to supervisory review and whether each officer had contact with a substantial percentage of the class over the relevant 10-year period. Because evidence in the record shows GEO's agents drafted and had knowledge of the responsible policies, individualized review of each officers' specific actions is not required. The knowledge element of Plaintiffs' TVPA claim continues to involve a common question, making decertification inappropriate.

### 8. Specific Tasks Performed

GEO's arguments on serious harm, scienter, and causation under the TVPA give rise to another of its challenges to Plaintiffs' claim—GEO contends the statute does not distinguish between acceptable labor and unacceptable labor, and if a line can be drawn between the two, it would necessitate individual inquiries into what tasks each class member performed. According to GEO, the TVPA requires only that labor be obtained or provided through coercion, and therefore, liability under the statute does not turn on the specific type of labor performed. Plaintiffs describe their claim as pertaining to the labor "performed in commonly accessible areas of the housing unit, and requir[ing] detainees to sweep, mop, and clean tables." Resp. to Mot. for Decertification, ECF No. 339 at 59 (quotation marks and citations omitted). I question whether the personal housekeeping required by the PBNDS constitutes labor under the TVPA. But, because Plaintiffs' claim does not allege that the PBNDS' personal housekeeping tasks violate the TVPA, it is not necessary to determine whether those tasks, if coerced, would be permissible under the statute or if liability turns on the type of labor performed.[29] Still, Plaintiffs

---

[29] I note, however, that I am not persuaded by GEO's claim that "keeping the floor free of debris" is the same as "mopping or sweeping the floor." *See* Mot. for Decertification, ECF No. 312 at 58.

should more clearly articulate the limits of their claim before trial. The line need not be a physical boundary based on the dorm layout and the location of the detainees' beds, as GEO suggests. The claim might simply be confined to the labor detainees performed in cleaning up after others (as opposed to cleaning up after themselves).

However the labor in Plaintiffs' TVPA claim is defined, individual inquiries into whether each class member performed the challenged tasks will not be necessary because, as I have already explained, there was a uniform policy. All detainees were required to "keep clean and sanitary all commonly accessible areas of the housing unit, including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs." 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 50; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. And "[e]ach and every detainee" was obligated to participate in the Facility's sanitation program and general cleanups. 2005 Handbook, ECF No. 273-1 at 18; 2007 Handbook, ECF No. 273-2 at 49; 2008 Handbook, ECF No. 273-3 at 19; 2010 Handbook, ECF No. 273-4 at 17; 2011 Handbook, ECF No. 273-5 at 17; Oct. 2013 Handbook, ECF 261-17 at 20. The fact that detainees may have performed labor not covered by Plaintiffs' claim does not justify decertification of the TVPA class.

### 9. Claim Time Barred

In both its Motion for Summary Judgment and Motion for Decertification, GEO argues that any part of Plaintiffs' TVPA claim accruing before December 23, 2008, is time barred for two reasons: First, GEO alleges the "scheme, plan, or pattern" theory of liability was not added to the statute until that time. Second, GEO contends that all claims accruing before December 23,

2008, would have been subject to a four-year limitations period, not the current 10-year period, and this case was not filed until 2014. The "scheme, plan, or pattern" language, however, was always included in the forced-labor statute. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 112, 114 Stat. 1464 (2000).[30] Thus, Plaintiffs' claims are not barred on that basis.

On December 23, 2008, Congress extended the statute of limitations for TVPA claims from four to ten years. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 221, 122 Stat. 5044 (2008). As explained in *Gilbert v. United States Olympic Committee*, 423 F. Supp. 3d 1112, 1129 (D. Colo. 2019), the existing ten-year statute of limitations applies to Plaintiffs' TVPA claim, to the extent the claim was alive when Congress amended the limitations period. In other words, claims within the four-year statute of limitations on December 23, 2008, are still valid, and claims accruing before that time are barred. Consequently, summary judgment will enter on Plaintiffs' TVPA claims accruing before December 23, 2004, and the TVPA class will be limited to all persons detained in the Facility from December 23, 2004, to October 22, 2014.[31]

### 10. Exclusion of Female Detainees from Class

The final argument GEO makes regarding the substance of Plaintiffs' TVPA claim is that female detainees should be excluded from the TVPA class because there was no segregation unit for female detainees at the Facility. According to GEO, if there was no place to segregate female detainees, any related warnings could not have been perceived as a reasonable threat. Yet,

---

[30] GEO does not provide any reply to Plaintiffs' response on this matter. If and when a party discovers it is mistaken in its argument to the Court, withdrawal or concession of the point is obligatory and appreciated. *See, e.g.*, Fed. R. Civ. P. 1.

