**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**October 22, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

---

ALEJANDRO MENOCAL; MARCOS
BRAMBILA; LOURDES ARGUETA;
HUGO HERNANDEZ; GRISEL
XAHUENTITLA; JESUS GAYTAN;
OLGA ALEXAKLINA; DAGOBERTO
VIZGUERRA; DEMETRIO VALERGA,
on their own behalf and on behalf of all
others similarly situated,

       Plaintiffs - Appellees,

v.

THE GEO GROUP, INC.,

       Defendant - Appellant.

No. 22-1409
(D.C. No. 1:14-CV-02887-JLK-MEH)
(D. Colo.)

---

### ORDER AND JUDGMENT*

---

Before **HOLMES**, Chief Judge, **McHUGH**, and **CARSON**, Circuit Judges.

---

Plaintiff-Appellee Alejandro Menocal commenced a class action lawsuit

against Defendant-Appellant The GEO Group, Inc. ("GEO"), alleging forced labor in

violation of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589, and

unjust enrichment in violation of Colorado common law.

---

    *    This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and
10th Cir. R. 32.1.

GEO filed a motion for summary judgment, claiming that it was entitled to derivative sovereign immunity pursuant to the Supreme Court's decision in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940). GEO argued that the *Yearsley* doctrine[1] functions as a shield from suit rather than as a defense to liability. The district court disagreed and, in relevant part, denied GEO's motion.

GEO now appeals from the court's order rejecting its claim of immunity from suit under *Yearsley*. And Mr. Menocal and other detainees in the class (collectively, "Plaintiffs-Appellees") have moved to dismiss the appeal, arguing that we lack appellate jurisdiction because the court's order rejecting this purported immunity is not immediately appealable.

---

[1] The parties joust about the proper characterization of the *Yearsley* doctrine. Specifically, they raise the question of whether it should be properly viewed as defining an "immunity" or a "defense." By characterizing it as an "immunity," GEO seeks to align the *Yearsley* doctrine with "numerous forms of immunity that qualify for the collateral order doctrine." Aplt.'s Br. in Opp'n to Mot. to Dismiss ("Aplt.'s Opp'n Br.") at 2. On the other hand, by characterizing the doctrine as a "defense," Plaintiffs-Appellees endeavor to highlight that the *Yearsley* doctrine provides "defenses to liability and not immunities from suit." Aplees.' Mot. to Dismiss at 8–9. Although noting that *Yearsley* "remains the seminal case for deriving immunity from a contractor's relationship with a sovereign entity," commentators have highlighted that the case "never used the term 'immunity.'" Kate Sablosky Elengold & Jonathan D. Glater, *The Sovereign Shield*, 73 Stan. L. Rev. 969, 989 (2021). In our view, it is neither necessary nor prudent in this case to wade into this debate regarding how to label the *Yearsley* doctrine. Rather, we focus our attention on the narrow question under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949) of whether an appeal from an order denying a contractor's assertion of protection under *Yearsley* can be reviewed completely separate from the merits. We answer that question in the negative. Accordingly, we lack jurisdiction under *Cohen* over GEO's interlocutory appeal invoking *Yearsley*'s protection.

We conclude that a district court's order denying application of the *Yearsley* doctrine is not subject to interlocutory appeal. More specifically, we determine that the question of *Yearsley*'s applicability cannot be reviewed completely separate from the merits and, accordingly, an interlocutory appeal cannot be taken from a court order resolving that question under the Supreme Court's decision in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). Accordingly, we **grant** Plaintiffs-Appellees' motion to dismiss the appeal for lack of appellate jurisdiction and **dismiss** this appeal.

## I

### A

GEO operates a private immigration detention facility in Aurora, Colorado—the Aurora Immigration Processing Center ("AIPC")—pursuant to a contract with a federal government agency, U.S. Immigration and Customs Enforcement ("ICE"). Mr. Menocal was detained as an AIPC detainee from June 2014 to September 2014.

Pursuant to GEO's Housing Unit Sanitation Policy (the "Sanitation Policy"), Mr. Menocal participated in AIPC's mandatory sanitation program during his detention. The Sanitation Policy required "[a]ll detainees . . . to keep clean and sanit[ize] all commonly accessible areas of the housing unit, including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs." Aplt.'s App., Vol. I, at 244 (AIPC Detainee Handbook Loc. Suppl., revised Oct. 2013). GEO staff members assigned these cleaning tasks—which also included cleaning the recreation yard and picking up trash—to detainees on a periodic basis.

3

AIPC placed the Sanitation Policy in the detainee handbook that it distributed to each detainee and posted notices related to the handbook on bulletin boards. AIPC communicated to detainees that refusal to perform their assigned cleaning tasks would result in a range of disciplinary actions. Upon a detainee's initial refusal, "the television [would] be turned off, and the detainee [would] not be permitted to participate in any activities/programs until the housing unit [was] cleaned." Aplt.'s App., Vol. I, at 244; *see, e.g.*, Aplees.' Suppl. App., Vol. II, at 46 (Dep. of Hugo Hernandez, dated June 24, 2020) ("If the detainee doesn't start cleaning or . . . [if] they refuse to clean, the TVs and the phones don't go on.").

