# IN THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLORADO

Civil Action No.: 1:14-cv-02887-JLK-CYC

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA,
*on their own behalf and on behalf of all others*
*similarly situated*,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

## DEFENDANT'S MOTION TO CERTIFY QUESTION FOR INTERLOCUTORY APPEAL

---

**D.C.COLO.LCivR 7.1(a) Certificate of Compliance**: Counsel for Defendant, The Geo Group Inc., hereby certify that they have conferred with Plaintiffs' counsel via email and telephone regarding the relief requested herein, more than 24 hours in advance of the filing of this Motion. Plaintiffs oppose the requested relief.

**Certification Regarding the Use of Generative Artificial Intelligence**: Counsel for GEO hereby attests that no Generative Artificial Intelligence was used in connection with the drafting of this Motion.

1

**Oral Argument Requested**: GEO requests oral argument on this Motion because the procedural history is complicated and the issue to be appealed arises in a complex area of law. The resolution, *vel non*, of that question will have implications for any future trial. Resolving the *Yearsley* question now ensures neither the Court nor the parties expend significant resources on a trial that will need redone. These consequences make oral argument appropriate.

## I.    INTRODUCTION

Defendant The GEO Group, Inc. ("GEO") requests this Court certify the following question to the Tenth Circuit under 28 U.S.C. § 1292(b): whether a government contractor can be held liable when it acts within the scope of authority validly conferred by the federal government, even if the contractor exercises discretion in implementing that authority.

This case might be the most natural candidate imaginable for interlocutory appeal under Section 1292. In its earlier stay order, this Court already recognized that the question presented—whether the Tenth Circuit will join the Ninth Circuit's approach in *Cabalce v. Thomas E. Blanchard & Associates*, 797 F.3d 720, 732 (9th Cir. 2015), or the competing approach endorsed in the Third, Fourth, and Fifth Circuits—is a purely legal question with the potential to dispose of the case. (Doc. 400). And, as the stay implied, it makes no sense to proceed to trial with that legal issue outstanding. But where this case becomes truly rare is the fact that the parties have already briefed and argued the issue before the Tenth Circuit. That court ultimately dismissed the appeal for lack of collateral-order jurisdiction, a decision that the Supreme Court affirmed, *Geo Group, Inc. v. Menocal*, 146 S. Ct. 774 (2026), but there is no jurisdictional question under Section 1292(b), and the briefs are ready to go. In fact, the Tenth Circuit would not need new briefing or argument; the parties could immediately file the same merits briefs they submitted previously. As Plaintiffs told the Supreme Court: "If a particular *Yearsley* order raises an unsettled legal question or implicates an important public interest, a contractor can seek permission to file an interlocutory

appeal under 28 U.S.C. § 1292(b)."  Resp. Br., No. 24-758, at 18 (filed Sept. 15, 2025) (Ex. G).

The acknowledged 3-1 circuit split doubtless qualifies as "an unsettled legal question."

This particular constellation of factors—a purely legal issue, with recognized outcome-determinative consequences, for which the parties have already briefed the appellate court—is a black swan.  In the interest of efficiency and fairness, the Court should certify appeal under Section 1292(b).

## II.    BACKGROUND

### A.    The Parties

The United States Immigration and Customs Enforcement ("ICE") is part of the Department of Homeland Security ("DHS") and charged with enforcing immigration laws.  (Doc. 298 at 6 (Admitted Fact #1)).  Part of this duty includes detaining aliens suspected of entering the United States unlawfully.  (*Id.* at 7 (Admitted Fact #3)).  Congress also empowered ICE with responsibility for arranging "appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).  Congress has further instructed that ICE "shall consider the availability for purchase or lease" of private facilities "prior to initiating any project for the construction of any new detention facility." 8 U.S.C. § 1231(g)(2).  ICE carries out this mandate through authority given to the Secretary of Homeland Security "to make contracts . . . as may be necessary and proper to carry out the Secretary's responsibilities."  6 U.S.C. § 112(b)(2).

