**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO**

Civil Action No.: 1:14-cv-02887-JLK-CYC

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA,
*on their own behalf and on behalf of all
others similarly situated*,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT OR
JUDGMENT ON THE PLEADINGS**

---

**D.C.COLO.LCivR 7.1(a) Certificate of Compliance**: Counsel for Defendant, The

Geo Group Inc., hereby certify that they have conferred with Plaintiffs' counsel via email and

telephone regarding the relief requested herein, more than 24 hours in advance of the filing of

this Motion.  Plaintiffs oppose this Motion.

**Certification Regarding the Use of Generative Artificial Intelligence**: Counsel for

Defendant hereby attests that no Generative Artificial Intelligence was used in connection with

the drafting of this Motion.

1

**Oral Argument Requested**: Defendant requests oral argument on this Motion because it goes to the core of whether Defendant can be held liable—indeed, whether or not they must even stand trial.  If the Motion is successful, qualified immunity would prevent Plaintiffs from bringing claims under the Trafficking Victims Protection Reauthorization Act.  The consequences of this potential argument make oral argument appropriate.

## I.    INTRODUCTION

Defendant The GEO Group, Inc. ("GEO") moves the Court under Rule 56 or, alternatively, Rule 12(c) to enter judgment in its favor as to Plaintiffs' claim under the Trafficking Victims Protection Reauthorization Act ("TVPA").  GEO is an agent of United States Immigration and Customs Enforcement ("ICE") acting at the government's direction and subject to its supervision.  As such, GEO is entitled to qualified immunity.  *Filarsky v. Delia*, 566 U.S. 377 (2012).  Moreover, it can immediately raise qualified immunity to avoid the burdens of trial.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    The United States Immigration and Customs Enforcement ("ICE") is part of the Department of Homeland Security ("DHS") and charged with enforcing immigration laws. *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 6 (Admitted Fact #1)).

2.    Part of this duty includes detaining aliens suspected of entering the United States unlawfully.  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 7 (Admitted Fact #3)).

3.    Pursuant to this directive, ICE contracts with GEO to house detainees in GEO-owned facilities throughout the country. *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 8 (Admitted Fact #6)).

4.  This case concerns GEO's facility in Aurora, Colorado: the Aurora Immigration Processing Center (the "AIPC").  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 8 (Admitted Fact #7)).

5.  GEO operated the AIPC under contracts with ICE during the ten years at issue—from October 22, 2004, to October 22, 2014.  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 8 (Admitted Fact #9)).

6.  GEO's contract incorporated and required compliance with ICE's Performance Based National Detention Standards ("PBNDS") and its predecessor National Detention Standards ("NDS").  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 9–13 (Admitted Facts #11–14, #16, #18)).

7.  The 2008 PBNDS stated: "[A]ll detainees are responsible for personal housekeeping. . . .  Detainees are required to maintain their immediate living areas in a neat and orderly manner."  *Operations Manual ICE Performance Based National Detention Standards (PBNDS) (2008)*; (Doc. 261-9 at 61).

8.  The 2011 PBNDS provided: "Detainees are required to maintain their immediate living areas in a neat and orderly manner."  *Performance-Based National Detention Standards 2011*; (Doc. 261-8 at 51).

9.  The ICE National Detainee Handbook, in effect at the time of the 2011 AIPC contract, includes the following explanation of detainees' obligations to clean assigned living areas: "You are not entitled to compensation for tasks that involve maintaining your personal area or cleaning up after yourself in general use areas.  You are required to perform basic cleaning tasks within your living unit, regardless of where you are held."  *National Detainee Handbook (2011)*; (Doc. 51-3 at 19).

10. Similarly, the 2013 version of the ICE National Detainee Handbook explains to detainees that they must clean their living area and common areas: "Will I get paid for keeping my living area clean?  No, you must keep areas that you use clean, including your living area and any general use areas that you use.  If you do not keep your areas clean, you may be disciplined." *National Detainee Handbook (2013)*; (Doc. 310-1 at 18).

11. The federal government also requires GEO to prepare a facility-specific handbook, which ICE reviews and approves before requiring GEO to provide it to every detainee.  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 14 (Admitted Fact #20), 16 (Admitted Fact #25)).

12. The AIPC Handbook provides the following explanation of detainees' housekeeping obligations:

> Each and every detainee must participate in the facility's sanitation program.  A list of detainees is developed each day by staff and is posted daily for viewing.  During a general cleanup all detainees must participate.
>
> \* \* \*
>
> Day rooms are open spaces in the housing units that are utilized for watching television, playing board games, dominos or cards, as well as for socializing among detainees.  Tables with chairs are provided for your use in the dayroom.
>
> All detainees in a housing unit are required to keep clean and sanitary all commonly accessible areas of the housing unit including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs.
>
> \* \* \*
>
> Detainees will take turns cleaning the area. . . .  If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned.  Continued refusal to clean will result in further disciplinary action.

*Aurora ICE Detainee Handbook Local Supplement*; (Doc. 261-17 at 20).

