**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA,
on their own behalf and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OR JUDGMENT ON THE PLEADINGS**

---

1

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 8
PLAINTIFFS' RESPONSE TO GEO'S STATEMENT OF
  UNDISPUTED MATERIAL FACTS .......................................................................... 9
PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL
  FACTS ..................................................................................................................... 19
ARGUMENT .......................................................................................................................... 23
  I.  GEO's Motion, Filed Five and a Half Years After the Dispositive
    Motion Deadline Seeking Judgment on an Unpled Defense, Is
    Untimely. ................................................................................................ 23
    A.  Qualified Immunity Is a Waivable Defense and GEO
      Waived It ..................................................................................... 24
    B.  GEO Has Not Established Good Cause to Deviate from the
      Scheduling Order. ...................................................................... 28
    C.  GEO's Proposed Amendment Does Not Meet Any of Rule
      15's Requirements. .................................................................... 31
  II.  GEO Is Not Entitled to Qualified Immunity ......................................... 32
  III.  GEO's Qualified Immunity Defense Fails on the Merits ...................... 41
    A.  There Are Material Disputes of Fact As to Whether GEO
      Violated the Class Members' Statutory Rights ......................... 42
    B.  It Is Clearly Established that Civil Detainees Cannot Be
      Forced to Labor by Threatening them with Solitary
      Confinement ................................................................................ 44
  IV.  The Court Should Certify Any Appeal as Frivolous or Dilatory ........... 48
  V.  GEO Is Not Entitled to Judgment on the Pleadings ............................. 51
CONCLUSION ...................................................................................................................... 51

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*A.N. v. Syling*,
    928 F.3d 1191 (10th Cir. 2019) ................................................................................ 45, 45

*Ahmad v. Furlong*,
    435 F.3d 1196 (10th Cir. 2006) ...................................................................................... 24

*Apostol v. Gallion*,
    870 F.2d 1335 (7th Cir. 1989) ....................................................................................... 49

*Bentley v. Cleveland Cnty Bd. of Cnty Comm'rs*,
    41 F.3d 600 (10th Cir. 1994) .......................................................................................... 24

*Bijeol v. Nelson*,
    579 F.2d 423 (7th Cir. 1978) ............................................................................... 42, 44, 47

*Breen v. Pruter*,
    679 F. App'x 713 (10th Cir. 2017)................................................................................. 32

*Brown v. Flowers*,
    974 F.3d 1178 (10th Cir. 2020) ..................................................................................... 45

*Cassady v. Goering*,
    567 F.3d 628 (10th Cir. 2009) ....................................................................................... 25

*Castleglen, Inc. v. Resolution Tr. Corp.*,
    984 F.2d 1571 (10th Cir. 1993) ............................................................................... 31, 31

*Channer v. Hall*,
    112 F.3d 214 (5th Cir. 1997) ......................................................................................... 47

*Charbonneau v. Mortg. Lenders of Am., LLC*,
    No. 18 Civ. 2062, 2020 U.S. Dist. LEXIS 133292 (D. Kan. July 28, 2020).................... 29

*DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*,
    844 F.2d 714 (10th Cir. 1988) ....................................................................................... 39

*Eddy v. V.I. Water & Power Auth.*,
    256 F.3d 204 (3d Cir. 2001)........................................................................................... 25

*Edwards v. Grubbs*,
    169 F.4th 1261 (11th Cir. 2026) .................................................................................... 24

3

*Est. of Purdy v. Bd. of Cty. Comm'rs of Jefferson Cnty.,*
No. 25 Civ. 556, 2025 U.S. Dist. LEXIS 250740 (D. Colo. Dec. 4, 2025) ............... 48, 50

*Estate of Lockett by & through Lockett v. Fallin.,*
841 F.3d 1098 (10th Cir. 2016) ...................................................................... 38

*Estate of Jensen by Jensen v. Clyde,*
989 F.3d 848 (10th Cir. 2021) .................................................................. 38, 38

*Estrada v. Martin Marietta Materials,*
No. 20 Civ. 375, 2020 U.S. Dist. LEXIS 253670 (D. Colo. Oct. 5, 2020)...................... 31

*Evans v. Fogarty,*
241 F. App'x 542 (10th Cir. 2007) ............................................................... 8, 25

*Filarsky v. Delia,*
566 U.S. 377 (2012)....................................................................... 34, 35, 39, 39

*Franco v. Bd. of Cnty. Comm'rs for the Cnty. of Roosevelt,*
609 F. App'x 957 (10th Cir. 2015)................................................................... 38

*Gen. Steel Domestic Sales, LLC v. Chumley,*
840 F.3d 1178 (10th Cir. 2016) ...................................................................... 39

*GEO Group, Inc. v. Menocal,*
146 S. Ct. 774 (2026)............................................................................ 29, 31

*Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n,*
771 F.3d 1230 (10th Cir. 2014) ...................................................................... 29

*Harden v. Bodiford,*
442 F. App'x 893 (4th Cir. 2011)............................................................ 42, 44, 46

*Hause v. Vaught,*
993 F.2d 1079 (4th Cir. 1993) ....................................................................... 47

*Hayes v. Whitman,*
264 F.3d 1017 (10th Cir. 2001) ...................................................................... 31

*Heath v. Envision Mgmt. Holding,*
No. 21 Civ. 304, 2023 U.S. Dist. LEXIS 135294 (D. Colo. Aug. 3, 2023)...................... 27

*Heller v. Woodward,*
735 F. Supp. 996 (D.N.M. 1990) ..................................................................... 50

*Henricks v. Pickaway Corr. Inst.,*
782 F.3d 744 (6th Cir. 2015) ........................................................................ 25

*Herrera v. Santa Fe Pub. Schs.*,
    41 F. Supp. 3d 1027 (D.N.M. 2014) ................................................................ 38

*Hruska's Grocery Co. v. Hruska's Inc.,*
    No. 24 Civ. 769, 2026 U.S. Dist. LEXIS 3261 (D. Utah Jan. 7, 2026) ............ 30

*Jaszewski v. Kiniksa Pharms. Corp., No. 23 Civ. 2011*,
    2024 U.S. Dist. LEXIS 250246 (D. Colo. May 8, 2024)................................... 30

*Kerns v. Bader*,
    663 F.3d 1173 (10th Cir. 2011) ....................................................................... 42

*Kickapoo Tribe of Indians v. Kansas,*
    Nos. 92 Civ. 4233, 92 Civ. 4234, 1993 U.S. Dist. LEXIS 8148 (D. Kan.
    May 19, 1993)................................................................................................... 49

*Luizzi v. State Farm Mut. Auto. Ins. Co.*,
    No. 24 Civ. 3292, 2025 U.S. Dist. LEXIS 250742 (D. Colo. Dec. 4, 2025).... 46

*MacArthur v. San Juan Cty.*,
    495 F.3d 1157 (10th Cir. 2007) ....................................................................... 25

*Marks v. United States*,
    430 U.S. 188 (1977)......................................................................................... 29

*Martinez v. Turner*,
    977 F.2d 421 (8th Cir. 1992) ..................................................................... 42, 47

*Maye v. City of New Haven*,
    89 F.4th 403 (2d Cir. 2023) ............................................................................ 24

*McCullum v. Tepe*,
    693 F.3d 696 (6th Cir. 2012) ........................................................................... 38

*McGarry v. Pallito*,
    687 F.3d 505 (2d Cir. 2012)......................................................... 44, 46, 46, 48

*Minter v. Prime Equip. Co.*,
    451 F.3d 1196 (10th Cir. 2006) ....................................................................... 31

*Mullenix v. Luna*,
    577 U.S. 7 (2015)............................................................................................. 45

*Packard v. Budaj*,
    86 F.4th 859 (10th Cir. 2023) ......................................................................... 41

*Painter v. Wells Fargo Bank, N.A.,*
    No. 07 Civ. 395, 2008 U.S. Dist. LEXIS 130223 (D.N.M. Oct. 28, 2008)............... 26, 27

*Poitra v. Sch. Dist. No. 1,*
    No. 14 Civ. 887, 2015 U.S. Dist. LEXIS 153284 (D. Colo. Oct. 21, 2015)..................... 30

*Reavis ex rel. Est. of Coale v. Frost*,
    967 F.3d 978 (10th Cir. 2020) ...................................................................................... 24

*Reiskin v. Greyhound Lines, Inc.,*
    No. 20 Civ. 2605, 2021 U.S. Dist. LEXIS 259347 (D. Colo. Nov. 16, 2021).................. 32

*Richardson v. McKnight*,
    521 U.S. 399 (1997)............................................................................................... *passim*

*Rosewood Services, Inc. v. Sunflower Diversified Services, Inc.,*
    413 F.3d 1163 (10th Cir. 2005) ..................................................................................... 37

*Sales v. Grant*,
    224 F.3d 293 (4th Cir. 2000) ........................................................................................ 25

*Scherbarth v. Woods,*
    No. 16 Civ. 2391, 2020 U.S. Dist. LEXIS 55786 (D. Colo. Mar. 31, 2020).................... 41

*Stewart v. Donges*,
    915 F.2d 572 (10th Cir. 1990) ................................................................................ 48, 50

*Tanner v. McMurray,*
    989 F.3d 860 (10th Cir. 2021) ................................................................................. 8, 37

*Templeton v. Anderson*,
    No. 12 Civ. 1276, U.S. Dist. LEXIS 41309 (D. Colo. Mar. 25, 2013)............................ 41

*Tesone v. Empire Mktg. Strategies*,
    942 F.3d 979 (10th Cir. 2019) ............................................................................ 28, 29, 30

*Tourscher v. McCullough*,
    184 F.3d 236 (3d Cir. 1999)......................................................................................... 47

*United States v. Kaufman*,
    546 F.3d 1242 (10th Cir. 2008) ................................................................................ 43, 48

*Williams v. Adams*,
    85 Mass. 171 (1861) .................................................................................................... 36

*Wong Wing v. United States*,
    163 U.S. 228 (1896)...................................................................................................... 46

*Zimmerman v. Univ. of Utah,*
    No. 13 Civ. 1131, 2018 U.S. Dist. LEXIS 232039 (D. Utah June 18, 2018) ................... 27

**STATUTES**

8 U.S.C. § 1555 ................................................................................................................. 18

18 U.S.C. § 1589 ............................................................................................................... 48

28 U.S.C. § 1292 ............................................................................................................... 28

42 U.S.C. § 1983 ............................................................................................................... 46

**FEDERAL RULES**

Fed. R. Civ. P. 8 ............................................................................................................... 25

Fed. R. Civ. P. 12 ............................................................................................................. 46

Fed. R. Civ. P. 15 ............................................................................................................. 31

Fed. R. Civ. P. 16 ............................................................................................................. 28

**OTHER AUTHORITIES**

Philip Wang, *ICE's Largest Prison Contractors Hail 'New Growth Opportunities' as Revenue Reaches All-Time High*, Time (Feb. 12, 2026, at 3:14 pm MT), https://time.com/7378284/ice-immigration-detention-contractors-record-revenue/ ................................................................................................................... 34

## **INTRODUCTION**

GEO's motion is calculated to derail trial by launching a third interlocutory appeal twelve years into this litigation, based on a defense GEO never pled.  On that basis alone, the Court should, after denying GEO's motion, certify that any appeal from that denial would be frivolous and dilatory, and proceed with trial.  *See* § IV, *infra*.

