**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO**

Civil Action No.: 1:14-cv-02887-JLK-CYC

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA,
*on their own behalf and on behalf of all
others similarly situated*,

      Plaintiffs,

v.

THE GEO GROUP, INC.,

      Defendant.

---

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT OR JUDGMENT ON THE PLEADINGS (Doc. 450)**

---

**Certification Regarding the Use of Generative Artificial Intelligence**: Counsel for

Defendant the GEO Group, Inc. ("GEO") hereby attests that no Generative Artificial

Intelligence was used in connection with the drafting of this brief.

## I.    INTRODUCTION

Plaintiffs' Opposition Brief is full of strong language and selective reframing.  But

noticeably absent is any in-circuit precedent (a) preventing GEO from bringing its Motion or

(b) indicating that it is not entitled to qualified immunity.  The lack of authority is telling.

1

The Tenth Circuit has clearly stated that qualified immunity is a protection to which GEO is entitled and a right that GEO can assert any time before trial.  Once invoked, it places a heavy burden on Plaintiffs to demonstrate GEO's actions violated a constitutional or statutory right that was clearly established at the time of GEO's conduct.  Plaintiffs' Opposition has not met this standard.  As a result, GEO's Motion for Partial Summary Judgment should be granted.

Perhaps recognizing their precarious legal position, Plaintiffs attempt to reframe GEO's Motion as inequitable and warranting denial solely because this litigation has been ongoing for 12 years.  That argument is an attempt to sidestep Tenth Circuit precedent.  But more importantly, it ignores the hazy legal position federal contractors faced when this litigation began.  Before the Supreme Court decided this case, the degree to which *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940) and qualified immunity enshrined an immunity from suit for government agents had divided circuits to the point of warranting Supreme Court review in this very case.  Contractors like GEO believed proceeding under the more specific *Yearsley* doctrine was the safer route to assert immunity given the divided landscape.  The Supreme Court disagreed, holding *Yearsley* is a defense available only to government contractors and not within the collateral-order doctrine—while qualified immunity is a genuine immunity from suit available to both contractors and employees and reviewable as a collateral order.  This clarification is welcome considering, as Plaintiffs recognize, that qualified immunity has fewer unanswered questions than *Yearsley* (*e.g.*, the effect of discretion) and provides a favorable legal standard for GEO.  Yet the fact Plaintiffs are on worse footing after the Supreme Court's decision does not mean GEO's Motion should be denied.  Just the opposite.  Nor should this Court fault GEO for the fact that Supreme Court review takes a while to complete.

## II.    REPLY CONCERNING STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    The United States Immigration and Customs Enforcement ("ICE") is part of the Department of Homeland Security ("DHS") and charged with enforcing immigration laws. *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 6 (Admitted Fact #1)).

- **Plaintiffs' response**: Admit.

2.    Part of this duty includes detaining aliens suspected of entering the United States unlawfully.  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 7 (Admitted Fact #3)).

- **Plaintiffs' response**: Admit.

3.    Pursuant to this directive, ICE contracts with GEO to house detainees in GEO-owned facilities throughout the country.  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 8 (Admitted Fact #6)).

- **Plaintiffs' response**: Admit.

4.    This case concerns GEO's facility in Aurora, Colorado: the Aurora Immigration Processing Center (the "AIPC").  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 8 (Admitted Fact #7)).

- **Plaintiffs' response**: Admit.

5.    GEO operated the AIPC under contracts with ICE during the ten years at issue—from October 22, 2004, to October 22, 2014.  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 8 (Admitted Fact #9)).

- **Plaintiffs' response**: Admit that GEO owns and continually operated AIPC under contracts with ICE from October 22, 2004 to October 22, 2014.

A. **GEO's reply**: Plaintiffs admit the stated fact.

6. GEO's contract incorporated and required compliance with ICE's Performance Based National Detention Standards ("PBNDS") and its predecessor National Detention Standards ("NDS"). *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 9–13 (Admitted Facts #11–14, #16, #18)).

- **Plaintiffs' response**: Admit that GEO's various contracts between 2004 and 2014 incorporated some version of either the NDS or the PBNDS, but as stated in contract HSCEDM-11-D-00003, "these constraints may change over time" and "the Contractor" (i.e. GEO) is responsible for remaining "knowledgeable of any changes to the constraints and perform[ing] in accordance with the most current version of the constraints. ECF No. 262-2 at 37-38.

  A. **GEO's reply**: Plaintiffs admit the stated fact. Moreover, Plaintiffs already admitted in prior summary judgment motions that "[a]ll immigration detention processing centers, including the AIPC, must adhere to ICE's standards," (Doc. 298 at 9 (Admitted Fact #11)), and that "[i]n each contract GEO entered into with ICE for the operation of the AIPC, the 2000 NDS, 2008 PBNDS, or the 2011 PBNDS, as applicable, were incorporated into the contract and GEO was required to comply with the same" (*id.* at 10 (Admitted Fact #13)).

7. The 2008 PBNDS stated: "[A]ll detainees are responsible for personal housekeeping. . . . Detainees are required to maintain their immediate living areas in a neat and orderly manner." *Operations Manual ICE Performance Based National Detention Standards (PBNDS) (2008)*; (Doc. 261-9 at 61).

4

- **Plaintiffs' response**: Dispute.  GEO omits the remainder of the second sentence it cites.  The complete sentence reads: "[D]etainees are required to maintain their immediate living areas in a neat and orderly manner *by*:

    A.  making their bunk beds daily,

    B.  Stacking loose papers,

    C.  Keeping the floor free of debris and dividers free of clutter, and

    D.  Not hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture. ECF No. 261-9 at 61-62 (emphasis added).

        ▪ **GEO's reply**: Plaintiffs' response is misleading.  Plaintiffs do not dispute that the sentence GEO has quoted is correctly quoted, instead they add additional language which is also included in the PBNDS, as quoted with emphasis added by Plaintiffs.  The additions do not impact the analysis here.

8.  The 2011 PBNDS provided: "Detainees are required to maintain their immediate living areas in a neat and orderly manner."  *Performance-Based National Detention Standards 2011*; (Doc. 261-8 at 51).

- **Plaintiffs' response**: Dispute.  GEO omits the remainder of the second sentence it cites.  The complete sentence reads: "[D]etainees are required to maintain their immediate living areas in a neat and orderly manner *by*:

    A.  making their bunk beds daily,

    B.  Stacking loose papers,

    C.  Keeping the floor free of debris and dividers free of clutter, and

    D. Not hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture. ECF No. 261-8 at 51 (emphasis added).

       ▪ **GEO's reply**: Plaintiffs' response is misleading. Plaintiffs do not dispute that the sentence GEO has quoted is correctly quoted, instead they add additional language which is also included in the PBNDS. GEO disputes that Plaintiffs have accurately stated the last bullet point of the 2011 PBNDS. The last bullet point reads: "refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture." (Doc. 261-8 at 51). The additions do not impact the analysis here.

9. The ICE National Detainee Handbook, in effect at the time of the 2011 AIPC contract, includes the following explanation of detainees' obligations to clean assigned living areas: "You are not entitled to compensation for tasks that involve maintaining your personal area or cleaning up after yourself in general use areas. You are required to perform basic cleaning tasks within your living unit, regardless of where you are held." *National Detainee Handbook (2011)*; (Doc. 51-3 at 19).

    • **Plaintiffs' response**: Admit that the cited document contains the quoted text. For completeness, Plaintiffs add that the Handbook goes on to say, "For example, you could be disciplined if you refuse to make your bed or otherwise refuse to clean up after yourself." ECF No. 51-3 at 19 (emphasis added).

    A. **GEO's reply**: Plaintiffs admit the stated fact.

10. Similarly, the 2013 version of the ICE National Detainee Handbook explains to detainees that they must clean their living area and common areas: "Will I get paid for keeping my living area clean?  No, you must keep areas that you use clean, including your living area and any general use areas that you use.  If you do not keep your areas clean, you may be disciplined." *National Detainee Handbook (2013)*; (Doc. 310-1 at 18).

- **Plaintiffs' response**: Admit that the cited document contains the quoted text.   For completeness, Plaintiffs add that the Handbook also directs detainees to consult policies created by GEO, stating, "It is up to you to know the rules for the work program.  Also see your facility's local rules."  ECF No. 310-1 at 18.

  A. **GEO's reply**: Plaintiffs admit the stated fact, which was also adopted, as drafted, by this Court in its Order regarding summary judgment.  (Doc. 380 at 9).

11. The federal government also requires GEO to prepare a facility-specific handbook, which ICE reviews and approves before requiring GEO to provide it to every detainee. *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 14 (Admitted Fact #20), 16 (Admitted Fact #25)).

- **Plaintiffs' response**: Dispute.   The cited admissions do not support GEO's statement.  Plaintiffs admit that the federal government required GEO to notify detainees, in the local detainee handbook, of the ICE-mandated disciplinary severity scale.  See ECF 298 at 14 (Admitted Fact #20).  Plaintiffs admit that facility-level policies, including the facility-specific handbook, are developed by local GEO employees and then reviewed and cleared by the ICE Contracting Officer's Technical Representative ("COTR").   ECF No. 271-11 (Ragsdale 30(b)(6) Dep. at 39:3-6).

