UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:14-cv-02887-JLK-CYC

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA,
on their own behalf and on behalf of all others similarly situated,

Plaintiffs,

v.

THE GEO GROUP, INC.

Defendant.

---

**THE GEO GROUP, INC.'S TRIAL BRIEF**

---

**Certification Regarding the Use of Generative Artificial Intelligence**

Counsel for Defendant The GEO Group, Inc. hereby attests that no generative artificial intelligence was used in connection with the drafting of this brief.

**INTRODUCTION**

This trial brief summarizes some of the key legal and evidentiary issues that will arise at the trial scheduled to begin in less than two weeks. Those issues are complex, as is the potential evidentiary record, which includes nearly 1,000 exhibits—the vast majority of which Plaintiffs have listed over GEO's objections. Moreover, a substantial number of motions and legal issues

remain undecided, including three motions filed six months ago raising case-dispositive issues; 18 motions in limine; six motions to exclude expert testimony under Federal Rule of Evidence 702; proposed jury instructions and verdict forms that, with the parties' objections, total 120 pages; a motion to bifurcate; numerous disputed deposition designations totaling 160 pages; disputes regarding the admissibility of recorded telephone calls made by Plaintiffs while detained during the relevant period; and a motion to amend the final pretrial order through which Plaintiffs seek to inject new, deeply flawed damages evidence that was required to be disclosed *years* ago (and that will necessitate further motions practice). As a result, the landscape for trial remains unclear, imposing substantial and unfair burdens on GEO.

Given the complexity and volume of these issues, this trial brief cannot address every issue likely to arise at trial or restate every argument or issue addressed in prior motions and other filings. Instead, this trial brief summarizes some of the key issues the Court will need to resolve during trial, including issues that must be addressed in connection with motions for judgment as a matter of law under Rule 50.

## OVERVIEW OF CLAIMS AND DEFENSES

Plaintiffs seek to impose sweeping liability on GEO, a contractor for United States Immigration and Customs Enforcement ("ICE"), for implementing the standards and practices necessary to operate a secure detention facility. The Aurora ICE Processing Center ("AIPC") is a residential detention facility accredited by the American Correctional Association ("ACA"), operated pursuant to ICE's Performance-Based National Detention Standards ("PBNDS"), and staffed by trained officers charged with ensuring the safety and security of every resident. AIPC and its staff must adhere to extensive mandatory standards to ensure the facility's safe operation—standards

common to other secure facilities housing adult detainees. Imposing liability for compliance with those requirements would not punish GEO for misconduct; it would punish GEO for adhering to the very standards that govern its facility and that are necessary to ensure the safety and security of residents and staff and the cleanliness and sanitation of the facility itself.

Plaintiffs have no cognizable theory of recovery. They claim that GEO violated the forced-labor provision of the Trafficking Victims Protection Act ("TVPA") by requiring detainees at AIPC, under threat of disciplinary segregation, to clean up after meals in common spaces through rotating duties. But requiring detainees to clean up after themselves is a basic housekeeping requirement necessary for the operation of any detention facility—not "coerced labor." It makes no difference that detainees cleaned common spaces on a rotating basis, rather than individually cleaning on a daily basis the common spaces they themselves used. Rotation simply ensures that every detainee contributes to the order and cleanliness of the common spaces they all use daily to eat meals, watch television, engage in recreation and other activities, and interact with one another. Moreover, segregation was *not* uniformly threatened or imposed when detainees refused to perform these basic housekeeping tasks—only when aggravating circumstances, such as violent, threatening, or disruptive behavior, were present. Segregation is a legitimate consequence for such misconduct, and the standards governing AIPC's operation mandated those disciplinary measures. GEO could not have possessed the requisite scienter under the TVPA—neither knowledge nor intent—by implementing those measures, either. And, as a matter of law, segregation in this secure detention setting constitutes neither physical restraint nor serious harm relative to the ordinary restraints and discipline necessary to ensure safety and order in any secure detention facility.

Plaintiffs' unjust-enrichment claim under Colorado law is equally meritless. Plaintiffs assert that GEO received a benefit at the expense of detainees participating in AIPC's Voluntary Work Program ("VWP") by compensating them at a rate of $1 per day. But the program did not "benefit" GEO financially. It was mandatory under the standards governing the facility's operation, and it increased GEO's costs while reducing the efficiencies it could have realized by hiring contractors or employees for the same work. GEO's retention of any alleged benefit is not "unjust" in any event, because GEO implemented a mandatory program that exists in similar federal detention settings nationwide, and detainees voluntarily participated.

Several legal defenses also bar Plaintiffs' claims. First, GEO is entitled to qualified immunity on Plaintiffs' TVPA claim because its purported cleaning and disciplinary "policies" were implemented under ICE's close supervision, among other reasons. Second, Plaintiffs' unjust-enrichment claim is preempted because the relief it seeks would pose an obstacle to the accomplishment of Congress's purposes in authorizing the VWP. Under any of those defenses, Plaintiffs cannot recover at all. Finally, GEO is entitled to derivative sovereign immunity on both of Plaintiffs' claims because ICE directed GEO to ensure detainees cleaned up after themselves (as well as the disciplinary measures necessary to ensure a safe and orderly facility) and directed GEO's payment of $1 per day to VWP participants, consistent with an act of Congress.

Plaintiffs must clear several additional hurdles at trial. The classes the Court previously certified for both claims should be decertified because, at a minimum, common issues no longer predominate over individualized ones. Any recovery of punitive damages on Plaintiffs' TVPA claim must comport with the strict limitations imposed by Colorado law, federal standards, and the Constitution. And Plaintiffs' untimely damages evidence—including their disclosure of brand-

new computations and supporting materials that were due in discovery *six years ago* under Federal Rule of Civil Procedure 26(a)(1)(A)(iii)—must be precluded under the mandatory sanction of Federal Rule of Civil Procedure 37(c)(1). Consequently, even if Plaintiffs could articulate a cognizable theory of liability and overcome GEO's defenses, they would be left with no evidence supporting any recovery.

## ISSUES TO ARISE DURING TRIAL

### I. Plaintiffs are precluded from relying on misleading, untimely damages "evidence" and calculations that were not disclosed until six years after the conclusion of discovery and only a month before trial.

The parties have extensively briefed Plaintiffs' deficient damages disclosures under Rule 26(a)(1)(A)(iii) and Plaintiffs' last-minute efforts to cure that deficiency through purported Federal Rule of Evidence 1006 "summary" exhibits, a never-before-disclosed economist employed directly by Plaintiffs' counsel who supposedly will lay a foundation for those "summaries" at trial, and amendments to the final pretrial order. *See* Dkts. 490, 491, 507, 508, 518, 526, 547, 552, 556-1, 564, 567. Further motions practice, which is forthcoming, is necessary to address these issues, which will cause reversible error if not corrected.[1] The Court should reject Plaintiffs' improper

[1] As will be explained in a forthcoming motion, in her recent deposition taken only last Thursday, the newly disclosed witness—a paid employee of Plaintiffs' counsel's law firm who has no personal knowledge or understanding of the underlying evidentiary materials—could not answer basic questions about the exhibits themselves or the underlying documents, did not know the identity of a third-party vendor who compiled the data on which she relied, admitted she was unaware of the extent of quality control conducted on underlying data (which is severely flawed and erroneous), could not explain the assumptions embedded in the "calculations" reflected in the new exhibits, and conceded that every decision regarding how to present the information in the exhibits was not the result of a neutral "summary" of voluminous documents but was instead based on instructions given to her by Plaintiffs' counsel. The exhibits and testimony are not mere "summaries" under Rule 1006—they are counsel-crafted arguments that cause the underlying data to be presented in misleading, argumentative ways that grossly inflate Plaintiffs' claimed damages.

tactics and, as Rule 37(c)(1) mandates, preclude Plaintiffs from relying on damages computations and supporting materials that should have been disclosed in discovery.

**A. Plaintiffs' discovery violation is not harmless.**

Rule 26(a)(1)(A)(iii) unambiguously required Plaintiffs to disclose in discovery a "computation of each category of damages claimed" and the materials "on which each computation is based." Plaintiffs did not do so. Instead, their amended disclosures of June 2020 stated only that they *would* measure damages for their unjust-enrichment claim based on expert calculations of the fair-market value of the laundry and janitorial labor performed by VWP participants. Dkt. 547-7 at 9. Plaintiffs never provided an actual computation, and their experts disavowed any opinion on value. *See* Dkt. 490-2 at 13, 84:20–25 (Alexander); Dkt. 491-2 at 16, 82:18–83:1 (Edelstein). Plaintiffs likewise promised to measure damages for their TVPA claim based on the fair-market value of the underlying labor (albeit without expert support), Dkt. 547-7 at 8–9, but that computation never materialized either.

Having received nothing six years after the close of discovery and months before trial, GEO moved for a preclusion sanction under Rule 37(c)(1). Dkts. 490, 491. Rather than attempt to show that their violation was harmless, Plaintiffs responded by openly contradicting their own Rule 26(a)(1)(A)(iii) disclosures: they took the position that their experts *could not* opine on fair-market value, pointed instead to irrelevant wage rates set by the Department of Labor ("DOL"), and disclaimed any obligation to compute damages based on those rates. Dkts. 507, 508. As GEO has explained, Plaintiffs' eleventh-hour pivot to a new and conflicting basis for computing

---

None of this is consistent with the Federal Rules of Evidence, and all of it is highly prejudicial. If allowed to be introduced, the exhibits and the witness's testimony would cause reversible error.

damages only underscores the need for a preclusion sanction. Dkt. 552 at 13–17. Plaintiffs' shifting positions have deprived GEO of any meaningful opportunity to test their theories and mount a defense, which is precisely the prejudice Rule 37(c)(1) is designed to prevent. The rule's "automatic and mandatory" sanction should therefore apply. *Wickware v. Manville*, 676 F. App'x 753, 765 (10th Cir. 2017) (citation omitted).

