**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA and
DEMETRIO VALERGA,
on their own behalf and on behalf of all others similarly situated,

Plaintiffs,

v.

THE GEO GROUP, INC.,

Defendant.

---

**PLAINTIFFS' TRIAL BRIEF**

---

# TABLE OF CONTENTS


I. Plaintiffs' Claims and Expected Proof .......... 3

A. Unjust Enrichment .......... 3

1. Legal Elements of the Unjust Enrichment Claim .......... 3

2. Expected Evidence Supporting Each Element .......... 4

3. Unjust Enrichment Damages .......... 7

B. Plaintiffs' Forced Labor Claim Under the Trafficking Victims Protection Act .......... 8

1. Legal Elements of Plaintiffs' Forced Labor Claim .......... 8

2. Expected Evidence Supporting Each Element of Plaintiffs' Forced Labor Claim .......... 10

3. Forced Labor Damages .......... 14

II. Summary of Witness Testimony Presented During Plaintiffs' Case-in-Chief .......... 15

A. Live Witness Testimony .......... 15

B. Expert Witnesses .......... 17

C. Deposition Witnesses .......... 17

III. Key Legal and Evidentiary Issues .......... 19

A. The Causation Standard Under the TVPA .......... 19

B. Corporate Knowledge .......... 21

C. GEO's Financial Evidence Is Inextricably Tied to Plaintiffs' Unjust Enrichment Claim .......... 23

D. Anticipated Objections Involving References to ICE .......... 24

E. Anticipated Objections Involving Evidence of Criminal Character .......... 28

F. Objections Involving Immigration History .......... 30

**<u>Certification Regarding the Use of Generative Artificial Intelligence:</u>** Counsel for the Plaintiffs and Defendant attest that no generative artificial intelligence was used in connection with the drafting of this Motion.

* * *

Plaintiffs respectfully submit this trial brief to address key legal and evidentiary issues expected to arise at trial.

## I. Plaintiffs' Claims and Expected Proof

### A. Unjust Enrichment

Plaintiffs allege that GEO has been unjustly enriched by bidding on and winning lucrative government contracts that relied on detainee participation in the Aurora Detention Facility's Voluntary Work Program, in which GEO paid detainees only $1.00 per day for their labor. Detainee labor in the Voluntary Work program encompassed much of the physical work—including janitorial, food service, and laundry work—that was required to operate the Facility. The unjust enrichment class includes every worker who participated in the Voluntary Work Program from October 22, 2011 to October 22, 2014.

Unjust enrichment claims are equitable in nature and tried to the Court rather than a jury. *Zokari v. Gates*, 561 F.3d 1076, 1086 (10th Cir. 2009). The Court has informed the Parties of its intention to empanel an advisory jury to hear the evidence and advise the Court as to a verdict on these claims and the appropriate measure of damages.

#### 1. Legal Elements of the Unjust Enrichment Claim

For Plaintiffs and the Class to recover on their unjust enrichment claims, they must show by a preponderance of the evidence that (1) GEO received a benefit (2) at the detainees' expense

(3) "under circumstances that would make it unjust for [GEO] to retain the benefit without commensurate compensation." ECF No. 380 at 72 (Order on Summary Judgment) (citing *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008)).

### 2. Expected Evidence Supporting Each Element

***Benefit to GEO.*** To satisfy the first element of the Unjust Enrichment claim, Plaintiffs will present evidence that GEO used detainee labor for core facility operations such as janitorial, food service, and laundry work, and that this use was inconsistent with the stated purpose of the Voluntary Work Program. They will present evidence that this practice kept GEO's labor costs static and low, allowing it to successfully bid on lucrative government contracts at a price the government was willing to pay and maintain the profit margin promised by those contracts. Plaintiffs' evidence will include:

- **Detainee Handbook (Exs. 145, 220-223, 957, 565, 418, 1000-1002, 1005)**, showing that GEO "Utilizes detainees to perform such functions as painting, food services, laundry services, barbershop and sanitation."
- **8.1.8 AUR Detainee Work Program (Ex. 31, 742-744, 746)**, showing that jobs in the Voluntary Work Program included janitorial work in living areas and other parts of the facility.
- **GEO's Profit and Loss Statements (Exs. 168-176)**, showing the profits GEO derived from the Aurora facility, which varied based on costs that included labor.

Plaintiffs will also present the following witness evidence through live or deposition testimony to support the first element of the unjust enrichment claim:

- **Melody Furst** will testify in person about how the Voluntary Work Program was administered, about related documentation of those matters, and about alternatives to the Voluntary Work Program.
- **Dawn Ceja** will testify live about the day to day operations of the facility, the administration of the Voluntary Work Program, and the drafting and adoption of Aurora policies, including the handbook and the cleaning policies.

- **Amber Martin** will testify by deposition about the creation of GEO's policies at the corporate level and its intentions for the same, the use of the Voluntary Work Program, the payment amounts in the Voluntary Work Program, and the reasons for the same.

- **Brian Evans** will testify by deposition about how GEO set its price when bidding on government contracts; how GEO earns revenue and generates profits from its government contracts; and how GEO tracks individual facility financial performance.

- **David Venturella** will testify by deposition about the government bidding process, the need for GEO to keep its price at a level the government will pay, and the role of labor in driving that pricing.

- **Plaintiffs** will testify live and through deposition about their experiences working in the Voluntary Work Program.

***At the Detainees' Expense.*** To satisfy the second element of the unjust enrichment claim, Plaintiffs will present evidence that the detainees supplied substantial labor while being paid only $1.00 each day, regardless of actual hours worked, when GEO could have paid more. To prove this element, Plaintiffs' evidence will include:

- **Detainee Handbook (Exs. 145, 220-223, 957, 565, 418, 1000-1002, 1005),** stating the VWP wage as $1/day.

- **Detainee Work Program, 8.1.8 AUR (Exs. 31, 742-744, 746),** stating the VWP wage as $1/day.

- **Voluntary Work Program signup form and related documents (*e.g.,* Exs. 24, 97, 109),** stating wage and requirements for working in program.

