**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-cv-02887-JLK

ALEJANDRO MENOCAL,
MARCOS BRAMBILA,
GRISEL XAHUENTITLA,
HUGO HERNANDEZ,
LOURDES ARGUETA,
JESUS GAYTAN,
OLGA ALEXAKLINA,
DAGOBERTO VIZGUERRA, and
DEMETRIO VALERGA,
*on their own behalf and on behalf of all others similarly situated*,

Plaintiffs,

v.

THE GEO GROUP, INC.,

Defendant.

---

**ORDER DENYING GEO'S MOTIONS (ECF NOS. 449, 450, & 451)**

---

Kane, J.

This matter is before me on the Motion to Certify Question for Interlocutory Appeal ("Motion to Certify") (ECF No. 449), the Motion for Partial Summary Judgment or Judgment on the Pleadings ("Motion for Partial Summary Judgment") (ECF No. 450), and the Motion to Stay Proceedings ("Motion to Stay") (ECF No. 451), all filed by Defendant The GEO Group, Inc. ("GEO"). The Motions are a continuation of GEO's efforts to delay a hearing of the merits in this case, as not one of the Motions is sufficiently supported by the law or the facts to warrant the relief requested. Consequently, I deny each Motion.

## I. Background & Procedural History

GEO operates the immigration detention facility in Aurora, Colorado (the "Facility"), pursuant to a contract with U.S. Immigration and Customs Enforcement ("ICE"). Plaintiffs in this case are individuals who were formerly detained at the Facility. This case began in October 2014 with the filing of Plaintiffs' Class Action Complaint for Unpaid Wages and Forced Labor (ECF No. 1). Plaintiffs' remaining claims in this case are pursued on their own behalf and on behalf of two classes of similarly situated individuals and are brought against GEO for (1) violations of the forced labor provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589, 1595; and (2) unjust enrichment. These claims challenge two separate policies implemented by GEO at the Facility. First, Plaintiffs assert that the cleaning policies created and implemented by GEO forced detainees to clean common areas of the Facility under the threat of solitary confinement, in violation of the TVPA. Second, Plaintiffs claim that GEO was unjustly enriched by paying detainees only $1.00 per day for their participation in the Facility's Voluntary Work Program (the "VWP").

In response to Plaintiffs' 2014 Complaint, GEO filed a Motion to Dismiss (ECF No. 11), which I granted in part, dismissing a Colorado minimum wage claim originally asserted by Plaintiffs, and denied in part, allowing Plaintiffs TVPA and unjust-enrichment claims to proceed. *See Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1135 (D. Colo. 2015). GEO then moved for reconsideration of my ruling. *See* Mot. for Reconsideration of Order Denying GEO's Mot. to Dismiss, ECF No. 29. I denied GEO's request, finding its Motion to be inappropriate. *See* Order on Mot. for Reconsideration, ECF No. 33. Unsatisfied, GEO filed a Motion for an Order Certifying an Interlocutory Appeal and Motion to Stay Litigation Pending Appeal (ECF No. 38).

I denied that combined Motion on the grounds that GEO had improperly presented an argument for the first time in its Motion for Reconsideration and that it sought to rehash its "now twice rejected arguments regarding the operative contract." Order on Mot. for Interlocutory Appeal at 3, ECF No. 48. In August 2015, the parties submitted their first proposed Scheduling and Discovery Order (ECF No. 28), which I did not approve, *see* 8/11/2015 Minute Entry, ECF No. 30.

After engaging in related discovery, Plaintiffs moved for class certification under Federal Rule of Civil Procedure 23. *See* Pls.' Mot. for Class Certification, ECF No. 49. I granted Plaintiffs' Motion, certifying a separate class of similarly situated individuals for each of Plaintiffs' claims. *See Menocal v. GEO Grp., Inc.,* 320 F.R.D. 258, 270 (D. Colo. 2017).[1] GEO filed an interlocutory appeal of my Order granting class certification, and while that appeal was pending, GEO again sought to stay the litigation, *see* Mot. to Stay Proceedings Pending Rule 23(f) Review, ECF No. 69. I granted GEO's request only as to class-related discovery and otherwise proceeded with the litigation. *See* Order Granting in Part & Denying in Part GEO's Mot. to Stay at 2-3, ECF No. 85. In February 2018, the Tenth Circuit affirmed my Order certifying the classes. *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 927 (10th Cir. 2018).

Meanwhile, the parties submitted a second proposed Scheduling and Discovery Order (ECF No. 61) in March 2017, which I again rejected, *see* 6/17/2017 Minute Entry, ECF No. 89, and a third proposed Scheduling and Discovery Order (ECF No. 98) in June 2017. That third proposed Order was approved and issued. *See* Scheduling and Discovery Order, ECF No. 103.

---

[1] For Plaintiffs' claim brought under the TVPA, the certified class includes: all persons detained in the Facility from December 23, 2004, to October 22, 2014. *See Menocal v. GEO Grp., Inc.*, 635 F. Supp. 3d 1151, 1158, 1196 (D. Colo. 2022). For Plaintiffs' unjust enrichment claim, the certified class includes: all people who performed work at the Facility under GEO's VWP from October 22, 2011, to October 22, 2014. *Id.* at 1158.

The following year, the parties filed a proposed Amended Stipulated Scheduling and Discovery Order (ECF No. 139), which was revised and adopted in October 2018, *see* Amended Stipulated Scheduling and Discovery Order, ECF No. 149. The Amended Order was further modified multiple times such that the final deadline for the parties to file dispositive motions was July 31, 2020. *See* 5/18/2020 Minute Order, ECF No. 267. Before that deadline passed, GEO filed a Cross-Motion for Summary Judgment (ECF No. 284), a Motion for Summary Judgment (ECF No. 305), a Motion to Dismiss for Failure to Join Required Party (ECF No. 307), and a Motion for Decertification of Class (ECF No. 312). In what I will refer to as my "Omnibus Order" (ECF No. 380), I denied the majority of GEO's Motions, only granting in part GEO's Motion for Summary Judgment to narrow the TVPA class period by two months. *See Menocal*, 635 F. Supp. 3d at 1198-99.

As relevant here, the Omnibus Order considered two of GEO's asserted defenses. First, the Order addressed GEO's claim that its contract with ICE guaranteed it immunity under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940),[2] from both Plaintiffs' TVPA and

---

[2] In my Omnibus Order, I referred to this defense as "derivative sovereign immunity," in accordance with GEO's presentation of its defenses. However, the U.S. Supreme Court has clarified, in no uncertain terms, that *Yearsley* does not offer government contractors an immunity to suit but instead provides them with a merits defense. *GEO Grp., Inc. v. Menocal*, 607 U.S. 438, 449-51 (2026). Thus, in this Order, I refer to the protection in question as the "*Yearsley* defense."

In GEO's pending Motion to Certify Question for Interlocutory Appeal, GEO claims that, "[i]n its Answer, [it] asserted derivative sovereign immunity as canonically articulated in *Yearsley*[]." Mot. to Certify at 7 (citing GEO's Answer at 14, ECF No. 26). In truth, however, GEO's Answer asserted only the related "government contractor defense," which GEO has consistently argued is distinct from *Yearsley*'s "derivative sovereign immunity." *See, e.g.*, App.'s Op. Br. at 22, *Menocal v. GEO Grp., Inc.*, 22-01409 (10th Cir.) (explaining that derivative sovereign immunity is a "related but distinct doctrine" from the government contractor defense). My Omnibus Order noted that, contrary to GEO's current representation, GEO did not plead derivative sovereign immunity in its Answer but did raise the defense in the Amended Stipulated Scheduling and Discovery Order. *See Menocal*, 635 F. Supp. 3d at 1171 n.15. GEO's repeated efforts to rewrite

unjust enrichment claims. And, second, the Omnibus Order evaluated the "government contractor defense" based on *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), that GEO asserted as to Plaintiffs' unjust enrichment claim. I ruled in favor of Plaintiffs on both defenses.

Under *Yearsley*, government contractors are protected from liability "for actions that were directed or required by the federal government, so long as the government's authority to carry out the contracted-for services was validly conferred by Congress." *Menocal*, 635 F. Supp. 3d at 1172 (citing *Yearsley*, 309 U.S. at 20-22). In concluding the *Yearsley* defense did not protect GEO from Plaintiffs' TVPA claim, I found that GEO's relevant cleaning policies were "independently developed and implemented" by GEO and "far exceeded its contractual obligations with ICE." *Id.* at 1173. Additionally, I determined that the *Yearsley* defense did not protect GEO from Plaintiffs' unjust-enrichment claim "[b]ecause GEO was not complying with any federal direction or contractual requirement to compensate VWP participants $1.00 per day and no more, but was instead exercising its discretion." *Id.* at 1177. My analysis of the defense's application to Plaintiffs' unjust-enrichment claim quoted the Ninth Circuit case *Cabalce v. Thomas E. Blanchard & Assoc.*, stating: "[N]othing in *Yearsley* extended immunity to [government] contractors exercising a discretionary governmental function." *Id.* at 1176 (quoting 797 F.3d 720, 732 (9th Cir. 2015)).

*Boyle* solidified a defense for government contractors that is similar to the *Yearsley* defense but separate. Under *Boyle*, certain contractors are protected from state law claims "[w]here the government has directed [the] contractor to do the very thing that is the subject of the claim." *Id.* at 1172 (quoting *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 n.6

---

the history of this case are not overlooked.

(2001)). Evaluating the application of the *Boyle* defense involves a multi-step process, in which a court: (1) considers whether the contract between the government and the contractor involves "uniquely federal interests," (2) determines whether the operation of state law results in a "significant conflict" with federal policy or frustrates "specific objectives of federal legislation," and (3) verifies whether the three limiting criteria for contractor immunity are satisfied. *See id.* at 1172 (quoting *Boyle*, 487 U.S. at 504, 507). Those limiting criteria are that "(1) the government approved reasonably precise specifications; (2) the contractor's performance conformed to those specifications; and (3) the contractor alerted the government to dangers known to the contractor but not to the United States." *Id.* (quoting *Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 255 (4th Cir. 2021)). In my Omnibus Order, I found GEO's *Boyle* defense failed as to Plaintiffs' unjust enrichment claim because "there is no obvious clash between federal polices or objectives and the state law underlying Plaintiffs' unjust enrichment claim." *Id.* at 1179.

After I issued my Omnibus Order, the parties, including GEO, conferred with each other and the Court to finally set this case for trial. *See* 10/19/22 Minute Order, ECF No. 381; 10/27/22 Order Setting Pretrial Conference, Final Trial Preparation Conference, & Three-Week Jury Trial, ECF No. 383. Despite those efforts, and its participation in them, GEO later filed an appeal of my Omnibus Order, *see* 2022 Notice of Appeal, ECF No. 387, and again sought to stay proceedings in the case, *see* Motion to Stay Proceedings Pending Appeal, ECF No. 391. Plaintiffs agreed that a limited stay was appropriate while they challenged the Tenth Circuit's jurisdiction over the appeal. *See* Pls.' Resp. to GEO's Mot. to Stay at 2-4, ECF No. 395. As a result, I stayed the case for matters comprehended within the appeal. 12/7/2022 Order, ECF No. 400. In October 2024, the Tenth Circuit determined that it lacked appellate jurisdiction over

GEO's appeal. *Menocal v. GEO Grp., Inc.*, No. 22-1409, 2024 WL 4544184, at *11 (10th Cir. Oct. 22, 2024) (unpublished). GEO petitioned the U.S. Supreme Court for certiorari, which was granted, and in February 2026, the Supreme Court issued its opinion in this case, *GEO Group v. Menocal*, affirming the Tenth Circuit's determination that it lacked jurisdiction, 607 U.S. at 452. Soon thereafter, I lifted the limited stay that was previously entered, held a pretrial conference, and re-set the case for trial. *See* 3/12/2026 Minute Order, ECF No. 439; 3/26/26 Order Setting Pretrial Conference, Final Trial Preparation Conference, & Three-Week Jury Trial, ECF No. 441; 6/3/2026 Minute Entry, ECF No. 447.

At that time, GEO filed its three motions that are the subject of this Order. With its first motion, GEO requests that my Omnibus Order be certified to the Tenth Circuit under 28 U.S.C. § 1292(b) so that GEO may appeal a specific question related to the *Yearsley* defense. *See* Mot. to Certify Question for Interlocutory Appeal ("Mot. to Certify") at 2, ECF No. 449. GEO could have made this request for certification in 2022 when it originally appealed my Omnibus Order, but GEO chose not to do so. GEO's second motion seeks summary judgment or judgment on the pleadings, claiming that GEO is entitled to qualified immunity. *See* Mot. for Partial Summ. J. at 25, ECF No. 450. In the hundreds of pages GEO has filed discussing its defenses over the twelve years this case has been pending, GEO has never before raised qualified immunity, but now that the case is ready for trial, GEO has chosen to pursue the defense. GEO's third motion urges me to stay all deadlines in this case based on a Petition for a Writ of Certiorari that it has filed with the Supreme Court in another case. *See* Def.'s Mot. to Stay Proceedings at 2, ECF No. 451.

Four months after submitting these three motions, GEO filed a Notice of Appeal (ECF No. 527), asserting that I had "constructively denied" its claim to qualified immunity by not

ruling on its motion for summary judgment within four months.[3] GEO contended that my "constructive denial" was immediately appealable and that its appeal divested this Court of jurisdiction. 2026 Notice of Appeal at 2, ECF No. 527. At a hearing on August 27, 2026, I found that GEO's appeal was improper and frivolous and that I continued to have jurisdiction over the case. I observed that GEO's appeal and insistence that this Court lacked jurisdiction only served to cause delay. *See* Order on Continuing Jurisdiction at 3-4, ECF No. 541. The Tenth Circuit recently issued an Order dismissing GEO's "premature appeal" for lack of jurisdiction. 9/9/26 Tenth Cir. Order at 5, ECF No. 549.

My Omnibus Order includes a twenty-four-page account of the substantive facts of this case. *See Menocal*, 635 F. Supp. 3d 1157-71. The parties have not indicated that the record has evolved since that time. *Cf.* Mot. for Partial Summ. J. at 11 (representing that the Motion for Partial Summary Judgment "rel[ies] on the undisputed facts and evidence previously developed during summary judgment"). As such, I incorporate my previous recitation of the facts into this Order and rely on it for my rulings here. Any additional relevant facts are cited in the analysis below.