[31] Appropriately, Plaintiffs concede that this ruling is justified.

Officer Quezada testified that there is in fact a female segregation unit, just in a different area of the Facility. Quezada Dep. 112:16-113:24, ECF No. 339-12. And, regardless, GEO led female detainees to believe they could be sent to segregation, which is sufficient for them to remain part of the TVPA class.

After considering GEO's decertification and summary judgment arguments related to Plaintiffs' TVPA claim, I find the predominance requirement continues to be satisfied by common questions, such as whether GEO's policies amounted to improper coercion under the TVPA, whether threats of 72 hours in segregation constituted threats of serious harm, and whether GEO knowingly obtained labor under those policies. Plaintiffs have presented sufficient evidence for those questions to be answered affirmatively. Consequently, both Plaintiffs' TVPA claim and the associated class survive.

## B. Unjust Enrichment Claim

GEO seeks summary judgment on Plaintiffs' unjust enrichment claim as well. To succeed on their claim, Plaintiffs must prove: (1) GEO received a benefit (2) at their expense (3) "under circumstances that would make it unjust for [GEO] to retain the benefit without commensurate compensation." *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (citing *Salzman v. Bachrach*, 996 P.2d 1263, 1266-67 (Colo. 2000)).

### 1. Benefit Received from Voluntary Work Program

GEO argues Plaintiffs cannot establish it received a benefit from the VWP because the program in fact caused it to lose profits. Under GEO's theory, if it did not have to operate the VWP, it would have hired additional employees and been able to realize a profit of up to 15% on

the increased labor costs. Plaintiffs poke holes in this theory by pointing out that GEO's contract with ICE requires GEO to implement the VWP and it is not certain that ICE would accept a contract with additional labor costs and baked-in profits. Plaintiffs present evidence that paying detainee participants more than $1.00 per day would result in additional costs to GEO. This conflicting evidence amounts to genuine disputes of material fact that prevent summary judgment.

Plaintiffs state that trial of their unjust enrichment claim is to the Court, while GEO requests a jury trial on all claims. *See* Am. Stipulated Scheduling & Disc. Order at 20. Unjust enrichment is an equitable claim and thus is generally decided by the Court. *See Lewis*, 189 P.3d at 1141. In this case, however, I find the assistance of a jury would be beneficial and so order that Plaintiffs' unjust enrichment claim will be heard by the jury on an advisory basis. *See* Fed. R. Civ. P. 39(c).

### 2. Existence of a Valid Contract

GEO also asserts Plaintiffs' unjust enrichment claim is not viable because participants' work in the VWP was covered by an express contract.[32] Unjust enrichment is not available as "a mere alternative legal theory when the subject is covered by an express contract." *West Ridge Group, LLC v. First Trust Co. of Onaga*, 414 F. App'x 112, 120 (10th Cir. 2011) (unpublished); *see also Pulte Home Corp., Inc. v. Countryside Cmty. Ass'n, Inc.*, 382 P.3d 821, 833 (Colo.

---

[32] Plaintiffs contend GEO waived this defense to their unjust enrichment claim because it is not asserted in GEO's Answer. However, GEO expressly included the defense in the Scheduling Order issued in October 2018. *See* Am. Stipulated Scheduling & Disc. Order at 5 ("[T]he existence of an express contract precludes Plaintiffs' unjust enrichment claim."); *id.* at 19 ("GEO may file a dispositive motion arguing that express contracts preclude Plaintiffs' unjust enrichment claim."). Plaintiffs have, therefore, had sufficient notice of the defense, and I find GEO has not waived it.