For continued refusal, a detainee would face a range of possible sanctions, including disciplinary transfer, solitary confinement for up to seventy-two hours, suspension of privileges, reprimand, and warning. In particular, Mr. Menocal and other former detainees stated that AIPC officials threatened them with solitary confinement. *See, e.g.*, Aplees.' Suppl. App., Vol. II, at 22–23 (Dep. of Mr. Menocal, dated July 22, 2020) ("I actually witnessed a group of people that did not follow the procedure, the rules, and they were taken away, and they were put in isolation. And they came back, I believe, a week later . . . ."); *id.* at 85 (Dep. of Dagoberto Vizguerra, dated Feb. 21, 2018) (recounting that an officer would "scream" at detainees "about going to segregation" for "not cleaning"); *id.* at 138–44 (Dep. of Alejandro Torres, dated July 16, 2020) (stating that he was sent to solitary confinement "four times" at AIPC for refusing to perform his assigned cleaning tasks).

4

In addition to the mandatory sanitation program, AIPC maintained a Voluntary Work Program.  Under that program, Mr. Menocal and other detainees voluntarily performed various jobs, including preparing food, operating the library, barbering, and doing the laundry.  Detainees were "[o]rdinarily . . . not . . . permitted to work in excess of eight hours daily or 40 hours weekly" and, as compensation, GEO paid the detainees $1.00 per day.  *See* Aplees.' Suppl. App., Vol. I, at 57 (Nat'l Detainee Handbook, ICE Det. Mgmt. Div., filed June 1, 2016); *see, e.g.*, Aplees.' Suppl. App., Vol. II, at 14 (Dep. of Mr. Menocal, dated July 22, 2020) ("Q. And when you signed up, did you understand that you would get paid a dollar a day?  A. Yes, sir. . . .").

**B**

On October 22, 2014, Mr. Menocal initiated a class action lawsuit against GEO, asserting (1) a claim of forced labor stemming from the Sanitation Policy, in violation of the TVPA, 18 U.S.C. § 1589; and (2) a claim of unjust enrichment stemming from the Voluntary Work Program, in violation of Colorado common law.[2] In its answer, GEO asserted a number of affirmative defenses and, as most relevant here, claimed derivative sovereign immunity as a government contractor.

On February 27, 2017, the district court granted Mr. Menocal's motion to certify a class for each claim.  *See Menocal v. GEO Grp., Inc*., 320 F.R.D. 258,

---

[2]    Mr. Menocal also claimed that GEO failed to pay detainees the minimum wage, in violation of the Colorado Minimum Wages of Workers Act, Colo. Rev. Stat. §§ 8-6-101–8-6-120.  The district court, however, found that the detainees were not covered under the statute and dismissed that claim.  *See Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1129 (D. Colo. 2015).  That decision is not at issue here.

5

270-71 (D. Colo. 2017), *aff'd*, 882 F.3d 905 (10th Cir. 2018).  For the claim brought under the TVPA, the class included all persons detained at AIPC between October 2004 and October 2014.  For the claim brought under Colorado's unjust enrichment law, the class included all detainees who participated in the Voluntary Work Program between October 2011 and October 2014.  GEO appealed, arguing that the district court abused its discretion by certifying classes that would require individualized determinations.  On interlocutory appeal, we rejected GEO's arguments and affirmed the district court's certification of both classes.  *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 927 (10th Cir. 2018).

After the close of discovery, Plaintiffs-Appellees moved for summary judgment on GEO's assertion of derivative sovereign immunity.  They argued that GEO was not required to maintain either the Sanitation Policy or the Voluntary Work Program under its contracts with ICE.  GEO cross-moved for summary judgment. GEO argued that "ICE explicitly authorized and directed the activities of which the Forced Labor class complains"—*viz.*, requiring detainees to perform cleaning tasks pursuant to the Sanitation Policy.  Aplt.'s App., Vol. II, at 309 (Def.'s Cross-Mot. for Summ. J., filed June 25, 2020).  Similarly, GEO argued that "ICE explicitly authorized and directed the activities of which the Voluntary Work Program Class complains" and authorized GEO's practice of paying detainees $1.00 per day.  *Id.* at 314.

On October 18, 2022, the district court granted Plaintiffs-Appellees' motion and denied GEO's cross motion, finding that "ICE neither directed nor required GEO

6

to improperly compel detainees' labor or to compensate [Voluntary Work Program]
participants only $1.00 per day." *Menocal v. GEO Grp., Inc.*, 635 F. Supp. 3d 1151,
1173 (D. Colo. 2022). The district court ultimately concluded that GEO was not
entitled to protection from suit under *Yearsley*.

In reaching that conclusion, the district court analyzed GEO's assertion of
derivative sovereign immunity under the two-prong test set forth in *Yearsley*.[3] First,
the district court queried whether the authority exercised by ICE in contracting with
GEO was validly conferred by Congress. Second, the district court assessed whether
GEO's challenged actions were required by its contractual obligations to ICE.

As to the TVPA claim, the district court answered the first question in the
affirmative, determining that 8 U.S.C. §§ 1103, 1226, and 1231 conferred upon the
Attorney General the authority to detain noncitizens and that the Attorney General
could in turn confer that authority on private contractors. But as to the second
question, the district court concluded that the Sanitation Policy exceeded the
detention standards that ICE promulgated. Specifically, the district court found that
ICE merely provided "disciplinary segregation [a]s a potential sanction" in the event

---

[3]    The district court also analyzed GEO's claim of immunity that raised
the government-contractor defense that the Supreme Court established in *United
States v. Boyle*, 469 U.S. 241 (1985). *Id.* at 1177–79. But on appeal, GEO asserts
that the government-contractor defense "has no relevance outside the small band of
cases involving tort claims against federal contractors and the [Federal Tort Claims
Act, 28 U.S.C. §§ 2671–2680]," and that "[t]his is not one of those cases." Aplt.'s
Opening Br. at 23. Because neither GEO's appeal nor Plaintiffs-Appellees' motion
to dismiss depend on the government-contractor defense, we decline to discuss it
further.

a detainee refused to clean their *assigned living area* and "did not mandate that detainees clean *the common areas or clean up after others*." *Id.* at 1174 (emphasis added). Further, the district court found that the "audit forms used by ICE [were] not specific enough to show that [ICE] directed or required GEO's cleaning policies and their implementation," despite GEO's arguments to the contrary. *Id.*

As to the unjust enrichment claim, the district court declined to address the first question—*viz.*, whether ICE's authority was validly conferred—having determined that GEO failed to show that ICE required GEO to pay detainees $1.00 per workday. *Id.* at 1175. The district court found that ICE set a payment *floor*, not ceiling, and—aside from that floor—did not require that detainees be paid any specific amount.

On November 16, 2022, GEO filed a timely notice of appeal from the district court's summary judgment order, challenging the court's conclusion as to GEO's assertion of immunity. Plaintiffs-Appellees filed a timely motion to dismiss for lack of appellate jurisdiction. That motion, the associated briefing, and the merits briefing is before us now.

## II

Because "this court must always satisfy itself of jurisdiction before addressing the merits of a claim," we begin with the jurisdictional issue. *Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1063 (10th Cir. 2002); *see also In re Franklin Sav. Corp.*, 385 F.3d 1279, 1286 (10th Cir. 2004) ("Jurisdictional issues must be addressed first and, if they are resolved against jurisdiction, the case is at an end.").

"[A] federal court *always* has jurisdiction to determine its own jurisdiction . . . ." *Shepherd v. Holder*, 678 F.3d 1171, 1180 (10th Cir. 2012) (quoting *United States v. Ruiz,* 536 U.S. 622, 628 (2002)).  "[I]t is beyond peradventure," however, that the party invoking our appellate jurisdiction bears the "burden to make such a jurisdictional showing."  *Cummings v. Dean*, 913 F.3d 1227, 1235 (10th Cir. 2019); *see, e.g.*, *Raley v. Hyundai Motor Co.*, 642 F.3d 1271, 1275 (10th Cir. 2011) ("Where an appellant fails to lead, we have no duty to follow.  It is the appellant's burden, not ours, to conjure up possible theories to invoke our legal authority to hear her appeal.").

We conclude that we lack appellate jurisdiction over GEO's interlocutory appeal of the district court's order denying GEO's claim of protection from suit under *Yearsley* because appellate review of an order denying such protection cannot be undertaken completely separate from the merits; consequently, an order denying *Yearsley*'s applicability does not satisfy the collateral order doctrine of *Cohen*.  We first outline the general contours of our appellate jurisdiction and briefly offer an overview of the collateral order doctrine.  Next, we discuss, as relevant here, the import of the Supreme Court's decision in *Yearsley*—as subsequently clarified in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016).  Finally, we explain why an order denying the applicability of the *Yearsley* doctrine cannot be reviewed completely separate from the merits and, consequently, why such orders do not qualify for interlocutory appeal under *Cohen*.

**A**

Our jurisdiction is limited to "appeals from all final decisions of the district courts of the United States."  28 U.S.C. § 1291.  "A 'final decisio[n]' is typically one 'by which a district court disassociates itself from a case.'"  *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (alteration in original) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)); *see Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 37 (2020) ("In civil litigation generally, a court's decision ordinarily becomes 'final,' for purposes of appeal, only upon completion of the entire case, *i.e.*, when the decision 'terminate[s the] action' . . . ." (alteration in original) (quoting *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 409 (2015))); *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1171 (10th Cir. 2023) ("[W]hen a district court has no more to do but 'execute the judgment,' we know that the decision it has entered is final for the purposes of conferring jurisdiction under § 1291." (quoting *Van Cauwenberghe v. Biard*, 486 U.S. 517, 521–22 (1988))). "This finality requirement 'precludes consideration of decisions that are subject to revision, and even of fully consummated decisions [that] are but steps towards final judgment in which they will merge.'"  *Roska ex rel. Roska v. Sneddon*, 437 F.3d 964, 969–70 (10th Cir. 2006) (alteration in original) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996)).  To that end, "[t]he denial of summary judgment is ordinarily not appealable."  *Castillo v. Day*, 790 F.3d 1013, 1017 (10th Cir. 2015).

The Supreme Court has long given this finality requirement a "practical rather than a technical construction."  *Cohen*, 337 U.S. at 546; *see Cobbledick v. United*

*States*, 309 U.S. 323, 324–25 (1940) ("Finality as a condition of review is an historic characteristic of federal appellate procedure.  It was written into the first Judiciary Act and has been departed from only when observance of it would practically defeat the right to any review at all." (footnotes omitted)).  A non-final order "practical[ly]" qualifies as a final decision if it "[1] conclusively determine[s] the disputed question, [2] resolve[s] an important issue completely separate from the merits of the action, and [3] [is] effectively unreviewable on appeal from a final judgment."  *Will v. Hallock*, 546 U.S. 345, 349 (2006) (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993)).

Importantly, in order to qualify as an appealable collateral order under *Cohen*, all three of these criteria must be satisfied.  *See United States v. Schneider*, 594 F.3d 1219, 1230 (10th Cir. 2010) ("[W]e need only find the absence of one of these elements to eliminate jurisdiction . . . ."); *In re Magic Circle Energy Corp.*, 889 F.2d 950, 954 (10th Cir. 1989) ("Because a party seeking to appeal on this basis must show that all three requirements of the doctrine are satisfied, we need not address each if any one is not met.").  "One other important point that we keep in mind when considering whether to apply the collateral order doctrine is that our focus is not on whether an immediate appeal should be available in a particular case, but instead we focus on whether an immediate appeal should be available for the category of orders at issue . . . ."  *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1035 (10th Cir. 2022) (emphasis omitted), *cert. denied*, 143 S. Ct. 2608 (2023); *see also Johnson v. Jones*, 515 U.S. 304, 315 (1995) ("We of course decide appealability for categories

11

of orders rather than individual orders.  Thus, we do not now in each individual case engage in ad hoc balancing to decide issues of appealability." (citations omitted)).

The Supreme Court has time and again stressed the narrow confines of the collateral order doctrine.  *See Mohawk*, 558 U.S. at 113 ("[T]he class of collaterally appealable orders must remain '*narrow and selective* in its membership.'" (emphasis added) (quoting *Will*, 546 U.S. at 350)); *Will*, 546 U.S. at 350 ("[W]e have not mentioned applying the collateral order doctrine recently without emphasizing its *modest scope*." (emphasis added)); *Swint*, 514 U.S. at 42 (noting that the doctrine encompasses "a *small* category of decisions that, although they do not end the litigation, must nonetheless be considered 'final'" (emphasis added) (quoting *Cohen*, 337 U.S. at 546)); *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994) ("[T]he conditions for collateral order appeal [are] *stringent*." (emphasis added)).  These consistently "cautionary directions" for marking the boundaries of the doctrine "[n]o doubt" reflect "the plain language of § 1291 . . . and [account] for the congressional policy which the statute seeks to advance—namely that it is the *district judge*, not the appellate judge, who in our system of justice has 'primary responsibility to police the prejudgment tactics of the litigants, and . . . the district judge can better exercise that responsibility if the appellate courts do not repeatedly intervene to second-guess prejudgment rulings.'"  *United States v. Wampler*, 624 F.3d 1330, 1334–35 (10th Cir. 2010) (second omission in original) (quoting *Richardson–Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985)).

12

Indeed, "[t]he types of orders that fall under the collateral order doctrine 'require *only two hands* to count.'" *Mohamed v. Jones*, 100 F.4th 1214, 1218 (10th Cir. 2024) (emphasis added) (quoting *Belya v. Kapral*, 45 F.4th 621, 629 n.5 (2d Cir. 2022), *cert. denied sub nom. Synod of Bishops of the Russian Orthodox Church Outside of Russ. v. Belya*, --- U.S. ----, 143 S. Ct. 2609 (2023)). On the one hand, there are orders denying "'constitutionally based immunities,' [such as] qualified, absolute, tribal, [and] Eleventh Amendment . . . immunity." *Id.* at 1218 & n.4 (quoting *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 664 (10th Cir. 2018) (collecting cases)). And on the other hand, there are "orders that would be moot following final judgment," such as orders denying class certification, intervention as of right, or motions for a speedy trial. *Id.* at 1219 & n.5 (collecting cases).

**B**

In *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), Nebraska landowners sought damages from a government contractor; the contractor built dikes in the Missouri River that produced erosion, washing away a part of their land. The parties agreed that the federal government authorized and directed the company's work to improve the navigability of the Missouri River. The parties further agreed that the government authorized and directed the company's work pursuant to federal law. The Supreme Court stated:

> [I]f this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for

13

> executing its will.  Where an agent or officer of the Government
> purporting to act on its behalf has been held to be liable for his
> conduct causing injury to another, the ground of liability has been
> found to be either that he exceeded his authority or that it was not
> validly conferred.

*Id.* at 20–21 (citations omitted).  In other words, in *Yearsley*, the Supreme Court

essentially created a two-prong framework.  The first prong focuses on whether the

government legally conferred its authority to the contractor.  The second prong

focuses on the government's specific instructions to a contractor.  Applying this two-

prong framework, the Supreme Court concluded that the company was not liable.

Specifically, the Court stated the following: "[I]t cannot be doubted that the remedy

to obtain compensation from the Government . . . excludes liability of the

Government's representatives lawfully acting on its behalf . . . ."  *Id.* at 22.

The Supreme Court has since clarified the scope of the *Yearsley* doctrine.  In

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016), the Court considered whether

the federal government's sovereign immunity shielded a marketing company that the

U.S. Navy contracted with to develop a recruiting campaign.  A class of young adults

claimed that the marketing company sent automated recruiting text messages to them

without their consent, in violation of the Telephone Consumer Protection Act, 47

U.S.C. § 227(b)(1)(A)(iii).

The marketing company asserted "derivative sovereign immunity," arguing

that "private persons performing Government work acquire the Government's

embracive immunity."  *Campbell-Ewald*, 577 U.S. at 166.  The Supreme Court

acknowledged that "[g]overnment contractors obtain certain immunity in connection

with work which they do pursuant to their contractual undertakings with the United

States." *Id.* (quoting *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)).  But the

Supreme Court noted that such "immunity, . . . unlike the sovereign's, is not

absolute." *Id.*

Addressing only the second prong of the *Yearsley* doctrine, the Court

determined that the marketing company acted contrary to the Navy's explicit

instructions.  Specifically, the Supreme Court explained that "[a] Navy representative

noted the importance of ensuring that . . . all recipients had consented to receiving

messages . . . and made clear that the Navy relied on [the marketing company's]

representation that the [opt-in] list was in compliance." *Id.* at 168.  The Supreme

Court concluded that the marketing company therefore could not claim the

government's embracive immunity.

## C

As we have suggested, we lack jurisdiction unless GEO can establish all three

conditions of *Cohen*'s collateral order doctrine.  *See EEOC v. PJ Utah, LLC*, 822

F.3d 536, 542 n.7 (10th Cir. 2016) ("[T]he appellant . . . bears the burden to establish

appellate jurisdiction."); *Boughton v. Cotter Corp.*, 10 F.3d 746, 749 (10th Cir. 1993)

("Unless all three requirements are established, jurisdiction is not available under the

collateral order doctrine.").  Stated differently, GEO's failure to establish any one of

the conditions is sufficient to defeat our appellate jurisdiction.  *See Schneider*, 594

F.3d at 1230.  And recall that, for this analysis, we "do not engage in . . .

'individualized jurisdictional inquir[ies]'"; rather, GEO's burden extends to "the

15

entire category to which a claim belongs." *Mohawk*, 558 U.S. at 107 (first quoting

*Coopers & Lybrand v. Livesay*, 437 U.S. 463, 473 (1978); then quoting *Digit. Equip.*,

511 U.S. at 868).

We conclude that GEO cannot establish that we have jurisdiction over this

interlocutory appeal because GEO cannot show that it satisfies the second *Cohen*

condition: that is, GEO cannot show that the question presented by its appeal—which

stems from an order denying the applicability of the *Yearsley* doctrine—can be

reviewed completely separate from the merits.[4]  Therefore, without reaching the other

two *Cohen* conditions,[5] we determine that Plaintiffs-Appellees' motion to dismiss is

well-taken and should be granted.

---

[4]    Plaintiffs-Appellees highlight that the Ninth Circuit reached the same
outcome in *Childs v. San Diego Family Housing LLC*, 22 F.4th 1092 (9th Cir. 2022).
*See* Aplees.' Mot. to Dismiss at 7.  True enough.  And the analysis in *Childs* is
instructive in some respects.  However, it offers limited direct guidance here because,
in *Childs*—for unstated reasons—the parties did "not dispute" that the second *Cohen*
condition was "satisfied," and therefore the *Childs* panel had no need to reach the
issue we resolve.  *Childs*, 22 F.4th at 1096.

[5]    The parties do not appear to dispute that the first *Cohen* condition is
satisfied: that is, they appear to agree that the district court's order conclusively
determined the question in dispute here.  *Compare* Aplt.'s Opp'n Br. at 7 (stating that
"Plaintiffs do not contest the first *Cohen* factor"), *with* Aplees.' Mot. to Dismiss at 8
(explaining why the second and third *Cohen* conditions are not satisfied, without
commenting on the first).  Stated otherwise, neither party disputes that the district
court's order is "the final word" on whether GEO may claim derivative immunity
under the *Yearsley* doctrine.  *State of Utah By & Through Utah State Dep't of Health
v. Kennecott Corp.*, 14 F.3d 1489, 1492 (10th Cir. 1994).  However, we have no need
to address the first *Cohen* condition to resolve this appeal, and, therefore, we do not
do so.

1

As noted, the second *Cohen* condition concerns whether the appeal would "resolve an important issue completely separate from the merits of the action." *Will*, 546 U.S. at 349; *see also Cohen*, 337 U.S. at 546. The second condition "is 'a distillation of the principle that there should not be piecemeal review of "steps towards final judgment in which they will merge."'" *Van Cauwenberghe*, 486 U.S. at 527 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12, n.13 (1983)); *see also Cohen*, 337 U.S. at 546 ("The purpose is to combine in *one review* all stages of the proceeding that effectively may be reviewed and corrected if and when final judgment results." (emphasis added)).

More specifically, this condition is animated by the notion that "[a]llowing appeals from interlocutory orders that involve considerations enmeshed in the merits of the dispute would waste judicial resources by requiring repetitive appellate review of substantive questions in the case." *Van Cauwenberghe*, 486 U.S. at 527–28. "An issue is completely separate from the merits if it is 'significantly different from the fact-related legal issues that likely underlie the plaintiff's claim on the merits.'" *Los Lobos Renewable Power*, 885 F.3d at 665 (quoting *Johnson*, 515 U.S. at 314); *accord Coomer v. Make Your Life Epic LLC*, 98 F.4th 1320, 1324–25 (10th Cir. 2024).

The question of whether the district court properly denied the protection of the *Yearsley* doctrine to a government contractor turns on (1) whether the government validly conferred the authority upon the government contractor; and (2) whether the government directed the complained-of action. *See Yearsley*, 309 U.S. at 20.

**2**

We can efficiently resolve the jurisdictional question before us by turning directly to the second inquiry.  In our view, there is overlap between the second *Yearsley* prong—*viz.*, whether the government directed the contractor's challenged actions—and the merits of a plaintiff's claims challenging the lawfulness of those actions.  This prong wades into the specific directions that the government gave to the contractor and whether, by failing to closely adhere to those instructions, the government contractor engaged in illegal conduct.  *See Campbell-Ewald*, 577 U.S. at 166 ("When a contractor *violates* both federal law and *the Government's explicit instructions*, as here alleged, no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation." (emphasis added)); *cf. Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 647 (4th Cir. 2018) ("Quite plainly, GDIT [i.e., the government contractor] performed exactly as CMS [i.e., the government agency] directed: GDIT called the number CMS instructed GDIT to call, on the prescribed day, and followed CMS's provided script when leaving the message.").

More specifically, the assessment of the applicability of the second *Yearsley* prong would "presumably overlap" with determinations on the merits regarding the lawfulness of the contractor's challenged actions.  *Kell v. Benzon*, 925 F.3d 448, 458 (10th Cir. 2019); *see* Aplees.' Mot. to Dismiss, Ex. A at 14 (Br. for the United States as Amicus Curiae, *Morales v. Cultural Care, Inc.*, No. 21-1676 (1st. Cir. Nov. 23, 2022)) ("[T]he question whether a defendant can establish a *Yearsley* defense is often

18

coterminous with the merits of the action.  That is because the defense applies . . .

only where the defendant acted lawfully . . . ."); *id.*, Ex. B. at 8–9 (Br. for the United

States as Amicus Curiae, *CACI Premier Tech., Inc. v. Al Shimari, et al.*, No. 19-648

(U.S. Aug. 2020) ("[B]ecause the 'derivative sovereign immunity' defense [i.e., the

*Yearsley* doctrine] requires that the government contractor have complied with all

relevant federal requirements, decisions addressing the defense at preliminary stages

of a case often also will not satisfy *the separateness* and conclusiveness requirements

of the collateral-order doctrine." (emphasis added)).  In other words, factual

questions concerning what the government did and did not specifically direct would

be at the heart of the *Yearsley* inquiry on the second prong *and* also at the heart of the

merits inquiry into the lawfulness of a contractor's challenged actions.  We thus

cannot say that orders denying the applicability of the *Yearsley* doctrine would

implicate questions "significantly different from" the merits of a plaintiff's claims.

*Los Lobos Renewable Power*, 885 F.3d at 665.

Although the Supreme Court has eschewed conducting the *Cohen* analysis on a

case-by-case basis, the present facts highlight the soundness of our conclusion—*viz.*,

that an appeal from an order denying purported immunity under *Yearsley* cannot be

reviewed completely separate from the merits.  *See, e.g.*, *Kell*, 925 F.3d at 455–59;

*Coomer*, 98 F.4th at 1327 (noting that the present "case illustrate[d] the fact-driven

nature of the analysis"); *see also La Union Del Pueblo Entero v. Abbott*, 68 F.4th

228, 233 n.13 (5th Cir. 2023) ("Despite *Mohawk*'s directive toward categorical rules,

determining whether a question is 'separate from the merits' will typically require

case-by-case analysis."); Aplees.' Mot. to Dismiss, Ex. B. at 14 (highlighting the case
at hand to show a failure of *Cohen*'s separateness requirement and noting the
following: "CACI's [i.e., the government contractor's] assertion of the [*Yearsley*]
defense here illustrates the point.  CACI could not demonstrate entitlement to the
defense without proving that it acted within the scope of a lawful delegation from the
government.  But respondents' [i.e., plaintiff's] claims themselves rest on the premise
that CACI" disregarded federal law and the government's express instructions.
(citation omitted)).

GEO's assertion that *Yearsley* immunizes its challenged conduct implicates
questions about what ICE directed GEO to do and whether GEO exceeded those
directions.  Specifically, any assessment of the propriety of GEO's reliance on
*Yearsley* to insulate it from the TVPA claim regarding the Sanitation Policy would
necessarily require us to determine what the contractual arrangement between ICE
and GEO specifically directed GEO to do in imposing sanitation responsibilities on
detainees and whether GEO adhered to the letter of those directions.  Intertwined
with that inquiry would be matters at the heart of Plaintiffs-Appellees' TVPA
claim—*viz.*, whether GEO "knowingly provide[d] or obtain[ed] the labor" of the
class "by means of," *inter alia*, (1) "threats of physical restraint to that person or
another person"; (2) "serious harm or threats of serious harm to that person or
another person"; (3) "the abuse or threatened abuse of law or legal process"; or
(4) "any scheme, plan, or pattern intended to cause the person to believe that, if that

person did not perform such labor or services, that person or another person would suffer . . . physical restraint." 18 U.S.C. § 1589(a).

A similar intertwining with the merits would plague the inquiry into the propriety of GEO's claimed immunity under *Yearsley* from Plaintiffs-Appellees' unjust enrichment claim. Our evaluation of the nature of the government's specific directions pertaining to the Voluntary Work Program—and GEO's adherence to them—would be at play in our determinations as to each of the elements of an unjust enrichment claim—i.e., whether "(1) [GEO] received a benefit (2) at [Plaintiffs-Appellees'] expense (3) under circumstances that would make it unjust for [GEO] to retain the benefit without commensurate compensation." *Pulte Home Corp., Inc. v. Countryside Cmty. Ass'n, Inc.*, 382 P.3d 821, 833 (Colo. 2016) (quoting *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008)).

GEO attempts to avoid this case-specific result, arguing that whether it is entitled to *Yearsley*'s protection "depends on the terms of that contract, not whether the challenged policies offend the TVPA or unjustly enrich GEO." Aplt.'s Opp'n Br.at 11. But *Campbell-Ewald* directly undercuts GEO's argument because it stresses that the *Yearsley* inquiry involves a factual assessment of whether the contractor exceeded or otherwise deviated from the government's explicit instructions—in a contract or otherwise. *See, e.g.*, *Taylor Energy Co. v. Luttrell*, 3 F.4th 172, 175–76 (5th Cir. 2021) ("For actions to be authorized and directed by the Government, the contractor's actions should comply with federal directives" (citing *Campbell-Ewald*, 577 U.S. at 167 n.7)).

21

The Court in *Campbell-Ewald* plainly indicated that a contractor "could be held liable for conduct causing injury to another"—and thus no derivative immunity exists—when the contractor "ha[s] 'exceeded [its] authority.'" 577 U.S. at 167 (quoting *Yearsley*, 309 U.S. at 20–21); *accord Zakka v. Palladium Int'l, LLC*, 298 A.3d 319, 328 (D.C. 2023) ("[A] contractor claiming *Yearsley* immunity from liability for a tortious act must establish that the government specifically authorized and directed it to perform the tortious act itself. Mere governmental acceptance or approval of a tortious act will not suffice to vest a government contractor with derivative sovereign immunity if the government did not actually direct the contractor to commit the tort. Nor does it suffice for a contractor to show only that the tortious act was within the scope of the activity that the government authorized and directed it to do."); *cf. Gay v. A.O. Smith Corp.*, No. 23-2078, 2024 WL 2558735, at *2 (3d Cir. May 24, 2024) (unpublished) (affirming the grant of summary judgment in part because the plaintiff failed to "present[] . . . evidence that [the government contractor] deviated from the [government's] instructions or exceeded its contractual authority"). And whether GEO exceeded the government's specific directions cannot be assessed "completely separate from the merits" of Plaintiffs-Appellees' claims. *Will*, 546 U.S. at 349.

The parties' merits briefing in this appeal further demonstrates that we could not determine whether GEO exceeded its authority for *Yearsley* purposes without engaging with the substance of the TVPA and unjust enrichment claims. As to the TVPA claim, questions concerning whether the contract prohibited GEO from punishing detainees with

solitary confinement loom large.  *Compare* Aplt.'s Opening Br. at 37 ("GEO's
housekeeping and disciplinary policies reflect the requirements and oversight of the
federal government for ICE detainees."), *with* Aplees.' Resp. Br. at 38–39 ("[T]he
contract requires GEO to comply with Federal Acquisition Regulation § 52.222-50,
which bars contractors from 'obtaining the labor or services of a person . . . by threats of
serious harm to, or physical restraint against, that person or another person.'" (omission
in original) (citations omitted)).

And, as to the unjust enrichment claim, questions of whether the contract required
GEO to pay detainees $1.00 a day, or simply set that amount as a minimum wage, are not
only relevant to the proper adjudication of that claim on the merits but also to the
applicability of the *Yearsley* doctrine.  *Compare* Aplt.'s Opening Br. at 27 ("Through the
AIPC contracts, the government explicitly directed GEO to provide [Voluntary Work
Program] participants at the AIPC a stipend of '$1 per day,' and later, 'at least $1 per
day.' . . .  By establishing a [Voluntary Work Program] and paying $1 per day, GEO
complied with the government's directions."), *with* Aplees.' Resp. Br. at 49 ("GEO's
contract *required* it to comply with state law.  Thus, GEO was not only permitted but
mandated to pay more than $1 a day." (citation omitted)).

Put simply, these are the sort of merits-related questions that *Cohen* prohibits
on interlocutory review.  They are the type of "inquir[ies] [that] would differ only
marginally from . . . inquir[ies] into the merits and counsel[] against application of
the collateral order doctrine."  *Cunningham v. Hamilton Cnty.*, 527 U.S. 198, 206
(1999).  As in this case, so would it be in all appeals challenging orders that reject

contractors' assertions of *Yearsley*'s protection from claims challenging their conduct purportedly under government contracts. That is because *both* the inquiries regarding *Yearsley* protection and the merits of those claims would relate to whether the government specifically directed the contractors' actions and whether, in practice, they deviated from the government's directions.

The significant role that the actual facts—as pleaded at the 12(b)(6) phase or established by the evidence at the summary-judgment phase—play in the *Yearsley* analysis not only helps to explain why review of a district court's order rejecting the applicability of the *Yearsley* doctrine cannot be reviewed completely separate from the merits, but also, importantly, helps to explain why review of that issue is distinguishable from review of denials of qualified immunity—which are routinely considered on an interlocutory basis. Though it vigorously presses the point, GEO is misguided in asserting that the *Yearsley* doctrine is "most akin to qualified immunity." Aplt.'s Opp'n Br. at 9.

On appeal from denial of qualified immunity, the court is concerned with resolving "abstract issues of law." *Johnson*, 515 U.S. at 317; *see Mitchell v. Forsyth*, 472 U.S. 511, 528 n.9 (1985) ("We emphasize at this point that the appealable issue is a purely legal one: whether the facts alleged []by the plaintiff . . . support a claim of violation of clearly established law."); *Fogarty v. Gallegos*, 523 F.3d 1147, 1153 (10th Cir. 2008) ("Although orders denying summary judgment are ordinarily not appealable, we have interlocutory jurisdiction over denials of qualified immunity at the summary judgment stage to the extent that they 'turn[ ] on an issue of law.'"

(alteration in original) (quoting *Mitchell*, 472 U.S. at 530)).  That is, such issues of law are the court's focus; the court is not concerned with determining what actually happened.

In this regard, ordinarily, the court simply accepts, *for purposes of its legal analysis*, "the plaintiff's version of the facts."  *See York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008) ("Our jurisdiction also extends to situations where a defendant claims on appeal that accepting the plaintiff's version of the facts as true, he is still entitled to qualified immunity."); *accord Buck v. City of Albuquerque*, 549 F.3d 1269, 1276 (10th Cir. 2008).  That version may or may not accurately depict what happened; yet the plaintiff may survive summary judgment on the qualified immunity issue under that version; then, it is up to the jury at trial to assess what actually happened.  *See Mitchell*, 471 U.S. at 527 ("[T]he trial judge may rule only that if the facts are as asserted by the plaintiff, the defendant is not immune.  At trial, the plaintiff may not succeed in proving his version of the facts, and the defendant may thus escape liability."); *id.* at 528 ("An appellate court reviewing the denial of the defendant's claim of [qualified] immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim.  All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions . . . ."); *see also Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring) ("It is only *after* plaintiff crosses the legal hurdle comprised of his or her two-part [qualified immunity] burden

of demonstrating the violation of a constitutional right that was clearly established, that courts should be concerned with the *true* factual landscape—as opposed to the factual landscape as plaintiff would have it."); *Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001) ("Courts of appeals clearly lack jurisdiction to review summary judgment orders deciding qualified immunity questions solely on the basis of evidence sufficiency—'which facts a party may, or may not, be able to prove at trial.' Consequently, an order will not be immediately appealable unless it 'present[s] more abstract issues of law.'" (alteration in original) (quoting *Johnson*, 515 U.S. at 317)).

Indeed, if the defendant fails or refuses to accept the plaintiff's version of the facts as true for purposes of the court's legal analysis on interlocutory appeal, the court lacks jurisdiction to adjudicate the dispute. *Compare Cox v. Glanz*, 800 F.3d 1231, 1243–44 (10th Cir. 2015) ("Ms. Cox nevertheless suggests that the court's fact-based manner of disposing of the defense divests us of jurisdiction to reach the qualified-immunity issue on appeal. We disagree. Notably, Sheriff Glanz has accepted the truth of Ms. Cox's version of the facts for purposes of this appeal. Under our controlling caselaw . . . that ordinarily will permit us to address the legal issues presented by the agreed-upon set of facts, and there is nothing about this case that would counsel against following that path."), *with Henderson v. Glanz*, 813 F.3d 938, 950 (10th Cir. 2015) ("This argument does not accept as true Ms. Henderson's version of the facts or view the facts in the light most favorable to Ms. Henderson. Because it instead challenges the district court's factual determinations about the sheriff's risk awareness and does not fall within one of the exceptions to the rule that

26

we may only consider purely legal questions on appeal from a denial of qualified immunity, we lack jurisdiction over Sheriff Glanz's appeal.").

 In contrast to the methodology employed in the context of qualified immunity interlocutory appeals, in the *Yearsley* inquiry, the court is concerned with the actual factual circumstances—e.g., what the government specifically directed the contractor to do and whether the contractor deviated from the government's directions. *See Cunningham*, 888 F.3d at 647.  And the court's need to delve into the actual underlying factual circumstances in conducting that inquiry invariably means that its review of orders denying *Yearsley* protection for the contractor's actions cannot be reviewed separate from the merits of a case challenging the lawfulness of the contractor's actions.  In sum, the review of denials of *Yearsley*'s protection cannot be confined to abstract issues of law—as is true with denials of qualified immunity— and, accordingly, GEO is misguided in believing that such denials of qualified immunity are closely analogous to the *Yearsley* situation and support its argument for interlocutory review.

Thus, we conclude that GEO cannot establish that we have jurisdiction over this interlocutory appeal because GEO cannot show that it satisfies the second *Cohen* condition.  Specifically, GEO cannot demonstrate that the review of denials of protection under *Yearsley* can be undertaken completely separate from the merits.

*    *    *

In sum, GEO fails to establish *Cohen*'s second condition—*viz.*, that this appeal would "resolve an important issue completely separate from the merits of the action."

*Will*, 546 U.S. at 349.  Because GEO's failure as to this condition is fatal to our

jurisdiction, we need not address the second and third conditions of *Cohen*.  The

upshot is that orders denying relief under the *Yearsley* doctrine do not present a

circumstance where it is proper to expand the narrow confines of the collateral order

doctrine.

**III**

For the foregoing reasons, we lack appellate jurisdiction over this appeal under

the collateral order doctrine.  We thus **GRANT** Plaintiffs-Appellees' motion and

**DISMISS** this appeal.[6]

Entered for the Court


Jerome A. Holmes
Chief Judge

---

[6]     Plaintiffs-Appellees filed a motion to provisionally seal Volume III of
Appellee's Supplemental Appendix, which contains (1) contracts between ICE and
GEO, (2) GEO's detainee work plans, and (3) the 2013 ICE National Detainee
Handbook.  The Clerk of Court provisionally granted that motion on April 6, 2023,
subject to final determination by the merits-panel.  As to the first two sets of
documents, the parties "articulate a real and substantial interest that justifies
depriving the public of access to the records that inform our decision-making
process." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124,
1135–36 (10th Cir. 2011).  As to the third document, the parties appear to agree that
it should be unsealed.  Accordingly, the motion is **granted in part** as to (1) the
contracts between ICE and GEO and (2) GEO's detainee work plans.  The motion is
**denied** as to (3) the 2013 ICE National Detainee Handbook.  The designated portions
of the appendix shall thus remain sealed in part.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                   Jane K. Castro
Clerk of Court                                       Chief Deputy Clerk

October 22, 2024

Mr. Dominic Draye
Mr. Scott A. Schipma
Greenberg Traurig
District of Columbia
2101 L Street, NW, Suite 1000
Washington, DC 20037

**RE:**    **22-1409, Menocal, et al v. GEO Group**
         Dist/Ag docket: 1:14-CV-02887-JLK-MEH

Dear Counsel:

Enclosed is a copy of the order and judgment issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R.35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

                              Sincerely,

                              Christopher M. Wolpert
                              Clerk of Court

cc:      Jennifer Bennett
            Rachel Dempsey
            Robert Friedman
            Alexander Hood
            Adam Koshkin
            Hans Meyer
            Brandt Milstein
            Michael Scimone
            David Hollis Seligman
            Andrew Hess Turner
            Juno Turner

CMW/jm