Pursuant to this directive, ICE contracts with GEO to house detainees in GEO-owned facilities throughout the country.  (Doc. 298 at 8 (Admitted Fact #6)).  This case concerns GEO's facility in Aurora, Colorado: the Aurora Immigration Processing Center (the "AIPC").  (*Id.* at 8 (Admitted Fact #7)).  GEO operated the AIPC under contracts with ICE during the ten years at issue—from October 22, 2004, to October 22, 2014.  (*Id.* (Admitted Fact #9)).  Its contract

incorporated and required compliance with the Performance Based National Detention Standards ("PBNDS"), a lengthy regulation governing every aspect of detention. (*See id.* at 9–13 (Admitted Facts #11–14, #16, #18)); U.S. Immigr. & Customs Enf't, Performance Based National Detention Standards (2011) https://www.ice.gov/detain/detention-management/2011 (revised December 2016). Compliance with the PBNDS is not only a contractual imperative, but also mandated by regulation. 8 C.F.R. § 235.3(e). Two provisions of the PBNDS are relevant here: (1) a federally mandated detainee housekeeping requirement that includes a schedule of disciplinary sanctions for noncompliance, and (2) a federally mandated Voluntary Work Program ("VWP") for which participants receive a stipend of at least $1 per day.

### B. The Federal Housekeeping Requirement

The federal government requires that all detainees participate in basic housekeeping to ensure a safe and sanitary environment. (Doc. 261-9 at 61 (2008 PBNDS: "[A]ll detainees are responsible for personal housekeeping. . . . Detainees are required to maintain their immediate living areas in a neat and orderly manner.")); (Doc. 261-8 at 51 (2011 PBNDS: "Detainees are required to maintain their immediate living areas in a neat and orderly manner.")). The ICE National Detainee Handbook, in effect at the time of the 2011 AIPC contract, includes the following explanation of detainees' obligation to clean assigned living areas: "You are not entitled to compensation for tasks that involve maintaining your personal area or cleaning up after yourself in general use areas. You are required to perform basic cleaning tasks within your living unit, regardless of where you are held." (Doc. 51-3 at 19). Similarly, the 2013 version of the ICE National Detainee Handbook explains to detainees that they must clean their living area and common areas: "Will I get paid for keeping my living area clean? No, you must keep areas that you use clean, including your living area and any general use areas that you use. If you do not

keep your areas clean, you may be disciplined." (Doc. 310-1 at 18).

The federal government also requires GEO to prepare a facility-specific handbook, which ICE reviews and approves before requiring GEO to provide it to every detainee. (Doc. 298 at 14 (Admitted Fact #20), 16 (Admitted Fact #25)). The AIPC Handbook provides the following explanation of detainees' housekeeping obligations:

> Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate.
> * * *
> Day rooms are open spaces in the housing units that are utilized for watching television, playing board games, dominos or cards, as well as for socializing among detainees. Tables with chairs are provided for your use in the dayroom.
>
> All detainees in a housing unit are required to keep clean and sanitary all commonly accessible areas of the housing unit including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs.
> * * *
> Detainees will take turns cleaning the area. . . . If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean will result in further disciplinary action.

(Doc. 261-17 at 20). ICE regularly audits the materials provided to detainees at intake, including the AIPC Handbook, and GEO has passed every audit since 2004. (Doc. 298 at 21 (Admitted Fact #37)).

ICE also dictates sanctions applicable to detainees who refuse to comply with the federal housekeeping requirements: GEO "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section." (Doc. 298 at 14 (Admitted Fact #19)); (Doc. 336 at 12 (Admitted Facts #12–14)); (Doc. 261-10 at 17 (2000 NDS)); (Doc. 261-9 at 45 (2008 PBNDS) ("shall adopt, without alteration, the offense categories and disciplinary sanctions set forth in this section")); (Doc. 261-8 at 39 (2011 PBNDS) ("All facilities shall have graduated

scales of offenses and disciplinary consequences as provided in this section.")).  The disciplinary scale in question classifies "[r]efusal to clean assigned living area" as a "high-moderate" offense for which ICE prescribes a program of 13 sanctions, including "Disciplinary Segregation (up to 72 hours)."  (Doc. 336 at 12 (Admitted Facts #12, #13)).  GEO invented none of this.

Ultimately, the federal government directed GEO to implement the housekeeping policy at issue and audited GEO to ensure compliance with that obligation.  At all times, GEO's housekeeping and associated disciplinary policies and practices at the AIPC were implemented and administered by GEO as authorized and directed by ICE.

### C.    The Federal Voluntary Work Program

Unlike housekeeping, the federally mandated VWP is, as its name suggests, voluntary—voluntary, that is, for detainees; GEO is required to offer the program under Section 5.8 of the PBNDS because the government has determined that an opportunity for work reduces idleness and improves discipline.  (Doc. 298 at 24 (Admitted Fact #42)).  For ***most of the timeframe*** relevant to this lawsuit, the PBNDS directed that the stipend for participants in the VWP "is $1 per day."  (Doc. 261-10 at 5).  Beginning on June 23, 2013, the AIPC contract required compliance with the 2011 PBNDS, which states that participants in the VWP will be compensated "at least $1.00 (USD) per day."  (*See* Doc. 271-4 at 2, 3).  At its own facilities, ICE pays exactly $1 per day, which is precisely the amount Congress appropriates to reimburse contractors like GEO.  *See* 8 U.S.C. § 1555(d); Publ. L. No. 95-431, 92 Stat. 1021 (1978).  At all relevant times, GEO complied with the requirements by paying VWP participants at the AIPC at least $1 per day.

### D.    Class Complaint

Plaintiffs brought a class action on behalf of all persons detained in the AIPC from October 22, 2004, to October 22, 2014.  (Doc. 49 at 10; Doc. 57 at 21).  They assert claims under the

Trafficking Victims Protection Act and common law unjust enrichment.[1]  Each claim challenges a separate federal policy GEO enforced during the class period.  The Trafficking Victims Protection Act claim challenges the federal requirement that detainees clean up living spaces and common areas.  (*See* Doc. 1 at 13–17).  The unjust enrichment claim challenges the amount of the stipend paid to participants in the federal VWP.  (*See id.* at 17–18).

###### E.    Cross Motions for Summary Judgment

In its Answer, GEO asserted derivative sovereign immunity as canonically articulated in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940).  (Doc. 26 at 14).  Following discovery, the parties filed cross-motions for summary judgment on the immunity issue.  (Docs. 260, 284).  Plaintiffs argued that *Yearsley* does not apply because ICE did not direct GEO to require detainees to clean common areas or to pay a rate of $1.00 per day.  (*See* Doc. 260 at 35–36, 39–40).  GEO responded by pointing out that both policies are required by the PBNDS, with which GEO is obliged to comply.  (*See* Doc. 270 at 3–4; Doc. 284 at 17–21, 22–23).  GEO further disagreed with Plaintiffs on the issue that has driven the subsequent appeals: whether a government contractor loses its immunity (which turns out to be an immunity from liability, not suit) simply because it has some measure of discretion in executing its contractual duties.  (Doc. 284 at 21 n.6).  GEO explained the immunity applies whenever a contractor complies with federal directions in performing duties validly assigned to it by the federal government.  (*Id.* at 14).

This Court denied GEO's motion for summary judgment and granted Plaintiffs' motion.  (Doc. 380).  For the legal standard governing the second *Yearsley* criterion, the Court looked to the Ninth Circuit's decision in *Cabalce*, for the proposition derivative sovereign immunity "is limited to cases in which a contractor had ***no*** discretion . . . and completely followed government

---

[1] Plaintiffs also brought a claim under Colorado's Minimum Wages of Workers Act, (Doc. 1 at 8), but the Court granted GEO's motion to dismiss as to that claim.  (Doc. 23 at 14).

specifications." (Doc. 380 at 32 (emphasis added)).  Thus, the Court considered decisive the fact that "there is no evidence that ICE prohibited GEO from compensating its workers more than $1.00 per day." (*Id.* at 34–35 (citing *Cabalce*)).  That reasoning is faithful to *Cabalce*, but the Tenth Circuit has not yet decided whether to join the Ninth Circuit or the alternative standard embraced in three other circuits, including one decision entered after the Court's summary judgment decision.  *Gay v. A.O. Smith Corp.*, No. 23-2078, 2024 WL 2558735 (3d Cir. May 24, 2024); *Taylor Energy Co., L.L.C. v. Luttrell*, 3 F.4th 172 (5th Cir. 2021); *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640 (4th Cir. 2018).

### F.    Appeal to the Tenth Circuit

GEO immediately appealed under 28 U.S.C. § 1291 and the collateral order doctrine. (Doc. 387).  Recognizing the case-dispositive nature of the immunity question, this Court stayed proceedings, pending the outcome of the appeal.  (Doc. 400).

In the Tenth Circuit, Plaintiffs filed a motion to dismiss, arguing that GEO's appeal was premature because derivative sovereign immunity is a defense to liability that requires a final judgment—not an immediately appealable immunity from suit.  (Ex. B at 2).

Rather than rule on that motion, the Tenth Circuit carried it with the case and instructed the parties to fully brief the merits of GEO's appeal.  (Ex. A at 11 (Appellate Doc. 24)); *Menocal v. Geo Grp., Inc.*, No. 22-1409.  On the merits, GEO argued this Court "applied the incorrect legal standard to deny [its] right to derivative sovereign immunity." (*See* Ex. C. at 29, 45).  GEO argued that the long history of immunity under *Yearsley*—including *Yearsley* itself—protects discretionary actions taken by a government contractor in furtherance of a federal contract.  (*See id.* at 37–38, 46).  GEO further informed the Tenth Circuit that this Court's decision tracked the Ninth Circuit's *Cabalce* opinion, but that a split has emerged on this question, with a number of

8

recent decisions in other circuits rejecting *Cabalce*.  (*Id.* at 35–36); (Ex. D).

The Tenth Circuit heard oral arguments on both Plaintiffs' motion to dismiss and the merits of GEO's appeal on September 18, 2023.  (Ex. A at 13 (Appellate Doc. 81)).  Over a year later, the court granted Plaintiffs' motion and dismissed the case for lack of jurisdiction on October 22, 2024.  (*Id.* at 14 (Appellate Doc. 98)).  GEO timely filed a petition for writ of certiorari.  It explained that circuit courts were split 5-3 "on whether denials of derivative sovereign immunity are appealable collateral orders." (Ex. E at 13).  The Supreme Court granted certiorari on the jurisdictional question and held that a district court order denying derivative sovereign immunity was not appealable before a final judgment.  *Menocal*, 146 S. Ct. at 786.  It transmitted its judgment on March 30, 2026.  (Ex. F).

### III.   LEGAL STANDARD

Appellate jurisdiction normally begins with a "final decision[] of the district courts of the United States."  28 U.S.C. § 1291.  Nonetheless, various mechanisms of interlocutory appeal supplement the final judgment rule.  One such mechanism is 28 U.S.C. § 1292(b), which authorizes certification of "certain pivotal and debatable decisions for immediate review."  *XTO Energy, Inc. v. ATD, LLC*, 189 F. Supp. 3d 1174, 1193 (D.N.M. 2016).  Section 1292(b) states:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.  The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b).  Appeals under Section 1292(b) are left to a district court's discretion based

on the circumstances of each case. *Carbajal v. Keefer*, 51 F. Supp. 3d 1065, 1068 (D. Colo. 2014).

## IV.   ARGUMENT

An issue's suitability for appeal under Section 1292(b) depends on four factors: (1) the timeliness of the motion; (2) whether the request presents a controlling question of law; (3) whether substantial grounds for difference of opinion exist; and (4) whether interlocutory appeal will advance the ultimate termination of the litigation. *See*, *Atlantic Richfield Co. v. NL Indus., Inc.*, No. 20-cv-00234-NYW-KAS, 2023 WL 5333756, at *5 (D. Colo. Aug. 18, 2023). As this Court already recognized when it entered a stay during GEO's collateral-order appeal, the Tenth Circuit's choice of whether to join the Ninth Circuit or the three circuits on the other side of the split is a purely legal question that will potentially resolve the entire case. If anything, the current decision is easier because the parties have already briefed and argued the issue before the Tenth Circuit, minimizing the delay from an interlocutory appeal.

### A.    Timeliness of Motion

Section 1292(b) includes a deadline for filing petitions with the appellate court, but it does not include a similar deadline for filing certification requests in the district court. The inclusion of a deadline (ten days) in one instance and not in the other is presumably intentional. *Bates v. United States*, 522 U.S. 23, 29–30 (1997) ("[I]t is generally presumed that Congress acts intentionally and purposely" where it "includes particular language in one section of a statute but omits it in another" (quotation omitted)). Some courts have nevertheless defaulted to a "reasonableness" standard. *Ahrenholz v. Bd. of Trs. of Univ. Ill.*, 219 F.3d 674, 675 (7th Cir. 2000); *United States ex rel. Quartararo v. Cath. Health Sys. of Long Island*, 521 F. Supp. 3d 265, 274 (E.D.N.Y. 2021).

Here, GEO timely noticed its collateral-order appeal following the summary judgment order.  (Doc. 387).  "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982).  The "aspect" of this case subject to appeal was precisely the issue that GEO now asks the Court to certify under Section 1292(b), namely the legal standard for immunity under *Yearsley*. A district court does not reacquire jurisdiction until the appellate court returns a mandate.  *Burton v. Johnson*, 975 F.2d 690, 693 (10th Cir. 1992).  For appeals to the United States Supreme Court, jurisdiction does not return until the Clerk of the United States Supreme Court sends a copy of the opinion and a certified copy of the judgment to the district court.  U.S. Sup. Ct. R. 45.

The Supreme Court transmitted its opinion and judgment on March 30, 2026.  The Tenth Circuit then immediately recalled its mandate and reassumed jurisdiction.  GEO has moved the Tenth Circuit to re-issue the mandate.  Although GEO does not believe this Court has jurisdiction until that time, it nevertheless brings this motion because the Court appears to believe that it has jurisdiction, and GEO desires to act timely following the Supreme Court's March 30, 2026 transmittal.

## B. Controlling Question of Law

Appeal under Section 1292(b) is available only for "a controlling question of law."  28 U.S.C. § 1292(b).  Questions on the meaning of a statute, constitutional provision, regulation, or common-law doctrine are questions of law.  *Chamberlain v. Crown Asset Mgmt.*, 622 F. Supp. 3d 1068, 1071 (D. Utah 2022) (citation modified).  The question must be "at a high enough level of abstraction to lift [it] out of the details of the evidence or facts of a particular case and give it general relevance to other cases in the same area of law."  *Id.* (citation omitted).  A question "is

11

controlling if its resolution is quite likely to affect the further course of litigation, even if not certain to do so." *Id.* (citation modified).

GEO's entitlement to derivative sovereign immunity is a controlling question of law—whether that immunity is an immunity from suit (as GEO originally believed) or immunity from liability (as Plaintiffs argued and the Supreme Court held).  *See Oulds v. Principle Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993); *see also Nwauzor v. Geo Grp. Inc.*, 127 F.4th 750, 759 (9th Cir. 2025) (describing the application of derivative sovereign immunity as a question of law).  There can be no question as to the question's generality, given the circuit split described below.  And this Court has already recognized that the resolution of the question is controlling. That was the basis for imposing a stay on all other aspects of the litigation when GEO first asked the Tenth Circuit to opine.  Nothing has changed with the Supreme Court's holding that collateral-order review is not the proper avenue, while expressly noting that its "holding still allows review of a given *Yearsley* denial by means of § 1292(b)'s separate appeal-certification process." *Menocal*, 146 S. Ct. at 786 n.5.  The method by which GEO may ask the Tenth Circuit to take a position on *Yearsley*'s second prong is irrelevant to the controlling effect that a decision on that question will have.

### C.    Substantial Grounds for Difference of Opinion

The third criterion for review under Section 1292(b) is that substantial grounds for difference of opinion exist.  This requirement is met when circuit courts "are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel or difficult questions of first impression are presented." *Chamberlain*, 622 F. Supp. 3d at 1072.  The best evidence of substantial grounds for a difference of opinion is "persuasive differing judicial opinions on the issue, even if those opinions are outside

the Tenth Circuit." *IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l*, 723 F. Supp. 3d 1053, 1057 (D. Kan. 2024).

The Tenth Circuit has not yet expressed its view on whether discretion in the performance of a contractor's duties undermines its claim to *Yearsley* protection. Four other circuits have answered that question—three of them at the time of this Court's ruling on summary judgment, and one since. This Court found the Ninth Circuit's decision in *Cabalce* persuasive and applied its rule that discretionary actions by a government contractor are not protected by derivative sovereign immunity. (Doc. 380 at 32, 35 (citing *Cabalce*, 797 F.3d at 732)). *Cabalce* concerned a federal contractor who stored and disposed of fireworks pursuant to a government contract. 797 F.3d at 723. When an explosion resulted in the death of five of its employees, the contractor removed the resulting lawsuits under 28 U.S.C. § 1442(a)(1). *Id.* at 725. It argued that "removal was proper because it acted under the color of the United States pursuant to its contract with the federal government, and because it had colorable federal defenses premised on derivative sovereign immunity." *Id.* (citation modified). The Ninth Circuit disagreed because there was insufficient "causal nexus between the plaintiffs' claims and the actions [the contractor] took pursuant to a federal officer's direction." *Id.* at 731. The Ninth Circuit went on to say that, even if the contractor had established a nexus, removal was still improper because the contractor did not have a colorable federal defense because "derivative sovereign immunity, as discussed in *Yearsley*, is limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications.'" *Id.* (quoting *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008)).

*Cabalce* is one approach to the question. In three other circuits, derivative sovereign immunity shields a contractor's discretionary actions. As the Western District of Pennsylvania

13

recently noted, the circuits are split on this question. *Gay v. A.O. Smith Corp.*, No. 2:19-cv-1311, 2022 WL 2829887, at *2 (W.D. Pa. Apr. 21, 2022) ("[T]he effect of a contractor's discretion on a claim of *Yearsley* immunity is an open legal question."). GEO believes the majority position is the more persuasive approach because *Cabalce* incorrectly conflates the government contractor defense with derivative sovereign immunity. At minimum, substantial grounds for disagreement exist.

### 1.    The Majority Approach

Three circuits reject *Cabalce* and hold derivative sovereign immunity applies to a government contractor's discretionary actions. All of those decisions postdate *Cabalce*.

The Fifth Circuit broke with the Ninth in *Taylor Energy Company, L.L.C.* There, an energy company challenged a federal contractor's oil-spill response and argued that derivative sovereign immunity did not protect the contractor because its "contract with the [federal government] lacks details and gives [the contractor] leeway in deciding how to run the capture and cleanup operation." *Taylor Energy Co., L.L.C.*, 3 F.4th 172 at 174. The Fifth Circuit rejected that argument and held that the appropriate inquiry for derivative sovereign immunity "is whether [the contractor] adhered to the [federal government's] instructions as described in the contract documents." *Id.* at 176. More specifically, the court found the second *Yearsley* prong was satisfied because the government directed the contractor "to come up with" a solution and then "authorized [the contractor's] plan, the design of the response system, and installation of the system." *Id.* Thus, the Fifth Circuit rejected the company's argument that "leeway" was fatal under *Yearsley*.

The Fourth Circuit reached the same conclusion in *Cunningham*. That case concerned a contract to promote enrollment in insurance plans under the Affordable Care Act. *Id.* at 644. The contract authorized, but did not require, the use of an autodialer and did not explicitly direct the

14

contractor "to make telephone calls without obtaining prior express consent." *Cunningham v. Gen. Dynamics Info. Tech, Inc.*, No. 1:16-cv-00546, 2017 WL 1682534, at *2 (E.D. Va. May 1, 2017). The contractor therefore exercised its discretion to use an autodialer, which would violate the Telephone Consumer Protection Act. *See generally Sartori v. Susan C. Little & Assoc.*, 571 Fed. Appx. 677, 682 (10th Cir. 2014) (explaining the Telephone Consumer Protection Act prohibits companies from making "any call (other than . . . with the prior express consent of the called party) using an automatic telephone dialing system)."). The Fourth Circuit nevertheless affirmed dismissal under *Yearsley* because the contractor "performed exactly as [the federal government] directed" because its conduct was permissible under the contract. *Cunningham*, 888 F.3d at 647. The court explained the contractor's actions fit within the scope of conduct "directed" under the contract even though the contract did not specifically require an autodialer and required compliance with applicable laws. *Id.* Put differently, discretionary actions within the scope of the agreement were enough to confer immunity from suit.[2] *See id.* at 648.

Finally, the Third Circuit in *Gay*, considered the *Yearsley* doctrine in the context of asbestos exposure. 2024 WL 2558735, at *1. The plaintiff argued that "derivative sovereign immunity is inapplicable to matters within a contractor's discretion." *Id.* at *2. More specifically, the plaintiff argued she was exposed to asbestos at a Navy facility where her late husband worked, and the contractor operating that facility was not immune because "the government did not 'authorize and direct' [the contractor's] failure to warn him about asbestos." *Id.* The Third Circuit rejected the plaintiff's zero-discretion argument, reasoning the contractor's "***main activities*** . . . *were* authorized and directed by the government" and that is enough to confer

---

[2] *Campbell-Ewald* also concerned the Telephone Consumer Protection Act. But there, the Supreme Court held there was no derivative sovereign immunity because the government specifically directed its contractor to obtain prior consent before using an autodialer. 577 U.S. at 168. The different outcomes reflect the different government directives.

immunity.  *Id.* (first emphasis added).

Three circuits thus hold derivative sovereign immunity turns on whether a contractor's conduct fell within the scope of authority authorized by the federal government, not on whether the government prescribed every operational detail.  These decisions at least establish substantial grounds for a difference of opinion.  For the reasons explained below, the majority's reasoning more faithfully follows Supreme Court precedent and is the more persuasive approach.

### 2.    Persuasiveness of the Majority Approach

This motion does not seek to persuade the Court that its earlier holding was incorrect, but to establish the good faith basis for the position it will urge before the Tenth Circuit, GEO notes the key defect in the Ninth Circuit's approach in *Cabalce*.

*Yearsley* and *Campbell-Ewald* applied the same two-part test for derivative sovereign immunity: (1) "what was done was within the constitutional power of Congress," and (2) the contractor "performed as the Government directed."  *Campbell-Ewald*, 577 U.S. at 167 (quoting *Yearsley*, 309 U.S. at 20–21).  A different doctrine protects contractors who manufacture products according to the government's specifications.  That rule, called the government contractor defense, originated in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988).  In *Boyle*, the Court construed an exception to the waiver of sovereign immunity in the Federal Tort Claims Act.  Specifically, the Court interpreted the so-called "discretionary-function exception," which carves out—*i.e.,* retains sovereign immunity—for the "performance or the failure to exercise or perform a discretionary function."  28 U.S.C. § 2680(a).  *Boyle*'s discussion of the discretionary-function exception is irrelevant to the *Yearsley* criteria.  *See Cunningham*, 888 F.3d at 646 n.4 ("*Boyle* is inapposite to determining the applicability of derivative sovereign immunity.").

16

The Ninth Circuit's holding in *Cabalce* erred in conflating the *Yearsley* doctrine with the government contractor defense.  It relied on *Hanford* to conclude that derivative sovereign immunity does not cover discretionary actions.  797 F.3d at 732.  But *Hanford* expressly considered "the common law government contractor defense" in connection with a class action claim under the Price-Anderson Act alleging radiation poisoning in connection with the development of weapons-grade plutonium.  534 F.3d at 995.  *Hanford* held that "the defense is inapplicable as a matter of law, because Congress enacted the [Price Anderson Act] before the courts recognized the government contractor defense."  *Id.*  Notably, the defendant in *Hanford* did not assert derivative sovereign immunity under *Yearsley*.  Moreover, while *Hanford* did state that *Yearsley* "limited the applicability of [derivative sovereign immunity] to principal-agent relationships where the agent had no discretion in the design process and completely followed government specifications," that statement relied on Justice Brennan's dissenting opinion in *Boyle*. *Id.* at 1001.  The Ninth Circuit's reasoning thus is doubly problematic; it redefines the *Yearsley* criteria based on precedent involving a different doctrine, and it uses a dissenting opinion to do so. Because of this error, the Ninth Circuit continues to conflate the government contractor defense with derivative sovereign immunity, treating the two as interrelated doctrines.  *See, e.g.*, *Nwauzor v. Geo Grp., Inc.*, 127 F.4th at 770, *cert. pending* No. 25-828 (filed Jan. 9, 2026).

Untangling the reasoning behind *Cabalce* confirms substantial grounds for a difference of opinion.  The parties have briefed this issue extensively in their merits briefs in the prior appeal. Whether the Tenth Circuit joins the Ninth or the three circuits to have addressed this question more recently remains to be seen, but an interlocutory appeal to learn the answer to that question is appropriate in light of the arguments on both sides.

###### D.    Advances the Ultimate Termination of Litigation

Finally, interlocutory review under Section 1292(b) is warranted because it will advance the ultimate termination of the litigation.

To satisfy this requirement, an appeal must "(1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly." *Chamberlain*, 622 F. Supp. 3d at 1072. This inquiry "properly turns on pragmatic considerations, assessed by reviewing the procedural and substantive status of the case with respect to the process or completion of discovery, the disposition of pretrial motions, the extent of the parties' preparation for trial, and the nature and scope of requested relief." *See XTO Energy, Inc.*, 189 F. Supp. 3d at 1195 (quotation omitted). Clarifying the law is itself an example of an interlocutory appeal advancing the ultimate termination of litigation. *Chamberlain*, 622 F. Supp. 3d at 1072. Another is where a defense could result in dismissal or summary judgment on all counts, obviating the need for a trial at all. *Obasi Inv. Ltd. v. Tibet Pharms., Inc.*, 931 F.3d 179, 183 (3d Cir. 2019).

This Court's summary judgment order rests on the *Yearsley* doctrine's applicability, *vel non*, to a government contractor's discretionary actions. (Doc. 380 at 32, 35). If the Tenth Circuit joins the Third, Fourth, and Fifth Circuits, GEO will be entitled to summary judgment on one or both claims. Nothing advances the termination of litigation like summary judgment.

In addition, as the previous discussion indicates, whether *Yearsley* covers discretionary actions is a complex area of law that will overshadow any future trial. Resolving the question now is pragmatic, considering this case was previously stayed for over three years, and trial is almost seven months away. The parties still need time to reacquaint themselves with the case, coordinate witnesses, and prepare pre-trial motions. That process will benefit from clarity on the law, even if

the Tenth Circuit adopts *Cabalce* or puts its own gloss on the *Yearsley* criteria.  Indeed, the latter outcome would require a re-trial just as surely as adoption of the three-circuit view.  It makes sense to resolve this central issue before proceeding to motions *in limine* and trial.

Finally, the delay from an interlocutory appeal should be minimal.  GEO intends to rely on its prior briefing.  Presumably Plaintiffs will do the same.  The Tenth Circuit just needs to answer what the parties have already briefed and argued.  Because that answer may obviate the need for trial or shed light on how the Tenth Circuit views the *Yearsley* criteria in advance of a trial that might otherwise be vacated, interlocutory appeal is appropriate.

## V. CONCLUSION

This is an exceptional case.  The Court has already recognized the centrality of a legal question on which the circuits are divided; the parties have already briefed and argued that question before the Tenth Circuit; and the resolution of that question could end the litigation entirely or, at the very least, assure a trial comports with the Tenth Circuit's understanding of *Yearsley*.  The Court should therefore certify the question for interlocutory appeal under Section 1292(b).

Respectfully submitted this 6th day of April, 2026.

GREENBERG TRAURIG, LLP

By: */s/ Dominic E. Draye*
       Dominic E. Draye
       2375 East Camelback Road, Suite 800
       Phoenix, Arizona 85016
       Telephone: (602) 445-8425
       Facsimile: (602) 445-8100
       Email: drayed@gtlaw.com

       David G. Palmer
       Naomi G. Beer
       1144 15th Street, Suite 3300
       Denver, Colorado 80202
       Telephone: (303) 572-6500

19

Facsimile: (303) 572-6540
Email: beern@gtlaw.com
Email: palmerdg@gtlaw.com

**JENNINGS HAUG KELEHER MCLEOD
WATERFALL LLP**

Adrienne Scheffey
3300 East 1st Ave, Suite 590
Denver, Colorado 80206
Telephone: (720) 509-0273
Email: acs@jkwlawyers.com

*Attorneys for Defendant-The Geo Group, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2026, a copy of the foregoing document was filed electronically.   Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.   Parties may access this filing through the Court's system.

By: *<u>/s/ Dominic E. Draye</u>*
    Dominic E. Draye

**INDEX OF EXHIBITS TO DEFENDANT'S MOTION TO CERTIFY QUESTION FOR INTERLOCUTORY APPEAL**

| Exhibit | Description |
|---|---|
| A | Appellate Docket for *Menocal v. Geo Grp., Inc.*, No. 22-1409 (10th Cir.), as of April 6, 2026 |
| B | Plaintiffs-Appellees' Motion to Dismiss Pursuant to 10th Cir. R. 27.3(A)(1)(A) for Lack of Appellate Jurisdiction in *Menocal v. Geo Grp., Inc.*, No. 22-1409 (10th Cir.) |
| C | Appellant's Opening Brief in *Menocal v. Geo Grp., Inc.*, No. 22-1409 (10th Cir.) |
| D | May 31, 2024, Notice of Supplemental Authority Under Fed. R. App. P. 28(j) in *Menocal v. Geo Grp., Inc.*, No. 22-1409 (10th Cir.) |
| E | GEO's Petition for Writ of Certiorari |
| F | Judgment of the Supreme Court in *Geo Grp., Inc. v. Menocal*, No. 24-758 |
| G | Brief for Respondents in *Geo Grp., Inc. v. Menocal*, No. 24-758 |