13. ICE regularly audits the materials provided to detainees at intake, including the AIPC Handbook, and GEO has passed every audit since 2004. *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 21 (Admitted Fact #37)).

14. On-site ICE officials further review and approve all GEO policies. *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 16 (Admitted Fact #25)).

15. ICE also dictates sanctions applicable to detainees who refuse to comply with the federal housekeeping requirements: GEO "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section." *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 14 (Admitted Fact #19)); (Doc. 336 at 12 (Admitted Facts #12–14)).

16. The disciplinary scale in question classifies "[r]efusal to clean assigned living area" as a "high-moderate" offense for which ICE prescribes a program of 13 sanctions, including "Disciplinary Segregation (up to 72 hours)." *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 336 at 12 (Admitted Facts #12, #13)).

17. On-site ICE officials implemented and enforced the disciplinary scale by telling named Plaintiff Demetri Valerga he could be placed in segregation if he did not clean his own common area. *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 22–23 (Admitted Fact #41)).

18. Unlike housekeeping, the federally mandated VWP is, as its name suggests, voluntary—voluntary, that is, for detainees; GEO is required to offer the program under Section 5.8 of the PBNDS because the government has determined that an opportunity for work reduces

5

idleness and improves discipline. *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 24 (Admitted Fact #42)).

19. For most of the timeframe relevant to this lawsuit, the PBNDS directed that the stipend for participants in the VWP "is $1 per day." *2000 National Detention Standards for Non-Dedicated Facilities*; (Doc. 261–10 at 5).

20. Beginning on June 23, 2013, the AIPC contract required compliance with the 2011 PBNDS, which states that participants in the VWP will be compensated "at least $1.00 (USD) per day." *2013 ICE-GEO Contract Modification*; (Doc. 271-4 at 2–3).

21. At its own facilities, ICE pays exactly $1 per day, which is precisely the amount Congress appropriates to reimburse contractors like GEO. *See* 8 U.S.C. § 1555(d); Publ. L. No. 95-431, 92 Stat. 1021 (1978).

### III.   BACKGROUND

The factual and procedural history of this case appear in GEO's concurrently filed Motion to Certify Question for Interlocutory Appeal. GEO incorporates that material by reference. Relevant here, while this matter was before the Supreme Court, Justice Alito penned a concurrence on the difference between the *Yearsley* defense and qualified immunity available to government contractors under *Filarsky*. *Geo Grp., Inc. v. Menocal*, 146 S. Ct. 774, 787 (2026) (Alito, J., concurring). In that concurrence, Justice Alito explained that the protections GEO sought were available in *Filarsky*'s grant of qualified immunity. Indeed, because qualified immunity "already vindicates the public interest in avoiding overdeterrence, timidity, and distraction among contractors, there is no overriding interest in also allowing immediate appeals of orders denying *Yearsley*'s more modest protections." *Id.* at 792.

Before the Supreme Court decided this case, the difference between *Yearsley* and qualified immunity was hazy at best. In fact, the degree to which they both enshrined an

6

immunity from suit for government agents had divided the circuits and created the need for Supreme Court review in the first place. Now, the law is settled. *Yearsley* is a defense available only to contractors and not within the collateral-order doctrine; qualified immunity is a genuine immunity from suit available to ***both*** contractors and employees and reviewable as a collateral order. Not only is the clarity welcome, but the net result is helpful for contractors. While contractors like GEO formerly believed that they should proceed under the more specific *Yearsley* doctrine, they now know that qualified immunity is the correct avenue if they want to have the option of immediate appellate review. And, as GEO's contemporaneously filed motion under 28 U.S.C. § 1292(b) illustrates, the legal standard for qualified immunity is more settled than *Yearsley*. Because GEO satisfies the conditions for qualified immunity, the Court should grant summary judgment on that basis.

## IV.   LEGAL STANDARD

Summary judgment is ordinarily appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But the Tenth Circuit "review[s] summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (citation modified). When a defendant asserts qualified immunity at summary judgment, the onus is on the plaintiff to demonstrate (1) "the defendant's actions violated a constitutional or statutory right," and (2) "the right at issue was clearly established at the time of the defendant's unlawful conduct." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citation modified). Qualified immunity thus protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "[I]f the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense."

*A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016).  A court will "ordinarily accept the plaintiff's version of the facts" at summary judgment, but those "facts must find support in the record."  *Id.* at 1136.

## V.    ARGUMENT

GEO brings this Motion knowing that the dispositive motions deadline has passed. Nonetheless, the Motion is timely because qualified immunity is a non-waivable immunity intended to avoid the burdens of trial.  The Motion imposes minimal, if any, burden on Plaintiffs because trial is about seven months away and GEO advances a pure question of law. Meanwhile, if the Motion is not decided on the merits, GEO faces the extraordinary harm of being forced to participate in a trial—and potentially face an adverse verdict—where it is immune.

### A.    Timeliness of Motion

Qualified immunity is a non-waivable right held by the defendant.  *See Cassady v. Goering*, 567 F.3d 628, 634 (10th Cir. 2009).  The immunity's purpose is to protect defendants "both from liability as well as from the ordinary burdens of litigation."  *Workman v. Jordan*, 958 F.2d 332, 335 (10th Cir. 1992).  As a result, it can be brought at any point before trial. *MacArthur v. San Juan Cnty.*, 495 F.3d 1157, 1162 (10th Cir. 2007) ("We have consistently held . . . that qualified immunity can be raised at any time and a district court may enter . . . judgment on that ground at any point before trial at which it is appropriate." (citation modified)).  Only extreme circumstances, like waiting until after a jury has rendered its verdict, can constitute forfeiture of the right to assert qualified immunity.  *See, e.g.*, *Evans v. Fogarty*, 241 Fed. Appx. 542, 550 n.9 (10th Cir. 2007) (denying qualified immunity because a defendant failed to raise the defense before the jury verdict).  But the general rule favors a decision on qualified immunity any time before trial.

8

Rule 8(c) of the Federal Rules of Civil Procedure prescribes that "a party must affirmatively state any avoidance or affirmative defense" when responding to a pleading. Fed. R. Civ. P. 8(c). The purpose behind Rule 8(c) is to put a "plaintiff on notice well in advance of trial that [the] defendant intends to present a defense in the nature of an avoidance." *Marino v. Otis Eng'g Corp.*, 839 F.2d 1404, 1408 (10th Cir. 1988) (citation modified). Some circuits hold "an affirmative defense may not be raised for the first time in a post-answer motion without first amending the answer." *See Ahmad v. Furlong*, 435 F.3d 1196, 1201 (10th Cir. 2006) (citing the "strict" approach used in *Harris v. Sec'y, U.S. Dep't of Veterans Affs.*, 126 F.3d 339, 344–45 (D.C. Cir. 1997)).

The Tenth Circuit does not follow that approach. *Id.* In *Ahmad*, the court held that a party could "'constructively' amend the answer by means of the summary judgment motion" so long as the standards governing motions to amend are met. *Id.* at 1202 (collecting cases from the Supreme Court and eight circuits); *see also Torres v. Puerto Rico*, 485 F.3d 5, 9 (1st Cir. 2007) ("We have held squarely that because an asserted right not to stand trial is lost no less by a court's refusal to entertain a pre-trial immunity claim as by an erroneous denial of it on the merits, a district court's refusal to consider the merits of a pretrial motion raising an immunity defense—even a refusal couched as a case-management order—is immediately appealable." (citation modified)). By allowing a "constructive" amendment via a summary judgment motion, the Tenth Circuit preserves the value of qualified immunity while giving the non-moving party ample opportunity to argue against it.

*Gorsuch, Ltd. v. Wells Fargo National Bank Association*, 771 F.3d 1230 (10th Cir. 2014), sets the standard for amending pleadings. *Gorsuch* says "a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard." *Id.* at 1240.

9

### 1.    Good Cause Under Rule 16(b)(4)

Rule 16(b)(4) of the Federal Rules of Civil Procedure states a scheduling order "may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4). Change or clarification of the law provides one example where Rule 16's good cause requirement is met.  *Pumpco, Inc. v. Schenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001) (finding good cause because "recent authority from the Colorado Court of Appeals[] establish[ed] a basis for an additional claim.").  The Supreme Court has now clarified that qualified immunity, rather than the *Yearsley* doctrine, is the correct avenue for government contractors to avoid the burdens of trial.  Prior to the Court's holding, the circuits had reached different conclusions as to whether *Yearsley* recognized a "jurisdictional immunity from suit." *Cunningham v. Gen. Dynamics Corp.*, 888 F.3d 640, 650 (4th Cir. 2018).  Now it is clear, especially with Justice Alito's concurrence, that only qualified immunity exempts contractors from the burdens of litigation.  That clarification constitutes good cause under Rule 16(b)(4). *See Pumpco*, 204 F.R.D. at 668.

### 2.    Leave to Amend Under Rule 15(a)

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This standard presumes parties can amend their pleadings and only prevents amendment when there is "undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility."  *See Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).  This provision is purposefully lenient because pleadings are "not an end in themselves but . . . a means to assist in the presentation of a case to enable it to be decided on the merits."  *Pumpco*, 204 F.R.D. 667, 669 (D. Colo. 2001).

10

### i.    Undue Prejudice

The most important factor under Rule 15(a)(2) "is whether a belated amendment prejudices the nonmoving party." *Christensen v. Denver Health Hosp.*, No. 1:22-cv-01916-RM, 2024 WL 6887139, at *2 (D. Colo. Apr. 21, 2024). Prejudice occurs only "if it would unfairly affect the nonmovant's preparation of its prosecution or defense to the amendment." *Id.* Because GEO's motion is based on a purely legal question rather than "raise[ing] significant new factual issues," *id.*, Plaintiffs are fully capable of defending against the constructive amendment.

"Qualified immunity issues are almost always questions of law," *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1217 (10th Cir. 2008), and GEO keeps with that tradition by relying on the undisputed facts and evidence previously developed during summary judgment. No additional discovery is necessary to determine GEO's eligibility for qualified immunity on Plaintiffs' TVPA claim. The relevant documents are already in the record, and the Court can take Plaintiffs' allegations in the complaint as true for purposes of this Motion. What remains is a pure question of law. *Id.* Constructive amendment therefore will not affect Plaintiffs' ability to defend against GEO's assertion of qualified immunity.

Precedent confirms that a constructive amendment today does not prejudice Plaintiffs' ability to defend against the asserted immunity. In *Ball Corp. v. Xidex Corp.*, 967 F.2d 1440, 1443 (10th Cir. 1992), the Tenth Circuit found a defendant was entitled to qualified immunity for statements it made in patent and trademark proceedings. The plaintiff argued the trial court erred because the defendant had "waived the immunity defense by failing to raise it in its pleadings." *Id.* The Tenth Circuit disagreed. It explained that the purposes of Rule 8(c) were served by the plaintiff having notice "at least three months prior to trial that [the defendant] would claim immunity." *Id.* at 1444. Three months before trial was sufficient time to avoid

prejudice on the legal question of qualified immunity. Similarly, in *Valiente v. Rivera*, 966 F.2d 21, 22–23 (1st Cir. 1992), a defendant asserted qualified immunity after the close of discovery and dispositive motions. The trial court denied the motion as untimely. *Id.* The defendant then appealed under the collateral order doctrine, which the First Circuit reviewed because "an asserted right not to stand trial is lost no less by a court's refusal to entertain a pre-trial immunity claim as by an erroneous denial of it on the merits." *Id.* at 23. The First Circuit then reversed because the motion was filed almost seven months before trial. *Id.* Seven months was sufficient time to decide qualified immunity on the merits—even though the motion was technically untimely under the trial court's scheduling order. These decisions are consistent with the general requirement for courts to decide qualified immunity on the merits.

Finally, a discussion of prejudice allows the Court to consider the harm each party would face if amendment is granted. Here, GEO's harm from being forced to remain in a lawsuit far exceeds Plaintiffs' inconvenience of responding to GEO's Motion. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Edy, Inc.*, 506 U.S. 139, 145 (1993) ("[T]he benefit conferred by qualified immunity to individual officials, is for the most part lost as litigation proceeds past motion practice."). Moreover, GEO is happy to ameliorate any inconvenience Plaintiffs face through an agreed briefing schedule. But when the respective harms are compared against one another, Plaintiffs' inconvenience falls far short of the harm GEO faces.

### ii. Undue Delay

"Lateness does not of itself justify the denial of [an] amendment." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 (10th Cir. 2006). The question instead is the reason for delay and its attendant circumstances. *Id.* Here, the delay is minimal during the timeframe when this Court has had jurisdiction. For several years, the Court correctly stayed proceedings while GEO's entitlement to immunity under *Yearsley* was on appeal first to the Tenth Circuit and

then to the Supreme Court.

GEO timely noticed its collateral-order appeal following this Court's summary judgment order. (Doc. 387). "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). A district court does not reacquire jurisdiction until the appellate court returns a mandate. *Burton v. Johnson*, 975 F.2d 690, 693 (10th Cir. 1992). For appeals to the United States Supreme Court, jurisdiction does not return until the Clerk of the United States Supreme Court sends a copy of the opinion and a certified copy of the judgment to the district court. U.S. Sup. Ct. R. 45. The Supreme Court issued its judgment on March 30, 2026. The Tenth Circuit, however, then immediately recalled its mandate. (Doc. 442).

Nevertheless, out of an abundance of caution and because this Court has announced a fast-paced schedule to proceed to trial, GEO immediately brings this Motion to assert qualified immunity—as it may. *MacArthur*, 495 F.3d at 1162 ("We have consistently held . . . that qualified immunity can be raised at any time and a district court may enter . . . judgment on that ground ***at any point before trial*** at which it is appropriate." (quotation omitted; emphasis added)).

### iii.    Remaining Factors

The remaining Rule 15(a)(2) factors are "bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility." *Frank*, 3 F.3d at 1365. GEO has not previously sought or obtained leave to amend, and as the previous analysis shows, GEO's delay in bringing this motion is not because of bad faith or dilatory motive. To the contrary, the reason GEO invested the time and resources in a trip to the Supreme Court was its desire

13

to end this litigation as quickly as possible.  As for futility, the analysis below explains why amendment is anything but futile.

Ultimately, Tenth Circuit precedent permits GEO to constructively amend its answer now that this Court has regained jurisdiction and lifted its stay.  That presents the strictly legal question of whether GEO is entitled to qualified immunity.

### B.    Entitlement to Qualified Immunity

#### 1.    Contractors' Qualified Immunity

Qualified immunity is normally asserted by government officials.  *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714, 716 (10th Cir. 1988).  In the last decade, the Supreme Court recognized that there was "no distinction in the common law 'between public servants and private individuals engaged in public service.'"  *Campbell-Ewald v. Gomez*, 577 U.S. 153, 167 (2016) (quoting *Filarsky*, 566 U.S. at 387).  Thus, *Filarsky* held that a contractor was entitled to qualified immunity on the same terms as the public employees who were named alongside him in the plaintiff's complaint.  566 U.S. at 391.  Even before that clarification, the Tenth Circuit allowed private parties to assert qualified immunity when they act "pursuant to contractual duties and perform governmental functions."  *DeVargas,* 844 F.2d at 723.  More recently, the Tenth Circuit recognized "three instances when courts may extend qualified immunity to private parties:" (i) when the private defendant is "closely supervised by the government;" (ii) when "there is a historical basis for providing immunity to that type of private entity;" and (iii) when "extending immunity implicates special policy concerns involved in suing government officials."  *General Steel Domestic Sales, L.L.C. v. Chumley*, 840 F.3d 1178, 1182 (10th Cir. 2016) (quotations omitted).  The federal government's use of

14

private contractors to provide immigration detention services satisfies any of these traditional pathways.

Congress requires ICE to arrange "appropriate places of detention for aliens detained pending removal or a decision on removal."  8 U.S.C. § 1231(g)(1).  In making such arrangements, ICE "shall consider the availability for purchase or lease" of private facilities "prior to initiating any project for the construction of any new detention facility."  8 U.S.C. § 1231(g)(2).  When the government selects an "appropriate" facility, it may "make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out" its detention responsibilities.  6 U.S.C. § 112(b)(2); *see also* 28 U.S.C. § 530C(a)(4) (empowering the Secretary of Homeland Security to "carr[y] out," "in [his] reasonable discretion," the activities of ICE "through any means, including . . . through contracts, grants, or cooperative agreements with non-Federal parties," unless such agreements are otherwise precluded by federal law).  The Secretary of Homeland Security has exercised that broad grant of authority to promulgate lengthy regulations covering every aspect of detention, compliance with which is a precondition of contracting with ICE.  8 C.F.R. § 235.3(e).

Those regulations are housed, in part, in the Performance Based National Detention Standards ("PBNDS") and the predecessor regulation, the National Detention Standards ("NDS").  Here, ICE expressly incorporated the PBNDS into its contract with GEO.  (Doc. 298 at 9–13 (Admitted Facts #11–14, #16, #18)).  Under the PBNDS, GEO had to maintain certain health and safety standards, implement certain forms of security for detainees and staff, and provide a set disciplinary system.  (*See generally*, PBNDS Parts 1, 2, and 3).  It further required GEO to ensure detainees are responsible for personal housekeeping and maintaining their assigned living areas "in a neat and orderly manner."  (Doc. 261-8 at 51 (2011 PBNDS)).

15

To effectuate the PBNDS, ICE assigned technical representatives to closely supervise work in GEO facilities in a number of ways, including: inspection and acceptance of services performed in accordance with the technical standards prescribed in the Agreement (Doc. 271-4 at 6 (2013 ICE-Contract Modification)); monitoring compliance with the PBNDS via full annual inspections and additional routine, follow-up, or unscheduled inspections as necessary (*Id.* at 8); and conducting ICE audits to ensure that GEO complies with all requirements of its contract, including its obligations under the PBNDS (Doc. 298 at 16 (Admitted Fact #25), 21 (Admitted Fact # 37)).  ICE employees thus direct and supervise how GEO performs work under its contracts with ICE.

With respect to the specific housekeeping policy at issue in this case, the ICE National Detainee Handbook required detainees "to perform basic cleaning tasks within [their] living unit, regardless of where [they] are held."  (Doc. 51-3 at 19); (*see also* Doc. 310-1 at 18 (National Detainee Handbook (2013)).  The AIPC Handbook, which ICE reviewed and approved and required GEO to provide every detainee, explained that all detainees would take turns doing housekeeping "to keep clean and sanitary all commonly accessible areas of the housing unit including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs."  (Doc. 261-17 at 20); (Doc. 298 at 21 (Admitted Fact #37)).  As for the sanctions for detainees who do not join their peers in maintaining a safe and sanitary living area, ICE specifies a 13-step scale of sanctions.  (Doc. 261-9 at 57 (2008 PBNDS)).  GEO copied that scale ***verbatim***.  (Doc. 298 at 14 (Admitted Fact #19)); (Doc. 336 at 12 (Admitted Facts #12–14)).  ICE employees provide close supervision of GEO's contract performance through direct on-site day-to-day monitoring of conditions and operations that include daily "on the spot" resolution of issues.  (Doc. 335-2 at 2–3).

Importantly for qualified immunity, the direction and supervision GEO faced under the PBNDS was significantly more onerous than *DeVargas*, where the Tenth Circuit held a private corporation could assert qualified immunity because it was closely supervised by the government. 844 F.2d at 715–16. In *DeVargas*, an individual brought suit after a government contractor denied his job application. *Id.* at 716. The applicant argued that the contractor, which provided security services for the Los Alamos National Laboratory, misinterpreted a federal regulation and subsequently violated his constitutional rights. *Id.* In determining that qualified immunity was available, the Tenth Circuit emphasized that the contractor performed functions that government employees otherwise would need to "perform had the government not contracted them out." *Id.* at 722. Qualified immunity thus was available because the contractor stood in a position that would otherwise have been occupied by a government employee and could point to an objective basis for believing its actions were appropriate. *See id.* at 721.

This same reasoning applies here. ICE determined that GEO's Aurora Immigration Processing Center was an "appropriate place[] of detention" and entered a contract with GEO on terms that the government determined were "necessary and proper" for carrying out its many detention responsibilities. 8 U.S.C. § 1231(g)(1); 6 U.S.C. § 112(b)(2); 28 U.S.C. § 530C(a)(4). ICE closely supervised GEO's operations through exhaustive PBNDS requirements and by placing ICE employees in GEO facilities to support compliance. (Doc. 271-4 at 8 (2013 ICE-GEO Contract Modification)). This is not a situation where the government awarded a contract with no material restrictions on how the contractor was to perform. *See, e.g.*, *Tanner v. McMurray*, 989 F.3d 860, 873 (10th Cir. 2021) ("The mere existence of a contract does not establish close supervision, and even a cursory review of the record reveals that Appellees operated with near-complete discretion in providing medical care

17

for detainees, as was compelled by the contract."). This case instead aligns with precedent since *Filarsky* and *DeVargas* finding private corporations can assert qualified immunity when they follow government direction and work closely with government personnel. *See Herrera v. Santa Fe Pub. Schs.*, 41 F. Supp. 3d 1027, 1186 (D.N.M. 2014) (finding close supervision because a contractor "was hired to provide security subject to [the government's] direction and alongside its personnel").

Plaintiffs may argue *Richardson v. McKnight*, 521 U.S. 399 (1997), prevents GEO from asserting qualified immunity. In *Richardson*, the Supreme Court held "private prison guards . . . do not enjoy immunity from suit in a § 1983 case." 521 U.S. at 412. *Richardson*, however, is distinguishable for several reasons. First, its holding is "self-consciously narrow" and only applies to private firms "systematically organized to assume a major lengthy administrative task . . . ***with limited direct supervision by the government***." *See id.* at 413 (emphasis added); *Filarsky*, 566 U.S. at 393. Second, *Filarsky* limited *Richardson* to cases under Section 1983. 566 U.S. at 392–93. Third, *Richardson* concerns a different basis for corporate qualified immunity—"extending immunity implicates special policy concerns"—not the close supervision category discussed above. *See* p.9 *supra*; *General Steel Domestic Sales*, 840 F.3d at 1182. Fourth, subsequent decisions have cabined *Richardson* to its facts. Even within correctional facilities, the Tenth Circuit has permitted various contractors to avail themselves of qualified immunity. *Estate of Lockett v. Fallin*, 841 F.3d 1098 (10th Cir. 2016) (doctors); *Estate of Jensen v. Clyde*, 989 F.3d 848 (10th Cir. 2021) (psychiatrists); *Franco v. Bd. of Cnty. Comm'rs*, 609 F. App'x 957 (10th Cir. 2015) (probation officers). As a result, some courts in the Tenth Circuit have hypothesized that *Richardson* may come out differently today. *See Herrera*, 41 F. Supp. 3d at 1186. Regardless, policy concerns are irrelevant when government supervision establishes GEO's entitlement to qualified immunity.

18

In addition to the federal government's "close supervision" of the work in question, GEO's services are entitled to qualified immunity because of the "historical" precedent for immunity in these circumstances and the "special policy concerns" around imposing liability on contractors. *General Steel*, 840 F.3d at 1182. The Supreme Court has already embraced both of these points in *Filarsky*. After a lengthy tour through contractors' entitlement to immunity, the Court concluded that "the common law did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities." *Filarsky*, 566 U.S. at 387. Directly on point here, an 1861 case extended immunity to the "master of a house of correction"—which Justice Scalia described as equivalent to an "independent contractor," *Richardson*, 521 U.S. at 415 & n.1 (Scalia, J., dissenting)—against claims that he failed "to provide suitable and proper food, clothing, and warmth" to detainees. *Williams v. Adams*, 85 Mass. 171 (1861). Slightly more generally, history is replete with examples of immunity for private parties engaged in law enforcement activities. *Filarsky*, 566 U.S. at 384–89.

As for governmental interests there is no question that government employees enjoy qualified immunity against Plaintiffs' claims. Plaintiffs tacitly admit as much by not suing the ICE agents who told Plaintiff Demetrio Valerga that he could be taken to segregation for refusing to help clean his living area. (*See* Doc. 298 at 22–23 (Admitted Fact # 41)). The reasons for that immunity are familiar. Qualified immunity prevents the "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Mitchell*, 472 U.S. at 526 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)). Those concerns apply "not only to public employees but also to others acting on behalf of the government." *Filarsky*, 566 U.S. at 390. "The public interest in ensuring performance of government duties free from the distractions that can accompany even

19

routine lawsuits is also implicated when individuals other than permanent government employees discharge these duties." *Id.* at 391; *id.* at 398 (Sotomayor, J., concurring). Whatever reasonable disagreements might attend public policy decisions, the government's interest in implementing the policies selected by elected officials depends on contractors as much as on government employees. *Filarsky*'s recognition that the same policy concerns apply to both types of government agents—contractors and employees—is another reason qualified immunity attaches here.

Whether as a matter of oversight, history, or policy, GEO is entitled to qualified immunity in this case.

### 2.    Immunity for Non-Section 1983 Claims

The most familiar context for qualified immunity is constitutional claims under Section 1983. That is not, however, the only species of claim for which the government's agents are immune. "The legal source of official immunity may lie either in a statute or in doctrines of absolute and qualified immunity developed by the courts." 33 *Wright & Miller's Federal Practice & Procedure* § 8355 (2d. ed. 2025). Indeed, qualified immunity's application to 1983 claims is based on the "common-law protections" that "ha[ve] not been abrogated" by the adoption of Section 1983. *Filarsky*, 566 U.S. at 383 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)).

The Tenth Circuit has already recognized that Congress did not intend to abrogate sovereign immunity when passing the TVPA. *Mojsilovic v. Okla. ex rel. Bd. of Regents for Univ. of Okla.*, 841 F.3d 1129, 1134 (10th Cir. 2016). This accords with similar findings from other courts. *Adams v. Calhoun Cnty.*, No. 18-1867, 2019 WL 3501815, at *2 (6th Cir. Apr. 24, 2019) ("[T]he district court properly determined that Congress did not abrogate state sovereign immunity through the [TVPA]."); *Travina v. Univ. of Tex.*, No. A-21-cv-01040-RP,

2022 WL 1308828, at *3 (W.D. Tex. May 2, 2022).

Because sovereign immunity shields the federal government from TVPA suits, GEO can similarly seek to avoid suit through qualified immunity. *See Wyoming v. Livingston*, 443 F.3d 1211, 1221 (10th Cir. 2006) ("Although qualified immunity and Supremacy Clause immunity have different sources and functions, there is a functional similarity between these two doctrines."). Qualified immunity, like sovereign immunity, "reduce[s] the inhibiting effect that a civil suit or prosecution can have on the effective exercise of official duties by enabling government officials to dispose of cases against them." *Id.* It would be contradictory to say a TVPA claim cannot proceed against the federal government but still proceed against employees or contractors doing the government's work.

The federal government exerts greater control over GEO's performance than in other cases where a contractor enjoyed qualified immunity. As such, it can assert qualified immunity against Plaintiffs' TVPA claim.

### C.    Qualified Immunity Analysis

On the merits, Plaintiffs have the burden. *Medina*, 252 F.3d at 1128. Plaintiffs bear the "heavy burden" of demonstrating that GEO's actions violated a constitutional or statutory right that was clearly established at the time of its conduct. *See Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1208 (10th Cir. 2017). Plaintiffs cannot meet this requirement.

### 1.    Violation of Constitutional or Statutory Right

The first element of qualified immunity requires Plaintiffs to show that GEO violated the Constitution or a federal statute, here the TVPA. *See id.* Plaintiffs assert that they were compelled to participate in housekeeping without compensation and under threat of sanctions according to ICE's disciplinary scale. (Doc. 1 ¶¶ 73–74).

21

As the Supreme Court recognized in *Procunier v. Martinez*, 416 U.S. 396, 405 (1974), "courts are ill equipped to deal with the increasingly urgent problems of prison administration." It explained "the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible [to] resolution by decree." *Id.* at 404–05. Indeed, "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). Prison administration is, in addition, "a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." *Id.* at 85. Courts, of course, stand ready to ensure prisons respect their detainees' federal rights. *Id.* at 84. But they will not serve as a mechanism to nitpick or frustrate otherwise lawful administration.

In keeping with the deference given to prison administrators, the Tenth Circuit found a policy requiring detainees "to work as [] prison janitor[s] for pay below the federal minimum wage" did not violate any federal rights. *Dmytryszyn v. Hickenlooper*, 527 Fed. Appx. 757, 760 (10th Cir. 2013). Other circuits have similarly upheld prison housekeeping requirements. *See, e.g.*, *Blake v. Hall*, 668 F.2d 52, 59 (1st Cir. 1981) ("We do not mean to suggest that prison officials cannot require inmates to keep their cells ***and living space*** clean. This can be done by any combination of discipline and reward that is appropriate and does not violate the [E]ighth [A]mendment." (emphasis added)); *McGarry v. Pallito*, 687 F.3d 505, 514 (2d Cir. 2012) ("We are prepared to continue to assume that correctional institutions may require inmates to perform personally related housekeeping chores such as, for example, cleaning the areas in or around their cells, without violating the Thirteenth Amendment.")). Indeed, the First Circuit has even opined that "inmates who create unconstitutional conditions, or thwart

22

the efforts of prison administrators to keep prison conditions up to constitutional standards[] are [not] necessarily entitled to relief from the very conditions they themselves create." *Blake*, 668 F.2d at 59 n.4.

All of these precedents point to the fact that detention facilities routinely adopt rules—with attendant sanctions—requiring detainees to clean up their living areas as a method of ensuring a safe and sanitary environment. ICE has done just that in its housekeeping policy. All GEO contributed was implementing that policy and conveying it to detainees, which ICE also requires. (Additional Undisputed Fact #14). Doing so does not violate any federal law, including the TVPA.

### 2.    Clearly Established Right

"The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff." *Caldwell v. Univ. of N.M. Bd. of Regents*, 510 F. Supp. 3d 982, 1029 (D.N.M. 2020) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be indisputable and unquestioned." *Lobozzo v. Colo. Dep't of Corr.*, 429 F. App'x 707, 710 (10th Cir. 2011) (citation modified).

As the preceding discussion demonstrates, Plaintiffs do not have a claim against GEO under the TVPA, much less one that is clearly established. If anything, case law in the Tenth Circuit seems clear that the government cannot be sued under the TVPA. *See Mojsilovic*, 841 F.3d at 1134. And there is no precedent—*zero*—conclusively establishing that an agent of the government can be liable for implementing a federal housekeeping policy and conveying it to detainees. Therefore, even if Plaintiffs had a claim against GEO, the complete lack of precedent recognizing such a violation of the TVPA means that it is not clearly established, and Plaintiffs fail to overcome the high hurdle of qualified immunity's second prong.

23

### D.    Judgment on the Pleadings—Alternative Path to Relief

GEO is entitled to summary judgment for the foregoing reasons, but it also is entitled to judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  Rule 12(c) follows the standard used to analyze motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 n.2 (10th Cir. 2002).  The inquiry is confined to the pleadings and facts subject to judicial notice.  *See Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

Rule 12(c)'s limited scope means the Court cannot consider GEO's facility-specific handbook, the 2011 and 2013 versions of the ICE Detainee Handbook, and any of the evidence developed during discovery.  But the Court can take judicial notice of the federal regulations applicable to detention contractors in the 2000 NDS, 2008 PBNDS, 2011 PBNDS,[1] and GEO's contracts with ICE.[2]  Those documents are public records available on ICE's website and disclosed under the Freedom of Information Act.  They thus are sufficiently reliable for the purposes of Rule 201 of the Federal Rules of Evidence.  *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009); *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab. Litig.*, 288 F. Supp. 3d 1211–12 (D.N.M. 2017) (taking judicial notice of documents produced in response to a Freedom of Information Act disclosure).

---

[1] U.S. Immigr. & Customs Enf't, Performance Based National Detention Standards (2011) https://www.ice.gov/detain/detention-management/2011 (revised December 2016);.U.S. Immigr. & Customs Enf't, Performance Based National Detention Standards (2008) https://www.ice.gov/detain/detention-management/2008 (revised December 2011); U.S. Immigr. & Customs Enf't, National Detention Standards (2000) https://www.ice.gov/detain/detention-management/2000.

[2] *FOIA ICE Library*, U.S. Immigr. & Customs Enf't, (Dec. 07, 2022), https://www.ice.gov/doclib/foia/detFacContracts/HSCEDM11D00003_P00016_DenverCDF_Aurora CO.pdf; *FOIA ICE Library*, U.S. Immigr. & Customs Enf't, (Sept. 23, 2010), http://www.ice.gov/doclib/foia/contracts/hsceop06d00010geo.pdf; *FOIA ICE Library*, U.S. Immigr. & Customs Enf't, (July. 30, 2015), https://www.ice.gov/doclib/foia/contracts/GEO%20Group-%20HSCEDM12D00001.pdf.

Limiting the foregoing analysis to the judicially noticeable documents, there is still sufficient information to find GEO is entitled to qualified immunity. The contracts demonstrate ICE's direct supervision of GEO through on-site ICE officials, policy approvals, and regular audits. That supervision approved and required GEO to undertake the complained-of conduct through compliance with the NDS and later versions of the PBNDS. GEO thus is also entitled to judgment in its favor as to Plaintiffs' TVPA claim under Rule 12(c).

## VI. CONCLUSION

The Court should enter judgment in GEO's favor as to Plaintiffs' claim under the TVPA. Plaintiffs cannot carry their burden to overcome qualified immunity because they have no right to be free from housekeeping responsibilities without compensation. No court has ever recognized a claim under the TVPA in these circumstances, and this Court should not be the first.

Respectfully submitted this 6th day of April, 2026.

**GREENBERG TRAURIG LLP**

By: */s/ Dominic E. Draye*
    Dominic E. Draye
    2375 East Camelback Road, Suite 800
    Phoenix, Arizona 85016
    Telephone: (602) 445-8425
    Facsimile: (602) 445-8100
    Email: drayed@gtlaw.com

    David G. Palmer
    Naomi G. Beer
    1144 15th Street, Suite 3300
    Denver, Colorado 80202
    Telephone: (303) 572-6500
    Facsimile: (303) 572-6540
    Email: beern@gtlaw.com
    Email: palmerdg@gtlaw.com

**JENNINGS HAUG KELEHER MCLEOD
WATERFALL LLP**

Adrienne Scheffey
3300 East 1st Ave, Suite 590
Denver, Colorado 80206
Telephone: (720) 509-0273
Email: acs@jkwlawyers.com

*Attorneys for Defendant-The Geo Group, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2026, a copy of the foregoing document was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

By: */s/ Dominic E. Draye*
Dominic E. Draye