GEO has flimsy excuses for waiting twelve years to assert qualified immunity, none of which justify a late or constructive amendment of the pleadings.  The Court should deem the defense waived, recognizing that GEO is flat wrong that qualified immunity is "non-waivable."  Mot. 8.  Inconclusive comments by a lone Supreme Court Justice in a concurrence nobody joined do not work a change in the law that would excuse GEO's dilatory conduct.

And, in any event, GEO is not entitled to qualified immunity.  GEO's own employees do not get qualified immunity.  *See Richardson v. McKnight*, 521 U.S. 399 (1997).  A medical provider hired by the government to work alongside GEO in a detention center would not get qualified immunity.  *See Tanner v. McMurray*, 989 F.3d 860, 861 (10th Cir. 2021).  It is thus difficult to understand how GEO is entitled to it.  And even if it were, there are clear disputes of fact about whether GEO forced detainees to do work that went beyond personal housekeeping – a clearly established legal distinction – making summary judgment inappropriate.

Qualified immunity "is not a parachute to be deployed only when the plane has run out of fuel." *Evans v. Fogarty*, 241 F. App'x 542, 550 n.9 (10th Cir. 2007).  From top to bottom, GEO's motion is frivolous and should be treated as such.  After twelve years, Plaintiffs deserve their day in court – not procedural gamesmanship.

## PLAINTIFFS' RESPONSE TO GEO'S STATEMENT OF
## UNDISPUTED MATERIAL FACTS

1.      The United States Immigration and Customs Enforcement ("ICE") is part of the Department of Homeland Security ("DHS") and charged with enforcing immigration laws. *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 6 (Admitted Fact #1)).

- Plaintiffs' response: Admit.

2.      Part of this duty includes detaining aliens suspected of entering the United States unlawfully. Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense; (Doc. 298 at 7 (Admitted Fact #3)).

- Plaintiffs' response: Admit.

3.      Pursuant to this directive, ICE contracts with GEO to house detainees in GEO-owned facilities throughout the country. Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense; (Doc. 298 at 8 (Admitted Fact #6)).

- Plaintiffs' response: Admit.

4.      This case concerns GEO's facility in Aurora, Colorado: the Aurora Immigration Processing Center (the "AIPC"). Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense; (Doc. 298 at 8 (Admitted Fact #7)).

- Plaintiffs' response: Admit.

5.      GEO operated the AIPC under contracts with ICE during the ten years at issue—from October 22, 2004, to October 22, 2014. Plaintiffs' Response in Opposition to Defendant's

9

Cross-Motion for Summary Judgment on Defendant's Affirmative Defense; (Doc. 298 at 8 (Admitted Fact #9)).

- Plaintiffs' response: Admit that GEO owns and continually operated AIPC under contracts with ICE from October 22, 2004 to October 22, 2014.

6.      GEO's contract incorporated and required compliance with ICE's Performance Based National Detention Standards ("PBNDS") and its predecessor National Detention Standards ("NDS"). Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense; (Doc. 298 at 9–13 (Admitted Facts #11–14, #16, #18)).

- Plaintiffs' response: Admit that GEO's various contracts between 2004 and 2014 incorporated some version of either the NDS or the PBNDS, but as stated in contract HSCEDM-11-D-00003, "these constraints may change over time" and "the Contractor" (i.e. GEO) is responsible for remaining "knowledgeable of any changes to the constraints and perform[ing] in accordance with the most current version of the constraints.  ECF No. 262-2 at 37-38.

7.      The 2008 PBNDS stated: "[A]ll detainees are responsible for personal housekeeping. Detainees are required to maintain their immediate living areas in a neat and orderly manner." Operations Manual ICE Performance Based National Detention Standards (PBNDS) (2008); (Doc. 261-9 at 61).

10

- Plaintiffs' response: Dispute. GEO omits the remainder of the second sentence it cites. The complete sentence reads: "[D]etainees are required to maintain their immediate living areas in a neat and orderly manner *by*:

  - making their bunk beds daily,

  - Stacking loose papers,

  - Keeping the floor free of debris and dividers free of clutter, and

  - Not hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture. ECF No. 261-9 at 61-62 (emphasis added).

8.      The 2011 PBNDS provided: "Detainees are required to maintain their immediate living areas in a neat and orderly manner." Performance-Based National Detention Standards 2011; (Doc. 261-8 at 51).

- Plaintiffs' response: Dispute. GEO omits the remainder of the second sentence it cites. The complete sentence reads: "[D]etainees are required to maintain their immediate living areas in a neat and orderly manner *by*:

  - making their bunk beds daily,

  - Stacking loose papers,

  - Keeping the floor free of debris and dividers free of clutter, and

  - Not hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture. ECF No. 261-8 at 51 (emphasis added).

11

9.      The ICE National Detainee Handbook, in effect at the time of the 2011 AIPC contract, includes the following explanation of detainees' obligations to clean assigned living areas: "You are not entitled to compensation for tasks that involve maintaining your personal area or cleaning up after yourself in general use areas. You are required to perform basic cleaning tasks within your living unit, regardless of where you are held." National Detainee Handbook (2011); (Doc. 51-3 at 19).

- Plaintiffs' response: Admit that the cited document contains the quoted text. For completeness, Plaintiffs add that the Handbook goes on to say, "For example, you could be disciplined if you refuse to make your bed or otherwise refuse to clean up after yourself." ECF No. 51-3 at 19 (emphasis added).

10.     Similarly, the 2013 version of the ICE National Detainee Handbook explains to detainees that they must clean their living area and common areas: "Will I get paid for keeping my living area clean? No, you must keep areas that you use clean, including your living area and any general use areas that you use. If you do not keep your areas clean, you may be disciplined." National Detainee Handbook (2013); (Doc. 310-1 at 18).

- Plaintiffs' response: Admit that the cited document contains the quoted text. For completeness, Plaintiffs add that the Handbook also directs detainees to consult policies created by GEO, stating, "It is up to you to know the rules for the work program.  Also see your facility's local rules."  ECF No. 310-1 at 18.

11.     The federal government also requires GEO to prepare a facility-specific handbook, which ICE reviews and approves before requiring GEO to provide it to every detainee. Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary

Judgment on Defendant's Affirmative Defense; (Doc. 298 at 14 (Admitted Fact #20), 16 (Admitted Fact #25)).

- Plaintiffs' response: Dispute. The cited admissions do not support GEO's statement.  Plaintiffs admit that the federal government required GEO to notify detainees, in the local detainee handbook, of the ICE-mandated disciplinary severity scale. See ECF 298 at 14 (Admitted Fact #20). Plaintiffs admit that facility-level policies, including the facility-specific handbook, are developed by local GEO employees and then reviewed and cleared by the ICE Contracting Officer's Technical Representative ("COTR"). ECF No. 271-11 (Ragsdale 30(b)(6) Dep. at 39:3-6).

12.    The AIPC Handbook provides the following explanation of detainees' housekeeping obligations:

> Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate.
>
> \* \* \*
>
> Day rooms are open spaces in the housing units that are utilized for watching television, playing board games, dominos or cards, as well as for socializing among detainees. Tables with chairs are provided for your use in the dayroom.
>
> All detainees in a housing unit are required to keep clean and sanitary all commonly accessible areas of the housing unit including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs.
>
> \* \* \*
>
> Detainees will take turns cleaning the area . . . If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean will result in further disciplinary action.

*Aurora ICE Detainee Handbook Local Supplement*; (Doc. 261-17 at 20).

- Plaintiffs' response: Admit that the quoted text appears in the cited document, alongside other immaterial statements. Plaintiffs note that GEO's quotation omits certain material and formatting, with the result that the quoted matter is misleading. Plaintiffs reproduce the complete text as it appears in the document below.

## HOUSING UNIT SANITATION

Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate. The assigned Housing Unit Officer will be responsible for assuring this general cleanup is done on a regular basis.

## DAY SPACE

Day rooms are open spaces in the housing units that are utilized for watching television, playing board games, dominos or cards, as well as for socializing among detainees. Tables with chairs are provided for your use in the dayroom.

All detainees in a housing unit are required to keep clean and sanitary all commonly accessible areas of the housing unit, including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs.

Detainees will take turns cleaning the area. If a detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit officer of the problem. Action will be taken to resolve this problem.

The day room area will be kept clean at all times. Should an officer notice that the area is not clean, the officer will make available necessary cleaning supplies. If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean the area will result in further disciplinary action.

13.     ICE regularly audits the materials provided to detainees at intake, including the AIPC Handbook, and GEO has passed every audit since 2004. Plaintiffs' Response in

14

Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense; (Doc. 298 at 21 (Admitted Fact #37)).

- Plaintiffs' response: Admit; however, the audit reviews only whether the orientation includes sections covering: "Unacceptable activities and behavior and corresponding sanctions; How to contact ICE; The availability of pro bono legal services, and how to pursue such services; Schedule of programs, services, daily activities, including visitation, telephone usage, mail service, religious programs, count procedures, access to and use of the law library and the general library; sick-call procedures, etc., and the detainee handbook." ECF No. 273-6 at 3 (10/5/2007), 12 (10/22/2009), 26 (10/21/2010), 38 (9/29/2011).

14.    On-site ICE officials further review and approve all GEO policies. Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense; (Doc. 298 at 16 (Admitted Fact #25)).

- Plaintiffs' response: Admit that GEO's written policies are reviewed and approved by an on-site official called the Contracting Officer's Technical Representative ("COTR"). ECF No. 261-16 (Nelson Tr.) 150:22-151:2).

15.    ICE also dictates sanctions applicable to detainees who refuse to comply with the federal housekeeping requirements: GEO "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section." Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense; (Doc. 298 at 14 (Admitted Fact #19)); (Doc. 336 at 12 (Admitted Facts #12–14)).

- Plaintiffs' response: Admit that ICE requires GEO to adopt, without changing, the offense categories and disciplinary sanctions set forth in this section; Plaintiffs dispute the characterization in the first sentence above, which implies that GEO's policies are the same as "federal housekeeping requirements."  See also Mot. at 23 (inaccurately claiming that GEO "implement[ed] a federal housekeeping policy").

16.     The disciplinary scale in question classifies "[r]efusal to clean assigned living area" as a "high-moderate" offense for which ICE prescribes a program of 13 sanctions, including "Disciplinary Segregation (up to 72 hours)." Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense; (Doc. 336 at 12 (Admitted Facts #12, #13)).

- Plaintiffs' response: Admit.

17.     On-site ICE officials implemented and enforced the disciplinary scale by telling named Plaintiff Demetri Valerga he could be placed in segregation if he did not clean his own common area. Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense; (Doc. 298 at 22–23 (Admitted Fact #41)).

- Plaintiffs' response: Admit the events stated above; however, Plaintiffs dispute that the ICE officers onsite at Aurora were authorized to condone acts that deviate from the requirements of the Contract, as GEO's implementation of the Housing Unit Sanitation Policy does. ECF No. 261-2 (A. Martin Dep. 198:22-199:10); ECF No. 287-6 (A. Martin Dep. 81:22-82:13); ECF No. 297-2 at 3-4 (Contracting Officer's Representative ("COR") Appointment Letter)

(listing functions and actions the COR "shall not" undertake, including "direct

the contractor . . . to operate in conflict with the contract terms and

conditions" and "[c]hange or modify any of the terms and conditions . . . of a

contract").

18.    Unlike housekeeping, the federally mandated VWP is, as its name suggests,

voluntary—voluntary, that is, for detainees; GEO is required to offer the program under Section

5.8 of the PBNDS because the government has determined that an opportunity for work reduces

idleness and improves discipline. Plaintiffs' Response in Opposition to Defendant's Cross-

Motion for Summary Judgment on Defendant's Affirmative Defense; (Doc. 298 at 24 (Admitted

Fact #42)).

- Plaintiffs' response: Admit that the 2000 NDS and all applicable versions of

  the PBNDS require that GEO provide detainees the opportunity to participate

  in a VWP.  See ECF 298 at 24 (Admitted Fact #42). Plaintiffs dispute GEO's

  incomplete statement about the government's rationale for mandating the

  VWP, for which it fails to cite any evidence.

19.    For most of the timeframe relevant to this lawsuit, the PBNDS directed that the

stipend for participants in the VWP "is $1 per day."  2000 National Detention Standards for

Non-Dedicated Facilities; (Doc. 261–10 at 5).

- Plaintiffs' response: Admit except for GEO's use of the phrase "directed that,"

  which implies that the quoted statement in the PBNDS is an instruction about

  how GEO must pay VWP workers, as opposed to a statement about the

  amount that ICE would reimburse GEO for VWP labor.  ECF No. 261-2 (A.

17

Martin Dep. 106:6-107:22).  Plaintiffs also note that GEO was required to comply with the 2008 PBNDS when they were published, although the quoted text is nearly identical in both the 2000 NDS and the 2008 PBNDS.  See ECF 261-9 at 63 (2008 PBNDS) ("the compensation is $1.00 per day").

20.    Beginning on June 23, 2013, the AIPC contract required compliance with the 2011 PBNDS, which states that participants in the VWP will be compensated "at least $1.00 (USD) per day." 2013 ICE-GEO Contract Modification; (Doc. 271-4 at 2–3).

- Plaintiffs' response: Admit the quoted content of the document, and that the 2011 PBNDS was formally incorporated into the Contract on June 23, 2013. Plaintiffs dispute GEO's implication that the option to pay more than $1 per day did not exist prior to it formally agreeing to incorporate portions of the 2011 PBNDS into its contract.  GEO had an obligation under the relevant contract to be "knowledgeable of any changes to the [PBNDS] and perform in accordance with the most current version of the [PBNDS]."  ECF No. 262-2 at 37-38.  In addition, GEO can and does request modifications of the Contract when it needs to.  ECF No. 261-2 (A. Martin Tr. 106:8-108:10).  GEO did not request a contract modification to pay detainees more than $1.00 per day.  Id. at 105:3-12.

21.    At its own facilities, ICE pays exactly $1 per day, which is precisely the amount Congress appropriates to reimburse contractors like GEO. See 8 U.S.C. § 1555(d); Publ. L. No. 95-431, 92 Stat. 1021 (1978).

- Plaintiffs' response: Dispute. GEO offers no evidence as to what ICE actually pays at its own facilities.

**PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

1. GEO is a for-profit company publicly traded on the New York Stock Exchange. Declaration of Michael J. Scimone ("Scimone Decl.") Ex.1 (GEO Group, Inc. Form 10-K); Scimone Decl., Ex. 2 (Deposition of Charles Hill ("Hill Dep.")) 19:22-20:7 ("A: Because it's a publicly traded company, we have to project our earning[s] to the Street . . . . Q: By the 'Street,' you mean 'Wall Street'? A: Wall Street, yes.").

2. During the class period, GEO earned revenues in excess of $1.5 billion per year. Scimone Decl., Ex. 1 (GEO Group, Inc. Form 10-K) at 53.

3. GEO derives this revenue from contracts with federal, state, and local government entities to operate and manage prisons, detention centers, and reentry facilities. *Id.* at 3.

4. GEO develops and operates facilities "based on contract awards, using our project development expertise and experience to design, construct and finance what we believe are state-of-the-art facilities that maximize security and efficiency." *Id.*

5. In order to win a detention center management contract from the federal government, GEO has to prevail in a competitive bidding process. Scimone Decl., Ex. 3 (Deposition of David Venturella ("Venturella Dep.")) 145:8-146:10; Hill Dep. 116:5-10.

6. Factors the government considers when evaluating bids on a detention center contract include price, technical specifications, and past performance. Scimone Decl., Ex. 4 (Deposition of Brian Evans ("Evans Dep.")) 25:16-26:6.

19

7.    When it bids on a contract, GEO develops a pricing model based on the requirements of the RFP to analyze the requirements for personnel, the facility, and the cost of operations from food service to supplies to maintenance.  This pricing is developed by a specialized Pricing Department in GEO's corporate office, which bases its projections on historical experience operating similar facilities.  Hill Dep. 23:18-24:23.

8.    GEO's Pricing Department is part of its larger Proposal Development Group.  The pricing process also involves GEO's regional offices, its corporate business managers, and are ultimately approved by GEO's Chief Financial Officer and Chief Executive Officer.  Hill Dep. 25:2-10.

9.    From time to time, GEO may request an "equitable adjustment" to its contract price when underlying assumptions change.  This involves a GEO officer in the company's regional office, corporate office, or at the facility level calculating the financial impact of the changed assumption, and this projection is then reviewed by multiple people, which may include GEO's business department, Operations Department, or contract administration department.  *Id.* 31:17-33:12.

10.    Facilities like GEO's Aurora ICE Processing Center employ personnel in multiple departments.  These include an Executive office and business support, maintenance, and personnel on three shifts so that the facility can operate 24 hours a day.  GEO staffs the facility with sufficient "relief" personnel so that if an employee is absent, GEO can "backfill" the position.  It calculates that staffing on the basis of full-time equivalents, i.e. a person working 40 hours per week.  *Id.* 89:13-92:15.

11.     GEO's staffing process takes account of all services required by the government contract, as well as "corporate requirements which are your executive staff business support," such as, for example, human resources and payroll.  Pricing also incorporates the experience of specialized operations, such as the Health Service Department and the Food Service Department *Id*. 94:19-98:9.

12.     During the time period prior to 2015, ICE contracts for immigration detention facilities almost always went to the lowest priced bidder unless they had an unsatisfactory performance record.  Scimone Decl., Ex. 4 (Deposition of David Venturella ("Venturella Dep.")) 152:22-154:16.  In some instances, the federal government will award a contract to an entity that is not the lowest bidder if that entity's past performance of government contracts is of higher quality than its competitors.  Evans Dep. 26:2-6.

13.     GEO takes this into account in structuring its business, which is "based on the fact that we can deliver as good or better-quality services at the same price or lower cost than the government can."  Evans Dep. 50:19-21.

14.     The 2011 Contract for operating the Aurora Facility was a two-year contract with multiple two-year option periods; ICE could choose to end the contract and hire a different contractor after each two-year period.  Hill Dep. 43:10-44:13.

15.     GEO must perform well under the contract and keep its prices reasonable or risk the government declining to renew the contract or declining to exercise an option period to extend the contract.  Hill Dep. 43:10-44:13; 117:5-14.

16.     Throughout the relevant period, GEO's contract with ICE required it to carry liability insurance.  Scimone Decl, Ex. 5 (2011 Contract); Ex. 6 (2006 Contract); Ex. 7 (2003 Contract).

17.     GEO competes for facility management contracts with other detention center contractors.  Evans Dep. 17:1-16.

18.     CoreCivic, Inc. is GEO's largest competitor in the prison/detention center management industry.  *Id*. 16:21-17:3.

19.     Detainees assigned to a housing detail under GEO's sanitation policy were required to "clean the rec yard, wipe the []phones, clean the microwave, change the garbage bag, clean the showers, disinfect the showers, [and] pick up all the trash, like the toothpaste [and] the shampoo bottles" in an 80-person housing pod (or a 48-person dormitory).  ECF No. 299-2 (Excerpts of Deposition of Hugo Hernandez) at 15-16.

20.     GEO's guards told detainees to "Clean, because you're going to the hole." ECF No. 336-14 (Excerpts of Deposition of Grisel Xahuentitla) at 12.

21.     The Housing Unit Sanitation Policy, which required this cleaning beyond personal housekeeping, was not created by ICE nor is it required by GEO's contract with ICE. ECF 261-7 (Declaration of Shannon Ely) ¶ 22.

22.     GEO's Aurora facility-level policies are developed by local GEO employees, who review and amend the policies annually.  ECF No. 261-11 (K. Martin Dep.) 51:22-25, 64:17-23; ECF No. 261-12 (Ceja 30(b)(6) Dep.) 33:22-34:1.

23.     ICE maintains an onsite official at the Aurora Facility called the Contracting Officer's Technical Representative ("COTR") to oversee GEO's performance under the contract

in a limited capacity.  The COTR cannot "make commitments, modifications, or other actions, which would commit the Government to a change in price, performance, quality, quantity, or delivery."  ECF No. 297-2 at 3.  Nor can the COTR "provide guidance to the contractor . . . which might be interpreted as a change in the scope or terms of the contract."  *Id.*  The COTR also cannot "direct the contractor . . . to operate in conflict with the contract terms and conditions."  *Id.* at 4.  The COTR's role is to "[r]eview technical proficiency and compliance against the technical provisions of the contract, and verify the performance of work by the contractor."  *Id*.

24.     GEO did not adopt the disciplinary scale stated in the PBNDS into its facility handbook verbatim.  ECF No. 298 at 16, Plaintiffs' Response to SUMF ¶ 24.

25.     Detainees at the Aurora Facility are not detained as punishment or as a sentence for a crime; rather they are held awaiting resolution of their deportation proceedings.  Venturella Dep. 130:22-131:19 (Aurora detainees' detention was "not punitive, it's not for punishment, it's not for rehabilitation, it[']s only to detain them while they are going through this process in the least restrictive setting"); Scimone Decl, Ex. 8 (Deposition of Daniel Ragsdale ("Ragsdale Dep.")_ 124:3-8 ("They are not sentenced prisoners . . . . it's a legal distinction but to some degree it's, I think, a meaningful one").

## **ARGUMENT**

**I.     GEO's Motion, Filed Five and a Half Years After the Dispositive Motion Deadline Seeking Judgment on an Unpled Defense, Is Untimely.**

Five and a half years after the deadline to complete discovery and file dispositive motions, GEO asks the Court to grant it summary judgment (or, in the alternative, judgment on the pleadings) on a qualified immunity claim that it never pled or otherwise raised during more

than a decade of litigation.  Qualified immunity, GEO is quick to point out, would allow it "to

avoid the burdens of trial" if granted.  Mot. at 2.  In practice, this means GEO will take another

trip to the Court of Appeals – its third in this case – if the Court denies GEO's motion, as it

should.  *See Reavis ex rel. Est. of Coale v. Frost*, 967 F.3d 978, 984 (10th Cir. 2020) ("An order

denying qualified immunity from suit, to the extent that it turns on an issue of law, is an

immediately appealable decision under the collateral order doctrine.").  GEO is not entitled to

qualified immunity, so this will waste at least a year before landing the case back where it is

now.  The Court should not tolerate GEO's gamesmanship 12 years into the litigation, with trial

on the horizon.

It may deny GEO's motion as untimely because GEO (1) waived qualified immunity by

not pleading or asserting it in litigation; (2) failed to establish good cause to deviate from the

scheduling order under Rule 16 because there is no intervening change in law; and/or (3) did not

meet Rule 15's criteria to amend a pleading as doing so at this stage would be prejudicial, in bad

faith, and unduly delayed.

## A.    Qualified Immunity Is a Waivable Defense and GEO Waived It.

"[B]oth qualified and absolute immunity are affirmative defenses that must be pleaded"

and can be waived.  *Bentley v. Cleveland Cnty Bd. of Cnty Comm'rs*, 41 F.3d 600, 604-05 (10th

Cir. 1994); *see also Ahmad v. Furlong*, 435 F.3d 1196, 1201 (10th Cir. 2006) ("Since qualified

immunity is a defense, the burden of pleading it rests with the defendant.") (citation omitted);

*Edwards v. Grubbs*, 169 F.4th 1261, 1275 (11th Cir. 2026) ("Qualified immunity, in other

words, is an affirmative defense that may be waived . . . it must be pled, and if it is not, it is

deemed waived.") (internal quotations and citations omitted); *Maye v. City of New Haven*, 89

F.4th 403, 407 (2d Cir. 2023) ("[Q]ualified immunity, unlike subject matter jurisdiction, is an

affirmative defense that can be waived."); *Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 750-

51 (6th Cir. 2015) (where defendants failed "to plead qualified immunity and were very tardy in

raising the defense, the district court did not abuse its discretion in presuming prejudice to [the

plaintiff] and finding waiver"); *Sales v. Grant*, 224 F.3d 293, 296 (4th Cir. 2000) (finding

"defendants waived their right" to "their claim of qualified immunity" where they failed to state

the basis for the claim in their answer and did not raise it in dispositive motions);[1] *see also* Fed.

R. Civ. P. 8(c) (affirmative defenses must be stated in response to a pleading).

GEO has waived qualified immunity. When considering whether qualified immunity is

waived, "the Court must inquire whether [1] the defendants violated any scheduling orders in

raising the defense for the first time in their summary judgment motions, [2] whether they

delayed asserting the defense for tactical purposes or any improper reason, and, most important,

[3] whether the delay prejudiced the plaintiff's case." *Eddy v. V.I. Water & Power Auth.*, 256

F.3d 204, 210 (3d Cir. 2001). Each of those factors counsels in favor of finding waiver.

---

[1]      GEO's cases are not to the contrary and none stand for the proposition that qualified
immunity is unwaivable. *See Cassady v. Goering*, 567 F.3d 628, 634 (10th Cir. 2009)
(permitting appeal of summary judgment order denying qualified immunity where the defense
was *properly* raised in timely summary judgment motion); *MacArthur v. San Juan Cty.*, 495 F.3d
1157, 1162 (10th Cir. 2007) (declining on appeal to find waiver of qualified immunity where
plaintiff's waiver argument consisted of "four sentences without the support of any relevant
authority and without any reasoned argument"). *Evans v. Fogarty* actually supports Plaintiffs'
position, finding that defendants who asserted qualified immunity in a motion to dismiss and lost
waived the defense when they failed to assert it further in "their motions for summary judgment,
the pretrial order, or in their oral motions for JMOL at the close of the plaintiffs' case." 241 F.
App'x 542, 550 n.9 (10th Cir. 2007).

*First*, there can be no doubt that GEO violated the scheduling order by asserting this defense nearly six years after the deadline for dispositive motions passed.  The "availability of the [qualified immunity] defense at various stages of litigation does not afford [defendants] 'carte blanche' to ignore or disregard case management deadlines imposed by the Court," and "the Court may refuse to entertain untimely summary judgment motions, even those that raise qualified immunity."  *Painter v. Wells Fargo Bank, N.A.*, No. 07 Civ. 395, 2008 U.S. Dist. LEXIS 130223, at *8-9 (D.N.M. Oct. 28, 2008).

*Second*, GEO's late assertion of this defense has all the appearance of a tactical maneuver meant to further delay a trial on the merits after 12 years of litigation.  With its most recent interlocutory appeal finally resolved after years of delay, and trial on the horizon, GEO now asserts a brand-new defense to create an immediately appealable collateral order it can use to prevent trial from going forward.  GEO does not conceal its objective: it filed a motion in the Tenth Circuit asking the panel that heard its prior appeal to retain jurisdiction over the case because an "additional appeal is likely in the coming months," including from its motion for "summary judgment based on qualified immunity, which [GEO claims] Justice Alito's concurring opinion noted permits the collateral-order appeal that GEO previously sought under the *Yearsley* doctrine."  *Menocal v. The GEO Group, Inc.*, No. 22-1409 (10th Cir.), ECF No. 114.  And this motion is equally transparent; GEO explains that its goal is "to avoid the burdens of trial" (read: obtain a third interlocutory appeal) and gives only cursory treatment to the qualified immunity analysis itself.  ECF No. 450 at 10.  GEO is more interested in delay, obstruction, and gamesmanship than it is in good-faith legal argument.

*Third*, GEO's decision to raise this defense now, on the eve of trial, for the first time, is prejudicial to Plaintiffs. GEO did not plead the defense in its Answer, ECF No. 26, nor did it raise the defense in any of the six dispositive motions it filed in this case prior to this one, including two summary judgment motions. ECF Nos. 284, 305. Instead, GEO raised the defense for the first time nearly six years after the dispositive motion deadline passed and discovery closed, as the Parties are working towards scheduled pretrial deadlines. The conduct in this case occurred between 2004 and 2014, and further delay exacerbates the already serious risk of fading witness memories and inability to find class members, some of whom were deported more than a decade ago. *See Heath v. Envision Mgmt. Holding*, No. 21 Civ. 304, 2023 U.S. Dist. LEXIS 135294, at *12 (D. Colo. Aug. 3, 2023) (delay causing "faded witness memories, stale evidence, and delayed outcomes" is prejudicial to plaintiffs).

Until GEO filed this motion, Plaintiffs had no notice at any point in this 12-year litigation that GEO intended to raise qualified immunity, and the Parties proceeded through discovery and dispositive motion practice without the faintest consideration of this defense. This course of action is prejudicial to Plaintiffs and the Court as "[o]nce the dispositive motion deadline passed without a [qualified immunity] motion from Defendants, the Court and Plaintiff[s] were entitled to assume that a motion raising qualified immunity would not be forthcoming, and to plan accordingly." *See Painter*, 2008 U.S. Dist. LEXIS 130223, at *9-10 ("To permit the [] Defendants to raise the defense by summary judgment motion, with impunity, after the dispositive motion deadline has passed would be tantamount to holding that only the Plaintiff must adhere to case management deadlines, while [the] Defendants are free to ignore them."); *Zimmerman v. Univ. of Utah*, No. 13 Civ. 1131, 2018 U.S. Dist. LEXIS 232039, at *11 (D. Utah

27

June 18, 2018) (defendant "waived qualified immunity as an affirmative defense and cannot now raise it" in a summary judgment motion filed after the dispositive motion deadline where it was "not raised in the defendants' answer").

Plaintiffs are further prejudiced by the fact that they have already waited four years for appellate courts to resolve GEO's prior appeal of this Court's *Yearsley* denial.  If GEO really believed it was entitled to qualified immunity (a dubious proposition, for multiple reasons explored below), it could have made that argument in connection with the *Yearsley* defense and sought appellate review of *both* theories during its 2022-2026 appeal.[2]  Litigation is not a game of "go fish," where a litigant whose defense is rejected by an appeals court may try different approaches *seriatim* until something sticks.  Nor is that approach fair to Plaintiffs who have waited four years for GEO's first bite at the apple to be rejected.

GEO asserted qualified immunity well after the deadline, for tactical purposes.  To permit it to raise the defense now will prejudice Plaintiffs.  GEO has waived the defense.

### B.    GEO Has Not Established Good Cause to Deviate from the Scheduling Order.

A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).  "In practice, this [good cause] standard requires the movant to show the scheduling deadlines cannot be met despite the movant's diligent efforts."  *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 988 (10th Cir. 2019) (internal quotations and citation omitted).

---

[2]    This litigation behavior is consistent with GEO's failure to seek certification of the *Yearsley* denial under 28 U.S.C. § 1292(b) until *after* an interlocutory appeal under the collateral-order doctrine was conclusively rejected by the Supreme Court; in both instances, GEO sought the less efficient path by fully exhausting one avenue of relief before even attempting an alternative that it otherwise could have pursued in tandem.

In assessing whether there is good cause to amend the scheduling order, among other things, courts ask whether the moving party "learn[ed] new information through discovery or if the underlying law has changed." *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014). Courts also evaluate whether the amendment to the scheduling order would cause "prejudice to the party opposing the modification." *Tesone*, 942 F.3d at 988 (internal quotations and citation omitted).

Despite GEO's claims to the contrary, there has been no change in law. GEO's argument centers on a footnote in Justice Alito's solo concurrence. But a footnote in a concurring opinion signed by a single Justice does not create or change law. *See Marks v. United States*, 430 U.S. 188, 193 (1977) (a result that "enjoys the assent of five Justices" or more is controlling).

Nor does the concurring footnote support GEO's reading of it. Justice Alito's footnote says the Supreme Court "*has not decided* whether corporate-contractor defendants like GEO Group may invoke qualified immunity." *GEO Group, Inc. v. Menocal*, 146 S. Ct. 774, 792 n.* (2026) (emphasis added). It does not affirm (or even suggest) that GEO is *entitled* to qualified immunity. To the contrary, it reinforces that "this Court has held that 'private prison guards' *may not* [assert qualified immunity] in [§ 1983] cases." *Id.* (emphasis added).[3] This is not enough to establish good cause under Rule 16. *See Charbonneau v. Mortg. Lenders of Am.,*

---

[3] A close reading of Justice Alito's concurrence further shows how meritless GEO's argument is – after noting that private prison guards (such as GEO's own employees) do not get qualified immunity, Justice Alito suggests that the *unavailability* of qualified immunity "[p]erhaps" weighs in favor of allowing an interlocutory appeal from a *Yearsley* denial – but then goes on to explain that the collateral-order doctrine must be applied categorically, not "as applied to particular defendants." *Id.* (cleaned up). In the end, this consideration did not lead Justice Alito to dissent, but to concur.

*LLC*, No. 18 Civ. 2062, 2020 U.S. Dist. LEXIS 133292, at \*13 (D. Kan. July 28, 2020) (despite intervening regulatory changes, no good cause to amend defenses where there was no change in controlling law and the substance of the defense was separately governed by preexisting case law); *Jaszewski v. Kiniksa Pharms. Corp.*, No. 23 Civ. 2011, 2024 U.S. Dist. LEXIS 250246, at \*7 (D. Colo. May 8, 2024) (Supreme Court decision tangentially addressing issue relevant to case does constitute a material change in law).

Moreover, GEO does not try to explain why the thin reed of Justice Alito's footnote means it could not have raised qualified immunity earlier – especially when its argument is based on essentially the same facts as the *Yearsley* defense. *See Hruska's Grocery Co. v. Hruska's Inc.*, No. 24 Civ. 769, 2026 U.S. Dist. LEXIS 3261, at \*8 (D. Utah Jan. 7, 2026) (no good cause to deviate from scheduling order where the proposed amendment "adds new state-law claims based on conduct [the moving party] knew about from the beginning of the case, rather than newly discovered information"). GEO's statement of material facts included with this motion recites facts nearly identical to those it relied on in its prior two summary judgment motions. Given that, GEO could have pressed this defense at any point during the last 12 years of litigation but did not – it was not "diligent" at all. *See Tesone*, 942 F.3d at 988. And as discussed above, this late addition is "prejudicial to [Plaintiffs]" because the parties "have already conducted substantial discovery." *Hruska's*, 2026 U.S. Dist. LEXIS 3261, at \*8; *see also Poitra v. Sch. Dist. No. 1*, No. 14 Civ. 887, 2015 U.S. Dist. LEXIS 153284, at \*16 (D. Colo. Oct. 21, 2015) ("[C]ourts have a high duty to insure the expeditious and sound management of the preparation of cases for trial. . . . Both the court and [Plaintiffs] are entitled to expect that by

a date certain, [Defendant's defenses] will be fixed and the case will proceed on that basis.")
(internal quotations and citation omitted).

### C.    GEO's Proposed Amendment Does Not Meet Any of Rule 15's Requirements.

GEO fares no better under the more forgiving Rule 15 standard.  Amendment of a pleading, even when done constructively through a summary judgment motion, requires "the court's leave."  Fed. R. Civ. P. 15(a)(2).  Whether to allow amendment is within the trial court's discretion.  *Castleglen, Inc. v. Resolution Tr. Corp.*, 984 F.2d 1571, 1584 (10th Cir. 1993).  The court may deny amendment "upon a showing of [1] undue delay, [2] bad faith or dilatory motive, . . . [3] undue prejudice to the opposing party, *or* [4] futility of amendment."  *Id.* at 1585 (citing *Foman*, 371 U.S. at 182) (emphasis added).  Only one such circumstance need be present for the court to deny leave to amend.  *See id.*  All are present here.

For all the reasons discussed above, the Court can and should deny GEO's constructive amendment based on the Rule 15 factors.  *First*, GEO has unduly delayed amendment by raising this unpled defense nearly six years after the deadline for dispositive motions, in an effort to "salvage a lost case by untimely suggestion of new theories."  *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006); *see also Hayes v. Whitman*, 264 F.3d 1017, 1026 (10th Cir. 2001) (affirming denial of motion to amend filed "[o]nly after the magistrate judge recommended ruling against [the moving party] on" summary judgment); *Estrada v. Martin Marietta Materials*, No. 20 Civ. 375, 2020 U.S. Dist. LEXIS 253670, at *4-6 (D. Colo. Oct. 5, 2020) (denying motion to amend to add new claim after close of discovery where the plaintiff was aware of the factual basis for the claim when he filed the original complaint and only sought to add it when it became the "only viable way" to recover).  *Second*, GEO's motion is in bad

31

faith, as it makes no secret of its intent to use this motion to delay trial. *Third*, an amendment is prejudicial to Plaintiffs because the proposed amendment is offered well after the close of discovery and on the eve of trial. *See Breen v. Pruter*, 679 F. App'x 713, 728-29 (10th Cir. 2017) (district court did not abuse discretion in denying motion to amend where amendment offered after discovery closed and dispositive motion deadline passed would have impacted trial preparation); *Reiskin v. Greyhound Lines, Inc.*, No. 20 Civ. 2605, 2021 U.S. Dist. LEXIS 259347, at *10 (D. Colo. Nov. 16, 2021) ("At this late stage in the litigation, where (even after multiple extensions) discovery has closed and the dispositive motion deadline has nearly run, allowing Plaintiffs to amend their Complaint . . . would unduly prejudice both the Defendant and a court system that is trying to process filed cases on a reasonable schedule."). *Fourth*, amendment would be futile because, as discussed in detail below, GEO is not entitled to qualified immunity.

## II.    GEO Is Not Entitled to Qualified Immunity.

GEO is right that the question of whether private for-profit contractors enjoy qualified immunity is "settled." Mot. at 6. But its suggestion that the question has been settled *in its favor* – by a concurrence authored by Justice Alito in *GEO Group, Inc. v. Menocal*, 146 S. Ct. at 787 that no other justice joined – is frivolous. Concurrences do not make law. If anything, the fact that no other justice joined Justice Alito's concurrence highlights how weak GEO's position is.

GEO's claim to qualified immunity is foreclosed by the Supreme Court's decision in *Richardson v. McKnight*, 521 U.S. 399 (1997). In that case, a prison inmate brought a § 1983 action against two prison guards employed by what was then called Corrections Corporation of America, a private, for-profit corporation contracted by the state of Tennessee to operate its

prison system. *Id.* at 401-02, 409. The guards unsuccessfully invoked qualified immunity. *Id.* at 402. The Supreme Court held that courts should look "both to history and to the purposes that underlie government employee immunity" to determine whether private parties enjoy qualified immunity, and in doing so, concluded that "[h]istory does *not* reveal a 'firmly rooted' tradition of immunity applicable to privately employed prison guards." *Id.* at 404 (emphasis in original). As to the purpose of the doctrine, the Court concluded that the "most important" immunity-producing concern, a desire to avoid "unwarranted timidity" on the part of public servants, is absent "when a private company subject to competitive market pressures operates a prison." *Id.* at 409. Specifically, the Court held that where a defendant works for a "firm . . . systematically organized to perform a major administrative task for profit," "marketplace pressures provide *the private firm* with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." *Id*. at 409-410 (emphasis added). While "lawsuits may well 'distract' these employees 'from their duties' . . . the risk of 'distraction' alone cannot be sufficient grounds for an immunity." *Id*. at 412 (cleaned up) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The Supreme Court's conclusions about *guards* employed by a company like GEO apply with even greater force to GEO itself – in fact, *all* of the Court's reasoning about the purposes of qualified immunity analyzes the effect of market pressures on a "*firm . . . systematically organized to perform a major administrative task for profit,*" reasoning that its government contract "*might* permit employee indemnification" and "grant this *private firm* freedom to respond to those market pressures through rewards and penalties that operate directly *upon its employees*." *Id.* at 409 (emphases added). If that rationale applies to GEO's employees, it applies with even greater force to GEO.

33

The *Richardson* Court emphasized that it "answered the immunity question narrowly, in the context in which it arose." *Id*. at 413. But that context is the same one this case presents: GEO, like the corporation in *Richardson*, is a for-profit company whose entire business is managing prisons and detention centers for government entities with "limited direct supervision by the government." *See Id*.; SAUMF ¶ 1. In fact, the *Richardson* Court rested its reasoning on the fact that the defendants' employer, Corrections Corporation of America, "undertakes its task for profit and potentially in competition with other firms." *Id*. Corrections Corporation of America, now called CoreCivic, is GEO's main competitor.[4] In other words, GEO is part of the reason the defendants in *Richardson* were not entitled to qualified immunity, and reciprocally, GEO is not entitled to it either.

GEO distorts the law in trying to instead analogize this case to the Supreme Court's decision in *Filarsky v. Delia*, 566 U.S. 377 (2012). In *Filarsky*, the Court allowed a private attorney retained by a municipal government to invoke qualified immunity. *Id.* at 393-94. But *Filarsky* is easily distinguishable: The individual seeking to invoke immunity was a single attorney with specialized knowledge and expertise the city did not possess, hired on a temporary basis to assist with a discrete project. *Id*. at 390. The Court reasoned that whether an individual is classified as a full-time employee or an independent contractor should not determine whether qualified immunity is available, finding a strong precedent in common law for extending qualified immunity to *individuals* engaged in part-time public service. *Id*. at 388. And *Filarsky*

---

[4]     *See, e.g.*, Philip Wang, *ICE's Largest Prison Contractors Hail 'New Growth Opportunities' as Revenue Reaches All-Time High*, Time (Feb. 12, 2026, at 3:14 pm MT), https://time.com/7378284/ice-immigration-detention-contractors-record-revenue/.

explicitly stated that it did *not* overrule *Richardson*, emphasizing the "particular circumstances of that case" – "a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms." *Id*. at 393 (quoting *Richardson*, 521 U.S. at 413).[5]

Again, those are the precise circumstances here. GEO is a publicly traded company organized to provide detention services to federal, state, and local governments. SAUMF ¶¶ 1-3. It is "systematically organized to perform a major administrative task for profit," *Richardson*, 521 U.S. at 409, employing various departments and staff to handle the complete lifecycle of the contracting process and all administrative aspects of detention services. SAUMF ¶¶ 7-10. GEO earns revenue from winning competitive bids for government contracts, based on its price and past performance. SAUMF ¶¶ 4-6; 12-13. It has systematized the process of winning those contracts using sophisticated pricing models, developed by a specialized Pricing Department, based on decades of experience operating detention facilities, which are reviewed by GEO's Proposal Development Group, corporate business managers, CFO, and CEO. SAUMF ¶¶ 7-9. This work includes using GEO's considerable expertise operating all of the components of the

---

[5]    GEO's argument that *Filarsky* somehow limited *Richardson* to cases under § 1983 is baseless. *Filarsky* merely says that, as acknowledged above, the Court in *Richardson* "emphasized that the particular circumstances of that case . . . combined sufficiently to mitigate the concerns underlying recognition of governmental immunity under § 1983." *Id*. at 393. As GEO itself goes on to note, "[t]he most familiar context for qualified immunity is constitutional claims under Section 1983." Motion at 20. But "qualified immunity's application to 1983 claims is based on the 'common-law protections' that 'ha[ve] not been abrogated' by the adoption of Section 1983." *Id*. (quoting *Filarsky*, 566 U.S. at 383). *Filarsky*'s mention of § 1983 is a function of § 1983 claims having been at issue in both *Richardson* and *Filarsky*, but *Filarsky* itself acknowledges that its analysis is not specific to that statute.

35

"major administrative task" of designing and operating detention centers, pursuant to the specifications in government contracts, to "maximize security and efficiency."  SAUMF ¶ 4.

GEO must continue its good performance under the contract or risk losing it.  To that end, it employs administrative, maintenance, guard, and medical personnel at the facility level, including backup personnel in case of absence.  SAUMF ¶ 10-11.  And it is required to carry insurance to indemnify its operations.  SAUMF ¶ 16.  If its operations under the contract are unsuccessful, it can be replaced with a competitor at the end of each two-year contract term. SAUMF ¶¶ 14-15; *see Richardson*, 521 U.S. at 409-10 (market pressures obviate the need for immunity where companies are required to "buy insurance sufficient to compensate victims of civil rights torts," and subject to "pressure from potentially competing firms who can try to take its place," as applied to GEO's major competitor.).[6]

It also "performs that task independently, with relatively less ongoing direct state supervision" than publicly operated jails.  *See Richardson*, 521 U.S. at 409-10.  GEO develops its own local policies, including the Housing Unit Sanitation Policy.  SAUMF ¶¶ 21-22

---

[6]  GEO's attempt to analogize its multibillion-dollar business operating detention centers across the country to the "master of a house of correction" in 1861, Def.'s Mot. 19, cannot be seriously credited.  Here again, GEO's reliance on the *dissent* in *Richardson* does not help its case; the *Richardson* majority explicitly rejected the dissent's argument that a lone case, *Williams v. Adams*, 85 Mass. 171 (1861), reflected a tradition of immunity for private prison corporation *employees*, finding that it "[did] not . . . clearly involve a private prison operator," was contrary to the weight of historical evidence, and "actually supports our point" because it recognized that the individual in question could have been held liable for an intentional tort, if not for negligence.  *Richardson*, 521 U.S. at 406.  This case forms the entirety of GEO's argument that history is on its side, apart from a passing, conclusory claim that "generally, history is replete with examples of immunity for private parties engaged in law enforcement activities" – as if that broad assertion is sufficient to answer the question.

Although GEO makes much of the fact that ICE has an on-site official at Aurora, it neglects to mention that this official, the Contracting Officer's Technical Representative ("COTR"), has a circumscribed role; the COTR cannot commit the government to any deviation from the contract; cannot provide guidance to the contractor about the scope or terms of the contract; and cannot direct GEO to operate in ways that are contrary to its contract. Response to SUMF ¶ 17; SAUMF ¶ 23. The COTR's role is simply to ensure that GEO complies with the technical requirements of the contract; the COTR does not supervise GEO's work beyond that narrow scope. *Id*. And, to the extent ICE audits GEO's performance, those audits are limited. Response to SUMF ¶ 13.

This is an even clearer case for a *Richardson* analysis than *Tanner v. McMurray* (which GEO largely ignores), where the Tenth Circuit considered and rejected the assertion of qualified immunity by "full-time employees of a for-profit, multi-state corporation organized to provide contract medical care in detention facilities." 989 F.3d 860, 861 (10th Cir. 2021). The Tenth Circuit concluded that, "[c]learly, CCS, a for-profit corporation acting to maximize shareholder value pursuant to its fiduciary duty, is not the noble part-time public servant envisioned by *Filarsky*." *Id* at 871. Similarly, in *Rosewood Services, Inc. v. Sunflower Diversified Services, Inc.*, the Tenth Circuit held that even a *non-profit* corporation providing community services to disabled adults was sufficiently subject to market forces "to avoid the need for qualified immunity" because the state could choose to cancel its contract for insufficient performance. 413 F.3d 1163, 1168-69 (10th Cir. 2005). The same is true here. SAUMF ¶ 14. This Court can hardly reach a different result, when GEO's entire business model is to privatize the government function of detention, earning it revenues in excess of $1.5 billion a year. SAUMF ¶ 2.

In contrast, the cases on which GEO relies all involve individuals or companies whose primary business was in the private sector and who were hired to carry out a discrete, specialized function for the government.  For example, in *Estate of Jensen by Jensen v. Clyde*, 989 F.3d 848, 855 (10th Cir. 2021), the defendants were a single doctor and licensed practical nurse who provided the "discrete function" of part-time medical services to a prison.[7]  The Tenth Circuit's decision in that case was driven by the consideration that "[t]he government has a strong interest in attracting *individuals* with 'specialized knowledge or expertise' to public service, often on a *part-time* basis."  *Id.* at 856 (emphasis added).  Similar facts underlie *The Estate of Lockett by & through Lockett v. Fallin*. 841 F.3d 1098, 1109 (10th Cir. 2016) (doctor who assisted in execution stood "in the same position as the attorney in *Filarsky*"); *see also Herrera v. Santa Fe Pub. Schs.*, 41 F. Supp.3d 1027, 1186-87 (D.N.M. 2014) (noting that whereas *Richardson* involved a "situation[] in which the government privatizes an entire function," the defendant in *Herrera* "has the freedom to select work that will not expose it to liability for government actions").  In *Franco v. Bd. of Cnty. Comm'rs for the Cnty. of Roosevelt*, 609 F. App'x 957, 959-60 (10th Cir. 2015), the Tenth Circuit explicitly weighed the facts of that case against both *Filarsky* and *Richardson* to conclude that the defendant's "position as an independently contracted probation officer is a good deal more like the one in *Filarsky* than *Richardson*, especially given the Court's express admonition that the 'typical case *of an individual* hired by

---

[7]    GEO describes this case as extending qualified immunity to "psychiatrists." Motion at 18. It does not.  The only time psychiatrists are mentioned in *Jensen* are in its discussion of *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012), in which the Sixth Circuit concluded that a private psychiatrist working for a prison did *not* get qualified immunity.  989 F.3d at 857.

the government to assist in carrying out its work will fall outside *Richardson's* exception."

(emphasis added; quoting *Filarsky*, 566 U.S. at 393).  That is not this case.

Perhaps recognizing that *Richardson* squarely forecloses its last-ditch bid to avoid trial,

GEO sidesteps the *Richardson*/*Filarsky* analysis almost entirely by collapsing it into a single

question: whether it was closely supervised by the government.  This is not how the law works;

both *Richardson* and *Filarsky* require courts "to look both to history and to the purposes that

underlie government employee immunity" to determine whether qualified immunity is available.

*Richardson*, 521 U.S. at 404; *see also Filarsky*, 566 U.S. 384-92 (analyzing historical common

law and policy).[8]  The "close supervision" question merely informs this inquiry.[9]  Regardless,

---

[8]    GEO cites the Tenth Circuit's 2016 decision in *Gen. Steel Domestic Sales, LLC v. Chumley*, 840 F.3d 1178, 1182 (10th Cir. 2016) to avoid this analysis.  Mot. at 14.  But the cited language is *dicta*, as *General Steel* was a Communications Decency Act case which "in no way involve[d] the government;" the court briefly summarized several cases in the course of saying that it "need not delve into this analysis" because qualified immunity was not on the table.  *Id.* at 1182.

[9]    GEO relies heavily (Mot. at 17-18) on the Tenth Circuit's decision in *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714 (10th Cir. 1988), but *DeVargas* carries little weight here.  First, and most importantly, it predates the Supreme Court's decisions in *Richardson* and *Filarsky*, as well as the Tenth Circuit's decision in *Tanner*.  *See DeVargas*, 844 F.2d at 716 ("The Supreme Court has not addressed qualified immunity defenses raised by private parties[.]").  But *DeVargas* is also distinguishable on its facts.  The plaintiff, who had vision in only one eye, applied for a job as a security inspector with a private contractor that provided security for a government facility.  *Id.* at 715.  Employees of the contractor refused to process his application for employment, relying on a government regulation that disqualified one-eyed individuals from security inspector duties.  *Id.* at 716.  The Tenth Circuit held that the contractor's employees could invoke qualified immunity if they (1) acted in accordance with the duties imposed by a contract with the government; (2) performed a governmental function; *and* (3) were sued solely on the basis of those acts performed pursuant to contract.  *Id.* at 722.  The *DeVargas* defendants met this test because they followed the government's regulation.  GEO, by contrast, explicitly *violated* its contract with the government by coercing labor.  *See* ECF No. 286 (Pls. Reply Mem. In Supp. Of Motion for Summary Judgment), Pls.' Reply Concerning Undisputed Facts ¶¶ 16, 17).

whether ICE "closely supervised" GEO's forced-labor program or whether GEO developed the program on its own for its own private reasons was the subject of the parties' cross-motions on summary judgment on the *Yearsley* defense, which GEO lost.  It then lost before the Supreme Court on the question of whether it could immediately appeal that loss.  Reframing the key question under *Yearsley* as a prong of the qualified immunity test not only distorts the law, it mischaracterizes facts the Court has already determined.

In its order granting summary judgment to Plaintiffs, the Court held that "GEO's cleaning policies, which it independently developed and implemented, far exceeded its contractual obligations with ICE."  ECF No. 380 at 29.  It was GEO, not ICE, that required detainees to clean "all commonly accessible areas" in their housing units; ICE's instructions to detainees were limited to their "immediate living areas."  *Id.*  As the Court concluded back in 2022, "The PBNDS did not mandate that detainees clean the common areas or clean up after others.  Yet, GEO's policies clearly did, and GEO extended the PBNDS disciplinary scale to cover its expanded cleaning mandates."  *Id.* at 31.

And even if the Court had not already ruled against it, GEO's claim that a few cherry-picked undisputed facts pave the way for qualified immunity here ignore the many facts that the parties vehemently disputed when they last briefed summary judgment back in 2022.  Plaintiffs dispute the degree to which ICE supervised GEO's operations as well as the degree to which GEO's policies were approved, or even reviewed, by ICE.  Response to SUMF ¶¶ 13, 17.  GEO disputes whether its facility-level policies were developed or reviewed by GEO employees.  ECF No. 286, SUMF ¶¶ 40-42.  It disputes whether cleaning common areas was required by GEO's sanitation procedures, and Plaintiffs disputed whether that cleaning was approved by ICE, and

whether ICE played any role in drafting that cleaning policy. *Id.*, SUMF ¶¶ 50, 52, 54-57.

Plaintiffs dispute the degree to which the disciplinary scale in the Aurora local detainee

handbook matched the scale contained in the PBNDS. Response to SUMF ¶ 17; SAUMF ¶ 24.

And Plaintiffs dispute the extent and nature of ICE's audits. ECF No. 286, Response to

Additional Facts, ¶¶ 24-25, 28. These disputes are, at minimum, sufficient to allow Plaintiffs to

get to trial on GEO's newly-discovered qualified immunity defense. *See Scherbarth v. Woods*,

No. 16 Civ. 2391, 2020 U.S. Dist. LEXIS 55786, at *20 (D. Colo. Mar. 31, 2020) (denying

summary judgment on qualified immunity where parties' "diametrically opposed version of the

facts" were intertwined with legal question); *Templeton v. Anderson*, No. 12 Civ. 1276, U.S.

Dist. LEXIS 41309, at *24 (D. Colo. Mar. 25, 2013) ("Courts generally do not grant qualified

immunity if disputed facts are material to its application.").

## III.   GEO's Qualified Immunity Defense Fails on the Merits

Even if GEO is entitled to assert qualified immunity, which it is not, the facts do not

support it. GEO devotes only two and a half pages of its summary judgment brief to the merits

of qualified immunity – a telling indication that it has not adequately addressed the subject.[10] On

summary judgment, the qualified immunity analysis turns on two questions: (1) whether the

facts, viewed in the light most favorable to Plaintiffs, would allow a reasonable jury to find that

GEO violated a statutory or constitutional right, and (2) whether that right was clearly

established at the time of the alleged violation. *See Packard v. Budaj*, 86 F.4th 859, 864 (10th

Cir. 2023).

---

[10]   And a further indication that GEO is more interested in the interlocutory appeal the
defense buys than in the defense itself.

This is not a case in which the Court should skip the first prong of qualified immunity and proceed straight to the second. *See Kerns v. Bader*, 663 F.3d 1173, 1180–81 (10th Cir. 2011) (Gorsuch, J.) (describing "seven particular circumstances" where courts should not analyze prong one) (citing *Pearson v. Callahan,* 555 U.S. 223, 236-42 (2009)). Here, (1) while the statutory violation is factbound, as explained in Part III.A. below, it presents a recurring, not unique fact pattern. *See Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) ("[r]equiring a pretrial detainee to work or be placed in administrative segregation is punishment . . . . Requiring a pretrial detainee to perform general housekeeping chores, on the other hand, is not"). (2) No other appeals court is scheduled to decide the factual question; (3) Plaintiffs' claims invoke federal, not state law; (4) the factual basis for the claim is fully developed; (5) the briefing here is adequate to assess the issue; (6) the law is clearly established that civil detainees may not be forced to labor through threats of solitary confinement (*see* Part III.B. below); and (7) there is no concern about constitutional avoidance because Plaintiffs' claims are statutory.

The Court should therefore proceed to the first question: whether a reasonable jury could find that GEO violated the TVPA.

### A.    There Are Material Disputes of Fact as to Whether GEO Violated the Class Members' Statutory Rights

There is consensus among circuit courts that officers in a civil detention context violate the Thirteenth Amendment when they use threats of "punitive segregation" to impose work assignments that "rise above" the level of "general housekeeping" tasks. *Harden v. Bodiford*, 442 F. App'x 893, 895 (4th Cir. 2011). Such tasks violate non-criminal detainees' Thirteenth Amendment rights because they are "not reasonably related to a legitimate non-punitive governmental objective." *Id*.; *cf. Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978) (detainee

42

who "was requested to clean up some cigarette butts outside the door to his room" did not suffer a Thirteenth Amendment violation because such "[d]aily general housekeeping responsibilities are not punitive in nature," but were imposed "for health and safety" reasons).

The claims in this case are brought under the TVPA, which is even broader in scope than the Thirteenth Amendment. Courts have widely recognized that in enacting the TVPA, Congress sought to expand Thirteenth Amendment precedents to encompass "forms of worker exploitation that do not rise to the level of involuntary servitude." *United States v. Kaufman*, 546 F.3d 1242, 1261 (10th Cir. 2008) (the TVPA and other "forced labor statutes apply to coerced acts other than work in an economic sense." *Id.* at 1263 (cleaned up)).

The Court has already identified disputes of fact as to GEO's claims that personal housekeeping tasks like "keeping the floor free of debris" are the same as "mopping or sweeping the floor," ECF No. 380 at 69, n.29 (cleaned up); or that its sanitation policies "resemble 'ordinary parents requiring chores,'" *id*. at 57-58 (quoting GEO's motion for summary judgment); and it has correctly noted that "Plaintiffs do not make the claim that detainees' personal housekeeping tasks constitute forced labor in violation of the TVPA." *Id.* at 30 n.16. The Court has also held that a reasonable jury could find that GEO's policies "clearly" required detainees to "clean up after others," and that GEO used threats of solitary confinement "to enforce GEO policies" that did not reflect government policies; *id.* at 31; and that, while "[o]ne can imagine a situation in which solitary confinement may be an appropriate sanction for a detainee who obstinately refuses to tend to his personal space and, by doing so, places Facility staff and other detainees at risk," this scenario is "far afield of the Facility's desire to have

detainees clean up after others, and its corresponding threats of punishment for detainees who refuse to assist in efforts to clean common areas." *Id.*

These findings would be sufficient to find a Thirteenth Amendment violation. *See McGarry v. Pallito*, 687 F.3d 505, 514 (2d Cir. 2012) (work imposed to "defray[] institutional costs" did not serve legitimate non-punitive objective); *Harden*, 442 F. App'x at 895; *Bijeol*, 579 F.2d at 424. In that context, a reasonable jury could construe the facts in the record here to conclude that detainees did more than "personal housekeeping" when they were required to "clean the rec yard, wipe the []phones, clean the microwave, change the garbage bag, clean the showers, disinfect the showers, [and] pick up all the trash, like the toothpaste [and] the shampoo bottles" in an 80-person housing pod (or a 48-person dormitory). SAUMF ¶ 19. The record here could well convince a jury that GEO forced detainees to work to reduce its own costs when it told them, "Clean, because you're going to the hole," SAUMF ¶ 20, and that this choice did not serve a "legitimate, non-punitive governmental objective." *Harden*, 442 F. App'x at 895.

Accordingly, the Court should find that material disputes of fact preclude summary judgment on the question of whether GEO committed a statutory violation, for purposes of deciding whether GEO is entitled to qualified immunity.

> **B.      It Is Clearly Established that Civil Detainees Cannot Be Forced to Labor by Threatening them with Solitary Confinement.**

GEO tries to sidestep the question of whether clearly established law prohibits forced labor in civil detention. Although the entire premise of its qualified immunity argument is that GEO stands in the shoes of the *government*, it argues there is "no precedent—***zero***—conclusively establishing that an *agent of the government* can be held liable for implementing a federal housekeeping policy." Def.'s Br. 23 (latter emphasis added). Besides casually mischaracterizing

Plaintiffs' claims[11] and facts already determined by this Court,[12] GEO's overconfident assertion

unduly narrows the lens to claims involving government contractors. But if GEO wishes to

claim the qualified immunity enjoyed by government *employees*, the lens must be widened to

what the law clearly prohibits *government employees* from doing. And the government's

employees have long been clearly prohibited from using threats of solitary confinement to coerce

punitive labor from civil detainees under the Thirteenth Amendment – a premise that applies

with even greater force to the TVPA.

"A right can be clearly established through a factually similar Supreme Court or

published Tenth Circuit decision, or through the clearly established weight of authority from

other courts." *Brown v. Flowers*, 974 F.3d 1178, 1184 (10th Cir. 2020) (cleaned up). Courts

may "not . . . define clearly established law at a high level of generality," *Mullenix v. Luna*, 577

U.S. 7, 12 (2015) (*per curiam*), but "a case directly on point is not required so long as 'existing

precedent [has] placed the statutory or constitutional question beyond debate.'" *A.N. v. Syling*,

928 F.3d 1191, 1197 (10th Cir. 2019) (*quoting White v. Pauly*, 580 U.S. 73, 79 (2017) (*per

curiam*)). The "question in all cases is whether the *violative nature* of the particular conduct at

issue is clearly established." *A.N.*, 928 F.3d at 1197 (cleaned up, emphasis added).

It has been the law for over a century that immigrant detainees cannot be subjected "to

infamous punishment at hard labor" unless they have been duly convicted of a crime – and the

---

[11]    Plaintiffs allege that GEO engaged in forced labor by implementing a housekeeping policy *using threats of serious harm and confinement*. Compl. ¶¶ 5-6, ECF No. 1.

[12]    The Court found that GEO did *not* implement a "federal housekeeping policy," but rather that "GEO's cleaning policy was 'not created by ICE'" and that "GEO unilaterally extended the PBNDS disciplinary scale to cover cleaning mandates *that were not required by ICE*." ECF No. 380 at 46 (quoting declaration from ICE official; emphasis added).

mere fact of being unlawfully present in the U.S. is not a crime. *Wong Wing v. United States*, 163 U.S. 228, 237 (1896). GEO's own executives – two of whom are former ICE officials – recognize that the Class Members here were civil detainees, not convicted criminals serving a punitive sentence.[13] And a long line of cases holds that civil detainees may not be punished by forcing them to labor.

Those cases speak to the exact conduct at issue here. In *Harden v. Bodiford*, 442 F. App'x 893, 894 (4th Cir. 2011), the plaintiff, a pretrial detainee, was assigned as a "pod worker" and was threatened with "punitive segregation" if he refused to work. He alleged that prison officials violated his Thirteenth Amendment rights under 42 U.S.C. § 1983. The Fourth Circuit held that "*[i]t is settled* that a pretrial detainee may not be subjected to any form of punishment" beyond "general housekeeping." *Id*. at 895 (emphasis added). Similarly, a year later, the Second Circuit denied qualified immunity to prison officials who had told a detainee, "that his refusal to work would result in his being placed in administrative segregation or 'put in the hole,'" because "*[i]t is clearly established* that requiring hard labor of pretrial detainees—persons not 'duly convicted'—violates the Thirteenth Amendment." *McGarry*, 687 F.3d at 509, 514 (2d Cir. 2012) (emphasis added).

Those are only the most recent cases on point. The premise on which they rest – that labor beyond "personally related housekeeping chores" violates the Thirteenth Amendment, *id*.

---

[13]    *See* SAUMF ¶ 25 (citing Venturella Dep. 130:22-131:19 (Aurora detainees' detention was "not punitive, it's not for punishment, it's not for rehabilitation, it[']s only to detain them while they are going through this process in the least restrictive setting"); Ragsdale Dep. 124:3-8 ("They are not sentenced prisoners . . . . it's a legal distinction but to some degree it's, I think, a meaningful one")).

at 514 – emerges from a consensus among the circuits that goes back to 1978.  *See Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978) (pretrial detainee whose jailers placed him in segregation when he refused to clean up cigarette butts did not suffer Thirteenth Amendment violation); *Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993) (detainee did not prove Thirteenth Amendment violation where he "provide[d] no details regarding the work he had to do as part of cleaning the 'module' where he was housed"); *Channer v. Hall*, 112 F.3d 214, 218–19 (5th Cir. 1997) (civil detainee who "was intimidated and threatened with solitary confinement if he failed to work" did not suffer Thirteenth Amendment violation because he performed a "housekeeping chore").

*Bijeol*, *Hause*, and *Channer* describe the proverbial exception that proves the rule, that that work beyond personal housekeeping chores cannot be compelled through threats of confinement.  The rule is further illustrated by the Eighth Circuit's holding in *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992), that, "[r]equiring a pretrial detainee to work or be placed in administrative segregation is punishment . . . . Requiring a pretrial detainee to perform general housekeeping chores, on the other hand, is not."  And the Third Circuit confirmed that rule in *Tourscher v. McCullough*, 184 F.3d 236 (3d Cir. 1999), where a pretrial detainee alleged that he was forced into involuntary servitude where his jailers threatened "to lock him up in the hole" if he did not work in the prison cafeteria.  *Id.* at 239, 242.

The consensus rule is clear that work that goes beyond "personally related housekeeping" cannot be compelled from civil detainees by threatening them with solitary confinement, and that law is "clearly established" because "all understand the Thirteenth Amendment to ban a condition of enforced compulsory service of one to another . . . . Where a detainee is required to

47

perform personally-related chores, this work is not for another." *McGarry*, 687 F.3d at 513-14[14]

(cleaned up, emphasis in original).

## IV.    The Court Should Certify Any Appeal as Frivolous or Dilatory.

The Court may prevent GEO from benefitting from its obvious gamesmanship by certifying that any appeal from this motion would be dilatory and/or frivolous.  GEO's current motion is a clear example of the risk courts have long recognized, that the availability of an "interlocutory appeal raising a . . . qualified immunity issue . . . risk[s] that such interlocutory appeals will be subject to abuse." *Stewart v. Donges*, 915 F.2d 572, 576 (10th Cir. 1990).  The "divestiture of jurisdiction rule, applicable generally when a defendant files a notice of appeal, should not leave the trial court powerless to prevent intentional dilatory tactics by enabling a defendant unilaterally to obtain a continuance at any time prior to trial by merely filing a motion, however frivolous, and appealing the trial court's denial thereof." *Id.*  So "the Tenth Circuit has recognized a procedure by which a district court may maintain jurisdiction over a defendant if the court certifies that the defendant's appeal is frivolous." *Est. of Purdy v. Bd. of Cty. Comm'rs of Jefferson Cnty.*, No. 25 Civ. 556, 2025 U.S. Dist. LEXIS 250740, at *3-4 (D. Colo. Dec. 4, 2025) (cleaned up).  The district court can prevent "dilatory tactics" by certifying that "(1) after a hearing and, (2) for substantial reasons given, (3) [it] found the claim to be frivolous." *Stewart*,

---

[14]    The cases above were all decided under the Thirteenth Amendment, which is both narrower in scope ("slavery and involuntary servitude") and less specific than the TVPA, which explicitly prohibits, as relevant here, "obtain[ing] the labor or services of a person" through "physical restraint or threats of physical restraint" or "by means of serious harm or threats of serious harm."  18 U.S.C. § 1589.  So what is true for the Thirteenth Amendment applies with even greater clarity to the TVPA. *See Kaufman*, 546 F.3d at 1261 (TVPA and other "forced labor statutes apply to coerced acts other than work in an economic sense." (cleaned up)).  In any event, the question under qualified immunity is whether the right was clearly established, not the basis for the cause of action.

915 F.2d at 576.  The effect of that certification is that the district court retains jurisdiction and may proceed with trial, even while the defendant seeks to appeal the ruling on the dilatory defense.  To certify that an appeal is frivolous, there "must be a sufficient basis for the court to infer that the principal reason for the defendant's appeal is to manipulate the court's schedule," such as where "the defendant waited to raise the defense or to appeal the unfavorable ruling until it was most advantageous to the defendant or most disadvantageous to the plaintiff."  *Kickapoo Tribe of Indians v. Kansas*, Nos. 92 Civ. 4233, 92 Civ. 4234, 1993 U.S. Dist. LEXIS 8148, at *21 (D. Kan. May 19, 1993); *see also Apostol v. Gallion,* 870 F.2d 1335, 1338-39 (7th Cir. 1989) ("Defendants may waive or forfeit their right not to be tried.  If they wait too long after the denial of summary judgment, or if they use claims of immunity in a manipulative fashion, they surrender any entitlement to obtain an appellate decision before trial.").

GEO's belated motion for summary judgment on an unpled defense filed on the eve of trial is precisely the type of dilatory tactic courts had in mind when they created this doctrine.  As discussed throughout this brief, GEO's motion for summary judgment (and concurrent motions to stay and for interlocutory appeal) is nothing more than a litigation tactic designed to avoid trial at any cost.  Until now, GEO had not raised a qualified immunity defense at any point in this 12-year litigation.  It never pled the defense and waited until nearly six years after discovery closed and dispositive motions were due to raise it.  And, it has done so only after the Supreme Court dismissed its appeal of the Court's order granting Plaintiffs summary judgment on GEO's *Yearsley* defense, based on the flimsy rationale that the musings of a single Justice in a concurrence that no other Justice joined, which does not suggest that qualified immunity applies, gave rise to a "Eureka!" moment.  The Court is not "powerless to prevent intentional dilatory

49

tactics" and should not allow GEO to "unilaterally . . . obtain a continuance at any time prior to trial by merely filing a motion, however frivolous, and appealing the trial court's denial thereof." *Stewart*, 915 F.2d at 576.

Trial courts and courts of appeal faced with similar tactics, including where a defendant raises qualified immunity and where the qualified immunity defense would not apply to all the claims in the action, have asserted their authority to maintain jurisdiction in the face of a frivolous appeal. For example, in *Heller v. Woodward*, the trial court recognized that an interlocutory appeal of an order denying summary judgment on qualified immunity would unnecessarily delay a trial on the plaintiff's state law tort claims and retained jurisdiction to proceed with the trial while the appeal was pending. 735 F. Supp. 996, 999 (D.N.M. 1990) ("[D]efendant will be compelled to defend a claim for damages regardless of the outcome of his claim of qualified immunity to the alleged First Amendment violation. As a result, these purposes for an immediate appeal would not be served by delaying the trial."); *see also Est. of Purdy*, 2025 U.S. Dist. LEXIS 250740, at \*8 (certifying an appeal from an order denying a motion to stay discovery while the defendant litigated its qualified immunity defense as frivolous because the order denying a stay was obviously not appealable and would delay discovery, which the defendant would inevitably participate in as to other claims). The same circumstances are present here. Even if GEO were to prevail on its qualified immunity defense, Plaintiffs' unjust enrichment claim would remain, and that claim would have to proceed to trial regardless such that the "purposes for an immediate appeal would not be served by delaying the trial." *Heller*, 735 F. Supp. at 999.

The Court here should not entertain GEO's gamesmanship. It should not only hold that GEO waived its qualified immunity defense (or reject it), but it should also certify that any appeal from that order would be frivolous and/or dilatory and proceed to trial on the current schedule.

## V.    GEO Is Not Entitled to Judgment on the Pleadings.

For all of the same reasons that GEO is not entitled to summary judgment on its unpled qualified immunity defense, it is not entitled to judgment on the pleadings on that same defense, which does not appear in its pleadings. *Luizzi v. State Farm Mut. Auto. Ins. Co.*, No. 24 Civ. 3292, 2025 U.S. Dist. LEXIS 250742, at *4 (D. Colo. Dec. 4, 2025) (motions for judgment on the pleadings use the Rule 12(b)(6) standard to "test the sufficiency of the allegations within the four corners" of the pleadings). Moreover, motions for judgment on the pleadings must be brought "early enough not to delay trial." Fed. R. Civ. P. 12(c). As discussed above, this motion is designed for the very purpose of delaying trial and thus not appropriate for judgment on the pleadings.

## CONCLUSION

For the reasons set forth herein, the Court should deny GEO's motion for summary judgment or judgment on the pleadings and certify any appeal as frivolous or dilatory.

\* \* \*

**Certification Regarding the Use of Generative Artificial Intelligence**: The undersigned counsel certifies that generative artificial intelligence was not used to draft this filing.

51

Dated: May 11, 2026

Respectfully submitted,

By: */s/ Michael J. Scimone*
Michael J. Scimone
Aaron Bryce Lee
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone.: (212) 245-1000
Facsimile: (646) 509-2060
Email: mscimone@outtengolden.com
Email: alee@outtengolden.com

Adam Koshkin
**OUTTEN & GOLDEN LLP**
1999 Harrison St., Suite 1500
Oakland, CA 94612
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: akoshkin@outtengolden.com

David Seligman
Juno Turner
Alexander Hood
Rachel Dempsey
Brianne Power
**TOWARDS JUSTICE**
1580 N Logan Street
Denver, CO 80203
Telephone: (720) 441-2236
Email: alex@towardsjustice.org
Email: david@towardsjustice.org
Email: andy@towardsjustice.org
Email: juno@towardsjustice.org
Email: rachel@towardsjustice.org
Email: brianne@towardsjustice.org

Andrew Turner
Brandt Milstein
**MILSTEIN TURNER, PLLC**
1490 Lafayette St. #304
Denver, CO 80218
Telephone: (303) 305-8230
Email: andrew@milsteinturner.com
Email: brandt@milsteinturner.com

Hans Meyer
**MEYER LAW OFFICE, P.C.**
P.O. Box 40394
Denver, CO 80204
Telephone: (303) 831-0817
Email: hans@themeyerlawoffice.com

*Class Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of May 2026, a true and correct copy of the foregoing Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment or Judgment on the Pleadings was electronically filed with the Clerk of the Court using the CM/ECF electronic filing system, which will send notification to all counsel of record.

*/s/ Michael J. Scimone*
Michael J. Scimone