A. **GEO's reply**: Plaintiffs' denial is contrary to their prior representations to this Court. Plaintiffs previously admitted "The 2000 NDS and all versions of the PBNDS require GEO to provide notice to detainees, in the local detainee handbook, of the ICE-mandated disciplinary severity scale" (Doc. 298 at 14 (Admitted Fact #20)) and that "*All* of GEO's policies are reviewed and approved by an on-site ICE official" (*Id.* at 16 (Admitted Fact #25))(emphasis added). Moreover, this Court already found undisputed that "GEO was obligated to adopt ICE's disciplinary severity scale found in the PBNDS and to provide notice of that scale to detainees through the local detainee handbook." (Doc. 380 at 9). Those admissions support the stated fact.

12. The AIPC Handbook provides the following explanation of detainees' housekeeping obligations:

> Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate.
>
> \* \* \*
>
> Day rooms are open spaces in the housing units that are utilized for watching television, playing board games, dominos or cards, as well as for socializing among detainees. Tables with chairs are provided for your use in the dayroom.
>
> All detainees in a housing unit are required to keep clean and sanitary all commonly accessible areas of the housing unit including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs.
>
> \* \* \*
>
> Detainees will take turns cleaning the area. . . . If the detainees in the housing unit do not clean the area after being instructed to do so, the televisions will be turned off, and the detainees will not be permitted to participate in any activities/programs until the housing unit is cleaned. Continued refusal to clean will result in further disciplinary action.

*Aurora ICE Detainee Handbook Local Supplement*; (Doc. 261-17 at 20).

- **Plaintiffs' response**: Admit that the quoted text appears in the cited document, alongside other immaterial statements.  Plaintiffs note that GEO's quotation omits certain material and formatting, with the result that the quoted matter is misleading. Plaintiffs reproduce the complete text as it appears in the document below.

> **HOUSING UNIT SANITATION**
>
> Each and every detainee must participate in the facility's sanitation program.  A list of detainees is developed each day by staff and is posted daily for viewing.  During a general cleanup all detainees must participate.  The assigned Housing Unit Officer will be responsible for assuring this general cleanup is done on a regular basis.
>
> **DAY SPACE**
>
> Day rooms are open spaces in the housing units that are utilized for watching television, playing board games, dominos or cards, as well as for socializing among detainees.  Tables with chairs are provided for your use in the dayroom.
>
> All detainees in a housing unit are required to keep clean and sanitary all commonly accessible areas of the housing unit, including walls, floors, windows, window ledges, showers, sinks, toilets, tables, and chairs.
>
> Detainees will take turns cleaning the area.  If a detainee feels that everyone is not doing their fair share, the detainee should inform the housing unit officer of the problem.  Action will be taken to resolve this problem.

- **GEO's reply**: GEO disputes that its text was misleading.  It does not dispute the added portion but believes it is irrelevant to the analysis.

13. ICE regularly audits the materials provided to detainees at intake, including the AIPC Handbook, and GEO has passed every audit since 2004.  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 21 (Admitted Fact #37)).

- **Plaintiffs' response**: Admit; however, the audit reviews only whether the orientation includes sections covering: "Unacceptable activities and behavior and corresponding sanctions; How to contact ICE; The availability of pro bono legal services, and how to pursue such services; Schedule of programs, services, daily activities, including visitation, telephone usage, mail service, religious programs,

count procedures, access to and use of the law library and the general library; sick-call procedures, etc., and the detainee handbook." ECF No. 273-6 at 3 (10/5/2007), 12 (10/22/2009), 26 (10/21/2010), 38 (9/29/2011).

> A. **GEO's reply**: Plaintiffs admit the stated fact and provide an unnecessary argument as to the scope of the audits that is not supported by the record. (Doc. 273).

14. On-site ICE officials further review and approve all GEO policies. *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 16 (Admitted Fact #25)).

- **Plaintiffs' response**: Admit that GEO's written policies are reviewed and approved by an on-site official called the Contracting Officer's Technical Representative ("COTR"). ECF No. 261-16 (Nelson Tr.) 150:22-151:2.

> A. **GEO's reply**: Plaintiffs admit the stated fact. Moreover, in its order on Summary Judgment, this Court already adopted as undisputed that detention facilities develop policies and ICE "review[s] and clear[s]" those policies. Ragsdale Dep. 39:3-6, ECF No. 271-11. ICE does so through its on-site Contracting Officer's Technical Representative ("COTR"). 2 Nelson Dep. 150:18-151:2, ECF No. 261-16." (Doc. 380 at 4).

15. ICE also dictates sanctions applicable to detainees who refuse to comply with the federal housekeeping requirements: GEO "shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section." *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 14 (Admitted Fact #19)); (Doc. 336 at 12 (Admitted Facts #12–14)).

- **Plaintiffs' response**: Admit that ICE requires GEO to adopt, without changing, the offense categories and disciplinary sanctions set forth in this section; Plaintiffs dispute the characterization in the first sentence above, which implies that GEO's policies are the same as "federal housekeeping requirements."  See also Mot. at 23 (inaccurately claiming that GEO "implement[ed] a federal housekeeping policy").

  A. **GEO's reply**: Plaintiffs denial is semantic and conflicts with their prior representations to this Court.  Plaintiffs previously admitted "All applicable versions of ICE's NDS and PBNDS require GEO to provide a disciplinary severity scale that includes the 'refusal to clean assigned living area' as an offense which can be sanctioned by '[d]isciplinary segregation (up to 72 hours).'"  (Doc. 336 at 12 (Admitted Fact #12)).  That admission supports the stated fact.

16. The disciplinary scale in question classifies "[r]efusal to clean assigned living area" as a "high-moderate" offense for which ICE prescribes a program of 13 sanctions, including "Disciplinary Segregation (up to 72 hours)."  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 336 at 12 (Admitted Facts #12, #13)).

- **Plaintiffs' response**: Admit.

17. On-site ICE officials implemented and enforced the disciplinary scale by telling named Plaintiff Demetri Valerga he could be placed in segregation if he did not clean his own common area.  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 22–23 (Admitted Fact #41)).

- **Plaintiffs' response**: Admit the events stated above; however, Plaintiffs dispute that the ICE officers onsite at Aurora were authorized to condone acts that deviate

from the requirements of the Contract, as GEO's implementation of the Housing

Unit Sanitation Policy does.  ECF No. 261-2 (A. Martin Dep. 198:22-199:10); ECF

No. 287-6 (A. Martin Dep. 81:22-82:13); ECF No. 297-2 at 3-4 (Contracting

Officer's Representative ("COR") Appointment Letter) (listing functions and

actions the COR "shall not" undertake, including "direct the contractor . . . to

operate in conflict with the contract terms and conditions" and "[c]hange or modify

any of the terms and conditions . . . of a contract").

> A. **GEO's reply**: Plaintiffs admit the stated fact.  The cited documents do not
> support their assertion that GEO's implementation of the Housing Unit
> Sanitation Policy "deviate[s]" from the Contract and the addition of
> argument about the interpretation of admitted factual events does not
> provide clarity as to GEO's proffered undisputed fact.

18. Unlike housekeeping, the federally mandated VWP is, as its name suggests, voluntary—voluntary, that is, for detainees; GEO is required to offer the program under Section 5.8 of the PBNDS because the government has determined that an opportunity for work reduces idleness and improves discipline.  *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 24 (Admitted Fact #42)).

> - **Plaintiffs' response**: Admit that the 2000 NDS and all applicable versions of the
>   PBNDS require that GEO provide detainees the opportunity to participate in a
>   VWP.  See ECF 298 at 24 (Admitted Fact #42).  Plaintiffs dispute GEO's
>   incomplete statement about the government's rationale for mandating the VWP, for
>   which it fails to cite any evidence.

> > A. **GEO's reply**: The government rationale comes from the 2000 NDS and all
> > versions of the PBNDS, which include language similar to "[t]he negative

impact of confinement shall be reduced through decreased idleness, improved morale, and fewer disciplinary incidents." (*See, e.g.*, Doc. 261-8 at 50). This section was also quoted by this Court in its Order on summary judgment as follows: "the enhancement of essential operations and services and the reduction of '[t]he negative impact of confinement . . . through less idleness, improved morale and fewer disciplinary incidents." (Doc. 380 at 34–35).

19. For most of the timeframe relevant to this lawsuit, the PBNDS directed that the stipend for participants in the VWP "is $1 per day." *2000 National Detention Standards for Non-Dedicated Facilities*; (Doc. 261–10 at 5).

- **Plaintiffs' response**: Admit except for GEO's use of the phrase "directed that," which implies that the quoted statement in the PBNDS is an instruction about how GEO must pay VWP workers, as opposed to a statement about the amount that ICE would reimburse GEO for VWP labor. ECF No. 261-2 (A. Martin Dep. 106:6-107:22). Plaintiffs also note that GEO was required to comply with the 2008 PBNDS when they were published, although the quoted text is nearly identical in both the 2000 NDS and the 2008 PBNDS. See ECF 261-9 at 63 (2008 PBNDS) ("the compensation is $1.00 per day").

  A. **GEO's reply**: Dispute. The reference to "compensation" in the PBNDS has no relation to what ICE would reimburse GEO. The PBNDS plainly states that the referenced "compensation" is what detainees participating in the VWP will receive: "Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy. The compensation is $1.00 per day." (Doc. 261-9 at 63 (2008 PBNDS)). These

standards were in place through May 2013, when the 2011 PBNDS replaced the prior standards. (Doc. 298 at 13 (Admitted Fact #18)).

20. Beginning on June 23, 2013, the AIPC contract required compliance with the 2011 PBNDS, which states that participants in the VWP will be compensated "at least $1.00 (USD) per day." *2013 ICE-GEO Contract Modification*; (Doc. 271-4 at 2–3).

- **Plaintiffs' response**: Admit the quoted content of the document, and that the 2011 PBNDS was formally incorporated into the Contract on June 23, 2013. Plaintiffs dispute GEO's implication that the option to pay more than $1 per day did not exist prior to it formally agreeing to incorporate portions of the 2011 PBNDS into its contract. GEO had an obligation under the relevant contract to be "knowledgeable of any changes to the [PBNDS] and perform in accordance with the most current version of the [PBNDS]." ECF No. 262-2 at 37-38. In addition, GEO can and does request modifications of the Contract when it needs to. ECF No. 261-2 (A. Martin Tr. 106:8-108:10). GEO did not request a contract modification to pay detainees more than $1.00 per day. Id. at 105:3-12.

  A. **GEO's reply**: Plaintiffs admit the substance of the stated fact.

21. At its own facilities, ICE pays exactly $1 per day, which is precisely the amount Congress appropriates to reimburse contractors like GEO. *See* 8 U.S.C. § 1555(d); Publ. L. No. 95-431, 92 Stat. 1021 (1978).

- **Plaintiffs' response**: Dispute. GEO offers no evidence as to what ICE actually pays at its own facilities.

  A. **GEO's reply**: 8 U.S.C. § 1555(d) states: "Appropriations now or hereafter provided . . . shall be available for payment of . . . payment of allowances (at such rate as may be specified from time to time in the appropriation Act

involved) to aliens while held in custody under the immigrations laws, for work performed." Pub1. L. No. 95-431, 92 Stat. 1021 (1978) then sets a "payment of allowances (at a rate not in excess of $1 per day) to aliens, while held in custody under the immigration laws, for work performed." These sources support the stated fact.

## III.  RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  GEO is a for-profit company publicly traded on the New York Stock Exchange. Declaration of Michael J. Scimone ("Scimone Decl.") Ex.1 (GEO Group, Inc. Form 10-K); Scimone Decl., Ex. 2 (Deposition of Charles Hill ("Hill Dep.")) 19:22-20:7 ("A: Because it's a publicly traded company, we have to project our earning[s] to the Street . . . . Q: By the 'Street,' you mean 'Wall Street'? A: Wall Street, yes.").

- **GEO's response**: Admit.

2.  During the class period, GEO earned revenues in excess of $1.5 billion per year. Scimone Decl., Ex. 1 (GEO Group, Inc. Form 10-K) at 53.

- **GEO's response**: Dispute.  The cited evidence does not cover Fiscal Years 2004–2009.  GEO admits that between Fiscal Years 2010–2014 it earned revenues in excess of $1.0 billion per year.

3.  GEO derives this revenue from contracts with federal, state, and local government entities to operate and manage prisons, detention centers, and reentry facilities. *Id.* at 3.

- **GEO's response**: Dispute.  The cited evidence does not support the stated fact.

4.  GEO develops and operates facilities "based on contract awards, using our project development expertise and experience to design, construct and finance what we believe are state-of-the-art facilities that maximize security and efficiency." *Id.*

- **GEO's response**: Admit.

15

5. In order to win a detention center management contract from the federal government, GEO has to prevail in a competitive bidding process. Scimone Decl., Ex. 3 (Deposition of David Venturella ("Venturella Dep.")) 145:8-146:10; Hill Dep. 116:5-10.

- **GEO's response**: Admit only that GEO had to prevail in a competitive process for the award of its contracts with ICE for services at the AIPC. The cited evidence otherwise does not support the stated fact.

6. Factors the government considers when evaluating bids on a detention center contract include price, technical specifications, and past performance. Scimone Decl., Ex. 4 (Deposition of Brian Evans ("Evans Dep.")) 25:16-26:6.

- **GEO's response**: Admit that Plaintiffs list some of the factors the government may consider in evaluating proposals for detention related facilities and services.

7. When it bids on a contract, GEO develops a pricing model based on the requirements of the RFP to analyze the requirements for personnel, the facility, and the cost of operations from food service to supplies to maintenance. This pricing is developed by a specialized Pricing Department in GEO's corporate office, which bases its projections on historical experience operating similar facilities. Hill Dep. 23:18-24:23.

- **GEO's response**: Admit.

8. GEO's Pricing Department is part of its larger Proposal Development Group. The pricing process also involves GEO's regional offices, its corporate business managers, and are ultimately approved by GEO's Chief Financial Officer and Chief Executive Officer. Hill Dep. 25:2-10.

- **GEO's response**: Admit.

9. From time to time, GEO may request an "equitable adjustment" to its contract price when underlying assumptions change. This involves a GEO officer in the company's regional

office, corporate office, or at the facility level calculating the financial impact of the changed assumption, and this projection is then reviewed by multiple people, which may include GEO's business department, Operations Department, or contract administration department. *Id.* 31:17-33:12.

- **GEO's response**: Dispute. The cited testimony of Hill explains only that when the Department of Labor changes the federal Service Contract Act wage rate, there is a process between ICE and GEO for requesting an equitable adjustment. As explained by Mr. Hill, this process exists because GEO does not absorb the cost of increased wages when there is a change in law, ICE pays for that change in rate that was not contemplated at the time of contracting. (Doc. 466-2 at 17–20 (Hill pgs. 31–34)).

10. Facilities like GEO's Aurora ICE Processing Center employ personnel in multiple departments. These include an Executive office and business support, maintenance, and personnel on three shifts so that the facility can operate 24 hours a day. GEO staffs the facility with sufficient "relief" personnel so that if an employee is absent, GEO can "backfill" the position. It calculates that staffing on the basis of full-time equivalents, *i.e.* a person working 40 hours per week. *Id.* 89:13-92:15.

- **GEO's response**: Admit that Plaintiffs list some of the positions employed at GEO's Aurora facility.

11. GEO's staffing process takes account of all services required by the government contract, as well as "corporate requirements which are your executive staff business support," such as, for example, human resources and payroll. Pricing also incorporates the experience of specialized operations, such as the Health Service Department and the Food Service Department *Id.* 94:19-98:9.

- **GEO's response**: Dispute.  The cited testimony of the witness does not support the "fact."  The witness expressly stated "that would be speculation on my part" and did not have knowledge about "all services."  Further the statement misstates the testimony.

12. During the time period prior to 2015, ICE contracts for immigration detention facilities almost always went to the lowest priced bidder unless they had an unsatisfactory performance record.  Scimone Decl., Ex. 4 (Deposition of David Venturella ("Venturella Dep.")) 152:22-154:16.  In some instances, the federal government will award a contract to an entity that is not the lowest bidder if that entity's past performance of government contracts is of higher quality than its competitors.  Evans Dep. 26:2-6.

- **GEO's response**: Dispute.  The quoted testimony from Mr. Venturella disputes the document he was reviewing that stated that prices usually went to the lowest bidder, stating instead "in the proposals that ·we've submitted, we ***don't believe that the price was ·based on lowest***, it was based on competitive, and again, being able to meet all the criteria in the RFP." (Doc. 466-3 at 18 (Venturella 153:8-11 (emphasis added))).  The citation to Evan's testimony also states that "often times" GEO is the "higher bid" when it submits its RFPs.  (Doc. 466-4 at 12 (Evans Dep. 25:14-25)).  Indeed, Mr. Hill went on to expressly testify that "·Again, my experience -- you know, ·Geo doesn't try to be the low-cost leader, we try to be the best value for the Government for the services we provide, so I'm not sure characterizing us as always trying to have the lowest price possible is accurate.· One bids with higher prices because our clients recognize the service we provide is preferrable to our competitors" **Exhibit A** (Hill Dep. 117).  In short, none of the cited testimony

supports the claim that contracts in this context more often than not go to the lowest proposal.

13. GEO takes this into account in structuring its business, which is "based on the fact that we can deliver as good or better-quality services at the same price or lower cost than the government can."  Evans Dep. 50:19-21.

- **GEO's response**: Dispute.  The cited evidence refers to GEO's business generally. It does not support the inference GEO "structure[es] its business" around being the lowest bidder.  It also is not referring to GEO's Aurora facility. Further, the cited testimony provides no reference to taking into account the prior mis-stated fact in "structuring its business."  As noted above, the testimony shows that price was not GEO's main driver, Mr. Hill explained "·Again, my experience -- you know, ·Geo doesn't try to be the low-cost leader, we try to be the best value for the Government for the services we provide, so I'm not sure characterizing us as always trying to have the lowest price possible is accurate.· One bids with higher prices because our clients recognize the service we provide is preferrable to our competitors" **Exhibit A** (Hill Dep. 117).

14. The 2011 Contract for operating the Aurora Facility was a two-year contract with multiple two-year option periods; ICE could choose to end the contract and hire a different contractor after each two-year period.  Hill Dep. 43:10-44:13.

- **GEO's response**: Dispute.  The cited evidence appears to be testimony about a portion of the RFP, not the contract and was in response to a general question about two year renewal terms. The Contract states: "Period of Performance is September 16, 2011 through September 15, 2021, if all options are exercised."  (Doc. 262-2).

15. GEO must perform well under the contract and keep its prices reasonable or risk the government declining to renew the contract or declining to exercise an option period to extend the contract.  Hill Dep. 43:10-44:13; 117:5-14.

- **GEO's response**: Dispute.   The cited testimony does not assert that GEO "must perform well under the contract," nor does it indicate that prices impact the government's decision to renew a contract or exercise an option.  The second subsection of cited testimony asks the witness, hypothetically, if there would be a price that would be too high to pay for detention services. (Doc. 466-2 at 38) ("And so if Geo's prices ran too high, for·example, there's some point at which it may endanger its ability to win a contract bid from ICE; correct? A: Yes.")).  There is no support in the cited testimony that ICE would not renew a contract over a pricing dispute, nor that GEO could change the pricing after the RFP is accepted in a way that would lead to cancellation.

16. Throughout the relevant period, GEO's contract with ICE required it to carry liability insurance.  Scimone Decl, Ex. 5 (2011 Contract); Ex. 6 (2006 Contract); Ex. 7 (2003 Contract).

- **GEO's response**: Dispute.  The testimony cited shows only a general liability insurance requirement for 2003.  The 2011 contract provision provided cites only to a FAR requiring Medical Liability Insurance.

17. GEO competes for facility management contracts with other detention center contractors.  Evans Dep. 17:1-16.

- **GEO's response**: Admit.

18. CoreCivic, Inc. is GEO's largest competitor in the prison/detention center management industry.  *Id.* 16:21-17:3.

- **GEO's response**: Admit.

19. Detainees assigned to a housing detail under GEO's sanitation policy were required to "clean the rec yard, wipe the []phones, clean the microwave, change the garbage bag, clean the showers, disinfect the showers, [and] pick up all the trash, like the toothpaste [and] the shampoo bottles" in an 80-person housing pod (or a 48-person dormitory).  ECF No. 299-2 (Excerpts of Deposition of Hugo Hernandez) at 15-16.

- **GEO's response**: Dispute.  The cited evidence does not support that cleaning occurred "in an 80-person housing pod (or a 48-person dormitory)."  There is no definition provided of "sanitation policy" nor details about if detainees were "assigned to a housing detail" in the quoted text.  GEO further disputes that this is an accurate description of the tasks that were included in the meal cleanup, discussed at pages 13 and 14 of this Court's Order on summary judgment.  (*See* Doc. 380).  Tellingly, Plaintiffs do not cite the actual policy at issue in this case. GEO admits only that the deposition testimony contains the quoted statement.

20. GEO's guards told detainees to "Clean, because you're going to the hole."  ECF No. 336-14 (Excerpts of Deposition of Grisel Xahuentitla) at 12.

- **GEO's response**: Dispute.  The cited evidence does not refer to a specific interaction between a detention officer and detainee.  It refers to theoretical conversation and what the detainee believed *would have* been an officer's comment.  Furthermore, none of the named Plaintiffs were placed in segregation for refusing to clean. ECF No. 336 (Admitted fact 28).

21. The Housing Unit Sanitation Policy, which required this cleaning beyond personal housekeeping, was not created by ICE nor is it required by GEO's contract with ICE.  ECF 261-7 (Declaration of Shannon Ely) ¶ 22.

- **GEO's response**: Dispute.  The cited evidence does not support that the Housing Unit Sanitation Policy "required [] cleaning beyond personal housekeeping."  GEO has previously asserted and continues to assert that ICE required  and approved of, all policies at the facility including the meal clean-up policy.  (Doc. 316-1; *see also* Doc. 291-1).   Moreover, as GEO has stated, ICE audits its handbook, which contains the Housing Unit Sanitation Policy/meal clean-up, and signs off on the same every year.  (Doc. 271-11 at 8) (Ragsdale Dep. 39:3-6)), (Doc. 271-11 (ice reviews and approves all handbooks)); (*see also* Doc. 270 at 7 ("All of GEO's policies are reviewed and approved by an on-site ICE official.  Plaintiffs' response: Admit")).

22. GEO's Aurora facility-level policies are developed by local GEO employees, who review and amend the policies annually.  ECF No. 261-11 (K. Martin Dep.) 51:22-25, 64:17-23; ECF No. 261-12 (Ceja 30(b)(6) Dep.) 33:22-34:1.

- **GEO's response**: Dispute.  GEO's Aurora Facility Level policies are developed at the direction of ICE, by GEO employees, who then seek and obtain ICE review and approval of all policies.  (Doc. 271-11 at 8) (Ragsdale Dep. 39:3-6)), (Doc. 271-11); *Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Defendant's Affirmative Defense*; (Doc. 298 at 14 (Admitted Fact #25)).

23. ICE maintains an onsite official at the Aurora Facility called the Contracting Officer's Technical Representative ("COTR") to oversee GEO's performance under the contract in a limited capacity.  The COTR cannot "make commitments, modifications, or other actions, which would commit the Government to a change in price, performance, quality, quantity, or delivery."  ECF No. 297-2 at 3.  Nor can the COTR "provide guidance to the contractor . . . which might be

interpreted as a change in the scope or terms of the contract." *Id.* The COTR also cannot "direct the contractor . . . to operate in conflict with the contract terms and conditions." *Id.* at 4. The COTR's role is to "[r]eview technical proficiency and compliance against the technical provisions of the contract, and verify the performance of work by the contractor." *Id.*

- **GEO's response**: Dispute. ICE has a significant presence at the facility beyond the COTR. (*See e.g.* Doc. 272-7, (Demetrio Valerga Dep., 135:15-137:19) (discussing ICE officers disciplining detainees on-site at Aurora))); (Doc. 271-11 at 8 (Ragsdale at 78:9 and 33:20-25)). Plaintiffs do not provide any evidence to support their first sentence, but GEO agrees that there are multiple on-site ICE officials monitoring its compliance with the contract's requirements. The cited authority further does not support the proposition that the COTR's role is limited to "[r]eview technical proficiency and compliance against the technical provisions of the contract, and verify the performance of work by the contractor." Instead, the cited authority indicates broad-reaching authority that includes: performing "on-site surveillance," conducting "inspections necessary to assure performance and compliance with the terms and conditions of the contract," notifying GEO "of deficiencies observed during surveillance," and reporting "all incidents of faulty or noncompliant work, delays, or problems, which may disrupt or hinder future performance." (Doc. 297-2 at 1).

24. GEO did not adopt the disciplinary scale stated in the PBNDS into its facility handbook verbatim. ECF No. 298 at 16, Plaintiffs' Response to SUMF ¶ 24.

- **GEO's response**: Dispute. Plaintiffs fail to cite evidence that the disciplinary severity scale is not adopted into the handbook verbatim other than a single non-final draft from 2005. The record-evidence shows this was a non-final version, and

therefore does not support Plaintiff's position.  (Doc. 317-2 at 13 (Ceja. Dep.)).

GEO further notes that Plaintiffs do not dispute that the disciplinary severity scale

appeared verbatim in every other handbook—nor can they.  (Doc. 317-1 at 11–12).

25. Detainees at the Aurora Facility are not detained as punishment or as a sentence for a crime; rather they are held awaiting resolution of their deportation proceedings.  Venturella Dep. 130:22-131:19 (Aurora detainees' detention was "not punitive, it's not for punishment, it's not for rehabilitation, it[']s only to detain them while they are going through this process in the least restrictive setting"); Scimone Decl, Ex. 8 (Deposition of Daniel Ragsdale ("Ragsdale Dep.")_ 124:3-8 ("They are not sentenced prisoners . . . . it's a legal distinction but to some degree it's, I think, a meaningful one").

- **GEO's response**: Admit, but clarify that during the period at issue, many of the detainees arrived at the facility due to a criminal conviction.

## IV.   ARGUMENT

Qualified immunity is a genuine immunity from suit.  Enduring a trial is itself offensive to the immunity and undermines the government's ability to hire and retain capable contractors.  *Filarsky v. Delia*, 566 U.S. 377, 391 (2012).  After all, "[t]he public interest in ensuring performance of government duties free from the distractions that can accompany even routine lawsuits is also implicated when individuals other than permanent government employees discharge these duties." *Id.*  Recognizing these core features of qualified immunity, the Tenth Circuit holds that, absent extreme circumstances, it cannot be waived.  *MacArthur v. San Juan County*, 495 F.3d 1157, 1162 (10th Cir. 2007).  Once raised, the familiar two-part test asks whether the defendant violated the plaintiff's right and whether that violation was clearly established at the time.  Here, there is nothing to indicate that GEO violated anyone's

rights, but at minimum, such violation was not clearly established.  The Court should therefore grant the Motion.

### A.     Qualified Immunity is a Non-Waivable Right Held by GEO

The Tenth Circuit has "consistently held . . . that qualified immunity can be raised at any time and a district court may enter . . . judgment on that ground at any point before trial at which it is appropriate." *Id.* (citation modified).  The timing of a qualified immunity motion thus is "inconsequential" and a defendant "do[es] not waive their right [to] qualified immunity, *i.e.* their right to be free from suit, by failing to assert it at the earliest possible time." *Valez ex rel. K.D. v. Salipan*, No. 1:21-cv-00990-WJ-JHR, 2022 WL 444282, at *1 (D.N.M. Feb. 14, 2022).  Recognizing this, courts within the Tenth Circuit have allowed defendants to assert qualified immunity for the first time at various stages of litigation.  *See, e.g.*, *Knellinger v. Young*, No. 1:22-cv-01379-CNS-STV, 2026 WL 411749, at *1 (D. Colo. Feb. 13, 2026) (raised for the first time following remand from the Tenth Circuit in a motion to dismiss); *Valez ex rel. K.D.*, 2022 WL 444282, at *1 (raised for the first time in the middle of discovery); *Ahmad v. Furlong*, 435 F.3d 1196, 1202 (10th Cir. 2006) (raised for the first time in a summary judgment motion); *MacArthur*, 495 F.3d at 1161–62 (raised for the first time at the pretrial conference); *Cassady v. Goering*, 567 F.3d 628, 633–34 (10th Cir. 2009) (appealed for the first time after the district court granted a retrial).  In each instance, those courts held failure to raise qualified immunity at an earlier stage did not result in waiver.

To avoid this precedent, Plaintiffs attempt to recast GEO's argument as arguing that qualified immunity must be granted in all circumstances.  (*See* Doc. 465 at 25).  This is a mischaracterization of GEO's argument.  The Motion recognizes waiver can occur in certain "extreme circumstances, like waiting until after a jury has rendered its verdict." (Doc. 450 at 8 (citing *Evans v. Fogarty*, 241 Fed. Appx. 542, 550 n.9 (10th Cir. 2007)).  The problem for

Plaintiffs is that extreme circumstances do not exist here. Trial is still over five months away, and Plaintiffs were immediately on notice about GEO's intent to assert qualified immunity after the Supreme Court decision issued. The facts of this case are thus less prejudicial to Plaintiffs than *Ball Corp. v. Xidex Corp.*, where the Tenth Circuit held qualified immunity was not waived despite being raised only three months before trial. 967 F.2d 1440, 1443–44 (10th Cir. 1992). Outstanding factual issues required the court in *Ball Corp.* to proceed to trial before deciding qualified immunity. *See id.* at 1443, 1445 (explaining actual malice is a mixed question of law and fact). Here, there are no outstanding factual issues that prevent a ruling on qualified immunity. *Infra* Section IV(D)(2). Thus, *Ball Corp.* confirms that qualified immunity is properly raised any time before trial. 967 F.2d at 1444; *Herrera v. City of Albuquerque*, 674 F. Supp. 2d 1271, 1280 (D.N.M. 2008) ("Because Defendants are entitled to raise the defense of qualified immunity even outside the dispositive motions deadline, and because there are no disputed material facts, the Court must determine as a matter of law whether [the defendant] is entitled to qualified immunity.").

Plaintiffs cite two Tenth Circuit cases to argue qualified immunity is a waivable defense. (Doc. 465 at 24). The first, *Bentley v. Cleveland County Board of County Commissioners*, says "both qualified and absolute immunity are affirmative defenses that must be pleaded." 41 F.3d 600, 604 (10th Cir. 1994). That statement concerned a post-judgment motion brought under the Oklahoma Governmental Tort Claims Act. *Id.* at 604. *Bentley* thus does nothing to undermine the pretrial rule; it only confirms the same "extreme circumstances" that warranted waiver in *Evans—i.e.*, raising an immunity defense after the jury returned a verdict. *Compare id.* at 602, 604, *with Evans*, 241 Fed. Appx. at 550 n.9. In addition, *Bentley* relies on *Quezada v. County of Bernalillo*, 944 F.2d 710, 718 (10th Cir. 1991), to support its holding. But *Quezada* states a defendant can raise qualified immunity for the first time "in

26

their answer, or in a motion to dismiss, or in a motion for summary judgment." 944 F.2d at 718. It further says a defendant who is "unsuccessful in having a lawsuit dismissed on qualified immunity grounds before trial may reassert the defense at trial or after trial." *Id.* That again supports the rule that qualified immunity is properly raised at any point before trial.

The second case cited by Plaintiffs—and GEO in its Motion—is *Ahmad v. Furlong*, 435 F.3d 1196 (10th Cir. 2006). (Doc. 465 at 24). *Ahmad* treats newly-raised assertions of qualified immunity as constructive amendments. 435 F.3d at 1202. The purpose of this rule is to ensure the non-moving party has ample opportunity to respond. *See id.*; *see also Ball Corp.*, 967 F.2d at 1443–44 ("This Court has held that the purpose behind rule 8(c) is that of putting [a] plaintiff on notice well in advance of trial that [the] defendant intends to present a defense in the nature of an avoidance."). The discussion below explains why GEO has given Plaintiffs adequate notice. *Infra* Section IV(B). For waiver, it is enough that *Ahmad* does not hold that qualified immunity is waived unless raised in the answer and, to the contrary, explains the technical mechanism by which it is preserved.

Plaintiffs then rely on a number of out-of-circuit cases to support their argument that qualified immunity can be waived. These cases range from simply applying the rule that a defendant cannot raise qualified immunity after a jury verdict, *Sales v. Grant*, 224 F.3d 293 (4th Cir. 2000), to disagreeing with the Tenth Circuit that qualified immunity is non-waivable, *Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 750-51 (6th Cir. 2015). None of them arise in the same posture as this case. Plaintiffs' citation to *Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204, 210 (3d Cir. 2001), is also unpersuasive because the Tenth Circuit does not require a similar test. Even on its own terms, the test in *Eddy* overlaps with the notice inquiry under *Ahmad* to the point of being redundant.

Qualified immunity is a non-waivable right held by GEO that can be asserted any time

27

before trial. For the reasons explained below, GEO has given Plaintiffs adequate time to respond to its assertion. GEO's Motion, therefore, must be decided on the merits.

### B. GEO Provided Plaintiffs Adequate Notice of Its Intent to Raise Qualified Immunity

Federal Rule of Civil Procedure 8(c) prescribes that "a party must affirmatively state any avoidance or affirmative defense" when responding to a pleading. The rule's purpose is to put a "plaintiff on notice well in advance of trial that [the] defendant intends to present a defense in nature of an avoidance." *Marino v. Otis Eng'g Corp.*, 839 F.2d 1404, 1408 (10th Cir. 1988) (citation modified). The notice-based approach ensures lawsuits are decided on the merits. *See, e.g.*, *Green Country Food Mkt. v. Bottling Grp., LLC*, 371 F.3d 1275, 1279 (10th Cir. 1992) ("A plaintiff should not be prevented from pursuing a claim simply because of a failure to set forth in the complaint a theory on which the plaintiff could recover, provided that a late shift in the thrust of the case will not prejudice the other party in maintaining its defense."); *Ball Corp.*, 967 F.2d at 1443-44 (finding that asserting qualified immunity three months before trial gave adequate notice).

For newly-raised assertions of qualified immunity, a defendant gives adequate notice when it meets the same standards governing motions to amend. *Ahmad*, 435 F.3d at 1202. Those standards require demonstrating "(1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard." *Gorsuch, Ltd. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014).

### 1. The Supreme Court Clarifying the Difference Between *Yearsley* and Qualified Immunity Constitutes Good Cause Under Rule 16(b)(4)

Federal Rule of Civil Procedure 16(b)(4) states a scheduling order may be modified for good cause. Change or clarification of the law provides one example where Rule 16's good cause requirement is met. *Pumpco, Inc. v. Schenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001) (finding good cause because "recent authority from the Colorado Court of Appeals[]

establish[ed] a basis for an additional claim"); *Gorsuch, Ltd.*, 771 F.3d at 1240 (relying on *Pumpco, Inc.*). As explained in GEO's Motion, the Supreme Court clarifying the correct avenue for government contractors to avoid the burdens of trial—qualified immunity as opposed to the *Yearsley* doctrine—constitutes good cause under Rule 16(b)(4). (Doc. 450 at 10).

Plaintiffs attempt to recast GEO's argument as relying entirely on a footnote in Justice Alito's concurring opinion. (Doc. 465 at 29). That is incorrect. The Supreme Court's overall holding explained the difference between *Yearsley* and qualified immunity. *See The Geo Grp., Inc. v. Menocal*, 146 S. Ct. 774, 784 (2026) (explaining *Yearsley* is dissimilar from qualified immunity for its different and more stringent requirements). Justice Alito's concurrence provides a more comprehensive explanation of why qualified immunity protects federal contractors like GEO. *Id.* at 791 (Alito, J., concurring) (supporting a limited reading of *Yearsley* precisely because qualified immunity already protects federal contractors from "overdeterrence, timidity, and distraction in Government functions" by making denials immediately appealable). But the clarification of law comes from the majority opinion.

Plaintiffs next argue GEO is misreading Justice Alito's concurrence. (*See* Doc. 465 at 29–30). This argument ignores the Supreme Court's overall holding, which makes sense, given that classifying *Yearsley* as a defense to liability only highlights the different and important role qualified immunity plays in protecting contractors. More fundamentally, Plaintiffs' argument misstates Justice Alito's position. The concurrence principally relies on government contractors receiving adequate protection under *Filarsky*'s grant of qualified immunity. *The Geo Grp., Inc.*, 146 S. Ct. at 791 (Alito, J., concurring). Justice Alito explained "the public has an interest in preventing overdeterrence, timidity, and distraction in Government functions no matter the nature of the defendant's particular relationship with the

government," but Supreme Court "doctrine already accommodates these concerns by allowing contractors to invoke qualified immunity." *Id.* (citation modified); *see also Filarsky*, 566 U.S. at 391. According to Justice Alito, this means *Yearsley* denials, if immediately appealable, would overlap with the greater protections available under qualified immunity. *Id.* That was a reason to limit *Yearsley*, but it assumes that qualified immunity is available.

Plaintiffs continue by drawing this Court's attention to a footnote in Justice Alito's concurrence. (*See* Doc. 465 at 29–30). They argue the footnote establishes GEO is not entitled to qualified immunity. (*Id.* at 29). Nothing could be further from the truth. The footnote merely explains that the specific question of "whether corporate-contractor defendants like GEO [] may invoke qualified immunity" has not been decided by the Court. *The Geo Grp., Inc.*, 146 S. Ct. at 792 n.* (Alito, J., concurring). It then goes on to suggest that the Court's majority holding implicitly requires finding corporate contractors ***can*** invoke qualified immunity, which is consistent with *Filarsky*. *Id.* Otherwise, the public interest in efficient government services would require giving those contractors the ability to immediately appeal *Yearsley* denials. *Id.* There is, of course, no reason that a contractor organized as a partnership or sole proprietor would enjoy qualified immunity while one organized as a corporation does not.

Plaintiffs finally argue Rule 16(b)(4) has not been met because it is "based on essentially the same facts as the *Yearsley* defense." (Doc. 465 at 30). This argument confuses changed factual circumstances with clarifications of law. Both are independent bases for amendment under Rule 16. *Gorsuch, Ltd.*, 771 F.3d at 1240 ("Rule 16's good cause requirement may be satisfied, for example, if a plaintiff learns new information through discovery *or* if the underlying law has changed." (emphasis added)). GEO relies on the latter to constructively amend its answer after the Supreme Court clarified the difference between

30

*Yearsley* and qualified immunity. This constitutes good cause under Rule 16. *See Pumpco, Inc.*, 204 F.R.D. at 668. It does not matter that the underlying facts remain the same.

The unpublished cases cited by Plaintiff do not require a different conclusion. The first, *Hruska's Grocery Company v. Hruska's Inc.*, involved a defendant who did not provide any basis for amendment. No. 2:24-cv-00769, 2026 WL 45166, at \*2 (D. Utah Jan. 7, 2026). The second, *Poitra v. School District No. 1 in County of Denver*, recognizes that district courts have inherent authority to manage their dockets. No. 14-cv-00887-WYD-CBS, 2015 WL 7247567, at \*5 (D. Colo. Oct. 21, 2015). That authority, however, is counterbalanced against deciding cases on the merits. *The Proctor & Gamble Co. v. Haugen*, 427 F.3d 727, 738 (10th Cir. 2005) (reversing a dismissal sanction due to "the judicial system's strong predisposition to resolve cases on their merits").

Ultimately, Plaintiffs do not and cannot dispute that the Supreme Court effected a significant clarification in the law governing contractor immunity. It would have been smoother if that clarification had occurred years ago, but it turns out that this was the case to raise the issue. That extraordinary fact provides good cause for a constructive amendment to assert qualified immunity.

> **2.    Rule 15(a)(2) is Similarly Met Because the Minimal Prejudice Experienced by Plaintiffs Does Not Outweigh the Harm GEO Faces by Standing for an Otherwise Improper Trial**

Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave [to amend] when justice so requires." This standard is purposefully lenient and presumes parties can amend their pleadings unless there is "undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility." *See Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993); *Pumpco, Inc.*, 204 F.R.D. at 669. GEO's Motion explains why the harm it faces by remaining in this lawsuit far exceeds any prejudice faced by Plaintiffs. (Doc. 450 at 12; see also *Filarsky*, 566

31

U.S. at 387 (Sotomayor, J., concurring) (fearing that contractors could be left "holding the bag" for government policies)).

### i.        Undue Prejudice

Prejudice to the nonmoving party remains the most important factor under Rule 15(a)(2). *Christensen v. Denver Hosp.*, No. 1:22-cv-01916-RM, 2024 WL 6887139, at *2 (D. Colo. Apr. 21, 2024). The Opposition identifies three feeble bases for prejudice: "fading witness memories," the "inability to find class members," and qualified immunity being raised after the close of discovery. (Doc. 465 at 27, 32). None of these arguments are persuasive. Trial is still over five months away, and there is plenty of time to decide GEO's Motion without changing the trial dates. This means there are no concerns over "fading witness memories" or Plaintiffs being unable to find class members. Plus, any memory fading has already occurred; the marginal effect of deciding this Motion is non-existent. Regarding discovery being closed, Plaintiffs do not explain why that would prejudice them. To the contrary, Plaintiffs filed an adequate response to GEO's Motion without additional discovery and without noting what they would need to uncover.

Plaintiffs hypothesize GEO will appeal an adverse ruling and assert prejudice based on that hypothetical appeal. (*See* Doc. 465 at 48). But Plaintiffs are also likely to appeal an adverse ruling. Because an appeal is likely either way, its avoidance cannot be a reason to rule one way or the other.

Plaintiffs offer two cases to support their prejudice arguments. The first, *Breen v. Pruter*, is distinguishable because that case concerned a plaintiff attempting to add a negligence claim after the close of discovery. 679 Fed. App'x 713, 728 (10th Cir. 2017). Unlike qualified immunity, negligence claims are waived if not raised before discovery because each element requires specific discovery. *See Keylon v. City of Albuquerque*, 535 F.3d 1210, 1217 (10th

Cir. 2008). Qualified immunity does not contain specific elements; it only asks whether an underlying violation was clearly established. Once again, Plaintiffs' Opposition proves the point. The second case cited by Plaintiffs, *Reskin v. Greyhound Lines, Inc.*, is distinguishable because that case concerned a plaintiff who had already amended the complaint three times, and the most recent amendment attempted to expand the litigation from "a discrete incident that affected a single individual" to a nationwide class action. No. 20-cv-02605-WJM-NRN, 2021 WL 9032885, at *3 (D. Colo. Nov. 16, 2021). That massive transformation of the case and implication of a whole different body of governing procedures is nothing like the present circumstance.

### ii.　　Remaining Factors

Plaintiffs' Opposition argues GEO's Motion was a tactical maneuver to delay trial. (Doc. 465 at 31). It argues the maneuver shows bad faith. (*Id.* at 26, 31).

Plaintiffs again ignore the procedural history of this case. GEO has long asserted that its service to the federal government makes it immune from the actions in question. It first raised that theory under the more specific *Yearsley* doctrine, which federal contractors believed was the more restrained and safer path before the Supreme Court's decision in this case. After that decision limited *Yearsley* to a liability defense, GEO then proceeded under qualified immunity. Doing so is not bad faith; it is the continuation of the debate the parties have been litigating for years. *See Pumpco, Inc.*, 204 F.R.D. at 668; *F.T.C. v. Superior Prod. Int'l*, No. 20-2366-HLT-GEB, 2021 WL 6112497, at *5 (D. Kan. Dec. 27, 2021) (finding good cause to amend because a change to the underlying law require the plaintiff to rely on a different, and previously known, remedy). Whatever Plaintiffs think of the merits of GEO's claim to immunity, there is no doubt that it has pursued immunity transparently and in good faith since the beginning of this case.

Plaintiffs cite three cases to support their argument on undue delay. All three are distinguishable because they concern amendments based on changed factual circumstances, not clarifications to the underlying law. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1207 (10th Cir. 2006); *Hayes v. Whitman*, 264 F.3d 1017, 1026 (10th Cir. 2001); *Estrada v. Martin Marietta Materials, Inc.*, No. 20-cv-00375-REB-SKC, 2020 WL 9424368, at *2 (D. Colo. Oct. 5, 2020). Plaintiffs offer no cases supporting their bad faith argument.

On the other side of the ledger, Plaintiffs do not dispute the reams of precedent explaining the harm that befalls an immune defendant who is forced to stand trial. *E.g.*, *Filarsky*, 566 U.S. at 389–91; *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 142–44 (1993); *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985). As the Supreme Court has explained in countless cases, the burden of trial and the risk of an adverse verdict are themselves an enormous burden on an immune defendant—and that burden cannot be undone through the appellate process. That insight underlies many of the rules permitting defendants to raise qualified immunity long after filing an answer. Combined with the extraordinary event of Supreme Court review in this case and the changed legal landscape that followed, GEO has cleared the low threshold to pursue a merits decision on qualified immunity—however it might come out.

C.    **Plaintiffs Overstate *Richardson*; GEO Can Assert Qualified Immunity Under Tenth Circuit Precedent**

In the last decade, the Supreme Court has recognized that there is "no distinction in the common law 'between public servants and private individuals engaged in public service.'" *Campbell-Ewald v. Gomez*, 577 U.S. 153, 167 (2016) (quoting *Filarsky*, 566 U.S. at 387). That recognition followed the approach taken by the Tenth Circuit, which allowed private parties to assert qualified immunity since at least 1988. *See DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714, 723 (10th Cir. 1988). The subsequent decades saw Tenth Circuit

34

precedent expand the scope of qualified immunity for private parties. Today, it allows a private party to assert qualified immunity in three instances: (i) when the private defendant is "closely supervised by the government"; (ii) when "there is a historical basis for providing immunity to that type of private entity"; or (iii) when "extending immunity implicates special policy concerns involved in suing government officials." *General Steel Domestic Sales, L.L.C. v. Chumley*, 840 F.3d 1178, 1182 (10th Cir. 2016) (quotations omitted). GEO's Motion explains why it fits each of these buckets. (Doc. 450 at 14–20).

Plaintiffs respond with an argument that "GEO's claim to qualified immunity is foreclosed by the Supreme Court's decision in *Richardson v. McKnight*, 521 U.S. 399 (1997)." (Doc. 465 at 32). GEO's Motion explained the many reasons *Richardson* does not apply to this case. (Doc. 450 at 18). But since the Opposition principally relies on *Richardson*, it is worth reiterating the salient points.

To begin, *Richardson* classifies its holding as "answer[ing] the immunity question narrowly, in the context in which it arose." 521 U.S. at 413. That context was a claim under 42 U.S.C. § 1983 for actions that a contractor performed "***with limited direct supervision by the government***." *Id.* (emphasis added). Two limiting principles appear immediately. *Filarsky* recognized the first: "*Richardson* was a self-consciously narrow decision" cabined to Section 1983 claims. *See* 566 U.S. at 393. Keeping with this understanding, the Tenth Circuit has continued to allow private contractors working in correctional facilities to avail themselves of qualified immunity. *See, e.g.*, *Estate of Lockett v. Fallin*, 841 F.3d 1098 (10th Cir. 2016) (doctors); *Franco v. Bd. of Cnty. Comm'rs*, 609 F. App'x 957 (10th Cir. 2015) (probation officers). GEO would not be so bold as to say *Richardson* is no longer good law, although some courts in the Tenth Circuit have hypothesized it would come out differently today. *See Herrera v. Santa Fe Pub. Schs.*, 41 F. Supp. 3d 1027, 1186 (D.N.M. 2014). At the very least,

*Richardson* is an outlier among the broader qualified immunity landscape.

The second limiting principle is that *Richardson* concerned a federal contractor "with limited direct supervision by the government." 521 U.S. at 413. The Tenth Circuit interprets the lack of government supervision means *Richardson* goes in its third immunity bucket—*i.e.*, whether "extending immunity implicates special policy concerns involved in suing government officials." *See General Steel Domestic Sales, L.L.C.*, 840 F.3d at 1182 (classifying *Richardson* in the third immunity bucket); *see also Richardson*, 521 U.S. at 407 (inquiring into the "purposes" behind immunity). GEO's Motion explains why its claim to qualified immunity is justified under each of the three buckets. (Doc. 450 at 19–20). But the primary thrust of its Motion is that ICE's close supervision entitles GEO to qualified immunity—*i.e.,* the Tenth Circuit's first immunity bucket. (*Id.* at 15–19). Plaintiffs are therefore mistaken to confine their argument to history and purpose as the only bases for determining GEO's entitlement to qualified immunity. (Doc. 465 at 38–39).

Fixated on the third bucket, Plaintiffs spend many pages trying to analogize GEO to the defendant in *Richardson* from a policy perspective. (Doc. 465 at 33–37). Not only is that argument contradictory to *Filarsky*'s rationale, which postdates *Richardson*, but it is at best relevant only to the third qualified immunity bucket—special policy concerns. *General Steel Domestic Sales, L.L.C.*, 840 F.3d at 1182. It is nonresponsive to GEO's core argument under the first bucket. This same flaw pervades Plaintiffs reliance on *Tanner v. McMurray*, 989 F.3d 860 (10th Cir. 2021). There, the Tenth Circuit also considered whether policy justifications allowed private medical professionals to assert qualified immunity. *Id.* at 869. There was no supervision of the professionals in *Tanner*. *Id.* at 871. The Tenth Circuit described their work as "largely free of County supervision" and "contained in a discrete and independent unit" where the professionals were "not carrying out government functions in tandem with

36

government employees." *Id.* The court also noted the contract between the defendant and government compelled "near-complete discretion." *Id.* at 873. That is night-and-day distinguishable from this case.

The few paragraphs where Plaintiffs address ICE's supervision of GEO emphasize two points: (1) on-site ICE officials "cannot commit the government to any deviation from the contract"; and (2) this Court has already held "GEO's cleaning policies . . . far exceeded its contractual obligations with ICE." (Doc. 465 at 36–37, 40). The first point is a straw man. No one is arguing that any single on-site official has the ability to amend the contract. Nor is that power necessary for ICE to supervise and direct its contractor's performance. *See Herrera*, 41 F. Supp. 3d at 1186 (finding close supervision because a contractor "was hired to provide security subject to [the government's] discretion and alongside its personnel"). Indeed, Plaintiffs admit that the purpose of ICE's on-site personnel is to ensure GEO's compliance with the contract—that is, to supervise GEO's compliance with ICE's directions. (Doc. 465 at 37). For the second point, Plaintiffs err in attempting to smuggle this Court's holding on the *Yearsley* criteria into qualified immunity. As the Supreme Court made clear in this very case, the two doctrines are different. Direct supervision does not cease any time a federal contractor has discretion. The contractor can still be closely supervised via extensive government regulations and day-to-day monitoring. *See DeVargas*, 844 F.2d at 717. Maintaining some degree of discretion is inconsequential. *See id.*

Ultimately, Plaintiffs fail to identify a single case that has followed *Richardson*'s self-described "narrow" holding. If *Filarsky* did not formally overrule it, what remains of *Richardson* is a fact-bound rule for Section 1983 cases in which the government provides "limited direct supervision." 521 U.S. at 413. Because ICE closely supervises GEO's work 24/7, *Richardson* is no bar to GEO's entitlement to qualified immunity.

37

**D.      Plaintiffs Have Not Met Their "Heavy" Burden of Demonstrating GEO Violated a Clearly Established Right**

On the merits of qualified immunity, Plaintiffs have no argument at all.  Plaintiffs bear the "heavy burden" of demonstrating that GEO's actions violated a constitutional or statutory right that was clearly established at the time of its conduct.  *See Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).  Their Opposition does not come close to satisfying that standard.

**1.      Plaintiffs Have Not Demonstrated that GEO Violated a Constitutional or Statutory Right**

The first prong requires Plaintiffs to establish that GEO violated a constitutional or statutory right.  *Id.*  This analysis turns on the substantive law at issue.  *McGettigan v. Di Mare*, 173 F. Supp. 3d 1114, 1121 (D. Colo. 2016).

Plaintiffs attempt to overcome the qualified immunity standard by repleading their claims under the Trafficking Victims Protection Restoration Act ("TVPA") as a Thirteenth Amendment claim.  (*See* Doc. 465 at 42).  Their goal is to come up with something that might make mandatory housekeeping illegal, but because the qualified immunity inquiry is specific to the claim actually pled, the maneuver fails.

The Thirteenth Amendment declares "[n]either slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  U.S. Const. amend. XIII. The Amendment's protections extend to pretrial detainees.  *Bell v. Wolfish*, 441 U.S. 520, 534 (1979).  A Thirteenth Amendment violation occurs when a defendant forces detainees to work for them "by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process."  *See United States v. Kozminski*, 487 U.S. 931, 952 (1988).

Even indulging Plaintiffs' shift from the TVPA to the Thirteenth Amendment, the consensus among circuits is that housekeeping requirements do not offend the Constitution. *Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978) ("Daily general housekeeping responsibilities are not punitive in nature and for [the] health and safety must be routinely observed in any multiple living unit."); *Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993) (rejecting argument that being forced to "clean[] up the whole 'module' several times a day" amounted to a Thirteenth Amendment violation); *Channer v. Hall*, 112 F.3d 214, 218–19 (5th Cir. 1997) (holding "housekeeping chores" like "fixing meals, scrubbing dishes, doing the laundry, and cleaning the building" are permissible under the Thirteenth Amendment's "civil duty" exception). Plaintiffs thus have failed to demonstrate that GEO's actions come anywhere close to a Thirteenth Amendment violation.

The cases cited by Plaintiffs do not alter that conclusion. In *McGarry v. Pallito*, decided the same year the Class Period ends, a pretrial detainee alleged that he was forced to work in a laundry facility "14 hours a day for three days a week doing other inmates' laundry." 687 F.3d 505, 514 (2d Cir. 2012). The court held this allegation sufficient to survive a motion to dismiss. *Id. McGarry* is thus legally and factually dissimilar. It is legally different because allegations alone are sufficient to defeat a motion to dismiss. *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016). And factually, a 14-hour shift in a laundry facility is much more onerous than the general housekeeping requirements at issue here. *McGarry*, 687 F.3d at 514 ("We are prepared to continue to assume that correctional institutions may require inmates to perform personally related housekeeping chores such as, for example, cleaning the areas in or around their cells, without violating the Thirteenth Amendment.") This latter distinction similarly dooms Plaintiffs' reliance on *Harden v. Bodiford*, 442 Fed. Appx. 893 (4th Cir. 2011). At issue in *Harden* was evidence the detainee "was required to work seven days a week,

ten hours a day, until he was released." *Id.* at 894–95 (stating "general housekeeping responsibilities" are not inherently punitive and are related to the legitimate, non-punitive governmental objective of prison cleanliness" (citation modified)). That goes far beyond general housekeeping requirements.

Confronting the obvious lack of a Thirteenth Amendment violation, Plaintiffs pivot back to the TVPA and argue that it has a broader scope than the Thirteenth Amendment. (Doc. 465 at 43). But they have no precedent for finding a TVPA violation on facts similar to this case. In fact, they do not even try. They instead conclude their argument by swinging back to the Thirteenth Amendment and declaring that the factual disputes previously identified by the Court "would be sufficient to find a Thirteenth Amendment violation." (*Id.* at 44). As noted above, that is not correct. But even indulging Plaintiffs' argument, any factual disputes are inconsequential because Plaintiffs must demonstrate a factual dispute going to both prongs of the qualified immunity analysis. *Estate of Beauford v. Mesa County, Colorado*, 35 F.4th 1248, 1261 (10th Cir. 2022). The discussion below explains why there are no outstanding fact questions that would turn the clearly established prong in Plaintiffs' favor. Plaintiffs' arguments under the TVPA thus fail alongside their non-existent Thirteenth Amendment claims.

### 2. Plaintiffs Have Also Failed to Show the Alleged Violation Was Clearly Established

Conduct "violates clearly established law when, at the time of the challenged conduct, the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation modified). A clearly established right does "not require a case directly on point." *Id.* But existing precedent must place the statutory or constitutional question beyond debate. *Id.* To say this standard is demanding would be an understatement. The Supreme

40

Court describes qualified immunity as protecting "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Given this daunting legal standard, the Tenth Circuit has held "[a] clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be indisputable and unquestioned." *Lobozzo v. Colo. Dep't of Corr.*, 429 F. App'x 707, 710 (10th Cir. 2011) (citation modified). When the jurisdiction has not considered the issue, a clearly established right can be shown through a "consensus of cases of persuasive authority from other jurisdictions." *Love v. Grashorn*, 134 F.4th 1109, 1116 (10th Cir. 2025). Absent a factually similar case in any jurisdiction, a clearly established right can occur when caselaw applies "with obvious clarity." *Id.* (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

Sticking with their Thirteenth Amendment analogy, Plaintiffs argue GEO's actions violate the TVPA because they obviously offend longstanding Thirteenth Amendment precedent. (*See* Doc. 465 at 45–46). This is the "obvious clarity" attack on qualified immunity.

The fact that Plaintiffs cannot point to a single factually similar case in the Tenth Circuit or anywhere else does not bode well. The obvious clarity category is not a means for breaking new ground. Rather, it simply recognizes "some things are so obviously unlawful that they don't require detailed explanation." *Lowe v. Rawmisch*, 864 F.3d 1205, 1210 (10th Cir. 2017) (quoting *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015)). Obvious clarity is therefore a rare basis for finding a clear violation of law. *Colbruno v. Kessler*, 928 F.3d 1155, 1165 (10th Cir. 2019). Any relevant ambiguities in caselaw render the standard unmet. *Id.* One example where conduct was found obviously illegal is a police officer shooting

"a dog (without considering non-lethal options) when there's no immediate danger." *Love*, 134 F.4th at 1116.

Plaintiffs mostly rely on the same cases already discussed in the previous section. Those cases do not present a clear constitutional holding applicable to this case and thus fail the obvious clarity standard. *Colbruno*, 928 F.3d at 1165. Indeed, Plaintiffs' reliance on *Bijeol* and *Channer*—two cases that hold general housekeeping requirements do ***not*** violate the Thirteenth Amendment—demonstrate just how far off their argument is. *Bijeol*, 579 F.2d at 424; *Channer*, 112 F.3d at 218–19.

The only new additions are a pair of cases decided under 28 U.S.C. § 1915: *Martinez v. Turner*, 977 F.2d 421 (8th Cir. 1992), and *Tourscher v. McCullough*, 184 F.3d 236 (3d Cir. 1999). In *Martinez*, the Eighth Circuit reversed an order dismissing a pro se complaint as frivolous because "[t]he district court could not, on the basis of the record before it, determine what, if any, work was being asked of [plaintiff]." 977 F.2d at 424. The case thus presents a limited holding on the applicable standard for dismissing a complaint under 28 U.S.C. § 1915(d) (1988). *Id.* at 423. This same flaw distinguishes *Tourscher*, 184 F.3d at 242 (reversing dismissal of a pro se complaint under 28 U.S.C. § 1915 because there was not enough information to determine if a Thirteenth Amendment violation occurred). Both cases turned on the standard for *in forma pauperis* cases under Section 1915, and neither comes close to establishing an obvious violation of the TVPA in this case.

Even resolving every factual dispute in Plaintiffs' favor suggests only that GEO required detainees to clean commonly accessible areas with the possibility of 72-hour segregation if they did not comply, exactly as provided in the Performance Based National Detention Standards. The consensus among circuits, however, is that housekeeping requirements—like the ones at issue here—do not offend the Constitution. *Bijeol*, 579 F.2d at

424; *Hause*, 993 F.2d at 1085; *Channer*, 112 F.3d at 218–19.    This is true even when segregation is a possible form of punishment.    *Channer*, 112 F.3d at 218 (considering policy "to place an inmate who refused to report to work, both criminal and INS detainees, in solitary confinement).    GEO's conduct thus did not violate a clearly established right for the purposes of qualified immunity.    If anything, the opposite is true.

Plaintiffs, therefore, have not met their "heavy" burden of demonstrating GEO violated a clearly established right.    *Carabajal*, 847 F.3d at 1208.    GEO's Motion thus should be granted, and the Court should enter judgment in GEO's favor as to Plaintiffs' claim under the TVPA.

### E.    GEO's Assertion of Qualified Immunity is Far from Frivolous

Plaintiffs count their unhatched chickens by presuming that the Court will erroneously deny GEO's Motion.    They then multiply their presumptuousness by asking the Court to take the extraordinary step of exposing GEO to trial in spite of *Mitchell v. Forsyth*, 472 U.S. 511 (1985).    To say the least, that request is both premature and inconsistent with Tenth Circuit and Supreme Court precedent.

In *Stewart v. Donges*, the Tenth Circuit held a district could retain jurisdiction over an interlocutory appeal "if the district court (1) after a hearing and, (2) for substantial reasons given, (3) found the claim to be frivolous."    915 F.2d 572, 576 (10th Cir. 1990).    As these factors suggest, "the party opposing appeal faces a rather difficult burden to overcome an interlocutory appeal and maintain jurisdiction in the district court."    *Howards v. Reichle*, No. 06-cv-01967-CMA-CBS, 2009 WL 2338086, at *2 (D. Colo. July 28, 2009); *see also Apostol v. Gallion*, 870 F.2d 1335, 1339 (7th Cir. 1989) (stating the power to certify "must be used with restraint").

Plaintiffs' argument under this section continues their practice of ignoring this case's procedural posture.    As if repetition makes it true, they continue to assert GEO filed its Motion

43

on the eve of trial (even though trial was more than six months away) and that the Motion is "a litigation tactic designed to avoid trial at all costs" (even though GEO is plainly entitled to qualified immunity and Tenth Circuit precedent says qualified immunity is non-waivable and can be asserted any time before trial). (Doc. 465 at 49). Earlier portions of GEO's Reply explain why those arguments are incorrect. *Supra* Sections IV(A)–(B). Here, it is enough to say that frivolousness requires Plaintiffs demonstrate GEO's arguments "are not just uncertain or questionable" but "utterly lack legal support." *Howards*, 2009 WL 2338086, at *4. GEO's Motion and this Reply provide ample caselaw establishing its right to qualified immunity. Accusing GEO of bad intentions does not overcome its right to immunity or the promptness of its Motion six days after the Supreme Court transmitted its holding and ***before*** the Tenth Circuit issued the mandate.

Illustrating the audacity of Plaintiffs' request, *Heller v. Woodward*, 735 F. Supp. 996 (D.N.M. 1990), is inapplicable. That case concerned a "pretrial record . . . replete with evidence that creates disputed issues of material fact concerning defendant's claim of immunity." *Id.* at 998. As traced above, GEO's argument for qualified immunity prevails, even resolving every fact issue in Plaintiffs' favor. Plaintiffs simply cannot show a clearly established violation of the TVPA. *See Supra* Section IV(D)(2).

## V. CONCLUSION

Requiring detained persons to participate in basic housekeeping assures a safe and sanitary environment for everyone. Not only does that policy stop lightyears short of violating the Thirteenth Amendment or the TVPA, but any novel violation of the latter law is not clearly established. Plaintiffs therefore fail to carry their "heavy" burden to defeat qualified immunity. The Court should therefore grant GEO's Motion and enter judgment in GEO's favor as to Plaintiffs' claim under the TVPA.

Respectfully submitted this 25th day of May, 2026.


**GREENBERG TRAURIG LLP**


By: */s/ Dominic E. Draye*
      Dominic E. Draye
      2375 East Camelback Road, Suite 800
      Phoenix, Arizona 85016
      Telephone: (602) 445-8425
      Facsimile: (602) 445-8100
      Email: drayed@gtlaw.com

      David G. Palmer
      Naomi G. Beer
      1144 15th Street, Suite 3300
      Denver, Colorado 80202
      Telephone: (303) 572-6500
      Facsimile: (303) 572-6540
      Email: beern@gtlaw.com
      Email: palmerdg@gtlaw.com



**JENNINGS HAUG KELEHER MCLEOD
WATERFALL LLP**

      Adrienne Scheffey
      3300 East 1st Ave, Suite 590
      Denver, Colorado 80206
      Telephone: (720) 509-0273
      Email: acs@jkwlawyers.com

      *Attorneys for Defendant-The Geo Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2026, a copy of the foregoing document was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

By: */s/ Dominic E. Draye*
     Dominic E. Draye

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OR JUDGMENT ON THE PLEADINGS**

| Exhibit | Description |
|---------|-------------|
| **A** | Deposition of James Charles Hill |