**B. Plaintiffs have not cured the prejudice.**

Recognizing the gravity of their violation, Plaintiffs, at the eleventh hour, are attempting to unilaterally amend the record of this long-running litigation by introducing damages computations that purportedly support their new approach. Those untimely computations, however, compound the prejudice caused by the violation rather than cure it.

Plaintiffs initially indicated that, 45 days before trial, they would update their experts' reports to "show the math involved in multiplying" the experts' hours estimates by potential DOL wage rates for laundry and janitorial work, and that a paralegal would prepare "summary" exhibits showing the same for other work. Dkt. 547 at 13–14 & n.4; *see also* Dkt. 556-3. Instead, Plaintiffs produced a single overhauled report that did not contain even the promised math, let alone a methodology for calculating fair-market value. Dkt. 556-1 at 2–4. They also produced two contradictory exhibits—one of which values only a portion of detainee labor at nearly double the benefit to GEO calculated by the other—that rest on either unexplained or facially erroneous assumptions for the unjust-enrichment claim, and calculate *nothing at all* for the TVPA claim. *Id.* at 4–6. Even Plaintiffs' representation regarding a "paralegal" proved inaccurate: Plaintiffs instead enlisted an undisclosed, in-house expert—Dr. Mona Birjandi, their counsel's Principal Economist and Director of Data Analytics—to prepare the exhibits. *Id.* at 6–8.

Plaintiffs then sought yet another bite at the apple. Exactly one month before trial, they moved under Rule 16(e) to amend the final pretrial order to add *six-and-a-half pages* of damages computations for both claims—all resting on unexplained assumptions that require expert testimony and were never tested in discovery. *See* Dkt. 564 at 5–6; Dkt. 564-3 at 4–11. Those new disclosures differed from the previous one Plaintiffs provided just two weeks earlier, with no explanation other than that the previous disclosures contained unidentified "rounding errors." Plaintiffs made no effort to conceal the purpose of those amendments, stating explicitly that they should be permitted in order to *obviate* the preclusion sanction mandated by Rule 37(c)(1). Dkt. 564 at 4.

Plaintiffs cannot, however, manufacture an excuse for their discovery violation through last-minute amendments to the pretrial order. Dkt. 567 at 7–10. Permitting that approach would turn Rule 26(a)(1)(A)(iii) on its head, encouraging surprise disclosures on the eve of trial and depriving the opposing party of any opportunity to test them. *See NeuroGrafix v. Brainlab, Inc.*, No. 12 C 6075, 2021 WL 1057312, at *5 (N.D. Ill. Mar. 18, 2021) (rejecting the same tactic). GEO "was entitled to know in discovery how [Plaintiffs] intended to measure and prove [their] damages, as well as the amount of those damages," and it is *GEO* that "would be prejudiced 'from the insertion of a wholly new measure of damages at this time.'" *See Genesis Health Clubs, Inc. v. LED Solar & Light Co.*, 639 F. App'x 550, 557 (10th Cir. 2016) (citation omitted). Plaintiffs, by contrast, would suffer no "manifest injustice" under Rule 16(e) from being held to the consequences of their own discovery violation. Dkt. 567 at 10–16. The preclusion sanction should be enforced.

## II. Plaintiffs have failed to articulate a cognizable theory of recovery.

### A. GEO is entitled to judgment as a matter of law on Plaintiffs' TVPA claim.

The TVPA's forced-labor provision, 18 U.S.C. § 1589, "prohibits the knowing procurement of labor 'by means of' the use or threat of—or a scheme intended to threaten—serious harm or physical restraint." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 918 (10th Cir. 2018). To recover under that provision, Plaintiffs must prove that GEO (i) knowingly (ii) used an unlawful method (iii) to coerce them to render labor. *See id.* Plaintiffs falter at each step.

#### 1. Plaintiffs cannot establish scienter as a matter of law.

Plaintiffs cannot establish that GEO acted knowingly. *See* 18 U.S.C. § 1589(a). The TVPA contains two scienter requirements: a *mens rea* element, which requires intent for each of the "four statutorily enumerated methods" of obtaining labor, and an *actus reus* element, which incorporates an additional intent requirement for two of those methods. *Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1156–57 (9th Cir. 2022); *see also United States v. Barai*, 55 F.4th 1245, 1253 (9th Cir. 2022) (noting that §§ 1589(a)(3) and (a)(4) "integrate a secondary scienter requirement"); *United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008) ("Section 1589 contains an express scienter requirement. In addition, one of the three ways in which labor can be obtained criminally contains a second scienter requirement."). The "requisite *mens rea*" for any TVPA claim thus requires proof that the defendant "intended the coercive pressure and its effects." *Martinez-Rodriguez*, 31 F.4th at 1156–57.

The Court's summary-judgment ruling is not to the contrary. Although the Court referred to a distinction between "knowledge and intent," its analysis in fact distinguishes between the *mens rea* and *actus reus* elements. *See* Dkt. 380 at 68. As the Court correctly recognized, the *actus reus*

element requires intent only for certain enumerated methods—here, an alleged "scheme, plan, or pattern." *Id.* The *mens rea* element, the Court noted, applies to "any violation" and requires knowledge of (i) the enumerated method and (ii) the resulting labor. *Id.* at 67–68. The Court relied on *Martinez-Rodriguez* for that formulation, and *Martinez-Rodriguez* expressly equated the requisite knowledge with intent. 31 F.4th at 1156–57. Intent is thus required for "any violation."

The record in this case is, and the trial record will be, devoid of evidence that GEO intended to coerce labor by adopting ICE's disciplinary schedule into its handbook for AIPC, including the possible sanction of segregation for failure to clean. The evidence shows just the opposite: segregation was neither threatened nor imposed when detainees merely declined to clean. If discipline was imposed, aggravating circumstances were present, such as disruptive or violent behavior. That is not coercive at all—*even if* the statute does not require intent. GEO plainly could not have known that it was "obtaining the labor in question as a result" of threatened segregation if it never threatened segregation in the first place. *See* Dkt. 380 at 67 (quoting *Martinez-Rodriguez*, 31 F.4th at 1156). GEO lacked the requisite scienter under any standard.

**2. Plaintiffs cannot prove any unlawful method.**

Plaintiffs contend that GEO coerced labor through two of the four methods enumerated in the TVPA: "physical restraint[] or threats of physical restraint" (§ 1589(a)(1)) and "serious harm or threats of serious harm" (§ 1589(a)(2)). Dkt. 540 at 3. Through a last-minute motion to amend the final pretrial order, Plaintiffs also seek to invoke the "scheme, plan, or pattern" method (§ 1589(a)(4)). Dkt. 564 at 5. But Plaintiffs have twice waived that theory—first by omitting it from the pretrial order and then by failing to offer any developed argument for amendment. Dkt. 567 at 17. Regardless, Plaintiffs cannot prevail on any theory.

***Physical restraint.*** The parties agree that the term "physical restraint" denotes the use of force to check a person's free activity or otherwise control the person's actions. Dkt. 545 at 54. That is the term's "plain meaning[]." *United States v. Walker*, 74 F.4th 1163, 1196 (10th Cir. 2023). And immigration detention is plainly a form of physical restraint because it results in a deprivation of liberty. *Santillan Quiroz v. Mullin*, 180 F.4th 1226, 1249 (10th Cir. 2026). Here, segregation was allegedly threatened against *detainees* who were *already* physically restrained as a consequence of their detention. Segregation changed none of that.

The Court previously rejected that argument, reasoning that "[i]ncreasing the level of confinement for already detained individuals … can constitute physical restraint." Dkt. 380 at 55 (citing *Bridges v. Poe*, 487 F. Supp. 3d 1250, 1261 (N.D. Ala. 2020)). The Tenth Circuit, however, has expressly held that "[t]ransferring a prison inmate to a more restrictive prison environment ordinarily does not deprive the inmate of liberty" because the inmate is already restrained. *Muhammad v. Hood*, 100 F. App'x 782, 783 (10th Cir. 2004) (observing that 30 days of segregation would not impose a unique restraint); *see also Adams v. Negron*, 94 F. App'x 676, 677–78 (10th Cir. 2004) (inmate's placement in "restrictive prison housing unit" did not deprive liberty). As then-Judge Gorsuch explained, a detainee "is not entitled to a particular degree of liberty" while detained. *Keck v. Zenon*, 240 F. App'x 815, 818 (10th Cir. 2007) (citation omitted) (rejecting argument that inmate's transfer from general population to segregation deprived liberty). Because segregation does not uniquely check a detainee's free activity, it cannot constitute physical restraint as a matter of law.

***Serious harm.*** The TVPA defines "serious harm" as harm that is "sufficiently serious" under the circumstances to compel a reasonable person of the "same background" and in the "same

circumstances" to perform labor. 18 U.S.C. § 1589(c)(2). Here, the segregation that detainees allegedly faced for refusing to clean was not sufficiently serious under the circumstances. As the Tenth Circuit has repeatedly held, segregation does not impose an "atypical and significant hardship … in relation to the ordinary incidents of" detention. *Keck*, 240 F. App'x at 818 (citation omitted). That is particularly true where, as here, segregation does not extend the length of a detainee's overall confinement and is promptly reviewed. *E.g.*, *Stallings v. Werholtz*, 492 F. App'x 841, 845–46 (10th Cir. 2012) (multi-year segregation imposed no unique hardship where it was reviewed periodically and did not increase length of confinement); *Schmitt v. Rice*, 421 F. App'x 858, 862 (10th Cir. 2011) (same for 8-month segregation); *Jordan v. Fed. Bureau of Prisons*, 191 F. App'x 639, 650–53 (10th Cir. 2006) (same for nearly five years of segregation).

Again, the Court previously disagreed, pointing to Plaintiffs' assertions of psychological and emotional harm resulting from segregation, as well as detainees' efforts to avoid segregation. *See* Dkt. 380 at 56. None of that evidence, however, shows how segregation amounts to serious harm relative to the *ordinary incidents of detention*. Nor does the fact that detention itself makes detainees "vulnerable to threats of segregation" (*id.* at 56–57) say anything about the seriousness of the resulting *harm*. That is not a "flippant comparison," *id.* at 57, but simply an acknowledgment of the relevant "circumstances"—exactly as the TVPA requires. Segregation cannot, as a matter of law, impose sufficiently serious harm, beyond what detainees already experience, to trigger a TVPA violation.

***Threatening policy.*** Plaintiffs belatedly argue that GEO's AIPC handbook set forth a policy of threatening segregation. Segregation, however, is a sanction that the standards governing AIPC require GEO to impose. *GEO* did not invent it. The Court previously held that GEO's

"cleaning policies … exceeded its contractual obligations with ICE," but only because those policies purportedly required *cleaning* beyond what ICE required. *See* Dkt. 380 at 29. As the Court recognized, the supposed "threat" of segregation nevertheless emanated from the federal standards governing AIPC. *See id.* at 30 ("The enforcement mechanism … is found in the PBNDS' disciplinary scale."). That recognition is significant because, even under the Court's construction of the TVPA, the "policy" method requires that GEO "intend[ed] detainees to find the looming threat of [segregation] threatening." *Id.* at 68 (citation omitted). GEO could not have "intended" anything when it did nothing more than incorporate into its handbook a disciplinary sanction that was mandated under the standards governing the facility. That is not actionable under the TVPA.

***Legitimate consequences.*** Not only does segregation constitute neither "physical restraint" nor "serious harm" as a matter of law, but its allegedly threatened use in this case was, also as a matter of law, a "legitimate consequence." *See Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) (distinguishing between "improper threats or coercion and permissible warnings of adverse but legitimate consequences"). The standards governing AIPC *require* GEO to impose segregation as a sanction, and "punishments for detainees who … refuse to complete basic personal housekeeping tasks" cannot "on their own[] give rise to TVPA liability." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1278 n.5 (11th Cir. 2020).

The Court previously reached the opposite conclusion by suggesting that segregation is not "lawful," based on the allegation that GEO threatened segregation for cleaning activities that ICE did not direct. *See* Dkt. 380 at 59. But the Court observed only that "Plaintiffs have presented evidence showing" that the consequences may have been illegitimate and explicitly held that it *could not* rule as a matter of law on the issue, leaving that issue to the jury. *Id.* at 55–60. Moreover,

it does not follow that the same "consequence" legitimately imposed for detainees' failure to engage in ICE-directed cleaning activities becomes *unlawful* when imposed for others. Indeed, the evidence demonstrates that—in practice—segregation was neither threatened nor imposed simply when a detainee declined to engage in daily cleanup activities. It was imposed when detainees engaged in disruptive or violent behavior, and detention facilities plainly have a "legitimate penological interest[]" in using restrictive conditions of confinement to address such misconduct. *See Adams*, 94 F. App'x at 678. Any such use here was therefore legitimate.

**3. Plaintiffs cannot prove causation.**

As a matter of law, Plaintiffs cannot establish that "an unlawful means of coercion caused them to render labor," *Menocal*, 882 F.3d at 918—an inquiry with both objective and subjective components, *see* Dkt. 380 at 62. Plaintiffs cannot prove objective causation because, as explained above, the alleged threat of segregation did not impose any unique hardship, relative to the ordinary incidents of detention, that a reasonable detainee would seek to avoid by cleaning. *See Keck*, 240 F. App'x at 818. And Plaintiffs cannot prove subjective causation because there is no evidence that detainees "actually labored" because of that alleged threat. *See* Dkt. 380 at 62 (citation omitted). In fact, the evidence shows that at least some detainees (such as Plaintiff Valerga) who claim that they were threatened with segregation for failure to clean contend it was *ICE officers* who made the threats, *see* Dkt. 313-5 at 12, something that cannot be attributed to GEO.

**4. The TVPA does not apply in this case.**

Even if Plaintiffs could somehow satisfy the elements of forced labor, their allegations fall outside the scope of the TVPA. The statute's "stated purpose … is to 'combat trafficking in persons, a contemporary manifestation of slavery ….'" *United States v. Kaufman*, 546 F.3d 1242,

1261 (10th Cir. 2008) (quoting 22 U.S.C. § 7101(a)). In enacting the statute, "Congress was prominently focused on sexual exploitation," in addition to other forms of trafficking involving "significant violations of labor, public health, and human rights." *Francisco v. Susano*, 525 F. App'x 828, 834 n.9 (10th Cir. 2013) (citation omitted). The statute plainly was not intended to reach allegations of forced labor in a secure detention setting. Indeed, Congress enacted the statute against the backdrop of precedent holding prohibitions on involuntary servitude inapplicable to threats of segregation used to compel housekeeping tasks in detention facilities. *See Channer v. Hall*, 112 F.3d 214, 217–19 (5th Cir. 1997) (relying on *United States v. Kozminski*, 487 U.S. 931 (1988)). The longstanding rule is that such tasks are a "civic duty," not exploitation or servitude.

The Court has observed that the TVPA is intentionally broader than the statutory language at issue in those cases. *See* Dkt. 23 at 8–9. But the statute merely expands "violations in the areas of trafficking in persons" to include "forced labor," among other things. *See* Victims of Trafficking and Violence Protection Act of 2000, H.R. Conf. Rep. 106–939, at 1 (Oct. 5, 2000). It does not purport to address "conduct that is currently regulated by labor law," but only the "increasingly subtle methods of *traffickers* who place their victims in modern-day slavery" through "means other than overt violence." *Id.* (emphasis added). The statute thus addresses the non-violent means by which trafficking is accomplished; it does not reach the compulsory performance of civic duties, such as housekeeping, in carceral settings. And it is *Plaintiffs* who bear the burden of proving that it does, not the other way around. *Contra* Dkt. 23 at 9–10 (placing the burden on GEO); *see Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 205–06 (5th Cir. 2017) (recognizing that plaintiffs must establish the TVPA's applicability). Plaintiffs cannot meet that burden, because applying the TVPA in these circumstances would violate its very purpose.

**B. GEO is entitled to judgment as a matter of law on Plaintiffs' unjust-enrichment claim.[2]**

To prevail on their unjust-enrichment claim under Colorado law, Plaintiffs must prove that "(1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008). Plaintiffs cannot satisfy any of these elements.

**1. Plaintiffs cannot prove that GEO received a benefit at their expense.**

Plaintiffs assert that GEO realized cost savings by obtaining the labor of VWP participants at a rate of $1 per day rather than hiring contractors or additional employees. But GEO derives *no* benefit from the VWP. GEO is required by ICE to implement the program and bear all associated costs, while providing participants a pass-through stipend of $1 per day. Unlike staff or contractors, who would be trained, experienced, and required to perform efficiently and independently, VWP participants require training that GEO must provide, and each participant must be supervised by detention officers in accordance with "sight and sound" supervision requirements. The VWP is not designed to be efficient or profitable; it is mandated for the benefit of *detainees*, ensuring that participants remain productive, rather than idle, during detention. *See* Dkt. 261-8 at 50 (2011 PBNDS) (VWP aims to reduce the "negative impact of confinement … through decreased idleness, improved morale and fewer disciplinary incidents" while also providing an opportunity to earn money). Nor would hiring contractors or employees to perform the same work reduce GEO's profits: GEO's federal contract accounts for the costs of staff labor and provides margins for those

[2] As GEO has argued elsewhere, unjust enrichment is equitable in nature and is therefore triable by the Court rather than the jury. *Zokari v. Gates*, 561 F.3d 1076, 1086 (10th Cir. 2009). For that reason, and for the others set forth in the pending motion to bifurcate and prior filings, *e.g.*, Dkt. 543, the trial must be bifurcated.

costs to ensure that they are profit-neutral. The program was neither designed to, nor does it, inure to GEO's financial benefit.

### 2. Plaintiffs cannot establish unjust circumstances.

Nor is GEO's retention of any supposed "benefit" unjust. That inquiry is "inherently malleable" and fact-intensive, *DCB Constr. Co. v. Cent. City Dev. Co.*, 965 P.2d 115, 120 (Colo. 1998), turning on the "intentions, expectations, and behavior of the parties," *Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm*, 287 P.3d 842, 847 (Colo. 2012); *see also Lewis*, 189 P.3d at 1140 (noting the need for "extensive factual findings to determine whether a party has been unjustly enriched"). Here, every relevant circumstance weighs against a finding of unjustness.

*First*, there is no indication that GEO intended to exploit detainee labor for financial gain. GEO did nothing more than offer a mandated program consistent with the standards and requirements that AIPC and its staff must follow, and it compensated participants at precisely the rate Congress has authorized. GEO's reliance on that authorization forecloses any inference of the misconduct that Colorado law requires. *DCB Constr.*, 965 P.2d at 120. Contrary to Plaintiffs' contention, that requirement is not confined to cases of landlord malfeasance, Dkt. 545 at 72–73; rather, it forms part of the fact-based unjustness inquiry mandated by settled law, *see Lewis*, 189 P.3d at 1142, 1143 (finding misconduct unnecessary only for claims involving a "commonality of purpose," as with a family member or confidant); *see also Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1206 (Colo. App. 2009) (holding, post-*Lewis*, that "some form of misconduct" is necessary under *DCB Construction*, "such as fraud, coercion, or a clear act of bad faith").

*Second*, there is no evidence that detainees expected any compensation beyond what Congress authorized. To the contrary, the evidence shows that they knowingly agreed to that very

compensation. Whether those agreements are enforceable, as the Court addressed on summary judgment, is immaterial. *See* Dkt. 380 at 73–75. "[A]n unenforceable agreement remains admissible for any purpose other than the enforcement of the agreement itself," *Black v. Hesse*, 869 F.2d 420, 422 (8th Cir. 1989), and the agreements here bear directly on what detainees contemporaneously knew, expected, and accepted.

## III. Several legal defenses prohibit liability in this case.

### A. GEO is entitled to qualified immunity on Plaintiffs' TVPA claim.

Under *Filarsky v. Delia*, 566 U.S. 377 (2012), private parties performing governmental functions are "entitled to the same immunity as the government officials who hired" them. *See Tanner v. McMurray*, 989 F.3d 860, 867 (10th Cir. 2021). The Tenth Circuit has repeatedly extended that protection to private contractors working in correctional facilities. *E.g.*, *Estate of Jensen v. Clyde*, 989 F.3d 848, 855–57 (10th Cir. 2021) (doctor); *Estate of Lockett v. Fallin*, 841 F.3d 1098, 1107–09 (10th Cir. 2016) (same); *Franco v. Bd. of Cnty. Comm'rs*, 609 F. App'x 957, 959–60 (10th Cir. 2015) (probation officer). It has likewise found "no bar against a private corporation claiming" the same protection. *Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1166 (10th Cir. 2005). The dispositive inquiry is whether a private party—an individual or a corporation—acts "pursuant to contractual duties and perform[s] governmental functions." *DeVargas v. Mason & Hanger-Silas Mason Co.*, 844 F.2d 714, 723 (10th Cir. 1988).

A corporation performing governmental functions may assert qualified immunity if (i) it is "closely supervised by the government"; (ii) a "historical basis" supports immunity; or (iii) "special policy concerns involved in suing government officials" are implicated. *General Steel*

*Domestic Sales, L.L.C. v. Chumley*, 840 F.3d 1178, 1182 (10th Cir. 2016) (citations omitted).[3] Where immunity is available, the inquiry turns on whether the corporation violated clearly established law. *Estate of Jensen*, 989 F.3d at 855–59.[4] Each ground for immunity applies here, and GEO did not violate any clearly established law by requiring detainees to participate in post-meal cleanup.

### 1. Qualified immunity applies here.

***Close supervision.*** The undisputed evidence shows that ICE, acting pursuant to congressional authorization, closely supervises GEO's work on a day-to-day basis and enforces hundreds of pages of regulations governing GEO's operations. Dkt. 450 at 15–18. ICE has designated AIPC an "appropriate place[] of detention" and contracted with GEO on "necessary and proper" terms to provide detention services. 8 U.S.C. § 1231(g)(1); 6 U.S.C. § 112(b)(2); 28 U.S.C. § 530C(a)(4). Those terms incorporate the regulations set forth in the PBNDS and its predecessor, the NDS, which expressly address the post-meal cleanup activities underlying Plaintiffs' TVPA claim—including disciplinary segregation as a sanction. *See* Dkt. 261-10 at 24 (2000 NDS); Dkt. 261-9 at 57 (2008 PBNDS); Dkt. 261-8 at 47 (2011 PBNDS). ICE monitors GEO's compliance

[3] Although *Tanner* mentioned only history and policy as grounds for private parties to assert qualified immunity, *see* 989 F.3d at 867, it described close supervision as "relevant under *Filarsky*," *id.* at 873. It also cited with approval *Rosewood Services*, which treated close supervision as an independent basis for immunity. 413 F.3d at 1167. And it left undisturbed *General Steel*, which invoked *Rosewood Services* for that very proposition. 840 F.3d at 1182.

[4] Some circuits further examine whether the party's actions were actually and validly authorized, *e.g.*, *Al Shimari v. CACI Premier Tech., Inc.*, 170 F.4th 162, 189 (4th Cir. 2026), but the Tenth Circuit has not adopted a "scope-of-authority exception" to qualified immunity, *Stanley v. Gallegos*, 852 F.3d 1210, 1211–12 (10th Cir. 2017); *accord Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," without regard to authorization).

with those regulations through, among other measures, an extensive regime of inspections and on-site oversight. *E.g.*, Dkt. 271-4 at 6, 8; Dkt. 335-2 at 2–3.

That supervision distinguishes this case from those in which courts have declined to extend qualified immunity in the detention context. *E.g.*, *Richardson v. McKnight*, 521 U.S. 399, 409 (1997) (no qualified immunity for private prison guards who worked "independently" of "ongoing direct state supervision"); *see also Filarsky*, 566 U.S. at 393 (noting the "limited direct supervision" in *Richardson* (citation omitted)). Because GEO was "under the direct supervision of [ICE] officials when [it] carried out the actions that [Plaintiffs] challenge[]," it is entitled to qualified immunity. *See Meadows v. Rockford Hous. Auth.*, 861 F.3d 672, 678 (7th Cir. 2017) (private security guards performing governmental functions are entitled to the "same protections" as the government).[5]

***Historical practice.*** In examining history, courts look to "the common law as it existed when Congress passed § 1983 in 1871." *Filarsky*, 566 U.S. at 384. At that time, "the common law did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities." *Id.* at 387; *see also id.* at 398 (Sotomayor, J., concurring) (recognizing a "firmly rooted tradition of immunity" for such individuals (quotation marks and citation omitted)). GEO is precisely such a private party engaged in public service: it carries out the "core federal function" of immigration detention on ICE's behalf. *See CoreCivic, Inc. v. Gov. of New Jersey*, 145 F.4th 315, 327 (3d Cir. 2025).

[5] Although ICE's direct supervision is beyond dispute, that supervision is not even necessary for GEO to assert qualified immunity. *See Filarsky*, 566 U.S. at 397–98 (Sotomayor, J., concurring) (noting that the defendant "worked alongside" governmental employees, which alone sufficed for immunity without regard to supervision).

Nothing more is required. *E.g.*, *Estate of Jensen*, 989 F.3d at 855–56 (private jail doctor was "carrying out governmental responsibilities" such that "common law principles support[ed]" immunity); *Estate of Lockett*, 841 F.3d at 1108 (private prison doctor "carrying out criminal penalties" exercised an "unquestionably … traditional function of government")[6]; *see also Filarsky*, 566 U.S. at 384–89 (collecting cases affording qualified immunity to private parties engaged in law-enforcement activities).[7] As *Filarsky* emphasized, immunity applies in the "typical case of an individual hired by the government to assist in carrying out its work." 566 U.S. at 393. This is just such a case.

***Public policy.*** Finally, qualified immunity is available for public-policy reasons, including "protecting against 'unwarranted timidity on the part of public officials,'" "ensuring 'talented candidates are not deterred by the threat of damages suits from entering public service,'" and "guarding against employees being distracted from their duties." *Estate of Jensen*, 989 F.3d at 856 (citation omitted). As Justice Alito explained in this very case, "the public has an interest in preventing overdeterrence, timidity, and distraction in Government functions *no matter* the 'nature of [the defendant's] particular relationship with the government.'" *GEO Grp., Inc. v. Menocal*, 146 S. Ct. 774, 791 (2026) (Alito, J., concurring) (emphasis added) (quoting *Filarsky*, 566 U.S. at 391). That

[6] *Tanner*, issued the same day as *Estate of Jensen*, reached a different result because the individuals asserting qualified immunity in that case were employees of a governmental contractor and did not "work[] directly" for the government. *See Bond v. Regalado*, No. 18-CV-231-GKF-CDL, 2021 WL 3559041, at *3 (N.D. Okla. Aug. 11, 2021). The opposite is true here, where GEO is ICE's direct contractor.

[7] Cases predating § 1983's enactment specifically afforded qualified immunity to independent contractors for correctional facilities. *Williams v. Adams*, 85 Mass. 171, 173–74 (1861); *see also Richardson*, 521 U.S. at 415 & n.1 (Scalia, J., dissenting) (discussing *Williams*).

interest is squarely "implicated when individuals other than permanent government employees discharge [government] duties," *Filarsky*, 566 U.S. at 391—exactly what GEO does here.

**2. GEO did not violate clearly established law.**

On the merits, Plaintiffs cannot carry their "heavy burden" of demonstrating that GEO violated a clearly established right under the TVPA. *Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1208 (10th Cir. 2017). Indeed, they cannot demonstrate *any* violation, because under settled law, sanctions authorized by the PBNDS for detainees' refusal to perform "basic personal housekeeping tasks" are not actionable under the TVPA. *Barrientos*, 951 F.3d at 1278 n.5.

Unable to identify any contrary authority, Plaintiffs instead rely on cases finding Thirteenth Amendment violations in detention settings based on threats of punishment for failure to perform non-personal housekeeping tasks. *See* Dkt. 465 at 42–48 & n.14 (noting that Plaintiffs' authority was "all decided under the Thirteenth Amendment"). But no "non-personal" housekeeping tasks are at issue here,[8] and in any event, Thirteenth Amendment cases do not establish a violation of the *TVPA*—Plaintiffs' unadorned assertion to the contrary notwithstanding. *Contra id.* ("[W]hat is true for the Thirteenth Amendment applies with even greater clarity to the TVPA.").[9] Nor does precedent concerning a *constitutional* violation place the existence of a *statutory* violation "beyond debate." *See Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (citation omitted). Plaintiffs' attempt to reverse-engineer a clearly established TVPA principle from Thirteenth Amendment

[8] GEO maintains that the Court erred in holding that the post-meal cleanup activities at issue in this case went beyond "personal housekeeping" required by the PBNDS. Dkt. 380 at 46.

[9] It does not follow that, just because the TVPA was enacted to "combat severe forms of worker exploitation that do not rise to the level of involuntary servitude," *Kaufman*, 546 F.3d at 1261 (citation omitted), conduct that violates the Thirteenth Amendment automatically satisfies the TVPA's specific provisions.

cases, on the premise that the statute is "broader in scope" than the Amendment, *see* Dkt. 465 at 43, defies the "particularized" inquiry that qualified immunity demands, *see Knopf*, 884 F.3d at 944 (citation omitted).

Regardless, it is clearly established that compelled housekeeping tasks like those at issue here are constitutional, including under the Thirteenth Amendment. *E.g.*, *McGarry v. Pallito*, 687 F.3d 505, 514 (2d Cir. 2012) ("[C]orrectional institutions may require inmates to perform personally related housekeeping chores such as … cleaning the areas in or around their cells, without violating the Thirteenth Amendment."); *Channer*, 112 F.3d at 218–19 (finding "housekeeping chores" like "fixing meals, scrubbing dishes, doing the laundry, and cleaning the building" permissible under the Thirteenth Amendment); *Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993) (rejecting argument that being forced to "clean[] up the whole 'module' several times a day" violated the Thirteenth Amendment); *Blake v. Hall*, 668 F.2d 52, 59 (1st Cir. 1981) (inmates can be required "to keep their cells and living space clean … by any combination of discipline and reward that is appropriate and does not violate the eighth amendment"); *Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978) ("Daily general housekeeping responsibilities are not punitive in nature and … must be routinely observed in any multiple living unit."). Plaintiffs themselves cite many of these cases, mistakenly characterizing them as an inapplicable "exception that proves the rule." Dkt. 465 at 44–48. To the contrary, those cases confirm—from a constitutional perspective, at a minimum—that GEO acted permissibly in requiring post-meal cleanup.

**B. Plaintiffs' unjust-enrichment claim is preempted.**

Under the Supremacy Clause, state common law that conflicts with federal law is "without effect." *Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126, 1128 (10th Cir. 2007) (citation omitted);

*see also Moon v. Goodyear Tire & Rubber Co.*, 519 F. App'x 620, 623 (11th Cir. 2013) (holding unjust-enrichment claim preempted); *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 447 (1st Cir. 2000) (same). Conflict preemption arises where it is impossible for a regulated party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of Congress's purposes and objectives. *Colo. Dep't of Pub. Health & Env't v. United States*, 693 F.3d 1214, 1223 (10th Cir. 2012). Plaintiffs' unjust-enrichment claim under Colorado common law is obstacle-preempted.

"Federal law gives federal officials discretion to contract for immigration detention." *CoreCivic*, 145 F.4th at 327; *see also GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (en banc). Congress has directed the Secretary of the Department of Homeland Security ("DHS") to "arrange for appropriate places of detention" for immigrants pending removal proceedings, 8 U.S.C. § 1231(g)(1); *see also* 6 U.S.C. § 557, and to enter into contracts with private parties as "necessary and proper to carry out" those responsibilities, 6 U.S.C. § 112(b)(2). ICE, a component of DHS, in turn contracts with private parties to provide immigration detention. *See* 48 C.F.R. § 3017.204-90; *see also GEO Grp.*, 50 F.4th at 751 (noting that ICE does not operate its own detention facilities).

To carry out that congressional mandate, ICE—through the PBNDS—requires its contractors to offer a VWP to "provide detainees opportunities to work and earn money while confined." Dkt. 261-9 at 60 (2008 PBNDS); Dkt. 261-8 at 50 (2011 PBNDS). Congress has authorized that program and has expressly set either $1 or "at least" $1 per day as the rate at which DHS reimburses contractors for compensating participants. *See* 8 U.S.C. § 1555(d); Dep't of Justice Appropriations Act of 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1027 (Oct. 10, 1978). Consistent with

that authorization, ICE guarantees detainees monetary compensation of $1 per day for their work. *See* Dkt. 261-9 at 63 (2008 PBNDS); Dkt. 261-8 at 50, 53 (2011 PBNDS).

No federal appellate court has ever questioned an ICE contractor's ability to compensate detainee labor at a rate of $1 per day, given that "Congress itself has long authorized" the practice. *See Barrientos*, 951 F.3d at 1277. Plaintiffs nonetheless contend that GEO was unjustly enriched by paying VWP participants at AIPC precisely that amount, and they purport to value the underlying labor at up to $24.05 per hour—the rate GEO pays its highly trained detention officers, and nearly two hundred times the rate set by Congress for an 8-hour day. Such a "dramatic increase to the wage rate set by Congress … fundamentally frustrates, if not entirely defeats, the delicate immigration public and private partnership structure envisioned and created by Congress." *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 779–80 (9th Cir. 2025) (Bennett, J., dissenting).[10]

If GEO faces liability for implementing the VWP as Congress and ICE have directed, it will have a strong incentive to seek to suspend altogether its contractual obligation to offer the VWP rather than absorb millions in legal expenses and damages. If that happens, "detainees will lose access to a voluntary program that provides meaningful benefits," as has occurred at other facilities facing similar claims. *Id.* at 780. And even if GEO were to maintain the program at Plaintiffs' demanded rates, "dramatic distinctions" would emerge in the "allowances applicable to detainees based on the happenstance of the location of their detention and the operator of their detention facility." *Id.* "[V]ast discrepancies in ICE's ability to contract with contractors throughout

[10] As explained in prior motions and related briefing, a petition for certiorari is currently pending in *Nwauzor*, and the United States Solicitor General's office has urged the Supreme Court to accept review over the case. Dkt. 550. Proceeding to trial under these circumstances is inappropriate, inefficient, and wasteful of both the Court's and the parties' resources.

the country" would also proliferate among other contractors, all of which have long "operated within [the] statutory scheme" established by Congress. *Id.* at 782–83. In short, the liability Plaintiffs seek to impose would "mak[e] the VWP too costly to operate, creat[e] discrepancies between similarly situated immigration detainees, and severely restrict[] if not entirely undermin[e] ICE's ability to negotiate with federal contractors." *Id.* at 783. That result "clearly" poses an obstacle to the purposes and objectives Congress sought to achieve in authorizing the VWP. *See id.* at 782.[11]

Because the relief Plaintiffs seek would interfere with an "inherently federal relationship[]," a presumption *favoring* preemption applies. *See GEO Grp.*, 50 F.4th at 761. Requiring GEO to compensate VWP participants at employee rates would "displace[] the contractual floor established by Congress and solidified in the contract between ICE and GEO." *Nwauzor*, 127 F.4th at 781 (Bennett, J., dissenting). It would also "dictate[] the terms by which federal detainees perform work under the VWP authorized by Congress." *Id.* To conclude that such relief would "not frustrate the federal government's ability to discharge its operations relative to immigration … is to turn a blind eye to … reality." *Id.*[12]

---

[11] Nothing in GEO's contract with ICE removes that obstacle. The contract limits GEO to employing U.S. citizens or lawful permanent residents with work authorization and requires GEO to pay those employees wage rates set by the Department of Labor ("DOL"). By its plain terms, the contract does not contemplate that GEO would pay detainees, who are ineligible for such employment, at those rates.

[12] It is immaterial that, in rejecting GEO's government-contractor defense, the Court concluded that paying more than $1 would neither conflict with federal policy nor frustrate federal objectives. Dkt. 380 at 38. Imposing liability through this lawsuit would endanger the VWP itself, thereby conflicting with and frustrating Congress's intent in establishing the program.

### C. GEO is entitled to derivative sovereign immunity on all claims.[13]

Under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), a government contractor is immune from liability for "accomplishing what the Federal Government requested." *Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1099 (2026). A contractor's entitlement to that immunity turns on whether the government (i) "validly conferred the authority" and (ii) "directed the complained-of action." *Menocal v. GEO Grp., Inc.*, No. 22-1409, 2024 WL 4544184, at *7 (10th Cir. Oct. 22, 2024), *judgment vacated*, 2026 WL 898347 (10th Cir. Mar. 30, 2026). The first prong asks whether the government possessed the "constitutional power" to confer authority, *id.* at *6 (quoting *Yearsley*, 309 U.S. at 20–21), while the second "wades into the specific directions that the government gave to the contractor and whether, by failing to closely adhere to those instructions, the government contractor engaged in illegal conduct," *id.* at *8. Stated differently, a contractor forfeits derivative immunity only if it "violates *both* federal law *and* the Government's explicit instructions." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016).

This Court has already correctly determined that ICE validly conferred authority on GEO to discipline detainees for failure to clean, and it assumed the same with respect to GEO's creation and administration of the VWP. *See* Dkt. 380 at 29, 33; *see also* Dkt. 284 at 16–17, 22. The only remaining question, therefore, is whether ICE directed GEO's use of disciplinary segregation for failure to clean and its compensation practices under the VWP. It plainly did.

[13] GEO maintains that derivative sovereign immunity applies in this case and that the Court applied an incorrect legal standard to that legal defense at summary judgment. Immediate appeal of this issue—rather than proceeding to a trial whose outcome will likely be overturned on appeal—is the most appropriate course. Dkt. 449.

**1. ICE directed GEO's use of disciplinary segregation for failure to clean.**

It is undisputed that GEO's contract with ICE required compliance with the PBNDS (and its predecessor, the NDS), and that every applicable version of those standards made detainees responsible for "personal housekeeping" and for maintaining their "immediate living areas." Dkt. 261-10 at 3 (2000 NDS); Dkt. 261-9 at 61 (2008 PBNDS); Dkt. 261-8 at 51 (2011 PBNDS). Under the PBNDS, "living area-related assignments" included "clean[ing] general use areas." Dkt. 261-9 at 7 (2008 PBNDS); Dkt. 261-8 at 6 (2011 PBNDS). ICE's National Detainee Handbook, which is incorporated into the PBNDS, likewise directed detainees to clean their "living unit" and "general use areas." Dkt. 51-3 at 19 (2011 version); *see also* Dkt. 310-1 at 18 (2013 version). And the ACA similarly required detainees to engage in "personal housekeeping and to clean their housing area." Trial Ex. 569 at 127. It is equally undisputed that GEO was required to adopt verbatim ICE's disciplinary schedule, which lists disciplinary segregation as one of 13 potential sanctions for a detainee's "[r]efusal to clean assigned living area." Dkt. 261-10 at 17, 24 (2000 NDS); Dkt. 261-9 at 45, 57 (2008 PBNDS); Dkt. 261-8 at 39, 47 (2011 PBNDS). Consistent with those requirements, GEO's AIPC handbook made detainees responsible for cleaning their "housing unit," including "all commonly accessible areas," and advised that failure to do so could result in "disciplinary action" in accordance with the PBNDS disciplinary schedule. Dkt. 273-1 at 18 (2005 handbook); Dkt. 273-2 at 50 (2007 handbook); Dkt. 273-3 at 19 (2008 handbook); Dkt. 273-4 at 17 (2010 handbook); Dkt. 273-5 at 17 (2011 handbook); Dkt. 261-17 at 20 (2013 handbook). Because GEO "simply performed as the Government directed," it is derivatively immune from liability for any injury that allegedly resulted. *See Campbell-Ewald*, 577 U.S. at 167.

In previously rejecting immunity, the Court reasoned that GEO "independently developed and implemented" cleaning and disciplinary "policies" that "far exceeded its contractual obligations with ICE." Dkt. 380 at 29. In the Court's view, GEO—on its own initiative—required detainees to "clean the common areas" and "clean up after others" under threat of disciplinary segregation. *Id.* at 31. That reasoning misapprehends both the nature of GEO's "policies" and ICE's role in their creation.

As an initial matter, the "commonly accessible areas" of the "housing unit" referenced in GEO's handbook are the same spaces encompassed by the "living area," "living unit," and "housing area" referenced in the PBNDS, the ICE National Detainee Handbook, and the ACA. In the detention context, those terms ordinarily include *both* a detainee's bunk area *and* common areas. *E.g.*, *Bijeol*, 579 F.2d at 424 ("living unit" included both a cell and a common room); *VanPatten v. Allen Cty. Jail*, No. 1:11-cv-73-PPS, 2013 WL 2149447, at *2 (N.D. Ind. May 16, 2013) ("living areas" included sweeping and wiping down tables); *Treadway v. Rushing*, No. 4:10 CV 2749, 2011 WL 13568, at *1 (N.D. Ohio Jan. 4, 2011) ("living areas" included entire housing unit); *Jones v. Wittenburg,* 509 F. Supp. 653, 702 (N.D. Ohio 1980) ("living areas" included all modules and cells); *see also Hause*, 993 F.2d at 1085 (affirming compelled cleaning of entire cell "module"). The Court set those cases aside on the ground that they did not involve the same governing standards, *see* Dkt. 380 at 31, but it is precisely *because* the PBNDS and the ICE National Detainee

Handbook leave the relevant terms undefined that the Court should look to cases illuminating their ordinary meaning in the detention context, *see Santillan Quiroz*, 180 F.4th at 1237.[14]

In any case, the reference in GEO's handbook to "commonly accessible areas" of the "housing unit" is entirely consistent with the PBNDS's description of the "living area" as including "general use areas," as well as with the ICE National Detainee Handbook's use of the same term. The Court's view that the Handbook's reference to "general use areas" confirms the limited scope of the PBNDS's reference to "living area" (Dkt. 380 at 30) overlooks that the PBNDS itself equates the two. *See* Dkt. 261-9 at 7 (2008 PBNDS); Dkt. 261-8 at 6 (2011 PBNDS). It also overlooks that GEO was required to conform its "policies" to the terms of ICE's handbook (which is expressly incorporated into the PBNDS), including its requirement that detainees clean "general use areas." And it ignores that the ACA requires cleaning of the "housing area."

The Court sought to avoid that difficulty by construing the ICE National Detainee Handbook to require cleaning only of "general use areas" that detainees personally used. *See* Dkt. 380 at 30. But that construction cannot be reconciled with the Court's conclusion that *any* compelled cleaning of common areas departs from the governing standards. If ICE required detainees, at a minimum, to clean up after themselves in common areas, then GEO's provision for cleaning those areas could not have been *per se* impermissible. The Court's reasoning is also detached from the realities of how such areas are used, implying an unworkable rule under which GEO must trace every mess in a common area to the detainee who created it in order to claim immunity. That ICE's

[14] Notably, though, the PBNDS uses the terms "housing unit" and "living area" interchangeably. *See* Dkt. 261-8 at 51 (2011 PBNDS) ("[D]etainees shall not be given work opportunities outside their housing units/living areas.").

handbook refers to "general-use areas that *you* use" (*id.* (quoting Dkt. 310-1 at 18)) does not mean that detainees must clean up only *their own* messes in those areas. That language simply identifies the physical areas to be cleaned by reference to detainees' general use of them.

Moreover, even if GEO's "policies" exceeded its contractual mandate, ICE repeatedly reviewed and approved them through annual audits. *See* Dkt. 270 at 6, 11, 14. The Court's view that ICE must have gone further and actually "directed or required" the text of those policies (Dkt. 380 at 32) misstates the law. *See Posada v. Cultural Care, Inc.*, 66 F.4th 348, 359 (1st Cir. 2023) (immunity applies where an action "was specifically 'approved' by the Government in advance" (citation omitted)). Derivative immunity turns not on whether ICE *itself* designed GEO's policies, but on whether ICE approved them. *See Taylor Energy Co. v. Luttrell*, 3 F.4th 172, 176–77 (5th Cir. 2021) (rejecting argument that private party's design of oil-containment system defeated immunity because the Coast Guard "routinely met" with the party and gave "approval before … next steps" were taken). That approval distinguishes this case from those in which a private party exercised discretion *without supervision*. *See Cabalce v. Thomas E. Blanchard & Assocs.*, 797 F.3d 720, 732 (9th Cir. 2015) (contractor "designed the destruction plan without government control or supervision").[15]

The Court's contrary holding effectively converts the governmental "direction" required for derivative immunity into a requirement of "dictation." That is not the ordinary meaning of the term. To "direct" means "to dispatch, aim, or guide," and the term thus "necessarily contemplates

[15] Indeed, *Cabalce* has little relevance here because its "no discretion" rationale rests on authority addressing the government-contractor defense, a related but distinct doctrine. *See* 797 F.3d at 732 (quoting *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008)).

'assist[ing]' or 'guid[ing]' someone else" rather than dictating a specific outcome. *United States v. Hernandez-Barajas*, 71 F.4th 1104, 1107 (8th Cir. 2023) (quoting *Webster's Third New Int'l Dict.* 640 (2002)). At a minimum, where, as here, ICE approved the "policies" that GEO developed in accordance with ICE's direction to impose disciplinary segregation as a sanction for failure to clean, there is no principled basis to conclude that GEO "far exceeded" that direction merely because the text of those "policies" does not replicate the governing standards word for word.

**2. ICE directed GEO's compensation practices for VWP participants.**

As with the cleaning and disciplinary standards, GEO was indisputably required to provide the VWP at AIPC. Dkt. 261-8 at 50 (2011 PBNDS); Dkt. 261-9 at 65 (2008 PBNDS). And during the class period, the PBNDS—consistent with the reimbursement amount fixed by Congress, *see* Dep't of Justice Appropriations Act of 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1027 (Oct. 10, 1978)—provided for compensation of either $1 or "at least" $1 per day for detainees participating in the VWP. Dkt. 261-9 at 65 (2008 PBNDS); Dkt. 261-8 at 53 (2011 PBNDS). Here again, GEO's provision of the VWP and its payment of $1 per day to participants simply conformed to the government's directions. *See Campbell-Ewald*, 577 U.S. at 167.

This Court previously disagreed—not because GEO failed to comply with the directive to pay VWP participants at least $1 per day (it did comply), but because GEO was *not* subject to a "requirement to compensate VWP participants $1.00 per day and *no more*." Dkt. 380 at 35–36 (emphasis added). That reasoning inverts the inquiry. Derivative sovereign immunity depends on whether a contractor complied with the directives it actually received, not with hypothetical ones. Under the Court's counterfactual approach, GEO would be denied immunity for failing to pay *any* amount above $1 per day, simply because the government did not impose an upper limit on

compensation. But a contractor does not lose its immunity merely because it could have exceeded contractual requirements. *See Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 647–48 (4th Cir. 2018) (rejecting argument that contractor lost immunity because it did not obtain plaintiffs' consent before placing phone calls required by its government contract).

Indeed, the Court's reasoning on this claim is irreconcilable with its own rationale for rejecting GEO's immunity from Plaintiffs' TVPA claim. There, the Court held that GEO "went beyond" ICE's directive to impose disciplinary segregation for a detainee's failure to clean his or her living area (as the Court defined it). Dkt. 380 at 40. For unjust enrichment, by contrast, the Court held that GEO *could have* gone beyond ICE's directive to pay VWP participants $1 per day. The Court explained that ICE did not direct GEO to pay "only $1.00 per day," *id.* at 33, but ICE likewise did not direct GEO to impose disciplinary segregation "only" for failure to clean living areas. The converse is equally true: ICE neither directed GEO to pay *more* than $1 per day nor directed it to impose discipline for failure to clean *more* than living areas. Yet under the Court's approach, GEO loses immunity both for implementing cleaning and disciplinary "policies" that ICE purportedly "did not mandate" (*id.* at 31) and for *failing* to pay more than ICE did mandate (*id.* at 36). That result is untenable.

The Court's suggestion that GEO received no compensation "directive" at all, but was instead permitted to "determine what is appropriate as an exercise of discretion," is equally untenable. *Id.* at 34. GEO had *no* discretion either to forgo the VWP or to pay participants less than $1 per day; ICE unambiguously mandated both. Asking whether GEO had discretion to do something else—pay more—does not answer whether it fulfilled the nondiscretionary directives it *was* given. Moreover, ICE closely supervised GEO's implementation of the program, such that GEO *was*

ICE's common-law "agent" in carrying it out. *See id.* at 33. The Court's own authority supports that conclusion. *See Cabalce*, 797 F.3d at 732 (citing the absence of governmental control in rejecting immunity); *see also DeFiore v. SOC LLC*, 85 F.4th 546, 555–56 (9th Cir. 2023) (drawing a "crucial distinction" between agent independent contractors and non-agent service providers and explaining that *Cabalce* involved the latter because the government lacked "overall control of the program"). That GEO's implementation of the VWP was subject to ICE's supervision more than suffices. *See DeFiore*, 85 F.4th at 556.

**IV. The Court should decertify both classes.**

Although the Court previously certified TVPA and unjust-enrichment classes under Rule 23(b)(3), it "may revisit its decision and choose to decertify" those classes. *Menocal*, 882 F.3d at 921. Decertification does not require a "significan[t]" intervening event; it requires only a finding that "a previously satisfied requirement of Rule 23 is now lacking." *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 262 (2d Cir. 2021). Here, at a minimum, the classes no longer satisfy Rule 23(b)(3)'s predominance requirement.[16] The classes are not "sufficiently cohesive to warrant adjudication by representation," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997), because common questions are not "more prevalent or important" than individual issues, *Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1194 (10th Cir. 2023) (citation omitted). Decertification is warranted.

**A. The TVPA class should be decertified.**

Rule 23(b)(3)'s predominance requirement "regularly presents the greatest obstacle to class certification," *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014), and it

---

[16] GEO reserves the right, based on the evidence adduced at trial, to seek decertification on the grounds that the other requirements of Rule 23 are also unsatisfied.

is fatal to the TVPA class here. The inquiry "begins with the elements of the underlying cause of action," *Cline v. Sunoco, Inc. (R&M)*, 159 F.4th 1171, 1186 (10th Cir. 2025) (citation omitted), and individualized issues predominate over common questions as to every element of Plaintiffs' TVPA claim.

***Uniform policy.*** As the Court initially framed the issue, the "glue" holding the class together was GEO's purported "policy" of threatening detainees with disciplinary segregation for failing to participate in post-meal cleanup. Dkt. 57 at 8; *see also* Dkt. 380 at 52–54. Although a uniform policy can satisfy the predominance requirement, *Cline*, 159 F.4th at 1187–88, no such policy existed here. Plaintiffs can point only to isolated language in the AIPC handbook listing segregation as one of 13 potential sanctions for a detainee's refusal to clean—hardly evidence that GEO uniformly mandated segregation rather than some other sanction. Even if that language could be read as such a mandate, the "policy" was not implemented. The evidence establishes that GEO officers neither threatened nor imposed segregation—or any other sanction—when detainees declined to clean and engaged in no other disruptive, violent, or other inappropriate conduct. Where segregation was imposed, it was imposed because of such aggravating circumstances. Individual issues therefore predominate, including whether a detainee faced *any* sanction for refusing to clean, whether that sanction was segregation, and whether aggravating circumstances were present. *See* Dkt. 312 at 36–39.[17]

[17] Even if Plaintiffs had preserved their "policy" theory, it would not justify certifying a class alleging threats or use of serious harm or physical restraint to coerce labor *independent* of any "policy." Such threats and uses are distinct prohibited means under the TVPA. 18 U.S.C. § 1589(a)(1), (2), (4). A common "policy" cannot supply the necessary "glue" to hold together a class alleging coerced labor by those means. At a minimum, the class should be decertified to the extent it rests on those theories.

***Serious harm.*** As to the seriousness of the harm, the Court held that common questions predominate because "[a]ll class members claim the same threat" of segregation for failure to clean. Dkt. 380 at 60. But the commonality of the alleged threat does not establish its *sufficient seriousness* across the class. The Court's suggestion that a jury could find segregation coercive to a "reasonable person in the detainees' position" (*see id.*) begs the question whether all class members occupied the same "position" such that the threat sufficed. The statute requires harm sufficient to compel a reasonable person of the "*same* background" and in the "*same* circumstances" to render labor, *see* 18 U.S.C. § 1589(c)(2) (emphases added), and the evidence shows that detainees allegedly threatened with segregation came from a multitude of backgrounds and circumstances extending well beyond their shared experience of being "detained in the same institution and subject to universal policies," *see* Dkt. 380 at 61. Detainees who experienced segregation during prior incarceration, for example, would perceive the threat differently than others. The same is true of detainees threatened with segregation when aggravating circumstances were present. Those individual issues will necessarily predominate over common questions, even setting aside the subjective effect of the alleged threats. *See id.*[18] Whether those issues also "defeat typicality" is beside the point. *See id.* at 62 (quoting *Menocal*, 882 F.3d at 917 n.5).

[18] The Court previously suggested that "consideration of the victims' particular circumstances" is unnecessary because the TVPA requires only an objective inquiry. *See* Dkt. 380 at 60–61. But the victims' "particular circumstances" are *part o*f the objective inquiry, which asks whether a reasonable person in the "same circumstances" would be coerced. The subjective inquiry, by contrast, asks whether the "specific alleged victim was coerced." *N.Y. State Nurses Ass'n v. Albany Med. Ctr.*, 473 F. Supp. 3d 63, 68 (N.D.N.Y. 2020) (citation omitted). And here, the subjective effect of the threatened segregation differed significantly across the class. *See* Dkt. 312 at 44–48. The Court's focus on objective similarities among class members does not suggest otherwise.

***Causation.*** The evidence demonstrates not only that GEO's alleged "policy" was not implemented as Plaintiffs claim, but also that *detainees* participated in post-meal cleanup for an array of reasons having nothing to do with any sanction. Some cleaned to stay busy, for example, while others did so in order to watch television sooner. Those disparate motivations confirm that causation can be established only through individualized proof. Dkt. 312 at 40–43. The Court previously disagreed, reasoning that—although detainees must have "actually labored" because of the alleged threat—causation can be proven by reference to "GEO's universal policies and the class members' common circumstances." Dkt. 380 at 62, 65–67 (citation omitted). As explained above, however, class members *did not* share a "common" experience with GEO's supposed policy, to the extent it existed as Plaintiffs characterize it. Without that "glue" holding the class together, there is no basis for extrapolating circumstantial causation evidence beyond individual experiences. *See Menocal*, 882 F.3d at 921 (describing the alleged policy as "the 'glue' that holds together the class members' reasons for performing housing unit cleaning duties" (citation omitted)).

***Scienter.*** Despite recognizing that proof of scienter requires a "highly fact-intensive analysis," the Court found it sufficient that GEO knew of the existence of its purported "policies." Dkt. 67, 68–69 (citation omitted). That is only half the equation. Under the very authority on which the Court relied, GEO must have known of both the "policies" *and* their coercive effects. *See Martinez-Rodriguez*, 31 F.4th at 1156; *see also* Dkt. 380 at 72 (framing the question as "whether GEO *knowingly obtained* labor under those policies" (emphasis added)). Whether GEO knew that its "policies" were effective necessarily turns on evidence concerning the specific instances in which they were applied. It is *that* "individualized, fact-intensive inquiry" that predominates over the "common question" of GEO's knowledge of the policies' existence. *See* Dkt. 380 at 68.

**B. The unjust-enrichment class should be decertified.**

As to unjust enrichment, individualized damages issues will "inevitably overwhelm" common liability questions because Plaintiffs have failed to offer any methodology "establishing that damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). At the certification stage, the Court excused that failure on the ground that damages "should be easily calculable using a simple formula" accounting for hours worked, the type of work performed, and the fair-market value of the work. Dkt. 57 at 19; *see also Menocal*, 882 F.3d at 927 (affirming that reasoning). That was in early 2017. In the more than *nine years* since, Plaintiffs have done nothing more than reference nonexistent expert opinions purportedly setting forth a methodology for determining the fair-market value of detainee labor. *See* Dkt. 547-7 at 8–9. Only after GEO identified that deficiency—years after the close of discovery and just months before trial—did Plaintiffs abruptly disavow their promised methodology and pivot to a new one, which they ultimately (and improperly) sought to write directly into an amended pretrial order. *See* Dkt. 567 at 2–5. Even that methodology, however, is riddled with errors and unexplained assumptions and cannot withstand the "rigorous analysis" that certification demands. *Comcast*, 569 U.S. at 35 (citation omitted).

The Court previously recognized that, if Plaintiffs' representations that damages would be "easily calculable using a simple formula … prove[d] untrue, decertification or amendment of the class for damages determinations may be appropriate at a later juncture." Dkt. 57 at 19. That juncture has arrived. Plaintiffs proved incapable of even *disclosing* the methodology they originally claimed would support their damages theory, instead pivoting at the eleventh hour to a conflicting methodology that *still* fails to reliably calculate damages. Even if that improper disclosure were

somehow to survive the mandatory preclusion sanction of Rule 37(c)(1), it cannot serve as a basis for proving damages on behalf of the entire class.

## V. Limitations on punitive damages must be strictly observed.

Plaintiffs seek punitive damages on their TVPA claim and contend that federal standards govern both their entitlement to such relief and the amount recoverable. As GEO has explained, however, federal law is deficient on these issues, and Colorado law therefore applies. *See* Dkt. 543 at 4–5; Dkt. 562 at 2–6. And even if governing rules could be divined from general sources of federal law, the trial must be structured in accordance with controlling limitations. *See* Dkt. 543 at 5–10; Dkt. 562 at 7–11. In either event, the Constitution independently constrains any recovery of punitive damages in this case.

### A. Colorado law governs punitive damages in this case.

Plaintiffs insist that federal standards apply, seeking to lower the bar for recovering punitive damages and to open the door to highly prejudicial evidence of GEO's financial condition. But 42 U.S.C. § 1988(a) requires federal courts to apply state remedial rules to federal civil-rights claims where (i) "no suitable federal rule exists"; (ii) "state law supplies one"; and (iii) "the state rule … is consistent with federal law." *Karnes v. SCI Colorado Funeral Servs., Inc.*, 162 F.3d 1077, 1080 (10th Cir. 1998). Each of those inquiries points to the application of Colorado law here.

*First*, no suitable federal rule governs the award of punitive damages under the TVPA. The Tenth Circuit has recognized that such damages are available, *see Francisco*, 525 F. App'x at 835, but that recognition alone does not establish a "conventional rule of civil litigation that governs such claims," *Karnes*, 162 F.3d at 1083. Indeed, *no* "sources of federal law suggest[]" *any* applicable standards. *See id.* at 1081. Federal courts have not articulated a burden of proof, for example,

let alone standards governing entitlement to punitive damages or the amount recoverable. In short, federal law is "deficient" on the issue. *See id.* at 1080.

*Second*, Colorado law supplies suitable rules to fill that gap. Under Colorado law, punitive damages are available only if fraud, malice, or willful and wanton conduct is proven beyond a reasonable doubt. Colo. Rev. Stat. § 13-25-127(2); *see also id.* § 13-21-102(1). Such damages may not exceed the amount of actual damages awarded to the injured party. *Id.* § 13-21-102(1)(a).[19] And evidence of a party's financial condition is categorically inadmissible in determining either entitlement to or the amount of such damages. *Id.* § 13-21-102(6); *see also Corbetta v. Albertson's, Inc.*, 975 P.2d 718, 719 (Colo. 1999).[20]

*Third*, Colorado law is consistent with federal law. In *Karnes*, the Tenth Circuit found a conflict between Colorado's heightened burden of proof for punitive damages and the specific "policy underlying the [Civil Rights Act]" to "significantly expand[] the monetary relief potentially available to [Title VII] plaintiffs." 162 F.3d at 1082 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 253 (1994)). The TVPA embodies no comparable policy. It seeks to "increase[] protection for victims of trafficking and punishment of traffickers," *Francisco*, 525 F. App'x at 834–35—a policy that can readily be "harmonized" with Colorado's rules, *Karnes*, 162 F.3d at 1082.

[19] In limited circumstances, courts are permitted to increase an award of punitive damages to up to three times the amount of actual damages. *See* Colo. Rev. Stat. § 13-21-102(3).

[20] That categorical prohibition also applies to any financial-condition evidence offered to prove Plaintiffs' claim for unjust enrichment under Colorado law. *See Corbetta*, 975 P.2d at 719, 723 (extending prohibition to entirety of any "civil action[] in which exemplary damages may be awarded" such that financial-condition evidence is not even discoverable).

**B. The trial must be structured consistent with federal standards.**

Even under general federal standards, Plaintiffs are, at a minimum, barred from introducing evidence of GEO's financial condition for any purpose other than calculating the amount of any punitive damages to which they may be entitled. Punitive damages are designed to punish and deter, and a defendant's financial condition is generally admissible to assess whether a particular award is reasonable in light of that purpose. *Deters v. Equifax Credit Info. Servs.*, 202 F.3d 1262, 1273 (10th Cir. 2000). Such evidence is otherwise inadmissible, *Whiteley v. OKC Corp.*, 719 F.2d 1051, 1055 (10th Cir. 1983), including to prove the "egregiousness" of the underlying conduct giving rise to punitive liability, *White v. Gen. Motors Corp.*, 908 F.2d 675, 685 (10th Cir. 1990). Indeed, admitting such "highly prejudicial" evidence for any other purpose would "alone … warrant[] reversal." *Whittenburg v. Werner Enters., Inc.*, 561 F.3d 1122, 1130 n.1 (10th Cir. 2009).[21]

To avoid that result, the trial should be structured under Rule 42(b) so that the same jury determines the amount of any punitive damages in a phase separate from liability and compensatory damages. *See Watchous Enters., LLC v. Mournes*, 87 F.4th 1170, 1182–83 (10th Cir. 2023) (approving such bifurcation). The amount of punitive damages is clearly separable from the other issues in this case, and the interests underlying Rule 42(b) favor separation. *See Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 964 (10th Cir. 1993). That inquiry not only turns on otherwise-inadmissible evidence of GEO's financial condition, but also depends on predicate, potentially dispositive findings as to whether GEO engaged in sufficiently "reprehensible conduct." *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1065 (10th Cir. 2016). Bifurcation would also

[21] Again, that prohibition applies to Plaintiffs' unjust-enrichment claim. *See Whiteley*, 719 F.2d at 1055 (financial-condition evidence is inadmissible "unless necessary to determine … damages" that are "punitive in nature").

avoid the serious prejudice GEO would suffer if the jury considered financial-condition evidence for non-punitive purposes, *Bond v. Sheriff of Ottawa Cnty.*, 173 F.4th 1265, 1307 (10th Cir. 2026), and would promote efficiency by ensuring that the amount of punitive damages is addressed only if the jury first finds Plaintiffs entitled to them, *Mandeville v. Quinstar Corp.*, 109 F. App'x 191, 194 (10th Cir. 2004). Plaintiffs, by contrast, would suffer no prejudice from a structure that confines to a second phase evidence they could not introduce in the first phase in any event. *Giertz v. State Farm Mut. Auto. Ins. Co.*, No. 22-1114, 2023 WL 3728197, at *4 (10th Cir. May 26, 2023).

### C. The jury must be guided by constitutional limitations.

Whether state or federal standards apply, the Constitution constrains any recovery of punitive damages in this case. Due process requires the Court to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to [Plaintiffs] and to the general damages recovered." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003). The touchstone is whether an award is "greater than reasonably necessary to punish and deter." *Lompe*, 818 F.3d at 1065 (citation omitted). If a "more modest punishment for the reprehensible conduct at issue" would suffice, the award is unconstitutional. *Id.* (quotation marks and citation omitted). The jury should therefore be instructed on several limitations to ensure that any award satisfies that "exacting" standard. *Id.* at 1062.

***Reprehensibility.*** Because Plaintiffs are presumed to be made whole by any compensatory award, punitive damages are available only if GEO's "culpability … is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm*, 538 U.S. at 419. Relevant factors include (i) whether the harm was physical or economic; (ii) whether GEO acted with indifference to or reckless disregard for the health or safety of others; (iii)

Plaintiffs' financial vulnerability; (iv) whether GEO's conduct was isolated or repeated; and (v) whether the conduct involved intentional malice, trickery, or deceit, or was merely accidental. *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1207 (10th Cir. 2012). Critically, punitive damages may not be used to punish GEO for harm to nonparties, such as detainees at other facilities who may have been subject to the same "policies" at issue here. *See Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007). The Court should therefore limit the evidence to GEO's practices at (and related profits from) AIPC and instruct the jury to disregard any perceived harm to nonparties in determining punitive damages. *See White v. Ford Motor Co.*, 500 F.3d 963, 972 (9th Cir. 2007) (trial court's "failure to give a harm to nonparties instruction violated due process").

***Relationship to harm.*** The ratio of any punitive award to the actual harm Plaintiffs allegedly suffered must also be reasonable. "[F]ew awards exceeding a single-digit ratio … will satisfy due process," and "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *State Farm*, 538 U.S. at 425. Although the "precise award" must reflect the particular "facts and circumstances" of the case, *id.*, the jury must be instructed, at a minimum, that any punitive award must "bear a reasonable relationship to the amount of the compensatory damages." *Truesdell v. Thomas*, 889 F.3d 719, 727 (11th Cir. 2018) (affirming that instruction).

***Comparable penalties.*** Finally, any punitive award must be reasonable in light of the civil penalties "authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 428. Courts in comparable TVPA cases have approved "punitive damages at a 1:1 ratio to compensatory damages for forced labor claims." *Solano v. Preciado*, 738 F. Supp. 3d 1356, 1369–70 (D. Or. 2024) (collecting cases and approving 1:1 ratio of $32,800). Because GEO lacked "fair notice" of any greater

ratio, *see Lompe*, 818 F.3d at 1073, the jury should be instructed not to award punitive damages exceeding compensatory damages—the same limitation Colorado law imposes, Colo. Rev. Stat. § 13-21-102(1)(a).

**CONCLUSION**

Plaintiffs' discovery and evidentiary violations must be corrected to avoid reversible error. Plaintiffs' claims suffer from legal defects that should be decided before trial by this Court or an appellate court, and will be subject to dispositive motions during trial. This case is not appropriate for class relief. The trial should be structured, and the jury instructed, to avoid constitutional defects in this case that would lead to reversal if not correctly addressed.

Dated: October 20, 2026

Respectfully submitted,

*s/ Frederick R. Yarger*

Carolyn J. Fairless
Frederick R. Yarger
James N. (Nick) Boeving
William D. Hauptman
Shiloh A. Rainwater
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone: 303.244.1800
Facsimile: 303.244.1879
Email: fairless@wtotrial.com
yarger@wtotrial.com
boeving@wtotrial.com
hauptman@wtotrial.com
rainwater@wtotrial.com

Adrienne Scheffey
Dana L. Eismeier
Michael Ley
Jennings Haug Keleher McLeod Waterfall LLP
3300 East 1st Avenue, Suite 590
Denver, CO 80206
Telephone: 720.509.0280
Email: acs@jkwlawyers.com
dle@jkwlawyers.com
myl@jkwlawyers.com

Dominic E. Draye
Nicholas LeFevre
Greenberg Traurig, LLP
2375 East Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: 602.445.8425
Facsimile: 602.445.8100
Email: Nicholas.Lefevre@gtlaw.com
drayed@gtlaw.com

David G. Palmer
Naomi G. Beer
Greenberg Traurig, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
Telephone: 303.572.6500
Facsimile: 303.572.6540
Email: beern@gtlaw.com
palmerdg@gtlaw.com

*Attorneys for Defendant The GEO Group, Inc.*

**CERTIFICATE OF SERVICE (CM/ECF)**

I HEREBY CERTIFY that on October 20, 2026, I electronically filed the foregoing **THE GEO GROUP, INC.'S TRIAL BRIEF** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/ Christine Keitlen*
Christine Keitlen