Plaintiffs will also present the following live or deposition testimony to support the second element of the unjust enrichment claim:

- **Melody Furst** will testify live about the wages detainees earned in the Voluntary Work Program.

- **Amber Martin** will testify by deposition about GEO's capacity and (to the extent required) its ability to pay detainees more than $1 per day for its Voluntary Work Program.

- **Plaintiffs** will testify live about wages, hours, duties, physical effects and other topics related to the Voluntary Work Program.

***Unjust Circumstances Making Retention of Benefit***. To satisfy the third element, Plaintiffs will present evidence showing how GEO deviated from the VWP's stated purpose. Plaintiffs will show that rather than operate the VWP for detainees' benefit, GEO operated the program to staff essential operations of the facility, keeping its costs low. The evidence will further show how workers in the Voluntary Work Program were subject GEO's control and uniquely vulnerable to GEO exploiting their circumstances. Plaintiffs' evidence will include:

- **Spreadsheet of ICE Payments at Other Facilities (Ex. 179)**, showing GEO's ability to pay detainees participating in the Voluntary Work Program more than $1.00 each day.

- **Detainee Work Program, 8.1.8 AUR (Exs. 31, 742-744, 746),** identifying scope of detainee work.

- **Detainee Handbook (Exs. 145, 220-223, 957, 565, 418, 1000-1002, 1005),** identifying stated purposes of VWP.

- **GEO's pricing model (Ex. 448),** showing that GEO based its pricing heavily on the cost of labor.

Plaintiffs will also present the following live or deposition testimony to support the third element of the unjust enrichment claim:

- **Amber Martin** will testify by deposition about the purposes of the VWP and its implementation, as well as about rules prohibiting GEO from using VWP workers to perform the jobs of GEO's own staff.

- **Dr. Stuart Grassian** testifying about the circumstances increasing detainees' vulnerability at the Facility.

- **Plaintiffs** will testify about their personal experiences participating in the VWP.

### 3. Unjust Enrichment Damages

Plaintiffs will seek restitution based on the "fair market value of the work" detainees performed in the Voluntary Work Program, which is "the usual measurement of enrichment in cases where nonreturnable benefits have been furnished at the defendant's request, but where the parties made no enforceable agreement as to price." Restatement (Third) of Restitution and Unjust Enrichment § 49, comment *f* (2011). Plaintiffs intend to calculate restitution by quantifying the value of the benefit furnished by non-detainee workers in labor hours, then multiplying that number by an hourly rate representing the fair market value of the labor, including fringe benefits, that GEO would have had to pay for this work in the absence of the VWP. Alternatively, Plaintiffs may seek disgorgement of that portion of GEO's profits from the Aurora facility during the class period that is attributable to detainee labor.

Plaintiffs' restitution theory will require the advisory jury to decide whether the hourly rate GEO would have paid for alternatives to detainee labor should be the rate GEO pays its guards, or the prevailing wage rate identified for those positions by the Department of Labor wage schedule attached to GEO's 2011 contract with the federal government. The testimony of GEO's employees will inform the advisory jury's analysis on this point.

The hours required to provide the equivalent of the benefit that VWP workers provided will be quantified through the expert testimony of Jeffrey Edelstein, as to janitorial work, and by Matthew Alexander, as to laundry work. The proof at trial may inform the experts' conclusions based on the methodology set out in their respective reports. In addition, Plaintiffs will present a FRE 1006 summary exhibit identifying non-janitorial and non-laundry work recorded in GEO's

business records, and calculating the possible damages scenarios depending on the wage rate chosen by the jury.

**B. Plaintiffs' Forced Labor Claim Under the Trafficking Victims Protection Act**

Plaintiffs' second claim alleges that from December 23, 2004 to October 22, 2014, the GEO Group violated the forced-labor provisions of the Trafficking Victims Protection Act ("TVPA") by forcing a 3- to 6-person detail of detainees to sweep, mop, and disinfect the common areas of the housing units three times per day, after each meal, under threat of solitary confinement. Plaintiffs argue that through its Housing Unit Sanitation Policy, GEO required detainees to do unpaid labor by threatening and imposing solitary confinement on detainees who refused to clean. Plaintiffs argue that these threats and actual use of solitary confinement constituted serious harm and physical restraint under the TVPA and establish a pattern of conduct intended to make detainees believe they would face such consequences if they refused to do janitorial work.

The Forced Labor Class seeks compensatory damages based on the value of the labor they were forced to provide, which Plaintiffs will quantify at trial through the testimony of Named Plaintiffs and Class Members and GEO's employees. Plaintiffs also seek punitive damages for this claim in an amount to be determined at trial by the jury.

**1. Legal Elements of Plaintiffs' Forced Labor Claim**

To succeed on their forced labor claim, Plaintiffs must prove by a preponderance of the evidence that (1) GEO obtained labor or services from detainees; (2) GEO did so through one or more of the following means: (a) physically restraining detainees or threatening to physically retrain them, (b) seriously harming detainees or threatening them with serious harm, or (c)

engaging in a pattern of conduct intended to cause the detainees to believe that they would suffer harm or physical restraint if they did not provide labor or services; (3) GEO obtained the labor "by means of" such improper coercive conduct; and (4) GEO acted knowingly. 18 U.S.C. § 1589(a). *See also* ECF No. 545 at 61 n. 39.

The TVPA defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). "Physical restraint" can include restraining someone who is already restrained by restricting their movement further. *See Bridges v. Poe*, 487 F. Supp. 3d 1250, 1261 (N.D. Ala. 2020). *See also* ECF No. 380 at 55-56. The jury is not required to agree on whether solitary confinement is serious harm, physical restraint, or both; whether GEO primarily used threats or actual harm or restraint; or whether GEO's conduct also shows a pattern of conduct intended to cause the belief in those consequences. It only needs to find (unanimously) that GEO's conduct meets at least one of those elements, and that GEO knowingly engaged in the conduct and obtained detainees' labor as a result. *See United States v. Barai*, 55 F.4th 1245, 1250 (9th Cir. 2022).

The third element requires Plaintiffs to prove causation, or that GEO obtained the labor "by means of" improper coercive conduct. The causation analysis has both a subjective and objective component. *Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258, 266-67 (D. Colo. 2017) ("*Menocal II*"). The subjective component considers whether the victims actually labored because of the perpetrator's conduct. *Id.* at 267. The objective component considers whether a

reasonable person in the same circumstances as the victim would have felt compelled to work. ECF No. 380. *See also United States v. Kalu*, 791 F.3d 1194, 1211-12 (10th Cir. 2015).

The final element of the TVPA claim requires proof that GEO knew (1) coercive circumstances existed, and (2) that GEO obtained the labor in question as a result. *See Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1156 (9th Cir. 2022) (quoting *United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008)). "Knowledge" means more than acting out of ignorance, mistake, or accident, but does not require Plaintiffs to prove that GEO had the specific intent to violate the law. ECF No. 380 at 67-68; Jury Instructions in *U.S. v. Dann*, No. 8 Cr. 390 (N.D. Cal. Oct. 6, 2009) ECF No. 92 ("*Dann* Instructions") at 11.

#### 2. Expected Evidence Supporting Each Element of Plaintiffs' Forced Labor Claim

Plaintiffs will present evidence at trial to prove that more likely than not, GEO knowingly obtained detainees' labor by any one of the three prohibited means.

***Obtained Labor.*** Plaintiffs will present evidence that detainees did daily janitorial work in common areas well beyond the personal housekeeping that Performance-Based National Detention Standards allow. Plaintiffs' evidence will include:

- **Detainee Handbook (Exs. 145, 220-223, 957, 565, 418, 1000-1002, 1005)**, describing the mandatory sanitation policy and possible consequences for not following all requirements in the handbook.
- **12.1.4 AUR Sanitation Procedures (Ex. 32, 33, 136, 137)**, describing the sanitation policy, describing details of the sanitation policy, including but not limited to detainees' obligations and duties in areas to be cleaned, and showing schedule of detainees assigned to carry out the sanitation policy.

Plaintiffs will also present the following witness evidence through live or deposition testimony to support the first element of their forced labor claim:

- **Dawn Ceja** will testify about the scope of GEO's sanitation policy and the work detainees were required to do.

- **Luis Pagan** will testify by deposition about detainee participation in the sanitation program and guards' responsibility for ensuring it was carried out.

- **Plaintiffs** will testify about their experiences cleaning pursuant to the sanitation policy, including their duties and hours worked.

***Physical Restraint or Threat of It.*** Plaintiffs will prove the second element of their forced labor claim through evidence that solitary confinement is physical restraint and that GEO threatened solitary confinement and imposed it. Plaintiffs' evidence will include:

- **Detainee Handbook**, describing GEO's policies, procedures, and possible punishments for detainees.

- **Orientation Slideshow**, stating requirements to work and follow the rules, as well as possible consequences.

- **Segregation Post Order (Ex. 131)**, describing GEO's policy that all detainees in administrative or disciplinary segregation must have hand restraints when anywhere that is not confined.

- **Incident Reports (*e.g.,* Ex. 188-193, 200, 204, 249, 286, 312, 313)**, describing incidents in which detainees were placed in solitary confinement for refusing to clean.

Plaintiffs will also present the following live or deposition testimony to support this element:

- **Dr. Stuart Grassian** will provide expert testimony about the nature of solitary confinement generally, comparing Aurora's use of it with other examples he has studied.

- **Plaintiffs** will testify about the conditions of physical restraint used in the Facility.

***Serious harm or threat of it*:** Plaintiffs will further prove the second element of their forced labor claim by presenting evidence that 72 hours of solitary confinement constitutes serious harm. Plaintiffs' evidence will include:

- **Segregation Post Order (Ex. 131)**, describing GEO's policy that all detainees in administrative or disciplinary segregation must have hand restraints when anywhere that is not confined and that detainees in solitary confinement are checked for suicide on a regular basis.

- **Incident Reports (Ex. 188-193, 249, 286, 312, 313)**, describing incidents in which detainees were placed in solitary confinement for refusing to clean.

Plaintiffs will also present the following live or deposition testimony to support this element:

- **Dawn Ceja** will testify about the rules, regulations, and conditions of solitary confinement at the Facility.

- **Dr. Stuart Grassian** will provide expert testimony about the effects of solitary confinement, even within 72 hours. Dr. Grassian will also describe how circumstances at the facility made detainees uniquely vulnerable to GEO's threats.

- **Plaintiffs** will testify about their experiences hearing guards threaten solitary confinement for refusing to clean and the impacts of those threats on their willingness to clean and their mental and emotional well-being.

***Scheme, plan, or pattern.*** Plaintiffs will further prove the second element of their forced labor claim through evidence that GEO engaged in a pattern of conduct intended to make detainees believe they would go to solitary confinement if they did not clean. Plaintiffs' evidence will include:

- **Detainee Handbook (Exs. 145, 220-223, 957, 565, 418, 1000-1002, 1005)**, showing GEO's policy that solitary confinement could be a punishment for refusing to comply with the sanitation policy.

- **Orientation Slideshow,** stating requirements that detainees participate in the sanitation program.

Plaintiffs will also present the following live or deposition testimony to prove this element:

- **Dawn Ceja** will testify about GEO's written policies related to solitary confinement as a form of punishment for refusing to clean and how those policies and punishments were communicated to detainees.

- **Luis Pagan** will testify by deposition that guards implemented the rules in the handbook, including the sanitation policy, and were acting within the scope of their job duties when they informed detainees of the consequences or placed them in solitary confinement.

- **Plaintiffs** will testify about their experiences of learning that solitary confinement was a consequence for refusing to clean under the sanitation policy.

***Knowledge.*** Plaintiffs will establish the third element of their forced labor claim by showing that GEO knew of the threat of solitary confinement and that GEO knew that it obtained labor as a result of those threats. Plaintiffs' evidence will include:

- **Detainee Handbook (Exs. 145, 220-223, 957, 565, 418, 1000-1002, 1005), Orientation Slide Show (Ex. 213, 233, 315),** describing GEO's written policy that solitary confinement could be used as a punishment for refusing to clean.

- **12.1.4 AUR Sanitation Procedures (Ex. 32, 33, 136, 137)**, describing the sanitation policy, describing details of the sanitation policy, including but not limited to detainees' obligations and duties in areas to be cleaned, and showing schedule of detainees assigned to carry out the sanitation policy.

Plaintiffs will also present the following live or deposition testimony to prove this element:

- **Dawn Ceja** will testify that GEO's written policies describing solitary confinement as a form of punishment for refusing to clean are clearly set forth in the detainee handbook. She will also describe the conditions of solitary confinement at the Facility.

- **Luis Pagan** will testify that GEO guards understood that it was their job to ensure that the sanitation policy was carried out, that they informed detainees of the possible consequences, and that the vast majority of detainees complied.

- **Plaintiffs** will testify about their experiences hearing GEO guards threaten detainees with solitary confinement for refusing to clean, witnessing detainees being placed in solitary confinement as a punishment for refusing to clean, and being placed in solitary confinement as a punishment for refusing to clean.

***Causation.*** Plaintiffs will present evidence that shows detainees were actually compelled to clean because of the looming threats of segregation and that a reasonable person in the detainees' circumstances would have felt similarly compelled. Plaintiffs' evidence will include:

- **Incident Reports (*e.g.,* Ex. 188-193, 200, 204, 249, 286, 312, 313)**, describing incidents in which detainees were placed in solitary confinement for refusing to clean.

Plaintiffs will also present the following live or deposition testimony to prove causation:

- **Luis Pagan** will testify about how the vast majority of detainees complied with the mandatory cleaning policies.

- **Dr. Stuart Grassian** will provide expert testimony about the psychological vulnerabilities of people in detention.

- **Plaintiffs** will testify about how solitary confinement and threats of solitary confinement compelled them and other detainees to clean.

### 3. Forced Labor Damages

In closing argument, Plaintiffs will walk through a calculation of the hours worked by detainee workers on post-meal cleaning details. The details of this calculation are set out at ECF No. 564.

## II. Summary of Witness Testimony Presented During Plaintiffs' Case-in-Chief

### A. Live Witness Testimony

**Alejandro Menocal.** Mr. Menocal, a former detainee, will testify in person about the work GEO required him to do and the consequences that he understood he would face if he refused, his experiences in detention and how they affected his decisions, and about his experience participating in the Voluntary Work Program. Mr. Menocal's testimony will address his observations of GEO's use of segregation as a punishment for not cleaning, his own experience in medical isolation, his interactions with guards and threats of solitary confinement, and other conditions of the Facility like sanitation and food conditions.

**Grisel Xahuentitla.** Ms. Xahuentitla, a former detainee, will testify in person about the sanitation policy's requirements and the consequences that she understood would be imposed if she refused to clean, her observations of specific threats made by GEO guards, her experiences in detention and how they affected her decisions and well-being, and her experience participating in the Voluntary Work Program. She will also share her experiences where she witnessed guards threatening solitary confinement to compel detainees to clean as well as other threats and forms of intimidation used by guards at the Facility that primed detainees for compliance.

**Hugo Hernandez ("Alex Ceren").** Mr. Ceren, a former detainee, will testify in person about GEO's intake procedures, daily life at the Facility and its layout, his experience participating in the Voluntary Work Program, experiences with GEO guards threatening solitary confinement, and the sanitation policy's requirements, expectations, and implementation at the Facility. He will also share about his duties, experiences, and compensation received while working in the law library as part of the Voluntary Work Program.

**Jesus Gaytan.** Mr. Gaytan, a former detainee, will testify in person about the conditions of confinement at the Facility, his experiences with the sanitation policy and the consequences of refusing to comply with that policy, and his experiences working in the laundry unit while participating in the Voluntary Work Program.

**Dawn Ceja.** Ms. Ceja, a former Assistant Warden of Operations, will testify live in Plaintiffs' case in chief as a hostile witness. Ms. Ceja will testify about GEO policies and procedures related to the sanitation policy and Voluntary Work Program. Her testimony will include descriptions, requirements, and expectations of the sanitation policy, permitted consequences for detainees refusing to clean, conditions of solitary confinement at the Facility, and how related information was disseminated to detainees and guards, including through the Detainee Handbook and orientation materials. Ms. Ceja will also describe various job duties, compensation received, and other technical descriptions of the Voluntary Work Program.

**Melody Furst.** Ms. Furst, a GEO employee, will testify live in Plaintiffs' case in chief as a hostile witness about how the Voluntary Work Program was administered, including payroll and staffing, and about related documentation of those matters, and about alternatives to the Voluntary Work Program.

**Mona Birjandi.** Ms. Birjandi is Principal Economist and Director of Data Analytics at Outten & Golden LLP. She will testify about the creation of two Fed. R. Evid. 1006 summary exhibits related to damages for Plaintiffs' unjust enrichment claim.

### B. Expert Witnesses

**Dr. Stuart Grassian.** Dr. Grassian, Plaintiffs' expert witness, will testify in person about the psychological effects of solitary confinement, and detainees' unique psychiatric vulnerability to threats and coercion.

**Jeffrey Edelstein.** Mr. Edelstein, Plaintiffs' expert witness, will testify in person about the labor requirements needed to maintain a sanitary environment at the Aurora Detention Facility, to quantify damages for Plaintiffs and the unjust enrichment Class.

**Peter Matthew Alexander.** Mr. Alexander will testify in person about the labor requirements needed to provide laundry services at the Aurora Detention Facility, to quantify damages for Plaintiffs and the unjust enrichment Class.

### C. Deposition Witnesses

**Alejandro Hernandez Torres.** Mr. Hernandez Torres, a former detainee, will testify by deposition about the conditions at the Facility, the impact of detention and separation from his family, the structure of the sanitation policy and Voluntary Work Program, conditions of solitary confinement at GEO, and about detainees' living conditions. His testimony will include descriptions of the work he did, the experience of being placed in segregation for refusing to clean, and the impacts of solitary confinement on his personal mental and emotional well-being.

**Demetrio Valerga.** Mr. Valerga, a former detainee, will testify by deposition about the conditions of segregation at the Facility, his experience participating in the Voluntary Work Program, and the structure and requirements of the sanitation policy.

**Luis Pagan.** Mr. Pagan, a former guard at the Aurora Facility, will testify by deposition about how GEO guards enforce the facility's rules, how GEO managed the solitary confinement

unit at the Aurora Facility, and how GEO guards document incidents that occur during their shifts. He will also testify about how guards explained the rules and potential consequences for failure to follow those rules to detainees, including telling detainees that solitary confinement was a potential consequence for refusing to clean. Mr. Pagan will also share his knowledge of the Voluntary Work Program and the work done by detainees who participated in it.

**Amber Martin.** Ms. Martin, a GEO executive, will testify by deposition about the creation and development of relevant GEO policies at the corporate level, the scope of the tasks performed by detainee workers as part of the Voluntary Work Program, and the extent to which those tasks are part of the daily operations of the facility. Ms. Martin will also testify about GEO's decision to pay $1 per day for Voluntary Work Program participation and (to the extent necessary in light of the Court's ruling on motions *in limine*), GEO's ability to pay more than $1/day in the voluntary work program. She will also share her understanding of the sanitation policy and consequences for detainees who refuse to clean.

**Brian Evans.** Mr. Evans, GEO's prior CFO, will testify by deposition about how GEO sets its price when bidding on government contracts, how GEO earns revenue and generates profits from its government contracts, and how GEO tracks individual facilities' financial performance. His testimony will also include a description of how immigration detention centers operate generally and information about GEO's contract related to the Aurora Facility.

**David Venturella.** Mr. Venturella, a former GEO executive, will testify by deposition about the role of immigration detention in GEO's business model, the nature of immigration detention, about the bidding process for detention contracts, and about GEO's competitive pressures to win those contracts.

## III. Key Legal and Evidentiary Issues

### A. The Causation Standard Under the TVPA

As part of their TVPA claim, Plaintiffs must prove causation, or that GEO obtained the detainees labor "by means of" its improper coercive conduct. *See* 18 U.S.C. § 1589(a). The causation inquiry asks whether it is more likely than not that "detainees would have cleaned up the common areas and after other detainees absent the ever-present threat of segregation." *See* ECF No. 380 at 65. Plaintiffs are not required to show that solitary confinement was likely, but only that the threat of solitary confinement was sufficient to compel the detainees to provide labor. *See* ECF No. 380 at 66-67.

As explained above, the causation analysis has both a subjective and objective component. *Supra Section I.B.1.* The causation element does not require statistical proof, but can be satisfied by class-wide circumstantial evidence. *See Menocal II*, 320 F.R.D. at 267. The jury is also not required to find that GEO's conduct was always successful in obtaining detainees' labor, because "partial success is sufficient to establish the requisite causation as to the labor thereby obtained." *See Martinez-Rodriguez v. Giles*, 31 F.4th at 1156. This is important, as the Court has already acknowledged that, "the nature of detention is unique in that it allows the detainer to almost fully control the experience of the detainee." *Menocal II*, 320 F.R.D. at 267. Therefore, "[g]iven the climate in which [Plaintiffs and class members] were detained, it is possible that an inference of causation would be appropriate even despite some class members' purported willingness to work for reasons other than GEO's improper means of coercion." ECF No. 380 at 62-63 (quoting *Menocal II*, 320 F.R.D. at 267).

Plaintiffs also do not need to show that each class member labored as a result of a direct threat, such as from an officer or the Handbook or Orientation videos, as the looming threat of GEO's policies is sufficient to infer causation. ECF No. 380 at 65. The jury can also infer causation even if a class member does not remember explicitly being warned of the possible threat of segregation before cleaning, as a class member "may have perceived the threat without remembering when or how it was made or may have continued to clean after the threat was made known." *Id.* at 66.

At trial, Plaintiffs will present substantial documentary and testimonial evidence showing that the detainees would not have cleaned under the sanitation policy without the looming threats of solitary confinement and that a reasonable person in the detainees' circumstances would have felt similarly compelled. *See supra* Section I.B.2. (Causation). This evidence includes testimony by GEO executives and staff, such as Assistant Warden Ceja, about uniform policies and practices that informed every detainee about the sanitation policy and the disciplinary consequences for refusing to clean, including solitary confinement, as well as the importance of following the rules and obeying guards while detained in the Aurora Facility. *See supra* Section II. Plaintiffs will also present GEO's Detainee Handbook, which describes the sanitation policy and associated disciplinary consequences in each version operative during the class period. *See supra* Section I.B.2. (Causation).

Further, former detainees will testify about their personal experience being taken to solitary confinement for refusing to clean, interactions with guards who threatened solitary confinement as a consequence of refusing to clean, their observations of others punished with solitary confinement for refusing to clean, and how those experiences compelled them to clean.

*See supra* Section II. Plaintiffs' expert Dr. Stuart Grassian will also testify about the psychological harm caused by solitary confinement and threats of solitary confinement, further supporting the conclusion that such harm could compel both detainees and a reasonable person in their circumstances to clean to avoid segregation. *See supra* Section II. All of this evidence provides a substantial basis for the jury to conclude that all detainees knew GEO imposed solitary confinement as a consequence for refusing to clean and that these ever-present threats compelled detainee labor. *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 922 (10th Cir. 2018) ("the same considerations could lead a reasonable factfinder to conclude by a preponderance of the evidence that each TVPA class member would not have performed his or her assigned cleaning duties without being subject to the Sanitation Policy."); *cf. Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016) (deciding whether generalized evidence is probative of class wide facts is the "near-exclusive province of the jury").

**B. Corporate Knowledge**

As described above, Plaintiffs must prove GEO knew (1) coercive circumstances existed, and (2) that GEO obtained the labor in question as a result. *Supra* Section I.B.1. To establish knowledge, the jury may consider GEO to have "the combined knowledge of its employees and agents." ECF No. 380 at 67 (quoting 3 Fletcher Cyc. Corp. § 807). The "best test" of whether knowledge of a corporation's employees can be imputed to the corporation itself is "whether the conditions and facts known were within the sphere of the authority of the particular agent" or employee. *Id.*

Here, the evidence at trial will show an interlocking chain of corporate knowledge, from frontline detention officers up through on-site managers all the way to GEO's executive officers.

GEO's sanitation policies, including the mandatory cleaning requirements and the disciplinary sanctions associated with them, were known to GEO executives, who defended them in their depositions as consistent with ICE policies (contrary to the Court's findings on summary judgment). On-site GEO officers with administrative oversight of the facility had knowledge of how corporate policies were carried out; developed handbooks, presentations, and other materials to inform detainees of those policies; and trained frontline employees on how to implement them. The frontline employees themselves were aware of the coercive effect that threats of "the hole" had on detainees, and GEO's records reflect instances where detention officers applied the sanction.

This chain of evidence will create a strong inference supporting knowledge. *See supra* Section I.B.2 (Knowingly). For example, GEO's corporate policies in use at the Aurora Facility and approved at the corporate level included written policies stating that detainees were required to clean the common areas of the housing pods and that up to 72 hours in solitary confinement was a permissible sanction for refusing to do so. *Id.* Testimony and documents will further reflect GEO's recordkeeping practices that memorialize the implementation of this policy in incident reports. Plaintiffs will also present testimony that GEO employees from executives to facility administrative staff to guards on the ground were all aware of the policy within the scope of their job duties. For example, GEO executive and corporate representative Amber Martin will testify about her knowledge of the sanitation policy, which is reviewed and approved in GEO's corporate offices, Assistant Warden Dawn Ceja will testify about how the sanitation policy is implemented on the ground in the facility and how guards are trained to carry it out, and guard

Luis Pagan, will testify about how he was trained on that policy and that implementing them was a core part of the guard's job. *Id.*

Plaintiffs will also testify about their personal experiences and observations of guards carrying out GEO's corporate policy. This includes occasions where they heard the guards threaten detainees with solitary confinement for refusing to clean or when they themselves were sent to segregation for refusing to clean. *See supra* Section II.

Because this evidence will show that GEO's officers and employees were aware of the policy from the corporate level to the facility level, the evidence will support a jury finding that GEO itself knew that solitary confinement was a threatened and actual punishment for refusing to clean under the sanitation policy and that GEO obtained detainees' cleaning labor through those threats and punishments.

### C. GEO's Financial Evidence Is Inextricably Tied to Plaintiffs' Unjust Enrichment Claim

Pending before the Court is Defendant's Motion to Bifurcate Trial and Plaintiffs' related opposition. ECF No. 543 (Motion to Bifurcate); ECF No. 553 (Opposition to Bifurcate); ECF No. 503 (Opposition to Defendant's Motions *In Limine*). GEO has asked the Court to "either exclude financial-condition evidence at trial or bifurcate the trial into two phases, with the same jury determining liability and compensatory damages in the first phase and the amount of punitive damages in the second." ECF No. 543 at 10. Plaintiffs oppose bifurcation, as a unified trial would be more efficient, less burdensome, and fairer to Plaintiffs; but just as importantly, strongly oppose GEO's attempt to exclude all evidence about its finances. In addition to other considerations outlined in Plaintiffs' briefs, the profitability of GEO's immigrant detention business is inextricably linked to GEO's liability under the unjust enrichment claim. *See* ECF

No. 553 at 4-12; ECF 503 at 15-18. And GEO previously stipulated to the admissibility of its profit and loss reports in the Pretrial Order. ECF No. 540 at 7. The Court should not permit it to walk back that stipulation.

Regardless of how the Court rules on bifurcation (which it should deny), the Court should permit Plaintiffs to prove their unjust enrichment case using evidence of GEO's financial performance at the Aurora Facility within the class period. GEO's briefing on bifurcation is focused on ensuring that evidence of GEO's overall, present-day financial condition is kept out, even though such evidence is obviously relevant to the punitive damages analysis for Plaintiffs' TVPA claims. *See* ECF No. 553 at 5-9. But those arguments do not bear on the use of evidence of GEO's financial performance at the Aurora Facility within the class period, nor could they. The Parties stipulated that GEO's profit and loss reports (Exs. 168-176) are admissible and those documents are necessary to show the benefit GEO obtained from detainees' labor in the Voluntary Work Program. When considered in conjunction with GEO's staffing plans and costs, GEO's facility-specific profit and loss statements, which contain an accounting of GEO's budget, expenses, and revenues on a monthly basis, allow the jury to understand how GEO derived a significant financial benefit from relying on underpaid detainee labor. Omitting these documents would prejudice Plaintiffs' merits case.

**D. Anticipated Objections Involving References to ICE.**

As Plaintiffs have requested in their Motion *in Limine* # 1, the Court should prohibit GEO from relitigating its *Yearsley* defense at trial and GEO should be prohibited from introducing evidence and argument that its actions were done at ICE's direction or under its supervision.

Yet, it is inevitable that ICE will come up during trial because it is the other party to the contract authorizing GEO to operate the Aurora Facility and was a looming presence in detainees' lives.

Plaintiffs do not object to all mentions of ICE or its role during trial. Plaintiffs do not object, for example to:

- Mentions of ICE as the counterparty to GEO's contract to operate the facility;
- GEO's requirement to abide by ICE's Performance Based National Detention Standards *as set forth in the contract*;[1]
- Discussion of the bidding process for ICE contracts, and ICE's decision to award (or renew) the Aurora contract;
- References to ICE's requirements for the Voluntary Work Program;
- Reference to the fact that detainees are held subject to ICE's authority at the Aurora Facility while their immigration case is pending, subject to the limits set forth in Plaintiffs' Motion in Limine # 7;[2]
- Discussion of ICE reimbursing GEO $1/day for detainee work in the Voluntary Work Program.

There is, however, a line to be drawn between references to ICE's presence at the Aurora facility and the introduction of evidence that is calculated to convey the impression that ICE condoned or approved of GEO's conduct. Many jurors may be presumed to have a baseline level of respect for law enforcement, and accordingly to assume that when a law enforcement agency condones a party's conduct, it is not illegal. This common-sense assumption is wrong. The *Yearsley* defense – which GEO lost on summary judgment – defines the stringent

[1] This does not, of course, extend to GEO continuing to blur the distinction between "personal housekeeping tasks" such as making one's bed (which are not part of Plaintiffs' claims) and janitorial work involving industrial chemicals in an 80-person dormitory (which are). At minimum, this would confuse and mislead the jury.

[2] Addressed further in Part III.E. below.

requirements that a private party must meet when conduct that is otherwise unlawful is directed by the government. Having failed to meet those requirements, GEO cannot now be permitted to adduce evidence that it cleared some *lower* bar of government approval, and invite the jury to tacitly invent a new immunity doctrine that would excuse its conduct, based on their assumptions about the law.

That is why Plaintiffs' Proposed Jury Instruction 2.6 is necessary. It is drafted with the intention of accurately informing jurors that nothing about GEO's relationship with ICE, standing alone, precludes a liability finding. It scrupulously avoids expounding on the Court's reasoning at summary judgment, or particularizing the facts that were relevant to the *Yearsley* inquiry – for example, Plaintiffs do not ask the Court to instruct the Jury specifically that ICE *did not* direct GEO's conduct, or that "GEO's actions went beyond its contracts with ICE; it did not just fulfill the obligations of its contracts." ECF No. 380 at 68.

But the issue of ICE's role may be expected to arise again, and if GEO's presentation crosses the line into improper invitations to disregard the law of the case, an expanded instruction may become appropriate. Throughout discovery, GEO's witnesses routinely volunteered testimony that ICE approved its policies, was present at the Aurora facility, or that everything GEO did was in furtherance of its contract with ICE. GEO's trial brief (filed the same day as this writing) continues to advance this narrative. In the parties' joint submission listing objections to deposition testimony, filed contemporaneously with this brief, GEO has designated long sections of such testimony, several of which serve no other purpose than to emphasize the close relationship between GEO and the agency. Plaintiffs have objected to these designations, and the Court should not admit them, consistent with Plaintiffs' motion *in limine*.

But if GEO continues to test the limits of the Court's rulings, then a more robust instruction may become appropriate as a sanction – for example, an instruction informing the jury of the Court's factual findings, and instructing it that the Court has rejected GEO's defense as a matter of law.

The following examples of testimony that GEO might seek to introduce into the record from witnesses it controls are objectionable for the reasons identified in Plaintiffs' motion *in limine* #1. These are drawn from the deposition designations that GEO seeks to admit, and introducing similar testimony at trial should lead the Court to impose an appropriate limiting instruction:

- Repeated insistence by GEO detention officers or other personnel that GEO's policies are synonymous with ICE policies or originate with ICE. *See* L. Pagan Tr. 26:19-27:17, 95:22-25.

- Evidence inviting the jury to draw improper inferences, such as undue focus on testimony that ICE considered GEO's conduct to be satisfactory. *See* Venturella Tr. 158:22-25.

- Repeated and gratuitous references to the presence of ICE personnel on-site at the Aurora facility. *See* A. Martin Tr. (Oct. 9, 2019) 23:19-25; 41:22-42:2, 51:14-22, 57:11-20, 82:3-20,

- Repeated references to ICE approving GEO's policies. *See* A. Martin Tr. (Oct. 9, 2019) 32:17-21, 49:11-25, 52:21-53:5

- Lengthy explanations of why (contrary to the Court's findings) GEO policies are, in fact, consistent with ICE standards. *See* A. Martin Tr. (Oct. 9, 2019) 163:9-165:18, 182:15-186:3, 187:10-188:4, 190:4-191:25, 192:15-25, 195:20-197:7; *see also* the entirety of GEO's designations in the Feb. 28, 2020 deposition of Amber Martin.

- Testimony about "GEO's obligations under its Contract with ICE and how those obligations were the impetus for its behavior." ECF No. 540 at 14 (description of anticipated testimony of D. Ragsdale).

All of this testimony was part of the record at summary judgment, and the Court did not find it persuasive to establish GEO's *Yearsley* defense; in fact, the Court granted summary judgment to

Plaintiffs, finding that the facts *could not* establish the *Yearsley* defense. Allowing GEO to introduce the same evidence at trial would mislead the jury and invite it to overrule the Court.

When, exactly, GEO's case crosses the line from permissible descriptions of ICE's role to one calculated to invite improper conclusions by the jury will be a judgment call for the Court at trial. Plaintiffs offer the above examples to assist the Court in discerning that line.

**E. Anticipated Objections Involving Evidence of Criminal Character**

Plaintiffs' motion *in limine* #6 asks the Court to bar admission of specific criminal arrests or convictions. More broadly, GEO may seek to introduce evidence that broadly portrays detainees as criminals *in general*, emphasizing their alleged bad character and propensity for violence,[3] aggression,[4] drunkenness,[5] or other erratic behavior. Needless to say, such broad characterizations are highly prejudicial on their face, and should be sharply limited under Fed. R. Evid. 403. And they are even more problematic in light of the fact that many political figures routinely portray all immigrants as criminals, whether or not they have committed criminal offenses.[6]

These tropes are not just prejudicial. They are also a kind of propensity evidence, of the kind generally prohibited by Fed. R. Evid. 404. In the context of a class action, introducing

[3] *See, e.g.,* GEO's designations of D. Valerga deposition at 34:25-36:6, 96:13-23; ECF No. 572 (Plaintiffs' objections to Audio Files), objections to Exs. 2875, 2887.

[4] *See, e.g.*, ECF No. 572 (Plaintiffs' objections to Audio Files), objections to Exs. 2875, 2887, 5660.

[5] ECF No. 572 (Plaintiffs' objections to Audio Files), objections to Exs. 6227, 6266, 6287, 6290, 6295.

[6] This unfortunate reality forms the backdrop for Plaintiffs' motion *in limine* #8, which seeks to prevent the use of derogatory or incendiary terms that implicitly associate immigrants with criminality, such as "Illegal" (used as a noun); "Illegal Alien," "Illegal Immigrant, etc.

evidence that an entire category of class members – the entirety of the class – has a character for criminality, aggression, violence, etc. invites the inference that on particular occasions when detainees were sent to solitary confinement, one or more of these aggravating factors was likely present. This inference is only made *more* problematic by the fact that it could be applied to *unspecified* instances of guards placing detainees in solitary confinement, that is, to other occasions not specifically documented by an exhibit or described in detail by a witness. To invite the jury to infer that *any* time GEO placed a detainee in solitary confinement, it had a good reason, simply because all detainees are (or were) criminals, is by definition to invite stereotyped thinking and highly prejudicial propensity evidence. The introduction of these stereotypes may be subtle, and introduced simply by undue and repeated references to detainees' past experiences in prison.[7]

This case does not concern crimes or criminality. The detention at issue is purely civil. References to criminal history or previous experience of arrest or incarceration are entirely irrelevant, can only be more prejudicial than probative, and should be prohibited clearly before the trial. Introducing or suggesting the existence of propensity evidence of criminality to the jury through an inappropriate question cannot be adequately cured, even after an objection is sustained. It will be difficult to un-ring the bell once the jury has heard, for example, "How did that compare to your previous experiences in prison?" Plaintiffs respectfully request a clear pretrial ruling prohibiting such references to prior incarceration, arrests, or criminal history.

---

[7] *See, e.g.,* GEO's designations of D. Valerga deposition at 17:18-18:25, 19:11-20:16, 32:8-33:11, 46:15-47:16, 48:15-49:22

Should the Court deny Plaintiffs' request to address this matter prospectively, the Court should be prepared to guard against such references being used to draw more attention to the fact of past criminal conduct than to the circumstances or knowledge that are relevant. And the Court will need to determine when a limiting instruction along the lines of Plaintiffs' proposed Instruction 2.5 – or perhaps one going beyond it in its particulars – becomes appropriate.

**F. Objections Involving Immigration History**

A third category of objections will involve references to the Plaintiffs and Class Members' immigration status and history. Detainees at Aurora were in immigration proceedings. That fact will necessarily be introduced at trial, and the parties have stipulated to a particular description of it. *See* ECF No. 540 at 6. Plaintiffs' motion *in limine* # 7 aims to curtail undue focus on the details of that status to avoid creating **a** distraction that would invite the jurors to draw improper inferences. For example, some jurors might have a more negative perception of someone who crosses the border far from a port of entry, compared with someone who overstayed a visa or came to the country as a minor. And some jurors might incorrectly assume that all deportable migrants fall in the former category.

While the jury selection process should be structured to avoid many of these concerns by excluding jurors with unfairly prejudicial views of immigrants, further invitations to juror bias could arise from undue focus on a particular witness's nationality or country of origin; the facts surrounding a witness's entry to, re-entry to, or departure from the United States; or the nature of their applications for immigration relief and the details of their immigration proceedings. Questions about current immigration status are particularly likely to invite juror bias.

Nevertheless, the permissible side of this line should allow witnesses to refer to the existence of their immigration cases at the time of their detention by GEO and how those immigration cases affected their willingness (or acquiescence) to working either in the Voluntary Work Program or in GEO's mandatory cleaning details. GEO's own statements about the fact of possible deportation, and its relationship to discipline at Aurora, may be relevant to issues of causation. And witnesses should be allowed to introduce basic biographical facts, such as how long they've lived in the country, their ties to people in their communities, and how their immigration cases threatened to sever those relationships.

Plaintiffs request a clear pretrial ruling that puts the parties on notice of which immigration questions are permissible. Plaintiffs request a prohibition on immigration-related questions other than:

1. Place of birth;
2. Age upon arrival in the United States;
3. Pendency of immigration case in Immigration Court during detention at the GEO;
4. Plaintiffs' understanding (and the source of their understanding) that disciplinary actions GEO could take would prejudice their pending immigration cases.

Plaintiffs request a clear prospective instruction limiting immigration questions to the foregoing. As in the above discussion of criminal history, Plaintiffs' concern is that improper questions would have a prejudicial effect that cannot be cured effectively, even if an objection is sustained. Once a question like, "You came back across the border after being deported from the United States, haven't you?" or, "You still don't have immigration status today, do you?" is asked, the sustained objection will not remedy the prejudicial effect of a matter that has no relevance to the

claims or defenses. This proceeding has nothing to do with the ultimate outcome of the immigration proceedings occurring while GEO held the Plaintiffs. A broad pretrial ruling is appropriate.

Should Plaintiffs' request be denied, the Court must continue to guard against undue and prejudicial focus on immigration status, while permitting only evidence that is relevant and necessary to present the claims and defenses.

Dated: October 20, 2026

Respectfully submitted,

By: */s/ Michael J. Scimone*
Michael J. Scimone
Aaron Bryce Lee
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone.: (212) 245-1000
Facsimile: (646) 509-2060
Email: mscimone@outtengolden.com
Email: alee@outtengolden.com

Adam Koshkin
**OUTTEN & GOLDEN LLP**
1999 Harrison Street, Suite 1500
Oakland, CA 94612
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: akoshkin@outtengolden.com

David Seligman
Juno Turner
Alexander Hood
Rachel Dempsey
Brianne Power
**TOWARDS JUSTICE**
1580 N Logan Street
Denver, CO 80203
Telephone: (720) 441-2236
Email: alex@towardsjustice.org
Email: david@towardsjustice.org
Email: andy@towardsjustice.org
Email: juno@towardsjustice.org
Email: rachel@towardsjustice.org
Email: brianne@towardsjustice.org

Andrew Turner
Brandt Milstein
**MILSTEIN TURNER, PLLC**
1490 Lafayette St. #304
Denver, CO 80218
Telephone: (303) 305-8230
Email: andrew@milsteinturner.com
Email: brandt@milsteinturner.com

Hans Meyer
**MEYER LAW OFFICE, P.C.**
P.O. Box 40394
Denver, CO 80204
Telephone: (303) 831-0817
Email: hans@themeyerlawoffice.com

*Class Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of October, a true and correct copy of the foregoing **PLAINTIFFS' TRIAL BRIEF** was electronically filed with the Clerk of the Court using the CM/ECF electronic filing system, which will send notification to all counsel of record.

*/s/ Michael J. Scimone*

Michael J. Scimone