## II. GEO's Motion for Partial Summary Judgment or Judgment on the Pleadings

Twelve years after this case was initiated and over five years after the dispositive-motion deadline in this case, GEO asserts—for the first time—that qualified immunity bars Plaintiffs' TVPA claim. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or

[3] GEO filed its Motion for Partial Summary Judgment on April 6, 2026. Based on the briefing schedule agreed to by GEO, its Motion was not fully briefed until May 25, 2026. I heard oral argument on the Motion promptly thereafter. *See* 6/3/2026 Minute Entry, ECF No. 477.

constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). GEO's Motion for Partial Summary Judgment[4] contends that, in his concurring opinion in *GEO Group, Inc. v. Menocal*, Justice Alito explained "the difference between the *Yearsley* defense and qualified immunity available to government contractors" and that this change or clarification of the law justifies GEO's failure to previously assert qualified immunity. Mot. for Partial Summ. J. at 6. GEO overstates any guidance provided in the Court's opinions—there has been no meaningful change in the law governing qualified immunity. Thus, I find GEO's Motion is untimely and that GEO has waived qualified immunity. More importantly, though, I conclude that, even if GEO had raised qualified immunity in a timely fashion, GEO is not entitled to such immunity under the clearly and well-established law.

**A. Timeliness of GEO's Motion**

GEO's Motion for Partial Summary Judgment was filed in April 2026. The dispositive motion deadline passed over five years before GEO filed that Motion. *See* 5/18/2020 Minute Order, ECF No. 267 (setting the dispositive motion deadline as July 31, 2020). As a result, GEO's Motion does not comply with the Scheduling Order in this case. Federal Rule of Civil Procedure 16(b)(4) permits amendments to the Scheduling Order "for good cause." Fed. R. Civ. P. 16(b)(4).[5] GEO claims that the good cause requirement is satisfied because of the change or

[4] GEO's Motion seeks, in the alternative, judgment on the pleadings. *See* Mot. for Partial Summ. J. at 24-25.GEO makes this request twelve years into the case and based on a defense that is not referenced or alluded to in the pleadings. On that basis and for the same reasons that its summary judgment demand fails, GEO's request for judgment on the pleadings is denied.

[5] A Pretrial Order has been issued in this case, and that Order supersedes the Scheduling Order. *See* Pretrial Order at 23, ECF No. 540. However, because the dates were established under the Scheduling Order when GEO filed its Motion, I consider the Rule 16(b)(4) standard.

clarification of the relevant law that occurred when the Supreme Court decided GEO's appeal in this case.

GEO's contention that Justice Alito's concurrence somehow alerted it to the availability of qualified immunity as a defense is not plausible. In the single paragraph in which Justice Alito discussed qualified immunity, he pointed out that *Filarsky v. Delia*, 566 U.S. 377, 389-92 (2012), and *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016), had allowed certain government contractors to invoke qualified immunity and that such immunity "provides a greater protection to contractors than *Yearsley* does." *GEO Grp.*, 607 U.S. at 461 (Alito, J., concurring in the judgment). The most recent case Justice Alito cited was decided in 2016, so the relevant law has been known since well before the deadline for filing dispositive motions in this case. Moreover, Justice Alito's comments in an opinion concurring in the judgment cannot constitute a change in the law.

At most, the majority opinion and Justice Alito's concurrence flagged for GEO that it may immediately appeal a denial of qualified immunity, but not a denial of the *Yearsley* defense. *See GEO Grp.*, 607 U.S. at 445-47; *id.* at 461 (Alito, J., concurring in the judgment).[6] GEO acknowledges that this realization—"the correct avenue . . . to avoid the burdens of trial"—is the new information it has gleaned. Reply in Supp. of Mot. for Partial Summ. J. at 29; *see also* Mot. for Partial Summ. J. at 10 ("Now it is clear, especially with Justice Alito's concurrence, that only qualified immunity exempts contractors from the burdens of litigation."). But this clarification in the law does not explain GEO's failure to assert qualified immunity in a timely fashion. GEO

[6] In its Reply in Support of its Motion for Partial Summary Judgment, GEO attempts to recast its argument, claiming "[t]he Supreme Court's overall holding explained the difference between *Yearsley* and qualified immunity." Reply in Supp. of Mot. for Partial Summ. J. at 29, ECF No. 474 (citing *GEO Grp.*, 607 U.S. at 448-49). But, other than in that one sentence, GEO does not discuss the majority opinion at all.

could have asserted both qualified immunity and the *Yearsley* defense at the outset and could have asserted both on summary judgment. Accordingly, GEO has not shown good cause for allowing an exception to the Scheduling Order, and GEO's Motion for Partial Summary Judgment is untimely.[7]

**B. Pleading Requirement**

GEO also failed to plead qualified immunity and has waived the defense. Generally, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . ." Fed. R. Civ. P. 8(c)(1). "Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)). Yet, GEO did not state in its Answer (ECF No. 26) to Plaintiffs' Complaint that it is entitled to qualified immunity.

"'The purpose of . . . pleading [an affirmative defense] is to give the opposing party notice of the [defense] and a chance to argue, if he can, why the imposition of [the defense] would be inappropriate.'" *Ahmad v. Furlong*, 435 F.3d 1196, 1201 (10th Cir. 2006) (quoting *Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971)). "[S]trict adherence to the pleading requirement is inappropriate when th[at] purpose . . . has otherwise been fulfilled." *Id.* Thus, when a party does not state a defense in responding to a complaint but later raises the defense, a court may permit the constructive amendment of the neglectful party's pleading if the standards that govern motions to amend a pleading are satisfied. *Id.* at 1201-02. In

[7] Additionally, my Civil Procedures Memorandum states: "Absent leave of the court, which will only be granted in exceptional circumstances, a party may only file one motion for summary judgment." Judge Kane Civil Pretrial & Trial Procedures Mem. at 10. GEO did not request leave, and I would not have granted it, as the circumstances here are not exceptional.

this case, because a Scheduling Order was in place and the deadline to amend pleadings under that Order has passed, the relevant standards are set forth in Federal Rule of Civil Procedure 16(b)(4) and Rule 15(a), which governs the amendment of pleadings pretrial. *See Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014). I have already found that GEO has not shown good cause for amending the Scheduling Order. I likewise find that the Rule 15(a) standard is not met.

Because the deadline for GEO to amend its answer as a matter of course under Rule 15(a) has passed, GEO may only amend its Answer with Plaintiffs' written consent or with this Court's leave. Fed. R. Civ. P. 15(a)(2). Plaintiffs have not consented. A court should freely give leave to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a). Denial of leave to amend under Rule 15(a) is generally only "justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993). All the relevant considerations would warrant denying GEO leave to amend its Answer.

First, undue delay has undoubtedly occurred with GEO's late assertion of qualified immunity and would continue if GEO were permitted to further pursue the defense. Before GEO filed its present Motion, it had not indicated in any way that it intended to assert qualified immunity in this case. By the time of the dispositive motion deadline, nearly six years into this case, GEO had filed a Motion to Dismiss (ECF No. 11), an Answer (ECF No. 26), a Motion to Dismiss for Failure to Join Required Party (ECF No. 307), a Cross-Motion for Summary Judgment (ECF No. 284), and a Motion for Summary Judgment (ECF No. 305), and GEO also signed on to four Proposed Stipulated Scheduling and Discovery Orders (ECF Nos. 28, 61, 98, &

139). None of these submissions asserted that GEO was entitled to qualified immunity. And as I have already explained, GEO's failure to raise qualified immunity at an earlier time cannot be justified by the Supreme Court's decision in this case.

GEO could have asserted qualified immunity at the same time that it asserted the *Yearsley* defense and then the Court of Appeals could have reviewed my rulings on both matters concurrently. GEO could have prevented the need for another appeal, which will surely and inexcusably delay the final resolution of this case for a year or more. GEO claims that its decision to proceed at this time under qualified immunity is merely "the continuation of the debate the parties have been litigating for years." Reply in Supp. of Mot. for Partial Summ. J. at 33. That is not how litigation progresses in this Court or under the Rules. Rule 8 requires the parties to state their claims and defenses at the beginning of the case so that the opposing side can conduct discovery and strategize accordingly. Litigation is not a continuing debate in which a party can simply assert a new, less-favored argument each time its preceding argument proves unsuccessful.

Second, Plaintiffs have been unduly prejudiced by GEO's belated assertion of qualified immunity and would be prejudiced by any additional delay. The parties have already filed multiple motions for summary judgment and have already gone through the process of providing and refining the "Statement of Undisputed Material Facts," as I require, *see* Judge Kane Civil Pretrial & Trial Procedures Memorandum at 9-10. Because GEO has filed another summary judgment motion, Plaintiffs have been forced to engage in another round of briefing and to undertake that tedious process once more. They have also had to prepare and present oral argument on the matter twice in the past few months as they simultaneously get ready for trial. Attention dedicated to this reprise of the summary judgment stage necessarily draws resources

from other tasks. Moreover, the case has already been postponed for four years while GEO pursued its appeals related to the *Yearsley* defense. With the kind of delay that has occurred in this case, memories often fade and witnesses are lost. Any additional delay is necessarily prejudicial. And, as I discuss further in ruling on GEO's Motion to Stay below, it would be contrary to the public interest. *See* Section IV., *infra*. GEO contends that its "harm from being forced to remain in a lawsuit far exceeds Plaintiffs' inconvenience of responding to GEO's Motion." Mot. for Partial Summ. J. at 12. GEO overlooks the fact that any harm it experiences is one of its own making, while Plaintiffs' harm has been beyond their control. GEO's argument also wrongly presumes that it is entitled to the protection of qualified immunity. *See* Subsections II.D., II.E., & II.F., *infra*.

Third, in evaluating GEO's conduct in this case, the only possible conclusion is that GEO's motive has been to cause delay. GEO's pending Motion to Certify is its fourth attempt at an appeal in this case, and its Notice of Appeal related to its Motion for Partial Summary Judgment is its fifth attempt. *See* Mot. for an Order Certifying an Interlocutory Appeal and Mot. to Stay Litigation Pending Appeal, ECF No. 38; Petition for Permission to Appeal Class Certification, ECF No. 58-1; 2022 Notice of Appeal; Motion to Certify; 2026 Notice of Appeal. GEO's appeals have thus far been successful. Throughout this case, more than twenty-five attorneys have appeared on GEO's behalf, which has caused inefficiencies. *See, e.g.*, notes 29 & 32, *infra* (describing how the arguments GEO has presented over time have conflicted, especially as different attorneys signed its filings). GEO has inundated the Court with lengthy and redundant filings. *See, e.g.*, Motion for Decertification of Class, ECF No. 312 (filing a 62-page motion two days after filing a 39-page Motion for Summary Judgment (ECF No. 305) and a separate 41-page Motion to Dismiss (ECF No. 307)). It has ignored or refused to accept my

rulings. *See, e.g.*, Subsection I., *supra* (recounting that GEO's first Motion seeking to certify an order for interlocutory appeal asserted "now twice rejected arguments regarding the operative contract") (quoting Order on Motion for Interlocutory Appeal at 3)); Subsections II.D., II.E., & III.B., *infra*. (discussing GEO's disregard of the findings in my Omnibus Order). GEO's present attempt to assert qualified immunity and to appeal yet again, years after pursuing the *Yearsley* defense and improperly appealing my related rulings, reveals GEO's lack of concern for efficiency or swift justice.

Fourth, as my analysis below concludes, any amendment asserting qualified immunity would be futile. *See* Subsections II.D., II.E., & II.F., *infra*.

Consequently, the relevant considerations weigh against granting GEO leave to amend under Rule 15(a). Given that GEO has not satisfied the Rule 15(a) or 16(b)(4) standards, I find it is improper to permit the constructive amendment of GEO's Answer.

**C. Waiver**

By failing to plead qualified immunity and to assert the defense in a timely fashion, GEO has waived its ability to claim that immunity. GEO argues that its "Motion [for Partial Summary Judgment] is timely because qualified immunity is a non-waivable immunity intended to avoid the burdens of trial." Mot. for Partial Summ. J. at 8; *see also* Reply in Support of Mot. for Partial Summ. J. at 27-28, ECF No. 474 ("Qualified immunity is a non-waivable right held by GEO . . . ."). GEO is wrong about the law as well as its consequence here.

GEO cites *Cassady v. Goering*, 567 F.3d 628, 634 (10th Cir. 2009), for the proposition that "[q]ualified immunity is a non-waivable right held by the defendant." Mot. for Partial Summ. J. at 8. In *Cassady*, however, the Tenth Circuit held that the defendant had not waived his

right to an interlocutory appeal of the district court's post-trial order denying the defendant qualified immunity. 567 F.3d at 634. Nothing about this holding supports GEO's assertion that qualified immunity is "non-waivable." The defendant in *Cassady* moved for summary judgment based on qualified immunity. *Id.* at 633. The trial court denied the motion in relevant part, and the case proceeded to trial. *Id.* In a post-trial motion, the defendant again claimed he was entitled to qualified immunity as a matter of law, and the trial court again denied that aspect of his motion. *Id.* But the trial court granted the plaintiff a new trial on other grounds. *Id.* The defendant appealed the district court's post-trial order. *Id.* Because final judgment had not entered, though, the defendant's appeal was interlocutory. *Id.* at 631, 634. The Tenth Circuit concluded that, with the defendant facing a retrial, the interlocutory appeal of the district court's post-trial order was appropriate. *Id.* at 634. *Cassady* does not support the principle that qualified immunity is a non-waivable right, and GEO cites no other authority that does.

Notwithstanding its unfounded assertion that qualified immunity is non-waivable, GEO contends that "[o]nly extreme circumstances, like waiting until after a jury has rendered its verdict, can constitute forfeiture of the right to assert qualified immunity." Mot. for Partial Summ. J. at 8. For this claim, GEO cites *Evans v. Fogarty*, 241 F. App'x 542 (10th Cir. 2007) (unpublished). GEO asserts that, in *Evans*, the Tenth Circuit "denie[d] qualified immunity because a defendant failed to raise the defense before the jury verdict." Mot. for Partial Summ. J. at 8 (citing *Evans*, 241 F. App'x at 550 n.9). That is a misstatement of the facts in *Evans*. A footnote in *Evans*, which GEO cites, explains that the defendants waived qualified immunity because, although they had initially asserted it in motions to dismiss, they failed to raise the defense again until after the first trial in the case. 241 F. App'x at 550 n.9. *Evans* makes clear

that, in the Tenth Circuit, qualified immunity can be waived if a defendant does not consistently pursue the defense.

GEO also cites to *MacArthur v. San Juan County*, in which the Tenth Circuit stated: "'[Q]ualified immunity can be raised at any time and a district court may enter . . . judgment on that ground at any point before trial at which it is appropriate.'" 495 F.3d 1157 (10th Cir. 2007) (quoting *Langley v. Adams County*, 987 F.2d 1473, 1481 n.3 (10th Cir. 1993)). GEO emphasizes the language "at any point before trial." That language describes when a judge may rule on a defendant's assertion of qualified immunity.[8] The court, in *MacArthur*, dismissed the plaintiffs' entire appeal as frivolous and specifically noted that the plaintiffs' four-sentence argument that the defendants had waived qualified immunity did not point to any relevant authority or contain reasoned argument. 495 F.3d at 1162. In contrast, Plaintiffs' challenges here are well-reasoned and supported by relevant authority.

The facts of the other cases GEO cites are clearly distinguishable. In *Ahmad v. Furlong*, the defendants asserted qualified immunity in their answer to the plaintiff's third amended complaint but not clearly in their answer to the operative complaint or in their timely motion for summary judgment. 435 F.3d at 1198-1200. The Tenth Circuit observed that the plaintiff did not object to the defense being raised, included argument opposing the claimed qualified immunity in his response to the motion for summary judgment, and did not point to any prejudice he would have suffered. *Id.* at 1203-04. Consequently, the court determined that the defendants had

[8] The relevant statement from *MacArthur* comes from a footnote in *Langley v. Adams County* in which the Tenth Circuit commented that it might be appropriate for a court of appeals to "consider[] evidence on appeal not part of the district court record or at least remand[] the case so the district court can consider the new evidence" since "a district court may enter summary judgment on [qualified immunity] 'at any point before trial' at which it is appropriate." 987 F.2d at 1481 n.3 (quoting *Mee v. Ortega*, 967 F.2d 423, 430 n.5 (10th Cir. 1992)).

sufficiently raised the defense in their motion for summary judgment and that defendants' answer could be constructively amended by their assertion of the defense in that motion. *Id.* Here, GEO never plead qualified immunity, ambiguously or otherwise, and Plaintiffs have objected to GEO's untimely assertion of qualified immunity and have pointed to prejudice they would suffer as a result of GEO's conduct. In *Ball Corp. v. Xidex Corp.*, qualified immunity was raised in a motion for summary judgment. 967 F.2d 1440, 1443-44 (10th Cir. 1992). Unlike this case, however, the proceedings in *Ball Corp.* moved swiftly, and there is no indication that the motion was filed after the pertinent deadline or any previous appeals. *See id.* In the First Circuit case *Valiente v. Rivera*, the defendant stated in his answer that he was entitled to qualified immunity, and the summary judgment motion he sought to file would not have violated any deadline in the case. 966 F.2d 21, 22-23 (1st Cir. 1992); Brief for Appellants, *Valiente v. Rivera*, Nos. 91-2277 & 91-2332, 1992 WL 12577598 (1st Cir. Mar. 18, 1992). Again, in this case, GEO did not plead qualified immunity, and its summary judgment motion is untimely. All the district court cases cited by GEO are similarly distinguishable because the defendants in those cases asserted qualified immunity either in their answer or in a motion to dismiss. *See Knellinger v. Young*, No. 21-cv-1379-CNS-STV, 2026 WL 411749, at *1 n.2 (D. Colo. Feb. 13, 2026) (defendants initially raised qualified immunity in their first motion to dismiss, but the district court and Tenth Circuit declined to reach those arguments); Defs.' Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim or, in the Alternative, for Qualified Immunity as to the Individual Capacity Claim Against Def. Salipan & Mem. in Supp., *Valez ex rel. K.D. v. Salipan*, No. 21-cv-00990-WJ-JHR, ECF No. 20 (D.N.M. Feb. 9, 2022) (defendants raised qualified immunity in their first substantive filing with the court—a motion to dismiss); *Herrera v. City of Albuquerque*, 674 F. Supp. 2d

1271, 1274-75 (D.N.M. 2008) (defendant raised qualified immunity as an affirmative defense in her answer).

In this case, GEO did not so much as hint that it might assert qualified immunity for nearly twelve years while it fully litigated other defenses. It did not raise qualified immunity in its Answer, in the Scheduling Orders, in its Motions to Dismiss, nor in its Motions for Summary Judgment. GEO's strategy and delay are inexcusable. Plaintiffs have already been burdened by GEO's unjustified conduct, and if GEO is permitted to proceed in violation of the Rules of Civil Procedure, my Practice Standards, and the Orders issued in this case, Plaintiffs will suffer more prejudice. Consequently, I find GEO has waived the defense of qualified immunity.

**D. Entitlement to Qualified Immunity**

However, even if GEO had asserted qualified immunity in a timely fashion and had not waived the defense, GEO still would not be entitled to its protection. In evaluating the merits of GEO's Motion for Partial Summary Judgment, I apply the same summary judgment standard set out in my Omnibus Order. *See Menocal*, 635 F. Supp. 3d at 1184-85. I find no genuine dispute of material fact exists, and as the law dictates, I conclude qualified immunity does not extend to a private company in GEO's position.

*1. Additional Relevant Background*

GEO is "a fully-integrated real estate investment trust . . . specializing in the ownership, leasing and management of correctional, detention and re-entry facilities and the provision of community-based services and youth services in the United States, Australia, South Africa and the United Kingdom." 2014 GEO Form 10-K, ECF No. 466-1 at 4. GEO is a for-profit company

that is publicly traded on the New York Stock Exchange. *See* Hill Dep. 19:25-20:1, ECF No. 466-2. GEO's business is divided into four distinct segments: its U.S. Corrections & Detention segment, its GEO Care segment, its International Services segment, and its Facility Construction & Design segment. 2014 GEO Form 10-K, ECF No. 466-1 at 5. GEO's U.S. Corrections & Detention segment primarily encompasses its U.S.-based privatized corrections and detention business. *Id.* GEO contracts with federal, state, and local correctional agencies located in all 50 states and owns, leases, and operates "a broad range of correctional and detention facilities including . . . immigration detention centers." *Id.*, ECF No. 466-1 at 4.

During the relevant period, GEO operated the Facility under a series of contracts with ICE to house civil immigration detainees. To win these contracts, GEO had to participate in a competitive bidding process, which involved submitting a response to a request for proposal that was generated by the agency. *See* Hill Dep. at 22:24-23:9; Venturella Dep. 145:14-147:23, ECF No. 466-3. Some of the factors the government may consider in evaluating proposals for detention facilities and services are price, technical specifications, and a company's past performance. Evans Dep. at 25:19-25, ECF No. 466-4. "[T]he Government moves contracts and pulls contracts, switches contracts between vendors based on price." Hill Dep. at 117:11-14.

The three relevant contracts between ICE and GEO took effect in 2003, 2006, and 2011. GEO's 2003 Contract with ICE was signed on March 27, 2003. 2003 Contract, ECF No. 262-5 at 2-4. The "base period" for that Contract was one year, but ICE could exercise a series of additional six-month options. *Id.*, ECF No. 262-5 at 6-10, 12. The maximum contract duration, however, was forty-two months. *Id.*, ECF No. 262-5 at 52. The "base term" for the 2006 Contract was 20 months, from October 1, 2006, to May 31, 2007, with year-long "base terms" that followed, ending on May 31, 2011. 2006 Contract, ECF No. 262-4 at 3-4. The "base period" for

the 2011 Contract was two years, from September 16, 2011, to September 15, 2013, with two-year option periods thereafter. 2011 Contract, ECF No. 262-2 at 3-12. But the total duration of the 2011 Contract could not exceed ten years. *Id.*, ECF No. 262-2 at 3, 49.

To monitor technical compliance with the ICE-GEO Contracts, ICE appointed employees known as the Contracting Officer's Technical Representative ("COTR").[9] *See, e.g.*, COTR Appointment Letter, ECF No. 297-2. The letter appointing the COTR indicates that the COTR's "primary duty is to monitor The GEO Group's performance to ensure that all of the technical requirements under the contract are met by the delivery date or within the period of performance, and at the price or within the estimated cost stipulated in the contract." *Id.* at 1; 2011 Contract, ECF No. 262-2 at 45 (describing the COTR as authorized "to monitor all technical aspects and assist[] in administering the contract"). The majority of the COTR's tasks identified in the letter involve surveillance, reporting, and invoice review. COTR Appointment Letter at 1-2. The ICE-GEO Contracts instruct that the COTR "may give technical direction to the Contractor that fills in details, requires pursuit of certain lines of inquiry or otherwise serves to facilitate the Contractor's compliance with the contract." 2011 Contract, ECF No. 288-1 at 41. But, "[t]o be valid, technical direction by the COTR [m]ust be consistent with the general scope of work set forth . . . in th[e] contract" and that direction "[m]ay not constitute new assignment of work nor change the expressed terms, conditions or specifications of th[e] contract." *Id.* Similarly, the appointment letter for the COTR directs that the COTR shall not:

> A) Make or give the appearance of being able to make commitments, modifications, or other actions, which would commit the Government to a change in price, performance, qualify, quantity, or delivery.
>
> B) Provide guidance to the contractor, either orally or in writing, which might be interpreted as a change in the scope or terms of the contract.

[9] The COTR was also known as the "Contracting Officer's Representative."

C) Change or modify any of the terms and conditions, or statement of work of a contract, business agreements, or transaction.

. . .

K) Interfere with the contractor's management by supervising contractor employees or otherwise directing their work efforts.

. . .

M) Make any agreement with the Contractor relating to the expenditure of Government funds.

. . .

O) Specify[] how the Contractor will accomplish performance.

P) Impos[e] or plac[e] a demand upon the Contractor to perform any task . . . .

COTR Appointment Letter at 3-4. ICE also conducts annual reviews of the Facility to determine whether it meets specific standards imposed by the Contracts. *See* Annual Review Mems., ECF No. 273-6.

The extent to which GEO was required to maintain insurance under its contracts with ICE is unclear. *See, e.g.*, 2011 GEO RFP Submission, ECF No. 288-1 at 214 (representing that "[a]ll insurance, licenses and permits are in place and will be renewed as necessary"); *id.*, ECF No. 288-1 at 216 ("All required insurance is already in place under our current contract and we foresee no further required insurance coverage under a new contract."). In a 2011 proposal submission to ICE for the Aurora Facility, GEO represented that its "major annual expense [wa]s in its investment in employees: salaries, training, recruiting and benefits." *Id.*, ECF No. 288-1 at 149. According to GEO, it "provide[d] salaries, benefits, training and career opportunities that allow[ed it] to recruit individuals with the skills, education and drive to ensure a sound, secure and efficient operation at the [Facility]." *Id.*, ECF No. 288-1 at 216. GEO touted that its "staff [wa]s highly motivated to stay with [it] once they [we]re screened, hired and trained." ECF No. 288-1 at 149. GEO explained that the motivation for staff comes from "the opportunity for

advancement through the recognition of excellence in performance" and "the fair treatment of employees." *Id.*

*2. Qualified Immunity for Government Officials under the TVPA*

The doctrine of qualified immunity stems from the U.S. Supreme Court's interpretation of 42 U.S.C. § 1983, a statute that authorizes individuals to sue state and local government officials for violations of constitutional or statutory rights. *See Pierson v. Ray*, 386 U.S. 547, 556-57 (1967) (explaining that § 1983 "'should be read against the background of tort liability,'" and "[p]art of the background of tort liability, in the case of police officers making an arrest, is the defense of good faith and probable cause" (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961))). The doctrine originally applied to claims against state and local officials brought under § 1983.[10] In *Procunier v. Navarette*, the Supreme Court specifically extended qualified immunity to state prison guards for claims brought under § 1983. 434 U.S. 555, 560-63 (1978). In this case, Plaintiffs do not bring claims under § 1983. Instead, they sue under a federal statute—the TVPA, which contains its own provision authorizing private civil suits. *See* 18 U.S.C. § 1595.[11] GEO

[10] The Supreme Court extended qualified immunity to constitutional claims brought against federal officials under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971). *See Butz v. Economou*, 438 U.S. 478, 504 (1978) ("[W]ithout congressional directions to the contrary, we deem it untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.").

[11] Section 1595 provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney[] fees.

does not identify a case in which a court has found that prison officials, and more specifically, a private prison corporation, may assert qualified immunity under the TVPA.

Circuit courts have found qualified immunity to be available under other federal statutes. *See, e.g.*, *Tapley v. Collins*, 211 F.3d 1210, 1215 n.9 (11th Cir. 2000) (listing cases in which federal appeals courts have held that qualified immunity is available as a defense under eight different federal statutes). And the Tenth Circuit has held that a state-entity defendant was entitled to sovereign immunity on a claim brought under the TVPA. *Mojsilovic v. Okla. ex rel. Bd. of Regents for Univ. of Okla.*, 841 F.3d 1129, 1134 (10th Cir. 2016). In *Mojsilovic*, the Tenth Circuit concluded that, "absent a valid source of constitutional authority to abrogate sovereign immunity and an unmistakably clear statement of congressional intent to do so," dismissal of the plaintiffs' claim against the state entity was appropriate. *Id.* Nevertheless, GEO does not cite any case in which a court has considered whether Congress intended to abrogate any available qualified immunity when it enacted 18 U.S.C. §§ 1589 and 1595.[12] This question was not directly addressed by the parties, but I presume that qualified immunity is available to government officials under the TVPA provisions at issue.[13]

---

18 U.S.C. § 1595(a).

[12] Citing *Wyoming v. Livingston*, 443 F.3d 1211, 1221 (10th Cir. 2006), GEO simply asserts: "Because sovereign immunity shields the federal government from TVPA suits, GEO can similarly seek to avoid suit through qualified immunity." Mot. for Partial Summ. J. at 21. *Livingston* has nothing to do with the TVPA; it involves *state* criminal laws. In *Livingston*, the court "h[e]ld that a federal officer is not entitled to Supremacy Clause immunity unless, in the course of performing an act which he is authorized to do under federal law, the agent had an objectively reasonable and well-founded basis to believe that his actions were necessary to fulfill his duties." 443 F.3d at 1222. GEO also states without citation or support: "[T]here is no question that government employees enjoy qualified immunity against Plaintiffs' claims." Mot. for Partial Summ. J. at 19.

[13] The only case I have found in which courts have entertained the notion that state prison officials may assert qualified immunity for claims brought under § 1589 is *Fletcher v. Williams*, No. 22-1371, 2023 WL 6307494 (10th Cir. Sept. 28, 2023) (unpublished). In that case, the question was not directly presented to the presiding courts. The Tenth Circuit affirmed the

*3. The Assertion of Qualified Immunity by Private Prison Guards and Firms*

Still, because GEO is a private party, and not a government official, I must assess whether GEO "could even assert qualified immunity before determining whether qualified immunity [i]s appropriate based on the facts of this case." *Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1165 (10th Cir. 2005). On occasion, courts have found that private parties may assert qualified immunity. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377, 393-94 (2012); *Rosewood Servs.*, 413 F.3d at 1166 (holding "that there is no bar against a private corporation claiming qualified immunity"). However, the law for contractors in GEO's position is clear: In *Richardson v. McKnight*, the U.S. Supreme Court held that prison guards who are employees of a private prison management firm are not entitled to qualified immunity from claims brought by prisoners under § 1983. 521 U.S. 399, 412 (1997).

The Court, in *Richardson*, "look[ed] both to history and to the purposes that underlie government employee immunity" to reach its conclusion. *Id.* at 404. The Court determined that "[h]istory does not reveal a 'firmly rooted' tradition of immunity applicable to privately employed prison guards," despite the heavy involvement of such private contractors in prison management during the 19th century. *Id.* at 404-05. The Court cited "evidence that the common law provided mistreated prisoners in prison leasing States with remedies against mistreatment by those private lessors," but it "found no evidence that the law gave purely private companies or their employees any special immunity from such suits." *Id.* at 405-06. Looking farther back, the Court explained that, from the Middle Ages into the 18th century, the common law "apparently authorized prisoner lawsuits to recover damages." *Id.* at 407. And, while the law provided "a

---

dismissal of the pro se plaintiff's complaint because the plaintiff "ha[d] not shown that federal law provides a remedy for an alleged violation of his rights under the Colorado constitution." *Fletcher*, 2023 WL 6307494, at *4.

kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign," there was "no indication of any more general immunity that might have applied to private individuals working for profit." *Id.*

In *Richardson*, the Supreme Court also considered whether immunity for private prison guards was justified by the purposes of the doctrine of qualified immunity. Those purposes are: "'ensur[ing] that talented candidates [a]re not deterred by the threat of damages suits from entering public service,'" "protecting the public from unwarranted timidity on the part of public officials," and addressing the concern that lawsuits may distract officials from their duties. *Id.* at 407-08 (quoting *Wyatt v. Cole*, 504 U.S. 158, 167 (1992)). The Court described "unwarranted timidity" as "the most important special government immunity-producing concern" and found that it is "less likely present, or at least is not special, when a private company subject to competitive market pressures operates a prison." *Id.* at 409; *see also id.* at 410 ("[Marketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or nonarduous employee job performance." (internal quotation marks omitted)). Continuing to emphasize the distinct position of private entities, the Court highlighted the insurance coverage requirements for private firms that contract with the government and the offsets and incentives firms could provide to employees as reasons privatization helps to ensure that talented candidates are not deterred from public service. *Id.* at 411. And the Court concluded that the threat of distracting workers from their duties is not enough by itself to justify providing immunity. *Id.* at 412. Thus, the Court held that neither the history nor the purpose of qualified immunity revealed anything "special enough about the job or about its organizational structure that would warrant providing the[] private prison guards with immunity." *Id.*

GEO is a publicly traded, for-profit corporation that contracted with ICE to assume a major, lengthy task for the government, which is providing immigration detention services. *See* Hill Dep. 19:25-20:1; 2014 GEO Form 10-K, ECF No. 466-1 at 4-5. GEO specializes in owning, leasing, and managing correctional, detention, and re-entry facilities, and one of the four segments of its operations is dedicated to its U.S.-based privatized corrections and detention business. *Id.* GEO engaged in a competitive process to secure the relevant contracts, the terms of which were limited and offered ICE the option of extending the contracts or not. *See* Hill Dep. at 22:24-23:9; Venturella Dep. 145:14-147:23; 2003 Contract, ECF No. 262-5 at 2-4, 6-10, 12, 52; 2006 Contract, ECF No. 262-4 at 3-4; 2011 Contract, ECF No. 262-2 at 3-12, 49. In all material ways, GEO was in the same position as the defendants' employer in *Richardson*—it is a private firm that was subject to market pressures, providing an extended service to the government as a detention and corrections contractor. Consequently, *Richardson* dictates that there is nothing sufficiently special about GEO's work or its organizational structure that would warrant permitting GEO to assert qualified immunity.

Nevertheless, GEO claims that its circumstances are less comparable to the defendants in *Richardson* and more like those of the defendant in *Filarsky v. Delia*. In *Filarsky*, a city contracted Steve Filarsky, an experienced employment lawyer, to conduct an internal affairs interview of a firefighter who was suspected of missing work to do construction on his home rather than because of illness. 566 U.S. at 380-81. Two fire department officials attended the interview with Filarsky. *Id.* at 381. As part of the interview, Filarsky prepared an order to produce that was signed by the Fire Chief and carried out by two other fire department officials. *Id.* at 382. The firefighter under investigation sued Filarsky and the other fire department officials under § 1983, alleging the order to produce violated the firefighter's rights under the

Fourth and Fourteenth Amendments to the U.S. Constitution. *Id.* at 381-82. The Court of Appeals affirmed the district court's grant of qualified immunity to the fire department officials but determined that Filarsky was not entitled to qualified immunity because he was a private attorney and not a city employee.

The Supreme Court considered whether Filarsky could be granted qualified immunity and reversed. *Id.* at 384, 394. In doing so, it "look[ed] to the 'general principles of tort immunities and defenses' applicable at common law, and the reasons [the Court has] afforded protection from suit under § 1983." *Id.* (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)). Regarding the common law, the court observed that, in the 19th century, "private citizens were actively involved in government work," and "the protections provided by the common law did not turn on whether someone we would call a police officer worked for the government full time or instead for both public and private employers." *Id.* at 385, 388. The Court also found that "[n]othing about the reasons [the Court has] given for recognizing immunity under § 1983 counsels against carrying forward the common-law rule." *Id.* at 389.

First, the Court explained that the interest in avoiding unwarranted timidity in those who serve the government "is of vital importance regardless whether the individual sued as a state actor works full time or on some other basis." *Id.* at 390 (internal quotation marks and citation omitted). The Court then addressed the government's need to ensure talented candidates are not deterred from public service, stating:

> The government's need to attract talented individuals is not limited to full-time public employees. Indeed, it is often when there is a particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals. . . . to the extent such private individuals do not depend on the government for their livelihood, they have freedom to select other work—work that will not expose them to liability for government actions.

*Id.* Lastly, the Court discussed the public interest in ensuring that government duties may be performed without distraction, noting that if Filarsky could not assert qualified immunity, the government employees he worked with were likely to be embroiled in and distracted by the litigation. *Id.* at 391.

Based on these conclusions, the Court held that Filarsky was entitled to the protection of qualified immunity. *See id.* at 394. A key factor for the Court was that Filarsky's claim to qualified immunity should not be rejected "solely because he was not a permanent, full-time employee of the [c]ity." *Id.*; *see also id.* at 380 ("The question in this case is whether an individual hired by the government to do its work is prohibited from seeking such immunity, solely because he works for the government on something other than a permanent or full-time basis.").

Unlike Filarsky, GEO is not performing a discrete task on a part-time or temporary basis for the government. GEO does not work within a government agency and does not advise government officials to carry out specific actions. While Filarsky had significant experience as a private attorney, GEO contracts with federal, state, and local correctional agencies located in all 50 states, 2014 GEO Form 10-K, ECF No. 466-1 at 4, and nothing in the record indicates it is likely to select other work. On the whole, GEO's circumstances mirror those of the private prison officials in *Richardson* and are obviously distinct from Filarsky's.

Even so, GEO claims *Richardson* is distinguishable. It is not. GEO stresses that *Richardson*'s holding is "self-consciously narrow." Mot. for Partial Summ. J. at 18 (citing *Richardson*, 521 U.S. at 413; *Filarsky* 566 U.S. at 393). But, however narrow *Richardson*'s holding is, it is directly applicable to the circumstances here. As the Court stated:

> [W]e have answered the immunity question narrowly, in the context in which it arose. That context is one in which a private firm, systematically organized to

> assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms. The case does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision.

*Richardson*, 521 U.S. at 413. GEO is a publicly traded corporation that is systematically organized to manage an institution for the government. *See* Hill Dep. 19:25-20:1; 2014 GEO Form 10-K, ECF No. 466-1 at 4-5. It undertakes that function for profit and was granted the government's business through a competitive process. *See* Hill Dep. at 22:24-23:9; Venturella Dep. 145:14-147:23. GEO's association with the federal government is not brief, nor does GEO act in an adjunct capacity. And, as I discuss further below, GEO does not act under the type of close official supervision that would alter the analysis in *Richardson*.

GEO also maintains that "subsequent decisions have cabined *Richardson* to its facts." Mot. for Partial Summ. J. at 18. GEO cites later-decided Tenth Circuit cases in which private doctors and probation officers were permitted to assert qualified immunity. But these cases all likened the defendants to Filarsky in ways that do not apply to GEO. In *Estate of Jensen v. Clyde*, the court held that a doctor was entitled to claim qualified immunity because, like Filarsky, he was working on a part-time basis alongside government personnel. 989 F.3d 848, 855 (10th Cir. 2021). The court also highlighted that, while the doctor "had some leeway in his decisions," "private doctors providing services at a jail 'act within a government system, not a private one,' and 'market pressures at play within a purely private firm simply do not reach them there.'" *Id.* at 856 (quoting *Perniciaro v. Lea*, 901 F.3d 241, 253 (5th Cir. 2018)). Similarly, in *Estate of Lockett v. Fallin*, the court found that a doctor hired to assist with an execution stood "in the same position as the attorney in *Filarsky*." 841 F.3d 1098, 1108-09 (10th Cir. 2016). And, in *Franco v. Board of County Commissioners*, the court determined that the defendant's position

"as an independently contracted probation officer is a good deal more like the one in *Filarsky* than *Richardson*." 609 F. App'x 957, 959 (10th Cir. 2015) (unpublished). *Richardson* recognized that historically, the law "provide[d] a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign." 521 U.S. at 407. The fact that cases decided after *Richardson* permitted those individuals to claim the protection of qualified immunity does not "cabin *Richardson*."[14] Despite GEO's claims to the contrary, *Richardson* controls in this case.

*4. Independent Consideration of the Bases for Extending Qualified Immunity*

An independent consideration of the relevant factors further validates that GEO is not entitled to qualified immunity. A finding of immunity must be "'predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it.'" *Owen v. City of Independence*, 445 U.S. 622, 638 (1980) (quoting *Imbler*, 424 U.S. at 421). In *Tanner v. McMurray*, the Tenth Circuit was presented with the question of "whether employees of a national private corporation providing medical services in a correctional institution can assert qualified immunity." 989 F.3d 860, 864 (10th Cir. 2021). Before considering that question, the court iterated the standard for when qualified immunity is extended to private parties performing governmental functions who are sued under § 1983. *Id.* at 867. The court instructed that the availability of qualified immunity to such private parties "depends on: (1) 'the common law as it existed when Congress passed § 1983 in 1871,' and (2)

[14] GEO also contends that, in *Filarsky v. Delia*, the Supreme Court limited *Richardson* to cases decided under § 1983. This argument is self-defeating, as the cases on which *GEO* relies were likewise decided under § 1983. *See, e.g.*, *Filarsky*, 566 U.S. at 380, 382, 394; *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714, 720 (10th Cir. 1988).

the policy reasons the Supreme Court has 'given for recognizing immunity under § 1983.'" *Id.* (quoting *Filarsky*, 566 U.S. at 384). This standard echoes the Supreme Court's two-part analysis in *Richardson* and *Filarsky*. *See Richardson*, 521 U.S. at 404 (looking "both to history and to the purposes that underlie government employee immunity in order to find the answer"); *Filarsky*, 566 U.S. at 384 (looking "to the 'general principles of tort immunities and defenses' applicable at common law, and the reasons [the Court has] afforded protection from suit under § 1983" (quoting *Imbler*, 424 U.S. at 418)).

Instead of accepting the standard articulated by the Tenth Circuit in *Tanner*, GEO looks to dicta in *General Steel Domestic Sales, L.L.C. v. Chumley*, 840 F.3d 1178, 1182 (10th Cir. 2016), for the factors that should be considered. In *General Steel*, after determining that the Communications Decency Act ("CDA") provides immunity from liability and not suit, the court commented:

> [T]here are three instances when courts may extend qualified immunity to private parties. First, if the private parties are 'closely supervised by the government.' *Rosewood Servs.,*[] 413 F.3d [at] 1167[]; *see also DeVargas*[], 844 F.2d [at] 722[]. Second, if there is a historical basis for providing immunity to that type of private entity. *Richardson*[], 521 U.S. [at] 404[]. Third, if extending immunity implicates "special policy concerns involved in suing government officials." *Wyatt*, 504 U.S. at 167. We need not delve into this analysis because this suit in no way involves the government, and [the defendants have] not identified a historical basis for providing private parties immunity from suit under the CDA.

*General Steel*, 840 F.3d at 1182.[15] GEO claims that "policy concerns are irrelevant when government supervision establishes [its] entitlement to qualified immunity." Mot. for Partial

[15] This dicta from *General Steel*, is in fact dicta layered on dicta. The case *General Steel* cites for the notion that qualified immunity may be extended to private parties who are "closely supervised by the government"—*Rosewood Services, Inc. v. Sunflower Diversified Services, Inc.*, acknowledges that "the courts of appeals have allowed private individuals to assert qualified immunity when the defendants were closely supervised by the government" but does not reach the defendants' related argument, finding it was waived. 413 F.3d at 1167. GEO does not cite any

Summ. J. at 18. But I agree with Plaintiffs that, under Supreme Court precedent and *Tanner*, close supervision by the government merely informs the other bases for extending qualified immunity to a private defendant and is not a separate justification for doing so.[16]

With that understanding, neither the relevant history[17] nor the purposes underlying qualified immunity provide a reason to extend qualified immunity to GEO. As the Court stated in *Richardson*, "[h]istory does not reveal a 'firmly rooted' tradition of immunity applicable to privately employed prison guards." 521 U.S. at 404. The only history GEO presents is a single case that the majority in *Richardson* discounted, noting it may not have involved a private prison operator and that it suggests immunity from suit would only exist for negligence and not conduct that involved gross negligence or was intentional. *Id.* at 406. Otherwise, GEO cites *Filarsky* and asserts that "history is replete with examples of immunity for private parties engaged in law enforcement activities." Mot. for Partial Summ. J. at 19. While ICE has law-enforcement duties, GEO's relevant obligations under its contract with ICE involve housing individuals in civil immigration detention. *See* Venturella Dep. at 131:3-19. None of the historical examples cited in *Filarsky* are analogous to GEO's contractual duties. *See Filarsky*, 566 U.S. at 387-88 (discussing temporary prosecutors, part-time judges, sheriffs, constables, private detectives, special policemen, and individuals enlisted to execute a warrant). Thus, GEO has not shown that any

---

case in which the Tenth Circuit has found it appropriate to extend qualified immunity to a private defendant on the sole basis that the defendant was closely supervised by the government.

[16] GEO argues that *Richardson* is inapplicable here because it applies only when a private prison management firm contends that special policy concerns warrant the extension of qualified immunity and not when a private corporation is subject to close government supervision, as GEO claims it was. Nothing in *Richardson* or *Filarsky* supports that the analysis in *Richardson* should be limited in that way. On the contrary, both cases indicate that close supervision should be considered in reviewing the historical common law and the pertinent policy concerns.

[17] I am not certain that consideration of history or the common law should be limited to the time Congress passed § 1983 in 1871. But neither party presents any more recent background or principles of tort immunities and defenses.

common law or history supports extending qualified immunity to it, and I find, based on the record in front of me, that there is no historical justification for doing so.

The relevant policy concerns likewise do not support allowing GEO to assert qualified immunity. Once more, the three interests underlying qualified immunity are: avoiding unwarranted timidity, ensuring individuals are not deterred from public service, and enabling those carrying out government duties to work without the distraction of litigation. In *Filarsky*, the Court described *Richardson* as "explain[ing] that the various incentives characteristic of the private market . . . ensured that the guards [in *Richardson*] would not perform their public duties with unwarranted timidity or be deterred from entering that line of work." *Filarsky*, 566 U.S. at 393 (citing *Richardson*, 521 U.S. at 410-11). The same is true here.[18] GEO is a "large multistate private prison management firm" that is "systematically organized to perform a major administrative task for profit." *See Richardson*, 521 U.S. at 409. It participated in a competitive process to secure ICE contracts for the Facility, *see* Hill Dep. at 22:24-23:9; Venturella Dep. 145:14-147:23, and GEO's performance could dictate whether ICE exercised the options to continue the contracts, *see* Evans Dep. at 25:19-25. GEO invested in its employees and focused on incentivizing "excellence in performance." 2011 GEO RFP Submission, ECF No. 288-1 at 149, 216. The incentives characteristic of the private market exist for GEO and its employees, eliminating the concern that they would perform their public duties with unwarranted timidity or would be deterred from engaging in the work. In *Richardson*, the Supreme Court explained that its "cases do not contemplate the complete elimination of lawsuit-based distractions." 521 U.S. at

[18] I note also that this case is not comparable to those in which officers are sued for their split-second decisionmaking. *See, e.g.*, *Estate of Joseph Valverde v. Dodge*, 967 F.3d 1049, 1062-66 (10th Cir. 2020). Here, GEO formulated a written policy that was implemented over years. While timidity may be undesirable, the risk is lessened when the conduct in question is calculated and considered.

411. Nevertheless, as a private company, GEO is not likely to have litigation distract it from its duties in the same way that government employees would. Because GEO is a large firm, it can shift tasks and delegate responsibilities as participation in litigation might require. *See, e.g.*, 2011 GEO RFP Submission, ECF No. 288-1 at 217 ("Various types of corporate support, such as technical consultation, recruiting, training, legal advice, etc. are available to the Warden/Facility Administrator and his staff as required."). GEO may also build the costs or risks of litigation into its contract bids. Consequently, none of the specified policy concerns supports permitting GEO to assert qualified immunity.

*5. GEO's Additional Arguments Regarding Government Supervision*

GEO's additional arguments regarding its supervision by ICE do not alter the analysis of the historical common law or the pertinent policy concerns, nor could they provide an independent basis for extending qualified immunity. According to GEO, "ICE closely supervised [its] operations through exhaustive [Performance-Based National Detention Standards ("PBNDS")] requirements and by placing ICE employees in GEO facilities to support compliance." Mot. for Partial Summ. J. at 17. GEO asserts its circumstances, therefore, align with precedent "finding private corporations can assert qualified immunity when they follow government direction and work closely with government personnel." *Id.*

GEO's claims regarding ICE's supervision largely ignore my previous findings that GEO was not "follow[ing] government direction." As already mentioned, I determined in my Omnibus Order that GEO's cleaning policies that are the subject of Plaintiffs' TVPA claim were "independently developed and implemented" by GEO and "far exceeded its contractual obligations with ICE." *Menocal*, 635 F. Supp. 3d at 1173. I also found that "[t]he audit forms

used by ICE [we]re not specific enough to show that it directed or required GEO's cleaning policies and their implementation"[19] and that "the COTR did not have the authority to approve changes to the ICE-GEO contracts." *Id.* at 1174.

While the COTR worked at the GEO Facility, the COTR's primary duty was to monitor whether GEO was complying with the technical requirements of the contract within the cost parameters. COTR Appointment Letter, ECF No. 297-2 at 1; 2011 Contract, ECF No. 262-2 at 45. For the most part, the COTR was tasked with surveillance, reporting, and invoice review. COTR Appointment Letter, ECF No. 297-2 at 1-2. The COTR could not give GEO new assignments or change the terms, conditions, or specifications of the contract or "[s]pecify[] how [GEO] w[ould] accomplish performance." 2011 Contract, ECF No. 288-1 at 41; COTR Appointment Letter at 3-4. And the COTR was prohibited from "[i]mposing or placing a demand [on GEO] to perform any task" and from "[i]nterfer[ing] with the [GEO]'s management by supervising [GEO's] employees or otherwise directing their work efforts." *Id.*

GEO conflates ensuring contract compliance with close and direct supervision. The ICE-GEO contract and ICE's presence at the GEO Facility do not resemble the type of supervision in the precedent GEO cites: *Filarsky*, *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714 (10th Cir. 1988), and *Herrera v. Santa Fe Public Schools*, 41 F. Supp. 3d 1027 (D.N.M. 2014). In *Filarsky*, the Fire Chief signed the order to produce that was prepared by Filarsky, and

[19] GEO asserts that an admitted fact from the parties' Cross-Motions for Summary Judgment motions is that ICE assigned technical representatives in GEO facilities to "conduct ICE audits to ensure that GEO complies with all requirements of its contract, including its obligations under the PBNDS." Mot. for Partial Summ. J. at 16 (citing Pls.' Resp. to Def's. Cross-Mot. for Summ. J. at 16, 21, ECF No. 298). GEO points specifically to "Admitted Fact #25" and "Admitted Fact # 37. But, in response to GEO's "fact" in ¶ 25 regarding ICE audits, Plaintiffs explicitly stated: "Admit that certain audits review compliance with certain PBNDS requirements; however, Plaintiffs dispute that the audits comprehensively review compliance with 'each' PBNDS requirement." *See* Pls.' Resp. to Def's. Cross-Mot. for Summ. J., ECF No. 298 at 20.

other fire department officials took part in the interview and execution of the order. 566 U.S. at 382. Filarsky was a single individual working within a larger government department and needed other government employees to both authorize and execute his recommended action. GEO, in contrast, is a large for-profit entity that operates pursuant to a government contract, but independently. The COTR monitors GEO's contract compliance. But there is no indication in the record that the COTR authorizes the actions of GEO or its employees or that the COTR executes tasks on behalf of GEO. *Cf.* 2011 Contract, ECF No. 288-1 at 41; COTR Appointment Letter at 3-4.

In *DeVargas*, the Tenth Circuit found that "the governmental authority involved require[d the] private defendants to act as they d[id]" and "the functions which the private parties performed pursuant to contract are functions which governmental employees would perform had the government not contracted them out." 844 F.2d at 721-22. The court then "conclude[d] that when private party defendants act in accordance with the duties imposed by a contract with a governmental body, perform a governmental function, and are sued solely on the basis of those acts performed pursuant to contract, qualified immunity is proper." 844 F.2d 714, 722 (10th Cir. 1988).[20] Significantly, in a footnote to that conclusion, the court stated:

> We express no opinion on the propriety of granting qualified immunity when a private contractor performing a governmental function, such as operating a prison, performs acts not required by the contract, and is sued for those acts. *See* Kay, The Implications of Prison Privatization on the Conduct of Prisoner Litigation Under 42 U.S.C. Section 1983, 40 Vand. L. Rev. 867, 883–88 (1987) (suggesting that when private contractors violate constitutional duties in order to maximize profit, qualified immunity is improper).

[20] GEO claims that *DeVargas* held "a private corporation could assert qualified immunity because it was closely supervised by the government." Mot. for Partial Summ. J. at 17. However, *DeVargas* does not discuss government supervision and, in the pages GEO cites, only states the "holding that private parties acting in accord with duties imposed by a contract with a governmental body are entitled to raise the defense of qualified immunity." 844 F.2d at 715-16.

*Id.* at 722 n.11. Again, I previously found that GEO implemented policies and performed acts not required by its contracts with ICE. *Menocal*, 635 F. Supp. 3d at 1173.

GEO also looks for support in *Herrera v. Santa Fe Public Schools*. There, the student-plaintiffs sued a private security company, among other defendants, for searches its employees conducted before a school dance that the plaintiffs alleged violated their rights under the Fourth Amendment to the U.S. Constitution. 41 F. Supp. 3d at 1031. The court held that the private security company was entitled to assert qualified immunity because it acted under close official supervision. *Id.* at 1187. The court found that the company's security officers worked under the direction and supervision of the school principal, and the principal directed the security company to perform the challenged pat-down searches. *Id.* at 1050, 1087; *see also id.* at 1037 n.18 (excerpting deposition testimony in which the principal said it was her understanding that, if she "explain[ed] [her] expectations to a particular security guard, that security guard w[ould] change his or her behavior and try to meet th[e] expectations [she'd] articulated to them"). The principal was responsible for ensuring proper search protocols were followed at the school dance and could intervene to stop the searches. *Id.* at 1052. School district personnel, including the principal, worked alongside the company's security officers in performing the challenged searches. *Id.* at 1056. The court also noted that the security company did "not appear to depend on the government for its economic livelihood—as a company running one fully privatized government function does—it has the freedom to select work that will not expose it to liability for government actions." *Id.* at 1187. These facts are clearly distinguishable from the circumstances here. GEO does not have just a few employees working within a larger government entity, those employees have not been specifically directed by government officials

to perform a discrete task, and that task is not being performed in the presence of someone with the authority to redirect the employees' duties.

GEO was not subject to the type of close and direct government supervision that would warrant the extension of qualified immunity. The precedent cited by GEO is not comparable to its circumstances nor instructive. Under firm Supreme Court precedent and based on my review of the relevant considerations, GEO is not entitled to assert qualified immunity.

**E. Violation of a Clearly Established Right**

Even if GEO's Motion for Partial Summary Judgment were timely, it had not waived its ability to assert qualified immunity, and it was entitled to assert that immunity as a private detention contractor—all of which are insurmountable ifs, Plaintiffs have presented sufficient evidence to overcome any qualified immunity GEO could claim. To defeat qualified immunity, a plaintiff must establish "(1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citing *Pearson*, 555 U.S. at 232). For the second inquiry, the fundamental question is whether the "clearly established right is one that is 'sufficiently clear that every reasonable official would have understood what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

GEO argues that "Plaintiffs do not have a claim against [it] under the TVPA." Mot. for Partial Summ. J. at 23. Yet again, GEO ignores my previous rulings. In my Omnibus Order, I concluded that Plaintiffs' TVPA claim could survive summary judgment, i.e., that a reasonable

jury could find GEO violated Plaintiffs' statutory rights. *See Menocal*, 635 F. Supp. 3d at 1183-96.

Thus, only the second prong of the qualified-immunity test is in-question. Plaintiffs have presented evidence that GEO formulated written policies that were implemented over years, requiring detainees to clean common areas of the Facility under threats of disciplinary action, including solitary confinement.[21] The case law establishes that requiring individuals who have not been convicted of a crime to engage in that type of labor under the threat of such sanctions has been a clear violation of § 1589 since the TVPA was passed in 2000.

The Thirteenth Amendment to the U.S. Constitution provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States . . . ." U.S. Const. amend XIII. The Amendment has long been interpreted to apply to pretrial and immigration detainees. *See, e.g.*, *Channer v. Hall*, 112 F.3d 214, 217-218 (5th Cir. 1997); *McGarry v. Pallito*, 687 F.3d 505, 511 (2d Cir. 2012). And threatening or imposing solitary confinement if a detainee failed to work could constitute a violation of the Amendment. *See, e.g.*, *id.* at 511-12 (relying on cases from 1964 and 1988). Some courts read a so-called "civic-duty" exception into the Amendment's prohibition on involuntary servitude such that government facilities housing individuals who had not been convicted of a crime could require those individuals to engage in "housekeeping" tasks. *See, e.g.*,

[21] GEO mischaracterizes Plaintiffs' claim as seeking to hold GEO "liable for implementing a federal housekeeping policy and conveying it to detainees." Mot. for Partial Summ. J. at 23. As Plaintiffs stress, I have already found that "GEO's cleaning policy was 'not created by ICE'" and that "GEO unilaterally extended the PBNDS disciplinary scale to cover cleaning mandates that were not required by ICE." *Menocal*, 635 F. Supp. 3d at 1182 (quoting Ely Decl. ¶ 22, ECF No. 261-7).

*Channer*, 112 F.3d at 218-19.[22] GEO relies heavily on this civic-duty exception in claiming that its housekeeping requirement does not offend the Constitution. However, GEO misses a key point—the exception was applied for government actors, not private contractors. For example, in *Jobson v. Henne*, the Second Circuit found that the Thirteenth Amendment allowed a state facility to require normal housekeeping chores to reduce the financial burden placed on the state from operating the facility. 335 F.2d 129, 131-32 (2d Cir. 1966). And, in *Channer v. Hall*, the Fifth Circuit connected the civic-duty exception to the government's ability to "compel its citizens, by threat of criminal sanction, to perform certain civic duties," like jury duty and military service. 112 F.3d at 218.[23]

Before the TVPA was enacted in 2000, the Thirteenth Amendment was enforced through the application of 18 U.S.C. § 1584. When Congress enacted § 1584 in 1948, it imported the phrase "involuntary servitude" from the Thirteenth Amendment, but it did not define that term.

---

[22] These cases often comingle their analysis of due process and Thirteenth Amendment violations, reasoning that if the housekeeping requirements were not punitive, the Thirteenth Amendment could not be violated. *See, e.g.*, *Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978); *Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993); *Tourscher v. McCoullough*, 184 F.3d 236, 242 (3d Cir. 1999).

[23] When courts have been faced with this exact question—whether the civic-duty housekeeping exception may apply to government contractors, they have determined that it may not. *See Owino v. CoreCivic, Inc.*, No. 17-cv-1112, 2018 WL 2193644, at *10 (S.D. Cal. May 14, 2018) (concluding that the fact the defendant may have been delegated a public function does not mean the government also delegated to the defendant its power to criminalize conduct and thus, the defendant "cannot lay claim to the civic duty exception" as "Defendant is a private entity, not a government"); *Novoa v. GEO Grp., Inc.*, No. 17-cv-02514, 2018 WL 3343494, at *13 (C.D. Cal. June 21, 2018) ("[B]ased on the rationale underlying the civic duty exception and its historical usage, the Court finds it inapplicable to a claim against a private corporation contracting with the federal government to run an immigration detention facility."); *Figgs v. GEO Grp., Inc.*, 18-cv-00089-TWP-MPB, 2019 WL 1428084, at *5 (S.D. Ind. Mar. 29, 2019) ("GEO has not cited a case in which a court applied the civic duty exception to a private entity, even one that was contracting with the government. The civic duty exception was conceived of as a recognition that the government occasionally requires citizens to perform public tasks like jury duty or military service that benefit the country at large. Channer[, 112 F.3d] at 218. But there is no indication that GEO's alleged coercive labor benefits anyone other than GEO, a private corporation.").

*See United States v. Kozminski*, 487 U.S. 931, 945 (1988). In *United States v. Kozminski*, the Supreme Court considered the meaning of "involuntary servitude" and "g[a]ve effect to congressional intent by construing [that term] in a way consistent with the understanding of the Thirteenth Amendment that prevailed at the time of § 1584's enactment." *Id.* at 944-45, 948. This construction resulted in a definition of involuntary servitude that limited § 1584's reach to "situations involving physical or legal coercion." *Id.* at 945, 947-48. The Court also observed that "not all situations in which labor is compelled by physical coercion or force of law" constituted involuntary servitude under the Thirteenth Amendment. *Id.* at 943 (explaining that there were exceptions for "exceptional" cases that were well established in the common law as well as "Governments . . . compelling their citizens, by threat of criminal sanction, to perform certain civic duties").

Congress enacted § 1589 as part of the TVPA to "address the issues raised by the decision of the United States Supreme Court in *United States v. Kozminski*." H.R. Conf. Rep. No. 106–939, at 100 (2000), as reprinted in 2000 U.S.C.C.A.N. 1380. Congress intended to "provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski*." *Id.* at 101; *see also United States v. Kaufman*, 546 F.3d 1242, 1261 (2008). According to the Conference Report accompanying the TVPA:

> Section 1589 creates a new crime of forced labor for persons who knowingly provide or obtain the labor or services of a person by threats of serious harm to, or physical restraint against that person or another; by use of fraud, deceit or misrepresentation if the person is a minor, mentally disabled, or otherwise particularly susceptible to undue influence; by means of any scheme, plan or pattern intended to cause the person to believe that if the person did not perform such labor or services, serious harm or physical restraint would be inflicted on that person or another; or by means of the abuse or threatened abuse of law or the legal process.

H.R. Conf. Rep. No. 106–939, at 99-100.

As I observed years ago in this case, the language of § 1589 is broader than the language in the Thirteenth Amendment and intentionally so. While the statute does not define the terms "labor or services," their ordinary meanings provide sufficient clarity. *See Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." (citing *Burns v. Alcala*, 420 U.S. 575, 580-81 (1975))). Merriam-Webster's Dictionary defines labor as "an expenditure of physical or mental effort especially when difficult or compulsory," *Labor*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/labor, and includes in the definition of service "a helpful act" and "useful labor that does not produce a tangible commodity," *Service*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/service. The breadth of these terms confirms that housekeeping tasks fall within the plain language of the statute. *Accord United States v. Callahan*, 801 F.3d 606, 620 (2015) (finding that performing domestic tasks "certainly constitute labor or service under the ordinary meaning of those words" as they are used in § 1589); *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014) (describing "forced domestic service" as "paradigmatic forced labor"); *see also* H.R. REP. NO. 106-939, at 101 (stating "it is intended that prosecutors will be able to bring more cases in which individuals have been trafficked into domestic service . . . ."). And no established exception exists. There is no textual or historical basis for reading a civic-duty exception into § 1589, especially not for a private contractor.[24]

---

[24] In my Order on GEO's Motion to Dismiss in 2015, I stated: "Defendants have cited no authority of reading a civic duty exception into § 1589, or for applying such an exception to a private, for-profit corporation under contract with the government." Order on Mot. to Dismiss at 22-23, ECF No. 23. That continues to be true.

To summarize: cases decided under the Thirteenth Amendment have long made apparent that compelling immigration detainees to work under threats of solitary confinement violated their rights, the performance of housekeeping tasks unquestionably constitutes labor and service under § 1589, and nothing in the clearly established law suggests that a civic-duty exception for a private contractor may be read into that statute. A reasonable jury could conclude that the evidence presented by Plaintiffs shows GEO forced immigration detainees to clean common areas under the threat of serious harm, and under the weight of the case law analyzing the Thirteenth Amendment and § 1589, every reasonable official would have understood that such conduct constituted a violation of Plaintiffs' rights protected by § 1589.

For all the above reasons—the untimeliness of GEO's Motion, that it has waived qualified immunity, that it is not entitled to assert such immunity, and that Plaintiffs' have shown a violation of clearly established law, I deny GEO's Motion for Partial Summary Judgment.

**F. Frivolousness of Any Appeal**

An interlocutory appeal from an order denying qualified immunity generally "divests the district court of jurisdiction to proceed with any part of the action against an appealing defendant." *Stewart v. Donges*, 915 F.2d 572, 576 (10th Cir. 1990). To prevent the misuse of an interlocutory appeal, however, the Tenth Circuit has instructed that a district court should not be divested of jurisdiction if the court, "(1) after a hearing and, (2) for substantial reasons given, (3) f[inds] the claim to be frivolous." *Id.* (quoting *United States v. Hines*, 689 F.2d 934, 937 (10th Cir. 1982)). At the Pretrial Conference on June 3, 2026, I gave the parties the opportunity to argue whether any appeal of the denial of qualified immunity would be frivolous. And, for all the substantial reasons given above, I find that it would be frivolous and that GEO's attempts to

pursue qualified immunity at this juncture are only for the purposes of delay. There is no genuine question regarding the law—GEO is not entitled to qualified immunity.

**III. GEO's Motion to Certify Question for Interlocutory Appeal**

When GEO filed its Motion for Partial Summary Judgment, it also filed a Motion seeking to certify my Omnibus Order so that it could immediately pursue another appeal of my rulings regarding its *Yearsley* defense. Courts of appeals have jurisdiction over "appeals from all final decisions of the district courts." 28 U.S.C. § 1291. "[A] decision generally is 'final' under § 1291 only when it 'resolves the entire case'—when it 'ends the litigation" (on merits or otherwise) and 'leaves nothing for the court to do but execute the judgment.'" *GEO Grp.*, 607 U.S. at 443-44 (quoting *Ritzen Group, Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 37-38 (2020)). This finality rule has a few exceptions that give courts of appeals jurisdiction over interlocutory appeals, i.e., appeals of non-final decisions, in specific circumstances. No final judgment has entered in this case, so GEO may only appeal if the Tenth Circuit has jurisdiction over its appeal pursuant to one of these exceptions.

GEO's first appeal in this case—of my Order certifying the classes—proceeded under the exception to the finality rule set out in Federal Rule of Civil Procedure 23(f), which provides that "[a] court of appeals may permit an appeal from an order granting or denying class-action certification" under Rule 23. GEO's second appeal in this case—of my Omnibus Order—cited the collateral-order doctrine[25] as the basis for the Tenth Circuit's jurisdiction over its

[25] The collateral-order doctrine applies when an order "(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) [is] effectively unreviewable on appeal from a final judgment." *GEO Grp.*, 607 U.S. at 444 (quoting *Van Cauwenberghe v. Biard*, 486 U.S. 517, 522 (1988)).

interlocutory appeal, but the Tenth Circuit and the U.S. Supreme Court both concluded the appeal was not permitted under that doctrine. *Menocal*, 2024 WL 4544184, at *11; *GEO Grp.*, 607 U.S. at 452. GEO's third appeal also cited the collateral-order doctrine, *see* 2026 Notice of Appeal at 2, and again, the Tenth Circuit found jurisdiction was lacking. 9/9/26 Tenth Cir. Order at 5. With its Motion to Certify, GEO looks to another exception to the finality rule, that found in 28 U.S.C. § 1292(b), as it seeks to appeal my Omnibus Order for a second time.

Under 28 U.S.C. § 1292(b), "[w]hen a district judge, in making in a civil action an order not otherwise appealable under [§ 1292], shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order." In that case, "[t]he Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order." 28 U.S.C. § 1292(b).

As the Supreme Court noted with respect to my Omnibus Order, I have seen "no reason to act under § 1292(b)." *GEO Grp.*, 607 U.S. at 452 n.5. Despite the fact that I have not issued an order under § 1292(b) over the past four years since I issued my Omnibus Order, GEO now asks that I act under that statute and certify the following question to the Tenth Circuit: "whether a government contractor can be held liable when it acts within the scope of authority validly conferred by the federal government, even if the contractor exercises discretion in implementing that authority," Mot. to Certify at 2, ECF No. 449.

I agree with my colleague, the esteemed Judge Nina Y. Wang, and GEO that, in evaluating requests to certify an order pursuant to § 1292(b), proper considerations are whether:

(1) the request for certification is timely; (2) the issue involves a controlling question of law; (3) there is substantial ground for difference of opinion as to resolution of the question; and (4) certification could materially advance the termination of the litigation. *See Atlantic Richfield Co. v. NL Indus., Inc.*, No. 20-cv-00234-NYW-KAS, 2023 WL 5333756, at *2 (D. Colo. Aug. 18, 2023). GEO insists that its proposed question should be certified because: (1) it is a purely legal question, (2) is outcome determinative in this case, (3) is the subject of a three-to-one circuit split, and (4) has already been briefed in the Tenth Circuit such that the parties would not need new briefing. Mot. to Certify at 2-3. GEO's arguments on the relevant considerations are unpersuasive.

**A. Timeliness of GEO's Request**

My Omnibus Order was issued in October 2022. GEO's present request under §1292(b)—to appeal that Omnibus Order for a second time—comes over three years too late. As mentioned, GEO initially sought to appeal my Omnibus Order based on the collateral-order doctrine. Plaintiffs immediately sought to have GEO's appeal dismissed for lack of jurisdiction, arguing that the *Yearsley* defense was not an immunity from suit that would have authorized GEO to appeal under the collateral-order doctrine. GEO could have sought certification under § 1292(b) before filing its appeal or immediately upon realizing the jurisdictional hurdle it faced, but it did not. Instead, GEO chose to take on the risk that the collateral-order doctrine did not apply and that its appeal would be deemed improper. Now that GEO's gamble did not pay off, it cannot seek to delay the case further by pursuing a path that was initially available to it. A mistaken strategic choice does not excuse an untimely request. And, as Plaintiffs stress, §

1292(b) is not meant to be "a procedural backstop for a litigant that has already taken an improper appeal." Resp. to Mot to Certify Question at 6, ECF No. 464.

GEO's Motion to Certify is an "inexcusably dilatory request," the granting of which would prejudice Plaintiffs and the search for justice, and I would deny it for its untimeliness alone. *See Richardson Electronics, Ltd. v. Panache Broadcasting of Penn., Inc.*, 202 F.3d 957, 958 (7th Cir. 2000) ("[A] district judge should not grant an inexcusably dilatory request" to appeal under § 1292(b)). However, I also find that GEO's request for certification does not meet the criteria set out in § 1292(b).

**B. Controlling Question of Law**

The first criterium is that the issue involves a "controlling question of law." *See* 28 U.S.C. § 1292(b). A question of law is "a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine." *Ahrenholz v. Bd. of Trustees of Univ. of Ill.*, 219 F.3d 674, 676 (2000). It must be a "'pure' question of law rather than merely[] an issue that might be free from factual contest." *Id.* at 676-77. This is because "if a case turn[s] on a pure question of law, something the court of appeals could decide quickly and cleanly without having to study the record, the court should be enabled to do so without having to wait till the end of the case." *Id.* at 677. "A question is 'controlling' if interlocutory reversal would terminate the action or at least conserve time for the lower court or time and expense for the parties." *In re Adam Aircraft Indus., Inc.*, No. 09-cv-00728-CMA, 2010 WL 717841, at *3 (D. Colo. Feb. 23, 2010).

GEO claims that, in my Order granting a limited stay in the case after GEO filed its Notice of Appeal of my Omnibus Order, I "recognized that the question presented . . . is a purely legal question with the potential to dispose of the case." Mot. to Certify at 2 (citing 12/7/22

Order, ECF No. 400); *see also id.* at 8 ("Recognizing the case-dispositive nature of the immunity question, this Court stayed proceedings, pending the outcome of the appeal. (Doc. 400)."); *id.* at 10 ("As this Court already recognized when it entered a stay during GEO's collateral-order appeal, the Tenth Circuit's choice of whether to join the Ninth Circuit or the three circuits on the other side of the split is a purely legal question that will potentially resolve the entire case."). The entirety of my Order granting the limited stay reads:

> ORDER; On November 16, 2022, Defendant The GEO Group, Inc. filed a Notice of Appeal [ECF No. 387] relating to my Order [ECF No. 380] granting Plaintiffs' Motion for Summary Judgment on GEO's Affirmative Defenses [ECF No. 260] and denying GEO's Cross Motion for Summary Judgment [ECF No. 284]. GEO then filed a Motion to Stay Proceedings Pending Appeal [ECF No. 391]. Plaintiffs' Response to that Motion [ECF No. 395] agrees that a stay is appropriate for matters that are comprehended within the appeal. As a result, GEO's Motion to Stay [ECF No. 391] is GRANTED in that all proceedings in this case related to the appeal are stayed pending further order of the Court. All trial-related deadlines and settings are VACATED. The parties are DIRECTED to confer within 10 days of any jurisdictional opinion issued by the Tenth Circuit and to submit a joint status report within 14 days of any such opinion. The parties shall state in the status report whether the stay should remain in place or whether the stay should be vacated and new trial dates set. Ordered by Judge John L. Kane on 12/7/2022. Text Only Entry(jlksec)

12/7/22 Order, ECF No. 400. Nowhere did I "recognize" the purely legal or case-dispositive nature of the question GEO seeks to have certified. Nor did I stay all proceedings in the case. I allowed the parties to control their case and conserve resources as they saw fit, while also moving the case forward. My determinations here do not conflict with any previous ruling I have made.

GEO's proposed question for certification is not a purely legal question. It would require the appellate court to consider what ICE did and did not direct, the extent to which GEO was given discretion, and if so, whether GEO exercised that discretion within the scope of ICE's direction. On appeal, the Tenth Circuit determined that the *Yearsley* defense is bound up with the

facts. *See Menocal*, 2024 WL 4544184, at *8 (concluding that "factual questions concerning what the government did and did not specifically direct would be at the heart of the *Yearsley* inquiry . . . ."). Were it to review GEO's proposed question regarding the *Yearsley* defense, the Court of Appeals would have to wade through the record and consider my assessment of the undisputed facts.

GEO contends the parties' briefing from its second appeal to the Tenth Circuit could be used by that court to immediately decide its proposed question. *See* Mot. to Certify at 8, 18 ("The Tenth Circuit just needs to answer what the parties have already briefed and argued."). GEO's Opening Brief in that appeal illustrates the factual nature of its question. For example, its Opening Brief asserts that "GEO complied with the government's directions." Appellant's Opening Br. in *Menocal v. GEO Grp., Inc.*, No. 22-01409 (10th Cir.), at 27, ECF No. 449-4 ("Opening Brief"). Yet, in my Omnibus Order, I pointed out that GEO's contract with ICE required it to comply with "[a]pplicable federal, state and local labor laws and codes," *Menocal*, 635 F. Supp. 3d at 1175-76 (quoting 2011 Contract, ECF No. 262-2 at 38), and I found that the "evidence suggests the participants' compensation was left to GEO's discretion." *Id.* at 1176. Much of GEO's presentation of the facts in its Motion to Certify echoes its Opening Brief and ignores my reading of the facts in the Omnibus Order. These continued factual challenges demonstrate that GEO's *Yearsley* question is not purely legal.

GEO's proposed question for certification also is not controlling in this case. First, GEO's assertion of error applies only to my analysis regarding Plaintiffs' unjust enrichment claim. My

Omnibus Order discussed GEO's discretion in the context of that claim only. *See id.* at 1173-75.[26] As such, any reversal by the Tenth Circuit would not terminate the action.

Additionally, GEO's proposed question for certification assumes that the government contractor "acts within the scope of authority validly conferred by the federal government," but I never made that finding with respect to Plaintiffs' unjust enrichment claim, *see id.* at 1175 (declining to address whether "ICE was authorized by Congress to dictate compensation for VWP participants," which GEO must show for its *Yearsley* defense). So, any reversal would likely require the Tenth Circuit to remand the case for a determination of whether Congress validly conferred on ICE the authority to set a specific rate of pay for participants in the VWP. *See* GEO's Cross-Mot. for Summ. J. at 3-4, 14, 16, 22, ECF No. 284 (recognizing that a "contractor must show 'the authority to carry out the project was validly conferred' by the government" (quoting *Yearsley*, 309 U.S. at 20-21)); Pls.' Resp. to GEO's Cross-Mot. for Summ. J. at 35-40, ECF No. 298 (arguing that, "[i]f the PBNDS were in fact a command by ICE to pay a specific rate, that command would be *ultra vires* and without valid Constitutional authority").

Given that the trial is less than a month away and that any appeal would not resolve the case, permitting GEO to file a fourth interlocutory appeal at this juncture could not possibly save

[26] In its Opening Brief on appeal, GEO suggested my conclusion that the *Yearsley* defense was inapplicable for Plaintiffs' TVPA claim turned on GEO's exercise of discretion. *See* Opening Br. at 36-37; *see also* Reply in Supp. of Mot. to Certify at 5, ECF No. 473. However, in actuality, I found that GEO's conduct underlying the TVPA claim was extra-contractual and not that GEO exercised discretion in implementing the aims of the contract. *See Menocal*, 635 F. Supp. 3d at 1173 (determining that GEO's cleaning policies that were the subject of the TVPA claim were "independently developed and implemented" by GEO and "far exceeded its contractual obligations with ICE").

court or party resources.[27] GEO's proposed question simply is not a pure question of law that the court could decide "quickly and cleanly." *See Ahrenholz*, 219 F.3d at 677.

**C. Substantial Ground for Difference of Opinion**

GEO contends that substantial grounds for difference of opinion exist because the Tenth Circuit has not spoken as to its proposed question and other circuits have answered the question in differing ways. *See* Mot. to Certify at 12-13. GEO claims that a three-to-one circuit split exists, with the Ninth Circuit holding that "discretionary actions by a government contractor are not protected by derivative sovereign immunity," *id.* at 13 (citing *Cabalce v. Thomas E. Blanchard & Assoc.*, 797 F.3d 720, 732 (9th Cir. 2015)), and the Third, Fourth, and Fifth Circuits holding that "derivative sovereign immunity applies to a government contractor's discretionary actions," *id.* at 14-16 (citing *Gay v. A.O. Smith Corp.*, No. 23-2078, 2024 WL 2558735, at *2 (3d Cir. May 24, 2024) (nonprecedential op.); *Taylor Energy Co., LLC v. Luttrell*, 3 F.4th 172, 176 (5th Cir. 2021); *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 647-48 (4th Cir. 2018)). In my Omnibus Order, I did not consider this purported circuit split because, in GEO's summary-judgment briefing, it did not portray the case law in that way, even though three of the opinions now cited by GEO predated its briefing. *See, e.g.*, GEO's Resp. to Pls.' Mot. for Summ.

---

[27]If GEO's proposed question were somehow construed to cover Plaintiff's TVPA claim as well, an interlocutory appeal would be even more disruptive and less efficient. The Supreme Court has clarified that the *Yearsley* defense "protects a contractor only when—and only because—it has acted lawfully . . . ." *GEO Grp.*, 607 U.S. at 449; *see also id.* ("Yearsley provides protection to a contractor when it has received a lawful authorization and acted according to its terms—meaning, when the contractor has acted within legal bounds. So in invoking Yearsley, the contractor is making the argument of a merits defense—that it is not liable because it has complied with the law."). In light of that explanation from the Supreme Court, GEO could not show that it is entitled to *Yearsley* protection unless it establishes that it did not violate the TVPA, which is a heavily fact-based consideration. *See Menocal*, 635 F. Supp. 3d at 1186-1196.

J. at 19-20, 29-30, ECF No. 270 (claiming "GEO had no discretion"); GEO's Cross-Mot. for Summ. J. at 21 n.6, ECF No. 284 (contrasting *Cunningham* with *Boyle*, but not *Cabalce*). GEO's current attempt to reframe both the law and my consideration of it is not well-taken.

Regardless, no substantial ground for a difference of opinion exists. In a recent decision that post-dates all the cases cited by GEO, the Supreme Court described the *Yearsley* defense, explaining that "contractors ordinarily have a constitutional defense only when the contractor is being sued precisely for accomplishing what the Federal Government requested." *Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1099 (2026). Here, ICE set outer boundaries for the VWP, including requirements that GEO: "(1) permit detainees to work no longer than '8 hours daily, 40 hours weekly,' 2008 PBNDS, ECF No. 261-9 at 63; (2) provide compensation for which it would be reimbursed at $1.00 per day per detainee, 2011 Contract, ECF No. 262-2 at 5; and (3) comply with '[a]pplicable federal, state and local labor laws and codes,' 2011 Contract, ECF No. 262-2 at 38." *Menocal*, 635 F. Supp. 3d at 1175. As my Omnibus Order concluded, there is no basis for finding that ICE requested for (or directed) GEO to pay detainees no more than $1 per day for their participation in the VWP. *Id.* at 1176. Consequently, GEO is not being sued for accomplishing precisely what the Federal Government requested. *See Hencely*, 146 S. Ct. at 1099.

The difference GEO identifies in the Third, Fourth, Fifth, and Ninth Circuit decisions is predominantly semantic. The Ninth Circuit defines the inquiry as whether the contractor has "discretion," while the other courts frame it as an evaluation of the government's "control," "direction," and "authorization." In using these varying terms, the circuit courts are considering opposite sides of the same coin.

In *Cabalce*, a Ninth Circuit case, the U.S. Department of the Treasury hired a contractor to store and destroy fireworks seized by the federal government, and after a catastrophic explosion occurred while some of the fireworks were being dismantled by a subcontractor, the families and representatives of deceased workers sued the contractor, among other parties. 797 F. 3d at 723-25. Under its agreement with the Department of the Treasury, the contractor was required to destroy the property "as prescribed and directed" by a designated government representative and was "to comply with federal, state, and local laws and regulations when destroying hazardous materials." *Id.* at 724 (internal quotation marks and citation omitted). Additionally, all destructions of the fireworks needed to "be coordinated and approved by the responsible seizing or blocking agency designated representative." *Id.* The court determined, however, that the contractors designed the fireworks-destruction plan they executed "without government control or supervision." *Id.* at 732; *see also id.* at 733 (finding the contractor did not establish "that the federal government reviewed in detail the destruction plan that had been independently devised" by the contractors); *id.* (noting that the contractor "presented no evidence reflecting that the destruction plan for the fireworks was devised under the direction, supervision, or control of a federal officer . . . ."). The Ninth Circuit followed its earlier precedent and concluded that, because the record did not reveal that the contractors "had no discretion" in devising the destruction plan, the *Yearsley* defense was inapplicable. *Id.* at 732. While the Ninth Circuit indicated that application of the *Yearsley* defense turned on whether the contractor lacked discretion, the court reasoned that the contractors had discretion because they acted without government control or supervision.

*Cunningham v. General Dynamics Information Technology, Inc.*, a Fourth Circuit case, involved an alleged violation of the Telephone Consumer Protection Act by a government

contractor. 888 F.3d at 642-43. The plaintiff claimed the contractor had unlawfully placed an autodialed, prerecorded phone call to him without receiving his consent. *Id.* The Centers for Medicaid & Medicare Services ("CMS") within the U.S. Department of Health and Human Services had engaged the contractor to inform individuals about the process for enrolling in health insurance plans under the Affordable Care Act. *Id.* at 643-44. "CMS authorized [the contractor] to use an autodialer to make the calls, provided a script for each call, and provided a list of phone numbers for each call." *Id.* at 644. Pursuant to the contract, CMS sent the contractor 2.65 million telephone numbers and directed the contractor to call each of the phone numbers over five days using specific scripts. *Id.* At the first step of the *Yearsley* inquiry, the Fourth Circuit analyzed whether the government authorized the contractor's actions. *Id.* at 647. The court found that the contractor "performed exactly as CMS directed: [it] called the number CMS instructed [it] to call, on the prescribed day, and followed CMS's provided script when leaving the message." *Id.*[28]

The plaintiff in *Cunningham* argued that the contractor did not perform exactly as CMS directed because the contract required it to follow applicable laws and the contractor violated that requirement by not obtaining prior consent from each individual on the call CMS provided. *Id.* The Fourth Circuit rejected this argument, finding there was no indication that CMS authorized the contractor to contact the individuals other than to place the automated call and that the contractor was not permitted to deviate from the script provided. *Id.* The court concluded that the

[28] Notably, the Fourth Circuit cited to a Ninth Circuit case and summarized it as "stating that a government contractor is not liable under *Yearsle*y if the work was done under the contract and in conformity with the contract terms, but may be liable for damages from acts 'over and beyond acts required to be performed' or acts 'not in conformity' with the contract." *Cunningham*, 888 F.3d at 647 (quoting *Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963)).

government authorized the contractor's actions and, consequently, affirmed the district court's ruling that the *Yearsley* defense barred the plaintiff's suit. *Id.* at 648, 651.[29]

In the Fifth Circuit case, *Taylor Energy Company, L.L.C. v. Luttrell*, an operator of offshore oil wells sued a government contractor that was tasked with installing a containment system after one of the operator's platforms collapsed causing its wells to leak oil across the ocean floor for over sixteen years. 3 F.4th at 173. The operator sought tort damages and equitable relief for the government contractor's trespass and "unauthorized activities" at the spill site. *Id.* at 174-75. The Fifth Circuit affirmed the district court's entry of summary judgment for the contractor based on application of the *Yearsley* defense. *Id.* at 177-78. In evaluating the first prong of the *Yearsley* standard, the court reviewed the documents authorizing and directing the contractor's work, noting that the documents enumerated specific tasks and deliverables with associated deadlines. *Id.* at 175-76. The court explained that, as designs and components changed

[29] GEO claims "the Fourth Circuit held that the discretionary decision to use an autodialer did not strip the contractor of derivative sovereign immunity." Reply in Supp. of Mot. to Certify at 7. But the court does not mention any discretionary decision by the contractor and, instead, emphasizes that the contractor acted exactly as expected under the contract. *Cunningham*, 888 F.3d at 647-48. Still, GEO asserts that "[t]he relevant fact from *Cunningham* is that the contractor had the ***option*** to use an auto-dialer or not." Reply in Supp. of Mot. to Certify at 7. GEO is incorrect that the contractor's use of the autodialer was discretionary. The plaintiff in *Cunningham* acknowledged that CMS "directed [the contractor] to make autodialed, prerecorded calls." *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, No. 16-cv-00545, 2017 WL 1682534, at *3 (E.D. Va. May 1, 2017); *see also* Order at 3, 8, *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, No. 16-cv-00545, ECF No. 47 ("In a subsequent contract modification, CMS required [the contractor] to use autodialing technology to initiate outbound calls."). The expectation that the contractor would use an autodialer is obvious because it is inconceivable how the contractor would have otherwise placed calls to 2.65 million phone numbers in five days. Additionally, I note that GEO's present reading of *Cunningham* differs significantly from its previous view of the case. *See, e.g.*, GEO's Reply in Supp. of Cross-Mot. for Summ. J. at 7, ECF No. 316 (asserting that "[i]n *Cunningham*, whether the contractor was entitled to immunity turned on whether the contractor was instructed to 'generate a list of phone numbers' or whether the government provided the contractor with a list of numbers and instructed them to call everyone on the list").

throughout the project, they were approved by a Coast Guard officer and other Government officials, and the contractor "went to the Coast Guard for approval before taking the next steps in the project." *Id.* at 176-77.[30] The court determined that the Government had directed the contractor's work and had authorized its plan, design, and installation. *Id.* at 176. The court held that there were no genuine factual disputes about the contractor's adherence to the Government's directives or as to whether the Government authorized and directed the contractor's work. *Id.* at 176-77.

Lastly, *Gay v. A.O. Smith Corporation* is a decision from the Third Circuit, which I note does not constitute binding precedent even in that Circuit. In that case, a retired Navy servicemember sued a government contractor for the servicemember's exposure to asbestos at the federally owned, but contractor operated, Knolls Atomic Power Laboratory. 2024 WL 2558735, at *1. In affirming the district court's determination that the government contractor had *Yearsley* protection, the panel observed that neither the Third Circuit nor the Supreme Court had limited the application of the *Yearsley* defense to circumstances in which a contractor had no discretion but to engage in the tort. *Id.* at *3. Nevertheless, the panel highlighted the government's role in the design and operation of the Laboratory. The panel described how:

- the Atomic Energy Commission "reviewed all plans and designs" for the Laboratory "including materials specifications, components in the power plant, and building and facility plans;" *id.* at *1;

[30] GEO claims a key fact in *Taylor Energy* was that the contractor had "leeway" in deciding what it would do to respond to the oil spill, Reply in Supp. of Mot. to Certify at 8, but that word was only used by the court in describing the plaintiff-operator's allegations, not the court's findings, 3 F.4th at 174 ("According to [the operator], [the contractor's] contract with the Coast Guard lacks details and gives [the contractor] leeway in deciding how to run the capture and cleanup operation.").

- a Navy officer directly oversaw the Laboratory's operation and was responsible "for the design, development, operation, and other aspects" of the laboratory, *id.*;
- the Navy was "deeply involved in the planning and designing process," *id.* at *3; and
- the contractor "carried out its obligations according to the terms of a contract with the Navy and pursuant to government oversight," *id.*

The panel acknowledged that "[t]he undisputed facts show that the government closely scrutinized and controlled [the contractor's] operations" at the Laboratory; that the Navy officer "exercised responsibility and control over the facility's management"; and that the contractor "was required to adhere to the government's specifications at all times." *Id.* at *4.

The rule that emerges from these various circuit cases is that, in determining whether the government "authorized and directed" a contractor's challenged conduct, the facts and claims in each case must be considered in light of the specificity of the government direction and the extent of the government's control or approval. *See Yearsley*, 309 U.S. at 20. A contractor that acts without substantial government direction and supervision may be said to exercise discretion, while a contractor that uses discretion to develop a plan that is then specifically approved by the government may be viewed as acting as authorized and directed by the government.

In my Omnibus Order, I found that ICE did not direct GEO to pay *only* $1 per day to participants in the VWP and also that ICE's monitoring of GEO was insufficient to bring GEO's actions within the scope of the *Yearsley* defense. *Menocal*, 635 F. Supp. 3d at 1176. Specifically, I found that GEO "was not complying with any federal direction or contractual requirement to compensate VWP participants $1.00 per day and no more," that ICE's auditing was not particularized regarding the VWP rate of pay, and that the COTR's authority was inadequate. *Id.* at 1176-77. For those reasons, GEO's *Yearsley* defense is unsustainable. GEO has not shown that

there are substantial grounds for a difference of opinion as to that conclusion or regarding the application of the *Yearsley* defense only when "a contractor is being sued precisely for accomplishing what the Federal Government requested." *Hencely*, 146 S. Ct. at 1099.

**D. Advance Termination of Litigation**

Just as the question GEO seeks to have certified is not controlling, its certification would not advance the termination of the litigation. Even if the Tenth Circuit were to reverse my ruling and resolve the unjust enrichment claim in its entirety, the litigation would continue for Plaintiffs' TVPA claim. This case is mere weeks from trial. An appeal is likely to last a year or more, even if the existing briefing is deemed sufficient. If the final judgment in this case does not favor GEO, it may appeal as soon as that judgment enters. At that time, GEO's claimed right to the *Yearsley* defense may be "fully vindica[ted] on appeal." *GEO Grp.*, 607 U.S. at 451.

GEO's request for certification under § 1292(b) is untimely and does not meet any of the requirements of the statute. Consequently, I deny GEO's Motion to Certify.

## IV. GEO's Motion to Stay and Preemption Defense

Also pending is GEO's Motion to Stay, in which GEO initially requested that I stay all deadlines in this case through June 1, 2026. GEO argues that a stay is warranted because it has filed a Petition for Writ of Certiorari with the U.S. Supreme Court in *GEO Group, Inc. v. Nwauzor*, No. 25-828 (Jan. 9, 2026). GEO has advised that the Supreme Court requested and received briefing on the issues from the Solicitor General of the United States and that the Court should issue a decision on GEO's Petition in the next couple of weeks. *See* Notice of

Supplemental Authority at 2, ECF No. 472; Notice of Supplemental Authority at 2, ECF No. 550. GEO claims that, if the Supreme Court grants certiorari in *Nwauzor*, GEO is both "likely to prevail" and that it has "a reasonable likelihood of being correct." *Id.* at 5. Regardless of whether the Court grants GEO's Petition or whether GEO might prevail in *Nwauzor*, I am not persuaded that there is any likelihood those proceedings will impact Plaintiffs' claims here, much less a probability that would warrant additional delay in this case. Further delay cannot be justified by what may possibly happen in another case, especially when the challenges in the other case are not directly applicable, only one of Plaintiffs' claims is implicated, GEO has waived any potentially similar defense here, my previous findings call into question the viability of any related defense, and the case is twelve years old.

In describing *Nwauzor*, GEO states: "Among the issues presented to the high court is whether state-law claims for unjust enrichment regarding [GEO's Voluntary Work Program ("VWP")] are preempted or offend intergovernmental immunity." Mot. to Stay at 2, ECF No. 451. This is a blatant misrepresentation. The question presented to the Supreme Court in the Petition for Writ of Certiorari is: "Whether the Supremacy Clause allows a state to reclassify federal immigration detainees participating in a federal work program as employees and thereby impose its state minimum-wage law just because a private contractor provides detention services at the federal facility where the detainees are housed." Pet. for Writ of Cert., ECF No. 451-2 at 3-4. I dismissed the minimum-wage claim asserted by Plaintiffs in this case long ago.

GEO's other descriptions of *Nwauzor* are more artful. GEO asserts that its Petition "focuses on a pair of Supremacy Clause doctrines that would dispose of Plaintiffs' state-law claim in this case and reshape the issue before this Court." Mot. to Stay at 4. Only Plaintiffs'

unjust enrichment claim is brought under state law, so any decision in *Nwauzor* could not impact Plaintiffs' TVPA claim.

The Supremacy Clause doctrines on which GEO's appeal in *Nwauzor* relies are inter-governmental immunity and preemption. Pet. for Writ of Cert., ECF No. 451-2 at 14-15. GEO has not asserted intergovernmental immunity as a defense that it intends to pursue, *see* Pretrial Order at 4-6, so I focus on *Nwauzor*'s preemption question.

Whether GEO should be permitted to assert preemption as a defense at trial is the subject of one of Plaintiffs' requests in their Motion *in Limine*. *See* Pls.' Mot. *in Limine* at 42-44, ECF No. 481. Plaintiffs argue that GEO should be prohibited from raising preemption as a defense at trial because it has waived the defense. I agree. GEO's Motion to Stay points to a single instance in its thousands of pages of filings in this case in which it mentioned that it "may file a motion arguing that Plaintiffs' claims are subject to the doctrine of preemption." *See* Reply in Supp. of Stay at 4, ECF No. 462 (quoting Am. Stipulated Scheduling & Discovery Order at 19, ECF No. 149). Notably, GEO has never filed such a motion. GEO contends Plaintiffs should have filed a timely motion regarding the adequacy of GEO's reference to preemption in the Scheduling and Discovery Order rather than "an eleventh-hour motion in limine seeking wholesale exclusion of a properly preserved defense." GEO's Resp. to Mot. in Limine at 49, ECF No. 509. But it is GEO's obligation to provide notice of its defenses, *see Ahmad*, 435 F.3d at 1201, and Plaintiffs need not implore GEO to do so.

GEO waived its preemption defense by failing to provide sufficient notice of that defense until the "eleventh hour." GEO did not state preemption as a defense in its responsive pleading, as is required by Federal Rule of Civil Procedure 8. And GEO's passing reference to preemption

in one of four proposed Scheduling and Discovery Orders (ECF Nos. 28, 61, 98, 139) that were filed in this case was insufficient to provide Plaintiffs with notice of the basis for the defense.

GEO included in the Pretrial Order the statement that it "will further show that Plaintiffs' claims are barred by the doctrine of preemption (as raised in the Scheduling Order ECF 149) because federal law authorized GEO to pay $1 per day for participation in the VWP, thereby preempting any equitable claim. *See* [8] U.S.C. § 1555(d); Publ. L. No. 95-431, 92 Stat. 1021 (1978)." Pretrial Order at 5-6, ECF No. 540.[31] GEO asserts that "because 'the pretrial order is the controlling document for trial,' the 'inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim.'" GEO's Resp. to Mot. in Limine at 47 (quoting *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002)). Thus, according to GEO, "whether [it] pleaded its preemption defense in an answer is beside the point, because the defense was 'properly raised when it was included in the [Pretrial Order].'" *Id.* This unquestionably is not the law.[32] If it were, Rule 8 would be superfluous, and its purposes would

---

[31] The parties' Proposed Pretrial Order was filed after GEO's Motion to Stay.

[32] The frustration and inefficiencies caused by GEO's changing counsel in this case are exemplified in the evolving arguments it has presented in its Motion to Stay, its Response to Plaintiffs' Motion *in Limine*, and its Motion for Partial Summary Judgment. In its Motion to Stay and Reply in Support to that Motion, which were principally signed by an attorney with Greenberg Traurig LLP, GEO argued that preemption could not be waived. *See* Mot. to Stay at 5; Reply in Supp. of Mot. to Stay at 4-6. However, in its Response to Plaintiffs' Motion in Limine, principally signed by an attorney with Wheeler Trigg O'Donnell LLP, GEO drops that argument altogether and insists instead that it has properly preserved the defense by including it in the Pretrial Order. GEO's Resp. to Pls.' Mot. in Limine at 47-48. In that Response to Plaintiffs' Motion in Limine, GEO argues that simply including a claim or defense in a Pretrial Order automatically amends any previous pleadings. *See id.* at 47-48. Yet, in its Motion for Partial Summary Judgment, which was principally signed by an attorney with Greenberg Traurig LLP, GEO recognized that, to assert its new defense of qualified immunity, it would need to satisfy the standard for constructively amending its answer, including fulfilling the requirements in Federal Rule of Civil Procedure 15(a). *See* Mot. for Partial Summ. J. at 8-14. The standard for constructive amendment would be irrelevant if including qualified immunity in the proposed Pretrial Order after filing its Motion for Partial Summary Judgment automatically resulted in

be undermined. The case to which GEO cites—*Wilson v. Muckala*—explains why: "[W]e do not normally expect to see claims or defenses not contained in the pleadings appearing for the first time in the pretrial order, especially in such cursory form. Such a practice deprives one's adversary of fair notice, possibly discovery, and the opportunity for motion practice, and is subject to abuse by those who employ a sporting theory of justice." *Id.* at 1215-1216.[33] There, the Tenth Circuit considered Federal Rule of Civil Procedure 16, which governs pretrial orders as well as scheduling orders, and emphasized that its purpose "is to avoid surprise, not foment it." *Id.* at 1216. The court advised that, if a new claim or defense appears for the first time in a pretrial order, opposing counsel should record his or her objection to the pretrial order. *Id.* Plaintiffs have done that here and have filed a Motion in Limine, as directed, seeking to bar the newly appearing defense.

I find that Plaintiffs have not received fair notice of any preemption defense. GEO stresses that its preemption defense "was expressly identified in the [Pretrial Order] well before

---

amendment of the deficient pleadings. With substantial consternation, I have tracked these divergent theories and endeavored to address them as they were presented.

[33] GEO also cites *Grill House, LLC v. Berkshire Hathaway Homestate Insurance Co.*, claiming that "affirmative defenses raised in a pretrial order are 'properly preserved' irrespective of whether advance notice was given." GEO's Resp. to Mot. in Limine at 48 (quoting *Grill House*, No. 20-cv-2108-WJM-KLM, 2022 WL 1487575, at *4 (D. Colo. May 11, 2022)). In *Grill House*, the defendant argued that it was entitled to summary judgment because the plaintiff had failed to provide prompt notice of its insurance claim as required by the applicable policy. 2022 WL 1487575, at *3. The plaintiff responded that defendant had waived that argument by failing to plead it. *Id.* However, the defendant had included in its answer the defense that the plaintiff's claims might be barred by breach of the policy conditions or failure to comply with conditions precedent in the policy. *Id.* at *4. Then, in its interrogatory responses, the defendant specified that the plaintiff had failed to provide prompt notice as required by the insurance policy by not notifying the insurer until nearly a year after the plaintiff claimed to have sustained the damage. *Id.* The court concluded that "even if these filings were insufficient to give Plaintiff notice of Defendant's anticipated affirmative defense," the defense "was explicitly stated in the parties' Final Pretrial Order." *Id.* Thus, the court found that the defendant had properly preserved the defense. *Id.* The court did not hold that a defendant could assert a new defense for the first time in the Pretrial Order.

trial." GEO's Resp. to Motion in Limine at 48. The proposed Pretrial Order was filed five months before the trial is to begin, but six years after discovery closed. Expecting Plaintiffs to fully litigate GEO's preemption defense along with the many other pretrial matters that have been raised in the five months preceding the trial is unfair and prejudicial. GEO's failure to provide sufficient notice of the defense until filing the proposed Pretrial Order deprived Plaintiffs of the opportunity to conduct related discovery and for motion practice on the defense. Accordingly, I conclude that GEO has waived any preemption defense and grant that aspect of Plaintiffs' Motion in Limine.

Not only has GEO waived preemption, but my previous rulings in this case cast doubt on whether such a defense could succeed. The type of preemption at-issue in GEO's Petition for Writ of Certiorari in *Nwauzor* is known as conflict preemption.[34] Pet. for Writ of Cert., ECF No. 451-2 at 47. As relevant here,[35] such preemption is found "where 'under the circumstances of [the] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 61 (1941)). In my Omnibus Order, I ruled that GEO's *Boyle* defense failed as to Plaintiffs' unjust enrichment claim because "there is no obvious clash between federal polices or objectives and the state law

---

[34]In *Nwauzor*, GEO seeks to appeal the Ninth Circuit's determination that the application of Washington State's Minimum Wage Act to immigration detainees participating in the VWP was not preempted by the federal law that caps reimbursement at $1 per day. Pet. for Writ of Cert., ECF No. 451-2 at 14.

[35] GEO also mentions impossibility preemption, another subtype of conflict preemption. *See* Pet. for Writ of Cert., ECF No. 451-2 at 47. But the record here is clear that it is not impossible for GEO to comply with both the relevant federal and state law. *See Menocal*, 635 F. Supp. 3d at 1176 ("[T]here is no evidence that ICE prohibited GEO from compensating its workers more than $1.00 per day.").

underlying Plaintiffs' unjust enrichment claim." *Menocal*, 635 F. Supp. 3d at 1179. More specifically, I found that "the application of Colorado unjust enrichment law to GEO's VWP (1) will not have a direct impact on government expenditures; (2) will have no significant impact on the government's contractual obligations and rights; and (3) will not affect the government's interest in detaining certain immigrants during the pendency of their immigration court proceedings." *Id.* at 1177-78. Thus, based on my previous rulings, a conclusion that Colorado's unjust enrichment law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" is improbable. *Crosby*, 530 U.S. at 373 (internal quotation marks and citation omitted).

Likely the most significant factor weighing against a stay in this case is its age. As I detailed above, GEO has again and again sought to delay these proceedings. Nothing about the pace of the case has been "breakneck." *See* Mot. to Stay at 2, ECF No. 451. The case is twelve years old. Discovery was completed six years ago. The trial was originally set to begin three years ago. GEO's assertion that "a short stay likely has no impact on the public interest" is galling. *Id.* at 9. The public has a strong interest in the immediate resolution of this case—the claims involve the execution of governmental duties and the use of public funds, in addition to the treatment of residents in our communities. With any additional delay, justice may become elusive because witnesses will be harder to find and memories will continue to fade. This risk is to the detriment of the public. Furthermore, GEO's slight ignores the impact on the courts and the limited resources they have to adjudicate cases, resources that should not be used to consider legal questions piecemeal, address untimely arguments, or repeatedly revisit rulings.

GEO's Motion to Stay is another unjustified attempt by GEO to prolong this case. No more. It is time for trial.

## V. Conclusion

Accordingly, GEO's Motion to Certify Question for Interlocutory Appeal (ECF No. 449), Motion for Partial Summary Judgment or Judgment on the Pleadings (ECF No. 450), and Motion to Stay Proceedings (ECF No. 451) are DENIED. Plaintiffs' Motion *in Limine* (ECF No. 481) is GRANTED IN PART in that GEO is prohibited from raising preemption as a defense at trial. Plaintiffs' Motion *in Limine* otherwise remains under consideration. The references in the Pretrial Order to qualified immunity and preemption, *see* Pretrial Order at 5, and GEO's Proposed Jury Instruction No. 3.12, *see* Joint Jury Instructions & Proposed Verdict Forms at 93-95, ECF No. 545, are STRICKEN. Any appeal taken from this Order denying the Motion for Partial Summary Judgment or Judgment on the Pleadings would be frivolous and only for a dilatory purpose. Thus, the case will proceed to trial as scheduled.[36]

DATED this 20th day of October, 2026.

John L. Kane

JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE

---

[36] As a final matter, I advise the parties, and GEO and its counsel in particular, that sanctions under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and my inherent authority will be imposed for any future conduct that is violative of § 1927 or the Civil or Local Rules. Such conduct includes presenting arguments that ignore my past findings and rulings in this case, mischaracterizing the law or the facts of a case, and seeking reconsideration of past rulings without proper grounds.