2016). Pointing to the document VWP participants must sign, GEO argues the detainees expressly agreed to be compensated only $1.00 per day and any remedy available to them would have to be under that agreement. *See* Detainee VWP Agreement, ECF No. 306-2 at 3. In response, Plaintiffs insist that the signed documents are unconscionable and not enforceable contracts.

Whether a contract is unconscionable is a question of law, decided based on state law. *Mullan v. Quickie Aircraft Corp.*, 797 F.2d 845, 849-50 (10th Cir. 1986). In *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986), the Colorado Supreme Court set out the applicable standard for unconscionability. *Davis* instructs:

> [T]o support a finding of unconscionability, there must be evidence of some overreaching on the part of one of the parties such as that which results from an inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to that party.

*Id.* Thus, for a contract to be unconscionable, it must be both procedurally and substantively so. The *Davis* court identified the following factors as relevant to the unconscionability determination:

> a standardized agreement executed by parties of unequal bargaining strength; lack of opportunity to read or become familiar with the document before signing it; use of fine print in the portion of the contract containing the provision; absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated; the terms of the contract, including substantive unfairness; the relationship of the parties, including factors of assent, unfair surprise and notice; and all the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect.

*Id.* (internal citations omitted)

Plaintiffs' examination of these factors is persuasive. The procedural unconscionability of the Detainee VWP Agreement (the "Agreement") is apparent from the VWP participants' unequal bargaining strength, their status as detainees, and the fact that they had a single method

of earning money in the Facility. It does not matter that participation in the VWP was not mandatory or that detainees wanted the opportunity to work. The only way they could participate was to sign GEO's standardized Agreement and earn $1.00 per day. GEO argues that the unconscionability of the Agreement depends on the particular financial circumstances of each detainee. Perhaps a financially well-off detainee would be less likely to participate in the VWP, but a detainee's additional resources do not give that detainee any more bargaining power in this context and there is no meaningful alternative.

Plaintiffs stress that the Agreement is also substantively unconscionable because paying VWP participants $1.00 per day is commercially unreasonable. GEO reasons that, since the federal government is entitled to require ICE detainees to perform housekeeping tasks without pay, paying $1.00 a day for work cannot be commercially unreasonable. GEO's Reply in Supp. of Mot. for Summ. J., ECF No. 350 at 79 n.8 (citing *Channer v. Hall*, 112 F.3d 214, 219 (5th Cir. 1997); ); 8 U.S.C. § 1555(d)). GEO's reasoning is incongruous. A communal contribution by a detainee is not a commercial transaction. Moreover, participants in the VWP perform more than just housekeeping tasks. I agree with Plaintiffs that, on its face, the $1.00 per day provision of the agreement, without any variation for the type, timing, duration, or other specifics of the work performed, is commercially unreasonable.

Consequently, I find the VWP Agreement does not bar Plaintiffs' unjust enrichment claim because it does not constitute an enforceable contract covering the subject matter of that claim.

**C. Rulings on GEO's Motions for Summary Judgment and for Decertification**

GEO has not shown that judgment as a matter of law is appropriate on Plaintiffs' TVPA claim. Despite GEO's many protests, common questions predominate such that certification of the TVPA class continues to be appropriate. Also, whether GEO lost profits due to the VWP involves genuine disputes of material fact that preclude summary judgment on Plaintiffs' unjust enrichment claim. And no enforceable contract dictated that Plaintiffs could only be paid $1.00 per day, so Plaintiffs are not limited to remedies under contract law. GEO's Motions for Summary Judgment and for Decertification of Class are, therefore, denied.

## VI.  Conclusion

Accordingly, Plaintiffs' Motion for Summary Judgment on GEO's Affirmative Defense (ECF No. 260) is GRANTED. GEO's Cross Motion for Summary Judgment (ECF Nos. 284), Motion to Dismiss (ECF No. 307), and Motion for Decertification of Class (ECF No. 312) are DENIED. GEO's Motion for Summary Judgment (ECF No. 305) is GRANTED IN PART in that the TVPA class is narrowed to beginning on December 23, 2004, and the Motion is otherwise DENIED. GEO's Motion to Strike (ECF No. 368) is DENIED at moot.

DATED this 18th day of October, 2022.

_John L. Kane_
_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE